```
 1                 WATERHOUSE - 10-19-21

 2         IN THE UNITED STATES BANKRUPTCY COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
 3                  DALLAS DIVISION
        ------------------------------
 4   IN RE:

 5                                 Chapter 11
     HIGHLAND CAPITAL
 6   MANAGEMENT, L.P.,             CASE NO.
                                   19-34054-SGI11
 7
               Debtor.
 8   ------------------------------
     HIGHLAND CAPITAL MANAGEMENT, L.P.,
 9
               Plaintiff,
10   vs.                           Adversary
                                   Proceeding No.
11   HIGHLAND CAPITAL MANAGEMENT    21-03000-SGI
     FUND ADVISORS, L.P.; NEXPOINT
12   ADVISORS, L.P.; HIGHLAND
     INCOME FUND; NEXPOINT
13   STRATEGIC OPPORTUNITIES FUND;
     NEXPOINT CAPITAL, INC.; and
14   CLO HOLDCO, LTD.,

15             Defendants.
     ------------------------------
16

17       REMOTE VIDEOTAPED DEPOSITION OF

18              FRANK WATERHOUSE

19             October 19, 2021

20

21

22

23

24   Reported by:  Susan S. Klinger, RMR-CRR, CSR

25   Job No: 201195
```

**Exhibit C**

1                    WATERHOUSE - 10-19-21

2

3

4                         October 19, 2021

5                         9:30 a.m.

6

7

8

9        Remote Deposition of FRANK WATERHOUSE,

10   held before Susan S. Klinger, a Registered

11   Merit Reporter and Certified Realtime Reporter

12   of the State of Texas.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              WATERHOUSE - 10-19-21

 2   A P P E A R A N C E S:

 3   (All appearances via Zoom.)

 4   Attorneys for the Reorganized Highland Capital

 5   Management:

 6        John Morris, Esq.

 7        Hayley Winograd, Esq.

 8        PACHULSKI STANG ZIEHL & JONES

 9        780 Third Avenue

10        New York, New York  10017

11   Attorneys for the Witness:

12        Debra Dandeneau, Esq.

13        Michelle Hartmann, Esq.

14        BAKER McKENZIE

15        1900 North Pearl Street

16        Dallas, Texas  75201

17   Attorneys for NexPoint Advisors, LP and

18   Highland Capital Management Fund Advisors,

19   L.P.:

20        Davor Rukavina, Esq.

21        An Nguyen, Esq.

22        MUNSCH HARDT KOPF & HARDD

23        500 North Akard Street

24        Dallas, Texas  75201-6659

25
```

1              WATERHOUSE - 10-19-21

2    Attorneys for Jim Dondero, Nancy Dondero, HCRA,

3    and HCMS:

4          Deborah Deitsch-Perez, Esq.

5          Michael Aigen, Esq.

6          STINSON

7          3102 Oak Lawn Avenue

8          Dallas, Texas  75219

9

10   Attorneys for Dugaboy Investment Trust:

11         Warren Horn, Esq.

12         HELLER, DRAPER & HORN

13         650 Poydras Street

14         New Orleans, Louisiana 70130

15

16   Attorneys for Marc Kirschner as the trustee for

17   the litigation SunTrust:

18         Deborah Newman, Esq.

19         QUINN EMANUEL URQUHART & SULLIVAN

20         51 Madison Avenue

21         New York, New York  10010

22

23   Also Present:

24         Ms. La Asia Canty

25

```
 1              WATERHOUSE - 10-19-21

 2                    I N D E X

 3

 4   WITNESS                              PAGE

 5   FRANK WATERHOUSE

 6   EXAMINATION BY MR. MORRIS             10

 7   EXAMINATION BY MR. RUKAVINA          256

 8   EXAMINATION BY MS. DEITSCH-PEREZ     352

 9   EXAMINATION BY MR. MORRIS            377

10   EXAMINATION BY MR. RUKAVINA          387

11   EXAMINATION BY MS. DEITSCH-PEREZ     393

12

13                E X H I B I T S

14   No.                                 Page

15   Exhibit 2  NPA et al Amended Complaint   142

16   Exhibit 33 6/3/19 Management          91

17             Representation

18   Exhibit 34 HCMLP Consolidated Financial   94

19             Statements

20   Exhibit 35 HCMFA Incumbency Certificate   151

21   Exhibit 36 Email string re 15(c)     170

22   Exhibit 39 HCMLP Operating Results 2/18   226

23   Exhibit 40 Summary of Assets and     236

24             Liabilities

25   Exhibit 41 12/19 Monthly Operating Report   258
```

1                    WATERHOUSE - 10-19-21

2    Exhibit 45 HCMFA Consolidated Financial      135

3              Statements

4    Exhibit 46 NexPoint 2019 Audited             218

5              Financials

6

7    Exhibit A1 Emails 11/25                       328

8    Exhibit A2 Emails 12/31                       338

9    Exhibit A6 Emails 1/12                        341

10   Exhibit A7 Promissory Notes                   297

11   Exhibit A9 Email, 8/31                        307

12   Exhibit A10 Acknowledgment from HCMLP         302

13   Exhibit A11 HCMLP Schedule 71A                309

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          WATERHOUSE - 10-19-21

 2            P R O C E E D I N G S

 3          VIDEOGRAPHER:  Good morning,

 4    Counselors.  My name is Scott Hatch.  I'm a

 5    certified legal videographer in association

 6    with TSG Reporting, Inc.

 7          Due to the severity of COVID-19 and

 8    following the practice of social

 9    distancing, I will not be in the same room

10    with the witness.  Instead, I will record

11    this videotaped deposition remotely.  The

12    reporter, Susan Klinger, also will not be

13    in the same room and will swear the witness

14    remotely.

15          Do all parties stipulate to the

16    validity of this video recording and remote

17    swearing, and that it will be admissible in

18    the courtroom as if it had been taken

19    following Rule 30 of the Federal Rules of

20    Civil Procedures and the state's rules

21    where this case is pending?

22          MR. HORN:  Yes.

23          MS. DANDENEAU:  Yes.

24          MR. MORRIS:  Yes.  John Morris.  I

25    would just try to do a negative notice
```

```
1          WATERHOUSE - 10-19-21

2    here, as we did yesterday.  If anybody has

3    a problem with what was just stated, can

4    you state your objection now?

5          Okay.  No response, so everybody

6    accepts the stipulation and the instruction

7    that was just given.

8          VIDEOGRAPHER:  Thank you.  This is

9    the start of media labeled Number 1 of the

10   video recorded deposition of Frank

11   Waterhouse In Re: Highland Capital

12   Management, L.P., in the United States

13   Bankruptcy Court for the Northern District

14   of Texas, Dallas Division, Case Number

15   21-03000-SGI.

16         This deposition is being held via

17   video conference with participants

18   appearing remotely due to COVID-19

19   restrictions on Tuesday, October 19th, 2021

20   at approximately 9:32 a.m.  My name is

21   Scott Hatch, legal video specialist with

22   TSG Reporting, Inc. headquartered at 228

23   East 45th Street, New York, New York.  The

24   court reporter is Susan Klinger in

25   association with TSG Reporting.
```

1          WATERHOUSE - 10-19-21

2          Counsel, please introduce

3     yourselves.

4          MR. MORRIS:  John Morris, Pachulski

5     Stang Ziehl & Jones for the reorganized

6     Highland Capital Management, L.P., the

7     plaintiff in these actions.

8          MS. DANDENEAU:  Deborah Dandeneau

9     from Baker McKenzie.  My partner, Michelle

10    Hartmann, is also in the room with me,

11    representing Frank Waterhouse individually.

12         MS. DEITSCH-PEREZ:  Deborah

13    Deitsch-Perez from Stinson, LLP,

14    representing Jim Dondero, Nancy Dondero,

15    HCRA, and HCMS.

16         MR. HORN:  Warren Horn with Heller,

17    Draper & Horn in New Orleans representing

18    Dugaboy Investment Trust.

19         MR. RUKAVINA:  Davor Rukavina with

20    Munsch Hardt Kopf & Harr in Dallas

21    representing NexPoint Advisors, LP and

22    Highland Capital Management Fund Advisors,

23    L.P.

24         MR. AIGEN:  Michael Aigen from

25    Stinson, and I represent the same parties

```
 1                   WATERHOUSE - 10-19-21

 2        as Deborah Deitsch-Perez.

 3                 MS. NEWMAN:  This is Deborah Newman

 4        from Quinn Emanuel.  We represent the

 5        litigation -- Marc Kirschner as the trustee

 6        for the litigation SunTrust.

 7                 MR. MORRIS:  I think that is

 8        everybody.

 9                 VIDEOGRAPHER:  Thank you.  Will the

10        court reporter please swear in the witness.

11                      FRANK WATERHOUSE,

12   having been first duly sworn, testified as

13   follows:

14                      EXAMINATION

15   BY MR. MORRIS:

16        Q.    Please state your name for the

17   record.

18        A.    My name is Frank Waterhouse.

19        Q.    Good morning, Mr. Waterhouse.  I'm

20   John Morris, as you know, from Pachulski Stang

21   Ziehl & Jones.  You understand that my firm and

22   I represent Highland Capital Management, L.P.;

23   is that right?

24        A.    Yes.

25        Q.    Okay.  And do you understand that
```

```
 1                    WATERHOUSE - 10-19-21

 2    we're here today for your deposition in your

 3    individual capacity?

 4         A.    Yes.

 5         Q.    Did you review and -- did you

 6    receive and review a subpoena that Highland

 7    Capital Management, L.P., served upon you?

 8         A.    Yes.

 9         Q.    You have been deposed before; right?

10         A.    Yes.

11         Q.    How many times have you been

12    deposed?

13         A.    About three or four times.

14         Q.    Okay.  And I defended you in one

15    deposition; isn't that right?

16         A.    That is correct.

17         Q.    So the general ground rules for this

18    deposition are largely the same as the

19    depositions you have given before.  And that is

20    I will ask you a series of questions, and it is

21    important that you allow me to finish my

22    question before you begin your answer; is that

23    fair?

24         A.    Yes.

25         Q.    And it is important that I allow you
```

1              WATERHOUSE - 10-19-21

2    to finish your answers before I begin a

3    question, but if I fail to do that, will you

4    let me know?

5         A.    I can certainly do that.

6         Q.    Okay.  Do you understand that this

7    deposition is being videotaped?

8         A.    Yes.

9         Q.    You understand that I may seek to

10   use portions of the videotape in a court of

11   law?

12        A.    I did not know that, until you just

13   said that.

14        Q.    Okay.  And you are aware of that now

15   before the deposition begins substantively; is

16   that right?

17        A.    Yes.

18        Q.    So unlike I think the other

19   depositions that you have given, this one is

20   being given remotely.  So that presents some

21   unique challenges, at least as compared to a

22   deposition that is taken in-person.

23             From time to time we're going to put

24   documents up on the screen, Mr. Waterhouse.

25   And it is important that I give you the

```
 1                 WATERHOUSE - 10-19-21

 2    opportunity to review any portion of the

 3    document that you think you need in order to

 4    fully and completely answer the question.

 5             So I would ask you to let me know if

 6    there is a portion of a document that you need

 7    to see in order to fully and completely answer

 8    the question.  Can you do that for me?

 9    A.    Yes.

10             MS. DANDENEAU:  Mr. Morris, I would

11          just note that we do have hard copies of

12          the documents that you sent, so if you can

13          just refer to the exhibit number as

14          reflected in the documents that you sent,

15          Mr. Waterhouse will be able to look at the

16          hard copies of those documents.

17             MR. MORRIS:  I appreciate that,

18          and -- and I will encourage him to do so.

19          There will be other documents that we did

20          not send to you that we'll be using today

21          though.

22    Q.    Okay.  With that as background, if

23    there is anything that I ask you, sir, that you

24    don't understand, will you let me know?

25    A.    Yes.
```

```
1                    WATERHOUSE - 10-19-21

2          Q.    Okay.  Are you currently employed?

3          A.    Yes.

4          Q.    By whom?

5          A.    The Skyview Group.

6          Q.    When did you become employed by the

7    Skyview Group?

8          A.    I believe March 1st of 2021.

9          Q.    Do you have a title at Skyview?

10         A.    Yes.

11         Q.    What is your title?

12         A.    My title is chief financial officer.

13         Q.    Do you report to anybody in your

14   role as CFO?

15         A.    I don't, no.

16         Q.    No.  Is there a president or a CEO

17   of Skyview?

18         A.    Yes.

19         Q.    Who is that?

20         A.    That is Scott Ellington.

21         Q.    But you don't report to

22   Mr. Ellington; is that right?

23         A.    I don't think so.

24         Q.    Does Skyview Group --

25               MS. DANDENEAU:  Excuse me, we --
```

```
 1              WATERHOUSE - 10-19-21

 2        A.    I -- I -- I might.  I just -- I

 3   don't recall.

 4        Q.    Okay.  Does Skyview Group provide

 5   any services to any entity directly or

 6   indirectly owned or controlled by Jim Dondero?

 7        A.    Yes.

 8        Q.    Can you name -- is that pursuant to

 9   written contracts?

10        A.    Yes.

11        Q.    And do you know how many contracts

12   exist?

13        A.    Approximately six or so.

14        Q.    And is the Skyview Group made up of

15   individuals who were formerly employees of

16   Highland Capital Management, L.P.?

17        A.    No.

18        Q.    Do you know how many -- how many --

19   how many employees does Skyview have?

20        A.    Approximately 35.

21        Q.    And can you tell me how many of

22   those 35 are former officers, directors, or

23   employees of Highland Capital Management, L.P.?

24        A.    I don't know the exact number.

25        Q.    Is it more than 20?
```

```
1                  WATERHOUSE - 10-19-21

2         A.    Yes.

3         Q.    Is it more than 30?

4         A.    I don't know.

5         Q.    Can you tell me what portion of

6    Skyview -- Skyview's revenue is derived from

7    entities that are directly or indirectly owned

8    or controlled by Jim Dondero?

9              MS. DANDENEAU:  Mr. Morris, I mean,

10         you called Mr. Waterhouse here individually

11         for purposes of his testimony in connection

12         with the noticed litigation.  I have given

13         you some leeway to ask him some background

14         information about Skyview Group, but this

15         is not a substitute for a deposition in

16         connection with any other pending disputes

17         that exist.  And -- and we agreed to accept

18         the subpoena on the basis of he -- this is

19         testimony that he is giving in connection

20         with the noticed litigation.

21              I really think that you are now

22         going a little bit far afield from the

23         purpose of this deposition.

24              MR. MORRIS:  Okay.  It is -- I'm not

25         intending to use these -- the answers to
```

1                    WATERHOUSE - 10-19-21

2          these questions for any purpose other than

3          this litigation.  I think you understand

4          fully why I'm asking the questions, and I

5          just have a couple more, if you will bear

6          with me.

7                    MS. DANDENEAU:  Okay.

8                    MS. DEITSCH-PEREZ:  Can we have an

9          agreement that an objection by one is an

10         objection for any other party here?

11                   MR. MORRIS:  Sure.  I would -- I

12         would encourage that, sure.

13                   MS. DEITSCH-PEREZ:  Thank you.

14                   MR. MORRIS:  It can't be sustained

15         or overruled more than one time, so...

16         Q.    Mr. Waterhouse, can you answer my

17    question, please.

18                   MS. DANDENEAU:  Do you want to

19         repeat it, Mr. Morris, for his benefit?

20                   MR. MORRIS:  Sure.

21         Q.    Can you -- can you tell me the

22    approximate portion of Skyview's revenue that

23    is derived from entities that are directly or

24    indirectly owned or controlled by Mr. Dondero?

25         A.    I don't know the exact number.

1                    WATERHOUSE - 10-19-21

2          Q.    Is it more than 75 percent?

3          A.    Yes.

4          Q.    Is it more than 90 percent?

5          A.    I don't know.

6          Q.    Okay.  Can I refer to Highland

7    Capital Management, L.P., as Highland?

8          A.    Yes.

9          Q.    All right.  And you previously

10   served as Highland's CFO; correct?

11         A.    Yes.

12         Q.    When did you join Highland?

13         A.    I don't recall the exact date.

14         Q.    Can you tell me what year?

15         A.    2006.

16         Q.    When did you -- in what year did you

17   become Highland's CFO?

18         A.    I don't recall the exact date.

19         Q.    I'm not asking you for the exact

20   date.  I'm asking you if you recall the year in

21   which you were appointed CFO.

22         A.    I don't recall the exact year.

23         Q.    Can you tell me which years it is

24   possible that you were appointed to CFO of

25   Highland?

1              WATERHOUSE - 10-19-21

2        A.    2011 or 2012.

3        Q.    Did you serve as Highland's CFO on a

4   continuous basis from in or around 2011 or 2012

5   until early 2021?

6        A.    Yes.

7        Q.    During that entire time you reported

8   directly to Jim Dondero; correct?

9        A.    I -- I don't know.

10       Q.    Is there anybody else you reported

11  to -- withdrawn.

12             Did you report to Mr. Dondero for

13  some portion of the time that you served as

14  CFO?

15       A.    Yes.

16       Q.    Is there a portion of time that you

17  don't recall who you reported to?

18       A.    Yes.

19       Q.    What portion of time do you have in

20  your mind when you can't recall who you

21  reported to?

22       A.    From the 2011 to -- for

23  approximately a year or two.

24       Q.    Okay.  So is it fair to say that you

25  reported to Mr. Dondero in your capacity as CFO

```
 1                   WATERHOUSE - 10-19-21

 2   from at least 2014 until the time you left

 3   Highland?

 4             MS. DANDENEAU:  Objection to form.

 5        A.    I don't want to speculate the exact

 6   or what year that changed or -- so I would like

 7   to stick with my testimony.

 8        Q.    Can you recall when you began

 9   reporting to Mr. Dondero?

10        A.    I don't recall.

11        Q.    Can you -- can you give me an

12   estimate of what year you think you might have

13   began reporting to Mr. Dondero?

14        A.    I will go back to my prior

15   testimony.

16        Q.    Okay.  There is no -- you have no

17   ability to tell me when you began reporting to

18   Mr. Dondero.

19             Do I have that right?

20             MS. DANDENEAU:  Objection to form.

21        A.    I don't recall.

22        Q.    Okay.  Do you recall who you might

23   have reported to before you began reporting to

24   Mr. Dondero?

25        A.    Yes.
```

1          WATERHOUSE - 10-19-21

2     Q.    Who might you have reported to in

3  your capacity as CFO before you started

4  reporting to Mr. Dondero?

5     A.    That would have been Patrick Boyce.

6     Q.    Are you aware that Highland filed

7  for bankruptcy on October 19th, 2019?

8     A.    Yes.

9     Q.    And we refer to that as the petition

10 date?

11    A.    Yes.

12    Q.    Okay.  Do you hold any professional

13 licenses, sir?

14    A.    Yes.

15    Q.    Can you tell me what professional

16 licenses you hold?

17    A.    I'm a certified public accountant.

18    Q.    Okay.  Anything else?

19    A.    No.

20    Q.    Do you have any other professional

21 licenses or certificates?

22    A.    When you say "professional license,"

23 that is not education?

24    Q.    Tell me -- sure.  Anything other

25 than a driver's license.

```
 1                    WATERHOUSE - 10-19-21

 2               Do you have any other license or

 3   certificate or certification?

 4        A.    Are you asking, like, where I went

 5   to school and the --

 6        Q.    I am not.  I am not.  I didn't say

 7   education.  I didn't ask about degrees.

 8               Do you know what a license is?

 9        A.    Well, yeah, I mean, a license is

10   something you get after you receive a certain

11   level of proficiency.

12        Q.    Do you have any licenses or

13   certifications other than your CPA?

14               MS. DANDENEAU:  Objection, form.

15               I assume you mean professional

16        licenses, Mr. Morris; correct?

17        Q.    Can you answer my question, sir?

18        A.    Mr. Morris, I'm thinking.  I

19   don't -- I don't think I have any others.

20        Q.    Are you familiar with an entity

21   called Highland Capital Management Fund

22   Advisors?

23        A.    Yes.

24        Q.    Were you ever -- can we refer to

25   that entity as HCMFA?
```

```
1                  WATERHOUSE - 10-19-21
2         A.    Yes.
3         Q.    Were you ever employed by HCMFA?
4         A.    Not that I recall.
5         Q.    Were you ever -- did you ever hold
6    the title of an officer or director of HCMFA?
7         A.    Yes.
8         Q.    What title did you hold?
9         A.    Treasurer.
10        Q.    When did you become the treasurer of
11   HCMFA?
12        A.    I don't recall.
13        Q.    Can you tell me the year?
14        A.    I don't -- I don't know the year.
15        Q.    Can you approximate the year in
16   which you became the treasurer of HCMFA?
17        A.    I don't know.
18        Q.    Can you tell me if it was before or
19   after 2016?
20        A.    I don't recall.
21        Q.    Are you still the -- do you know if
22   you're still the treasurer of HCMFA today?
23        A.    Today, I am the acting treasurer for
24   HCMFA.
25        Q.    Is there a distinction between
```

```
1                    WATERHOUSE - 10-19-21
2   treasurer and acting treasurer?
3        A.    I said "acting treasurer" as I am an
4   employee of Skyview, as you previously
5   stated -- or asked.
6        Q.    But you are the treasurer of HCMFA
7   today; correct?
8        A.    I am -- I am the acting treasurer
9   for HCMFA.
10       Q.    How did you become the treasurer of
11  HCMFA?
12       A.    Are you asking how I became the
13  treasurer of HCMFA today?
14       Q.    How did you become appointed to
15  serve as the treasurer of HCMFA?
16       A.    Well, in -- in -- in what time
17  capacity?
18       Q.    The first time that you were
19  appointed.
20       A.    First time.  I believe I was asked
21  to serve as treasurer for HCMFA the first time.
22       Q.    By who?  Who asked you to do that?
23       A.    I don't recall.
24       Q.    Is there anything that would refresh
25  your recollection as to who appointed you as
```

```
 1                    WATERHOUSE - 10-19-21

 2    the treasurer of CF- -- HCMFA for the first

 3    time?

 4         A.    I don't -- I mean, there would be

 5    some documents, some legal documents.  I don't

 6    know where those are.

 7         Q.    How many times have you been

 8    appointed the treasurer of HCMFA?

 9         A.    I don't know.

10         Q.    Was it more than once?

11         A.    I don't know.

12         Q.    Can you tell me any period of time

13    since 2016 that you did not hold the title of

14    treasurer of HCMFA?

15              MS. DANDENEAU:  Objection to form.

16         A.    I don't recall.

17         Q.    What are your duties and

18    responsibilities as the treasurer of HCMFA?

19         A.    My duties are to do the best job

20    that I can as the -- as an accountant and

21    finance guy.

22         Q.    What specific duties and

23    responsibilities do you have as the treasurer

24    of HCMFA?

25         A.    My duties are to do the best job
```

1                    WATERHOUSE - 10-19-21

2    that I can as the accounting and finance person

3    for HCMFA.

4         Q.    As the accounting and finance person

5    for HCMFA, do you have any particular areas of

6    responsibility?

7         A.    Yeah, it is to manage the accounting

8    and finance function for HCMFA.

9         Q.    Would that include -- do you have

10   responsibility for overseeing HCMFA's annual

11   audit?

12        A.    Can I please elaborate on my prior

13   question?

14        Q.    Of course.  You -- you are giving

15   answers.  I'm asking questions.

16        A.    Okay.  Yes, so the -- it -- like I

17   said, it is to manage the accounting finance

18   aspect, but I am, as we discussed, the

19   treasurer.  That is -- being treasurer is what

20   gives me that -- that management function.

21        Q.    Does anybody report to you in your

22   capacity as treasurer of HCMFA?

23        A.    I don't believe so.

24        Q.    Does HCMFA have a chief financial

25   officer?

```
 1              WATERHOUSE - 10-19-21

 2       A.    I don't -- I don't know.

 3       Q.    You don't know?

 4             You're the treasurer of HCMFA but

 5   you don't know if HCMFA has a chief financial

 6   officer.

 7             Do I have that right?

 8       A.    That's right.

 9       Q.    Okay.  Have you heard of a company

10   called NexPoint Advisors?

11       A.    Yes.

12       Q.    We will refer to that as NexPoint.

13   Okay?

14       A.    Okay.

15       Q.    Were you ever employed by NexPoint?

16       A.    I don't recall.

17       Q.    Did you ever hold any title with

18   respect to the entity known as NexPoint?

19       A.    Yes.

20       Q.    What titles have you held in

21   relation to NexPoint?

22       A.    Treasurer.  I think it was only

23   treasurer.

24       Q.    Can you tell me the approximate year

25   you became the treasurer of NexPoint?
```

```
1                WATERHOUSE - 10-19-21

2         A.    I don't know.

3         Q.    Are you still the treasurer of

4    NexPoint today?

5         A.    I am the acting treasurer for

6    NexPoint.

7         Q.    When did your title change from

8    treasurer to acting treasurer?

9         A.    I don't know.

10        Q.    Did your duties and responsibilities

11   change at all when your title was changed from

12   treasurer to acting treasurer?

13        A.    I don't -- I don't believe so.

14        Q.    Why did --

15        A.    I still manage the finance and

16   accounting function for NexPoint.

17        Q.    Why did your title change from

18   treasurer to acting treasurer?

19        A.    I don't -- I'm using the term

20   "acting treasurer" as I'm a Skyview employee.

21   I don't -- I don't know -- again, I am a -- as

22   I am the Skyview employee.

23        Q.    Okay.

24        A.    And we -- we provide officer

25   services.
```

1                    WATERHOUSE - 10-19-21

2        Q.    And you serve as an officer of

3    HCMFA; correct?

4        A.    I think we went over that with my

5    testimony.  Yes, I'm the acting treasurer for

6    HCMFA.

7        Q.    And you are an officer of NexPoint;

8    correct?

9        A.    I think -- I am the acting treasurer

10   for NexPoint Advisors.

11       Q.    And -- and who appointed you acting

12   treasurer of NexPoint Advisors?

13       A.    I don't recall specifically.

14       Q.    Do you have any recollection of who

15   might have appointed you the treasurer of

16   NexPoint?

17       A.    I mean, it -- it -- I don't recall

18   exactly who it was.

19       Q.    Who were the possibilities?

20             MS. DEITSCH-PEREZ:  Object to the

21       form.

22       Q.    You can answer.

23       A.    Someone in the legal group for

24   NexPoint.  The other officers as well.

25       Q.    Have you heard of a company called

```
 1                   WATERHOUSE - 10-19-21
 2   Highland Capital Management Services, Inc.?
 3        A.    Yes.
 4        Q.    We will refer to that as HCMS.
 5   Okay?
 6        A.    HCMS.  Okay.
 7        Q.    Were you ever employed by HCMS?
 8        A.    No.
 9        Q.    Have you ever held any titles in
10   relation to HCMF -- I apologize -- HCMS?
11        A.    Yes.
12        Q.    What titles have you held in
13   relation to HCMS?
14        A.    Treasurer and acting treasurer.
15        Q.    When did you first become treasurer
16   or acting treasurer of HCMS?
17        A.    I don't recall the exact dates.
18        Q.    Can you recall -- can you
19   approximate the year that you became the
20   treasurer of HCMS?
21        A.    I don't -- I don't know.
22        Q.    Are you still the treasurer of HCMS
23   today?
24        A.    I am the acting treasurer for HCMS.
25        Q.    And are your duties and
```

```
1                WATERHOUSE - 10-19-21
2    responsibilities as the acting treasurer for
3    HCMS and the acting treasurer for NexPoint the
4    same as your duties and responsibilities in
5    your role as the acting treasurer of HCMFA?
6         A.    More or less.
7         Q.    Have you ever heard of a company
8    called HCRE Partners, LLC?
9         A.    Yes.
10        Q.    And do you understand that that
11   entity is now known today as NexPoint Real
12   Estate Partners?
13        A.    I did not know that.
14        Q.    All right.  Can we refer to HCRE
15   Partners as HCRE?
16             MS. DANDENEAU:  Objection to form.
17             Did you mean NexPoint Real Estate
18        Partners, Mr. Morris?
19             MR. MORRIS:  No.
20             MS. DANDENEAU:  Oh.
21             MR. MORRIS:  He said he wasn't
22        familiar that it was succeeded by that
23        entity.  So --
24             MS. DANDENEAU:  Okay.
25             MR. MORRIS:  -- let's go with what
```

```
 1                 WATERHOUSE - 10-19-21

 2         the witness knows.

 3         Q.    You're familiar with an entity

 4    called HCRE Partners, LLC; correct?

 5         A.    Yes.

 6         Q.    Okay.  So that is the entity that we

 7    will refer to as HCRE.  If you're aware of any

 8    successor, that is great.  If not, let's just

 9    define it as such.

10               Have you ever been employed by HCRE

11    or any entity that you know to have succeeded

12    HCRE?

13         A.    No.

14         Q.    Did you ever serve as an officer or

15    director of HCRE or any successor?

16         A.    Not that I recall.

17         Q.    Okay.  Can we refer to NexPoint and

18    HCMFA as the advisors?

19         A.    Yes.

20         Q.    In general, the advisors provided

21    investment advisory services to certain retail

22    funds; correct?

23         A.    Yes.

24         Q.    And we will refer to the retail

25    funds that are served by the advisors
```

1          WATERHOUSE - 10-19-21

2    collectively as the retail funds; is that okay?

3          A.    Okay.

4          Q.    Each of the retail funds is governed

5    by a board; correct?

6          A.    Yes.

7          Q.    And do you know the people who serve

8    on the boards of the retail funds?

9                MS. DANDENEAU:  Objection to form.

10         A.    I don't know all of them.

11         Q.    Do you know whether the same people

12   serve on the board of each of the retail funds

13   as we've defined that term?

14         A.    Which -- so when you say "retail

15   funds" -- again, I want to be -- what retail

16   funds are you referring to, because there are

17   -- there are several distinctions?

18               What retail funds are you using when

19   you refer to them?

20         Q.    That is why -- that is why I tried

21   to define the terms.  So let me do it again.

22               Retail funds for the purposes of

23   this deposition means any retail fund to which

24   either of the advisors provides advisory

25   services.  Okay?

```
 1                   WATERHOUSE - 10-19-21

 2         A.    Okay.

 3         Q.    Okay.  So do you know whether the

 4   same people serve on the board of each of the

 5   retail funds?

 6         A.    I don't know.

 7         Q.    Were you ever employed by any of the

 8   retail funds?

 9         A.    No.

10         Q.    No?

11         A.    No.

12         Q.    Okay.  Do you have any title with

13   respect to any of the retail funds?

14         A.    Yes.

15         Q.    What titles do you hold --

16   withdrawn.

17               Do you have the same titles with

18   respect to all of the retail funds or do

19   they -- or just something else?

20               MS. DANDENEAU:  Objection to form.

21         Q.    Withdrawn.

22               Do you have the same title with

23   respect to each of the retail funds?

24         A.    No.

25         Q.    Tell me which title you have with
```

1          WATERHOUSE - 10-19-21

2     respect to each retail fund.

3              Actually, let's do it a different

4     way.  I withdraw the question.

5              Can you give me one title you have

6     in relation to any retail fund?

7          A.   Yes.

8          Q.   What title -- what title can you

9     give me?

10         A.   Principal executive officer.

11         Q.   Do you serve as principal executive

12    officer for each of the retail funds?

13         A.   No.

14         Q.   Can you identify for me the retail

15    funds in which you serve as the principal

16    executive officer?

17         A.   Yes.  Highland Funds 1, Highland

18    Funds 2, Highland Income Fund, Highland Global

19    Allocation Fund.

20         Q.   I'm sorry, you said "Global

21    Allocation Fund"?

22         A.   Yes.

23              VIDEOGRAPHER:  Excuse me,

24         Mr. Morris.  This is the videographer.  I'm

25         concerned about the lighting in the

1          WATERHOUSE - 10-19-21

2     witness' camera.

3          Do you want to go off the record and

4     make some adjustments?

5          MR. MORRIS:  Sure, but just for this

6     purpose.  I don't want to take a break.  We

7     just started.

8          MS. DANDENEAU:  Yeah, that is fine.

9     That is fine.  We're going to put you on

10     mute.

11          MR. MORRIS:  All right.

12          MS. DANDENEAU:  I'm going to try to

13     open up some of the shades.

14          VIDEOGRAPHER:  We're going off the

15     record at 10:08 a.m.

16     (Recess taken 10:08 a.m. to 10:11 a.m.)

17          VIDEOGRAPHER:  We are back on the

18     record at 10:11 a.m.

19     Q.    Mr. Waterhouse, when did you become

20   the principal executive officer of the four

21   retail funds that you just identified?

22     A.    I don't recall.

23     Q.    Do you recall the approximate year

24   that you became the principal executive officer

25   of the four funds?

```
1                WATERHOUSE - 10-19-21

2        A.    2021.

3        Q.    Did you ever hold any title with

4   respect to any of the four funds you have just

5   identified other than principal executive

6   officer?

7        A.    I don't recall.

8        Q.    Is it possible that you held a

9   position or a title with the four funds you

10  just identified prior to 2021?

11       A.    Yes.

12       Q.    But you don't recall if you did or

13  not; do I have that right?

14       A.    No.  You -- I thought you asked, did

15  I hold other titles.

16       Q.    Did you hold any title at the four

17  retail funds for which you now serve as

18  principal executive officer at any time prior

19  to 2021?

20       A.    Yes.

21       Q.    What titles did you hold?

22       A.    I don't recall all the titles.

23       Q.    Do you recall any of the titles?

24       A.    Yes.

25       Q.    What titles do you recall holding at
```

1          WATERHOUSE - 10-19-21

2    those four retail funds before 2021?

3          A.    Principal executive officer.

4          Q.    Were you the principal executive

5    officer of the four retail funds that you have

6    identified?

7          A.    Sorry, could you repeat the

8    question?

9          Q.    Were you the principal executive

10   officer for each of the four retail funds that

11   you have identified?

12         A.    Yes.

13         Q.    When did you become the principal

14   executive -- withdrawn.

15               Can you give me the approximate year

16   that you became the principal executive officer

17   for each of the four retail funds you've

18   identified?

19         A.    I don't recall.

20         Q.    What are your duties and

21   responsibilities as the principal executive

22   officer of these four retail funds?

23         A.    It is to manage the finance and

24   accounting positions.

25         Q.    So at the same time you serve as the

1                    WATERHOUSE - 10-19-21

2    treasurer of the advisors, you also serve as

3    the principal executive officer of these four

4    retail funds; correct?

5         A.    Yes.

6         Q.    Did you ever hold any title with

7    respect to any other retail fund?

8         A.    Not that I recall.

9         Q.    During the period that you served as

10   Highland's CFO, from time to time Highland

11   loaned money to certain of its officers and

12   employees; correct?

13        A.    Yes.

14        Q.    During the period that you served as

15   Highland's CFO, from time to time Highland

16   loaned money to certain --

17        A.    Let me -- let me retract that,

18   sorry, that -- you asked during the time I was

19   CFO, Highland loaned moneys to employees.  I

20   don't -- I don't recall that during my tenure

21   of CFO.

22        Q.    You have no recollection during the

23   time that you were the CFO of Highland of

24   Highland ever loaning any money to any officer

25   or director of Highland?

1          WATERHOUSE - 10-19-21

2          A.    I don't recall during my tenure of

3    Highland or my -- as CFO of Highland -- yeah,

4    if there are any loans as CFO of Highland.

5          Q.    I'm just talking about officers and

6    employees right now.  You have no recollection

7    of Highland ever making a loan to any of its

8    officers or employees during the time that you

9    served as CFO.  Do I have that right?

10              MS. DANDENEAU:  Objection to form.

11         A.    So I thought you were saying

12   officers and employees as CFO, right, so there

13   were -- I mean, okay, yes.

14         Q.    I would ask you to listen carefully

15   to my question.  If I -- if I'm not clear, let

16   me know, but I'm really trying to be as clear

17   as I can.

18         A.    I'm listening as carefully as I can,

19   and you are asking very specific questions in a

20   timeline.  And I'm trying to answer your

21   questions as specifically as I can, and I

22   apologize if -- if I'm going back.  I am -- you

23   are asking very specific questions.  Thank you.

24         Q.    During the period that you served as

25   Highland's CFO, from time to time Highland

1          WATERHOUSE - 10-19-21

2    loaned money to certain corporate affiliates;

3    correct?

4          MS. DANDENEAU:  Objection to form.

5      A.    What are corporate affiliates?

6      Q.    How about the ones that are in

7    Highland's audited financial statements under

8    the section entitled Loans to Affiliates.  Why

9    don't we start with those.  Do you have any

10   understanding of what the phrase "affiliates"

11   means?

12         MS. DANDENEAU:  Objection to form.

13     A.    I understand what affiliates are,

14   yet affiliates can have different meanings in

15   different contexts, so...

16     Q.    Why don't you -- why don't you tell

17   me what your understanding of the term

18   "affiliate" is in relation to Highland Capital

19   Management, L.P.

20     A.    Is that a -- it depends on the

21   context.

22     Q.    How about the context of making

23   loans?

24         MS. DANDENEAU:  Objection to form.

25     A.    I didn't make the determination of

```
1               WATERHOUSE - 10-19-21
2    who an affiliate was or is at the time those --
3    I didn't -- that wasn't my job to make a
4    determination of who an affiliate is.
5         Q.    All right.  So as the CFO of
6    Highland, do you have any ability right now to
7    tell me which companies that were directly or
8    indirectly owned and/or controlled by
9    Mr. Dondero in whole or in part received loans
10   from Highland Capital Management, L.P.?
11              MS. DANDENEAU:  Objection to form.
12              MS. DEITSCH-PEREZ:  Objection, form.
13        A.    Yes.
14        Q.    Okay.  Identify every entity that
15   you can think of that was directly or
16   indirectly owned and/or controlled by
17   Mr. Dondero in whole or in part that received a
18   loan from Highland Capital Management, L.P.
19              MR. RUKAVINA:  Objection, legal
20         conclusion.
21        A.    NexPoint Advisors, Highland Capital
22   Management Fund Advisors, HCM Services,
23   Dugaboy.  Sorry, I don't think -- Dugaboy
24   doesn't fit that definition.  You said owned
25   and controlled.  I don't think that that
```

```
 1              WATERHOUSE - 10-19-21
 2   definition --
 3       Q.   I said owned and/or controlled.
 4       A.   I don't -- again, I'm not -- I'm not
 5   the legal expert.  I don't think it controls --
 6   he controls Dugaboy, so again, I'm not the
 7   legal person.
 8       Q.   I'm not asking you for a legal
 9   conclusion, sir.  I'm asking you for your
10   knowledge, okay, as the CFO -- the former CFO
11   of Highland Capital Management, other than
12   NexPoint, HCMFA, and HCMF -- HCMS, can you
13   think of any other entities that were owned
14   and/or controlled directly or indirectly in
15   whole or in part by Jim Dondero who received a
16   loan from Highland Capital Management, L.P.?
17              MS. DANDENEAU:  Objection to form.
18       A.   HCRE.
19       Q.   Any others?
20       A.   That is -- that is all I can think
21   of.
22       Q.   And you're aware that from time to
23   time while you were the CFO, Highland loaned
24   money to Jim Dondero; correct?
25       A.   Yes.
```

1          WATERHOUSE - 10-19-21

2     Q.    Okay.  Can we refer to the four

3  entities that you just named and Mr. Dondero as

4  the affiliates?

5     A.    So that would be Jim Dondero,

6  NexPoint Advisors, Highland Capital Management

7  Fund Advisors, and HCRE.

8     Q.    And HCMS?

9     A.    And HCMS, okay.

10    Q.    And can we refer to the loans that

11 were given to each of those affiliates as the

12 affiliate loans?

13    A.    Yes.

14    Q.    And is it fair to say that each of

15 the affiliates were the borrowers under the

16 affiliate loans as we're defining the term?

17         MR. RUKAVINA:  Objection, legal

18    conclusion.

19    A.    The borrowers are whoever were on

20 the notes.  I don't -- I don't know.  I'm not

21 the legal person.

22    Q.    But you --

23    A.    I don't know.

24    Q.    You do know, as Highland's former

25 CFO, that each of the affiliates that you have

```
 1                WATERHOUSE - 10-19-21
 2  identified tendered notes to Highland; correct?
 3             MR. RUKAVINA:  Hey, John, will you
 4        just give me a running objection to legal
 5        conclusion to HCM --
 6             MR. MORRIS:  No.  No, if you want to
 7        object --
 8             MR. RUKAVINA:  I will object every
 9        time.  Object to legal conclusion.
10             MR. MORRIS:  That is fine.
11   A.     Sorry, can you repeat the question?
12   Q.     Are you aware that each of the --
13  that each of the affiliates, as we have defined
14  the term, gave to Highland a promissory note in
15  exchange for the loans?
16             MR. RUKAVINA:  Objection to the
17        extent that calls for a legal conclusion.
18   A.     I don't.
19   Q.     No, you don't know that?
20   A.     No, they didn't -- you said they
21  exchanged a promissory note for a loan.  I
22  don't -- I don't understand that question, so I
23  said no.
24   Q.     At the time of the bankruptcy
25  filing, did Highland have in its possession
```

1          WATERHOUSE - 10-19-21

2    promissory notes that were signed by each of

3    the affiliates?

4         A.    Yes.

5         Q.    To the best of your knowledge,

6    during the time that you served as Highland's

7    CFO, did Highland disclose to its outside

8    auditors all of the loans that were made to

9    affiliates?

10             MR. RUKAVINA:  Objection, that calls

11        for a legal conclusion.

12             MS. DEITSCH-PEREZ:  I also couldn't

13        hear you, John, because there was some

14        garbling on -- on the -- on the call.

15             MR. MORRIS:  Folks, I've got to tell

16        you this is not going well, and I'm

17        reserving my right --

18             MS. DANDENEAU:  John, it was just

19        the end of that question.  It was just the

20        end of that question.  I couldn't hear it

21        either.  Sorry, if you could repeat it,

22        please.

23             MR. MORRIS:  That is less than an

24        hour into this, but folks are trying to run

25        out the clock, and so I'm just going to

1           WATERHOUSE - 10-19-21

2      state that now.

3           MS. DANDENEAU:  You know, and,

4      Mr. Morris, I really object to that.  I

5      mean --

6           MR. MORRIS:  Okay.

7           MS. DANDENEAU:  -- Mr. Waterhouse

8      just told you he's trying to listen to your

9      questions and answer them carefully, and

10     you have no basis for saying that.

11          MR. MORRIS:  Okay.

12          MS. DANDENEAU:  This does not --

13     this is not an experienced witness, so he's

14     trying to do the best he can.

15     Q.    Mr. Waterhouse, during the time that

16   you served as Highland's CFO, did Highland

17   disclose to its outside auditors all of the

18   loans that it made to each of the affiliates

19   that you have identified?

20          MR. RUKAVINA:  Objection, legal

21     conclusion.

22     A.    Yes.

23     Q.    To the best of your knowledge, while

24   you were Highland's CFO, were all of the

25   affiliate loans described in Highland's audited

1                    WATERHOUSE - 10-19-21

2    financial statements?

3              MR. RUKAVINA:  Objection, legal

4         conclusion.

5         A.    When an audit was performed, any

6    loans that were made by Highland to the

7    affiliates were disclosed to auditors.

8         Q.    Are you aware of any loan that was

9    made to any affiliate that was not disclosed to

10   the auditors?

11        A.    I'm not aware.

12        Q.    To the best of your knowledge, did

13   each of the affiliates who were --

14   (inaudible) -- loaned from Highland execute a

15   promissory note in connection with that loan?

16             MR. RUKAVINA:  Objection, legal

17        conclusion.

18        A.    Sorry, you -- halfway through the

19   question it got muffled.

20             Can you repeat that again?

21        Q.    To the best of your knowledge, did

22   every affiliate execute a promissory note in

23   connection with each loan that it obtained from

24   Highland?

25             MR. RUKAVINA:  Objection, legal

1                WATERHOUSE - 10-19-21

2     conclusion.

3     A.    Yes.

4     Q.    You are not aware of any loan that

5  any affiliate ever obtained from Highland where

6  the affiliate did not give a promissory note in

7  return; is that fair?

8     A.    Yes, I'm not aware.

9     Q.    And to the best of your knowledge,

10  did Highland loan to each affiliate an amount

11  of money equal to the principal amount of each

12  promissory note?

13          MR. RUKAVINA:  Objection, legal

14     conclusion.

15     A.    Yes.

16     Q.    During the time that you served as

17  CFO, did Highland ever loan money to

18  Mark Okada?

19     A.    I -- I don't recall.

20     Q.    Did you ever see any promissory

21  notes executed by Mark Okada?

22     A.    I don't recall.

23     Q.    Do you know if Highland ever forgave

24  any loan that it ever made to Mr. Okada?

25     A.    I don't recall.

1          WATERHOUSE - 10-19-21

2      Q.    Do you recall if Mr. Okada paid back

3   all principal and interest due and owing under

4   any loan he obtained from Highland?

5          MS. DEITSCH-PEREZ:  Objection to

6      form.

7          MS. DANDENEAU:  Objection to form.

8      A.    I don't recall.

9      Q.    Do you recall whether -- during your

10  time as CFO, whether Highland ever loaned money

11  to Jim Dondero?

12     A.    Yes.

13     Q.    To the best of your knowledge, did

14  Mr. Dondero sign and deliver to Highland a

15  promissory note in connection with each loan

16  that he obtained from Highland?

17     A.    If you are referring to the

18  promissory notes that, you know, part of

19  Highland's records, yes.

20     Q.    Okay.  You're not aware of any loan

21  that Mr. Dondero took from Highland that wasn't

22  backed up by -- by a promissory note with a

23  face -- with a principal amount equal to the

24  amount of the loan; correct?

25     A.    Am I aware that Jim Dondero took a

1        WATERHOUSE - 10-19-21

2   loan?

3        Q.    Without giving a -- let me ask a

4   better question.  I'm sorry, Mr. Waterhouse.

5              Are you aware of any loan that

6   Mr. Dondero obtained from Highland where he

7   didn't give a promissory note in return?

8        A.    I'm not aware.

9        Q.    During the time that you served as

10  Highland's CFO, did Highland ever forgive any

11  loans, in whole or in part, that it made to

12  Mr. Dondero?

13       A.    Not that I'm aware.

14       Q.    At the time that you served as

15  Highland's CFO, did Highland ever forgive any

16  loan, in whole or in part, that it made to any

17  affiliate as we've defined the term today?

18       A.    Not that I'm aware.

19       Q.    During the time that you served as

20  Highland's CFO, did Highland ever forgive, in

21  whole or in part, any loan that it ever made to

22  any officer or employee?

23       A.    Highland forgave loans to officers

24  and employees.  It may not have been at the

25  time when my title was CFO.

```
 1                  WATERHOUSE - 10-19-21

 2        Q.    Okay.  And so I appreciate the

 3   distinction.

 4              Is it fair to say that, to the best

 5   of your knowledge, Highland did not forgive a

 6   loan that it made to an officer or employee

 7   after 2013?

 8              MS. DANDENEAU:  Objection to form.

 9        A.    I don't recall.

10        Q.    To the best of your knowledge, did

11   Highland disclose to its auditors every

12   instance where it forgave, in whole or in part,

13   a loan that it had made to one of its officers

14   or employees?

15        A.    No.

16        Q.    Can you think of -- can you -- can

17   you identify any loan to an officer or employee

18   that was forgiven by Highland, in whole or in

19   part, that was not disclosed to Highland's

20   outside auditors?

21        A.    Look, I don't recall all of the

22   loans and the loan forgiveness.  I just know as

23   part of the audit process there is a

24   materiality concept.

25              So if there were loans to employees
```

1              WATERHOUSE - 10-19-21

2     that were of -- you know, that were deemed

3     immaterial, those items may not have been

4     disclosed by the team to the auditors.

5          Q.    I appreciate that.

6               Do you have an understanding as to

7     what the level of materiality was?

8          A.    I don't recall.

9          Q.    As the CFO of Highland, to the best

10    of your knowledge, did Highland disclose to its

11    outside auditors every loan that was forgiven,

12    in whole or in part, that was material as that

13    term was defined by the outside auditors?

14         A.    Yes.

15         Q.    And do you recall where -- do you

16    recall where the definition of materiality can

17    be found for -- for this particular purpose?

18              MS. DANDENEAU:  Objection to form.

19         A.    No.  You -- I don't determine

20    materiality.

21         Q.    Okay.  I'm just asking you if you

22    can help me understand where it is, but I think

23    we will find it in a few minutes.

24              You are aware that Highland has

25    commenced lawsuits against each of the

```
1                    WATERHOUSE - 10-19-21

2   affiliates, as we've defined the term, to

3   collect under certain promissory notes; is that

4   right?

5        A.    Yes.

6        Q.    And are you familiar with the notes

7   that are issue -- at issue in the lawsuits?

8              MS. DANDENEAU:   Objection to form.

9        A.    Generally familiar.

10       Q.    Can we refer to the lawsuits that

11  Highland has commenced against the affiliates

12  collectively as the lawsuits?

13       A.    Yes.  And, again, the affiliates are

14  NexPoint, HCMFA, HCMS, and HCRE.

15       Q.    And Mr. Dondero?

16       A.    Okay.  See, that is a new -- and now

17  Mr. Dondero is included in your affiliate

18  definition.

19       Q.    I just --

20       A.    I thought affiliates -- I thought

21  affiliates were just the four prior entities,

22  so I just want to be clear.

23       Q.    I appreciate that.  So let's --

24  let's keep them separate and let's refer to the

25  four corporate entities as the affiliates, and
```

1                    WATERHOUSE - 10-19-21

2    Mr. Dondero we will call Mr. Dondero.  Okay?

3         A.    Okay.  Thank you.  As you can see,

4    Mr. Morris, there is a lot of entities -- a lot

5    here.  I just want to be clear.

6         Q.    Okay.  Now, the affiliates of

7    Mr. Dondero signed promissory notes that are

8    not subject to the lawsuit.

9              Do you understand that?

10             MS. DANDENEAU:  Objection to form.

11        A.    The affiliates and Mr. Dondero

12   signed --

13        Q.    You know what?  I will skip it.

14   That is okay.  Okay.

15             From time to time while you were

16   Highland's CFO, payments were applied against

17   principal and interests that were due under the

18   notes that were tendered by the affiliates and

19   Mr. Dondero; correct?

20             MR. RUKAVINA:  Objection to the

21        extent that calls for a legal conclusion.

22        A.    Yes.

23        Q.    Did Highland have a process where --

24   whereby payments would be applied against

25   principal and interest against the notes that

1              WATERHOUSE - 10-19-21

2    were given by the affiliates and Mr. Dondero?

3         A.    Yes.

4         Q.    Can you describe the process for me?

5         A.    The process, payment should be

6    applied as laid out in the -- in the promissory

7    note.

8         Q.    From time to time were payments made

9    that were not required under the promissory

10   notes?

11             MS. DANDENEAU:  Objection to form.

12        A.    Yes.

13        Q.    Who was responsible for deciding

14   when and how much the payments would be made

15   with respect to each of the notes that were

16   issued by the affiliates and Mr. Dondero?

17        A.    Who was responsible for deciding how

18   much was paid prior to the due date?

19        Q.    Yes.

20        A.    I don't know.

21        Q.    Did you approve of each payment that

22   was made against principal and interest on the

23   notes that were given by the affiliates and

24   Mr. Dondero?

25             MS. DANDENEAU:  Objection to form.

1          WATERHOUSE - 10-19-21

2          A.     Did I approve the payments?  I

3     approve -- I approve -- if there was cash -- if

4     there was cash being repaid on a note payment,

5     yes, I approved in the general sense of being

6     made aware of the payment and the amount.

7          Q.     And are you the person who

8     authorized Highland's employees to effectuate

9     those payments?

10         A.     Yes.

11         Q.     When you gave the instruction to

12    effectuate the payment, did you obtain

13    Mr. Dondero's prior approval?

14         A.     I mean, it -- I mean, it -- it

15    depends.

16         Q.     Can you think of any instance where

17    you directed Highland's employees to make a

18    payment of principal or interest against any

19    note that was tendered by an affiliate or

20    Mr. Dondero that Mr. Dondero did not approve of

21    in advance?

22         A.     I can't recall specifically.

23         Q.     Can you identify -- withdrawn.

24                Did Mr. Dondero ever tell you that a

25    payment that was made against principal and

```
 1                    WATERHOUSE - 10-19-21

 2   interest due under one of the notes that was

 3   tendered by an affiliate or himself should not

 4   have been made?

 5        A.    Yes.

 6        Q.    Can you identify the payment for me?

 7        A.    It would be for -- for NexPoint

 8   Advisors.

 9        Q.    Okay.  And when did Mr. Dondero tell

10   you that a payment that you had initiated on

11   behalf of NexPoint should not have been made?

12        A.    I wasn't initiating payment.  It was

13   in the context of the -- I think you used this

14   term, "the advisors," so NexPoint Advisors and

15   Highland Capital Management Fund Advisors had

16   overpaid on certain agreements with Highland

17   Capital Management, L.P.  And as a part of that

18   process, the advisors -- what I was told at the

19   time were in talks and negotiations and

20   discussions with Highland Capital Management,

21   L.P., on offsets in relation to those

22   overpayments.

23        Q.    When did this conversation take

24   place?

25                    MS. DANDENEAU:  Objection to form.
```

```
1              WATERHOUSE - 10-19-21
2      A.    I don't recall specifically.
3      Q.    Do you recall what year it was?
4      A.    Yes.
5      Q.    What year did the conversation with
6   Mr. Dondero take place that you just described?
7      A.    2020.
8      Q.    Okay.  Do you remember if it was
9   December 2020?
10     A.    It -- it -- I don't -- I don't
11  recall what month specifically, but it would
12  have been November or December.
13     Q.    And we're talking here about a
14  payment of principal and/or interest that was
15  due -- withdrawn.
16           We're talking here about a payment
17  of principal and interest that was applied
18  against NexPoint's note; correct?
19           MS. DANDENEAU:  Objection to form.
20     A.    I don't recall what that payment
21  consisted of.
22     Q.    Is it possible that the payment you
23  have in mind related to the shared services
24  agreement?
25           MS. DANDENEAU:  Objection to form.
```

1                    WATERHOUSE - 10-19-21

2          A.    No.

3          Q.    Are you certain that the payment --

4    that the payment that you have in mind related

5    to the promissory note that NexPoint issued in

6    favor of Highland?

7                MS. DANDENEAU:  Objection to form.

8          A.    Yes.

9          Q.    Okay.  Other than that one payment,

10   can you identify any other instance where

11   Mr. Dondero told you that a payment should not

12   have been applied against principal and

13   interest under any promissory note tendered by

14   any affiliate or Mr. Dondero?

15               MS. DANDENEAU:  Objection to form.

16               MS. DEITSCH-PEREZ:  Objection to

17        form.

18         A.    Not that I recall.

19         Q.    Thank you very much.

20               Do you know if Mr. Dondero approved

21   in advance of each loan made to each affiliate

22   and himself during the time that you were the

23   CFO?

24               MS. DEITSCH-PEREZ:  Object to the

25        form.

```
1              WATERHOUSE - 10-19-21

2        A.    Yes, generally.

3        Q.    Can you identify any loan that was

4    ever made to an affiliate or to Mr. Dondero

5    that Mr. Dondero did not approve of in advance?

6        A.    Other than the ones that are in

7    dispute, I'm not aware.

8        Q.    Do you believe that Mr. Dondero did

9    not approve of each of the loans that are in

10   dispute in advance of the time that the loan

11   was made?

12             MS. DANDENEAU:  Objection to form.

13       A.    Given what is in the dispute, you

14   know, and -- and -- and the way things might --

15   yeah, I mean...

16       Q.    I am not asking about the dispute,

17   and it was probably my mistake to follow you

18   there.

19             Were you aware of every loan made by

20   Highland to each of its affiliates and

21   Mr. Dondero while you were the CFO at the time

22   each loan was made?

23       A.    Was I aware of every loan, yes.

24       Q.    Okay.  And if you put yourself back

25   in time, do you recall that any of the loans
```

1          WATERHOUSE - 10-19-21

2    that were made to one of the affiliates or

3    Mr. Dondero during the time that you were the

4    CFO was made without Mr. Dondero's prior

5    knowledge and approval?

6          A.     Not that I recall.

7          Q.     Thank you.  In fact, do you -- as

8    the CFO, would you have allowed Highland to

9    loan money to an affiliate or to Mr. Dondero

10   without obtaining Mr. Dondero's prior approval?

11              MS. DANDENEAU:  Objection to form.

12         A.     I can't -- there was so many times

13   over the years, I can't speak for every single

14   one, but generally, yes, I -- I spoke to him.

15         Q.     You -- you never -- you never --

16   withdrawn.  I will just take that.

17              Can you recall any payment that was

18   ever made against principal and interest on a

19   note that was issued in favor of Highland by an

20   affiliate or Mr. Dondero that you personally

21   did not know about in advance?

22         A.     There are so many through the years,

23   I don't -- I don't -- I don't recall every

24   single one.

25         Q.     Okay.  Can you identify any payment

1              WATERHOUSE - 10-19-21

2    that was made against principal and interest on

3    any note tendered by any affiliate or

4    Mr. Dondero that you didn't know about in

5    advance?

6         A.    I don't recall.

7         Q.    Other than Mr. Dondero -- withdrawn.

8              Did anybody at Highland have the

9    authority to make a payment against principal

10   and interest due under a loan given to the

11   affiliates and Mr. Dondero without your

12   knowledge and approval?

13             MS. DANDENEAU:  Objection to form.

14        A.    Sorry, there was -- to make a

15   payment on an affiliate loan, what you are

16   saying would it require my knowledge and

17   approval, yes.

18        Q.    Okay.  I appreciate that.  Thank

19   you.

20             Did anybody at Highland have the

21   authority, to the best of your knowledge, to

22   effectuate a loan to an affiliate without

23   Mr. Dondero's prior knowledge and approval?

24             MS. DANDENEAU:  Objection to form.

25        A.    I can't speak for all, but

```
 1                   WATERHOUSE - 10-19-21
 2   generally, yes.
 3       Q.    Did you personally communicate with
 4   Mr. Dondero to let him know each time a payment
 5   of principal or interest was being made against
 6   any note that was tendered by an affiliate or
 7   Mr. Dondero to Highland?
 8       A.    I don't -- are you saying, did I let
 9   Mr. Dondero know if a payment was made on any
10   affiliate or loan to Mr. Dondero?  I mean,
11   not -- not every -- no.
12       Q.    Let me ask it this way:  Did you
13   have a practice of informing Mr. Dondero when
14   payments were made against principal and
15   interest on any note that was tendered by an
16   affiliate or Mr. Dondero?
17            MS. DEITSCH-PEREZ:  Objection to
18       form.
19            MS. DANDENEAU:  Objection to form.
20       A.    No, I did not.
21       Q.    Did Mr. Dondero ever tell you that a
22   payment of principal or interest had been made
23   against a note that was tendered by an
24   affiliate or himself that he had been unaware
25   of?
```

1                    WATERHOUSE - 10-19-21

2        A.    Not that I recall.

3        Q.    Are you aware that Mr. Dondero and

4    the affiliates -- withdrawn.

5              Are you aware that Mr. Dondero

6    NexPoint, HCRE, and HCMS all contend that they

7    do not have to pay on any of the notes they

8    issued because they are subject to an oral

9    agreement between Mr. Dondero and Nancy

10   Dondero, in her capacity as the trustee of the

11   Dugaboy Investment Trust?

12             MS. DANDENEAU:  Objection to form.

13       A.    I didn't -- I didn't -- I didn't

14   know that it was all notes.

15       Q.    Okay.  Are you -- did you ever learn

16   that there was an oral agreement between Jim

17   Dondero and Nancy Dondero pertaining to any

18   notes issued by any affiliate or Mr. Dondero?

19             MS. DEITSCH-PEREZ:  Object to the

20       form.

21       A.    Yes.

22       Q.    Do you have any understanding as to

23   the terms of that agreement?

24       A.    Yes.

25       Q.    What is your understanding of the

1              WATERHOUSE - 10-19-21

2   terms of the agreement?

3      A.   That there were certain milestones

4   that had to be reached.

5      Q.   Do you have any understanding of the

6   terms of the agreement between Mr. Dondero and

7   Nancy Dondero concerning any of the notes

8   issued by the affiliates or Mr. Dondero other

9   than that there have to be milestones reached?

10         MS. DEITSCH-PEREZ:  Object to the

11      form.

12      A.   There are milestones, I found out

13   yesterday, or there was some --

14         MS. DANDENEAU:  Okay.  I'm just

15      going to object to the extent that you

16      learned anything in conversations with

17      counsel, please don't reveal -- that is

18      privileged, and don't reveal any privileged

19      communications.

20         THE WITNESS:  Okay.

21      A.   So I'm not aware of anything else.

22      Q.   Do you know what the milestones

23   were?

24         MS. DANDENEAU:  Objection to form.

25      A.   I don't.

```
1                    WATERHOUSE - 10-19-21

2        Q.    Do you know anything about -- do you

3   know what promissory notes the agreement

4   covered?

5        A.    I don't.

6        Q.    Do you know if -- if Jim and Nancy

7   Dondero entered into one agreement or more than

8   one agreement?

9             MS. DEITSCH-PEREZ:  Object to the

10        form.

11        A.    I don't know.

12        Q.    Do you know if the agreement is in

13   writing?

14        A.    I don't know.

15        Q.    How did you learn of the existence

16   of the agreement?

17             MS. DANDENEAU:  Objection to form.

18        Again --

19        A.    I don't -- I don't recall who told

20   me.

21        Q.    You have no recollection of who told

22   you about this agreement between Jim and Nancy

23   Dondero?

24             MS. DEITSCH-PEREZ:  Object to the

25        form.
```

```
1                  WATERHOUSE - 10-19-21

2        A.    I don't recall.

3        Q.    Do you recall how you learned of the

4  agreement?

5              Was it in a meeting?  Was it in a

6  phone call?  Was it in an email?

7        A.    I don't recall.

8        Q.    Do you recall when you learned of

9  the agreement?

10       A.    Not specifically.

11       Q.    Do you recall what year you learned

12 of the agreement?

13       A.    In -- look, I mean, there are so

14 many notes.  I may be getting -- I believe it

15 was 2020.

16       Q.    All right.  I'm not asking about

17 notes, sir.  I'm asking about the agreement

18 that you testified you knew about between Jim

19 and Don- -- Nancy Dondero.  Okay.

20             Do you understand my question now?

21 Should I ask my question again?

22       A.    Yeah, sure.  Go ahead.

23       Q.    I'm going to use the word

24 "agreement" to refer to the agreement that

25 Mr. Dondero and Nancy Dondero entered into
```

```
1                    WATERHOUSE - 10-19-21
2    where you understood that certain milestones
3    had to be reached.  Okay?
4         A.    Uh-huh.
5              MS. DANDENEAU:  Objection.
6              MS. DEITSCH-PEREZ:  Object to the
7         form.
8              MR. MORRIS:  Just defining a term,
9         what is the objection.
10             MS. DEITSCH-PEREZ:  The objection --
11             MR. MORRIS:  I will move on.  I will
12        move on.
13             MS. DEITSCH-PEREZ:  John --
14        Q.    Sir, are you okay with that
15   definition of agreement?
16        A.    Okay.
17        Q.    Okay.  So you don't recall who --
18   who informed you of the existence of the
19   agreement; is that right?
20        A.    I don't recall.
21        Q.    You don't recall who told you the
22   terms of the agreement.
23             Do I have that right?
24        A.    Correct.
25        Q.    And you don't recall if you learned
```

```
1                  WATERHOUSE - 10-19-21
2    about the agreement in a meeting, through an
3    email, or through a phone call.
4              Do I have that right?
5        A.    I don't recall.
6        Q.    Can you tell me when you learned of
7    the agreement?
8        A.    I don't -- I don't -- I don't
9    remember specifically.
10       Q.    Can you tell me if you learned of
11   the agreement before or after the petition
12   date?
13       A.    It would have been -- it would have
14   been after.
15       Q.    Can you tell me if you learned of
16   the agreement before or after January 9th,
17   2020?
18       A.    It would have been after.
19       Q.    Can you tell me if you learned of
20   the agreement before or after you left Highland
21   Capital Management in February of 2021?
22       A.    I don't -- I don't -- I don't know.
23       Q.    It is possible that you learned of
24   it while you were a Highland employee.
25              Do I have that right?
```

```
1                WATERHOUSE - 10-19-21

2        A.     I don't remember the -- I mean, it

3   was sometime in 2021.  I don't remember when.

4        Q.     All right.  So to the best of your

5   recollection, it was in 2021 but you don't

6   recall if it was before or after you ceased to

7   be a Highland employee.

8               Do I have that right?

9        A.     Yeah, I mean, it was -- it was

10  likely after I was -- after I left Highland

11  because, if I put myself back into the last

12  days of -- of 2021, it was -- you know, the

13  communications with Mr. Dondero were -- were --

14  were -- there weren't as many communications

15  because of the circumstances.

16       Q.     And so based on that you believe

17  that it is most likely that you learned of this

18  agreement sometime after you left Highland

19  employment?

20       A.     I wouldn't use the term "most

21  likely."  I don't recall specifically.  I don't

22  recall.

23       Q.     Do you recall ever telling Jim Seery

24  about this agreement?

25       A.     No, I don't -- I didn't tell
```

1          WATERHOUSE - 10-19-21

2    Jim Seery.

3         Q.    Did you tell anybody at DSI about

4    this agreement?

5         A.    No.

6         Q.    Did you tell any of Highland's

7    independent directors about this agreement?

8         A.    No.

9         Q.    Did you tell anybody at Pachulski

10   Stang Ziehl & Jones about this agreement?

11        A.    No.

12        Q.    Did you tell any employee of

13   Highland about this agreement?

14        A.    No.

15             MS. DANDENEAU:  Mr. Morris, it has

16        been an hour and a half.  Is this a good

17        time for a break?

18             MR. MORRIS:  Sure.

19        Q.    Mr. Waterhouse, I will just remind

20   you that during the break please don't speak

21   with anybody about the deposition, the

22   substance of your testimony or anything else

23   concerning the deposition.  Okay?

24        A.    Yes.

25             MR. MORRIS:  So it is 11:02.  We're

```
1                WATERHOUSE - 10-19-21

2        at 11:02 your time.  Let's come back, I

3        guess, at 15 -- at 11:15 your time.

4                VIDEOGRAPHER:  We're going off the

5        record at 11:02 a.m.

6        (Recess taken 11:02 a.m. to 11:20 a.m.)

7                VIDEOGRAPHER:  We are back on the

8        record at 11:20 a.m.

9        Q.    Mr. Waterhouse, did you speak with

10  anybody during the break about this deposition?

11       A.    No.

12               MS. DANDENEAU:  Other than -- other

13       than his counsel.

14       Q.    Did you speak to your counsel about

15  the substance of your deposition today?

16       A.    No, I didn't bring it up.

17       Q.    I didn't ask you if you brought it

18  up.  I asked you if you had any conversation

19  with your lawyer about the substance of your

20  deposition.

21               MS. DANDENEAU:  Yes, he did.

22       Q.    Can you tell me what the -- you

23  discussed?

24               MS. DANDENEAU:  No, I object to

25       that.  He's not going to answer.  That is a
```

1          WATERHOUSE - 10-19-21

2    privileged conversation.

3          MR. MORRIS:  So I just want to make

4    sure that I understand.  During the break

5    you spoke with your client about the

6    substance of this deposition; is that

7    right?

8          MS. DANDENEAU:  Yes, John.

9          MR. MORRIS:  And you refuse -- you

10   refuse to let your client tell me what was

11   discussed; is that right?

12         MS. DANDENEAU:  That's correct.

13         MR. MORRIS:  You know, I had given

14   the instruction prior to the break not to

15   speak with counsel.  I would have

16   appreciated --

17         MS. DANDENEAU:  No, you didn't --

18   actually, that is not true, Mr. Morris.

19   You said not to speak with anyone.  We

20   never have interpreted that to mean

21   conversations with counsel.  That's never

22   been -- I have never, ever heard that

23   instruction.

24         MR. MORRIS:  Okay.  We will -- we

25   will -- we will deal with it when and if we

1          WATERHOUSE - 10-19-21

2     have to.

3     Q.    Mr. Waterhouse, after learning about

4  the agreement, did you ask anybody if the

5  agreement was reflected in a writing?

6          MS. DANDENEAU:  Objection to form.

7     A.    No.

8     Q.    Did you ask anybody if the terms of

9  the agreement were memorialized anywhere?

10          MS. DANDENEAU:  Objection to form.

11          MR. MORRIS:  What is the --

12     A.    No.

13          MS. DANDENEAU:  Well, because you

14          keep talking about this agreement and I --

15          I -- I think, Mr. Morris, that is really

16          not clear what you mean by "the agreement."

17          And maybe you can just go back and restate

18          what that is.

19          MR. MORRIS:  Okay.  Your client has

20          agreed with me twice on the definition, but

21          I will try one more time.

22     Q.    Mr. Waterhouse, do you understand

23  that when I use the term "agreement," I'm

24  referring to the agreement between Jim and

25  Nancy Dondero concerning certain promissory

```
 1                    WATERHOUSE - 10-19-21
 2   notes where you learned that one of the terms
 3   of the agreement was milestones reached?
 4        A.    Okay.
 5        Q.    And did you understand that that was
 6   the -- the agreement that we were referring to
 7   every time we used the word "agreement" in this
 8   deposition?
 9        A.    I don't know anything about this
10   agreement.  So, look, I do -- it -- I don't
11   know whether --
12        Q.    Let's -- let's try this again.
13        A.    Yeah.  Look, I don't know what this
14   agreement relates.
15             MS. DEITSCH-PEREZ:  John, John --
16        Q.    Let me try --
17             MS. DEITSCH-PEREZ:  John, please let
18        the witness finish.
19             MR. MORRIS:  Please stop.  Please
20        stop.  Please stop talking.
21             MS. DEITSCH-PEREZ:  No, you stop.
22        Let the witness --
23             MR. MORRIS:  Stop talking.
24             MS. DEITSCH-PEREZ:  -- finish -- you
25        interrupted him.
```

1          WATERHOUSE - 10-19-21

2          MR. MORRIS:  You know what, you

3     guys, this is really wrong.  It is really,

4     really wrong.  Okay?

5          I had the witness agree not once,

6     but twice to the definition of agreement.

7     Okay?  I'm going to try and do it a third

8     time.

9          MS. DANDENEAU:  No, but, please,

10    John, really --

11         MR. MORRIS:  No, please stop

12    talking.  Please.  It is my deposition.

13    Object to questions.

14         MS. DANDENEAU:  No, but also you

15    instructed him that -- that if you were

16    going -- if you were interrupting him, that

17    he should remind you that you're

18    interrupting him and -- and --

19         MR. MORRIS:  Let him do that.  Let

20    him do that.

21         MS. DANDENEAU:  Okay.  Well, you --

22         MR. MORRIS:  Please stop talking.

23    A.    Okay.  I don't know any of the

24  details of these agreements.  I don't know

25  anything about them.  I heard -- someone -- I

```
1                  WATERHOUSE - 10-19-21

2    don't know who, I don't know when, as you

3    asked, sometime in '21, someone told me about

4    this -- or I don't honestly know -- I don't

5    even recall exactly how I was made aware of

6    this, but I was.  I don't know -- I don't know

7    any of these details, and I'm getting -- again,

8    there is, you know, I -- I -- I had a passing

9    conversation with -- with Jim at some point

10   on -- on some -- on the executive comp, and I'm

11   getting confused of what is what, because

12   again, I don't know any of these details.

13        Q.    Okay.  Let me try again,

14   Mr. Waterhouse, and I apologize.

15             Are you aware of any agreement

16   between Jim Dondero and Nancy Dondero

17   concerning any promissory note that was given

18   to Highland by any affiliate or Mr. Dondero?

19             MS. DEITSCH-PEREZ:  Object to the

20        form.

21        A.    I've heard of an agreement.  That

22   is -- that is -- I mean, if you are using aware

23   as heard, sure.

24        Q.    And you understand that one of the

25   terms of the agreement is that it was based on
```

1              WATERHOUSE - 10-19-21

2  milestones that had to be reached; is that

3  right?

4              MS. DANDENEAU:  Objection to form.

5       A.    That was one of the words that was

6  used when I heard about it, yes.

7       Q.    And when you heard about this

8  agreement that had a term in it concerning

9  milestones reached, did you ask the person who

10 was telling you about the agreement whether or

11 not it was in writing?

12      A.    I did not.

13      Q.    Did you ask any questions at all?

14              MS. DANDENEAU:  Objection to form.

15      A.    Not that I recall.

16      Q.    But do you understand that going

17 forward, we're going to refer to the agreement

18 as the agreement that you just described that

19 you were --

20              MS. DANDENEAU:  Object to the form.

21      A.    Yes.

22      Q.    Okay.  You don't have any personal

23 knowledge concerning the terms of the

24 agreement; correct?

25              MS. DEITSCH-PEREZ:  Object to the

1          WATERHOUSE - 10-19-21

2     form.

3          Q.    You can answer.

4          A.    I don't -- I heard about the

5     agreement.  I don't know anything -- I heard

6     there was an agreement.  That is -- again, as I

7     testified before -- I said before, heard about

8     it, don't know the details.  I believe it was

9     sometime this year.

10         Q.    Do you have any personal knowledge

11    about the terms of the agreement, sir?

12               MS. DANDENEAU:  Objection to form.

13         A.    Other than what I have previously

14    discussed, I don't -- I don't know.

15         Q.    Did -- did Mr. Dondero tell you

16    about the existence of the agreement?

17         A.    I don't recall.

18         Q.    Do you recall the source of your

19    information when you learned about the

20    agreement?

21         A.    No, I don't -- I don't recall.  I

22    don't remember.  I just -- I heard about it

23    generally.  I don't remember -- I don't

24    remember who, how, if, how.  I don't remember.

25         Q.    You know, Mr. Waterhouse, I just

1                    WATERHOUSE - 10-19-21

2    want to be clear that I never would have asked

3    you to appear at this deposition if your name

4    hadn't been included in responses to discovery

5    as to somebody with knowledge about the -- who

6    was told about the existence of the agreement.

7              That is what prompted me do this,

8    and I really do feel compelled to tell you that

9    I otherwise would never have called you as a

10   witness.  So I regret that you're being put

11   through this today.  I had no intention of

12   burdening you or taking your time, but that is

13   the reason that we issued the subpoena is

14   because certain of the defendants identified

15   you as somebody --

16             MS. DEITSCH-PEREZ:  Mr. Morris, you

17        are here to ask questions, not to have --

18             MR. MORRIS:  I feel badly for the

19        guy.  I really do.

20             MS. DEITSCH-PEREZ:  I'm sure you do.

21             MR. MORRIS:  I do.  Stop.

22             MS. DEITSCH-PEREZ:  You stop.

23             MR. MORRIS:  I'm allowed.

24             MS. DEITSCH-PEREZ:  No, you're not

25        allowed to have a chat with the witness.

```
 1                WATERHOUSE - 10-19-21
 2      Q.    Okay.  Well, I hope that you
 3   appreciate what I'm saying here,
 4   Mr. Waterhouse.
 5            MS. DANDENEAU:  All right.  Let's go
 6        ahead and ask questions, and again, you're
 7        entitled to probe his -- his knowledge
 8        of -- whatever knowledge he has about
 9        this -- this agreement and --
10            MR. MORRIS:  That is what I'm doing.
11            MS. DANDENEAU:  -- he will answer
12        the questions to the best that he can.
13            MR. MORRIS:  That is what I'm doing.
14      Q.    Mr. Waterhouse, I take it you do not
15   know which promissory notes issued by which
16   affiliates or Mr. Dondero are the subject of
17   this agreement; do I have that right?
18      A.    Yes, I don't -- I don't know.
19      Q.    Do you know of any way to determine
20   which promissory notes issued by the affiliates
21   and Mr. Dondero are the subject of this
22   agreement other than asking Jim or Nancy
23   Dondero?
24            MS. DANDENEAU:  Objection to form.
25      A.    I don't know.
```

```
1                  WATERHOUSE - 10-19-21

2        Q.    Did you ever make --

3        A.    I don't know anything about these

4   agreements.

5        Q.    Did you ever make any effort to

6   determine which promissory notes are subject to

7   this agreement?

8        A.    No.

9        Q.    Did you ever ask anybody which

10  promissory notes are subject to this agreement?

11       A.    No.

12       Q.    Do you know if there is a list

13  anywhere of the promissory notes that are

14  subject to this agreement?

15       A.    I'm not aware.

16       Q.    Have you ever seen the terms of the

17  agreement written down anywhere?

18       A.    No.

19       Q.    Have you ever asked anybody whether

20  the terms of the agreement were written down

21  anywhere?

22       A.    I have not.

23       Q.    Did learning about the agreement

24  cause you to do anything in response?

25             MS. DANDENEAU:  Objection to form.
```

```
1              WATERHOUSE - 10-19-21
2        A.    No.
3        Q.    Did anybody ever describe to you the
4   nature of the milestones that you referred to
5   earlier?
6        A.    No, I don't -- I don't have any
7   details of this.
8        Q.    That is fine.
9              PricewaterhouseCoopers served as
10  Highland's outside auditors prior to the
11  petition date; correct?
12       A.    Yes.
13       Q.    You refer to PricewaterhouseCoopers
14  as PwC?
15       A.    Yes.
16       Q.    PricewaterhouseCoopers audited
17  Highland's financial statements on an annual
18  basis; correct?
19       A.    During my -- during my time as -- as
20  CFO, yes, PricewaterhouseCoopers was the
21  auditor.
22       Q.    Do you know why Highland had its
23  annual financial statements audited each year?
24       A.    Generally.
25       Q.    Tell me your general understanding
```

1                    WATERHOUSE - 10-19-21

2    as to the reason why Highland had its annual

3    financial statements audited each year.

4         A.    From -- from time to time, they were

5    used -- or asked for, as part of diligence or

6    transactions or -- or things of that nature.

7         Q.    And were they given to third parties

8    for purposes of diligence or transactions from

9    time to time?

10        A.    As far as I'm aware, yes.

11        Q.    And was it your understanding as the

12   CFO that the third parties who received the

13   financial statements in diligence or

14   transactions was going to rely on those?

15             MS. DANDENEAU:  Objection to form.

16        A.    I don't know -- I don't know gen --

17   I don't know specifically what they were going

18   to rely on.  You know, we would get requests

19   for audited financial statements.  I don't know

20   what they were relying on.

21        Q.    And --

22        A.    You would have to ask them.

23        Q.    Did you personally play a role in

24   PwC's annual audit and the conduct of the

25   audit?

```
1              WATERHOUSE - 10-19-21

2         MS. DANDENEAU:  Objection to form.

3    A.    During my tenure as CFO, I played a

4    very minimal role.

5    Q.    What was the minimal role that you

6    played?

7    A.    You know, again, it was -- it was to

8    check in with the team, to make sure that, you

9    know, audit -- the deadlines were being hit,

10   information was being presented to the auditors

11   in a -- in a timely fashion, but, you know,

12   other than that, it was a very capable team

13   that are still current employees of Highland

14   and, you know, they -- they conducted 99

15   percent of -- look, I don't want to give

16   percentages.  I mean, this is -- but I -- I --

17   I played a minimal role towards the end.

18        Before during my earlier years as

19   CFO, I did more, and then as time went on, I

20   did less in it.

21   Q.    Okay.  Was there a person at

22   Highland who was responsible for overseeing

23   Highland's participation in PwC's audit during

24   the time that you were the CFO?

25   A.    Yeah.  I mean, there was -- there
```

1              WATERHOUSE - 10-19-21

2    was a -- there was a point -- it varies.  It

3    varies by year, in function, in time and, you

4    know, depending on the request, but yes, I

5    mean, there is -- there is -- there is

6    generally a point person of communication.

7        Q.   And who was the point person from

8    2016 until the time you left Highland?

9        A.   I don't -- I don't know

10   specifically, but it would have been, you

11   know -- you know, someone on the corporate

12   accounting team.

13       Q.   And was there a head of the

14   corporate accounting team?

15       A.   Yes, so -- yes.

16       Q.   Who was the head of corporate

17   accounting for the five years prior to the time

18   you left Highland?

19       A.   I don't -- if you're asking from

20   2016 on, I don't -- it was Dave Klos, but,

21   again, there was -- there was changes to the

22   team and the reporting structure.  I don't

23   remember exactly when that happened during --

24   you know, over the last -- since 2016.

25       Q.   Did the folks who participated and

1              WATERHOUSE - 10-19-21

2    ran the audit all report to you, directly or

3    indirectly?

4         A.    Yes.

5         Q.    And did you have any responsibility

6    for making sure that the audit report was

7    accurate before it was finalized?

8         A.    Yeah.  I mean, you know, that --

9    that is -- my responsibility to the auditors

10   was -- again, is -- and the CFO is to -- we are

11   providing accurate financial statements; right?

12            And -- and -- and as part of any

13   audit, we disclose all relevant information as

14   part of any audit.

15        Q.    Okay.  And as the CFO, did you take

16   steps to make sure that the audit report was

17   accurate?

18        A.    I mean, I would say in a general

19   sense, yes.  But, again, I mean, I had a

20   very -- I had a very capable and competent

21   team.  I wasn't managing them.

22            You know, part of what I do is I let

23   the team -- I want managers to grow.  I want

24   managers to have rope.  And that is -- you

25   know, I'm not a stand-behind-you type of guy.

1          WATERHOUSE - 10-19-21

2   If you -- if you talk to my team members, I'm

3   not micromanaging people.  I want people to

4   learn and grow in their function so they can go

5   on and do bigger and better things with their

6   careers.

7                And so, yes, generally I was

8   responsible for it, but I wanted the team to

9   learn and grow and be responsible for the bulk

10  of the audit.

11       Q.    Did you personally review each audit

12  report before it was finalized to satisfy

13  yourself that it was accurate?

14       A.    I don't -- I don't recall, you know,

15  for every single -- we're talking 2016, there

16  would have been three years, 2016 to '17, '18.

17  I don't -- we're -- we're going back

18  five years-plus.  I don't -- you know, I don't

19  recall.

20       Q.    Did you have a practice that you

21  employed to make sure that you were satisfied

22  that Highland's audit reports were true and

23  accurate to the best of your knowledge?

24       A.    I mean, our -- the practice was set

25  up with our -- the -- the practice to put

1                    WATERHOUSE - 10-19-21

2    together accurate audited or accurate financial

3    statements is to your control environment.

4              So, you know, the -- so the practice

5    was to maintain a stable control environment

6    which then the output is -- is accurate

7    financial statements.

8              So -- so, you know, if I was

9    comfortable that the control environment was

10   operating, then, you know, that would dictate

11   how I would -- you know, what I might or might

12   not do in a given year.

13        Q.   Okay.  Do you recall ever being

14   uncomfortable with the control environment

15   during the period that you served as CFO?

16        A.   Yeah.  I mean, look, yes, there are

17   times -- you know, nothing is perfect.  So

18   there were -- there were times when, yes, you

19   know -- there are times I learned I was

20   uncomfortable with the control environment, and

21   that is part of the management of the process

22   and having, you know -- and -- and working

23   through whatever obstacles present themselves.

24        Q.   Okay.  Were you ever uncomfortable

25   with the control process as it related to

```
 1                   WATERHOUSE - 10-19-21

 2   reporting and disclosures of loans to

 3   affiliates and Mr. Dondero?

 4             MS. DANDENEAU:  Objection to form.

 5        A.    I don't -- I don't recall --

 6        Q.    So you don't recall --

 7        A.    -- the --

 8             MS. DANDENEAU:  Mr. Morris --

 9        A.    I don't recall being uncomfortable.

10   But, again, we're going back several years.  I

11   don't -- you know, the practice in an audit is

12   to disclose all information to the auditors.

13   And I don't -- I don't recall.

14        Q.    As part of the process of the audit,

15   did you sign what is sometimes referred to as a

16   management representation letter?

17        A.    Yes.

18             MR. MORRIS:  Can we put up on the

19        screen a document that we have premarked as

20        Exhibit 33.

21             (Exhibit 33 marked.)

22             MS. DANDENEAU:  Mr. Morris, that is

23        not in the binder; correct?

24             MR. MORRIS:  Correct.

25        Q.    So you will see, Mr. Waterhouse,
```

```
 1                  WATERHOUSE - 10-19-21

 2    this is a letter dated June 3rd.  And if we

 3    could go to the signature page.

 4                  And do you see that you and

 5    Mr. Dondero signed this document?

 6        A.    Yes.

 7        Q.    That is your signature; right?

 8        A.    Yes.

 9             MR. MORRIS:  Okay.  Can you go back

10        to the top.

11             MS. DANDENEAU:  Mr. Morris, can you

12        have somebody post this in the chat so that

13        we have can have a copy of this, please.

14             MR. MORRIS:  Yeah, sure.  Asia, can

15        you do that, please.

16        Q.    Okay.  Do you see at the bottom of

17    the second paragraph there is a reference to

18    materiality?

19        A.    Yes.

20        Q.    Okay.  It says, Materiality used for

21    purposes of these representations is

22    $1.7 million.

23                  Do you see that?

24        A.    I do.

25        Q.    And did PwC set that level of
```

1              WATERHOUSE - 10-19-21

2    materiality?

3         A.    Yes.

4         Q.    And for purposes of the audit, did

5    PwC set the level of materiality each year?

6         A.    Yes.

7         Q.    Did that number change over time?

8         A.    I'm not aware of what materiality is

9    every single year, so -- but, you know, this

10   number would likely fluctuate.

11        Q.    Okay.  I'm going to go back to a

12   question I asked you earlier today.  And that

13   is in connection -- this letter is issued in

14   connection with the audit for the period ending

15   12/31/2018; correct?

16        A.    Yes.

17        Q.    Okay.  And is it fair to say that if

18   any -- actually, withdrawn.  I'm going to take

19   it outside of this.

20              If Highland ever forgave the loan to

21   any affiliate or any of its officers or

22   employees, in whole or in part, to the best of

23   your knowledge, would that forgiveness have

24   been disclosed in the audited financial

25   statements if it exceeded the level of

1          WATERHOUSE - 10-19-21

2   materiality that PwC established?

3          MS. DANDENEAU:  Objection to form.

4      A.    So, again, during my tenure as CFO,

5   and -- Highland -- it was -- it is required to

6   disclose any affiliate loans that are in excess

7   of materiality.

8          Now, the forgiveness of those loans

9   may or may not -- I mean, since materiality

10  fluctuates every year, a -- you know, if a loan

11  was forgiven, it may or may not, you know --

12  and, look, I would want to consult the guidance

13  around this.

14          It is not something we do -- you

15  know, it is not -- you know, GAAP can be and

16  disclosures can be very specialized so, again,

17  we want to consult the guidance.  But we would

18  see if and what would need to be disclosed if

19  it were deemed immaterial.

20      Q.    Did you and Mr. Dondero sign

21  management representation letters of this type

22  in each year in which you served as Highland's

23  CFO?

24      A.    I -- I -- I will speak for myself.

25  I signed them.  There may have been others that

1           WATERHOUSE - 10-19-21

2     signed as well.  I don't -- I don't recall.

3          Q.    But to the best of your knowledge,

4     you, personally, signed a management

5     representation letter in connection with

6     Highland's audit each year that you served as

7     the CFO; correct?

8          A.    I would say generally speaking,

9     Mr. Morris.  I don't recall for every single

10    year, you know, generally, but I would want to

11    refer to all the rep letters and see who signed

12    them.

13         Q.    Do you recall Highland having its

14    financial statements audited in any year during

15    the period that you were a CFO where you didn't

16    sign the management representation letter?

17         A.    I don't recall.  But, John, we're

18    going back five, six, seven, eight, nine,

19    decade.  I don't -- I don't remember.

20         Q.    I don't want to go back that many

21    decades, but I'm just asking you if you recall

22    that there was you didn't sign it?

23         A.    I -- I -- I don't, but my memory

24    is -- again, I -- I -- I can't tell you what I

25    did in 2012.  I mean, I think generally, yes,

1              WATERHOUSE - 10-19-21

2    but I don't -- I don't know for sure, and I

3    would want to rely on the document.

4         Q.    Let me ask the question a little bit

5    differently then.

6              Do you have any reason to believe

7    that Highland had its annual financial audit

8    and you did not sign a management

9    representation letter in connection with that

10   audit?

11             MS. DANDENEAU:  Objection to form.

12        A.    I don't believe it would, but,

13   again, I would want to -- I don't recall and I

14   would want to confirm it to -- to make, you

15   know, an affirmative -- to give an affirmative

16   answer.

17        Q.    Do you know whether PwC required

18   management to sign management representation

19   letters?

20             MS. DANDENEAU:  Objection to form.

21        A.    Yes.  I mean, it -- management

22   representation letters are signed by

23   management.

24        Q.    Okay.  And do you know -- do you

25   have any understanding as to why PwC requires

1          WATERHOUSE - 10-19-21

2    management to sign management representation

3    letters?

4               MS. DEITSCH-PEREZ:  Object to the

5          form.

6          A.    I don't know why PwC's -- what PwC's

7    specific practice is.  I know generally what

8    management representation letters are.

9          Q.    Okay.  Do you personally -- I'm not

10   asking about PwC.  I'm asking for you -- I'm

11   asking about you, do you have an understanding

12   as to why the auditor asks for management

13   representation letters?

14         A.    Okay.  So you're asking me in my

15   personal capacity, yes, I have a general

16   understanding of why.

17         Q.    Can you give me the general

18   understanding that you have as to why

19   management representation letters are required?

20         A.    They are -- they are required to --

21   they are -- they are one of the items required

22   in an audit to help verify completeness.

23         Q.    Do you have any -- any other

24   understanding as to why management

25   representation letters are required?

1           WATERHOUSE - 10-19-21

2       A.    That is -- that is -- other than

3    what I said, it is -- it is -- it is required

4    so -- to ensure that the -- you know, there

5    is -- there is completeness in what is being

6    audited.

7       Q.    Did you -- did you have a practice

8    whereby you and Mr. Dondero conferred about the

9    management representation letters before you

10   signed them?

11      A.    No.

12      Q.    Did you have a practice --

13   withdrawn.

14          Do you see just the next sentence

15   after the materiality, there is a sentence that

16   states:  We confirm, to the best of our

17   knowledge and belief, as of June 3rd, 2019, the

18   date of your report, the following

19   representations made to you during your audit.

20          Do you see that sentence?

21      A.    Yes.

22      Q.    Okay.  Did you understand when you

23   signed this letter that you were confirming the

24   representations that followed?

25      A.    When I signed this management

```
 1                    WATERHOUSE - 10-19-21

 2    letter -- representation letter, yes.

 3         Q.    Okay.  Did you discuss this letter

 4    with Mr. Dondero before you signed it?

 5         A.    I don't recall.

 6         Q.    Do you recall if Mr. Dondero asked

 7    you any questions before he signed the letter?

 8         A.    I don't recall.

 9         Q.    Do you recall if you asked

10    Mr. Dondero any questions before you signed

11    this letter?

12         A.    I don't recall.

13         Q.    Is it fair to say that Mr. Dondero

14    did not disclose to you the existence of the

15    agreement that we have -- as we've defined that

16    term prior to the time you signed this letter?

17              MS. DANDENEAU:  Objection to form.

18         A.    I don't think I understand the

19    question.  So, again, you are saying, did

20    Mr. Dondero not disclose to me the existence of

21    this letter?

22         Q.    No, I apologize.

23              Did Mr. Dondero disclose to you the

24    existence of the agreement prior to the time

25    you signed this letter on June 3rd, 2019?
```

1          WATERHOUSE - 10-19-21

2     A.    The agreement -- the agreement that

3   we talked about earlier?

4     Q.    Correct.

5     A.    Look, as I said earlier, the first

6   time I heard of this agreement was sometime

7   this year.

8     Q.    Okay.  Can we turn -- let's just

9   look at a couple of items on the list.  If we

10  can go to page 33416.  Do you see in Number 35

11  it talks about the proper recording or

12  disclosure in the financial statements of ND

13  relationships and transactions with related

14  parties.

15          Do you see that?

16    A.    I do.

17    Q.    As the CFO, do you have any

18  understanding as to whether Dugaboy is a

19  related party?

20    A.    I don't recall.

21    Q.    Do you know whether any of the

22  affiliates are related parties?

23    A.    If -- if it was NexPoint, HCMFA,

24  HCMS, HCRE, yeah, if -- if that is the

25  affiliate definition, and there.  In ASC 850 --

1           WATERHOUSE - 10-19-21

2    again, I mean, I haven't looked at ASC 850 in

3    quite some time, but, you know, if -- if there

4    is a control language, you know, ASC 850, would

5    that -- that section in GAAP would -- would

6    pick up and define what are related parties.

7           So, you know, like I said, if -- one

8    of the four entities I just described, if -- if

9    they are in that control definition of ASC 850,

10   they would be picked up in 35D.

11   Q.   Do you -- do you have any reason to

12   believe that they would be picked up in that

13   definition, based on your knowledge and

14   experience?

15   A.   I -- I believe that entities

16   controlled under GAAP are -- are affiliates.

17   Q.   Okay.  Would Mr. Dondero also

18   qualify as a related party for purposes of

19   Section 35D, to the best of your knowledge?

20   A.   Yeah, I don't -- I don't know.  I

21   would think -- I would have to read the code

22   section to see if someone personally -- is it

23   talking about related parties.  So, look, if

24   your own in control, yeah, I mean, I would have

25   to read the section.

1          WATERHOUSE - 10-19-21

2          Q.    To the best of your knowledge, was

3     the existence of the agreement ever disclosed

4     to PwC?

5          A.    I'm not -- I'm not aware.

6          Q.    Do you recall if the agreement was

7     ever disclosed in Highland's audited financial

8     statements?

9          A.    I don't -- I don't remember if it

10    was in every Highland's audited financial

11    statements during my tenure.  We would have to

12    read the financial statements to see what was

13    disclosed, but I'm not -- I mean, as I sit here

14    today, I'm not aware.

15         Q.    That is all I'm asking for.

16         A.    I'm not aware.

17         Q.    Can we go to the next page, please,

18    and look at 36.  36 says, we have disclosed to

19    you the identity of the partnership's related

20    party relationships and all the related party

21    relationships and transactions of which we are

22    aware.

23              Do you see that?

24         A.    Yes.

25         Q.    To the best of your knowledge, as of

1          WATERHOUSE - 10-19-21

2    June 3rd, 2019, did Highland disclose to PwC

3    the identity of the partnership's related

4    parties and all the related party relationships

5    and transactions of which it was aware?

6          A.    I mean, I can speak for myself as

7    signer of this representation letter.  I

8    disclosed what -- what, you know, what --

9    what -- what I knew.  Sorry, look, yes, so I --

10   I disclosed what I knew.

11         Q.    Okay.  Can we go to page 419.  Do

12   you see at the end there is a reference to

13   events that occurred since the end of the

14   fiscal year and the date of the letter?

15         A.    Yes.

16         Q.    And were you aware of that -- of

17   that provision of the management representation

18   letter before you signed the document?

19         A.    Yes.

20         Q.    Do you have an understanding as to

21   why PwC asked for that confirmation of that

22   particular part of the management

23   representation letter?

24         A.    It is -- it is -- it is just -- it

25   is a typical audit request.

1              WATERHOUSE - 10-19-21

2         Q.    And do you understand -- do you have

3    an understanding that PwC wanted to know that

4    as of the date of the audit whether any

5    material changes had occurred since the end of

6    the fiscal year, using the definition of

7    materiality that is in this particular

8    management representation letter?

9         A.    It -- it is -- it is -- it is a --

10   it is as described.  It is just a poorly worded

11   question, so it is hard for me to say yes.

12        Q.    If I asked you this, I apologize,

13   but did you ever learn when the agreement was

14   entered into?

15        A.    I don't -- I don't -- like I said

16   before, I don't know or have any details of the

17   agreement.

18        Q.    Okay.  Did you ever ask anybody when

19   the agreement was entered into?

20        A.    I did not.

21        Q.    Let's look at the audited financial

22   statements.  We will put up on the screen a

23   document that has been premarked as Exhibit 34.

24              (Exhibit 34 marked.)

25              MS. DANDENEAU:  And again, if Ms. La

WATERHOUSE - 10-19-21

1
2      Canty could please put that in the chat

3      room, that would be great.

4             MR. MORRIS:  I will assure you we

5      will put every document in the chat room.

6      Q.    Now, I'm just going to ask you

7   questions that are related to the provisions of

8   this report that concern the affiliate loans,

9   but again, Mr. Waterhouse, if there is any part

10  of the document that you need to see or that

11  you think you might need to see in order to

12  refresh your recollection to answer any of my

13  questions, will you let me know that?

14     A.    Yes.

15     Q.    Because this is a pretty lengthy

16  document, but do you see that the cover page

17  here is the Highland consolidated financial

18  statements for the period ending December 31st,

19  2018?

20     A.    Yes.

21     Q.    If we can go to -- I think it is the

22  next one, looking for PwC's signature line.

23            MS. CANTY:  I'm sorry, John, did you

24  say something?

25            MR. MORRIS:  Yes, can we turn the

1          WATERHOUSE - 10-19-21

2      page.  I think it is 215.  Yes, stop right

3      there, just above -- I'm sorry, I want to

4      see just the date of the report.

5      Q.    Okay.  Do you see at the bottom of

6  that page there, Mr. Waterhouse,

7  PricewaterhouseCoopers has signed this audit

8  report?

9      A.    Yes, I see their signature.

10     Q.    Okay.  And it is the dated same day

11 as your management representation letter; is

12 that right?

13     A.    It is -- yes, it is the same day.

14     Q.    Was that the practice to sign the

15 management representation letter on the same

16 day that the audit report was signed?

17     A.    Yes, that is typical in every audit.

18     Q.    Can we just scroll down to the

19 balance sheet on the next page.

20          Do you see that there is a line

21 there that says, Notes and Other Amounts Due

22 from Affiliates?

23     A.    Yes.

24     Q.    Does that line, to the best of your

25 knowledge, include the amounts that were due

1          WATERHOUSE - 10-19-21

2   under the affiliate under the notes signed by

3   the affiliates and Mr. Dondero?

4          MR. RUKAVINA:  Objection to the

5      extent that calls for a legal conclusion.

6      A.    I mean, I would want to see the

7   detail and the build to this $173,398,000, but,

8   yes, I mean, if -- if -- given what we

9   discussed before, you know, it -- it should

10  capture that.

11     Q.    And -- and while you were the CFO of

12  Highland, were all notes held by Highland that

13  were issued by an affiliate or Mr. Dondero

14  carried as assets on Highland's balance sheets?

15         MS. DANDENEAU:  Objection to form.

16         MS. DEITSCH-PEREZ:  Object to form.

17     A.    I don't -- I don't know how else

18  they would be carried.

19     Q.    Okay.  Can you think of any -- are

20  you aware of any promissory note issued by an

21  affiliate or Mr. Dondero that was not carried

22  on Highland's audited financial balance sheets?

23     A.    I'm -- I'm -- I'm not aware.

24     Q.    Okay.  Are you aware of any category

25  of asset on Highland's balance sheet in which

1          WATERHOUSE - 10-19-21

2    any of the promissory notes issued by an

3    affiliate or Mr. Dondero would have been

4    included?

5              MS. DANDENEAU:  Objection to form.

6         A.    Sorry, am I aware of any asset of an

7    affiliate being included --

8         Q.    That -- let me -- let me try again.

9              Do you see there is a number of

10   different assets that are described on this

11   balance sheet?

12        A.    Yes.

13        Q.    One of the assets that is described

14   is Notes and Other Amounts Due from Affiliates;

15   right?

16        A.    Yes.

17        Q.    And it is reasonable to conclude

18   that the notes from the affiliates and

19   Mr. Dondero are included in that line item;

20   right?

21        A.    Yes, based on this description.

22   Again, I would want to see a build of this to

23   100 percent confirm, but based on the

24   description, the asset description, it is -- it

25   is likely.

1          WATERHOUSE - 10-19-21

2               Now, does that mean absolute?  I

3     don't know.

4          Q.    Do you have any reason to believe

5     that the promissory notes would have been

6     carried on the balance sheet in a category

7     other than Notes and Other Amounts Due from

8     Affiliates?

9          A.    If they were deemed -- no.  If they

10    were deemed an affiliate, you know, under GAAP,

11    they should be carried in that line.

12    Otherwise, it would go into another line.

13         Q.    Okay.  And do you see the total

14    asset base as of December 31st, 2018, was

15    approximately $1.04 billion?

16         A.    Yes.

17         Q.    Is my math correct that the Notes

18    and Other Amounts Due from Affiliates

19    constituted approximately 17 percent of

20    Highland's assets as of the end of 2018?

21         A.    Well, so how are you defining

22    Highland?

23         Q.    Highland Capital Management, L.P.,

24    the entity that this audit is subject to -- or

25    the subject of.

1           WATERHOUSE - 10-19-21

2      A.    On a consolidated or unconsolidated

3  basis?

4      Q.    I'm looking at the balance sheet.

5  It is a consolidated balance sheet.  Okay?

6           Does the Notes and Other Amounts Due

7  from Affiliates constitute approximately

8  17 percent of the total assets of Highland

9  Capital Management, L.P., on a consolidated

10  basis?

11           MS. DANDENEAU:  Objection to form.

12      A.    I don't have a calculator in front

13  of me but I will take your math, if you are

14  taking the 173 divided by the billion.

15      Q.    Okay.

16      A.    If that is accurate, yes.  But,

17  again, on a consolidated basis.

18      Q.    And on an unconsolidated basis the

19  percentage would be higher; correct?

20      A.    I -- no.  I don't know.

21      Q.    Well, okay.  That is fair.

22           MR. MORRIS:  Can we turn to

23      page 241, please.

24      Q.    Do you see that this is a section of

25  the audit report that is entitled Notes and

1              WATERHOUSE - 10-19-21

2    Other Amounts Due from Affiliates?

3         A.    Sorry, I can't see the -- the --

4         Q.    It is at the top.

5         A.    Notes and Other Amounts Due from

6    Affiliates, yes, I see that.  I don't -- I

7    don't have a page number, but I'm on a page

8    that says at the top:  Notes and Other Amounts

9    Due from Affiliates.

10        Q.    Okay.  And that is the same title of

11   the line item on the balance sheet that we just

12   looked at; right?  Notes and Other Amounts Due

13   from Affiliates?

14        A.    Yes.

15        Q.    And is it your understanding, based

16   on your experience and knowledge as the CFO,

17   that this is the section of the narrative that

18   ties into the line item that we just looked at?

19        A.    Yes.

20        Q.    And is this section of the audit

21   report intended to describe and disclose all of

22   the material facts concerning the Notes and

23   Other Amounts Due from Affiliates?

24              MS. DANDENEAU:  Objection, form.

25        A.    This -- these notes -- these notes

1          WATERHOUSE - 10-19-21

2   of the financial statements are -- the purpose

3   is to disclose any material items in relation

4   to that balance sheet line item.

5       Q.    Okay.  And all of the information,

6   to the best of your knowledge, that is set

7   forth in this section of the audit report was

8   provided by Highland; correct?

9       A.    Yes, it would have been provided by

10  the corporate accounting team.

11      Q.    Okay.  And the corporate accounting

12  team, did that team report to you in the

13  organizational structure?

14      A.    Yes.

15      Q.    And did you have any concerns about

16  the controls that were in place to make sure

17  that the information provided with respect to

18  Notes and Other Amounts Due from Affiliates was

19  accurate and complete?

20          MS. DANDENEAU:  Objection to form.

21      A.    Not that I recall.

22      Q.    Okay.  Do you recall ever being

23  concerned that any portion of the Notes and

24  Other Amounts Due from Affiliates in any audit

25  report was inaccurate, incomplete, or not

1          WATERHOUSE - 10-19-21

2   reliable?

3       A.    I didn't -- I had concerns about,

4   you know, like I talked about before, of there

5   were -- there were potentially issues in the

6   control environment.  But as far as it relates

7   to the audited financial statements, any -- the

8   team would work with the auditors to disclose

9   all -- all notes in Highland's possession.

10          And any -- any notes that were

11  deemed material by the auditor, right, these

12  were disclosed in these -- in this section, you

13  know, in -- in the notes to the consolidated

14  financial statements as you presented.

15      Q.    Do you recall ever having a

16  conversation with anybody at any time

17  concerning the accuracy of the section of audit

18  reports that relates to Notes and Other Amounts

19  Due from Affiliates?

20          MS. DANDENEAU:  Objection to form.

21      A.    You know, as -- as -- I didn't have

22  direct conversations with

23  PricewaterhouseCoopers as I had, you know --

24  I -- I had the team that managed this.

25          Again, I wasn't anywhere chose to

1          WATERHOUSE - 10-19-21

2     being the point person of this audit.  And I

3     can't recall, you know, when -- you know, I

4     don't even know if I was ever the point person

5     during my tenure as CFO.

6          I don't know if PwC had any concerns

7     when they were performing those audit

8     procedures.  They may have and they may have --

9     and it may not have been communicated to me.  I

10    don't know.

11          MR. MORRIS:  All right.  I move to

12      strike.

13    Q.   And I'm going to ask you to listen

14    carefully to my question.

15          Did you -- do you recall ever having

16    a conversation with anybody at any time

17    concerning the accuracy of the reporting

18    provided in the audited financial statement on

19    the topic of Notes and Other Amounts Due?

20          MS. DANDENEAU:  Objection to form.

21    A.   I don't recall for this, but that

22    doesn't mean that it didn't exist.

23    Q.   Okay.  But you have no reason to

24    believe, as you sit here right now, that you

25    ever discussed with anybody concerns over the

1          WATERHOUSE - 10-19-21

2    accuracy of the section of the audit reports

3    called Notes and Other Amounts Due from

4    Affiliates; correct?

5              MS. DANDENEAU:  Object to the form.

6              MS. DEITSCH-PEREZ:  Objection to

7         form.

8         A.    I don't recall having any

9    conversations.  But, again, I mean, this is --

10   this is two years ago.

11        Q.    I'm just asking for your

12   recollection, sir.

13        A.    Yes.

14        Q.    If you don't recall, this will --

15        A.    Yeah.

16        Q.    (Overspeak) -- if you don't

17   recall --

18        A.    Yeah, I don't -- I don't recall.

19        Q.    Do you know who was responsible for

20   drafting the audit report?

21        A.    Are you asking the actual Highland

22   employee responsible?  I mean, it was

23   Highland's responsibility, so, I mean, that

24   is --

25        Q.    Right.

1              WATERHOUSE - 10-19-21

2         A.     -- Highland's responsibility.

3    Highland's responsibility.

4         Q.     Who, at Highland, was responsible

5    for drafting this section of the audit report?

6         A.     I -- I don't know the answer to

7    that.  Again, there was a team who worked on

8    this.  And I don't know, you know, whether it

9    was the staff or the manager.

10              Again, this is where I let the teams

11   manage.  And, you know, there may be a

12   corporate accountant who worked on this.  I

13   just -- you know, I wasn't part of that process

14   to give that person experience.  I don't know.

15        Q.     Do you recall having any

16   communications with anybody at any time

17   concerning this section of the report?

18        A.     Yeah, I don't recall.

19        Q.     Do you recall whether you ever told

20   anybody at any time that any aspect of this

21   section of the report was inaccurate or

22   incomplete?

23        A.     I don't recall.

24        Q.     As you sit here today, do you have

25   any reason to believe that this section of the

1              WATERHOUSE - 10-19-21

2    audit report is incomplete or inaccurate in any

3    way?

4              And I'm happy to give you a moment

5    to -- to look at it, if you would like.

6              MS. DANDENEAU:  Objection to form.

7              MS. DEITSCH-PEREZ:  Same.

8         A.   I mean, I would have to look at -- I

9    would have to look at the bill to the note

10   schedule to make sure I know you presented me

11   with materiality, but again, there might be a

12   note as of 12/31/18 that somehow was -- was

13   under materiality not disclosed.  I don't -- I

14   don't know.  I would need more information.

15        Q.   Okay.  But without more information,

16   you have no reason to believe anything this

17   section is inaccurate; correct?

18             MS. DANDENEAU:  Objection to form.

19        A.   I don't.  I mean, you know, this was

20   part of the audit.

21        Q.   Thank you.  Now, you will see if we

22   could scroll just a little bit more that each

23   of the first five paragraphs concerns

24   specifically the four affiliates that we've

25   been discussing and Mr. Dondero.

1          WATERHOUSE - 10-19-21

2          MR. MORRIS:  If we could go the

3     other way, La Asia.  We don't need Okada.

4     We're going to have to thread the needle.

5     Okay.  Good, perfect.

6     Q.    Do you see those five paragraphs

7  certain the four affiliates and Mr. Dondero as

8  we've been referring to today?

9     A.    Yes.

10     Q.    Okay.  And do you see at the end of

11  every paragraph it states, quote:  A fair value

12  of a partnership's outstanding notes receivable

13  approximates the carrying value of the notes

14  receivable?

15     A.    Yes, I see that.

16     Q.    Do you have an understanding of what

17  that means?

18     A.    Yes.

19     Q.    What is your understanding of that

20  sentence?

21     A.    It is the -- again, the -- the fair

22  value, right, which is -- which is what the --

23  what Highland could sell that asset for.  This

24  statement is comparing the fair value of the

25  notes to the carrying value, so the carrying

```
 1              WATERHOUSE - 10-19-21
 2    value is the line item that you showed me
 3    earlier that is in Notes and Other Amounts Due
 4    from Affiliates.
 5         Q.    Okay.  Is another way to say this is
 6    that the fair market value of the notes equals
 7    the principal amount and -- withdrawn.
 8              Is the fair way to interpret this
 9    that the fair market value of the notes equals
10    all remaining unpaid principal and interest due
11    under the notes?
12              MS. DANDENEAU:  Object to the form.
13              MS. DEITSCH-PEREZ:  Objection, form.
14         A.    I don't know the answer to that,
15    because I don't recall where -- where any --
16    where -- in what line item was the interest
17    component reported.
18         Q.    All right.  Well, if we look in this
19    audit report, you will see in the middle of the
20    first paragraph, for example, it states that as
21    of December 31st, 2018, total interest and
22    principal due on outstanding promissory notes
23    was approximately $5.3 million.
24              Do you see that?
25         A.    I do.
```

1                   WATERHOUSE - 10-19-21

2      Q.    Is that the carrying value or the

3  fair value?

4      A.    That would be the carrying value --

5      Q.    And is the last --

6      A.    -- in my opinion.

7      Q.    Okay.  And it is in your opinion as

8  the chief financial officer of Highland during

9  the period of time that you described; right?

10  It is an educated opinion?

11      A.    I'm reading this at face value.  I'm

12  taking that as that is carrying value.

13      Q.    Okay.  And does the last sentence

14  say that the carrying value is roughly

15  approximate to the fair market value?

16           MS. DANDENEAU:  Objection to form.

17           MS. DEITSCH-PEREZ:  Objection, form.

18      A.    Again, this note to the financial

19  statement is specific to notes and other

20  amounts due from affiliates.

21      Q.    Correct.

22      A.    If the interest component is

23  reported elsewhere on the balance sheet, you

24  know, it -- it -- it could be off.  Again, I

25  don't have the detail.  I don't know, but yes,

1              WATERHOUSE - 10-19-21

2   look, I mean, if you -- I mean, if you are

3   saying the 5.3 million is in the notes and

4   other amounts due from affiliates, then the

5   last statement is saying the fair value

6   approximates 5.3 million.  That is what that

7   last sentence is saying.

8        Q.    Do you see in the middle of the

9   first paragraph -- not in the middle, the next

10  to last sentence there is a statement that the

11  partnership will not demand payment on amounts

12  that exceed HCMFA's excess cash availability

13  prior to May 31st, 2021.

14             Do you see that?

15       A.    I do.

16       Q.    Do you know when Highland agreed not

17  to demand payment as described in that

18  sentence?

19       A.    I don't know specifically.

20       Q.    Do you know why Highland agreed not

21  to demand payment on HCMFA's notes until May

22  2021?

23       A.    Yes.

24       Q.    Why was that decision made?

25       A.    You know, well, it -- it -- that

1             WATERHOUSE - 10-19-21

2    decision was made as to not put HCMFA into a

3    position where it didn't have sufficient assets

4    to pay for the demand note.

5         Q.    And at the time the agreement was

6    entered into, pursuant to which the partnership

7    wouldn't demand payment, did HCMFA have

8    insufficient assets to satisfy the notes if a

9    demand had been made?

10             MS. DANDENEAU:  Objection to form.

11        A.    I don't have HCMFA's financial

12   statements in front of me as of 12/31/18.

13        Q.    Was there a concern that HCMFA would

14   be unable to satisfy its demands under the

15   notes if demand was made?

16             MS. DANDENEAU:  Objection to form.

17        A.    Well, there is -- I don't recall --

18   I mean, there is something, right, in place to

19   basically not demand payment until May 31, 2021

20   as detailed here.

21        Q.    And who made the decision to enter

22   into -- who made the decision on behalf of

23   Highland not to demand payment until May 31st,

24   2021?

25        A.    I'm trying to remember.  I don't

1          WATERHOUSE - 10-19-21

2   remember exactly -- I don't remember if it was

3   myself or -- or Jim Dondero who -- who -- there

4   was -- there was something signed, from what I

5   recall, that -- that -- that backed up this

6   line item in the -- in the notes I'm -- look,

7   I'm, I'm --

8          Q.    We will get to that.

9          A.    You --

10         Q.    I'm just --

11         A.    You have -- I mean --

12         Q.    We're going to give that to you.

13  I'm going to give that to you.

14         A.    You -- you -- you have all the

15  documents.  I don't have the documents, and

16  that is what makes it so hard.  I don't have

17  any documents to prepare for this deposition;

18  right?  You have all -- I don't -- I don't -- I

19  don't remember, but, you know, again, it would

20  probably be myself or Jim.

21         Q.    Do you know if Highland received

22  anything in return for its agreement not to

23  make a demand for two years?

24         A.    I don't -- I don't think it referred

25  anything.

1          WATERHOUSE - 10-19-21

2     Q.    And did you and Mr. Dondero discuss

3  HCMFA's ability to satisfy the notes if a

4  demand was made at the time this agreement was

5  entered into?

6          MS. DANDENEAU:  Objection to form.

7     A.    I don't -- I don't -- I don't recall

8  having a specific conversation, if I did, or --

9  or David Klos.

10    Q.    Okay.  I'm just asking if you recall

11 any conversations that you had.

12    A.    I don't recall.

13    Q.    Okay.  Do you know why Highland

14 loaned the money to HCMFA that is the subject

15 of the notes described in this paragraph?

16    A.    I don't remember specifically why

17 5.3 million was loaned.  I mean, I -- it would

18 have to be put in the context.

19    Q.    Do you have any recollection at all

20 as to why Highland ever loaned any money to

21 HCMFA?

22    A.    Yes.

23          MS. DANDENEAU:  Objection to form.

24    Q.    What do you remember about that?

25    A.    There was a Highland Global

1          WATERHOUSE - 10-19-21

2   Allocation Fund, which was a -- a fund managed

3   by Highland Capital Management Fund Advisors.

4   There was a -- we -- I'm just telling you,

5   there was -- there was -- there was a -- a

6   ultimately a NAV error found in this fund while

7   it was an open-ended fund and, you know, there

8   were amounts owed by the advisor in -- in

9   relation to that NAV error.

10          There were also, for the same fund,

11  that same fund was ongoing an

12  open-end-to-close-end conversion, and as part

13  of that proposal, shareholders who voted for

14  the conversion received compensation from the

15  advisor.

16      Q.    All right.  Now, the events that

17  you're describing occurred in the spring of

18  2019; right?

19      A.    These started back -- I think, I

20  mean --

21      Q.    I apologize.

22      A.    -- that -- I mean, the answer to

23  that is no.

24      Q.    I apologize, the loans that were

25  made in connection with the events that you're

1          WATERHOUSE - 10-19-21

2    describing occurred in May 2019; right?

3              MR. RUKAVINA:  Objection to the

4         extent that calls for a legal conclusion.

5         A.    I don't recall specifically what

6    amounts of money were moved when, for what

7    purpose.

8         Q.    Okay.  Fair enough.  Going to the

9    next paragraph, do you recall that NexPoint

10   Advisors had obtained a number of loans from

11   Highland, and they rolled up those loans into

12   one note in approximately 2017?

13        A.    This is for NexPoint Advisors?

14        Q.    Yes.

15        A.    I -- I mean, I don't -- I don't

16   recall the NexPoint Advisors loan being a

17   roll-up loan, but --

18        Q.    Do you know why?

19        A.    But, look, if you have documents

20   that show -- I mean, look, I just don't recall.

21        Q.    Okay.  That is fair.  Do you know

22   why -- do you have any recollection as to why

23   Highland loaned money to NexPoint?

24        A.    Yes.

25        Q.    Why did High -- why do you recall --

1          WATERHOUSE - 10-19-21

2  what is the reason you recall Highland lending

3  money to NexPoint?

4      A.    I mean, I was just -- I just -- I

5  just recall.  I mean, I just -- I don't

6  remember why.

7      Q.    I understand.  And I'm asking you if

8  you recall --

9      A.    Oh, why -- I thought you say --

10  NexPoint Advisors was launching a fund which

11  is -- I believe that the legal name is NexPoint

12  Capital, Inc.  And it -- it provided a

13  co-invest into that fund.

14              And, from what I remember, the --

15  the -- that NexPoint borrowed money from

16  Highland at the time to make that co-invest.

17      Q.    So this was an investment that

18  NexPoint was required to make; is that right?

19              MS. DANDENEAU:  Objection to form.

20      A.    I don't know if it was required to

21  make, I don't recall that, or if it just made

22  it.

23      Q.    Okay.  But your recollection is that

24  NexPoint made an investment and they borrowed

25  money from Highland to finance the investment.

1              WATERHOUSE - 10-19-21

2              Do I have that right?

3        A.    Yes.

4        Q.    How about HCRE?  Do you know why

5   HCRE borrowed money from Highland?

6        A.    I don't remember specifically.

7        Q.    Do you remember generally?

8        A.    Generally, yeah -- I mean, yes.

9        Q.    Can you tell me your general

10  recollection as to why Highland loaned money to

11  HCRE?

12       A.    For -- for -- for investment

13  purposes.

14       Q.    So HCRE made the investment and it

15  obtained a loan, or loans, from Highland in

16  order to finance that investment or those

17  investments.

18             Do I have that right?

19       A.    I mean, I -- you know, generally.

20       Q.    Okay.  How about Highland Management

21  Services, Inc.?

22             Do you have any recollection as to

23  why HCMS borrowed money from Highland?

24       A.    Generally.

25       Q.    What is your general recollection as

1               WATERHOUSE - 10-19-21

2   to why HCMS borrowed money from Highland?

3       A.    For -- for investment purposes.

4       Q.    So it is the same thing, HCMS wanted

5   to make investments and it borrowed money from

6   Highland in order to finance those investments;

7   is that right?

8       A.    I mean, yes, generally.  I mean, I

9   can't -- I don't -- on the services, there --

10  there are several loans in these schedules.

11  You know, I can't remember why every single one

12  of these were made, but I would say, yeah, I

13  mean, generally.

14      Q.    Okay.  I appreciate that.

15          MR. MORRIS:  Let's go to the page

16       with Bates No. 251.  La Asia, are you

17       there?

18          MS. CANTY:  Sorry, John.  It went

19       out for a minute.  Can you say that again.

20       I don't know what is going on.

21          MR. MORRIS:  The page with Bates

22       No. 251, can we go to that.

23          MS. CANTY:  Yes, sorry.

24          MR. MORRIS:  Keep going to the

25       bottom.  Yeah, there you go.

1           WATERHOUSE - 10-19-21

2      Q.    Do you see, Mr. Waterhouse, that

3   there is a section there called Subsequent

4   Events?

5      A.    I do.

6      Q.    And does this relate to the last

7   sentence above the signature line on the

8   management representation letter that we talked

9   about earlier where you made the representation

10  that you disclosed subsequent events?

11     A.    I mean, it relates to it, but not in

12  its entirety.

13     Q.    Okay.

14          MR. MORRIS:  If we can scroll up to

15       capture the entirety of this section right

16       here.

17     Q.    And what do you mean by that, sir?

18          MR. MORRIS:  Yeah, right there.

19       Perfect.

20     A.    There are -- there are different

21  subsequent events in -- under GAAP.  So there

22  are -- and -- and -- so what we see in the

23  notes to the financial statements are one type

24  of subevent.

25     Q.    Okay.  And -- and would the type of

1          WATERHOUSE - 10-19-21

2    subsequent event relating to affiliate loans be

3    captured in this section if they were -- if

4    they were made after the end of the fiscal year

5    and prior to the issuance of the audit report?

6         A.    Yes, if they were deemed material or

7    disclosable.

8         Q.    Okay.  I appreciate that.

9              Do you see the next to the last

10   entry there?  It says, Over the course of 2019

11   through the report date, HCMFA issued

12   promissory notes to the partnership in the

13   aggregate amount of $7.4 million?

14        A.    Yes.

15        Q.    And does that refresh your

16   recollection that those are the notes that

17   related to the NAV error that you mentioned

18   earlier?

19        A.    I don't -- I don't remember the

20   exact.  Again, there are -- I mentioned two

21   line items; right?

22        Q.    Yes.

23        A.    I mean, it was the GAAP conversion

24   process plus the -- the NAV error.  I don't

25   have the details.  I don't recall specifically

```
1                    WATERHOUSE - 10-19-21

2    if -- you know, what -- if that 7.4 million was

3    solely attributable to the NAV error.

4        Q.    Okay.  But there is no question that

5    Highland told PricewaterhouseCoopers that over

6    the course of 2019 HCMFA issued promissory

7    notes to the partnership in the aggregate

8    amount of $7.4 million; correct?

9        A.    In the course of the audit, we would

10   have produced all promissory notes in our

11   possession, including the ones that are

12   detailed here.

13       Q.    Do you recall that you signed the

14   two promissory notes that are referenced in

15   that provision?

16             MS. DANDENEAU:  Objection to form.

17       A.    I didn't recall initially but I've

18   been reminded.

19       Q.    Okay.  And -- and do you recall that

20   those notes are dated May 2nd and May 3rd,

21   2019?

22       A.    Yes.

23       Q.    So that was just a month before the

24   audit was completed; correct?

25       A.    Yes.  I think we had a June 3rd
```

1                    WATERHOUSE - 10-19-21

2      date, right, if -- if my memory serves me

3      right.

4           Q.    Yes, I will represent to you that

5      your memory is accurate in that regard.

6                 Did anybody ever instruct you as the

7      CFO to correct this statement that we're

8      looking at in subsequent events?

9           A.    So let me understand.  You're saying

10     when I was CFO at Highland Capital did anyone

11     ever ask me to correct the -- over the course

12     of 2019 through the report date HCMFA issued

13     promissory notes, this statement?

14          Q.    Right.

15          A.    Not that I'm aware.

16          Q.    While you were the CFO of Highland,

17     did anybody ever tell you that that sentence

18     was wrong?

19          A.    Not that I'm aware.

20          Q.    Highland -- withdrawn.

21                HCMFA disclosed these notes in its

22     own audited financial statements; right?

23                MR. RUKAVINA:  Objection, form.

24          A.    I assume that these would be

25     material -- if these are material financial

```
1              WATERHOUSE - 10-19-21

2   statements, yes, they -- they -- they should be

3   and they were likely disclosed.

4        Q.    Now, there is no statement

5   concerning the 2019 notes about the forbearance

6   that we looked at in the affiliated note

7   section of the report; right?

8              MS. DANDENEAU:  Objection to form.

9        Q.    I'll withdraw.  That was bad.

10             Do you recall when we were looking

11  at the paragraph concerning HCMFA earlier it

12  had that disclosure about the agreement whereby

13  Highland wouldn't ask for demand on the -- on

14  the HCMFA notes?

15       A.    Yes.

16       Q.    That forbearance disclosure is not

17  made with respect to the 2019 notes; right?

18       A.    Not -- look, not that I can recall,

19  unless -- unless it was done at a subsequent

20  day.

21       Q.    Right.  And it is not in the

22  subsequent event section that we're looking at

23  right now where the 2019 notes are described;

24  right?

25       A.    Right.  But this is through
```

1                    WATERHOUSE - 10-19-21

2    June 3rd.  It could have been done on June 4th.

3    I don't -- I don't -- I don't recall.

4         Q.    Okay.

5              MR. MORRIS:  Can we put up on the

6         screen the HCMFA audit report.  And while

7         we're --

8              MS. DANDENEAU:  What exhibit is

9         this?

10              MR. MORRIS:  La Asia, what number is

11         that?

12              MS. CANTY:  45.

13              MR. MORRIS:  So this will be marked

14         as Exhibit 45.

15              (Exhibit 45 marked.)

16              MS. CANTY:  Yeah, and I will put it

17         in the chat.

18              MS. DANDENEAU:  Thank you.

19         Q.    Okay.  All right.  Do you see that

20    this is the consolidated financial statements

21    for HCMFA for the period ending 12/31/18?

22         A.    Yes.

23         Q.    As the treasurer of HCMFA at the

24    time, did you have to sign a management

25    representation letter similar to the one that

```
1                    WATERHOUSE - 10-19-21

2    we looked at earlier for Highland?

3         A.    I would imagine I would have been

4    asked to.  I don't recall if I did.

5         Q.    Do you recall ever being asked by an

6    auditor to sign a management representation

7    letter and then not doing it?

8         A.    No.

9              MR. MORRIS:  Can we just scroll down

10        again.  I just want to see the date of the

11        document.

12        A.    I mean, let me -- you know, there

13   are different versions to management

14   representation letters I will qualify.

15             Yes, there are certain -- from time

16   to time auditors can make representations

17   that -- in the rep letter that is being

18   proposed that are inaccurate or out of scope or

19   things like that and they've asked for

20   signature.

21             In that context, yes.  I mean, you

22   know -- I mean, if I have been asked to sign

23   and make those representations and those

24   representations are invalid, yes, I would not,

25   I mean, I -- I wouldn't sign that.
```

1          WATERHOUSE - 10-19-21

2      Q.    Okay.  PricewaterhouseCoopers served

3  as HCMFA's outside auditors as well; correct?

4      A.    Yes.

5      Q.    Do you see that this audit report is

6  signed on June 3rd, 2019, just like the

7  Highland audit report?

8      A.    That is correct.

9      Q.    And did the process of -- of

10 preparing HCMFA's audit report, was that the

11 same process that Highland followed when it did

12 its audit report at this time?

13     A.    I mean, it is a different entity.

14 There are different assets.  You know, it --

15 it -- it is -- as you saw, Highland's

16 financials are on a consolidated basis.  This

17 is different, so it is under the same control

18 environment and team.

19     Q.    Okay.  I appreciate that.  So the

20 same control environment and team participated

21 in the preparation of the audit for Highland

22 and for HCMFA at around the same time; correct?

23     A.    Yes.

24           MR. MORRIS:  Can we go to page 17 of

25     the report.  I don't have the Bates number.

1          WATERHOUSE - 10-19-21

2      Q.    Okay.  Do you see that just like

3  Highland's audited financial report, HCMFA's

4  audited financial report also has a section

5  related to subsequent events?

6      A.    Yes.

7      Q.    And am I reading this correctly that

8  just as Highland had done, HCMFA disclosed in

9  its audited financial report a subsequent event

10  that related to the issuance of promissory

11  notes to Highland in the aggregate amount of

12  $7.4 million in 2019?

13      A.    That is what I see in the report.

14      Q.    And you were the treasurer of HCMFA

15  at the time; right?

16      A.    Yes, to the best of my knowledge.

17      Q.    And did anybody ever tell you prior

18  to the time of the issuance of this audit

19  report that that sentence relating to HCMFA's

20  2019 notes was inaccurate or wrong in any way?

21      A.    Not that I recall.

22      Q.    As you sit here right now, has

23  anybody ever told you that that sentence is

24  inaccurate or wrong in any way?

25      A.    Not that I recall.

1          WATERHOUSE - 10-19-21

2     Q.    I apologize if I asked you this

3  already, but has anybody ever told you at any

4  time that you are not authorized to sign the

5  promissory notes that are the subject of the

6  sentence we're looking at?

7     A.    Not that I recall.

8     Q.    Did anybody ever tell you at any

9  time that you had made a mistake when you

10  signed the promissory notes that are the

11  subject of this sentence?

12     A.    Say that again.  Did anyone ever say

13  that I made a mistake?

14     Q.    Let me ask the question again.

15          Did anybody ever tell you at any

16  time that you made a mistake when you signed

17  the two promissory notes in Highland's favor on

18  behalf of HCMFA in 2019?

19     A.    Not that I recall.

20          MR. MORRIS:  Let's just look at the

21          promissory notes quickly.  Can we please

22          put up Document Number 1, and so this is in

23          the pile that y'all have.  We'll just go

24          for a few more minutes and we can take our

25          lunch break.

1          WATERHOUSE - 10-19-21

2     Q.    All right.  So I don't know if you

3   have seen this before, sir.  Do you see that

4   this is a complaint against HCMFA?

5     A.    Yes, I am looking at it on the

6   screen.

7     Q.    Okay.  And have you ever seen this

8   document before?

9     A.    I went through some of these

10  documents with my counsel here yesterday.

11          MR. MORRIS:  All right.  Can we go

12          to Exhibit 1 of this document.

13     Q.    Do you see Exhibit 1 is a

14  $2.4 million promissory note back in 2019?

15     A.    Yeah, I found it in the book.  Yes,

16  I have it here in front of me.

17     Q.    And this is a demand note, right, if

18  you look at Paragraph 2?

19     A.    Yes.

20     Q.    And this is a note where the maker

21  is HCMFA, and Highland is the payee; right?

22     A.    Yes.

23          MR. MORRIS:  And if we can scroll

24          down, can we just see Mr. Waterhouse's

25          signature.

1          WATERHOUSE - 10-19-21

2     Q.    Is that your signature, sir?

3     A.    Yes, it is.

4     Q.    And did you sign this document on or

5  around May 2nd, 2019?

6     A.    I don't recall specifically signing

7  this, but this is my signature.

8     Q.    Okay.  And do you recall that

9  Highland transferred $2.4 million to HCMFA at

10  or around the time you signed this document?

11    A.    I don't recall specifically.  I

12  would want to, as I sit here today, go back and

13  confirm that, but again, presumably that --

14  that -- that did happen.

15    Q.    You wouldn't have signed this

16  document if you didn't believe that HCMFA

17  either received or was going to receive

18  $2.4 million from Highland; is that fair?

19    A.    I mean, it -- if -- if -- if there

20  wasn't a transfer of value, yeah, I mean, you

21  know, I would have no reason to -- to sign a

22  note.

23    Q.    And -- and Highland wouldn't have

24  given this note to PricewaterhouseCoopers if --

25  withdrawn.

1          WATERHOUSE - 10-19-21

2          HCMFA wouldn't have given this note

3    to PricewaterhouseCoopers if it hadn't received

4    the principal value of -- of the note in the

5    form of a loan; correct?

6          MR. RUKAVINA:  Objection, legal

7       conclusion, speculation and form.

8       A.    Again, we -- what we provided to PwC

9    were, as part of the audit, any promissory

10   notes executed and outstanding.  You know, as a

11   part of the audit, they, you know, they -- they

12   have copies of all the bank statements,

13   things -- things of that sort.

14          MR. MORRIS:  Okay.  Can we go to

15       Exhibit 2.

16          (Exhibit 2 marked.)

17       Q.    Do you see that this is a promissory

18   note dated May 3rd, 2019 in the amount of

19   $5 million?

20       A.    Yes.

21       Q.    Do you believe this is also a demand

22   note if you look at Paragraph 2?

23       A.    Yes.

24       Q.    And do you see that HCMFA is the

25   maker, and Highland is the payee?

```
1              WATERHOUSE - 10-19-21

2        A.    Yes.

3        Q.    And if we go to the bottom, can we

4   just confirm that that is your signature?

5        A.    Yes.

6        Q.    And together these notes are the

7   notes that are referred to both in Highland and

8   HCMFA's audited financial reports in the

9   subsequent event sections; correct?

10            MS. DANDENEAU:  Objection to form.

11       A.    They -- they -- they totaled

12  $7.4 million, so presumably, yes.

13       Q.    Okay.  And you were authorized to

14  sign these two notes; correct?

15            MR. RUKAVINA:  Objection, legal

16       conclusion.

17       A.    Yeah.  I mean, I'm -- I was the

18  officer of -- of HCMFA.  You know, I -- I'm not

19  the legal expert on -- on what that -- what

20  that confers to me or what it doesn't.  I mean,

21  that is my signature on the notes.

22       Q.    And you believed you were authorized

23  to sign the notes; is that fair?

24       A.    I signed a lot of documents in my

25  capacity, just because it is operational in
```

1          WATERHOUSE - 10-19-21

2   nature.  So, you know, to me this was just

3   another document, to be perfectly honest.

4       Q.    Sir, would you have signed

5   promissory notes with the principal amount of

6   $7.4 million if you didn't believe you were

7   authorized to do so?

8              MS. DANDENEAU:  Objection to form.

9       Q.    Are you frozen?

10      A.    No.  I'm just -- you know, it is --

11  you know, again, I typically don't sign

12  promissory notes, and I don't recall why I

13  signed these, but -- you know, but I did.

14      Q.    All right.  So listen carefully to

15  my question.  Would you have ever signed

16  promissory notes with a face amount of

17  $7.4 million without believing that you were

18  authorized to do so?

19      A.    No.  I mean, I'm -- I'm putting my

20  signature on there, so no.

21      Q.    Okay.  And would you have signed two

22  promissory notes obligating HCMFA to pay

23  Highland $7.4 million without Mr. Dondero's

24  prior knowledge and approval?

25              MS. DEITSCH-PEREZ:  Object to the

1                    WATERHOUSE - 10-19-21

2      form.

3         A.    You know, from -- from what I recall

4      around these notes, you know, I don't recall

5      specifically Mr. -- Mr. Dondero saying to -- to

6      make this a loan.

7             So my conversation with Mr. Dondero

8      around the culmination of the NAV error as

9      related to TerreStar which was a -- a -- I

10     think it was a year and a half process.  I

11     don't know, it was a multi-month process, very

12     laborious, very difficult.

13            When we got to the end, I had a

14     conversation with Mr. Dondero on where to, you

15     know, basically get the funds to reimburse the

16     fund, and I recall him saying, get the money

17     from Highland.

18        Q.    And so he told you to get the money

19     from Highland; is that right?

20        A.    That is what I recall -- in my

21     conversation with him, that is -- that is what

22     I can recall.

23        Q.    Do you know who drafted these notes?

24        A.    I don't.

25        Q.    Did you ask somebody to draft the

1          WATERHOUSE - 10-19-21

2    notes?

3          A.    I didn't ask -- I don't specifically

4    ask people to draft notes really.  I mean,

5    again, you know, the legal group at Highland is

6    responsible and has always been responsible for

7    drafting promissory notes.

8          Q.    So based on your -- based on the

9    practice, you believe that somebody from the

10   Highland's legal department would have drafted

11   these notes.  Do I have that right?

12              MS. DEITSCH-PEREZ:  Object to the

13         form.  John, I also asked you for the Word

14         versions of these notes so we could look at

15         the properties, and you have not provided

16         them.  Are you intending to?

17              MR. MORRIS:  No.

18         Q.    Can you answer my question, sir?

19         A.    Again, I --

20              MS. DANDENEAU:  Do you want him to

21         repeat it?

22         A.    Yeah, why don't you repeat it?

23         Q.    Sure.  Mr. Waterhouse, based on the

24   practice that you have described in your

25   understanding, do you believe that these notes

1           WATERHOUSE - 10-19-21

2    would have been drafted by somebody in the

3    legal department?

4           MS. DEITSCH-PEREZ:  Object to the

5       form.

6       A.    Yes.

7       Q.    Okay.  And do you know who would

8    have instructed -- do you have any knowledge as

9    to who would have instructed the legal

10   department to draft these notes?

11          MS. DEITSCH-PEREZ:  Object to the

12      form.

13      A.    It was whoever was working -- I

14   mean, it was likely someone on the team.  I

15   mean, I don't remember exactly on every note or

16   every document, but, again, a lot of these

17   things of this nature -- they're operational in

18   nature -- were handled by the team.

19          The team knows to -- I mean, we

20   don't draft documents.  We're not lawyers.

21   We're not attorneys.  It is not what I do or

22   accountants do.

23          So they are always instructed to go

24   and -- and go to the legal team to get

25   documents like this drafted.  Also, when you go

1              WATERHOUSE - 10-19-21

2     to the legal team, the -- you know, we always

3     loop in compliance.  And compliance -- when you

4     go to the legal team, compliance is part of

5     legal team.  They're made aware of -- of -- of

6     these types of transactions.

7          Q.    And do you believe that you had

8     the -- withdrawn.

9              Did you ever tell Mr. Dondero --

10    (inaudible) -- did you see those?

11         A.    Sorry.

12             MS. DEITSCH-PEREZ:  I did not hear

13         the end of that question.

14         Q.    Did you ever tell Mr. Dondero that

15    you signed these two notes?

16         A.    I don't recall ever -- no, I don't

17    recall having a conversation with him.

18         Q.    Did you ever discuss these two notes

19    with him at any time?

20         A.    The conversation, I recall, was what

21    I described earlier.  And that is the only time

22    I recall ever discussing this.

23         Q.    Okay.  But the corporate accounting

24    group had a copy of this -- of these two notes.

25    And pursuant to the audit process, the

1            WATERHOUSE - 10-19-21

2    corporate accounting group gave the two notes

3    to PricewaterhouseCoopers in connection with

4    the audit; correct?

5            MS. DANDENEAU:  Objection to form.

6        A.    Yes.  I mean, that is -- yeah, I

7    mean, they -- unless the legal team can also

8    retain copies of items like this.  I mean, I

9    don't know everything that they would retain as

10   well.

11           The legal team would also, if they

12   had documents as part of audits, turn that over

13   to the auditors as well.  So it could have been

14   the corporate accounting team.  It could be

15   someone on the legal team.

16       Q.    All right.  So you didn't -- you

17   didn't draft this note; right?

18       A.    I -- I -- I did not.

19       Q.    But somebody at Highland did; is

20   that fair?

21           MS. DEITSCH-PEREZ:  Object to the

22       form.

23       A.    I don't know.  I mean, we can go to

24   the legal team.  I don't -- I'm not sitting

25   behind someone in legal.  Maybe they went to

1              WATERHOUSE - 10-19-21

2    outside counsel.  I have no idea.

3        Q.    Did you have any reason to believe

4    you weren't authorized to sign this note,

5    either of these two notes?

6        A.    I think I have already answered that

7    question.

8        Q.    Okay.  You didn't give these notes

9    to PricewaterhouseCoopers; correct?

10              MS. DANDENEAU:  Objection to form.

11       A.    I don't recall giving these to

12   PricewaterhouseCoopers.

13       Q.    And in the practice that you have

14   described, somebody in the corporate accounting

15   group would have given these two notes to

16   PricewaterhouseCoopers; correct?

17              MS. DANDENEAU:  Objection to form.

18       A.    I think I've answered that.  I said

19   either the corporate accounting team or maybe

20   the legal team.

21              MR. MORRIS:  Okay.  Why don't we

22        take our lunch break here.

23              VIDEOGRAPHER:  We're going off the

24        record at 1:04 p.m.

25        (Recess taken 1:04 p.m. to 1:49 p.m.)

1              WATERHOUSE - 10-19-21

2              VIDEOGRAPHER:  We are back on the

3      record at 1:49 p.m.

4      Q.    Mr. Waterhouse, did you speak with

5  anybody during the break about the substance of

6  this deposition?

7      A.    I spoke to -- to Deb and Michelle.

8      Q.    About the substance of the

9  deposition?

10     A.    Yes.

11     Q.    Can you tell me what you talked

12  about?

13             MS. DANDENEAU:  No.  We object on

14      the basis of privilege.

15     Q.    Okay.  You are going to follow your

16  counsel's objection here?

17     A.    Yes.

18     Q.    Okay.

19             MR. MORRIS:  Can we put up on the

20      screen Exhibit 35.

21             (Exhibit 35 marked.)

22     Q.    Are you able to see that document,

23  sir?

24     A.    Yes.

25     Q.    Have you ever seen an incumbency

1              WATERHOUSE - 10-19-21

2    certificate before?

3         A.    I have.

4         Q.    Do you have a general understanding

5    of what an incumbency certificate is?

6         A.    I have a general understanding.

7         Q.    What is your general understanding?

8         A.    You know, those -- my general

9    understanding is that the incumbency

10   certificate basically lists folks that can --

11   are like authorized signers.

12        Q.    Okay.  And do you see that this is

13   an incumbency certificate for Highland Capital

14   Management Fund Advisors, L.P.?

15        A.    Yes.

16        Q.    Okay.  And if we could scroll down

17   just a little bit, do you see that it's dated

18   effective as of April 11th, 2019?

19        A.    Yes, I see that.

20        Q.    Okay.  And is that your signature in

21   the middle of the signature block?

22        A.    Yes, it is.

23        Q.    And by signing it, did you accept

24   appointment as the treasurer of HCMFA effective

25   as of April 11th, 2019?

1            WATERHOUSE - 10-19-21

2        A.     Again, I'm not the legal -- I don't

3   know if this makes me the treasurer or the

4   appointment.  I don't know -- I don't know

5   that, so I don't -- I don't know if that

6   document -- again, I think -- again, I'm not

7   the legal expert.  I think isn't there --

8   aren't there other legal documents that detail

9   who the officers are that could be incorporated

10  or things like that?  Again, I don't want to

11  play armchair attorney here.

12       Q.     I'm not asking you for a legal

13  conclusion.  I'm asking you for your knowledge

14  and understanding.  When you signed this

15  document, did you understand that you were

16  accepting an appointment as the treasurer of

17  HCMFA?

18            MS. DANDENEAU:  Objection to form.

19            MS. DEITSCH-PEREZ:  Objection, form.

20       A.     Again, I don't think this -- that

21  wasn't my understanding.  I don't think this

22  makes -- this document makes me the treasurer.

23       Q.     What do you think this document --

24  why did you sign this document?

25            MS. DEITSCH-PEREZ:  Objection to

1          WATERHOUSE - 10-19-21

2     form.

3          MR. MORRIS:  You're objecting to the

4     form of the question when I asked him why

5     did you sign the document?  What is the

6     basis for the objection?

7          MS. DEITSCH-PEREZ:  Because, John, I

8     think that it does call for a legal

9     conclusion other than -- with him saying

10    because somebody told me to sign this

11    document.  But if you want to go there,

12    that is fine.

13         MR. MORRIS:  Okay.

14         MS. DANDENEAU:  I don't think --

15    he's already said he's not a lawyer.

16         MR. MORRIS:  I'll allow the witness

17    to answer this question.

18    Q.    Why did you sign this document, sir?

19    A.    I mean, our -- our legal group would

20    bring by these incumbency certificates from

21    time to time.  I have no idea why they're being

22    updated, and I was asked to sign.

23    Q.    Did you ask anybody, what is this

24    document?

25    A.    No.

1                    WATERHOUSE - 10-19-21

2        Q.    Did anybody tell you why they needed

3    you to sign the document?

4        A.    Not that I can recall.

5        Q.    You testified earlier that you

6    understood that you served as the acting

7    treasurer for HCMFA; correct?

8        A.    Yes.

9        Q.    How did you become the acting

10   treasurer of HCMFA?

11            MS. DANDENEAU:  Objection to form.

12       A.    I don't -- I don't know the legal --

13   I don't know the legal mechanic of how I became

14   the acting treasurer.

15       Q.    I'm not asking for the legal

16   mechanic.  I'm asking you as the person who

17   is --

18            MS. DANDENEAU:  John, you said --

19            MR. MORRIS:  Stop.

20            MS. DANDENEAU:  -- how did you

21       become the treasurer.  That is --

22            MR. MORRIS:  Please stop.

23            MS. DANDENEAU:  That is a legal

24       question.

25            MR. MORRIS:  I am not asking any

1                    WATERHOUSE - 10-19-21

2           legal questions, to be clear.  I'm asking

3           for this witness' understanding as to how

4           he became the acting treasurer of HCMFA.

5           If he doesn't know, he can say he doesn't

6           know, but this legal stuff is nonsense, and

7           I really object to it.

8           Q.    Sir, I'm asking you a very simple

9     question.

10               MS. DANDENEAU:  Argumentative.

11          Q.    You testified -- you testified that

12    you became the acting treasurer of HCM --

13    HCMFA; correct?

14          A.    Yes.

15          Q.    How did that happen?

16               MS. DANDENEAU:  Again, object to

17          form.

18               MR. MORRIS:  I can't wait to do this

19          in a courtroom.  Good God.

20          Q.    Go ahead, sir.

21          A.    I don't know the exact process of

22    how that happened.

23          Q.    Do you have any idea whether signing

24    this document was part of the process?

25               MR. MORRIS:  You know what --

1         WATERHOUSE - 10-19-21

2         MS. DANDENEAU:  Objection.

3         MR. MORRIS:  -- withdrawn.  You guys

4    want to do this, I can't wait.  I can't

5    wait.  This is the craziest stuff ever.

6         MS. DANDENEAU:  John, he said he's

7    not a lawyer, and you are asking him for a

8    legal conclusion, and he says he doesn't

9    know, and you persist.

10        MR. MORRIS:  Okay.

11        MS. DANDENEAU:  So you can ask these

12   questions --

13        MR. MORRIS:  Did anyone -- please

14   stop talking.

15        MS. DANDENEAU:  -- at another

16   point -- no, no, no, I'm entitled to talk,

17   too; right?  If you're going to make these

18   accusations as if we're trying to stonewall

19   you, this is not the witness to ask that

20   question.

21        MR. MORRIS:  I can't -- I can't

22   wait -- I can't wait to do this in a

23   courtroom.  I will just leave it at that.

24        MS. DANDENEAU:  That's right, I'm

25   sure you can't.

1           WATERHOUSE - 10-19-21

2       Q.    Did anyone ever tell you, sir, that

3   even though you were the acting treasurer of

4   HCMFA, that you were not authorized to sign the

5   two promissory notes that we looked at before

6   lunch?

7       A.    I'm not sure I understand the

8   question.  I wasn't -- I mean, I'm -- I'm the

9   current acting treasurer.

10      Q.    Did anybody ever tell you at any

11  time that even though you were the acting

12  treasurer of HCMFA, that you were not

13  authorized to sign the two promissory notes

14  that we looked at before lunch?

15            MS. DANDENEAU:  Objection to form.

16      A.    Not that I recall.

17      Q.    Did anybody ever tell you at any

18  time that you were not authorized to sign the

19  two promissory notes that we looked at before

20  lunch?

21      A.    Not that I recall.

22      Q.    Did anybody ever tell you at any

23  time that you should not have signed the two

24  promissory notes that we looked at before

25  lunch?

1          WATERHOUSE - 10-19-21

2     A.    Not that I recall.

3     Q.    Did you ever tell anybody at any

4  time that you weren't authorized to sign the

5  two promissory notes that we looked at before

6  lunch?

7     A.    Not that I recall.

8     Q.    Did you ever tell anybody at any

9  time that you made a mistake when you signed

10  the two promissory notes that we looked at

11  before lunch?

12     A.    Not that I recall.

13     Q.    As you sit here right now, do you

14  have any reason to believe that you were not

15  authorized to sign the two documents that we

16  looked at before lunch?

17          MS. DANDENEAU:  Objection to form.

18     A.    If -- if this is the -- the valid

19  incumbency certificate, I mean, this does --

20  this does detail who the signers are.

21     Q.    Okay.  And looking at that document,

22  does that give you comfort that you were

23  authorized to sign the two promissory notes

24  that we looked at before lunch?

25          MS. DEITSCH-PEREZ:  Object to the

1          WATERHOUSE - 10-19-21

2      form.

3              MS. DANDENEAU:  Objection, form.

4      A.    Yes.

5      Q.    As of October 20th -- withdrawn.

6              I'm trying to take your mind back to

7      a year ago, October 2020.  Do you recall at

8      that time that the boards of the retail funds

9      were making inquiries about obligations that

10     were owed by the advisors to Highland in

11     connection with their 15(c) review?

12             MS. DANDENEAU:  Objection to form.

13     A.    I don't -- I don't recall.

14     Q.    As of October 2020, you had no

15     reason to believe you weren't authorized to

16     sign the two promissory notes that we just

17     looked at; correct?

18             MS. DANDENEAU:  Objection, form.

19             MS. DEITSCH-PEREZ:  Objection to

20     form.

21     A.    I didn't think about it in October

22     of 2020, but I mean --

23     Q.    Did you have any reason to believe

24     at that time that you weren't authorized to

25     sign the two notes that we just looked at?

1              WATERHOUSE - 10-19-21

2        A.    Not that I'm aware, no.

3        Q.    Did you have any reason to believe a

4   year ago that you made a mistake when you

5   signed those two notes?

6        A.    Not that I'm aware.

7        Q.    A year ago you believed that HCMFA

8   owed Highland the unpaid principal amounts that

9   were due under those two notes; correct?

10       A.    They're -- they're promissory notes

11  that were -- as you presented, that were --

12  that were executed.  Whether they're valid or

13  if there's other reasons, I didn't -- I don't

14  know.

15       Q.    I'm not asking you whether they're

16  valid or not.  I'm asking you for your state of

17  mind.  A year ago you believed that HCMFA

18  was -- was obligated to pay the unpaid

19  principal amount under the two notes that you

20  signed; correct?

21       A.    Yeah, I'm -- I'm -- yes.

22       Q.    Thank you.  Are you aware -- you're

23  aware that -- that in 2017, NexPoint issued a

24  note in favor of Highland in the approximate

25  amount of $30 million; correct?

1          WATERHOUSE - 10-19-21

2     A.    I'm -- I'm -- I'm generally aware.

3     Q.    Okay.  And are you generally aware

4 that from time to time, after the note was

5 issued by NexPoint, that moneys were applied to

6 principal and interest that were due under the

7 NexPoint note?

8     A.    Yes, I'm generally aware.

9     Q.    Okay.  And did anybody ever tell you

10 that the payments that were made against the

11 NexPoint notes were made by mistake?

12    A.    Yes.

13    Q.    And is it the one payment that we

14 talked about earlier today?

15    A.    We talked about a lot of things

16 today.  What payment are we talking about?

17    Q.    Okay.  Who told you that any payment

18 made against the NexPoint note was made by

19 mistake?

20    A.    D.C. Sauter.

21    Q.    When did Mr. Sauter tell you that?

22    A.    I don't -- I don't remember

23 specifically.

24    Q.    Do you remember what payments --

25    A.    Sometime -- sometime this year.

1                    WATERHOUSE - 10-19-21

2        Q.      Sometime in 2021?

3        A.      Yes.

4        Q.      Do you remember what payment he was

5   referring to?

6        A.      It was the -- the payment made in

7   January of 2021 or -- yeah, January of -- of

8   this -- January of 2021.

9        Q.      Okay.  So did anybody ever tell you

10  at any time that any payment that was made

11  against principal --

12       A.      And -- and -- and -- hold on, and it

13  may have been other -- again, it may have been

14  that payment or -- or there may have been what

15  he was explaining, a misapplication of prior

16  payments as well.

17       Q.      Can you -- can you give me any

18  specificity -- withdrawn.

19              Withdrawn.  Can you tell me

20  everything that Mr. Sauter told you about --

21  about errors in relation to payments made

22  against principal and interest due under the

23  NexPoint note?

24              MS. DANDENEAU:  Can I just --

25              MR. RUKAVINA:  Hold on.  Hold on.

1          WATERHOUSE - 10-19-21

2          I'm going to object here, and I'm going to

3          instruct the witness not to answer

4          depending on the discussion that you had --

5          Mr. Waterhouse, I'm the lawyer for

6          NexPoint, and as everyone here knows, D.C.

7          Sauter is in-house counsel.

8                So if you and Mr. Sauter were having

9          a factual discussion and him preparing his

10         affidavit, et cetera, then go ahead and

11         answer that.  But if you were having a

12         discussion as to our legal strategy in this

13         lawsuit, or anything having to do with

14         that, then do not answer that.

15               And if you need to talk to either

16         your counsel or me about that, then we need

17         to have that discussion now.

18         A.    Okay.  Yeah, I don't -- I don't

19    really know how to make that distinction, so

20    maybe I need to talk to counsel before I

21    answer, or if I can answer.

22         Q.    Let me just ask you this question:

23    Did -- did you have any conversation with

24    Mr. Sauter about any payment of principal and

25    interest prior to the time that you left

1              WATERHOUSE - 10-19-21

2   Highland's employment, or did it happen after

3   you left Highland's employment?

4       A.   I don't -- I don't recall if -- I

5   don't recall.  I mean, it was sometime in 2021.

6   I don't remember if it was before or after I

7   was let go from Highland.

8       Q.   Okay.  So -- so nobody told you

9   prior to 2021 that any error or mistake was

10  made in the application of payments against

11  principal and interest due on the NexPoint

12  note.  Do I have that right?

13      A.   Yeah, I don't -- I don't recall this

14  being in 2020.

15      Q.   Okay.  And it didn't happen in 2019;

16  correct?

17      A.   I don't recall that happened.

18      Q.   And it didn't happen in 2018;

19  correct?

20      A.   I don't -- I don't recall that

21  happening.

22      Q.   And it didn't happen in 2017;

23  correct?

24      A.   I don't recall.

25      Q.   But -- but you believe the

1          WATERHOUSE - 10-19-21

2    conversation took place in 2021.  You just

3    don't remember if it was before or after you

4    left Highland's employment.  Do I have that

5    right?

6          A.    It was sometime this year.  I

7    don't -- I don't remember.

8          Q.    Okay.  Did you report this

9    conversation to Mr. Seery at any point?

10         A.    I don't believe so.

11         Q.    Did you report this conversation to

12   anybody at DSI at any time?

13         A.    I don't recall.

14         Q.    Do you have -- you don't have a

15   recollection of ever doing that; correct?

16         A.    Yeah, that's right.  I don't recall

17   doing that.

18         Q.    Do you recall telling anybody at

19   Pachulski Stang about the conversation you

20   recall with Mr. Sauter?

21         A.    No, I don't -- I don't recall.

22         Q.    Did you tell any of the independent

23   board members about your conversation with

24   Mr. Sauter?

25         A.    I don't recall.

1          WATERHOUSE - 10-19-21

2     Q.    Did you tell any of the employees at

3  Highland before you left Highland's employment

4  about this call that you had with Mr. Sauter?

5          MS. DANDENEAU:  Objection to form.

6     A.    No, I don't -- no, I don't recall.

7     Q.    NexPoint -- to the best of your

8  knowledge, did NexPoint ever file a proof of

9  claim against Highland to try to recover moneys

10  that were mistakenly paid against the principal

11  and interest due under the note?

12     A.    Okay.  Hold on.  You are saying did

13  NexPoint Advisors file a proof of claim to

14  Highland for errors related to payments under

15  the NexPoint note to Highland?

16     Q.    Correct.

17     A.    I'm -- I'm -- I'm not -- I'm not

18  aware.

19     Q.    Are you aware --

20     A.    I'm not the legal person here, I

21  don't know.

22     Q.    I'm just asking for your knowledge,

23  sir.

24     A.    Yeah, I don't know.  I'm not aware.

25     Q.    Are you aware of any claim of any

1                    WATERHOUSE - 10-19-21

2    kind that NexPoint has ever made to try to

3    recover the amounts that it contends were -- or

4    that Mr. Sauter contend were mistakenly applied

5    against principal and interest due under the

6    NexPoint note?

7         A.    I'm not aware.

8              MS. DANDENEAU:   Objection to form.

9         Q.    Okay.  The advisors' agreements with

10   the retail funds are subject to annual renewal;

11   correct?

12        A.    Yes.

13        Q.    And do you participate in the

14   renewal process each year?

15        A.    Yes.

16        Q.    What role do you play in the renewal

17   process?

18        A.    I'm -- I'm asked by the retail board

19   to walk-through the advisors financials.

20        Q.    And do you do that in the context of

21   a board meeting?

22        A.    Yes, it is -- yes, it is typically

23   done in a board meeting.

24        Q.    And do you recall the time --

25   does -- does the renewal process happen around

1          WATERHOUSE - 10-19-21

2    the same time each year?

3          A.    Yes, it is -- it is around the same

4    time every year.

5          Q.    And what -- what time period of the

6    year does the renewal process occur?

7          A.    Approximately the September

8    timeframe.

9          Q.    During that process, in your

10   experience, does the board typically conduct

11   its own diligence and ask for information?

12         A.    Does the board ask for lots of -- I

13   mean, just -- I mean, lots of information as a

14   part of that -- that -- as part of that board

15   meeting and that process.

16         Q.    Okay.  And do you recall that the

17   process in 2020 spilled into October?

18         A.    Yes.  Yes.

19         Q.    Okay.  And as part of the process in

20   2020, the retail board asked -- asked what are

21   referred to as 15(c) questions; right?

22         A.    I guess I don't want to be -- they

23   asked 15(c) -- are you saying they asked 15(c)

24   questions and this is why it went into October

25   or --

1         WATERHOUSE - 10-19-21

2      Q.    No, I apologize.

3            Do you have an understanding of

4   what -- of what 15(c) refers to in the context

5   of the annual renewal process?

6      A.    Yes, generally.

7      Q.    All right.  What is your general

8   understanding of the term "15(c)" in the

9   context of the annual renewal process?

10     A.    I -- I think 15(c) is the section

11  that -- that -- you know, that -- that the

12  board has to evaluate every year, the retail

13  board.  They have to, you know, go through,

14  evaluate, and go through that approval process

15  on a yearly basis.

16     Q.    Okay.

17           MR. MORRIS:  Can we put up on the

18       screen Exhibit 36, please.

19           (Exhibit 36 marked.)

20           MR. MORRIS:  I guess let's just

21       start at the bottom so Mr. Waterhouse can

22       see what is here.

23     Q.    You see this begins with an email

24  from Blank Rome to a number of people.

25           MR. MORRIS:  And if we can scroll

1          WATERHOUSE - 10-19-21

2          up -- keep going just a little bit.

3          Q.    You will see that there is an email

4     from Lauren Thedford to Thomas Surgent and

5     others where she reports that she was attaching

6     and reproducing below additional 15(c)

7     follow-up questions from the board.

8                Do you see that?

9          A.    Yes.

10         Q.    And do you see Question No. 2 asks

11    whether there are any material outstanding

12    amounts currently payable or due in the future

13    (e.g., notes) to HCMLP by HCMFA or NexPoint

14    Advisors or any other affiliate that provides

15    services to the funds?

16               Do you see that?

17         A.    Yes.

18         Q.    And -- and did you -- do you recall

19    that in -- in October of 2020 the retail boards

20    were asking for that information?

21         A.    I don't recall it, but there --

22    they're obviously asking in this email.

23         Q.    Okay.

24               MR. MORRIS:  Can we scroll up a

25          little bit, please.

1          WATERHOUSE - 10-19-21

2     Q.    And then do you see that

3  Ms. Thedford includes you on the email string

4  on Tuesday, October 6th, at 5:52?

5     A.    Yes.

6     Q.    And she asks you and Dave Klos and

7  Kristin Hendrix for advice on that particular

8  Request No. 2 that I have just read; right?

9     A.    Yes.

10    Q.    Okay.  Can you tell me who

11 Ms. Thedford is?

12    A.    She was an attorney that was in the

13 legal group.

14    Q.    At Highland Capital Management,

15 L.P.?

16    A.    I'm -- I'm -- I'm -- I don't

17 remember if she was an employee of Highland or

18 any of the advisors.

19    Q.    Okay.  Do you know if she served as

20 the corporate secretary for both HCMFA and

21 NexPoint?

22    A.    Yes.

23    Q.    And -- okay.

24          Do you know whether Ms. Thedford

25 held any positions in relation to the retail

1                 WATERHOUSE - 10-19-21

2    funds as we defined that term?

3         A.    Yes.

4         Q.    What is your understanding of the

5    positions that Ms. Thedford held at the retail

6    funds?

7         A.    I -- I recall her being an officer.

8    I don't recall her title.

9         Q.    Okay.  Is she still an officer at

10   any of the retail funds today?

11        A.    No.

12        Q.    Do you know when she ceased to be an

13   officer of the retail funds?

14        A.    Approximately.

15        Q.    And when did she approximately cease

16   to be an officer of the retail funds?

17        A.    It was in -- it was in early of

18   2021.

19        Q.    Okay.  Do you know when she became

20   an officer of the retail funds?

21        A.    I don't recall.

22        Q.    To the best of your recollection,

23   was she an officer of the retail funds in

24   October of 2020?

25        A.    I believe so.

1                    WATERHOUSE - 10-19-21

2        Q.    Okay.  Do you know what title she

3   held in her capacity as an officer, if any?

4        A.    I told you I don't remember.

5        Q.    Okay.  So she sends this email to

6   you at 5:52 p.m. on October 6th.

7              And if we can scroll up to the

8   response, you responded a minute later with a

9   one-word answer:  Yes.

10             Do you see that?

11       A.    Yes.

12       Q.    And -- and yes is -- yes was in

13  response to the retail board's Question No. 2,

14  right, whether there are any material

15  outstanding amounts currently payable or due in

16  the future?

17       A.    Yes.

18             MR. MORRIS:  And can we scroll up to

19        see what happened next.

20       Q.    So Ms. Thedford writes back to you a

21  few minutes later and she asks whether you

22  could provide the amounts.

23             Do you see that?

24       A.    Yes.

25       Q.    And then you respond further and you

```
1                  WATERHOUSE - 10-19-21

2    refer her to the balance sheet that was

3    provided to the board as part of the 15(c)

4    materials.

5               Do you see that?

6         A.    Yes.

7         Q.    And -- and did the advisors provide

8    to the board certain balance sheets in 2020 in

9    connection with the 15(c) review?

10        A.    Yes, they did.

11        Q.    Okay.  And were the amounts that

12   were outstanding or that were to be due in the

13   future by the advisors to Highland included in

14   the liability section of the balance sheet that

15   was given to the retail board?

16        A.    Yes.  Notes would be reflected as

17   liabilities.

18        Q.    Okay.  And --

19        A.    If I'm understanding your question

20   correctly.

21        Q.    You are.  And -- and -- and those

22   liabilities you -- you were -- you believed

23   were responsive to the retail board's question;

24   correct?

25        A.    Yes.
```

1          WATERHOUSE - 10-19-21

2     Q.    Okay.  And then if we can scroll up,

3  you see Ms. Thedford responds to you

4  nine minutes later with a draft response.

5          Do you see that?

6     A.    Yes.

7     Q.    And she says that she is taking from

8  the 6/30 financials certain information about

9  amounts that were due to HCMLP and affiliates

10  as of June 30th, 2020.

11          Do you see that?

12     A.    I do.

13     Q.    Okay.  And did you believe, as the

14  treasurer of NexPoint and HCMFA and as the CFO

15  of Highland, that the information that

16  Ms. Thedford obtained from the 6/30 financials

17  was accurate and responsive in relation to the

18  retail fund board's question?

19     A.    I just want to make sure I

20  understand the question.

21          Are you saying that the financial

22  information provided to the retail board as

23  part of the 15(c) process, which included

24  financial statements as of June 30th of 2021,

25  did I feel like those were responsive to their

```
 1              WATERHOUSE - 10-19-21
 2   questions?
 3        Q.   Yes.
 4        A.   Yes.
 5        Q.   Thank you.
 6             MS. DEITSCH-PEREZ:  John, it is not
 7        in the chat yet.  Can you just make sure it
 8        gets put in there.
 9             MR. MORRIS:  Sure.
10             MS. CANTY:  I put it in there.  I
11        think maybe I just sent it directly, so let
12        me make sure it says to everyone.  But I
13        did put it in there.  I will try again.
14             MR. MORRIS:  Thank you, La Asia.
15             MS. DANDENEAU:  What number is it.
16             MR. MORRIS:  What, the Bates number?
17             MS. DEITSCH-PEREZ:  No, the --
18        this -- yeah, 36 is not in the chat.
19             MR. MORRIS:  Okay.  We'll get it.
20             MS. DANDENEAU:  I think that
21        Ms. Canty just sent it to me originally.
22        Sorry.
23             MR. MORRIS:  Okay.  We will get it
24        there.
25             MS. CANTY:  Okay.  It is there now
```

1          WATERHOUSE - 10-19-21

2     for everyone.

3          MS. DEITSCH-PEREZ:  Got it.  Thank

4     you.

5     Q.    Do you recall if the proposed

6     response that Ms. Thedford crafted was

7     delivered to the retail board with the -- with

8     the yellow dates having been completed?

9     A.    I don't know.

10          MR. MORRIS:  Davor, I'm going to ask

11          that the advisors and -- the advisors of

12          both HCMFA and NexPoint produce to me any

13          report that was given to the retail board

14          concerning the promissory notes at issue,

15          including the obligations under the notes.

16     Q.    Do you know -- do you know if

17     ultimately NexPoint informed the retail board

18     in response to its question that NexPoint owed

19     Highland approximately 23 or $24 million?

20          MS. DANDENEAU:  Objection to the

21          form.

22     A.    Sorry, are you asking, did NexPoint

23     tell the retail board that it owed Highland?

24     Q.    Let me ask a better question,

25     Mr. Waterhouse.

1          WATERHOUSE - 10-19-21

2          Did -- do you know if anybody ever

3   answered the retail board's question that was

4   Number 2?

5     A.    I don't -- I can't say for sure.

6     Q.    Okay.  Do you recall -- I think you

7   testified earlier that you walked through the

8   advisors' financials with the retail board;

9   correct?

10    A.    Yes.

11    Q.    And as part of that process, did you

12  disclose to the retail board the obligations

13  that NexPoint and HCMFA had to Highland under

14  promissory notes?

15    A.    The retail board, as I stated

16  earlier, receives financial information,

17  balance sheet, income statement information

18  from the advisors.  That information is

19  provided to the retail board in connection with

20  the 15(c) process.

21          So any notes between the advisors

22  and the Highland would be -- anything would be

23  detailed in those financial statements.

24    Q.    Do you recall in 2020 ever speaking

25  with the retail board about the advisors'

1              WATERHOUSE - 10-19-21

2  obligations under the notes to Highland?

3              MS. DANDENEAU:  Objection to form.

4              MS. DEITSCH-PEREZ:  Object to the

5       form.

6       A.    I don't recall specifically.

7       Q.    Do you have any general recollection

8  of discussing with the retail board the

9  advisors' obligations to Highland under the

10  notes that they issued?

11              MS. DANDENEAU:  Object to the form.

12              MS. DEITSCH-PEREZ:  Object to the

13       form.

14       A.    I just recall generally just -- it

15  is just -- I present the financial statements,

16  and if they have questions, I answer their

17  questions and walk them through.

18              I don't recall what they asked.  I

19  don't recall where the discussion went.  I

20  don't recall anything of that nature.

21       Q.    Okay.  Do you know if anybody on

22  behalf of HCMF -- HCMFA ever told the retail

23  board that HCMFA had no obligations under the

24  two 2019 notes that you signed?  Withdrawn.

25              Do you know whether anybody on

1          WATERHOUSE - 10-19-21

2    behalf of HCMFA ever told the retail boards

3    that you weren't authorized to sign either of

4    the two 2019 notes?

5              MS. DANDENEAU:  Objection to form.

6         A.    I'm not aware.

7         Q.    Are you aware of anybody on behalf

8    of HCMFA ever telling the retail boards that

9    your execution of the two 2019 notes was a

10   mistake?

11             MS. DANDENEAU:  Objection to form.

12        A.    I'm not aware.

13        Q.    Are you aware of anybody on behalf

14   of HCMFA ever telling the retail boards that

15   HCMFA did not have to pay the amounts reflected

16   in the two notes that you signed in 2019?

17        A.    I'm not aware.

18        Q.    Do you know whether anybody ever

19   told the retail boards -- withdrawn.

20             Do you know whether anybody ever

21   told the retail boards that Highland has

22   commenced a lawsuit to recover on the two notes

23   that you signed in 2019?

24        A.    I'm not aware.

25        Q.    Are you aware of anybody informing

```
1                  WATERHOUSE - 10-19-21
2    the retail boards that Highland has sued to
3    recover on the NexPoint note?
4         A.    I'm not aware.
5         Q.    Do you know whether anybody ever
6    told the retail board that Highland had
7    declared a default with respect to the two
8    HCMFA notes that you signed in 2019?
9         A.    I'm not aware.
10        Q.    Are you aware of anybody ever
11   informing the retail boards that Highland had
12   declared a default under the NexPoint note?
13        A.    I'm not aware.
14        Q.    Are you aware of anybody telling the
15   retail board that Highland made a demand for
16   payment under the 2019 notes that you signed on
17   behalf of HCMFA?
18        A.    I'm not aware.
19        Q.    Let's -- let's see if there is a
20   response to Ms. Thedford's email, if we can
21   scroll up.
22              Do you see you responded to
23   Ms. Thedford five minutes after she provided
24   the draft response to you?
25        A.    Yes.
```

1            WATERHOUSE - 10-19-21

2       Q.    Okay.  And do you see that Dustin

3   Norris is copied on this email?

4       A.    Yes, he is.

5       Q.    Great.  Do you know whether

6   Mr. Norris held any positions at either of the

7   advisors as of October 6, 2020?

8       A.    I will go back to -- I'm not the

9   legal expert of what appoints you or how or

10  why, but you did see Dustin's name on the

11  incumbency certificate that you produced

12  earlier.

13      Q.    Do you know what his title was in

14  October of 2020?

15            MS. DANDENEAU:  Objection to form.

16      A.    I don't -- I don't recall.

17      Q.    Was he -- did he have a title with

18  each of the advisors, to the best of your

19  recollection?

20      A.    I don't recall.

21      Q.    Do you know why he is included on

22  this email string?

23      A.    I didn't add Dustin.  It looks like

24  Lauren did.  I don't know why she added him or

25  not.  You would have to ask her.

1          WATERHOUSE - 10-19-21

2     Q.    Does Mr. Norris play a role in

3   formulating the advisors' responses to the

4   questions asked by the retail board in

5   connection with the 15(c) annual review?

6          MS. DANDENEAU:  Objection to form.

7     A.    He -- Dustin Norris is there in the

8   board meetings.  But -- so he has a role, yes.

9     Q.    Okay.  And does Mr. Norris hold any

10  positions, to the best of your knowledge, in

11  relation to any of the retail funds?

12    A.    I don't -- I don't believe he does.

13    Q.    How about Mr. Post, do you know

14  whether Mr. Post holds any position in either

15  of the advisors?

16    A.    I mean, he -- he -- yes.

17    Q.    What is your understanding of the

18  positions that Mr. Post holds in relation to

19  the advisors?

20         MS. DANDENEAU:  Objection to form.

21    A.    He is an employee of NexPoint

22  Advisors.  He is also the chief compliance

23  officer for -- for NexPoint.

24    Q.    Who is the chief compliance officer

25  for HCMFA, if you know?

1           WATERHOUSE - 10-19-21

2               MS. DANDENEAU:  Objection to form.

3       A.    That would be Jason as well.

4       Q.    Okay.  Now, looking at your

5   response, you noted initially that nothing was

6   owed under shared services.  Do I have that

7   right in substance?

8       A.    Yeah.  I think I'm being responsive

9   to Lauren's question here, whether any of the

10  shared service invoices are outstanding.

11      Q.    Right.

12      A.    Yes.

13      Q.    And that is because -- and that is

14  because the retail the retail board has asked

15  for the disclosure of all material obligations

16  that were owed to HCMLP either then or in the

17  future; isn't that right?

18              MS. DANDENEAU:  Objection to form.

19      Q.    We can go back down and look.

20      A.    Look, I don't know if that's a

21  material item, I mean, again, but sure.

22      Q.    Okay.  But there were no shared

23  services outstanding; correct?

24              MS. DANDENEAU:  Objection to form.

25      A.    That is what this email seems to

1          WATERHOUSE - 10-19-21

2   indicate.

3          Q.    And you wouldn't have written it if

4   you didn't believe it to be true at the time;

5   correct?

6          A.    Correct.

7          Q.    And when you referred to shared

8   services outstanding, what you meant there was

9   that neither NexPoint nor HCMFA owed Highland

10  any money under the shared services agreements

11  that they had with Highland as of October 6th,

12  2020; right?

13         A.    I don't know if it is as of October

14  6, 2020 or if it was from -- like through the

15  financials -- through the date of the

16  financials as of June 30.

17         Q.    Okay.  And then you noted that

18  HCMA -- the HCMFA note is a demand note; right?

19         A.    Yes.

20         Q.    And then you referred Ms. Thedford

21  to Kristin Hendrix for the term of the NexPoint

22  note.  Do I have that right?

23         A.    Yes.

24         Q.    And then you refer to that agreement

25  that is referenced in the 2018 audited

1           WATERHOUSE - 10-19-21

2    financials about Highland's agreement not to

3    make demand upon HCMFA until May 2021; correct?

4        A.    Correct.

5        Q.    And then -- and then the next thing

6    you write is that the attorneys think that BK

7    doesn't change that, but don't know for sure at

8    the end of the day.

9              Do you see that sentence?

10       A.    Yes.

11       Q.    Which attorneys were you referring

12   to?

13       A.    I don't remember.

14       Q.    Did you have a conversation with

15   attorneys concerning whether the bankruptcy

16   would change or alter in any way the agreement

17   not to make a demand under the HCMFA note?

18       A.    Look, yeah, I mean, I don't

19   specifically remember, but generally, I mean,

20   it is in this email.  I don't -- I don't -- I

21   don't -- I don't remember who I talked to or,

22   you know, was it inside counsel, outside

23   counsel, but obviously I talked to somebody.

24       Q.    Do you have any recollection --

25       A.    Well, I don't even know if it's --

1                    WATERHOUSE - 10-19-21

2    actually, it may not even have been me.  I say

3    the attorneys in, you know, a lot of -- like I

4    talked about the team.

5              It could have been someone on the

6    team, like, hey, we need to run this down, and

7    maybe they talked to attorneys again and

8    relayed that information to me.

9              So I really don't know if I spoke or

10   someone else did or -- or, I mean, and maybe it

11   wasn't even from corporate accounting.  Maybe

12   it was, you know, other -- I'm kind of

13   summarizing, you know, again, so I don't really

14   know -- I can't really say for sure.  I don't

15   remember how I came about of this knowledge.

16       Q.    I appreciate your efforts,

17   Mr. Waterhouse, but I will just tell you that

18   if I ask a question and you don't know the

19   answer or you don't recall, I'm happy to accept

20   that.  I don't -- I don't want you to

21   speculate, so I want to be clear about that.

22   So I appreciate it.

23             Let me just ask you simply:  Do you

24   know what attorneys -- can you identify any of

25   the attorneys who thought that the bankruptcy

1          WATERHOUSE - 10-19-21

2     process didn't change the agreement?

3          A.    I don't recall.

4          Q.    Okay.  Perfect.

5                And then let's look at the last

6     sentence.  It says, quote:  The response should

7     include, as I covered in the board meeting,

8     that both entities have the full faith and

9     backing from Jim Dondero, and to my knowledge

10    that hasn't changed.

11               Do you see that?

12         A.    Yes.

13         Q.    Okay.  Prior to October 6th, 2020,

14    had you told the retail board that HCMFA and

15    NexPoint have the full faith and backing from

16    Jim Dondero?

17         A.    Yes.

18         Q.    Do you remember in the context in

19    which you told the retail board that?

20         A.    I mean, generally, yes.

21         Q.    Tell me what you recall.

22         A.    So we were walking through the

23    financials from the advisors; right?  So as I

24    described to you, you have got HCMFA and NPA.

25    And these -- the financials, you know, show

1           WATERHOUSE - 10-19-21

2    they have liabilities on them that exceed

3    assets.

4           So the retail board has asked, okay,

5    you know, how -- you know, if -- if these

6    liabilities come due or they're payable, you

7    know, how does that come about?

8           And, you know, the response is,

9    well, the advisors have the -- the full faith

10   and backing from -- from Jim Dondero.

11       Q.   And how did you know that the

12   advisors had the full faith and backing from

13   Jim Dondero?  What was the basis for that

14   statement that you made to the retail board?

15       A.   I talked to Jim about it at some

16   point in the past.

17       Q.   And did you tell Mr. Dondero that

18   you were going to inform the retail board that

19   the advisors had his full faith and backing

20   before you actually told that to the retail

21   board?

22       A.   I don't recall having that

23   conversation.

24       Q.   Do you recall if you ever informed

25   Mr. Dondero that you had disclosed or told the

1                    WATERHOUSE - 10-19-21

2      retail board that the advisors had the full

3      faith and backing of Mr. -- Mr. Dondero?

4              MS. DEITSCH-PEREZ:  Object to the

5          form.

6          A.    I don't recall discussing that with

7      him at the time.

8          Q.    When you told this to the board, was

9      Mr. Dondero participating in the discussion?

10         A.    Not that I recall.

11         Q.    Withdrawn.  Was it not -- withdrawn.

12             Do you recall whether -- when you

13     covered this issue with the board, was that in

14     a -- a Zoom call or a Webex call?  Was it a

15     telephone call?  Was it in-person?  Like where

16     were you physically in relation to the board?

17         A.    I believe I was at home.

18         Q.    Okay.  Can you identify every person

19     that you recall who was present for this

20     disclosure other than -- other than the board

21     members themselves?

22             MS. DEITSCH-PEREZ:  Object to the

23         form.

24         A.    I don't recall everyone on the call.

25         Q.    Can you identify anybody who was on

1            WATERHOUSE - 10-19-21

2    the call?

3         A.    Other than the board members?

4         Q.    Yes.

5         A.    Lauren Thedford.  I mean, there

6    are -- there are many -- my section is just one

7    of many sections that are just -- you know, as

8    you can appreciate, this is a long board

9    meeting.

10            I can't recall specifically, really

11   even generally, or who was on when this was

12   discussed.  But Lauren was typically on for the

13   entire time.

14        Q.    I apologize if I asked you this, but

15   do either of Mr. Norris or Mr. Post hold any

16   positions relative to the retail funds?

17        A.    I think you asked me this already,

18   John.

19        Q.    Okay.  I just don't recall.  Can you

20   just refresh my recollection if I did, in fact,

21   ask you the question?

22        A.    I don't believe -- if we can go

23   back.  I don't believe Mr. Norris has a title

24   at the retail funds.  Mr. -- and Mr. Post is

25   the CCO of the advisor, the advisors.

1          WATERHOUSE - 10-19-21

2     Q.    Okay.  Do you know if either of them

3 have a position with the retail board -- with

4 the retail funds?

5     A.    I don't believe Mr. Norris has a

6 position with the retail funds.

7     Q.    All right.  What about Mr. Post?

8     A.    Mr. Post is the CCO of the advisors.

9     Q.    Okay.  Does he hold any position --

10     A.    I don't believe so.

11     Q.    -- with the retail funds?

12     A.    I don't believe so.

13     Q.    Okay.

14     A.    I don't know if being the CCO for

15 the advisor conveys something for the retail

16 funds.  Again, I am not -- that is the legal

17 compliance part of it.  I don't know.

18     Q.    Why did you tell the retail board

19 that the advisors have the full faith and

20 backing from Mr. Dondero?

21          MS. DANDENEAU:  Objection to form.

22     A.    It is -- it is -- it is what has

23 been discussed with them prior.

24     Q.    And were you -- were you trying to

25 give them comfort that even though the

1          WATERHOUSE - 10-19-21

2    liabilities exceeded the assets that the

3    advisors would still be able to meet their

4    obligations as they become due?

5          MS. DANDENEAU:  Objection to form.

6          MS. DEITSCH-PEREZ:  Object form.

7     A.    I -- I can't -- I don't remember

8    specifically the conversation, but generally --

9    you know, generally, yes.  And that is why --

10   but, you know, again, in this email saying, you

11   know, I am sure I qualified it with the retail

12   board, you know, as I said I like -- you know,

13   to my knowledge, that hasn't changed.  But,

14   again, generally -- generally that is what I

15   remember.

16    Q.    Okay.  Do you recall if in the

17   advisors' response to the retail board's

18   question if the response included any statement

19   concerning Mr. Dondero and -- and the full

20   faith and backing that he was giving to the

21   advisors?

22          MS. DEITSCH-PEREZ:  Object to the

23        form.

24    A.    I don't -- I don't remember

25   specifically what was provided.

1                    WATERHOUSE - 10-19-21

2         Q.    Okay.

3         A.    And I don't really -- I don't really

4    remember generally either.

5         Q.    Okay.

6              MR. MORRIS:  So -- so, again, I'm

7         just going to ask Mr. Rukavina if your

8         clients can produce as soon as possible the

9         15(c) response, the written response that

10         the advisors made, if any, to the board's

11         Question No. 2.

12              I'm not looking for the whole

13         response, but I certainly want the response

14         to Question No. 2.

15         Q.    Do you have a general understanding

16    as to the amount by which -- withdrawn.

17              Did -- did the assets of --

18    withdrawn.

19              Did the liabilities of HCMFA exceed

20    its assets in 2020?

21              MS. DANDENEAU:  Objection to form.

22              MS. DEITSCH-PEREZ:  Objection, form.

23         A.    I believe I have already answered

24    that question earlier, I think.  I believe I

25    said yes.

1          WATERHOUSE - 10-19-21

2     Q.    Okay.  And did the liabilities of

3  NexPoint exceed its assets in 2020?

4          MS. DEITSCH-PEREZ:  Objection to

5     form.

6     A.    I don't believe so.

7     Q.    Okay.  So -- so it was only one of

8  the two advisors who had liabilities that

9  exceeded the value of the assets.

10          Do I have that right?

11          MS. DEITSCH-PEREZ:  Objection to

12     form.

13          MS. DANDENEAU:  Form.

14     A.    Yes.

15     Q.    And do you know, ballpark, the

16  amount by which the value of HCMFA's

17  liabilities exceeded their assets in 2020?

18          MS. DANDENEAU:  Objection to form.

19     A.    I don't -- I don't recall.

20          MR. MORRIS:  I had specifically

21     requested in discovery the audited

22     financial reports for both advisors and

23     NexPoint.  I think I may have gotten one

24     for NexPoint but I'm still waiting for the

25     balance.  And I'm going to renew my request

1            WATERHOUSE - 10-19-21

2        for those documents too.

3        Q.    Let's go to the next exhibit, which

4    is Number 10.  So I think it is in your stack,

5    Mr. Waterhouse.

6            MR. MORRIS:  And we can take the one

7        down from the screen and put up Number 10

8        for everybody.

9            (Exhibit 10 marked.)

10       Q.    And I don't know if you have ever

11   seen this before, but I'm really putting it up

12   on the screen for purposes of turning to the

13   very last page of the document.

14            So this is a document that we have

15   been -- that we premarked as Exhibit 10.  And

16   we're turning to the last page of the document,

17   which is a document that was filed in the

18   adversary proceeding 21-3004.  And -- no, I

19   apologize, I think we -- right there.  Perfect.

20            And it is page 31 of 31.

21            MR. MORRIS:  I think there may have

22       been some something erroneously stapled to

23       the hard copy that I gave you folks, but

24       I'm looking for page 31 of 31 in the

25       document that begins with the first page of

1          WATERHOUSE - 10-19-21

2     Exhibit 10.

3          Q.    Do you have that, Mr. Waterhouse?

4          A.    I don't have it yet.  I'm looking.

5          Q.    All right.  If you look at the top

6     right-hand corner, you will see it says page

7     hopefully something of 31?

8          A.    Yes, I've got it now.

9          Q.    Okay.  You have got 31 of 31.  You

10    can take a moment to read that, if you would

11    like.

12         A.    (Reviewing document.)  Okay.

13         Q.    Have you ever seen this before?

14         A.    I don't know if I have seen this

15    specific document, but, you know, I've --

16    I'm -- I'm aware of it.

17         Q.    And is this the document that you

18    had in mind when you sent that email to

19    Ms. Thedford that we just looked at where you

20    said that Highland had agreed not to make a

21    demand upon HCMFA until May 2021?

22         A.    Honestly, I don't -- it wasn't this

23    document.  I mean, it's something like this,

24    yes.  I mean, yes.

25         Q.    Well --

```
 1                    WATERHOUSE - 10-19-21

 2        A.    It is something like this, but I

 3   don't think it was this specific document.

 4        Q.    Well, but this document does say in

 5   the last sentence that Highland agreed not to

 6   seek -- not to demand payment from HCMFA prior

 7   to May 31, 2021; right?

 8        A.    Yes.

 9        Q.    And are you aware of any other

10   document that was ever created pursuant to

11   which Highland agreed not to demand payment on

12   amounts owed by HCMFA before May 31, 2021?

13        A.    Hold on.  Are you asking, am I aware

14   of a document that by HCMFA that basically says

15   otherwise?

16        Q.    No.  Let me try again.

17              Are you aware of any other document

18   pursuant to which -- pursuant to which Highland

19   agreed not to make a demand on HCMFA until May

20   31st, 2021?

21        A.    I'm -- I think there was something

22   in connection with -- with the -- with the

23   audit that basically says the same thing.

24        Q.    Okay.  And do you think that the

25   audit is referring to this particular document?
```

```
 1                 WATERHOUSE - 10-19-21
 2        A.    I don't know.
 3        Q.    All right.  This document is dated
 4   April 15, 2019.  Do you see that?
 5        A.    I do.
 6        Q.    And do you remember that the audit
 7   was completed on June 3rd, 2019?
 8        A.    Yes.
 9        Q.    And do you recall that the audited
10   financials -- and I'm happy to pull them up if
11   you would like, but do you recall that the
12   audited financials included a reference to the
13   agreement pursuant to which Highland agreed not
14   to make a demand until May 31st, 2021?
15        A.    Yes, I remember.
16        Q.    And as part of the process, would
17   you have expected the corporate accounting team
18   to have provided a copy of this document to
19   PwC?
20             MS. DANDENEAU:  Objection to form.
21        A.    Yes, I would have expected something
22   like this, or again, you know, some document
23   that basically states -- states the deferral
24   till May 31 of 2020.
25        Q.    Okay.
```

```
1              WATERHOUSE - 10-19-21

2     A.    May 31 of 2021, excuse me.

3     Q.    And this document states the

4  deferral that you just described; correct?

5     A.    It does.

6     Q.    And this document states the

7  deferral that was described in the audited

8  financial statements that we looked at before;

9  correct?

10    A.    It does.

11          MR. MORRIS:  Okay.  Can we scroll

12     down just a little bit to see who signed on

13     behalf of the acknowledgment there.

14    Q.    Okay.  So Mr. Dondero signed this

15 document on behalf of both HCMFA and Highland;

16 do you see that?

17    A.    I do.

18    Q.    Okay.  Did you discuss this document

19 or the -- withdrawn.

20          Did you discuss the concept of the

21 deferral with Mr. Dondero in the spring of

22 2019?

23    A.    I think I testified I don't recall.

24    Q.    Okay.  Do you know whose idea it was

25 to issue the acknowledgment in this form?
```

1                    WATERHOUSE - 10-19-21

2       A.    I don't recall.

3             MR. MORRIS:  Can we scroll back up

4       to the document, please.

5       Q.    Do you see in the beginning it says,

6   reference is made to certain outstanding

7   amounts loaned from Highland to HCMFA for

8   funding ongoing operations.

9             Do you see that?

10      A.    Yes.

11      Q.    And were you aware as the CFO of

12  Highland and as the treasurer of HCMFA that as

13  of April 15, 2019, Highland had made certain

14  loans to HCMFA to fund HCMFA's ongoing

15  operations?

16      A.    Yes.

17      Q.    And were you aware that those loans

18  were payable on demand and remained outstanding

19  as of December 31st, 2018?

20      A.    Yes.

21      Q.    And were you aware that those

22  amounts were payable on demand, and they

23  remained outstanding as of April 15, 2019?

24            MS. DEITSCH-PEREZ:  Object to the

25      form.

```
1                  WATERHOUSE - 10-19-21
2        A.    Well, this -- this document dated
3   April 15, 2019 says they have been deferred to
4   May 31, 2021.
5        Q.    Right.  But I'm just sticking to the
6   first paragraph where they refer to the
7   outstanding amounts.  And in the end it says
8   the -- it remained outstanding on December
9   31st, 2018, and I think you told me that you
10  understood that, and then I'm just trying to
11  capture the last piece of it.
12              Did you understand that there were
13  amounts outstanding from the loan that Highland
14  made to HCMFA to fund ongoing operations as of
15  April 15th, 2019?
16       A.    Yes.
17       Q.    Thank you.  Let's look at the next
18  sentence.  HCMFA expects that it may be unable
19  to repay such amounts should they become due
20  for the period commencing today and continuing
21  through May 31st, 2021.
22              Do you see that?
23              MS. DANDENEAU:  Objection to form.
24       A.    I do.
25       Q.    As the CFO -- withdrawn.
```

1          WATERHOUSE - 10-19-21

2          As the treasurer of HCMFA, did you

3    believe that -- do you believe that statement

4    was true and accurate at the time it was

5    rendered?

6      A.    I mean, it -- it -- the answer to

7    that is I really didn't have any -- I didn't

8    have an opinion really.

9      Q.    Did you do anything to educate

10   yourself in April of 2019 on the issue of

11   whether HCMFA could repay the amounts that it

12   owed to Highland should they become due?

13     A.    I don't believe so.

14     Q.    Did you at any time form any

15   opinions as to HCMFA's ability to repay all

16   amounts due to Highland should they become due?

17     A.    Not really.  I guess I don't...

18     Q.    Well, you told the retail board that

19   HCMFA's liabilities exceeded their assets in

20   2020; correct?

21     A.    Yes.

22     Q.    Based on the work that you did to

23   prepare for the retail board, did you form any

24   view as to whether HCMFA would be unable to

25   repay the amounts that it owed to Highland

1                    WATERHOUSE - 10-19-21

2    should they become due?

3              MS. DANDENEAU:  Objection to form.

4         A.    I mean, I -- when you look at that,

5    to answer you, completely, you know, again,

6    if -- the response I gave the retail board was,

7    you know, the -- the advice -- HCMFA advisors

8    have the -- have the full faith and backing of

9    Jim Dondero.  So I didn't form an opinion of

10   whether the advisor could pay it or not.

11        Q.    Did you form any view as to whether

12   the advisors could repay the amounts that it

13   owed to Highland should they become due without

14   the full faith and backing of Mr. Dondero?

15             MS. DANDENEAU:  Objection to form.

16             MS. DEITSCH-PEREZ:  Form.

17        A.    I mean, if you -- if you -- if you

18   take that last statement out, I mean, it would

19   be difficult for HCMFA to pay back demand notes

20   at that time.

21        Q.    And it was precisely for that reason

22   that you told the retail board that -- that the

23   retail -- that the advisors had the full faith

24   and backing of Mr. Dondero; correct?

25             MS. DANDENEAU:  Objection to form.

1          WATERHOUSE - 10-19-21

2     A.    I mean, yes, as the mouthpiece, I

3  was relaying information.

4     Q.    Okay.  And you relayed that

5  information with the knowledge and approval of

6  Mr. Dondero; correct?

7          MS. DEITSCH-PEREZ:  Object to the

8     form.

9     A.    As I stated in the email, I don't

10  believe, and I think I testified I don't

11  believe I had conversations with Mr. Dondero at

12  the time of that board meeting.

13     Q.    Did you tell the retail board that

14  the advisors had the full faith and backing of

15  Mr. Dondero without Mr. Dondero's prior

16  approval?

17     A.    Yeah, I -- I -- yes, I'm -- like I

18  said, I think I testified earlier, I'm sure I

19  qualified it as well.

20     Q.    What do you mean by that?

21          MS. DANDENEAU:  Objection to form.

22     A.    Again -- again, like I said in the

23  email, it has the full faith and backing of Jim

24  Dondero unless that has changed.

25     Q.    Actually that is not what you said,

1                    WATERHOUSE - 10-19-21

2     so let's put the email back up.

3          A.    It is -- it is -- it is in the

4     email.

5          Q.    Let's put the email back up.  You

6     didn't say unless it has changed.  You said you

7     believe it hasn't changed; right?

8          A.    Okay.  And to my knowledge that

9     hasn't changed, that is what it says.

10         Q.    That's right.

11         A.    But, again, I mean, that is -- I

12    don't know everything.  And I'm not in every

13    conversation.  I'm not -- to presume that I am,

14    is -- and you have to put myself -- as you

15    started this out, Mr. Morris, I was at home in

16    October of 2020 with COVID -- or, you know,

17    under these COVID times that we described is

18    very difficult.

19               We have all been working at home for

20    really the first time ever, undergoing

21    processes, procedures, control environments

22    that have been untested, and there is poor

23    communication.

24               So I am relaying, as I'm telling you

25    now, what is in the email.  And unless

```
 1                  WATERHOUSE - 10-19-21

 2    something has changed -- to my knowledge, it

 3    hasn't changed, but it could have changed.

 4         Q.    When you say that the advisors have

 5    the full faith and backing from Mr. Dondero,

 6    did you intend to convey that, to the extent

 7    the advisors were unable to satisfy their

 8    obligations as they become due, Mr. Dondero

 9    would do it for them?

10              MS. DANDENEAU:  Object to the form.

11              MS. DEITSCH-PEREZ:  Object to the

12         form.

13              And, John, we have given you a lot

14         of leeway here but this does not seem

15         relevant to this case.  You seem sort of

16         taking a complete sort of diversion into

17         the allegations and the complaint just

18         filed on Friday, and so I would ask you to

19         move on because --

20              MR. MORRIS:  And I will tell you --

21         I will tell you that I have never read that

22         complaint cover-to-cover.  I have nothing

23         to do with the prosecution of those claims.

24         And this issue that we're talking about

25         right now is related solely to the
```

1          WATERHOUSE - 10-19-21

2     promissory notes that your clients refuse

3     to pay.

4          So I'm going to continue to ask my

5     questions, and I would ask the court

6     reporter to read back my last question.

7               (Record read.)

8          MS. DEITSCH-PEREZ:  And then I

9     believe there were objections to form.

10    Q.    You can answer the question.

11    A.    Yes.

12    Q.    Thank you very much, sir.

13         MR. MORRIS:  Can we go back to the

14    other document, please?

15    Q.    Mr. Waterhouse, do you know if this

16  document was ever shared with the retail board?

17    A.    I don't recall.

18    Q.    Did you ever share it with the

19  retail board?

20    A.    I don't recall.

21    Q.    Did you ever tell the retail board

22  about the substance of this document?

23    A.    I don't recall.

24    Q.    Did you ever tell the retail board

25  that Highland had agreed not to make a demand

1          WATERHOUSE - 10-19-21

2    against HCMFA until May 2021?

3          A.    I don't recall.

4          Q.    Do you know whether anybody on

5    behalf of the advisors ever informed the retail

6    board that Highland had agreed on April 15,

7    2019, not to make a demand against HCMFA under

8    the promissory notes?

9          A.    I don't recall.

10         Q.    Did you instruct Ms. Thedford or

11   anybody else responding to the retail board's

12   15(c) inquiry to disclose this document?

13         A.    Did I instruct Ms. Thedford or

14   anyone else to -- to -- to produce this, to

15   disclose this document?  Is that what you -- I

16   just want to make sure.

17         Q.    Uh-huh.

18         A.    Yeah, I don't -- I don't recall.

19         Q.    Did you instruct anybody to inform

20   the retail board, in response to their question

21   as part of the 15(c) process, to -- to tell the

22   retail board about Highland's agreement not to

23   make a demand until 2021?

24              MS. DANDENEAU:  Objection to form.

25         A.    I don't recall.

1          WATERHOUSE - 10-19-21

2     Q.     Did you ever inform PwC that HCMFA's

3     liabilities exceeded its assets?

4          MS. DANDENEAU:  Object to the form.

5     A.     I don't -- I don't think I told

6     them.  I mean, they -- they audited the

7     financial statements.

8     Q.     Did -- do you know if anybody on

9     behalf of Highland ever informed

10    PricewaterhouseCoopers that HCMFA may be unable

11    to repay amounts owing to Highland, should they

12    become due?

13         MS. DANDENEAU:  Objection to form.

14    A.     Yes.  Again, I think I testified

15    earlier that -- that this was communicated to

16    the auditors.

17    Q.     Ideally --

18    A.     I don't know who exactly did that.

19    I don't recall doing it, but, yeah, it was --

20    it was communicated.  And that is why -- I

21    mean, there is a disclosure in the financial

22    statements; right?

23    Q.     There is, and that disclosure

24    relates to the last sentence of this document;

25    correct?

```
1                 WATERHOUSE - 10-19-21

2        A.    Yes.

3        Q.    Do you recall looking in the

4   document and seeing anything that was disclosed

5   with respect to the sentence above that?

6        A.    No.

7        Q.    Do you know whether anybody on

8   behalf of Highland ever informed

9   PricewaterhouseCoopers that HCMFA expects that

10  it may be unable to repay amounts due and owing

11  to Highland should they become due?

12             MS. DEITSCH-PEREZ:  Object to the

13        form.  I think that is the third time.

14        A.    I don't recall.  Again, as I said,

15  we -- all of this was given to the auditors.

16        Q.    Do you know if Highland received

17  anything of value in exchange for its agreement

18  not to demand payment on amounts owed by HCMFA

19  prior to May 31st, 2021?

20             MS. DEITSCH-PEREZ:  Object to the

21        form.  That is the second time.

22             MS. DANDENEAU:  Object to the form.

23        A.    I have answered this question.

24             MR. RUKAVINA:  Hold on.  Object to

25        legal conclusion.  Go ahead.
```

1                    WATERHOUSE - 10-19-21

2        A.    I have answered this question

3    before.

4        Q.    And the answer was no?

5        A.    I'm not aware.

6        Q.    Now, this acknowledgment can't

7    possibly apply to the two notes that you signed

8    on behalf of HCMFA because those notes were

9    signed on May 2nd and May 3rd, 2019; is that

10   right?

11            MS. DANDENEAU:  Objection to form.

12       A.    Unless there is a drafting error.

13       Q.    Okay.  Are you aware of a drafting

14   error?

15       A.    I'm not aware.  I didn't -- I wasn't

16   part of -- I didn't sign this note or this

17   acknowledgment.  I didn't draft it.

18       Q.    But you do see it is dated April 15,

19   2019; right?

20       A.    Yes.

21       Q.    And this was a document that was

22   actually included by the advisors in a pleading

23   they filed with the Court; right?

24            MR. RUKAVINA:  Well, I don't know

25        that so I object to form.

1         WATERHOUSE - 10-19-21

2    Q.    Okay.  Let's go to the first page of

3    the document and just confirm that.

4         MR. AIGEN:  Mr. Morris, I just note

5         that you already said there was some error

6         with the document that is listed as

7         exhibit --

8         MR. MORRIS:  No.  No, no, no.

9         MS. DEITSCH-PEREZ:  Oh, okay.

10        MR. MORRIS:  What I said is that

11        there is a few pages that were mistakenly

12        stapled to the end of the document.

13        MS. DEITSCH-PEREZ:  Okay.

14        MR. MORRIS:  There is no problem

15        with this document.

16        MS. DEITSCH-PEREZ:  And just so

17        we're clear that the document -- the pages

18        that start with defendant's amended answer

19        are not intended to be part of this

20        document?

21        MR. MORRIS:  That's correct.

22        MS. DEITSCH-PEREZ:  And that the --

23        but it is your representation that the rest

24        of the document is -- is -- is correct

25        because we don't -- we don't have any way

1          WATERHOUSE - 10-19-21

2      of verifying that, we're just --

3          MR. MORRIS:  You do, actually.  You

4      could just go to Docket No. 21-3004.

5          MS. DEITSCH-PEREZ:  If you want to

6      stop this deposition so we can go and pull

7      that document up, we're happy to do it.  So

8      I am just asking you for your

9      representation.

10          MR. MORRIS:  Sure.  I gave that.

11          MS. DEITSCH-PEREZ:  Okay.

12      Q.    So do you see that this is a

13  document that was actually filed with the Court

14  by Highland Capital Management Fund Advisors?

15      A.    No.  I get with the first page in

16  the section.  Maybe I'm looking at the wrong

17  thing.  It says, Highland Capital Management.

18      Q.    Don't worry about it.  Don't worry

19  about it.

20      A.    Maybe I went back -- okay.

21          MR. MORRIS:  All right.  Can we put

22      up on the screen Exhibit 2.

23          (Exhibit 2 marked.)

24          MR. MORRIS:  I think it is

25      Exhibit 1.

1          WATERHOUSE - 10-19-21

2          MS. DANDENEAU:  I'm sorry, John, did

3     you say Exhibit 2 or Exhibit 1?

4          MR. MORRIS:  It is Exhibit 2 in the

5     binders so it is premarked Exhibit 2.  And

6     now I'm asking -- right there -- going to

7     Exhibit 1 to the document that was marked

8     as Exhibit 2.

9          MS. DANDENEAU:  Got it.  In the

10     binder there is no --

11          MS. DEITSCH-PEREZ:  There is no

12     Exhibit 1.

13          MR. MORRIS:  All right.  So look at

14     the one on the screen.

15     Q.    Do you see, Mr. Waterhouse, that

16   this is a promissory note dated May 31st, 2017,

17   in the approximate amount of $30.7 million?

18     A.    Yes.

19     Q.    And do you see that the maker of the

20   note is NexPoint?

21     A.    Yes.

22     Q.    And that Highland is the payee; is

23   that right?

24     A.    Yes.

25     Q.    Okay.  And do you see in Paragraph 2

```
 1              WATERHOUSE - 10-19-21
 2   this is an annual installment note?
 3        A.    Can you scroll down.
 4        Q.    Sure.
 5              MR. MORRIS:  Can we scroll down --
 6        yeah, there you go.
 7        A.    Right there, yeah.  Yes.
 8              MR. MORRIS:  And can we scroll down
 9        to the signature line.
10        Q.    And do you recognize that as
11   Mr. Dondero's signature?
12        A.    Yes.
13        Q.    And is this the promissory note that
14   we talked about earlier where NexPoint had made
15   certain payments in the aggregate amount of
16   about 6 to $7 million against principal and
17   interest?
18        A.    I don't recall discussing the
19   aggregate principal amounts of 6 to $7 million,
20   but -- so I don't -- I don't recall that prior
21   discussion with those amounts.
22        Q.    All right.  Let's take a look.
23   NexPoint always included this promissory note
24   as a liability on its audited financial
25   statements; right?
```

1          WATERHOUSE - 10-19-21

2     A.    Yes.

3     Q.    And NexPoint had its financial

4   statements audited; isn't that correct?

5     A.    Yes.

6     Q.    And was the process of NexPoint's

7   audit similar to the process you described

8   earlier for Highland and HCMFA?

9     A.    Yes, it is similar.

10    Q.    Okay.

11          MR. MORRIS:  Can we put up

12        NexPoint's audited financials and let

13        everybody know what exhibit number it is,

14        La Asia?

15          MS. CANTY:  It is going to be

16        Exhibit 46.

17          (Exhibit 46 marked.)

18    Q.    And do you see, sir, that we've put

19   up NexPoint Advisors' consolidated financial

20   statements and supplemental information for the

21   period ending December 31st, 2019?

22    A.    Yes.

23    Q.    Did you participate in the process

24   whereby these audited financial statements were

25   issued?

1              WATERHOUSE - 10-19-21

2        A.     I didn't participate directly, as

3    I've described before, about the -- the team

4    performing the audit.

5        Q.     Do you recall when the audit of

6    NexPoint's financial statements for the period

7    ending December 31st, 2019 was completed?

8        A.     Yes.

9        Q.     And when do you recall it being

10   completed?

11       A.     In January of 2021.

12       Q.     Do you know why the 2019 audit

13   report wasn't completed until January of 2021?

14       A.     Yes.

15       Q.     Why was the NexPoint audit report

16   for the period ending 12/31/19 not completed

17   until January 2021?

18       A.     Because we had to deal with working

19   from home from -- with COVID, and on top of all

20   of our daily responsibilities and job duties

21   at -- at providing -- at Highland providing

22   services to NexPoint, we had to do all of this

23   extra work for a bankruptcy that was filed in

24   October of 2019.

25              MR. MORRIS:  Can we go to the

1          WATERHOUSE - 10-19-21

2          balance sheet on page 3?  Okay.  Stop right

3          there.

4          Q.    Do you see under the liabilities

5     section, the last item is note payable to

6     affiliate?

7          A.    Yes.

8          Q.    And is that the note that we just

9     looked at?

10               MS. DANDENEAU:  Objection to form.

11         Q.    Withdrawn.

12               Is that the approximately

13    $30 million note that we just looked at that

14    was dated from 2017?

15               MS. DANDENEAU:  Objection to form.

16         A.    I believe no.

17         Q.    Okay.  You're not aware of any other

18    note that was outstanding from NexPoint to

19    Highland as of the end of the year 2019, other

20    than that one $30 million note; right?

21         A.    I don't recall.

22         Q.    And as of the end of 2019, the

23    principal amount that was due on the note was

24    approximately $23 million; right?

25               MS. DEITSCH-PEREZ:  Object to the

1                    WATERHOUSE - 10-19-21

2          form.

3          A.      Approximately.

4          Q.      And does that refresh your

5     recollection that between the time the note was

6     executed and the end of 2019, that NexPoint had

7     paid down approximately $7 million?

8          A.      Yes.  If we are just doing the math,

9     yes.

10         Q.      Okay.  Did NexPoint complete its

11    audit from 2020?

12         A.      Sorry, you kind of broke up.  Do

13    NexPoint complete?

14         Q.      The audit of its financial

15    statements for the period ending December 31st,

16    2020?

17         A.      No.

18         Q.      No, it's not complete?

19         A.      No, it is not complete.

20         Q.      Did HCMFA complete its audit for the

21    year ending December 31st, 2020?

22         A.      No.

23                 MR. MORRIS:  Can we go to page 15,

24         please, the paragraph at the bottom.

25         Q.      Do you see that NexPoint has

1          WATERHOUSE - 10-19-21

2   included under notes payable to Highland a

3   reference to the amounts that were outstanding

4   as of the year-end 2019 under the note that we

5   looked at just a moment ago?

6          A.    Yes.  Are you talking about the

7   second paragraph?

8          Q.    I'm actually talking about first

9   paragraph.  Do you understand that the first

10  paragraph is a reference to the 2017 note, and

11  the amounts that were -- the principal amount

12  that was outstanding as of the end of 2019?

13              MS. DANDENEAU:  Objection to form.

14          John, do you mean the first paragraph of

15          that page?

16              MR. MORRIS:  No, the first paragraph

17          under notes payable to Highland.

18          A.    Yeah, I see the paragraph, and

19  again, this is what I answered earlier.  I

20  believe so, just because I don't -- again, this

21  is a number in a balance sheet, and without

22  matching it up and seeing the detail with the

23  schedule like I kind of talked about for

24  Highland's financial statements, it is a little

25  bit more difficult to tie everything in

1          WATERHOUSE - 10-19-21

2    perfectly together.

3          Q.   Okay.  But you're not aware of any

4    note that was outstanding at the end of 2019

5    from NexPoint to Highland other than whatever

6    principal was still due and owing under the

7    $30 million note issued in 2017; correct?

8          A.   Well, it -- I don't -- there is

9    reference in the second paragraph.  I don't --

10   I don't -- I don't recall what that is

11   referring to, so I don't -- I don't know.

12         Q.   Well, if you listen carefully to my

13   question, right, I'm asking about notes that

14   were outstanding at the end of 2019, and if we

15   look at the paragraph you just referred to, it

16   says that during the year there were new notes

17   issued totaling $1.5 million, but by the end of

18   the year, no principal or interest was

19   outstanding on the notes.

20             Do you see that?

21         A.   Oh, I do, yes.

22         Q.   So does that refresh your

23   recollection that there were no notes

24   outstanding from NexPoint to Highland other

25   than the principal remaining under the original

WATERHOUSE - 10-19-21

1

2    $30 million 2017 note that we looked at a

3    moment ago?

4         A.    Well, we're at the bottom of the

5    page.  Is there anything on page 16?

6         Q.    That is a fair question, sure.  That

7    is it.

8         A.    Okay.  So it appears that that is

9    the only note that is detailed in the notes in

10   the financial statement.

11        Q.    And you don't have any memory of any

12   other note other than the 2017 note, right,

13   being outstanding as of the end of the year?

14        A.    I deal with thousands of

15   transactions every year.  I don't really have a

16   very specific memory for what exactly was

17   outstanding.

18             MR. MORRIS:  Why don't we take a

19        break now.  We've been going for a little

20        while.  It's 3:26.  Let's come back at

21        3:40.

22             VIDEOGRAPHER:  We're going off the

23        record at 3:26 p.m.

24        (Recess taken 3:26 p.m. to 3:39 p.m.)

25             VIDEOGRAPHER:  We are going back on

1        WATERHOUSE - 10-19-21

2        the record at 3:39 p.m.

3        Q.    All right.  Mr. Waterhouse, we -- I

4    don't think we have a lot more here.

5             To the best of your knowledge and

6    recollection, were all affiliate loans and all

7    loans made to Mr. Dondero recorded on

8    Highland's books and records as assets of

9    Highland?

10            MS. DANDENEAU:  Object to the form,

11        asked and answered.

12       A.    To my knowledge, yes.

13       Q.    Okay.  Can you recall any loan to

14   any affiliate or Mr. Dondero that was not

15   recorded on Highland's books and records as an

16   asset?

17       A.    Like during my time as CFO?  I don't

18   recall.

19       Q.    How about after the time that you

20   were CFO?  Did you recall that there was a loan

21   by Highland to an affiliate or to Mr. Dondero

22   that hadn't been previously recorded on

23   Highland's books as an asset?

24            MS. DANDENEAU:  Objection to form.

25       A.    I guess I don't understand the

```
1              WATERHOUSE - 10-19-21

2     question.  I left Highland as of -- I'm not

3     aware of -- I left Highland in February --

4     probably the last day of February of 2021.

5          Q.    Okay.

6          A.    I'm not -- I'm not aware of any --

7     I'm not aware of anything past that date.

8          Q.    Okay.  While you were the CFO at

9     Highland, did Highland prepare in the ordinary

10    course of business a document that reported

11    operating results on a monthly basis?

12         A.    Yes.

13         Q.    And are you generally familiar with

14    the monthly operating reports?

15         A.    Yeah.  You are referring to the

16    reports that we filed to the Court every month?

17         Q.    I apologize, I'm not.  I'm taking

18    you back to the pre-petition period.  There was

19    a report that I have seen that I'm going to

20    show you, but I'm just asking for your

21    knowledge.

22              MR. MORRIS:  Let's put it up on the

23         screen, Exhibit 39.

24              (Exhibit 39 marked.)

25         Q.    Do you see this is a document that
```

1              WATERHOUSE - 10-19-21

2    is called operating results?

3         A.    Yeah, that's the title of it.

4         Q.    Okay.  And was a report of operating

5    results prepared by Highland on a monthly basis

6    during the time that you served as CFO?

7         A.    No.

8         Q.    Are you familiar with a document of

9    this type?  And we can certainly look at the

10   next page or two to refresh your recollection.

11        A.    I'm just looking at the title.  I

12   don't really -- again, as I discussed before, I

13   don't have any records or documents or emails

14   or appointments or anything that I was able to

15   use prior to -- prior to this deposition, so

16   I'm doing the best I can.

17        Q.    Okay.  You don't need to apologize.

18   I'm just asking you if you are familiar with

19   the document called Operating Results that was

20   prepared on a monthly basis at Highland?

21             MS. DEITSCH-PEREZ:  Object to the

22        form.

23        Q.    If you're not, you're not.

24        A.    I don't believe this was prepared on

25   a monthly basis.

1                    WATERHOUSE - 10-19-21

2        Q.    Okay.  Do you see that this one

3    is -- is dated February 2018?

4        A.    Yes.

5        Q.    Do you have -- do you believe --

6    have you ever seen a document that was

7    purporting to report operating results for

8    Highland?

9              MS. DANDENEAU:  Objection to form.

10       A.    Yes.

11       Q.    Okay.  And when you say that you

12   don't believe it was produced on a monthly

13   basis, was it produced on any periodic bases to

14   the best of your recollection?

15       A.    I believe it was -- it was prepared

16   on an annual basis.

17       Q.    Okay.

18             MR. MORRIS:  Can we look at the next

19       page.

20       Q.    Do you see that there is a statement

21   here called:  Significant items impacting

22   HCMLP's balance sheet?

23             And it is dated February 2018.

24       A.    Yes.

25       Q.    Do you recall that there was a

1                    WATERHOUSE - 10-19-21

2    report that Highland prepared that identified

3    significant items impacting the balance sheet?

4         A.    A report that was prepared.

5         Q.    Let me ask a better question:  Did

6    Highland prepare reports to the best of your

7    recollection that identified significant items

8    that impacted its balance sheet?

9         A.    Well, so Highland prepared a -- a

10   monthly close package.  And maybe I'm

11   getting -- and -- and maybe change names at one

12   time or maybe I'm just -- again, just

13   misremembering -- but in that, yes, there is a

14   page that would detail just changes in -- you

15   know, just changes month over month on the

16   balance sheet.

17        Q.    Okay.  And maybe it is my fault.

18   Maybe I didn't know the proper name for it.

19   But let's use the phrase "monthly close

20   package."

21             Did Highland prepare a monthly close

22   package in the ordinary course of business

23   during the time that you served as CFO?

24             MS. DANDENEAU:  Objection to form.

25        A.    Yes.

1          WATERHOUSE - 10-19-21

2      Q.    And did the monthly close package

3   that Highland prepared include information

4   concerning significant items that impacted

5   Highland's balance sheet?

6      A.    Yes, it had a page like that is --

7   that is on the screen that detailed items

8   like -- of that nature.

9      Q.    And do you know who -- was there

10  anybody at Highland who was responsible for

11  overseeing the preparation of the monthly

12  reporting package?

13     A.    That would have been -- again, it

14  varies over time during my tenure as CFO.

15  It -- it varied over -- over time, but -- but

16  typically a -- a corporate accounting manager.

17     Q.    And who were the corporate

18  accounting managers during your tenure as CFO?

19     A.    It would have been Dave Klos and

20  Kristin Hendrix.

21     Q.    And did the corporate accounting

22  manager deliver to you drafts of the monthly

23  close package before it was finalized?

24     A.    Sometimes.

25     Q.    Was that the practice even if there

1                    WATERHOUSE - 10-19-21

2    were exceptions to the practice?

3         A.    The practice meaning that they

4    sometimes lured them to me?

5         Q.    That that was the expectation even

6    if circumstances prevented that from happening

7    from time to time.

8              MS. DEITSCH-PEREZ:  Object to the

9         form.

10        A.    I -- I would say it started out that

11   way but over the years it -- it was not

12   enforced.

13        Q.    Okay.  So you were -- you reviewed

14   and approved monthly -- monthly reporting

15   packages for a certain period of time and then

16   over time you stopped doing that.

17              Do I have that right?

18              MS. DANDENEAU:  Objection to form.

19        A.    Yes, I mean, if you're talking about

20   a formal meeting where we sit down and go

21   through and approve it.  I would say that was

22   standard practice a decade -- you know, early

23   on.  And as time went on that -- that -- that

24   practice wasn't followed.

25        Q.    Okay.

1          WATERHOUSE - 10-19-21

2          A.    And, quite frankly, I don't even

3    know if these were -- these were sent to me

4    even in any capacity.

5          Q.    What was the purpose of preparing

6    the monthly reporting package -- withdrawn.

7                What was the purpose of preparing

8    the monthly close package?

9                MS. DEITSCH-PEREZ:  Object to the

10         form.

11         A.    The -- the original purpose was so

12   that it would just -- it would be a report that

13   was reviewed monthly with senior management.

14         Q.    Who was included in the idea of

15   senior management?

16         A.    You know, I think originally when

17   this was conceived that would have been like

18   Jim Dondero and Mark Okada.

19         Q.    Were monthly reporting -- withdrawn.

20               Were monthly close packages prepared

21   to the best of your knowledge until the time

22   you left Highland?

23         A.    To my knowledge -- I don't know,

24   actually.  I mean, to my knowledge, I believe

25   it was being -- that was still being done.  I

1                    WATERHOUSE - 10-19-21

2    don't know because, again, I wasn't reviewing

3    them.  I hadn't reviewed a close package for --

4    for a long time.  But I believe the standard

5    practice that was still being carried out.

6          Q.    Did you ever have any discussions

7    with the debtor's independent board concerning

8    any promissory notes that were issued by any of

9    the affiliates or Mr. Dondero?

10         A.    I can't -- I can't -- I can't recall

11   specifically.

12         Q.    Did you speak with the independent

13   board from time to time?

14         A.    Yes, from -- from -- from time to

15   time I had discussions with the independent

16   board members, you know, either -- either, you

17   know, by themselves or wholly, you know, as --

18   as a -- as a combined work.

19         Q.    Okay.  Before we talk about

20   Mr. Seery, do you recall ever having a

21   conversation with Mr. Nelms or Mr. Dubel

22   concerning any promissory note that was

23   rendered by one of the affiliates or

24   Mr. Dondero to Highland?

25         A.    I don't recall any conversations

1          WATERHOUSE - 10-19-21

2    specifically.

3          Q.    Do you know if the topic was ever

4    discussed, even if you don't remember it

5    specifically?

6              MS. DANDENEAU:  Objection to form.

7          A.    It -- it -- it may have.  I don't

8    know.  I don't recall.

9          Q.    Do you recall ever discussing any

10   promissory note issued by any of the affiliates

11   or Mr. Dondero with James Seery?

12         A.    I don't -- I don't recall

13   specifically.

14         Q.    Do you recall generally ever

15   discussing the topic of promissory notes issued

16   by any of the affiliates or Mr. Dondero to

17   Highland with Mr. Seery?

18         A.    Nothing -- nothing is really jumping

19   out at me.

20         Q.    Do you recall if you ever told

21   Mr. Seery that any of the affiliates or

22   Mr. Dondero didn't have an obligation to pay

23   all amounts due and owing under their notes?

24         A.    I don't recall having that

25   conversation.

1                    WATERHOUSE - 10-19-21

2      Q.    Did you ever tell Mr. Seery that you

3   had any reason to believe that the amounts

4   reflected in the notes issued by the affiliates

5   and Mr. Dondero were invalid for any reason?

6      A.    I don't -- I don't recall.

7      Q.    Did you tell Mr. Dondero -- did you

8   tell Mr. Seery that you thought the promissory

9   notes issued by the advisors and Mr. Dondero

10   that were outstanding as of the petition date

11   were assets of the estate?

12      A.    I don't recall having a specific

13   conversation about those -- you know, those

14   notes outstanding as -- as of the petition date

15   being assets on the estate.  I mean, we put

16   together -- you know, they're in the books and

17   records of the financial statements.  I don't

18   recall having a specific conversation.

19      Q.    Did you ever prepare any documents

20   that were delivered to Mr. Seery that concerned

21   the promissory notes issued by any of the

22   affiliates or Mr. Dondero?

23              MS. DANDENEAU:  Objection to form.

24      A.    Did I produce any that concerned --

25   you mean did I just -- did I give Mr. Seery

1        WATERHOUSE - 10-19-21

2   anything that -- that said I have concerns over

3   these notes?

4        Q.   No.  Let me try again.  Maybe it was

5   my question.

6            Did you ever give Mr. Seery any

7   information concerning any of the notes that

8   were issued by any of the affiliates or

9   Mr. Dondero?

10           MS. DANDENEAU:  Objection to form.

11       A.   I don't recall if I did or not.  I

12  don't -- I don't remember.  I mean, you have my

13  emails.  You may have asked.  Again, I don't --

14  I don't know.

15           MR. MORRIS:  Can we put up the

16       document that has been premarked as Exhibit

17       39?

18           MS. DANDENEAU:  John, that is this

19       document, isn't it?

20           MR. MORRIS:  Oh, yeah, it might be,

21       as a matter of fact.  Let's go to Number

22       40.

23           (Exhibit 40 marked.)

24       Q.   During the bankruptcy,

25  Mr. Waterhouse, did you prepare documents that

1          WATERHOUSE - 10-19-21

2    were filed with the bankruptcy court?

3          A.    I didn't -- I didn't prepare them

4    personally.

5          Q.    Did people prepare them under your

6    direction?

7          A.    Yes.  There were members of the team

8    that prepared them, and they worked in -- you

9    know, there were members of DSI that were

10   involved in the process as well.

11         Q.    To the best of your knowledge, did

12   DSI rely on the employees of Highland for the

13   information that they used to prepare the

14   bankruptcy filings?

15         A.    Yes.  The books and records were

16   with the Highland personnel.

17         Q.    Okay.  And do you see on the screen

18   here, there is a document that we have marked

19   as Exhibit 40 that is -- that is titled Summary

20   of Assets and Liabilities?

21         A.    Uh-huh.

22         Q.    Okay.  And do you recall reviewing

23   any summary of assets and liabilities before it

24   was filed with the bankruptcy court?

25         A.    Yes, I recall reviewing this at a

1          WATERHOUSE - 10-19-21

2    high level.

3         Q.    And did you believe that it was

4    accurate at the time it was filed?

5         A.    I didn't have any other reason to

6    believe otherwise.

7         Q.    Okay.  Do you see that the total

8    value of all properties listed in Part 1 is

9    approximately $410 million?

10              MS. DEITSCH-PEREZ:  Objection to

11         form.

12        A.    Yes, it is in 1c.

13        Q.    Yes.

14        A.    Yes, I see that.

15        Q.    Okay.  If we go to the second page,

16   now I think I may just have excerpts here, just

17   so everybody is clear, but if we scroll down to

18   the second page, you will see that there is

19   a -- a little further.  There you go.  You will

20   see there is a reference to Item 71, notes

21   receivable.

22              Do you see that?

23        A.    I do.

24        Q.    And that was a reference to the

25   notes receivable from the affiliates and

```
 1                   WATERHOUSE - 10-19-21

 2   Mr. Dondero, among others; is that right?

 3             MS. DANDENEAU:  Objection to form.

 4        A.    Yes.  The affiliate notes and the

 5   Dondero notes were in this amount, but they

 6   weren't -- again, like you said, and among

 7   others.

 8        Q.    Okay.  We will look at the

 9   specificity because I'm not playing gaming

10   here, but do you know if the $150 million of

11   notes receivable was included within the

12   $410 million of total value of the debtor's

13   assets?

14             MS. DANDENEAU:  Objection to form.

15        A.    I -- I -- I believe so.

16        Q.    Right.  And so is it fair to say

17   that as of the date this document was prepared,

18   the notes receivable were more than one-third

19   of the value of the debtor's assets?

20             MS. DEITSCH-PEREZ:  Object to the

21        form.

22             MS. DANDENEAU:  Object to the form.

23        A.    Again, if you are just taking the

24   math, 150 divided by whatever the $400 million

25   number is above, then yes, you get there.
```

1          WATERHOUSE - 10-19-21

2      Q.    Okay.

3      A.    You know, but as of the time of this

4  filing, that is what was put in this filing,

5  right, but, you know, I mean, numbers --

6  numbers change, facts and circumstances change.

7      Q.    But as the CFO of Highland, the

8  debtor in bankruptcy, did you believe that this

9  number accurately reflected the total amount

10  due under the notes receivable?

11      A.    That is what we had in our books and

12  records.

13      Q.    Okay.  And did you believe as the

14  CFO that the books and records accurately

15  reported the then value of the debtor's assets?

16          MS. DANDENEAU:  Objection to form.

17      A.    We didn't -- as part of this filing,

18  there was no fair value measurement or

19  anything.  These were just accounting entries

20  for the promissory notes.  There is no analysis

21  for impairment or fair market value adjustments

22  or anything of that nature.  This is purely

23  taking numbers and putting them in our form.

24      Q.    Did you do any impairment analysis

25  at any time while you were employed by

```
1              WATERHOUSE - 10-19-21
```

2  Highland?

3      A.    Yes, we did do impairment analysis

4  on -- on assets.

5      Q.    Okay.  Did you ever do an impairment

6  analysis on any of the promissory notes that

7  were given to Highland by any of the affiliates

8  or Mr. Dondero?

9      A.    Not that I recall.

10     Q.    Under what circumstances do you

11  prepare impairment analyses?

12     A.    As -- as -- if you're preparing

13  financials in accordance with GAAP, generally

14  accepted accounting principles, if you're

15  preparing full GAAP financials, you should be

16  preparing -- you should be undergoing on a

17  periodic basis any fair market value

18  adjustments to assets.

19          As I was instructed at the time of

20  the petition date, we weren't producing GAAP

21  financials.  So this wasn't something I was

22  worried about nor concerned about.

23     Q.    Okay.  Were NexPoint and HCMFA and

24  Highland's audited financial statements

25  prepared in accordance with GAAP?

1           WATERHOUSE - 10-19-21

2       A.    The audited financials -- yes,

3  audited financial statements are prepared in

4  accordance with GAAP.

5       Q.    Do you recall whether any of

6  Highland or HCMFA or NexPoint ever made a fair

7  market value adjustment to any of the notes

8  issued by any of the affiliates or Mr. Dondero

9  to Highland?

10      A.    I do not recall that happening, but

11  the -- it is because under -- under GAAP,

12  the -- the treatment of liabilities is

13  different than assets.

14      Q.    Okay.  So then let's just focus on

15  Highland's audited financial statements.

16           The last audited financial

17  statements were for the period ending December

18  31st, 2018; correct?

19      A.    That is my understanding.

20      Q.    And you had -- you had an obligation

21  to disclose anything to PricewaterhouseCoopers

22  concerning any subsequent events between the

23  end of 2018 and June 3rd, 2019; correct?

24           MS. DANDENEAU:  Objection to form.

25           MS. DEITSCH-PEREZ:  Form.

1                    WATERHOUSE - 10-19-21

2        A.    Correct.

3        Q.    Okay.  To the best of your

4   knowledge, as Highland's CFO, did Highland ever

5   make any fair market value adjustments to any

6   of the promissory notes that were carried on

7   its balance sheet and that were issued by any

8   of the affiliates or Mr. Dondero?

9        A.    I think I answered that question

10  earlier.  I don't recall doing that for any of

11  the -- those -- those notes.  So it would have

12  included the audit for the -- for the 2018

13  period.

14       Q.    Okay.

15            MR. MORRIS:  Can we go to the next

16       page.

17       Q.    Do you see this is a note a list of

18  notes receivable?  Do you see that?

19       A.    Yes, I do.

20       Q.    And do you see that this ties into

21  the page that we were just looking?

22       A.    I'm sorry, can we go back to the

23  prior page?  I mean, it was at 150,331,222.  It

24  was on the prior page.  Next page.  Yes, it

25  agrees.

```
1                    WATERHOUSE - 10-19-21

2         Q.    Okay.  So now let's look at that

3    schedule.  So this was the face amount of all

4    of the promissory notes that Highland held at

5    the time this document was filed with the

6    bankruptcy court; right?

7         A.    Yes.

8         Q.    There is a footnote there that says,

9    doubtful or uncollectible accounts are

10   evaluated at year-end.

11              Do you see that?

12        A.    I do.

13        Q.    Okay.  And is it fair to say that as

14   of the year-end 2018, the year before this,

15   that to the extent any of these notes were

16   outstanding at that time, they weren't deemed

17   to be doubtful or uncollectible?

18        A.    Yeah.  For the 2018 audit, there

19   weren't any -- there weren't any adjustments to

20   fair value.

21        Q.    Okay.  And during the bankruptcy, do

22   you recall that Highland subsequently reserved

23   for the Hunter Mountain Investment Trust note?

24        A.    Yes.

25        Q.    Why did Highland -- were you
```

```
 1              WATERHOUSE - 10-19-21
 2   involved in the decision to reserve the Hunter
 3   Mountain Investment Trust note?
 4        A.    I was not.
 5        Q.    Do you know why Highland decided to
 6   reserve for the Hunter Mountain Investment
 7   Trust note?
 8        A.    I don't know yet decision was made.
 9   I believe it was made by someone at DSI.
10        Q.    Okay.  I'm just asking if you know
11   why.
12              Did you ever ask anyone why they
13   reserved for that particular note?
14        A.    I don't recall.
15        Q.    Do you know whether the debtor
16   reserved for any other note on this list during
17   the bankruptcy?
18        A.    Again, I don't recall.  I wasn't
19   part of any process of -- again, like any fair
20   value adjustments or anything to that degree.
21   Like I said, a lot of that was done by DSI and
22   it was kind of out of our court.
23        Q.    Okay.  Do you know if any note
24   receivable on this list was ever deemed by the
25   debtor to be doubtful or uncollectible?
```

1          WATERHOUSE - 10-19-21

2     A.    I don't -- I don't have a

3  recollection of every filing, so I don't know.

4     Q.    Did you ever have a discussion with

5  anybody at any time about whether any of the

6  notes receivable on this list should be deemed

7  to be doubtful or uncollectible?

8     A.    No.  As I previously stated, we were

9  told we didn't have to keep GAAP financials.

10  We weren't having -- you know, there is no

11  underlying audits being performed, so I mean,

12  it wasn't something I worried about.

13          MR. MORRIS:  I move to strike.

14     Q.    Did you ever have a conversation

15  with anybody about any of the notes receivable

16  and whether they should be deemed to be

17  doubtful or uncollectible?  Did you have the

18  conversation, yes or no?

19          MS. DANDENEAU:  Objection to form.

20     A.    I don't recall.

21     Q.    Do you recall ever telling anybody

22  that you believed any of the notes receivable

23  on this list should be doubtful -- should be

24  deemed to be doubtful or uncollectible?

25          MS. DANDENEAU:  Objection to form.

1          WATERHOUSE - 10-19-21

2     A.    I don't recall.  I mean, it may have

3   happened, you know, again, when we initially

4   getting DSI up to speed and going through

5   financials, it may have happened, but I don't

6   recall specifically.

7     Q.    While you were the CFO of Highland

8   during the time that the company was in

9   bankruptcy, did you have any reason to believe

10  that any of the notes receivable on this list

11  other than Hunter Mountain Investment Trust

12  should have been characterized as doubtful or

13  uncollectible?

14          MS. DANDENEAU:  Objection to form.

15          MS. DEITSCH-PEREZ:  Form.

16    A.    I didn't know.  I didn't form an

17  opinion.  Bankruptcy was new to me.  It still

18  is new to me, even after going through this.

19  So I really didn't know what to expect nor

20  really -- you know, I didn't know.

21          MR. MORRIS:  I move to strike.

22    Q.    During the period of Highland's

23  bankruptcy when you were serving as CFO, did

24  you have any reason to believe any of the notes

25  on this list were doubtful or uncollectible?

1          WATERHOUSE - 10-19-21

2          MS. DEITSCH-PEREZ:  This is like the

3     fifth time you've asked it.  Object to the

4     form.

5          MR. MORRIS:  I'm moving to strike,

6     if you haven't noticed, because he's not

7     answering the question.

8          MS. DEITSCH-PEREZ:  He was answering

9     the question, you just didn't like it, like

10    the answer.

11         MR. MORRIS:  Good Lord.

12    Q.    Go ahead, Mr. Waterhouse.

13    A.    Again, I don't -- we brought up a

14    myriad of issues at the start of the bankruptcy

15    case.  I don't recall if this was one of them,

16    but, again, there are a lot of things we

17    couldn't change.  Even, you know, I was told

18    status quo, blah, blah, blah, right, there is a

19    stay, you can't -- you know, I don't recall

20    specifically, but that doesn't mean it didn't

21    happen.

22         MR. MORRIS:  I move to strike.

23    Q.    During the time that Highland was in

24    bankruptcy and you served as CFO, did you have

25    any reason to believe that any of the notes

1          WATERHOUSE - 10-19-21

2    receivable on this list were doubtful or

3    uncollectible?

4          MS. DEITSCH-PEREZ:  Object to the

5          form.

6    A.    Potentially.

7    Q.    Did you ever tell anybody that?

8    A.    As I just stated like five times,

9    yes, we -- at the beginning after filing and we

10   were getting DSI and others up to speed, you

11   know, we had a myriad of discussions of a lot

12   of things and this was likely one of them.  I

13   don't -- but I don't recall specifically we

14   talked --

15   Q.    I don't want to know -- I don't want

16   to know what was --

17         MS. DEITSCH-PEREZ:  Wait, wait.

18         Excuse me.  Mr. Morris, you did not let him

19         finish his answer.

20   A.    I spoke -- we had -- we were

21   bringing Fred Karesa and Brad Sharp (phonetic)

22   up to speed on all of these items, contracts,

23   and investments and going through -- we had

24   hours and hours and hours of discussion.  And

25   then not only do I have to repeat this not

1          WATERHOUSE - 10-19-21

2    once, twice, three, four times with -- you

3    know, I mean, we -- I don't -- I don't remember

4    the sum culmination of all these discussions.

5    They all kind of blend together.

6              MR. MORRIS:  Okay.  I move to strike

7         and I will try one more time.

8         Q.   Did you ever tell anybody at DSI

9    that you believed any of the notes receivable

10   on this list were doubtful or uncollectible?

11             MS. DANDENEAU:  Object to form.

12        A.   Potentially.

13        Q.   Potentially you told them or

14   potentially they were doubtful or

15   uncollectible?

16        A.   Potentially I told them that we

17   needed to look at the value of these -- of

18   these assets.

19        Q.   Okay.  Did you -- okay.  It is

20   potential that you told them and it is

21   potentially that you didn't; right?

22             MS. DANDENEAU:  Objection to form.

23        A.   I've gone through that.  I don't

24   recall specifically.

25        Q.   So you should just -- I don't want

1           WATERHOUSE - 10-19-21

2    to tell what you to do.  Do you have --

3               MS. DANDENEAU:  Good.

4         Q.    Other than -- other than telling

5    them that they should look at the values, do

6    you have any recollection whatsoever of ever

7    having told anybody at DSI that any of the

8    notes receivable on this page were doubtful or

9    uncollectible?

10              MS. DEITSCH-PEREZ:  Object to the

11         form.

12              MS. DANDENEAU:  Objection.

13        A.    I recall having general discussions

14   about everything on our balance sheet which

15   would have included these -- these notes

16   receivable.

17        Q.    Okay.

18        A.    I don't recall specifically where

19   those discussions delved into.

20        Q.    Do you recall any discussion at all

21   on the topic of whether any of these notes on

22   this list were doubtful or uncollectible?

23              MR. AIGEN:  Mr. Morris, how on earth

24         is that question different from the

25         question that you just asked for the last

1          WATERHOUSE - 10-19-21

2  five times?  I mean, really I thought you

3  were -- (overspeak.)

4          MR. MORRIS:  Because he never

5  answered it.

6          MS. DEITSCH-PEREZ:  Are you

7  listening to him?

8          MR. MORRIS:  You know --

9          MS. DEITSCH-PEREZ:  He basically

10  said that he had a conversation with DSI

11  that went over all of this stuff and that

12  conversation could have included the notes

13  but he doesn't recall specifically.

14          What more do you want him -- to ask

15  of him?

16          MR. MORRIS:  I want him -- I would

17  love him to say -- I would like him to

18  testify to the truth, and that is he has no

19  recollection.

20          MS. DEITSCH-PEREZ:  Well, the truth

21  as you would like to see it, but -- but he

22  is testifying truthfully.  And I -- and, by

23  the way, I move to strike that comment --

24          MR. MORRIS:  Okay.

25          MS. DEITSCH-PEREZ:  -- because it

1              WATERHOUSE - 10-19-21

2        suggests that he has not testified

3        truthfully.

4              MR. MORRIS:  I will ask my question

5        again.  And if at any time you want to

6        direct him not to answer, that is your

7        prerogative.

8        Q.    Mr. Waterhouse, do you have any

9    recollection at all of ever telling anybody

10   from DSI that any of these notes were doubtful

11   or uncollectible?

12             MS. DANDENEAU:  Object to form.

13       A.    I don't remember specifically.

14       Q.    Do you remember generally that

15   specific topic?

16       A.    We generally talked about assets,

17   values.  If -- we had discussions of that and

18   collectability in nature.  I mean, of Highland,

19   the funds, the CLOs, the entire complex.  We

20   had discussions like that, which is, you know,

21   as you look at a billion dollar consolidated

22   balance sheet.

23             So I generally remember -- this is

24   billions of dollars, including these assets --

25   having discussions of this -- of this type.

1          WATERHOUSE - 10-19-21

2      Q.    Do you believe that an affiliate

3   loan on this list was doubtful or

4   uncollectible?  Would you have told that to

5   DSI?

6           MS. DANDENEAU:  Objection to form.

7           MS. DEITSCH-PEREZ:  Object to form.

8      A.    If we had, like -- again, if we --

9   if -- if we weren't preparing financial

10  statements in accordance with GAAP, and -- you

11  know, if DSI at that point -- they were --

12  again, I was new to bankruptcy.

13          The CRO is -- we are delegating

14  everything to the CRO.  All the decisionmaking.

15  Remember -- remember when you and I went into

16  Delaware Court and we were saying DSI basically

17  does everything, remember this, Mr. Morris?

18          You were my counsel at the time, and

19  basically we're running everything through DSI.

20  That was what this was like in the early part.

21          Everything was communicated through

22  DSI.  So DSI says this.  DSI says that.  That

23  is what we're doing, and we're pointing out

24  things to them.

25          Now, they decide what direction this

1                    WATERHOUSE - 10-19-21

2    goes.

3         Q.    Did you point out that any of

4    these --

5         A.    I don't recall specifically.

6         Q.    Okay.  At any time that you served

7    as Highland's CFO, did you ever point out to

8    DSI that any of these loans were doubtful or

9    uncollectible?

10              MS. DEITSCH-PEREZ:  Object to the

11        form.

12              MS. DANDENEAU:  Objection.

13        A.    If you're asking me if I had a

14   conversation with DSI, if any of these loans

15   were doubtful or uncollectible, I don't recall

16   specifically.

17        Q.    Do you recall that the debtor filed

18   on the docket monthly operating reports?

19        A.    Yes.

20        Q.    You prepared those personally,

21   didn't you?

22              MS. DEITSCH-PEREZ:  Objection to

23        form.

24        A.    I didn't personally prepare them,

25   the team did with DSI.

1              WATERHOUSE - 10-19-21

2        Q.    But you signed them; correct?

3        A.    My signature is on the MORs.

4        Q.    And you signed them as the preparer

5   of the document; correct?

6        A.    Yes, I did this pursuant to DSI's

7   instructions.

8        Q.    Okay.  You wouldn't have signed the

9   document if you didn't believe it to be

10  accurate; correct?

11       A.    If I had reason to believe it

12  wasn't, presumably I wouldn't have signed it.

13       Q.    Okay.  And do you have any reason to

14  believe right now that any monthly operating

15  report that has your signature on it was

16  inaccurate in any way?

17            MS. DEITSCH-PEREZ:  Object to the

18       form.

19       A.    My understanding of the monthly

20  operating reports is we were filing them in

21  accordance with the standards set by the Court.

22  It wasn't -- you know, again, I don't -- you

23  know, it wasn't GAAP.  It wasn't these other

24  standards, so I testified I didn't have

25  experience in this.  The CRO was running the

1          WATERHOUSE - 10-19-21

2    show.  I followed their advice.

3        Q.    But you assured yourself that

4    everything in the report was accurate before

5    you signed them; correct?

6              MS. DANDENEAU:  Objection to form.

7        A.    I trusted the guidance from the CRO

8    and their team and their experience and their

9    guidance for doing this for many, many, many

10   years to -- to -- to categorize and put things

11   in ways on the form.

12             You know, my team had -- had not

13   filled out these forms before and needed all of

14   this guidance.  I'm not an expert in this.  I

15   have oversight of it.  I signed the form.  DSI

16   told me to.

17       Q.    And you and your team are the source

18   of the information that DSI used to create the

19   reports; correct?

20             MS. DANDENEAU:  Objection to form.

21       A.    The books and records reside with

22   the -- with -- with the corporate accounting

23   team.

24       Q.    Okay.  And the corporate accounting

25   team was the corporate accounting team that was

1          WATERHOUSE - 10-19-21

2    under your direction; correct?

3        A.    Yes.

4        Q.    So -- so your team was responsible

5    for maintaining Highland's books and records;

6    correct?

7        A.    I'm sorry, my team was responsible?

8        Q.    Correct.

9        A.    Yes.  They -- they -- they were

10   the -- the -- the general ledger of Highland,

11   that responsibility was with the corporate

12   accounting team.

13       Q.    The corporate accounting group

14   reported to you; correct?

15       A.    Yes.

16             MR. MORRIS:  Can we put up 41,

17       please.

18             (Exhibit 41 marked.)

19       Q.    All right.  You will see that this

20   is a report that is dated January 31st, 2020,

21   but it is for the month ending December 2019.

22             Do you see that?

23       A.    I do.

24       Q.    And you signed this report in your

25   capacity as the chief financial officer of

1                    WATERHOUSE - 10-19-21

2    Highland; correct?

3         A.    Yes.

4         Q.    And you're the preparer -- you're

5    identified as the preparer of the report;

6    correct?

7         A.    That is correct.

8         Q.    Do you recall participating in the

9    preparation of monthly operating reports?

10        A.    As I testified earlier, it was put

11   together, you know, with the team.  The team

12   worked with DSI to put these monthly operating

13   reports together.  We had no experience at this

14   time of the monthly operating reports or things

15   of this nature.

16              MR. MORRIS:  Can you turn to the

17        next page, please.

18        Q.    Do you see a line item under assets

19   due from affiliates?

20        A.    Yes, I do.

21        Q.    Okay.  And to the best of your

22   knowledge and understanding, as the person who

23   is identified as the preparer of this report,

24   does that line item include the affiliate loans

25   that we've been talking about?

1                WATERHOUSE - 10-19-21

2        A.     Again, I would have to see, just

3    like we did with the financial statements of

4    Highland and NexPoint, I would have to see a

5    detailed build, but, you know, if you look at

6    the other line items, you know, the only other

7    place it could be would be in -- in other

8    assets.

9        Q.     Okay.  And as a matter of

10   arithmetic, is it fair to say that is the value

11   of the assets due from affiliates was more than

12   25 percent of the value of Highland's total

13   assets as of 12/31/2019?

14             MS. DANDENEAU:  Objection to form.

15       A.     I'm really not doing the mental math

16   right now, so I've been going at this depo for

17   hours, so I'm really not -- you know --

18       Q.     All right.  No problem.

19       A.     -- these are millions of dollars.

20       Q.     Let's look at the Footnote 1,

21   please.  Do you see there is a reference to the

22   Hunter Mountain note?

23       A.     Yes, I see that in Footnote 1.

24       Q.     Okay.  And that's the reserve that

25   was taken against that note?

1                    WATERHOUSE - 10-19-21

2         A.    Yes, that is what this indicates.

3         Q.    Okay.  And were you aware that the

4    reserve was being taken on that it was?

5         A.    I was -- I was aware, yeah, at some

6    point, yes.

7         Q.    Okay.  And are you aware of any

8    reserve being taken with respect to any other

9    note that was issued in favor of Highland?

10        A.    Again, as I testified, we didn't go

11   through an analysis on -- on -- on the other

12   notes.

13        Q.    Can we turn --

14        A.    I believe -- I believe it says that

15   in Footnote 1, fair value has not been

16   determined with respect to any of the notes.

17              So this footnote -- footnotes, look,

18   there has been no determination.

19        Q.    Okay.  The determination was made in

20   the audited financial statements just six

21   months earlier; right?  We saw that earlier?

22        A.    That was as of 12/31/18.  I mean,

23   things -- circumstances -- there's a bank --

24   circumstances change, things change -- things

25   change over time, you know, facts and

1          WATERHOUSE - 10-19-21

2    circumstances change.  Again, you have to do an

3    analysis.

4          Q.    Okay.  And you do recall that in

5    Highland's 2018 financial statement, all of the

6    notes issued by affiliates and Mr. Dondero that

7    were due at year-end had a fair value equal to

8    the carrying value; correct?  We looked at

9    that?

10         A.    Yes.  That was in the -- in the

11   disclosure for the -- for the affiliate notes,

12   yes.

13         Q.    And -- and you were obligated to

14   share with PwC any subsequent events between

15   the end of 2018 and the date that you signed

16   your management representation letter on June

17   3rd, 2019; correct?

18              MS. DEITSCH-PEREZ:  Object to the

19         form.

20         A.    Yes.  I -- I -- I signed the

21   management, you know, my signature is in the

22   management representation letter -- I hope I'm

23   answering your question -- that is dated in

24   June with the representations made in that

25   management representation letter.

1           WATERHOUSE - 10-19-21

2      Q.    Okay.  And there was nothing that

3  caused PricewaterhouseCoopers to include in

4  subsequent events any adjustment to the

5  conclusion that the fair value of the affiliate

6  notes and the notes issued by Mr. Dondero

7  equaled the carrying value; correct?

8           MS. DANDENEAU:  Objection to the

9      form.

10     A.    That is correct.  That is what was

11 in the -- in the -- in the footnotes.

12     Q.    Okay.  So are you aware of anything

13 that occurred between June 3rd, 2019 and

14 December 31st, 2019 that would have caused the

15 fair value of the notes to differ from the

16 carrying value?

17     A.    Yeah.  Highland filed for

18 bankruptcy, things changed -- I mean, there was

19 a bankruptcy filed in October of -- of -- of

20 2019, right, the petition date that we've

21 described earlier.

22           I mean, I had a -- I guess looking

23 back naively, I thought we were going to get an

24 audit from PwC for year-ended 2019, and when we

25 had discussions with PwC, they were like, are

1               WATERHOUSE - 10-19-21

2    you crazy, we're not auditing this.  Values

3    change, all these things change, bankruptcy

4    changes the entire scenario.  I mean -- and

5    they're like, we're not -- we're not touching

6    this.

7               And so, you know, I was like, okay,

8    sorry, I get it, okay, no an audit.

9               I mean, it is -- you know, and --

10   you know, and we weren't preparing GAAP

11   financial statements.

12              Again, I didn't know what we were

13   doing in relation to our financial statements,

14   but these were the discussions I was having at

15   the time.  And yeah, I mean, filing bankruptcy

16   from what I got from outside auditors and

17   others involved changed things dramatically.

18        Q.   Okay.  Highland wasn't the obligor

19   under any of the notes that we're talking

20   about; correct?

21        A.   No.

22        Q.   So --

23        A.   That's right.

24        Q.   So can you identify any fact that

25   would cause the fair value to deviate from the

1          WATERHOUSE - 10-19-21

2   carrying value during the seven-month period

3   between June 3rd and the end of the year, 2019?

4          MS. DANDENEAU:  Objection to form.

5      A.    No.  I mean, I'm putting myself back

6   at that time, right.  Hindsight is 2020, but we

7   didn't do an analysis, but we would have done a

8   fulsome analysis and looked at all of the facts

9   and circumstances at the time, but asset values

10  change.  You know, there could have been a

11  market crash in hindsight in 2020, which --

12  which affected entities' abilities.

13          There could have been all of these

14  things, right, that -- that happen.  It is --

15  it is easy to look back in hindsight, but when

16  you are looking at this in -- in realtime, the

17  analysis is different, and again, we didn't do

18  an analysis.

19      Q.    Okay.  You didn't do an analysis.

20          Do I have that right?

21      A.    I don't -- I don't recall doing one

22  or maybe -- you know, I don't recall doing one.

23          MR. MORRIS:  Okay.  I'm going to

24          take a break.  I may be done, so the time

25          now is -- is 4:30 your time.  Let's just

1          WATERHOUSE - 10-19-21

2     take a short break until 4:40 your time.

3          MS. DANDENEAU:  Okay.

4          VIDEOGRAPHER:  We're going off the

5     record, 4:31 p.m.

6     (Recess taken 4:31 p.m. to 4:43 p.m.)

7          VIDEOGRAPHER:  We are back on the

8     record at 4:43 p.m.

9          MR. MORRIS:  I have no further

10    questions.

11         MR. RUKAVINA:  Okay.

12    Mr. Waterhouse, I will go next.

13                    EXAMINATION

14  BY MR. RUKAVINA:

15    Q.    Sir, my name is Davor Rukavina.  I'm

16  the lawyer for --

17         MR. MORRIS:  Hey, Davor, just before

18    you begin, I just want to put on the record

19    Highland's objection to documents that were

20    produced to me 10 minutes before the

21    deposition began.

22         MR. RUKAVINA:  What the basis of

23    your objection?

24         MR. MORRIS:  That they were due

25    quite some time ago, and the fact that you

1          WATERHOUSE - 10-19-21

2     had -- I just think it's appropriate to --

3     to dump documents on somebody 10 minutes

4     before the deposition.  I just think

5     that's --

6          MR. RUKAVINA:  Well, these are

7     documents Highland produced.  I'm not aware

8     of any rule I have to give you advance

9     documents when I know for the record that

10    other than the exhibits that you sent to us

11    last week, most of the exhibits you used

12    today you did not provide to me prior to

13    this deposition.

14          MR. MORRIS:  No, but the documents

15    were produced by me in -- in litigation,

16    right?

17          MR. RUKAVINA:  I'm going to use

18    primarily, John, the documents that you

19    produced to me today, but you may.

20          MR. MORRIS:  Primarily.  I've got --

21    I've got my objection.  You have got your

22    response.  Proceed.

23    Q.   Mr. Waterhouse, again, I represent

24  the advisors, HCMFA and NexPoint Advisors.

25          Do you understand that?

```
1              WATERHOUSE - 10-19-21

2     A.    Yes.

3     Q.    You and I have never met or talked

4   before today, have we?

5     A.    No, I have -- I have heard your

6   voice on calls before.

7     Q.    Okay.

8           MR. RUKAVINA:  Madam Court Reporter,

9           I will use a few exhibits today.  My

10          associate, Mr. Nguyen, will find some way

11          to get them to you.  I don't know how to do

12          that, but it looks like you guys do.

13               I am going to use numbers as well.

14          But to differentiate them from Mr. Morris

15          we're going to mark mine with the prefix A

16          for advisors.

17               Do you understand?

18          COURT REPORTER:  Yes.

19          MR. RUKAVINA:  Okay.  Perfect.

20    Q.    Okay.  So, Mr. Waterhouse, let's

21  start with those two HCMFA notes that you were

22  asked about, one for 5 million and one for

23  2.4 million.

24               Do you recall those notes?

25    A.    Yes.
```

1                    WATERHOUSE - 10-19-21

2       Q.    Were you ever the CFO of HCMFA?

3       A.    I don't recall.

4       Q.    So to the best of your recollection,

5    you were still an officer of HCMFA in 2019,

6    just that your title was treasurer?

7            MR. MORRIS:  Object to the form of

8        the question.  There is no leading here.

9        He works for your client.

10           MS. DANDENEAU:  That is not -- that

11       is not true.

12           MR. MORRIS:  He's the treasurer --

13       he is the treasurer of your client.  I

14       don't -- I'm going to object every time you

15       try to lead, so...

16           MR. RUKAVINA:  Totally fine to

17       object.

18           MR. MORRIS:  Okay.

19       Q.    Please answer my question,

20    Mr. Waterhouse.

21       A.    I'm sorry, could you repeat?  There

22    was...

23       Q.    Yes.  You were -- you testified

24    earlier that in 2019 you were an officer of

25    HCMFA; correct?

1          WATERHOUSE - 10-19-21

2          A.    Yes, I testified that I was the

3    treasurer and I didn't know if that incumbency

4    certificate, you know, was one that appointed

5    me as a treasurer, but yes.

6          Q.    I'm just trying to confirm that

7    sitting here today, to the best of your

8    recollection, at that time you were -- your

9    title was treasurer.  It was not chief

10   financial officer.

11         A.    I don't recall that being my title.

12         Q.    Okay.  And in May of 2019, however,

13   I think you testified you were the chief

14   financial officer of the debtor; correct?

15              MR. MORRIS:  Objection to the form

16         of the question.

17         A.    Yes, I was -- yes.

18         Q.    Okay.  As such, in May of 2019, did

19   you have the authority, to your understanding,

20   to unilaterally loan $5 million or $2.4 million

21   to anyone on behalf of the debtor?

22              MR. MORRIS:  Objection to the form

23         of the question.

24         A.    Sorry, can you repeat that?

25         Q.    Yes.  So in your capacity as the

```
1              WATERHOUSE - 10-19-21
2    chief financial officer of the debtor, Highland
3    Capital Management, L.P., in May of 2019, did
4    you believe that you unilaterally, just Frank
5    Waterhouse, had the authority to loan on behalf
6    of the debtor to anyone $5 million and
7    $2.4 million?
8              MR. MORRIS:  Objection to the form
9         of the question.
10   A.    No.
11   Q.    Is it because loans of that amount
12   would have had to be approved by someone else?
13   A.    Yes.
14   Q.    Who in '20 -- in May of 2019, if
15   Highland wanted to loan 5 million or
16   $2.4 million to someone, what would have been
17   the internal approval procedure?
18             MR. MORRIS:  Objection to the form
19        of the question.
20   A.    If -- if we had loans of that nature
21   that needed to be made due to their size, we
22   would have gotten approval from the -- the
23   president of Highland.
24   Q.    And who that was individual?
25   A.    It was James Dondero.
```

1                    WATERHOUSE - 10-19-21

2        Q.    Okay.  Now, I'm going to ask you a

3    similar question but for a different entity.

4              In May of 2019, as the treasurer of

5    HCMFA, did you believe that you unilaterally

6    had the ability to cause HCMFA to become the

7    borrower of a $5 million loan and a

8    $2.4 million loan?

9              MR. MORRIS:  Objection to the form

10        of the question.

11        A.    No.

12        Q.    What would -- what would the

13    approval have taken place -- strike that.

14              What would the approval process have

15    been like in May of 2019 at HCMFA for HCMFA to

16    take out a $7.4 million loan?

17              MR. MORRIS:  Objection to the form

18        of the question.

19        A.    The process would have been similar

20    to what we just discussed on -- for Highland to

21    make a loan to others.  So, again, you know,

22    we -- we would have -- either myself or someone

23    on the team would have discussed this with

24    the -- the president and owner of -- of HCMFA.

25        Q.    And who was that individual?

1              WATERHOUSE - 10-19-21

2      A.     That was James -- Jim Dondero.

3      Q.     So do I understand that in May of

4   2019, on behalf of both the lender, Highland,

5   and the borrower, HCMFA, Mr. Dondero would have

6   had to approve $7.4 million in loans?

7              MR. MORRIS:  Objection to the form

8         of the question.

9      A.     Yes.

10     Q.     You mentioned when Mr. Morris was

11  asking you the NAV error, N-A-V error, with

12  respect to TerreStar, without writing us a

13  novel, unless you feel like you have to, can

14  you summarize what that NAV error was?  What

15  happened?

16     A.     There was a -- in the Highland

17  Global Allocation Fund, it owned at the time an

18  equity interest in a company called TerreStar.

19  And TerreStar is -- at the time was a private

20  company, and it may still be today.  Again, I'm

21  putting myself back then as a private company.

22             We had -- sorry, I don't mean we --

23  the fund and the advisor used Houlihan Lokey

24  to -- to value that investment.  And during

25  that time there was some trades that were

```
1              WATERHOUSE - 10-19-21

2    executed at market levels that were much lower

3    than the Houlihan Lokey model.

4              And based on information and

5    discussions with the portfolio managers and,

6    you know, principals that were very familiar

7    with TerreStar, it was determined that those

8    trades were non-orderly and they were not

9    considered in the valuation as consulted with

10   Houlihan Lokey and PricewaterhouseCoopers at

11   the time.

12             Subsequent to a -- I can't remember

13   the exact circumstances of why the SEC got

14   involved.  I think it was due to this -- this

15   investment became a material position in the

16   fund.  It triggered an SEC, kind of, inquiry.

17   And as part of that inquiry, they questioned

18   the valuation methodology.  "They" meaning the

19   SEC.

20             And at the culmination of that

21   process -- this is all summarized -- the value

22   that was -- that ultimately had to be used in

23   the fund's NAV was different than -- materially

24   different than what the original valuation at

25   Houlihan Lokey provided.
```

1          WATERHOUSE - 10-19-21

2               And given that there was this fund

3     was, as we discussed -- I don't know if we

4     discussed it, but it was an open-ended fund

5     that was going -- that was converting to a

6     close-end fund.

7               Due to the fact that it was an

8     open-ended fund, you had to recalculate NAV and

9     see what the impact was on people -- on

10    investors coming in and out of the fund and if

11    there is a detrimental impact and to calculate

12    what that -- what that impact was and if there

13    was any amounts owed to the fund pursuant to

14    the error.

15         Q.    Were you personally involved

16    internally at either Highland or HCMFA with

17    these investigations and discussions with the

18    SEC?

19         A.    I was.

20         Q.    Which other key people or senior

21    people at Highland were involved, to your

22    recollection?

23         A.    Myself, Thomas Surgent, David Klos,

24    Lauren Thedford, Jason Post.

25         Q.    Mr. Dondero, was he --

```
 1                  WATERHOUSE - 10-19-21

 2       A.    I believe Cliff Stoops.  I'm trying

 3  to think.  And maybe that is -- that is -- that

 4  is -- that is all kind I can recall at the

 5  moment.

 6       Q.    Do you recall whether it was

 7  determined that the fund suffered losses as a

 8  result of this error?

 9       A.    The -- the fund -- the -- the --

10  because the open-ended nature of the fund,

11  there were losses that were attributable to

12  investors.  Meaning they -- they would have

13  redeemed and got a less money or -- or they

14  subscribed in and maybe because they didn't get

15  enough shares and then they later sold and then

16  they were harmed in that fashion.

17               And there is -- there is -- there

18  were very -- there were very detailed

19  calculations and, you know, all these different

20  scenarios that we had to -- I'm sorry, I keep

21  saying "we" -- that the individuals involved

22  had to calculate and quantify.

23       Q.    Well, do you recall whether HCMFA

24  admitted certain fault and liability for this

25  error?
```

1          WATERHOUSE - 10-19-21

2     A.    I don't recall specifically.

3     Q.    Do you recall whether HCMFA caused

4 any funds to be paid to the investors and the

5 fund the subject of the NAV error?

6     A.    Yes.

7     Q.    Do you recall the approximate amount

8 of funds, moneys paid to the investors and the

9 fund?

10    A.    It was -- it was approximately

11 $7 million.

12    Q.    If I was to suggest 7.8 million,

13 would that ring more true or are you sticking

14 with your original answer?

15    A.    It was -- it was approximately 7 --

16 7 to $8 million.  Again, I don't remember the

17 exact number, but it was in that ballpark.

18    Q.    So regardless of whether HCMFA

19 accepted fault or liability, it caused some

20 $7 million or more to be paid out to affected

21 investors in the fund?

22         MR. MORRIS:  Objection to the form

23    of the question.

24    A.    And I want to make sure I'm

25 understanding your question because there is a

1          WATERHOUSE - 10-19-21

2     lot of different entities that are going on to

3     my head.

4               I think what you are saying is based

5     on this error, shareholders were harmed by this

6     approximately $7.8 million -- by approximately

7     $7.8 million.  Is that what you are asking?

8          Q.    Yes, sir.

9          A.    Yes, that was -- again, I don't have

10    the exact numbers.  If I take -- it was -- it

11    was in that ballpark, and there is a detail

12    calculation and write-up that could, that --

13    that exists someplace.

14         Q.    Now, at that time, at the time that

15    the NAV error occurred, was there a contract in

16    place between HCMFA and the debtor pursuant to

17    which the debtor was providing services to

18    HCMFA?

19               MR. MORRIS:  Objection to the form

20         of the question.

21         A.    Yes.

22         Q.    Was that contract generally called a

23    shared services agreement?

24         A.    It was generally called that, but

25    there were -- there were -- I mean, it -- it --

```
1                 WATERHOUSE - 10-19-21

2    it depends on who you talk to, but yes,

3    generally, there were -- there are multiple

4    agreements.

5         Q.    Pursuant to one or more of those

6    agreements, was the debtor providing certain

7    services to HCMFA?

8              MR. MORRIS:  Objection to the form

9         of the question.

10        A.    Yes.

11        Q.    And can you at a very high level

12   summarize in 2018 and 2019 what those services

13   were?

14        A.    Yes, there was a -- yes.

15        Q.    Okay.  Please -- please go -- go

16   through a short summary.

17        A.    There was a -- a cost reimbursement

18   agreement between Highland Capital Management

19   Fund Advisors and Highland Capital Management,

20   L.P.  That agreement was for what we referred

21   to as front office services, so investment

22   management, things of that nature.

23              There was I think what most people

24   refer to as the shared services agreement that

25   was -- that agreement was between Highland
```

1                    WATERHOUSE - 10-19-21

2     Capital Management Fund Advisors and Highland

3     Capital Management for back office services.

4          Q.     And can you summarize what you mean

5     by back office services?

6          A.     Those services were for accounting,

7     finance, tax, valuation, HR, IT, you know,

8     legal compliance, things of -- things of those

9     nature -- or things of that nature, excuse me.

10         Q.     So in the spring of 2019, do you

11    recall whether HCMFA took the position that it

12    was actually Highland that caused the NAV error

13    to occur pursuant to the valuation services

14    that Highland was providing?

15              MR. MORRIS:  Objection to the form

16         of the question.

17         A.     I do not recall.

18         Q.     Did you ever have any discussions

19    with anyone, Jim Dondero or anyone in the first

20    half of 2019 as to whether Highland, the

21    debtor, that is, had any liability to HCMFA

22    related to the NAV error?

23              MR. MORRIS:  Objection to the form

24         of the question.

25         A.     I do not recall.

1          WATERHOUSE - 10-19-21

2     Q.    And then you mentioned that the fund

3  was being closed and some compensation related

4  to that.  Can you -- can you elaborate?  What

5  were you referring to?

6     A.    Right.  So the advisor, pursuant to

7  board approval, put a proposal in front of the

8  shareholders of the Highland Global Allocation

9  Fund to convert it from an open-ended fund to a

10 closed-end fund.

11          So an open-ended fund, when

12 shareholders subscribe to the fund or redeem

13 into the fund, they do it at NAV.

14          When it is -- when you have a

15 closed-end fund, closed-end funds are -- are

16 publicly-traded, like on the New York Stock

17 Exchange, exchanges like that, and -- and

18 shareholders or investors, they're not --

19 they're -- they're not subscribing and

20 redeeming with the fund.  They are like shares

21 of Apple.

22          Those shares of the Highland Global

23 Allocation Fund trade on an exchange, and that

24 is how you, you know, that is how, you know,

25 you become an equity owner in the fund or you

```
1                  WATERHOUSE - 10-19-21
2    sell your shares and you are no longer an
3    equity owner.
4             As part of that proposal, the
5    advisor told shareholders if you -- if you vote
6    for this proposal to -- to convert it from an
7    open-ended fund to a closed-end fund, we will
8    pay you some amounts of money.  I forgot -- a
9    certain number of points.  I think it was
10   like -- it was like two to three points or
11   something -- something like that.
12        Q.   Okay.  You mentioned when Mr. Morris
13   was asking you, going back to those two
14   promissory notes, you will recall the 5 million
15   and 2.4 million, you mentioned something to the
16   effect that Mr. Dondero told -- told you to pay
17   some moneys out of Highland.  Do you remember
18   that discussion with Mr. Morris?
19        A.   I do.
20        Q.   So, to the best of your
21   recollection, did you have a discussion with
22   Mr. Dondero about making some payments in May
23   of 2019 out of Highland?
24        A.   I recall, as I testified earlier,
25   that I had a conversation with Mr. Dondero
```

```
1              WATERHOUSE - 10-19-21
```

2   for -- for these amounts attributable to -- it

3   was either the error -- you know, the error,

4   and in that conversation he said, go get the

5   money from Highland.  I believe that is what I

6   testified earlier, and that -- that is my

7   recollection.

8        Q.    Do you recall if that was an

9   in-person meeting or some other mode for the

10  meeting?

11       A.    I -- I -- I recall that being

12  in-person.

13       Q.    Do you recall if anyone else was

14  present, or was it just you and Mr. Dondero?

15       A.    I recall just he and I.

16       Q.    And the moneys that he told you to

17  find from -- or get from Highland, was that in

18  the amount of $5 million and $2.4 million?

19            MR. MORRIS:  Objection to the form

20       of the question.

21       A.    I believe so, but I would have to go

22  back and look and see when those moneys were

23  actually paid into the -- into the fund and,

24  you know, when those transfers were done.  If

25  they were all done around that same time, then

```
 1                WATERHOUSE - 10-19-21
 2   yes, I would say it was -- it was all related
 3   to that.
 4        Q.    Did Mr. Dondero tell you that those
 5   funds would be a loan from Highland to HCMFA?
 6        A.    I don't recall.
 7              MR. MORRIS:  Objection to the form
 8        of the question.
 9        Q.    Now, and forgive me, I'm probably
10   the only non-American born here, but I speak
11   reasonably well in English.  I don't recall,
12   does that mean you don't remember or does that
13   mean it didn't happen?
14              MR. MORRIS:  Objection to the form
15        of the question.
16        A.    It -- it means I don't -- I don't
17   remember.
18        Q.    Did Mr. Dondero tell you to have
19   those two promissory notes prepared?
20        A.    I don't recall.
21        Q.    When you -- again, when you say, I
22   don't recall today, that means that sitting
23   here today, you just don't remember one way or
24   the other.  Is that accurate?
25        A.    Yes.
```

1          WATERHOUSE - 10-19-21

2     Q.    Is it possible that you, having

3  heard what Mr. Dondero said and seeing funds

4  being transferred, assumed that that would be a

5  loan without him actually telling you that

6  would be a loan?

7          MR. MORRIS:  Objection to the form

8     of the question.

9     A.    Sorry, I want to make sure -- did I

10 ask the amounts that were transferred that I --

11 that -- that I assumed that that was a loan?

12    Q.    Well, let me -- let me take -- let

13 me try again.

14         So you have established already that

15 there were quite a number of promissory notes

16 back and forth -- I'm sorry, quite a number of

17 promissory notes with affiliated companies and

18 individuals owing Highland money; right?

19    A.    Yes.

20    Q.    And you have established that there

21 were many transactions and transfers going back

22 and forth over the years; right?

23         MS. DANDENEAU:  Objection to form.

24    A.    In -- yes, in my capacity as CFO and

25 my employment, yes, that is -- yes.

1                    WATERHOUSE - 10-19-21

2        Q.    And that's part of the reason why

3    you just can't remember some of the details

4    today because this -- this happened years ago,

5    and there were a number of transactions.  Is

6    that accurate?

7              MS. DANDENEAU:  Objection to the

8        form.

9              MR. MORRIS:  Objection to the form

10        of the question.

11        A.    I mean, I deal with thousands of --

12    of -- of -- of transactions, you know, whether

13    it has -- the processing of transactions, you

14    know, if it has got, you know, more -- more

15    zeros, you know, behind it than others.

16              When you look at thousands of

17    transactions over the years for funds and

18    advisors and -- and, you know, financial

19    statements, I mean, it is -- it is very hard

20    going back in -- in -- in my -- you know,

21    14-ish year career at -- at Highland to

22    remember a lot of those details, especially

23    when I don't have any records or books or

24    anything like that, and -- and going back many

25    years.

1          WATERHOUSE - 10-19-21

2     Q.    And that is fine.  That -- that --

3  that is why I asked the question.

4          Is it possible in May of 2019 when

5  Mr. Dondero told you to transfer the funds from

6  Highland, you just assumed on your own that

7  those would be loans without him actually

8  telling you that those would be loans?

9          MR. MORRIS:  Objection to the form

10     of the question.

11     A.    I don't know.

12     Q.    I'm sorry, you --

13     A.    I said I don't know.

14     Q.    Okay.  Well, as the -- as the CFO

15  for Highland, if you saw $7.4 million going

16  out, you would feel some responsibility to

17  account for that, wouldn't you?

18          MR. MORRIS:  Objection to the form

19     of the question.

20     A.    Yes.

21     Q.    Is it fair to say that those would

22  be in the range large enough to rise up to your

23  level?

24          MR. MORRIS:  Objection to the form

25     of the question.

1           WATERHOUSE - 10-19-21

2      A.    If -- I don't know if I understand

3  your question.  Those amounts would arise to my

4  level where I would be involved or...

5      Q.    You would want to know what a

6  transfer for that amount, $7.4 million, was all

7  about, as the CFO of Highland, wouldn't you?

8           MR. MORRIS:  Objection to the form

9      of the question.

10     A.    Yes, I make it -- I mean, I -- I

11  review all sorts of payments, I mean, even

12  smaller dollar payments on a periodic basis,

13  you know, to -- to -- to understand and to make

14  sure that we are paying things in a -- you

15  know, in -- in -- in an informed way.  And, you

16  know -- and we're -- and we're paying things

17  pursuant to vendor contracts and things like

18  that.

19     Q.    So as part of that, is it possible

20  that seeing $7.4 million go out you would have

21  promissory notes made in order to keep a paper

22  trail, assuming that those were loans, when

23  perhaps they were never intended to be loans by

24  Mr. Dondero?

25           MR. MORRIS:  Objection to the form

```
1              WATERHOUSE - 10-19-21

2         of the question.

3         A.    I don't know.  As I testified

4    earlier, I had conversations with Mr. Dondero

5    about -- about the -- the -- the moneys that

6    were needed for the NAV error.  And I recall

7    him saying go get it from Highland -- or get it

8    from Highland.

9         Q.    Well, why did you sign those

10   promissory notes and why didn't you have him

11   sign them?

12              MR. MORRIS:  Objection to the form

13        of the question.

14        A.    I don't know.  I don't know.

15        Q.    You mentioned earlier that you

16   typically don't sign promissory notes.  Am I

17   remembering your testimony correctly?

18              I mean, promissory notes on behalf

19   of the entities.  Not yourself, obviously.

20        A.    Yes, that is what I said earlier.

21        Q.    Do you recall any other promissory

22   notes in the million-plus range that you had

23   ever signed before on behalf of any entity?

24        A.    There is -- there has been a lot of

25   transactions over the years.  I don't -- I
```

1          WATERHOUSE - 10-19-21

2    don't -- I don't recall generally.  I don't --

3    I don't recall.

4        Q.    So -- but to the best of your

5    recollection, it was on your initiative,

6    following your discussion with Mr. Dondero,

7    that you had someone draft those two promissory

8    notes; is that correct?

9            MR. MORRIS:  Objection to the form

10       of the question.

11       A.    Yes, we would have -- the team, as I

12   stated earlier, we don't draft promissory

13   notes.  "The team" meaning the accounting and

14   finance team.

15            So the team would have worked with

16   the legal group at Highland to draft any notes.

17       Q.    Do you believe or do you have any

18   recollection as to whether you would have done

19   that pursuant to an email or telephone call or

20   in-person meeting?

21            MR. MORRIS:  Objection to the form

22       of the question.

23       A.    Are you asking if I would have -- if

24   those notes would have been drafted pursuant to

25   an email or phone call?

1                    WATERHOUSE - 10-19-21

2         Q.    Strike that.

3               Do you recall whether you sent an

4    email to anyone asking them to draft those two

5    promissory notes?

6         A.    I don't recall because, again,

7    once -- I would have instructed -- likely

8    instructed the team to -- to work with the

9    legal group to draft these documents.

10              I -- I -- I -- yeah, I didn't -- I

11   mean, that is more an operational-type

12   procedure.  So, you know, a manager or a

13   controller or working with legal.  You know,

14   they -- they can certainly handle that task to

15   get that -- you know, to request that from

16   legal.

17        Q.    And who on your team do you think

18   you would have asked to do that?

19              MR. MORRIS:  Objection --

20        Q.    Who would have been the logical

21   person or people, if you don't remember their

22   name today?

23              MR. MORRIS:  Objection to the form

24        of the question.

25        A.    It -- it -- there is only two

1        WATERHOUSE - 10-19-21

2   managers of the group.  That would have been

3   Dave Klos or Kristin Hendrix.

4            Dave was the -- one of his duties

5   was managing the valuation team, and so he was

6   intimately involved with this process.  So, you

7   know...

8        Q.    Okay.

9        A.    I don't recall specifically but, I

10  mean, my general -- you know, I -- I -- I

11  likely would have talked to Dave first about it

12  versus someone like Kristin who hadn't been

13  intimately involved.

14       Q.    And -- and do you have a view as to

15  whether it is most likely that you would have

16  done that by email or in-person or how would

17  you believe you would have communicated that to

18  Mr. Klos?

19            MR. MORRIS:  Objection to the form

20       of the question.

21       A.    I likely would have done that in

22  person.  Again, if things of this nature

23  that -- again, you have to put ourselves back

24  to, we have been working on this very stressful

25  project for many, many months.  And once the

```
 1                 WATERHOUSE - 10-19-21

 2    go-ahead was to -- you know, we see the light

 3    at the end of the tunnel with wrapping this up

 4    and making shareholders whole -- sorry to say

 5    "we" -- you know, the -- so the folks that are

 6    involved in it.

 7                 I like to talk to people

 8    face-to-face and -- and -- and go to -- and go

 9    to their desk, because that shows if I'm going

10    to their desk that -- that is something that I

11    want done, you know.

12        Q.    And do you remember, Mr. Waterhouse,

13    getting those two promissory notes in paper

14    format or by email before they were executed?

15              MR. MORRIS:  Objection to the form

16        of the question.

17        A.    I don't recall.

18        Q.    For whatever was the ordinary course

19    back then in May 2019, would you expect to have

20    received them only on paper or would you have

21    expected to have received them in Word document

22    or PDF document by email?

23              MR. MORRIS:  Objection to the form

24        of the question.

25        A.    I -- I didn't sign -- I signed very
```

1               WATERHOUSE - 10-19-21

2    few documents via email.  I can't say that it

3    never happened, but people either stopped by my

4    office and physically walked in documents for

5    signature that we discussed face-to-face.

6               Or documents were -- if -- if --

7    if -- if -- let's say I wasn't there or I

8    wasn't available, documents were dropped off.

9    I had -- I had some in- and outboxes in front

10   of my -- my office there at the Crescent.

11              Documents would be dropped off for

12   signature.  There would be a cover sheet that

13   would be -- have been applied to those

14   documents detailing, you know, who dropped it

15   off, the purpose, why, what time.

16              And then, you know, as I stated, I

17   don't draft documents and I always go to the

18   legal group and the compliance group to make

19   sure that they're in the loop.  And there is

20   a -- a box or section that says, Has legal

21   reviewed or approved, or something to that

22   nature.

23              Again, I don't -- I don't have

24   access to that cover sheet anymore, but it

25   was -- it was something to that effect.

1          WATERHOUSE - 10-19-21

2              And my assistant, you know, if she

3    was there, she would review that -- you know,

4    whatever was being dropped off.  And if that

5    has legal, you know, reviewed or -- reviewed or

6    approved it, if that wasn't -- if that stuff

7    hadn't been done, it was like she would just

8    tell them like, go -- go -- go to the legal

9    group, because --

10        Q.    Let me -- let me pause --

11              MS. DANDENEAU:  Let him finish.

12              MR. MORRIS:  Thank you.  Go ahead.

13        A.    I take -- go to the legal group

14   because that -- that was my -- you know, I

15   didn't -- I didn't review anything that -- that

16   they weren't -- you know, or there wasn't some

17   representation made to me that they had

18   reviewed, approved in some capacity.

19              Again, my -- my -- my goal, as CFO,

20   is to provide transparency and make sure that

21   groups like compliance and other things -- and

22   the other group in legal are -- are in -- you

23   know, their -- they're made aware of

24   transactions of -- you know, that are crossing

25   my desk.

1           WATERHOUSE - 10-19-21

2           Because I'm not in every

3    conversation.  They're not in every

4    conversation -- meaning legal compliance -- and

5    I just want to make sure that -- that everyone

6    is in sync to, you know, to -- to the extent

7    possible.

8        Q.    So if we summarize, you don't

9    specifically remember signing these two notes,

10   but most likely it would have been that they

11   would have presented -- been presented to you

12   physically on paper?

13           MR. MORRIS:  Objection to the form

14       of the question.

15       A.    They would -- they would have been

16   presented physically on paper most likely or

17   someone would have left it.  But, I mean,

18   again, I don't -- I don't recall.

19       Q.    I understand.  Understand.

20           When you signed -- when you signed

21   documents, when you personally signed

22   documents, did you typically use a ink pen or

23   did you use a stamp?

24       A.    No, I -- I -- I use a -- an -- an

25   ink pen.

1          WATERHOUSE - 10-19-21

2     Q.    Do you know -- was there a file at

3 Highland kept anywhere with ink-signed

4 originals of a promissory notes in general or

5 these two promissory notes specifically?

6          MR. MORRIS:  Objection to the form

7     of the question.

8     A.    Sorry, I just want to make sure I

9 understand your question.  Are you saying is

10 there a file somewhere that has ink-signed

11 originals of these two promissory notes?

12    Q.    Yes.

13    A.    I would -- I would assume they're

14 some place.  I mean --

15    Q.    Well, was there a -- was there a

16 place where Highland generally kept originals

17 of promissory notes owed to it?

18    A.    I wouldn't -- no.

19          MR. RUKAVINA:  Mr. Nguyen, would you

20 please pull up my A7, alpha 7.

21    Q.    These are the two promissory notes,

22 Mr. Waterhouse.

23          (Exhibit A7 marked.)

24    Q.    And please -- Mr. Waterhouse, please

25 command my associate to scroll down as you need

WATERHOUSE - 10-19-21

1      to, but I want you to take a very close look at

2      your two signatures here and tell me whether

3      you believe, in fact, that you ink signed them

4      or whether you --

5              MS. DANDENEAU:  Mr. Rukavina,

6          Mr. Waterhouse has the copies.

7              MR. RUKAVINA:  Perfect.  Then you

8          can take this down, Mr. Nguyen.

9      A.      These -- these -- these signatures

10     are identical, now that I stare at them, and I

11     mean, they are so close -- I mean, they're

12     identical that, I mean, even with my chicken

13     scratch signature, I don't know if I can -- you

14     know, I do this 100 times, could I do that

15     as -- as precisely as I see between the two

16     notes.

17     Q.      Well, that is why I ask.

18     Mr. Waterhouse, now that you have examined

19     them, does it seem like it is more likely that

20     you actually electronically signed these?

21             MR. MORRIS:  Objection to the form

22         of the question.

23     A.      Is -- I don't -- I don't recall

24     specifically.  As I said before, my assistant

```
1              WATERHOUSE - 10-19-21
```

2  did have a -- an electronic signature, and that

3  was used from time to time.  It wasn't as

4  common practice back in 2019.  It definitely

5  was more common practice when we had to work

6  from home and remotely for COVID because it

7  that made it almost impossible to, right,

8  provide wet signatures since we're all working

9  from home remotely.

10       Q.    Well, going just for these two

11  promissory notes, Mr. Waterhouse, in light of

12  your inability to remember any details, are you

13  sure you actually signed either or both of

14  those notes?

15            MS. DANDENEAU:  Objection to form.

16       A.    I don't recall specifically

17  signing -- actually physically signing these

18  notes.  As I said before, I don't recall doing

19  that.  This -- this looks like my signature,

20  but yet these two signatures are identical.

21       Q.    So you don't recall physically

22  signing them, and I take it you don't recall

23  electronically signing them either?

24       A.    I don't recall.  You know, Highland

25  has all my emails.  If that occurred, you know,

1          WATERHOUSE - 10-19-21

2   you know, I don't have any of these records is

3   what I'm saying.  I don't have any of those

4   records.

5          Q.    That is why I'm asking you these

6   questions in great detail because I don't have

7   those emails.  I'm trying to -- I'm hoping that

8   you will give me some names or some details so

9   I can go look for more emails, but again, you

10  don't remember any -- any individual, other

11  than Mr. Dondero that we've discussed, you

12  don't remember any individual with whom you

13  discussed these promissory notes prior to their

14  execution?

15          MR. MORRIS:  Objection to the form

16     of the question.

17      A.    I don't recall discussing it with

18  anybody else.

19      Q.    Okay.

20      A.    I mean, prior --

21      Q.    I understand.

22      A.    You know, there was no one else --

23  there was no one else in that meeting that I

24  recall with Mr. Dondero.

25      Q.    Now, when you established that by

1          WATERHOUSE - 10-19-21

2  May of 2019 --

3       A.    And -- and from what I recall, and

4  the reason why I was by myself is -- is, you

5  know, I don't -- I don't want to speculate, I'm

6  sorry.

7       Q.    Okay.  We have established that by

8  May of 2019, in your view, the liabilities of

9  HCMFA exceeded its assets; correct?

10      A.    Yeah.  I mean, again, I don't have

11 financial statements in front of me, but I

12 think, if I recall, we'd have to go through the

13 testimony with Mr. Morris, I believe that was

14 the case.

15      Q.    In fact, you will recall that in

16 April of 2019, Mr. Dondero signed a document

17 that extended the demand feature of two prior

18 notes to May 31, 2019.  Do you recall that?

19          MS. DEITSCH-PEREZ:  I think you

20      might -- maybe have the court reporter read

21      that back.  You might have misspoke.

22          (Record read.)

23          MR. RUKAVINA:  And I did misspeak.

24      Q.    I meant to say to May 31, 2021.  Do

25 you recall that, sir?

1                    WATERHOUSE - 10-19-21

2              MR. MORRIS:  Objection to the form

3      of the question.

4      A.    Yes.

5              MR. RUKAVINA:  And, Mr. Nguyen, just

6      so that the record is clear, will you please

7      pull up my Exhibit Alpha 10, A10.

8              (Exhibit A10 marked.)

9      Q.    You don't have this one in front of

10     you, Mr. Waterhouse?  This is the one that

11     Mr. Morris used earlier.  Do you see that

12     document, sir?

13     A.    Yes, I do.

14     Q.    And this is what you were testifying

15     about before when Mr. Morris was asking you.

16     Do you remember that?

17     A.    Yes.

18     Q.    So here is my question for you,

19     Mr. Waterhouse:  As the chief financial officer

20     of Highland, was it prudent for Highland less

21     than three weeks later to be lending

22     $7.2 million to an insolvent entity that

23     couldn't even then pay its debts back to

24     Highland?

25              MS. DANDENEAU:  Objection to form.

1          WATERHOUSE - 10-19-21

2          MR. MORRIS:  Objection to the form

3     of the question.

4     A.    Sorry, I just want to make sure --

5 are you asking me, did you say, was it prudent

6 for Highland to loan $7.4 million to HCMFA a

7 few weeks after this document was executed?

8     Q.    Yes, and at a time when HCMFA's

9 liabilities exceeded its assets.

10          MR. MORRIS:  Objection to the form

11     of the question.

12     A.    I don't -- it is odd.  I don't know.

13          MR. RUKAVINA:  You can take this

14 exhibit down, Mr. Nguyen.

15     Q.    Do you recall asking anyone,

16 Mr. Dondero or -- or anyone outside as to

17 whether Highland ought to be lending

18 $7.4 million to HCMF regarding HCMF's

19 creditworthiness?

20          MR. MORRIS:  Objection to the form

21     of the question.

22     A.    I don't recall.

23     Q.    Did you receive personally any of

24 that $7.4 million?

25     A.    No.

```
1              WATERHOUSE - 10-19-21
2     Q.    Did you even --
3           MR. MORRIS:  I didn't hear that
4     question, sir.
5           MR. RUKAVINA:  The one that he
6     answered, John, or my new one?
7           MR. MORRIS:  No, no, your question,
8     Davor.
9           MR. RUKAVINA:  I had asked him
10    whether he received any of the
11    $7.4 million.  He said no.
12          MR. MORRIS:  Yeah.  I thought there
13    was a question after that.  Maybe I was
14    mistaken.  I apologize.
15          MR. RUKAVINA:  I had started a new
16    question, so here, let me start the new
17    question again.
18    Q.    Did you personally receive any
19    direct benefit from those two notes for
20    $7.4 million?
21    A.    No.
22    Q.    Did you ever personally consider
23    yourself obligated to repay either or both of
24    those notes?
25    A.    No.
```

1                WATERHOUSE - 10-19-21

2                MR. RUKAVINA:  Pull up those notes

3    again, Mr. Nguyen.

4         Q.    You can have them in front of you,

5    Exhibit 7, Mr. Waterhouse, whatever is easier

6    for you.  If you go to your signature page, my

7    question to you is, why did you not include

8    your title as treasurer by your name, Frank

9    Waterhouse?

10                MS. DANDENEAU:  Objection to form.

11        A.    I didn't -- I didn't draft this

12   document.

13        Q.    So you relied on whoever drafted it

14   to draft it correctly?

15        A.    Yes.

16        Q.    Okay.  But back then when you signed

17   this, did it ever cross your mind that you were

18   the maker on these notes?

19        A.    No.

20        Q.    Back then when you signed this

21   document, did it ever cross your mind that you

22   could be a co-obligor on these notes?

23        A.    No.  I didn't receive $7.4 million,

24   I mean...

25        Q.    But can you say that HCMFA received

1           WATERHOUSE - 10-19-21

2     $7.4 million?

3     A.    I would have to go back and look and

4     check in, you know, the -- the financial

5     records and the bank statements.

6           MR. RUKAVINA:  You can take this

7     exhibit down, Mr. Nguyen.

8     Q.    Mr. Waterhouse, I'm not trying to be

9     a smart-ass, but if the law says that because

10    of the way that you signed this promissory

11    note, if that is what the law says, that that

12    made you personally -- personally liable, then

13    you would agree with me that that was never

14    your intent?

15          MR. MORRIS:  Objection to the form

16          of the question.

17    A.    That was never -- I wouldn't sign a

18    note and not get consideration in return.

19    Q.    So putting all other issues aside,

20    if the law -- if the law says that you were

21    liable for those notes because of how you

22    signed them, then would you agree with me that

23    these notes are a mistake?

24          MR. MORRIS:  Objection to the form

25          of the question.

1          WATERHOUSE - 10-19-21

2          MS. DANDENEAU:  Objection to the

3     form.

4     A.    Yes.

5     Q.    So do you agree with me that it's

6     odd -- I think that is the word you used --

7     that Highland would be loaning $7.4 million a

8     few weeks after that extension to an entity

9     whose liabilities exceeded its assets, and you

10    would agree with me that it was never your

11    intention to be in any way liable for these two

12    promissory notes; correct?

13         MR. MORRIS:  Objection to the form

14    of the question.

15    A.    Sorry, you -- you asked a lot there.

16         MR. RUKAVINA:  I will strike it and

17    I will move on.

18         Let's go to -- pull up Exhibit 9,

19    please Mr. Nguyen -- Alpha 9, I'm sorry, Alpha

20    9, A9.

21         (Exhibit A9 marked.)

22    Q.    Sir, take a moment to look at this,

23    but this is an email, and you will see attached

24    July 31, 2020 affiliate notes.

25         Do you see that attachment?

1           WATERHOUSE - 10-19-21

2      A.    Yes.

3      Q.    Okay.  And do you see an entry for

4  Highland Capital Management Fund Advisors?

5           MR. MORRIS:  I'm sorry, hold on.

6      Where are you looking?

7           MR. RUKAVINA:  Last page, John.

8           MR. MORRIS:  Is it the page on the

9      screen?

10          MR. RUKAVINA:  Oh, I'm sorry.

11     Mr. Nguyen just did it.  Yes, the last page

12     there.

13          MR. MORRIS:  Thank you.

14     Q.    Do you see an entry there for HCMFA?

15     A.    Yes.

16     Q.    About $10.5 million.

17          Do you see that?

18     A.    I do.

19     Q.    And, now, do you have any

20  explanation for why if HCMFA owed $7.4 million,

21  plus the 5.3 million that had been extended,

22  why that amount was only 10.5 million?

23     A.    I don't know.  Okay.

24          MR. RUKAVINA:  Close this one and

25     pull up, Mr. Nguyen, the schedules,

1              WATERHOUSE - 10-19-21

2        schedule of assets.  What exhibit is this

3        of ours, Mr. Nguyen?

4              MR. NGUYEN:  This is A11.

5              MR. RUKAVINA:  Oh, this will be A11.

6              (Exhibit A11 marked.)

7        Q.    You don't have this in front of you,

8    Mr. Waterhouse?

9        A.    Okay.

10       Q.    This is what Mr. Morris used

11   earlier.  Do you remember looking at this with

12   Mr. Morris?

13       A.    Yes.

14             MR. RUKAVINA:  You might have to

15        zoom in a little.  Okay.

16       Q.    Now, I see Affiliate Note A, B, and

17   C.

18             Do you have any recollection as to

19   why the names of the affiliates are omitted?

20       A.    I don't.  I testified earlier that,

21   you know, the team worked with DSI in providing

22   these.  I -- I don't -- I don't know.

23       Q.    Can we deduce -- is it logical to

24   deduce that Affiliate Note A would be NexPoint

25   given its size of $24.5 million?

1                    WATERHOUSE - 10-19-21

2                    MR. MORRIS:  Objection to the form

3          of the question.

4          A.    I mean, it -- it is a -- it is -- it

5     is approximate.

6          Q.    Well, can we -- can we deduce -- or,

7     I'm sorry, strike that.

8                    Can you, sitting here today,

9     logically conclude that Affiliate Note B or C

10    represents HCMFA?

11                   MR. MORRIS:  Objection to the form

12         of the question.

13         A.    I don't know.  I don't know.  I

14    can't.

15         Q.    Okay.  As of the petition date, we

16    have established that HCMFA, under promissory

17    notes, owed $7.4 million and $5.3 million to

18    the debtor; correct?

19                   MR. MORRIS:  Objection to the form

20         of the question.

21         A.    Yes.

22         Q.    Okay.  And by my reckoning, that

23    would be somewhere approaching $13 million.

24                   MR. MORRIS:  Objection to the form

25         of the question.

1           WATERHOUSE - 10-19-21

2        Q.    It would be $12.7 million.  Is that

3    generally correct?

4        A.    Sorry, the amounts were 7.4, 5.3.

5        Q.    Yes.

6        A.    Okay.  Yeah, that -- that -- I can

7    do that math, yes.

8        Q.    Do you have any explanation or any

9    understanding of why there is no similar entry

10   listed here on the schedule of assets filed

11   with the bankruptcy court?

12           MR. MORRIS:  Objection to the form

13      of the question.

14      A.    I don't know.  We have to look at

15   the supporting schedules, like I talked about

16   other -- presumably there is -- there is a

17   build to the schedule that would provide the

18   detail.

19      Q.    Well, that was going to be my next

20   question.  You anticipated it.

21           MR. RUKAVINA:  You can -- you can

22      take this down, Mr. Nguyen.

23      Q.    Do you believe that whenever you and

24   your team provided the underlying data to the

25   financial advisor that the actual names of the

1      WATERHOUSE - 10-19-21

2    affiliates for Affiliate Note A, B, and C would

3    have been listed there?

4        A.    Are you asking we provided the names

5    to the financial advisor?  I don't -- I don't

6    understand who the financial advisor is.

7        Q.    I'm sorry, DSI.

8              Let me ask the question this way,

9    Mr. Waterhouse.

10             Whenever you provided information

11   about the affiliate notes to DSI, do you

12   believe that you would have included the actual

13   names of the affiliates, you or your team, or

14   that you would have done the Affiliate Note A,

15   Note B, Note C?

16             MR. MORRIS:  Objection to the form

17        of the question.

18             MS. DANDENEAU:  Objection to the

19        form.

20       A.    We -- like I testified earlier, when

21   we were -- we gave everything to -- to DSI.  We

22   were giving all of our records, all of our

23   files, everything to DSI.  We weren't redacting

24   information or saying, hey, here is a note,

25   here is Affiliate Note A or B.

```
1              WATERHOUSE - 10-19-21
2              I mean, it was -- our job and our
3    focus -- and I testified in court back in 2019;
4    right -- was -- was to be transparent and, you
5    know, get DSI up to speed on -- on the matters
6    at Highland.  So I can't see us redacting at
7    that point.
8              MR. RUKAVINA:  Mr. Nguyen, will you
9         please pull up Mr. Morris' Exhibit 36.
10        Just the very first page, the very top
11        email.  You might zoom in a little bit.
12        Q.   Now, you recall being asked about
13   this by Mr. Morris?
14        A.   Yes, I do.
15        Q.   And you wrote:  The HCMFA note is a
16   demand note.
17              You wrote that; right?
18        A.   Yes.
19        Q.   And, in fact, weren't there by that
20   point in time several notes?
21        A.   Yes, there were.  Again, I don't --
22   I don't remember everything specifically.  I
23   mean --
24        Q.   I understand.  I understand.
25              So this is an example where -- where
```

1               WATERHOUSE - 10-19-21

2    you might have made a mistake by referring to a

3    singular instead of a plural; right?

4    A.    Yes.

5    Q.    Okay.  And you -- you wrote -- a

6    couple of sentences later, you wrote:  There

7    was an agreement between HCMLP and HCMFA the

8    earliest they could demand is May 2021.

9           You wrote that; right?

10    A.    Yes.

11    Q.    But I think you -- you agreed with

12    Mr. Morris that that can't possibly apply to

13    the May 2019 notes, can it?

14         MR. MORRIS:  Objection to the form

15        of the question.  That is not what he

16        testified to.

17    Q.    Let me ask -- let me ask a different

18    question.

19           Sitting here today -- or if you can

20    answer me from your memory on October 6,

21    2020 -- did the April acknowledgment that

22    extended the maturity date apply to the

23    May 2019 notes also?

24    A.    I don't recall specifically.

25    Q.    Well, you recall that the notes that

1        WATERHOUSE - 10-19-21

2   you signed were demand notes; right?

3        A.    Yes.

4        Q.    Do you find it logical, based on

5   your experience, that had they intended to have

6   a different or a set maturity date, you would

7   have instructed that that set maturity date be

8   included instead of a demand feature?

9              MR. MORRIS:  Objection to the form

10       of the question.

11       A.    Sorry, just want to make sure I

12  understand.  You are saying that -- that the

13  $5 million note, the $2.4 million note, if

14  those were supposed to be a term note, that I

15  would have made sure that those were a term

16  note?

17       Q.    I'm saying -- I'm saying,

18  Mr. Waterhouse, that on May the 2nd and May the

19  3rd, 2019, if you intended that those two

20  promissory notes could not be called until May

21  2021, would you have included such language in

22  those two promissory notes?

23             MR. MORRIS:  Objection to the form

24       of the question.

25       A.    I guess -- I'm sorry, I don't recall

1          WATERHOUSE - 10-19-21

2    putting language in those May notes.  I don't

3    remember what language you are referring to.

4         Q.   Well, let's read this again.

5              There was an agreement between HCMLP

6    and HCMFA the earliest they could demand is May

7    2021.

8              Do you recall that agreement?

9         A.   Yes, that was the agreement we

10   looked at earlier; correct?

11        Q.   Okay.  Yes.

12             Do you -- do you understand now that

13   that agreement that we looked at earlier also

14   applied to the May 2019 notes that you signed?

15        A.   I don't -- I don't know.

16        Q.   But as of October 6, 2020, you're

17   writing that there is one demand note and

18   you're categorizing that demand note as not

19   being demandable on May 2021; correct?

20        A.   Yes.

21        Q.   And you know now that you made at

22   least one mistake in this email; correct?

23             MR. MORRIS:  Objection to the form

24        of the question.

25        A.   Yes.

1          WATERHOUSE - 10-19-21

2          MR. RUKAVINA:  You can pull this

3     down, Mr. Nguyen.

4     Q.    So, Mr. Waterhouse, you don't

5 remember Mr. Dondero telling you to make these

6 loans or not.  HCMLP was loaning $7.4 million

7 to someone that their assets were less than

8 their liabilities.

9          We don't see on the July list of

10 notes, where there is $12.7 million of notes,

11 we don't see that on the bankruptcy schedules,

12 and we have this Exhibit 36 where you are

13 confused.

14          Are you prepared to tell me, sir,

15 today that you might have made a mistake in

16 executing those two promissory notes?

17          MR. MORRIS:  Objection to the form

18     of the question.

19     A.    I -- I don't know.

20     Q.    And if it turns out that you're

21 personally liable for those promissory notes,

22 it would certainly be a mistake, wouldn't it?

23          MS. DANDENEAU:  Objection to the

24     form.

25          MR. MORRIS:  Join.

1              WATERHOUSE - 10-19-21

2        A.    Yes.

3        Q.    If Mr. Dondero testifies that he

4   never told you to make these loans, would you

5   disagree with his testimony?

6              MR. MORRIS:  Objection to the form

7        of the question.

8        A.    Like I testified earlier with my

9   conversation with Mr. Dondero, all I recall is

10  he said, get the money from Highland.

11       Q.    And if Mr. Dondero testifies that

12  he, in consultation with other senior personnel

13  at Highland, decided that Highland needed to

14  pay HCMFA $7.4 million as compensation for the

15  NAV error and not a loan, would you have any

16  reason to disagree with Mr. Dondero?

17             MR. MORRIS:  Objection to the form

18       of the question.

19       A.    If that was -- if that was his

20  intent, yes, it would -- I would --

21       Q.    Do you have any reason to disagree

22  with him?

23             MR. MORRIS:  Objection to the form

24       of the question.

25       A.    If that was his intent, I don't

1                    WATERHOUSE - 10-19-21

2     know.  I don't know how I disagree with that.

3         Q.    And just to confirm, you don't

4     remember ever asking Mr. Dondero whether you

5     should have two promissory notes prepared?

6         A.    No.

7         Q.    And you don't remember discussing

8     with Mr. Dondero what the terms of those two

9     promissory notes should be?

10        A.    I don't recall -- I testified all I

11    recall is he said, get the money from Highland.

12    I don't -- the -- the terms of the note, I

13    don't recall ever having a discussion around

14    the terms of the note, but since I don't draft

15    the notes, that -- there could have been a

16    conversation with other people later.

17        Q.    Do you have any memory of whether

18    after the notes were drafted, but before you

19    signed them, that you communicated with

20    Mr. Dondero in any way to just confirm or -- or

21    get his blessing or ratification to signing

22    those notes?

23              MR. MORRIS:  Objection to the form

24        of the question.

25        A.    I don't recall.

```
1              WATERHOUSE - 10-19-21

2       Q.    Again, the only thing you remember,

3  sitting here today, was Mr. Dondero said, get

4  the money from Highland, and that is it, that

5  is all you remember?

6              MR. MORRIS:  Objection to the form

7       of the question.

8       A.    I testified to that several times.

9  This was over two years ago.  A lot has

10 happened.  That is all I recall.

11      Q.    And help me here.  I'm not very

12 technologically astute.  When you -- and I -- I

13 recognize that you do it rarely, but when you

14 sign a document electronically, do you believe

15 that there is an electronic record of you

16 having authorized or signed a document

17 electronically?

18             MR. MORRIS:  Objection to the form

19      of the question.

20      A.    I -- I don't know the tech answer to

21 that, but, you know, since I don't have -- I

22 don't ever attach my signature block

23 electronically, my assistant would have done

24 that, and if that is done over email like we

25 did several times -- you know, multiple,
```

```
1                 WATERHOUSE - 10-19-21
```

2    multiple times over COVID, she would attach my

3    signature block and then email it out to

4    whatever party.

5         Q.    What was your assistant's name in

6    May 2019?

7         A.    It was Naomi Chisum.

8         Q.    Is she the only one?  I'm sorry, was

9    she your only assistant that would have maybe

10   facilitated logistically something like you

11   just described?

12        A.    You know, she was out on maternity

13   leave at some point.  I don't -- I don't recall

14   those dates where she was out for maternity

15   leave.  There was -- there were folks backing

16   her up.  I don't recall specifically who

17   those -- who those, you know, administrative

18   assistants were, and I don't recall

19   specifically if she was out during this time on

20   maternity leave.

21             I do know that that she was out for

22   a period of time, or who knows, or she could

23   have been on vacation that day or, you know, I

24   don't know.

25        Q.    Switching gears now, the two

```
1                   WATERHOUSE - 10-19-21
2    complaints that have been filed that is against
3    HCMFA and NexPoint, did you see any drafts of
4    those complaints before they were filed?
5                   MR. MORRIS:  Objection to the form
6           of the question, and to the extent that you
7           had any communications with counsel or you
8           were shown drafts of the complaints by
9           counsel while you were employed by
10          Highland, I direct you not to answer.
11      A.    I -- I reviewed documents yesterday
12   with counsel here.  I believe that is the first
13   time I have ever seen those.
14      Q.    Okay.  Did you ever discuss with
15   Mr. Seery these two lawsuits before or after
16   they were filed?
17      A.    I don't recall.
18      Q.    Were you ever interviewed by legal
19   counsel, to your knowledge, about these
20   promissory notes before the complaints were
21   filed?  Without going into what was said, were
22   you ever interviewed by legal counsel?
23                  MR. MORRIS:  Objection to the form
24          of the question.
25      A.    I don't recall.
```

1          WATERHOUSE - 10-19-21

2     Q.    Obviously with COVID, it changed,

3  but -- but before COVID, did you used to meet

4  with Mr. Seery from time to time in-person?

5     A.    Yeah, I mean, so before COVID -- so

6  we're talking kind of late March, early April,

7  right, there was about -- I don't remember the

8  specific date when the board for Highland was

9  appointed.  I believe it was around February of

10  2020, so maybe there was a month-and-a-half,

11  two-month window where we were meeting

12  in-person or, you know, like we were actually

13  in the office, excuse me, we were in the

14  office.

15          And, you know, when they were first

16  appointed, the board members and Mr. Seery

17  were -- were definitely down here more

18  in-person.

19     Q.    Did you ever see Mr. Seery taking

20  written notes of -- of his meetings with you or

21  others?

22     A.    I don't recall.

23     Q.    Do you recall on any Zoom or video

24  conference with Mr. Seery, seeing him take

25  notes, written notes?

1      WATERHOUSE - 10-19-21

2      A.    The Zoom calls we had, I don't

3   recall having seen video or, you know, or if it

4   was on Zoom, I just remember it being -- well,

5   no, you know what, there were some -- you know,

6   I take that back.

7           So there were -- there were some

8   times that I did remember seeing Mr. Seery

9   on -- on some of the Zoom calls.

10      Q.    Well, let me --

11      A.    I don't -- sorry, I'm thinking.  I'm

12   thinking -- I'm going back.  I'm trying to

13   process this.

14      Q.    I can make it much quicker,

15   Mr. Waterhouse.  I have heard -- I have heard

16   that Mr. Seery is a copious note taker.

17           Do you have any knowledge about

18   that?

19      A.    No.

20      Q.    Okay.  Switching gears yet again,

21   and this will be last theme.  Do you need a

22   restroom break, or are you good to go for

23   another half an hour?

24           MS. DEITSCH-PEREZ:  I need a

25        restroom break.

1                    WATERHOUSE - 10-19-21

2          MR. RUKAVINA:  Can we make it five

3      minutes?

4          THE WITNESS:  Five minutes would be

5      great.

6          VIDEOGRAPHER:  We're going off the

7      record at 5:53 p.m.

8      (Recess taken 5:53 p.m. to 5:59 p.m.)

9          VIDEOGRAPHER:  We are back on the

10     record at 5:59 p.m.

11     Q.    Mr. Waterhouse, I had asked you

12 earlier about contracts between HCMFA and the

13 debtor, and now I'm going to talk about

14 contracts between the debtor and NexPoint

15 Advisors.  Okay?

16     A.    Okay.

17     Q.    Now, were there contracts similar to

18 the ones with HCMFA that NexPoint had in the

19 nature of employee reimbursement and shared

20 services?

21     A.    Yes, they -- NexPoint Advisors and

22 Highland Capital Management Fund Advisors had

23 cost reimbursement and shared services

24 agreements with Highland Capital Management,

25 L.P.

1              WATERHOUSE - 10-19-21

2      Q.     And was that shared services

3  agreement, to the best of your understanding,

4  in place as of December 31, 2020?

5      A.     It was -- it was terminated at some

6  point, and I remember the contracts had

7  different termination dates, but I think the --

8  the date of termination was January 31st of

9  2021, after the termination was put in.

10             So yeah, it would be in place at the

11  end of the year of December -- it would be in

12  place at December 31st, 2020.

13     Q.     And pursuant to that agreement as of

14  December 31st, 2020, was the debtor providing

15  what you would describe as back office services

16  to NexPoint?

17     A.     Yes.

18     Q.     Would those have included accounting

19  services?

20     A.     Yes.

21     Q.     And as part of those accounting

22  services, would the debtor have assisted

23  NexPoint with paying its bills?

24             MR. MORRIS:  Objection to the form

25      of the question.

1              WATERHOUSE - 10-19-21

2       A.    Yes.

3       Q.    So let's break that up.  You were a

4  treasurer of NexPoint as well in December of

5  2020?

6              MR. MORRIS:  Objection to the form

7       of the question.

8       A.    Yes.

9       Q.    Okay.  And in December of 2020, did

10 NexPoint have its own bank accounts?

11      A.    Yes.

12      Q.    And did it use those bank accounts

13 to pay various of its obligations?

14      A.    Yes.

15      Q.    Did employees of the debtor have the

16 ability to cause transfers to be made from

17 those bank accounts on behalf of NexPoint?

18      A.    Yes.

19      Q.    And is that one of services that the

20 debtor provided NexPoint, basically ensuring

21 that accounts payable and other obligations

22 would be paid?

23      A.    Yes.

24              MR. MORRIS:  Objection to the form

25      of the question.

1                    WATERHOUSE - 10-19-21

2          Q.     You answered yes?

3          A.     Yes.

4          Q.     And the payments, though, whose

5     funds would they be made from?

6          A.     From the bank account of NexPoint

7     Advisors.  If they were NexPoint advisor

8     obligations, it would be made from NexPoint

9     Advisors' bank account.

10         Q.     So let's pull up Exhibit Alpha 1.

11    You should have that -- it is my Tab 1 or my

12    Exhibit 1.

13                (Exhibit A1 marked.)

14         Q.     So this is a -- this is a series of

15    emails, Mr. Waterhouse.  Let's look at the

16    first page here, November 25, 2020, between

17    Kristin Hendrix and yourself.

18                Do you see that, sir?

19         A.     I do.

20         Q.     And do you see where Ms. Hendrix

21    writes:  NPA.

22                Do you know what NPA stood for?

23         A.     Yes.

24         Q.     And what does it stand for?

25         A.     NexPoint Advisors.

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    And was that how you-all internally

 3    at Highland refer to NexPoint Advisors, L.P.?

 4        A.    I mean, yes, amongst other things.

 5        Q.    And she writes at the bottom of her

 6    email:  Okay to release?

 7              Do you see that?

 8        A.    Yes, I do.

 9        Q.    So what --

10              MR. MORRIS:  Hold on one second.

11              Okay.  Go ahead.

12              MR. RUKAVINA:  Yeah.

13        Q.    So what is -- what is Ms. Hendrix

14    here on November 25 asking of you?

15        A.    She is asking me -- so she -- these

16    are -- these are payments -- typically we would

17    do an accounts payable run every week at the

18    end of every Friday.  But looking at this date,

19    it is Wednesday, November 25th, which means, to

20    me, it is likely Thanksgiving weekend.

21              So this is the day before

22    Thanksgiving, so this is the last kind of --

23    kind of day before the holidays and vacation

24    and things of that nature.  So it is

25    effectively the Friday of that week.
```

1          WATERHOUSE - 10-19-21

2          So she is -- she is putting in all

3   the payments for the week because we batch

4   payments weekly.  And these are the payments

5   that go out that week, and she is informing me

6   of the payments and -- you know, again, at the

7   bottom of the email, she is asking for my okay

8   to -- to release these payments in the wire

9   system.

10          Q.    So these would be accounts payable

11   of NexPoint?

12          A.    I mean, it would be accounts payable

13   for all of these entities listed on this email.

14          Q.    And who was Ms. Hendrix employed by

15   in November and December of 2020?

16          A.    Highland Capital Management.

17          Q.    Okay.  So -- so part of the services

18   that NexPoint had contracted with was for

19   Highland to ensure that NexPoint timely paid

20   its accounts payable; is that accurate?

21          MR. MORRIS:  Objection to the form

22      of the question.  You have got to be

23      kidding me.

24          Q.    Is that accurate?

25          A.    Yes.

1             WATERHOUSE - 10-19-21

2        Q.    And did NexPoint rely on employees

3    of the debtor to ensure that NexPoint's

4    accounts payable were timely paid?

5             MR. MORRIS:  Objection to the form

6        of the question.

7        A.    Yes.

8             MR. RUKAVINA:  Let's flip to the

9        next page, Mr. Nguyen, if you will please

10       scroll to the next page.

11       Q.    So this is an email similar to the

12   prior one, November 30th.

13            Do you see where it says, NPA HCMFA,

14   USD $325,000 one-day loan?

15            Do you see that, sir?

16       A.    I do.

17       Q.    Do you have any memory of what that

18   was?

19       A.    I don't recall what that -- what

20   that payment was for.

21       Q.    Did it sometimes occur that one

22   advisor would, on very short-terms, make loans

23   to another advisor?

24       A.    Yes.  This -- this -- this occurred

25   from -- from -- from time to time.  It actually

1                    WATERHOUSE - 10-19-21

2      looking at -- I'm -- I'm looking at the date of

3      this email.  It is November 30th.  It is the

4      last day of the month.

5                    HCMFA has obligations it needs to

6      pay to its broker-dealer, which is HCFD.  And

7      it likely was short funds to make those

8      obligations under that -- under its agreement,

9      and so it provided a one-day loan because on

10     the next business day on 12/1 -- or the next

11     business day in December, it would receive

12     management fees from the underlying funds that

13     it managed and it would be able to pay back

14     that loan to NexPoint Advisors.

15         Q.    So -- so here Ms. Hendrix was

16     seeking your approval to transfer $325,000 from

17     NexPoint to HCMFA for a one-day loan; is that

18     correct?

19         A.    That is correct.

20         Q.    Let's flip to the next page, sir.

21               MR. RUKAVINA:  And, Mr. Nguyen, if

22         you will please scroll down.

23         Q.    Now we have as an entry for

24     $325,000, 11/30 loan payment.

25               Do you see that, sir?

```
1                    WATERHOUSE - 10-19-21

2        A.    Yes.

3        Q.    And that is probably the loan that

4   was approved on the prior page?

5        A.    Yes, most likely.

6        Q.    So is it also true, sir, that in

7   addition to accounts payable debtor employees

8   would be assisting NexPoint with respect to

9   paying back its debt?

10            MR. MORRIS:  Objection to the form

11       of the question.

12       A.    I mean, yes, for loans of this

13  nature, yes.

14       Q.    Well, what about long term loans?

15  Was it reasonable for NexPoint to expect debtor

16  employees to ensure that NexPoint timely paid

17  its obligations under long-term notes?

18            MR. MORRIS:  Objection to the form

19       of the question.

20            MS. DANDENEAU:  Objection to form.

21       A.    I mean, that is one of the things

22  that the Highland personnel did provide to the

23  advisors.  Yes, we would -- we would -- over

24  the years, yes, we -- we -- we -- we did do

25  that generally.  Again, I don't remember
```

1           WATERHOUSE - 10-19-21

2    specifically but, yes, generally we -- you

3    know, we did do that.

4        Q.    So do you recall -- and we can pull

5    it up, if need be -- that under the NexPoint

6    note that Mr. Morris asked you about earlier,

7    the one for more than $30 million, that

8    NexPoint was obligated to make an annual

9    payment of principal and interest?

10           MR. MORRIS:  Objection to the form

11       of the question.

12       A.    Yes, it was -- yes, it -- it was an

13   amortizing note.  It was -- you know, from what

14   we reviewed earlier, it was payable by

15   December 31st of each year.  So -- but are --

16   are you asking me --

17       Q.    I'm just asking you, sir, if you

18   recall the note.

19       A.    Yes, the $30 million note, yes, we

20   reviewed it earlier, yes.

21       Q.    And do you recall Mr. Morris had you

22   go through the fact that NexPoint had made

23   payments in years prior to 2020 on that note?

24       A.    I do.

25       Q.    And do you believe that employees of

1                WATERHOUSE - 10-19-21

2    the debtor would have played any role in

3    NexPoint having made those prior payments?

4                MR. MORRIS:  Objection to the form

5      of the question.

6    A.    Yes.

7    Q.    And what role in years prior to 2020

8    would employees of the debtor have had with

9    respect to NexPoint making that annual payment?

10    A.    We -- we -- we would have -- I keep

11    saying "we."  The team would have calculated

12    any amounts due under that loan and other

13    loans, as -- as standard course.

14                We would -- since we provided

15    treasury services to the advisors, we would

16    inform the -- the -- the -- we informed

17    Mr. Dondero of any cash obligations that are

18    forthcoming, whether we do cash projections.

19                If, you know, any of these payments

20    would have -- or, you know, the sum total of

21    all of these payments, including any note

22    payments, if there were any cash shortfalls, we

23    would have informed Mr. Dondero of any cash

24    shortfalls.  We could adequately plan, you

25    know, in instances like that.

1                    WATERHOUSE - 10-19-21

2              Or, sorry, we -- I say "we" -- I

3    keep saying "we" -- I keep wearing my -- again,

4    my -- my treasurer hat.

5              But, yes, it is to -- it is to

6    inform Mr. Dondero of the obligations of the

7    advisors in terms of cash and obligations that

8    are -- are upcoming and that -- and that are --

9    are scheduled to be paid.

10        Q.    And would those obligations that are

11   upcoming and scheduled to be paid prior to 2020

12   have incurred the annual payment on that

13   NexPoint $30 million note?

14              MS. DANDENEAU:  Objection to form.

15              MS. DEITSCH-PEREZ:  Davor, I think

16        you misspoke.  You might want to just

17        repeat the question.

18        Q.    Okay.  Let me repeat the question,

19   sir.

20              Prior to 2020, those services that

21   you just described, would that -- on behalf of

22   the debtor, would that have included NexPoint's

23   payments on the $30 million note?

24        A.    Yes.

25        Q.    So someone at the debtor in treasury

1                    WATERHOUSE - 10-19-21

2     or accounting would have sent some schedule or

3     a reminder that a payment would be coming due

4     in the future.  Is that generally the practice?

5          A.    Yes, we would -- you know, again, I

6     didn't -- I didn't micromanage the teams, but

7     we had a -- a corporate accounting calendar

8     that we use as kind of a tickler file to keep

9     track of payments.

10               I actually, you know, don't know how

11    actively they're using that in -- in prior to

12    2020, but it was actively used at some point.

13               We did look at NexPoint cash

14    periodically and cash for the other advisors as

15    well and payments.  You know, we -- payments

16    like this would have appeared in our cash

17    projections, in the advisor's cash projections.

18               And, again, as like I said earlier,

19    they would have appeared there, so there would

20    be time to plan for making any of these

21    payments.

22          Q.    And based on your experience, would

23    it have been reasonable for NexPoint to rely on

24    the debtors' employees to inform NexPoint of an

25    upcoming payment due on the $30 million

1                    WATERHOUSE - 10-19-21

2    promissory note?

3                    MR. MORRIS:  Objection to form of

4         the question.

5                    MS. DANDENEAU:  Objection to form.

6         A.    Yes.  Yes, they did.  I mean, but I

7    mean, but I don't think these -- these notes

8    were any secret to anybody.

9         Q.    I understand, and I'm not suggesting

10   otherwise.

11                   MR. RUKAVINA:  Please pull up Alpha

12   2, Mr. Nguyen.

13                   (Exhibit A2 marked.)

14        Q.    Now, this document is similar to the

15   ones we've seen before as of December 31, 2020,

16   and I don't see under NTA anything there for

17   paying the promissory note to Highland.

18                   Do you see anything like that?

19        A.    I do not.

20                   MR. RUKAVINA:  You can pull that --

21   that exhibit down, Mr. Nguyen.

22        Q.    You are aware, of course, by now

23   that, in fact, NexPoint failed to make the

24   payment due December 31, 2020, are you not?

25        A.    I am aware, and yes, I do understand

1              WATERHOUSE - 10-19-21

2    it.

3         Q.    Were you aware that Highland

4    accelerated that $30 million promissory note?

5         A.    I am aware.

6         Q.    Were you aware of that acceleration

7    at the time that it occurred?

8         A.    I don't remember specifically.

9         Q.    Do you recall whether anyone asked

10   you -- prior to the acceleration, anyone asked

11   you at Highland, what Highland should do with

12   respect to the missed payment?

13        A.    Did anyone ask me what Highland

14   should do about the missed payment?

15        Q.    Yes, before acceleration.

16             MR. MORRIS:  Objection to the form

17        of the question.

18        A.    I mean, what -- what I recall is

19   there was the -- sorry, are you asking me --

20             MS. DANDENEAU:  Why don't you just

21        repeat the question, Mr. Rukavina.

22        Q.    Let me try again, Mr. Waterhouse,

23   let me try again.

24             I am saying you're the CFO of

25   someone, in this case, Highland, and the

1          WATERHOUSE - 10-19-21

2     borrower failed to make the required payment.

3     Are you with me so far?

4          A.    I am.

5          Q.    Did anyone then ask you, what should

6     we do with respect to our rights against the

7     borrower that missed the payment?

8          A.    Not that I recall.

9          Q.    Did you play a role in the decision

10    to accelerate that $30 million promissory note?

11         A.    I did not.

12         Q.    Do you recall whether Mr. Seery ever

13    asked you before the acceleration as to whether

14    he should accelerate the note?

15         A.    I don't recall.

16         Q.    And you don't recall when you

17    learned of the acceleration itself?

18              MR. MORRIS:  Objection to the form

19         of that question.

20         A.    It was -- it was sometime in

21    early -- in early 2021.  I don't remember

22    specifically.

23         Q.    But do you recall whether it was

24    after the acceleration had already been

25    transmitted?

1                    WATERHOUSE - 10-19-21

2                    MS. DANDENEAU:  Objection to the

3          form of the question.

4          A.    I don't recall.

5          Q.    Do you recall in early to mid

6     January of 2021, after the default, discussing

7     the default with Mr. Dondero?

8          A.    I do recall discussing with

9     Mr. Dondero after December 31, 2020?

10         Q.    Yes, the fact of the default.

11         A.    I don't recall.

12                MR. RUKAVINA:  Let's pull up my

13    Exhibit 6, Alpha 6.

14                (Exhibit A6 marked.)

15                MR. RUKAVINA:  And, Mr. Nguyen, if

16         you will please scroll down.

17         Q.    This email chain begins with you

18    writing to Ms. Hendrix on January the 12th:

19    NexPoint note to HCMLP.

20                Do you see that, sir?

21         A.    I do.

22         Q.    Were you discussing this same

23    $30 million note we're talking about right now

24    with Ms. Hendrix?

25         A.    Yes.

1            WATERHOUSE - 10-19-21

2        Q.    Okay.  Do you recall what prompted

3    you to send that email to her?

4        A.    Yes, I had -- I had a conversation

5    with Jim.

6        Q.    Okay.  And what -- what did you

7    discuss with Jim that led to this email chain?

8        A.    He -- he called me and he said he

9    wanted to make payment on the NexPoint note,

10   and I didn't -- I didn't know the -- the amount

11   offhand, so I reached out to Kristin and got

12   the details and relayed that to him.

13       Q.    And you see you sent that email to

14   her at 11:15 a.m.  Does that help you remember

15   when you had this discussion with Mr. Dondero?

16   In other words, was it that morning or the day

17   before, or can you -- can you --

18       A.    No, it was -- it was that morning.

19       Q.    And do you recall how you had that

20   conversation with him?

21            MR. MORRIS:  Objection to the form

22       of the question.

23       Q.    By telephone, by email, in-person?

24       A.    Yeah, he -- he called me.  I was at

25   home.  We were working from home here in

```
1                    WATERHOUSE - 10-19-21

2    December of 2020.  He called me from home.  He

3    said he was in court.  He wanted to -- he asked

4    about, you know, making payment on the note and

5    the amount, and so I didn't have those numbers

6    in front of me, so I said I would get back to

7    him.  I wanted all the details, so here is

8    this -- so I reached out to Kristin.

9         Q.    And then she gave you that

10   $1,406,000 figure?

11               MR. RUKAVINA:  Mr. Nguyen, if you

12   will scroll up, please.

13        A.    Yes.  Yeah, she -- the $1,406,112.

14        Q.    And do you recall whether you

15   conveyed that amount to Mr. Dondero?

16        A.    Yes.  I -- I called him back and

17   gave him -- gave him this amount.

18        Q.    Are you aware of whether NexPoint,

19   in fact, then made that 1 million 406 and

20   change payment?

21        A.    Yes, they did.

22        Q.    Did you discuss with Mr. Dondero at

23   that time, either the first conference or the

24   second conference that day -- strike that.

25               When you conveyed the number to
```

1           WATERHOUSE - 10-19-21

2    Mr. Dondero, was -- was it also on January

3    12th?

4         A.    Sorry, when I conveyed the

5    $1.4 million number?

6         Q.    Yes.

7         A.    Yes, yes, it was that -- it was --

8         Q.    So you had --

9         A.    It was that point.

10        Q.    Well, to the best of your

11   recollection, you had a conference with

12   Mr. Dondero by the telephone in the morning,

13   and then another conference with him by

14   telephone after 11:40 a.m. that morning?

15        A.    Yeah, I can't remember -- yeah, it

16   was either that morning or it could have been,

17   you know, early afternoon, but again, I

18   remember calling him back, relaying this

19   information to him, and he said, okay, pay --

20   you know, make -- make this payment.

21        Q.    And during either of those two

22   calls, did you tell Mr. Dondero anything to the

23   effect that making those -- I'm sorry, making

24   that payment would not de-accelerate the

25   promissory note?

```
1                    WATERHOUSE - 10-19-21
2         A.    No.
3         Q.    Did you tell him anything to the
4    effect that making that payment would not cure
5    the default?
6         A.    No.
7         Q.    Did you discuss that in any way with
8    him?
9         A.    No, I did not.
10         Q.    Did he say why he wanted to have
11    that $1.4 million payment made?
12              MR. MORRIS:  Objection to the form
13         of the question.
14         A.    He -- he -- he didn't go into
15    specifics.
16         Q.    Did he say anything to you to the
17    effect that if NexPoint makes that payment,
18    then the note will be de-accelerated?
19              MR. MORRIS:  Objection to the form
20         of the question.
21         A.    I don't recall.
22              MR. RUKAVINA:  You can put this one
23         down, Mr. Nguyen.
24         Q.    And, again, when you say you don't
25    recall, you mean you don't remember right now
```

1          WATERHOUSE - 10-19-21

2   either way; correct?

3       A.    Yeah, I don't remember.  I don't

4   remember us discussing that.

5       Q.    Now -- and we're almost done, I

6   promise.  I'm just going to -- I don't know how

7   to ask this question, so I'm just going to try

8   to do my best.

9            Prior to the default on December 31,

10  2020, did Mr. Seery ever tell you any words to

11  the effect that you or someone at Highland

12  should ensure that NexPoint doesn't make its

13  payment?

14      A.    No.

15      Q.    Did you have any hint or any belief

16  that anyone at NexPoint -- I'm sorry, strike

17  that.

18           Did you have any reason to believe

19  that anyone with Highland was actively trying

20  to get NexPoint to make that default by not

21  paying on December 31?

22           MR. MORRIS:  Objection to the form

23      of the question.

24      A.    Are you asking, did any Highland

25  employees actively work to make -- to

```
1              WATERHOUSE - 10-19-21

2   somehow --

3        Q.    Yes.  Let me take a step back.  Let

4   me take a step back.

5              So you are aware now that as a

6   result of that default, what was still some

7   25-year note was accelerated and became

8   immediately due.  You are aware of that now;

9   right?

10       A.    Yes.

11       Q.    And can you see how someone at

12  Highland might actually have been pleased with

13  that development?

14             MR. MORRIS:  Objection to the form.

15       Q.    Not that they were --- not that they

16  were pleased, but you can see how someone at

17  Highland might have been pleased with that

18  development?

19             MR. MORRIS:  Objection to the form

20       of the question.

21             MS. DANDENEAU:  Object to form.

22       A.    I don't know how they would have

23  reacted to that.

24       Q.    Okay.  But you're not -- you're not

25  aware of any instructions or any actions being
```

1          WATERHOUSE - 10-19-21

2     given or taken at Highland by Mr. Seery, the

3     independent board, DSI, that -- that would have

4     basically led Highland to ensure that NexPoint

5     would fail to make that payment?

6          A.    I'm not aware.

7          Q.    In other words, there wasn't a trick

8     or a settlement; right?

9               MS. DEITSCH-PEREZ:  Objection to

10          form.

11              MS. DANDENEAU:  Object to form.

12              MR. MORRIS:  Object to form.

13         A.    I'm not aware.

14              Look, I'm not aware.  I'm not in

15    every conversation.  I mean, and I'm just --

16    again, I'm sitting at home.  It is the end of

17    the year.  Again, I'm not aware.

18         Q.    That is a perfectly legitimate

19    answer.  I don't know why -- why you think

20    otherwise.

21              Okay.  Just give me one second to

22    compose my thoughts.

23              MS. DEITSCH-PEREZ:  While you're

24          taking your one second, why don't we take

25          three minutes.  I will be right back.

```
 1                WATERHOUSE - 10-19-21

 2                VIDEOGRAPHER:  Do we want to go off

 3        the record?

 4                MR. RUKAVINA:  Yes.

 5                VIDEOGRAPHER:  All right.  We're

 6        going off the record at 6:27 p.m.

 7        (Recess taken 6:27 p.m. to 6:30 p.m.)

 8                VIDEOGRAPHER:  We are back on the

 9        record at 6:30 p.m.

10                MR. HORN:  Is Deb back?

11                MS. DANDENEAU:  Are you asking about

12        me?  I'm here.

13                MR. HORN:  Oh, okay.  I don't see

14        you, sorry.

15        Q.    Actually, yeah, Mr. Waterhouse, so

16     when you had --

17                MS. DANDENEAU:  Are you asking about

18        Deb Dandeneau or Deborah?  I mean, there

19        are a lot -- as we talked about, a lot of

20        Debs.  I'm here.

21                MS. DEITSCH-PEREZ:  I'm here.

22                MR. HORN:  Yes, I was asking about

23        DDP.

24                MS. DEITSCH-PEREZ:  Oh, DDP is here.

25                MR. HORN:  Okay.  Here we go.  I'm
```

1          WATERHOUSE - 10-19-21

2     going back on mute.

3          MS. DANDENEAU:  Get the right

4     nomenclature.

5          Q.    Mr. Waterhouse, on January 12th,

6     2021, when you had those talks with Mr. Dondero

7     about the $1.4 million payment, did you have a

8     communication or a conversation with Mr. Seery

9     about that payment after January 12th, 2021?

10         A.    I don't recall.

11         Q.    Well, in response to Mr. Dondero

12    reaching out to you, do you recall on that day,

13    January 12th, talking to Mr. Seery or anyone at

14    Highland other than the email chain we just saw

15    about Mr. Dondero's call with you?

16         A.    Did I talk to -- I spoke with

17    Kristin -- I don't know if I spoke to her.  I

18    likely spoke to Kristin Hendrix because we had

19    to get the wire on NexPoint's behalf to make

20    the payment to Highland.

21         Q.    So it is true, then, that -- that

22    employees of the debtor did actually cause that

23    payment to be made when it was made after

24    January 12th?

25         A.    Yes, I mean, we -- we -- as I

1          WATERHOUSE - 10-19-21

2    testified earlier, we provided that accounting

3    finance treasury function as -- under the

4    shared services agreement.  And so once I

5    got the -- I talked to Jim, got the approval to

6    make this payment, we have to then make the

7    payment, or the team does, and so the payment

8    was made.

9          Q.    Okay.  But -- okay.  And -- and

10   sitting here right now, after Jim called you,

11   you don't remember talking to anyone other than

12   the -- the couple of people you mentioned,

13   talking to anyone about something to the effect

14   that, hey, Jim wants to make this payment now?

15             MR. MORRIS:  Objection to the form

16        of the question.

17        A.    I don't -- I don't recall.

18        Q.    And does that include legal counsel?

19             Without going into any detail, on

20   January 12th or before that payment was made,

21   did you consult with legal counsel about

22   anything having to do with the $1.4 million

23   payment?

24        A.    I don't recall.

25        Q.    Okay.  Thank you, sir, for your

1           WATERHOUSE - 10-19-21

2    time.

3              MR. RUKAVINA:  Pass the witness.

4              MR. MORRIS:  I just have a few

5         questions, if I may.

6              MS. DEITSCH-PEREZ:  Don't you go at

7         the end?

8              MR. MORRIS:  Oh, I apologize.  He is

9         your witness.  I'm surprised you want to

10        ask him questions, but go right ahead.

11             MS. DEITSCH-PEREZ:  Just have a

12        couple of things.

13             MR. RUKAVINA:  And I will just

14        object to that, that he's our witness.

15        That's not --

16             MR. MORRIS:  I'm not talking to you.

17        I'm not talking to you.

18             MS. DANDENEAU:  Also, Mr. Morris, it

19        is -- it is --

20             MS. DEITSCH-PEREZ:  He is not my

21        witness.  He's been subpoenaed by you.

22        Okay?

23             That is no offense, Mr. Waterhouse,

24        I'm -- I'm not -- okay.  Anyway.

25                      EXAMINATION

1          WATERHOUSE - 10-19-21

2    BY MS. DEITSCH-PEREZ:

3         Q.    Good evening.  I'm very sorry to be

4    going last and I know you have had a long and

5    taxing day, so I thank you for indulging me.

6              The kinds of services that you

7    describe that the -- that Highland provided for

8    NexPoint, did Highland also provide similar

9    services to that to HCRE and HCMS?

10        A.    Yes.

11             MR. MORRIS:  Objection to the form

12        of the question.

13        Q.    What kind of services did Highland

14   provide to HCRE and HCMS?

15             MR. MORRIS:  Objection to the form

16        of the question.

17             MS. DEITSCH-PEREZ:  What is your

18        objection, John?

19             MR. MORRIS:  It is vague and

20        ambiguous.  Unlike the advisors and

21        NexPoint, they actually had shared services

22        agreements.

23             MS. DEITSCH-PEREZ:  I got -- I

24        understand your objection.  That is fine.

25        Q.    Let's take them one at a time.

1          WATERHOUSE - 10-19-21

2          What kinds of services did Highland

3   provide to HCRE?

4          MR. MORRIS:  Objection to the form

5      of the question.

6      A.   HCMS, Highland employees provided

7   accounting services, treasury management

8   services, potentially legal services.  I

9   don't -- but I wouldn't have been directly

10  involved in that.  But as far as the teams that

11  I manage, it was accounting, treasury, things

12  of that nature.

13     Q.   Okay.  And that was for HCM, LLP --

14     A.   And -- and, sorry, it would also be

15  any asset valuation if needed as well.

16     Q.   Okay.  We went back and forth on

17  each other and I apologize, so just to clarify.

18          You were talking about the services

19  that Highland Capital Management provided to

20  HCMS; is that right?

21     A.   HCMS.  So, again, yes.  And

22  accounting, treasury, valuation, and also tax

23  services too.

24     Q.   Okay.

25     A.   Tax services.  Look, I'm expanding

1          WATERHOUSE - 10-19-21

2    this, their HR services as well.

3          Q.    Okay.  And did that include bill

4    paying?

5               MR. MORRIS:  Objection to the form

6          of the question.

7          Q.    Did the services that HCM provided

8    to HCMS include bill paying?

9               MR. MORRIS:  Objection to the form

10         of the question.

11         A.    Yes.

12         Q.    And did the services that HCMLP

13   provided to HCMS include scheduling upcoming

14   bills?

15              MR. MORRIS:  Objection to the form

16         of the question.

17         A.    Yes.

18         Q.    And did HCMLP regularly pay -- cause

19   to be paid the payments on loans HCMS had from

20   HCMLP?

21              MR. MORRIS:  Objection to the form

22         of the question.

23         A.    Yes.

24         Q.    Typically -- if there is a

25   typically, how far in advance of due dates did

```
 1                  WATERHOUSE - 10-19-21

 2    HCMLP cause HCMS to pay its bills?

 3                  MR. MORRIS:  Objection to the form

 4         of the question.

 5         A.    I mean, it -- it -- it depend -- it

 6    depended on the nature of the payment and the

 7    vendor, but, you know, if there were -- if

 8    there were larger scheduled payments, you know,

 9    I would like to give at least 30 days notice.

10                  And that is -- that is kind of my

11    rule of thumb so no one is surprised.

12         Q.    Okay.  And was it generally HCMLP's

13    practice to timely pay HCMS' bills?

14                  MR. MORRIS:  Objection to the form

15         of the question.

16         A.    It -- it -- it -- that depended on

17    the nature of the payment.

18         Q.    Okay.  And can you explain what you

19    mean by that?

20         A.    Yeah, I mean if -- if it was -- I

21    mean -- if there was some professional fees

22    that weren't -- you know, they were due but

23    they weren't urgent, those fees may not be paid

24    as timely as others that have a due date or --

25    or things like that.
```

1                    WATERHOUSE - 10-19-21

2        Q.    Okay.  Are loan payments the kinds

3   of thing that HCMLP would pay on time because

4   of potential consequences of not paying on

5   time?

6              MR. MORRIS:  Objection to the form

7        of the question.

8        A.    Yes.  As I testified earlier, we

9   would want to give, you know, notice on -- on

10  -- on larger payments and -- and things of that

11  nature so we didn't miss due dates.

12       Q.    Okay.  And over the course of time,

13  did HCMLP generally pay HCMS' loan payments in

14  a timely fashion?

15             MR. MORRIS:  Objection to the form

16       of the question.

17       A.    I can't remember specifically, but

18  generally, yes.

19       Q.    Okay.  Now, did HCMLP provide

20  similar services to HCRE that you have

21  described it provided to HCMS?

22             MR. MORRIS:  Objection to the form

23       of the question.

24       A.    Yes, but I don't think it -- it

25  provided -- I don't think it provided HR

1         WATERHOUSE - 10-19-21

2    services.

3         Q.    Can you describe the accounting and

4    treasury services that HCMLP provided for HCRE?

5         A.    Yeah, it -- it would provide

6    bookkeeping services on a -- on a periodic

7    basis.  It would make payments, you know, as

8    needed.

9         Q.    Okay.  So did it provide --

10        A.    And -- and I believe it -- it -- it

11   provided tax services as well.

12        Q.    Okay.  And so did it provide the

13   same kind of bill -- did HCMLP provide the same

14   kind of bill-paying services for HCRE that it

15   provided for HCMS and NexPoint?

16             MR. MORRIS:  Objection to the form

17        of the question.

18        A.    Yes.

19        Q.    And over the course of time, did

20   HCMLP generally cause to be made the loan

21   payments that HCRE owed to HCMLP?

22             MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Yes.

25        Q.    Did HCMLP make loan payment -- the

1                    WATERHOUSE - 10-19-21

2   loan payment that was due from HCMS to HCMLP in

3   December of 2020?

4              MR. MORRIS:  Objection to the form

5       of the question.

6       A.    I don't believe that payment --

7   payment was made.

8       Q.    Okay.  And when HCMLP caused HCMS in

9   the past to make loan payments, whose money did

10  it use to make those payments?

11             MR. MORRIS:  Objection to the form

12      of the question.

13      A.    It was the -- the money in HCMS's

14  operating account would be made to that --

15  those moneys would be used to make payment to

16  Highland Capital Management.

17      Q.    Okay.  And Highland -- is it correct

18  that Highland Capital Management personnel had

19  the access to HCMS's accounts to be able to

20  cause such payments to be made?

21      A.    Yes, Highland personnel had access

22  to those accounts.

23      Q.    Okay.  And so now for HCRE, whose

24  money was used when HCMLP caused HCRE

25  payments -- loan payments to Highland to be

1                    WATERHOUSE - 10-19-21

2    made?

3            MR. MORRIS:  Objection to the form

4        of the question.

5        A.    It was -- it was cash in HCRE's bank

6    account that would be used to make payments to

7    Highland Capital Management.

8        Q.    Okay.  And so did Highland Capital

9    Management have access to HCRE's funds in order

10   to be able to make such payments?

11           MR. MORRIS:  Objection to the form

12       of the question.

13       A.    Personnel at Highland Capital

14   Management had access to HCRE's bank account to

15   effectuate the payments.

16       Q.    Okay.  And was the payment due from

17   HCRE to HCMLP due in December of 2020 made?

18       A.    It --

19       Q.    In December of 2020.

20       A.    It was not.

21       Q.    Okay.  And was there money in HCRE's

22   account that would have enabled the payment to

23   be made had HCM personnel attempted to make the

24   payment?

25           MR. MORRIS:  Objection to the form

1          WATERHOUSE - 10-19-21

2          of the question.

3          A.    I -- I don't recall.

4          Q.    Do you have any reason to believe

5    that either HCRE or HCMS simply didn't have the

6    funds on hand to make the December 2020

7    payments?

8          A.    I don't know.

9          Q.    I guess I'm asking, do you have any

10   reason to believe that they didn't have the

11   funds?

12         A.    We managed cash for so many

13   different entities and funds, and I don't

14   recall, you know, where the cash position was

15   for HCRE and HCMS at 12/31/2020.

16         Q.    Okay.

17         A.    I just don't recall, and I don't --

18   and I don't remember what the loan payment

19   obligations were from HCRE to Highland, and

20   from HCMS to Highland.  I don't recall.  I

21   don't recall, I mean...

22         Q.    Let me come at it a different way.

23   Were the -- were the payments that would

24   otherwise have been due in December of 2020

25   made in January of 2021 for HCMS and HCRE?

1       WATERHOUSE - 10-19-21

2       A.    I believe the HCRE payment was made

3    in January of 2021.  I don't recall any

4    payments being made from HCMS to Highland.

5       Q.    If it -- how is it the HCRE payment

6    came to be made?  Why did you make it -- why

7    did HCM make the payment in January of 2021?

8       A.    Jim -- Jim called me and instructed

9    me to -- to make the payment on behalf of HCRE,

10   Jim Dondero -- Jim Dondero.

11      Q.    Did he seem upset that -- that the

12   payment had not been made?

13      A.    Yeah.  On the note that was, you

14   know, that was the term note, yes, he -- he was

15   displeased that the -- that the payment had not

16   been made by year-end.

17      Q.    Okay.  And did you make the -- cause

18   the payment to be made as -- as requested?

19      A.    Yes.

20      Q.    And did anyone else from HCM

21   participate with you in causing the payment to

22   be made to -- on the HCRE loan?

23      A.    Yes.  It would have been Kristin

24   Hendrix.  I -- again, I don't -- as I testified

25   earlier, I'm not an officer of HCRE.  I don't

1           WATERHOUSE - 10-19-21

2   believe I'm an authorized signer.  So I

3   can't -- other personnel have to make payment

4   from HCRE to -- to -- to -- to Highland.

5       Q.    Okay.  And in the conversation

6   that -- that you had with Mr. Dondero when he

7   requested the payment to be made, did you say

8   to him words to the effect, Jim, this loan is

9   going to stay in default, what are you making

10  the payment for, anything like that?

11      A.    No.

12      Q.    In fact, did you have the impression

13  from him that he thought that the loan would

14  be -- the default would be cured by making the

15  payment?

16          MR. MORRIS:  Objection to the form

17      of the question.

18      A.    Did I get the impression from Jim

19  Dondero that the loan would be cured if the

20  payment from HCRE --

21      Q.    Yeah, if that is what he thought.

22          MR. MORRIS:  Objection to the form

23      of the question.

24      A.    I didn't get any impression from him

25  on that at the time.

1          WATERHOUSE - 10-19-21

2     Q.    Do you know whether there was an

3  HCMS term loan that had a payment due in

4  December of 2020?

5     A.    I don't recall.

6     Q.    Okay.  And so the reason you don't

7  recall whether or not there was a payment in

8  January of 2021 is because you just don't

9  remember whether there was such a loan at all?

10         MR. MORRIS:  Objection to the form

11     of the question.

12     A.    I don't remember.  There is -- there

13  is so many notes, and I mean, demands, and I

14  don't -- I don't remember.  It's a lot to keep

15  track in your head.

16     Q.    I understand, and -- and I hear your

17  frustration when you have explained that the

18  debtor has your documents and you don't, and so

19  I fully appreciate it, and this is no knock on

20  you.  It's a knock on somebody else on this

21  call.

22         MR. MORRIS:  I move to strike.  That

23     was pretty obnoxious, but go ahead.

24     Q.    Okay.  But so, Mr. Waterhouse, if --

25  if a payment on the HCMS loan was made in

1          WATERHOUSE - 10-19-21

2  January of 2021, do you think it was part of

3  the same conversation where Jim Dondero said,

4  hey, why didn't that get paid, please make

5  that -- get that payment done?

6          MR. MORRIS:  I object to the form of

7      the question.

8      A.    Yes.  Likely it would have been -- I

9  mean, again, I don't recall a payment being

10  made, but, you know, again, I don't remember

11  everything.

12     Q.    Okay.  Did -- at the time you were

13  communicating with Kristin Hendrix about the

14  payment being made, whichever payments were

15  made in January, did she say anything to you

16  about the payments not curing the loan

17  defaults?

18     A.    No.

19     Q.    Okay.  All right.  So I'm going to

20  take you back to very early in the deposition

21  when Mr. Morris was asking you about the --

22  the -- the -- the agreement with respect to

23  the -- the forgiveness element of the loans, so

24  that is just to orient you.

25          Do you remember that there was a

1          WATERHOUSE - 10-19-21

2    time that you and Mr. Dondero were

3    communicating about potential means of

4    resolving the Highland bankruptcy by what was

5    colloquially referred to as a pot plan?

6         A.    Yes.

7         Q.    Okay.  And can you tell me generally

8    when that was?

9         A.    Like mid -- mid 2020, sometime in

10   2020, mid 2020.

11        Q.    Okay.  And did the process of trying

12   to figure out what the numbers should be

13   involve looking at what one should pay for the

14   Highland assets?

15             MR. MORRIS:  Objection to the form

16        of the question.

17        A.    Yes.

18        Q.    Okay.  And did there come a time

19   when you were proposing some potential numbers

20   and Mr. Dondero said something to you like,

21   well, why are you including payment for the

22   related party notes, those, you know, were

23   likely to be forgiven as part of my deferred

24   executive compensation?

25             MR. MORRIS:  Objection to the form

1          WATERHOUSE - 10-19-21

2     of the question.

3          A.    Yes, we did have that conversation.

4          Q.    Okay.  Was that conversation in

5     connection with trying to figure out the right

6     numbers for a pot plan?

7          A.    Yeah.  I mean, it was -- it was -- I

8     mean, Jim -- Jim would ask for, you know,

9     most -- most recent asset values, you know, for

10    Highland, and -- and myself and the team

11    provided those to him, so it was in that

12    context.

13         Q.    Okay.  And does that refresh your

14    recollection that these communications were in

15    2020 rather than 2021?

16              MR. MORRIS:  Objection to the form

17         of the question.

18         A.    The -- the -- the executive

19    compensation discussions were definitely in

20    2020.

21         Q.    Okay.  Now, did you ever make

22    proposals that took into account Jim's comment

23    that the notes were likely to end up forgiven

24    as part of his compensation?

25              MR. MORRIS:  Objection to the form

1              WATERHOUSE - 10-19-21

2        of the question.

3        A.    Yes, we -- the team and myself put

4   together, you know, asset summaries of Highland

5   at various times for all the assets of

6   Highland, and not including the notes.

7        Q.    Okay.  And were those presentations

8   communicated to -- to Mr. Seery?

9        A.    No.  Well, look, I didn't tell -- I

10  didn't tell Mr. Seery.  I don't know what

11  Mr. Dondero did with the information.

12       Q.    Okay.

13       A.    I did not have conversations with

14  Mr. Seery.

15       Q.    Okay.  Do you know who saw the

16  presentations that you put together that didn't

17  include the value of the related party notes?

18       A.    We're talking presentations -- these

19  are -- these are Excel spreadsheets?

20       Q.    Uh-huh.

21       A.    I don't know who -- these were given

22  to -- to Jim Dondero.  I don't know what was

23  done with them after that.

24       Q.    Okay.  You also mentioned earlier

25  that sometime during your tenure at Highland

1          WATERHOUSE - 10-19-21

2   you knew of the practice of giving forgivable

3   loans to executives.

4          MR. MORRIS:  Objection to the form

5      of the question.

6      Q.   Can you -- can you tell me what you

7   recall about that practice?

8          MR. MORRIS:  Objection to the form

9      of the question.

10     A.   Yes, so there were -- there were --

11  during my tenure at Highland, there were loans

12  or -- given to employees that were later

13  forgiven at a future date and time.

14     Q.   Okay.  And when the loans were

15  given, did the notes, to your recollection, say

16  anything about the potential forgiveness term?

17         MR. MORRIS:  Objection to the form

18     of the question.

19     A.   When you say "did the notes," did

20  the promissory notes detail the forgiveness?

21     Q.   Yes.

22     A.   Not that I recall.

23     Q.   And until such time as whatever was

24  to trigger the forgiveness occurred, were the

25  notes bona fide notes as far as you were

1        WATERHOUSE - 10-19-21

2   concerned?

3            MR. MORRIS:  Objection to the form

4       of the question.

5       A.    Yes, similar to -- yes.

6       Q.    Okay.  You were going to say similar

7   to what?

8       A.    Mr. Morris earlier today showed

9   notes of the financial statements about various

10  affiliate loans.  I -- I -- I do recall these

11  notes because I -- at that time personally

12  worked on the -- the financial statements of

13  Highland.  That was, you know, in my role as a

14  corporate accountant.

15           And there were -- those loans

16  were -- to the partners were detailed in the

17  notes to the financial statements, similar to

18  what we went through earlier today in the prior

19  testimony about what we saw with Highland

20  and -- and -- and the -- and HCMFA.

21      Q.    Is it fair to say that on Highland's

22  balance sheet there were any number of assets

23  that the value of which could be affected by

24  subsequent events?

25           MR. MORRIS:  Objection to the form

```
1                    WATERHOUSE - 10-19-21

2        of the question.

3        A.    Yes.  I mean, yes, that -- there

4   are.  And that is -- yes.

5        Q.    Okay.  And is it typical accounting

6   practice that until there is some certainty

7   about those potential future events, that asset

8   value listed on -- on the books doesn't take

9   into account those potential future events?

10                MR. MORRIS:  Objection to the form

11        of the question.

12        A.    Yeah, if those -- yes.  If -- if

13   those future events, you know, at the time of

14   issuance are not known or knowable, like I

15   discussed earlier with, like, market practice,

16   asset dislocation, or, you know, I mean, things

17   like that, you -- I mean, it -- it could affect

18   its fair value --

19        Q.    Okay.

20        A.    -- in the future.

21        Q.    And am I correct you wouldn't feel

22   compelled to footnote in every possible change

23   in -- in an asset when those possibilities are

24   still remote?

25                MR. MORRIS:  Objection to the form
```

1                    WATERHOUSE - 10-19-21

2      of the question.

3      A.    The accounting standard is you have

4    to estimate to the best -- you know, to -- to

5    the best of your ability, the fair value of an

6    asset as of the balance sheet date under --

7    under GAAP.

8      Q.    Did -- strike that.

9            Okay.  Give me a minute.  I'm

10   close -- I'm close to done.  Let me just go off

11   and look at my notes for a second.  So take two

12   minutes.

13           VIDEOGRAPHER:  We're going off the

14           record at 7:02 p.m.

15   (Recess taken 7:02 p.m. to 7:03 p.m.)

16           VIDEOGRAPHER:  We are back on the

17           record at 7:03 p.m.

18      Q.    Mr. Waterhouse, is it generally your

19   understanding that people you work with now

20   have been asking the debtor for full and

21   unfettered access to their own former files?

22           MR. MORRIS:  Objection to the form

23           of the question.

24      A.    Yes, I am -- I am generally aware.

25      Q.    Okay.  And do you think you could

1          WATERHOUSE - 10-19-21

2    have been better prepared for this deposition

3    if the debtor had complied with those requests?

4          MR. MORRIS:  Objection to the form

5       of the question.

6       A.    I -- I -- I most certainly -- yes.

7    I mean, again, these are multiple years,

8    multiple years ago, lots and lots of

9    transactions.

10          You know, we asked about NAV errors

11   and, you know, things like that and these

12   are -- it would make this process a lot more --

13   a lot easier and if we had -- if we had access

14   to that.

15      Q.    Okay.  And has the debtor -- is the

16   debtor suing you right now?

17      A.    Yes.

18      Q.    And is the debtor trying to renege

19   on deals that it had previously made with you?

20          MR. MORRIS:  Objection to the form

21       of the question.

22      A.    Sorry, I need to -- it is my

23   understanding that the litigation trust is

24   suing me.  And not being a lawyer, I don't

25   know -- is that the debtor?

1                    WATERHOUSE - 10-19-21

2              Is that -- I don't know the

3    relationship.  So, again, I'm not the lawyers.

4    I've said many times.  But my understanding is

5    the litigation trust is suing me.  I could be

6    wrong there.  I don't know.

7         Q.    Okay.  I understand.

8              Someone with some connection to the

9    Highland debtor has brought a claim against

10   you; is that fair?

11             MR. MORRIS:   Objection to the form

12        of the question.

13        A.    Yes.

14        Q.    Okay.  And is there also some motion

15   practice in the bankruptcy where the debtor or

16   someone associated with the debtor is

17   attempting to undo something that was

18   previously resolved with you?

19        A.    Yes.

20        Q.    And so in one action somebody is

21   associated with the debtors trying to --

22   threatening you with trying to take money from

23   you, and then in the other -- and trying to --

24   and in the other they are threatening not to

25   pay you things that had previously been agreed;

1            WATERHOUSE - 10-19-21

2   is that correct?

3            MR. MORRIS:  Objection to the form

4        of the question.

5        A.   I want to be -- yes, I -- there

6   is -- I'm being sued, again, on -- on something

7   that was agreed to with Mr. Seery and myself.

8   I don't -- I don't -- I don't own that claim.

9        Q.   Okay.

10       A.   To be transparent, I don't own that

11  claim.  So it is not my personal property.

12       Q.   Okay.

13       A.   And -- and being the nonlawyer, I

14  don't know how I can get sued for something

15  that I don't owe or, like, I don't own

16  anything.  I'm not the lawyer.  But, I mean, if

17  that is -- if I'm understanding the facts

18  correctly.

19       Q.   Okay.  And the lawsuit that was

20  filed that names you, that was just filed

21  this -- this past week; is that right?

22            MS. DANDENEAU:  Ms. Deitsch-Perez, I

23        do want to interrupt at this point because

24        just as I told Mr. Morris, that this is a

25        deposition about the noticed litigation.

1         WATERHOUSE - 10-19-21

2              I really don't want to go -- go

3     afield --

4              MS. DEITSCH-PEREZ:  Yeah.

5              MS. DANDENEAU:  -- and open up a

6     whole new line of inquiry about the lawsuit

7     or the -- the motion and the bankruptcy

8     court.  We will be here all night.

9              MS. DEITSCH-PEREZ:  And I

10    understand.

11    Q.    My -- my point is:  Do you feel

12    like -- like there is some effort by these

13    parties related to the debtor to intimidate

14    you -- not that you -- I'm not saying you are

15    or you aren't.

16              But do you feel like there is some

17    effort to intimidate you and maybe an effort to

18    deter you from being as prepared as you might

19    be in this deposition?

20              MR. MORRIS:  Objection to the form

21    of the question.

22    A.    I was -- I was surprised by the

23    lawsuit, by me being named, because, again, I

24    don't own the asset and things like that.

25    Yeah, I just -- I want to move forward with my

1                    WATERHOUSE - 10-19-21

2    life at Skyview.

3                    MS. DEITSCH-PEREZ:  Thank you.

4                    THE WITNESS:  Thank you.

5                        FURTHER EXAMINATION

6    BY MR. MORRIS:

7         Q.    If I may, I just have a few

8    questions.

9                    Mr. Waterhouse, we saw a number of

10   documents that Mr. Rukavina put up on the

11   screen where Ms. Hendrix would send you a

12   schedule of payments that were due on behalf of

13   certain Highland affiliates.

14                   Do you remember that?

15        A.    Yes.

16        Q.    And in each instance she asked for

17   your approval to make the payments; is that

18   right?

19        A.    Yes, she did.

20        Q.    And was that the -- was that the

21   practice in the second half of 2020 whereby

22   Ms. Hendrix would prepare a list of payments

23   that were due on behalf of Highland associates

24   and ask for approval?

25        A.    Yes.

1          WATERHOUSE - 10-19-21

2     Q.    And I think you said that there was

3  a -- a --

4     A.    It was -- I think I testified to

5  this earlier when we talked about procedures

6  and policy, you know, again, I want to be

7  informed of -- of -- of -- of -- of any

8  payments that are going out.  I want to be made

9  aware of these payments, and that was just a

10 general policy, not just for 2020.

11    Q.    Okay.  So it went beyond 2020?

12    A.    Yes.

13    Q.    Is that right?

14    A.    Yes.

15    Q.    Okay.  And the corporate accounting

16 group would prepare a calendar that would set

17 forth all of the payments that were anticipated

18 in the -- in the three weeks ahead; is that

19 right?

20    A.    I -- like I testified earlier, we

21 had a corporate calendar that was set up, you

22 know, to -- to provide reminders or, you know,

23 of anything of any nature, whether it is

24 payments or -- or financial statements or, you

25 know, whatever it is, you know, to meet

1          WATERHOUSE - 10-19-21

2  deadlines.

3          I don't know how, as I testified

4  earlier, how much they were using that

5  calendar.

6     Q.   Okay.  But -- but you did get notice

7  and a request to approve the payments that were

8  coming due on behalf of Highland's affiliates.

9  Do I have that right?

10          MS. DANDENEAU:  Objection to form.

11     A.    I mean, generally, yes.  I mean, you

12  know, as we saw with these emails, generally, I

13  mean, did that encompass everything, no.

14     Q.    Okay.  Do you know why the

15  payment -- do you know why there was no payment

16  made by NexPoint at the end of 2020?

17     A.    Yes.  There was -- there was -- we

18  talked about these agreements between the

19  advisors and Highland, the shared services and

20  the cost reimbursement agreement.

21          And in late 2020, there were

22  overpayments, large overpayments that had been

23  made over the years on these agreements, and it

24  was my understanding that the advisors were --

25  were talking with -- like Jim Seery and others

1      WATERHOUSE - 10-19-21

2  to offset any obligations that the advisors

3  owed to Highland as offset to the overpayments

4  on these agreements.

5      Q.    Okay.  Did you participate in any of

6  those conversations?

7      A.    I did not.

8      Q.    Okay.  Do you know -- do you recall

9  that the -- at the end of November, the debtor

10  did notice to the advisors of their intent to

11  terminate the shared services agreements?

12      A.    Like I testified earlier, there

13  was -- the agreements weren't identical, from

14  what I recall, and there is one that had a

15  longer notice period, which I think had a

16  60-day notice period.  I don't recall which one

17  that was, so not all of them were -- notice

18  hadn't been given as of November 30th, for all

19  of the agreements.

20      Q.    Upon the receipt of the -- the

21  termination notices that you recall, do you

22  know if the advisors decided at that point not

23  to make any further payments of any kind to

24  Highland?

25          MR. RUKAVINA:  Objection, form.

1                   WATERHOUSE - 10-19-21

2        A.     No.   The advisors -- the advisors

3    had stopped making payments prior to that

4    notice.

5        Q.     Okay.   And how do you know that the

6    advisors stopped making -- making payments

7    prior to the notice?

8        A.     I had -- I had a conversation

9    with -- with Jim Dondero.

10       Q.     And did Mr. Dondero tell you that

11   the advisors would no longer make payments to

12   Highland?

13             MS. DEITSCH-PEREZ:   Object to the

14        form.

15       A.     Yes, he -- he -- again, he said

16   they -- they -- the advisors have overpaid on

17   these agreements, to not make any future

18   payments, and that there needs to be offsets,

19   and they're working on getting offsets to these

20   overpayment.

21       Q.     Do you know if anybody ever

22   instructed Highland's employees to make the

23   payment that was due by NexPoint at the end of

24   the year?

25       A.     Did anyone instruct Highland's

WATERHOUSE - 10-19-21

1    

2    employees to make that payment?

3         Q.    Correct.

4         A.    Anyone -- not that I'm aware.

5         Q.    Were any of Highland's employees

6    authorized to make the payments on behalf of

7    its affiliates -- withdrawn.

8              Was any of Highland's employees

9    authorized to effectuate the payment on behalf

10   of NexPoint that was due at the end of the year

11   without getting approval from either you or

12   Mr. Dondero?

13        A.    They had the -- they had the ability

14   to make the payment, but they didn't -- you

15   know, that -- that payment needed to be

16   approved.

17        Q.    Okay.  And it needed to be approved

18   by you or Mr. Dondero; is that right?

19        A.    I mean, I'm not going to make the

20   unilateral decision.

21        Q.    Is that a decision that you

22   understood had to be made by Mr. Dondero?

23        A.    Yes.  Sitting back in December of

24   2020, the -- that -- there was this off --

25   offset negotiation that -- that was happening,

1           WATERHOUSE - 10-19-21

2    so I mean, until those negotiations were

3    resolved, you know, there wasn't any

4    payments -- there weren't any payments.

5          Q.    And -- and there were no payments

6    until the negotiations were resolved because

7    that was the directive that you received from

8    Mr. Dondero; correct?

9          A.    I don't think he said -- I mean, I

10   think -- yeah, I mean -- I'm trying to recall

11   the conversation.  It was -- you know, there

12   is -- there is these negotiations.  There's --

13   there needs to be these offsets.  They're

14   talking with the debtor.  So, you know, until

15   this is resolved, right, I mean, depending on

16   how, whatever that resolution was, were we to

17   take any action.

18         Q.    Okay.  How about with respect to

19   HCMS, did HCMS have a term payment due at the

20   end of the year?

21         A.    Again, I don't -- I don't recall.

22         Q.    Okay.  You discussed briefly two

23   payments that were made in January of 2021, one

24   on behalf of NexPoint, and one on behalf of

25   HCMS.  Do I have that right?

1                    WATERHOUSE - 10-19-21

2        A.    No.   The two payments I recall were

3   NexPoint and HCRE.

4        Q.    Okay.  And those two payments --

5   thank you for the correction.  And those two

6   payments were made because Mr. Dondero

7   authorized those payments to be made; correct?

8        A.    Yes.

9        Q.    And they hadn't been made before

10  that because Mr. Dondero had not authorized

11  them to be made?

12              MS. DEITSCH-PEREZ:  Object to the

13        form.

14        A.    Yes, because of these negotiations.

15        Q.    Okay.  Just a couple of more

16  questions.

17              Did anybody, to the best of your

18  knowledge, on behalf of HCMFA, ever tell the

19  SEC that HCMLP was responsible for the mistakes

20  that were made on the TerreStar valuation?

21        A.    Did anyone from Highland on HCMFA's

22  behalf tell the SEC that Highland -- that

23  Highland was responsible for there -- I just

24  want to make sure --

25        Q.    It was a little bit different, so

1              WATERHOUSE - 10-19-21

2    let me try again.

3         A.    These are very long questions, John.

4    I'm not trying to be --

5         Q.    That is good.  Do you know whether

6    anybody -- do you know whether anybody on

7    behalf of HCMS -- HCMFA ever told the SEC that

8    Highland was the responsible party for the

9    TerreStar valuation error?

10        A.    Not that I'm aware.

11        Q.    Okay.  Did anybody on behalf of

12   the -- on behalf of HCMFA ever tell the retail

13   board that Highland was responsible for the

14   TerreStar valuation error?

15        A.    Not that I'm aware.

16        Q.    Do you know if HCMFA made an

17   insurance claim with respect to the damages

18   that were incurred in relation to the TerreStar

19   valuation error?

20        A.    Yes.

21        Q.    And do you know why they made that

22   insurance claim?

23        A.    Because there was an error.  I

24   mean --

25        Q.    Was the insured's claim made -- was

1          WATERHOUSE - 10-19-21

2     the insurance claim made under HCMFA's policy?

3          A.    Yes.

4          Q.    Did HCMFA at any time prior to the

5     petition date -- withdrawn.

6               You were asked a couple of questions

7     where -- where you said that Mr. Dondero told

8     you that he was ascribing zero value to the

9     notes as part of a pot plan because he believed

10    that the notes were part of executive

11    compensation.

12              Do I have that right?

13              MS. DEITSCH-PEREZ:  Object to the

14         form.

15         A.    Yes.

16         Q.    Okay.  Have you ever heard that

17    before the time that Mr. Dondero told you that

18    in the conversation about the pot plan?

19         A.    Had I heard that prior to my

20    conversation with Mr. Dondero?

21         Q.    Yes.

22         A.    No, I had not heard that prior.

23         Q.    Okay.  And that was in the context

24    of his formulation of the settlement proposal;

25    is that right?

1              WATERHOUSE - 10-19-21

2         A.    I mean, generally, yes.  You know,

3    we were asked to provide asset values, right,

4    and he was having settlement discussions.

5    Again, I don't know who those went to

6    ultimately.  I don't recall.

7              MR. MORRIS:  I have no further

8         questions.  Thank you very much for your

9         patience.  I apologize for the late hour.

10             MS. DEITSCH-PEREZ:  John, you stay

11        on about your email when --

12             MR. RUKAVINA:  Hold on, I'm not

13        done.

14             MS. DEITSCH-PEREZ:  Oh, okay.  Davor

15        still has questions.  Sorry.  I was going

16        to say both John and Davor, could you stay

17        on afterwards just to talk about the

18        requests.

19             FURTHER EXAMINATION

20   BY MR. RUKAVINA:

21        Q.    Mr. Waterhouse, you were just now

22   testifying about a discussion you had with

23   Mr. Dondero where he said something like no

24   more payments.

25             Do you remember that testimony?

```
1              WATERHOUSE - 10-19-21

2      A.    Yes.

3      Q.    Okay.  And was that late November or

4  early December of 2020?

5      A.    It was, I would say, first or second

6  week of November.

7      Q.    Okay.  Do you recall whether --

8  whenever you had that discussion, whether

9  Mr. Dondero had already been fired by the

10 debtor?

11     A.    Yes, I -- I believe he was not an

12 employee of the debtor anymore at that time.

13     Q.    And when you were discussing this

14 with Mr. Dondero and he said no more payments,

15 you were discussing the two shared services

16 agreements and employee reimbursement

17 agreements we testified -- you testified about

18 before; is that correct?

19           MR. MORRIS:  Objection to the form

20     of the question.

21     A.    That is correct.

22     Q.    And had your office or you -- and we

23 will talk at a future deposition about the

24 administrative claim.

25           But had -- by that time that you
```

```
1                WATERHOUSE - 10-19-21

2    talked to Mr. Dondero, had your office or you

3    done any estimate of what the alleged

4    overpayments were?

5              MR. MORRIS:  Objection to the form

6         of the question.

7         A.    Yes, we had -- there was a -- there

8    was a detailed analysis that was put together

9    by David Klos at the time.

10        Q.    And do you recall just generally

11   what the total amount for both advisors of the

12   overpayments was?

13        A.    It was in excess of $10 million.

14        Q.    Was it in excess of $14 million?

15             MR. MORRIS:  Objection to the form

16        of the question.

17        A.    I -- I remember it was an

18   eight-figure number.  I don't remember

19   specifically.

20        Q.    Okay.  And did you convey that

21   number to Mr. Dondero when you had that

22   conversation?

23        A.    Yes.

24        Q.    What was his reaction?

25        A.    I mean, he wasn't happy.
```

1                    WATERHOUSE - 10-19-21

2        Q.    Is it fair to say he was upset?

3        A.    Yes.

4        Q.    Did Mr. Dondero ever expressly tell

5   you to not have NexPoint make the required

6   December 31, 2020, payment?

7        A.    Yes, I recall him saying don't make

8   the payment because it was being negotiated, as

9   I discussed with Mr. Morris, this offset

10  concept.  So there were obligations due by the

11  advisors to Highland, they should be offset

12  that -- you know, those obligations should be

13  offset by this -- by this overpayment.

14       Q.    And when did he tell you that?

15       A.    I would say -- I would say around --

16  probably December -- December-ish.

17       Q.    Early December, late December?

18       A.    I don't recall with as much

19  specificity as -- as -- as -- as stopping the

20  shared services payments, because we had

21  actually made one shared services payment in

22  November.  So that is why I need to remember

23  that one more clearly.  I don't remember where

24  exactly in December that conversation occurred.

25       Q.    Did Mr. Dondero expressly use the

```
1                   WATERHOUSE - 10-19-21

2    word "NexPoint" when he was saying don't make

3    these payments?

4            MR. MORRIS:  Objection to the form

5        of the question, asked and answered.

6        A.    Yeah, we were -- we were discussing

7    advisor obligations.  So it was -- you know, it

8    was just obligations from the advisors.

9            And -- and he specifically talked

10   about the NexPoint payment as well.

11       Q.    Okay.  And it is your testimony that

12   he expressly told you not to make that NexPoint

13   December 31 payment?

14           MR. MORRIS:  Objection, asked and

15       answered twice.

16       A.    Yes, he -- he did, during that

17   conversation.

18       Q.    And did you ever follow up with him

19   after that about whether NexPoint should or

20   shouldn't make that payment?

21       A.    I did not.

22       Q.    Did you ever, on or about

23   December 31, 2020, remind him and say, hey,

24   this payment is due, what shall I -- what

25   should I do?
```

```
1              WATERHOUSE - 10-19-21

2       A.    I did not.

3       Q.    So sitting here today, you -- you

4   remember distinctly that Dondero in December of

5   2020 expressly told you not to have NexPoint

6   make that payment?

7            MR. MORRIS:  Objection, asked and

8       answered three times.

9       A.    Yes.

10      Q.    Can you say categorically it wasn't

11  just some general discussion where he told you

12  not to make payments?

13           MR. MORRIS:  Objection, asked and

14      answer four times.

15           MR. HORN:  Four times now.  Go for

16      five.

17      A.    Yes.

18      Q.    Did you tell Mr. Seery that?

19      A.    I don't believe I did.  I don't

20  recall.

21      Q.    And was this an in-person discussion

22  or telephone or email?  Do you remember?

23      A.    This was a phone -- a phone

24  conversation.

25      Q.    Okay.  Would you have a record of --
```

```
1                    WATERHOUSE - 10-19-21
2    on your cell phone of when that conversation
3    might have taken place?
4              I'm sorry, strike that.
5              Was that by cell phone?
6         A.   I believe -- yes, because we -- I
7    was at home.  I mean, I don't have a landline.
8    All I have is my cell phone.
9         Q.   Do you know whether your cell phone
10   still has records of conversations from
11   December 2020 on it?
12        A.   My call log doesn't go back that
13   far.
14        Q.   Okay.  Thank you.
15             MR. RUKAVINA:  I will pass the
16   witness.
17             MS. DEITSCH-PEREZ:  Just a couple
18        quick questions.
19                  FURTHER EXAMINATION
20   BY MS. DEITSCH-PEREZ:
21        Q.   With respect to HCRE and HCMS, am I
22   correct there was -- there was no direction not
23   to pay those loan payments?
24             MR. MORRIS:  Objection to the form
25        of the question.
```

1          WATERHOUSE - 10-19-21

2     A.    Yes, I don't recall having

3  conversations about, you know, those -- those

4  entities.

5     Q.    And, in fact, what was the tone that

6  Mr. Dondero had when he talked to you about the

7  fact that HCRE and HCMS payments hadn't been

8  made when he found out that they hadn't been

9  paid?

10          MS. DANDENEAU:  Objection to form.

11          MR. MORRIS:  Objection to form.

12     Q.    What was the tone he took with you?

13     A.    Oh, it was -- it was -- it was -- it

14  was very negative.  I mean, I think he cursed

15  at me and he doesn't usually curse.

16     Q.    Okay.  And in your mind, is that

17  consistent with the fact that he was surprised

18  that those payments hadn't been made?

19          MR. MORRIS:  Objection to the form

20     of the question.

21     A.    Yes.

22     Q.    Okay.  Thank you.

23          MR. MORRIS:  I have nothing further.

24     Thank you so much, Mr. Waterhouse.

25          MR. HORN:  I have no questions.

1          WATERHOUSE - 10-19-21

2          Thank you, Mr. Waterhouse.  We appreciate

3          your time.  I am logging off the discussion

4          and I will talk to y'all tomorrow.

5               MR. MORRIS:  Super.

6               VIDEOGRAPHER:  If there are no

7          further questions, this ends the

8          deposition -- excuse me.  This ends the

9          deposition, and we are going off the record

10         at 7:30 p.m.

11         (Deposition concluded at 7:30 p.m.)

12

13                    _____

14                    FRANK WATERHOUSE

15

16    Subscribed and sworn to before me

17    this      day of              2021.

18

19    ---------------------------------

20

21

22

23

24

25

1              WATERHOUSE - 10-19-21

2                C E R T I F I C A T E

3

4        I, SUSAN S. KLINGER, a certified shorthand

5    reporter within and for the State of Texas, do

6    hereby certify:

7        That FRANK WATERHOUSE, the witness whose

8    deposition is hereinbefore set forth, was duly

9    sworn by me and that such deposition is a true

10   record of the testimony given by such witness.

11       I further certify that I am not related to

12   any of the parties to this action by blood or

13   marriage; and that I am in no way interested in

14   the outcome of this matter.

15       IN WITNESS WHEREOF, I have hereunto set my

16   hand this 19th of October, 2021.

17

18   _____

19            Susan S. Klinger, RMR-CRR, CSR

20            Texas CSR# 6531

21

22

23

24

25

1            WATERHOUSE - 10-19-21

2   NAME OF CASE:  In re:  Highland Capital

3   DATE OF DEPOSITION:  October 19, 2021

4   NAME OF WITNESS:  Frank Waterhouse

5   Reason Codes:

6       1.  To clarify the record.

7       2.  To conform to the facts.

8       3.  To correct transcription errors.

9   Page____Line_____Reason_____

10  From_____to_____

11  Page____Line_____Reason_____

12  From_____to_____

13  Page____Line_____Reason_____

14  From_____to_____

15  Page____Line_____Reason_____

16  From_____to_____

17  Page____Line_____Reason_____

18  From_____to_____

19  Page____Line_____Reason_____

20  From_____to_____

21  Page____Line_____Reason_____

22  From_____to_____

23  Page____Line_____Reason_____

24  From_____to_____

25