Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

ATTORNEYS FOR NEXPOINT ADVISORS, L.P.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § | Adversary Proceeding No. |
| vs. | § § | 21-03005-sgj |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § | |
| Defendants. | § § | |

**REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION
TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES**

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW NexPoint Advisors, L.P. ("NexPoint"), one of the defendants in the above styled and numbered Adversary Proceeding initiated by Highland Capital Management, L.P. as the plaintiff (the "Debtor"), and files this its *Reply* (the "Reply") in support of its *Motion to Extend Expert Disclosure and Discovery Deadlines* (the "Motion"), and replying to the *Objection to Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines* (the "Objection"), filed by the Debtor, respectfully stating as follows:

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES—Page 1

## I.  SUMMARY

1. The Shared Services Agreement required the Debtor to assist and *advise* with payments, including on notes. That is in the contract. The Debtor's former CFO confirmed it. The Shared Services Agreement contains a standard of care that the Debtor had to follow. That is also in the contract. And the Fifth Circuit confirms that expert testimony is appropriate, and potentially *required*, when the standard of care is not obvious. Here, it was obvious until it wasn't. Before Mr. Waterhouse's deposition, the standard of care was not at issue *per se*. The Defendant simply alleged the Debtor was obligated to facilitate the December payment but did not. That came down to simple contract interpretation. No expert was needed because any lay juror could understand that the Debtor breached its duties by doing nothing to facilitate the payment. But things changed after Mr. Waterhouse's testimony in late October, when he testified that Mr. Dondero allegedly *told* him not to pay this note. The question then became what the Debtor was obligated to do next under the contractual standard of care. The answer is not obvious. And it is the type of issue on which a jury could only benefit from expert opinion testimony. This is precisely the type of case where the Fifth Circuit finds expert testimony appropriate, if not required. Nor is there prejudice to the Debtor: there is no trial setting, the Debtor can contest the admission of the expert's testimony and present its own rebuttal, and, if the Debtor prevails, it also can also seek to recover all collection costs.

## II.  THE EXPERT TESTIMONY IS APPROPRIATE

2. The Shared Services Agreement, in place during November and December, 2020, provides as follows:

> Section 6.01. <u>Standard of Care</u>. Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. To the extent not

> inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies, and procedures in performing its duties hereunder.

See Rukavina Declaration, Exh. A at § 6.01.

3. "Covered Person" includes the "Staff and Services Provider," *i.e.* the Debtor, and its managers, directors, officers, and shareholders. *See id.* at p 2. There can be no dispute that section 6.01 applied to the Debtor itself, to Mr. Waterhouse, and to the other employees involved (David Kloss, the controller, and Kristin Hendrix, the senior accountant).

4. The Debtor argues that section 6.01 applies only to duties specifically set forth in the Shared Services Agreement, and that the duty to facilitate payments on NexPoint's behalf is not among those duties. This argument is wrong. The Shared Services Agreement identifies at least three services that the Debtor was required to provide that are directly on point:

> (a)   *Back- and Middle Office.*  Assistance and advice with respect to back- and middle-office functions including, but not limited to . . . finance and accounting, <u>payments</u>, operation, book keeping, cash management . . . accounts payable . . .
>
> (k)   *Ancillary Services.*  Assistance and advice on all things ancillary or incidental to the foregoing.
>
> (l)   *Other.*  Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of [NexPoint] as [NexPoint] and [the Debtor] may from time to time agree.

*See id.* at § 2.02 (emphasis added).

5. Assistance and advice—again, *advice*—with respect to "payments" is expressly included. And, should there be any doubt, the Debtor's own Chief Financial Officer at the time confirmed that it was "reasonable for NexPoint to rely on the debtors' employees to inform NexPoint of an upcoming payment due on the $30 million promissory note." *See* Rukavina Declaration at Exh. C, 337:22-338:8. That is why NexPoint was paying millions of dollars to the Debtor, to assist and *advise* NexPoint with respect to NexPoint's payment obligations. Advice would include advising NexPoint of the consequences of a potential default, especially given the

Debtor's conflict-of-interest at the time between being NexPoint's creditor as well as its accounting, payment, and legal professional. This is especially the case if Mr. Dondero in fact instructed Mr. Waterhouse not to make the payment on the belief that the payment was not due, or would be netted against NexPoint's overpayments to the Debtor.

6. Next, the Debtor argues that expert testimony is not proper on the scope of a party's legal duty, because that is a legal conclusion for the Court. NexPoint agrees. The Debtor also argues that whether the Debtor owed or breached a legal duty is for the jury to decide. NexPoint agrees in part: whether duties are *breached* is an issue for the jury; not whether duties were owed. *See Askanese v. Fajto*, 130 F.3d 657, 673 (5th Cir. 1997). None of these issues are present here: the Court will construe the Shared Services Agreement as a matter of law; that agreement contains section 6.01, and the Court will construe that section. But, the standard of care in that section is:

> the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

*See* Rukavina Declaration, Exh. A at § 6.01.

7. The issue is simple: if the jury finds that Mr. Dondero did in fact instruct Mr. Waterhouse not to make the payment, then did the Debtor fail to act with "the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims" by failing to do anything to advise NexPoint as to the consequences of a default, failing to confirm that Mr. Waterhouse correctly understood the instruction, or not even trying to dissuade Mr. Dondero from his alleged instruction? As simple as this issue appears to sophisticated bankruptcy professionals, it is not one a lay juror could resolve from personal experience or common sense.

8. "Expert testimony is generally <u>required</u> to prove the applicable standard of care." *Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003) (emphasis added); *Streber v. Hunter*, 221 F.3d 701, 724 (5th Cir. 2000) ("Breach of the standard of care must generally be proven by expert testimony"). [E]xpert testimony is <u>necessary</u> to establish the standard of care . . . Similarly, breach of a fiduciary duty or a conflict of interest <u>requires</u> proof of expert testimony." *Geiserman v. MacDonald*, 893 F.2d 787, 793-94 (5th Cir. 1990) (internal quotations removed) (emphasis added). An expert is appropriate, and potentially needed, for the jury to understand whether the Debtor employed "the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." That should not be a controversial proposition.

9. The Debtor cites the Fifth Circuit's opinion in *Askanese v. Fajto* as support for its argument. 130 F.3d 657 (5th Cir. 1997). In that opinion, the Fifth Circuit affirmed the exclusion of an expert because "[i]t is not for [the expert] to tell the trier of fact what to decide." *Id*. at 1997. Here, NexPoint's expert would not be telling the jury what to decide; only whether, in his opinion, the Debtor's actions and inactions breached the duties as otherwise specified in the Shared Services Agreement and construed by the Court. The Debtor would have the ability to have a rebuttal expert, and the jury would be free to disregard the expert's testimony. NexPoint's expert would not be telling the jury how to decide, only his opinion as to whether the standard of care as specified in the agreement and construed by the Court was met. Conversely, if NexPoint's lay witnesses purported to present evidence on these duties at trial, the Debtor would certainly object to any such evidence because it would *not* be expert testimony.

### III.  REPLY REGARDING "GOOD CAUSE"

A.  **NEXPOINT'S NEED AND GOOD CAUSE FOR LEAVE**

10.    The Debtor argues that NexPoint seeks leave because the testimony of its witness, Mr. Waterhouse, allegedly did not go well. But the Debtor takes some liberties in its argument. For one thing, Mr. Waterhouse is not one of NexPoint's witnesses. In fact, the Debtor took his deposition and he is not NexPoint's witness. Also, his deposition did not go badly for NexPoint. On the contrary, other than his unexpected testimony regarding Mr. Dondero's alleged instruction not to pay the note, his testimony was not harmful to NexPoint and was, objectively, neither helpful nor harmful to either side. The Debtor makes these wrong allegations solely to shoehorn its argument into a case that it cites. *See* Objection at ¶ 43.

11.    But the more pertinent objection is that, as NexPoint has always argued that the Debtor caused the alleged default, NexPoint should have retained an expert months ago: "[i]If NexPoint wanted to offer 'expert testimony' concerning Highland's duties under the SSA, it had nine months to do so, and Mr. Waterhouse's testimony, expected or not, does nothing to change that." Objection at ¶ 44. This argument is wrong as a matter of Fifth Circuit law.

12.    Prior to Mr. Waterhouse's deposition, NexPoint did not know that Mr. Dondero allegedly instructed Mr. Waterhouse not to make the payment. NexPoint understood that the Debtor's employees simply dropped the ball on ensuring that the payment was made. Under those facts, expert testimony would not have been needed because anyone, using common sense, can determine whether the Debtor in that case breached it duties. But the situation changed when Mr. Waterhouse gave his deposition testimony because, if the jury believes that Mr. Dondero gave the instruction, now the situation is much more complicated; *i.e.* whether, in light of such an alleged instruction, the Debtor nevertheless breached its duties. This important distinction has been aptly explained by the Fifth Circuit in a case where the issue was whether a trustee breached his duties:

> Finders of fact are supposed to reach their conclusions on the basis of common sense, common understanding and fair beliefs, grounded on evidence consisting of direct statements by witnesses or proof of circumstances from which inferences can fairly be drawn.  Accordingly, we have explained that, as a general rule, expert testimony is not needed in many if not most cases. Moreover, although expert testimony may be necessary in a professional negligence case to establish the standard of care for the industry, an exception applies in instances of negligence that are a matter of common knowledge comprehensible to laymen.
>
> Although Liberty Mutual contends that expert testimony was required in this case, Lamesa suggests that inasmuch as the Trustee failed to act in the face of obvious danger posed by Mrs. Schooler's ready access to the bankruptcy estate's assets, and in the face of repeated warnings and inquiries by a concerned creditor, a layperson could discern that the standard of care was not met in this case.
>
> We agree with Lamesa that, under the facts of this case, expert testimony was not required to establish that the Trustee breached her duties. While the precise course of action the Trustee should have taken may be subject to reasonable debate, it requires no technical or expert knowledge to recognize that she affirmatively should have undertaken *some* form of action to acquire for the bankruptcy estate the assets to which it was entitled. As the bankruptcy court explained, by doing nothing, the Trustee ignored basic human nature.

*In re Schooler*, 725 F.3d 498, 514-15 (5th Cir. 2013) (internal citations and quotations omitted).

13.     So too, here, NexPoint did not need an expert for the jury to conclude that the Debtor breached its duties by doing *nothing* in light of the upcoming payment, without Mr. Dondero's alleged instruction.  But if the jury finds that that instruction occurred, the situation is more complicated: did the Debtor have an affirmative duty after receiving such instruction to seek confirmation, advise as to the potential consequences of a default, or try to dissuade Mr. Dondero?  These issues are not within a lay person's common knowledge or common sense.  And this is all the more important because, at the same time, the Debtor was providing legal services to NexPoint; *i.e.* the Debtor was NexPoint's law firm.

14.     By analogy, it is one thing for a lawyer to fail to inform his client of an upcoming deposition, which leads to a "death penalty" order.  Anyone can know, using common sense, that the lawyer committed professional negligence.  But what if the lawyer advises the client of the

deadline, but the client tells the lawyer he does not feel like attending the deposition? Can the lawyer sit on his hands and do nothing, or must the lawyer take affirmative steps, for example, to inform the client of the potential consequences, try to reschedule the deposition, or try to dissuade the client from his decision? That is a much more difficult question. Here again:

> the general rule is that expert testimony is required to establish the standard of care in a legal malpractice action; an exception to the general rule is recognized where the attorney's lack of care and skill is so evident that the jury can find negligence as a matter of common knowledge, e.g., when an attorney allows the statute of limitations to run on a client's claim.

*Floyd v. Hefner*, 556 F. Supp. 2d 617, 643 (S.D. Tex. 2008).

15. The Debtor's objection that the expert testimony is irrelevant is likewise wrong. NexPoint has explained above why expert testimony is appropriate, and arguably required, to address the standard of care in the Shared Services Agreement. NexPoint has likewise demonstrated that the Shared Services Agreement expressly provides for assistance and advice with respect to "payments." Here, the Debtor attempts misdirection:

> NexPoint does not and cannot identify any provision in the SSA that imposes a duty on Highland to make Annual Installment payments on NexPoint's behalf without direction from an authorized NexPoint representative.

Objection at ¶ 49.

16. NexPoint has never argued that the Debtor should have made the payment "on NexPoint's behalf," in the sense that the Debtor would do so from its funds. And, the issue is not whether the payment should have been made without direction from an authorized NexPoint representative—itself a disputed question of fact made much more complicated by the fact that it was the same individual responsible for the payment on both sides, who was also an officer of both parties. Even if the Debtor is correct, though, the point is that the Debtor failed in its duties to *seek* such authorization.

17. The Debtor also argues that, as NexPoint should always have known that Mr. Dondero did not authorize the payment, Mr. Waterhouse's testimony that Mr. Dondero instructed him not to make the payment does not change the situation such that NexPoint's delay is unreasonable. First, the issue is not whether NexPoint instructed the Debtor to make the payment; that is merely the Debtor's interpretation of its duties under the Shared Services Agreement and the Court or the jury will have to decide whether that is correct. NexPoint does not agree that is the correct standard (and its expert has not been asked to opine on that issue). Second, the issue is the Debtor's failure to *advise* NexPoint on the issue—and *advice* is an express duty under the contract. Third, the Debtor fails to recount the whole of Mr. Dondero's testimony on the "authorization" issue:

> Q. Okay. And do you know whether anybody acting on behalf of any of the three corporate obligors under the term notes ever took any steps in December 2020 to make sure that Highland would, in fact, make the payments that were due at year-end?
>
> MS. DEITSCH-PEREZ: Object to the form.
>
> A. No, there was a reliance on Highland.
>
> Q. Okay. Is it your testimony that Highland was authorized to make the payments under the notes at year-end without being directed by a representative of the three corporate obligors?
>
> A. Yes. It is my contention that that is how it worked in prior years also.
>
> Q. And so you believe that nobody on behalf of any of the corporate obligors ever authorized or directed Highland to make the payments but that Highland did it without -- without direction?
>
> MS. DEITSCH-PEREZ: Object to the form.
>
> A. Yes, typically. And in 2017 or 2018, 2019, for sure.

Morris Declaration Exh. 4 at: 462:24-463:25.

18. And contrary to the Debtor's characterization of Mr. Waterhouse's testimony, Mr. Waterhouse testified as follows:

Q. Well, what about long term loans? Was it reasonable for NexPoint to expect debtor employees to ensure that NexPoint timely paid its obligations under long-term notes?

MR. MORRIS: Objection to the form of the question.

MS. DANDENEAU: Objection to form.

A. I mean, that is one of the things that the Highland personnel did provide to the advisors. Yes, we would -- we would – over the years, yes, we -- we -- we -- we did do that generally. Again, I don't remember specifically but, yes, generally we – you know, we did do that.

\* \* \*

Q. And what role in years prior to 2020 would employees of the debtor have had with respect to NexPoint making that annual payment?

A. We -- we -- we would have -- I keep saying "we." The team would have calculated any amounts due under that loan and other loans, as -- as standard course. We would -- since we provided treasury services to the advisors, we would inform the -- the -- the -- we informed Mr. Dondero of any cash obligations that are forthcoming, whether we do cash projections. If, you know, any of these payments would have -- or, you know, the sum total of all of these payments, including any note payments, if there were any cash shortfalls, we would have informed Mr. Dondero of any cash shortfalls. We could adequately plan, you know, in instances like that.

Or, sorry, we -- I say "we" – I keep saying "we" -- I keep wearing my -- again, my -- my treasurer hat. But, yes, it is to -- it is to inform Mr. Dondero of the obligations of the advisors in terms of cash and obligations that are -- are upcoming and that -- and that are -- are scheduled to be paid.

\* \* \*

Q. And based on your experience, would it have been reasonable for NexPoint to rely on the debtors' employees to inform NexPoint of an upcoming payment due on the $30 million promissory note?

MR. MORRIS: Objection to form of the question.

MS. DANDENEAU: Objection to form.

>A. Yes. Yes, they did. I mean, but I mean, but I don't think these -- these notes were any secret to anybody

Rukavina Declaration at Exh. C: 333:14-338:8.

19. The situation was not, therefore, as the Debtor construes it; that the Debtor could sit around and do nothing until an instruction to pay was issued. On the contrary, as the Shared Services Agreement requires, it was to *advise* NexPoint: "to inform Mr. Dondero of the obligations of the advisors in terms of cash and obligations that are [] upcoming . . . [and] scheduled to be paid." Whatever else can be said about what happened, and whether the jury will believe Mr. Dondero or Mr. Waterhouse, one thing is clear: the course that had been followed for years was not followed here, because the Debtor failed to inform Mr. Dondero of the upcoming alleged obligation, whether outright or because of Mr. Dondero's alleged instruction not to pay.

20. On the issue of timing, NexPoint has already explained that, while it understood that Mr. Dondero instructed Mr. Waterhouse to make no further payments on the Shared Services Agreement, Mr. Dondero never made a similar instruction regarding the Note. *See* Rukavina Declaration at ¶ 10. Mr. Waterhouse's counsel prevented NexPoint's counsel from discussing the matter with Mr. Waterhouse, due to ongoing litigation between the Debtor and Mr. Waterhouse. *See id*. at ¶ 11. If the Court questions the truthfulness of this, the Court need only review the transcript of Mr. Waterhouse' deposition, where NexPoint's attorney asked four (4) times whether Mr. Waterhouse was sure of the instruction, as evidence of counsel's surprise at the answer. *See* Rukavina Declaration a Exh. C: 390:4-392:17.

21. At the same time, it appears that the Debtor knew what Mr. Waterhouse's answer would be well ahead of time—an issue also relevant below to prejudice. On May 11, 2021, the Debtor served its amended responses to NexPoint's discovery. *See* Supplemental Rukavina

Declaration [filed concurrently herewith] at Exh. "A." In those, the Debtor answered the following interrogatory:

> **INTERROGATORY NO. 2:**
>
> If the Debtor contends that it was not responsible for causing payments to be made under the Note on NexPoint's behalf pursuant to the Shared Services Agreement, explain the legal and factual basis for such contention.
>
> **RESPONSE TO INTERROGATORY NO. 2:**
>
> The Debtor objects to Interrogatory No. 2 on the ground that it seeks a legal conclusion or legal analysis. Subject to its objection, the Shared Services Agreement did not provide that the Debtor was responsible for causing payments to be made under the Note. The Debtor further states that after the Debtor sent NexPoint the Default Letters, NexPoint did not contend that the Debtor was required to make payments under the Note on NexPoint's behalf. The Debtor's personnel caused the January Payment to be processed upon instruction from NexPoint.

*See* Supplemental Rukavina Declaration at Exh. "B" at p. 7.

22.     Even though NexPoint asked the Debtor to explain, factually, why the Debtor was not responsible for causing payments to be made, rather than including in its answer that Mr. Dondero gave Mr. Waterhouse the alleged instruction, the Debtor merely answered (as it does now, despite the clear language of the Shard Services Agreement) that the contract did not impose this responsibility on the Debtor. Yet, the Debtor's answer to the following request for production strongly suggests that the Debtor knew of the alleged instruction, yet did not include it in the interrogatory answer:

> **REQUEST FOR PRODUCTION NO. 1**:
>
> All Communications pursuant to which any director, officer, or employee of the Debtor was advised or instructed not to make the December Payment or to cause the December Payment to be made.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

Subject to the General Objections, the Debtor is unaware of any documents responsive to Request for Production No. 1. <u>Any Communications responsive to Request for Production No. 1 were verbal</u>.

*See id*. at p. 10 (emphasis added).

23. The Debtor could and should have stated what these verbal communications were in May, 2021. Instead, NexPoint was forced to wait until Mr. Waterhouse's deposition to learn of the alleged verbal communication. Alternatively, the Debtor too did not know ahead of time how Mr. Waterhouse would answer, but then it can hardly accuse NexPoint of any delay.

**B.    EXPERT TESTIMONY IS RELEVANT**

24. NexPoint has already addressed above why expert testimony is appropriate, why it may even be required, and why, both pursuant to the language of the contract and the Debtor's CFO's testimony, the Debtor had *some* level of duties with respect to the payment.

25. The Debtor argues that the agreement exculpates the Debtor for "any acts or omissions unless it is determined by a court of competent jurisdiction to 'be the result of gross negligence or to constitute fraud or willful misconduct.'" Objection at p. 13, n. 8. That is not true. That exculpation provision applies only to the "conduct of the business of [NexPoint]." Rukavina Declaration Exh. A at § 6.02. The payment of a note is not the "business" of NexPoint; its business is managing and advising funds and investments. Even so, if the Debtor argues otherwise, then that is a matter for the jury, and the issue is not one appropriate to the present Motion.

26. The Debtor's reliance on the Shared Service Agreement's indemnification provision is likewise unavailing: "an indemnity provision does not apply to claims between the parties to the agreement." *Derr Constr. Co. v. Houston*, 846 S.W.2d 854, 858 (Tex. App. – Houston [14th Dist.] 1992). *Accord In re 1701 Commerce LLC*, 2014 Bankr. LEXIS 3962 at *40 (Bankr. N.D. Tex. 2014) ("[u]nder Texas law, indemnity agreements do not generally apply to

claims between the parties to an agreement"). There is an exception if the agreement expressly provides that the indemnification applies to a claim brought by one party against the other, *see In re 1701 Commerce LLC*, 2014 Bankr. LEXIS at *40, but the language in the Shared Services Agreement does not so provide.

C.    **THE DEBTOR WILL NOT BE PREJUDICED**

27.    The Debtor will not suffer prejudice if the Motion is granted. If the Debtor hires a rebuttal expert and prevails at trial, then it will be entitled to the costs of that expert. The scheduling order provided for expert designations by October 29, 2021. NexPoint filed its motion on that day. The Debtor cannot credibly argue prejudice with respect to added costs when the Debtor would have incurred those costs anyway had NexPoint provided an expert report on that day. In this respect:

> any additional costs incurred from an extension would not be unreasonable. Here, Plaintiffs seek an extension so they can offer an expert witness for their products liability claims. Defendants have been aware of these claims since this case's inception. Because expert witnesses are crucial for Plaintiffs' prima facie case, Defendants have known they would need to prepare rebuttal evidence since this case began on October 14, 2019. These facts do not present an instance in which a party adds an additional claim, or introduces an eleventh-hour witness, to foist additional litigation costs without warning.

*Adams v. Medtronics Inc.*, 2021 U.S. Dist. LEXIS 47246 at *12 (E.D. Tex. 2021).

28.    Likewise here, the Debtor always knew of NexPoint's defense. And, as discussed above, it appears that the Debtor (but not NexPoint) knew what Mr. Waterhouse's testimony would be in May, 2021. Again, had NexPoint provided an expert report on October 29, the Debtor would have incurred whatever costs it would have incurred anyway, except that, in that instance, the Debtor would likely be moving to extend the expert deadline, since the scheduling order does not provide for a separate rebuttal expert deadline. Moreover, the Debtor will have every opportunity

to contest the expert's admission at trial; the Court's approval of the Motion does not mean that the expert's testimony is admissible.

29.  The Debtor's discussion of a "continuance" is irrelevant, as trial has not been set and likely will not be set for a long time given the Debtor's own desire to pursue summary judgment practice. In that respect, assuming the Court grants the Motion on December 13, 2021, and the Debtor needs one month for a rebuttal expert, and the parties need two weeks for expert depositions, that would still mean that this case would be trial ready by the end of February, 2022—thirteen (13) months after being filed. This is not unreasonable and is faster than many cases are declared trial ready. In fact, the Debtor has indicated that it will move for summary judgment by December 17, 2021, with responses due on January 17, 2022, with the Debtor's reply on January 31, 2022—a schedule the Court accepted. And, on December 7, 2021, the Debtor apparently filed motions seeking to consolidate for trial various note cases, including this one, which motion alone will likely take significant time to decide as several District Court judges are involved. In other words, this Adversary Proceeding is not going to be certified as trial ready for a few months at least. Nor would granting this Motion affect the timing of the summary judgment proceedings; whether the Debtor breached the standard of care is a question of fact outside the scope of summary judgment.

## IV.    PRAYER

WHEREFORE, PREMISES CONSIDERED, NexPoint respectfully requests that the Court overrule the Debtor's objection and grant the Motion.

RESPECTFULLY SUBMITTED this 8th day of December, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina
    State Bar No. 24030781
    Julian P. Vasek.
    State Bar No. 24070790
    500 N. Akard Street, Suite 3800
    Dallas, Texas 75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    Email: drukavina@munsch.com
    Email: jvasek@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on December 8th, 2021, a true and correct copy of the foregoing document, including the exhibit thereto, was served via the Court's CM/ECF system on parties entitled to notice thereof, including on counsel for the Debtor.

    /s/ Davor Rukavina
    Davor Rukavina