# EXHIBIT 1

Docket #0001  Date Filed: 1/22/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § § | Adversary Proceeding No. |
| vs. | § § | _____ |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § § § | |
| Defendant. | § § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_NY:41996.4 36027/002

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
1934054210127000000000010

D-CNL002795
**Appx. 00001**

## COMPLAINT FOR (I) BREACH OF CONTRACT
## AND (II) TURNOVER OF PROPERTY OF THE DEBTOR'S ESTATE

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), by its undersigned counsel, as and for its complaint (the "Complaint") against defendant, Highland Capital Management Fund Advisors, L.P. ("HCMFA" or "Defendant"), alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

### PRELIMINARY STATEMENT

1.      The Debtor brings this action against HCMFA as a result of HCMFA's defaults under two promissory notes executed by HCMFA in favor of the Debtor in the aggregate original principal amount of $7,400,000 and payable upon the Debtor's demand.  Despite due demand, HCMFA has failed to pay amounts due and owing under the notes and the accrued but unpaid interest thereon.

2.      Through this Complaint, the Debtor seeks (a) damages from HCMFA in an amount equal to (i) the aggregate outstanding principal due under the Notes (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the Notes), and (b) turnover by HCMFA to the Debtor of the foregoing amounts.

### JURISDICTION AND VENUE

3.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

DOCS_NY:41996.4 36027/002

D-CNL002796

**Appx. 00002**

4.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

5.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

6.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

7.     The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

8.     Upon information and belief, HCMFA is a limited partnership with offices located in Dallas, Texas and is organized under the laws of the state of Delaware.

## CASE BACKGROUND

9.     On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

10.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members:  (a) Redeemer Committee of Highland Crusader Fund, (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis LP and Acis GP.

DOCS_NY:41996.4 36027/002

D-CNL002797

**Appx. 00003**

11.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

12.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

## STATEMENT OF FACTS

**A.**    **The HCMFA Notes**

13.     HCMFA is the maker under a series of promissory notes in favor of the Debtor.

14.     Specifically, on May 2, 2019, HCMFA executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $2,400,000 ("HCMFA's First Note").  A true and correct copy of HCMFA's First Note is attached hereto as **Exhibit 1**.

15.     On May 3, 2019, HCMFA executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $5,000,000 ("HCMFA's Second Note," and together with HCMFA's First Note, the "Notes").  A true and correct copy of HCMFA's Second Note is attached hereto as **Exhibit 2**.

16.     Section 2 of each Note provides: "**Payment of Principal and Interest**.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee."

17.     Section 4 of each Note provides:

**Acceleration Upon Default**.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

---

[2] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

DOCS_NY:41996.4 36027/002

D-CNL002798

**Appx. 00004**

18.     Section 6 of each Note provides:

**Attorneys' Fees**.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**B.     HCMFA's Default under Each Note**

19.     By letter dated December 3, 2020, the Debtor made demand on HCMFA for payment under the Notes by December 11, 2020 (the "Demand Letter").  A true and correct copy of the Demand Letter is attached hereto as **Exhibit 3**.  The Demand Letter provided:

By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $7,687,653.07, which represents all accrued interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Demand Letter (emphasis in the original).

20.     Despite the Debtor's demand, HCMFA did not pay all or any portion of the amounts demanded by the Debtor on December 11, 2020 or at any time thereafter.

21.     As of December 11, 2020, there was an outstanding principal amount of $2,457,517.15 on HCMFA's First Note and accrued but unpaid interest in the amount of $35,884.46, resulting in a total outstanding amount as of that date of $2,493,401.61.

22.     As of December 11, 2020, there was an outstanding principal balance of $5,119,827.40 on HCMFA's Second Note and accrued but unpaid interest in the amount of $74,424.05, resulting in a total outstanding amount as of that date of $5,194,251.45.

23.     Thus, as of December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the Notes was $7,687,653.07

DOCS_NY:41996.4 36027/002

D-CNL002799

**Appx. 00005**

24.    Pursuant to Section 4 of each Note, each Note is in default and is currently due and payable.

## FIRST CLAIM FOR RELIEF
### (For Breach of Contract)

25.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

26.    Each Note is a binding and enforceable contract.

27.    HCMFA breached each Note by failing to pay all amounts due to the Debtor upon the Debtor's demand.

28.    Pursuant to each Note, the Debtor is entitled to damages from HCMFA in an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses) for HCMFA's breach of its obligations under each of the Notes.

29.    As a direct and proximate cause of HCMFA's breach of each Note, the Debtor has suffered damages in the total amount of at least $7,687,653.07 as of December 11, 2020, plus an amount equal to all accrued but unpaid interest from that date, plus the Debtor's cost of collection.

## SECOND CLAIM FOR RELIEF
### (Turnover by HCMFA Pursuant to 11 U.S.C. § 542(b))

30.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

31.    HCMFA owes the Debtor an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs

6

D-CNL002800

**Appx. 00006**

and reasonable attorneys' fees and expenses) for HCMFA's breach of its obligations under each of the Notes.

32.    Each Note is property of the Debtor's estate, and the amounts due under each Note are matured and payable upon demand.

33.    HCMFA has not paid the amounts due under each Note to the Debtor.

34.    The Debtor has made demand for the turnover of the amounts due under each Note.

35.    As of the date of filing of this Complaint, HCMFA has not turned over to the Debtor all or any of the amounts due under each of the Notes.

36.    The Debtor is entitled to the turnover of all amounts due under each of the Notes.

WHEREFORE, the Debtor prays for judgment as follows:

(i)    On its First Claim for Relief, damages in an amount to be determined at trial, including, among other things, (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)    On its Second Claim for Relief, ordering turnover by HCMFA to the Debtor of an amount equal to (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses); and

(iii)    Such other and further relief as this Court deems just and proper.

DOCS_NY:41996.4 36027/002

D-CNL002801

**Appx. 00007**

Dated:  January 22, 2021.        **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
                  ikharasch@pszjlaw.com
                  jmorris@pszjlaw.com
                  gdemo@pszjlaw.com
                  hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

DOCS_NY:41996.4 36027/002

D-CNL002802

**Appx. 00008**

# EXHIBIT 1

**EXHIBIT 1**

# PROMISSORY NOTE

$2,400,000.00                                                                    May 2, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION FOUR HUNDRED THOUSAND and 00/100 Dollars ($2,400,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    Interest Rate.   The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "*applicable federal rate*" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    Payment of Principal and Interest.   The accrued interest and principal of this Note shall be due and payable on demand.

3.    Prepayment Allowed; Renegotiation Discretionary.   Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    Acceleration Upon Default.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    Waiver.   Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    Attorneys' Fees.   If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
FRANK WATERHOUSE

2

D-CNL002805

**Appx. 00011**

# EXHIBIT 2

**EXHIBIT 2**

# EXHIBIT 1

**PROMISSORY NOTE**

$5,000,000.00                                                                                             May 3, 2019

      FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of FIVE MILLION and 00/100 Dollars ($5,000,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

      1.    <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

      2.    <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand.

      3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      4.    <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

      5.    <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

      6.    <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
FRANK WATERHOUSE

2

D-CNL002808

**Appx. 00015**

# EXHIBIT 3

**EXHIBIT 3**

D-CNL002809
**Appx. 00016**

HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

Highland Capital Management Fund Advisors, LP
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  Frank Waterhouse, CFO

   Re:  Demand on Promissory Notes:

Dear Mr. Waterhouse,

Highland Capital Management Fund Advisors, LP ("Maker") entered into the following promissory notes (collectively, the "Notes"), among others,[1] in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 5/2/2019 | $2,400,000 | $2,457,517.15 | $35,884.46 | $2,493,401.61 |
| 5/3/2019 | $5,000,000 | $5,119,827.40 | $74,424.05 | $5,194,251.45 |
| TOTALS | $7,400,000 | $7,577,344.55 | $110,308.52 | $7,687,653.07 |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee.  By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $7,687,653.07, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are

---

[1] Maker is also obligated to pay amounts due under promissory notes issued in favor of Payee prior to April 15, 2019.  Pursuant to that certain *Acknowledgment from HCMLP*, dated as of April 15, 2019, Payee agreed not to demand payment on such amounts until May 31, 2021.  Payee reserves all rights with respect to such amounts.

D-CNL002810
**Appx. 00017**

expressly reserved. Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full. Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       DC Sauter

D-CNL002811

**Appx. 00018**

## Appendix A

ABA #:            322070381
Bank Name:        East West Bank
Account Name:     Highland Capital Management, LP
Account #:        5500014686

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Highland Capital Management, L.P. | DEFENDANTS<br>Highland Capital Management Fund Advisors, L.P. |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Hayward LLP<br>10501 N. Central Expressway, Suite 106<br>Dallas, Texas 75231  Tel.: (972) 755-7100 | **ATTORNEYS** (If Known)<br>Munsch Hardt Kopf & Harr, P.C.<br>500 N. Akard Street, Suite 3800<br>Dallas, Texas 75201  Tel.: (214) 855-7500 |
| **PARTY** (Check One Box Only)<br>☑ Debtor  ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor  ☐ Other<br>☐ Trustee | **PARTY** (Check One Box Only)<br>☐ Debtor  ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor  ☑ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Count 1:  Breach of contract; Count 2:  Turnover pursuant to 11 U.S.C. 542

### NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☑2 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny
**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☑ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $7,687,653.07 plus interest, fees, and expenses |
| Other Relief Sought | |

D-CNL002813

**Appx. 00020**

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br> Highland Capital Management, L.P. | BANKRUPTCY CASE NO.<br> 19-34054-sgj11 | |
| DISTRICT IN WHICH CASE IS PENDING<br> Northern District of Texas | DIVISION OFFICE<br> Dallas | NAME OF JUDGE<br>Stacey G. C. Jernigan |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br><br>   January 22, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>   Zachery Z. Annable | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located.  Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate.  There also may be lawsuits concerning the debtor's discharge.  If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF).  (CM/ECF captures the information on Form 1040 as part of the filing process.)  When completed, the cover sheet summarizes basic information on the adversary proceeding.  The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court.  The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney).  A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.**  Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.**  Give the names and addresses of the attorneys, if known.

**Party**.  Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.**  Enter the dollar amount being demanded in the complaint.

**Signature.**  This cover sheet must be signed by the attorney of record in the box on the second page of the form.  If the plaintiff is represented by a law firm, a member of the firm must sign.  If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

D-CNL002814

# EXHIBIT 2

Case 21-03005-sgj Doc 63 Filed 08/27/21    Entered 08/27/21 17:29:13    Page 1 of 18

Docket #0063  Date Filed: 8/27/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § § | Adversary Proceeding No. |
| vs. | § § § | 21-03005 |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § | |
| Defendants. | § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210827000000000012

**AMENDED COMPLAINT FOR (I) BREACH OF CONTRACT,
(II) TURNOVER OF PROPERTY, (III) FRAUDULENT TRANSFER, AND (IV)
BREACH OF FIDUCIARY DUTY**

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above captioned chapter 11 case (the "Bankruptcy Case"), and the plaintiff (the "Plaintiff") in the above-captioned adversary proceeding (the "Adversary Proceeding") by its undersigned counsel, as and for its amended complaint (the "Complaint") against defendants NexPoint Advisors, L.P. ("NPA"), James Dondero ("Mr. Dondero"), Nancy Dondero ("Ms. Dondero"), and The Dugaboy Investment Trust ("Dugaboy" and together with NPA, Mr. Dondero, and Ms. Dondero, the "Defendants"), alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

**PRELIMINARY STATEMENT**

1.      The Debtor brings this action against Defendants in connection with NPA's default under a promissory note executed by NPA in favor of the Debtor in the original principal amount of $30,746,812.33, and payable in annual installments.  NPA has failed to pay amounts when due under the Note (as defined below), the Note is in default, and the amounts due under the Note have been accelerated pursuant to the terms of the Note.

2.      In paragraph 42 of NPA's *First Amended Answer* [Docket No. 34-3], NPA contends that the Debtor orally agreed to relieve it of the obligations under the notes upon fulfillment of "conditions subsequent" (the "Alleged Agreement").  NPA further contends that the Alleged Agreement was entered into between James Dondero, acting on behalf of NPA, and his sister, Nancy Dondero, as representative of a majority of the Class A shareholders of the Plaintiff, including Dugaboy (the "Representative"), acting on behalf of the Debtor.  At the time Mr.

2

D-CNL002936
**Appx. 00024**

Dondero entered into the Alleged Agreement on behalf of NPA, he controlled both NPA and the Debtor and was the lifetime beneficiary of Dugaboy.

3.      Based on its books and records, discovery to date, and other facts, the Debtor believes that the Alleged Agreement is a fiction created after the commencement of this Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due under the Note.

4.      Nevertheless, the Debtor amends its Complaint to add certain claims and name additional parties who would be liable to the Debtor if the Alleged Agreement were determined to exist and be enforceable.  Specifically, in addition to pursuing claims against NPA for breach of its obligations under the Note and for turnover, the Debtor adds alternative claims (a) against NPA for actual fraudulent transfer and aiding and abetting Dugaboy in its breach of fiduciary duty, (b) against Dugaboy for declaratory relief and for breach of fiduciary duty, and (c) against Nancy Dondero for aiding and abetting Dugaboy in the breach of his fiduciary duties.

5.      As remedies, the Debtor seeks (a) damages from NPA in an amount equal to (i) the outstanding principal due under the Note (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the Note), for NPA's breach of its obligations under the Note, (b) turnover by NPA to the Debtor of the foregoing amounts; (c) avoidance of the Alleged Agreement and the transfers thereunder and recovery of the funds transferred from the Plaintiff to, or for the benefit of, NPA pursuant to the Note; (d) declaratory relief, and (e) damages arising from the Defendants' breach of fiduciary duties or aiding and abetting thereof.

D-CNL002937

Appx. 00025

## JURISDICTION AND VENUE

6.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

8.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

10.     The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

11.     Upon information and belief, NPA is a limited partnership with offices located in Dallas, Texas, and organized under the laws of the state of Delaware.

12.     Upon information and belief, Mr. Dondero is an individual residing in Dallas, Texas.  He is the co-founder of the Debtor and was the Debtor's President and Chief Executive Officer until his resignation on January 9, 2020.  At all relevant times, Mr. Dondero controlled NPA; Mr. Dondero also controlled the Debtor until January 9, 2020.

13.     Upon information and belief, Dugaboy is (a) a limited partner of the Debtor, and (b) one of Mr. Dondero's family investment trusts for which is he a lifetime beneficiary.

4

D-CNL002938

**Appx. 00026**

14.     Upon information and belief, Nancy Dondero is an individual residing in the state of Florida and who is Mr. Dondero's sister, and a trustee of Dugaboy.

## CASE BACKGROUND

15.     On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

16.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members:  (a) Redeemer Committee of Highland Crusader Fund ("Redeemer"), (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively, "Acis").

17.     On June 25, 2021, the U.S. Trustee in this Court filed that certain *Notice of Amended Unsecured Creditors' Committee* [Docket No. 2485] notifying the Court that Acis and Redeemer had resigned from the Committee.

18.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

19.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

---

[2] All docket numbers refer to the main docket for the Debtor's Case maintained by this Court.

D-CNL002939

Appx. 00027

## STATEMENT OF FACTS

A.    **The NPA Note**

20.    NPA is the maker under a promissory note in favor of the Debtor.

21.    Specifically, on May 31, 2017, NPA executed a promissory note in favor

of the Debtor, as payee, in the original principal amount of $30,746, 812.33 (the "<u>Note</u>").  A true

and correct copy of the Note is attached hereto as **<u>Exhibit 1</u>**.

22.    Section 2 of the Note provides: "**<u>Payment of Principal and Interest</u>**.

Principal and interest under this Note shall be due and payable as follows:

> **2.1    <u>Annual Payment Dates</u>.**  During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**<u>Annual Installment</u>**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this note.

> **2.2    <u>Final Payment Date</u>**.    The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**<u>Maturity Date</u>**").

23.    Section 3 of the Note provides:

> **<u>Prepayment Allowed: Renegotiation Discretionary</u>**.    Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

24.    Section 4 of the Note provides:

> **<u>Acceleration Upon Default</u>**.    Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

6

25.    Section 6 of the Note provides:

**Attorneys' Fees**.    If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**B.    NPA's Default Under the Note**

26.    NPA failed to make the payment due under the Note on December 31, 2020 in the amount of $1,406,111.92.

27.    By letter dated January 7, 2021, the Debtor made demand on NPA for immediate payment under the Note (the "Demand Letter").  A true and correct copy of the Demand Letter is attached hereto as **Exhibit 2**.  The Demand Letter provides:

Because of Maker's failure to pay, the Note is in default.  Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of January 8, 2021 is $24,471,804.98; however, interest continues to accrue under the Note.

**The Note is in default, and payment is due immediately.**

Demand Letter (emphasis in the original).

28.    On January 14, 2021, in an apparent attempt to cure its default, NPA paid the Debtor the $1,406,111.92 that was due on December 31, 2020 (the "Partial Payment").

29.    The Note does not contain a cure provision. Therefore, the Partial Payment did not cure NPA's default.  Accordingly, on January 15, 2021, the Debtor sent NPA a follow-up letter to its Demand Letter (the "Second Demand Letter"), a true and correct copy of which is attached hereto as **Exhibit 3**, stating:

[T]he Partial Payment will be applied as payment against the amounts due under the Note in accordance with Section 3 thereof.  **The Note remains in default, and all amounts due thereunder are due immediately**.

7

> After adjusting for the Partial Payment and the continued accrual of interest, the amount due under the Note as of January 15, 2021, is $23,071,195.03 (which amount does not include expenses incurred to date in collecting the Note).

Second Demand Letter (emphasis in original).

30.    Despite the Debtor's demands, NPA did not pay the amount demanded by the Debtor on January 7, 2021, or at any time thereafter.

31.    As of January 15, 2021, the total outstanding principal and accrued but unpaid interest due under the Note was $23,071,195.03

32.    Pursuant to Section 4 of the Note, the Note is in default, and is currently due and payable.

**C.    The Debtor Files the Original Complaint**

33.    On January 22, 2021, the Debtor filed the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* [Docket No. 1] (the "Original Complaint").  In the Original Complaint, the Debtor brought claims for (i) breach of contract for NPA's breach of its obligations under the Note and (ii) turnover by NPA for the outstanding amounts under the Note, plus all accrued and unpaid interest until the date of payment plus the Debtor's costs of collection and reasonable attorney's fees.

**D.    NPA's Affirmative Defenses**

34.    On March 1, 2021, NPA filed *Defendant's Original Answer* [Docket No. 6] (the "Original Answer").  In its Original Answer, NPA asserted three affirmative defenses: (i) the claims are barred because the Plaintiff caused NPA to default, (ii) the claims are barred because the Plaintiff caused NPA to delay in making payment, and (iii) waiver and estoppel. *See id.* ¶¶39-41.

35.    On June 9, 2021, NPA filed *Defendant's First Amended Answer* [Docket No. 35-3] (the "Amended Answer"), that asserted a new affirmative defense; namely, that the

8

Debtor previously agreed that it would not collect on the Notes "upon fulfillment of conditions subsequent" (*i.e.*, the Alleged Agreement) *id.* ¶42.

36.    According to NPA, the Alleged Agreement was orally entered into "sometime between December of the year each note was made and February of the following year."

37.    According to NPA, Mr. Dondero, acting on its behalf, entered into the Alleged Agreement with his sister, Nancy Dondero, acting as the Representative.

38.    Mr. Dondero controlled both NPA and the Debtor at the time he entered into the Alleged Agreement on behalf of NPA.

39.    Upon information and belief, the Debtor's books and records do not reflect the Alleged Agreement.

**E.    Dugaboy Lacked Authority to Act on Behalf of the Debtor**

40.    Under section 4.2 of the *Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (the "Limited Partnership Agreement"), and attached hereto as **Exhibit 4**, Dugaboy was not authorized to enter into the Alleged Agreement on behalf of the Partnership, or otherwise bind the Partnership (as "Partnership" is defined in the Limited Partnership Agreement).

41.    Section 4.2(b) of the Limited Partnership Agreement states:

Management of Business.  No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

**Exhibit 4**, § 4.2(b).

42.    No provision in the Limited Partnership Agreement authorizes any of the Partnership's limited partners to bind the Partnership.

<center>9</center>

43.    Nancy Dondero also lacked authority to enter into the Alleged Agreement or to otherwise bind the Debtor

## FIRST CLAIM FOR RELIEF
### (Against NPA)

### (For Breach of Contract)

44.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

45.    The Note is a binding and enforceable contract.

46.    NPA breached the Note by failing to pay all amounts due to the Debtor upon NPA's default and acceleration.

47.    Pursuant to the Note, the Debtor is entitled to damages from NPA in an amount equal to (i) the aggregate outstanding principal due under the Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for NPA's breach of its obligations under the Note.

48.    As a direct and proximate cause of NPA's breach of the Note, the Debtor has suffered damages in the amount of at least $23,071,195.03, as of January 15, 2021, plus an amount equal to all accrued buy unpaid interest from that date, plus the Debtor's cost of collection.

## SECOND CLAIM FOR RELIEF
### (Against NPA)
### (Turnover by NPA Pursuant to 11 U.S.C. § 542(b))

49.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

50.    NPA owes the Debtor an amount equal to (i) the aggregate outstanding principal due under the Note, plus (ii) all accrued and unpaid interest thereon until the date of

D-CNL002944

Appx. 00032

payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for NPA's breach of its obligations under the Note.

51.     The Note is property of the Debtor's estate that is matured and payable upon default and acceleration.

52.     NPA has not paid the amount due under the Note to the Debtor.

53.     The Debtor has made demand for the turnover of the amount due under the Note.

54.     As of the date of filing of this Complaint, NPA has not turned over the amount due under the Note.

55.     The Debtor is entitled to the amount due under the Note.

<div align="center">

**THIRD CLAIM FOR RELIEF**
**(Against NPA)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) and 550)**

</div>

56.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

57.     The Debtor made the transfer pursuant to the Alleged Agreement within two years of the Petition Date.

58.     Mr. Dondero entered into the Alleged Agreement on behalf of NPA with actual intent to hinder, delay, or defraud a present or future creditor, demonstrated by, *inter alia*:

(a) The transfer was made to, or for the benefit of, NPA, an insider of the Debtor.

(b) Mr. Dondero entered into the Alleged Agreement on behalf of NPA with his sister, Nancy Dondero.

(c) Mr. Dondero did not inform the Debtor's CFO or outside auditors about the Alleged Agreement.

<div align="center">11</div>

(d) The Debtor's books and record do not reflect the Alleged Agreement.

(e) The Alleged Agreement was not subject to negotiation.

(f) The value of the consideration received by the Debtor for the transfer was not reasonably equivalent in value.

59.   The pattern of conduct, series of transactions, and general chronology of events under inquiry in connection with the debt NPA incurred under the Note demonstrates a scheme of fraud.

60.   Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfer made pursuant to the Alleged Agreement from NPA.

61.   Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfer made thereunder, and (ii) recovering from NPA an amount equal to all obligations remaining under the Note.

<u>**FOURTH CLAIM FOR RELIEF**</u>
**(Against NPA)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))**

62.   The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

63.   The Debtor made the transfers pursuant to the Alleged Agreement after, or within a reasonable time before, creditors' claims arose.

64.   Mr. Dondero entered into the Alleged Agreement on behalf of NPA with actual intent to hinder, delay, or defraud a present or future creditor of the Debtor, demonstrated by, *inter alia*:

(g) The transfer was made to, or for the benefit of, NPA, an insider of the Debtor.

12

(h) Mr. Dondero entered into the Alleged Agreement on behalf of NPA with his sister, Nancy Dondero.

(i) Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement.

(j) Upon information and belief, the Debtor's books and record do not reflect the Alleged Agreement.

(k) The Alleged Agreement was not subject to negotiation.

(l) The value of the consideration received by the Debtor for the transfer was not reasonably equivalent in value.

65.    Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from NPA.

66.    Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfer made thereunder, and (ii) recovering from NPA an amount equal to all obligations remaining under the Notes.

<div align="center">

**FIFTH CLAIM FOR RELIEF**
**(Against Dugaboy and Ms. Dondero)**
**(For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)**

</div>

67.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

68.    A bona fide, actual, present dispute exists between the Debtor, on the one hand, and Dugaboy and Ms. Dondero on the other hand, concerning whether Dugaboy and/or Ms. Dondero, acting as the Representative, were authorized to enter into the Alleged Agreement on the Debtor's behalf.

<div align="center">

13

</div>

D-CNL002947

**Appx. 00035**

69.    A judgment declaring the parties' respective rights and obligations will resolve their dispute.

70.    Pursuant to Bankruptcy Rule 7001, the Debtor specifically seeks declarations that:

- (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement,

- (b) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) was authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership,

- (c) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) otherwise had any right or authority to enter into the Alleged Agreement on behalf of the Partnership, and

- (d) the Alleged Agreement is null and void.

**SIXTH CLAIM FOR RELIEF**
**(Against Dugaboy and Ms. Dondero)**
**(Breach of Fiduciary Duty)**

71.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

72.    If Dugaboy, as a limited partner, or Ms. Dondero, as Representative, had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero would owe the Debtor a fiduciary duty.

14

D-CNL002948

**Appx. 00036**

73.     If Dugaboy or Ms. Dondero (as Representative) had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero breached their fiduciary duty of care to the Debtor by entering into and authorizing the purported Alleged Agreement on behalf of the Debtor.

74.     Accordingly, the Debtor is entitled to recover from Dugaboy and Ms. Dondero (a) actual damages that the Debtor suffered as a result of their breach of fiduciary duty, and (b) for punitive and exemplary damages.

**SEVENTH CLAIM FOR RELIEF**
**(Against James Dondero and Nancy Dondero)**
**(Aiding and Abetting a Breach of Fiduciary Duty)**

75.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

76.     James Dondero and Nancy Dondero (together, the "Donderos") were aware that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor.

77.     The Donderos aided and abetted Dugaboy's breach of its fiduciary duties to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

78.     The Donderos aided and abetted Dugaboy's breach of its fiduciary duty to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

79.     Accordingly, the Donderos are jointly and severally liable (a) for the actual damages that the Debtor suffered as a result of aiding and abetting Dondero's breaches of fiduciary duties, and (b) for punitive and exemplary damages

WHEREFORE, the Debtor prays for judgment as follows:

(i)     On its First Claim for Relief, damages in an amount to be determined at trial but includes (a) the outstanding principal due under the Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to

D-CNL002949
**Appx. 00037**

the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)      On its Second Claim for Relief, ordering turnover by NPA to the Debtor of an amount equal to (a) the outstanding principal due under the Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(iii)      On its Third Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder pursuant to the Alleged Agreement arising from actual fraudulent transfer under section 548 of the Bankruptcy Code;

(iv)      On its Fourth Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder pursuant to the Alleged Agreement of funds arising from actual fraudulent transfer under Tex. Bus. & C. Code § 24.005(a)(1);

(v)      On its Fifth Claim for Relief, a declaration that: (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement, (b) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) was authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership, (c) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) otherwise had any right or authority to enter into the Alleged

16

D-CNL002950

Appx. 00038

Agreement on behalf of the Partnership, and (d) the Alleged Agreement is null and void;

(vi)     On its Sixth Claim for Relief, actual damages from Dugaboy and Ms. Dondero, in an amount to be determined at trial, that Debtor suffered as a result of their breach of fiduciary duty, and for punitive and exemplary damages;

(vii)    On its Seventh Claim for Relief, actual damages from the Donderos, jointly and severally, in an amount to be determined at trial, that Debtor suffered as a result of aiding and abetting Dugaboy's breaches of fiduciary duty, and for punitive and exemplary damages and

(iii)    Such other and further relief as this Court deems just and proper.

17

D-CNL002951

**Appx. 00039**

Dated: As of July 13, 2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:   jpomerantz@pszjlaw.com
          ikharasch@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com

-and-

/s/ Zachery Z. Annable
HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

18

# EXHIBIT 1

## PROMISSORY NOTE

**$30,746,812.33**                                                    **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in Exhibit A hereto, from NexPoint Advisors, L.P., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, NEXPOINT ADVISORS, L.P. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of THIRTY MILLION, SEVEN HUNDRED FORTY SIX THOUSAND, EIGHT HUNDRED TWELVE AND 33/100 DOLLARS ($30,746,812.33), together with interest, on the terms set forth below.  All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of six percent (6.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.    Payment of Principal and Interest. Principal and interest under this Note shall be payable as follows:

2.1    Annual Payment Dates. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

2.2    Final Payment Date.        The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

3.    Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same

D-CNL002954

**Appx. 00042**

shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.     Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.     Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.     Prior Notes.    The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

NEXPOINT ADVISORS, L.P.
By: NexPoint Advisors GP, LLC, its general partner

By: _____
Name:
Title:

2

**EXHIBIT A**

**PRIOR NOTES**

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 8/21/14 | $4,000,000 | 6.00% | $4,616,739.73 |
| 10/1/14 | $6,000,000 | 6.00% | $6,959,671.23 |
| 11/14/14 | $2,500,000 | 6.00% | $2,881,780.82 |
| 1/29/15 | $3,100,000 | 6.00% | $3,534,679.45 |
| 7/22/15 | $12,075,000 | 6.00% | $12,753,941.10 |
| | **$27,675,000** | | **$30,746,812.33** |

3

D-CNL002956

**Appx. 00044**

# EXHIBIT 2

D-CNL002957

**Appx. 00045**

HIGHLAND CAPITAL MANAGEMENT, L.P.

January 7, 2021

NexPoint Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  James Dondero

      Re:  Demand on Promissory Note

Dear Mr. Dondero,

On May 31, 2017, NexPoint Advisors, L.P, entered into that certain promissory note in the original principal amount of $30,746,812.33 (the "Note") in favor of Highland Capital Management, L.P. ("Payee").

As set forth in Section 2 of the Note, accrued interest and principal on the Note is due and payable in thirty equal annual payments with each payment due on December 31 of each calendar year.  Maker failed to make the payment due on December 31, 2020.

Because of Maker's failure to pay, the Note is in default.  Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of January 8, 2021 is $24,471,804.98; however, interest continues to accrue under the Note.

**The Note is in default, and payment is due immediately.**  Payments on the Note must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Note or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved.  Interest, including default interest if applicable, on the Note will continue to accrue until the Note is paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

DOCS_NY:41916.2 36027/002

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       DC Sauter

D-CNL002959

**Appx. 00047**

**Appendix A**

ABA #:             322070381
Bank Name:      East West Bank
Account Name:  Highland Capital Management, LP
Account #:        5500014686

# EXHIBIT 3

D-CNL002961

**Appx. 00049**

### HIGHLAND CAPITAL MANAGEMENT, L.P.

January 15, 2021

NexPoint Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James Dondero

      Re: Partial Payment on Promissory Note

Dear Mr. Dondero,

On May 31, 2017, NexPoint Advisors, L.P, ("Maker"), entered into that certain promissory note in the original principal amount of $30,746,812.33 (the "Note") in favor of Highland Capital Management, L.P. ("Payee"). A copy of the Note is attached hereto as **Appendix A**.

On January 7, 2021, Payee notified you that because of Maker's failure to make the payment due on December 31, 2020 (the "Default"), the Note was in default and that all principal, interest, and any other amounts due on the Note were immediately due and payable. The amount due and payable on the Note as of January 8, 2021, was $24,471,804.98; however, interest continues to accrue under the Note.

On January 14, 2021, Payee received a wire from Maker in the amount of $1,406,111.92 (the "Partial Payment"). To reiterate, the amount due under the Note as of January 8, 2021, was $24,471,804.98. The Partial Payment will be applied as payment against the amounts due under the Note pursuant to Section 3 thereof. **The Note remains in default, and all amounts due thereunder are due immediately.**

After adjusting for the Partial Payment and the continued accrual of interest, the amount due under the Note as of January 15, 2021, is $23,071,195.03 (which amount does not include expenses incurred to date in collecting the Note). Payment of such amount is due immediately. Payments on the Note must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix B**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Note or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved, including the right to recover Payee's expenses incurred in collecting the Note. Interest, including default interest if applicable, on the Note will continue to accrue until the Note is paid in full. Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

D-CNL002962
**Appx. 00050**

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       DC Sauter
       A.  Lee Hogewood III

D-CNL002963

**Appx. 00051**

# Appendix A

D-CNL002964

<div align="center">**PROMISSORY NOTE**</div>

**$30,746,812.33**                                                                      **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in Exhibit A hereto, from NexPoint Advisors, L.P., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, NEXPOINT ADVISORS, L.P. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of THIRTY MILLION, SEVEN HUNDRED FORTY SIX THOUSAND, EIGHT HUNDRED TWELVE AND 33/100 DOLLARS ($30,746,812.33), together with interest, on the terms set forth below. All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.        Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of six percent (6.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.        Payment of Principal and Interest. Principal and interest under this Note shall be payable as follows:

2.1        Annual Payment Dates. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

2.2        Final Payment Date.        The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

3.        Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.        Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same

shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.    <u>Prior Notes</u>.    The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

NEXPOINT ADVISORS, L.P.
By: NexPoint Advisors GP, LLC, its general partner

By: _____
Name:
Title:

2

D-CNL002966

**Appx. 00054**

**EXHIBIT A**

**PRIOR NOTES**

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 8/21/14 | $4,000,000 | 6.00% | $4,616,739.73 |
| 10/1/14 | $6,000,000 | 6.00% | $6,959,671.23 |
| 11/14/14 | $2,500,000 | 6.00% | $2,881,780.82 |
| 1/29/15 | $3,100,000 | 6.00% | $3,534,679.45 |
| 7/22/15 | $12,075,000 | 6.00% | $12,753,941.10 |
| | **$27,675,000** | | **$30,746,812.33** |

3

D-CNL002967

**Appx. 00055**

**Appendix B**

ABA #:            322070381
Bank Name:     East West Bank
Account Name:  Highland Capital Management, LP
Account #:      5500014686

D-CNL002968
**Appx. 00056**

# EXHIBIT 4

D-CNL002969

**Appx. 00057**

**FOURTH AMENDED AND RESTATED**

**AGREEMENT OF LIMITED PARTNERSHIP**

**OF**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THE PARTNERSHIP INTERESTS REPRESENTED BY THIS LIMITED PARTNERSHIP AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OP 1933 OR UNDER ANY STATE SECURITIES ACTS IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS. THE SALE OR OTHER DISPOSITION OF THE PARTNERSHIP INTERESTS IS PROHIBITED UNLESS THAT SALE OR DISPOSITION IS MADE IN COMPLIANCE WITH ALL SUCH APPLICABLE ACTS. ADDITIONAL RESTRICTIONS ON TRANSFER OF THE PARTNERSHIP INTERESTS ARE SET FORTH IN THIS AGREEMENT.

**FOURTH AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

TABLE OF CONTENTS

ARTICLE 1 GENERAL .................................................................................................1
 1.1. Continuation ..............................................................................................1
 1.2. Name .........................................................................................................1
 1.3. Purpose .....................................................................................................1
 1.4. Term. ........................................................................................................1
 1.5. Partnership Offices; Addresses of Partners. ............................................1

ARTICLE 2 DEFINITIONS ..........................................................................................2
 2.1. Definitions .................................................................................................2
 2.2. Other Definitions ......................................................................................6

ARTICLE 3 FINANCIAL MATTERS............................................................................6
 3.1. Capital Contributions ...............................................................................6
 3.2. Allocations of Profits and Losses.............................................................8
 3.3. Allocations on Transfers ..........................................................................9
 3.4. Special Allocations...................................................................................9
 3.5. Curative Allocations...............................................................................10
 3.6. Code Section 704(c) Allocations............................................................10
 3.7. Capital Accounts ....................................................................................11
 3.8. Distributive Share for Tax Purpose ........................................................12
 3.9. Distributions...........................................................................................12
 3.10. Compensation and Reimbursement of General Partner ..........................14
 3.11. Books, Records, Accounting, and Reports..............................................14
 3.12. Tax Matters ............................................................................................14

ARTICLE 4 RIGHTS AND OBLIGATIONS OF PARTNERS ......................................15
 4.1. Rights and Obligations of the General Partner........................................15
 4.2. Rights and Obligations of Limited Partners ...........................................19
 4.3. Transfer of Partnership Interests ............................................................19
 4.4. Issuances of Partnership Interests to New and Existing Partners.............21
 4.5. Withdrawal of General Partner ...............................................................21
 4.6. Admission of Substitute Limited Partners and Successor General Partner.......................21

ARTICLE 5 DISSOLUTION AND WINDING UP.........................................................22
 5.1. Dissolution .............................................................................................22
 5.2. Continuation of the Partnership..............................................................23
 5.3. Liquidation .............................................................................................23
 5.4. Distribution in Kind ...............................................................................24
 5.5. Cancellation of Certificate of Limited Partnership .................................24
 5.6. Return of Capital ....................................................................................24
 5.7. Waiver of Partition..................................................................................24

ARTICLE 6 GENERAL PROVISIONS.........................................................................24
 6.1. Amendments to Agreement.....................................................................24

i

| | | |
|---|---|---|
| 6.2. | Addresses and Notices | 25 |
| 6.3. | Titles and Captions | 25 |
| 6.4. | Pronouns and Plurals | 25 |
| 6.5. | Further Action | 25 |
| 6.6. | Binding Effect | 25 |
| 6.7. | Integration | 25 |
| 6.8. | Creditors | 25 |
| 6.9. | Waiver | 25 |
| 6.10. | Counterparts | 25 |
| 6.11. | Applicable Law | 25 |
| 6.12. | Invalidity of Provisions | 25 |
| 6.13. | Mandatory Arbitration | 26 |

D-CNL002972

Appx. 00060

### FOURTH AMENDED AND RESTATED
### AGREEMENT OF LIMITED PARTNERSHIP
### OF
### HIGHLAND CAPITAL MANAGEMENT, L.P.

THIS FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is entered into on this 24th day of December, 2015, to be effective as of December 24, 2015, by and among Strand Advisors, Inc., a Delaware corporation (*"Strand"*), as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner.

Certain terms used in this Agreement are defined in Article 2.

## ARTICLE 1

## GENERAL

**1.1.    Continuation**.  Subject to the provisions of this Agreement, the Partners hereby continue the Partnership as a limited partnership pursuant to the provisions of the Delaware Act.  Except as expressly provided herein, the rights and obligations of the Partners and the administration and termination of the Partnership shall be governed by the Delaware Act.

**1.2.    Name.**  The name of the Partnership shall be, and the business of the Partnership shall be conducted under the name of Highland Capital Management, L.P.  The General Partner, in its sole and unfettered discretion, may change the name of the Partnership at any time and from time to time and shall provide Limited Partners with written notice of such name change within twenty (20) days after such name change.

**1.3.    Purpose.**  The purpose and business of the Partnership shall be the conduct of any business or activity that may lawfully be conducted by a limited partnership organized pursuant to the Delaware Act.  Any or all of the foregoing activities may be conducted directly by the Partnership or indirectly through another partnership, joint venture, or other arrangement.

**1.4.    Term.**  The Partnership was formed as a limited partnership on July 7, 1997, and shall continue until terminated pursuant to this Agreement.

**1.5.    Partnership Offices; Addresses of Partners**.

(a)    Partnership Offices.  The registered office of the Partnership in the State of Delaware shall be 1013 Centre Road, Wilmington, Delaware 19805-1297, and its registered agent for service of process on the Partnership at that registered office shall be Corporation Service Company, or such other registered office or registered agent as the General Partner may from time to time designate.  The principal office of the Partnership shall be 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other place as the General Partner may from time to time designate.  The Partnership may maintain offices at such other place or places as the General Partner deems advisable.

(b)    Addresses of Partners.  The address of the General Partner is 300 Crescent Court, Suite 700, Dallas, Texas 75201.  The address of each Limited Partner shall be the address of that Limited Partner appearing on the books and records of the Partnership.  Each Limited Partner agrees to provide the General Partner with prompt written notice of any change in his/her/its address.

# ARTICLE 2

## DEFINITIONS

**2.1.    Definitions.**  The following definitions shall apply to the terms used in this Agreement, unless otherwise clearly indicated to the contrary in this Agreement:

"*Additional Capital Contribution*" has the meaning set forth in Section 3.1(b) of this Agreement.

"*Adjusted Capital Account Deficit*" means, with respect *to* any Partner, the deficit balance, if any, in the Capital Account of that Partner as of the end of the relevant Fiscal Year, or other relevant period, giving effect to all adjustments previously made thereto pursuant to Section 3.7 and further adjusted as follows: (i) credit to that Capital Account, any amounts which that Partner is obligated or deemed obligated to restore pursuant to any provision of this Agreement or pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c); (ii) debit to that Capital Account, the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6); and (iii) to the extent required under the Treasury Regulations, credit to that Capital Account (A) that Partner's share of "minimum gain" and (B) that Partner's share of "partner nonrecourse debt minimum gain." (Each Partner's share of the minimum gain and partner nonrecourse debt minimum gain shall be determined under Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5), respectively.)

"*Affiliate*" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question.  As used in this definition, the term "*control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting Securities, by contract or otherwise.

"*Agreement*" means this Fourth Amended and Restated Agreement of Limited Partnership, as it may be amended, supplemented, or restated from time to time.

"*Business Day*" means Monday through Friday of each week, except that a legal holiday recognized as such by the government of the United States or the State of Texas shall not be regarded as a Business Day.

"*Capital Account*" means the capital account maintained for a Partner pursuant to Section 3.7(a).

"*Capital Contribution*" means, with respect to any Partner, the amount of money or property contributed to the Partnership with respect to the interest in the Partnership held by that Person.

"*Certificate of Limited Partnership*" means the Certificate of Limited Partnership filed with the Secretary of State of Delaware by the General Partner, as that Certificate may be amended, supplemented or restated from time to time.

"*Class A Limited Partners*" means those Partners holding a Class A Limited Partnership Interest, as shown on Exhibit A.

"*Class A Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class A Limited Partner."

2

"*Class B Limited Partner*" means those Partners holding a Class B Limited Partnership Interest, as shown on <u>Exhibit A</u>.

"*Class B Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class B Limited Partner."

"*Class B NAV Ratio Trigger Period*" means any period during which the Class B Limited Partner's aggregate capital contributions, including the original principal balance of the Contribution Note, and reduced by the aggregate amount of distributions to the Class B Limited Partner, exceed 75 percent of the product of the Class B Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class B NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class B NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class B NAV Ratio Trigger Period.

"*Class C Limited Partner*" means those Partners holding a Class C Limited Partnership Interest, as shown on <u>Exhibit A</u>.

"*Class C Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class C Limited Partner."

"*Class C NAV Ratio Trigger Period*" means any period during which an amount equal to $93,000,000.00 reduced by the aggregate amount of distributions to the Class C Limited Partner after the Effective Date exceeds 75 percent of the product of the Class C Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class C NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class C NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class C NAV Ratio Trigger Period.

"*Code*" means the Internal Revenue Code of 1986, as amended and in effect from time to time.

"*Contribution Note*" means that certain Secured Promissory Note dated December 21, 2015 by and among Hunter Mountain Investment Trust, as maker, and the Partnership as Payee.

"*Default Loan*" has the meaning set forth in <u>Section 3.1(c)(i)</u>.

"*Defaulting Partner*" has the meaning set forth in <u>Section 3.1(c)</u>.

"*Delaware Act*" means the Delaware Revised Uniform Limited Partnership Act, Part IV, Title C, Chapter 17 of the Delaware Corporation Law Annotated, as it may be amended, supplemented or restated from time to time, and any successor to that Act.

"*Effective Date*" means the date first recited above.

"*Fiscal Year*" has the meaning set forth in <u>Section 3.11(b)</u>.

3

D-CNL002975

**Appx. 00063**

"*Founding Partner Group*" means, all partners holding partnership interests in the Partnership immediately before the Effective Date.

"*General Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a General Partner pursuant to the terms of this Agreement; and (ii) has not ceased to be a General Partner pursuant to the terms of this Agreement.

"*Limited Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a Limited Partner pursuant to the terms of this Agreement, and (ii) has not ceased to be a Limited Partner pursuant to the terms of this Agreement.

"*Liquidator*" has the meaning set forth in Section 5.3.

"*Losses*" means, for each Fiscal Year, the losses and deductions of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any expenditures described in Code Section 705(a)(2)(B).

"*Majority Interest*" means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners.

"*NAV Ratio Trigger Period*" means a Class B NAV Ratio Trigger Period or a Class C NAV Ratio Trigger Period.

"*Net Increase in Working Capital Accounts*" means the excess of (i) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the end of the period being measured over (ii) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the beginning of the period being measured; provided, however, that amounts within each of the aforementioned categories shall be excluded from the calculation to the extent they are specifically identified as being derived from investing or financing activities. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership and appropriate adjustments may be made to the extent the Partnership adds new ledger accounts to its books and records that are current assets or current liabilities.

"*New Issues*" means Securities that are considered to be "new issues," as defined in the Conduct Rules of the National Association of Securities Dealers, Inc.

"*Nonrecourse Deduction*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1), as computed under Treasury Regulations Section 1.704-2(c).

"*Nonrecourse Liability*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"*Operating Cash Flow*" means Total Revenue less Total Operating Expenses plus Depreciation & Amortization less Net Increase in Working Capital Accounts year over year. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership.

D-CNL002976

**Appx. 00064**

"*Partner*" means a General Partner or a Limited Partner.

"*Partner Nonrecourse Debt*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"*Partner Nonrecourse Deductions*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"*Partner Nonrecourse Debt Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(5).

"*Partnership*" means Highland Capital Management, L.P., the Delaware limited partnership established pursuant to this Agreement.

"*Partnership Capital*" means, as of any relevant date, the net book value of the Partnership's assets.

"*Partnership Interest*" means the interest acquired by a Partner in the Partnership including, without limitation, that Partner's right: (a) to an allocable share of the Profits, Losses, deductions, and credits of the Partnership; (b) to a distributive share of the assets of the Partnership; (c) if a Limited Partner, to vote on those matters described in this Agreement; and (d) if the General Partner, to manage and operate the Partnership.

"*Partnership Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(d).

"*Percentage Interest*" means the percentage set forth opposite each Partner's name on Exhibit A as such Exhibit may be amended from time to time in accordance with this Agreement.

"*Person*" means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity.

"*Priority Distributions*" has the meaning set forth in Section 3.9(b).

"*Profits*" means, for each Fiscal Year, the income and gains of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any income described in Code Section 705(a)(1)(B).

"*Profits Interest Partner*" means any Person who is issued a Partnership Interest that is treated as a "profits interest" for federal income tax purposes.

"*Purchase Notes*" means those certain Secured Promissory Notes of even date herewith by and among Hunter Mountain Investment Trust, as maker, and The Dugaboy Investment Trust, The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #2, each as Payees of the respective Secured Promissory Notes.

D-CNL002977

**Appx. 00065**

"*Record Date*" means the date established by the General Partner for determining the identity of Limited Partners entitled to vote or give consent to Partnership action or entitled to exercise rights in respect of any other lawful action of Limited Partners.

"*Second Amended Buy-Sell and Redemption Agreement*" means that certain Second Amended and Restated Buy-Sell and Redemption Agreement, dated December 21, 2015, to be effective as of December 21, 2015 by and between the Partnership and its Partners, as may be amended, supplemented, or restated from time to time.

"*Securities*" means the following: (i) securities of any kind (including, without limitation, "securities" as that term is defined in Section 2(a)(1) of the Securities Act; (ii) commodities of any kind (as that term is defined by the U.S. Securities Laws and the rules and regulations promulgated thereunder); (iii) any contracts for future or forward delivery of any security, commodity or currency; (iv) any contracts based on any securities or group of securities, commodities or currencies; (v) any options on any contracts referred to in clauses (iii) or (iv); or (vi) any evidences of indebtedness (including participations in or assignments of bank loans or trade credit claims). The items set forth in clauses (i) through (vi) herein include, but are not limited to, capital stock, common stock, preferred stock, convertible securities, reorganization certificates, subscriptions, warrants, rights, options, puts, calls, bonds, mutual fund interests, debentures, notes, certificates of deposit, letters of credit, bankers acceptances, trust receipts and other securities of any corporation or other entity, whether readily marketable or not, rights and options, whether granted or written by the Partnership or by others, treasury bills, bonds and notes, any securities or obligations issued or guaranteed by the United States or any foreign country or any state or possession of the United States or any foreign country or any political subdivision or agency or instrumentality of any of the foregoing, and derivatives of any of the foregoing.

"*Securities Act*" means the Securities Act of 1933, as amended, and any successor to such statute.

"*Substitute Limited Partner*" has the meaning set forth in Section 4.6(a).

"*Transfer*" or derivations thereof, of a Partnership Interest means, as a noun, the transfer, sale, assignment, exchange, pledge, hypothecation or other disposition of a Partnership Interest, or any part thereof, directly or indirectly, and as a verb, voluntarily or involuntarily to transfer, sell, assign, exchange, pledge, hypothecate or otherwise dispose of.

"*Treasury Regulations*" means the Department of Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of succeeding regulations).

**2.2.    Other Definitions**.  All terms used in this Agreement that are not defined in this Article 2 have the meanings contained elsewhere in this Agreement.

## ARTICLE 3

### FINANCIAL MATTERS

**3.1.    Capital Contributions**.

(a)    Initial Capital Contributions.  The initial Capital Contribution of each Partner shall be set forth in the books and records of the Partnership.

(b)    Additional Capital Contributions.

6

D-CNL002978

**Appx. 00066**

(i) The General Partner, in its reasonable discretion and for a *bona fide* business purpose, may request in writing that the Founding Partner Group make additional Capital Contributions in proportion to their Percentage Interests (each, an "***Additional Capital Contribution***").

(ii) Any failure by a Partner to make an Additional Capital Contribution requested under <u>Section 3.1(b)(i)</u> on or before the date on which that Additional Capital Contribution was due shall result in the Partner being in default.

(c) <u>Consequences to Defaulting Partners</u>. In the event a Partner is in default under <u>Section 3.1(b)</u> (a "***Defaulting Partner***"), the Defaulting Partner, in its sole and unfettered discretion, may elect to take either one of the option set forth below.

(i) <u>Default Loans</u>. If the Defaulting Partner so elects, the General Partner shall make a loan to the Defaulting Partner in an amount equal to that Defaulting Partner's additional capital contribution (a "***Default Loan***"). A Default Loan shall be deemed advanced on the date actually advanced. Default Loans shall earn interest on the outstanding principal amount thereof at a rate equal to the Applicable Federal Mid-Term Rate (determined by the Internal Revenue Service for the month in which the loan is deemed made) from the date actually advanced until the same is repaid in full. The term of any Default Loan shall be six (6) months, unless otherwise extended by the General Partner in its sole and unfettered discretion. If the General Partner makes a Default Loan, the Defaulting Partner shall not receive any distributions pursuant to <u>Section 3.9(a)</u> or <u>Section 5.3</u> or any proceeds from the Transfer of all or any part of its Partnership Interest while the Default Loan remains unpaid. Instead, the Defaulting Partner's share of distributions or such other proceeds shall (until all Default Loans and interest thereon shall have been repaid in full) first be paid to the General Partner. Such payments shall be applied first to the payment of interest on such Default Loans and then to the repayment of the principal amounts thereof, but shall be considered, for all other purposes of this Agreement, to have been distributed to the Defaulting Partner. The Defaulting Partner shall be liable for the reasonable fees and expenses incurred by the General Partner (including, without limitation, reasonable attorneys' fees and disbursements) in connection with any enforcement or foreclosure upon any Default Loan and such costs shall, to the extent enforceable under applicable law, be added to the principal amount of the applicable Default Loan. In addition, at any time during the term of such Default Loan, the Defaulting Partner shall have the right to repay, in full, the Default Loan (including interest and any other charges). If the General Partner makes a Default Loan, the Defaulting Partner shall be deemed to have pledged to the General Partner and granted to the General Partner a continuing first priority security interest in, all of the Defaulting Partner's Partnership Interest to secure the payment of the principal of, and interest on, such Default Loan in accordance with the provisions hereof, and for such purpose this Agreement shall constitute a security agreement. The Defaulting Partner shall promptly execute, acknowledge and deliver such financing statements, continuation statements or other documents and take such other actions as the General Partner shall request in writing in order to perfect or continue the perfection of such security interest; and, if the Defaulting Partner shall fail to do so within seven (7) days after the Defaulting Partner's receipt of a notice making demand therefor, the General Partner is hereby appointed the attorney-in-fact of, and is hereby authorized on behalf of, the Defaulting Partner, to execute, acknowledge and deliver all such documents and take all such other actions as may be required to perfect such security interest. Such appointment and authorization are coupled with an interest and shall be irrevocable. The General Partner shall, prior to exercising any right or remedy (whether at law, in equity or pursuant to the terms hereof) available to it in connection with such security interest, provide to the Defaulting Partner a notice, in reasonable detail, of the right or remedy to be exercised and the intended timing of such exercise which shall not be less than five (5) days following the date of such notice.

D-CNL002979

**Appx. 00067**

(ii)    Reduction of Percentage Interest.  If the Defaulting Partner does not elect to obtain a Default Loan pursuant to Section 3.1(c)(i), the General Partner shall reduce the Defaulting Partner's Percentage Interest in accordance with the following formula:

> The Defaulting Partner's new Percentage Interest shall equal the product of (1) the Defaulting Partner's current Percentage Interest, multiplied by (2) the quotient of (a) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), divided by (b) the sum of (i) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), plus (ii) the amount of the additional capital contribution that such Defaulting Partner failed to make when due.

To the extent any downward adjustment is made to the Percentage Interest of a Partner pursuant to this Section 3.1(c)(ii), any resulting benefit shall accrue to the Partners (other than the Defaulting Partner) in proportion to their respective Percentage Interests.

**3.2.    Allocations of Profits and Losses.**

(a)    Allocations of Profits.  Except as provided in Sections 3.4, 3.5, and 3.6, Profits for any Fiscal Year will be allocated to the Partners as follows:

(i)    First, to the Partners until cumulative Profits allocated under this Section 3.2(a)(i) for all prior periods equal the cumulative Losses allocated to the Partners under Section 3.2(b)(iii) for all prior periods in the inverse order in which such Losses were allocated; and

(ii)    Next, to the Partners until cumulative Profits allocated under this Section 3.2(a)(ii) for all prior periods equal the cumulative Losses allocated to the Partners under Section 3.2(b)(ii) for all prior periods in the inverse order in which such Losses were allocated; and

(iii)    Then, to all Partners in proportion to their respective Percentage Interests.

(b)    Allocations of Losses.  Except as provided in Sections 3.4, 3.5, and 3.6, Losses for any Fiscal Year will be will be allocated as follows:

(i)    First, to the Partners until cumulative Losses allocated under this Section 3.2(b)(i) for all prior periods equal the cumulative Profits allocated to the Partners under Section 3.2(a)(iii) for all prior periods in the inverse order in which such Profits were allocated; and

(ii)    Next, to the Partners in proportion to their respective positive Capital Account balances until the aggregate Capital Account balances of the Partners (excluding any negative Capital Account balances) equal zero; *provided, however,* losses shall first be allocated to reduce amounts that were last allocated to the Capital Accounts of the Partners; and

(iii)    Then, to all Partners in proportion to their respective Percentage Interests.

8

D-CNL002980

**Appx. 00068**

(c)    <u>Limitation on Loss Allocations</u>.  If any allocation of Losses would cause a Limited Partner to have an Adjusted Capital Account Deficit, those Losses instead shall be allocated to the General Partner.

**3.3.**    **Allocations on Transfers**.  Taxable items of the Partnership attributable to a Partnership Interest that has been Transferred (including the simultaneous decrease in the Partnership Interest of existing Partners resulting from the admission of a new Partner) shall be allocated in accordance with Section 4.3(d).

**3.4.**    **Special Allocations.**  If the requisite stated conditions or facts are present, the following special allocations shall be made in the following order:

(a)    <u>Partnership Minimum Gain Chargeback</u>**.**  Notwithstanding any other provision of this <u>Article 3</u>, if there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, prior to any other allocation under this Agreement, each Partner shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to that Partner's share of the net decrease in Partnership Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2)**.**  The items to be allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g)**.**  This <u>Section 3.4(a)</u> is intended to comply with the partnership minimum gain chargeback requirements of the Treasury Regulations and shall be subject to all exceptions provided therein.

(b)    <u>Partner Nonrecourse Debt Minimum Gain Chargeback</u>**.**  Notwithstanding any other provision of this <u>Article 3</u> (other than <u>Section 3.4(a)</u>), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Partner with a share of such Partner Nonrecourse Debt Minimum Gain as of the beginning of the year shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods in an amount equal to that Partner's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g)**.**  This <u>Section 3.4(b)</u> is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements of the Treasury Regulations, shall be interpreted consistently with the Treasury Regulations and shall be subject to all exceptions provided therein.

(c)    <u>Qualified Income Offset</u>**.**  If a Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), then items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible; *provided, however,* an allocation pursuant to this <u>Section 3.4(c)</u> shall be made if and only to the extent that the Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this <u>Article 3</u> have been tentatively made without considering this <u>Section 3.4(c)</u>.

(d)    <u>Gross Income Allocation</u>**.**  If a Partner has a deficit Capital Account at the end of any Fiscal Year of the Partnership that exceeds the sum of (i) the amount the Partner is obligated to restore, and (ii) the amount the Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), then each such Partner shall be specially allocated items of income and gain of the Partnership in the amount of the excess as quickly as possible; *provided, however,* an allocation pursuant to this <u>Section 3.4(d)</u> shall be made if and only to

9

the extent that the Partner would have a deficit Capital Account in excess of that sum after all other allocations provided for in this Article 3 have been tentatively made without considering Section 3.4(c) or 3.4(d).

(e)     Nonrecourse Deductions.  Nonrecourse Deductions for any taxable year or other period for which allocations are made shall he allocated among the Partners in accordance with their Percentage interests.

(f)     Partner Nonrecourse Deductions.  Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

(g)     Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any asset of the Partnership under Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and that gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Treasury Regulations.

(h)     Section 481 Adjustments.  Any allocable items of income, gain, expense, deduction or credit required to be made by Section 481 of the Code as the result of the sale, transfer, exchange or issuance of a Partnership Interest will be specially allocated to the Partner receiving said Partnership Interest whether such items are positive or negative in amount.

3.5.     Curative Allocations.  The "*Basic Regulatory Allocations*" consist of (i) the allocations pursuant to Section 3.2(c), and (ii) the allocations pursuant to Sections 3.4.  Notwithstanding any other provision of this Agreement, the Basic Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of the allocations of other items and the Basic Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Basic Regulatory Allocations had not occurred.  For purposes of applying the foregoing sentence, allocations pursuant to this Section 3.5 shall be made with respect to allocations pursuant to Section 3.4 (g) and (h) only to the extent that it is reasonably determined that those allocations will otherwise be inconsistent with the economic agreement among the Partners. To the extent that a special allocation under Section 3.4 is determined not to comply with applicable Treasury Regulations, then the Partners intend that the items shall be allocated in accordance with the Partners' varying Percentage Interests throughout each tax year during which such items are recognized for tax purposes.

3.6.     Code Section 704(c) Allocations.  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation at the time of the contribution between the tax basis of the property to the Partnership and the fair market value of that property.  Except as otherwise provided herein, any elections or other decisions relating to those allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intent of this Agreement.  Allocations of income, gain, loss and deduction pursuant to this Section 3.6 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, the Capital Account of any Partner or the share

10

D-CNL002982

of Profits, Losses, other tax items or distributions of any Partner pursuant to any provision of this Agreement.

     **3.7.**    **Capital Accounts**.

     (a)    <u>Maintenance of Capital Accounts</u>.  The Partnership shall establish and maintain a separate capital account (*"Capital Account"*) for each Partner in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), subject to and in accordance with the provisions set forth in this <u>Section 3.7</u>.

     (i)    The Capital Account balance of each Partner shall be credited (increased) by (A) the amount of cash contributed by that Partner to the capital of the Partnership, (B) the fair market value of property contributed by that Partner to the capital of the Partnership (net of liabilities secured by that contributed property that the Partnership assumes or takes subject to under Code Section 752), and (C) that Partner's allocable share of Profits and any items in the nature of income or gain which are specially allocated pursuant to <u>Sections 3.4</u> and <u>3.5</u>; and

     (ii)    The Capital Account balance of each Partner shall be debited (decreased) by (A) the amount of cash distributed to that Partner by the Partnership, (B) the fair market value of property distributed to that Partner by the Partnership (net of liabilities secured by that distributed property that such Partner assumes or takes subject to under Code Section 752), (C) that Partner's allocable share of expenditures of the Partnership described in Code Section 705(a)(2)(B), and (D) that Partner's allocable share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to <u>Sections 3.2</u>, <u>3.4</u> and <u>3.5</u>.

The provisions of this <u>Section 3.7</u> and the other provisions of this Agreement relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Code Section 704(b) and the Treasury Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions.  The General Partner may modify the manner in which the Capital Accounts are maintained under this <u>Section 3.7</u> in order to comply with those provisions, as well as upon the occurrence of events that might otherwise cause this Agreement not to comply with those provisions.

     (b)    <u>Negative Capital Accounts</u>.  If any Partner has a deficit balance in its Capital Account, that Partner shall have no obligation to restore that negative balance or to make any Capital Contribution by reason thereof, and that negative balance shall not be considered an asset of the Partnership or of any Partner.

     (c)    <u>Interest</u>.  No interest shall be paid by the Partnership on Capital Contributions or on balances in Capital Accounts.

     (d)    <u>No Withdrawal</u>.  No Partner shall be entitled to withdraw any part of his/her/its Capital Contribution or his/her/its Capital Account or to receive any distribution from the Partnership, except as provided in <u>Section 3.9</u> and <u>Article 5</u>.

     (e)    <u>Loans From Partners</u>.  Loans by a Partner to the Partnership shall not be considered Capital Contributions.

     (f)    <u>Revaluations</u>.  The Capital Accounts of the Partners shall not be "booked-up" or "booked-down" to their fair market values under Treasury Regulations Section 1.704(c)-1(b)(2)(iv)(f) or otherwise.

<div align="center">11</div>

**3.8.    Distributive Share for Tax Purpose.**  All items of income, deduction, gain, loss or credit that are recognized for federal income tax purposes will be allocated among the Partners in accordance with the allocations of Profits and Losses hereunder as determined by the General Partner in its sole and unfettered discretion.  Notwithstanding the foregoing, the General Partner may (i) as to each New Issue, specially allocate to the Partners who were allocated New Issue Profit from that New Issue any short-term capital gains realized during the Fiscal Year upon the disposition of such New Issue during that Fiscal Year, and (ii) specially allocate items of gain (or loss) to Partners who withdraw capital during any Fiscal Year in a manner designed to ensure that each withdrawing Partner is allocated gain (or loss) in an amount equal to the difference between that Partner's Capital Account balance (or portion thereof being withdrawn) at the time of the withdrawal and the tax basis for his/her/ its Partnership Interest at that time (or proportionate amount thereof); *provided, however,* that the General Partner may, without the consent of any other Partner, (a) alter the allocation of any item of taxable income, gain, loss, deduction or credit in any specific instance where the General Partner, in its sole and unfettered discretion, determines such alteration to be necessary or appropriate to avoid a materially inequitable result *(e.g.,* where the allocation would create an inappropriate tax liability); and/or (b) adopt whatever other method of allocating tax items as the General Partner determines is necessary or appropriate in order to be consistent with the spirit and intent of the Treasury Regulations under Code Sections 704(b) and 704(c).

**3.9.    Distributions**.

(a)    General.  The General Partner may make such pro rata or non-pro rata distributions as it may determine in its sole and unfettered discretion, without being limited to current or accumulated income or gains, but no such distribution shall be made out of funds required to make current payments on Partnership indebtedness; provided, however, that the General Partner may not make non-pro rata distributions under this Section 3.9(a) during an NAV Ratio Trigger Period without the consent of the Class B Limited Partner (in the case of a Class B NAV Ratio Trigger Period) and/or the Class C Limited Partner (in the case of a Class C NAV Ratio Trigger Period); provided, further this provision should not be interpreted to limit in any way the General Partner's ability to make non-pro rata tax distributions under Section 3.9(c) and Section 3.9(f).  The Partnership has entered into one or more credit facilities with financial institutions that may limit the amount and timing of distributions to the Partners.  Thus, the Partners acknowledge that distributions from the Partnership may be limited. Any distributions made to the Class B Limited Partner or the Class C Limited Partner pursuant to Section 3.9(b) shall reduce distributions otherwise allocable to such Partners under this Section 3.9(a) until such aggregate reductions are equal to the aggregate distributions made to the Class B Partners and the Class C Partners under Section 3.9(b).

(b)    Priority Distributions.  Prior to the distribution of any amounts to Partners pursuant to Section 3.9(a), and notwithstanding any other provision in this Agreement to the contrary, the Partnership shall make the following distributions ("***Priority Distributions***") pro-rata among the Class B Limited Partner and the Class C Limited Partner in accordance with their relative Percentage Interests:

(i)    No later than March 31st of each calendar year, commencing March 31, 2017, an amount equal to $1,600,000.00;

(ii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to three percent (3%) of the Partnership's investment gain for the prior year, as reflected in the Partnership's books and records within ledger account number 90100 plus three percent (3%) of the gross realized investment gains for the prior year of Highland Select Equity Fund, as reflected in its books and records;

12

D-CNL002984

(iii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to ten percent (10%) of the Partnership's Operating Cash Flow for the prior year; and

(iv)    No later than December 24th of each year, commencing December 24, 2016, an amount equal to the aggregate annual principal and interest payments on the Purchase Notes for the then current year.

(c)    Tax Distributions.  The General Partner may, in its sole discretion, declare and make cash distributions pursuant hereto to the Partners to allow the federal and state income tax attributable to the Partnership's taxable income that is passed through the Partnership to the Partners to be paid by such Partners (a "**Tax Distribution**").  The General Partner may, in its discretion, make Tax Distributions to the Founding Partner Group without also making Tax Distributions to other Partners; provided, however, that if the General Partner makes Tax Distributions to the Founding Partner Group, Tax Distributions must also be made the Class B Limited Partner to the extent the Class B Limited Partner provides the Partnership with documentation showing it is subject to an entity-level federal income tax obligation.  Notwithstanding anything else in this Agreement, the General Partner may declare and pay Tax Distributions even if such Tax Distributions cause the Partnership to be unable to make Priority Distributions under Section 3.9(b).

(d)    Payments Not Deemed Distributions.    Any amounts paid pursuant to Sections 4.1(e) or 4.1(h) shall not be deemed to be distributions for purposes of this Agreement.

(e)    Withheld Amounts.  Notwithstanding any other provision of this Section 3.9 to the contrary, each Partner hereby authorizes the Partnership to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership with respect to that Partner as a result of that Partner's participation in the Partnership.  If and to the extent that the Partnership shall be required to withhold or pay any such taxes, that Partner shall be deemed for all purposes of this Agreement to have received a payment from the Partnership as of the time that withholding or tax is paid, which payment shall be deemed to be a distribution with respect to that Partner's Partnership Interest to the extent that the Partner (or any successor to that Partner's Partnership Interest) is then entitled to receive a distribution. To the extent that the aggregate of such payments to a Partner for any period exceeds the distributions to which that Partner is entitled for that period, the amount of such excess shall be considered a loan from the Partnership to that Partner.  Such loan shall bear interest (which interest shall be treated as an item of income to the Partnership) at the "Applicable Federal Rate" (as defined in the Code), as determined hereunder from time to time, until discharged by that Partner by repayment, which may be made in the sole and unfettered discretion of the General Partner out of distributions to which that Partner would otherwise be subsequently entitled.  Any withholdings authorized by this Section 3.9(d) shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel or other evidence satisfactory to the General Partner to the effect that a lower rate is applicable, or that no withholding is applicable.

(f)    Special Tax Distributions.  The Partnership shall, upon request of such Founding Partner, make distributions to the Founding Partners (or loans, at the election of the General Partner) in an amount necessary for each of them to pay their respective federal income tax obligations incurred through the effective date of the Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., the predecessor to this Agreement.

(g)    Tolling of Priority Distributions.  In the event of a "Honis Trigger Event," as defined in the Second Amended Buy-Sell and Redemption Agreement, the Partnership shall not make any distributions, including priority distributions under Section 3.9(b), to the Class B Limited Partner or the Class C Limited Partner until such time as a replacement trust administrator, manager and general partner,

D-CNL002985

**Appx. 00073**

as applicable, acceptable to the Partnership in its sole discretion, as indicated by an affirmative vote of consent by a Majority Interest, shall be appointed to the Class B Limited Partner/Class C Limited Partner and any of its direct or indirect owners that have governing documents directly affected by a Honis Trigger Event.

    **3.10.**    **Compensation and Reimbursement of General Partner**.

        (a)    <u>Compensation</u>.  The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements unless approved by a Majority Interest; provided, however, that no compensation above five million dollars per year may be approved, even by a Majority Interest, during a NAV Ratio Trigger Period.

        (b)    <u>Reimbursement for Expenses</u>.  In addition to amounts paid under other Sections of this Agreement, the General Partner and its Affiliates shall be reimbursed for all expenses, disbursements, and advances incurred or made, and all fees, deposits, and other sums paid in connection with the organization and operation of the Partnership, the qualification of the Partnership to do business, and all related matters.

    **3.11.**    **Books, Records, Accounting, and Reports**.

        (a)    <u>Records and Accounting</u>.  The General Partner shall keep or cause to be kept appropriate books and records with respect to the Partnership's business, which shall at all times be kept at the principal office of the Partnership or such other office as the General Partner may designate for such purpose.  The books of the Partnership shall be maintained for financial reporting purposes on the accrual basis or on a cash basis, as the General Partner shall determine in its sole and unfettered discretion, in accordance with generally accepted accounting principles and applicable law. Upon reasonable request, the Class B Limited Partner or the Class C Limited Partner may inspect the books and records of the Partnership.

        (b)    <u>Fiscal Year</u>.  The fiscal year of the Partnership shall be the calendar year unless otherwise determined by the General Partner in its sole and unfettered discretion.

        (c)    <u>Other Information</u>.  The General Partner may release information concerning the operations of the Partnership to any financial institution or other Person that has loaned or may loan funds to the Partnership or the General Partner or any of its Affiliates, and may release such information to any other Person for reasons reasonably related to the business and operations of the Partnership or as required by law or regulation of any regulatory body.

        (d)    <u>Distribution Reporting to Class B Limited Partner and Class C Limited Partner</u>. Upon request, the Partnership shall provide the Class B Limited Partner and/or the Class C Limited Partner information on any non-pro rata distributions made under <u>Section 3.9</u> to Partners other than the Partner requesting the information.

    **3.12.**    **Tax Matters**.

        (a)    <u>Tax Returns</u>.  The General Partner shall arrange for the preparation and timely filing of all returns of Partnership income, gain, loss, deduction, credit and other items necessary for federal, state and local income tax purposes.  The General Partner shall deliver to each Partner as copy of his/her/its IRS Form K-1 as soon as practicable after the end of the Fiscal Year, but in no event later than October 1.  The classification, realization, and recognition of income, gain, loss, deduction, credit and

<div align="center">14</div>

other items shall be on the cash or accrual method of accounting for federal income tax purposes, as the General Partner shall determine in its sole and unfettered discretion.  The General Partner in its sole and unfettered discretion may pay state and local income taxes attributable to operations of the Partnership and treat such taxes as an expense of the Partnership.

(b)    Tax Elections.  Except as otherwise provided herein, the General Partner shall, in its sole and unfettered discretion, determine whether to make any available tax election.

(c)    Tax Controversies.  Subject to the provisions hereof, the General Partner is designated the Tax Matters Partner (as defined in Code Section 6231), and is authorized and required to represent the Partnership, at the Partnership's expense, in connection with all examinations of the Partnership's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith.  Each Partner agrees to cooperate with the General Partner in connection with such proceedings.

(d)    Taxation as a Partnership.  No election shall be made by the Partnership or any Partner for the Partnership to be excluded from the application of any of the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code or from any similar provisions of any state tax laws.

## ARTICLE 4

## RIGHTS AND OBLIGATIONS OF PARTNERS

**4.1.    Rights and Obligations of the General Partner.**  In addition to the rights and obligations set forth elsewhere in this Agreement, the General Partner shall have the following rights and obligations:

(a)    Management.  The General Partner shall conduct, direct, and exercise full control of over all activities of the Partnership.  Except as otherwise expressly provided in this Agreement, all management powers over the business and affairs of the Partnership shall be exclusively vested in the General Partner, and Limited Partners shall have no right of control over the business and affairs of the Partnership.  In addition to the powers now or hereafter granted to a general partner of a limited partnership under applicable law or that are granted to the General Partner under any provision of this Agreement, the General Partner shall have full power and authority to do all things deemed necessary or desirable by it to conduct the business of the Partnership, including, without limitation: (i) the determination of the activities in which the Partnership will participate; (ii) the performance of any and all acts necessary or appropriate to the operation of any business of the Partnership (including, without limitation, purchasing and selling any asset, any debt instruments, any equity interests, any commercial paper, any note receivables and any other obligations); (iii) the procuring and maintaining of such insurance as may be available in such amounts and covering such risks as are deemed appropriate by the General Partner; (iv) the acquisition, disposition, sale, mortgage, pledge, encumbrance, hyphothecation, of exchange of any or all of the assets of the Partnership; (v) the execution and delivery on behalf of, and in the name of the Partnership, deeds, deeds of trust, notes, leases, subleases, mortgages, bills of sale and any and all other contracts or instruments necessary or incidental to the conduct of the Partnership's business; (vi) the making of any expenditures, the borrowing of money, the guaranteeing of indebtedness and other liabilities, the issuance of evidences of indebtedness, and the incurrence of any obligations it deems necessary or advisable for the conduct of the activities of the Partnership, including, without limitation, the payment of compensation and reimbursement to the General Partner and its Affiliates pursuant to Section 3.10; (vii) the use of the assets of the Partnership (including, without limitation, cash on hand) for any Partnership purpose on any terms it sees fit, including, without limitation, the financing of operations of the Partnership, the lending of funds to other Persons, and the repayment of obligations

15

of the Partnership; (viii) the negotiation, execution, and performance of any contracts that it considers desirable, useful, or necessary to the conduct of the business or operations of the Partnership or the implementation of the General Partner's powers under this Agreement; (ix) the distribution of Partnership cash or other assets; (x) the selection, hiring and dismissal of employees, attorneys, accountants, consultants, contractors, agents and representatives and the determination of their compensation and other teens of employment or hiring; (xi) the formation of any further limited or general partnerships, joint ventures, or other relationships that it deems desirable and the contribution to such partnerships, ventures, or relationships of assets and properties of the Partnership; and (xii) the control of any matters affecting the rights and obligations of the Partnership, including, without limitation, the conduct of any litigation, the incurring of legal expenses, and the settlement of claims and suits.

(b)    Certificate of Limited Partnership.    The General Partner caused the Certificate of Limited Partnership of the Partnership to be filed with the Secretary of State of Delaware as required by the Delaware Act and shall cause to be filed such other certificates or documents (including, without limitation, copies, amendments, or restatements of this Agreement) as may be determined by the General Partner to be reasonable and necessary or appropriate for the formation, qualification, or registration and operation of a limited partnership (or a partnership in which Limited Partners have limited liability) in the State of Delaware and in any other state where the Partnership may elect to do business.

(c)    Reliance by Third Parties.    Notwithstanding any other provision of this Agreement to the contrary, no lender or purchaser or other Person, including any purchaser of property from the Partnership or any other Person dealing with the Partnership, shall be required to verify any representation by the General Partner as to its authority to encumber, sell, or otherwise use any assess or properties of the Partnership, and any such lender, purchaser, or other Person shall be entitled to rely exclusively on such representations and shall be entitled to deal with the General Partner as if it were the sole party in interest therein, both legally and beneficially. Each Limited Partner hereby waives any and all defenses or other remedies that may be available against any such lender, purchaser, or other Person to contest, negate, or disaffirm any action of the General Partner in connection with any such sale or financing. In no event shall any Person dealing with the General Partner or the General Partner's representative with respect to any business or property of the Partnership be obligated to ascertain that the terms of this Agreement have been complied with, and each such Person shall be entitled to rely on the assumptions that the Partnership has been duly formed and is validly in existence. In no event shall any such Person be obligated to inquire into the necessity or expedience of any act or action of the General Partner or the General Partner's representative, and every contract, agreement, deed, mortgage, security agreement, promissory note, or other instrument or document executed by the General Partner or the General Partner's representative with respect to any business or property of the Partnership shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (i), at the time of the execution and delivery thereof, this Agreement was in full force and effect; (ii) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Partnership; and (iii) the General Partner or the General Partner's representative was duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership.

(d)    Partnership Funds.    The funds of the Partnership shall be deposited in such account or accounts as are designated by the General Partner. The General Partner may, in its sole and unfettered discretion, deposit funds of the Partnership in a central disbursing account maintained by or in the name of the General Partner, the Partnership, or any other Person into which funds of the General Partner, the Partnership, on other Persons are also deposited; *provided, however,* at all times books of account are maintained that show the amount of funds of the Partnership on deposit in such account and interest accrued with respect to such funds as credited to the Partnership. The General Partner may use the funds of the Partnership as compensating balances for its benefit; *provided, however,* such funds do

D-CNL002988

**Appx. 00076**

not directly or indirectly secure, and are not otherwise at risk on account of, any indebtedness or other obligation of the General Partner or any director, officer, employee, agent, representative, or Affiliate thereof. Nothing in this Section 4.1(d) shall be deemed to prohibit or limit in any manner the right of the Partnership to lend funds to the General Partner or any Affiliate thereof pursuant to Section 4.1(e)(i). All withdrawals from or charges against such accounts shall be made by the General Partner or by its representatives. Funds of the Partnership may be invested as determined by the General Partner in accordance with the terms and provisions of this Agreement.

(e)     Loans to or from General Partner; Contracts with Affiliates; Joint Ventures.

(i)      The General Partner or any Affiliate of the General Partner may lend to the Partnership funds needed by the Partnership for such periods of time as the General Partner may determine; provided, however, the General Partner or its Affiliate may not charge the Partnership interest at a rate greater than the rate (including points or other financing charges or fees) that would be charged the Partnership (without reference to the General Partner's financial abilities or guaranties) by unrelated lenders on comparable loans. The Partnership shall reimburse the General Partner or its Affiliate, as the case may be, for any costs incurred by the General Partner or that Affiliate in connection with the borrowing of funds obtained by the General Partner or that Affiliate and loaned to the Partnership. The Partnership may loan funds to the General Partner and any member of the Founding Partner Group at the General Partner's sole and exclusive discretion.

(ii)     The General Partner or any of its Affiliates may enter into an agreement with the Partnership to render services, including management services, for the Partnership. Any service rendered for the Partnership by the General Partner or any Affiliate thereof shall be on terms that are fair and reasonable to the Partnership.

(iii)    The Partnership may Transfer any assets to joint ventures or other partnerships in which it is or thereby becomes a participant upon terms and subject to such conditions consistent with applicable law as the General Partner deems appropriate; provided, however, that the Partnership may not transfer any asset to the General Partner or one of its Affiliates during any NAV Ratio Trigger Period for consideration less than such asset's fair market value.

(f)     Outside Activities' Conflicts of Interest. The General Partner or any Affiliate thereof and any director, officer, employee, agent, or representative of the General Partner or any Affiliate thereof shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Partnership, including, without limitation, business interests and activities in direct competition with the Partnership. Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement or the partnership relationship created hereby in any business ventures of the General Partner, any Affiliate thereof, or any director, officer, employee, agent, or representative of either the General Partner or any Affiliate thereof.

(g)     Resolution of Conflicts of Interest. Unless otherwise expressly provided in this Agreement or any other agreement contemplated herein, whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Limited Partner, on the other hand, any action taken by the General Partner, in the absence of bad faith by the General Partner, shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein or under the Delaware Act or any other applicable law, rule, or regulation.

(h)     Indemnification. The Partnership shall indemnify and hold harmless the General Partner and any director, officer, employee, agent, or representative of the General Partner (collectively,

17

the "*GP Party*"*),* against all liabilities, losses, and damages incurred by any of them by reason of any act performed or omitted to be performed in the name of or on behalf of the Partnership, or in connection with the Partnership's business, including, without limitation, attorneys' fees and any amounts expended in the settlement of any claims or liabilities, losses, or damages, to the fullest extent permitted by the Delaware Act; *provided, however,* the Partnership shall have no obligation to indemnify and hold harmless a GP Party for any action or inaction that constitutes gross negligence or willful or wanton misconduct. The Partnership, in the sole and unfettered discretion of the General Partner, may indemnify and hold harmless any Limited Partner, employee, agent, or representative of the Partnership, any Person who is or was serving at the request of the Partnership acting through the General Partner as a director, officer, partner, trustee, employee, agent, or representative of another corporation, partnership, joint venture, trust, or other enterprise, and any other Person to the extent determined by the General Partner in its sole and unfettered discretion, but in no event shall such indemnification exceed the indemnification permitted by the Delaware Act. Notwithstanding anything to the contrary in this Section 4.1(h) or elsewhere in this Agreement, no amendment to the Delaware Act after the date of this Agreement shall reduce or limit in any manner the indemnification provided for or permitted by this Section 4.1(h) unless such reduction or limitation is mandated by such amendment for limited partnerships formed prior to the enactment of such amendment. In no event shall Limited Partners be subject to personal liability by reason of the indemnification provisions of this Agreement.

(i)     Liability of General Partner.

(i)     Neither the General Partner nor its directors, officers, employees, agents, or representatives shall be liable to the Partnership or any Limited Partner for errors in judgment or for any acts or omissions that do not constitute gross negligence or willful or wanton misconduct.

(ii)     The General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its directors, officers, employees, agents, or representatives, and the General Partner shall not be responsible for any misconduct or negligence on the part of any agent or representative appointed by the General Partner.

(j)     Reliance by General Partner.

(i)     The General Partner may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

(ii)     The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, and other consultants and advisers selected by it, and any opinion of any such Person as to matters which the General Partner believes to be within such Person's professional or expert competence shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by the General Partner hereunder in good faith and in accordance with such opinion.

(k)     The General Partner may, from time to time, designate one or more Persons to be officers of the Partnership. No officer need be a Partner. Any officers so designated shall have such authority and perform such duties as the General Partner may, from time to time, delegate to them. The General Partner may assign titles to particular officers, including, without limitation, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer. Each officer shall hold office until such Person's successor shall be duly designated and shall qualify or until such Person's death or

D-CNL002990
**Appx. 00078**

until such Person shall resign or shall have been removed in the manner hereinafter provided.  Any number of offices may be held by the same Person.  The salaries or other compensation, if any, of the officers and agents of the Partnership shall be fixed from time to time by the General Partner.  Any officer may be removed as such, either with or without cause, by the General Partner whenever in the General Partner's judgment the best interests of the Partnership will be served thereby.  Any vacancy occurring in any office of the Partnership may be filled by the General Partner.

　　　　4.2.　　**Rights and Obligations of Limited Partners**.  In addition to the rights and obligations of Limited Partners set forth elsewhere in this Agreement, Limited Partners shall have the following rights and obligations:

　　　　　　　　(a)　　<u>Limitation of Liability</u>.  Limited Partners shall have no liability under this Agreement except as provided herein or under the Delaware Act.

　　　　　　　　(b)　　<u>Management of Business</u>.  No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

　　　　　　　　(c)　　<u>Return of Capital</u>.  No Limited Partner shall be entitled to the withdrawal or return of its Capital Contribution except to the extent, if any, that distributions made pursuant to this Agreement or upon termination of the Partnership may be considered as such by law and then only to the extent provided for in this Agreement.

　　　　　　　　(d)　　<u>Second Amended Buy-Sell and Redemption Agreement</u>.  Each Limited Partner shall comply with the terms and conditions of the Second Amended Buy-Sell and Redemption Agreement.

　　　　　　　　(e)　　<u>Default on Priority Distributions</u>.  If the Partnership fails to timely pay Priority Distributions pursuant to Section 3.9(b), and the Partnership does not subsequently make such Priority Distribution within ninety days of its due date, the Class B Limited Partner or the Class C Limited Partner may require the Partnership to liquidate publicly traded securities held by the Partnership or Highland Select Equity Master Fund, L.P., a Delaware limited partnership controlled by the Partnership; <u>provided, however</u>, that the General Partner may in its sole discretion elect instead to liquidate other non-publicly traded securities owned by the Partnership in order to satisfy the Partnership's obligations under <u>Section 3.9(b)</u> and this <u>Section 4.2(e)</u>.  In either case, Affiliates of the General Partner shall have the right of first offer to purchase any securities liquidated under this <u>Section 4.2(e)</u>.

　　　　4.3.　　**Transfer of Partnership Interests**.

　　　　　　　　(a)　　<u>Transfer</u>.  No Partnership Interest shall be Transferred, in whole or in part, except in accordance with the terms and conditions set forth in this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement.  Any Transfer or purported Transfer of any Partnership Interest not made in accordance with this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement shall be null and void.  An alleged transferee shall have no right to require any information or account of the Partnership's transactions or to inspect the Partnership's books.  The Partnership shall be entitled to treat the alleged transferor of a Partnership Interest as the absolute owner thereof in all respects, and shall incur no liability to any alleged transferee for distributions to the Partner owning that Partnership Interest of record or for allocations of Profits, Losses, deductions or credits or for transmittal of reports and notices required to be given to holders of Partnership Interests.

D-CNL002991

**Appx. 00079**

(b)      Transfers by General Partner.  The General Partner may Transfer all, but not less than all, of its Partnership Interest to any Person only with the approval of a Majority Interest; provided, however, that the General Partner may not Transfer its Partnership Interest during any NAV Ratio Trigger Period except to the extent such Transfers are for estate planning purposes or resulting from the death of the individual owner of the General Partner.  Any Transfer by the General Partner of its Partnership Interest under this Section 4.3(b) to an Affiliate of the General Partner or any other Person shall not constitute a withdrawal of the General Partner under Section 4.5(a), Section 5.1(b), or any other provision of this Agreement.  If any such Transfer is deemed to constitute a withdrawal under such provisions or otherwise and results in the dissolution of the Partnership under this Agreement or the laws of any jurisdiction to which the Partnership of this Agreement is subject, the Partners hereby unanimously consent to the reconstitution and continuation of the Partnership immediately following such dissolution, pursuant to Section 5.2.

(c)      Transfers by Limited Partners.  The Partnership Interest of a Limited Partner may not be Transferred without the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), and in accordance with the Second Amended Buy-Sell and Redemption Agreement.

(d)      Distributions and Allocations in Respect of Transferred Partnership Interests.  If any Partnership Interest is Transferred during any Fiscal Year in compliance with the provisions of Article 4 and the Second Amended Buy-Sell and Redemption Agreement, Profits, Losses, and all other items attributable to the transferred interest for that period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner; provided that no allocations shall be made under this Section 4.3(d) that would affect any special allocations made under Section 3.4.  All distributions declared on or before the date of that Transfer shall be made to the transferor.  Solely for purposes of making such allocations and distributions, the Partnership shall recognize that Transfer not later than the end of the calendar month during which it is given notice of that Transfer; *provided, however,* if the Partnership does not receive a notice stating the date that Partnership Interest was Transferred and such other information as the General Partner may reasonably require within thirty (30) days after the end of the Fiscal Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the person who, according to the books and records of the Partnership, on the last day of the Fiscal Year during which the Transfer occurs, was the owner of the Partnership Interest.  Neither the Partnership nor any Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 4.3(d), whether or not any Partner or the Partnership has knowledge of any Transfer of ownership of any Partnership Interest.

(e)      Forfeiture of Partnership Interests Pursuant to the Contribution Note.  In the event any Class B Limited Partnership Interests are forfeited in favor of the Partnership as a result of any default on the Contribution Note, the Capital Accounts and Percentage Interests associated with such Class B Limited Partnership Interests shall be allocated pro rata among the Class A Partners.  The Priority Distributions in Section 3.9(b) made after the date of such forfeiture shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the Class B Limited Partnership Interest transferred pursuant to this Section 4.3(e) over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any forfeiture of such Class B Limited Partnership Interest.

(f)      Transfers of Partnership Interests Pursuant to the Purchase Notes.  Notwithstanding any other provision in this Agreement, the Partnership shall respect, and the General Partner hereby provides automatic consent for, any transfers (in whole or transfers of partial interests) of

20

the Class C Limited Partnership Interests, or a portion thereof, if such transfer occurs as a result of a default on the Purchase Notes.  Upon the transfer of any Class C Limited Partnership Interest to any member of the Founding Partner Group (or their assigns), such Class C Limited Partnership Interest shall automatically convert to a Class A Partnership Interest.  The Priority Distributions in Section 3.9(b) shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the transferred Class C Limited Partnership Interest over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any transfer of such Class C Limited Partnership Interest.

### 4.4.    Issuances of Partnership Interests to New and Existing Partners.

(a)    Issuance of Partnership Interests to New Limited Partners.  The General Partner may admit one or more additional Persons as Limited Partners ("Additional Limited Partners") to the Partnership at such times and upon such terms as it deems appropriate in its sole and unfettered discretion; provided, however, that the General Partner may only admit additional Persons as Limited Partners in relation to the issuance of equity incentives to key employees of the Partnership; provided, further that the General Partner may not issue such equity incentives to the extent they entitle the holders, in the aggregate, to a Percentage Interest in excess of twenty percent without the consent of the Class B Limited Partner and the Class C Limited Partner.  All Class A Limited Partners, the Class B Limited Partner and the Class C Limited Partner shall be diluted proportionately by the issuance of such limited partnership interests.  No Person may be admitted to the Partnership as a Limited Partner until he/she/it executes an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.

(b)    Issuance of an Additional Partnership Interest to an Existing Partner.  The General Partner may issue an additional Partnership Interest to any existing Partner at such times and upon such terms as it deems appropriate in its sole and unfettered discretion.  Upon the issuance of an additional Partnership Interest to an existing Partner, the Percentage Interests of the members of the Founding Partner Group shall be diluted proportionately.  Any additional Partnership Interest shall be subject to all the terms and conditions of this Agreement and the Second Amended Buy-Sell and Redemption Agreement.

### 4.5.    Withdrawal of General Partner

(a)    Option.  In the event of the withdrawal of the General Partner from the Partnership, the departing General Partner (the "***Departing Partner***") shall, at the option of its successor (if any) exercisable prior to the effective date of the departure of that Departing Partner, promptly receive from its successor in exchange for its Partnership Interest as the General Partner, an amount in cash equal to its Capital Account balance, determined as of the effective date of its departure.

(b)    Conversion.  If the successor to a Departing Partner does not exercise the option described in Section 4.5(a), the Partnership Interest of the Departing Partner as the General Partner of the Partnership shall be converted into a Partnership Interest as a Limited Partner.

### 4.6.    Admission of Substitute Limited Partners and Successor General Partner.

(a)    Admission of Substitute Limited Partners.  A transferee (which may be the heir or legatee of a Limited Partner) or assignee of a Limited Partner's Partnership Interest shall be entitled to receive only the distributive share of the Partnership's Profits, Losses, deductions, and credits attributable to that Partnership Interest.  To become a substitute Limited Partner (a "***Substitute Limited Partner***"),

D-CNL002993

that transferee or assignee shall (1) obtain the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), (ii) comply with all the requirements of this Agreement and the Second Amended Buy-Sell and Redemption Agreement with respect to the Transfer of the Partnership Interest at issue, and (iii) execute an Addendum to this Agreement in the form attached as <u>Exhibit B</u> (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement. Upon admission of a Substitute Limited Partner, that Limited Partner shall be subject to all of the restrictions applicable to, shall assume all of the obligations of, and shall attain the status of a Limited Partner under and pursuant to this Agreement with respect to the Partnership Interest held by that Limited Partner.

(b)    <u>Admission of Successor General Partner</u>.  A successor General Partner selected pursuant to <u>Section 5.2</u> or the transferee of or successor to all of the Partnership Interest of the General Partner pursuant to <u>Section 4.3(b)</u> shall be admitted to the Partnership as the General Partner, effective as of the date of the withdrawal or removal of the predecessor General Partner or the date of Transfer of that predecessor's Partnership Interest.

(c)    <u>Action by General Partner</u>.  In connection with the admission of any substitute Limited Partner or successor General Partner or any additional Limited Partner, the General Partner shall have the authority to take all such actions as it deems necessary or advisable in connection therewith, including the amendment of <u>Exhibit A</u> and the execution and filing with appropriate authorities of any necessary documentation.

## ARTICLE 5

## DISSOLUTION AND WINDING UP

**5.1.    Dissolution.**  The Partnership shall be dissolved upon:

(a)    The withdrawal, bankruptcy, or dissolution of the General Partner, or any other event that results in its ceasing to be the General Partner (other than by reason of a Transfer pursuant to <u>Section 4.3(b)</u>);

(b)    An election to dissolve the Partnership by the General Partner that is approved by the affirmative vote of a Majority Interest; *provided, however,* the General Partner may dissolve the Partnership without the approval of the Limited Partners in order to comply with Section 14 of the Second Amended Buy-Sell and Redemption Agreement; or

(c)    Any other event that, under the Delaware Act, would cause its dissolution.

For purposes of this <u>Section 5.1</u>, the bankruptcy of the General Partner shall be deemed to have occurred when the General Partner: (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding:  (iv) files a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the General Partner in a proceeding of the type described in clauses (i) through (iv) of this paragraph; (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties; or (vii) one hundred twenty (120) days expire after the date of the commencement of a proceeding against the General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or

22

D-CNL002994

similar relief under any law if the proceeding has not been previously dismissed, or ninety (90) days expire after the date of the appointment, without the General Partner's consent or acquiescence, of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties if the appointment has not previously been vacated or stayed, or ninety (90) days expire after the date of expiration of a stay, if the appointment has not previously been vacated.

**5.2.    Continuation of the Partnership**.  Upon the occurrence of an event described in Section 5.1(a), the Partnership shall be deemed to be dissolved and reconstituted if a Majority Interest elect to continue the Partnership within ninety (90) days of that event.  If no election to continue the Partnership is made within ninety (90) days of that event, the Partnership shall conduct only activities necessary to wind up its affairs.  If an election to continue the Partnership is made upon the occurrence of an event described in Section 5.1(a), then:

(a)    Within that ninety (90)-day period a successor General Partner shall be selected by a Majority Interest;

(b)    The Partnership shall be deemed to be reconstituted and shall continue until the end of the term for which it is formed unless earlier dissolved in accordance with this Article 5;

(c)    The interest of the former General Partner shall be converted to an interest as a Limited Partner; and

(d)    All necessary steps shall be taken to amend or restate this Agreement and the Certificate of Limited Partnership, and the successor General Partner may for this purpose amend this Agreement and the Certificate of Limited Partnership, as appropriate, without the consent of any Partner.

**5.3.    Liquidation**.  Upon dissolution of the Partnership, unless the Partnership is continued under Section 5.2, the General Partner or, in the event the General Partner has been dissolved, becomes bankrupt (as defined in Section 5.1), or withdraws from the Partnership, a liquidator or liquidating committee selected by a Majority Interest, shall be the Liquidator.  The Liquidator (if other than the General Partner) shall be entitled to receive such compensation for its services as may be approved by a Majority Interest.  The Liquidator shall agree not to resign at any time without fifteen (15) days' prior written notice and (if other than the General Partner) may be removed at any time, with or without cause, by notice of removal approved by a Majority Interest.  Upon dissolution, removal, or resignation of the Liquidator, a successor and substitute Liquidator (who shall have and succeed to all rights, powers, and duties of the original Liquidator) shall within thirty (30) days thereafter be selected by a Majority Interest. The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the Liquidator shall be deemed to refer also to any such successor or substitute Liquidator appointed in the manner provided herein.  Except as expressly provided in this Article 5, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the parties hereto, all of the powers conferred upon the General Partner under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Partnership as provided herein.  The Liquidator shall liquidate the assets of the Partnership and apply and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

D-CNL002995

**Appx. 00083**

(a)     To the payment of the expenses of the terminating transactions including, without limitation, brokerage commission, legal fees, accounting fees and closing costs;

(b)     To the payment of creditors of the Partnership, including Partners, in order of priority provided by law;

(c)     To the Partners and assignees to the extent of, and in proportion to, the positive balances in their respective Capital Accounts as provided in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2); *provided, however,* the Liquidator may place in escrow a reserve of cash or other assets of the Partnership for contingent liabilities in an amount determined by the Liquidator to be appropriate for such purposes; and

(d)     To the Partners in proportion to their respective Percentage Interests.

**5.4.     Distribution in Kind.**  Notwithstanding the provisions of <u>Section 5.3</u> that require the liquidation of the assets of the Partnership, but subject to the order of priorities set forth therein, if on dissolution of the Partnership the Liquidator determines that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners and assignees, the Liquidator may defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Partnership (other than those to Partners) and/or may distribute to the Partners and assignees, in lieu of cash, as tenants in common and in accordance with the provisions of <u>Section 5.3</u>, undivided interests in such Partnership assets as the Liquidator deems not suitable for liquidation.  Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any joint operating agreements or other agreements governing the operation of such properties at such time.  The Liquidator shall determine the fair market value of any property distributed in kind using such reasonable method of valuation as it may adopt.

**5.5.     Cancellation of Certificate of Limited Partnership.**  Upon the completion of the distribution of Partnership property as provided in <u>Sections 5.3</u> and <u>5.4</u>, the Partnership shall be terminated, and the Liquidator (or the General Partner and Limited Partners if necessary) shall cause the cancellation of the Certificate of Limited Partnership in the State of Delaware and of all qualifications and registrations of the Partnership as a foreign limited partnership in jurisdictions other **than** the State of Delaware and shall take such other actions as may be necessary to terminate the Partnership.

**5.6.     Return of Capital.**  The General Partner shall not be personally liable for the return of the Capital Contributions of Limited Partners, or any portion thereof, it being expressly understood that any such return shall be **made** solely from Partnership assets.

**5.7.     Waiver of Partition.**  Each Partner hereby waives any rights to partition of the Partnership property.

<div align="center">

**ARTICLE 6**

**GENERAL PROVISIONS**

</div>

**6.1.     Amendments to Agreement.**  The General Partner may amend this Agreement without the consent of any Partner if the General Partner reasonably determines that such amendment is necessary and appropriate; *provided, however, any* action taken by the General Partner shall be subject to its fiduciary duties to the Limited Partners under the Delaware Act; provided further that any amendments

<div align="center">24</div>

that adversely affect the Class B Limited Partner or the Class C Limited Partner may only be made with the consent of such Partner adversely affected.

**6.2.    Addresses and Notices.**  Any notice, demand, request, or report required or permitted to be given or made to a Partner under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by United States registered or certified mail to the Partner at his/her/its address as shown on the records of the Partnership, regardless of any claim of any Person who may have an interest in any Partnership Interest by reason of an assignment or otherwise.

**6.3.    Titles and Captions.**  All article and section titles and captions in the Agreement are for convenience only, shall not be deemed part of this Agreement, and in no way shall define, limit, extend, or describe the scope or intent of any provisions hereof.  Except as specifically provided otherwise, references to "Articles," "Sections" and "Exhibits" are to "Articles," "Sections" and "Exhibits" of this Agreement.  All Exhibits hereto are incorporated herein by reference.

**6.4.    Pronouns and Plurals.**  Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns, and verbs shall include the plural and vice versa.

**6.5.    Further Action.**  The parties shall execute all documents, provide all information, and take or refrain from taking all actions as may be necessary or appropriate to achieve the purposes of this Agreement.

**6.6.    Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns.

**6.7.    Integration.**  This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

**6.8.    Creditors.**  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership.

**6.9.    Waiver.**  No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement, or condition.

**6.10.    Counterparts.**  This agreement may be executed in counterparts, all of which together shall constitute one agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

**6.11.    Applicable Law.**  This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to the principles of conflicts of law.

**6.12.    Invalidity of Provisions.**  If any provision of this Agreement is declared or found to be illegal, unenforceable, or void, in whole or in part, then the parties shall be relieved of all obligations arising under that provision, but only to the extent that it is illegal, unenforceable, or void, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying that provision to the extent necessary to make it legal and enforceable while preserving its intent or, if that is

25

D-CNL002997

Appx. 00085

not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives.

**6.13.    General Partner Discretion.**  Whenever the General Partner may use its sole discretion, the General Partner may consider any items it deems relevant, including its own interest and that of its affiliates.

**6.14.    Mandatory Arbitration.**   In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief.  The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service.  A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas.  The discovery process shall be limited to the following:  Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.  The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law.  In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules.  All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site.  Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees.  The duty to arbitrate described above shall survive the termination of this Agreement.  Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury.  All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

D-CNL002998

**Appx. 00086**

*Remainder of Page intentionally Left Blank.*
*Signature Page Follows.*

D-CNL002999
**Appx. 00087**

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
James D. Dondero,
President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated
Agreement of Limited Partnership*

D-CNL003000
**Appx. 00088**

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
　　　James D. Dondero,
　　　President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:　　Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:　　Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:　　Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated
Agreement of Limited Partnership*

**HUNTER MOUNTAIN INVESTMENT TRUST**
By: Beacon Mountain LLC, Administrator

By: _____
Name: John Honis
Its:     President

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

D-CNL003002

**Appx. 00090**

## EXHIBIT A

|  | Percentage Interest | |
| --- | --- | --- |
| **CLASS A PARTNERS** | **By Class** | **Effective %** |
| GENERAL PARTNER: | | |
| Strand Advisors | 0.5573% | 0.2508% |
| LIMITED PARTNERS: | | |
| The Dugaboy Investment Trust | 74.4426% | 0.1866% |
| Mark K. Okada | 19.4268% | 0.0487% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #1 | 3.9013% | 0.0098% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #2 | 1.6720% | 0.0042% |
| Total Class A Percentage Interest | 100.0000% | 0.500% |
| **CLASS B LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 55.0000% |
| **CLASS C LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 44.500% |
| **PROFIT AND LOSS AMONG CLASSES** | | |
| Class A Partners | 0.5000% | |
| Class B Partners | 55.0000% | |
| Class C Partners | 44.5000% | |

**EXHIBIT B**

**ADDENDUM
TO THE
FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP
OF
HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS ADDENDUM (this "**Addendum**") to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, to be effective as of December 24, 2015, as amended from time to time (the "Agreement"), is made and entered into as of the ____ day of _____, 20_, by and between Strand Advisors, Inc., as the sole General Partner (the "**General Partner**") of Highland Capital Management, L.P. (the "**Partnership**") and _____ ("_____") (except as otherwise provided herein, all capitalized terms used herein shall have the meanings set forth in the Agreement).

RECITALS:

WHEREAS, the General Partner, in its sole and unfettered discretion, and without the consent of any Limited Partner, has the authority under (i) Section 4.4 of the Agreement to admit Additional Limited Partners, (ii) Section 4.6 of the Agreement to admit Substitute Limited Partners and (iii) Section 6.1 of the Agreement to amend the Agreement;

WHEREAS, the General Partner desires to admit _____ as a Class __ Limited Partner holding a __% Percentage Interest in the Partnership as of the date hereof;

WHEREAS, _____desires to become a Class __ Limited Partner and be bound by the terms and conditions of the Agreement; and

WHEREAS, the General Partner desires to amend the Agreement to add _____ as a party thereto.

AGREEMENT:

RESOLVED, as a condition to receiving a Partnership Interest in the Partnership, _____ acknowledges and agrees that he/she/it (i) has received and read a copy of the Agreement, (ii) shall be bound by the terms and conditions of the Agreement; and (iii) shall promptly execute an addendum to the Second Amended Buy-Sell and Redemption Agreement; and be it

FURTHER RESOLVED, the General Partner hereby amends the Agreement to add _____ as a Limited Partner, and the General Partner shall attach this Addendum to the Agreement and make it a part thereof; and be it

FURTHER RESOLVED, this Addendum may be executed in any number of counterparts, all of which together shall constitute one Addendum binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the day and year above written.

GENERAL PARTNER:

**STRAND ADVISORS, INC.**

By: _____
       Name: _____
       Title: _____

NEW LIMITED PARTNER:

[_____]

AGREED AND ACCEPTED:

In consideration of the terms of this Addendum and the Agreement, in consideration of the Partnership's allowing the above signed Person to become a Limited Partner of the Partnership, and for other good and valuable consideration receipt of which is hereby acknowledged, the undersigned shall be bound by the terms and conditions of the Agreement as though a party thereto.

SPOUSE OF NEW LIMITED PARTNER:

[_____]

D-CNL003005

**Appx. 00093**

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Highland Capital Management, L.P. | DEFENDANTS<br>NexPoint Advisors, L.P., James Dondero, Nancy Dondero, and The Dugaboy Investment Trust |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Hayward PLLC<br>10501 N. Central Expressway, Suite 106<br>Dallas, Texas 75231  Tel.: (972) 755-7100 | ATTORNEYS (If Known)<br>Munsch Hardt Kopf & Harr, P.C. (for NexPoint); Stinson LLP (for Nancy Dondero); Heller, Draper, & Horn, L.L.C. (for The Dugaboy Investment Trust) |
| PARTY (Check One Box Only)<br>☑ Debtor   ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor   ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor   ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor   ☑ Other<br>☐ Trustee |

| CAUSE OF ACTION (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)<br>Breach of Contract; Turnover Pursuant to 11 USC 542(b); Avoidance and Recovery of Actual Fraudulent Transfer under 11 USC 548(a)(1)(A) and 550; Avoidance and Recovery of Actual Fraudulent Transfer under 11 USC 544(b) and 550 and Tex. Bus. & C. Code 24.005(a)(1); Declaratory Relief; Breach of Fiduciary Duty; Aiding & Abetting Breach of Fiduciary Duty |
|---|

**NATURE OF SUIT**

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

| FRBP 7001(1) – Recovery of Money/Property | FRBP 7001(6) – Dischargeability (continued) |
|---|---|
| ☑2 11-Recovery of money/property - §542 turnover of property | ☐ 61-Dischargeability - §523(a)(5), domestic support |
| ☐ 12-Recovery of money/property - §547 preference | ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury |
| ☐3 13-Recovery of money/property - §548 fraudulent transfer | ☐ 63-Dischargeability - §523(a)(8), student loan |
| ☑4 14-Recovery of money/property - other | ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation<br>(other than domestic support) |
| **FRBP 7001(2) – Validity, Priority or Extent of Lien** | ☐ 65-Dischargeability - other |
| ☐ 21-Validity, priority or extent of lien or other interest in property | |
| | **FRBP 7001(7) – Injunctive Relief** |
| **FRBP 7001(3) – Approval of Sale of Property** | ☐ 71-Injunctive relief – imposition of stay |
| ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h) | ☐ 72-Injunctive relief – other |
| **FRBP 7001(4) – Objection/Revocation of Discharge** | **FRBP 7001(8) Subordination of Claim or Interest** |
| ☐ 41-Objection / revocation of discharge - §727(c),(d),(e) | ☐ 81-Subordination of claim or interest |
| **FRBP 7001(5) – Revocation of Confirmation** | **FRBP 7001(9) Declaratory Judgment** |
| ☐ 51-Revocation of confirmation | ☐5 91-Declaratory judgment |
| **FRBP 7001(6) – Dischargeability** | **FRBP 7001(10) Determination of Removed Action** |
| ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims | ☐ 01-Determination of removed claim or cause |
| ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation,<br>actual fraud | **Other** |
| | ☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq. |
| ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny | ☑ 02-Other (e.g. other actions that would have been brought in state court<br>if unrelated to bankruptcy case) |
| **(continued next column)** | |

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ Damages in an amount to be determined at trial |

| Other Relief Sought | Turnover of amounts due under note, avoidance of transfers to defendants, declaratory relief, punitive and exemplary damages, costs, attorneys' fees |
|---|---|

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Highland Capital Management, L.P. | BANKRUPTCY CASE NO.<br>19-34054-sgj11 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Dallas | NAME OF JUDGE<br>Stacey G. C. Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>August 27, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Zachery Z. Annable | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

# EXHIBIT 3

Appx. 00096

Docket #0068  Date Filed: 8/27/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03006 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC, JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST | § | |
| | § | |
| Defendants. | | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_NY:42003.4 36027/002

1934054210827000000000013

D-CNL003083

Appx. 00097

**AMENDED COMPLAINT FOR (I) BREACH OF CONTRACT,
(II) TURNOVER OF PROPERTY, (III) FRAUDULENT TRANSFER, AND (IV)
BREACH OF FIDUCIARY DUTY**

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"), and the plaintiff (the "Plaintiff") in the above-captioned adversary proceeding (the "Adversary Proceeding"), by its undersigned counsel, as and for its amended complaint (the "Complaint") against defendants Highland Capital Management Services, Inc. ("HCMS"), James Dondero ("Mr. Dondero"), Nancy Dondero ("Ms. Dondero"), and The Dugaboy Investment Trust ("Dugaboy" and together with HCMS, Mr. Dondero, and Ms. Dondero, the "Defendants") alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

**PRELIMINARY STATEMENT**

1.      The Debtor brings this action against Defendants in connection with HCMS's defaults under (i) four demand notes, in the aggregate principal amount of $900,000, and payable upon the Debtor's demand, and (ii) one term note, in the aggregate principal amount of $20,247,628.02, and payable in the event of default, all executed by HCMS in favor of the Debtor. HCMS has failed to pay amounts due and owing under the notes and the accrued but unpaid interest thereon.

2.      In paragraph 56 of HCMS's *First Amended Answer to Plaintiff's Complaint* [Docket No. 34], HCMS contends that the Debtor orally agreed to relieve it of the obligations under the Notes (as defined below) upon fulfillment of "conditions subsequent" (the "Alleged Agreement"). HCMS further contends that the Alleged Agreement was entered into between James Dondero, acting on behalf of HCMS, and his sister, Nancy Dondero, as representative of a majority of the Class A shareholders of the Plaintiff, including Dugaboy (the "Representative"),

2

D-CNL003084

**Appx. 00098**

acting on behalf of the Debtor.  At the time Mr. Dondero entered into the Alleged Agreement on behalf of HCMS, he controlled both HCMS and the Debtor and was the lifetime beneficiary of Dugaboy.

3.    Based on its books and records, discovery to date, and other facts, the Debtor believes that the Alleged Agreement is a fiction created after the commencement of this Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due under the Notes.

4.    Nevertheless, the Debtor amends its Complaint to add certain claims and name additional parties who would be liable to the Debtor if the Alleged Agreement were determined to exist and be enforceable.  Specifically, in addition to pursuing claims against HCMS for breach of its obligations under the Notes and for turnover, the Debtor adds alternative claims (a) against HCMS for actual fraudulent transfer and aiding and abetting Dugaboy in its breach of fiduciary duty, (b) against Dugaboy for declaratory relief and for breach of fiduciary duty, and (c) against Nancy Dondero for aiding and abetting Dugaboy in the breach of his fiduciary duties.

5.    As remedies, the Debtor seeks (a) damages from HCMS in an amount equal to (i) the aggregate outstanding principal due under the Notes (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the notes), for HCMS's breach of its obligations under the Notes, (b) turnover by HCMS to the Debtor of the foregoing amounts; (c) avoidance of the Alleged Agreement and the transfers thereunder and recovery of the funds transferred from the Plaintiff to, or for the benefit of, HCMS pursuant to the Notes; (d) declaratory relief, and (e) damages arising from the Defendants' breach of fiduciary duties or aiding and abetting thereof.

DOCS_NY:42003.4 36027/002

D-CNL003085
**Appx. 00099**

**JURISDICTION AND VENUE**

6.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

8.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**THE PARTIES**

10.     The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

11.     Upon information and belief, HCMS is a company with offices located in Dallas, Texas, and is incorporated in the state of Delaware.

12.     Upon information and belief, Mr. Dondero is an individual residing in Dallas, Texas.  He is the co-founder of the Debtor and was the Debtor's President and Chief Executive Officer until his resignation on January 9, 2020.  At all relevant times, Mr. Dondero controlled HCRE; Mr. Dondero also controlled the Debtor until January 9, 2020.

13.     Upon information and belief, Dugaboy is (a) a limited partner of the Debtor, and (b) one of Mr. Dondero's family investment trusts for which is he a lifetime beneficiary.

4

D-CNL003086

**Appx. 00100**

14.    Upon information and belief, Nancy Dondero is an individual residing in the state of Florida and who is Mr. Dondero's sister, and a trustee of Dugaboy.

## CASE BACKGROUND

15.    On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

16.    On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members: (a) Redeemer Committee of Highland Crusader Fund ("Redeemer"), (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively, "Acis").

17.    On June 25, 2021, the U.S. Trustee in this Court filed that certain *Notice of Amended Unsecured Creditors' Committee* [Docket No. 2485] notifying the Court that Acis and Redeemer had resigned from the Committee.

18.    On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

19.    The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this chapter 11 case.

---

[2] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

DOCS_NY:42003.4 36027/002

D-CNL003087

Appx. 00101

## STATEMENT OF FACTS

**A.** **The HCMS Demand Notes**

20. HCMS is the maker under a series of demand notes in favor of the Debtor.

21. Specifically, on March 28, 2018, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $150,000 ("HCMS's First Demand Note"). A true and correct copy of HCMS's First Demand Note is attached hereto as **Exhibit 1**.

22. On June 25, 2018, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $200,000 ("HCMS's Second Demand Note"). A true and correct copy of HCMS's Second Demand Note is attached hereto as **Exhibit 2.**

23. On May 29, 2019, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $400,000 ("HCMS's Third Demand Note"). A true and correct copy of HCMS's Third Demand Note is attached hereto as **Exhibit 3.**

24. On June 26, 2019, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $150,000 ("HCMS's Fourth Demand Note," and collectively, with HCMS's First Demand Note, HCMS's Second Demand Note, and HCMS's Third Demand Note, the "Demand Notes"). A true and correct copy of HCMS's Fourth Demand Note is attached hereto as **Exhibit 4.**

25. Section 2 of the Demand Notes provide: "**Payment of Principal and Interest**. The accrued interest and principal of this Note shall be due and payable on demand of the Payee."

26. Section 4 of the Demand Notes provide:

**Acceleration Upon Default**. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and

6

D-CNL003088
**Appx. 00102**

the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

27. Section 6 of the Demand Notes provide:

**Attorneys' Fees**. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**B.    HCMS's Defaults Under Each Demand Note**

28. By letter dated December 3, 2020, the Debtor made demand on HCMS for payment under the Demand Notes by December 11, 2020 (the "<u>Demand Letter</u>"). A true and correct copy of the Demand Letter is attached hereto as **Exhibit 5**. The Demand Letter provided:

By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $947,519.43, which represents all accrued interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Demand Letter (emphasis in the original).

29. Despite the Debtor's demand, HCMS did not pay all or any portion of the amounts demanded by the Debtor on December 11, 2020.

30. As of December 11, 2020, there was an outstanding principal amount of $158,776.59 on HCMS's First Demand Note and accrued but unpaid interest in the amount of $3,257.32, resulting in a total outstanding amount as of that date of $162,033.91.

31. As of December 11, 2020, there was an outstanding principal balance of $212,403.37 on HCMS's Second Demand Note and accrued but unpaid interest in the amount of $2,999.54, resulting in a total outstanding amount as of that date of $215,402.81.

7

D-CNL003089
**Appx. 00103**

32.     As of December 11, 2020, there was an outstanding principal balance of $409,586.19 on HCMS's Third Demand Note and accrued but unpaid interest in the amount of $5,256.62, resulting in a total outstanding amount as of that date of $414,842.81.

33.     As of December 11, 2020, there was an outstanding principal balance of $153,564.74 on HCMS's Fourth Demand Note and accrued but unpaid interest in the amount of $1,675.16, resulting in a total outstanding amount as of that date of $155,239.90.

34.     Thus, as of December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the Demand Notes was $947,519.43.  Pursuant to Section 4 of each Demand Note, each Note is in default, and is currently due and payable.

**C.     The HCMS Term Note**

35.     HCMS is the maker under a term note in favor of the Debtor.

36.     Specifically, on May 31, 2017, HCMS executed a term note in favor of the Debtor, as payee, in the original principal amount of $20,247,628.02 (the "Term Note," and together with the Demand Notes, the "Notes").  A true and correct copy of the Term Note is attached hereto as **Exhibit 6**.

37.     Section 2 of the Term Note provides: "**Payment of Principal and Interest**.  Principal and interest under this Note shall be due and payable as follows:

> **2.1     Annual Payment Dates.**  During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this note.

> **2.2     Final Payment Date**.  The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

8

D-CNL003090

**Appx. 00104**

38.     Section 3 of the Note provides:

**Prepayment Allowed: Renegotiation Discretionary**.     Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

39.     Section 4 of the Term Note provides:

**Acceleration Upon Default**.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

40.     Section 6 of the Term Note provides:

**Attorneys' Fees**.   If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**D.     HCMS's Default Under the Term Note**

41.     HCMS failed to make the payment due under the Term Note on December 31, 2020.

42.     By letter dated January 7, 2021, the Debtor made demand on HCMS for immediate payment under the Term Note (the "Second Demand Letter").  A true and correct copy of the Second Demand Letter is attached hereto as **Exhibit 7**.  The Second Demand Letter provides:

Because of Maker's failure to pay, the Note is in default.  Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of January 8, 2021 is $6,757,248.95; however, interest continues to accrue under the Note.

9

D-CNL003091

Appx. 00105

**The Note is in default, and payment is due <u>immediately.</u>**

Second Demand Letter (emphasis in the original).

43.    As of January 8, 2021, the total outstanding principal and accrued but unpaid interest under the Term Note was $6,757,248.95.

44.    Pursuant to Section 4 of the Term Note, the Note is in default, and is currently due and payable.

**E.    <u>The Debtor Files the Original Complaint</u>**

45.    On January 22, 2021, the Debtor filed the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* [Docket No. 1] (the "<u>Original Complaint</u>").  In the Original Complaint, the Debtor brought claims for (i) breach of contract for HCMS's breach of its obligations under the Notes and (ii) turnover by HCMS for the outstanding amounts under the Notes, plus all accrued and unpaid interest until the date of payment plus the Debtor's costs of collection and reasonable attorney's fees.

**F.    <u>HCMS's Affirmative Defenses</u>**

46.    On March 13, 2021, HCMS filed *Highland Capital Management Services, Inc.'s Answer to Plaintiff's Complaint* [Docket No. 6] (the "<u>Original Answer</u>").  In its Original Answer, HCMS asserted four affirmative defenses: (i) the claims are barred in whole or in part under the doctrines of justification or repudiation, (ii) waiver, (iii) estoppel, and (iv) offset and/or setoff (the "<u>Setoff Defense</u>"). *See id.* ¶¶ 53-56.

47.    On June 11, 2021, HCMS filed its *First Amended Answer to Plaintiff's Complaint* [Docket No. 34] (the "<u>Amended Answer</u>"), that omitted the Setoff Defense but asserted two affirmative defenses: (i) the Debtor previously agreed that it would not collect on the Notes

DOCS_NY:42003.4 36027/002

D-CNL003092

**Appx. 00106**

"upon fulfillment of conditions subsequent" (*i.e.*, the Alleged Agreement) *id.* ¶ 56, and (ii) the Notes are "ambiguous," *id.* ¶ 57.

48.    According to HCMS, the Alleged Agreement was orally entered into "sometime between December of the year each note was made and February of the following year."

49.    According to HCMS, Mr. Dondero, acting on its behalf, entered into the Alleged Agreement with his sister, Nancy Dondero, acting as the Representative.

50.    Mr. Dondero controlled the Debtor at the time he entered into the Alleged Agreement on behalf of HCMS.

51.    Upon information and belief, the Debtor's books and records do not reflect the Alleged Agreement.

**G.    Dugaboy Lacked Authority to Act on Behalf of the Debtor**

52.    Under section 4.2 of the *Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (the "Limited Partnership Agreement"), and attached hereto as **Exhibit 8**, Dugaboy was not authorized to enter into the Alleged Agreement on behalf of the Partnership, or otherwise bind the Partnership (as "Partnership" is defined in the Limited Partnership Agreement).

53.    Section 4.2(b) of the Limited Partnership Agreement states:

> Management of Business.  No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

**Exhibit 8**, § 4.2(b).

54.    No provision in the Limited Partnership Agreement authorizes any of the Partnership's limited partners to bind the Partnership.

DOCS_NY:42003.4 36027/002

D-CNL003093

**Appx. 00107**

55.     Nancy Dondero also lacked authority to enter into the Alleged Agreement or to otherwise bind the Debtor.

## FIRST CLAIM FOR RELIEF

### (Against HCMS)

### (For Breach of Contract)

56.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

57.     The Notes are binding and enforceable contracts.

58.     HCMS breached each Demand Note by failing to pay all amounts due to the Debtor upon the Debtor's demand.

59.     HCMS breached the Term Note by failing to pay all amounts due to the Debtor upon HCMS's default and acceleration.

60.     Pursuant to each Note, the Debtor is entitled to damages from HCMS in an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for HCMS's breach of its obligations under each of the Demand Notes.

61.     As a direct and proximate cause of HCMS's breach of each Demand Note, the Debtor has suffered damages in the amount of at least $947,519.43, as of December 11, 2020, plus an amount equal to all accrued but unpaid interest from that date, plus the Debtor's cost of collection.

62.     As a direct and proximate cause of HCMS's breach of the Term Note, the Debtor has suffered damages in the amount of at least $6,757,248.95, as of January 8, 2021, plus

DOCS_NY:42003.4 36027/002

D-CNL003094
Appx. 00108

an amount equal to all accrued but unpaid interest from that date, plus the Debtor's cost of collection.

### SECOND CLAIM FOR RELIEF

**(Against HCMS)**

**(Turnover by HCMS Pursuant to 11 U.S.C. § 542(b))**

63.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

64.     HCMS owes the Debtor an amount equal to (i) the aggregate outstanding principal due under each of the Notes, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for HCMS's breach of its obligations under each of the Notes

65.     Each Demand Note is property of the Debtor's estate and the amounts due under each Demand Note is matured and payable upon demand.

66.     The Term Note is property of the Debtor's estate and the amounts due under the Term Note is matured and payable upon default and acceleration.

67.     The Debtor has made demand for turnover of the amounts due under each of the Notes

68.     As of the date of filing this Complaint, HCMS has not turned over to the Debtor all or any of the amounts due under each of the Notes.

69.     The Debtor is entitled to the turnover of all amounts due under each of the Notes.

13

D-CNL003095

**Appx. 00109**

### THIRD CLAIM FOR RELIEF
**(Against HCMS)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) and 550)**

70.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

71.     The Debtor made the transfers pursuant to the Alleged Agreement within two years of the Petition Date.

72.     HCMS entered into the Alleged Agreement with actual intent to hinder, delay, or defraud a present or future creditor, demonstrated by, *inter alia*:

(a) The transfers were made to, or for the benefit of, HCMS, an insider of the Debtor.

(b) Mr. Dondero entered into the Alleged Agreement on behalf of HCMS with his sister, Nancy Dondero.

(c) Mr. Dondero did not inform the Debtor's CFO or outside auditors about the Alleged Agreement.

(d) The Debtor's books and record do not reflect the Alleged Agreement.

(e) The Alleged Agreement was not subject to negotiation.

(f) The value of the consideration received by the Debtor for the transfers was not reasonably equivalent in value.

73.     The pattern of conduct, series of transactions, and general chronology of events under inquiry in connection with the debt HCMS incurred under the Notes demonstrates a scheme of fraud.

74.     Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from HCMS.

14

75.     Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfers thereunder, and (ii) recovering from HCMS an amount equal to all obligations remaining under the Notes.

### FOURTH CLAIM FOR RELIEF
### (Against HCMS)
### (Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))

76.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

77.     The Debtor made the transfers pursuant to the Alleged Agreement after, or within a reasonable time before, creditors' claims arose.

78.     Mr. Dondero entered into the Alleged Agreement on behalf of HCMS with actual intent to hinder, delay, or defraud a present or future creditor of the Debtor, demonstrated by, *inter alia*:

(g) The transfers were made to, or for the benefit of, HCMS, an insider of the Debtor.

(h) Mr. Dondero entered into the Alleged Agreement on behalf of HCMS with his sister, Nancy Dondero.

(i) Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement.

(j) Upon information and belief, the Debtor's books and record do not reflect the Alleged Agreement.

(k) The Alleged Agreement was not subject to negotiation.

(l) The value of the consideration received by the Debtor for the transfers was not reasonably equivalent in value.

15

D-CNL003097

Appx. 00111

79.     Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from HCMS.

80.     Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfers thereunder, and (ii) recovering from HCMS an amount equal to all obligations remaining under the Notes.

**FIFTH CLAIM FOR RELIEF**
**(Against Dugaboy and Ms. Dondero)**
**(For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)**

81.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

82.     A bona fide, actual, present dispute exists between the Debtor, on the one hand, and Dugaboy and Ms. Dondero on the other hand, concerning whether Dugaboy and/or Ms. Dondero, acting as the Representative, were authorized to enter into the Alleged Agreement on the Debtor's behalf.

83.     A judgment declaring the parties' respective rights and obligations will resolve their dispute.

84.     Pursuant to Bankruptcy Rule 7001, the Debtor specifically seeks declarations that:

- (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement,

16

D-CNL003098
Appx. 00112

- (b) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) was authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership,

- (c) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) otherwise had any right or authority to enter into the Alleged Agreement on behalf of the Partnership, and

- (d) the Alleged Agreement is null and void.

**SIXTH CLAIM FOR RELIEF**
**(Against Dugaboy and Ms. Dondero)**
**(Breach of Fiduciary Duty)**

85.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

86.     If Dugaboy, as a limited partner, or Ms. Dondero, as Representative, had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero would owe the Debtor a fiduciary duty.

87.     If Dugaboy or Ms. Dondero (as Representative) had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero breached their fiduciary duty of care to the Debtor by entering into and authorizing the purported Alleged Agreement on behalf of the Debtor.

88.     Accordingly, the Debtor is entitled to recover from Dugaboy and Ms. Dondero (a) actual damages that the Debtor suffered as a result of their breach of fiduciary duty, and (b) for punitive and exemplary damages.

DOCS_NY:42003.4 36027/002

D-CNL003099
**Appx. 00113**

## SEVENTH CLAIM FOR RELIEF
### (Against James Dondero and Nancy Dondero)
### (Aiding and Abetting a Breach of Fiduciary Duty)

89.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

90.     James Dondero and Nancy Dondero (together, the "Donderos") were aware that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor.

91.     The Donderos aided and abetted Dugaboy's breach of its fiduciary duties to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

92.     The Donderos aided and abetted Dugaboy's breach of its fiduciary duty to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

93.     Accordingly, the Donderos are jointly and severally liable (a) for the actual damages that the Debtor suffered as a result of aiding and abetting Dondero's breaches of fiduciary duties, and (b) for punitive and exemplary damages.

WHEREFORE, the Debtor prays for judgment as follows:

(i)     On its First Claim for Relief, damages in an amount to be determined at trial but includes (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's cost of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)     On its Second Claim for Relief, ordering turnover by HCMS to the Debtor of an amount equal to (a) the aggregate principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's cost of collection (including all court costs and reasonable attorneys' fees and expenses);

18

DOCS_NY:42003.4 36027/002

(iii)    On its Third Claim for Relief, avoidance of the Alleged Agreements and the transfers thereunder pursuant to the Alleged Agreement of funds arising from actual fraudulent transfer under section 548 of the Bankruptcy Code;

(iv)    On its Fourth Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder pursuant to the Alleged Agreement of funds arising from actual fraudulent transfer under Tex. Bus. & C. Code § 24.005(a)(1);

(v)    On its Fifth Claim for Relief, a declaration that: (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement, (b) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) was authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership, (c) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) otherwise had any right or authority to enter into the Alleged Agreement on behalf of the Partnership, and (d) the Alleged Agreement is null and void;

(vi)    On its Sixth Claim for Relief, actual damages from Dugaboy and Ms. Dondero, in an amount to be determined at trial, that Debtor suffered as a result of their breach of fiduciary duty, and for punitive and exemplary damages;

(vii)    On its Seventh Claim for Relief, actual damages from the Donderos, jointly and severally, in an amount to be determined at trial, that Debtor suffered as a result

DOCS_NY:42003.4 36027/002

D-CNL003101

Appx. 00115

of aiding and abetting Dugaboy's breaches of fiduciary duty, and for punitive and

exemplary damages; and

(iii)    Such other and further relief as this Court deems just and proper.


Dated:  As of July 13, 2021.               PACHULSKI STANG ZIEHL & JONES LLP
                                           Jeffrey N. Pomerantz (CA Bar No.143717)
                                           Ira D. Kharasch (CA Bar No. 109084)
                                           John A. Morris (NY Bar No. 2405397)
                                           Gregory V. Demo (NY Bar No. 5371992)
                                           Hayley R. Winograd (NY Bar No. 5612569)
                                           10100 Santa Monica Blvd., 13th Floor
                                           Los Angeles, CA 90067
                                           Telephone: (310) 277-6910
                                           Facsimile: (310) 201-0760
                                           E-mail:    jpomerantz@pszjlaw.com
                                                      ikharasch@pszjlaw.com
                                                      jmorris@pszjlaw.com
                                                      gdemo@pszjlaw.com
                                                      hwinograd@pszjlaw.com

                                           -and-

                                           */s/ Zachery Z. Annable*
                                           HAYWARD PLLC
                                           Melissa S. Hayward
                                           Texas Bar No. 24044908
                                           MHayward@HaywardFirm.com
                                           Zachery Z. Annable
                                           Texas Bar No. 24053075
                                           ZAnnable@HaywardFirm.com
                                           10501 N. Central Expy, Ste. 106
                                           Dallas, Texas 75231
                                           Tel: (972) 755-7100
                                           Fax: (972) 755-7110

                                           *Counsel for Highland Capital Management, L.P.*

DOCS_NY:42003.4 36027/002

D-CNL003102

Appx. 00116

# EXHIBIT 1

# PROMISSORY NOTE

$150,000.00                                                                March 28, 2018

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. (*"Maker"*) promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. (*"Payee"*), in legal and lawful tender of the United States of America, the principal sum of ONE HUNDRED AND FIFTY THOUSAND and 00/100 Dollars ($150,000.00), together with interest, on the terms set forth below (the *"Note"*). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.  <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term *"applicable federal rate"* (2.88 %) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.  <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.  <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.  <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.  <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.  <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

D-CNL003104

**Appx. 00118**

7. <u>Limitation on Agreements</u>. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8. <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC.

2

D-CNL003105

**Appx. 00119**

# EXHIBIT 2

# PROMISSORY NOTE

$200,000.00                                                                                    June 25, 2018

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO HUNDRED THOUSAND and 00/100 Dollars ($200,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    Interest Rate. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (3.05 %) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    Payment of Principal and Interest. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.    Prepayment Allowed; Renegotiation Discretionary. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7. <u>Limitation on Agreements</u>. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8. <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC.

2

# EXHIBIT 3

<div align="center">**PROMISSORY NOTE**</div>

$400,000                                                                                    May 29, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("***Maker***") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("***Payee***"), in legal and lawful tender of the United States of America, the principal sum of FOUR HUNDRED THOUSAND and 00/100 Dollars ($400,000.00), together with interest, on the terms set forth below (the "***Note***"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.     Interest Rate.    The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.     Payment of Principal and Interest.    The accrued interest and principal of this Note shall be due and payable on demand.

3.     Prepayment Allowed; Renegotiation Discretionary.    Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.     Acceleration Upon Default.    Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.     Waiver.    Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.     Attorneys' Fees.    If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
FRANK WATERHOUSE

2

D-CNL003111

**Appx. 00125**

# EXHIBIT 4

## PROMISSORY NOTE

$150,000                                         June 26, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("***Maker***") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("***Payee***"), in legal and lawful tender of the United States of America, the principal sum of ONE HUNDRED AND FIFTY THOUSAND and 00/100 Dollars ($150,000.00), together with interest, on the terms set forth below (the "***Note***"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1. <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.37%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2. <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand.

3. <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4. <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5. <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6. <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

D-CNL003113

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.    The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
FRANK WATERHOUSE

2

D-CNL003114

**Appx. 00128**

# EXHIBIT 5

D-CNL003115

**Appx. 00129**

### HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

Highland Capital Management Services, Inc.
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: Frank Waterhouse, CFO

   Re: Demand on Promissory Notes:

Dear Mr. Waterhouse,

Highland Capital Management Services, Inc. ("Maker") entered into the following promissory notes (collectively, the "Notes") in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 3/28/18 | $150,000 | $158,776.59 | $3,257.32 | $162,033.91 |
| 6/25/18 | $200,000 | $212,403.27 | $2,999.54 | $215,402.81 |
| 5/29/19 | $400,000 | $409,586.19 | $5,256.62 | $414,842.81 |
| 6/26/19 | $150,000 | $153,564.74 | $1,675.16 | $155,239.90 |
| TOTALS | $900,000 | $934,330.79 | $13,188.64 | $947,519.43 |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee. By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $947,519.43, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved. Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full. Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

DOCS_NY:41635.1 36027/002

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo

D-CNL003117

**Appx. 00131**

**Appendix A**

ABA #:          322070381
Bank Name:      East West Bank
Account Name:   Highland Capital Management, LP
Account #:      5500014686

# EXHIBIT 6

D-CNL003119

**Appx. 00133**

## PROMISSORY NOTE

**$20,247,628.02**                                                    **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in <u>Exhibit A</u> hereto, from Highland Capital Management Services, Inc., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of TWENTY MILLION, TWO HUNDRED FORTY SEVEN THOUSAND, SIX HUNDRED TWENTY EIGHT AND 02/100 DOLLARS ($20,247,628.02), together with interest, on the terms set forth below. All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of two and seventy-five hundredths percent (2.75%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.      <u>Payment of Principal and Interest</u>. Principal and interest under this Note shall be payable as follows:

2.1      <u>Annual Payment Dates</u>.  During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

2.2      <u>Final Payment Date</u>.      The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

3.      <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No

failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.      Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.      Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.      Prior Notes.    The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.

By:_____
Name:
Title:

2

D-CNL003121

**Appx. 00135**

**EXHIBIT A**

**PRIOR NOTES**

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 5/29/15 | $500,000 | 2.30% | $523,095 |
| 10/1/15 | $350,000 | 2.58% | $315,500 |
| 10/2/15 | $310,000 | 2.58% | $323,301 |
| 10/27/15 | $200,000 | 2.58% | $208,228 |
| 10/28/15 | $200,000 | 2.58% | $208,214 |
| 10/30/15 | $100,000 | 2.58% | $104,093 |
| 11/23/15 | $100,000 | 2.57% | $103,908 |
| 11/24/15 | $250,000 | 2.57% | $259,752 |
| 2/10/16 | $2,000,000 | 2.62% | $ 83,390 |
| 2/11/16 | $250,000 | 2.62% | $258,524 |
| 4/5/16 | $6,000,000 | 2.25% | $6,155,712 |
| 5/4/16 | $2,700,000 | 2.24% | $2,764,954 |
| 7/1/16 | $30,000 | 2.18% | $30,598 |
| 8/5/16 | $525,000 | 2.18% | $534,375 |
| 8/22/16 | $250,000 | 2.18% | $254,465 |
| 9/22/16 | $185,000 | 2.18% | $187,773 |
| 12/12/16 | $7,700,000 | 2.26% | $7,781,050 |
| 3/31/17 | $150,000 | 2.78% | $150,697 |
| | **$21,800,000** | | **$20,247,628.02** |

3

# EXHIBIT 7

## HIGHLAND CAPITAL MANAGEMENT, L.P.

January 7, 2021

Highland Capital Management Services, Inc.
c/o Bonds Ellis Eppich Schafer Jones LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76012
Attention:  James Dondero

Re:  Demand on Promissory Note

Dear Mr. Dondero,

On May 31, 2017, Highland Capital Management Services, Inc. entered into that certain promissory note in the original principal amount of $20,247,628.02 (the "Note") in favor of Highland Capital Management, L.P. ("Payee").

As set forth in Section 2 of the Note, accrued interest and principal on the Note is due and payable in thirty equal annual payments with each payment due on December 31 of each calendar year.  Maker failed to make the payment due on December 31, 2020.

Because of Maker's failure to pay, the Note is in default.  Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of January 8, 2021 is $6,757,248.95; however, interest continues to accrue under the Note.

**The Note is in default, and payment is due <u>immediately.</u>**  Payments on the Note must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Note or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved.  Interest, including default interest if applicable, on the Note will continue to accrue until the Note is paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

DOCS_NY:41914.2 36027/002

cc:    Fred Caruso
        James Romey
        Jeffrey Pomerantz
        Ira Kharasch
        Gregory Demo
        D. Michael Lynn

D-CNL003125

**Appx. 00139**

**Appendix A**

| | |
|---|---|
| ABA #: | 322070381 |
| Bank Name: | East West Bank |
| Account Name: | Highland Capital Management, LP |
| Account #: | 5500014686 |

# EXHIBIT 8

D-CNL003127

**Appx. 00141**

**FOURTH AMENDED AND RESTATED**

**AGREEMENT OF LIMITED PARTNERSHIP**

**OF**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THE PARTNERSHIP INTERESTS REPRESENTED BY THIS LIMITED PARTNERSHIP AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OP 1933 OR UNDER ANY STATE SECURITIES ACTS IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS. THE SALE OR OTHER DISPOSITION OF THE PARTNERSHIP INTERESTS IS PROHIBITED UNLESS THAT SALE OR DISPOSITION IS MADE IN COMPLIANCE WITH ALL SUCH APPLICABLE ACTS. ADDITIONAL RESTRICTIONS ON TRANSFER OF THE PARTNERSHIP INTERESTS ARE SET FORTH IN THIS AGREEMENT.

**FOURTH AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

TABLE OF CONTENTS

| | | |
|---|---|---|
| ARTICLE 1 | GENERAL | 1 |
| 1.1. | Continuation | 1 |
| 1.2. | Name | 1 |
| 1.3. | Purpose | 1 |
| 1.4. | Term. | 1 |
| 1.5. | Partnership Offices; Addresses of Partners. | 1 |
| ARTICLE 2 | DEFINITIONS | 2 |
| 2.1. | Definitions | 2 |
| 2.2. | Other Definitions | 6 |
| ARTICLE 3 | FINANCIAL MATTERS | 6 |
| 3.1. | Capital Contributions | 6 |
| 3.2. | Allocations of Profits and Losses | 8 |
| 3.3. | Allocations on Transfers | 9 |
| 3.4. | Special Allocations | 9 |
| 3.5. | Curative Allocations | 10 |
| 3.6. | Code Section 704(c) Allocations | 10 |
| 3.7. | Capital Accounts | 11 |
| 3.8. | Distributive Share for Tax Purpose | 12 |
| 3.9. | Distributions | 12 |
| 3.10. | Compensation and Reimbursement of General Partner | 14 |
| 3.11. | Books, Records, Accounting, and Reports | 14 |
| 3.12. | Tax Matters | 14 |
| ARTICLE 4 | RIGHTS AND OBLIGATIONS OF PARTNERS | 15 |
| 4.1. | Rights and Obligations of the General Partner | 15 |
| 4.2. | Rights and Obligations of Limited Partners | 19 |
| 4.3. | Transfer of Partnership Interests | 19 |
| 4.4. | Issuances of Partnership Interests to New and Existing Partners | 21 |
| 4.5. | Withdrawal of General Partner | 21 |
| 4.6. | Admission of Substitute Limited Partners and Successor General Partner | 21 |
| ARTICLE 5 | DISSOLUTION AND WINDING UP | 22 |
| 5.1. | Dissolution | 22 |
| 5.2. | Continuation of the Partnership | 23 |
| 5.3. | Liquidation | 23 |
| 5.4. | Distribution in Kind | 24 |
| 5.5. | Cancellation of Certificate of Limited Partnership | 24 |
| 5.6. | Return of Capital | 24 |
| 5.7. | Waiver of Partition. | 24 |
| ARTICLE 6 | GENERAL PROVISIONS | 24 |
| 6.1. | Amendments to Agreement | 24 |

i

| 6.2. | Addresses and Notices | 25 |
| 6.3. | Titles and Captions | 25 |
| 6.4. | Pronouns and Plurals | 25 |
| 6.5. | Further Action | 25 |
| 6.6. | Binding Effect | 25 |
| 6.7. | Integration | 25 |
| 6.8. | Creditors | 25 |
| 6.9. | Waiver | 25 |
| 6.10. | Counterparts | 25 |
| 6.11. | Applicable Law | 25 |
| 6.12. | Invalidity of Provisions | 25 |
| 6.13. | Mandatory Arbitration | 26 |

ii

D-CNL003130

Appx. 00144

### FOURTH AMENDED AND RESTATED
### AGREEMENT OF LIMITED PARTNERSHIP
### OF
### HIGHLAND CAPITAL MANAGEMENT, L.P.

THIS FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is entered into on this 24th day of December, 2015, to be effective as of December 24, 2015, by and among Strand Advisors, Inc., a Delaware corporation (*"Strand"*), as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner.

Certain terms used in this Agreement are defined in Article 2.

## ARTICLE 1

## GENERAL

**1.1.    Continuation**.  Subject to the provisions of this Agreement, the Partners hereby continue the Partnership as a limited partnership pursuant to the provisions of the Delaware Act.  Except as expressly provided herein, the rights and obligations of the Partners and the administration and termination of the Partnership shall be governed by the Delaware Act.

**1.2.    Name.**  The name of the Partnership shall be, and the business of the Partnership shall be conducted under the name of Highland Capital Management, L.P.  The General Partner, in its sole and unfettered discretion, may change the name of the Partnership at any time and from time to time and shall provide Limited Partners with written notice of such name change within twenty (20) days after such name change.

**1.3.    Purpose.**  The purpose and business of the Partnership shall be the conduct of any business or activity that may lawfully be conducted by a limited partnership organized pursuant to the Delaware Act.  Any or all of the foregoing activities may be conducted directly by the Partnership or indirectly through another partnership, joint venture, or other arrangement.

**1.4.    Term.**  The Partnership was formed as a limited partnership on July 7, 1997, and shall continue until terminated pursuant to this Agreement.

**1.5.    Partnership Offices; Addresses of Partners**.

(a)    Partnership Offices.  The registered office of the Partnership in the State of Delaware shall be 1013 Centre Road, Wilmington, Delaware 19805-1297, and its registered agent for service of process on the Partnership at that registered office shall be Corporation Service Company, or such other registered office or registered agent as the General Partner may from time to time designate.  The principal office of the Partnership shall be 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other place as the General Partner may from time to time designate.  The Partnership may maintain offices at such other place or places as the General Partner deems advisable.

(b)    Addresses of Partners.  The address of the General Partner is 300 Crescent Court, Suite 700, Dallas, Texas 75201.  The address of each Limited Partner shall be the address of that Limited Partner appearing on the books and records of the Partnership.  Each Limited Partner agrees to provide the General Partner with prompt written notice of any change in his/her/its address.

## ARTICLE 2

## DEFINITIONS

**2.1.** **Definitions.** The following definitions shall apply to the terms used in this Agreement, unless otherwise clearly indicated to the contrary in this Agreement:

"*Additional Capital Contribution*" has the meaning set forth in Section 3.1(b) of this Agreement.

"*Adjusted Capital Account Deficit*" means, with respect *to* any Partner, the deficit balance, if any, in the Capital Account of that Partner as of the end of the relevant Fiscal Year, or other relevant period, giving effect to all adjustments previously made thereto pursuant to Section 3.7 and further adjusted as follows: (i) credit to that Capital Account, any amounts which that Partner is obligated or deemed obligated to restore pursuant to any provision of this Agreement or pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c); (ii) debit to that Capital Account, the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6); and (iii) to the extent required under the Treasury Regulations, credit to that Capital Account (A) that Partner's share of "minimum gain" and (B) that Partner's share of "partner nonrecourse debt minimum gain." (Each Partner's share of the minimum gain and partner nonrecourse debt minimum gain shall be determined under Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5), respectively.)

"*Affiliate*" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question. As used in this definition, the term "*control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting Securities, by contract or otherwise.

"*Agreement*" means this Fourth Amended and Restated Agreement of Limited Partnership, as it may be amended, supplemented, or restated from time to time.

"*Business Day*" means Monday through Friday of each week, except that a legal holiday recognized as such by the government of the United States or the State of Texas shall not be regarded as a Business Day.

"*Capital Account*" means the capital account maintained for a Partner pursuant to Section 3.7(a).

"*Capital Contribution*" means, with respect to any Partner, the amount of money or property contributed to the Partnership with respect to the interest in the Partnership held by that Person.

"*Certificate of Limited Partnership*" means the Certificate of Limited Partnership filed with the Secretary of State of Delaware by the General Partner, as that Certificate may be amended, supplemented or restated from time to time.

"*Class A Limited Partners*" means those Partners holding a Class A Limited Partnership Interest, as shown on Exhibit A.

"*Class A Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class A Limited Partner."

2

"*Class B Limited Partner*" means those Partners holding a Class B Limited Partnership Interest, as shown on Exhibit A.

"*Class B Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class B Limited Partner."

"*Class B NAV Ratio Trigger Period*" means any period during which the Class B Limited Partner's aggregate capital contributions, including the original principal balance of the Contribution Note, and reduced by the aggregate amount of distributions to the Class B Limited Partner, exceed 75 percent of the product of the Class B Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class B NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class B NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class B NAV Ratio Trigger Period.

"*Class C Limited Partner*" means those Partners holding a Class C Limited Partnership Interest, as shown on Exhibit A.

"*Class C Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class C Limited Partner."

"*Class C NAV Ratio Trigger Period*" means any period during which an amount equal to $93,000,000.00 reduced by the aggregate amount of distributions to the Class C Limited Partner after the Effective Date exceeds 75 percent of the product of the Class C Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class C NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class C NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class C NAV Ratio Trigger Period.

"*Code*" means the Internal Revenue Code of 1986, as amended and in effect from time to time.

"*Contribution Note*" means that certain Secured Promissory Note dated December 21, 2015 by and among Hunter Mountain Investment Trust, as maker, and the Partnership as Payee.

"*Default Loan*" has the meaning set forth in Section 3.1(c)(i).

"*Defaulting Partner*" has the meaning set forth in Section 3.1(c).

"*Delaware Act*" means the Delaware Revised Uniform Limited Partnership Act, Part IV, Title C, Chapter 17 of the Delaware Corporation Law Annotated, as it may be amended, supplemented or restated from time to time, and any successor to that Act.

"*Effective Date*" means the date first recited above.

"*Fiscal Year*" has the meaning set forth in Section 3.11(b).

3

"*Founding Partner Group*" means, all partners holding partnership interests in the Partnership immediately before the Effective Date.

"*General Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a General Partner pursuant to the terms of this Agreement; and (ii) has not ceased to be a General Partner pursuant to the terms of this Agreement.

"*Limited Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a Limited Partner pursuant to the terms of this Agreement, and (ii) has not ceased to be a Limited Partner pursuant to the terms of this Agreement.

"*Liquidator*" has the meaning set forth in Section 5.3.

"*Losses*" means, for each Fiscal Year, the losses and deductions of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any expenditures described in Code Section 705(a)(2)(B).

"*Majority Interest*" means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners.

"*NAV Ratio Trigger Period*" means a Class B NAV Ratio Trigger Period or a Class C NAV Ratio Trigger Period.

"*Net Increase in Working Capital Accounts*" means the excess of (i) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the end of the period being measured over (ii) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the beginning of the period being measured; provided, however, that amounts within each of the aforementioned categories shall be excluded from the calculation to the extent they are specifically identified as being derived from investing or financing activities. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership and appropriate adjustments may be made to the extent the Partnership adds new ledger accounts to its books and records that are current assets or current liabilities.

"*New Issues*" means Securities that are considered to be "new issues," as defined in the Conduct Rules of the National Association of Securities Dealers, Inc.

"*Nonrecourse Deduction*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1), as computed under Treasury Regulations Section 1.704-2(c).

"*Nonrecourse Liability*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"*Operating Cash Flow*" means Total Revenue less Total Operating Expenses plus Depreciation & Amortization less Net Increase in Working Capital Accounts year over year. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership.

4

D-CNL003134

"*Partner*" means a General Partner or a Limited Partner.

"*Partner Nonrecourse Debt*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"*Partner Nonrecourse Deductions*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"*Partner Nonrecourse Debt Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(5).

"*Partnership*" means Highland Capital Management, L.P., the Delaware limited partnership established pursuant to this Agreement.

"*Partnership Capital*" means, as of any relevant date, the net book value of the Partnership's assets.

"*Partnership Interest*" means the interest acquired by a Partner in the Partnership including, without limitation, that Partner's right: (a) to an allocable share of the Profits, Losses, deductions, and credits of the Partnership; (b) to a distributive share of the assets of the Partnership; (c) if a Limited Partner, to vote on those matters described in this Agreement; and (d) if the General Partner, to manage and operate the Partnership.

"*Partnership Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(d).

"*Percentage Interest*" means the percentage set forth opposite each Partner's name on Exhibit A as such Exhibit may be amended from time to time in accordance with this Agreement.

"*Person*" means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity.

"*Priority Distributions*" has the meaning set forth in Section 3.9(b).

"*Profits*" means, for each Fiscal Year, the income and gains of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any income described in Code Section 705(a)(1)(B).

"*Profits Interest Partner*" means any Person who is issued a Partnership Interest that is treated as a "profits interest" for federal income tax purposes.

"*Purchase Notes*" means those certain Secured Promissory Notes of even date herewith by and among Hunter Mountain Investment Trust, as maker, and The Dugaboy Investment Trust, The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #2, each as Payees of the respective Secured Promissory Notes.

5

"*Record Date*" means the date established by the General Partner for determining the identity of Limited Partners entitled to vote or give consent to Partnership action or entitled to exercise rights in respect of any other lawful action of Limited Partners.

"*Second Amended Buy-Sell and Redemption Agreement*" means that certain Second Amended and Restated Buy-Sell and Redemption Agreement, dated December 21, 2015, to be effective as of December 21, 2015 by and between the Partnership and its Partners, as may be amended, supplemented, or restated from time to time.

"*Securities*" means the following: (i) securities of any kind (including, without limitation, "securities" as that term is defined in Section 2(a)(1) of the Securities Act; (ii) commodities of any kind (as that term is defined by the U.S. Securities Laws and the rules and regulations promulgated thereunder); (iii) any contracts for future or forward delivery of any security, commodity or currency; (iv) any contracts based on any securities or group of securities, commodities or currencies; (v) any options on any contracts referred to in clauses (iii) or (iv); or (vi) any evidences of indebtedness (including participations in or assignments of bank loans or trade credit claims). The items set forth in clauses (i) through (vi) herein include, but are not limited to, capital stock, common stock, preferred stock, convertible securities, reorganization certificates, subscriptions, warrants, rights, options, puts, calls, bonds, mutual fund interests, debentures, notes, certificates of deposit, letters of credit, bankers acceptances, trust receipts and other securities of any corporation or other entity, whether readily marketable or not, rights and options, whether granted or written by the Partnership or by others, treasury bills, bonds and notes, any securities or obligations issued or guaranteed by the United States or any foreign country or any state or possession of the United States or any foreign country or any political subdivision or agency or instrumentality of any of the foregoing, and derivatives of any of the foregoing.

"*Securities Act*" means the Securities Act of 1933, as amended, and any successor to such statute.

"*Substitute Limited Partner*" has the meaning set forth in Section 4.6(a).

"*Transfer*" or derivations thereof, of a Partnership Interest means, as a noun, the transfer, sale, assignment, exchange, pledge, hypothecation or other disposition of a Partnership Interest, or any part thereof, directly or indirectly, and as a verb, voluntarily or involuntarily to transfer, sell, assign, exchange, pledge, hypothecate or otherwise dispose of.

"*Treasury Regulations*" means the Department of Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of succeeding regulations).

2.2. **Other Definitions**. All terms used in this Agreement that are not defined in this Article 2 have the meanings contained elsewhere in this Agreement.

## ARTICLE 3

## FINANCIAL MATTERS

3.1. **Capital Contributions**.

(a) Initial Capital Contributions. The initial Capital Contribution of each Partner shall be set forth in the books and records of the Partnership.

(b) Additional Capital Contributions.

6

(i)       The General Partner, in its reasonable discretion and for a *bona fide* business purpose, may request in writing that the Founding Partner Group make additional Capital Contributions in proportion to their Percentage Interests (each, an "***Additional Capital Contribution***").

(ii)      Any failure by a Partner to make an Additional Capital Contribution requested under Section 3.1(b)(i) on or before the date on which that Additional Capital Contribution was due shall result in the Partner being in default.

(c)      Consequences to Defaulting Partners. In the event a Partner is in default under Section 3.1(b) (a "***Defaulting Partner***"), the Defaulting Partner, in its sole and unfettered discretion, may elect to take either one of the option set forth below.

(i)       Default Loans. If the Defaulting Partner so elects, the General Partner shall make a loan to the Defaulting Partner in an amount equal to that Defaulting Partner's additional capital contribution (a "***Default Loan***"). A Default Loan shall be deemed advanced on the date actually advanced. Default Loans shall earn interest on the outstanding principal amount thereof at a rate equal to the Applicable Federal Mid-Term Rate (determined by the Internal Revenue Service for the month in which the loan is deemed made) from the date actually advanced until the same is repaid in full. The term of any Default Loan shall be six (6) months, unless otherwise extended by the General Partner in its sole and unfettered discretion. If the General Partner makes a Default Loan, the Defaulting Partner shall not receive any distributions pursuant to Section 3.9(a) or Section 5.3 or any proceeds from the Transfer of all or any part of its Partnership Interest while the Default Loan remains unpaid. Instead, the Defaulting Partner's share of distributions or such other proceeds shall (until all Default Loans and interest thereon shall have been repaid in full) first be paid to the General Partner. Such payments shall be applied first to the payment of interest on such Default Loans and then to the repayment of the principal amounts thereof, but shall be considered, for all other purposes of this Agreement, to have been distributed to the Defaulting Partner. The Defaulting Partner shall be liable for the reasonable fees and expenses incurred by the General Partner (including, without limitation, reasonable attorneys' fees and disbursements) in connection with any enforcement or foreclosure upon any Default Loan and such costs shall, to the extent enforceable under applicable law, be added to the principal amount of the applicable Default Loan. In addition, at any time during the term of such Default Loan, the Defaulting Partner shall have the right to repay, in full, the Default Loan (including interest and any other charges). If the General Partner makes a Default Loan, the Defaulting Partner shall be deemed to have pledged to the General Partner and granted to the General Partner a continuing first priority security interest in, all of the Defaulting Partner's Partnership Interest to secure the payment of the principal of, and interest on, such Default Loan in accordance with the provisions hereof, and for such purpose this Agreement shall constitute a security agreement. The Defaulting Partner shall promptly execute, acknowledge and deliver such financing statements, continuation statements or other documents and take such other actions as the General Partner shall request in writing in order to perfect or continue the perfection of such security interest; and, if the Defaulting Partner shall fail to do so within seven (7) days after the Defaulting Partner's receipt of a notice making demand therefor, the General Partner is hereby appointed the attorney-in-fact of, and is hereby authorized on behalf of, the Defaulting Partner, to execute, acknowledge and deliver all such documents and take all such other actions as may be required to perfect such security interest. Such appointment and authorization are coupled with an interest and shall be irrevocable. The General Partner shall, prior to exercising any right or remedy (whether at law, in equity or pursuant to the terms hereof) available to it in connection with such security interest, provide to the Defaulting Partner a notice, in reasonable detail, of the right or remedy to be exercised and the intended timing of such exercise which shall not be less than five (5) days following the date of such notice.

7

D-CNL003137

**Appx. 00151**

(ii)  <u>Reduction of Percentage Interest</u>.  If the Defaulting Partner does not elect to obtain a Default Loan pursuant to <u>Section 3.1(c)(i)</u>, the General Partner shall reduce the Defaulting Partner's Percentage Interest in accordance with the following formula:

The Defaulting Partner's new Percentage Interest shall equal the product of (1) the Defaulting Partner's current Percentage Interest, multiplied by (2) the quotient of (a) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), divided by (b) the sum of (i) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), plus (ii) the amount of the additional capital contribution that such Defaulting Partner failed to make when due.

To the extent any downward adjustment is made to the Percentage Interest of a Partner pursuant to this <u>Section 3.1(c)(ii)</u>, any resulting benefit shall accrue to the Partners (other than the Defaulting Partner) in proportion to their respective Percentage Interests.

**3.2.**  **Allocations of Profits and Losses**.

(a)  <u>Allocations of Profits</u>.  Except as provided in <u>Sections 3.4</u>, <u>3.5</u>, and <u>3.6</u>, Profits for any Fiscal Year will be allocated to the Partners as follows:

(i)  <u>First</u>, to the Partners until cumulative Profits allocated under this <u>Section 3.2(a)(i)</u> for all prior periods equal the cumulative Losses allocated to the Partners under <u>Section 3.2(b)(iii)</u> for all prior periods in the inverse order in which such Losses were allocated; and

(ii)  <u>Next</u>, to the Partners until cumulative Profits allocated under this <u>Section 3.2(a)(ii)</u> for all prior periods equal the cumulative Losses allocated to the Partners under <u>Section 3.2(b)(ii)</u> for all prior periods in the inverse order in which such Losses were allocated; and

(iii)  <u>Then</u>, to all Partners in proportion to their respective Percentage Interests.

(b)  <u>Allocations of Losses</u>.  Except as provided in <u>Sections 3.4</u>, <u>3.5</u>, and <u>3.6</u>, Losses for any Fiscal Year will be will be allocated as follows:

(i)  <u>First</u>, to the Partners until cumulative Losses allocated under this <u>Section 3.2(b)(i)</u> for all prior periods equal the cumulative Profits allocated to the Partners under <u>Section 3.2(a)(iii)</u> for all prior periods in the inverse order in which such Profits were allocated; and

(ii)  <u>Next</u>, to the Partners in proportion to their respective positive Capital Account balances until the aggregate Capital Account balances of the Partners (excluding any negative Capital Account balances) equal zero; *provided, however,* losses shall first be allocated to reduce amounts that were last allocated to the Capital Accounts of the Partners; and

(iii)  <u>Then</u>, to all Partners in proportion to their respective Percentage Interests.

D-CNL003138

**Appx. 00152**

(c)    Limitation on Loss Allocations.  If any allocation of Losses would cause a Limited Partner to have an Adjusted Capital Account Deficit, those Losses instead shall be allocated to the General Partner.

**3.3.    Allocations on Transfers**.  Taxable items of the Partnership attributable to a Partnership Interest that has been Transferred (including the simultaneous decrease in the Partnership Interest of existing Partners resulting from the admission of a new Partner) shall be allocated in accordance with Section 4.3(d).

**3.4.    Special Allocations.**  If the requisite stated conditions or facts are present, the following special allocations shall be made in the following order:

(a)    Partnership Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 3, if there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, prior to any other allocation under this Agreement, each Partner shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to that Partner's share of the net decrease in Partnership Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This Section 3.4(a) is intended to comply with the partnership minimum gain chargeback requirements of the Treasury Regulations and shall be subject to all exceptions provided therein.

(b)    Partner Nonrecourse Debt Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 3 (other than Section 3.4(a)), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Partner with a share of such Partner Nonrecourse Debt Minimum Gain as of the beginning of the year shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods in an amount equal to that Partner's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This Section 3.4(b) is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements of the Treasury Regulations, shall be interpreted consistently with the Treasury Regulations and shall be subject to all exceptions provided therein.

(c)    Qualified Income Offset.  If a Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), then items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible; *provided, however,* an allocation pursuant to this Section 3.4(c) shall be made if and only to the extent that the Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 3 have been tentatively made without considering this Section 3.4(c).

(d)    Gross Income Allocation.  If a Partner has a deficit Capital Account at the end of any Fiscal Year of the Partnership that exceeds the sum of (i) the amount the Partner is obligated to restore, and (ii) the amount the Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), then each such Partner shall be specially allocated items of income and gain of the Partnership in the amount of the excess as quickly as possible; *provided, however,* an allocation pursuant to this Section 3.4(d) shall be made if and only to

9

the extent that the Partner would have a deficit Capital Account in excess of that sum after all other allocations provided for in this Article 3 have been tentatively made without considering Section 3.4(c) or 3.4(d).

(e)     Nonrecourse Deductions.  Nonrecourse Deductions for any taxable year or other period for which allocations are made shall he allocated among the Partners in accordance with their Percentage interests.

(f)     Partner Nonrecourse Deductions.  Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

(g)     Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any asset of the Partnership under Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and that gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Treasury Regulations.

(h)     Section 481 Adjustments.  Any allocable items of income, gain, expense, deduction or credit required to be made by Section 481 of the Code as the result of the sale, transfer, exchange or issuance of a Partnership Interest will be specially allocated to the Partner receiving said Partnership Interest whether such items are positive or negative in amount.

3.5.     Curative Allocations.  The "*Basic Regulatory Allocations*" consist of (i) the allocations pursuant to Section 3.2(c), and (ii) the allocations pursuant to Sections 3.4.  Notwithstanding any other provision of this Agreement, the Basic Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of the allocations of other items and the Basic Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Basic Regulatory Allocations had not occurred.  For purposes of applying the foregoing sentence, allocations pursuant to this Section 3.5 shall be made with respect to allocations pursuant to Section 3.4 (g) and (h) only to the extent that it is reasonably determined that those allocations will otherwise be inconsistent with the economic agreement among the Partners. To the extent that a special allocation under Section 3.4 is determined not to comply with applicable Treasury Regulations, then the Partners intend that the items shall be allocated in accordance with the Partners' varying Percentage Interests throughout each tax year during which such items are recognized for tax purposes.

3.6.     Code Section 704(c) Allocations.  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation at the time of the contribution between the tax basis of the property to the Partnership and the fair market value of that property.  Except as otherwise provided herein, any elections or other decisions relating to those allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intent of this Agreement.  Allocations of income, gain, loss and deduction pursuant to this Section 3.6 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, the Capital Account of any Partner or the share

D-CNL003140

Appx. 00154

of Profits, Losses, other tax items or distributions of any Partner pursuant to any provision of this Agreement.

3.7. **Capital Accounts**.

(a) <u>Maintenance of Capital Accounts</u>. The Partnership shall establish and maintain a separate capital account (*"Capital Account"*) for each Partner in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), subject to and in accordance with the provisions set forth in this <u>Section 3.7</u>.

(i) The Capital Account balance of each Partner shall be credited (increased) by (A) the amount of cash contributed by that Partner to the capital of the Partnership, (B) the fair market value of property contributed by that Partner to the capital of the Partnership (net of liabilities secured by that contributed property that the Partnership assumes or takes subject to under Code Section 752), and (C) that Partner's allocable share of Profits and any items in the nature of income or gain which are specially allocated pursuant to <u>Sections 3.4</u> and <u>3.5</u>; and

(ii) The Capital Account balance of each Partner shall be debited (decreased) by (A) the amount of cash distributed to that Partner by the Partnership, (B) the fair market value of property distributed to that Partner by the Partnership (net of liabilities secured by that distributed property that such Partner assumes or takes subject to under Code Section 752), (C) that Partner's allocable share of expenditures of the Partnership described in Code Section 705(a)(2)(B), and (D) that Partner's allocable share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to <u>Sections 3.2</u>, <u>3.4</u> and <u>3.5</u>.

The provisions of this <u>Section 3.7</u> and the other provisions of this Agreement relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Code Section 704(b) and the Treasury Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions. The General Partner may modify the manner in which the Capital Accounts are maintained under this <u>Section 3.7</u> in order to comply with those provisions, as well as upon the occurrence of events that might otherwise cause this Agreement not to comply with those provisions.

(b) <u>Negative Capital Accounts</u>. If any Partner has a deficit balance in its Capital Account, that Partner shall have no obligation to restore that negative balance or to make any Capital Contribution by reason thereof, and that negative balance shall not be considered an asset of the Partnership or of any Partner.

(c) <u>Interest</u>. No interest shall be paid by the Partnership on Capital Contributions or on balances in Capital Accounts.

(d) <u>No Withdrawal</u>. No Partner shall be entitled to withdraw any part of his/her/its Capital Contribution or his/her/its Capital Account or to receive any distribution from the Partnership, except as provided in <u>Section 3.9</u> and <u>Article 5</u>.

(e) <u>Loans From Partners</u>. Loans by a Partner to the Partnership shall not be considered Capital Contributions.

(f) <u>Revaluations</u>. The Capital Accounts of the Partners shall not be "booked-up" or "booked-down" to their fair market values under Treasury Regulations Section 1.704(c)-1(b)(2)(iv)(f) or otherwise.

11

**3.8.    Distributive Share for Tax Purpose.**  All items of income, deduction, gain, loss or credit that are recognized for federal income tax purposes will be allocated among the Partners in accordance with the allocations of Profits and Losses hereunder as determined by the General Partner in its sole and unfettered discretion.  Notwithstanding the foregoing, the General Partner may (i) as to each New Issue, specially allocate to the Partners who were allocated New Issue Profit from that New Issue any short-term capital gains realized during the Fiscal Year upon the disposition of such New Issue during that Fiscal Year, and (ii) specially allocate items of gain (or loss) to Partners who withdraw capital during any Fiscal Year in a manner designed to ensure that each withdrawing Partner is allocated gain (or loss) in an amount equal to the difference between that Partner's Capital Account balance (or portion thereof being withdrawn) at the time of the withdrawal and the tax basis for his/her/ its Partnership Interest at that time (or proportionate amount thereof); *provided, however,* that the General Partner may, without the consent of any other Partner, (a) alter the allocation of any item of taxable income, gain, loss, deduction or credit in any specific instance where the General Partner, in its sole and unfettered discretion, determines such alteration to be necessary or appropriate to avoid a materially inequitable result *(e.g.,* where the allocation would create an inappropriate tax liability); and/or (b) adopt whatever other method of allocating tax items as the General Partner determines is necessary or appropriate in order to be consistent with the spirit and intent of the Treasury Regulations under Code Sections 704(b) and 704(c).

**3.9.    Distributions**.

    (a)    General.    The General Partner may make such pro rata or non-pro rata distributions as it may determine in its sole and unfettered discretion, without being limited to current or accumulated income or gains, but no such distribution shall be made out of funds required to make current payments on Partnership indebtedness; provided, however, that the General Partner may not make non-pro rata distributions under this Section 3.9(a) during an NAV Ratio Trigger Period without the consent of the Class B Limited Partner (in the case of a Class B NAV Ratio Trigger Period) and/or the Class C Limited Partner (in the case of a Class C NAV Ratio Trigger Period); provided, further this provision should not be interpreted to limit in any way the General Partner's ability to make non-pro rata tax distributions under Section 3.9(c) and Section 3.9(f).  The Partnership has entered into one or more credit facilities with financial institutions that may limit the amount and timing of distributions to the Partners.  Thus, the Partners acknowledge that distributions from the Partnership may be limited. Any distributions made to the Class B Limited Partner or the Class C Limited Partner pursuant to Section 3.9(b) shall reduce distributions otherwise allocable to such Partners under this Section 3.9(a) until such aggregate reductions are equal to the aggregate distributions made to the Class B Partners and the Class C Partners under Section 3.9(b).

    (b)    Priority Distributions.    Prior to the distribution of any amounts to Partners pursuant to Section 3.9(a), and notwithstanding any other provision in this Agreement to the contrary, the Partnership shall make the following distributions ("***Priority Distributions***") pro-rata among the Class B Limited Partner and the Class C Limited Partner in accordance with their relative Percentage Interests:

        (i)    No later than March 31st of each calendar year, commencing March 31, 2017, an amount equal to $1,600,000.00;

        (ii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to three percent (3%) of the Partnership's investment gain for the prior year, as reflected in the Partnership's books and records within ledger account number 90100 plus three percent (3%) of the gross realized investment gains for the prior year of Highland Select Equity Fund, as reflected in its books and records;

12

(iii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to ten percent (10%) of the Partnership's Operating Cash Flow for the prior year; and

(iv)    No later than December 24th of each year, commencing December 24, 2016, an amount equal to the aggregate annual principal and interest payments on the Purchase Notes for the then current year.

(c)    <u>Tax Distributions</u>.  The General Partner may, in its sole discretion, declare and make cash distributions pursuant hereto to the Partners to allow the federal and state income tax attributable to the Partnership's taxable income that is passed through the Partnership to the Partners to be paid by such Partners (a "*Tax Distribution*").  The General Partner may, in its discretion, make Tax Distributions to the Founding Partner Group without also making Tax Distributions to other Partners; provided, however, that if the General Partner makes Tax Distributions to the Founding Partner Group, Tax Distributions must also be made the Class B Limited Partner to the extent the Class B Limited Partner provides the Partnership with documentation showing it is subject to an entity-level federal income tax obligation.  Notwithstanding anything else in this Agreement, the General Partner may declare and pay Tax Distributions even if such Tax Distributions cause the Partnership to be unable to make Priority Distributions under <u>Section 3.9(b)</u>.

(d)    <u>Payments Not Deemed Distributions</u>.    Any amounts paid pursuant to Sections <u>4.1(e)</u> or <u>4.1(h)</u> shall not be deemed to be distributions for purposes of this Agreement.

(e)    <u>Withheld Amounts</u>.  Notwithstanding any other provision of this <u>Section 3.9</u> to the contrary, each Partner hereby authorizes the Partnership to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership with respect to that Partner as a result of that Partner's participation in the Partnership.  If and to the extent that the Partnership shall be required to withhold or pay any such taxes, that Partner shall be deemed for all purposes of this Agreement to have received a payment from the Partnership as of the time that withholding or tax is paid, which payment shall be deemed to be a distribution with respect to that Partner's Partnership Interest to the extent that the Partner (or any successor to that Partner's Partnership Interest) is then entitled to receive a distribution.  To the extent that the aggregate of such payments to a Partner for any period exceeds the distributions to which that Partner is entitled for that period, the amount of such excess shall be considered a loan from the Partnership to that Partner.  Such loan shall bear interest (which interest shall be treated as an item of income to the Partnership) at the "Applicable Federal Rate" (as defined in the Code), as determined hereunder from time to time, until discharged by that Partner by repayment, which may be made in the sole and unfettered discretion of the General Partner out of distributions to which that Partner would otherwise be subsequently entitled.  Any withholdings authorized by this <u>Section 3.9(d)</u> shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel or other evidence satisfactory to the General Partner to the effect that a lower rate is applicable, or that no withholding is applicable.

(f)    <u>Special Tax Distributions</u>.  The Partnership shall, upon request of such Founding Partner, make distributions to the Founding Partners (or loans, at the election of the General Partner) in an amount necessary for each of them to pay their respective federal income tax obligations incurred through the effective date of the Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., the predecessor to this Agreement.

(g)    <u>Tolling of Priority Distributions</u>.  In the event of a "Honis Trigger Event," as defined in the Second Amended Buy-Sell and Redemption Agreement, the Partnership shall not make any distributions, including priority distributions under <u>Section 3.9(b)</u>, to the Class B Limited Partner or the Class C Limited Partner until such time as a replacement trust administrator, manager and general partner,

D-CNL003143

**Appx. 00157**

as applicable, acceptable to the Partnership in its sole discretion, as indicated by an affirmative vote of consent by a Majority Interest, shall be appointed to the Class B Limited Partner/Class C Limited Partner and any of its direct or indirect owners that have governing documents directly affected by a Honis Trigger Event.

### 3.10.   Compensation and Reimbursement of General Partner.

(a)   Compensation.   The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements unless approved by a Majority Interest; provided, however, that no compensation above five million dollars per year may be approved, even by a Majority Interest, during a NAV Ratio Trigger Period.

(b)   Reimbursement for Expenses.   In addition to amounts paid under other Sections of this Agreement, the General Partner and its Affiliates shall be reimbursed for all expenses, disbursements, and advances incurred or made, and all fees, deposits, and other sums paid in connection with the organization and operation of the Partnership, the qualification of the Partnership to do business, and all related matters.

### 3.11.   Books, Records, Accounting, and Reports.

(a)   Records and Accounting.   The General Partner shall keep or cause to be kept appropriate books and records with respect to the Partnership's business, which shall at all times be kept at the principal office of the Partnership or such other office as the General Partner may designate for such purpose.  The books of the Partnership shall be maintained for financial reporting purposes on the accrual basis or on a cash basis, as the General Partner shall determine in its sole and unfettered discretion, in accordance with generally accepted accounting principles and applicable law. Upon reasonable request, the Class B Limited Partner or the Class C Limited Partner may inspect the books and records of the Partnership.

(b)   Fiscal Year.   The fiscal year of the Partnership shall be the calendar year unless otherwise determined by the General Partner in its sole and unfettered discretion.

(c)   Other Information.   The General Partner may release information concerning the operations of the Partnership to any financial institution or other Person that has loaned or may loan funds to the Partnership or the General Partner or any of its Affiliates, and may release such information to any other Person for reasons reasonably related to the business and operations of the Partnership or as required by law or regulation of any regulatory body.

(d)   Distribution Reporting to Class B Limited Partner and Class C Limited Partner.   Upon request, the Partnership shall provide the Class B Limited Partner and/or the Class C Limited Partner information on any non-pro rata distributions made under Section 3.9 to Partners other than the Partner requesting the information.

### 3.12.   Tax Matters.

(a)   Tax Returns.   The General Partner shall arrange for the preparation and timely filing of all returns of Partnership income, gain, loss, deduction, credit and other items necessary for federal, state and local income tax purposes.  The General Partner shall deliver to each Partner as copy of his/her/its IRS Form K-1 as soon as practicable after the end of the Fiscal Year, but in no event later than October 1.  The classification, realization, and recognition of income, gain, loss, deduction, credit and

14

other items shall be on the cash or accrual method of accounting for federal income tax purposes, as the General Partner shall determine in its sole and unfettered discretion.  The General Partner in its sole and unfettered discretion may pay state and local income taxes attributable to operations of the Partnership and treat such taxes as an expense of the Partnership.

(b)    Tax Elections.  Except as otherwise provided herein, the General Partner shall, in its sole and unfettered discretion, determine whether to make any available tax election.

(c)    Tax Controversies.  Subject to the provisions hereof, the General Partner is designated the Tax Matters Partner (as defined in Code Section 6231), and is authorized and required to represent the Partnership, at the Partnership's expense, in connection with all examinations of the Partnership's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith.  Each Partner agrees to cooperate with the General Partner in connection with such proceedings.

(d)    Taxation as a Partnership.  No election shall be made by the Partnership or any Partner for the Partnership to be excluded from the application of any of the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code or from any similar provisions of any state tax laws.

## ARTICLE 4

## RIGHTS AND OBLIGATIONS OF PARTNERS

**4.1.    Rights and Obligations of the General Partner.**  In addition to the rights and obligations set forth elsewhere in this Agreement, the General Partner shall have the following rights and obligations:

(a)    Management.  The General Partner shall conduct, direct, and exercise full control of over all activities of the Partnership.  Except as otherwise expressly provided in this Agreement, all management powers over the business and affairs of the Partnership shall be exclusively vested in the General Partner, and Limited Partners shall have no right of control over the business and affairs of the Partnership.  In addition to the powers now or hereafter granted to a general partner of a limited partnership under applicable law or that are granted to the General Partner under any provision of this Agreement, the General Partner shall have full power and authority to do all things deemed necessary or desirable by it to conduct the business of the Partnership, including, without limitation: (i) the determination of the activities in which the Partnership will participate; (ii) the performance of any and all acts necessary or appropriate to the operation of any business of the Partnership (including, without limitation, purchasing and selling any asset, any debt instruments, any equity interests, any commercial paper, any note receivables and any other obligations); (iii) the procuring and maintaining of such insurance as may be available in such amounts and covering such risks as are deemed appropriate by the General Partner; (iv) the acquisition, disposition, sale, mortgage, pledge, encumbrance, hyphothecation, of exchange of any or all of the assets of the Partnership; (v) the execution and delivery on behalf of, and in the name of the Partnership, deeds, deeds of trust, notes, leases, subleases, mortgages, bills of sale and any and all other contracts or instruments necessary or incidental to the conduct of the Partnership's business; (vi) the making of any expenditures, the borrowing of money, the guaranteeing of indebtedness and other liabilities, the issuance of evidences of indebtedness, and the incurrence of any obligations it deems necessary or advisable for the conduct of the activities of the Partnership, including, without limitation, the payment of compensation and reimbursement to the General Partner and its Affiliates pursuant to Section 3.10; (vii) the use of the assets of the Partnership (including, without limitation, cash on hand) for any Partnership purpose on any terms it sees fit, including, without limitation, the financing of operations of the Partnership, the lending of funds to other Persons, and the repayment of obligations

D-CNL003145

**Appx. 00159**

of the Partnership; (viii) the negotiation, execution, and performance of any contracts that it considers desirable, useful, or necessary to the conduct of the business or operations of the Partnership or the implementation of the General Partner's powers under this Agreement; (ix) the distribution of Partnership cash or other assets; (x) the selection, hiring and dismissal of employees, attorneys, accountants, consultants, contractors, agents and representatives and the determination of their compensation and other teens of employment or hiring; (xi) the formation of any further limited or general partnerships, joint ventures, or other relationships that it deems desirable and the contribution to such partnerships, ventures, or relationships of assets and properties of the Partnership; and (xii) the control of any matters affecting the rights and obligations of the Partnership, including, without limitation, the conduct of any litigation, the incurring of legal expenses, and the settlement of claims and suits.

(b)    _Certificate of Limited Partnership_.  The General Partner caused the Certificate of Limited Partnership of the Partnership to be filed with the Secretary of State of Delaware as required by the Delaware Act and shall cause to be filed such other certificates or documents (including, without limitation, copies, amendments, or restatements of this Agreement) as may be determined by the General Partner to be reasonable and necessary or appropriate for the formation, qualification, or registration and operation of a limited partnership (or a partnership in which Limited Partners have limited liability) in the State of Delaware and in any other state where the Partnership may elect to do business.

(c)    _Reliance by Third Parties_.    Notwithstanding any other provision of this Agreement to the contrary, no lender or purchaser or other Person, including any purchaser of property from the Partnership or any other Person dealing with the Partnership, shall be required to verify any representation by the General Partner as to its authority to encumber, sell, or otherwise use any assess or properties of the Partnership, and any such lender, purchaser, or other Person shall be entitled to rely exclusively on such representations and shall be entitled to deal with the General Partner as if it were the sole party in interest therein, both legally and beneficially.  Each Limited Partner hereby waives any and all defenses or other remedies that may be available against any such lender, purchaser, or other Person to contest, negate, or disaffirm any action of the General Partner in connection with any such sale or financing.  In no event shall any Person dealing with the General Partner or the General Partner's representative with respect to any business or property of the Partnership be obligated to ascertain that the terms of this Agreement have been complied with, and each such Person shall be entitled to rely on the assumptions that the Partnership has been duly formed and is validly in existence.  In no event shall any such Person be obligated to inquire into the necessity or expedience of any act or action of the General Partner or the General Partner's representative, and every contract, agreement, deed, mortgage, security agreement, promissory note, or other instrument or document executed by the General Partner or the General Partner's representative with respect to any business or property of the Partnership shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (i), at the time of the execution and delivery thereof, this Agreement was in full force and effect; (ii) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Partnership; and (iii) the General Partner or the General Partner's representative was duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership.

(d)    _Partnership Funds_.  The funds of the Partnership shall be deposited in such account or accounts as are designated by the General Partner.  The General Partner may, in its sole and unfettered discretion, deposit funds of the Partnership in a central disbursing account maintained by or in the name of the General Partner, the Partnership, or any other Person into which funds of the General Partner, the Partnership, on other Persons are also deposited; _provided, however,_ at all times books of account are maintained that show the amount of funds of the Partnership on deposit in such account and interest accrued with respect to such funds as credited to the Partnership.  The General Partner may use the funds of the Partnership as compensating balances for its benefit; _provided, however,_ such funds do

16

not directly or indirectly secure, and are not otherwise at risk on account of, any indebtedness or other obligation of the General Partner or any director, officer, employee, agent, representative, or Affiliate thereof. Nothing in this Section 4.1(d) shall be deemed to prohibit or limit in any manner the right of the Partnership to lend funds to the General Partner or any Affiliate thereof pursuant to Section 4.1(e)(i). All withdrawals from or charges against such accounts shall be made by the General Partner or by its representatives. Funds of the Partnership may be invested as determined by the General Partner in accordance with the terms and provisions of this Agreement.

(e)     Loans to or from General Partner: Contracts with Affiliates; Joint Ventures.

(i)     The General Partner or any Affiliate of the General Partner may lend to the Partnership funds needed by the Partnership for such periods of time as the General Partner may determine; provided, however, the General Partner or its Affiliate may not charge the Partnership interest at a rate greater than the rate (including points or other financing charges or fees) that would be charged the Partnership (without reference to the General Partner's financial abilities or guaranties) by unrelated lenders on comparable loans. The Partnership shall reimburse the General Partner or its Affiliate, as the case may be, for any costs incurred by the General Partner or that Affiliate in connection with the borrowing of funds obtained by the General Partner or that Affiliate and loaned to the Partnership. The Partnership may loan funds to the General Partner and any member of the Founding Partner Group at the General Partner's sole and exclusive discretion.

(ii)     The General Partner or any of its Affiliates may enter into an agreement with the Partnership to render services, including management services, for the Partnership. Any service rendered for the Partnership by the General Partner or any Affiliate thereof shall be on terms that are fair and reasonable to the Partnership.

(iii)     The Partnership may Transfer any assets to joint ventures or other partnerships in which it is or thereby becomes a participant upon terms and subject to such conditions consistent with applicable law as the General Partner deems appropriate; provided, however, that the Partnership may not transfer any asset to the General Partner or one of its Affiliates during any NAV Ratio Trigger Period for consideration less than such asset's fair market value.

(f)     Outside Activities' Conflicts of Interest. The General Partner or any Affiliate thereof and any director, officer, employee, agent, or representative of the General Partner or any Affiliate thereof shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Partnership, including, without limitation, business interests and activities in direct competition with the Partnership. Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement or the partnership relationship created hereby in any business ventures of the General Partner, any Affiliate thereof, or any director, officer, employee, agent, or representative of either the General Partner or any Affiliate thereof.

(g)     Resolution of Conflicts of Interest. Unless otherwise expressly provided in this Agreement or any other agreement contemplated herein, whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Limited Partner, on the other hand, any action taken by the General Partner, in the absence of bad faith by the General Partner, shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein or under the Delaware Act or any other applicable law, rule, or regulation.

(h)     Indemnification. The Partnership shall indemnify and hold harmless the General Partner and any director, officer, employee, agent, or representative of the General Partner (collectively,

17

the "**GP Party**"), against all liabilities, losses, and damages incurred by any of them by reason of any act performed or omitted to be performed in the name of or on behalf of the Partnership, or in connection with the Partnership's business, including, without limitation, attorneys' fees and any amounts expended in the settlement of any claims or liabilities, losses, or damages, to the fullest extent permitted by the Delaware Act; *provided, however,* the Partnership shall have no obligation to indemnify and hold harmless a GP Party for any action or inaction that constitutes gross negligence or willful or wanton misconduct. The Partnership, in the sole and unfettered discretion of the General Partner, may indemnify and hold harmless any Limited Partner, employee, agent, or representative of the Partnership, any Person who is or was serving at the request of the Partnership acting through the General Partner as a director, officer, partner, trustee, employee, agent, or representative of another corporation, partnership, joint venture, trust, or other enterprise, and any other Person to the extent determined by the General Partner in its sole and unfettered discretion, but in no event shall such indemnification exceed the indemnification permitted by the Delaware Act. Notwithstanding anything to the contrary in this Section 4.1(h) or elsewhere in this Agreement, no amendment to the Delaware Act after the date of this Agreement shall reduce or limit in any manner the indemnification provided for or permitted by this Section 4.1(h) unless such reduction or limitation is mandated by such amendment for limited partnerships formed prior to the enactment of such amendment. In no event shall Limited Partners be subject to personal liability by reason of the indemnification provisions of this Agreement.

  (i)  Liability of General Partner.

    (i)  Neither the General Partner nor its directors, officers, employees, agents, or representatives shall be liable to the Partnership or any Limited Partner for errors in judgment or for any acts or omissions that do not constitute gross negligence or willful or wanton misconduct.

    (ii)  The General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its directors, officers, employees, agents, or representatives, and the General Partner shall not be responsible for any misconduct or negligence on the part of any agent or representative appointed by the General Partner.

  (j)  Reliance by General Partner.

    (i)  The General Partner may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

    (ii)  The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, and other consultants and advisers selected by it, and any opinion of any such Person as to matters which the General Partner believes to be within such Person's professional or expert competence shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by the General Partner hereunder in good faith and in accordance with such opinion.

    (k)  The General Partner may, from time to time, designate one or more Persons to be officers of the Partnership. No officer need be a Partner. Any officers so designated shall have such authority and perform such duties as the General Partner may, from time to time, delegate to them. The General Partner may assign titles to particular officers, including, without limitation, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer. Each officer shall hold office until such Person's successor shall be duly designated and shall qualify or until such Person's death or

D-CNL003148

until such Person shall resign or shall have been removed in the manner hereinafter provided. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Partnership shall be fixed from time to time by the General Partner. Any officer may be removed as such, either with or without cause, by the General Partner whenever in the General Partner's judgment the best interests of the Partnership will be served thereby. Any vacancy occurring in any office of the Partnership may be filled by the General Partner.

**4.2.    Rights and Obligations of Limited Partners**. In addition to the rights and obligations of Limited Partners set forth elsewhere in this Agreement, Limited Partners shall have the following rights and obligations:

(a)    Limitation of Liability. Limited Partners shall have no liability under this Agreement except as provided herein or under the Delaware Act.

(b)    Management of Business. No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

(c)    Return of Capital. No Limited Partner shall be entitled to the withdrawal or return of its Capital Contribution except to the extent, if any, that distributions made pursuant to this Agreement or upon termination of the Partnership may be considered as such by law and then only to the extent provided for in this Agreement.

(d)    Second Amended Buy-Sell and Redemption Agreement. Each Limited Partner shall comply with the terms and conditions of the Second Amended Buy-Sell and Redemption Agreement.

(e)    Default on Priority Distributions. If the Partnership fails to timely pay Priority Distributions pursuant to Section 3.9(b), and the Partnership does not subsequently make such Priority Distribution within ninety days of its due date, the Class B Limited Partner or the Class C Limited Partner may require the Partnership to liquidate publicly traded securities held by the Partnership or Highland Select Equity Master Fund, L.P., a Delaware limited partnership controlled by the Partnership; provided, however, that the General Partner may in its sole discretion elect instead to liquidate other non-publicly traded securities owned by the Partnership in order to satisfy the Partnership's obligations under Section 3.9(b) and this Section 4.2(e). In either case, Affiliates of the General Partner shall have the right of first offer to purchase any securities liquidated under this Section 4.2(e).

**4.3.    Transfer of Partnership Interests**.

(a)    Transfer. No Partnership Interest shall be Transferred, in whole or in part, except in accordance with the terms and conditions set forth in this Section 4.3 and the Second Amended Buy-Sell and Redemption Agreement. Any Transfer or purported Transfer of any Partnership Interest not made in accordance with this Section 4.3 and the Second Amended Buy-Sell and Redemption Agreement shall be null and void. An alleged transferee shall have no right to require any information or account of the Partnership's transactions or to inspect the Partnership's books. The Partnership shall be entitled to treat the alleged transferor of a Partnership Interest as the absolute owner thereof in all respects, and shall incur no liability to any alleged transferee for distributions to the Partner owning that Partnership Interest of record or for allocations of Profits, Losses, deductions or credits or for transmittal of reports and notices required to be given to holders of Partnership Interests.

19

D-CNL003149

(b)     Transfers by General Partner.  The General Partner may Transfer all, but not less than all, of its Partnership Interest to any Person only with the approval of a Majority Interest; provided, however, that the General Partner may not Transfer its Partnership Interest during any NAV Ratio Trigger Period except to the extent such Transfers are for estate planning purposes or resulting from the death of the individual owner of the General Partner.  Any Transfer by the General Partner of its Partnership Interest under this Section 4.3(b) to an Affiliate of the General Partner or any other Person shall not constitute a withdrawal of the General Partner under Section 4.5(a), Section 5.1(b), or any other provision of this Agreement.  If any such Transfer is deemed to constitute a withdrawal under such provisions or otherwise and results in the dissolution of the Partnership under this Agreement or the laws of any jurisdiction to which the Partnership of this Agreement is subject, the Partners hereby unanimously consent to the reconstitution and continuation of the Partnership immediately following such dissolution, pursuant to Section 5.2.

(c)     Transfers by Limited Partners.  The Partnership Interest of a Limited Partner may not be Transferred without the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), and in accordance with the Second Amended Buy-Sell and Redemption Agreement.

(d)     Distributions and Allocations in Respect of Transferred Partnership Interests.  If any Partnership Interest is Transferred during any Fiscal Year in compliance with the provisions of Article 4 and the Second Amended Buy-Sell and Redemption Agreement, Profits, Losses, and all other items attributable to the transferred interest for that period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner; provided that no allocations shall be made under this Section 4.3(d) that would affect any special allocations made under Section 3.4.  All distributions declared on or before the date of that Transfer shall be made to the transferor.  Solely for purposes of making such allocations and distributions, the Partnership shall recognize that Transfer not later than the end of the calendar month during which it is given notice of that Transfer; *provided, however,* if the Partnership does not receive a notice stating the date that Partnership Interest was Transferred and such other information as the General Partner may reasonably require within thirty (30) days after the end of the Fiscal Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the person who, according to the books and records of the Partnership, on the last day of the Fiscal Year during which the Transfer occurs, was the owner of the Partnership Interest.  Neither the Partnership nor any Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 4.3(d), whether or not any Partner or the Partnership has knowledge of any Transfer of ownership of any Partnership Interest.

(e)     Forfeiture of Partnership Interests Pursuant to the Contribution Note.  In the event any Class B Limited Partnership Interests are forfeited in favor of the Partnership as a result of any default on the Contribution Note, the Capital Accounts and Percentage Interests associated with such Class B Limited Partnership Interests shall be allocated pro rata among the Class A Partners.  The Priority Distributions in Section 3.9(b) made after the date of such forfeiture shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the Class B Limited Partnership Interest transferred pursuant to this Section 4.3(e) over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any forfeiture of such Class B Limited Partnership Interest.

(f)     Transfers of Partnership Interests Pursuant to the Purchase Notes.  Notwithstanding any other provision in this Agreement, the Partnership shall respect, and the General Partner hereby provides automatic consent for, any transfers (in whole or transfers of partial interests) of

20

D-CNL003150

**Appx. 00164**

the Class C Limited Partnership Interests, or a portion thereof, if such transfer occurs as a result of a default on the Purchase Notes. Upon the transfer of any Class C Limited Partnership Interest to any member of the Founding Partner Group (or their assigns), such Class C Limited Partnership Interest shall automatically convert to a Class A Partnership Interest. The Priority Distributions in Section 3.9(b) shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the transferred Class C Limited Partnership Interest over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any transfer of such Class C Limited Partnership Interest.

**4.4.    Issuances of Partnership Interests to New and Existing Partners.**

(a)    Issuance of Partnership Interests to New Limited Partners. The General Partner may admit one or more additional Persons as Limited Partners ("Additional Limited Partners") to the Partnership at such times and upon such terms as it deems appropriate in its sole and unfettered discretion; provided, however, that the General Partner may only admit additional Persons as Limited Partners in relation to the issuance of equity incentives to key employees of the Partnership; provided, further that the General Partner may not issue such equity incentives to the extent they entitle the holders, in the aggregate, to a Percentage Interest in excess of twenty percent without the consent of the Class B Limited Partner and the Class C Limited Partner. All Class A Limited Partners, the Class B Limited Partner and the Class C Limited Partner shall be diluted proportionately by the issuance of such limited partnership interests. No Person may be admitted to the Partnership as a Limited Partner until he/she/it executes an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.

(b)    Issuance of an Additional Partnership Interest to an Existing Partner. The General Partner may issue an additional Partnership Interest to any existing Partner at such times and upon such terms as it deems appropriate in its sole and unfettered discretion. Upon the issuance of an additional Partnership Interest to an existing Partner, the Percentage Interests of the members of the Founding Partner Group shall be diluted proportionately. Any additional Partnership Interest shall be subject to all the terms and conditions of this Agreement and the Second Amended Buy-Sell and Redemption Agreement.

**4.5.    Withdrawal of General Partner**

(a)    Option. In the event of the withdrawal of the General Partner from the Partnership, the departing General Partner (the "***Departing Partner***") shall, at the option of its successor (if any) exercisable prior to the effective date of the departure of that Departing Partner, promptly receive from its successor in exchange for its Partnership Interest as the General Partner, an amount in cash equal to its Capital Account balance, determined as of the effective date of its departure.

(b)    Conversion. If the successor to a Departing Partner does not exercise the option described in Section 4.5(a), the Partnership Interest of the Departing Partner as the General Partner of the Partnership shall be converted into a Partnership Interest as a Limited Partner.

**4.6.    Admission of Substitute Limited Partners and Successor General Partner.**

(a)    Admission of Substitute Limited Partners. A transferee (which may be the heir or legatee of a Limited Partner) or assignee of a Limited Partner's Partnership Interest shall be entitled to receive only the distributive share of the Partnership's Profits, Losses, deductions, and credits attributable to that Partnership Interest. To become a substitute Limited Partner (a "***Substitute Limited Partner***"),

21

that transferee or assignee shall (1) obtain the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), (ii) comply with all the requirements of this Agreement and the Second Amended Buy-Sell and Redemption Agreement with respect to the Transfer of the Partnership Interest at issue, and (iii) execute an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.  Upon admission of a Substitute Limited Partner, that Limited Partner shall be subject to all of the restrictions applicable to, shall assume all of the obligations of, and shall attain the status of a Limited Partner under and pursuant to this Agreement with respect to the Partnership Interest held by that Limited Partner.

(b)     Admission of Successor General Partner.  A successor General Partner selected pursuant to Section 5.2 or the transferee of or successor to all of the Partnership Interest of the General Partner pursuant to Section 4.3(b) shall be admitted to the Partnership as the General Partner, effective as of the date of the withdrawal or removal of the predecessor General Partner or the date of Transfer of that predecessor's Partnership Interest.

(c)     Action by General Partner.  In connection with the admission of any substitute Limited Partner or successor General Partner or any additional Limited Partner, the General Partner shall have the authority to take all such actions as it deems necessary or advisable in connection therewith, including the amendment of Exhibit A and the execution and filing with appropriate authorities of any necessary documentation.

## ARTICLE 5

## DISSOLUTION AND WINDING UP

**5.1.    Dissolution.**  The Partnership shall be dissolved upon:

(a)     The withdrawal, bankruptcy, or dissolution of the General Partner, or any other event that results in its ceasing to be the General Partner (other than by reason of a Transfer pursuant to Section 4.3(b));

(b)     An election to dissolve the Partnership by the General Partner that is approved by the affirmative vote of a Majority Interest; *provided, however,* the General Partner may dissolve the Partnership without the approval of the Limited Partners in order to comply with Section 14 of the Second Amended Buy-Sell and Redemption Agreement; or

(c)     Any other event that, under the Delaware Act, would cause its dissolution.

For purposes of this Section 5.1, the bankruptcy of the General Partner shall be deemed to have occurred when the General Partner: (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding:  (iv) files a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the General Partner in a proceeding of the type described in clauses (i) through (iv) of this paragraph; (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties; or (vii) one hundred twenty (120) days expire after the date of the commencement of a proceeding against the General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or

22

similar relief under any law if the proceeding has not been previously dismissed, or ninety (90) days expire after the date of the appointment, without the General Partner's consent or acquiescence, of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties if the appointment has not previously been vacated or stayed, or ninety (90) days expire after the date of expiration of a stay, if the appointment has not previously been vacated.

**5.2.    Continuation of the Partnership**.  Upon the occurrence of an event described in Section 5.1(a), the Partnership shall be deemed to be dissolved and reconstituted if a Majority Interest elect to continue the Partnership within ninety (90) days of that event.  If no election to continue the Partnership is made within ninety (90) days of that event, the Partnership shall conduct only activities necessary to wind up its affairs.  If an election to continue the Partnership is made upon the occurrence of an event described in Section 5.1(a), then:

(a)    Within that ninety (90)-day period a successor General Partner shall be selected by a Majority Interest;

(b)    The Partnership shall be deemed to be reconstituted and shall continue until the end of the term for which it is formed unless earlier dissolved in accordance with this Article 5;

(c)    The interest of the former General Partner shall be converted to an interest as a Limited Partner; and

(d)    All necessary steps shall be taken to amend or restate this Agreement and the Certificate of Limited Partnership, and the successor General Partner may for this purpose amend this Agreement and the Certificate of Limited Partnership, as appropriate, without the consent of any Partner.

**5.3.    Liquidation**.  Upon dissolution of the Partnership, unless the Partnership is continued under Section 5.2, the General Partner or, in the event the General Partner has been dissolved, becomes bankrupt (as defined in Section 5.1), or withdraws from the Partnership, a liquidator or liquidating committee selected by a Majority Interest, shall be the Liquidator.  The Liquidator (if other than the General Partner) shall be entitled to receive such compensation for its services as may be approved by a Majority Interest.  The Liquidator shall agree not to resign at any time without fifteen (15) days' prior written notice and (if other than the General Partner) may be removed at any time, with or without cause, by notice of removal approved by a Majority Interest.  Upon dissolution, removal, or resignation of the Liquidator, a successor and substitute Liquidator (who shall have and succeed to all rights, powers, and duties of the original Liquidator) shall within thirty (30) days thereafter be selected by a Majority Interest. The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the Liquidator shall be deemed to refer also to any such successor or substitute Liquidator appointed in the manner provided herein.  Except as expressly provided in this Article 5, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the parties hereto, all of the powers conferred upon the General Partner under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Partnership as provided herein.  The Liquidator shall liquidate the assets of the Partnership and apply and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

23

(a)     To the payment of the expenses of the terminating transactions including, without limitation, brokerage commission, legal fees, accounting fees and closing costs;

(b)     To the payment of creditors of the Partnership, including Partners, in order of priority provided by law;

(c)     To the Partners and assignees to the extent of, and in proportion to, the positive balances in their respective Capital Accounts as provided in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2); *provided, however,* the Liquidator may place in escrow a reserve of cash or other assets of the Partnership for contingent liabilities in an amount determined by the Liquidator to be appropriate for such purposes; and

(d)     To the Partners in proportion to their respective Percentage Interests.

**5.4.    Distribution in Kind.**  Notwithstanding the provisions of <u>Section 5.3</u> that require the liquidation of the assets of the Partnership, but subject to the order of priorities set forth therein, if on dissolution of the Partnership the Liquidator determines that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners and assignees, the Liquidator may defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Partnership (other than those to Partners) and/or may distribute to the Partners and assignees, in lieu of cash, as tenants in common and in accordance with the provisions of <u>Section 5.3</u>, undivided interests in such Partnership assets as the Liquidator deems not suitable for liquidation**.**  Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any joint operating agreements or other agreements governing the operation of such properties at such time**.**  The Liquidator shall determine the fair market value of any property distributed in kind using such reasonable method of valuation as it may adopt.

**5.5.    Cancellation of Certificate of Limited Partnership.**  Upon the completion of the distribution of Partnership property as provided in <u>Sections 5.3</u> and <u>5.4</u>, the Partnership shall be terminated, and the Liquidator (or the General Partner and Limited Partners if necessary) shall cause the cancellation of the Certificate of Limited Partnership in the State of Delaware and of all qualifications and registrations of the Partnership as a foreign limited partnership in jurisdictions other **than** the State of Delaware and shall take such other actions as may be necessary to terminate the Partnership.

**5.6.    Return of Capital.**  The General Partner shall not be personally liable for the return of the Capital Contributions of Limited Partners, or any portion thereof, it being expressly understood that any such return shall be **made** solely from Partnership assets.

**5.7.    Waiver of Partition.**  Each Partner hereby waives any rights to partition of the Partnership property.

### ARTICLE 6

### GENERAL PROVISIONS

**6.1.    Amendments to Agreement.**  The General Partner may amend this Agreement without the consent of any Partner if the General Partner reasonably determines that such amendment is necessary and appropriate; *provided, however, any* action taken by the General Partner shall be subject to its fiduciary duties to the Limited Partners under the Delaware Act; provided further that any amendments

D-CNL003154

**Appx. 00168**

that adversely affect the Class B Limited Partner or the Class C Limited Partner may only be made with the consent of such Partner adversely affected.

     **6.2.**     **Addresses and Notices.** Any notice, demand, request, or report required or permitted to be given or made to a Partner under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by United States registered or certified mail to the Partner at his/her/its address as shown on the records of the Partnership, regardless of any claim of any Person who may have an interest in any Partnership Interest by reason of an assignment or otherwise.

     **6.3.**     **Titles and Captions.** All article and section titles and captions in the Agreement are for convenience only, shall not be deemed part of this Agreement, and in no way shall define, limit, extend, or describe the scope or intent of any provisions hereof**.** Except as specifically provided otherwise, references to "Articles," "Sections" and "Exhibits" are to "Articles," "Sections" and "Exhibits" of this Agreement**.** All Exhibits hereto are incorporated herein by reference.

     **6.4.**     **Pronouns and Plurals.** Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns, and verbs shall include the plural and vice versa.

     **6.5.**     **Further Action.** The parties shall execute all documents, provide all information, and take or refrain from taking all actions as may be necessary or appropriate to achieve the purposes of this Agreement.

     **6.6.**     **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns.

     **6.7.**     **Integration.** This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

     **6.8.**     **Creditors.** None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership.

     **6.9.**     **Waiver.** No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement, or condition.

     **6.10.**    **Counterparts.** This agreement may be executed in counterparts, all of which together shall constitute one agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

     **6.11.**    **Applicable Law.** This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to the principles of conflicts of law.

     **6.12.**    **Invalidity of Provisions.** If any provision of this Agreement is declared or found to be illegal, unenforceable, or void, in whole or in part, then the parties shall be relieved of all obligations arising under that provision, but only to the extent that it is illegal, unenforceable, or void, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying that provision to the extent necessary to make it legal and enforceable while preserving its intent or, if that is

25

not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives.

**6.13. General Partner Discretion.** Whenever the General Partner may use its sole discretion, the General Partner may consider any items it deems relevant, including its own interest and that of its affiliates.

**6.14. Mandatory Arbitration.** In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief. The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service. A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas. The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted. The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law. Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law. In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules. All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury. All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

D-CNL003156

Appx. 00170

*Remainder of Page intentionally Left Blank.*
*Signature Page Follows.*

27

D-CNL003157

**Appx. 00171**

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
James D. Dondero,
President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**MARK K. OKADA**
_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated
Agreement of Limited Partnership*

D-CNL003158

**Appx. 00172**

    IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
      James D. Dondero,
      President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated
Agreement of Limited Partnership*

**HUNTER MOUNTAIN INVESTMENT TRUST**
By: Beacon Mountain LLC, Administrator

By: _____
Name: John Honis
Its:    President

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

**EXHIBIT A**

| | Percentage Interest | |
| --- | --- | --- |
| **CLASS A PARTNERS** | **By Class** | **Effective %** |
| GENERAL PARTNER: | | |
| Strand Advisors | 0.5573% | 0.2508% |
| LIMITED PARTNERS: | | |
| The Dugaboy Investment Trust | 74.4426% | 0.1866% |
| Mark K. Okada | 19.4268% | 0.0487% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #1 | 3.9013% | 0.0098% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #2 | 1.6720% | 0.0042% |
| Total Class A Percentage Interest | 100.0000% | 0.500% |
| **CLASS B LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 55.0000% |
| **CLASS C LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 44.500% |
| **PROFIT AND LOSS AMONG CLASSES** | | |
| Class A Partners | 0.5000% | |
| Class B Partners | 55.0000% | |
| Class C Partners | 44.5000% | |

**EXHIBIT B**

**ADDENDUM**
**TO THE**
**FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS ADDENDUM (this "**Addendum**") to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, to be effective as of December 24, 2015, as amended from time to time (the "Agreement"), is made and entered into as of the ___ day of _____, 20_, by and between Strand Advisors, Inc., as the sole General Partner (the "**General Partner**") of Highland Capital Management, L.P. (the "**Partnership**") and _____ ("_____") (except as otherwise provided herein, all capitalized terms used herein shall have the meanings set forth in the Agreement).

RECITALS:

WHEREAS, the General Partner, in its sole and unfettered discretion, and without the consent of any Limited Partner, has the authority under (i) Section 4.4 of the Agreement to admit Additional Limited Partners, (ii) Section 4.6 of the Agreement to admit Substitute Limited Partners and (iii) Section 6.1 of the Agreement to amend the Agreement;

WHEREAS, the General Partner desires to admit _____ as a Class __ Limited Partner holding a __% Percentage Interest in the Partnership as of the date hereof;

WHEREAS, _____desires to become a Class __ Limited Partner and be bound by the terms and conditions of the Agreement; and

WHEREAS, the General Partner desires to amend the Agreement to add _____ as a party thereto.

AGREEMENT:

RESOLVED, as a condition to receiving a Partnership Interest in the Partnership, _____ acknowledges and agrees that he/she/it (i) has received and read a copy of the Agreement, (ii) shall be bound by the terms and conditions of the Agreement; and (iii) shall promptly execute an addendum to the Second Amended Buy-Sell and Redemption Agreement; and be it

FURTHER RESOLVED, the General Partner hereby amends the Agreement to add _____ as a Limited Partner, and the General Partner shall attach this Addendum to the Agreement and make it a part thereof; and be it

FURTHER RESOLVED, this Addendum may be executed in any number of counterparts, all of which together shall constitute one Addendum binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the day and year above written.

GENERAL PARTNER:

**STRAND ADVISORS, INC.**

By: _____
   Name: _____
   Title: _____


NEW LIMITED PARTNER:

[_____]

AGREED AND ACCEPTED:

In consideration of the terms of this Addendum and the Agreement, in consideration of the Partnership's allowing the above signed Person to become a Limited Partner of the Partnership, and for other good and valuable consideration receipt of which is hereby acknowledged, the undersigned shall be bound by the terms and conditions of the Agreement as though a party thereto.

SPOUSE OF NEW LIMITED PARTNER:

[_____]

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS Highland Capital Management, L.P. | DEFENDANTS Highland Capital Management Services, Inc., James Dondero, Nancy Dondero, and The Dugaboy Investment Trust |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.) Hayward PLLC 10501 N. Central Expressway, Suite 106 Dallas, Texas 75231 Tel.: (972) 755-7100 | ATTORNEYS (If Known) Stinson LLP (for Highland Capital Management Services, Inc. and Nancy Dondero); Heller, Draper & Horn, L.L.C. (for The Dugaboy Investment Trust) |
| PARTY (Check One Box Only) ☑ Debtor ☐ U.S. Trustee/Bankruptcy Admin ☐ Creditor ☐ Other ☐ Trustee | PARTY (Check One Box Only) ☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin ☐ Creditor ☑ Other ☐ Trustee |

CAUSE OF ACTION (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Breach of Contract; Turnover Pursuant to 11 USC 542(b); Avoidance and Recovery of Actual Fraudulent Transfer under 11 USC 548(a)(1)(A) and 550; Avoidance and Recovery of Actual Fraudulent Transfer under 11 USC 544(b) and 550 and Tex. Bus. & C. Code 24.005(a)(1); Declaratory Relief; Breach of Fiduciary Duty; Aiding & Abetting Breach of Fiduciary Duty

### NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☑2 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐3 13-Recovery of money/property - §548 fraudulent transfer
☑4 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny
(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐5 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ Damages in an amount to be determined at trial |

Other Relief Sought  Turnover of amounts due under note, avoidance of transfers to defendants, declaratory relief, punitive and exemplary damages, costs, attorneys' fees

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Highland Capital Management, L.P. | BANKRUPTCY CASE NO.<br>19-34054-sgj11 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Dallas | NAME OF JUDGE<br>Stacey G. C. Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>August 27, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Zachery Z. Annable | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

# EXHIBIT 4

Appx. 00180

Docket #0063  Date Filed: 8/27/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § Case No. 19-34054-sgj11 |
| | § |
| Debtor. | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | § Adversary Proceeding No. |
| | § |
| vs. | § 21-03007 |
| | § |
| HCRE PARTERS, LLC (N/K/A/ NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST | § |
| | § |
| | § |
| | § |
| Defendants. | § |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦¦
1934054210827000000000014

**AMENDED COMPLAINT FOR (I) BREACH OF CONTRACT,
(II) TURNOVER OF PROPERTY, (III) FRAUDULENT TRANSFER, AND (IV)
BREACH OF FIDUCIARY DUTY**

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"), and the plaintiff (the "Plaintiff") in the above-captioned adversary proceeding (the "Adversary Proceeding"), by its undersigned counsel, as and for its amended complaint (the "Complaint") against defendants HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) ("HCRE"), James Dondero ("Mr. Dondero"), Nancy Dondero ("Ms. Dondero"), and The Dugaboy Investment Trust ("Dugaboy" and together with HCRE, Mr. Dondero, and Ms. Dondero, the "Defendants"), alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

**PRELIMINARY STATEMENT**

1.      The Debtor brings this action against Defendants in connection with HCRE's defaults under (i) four demand notes, in the aggregate principal amount of $4,250,000, and payable upon the Debtor's demand, and (ii) one term note, in the aggregate principal amount of $6,059,831.51, payable in the event of default, all executed by HCRE in favor of the Debtor. HCRE has failed to pay amounts due and owing under the notes and the accrued but unpaid interest thereon.

2.      In paragraph 58 of HCRE's *First Amended Answer to Plaintiff's Complaint* [Docket No. 34], HCMS contends that the Debtor orally agreed to relieve it of the obligations under the Notes (as defined below) upon fulfillment of "conditions subsequent" (the "Alleged Agreement"). HCRE further contends that the Alleged Agreement was entered into between James Dondero and his sister, Nancy Dondero, as representative of a majority of the Class A

2

D-CNL003242

**Appx. 00182**

shareholders of the Plaintiff, including Dugaboy (the "Representative"), acting on behalf of the Debtor. At the time Mr. Dondero entered into the Alleged Agreement on behalf of HCRE, he controlled both HCRE and the Debtor and was the lifetime beneficiary of Dugaboy.

3. Based on its books and records, discovery to date, and other facts, the Debtor believes that the Alleged Agreement is a fiction created after the commencement of this Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due under the Notes.

4. Nevertheless, the Debtor amends its Complaint to add certain claims and name additional parties who would be liable to the Debtor if the Alleged Agreement were determined to exist and be enforceable. Specifically, in addition to pursuing claims against HCMS for breach of its obligations under the Notes and for turnover, the Debtor adds alternative claims (a) against HCMS for actual fraudulent transfer and aiding and abetting Dugaboy in its breach of fiduciary duty, (b) against Dugaboy for declaratory relief and for breach of fiduciary duty, and (c) against Nancy Dondero for aiding and abetting Dugaboy in the breach of his fiduciary duties.

5. As remedies, the Debtor seeks (a) damages from HCRE in an amount equal to (i) the aggregate outstanding principal due under the Notes (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the notes), for HCRE's breach of its obligations under the Notes, and (b) turnover by HCRE to the Debtor of the foregoing amounts; (c) avoidance of the Alleged Agreement and the transfers thereunder and recovery of the funds transferred from the Plaintiff to, or for the benefit of, HCRE pursuant to the Notes; (d) declaratory relief, and (e) damages arising from the Defendants' breach of fiduciary duties or aiding and abetting thereof.

DOCS_NY:42002.5 36027/002

D-CNL003243

**Appx. 00183**

## JURISDICTION AND VENUE

6.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

8.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

10.     The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

11.     Upon information and belief, HCRE is a limited liability company with offices located in Dallas, Texas, and is organized under the laws of the state of Delaware.

12.     Upon information and belief, Mr. Dondero is an individual residing in Dallas, Texas.  He is the co-founder of the Debtor and was the Debtor's President and Chief Executive Officer until his resignation on January 9, 2020.  At all relevant times, Mr. Dondero controlled HCRE; Mr. Dondero also controlled the Debtor until January 9, 2020.

13.     Upon information and belief, Dugaboy is (a) a limited partner of the Debtor, and (b) one of Mr. Dondero's family investment trusts for which is he a lifetime beneficiary.

DOCS_NY:42002.5 36027/002

14.     Upon information and belief, Nancy Dondero is an individual residing in the state of Florida and who is Mr. Dondero's sister, and a trustee of Dugaboy.

## CASE BACKGROUND

15.     On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

16.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members:  (a) Redeemer Committee of Highland Crusader Fund ("Redeemer"), (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively, "Acis").

17.     On June 25, 2021, the U.S. Trustee in this Court filed that certain *Notice of Amended Unsecured Creditors' Committee* [Docket No. 2485] notifying the Court that Acis and Redeemer had resigned from the Committee.

18.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

19.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

---

[2] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

DOCS_NY:42002.5 36027/002

D-CNL003245

Appx. 00185

**STATEMENT OF FACTS**

A. **The HCRE Demand Notes**

20. HCRE is the maker under a series of demand notes in favor of the Debtor.

21. Specifically, on November 27, 2013, HCRE executed a demand note in favor of the Debtor, as payee, in the original principal amount of $100,000 ("HCRE's First Demand Note"). A true and correct copy of HCRE's First Demand Note is attached hereto as **Exhibit 1**.

22. On October 12, 2017, HCRE executed a demand note in favor of the Debtor, as payee, in the original principal amount of $2,500,000 ("HCRE's Second Demand Note"). A true and correct copy of HCRE's Second Demand Note is attached hereto as **Exhibit 2.**

23. On October 15, 2018, 2017, HCRE executed a demand note in favor of the Debtor, as payee, in the original principal amount of $750,000 ("HCRE's Third Demand Note"). A true and correct copy of HCRE's Third Demand Note is attached hereto as **Exhibit 3**

24. On September 25, 2019, HCRE executed a demand note in favor of the Debtor, as payee, in the original principal amount of $900,000 ("HCRE's Fourth Demand Note," and collectively, with HCRE's First Demand Note, HCRE's Second Demand Note, and HCRE's Third Demand Note, the "Demand Notes"). A true and correct copy of HCRE's Fourth Demand Note is attached hereto as **Exhibit 4.**

25. Section 2 of the Demand Notes provide: "**Payment of Principal and Interest**. The accrued interest and principal of this Note shall be due and payable on demand of the Payee."

26. Section 4 of the Demand Notes provide:

**Acceleration Upon Default**. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice

6

D-CNL003246

**Appx. 00186**

of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

27. Section 6 of the Demand Notes provide:

**Attorneys' Fees**. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

## B.    HCRE's Defaults Under Each Demand Note

28. By letter dated December 3, 2020, the Debtor made demand on HCRE for payment of the Demand Note Repayment Amount by December 11, 2020 (the "Demand Letter"). A true and correct copy of the Demand Letter is attached hereto as **Exhibit 5**. The Demand Letter provides:

By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $5,012,260.96, which represents all accrued interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Demand Letter (emphasis in the original).

29. Despite the Debtor's demand, HCRE did not pay all or any portion of the amount demanded by the Debtor on December 11, 2020, or at any time thereafter.

30. As of December 11, 2020, there was an outstanding principal amount of $171,542 on HCRE's First Demand Note and accrued but unpaid interest in the amount of $526.10, resulting in a total outstanding amount as of that date of $172,068.10.

7

D-CNL003247

**Appx. 00187**

31.    As of December 11, 2020, there was an outstanding principal balance of $3,149,919.12 on HCRE's Second Demand Note and accrued but unpaid interest in the amount of $41,423.60, resulting in a total outstanding amount as of that date of $3,191,342.72.

32.    As of December 11, 2020, there was an outstanding principal balance of $874,977.53 on HCRE's Third Demand Note and accrued but unpaid interest in the amount of $10,931.23, resulting in a total outstanding amount as of that date of $885,908.76.

33.    As of December 11, 2020, there was an outstanding principal balance of $750,279.14 on HCRE's Fourth Demand Note and accrued but unpaid interest in the amount of $12,662.24, resulting in a total outstanding amount as of that date of $762,941.38.

34.    Thus, as of December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the Demand Notes was $5,012,260.96.

35.    Pursuant to Section 4 of each Note, each Note is in default, and is currently due and payable.

**C.    The HCRE Term Note**

36.    HCRE is the maker under a term note in favor of the Debtor.

37.    Specifically, on May 31, 2017, HCRE executed a term note in favor of the Debtor, as payee, in the original principal amount of $6,059,831 (the "Term Note," and together with the Demand Notes, the "Notes"). A true and correct copy of the Term Note is attached hereto as **Exhibit 6**.

38.    Section 2 of the Term Note provides: "**Payment of Principal and Interest**. Principal and interest under this Note shall be due and payable as follows:

**2.1    Annual Payment Dates.**  During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of

8

D-CNL003248

**Appx. 00188**

this Note, commencing on the first such date to occur after the date of execution of this note.

**2.2**   **Final Payment Date**.   The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

39.      Section 3 of the Term Note provides:

**Prepayment Allowed: Renegotiation Discretionary**.   Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

40.      Section 4 of the Term Note provides:

**Acceleration Upon Default**.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

41.      Section 6 of the Term Note provides:

**Attorneys' Fees**.   If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**D.**     **HCRE's Default Under the Term Note**

42.      HCRE failed to make the payment due under the Term Note on December 31, 2020.

43.      By letter dated January 7, 2021, the Debtor made demand on HCRE for immediate payment under the Term Note (the "Second Demand Letter").  A true and correct copy of the Second Demand Letter is attached hereto as **Exhibit 7**.  The Demand Letter provides:

<div align="center">9</div>

D-CNL003249
**Appx. 00189**

Because of Maker's failure to pay, the Note is in default.  Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of January 8, 2021 is $6,145,466.84; however, interest continues to accrue under the Note.

**The Term Note is in default, and payment is due <u>immediately</u>.**

Second Demand Letter (emphasis in the original).

44.    Despite the Debtor's demands, HCRE did not pay the amount demanded by the debtor on January 7, 2021, or at any time thereafter.

45.    As of January 8, 2021, the total outstanding principal and accrued but unpaid interest under the Term Note was 6,145,466.84.

46.    Pursuant to Section 4 of the Term Note, the Note is in default, and is currently due and payable.

**E.    <u>The Debtor Files the Original Complaint</u>**

47.    On January 22, 2021, the Debtor filed the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* [Docket No. 1] (the "<u>Original Complaint</u>").  In the Original Complaint, the Debtor brought claims for (i) breach of contract for HCRE's breach of its obligations under the Notes and (ii) turnover by HCRE for the outstanding amounts under the Notes, plus all accrued and unpaid interest until the date of payment plus the Debtor's costs of collection and reasonable attorney's fees.

**F.    <u>HCRE's Affirmative Defenses</u>**

48.    On March 13, 2021, HCMS filed *Highland Capital Management Services, Inc.'s Answer to Plaintiff's Complaint* [Docket No. 6] (the "<u>Original Answer</u>").  In its Original Answer, HCMS asserted four affirmative defenses: (i) the claims are barred in whole or in part under the doctrines of justification or repudiation, (ii) waiver, (iii) estoppel, and (iv) offset and/or setoff (the "<u>Setoff Defense</u>"). *See id.* ¶¶ 55-58.

10

D-CNL003250
**Appx. 00190**

49. On June 11, 2021, HCRE filed its *First Amended Answer to Plaintiff's Complaint* [Docket No. 34] (the "Amended Answer"), that omitted the Setoff Defense but asserted two affirmative defenses: (i) the Debtor previously agreed that it would not collect on the Notes "upon fulfillment of conditions subsequent" (*i.e.*, the Alleged Agreement) *id.* ¶ 58, and (ii) the Notes are "ambiguous," *id.* ¶ 59.

50. According to HCRE, the Alleged Agreement was orally entered into "sometime between December of the year each note was made and February of the following year."

51. According to HCRE, Mr. Dondero, acting on its behalf, entered into the Alleged Agreement with his sister, Nancy Dondero, acting as the Representative.

52. Mr. Dondero controlled the Debtor at the time he entered into the Alleged Agreement on behalf of HCRE.

53. Upon information and belief, the Debtor's books and records do not reflect the Alleged Agreement.

**G.** **Dugaboy Lacked Authority to Act on Behalf of the Debtor**

54. Under section 4.2 of the *Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (the "Limited Partnership Agreement"), and attached hereto as **Exhibit 8**, Dugaboy was not authorized to enter into the Alleged Agreement on behalf of the Partnership, or otherwise bind the Partnership (as "Partnership" is defined in the Limited Partnership Agreement).

55. Section 4.2(b) of the Limited Partnership Agreement states:

Management of Business. No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

11

D-CNL003251

**Appx. 00191**

**Exhibit 8**, § 4.2(b).

56. No provision in the Limited Partnership Agreement authorizes any of the Partnership's limited partners to bind the Partnership.

57. Nancy Dondero also lacked authority to enter into the Alleged Agreement or to otherwise bind the Debtor.

<div align="center">

**FIRST CLAIM FOR RELIEF**
**(Against HCRE)**

**(For Breach of Contract)**
</div>

58. The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

59. Each Note is a binding and enforceable contract.

60. HCRE breached each Demand Note by failing to pay all amounts due to the Debtor upon the Debtor's demand.

61. HCRE breached the Term Note by failing to pay all amounts due to the Debtor upon HCRE's default and acceleration.

62. Pursuant to each Note, the Debtor is entitled to damages from HCRE in an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for HCRE's breach of its obligations under each of the Notes.

63. As a direct and proximate cause of HCRE's breach of each Demand Note, the Debtor has suffered damages in the amount of at least $5,012,260.96, as of December 11, 2020, plus an amount equal to all accrued but unpaid interest from that date, plus the Debtor's cost of collection.

<div align="center">12</div>

DOCS_NY:42002.5 36027/002

64.      As a direct and proximate cause of HCRE's breach of the Term Note, the Debtor has suffered damages in the amount of at least $6,145,466.84, as of January 8, 2021, plus an amount equal to all accrued but unpaid interest from that date, plus the Debtor's cost of collection.

<div align="center">

**SECOND CLAIM FOR RELIEF**
**(Against HCRE)**
**(Turnover by HCRE Pursuant to 11 U.S.C. § 542(b))**

</div>

65.      The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

66.      HCRE owes the Debtor an amount equal to (i) the aggregate outstanding principal due under each of the Notes, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for HCRE's breach of its obligations under each of the Notes

67.      Each Demand Note is property of the Debtor's estate and the amounts due under each Demand Note is matured and payable upon demand.

68.      The Term Note is property of the Debtor's estate and the amounts due under the Term Note is matured and payable upon default and acceleration.

69.      The Debtor has made demand for turnover of the amounts due under each of the Notes.

70.      As of the date of filing this Complaint, HCRE has not turned over to the Debtor all or any of the amounts due under each of the Notes.

71.      The Debtor is entitled to the turnover of all amounts due under each of the Notes.

DOCS_NY:42002.5 36027/002

D-CNL003253

**Appx. 00193**

### THIRD CLAIM FOR RELIEF
#### (Against HCRE)
### (Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) and 550)

72. The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

73. The Debtor made the transfers pursuant to the Alleged Agreement within two years of the Petition Date.

74. Mr. Dondero entered into the Alleged Agreement on behalf of HCRE with actual intent to hinder, delay, or defraud a present or future creditor, demonstrated by, *inter alia*:

(a) The transfers were made to, or for the benefit of, HCRE, an insider of the Debtor.

(b) Mr. Dondero entered into the Alleged Agreement on behalf of HCRE with his sister, Nancy Dondero.

(c) Mr. Dondero did not inform the Debtor's CFO or outside auditors about the Alleged Agreement.

(d) The Debtor's books and record do not reflect the Alleged Agreement.

(e) The Alleged Agreement was not subject to negotiation.

(f) The value of the consideration received by the Debtor for the transfers was not reasonably equivalent in value.

75. The pattern of conduct, series of transactions, and general chronology of events under inquiry in connection with the debt HCRE incurred under the Notes demonstrates a scheme of fraud.

76. Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from HCRE.

DOCS_NY:42002.5 36027/002

D-CNL003254

**Appx. 00194**

77.    Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfer thereunder, and (ii) recovering from HCRE an amount equal to all obligations remaining under the Notes.

<u>**FOURTH CLAIM FOR RELIEF**</u>
**(Against HCRE)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))**

78.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

79.    The Debtor made the transfers pursuant to the Alleged Agreement after, or within a reasonable time before, creditors' claims arose.

80.    Mr. Dondero entered into the Alleged Agreement on behalf of HCRE with actual intent to hinder, delay, or defraud a present or future creditor of the Debtor, demonstrated by, *inter alia*:

(g) The transfers were made to, or for the benefit of, HCRE, an insider of the Debtor.

(h) Mr. Dondero entered into the Alleged Agreement on behalf of HCRE with his sister, Nancy Dondero.

(i) Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement.

(j) Upon information and belief, the Debtor's books and record do not reflect the Alleged Agreement.

(k) The Alleged Agreement was not subject to negotiation.

(l) The value of the consideration received by the Debtor for the transfers was not reasonably equivalent in value.

15

D-CNL003255
**Appx. 00195**

81.     Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from HCRE.

82.     Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfer thereunder, and (ii) recovering from HCRE an amount equal to all obligations remaining under the Notes.

## FIFTH CLAIM FOR RELIEF
**(Against Dugaboy and Ms. Dondero)**
**(For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)**

83.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

84.     A bona fide, actual, present dispute exists between the Debtor, on the one hand, and Dugaboy and Ms. Dondero on the other hand, concerning whether Dugaboy and/or Ms. Dondero, acting as the Representative, were authorized to enter into the Alleged Agreement on the Debtor's behalf.

85.     A judgment declaring the parties' respective rights and obligations will resolve their dispute.

86.     Pursuant to Bankruptcy Rule 7001, the Debtor specifically seeks declarations that:

- (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement,

DOCS_NY:42002.5 36027/002

D-CNL003256
**Appx. 00196**

- (b) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) was authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership,

- (c) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) otherwise had any right or authority to enter into the Alleged Agreement on behalf of the Partnership, and

- (d) the Alleged Agreement is null and void.

### SIXTH CLAIM FOR RELIEF
### (Against Dugaboy and Ms. Dondero)
### (Breach of Fiduciary Duty)

87.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

88.     If Dugaboy, as a limited partner, or Ms. Dondero, as Representative, had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero would owe the Debtor a fiduciary duty.

89.     If Dugaboy or Ms. Dondero (as Representative) had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero breached their fiduciary duty of care to the Debtor by entering into and authorizing the purported Alleged Agreement on behalf of the Debtor.

90.     Accordingly, the Debtor is entitled to recover from Dugaboy and Ms. Dondero (a) actual damages that the Debtor suffered as a result of their breach of fiduciary duty, and (b) for punitive and exemplary damages.

DOCS_NY:42002.5 36027/002

D-CNL003257

**Appx. 00197**

## SEVENTH CLAIM FOR RELIEF
### (Against James Dondero and Nancy Dondero)
### (Aiding and Abetting a Breach of Fiduciary Duty)

91.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

92.    James Dondero and Nancy Dondero (together, the "Donderos") were aware that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor.

93.    The Donderos aided and abetted Dugaboy's breach of its fiduciary duties to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

94.    The Donderos aided and abetted Dugaboy's breach of its fiduciary duty to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

95.    Accordingly, the Donderos are jointly and severally liable (a) for the actual damages that the Debtor suffered as a result of aiding and abetting Dondero's breaches of fiduciary duties, and (b) for punitive and exemplary damages.

WHEREFORE, the Debtor prays for judgment as follows:

(i)    On its First Claim for Relief, damages in an amount to be determined at trial but includes (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's cost of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)    On its Second Claim for Relief, ordering turnover by HCRE to the Debtor of an amount equal to (a) the aggregate principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's cost of collection (including all court costs and reasonable attorneys' fees and expenses);

18

D-CNL003258
Appx. 00198

(iii)    On its Third Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder pursuant to the Alleged Agreement arising from actual fraudulent transfer under section 548 of the Bankruptcy Code;

(iv)    On its Fourth Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder pursuant to the Alleged Agreement of funds arising from actual fraudulent transfer under Tex. Bus. & C. Code § 24.005(a)(1);

(v)    On its Fifth Claim for Relief, a declaration that: (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement, (b) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) was authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership, (c) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) otherwise had any right or authority to enter into the Alleged Agreement on behalf of the Partnership, and (d) the Alleged Agreement is null and void;

(vi)    On its Sixth Claim for Relief, actual damages from Dugaboy and Ms. Dondero, in an amount to be determined at trial, that Debtor suffered as a result of their breach of fiduciary duty, and for punitive and exemplary damages;

(vii)    On its Seventh Claim for Relief, actual damages from the Donderos, jointly and severally, in an amount to be determined at trial, that Debtor suffered

DOCS_NY:42002.5 36027/002

D-CNL003259

Appx. 00199

as a result of aiding and abetting Dugaboy's breaches of fiduciary duty, and for

punitive and exemplary damages; and

(iii)    Such other and further relief as this Court deems just and proper.


Dated:  As of July 13, 2021.              PACHULSKI STANG ZIEHL & JONES LLP
                                          Jeffrey N. Pomerantz (CA Bar No.143717)
                                          Ira D. Kharasch (CA Bar No. 109084)
                                          John A. Morris (NY Bar No. 2405397)
                                          Gregory V. Demo (NY Bar No. 5371992)
                                          Hayley R. Winograd (NY Bar No. 5612569)
                                          10100 Santa Monica Blvd., 13th Floor
                                          Los Angeles, CA 90067
                                          Telephone: (310) 277-6910
                                          Facsimile: (310) 201-0760
                                          E-mail:    jpomerantz@pszjlaw.com
                                                     ikharasch@pszjlaw.com
                                                     jmorris@pszjlaw.com
                                                     gdemo@pszjlaw.com
                                                     hwinograd@pszjlaw.com

                                          -and-

                                          /s/ Zachery Z. Annable
                                          HAYWARD PLLC
                                          Melissa S. Hayward
                                          Texas Bar No. 24044908
                                          MHayward@HaywardFirm.com
                                          Zachery Z. Annable
                                          Texas Bar No. 24053075
                                          ZAnnable@HaywardFirm.com
                                          10501 N. Central Expy, Ste. 106
                                          Dallas, Texas 75231
                                          Tel: (972) 755-7100
                                          Fax: (972) 755-7110

                                          Counsel for Highland Capital Management, L.P.

DOCS_NY:42002.5 36027/002

D-CNL003260

Appx. 00200

# EXHIBIT 1

**PROMISSORY NOTE**

$100,000                                                      November 27, 2013

     FOR VALUE RECEIVED, HCRE PARTNERS, LLC ("***Maker***") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("***Payee***"), in legal and lawful tender of the United States of America, the principal sum of ONE HUNDRED THOUSAND and 00/100 Dollars ($100,000.00), together with interest, on the terms set forth below (the "***Note***").  All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.    Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to 8.00% per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

     2.    Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

     3.    Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.    Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     5.    Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     6.    Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

     7.    Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or

performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HCRE PARTNERS, LLC

2

D-CNL003263

**Appx. 00203**

# EXHIBIT 2

# PROMISSORY NOTE

$2,500,000                                                                              October 12, 2017

     FOR VALUE RECEIVED, HCRE PARTNERS, LLC (*"Maker"*) promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. (*"Payee"*), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the *"Note"*). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

    1.   <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to 8.00% per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

    2.   <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

    3.   <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

    4.   <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, become the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

    5.   <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

    6.   <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

    7.   <u>Limitation on Agreements</u>. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or

D-CNL003265

**Appx. 00205**

performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8. <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HCRE PARTNERS, LLC

2

# EXHIBIT 3

## PROMISSORY NOTE

$750,000 October 15, 2018

FOR VALUE RECEIVED, HCRE PARTNERS, LLC ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of SEVEN HUNDRED FIFTY THOUSAND and 00/100 Dollars ($750,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1. <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to 8.00% per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2. <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3. <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4. <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5. <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6. <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7. <u>Limitation on Agreements</u>. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or

performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8. <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HCRE PARTNERS, LLC

2

# EXHIBIT 4

D-CNL003270

**Appx. 00210**

# PROMISSORY NOTE

$900,000                                                            September 25, 2019

FOR VALUE RECEIVED, HCRE PARTNERS, LLC ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of NINE HUNDRED THOUSAND and 00/100 Dollars ($900,000.00), together with interest, on the terms set forth below (the "*Note*").  All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to 8.00% per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.      Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.      Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.      Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.      Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or

performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HCRE PARTNERS, LLC

2

D-CNL003272

**Appx. 00212**

# EXHIBIT 5

D-CNL003273
**Appx. 00213**

### HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)
c/o NexPoint Advisors, LP
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James Dondero

      Re: Demand on Promissory Notes:

Dear Mr. Dondero,

      HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) ("Maker") entered into the following promissory notes (collectively, the "Notes") in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 11/27/13 | $100,000 | $171,542.00 | $526.10 | $172,068.10 |
| 10/12/17 | $2,500,000 | $3,149,919.12 | $41,423.60 | $3,191,342.72 |
| 10/15/18 | $750,000 | $874,977.53 | $10,931.23 | $885,908.76 |
| 9/25/19 | $900,000 | $750,279.14 | $12,662.24 | $762,941.38 |
| **TOTALS** | **$4,250,000** | **$4,946,717.79** | **$65,543.17** | **$5,012,260.96** |

      As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee. By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $5,012,260.96, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

      **Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

      Payments on the Notes must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix A**.

      Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved. Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full. Any such interest will remain the obligation of Maker.

DOCS_NY:41665.1 36027/002

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:     Fred Caruso
        James Romey
        Jeffrey Pomerantz
        Ira Kharasch
        Gregory Demo
        DC Sauter

D-CNL003275

**Appx. 00215**

**Appendix A**

| | |
|---|---|
| ABA #: | 322070381 |
| Bank Name: | East West Bank |
| Account Name: | Highland Capital Management, LP |
| Account #: | 5500014686 |

# EXHIBIT 6

D-CNL003277

**Appx. 00217**

## PROMISSORY NOTE

**$6,059,831.51**                                                                **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in <u>Exhibit A</u> hereto, from HCRE Partners, LLC, as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, HCREA PARTNERS, LLC ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of SIX MILLION, FIFTY NINE THOUSAND, EIGHT HUNDRED THIRTY ONE AND 51/100 DOLLARS ($6,059,831.51), together with interest, on the terms set forth below.  All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of eight percent (8.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.      <u>Payment of Principal and Interest</u>. Principal and interest under this Note shall be payable as follows:

2.1      <u>Annual Payment Dates</u>. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

2.2      <u>Final Payment Date</u>.       The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

3.      <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same

shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.    Prior Notes.    The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

HCRE PARTNERS, LLC

By: _____
Name: James Dondero
Title:

2

**EXHIBIT A**

**PRIOR NOTES**

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 1/9/14 | $100,000.00 | 8.00% | $108,000.00 |
| 1/29/14 | $600,000.00 | 8.00% | $648,000.00 |
| 3/10/14 | $2,000,000.00 | 8.00% | $2,009,643.84 |
| 3/28/14 | $50,000.00 | 8.00% | $54,000.00 |
| 1/26/15 | $1,500,000.00 | 8.00% | $1,545,356.16 |
| 4/2/15 | $1,500,000.00 | 8.00% | $1,545,356 |
| | $5,750,000.00 | | $6,059,831.51 |

D-CNL003280

Appx. 00220

# EXHIBIT 7

## HIGHLAND CAPITAL MANAGEMENT, L.P.

January 7, 2021

HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)
c/o NexPoint Advisors, LP
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  James Dondero

      Re:  Demand on Promissory Note

Dear Mr. Dondero,

On May 31, 2017, HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) ("Maker") entered into that certain promissory note in the original principal amount of $6,059,831.51 (the "Note") in favor of Highland Capital Management, L.P. ("Payee").

As set forth in Section 2 of the Note, accrued interest and principal on the Note is due and payable in thirty equal annual payments with each payment due on December 31 of each calendar year.  Maker failed to make the payment due on December 31, 2020.

Because of Maker's failure to pay, the Note is in default.  Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of January 8, 2021 is $6,145,466.84; however, interest continues to accrue under the Note.

**The Note is in default, and payment is due <u>immediately.</u>**  Payments on the Note must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Note or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved.  Interest, including default interest if applicable, on the Note will continue to accrue until the Note is paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

DOCS_NY:41913.2 36027/002

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       DC Sauter

D-CNL003283

**Appx. 00223**

**Appendix A**

ABA #:            322070381
Bank Name:        East West Bank
Account Name:     Highland Capital Management, LP
Account #:        5500014686

# EXHIBIT 8

**FOURTH AMENDED AND RESTATED**

**AGREEMENT OF LIMITED PARTNERSHIP**

**OF**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THE PARTNERSHIP INTERESTS REPRESENTED BY THIS LIMITED PARTNERSHIP AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OP 1933 OR UNDER ANY STATE SECURITIES ACTS IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS. THE SALE OR OTHER DISPOSITION OF THE PARTNERSHIP INTERESTS IS PROHIBITED UNLESS THAT SALE OR DISPOSITION IS MADE IN COMPLIANCE WITH ALL SUCH APPLICABLE ACTS. ADDITIONAL RESTRICTIONS ON TRANSFER OF THE PARTNERSHIP INTERESTS ARE SET FORTH IN THIS AGREEMENT.

**FOURTH AMENDED AND RESTATED
AGREEMENT OF LIMITED PARTNERSHIP
OF
HIGHLAND CAPITAL MANAGEMENT, L.P.**

TABLE OF CONTENTS

ARTICLE 1    GENERAL ................................................................................................1
   1.1.    Continuation ....................................................................................1
   1.2.    Name ...............................................................................................1
   1.3.    Purpose ...........................................................................................1
   1.4.    Term. ...............................................................................................1
   1.5.    Partnership Offices; Addresses of Partners. ..................................1

ARTICLE 2    DEFINITIONS ...........................................................................................2
   2.1.    Definitions .......................................................................................2
   2.2.    Other Definitions ............................................................................6

ARTICLE 3    FINANCIAL MATTERS ............................................................................6
   3.1.    Capital Contributions .....................................................................6
   3.2.    Allocations of Profits and Losses ...................................................8
   3.3.    Allocations on Transfers .................................................................9
   3.4.    Special Allocations .........................................................................9
   3.5.    Curative Allocations .....................................................................10
   3.6.    Code Section 704(c) Allocations ..................................................10
   3.7.    Capital Accounts ..........................................................................11
   3.8.    Distributive Share for Tax Purpose ..............................................12
   3.9.    Distributions. ................................................................................12
   3.10.    Compensation and Reimbursement of General Partner ................14
   3.11.    Books, Records, Accounting, and Reports ....................................14
   3.12.    Tax Matters ...................................................................................14

ARTICLE 4    RIGHTS AND OBLIGATIONS OF PARTNERS ..................................15
   4.1.    Rights and Obligations of the General Partner ..............................15
   4.2.    Rights and Obligations of Limited Partners .................................19
   4.3.    Transfer of Partnership Interests ..................................................19
   4.4.    Issuances of Partnership Interests to New and Existing Partners...21
   4.5.    Withdrawal of General Partner .....................................................21
   4.6.    Admission of Substitute Limited Partners and Successor General Partner...................21

ARTICLE 5    DISSOLUTION AND WINDING UP ......................................................22
   5.1.    Dissolution ....................................................................................22
   5.2.    Continuation of the Partnership....................................................23
   5.3.    Liquidation ...................................................................................23
   5.4.    Distribution in Kind .....................................................................24
   5.5.    Cancellation of Certificate of Limited Partnership .......................24
   5.6.    Return of Capital ..........................................................................24
   5.7.    Waiver of Partition. ......................................................................24

ARTICLE 6    GENERAL PROVISIONS .......................................................................24
   6.1.    Amendments to Agreement...........................................................24

i

| | | |
|---|---|---|
| 6.2. | Addresses and Notices | 25 |
| 6.3. | Titles and Captions | 25 |
| 6.4. | Pronouns and Plurals | 25 |
| 6.5. | Further Action | 25 |
| 6.6. | Binding Effect | 25 |
| 6.7. | Integration | 25 |
| 6.8. | Creditors | 25 |
| 6.9. | Waiver | 25 |
| 6.10. | Counterparts | 25 |
| 6.11. | Applicable Law | 25 |
| 6.12. | Invalidity of Provisions | 25 |
| 6.13. | Mandatory Arbitration | 26 |

D-CNL003288

Appx. 00228

**FOURTH AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is entered into on this 24th day of December, 2015, to be effective as of December 24, 2015, by and among Strand Advisors, Inc., a Delaware corporation (*"Strand"*), as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner.

Certain terms used in this Agreement are defined in Article 2.

## ARTICLE 1

## GENERAL

**1.1.    Continuation.**  Subject to the provisions of this Agreement, the Partners hereby continue the Partnership as a limited partnership pursuant to the provisions of the Delaware Act.  Except as expressly provided herein, the rights and obligations of the Partners and the administration and termination of the Partnership shall be governed by the Delaware Act.

**1.2.    Name.**  The name of the Partnership shall be, and the business of the Partnership shall be conducted under the name of Highland Capital Management, L.P.  The General Partner, in its sole and unfettered discretion, may change the name of the Partnership at any time and from time to time and shall provide Limited Partners with written notice of such name change within twenty (20) days after such name change.

**1.3.    Purpose.**  The purpose and business of the Partnership shall be the conduct of any business or activity that may lawfully be conducted by a limited partnership organized pursuant to the Delaware Act.  Any or all of the foregoing activities may be conducted directly by the Partnership or indirectly through another partnership, joint venture, or other arrangement.

**1.4.    Term.**  The Partnership was formed as a limited partnership on July 7, 1997, and shall continue until terminated pursuant to this Agreement.

**1.5.    Partnership Offices; Addresses of Partners.**

(a)    Partnership Offices.  The registered office of the Partnership in the State of Delaware shall be 1013 Centre Road, Wilmington, Delaware 19805-1297, and its registered agent for service of process on the Partnership at that registered office shall be Corporation Service Company, or such other registered office or registered agent as the General Partner may from time to time designate. The principal office of the Partnership shall be 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other place as the General Partner may from time to time designate.  The Partnership may maintain offices at such other place or places as the General Partner deems advisable.

(b)    Addresses of Partners.  The address of the General Partner is 300 Crescent Court, Suite 700, Dallas, Texas 75201.  The address of each Limited Partner shall be the address of that Limited Partner appearing on the books and records of the Partnership.  Each Limited Partner agrees to provide the General Partner with prompt written notice of any change in his/her/its address.

# ARTICLE 2

## DEFINITIONS

**2.1.    Definitions.**  The following definitions shall apply to the terms used in this Agreement, unless otherwise clearly indicated to the contrary in this Agreement:

"*Additional Capital Contribution*" has the meaning set forth in Section 3.1(b) of this Agreement.

"*Adjusted Capital Account Deficit*" means, with respect *to* any Partner, the deficit balance, if any, in the Capital Account of that Partner as of the end of the relevant Fiscal Year, or other relevant period, giving effect to all adjustments previously made thereto pursuant to Section 3.7 and further adjusted as follows: (i) credit to that Capital Account, any amounts which that Partner is obligated or deemed obligated to restore pursuant to any provision of this Agreement or pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c); (ii) debit to that Capital Account, the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6); and (iii) to the extent required under the Treasury Regulations, credit to that Capital Account (A) that Partner's share of "minimum gain" and (B) that Partner's share of "partner nonrecourse debt minimum gain." (Each Partner's share of the minimum gain and partner nonrecourse debt minimum gain shall be determined under Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5), respectively.)

"*Affiliate*" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question.  As used in this definition, the term "*control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting Securities, by contract or otherwise.

"*Agreement*" means this Fourth Amended and Restated Agreement of Limited Partnership, as it may be amended, supplemented, or restated from time to time.

"*Business Day*" means Monday through Friday of each week, except that a legal holiday recognized as such by the government of the United States or the State of Texas shall not be regarded as a Business Day.

"*Capital Account*" means the capital account maintained for a Partner pursuant to Section 3.7(a).

"*Capital Contribution*" means, with respect to any Partner, the amount of money or property contributed to the Partnership with respect to the interest in the Partnership held by that Person.

"*Certificate of Limited Partnership*" means the Certificate of Limited Partnership filed with the Secretary of State of Delaware by the General Partner, as that Certificate may be amended, supplemented or restated from time to time.

"*Class A Limited Partners*" means those Partners holding a Class A Limited Partnership Interest, as shown on Exhibit A.

"*Class A Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class A Limited Partner."

D-CNL003290

**Appx. 00230**

"*Class B Limited Partner*" means those Partners holding a Class B Limited Partnership Interest, as shown on <u>Exhibit A</u>.

"*Class B Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class B Limited Partner."

"*Class B NAV Ratio Trigger Period*" means any period during which the Class B Limited Partner's aggregate capital contributions, including the original principal balance of the Contribution Note, and reduced by the aggregate amount of distributions to the Class B Limited Partner, exceed 75 percent of the product of the Class B Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class B NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class B NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class B NAV Ratio Trigger Period.

"*Class C Limited Partner*" means those Partners holding a Class C Limited Partnership Interest, as shown on <u>Exhibit A</u>.

"*Class C Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class C Limited Partner."

"*Class C NAV Ratio Trigger Period*" means any period during which an amount equal to $93,000,000.00 reduced by the aggregate amount of distributions to the Class C Limited Partner after the Effective Date exceeds 75 percent of the product of the Class C Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class C NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class C NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class C NAV Ratio Trigger Period.

"*Code*" means the Internal Revenue Code of 1986, as amended and in effect from time to time.

"*Contribution Note*" means that certain Secured Promissory Note dated December 21, 2015 by and among Hunter Mountain Investment Trust, as maker, and the Partnership as Payee.

"*Default Loan*" has the meaning set forth in <u>Section 3.1(c)(i)</u>.

"*Defaulting Partner*" has the meaning set forth in <u>Section 3.1(c)</u>.

"*Delaware Act*" means the Delaware Revised Uniform Limited Partnership Act, Part IV, Title C, Chapter 17 of the Delaware Corporation Law Annotated, as it may be amended, supplemented or restated from time to time, and any successor to that Act.

"*Effective Date*" means the date first recited above.

"*Fiscal Year*" has the meaning set forth in <u>Section 3.11(b)</u>.

3

D-CNL003291

**Appx. 00231**

"*Founding Partner Group*" means, all partners holding partnership interests in the Partnership immediately before the Effective Date.

"*General Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a General Partner pursuant to the terms of this Agreement; and (ii) has not ceased to be a General Partner pursuant to the terms of this Agreement.

"*Limited Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a Limited Partner pursuant to the terms of this Agreement, and (ii) has not ceased to be a Limited Partner pursuant to the terms of this Agreement.

"*Liquidator*" has the meaning set forth in Section 5.3.

"*Losses*" means, for each Fiscal Year, the losses and deductions of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any expenditures described in Code Section 705(a)(2)(B).

"*Majority Interest*" means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners.

"*NAV Ratio Trigger Period*" means a Class B NAV Ratio Trigger Period or a Class C NAV Ratio Trigger Period.

"*Net Increase in Working Capital Accounts*" means the excess of (i) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the end of the period being measured over (ii) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the beginning of the period being measured; provided, however, that amounts within each of the aforementioned categories shall be excluded from the calculation to the extent they are specifically identified as being derived from investing or financing activities. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership and appropriate adjustments may be made to the extent the Partnership adds new ledger accounts to its books and records that are current assets or current liabilities.

"*New Issues*" means Securities that are considered to be "new issues," as defined in the Conduct Rules of the National Association of Securities Dealers, Inc.

"*Nonrecourse Deduction*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1), as computed under Treasury Regulations Section 1.704-2(c).

"*Nonrecourse Liability*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"*Operating Cash Flow*" means Total Revenue less Total Operating Expenses plus Depreciation & Amortization less Net Increase in Working Capital Accounts year over year. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership.

D-CNL003292

**Appx. 00232**

"*Partner*" means a General Partner or a Limited Partner.

"*Partner Nonrecourse Debt*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"*Partner Nonrecourse Deductions*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"*Partner Nonrecourse Debt Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(5).

"*Partnership*" means Highland Capital Management, L.P., the Delaware limited partnership established pursuant to this Agreement.

"*Partnership Capital*" means, as of any relevant date, the net book value of the Partnership's assets.

"*Partnership Interest*" means the interest acquired by a Partner in the Partnership including, without limitation, that Partner's right: (a) to an allocable share of the Profits, Losses, deductions, and credits of the Partnership; (b) to a distributive share of the assets of the Partnership; (c) if a Limited Partner, to vote on those matters described in this Agreement; and (d) if the General Partner, to manage and operate the Partnership.

"*Partnership Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(d).

"*Percentage Interest*" means the percentage set forth opposite each Partner's name on Exhibit A as such Exhibit may be amended from time to time in accordance with this Agreement.

"*Person*" means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity.

"*Priority Distributions*" has the meaning set forth in Section 3.9(b).

"*Profits*" means, for each Fiscal Year, the income and gains of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any income described in Code Section 705(a)(1)(B).

"*Profits Interest Partner*" means any Person who is issued a Partnership Interest that is treated as a "profits interest" for federal income tax purposes.

"*Purchase Notes*" means those certain Secured Promissory Notes of even date herewith by and among Hunter Mountain Investment Trust, as maker, and The Dugaboy Investment Trust, The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #2, each as Payees of the respective Secured Promissory Notes.

5

D-CNL003293

**Appx. 00233**

"*Record Date*" means the date established by the General Partner for determining the identity of Limited Partners entitled to vote or give consent to Partnership action or entitled to exercise rights in respect of any other lawful action of Limited Partners.

"*Second Amended Buy-Sell and Redemption Agreement*" means that certain Second Amended and Restated Buy-Sell and Redemption Agreement, dated December 21, 2015, to be effective as of December 21, 2015 by and between the Partnership and its Partners, as may be amended, supplemented, or restated from time to time.

"*Securities*" means the following: (i) securities of any kind (including, without limitation, "securities" as that term is defined in Section 2(a)(1) of the Securities Act; (ii) commodities of any kind (as that term is defined by the U.S. Securities Laws and the rules and regulations promulgated thereunder); (iii) any contracts for future or forward delivery of any security, commodity or currency; (iv) any contracts based on any securities or group of securities, commodities or currencies; (v) any options on any contracts referred to in clauses (iii) or (iv); or (vi) any evidences of indebtedness (including participations in or assignments of bank loans or trade credit claims). The items set forth in clauses (i) through (vi) herein include, but are not limited to, capital stock, common stock, preferred stock, convertible securities, reorganization certificates, subscriptions, warrants, rights, options, puts, calls, bonds, mutual fund interests, debentures, notes, certificates of deposit, letters of credit, bankers acceptances, trust receipts and other securities of any corporation or other entity, whether readily marketable or not, rights and options, whether granted or written by the Partnership or by others, treasury bills, bonds and notes, any securities or obligations issued or guaranteed by the United States or any foreign country or any state or possession of the United States or any foreign country or any political subdivision or agency or instrumentality of any of the foregoing, and derivatives of any of the foregoing.

"*Securities Act*" means the Securities Act of 1933, as amended, and any successor to such statute.

"*Substitute Limited Partner*" has the meaning set forth in Section 4.6(a).

"*Transfer*" or derivations thereof, of a Partnership Interest means, as a noun, the transfer, sale, assignment, exchange, pledge, hypothecation or other disposition of a Partnership Interest, or any part thereof, directly or indirectly, and as a verb, voluntarily or involuntarily to transfer, sell, assign, exchange, pledge, hypothecate or otherwise dispose of.

"*Treasury Regulations*" means the Department of Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of succeeding regulations).

2.2.    **Other Definitions**.  All terms used in this Agreement that are not defined in this Article 2 have the meanings contained elsewhere in this Agreement.

### ARTICLE 3

### FINANCIAL MATTERS

3.1.    **Capital Contributions**.

(a)    Initial Capital Contributions.  The initial Capital Contribution of each Partner shall be set forth in the books and records of the Partnership.

(b)    Additional Capital Contributions.

6

(i)    The General Partner, in its reasonable discretion and for a *bona fide* business purpose, may request in writing that the Founding Partner Group make additional Capital Contributions in proportion to their Percentage Interests (each, an "***Additional Capital Contribution***").

(ii)    Any failure by a Partner to make an Additional Capital Contribution requested under Section 3.1(b)(i) on or before the date on which that Additional Capital Contribution was due shall result in the Partner being in default.

(c)    Consequences to Defaulting Partners.  In the event a Partner is in default under Section 3.1(b) (a "***Defaulting Partner***"), the Defaulting Partner, in its sole and unfettered discretion, may elect to take either one of the option set forth below.

(i)    Default Loans.  If the Defaulting Partner so elects, the General Partner shall make a loan to the Defaulting Partner in an amount equal to that Defaulting Partner's additional capital contribution (a "***Default Loan***").  A Default Loan shall be deemed advanced on the date actually advanced.  Default Loans shall earn interest on the outstanding principal amount thereof at a rate equal to the Applicable Federal Mid-Term Rate (determined by the Internal Revenue Service for the month in which the loan is deemed made) from the date actually advanced until the same is repaid in full.  The term of any Default Loan shall be six (6) months, unless otherwise extended by the General Partner in its sole and unfettered discretion.  If the General Partner makes a Default Loan, the Defaulting Partner shall not receive any distributions pursuant to Section 3.9(a) or Section 5.3 or any proceeds from the Transfer of all or any part of its Partnership Interest while the Default Loan remains unpaid.  Instead, the Defaulting Partner's share of distributions or such other proceeds shall (until all Default Loans and interest thereon shall have been repaid in full) first be paid to the General Partner.  Such payments shall be applied first to the payment of interest on such Default Loans and then to the repayment of the principal amounts thereof, but shall be considered, for all other purposes of this Agreement, to have been distributed to the Defaulting Partner.  The Defaulting Partner shall be liable for the reasonable fees and expenses incurred by the General Partner (including, without limitation, reasonable attorneys' fees and disbursements) in connection with any enforcement or foreclosure upon any Default Loan and such costs shall, to the extent enforceable under applicable law, be added to the principal amount of the applicable Default Loan.  In addition, at any time during the term of such Default Loan, the Defaulting Partner shall have the right to repay, in full, the Default Loan (including interest and any other charges).  If the General Partner makes a Default Loan, the Defaulting Partner shall be deemed to have pledged to the General Partner and granted to the General Partner a continuing first priority security interest in, all of the Defaulting Partner's Partnership Interest to secure the payment of the principal of, and interest on, such Default Loan in accordance with the provisions hereof, and for such purpose this Agreement shall constitute a security agreement.  The Defaulting Partner shall promptly execute, acknowledge and deliver such financing statements, continuation statements or other documents and take such other actions as the General Partner shall request in writing in order to perfect or continue the perfection of such security interest; and, if the Defaulting Partner shall fail to do so within seven (7) days after the Defaulting Partner's receipt of a notice making demand therefor, the General Partner is hereby appointed the attorney-in-fact of, and is hereby authorized on behalf of, the Defaulting Partner, to execute, acknowledge and deliver all such documents and take all such other actions as may be required to perfect such security interest.  Such appointment and authorization are coupled with an interest and shall be irrevocable.  The General Partner shall, prior to exercising any right or remedy (whether at law, in equity or pursuant to the terms hereof) available to it in connection with such security interest, provide to the Defaulting Partner a notice, in reasonable detail, of the right or remedy to be exercised and the intended timing of such exercise which shall not be less than five (5) days following the date of such notice.

7

        (ii)     <u>Reduction of Percentage Interest</u>.  If the Defaulting Partner does not elect to obtain a Default Loan pursuant to <u>Section 3.1(c)(i)</u>, the General Partner shall reduce the Defaulting Partner's Percentage Interest in accordance with the following formula:

> The Defaulting Partner's new Percentage Interest shall equal the product of (1) the Defaulting Partner's current Percentage Interest, multiplied by (2) the quotient of (a) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), divided by (b) the sum of (i) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), plus (ii) the amount of the additional capital contribution that such Defaulting Partner failed to make when due.

To the extent any downward adjustment is made to the Percentage Interest of a Partner pursuant to this <u>Section 3.1(c)(ii)</u>, any resulting benefit shall accrue to the Partners (other than the Defaulting Partner) in proportion to their respective Percentage Interests.

**3.2.**      **Allocations of Profits and Losses**.

        (a)     <u>Allocations of Profits</u>.  Except as provided in <u>Sections 3.4</u>, <u>3.5</u>, and <u>3.6</u>, Profits for any Fiscal Year will be allocated to the Partners as follows:

        (i)     <u>First</u>, to the Partners until cumulative Profits allocated under this <u>Section 3.2(a)(i)</u> for all prior periods equal the cumulative Losses allocated to the Partners under <u>Section 3.2(b)(iii)</u> for all prior periods in the inverse order in which such Losses were allocated; and

        (ii)     <u>Next</u>, to the Partners until cumulative Profits allocated under this <u>Section 3.2(a)(ii)</u> for all prior periods equal the cumulative Losses allocated to the Partners under <u>Section 3.2(b)(ii)</u> for all prior periods in the inverse order in which such Losses were allocated; and

        (iii)     <u>Then</u>, to all Partners in proportion to their respective Percentage Interests.

        (b)     <u>Allocations of Losses</u>.  Except as provided in <u>Sections 3.4</u>, <u>3.5</u>, and <u>3.6</u>, Losses for any Fiscal Year will be will be allocated as follows:

        (i)     <u>First</u>, to the Partners until cumulative Losses allocated under this <u>Section 3.2(b)(i)</u> for all prior periods equal the cumulative Profits allocated to the Partners under <u>Section 3.2(a)(iii)</u> for all prior periods in the inverse order in which such Profits were allocated; and

        (ii)     <u>Next</u>, to the Partners in proportion to their respective positive Capital Account balances until the aggregate Capital Account balances of the Partners (excluding any negative Capital Account balances) equal zero; *provided, however,* losses shall first be allocated to reduce amounts that were last allocated to the Capital Accounts of the Partners; and

        (iii)     <u>Then</u>, to all Partners in proportion to their respective Percentage Interests.

D-CNL003296

**Appx. 00236**

(c)     Limitation on Loss Allocations.  If any allocation of Losses would cause a Limited Partner to have an Adjusted Capital Account Deficit, those Losses instead shall be allocated to the General Partner.

**3.3.     Allocations on Transfers.**  Taxable items of the Partnership attributable to a Partnership Interest that has been Transferred (including the simultaneous decrease in the Partnership Interest of existing Partners resulting from the admission of a new Partner) shall be allocated in accordance with Section 4.3(d).

**3.4.     Special Allocations.**  If the requisite stated conditions or facts are present, the following special allocations shall be made in the following order:

(a)     Partnership Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 3, if there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, prior to any other allocation under this Agreement, each Partner shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to that Partner's share of the net decrease in Partnership Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This Section 3.4(a) is intended to comply with the partnership minimum gain chargeback requirements of the Treasury Regulations and shall be subject to all exceptions provided therein.

(b)     Partner Nonrecourse Debt Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 3 (other than Section 3.4(a)), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Partner with a share of such Partner Nonrecourse Debt Minimum Gain as of the beginning of the year shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods in an amount equal to that Partner's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This Section 3.4(b) is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements of the Treasury Regulations, shall be interpreted consistently with the Treasury Regulations and shall be subject to all exceptions provided therein.

(c)     Qualified Income Offset.  If a Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), then items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible; *provided, however,* an allocation pursuant to this Section 3.4(c) shall be made if and only to the extent that the Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 3 have been tentatively made without considering this Section 3.4(c).

(d)     Gross Income Allocation.  If a Partner has a deficit Capital Account at the end of any Fiscal Year of the Partnership that exceeds the sum of (i) the amount the Partner is obligated to restore, and (ii) the amount the Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), then each such Partner shall be specially allocated items of income and gain of the Partnership in the amount of the excess as quickly as possible; *provided, however,* an allocation pursuant to this Section 3.4(d) shall be made if and only to

9

D-CNL003297
**Appx. 00237**

the extent that the Partner would have a deficit Capital Account in excess of that sum after all other allocations provided for in this Article 3 have been tentatively made without considering Section 3.4(c) or 3.4(d).

(e)    Nonrecourse Deductions.  Nonrecourse Deductions for any taxable year or other period for which allocations are made shall he allocated among the Partners in accordance with their Percentage interests.

(f)    Partner Nonrecourse Deductions.  Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

(g)    Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any asset of the Partnership under Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and that gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Treasury Regulations.

(h)    Section 481 Adjustments.  Any allocable items of income, gain, expense, deduction or credit required to be made by Section 481 of the Code as the result of the sale, transfer, exchange or issuance of a Partnership Interest will be specially allocated to the Partner receiving said Partnership Interest whether such items are positive or negative in amount.

3.5.    Curative Allocations.  The "*Basic Regulatory Allocations*" consist of (i) the allocations pursuant to Section 3.2(c), and (ii) the allocations pursuant to Sections 3.4.  Notwithstanding any other provision of this Agreement, the Basic Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of the allocations of other items and the Basic Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Basic Regulatory Allocations had not occurred.  For purposes of applying the foregoing sentence, allocations pursuant to this Section 3.5 shall be made with respect to allocations pursuant to Section 3.4 (g) and (h) only to the extent that it is reasonably determined that those allocations will otherwise be inconsistent with the economic agreement among the Partners. To the extent that a special allocation under Section 3.4 is determined not to comply with applicable Treasury Regulations, then the Partners intend that the items shall be allocated in accordance with the Partners' varying Percentage Interests throughout each tax year during which such items are recognized for tax purposes.

3.6.    Code Section 704(c) Allocations.  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation at the time of the contribution between the tax basis of the property to the Partnership and the fair market value of that property.  Except as otherwise provided herein, any elections or other decisions relating to those allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intent of this Agreement.  Allocations of income, gain, loss and deduction pursuant to this Section 3.6 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, the Capital Account of any Partner or the share

D-CNL003298

Appx. 00238

of Profits, Losses, other tax items or distributions of any Partner pursuant to any provision of this Agreement.

**3.7. Capital Accounts**.

(a) <u>Maintenance of Capital Accounts</u>. The Partnership shall establish and maintain a separate capital account ("*Capital Account*") for each Partner in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), subject to and in accordance with the provisions set forth in this <u>Section 3.7</u>.

(i) The Capital Account balance of each Partner shall be credited (increased) by (A) the amount of cash contributed by that Partner to the capital of the Partnership, (B) the fair market value of property contributed by that Partner to the capital of the Partnership (net of liabilities secured by that contributed property that the Partnership assumes or takes subject to under Code Section 752), and (C) that Partner's allocable share of Profits and any items in the nature of income or gain which are specially allocated pursuant to <u>Sections 3.4</u> and <u>3.5</u>; and

(ii) The Capital Account balance of each Partner shall be debited (decreased) by (A) the amount of cash distributed to that Partner by the Partnership, (B) the fair market value of property distributed to that Partner by the Partnership (net of liabilities secured by that distributed property that such Partner assumes or takes subject to under Code Section 752), (C) that Partner's allocable share of expenditures of the Partnership described in Code Section 705(a)(2)(B), and (D) that Partner's allocable share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to <u>Sections 3.2</u>, <u>3.4</u> and <u>3.5</u>.

The provisions of this <u>Section 3.7</u> and the other provisions of this Agreement relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Code Section 704(b) and the Treasury Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions. The General Partner may modify the manner in which the Capital Accounts are maintained under this <u>Section 3.7</u> in order to comply with those provisions, as well as upon the occurrence of events that might otherwise cause this Agreement not to comply with those provisions.

(b) <u>Negative Capital Accounts</u>. If any Partner has a deficit balance in its Capital Account, that Partner shall have no obligation to restore that negative balance or to make any Capital Contribution by reason thereof, and that negative balance shall not be considered an asset of the Partnership or of any Partner.

(c) <u>Interest</u>. No interest shall be paid by the Partnership on Capital Contributions or on balances in Capital Accounts.

(d) <u>No Withdrawal</u>. No Partner shall be entitled to withdraw any part of his/her/its Capital Contribution or his/her/its Capital Account or to receive any distribution from the Partnership, except as provided in <u>Section 3.9</u> and <u>Article 5</u>.

(e) <u>Loans From Partners</u>. Loans by a Partner to the Partnership shall not be considered Capital Contributions.

(f) <u>Revaluations</u>. The Capital Accounts of the Partners shall not be "booked-up" or "booked-down" to their fair market values under Treasury Regulations Section 1.704(c)-1(b)(2)(iv)(f) or otherwise.

11

D-CNL003299

**Appx. 00239**

**3.8.    Distributive Share for Tax Purpose.**  All items of income, deduction, gain, loss or credit that are recognized for federal income tax purposes will be allocated among the Partners in accordance with the allocations of Profits and Losses hereunder as determined by the General Partner in its sole and unfettered discretion.  Notwithstanding the foregoing, the General Partner may (i) as to each New Issue, specially allocate to the Partners who were allocated New Issue Profit from that New Issue any short-term capital gains realized during the Fiscal Year upon the disposition of such New Issue during that Fiscal Year, and (ii) specially allocate items of gain (or loss) to Partners who withdraw capital during any Fiscal Year in a manner designed to ensure that each withdrawing Partner is allocated gain (or loss) in an amount equal to the difference between that Partner's Capital Account balance (or portion thereof being withdrawn) at the time of the withdrawal and the tax basis for his/her/ its Partnership Interest at that time (or proportionate amount thereof); *provided, however,* that the General Partner may, without the consent of any other Partner, (a) alter the allocation of any item of taxable income, gain, loss, deduction or credit in any specific instance where the General Partner, in its sole and unfettered discretion, determines such alteration to be necessary or appropriate to avoid a materially inequitable result *(e.g., where the allocation would create an inappropriate tax liability);* and/or (b) adopt whatever other method of allocating tax items as the General Partner determines is necessary or appropriate in order to be consistent with the spirit and intent of the Treasury Regulations under Code Sections 704(b) and 704(c).

**3.9.    Distributions**.

(a)    General.  The General Partner may make such pro rata or non-pro rata distributions as it may determine in its sole and unfettered discretion, without being limited to current or accumulated income or gains, but no such distribution shall be made out of funds required to make current payments on Partnership indebtedness; provided, however, that the General Partner may not make non-pro rata distributions under this Section 3.9(a) during an NAV Ratio Trigger Period without the consent of the Class B Limited Partner (in the case of a Class B NAV Ratio Trigger Period) and/or the Class C Limited Partner (in the case of a Class C NAV Ratio Trigger Period); provided, further this provision should not be interpreted to limit in any way the General Partner's ability to make non-pro rata tax distributions under Section 3.9(c) and Section 3.9(f).  The Partnership has entered into one or more credit facilities with financial institutions that may limit the amount and timing of distributions to the Partners.  Thus, the Partners acknowledge that distributions from the Partnership may be limited. Any distributions made to the Class B Limited Partner or the Class C Limited Partner pursuant to Section 3.9(b) shall reduce distributions otherwise allocable to such Partners under this Section 3.9(a) until such aggregate reductions are equal to the aggregate distributions made to the Class B Partners and the Class C Partners under Section 3.9(b).

(b)    Priority Distributions.  Prior to the distribution of any amounts to Partners pursuant to Section 3.9(a), and notwithstanding any other provision in this Agreement to the contrary, the Partnership shall make the following distributions ("**Priority Distributions**") pro-rata among the Class B Limited Partner and the Class C Limited Partner in accordance with their relative Percentage Interests:

(i)    No later than March 31st of each calendar year, commencing March 31, 2017, an amount equal to $1,600,000.00;

(ii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to three percent (3%) of the Partnership's investment gain for the prior year, as reflected in the Partnership's books and records within ledger account number 90100 plus three percent (3%) of the gross realized investment gains for the prior year of Highland Select Equity Fund, as reflected in its books and records;

12

(iii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to ten percent (10%) of the Partnership's Operating Cash Flow for the prior year; and

(iv)    No later than December 24th of each year, commencing December 24, 2016, an amount equal to the aggregate annual principal and interest payments on the Purchase Notes for the then current year.

(c)    <u>Tax Distributions</u>.  The General Partner may, in its sole discretion, declare and make cash distributions pursuant hereto to the Partners to allow the federal and state income tax attributable to the Partnership's taxable income that is passed through the Partnership to the Partners to be paid by such Partners (a "***Tax Distribution***").  The General Partner may, in its discretion, make Tax Distributions to the Founding Partner Group without also making Tax Distributions to other Partners; provided, however, that if the General Partner makes Tax Distributions to the Founding Partner Group, Tax Distributions must also be made to the Class B Limited Partner to the extent the Class B Limited Partner provides the Partnership with documentation showing it is subject to an entity-level federal income tax obligation.  Notwithstanding anything else in this Agreement, the General Partner may declare and pay Tax Distributions even if such Tax Distributions cause the Partnership to be unable to make Priority Distributions under <u>Section 3.9(b)</u>.

(d)    <u>Payments Not Deemed Distributions</u>.    Any amounts paid pursuant to <u>Sections 4.1(e)</u> or <u>4.1(h)</u> shall not be deemed to be distributions for purposes of this Agreement.

(e)    <u>Withheld Amounts</u>.  Notwithstanding any other provision of this <u>Section 3.9</u> to the contrary, each Partner hereby authorizes the Partnership to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership with respect to that Partner as a result of that Partner's participation in the Partnership.  If and to the extent that the Partnership shall be required to withhold or pay any such taxes, that Partner shall be deemed for all purposes of this Agreement to have received a payment from the Partnership as of the time that withholding or tax is paid, which payment shall be deemed to be a distribution with respect to that Partner's Partnership Interest to the extent that the Partner (or any successor to that Partner's Partnership Interest) is then entitled to receive a distribution.  To the extent that the aggregate of such payments to a Partner for any period exceeds the distributions to which that Partner is entitled for that period, the amount of such excess shall be considered a loan from the Partnership to that Partner.  Such loan shall bear interest (which interest shall be treated as an item of income to the Partnership) at the "Applicable Federal Rate" (as defined in the Code), as determined hereunder from time to time, until discharged by that Partner by repayment, which may be made in the sole and unfettered discretion of the General Partner out of distributions to which that Partner would otherwise be subsequently entitled.  Any withholdings authorized by this <u>Section 3.9(d)</u> shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel or other evidence satisfactory to the General Partner to the effect that a lower rate is applicable, or that no withholding is applicable.

(f)    <u>Special Tax Distributions</u>.  The Partnership shall, upon request of such Founding Partner, make distributions to the Founding Partners (or loans, at the election of the General Partner) in an amount necessary for each of them to pay their respective federal income tax obligations incurred through the effective date of the Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., the predecessor to this Agreement.

(g)    <u>Tolling of Priority Distributions</u>.  In the event of a "Honis Trigger Event," as defined in the Second Amended Buy-Sell and Redemption Agreement, the Partnership shall not make any distributions, including priority distributions under <u>Section 3.9(b)</u>, to the Class B Limited Partner or the Class C Limited Partner until such time as a replacement trust administrator, manager and general partner,

D-CNL003301

**Appx. 00241**

as applicable, acceptable to the Partnership in its sole discretion, as indicated by an affirmative vote of consent by a Majority Interest, shall be appointed to the Class B Limited Partner/Class C Limited Partner and any of its direct or indirect owners that have governing documents directly affected by a Honis Trigger Event.

       **3.10.**    **Compensation and Reimbursement of General Partner**.

       (a)    <u>Compensation</u>.  The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements unless approved by a Majority Interest; provided, however, that no compensation above five million dollars per year may be approved, even by a Majority Interest, during a NAV Ratio Trigger Period.

       (b)    <u>Reimbursement for Expenses</u>.  In addition to amounts paid under other Sections of this Agreement, the General Partner and its Affiliates shall be reimbursed for all expenses, disbursements, and advances incurred or made, and all fees, deposits, and other sums paid in connection with the organization and operation of the Partnership, the qualification of the Partnership to do business, and all related matters.

       **3.11.**    **Books, Records, Accounting, and Reports**.

       (a)    <u>Records and Accounting</u>.  The General Partner shall keep or cause to be kept appropriate books and records with respect to the Partnership's business, which shall at all times be kept at the principal office of the Partnership or such other office as the General Partner may designate for such purpose.  The books of the Partnership shall be maintained for financial reporting purposes on the accrual basis or on a cash basis, as the General Partner shall determine in its sole and unfettered discretion, in accordance with generally accepted accounting principles and applicable law.  Upon reasonable request, the Class B Limited Partner or the Class C Limited Partner may inspect the books and records of the Partnership.

       (b)    <u>Fiscal Year</u>.  The fiscal year of the Partnership shall be the calendar year unless otherwise determined by the General Partner in its sole and unfettered discretion.

       (c)    <u>Other Information</u>.  The General Partner may release information concerning the operations of the Partnership to any financial institution or other Person that has loaned or may loan funds to the Partnership or the General Partner or any of its Affiliates, and may release such information to any other Person for reasons reasonably related to the business and operations of the Partnership or as required by law or regulation of any regulatory body.

       (d)    <u>Distribution Reporting to Class B Limited Partner and Class C Limited Partner</u>.  Upon request, the Partnership shall provide the Class B Limited Partner and/or the Class C Limited Partner information on any non-pro rata distributions made under <u>Section 3.9</u> to Partners other than the Partner requesting the information.

       **3.12.**    **Tax Matters**.

       (a)    <u>Tax Returns</u>.  The General Partner shall arrange for the preparation and timely filing of all returns of Partnership income, gain, loss, deduction, credit and other items necessary for federal, state and local income tax purposes.  The General Partner shall deliver to each Partner as copy of his/her/its IRS Form K-1 as soon as practicable after the end of the Fiscal Year, but in no event later than October 1.  The classification, realization, and recognition of income, gain, loss, deduction, credit and

14

other items shall be on the cash or accrual method of accounting for federal income tax purposes, as the General Partner shall determine in its sole and unfettered discretion.  The General Partner in its sole and unfettered discretion may pay state and local income taxes attributable to operations of the Partnership and treat such taxes as an expense of the Partnership.

(b)      Tax Elections.  Except as otherwise provided herein, the General Partner shall, in its sole and unfettered discretion, determine whether to make any available tax election.

(c)      Tax Controversies.  Subject to the provisions hereof, the General Partner is designated the Tax Matters Partner (as defined in Code Section 6231), and is authorized and required to represent the Partnership, at the Partnership's expense, in connection with all examinations of the Partnership's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith.  Each Partner agrees to cooperate with the General Partner in connection with such proceedings.

(d)      Taxation as a Partnership.  No election shall be made by the Partnership or any Partner for the Partnership to be excluded from the application of any of the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code or from any similar provisions of any state tax laws.

## ARTICLE 4

## RIGHTS AND OBLIGATIONS OF PARTNERS

**4.1.    Rights and Obligations of the General Partner.**  In addition to the rights and obligations set forth elsewhere in this Agreement, the General Partner shall have the following rights and obligations:

(a)      Management.  The General Partner shall conduct, direct, and exercise full control of over all activities of the Partnership.  Except as otherwise expressly provided in this Agreement, all management powers over the business and affairs of the Partnership shall be exclusively vested in the General Partner, and Limited Partners shall have no right of control over the business and affairs of the Partnership.  In addition to the powers now or hereafter granted to a general partner of a limited partnership under applicable law or that are granted to the General Partner under any provision of this Agreement, the General Partner shall have full power and authority to do all things deemed necessary or desirable by it to conduct the business of the Partnership, including, without limitation: (i) the determination of the activities in which the Partnership will participate; (ii) the performance of any and all acts necessary or appropriate to the operation of any business of the Partnership (including, without limitation, purchasing and selling any asset, any debt instruments, any equity interests, any commercial paper, any note receivables and any other obligations); (iii) the procuring and maintaining of such insurance as may be available in such amounts and covering such risks as are deemed appropriate by the General Partner; (iv) the acquisition, disposition, sale, mortgage, pledge, encumbrance, hyphothecation, of exchange of any or all of the assets of the Partnership; (v) the execution and delivery on behalf of, and in the name of the Partnership, deeds, deeds of trust, notes, leases, subleases, mortgages, bills of sale and any and all other contracts or instruments necessary or incidental to the conduct of the Partnership's business; (vi) the making of any expenditures, the borrowing of money, the guaranteeing of indebtedness and other liabilities, the issuance of evidences of indebtedness, and the incurrence of any obligations it deems necessary or advisable for the conduct of the activities of the Partnership, including, without limitation, the payment of compensation and reimbursement to the General Partner and its Affiliates pursuant to Section 3.10; (vii) the use of the assets of the Partnership (including, without limitation, cash on hand) for any Partnership purpose on any terms it sees fit, including, without limitation, the financing of operations of the Partnership, the lending of funds to other Persons, and the repayment of obligations

15

of the Partnership; (viii) the negotiation, execution, and performance of any contracts that it considers desirable, useful, or necessary to the conduct of the business or operations of the Partnership or the implementation of the General Partner's powers under this Agreement; (ix) the distribution of Partnership cash or other assets; (x) the selection, hiring and dismissal of employees, attorneys, accountants, consultants, contractors, agents and representatives and the determination of their compensation and other teens of employment or hiring; (xi) the formation of any further limited or general partnerships, joint ventures, or other relationships that it deems desirable and the contribution to such partnerships, ventures, or relationships of assets and properties of the Partnership; and (xii) the control of any matters affecting the rights and obligations of the Partnership, including, without limitation, the conduct of any litigation, the incurring of legal expenses, and the settlement of claims and suits.

(b) <u>Certificate of Limited Partnership</u>. The General Partner caused the Certificate of Limited Partnership of the Partnership to be filed with the Secretary of State of Delaware as required by the Delaware Act and shall cause to be filed such other certificates or documents (including, without limitation, copies, amendments, or restatements of this Agreement) as may be determined by the General Partner to be reasonable and necessary or appropriate for the formation, qualification, or registration and operation of a limited partnership (or a partnership in which Limited Partners have limited liability) in the State of Delaware and in any other state where the Partnership may elect to do business.

(c) <u>Reliance by Third Parties</u>. Notwithstanding any other provision of this Agreement to the contrary, no lender or purchaser or other Person, including any purchaser of property from the Partnership or any other Person dealing with the Partnership, shall be required to verify any representation by the General Partner as to its authority to encumber, sell, or otherwise use any assess or properties of the Partnership, and any such lender, purchaser, or other Person shall be entitled to rely exclusively on such representations and shall be entitled to deal with the General Partner as if it were the sole party in interest therein, both legally and beneficially. Each Limited Partner hereby waives any and all defenses or other remedies that may be available against any such lender, purchaser, or other Person to contest, negate, or disaffirm any action of the General Partner in connection with any such sale or financing. In no event shall any Person dealing with the General Partner or the General Partner's representative with respect to any business or property of the Partnership be obligated to ascertain that the terms of this Agreement have been complied with, and each such Person shall be entitled to rely on the assumptions that the Partnership has been duly formed and is validly in existence. In no event shall any such Person be obligated to inquire into the necessity or expedience of any act or action of the General Partner or the General Partner's representative, and every contract, agreement, deed, mortgage, security agreement, promissory note, or other instrument or document executed by the General Partner or the General Partner's representative with respect to any business or property of the Partnership shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (i), at the time of the execution and delivery thereof, this Agreement was in full force and effect; (ii) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Partnership; and (iii) the General Partner or the General Partner's representative was duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership.

(d) <u>Partnership Funds</u>. The funds of the Partnership shall be deposited in such account or accounts as are designated by the General Partner. The General Partner may, in its sole and unfettered discretion, deposit funds of the Partnership in a central disbursing account maintained by or in the name of the General Partner, the Partnership, or any other Person into which funds of the General Partner, the Partnership, on other Persons are also deposited; *provided, however,* at all times books of account are maintained that show the amount of funds of the Partnership on deposit in such account and interest accrued with respect to such funds as credited to the Partnership. The General Partner may use the funds of the Partnership as compensating balances for its benefit; *provided, however,* such funds do

16

not directly or indirectly secure, and are not otherwise at risk on account of, any indebtedness or other obligation of the General Partner or any director, officer, employee, agent, representative, or Affiliate thereof. Nothing in this Section 4.1(d) shall be deemed to prohibit or limit in any manner the right of the Partnership to lend funds to the General Partner or any Affiliate thereof pursuant to Section 4.1(e)(i). All withdrawals from or charges against such accounts shall be made by the General Partner or by its representatives. Funds of the Partnership may be invested as determined by the General Partner in accordance with the terms and provisions of this Agreement.

    (e)    <u>Loans to or from General Partner; Contracts with Affiliates; Joint Ventures</u>.

    (i)    The General Partner or any Affiliate of the General Partner may lend to the Partnership funds needed by the Partnership for such periods of time as the General Partner may determine; *provided, however,* the General Partner or its Affiliate may not charge the Partnership interest at a rate greater than the rate (including points or other financing charges or fees) that would be charged the Partnership (without reference to the General Partner's financial abilities or guaranties) by unrelated lenders on comparable loans. The Partnership shall reimburse the General Partner or its Affiliate, as the case may be, for any costs incurred by the General Partner or that Affiliate in connection with the borrowing of funds obtained by the General Partner or that Affiliate and loaned to the Partnership. The Partnership may loan funds to the General Partner and any member of the Founding Partner Group at the General Partner's sole and exclusive discretion.

    (ii)    The General Partner or any of its Affiliates may enter into an agreement with the Partnership to render services, including management services, for the Partnership. Any service rendered for the Partnership by the General Partner or any Affiliate thereof shall be on terms that are fair and reasonable to the Partnership.

    (iii)    The Partnership may Transfer any assets to joint ventures or other partnerships in which it is or thereby becomes a participant upon terms and subject to such conditions consistent with applicable law as the General Partner deems appropriate; provided, however, that the Partnership may not transfer any asset to the General Partner or one of its Affiliates during any NAV Ratio Trigger Period for consideration less than such asset's fair market value.

    (f)    <u>Outside Activities' Conflicts of Interest</u>. The General Partner or any Affiliate thereof and any director, officer, employee, agent, or representative of the General Partner or any Affiliate thereof shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Partnership, including, without limitation, business interests and activities in direct competition with the Partnership. Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement or the partnership relationship created hereby in any business ventures of the General Partner, any Affiliate thereof, or any director, officer, employee, agent, or representative of either the General Partner or any Affiliate thereof.

    (g)    <u>Resolution of Conflicts of Interest</u>. Unless otherwise expressly provided in this Agreement or any other agreement contemplated herein, whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Limited Partner, on the other hand, any action taken by the General Partner, in the absence of bad faith by the General Partner, shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein or under the Delaware Act or any other applicable law, rule, or regulation.

    (h)    <u>Indemnification</u>. The Partnership shall indemnify and hold harmless the General Partner and any director, officer, employee, agent, or representative of the General Partner (collectively,

D-CNL003305

**Appx. 00245**

the "*GP Party*"), against all liabilities, losses, and damages incurred by any of them by reason of any act performed or omitted to be performed in the name of or on behalf of the Partnership, or in connection with the Partnership's business, including, without limitation, attorneys' fees and any amounts expended in the settlement of any claims or liabilities, losses, or damages, to the fullest extent permitted by the Delaware Act; *provided, however,* the Partnership shall have no obligation to indemnify and hold harmless a GP Party for any action or inaction that constitutes gross negligence or willful or wanton misconduct.  The Partnership, in the sole and unfettered discretion of the General Partner, may indemnify and hold harmless any Limited Partner, employee, agent, or representative of the Partnership, any Person who is or was serving at the request of the Partnership acting through the General Partner as a director, officer, partner, trustee, employee, agent, or representative of another corporation, partnership, joint venture, trust, or other enterprise, and any other Person to the extent determined by the General Partner in its sole and unfettered discretion, but in no event shall such indemnification exceed the indemnification permitted by the Delaware Act.  Notwithstanding anything to the contrary in this Section 4.1(h) or elsewhere in this Agreement, no amendment to the Delaware Act after the date of this Agreement shall reduce or limit in any manner the indemnification provided for or permitted by this Section 4.1(h) unless such reduction or limitation is mandated by such amendment for limited partnerships formed prior to the enactment of such amendment.  In no event shall Limited Partners be subject to personal liability by reason of the indemnification provisions of this Agreement.

   (i)  <u>Liability of General Partner</u>.

    (i)  Neither the General Partner nor its directors, officers, employees, agents, or representatives shall be liable to the Partnership or any Limited Partner for errors in judgment or for any acts or omissions that do not constitute gross negligence or willful or wanton misconduct.

    (ii)  The General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its directors, officers, employees, agents, or representatives, and the General Partner shall not be responsible for any misconduct or negligence on the part of any agent or representative appointed by the General Partner.

   (j)  <u>Reliance by General Partner</u>.

    (i)  The General Partner may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

    (ii)  The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, and other consultants and advisers selected by it, and any opinion of any such Person as to matters which the General Partner believes to be within such Person's professional or expert competence shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by the General Partner hereunder in good faith and in accordance with such opinion.

   (k)  The General Partner may, from time to time, designate one or more Persons to be officers of the Partnership.  No officer need be a Partner.  Any officers so designated shall have such authority and perform such duties as the General Partner may, from time to time, delegate to them.  The General Partner may assign titles to particular officers, including, without limitation, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer.  Each officer shall hold office until such Person's successor shall be duly designated and shall qualify or until such Person's death or

D-CNL003306

until such Person shall resign or shall have been removed in the manner hereinafter provided.  Any number of offices may be held by the same Person.  The salaries or other compensation, if any, of the officers and agents of the Partnership shall be fixed from time to time by the General Partner.  Any officer may be removed as such, either with or without cause, by the General Partner whenever in the General Partner's judgment the best interests of the Partnership will be served thereby.  Any vacancy occurring in any office of the Partnership may be filled by the General Partner.

**4.2.**    **Rights and Obligations of Limited Partners**.  In addition to the rights and obligations of Limited Partners set forth elsewhere in this Agreement, Limited Partners shall have the following rights and obligations:

(a)    <u>Limitation of Liability</u>.  Limited Partners shall have no liability under this Agreement except as provided herein or under the Delaware Act.

(b)    <u>Management of Business</u>.  No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

(c)    <u>Return of Capital</u>.  No Limited Partner shall be entitled to the withdrawal or return of its Capital Contribution except to the extent, if any, that distributions made pursuant to this Agreement or upon termination of the Partnership may be considered as such by law and then only to the extent provided for in this Agreement.

(d)    <u>Second Amended Buy-Sell and Redemption Agreement</u>.  Each Limited Partner shall comply with the terms and conditions of the Second Amended Buy-Sell and Redemption Agreement.

(e)    <u>Default on Priority Distributions</u>.  If the Partnership fails to timely pay Priority Distributions pursuant to Section 3.9(b), and the Partnership does not subsequently make such Priority Distribution within ninety days of its due date, the Class B Limited Partner or the Class C Limited Partner may require the Partnership to liquidate publicly traded securities held by the Partnership or Highland Select Equity Master  Fund, L.P., a Delaware limited partnership controlled by the Partnership; <u>provided, however</u>, that the General Partner may in its sole discretion elect instead to liquidate other non-publicly traded securities owned by the Partnership in order to satisfy the Partnership's obligations under <u>Section 3.9(b)</u> and this <u>Section 4.2(e)</u>.  In either case, Affiliates of the General Partner shall have the right of first offer to purchase any securities liquidated under this <u>Section 4.2(e)</u>.

**4.3.**    **Transfer of Partnership Interests**.

(a)    <u>Transfer</u>.  No Partnership Interest shall be Transferred, in whole or in part, except in accordance with the terms and conditions set forth in this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement.  Any Transfer or purported Transfer of any Partnership Interest not made in accordance with this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement shall be null and void.  An alleged transferee shall have no right to require any information or account of the Partnership's transactions or to inspect the Partnership's books.  The Partnership shall be entitled to treat the alleged transferor of a Partnership Interest as the absolute owner thereof in all respects, and shall incur no liability to any alleged transferee for distributions to the Partner owning that Partnership Interest of record or for allocations of Profits, Losses, deductions or credits or for transmittal of reports and notices required to be given to holders of Partnership Interests.

19

D-CNL003307
**Appx. 00247**

     (b)     <u>Transfers by General Partner</u>.  The General Partner may Transfer all, but not less than all, of its Partnership Interest to any Person only with the approval of a Majority Interest; provided, however, that the General Partner may not Transfer its Partnership Interest during any NAV Ratio Trigger Period except to the extent such Transfers are for estate planning purposes or resulting from the death of the individual owner of the General Partner.  Any Transfer by the General Partner of its Partnership Interest under this <u>Section 4.3(b)</u> to an Affiliate of the General Partner or any other Person shall not constitute a withdrawal of the General Partner under <u>Section 4.5(a)</u>, <u>Section 5.1(b)</u>, or any other provision of this Agreement.  If any such Transfer is deemed to constitute a withdrawal under such provisions or otherwise and results in the dissolution of the Partnership under this Agreement or the laws of any jurisdiction to which the Partnership of this Agreement is subject, the Partners hereby unanimously consent to the reconstitution and continuation of the Partnership immediately following such dissolution, pursuant to <u>Section 5.2</u>.

     (c)     <u>Transfers by Limited Partners</u>.  The Partnership Interest of a Limited Partner may not be Transferred without the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), and in accordance with the Second Amended Buy-Sell and Redemption Agreement.

     (d)     <u>Distributions and Allocations in Respect of Transferred Partnership Interests</u>.  If any Partnership Interest is Transferred during any Fiscal Year in compliance with the provisions of <u>Article 4</u> and the Second Amended Buy-Sell and Redemption Agreement, Profits, Losses, and all other items attributable to the transferred interest for that period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner; provided that no allocations shall be made under this Section 4.3(d) that would affect any special allocations made under <u>Section 3.4</u>.  All distributions declared on or before the date of that Transfer shall be made to the transferor.  Solely for purposes of making such allocations and distributions, the Partnership shall recognize that Transfer not later than the end of the calendar month during which it is given notice of that Transfer; ***provided, however,*** if the Partnership does not receive a notice stating the date that Partnership Interest was Transferred and such other information as the General Partner may reasonably require within thirty (30) days after the end of the Fiscal Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the person who, according to the books and records of the Partnership, on the last day of the Fiscal Year during which the Transfer occurs, was the owner of the Partnership Interest.  Neither the Partnership nor any Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this <u>Section 4.3(d)</u>, whether or not any Partner or the Partnership has knowledge of any Transfer of ownership of any Partnership Interest.

     (e)     <u>Forfeiture of Partnership Interests Pursuant to the Contribution Note</u>.  In the event any Class B Limited Partnership Interests are forfeited in favor of the Partnership as a result of any default on the Contribution Note, the Capital Accounts and Percentage Interests associated with such Class B Limited Partnership Interests shall be allocated pro rata among the Class A Partners.  The Priority Distributions in Section 3.9(b) made after the date of such forfeiture shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the Class B Limited Partnership Interest transferred pursuant to this <u>Section 4.3(e)</u> over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any forfeiture of such Class B Limited Partnership Interest.

     (f)     <u>Transfers of Partnership Interests Pursuant to the Purchase Notes</u>. Notwithstanding any other provision in this Agreement, the Partnership shall respect, and the General Partner hereby provides automatic consent for, any transfers (in whole or transfers of partial interests) of

20

the Class C Limited Partnership Interests, or a portion thereof, if such transfer occurs as a result of a default on the Purchase Notes. Upon the transfer of any Class C Limited Partnership Interest to any member of the Founding Partner Group (or their assigns), such Class C Limited Partnership Interest shall automatically convert to a Class A Partnership Interest. The Priority Distributions in Section 3.9(b) shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the transferred Class C Limited Partnership Interest over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any transfer of such Class C Limited Partnership Interest.

**4.4.    Issuances of Partnership Interests to New and Existing Partners**.

(a)    Issuance of Partnership Interests to New Limited Partners. The General Partner may admit one or more additional Persons as Limited Partners ("Additional Limited Partners") to the Partnership at such times and upon such terms as it deems appropriate in its sole and unfettered discretion; provided, however, that the General Partner may only admit additional Persons as Limited Partners in relation to the issuance of equity incentives to key employees of the Partnership; provided, further that the General Partner may not issue such equity incentives to the extent they entitle the holders, in the aggregate, to a Percentage Interest in excess of twenty percent without the consent of the Class B Limited Partner and the Class C Limited Partner. All Class A Limited Partners, the Class B Limited Partner and the Class C Limited Partner shall be diluted proportionately by the issuance of such limited partnership interests. No Person may be admitted to the Partnership as a Limited Partner until he/she/it executes an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.

(b)    Issuance of an Additional Partnership Interest to an Existing Partner. The General Partner may issue an additional Partnership Interest to any existing Partner at such times and upon such terms as it deems appropriate in its sole and unfettered discretion. Upon the issuance of an additional Partnership Interest to an existing Partner, the Percentage Interests of the members of the Founding Partner Group shall be diluted proportionately. Any additional Partnership Interest shall be subject to all the terms and conditions of this Agreement and the Second Amended Buy-Sell and Redemption Agreement.

**4.5.    Withdrawal of General Partner**

(a)    Option. In the event of the withdrawal of the General Partner from the Partnership, the departing General Partner (the "***Departing Partner***") shall, at the option of its successor (if any) exercisable prior to the effective date of the departure of that Departing Partner, promptly receive from its successor in exchange for its Partnership Interest as the General Partner, an amount in cash equal to its Capital Account balance, determined as of the effective date of its departure.

(b)    Conversion. If the successor to a Departing Partner does not exercise the option described in Section 4.5(a), the Partnership Interest of the Departing Partner as the General Partner of the Partnership shall be converted into a Partnership Interest as a Limited Partner.

**4.6.    Admission of Substitute Limited Partners and Successor General Partner**.

(a)    Admission of Substitute Limited Partners. A transferee (which may be the heir or legatee of a Limited Partner) or assignee of a Limited Partner's Partnership Interest shall be entitled to receive only the distributive share of the Partnership's Profits, Losses, deductions, and credits attributable to that Partnership Interest. To become a substitute Limited Partner (a "***Substitute Limited Partner***"),

21

that transferee or assignee shall (1) obtain the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), (ii) comply with all the requirements of this Agreement and the Second Amended Buy-Sell and Redemption Agreement with respect to the Transfer of the Partnership Interest at issue, and (iii) execute an Addendum to this Agreement in the form attached as <u>Exhibit B</u> (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.  Upon admission of a Substitute Limited Partner, that Limited Partner shall be subject to all of the restrictions applicable to, shall assume all of the obligations of, and shall attain the status of a Limited Partner under and pursuant to this Agreement with respect to the Partnership Interest held by that Limited Partner.

(b)      <u>Admission of Successor General Partner</u>.  A successor General Partner selected pursuant to <u>Section 5.2</u> or the transferee of or successor to all of the Partnership Interest of the General Partner pursuant to <u>Section 4.3(b)</u> shall be admitted to the Partnership as the General Partner, effective as of the date of the withdrawal or removal of the predecessor General Partner or the date of Transfer of that predecessor's Partnership Interest.

(c)      <u>Action by General Partner</u>.  In connection with the admission of any substitute Limited Partner or successor General Partner or any additional Limited Partner, the General Partner shall have the authority to take all such actions as it deems necessary or advisable in connection therewith, including the amendment of <u>Exhibit A</u> and the execution and filing with appropriate authorities of any necessary documentation.

## ARTICLE 5

## DISSOLUTION AND WINDING UP

**5.1.     Dissolution.**  The Partnership shall be dissolved upon:

(a)      The withdrawal, bankruptcy, or dissolution of the General Partner, or any other event that results in its ceasing to be the General Partner (other than by reason of a Transfer pursuant to <u>Section 4.3(b)</u>);

(b)      An election to dissolve the Partnership by the General Partner that is approved by the affirmative vote of a Majority Interest; *provided, however,* the General Partner may dissolve the Partnership without the approval of the Limited Partners in order to comply with Section 14 of the Second Amended Buy-Sell and Redemption Agreement; or

(c)      Any other event that, under the Delaware Act, would cause its dissolution.

For purposes of this <u>Section 5.1</u>, the bankruptcy of the General Partner shall be deemed to have occurred when the General Partner: (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding:  (iv) files a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the General Partner in a proceeding of the type described in clauses (i) through (iv) of this paragraph; (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties; or (vii) one hundred twenty (120) days expire after the date of the commencement of a proceeding against the General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or

D-CNL003310

**Appx. 00250**

similar relief under any law if the proceeding has not been previously dismissed, or ninety (90) days expire after the date of the appointment, without the General Partner's consent or acquiescence, of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties if the appointment has not previously been vacated or stayed, or ninety (90) days expire after the date of expiration of a stay, if the appointment has not previously been vacated.

**5.2.    Continuation of the Partnership**.  Upon the occurrence of an event described in Section 5.1(a), the Partnership shall be deemed to be dissolved and reconstituted if a Majority Interest elect to continue the Partnership within ninety (90) days of that event.  If no election to continue the Partnership is made within ninety (90) days of that event, the Partnership shall conduct only activities necessary to wind up its affairs.  If an election to continue the Partnership is made upon the occurrence of an event described in Section 5.1(a), then:

(a)    Within that ninety (90)-day period a successor General Partner shall be selected by a Majority Interest;

(b)    The Partnership shall be deemed to be reconstituted and shall continue until the end of the term for which it is formed unless earlier dissolved in accordance with this Article 5;

(c)    The interest of the former General Partner shall be converted to an interest as a Limited Partner; and

(d)    All necessary steps shall be taken to amend or restate this Agreement and the Certificate of Limited Partnership, and the successor General Partner may for this purpose amend this Agreement and the Certificate of Limited Partnership, as appropriate, without the consent of any Partner.

**5.3.    Liquidation**.  Upon dissolution of the Partnership, unless the Partnership is continued under Section 5.2, the General Partner or, in the event the General Partner has been dissolved, becomes bankrupt (as defined in Section 5.1), or withdraws from the Partnership, a liquidator or liquidating committee selected by a Majority Interest, shall be the Liquidator.  The Liquidator (if other than the General Partner) shall be entitled to receive such compensation for its services as may be approved by a Majority Interest.  The Liquidator shall agree not to resign at any time without fifteen (15) days' prior written notice and (if other than the General Partner) may be removed at any time, with or without cause, by notice of removal approved by a Majority Interest.  Upon dissolution, removal, or resignation of the Liquidator, a successor and substitute Liquidator (who shall have and succeed to all rights, powers, and duties of the original Liquidator) shall within thirty (30) days thereafter be selected by a Majority Interest. The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the Liquidator shall be deemed to refer also to any such successor or substitute Liquidator appointed in the manner provided herein.  Except as expressly provided in this Article 5, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the parties hereto, all of the powers conferred upon the General Partner under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Partnership as provided herein.  The Liquidator shall liquidate the assets of the Partnership and apply and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

23

(a)    To the payment of the expenses of the terminating transactions including, without limitation, brokerage commission, legal fees, accounting fees and closing costs;

(b)    To the payment of creditors of the Partnership, including Partners, in order of priority provided by law;

(c)    To the Partners and assignees to the extent of, and in proportion to, the positive balances in their respective Capital Accounts as provided in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2); *provided, however,* the Liquidator may place in escrow a reserve of cash or other assets of the Partnership for contingent liabilities in an amount determined by the Liquidator to be appropriate for such purposes; and

(d)    To the Partners in proportion to their respective Percentage Interests.

**5.4.** **Distribution in Kind.** Notwithstanding the provisions of <u>Section 5.3</u> that require the liquidation of the assets of the Partnership, but subject to the order of priorities set forth therein, if on dissolution of the Partnership the Liquidator determines that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners and assignees, the Liquidator may defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Partnership (other than those to Partners) and/or may distribute to the Partners and assignees, in lieu of cash, as tenants in common and in accordance with the provisions of <u>Section 5.3</u>, undivided interests in such Partnership assets as the Liquidator deems not suitable for liquidation. Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any joint operating agreements or other agreements governing the operation of such properties at such time**.** The Liquidator shall determine the fair market value of any property distributed in kind using such reasonable method of valuation as it may adopt.

**5.5.** **Cancellation of Certificate of Limited Partnership.** Upon the completion of the distribution of Partnership property as provided in <u>Sections 5.3</u> and <u>5.4</u>, the Partnership shall be terminated, and the Liquidator (or the General Partner and Limited Partners if necessary) shall cause the cancellation of the Certificate of Limited Partnership in the State of Delaware and of all qualifications and registrations of the Partnership as a foreign limited partnership in jurisdictions other **than** the State of Delaware and shall take such other actions as may be necessary to terminate the Partnership.

**5.6.** **Return of Capital.** The General Partner shall not be personally liable for the return of the Capital Contributions of Limited Partners, or any portion thereof, it being expressly understood that any such return shall be **made** solely from Partnership assets.

**5.7.** **Waiver of Partition.** Each Partner hereby waives any rights to partition of the Partnership property.

## ARTICLE 6

## GENERAL PROVISIONS

**6.1.** **Amendments to Agreement.** The General Partner may amend this Agreement without the consent of any Partner if the General Partner reasonably determines that such amendment is necessary and appropriate; *provided, however, any* action taken by the General Partner shall be subject to its fiduciary duties to the Limited Partners under the Delaware Act; provided further that any amendments

24

that adversely affect the Class B Limited Partner or the Class C Limited Partner may only be made with the consent of such Partner adversely affected.

      **6.2.**    **Addresses and Notices.**  Any notice, demand, request, or report required or permitted to be given or made to a Partner under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by United States registered or certified mail to the Partner at his/her/its address as shown on the records of the Partnership, regardless of any claim of any Person who may have an interest in any Partnership Interest by reason of an assignment or otherwise.

      **6.3.**    **Titles and Captions.**  All article and section titles and captions in the Agreement are for convenience only, shall not be deemed part of this Agreement, and in no way shall define, limit, extend, or describe the scope or intent of any provisions hereof.  Except as specifically provided otherwise, references to "Articles," "Sections" and "Exhibits" are to "Articles," "Sections" and "Exhibits" of this Agreement.  All Exhibits hereto are incorporated herein by reference.

      **6.4.**    **Pronouns and Plurals.**  Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns, and verbs shall include the plural and vice versa.

      **6.5.**    **Further Action.**  The parties shall execute all documents, provide all information, and take or refrain from taking all actions as may be necessary or appropriate to achieve the purposes of this Agreement.

      **6.6.**    **Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns.

      **6.7.**    **Integration.**  This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

      **6.8.**    **Creditors.**  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership.

      **6.9.**    **Waiver.**  No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement, or condition.

      **6.10.**    **Counterparts.**  This agreement may be executed in counterparts, all of which together shall constitute one agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

      **6.11.**    **Applicable Law.**  This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to the principles of conflicts of law.

      **6.12.**    **Invalidity of Provisions.**  If any provision of this Agreement is declared or found to be illegal, unenforceable, or void, in whole or in part, then the parties shall be relieved of all obligations arising under that provision, but only to the extent that it is illegal, unenforceable, or void, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying that provision to the extent necessary to make it legal and enforceable while preserving its intent or, if that is

D-CNL003313
**Appx. 00253**

not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives.

**6.13.    General Partner Discretion.**  Whenever the General Partner may use its sole discretion, the General Partner may consider any items it deems relevant, including its own interest and that of its affiliates.

**6.14.    Mandatory Arbitration.**   In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief.  The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service.  A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas.  The discovery process shall be limited to the following:  Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.  The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law.  In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules.  All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site.  Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees.  The duty to arbitrate described above shall survive the termination of this Agreement.  Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury.  All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

26

*Remainder of Page intentionally Left Blank.*
*Signature Page Follows.*

D-CNL003315

**Appx. 00255**

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
　　　James D. Dondero,
　　　President


LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:　 Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1**


By: _____
Name: Lawrence Tonomura
Its:　 Trustee


**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2**


By: _____
Name: Lawrence Tonomura
Its:　 Trustee


**MARK K. OKADA**

_____
Mark K. Okada


*Signature Page to Fourth Amended and Restated Agreement of Limited Partnership*

D-CNL003316
**Appx. 00256**

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
     James D. Dondero,
     President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:     Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:     Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:     Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

D-CNL003317
**Appx. 00257**

**HUNTER MOUNTAIN INVESTMENT TRUST**
By: Beacon Mountain LLC, Administrator

By: _____
Name: John Honis
Its:     President

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

D-CNL003318

**Appx. 00258**

**EXHIBIT A**

| | Percentage Interest | |
|---|---|---|
| **CLASS A PARTNERS** | **By Class** | **Effective %** |
| GENERAL PARTNER: | | |
| Strand Advisors | 0.5573% | 0.2508% |
| LIMITED PARTNERS: | | |
| The Dugaboy Investment Trust | 74.4426% | 0.1866% |
| Mark K. Okada | 19.4268% | 0.0487% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #1 | 3.9013% | 0.0098% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #2 | 1.6720% | 0.0042% |
| Total Class A Percentage Interest | 100.0000% | 0.500% |
| **CLASS B LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 55.0000% |
| **CLASS C LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 44.500% |
| **PROFIT AND LOSS AMONG CLASSES** | | |
| Class A Partners | 0.5000% | |
| Class B Partners | 55.0000% | |
| Class C Partners | 44.5000% | |

D-CNL003319

**Appx. 00259**

**EXHIBIT B**

**ADDENDUM**
**TO THE**
**FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS ADDENDUM (this "**Addendum**") to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, to be effective as of December 24, 2015, as amended from time to time (the "Agreement"), is made and entered into as of the ____ day of _____, 20__, by and between Strand Advisors, Inc., as the sole General Partner (the "**General Partner**") of Highland Capital Management, L.P. (the "**Partnership**") and _____ ("_____") (except as otherwise provided herein, all capitalized terms used herein shall have the meanings set forth in the Agreement).

RECITALS:

WHEREAS, the General Partner, in its sole and unfettered discretion, and without the consent of any Limited Partner, has the authority under (i) Section 4.4 of the Agreement to admit Additional Limited Partners, (ii) Section 4.6 of the Agreement to admit Substitute Limited Partners and (iii) Section 6.1 of the Agreement to amend the Agreement;

WHEREAS, the General Partner desires to admit _____ as a Class __ Limited Partner holding a __% Percentage Interest in the Partnership as of the date hereof;

WHEREAS, _____ desires to become a Class __ Limited Partner and be bound by the terms and conditions of the Agreement; and

WHEREAS, the General Partner desires to amend the Agreement to add _____ as a party thereto.

AGREEMENT:

RESOLVED, as a condition to receiving a Partnership Interest in the Partnership, _____ acknowledges and agrees that he/she/it (i) has received and read a copy of the Agreement, (ii) shall be bound by the terms and conditions of the Agreement; and (iii) shall promptly execute an addendum to the Second Amended Buy-Sell and Redemption Agreement; and be it

FURTHER RESOLVED, the General Partner hereby amends the Agreement to add _____ as a Limited Partner, and the General Partner shall attach this Addendum to the Agreement and make it a part thereof; and be it

FURTHER RESOLVED, this Addendum may be executed in any number of counterparts, all of which together shall constitute one Addendum binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the day and year above written.

GENERAL PARTNER:

**STRAND ADVISORS, INC.**

By: _____
　　　Name: _____
　　　Title: _____

NEW LIMITED PARTNER:

[_____]

AGREED AND ACCEPTED:

In consideration of the terms of this Addendum and the Agreement, in consideration of the Partnership's allowing the above signed Person to become a Limited Partner of the Partnership, and for other good and valuable consideration receipt of which is hereby acknowledged, the undersigned shall be bound by the terms and conditions of the Agreement as though a party thereto.

SPOUSE OF NEW LIMITED PARTNER:

[_____]

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS Highland Capital Management, L.P. | DEFENDANTS HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC), James Dondero, Nancy Dondero, and The Dugaboy Investment Trust |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.) Hayward PLLC 10501 N. Central Expressway, Suite 106 Dallas, Texas 75231 Tel.: (972) 755-7100 | ATTORNEYS (If Known) Stinson LLP (for NexPoint Real Estate Partners, LLC and Nancy Dondero); Heller, Draper & Horn, L.L.C. (for The Dugaboy Investment Trust) |

| PARTY (Check One Box Only) ☑ Debtor   □ U.S. Trustee/Bankruptcy Admin □ Creditor  □ Other □ Trustee | PARTY (Check One Box Only) □ Debtor   □ U.S. Trustee/Bankruptcy Admin □ Creditor  ☑ Other □ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Breach of Contract; Turnover Pursuant to 11 USC 542(b); Avoidance and Recovery of Actual Fraudulent Transfer under 11 USC 548(a)(1)(A) and 550; Avoidance and Recovery of Actual Fraudulent Transfer under 11 USC 544(b) and 550 and Tex. Bus. & C. Code 24.005(a)(1); Declaratory Relief; Breach of Fiduciary Duty; Aiding & Abetting Breach of Fiduciary Duty

### NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☑2 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☑3 13-Recovery of money/property - §548 fraudulent transfer
☑4 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☑5 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☑ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand $ Damages in an amount to be determined at trial |

| Other Relief Sought Turnover of amounts due under note, avoidance of transfers to defendants, declaratory relief, punitive and exemplary damages, costs, attorneys' fees |
|---|

D-CNL003322

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Highland Capital Management, L.P. | BANKRUPTCY CASE NO.<br>19-34054-sgj11 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Dallas | NAME OF JUDGE<br>Stacey G. C. Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |

| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | |
|---|---|
| DATE<br>August 27, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Zachery Z. Annable |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

# EXHIBIT 5

Docket #0006  Date Filed: 3/1/2021

K&L GATES LLP
Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Tel: (214) 939-5659
artoush.varshosaz@klgates.com

A. Lee Hogewood, III (*pro hac vice*)
4350 Lassiter at North Hills Ave., Suite 300
Raleigh, NC 27609
Tel: (919) 743-7306
Lee.hogewood@klgates.com

*Counsel for Highland Capital Management Fund Advisors, L.P.*

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
drukavina@munsch.com
jvasek@munsch.com

*Counsel for Highland Capital Management Fund Advisors, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S ORIGINAL ANSWER

COMES NOW Highland Capital Management Fund Advisors, L.P. (the "Defendant"), the

defendant in the above-styled and numbered adversary proceeding (the "Adversary Proceeding")

filed by Highland Capital Management, L.P. (the "Plaintiff"), and files this its *Defendant's*

*Original Answer* (the "Answer"), responding to the *Complaint for (I) Breach of Contract and (II)*

DEFENDANT'S ORIGINAL ANSWER

1934054210302000000000006

*Turnover of Property of the Debtor's Estate* (the "Complaint").  Where an allegation in the Complaint is not expressly admitted in this Answer, it is denied.

## PRELIMINARY STATEMENT

1.      The first sentence of ¶ 1 sets forth the Plaintiff's objective in bringing the Complaint and does not require a response.  To the extent it contains factual allegations, they are denied.  The second sentence contains a legal conclusion that does not require a response.  To the extent it contains factual allegations, they are denied.

2.      Paragraph 2 contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

3.      The Defendant admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Case to adjudicate this dispute.  Any allegations in ¶ 3 not expressly admitted are denied.

4.      The Defendant admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding.  Any allegations in ¶ 4 not expressly admitted are denied.

5.      The Defendant denies that a breach of contract claim is core.  The Defendant denies that a § 542(b) turnover proceeding is the appropriate mechanism to collect a contested debt.  The Defendant admits that a § 542(b) turnover proceeding is statutorily core but denies that it is Constitutionally core under *Stern v. Marshall*.  The Defendant does not consent to the Bankruptcy Court entering final orders or judgment in this Adversary Proceeding.  Any allegations in ¶ 5 not expressly admitted are denied.

6.      The Defendant admits ¶ 6 of the Complaint.

DEFENDANT'S ORIGINAL ANSWER

D-CNL002869

**Appx. 00266**

## THE PARTIES

7.     The Defendant admits ¶ 7 of the Complaint.

8.     The Defendant admits ¶ 8 of the Complaint.

## CASE BACKGROUND

9.     The Defendant admits ¶ 9 of the Complaint.

10.    The Defendant admits ¶ 10 of the Complaint.

11.    The Defendant admits ¶ 11 of the Complaint.

12.    The Defendant admits ¶ 12 of the Complaint.

## STATEMENT OF FACTS

**A.    The HCMFA Notes**

13.    The Defendant admits that it has executed at least one promissory note under which the Debtor is the payee.  Any allegations in ¶ 13 not expressly admitted are denied.

14.    The Defendant admits ¶ 14 of the Complaint.

15.    The Defendant admits ¶ 15 of the Complaint.

16.    The Defendant denies ¶ 16 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 16 is not verbatim.

17.    The Defendant denies ¶ 17 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 17 is not verbatim.

18.    The Defendant admits ¶ 18 of the Complaint.

**B.    HCMFA's Default under Each Note**

19.    The Defendant admits that Exhibit 3 to the Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent ¶ 19 of the Complaint asserts a legal conclusion, no response is required, and it is denied. To the extent not expressly admitted, ¶ 19 of the Complaint is denied.

---

DEFENDANT'S ORIGINAL ANSWER                        Page **3** of **7**

20.     To the extent ¶ 20 of the Complaint asserts a legal conclusion, no response is necessary, and it is denied.  The Defendant otherwise admits ¶ 20 of the Complaint.

21.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 21 of the Complaint and therefore denies the same.

22.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 22 of the Complaint and therefore denies the same.

23.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 23 of the Complaint and therefore denies the same.

24.     The Defendant denies ¶ 24 of the Complaint.

### FIRST CLAIM FOR RELIEF
**(For Breach of Contract)**

25.     Paragraph 25 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

26.     Paragraph 26 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 26 of the Complaint and therefore denies the same.

27.     Paragraph 27 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 27 of the Complaint and therefore denies the same.

28.     Paragraph 28 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient

D-CNL002871

**Appx. 00268**

to form a belief about the truth of the allegations in ¶ 28 of the Complaint and therefore denies the same.

      29.      The Defendant denies ¶ 29 of the Complaint.

<div align="center">

**SECOND CLAIM FOR RELIEF**
**(Turnover by HCMFA Pursuant to 11 U.S.C. § 542(b))**

</div>

      30.      Paragraph 30 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

      31.      Paragraph 31 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 31 of the Complaint and therefore denies the same.

      32.      Paragraph 32 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 32 of the Complaint and therefore denies the same.

      33.      The Defendant denies ¶ 33 of the Complaint.

      34.      Paragraph 34 of the Complaint states a legal conclusion that does not require a response.  The Defendant admits that the Plaintiff transmitted the Demand Letter.  To the extent ¶ 34 alleges other facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 34 of the Complaint and therefore denies the same.

      35.      The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 35 of the Complaint and therefore denies the same.

      36.      Paragraph 36 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient

D-CNL002872

**Appx. 00269**

to form a belief about the truth of the allegations in ¶ 36 of the Complaint and therefore denies the same.

37.     The Defendant denies that the Plaintiff is entitled to the relief requested in the prayer, including parts (i), (ii), and (iii).

## JURY DEMAND

38.     The Defendant demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

39.     The Defendant does not consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully request that, following a trial on the merits, the Court enter a judgment that the Plaintiff take noting on the Complaint and provide the Defendant such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this 1st day of March, 2021.

D-CNL002873

**Appx. 00270**

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
_____
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    500 N. Akard Street, Suite 3800
    Dallas, Texas 75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    drukavina@munsch.com
    jvasek@munsch.com

**K&L GATES LLP**

    Artoush Varshosaz (TX Bar No.
    24066234)
    1717 Main Street, Suite 2800
    Dallas, TX 75201
    Tel: (214) 939-5659
    artoush.varshosaz@klgates.com

    A. Lee Hogewood, III (_pro hac vice_)
    4350 Lassiter at North Hills Ave., Suite
    300
    Raleigh, NC 27609
    Tel: (919) 743-7306
    Lee.hogewood@klgates.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS,
L.P.**

**CERTIFICATE OF SERVICE**

    The undersigned hereby certifies that, on the 1st day of March, 2021, a true and correct copy of this document was electronically served by the Court's ECF system on parties entitled to notice thereof, including counsel for the Plaintiff.

        /s/ Davor Rukavina
        _____
          Davor Rukavina, Esq.

D-CNL002874

**Appx. 00271**

# EXHIBIT 6

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR HIGHLAND MANAGEMENT
SERVICES, INC.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| | § | **Case No.: 19-34054-sgj11** |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | **Adv. Pro. No. 21-03006-sgj** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.,** | § | |
| | § | |
| | § | |
| Defendant. | § | |

## HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.'S
## ANSWER TO PLAINTIFF'S COMPLAINT

Defendant Highland Capital Management Services, Inc. ("HCMS" or "Defendant") files this Answer in response to Highland Capital Management L.P.'s ("Plaintiff" or "Debtor") Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate (the "Complaint") and respectfully states as follows:

## PRELIMINARY STATEMENT[1]

1. The first sentence of Paragraph 1 sets forth Plaintiff's objective in bringing the Complaint and does not require a response. To the extent a response is required, Defendant denies the allegations in the first sentence of Paragraph 1. The second sentence contains a legal conclusion that does not require a response. To the extent a response is required, Defendant denies the allegations in the second sentence of Paragraph 1.

2. Paragraph 2 contains a summary of the relief Plaintiff seeks and does not require a response. To the extent a response is required, Defendant denies the allegations in Paragraph 2.

## JURISDICTION AND VENUE

3. Defendant admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers constitutional authority on the Bankruptcy Court to adjudicate this dispute. Defendant denies any allegations in Paragraph 3 that are not expressly admitted.

4. Paragraph 4 states a legal conclusion that does not require a response. To the extent a response is required, Defendant admits the Bankruptcy Court has statutory jurisdiction over this Adversary Proceeding but denies that the Court has constitutional authority over this Adversary Proceeding. Defendant denies any allegations in Paragraph 4 that are not expressly admitted.

5. Defendant denies that Plaintiff's breach of contract claim is a core proceeding. Defendant further denies that a turnover proceeding under 11 U.S.C. § 542(b) is the appropriate mechanism to collect a contested debt. Defendant admits that a turnover proceeding under 11 U.S.C. § 542(b) is a statutorily core proceeding but denies that it is constitutionally core under *Stern v. Marshall*. Defendant does not consent to the Bankruptcy Court entering final orders or

---

[1] The headings herein are from Plaintiff's Complaint and are solely included for the Court's convenience.

judgment in this Adversary Proceeding. Defendant denies any allegations in Paragraph 5 that are not expressly admitted.

6. Paragraph 6 states a legal conclusion to which no response is required. To the extent a response is required, Defendant admits that venue is proper in this District.

## THE PARTIES

7. Defendant admits the allegations in Paragraph 7 of the Complaint.

8. Defendant admits the allegations in Paragraph 8 of the Complaint.

## CASE BACKGROUND

9. Defendant admits the allegations in Paragraph 9 of the Complaint.

10. Defendant admits the allegations in Paragraph 10 of the Complaint.

11. Defendant admits the allegations in Paragraph 11 of the Complaint.

12. Defendant admits the allegations in Paragraph 12 of the Complaint.

## STATEMENT OF FACTS

**A.** **The HCMS Demand Notes**

13. Defendant admits it has executed at least one promissory note under which the Debtor is the payee. Defendant denies any allegations in Paragraph 13 that are not expressly admitted.

14. Defendant admits that it signed the document attached to the Complaint as Exhibit 1. Defendant denies any allegations in Paragraph 14 that are not expressly admitted.

15. Defendant admits that it signed the document attached to the Complaint as Exhibit 2. Defendant denies any allegations in Paragraph 15 that are not expressly admitted.

16. Defendant admits that it signed the document attached to the Complaint as Exhibit 3. Defendant denies any allegations in Paragraph 16 that are not expressly admitted.

17.    Defendant admits that it signed the document attached to the Complaint as Exhibit 4. Defendant denies any allegations in Paragraph 17 that are not expressly admitted.

18.    Defendant admits that Plaintiff correctly transcribed Section 2 of Exhibits 1-4 to the Complaint in Paragraph 18.

19.    Defendant admits that Plaintiff correctly transcribed Section 4 of Exhibits 1-4 to the Complaint in Paragraph 19.

20.    Defendant admits that Plaintiff correctly transcribed Section 6 of Exhibits 1-4 of the Complaint in Paragraph 20.

**B.    Allegations regarding the Demand Notes**

21.    Defendant admits that Plaintiff sent it a copy of Exhibit 5. Defendant admits that Plaintiff correctly transcribed an excerpt of Exhibit 5 in the third sentence of Paragraph 21. Defendant denies any allegations in Paragraph 21 that are not expressly admitted.

22.    To the extent Paragraph 22 asserts a legal conclusion, no response is required, and it is denied. Defendant otherwise admits the allegations in Paragraph 22.

23.    Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 23 and, therefore, denies them.

24.    Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 24 and, therefore, denies them.

25.    Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 25 and, therefore, denies them.

26.    Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 26 and, therefore, denies them.

27.     Defendant lacks sufficient information or knowledge to admit or deny the allegations in the first sentence of Paragraph 27 and, therefore, denies them. Defendant denies the allegations in the second sentence of Paragraph 27 of the Complaint.

**C.     The HCMS Term Note**

28.     Defendant admits that it has executed at least one promissory note under which Debtor is the payee. Defendant denies any allegations in Paragraph 28 that are not expressly admitted.

29.     Defendant admits it signed the document attached to the Complaint as Exhibit 6. Defendant denies any allegations in Paragraph 29 that are not expressly admitted.

30.     Defendant admits that Plaintiff correctly transcribed Section 2 of Exhibit 6 to the Complaint in Paragraph 30. Defendant denies any allegations in Paragraph 30 that are not expressly admitted.

31.     Defendant admits that Plaintiff correctly transcribed Section 3 of Exhibit 6 to the Complaint in Paragraph 31. Defendant denies any allegations in Paragraph 31 that are not expressly admitted.

32.     Defendant admits that Plaintiff correctly transcribed Section 4 of Exhibit 6 to the Complaint in Paragraph 32. Defendant denies any allegations in Paragraph 32 that are not expressly admitted.

33.     Defendant admits that Plaintiff correctly transcribed Section 6 of Exhibit 6 to the Complaint in Paragraph 33. Defendant denies any allegations in Paragraph 33 that are not expressly admitted.

**D.     Allegations regarding the Term Note.**

34.     To the extent Paragraph 34 of the Complaint asserts a legal conclusion, no response is required, and it is denied. Defendant otherwise admits Paragraph 34 of the Complaint.

35.    Defendant admits that Plaintiff sent it a copy of Exhibit 7. Defendant admits that Plaintiff correctly transcribed an excerpt of Exhibit 7 in the third sentence of Paragraph 35 of the Complaint. Defendant denies any allegations in Paragraph 35 that are not expressly admitted.

36.    Defendant is without sufficient information or knowledge to admit or deny the allegations in Paragraph 36 of the Complaint and, therefore, denies them.

37.    Defendant denies Paragraph 37 of the Complaint.

**FIRST CLAIM FOR RELIEF**
**(For Breach of Contract)**

38.    Paragraph 38 of the Complaint seeks to incorporate the allegations in the preceding paragraphs and does not require a response. Defendant incorporates all prior denials herein by reference.

39.    Paragraph 39 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

40.    Paragraph 40 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

41.    Paragraph 41 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

42.    Paragraph 42 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

43.    Defendant denies Paragraph 43 of the Complaint.

44.     Defendant denies Paragraph 44 of the Complaint.

## SECOND CLAIM FOR RELIEF
### (Turnover by HCMS Pursuant to 11 U.S.C. § 549(b))

45.     Paragraph 45 seeks to incorporate the allegations in the preceding paragraphs and does not require a response. Defendant incorporates all prior denials herein by reference.

46.     Paragraph 46 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

47.     Paragraph 47 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

48.     Paragraph 48 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

49.     Defendant admits that Plaintiff transmitted Exhibits 5 and 7 to the Complaint. Defendant lacks sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 49 of the Complaint and, therefore, denies them.

50.     Defendant lacks sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 50 of the Complaint and, therefore, denies them.

51.     Defendant denies Paragraph 51 of the Complaint.

52.     Defendant denies that Plaintiff is entitled to the relief requested in the prayer of the Complaint, including parts (i), (ii), and (iii).

## AFFIRMATIVE DEFENSES

53.     Plaintiff's claims are barred in whole or in part by the doctrine of justification and/or repudiation.

54.     Plaintiff's claims are barred in whole or in part by the doctrine of estoppel.

55.     Plaintiff's claims are barred in whole or in part by the doctrine of waiver.

56.     Plaintiff's claims are barred in whole or in part by the doctrines of offset and/or setoff.

## JURY DEMAND

57.     HCMS demands a trial by jury of all issues so triable under Federal Rule of Civil Procedure 38 and Federal Rule of Bankruptcy Procedure 9015.

58.     HCMS does not consent to the Bankruptcy Court conducting a jury trial and therefore demands such jury trial in the District Court.

## PRAYER

For these reasons, HCMS respectfully requests that, following a trial on the merits, the Court deny the relief Plaintiffs seeks through its Complaint, enter a judgment that the Plaintiff take nothing on the Complaint, and grant HCMS such other relief at law or in equity to which it may be entitled.

Respectfully submitted,

*/s/ Lauren K. Drawhorn*
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email:  jason.rudd@wickphillips.com
            lauren.drawhorn@wickphillips.com

**COUNSEL FOR HIGHLAND MANAGEMENT
SERVICES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2021, a true and correct copy of the foregoing pleading was served via the Court's CM/ECF system upon counsel for the Plaintiff and all other parties requesting or consenting to such service in this adversary case.

Jeffrey N. Pomerantz
jpomerantz@pszjlaw.com
Ira D. Kharasch
ikharasch@pszjlaw.com
John A. Morris
jmorris@pszjlaw.com
Gregory V. Demo
gdemo@pszjlaw.com
Hayley R. Winograd
hwinograd@pszjlaw.com
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067
Facsimile: (310) 201-0760
*Counsel for Highland Capital Management, L.P.*

Melissa S. Hayward
MHayward@HaywardFirm.com
Zachery Z. Annable
ZAnnable@HaywardFirm.com
HAYWARD PLLC
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Fax: (972) 755-7110

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

# EXHIBIT 7

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR HCRE PARTNERS, LLC
(N/K/A NEXPOINT REAL ESTATE
PARTNERS, LLC)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | |
| | § | **Case No.: 19-34054-sgj11** |
| | § | |
| **Debtor.** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Adv. Pro. No. 21-03007-sgj** |
| **vs.** | § | |
| | § | |
| **HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC),** | § | |
| | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

## HCRE PARTNERS, LLC'S ANSWER TO PLAINTIFF'S COMPLAINT

Defendant HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) ("HCRE" or

"Defendant") files this Answer in response to Highland Capital Management L.P.'s ("Plaintiff" or

"Debtor") Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's

Estate (the "Complaint") in the above-referend adversary proceeding (the "Adversary Proceeding") and respectfully states as follows:

## PRELIMINARY STATEMENT[1]

1.        The first sentence of Paragraph 1 sets forth Plaintiff's objective in bringing the Complaint and does not require a response. To the extent a response is required, Defendant denies the allegations in the first sentence of Paragraph 1. The second sentence contains a legal conclusion that does not require a response. To the extent a response is required, Defendant denies the allegations in the second sentence of Paragraph 1.

2.        Paragraph 2 contains a summary of the relief Plaintiff seeks and does not require a response. To the extent a response is required, Defendant denies the allegations in Paragraph 2.

## JURISDICTION AND VENUE

3.        Defendant admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers constitutional authority on the Bankruptcy Court to adjudicate this dispute. Defendant denies any allegations in Paragraph 3 that are not expressly admitted.

4.        Paragraph 4 states a legal conclusion that does not require a response. To the extent a response is required, Defendant admits the Bankruptcy Court has statutory jurisdiction over this Adversary Proceeding but denies that the Court has constitutional authority over this Adversary Proceeding. Defendant denies any allegations in Paragraph 4 that are not expressly admitted.

5.        Defendant denies that Plaintiff's breach of contract claim is a core proceeding. Defendant further denies that a turnover proceeding under 11 U.S.C. § 542(b) is the appropriate mechanism to collect a contested debt. Defendant admits that a turnover proceeding under 11

---

[1]    The headings herein are from Plaintiff's Complaint and are solely included for the Court's convenience.

U.S.C. § 542(b) is a statutorily core proceeding but denies that it is constitutionally core under *Stern v. Marshall*. Defendant does not consent to the Bankruptcy Court entering final orders or judgment in this Adversary Proceeding. Defendant denies any allegations in Paragraph 5 that are not expressly admitted.

6. Paragraph 6 states a legal conclusion to which no response is required. To the extent a response is required, Defendant admits that venue is proper in this District.

## THE PARTIES

7. Defendant admits the allegations in Paragraph 7 of the Complaint.

8. Defendant admits the allegations in Paragraph 8 of the Complaint.

## CASE BACKGROUND

9. Defendant admits the allegations in Paragraph 9 of the Complaint.

10. Defendant admits the allegations in Paragraph 10 of the Complaint.

11. Defendant admits the allegations in Paragraph 11 of the Complaint.

12. Defendant admits the allegations in Paragraph 12 of the Complaint.

## STATEMENT OF FACTS

**A.     The HCRE Demand Notes**

13. Defendant admits it has executed at least one promissory note under which the Debtor is the payee. Defendant denies any allegations in Paragraph 13 that are not expressly admitted.

14. Defendant admits that it signed the document attached to the Complaint as Exhibit 1. Defendant denies any allegations in Paragraph 14 that are not expressly admitted.

15. Defendant admits that it signed the document attached to the Complaint as Exhibit 2. Defendant denies any allegations in Paragraph 15 that are not expressly admitted.

16.    Defendant admits that it signed the document attached to the Complaint as Exhibit 3. Defendant denies any allegations in Paragraph 16 that are not expressly admitted.

17.    Defendant admits that it signed the document attached to the Complaint as Exhibit 4. Defendant denies any allegations in Paragraph 17 that are not expressly admitted.

18.    Defendant admits that Plaintiff correctly transcribed Section 2 of Exhibits 1-4 to the Complaint in Paragraph 18.

19.    Defendant admits that Plaintiff correctly transcribed Section 4 of Exhibits 1-4 to the Complaint in Paragraph 19.

20.    Defendant admits that Plaintiff correctly transcribed Section 6 of Exhibits 1-4 of the Complaint in Paragraph 20.

**B.    Allegations regarding the Demand Notes**

21.    Defendant admits that Plaintiff sent it a copy of Exhibit 5. Defendant admits that Plaintiff correctly transcribed an excerpt of Exhibit 5 in the third sentence of Paragraph 21. Defendant denies any allegations in Paragraph 21 that are not expressly admitted.

22.    To the extent Paragraph 22 asserts a legal conclusion, no response is required, and it is denied. Defendant otherwise admits the allegations in Paragraph 22.

23.    Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 23 and, therefore, denies them.

24.    Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 24 and, therefore, denies them.

25.    Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 25 and, therefore, denies them.

26.    Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 26 and, therefore, denies them.

27. Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 27 and, therefore, denies them.

28. Defendant denies the allegations in Paragraph 28 of the Complaint.

**C. The HCRE Term Note**

29. Defendant admits that it has executed at least one promissory note under which Debtor is the payee. Defendant denies any allegations in Paragraph 29 that are not expressly admitted.

30. Defendant admits it signed the document attached to the Complaint as Exhibit 6. Defendant denies any allegations in Paragraph 30 that are not expressly admitted.

31. Defendant admits that Plaintiff correctly transcribed Section 2 of Exhibit 6 to the Complaint in Paragraph 31. Defendant denies any allegations in Paragraph 31 that are not expressly admitted.

32. Defendant admits that Plaintiff correctly transcribed Section 3 of Exhibit 6 to the Complaint in Paragraph 32. Defendant denies any allegations in Paragraph 32 that are not expressly admitted.

33. Defendant admits that Plaintiff correctly transcribed Section 4 of Exhibit 6 to the Complaint in Paragraph 33. Defendant denies any allegations in Paragraph 33 that are not expressly admitted.

34. Defendant admits that Plaintiff correctly transcribed Section 6 of Exhibit 6 to the Complaint in Paragraph 34. Defendant denies any allegations in Paragraph 34 that are not expressly admitted.

**D. Allegations regarding the Term Note.**

35. To the extent Paragraph 35 of the Complaint asserts a legal conclusion, no response is required, and it is denied. Defendant otherwise admits Paragraph 35 of the Complaint.

36. Defendant admits that Plaintiff sent it a copy of Exhibit 7. Defendant admits that Plaintiff correctly transcribed an excerpt of Exhibit 7 in the third sentence of Paragraph 36 of the Complaint. Defendant denies any allegations in Paragraph 36 that are not expressly admitted.

37. To the extent Paragraph 37 of the Complaint asserts a legal conclusion, no response is required, and it is denied. Defendant otherwise admits Paragraph 37 of the Complaint.

38. Defendant is without sufficient information or knowledge to admit or deny the allegations in Paragraph 38 of the Complaint and, therefore, denies them.

39. Defendant denies Paragraph 39 of the Complaint.

### FIRST CLAIM FOR RELIEF
### (For Breach of Contract)

40. Paragraph 40 of the Complaint seeks to incorporate the allegations in the preceding paragraphs and does not require a response. Defendant incorporates all prior denials herein by reference.

41. Paragraph 41 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

42. Paragraph 42 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

43. Paragraph 43 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

44.     Paragraph 44 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

45.     Defendant denies Paragraph 45 of the Complaint.

46.     Defendant denies Paragraph 46 of the Complaint.

**SECOND CLAIM FOR RELIEF**
**(Turnover by HCRE Pursuant to 11 U.S.C. § 549(b))**

47.     Paragraph 47 seeks to incorporate the allegations in the preceding paragraphs and does not require a response. Defendant incorporates all prior denials herein by reference.

48.     Paragraph 48 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

49.     Paragraph 49 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

50.     Paragraph 50 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

51.     Defendant admits that Plaintiff transmitted Exhibits 5 and 7 to the Complaint. Defendant lacks sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 51 of the Complaint and, therefore, denies them.

52.     Defendant lacks sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 52 of the Complaint and, therefore, denies them.

53.     Defendant denies Paragraph 53 of the Complaint.

54.     Defendant denies that Plaintiff is entitled to the relief requested in the prayer of the Complaint, including parts (i), (ii), and (iii).

## AFFIRMATIVE DEFENSES

55.     Plaintiff's claims are barred in whole or in part by the doctrine of justification and/or repudiation.

56.     Plaintiff's claims are barred in whole or in part by the doctrine of estoppel.

57.     Plaintiff's claims are barred in whole or in part by the doctrine of waiver.

58.     Plaintiff's claims are barred in whole or in part by the doctrines of offset and/or setoff.

## JURY DEMAND

59.     HCRE demands a trial by jury of all issues so triable under Federal Rule of Civil Procedure 38 and Federal Rule of Bankruptcy Procedure 9015.

60.     HCRE does not consent to the Bankruptcy Court conducting a jury trial and therefore demands such jury trial in the District Court.

## PRAYER

For these reasons, HCRE respectfully requests that, following a trial on the merits, the Court deny the relief Plaintiffs seeks through its Complaint, enter a judgment that the Plaintiff take nothing on the Complaint, and grant HCRE such other relief at law or in equity to which it may be entitled.

Respectfully submitted,

*/s/ Lauren K. Drawhorn*
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email:  jason.rudd@wickphillips.com
        lauren.drawhorn@wickphillips.com

**COUNSEL FOR HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE PARTNERS, LLC)**


## CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2021, a true and correct copy of the foregoing pleading was served via the Court's CM/ECF system upon counsel for the Plaintiff and all other parties requesting or consenting to such service in this adversary case.

Jeffrey N. Pomerantz
jpomerantz@pszjlaw.com
Ira D. Kharasch
ikharasch@pszjlaw.com
John A. Morris
jmorris@pszjlaw.com
Gregory V. Demo
gdemo@pszjlaw.com
Hayley R. Winograd
hwinograd@pszjlaw.com
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067
Facsimile: (310) 201-0760
*Counsel for Highland Capital Management, L.P.*

Melissa S. Hayward
MHayward@HaywardFirm.com
Zachery Z. Annable
ZAnnable@HaywardFirm.com
HAYWARD PLLC
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Fax: (972) 755-7110


*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

# EXHIBIT 8

**Appx. 00292**

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT SERVICES, INC.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| | § | **Case No.: 19-34054-sgj11** |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | **Adv. Pro. No. 21-03006-sgj** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.,** | § | |
| | § | |
| | § | |
| Defendant. | § | |

## HIGHLAND CAPITAL MANAGEMENT SERVICES INC.'S MOTION FOR LEAVE TO FILE AMENDED ANSWER AND BRIEF IN SUPPORT

Defendant Highland Capital Management Services, Inc. ("HCMS" or "Defendant") files

this Motion for Leave to File Amended Answer and Brief in Support ("Motion")[1] in response to

---

[1]    Defendant files its brief in the same document as the motion pursuant to Local Bankruptcy Rule 7007-1(d).

Highland Capital Management L.P.'s ("Plaintiff" or "Debtor") Complaint in the above-referenced adversary proceeding (the "Adversary Proceeding") and respectfully states as follows:

## I. RELEVANT BACKGROUND

1.      On January 22, 2021, Plaintiff filed its Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate (the "Complaint"), commencing this Adversary Proceeding. Defendant's counsel accepted service of the Complaint on February 1, 2021 and the parties agreed the Defendant's deadline to answer or otherwise respond to the Complaint was March 3, 2021. On March 3, 2021, Defendant filed its Answer to Plaintiff's Complaint ("Original Answer").

2.      On March 11, 2021, Plaintiff and Defendant filed a Stipulation and Proposed Scheduling Order [ECF No. 7], setting forth a proposed joint scheduling order in lieu of the Alternative Scheduling Order issued by the Court. On March 16, 2021, the Court entered its Order Approving Stipulation Regarding Scheduling Order [ECF No. 9] (the "Scheduling Order").

3.      Under the Scheduling Order, the deadline to serve discovery requests is May 10, 2021 and responses to discovery requests are due June 14, 2021. Fact discovery closes July 5, 2017, dispositive motions must be filed by August 16, 2021, and trial docket call is October 4, 2021 at 1:30 p.m.

4.      Preparation of the defense of this adversary has been made extremely difficult by the constraints imposed by the Debtor with respect to access to witnesses and evidence. In connection with preparation of the defense, Defendant realized its affirmative defenses were not as clear as they could have been and that the additional defenses which it seeks to assert in this Adversary Proceeding should be more fully set out as follows: (i) the Debtor's ability to make demand on the Notes was subject to a condition subsequent that has not yet become unable to be met, and (ii) the Notes are ambiguous. The original listing of affirmative defenses was intended to

cover any such defenses, however, in an abundance of caution Defendant seeks leave to amend and more clearly set out its intended defenses. The Scheduling Order does not contain a deadline to amend pleadings; therefore, Defendant's Motion is governed by Federal Rule of Civil Procedure 15(a)(2), made applicable to this Adversary Proceeding by Federal Rule of Bankruptcy Procedure 7015, which favors liberal amendment of pleadings. *See* FED. R. CIV. P. 15(a)(2); FED. R. BANKR. P. 7015.

5.    Given the deadlines for discovery and pre-trial matters under the Scheduling Order, Defendant's proposed amendment will not delay the proceedings or otherwise prejudice the Plaintiff. Moreover, the proposed amendment is not sought in bad faith, but in furtherance of meritorious defenses based on additional investigation.

6.    Because Defendant's Motion is not sought in bad faith and will not result in undue delay or prejudice to Plaintiff, the Court should grant Defendant's Motion under the standard favoring liberal amendment of pleadings under Rule 15.

## II.  ARGUMENT AND AUTHORITY

7.    Rule 15(a) governs amendments to pleadings and provides that a party may amend its pleading with the opposing party's written consent or the court's leave.  FED. R. CIV P. 15(a). The court "should freely give leave when justice so requires." *Id*. Rule 15 "evinces a bias in favor of granting leave to amend." *Dussouy v. Gulf Coast Inv. Corp.,* 660 F.2d 594, 597 (5th Cir. 1981); *Marshall v. MarOpCo, Inc.*, 223 F.Supp.3d 562, 566 (N.D. Tex. 2017) ("Since *Dussouy*, the Fifth Circuit has repeatedly held that Rule 15(a) evinces a liberal amendment policy."). "The policy of the federal rules is to permit liberal amendment to facilitate determination of claims on the merits and to prevent litigation from becoming a technical exercise in the fine points of pleading." *Dussouy*, 660 F.2d at 598. While decisions to grant leave are within the discretion of the trial court, its discretion is not broad enough to permit denial if the court lacks a "substantial reason

to do so." *Dussouy*, 660 F.2d at 598. Instead, leave to amend should be granted unless there is a substantial reason for denying leave. *InternetAd Sys., LLC v. Opodo Ltd.*, 481 F.Supp.2d 596, 603 (N.D. Tex. 2007). Courts may consider the following factors in determining whether a substantial reason exists to deny leave: (i) delay or prejudice to the non-movant; (ii) bad faith or dilatory motives on the part of the movant; (iii) repeated failure to cure deficiencies; or (iv) futility of amendment. *InternetAd Sys*, 481 F.Supp.2d at 604. *Sabre, Inc. v. Lyn-Lea Travel Corp.*, No. Civ. A. 3:96-CV-2068R, 2003 WL 21339291, *4 (N.D. Tex. June 5, 2003).

8.      Here, there is no substantial reason to deny Defendant's Motion and, as such, the Court should grant Defendant leave to amend its answer. First, there is no undue delay or prejudice to Plaintiff. This is not a situation where there is an "unexplained delay" following the original answer. *See, e.g., In re Southmark Corp.*, 88 F.3d 311, 316 (5th Cir. 1996) (denying motion for leave to amend where the plaintiff sought to add cause of action more than one year after the original complaint was filed and eleven months after the first amended complaint was filed with no reasonable explanation for such delay). Instead, Defendant was served with the Complaint less than three months ago and its answer was due less than two months ago.  Defendant seeks to amend its answer to add two affirmative defenses based on its further investigation into the allegations of Plaintiff and in connection with its preparation for serving written discovery. Defendant discovered these new defenses in connection with its investigation and preparation for written discovery in connection with its defense of the case and within the expected timeline of this contested matter based on the Scheduling Order. Further, allowing Defendant to amend its answer will not result in prejudice to Plaintiff. Fact discovery does not close until July 5, 2021 and, although both parties will likely serve written discovery today, Plaintiff has not yet conducted any discovery. *See, e.g., Sabre, Inc.*, 2003 WL 21339291 at *4 (noting that undue prejudice arises

where a new theory requires a reiteration of discovery proceedings). Accordingly, there is no undue delay or prejudice to Plaintiff.

9.      Nor does Defendant seek to amend in bad faith. In determining bad faith, Courts consider whether "the movant first presents a theory difficult to establish but favorable and, only after that fails, presents a less favorable theory." *Sabre*, 2003 WL 21339291 at *6. Here, Defendant is not seeking to add a new theory after the first theory failed – discovery has not yet begun, and the dispositive motion deadline is almost four months away – and the circumstances do not give rise to an inference that Defendant is engaging in tactical maneuvers. Defendant is seeking to amend its answer, less than two months after filing it, because it determined additional defenses were applicable as it continued to investigate its defense of the Plaintiff's allegations and prepare for discovery. Accordingly, Defendant's Motion is not brought in bad faith or for dilatory motives.

10.     Third, this is not a situation where Defendant has repeatedly failed to cure deficiencies with prior amendments. This is Defendant's first request for leave to amend and, if granted, will be Defendant's first amendment to its answer. As such, repeated failure to cure deficiencies is not a reason to deny Defendant's Motion.

11.     Last, Defendant's proposed amendments are not futile. Amendments to defenses are futile "where they would necessarily fail or are so lacking in merit on their face." *Southpoint Condo. Ass'n Inc. v. Lexington Ins. Co.*, Case No. 19-cv-61365, 2020 WL 639400, *6 (S.D. Fla. Feb. 11, 2020). Some courts refuse to address the issue of futility in a motion for leave to amend context and instead does so in the context of a Rule 12(b)(6) or Rule 56 motion, "where the procedural safeguards are surer." *Garcia v. Zale Corp.*, 2006 WL 298156, *1 (N.D. Tex. Feb. 1, 2006) (Fitzwater, J.) ("…the court's almost unvarying practice when futility is raised is to address the merits of the claim or defense in the context of a Rule 12(b)(6) or Rule 56 motion."). Here, the

proposed affirmative defenses are not futile,[2] and Defendant expects evidence supporting such defenses will be uncovered through discovery. *See, e.g., Don Stevenson Design, Inc. v. Randy Herrera Designer, LLC*, No. 5:16-CV-1130, 2017 WL 10581124, *1 (W.D. Tex. Sept. 8, 2017) ("Finally, Defendants' Motion for Leave is not futile because additional evidence substantiating the statute of limitations defense may come forward during the remainder of discovery.").

12.     Further, "even if there is substantial reason to deny leave to amend, the court should consider prejudice to the movant, as well as judicial economy, in determining whether justice requires granting leave." *Allen v. Target Corporation*, 2007 WL 9735894, *1 (S.D. Tex. Nov 29, 2007). As a result, in considering a motion for leave to add additional affirmative defenses, Rule 8(c)'s requirement that affirmative defenses be pleaded or waived "must be applied in the context of the Federal Rules' liberal pleading and amendment policy, the goal of which is to do substantial justice." *Id.* At *1-2 (granting defendant's motion for leave to add affirmative defenses known previously because the delay did not constitute a substantial reason to deny leave and justice requires allowing the amendment).

13.     Because there is no substantial reason to deny Defendant's request, Defendant's additional affirmative defenses could be waived if not allowed, and Plaintiff is free to challenge any of Defendant's affirmative defenses under Rule 56, made applicable to this Adversary Proceeding by Bankruptcy Rule 7056. Leave to amend should be freely granted and, as such, the Court should grant Defendant's Motion.

---

[2]    Plaintiff contemplated at least some of its loans to affiliates or related entities (such as the Notes at issue in this Adversary Proceeding) "may not result in allowed or enforceable claims" by the Plaintiff. *See* Global Notes and Statement of Limitations, Methods, and Disclaimers Regarding Debtor's Amended Schedules of Assets and Liabilities, p. 3 "Intercompany Claims" [Docket No. 1082-1], Global Notes and Statement of Limitations, methods, and Disclaimer Regarding Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs, p. 3 "Intercompany Claims" [Docket No. 247-1]. Defendant believes the reason some of these intercompany loans may not be allowed or enforceable is because collectability was dependent on a condition subsequent and/or they are ambiguous – the very defense Defendant now seeks to include in its Answer.

---

### III.  PROPOSED AMENDED ANSWER ATTACHED

14.     Defendant's proposed First Amended Answer is attached hereto as **Exhibit A**.

### IV.  CONCLUSION

The Court should liberally grant leave to file amended pleadings absent a demonstration that such amendment would result in undue delay, prejudice, or is sought in bad faith. There is no such evidence of any of the foregoing here. For these reasons, Defendant respectfully requests the Court (i) grant this Motion; (ii) deem Defendant's First Amended Answer filed as of the date of the order granting this Motion; and grant Defendant such other relief at law or in equity to which it may be entitled.

Respectfully submitted,

*/s/ Lauren K. Drawhorn*
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email:  jason.rudd@wickphillips.com
         lauren.drawhorn@wickphillips.com

**COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.**

## CERTIFICATE OF CONFERENCE

Between April 21 and 25, 2021, I conferred with John Morris, counsel for the Plaintiff, regarding the relief requested herein and Mr. Morris indicated that the Plaintiff is opposed to the relief requested in Defendant's Motion.

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2021, a true and correct copy of the foregoing pleading was served via the Court's CM/ECF system upon counsel for the Plaintiff and all other parties requesting or consenting to such service in this adversary case.

Jeffrey N. Pomerantz
jpomerantz@pszjlaw.com
Ira D. Kharasch
ikharasch@pszjlaw.com
John A. Morris
jmorris@pszjlaw.com
Gregory V. Demo
gdemo@pszjlaw.com
Hayley R. Winograd
hwinograd@pszjlaw.com
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067
Facsimile: (310) 201-0760
*Counsel for Highland Capital Management, L.P.*

Melissa S. Hayward
MHayward@HaywardFirm.com
Zachery Z. Annable
ZAnnable@HaywardFirm.com
HAYWARD PLLC
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Fax: (972) 755-7110

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

# EXHIBIT A

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT SERVICES, INC.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| | § | **Case No.: 19-34054-sgj11** |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | **Adv. Pro. No. 21-03006-sgj** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.,** | § | |
| | § | |
| | § | |
| Defendant. | § | |

## HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.'S
## FIRST AMENDED ANSWER TO PLAINTIFF'S COMPLAINT

Defendant Highland Capital Management Services, Inc. ("HCMS" or "Defendant") files

this First Amended Answer in response to Highland Capital Management L.P.'s ("Plaintiff" or

"Debtor") Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's

Estate (the "Complaint") and respectfully states as follows:

## PRELIMINARY STATEMENT[1]

1.      The first sentence of Paragraph 1 sets forth Plaintiff's objective in bringing the Complaint and does not require a response. To the extent a response is required, Defendant denies the allegations in the first sentence of Paragraph 1. The second sentence contains a legal conclusion that does not require a response. To the extent a response is required, Defendant denies the allegations in the second sentence of Paragraph 1.

2.      Paragraph 2 contains a summary of the relief Plaintiff seeks and does not require a response. To the extent a response is required, Defendant denies the allegations in Paragraph 2.

## JURISDICTION AND VENUE

3.      Defendant admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers constitutional authority on the Bankruptcy Court to adjudicate this dispute. Defendant denies any allegations in Paragraph 3 that are not expressly admitted.

4.      Paragraph 4 states a legal conclusion that does not require a response. To the extent a response is required, Defendant admits the Bankruptcy Court has statutory jurisdiction over this Adversary Proceeding but denies that the Court has constitutional authority over this Adversary Proceeding. Defendant denies any allegations in Paragraph 4 that are not expressly admitted.

5.      Defendant denies that Plaintiff's breach of contract claim is a core proceeding. Defendant further denies that a turnover proceeding under 11 U.S.C. § 542(b) is the appropriate mechanism to collect a contested debt. Defendant admits that a turnover proceeding under 11 U.S.C. § 542(b) is a statutorily core proceeding but denies that it is constitutionally core under *Stern v. Marshall*. Defendant does not consent to the Bankruptcy Court entering final orders or

---

[1]    The headings herein are from Plaintiff's Complaint and are solely included for the Court's convenience.

judgment in this Adversary Proceeding. Defendant denies any allegations in Paragraph 5 that are not expressly admitted.

6.        Paragraph 6 states a legal conclusion to which no response is required. To the extent a response is required, Defendant admits that venue is proper in this District.

## THE PARTIES

7.        Defendant admits the allegations in Paragraph 7 of the Complaint.

8.        Defendant admits the allegations in Paragraph 8 of the Complaint.

## CASE BACKGROUND

9.        Defendant admits the allegations in Paragraph 9 of the Complaint.

10.        Defendant admits the allegations in Paragraph 10 of the Complaint.

11.        Defendant admits the allegations in Paragraph 11 of the Complaint.

12.        Defendant admits the allegations in Paragraph 12 of the Complaint.

## STATEMENT OF FACTS

**A.        The HCMS Demand Notes**

13.        Defendant admits it has executed at least one promissory note under which the Debtor is the payee. Defendant denies any allegations in Paragraph 13 that are not expressly admitted.

14.        Defendant admits that it signed the document attached to the Complaint as Exhibit 1. Defendant denies any allegations in Paragraph 14 that are not expressly admitted.

15.        Defendant admits that it signed the document attached to the Complaint as Exhibit 2. Defendant denies any allegations in Paragraph 15 that are not expressly admitted.

16.        Defendant admits that it signed the document attached to the Complaint as Exhibit 3. Defendant denies any allegations in Paragraph 16 that are not expressly admitted.

17.     Defendant admits that it signed the document attached to the Complaint as Exhibit 4. Defendant denies any allegations in Paragraph 17 that are not expressly admitted.

18.     Defendant admits that Plaintiff correctly transcribed Section 2 of Exhibits 1-4 to the Complaint in Paragraph 18.

19.     Defendant admits that Plaintiff correctly transcribed Section 4 of Exhibits 1-4 to the Complaint in Paragraph 19.

20.     Defendant admits that Plaintiff correctly transcribed Section 6 of Exhibits 1-4 of the Complaint in Paragraph 20.

**B.     Allegations regarding the Demand Notes**

21.     Defendant admits that Plaintiff sent it a copy of Exhibit 5. Defendant admits that Plaintiff correctly transcribed an excerpt of Exhibit 5 in the third sentence of Paragraph 21. Defendant denies any allegations in Paragraph 21 that are not expressly admitted.

22.     To the extent Paragraph 22 asserts a legal conclusion, no response is required, and it is denied. Defendant otherwise admits the allegations in Paragraph 22.

23.     Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 23 and, therefore, denies them.

24.     Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 24 and, therefore, denies them.

25.     Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 25 and, therefore, denies them.

26.     Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 26 and, therefore, denies them.

27.    Defendant lacks sufficient information or knowledge to admit or deny the allegations in the first sentence of Paragraph 27 and, therefore, denies them. Defendant denies the allegations in the second sentence of Paragraph 27 of the Complaint.

**C.    The HCMS Term Note**

28.    Defendant admits that it has executed at least one promissory note under which Debtor is the payee. Defendant denies any allegations in Paragraph 28 that are not expressly admitted.

29.    Defendant admits it signed the document attached to the Complaint as Exhibit 6. Defendant denies any allegations in Paragraph 29 that are not expressly admitted.

30.    Defendant admits that Plaintiff correctly transcribed Section 2 of Exhibit 6 to the Complaint in Paragraph 30. Defendant denies any allegations in Paragraph 30 that are not expressly admitted.

31.    Defendant admits that Plaintiff correctly transcribed Section 3 of Exhibit 6 to the Complaint in Paragraph 31. Defendant denies any allegations in Paragraph 31 that are not expressly admitted.

32.    Defendant admits that Plaintiff correctly transcribed Section 4 of Exhibit 6 to the Complaint in Paragraph 32. Defendant denies any allegations in Paragraph 32 that are not expressly admitted.

33.    Defendant admits that Plaintiff correctly transcribed Section 6 of Exhibit 6 to the Complaint in Paragraph 33. Defendant denies any allegations in Paragraph 33 that are not expressly admitted.

**D.    Allegations regarding the Term Note.**

34.    To the extent Paragraph 34 of the Complaint asserts a legal conclusion, no response is required, and it is denied. Defendant otherwise admits Paragraph 34 of the Complaint.

35.    Defendant admits that Plaintiff sent it a copy of Exhibit 7. Defendant admits that Plaintiff correctly transcribed an excerpt of Exhibit 7 in the third sentence of Paragraph 35 of the Complaint. Defendant denies any allegations in Paragraph 35 that are not expressly admitted.

36.    Defendant is without sufficient information or knowledge to admit or deny the allegations in Paragraph 36 of the Complaint and, therefore, denies them.

37.    Defendant denies Paragraph 37 of the Complaint.

### FIRST CLAIM FOR RELIEF
### (For Breach of Contract)

38.    Paragraph 38 of the Complaint seeks to incorporate the allegations in the preceding paragraphs and does not require a response. Defendant incorporates all prior denials herein by reference.

39.    Paragraph 39 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

40.    Paragraph 40 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

41.    Paragraph 41 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

42.    Paragraph 42 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

43.    Defendant denies Paragraph 43 of the Complaint.

44.      Defendant denies Paragraph 44 of the Complaint.

## SECOND CLAIM FOR RELIEF
### (Turnover by HCMS Pursuant to 11 U.S.C. § 549(b))

45.      Paragraph 45 seeks to incorporate the allegations in the preceding paragraphs and does not require a response. Defendant incorporates all prior denials herein by reference.

46.      Paragraph 46 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

47.      Paragraph 47 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

48.      Paragraph 48 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

49.      Defendant admits that Plaintiff transmitted Exhibits 5 and 7 to the Complaint. Defendant lacks sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 49 of the Complaint and, therefore, denies them.

50.      Defendant lacks sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 50 of the Complaint and, therefore, denies them.

51.      Defendant denies Paragraph 51 of the Complaint.

52.      Defendant denies that Plaintiff is entitled to the relief requested in the prayer of the Complaint, including parts (i), (ii), and (iii).

## AFFIRMATIVE DEFENSES

53.     Plaintiff's claims are barred in whole or in part by the doctrine of justification and/or repudiation.

54.     Plaintiff's claims are barred in whole or in part by the doctrine of estoppel.

55.     Plaintiff's claims are barred in whole or in part by the doctrine of waiver.

56.     Plaintiff's claims are barred in whole or in part because prior to the demands for payment Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent.

57.     HCMS further asserts that each Note is ambiguous.

## JURY DEMAND

58.     HCMS demands a trial by jury of all issues so triable under Federal Rule of Civil Procedure 38 and Federal Rule of Bankruptcy Procedure 9015.

59.     HCMS does not consent to the Bankruptcy Court conducting a jury trial and therefore demands such jury trial in the District Court.

## PRAYER

For these reasons, HCMS respectfully requests that, following a trial on the merits, the Court deny the relief Plaintiffs seeks through its Complaint, enter a judgment that the Plaintiff take nothing on the Complaint, and grant HCMS such other relief at law or in equity to which it may be entitled.

Respectfully submitted,


/s/ Lauren K. Drawhorn
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email:  jason.rudd@wickphillips.com
            lauren.drawhorn@wickphillips.com

**COUNSEL FOR HIGHLAND MANAGEMENT SERVICES, INC.**


## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2021, a true and correct copy of the foregoing pleading was served via the Court's CM/ECF system upon counsel for the Plaintiff and all other parties requesting or consenting to such service in this adversary case.

Jeffrey N. Pomerantz
jpomerantz@pszjlaw.com
Ira D. Kharasch
ikharasch@pszjlaw.com
John A. Morris
jmorris@pszjlaw.com
Gregory V. Demo
gdemo@pszjlaw.com
Hayley R. Winograd
hwinograd@pszjlaw.com
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067
Facsimile: (310) 201-0760
*Counsel for Highland Capital Management, L.P.*

Melissa S. Hayward
MHayward@HaywardFirm.com
Zachery Z. Annable
ZAnnable@HaywardFirm.com
HAYWARD PLLC
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Fax: (972) 755-7110


/s/ Lauren K. Drawhorn
Lauren K. Drawhorn

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | **Chapter 11** |
| **L.P.** | § | |
| | § | **Case No.: 19-34054-sgj11** |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P.** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| vs. | § | **Adv. Pro. No. 21-03006-sgj** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT** | § | |
| **SERVICES, INC.,** | § | |
| | § | |
| Defendant. | § | |

**ORDER GRANTING HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.'S**
**MOTION FOR LEAVE TO AMEND ANSWER TO PLAINTIFF'S COMPLAINT**

On this day, the Court considered Defendant Highland Capital Management Services,

Inc.'s ("Defendant") Motion for Leave to Amend its Answer to Plaintiff's Complaint (the

"Motion"). Having considered the Motion, and finding good cause exists, the Court hereby, **GRANTS** the Motion.

IT IS THEREFORE ORDERED that Defendant's First Amended Answer to Plaintiff's Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate, is hereby **DEEMED FILED** as of the date of this Order.

### END OF ORDER ###

# EXHIBIT 9

Appx. 00313

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR NEXPOINT REAL ESTATE
PARTNERS, LLC F/K/A HCRE PARTNERS, LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P.** | § | **Case No.: 19-34054-sgj11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P.** | § | |
| | § | |
| Plaintiff, | § | |
| | § | **Adv. Pro. No. 21-03007-sgj** |
| vs. | § | |
| | § | |
| **HCRE PARTNERS, LLC (n/k/a** | § | |
| **NEXPOINT REAL ESTATE PARTNERS,** | § | |
| **LLC),** | § | |
| | § | |
| Defendant. | § | |

## NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC'S
## MOTION FOR LEAVE TO FILE AMENDED ANSWER AND BRIEF IN SUPPORT

Defendant NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC ("NREP" or

"Defendant") files this Motion for Leave to File Amended Answer and Brief in Support

("Motion")[1] in response to Highland Capital Management L.P.'s ("Plaintiff" or "Debtor")

---

[1]    Defendant files its brief in the same document as the motion pursuant to Local Bankruptcy Rule 7007-1(d).

Complaint in the above-referenced adversary proceeding (the "Adversary Proceeding") and respectfully states as follows:

## I. RELEVANT BACKGROUND

1.      On January 22, 2021, Plaintiff filed its Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate (the "Complaint"), commencing this Adversary Proceeding. Defendant's counsel accepted service of the Complaint on February 1, 2021 and the parties agreed the Defendant's deadline to answer or otherwise respond to the Complaint was March 3, 2021. On March 3, 2021, Defendant filed its Answer to Plaintiff's Complaint ("Original Answer").

2.      On March 11, 2021, Plaintiff and Defendant filed a Stipulation and Proposed Scheduling Order [ECF No. 8], setting forth a proposed joint scheduling order in lieu of the Alternative Scheduling Order issued by the Court. On March 16, 2021, the Court entered its Order Approving Stipulation Regarding Scheduling Order [ECF No. 10] (the "Scheduling Order").

3.      Under the Scheduling Order, the deadline to serve discovery requests is May 31, 2021 and responses to discovery requests are due July 5, 2021. Fact discovery closes July 26, 2017, dispositive motions must be filed by September 6, 2021, and trial docket call is November 8, 2021 at 1:30 p.m.

4.      Preparation of the defense of this adversary has been made extremely difficult by the constraints imposed by the Debtor with respect to access to witnesses and evidence. In connection with preparation of the defense, Defendant realized its affirmative defenses were not as clear as they could have been and that the additional defenses which it seeks to assert in this Adversary Proceeding should have been more fully set out as follows: (i) the Debtor's ability to make demand on the Notes was subject to a condition subsequent that has not yet become unable to be met, and (ii) the Notes are ambiguous. The original listing of affirmative defenses was

intended to cover such defenses, however, in an abundance of caution, Defendant seeks leave to amend and more clearly set out its intended defenses. The Scheduling Order does not contain a deadline to amend pleadings; therefore, Defendant's Motion is governed by Federal Rule of Civil Procedure 15(a)(2), made applicable to this Adversary Proceeding by Federal Rule of Bankruptcy Procedure 7015, which favors liberal amendment of pleadings. *See* Fed. R. Civ. P. 15(a)(2); Fed. R. Bankr. P. 7015.

5.      Given the deadlines for discovery and pre-trial matters under the Scheduling Order, Defendant's proposed amendment will not delay the proceedings or otherwise prejudice the Plaintiff. Moreover, the proposed amendment is not sought in bad faith, but in furtherance of meritorious defenses based on additional investigation.

6.      Because Defendant's Motion is not sought in bad faith and will not result in undue delay or prejudice to Plaintiff, the Court should grant Defendant's Motion under the standard favoring liberal amendment of pleadings under Rule 15.

## II.  ARGUMENT AND AUTHORITY

7.      Rule 15(a) governs amendments to pleadings and provides that a party may amend its pleading with the opposing party's written consent or the court's leave.  Fed. R. Civ P. 15(a). The court "should freely give leave when justice so requires." *Id.* Rule 15 "evinces a bias in favor of granting leave to amend." *Dussouy v. Gulf Coast Inv. Corp.,* 660 F.2d 594, 597 (5th Cir. 1981); *Marshall v. MarOpCo, Inc.*, 223 F.Supp.3d 562, 566 (N.D. Tex. 2017) ("Since *Dussouy*, the Fifth Circuit has repeatedly held that Rule 15(a) evinces a liberal amendment policy."). "The policy of the federal rules is to permit liberal amendment to facilitate determination of claims on the merits and to prevent litigation from becoming a technical exercise in the fine points of pleading." *Dussouy*, 660 F.2d at 598. Leave to amend should be granted unless there is a substantial reason for denying leave. *InternetAd Sys., LLC v. Opodo Ltd.*, 481 F.Supp.2d 596, 603 (N.D. Tex. 2007).

Courts may consider the following factors in determining whether a substantial reason exists to deny leave: (i) delay or prejudice to the non-movant; (ii) bad faith or dilatory motives on the part of the movant; (iii) repeated failure to cure deficiencies; or (iv) futility of amendment. *InternetAd Sys*, 481 F.Supp.2d at 604; *Sabre, Inc. v. Lyn-Lea Travel Corp.*, No. Civ. A. 3:96-CV-2068R, 2003 WL 21339291, *4 (N.D. Tex. June 5, 2003).

8.    Here, there is no substantial reason to deny Defendant's Motion and, as such, the Court should grant Defendant leave to amend its answer. First, there is no undue delay or prejudice to Plaintiff. This is not a situation where there is an "unexplained delay" following the original answer. *See, e.g., In re Southmark Corp.*, 88 F.3d 311, 316 (5th Cir. 1996) (denying motion for leave to amend where the plaintiff sought to add a cause of action more than one year after the original complaint was filed and eleven months after the first amended complaint was filed with no reasonable explanation for such delay). Instead, Defendant was served with the Complaint less than three months ago and its answer was due less than two months ago. Defendant seeks to amend its answer to clarify its defense by adding two affirmative defenses based on its further investigation into the allegations of Plaintiff and in connection with its preparation for serving written discovery. Defendant determined these affirmative defenses applied in connection with its investigation and preparation for written discovery in connection with its defense of the case and within the expected timeline of this contested matter based on the Scheduling Order. Further, allowing Defendant to amend its answer will not result in prejudice to Plaintiff. Fact discovery does not close until July 26, 2021 and Plaintiff has not yet conducted any discovery. *See, e.g., Sabre, Inc.*, 2003 WL 21339291 at *4 (noting that undue prejudice arises where a new theory requires a reiteration of discovery proceedings). Accordingly, there is no undue delay or prejudice to Plaintiff.

9.      Nor does Defendant seek to amend in bad faith. In determining bad faith, Courts consider whether "the movant first presents a theory difficult to establish but favorable and, only after that fails, presents a less favorable theory." *Sabre*, 2003 WL 21339291 at *6. Here, Defendant is not seeking to add a new theory after the first theory failed – discovery has not yet begun, and the dispositive motion deadline is approximately four months away – and the circumstances do not give rise to an inference that Defendant is engaging in tactical maneuvers. Defendant is seeking to amend its answer, less than two months after filing it, because it determined additional defenses were applicable as it continued to investigate its defense of the Plaintiff's allegations and prepare for discovery. Accordingly, Defendant's Motion is not brought in bad faith or for dilatory motives.

10.     Third, this is not a situation where Defendant has repeatedly failed to cure deficiencies with prior amendments. This is Defendant's first request for leave to amend and, if granted, will be Defendant's first amendment to its answer. As such, repeated failure to cure deficiencies is not a reason to deny Defendant's Motion.

11.     Last, Defendant's proposed amendments are not futile. Amendments to defenses are futile "where they would necessarily fail or are so lacking in merit on their face." *Southpoint Condo. Ass'n Inc. v. Lexington Ins. Co.*, Case No. 19-cv-61365, 2020 WL 639400, *6 (S.D. Fla. Feb. 11, 2020). Some courts refuse to address the issue of futility in a motion for leave to amend context and instead does so in the context of a Rule 12(b)(6) or Rule 56 motion, "where the procedural safeguards are surer." *Garcia v. Zale Corp.*, 2006 WL 298156, *1 (N.D. Tex. Feb. 1, 2006) (Fitzwater, J.) ("…the court's almost unvarying practice when futility is raised is to address the merits of the claim or defense in the context of a Rule 12(b)(6) or Rule 56 motion."). Here, the

proposed affirmative defenses are not futile,[2] and Defendant expects evidence supporting such defenses will be uncovered through discovery. *See, e.g., Don Stevenson Design, Inc. v. Randy Herrera Designer, LLC*, No. 5:16-CV-1130, 2017 WL 10581124, *1 (W.D. Tex. Sept. 8, 2017) ("Finally, Defendants' Motion for Leave is not futile because additional evidence substantiating the statute of limitations defense may come forward during the remainder of discovery.").

12.     Further, "even if there is substantial reason to deny leave to amend, the court should consider prejudice to the movant, as well as judicial economy, in determining whether justice requires granting leave." *Allen v. Target Corporation*, 2007 WL 9735894, *1 (S.D. Tex. Nov 29, 2007). As a result, in considering a motion for leave to add additional affirmative defenses, Rule 8(c)'s requirement that affirmative defenses be pleaded or waived "must be applied in the context of the Federal Rules' liberal pleading and amendment policy, the goal of which is to do substantial justice." *Id.* At *1-2 (granting defendant's motion for leave to add affirmative defenses known previously because the delay did not constitute a substantial reason to deny leave and justice requires allowing the amendment).

13.     Because there is no substantial reason to deny Defendant's request, Defendant's additional affirmative defenses could be waived if not allowed, and Plaintiff is free to challenge any of Defendant's affirmative defenses under Rule 56, made applicable to this Adversary Proceeding by Bankruptcy Rule 7056. Leave to amend should be freely granted and, as such, the Court should grant Defendant's Motion.

---

[2]   Plaintiff contemplated at least some of its loans to affiliates or related entities (such as the Notes at issue in this Adversary Proceeding) "may not result in allowed or enforceable claims" by the Plaintiff. *See* Global Notes and Statement of Limitations, Methods, and Disclaimers Regarding Debtor's Amended Schedules of Assets and Liabilities, p. 3 "Intercompany Claims" [Docket No. 1082-1], Global Notes and Statement of Limitations, methods, and Disclaimer Regarding Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs, p. 3 "Intercompany Claims" [Docket No. 247-1]. Defendant believes the reason some of these intercompany loans may not be allowed or enforceable is because collectability was dependent on a condition subsequent and/or they are ambiguous – the very defense Defendant now seeks to include in its Answer.

---

### III.  PROPOSED AMENDED ANSWER ATTACHED

14.    Defendant's proposed First Amended Answer is attached hereto as **Exhibit A**.

### IV.  CONCLUSION

The Court should liberally grant leave to file amended pleadings absent a demonstration that such amendment would result in undue delay, prejudice, or is sought in bad faith. There is no such evidence of any of the foregoing here. For these reasons, Defendant respectfully requests the Court (i) grant this Motion; (ii) deem Defendant's First Amended Answer filed as of the date of the order granting this Motion; and grant Defendant such other relief at law or in equity to which it may be entitled.

Respectfully submitted,

*/s/ Lauren K. Drawhorn*
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email:  jason.rudd@wickphillips.com
          lauren.drawhorn@wickphillips.com

**COUNSEL FOR HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE PARTNERS, LLC)**

### CERTIFICATE OF CONFERENCE

Between April 21 and 25, 2021, I conferred with John Morris, counsel for the Plaintiff, regarding the relief requested herein and Mr. Morris indicated that the Plaintiff is opposed to the relief requested in Defendant's Motion.

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2021, a true and correct copy of the foregoing pleading was served via the Court's CM/ECF system upon counsel for the Plaintiff and all other parties requesting or consenting to such service in this adversary case.

Jeffrey N. Pomerantz
jpomerantz@pszjlaw.com
Ira D. Kharasch
ikharasch@pszjlaw.com
John A. Morris
jmorris@pszjlaw.com
Gregory V. Demo
gdemo@pszjlaw.com
Hayley R. Winograd
hwinograd@pszjlaw.com
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067
Facsimile: (310) 201-0760
*Counsel for Highland Capital Management, L.P.*

Melissa S. Hayward
MHayward@HaywardFirm.com
Zachery Z. Annable
ZAnnable@HaywardFirm.com
HAYWARD PLLC
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Fax: (972) 755-7110

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

# EXHIBIT A

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR NEXPOINT REAL ESTATE
PARTNERS, LLC F/K/A HCRE PARTNERS, LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P.** | § | **Case No.: 19-34054-sgj11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P.** | § | |
| | § | |
| Plaintiff, | § | |
| | § | **Adv. Pro. No. 21-03007-sgj** |
| vs. | § | |
| | § | |
| **HCRE PARTNERS, LLC (n/k/a** | § | |
| **NEXPOINT REAL ESTATE PARTNERS,** | § | |
| **LLC),** | § | |
| | § | |
| Defendant. | § | |

## NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC'S
## FIRST AMENDED ANSWER TO PLAINTIFF'S COMPLAINT

Defendant NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC ("NREP" or

"Defendant") files this First Amended Answer in response to Highland Capital Management L.P.'s

("Plaintiff" or "Debtor") Complaint for (I) Breach of Contract and (II) Turnover of Property of the

Debtor's Estate (the "Complaint") in the above-referend adversary proceeding (the "Adversary Proceeding") and respectfully states as follows:

## PRELIMINARY STATEMENT[1]

1. The first sentence of Paragraph 1 sets forth Plaintiff's objective in bringing the Complaint and does not require a response. To the extent a response is required, Defendant denies the allegations in the first sentence of Paragraph 1. The second sentence contains a legal conclusion that does not require a response. To the extent a response is required, Defendant denies the allegations in the second sentence of Paragraph 1.

2. Paragraph 2 contains a summary of the relief Plaintiff seeks and does not require a response. To the extent a response is required, Defendant denies the allegations in Paragraph 2.

## JURISDICTION AND VENUE

3. Defendant admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers constitutional authority on the Bankruptcy Court to adjudicate this dispute. Defendant denies any allegations in Paragraph 3 that are not expressly admitted.

4. Paragraph 4 states a legal conclusion that does not require a response. To the extent a response is required, Defendant admits the Bankruptcy Court has statutory jurisdiction over this Adversary Proceeding but denies that the Court has constitutional authority over this Adversary Proceeding. Defendant denies any allegations in Paragraph 4 that are not expressly admitted.

5. Defendant denies that Plaintiff's breach of contract claim is a core proceeding. Defendant further denies that a turnover proceeding under 11 U.S.C. § 542(b) is the appropriate mechanism to collect a contested debt. Defendant admits that a turnover proceeding under 11

---

1 The headings herein are from Plaintiff's Complaint and are solely included for the Court's convenience.

U.S.C. § 542(b) is a statutorily core proceeding but denies that it is constitutionally core under *Stern v. Marshall*. Defendant does not consent to the Bankruptcy Court entering final orders or judgment in this Adversary Proceeding. Defendant denies any allegations in Paragraph 5 that are not expressly admitted.

6.      Paragraph 6 states a legal conclusion to which no response is required. To the extent a response is required, Defendant admits that venue is proper in this District.

## THE PARTIES

7.      Defendant admits the allegations in Paragraph 7 of the Complaint.

8.      Defendant admits the allegations in Paragraph 8 of the Complaint.

## CASE BACKGROUND

9.      Defendant admits the allegations in Paragraph 9 of the Complaint.

10.      Defendant admits the allegations in Paragraph 10 of the Complaint.

11.      Defendant admits the allegations in Paragraph 11 of the Complaint.

12.      Defendant admits the allegations in Paragraph 12 of the Complaint.

## STATEMENT OF FACTS

**A.      The Demand Notes**

13.      Defendant admits it has executed at least one promissory note under which the Debtor is the payee. Defendant denies any allegations in Paragraph 13 that are not expressly admitted.

14.      Defendant admits that it signed the document attached to the Complaint as Exhibit 1. Defendant denies any allegations in Paragraph 14 that are not expressly admitted.

15.      Defendant admits that it signed the document attached to the Complaint as Exhibit 2. Defendant denies any allegations in Paragraph 15 that are not expressly admitted.

16.    Defendant admits that it signed the document attached to the Complaint as Exhibit 3. Defendant denies any allegations in Paragraph 16 that are not expressly admitted.

17.    Defendant admits that it signed the document attached to the Complaint as Exhibit 4. Defendant denies any allegations in Paragraph 17 that are not expressly admitted.

18.    Defendant admits that Plaintiff correctly transcribed Section 2 of Exhibits 1-4 to the Complaint in Paragraph 18.

19.    Defendant admits that Plaintiff correctly transcribed Section 4 of Exhibits 1-4 to the Complaint in Paragraph 19.

20.    Defendant admits that Plaintiff correctly transcribed Section 6 of Exhibits 1-4 of the Complaint in Paragraph 20.

**B.    Allegations regarding the Demand Notes**

21.    Defendant admits that Plaintiff sent it a copy of Exhibit 5. Defendant admits that Plaintiff correctly transcribed an excerpt of Exhibit 5 in the third sentence of Paragraph 21. Defendant denies any allegations in Paragraph 21 that are not expressly admitted.

22.    To the extent Paragraph 22 asserts a legal conclusion, no response is required, and it is denied. Defendant otherwise admits the allegations in Paragraph 22.

23.    Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 23 and, therefore, denies them.

24.    Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 24 and, therefore, denies them.

25.    Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 25 and, therefore, denies them.

26.    Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 26 and, therefore, denies them.

27.     Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 27 and, therefore, denies them.

28.     Defendant denies the allegations in Paragraph 28 of the Complaint.

**C.     The Term Note**

29.     Defendant admits that it has executed at least one promissory note under which Debtor is the payee. Defendant denies any allegations in Paragraph 29 that are not expressly admitted.

30.     Defendant admits it signed the document attached to the Complaint as Exhibit 6. Defendant denies any allegations in Paragraph 30 that are not expressly admitted.

31.     Defendant admits that Plaintiff correctly transcribed Section 2 of Exhibit 6 to the Complaint in Paragraph 31. Defendant denies any allegations in Paragraph 31 that are not expressly admitted.

32.     Defendant admits that Plaintiff correctly transcribed Section 3 of Exhibit 6 to the Complaint in Paragraph 32. Defendant denies any allegations in Paragraph 32 that are not expressly admitted.

33.     Defendant admits that Plaintiff correctly transcribed Section 4 of Exhibit 6 to the Complaint in Paragraph 33. Defendant denies any allegations in Paragraph 33 that are not expressly admitted.

34.     Defendant admits that Plaintiff correctly transcribed Section 6 of Exhibit 6 to the Complaint in Paragraph 34. Defendant denies any allegations in Paragraph 34 that are not expressly admitted.

**D.     Allegations regarding the Term Note.**

35.     To the extent Paragraph 35 of the Complaint asserts a legal conclusion, no response is required, and it is denied. Defendant otherwise admits Paragraph 35 of the Complaint.

36.    Defendant admits that Plaintiff sent it a copy of Exhibit 7. Defendant admits that Plaintiff correctly transcribed an excerpt of Exhibit 7 in the third sentence of Paragraph 36 of the Complaint. Defendant denies any allegations in Paragraph 36 that are not expressly admitted.

37.    To the extent Paragraph 37 of the Complaint asserts a legal conclusion, no response is required, and it is denied. Defendant otherwise admits Paragraph 37 of the Complaint.

38.    Defendant is without sufficient information or knowledge to admit or deny the allegations in Paragraph 38 of the Complaint and, therefore, denies them.

39.    Defendant denies Paragraph 39 of the Complaint.

### FIRST CLAIM FOR RELIEF
### (For Breach of Contract)

40.    Paragraph 40 of the Complaint seeks to incorporate the allegations in the preceding paragraphs and does not require a response. Defendant incorporates all prior denials herein by reference.

41.    Paragraph 41 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

42.    Paragraph 42 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

43.    Paragraph 43 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

44.     Paragraph 44 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

45.     Defendant denies Paragraph 45 of the Complaint.

46.     Defendant denies Paragraph 46 of the Complaint.

### SECOND CLAIM FOR RELIEF
### (Turnover Pursuant to 11 U.S.C. § 549(b))

47.     Paragraph 47 seeks to incorporate the allegations in the preceding paragraphs and does not require a response. Defendant incorporates all prior denials herein by reference.

48.     Paragraph 48 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

49.     Paragraph 49 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

50.     Paragraph 50 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

51.     Defendant admits that Plaintiff transmitted Exhibits 5 and 7 to the Complaint. Defendant lacks sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 51 of the Complaint and, therefore, denies them.

52.     Defendant lacks sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 52 of the Complaint and, therefore, denies them.

53.     Defendant denies Paragraph 53 of the Complaint.

54. Defendant denies that Plaintiff is entitled to the relief requested in the prayer of the Complaint, including parts (i), (ii), and (iii).

## AFFIRMATIVE DEFENSES

55. Plaintiff's claims are barred in whole or in part by the doctrine of justification and/or repudiation.

56. Plaintiff's claims are barred in whole or in part by the doctrine of estoppel.

57. Plaintiff's claims are barred in whole or in part by the doctrine of waiver.

58. Plaintiff's claims are barred in whole or in part because prior to the demands for payment, Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent.

59. Defendant further asserts that each Note is ambiguous.

## JURY DEMAND

60. Defendant demands a trial by jury of all issues so triable under Federal Rule of Civil Procedure 38 and Federal Rule of Bankruptcy Procedure 9015.

61. Defendant does not consent to the Bankruptcy Court conducting a jury trial and therefore demands such jury trial in the District Court.

## PRAYER

For these reasons, Defendant respectfully requests that, following a trial on the merits, the Court deny the relief Plaintiffs seeks through its Complaint, enter a judgment that the Plaintiff take nothing on the Complaint, and grant Defendant such other relief at law or in equity to which it may be entitled.

Respectfully submitted,

*/s/ Lauren K. Drawhorn*
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email:  jason.rudd@wickphillips.com
              lauren.drawhorn@wickphillips.com

**COUNSEL FOR NEXPOINT REAL ESTATE
PARTNERS, LLC F/K/A HCRE PARTNERS, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2021, a true and correct copy of the foregoing pleading was served via the Court's CM/ECF system upon counsel for the Plaintiff and all other parties requesting or consenting to such service in this adversary case.

Jeffrey N. Pomerantz
jpomerantz@pszjlaw.com
Ira D. Kharasch
ikharasch@pszjlaw.com
John A. Morris
jmorris@pszjlaw.com
Gregory V. Demo
gdemo@pszjlaw.com
Hayley R. Winograd
hwinograd@pszjlaw.com
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067
Facsimile: (310) 201-0760
*Counsel for Highland Capital Management, L.P.*

Melissa S. Hayward
MHayward@HaywardFirm.com
Zachery Z. Annable
ZAnnable@HaywardFirm.com
HAYWARD PLLC
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Fax: (972) 755-7110

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P.** | § | **Case No.: 19-34054-sgj11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P.** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Adv. Pro. No. 21-03007-sgj** |
| vs. | § | |
| | § | |
| **HCRE PARTNERS, LLC (n/k/a** | § | |
| **NEXPOINT REAL ESTATE PARTNERS,** | § | |
| **LLC),** | § | |
| | § | |
| **Defendant.** | § | |

**ORDER GRANTING NEXPOINT REAL ESTATE
PARTNERS, LLC F/K/A HCRE PARTNERS, LLC'S MOTION FOR
LEAVE TO AMEND ANSWER TO PLAINTIFF'S COMPLAINT**

On this day, the Court considered Defendant NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC's ("Defendant") Motion for Leave to Amend its Answer to Plaintiff's Complaint (the "Motion"). Having considered the Motion, and finding good cause exists, the Court hereby, **GRANTS** the Motion.

IT IS THEREFORE ORDERED that Defendant's First Amended Answer to Plaintiff's Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate, is hereby **DEEMED FILED** as of the date of this Order.

### END OF ORDER ###

# EXHIBIT 10

**Appx. 00334**

Docket #0032  Date Filed: 5/22/2021

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | Adv. No. 21-03004 |
| v. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S MOTION FOR LEAVE TO AMEND ANSWER**

TO THE HONORABLE COURT:

COMES NOW Highland Capital Management Fund Advisors, L.P., the defendant (the

"Defendant") in the above styled and numbered adversary proceeding (the "Adversary

Proceeding"), and files this its *Defendant's Motion for Leave to Amend Answer* (the "Motion"),

respectfully stating as follows:

## I.    SUMMARY

1.    This Adversary Proceeding concerns two promissory notes allegedly payable by the Defendant to Highland Capital Management, L.P. (the "Plaintiff") in the combined amounts of $7.4 million (the "Notes").  Now that the Defendant has access to former employees of the Plaintiff and to various books and records, the Defendant has learned that the Notes were unauthorized, represent a mutual mistake, and were never intended as debt, but rather that the Plaintiff was compensating the Defendant for the Plaintiff's own liability to the Defendant for causing a serious valuation error.  Accordingly, and not having learned of these facts until recently, the Defendant respectfully seeks leave to assert resulting affirmative defenses.

## II.    PROCEDRUAL BACKGROUND

2.    On January 22, 2021, the Plaintiff filed its *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* (the "Complaint"), thereby initiating this Adversary Proceeding.

3.    On March 1, 2021, the Defendant filed its *Defendant's Original Answer* (the "Answer").  The Answer does not contain any affirmative defenses.

4.    The agreed scheduling order entered in this Adversary Proceeding does not contain a deadline to amend operative pleadings.  *See* Docket No. 13.

5.    This Adversary Proceeding is non-core and the Defendant has not consented to the Bankruptcy Court's entry of final orders or judgment.  The Defendant has asserted a right to trial by jury.

6.    The Defendant has filed a motion for withdrawal of the reference, which motion remains pending, and this Motion is subject to, and without prejudice to, any and all arguments raised in support of the withdrawal of the reference.

### III.    **FACTUAL BACKGROUND**

7.    This Motion is supported by the Declaration of Dennis C. Sauter (the "Sauter Declaration"), attached hereto as Exhibit "A" and incorporated herein.

8.    The Defendant is a registered advisor under the Investment Advisors Act of 1940. Sauter Declaration at ¶ 4.  As such, the Defendant advises various independent funds which, in turn, are investment vehicles for a large number of investors.  *See id.*  One such fund was Highland Global Allocation Fund ("HGAF").  *Id.* at ¶ 24.

9.    Prior to the end of February, 2021, and during all times relevant to the Notes, the Plaintiff and the Defendant were parties to that certain *Second Amended and Restated Shared Services Agreement* dated February 8, 2013 (the "Shared Services Agreement").  *Id.* at ¶ 6.  This was standard business practices for the Plaintiff and various other affiliated companies, including other advisers, within the Plaintiff's "complex" of business: the Plaintiff would employ most of the employees and then share those employees with the Defendant and other "complex" entities, in exchange for payments by the Defendant and such other entities.  *Id.* at ¶ 7.  The Defendant otherwise had very few direct employees.  *Id.* at ¶ 5.  Thus, under the Shared Services Agreement, employees of the Plaintiff (many of whom were highly trained and specialized) provided many of the key services to the Defendant on an as-needed basis.  *Id.* at ¶ 8.  These services included legal, accounting, regulatory, compliance, IT, valuation, and tax services, among others.  *Id.* at ¶ 8. Additionally, under the Shared Services Agreement the Debtor provided critical electronic infrastructure to HCMFA and other "complex" entities, such that the books and records, and e-mail communications, of HCMFA were actually stored.  *Id.* at ¶ 8.

10.    In March, 2018, HGAF sold equity interests it held in TerreStar.  *Id.* at ¶ 24.  As part of this, it was necessary to calculate the "net asset value" ("NAV") of these securities and of

HGAF assets. *Id.* at ¶ 24. The Defendant was responsible for advising on the NAV. In turn, pursuant to the Shared Services Agreement, the Plaintiff was responsible to the Defendant to calculate the NAV, and the Plaintiff had several employees charged with these and similar calculations as part of the Plaintiff's routine business services and as part of what the Plaintiff regularly provided to the Defendant and affiliated companies. *Id.* at ¶ 24.

11.    The Plaintff made a mistake in calculating the NAV (the "<u>NAV Error</u>"). *Id.* at ¶ 25. The NAV Error was discovered in early 2019 as HGAF was being converted from an open-ended fund to a closed-ended fund. *Id.* at ¶ 25. The Securities and Exchange Commission opened an investigation, and various employees and representatives of the Plaintiff, the Defendant, and HGAF worked with the SEC to correct the error and to compensate HGAF and the various investors in HGAF harmed by the NAV Error. *Id.* at ¶ 25. Ultimately, and working with the SEC, the Plaintiff determined that the losses from the NAV Error to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the NAV Error itself, as well as rebating related advisor fees and processing costs; and (ii) $1.4 million of losses to the shareholders of HGAF. *Id.* at ¶ 26.

12.    The Defendant accepted responsibility for the NAV Error and paid out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019. *Id.* at ¶ 27. In turn, the Plaintiff accepted responsibility to the Defendant for having caused the NAV Error, and the Plaintiff ultimately, whether through insurance or its own funds, compensated the Defendant for the above payments. *Id.* at ¶ 28. The Defendant is unsure as to the flow of funds; *i.e.* whether the Plaintiff paid HGAF directly or through the Defendant, and is awaiting discovery from the Plaintiff on that point. Either way, the Plaintiff accepted, and paid, approximately $7.5 million to compensate for the NAV Error that it caused.

13.    Frank Waterhouse ("Waterhouse") was the Chief Financial Officer of both the Plaintiff and the Defendant.  *Id.* at ¶ 29.  Waterhouse prepared and signed the Notes.  Interestingly, Waterhouse did not sign the Notes in a representative capacity for the Defendant, but rather as:

**MAKER:**



_____

FRANK WATERHOUSE

This was highly unusual and indicates that the Plaintiff's legal department did not prepare the Notes.  It is also highly unusual that the Notes were not signed by Jim Dondero or by the general partner of the Defendant.

14.    Waterhouse was not authorized to execute the Notes on behalf of the Defendant, and he was not authorized to lend funds by the Plaintiff.  *Id.* at ¶ 22.  It appears that what happened is that Waterhouse, either for some internal accounting purpose or because funds were flowing from the Plaintiff to the Defendant, believed that some document was necessary or that what was being funded was a loan, so he unilaterally, and in mistake, prepared and signed the Notes.  *Id.* at ¶ 30.  In short, Waterhouse made a mistake, there was no loan, there was no return consideration for any loan, and the Notes, if anything, are a mutual mistake and are void.  *Id.* at ¶ 30 & 32.

15.    The Defendant only learned of these facts in April, 2021, and was therefore unable to assert defenses and affirmative defenses based on these facts at the time that it filed its Answer.  *Id.* at ¶ 21.  This is because the Defendant's own employees had no knowledge of the facts and circumstances surrounding the Notes; the Plaintiff, through its CEO Mr. Seery, had prohibited employees of the Plaintiff from discussing matters with the Defendant that may relate to controversies or litigation under penalty of termination; the Defendant did not have access to all

of its books and records, as they were in the possession of the Plaintiff pursuant to the Shared Services Agreement; and an injunction from the Bankruptcy Court prohibited Mr. Dondero from "indirectly" communicating with the Plaintiff's employees (Mr. Dondero controls the Defendant). *Id.* at ¶¶ 13-17.

16.    By mid-April, 2021, the Plaintiff has terminated most of its employees, those employees formed their own company, and the Defendant retained that company to provide services to the Defendant basically in continuation of the services provided by the Plaintiff pursuant to the Shared Services Agreement. *Id.* at ¶¶ 19-20. Additionally, the Plaintiff provided many, but not all, of the Defendant's books and records to the Defendant. *See id.* Thus, it was not until then that the Defendant was meaningfully able to talk to persons with some knowledge regarding the facts and circumstances surrounding the Notes and to review its books and records to determine that the NAV Error had occurred and that the Plaintiff paying for the resulting damages was compensation by the Plaintiff for its own error, as opposed to a loan from the Plaintiff to the Defendant. *Id.* at ¶¶ 21-22.

17.    The Defendant also notes that the Plaintiff, on its schedules, did not schedule the Notes even though it scheduled various other promissory notes owed by its affiliates. *See* Docket No. 247 at 13 of 74. Additionally, on April 15, 2019, the Plaintiff agreed to extend the date that certain demand notes payable by the Defendant to the Plaintiff could be demanded to May 31, 2021, as the Defendant expected to be unable to pay those notes. *See* Sauter Declaration at ¶ 31. It is illogical and highly improbable that, notwithstanding that admission and acknowledgement, the Plaintiff would nevertheless loan the Defendant $7.4 million some two weeks later. Rather, as the evidence suggests, Waterhouse made a mistake in not realizing that the funds being paid by the Plaintiff to the Defendant were in compensation for the NAV Error and not a loan.

## IV.   DISCUSSION

18.   Attached hereto as Exhibit "B" is the Defendant's proposed Amended Answer, incorporating new defenses or affirmative defenses resulting from the knowledge of the facts above.

19.   Federal Rule of Civil Procedure 15, as made applicable to this Adversary Proceeding by Federal Rule of Bankruptcy Procedure 7015, provides for leave to amend a pleading, which leave "[t]he court should freely give [] when justice so requires." FED. R. CIV. P. 15(a)(2).

20.   The Court must "possess a 'substantial reason' to deny a request for leave to amend." *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004).  The Fifth Circuit has outlined five "consideration" guiding the Rule 15 inquiry: "1) undue delay, 2) bad faith or dilatory motive, 3) repeated failure to cure deficiencies by previous amendments, 4) undue prejudice to the opposing party, and 5) futility of the amendment." *Id*.

21.   <u>No Undue Delay</u>.  There has been no undue delay.  The Defendant filed its Answer only some seventy (80) days ago.  This Adversary Proceeding has been pending for four (4) months.  The Defendant has not filed a prior motion for leave to amend.  And, most importantly, as evidenced by the Sauter Declaration, the Defendant had no way of knowing of these defenses and affirmative defenses until the termination of the Shared Services Agreement and the ability of the Defendant to communicate with former employees of the Plaintiff who, prior to that time, were under instructions to not discuss matters of a potential litigation nature with the Defendant under penalty of termination, and to have access to its books and records.  Thus, it was not until April, 2021, that the Defendant was even able to learn of these defenses to the Notes or the facts and circumstances surrounding the Notes.

22.    <u>No Bad Faith or Dilatory Motive</u>.  There is no bad faith or dilatory motive for the same reasons as above; the Defendant only recently learned of its defenses, the Defendant moved for leave promptly after learning of them; and leave to amend is not sought to avoid summary judgment or continue trial.

23.    <u>No Repeated Failures to Cure By Prior Amendments</u>.  This is the Defendant's first motion to amend.

24.    <u>No Undue Prejudice</u>.  There is no undue prejudice to the Plaintiff.  Discovery is ongoing and depositions have not been scheduled.  The Defendant is agreeable to further extending discovery.  The Plaintiff will have every reasonable opportunity to test the new defenses, and all underlying witness and documents related to the same are available.

25.    <u>No Futility of the Amendment</u>.  The Defendant's defense is not futile:

(i)    it is supported by *prima facie* evidence by the Sauter Declaration;

(ii)    the amount of the Notes, one for $5 million and one for $2.4 million, is almost identical to the ultimate $5,186,496 payment by the Defendant on February 15, 2019 and the $2,398,842 May 21, 2019 payment by the Defendant;

(iii)    the fact that the Plaintiff did not schedule the Notes, while scheduling many others, is evidence that the Plaintiff itself did not consider the Notes legitimate (or know of their existence);

(iv)    the fact that Waterhouse signed the Notes, and not in a representative capacity for the Defendant, whereas all other notes are prepared by the Plaintiff's legal department and signed by other agents in representative capacities, is evidence that Waterhouse made a mistake or did not understand what was going on, and had no authority or clearance to bind the Defendant to the Notes, and that, perhaps, the

Notes were done for some draft, or accounting, or temporary purpose with no intention or expectation, even on the part of Waterhouse, that the Notes ever be legitimate.

26.    The Defendant is not suggesting that the merits of its defenses be tried through this Motion; only that its defenses and the Motion are not "futile."

27.    Accordingly, as no substantial reason exists to deny the amendment, the Court should "freely" grant leave to the Defendant to amend its Answer.

## V.    **PRAYER**

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully requests that the Court enter an order: (i) granting this Motion; (ii) granting the Defendant leave to file the Amended Answer attached hereto as Exhibit "B"; and (iii) granting the Defendant such other and further relief to which it may be justly entitled.

RESPECTFULLY SUBMITTED this 22d day of May, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina
_____
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas  75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email: drukavina@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.**

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that he discussed the relief requested herein with Jeff Pomerantz, Esq. and John Morris, Esq., on March 21, 2021, but that, as of the filing hereof, he has not heard back regarding whether the Plaintiff opposes said relief.

/s/  Davor Rukavina
Davor Rukavina

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 22d day of May, 2021, true and correct copies of this document and the exhibits hereto were electronically served by the Court's ECF system on parties entitled to notice thereof, including on the Plaintiff through its counsel of record.

/s/  Davor Rukavina
Davor Rukavina

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | Chapter 11 |
| L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

## DECLARATION OF DENNIS C. SAUTER, JR.

I, Dennis C. Sauter, Jr., hereby swear under oath and penalty of perjury pursuant to the laws of the United States of America that the following is true and correct to the best of my knowledge and belief:

1.      My name is Dennis C. Sauter, Jr.  I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise qualified to give this Declaration.  I have personal knowledge of the facts stated in this Declaration, or such facts are known to me from my review of the books and records of Highland Capital Management Fund Advisors, L.P. ("HCMFA").

2.      I am an attorney licensed to practice law in the State of Texas and have been such since 2001.

DECLARATION OF DENNIS C. SAUTER, JR.—Page 1

EXHIBIT "A"

Appx. 00345

3.      While I provided limited legal services to Highland Capital Management, L.P. (the "Debtor") and its affiliated entities as outside counsel before I became in-house counsel, those services were limited to real estate transactions having nothing to do with the facts discussed in this Declaration.

4.      HCMFA is a registered advisor under the Investment Advisors Act of 1940. CITE. As such, HCMFA advises various independent funds, which, in turn, are investment vehicles for a large number of investors.

5.      HCMFA has always had very few employees. During 2019, for example, HCMFA had only 7 to 9 employees.

6.      Instead, most of the services needed by HCMFA to transact its business were provided by the Debtor pursuant to that certain *Second Amended and Restated Shared Services Agreement* dated February 8, 2013 (the "Shared Services Agreement"), a true and correct copy of which is attached hereto as Exhibit 1.

7.      This was standard business practices for the Debtor and various other affiliated companies, including other advisers within the Debtor's and its affiliates "complex" of businesses: the Debtor would employ most of the employees and then share those employees with HCMFA and other "complex" entities in exchange for payments by HCMFA and such other entities.

8.      Thus, under the Shared Services Agreement, employees of the Debtor (many of whom were highly trained and specialized) provided many of the key services to HCMFA on an as-needed basis. These services included legal, accounting, regulatory, compliance, IT, and tax services, among others. Additionally, under the Shared Services Agreement the Debtor provided critical electronic infrastructure to HCMFA and other "complex" entities, such that the books and records, and e-mail communications, of HCMFA were actually stored on the Debtor's server.

9.      These facts are very important to the issues I will discuss below.

---

DECLARATION OF DENNIS C. SAUTER, JR.—Page 2

10.    On January 22, 2021, the Debtor filed its *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* (the "Complaint") against HCMFA, thereby initiating this Adversary Proceeding.

11.    The Complaint concerns two promissory notes each dated May 2, 2019 (the "Notes") that the Debtor seeks a judgment against HCMFA for: (i) a note for $5 million; and (ii) a note for $2.4 million.

12.    On March 1, 2021, HCMFA filed its *Defendant's Original Answer* (the "Answer").

13.    At the time that the Debtor filed the Complaint, I promptly undertook an internal review of the background facts concerning the Notes. I had no knowledge of them since I had not been employed by HCMFA, and the few employees of HCMFA had no knowledge of the Notes. I also discussed the Notes with James Dondero, formerly the CEO of the Debtor, and Mr. Dondero could not recall the genesis of the Notes. My review of the limited books and records of HCMFA that were not in the possession of the Debtor did not reveal any background facts regarding the Notes or the existence of the Notes.

14.    Normally, I would have discussed the Notes with employees of the Debtor who also provided services to HCMFA pursuant to the Shared Services Agreement in order to assess what defenses or affirmative defenses to the Complaint existed. However, in this instance I was precluded from doing so.

15.    First, attached hereto as Exhibit 2 is a true and correct copy of an e-mail exchange between me and Mr. James Seery dated September 17, 2020. Mr. Seery was and remains the Chief Executive Officer of the Debtor. As stated in Exhibit 2, Mr. Seery was informing me that Debtor employees had been instructed not to discuss with me anything that is "inimical" to the interests of the Debtor, and that they would be terminated if they did so. This e-mail communication comports with other communications between myself and Mr. Seery and/or Debtor's counsel,

where I was cautioned not to discuss with Debtor employees matters that may be adverse to the Debtor.

16.     Second, by the time of the filing of the Complaint, the Court had entered a preliminary injunction against Mr. Dondero, a true and correct copy of which is attached hereto as Exhibit 3. That injunction prohibited Mr. Dondero from "directly or indirectly . . . communicating with any of the Debtor's employees, except as it specifically relates to shared services currently provided." As the information concerning the Notes was background information and not related to "services currently provided," I was concerned that, if I discussed the Notes with the Debtor's employees, the Debtor would argue that either Mr. Dondero or I violated the Court's injunction.

17.     In sum, after the Complaint was filed, no one at HCMFA knew anything about the Notes, and I was precluded from contacting the people that would have known something about the notes, *i.e.* the Debtor's employees, to discuss what they may have known. I also had very limited access to HCMFA books and records and, even if I had had full access, I would not have known what relevant books and records to search for in the many millions of files without first obtaining a generalized background of the facts regarding the Notes from Debtor employees.

18.     I then worked with outside counsel at Munsch Hardt Kopf & Harr, P.C. to review the Complaint and prepare and file the Answer. That original Answer did not contain any affirmative defenses because, as explained above, no one at HCMFA knew of any facts that might give rise to an affirmative defense.

19.     The situation changed by mid-April, 2021. As of late February, 2021, the Debtor terminated the Shared Services Agreement and terminated most of its former employees. Many of those employees then formed their own company, Skyview Group, which then contracted with HCMFA (and others) to continue providing essentially the same services that they had previously provided under the Shared Services Agreement. Additionally, the Debtor provided access to

HCMFA of much of its books and records (although not all). Thus, as of March, 2021, I was able to communicate with most former Debtor employees and to access the books and records of HCMFA without fear of violating any court order.

20.     March, 2021, was exceedingly busy, to say the least. With the termination of the Shared Services Agreement, HCMFA, other entities that I am general counsel to, and I were preoccupied with transitioning the services that the Debtor had been providing for more than a decade to a new entity, using new infrastructure, new offices, new networks, etc., all for the primary goal of ensuring a smooth and uninterrupted continuity of business and services provided by HCMFA and others to third parties.

21.     By mid-April, 2021, the situation had calmed down to the point that I was able to discuss the Notes with former employees, most importantly Frank Waterhouse ("Waterhouse") and Will Mabry ("Mabry"). Mabry in particular was able to provide me internal documents and memorandums that I had not previously known about or had access to that helped with the factual background of the Notes.

22.     From these discussions and documents, I have been able to understand the factual background concerning the Notes, ultimately concluding that the Notes were signed by mistake by Waterhouse without authority from HCMFA and have no consideration and were never intended to be debt instruments of HCMFA.

23.     My investigation has revealed the following.

24.     One of the funds that HCMFA advises is Highland Global Allocation Fund ("GAF"). In March, 2018, GAF sold equity interests it held in TerreStar. As part of this, it was necessary to calculate the "net asset value" ("NAV") of these securities and of GAF assets. HCMFA was responsible for advising on the NAV. In turn, pursuant to the Shared Services Agreement and in accordance with applicable compliance and operating procedures, the Debtor

was responsible to HCMFA to calculate the NAV, and the Debtor had several employees charged with these and similar calculations as part of the Debtor's routine business services and as part of what the Debtor regularly provided to HCMFA and affiliated companies.

25.     The Debtor made a mistake in calculating the NAV (the "NAV Error"). The NAV Error was discovered in early 2019 as GAF was being converted from an open-ended fund to a closed-ended fund.  The Securities and Exchange Commission opened an investigation, and various employees and representatives of the Debtor, HCMFA, and GAF worked with the SEC to correct the error and to compensate GAF and the various investors in GAF harmed by the NAV Error.

26.     Ultimately, and working with the SEC, the Debtor determined that the losses from the NAV Error to GAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the NAV Error itself, as well as rebating related advisor fees and processing costs; and (ii) $1.4 million of losses to the shareholders of GAF.

27.     HCMFA accepted responsibility for the NAV Error and paid out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019.  I am not sure of the flow of funds, whether the funds flowed through HCMFA or were paid by the Debtor on behalf of HCMFA, and discovery will likely clear that up.  Either way, however, the payments were of HCMFA funds and on behalf of HCMFA.

28.     In turn, the Debtor accepted responsibility to HCMFA for having caused the NAV Error, and the Debtor ultimately, whether through insurance or its own funds, compensated HCMFA for the above payments.

29.     Returning to the Notes, Waterhouse was the Chief Financial Officer of both the Debtor and HCMFA during the above events and at the time he signed the Notes.

30.    It appears clear that Waterhouse made a mistake in preparing and signing the Notes. First, , the Notes correspond very closely to the ultimate $5,186,496 and $2,398,842 payments. Second, it appears that Waterhouse assumed, incorrectly, that the funds being paid by the Debtor were a loan to HCMFA, instead of payments as compensation and restitution to HCMFA for the Debtor having caused the NAV Error.  Third, it therefore appears that Waterhouse prepared the Notes for some internal accounting or other purpose, but without there being actual consideration for the Notes and without any intention on the part of the Debtor and HCMFA that there be Notes or that there be a loan transaction.

31.    I also note that, as of May, 2019, HCMFA had executed other demand notes payable to the Debtor. On April 15, 2019, the Debtor executed that certain *Acknowledgement from HCMLP*, a true and correct copy of which is attached hereto as *Exhibit 4*.  By the same, the Debtor agreed not to demand payment of these notes prior to May 31, 2021, because HCMFA believed that it would not be able to repay those notes prior to that time.  It is illogical that, in light of the same, the Debtor would shortly thereafter lend an additional $7.4 million to HCMFA.  Rather, as my investigation has shown, the Debtor did not lend the funds to HCMFA but instead paid the funds, directly or indirectly, to compensate HCMFA for the NAV Error, which was the Debtor's error and therefore its obligation to correct and compensate for.

32.    Therefore, in light of having learned of these facts in mid to late-April, 2019, HCMFA now believes that it has affirmative defenses to the Notes in the nature of mutual mistake, void for lack of consideration, and no proper authority of Waterhouse to sign the Notes.

33.    Neither I, nor HCMFA, nor any of HCMFA's agents, have been less than diligent in investigating the Notes and the Complaint.

34.    HCMFA respectfully requests that it be granted leave to assert these affirmative defenses in the Adversary Proceeding.

DECLARATION OF DENNIS C. SAUTER, JR.—Page 7

Signed: May ___21___, 2021

DENNIS C. SAUTER, JR.

## SECOND AMENDED AND RESTATED
## SHARED SERVICES AGREEMENT

THIS SECOND AMENDED AND RESTATED SHARED SERVICES AGREEMENT (this "*Agreement*") is entered into to be effective as of 8th day of February, 2013 (the "*Effective Date*") by and among Highland Capital Management, L.P., a Delaware limited partnership ("*HCMLP*"), and Highland Capital Management Fund Advisors, L.P., formerly known as Pyxis Capital, L.P., a Delaware limited partnership ("*HCMFA*"), and any affiliate of HCMFA that becomes a party hereto. Each of the signatories hereto is individually a "*Party*" and collectively the "*Parties*".

RECITALS

A.     During the Term, HCMLP will provide to HCMFA certain services as more fully described herein and the Parties desire to allocate the costs incurred for such services and assets among them in accordance with the terms and conditions in this Agreement.

AGREEMENT

In consideration of the foregoing recitals and the mutual covenants and conditions contained herein, the Parties agree, intending to be legally bound, as follows:

ARTICLE I
DEFINITIONS

"*Actual Cost*" means, with respect to any period hereunder, one hundred percent (100%) of the actual costs and expenses caused by, incurred or otherwise arising from or relating to (i) the Shared Services and (ii) the Shared Assets, in each case during such period.

"*Affiliate*" means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, a specified Person. The term "*control*" (including, with correlative meanings, the terms "*controlled by*" and "*under common control with*") means the possession of the power to direct the management and policies of the referenced Person, whether through ownership interests, by contract or otherwise.

"*Agreement*" has the meaning set forth in the preamble.

"*Allocation Percentage*" has the meaning set forth in Section 4.01.

"*Applicable Margin*" shall mean an additional amount equal to 5% of all costs allocated by Service Provider to the other parties hereto under Article IV; provided that the parties may agree on a different margin percentage as to any item or items to the extent the above margin percentage, together with the allocated cost of such item or service, would not reflect an arm's length value of the particular service or item allocated.

"*Change*" has the meaning set forth in Section 2.02(a).

"*Change Request*" has the meaning set forth in Section 2.02(b).

"*Code*" means the Internal Revenue Code of 1986, as amended, and the related regulations and published interpretations.

"**_Effective Date_**" has the meaning set forth in the preamble.

"**_Governmental Entity_**" means any government or any regulatory agency, bureau, board, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"**_Liabilities_**" means any cost, liability, indebtedness, obligation, co-obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any nature (whether direct or indirect, known or unknown, absolute or contingent, liquidated or unliquidated, due or to become due, accrued or unaccrued, matured or unmatured).

"**_Loss_**" means any cost, damage, disbursement, expense, liability, loss, obligation, penalty or settlement, including interest or other carrying costs, legal, accounting and other professional fees and expenses incurred in the investigation, collection, prosecution and defense of claims and amounts paid in settlement, that may be imposed on or otherwise incurred or suffered by the referenced Person; provided, however, that the term "**_Loss_**" will not be deemed to include any special, exemplary or punitive damages, except to the extent such damages are incurred as a result of third party claims.

"**_New Shared Service_**" has the meaning set forth in Section 2.03.

"**_Party_**" or "**_Parties_**" has the meaning set forth in the preamble.

"**_Person_**" means an association, a corporation, an individual, a partnership, a limited liability company, a trust or any other entity or organization, including a Governmental Entity.

"**_Quarterly Report_**" has the meaning set forth in Section 5.01.

"**_Recipient_**" means HCMFA and any of HCMFA's direct or indirect Subsidiaries or managed funds or accounts in their capacity as a recipient of the Shared Services and/or Shared Assets.

"**_Service Provider_**" means any of HCMLP and its direct or indirect Subsidiaries in its capacity as a provider of Shared Services or Shared Assets.

"**_Service Standards_**" has the meaning set forth in Section 6.01.

"**_Shared Assets_**" shall have the meaning set forth in Section 3.02.

"**_Shared Services_**" shall have the meaning set forth in Section 2.01.

"**_Subsidiary_**" means, with respect to any Person, any Person in which such Person has a direct or indirect equity ownership interest in excess of 50%.

"**_Tax_**" or "**_Taxes_**" means: (i) all state and local sales, use, value-added, gross receipts, foreign, privilege, utility, infrastructure maintenance, property, federal excise and similar levies, duties and other similar tax-like charges lawfully levied by a duly constituted taxing authority against or upon the Shared Services and the Shared Assets; and (ii) tax-related surcharges or fees that are related to the Shared Services and the Shared Assets identified and authorized by applicable tariffs.

"**_Term_**" has the meaning set forth in Section 7.01.

ARTICLE II
SHARED SERVICES

Section 2.01    Services.  During the Term, Service Provider will provide Recipient with Shared Services, including without limitation, all of the (i) finance and accounting services, (ii) human resources services, (iii) marketing services, (iv) legal services, (v) corporate services, (vi) information technology services, and (vii) operations services; each as requested by HCMFA and as described more fully on **Annex A** attached hereto, the "***Shared Services***"), it being understood that personnel providing Shared Services may be deemed to be employees of HCMFA to the extent necessary for purposes of the Investment Advisers Act of 1940, as amended.

Section 2.02    Changes to the Shared Services.

(a)    During the Term, the Parties may agree to modify the terms and conditions of a Service Provider's performance of any Shared Service in order to reflect new procedures, processes or other methods of providing such Shared Service, including modifying the applicable fees for such Shared Service to reflect the then current fair market value of such service (a "***Change***").  The Parties will negotiate in good faith the terms upon which a Service Provider would be willing to provide such New Shared Service to Recipient.

(b)    The Party requesting a Change will deliver a description of the Change requested (a "***Change Request***") and no Party receiving a Change Request may unreasonably withhold, condition or delay its consent to the proposed Change.

(c)    Notwithstanding any provision of this Agreement to the contrary, a Service Provider may make: (i) Changes to the process of performing a particular Shared Service that do not adversely affect the benefits to Recipient of Service Provider's provision or quality of such Shared Service in any material respect or increase Recipient's cost for such Shared Service; (ii) emergency Changes on a temporary and short-term basis; and/or (iii) Changes to a particular Shared Service in order to comply with applicable law or regulatory requirements, in each case without obtaining the prior consent of Recipient.  A Service Provider will notify Recipient in writing of any such Change as follows: in the case of clauses (i) and (iii) above, prior to the implementation of such Change, and, in the case of clause (ii) above, as soon as reasonably practicable thereafter.

Section 2.03    New Shared Services.  The Parties may, from time to time during the Term of this Agreement, negotiate in good faith for Shared Services not otherwise specifically listed in Section 2.01 (a "***New Shared Service***").  Any agreement between the Parties on the terms for a New Shared Service must be in accordance with the provisions of Article IV and Article V hereof, will be deemed to be an amendment to this Agreement and such New Shared Service will then be a "***Shared Service***" for all purposes of this Agreement.

Section 2.04    Subcontractors.  Nothing in this Agreement will prevent Service Provider from, with the consent of Recipient, using subcontractors, hired with due care, to perform all or any part of a Shared Service hereunder.  A Service Provider will remain fully responsible for the performance of its obligations under this Agreement in accordance with its terms, including any obligations it performs through subcontractors, and a Service Provider will be solely responsible for payments due to its subcontractors.

3

ARTICLE III
SHARED ASSETS

Section 3.01    <u>Shared IP Rights</u>.  Each Service Provider hereby grants to Recipient a non-exclusive right and license to use the intellectual property and other rights granted or licensed, directly or indirectly, to such Service Provider (the "***Shared IP Rights***") pursuant to third party intellectual property Agreements ("***Third Party IP Agreements***"), provided that the rights granted to Recipient hereunder are subject to the terms and conditions of the applicable Third Party IP Agreement, and that such rights shall terminate, as applicable, upon the expiration or termination of the applicable Third Party IP Agreement. Recipient shall be licensed to use the Shared IP Rights only for so long as it remains an Affiliate of HCMLP.  In consideration of the foregoing licenses, Recipient agrees to take such further reasonable actions as a Service Provider deems to be necessary or desirable to comply with its obligations under the Third Party IP Agreements.

Section 3.02    <u>Other Shared Assets</u>.  Subject to Section 3.01, each Service Provider hereby grants Recipient the right, license or permission, as applicable, to use and access the benefits under the agreements, contracts and licenses that such Service Provider will purchase, acquire, become a party or beneficiary to or license on behalf of Recipient (the "***Future Shared Assets***" and collectively with the Shared IP Rights, the "***Shared Assets***").

ARTICLE IV
COST ALLOCATION

Section 4.01    <u>Actual Cost Allocation Formula</u>.  The Actual Cost of any item relating to any Shared Services or Shared Assets shall be allocated based on the Allocation Percentage.  For purposes of this Agreement, "***Allocation Percentage***" means:

(a)    To the extent 100% of such item is demonstrably attributable to HCMFA, 100% of the Actual Cost of such item shall be allocated to HCMFA as agreed by HCMFA;

(b)    To the extent a specific percentage of use of such item can be determined (e.g., 70% for HCMLP and 30% for HCMFA), that specific percentage of the Actual Cost of such item will be allocated to HCMLP or HCMFA, as applicable and as agreed by HCMFA; and

(c)    All other portions of the Actual Cost of any item that cannot be allocated pursuant to clause (a) or (b) above shall be allocated between HCMLP and HCMFA in such proportion as is agreed in good faith between the parties.

Section 4.02    <u>Non-Cash Cost Allocation</u>.  The actual, fully burdened cost of any item relating to any Shared Services or Shared Assets that does not result in a direct, out of pocket cash expense may be allocated to HCMLP and HCMFA for financial statement purposes only, as agreed by HCMFA, without any corresponding cash reimbursement required, in accordance with generally accepted accounting principles, based on the Allocation Percentage principles described in Section 4.01 hereof.

ARTICLE V
PAYMENT OF COST AND REVENUE SHARE; TAXES

Section 5.01    <u>Quarterly Statements</u>.  Within thirty (30) days following the end of each calendar quarter during the Term (or at such time as may be otherwise agreed by the parties), each Service Provider shall furnish the other Parties hereto with a written statement with respect to the Actual Cost paid by it in respect of Shared Services and Shared Assets provided by it, in each case, during such

4

period, setting forth (i) the cost allocation in accordance with Article IV hereof together with the Applicable Margin on such allocated amounts, and (ii) any amounts paid pursuant to Section 5.02 hereof, together with such other data and information necessary to complete the items described in Section 5.03 hereof (hereinafter referred to as the "**Quarterly Report**").

Section 5.02    Settlement Payments.    At any time during the Term, any Party may make payment of the amounts that are allocable to such Party together with the Applicable Margin related thereto, regardless of whether an invoice pursuant to Section 5.03 hereof has been issued with respect to such amounts.

Section 5.03    Determination and Payment of Cost and Revenue Share.

(a)    Within ten (10) days of the submission of the Quarterly Report described in Section 5.02 hereof (or at such other time as may be agreed by the parties), the Parties shall (i) agree on the cost share of each of the Parties and Applicable Margin as calculated pursuant to the provisions of this Agreement; and (ii) prepare and issue invoices for the cost share and Applicable Margin payments that are payable by any of the Parties.

(b)    Within ten (10) days of preparation of the agreement and the issuance of the invoice described in Section 5.03(a) (or at such other time as may be agreed by the parties), the Parties shall promptly make payment of the amounts that are set forth on such cost allocation invoice. Notwithstanding anything in this Agreement to the contrary, provision of the Shared Services shall commence from the Effective Date, but no fees shall be payable from Recipient or otherwise accrue with respect to such services provided during the month of December 2011.

Section 5.04    Taxes.

(a)    Recipient is responsible for and will pay all Taxes applicable to the Shared Services and the Shared Assets provided to Recipient, provided, that such payments by Recipient to Service Provider will be made in the most tax-efficient manner and provided further, that Service Provider will not be subject to any liability for Taxes applicable to the Shared Services and the Shared Assets as a result of such payment by Recipient. Service Provider will collect such Tax from Recipient in the same manner it collects such Taxes from other customers in the ordinary course of Service Provider's business, but in no event prior to the time it invoices Recipient for the Shared Services and Shared Assets, costs for which such Taxes are levied. Recipient may provide Service Provider with a certificate evidencing its exemption from payment of or liability for such Taxes.

(b)    Service Provider will reimburse Recipient for any Taxes collected from Recipient and refunded to Service Provider. In the event a Tax is assessed against Service Provider that is solely the responsibility of Recipient and Recipient desires to protest such assessment, Recipient will submit to Service Provider a statement of the issues and arguments requesting that Service Provider grant Recipient the authority to prosecute the protest in Service Provider's name. Service Provider's authorization will not be unreasonably withheld. Recipient will finance, manage, control and determine the strategy for such protest while keeping Service Provider reasonably informed of the proceedings. However, the authorization will be periodically reviewed by Service Provider to determine any adverse impact on Service Provider, and Service Provider will have the right to reasonably withdraw such authority at any time. Upon notice by Service Provider that it is so withdrawing such authority, Recipient will expeditiously terminate all proceedings. Any adverse consequences suffered by Recipient as a result of the withdrawal will be submitted to arbitration pursuant to Section 9.14. Any contest for Taxes brought by Recipient may not result in any lien attaching to any property or rights of Service Provider or otherwise jeopardize Service Provider's interests or rights in any of its property. Recipient agrees to

indemnify Service Provider for all Losses that Service Provider incurs as a result of any such contest by Recipient.

    (c)  The provisions of this Section 5.04 will govern the treatment of all Taxes arising as a result of or in connection with this Agreement notwithstanding any other Article of this Agreement to the contrary.

## ARTICLE VI
## SERVICE PROVIDER RESPONSIBILITIES

   Section 6.01  <u>Service Provider General Obligations</u>.  Service Provider will provide the Shared Services and the Shared Assets to Recipient on a non-discriminatory basis and will provide the Shared Services and the Shared Assets in the same manner as if it were providing such services and assets on its own account (the "***Service Standards***").  Service Provider will conduct its duties hereunder in a lawful manner in compliance with applicable laws, statutes, rules and regulations and in accordance with the Service Standards, including, for avoidance of doubt, laws and regulations relating to privacy of customer information.

   Section 6.02  <u>Books and Records; Access to Information</u>.  Service Provider will keep and maintain books and records on behalf of Recipient in accordance with past practices and internal control procedures.  Recipient will have the right, at any time and from time to time upon reasonable prior notice to Service Provider, to inspect and copy (at its expense) during normal business hours at the offices of Service Provider the books and records relating to the Shared Services and Shared Assets, with respect to Service Provider's performance of its obligations hereunder.  This inspection right will include the ability of Recipient's financial auditors to review such books and records in the ordinary course of performing standard financial auditing services for Recipient (but subject to Service Provider imposing reasonable access restrictions to Service Provider's and its Affiliates' proprietary information and such financial auditors executing appropriate confidentiality agreements reasonably acceptable to Service Provider).  Service Provider will promptly respond to any reasonable requests for information or access.  For the avoidance of doubt, all books and records kept and maintained by Service Provider on behalf of Recipient shall be the property of Recipient, and Service Provider will surrender promptly to Recipient any of such books or records upon Recipient's request (provided that Service Provider may retain a copy of such books or records) and shall make all such books and records available for inspection and use by the Securities and Exchange Commission or any person retained by Recipient at all reasonable times.  Such records shall be maintained by Service Provider for the periods and in the places required by laws and regulations applicable to Recipient.

   Section 6.03  <u>Return of Property and Equipment</u>.  Upon expiration or termination of this Agreement, Service Provider will be obligated to return to Recipient, as soon as is reasonably practicable, any equipment or other property or materials of Recipient that is in Service Provider's control or possession.

## ARTICLE VII
## TERM AND TERMINATION

   Section 7.01  <u>Term</u>.  The term of this Agreement will commence as of the Effective Date and will continue in full force and effect until the first anniversary of the Effective Date (the "***Term***"), unless terminated earlier in accordance with Section 9.02.  The Term shall automatically renew for successive one year periods unless sooner terminated under Section 7.02.

Appx. 00358

Section 7.02    Termination.  Either Party may terminate this Agreement, with or without cause, upon at least 60 days advance written notice at any time prior to the expiration of the Term.

ARTICLE VIII
LIMITED WARRANTY

Section 8.01    Limited Warranty.  Service Provider will perform the Shared Services hereunder in accordance with the Service Standards.  Except as specifically provided in this Agreement, Service Provider makes no express or implied representations, warranties or guarantees relating to its performance of the Shared Services and the granting of the Shared Assets under this Agreement, including any warranty of merchantability, fitness, quality, non-infringement of third party rights, suitability or adequacy of the Shared Services and the Shared Assets for any purpose or use or purpose.  Service Provider will (to the extent possible and subject to Service Provider's contractual obligations) pass through the benefits of any express warranties received from third parties relating to any Shared Service and Shared Asset, and will (at Recipient's expense) assist Recipient with any warranty claims related thereto.

ARTICLE IX
MISCELLANEOUS

Section 9.01    No Partnership or Joint Venture; Independent Contractor.  Nothing contained in this Agreement will constitute or be construed to be or create a partnership or joint venture between or among HCMLP or HCMFA or their respective successors or assigns.  The Parties understand and agree that, with the exception of the procurement by Service Provider of licenses or other rights on behalf of Recipient pursuant to Section 3.01, this Agreement does not make any of them an agent or legal representative of the other for any purpose whatsoever.  With the exception of the procurement by Service Provider of licenses or other rights on behalf of Recipient pursuant to Section 3.01, no Party is granted, by this Agreement or otherwise, any right or authority to assume or create any obligation or responsibilities, express or implied, on behalf of or in the name of any other Party, or to bind any other Party in any manner whatsoever.  The Parties expressly acknowledge that Service Provider is an independent contractor with respect to Recipient in all respects, including with respect to the provision of the Shared Services.

Section 9.02    Amendments; Waivers.  Except as expressly provided herein, this Agreement may be amended only by agreement in writing of all Parties.  No waiver of any provision nor consent to any exception to the terms of this Agreement or any agreement contemplated hereby will be effective unless in writing and signed by all of the Parties affected and then only to the specific purpose, extent and instance so provided.  No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 9.03    Schedules and Exhibits; Integration.  Each Schedule and Exhibit delivered pursuant to the terms of this Agreement must be in writing and will constitute a part of this Agreement, although schedules need not be attached to each copy of this Agreement.  This Agreement, together with such Schedules and Exhibits constitutes the entire agreement among the Parties pertaining to the subject matter hereof and supersedes all prior agreements and understandings of the Parties in connection therewith.

Section 9.04    Further Assurances.  Each Party will take such actions as any other Party may reasonably request or as may be necessary or appropriate to consummate or implement the transactions contemplated by this Agreement or to evidence such events or matters.

7

Section 9.05    Governing Law.  This Agreement and the legal relations between the Parties will be governed by and construed in accordance with the laws of the State of Texas applicable to contracts made and performed in such State and without regard to conflicts of law doctrines unless certain matters are preempted by federal law.

Section 9.06    Assignment.  Except as otherwise provided hereunder, neither this Agreement nor any rights or obligations hereunder are assignable by one Party without the express prior written consent of the other Parties.

Section 9.07    Headings.  The descriptive headings of the Articles, Sections and subsections of this Agreement are for convenience only and do not constitute a part of this Agreement.

Section 9.08    Counterparts.  This Agreement and any amendment hereto or any other agreement delivered pursuant hereto may be executed in one or more counterparts and by different Parties in separate counterparts.  All counterparts will constitute one and the same agreement and will become effective when one or more counterparts have been signed by each Party and delivered to the other Parties.

Section 9.09    Successors and Assigns; No Third Party Beneficiaries.  This Agreement is binding upon and will inure to the benefit of each Party and its successors or assigns, and nothing in this Agreement, express or implied, is intended to confer upon any other Person or Governmental Entity any rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 9.10    Notices.  All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given: (i)immediately when personally delivered; (ii) when received by first class mail, return receipt requested; (iii) one day after being sent for overnight delivery by Federal Express or other overnight delivery service; or (iv) when receipt is acknowledged, either electronically or otherwise, if sent by facsimile, telecopy or other electronic transmission device.  Notices, demands and communications to the other Parties will, unless another address is specified by such Parties in writing, be sent to the addresses indicated below:

> If to HCMLP, addressed to:
>
> Highland Capital Management, L.P.
> 300 Crescent Court, Suite 700
> Dallas, Texas 75201
> Attention:  General Counsel
> Fax:  (972) 628-4147
>
> If to HCMFA, addressed to:
>
> Highland Capital Management Fund Advisors, L.P.
> 300 Crescent Court, Suite 700
> Dallas, Texas 75201
> Attention:  General Counsel
> Fax:  (972) 628-4147

Section 9.11    Expenses.  Except as otherwise provided herein, the Parties will each pay their own expenses incident to the negotiation, preparation and performance of this Agreement, including the fees, expenses and disbursements of their respective investment bankers, accountants and counsel.

Appx. 00360

Section 9.12    <u>Waiver</u>.  No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 9.13    <u>Severability</u>.  If any provision of this Agreement is held to be unenforceable for any reason, it will be adjusted rather than voided, if possible, to achieve the intent of the Parties.  All other provisions of this Agreement will be deemed valid and enforceable to the extent possible.

Section 9.14    <u>Arbitration; Jurisdiction</u>.  Notwithstanding anything contained in this Agreement or the Annexes hereto to the contrary, in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; <u>provided, however</u>, that either party or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief.  The Arbitration will be conducted by the American Arbitration Association, or another, mutually agreeable arbitration service.  The arbitrator(s) shall be duly licensed to practice law in the State of Texas.  The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each.  Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production.  In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents.  The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.  The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered.  No arbitrator will have authority to render a decision that contains an outcome determinative error of state or federal law, or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.  In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable, arbitration service rules.  The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site.  Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees.  The duty to arbitrate described above shall survive the termination of this Agreement.  Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury.  All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

Section 9.15    <u>General Rules of Construction</u>.  For all purposes of this Agreement and the Exhibits and Schedules delivered pursuant to this Agreement: (i) the terms defined in Article I have the meanings assigned to them in Article I and include the plural as well as the singular; (ii) all accounting terms not otherwise defined herein have the meanings assigned under GAAP; (iii) all references in this Agreement to designated "Articles," "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of the body of this Agreement; (iv) pronouns of either gender or neuter will include, as appropriate, the other pronoun forms; (v) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; (vi) "or" is not exclusive; (vii) "including" and "includes" will be deemed to be followed by "but not limited to" and "but is not limited to, "respectively; (viii) any definition of or

9

reference to any law, agreement, instrument or other document herein will be construed as referring to such law, agreement, instrument or other document as from time to time amended, supplemented or otherwise modified; and (ix) any definition of or reference to any statute will be construed as referring also to any rules and regulations promulgated thereunder.

10

IN WITNESS HEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officers as of the day and year first above written.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:    Strand Advisors, Inc., its general partner

By: _____
Name:  James Dondero
Title:    President


HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.

By:    Strand Advisors XVI, Inc., its general partner

By: _____
Name:  Brian Mitts
Title:    Assistant Secretary

11

**Annex A**

**Shared Services**

Compliance
        General compliance
        Compliance systems

Facilities
        Equipment
        General Overhead
        Office Supplies
        Rent & Parking

Finance & Accounting
        Book keeping
        Cash management
        Cash forecasting
        Credit facility reporting
        Financial reporting
        Accounts payable
        Accounts receivable
        Expense reimbursement
        Vendor management

HR
        Drinks/snacks
        Lunches
        Recruiting

IT
        General support & maintenance (OMS, development, support)
        Telecom (cell, phones, broadband)
        WSO

Legal
        Corporate secretarial services
        Document review and preparation
        Litigation support
        Management of outside counsel

Marketing and PR
        Public relations

Tax
        Tax audit support
        Tax planning
        Tax prep and filing

Investments
        Investment research on an ad hoc basis as requested by HCMFA

|  | Valuation Committee |
| <u>Trading</u> | |
|  | Trading desk services |
| <u>Operations</u> | |
|  | Trade settlement |

13

Appx. 00365

**Rukavina, Davor**

| | |
|---|---|
| **From:** | James Seery <jpseeryjr@gmail.com> |
| **Sent:** | Thursday, September 17, 2020 4:17 PM |
| **To:** | DC Sauter |
| **Cc:** | Gregory V. Demo |
| **Subject:** | Re: Acis Settlement |

DC

I believe your concerns regarding the release are misplaced as it does not bind entities that HCMLP does not control. Greg can walk you through the language, but I do not believe it requires adjustment nor does it create any liability. To the contrary, it reduces liability.

With regard to the HCMLP employee prohibitions, no employee whether legal or non-legal can work on any matter that is inimical to the interests of HCMLP. I ,as CEO, and the Independent Board will make the determination as to whether an action violates the prohibition, and a breach of the prohibition will lead to termination for cause. I believe that most of the employees have been informed of this requirement and are following the directive.

With regard to transactional matters, HCMLP employees will continue to work with you on those issues that do not run afoul of the prohibition above. If there is a particular matter where you are taking a potentially adversarial action vis a vis HCMLP, please let me know what it is. We can then consider whether a customized operating protocol for that issue is needed or whether you will simply be on your own. I will make the determination with the advice of counsel. We do not believe the Texas rules of professional responsibility apply in this situation.

Please let me know what matter you are considering with respect to the immediately preceding paragraph, and we will consider how to best address your concerns.

Best. Jim

Jim Seery
631-804-2049
jpseeryjr@gmail.com

---

**From:** DC Sauter <DSauter@NexPointadvisors.com>
**Date:** Thursday, September 17, 2020 at 4:56 PM
**To:** Jim Seery <jpseeryjr@gmail.com>
**Cc:** Greg Demo <GDemo@pszjlaw.com>
**Subject:** RE: Acis Settlement

Jim/Greg, follow up on my email below. I have a few items that have been placed on my plate, and I really need to understand who I can speak with and the extent to which they are permitted to share information with me.



D.C. SAUTER

**NEXPOINT**

1

EXHIBIT 2

**Appx. 00366**

O: 972.628.4117  |  C: 469.877.6440

---

**From:** DC Sauter
**Sent:** Tuesday, September 15, 2020 8:55 AM
**To:** 'James Seery' <jpseeryjr@gmail.com>
**Cc:** Gregory V. Demo <GDemo@pszjlaw.com>
**Subject:** RE: Acis Settlement

My apologies for copying Isaac.  I was under the mistaken impression that he would have assisted in the settlement.

In my view, the requested clarification is beneficial to Strand, HCMLP, and the other "HCMLP Entities."  The documents purport to release ACIS from claims on behalf of, among others, any entity that is "managed" by HCMLP and "respective current advisors, trustees, directors, officers, managers, members, partners, current or former employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns" of any "HCMLP Entity."  Those "HCMLP Entities" lack the authority to bind a whole host of parties in that laundry list, which could result in claims against HCMLP, Strand, and the other "HCMLP Entities" by both the "ACIS Released Parties," who will claim they didn't receive the benefit of the bargain, and the parties on whose behalf the "HCMLP Parties" purported to release claims who didn't consent to the release.

Additionally, I'd like to visit with you all regarding the board's position that prohibits certain HCMLP personnel from working on certain matters.

First, I am unclear whether the prohibition applies to only HCMLP legal personnel or whether it applies to all HCMLP employees.  Please clarify.

Second, as you may know, virtually all of these matters are falling into my lap, and in most cases I lack any knowledge about them.  It would help me tremendously if current HCMLP employees, and particularly the legal personnel, could provide me with transactional background to assist in the transition of the matter.  While I understand the board's concern with Judge Jernigan's order, I don't believe that the Texas Disciplinary Rules of Professional Conduct mandate or even permit an attorney licensed in the State of Texas to refuse to cooperate with a former client in the transfer of a matter to a new attorney.  Rule 1.15(d) states that "[u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payments of fee that has not been earned." The comments to that rule provide additional clarity:  "In every instance of withdrawal and even if the lawyer has been unfairly discharged by the client, a lawyer must take all reasonable steps to mitigate the consequences to the client."  T.D.R.P.C. Rule 1.15, comment 9.  Proper steps may include providing information to new counsel or even continuing to represent the client for a limited time to meet impending deadlines. *Microsoft Corp. v. Commonwealth Sci. & Indus. Research Org.*, 2007 U.S. Dist. LEXIS 91550 *23-24 fn. 11 (E.D. Tex. Dec. 13, 2007).  Even if the board insists that the HCMLP legal personnel cannot continue to represent others in non-HCMLP matters or matters adverse to HCMLP (irrespective of any conflict of interest analysis of whether those attorneys may continue to represent HCMLP in those matters), the ethical rules require that the attorneys provide assistance in transferring those matters to me or others.

Finally, I routinely handle, and am routinely asked to handle, legal matters that relate to real estate for entities owned or controlled by HCMLP (Park West, the Arizona assets, the Maple Ave. property, to name a few).  I am not an HCMLP employee, and it's my understanding that NexPoint Advisors, L.P. is not compensated for the time I spend on HCMLP matters.  I'm not suggesting that this arrangement should change, but it feels from my perspective that the board's position is only working in one direction.  In other words, if I understand the board's position correctly, I can work on both NexPoint and HCMLP matters, but the HCMLP legal employees may only work on HCMLP-related matters.  It has also put a significant amount of additional work on my plate.  I would like to understand two things.  First, what is the scope of my authority in these matters, and what is the proper protocol vis-à-vis you, DSI, and the board?  I have tried to take the conservative approach in keeping you all informed and asking for consent or approval where I thoughts it

**Appx. 00367**

appropriate.  I assume this is how you'd like to continue to handle things, but I would like confirmation of that.  Second, I have heard that you all were working to transfer a couple of the legal personnel (perhaps Thedford and Post) to HCMFA so they could assist with the work load (particularly in the areas where I don't have a significant amount of experience).  I'd like to know where that stands and when relief can be expected.

I'm available most of today and tomorrow to discuss.


**D.C. Sauter**

# NEXPOINT
O: 972.628.4117  |  C: 469.877.6440

---

**From:** James Seery <jpseeryjr@gmail.com>
**Sent:** Tuesday, September 15, 2020 7:01 AM
**To:** DC Sauter <DSauter@NexPointadvisors.com>
**Cc:** Gregory V. Demo <GDemo@pszjlaw.com>; Isaac Leventon <ILeventon@HighlandCapital.com>
**Subject:** Re: Acis Settlement

DC.  We will discuss and revert to you.  Neither Isaac nor anyone else at HCMLP is permitted to work on any issues related to the settlement and release other than as directed by me.

Thanks

Sent from my iPad


On Sep 14, 2020, at 7:08 PM, DC Sauter <DSauter@nexpointadvisors.com> wrote:


Greg,

I've been asked to review the attached release on behalf of HCMFA and the closed-end funds.  I'm concerned that the language below creates an ambiguity as to whether the closed-end funds and HCMFA have released claims against the ACIS parties:

  1.    The release by Strand, which also serves as the general partner of HCMFA; and
  2.    The release by each "HCMLP Entity" of its "respective current advisors, trustees, directors, officers, managers, members, partners, current or former employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns."

We would like the final sentence in paragraph 1.a. of the Release to be revised to specifically identify HCMFA and the closed-end funds as parties not covered by the release.  Please let me know if you'd like to discuss in more detail.


**D.C. Sauter | General Counsel, Real Estate**

<image001.jpg>

300 Crescent Court  |  Suite 700  |  Dallas, Texas 75201
O: 972.628.4117  |  C: 469.877.6440  |  F: 972.628.4147
dsauter@nexpointadvisors.com  |  www.NexPointGroup.com

3

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

&lt;Acis - Release (EXECUTION VERSION).pdf&gt;

Appx. 00369

Docket #0059 Date Filed: 1/12/2021



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 11, 2021**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | No. 20-03190-sgj |
| | § | |
| JAMES D. DONDERO, | § | |
| | § | |
| Defendant. | § | |

### ORDER GRANTING DEBTOR'S MOTION FOR A PRELIMINARY INJUNCTION AGAINST JAMES DONDERO

This matter having come before the Court on *Plaintiff Highland Capital Management,*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210111

EXHIBIT 3

**Appx. 00370**

*L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero* [Adv. Pro. Docket No. 2] (the "Motion"), filed by Highland Capital Management, L.P., the debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"), and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"); and this Court having considered (a) the Motion, (b) *Plaintiff Highland Capital Management, L.P.'s Verified Original Complaint for Injunctive Relief* [Adv. Pro. Docket No. 1] (the "Complaint"), (c) the arguments and law cited in the *Debtor's Amended Memorandum of Law in Support of its Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero* [Adv. Pro. Docket No. 3] (the "Memorandum of Law," and together with the Motion and Complaint, the "Debtor's Papers"), (d) *James Dondero's Response in Opposition to Debtor's Motion for a Preliminary Injunction* [Adv. Pro. Docket No. 52] (the "Opposition") filed by James Dondero, (e) the testimonial and documentary evidence admitted into evidence during the hearing held on January 8, 2021 (the "Hearing"), including assessing the credibility of Mr. James Dondero, (f) the arguments made during the Hearing, and (g) all prior proceedings relating to the Motion, including the December 10, 2020 hearing on the *Debtor's Motion for a Temporary Restraining Order and Preliminary Injunction against James Dondero* [Adv. Pro. Docket No. 6] (the "TRO Hearing"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that injunctive relief is warranted under sections 105(a) and 362(a) of the Bankruptcy Code and that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest;

and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate and that no other notice need be provided; and this Court having determined that the legal and factual bases set forth in the Debtor's Papers, and the evidence submitted in support thereof, establish good cause for the relief granted herein, and that (1) such relief is necessary to avoid immediate and irreparable harm to the Debtor's estate and reorganization process; (2) the Debtor is likely to succeed on the merits of its underlying claim for injunctive relief; (3) the balance of the equities tip in the Debtor's favor; and (4) such relief serves the public interest; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor and for the reasons set forth in the record on this Motion, it is **HEREBY ORDERED THAT**:

1.     The Motion is **GRANTED** as set forth herein.

2.     James Dondero is preliminarily enjoined and restrained from (a) communicating (whether orally, in writing, or otherwise), directly or indirectly, with any Board member unless Mr. Dondero's counsel and counsel for the Debtor are included in any such communication; (b) making any express or implied threats of any nature against the Debtor or any of its directors, officers, employees, professionals, or agents, in whatever capacity they are acting; (c) communicating with any of the Debtor's employees, except as it specifically relates to shared services currently provided to affiliates owned or controlled by Mr. Dondero; (d) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's decisions concerning its operations, management, treatment of claims, disposition of assets owned, controlled or managed by the Debtor, and the pursuit of the Plan or any

alternative to the Plan; and (e) otherwise violating section 362(a) of the Bankruptcy Code (collectively, the "Prohibited Conduct").[2]

3.      James Dondero is further preliminarily enjoined and restrained from causing, encouraging, or conspiring with (a) any entity owned or controlled by him, and/or (b) any person or entity acting with him or on his behalf, to, directly or indirectly, engage in any Prohibited Conduct.

4.      James Dondero is further preliminarily enjoined and restrained from communicating (in person, telephonically, by e-mail, text message or otherwise) with Scott Ellington and/or Isaac Leventon, unless otherwise ordered by the Court.

5.      James Dondero is further preliminarily enjoined and restrained from physically entering, or virtually entering through the Debtor's computer, email, or information systems, the Debtor's offices located at Crescent Court in Dallas, Texas, or any other offices or facilities owned or leased by the Debtor, regardless of any agreements, subleases, or otherwise, held by the Debtor's affiliates or entities owned or controlled by Mr. Dondero, without the prior written permission of Debtor's counsel made to Mr. Dondero's counsel.  If Mr. Dondero enters the Debtor's office or other facilities or systems without such permission, such entrance will constitute trespass.

6.      James Dondero is ordered to attend all future hearings in this Bankruptcy Case by Webex (or whatever other video platform is utilized by the Court), unless otherwise ordered by the Court.

7.      This Order shall remain in effect until the date that any plan of reorganization or liquidation resolving the Debtor's case becomes effective, unless otherwise ordered by the Court.

---

[2] For the avoidance of doubt, this Order does not enjoin or restrain Mr. Dondero from (1) seeking judicial relief upon proper notice or from objecting to any motion filed in this Bankruptcy Case, or (2) communicating with the committee of unsecured creditors (the "UCC") and its professionals regarding a pot plan.

4

8.      All objections to the Motion are overruled in their entirety.

9.      The Court shall retain exclusive jurisdiction with respect to all matters arising from or relating to the implementation, interpretation, and enforcement of this Order.

### ### END OF ORDER ###

**Acknowledgement from HCMLP**

April 15, 2019

Reference is hereby made to certain outstanding amounts loaned from HIGHLAND CAPITAL MANAGEMENT, L.P. ("HCMLP") to HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. ("HCMF") for funding of HCMF's ongoing operations, which are payable on demand and remained outstanding on December 31, 2018 and as of the date hereof.

HCMF expects that it may be unable to repay such amounts should they become due, for the period commencing today and continuing through May 31, 2021.

HCMLP hereby agrees to not demand payment on amounts owed by HCMF prior to May 31, 2021.

Highland Capital Management, L.P.
By: Strand Advisors, Inc., its general partner

By: _____

**Acknowledged By:**

Highland Capital Management Fund Advisors, L.P.
By: Strand XVI, Inc., its general partner

By: _____

EXHIBIT 4

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | Chapter 11 |
| L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, | § | |
| L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | Adv. No. 21-03004 |
| v. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S AMENDED ANSWER

COMES NOW Highland Capital Management Fund Advisors, L.P. (the "Defendant"), the

defendant in the above-styled and numbered adversary proceeding (the "Adversary Proceeding")

filed by Highland Capital Management, L.P. (the "Plaintiff"), and files this its *Defendant's*

*Amended Answer* (the "Answer"), responding to the *Complaint for (I) Breach of Contract and (II)*

*Turnover of Property of the Debtor's Estate* (the "Complaint").  Where an allegation in the

Complaint is not expressly admitted in this Answer, it is denied.

EXHIBIT "B"

**Appx. 00376**

## PRELIMINARY STATEMENT

1.      The first sentence of ¶ 1 sets forth the Plaintiff's objective in bringing the Complaint and does not require a response.  To the extent it contains factual allegations, they are denied.  The second sentence contains a legal conclusion that does not require a response.  To the extent it contains factual allegations, they are denied.

2.      Paragraph 2 contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

3.      The Defendant admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Case to adjudicate this dispute.  Any allegations in ¶ 3 not expressly admitted are denied.

4.      The Defendant admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding.  Any allegations in ¶ 4 not expressly admitted are denied.

5.      The Defendant denies that a breach of contract claim is core.  The Defendant denies that a § 542(b) turnover proceeding is the appropriate mechanism to collect a contested debt.  The Defendant admits that a § 542(b) turnover proceeding is statutorily core but denies that it is Constitutionally core under *Stern v. Marshall*.  The Defendant does <u>not</u> consent to the Bankruptcy Court entering final orders or judgment in this Adversary Proceeding.  Any allegations in ¶ 5 not expressly admitted are denied.

6.      The Defendant admits ¶ 6 of the Complaint.

## THE PARTIES

7.      The Defendant admits ¶ 7 of the Complaint.

8.      The Defendant admits ¶ 8 of the Complaint.

## CASE BACKGROUND

9.      The Defendant admits ¶ 9 of the Complaint.

10.     The Defendant admits ¶ 10 of the Complaint.

11.     The Defendant admits ¶ 11 of the Complaint.

12.     The Defendant admits ¶ 12 of the Complaint.

## STATEMENT OF FACTS

A.      **The HCMFA Notes**

13.     The Defendant admits that it has executed at least one promissory note under which the Debtor is the payee.  Any allegations in ¶ 13 not expressly admitted are denied.

14.     The Defendant denies ¶ 14 of the Complaint.

15.     The Defendant denies ¶ 15 of the Complaint.

16.     The Defendant denies ¶ 16 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 16 is not verbatim.

17.     The Defendant denies ¶ 17 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 17 is not verbatim.

18.     The Defendant admits ¶ 18 of the Complaint.

B.      **HCMFA's Default under Each Note**

19.     The Defendant admits that Exhibit 3 to the Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent ¶ 19 of the Complaint asserts a legal conclusion, no response is required, and it is denied. To the extent not expressly admitted, ¶ 19 of the Complaint is denied.

20.     To the extent ¶ 20 of the Complaint asserts a legal conclusion, no response is necessary, and it is denied.  The Defendant otherwise admits ¶ 20 of the Complaint.

21.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 21 of the Complaint and therefore denies the same.

22.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 22 of the Complaint and therefore denies the same.

23.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 23 of the Complaint and therefore denies the same.

24.     The Defendant denies ¶ 24 of the Complaint.

### FIRST CLAIM FOR RELIEF
**(For Breach of Contract)**

25.     Paragraph 25 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

26.     Paragraph 26 of the Complaint states a legal conclusion that does not require a response.   To the extent it alleges facts, the Defendant denies the allegations in ¶ 26 of the Complaint.

27.     Paragraph 27 of the Complaint states a legal conclusion that does not require a response.   To the extent it alleges facts, the Defendant denies the allegations in ¶ 27 of the Complaint.

28.     Paragraph 28 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 28 of the Complaint.

29.     The Defendant denies ¶ 29 of the Complaint.

### SECOND CLAIM FOR RELIEF
**(Turnover by HCMFA Pursuant to 11 U.S.C. § 542(b))**

30.     Paragraph 30 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

31.     Paragraph 31 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 31 of the Complaint.

32.     Paragraph 32 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 32 of the Complaint.

33.     The Defendant denies ¶ 33 of the Complaint.

34.     Paragraph 34 of the Complaint states a legal conclusion that does not require a response.  The Defendant admits that the Plaintiff transmitted the Demand Letter.  To the extent ¶ 34 alleges other facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 34 of the Complaint and therefore denies the same.

35.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 35 of the Complaint and therefore denies the same.

36.     Paragraph 36 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 36 of the Complaint.

37.     The Defendant denies that the Plaintiff is entitled to the relief requested in the prayer, including parts (i), (ii), and (iii).

## AFFIRMATIVE DEFENSES

38.     At all material times to the Complaint, the Defendant, a registered advisor, advised various third-party funds as to their investments.  One such fund was Highland Global Allocation Fund ("HGAF").

39.    At all material times to the Complaint, the Defendant contracted with the Plaintiff whereby the Plaintiff, through its employees, would provide certain services to the Defendant, including with respect to the Defendant's advice to the third-party funds.  These services so provided included accounting, legal, regulatory, valuation, and compliance services.

40.    In March, 2018, HGAF sold equity interests it held in TerreStar.  As part of this, it was necessary to calculate the "net asset value" ("NAV") of these securities and of HGAF assets. The Defendant was responsible for advising on the NAV.  In turn, pursuant to the Shared Services Agreement in effect at that time between the Plaintiff and the Defendant, the Plaintiff was responsible to the Defendant to calculate the NAV, and the Plaintiff had several employees charged with these and similar calculations as part of the Plaintiff's routine business services and as part of what the Plaintiff regularly provided to the Defendant and affiliated companies.

41.    The Plaintff made a mistake in calculating the NAV (the "NAV Error").  The NAV Error was discovered in early 2019 as HGAF was being converted from an open-ended fund to a closed-ended fund.  The Securities and Exchange Commission opened an investigation, and various employees and representatives of the Plaintiff, the Defendant, and HGAF worked with the SEC to correct the error and to compensate HGAF and the various investors in HGAF harmed by the NAV Error.  Ultimately, and working with the SEC, the Plantiff determined that the losses from the NAV Error to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the NAV Error itself, as well as rebating related advisor fees and processing costs; and (ii) $1.4 million of losses to the shareholders of HGAF.

42.    The Defendant accepted responsibility for the NAV Error and paid out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019.  In turn, the Plaintiff accepted responsibility to the Defendant for having caused the NAV Error, and the Plaintiff ultimately, whether through insurance or its own funds, compensated the Defendant for the above payments

by paying, or causing to be paid, approximately $7.5 million to the Defendant directly or indirectly to HGAF and its investors.

43.    At this time, Frank Waterhouse ("Waterhouse") was the Chief Financial Officer to both the Plaintiff and the Defendant.  Waterhouse signed the two promissory notes the subject of the Complaint (the "Notes").  He did not sign the Notes in any representative capacity for the Defendant.  The Defendant did not authorize Waterhouse to sign the Notes or to bind the Defendant in any way to the Note.

44.    Waterhouse made a mistake in preparing and signing the Notes for the Defendant. Upon information and belief, Waterhouse was not aware that payments from the Plaintiff to the Defendant were to compensate the Defendant for the NAV Error and resulting damages, instead assuming that the Notes were like prior notes between the Plaintiff and the Defendant.  Waterhouse failed to properly inquire into the underlying transaction and, either for unknown accounting or other purposes, Waterhouse prepared and signed the Notes on his own, without proper knowledge of the underlying facts and without actual authority from either the Plaintiff or the Defendant.

45.    In sum, neither the Plaintiff nor the Defendant intended that any funds paid by the Plaintiff to the Defendant be treated as debt but that they instead be treated as compensation by the Plaintiff to the Defendant for the NAV Error that the Plaintiff caused.  The Notes are an unauthorized mistake and a nullity, and are void for a lack of consideration.

46.    To the extent Waterhouse had apparent authority to bind the Defendant to the Notes, such apparently authority does not apply to the Notes because Waterhouse's lack of actual authority is imputed to the Plaintiff, as Waterhouse was the CFO for the Plaintiff.

47.    Accordingly, the Notes are void or unenforceable for lack of consideration, for mutual mistake, and for the lack of authority from the Defendant to Waterhouse to execute the same for the Defendant.

## **JURY DEMAND**

48.    The Defendant demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

49.    The Defendant does <u>not</u> consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully request that, following a trial on the merits, the Court enter a judgment that the Plaintiff take noting on the Complaint and provide the Defendant such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this _____ day of May, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    500 N. Akard Street, Suite 3800
    Dallas, Texas  75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    drukavina@munsch.com
    jvasek@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**

# EXHIBIT 11

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
drukavina@munsch.com
jvasek@munsch.com

COUNSEL FOR NEXPOINT ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| | § | |
| Plaintiff, | § | |
| | § | Adv. No. 21-03005 |
| v. | § | |
| | § | |
| NEXPOINT ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S MOTION FOR LEAVE TO AMEND ANSWER

TO THE HONORABLE COURT:

COMES NOW NexPoint Advisors, L.P., the defendant (the "Defendant") in the above styled and numbered adversary proceeding (the "Adversary Proceeding"), and files this its *Defendant's Motion for Leave to Amend Answer* (the "Motion"), respectfully stating as follows:

## I.    SUMMARY

1.    This Adversary Proceeding concerns one promissory note allegedly payable by the Defendant to Highland Capital Management, L.P. (the "Plaintiff") in the amount of

$23,071,195.03 (the "<u>Note</u>"). While the Defendant was able to assert certain affirmative defenses to the Note in its original answer, now that the Defendant has access to former employees of the Plaintiff and to various books and records, and has had the time and ability to investigate potential additional affirmative defenses to the Note, the Defendant has learned that the Note is subject to a condition subsequent that discharged the Note. Accordingly, and not having learned of these facts until recently, the Defendant respectfully seeks leave to assert resulting affirmative defenses.

## II. PROCEDRUAL BACKGROUND

2. On January 22, 2021, the Plaintiff filed its *Complaint for (i) Breach of Contract and (ii) Turnover of Property of the Debtor's Estate* (the "<u>Complaint</u>"), thereby initiating this Adversary Proceeding.

3. On March 1, 2021, the Defendant filed its *Defendant's Original Answer* (the "<u>Answer</u>").

4. The agreed scheduling order entered in this Adversary Proceeding does not contain a deadline to amend operative pleadings. *See* Docket No. 13.

5. This Adversary Proceeding is non-core and the Defendant has not consented to the Bankruptcy Court's entry of final orders or judgment. The Defendant has asserted a right to trial by jury. The Court has orally agreed that the Defendant has a right to a jury trial, and the Court has stated that it will recommend to the District Court that the reference of this Adversary Proceeding be withdrawn once the case is certified ready for trial.

## III. FACTUAL BACKGROUND

6. This Motion is supported by: (i) the Declaration of Dennis C. Sauter (the "<u>Sauter Declaration</u>"), attached hereto as Exhibit "A" and incorporated herein; and (ii) the Declaration of James Dondero (the "<u>Dondero Declaration</u>"), attached hereto as Exhibit "B" and incorporated herein.

7.      The Note is a term note, payable in annual installments of principal and interest. The Plaintiff alleges that the Defendant failed to make the annual payment due December 31, 2020, and that, accordingly, the Defendant breached the Note, the Plaintiff accelerated the Note, and the full unpaid amount of the Note remains outstanding.  On January 14, 2021, however, and as admitted by the Plaintiff, the Defendant made the full December 31 payment, which payment was not rejected by the Plaintiff.

8.      The Answer contains three affirmative defenses: two related to the Plaintiff having caused the alleged default in payment on the Note, as it was the Plaintiff, pursuant to the parties' then-existing shared services agreement, that was responsible for ensuring that the Defendant made the December 31 payment (as the Plaintiff had done in each prior year); and an affirmative defense of waiver, in that the Plaintiff accepted the Defendant's January 14 payment.

9.      The Defendant had all the information it needed at that time to assert these affirmative defenses, as the Defendant knew of the shared services agreement, expected the Plaintiff to ensure the Defendant timely made all payments, and obviously knew that it had made the January 14 payment.  However, at that time, and until recently, the Defendant was not able to investigate other potential affirmative defenses that it may have had.

10.     Prior to the end of February, 2021, and during all times relevant to the Notes, the Plaintiff and the Defendant were parties to that certain *Amended and Restated Shared Services Agreement* dated January 1, 2018 (the "Shared Services Agreement").  Exhibit A at ¶ 6.  This was standard business practices for the Plaintiff and various other affiliated companies, including other advisers, within the Plaintiff's "complex" of business: the Plaintiff would employ most of the employees and then share those employees with the Defendant and other "complex" entities, in exchange for payments by the Defendant and such other entities.  *Id.* at ¶¶ 6-7.  The Defendant otherwise had very few direct employees.  *Id.* at ¶ 6.  Thus, under the Shared Services Agreement, employees of the Plaintiff (many of whom were highly trained and specialized) provided many of

the key services to the Defendant on an as-needed basis. *Id.* at ¶¶ 7-8. These services included legal, accounting, regulatory, compliance, IT, valuation, and tax services, among others. *Id.* Additionally, under the Shared Services Agreement the Debtor provided critical electronic infrastructure to HCMFA and other "complex" entities, such that the books and records, and e-mail communications, of HCMFA were actually stored. *Id.* at ¶ 8.

11. The Defendants' own employees had very limited knowledge regarding the Note, although they knew about the circumstances of the alleged default, as noted above. *Id*. at ¶ 13. They did not otherwise know, however, of the facts and circumstances surrounding the execution of the Note, or any conditions subsequent or other agreements that may affect the Note, thereby providing additional affirmative defenses. *Id*. at ¶¶13-14. At the time that the Defendant filed its Answer, the Defendant was precluded from discussing the Note with those employees of the Plaintiff that may have had relevant knowledge, and of reviewing books and records regarding the Note. *Id.* at ¶¶ 14-16. Specifically, the Plaintiff, through its CEO Mr. Seery, had prohibited employees of the Plaintiff from discussing matters with the Defendant that may relate to controversies or litigation under penalty of termination; the Defendant did not have access to all of its books and records, as they were in the possession of the Plaintiff pursuant to the Shared Services Agreement; and an injunction from the Bankruptcy Court prohibited Mr. Dondero from "indirectly" communicating with the Plaintiff's employees (Mr. Dondero controls the Defendant). *Id.* at ¶¶ 14-17.

12. Around the time of the Answer, whether shortly before or after, Mr. James Dondero ("Dondero"), who is the president of the Defendant's general partner and the former Chief Executive of the Plaintiff, indicated that the Plaintiff frequently lent funds to Dondero or other entities affiliated with Dondero, which loans would be subject to promissory notes modified by conditions subsequent that may lead the notes to be discharged. *Id*. at ¶ 14. However, Dondero did not recall all details concerning the Note and whether this specific Note fell into the category

of dischargeable promissory notes. *Id*. The Defendant was not able to, at that time, undertake an investigation to determine whether this Note was in fact one of such dischargeable notes (for the reasons stated above), and the Defendant did not believe that it could assert an affirmative defense based on such discharge without undertaking such an investigation. *Id*. at ¶¶ 13-18.

13.    This situation changed in mid-May, 2021. *Id*. at ¶¶ 21-23. By April, 2021, the Plaintiff had terminated the Shared Services Agreement (as of late February, 2021) and the Plaintiff's former employees formed a new company, Skyview Group, which then contracted with the Defendant and others to continue providing essentially the same services they had previously provided through the Plaintiff. *Id*. March and April, 2021, were exceedingly busy for the Defendant, having to convert the Plaintiff's former employees and infrastructure to the new ones, and engaging in various other adversary proceedings and hearings against the Plaintiff. *Id*.

14.    By mid-May, 2021, however, the situation had calmed down enough, and the Defendant had access to the Plaintiff's former employees, including Frank Waterhouse, its former Chief Financial Officer, to mount a more thorough investigation of the Note. *Id*. at 23. Exhibit "B" at ¶ 10-12. Additionally, as additional lawyers began to work through the disclosures and issues in the cases, the Defendant learned of additional facts, including a February 2021 letter sent from D. Michael Lynn to the Plaintiff informing the Plaintiff of the dischargeable notes. *Id*. All of this triggered additional communications with Mr. Dondero and Mr. Waterhouse such that, by the end of May, 2021, the Defendant was able to confirm that the Note was subject to a condition subsequent of discharge. Exhibit "A" at ¶¶ 23-25; Exhibit "B" at ¶¶ 10-13.

15.    That condition subsequent is essentially the same as has been raised by Mr. Dondero and other defendants to promissory note claims brought by the Plaintiff. Essentially, instead of taking a large salary or profits from the Plaintiff, Mr. Dondero would, on an as needed basis, ask the Plaintiff to lend funds to himself or to other entities affiliated with him, such as the Defendant. Those notes were legitimate notes. However, as had been the practice at the Plaintiff

and as is not unusual in the industry, the notes could be, and in this instance were, subject to a condition subsequent that might lead to the forgiveness and discharge of the notes, and therefore to potential income to Mr. Dondero or other payors.  Exhibit "B" at ¶ 9.  That would occur when when an appreciated asset was sold.  *Id*.

16.     Thus, here, Mr. Dondero, for the Plaintiff, entered into an agreement with Nancy Dondero, as the representative of a majority of the Class A holders of the Plaintiff, that the Note would be discharged upon the disposition at above cost of any of the portfolio company interests managed and/or owned, directly or indirectly, by the Plaintiff and/or its affiliates or managed funds.  *Id*.  Hence the affirmative defense the Defendant seeks to assert by this Motion.

## IV.    DISCUSSION

17.     Attached hereto as Exhibit "C" is the Defendant's proposed Amended Answer, incorporating new defenses or affirmative defenses resulting from the knowledge of the facts above.

18.     Federal Rule of Civil Procedure 15, as made applicable to this Adversary Proceeding by Federal Rule of Bankruptcy Procedure 7015, provides for leave to amend a pleading, which leave "[t]he court should freely give [] when justice so requires."  FED. R. CIV. P. 15(a)(2).

19.     The Court must "possess a 'substantial reason' to deny a request for leave to amend."  *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004).  The Fifth Circuit has outlined five "consideration" guiding the Rule 15 inquiry: "1) undue delay, 2) bad faith or dilatory motive, 3) repeated failure to cure deficiencies by previous amendments, 4) undue prejudice to the opposing party, and 5) futility of the amendment."  *Id*.

20.     <u>No Undue Delay</u>.  There has been no undue delay.  The Defendant filed its Answer only some one hundred (100) days ago.  This Adversary Proceeding has been pending for six (6) months.  The Defendant has not filed a prior motion for leave to amend.  And, most importantly,

**Appx. 00390**

as evidenced by the Sauter Declaration, the Defendant could not reasonably confirm the validity of the affirmative defense until recently, whereafter the Defendant acted promptly to file this Motion. Only as of mid-May was the Defendant able to satisfy itself, including through communications with former employees and others, that what Dondero remembered was accurate and that it applied to this Note specifically. The Defendant should not be penalized for having waited to confirm the validity of this defense, as opposed to rushing to assert it under Rule 11 before it could assure itself, and the Court, that the defense was valid.

21.    The Defendant will add the following. On March 16, 2021, Dondero filed an answer to a separate promissory note suit commenced against him by the Plaintiff, Adversary Proceeding No. 21-03003, at docket no. 6. In his answer, Dondero asserted an affirmative defense of: "Defendant asserts that Plaintiff's claims should be barred because it was previously agreed by Plaintiff that Plaintiff would not collect on the Notes." On April 6, 2021, Dondero amended his answer to assert an affirmative defense of: "Defendant asserts that Plaintiff's claims should be barred because prior to the demands for payment Plaintiff agreed that it would not collect on the Notes upon fulfillment of conditions subsequent." In other words, since, as of March and April, 2021, it was generally known that there were dischargeable promissory notes out there, the Defendant had no reason to wait to assert the same defenses except because it honestly waited until it could complete its own independent investigation.

22.    <u>No Bad Faith or Dilatory Motive</u>. There is no bad faith or dilatory motive for the same reasons as above; the Defendant only recently confirmed its defense, the Defendant moved for leave promptly after confirming the same; and leave to amend is not sought to avoid summary judgment or continue trial. Again, the reason for any delay is precisely to avoid a potential Rule 11 argument or issue in asserting an affirmative defense without a sufficient investigation having been mounted.

23.   <u>No Repeated Failures to Cure By Prior Amendments</u>.  This is the Defendant's first motion to amend.

24.   <u>No Undue Prejudice</u>.   There is no undue prejudice to the Plaintiff.   Discovery is ongoing and depositions have not been scheduled.  The Defendant is agreeable to further extending discovery.  The Plaintiff will have every reasonable opportunity to test the new defenses, and all underlying witness and documents related to the same are available.  Moreover, both from Mr. Lynn's February letter and from Dondero's prior answers, and other adversary proceedings pending, the Plaintiff is already facing this same affirmative defense, it does not come as a surprise to the Plaintiff, and the Plaintiff will have to take discovery, prepare briefing, and try the same issues anyway.  Finally, given that the Court agrees that the reference will have to be withdrawn, it is highly unlikely that the District Court will be able to convene a jury trial any time soon, meaning that there is no true trial date that will be prejudiced by the amendment.

25.   <u>No Futility of the Amendment</u>.   The Defendant's defense is not futile.   It is supported by *prima facie* evidence by the Dondero Declaration.  Whether the trier of fact agrees or disagrees with the defense is for the trier of fact, but the defense itself is not futile on its face.

26.   Accordingly, as no substantial reason exists to deny the amendment, the Court should "freely" grant leave to the Defendant to amend its Answer.

## V.   **PRAYER**

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully requests that the Court enter an order: (i) granting this Motion; (ii) granting the Defendant leave to file the Amended Answer attached hereto as Exhibit "C"; and (iii) granting the Defendant such other and further relief to which it may be justly entitled.

RESPECTFULLY SUBMITTED this 9th day of June, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina
       Davor Rukavina, Esq.
       Texas Bar No. 24030781
       Julian P. Vasek, Esq.
       Texas Bar No. 24070790
       3800 Ross Tower
       500 N. Akard Street
       Dallas, Texas  75201-6659
       Telephone: (214) 855-7500
       Facsimile: (214) 855-7584
       Email: drukavina@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.**

**CERTIFICATE OF CONFERENCE**

The undersigned hereby certifies that he discussed the relief requested herein with Jeff Pomerantz, Esq. and John Morris, Esq., on June 8, 2021, but that, as of the filing hereof, the Plaintiff has not consented to such relief and this Motion is therefore presented as opposed.

/s/  Davor Rukavina
Davor Rukavina

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on this the 9th day of June, 2021, true and correct copies of this document and the exhibits hereto were electronically served by the Court's ECF system on parties entitled to notice thereof, including on the Plaintiff through its counsel of record.

/s/  Davor Rukavina
Davor Rukavina

# EXHIBIT 12

Appx. 00394

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT SERVICES, INC.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| | § | **Case No.: 19-34054-sgj11** |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| vs. | § | **Adv. Pro. No. 21-03006-sgj** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.,** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

## HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.'S
## FIRST AMENDED ANSWER TO PLAINTIFF'S COMPLAINT

Defendant Highland Capital Management Services, Inc. ("HCMS" or "Defendant") files this First Amended Answer in response to Highland Capital Management L.P.'s ("Plaintiff" or "Debtor") Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate (the "Complaint") and respectfully states as follows:

## PRELIMINARY STATEMENT[1]

1.      The first sentence of Paragraph 1 sets forth Plaintiff's objective in bringing the Complaint and does not require a response. To the extent a response is required, Defendant denies the allegations in the first sentence of Paragraph 1. The second sentence contains a legal conclusion that does not require a response. To the extent a response is required, Defendant denies the allegations in the second sentence of Paragraph 1.

2.      Paragraph 2 contains a summary of the relief Plaintiff seeks and does not require a response. To the extent a response is required, Defendant denies the allegations in Paragraph 2.

## JURISDICTION AND VENUE

3.      Defendant admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers constitutional authority on the Bankruptcy Court to adjudicate this dispute. Defendant denies any allegations in Paragraph 3 that are not expressly admitted.

4.      Paragraph 4 states a legal conclusion that does not require a response. To the extent a response is required, Defendant admits the Bankruptcy Court has statutory jurisdiction over this Adversary Proceeding but denies that the Court has constitutional authority over this Adversary Proceeding. Defendant denies any allegations in Paragraph 4 that are not expressly admitted.

5.      Defendant denies that Plaintiff's breach of contract claim is a core proceeding. Defendant further denies that a turnover proceeding under 11 U.S.C. § 542(b) is the appropriate mechanism to collect a contested debt. Defendant admits that a turnover proceeding under 11 U.S.C. § 542(b) is a statutorily core proceeding but denies that it is constitutionally core under *Stern v. Marshall*. Defendant does not consent to the Bankruptcy Court entering final orders or

---

[1]    The headings herein are from Plaintiff's Complaint and are solely included for the Court's convenience.

judgment in this Adversary Proceeding. Defendant denies any allegations in Paragraph 5 that are not expressly admitted.

6.      Paragraph 6 states a legal conclusion to which no response is required. To the extent a response is required, Defendant admits that venue is proper in this District.

## THE PARTIES

7.      Defendant admits the allegations in Paragraph 7 of the Complaint.

8.      Defendant admits the allegations in Paragraph 8 of the Complaint.

## CASE BACKGROUND

9.      Defendant admits the allegations in Paragraph 9 of the Complaint.

10.      Defendant admits the allegations in Paragraph 10 of the Complaint.

11.      Defendant admits the allegations in Paragraph 11 of the Complaint.

12.      Defendant admits the allegations in Paragraph 12 of the Complaint.

## STATEMENT OF FACTS

**A.      The HCMS Demand Notes**

13.      Defendant admits it has executed at least one promissory note under which the Debtor is the payee. Defendant denies any allegations in Paragraph 13 that are not expressly admitted.

14.      Defendant admits that it signed the document attached to the Complaint as Exhibit 1. Defendant denies any allegations in Paragraph 14 that are not expressly admitted.

15.      Defendant admits that it signed the document attached to the Complaint as Exhibit 2. Defendant denies any allegations in Paragraph 15 that are not expressly admitted.

16.      Defendant denies that it signed the document attached to the Complaint as Exhibit 3. Defendant denies any allegations in Paragraph 16 that are not expressly admitted.

17.     Defendant denies that it signed the document attached to the Complaint as Exhibit 4. Defendant denies any allegations in Paragraph 17 that are not expressly admitted.

18.     Defendant admits that Plaintiff correctly transcribed Section 2 of Exhibits 1-4 to the Complaint in Paragraph 18.

19.     Defendant admits that Plaintiff correctly transcribed Section 4 of Exhibits 1-4 to the Complaint in Paragraph 19.

20.     Defendant admits that Plaintiff correctly transcribed Section 6 of Exhibits 1-4 of the Complaint in Paragraph 20.

**B.     Allegations regarding the Demand Notes**

21.     Defendant admits that Plaintiff sent it a copy of Exhibit 5. Defendant admits that Plaintiff correctly transcribed an excerpt of Exhibit 5 in the third sentence of Paragraph 21. Defendant denies any allegations in Paragraph 21 that are not expressly admitted.

22.     To the extent Paragraph 22 asserts a legal conclusion, no response is required, and it is denied. Defendant otherwise admits the allegations in Paragraph 22.

23.     Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 23 and, therefore, denies them.

24.     Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 24 and, therefore, denies them.

25.     Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 25 and, therefore, denies them.

26.     Defendant lacks sufficient information or knowledge to admit or deny the allegations in Paragraph 26 and, therefore, denies them.

27. Defendant lacks sufficient information or knowledge to admit or deny the allegations in the first sentence of Paragraph 27 and, therefore, denies them. Defendant denies the allegations in the second sentence of Paragraph 27 of the Complaint.

**C.     The HCMS Term Note**

28. Defendant admits that it has executed at least one promissory note under which Debtor is the payee. Defendant denies any allegations in Paragraph 28 that are not expressly admitted.

29. Defendant admits it signed the document attached to the Complaint as Exhibit 6. Defendant denies any allegations in Paragraph 29 that are not expressly admitted.

30. Defendant admits that Plaintiff correctly transcribed Section 2 of Exhibit 6 to the Complaint in Paragraph 30. Defendant denies any allegations in Paragraph 30 that are not expressly admitted.

31. Defendant admits that Plaintiff correctly transcribed Section 3 of Exhibit 6 to the Complaint in Paragraph 31. Defendant denies any allegations in Paragraph 31 that are not expressly admitted.

32. Defendant admits that Plaintiff correctly transcribed Section 4 of Exhibit 6 to the Complaint in Paragraph 32. Defendant denies any allegations in Paragraph 32 that are not expressly admitted.

33. Defendant admits that Plaintiff correctly transcribed Section 6 of Exhibit 6 to the Complaint in Paragraph 33. Defendant denies any allegations in Paragraph 33 that are not expressly admitted.

**D.     Allegations regarding the Term Note.**

34. To the extent Paragraph 34 of the Complaint asserts a legal conclusion, no response is required, and it is denied. Defendant otherwise denies Paragraph 34 of the Complaint.

35.     Defendant admits that Plaintiff sent it a copy of Exhibit 7. Defendant admits that Plaintiff correctly transcribed an excerpt of Exhibit 7 in the third sentence of Paragraph 35 of the Complaint. Defendant denies any allegations in Paragraph 35 that are not expressly admitted.

36.     Defendant is without sufficient information or knowledge to admit or deny the allegations in Paragraph 36 of the Complaint and, therefore, denies them.

37.     Defendant denies Paragraph 37 of the Complaint.

## FIRST CLAIM FOR RELIEF
### (For Breach of Contract)

38.     Paragraph 38 of the Complaint seeks to incorporate the allegations in the preceding paragraphs and does not require a response. Defendant incorporates all prior denials herein by reference.

39.     Paragraph 39 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

40.     Paragraph 40 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

41.     Paragraph 41 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

42.     Paragraph 42 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

43.     Defendant denies Paragraph 43 of the Complaint.

44.     Defendant denies Paragraph 44 of the Complaint.

## SECOND CLAIM FOR RELIEF
### (Turnover by HCMS Pursuant to 11 U.S.C. § 549(b))

45.     Paragraph 45 seeks to incorporate the allegations in the preceding paragraphs and does not require a response. Defendant incorporates all prior denials herein by reference.

46.     Paragraph 46 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

47.     Paragraph 47 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

48.     Paragraph 48 of the Complaint states a legal conclusion that does not require a response. To the extent it alleges facts, Defendant lacks sufficient information or knowledge to admit or deny the allegations and, therefore, denies them.

49.     Defendant admits that Plaintiff transmitted Exhibits 5 and 7 to the Complaint. Defendant lacks sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 49 of the Complaint and, therefore, denies them.

50.     Defendant lacks sufficient information or knowledge to admit or deny the remaining allegations in Paragraph 50 of the Complaint and, therefore, denies them.

51.     Defendant denies Paragraph 51 of the Complaint.

52.     Defendant denies that Plaintiff is entitled to the relief requested in the prayer of the Complaint, including parts (i), (ii), and (iii).

## AFFIRMATIVE DEFENSES

53.    Plaintiff's claims are barred in whole or in part by the doctrine of justification and/or repudiation.

54.    Plaintiff's claims are barred in whole or in part by the doctrine of estoppel.

55.    Plaintiff's claims are barred in whole or in part by the doctrine of waiver.

56.    Plaintiff's claims are barred in whole or in part because prior to the demands for payment Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each note was made and February of the following year, Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed with Mr. James Dondero, acting for Defendant, that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Mr. Dondero's control. This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

57.    HCMS further asserts that each Note is ambiguous as a whole based on the signatory and/or references to unspecified related agreements.

## JURY DEMAND

58.    HCMS demands a trial by jury of all issues so triable under Federal Rule of Civil Procedure 38 and Federal Rule of Bankruptcy Procedure 9015.

59.    HCMS does not consent to the Bankruptcy Court conducting a jury trial and therefore demands such jury trial in the District Court.

### PRAYER

For these reasons, HCMS respectfully requests that, following a trial on the merits, the Court deny the relief Plaintiffs seeks through its Complaint, enter a judgment that the Plaintiff take nothing on the Complaint, and grant HCMS such other relief at law or in equity to which it may be entitled.

Respectfully submitted,

*/s/ Lauren K. Drawhorn*
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email:  jason.rudd@wickphillips.com
              lauren.drawhorn@wickphillips.com

**COUNSEL FOR HIGHLAND MANAGEMENT SERVICES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2021, a true and correct copy of the foregoing pleading was served via the Court's CM/ECF system upon counsel for the Plaintiff and all other parties requesting or consenting to such service in this adversary case.

Jeffrey N. Pomerantz
jpomerantz@pszjlaw.com
John A. Morris
jmorris@pszjlaw.com
Gregory V. Demo
gdemo@pszjlaw.com
Hayley R. Winograd
hwinograd@pszjlaw.com
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067
Facsimile: (310) 201-0760
*Counsel for Highland Capital Management, L.P.*

Melissa S. Hayward
MHayward@HaywardFirm.com
Zachery Z. Annable
ZAnnable@HaywardFirm.com
HAYWARD PLLC
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Fax: (972) 755-7110

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

# EXHIBIT 13

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

COUNSEL FOR HIGHLAND CAPITAL
MANAGEMENT FUND ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

## <u>DEFENDANT'S AMENDED ANSWER</u>

COMES NOW Highland Capital Management Fund Advisors, L.P. (the "<u>Defendant</u>"), the

defendant in the above-styled and numbered adversary proceeding (the "<u>Adversary Proceeding</u>")

filed by Highland Capital Management, L.P. (the "<u>Plaintiff</u>"), and files this its *Defendant's*

*Amended Answer* (the "<u>Answer</u>"), responding to the *Complaint for (I) Breach of Contract and (II)*

*Turnover of Property of the Debtor's Estate* (the "<u>Complaint</u>").   Where an allegation in the

Complaint is not expressly admitted in this Answer, it is denied.

## PRELIMINARY STATEMENT

1.      The first sentence of ¶ 1 sets forth the Plaintiff's objective in bringing the Complaint and does not require a response.  To the extent it contains factual allegations, they are denied.  The second sentence contains a legal conclusion that does not require a response.  To the extent it contains factual allegations, they are denied.

2.      Paragraph 2 contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

3.      The Defendant admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Case to adjudicate this dispute.  Any allegations in ¶ 3 not expressly admitted are denied.

4.      The Defendant admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding.  Any allegations in ¶ 4 not expressly admitted are denied.

5.      The Defendant denies that a breach of contract claim is core.  The Defendant denies that a § 542(b) turnover proceeding is the appropriate mechanism to collect a contested debt.  The Defendant admits that a § 542(b) turnover proceeding is statutorily core but denies that it is Constitutionally core under *Stern v. Marshall*.  The Defendant does <u>not</u> consent to the Bankruptcy Court entering final orders or judgment in this Adversary Proceeding.  Any allegations in ¶ 5 not expressly admitted are denied.

6.      The Defendant admits ¶ 6 of the Complaint.

## THE PARTIES

7.      The Defendant admits ¶ 7 of the Complaint.

8.      The Defendant admits ¶ 8 of the Complaint.

## CASE BACKGROUND

9.      The Defendant admits ¶ 9 of the Complaint.

10.     The Defendant admits ¶ 10 of the Complaint.

11.     The Defendant admits ¶ 11 of the Complaint.

12.     The Defendant admits ¶ 12 of the Complaint.

## STATEMENT OF FACTS

### A.      The HCMFA Notes

13.     The Defendant admits that it has executed at least one promissory note under which the Debtor is the payee.  Any allegations in ¶ 13 not expressly admitted are denied.

14.     The Defendant denies ¶ 14 of the Complaint.

15.     The Defendant denies ¶ 15 of the Complaint.

16.     The Defendant denies ¶ 16 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 16 is not verbatim.

17.     The Defendant denies ¶ 17 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 17 is not verbatim.

18.     The Defendant admits ¶ 18 of the Complaint.

### B.      HCMFA's Default under Each Note

19.     The Defendant admits that Exhibit 3 to the Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent ¶ 19 of the Complaint asserts a legal conclusion, no response is required, and it is denied. To the extent not expressly admitted, ¶ 19 of the Complaint is denied.

20.     To the extent ¶ 20 of the Complaint asserts a legal conclusion, no response is necessary, and it is denied.  The Defendant otherwise admits ¶ 20 of the Complaint.

21.    The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 21 of the Complaint and therefore denies the same.

22.    The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 22 of the Complaint and therefore denies the same.

23.    The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 23 of the Complaint and therefore denies the same.

24.    The Defendant denies ¶ 24 of the Complaint.

### FIRST CLAIM FOR RELIEF
**(For Breach of Contract)**

25.    Paragraph 25 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

26.    Paragraph 26 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 26 of the Complaint.

27.    Paragraph 27 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 27 of the Complaint.

28.    Paragraph 28 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 28 of the Complaint.

29.    The Defendant denies ¶ 29 of the Complaint.

### SECOND CLAIM FOR RELIEF
**(Turnover by HCMFA Pursuant to 11 U.S.C. § 542(b))**

30.    Paragraph 30 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

31.     Paragraph 31 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 31 of the Complaint.

32.     Paragraph 32 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 32 of the Complaint.

33.     The Defendant denies ¶ 33 of the Complaint.

34.     Paragraph 34 of the Complaint states a legal conclusion that does not require a response.  The Defendant admits that the Plaintiff transmitted the Demand Letter.  To the extent ¶ 34 alleges other facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 34 of the Complaint and therefore denies the same.

35.     The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 35 of the Complaint and therefore denies the same.

36.     Paragraph 36 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant denies the allegations in ¶ 36 of the Complaint.

37.     The Defendant denies that the Plaintiff is entitled to the relief requested in the prayer, including parts (i), (ii), and (iii).

## <u>AFFIRMATIVE DEFENSES</u>

38.     At all material times to the Complaint, the Defendant, a registered advisor, advised various third-party funds as to their investments.  One such fund was Highland Global Allocation Fund ("<u>HGAF</u>").

39.     At all material times to the Complaint, the Defendant contracted with the Plaintiff whereby the Plaintiff, through its employees, would provide certain services to the Defendant,

---

DEFENDANT'S AMENDED ANSWER                                                      Page **5** of **9**

including with respect to the Defendant's advice to the third-party funds. These services so provided included accounting, legal, regulatory, valuation, and compliance services.

40. In March, 2018, HGAF sold equity interests it held in TerreStar. As part of this, it was necessary to calculate the "net asset value" ("NAV") of these securities and of HGAF assets. The Defendant was responsible for advising on the NAV. In turn, pursuant to the Shared Services Agreement in effect at that time between the Plaintiff and the Defendant, the Plaintiff was responsible to the Defendant to calculate the NAV, and the Plaintiff had several employees charged with these and similar calculations as part of the Plaintiff's routine business services and as part of what the Plaintiff regularly provided to the Defendant and affiliated companies.

41. The Plaintff made a mistake in calculating the NAV (the "NAV Error"). The NAV Error was discovered in early 2019 as HGAF was being converted from an open-ended fund to a closed-ended fund. The Securities and Exchange Commission opened an investigation, and various employees and representatives of the Plaintiff, the Defendant, and HGAF worked with the SEC to correct the error and to compensate HGAF and the various investors in HGAF harmed by the NAV Error. Ultimately, and working with the SEC, the Plantiff determined that the losses from the NAV Error to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the NAV Error itself, as well as rebating related advisor fees and processing costs; and (ii) $1.4 million of losses to the shareholders of HGAF.

42. The Defendant accepted responsibility for the NAV Error and paid out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019. In turn, the Plaintiff accepted responsibility to the Defendant for having caused the NAV Error, and the Plaintiff ultimately, whether through insurance or its own funds, compensated the Defendant for the above payments by paying, or causing to be paid, approximately $7.5 million to the Defendant directly or indirectly to HGAF and its investors.

43.    At this time, Frank Waterhouse ("Waterhouse") was the Chief Financial Officer to both the Plaintiff and the Defendant.  Waterhouse signed the two promissory notes the subject of the Complaint (the "Notes").  He did not sign the Notes in any representative capacity for the Defendant.  The Defendant did not authorize Waterhouse to sign the Notes or to bind the Defendant in any way to the Note.

44.    Waterhouse made a mistake in preparing and signing the Notes for the Defendant. Upon information and belief, Waterhouse was not aware that payments from the Plaintiff to the Defendant were to compensate the Defendant for the NAV Error and resulting damages, instead assuming that the Notes were like prior notes between the Plaintiff and the Defendant.  Waterhouse failed to properly inquire into the underlying transaction and, either for unknown accounting or other purposes, Waterhouse prepared and signed the Notes on his own, without proper knowledge of the underlying facts and without actual authority from either the Plaintiff or the Defendant.

45.    In sum, neither the Plaintiff nor the Defendant intended that any funds paid by the Plaintiff to the Defendant be treated as debt but that they instead be treated as compensation by the Plaintiff to the Defendant for the NAV Error that the Plaintiff caused.  The Notes are an unauthorized mistake and a nullity, and are void for a lack of consideration.

46.    To the extent Waterhouse had apparent authority to bind the Defendant to the Notes, such apparently authority does not apply to the Notes because Waterhouse's lack of actual authority is imputed to the Plaintiff, as Waterhouse was the CFO for the Plaintiff.

47.    Accordingly, the Notes are void or unenforceable for lack of consideration, for mutual mistake, and for the lack of authority from the Defendant to Waterhouse to execute the same for the Defendant.

**JURY DEMAND**

48.      The Defendant demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

49.      The Defendant does <u>not</u> consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully request that, following a trial on the merits, the Court enter a judgment that the Plaintiff take noting on the Complaint and provide the Defendant such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this 6th day of July, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
　　　Davor Rukavina, Esq.
　　　Texas Bar No. 24030781
　　　Julian P. Vasek, Esq.
　　　Texas Bar No. 24070790
　　　500 N. Akard Street, Suite 3800
　　　Dallas, Texas  75202-2790
　　　Telephone: (214) 855-7500
　　　Facsimile: (214) 978-4375
　　　drukavina@munsch.com
　　　jvasek@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 6th day of July, 2021, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for the plaintiff.

By: /s/ Davor Rukavina
Davor Rukavina, Esq.

# EXHIBIT 14

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
drukavina@munsch.com
jvasek@munsch.com

COUNSEL FOR NEXPOINT ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | Adv. No. 21-03005 |
| v. | § | |
| | § | |
| NEXPOINT ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S FIRST AMENDED ANSWER

COMES NOW NexPoint Advisors, L.P. (the "Defendant"), the defendant in the above-styled and numbered adversary proceeding (the "Adversary Proceeding") filed by Highland Capital Management, L.P. (the "Plaintiff"), and files this its *Defendant's First Amended Answer* (the "Answer"), responding to the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* (the "Complaint").  Where an allegation in the Complaint is not expressly admitted in this Answer, it is denied.

DEFENDANT'S FIRST AMENDED ANSWER—Page 1

## PRELIMINARY STATEMENT

1.      The first sentence of ¶ 1 sets forth the Plaintiff's objective in bringing the Complaint and does not require a response.  To the extent it contains factual allegations, they are denied.  The second sentence contains a legal conclusion that does not require a response.  To the extent it contains factual allegations, they are denied.

2.      Paragraph 2 contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

3.      The Defendant admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Case to adjudicate this dispute.  Any allegations in ¶ 3 not expressly admitted are denied.

4.      The Defendant admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding.  Any allegations in ¶ 4 not expressly admitted are denied.

5.      The Defendant denies that a breach of contract claim is core.  The Defendant denies that a § 542(b) turnover proceeding is the appropriate mechanism to collect a contested debt.  The Defendant admits that a § 542(b) turnover proceeding is statutorily core but denies that it is Constitutionally core under *Stern v. Marshall*.  The Defendant does not consent to the Bankruptcy Court entering final orders or judgment in this Adversary Proceeding.  Any allegations in ¶ 5 not expressly admitted are denied.

6.      The Defendant admits ¶ 6 of the Complaint.

## THE PARTIES

7.      The Defendant admits ¶ 7 of the Complaint.

DEFENDANT'S FIRST AMENDED ANSWER—Page 2

8.      The Defendant admits ¶ 8 of the Complaint.

## CASE BACKGROUND

9.      The Defendant admits ¶ 9 of the Complaint.

10.      The Defendant admits ¶ 10 of the Complaint.

11.      The Defendant admits ¶ 11 of the Complaint.

12.      The Defendant admits ¶ 12 of the Complaint.

## STATEMENT OF FACTS

A.      **The NPA Notes**

13.      The Defendant admits that it has executed at least one promissory note under which the Debtor is the payee.  Any allegations in ¶ 13 not expressly admitted are denied.

14.      The Defendant admits ¶ 14 of the Complaint.

15.      The Defendant denies ¶ 15 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 15 is not verbatim.

16.      The Defendant admits ¶ 16 of the Complaint.

17.      The Defendant denies ¶ 17 of the Complaint.  The document speaks for itself and the quote set forth in ¶ 17 is not verbatim.

18.      The Defendant admits ¶ 18 of the Complaint.

B.      **NPA's Default under the Note**

19.      The Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 19 of the Complaint and therefore denies the same.

20.      The Defendant admits that Exhibit 2 to the Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent ¶ 20 of the Complaint asserts a legal conclusion, no response is required, and it is denied. To the extent not expressly admitted, ¶ 20 of the Complaint is denied.

DEFENDANT'S FIRST AMENDED ANSWER—Page 3

21.    The Defendant admits that it paid the Debtor $1,406,111.92 on January 14, 2021.

To the extent not expressly admitted, paragraph 21 of the Complaint is denied.

22.    The Defendant admits that Exhibit 3 to the Complaint (the "<u>Second Demand</u>

<u>Letter</u>") is a true and correct copy of what it purports to be and that the document speaks for itself.

To the extent ¶ 22 of the Complaint asserts a legal conclusion, no response is required, and it is

denied.  To the extent not expressly admitted, ¶ 22 of the Complaint is denied.

23.    To the extent ¶ 23 of the Complaint asserts a legal conclusion, no response is

necessary, and it is denied.  The Defendant otherwise admits ¶ 23 of the Complaint.

24.    The Defendant lacks knowledge or information sufficient to form a belief about the

truth of the allegations in ¶ 24 of the Complaint and therefore denies the same.

25.    The Defendant denies ¶ 25 of the Complaint.

### FIRST CLAIM FOR RELIEF
**(For Breach of Contract)**

26.    Paragraph 26 of the Complaint is a sentence of incorporation that does not require

a response.  All prior denials are incorporated herein by reference.

27.    Paragraph 27 of the Complaint states a legal conclusion that does not require a

response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient

to form a belief about the truth of the allegations in ¶ 27 of the Complaint and therefore denies the

same.

28.    Paragraph 28 of the Complaint states a legal conclusion that does not require a

response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient

to form a belief about the truth of the allegations in ¶ 28 of the Complaint and therefore denies the

same.

29.    Paragraph 29 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 29 of the Complaint and therefore denies the same.

30.    The Defendant denies ¶ 30 of the Complaint.

## SECOND CLAIM FOR RELIEF
### (Turnover by HCMFA Pursuant to 11 U.S.C. § 542(b))

31.    Paragraph 31 of the Complaint is a sentence of incorporation that does not require a response.  All prior denials are incorporated herein by reference.

32.    Paragraph 32 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 32 of the Complaint and therefore denies the same.

33.    Paragraph 33 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 33 of the Complaint and therefore denies the same.

34.    The Defendant denies ¶ 34 of the Complaint.

35.    Paragraph 35 of the Complaint states a legal conclusion that does not require a response.  The Defendant admits that the Plaintiff transmitted the Demand Letter and the Second Demand Letter, and those documents speak for themselves.  To the extent ¶ 35 alleges other facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 35 of the Complaint and therefore denies the same.

36.    The Defendant denies ¶ 36 of the Complaint.

Appx. 00420

37.    Paragraph 37 of the Complaint states a legal conclusion that does not require a response.  To the extent it alleges facts, the Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in ¶ 37 of the Complaint and therefore denies the same.

38.    The Defendant denies that the Plaintiff is entitled to the relief requested in the prayer, including parts (i), (ii), and (iii).

## AFFIRMATIVE DEFENSES

39.    Pursuant to that certain Shared Services Agreement, the Plaintiff was responsible for making payments on behalf of the Defendant under the note.  Any alleged default under the note was the result of the Plaintiff's own negligence, misconduct, breach of contract, etc.

40.    Delay in the performance of a contract is excused when the party who seeks to enforce the contract caused the delay.  It was therefore inappropriate for the Plaintiff to accelerate the note when the brief delay in payment was the Plaintiff's own fault.

41.    Furthermore, the Plaintiff was waived the right to accelerate the note and/or the Plaintiff is estopped to enforce the alleged acceleration by accepting payment after the same.

42.    Furthermore, the Plaintiff's claims are barred in whole or in part because, prior to any alleged breach or acceleration, the Plaintiff agreed that it would not collect on the note upon fulfilment of certain conditions subsequent.  Specifically, sometime between December of the year in which each Note was made and February of the following year, Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed with Mr. James Dondero, acting for Defendant, that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Mr. Dondero's control. This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant believes there may be testimony or email correspondence that

discusses the existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

### **JURY DEMAND**

43.    The Defendant demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

44.    The Defendant does <u>not</u> consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

### **PRAYER**

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully request that, following a trial on the merits, the Court enter a judgment that the Plaintiff take nothing on the Complaint and provide the Defendant such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this 9th day of August, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By:  /s/  Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    500 N. Akard Street, Suite 3800
    Dallas, Texas  75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    drukavina@munsch.com
    jvasek@munsch.com

**COUNSEL FOR NEXPOINT
ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on the 9th day of August, 2021, a true and correct copy of this document was served electronically via the Court's CM/ECF system on the following recipients:

**Zachery Z. Annable**
Hayward PLLC
10501 N. Central Expressway
Suite 106
Dallas, TX 75231
Email: zannable@haywardfirm.com

**Melissa S. Hayward**
Hayward PLLC
10501 N. Central Expry, Ste. 106
Dallas, TX 75231
Email: MHayward@HaywardFirm.com

**Juliana Hoffman**
Sidley Austin LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Email: jhoffman@sidley.com

**Paige Holden Montgomery**
Sidley Austin LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Email: pmontgomery@sidley.com

/s/ Davor Rukavina
Davor Rukavina, Esq.

# EXHIBIT 15

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

*Counsel for Defendant NexPoint Advisors, L.P.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-SGJ-11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03005-sgj |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT NEXPOINT ADVISORS, L.P.'S
ANSWER TO AMENDED COMPLAINT**

Defendant NexPoint Advisors, L.P. ("NexPoint"), a defendant in the above-styled and

numbered adversary proceeding (the "Adversary Proceeding") filed by Highland Capital

Management, L.P. (the "Plaintiff"), hereby files this Answer (the "Answer") responding to the

*Amended Complaint for (I) Breach of Contract and (II) Turnover of Property (III) Fraudulent*

*Transfer, and (IV) Breach of Fiduciary Duty* [Adv. Dkt. 73] (the "Amended Complaint"). Where

an allegation in the Amended Complaint is not expressly admitted in this Answer, it is denied.

## PRELIMINARY STATEMENT

1.      The first sentence of paragraph 1 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied. The second sentence contains a legal conclusion that does not require a response. To the extent it contains factual allegations, they are denied.

2.      Defendant NexPoint admits that NPA's First Amended Answer speaks for itself. To the extent paragraph 2 contradicts the First Amended Answer, it is denied.

3.      Defendant NexPoint denies the allegations in paragraph 3 of the Amended Complaint.

4.      Paragraph 4 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied.

5.      Paragraph 5 of the Amended Complaint contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

6.      Defendant NexPoint admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Court to adjudicate this dispute. Any allegations in paragraph 6 not expressly admitted are denied.

7.      Defendant NexPoint admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding. Any allegations in paragraph 7 not expressly admitted are denied.

8.      Defendant NexPoint denies the allegations contained in paragraph 8 of the Amended Complaint.  Defendant NexPoint does not consent to any trial before, or final order entered by, the Bankruptcy Court.  Defendant NexPoint demands a trial by jury of all issues so triable.

9.      Defendant NexPoint admits the allegations in paragraph 9 of the Amended Complaint.

## THE PARTIES

10.     Defendant NexPoint admits the allegations in paragraph 10 of the Amended Complaint.

11.     Defendant NexPoint admits the allegations in paragraph 11 of the Amended Complaint.

12.     Defendant NexPoint admits the allegations in paragraph 12 of the Amended Complaint.

13.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 13 of the Amended Complaint and therefore denies the same.

14.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 of the Amended Complaint and therefore denies the same.

## CASE BACKGROUND

15.     Defendant NexPoint admits the allegations in paragraph 15 of the Amended Complaint.

16.     Defendant NexPoint admits the allegations in paragraph 16 of the Amended Complaint.

17.    Defendant NexPoint admits the allegations in paragraph 17 of the Amended Complaint.

18.    Defendant NexPoint admits the allegations in paragraph 18 of the Amended Complaint.

19.    Defendant NexPoint admits the allegations in paragraph 19 of the Amended Complaint.

## STATEMENT OF FACTS

20.    Defendant NexPoint admits that it has executed at least one promissory note under which the Debtor is a payee.  Any allegations in paragraph 20 note expressly admitted are denied.

21.    Defendant NexPoint admits the allegations in paragraph 21 of the Amended Complaint.

22.    Defendant NexPoint denies paragraph 22 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 22 is not verbatim.

23.    Defendant NexPoint admits the allegations in paragraph 23 of the Amended Complaint.

24.    Defendant NexPoint denies paragraph 24 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 24 is not verbatim.

25.    Defendant NexPoint admits the allegations in paragraph 25 of the Amended Complaint.

26.    Defendant NexPoint admits that it did not make a payment under the Note on December 31, 2020. Defendant NexPoint denies that any payment was due under the Note on December 31, 2020.  To the extent not expressly admitted, paragraph 26 of the Amended Complaint is denied.

27.     Defendant NexPoint admits that Exhibit 2 to the Amended Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 27 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, paragraph 27 of the Amended Complaint is denied.

28.     Defendant NexPoint admits that it paid the Debtor $1,406,111.92 on January 14, 2021, but denies that any payment was due on December 31, 2020 or that this was an attempt to cure a default.  To the extent not expressly admitted, paragraph 28 of the Amended Complaint is denied.

29.     Defendant NexPoint admits that Exhibit 3 to the Amended Complaint (the "Second Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 29 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, paragraph 29 of the Amended Complaint is denied.

30.     To the extent paragraph 30 of the Amended Complaint asserts a legal conclusion, no response is necessary, and it is denied.  The Defendant otherwise admits paragraph 30 of the Amended Complaint.

31.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31 of the Amended Complaint and therefore denies the same.

32.     Defendant NexPoint denies the allegations in paragraph 32 of the Amended Complaint.

33.     Defendant NexPoint admits that the Debtor filed the Original Complaint in this action on January 22, 2021, as alleged in the first sentence of paragraph 33 of the Amended

Complaint. Defendant NexPoint denies it is liable for the relief requested in the Original Complaint. To the extent not expressly admitted, paragraph 33 of the Amended Complaint is denied.

34.    Defendant NexPoint admits the allegations in paragraph 34 of the Amended Complaint.

35.    Defendant NexPoint admits the allegations in paragraph 35 of the Amended Complaint.

36.    Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself.  To the extent paragraph 36 contradicts the First Amended Answer, it is denied.

37.    Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself.  To the extent paragraph 37 contradicts the First Amended Answer, it is denied.

38.    Paragraph 38 of the Amended Complaint asserts a legal conclusion to which no answer is required.  To the extent of any factual allegation, Defendant NexPoint admits that Mr. Dondero controlled NPA and denies that he controlled the Debtor at the time of the Alleged Agreement.

39.    Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 39 of the Amended Complaint and therefore denies the same.

40.    Defendant NexPoint denies the allegations in paragraph 40 of the Amended Complaint.

41.    Defendant NexPoint admits that Exhibit 4 to the Amended Complaint is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 41 of the Amended Complaint asserts a legal conclusion, no response is required, and

it is denied. To the extent not expressly admitted, paragraph 41 of the Amended Complaint is denied.

42. Paragraph 42 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

43. Paragraph 43 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

<div align="center">

**FIRST CLAIM FOR RELIEF**
**(against NexPoint)**
**(for Breach of Contract)**

</div>

44. Paragraph 44 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

45. Paragraph 45 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

46. Paragraph 46 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

47. Paragraph 47 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

48. Paragraph 48 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

<div align="center">

**SECOND CLAIM FOR RELIEF**
**(against NexPoint)**
**(Turnover by NexPoint Pursuant to 11 U.S.C. § 542(b))**

</div>

49. Paragraph 49 of the Amended Complaint is a sentence of incorporation that does not require a response and is therefore denied. All prior responses are incorporated herein by reference.

50.     Paragraph 50 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

51.     Paragraph 51 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

52.     Paragraph 52 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

53.     Paragraph 53 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  Defendant NexPoint admits that the Plaintiff transmitted the Demand Letter and the Second Demand Letter, and those documents speak for themselves.

54.     Paragraph 54 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

55.     Paragraph 55 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

### THIRD CLAIM FOR RELIEF
**(Against NexPoint)**
**(Avoidance and Recovery of Actual Fraudulent Transfer under 11 U.S.C. §§ 548(a)(1)(A) and 550)**

56.     Paragraph 56 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

57.     Paragraph 57 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

58.     Paragraph 58 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

59.    Paragraph 59 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

60.    Paragraph 60 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

61.    Paragraph 61 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

## FOURTH CLAIM FOR RELIEF
### (Against NexPoint)
### (Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. § 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))

62.    Paragraph 62 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

63.    Paragraph 63 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

64.    Paragraph 64 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

65.    Paragraph 65 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

66.    Paragraph 66 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

## FIFTH CLAIM FOR RELIEF
### (Against Dugaboy Investment Trust and Nancy Dondero)
### (For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)

67.    Paragraph 67 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

68.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

69.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

70.     Paragraph 70 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

## SIXTH CLAIM FOR RELIEF
**(Against Dugaboy Investment Trust and Nancy Dondero)**
**(Breach of Fiduciary Duty)**

71.     Paragraph 71 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

72.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

73.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

74.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

## SEVENTH CLAIM FOR RELIEF
**(Against James Dondero and Nancy Dondero)**
**(Aiding and Abetting a Breach of Fiduciary Duty)**

75.     Paragraph 75 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

76.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

77.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

78.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

79.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

Defendant NexPoint denies that the Plaintiff is entitled to the relief requested in the prayer, including as to parts (i), (ii), (iii), (iv), (v), (vi), (vii) and (iii) [sic].

## AFFIRMATIVE DEFENSES

80.     Pursuant to that certain Shared Services Agreement, the Plaintiff was responsible for making payments on behalf of the Defendant under the note.  Any alleged default under the note was the result of the Plaintiff's own negligence, misconduct, breach of contract, etc.

81.     Delay in the performance of a contract is excused when the party who seeks to enforce the contract caused the delay.  It was therefore inappropriate for the Plaintiff to accelerate the note when the brief delay in payment was the Plaintiff's own fault.

82.     Furthermore, the Plaintiff has waived the right to accelerate the note and /or the Plaintiff is estopped to enforce the alleged acceleration by accepting payment after the same.

83.     Furthermore, the Plaintiff's claims are barred in whole or in part because, prior to any alleged breach or acceleration, the Plaintiff agreed that it would not collect on the note upon fulfilment of certain conditions subsequent. Specifically, sometime between December of the year in which each Note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant NexPoint believes there may be testimony or email correspondence that discusses the

existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

84. Defendant NexPoint asserts that any fraudulent transfer claim is barred because NexPoint acted in good faith, without knowledge of any alleged avoidability, and because reasonably equivalent value was provided for any alleged transfer or obligation.

85. Defendant NexPoint asserts that any fraudulent transfer claim is barred because no transferor or transferee, or obligor or obligee, was insolvent.

86. To the extent of any avoidance, NexPoint asserts a lien under 11 U.S.C. § 548(c) to the extent that NexPoint gave value, and a similar preference lien under any applicable provision of the Texas Uniform Fraudulent Transfer Act.

## JURY DEMAND

87. Defendant NexPoint demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

88. Defendant NexPoint does _not_ consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant NexPoint respectfully requests that, following a trial on the merits, the Court enter a judgment that the Plaintiff take nothing on the Amended Complaint and provide Defendant NexPoint such other relief to which it is entitled**.**

RESPECTFULLY SUBMITTED this 1st day of September, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina
      Davor Rukavina, Esq.
      Texas Bar No. 24030781
      Julian P. Vasek, Esq.
      Texas Bar No. 24070790
      3800 Ross Tower
      500 N. Akard Street
      Dallas, Texas  75201-6659
      Telephone: (214) 855-7500
      Facsimile: (214) 855-7584
      Email: drukavina@munsch.com

**COUNSEL FOR NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

      /s/ Davor Rukavina
      Davor Rukavina

# EXHIBIT 16

Deborah Deitsch-Perez
Michael P. Aigen
**STINSON LLP**
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

*Counsel for Defendant Highland Capital
Management Services, Inc.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054-SGJ-11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | **Adversary No.: 21-03006-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

### DEFENDANT HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.'S
### ANSWER TO AMENDED COMPLAINT

Defendant Highland Capital Management Services, Inc. ("HCMS"), defendant in the above-styled and numbered adversary proceeding (the "Adversary Proceeding") filed by Highland Capital Management, L.P. (the "Plaintiff"), hereby files this Answer (the "Answer") responding to the *Amended Complaint for (I) Breach of Contract and (II) Turnover of Property (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty* [Adv. Dkt. 68] (the "Amended

Complaint"). Where an allegation in the Amended Complaint is not expressly admitted in this Amended Answer, it is denied.

In filing this Answer, Defendant HCMS does not waive any rights to compel arbitration, as set forth in Defendants' Motion to Compel Arbitration [Adv. Dkt. 70], filed on September 1, 2021.[1]

## PRELIMINARY STATEMENT

1.    The first sentence of paragraph 1 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied. The second sentence contains a legal conclusion that does not require a response. To the extent it contains factual allegations, they are denied.

2.    Defendant HCMS admits that HCMS' First Amended Answer speaks for itself. To the extent paragraph 2 contradicts the First Amended Answer, it is denied.

3.    Defendant HCMS denies the allegations in paragraph 3 of the Amended Complaint.

4.    Paragraph 4 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied.

5.    Paragraph 5 of the Amended Complaint contains a summary of the relief the Plaintiff seeks and does not require a response. To the extent it contains factual allegations, they are denied.

---

[1] *Williams v. Cigna Financial Advisors, Inc.*, 56 F.3d 656 (5th Cir. 1995) (Defendant did not substantially invoke the judicial process and waive its right to arbitration despite removal of action to federal court, filing motion to dismiss, filing motion to stay proceedings, answering plaintiff's complaint, asserting counterclaim, and exchanging discovery); *Keytrade USA, Inc. v. AIN Temouchent M/V*, 404 F.3d 891 (5th Cir. 2005) (Arbitration not waived when defendant filed a 100-plus page motion for summary judgment and a concurrent motion to arbitrate); *Gulf Guaranty Life Ins. Co. v. Conn. Gen. Life Ins. Co.*, 304 F.3d 476 (5th Cir. 2002) (no waiver of arbitration right when the party seeking arbitration did no more than defend itself against the claims being sued for).

## JURISDICTION AND VENUE

6.     Defendant HCMS admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Court to adjudicate this dispute. Any allegations in paragraph 6 not expressly admitted are denied.

7.     Defendant HCMS admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding. Any allegations in paragraph 7 not expressly admitted are denied.

8.     Defendant HCMS denies that a breach of contract claim is core. Defendant HCMS denies that a § 542(b) turnover proceeding is the appropriate mechanism to collect a contested debt. Defendant HCMS admits that a § 542(b) turnover proceeding is statutorily core but denies that it is Constitutionally core under *Stern v. Marshall*. Defendant HCMS does <u>not</u> consent to the Bankruptcy Court entering final orders or judgment in this Adversary Proceeding. Any allegations in paragraph 8 not expressly admitted are denied.

9.     Subject to the Defendants' Motion to Compel Arbitration, Defendant HCMS admits paragraph 9 of the Amended Complaint.

## THE PARTIES

10.     Defendant HCMS admits the allegations in paragraph 10 of the Amended Complaint.

11.     Defendant HCMS admits the allegations in paragraph 11 of the Amended Complaint.

12.     Defendant HCMS admits that Defendant James Dondero was the President of the Debtor's General Partner, Strand Advisors, Inc. and the Debtor's CEO until his resignation on

January 9, 2020.  The third sentence of paragraph 12 asserts a legal conclusion to which no response is required.  Defendant HCMS denies any remaining allegations contained in paragraph 12.

13.    Defendant HCMS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 13 of the Amended Complaint and therefore denies the same.

14.    Defendant HCMS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 of the Amended Complaint and therefore denies the same.

## CASE BACKGROUND

15.    Defendant HCMS admits the allegations in paragraph 15 of the Amended Complaint.

16.    Defendant HCMS admits the allegations in paragraph 16 of the Amended Complaint.

17.    Defendant HCMS admits the allegations in paragraph 17 of the Amended Complaint.

18.    Defendant HCMS admits the allegations in paragraph 18 of the Amended Complaint.

19.    Defendant HCMS admits the allegations in paragraph 19 of the Amended Complaint.

## STATEMENT OF FACTS

20.     Defendant HCMS admits that it has executed at least one promissory note under which the Debtor is a payee.  Any allegations in paragraph 20 note expressly admitted are denied.

21.     Defendant HCMS admits that it signed the document attached to the Complaint as Exhibit 1.  Defendant HCMS denies any allegations in paragraph 21 that are not expressly admitted.

22.     Defendant HCMS admits that it signed the document attached to the Complaint as Exhibit 2.  Defendant HCMS denies any allegations in paragraph 22 that are not expressly admitted.

23.     Defendant HCMS denies that it signed the document attached to the Complaint as Exhibit 3.  Defendant HCMS denies any allegations in paragraph 23 that are not expressly admitted.

24.     Defendant HCMS denies that it signed the document attached to the Complaint as Exhibit 4.  Defendant HCMS denies any allegations in paragraph 21 that are not expressly admitted.

25.     Defendant HCMS admits that Plaintiff correctly transcribed Section 2 of Exhibits 1-4 to the Complaint in paragraph 25.

26.     Defendant HCMS admits that Plaintiff correctly transcribed Section 4 of Exhibits 1-4 to the Complaint in paragraph 26.

27.     Defendant HCMS admits that Plaintiff correctly transcribed Section 6 of Exhibits 1-4 to the Complaint in paragraph 27.

28.     Defendant HCMS admits that Plaintiff sent it a copy of Exhibit 5.  Defendant HCMS admits that Plaintiff correctly transcribed an excerpt of Exhibit 5 in the third sentence of

**Appx. 00443**

paragraph 28.  Defendant HCMS denies any allegations in paragraph 28 that are not expressly admitted.

29.    To the extent paragraph 29 asserts a legal conclusion, no response is required, and it is denied.  Defendant HCMS otherwise admits the allegations in paragraph 29.

30.    Defendant HCMS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 30 of the Amended Complaint and therefore denies the same.

31.    Defendant HCMS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31 of the Amended Complaint and therefore denies the same.

32.    Defendant HCMS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 32 of the Amended Complaint and therefore denies the same.

33.    Defendant HCMS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 33 of the Amended Complaint and therefore denies the same.

34.    Defendant HCMS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 34 of the Amended Complaint and therefore denies the same.  Defendant HCMS denies the allegations in the second sentence of paragraph 34 of the Amended Complaint.

35.    Defendant HCMS admits that it has executed at least one promissory note under which Debtor is the payee.  Defendant HCMS denies any allegations in paragraph 35 that are not expressly admitted.

36.    Defendant HCMS admits that it signed the document attached to the Amended Complaint as Exhibit 6.  Defendant HCMS denies any allegations in paragraph 29 that are not expressly admitted.

37.    Defendant HCMS admits that Plaintiff correctly transcribed Section 2 of Exhibit 6 to the Amended Complaint in paragraph 37.  Defendant HCMS denies any allegations in paragraph 37 that are not expressly admitted.

38.    Defendant HCMS admits that Plaintiff correctly transcribed Section 3 of Exhibit 6 to the Amended Complaint in paragraph 38.  Defendant HCMS denies any allegations in paragraph 37 that are not expressly admitted.

39.    Defendant HCMS admits that Plaintiff correctly transcribed Section 4 of Exhibit 6 to the Amended Complaint in paragraph 39.  Defendant HCMS denies any allegations in paragraph 37 that are not expressly admitted.

40.    Defendant HCMS admits that Plaintiff correctly transcribed Section 6 of Exhibit 6 to the Amended Complaint in paragraph 40.  Defendant HCMS denies any allegations in paragraph 37 that are not expressly admitted.

41.    To the extent paragraph 41 of the Amended Complaint asserts a legal conclusion, no response is necessary, and it is denied.  Defendant HCMS otherwise denies paragraph 41 of the Amended Complaint.

42.    Defendant HCMS admits that Plaintiff sent it a copy of Exhibit 7.  Defendant HCMS admits that Plaintiff correctly transcribed an excerpt of Exhibit 7 in the third sentence of paragraph 42 of the Amended Complaint.  Defendant HCMS denies any allegations in paragraph 42 that are not expressly admitted.

43. Defendant HCMS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 43 of the Amended Complaint and therefore denies the same.

44. Defendant HCMS denies the allegations in paragraph 44 of the Amended Complaint.

45. Defendant HCMS admits that the Debtor filed the Original Complaint in this action on January 22, 2021, as alleged in the first sentence of paragraph 45 of the Amended Complaint. Defendant HCMS denies it is liable for the relief requested in the Original Complaint. To the extent not expressly admitted, paragraph 45 of the Amended Complaint is denied.

46. Defendant HCMS admits the allegations in paragraph 46 of the Amended Complaint.

47. Defendant HCMS admits the allegations in paragraph 47 of the Amended Complaint.

48. In response to the allegations in paragraph 48 of the Amended Complaint, Defendant HCMS admits that HCMS' First Amended Answer speaks for itself. To the extent paragraph 48 contradicts the First Amended Answer, it is denied.

49. Defendant HCMS admits that HCMS' First Amended Answer speaks for itself. To the extent paragraph 49 contradicts the First Amended Answer, it is denied.

50. Paragraph 50 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

51. Defendant HCMS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 51 of the Amended Complaint and therefore denies the same.

52.     Defendant HCMS denies the allegations in paragraph 52 of the Amended Complaint.

53.     Defendant HCMS admits that Exhibit 8 to the Amended Complaint is a true and correct copy of what it purports to be and that the document speaks for itself. To the extent paragraph 53 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied. To the extent not expressly admitted, paragraph 53 of the Amended Complaint is denied.

54.     Paragraph 54 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

55.     Paragraph 55 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

### FIRST CLAIM FOR RELIEF
### (against HCMS)
### (for Breach of Contract)

56.     Paragraph 56 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

57.     Paragraph 57 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

58.     Paragraph 58 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

59.     Paragraph 59 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

60.     Paragraph 60 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

61. Defendant HCMS denies paragraph 61 of the Amended Complaint.

62. Defendant HCMS denies paragraph 62 of the Amended Complaint.

## SECOND CLAIM FOR RELIEF
### (against HCMS)
### (Turnover by HCMS Pursuant to 11 U.S.C. § 542(b))

63. Paragraph 63 of the Amended Complaint is a sentence of incorporation that does not require a response and is therefore denied. All prior responses are incorporated herein by reference.

64. Paragraph 64 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

65. Paragraph 65 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

66. Paragraph 66 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

67. Defendant HCMS admits that Plaintiff transmitted Exhibits 5 and 7 to the Amended Complaint.

68. Paragraph 68 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

69. Defendant HCMS denies paragraph 69 of the Amended Complaint.

## THIRD CLAIM FOR RELIEF
### (Against HCMS)
### (Avoidance and Recovery of Actual Fraudulent Transfer under 11 U.S.C. §§ 548(a)(1)(A) and 550)

70. Paragraph 70 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

71.     Paragraph 71 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

72.     Paragraph 72 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

73.     Paragraph 73 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

74.     Paragraph 74 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

75.     Paragraph 75 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

### FOURTH CLAIM FOR RELIEF
**(Against HCMS)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. § 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))**

76.     Paragraph 76 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

77.     Paragraph 77 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

78.     Paragraph 78 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

79.     Paragraph 79 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

80.     Paragraph 80 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

## FIFTH CLAIM FOR RELIEF
### (Against Dugaboy Investment Trust and Nancy Dondero)
### (For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)

81.    Paragraph 81 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

82.    This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant HCMS is not required to respond to this claim.

83.    This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant HCMS is not required to respond to this claim.

84.    Paragraph 84 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

## SIXTH CLAIM FOR RELIEF
### (Against Dugaboy Investment Trust and Nancy Dondero)
### (Breach of Fiduciary Duty)

85.    Paragraph 85 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

86.    This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant HCMS is not required to respond to this claim.

87.    This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant HCMS is not required to respond to this claim.

88.    This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant HCMS is not required to respond to this claim.

## SEVENTH CLAIM FOR RELIEF
### (Against James Dondero and Nancy Dondero)
### (Aiding and Abetting a Breach of Fiduciary Duty)

89.    Paragraph 89 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

90.    This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant HCMS is not required to respond to this claim.

91.    This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant HCMS is not required to respond to this claim.

92.    This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant HCMS is not required to respond to this claim.

93.    This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant HCMS is not required to respond to this claim.

Defendant HCMS denies that the Plaintiff is entitled to the relief requested in the prayer, including as to parts (i), (ii), (iii), (iv), (v), (vi), (vii) and (iii) [sic].

## AFFIRMATIVE DEFENSES

94.    Plaintiff's claims are barred in whole or in part by the doctrine of justification and/or repudiation.

95.    Plaintiff's claims are barred in whole or in part by the doctrine of estoppel.

96.    Plaintiff's claims are barred in whole or in part by the doctrine of waiver.

97.    Plaintiff's claims are barred in whole or in part because prior to the demands for payment Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority

of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant HCMS believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

98.    Defendant HCMS further asserts that Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because at all relevant times Defendant HCMS acted in good faith.

99.    Defendant HCMS further asserts that Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because the alleged fraudulent transfer (*i.e.*, the "Alleged Agreement") was taken in good faith and for reasonably equivalent value.

100.    Defendant HCMS further asserts that Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because there was no intent to hinder, delay, or defraud any creditors of the Debtor by entering into the "Alleged Agreement."

101.    Defendant HCMS further asserts that Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because the Debtor was solvent at the time the "Alleged Agreement" was made.

102.    Defendant HCMS further asserts that each Note is ambiguous as a whole based on the signatory and/or references to unspecified related agreements.

## JURY DEMAND

103.    Except to the extent compelled to arbitration, Defendant HCMS demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

104.    Defendant HCMS does <u>not</u> consent to the Bankruptcy Court conducting a jury

trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant HCMS respectfully requests that,

following a trial on the merits, the Court enter a judgment that the Plaintiff take nothing on the

Amended Complaint and provide Defendant HCMS such other relief to which it is entitled**.**

Dated: September 1, 2021                          Respectfully submitted,

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas State Bar No. 24036072
Michael P. Aigen
Texas State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Email:  deborah.deitschperez@stinson.com
Email:  michael.aigen@stinson.com

**ATTORNEYS FOR DEFENDANT
HIGHLAND CAPITAL
MANAGEMENT SERVICES, INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of
this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez

# EXHIBIT 17

Deborah Deitsch-Perez
Michael P. Aigen
**STINSON LLP**
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

*Counsel for Defendant HCRE Partners, LLC*
*(n/k/a NexPoint Real Estate Partners, LLC)*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054-SGJ-11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | **Adversary No.: 21-03007-sgj** |
| **HCRE PARTNERS, LLC (n/k/a NEXPOINT** | § | |
| **REAL ESTATE PARTNERS, LLC), JAMES** | § | |
| **DONDERO, NANCY DONDERO, AND THE** | § | |
| **DUGABOY INVESTMENT TRUST** | § | |
| | § | |
| Defendants. | § | |

<u>**DEFENDANT HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE**</u>
<u>**PARTNERS, LLC)'S ANSWER TO AMENDED COMPLAINT**</u>

Defendant HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) ("<u>NREP</u>"),

defendant in the above-styled and numbered adversary proceeding (the "<u>Adversary Proceeding</u>")

filed by Highland Capital Management, L.P. (the "<u>Plaintiff</u>"), hereby files this Answer (the

"<u>Answer</u>") responding to the *Amended Complaint for (I) Breach of Contract and (II) Turnover of*

*Property (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty* [Adv. Dkt. 63] (the

DEFENDANT HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE
PARTNERS, LLC)'S ANSWER TO AMENDED COMPLAINT                                    PAGE 1
CORE/3522697.0002/169030070

**Appx. 00455**

"Amended Complaint"). Where an allegation in the Amended Complaint is not expressly admitted in this Amended Answer, it is denied.

In filing this Answer, Defendant NREP does not waive any rights to compel arbitration, as set forth in Defendants' Motion to Compel Arbitration [Adv. Dkt. 65], filed on September 1, 2021.[1]

## PRELIMINARY STATEMENT

1.    The first sentence of paragraph 1 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied. The second sentence contains a legal conclusion that does not require a response. To the extent it contains factual allegations, they are denied.

2.    Defendant NREP admits that NREP's First Amended Answer speaks for itself.  To the extent paragraph 2 contradicts the First Amended Answer, it is denied.

3.    Defendant NREP denies the allegations in paragraph 3 of the Amended Complaint.

4.    Paragraph 4 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied.

---

[1] *Williams v. Cigna Financial Advisors, Inc.*, 56 F.3d 656 (5th Cir. 1995) (Defendant did not substantially invoke the judicial process and waive its right to arbitration despite removal of action to federal court, filing motion to dismiss, filing motion to stay proceedings, answering plaintiff's complaint, asserting counterclaim, and exchanging discovery); *Keytrade USA, Inc. v. AIN Temouchent M/V*, 404 F.3d 891 (5th Cir. 2005) (Arbitration not waived when defendant filed a 100-plus page motion for summary judgment and a concurrent motion to arbitrate); *Gulf Guaranty Life Ins. Co. v. Conn. Gen. Life Ins. Co.*, 304 F.3d 476 (5th Cir. 2002) (no waiver of arbitration right when the party seeking arbitration did no more than defend itself against the claims made against it).

DEFENDANT HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE
PARTNERS, LLC)'S ANSWER TO AMENDED COMPLAINT                                    PAGE 2
CORE/3522697.0002/169030070

Appx. 00456

5.      Paragraph 5 of the Amended Complaint contains a summary of the relief the Plaintiff

seeks and does not require a response.   To the extent it contains factual allegations, they are

denied.

## JURISDICTION AND VENUE

6.      Defendant NREP admits that this Adversary Proceeding relates to the Plaintiff's

bankruptcy case but denies any implication that this fact confers Constitutional authority on the

Bankruptcy Court to adjudicate this dispute. Any allegations in paragraph 6 not expressly

admitted are denied.

7.      Defendant NREP admits that the Court has statutory (but not Constitutional)

jurisdiction to hear this Adversary Proceeding. Any allegations in paragraph 7 not expressly

admitted are denied.

8.      Defendant NREP denies that a breach of contract claim is core.  Defendant NREP

denies that a § 542(b) turnover proceeding is the appropriate mechanism to collect a contested

debt. Defendant NREP admits that a § 542(b) turnover proceeding is statutorily core but denies

that it is Constitutionally core under *Stern v. Marshall*.  Defendant NREP does <u>not</u> consent to the

Bankruptcy Court entering final orders or judgment in this Adversary Proceeding. Any

allegations in paragraph 8 not expressly admitted are denied.

9.      Subject to the Defendants' Motion to Compel Arbitration, Defendant NREP admits

paragraph 9 of the Amended Complaint.

## THE PARTIES

10.      Defendant NREP admits the allegations in paragraph 10 of the Amended

Complaint.

DEFENDANT HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE
PARTNERS, LLC)'S ANSWER TO AMENDED COMPLAINT                                                                PAGE 3
CORE/3522697.0002/169030070

Appx. 00457

11.     Defendant NREP admits the allegations in paragraph 11 of the Amended Complaint.

12.     Defendant NREP admits that Defendant James Dondero was the President of the Debtor's General Partner, Strand Advisors, Inc. and the Debtor's CEO until his resignation on January 9, 2020.  The third sentence of paragraph 12 asserts a legal conclusion to which no response is required.  Defendant NREP denies any remaining allegations contained in paragraph 12.

13.     Defendant NREP lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 13 of the Amended Complaint and therefore denies the same.

14.     Defendant NREP lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 of the Amended Complaint and therefore denies the same.

## CASE BACKGROUND

15.     Defendant NREP admits the allegations in paragraph 15 of the Amended Complaint.

16.     Defendant NREP admits the allegations in paragraph 16 of the Amended Complaint.

17.     Defendant NREP admits the allegations in paragraph 17 of the Amended Complaint.

18.     Defendant NREP admits the allegations in paragraph 18 of the Amended Complaint.

DEFENDANT HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE
PARTNERS, LLC)'S ANSWER TO AMENDED COMPLAINT                    PAGE 4
CORE/3522697.0002/169030070

Appx. 00458

19.     Defendant NREP admits the allegations in paragraph 19 of the Amended Complaint.

## **STATEMENT OF FACTS**

20.     Defendant NREP admits that it has executed at least one promissory note under which the Debtor is a payee.  Any allegations in paragraph 20 note expressly admitted are denied.

21.     Defendant NREP admits that it signed the document attached to the Amended Complaint as Exhibit 1.  Defendant NREP denies any allegations in paragraph 21 that are not expressly admitted.

22.     Defendant NREP admits that it signed the document attached to the Amended Complaint as Exhibit 2.  Defendant NREP denies any allegations in paragraph 22 that are not expressly admitted.

23.     Defendant NREP admits that it signed the document attached to the Amended Complaint as Exhibit 3.  Defendant NREP denies any allegations in paragraph 23 that are not expressly admitted.

24.     Defendant NREP admits that it signed the document attached to the Amended Complaint as Exhibit 4.  Defendant NREP denies any allegations in paragraph 24 that are not expressly admitted.

25.     Defendant NREP admits that Plaintiff correctly transcribed Section 2 of Exhibits 1-4 to the Amended Complaint in paragraph 25.

26.     Defendant NREP admits that Plaintiff correctly transcribed Section 4 of Exhibits 1-4 to the Amended Complaint in paragraph 26.

27.     Defendant NREP admits that Plaintiff correctly transcribed Section 6 of Exhibits 1-4 to the Amended Complaint in paragraph 27.

DEFENDANT HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE
PARTNERS, LLC)'S ANSWER TO AMENDED COMPLAINT                                          PAGE 5
CORE/3522697.0002/169030070

**Appx. 00459**

28.     Defendant NREP admits that Plaintiff sent it a copy of Exhibit 5.  Defendant NREP admits that Plaintiff correctly transcribed an excerpt of Exhibit 5 in the third sentence of paragraph 28.  Defendant NREP denies any allegations in paragraph 28 that are not expressly admitted.

29.     To the extent paragraph 29 asserts a legal conclusion, no response is required, and it is denied.  Defendant otherwise admits the allegations in paragraph 29.

30.     Defendant NREP lacks sufficient information or knowledge to admit or deny the allegations in paragraph 30 and, therefore, denies them.

31.     Defendant NREP lacks sufficient information or knowledge to admit or deny the allegations in paragraph 31 and, therefore, denies them.

32.     Defendant NREP lacks sufficient information or knowledge to admit or deny the allegations in paragraph 32 and, therefore, denies them.

33.     Defendant NREP lacks sufficient information or knowledge to admit or deny the allegations in paragraph 33 and, therefore, denies them.

34.     Defendant NREP lacks sufficient information or knowledge to admit or deny the allegations in paragraph 34 and, therefore, denies them.

35.     Defendant NREP denies the allegations in paragraph 35 of the Amended Complaint.

36.     Defendant NREP admits that it has executed at least one promissory note under which Debtor is the payee.  Defendant NREP denies any allegations in paragraph 36 that are not expressly admitted.

37.     Defendant NREP admits that it signed the document attached to the Complaint as Exhibit 6.  Defendant NREP denies any allegations in paragraph 37 that are not expressly admitted.

DEFENDANT HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE PARTNERS, LLC)'S ANSWER TO AMENDED COMPLAINT                                      PAGE 6
CORE/3522697.0002/169030070

Appx. 00460

38.    Defendant NREP admits that Plaintiff correctly transcribed Section 2 of Exhibit 6 to the Amended Complaint in paragraph 38.  Defendant NREP denies any allegations in paragraph 38 that are not expressly admitted.

39.    Defendant NREP admits that Plaintiff correctly transcribed Section 3 of Exhibit 6 to the Amended Complaint in paragraph 39.  Defendant NREP denies any allegations in paragraph 39 that are not expressly admitted.

40.    Defendant NREP admits that Plaintiff correctly transcribed Section 4 of Exhibit 6 to the Amended Complaint in paragraph 40.  Defendant NREP denies any allegations in paragraph 40 that are not expressly admitted.

41.    Defendant NREP admits that Plaintiff correctly transcribed Section 6 of Exhibit 6 to the Amended Complaint in paragraph 41.  Defendant NREP denies any allegations in paragraph 41 that are not expressly admitted.

42.    To the extent paragraph 42 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  Defendant NREP otherwise denies paragraph 42 of the Amended Complaint.

43.    Defendant NREP admits that Plaintiff sent it a copy of Exhibit 7.  Defendant NREP admits that Plaintiff correctly transcribed an excerpt of Exhibit 7 in the third sentence of paragraph 43 of the Amended Complaint.  Defendant NREP denies any allegations in paragraph 43 that are note expressly admitted.

44.    To the extent paragraph 44 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  Defendant NREP otherwise admits paragraph 44 of the Amended Complaint.

DEFENDANT HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE
PARTNERS, LLC)'S ANSWER TO AMENDED COMPLAINT                                          PAGE 7
CORE/3522697.0002/169030070

Appx. 00461

45.    Defendant NREP is without sufficient information or knowledge to admit or deny the allegations in paragraph 45 of the Amended Complaint and, therefore, denies them.

46.    Defendant NREP denies paragraph 46 of the Amended Complaint.

47.    Defendant NREP admits that the Debtor filed the Original Complaint in this action on January 22, 2021, as alleged in the first sentence of paragraph 47 of the Amended Complaint. Defendant NREP denies it is liable for the relief requested in the Original Complaint. To the extent not expressly admitted, paragraph 47 of the Amended Complaint is denied.

48.    Defendant NREP admits the allegations in paragraph 48 of the Amended Complaint.

49.    Defendant NREP admits that NREP's First Amended Answer speaks for itself.  To the extent paragraph 49 contradicts the First Amended Answer, it is denied.

50.    In response to the allegations in paragraph 48 of the Amended Complaint, Defendant NREP admits that NREP's First Amended Answer speaks for itself.  To the extent paragraph 50 contradicts the First Amended Answer, it is denied.

51.    Defendant NREP admits that NREP's First Amended Answer speaks for itself.  To the extent paragraph 51 contradicts the First Amended Answer, it is denied.

52.    Paragraph 52 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

53.    Defendant NREP lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 53 of the Amended Complaint and therefore denies the same.

54.    Defendant NREP admits that Exhibit 4 to the Amended Complaint is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent

DEFENDANT HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE
PARTNERS, LLC)'S ANSWER TO AMENDED COMPLAINT                                      PAGE 8
CORE/3522697.0002/169030070

**Appx. 00462**

paragraph 41 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, paragraph 54 of the Amended Complaint is denied.

55.      Defendant NREP admits that Exhibit 4 to the Amended Complaint is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 41 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, paragraph 54 of the Amended Complaint is denied.

56.      Paragraph 56 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

57.      Paragraph 57 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

<div align="center">

**FIRST CLAIM FOR RELIEF**
**(against NREP)**
**(for Breach of Contract)**

</div>

58.      Paragraph 58 of the Amended Complaint is a sentence of incorporation that does not require a response.  All prior responses are incorporated herein by reference.

59.      Paragraph 59 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

60.      Paragraph 60 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

61.      Paragraph 61 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

DEFENDANT HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE
PARTNERS, LLC)'S ANSWER TO AMENDED COMPLAINT                                      PAGE 9
CORE/3522697.0002/169030070

**Appx. 00463**

62.    Paragraph 62 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

63.    Defendant NREP denies paragraph 63 of the Amended Complaint.

64.    Defendant NREP denies paragraph 64 of the Amended Complaint.

## SECOND CLAIM FOR RELIEF
### (against NREP)
### (Turnover by NREP Pursuant to 11 U.S.C. § 542(b))

65.    Paragraph 65 of the Amended Complaint is a sentence of incorporation that does not require a response and is therefore denied. All prior responses are incorporated herein by reference.

66.    Paragraph 66 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

67.    Paragraph 67 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

68.    Paragraph 68 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

69.    Defendant NREP admits that Plaintiff transmitted Exhibits 5 and 7 to the Amended Complaint. Defendant NREP lacks sufficient information or knowledge to admit or deny the remaining allegations in paragraph 69 of the Amended Complaint and, therefore, denies them.

70.    Paragraph 70 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied Defendant

71.    Defendant NREP denies paragraph 71 of the Amended Complaint.

DEFENDANT HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE
PARTNERS, LLC)'S ANSWER TO AMENDED COMPLAINT                    PAGE 10
CORE/3522697.0002/169030070

Appx. 00464

## THIRD CLAIM FOR RELIEF
### (Against NREP)
### (Avoidance and Recovery of Actual Fraudulent Transfer under 11 U.S.C. §§ 548(a)(1)(A) and 550)

72.     Paragraph 72 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

73.     Paragraph 73 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

74.     Paragraph 74 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

75.     Paragraph 75 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

76.     Paragraph 76 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

77.     Paragraph 77 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

## FOURTH CLAIM FOR RELIEF
### (Against NREP)
### (Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. § 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))

78.     Paragraph 78 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

79.     Paragraph 79 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

DEFENDANT HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE
PARTNERS, LLC)'S ANSWER TO AMENDED COMPLAINT                              PAGE 11
CORE/3522697.0002/169030070

**Appx. 00465**

80. Paragraph 80 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

81. Paragraph 81 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

82. Paragraph 82 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

### FIFTH CLAIM FOR RELIEF
**(Against Dugaboy Investment Trust and Nancy Dondero)**
**(For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)**

83. Paragraph 83 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

84. This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero. Therefore, Defendant NREP is not required to respond to this claim.

85. This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero. Therefore, Defendant NREP is not required to respond to this claim.

86. Paragraph 70 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

### SIXTH CLAIM FOR RELIEF
**(Against Dugaboy Investment Trust and Nancy Dondero)**
**(Breach of Fiduciary Duty)**

87. Paragraph 87 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

88. This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero. Therefore, Defendant NREP is not required to respond to this claim.

DEFENDANT HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE
PARTNERS, LLC)'S ANSWER TO AMENDED COMPLAINT PAGE 12
CORE/3522697.0002/169030070

**Appx. 00466**

89.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NREP is not required to respond to this claim.

90.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NREP is not required to respond to this claim.

### SEVENTH CLAIM FOR RELIEF
**(Against James Dondero and Nancy Dondero)**
**(Aiding and Abetting a Breach of Fiduciary Duty)**

91.     Paragraph 91 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

92.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NREP is not required to respond to this claim.

93.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NREP is not required to respond to this claim.

94.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NREP is not required to respond to this claim.

95.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NREP is not required to respond to this claim.

Defendant NREP denies that the Plaintiff is entitled to the relief requested in the prayer, including as to parts (i), (ii), (iii), (iv), (v), (vi), (vii) and (iii) [sic].

### AFFIRMATIVE DEFENSES

96.     Plaintiff's claims are barred in whole or in part by the doctrine of justification and/or repudiation.

97.     Plaintiff's claims are barred in whole or in part by the doctrine of estoppel.

98.     Plaintiff's claims are barred in whole or in part by the doctrine of waiver.

DEFENDANT HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE
PARTNERS, LLC)'S ANSWER TO AMENDED COMPLAINT                                          PAGE 13
CORE/3522697.0002/169030070

**Appx. 00467**

99. Plaintiff's claims are barred in whole or in part because prior to the demands for payment, Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each Note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant NREP believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

100. Defendant NREP further asserts that Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because at all relevant times Defendant NREP acted in good faith.

101. Defendant NREP further asserts that Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because the alleged fraudulent transfer (*i.e.*, the "Alleged Agreement") was taken in good faith and for reasonably equivalent value.

102. Defendant NREP further asserts that Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because there was no intent to hinder, delay, or defraud any creditors of the Debtor by entering into the "Alleged Agreement."

103. Defendant NREP further asserts that Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because the Debtor was solvent at the time the "Alleged Agreement" was made.

104. Defendant NREP further asserts that each Note is ambiguous as a whole based on references to unspecified related agreements.

DEFENDANT HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE
PARTNERS, LLC)'S ANSWER TO AMENDED COMPLAINT                                                  PAGE 14
CORE/3522697.0002/169030070

**Appx. 00468**

## JURY DEMAND

105. Except to the extent compelled to arbitration, Defendant NREP demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

106. Defendant NREP does <u>not</u> consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant NREP respectfully requests that, following a trial on the merits, the Court enter a judgment that the Plaintiff take nothing on the Amended Complaint and provide Defendant NREP such other relief to which it is entitled**.**

Dated: September 1, 2021

Respectfully submitted,

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas State Bar No. 24036072
Michael P. Aigen
Texas State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR DEFENDANT HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC)**

DEFENDANT HCRE PARTNERS, LLC (N/K/A NexPoint Real Estate
PARTNERS, LLC)'S ANSWER TO AMENDED COMPLAINT                    PAGE 15
CORE/3522697.0002/169030070

Appx. 00469

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez

DEFENDANT HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE
PARTNERS, LLC)'S ANSWER TO AMENDED COMPLAINT                    PAGE 16
CORE/3522697.0002/169030070

Appx. 00470

# EXHIBIT 18

Appx. 00471

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
drukavina@munsch.com
jvasek@munsch.com

*Counsel for Highland Capital Management Fund Advisors, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 21-03004 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P. | § | |
| | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS
## FOR ADMISSIONS, INTERROGATORIES, AND REQUESTS FOR PRODUCTION

TO:  Highland Capital Management, L.P. through its counsel of record, Jeffrey Pomerantz and John Morris, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA 90067, jpomerantz@pszjlaw.com; jmorris@pszjlaw.com; Zachery Annable, Hayward PLLC, 10501 N. Central Expy., Ste. 106, Dallas, TX 75231, zannable@haywardfirm.com

Highland Capital Management Fund Advisors, L.P. ("HCMFA"), the defendant in the above-styled and numbered adversary proceeding, hereby makes the following objections and

---

DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS
FOR ADMISSIONS, INTERROGATORIES, AND REQUESTS FOR PRODUCTION                    Page **1** of 7

**Appx. 00472**

gives the following responses to the *Debtor's First Requests for Admissions Directed to Highland Capital Management Fund Advisors, L.P.*, the *Debtor's First Request for Production of Documents Directed to Highland Capital Management Fund Advisors, L.P.*, and the *Debtor's First Set of Interrogatories Directed to Highland Capital Management Fund Advisors, L.P.*, pursuant to Rules 33, 34, and 36 of the Federal Rules of Civil Procedure and Rules 7033, 7034, and 7036 of the Federal Rules of Bankruptcy Procedure.

## I.  REQUESTS FOR ADMISSIONS

**REQUEST FOR ADMISSION 1:**

Admit that attached as Exhibit A is a true and correct copy of the Note (a) executed by HCMFA, as maker, in favor of the Debtor, as payee, (b) dated May 2, 2019, (c) in the original principal amount of $2,400,000.

**RESPONSE:**  HCMFA admits only that the document attached as Exhibit A purports to be a note dated May 2, 2019 in the original principal amount of $2,400,000.  HCMFA denies that the note represents a legitimate debt, and HCMFA denies that Frank Waterhouse had the authority to execute the note on its behalf.  To the extent not expressly admitted, this request is denied.

**REQUEST FOR ADMISSION 2:**

Admit that attached as Exhibit B is a true and correct copy of the Note (a) executed by HCMFA, as maker, in favor of the Debtor, as payee, (b) dated May 3, 2019, (c) in the original principal amount of $5,000,000.

**RESPONSE:**  HCMFA admits only that the document attached as Exhibit B purports to be a note dated May 3, 2019 in the original principal amount of $5,000,000.  HCMFA denies that the note represents a legitimate debt, and HCMFA denies that Frank Waterhouse had the authority to execute the note on its behalf.  To the extent not expressly admitted, this request is denied.

**REQUEST FOR ADMISSION 3:**

Admit that attached as Exhibit C is the Debtor's Demand Letter to HCMFA demanding payment of the accrued interest and principal due on the Notes in the aggregate amount of $7,687,653.07 (the "Outstanding Amount"), by December 11, 2020.

**RESPONSE:**  HCMFA admits that Exhibit C is a true and correct copy of a letter the Debtor sent to HCMFA on or about December 11, 2020.  HCMFA denies that the letter had any legal effect.  To the extent not expressly admitted, this request is denied.

DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS FOR ADMISSIONS, INTERROGATORIES, AND REQUESTS FOR PRODUCTION                    Page **2** of 7

Appx. 00473

**REQUEST FOR ADMISSION 4:**

Admit that HCMFA has not paid the Debtor the Outstanding Amount.

**RESPONSE:** HCMFA denies that any amount is due and payable under the note. HCMFA admits that it has not paid the amount the Debtor demanded in its December 11, 2020 letter. To the extent not expressly admitted, this request is denied.

## II.    REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION 1:**

All Documents and Communications Concerning Your denial of any of the allegations set forth in paragraph 19 of the Complaint, including Your contention that "[t]o the extent not expressly admitted, ¶ 19 of the Complaint is denied," stated in paragraph 19 of the Answer.

**RESPONSE:** HCMFA will produce responsive, non-privileged documents from January 1, 2019 to present that are within its possession, custody, or control. HCMFA notes, however, that most responsive documents will likely be on the Debtor's servers, to which HCMFA does not have access. The Debtor therefore should encounter responsive documents in connection with responding to HCMFA's requests for production.

**REQUEST FOR PRODUCTION 2:**

All Documents and Communications Concerning Your denial of any of the allegations set forth in paragraph 20 of the Complaint. See paragraph 20 of the Answer.

**RESPONSE:** HCMFA will produce responsive, non-privileged documents from January 1, 2019 to present that are within its possession, custody, or control. HCMFA notes, however, that most responsive documents will likely be on the Debtor's servers, to which HCMFA does not have access. The Debtor therefore should encounter responsive documents in connection with responding to HCMFA's requests for production.

**REQUEST FOR PRODUCTION 3:**

All Documents and Communications Concerning Your denial of the allegation that "[p]ursuant to Section 4 of each Note, each Note is in default and is currently due and payable," as referenced in paragraph 24 of the Answer.

**RESPONSE:** HCMFA will produce responsive, non-privileged documents from January 1, 2019 to present that are within its possession, custody, or control. HCMFA notes, however, that most responsive documents will likely be on the Debtor's servers, to which HCMFA does not have access. The Debtor therefore should encounter responsive documents in connection with responding to HCMFA's requests for production.

DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS
FOR ADMISSIONS, INTERROGATORIES, AND REQUESTS FOR PRODUCTION          Page **3** of 7

Appx. 00474

**REQUEST FOR PRODUCTION 4:**

All Documents and Communications Concerning Your denial of the allegation that "[a]s a direct and proximate cause of HCMFA's breach of each Note, the Debtor has suffered damages in the total amount of at least $7,687,653.07 as of December 11, 2020, plus an amount equal to all accrued but unpaid interest from that date, plus the Debtor's cost of collection," as referenced in paragraph 29 of the Answer.

> **RESPONSE:** HCMFA will produce responsive, non-privileged documents from January 1, 2019 to present that are within its possession, custody, or control. HCMFA notes, however, that most responsive documents will likely be on the Debtor's servers, to which HCMFA does not have access. The Debtor therefore should encounter responsive documents in connection with responding to HCMFA's requests for production.

**REQUEST FOR PRODUCTION 5:**

All Documents and Communications Concerning Your denial of the allegation that "HCMFA has not paid the amounts due under each Note to the Debtor," as referenced in paragraph 33 of the Answer.

> **RESPONSE:** HCMFA will produce responsive, non-privileged documents from January 1, 2019 to present that are within its possession, custody, or control. HCMFA notes, however, that most responsive documents will likely be on the Debtor's servers, to which HCMFA does not have access. The Debtor therefore should encounter responsive documents in connection with responding to HCMFA's requests for production.

**REQUEST FOR PRODUCTION 6:**

All Documents and Communications Concerning Your denial that "[t]he Debtor has made demand for the turnover of the amounts due under each Note," as referenced in paragraph 34 of the Answer.

> **RESPONSE:** HCMFA will produce responsive, non-privileged documents from January 1, 2019 to present that are within its possession, custody, or control. HCMFA notes, however, that most responsive documents will likely be on the Debtor's servers, to which HCMFA does not have access. The Debtor therefore should encounter responsive documents in connection with responding to HCMFA's requests for production.

**REQUEST FOR PRODUCTION 7:**

All Documents and Communications Concerning any legal or equitable defense that You intend to assert in the above-referenced Adversary Proceeding.

> **RESPONSE:** HCMFA will produce responsive, non-privileged documents from January 1, 2019 to present that are within its possession, custody, or control. HCMFA notes, however, that most responsive documents will likely be on the Debtor's servers, to which HCMFA does not have access. The Debtor therefore should encounter responsive documents in connection with responding to HCMFA's requests for production.

DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS FOR ADMISSIONS, INTERROGATORIES, AND REQUESTS FOR PRODUCTION          Page **4** of **7**

Appx. 00475

**REQUEST FOR PRODUCTION 8:**

All Documents and Communications that You intend to offer into evidence in the above referenced Adversary Proceeding.

**RESPONSE:** HCMFA objects to this request to the extent it seeks to impose obligations that exceed those imposed by applicable law. HCMFA is still in the process of identifying documents and communications it will offer into evidence, and the parties have stipulated to a deadline for filing witness and exhibit lists (August 30, 2021). For the avoidance of doubt, documents responsive to this request will likely be responsive to other requests, in which case they will not be withheld elsewhere based on this objection.

## III.   INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify every person that You believe has personal knowledge of any legal or equitable defense that You intend to assert in the above-referenced Adversary Proceeding.

**RESPONSE:** HCMFA objects to this request to the extent it asks HCMFA to identify attorneys whose knowledge would be privileged. Subject to such objection, HCMFA identifies James Dondero, Frank Waterhouse, Jason Post, Thomas Surgent, Lauren Thedford, and Will Mabry.

**INTERROGATORY NO. 2:**

Identify each witness that You intend to call at the Hearing in this Adversary Proceeding.

**RESPONSE:** HCMFA objects to this request to the extent it seeks to impose obligations that exceed those imposed by applicable law. HCMFA is still in the process of identifying witnesses it will call at trial, and the parties have stipulated to a deadline for filing witness and exhibit lists (August 30, 2021). For the avoidance of doubt, individuals responsive to this request will likely be responsive to other interrogatories, in which case their identities will not be withheld elsewhere based on this objection.

## IV.   RESERVATION OF RIGHTS

HCMFA reserves the right to amend or supplement these written objections and responses at any time, consistent with the applicable Federal Rules of Civil Procedure.

RESPECTFULLY SUBMITTED this 19th day of May, 2021.

DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS
FOR ADMISSIONS, INTERROGATORIES, AND REQUESTS FOR PRODUCTION          Page **5** of **7**

Appx. 00476

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ *Julian P. Vasek*
_____
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
drukavina@munsch.com
jvasek@munsch.com

**COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on the 19th day of May, 2021, a true and correct copy of this document was electronically served via email on counsel for the Debtor (jpomerantz@pszjlaw.com; jmorriss@pszjlaw.com; zannable@haywardfirm.com).

/s/ *Julian P. Vasek*
_____
Julian P. Vasek, Esq.

DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS
FOR ADMISSIONS, INTERROGATORIES, AND REQUESTS FOR PRODUCTION          Page **6** of 7

Appx. 00477

<u>Verification</u>

STATE OF TEXAS     §
                      §

COUNTY OF DALLAS    §

        Before me, the undersigned notary, on this day personally appeared James Dondero, the affiant, whose identity is known to me. After I administered an oath, affiant testified as follows:

        "My name is James Dondero. I am capable of making this Verification. I have read the foregoing document. The facts stated in the answers to the interrogatories are within my personal knowledge and/or are based on information I obtained from other persons, and are true and correct."

                  Highland Capital Management Fund Advisors, L.P.

                  By:     Strand Advisors XVI, Inc., its General Partner

                  By:

                  Name:  James Dondero

                  Title:  Director

SUBSCRIBED AND SWORN TO BEFORE ME on this the _19th_ day of May, 2021.

                  Notary Public, State of Texas _Linda Lauchner_
                  My Commission Expires:  6/19/2

> LINDA LAUCHNER
> Notary Public, State of Texas
> Comm. Expires 06-19-2021
> Notary ID 1049001

Appx. 00478

# EXHIBIT 19

Appx. 00479

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
drukavina@munsch.com
jvasek@munsch.com

*Counsel for NexPoint Advisors, L.P*

<div align="center">

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

</div>

| | | |
|---|---|---|
| In re | § | |
| | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | Adv. No. 21-03005 |
| v. | § | |
| | § | |
| NEXPOINT ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

<div align="center">

**DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS
FOR ADMISSIONS, INTERROGATORIES, AND REQUESTS FOR PRODUCTION**

</div>

TO:    Highland Capital Management, L.P. through its counsel of record, Jeffrey Pomerantz and John Morris, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA  90067,  jpomerantz@pszjlaw.com;  jmorris@pszjlaw.com;  Zachery Annable, Hayward PLLC, 10501 N. Central Expy., Ste. 106, Dallas, TX 75231, zannable@haywardfirm.com

NexPoint Advisors, L.P. ("NexPoint"), the defendant in the above-styled and numbered adversary proceeding, hereby makes the following objections and gives the following responses

DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS
FOR ADMISSIONS, INTERROGATORIES, AND REQUESTS FOR PRODUCTION                          Page **1** of **8**

**Appx. 00480**

to the *Debtor's First Requests for Admissions Directed to NexPoint Advisors, L.P.*, the *Debtor's First Request for Production of Documents Directed to NexPoint Advisors, L.P.*, and the *Debtor's First Set of Interrogatories Directed to NexPoint Advisors, L.P.*, pursuant to Rules 33, 34, and 36 of the Federal Rules of Civil Procedure and Rules 7033, 7034, and 7036 of the Federal Rules of Bankruptcy Procedure.

## I. <u>REQUESTS FOR ADMISSIONS</u>

**REQUEST FOR ADMISSION 1:**

Admit that attached as **Exhibit A** is a true and correct copy of the Note (a) executed by NPA, as maker, in favor of the Debtor, as payee, (b) dated May 31, 2017, (c) in the original face amount of $30,746,812.33.

**RESPONSE:** Admitted.

**REQUEST FOR ADMISSION 2:**

Admit that on or about May 31, 2017, the Debtor paid $30,746,812.33 to NPA (or for its benefit) in exchange for the Note (the "<u>Consideration</u>").

**RESPONSE:** Denied.

**REQUEST FOR ADMISSION 3:**

Admit that attached as **Exhibit B** is the Debtor's January 7, 2021 demand letter (the "<u>Demand Letter</u>") to NPA demanding payment of the accrued interest and principal due, and any other amounts due on the Note, in the aggregate amount of $24,471,804.98 as of January 8, 2021.

**RESPONSE:** NexPoint admits that Exhibit B is a true and correct copy of a letter the Debtor sent to NexPoint on or about January 7, 2021. NexPoint denies the letter had any legal effect given that the Debtor caused NexPoint's alleged default. To the extent not expressly admitted, this request is denied.

**REQUEST FOR ADMISSION 4:**

Admit that, after receiving the Demand Letter, NPA never asked, requested, or demanded that the Debtor make any payments on the Note on behalf of NPA.

**RESPONSE:** NexPoint admits that it made no such express request, but NexPoint denies it had any obligation to request that the Debtor do something it was already obligated to do. To the extent not expressly admitted, this request is denied.

DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS
FOR ADMISSIONS, INTERROGATORIES, AND REQUESTS FOR PRODUCTION          Page **2** of **8**

Appx. 00481

**REQUEST FOR ADMISSION 5:**

Admit that (a) on January 14, 2021, NPA paid the Debtor $1,406,111.92 that was due under the Note on December 31, 2020 (the "January Payment"), and (b) the Debtor did nothing to assist or aid NPA in making the January Payment.

> **RESPONSE:** NexPoint admits that it made the January Payment but denies that the January Payment was past due through any fault of NexPoint. NexPoint admits that the Debtor wrongfully failed to assist NexPoint with making payments when due under the Note, including the January Payment. To the extent not expressly admitted, this request is denied.

**REQUEST FOR ADMISSION 6:**

Admit that attached as **Exhibit C** is the Debtor's January 15, 2021 demand letter (the "Second Demand Letter") to NPA demanding payment of the accrued interest and principal due, and any other amounts due on the Note, in the aggregate amount of $23,071,195.03 as of January 15, 2021 (the "Outstanding Amount").

> **RESPONSE:** NexPoint admits that Exhibit C is a true and correct copy of a letter the Debtor sent to NexPoint on or about January 15, 2021. NexPoint denies the letter had any legal effect given that the Debtor caused NexPoint's alleged default. To the extent not expressly admitted, this request is denied.

**REQUEST FOR ADMISSION 7:**

Admit that, as of January 22, 2021, NPA has not paid the Debtor the Outstanding Amount.

> **RESPONSE:** NexPoint denies that any amount is due and payable under the note. NexPoint admits that it has not paid the balance owing under the note, as such balance is not due. To the extent not expressly admitted, this request is denied.

## II.   REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION 1:**

All Documents and Communications Concerning Your contention that "Plaintiff was responsible for making payments on behalf of the Defendant under the [N]ote," as alleged in paragraph 39 of the Answer.

> **RESPONSE:** NexPoint will produce responsive, non-privileged documents from May 31, 2017 to present that are within its possession, custody, or control. NexPoint notes, however, that most responsive documents will likely be on the Debtor's servers, to which NexPoint does not have access. The Debtor therefore should encounter responsive documents in connection with responding to NexPoint's requests for production.

DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS
FOR ADMISSIONS, INTERROGATORIES, AND REQUESTS FOR PRODUCTION          Page **3** of **8**

Appx. 00482

**REQUEST FOR PRODUCTION 2:**

All Documents and Communications Concerning Your contention that "[a]ny alleged default under the [N]ote was the result of Plaintiff's own negligence, misconduct, breach of contract, etc.," as alleged in paragraph 39 of the Answer.

> **RESPONSE:** NexPoint will produce responsive, non-privileged documents from May 31, 2017 to present that are within its possession, custody, or control. NexPoint notes, however, that most responsive documents will likely be on the Debtor's servers, to which NexPoint does not have access. The Debtor therefore should encounter responsive documents in connection with responding to NexPoint's requests for production.

**REQUEST FOR PRODUCTION 3:**

All Documents and Communications Concerning Your contention that "the brief delay in payment was the Plaintiff's own fault," as alleged in paragraph 40 of the Answer.

> **RESPONSE:** NexPoint will produce responsive, non-privileged documents from May 31, 2017 to present that are within its possession, custody, or control. NexPoint notes, however, that most responsive documents will likely be on the Debtor's servers, to which NexPoint does not have access. The Debtor therefore should encounter responsive documents in connection with responding to NexPoint's requests for production.

**REQUEST FOR PRODUCTION 4:**

All Documents and Communications Concerning the affirmative defenses of "waiver" or "estoppel." *See* Answer ¶ 41.

> **RESPONSE:** NexPoint will produce responsive, non-privileged documents from May 31, 2017 to present that are within its possession, custody, or control. NexPoint notes, however, that most responsive documents will likely be on the Debtor's servers, to which NexPoint does not have access. The Debtor therefore should encounter responsive documents in connection with responding to NexPoint's requests for production.

**REQUEST FOR PRODUCTION 5:**

All Documents and Communications Concerning the Default Letter, including but not limited to any subsequent request or demand by NPA that the Debtor make the payment demanded under the Note on Your behalf.

> **RESPONSE:** NexPoint will produce responsive, non-privileged documents from May 31, 2017 to present that are within its possession, custody, or control. NexPoint notes, however, that most responsive documents will likely be on the Debtor's servers, to which NexPoint does not have access. The Debtor therefore should encounter responsive documents in connection with responding to NexPoint's requests for production.

DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS
FOR ADMISSIONS, INTERROGATORIES, AND REQUESTS FOR PRODUCTION                Page **4** of **8**

**Appx. 00483**

**REQUEST FOR PRODUCTION 6:**

All Documents and Communications that You intend to offer into evidence in this Adversary Proceeding.

**RESPONSE:** NexPoint objects to this request to the extent it seeks to impose obligations that exceed those imposed by applicable law. NexPoint is still in the process of identifying documents and communications it will offer into evidence, and the parties have stipulated to a deadline for filing witness and exhibit lists (July 26, 2021). For the avoidance of doubt, documents responsive to this request will likely be responsive to other requests, in which case they will not be withheld elsewhere based on this objection.

## III. INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify each person who You believe has personal knowledge of any facts Concerning Your contention that "Plaintiff was responsible for making payments on behalf of the Defendant under the [N]ote," as alleged in paragraph 39 of the Answer.

**RESPONSE:** Frank Waterhouse and James Dondero.

**INTERROGATORY NO. 2:**

Identify each person who You believe has personal knowledge of any facts to Concerning Your contention that "[a]ny alleged default under the [N]ote was the result of Plaintiff's own negligence, misconduct, breach of contract, etc.," as alleged in paragraph 39 of the Answer.

**RESPONSE:** Frank Waterhouse and James Dondero.

**INTERROGATORY NO. 3:**

Identify each person who You believe has personal knowledge of any facts Concerning Your contention that "the brief delay in payment was the Plaintiff's own fault," as alleged in paragraph 40 of the Answer.

**RESPONSE:** Frank Waterhouse and James Dondero.

**INTERROGATORY NO. 4:**

Identify each person who You believe has personal knowledge of any facts Concerning Your contention that "the brief delay in payment was the Plaintiff's own fault," as alleged in paragraph 40 of the Answer.

**RESPONSE:** Frank Waterhouse and James Dondero.

DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS
FOR ADMISSIONS, INTERROGATORIES, AND REQUESTS FOR PRODUCTION          Page **5** of **8**

**Appx. 00484**

**INTERROGATORY NO. 5:**

Identify each person who You believe has personal knowledge of any facts Concerning Your response to the Demand Letter, including but not limited to any subsequent request or demand by NPA that the Debtor make the payment demanded under the Note on Your behalf, if any.

**RESPONSE:** Frank Waterhouse and James Dondero.

**INTERROGATORY NO. 6:**

Identify each witness that You intend to call at trial in this Adversary Proceeding.

**RESPONSE:** NexPoint objects to this request to the extent it seeks to impose obligations that exceed those imposed by applicable law. NexPoint is still in the process of identifying witnesses it will call at trial, and the parties have stipulated to a deadline for filing witness and exhibit lists (July 26, 2021). For the avoidance of doubt, names responsive to this request will likely be responsive to other requests, in which case they will not be withheld elsewhere based on this objection.

## IV.    RESERVATION OF RIGHTS

NexPoint reserves the right to amend or supplement these written objections and responses at any time, consistent with the applicable Federal Rules of Civil Procedure.

RESPECTFULLY SUBMITTED this 3rd day of May, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By:  /s/  Davor Rukavina
 Davor Rukavina, Esq.
 Texas Bar No. 24030781
 Julian P. Vasek, Esq.
 Texas Bar No. 24070790
 500 N. Akard Street, Suite 3800
 Dallas, Texas  75202-2790
 Telephone: (214) 855-7500
 Facsimile: (214) 978-4375
 drukavina@munsch.com
 jvasek@munsch.com

**COUNSEL FOR NEXPOINT ADVISORS, L.P.**

DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS FOR ADMISSIONS, INTERROGATORIES, AND REQUESTS FOR PRODUCTION                Page **6** of 8

Appx. 00485

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on the 3rd day of May, 2021, a true and correct copy of this document was electronically served via email on counsel for the Debtor (jpomerantz@pszjlaw.com; jmorriss@pszjlaw.com; zannable@haywardfirm.com).

/s/ Davor Rukavina
Davor Rukavina, Esq.

DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS
FOR ADMISSIONS, INTERROGATORIES, AND REQUESTS FOR PRODUCTION     Page **7** of **8**

Appx. 00486

<u>Verification</u>

STATE OF TEXAS       §
                                 §

COUNTY OF DALLAS____ §

        Before me, the undersigned notary, on this day personally appeared _____, the affiant, whose identity is known to me. After I administered an oath, affiant testified as follows:

        "My name is _____. I am capable of making this Verification. I have read the foregoing document. The facts stated in the answers to the interrogatories are within my personal knowledge and/or are based on information I obtained from other persons, and are true and correct."

        NexPoint Advisors, L.P.

        By: _____

        Title: _____

SUBSCRIBED AND SWORN TO BEFORE ME on this the ____ day of May, 2021.

        _____
        Notary Public, State of Texas
        My Commission Expires: _____

DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS
FOR ADMISSIONS, INTERROGATORIES, AND REQUESTS FOR PRODUCTION      Page **8** of 8
4845-9657-9815v.2 019717.00001

Appx. 00487

# EXHIBIT 20

Appx. 00488

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR HIGHLAND CAPITAL**
**MANAGEMENT SERVICES, INC.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | **Chapter 11** |
| **L.P.** | § | |
| | § | **Case No.: 19-34054-sgj11** |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P.** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| vs. | § | **Adv. Pro. No. 21-03006-sgj** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT** | § | |
| **SERVICES, INC.,** | § | |
| | § | |
| **Defendant.** | § | |

## DEFENDANT HIGHLAND CAPITAL MANAGEMENT
## SERVICES, INC.'S RESPONSES TO HIGHLAND CAPITAL
## MANAGEMENT, L.P.'S FIRST REQUESTS FOR ADMISSION

Defendant Highland Capital Management Services, Inc.'s ("Defendant" or "HCMS")
hereby responds to Highland Capital Management, L.P.'s (the "Debtor") First Requests for
Admission as follows:

D-CNL003076
**Appx. 00489**

## RESPONSES TO FIRST REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 1**: Admit that attached as **Exhibit A** is a true and correct copy of the Demand Note (a) executed by HCMS, as maker, in favor of the Debtor, as payee, (b) dated March 28, 2018, (c) in the original principal amount of $150,000.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 2**: Admit that attached as **Exhibit B** is a true and correct copy of the Demand Note (a) executed by HCMS, as maker, in favor of the Debtor, as payee, (b) dated June 25, 2018, (c) in the original principal amount of $200,000.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 3**: Admit that attached as **Exhibit C** is a true and correct copy of the Demand Note (a) executed by HCMS, as maker, in favor of the Debtor, as payee, (b) dated May 29, 2019, (c) in the original principal amount of $400,000.

**RESPONSE:** Deny.

**REQUEST FOR ADMISSION NO. 4**: Admit that attached as **Exhibit D** is a true and correct copy of the Demand Note (a) executed by HCMS, as maker, in favor of the Debtor, as payee, (b) dated June 26, 2019, (c) in the original principal amount of $150,000.

**RESPONSE:** Deny.

**REQUEST FOR ADMISSION NO. 5**: Admit that attached as **Exhibit E** is a true and correct copy of the Term Note (a) executed by HCMS, as maker, in favor of the Debtor, as payee, (b) dated May 31, 2017, (c) in the original principal amount of $20,247,628.02.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 6**: Admit that attached as **Exhibit F** is a true and correct copy of the Debtor's First Demand Letter to HCMS demanding payment of the accrued interest and principal due on the Demand Notes in the aggregate amount of $947,519.43 by December 11, 2020.

**RESPONSE:** HCMS admits that Exhibit F purports to be a letter from Debtor to HCMS dated December 3, 2020, demanding HCMS pay $947,519.43 by December 11, 2020, and the Debtor alleged such amount constituted accrued interest and payment on certain promissory notes issued 3/28/2018, 6/25/2018, 5/29/2019, and 6/26/2019.

**REQUEST FOR ADMISSION NO. 7**: Admit that attached as **Exhibit G** is a true and correct copy of the Debtor's Second Demand Letter to HCMS demanding immediate payment of the accrued interest, principal, and all other amounts due on the Term Note in the aggregate amount of $6,757,248.95.

DEFENDANT HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.'S RESPONSES TO
HIGHLAND CAPITAL MANAGEMENT, L.P.'S FIRST REQUESTS FOR ADMISSION

PAGE 2 OF 4

D-CNL003077

**Appx. 00490**

**RESPONSE:** HCMS admits that Exhibit G purports to be a letter from Debtor to HCMS dated January 7, 2021, demanding HCMS immediately pay $6,757,248.95, and the Debtor alleged such amount constituted accrued principal, interest, and any other amounts due on a certain promissory note dated May 31, 2017.

**REQUEST FOR ADMISSION NO. 8**:      Admit that the Debtor does not owe any debt or obligation to HCMS arising from, concerning, or otherwise relating to any of the Demand Notes.

**RESPONSE:** Deny.

<div style="margin-left: 40%;">

Respectfully submitted,

*/s/ Lauren K. Drawhorn*
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email:  jason.rudd@wickphillips.com
            lauren.drawhorn@wickphillips.com

**COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.**

</div>

D-CNL003078
**Appx. 00491**

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on June 14, 2021, a true and correct copy of the foregoing document was served via email on counsel for the Debtor.

Jeffrey N. Pomerantz
jpomerantz@pszjlaw.com
John A. Morris
jmorris@pszjlaw.com
Gregory V. Demo
gdemo@pszjlaw.com
Hayley R. Winograd
hwinograd@pszjlaw.com
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067
Facsimile: (310) 201-0760
*Counsel for Highland Capital Management, L.P.*

Melissa S. Hayward
MHayward@HaywardFirm.com
Zachery Z. Annable
ZAnnable@HaywardFirm.com
HAYWARD PLLC
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Fax: (972) 755-7110

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

D-CNL003079
**Appx. 00492**

# EXHIBIT 21

Appx. 00493

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR HIGHLAND CAPITAL**
**MANAGEMENT SERVICES, INC.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | **Chapter 11** |
| **L.P.** | § | |
| | § | **Case No.: 19-34054-sgj11** |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P.** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | **Adv. Pro. No. 21-03006-sgj** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT** | § | |
| **SERVICES, INC.,** | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT HIGHLAND CAPITAL MANAGEMENT
## SERVICES, INC.'S ANSWERS TO HIGHLAND CAPITAL
## MANAGEMENT, L.P.'S FIRST SET OF INTERROGATORIES

Defendant Highland Capital Management Services, Inc.'s ("Defendant" or "HCMS") hereby responds to Highland Capital Management, L.P.'s (the "Debtor") First Set of Interrogatories as follows:

**DEFENDANT HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.'S ANSWERS TO
HIGHLAND CAPITAL MANAGEMENT, L.P.'S FIRST SET OF INTERROGATORIES**

**PAGE 1 OF 5**

D-CNL003071

**Appx. 00494**

## ANSWERS TO FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1:** Identify every person that You believe has personal knowledge of the facts and circumstances Concerning Your affirmative defense that the Debtor's claims are "barred in whole or in part by the doctrine of justification and/or repudiation," as alleged in paragraph 53 of the Answer.

**ANSWER:** HCMS believes the following persons have knowledge of the facts and circumstances surrounding HCMS' justification and/or repudiation defense:

**Corporate representative of HCMS**
c/o WICK PHILLIPS GOULD & MARTIN LLP,
Attn: Lauren K. Drawhorn
100 Throckmorton St., Suite 1500
Fort Worth, TX 76102

**Corporate representative of Debtor**
c/o PACHULSKI STANG ZIEHL & JONES, LLP, Attn: John Morris
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

**James Dondero**
c/o BONDS ELLIS EPPIC SHAFER JONES LLP
Attn: Clay M. Taylor and Bryan C. Assink
420 Throckmorton St., Suite 1000
Fort Worth, Texas 76102

**Frank Waterhouse**
c/o Ross & Smith PC
Attn: Frances Smith
700 N. Pearl Street, Suite 1610
Dallas, TX 75201

**Kristin Hendrix**
c/o PACHULSKI STANG ZIEHL & JONES, LLP, Attn: John Morris
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

**David Klos**
c/o PACHULSKI STANG ZIEHL & JONES, LLP, Attn: John Morris
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

**INTERROGATORY NO. 2:** Identify every person that You believe has personal knowledge of the facts and circumstances Concerning Your affirmative defense that the Debtor's "claims are barred in whole or in part by the doctrine of estoppel," as alleged in paragraph 54 of the Answer.

DEFENDANT HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.'S ANSWERS TO
HIGHLAND CAPITAL MANAGEMENT, L.P.'S FIRST SET OF INTERROGATORIES

PAGE 2 OF 5

D-CNL003072
**Appx. 00495**

**ANSWER:** HCMS believes the following persons have knowledge of the facts and circumstances surrounding HCMS' estoppel defense:

> **Corporate representative of HCMS**
> c/o WICK PHILLIPS GOULD & MARTIN LLP,
> Attn: Lauren K. Drawhorn
> 100 Throckmorton St., Suite 1500
> Fort Worth, TX 76102
>
> **Corporate representative of Debtor**
> c/o PACHULSKI STANG ZIEHL & JONES, LLP, Attn: John Morris
> 10100 Santa Monica Blvd., 13th Floor
> Los Angeles, CA 90067
>
> **James Dondero**
> c/o BONDS ELLIS EPPIC SHAFER JONES LLP
> Attn: Clay M. Taylor and Bryan C. Assink
> 420 Throckmorton St., Suite 1000
> Fort Worth, Texas 76102
>
> **Frank Waterhouse**
> c/o Ross & Smith PC
> Attn: Frances Smith
> 700 N. Pearl Street, Suite 1610
> Dallas, TX 75201
>
> **Kristin Hendrix**
> c/o PACHULSKI STANG ZIEHL & JONES, LLP, Attn: John Morris
> 10100 Santa Monica Blvd., 13th Floor
> Los Angeles, CA 90067
>
> **David Klos**
> c/o PACHULSKI STANG ZIEHL & JONES, LLP, Attn: John Morris
> 10100 Santa Monica Blvd., 13th Floor
> Los Angeles, CA 90067

**INTERROGATORY NO. 3:** Identify every person that You believe has personal knowledge of the facts and circumstances Concerning Your affirmative defense that the Debtor's "claims are barred in whole or in part by the doctrine of waiver," as alleged in paragraph 55 of the Answer.

**ANSWER:** HCMS believes the following persons have knowledge of the facts and circumstances surrounding HCMS' waiver defense:

---

DEFENDANT HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.'S ANSWERS TO HIGHLAND CAPITAL MANAGEMENT, L.P.'S FIRST SET OF INTERROGATORIES

PAGE 3 OF 5

D-CNL003073

**Appx. 00496**

**Corporate representative of HCMS**
c/o Wick Phillips Gould & Martin LLP,
Attn: Lauren K. Drawhorn
100 Throckmorton St., Suite 1500
Fort Worth, TX 76102

**Corporate representative of Debtor**
c/o Pachulski Stang Ziehl & Jones, LLP, Attn: John Morris
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

**James Dondero**
c/o Bonds Ellis Eppic Shafer Jones LLP
Attn: Clay M. Taylor and Bryan C. Assink
420 Throckmorton St., Suite 1000
Fort Worth, Texas 76102

**Frank Waterhouse**
c/o Ross & Smith PC
Attn: Frances Smith
700 N. Pearl Street, Suite 1610
Dallas, TX 75201

**Kristin Hendrix**
c/o Pachulski Stang Ziehl & Jones, LLP, Attn: John Morris
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

**David Klos**
c/o Pachulski Stang Ziehl & Jones, LLP, Attn: John Morris
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

**INTERROGATORY NO. 4:**     Identify every person that You believe has personal knowledge of the facts and circumstances Concerning Your affirmative defense that the Debtor's "claims are barred in whole or in part by the doctrines of offset and/or setoff," as alleged in paragraph 56 of the Answer.

**ANSWER:**     HCMS withdraws its affirmative defense of offset and/or setoff.

**INTERROGATORY NO. 5:**     Identify every debt and obligation that You contend the Debtor owes to You and is subject to "offset and/or setoff," as alleged in paragraph 56 of the Answer, including (a) the amount of the debt or obligation, (b) the date the debt or obligation was incurred, (c) the proof of claim in which You asserted a right to recover on the debt or obligation, if any, (d) the person who authorized the Debtor to incur the debt or obligation, and (e) the facts and circumstances concerning the Debtor's accrual of such debt or obligation.

**ANSWER:**     HCMS withdraws its affirmative defense of offset and/or setoff.

D-CNL003074
Appx. 00497

**INTERROGATORY NO. 6:**    Identify each witness that You intend to call at trial in this Adversary Proceeding.

**ANSWER:**    HCMS will provide its list of witnesses within the time required under the Federal Rules of Civil Procedures, the agreed-upon Scheduling Order in this case, and the Local Rules for the United States Bankruptcy Court for the Northern District of Texas.

Respectfully submitted,

*/s/ Lauren K. Drawhorn*
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email: jason.rudd@wickphillips.com
            lauren.drawhorn@wickphillips.com

**COUNSEL FOR HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.**

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on June 14, 2021, a true and correct copy of the foregoing document was served via email on counsel for the Debtor.

Jeffrey N. Pomerantz
jpomerantz@pszjlaw.com
John A. Morris
jmorris@pszjlaw.com
Gregory V. Demo
gdemo@pszjlaw.com
Hayley R. Winograd
hwinograd@pszjlaw.com
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067
Facsimile: (310) 201-0760
*Counsel for Highland Capital Management, L.P.*

Melissa S. Hayward
MHayward@HaywardFirm.com
Zachery Z. Annable
ZAnnable@HaywardFirm.com
HAYWARD PLLC
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Fax: (972) 755-7110

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

D-CNL003075
**Appx. 00498**

# EXHIBIT 22

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR NEXPOINT REAL ESTATE
PARTNERS, LLC F/K/A HCRE PARTNERS, LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | |
| | § | **Case No.: 19-34054-sgj11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | **Adv. Pro. No. 21-03007-sgj** |
| vs. | § | |
| | § | |
| **HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC),** | § | |
| | § | |
| | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A
## HCRE PARTNERS, LLC'S RESPONSES TO DEBTOR HIGHLAND
## CAPITAL MANAGEMENT, L.P.'S REQUEST FOR ADMISSIONS

To:     Highland Capital Management, L.P., by and through its attorneys of record, John Morris, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California 90067

Defendant NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC's ("Defendant" or "NREP") responds as follows to Highland Capital Management, L.P.'s

**DEFENDANT NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC'S
RESPONSES TO DEBTOR HIGHLAND CAPITAL MANAGEMENT, L.P.'S REQUEST FOR
ADMISSIONS**        **PAGE 1 OF 6**

Appx. 00500

("HCMLP") Request for Admissions. NREP specifically reserves the right to reasonably supplement and amend any and all of its responses, answers, and objections in accordance with the Federal Rules of Bankruptcy Procedure and Federal Rules of Civil Procedure.

## RESPONSES TO REQUEST FOR ADMISSIONS

**REQUEST FOR ADMISSION NO. 1**: Admit that attached as **Exhibit 1** to the Complaint is a true and correct copy of a Demand Note (a) executed by James Dondero on Your behalf, as maker, in favor of the Debtor, as payee, (b) dated November 27, 2013, (c) in the original face amount of $100,000 (the "November 2013 Note").

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 2**: Admit that on or about November 27, 2013, the Debtor paid $100,000 to You (or for Your benefit) in exchange for the November 2013 Note.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 3**: Admit that on or about November 27, 2013, the Debtor transferred $100,000 to an account for Your benefit.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 4**: Admit that attached as **Exhibit 2** to the Complaint is a true and correct copy of a Demand Note (a) executed by James Dondero on Your behalf, as maker, in favor of the Debtor, as payee, (b) dated October 12, 2017, (c) in the original face amount of $2,500,000 (the "October 2017 Note").

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 5**: Admit that on or about October 12, 2017, the Debtor paid $2,500,000 to You (or for Your benefit) in exchange for the October 2017 Note.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 6**: Admit that on or about October 12, 2017, the Debtor transferred $2,500,000 to an account for Your benefit.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 7**: Admit that attached as **Exhibit 3** to the Complaint is a true and correct copy of a Demand Note (a) executed by James Dondero on Your behalf, as maker, in favor of the Debtor, as payee, (b) dated October 15, 2018, (c) in the original face amount of $750,000 (the "October 2018 Note").

**DEFENDANT NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC'S RESPONSES TO DEBTOR HIGHLAND CAPITAL MANAGEMENT, L.P.'S REQUEST FOR ADMISSIONS**     **PAGE 2 OF 6**

Appx. 00501

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 8**:     Admit that on or about October 15, 2018, the Debtor paid $750,000 to You (or for Your benefit) in exchange for the October 2018 Note.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 9**:     Admit that on or about October 15, 2018, the Debtor transferred $750,000 to an account for Your benefit.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 10**:     Admit that attached as **Exhibit 4** to the Complaint is a true and correct copy of a Demand Note (a) executed by James Dondero on Your behalf, as maker, in favor of the Debtor, as payee, (b) dated September 25, 2019, (c) in the original face amount of $900,000 (the "September 2019 Note").

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 11**:     Admit that on or about September 25, 2019, the Debtor paid $900,000 to You (or for Your benefit) in exchange for the September 2019 Note.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 12**:     Admit that on or about September 25, 2019, the Debtor transferred $900,000 to an account for Your benefit.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 13**:     Admit that attached as Exhibit 6 to the Complaint is a true and correct copy of the Term Note (a) executed by James Dondero on Your behalf, as maker, in favor of the Debtor, as payee, (b) dated May 31, 2017, (c) in the original face amount of $6,059,831.

**RESPONSE:** Deny.

**REQUEST FOR ADMISSION NO. 14**:     Admit that You gave the Term Note to the Debtor in consideration for the Debtor's agreement to cancel and extinguish each of the Prior Notes (as defined in the Term Note and as specifically identified in Exhibit A to the Term Note), including all obligations then due and owing under each of the Prior Notes.

**RESPONSE:** NREP admits the Term Note substituted for and superseded in their entirety certain promissory notes described in Exhibit A to the Term Note. NREP denies the remainder of this Request.

DEFENDANT NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC'S          PAGE 3 OF 6
RESPONSES TO DEBTOR HIGHLAND CAPITAL MANAGEMENT, L.P.'S REQUEST FOR
ADMISSIONS

Appx. 00502

**REQUEST FOR ADMISSION NO. 15**:    Admit that attached as **Exhibit 5** to the Complaint is the Debtor's December 3, 2020 demand letter (the "Demand Letter") to You demanding payment of the accrued interest and principal due and payable on the Demand Notes in the aggregate amount of $5,0012,260.96 (the "Outstanding Amount").

**RESPONSE:** Deny.

**REQUEST FOR ADMISSION NO. 16**:    Admit that as of May 31, 2021, You have not paid the Debtor the Outstanding Amount.

**RESPONSE:** NREP admits only that NREP has not paid the Debtor the amount the Debtor asserts is due on the Demand Notes in the amount of $5,012,260.96. NREP denies the remainder of this Request.

**REQUEST FOR ADMISSION NO. 17**:    Admit that You have not paid any amounts due under any of the Demands Notes since December 3, 2020.

**RESPONSE:** Deny.

**REQUEST FOR ADMISSION NO. 18**:    Admit that attached as **Exhibit 7** to the Complaint is the Debtor's January 7, 2021 default letter (the "Default Letter") to You demanding payment of the accrued interest and principal due and payable on the Term Note in the amount of $6,145,466.84 (the "Unpaid Term Loan Amount").

**RESPONSE:** NREP admits that Exhibit 7 to the Complaint purports to be a letter from Debtor dated January 7, 2021 alleging NREP is in default under the Term Note and demanding NREP pay $6,145,466.84, and the Debtor alleged such amount constituted accrued interest and principal due and payable on the Term Note.

**REQUEST FOR ADMISSION NO. 19**:    Admit that as of May 31, 2021, You have not paid the Debtor the Unpaid Term Loan Amount.

**RESPONSE:** NREP admits only that NREP has not paid the Debtor the amount the Debtor asserts is due on the Term Note in the amount of $5,012,260.96. NREP denies the remainder of this Request.

**REQUEST FOR ADMISSION NO. 20**:    Admit that on or about December 31, 2017, You paid the Annual Installment then due under the Term Note.

**RESPONSE:** NREP admits that payment was made on the Term Note on or around December 31, 2017.

**REQUEST FOR ADMISSION NO. 21**:    Admit that on or about December 31, 2018, You paid the Annual Installment then due under the Term Note.

**RESPONSE:** NREP admits that payment was made on the Term Note on or around December 19, 2018.

DEFENDANT NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC'S            PAGE 4 OF 6
RESPONSES TO DEBTOR HIGHLAND CAPITAL MANAGEMENT, L.P.'S REQUEST FOR
ADMISSIONS

Appx. 00503

**REQUEST FOR ADMISSION NO. 22**:    Admit that on or about December 31, 2019, You paid the Annual Installment then due under the Term Note.

**RESPONSE:** NREP admits that payment was made on the Term Note on or around December 30, 2019.

**REQUEST FOR ADMISSION NO. 23**:    Admit that You failed to pay the Annual Installment due under the Term Note on December 31, 2020.

**RESPONSE:** Deny.

<div align="center">

Respectfully submitted,

</div>

*/s/ Lauren K. Drawhorn*
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email:  jason.rudd@wickphillips.com
            lauren.drawhorn@wickphillips.com

**COUNSEL FOR NEXPOINT REAL ESTATE PARTNERS, LLC'S F/K/A HCRE PARTNERS, LLC**

DEFENDANT NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC'S
RESPONSES TO DEBTOR HIGHLAND CAPITAL MANAGEMENT, L.P.'S REQUEST FOR
ADMISSIONS

PAGE 5 OF 6

Appx. 00504

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that, on July 6, 2021, a true and correct copy of the foregoing document was served via email on counsel for the Debtor.

Jeffrey N. Pomerantz
jpomerantz@pszjlaw.com
John A. Morris
jmorris@pszjlaw.com
Gregory V. Demo
gdemo@pszjlaw.com
Hayley R. Winograd
hwinograd@pszjlaw.com
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067
Facsimile: (310) 201-0760
*Counsel for Highland Capital Management, L.P.*

Melissa S. Hayward
MHayward@HaywardFirm.com
Zachery Z. Annable
ZAnnable@HaywardFirm.com
HAYWARD PLLC
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Fax: (972) 755-7110

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

**DEFENDANT NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC'S RESPONSES TO DEBTOR HIGHLAND CAPITAL MANAGEMENT, L.P.'S REQUEST FOR ADMISSIONS**      **PAGE 6 OF 6**

Appx. 00505

# EXHIBIT 23

Appx. 00506

Jason M. Rudd
Texas State Bar No. 24028786
jason.rudd@wickphillips.com
Lauren K. Drawhorn
Texas State Bar No. 24074528
lauren.drawhorn@wickphillips.com
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255

**COUNSEL FOR NEXPOINT REAL ESTATE
PARTNERS, LLC F/K/A HCRE PARTNERS, LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | § | |
| | § | **Case No.: 19-34054-sgj11** |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | **Adv. Pro. No. 21-03007-sgj** |
| vs. | § | |
| | § | |
| HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC), | § | |
| | § | |
| | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A
## HCRE PARTNERS, LLC'S ANSWERS TO DEBTOR HIGHLAND
## CAPITAL MANAGEMENT, L.P.'S FIRST SET OF INTERROGATORIES

To: Highland Capital Management, L.P., by and through its attorneys of record, John Morris, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California 90067

Defendant NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC's

("<u>Defendant</u>" or "<u>NREP</u>") responds as follows to Highland Capital Management, L.P.'s

**DEFENDANT NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC'S**
**ANSWERS TO DEBTOR HIGHLAND CAPITAL MANAGEMENT, L.P.'S FIRST SET OF**
**INTERROGATORIES**

**PAGE 1 OF 6**

**Appx. 00507**

("HCMLP") First Set of Interrogatories. NREP specifically reserves the right to reasonably supplement and amend any and all of its responses, answers, and objections in accordance with the Federal Rules of Bankruptcy Procedure and Federal Rules of Civil Procedure.

## ANSWERS TO FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1:** Identify each person who You believe has actual knowledge Concerning the (a) preparation, (b) purpose, and (c) execution of each of the Demand Notes, including any such person's last known contact information.

**ANSWER:** NREP believes the following persons may have knowledge of the facts and circumstances surrounding the Demand Notes:

> **Corporate representative of NREP**
> c/o WICK PHILLIPS GOULD & MARTIN LLP,
> Attn: Lauren K. Drawhorn
> 100 Throckmorton St., Suite 1500
> Fort Worth, TX 76102

> **Corporate representative of Debtor**
> c/o PACHULSKI STANG ZIEHL & JONES, LLP, Attn: John Morris
> 10100 Santa Monica Blvd., 13th Floor
> Los Angeles, CA 90067

> **James Dondero**
> c/o BONDS ELLIS EPPIC SHAFER JONES LLP
> Attn: Clay M. Taylor and Bryan C. Assink
> 420 Throckmorton St., Suite 1000
> Fort Worth, TX 76102

> **Frank Waterhouse**
> c/o Ross & Smith PC
> Attn: Frances Smith
> 700 N. Pearl Street, Suite 1610
> Dallas, TX 75201

> **Kristin Hendrix**
> c/o PACHULSKI STANG ZIEHL & JONES, LLP, Attn: John Morris
> 10100 Santa Monica Blvd., 13th Floor
> Los Angeles, CA 90067

> **David Klos**
> c/o PACHULSKI STANG ZIEHL & JONES, LLP, Attn: John Morris
> 10100 Santa Monica Blvd., 13th Floor
> Los Angeles, CA 90067

DEFENDANT NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC'S
ANSWERS TO DEBTOR HIGHLAND CAPITAL MANAGEMENT, L.P.'S FIRST SET OF
INTERROGATORIES

PAGE 2 OF 6

Appx. 00508

**Scott Ellington**
c/o ROSS & SMITH PC
Attn: Frances Smith
700 N. Pearl Street, Suite 1610
Dallas, TX 75201

**John Honis**
Tel: 214-335-7969

**INTERROGATORY NO. 2:** Identify each person who You believe has actual knowledge Concerning the (a) preparation, (b) purpose, and (c) execution of the Term Note, including any such person's last known contact information.

**ANSWER:** NREP believes the following persons may have knowledge of the facts and circumstances surrounding the Term Note:

**Corporate representative of NREP**
c/o WICK PHILLIPS GOULD & MARTIN LLP,
Attn: Lauren K. Drawhorn
100 Throckmorton St., Suite 1500
Fort Worth, TX 76102

**Corporate representative of Debtor**
c/o PACHULSKI STANG ZIEHL & JONES, LLP, Attn: John Morris
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

**James Dondero**
c/o BONDS ELLIS EPPIC SHAFER JONES LLP
Attn: Clay M. Taylor and Bryan C. Assink
420 Throckmorton St., Suite 1000
Fort Worth, TX 76102

**Frank Waterhouse**
c/o Ross & Smith PC
Attn: Frances Smith
700 N. Pearl Street, Suite 1610
Dallas, TX 75201

**Kristin Hendrix**
c/o PACHULSKI STANG ZIEHL & JONES, LLP, Attn: John Morris
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

DEFENDANT NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC'S
ANSWERS TO DEBTOR HIGHLAND CAPITAL MANAGEMENT, L.P.'S FIRST SET OF
INTERROGATORIES

PAGE 3 OF 6

Appx. 00509

**David Klos**
c/o PACHULSKI STANG ZIEHL & JONES, LLP, Attn: John Morris
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

**Scott Ellington**
c/o ROSS & SMITH PC
Attn: Frances Smith
700 N. Pearl Street, Suite 1610
Dallas, TX 75201

**John Honis**
Tel: 214-335-7969

**INTERROGATORY NO. 3:**      Identify each person who You believe has actual knowledge of any facts Concerning any of the affirmative defenses set forth in Your answer, including any such person's last known contact information.

**ANSWER:**      NREP believes the following persons may have knowledge of the facts concerning NREP's affirmative defenses:

**Corporate representative of NREP**
c/o WICK PHILLIPS GOULD & MARTIN LLP,
Attn: Lauren K. Drawhorn
100 Throckmorton St., Suite 1500
Fort Worth, TX 76102

**Corporate representative of Debtor**
c/o PACHULSKI STANG ZIEHL & JONES, LLP, Attn: John Morris
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

**James Dondero**
c/o BONDS ELLIS EPPIC SHAFER JONES LLP
Attn: Clay M. Taylor and Bryan C. Assink
420 Throckmorton St., Suite 1000
Fort Worth, TX 76102

**Frank Waterhouse**
c/o Ross & Smith PC
Attn: Frances Smith
700 N. Pearl Street, Suite 1610
Dallas, TX 75201

DEFENDANT NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC'S                    PAGE 4 OF 6
ANSWERS TO DEBTOR HIGHLAND CAPITAL MANAGEMENT, L.P.'S FIRST SET OF
INTERROGATORIES

Appx. 00510

**Kristin Hendrix**
c/o PACHULSKI STANG ZIEHL & JONES, LLP, Attn: John Morris
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

**David Klos**
c/o PACHULSKI STANG ZIEHL & JONES, LLP, Attn: John Morris
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

**Nancy Dondero**
Crescent Research Services Inc.
Vero Beach, FL
Tel: 772-234-6182

**INTERROGATORY NO. 4:** Identify (a) anything of value that You received in exchange for each Demand Note, and (b) the date You received anything of value in exchange for each Note.

**ANSWER:** NREP received the funds evidenced in each Demand Note on or about the date that each Demand Note was entered into by the parties to the Demand Notes.

**INTERROGATORY NO. 5:** Identify (a) anything of value that You received in exchange for the Term Note, and (b) the date You received anything of value in exchange for the Term Note.

**ANSWER:** NREP received the funds evidenced in the Term Note on or about the date the Term Note was entered into by the parties to the Term Note.

**INTERROGATORY NO. 6:** Identify every debt that You contend the Debtor owes to You and that is subject to "offset and/or setoff," as referenced in paragraph 58 of Your Answer, including (a) the amount of such debt, (b) the date that such debt was allegedly incurred, (c) the facts and circumstances Concerning the Debtor's incurrence of such debt, and the Demand Note or Term Note subject to any alleged "offset and/or setoff."

**ANSWER:** NREP withdraws its offset and/or setoff defense.

**INTERROGATORY NO. 7:** Identify each person who You believe has actual knowledge of any debt identified in response to Interrogatory No. 6.

**ANSWER:** NREP withdraws its offset and/or setoff defense.

**INTERROGATORY NO. 8:** Identify each witness You intend to call at trial in this Adversary Proceeding.

DEFENDANT NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC'S
ANSWERS TO DEBTOR HIGHLAND CAPITAL MANAGEMENT, L.P.'S FIRST SET OF
INTERROGATORIES

PAGE 5 OF 6

Appx. 00511

**ANSWER:** NREP will provide its list of witnesses within the time required under the Federal Rules of Civil Procedures, the agreed-upon Scheduling Order in this case, and the Local Rules for the United States Bankruptcy Court for the Northern District of Texas.

Respectfully submitted,

*/s/ Lauren K. Drawhorn*
Jason M. Rudd
Texas Bar No. 24028786
Lauren K. Drawhorn
Texas Bar No. 24074528
**WICK PHILLIPS GOULD & MARTIN, LLP**
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
Telephone: (214) 692-6200
Fax: (214) 692-6255
Email:  jason.rudd@wickphillips.com
        lauren.drawhorn@wickphillips.com

**COUNSEL FOR NEXPOINT REAL ESTATE PARTNERS, LLC'S F/K/A HCRE PARTNERS, LLC**

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on July 6, 2021, a true and correct copy of the foregoing document was served via email on counsel for the Debtor.

Jeffrey N. Pomerantz
jpomerantz@pszjlaw.com
John A. Morris
jmorris@pszjlaw.com
Gregory V. Demo
gdemo@pszjlaw.com
Hayley R. Winograd
hwinograd@pszjlaw.com
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067
Facsimile: (310) 201-0760
*Counsel for Highland Capital Management, L.P.*

Melissa S. Hayward
MHayward@HaywardFirm.com
Zachery Z. Annable
ZAnnable@HaywardFirm.com
HAYWARD PLLC
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Fax: (972) 755-7110

*/s/ Lauren K. Drawhorn*
Lauren K. Drawhorn

---

**DEFENDANT NEXPOINT REAL ESTATE PARTNERS, LLC F/K/A HCRE PARTNERS, LLC'S ANSWERS TO DEBTOR HIGHLAND CAPITAL MANAGEMENT, L.P.'S FIRST SET OF INTERROGATORIES**          **PAGE 6 OF 6**

Appx. 00512

# EXHIBIT 24

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com
**ATTORNEYS FOR JAMES DONDERO**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com
**ATTORNEYS FOR JAMES DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| Debtor. | § | Case No. 19-34054-sgj11 |
| | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03003-sgj |
| | § | |
| JAMES DONDERO, NANCY DONDERO, AND | § | |
| THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## DEFENDANT JAMES DONDERO'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS FOR ADMISSION, INTERROGATORIES, AND REQUESTS FOR PRODUCTION

TO:  Highland Capital Management, L.P., by and through its attorneys of record, Zachery Z. Annable, Hayward PLLC, 10501 N. Central Expy., Ste. 106, Dallas, Texas 75231.

Defendant James Dondero ("Defendant" or "Dondero") serves his Objections and Responses to Plaintiff Highland Capital Management, L.P.'s ("Debtor" or "Highland") Requests for Admission, Interrogatories, and Requests for Production ("Requests"), as follows:

1

## REQUESTS FOR PRODUCTION

**Request for Production No. 1:**

All Documents and Communications Concerning the existence of the Agreement.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 2:**

All Documents and Communications Concerning the negotiation of the Agreement.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 3:**

All Documents and Communications Concerning the terms of the Agreement.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 4:**

All Communications Concerning the Agreement between You and (a) Nancy Dondero, or

(b) Mark Okada, or (c) Frank Waterhouse, or (d) PricewaterhouseCoopers LLP or (d) any Class A

shareholders of Highland (*see* paragraph 82 of the Amended Answer) for the period January 1,

2018 to the present. *See* paragraph 82 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 5:**

All Documents and Communications Concerning the cost of the "portfolio companies," as referred to in paragraph 82 of the Amended Answer, including Documents and Communications sufficient to identify the (a) portfolio company, (b) the date each portfolio company was acquired, (c) the consideration paid by Highland for its investment in the portfolio company.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 6:**

All Documents and Communications Concerning the value of each of the "portfolio companies" at or around the time the Agreement was entered into.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 7:**

All Documents and Communications Concerning Mr. Dondero's assertion that "Plaintiff's claims are barred, in whole or in part, due to waiver," as alleged in paragraph 83 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 8:**

All Documents and Communications Concerning Mr. Dondero's assertion that "Plaintiff's claims are barred, in whole or in part, due to estoppel," as alleged in paragraph 84 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 9:**

All Documents and Communications Concerning Mr. Dondero's assertion that "Plaintiff's claims are barred, in whole or in part, due to failure of consideration," as alleged in paragraph 86 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 10:**

All Documents and Communications Concerning Mr. Dondero's assertion that "Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because at all relevant times Defendant James Dondero acted in good faith," as alleged in paragraph 87 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 11:**

All Documents and Communications Concerning Mr. Dondero's assertion that "Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because the alleged transfer (*i.e.,*

4

the 'Alleged Agreement') was . . . for reasonably equivalent value," as alleged in paragraph 88 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 12:**

All Documents and Communications Concerning Mr. Dondero's assertion that "Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because there was no intent to hinder, delay, or defraud any creditors of the Debtor by entering into the 'Alleged Agreement,'" as alleged in paragraph 89 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 13:**

All Documents and Communications Concerning Mr. Dondero's allegation that the use of "forgivable loans [was] a practice that was standard at [Highland]," as alleged in paragraph 83 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 14:**

All Documents and Communications Concerning any loan ever given by Highland that was actually forgiven, including any loan ever given by Highland to: (a) Mr. Dondero, (b) Highland Capital Management Fund Advisors, L.P., (c) NexPoint Advisors, L.P., (d) HCRE

5

Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC), (e) Highland Capital Management

Services, Inc., that was actually forgiven.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 15:**

All Documents and Communications reflecting Your compensation for the years 2016,

2017, 2018, 2019, and 2020, including salary, deferred benefits, bonuses, expense reimbursements,

and tax returns.

**RESPONSE:**

Dondero objects to this Request because the documents requested are in the possession of the Debtor and the Debtor has refused to produce these documents in this litigation. Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 16:**

All Documents provided to each of Your two experts. *See James Dondero's Rule 26(a)(2)*

*Expert Disclosures*, disclosed on May 28, 2021.

**RESPONSE:**

Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 17:**

For each year during the period 2016 through the present, those portions of Your federal

and state income tax returns Concerning Highland or any current or former affiliate of Highland.

**RESPONSE:**

Dondero objects to this Request because it seeks documents not reasonably calculated to lead to the discovery of relevant information. Subject to this objection, Dondero will produce responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 18:**

To the extent not responsive to the prior Requests, all Documents and Communications

Concerning each of Your responses to the Interrogatories.

**RESPONSE:**

Dondero objects to this Request because it is vague and not specifically tailored. Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 19:**

All Documents You intend to introduce at trial in this Adversary Proceeding.

**RESPONSE:**

Subject to any scheduling order agreed to by the parties or entered by the Court, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

CORE/3522697.0002/169336907.3

**Appx. 00520**

## REQUESTS FOR ADMISSION

**Request for Admission No. 1:**

Admit that You never disclosed the terms of the Agreement to PricewaterhouseCoopers LLP.

**RESPONSE:**

ADMIT.

**Request for Admission No. 2:**

Admit that You never disclosed the existence of the Agreement to PricewaterhouseCoopers LLP.

**RESPONSE:**

ADMIT.

**Request for Admission No. 3:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the terms of the Agreement to Frank Waterhouse.

**RESPONSE:**

DENY.

**Request for Admission No. 4:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the existence of the Agreement to Frank Waterhouse.

**RESPONSE:**

DENY.

**Request for Admission No. 5:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the terms of the Agreement to Mark Okada.

CORE/3522697.0002/169336907.3

**RESPONSE:**

ADMIT.

**Request for Admission No. 6:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the existence of the Agreement to Mark Okada.

**RESPONSE:**

ADMIT.

**Request for Admission No. 7:**

Admit that no document was created prior to the commencement of the Adversary Proceeding that reflects or memorializes the terms of the Agreement.

**RESPONSE:**

ADMIT.

**Request for Admission No. 8:**

Admit that no document was created prior to the commencement of the Adversary Proceeding Concerning the existence of the Agreement.

**RESPONSE:**

DENY.

**Request for Admission No. 9:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the terms of the Agreement to any creditor of Highland.

**RESPONSE:**

DENY.

**Request for Admission No. 10:**

9

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the existence of the Agreement to any creditor of Highland.

**RESPONSE:**

DENY.

**Request for Admission No. 11:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the terms of the Agreement to the Bankruptcy Court.

**RESPONSE:**

ADMIT.

**Request for Admission No. 12:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the existence of the Agreement to the Bankruptcy Court.

**RESPONSE:**

ADMIT.

**Request for Admission No. 13:**

Admit that You never caused Highland to disclose the terms of the Agreement in connection with the Bankruptcy Case.

**RESPONSE:**

ADMIT.

**Request for Admission No. 14:**

Admit that You never caused Highland to disclose the existence of the Agreement in connection with the Bankruptcy Case.

**RESPONSE:**

ADMIT.

10

**Request for Admission No. 15:**

Admit that Highland never gave You a loan that was actually forgiven.

**RESPONSE:**

ADMIT.

**Request for Admission No. 16:**

Admit that Highland never gave Mark Okada a loan that was actually forgiven.

**RESPONSE:**

ADMIT.

**Request for Admission No. 17:**

Admit that Highland never gave a loan to any entity directly or indirectly owned or controlled by You that was actually forgiven.

**RESPONSE:**

ADMIT.

## INTERROGATORIES

**Interrogatory No. 1:**

Identify the "testimony" that You believe "discusses the existence of [the Agreement] that may be uncovered through discovery in this Adversary Proceeding," including the (a) name of the witness, (b) the substance of the anticipated testimony, and (c) the basis for Your belief. *See* paragraph 82 of the Amended Answer.

**RESPONSE:**

James Dondero objects to this Interrogatory because discovery is ongoing and because the Interrogatory seeks privileged information.

**Interrogatory No. 2:**

Identify the "email correspondence" that You believe "discusses the existence of [the Agreement] that may be uncovered through discovery in this Adversary Proceeding," including the (a) name(s) of the sender(s) and recipient(s) of such email correspondence, (b) the date of any such email correspondence, and (c) the substance of any such e-mail correspondence. *See* paragraph 82 of the Amended Answer.

**RESPONSE:**

James Dondero objects to this Interrogatory because discovery is ongoing and because the Interrogatory seeks privileged information.

**Interrogatory No. 3:**

Identify the "portfolio companies" referred to in paragraph 82 of the Amended Answer.

**RESPONSE:**

MGM, Cornerstone, and Trussway.

**Interrogatory No. 4:**

Identify every loan made by Highland that was actually forgiven, including (a) the date of the loan, (b) the principal amount of the loan, (c) the obligor/debtor under the loan, (d) the reason

for the loan, (e) the date the loan was forgiven, (f) the amount of principal forgiven, and (g) the

reason the loan was forgiven.

**RESPONSE:**

      James Dondero objects to this Interrogatory because this information is in the possession of Plaintiff and Plaintiff has refused to provide this information to James Dondero in discovery. Therefore, James Dondero is unable to respond to this Interrogatory. Subject to these objections, James Dondero believes the following individuals may have received loans made by Highland that were forgiven, in whole or in part:  Mike Hurley, Tim Lawler, Pat Daugherty, Jack Yang, Paul Adkins, Gibran Mahmud, Jean-Luc Eberlin, and Appu Mundassery.

**<u>Interrogatory No. 5:</u>**

      Identify which part or parts of the Notes are "ambiguous," as alleged in paragraph 85 of

the Amended Answer, and state the basis for Your belief.

**RESPONSE:**

      James Dondero contends that each note as a whole is ambiguous because it refers to additional agreements without specifying them.

**<u>Interrogatory No. 6:</u>**

      Identify all witnesses You intend to call at trial for the Adversary Proceeding.

**RESPONSE:**

      James Dondero objects to this Interrogatory because it is premature. James Dondero will identify any witnesses in accordance with any scheduling order entered by the Court.

Dated: September 27, 2021         Respectfully submitted,

*/s/Michael P. Aigen*
Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

-and-

*/s/Clay M. Taylor*
Clay M. Taylor
State Bar No. 24033261
Bryan C. Assink
State Bar No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com

**ATTORNEYS FOR JAMES DONDERO**

CORE/3522697.0002/169336907.3

**VERIFICATION**

STATE OF TEXAS )
                          )
COUNTY OF DALLAS )

On this day, James D. Dondero appeared before me, the undersigned notary public, and upon his oath, certified that he had read DEFENDANT JAMES DONDERO'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S INTERROGATORIES and that the facts stated therein are within his personal knowledge and are true and correct to the best of his knowledge, information and belief.

_____
JAMES D. DONDERO

SWORN TO and SUBSCRIBED before me by James D. Dondero on the 27th day of September, 2021.

_____
Notary Public for the State of TX

TARA LOIBEN
Notary Public, State of Texas
Comm. Expires 04-15-2023
Notary ID 128585486

CORE/3522697.0002/169336907.3

## <u>**CERTIFICATE OF SERVICE**</u>

I, the undersigned, hereby certify that, on September 27, 2021, a true and correct copy of the foregoing document was served via email on counsel for the Debtor.

_/s/ Michael P. Aigen_____
Michael P. Aigen

# EXHIBIT 25

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**– AND –**

Daniel P. Elms
State Bar No. 24002049
GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3600 telephone
(214) 665-3601 facsimile
Email: elmsd@gtlaw.com

**ATTORNEYS FOR NANCY DONDERO**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | Case No. 19-34054-sgjl 1 |
| Debtor. | § § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § | Adversary Proceeding No. |
| vs. | § § | 21-03003-sgj |
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § § | |
| Defendants. | § § | |

## DEFENDANT NANCY DONDERO'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS FOR ADMISSION, INTERROGATORIES, AND REQUESTS FOR PRODUCTION

TO:     Highland Capital Management, L.P., by and through its attorneys of record, Zachery Z. Annable, Hayward PLLC, 10501 N. Central Expy., Ste. 106, Dallas, Texas 75231.

Defendant Nancy Dondero ("Defendant" or "Dondero") serves her Objections and Responses to Plaintiff Highland Capital Management, L.P.'s ("Debtor" or "Highland") Requests for Admission, Interrogatories, and Requests for Production ("Requests"), as follows:

## REQUESTS FOR PRODUCTION

**Request For Production No. 1:**

All Documents and Communications Concerning the existence of the Agreement.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 2:**

All Documents and Communications Concerning the negotiation of the Agreement.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 3:**

All Documents and Communications Concerning the terms of the Agreement.

**RESPONSE:**

CORE/3522697.0002/169345143.4

**Appx. 00532**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 4:**

All Documents and Communications you actually reviewed in connection with Your

decision to enter into the Agreement.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 5:**

All Communications Concerning the Agreement between You and (a) James Dondero, or

(b) Mark Okada, or (c) Frank Waterhouse, or (d) PricewaterhouseCoopers LLP, or (e) any Class

A shareholders of Highland (see paragraph 82 of the Amended Answer) for the period January 1,

2018 to the present.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 6:**

All Documents and Communications Concerning the "portfolio companies," as referred to

in paragraph 82 of the Amended Answer.

**RESPONSE:**

CORE/3522697.0002/169345143.4

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 7:**

All Documents and Communications Concerning James Dondero's assertion that "Plaintiff's claims are barred, in whole or in part, due to waiver," as alleged in paragraph 83 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 8:**

All Documents and Communications Concerning James Dondero's assertion that "Plaintiff's claims are barred, in whole or in part, due to estoppel," as alleged in paragraph 84 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 9:**

All Documents and Communications Concerning James Dondero's assertion that "Plaintiff's claims are barred, in whole or in part, due to failure of consideration," as alleged in paragraph 86 of the Amended Answer.

**RESPONSE:**

4

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 10:**

All Documents and Communications Concerning James Dondero's assertion that "Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because at all relevant times Defendant James Dondero acted in good faith," as alleged in paragraph 87 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 11:**

All Documents and Communications Concerning James Dondero's assertion that "Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because the alleged transfer (i.e., the 'Alleged Agreement') was . . . for reasonably equivalent value," as alleged in paragraph 88 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 12:**

All Documents and Communications Concerning James Dondero's assertion that "Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because there was no

5

intent to hinder, delay, or defraud any creditors of the Debtor by entering into the 'Alleged Agreement,'" as alleged in paragraph 89 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 13:**

All Documents and Communications Concerning any agreement You ever entered into "as representative for a majority of the Class A shareholders of Plaintiff." See paragraph 82 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 14:**

To the extent not responsive to the prior Requests, all Documents and Communications Concerning each of Your responses to the Interrogatories.

**RESPONSE:**

Dondero objects to this Request because it is vague and not specifically tailored. Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 15:**

All Documents You intend to introduce at trial in this Adversary Proceeding.

**RESPONSE:**

Subject to any scheduling order agreed to by the parties or entered by the Court, Dondero will produce all responsive documents, if any, at a mutually agreeable place and time.

7

## REQUESTS FOR ADMISSION

**Request For Admission No. 1:**

Admit that You never disclosed the terms of the Agreement to PricewaterhouseCoopers LLP.

**RESPONSE:**

ADMIT.

**Request For Admission No. 2:**

Admit that You never disclosed the existence of the Agreement to PricewaterhouseCoopers LLP.

**RESPONSE:**

ADMIT.

**Request For Admission No. 3:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the terms of the Agreement to Frank Waterhouse.

**RESPONSE:**

ADMIT.

**Request For Admission No. 4:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the existence of the Agreement to Frank Waterhouse.

**RESPONSE:**

ADMIT.

**Request For Admission No. 5:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the terms of the Agreement to Mark Okada.

8

**RESPONSE:**

ADMIT.

**Request For Admission No. 6:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the existence of the Agreement to Mark Okada.

**RESPONSE:**

ADMIT.

**Request For Admission No. 7:**

Admit that no document was created prior to the commencement of the Adversary Proceeding that reflects or memorializes the terms of the Agreement.

**RESPONSE:**

Nancy Dondero lacks sufficient information to admit or deny this request.

**Request For Admission No. 8:**

Admit that no document was created prior to the commencement of the Adversary Proceeding Concerning the existence of the Agreement.

**RESPONSE:**

Nancy Dondero lacks sufficient information to admit or deny this request.

**Request For Admission No. 9:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the terms of the Agreement to any creditor of Highland.

**RESPONSE:**

ADMIT.

**Request For Admission No. 10:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the existence of the Agreement to any creditor of Highland.

**RESPONSE:**

ADMIT.

**Request For Admission No. 11:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the terms of the Agreement to the Bankruptcy Court.

**RESPONSE:**

ADMIT.

**Request For Admission No. 12:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the existence of the Agreement to the Bankruptcy Court.

**RESPONSE:**

ADMIT.

**Request For Admission No. 13:**

Admit that You never caused Highland to disclose the terms of the Agreement in connection with the Bankruptcy Case.

**RESPONSE:**

ADMIT.

**Request For Admission No. 14:**

Admit that You never caused Highland to disclose the existence of the Agreement in connection with the Bankruptcy Case.

**RESPONSE:**

ADMIT.

10

**Request For Admission No. 15:**

Admit that, prior to the Commencement of the Adversary Proceeding, You never disclosed the terms of the Agreement to anyone.

**RESPONSE:**

ADMIT (other than my brother).

**Request For Admission No. 16:**

Admit that, prior to the Commencement of the Adversary Proceeding, You never disclosed the existence of the Agreement to anyone.

**RESPONSE:**

ADMIT (other than my brother).

CORE/3522697.0002/169345143.4

**Appx. 00541**

## <u>INTERROGATORIES</u>

**<u>Interrogatory No. 1</u>:**

Identify each individual to whom You disclosed the terms of the Agreement prior to the commencement of the Action, including (a) the name of each person, (b) the date the disclosure was made, and (c) the substance of the disclosure.

**RESPONSE:**

None.

**<u>Interrogatory No. 2</u>:**

Identify each Person to whom You disclosed the existence of the Agreement prior to the commencement of the Adversary Proceeding, including (a) the name of each person, (b) the date the disclosure was made, and (c) the substance of the disclosure.

**RESPONSE:**

None.

**<u>Interrogatory No. 3</u>:**

Identify every Document and Communication Concerning the terms of the Agreement.

**RESPONSE:**

The Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.

**<u>Interrogatory No. 4</u>:**

Identify every Document and Communication Concerning the existence of the Agreement.

**RESPONSE:**

The Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.

**<u>Interrogatory No. 5</u>:**

CORE/3522697.0002/169345143.4

**Appx. 00542**

Identify every Document and Communication you reviewed in connection with Your decision to enter into the Agreement.

**RESPONSE:**

In addition to conversations with James Dondero, Nancy Dondero either reviewed or discussed with James Dondero the Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. and The Dugaboy Trust documents.

**Interrogatory No. 6:**

Other than the Agreement (as set forth in paragraph 82 of the Amended Answer), identify every agreement You ever entered into "as a representative of a majority of Class A shareholders of Plaintiff," including (a) the parties with whom the agreement was made, (b) the date of the agreement, and (c) the terms of the agreement.

**Response:**

Other than generally approving compensation, including the Agreements at issue in the Notes proceedings, none.

**Interrogatory No. 7:**

Identify all witnesses You intend to call at trial for the Adversary Proceeding.

**RESPONSE:**

Nancy Dondero objects to this Interrogatory because it is premature. Nancy Dondero will identify any witnesses in accordance with any scheduling order entered by the Court.

Dated: September 27, 2021          Respectfully submitted,

*/s/Michael P. Aigen*

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

-and-

*/s/Daniel P. Elms*

Daniel P. Elms
State Bar No. 24002049
GREENBERG TRAURIG, LLP
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
(214) 665-3600 telephone
(214) 665-3601 facsimile
Email: elmsd@gtlaw.com

**ATTORNEYS FOR NANCY DONDERO**

14

## VERIFICATION

STATE OF COLORADO   )
                            )
COUNTY OF PITKIN     )

On this day, Nancy Dondero appeared before me, the undersigned notary public, and upon her oath, certified that she had read DEFENDANT NANCY DONDERO'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S INTERROGATORIES and that the facts stated therein are within her personal knowledge and are true and correct to the best of her knowledge, information and belief.

_____
NANCY DONDERO

SWORN TO and SUBSCRIBED before me by Nancy Dondero on the ___ day of September, 2021.

_____
Notary Public in and for the State of Colorado

15

Appx. 00545

## <u>CERTIFICATE OF SERVICE</u>

      I, the undersigned, hereby certify that, on September 27, 2021, a true and correct copy of the foregoing document was served via email on counsel for the Debtor.


<u>*/s/ Michael P. Aigen*</u>
Michael P. Aigen

16

# EXHIBIT 26

Douglas S. Draper (La. Bar No. 5073)
Leslie A. Collins (La. Bar No. 14891)
Greta M. Brouphy (La. Bar No. 26216)
HELLER, DRAPER & HORN, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
(504) 299-3300 telephone
(504) 299-3399 facsimile

**ATTORNEYS FOR THE DUGABOY INVESTMENT TRUST**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | §  Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | §  Case No. 19-34054-sgjl 1 |
| Debtor. | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | §  Adversary Proceeding No. |
| | § |
| vs. | §  21-03003-sgj |
| | § |
| JAMES DONDERO, NANCY DONDERO, | § |
| AND THE DUGABOY INVESTMENT TRUST, | § |
| | § |
| Defendants. | § |
| | § |
| | § |

## DEFENDANT THE DUGABOY INVESTMENT TRUST'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS FOR ADMISSION, INTERROGATORIES, AND REQUESTS FOR PRODUCTION

TO:    Highland Capital Management, L.P., by and through its attorneys of record, Zachery Z. Annable, Hayward PLLC, 10501 N. Central Expy., Ste. 106, Dallas, Texas 75231.

Defendant The Dugaboy Investment Trust ("Defendant" or "Dugaboy") serves its

Objections and Responses to Plaintiff Highland Capital Management, L.P.'s ("Debtor" or

1

"Highland") Requests for Admission, Interrogatories, and Requests for Production ("Requests"), as follows:

## REQUESTS FOR PRODUCTION

**Request For Production No. 1:**

All Documents and Communications Concerning the existence of the Agreement.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dugaboy will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 2:**

All Documents and Communications Concerning the negotiation of the Agreement.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dugaboy will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 3:**

All Documents and Communications Concerning the terms of the Agreement.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dugaboy will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 4:**

All Documents and Communications you actually reviewed in connection with Your decision to enter into the Agreement.

CORE/3522697.0002/169683159.1

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dugaboy will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 5:**

All Communications Concerning the Agreement between You and (a) James Dondero, or

(b) Mark Okada, or (c) Frank Waterhouse, or (d) Nancy Dondero, or (e) any Class A shareholders

of Highland. *See* paragraph 82 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dugaboy will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 6:**

All Documents and Communications Concerning the "portfolio companies," as referred to

in paragraph 82 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dugaboy will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 7:**

All Documents and Communications Concerning James Dondero's assertion that

"Plaintiff's claims are barred, in whole or in part, due to waiver," as alleged in paragraph 83 of the

Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dugaboy will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 8:**

All Documents and Communications Concerning James Dondero's assertion that "Plaintiff's claims are barred, in whole or in part, due to estoppel," as alleged in paragraph 84 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dugaboy will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 9:**

All Documents and Communications Concerning James Dondero's assertion that "Plaintiff's claims are barred, in whole or in part, due to failure of consideration," as alleged in paragraph 86 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dugaboy will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 10:**

All Documents and Communications Concerning James Dondero's assertion that "Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because at all relevant times Defendant James Dondero acted in good faith," as alleged in paragraph 87 of the Amended Answer.

4

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dugaboy will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 11:**

All Documents and Communications Concerning James Dondero's assertion that "Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because the alleged transfer (*i.e.*, the 'Alleged Agreement') was . . . for reasonably equivalent value," as alleged in paragraph 88 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dugaboy will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 12:**

All Documents and Communications Concerning James Dondero's assertion that "Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because there was no intent to hinder, delay, or defraud any creditors of the Debtor by entering into the 'Alleged Agreement,'" as alleged in paragraph 89 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dugaboy will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 13:**

All Documents and Communications Concerning any agreement Nancy Dondero ever entered into "as representative for a majority of the Class A shareholders of Plaintiff." *See* paragraph 82 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dugaboy will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 14:**

To the extent not responsive to the prior Requests, all Documents and Communications Concerning each of Your responses to the Interrogatories.

**RESPONSE:**

Dugaboy objects to this Request because it is vague and not specifically tailored. Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Dugaboy will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 15:**

All Documents You intend to introduce at trial in this Adversary Proceeding.

**RESPONSE:**

Subject to any scheduling order agreed to by the parties or entered by the Court, Dugaboy will produce all responsive documents, if any, at a mutually agreeable place and time.

## REQUESTS FOR ADMISSION

**Request For Admission No. 1:**

Admit that You never disclosed the terms of the Agreement to PricewaterhouseCoopers LLP.

**RESPONSE:**

ADMIT.

**Request For Admission No. 2:**

Admit that You never disclosed the existence of the Agreement to PricewaterhouseCoopers LLP.

**RESPONSE:**

ADMIT.

**Request For Admission No. 3:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the terms of the Agreement to Frank Waterhouse.

**RESPONSE:**

ADMIT.

**Request For Admission No. 4:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the existence of the Agreement to Frank Waterhouse.

**RESPONSE:**

ADMIT.

**Request For Admission No. 5:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the terms of the Agreement to Mark Okada.

7

**RESPONSE:**

ADMIT.

**Request For Admission No. 6:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the existence of the Agreement to Mark Okada.

**RESPONSE:**

ADMIT.

**Request For Admission No. 7:**

Admit that no document was created prior to the commencement of the Adversary Proceeding that reflects or memorializes the terms of the Agreement.

**RESPONSE:**

Dugaboy lacks sufficient information to admit or deny this request.

**Request For Admission No. 8:**

Admit that no document was created prior to the commencement of the Adversary Proceeding Concerning the existence of the Agreement.

**RESPONSE:**

Dugaboy lacks sufficient information to admit or deny this request.

**Request For Admission No. 9:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the terms of the Agreement to any creditor of Highland.

**RESPONSE:**

ADMIT.

**Request For Admission No. 10:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the existence of the Agreement to any creditor of Highland.

**RESPONSE:**

ADMIT.

**Request For Admission No. 11:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the terms of the Agreement to the Bankruptcy Court.

**RESPONSE:**

ADMIT.

**Request For Admission No. 12:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the existence of the Agreement to the Bankruptcy Court.

**RESPONSE:**

ADMIT.

**Request For Admission No. 13:**

Admit that You never caused Highland to disclose the terms of the Agreement in connection with the Bankruptcy Case.

**RESPONSE:**

ADMIT.

**Request For Admission No. 14:**

Admit that You never caused Highland to disclose the existence of the Agreement in connection with the Bankruptcy Case.

**RESPONSE:**

ADMIT.

**Request For Admission No. 15:**

Admit that, prior to the Commencement of the Adversary Proceeding, You never disclosed the terms of the Agreement to anyone.

**RESPONSE:**

ADMIT.

**Request For Admission No. 16:**

Admit that, prior to the Commencement of the Adversary Proceeding, You never disclosed the existence of the Agreement to anyone.

**RESPONSE:**

ADMIT.

10

## INTERROGATORIES

**Interrogatory No. 1:**

Identify each individual to whom You disclosed the terms of the Agreement prior to the commencement of the Adversary Proceeding, including (a) the name of each person, (b) the date the disclosure was made, and (c) the substance of the disclosure.

**RESPONSE:**

None.

**Interrogatory No. 2:**

Identify each Person to whom You disclosed the existence of the Agreement prior to the commencement of the Adversary Proceeding, including (a) the name of each person, (b) the date the disclosure was made, and (c) the substance of the disclosure.

**RESPONSE:**

None.

**Interrogatory No. 3:**

Identify every Document and Communication Concerning the terms of the Agreement.

**RESPONSE:**

The Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.

**Interrogatory No. 4:**

Identify every Document and Communication Concerning the existence of the Agreement.

**RESPONSE:**

The Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.

**Interrogatory No. 5:**

CORE/3522697.0002/169683159.1

Identify every Document and Communication you reviewed in connection with Your decision to enter into the Agreement.

**RESPONSE:**

In addition to conversations with James Dondero, Nancy Dondero either reviewed or discussed with James Dondero the Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. and The Dugaboy Trust documents.

**Interrogatory No. 6:**

Other than the Agreement (as set forth in paragraph 82 of the Amended Answer), identify every agreement Nancy Dondero ever entered into "as a representative of a majority of Class A shareholders of Plaintiff," including (a) the parties with whom the agreement was made, (b) the date of the agreement, and (c) the terms of the agreement.

**Response:**

Other than generally approving compensation, including the Agreements at issue in the Notes proceedings, none.

**Interrogatory No. 7:**

Identify all witnesses You intend to call at trial for the Adversary Proceeding.

**RESPONSE:**

Dugaboy objects to this Interrogatory because it is premature. Dugaboy will identify any witnesses in accordance with any scheduling order entered by the Court.

12

Dated: September 27, 2021          Respectfully submitted,

*/s/Douglas Draper*
Douglas S. Draper (La. Bar No. 5073)
Leslie A. Collins (La. Bar No. 14891)
Greta M. Brouphy (La. Bar No. 26216)
HELLER, DRAPER & HORN, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
(504) 299-3300 telephone
(504) 299-3399 facsimile

13

## VERIFICATION

STATE OF COLORADO )
                         )
COUNTY OF PITKIN )

On this day, Nancy Dondero appeared before me, the undersigned notary public, and upon her oath, certified that she has read DEFENDANT THE DUGABOY INVESTMENT TRUST'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S INTERROGATORIES and that the facts stated therein are within her personal knowledge and are true and correct to the best of her knowledge, information and belief.

_____
NANCY DONDERO

SWORN TO and SUBSCRIBED before me by Nancy Dondero on the ___ day of September, 2021.

_____
Notary Public in and for the State of Colorado

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that, on September 27, 2021, a true and correct copy of the foregoing document was served via email on counsel for the Debtor.

_/s/Douglas S. Draper_____
Douglas S. Draper

CORE/3522697.0002/169683159.1

Appx. 00562

# EXHIBIT 27

Davor Rukavina
Thomas D. Berghman
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## DEFENDANT NEXPOINT ADVISORS, L.P.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS FOR ADMISSION, INTERROGATORIES, AND REQUESTS FOR PRODUCTION

TO:    Highland Capital Management, L.P., by and through its attorneys of record, Zachery Z. Annable, Hayward PLLC, 10501 N. Central Expy., Ste. 106, Dallas, Texas 75231.

Defendant NexPoint Advisors, L.P. ("Defendant" or "NexPoint") serves its Objections and

Responses to Plaintiff Highland Capital Management, L.P.'s ("Debtor" or "Highland") Requests

for Admission, Interrogatories, and Requests for Production ("Requests"), as follows:

1

## REQUESTS FOR PRODUCTION

**Request for Production No. 1:**

All Documents and Communications Concerning the existence of the Agreement.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 2:**

All Documents and Communications Concerning the negotiation of the Agreement.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 3:**

All Documents and Communications Concerning the terms of the Agreement.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 4:**

All Communications Concerning the Agreement between You and (a) James Dondero, or

(b) Nancy Dondero, or (c) Frank Waterhouse, or (d) Your outside auditor(s), or (e) any Class A

shareholders of Highland (*see* paragraph 83 of the Amended Answer) for the period January 1,

2018 to the present.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

Appx. 00565

**Request for Production No. 5:**

All Documents and Communications Concerning Your assertion that "Plaintiff was responsible for making payments on behalf of the Defendant under the note," as alleged in paragraph 80 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 6:**

All Documents and Communications Concerning Your assertion that "[a]ny alleged default under the note was the result of the Plaintiff's negligence, misconduct, breach of contract, etc.," as alleged in paragraph 80 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 7:**

All Documents and Communications Concerning Your assertion that Plaintiff "caused the delay" in the performance of the contract, as alleged in paragraph 81 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 8:**

All Documents and Communications Concerning Your assertion that "Plaintiff has waived the right to accelerate the note and/or the Plaintiff is estopped to enforce the alleged acceleration by accepting payment after the same," as alleged in paragraph 82 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 9:**

All Documents and Communications Concerning Your assertion that NexPoint acted in "good faith," as alleged in paragraph 84 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 10:**

All Documents and Communications Concerning Your assertion that "reasonably equivalent value was provided for any alleged transfer or obligation," as alleged in paragraph 84 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 11:**

Your audited financial statements for the period January 1, 2018 to the present.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, redacted as needed, at a mutually agreeable place and time.

**Request for Production No. 12:**

Your unaudited financial statements for the period January 1, 2018 to the present, to the extent any portion of that time period is not covered by the audited financial statements.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, redacted as needed, at a mutually agreeable place and time.

**Request for Production No. 13:**

For the period January 1, 2018 through the present, all Communications between You and

Your outside auditor(s) concerning the Notes.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 14:**

All Documents and Communications Concerning any compensation that You paid to

James Dondero for each of Your fiscal years 2016, 2017, 2018, and 2019, and 2020.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 15:**

All Documents and Communications Concerning any loan that You ever made to or for

the benefit of James Dondero.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 16:**

All Documents and Communications Concerning any Loan that You ever made to or for

the benefit of James Dondero that You forgave.

5

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 17:**

To the extent not responsive to the prior requests, all Documents and Communications

Concerning each of Your responses to the Interrogatories.

**RESPONSE:**

Defendant objects to this Request because it is vague and not specifically tailored. Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 18:**

All Documents You intend to introduce at trial in this Adversary Proceeding.

**RESPONSE:**

Subject to any scheduling order agreed to by the parties or entered by the Court, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

Appx. 00569

## REQUESTS FOR ADMISSION

**Request for Admission No. 1:**

Admit that You never disclosed the terms of the Agreement to Your outside auditor(s).

**RESPONSE:**

ADMIT.

**Request for Admission No. 2:**

Admit that You never disclosed the existence of the Agreement to Your outside auditor(s).

**RESPONSE:**

ADMIT.

**Request for Admission No. 3:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the terms of the Agreement to Frank Waterhouse.

**RESPONSE:**

DENY.

**Request for Admission No. 4:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the existence of the Agreement to Frank Waterhouse.

**RESPONSE:**

DENY.

**Request for Admission No. 5:**

Admit that no document was created prior to the commencement of the Adversary Proceeding that reflects or memorializes the terms of the Agreement.

**RESPONSE:**

ADMIT.

7

**Request for Admission No. 6:**

Admit that no document was created prior to the commencement of the Adversary Proceeding Concerning the existence of the Agreement.

**RESPONSE:**

DENY.

**Request for Admission No. 7:**

Admit that You did not disclose the terms of the Agreement in connection with the Bankruptcy Case at any time prior to March 1, 2021, including in connection with any objection to the Plan or Disclosure Statement.

**RESPONSE:**

DENY.

**Request for Admission No. 8:**

Admit that You did not disclose the existence of the Agreement in connection with the Bankruptcy Case at any time prior to March 1, 2021, including in connection with any objection to the Plan or Disclosure Statement.

**RESPONSE:**

DENY.

8

## INTERROGATORIES

**Interrogatory No. 1:**

Identify the "testimony" that You believe "discusses the existence of [the Agreement] that may be uncovered through discovery in this Adversary Proceeding," including the (a) name of the witness, (b) the substance of the anticipated testimony, and (c) the basis for Your belief. See paragraph 83 of the Amended Answer.

**RESPONSE:**

Defendant objects to this Interrogatory because discovery is ongoing and because the Interrogatory seeks privileged information.

**Interrogatory No. 2:**

Identify the "email correspondence" that You believe "discusses the existence of [the Agreement] that may be uncovered through discovery in this Adversary Proceeding," including the (a) name(s) of the sender(s) and recipient(s) of such email correspondence, (b) the date of any such email correspondence, and (c) the substance of any such e-mail correspondence.

**RESPONSE:**

Defendant objects to this Interrogatory because discovery is ongoing and because the Interrogatory seeks privileged information.

**Interrogatory No. 3:**

Identify each of Your employees, officers, representatives, and agents who knew of the terms and existence of the Agreement prior to March 1, 2021, and for each such person, identify (a) the name of the person, (b) the person's title or connection to You, (c) the date on which the person first learned of the terms and existence of the Agreement, and (d) how and from whom the person first learned of the terms and existence of the Agreement.

9

**RESPONSE:**

Defendant objects to this Interrogatory to the extent that it seeks privileged information. Subject to this objection, Defendant states that James Dondero and Frank Waterhouse knew of the terms and existence of the Agreement prior to March 1, 2021.

**Interrogatory No. 4:**

Identify all witnesses You intend to call at trial for the Adversary Proceeding.

**RESPONSE:**

Defendant objects to this Interrogatory because it is premature. Defendant will identify any witnesses in accordance with any scheduling order entered by the Court.

Dated: September 27, 2021    Respectfully submitted,

*/s/Julian P. Vasek*　　　　　　　
Davor Rukavina
State Bar No. 24030781
Thomas D. Berghman
State Bar No. 24082683
Julian P. Vasek.
State Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
Email:  drukavina@munsch.com
Email: tberghman@munsch.com
Email: jvasek@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P.**

## **VERIFICATION**

STATE OF TEXAS      )
                               )

COUNTY OF DALLAS    )

On this day, James D. Dondero appeared before me, the undersigned notary public, and upon his oath, certified that he had read DEFENDANT NEXPOINT ADVISORS, L.P.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S INTERROGATORIES and that the facts stated therein are within his personal knowledge and are true and correct to the best of his knowledge, information and belief.

_____
JAMES D. DONDERO

SWORN TO and SUBSCRIBED before me by James D. Dondero on the 27th day of September, 2021.

_____
Notary Public for the State of TX

> TARA LOIBEN
> Notary Public, State of Texas
> Comm. Expires 04-15-2023
> Notary ID 128585486

12

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that, on September 27, 2021, a true and correct copy of the foregoing document was served via email on counsel for the Debtor.

*/s/ Julian P. Vasek*
Julian P. Vasek

4821-0392-2685v.1 019717.00001

# EXHIBIT 28

Appx. 00577

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.**

## IN THE UNITED STATES BANKRUPTCY
## COURT FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Debtor. | § § § § § § § | Chapter 11<br><br>Case No. 19-34054-sgj 1 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Plaintiff,<br><br>vs.<br><br>HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>Defendants. | § § § § § § § § § § § § § § § | Adversary Proceeding No.<br><br>21-03006-sgj |

## DEFENDANT HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS FOR ADMISSION, INTERROGATORIES, AND REQUESTS FOR PRODUCTION

TO:     Highland Capital Management, L.P., by and through its attorneys of record, Zachery Z. Annable, Hayward PLLC, 10501 N. Central Expy., Ste. 106, Dallas, Texas 75231.

Defendant Highland Capital Management Services, Inc. ("Defendant" or "HCMS")

serves its Objections and Responses to Plaintiff Highland Capital Management, L.P.'s ("Debtor"

1

**Appx. 00578**

or "Highland") Requests for Admission, Interrogatories, and Requests for Production

("Requests"), as follows:

## REQUESTS FOR PRODUCTION

### Request For Production No. 1:

All Documents and Communications Concerning the existence of the Agreement.

### RESPONSE:

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

### Request For Production No. 2:

All Documents and Communications Concerning the negotiation of the Agreement.

### RESPONSE:

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

### Request For Production No. 3:

All Documents and Communications Concerning the terms of the Agreement.

### RESPONSE:

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

### Request For Production No. 4:

All Communications Concerning the Agreement between You and (a) James Dondero, or

(b) Nancy Dondero, or (c) Frank Waterhouse, or (d) any Class A shareholders of Highland (*see*

paragraph 97 of the Amended Answer), or (e) Your outside auditor(s) for the period January 1,

2018 to the present.

### RESPONSE:

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 5:**

All Documents and Communications Concerning Your assertion that "Plaintiff's claims are barred, in whole or in part, due to waiver," as alleged in paragraph 96 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 6:**

All Documents and Communications Concerning Your assertion that "Plaintiff's claims are barred, in whole or in part, due to estoppel," as alleged in paragraph 95 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 7:**

All Documents and Communications Concerning Your assertion that "Plaintiff's claims are barred in whole or in part by the doctrine of justification and/or repudiation," as alleged in paragraph 94 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 8:**

All Documents and Communications Concerning Your assertion that "Plaintiff's

fraudulent transfer claims should be barred, in whole or in part, because at all relevant times

Defendant HCMS acted in good faith," as alleged in paragraph 98 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 9:**

All Documents and Communications Concerning Your assertion that "Plaintiff's

fraudulent transfer claims should be barred, in whole or in part, because the alleged transfer (i.e.,

the "Alleged Agreement") was . . . for reasonably equivalent value," as alleged in paragraph 99

of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 10:**

All Documents and Communications Concerning Your assertion that "Plaintiff's

fraudulent transfer claims should be barred, in whole or in part, because there was no intent to

hinder, delay, or defraud any creditors of the Debtor by entering into the 'Alleged Agreement',"

as alleged in paragraph 100 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 11:**

Your audited financial statements for the period January 1, 2018 to the present.

4

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, redacted as needed, at a mutually agreeable place and time.

**Request For Production No. 12:**

Your unaudited financial statements for the period January 1, 2018 to the present, to the

extent any portion of that time period is not covered by the audited financial statements.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, redacted as needed, at a mutually agreeable place and time.

**Request For Production No. 13:**

For the period January 1, 2018 through the present, all Communications between You

and Your outside auditor(s) concerning the Notes.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 14:**

All Documents and Communications Concerning any compensation that You paid to

James Dondero for each of Your fiscal years 2016, 2017, 2018, and 2019, and 2020.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 15:**

CORE/3522697.0002/169345241.2

**Appx. 00582**

All Documents and Communications Concerning any loan that You ever made to or for

the benefit of James Dondero.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 16:**

All Documents and Communications Concerning any Loan that You ever made to or for

the benefit of James Dondero that You forgave.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 17:**

To the extent not responsive to the prior requests, all Documents and Communications

Concerning each of Your responses to the Interrogatories.

**RESPONSE:**

Defendant objects to this Request because it is vague and not specifically tailored. Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request For Production No. 18:**

All Documents You intend to introduce at trial in this Adversary Proceeding.

**RESPONSE:**

Subject to any scheduling order agreed to by the parties or entered by the Court, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

6

## REQUESTS FOR ADMISSION

**Request For Admission No. 1:**

Admit that You never disclosed the terms of the Agreement to Your outside auditor(s).

**RESPONSE:**

ADMIT.

**Request For Admission No. 2:**

Admit that You never disclosed the existence of the Agreement to Your outside auditor(s).

**RESPONSE:**

ADMIT.

**Request For Admission No. 3:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the terms of the Agreement to Frank Waterhouse.

**RESPONSE:**

DENY.

**Request For Admission No. 4:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the existence of the Agreement to Frank Waterhouse.

**RESPONSE:**

DENY.

**Request For Admission No. 5:**

Admit that no document was created prior to the commencement of the Adversary Proceeding that reflects or memorializes the terms of the Agreement.

**RESPONSE:**

CORE/3522697.0002/169345241.2

**Appx. 00584**

ADMIT.

**Request For Admission No. 6**:

Admit that no document was created prior to the commencement of the Adversary

Proceeding Concerning the existence of the Agreement.

**RESPONSE:**

DENY.

**Request For Admission No. 7**:

Admit that You did not disclose the terms of the Agreement in connection with the

Bankruptcy Case at any time prior to March 1, 2021, including in connection with any objection

to the Plan or Disclosure Statement.

**RESPONSE:**

DENY.

**Request For Admission No. 8**:

Admit that You did not disclose the existence of the Agreement in connection with the

Bankruptcy Case at any time prior to March 1, 2021, including in connection with any objection

to the Plan or Disclosure Statement.

**RESPONSE:**

DENY.

CORE/3522697.0002/169345241.2

### INTERROGATORIES

**Interrogatory No. 1:**

Identify the "testimony" that You believe "discusses the existence of [the Agreement] that may be uncovered through discovery in this Adversary Proceeding," including the (a) name of the witness, (b) the substance of the anticipated testimony, and (c) the basis for Your belief. *See* paragraph 97 of the Amended Answer.

**RESPONSE:**

Defendant objects to this Interrogatory because discovery is ongoing and because the Interrogatory seeks privileged information.


**Interrogatory No. 2:**

Identify the "email correspondence" that You believe "discusses the existence of [the Agreement] that may be uncovered through discovery in this Adversary Proceeding," including the (a) name(s) of the sender(s) and recipient(s) of such email correspondence, (b) the date of any such email correspondence, and (c) the substance of any such e-mail correspondence.

**RESPONSE:**

Defendant objects to this Interrogatory because discovery is ongoing and because the Interrogatory seeks privileged information.

**Interrogatory No. 3:**

Identify each of Your employees, officers, representatives, and agents who knew of the terms and existence of the Agreement prior to March 1, 2021, and for each such person, identify (a) the name of the person, (b) the person's title or connection to You, (c) the date on which the person first learned of the terms and existence of the Agreement, and (d) how and from whom the person first learned of the terms and existence of the Agreement.

**RESPONSE:**

Defendant objects to this Interrogatory to the extent that it seeks privileged information. Subject to this objection, Defendant states that James Dondero and Frank Waterhouse knew of the terms and existence of the Agreement prior to March 1, 2021.

**Interrogatory No. 4:**

Identify which part or parts of the Notes are "ambiguous," as alleged in paragraph 102 of

the Amended Answer, and state the basis for Your belief.

**RESPONSE:**

Defendant contends that each note as a whole is ambiguous because it refers to additional agreements without specifying them.

**Interrogatory No. 5:**

Identify all witnesses You intend to call at trial for the Adversary Proceeding.

**RESPONSE:**

Defendant objects to this Interrogatory because it is premature. Defendant will identify any witnesses in accordance with any scheduling order entered by the Court.

10

Dated: September 27, 2021

Respectfully submitted,

*/s/Deborah Deitsch-Perez*

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR DEFENDANT HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.**

11

Appx. 00588

## VERIFICATION

STATE OF TEXAS      )
                     )

COUNTY OF DALLAS    )

On this day, James D. Dondero appeared before me, the undersigned notary public, and upon his oath, certified that he had read DEFENDANT HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S INTERROGATORIES and that the facts stated therein are within his personal knowledge and are true and correct to the best of his knowledge, information and belief.

_____
JAMES D. DONDERO

SWORN TO and SUBSCRIBED before me by James D. Dondero on the 27th day of September, 2021.

_____
Notary Public in and for the State of Texas

TARA LOIBEN
Notary Public, State of Texas
Comm. Expires 04-15-2023
Notary ID 128585486

CORE/3522697.0002/169345241.2

Appx. 00589

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on September 27, 2021, a true and correct copy of the foregoing document was served via email on counsel for the Debtor.

/s/ Michael P. Aigen
Michael P. Aigen

13

# EXHIBIT 29

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR NEXPOINT REAL ESTATE PARTNERS, LLC**

## IN THE UNITED STATE BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03007-sgj |
| | § | |
| HCRE PARTNERS, LLC (N/K/A NEXPOINT | § | |
| REAL ESTATE PARTNERS, LLC), JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## DEFENDANT NEXPOINT REAL ESTATE PARTNERS, LLC'S OBJECTIONS AND
## RESPONSES TO PLAINTIFF'S REQUESTS FOR ADMISSION, INTERROGATORIES,
## AND REQUESTS FOR PRODUCTION

TO:     Highland Capital Management, L.P., by and through its attorneys of record, Zachery Z.
        Annable, Hayward PLLC, 10501 N. Central Expy., Ste. 106, Dallas, Texas 75231.

        Defendant HCRE Partners, LLC, n/k/a NexPoint Real Estate Partners, LLC ("Defendant"

or "NREP"), serves its Objections and Responses to Plaintiff Highland Capital Management,

1

L.P.'s ("Debtor" or "Highland") Requests for Admission, Interrogatories, and Requests for Production ("Requests"), as follows:

## REQUESTS FOR PRODUCTION

**Request for Production No. 1:**

All documents and communications Concerning the existence of the Agreement.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 2:**

All Documents and Communications Concerning the negotiation of the Agreement.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 3:**

All Documents and Communications Concerning the terms of the Agreement.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 4:**

All Communications Concerning the Agreement between You and (a) James Dondero, or (b) Nancy Dondero, or (c) Frank Waterhouse, or (d) any Class A shareholders of Highland (see paragraph 99 of the Amended Answer), or (e) Your outside auditor(s) for the period January 1, 2018 to the present.

**RESPONSE:**

2

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 5:**

All Documents and Communications Concerning Your assertion that "Plaintiff's claims are barred, in whole or in part, due to waiver," as alleged in paragraph 98 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 6:**

All Documents and Communications Concerning Your assertion that "Plaintiff's claims are barred, in whole or in part, due to estoppel," as alleged in paragraph 97 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 7:**

All Documents and Communications Concerning Your assertion that "Plaintiff's claims are barred in whole or in part by the doctrine of justification and/or repudiation," as alleged in paragraph 96 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 8:**

3

All Documents and Communications Concerning Your assertion that "Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because at all relevant times Defendant NREP acted in good faith," as alleged in paragraph 100 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 9:**

All Documents and Communications Concerning Your assertion that "Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because the alleged transfer (i.e., the "Alleged Agreement") was . . . for reasonably equivalent value," as alleged in paragraph 101 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 10:**

All Documents and Communications Concerning Your assertion that "Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because there was no intent to hinder, delay, or defraud any creditors of the Debtor by entering into the 'Alleged Agreement'," as alleged in paragraph 102 of the Amended Answer.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 11:**

Your audited financial statements for the period January 1, 2018 to the present.

CORE/3522697.0002/169345052.1

**Appx. 00595**

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, redacted as needed, at a mutually agreeable place and time.

**Request for Production No. 12:**

Your unaudited financial statements for the period January 1, 2018 to the present, to the

extent any portion of that time period is not covered by the audited financial statements.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, redacted as needed, at a mutually agreeable place and time.

**Request for Production No. 13:**

For the period January 1, 2018 through the present, all Communications between You and

Your outside auditor(s) concerning the Notes.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 14:**

All Documents and Communications Concerning any compensation that You paid to

James Dondero for each of Your fiscal years 2016, 2017, 2018, and 2019, and 2020.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 15:**

5

All Documents and Communications Concerning any loan that You ever made to or for the benefit of James Dondero.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 16:**

All Documents and Communications Concerning any Loan that You ever made to or for the benefit of James Dondero that You forgave.

**RESPONSE:**

Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 17:**

To the extent not responsive to the prior requests, all Documents and Communications Concerning each of Your responses to the Interrogatories.

**RESPONSE:**

Defendant objects to this Request because it is vague and not specifically tailored. Subject to any restrictions imposed by the Debtor and/or the Bankruptcy Court impeding the collection of responsive documents, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

**Request for Production No. 18:**

All Documents You intend to introduce at trial in this Adversary Proceeding.

**RESPONSE:**

Subject to any scheduling order agreed to by the parties or entered by the Court, Defendant will produce all responsive documents, if any, at a mutually agreeable place and time.

6

## REQUESTS FOR ADMISSION

**Request for Admission No. 1:**

Admit that You never disclosed the terms of the Agreement to Your outside auditor(s).

**RESPONSE:**

ADMIT.

**Request for Admission No. 2:**

Admit that You never disclosed the existence of the Agreement to Your outside auditor(s).

**RESPONSE:**

ADMIT.

**Request for Admission No. 3:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the terms of the Agreement to Frank Waterhouse.

**RESPONSE:**

DENY.

**Request for Admission No. 4:**

Admit that, prior to the commencement of the Adversary Proceeding, You never disclosed the existence of the Agreement to Frank Waterhouse.

**RESPONSE:**

DENY.

**Request for Admission No. 5:**

Admit that no document was created prior to the commencement of the Adversary Proceeding that reflects or memorializes the terms of the Agreement.

**RESPONSE:**

ADMIT.

CORE/3522697.0002/169345052.1

**Request for Admission No. 6:**

Admit that no document was created prior to the commencement of the Adversary Proceeding Concerning the existence of the Agreement.

**RESPONSE:**

DENY.

**Request for Admission No. 7:**

Admit that You did not disclose the terms of the Agreement in connection with the Bankruptcy Case at any time prior to March 1, 2021, including in connection with any objection to the Plan or Disclosure Statement.

**RESPONSE:**

DENY.

**Request for Admission No. 8:**

Admit that You did not disclose the existence of the Agreement in connection with the Bankruptcy Case at any time prior to March 1, 2021, including in connection with any objection to the Plan or Disclosure Statement.

**RESPONSE:**

DENY.

8

## **INTERROGATORIES**

**Interrogatory No. 1:**

Identify the "testimony" that You believe "discusses the existence of [the Agreement] that may be uncovered through discovery in this Adversary Proceeding," including the (a) name of the witness, (b) the substance of the anticipated testimony, and (c) the basis for Your belief. See paragraph 99 of the Amended Answer.

**RESPONSE:**

Defendant objects to this Interrogatory because discovery is ongoing and because the Interrogatory seeks privileged information.

**Interrogatory No. 2:**

Identify the "email correspondence" that You believe "discusses the existence of [the Agreement] that may be uncovered through discovery in this Adversary Proceeding," including the (a) name(s) of the sender(s) and recipient(s) of such email correspondence, (b) the date of any such email correspondence, and (c) the substance of any such e-mail correspondence.

**RESPONSE:**

Defendant objects to this Interrogatory because discovery is ongoing and because the Interrogatory seeks privileged information.

**Interrogatory No. 3:**

Identify each of Your employees, officers, representatives, and agents who knew of the terms and existence of the Agreement prior to March 1, 2021, and for each such person, identify (a) the name of the person, (b) the person's title or connection to You, (c) the date on which the person first learned of the terms and existence of the Agreement, and (d) how and from whom the person first learned of the terms and existence of the Agreement.

9

**RESPONSE:**

Defendant objects to this Interrogatory to the extent that it seeks privileged information. Subject to this objection, Defendant states that James Dondero knew of the terms and existence of the Agreement prior to March 1, 2021.

**Interrogatory No. 4:**

Identify which part or parts of the Notes are "ambiguous," as alleged in paragraph 104 of

the Amended Answer, and state the basis for Your belief.

**RESPONSE:**

Defendant contends that each note as a whole is ambiguous because it refers to additional agreements without specifying them.

**Interrogatory No. 5:**

Identify all witnesses You intend to call at trial for the Adversary Proceeding.

**RESPONSE:**

Defendant objects to this Interrogatory because it is premature. Defendant will identify any witnesses in accordance with any scheduling order entered by the Court.

10

Dated: September 27, 2021       Respectfully submitted,

*/s/Michael P. Aigen*
Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR NEXPOINT REAL ESTATE
PARTNERS, LLC**

11

## **VERIFICATION**

STATE OF TEXAS          )
                        )
COUNTY OF DALLAS        )

On this day, James D. Dondero appeared before me, the undersigned notary public, and upon his oath, certified that he had read DEFENDANT NEXPOINT REAL ESTATE PARTNERS, LLC'S JAMES DONDERO'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S INTERROGATORIES and that the facts stated therein are within his personal knowledge and are true and correct to the best of his knowledge, information and belief.

_____

JAMES D. DONDERO

SWORN TO and SUBSCRIBED before me by James D. Dondero on the 27th day of September, 2021.

_____

Notary Public in and for the State of Texas

TARA LOIBEN
Notary Public, State of Texas
Comm. Expires 04-15-2023
Notary ID 128585486

CORE/3522697.0002/169345052.1

Appx. 00603

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on September 27, 2021, a true and correct copy of the foregoing document was served via email on counsel for the Debtor.

*/s/ Michael P. Aigen* _____
Michael P. Aigen

13

# EXHIBIT 30

**FOURTH AMENDED AND RESTATED**

**AGREEMENT OF LIMITED PARTNERSHIP**

**OF**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THE PARTNERSHIP INTERESTS REPRESENTED BY THIS LIMITED PARTNERSHIP AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OP 1933 OR UNDER ANY STATE SECURITIES ACTS IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS. THE SALE OR OTHER DISPOSITION OF THE PARTNERSHIP INTERESTS IS PROHIBITED UNLESS THAT SALE OR DISPOSITION IS MADE IN COMPLIANCE WITH ALL SUCH APPLICABLE ACTS. ADDITIONAL RESTRICTIONS ON TRANSFER OF THE PARTNERSHIP INTERESTS ARE SET FORTH IN THIS AGREEMENT.

D-CNL002970

Appx. 00606

**FOURTH AMENDED AND RESTATED
AGREEMENT OF LIMITED PARTNERSHIP
OF
HIGHLAND CAPITAL MANAGEMENT, L.P.**

TABLE OF CONTENTS

ARTICLE 1    GENERAL .................................................................................................1
    1.1.    Continuation ...............................................................................................1
    1.2.    Name ..........................................................................................................1
    1.3.    Purpose ......................................................................................................1
    1.4.    Term. .........................................................................................................1
    1.5.    Partnership Offices; Addresses of Partners. ..............................................1

ARTICLE 2    DEFINITIONS ...........................................................................................2
    2.1.    Definitions .................................................................................................2
    2.2.    Other Definitions .......................................................................................6

ARTICLE 3    FINANCIAL MATTERS.............................................................................6
    3.1.    Capital Contributions ................................................................................6
    3.2.    Allocations of Profits and Losses...............................................................8
    3.3.    Allocations on Transfers ............................................................................9
    3.4.    Special Allocations.....................................................................................9
    3.5.    Curative Allocations.................................................................................10
    3.6.    Code Section 704(c) Allocations...............................................................10
    3.7.    Capital Accounts ......................................................................................11
    3.8.    Distributive Share for Tax Purpose ..........................................................12
    3.9.    Distributions.............................................................................................12
    3.10.   Compensation and Reimbursement of General Partner ............................14
    3.11.   Books, Records, Accounting, and Reports.................................................14
    3.12.   Tax Matters ..............................................................................................14

ARTICLE 4    RIGHTS AND OBLIGATIONS OF PARTNERS ........................................15
    4.1.    Rights and Obligations of the General Partner .........................................15
    4.2.    Rights and Obligations of Limited Partners..............................................19
    4.3.    Transfer of Partnership Interests..............................................................19
    4.4.    Issuances of Partnership Interests to New and Existing Partners...............21
    4.5.    Withdrawal of General Partner .................................................................21
    4.6.    Admission of Substitute Limited Partners and Successor General Partner.......21

ARTICLE 5    DISSOLUTION AND WINDING UP..........................................................22
    5.1.    Dissolution ...............................................................................................22
    5.2.    Continuation of the Partnership................................................................23
    5.3.    Liquidation ...............................................................................................23
    5.4.    Distribution in Kind .................................................................................24
    5.5.    Cancellation of Certificate of Limited Partnership ...................................24
    5.6.    Return of Capital ......................................................................................24
    5.7.    Waiver of Partition....................................................................................24

ARTICLE 6    GENERAL PROVISIONS...........................................................................24
    6.1.    Amendments to Agreement.........................................................................24

i

D-CNL002971

**Appx. 00607**

| 6.2. | Addresses and Notices | 25 |
| 6.3. | Titles and Captions | 25 |
| 6.4. | Pronouns and Plurals | 25 |
| 6.5. | Further Action | 25 |
| 6.6. | Binding Effect | 25 |
| 6.7. | Integration | 25 |
| 6.8. | Creditors | 25 |
| 6.9. | Waiver | 25 |
| 6.10. | Counterparts | 25 |
| 6.11. | Applicable Law | 25 |
| 6.12. | Invalidity of Provisions | 25 |
| 6.13. | Mandatory Arbitration | 26 |

ii

D-CNL002972

Appx. 00608

**FOURTH AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is entered into on this 24th day of December, 2015, to be effective as of December 24, 2015, by and among Strand Advisors, Inc., a Delaware corporation (*"Strand"*), as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner.

Certain terms used in this Agreement are defined in Article 2.

## ARTICLE 1

## GENERAL

**1.1.    Continuation.**  Subject to the provisions of this Agreement, the Partners hereby continue the Partnership as a limited partnership pursuant to the provisions of the Delaware Act.  Except as expressly provided herein, the rights and obligations of the Partners and the administration and termination of the Partnership shall be governed by the Delaware Act.

**1.2.    Name.**  The name of the Partnership shall be, and the business of the Partnership shall be conducted under the name of Highland Capital Management, L.P.  The General Partner, in its sole and unfettered discretion, may change the name of the Partnership at any time and from time to time and shall provide Limited Partners with written notice of such name change within twenty (20) days after such name change.

**1.3.    Purpose.**  The purpose and business of the Partnership shall be the conduct of any business or activity that may lawfully be conducted by a limited partnership organized pursuant to the Delaware Act.  Any or all of the foregoing activities may be conducted directly by the Partnership or indirectly through another partnership, joint venture, or other arrangement.

**1.4.    Term.**  The Partnership was formed as a limited partnership on July 7, 1997, and shall continue until terminated pursuant to this Agreement.

**1.5.    Partnership Offices; Addresses of Partners.**

(a)    Partnership Offices.  The registered office of the Partnership in the State of Delaware shall be 1013 Centre Road, Wilmington, Delaware 19805-1297, and its registered agent for service of process on the Partnership at that registered office shall be Corporation Service Company, or such other registered office or registered agent as the General Partner may from time to time designate.  The principal office of the Partnership shall be 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other place as the General Partner may from time to time designate.  The Partnership may maintain offices at such other place or places as the General Partner deems advisable.

(b)    Addresses of Partners.  The address of the General Partner is 300 Crescent Court, Suite 700, Dallas, Texas 75201.  The address of each Limited Partner shall be the address of that Limited Partner appearing on the books and records of the Partnership.  Each Limited Partner agrees to provide the General Partner with prompt written notice of any change in his/her/its address.

D-CNL002973

## ARTICLE 2

## DEFINITIONS

2.1.    **Definitions.**  The following definitions shall apply to the terms used in this Agreement, unless otherwise clearly indicated to the contrary in this Agreement:

"*Additional Capital Contribution*" has the meaning set forth in Section 3.1(b) of this Agreement.

"*Adjusted Capital Account Deficit*" means, with respect *to* any Partner, the deficit balance, if any, in the Capital Account of that Partner as of the end of the relevant Fiscal Year, or other relevant period, giving effect to all adjustments previously made thereto pursuant to Section 3.7 and further adjusted as follows: (i) credit to that Capital Account, any amounts which that Partner is obligated or deemed obligated to restore pursuant to any provision of this Agreement or pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c); (ii) debit to that Capital Account, the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6); and (iii) to the extent required under the Treasury Regulations, credit to that Capital Account (A) that Partner's share of "minimum gain" and (B) that Partner's share of "partner nonrecourse debt minimum gain." (Each Partner's share of the minimum gain and partner nonrecourse debt minimum gain shall be determined under Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5), respectively.)

"*Affiliate*" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question.  As used in this definition, the term "*control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting Securities, by contract or otherwise.

"*Agreement*" means this Fourth Amended and Restated Agreement of Limited Partnership, as it may be amended, supplemented, or restated from time to time.

"*Business Day*" means Monday through Friday of each week, except that a legal holiday recognized as such by the government of the United States or the State of Texas shall not be regarded as a Business Day.

"*Capital Account*" means the capital account maintained for a Partner pursuant to Section 3.7(a).

"*Capital Contribution*" means, with respect to any Partner, the amount of money or property contributed to the Partnership with respect to the interest in the Partnership held by that Person.

"*Certificate of Limited Partnership*" means the Certificate of Limited Partnership filed with the Secretary of State of Delaware by the General Partner, as that Certificate may be amended, supplemented or restated from time to time.

"*Class A Limited Partners*" means those Partners holding a Class A Limited Partnership Interest, as shown on Exhibit A.

"*Class A Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class A Limited Partner."

2

*"Class B Limited Partner"* means those Partners holding a Class B Limited Partnership Interest, as shown on Exhibit A.

*"Class B Limited Partnership Interest"* means a Partnership Interest held by a Partner in its capacity as a Class B Limited Partner."

*"Class B NAV Ratio Trigger Period"* means any period during which the Class B Limited Partner's aggregate capital contributions, including the original principal balance of the Contribution Note, and reduced by the aggregate amount of distributions to the Class B Limited Partner, exceed 75 percent of the product of the Class B Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class B NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class B NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class B NAV Ratio Trigger Period.

*"Class C Limited Partner"* means those Partners holding a Class C Limited Partnership Interest, as shown on Exhibit A.

*"Class C Limited Partnership Interest"* means a Partnership Interest held by a Partner in its capacity as a Class C Limited Partner."

*"Class C NAV Ratio Trigger Period"* means any period during which an amount equal to $93,000,000.00 reduced by the aggregate amount of distributions to the Class C Limited Partner after the Effective Date exceeds 75 percent of the product of the Class C Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class C NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class C NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class C NAV Ratio Trigger Period.

*"Code"* means the Internal Revenue Code of 1986, as amended and in effect from time to time.

*"Contribution Note"* means that certain Secured Promissory Note dated December 21, 2015 by and among Hunter Mountain Investment Trust, as maker, and the Partnership as Payee.

*"Default Loan"* has the meaning set forth in Section 3.1(c)(i).

*"Defaulting Partner"* has the meaning set forth in Section 3.1(c).

*"Delaware Act"* means the Delaware Revised Uniform Limited Partnership Act, Part IV, Title C, Chapter 17 of the Delaware Corporation Law Annotated, as it may be amended, supplemented or restated from time to time, and any successor to that Act.

*"Effective Date"* means the date first recited above.

*"Fiscal Year"* has the meaning set forth in Section 3.11(b).

3

"*Founding Partner Group*" means, all partners holding partnership interests in the Partnership immediately before the Effective Date.

"*General Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a General Partner pursuant to the terms of this Agreement; and (ii) has not ceased to be a General Partner pursuant to the terms of this Agreement.

"*Limited Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a Limited Partner pursuant to the terms of this Agreement, and (ii) has not ceased to be a Limited Partner pursuant to the terms of this Agreement.

"*Liquidator*" has the meaning set forth in Section 5.3.

"*Losses*" means, for each Fiscal Year, the losses and deductions of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any expenditures described in Code Section 705(a)(2)(B).

"*Majority Interest*" means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners.

"*NAV Ratio Trigger Period*" means a Class B NAV Ratio Trigger Period or a Class C NAV Ratio Trigger Period.

"*Net Increase in Working Capital Accounts*" means the excess of (i) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the end of the period being measured over (ii) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the beginning of the period being measured; provided, however, that amounts within each of the aforementioned categories shall be excluded from the calculation to the extent they are specifically identified as being derived from investing or financing activities. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership and appropriate adjustments may be made to the extent the Partnership adds new ledger accounts to its books and records that are current assets or current liabilities.

"*New Issues*" means Securities that are considered to be "new issues," as defined in the Conduct Rules of the National Association of Securities Dealers, Inc.

"*Nonrecourse Deduction*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1), as computed under Treasury Regulations Section 1.704-2(c).

"*Nonrecourse Liability*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"*Operating Cash Flow*" means Total Revenue less Total Operating Expenses plus Depreciation & Amortization less Net Increase in Working Capital Accounts year over year. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership.

D-CNL002976

Appx. 00612

"*Partner*" means a General Partner or a Limited Partner.

"*Partner Nonrecourse Debt*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"*Partner Nonrecourse Deductions*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"*Partner Nonrecourse Debt Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(5).

"*Partnership*" means Highland Capital Management, L.P., the Delaware limited partnership established pursuant to this Agreement.

"*Partnership Capital*" means, as of any relevant date, the net book value of the Partnership's assets.

"*Partnership Interest*" means the interest acquired by a Partner in the Partnership including, without limitation, that Partner's right: (a) to an allocable share of the Profits, Losses, deductions, and credits of the Partnership; (b) to a distributive share of the assets of the Partnership; (c) if a Limited Partner, to vote on those matters described in this Agreement; and (d) if the General Partner, to manage and operate the Partnership.

"*Partnership Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(d).

"*Percentage Interest*" means the percentage set forth opposite each Partner's name on Exhibit A as such Exhibit may be amended from time to time in accordance with this Agreement.

"*Person*" means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity.

"*Priority Distributions*" has the meaning set forth in Section 3.9(b).

"*Profits*" means, for each Fiscal Year, the income and gains of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any income described in Code Section 705(a)(1)(B).

"*Profits Interest Partner*" means any Person who is issued a Partnership Interest that is treated as a "profits interest" for federal income tax purposes.

"*Purchase Notes*" means those certain Secured Promissory Notes of even date herewith by and among Hunter Mountain Investment Trust, as maker, and The Dugaboy Investment Trust, The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #2, each as Payees of the respective Secured Promissory Notes.

5

"*Record Date*" means the date established by the General Partner for determining the identity of Limited Partners entitled to vote or give consent to Partnership action or entitled to exercise rights in respect of any other lawful action of Limited Partners.

"*Second Amended Buy-Sell and Redemption Agreement*" means that certain Second Amended and Restated Buy-Sell and Redemption Agreement, dated December 21, 2015, to be effective as of December 21, 2015 by and between the Partnership and its Partners, as may be amended, supplemented, or restated from time to time.

"*Securities*" means the following: (i) securities of any kind (including, without limitation, "securities" as that term is defined in Section 2(a)(1) of the Securities Act; (ii) commodities of any kind (as that term is defined by the U.S. Securities Laws and the rules and regulations promulgated thereunder); (iii) any contracts for future or forward delivery of any security, commodity or currency; (iv) any contracts based on any securities or group of securities, commodities or currencies; (v) any options on any contracts referred to in clauses (iii) or (iv); or (vi) any evidences of indebtedness (including participations in or assignments of bank loans or trade credit claims). The items set forth in clauses (i) through (vi) herein include, but are not limited to, capital stock, common stock, preferred stock, convertible securities, reorganization certificates, subscriptions, warrants, rights, options, puts, calls, bonds, mutual fund interests, debentures, notes, certificates of deposit, letters of credit, bankers acceptances, trust receipts and other securities of any corporation or other entity, whether readily marketable or not, rights and options, whether granted or written by the Partnership or by others, treasury bills, bonds and notes, any securities or obligations issued or guaranteed by the United States or any foreign country or any state or possession of the United States or any foreign country or any political subdivision or agency or instrumentality of any of the foregoing, and derivatives of any of the foregoing.

"*Securities Act*" means the Securities Act of 1933, as amended, and any successor to such statute.

"*Substitute Limited Partner*" has the meaning set forth in Section 4.6(a).

"*Transfer*" or derivations thereof, of a Partnership Interest means, as a noun, the transfer, sale, assignment, exchange, pledge, hypothecation or other disposition of a Partnership Interest, or any part thereof, directly or indirectly, and as a verb, voluntarily or involuntarily to transfer, sell, assign, exchange, pledge, hypothecate or otherwise dispose of.

"*Treasury Regulations*" means the Department of Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of succeeding regulations).

2.2.    **Other Definitions**. All terms used in this Agreement that are not defined in this Article 2 have the meanings contained elsewhere in this Agreement.

## ARTICLE 3

## FINANCIAL MATTERS

3.1.    **Capital Contributions**.

(a)    Initial Capital Contributions.  The initial Capital Contribution of each Partner shall be set forth in the books and records of the Partnership.

(b)    Additional Capital Contributions.

6

       (i)     The General Partner, in its reasonable discretion and for a *bona fide* business purpose, may request in writing that the Founding Partner Group make additional Capital Contributions in proportion to their Percentage Interests (each, an "***Additional Capital Contribution***").

       (ii)     Any failure by a Partner to make an Additional Capital Contribution requested under <u>Section 3.1(b)(i)</u> on or before the date on which that Additional Capital Contribution was due shall result in the Partner being in default.

       (c)    <u>Consequences to Defaulting Partners</u>.  In the event a Partner is in default under <u>Section 3.1(b)</u> (a "***Defaulting Partner***"), the Defaulting Partner, in its sole and unfettered discretion, may elect to take either one of the option set forth below.

       (i)     <u>Default Loans</u>.  If the Defaulting Partner so elects, the General Partner shall make a loan to the Defaulting Partner in an amount equal to that Defaulting Partner's additional capital contribution (a "***Default Loan***").  A Default Loan shall be deemed advanced on the date actually advanced.  Default Loans shall earn interest on the outstanding principal amount thereof at a rate equal to the Applicable Federal Mid-Term Rate (determined by the Internal Revenue Service for the month in which the loan is deemed made) from the date actually advanced until the same is repaid in full.  The term of any Default Loan shall be six (6) months, unless otherwise extended by the General Partner in its sole and unfettered discretion.  If the General Partner makes a Default Loan, the Defaulting Partner shall not receive any distributions pursuant to <u>Section 3.9(a)</u> or <u>Section 5.3</u> or any proceeds from the Transfer of all or any part of its Partnership Interest while the Default Loan remains unpaid.  Instead, the Defaulting Partner's share of distributions or such other proceeds shall (until all Default Loans and interest thereon shall have been repaid in full) first be paid to the General Partner.  Such payments shall be applied first to the payment of interest on such Default Loans and then to the repayment of the principal amounts thereof, but shall be considered, for all other purposes of this Agreement, to have been distributed to the Defaulting Partner.  The Defaulting Partner shall be liable for the reasonable fees and expenses incurred by the General Partner (including, without limitation, reasonable attorneys' fees and disbursements) in connection with any enforcement or foreclosure upon any Default Loan and such costs shall, to the extent enforceable under applicable law, be added to the principal amount of the applicable Default Loan.  In addition, at any time during the term of such Default Loan, the Defaulting Partner shall have the right to repay, in full, the Default Loan (including interest and any other charges).  If the General Partner makes a Default Loan, the Defaulting Partner shall be deemed to have pledged to the General Partner and granted to the General Partner a continuing first priority security interest in, all of the Defaulting Partner's Partnership Interest to secure the payment of the principal of, and interest on, such Default Loan in accordance with the provisions hereof, and for such purpose this Agreement shall constitute a security agreement.  The Defaulting Partner shall promptly execute, acknowledge and deliver such financing statements, continuation statements or other documents and take such other actions as the General Partner shall request in writing in order to perfect or continue the perfection of such security interest; and, if the Defaulting Partner shall fail to do so within seven (7) days after the Defaulting Partner's receipt of a notice making demand therefor, the General Partner is hereby appointed the attorney-in-fact of, and is hereby authorized on behalf of, the Defaulting Partner, to execute, acknowledge and deliver all such documents and take all such other actions as may be required to perfect such security interest.  Such appointment and authorization are coupled with an interest and shall be irrevocable.  The General Partner shall, prior to exercising any right or remedy (whether at law, in equity or pursuant to the terms hereof) available to it in connection with such security interest, provide to the Defaulting Partner a notice, in reasonable detail, of the right or remedy to be exercised and the intended timing of such exercise which shall not be less than five (5) days following the date of such notice.

7

   (ii) <u>Reduction of Percentage Interest</u>.  If the Defaulting Partner does not elect to obtain a Default Loan pursuant to <u>Section 3.1(c)(i)</u>, the General Partner shall reduce the Defaulting Partner's Percentage Interest in accordance with the following formula:

   The Defaulting Partner's new Percentage Interest shall equal the product of (1) the Defaulting Partner's current Percentage Interest, multiplied by (2) the quotient of (a) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), divided by (b) the sum of (i) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), plus (ii) the amount of the additional capital contribution that such Defaulting Partner failed to make when due.

To the extent any downward adjustment is made to the Percentage Interest of a Partner pursuant to this <u>Section 3.1(c)(ii)</u>, any resulting benefit shall accrue to the Partners (other than the Defaulting Partner) in proportion to their respective Percentage Interests.

  **3.2.**  **Allocations of Profits and Losses**.

   (a) <u>Allocations of Profits</u>.  Except as provided in <u>Sections 3.4</u>, <u>3.5</u>, and <u>3.6</u>, Profits for any Fiscal Year will be allocated to the Partners as follows:

   (i) <u>First</u>, to the Partners until cumulative Profits allocated under this <u>Section 3.2(a)(i)</u> for all prior periods equal the cumulative Losses allocated to the Partners under <u>Section 3.2(b)(iii)</u> for all prior periods in the inverse order in which such Losses were allocated; and

   (ii) <u>Next</u>, to the Partners until cumulative Profits allocated under this <u>Section 3.2(a)(ii)</u> for all prior periods equal the cumulative Losses allocated to the Partners under <u>Section 3.2(b)(ii)</u> for all prior periods in the inverse order in which such Losses were allocated; and

   (iii) <u>Then</u>, to all Partners in proportion to their respective Percentage Interests.

   (b) <u>Allocations of Losses</u>.  Except as provided in <u>Sections 3.4</u>, <u>3.5</u>, and <u>3.6</u>, Losses for any Fiscal Year will be will be allocated as follows:

   (i) <u>First</u>, to the Partners until cumulative Losses allocated under this <u>Section 3.2(b)(i)</u> for all prior periods equal the cumulative Profits allocated to the Partners under <u>Section 3.2(a)(iii)</u> for all prior periods in the inverse order in which such Profits were allocated; and

   (ii) <u>Next</u>, to the Partners in proportion to their respective positive Capital Account balances until the aggregate Capital Account balances of the Partners (excluding any negative Capital Account balances) equal zero; *provided, however,* losses shall first be allocated to reduce amounts that were last allocated to the Capital Accounts of the Partners; and

   (iii) <u>Then</u>, to all Partners in proportion to their respective Percentage Interests.

8

(c)     Limitation on Loss Allocations.  If any allocation of Losses would cause a Limited Partner to have an Adjusted Capital Account Deficit, those Losses instead shall be allocated to the General Partner.

**3.3.     Allocations on Transfers**.  Taxable items of the Partnership attributable to a Partnership Interest that has been Transferred (including the simultaneous decrease in the Partnership Interest of existing Partners resulting from the admission of a new Partner) shall be allocated in accordance with Section 4.3(d).

**3.4.     Special Allocations.**  If the requisite stated conditions or facts are present, the following special allocations shall be made in the following order:

(a)     Partnership Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 3, if there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, prior to any other allocation under this Agreement, each Partner shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to that Partner's share of the net decrease in Partnership Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This Section 3.4(a) is intended to comply with the partnership minimum gain chargeback requirements of the Treasury Regulations and shall be subject to all exceptions provided therein.

(b)     Partner Nonrecourse Debt Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 3 (other than Section 3.4(a)), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Partner with a share of such Partner Nonrecourse Debt Minimum Gain as of the beginning of the year shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods in an amount equal to that Partner's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This Section 3.4(b) is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements of the Treasury Regulations, shall be interpreted consistently with the Treasury Regulations and shall be subject to all exceptions provided therein.

(c)     Qualified Income Offset.  If a Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), then items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible; *provided, however,* an allocation pursuant to this Section 3.4(c) shall be made if and only to the extent that the Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 3 have been tentatively made without considering this Section 3.4(c).

(d)     Gross Income Allocation.  If a Partner has a deficit Capital Account at the end of any Fiscal Year of the Partnership that exceeds the sum of (i) the amount the Partner is obligated to restore, and (ii) the amount the Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), then each such Partner shall be specially allocated items of income and gain of the Partnership in the amount of the excess as quickly as possible; *provided, however,* an allocation pursuant to this Section 3.4(d) shall be made if and only to

9

D-CNL002981

**Appx. 00617**

the extent that the Partner would have a deficit Capital Account in excess of that sum after all other allocations provided for in this Article 3 have been tentatively made without considering Section 3.4(c) or 3.4(d).

(e)    Nonrecourse Deductions.  Nonrecourse Deductions for any taxable year or other period for which allocations are made shall he allocated among the Partners in accordance with their Percentage interests.

(f)    Partner Nonrecourse Deductions.  Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

(g)    Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any asset of the Partnership under Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and that gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Treasury Regulations.

(h)    Section 481 Adjustments.  Any allocable items of income, gain, expense, deduction or credit required to be made by Section 481 of the Code as the result of the sale, transfer, exchange or issuance of a Partnership Interest will be specially allocated to the Partner receiving said Partnership Interest whether such items are positive or negative in amount.

3.5.    Curative Allocations.  The "*Basic Regulatory Allocations*" consist of (i) the allocations pursuant to Section 3.2(c), and (ii) the allocations pursuant to Sections 3.4.  Notwithstanding any other provision of this Agreement, the Basic Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of the allocations of other items and the Basic Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Basic Regulatory Allocations had not occurred.  For purposes of applying the foregoing sentence, allocations pursuant to this Section 3.5 shall be made with respect to allocations pursuant to Section 3.4 (g) and (h) only to the extent that it is reasonably determined that those allocations will otherwise be inconsistent with the economic agreement among the Partners. To the extent that a special allocation under Section 3.4 is determined not to comply with applicable Treasury Regulations, then the Partners intend that the items shall be allocated in accordance with the Partners' varying Percentage Interests throughout each tax year during which such items are recognized for tax purposes.

3.6.    Code Section 704(c) Allocations.  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation at the time of the contribution between the tax basis of the property to the Partnership and the fair market value of that property.  Except as otherwise provided herein, any elections or other decisions relating to those allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intent of this Agreement.  Allocations of income, gain, loss and deduction pursuant to this Section 3.6 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, the Capital Account of any Partner or the share

D-CNL002982

**Appx. 00618**

of Profits, Losses, other tax items or distributions of any Partner pursuant to any provision of this Agreement.

**3.7.    Capital Accounts**.

(a)    <u>Maintenance of Capital Accounts</u>.  The Partnership shall establish and maintain a separate capital account (*"Capital Account"*) for each Partner in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), subject to and in accordance with the provisions set forth in this <u>Section 3.7</u>.

(i)    The Capital Account balance of each Partner shall be credited (increased) by (A) the amount of cash contributed by that Partner to the capital of the Partnership, (B) the fair market value of property contributed by that Partner to the capital of the Partnership (net of liabilities secured by that contributed property that the Partnership assumes or takes subject to under Code Section 752), and (C) that Partner's allocable share of Profits and any items in the nature of income or gain which are specially allocated pursuant to <u>Sections 3.4</u> and <u>3.5</u>; and

(ii)    The Capital Account balance of each Partner shall be debited (decreased) by (A) the amount of cash distributed to that Partner by the Partnership, (B) the fair market value of property distributed to that Partner by the Partnership (net of liabilities secured by that distributed property that such Partner assumes or takes subject to under Code Section 752), (C) that Partner's allocable share of expenditures of the Partnership described in Code Section 705(a)(2)(B), and (D) that Partner's allocable share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to <u>Sections 3.2</u>, <u>3.4</u> and <u>3.5</u>.

The provisions of this <u>Section 3.7</u> and the other provisions of this Agreement relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Code Section 704(b) and the Treasury Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions.  The General Partner may modify the manner in which the Capital Accounts are maintained under this <u>Section 3.7</u> in order to comply with those provisions, as well as upon the occurrence of events that might otherwise cause this Agreement not to comply with those provisions.

(b)    <u>Negative Capital Accounts</u>.  If any Partner has a deficit balance in its Capital Account, that Partner shall have no obligation to restore that negative balance or to make any Capital Contribution by reason thereof, and that negative balance shall not be considered an asset of the Partnership or of any Partner.

(c)    <u>Interest</u>.  No interest shall be paid by the Partnership on Capital Contributions or on balances in Capital Accounts.

(d)    <u>No Withdrawal</u>.  No Partner shall be entitled to withdraw any part of his/her/its Capital Contribution or his/her/its Capital Account or to receive any distribution from the Partnership, except as provided in <u>Section 3.9</u> and <u>Article 5</u>.

(e)    <u>Loans From Partners</u>.  Loans by a Partner to the Partnership shall not be considered Capital Contributions.

(f)    <u>Revaluations</u>.  The Capital Accounts of the Partners shall not be "booked-up" or "booked-down" to their fair market values under Treasury Regulations Section 1.704(c)-1(b)(2)(iv)(f) or otherwise.

11

D-CNL002983

**Appx. 00619**

**3.8.    Distributive Share for Tax Purpose.**  All items of income, deduction, gain, loss or credit that are recognized for federal income tax purposes will be allocated among the Partners in accordance with the allocations of Profits and Losses hereunder as determined by the General Partner in its sole and unfettered discretion.  Notwithstanding the foregoing, the General Partner may (i) as to each New Issue, specially allocate to the Partners who were allocated New Issue Profit from that New Issue any short-term capital gains realized during the Fiscal Year upon the disposition of such New Issue during that Fiscal Year, and (ii) specially allocate items of gain (or loss) to Partners who withdraw capital during any Fiscal Year in a manner designed to ensure that each withdrawing Partner is allocated gain (or loss) in an amount equal to the difference between that Partner's Capital Account balance (or portion thereof being withdrawn) at the time of the withdrawal and the tax basis for his/her/ its Partnership Interest at that time (or proportionate amount thereof); *provided, however,* that the General Partner may, without the consent of any other Partner, (a) alter the allocation of any item of taxable income, gain, loss, deduction or credit in any specific instance where the General Partner, in its sole and unfettered discretion, determines such alteration to be necessary or appropriate to avoid a materially inequitable result *(e.g., where the allocation would create an inappropriate tax liability);* and/or (b) adopt whatever other method of allocating tax items as the General Partner determines is necessary or appropriate in order to be consistent with the spirit and intent of the Treasury Regulations under Code Sections 704(b) and 704(c).

**3.9.    Distributions**.

(a)    General.  The General Partner may make such pro rata or non-pro rata distributions as it may determine in its sole and unfettered discretion, without being limited to current or accumulated income or gains, but no such distribution shall be made out of funds required to make current payments on Partnership indebtedness; provided, however, that the General Partner may not make non-pro rata distributions under this Section 3.9(a) during an NAV Ratio Trigger Period without the consent of the Class B Limited Partner (in the case of a Class B NAV Ratio Trigger Period) and/or the Class C Limited Partner (in the case of a Class C NAV Ratio Trigger Period); provided, further this provision should not be interpreted to limit in any way the General Partner's ability to make non-pro rata tax distributions under Section 3.9(c) and Section 3.9(f).  The Partnership has entered into one or more credit facilities with financial institutions that may limit the amount and timing of distributions to the Partners.  Thus, the Partners acknowledge that distributions from the Partnership may be limited. Any distributions made to the Class B Limited Partner or the Class C Limited Partner pursuant to Section 3.9(b) shall reduce distributions otherwise allocable to such Partners under this Section 3.9(a) until such aggregate reductions are equal to the aggregate distributions made to the Class B Partners and the Class C Partners under Section 3.9(b).

(b)    Priority Distributions.  Prior to the distribution of any amounts to Partners pursuant to Section 3.9(a), and notwithstanding any other provision in this Agreement to the contrary, the Partnership shall make the following distributions ("***Priority Distributions***") pro-rata among the Class B Limited Partner and the Class C Limited Partner in accordance with their relative Percentage Interests:

(i)    No later than March 31st of each calendar year, commencing March 31, 2017, an amount equal to $1,600,000.00;

(ii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to three percent (3%) of the Partnership's investment gain for the prior year, as reflected in the Partnership's books and records within ledger account number 90100 plus three percent (3%) of the gross realized investment gains for the prior year of Highland Select Equity Fund, as reflected in its books and records;

12

(iii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to ten percent (10%) of the Partnership's Operating Cash Flow for the prior year; and

(iv)    No later than December 24th of each year, commencing December 24, 2016, an amount equal to the aggregate annual principal and interest payments on the Purchase Notes for the then current year.

(c)    Tax Distributions. The General Partner may, in its sole discretion, declare and make cash distributions pursuant hereto to the Partners to allow the federal and state income tax attributable to the Partnership's taxable income that is passed through the Partnership to the Partners to be paid by such Partners (a "*Tax Distribution*"). The General Partner may, in its discretion, make Tax Distributions to the Founding Partner Group without also making Tax Distributions to other Partners; provided, however, that if the General Partner makes Tax Distributions to the Founding Partner Group, Tax Distributions must also be made the Class B Limited Partner to the extent the Class B Limited Partner provides the Partnership with documentation showing it is subject to an entity-level federal income tax obligation. Notwithstanding anything else in this Agreement, the General Partner may declare and pay Tax Distributions even if such Tax Distributions cause the Partnership to be unable to make Priority Distributions under Section 3.9(b).

(d)    Payments Not Deemed Distributions. Any amounts paid pursuant to Sections 4.1(e) or 4.1(h) shall not be deemed to be distributions for purposes of this Agreement.

(e)    Withheld Amounts. Notwithstanding any other provision of this Section 3.9 to the contrary, each Partner hereby authorizes the Partnership to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership with respect to that Partner as a result of that Partner's participation in the Partnership. If and to the extent that the Partnership shall be required to withhold or pay any such taxes, that Partner shall be deemed for all purposes of this Agreement to have received a payment from the Partnership as of the time that withholding or tax is paid, which payment shall be deemed to be a distribution with respect to that Partner's Partnership Interest to the extent that the Partner (or any successor to that Partner's Partnership Interest) is then entitled to receive a distribution. To the extent that the aggregate of such payments to a Partner for any period exceeds the distributions to which that Partner is entitled for that period, the amount of such excess shall be considered a loan from the Partnership to that Partner. Such loan shall bear interest (which interest shall be treated as an item of income to the Partnership) at the "Applicable Federal Rate" (as defined in the Code), as determined hereunder from time to time, until discharged by that Partner by repayment, which may be made in the sole and unfettered discretion of the General Partner out of distributions to which that Partner would otherwise be subsequently entitled. Any withholdings authorized by this Section 3.9(d) shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel or other evidence satisfactory to the General Partner to the effect that a lower rate is applicable, or that no withholding is applicable.

(f)    Special Tax Distributions. The Partnership shall, upon request of such Founding Partner, make distributions to the Founding Partners (or loans, at the election of the General Partner) in an amount necessary for each of them to pay their respective federal income tax obligations incurred through the effective date of the Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., the predecessor to this Agreement.

(g)    Tolling of Priority Distributions. In the event of a "Honis Trigger Event," as defined in the Second Amended Buy-Sell and Redemption Agreement, the Partnership shall not make any distributions, including priority distributions under Section 3.9(b), to the Class B Limited Partner or the Class C Limited Partner until such time as a replacement trust administrator, manager and general partner,

13

as applicable, acceptable to the Partnership in its sole discretion, as indicated by an affirmative vote of consent by a Majority Interest, shall be appointed to the Class B Limited Partner/Class C Limited Partner and any of its direct or indirect owners that have governing documents directly affected by a Honis Trigger Event.

### 3.10. Compensation and Reimbursement of General Partner.

(a)    Compensation.    The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements unless approved by a Majority Interest; provided, however, that no compensation above five million dollars per year may be approved, even by a Majority Interest, during a NAV Ratio Trigger Period.

(b)    Reimbursement for Expenses.    In addition to amounts paid under other Sections of this Agreement, the General Partner and its Affiliates shall be reimbursed for all expenses, disbursements, and advances incurred or made, and all fees, deposits, and other sums paid in connection with the organization and operation of the Partnership, the qualification of the Partnership to do business, and all related matters.

### 3.11. Books, Records, Accounting, and Reports.

(a)    Records and Accounting.    The General Partner shall keep or cause to be kept appropriate books and records with respect to the Partnership's business, which shall at all times be kept at the principal office of the Partnership or such other office as the General Partner may designate for such purpose. The books of the Partnership shall be maintained for financial reporting purposes on the accrual basis or on a cash basis, as the General Partner shall determine in its sole and unfettered discretion, in accordance with generally accepted accounting principles and applicable law. Upon reasonable request, the Class B Limited Partner or the Class C Limited Partner may inspect the books and records of the Partnership.

(b)    Fiscal Year.    The fiscal year of the Partnership shall be the calendar year unless otherwise determined by the General Partner in its sole and unfettered discretion.

(c)    Other Information.    The General Partner may release information concerning the operations of the Partnership to any financial institution or other Person that has loaned or may loan funds to the Partnership or the General Partner or any of its Affiliates, and may release such information to any other Person for reasons reasonably related to the business and operations of the Partnership or as required by law or regulation of any regulatory body.

(d)    Distribution Reporting to Class B Limited Partner and Class C Limited Partner. Upon request, the Partnership shall provide the Class B Limited Partner and/or the Class C Limited Partner information on any non-pro rata distributions made under Section 3.9 to Partners other than the Partner requesting the information.

### 3.12. Tax Matters.

(a)    Tax Returns.    The General Partner shall arrange for the preparation and timely filing of all returns of Partnership income, gain, loss, deduction, credit and other items necessary for federal, state and local income tax purposes. The General Partner shall deliver to each Partner as copy of his/her/its IRS Form K-1 as soon as practicable after the end of the Fiscal Year, but in no event later than October 1. The classification, realization, and recognition of income, gain, loss, deduction, credit and

14

other items shall be on the cash or accrual method of accounting for federal income tax purposes, as the General Partner shall determine in its sole and unfettered discretion.  The General Partner in its sole and unfettered discretion may pay state and local income taxes attributable to operations of the Partnership and treat such taxes as an expense of the Partnership.

(b)  Tax Elections.  Except as otherwise provided herein, the General Partner shall, in its sole and unfettered discretion, determine whether to make any available tax election.

(c)  Tax Controversies.  Subject to the provisions hereof, the General Partner is designated the Tax Matters Partner (as defined in Code Section 6231), and is authorized and required to represent the Partnership, at the Partnership's expense, in connection with all examinations of the Partnership's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith.  Each Partner agrees to cooperate with the General Partner in connection with such proceedings.

(d)  Taxation as a Partnership.  No election shall be made by the Partnership or any Partner for the Partnership to be excluded from the application of any of the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code or from any similar provisions of any state tax laws.

## ARTICLE 4

## RIGHTS AND OBLIGATIONS OF PARTNERS

**4.1.  Rights and Obligations of the General Partner.**  In addition to the rights and obligations set forth elsewhere in this Agreement, the General Partner shall have the following rights and obligations:

(a)  Management.  The General Partner shall conduct, direct, and exercise full control of over all activities of the Partnership.  Except as otherwise expressly provided in this Agreement, all management powers over the business and affairs of the Partnership shall be exclusively vested in the General Partner, and Limited Partners shall have no right of control over the business and affairs of the Partnership.  In addition to the powers now or hereafter granted to a general partner of a limited partnership under applicable law or that are granted to the General Partner under any provision of this Agreement, the General Partner shall have full power and authority to do all things deemed necessary or desirable by it to conduct the business of the Partnership, including, without limitation: (i) the determination of the activities in which the Partnership will participate; (ii) the performance of any and all acts necessary or appropriate to the operation of any business of the Partnership (including, without limitation, purchasing and selling any asset, any debt instruments, any equity interests, any commercial paper, any note receivables and any other obligations); (iii) the procuring and maintaining of such insurance as may be available in such amounts and covering such risks as are deemed appropriate by the General Partner; (iv) the acquisition, disposition, sale, mortgage, pledge, encumbrance, hyphothecation, of exchange of any or all of the assets of the Partnership; (v) the execution and delivery on behalf of, and in the name of the Partnership, deeds, deeds of trust, notes, leases, subleases, mortgages, bills of sale and any and all other contracts or instruments necessary or incidental to the conduct of the Partnership's business; (vi) the making of any expenditures, the borrowing of money, the guaranteeing of indebtedness and other liabilities, the issuance of evidences of indebtedness, and the incurrence of any obligations it deems necessary or advisable for the conduct of the activities of the Partnership, including, without limitation, the payment of compensation and reimbursement to the General Partner and its Affiliates pursuant to Section 3.10; (vii) the use of the assets of the Partnership (including, without limitation, cash on hand) for any Partnership purpose on any terms it sees fit, including, without limitation, the financing of operations of the Partnership, the lending of funds to other Persons, and the repayment of obligations

15

of the Partnership; (viii) the negotiation, execution, and performance of any contracts that it considers desirable, useful, or necessary to the conduct of the business or operations of the Partnership or the implementation of the General Partner's powers under this Agreement; (ix) the distribution of Partnership cash or other assets; (x) the selection, hiring and dismissal of employees, attorneys, accountants, consultants, contractors, agents and representatives and the determination of their compensation and other teens of employment or hiring; (xi) the formation of any further limited or general partnerships, joint ventures, or other relationships that it deems desirable and the contribution to such partnerships, ventures, or relationships of assets and properties of the Partnership; and (xii) the control of any matters affecting the rights and obligations of the Partnership, including, without limitation, the conduct of any litigation, the incurring of legal expenses, and the settlement of claims and suits.

(b)     **Certificate of Limited Partnership.**  The General Partner caused the Certificate of Limited Partnership of the Partnership to be filed with the Secretary of State of Delaware as required by the Delaware Act and shall cause to be filed such other certificates or documents (including, without limitation, copies, amendments, or restatements of this Agreement) as may be determined by the General Partner to be reasonable and necessary or appropriate for the formation, qualification, or registration and operation of a limited partnership (or a partnership in which Limited Partners have limited liability) in the State of Delaware and in any other state where the Partnership may elect to do business.

(c)     **Reliance by Third Parties.**  Notwithstanding any other provision of this Agreement to the contrary, no lender or purchaser or other Person, including any purchaser of property from the Partnership or any other Person dealing with the Partnership, shall be required to verify any representation by the General Partner as to its authority to encumber, sell, or otherwise use any assess or properties of the Partnership, and any such lender, purchaser, or other Person shall be entitled to rely exclusively on such representations and shall be entitled to deal with the General Partner as if it were the sole party in interest therein, both legally and beneficially.  Each Limited Partner hereby waives any and all defenses or other remedies that may be available against any such lender, purchaser, or other Person to contest, negate, or disaffirm any action of the General Partner in connection with any such sale or financing.  In no event shall any Person dealing with the General Partner or the General Partner's representative with respect to any business or property of the Partnership be obligated to ascertain that the terms of this Agreement have been complied with, and each such Person shall be entitled to rely on the assumptions that the Partnership has been duly formed and is validly in existence.  In no event shall any such Person be obligated to inquire into the necessity or expedience of any act or action of the General Partner or the General Partner's representative, and every contract, agreement, deed, mortgage, security agreement, promissory note, or other instrument or document executed by the General Partner or the General Partner's representative with respect to any business or property of the Partnership shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (i), at the time of the execution and delivery thereof, this Agreement was in full force and effect; (ii) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Partnership; and (iii) the General Partner or the General Partner's representative was duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership.

(d)     **Partnership Funds.**  The funds of the Partnership shall be deposited in such account or accounts as are designated by the General Partner.  The General Partner may, in its sole and unfettered discretion, deposit funds of the Partnership in a central disbursing account maintained by or in the name of the General Partner, the Partnership, or any other Person into which funds of the General Partner, the Partnership, on other Persons are also deposited; *provided, however,* at all times books of account are maintained that show the amount of funds of the Partnership on deposit in such account and interest accrued with respect to such funds as credited to the Partnership.  The General Partner may use the funds of the Partnership as compensating balances for its benefit; *provided, however,* such funds do

16

not directly or indirectly secure, and are not otherwise at risk on account of, any indebtedness or other obligation of the General Partner or any director, officer, employee, agent, representative, or Affiliate thereof.  Nothing in this Section 4.1(d) shall be deemed to prohibit or limit in any manner the right of the Partnership to lend funds to the General Partner or any Affiliate thereof pursuant to Section 4.1(e)(i).  All withdrawals from or charges against such accounts shall be made by the General Partner or by its representatives.  Funds of the Partnership may be invested as determined by the General Partner in accordance with the terms and provisions of this Agreement.

(e)     Loans to or from General Partner; Contracts with Affiliates; Joint Ventures.

(i)     The General Partner or any Affiliate of the General Partner may lend to the Partnership funds needed by the Partnership for such periods of time as the General Partner may determine; *provided, however,* the General Partner or its Affiliate may not charge the Partnership interest at a rate greater than the rate (including points or other financing charges or fees) that would be charged the Partnership (without reference to the General Partner's financial abilities or guaranties) by unrelated lenders on comparable loans.  The Partnership shall reimburse the General Partner or its Affiliate, as the case may be, for any costs incurred by the General Partner or that Affiliate in connection with the borrowing of funds obtained by the General Partner or that Affiliate and loaned to the Partnership.  The Partnership may loan funds to the General Partner and any member of the Founding Partner Group at the General Partner's sole and exclusive discretion.

(ii)     The General Partner or any of its Affiliates may enter into an agreement with the Partnership to render services, including management services, for the Partnership.  Any service rendered for the Partnership by the General Partner or any Affiliate thereof shall be on terms that are fair and reasonable to the Partnership.

(iii)     The Partnership may Transfer any assets to joint ventures or other partnerships in which it is or thereby becomes a participant upon terms and subject to such conditions consistent with applicable law as the General Partner deems appropriate; provided, however, that the Partnership may not transfer any asset to the General Partner or one of its Affiliates during any NAV Ratio Trigger Period for consideration less than such asset's fair market value.

(f)     Outside Activities' Conflicts of Interest.  The General Partner or any Affiliate thereof and any director, officer, employee, agent, or representative of the General Partner or any Affiliate thereof shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Partnership, including, without limitation, business interests and activities in direct competition with the Partnership.  Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement or the partnership relationship created hereby in any business ventures of the General Partner, any Affiliate thereof, or any director, officer, employee, agent, or representative of either the General Partner or any Affiliate thereof.

(g)     Resolution of Conflicts of Interest.  Unless otherwise expressly provided in this Agreement or any other agreement contemplated herein, whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Limited Partner, on the other hand, any action taken by the General Partner, in the absence of bad faith by the General Partner, shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein or under the Delaware Act or any other applicable law, rule, or regulation.

(h)     Indemnification.  The Partnership shall indemnify and hold harmless the General Partner and any director, officer, employee, agent, or representative of the General Partner (collectively,

17

D-CNL002989

**Appx. 00625**

the "*GP Party*"*),* against all liabilities, losses, and damages incurred by any of them by reason of any act performed or omitted to be performed in the name of or on behalf of the Partnership, or in connection with the Partnership's business, including, without limitation, attorneys' fees and any amounts expended in the settlement of any claims or liabilities, losses, or damages, to the fullest extent permitted by the Delaware Act; *provided, however,* the Partnership shall have no obligation to indemnify and hold harmless a GP Party for any action or inaction that constitutes gross negligence or willful or wanton misconduct. The Partnership, in the sole and unfettered discretion of the General Partner, may indemnify and hold harmless any Limited Partner, employee, agent, or representative of the Partnership, any Person who is or was serving at the request of the General Partner acting through the General Partner as a director, officer, partner, trustee, employee, agent, or representative of another corporation, partnership, joint venture, trust, or other enterprise, and any other Person to the extent determined by the General Partner in its sole and unfettered discretion, but in no event shall such indemnification exceed the indemnification permitted by the Delaware Act. Notwithstanding anything to the contrary in this <u>Section 4.1(h)</u> or elsewhere in this Agreement, no amendment to the Delaware Act after the date of this Agreement shall reduce or limit in any manner the indemnification provided for or permitted by this <u>Section 4.1(h)</u> unless such reduction or limitation is mandated by such amendment for limited partnerships formed prior to the enactment of such amendment. In no event shall Limited Partners be subject to personal liability by reason of the indemnification provisions of this Agreement.

    (i)    <u>Liability of General Partner</u>.

    (i)    Neither the General Partner nor its directors, officers, employees, agents, or representatives shall be liable to the Partnership or any Limited Partner for errors in judgment or for any acts or omissions that do not constitute gross negligence or willful or wanton misconduct.

    (ii)    The General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its directors, officers, employees, agents, or representatives, and the General Partner shall not be responsible for any misconduct or negligence on the part of any agent or representative appointed by the General Partner.

    (j)    <u>Reliance by General Partner</u>.

    (i)    The General Partner may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

    (ii)    The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, and other consultants and advisers selected by it, and any opinion of any such Person as to matters which the General Partner believes to be within such Person's professional or expert competence shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by the General Partner hereunder in good faith and in accordance with such opinion.

    (k)    The General Partner may, from time to time, designate one or more Persons to be officers of the Partnership. No officer need be a Partner. Any officers so designated shall have such authority and perform such duties as the General Partner may, from time to time, delegate to them. The General Partner may assign titles to particular officers, including, without limitation, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer. Each officer shall hold office until such Person's successor shall be duly designated and shall qualify or until such Person's death or

D-CNL002990

**Appx. 00626**

until such Person shall resign or shall have been removed in the manner hereinafter provided.  Any number of offices may be held by the same Person.  The salaries or other compensation, if any, of the officers and agents of the Partnership shall be fixed from time to time by the General Partner.  Any officer may be removed as such, either with or without cause, by the General Partner whenever in the General Partner's judgment the best interests of the Partnership will be served thereby.  Any vacancy occurring in any office of the Partnership may be filled by the General Partner.

　　　　**4.2.**　　**Rights and Obligations of Limited Partners**.  In addition to the rights and obligations of Limited Partners set forth elsewhere in this Agreement, Limited Partners shall have the following rights and obligations:

　　　　　　　　(a)　　<u>Limitation of Liability</u>.　　Limited Partners shall have no liability under this Agreement except as provided herein or under the Delaware Act.

　　　　　　　　(b)　　<u>Management of Business</u>.  No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

　　　　　　　　(c)　　<u>Return of Capital</u>.  No Limited Partner shall be entitled to the withdrawal or return of its Capital Contribution except to the extent, if any, that distributions made pursuant to this Agreement or upon termination of the Partnership may be considered as such by law and then only to the extent provided for in this Agreement.

　　　　　　　　(d)　　<u>Second Amended Buy-Sell and Redemption Agreement</u>.  Each Limited Partner shall comply with the terms and conditions of the Second Amended Buy-Sell and Redemption Agreement.

　　　　　　　　(e)　　<u>Default on Priority Distributions</u>.  If the Partnership fails to timely pay Priority Distributions pursuant to Section 3.9(b), and the Partnership does not subsequently make such Priority Distribution within ninety days of its due date, the Class B Limited Partner or the Class C Limited Partner may require the Partnership to liquidate publicly traded securities held by the Partnership or Highland Select Equity Master  Fund, L.P., a Delaware limited partnership controlled by the Partnership; <u>provided</u>, <u>however</u>, that the General Partner may in its sole discretion elect instead to liquidate other non-publicly traded securities owned by the Partnership in order to satisfy the Partnership's obligations under <u>Section 3.9(b)</u> and this <u>Section 4.2(e)</u>.  In either case, Affiliates of the General Partner shall have the right of first offer to purchase any securities liquidated under this <u>Section 4.2(e)</u>.

　　　　**4.3.**　　**Transfer of Partnership Interests**.

　　　　　　　　(a)　　<u>Transfer</u>.  No Partnership Interest shall be Transferred, in whole or in part, except in accordance with the terms and conditions set forth in this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement.  Any Transfer or purported Transfer of any Partnership Interest not made in accordance with this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement shall be null and void.  An alleged transferee shall have no right to require any information or account of the Partnership's transactions or to inspect the Partnership's books.  The Partnership shall be entitled to treat the alleged transferor of a Partnership Interest as the absolute owner thereof in all respects, and shall incur no liability to any alleged transferee for distributions to the Partner owning that Partnership Interest of record or for allocations of Profits, Losses, deductions or credits or for transmittal of reports and notices required to be given to holders of Partnership Interests.

19

D-CNL002991

(b)    <u>Transfers by General Partner</u>.  The General Partner may Transfer all, but not less than all, of its Partnership Interest to any Person only with the approval of a Majority Interest; provided, however, that the General Partner may not Transfer its Partnership Interest during any NAV Ratio Trigger Period except to the extent such Transfers are for estate planning purposes or resulting from the death of the individual owner of the General Partner.  Any Transfer by the General Partner of its Partnership Interest under this <u>Section 4.3(b)</u> to an Affiliate of the General Partner or any other Person shall not constitute a withdrawal of the General Partner under <u>Section 4.5(a)</u>, <u>Section 5.1(b)</u>, or any other provision of this Agreement.  If any such Transfer is deemed to constitute a withdrawal under such provisions or otherwise and results in the dissolution of the Partnership under this Agreement or the laws of any jurisdiction to which the Partnership of this Agreement is subject, the Partners hereby unanimously consent to the reconstitution and continuation of the Partnership immediately following such dissolution, pursuant to <u>Section 5.2</u>.

(c)    <u>Transfers by Limited Partners</u>.  The Partnership Interest of a Limited Partner may not be Transferred without the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), and in accordance with the Second Amended Buy-Sell and Redemption Agreement.

(d)    <u>Distributions and Allocations in Respect of Transferred Partnership Interests</u>.  If any Partnership Interest is Transferred during any Fiscal Year in compliance with the provisions of <u>Article 4</u> and the Second Amended Buy-Sell and Redemption Agreement, Profits, Losses, and all other items attributable to the transferred interest for that period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner; provided that no allocations shall be made under this Section 4.3(d) that would affect any special allocations made under <u>Section 3.4</u>.  All distributions declared on or before the date of that Transfer shall be made to the transferor.  Solely for purposes of making such allocations and distributions, the Partnership shall recognize that Transfer not later than the end of the calendar month during which it is given notice of that Transfer; ***provided, however,*** if the Partnership does not receive a notice stating the date that Partnership Interest was Transferred and such other information as the General Partner may reasonably require within thirty (30) days after the end of the Fiscal Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the person who, according to the books and records of the Partnership, on the last day of the Fiscal Year during which the Transfer occurs, was the owner of the Partnership Interest.  Neither the Partnership nor any Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this <u>Section 4.3(d)</u>, whether or not any Partner or the Partnership has knowledge of any Transfer of ownership of any Partnership Interest.

(e)    <u>Forfeiture of Partnership Interests Pursuant to the Contribution Note</u>.  In the event any Class B Limited Partnership Interests are forfeited in favor of the Partnership as a result of any default on the Contribution Note, the Capital Accounts and Percentage Interests associated with such Class B Limited Partnership Interests shall be allocated pro rata among the Class A Partners.  The Priority Distributions in Section 3.9(b) made after the date of such forfeiture shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the Class B Limited Partnership Interest transferred pursuant to this <u>Section 4.3(e)</u> over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any forfeiture of such Class B Limited Partnership Interest.

(f)    <u>Transfers of Partnership Interests Pursuant to the Purchase Notes</u>. Notwithstanding any other provision in this Agreement, the Partnership shall respect, and the General Partner hereby provides automatic consent for, any transfers (in whole or transfers of partial interests) of

20

the Class C Limited Partnership Interests, or a portion thereof, if such transfer occurs as a result of a default on the Purchase Notes. Upon the transfer of any Class C Limited Partnership Interest to any member of the Founding Partner Group (or their assigns), such Class C Limited Partnership Interest shall automatically convert to a Class A Partnership Interest. The Priority Distributions in Section 3.9(b) shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the transferred Class C Limited Partnership Interest over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any transfer of such Class C Limited Partnership Interest.

### 4.4. Issuances of Partnership Interests to New and Existing Partners.

(a)     Issuance of Partnership Interests to New Limited Partners. The General Partner may admit one or more additional Persons as Limited Partners ("Additional Limited Partners") to the Partnership at such times and upon such terms as it deems appropriate in its sole and unfettered discretion; provided, however, that the General Partner may only admit additional Persons as Limited Partners in relation to the issuance of equity incentives to key employees of the Partnership; provided, further that the General Partner may not issue such equity incentives to the extent they entitle the holders, in the aggregate, to a Percentage Interest in excess of twenty percent without the consent of the Class B Limited Partner and the Class C Limited Partner. All Class A Limited Partners, the Class B Limited Partner and the Class C Limited Partner shall be diluted proportionately by the issuance of such limited partnership interests. No Person may be admitted to the Partnership as a Limited Partner until he/she/it executes an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.

(b)     Issuance of an Additional Partnership Interest to an Existing Partner. The General Partner may issue an additional Partnership Interest to any existing Partner at such times and upon such terms as it deems appropriate in its sole and unfettered discretion. Upon the issuance of an additional Partnership Interest to an existing Partner, the Percentage Interests of the members of the Founding Partner Group shall be diluted proportionately. Any additional Partnership Interest shall be subject to all the terms and conditions of this Agreement and the Second Amended Buy-Sell and Redemption Agreement.

### 4.5. Withdrawal of General Partner

(a)     Option. In the event of the withdrawal of the General Partner from the Partnership, the departing General Partner (the "**Departing Partner**") shall, at the option of its successor (if any) exercisable prior to the effective date of the departure of that Departing Partner, promptly receive from its successor in exchange for its Partnership Interest as the General Partner, an amount in cash equal to its Capital Account balance, determined as of the effective date of its departure.

(b)     Conversion. If the successor to a Departing Partner does not exercise the option described in Section 4.5(a), the Partnership Interest of the Departing Partner as the General Partner of the Partnership shall be converted into a Partnership Interest as a Limited Partner.

### 4.6. Admission of Substitute Limited Partners and Successor General Partner.

(a)     Admission of Substitute Limited Partners. A transferee (which may be the heir or legatee of a Limited Partner) or assignee of a Limited Partner's Partnership Interest shall be entitled to receive only the distributive share of the Partnership's Profits, Losses, deductions, and credits attributable to that Partnership Interest. To become a substitute Limited Partner (a "**Substitute Limited Partner**"),

D-CNL002993

**Appx. 00629**

that transferee or assignee shall (1) obtain the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), (ii) comply with all the requirements of this Agreement and the Second Amended Buy-Sell and Redemption Agreement with respect to the Transfer of the Partnership Interest at issue, and (iii) execute an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement. Upon admission of a Substitute Limited Partner, that Limited Partner shall be subject to all of the restrictions applicable to, shall assume all of the obligations of, and shall attain the status of a Limited Partner under and pursuant to this Agreement with respect to the Partnership Interest held by that Limited Partner.

(b)     Admission of Successor General Partner.  A successor General Partner selected pursuant to Section 5.2 or the transferee of or successor to all of the Partnership Interest of the General Partner pursuant to Section 4.3(b) shall be admitted to the Partnership as the General Partner, effective as of the date of the withdrawal or removal of the predecessor General Partner or the date of Transfer of that predecessor's Partnership Interest.

(c)     Action by General Partner.  In connection with the admission of any substitute Limited Partner or successor General Partner or any additional Limited Partner, the General Partner shall have the authority to take all such actions as it deems necessary or advisable in connection therewith, including the amendment of Exhibit A and the execution and filing with appropriate authorities of any necessary documentation.

## ARTICLE 5

### DISSOLUTION AND WINDING UP

**5.1.     Dissolution.**  The Partnership shall be dissolved upon:

(a)     The withdrawal, bankruptcy, or dissolution of the General Partner, or any other event that results in its ceasing to be the General Partner (other than by reason of a Transfer pursuant to Section 4.3(b));

(b)     An election to dissolve the Partnership by the General Partner that is approved by the affirmative vote of a Majority Interest; *provided, however,* the General Partner may dissolve the Partnership without the approval of the Limited Partners in order to comply with Section 14 of the Second Amended Buy-Sell and Redemption Agreement; or

(c)     Any other event that, under the Delaware Act, would cause its dissolution.

For purposes of this Section 5.1, the bankruptcy of the General Partner shall be deemed to have occurred when the General Partner: (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding:  (iv) files a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the General Partner in a proceeding of the type described in clauses (i) through (iv) of this paragraph; (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties; or (vii) one hundred twenty (120) days expire after the date of the commencement of a proceeding against the General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or

22

D-CNL002994

**Appx. 00630**

similar relief under any law if the proceeding has not been previously dismissed, or ninety (90) days expire after the date of the appointment, without the General Partner's consent or acquiescence, of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties if the appointment has not previously been vacated or stayed, or ninety (90) days expire after the date of expiration of a stay, if the appointment has not previously been vacated.

**5.2.    Continuation of the Partnership**.  Upon the occurrence of an event described in Section 5.1(a), the Partnership shall be deemed to be dissolved and reconstituted if a Majority Interest elect to continue the Partnership within ninety (90) days of that event.  If no election to continue the Partnership is made within ninety (90) days of that event, the Partnership shall conduct only activities necessary to wind up its affairs.  If an election to continue the Partnership is made upon the occurrence of an event described in Section 5.1(a), then:

(a)    Within that ninety (90)-day period a successor General Partner shall be selected by a Majority Interest;

(b)    The Partnership shall be deemed to be reconstituted and shall continue until the end of the term for which it is formed unless earlier dissolved in accordance with this Article 5;

(c)    The interest of the former General Partner shall be converted to an interest as a Limited Partner; and

(d)    All necessary steps shall be taken to amend or restate this Agreement and the Certificate of Limited Partnership, and the successor General Partner may for this purpose amend this Agreement and the Certificate of Limited Partnership, as appropriate, without the consent of any Partner.

**5.3.    Liquidation**.  Upon dissolution of the Partnership, unless the Partnership is continued under Section 5.2, the General Partner or, in the event the General Partner has been dissolved, becomes bankrupt (as defined in Section 5.1), or withdraws from the Partnership, a liquidator or liquidating committee selected by a Majority Interest, shall be the Liquidator.  The Liquidator (if other than the General Partner) shall be entitled to receive such compensation for its services as may be approved by a Majority Interest.  The Liquidator shall agree not to resign at any time without fifteen (15) days' prior written notice and (if other than the General Partner) may be removed at any time, with or without cause, by notice of removal approved by a Majority Interest.  Upon dissolution, removal, or resignation of the Liquidator, a successor and substitute Liquidator (who shall have and succeed to all rights, powers, and duties of the original Liquidator) shall within thirty (30) days thereafter be selected by a Majority Interest.  The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the Liquidator shall be deemed to refer also to any such successor or substitute Liquidator appointed in the manner provided herein.  Except as expressly provided in this Article 5, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the parties hereto, all of the powers conferred upon the General Partner under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Partnership as provided herein.  The Liquidator shall liquidate the assets of the Partnership and apply and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

23

(a)     To the payment of the expenses of the terminating transactions including, without limitation, brokerage commission, legal fees, accounting fees and closing costs;

(b)     To the payment of creditors of the Partnership, including Partners, in order of priority provided by law;

(c)     To the Partners and assignees to the extent of, and in proportion to, the positive balances in their respective Capital Accounts as provided in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2); *provided, however,* the Liquidator may place in escrow a reserve of cash or other assets of the Partnership for contingent liabilities in an amount determined by the Liquidator to be appropriate for such purposes; and

(d)     To the Partners in proportion to their respective Percentage Interests.

**5.4.    Distribution in Kind.**  Notwithstanding the provisions of Section 5.3 that require the liquidation of the assets of the Partnership, but subject to the order of priorities set forth therein, if on dissolution of the Partnership the Liquidator determines that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners and assignees, the Liquidator may defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Partnership (other than those to Partners) and/or may distribute to the Partners and assignees, in lieu of cash, as tenants in common and in accordance with the provisions of Section 5.3, undivided interests in such Partnership assets as the Liquidator deems not suitable for liquidation**.**  Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any joint operating agreements or other agreements governing the operation of such properties at such time**.**  The Liquidator shall determine the fair market value of any property distributed in kind using such reasonable method of valuation as it may adopt.

**5.5.    Cancellation of Certificate of Limited Partnership.**  Upon the completion of the distribution of Partnership property as provided in Sections 5.3 and 5.4, the Partnership shall be terminated, and the Liquidator (or the General Partner and Limited Partners if necessary) shall cause the cancellation of the Certificate of Limited Partnership in the State of Delaware and of all qualifications and registrations of the Partnership as a foreign limited partnership in jurisdictions other **than** the State of Delaware and shall take such other actions as may be necessary to terminate the Partnership.

**5.6.    Return of Capital.**  The General Partner shall not be personally liable for the return of the Capital Contributions of Limited Partners, or any portion thereof, it being expressly understood that any such return shall be **made** solely from Partnership assets.

**5.7.    Waiver of Partition.**  Each Partner hereby waives any rights to partition of the Partnership property.

## ARTICLE 6

## GENERAL PROVISIONS

**6.1.    Amendments to Agreement.**  The General Partner may amend this Agreement without the consent of any Partner if the General Partner reasonably determines that such amendment is necessary and appropriate; *provided, however, any* action taken by the General Partner shall be subject to its fiduciary duties to the Limited Partners under the Delaware Act; provided further that any amendments

24

that adversely affect the Class B Limited Partner or the Class C Limited Partner may only be made with the consent of such Partner adversely affected.

      **6.2.**    **Addresses and Notices.**  Any notice, demand, request, or report required or permitted to be given or made to a Partner under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by United States registered or certified mail to the Partner at his/her/its address as shown on the records of the Partnership, regardless of any claim of any Person who may have an interest in any Partnership Interest by reason of an assignment or otherwise.

      **6.3.**    **Titles and Captions.**  All article and section titles and captions in the Agreement are for convenience only, shall not be deemed part of this Agreement, and in no way shall define, limit, extend, or describe the scope or intent of any provisions hereof**.**  Except as specifically provided otherwise, references to "Articles," "Sections" and "Exhibits" are to "Articles," "Sections" and "Exhibits" of this Agreement**.**  All Exhibits hereto are incorporated herein by reference.

      **6.4.**    **Pronouns and Plurals.**  Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns, and verbs shall include the plural and vice versa.

      **6.5.**    **Further Action.**  The parties shall execute all documents, provide all information, and take or refrain from taking all actions as may be necessary or appropriate to achieve the purposes of this Agreement.

      **6.6.**    **Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns.

      **6.7.**    **Integration.**  This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

      **6.8.**    **Creditors.**  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership.

      **6.9.**    **Waiver.**  No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement, or condition.

      **6.10.**    **Counterparts.**  This agreement may be executed in counterparts, all of which together shall constitute one agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

      **6.11.**    **Applicable Law.**  This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to the principles of conflicts of law.

      **6.12.**    **Invalidity of Provisions.**  If any provision of this Agreement is declared or found to be illegal, unenforceable, or void, in whole or in part, then the parties shall be relieved of all obligations arising under that provision, but only to the extent that it is illegal, unenforceable, or void, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying that provision to the extent necessary to make it legal and enforceable while preserving its intent or, if that is

D-CNL002997

**Appx. 00633**

not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives.

    **6.13.    General Partner Discretion.**  Whenever the General Partner may use its sole discretion, the General Partner may consider any items it deems relevant, including its own interest and that of its affiliates.

    **6.14.    Mandatory Arbitration.**    In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief.  The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service.  A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas.  The discovery process shall be limited to the following:  Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.  The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law.  In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules.  All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site.  Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees.  The duty to arbitrate described above shall survive the termination of this Agreement.  Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury.  All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

D-CNL002998

**Appx. 00634**

*Remainder of Page intentionally Left Blank.*
*Signature Page Follows.*

D-CNL002999

**Appx. 00635**

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
James D. Dondero,
President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:   Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:   Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:   Trustee

MARK K. OKADA
_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated
Agreement of Limited Partnership*

D-CNL003000

**Appx. 00636**

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
        James D. Dondero,
        President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

D-CNL003001
**Appx. 00637**

**HUNTER MOUNTAIN INVESTMENT TRUST**
By: Beacon Mountain LLC, Administrator

By: _____
Name: John Honis
Its:　　President

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

## EXHIBIT A

| CLASS A PARTNERS | Percentage Interest | |
|---|---|---|
| | By Class | Effective % |
| GENERAL PARTNER: | | |
| Strand Advisors | 0.5573% | 0.2508% |
| LIMITED PARTNERS: | | |
| The Dugaboy Investment Trust | 74.4426% | 0.1866% |
| Mark K. Okada | 19.4268% | 0.0487% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #1 | 3.9013% | 0.0098% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #2 | 1.6720% | 0.0042% |
| Total Class A Percentage Interest | 100.0000% | 0.500% |
| **CLASS B LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 55.0000% |
| **CLASS C LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 44.500% |
| **PROFIT AND LOSS AMONG CLASSES** | | |
| Class A Partners | 0.5000% | |
| Class B Partners | 55.0000% | |
| Class C Partners | 44.5000% | |

**EXHIBIT B**

**ADDENDUM**
**TO THE**
**FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS ADDENDUM (this "**Addendum**") to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, to be effective as of December 24, 2015, as amended from time to time (the "Agreement"), is made and entered into as of the ____ day of _____, 20_, by and between Strand Advisors, Inc., as the sole General Partner (the "**General Partner**") of Highland Capital Management, L.P. (the "**Partnership**") and _____ ("_____") (except as otherwise provided herein, all capitalized terms used herein shall have the meanings set forth in the Agreement).

RECITALS:

WHEREAS, the General Partner, in its sole and unfettered discretion, and without the consent of any Limited Partner, has the authority under (i) Section 4.4 of the Agreement to admit Additional Limited Partners, (ii) Section 4.6 of the Agreement to admit Substitute Limited Partners and (iii) Section 6.1 of the Agreement to amend the Agreement;

WHEREAS, the General Partner desires to admit _____ as a Class __ Limited Partner holding a __% Percentage Interest in the Partnership as of the date hereof;

WHEREAS, _____ desires to become a Class __ Limited Partner and be bound by the terms and conditions of the Agreement; and

WHEREAS, the General Partner desires to amend the Agreement to add _____ as a party thereto.

AGREEMENT:

RESOLVED, as a condition to receiving a Partnership Interest in the Partnership, _____ acknowledges and agrees that he/she/it (i) has received and read a copy of the Agreement, (ii) shall be bound by the terms and conditions of the Agreement; and (iii) shall promptly execute an addendum to the Second Amended Buy-Sell and Redemption Agreement; and be it

FURTHER RESOLVED, the General Partner hereby amends the Agreement to add _____ as a Limited Partner, and the General Partner shall attach this Addendum to the Agreement and make it a part thereof; and be it

FURTHER RESOLVED, this Addendum may be executed in any number of counterparts, all of which together shall constitute one Addendum binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the day and year above written.

GENERAL PARTNER:

**STRAND ADVISORS, INC.**

By:  _____
     Name: _____
     Title: _____


NEW LIMITED PARTNER:

[_____]

AGREED AND ACCEPTED:

In consideration of the terms of this Addendum and the Agreement, in consideration of the Partnership's allowing the above signed Person to become a Limited Partner of the Partnership, and for other good and valuable consideration receipt of which is hereby acknowledged, the undersigned shall be bound by the terms and conditions of the Agreement as though a party thereto.

SPOUSE OF NEW LIMITED PARTNER:

[_____]

# EXHIBIT 31

Docket #0083  Date Filed: 9/1/2021

Deborah Deitsch-Perez – State Bar ID 24036072
Michael P. Aigen – State Bar ID 24012196
**STINSON LLP**
3102 Oak Lawn Ave, Suite 777
Dallas, Texas 75219
(214) 560-2201 – Telephone
(214) 560-2203 – Facsimile

-AND-

Clay M. Taylor – State Bar ID 24033261
Bryan C. Assink – State Bar ID 24089009
**BONDS ELLIS EPPICH SCHAFER JONES LLP**
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 – Telephone
(817) 405-6902 – Facsimile

ATTORNEYS FOR DEFENDANT JAMES DONDERO

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054-SGJ-11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | **Adversary No.: 21-03003** |
| **JAMES DONDERO, NANCY DONDERO,** | § | |
| **AND THE DUGABOY INVESTMENT TRUST** | § | |
| | § | |
| Defendants. | § | |

### DEFENDANT JAMES DONDERO'S ANSWER TO AMENDED COMPLAINT

Defendant James Dondero ("James <u>Dondero</u>"), defendant in the above-styled and

numbered adversary proceeding (the "<u>Adversary Proceeding</u>") filed by Highland Capital

Management, L.P. (the "<u>Plaintiff</u>"), hereby files this Answer (the "<u>Answer</u>") responding to the

---

1934054210901000000000007

*Amended Complaint for (I) Breach of Contract and (II) Turnover of Property (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty* [Adv. Dkt. 73] (the "Amended Complaint"). Where an allegation in the Amended Complaint is not expressly admitted in this Amended Answer, it is denied.

In filing this Answer, Defendant James Dondero does not waive any rights to compel arbitration, as set forth in Defendants' Motion to Compel Arbitration [Adv. Dkt. 80], filed on September 1, 2021.[1]

## PRELIMINARY STATEMENT

1.     The first sentence of paragraph 1 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied. The second sentence contains a legal conclusion that does not require a response. To the extent it contains factual allegations, they are denied.

2.     Defendant James Dondero admits that he amended his answer and served sworn responses to interrogatories and that these documents speak for themselves.  To the extent paragraph 2 alleges other facts, Defendant James Dondero lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 2 of the Amended Complaint and therefore denies the same.

3.     Defendant James Dondero denies the allegations in paragraph 3 of the Amended Complaint.

---

[1] *Williams v. Cigna Financial Advisors, Inc.*, 56 F.3d 656 (5th Cir. 1995) (Defendant did not substantially invoke the judicial process and waive its right to arbitration despite removal of action to federal court, filing motion to dismiss, filing motion to stay proceedings, answering plaintiff's complaint, asserting counterclaim, and exchanging discovery); *Keytrade USA, Inc. v. AIN Temouchent M/V*, 404 F.3d 891 (5th Cir. 2005) (Arbitration not waived when defendant filed a 100-plus page motion for summary judgment and a concurrent motion to arbitrate); *Gulf Guaranty Life Ins. Co. v. Conn. Gen. Life Ins. Co.*, 304 F.3d 476 (5th Cir. 2002) (no waiver of arbitration right when the party seeking arbitration did no more than defend itself against the claims made against it).

D-CNL002046

**Appx. 00644**

4.      Paragraph 4 of the Amended Complaint contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

5.      Paragraph 5 of the Amended Complaint contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

6.      Defendant James Dondero admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Court to adjudicate this dispute. Any allegations in paragraph 6 not expressly admitted are denied.

7.      Defendant James Dondero admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding. Any allegations in paragraph 7 not expressly admitted are denied.

8.      Defendant James Dondero denies that a breach of contract claim is core.  Defendant James Dondero denies that a § 542(b) turnover proceeding is the appropriate mechanism to collect a contested debt. Defendant James Dondero admits that a § 542(b) turnover proceeding is statutorily core but denies that it is Constitutionally core under *Stern v. Marshall*.  Defendant James Dondero does not consent to the Bankruptcy Court entering final orders or judgment in this Adversary Proceeding. Any allegations in paragraph 8 not expressly admitted are denied.

9.      Subject to the Defendants' Motion to Compel Arbitration, Defendant James Dondero admits paragraph 9 of the Amended Complaint.

## THE PARTIES

10.    Defendant James Dondero admits the allegations in paragraph 10 of the Amended Complaint.

11.    Defendant James Dondero admits the first and second sentences of the allegations in paragraph 11 of the Amended Complaint.  The third sentence of paragraph 11 asserts a legal conclusion to which no response is required. To the extent a response is required or appropriate, Defendant James Dondero admits that he was the President of the Debtor's General Partner, Strand Advisors, Inc. and the Debtor's CEO until his resignation on January 9, 2020. Defendant James Dondero denies any remaining allegations contained in paragraph 11.

12.    Defendant James Dondero admits the allegations in paragraph 12 of the Amended Complaint.

13.    Defendant James Dondero admits that Nancy Dondero is his sister and admits that she is a trustee of Dugaboy. Any allegations in paragraph 13 not expressly admitted are denied.

## CASE BACKGROUND

14.    Defendant James Dondero admits the allegations in paragraph 14 of the Amended Complaint.

15.    Defendant James Dondero admits the allegations in paragraph 15 of the Amended Complaint.

16.    Defendant James Dondero admits the allegations in paragraph 16 of the Amended Complaint.

17.    Defendant James Dondero admits the allegations in paragraph 17 of the Amended Complaint.

D-CNL002048

**Appx. 00646**

18.     Defendant James Dondero admits the allegations in paragraph 18 of the Amended Complaint.

## STATEMENT OF FACTS

19.     Defendant James Dondero admits that he has executed promissory notes under which the Debtor is the payee. Any allegations in paragraph 19 not expressly admitted are denied.

20.     Defendant James Dondero admits that he executed a note as alleged in the first sentence of paragraph 20 of the Amended Complaint.  Defendant James Dondero admits that the attached document appears to be a copy of the referenced note.

21.     Defendant James Dondero admits that he executed a note as alleged in the first sentence of paragraph 21 of the Amended Complaint.  Defendant James Dondero admits that the attached document appears to be a copy of the referenced note.

22.     Defendant James Dondero admits that he executed a note as alleged in the first sentence of paragraph 22 of the Amended Complaint. Defendant James Dondero admits that the attached document appears to be a copy of the referenced note.

23.     Defendant James Dondero admits that Section 2 of each note attached to the Amended Complaint contains the provision quoted in paragraph 23 of the Amended Complaint.

24.     Defendant James Dondero denies the allegations in paragraph 24 of the Amended Complaint. It appears that the provisions of each Note differ. Accordingly, the allegations made in this paragraph are denied.

25.     Defendant James Dondero denies the allegations in paragraph 25 of the Amended Complaint. It appears that the provisions of each Note differ. Accordingly, the allegations made in this paragraph are denied.

26.     In response to paragraph 26 of the Amended Complaint, Defendant James Dondero admits that Exhibit 4 to the Amended Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself. To the extent paragraph 26 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied. To the extent not expressly admitted, paragraph 26 of the Amended Complaint is denied.

27.     To the extent paragraph 27 of the Amended Complaint asserts a legal conclusion, no response is necessary, and it is denied. Defendant James Dondero otherwise admits paragraph 27 of the Complaint.

28.     Defendant James Dondero lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 28 of the Amended Complaint and therefore denies same.

29.     Defendant James Dondero lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 29 of the Amended Complaint and therefore denies same.

30.     Defendant James Dondero lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 30 of the Amended Complaint and therefore denies same.

31.     Defendant James Dondero lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31 of the Amended Complaint and therefore denies same.

32.     Defendant James Dondero denies the allegations in paragraph 32 of the Amended Complaint.

D-CNL002050
Appx. 00648

33.     Defendant James Dondero admits that the Debtor filed the Original Complaint in this action on January 22, 2021 as alleged in the first sentence of paragraph 33 of the Amended Complaint. Defendant James Dondero denies he is liable for the relief requested in the Original Complaint. To the extent not expressly admitted, paragraph 33 of the Amended Complaint is denied.

34.     Defendant James Dondero admits the allegations in paragraph 34 of the Amended Complaint.

35.     Defendant James Dondero admits the allegations in paragraph 35 of the Amended Complaint.

36.     In response to the allegations in paragraph 36 of the Amended Complaint, Defendant James Dondero admits that the Alleged Agreement was orally entered into in January or February 2019 or thereabouts.  To the extent not expressly admitted, paragraph 36 of the Amended Complaint is denied.

37.     Defendant James Dondero admits the allegations in paragraph 37 of the Amended Complaint.

38.     Paragraph 38 of the Amended Complaint asserts a legal conclusion to which no response is required. To the extent a response is required or appropriate, Defendant James Dondero admits that he was the President of the Debtor's General Partner, Stand Advisors, Inc. and the Debtor's CEO until his resignation on January 9, 2020. To the extent not expressly admitted, paragraph 38 of the Amended Complaint is denied.

39.     In response to paragraph 39 of the Amended Complaint, Defendant James Dondero informed the Debtor's CFO that the loans were potentially forgivable and testified that he doesn't remember if he told the Debtor's CFO about the Alleged Agreement.  Subject to the

D-CNL002051

Appx. 00649

foregoing, Defendant James Dondero otherwise admits the allegations in paragraph 39 of the Amended Complaint.

40.     In response to paragraph 40 of the Amended Complaint, Defendant James Dondero admits that he discussed the Alleged Agreement with Nancy Dondero and that no one else participated in the discussions surrounding the execution or authorization of the Alleged Agreement. To the extent not expressly admitted, paragraph 40 of the Amended Complaint is denied.

41.     Defendant James Dondero lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 41 of the Amended Complaint and therefore denies same.

42.     Defendant James Dondero denies the allegations in paragraph 42 of the Amended Complaint.

43.     Defendant James Dondero admits the allegations in paragraph 43 of the Amended Complaint.

44.     Paragraph 44 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

45.     Paragraph 45 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

### FIRST CLAIM FOR RELIEF
**(Against James Dondero)**
**(Breach of Contract)**

46.     Paragraph 46 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

47.     Paragraph 47 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

48.     Paragraph 48 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

49.     Paragraph 49 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

50.     Paragraph 50 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

### SECOND CLAIM FOR RELIEF
#### (Against James Dondero)
#### (Turnover Pursuant to 11 U.S.C. § 542(b))

51.     Paragraph 51 of the Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

52.     Paragraph 52 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

53.     Paragraph 53 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

54.     Paragraph 54 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

55.     Paragraph 55 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. Defendant James Dondero admits that the Plaintiff transmitted the Demand Letter, and that document speaks for itself.  To the extent paragraph 55 alleges other facts, Defendant James Dondero lacks knowledge or information sufficient to form

D-CNL002053

**Appx. 00651**

a belief about the truth of the allegations in paragraph 55 of the Amended Complaint and therefore denies the same.

56.     Paragraph 56 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

57.     Paragraph 57 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

### THIRD CLAIM FOR RELIEF
**(Against James Dondero)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. § 548(a)(1)(A) and 550)**

58.     Paragraph 58 of the Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

59.     Paragraph 59 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

60.     Paragraph 60 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

61.     Paragraph 61 of the Amended Complaint states a legal conclusion that does not require a response and therefore it is denied.

62.     Paragraph 62 of the Amended Complaint states a legal conclusion that does not require a response and therefore it is denied.

63.     Paragraph 63 of the Amended Complaint states a legal conclusion that does not require a response and therefore it is denied.

D-CNL002054
**Appx. 00652**

### FOURTH CLAIM FOR RELIEF
#### (Against James Dondero)
#### (Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. § 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))

64.    Paragraph 64 of the Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

65.    Paragraph 65 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

66.    Paragraph 66 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

67.    Paragraph 67 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

68.    Paragraph 68 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

### FIFTH CLAIM FOR RELIEF
#### (Against Dugaboy)
#### (For Declaratory Relief: --11 U.S.C. § 105(a) and Fed. R. Bankr. P 7001)

69.    This claim is only asserted against Defendant The Dugaboy Investment Trust. Therefore, Defendant James Dondero is not required to respond to this claim.

70.    This claim is only asserted against Defendant The Dugaboy Investment Trust. Therefore, Defendant James Dondero is not required to respond to this claim.

71.    This claim is only asserted against Defendant The Dugaboy Investment Trust. Therefore, Defendant James Dondero is not required to respond to this claim.

72.    This claim is only asserted against Defendant The Dugaboy Investment Trust. Therefore, Defendant James Dondero is not required to respond to this claim.

D-CNL002055

**Appx. 00653**

## SIXTH CLAIM FOR RELIEF
### (Against Dugaboy)
### (Breach of Fiduciary Duty)

73.     This claim is only asserted against Defendant The Dugaboy Investment Trust. Therefore, Defendant James Dondero is not required to respond to this claim.

74.     This claim is only asserted against Defendant The Dugaboy Investment Trust. Therefore, Defendant James Dondero is not required to respond to this claim.

75.     This claim is only asserted against Defendant The Dugaboy Investment Trust. Therefore, Defendant James Dondero is not required to respond to this claim.

76.     This claim is only asserted against Defendant The Dugaboy Investment Trust. Therefore, Defendant James Dondero is not required to respond to this claim.

## SEVENTH CLAIM FOR RELIEF
### (Against James Dondero and Nancy Dondero)
### (Aiding and Abetting a Breach of Fiduciary Duty)

77.     Defendant James Dondero is moving to dismiss this claim. Therefore, he is not required to respond to this claim at this time.

78.     Defendant James Dondero is moving to dismiss this claim. Therefore, he is not required to respond to this claim at this time.

79.     Defendant James Dondero is moving to dismiss this claim. Therefore, he is not required to respond to this claim at this time.

80.     Defendant James Dondero is moving to dismiss this claim. Therefore, he is not required to respond to this claim at this time.

81.     Defendant James Dondero is moving to dismiss this claim. Therefore, he is not required to respond to this claim at this time.

D-CNL002056

**Appx. 00654**

Defendant James Dondero denies that the Plaintiff is entitled to the relief requested in the prayer, including as to parts (i), (ii), (iii), (iv), (v), (vi), and (vii).

### AFFIRMATIVE DEFENSES

82.     Plaintiff's claims are barred in whole or in part because prior to the demands for payment Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. The purpose of this agreement was to provide compensation to Defendant James Dondero, who was otherwise underpaid compared to reasonable compensation levels in the industry, through the use of forgivable loans, a practice that was standard at HCMLP and in the industry.  This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant James Dondero believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

83.     Defendant James Dondero further asserts that Plaintiff's claims are barred, in whole or in part, due to waiver.

84.     Defendant James Dondero further asserts that Plaintiff's claims are barred, in whole or in part, due to estoppel.

85.     Defendant James Dondero further asserts that Note is ambiguous.

86.     Defendant James Dondero further asserts that Plaintiff's claims may be barred, in whole or in part, due to failure of consideration.

D-CNL002057

**Appx. 00655**

87.    Defendant James Dondero further asserts that Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because at all relevant times Defendant James Dondero acted in good faith.

88.    Defendant James Dondero further asserts that Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because the alleged fraudulent transfer (*i.e.*, the "Alleged Agreement") was taken in good faith and for reasonably equivalent value.

89.    Defendant James Dondero further asserts that Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because there was no intent to hinder, delay, or defraud any creditors of the Debtor by entering into the "Alleged Agreement."

90.    Defendant James Dondero further asserts that Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because the Debtor was solvent at the time the "Alleged Agreement" was made.

91.    Defendant James Dondero further asserts that Plaintiff's claims must be resolved in arbitration.

## JURY DEMAND

92.    Except to the extent compelled to arbitration, Defendant James Dondero demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

93.    Defendant James Dondero does <u>not</u> consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant James Dondero respectfully requests that, following a trial on the merits, the Court enter a judgment that the Plaintiff take

D-CNL002058

**Appx. 00656**

nothing on the Amended Complaint and provide Defendant James Dondero such other relief to which he is entitled.

Dated: September 1, 2021

Respectfully submitted,

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
**STINSON LLP**
3102 Oak Lawn Ave, Suite 777
Dallas, Texas 75219
(214) 560-2201 – Telephone
(214) 560-2203 – Facsimile
michael.aigen@stinson.com
deborah.deitschperez@stinson.com

**-and-**

Clay M. Taylor
State Bar No. 24033261
Bryan C. Assink
State Bar No. 24089009
**BONDS ELLIS EPPICH SCHAFER JONES LLP**
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
clay.taylor@bondsellis.com
bryan.assink@bondsellis.com

**ATTORNEYS FOR DEFENDANT
JAMES DONDERO**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez

D-CNL002059
**Appx. 00657**

# EXHIBIT 32

Appx. 00658

Docket #0079  Date Filed: 8/27/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § Case No. 19-34054-sgj11 |
| | § |
| Debtor. | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | § Adversary Proceeding No. |
| | § |
| vs. | § 21-3003 |
| | § |
| JAMES DONDERO, NANCY DONDERO, AND | § |
| THE DUGABOY INVESTMENT TRUST, | § |
| | § |
| Defendants. | § |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210827000000000011

D-CNL001975

Appx. 00659

**AMENDED COMPLAINT FOR (I) BREACH OF CONTRACT,
(II) TURNOVER OF PROPERTY, (III) FRAUDULENT TRANSFER, AND (IV)
BREACH OF FIDUCIARY DUTY**

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"), and the plaintiff (the "Plaintiff") in the above-captioned adversary proceeding (the "Adversary Proceeding"), by its undersigned counsel, as and for its amended complaint (the "Complaint") against defendants James Dondero ("Mr. Dondero"), Nancy Dondero, and The Dugaboy Investment Trust ("Dugaboy," and together with Mr. Dondero and Nancy Dondero, "Defendants"), alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

**PRELIMINARY STATEMENT**

1.      The Debtor brings this action against Defendants in connection with Mr. Dondero's defaults under three promissory notes executed by Mr. Dondero in favor of the Debtor in the aggregate original principal amount of $8,825,000, and payable upon the Debtor's demand. Despite due demand, Mr. Dondero has failed to pay amounts due and owing under the notes and the accrued but unpaid interest thereon.

2.      After amending his answer and his sworn responses to interrogatories, Mr. Dondero now contends that the Debtor orally agreed to relieve him of his obligations under the notes upon fulfillment of "conditions subsequent" (the "Alleged Agreement"). Mr. Dondero further contends that he entered into the Alleged Agreement with his sister, Nancy Dondero, as trustee of Dugaboy, acting on behalf of the Debtor. At the time Mr. Dondero entered into the Alleged Agreement, he controlled the Debtor and was the lifetime beneficiary of Dugaboy.

2

D-CNL001976
**Appx. 00660**

3.      Based on its books and records, discovery to date, and other facts, the Debtor believes that the Alleged Agreement is a fiction created after the commencement of this Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due under the notes.

4.      Nevertheless, the Debtor amends its Complaint for the purpose of adding certain claims and naming additional parties who would be liable to the Debtor if the Alleged Agreement were determined to exist and be enforceable.  Specifically, in addition to pursuing claims against Mr. Dondero for breach of his obligations under the notes and for turnover, the Debtor adds alternative claims (a) against Mr. Dondero for actual fraudulent transfer and aiding and abetting Dugaboy in its breach of fiduciary duty, (b) against Dugaboy for declaratory relief and for breach of fiduciary duty, and (c) against Nancy Dondero for aiding and abetting Dugaboy in the breach of his fiduciary duties.

5.      As remedies, the Debtor seeks (a) damages from Mr. Dondero in an amount equal to (i) the aggregate outstanding principal due under the Notes (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the notes), for Mr. Dondero's breach of his obligations under the Notes, (b) turnover by Mr. Dondero to the Debtor of the foregoing amounts; (c) avoidance of the Alleged Agreement and the transfers thereunder and recovery of the funds transferred from the Plaintiff to, or for the benefit of, Mr. Dondero pursuant to the Notes; (d) declaratory relief, and (e) damages arising from the Defendants' breach of fiduciary duties or aiding and abetting thereof.

DOCS_NY:43594.1 36027/002

D-CNL001977

Appx. 00661

## JURISDICTION AND VENUE

6.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

8.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

10.      The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

11.      Upon information and belief, Mr. Dondero is an individual residing in Dallas, Texas.  He is the co-founder of the Debtor and was the Debtor's President and Chief Executive Officer until his resignation on January 9, 2020.  At all relevant times, Mr. Dondero controlled the Debtor.

12.      Upon information and belief, Dugaboy is (a) a limited partner of the Debtor, and (b) one of Mr. Dondero's family investment trusts for which is he a lifetime beneficiary.

13.      Upon information and belief, Nancy Dondero is Mr. Dondero's sister, and the trustee of Dugaboy.

DOCS_NY:43594.1 36027/002

D-CNL001978
**Appx. 00662**

**CASE BACKGROUND**

14.     On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

15.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members:  (a) Redeemer Committee of Highland Crusader Fund ("Redeemer"), (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively, "Acis").

16.     On June 25, 2021, the U.S. Trustee in this Court filed that certain *Notice of Amended Unsecured Creditors' Committee* [Docket No. 2485] notifying the Court that Acis and Redeemer had resigned from the Committee.

17.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

18.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

**STATEMENT OF FACTS**

A.     **The Dondero Notes**

19.     Mr. Dondero, in his personal capacity, is the maker under a series of promissory notes in favor of the Debtor.

---

[2] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

DOCS_NY:43594.1 36027/002

D-CNL001979

**Appx. 00663**

20.     Specifically, on February 2, 2018, Mr. Dondero executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $3,825,000 ("Dondero's First Note").  A true and correct copy of Dondero's First Note is attached hereto as **Exhibit 1**.

21.     On August 1, 2018, Mr. Dondero executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $2,500,000 ("Dondero's Second Note").  A true and correct copy of Dondero's Second Note is attached hereto as **Exhibit 2.**

22.     On August 13, 2018, Mr. Dondero executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $2,500,000 ("Dondero's Third Note" and collectively, with Dondero's First Note and Dondero's Second Note, the "Notes").  A true and correct copy of Dondero's Third Note is attached hereto as **Exhibit 3.**

23.     Section 2 of each Note provides: "**Payment of Principal and Interest**.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee."

24.     Section 4 of each Note provides:

**Acceleration Upon Default**.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

25.     Section 6 of each Note provides:

**Attorneys' Fees**.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

6

D-CNL001980

**Appx. 00664**

**B.      Mr. Dondero Defaults Under Each Note**

26.      By letter dated December 3, 2020, the Debtor made demand on Mr. Dondero for payment under the Notes by December 11, 2020 (the "Demand Letter"). A true and correct copy of the Demand Letter is attached hereto as **Exhibit 4**. The Demand Letter provided:

> By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $9,004,013.07, which represents all accrued interest and principal through and including December 11, 2020.
>
> **Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Demand Letter (emphasis in the original).

27.      Despite the Debtor's demand, Mr. Dondero did not pay all or any portion of the amounts demanded by the Debtor on December 11, 2020, or at any time thereafter.

28.      As of December 11, 2020, there was an outstanding principal amount of $3,687,269.71 on Dondero's First Note and accrued but unpaid interest in the amount of $21,003.70, resulting in a total outstanding amount as of that date of $3,708,273.41.

29.      As of December 11, 2020, there was an outstanding principal balance of $2,619,929.42 on Dondero's Second Note and accrued but unpaid interest in the amount of $27,950.70, resulting in a total outstanding amount as of that date of $2,647,880.12.

30.      As of December 11, 2020, there was an outstanding principal balance of $2,622,425.61 on Dondero's Third Note and accrued but unpaid interest in the amount of $25,433.94, resulting in a total outstanding amount as of that date of $2,647,859.55.

31.      Thus, as of December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the Notes was $9,004,013.07.

32.      Pursuant to Section 4 of each Note, each Note is in default, and is currently due and payable.

DOCS_NY:43594.1 36027/002

D-CNL001981

**Appx. 00665**

C.    **The Debtor Files the Original Complaint**

33.    On January 22, 2021, the Debtor filed the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* [Docket No. 1] (the "Original Complaint").  In the Original Complaint, the Debtor brought claims for (i) breach of contract for Mr. Dondero's breach of his obligations under the Notes and (ii) turnover by Mr. Dondero for the outstanding amounts under the Notes, plus all accrued and unpaid interest until the date of payment plus the Debtor's costs of collection and reasonable attorney's fees.

D.    **Mr. Dondero's Affirmative Defenses**

34.    On March 16, 2021, Mr. Dondero filed his *Original Answer* [Docket No. 6] (the "Original Answer").  In his Original Answer, Mr. Dondero asserted four affirmative defenses: (i) the Debtor's claims should be barred because it was previously agreed by the Debtor that the Debtor would not collect on the Notes, (ii) waiver, (iii) estoppel, and (iv) failure of consideration. *See id.* ¶¶ 40-43.

35.    On April 6, 2021, Mr. Dondero filed his *Amended Answer* [Docket No. 16] (the "Amended Answer"), asserting three additional affirmative defenses: (i) the Debtor previously agreed that it would not collect on the Notes "upon fulfillment of conditions subsequent" (*i.e.*, the Alleged Agreement) *id.* ¶ 40, (ii) The Debtor's claims are barred, in whole or in part, due to setoff, *id.* ¶ 41, and (iii) the Notes are "ambiguous," *id.* ¶ 45.

36.    According to Mr. Dondero, the Alleged Agreement was orally entered into in January or February 2019, and was not memorialized in any documentation.

37.    According to Mr. Dondero, he entered into the Alleged Agreement with his sister, Nancy Dondero, acting in her capacity as the Trustee of Dugaboy, which purportedly held the majority of the Debtor's Class A limited partnership interests.

DOCS_NY:43594.1 36027/002

38.    Mr. Dondero controlled the Debtor at the time he entered into the Alleged Agreement.

39.    Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement.

40.    According to Mr. Dondero, he discussed the Alleged Agreement with Nancy Dondero, but (a) no one else participated in the discussions surrounding the execution or authorization of the Alleged Agreement, and (b) the Alleged Agreement was not subject to any negotiation.

41.    Upon information and belief, the Debtor's books and records do not reflect the Alleged Agreement.

### E.    Dugaboy Lacked Authority to Act on Behalf of the Debtor

42.    Under section 4.2 of the *Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (the "Limited Partnership Agreement"), and attached hereto as **Exhibit 5**, Dugaboy was not authorized to enter into the Alleged Agreement on behalf of the Partnership, or otherwise bind the Partnership (as "Partnership" is defined in the Limited Partnership Agreement).

43.    Section 4.2(b) of the Limited Partnership Agreement states:

> Management of Business.  No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

**Exhibit 5**, § 4.2(b).

44.    No provision in the Limited Partnership Agreement authorizes any of the Partnership's limited partners to bind the Partnership.

9

D-CNL001983

**Appx. 00667**

45.     Nancy Dondero also lacked authority to enter into the Alleged Agreement or to otherwise bind the Debtor.

<div align="center">

**FIRST CLAIM FOR RELIEF**
**(Against Mr. Dondero)**
**(Breach of Contract)**

</div>

46.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

47.     Each Note is a binding and enforceable contract.

48.     Mr. Dondero breached each Note by failing to pay all amounts due to the Debtor upon the Debtor's demand.

49.     Pursuant to each Note, the Debtor is entitled to damages from Mr. Dondero in an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for Mr. Dondero's breach of his obligations under each of the Notes.

50.     As a direct and proximate cause of Mr. Dondero's breach of each Note, the Debtor has suffered damages in the total amount of at least $9,004,013.07, as of December 11, 2020, plus an amount equal to all accrued but unpaid interest from that date plus the Debtor's cost of collection.

<div align="center">

**SECOND CLAIM FOR RELIEF**
**(Against Mr. Dondero)**
**(Turnover Pursuant to 11 U.S.C. § 542(b))**

</div>

51.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

52.     Mr. Dondero owes the Debtor an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until

<div align="center">10</div>

D-CNL001984
**Appx. 00668**

the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for Mr. Dondero's breach of his obligations under each of the Notes.

53.     Each Note is property of the Debtor's estate and the amounts due under each Note is matured and payable upon demand.

54.     Mr. Dondero has not paid the amounts dues under each Note to the Debtor.

55.     The Debtor has made demand for the turnover of the amounts due under each Note.

56.     As of the date of filing of this Complaint, Mr. Dondero has not turned over to the Debtor all or any of the amounts due under each of the Notes.

57.     The Debtor is entitled to the turnover of all amounts due under each of the Notes.

**<u>THIRD CLAIM FOR RELIEF</u>**
**(Against Mr. Dondero)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) and 550)**

58.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

59.     The Debtor made the transfers in the aggregate amount of $8,825,000 in exchange for the Alleged Agreement within two years of the Petition Date.

60.     Mr. Dondero entered into the Alleged Agreement with actual intent to hinder, delay, or defraud a present or future creditor, demonstrated by, *inter alia*:

(a) The transfers were made to, or for the benefit of, Mr. Dondero, an insider of the Debtor.

11

D-CNL001985
**Appx. 00669**

(b) Mr. Dondero entered into the Alleged Agreement with his sister, Nancy Dondero.

(c) Mr. Dondero did not inform the Debtor's CFO or outside auditors about the Alleged Agreement.

(d) The Debtor's books and record do not reflect the Alleged Agreement.

(e) The Alleged Agreement was not subject to negotiation.

(f) The value of the consideration received by the Debtor for the transfers was not reasonably equivalent in value.

61.     The pattern of conduct, series of transactions, and general chronology of events under inquiry in connection with the debt Mr. Dondero incurred under the Notes demonstrates a scheme of fraud.

62.     Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from Mr. Dondero.

63.     Accordingly, the Debtor is entitled to a judgement: (i) avoiding Alleged Agreement and the transfers thereunder, and (ii) recovering from Mr. Dondero the amount of $8,825,000.

**FOURTH CLAIM FOR RELIEF**
**(Against Mr. Dondero)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))**

64.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

DOCS_NY:43594.1 36027/002

D-CNL001986
**Appx. 00670**

65.    The Debtor made the transfers in the aggregate amount of $8,825,000 in exchange for the Alleged Agreement after, or within a reasonable time before, creditors' claims arose.

66.    Mr. Dondero entered into the Alleged Agreement with actual intent to hinder, delay, or defraud a present or future creditor of the Debtor, demonstrated by, *inter alia*:

(g) The transfers were made to, or for the benefit of, Mr. Dondero, an insider of the Debtor.

(h) Mr. Dondero entered into the Alleged Agreement with his sister, Nancy Dondero.

(i) Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement.

(j) Upon information and belief, the Debtor's books and record do not reflect the Alleged Agreement.

(k) The Alleged Agreement was not subject to negotiation.

(l) The value of the consideration received by the Debtor for the transfers was not reasonably equivalent in value.

67.    Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from Mr. Dondero.

68.    Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfers thereunder, and (ii) recovering from Mr. Dondero the amount of $8,825,000.

DOCS_NY:43594.1 36027/002

D-CNL001987

Appx. 00671

**FIFTH CLAIM FOR RELIEF**
**(Against Dugaboy)**
**(For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)**

69. The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

70. A bona fide, actual, present dispute exists between the Debtor and Dugaboy concerning whether Dugaboy was authorized to entered into the Alleged Agreement on the Debtor's behalf.

71. A judgment declaring the parties' respective rights and obligations will resolve their dispute..

72. Pursuant to Bankruptcy Rule 7001, the Debtor specifically seeks declarations that:

- (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement,

- (b) Dugaboy was not authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership,

- (c) Dugaboy otherwise had no right  or authority to enter into the Alleged Agreement on behalf of the Partnership, and

- (d) the Alleged Agreement is null and void.

14

D-CNL001988
**Appx. 00672**

## SIXTH CLAIM FOR RELIEF
### (Against Dugaboy)
### (Breach of Fiduciary Duty)

73.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

74.    If Dugaboy, as a limited partner, had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy would owe the Debtor a fiduciary duty.

75.    If Dugaboy had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy breached its fiduciary duty of care to the Debtor by entering into and authorizing the purported Alleged Agreement on behalf of the Debtor.

76.    Accordingly, the Debtor is entitled to recover from Dugaboy (a) actual damages that the Debtor suffered as a result of its breach of fiduciary duty, and (b) for punitive and exemplary damages.

## SEVENTH CLAIM FOR RELIEF
### (Against James Dondero and Nancy Dondero)
### (Aiding and Abetting a Breach of Fiduciary Duty)

77.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

78.    James Dondero and Nancy Dondero (together, the "Donderos") were aware that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor.

79.    The Donderos aided and abetted Dugaboy's breach of its fiduciary duties to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

80.    The Donderos aided and abetted Dugaboy's breach of its fiduciary duty to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

15

D-CNL001989

Appx. 00673

81.    Accordingly, the Donderos are jointly and severally liable (a) for the actual damages that the Debtor suffered as a result of aiding and abetting Dondero's breaches of fiduciary duties, and (b) for punitive and exemplary damages.

WHEREFORE, the Debtor prays for judgment as follows:

(i)    On its First Claim for Relief, damages in an amount to be determined at trial but includes (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)    On its Second Claim for Relief, ordering turnover by Mr. Dondero to the Debtor of an amount equal to (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(iii)    On its Third Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder and recovering from Mr. Dondero the amount of $8,825,000 pursuant to section 548 of the Bankruptcy Code;

(iv)    On its Fourth Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder and recovering from Mr. Dondero the amount of $8,825,000 pursuant to section Tex. Bus. & C. Code § 24.005(a)(1);

(v)    On its Fifth Claim for Relief, a declaration that: (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business,

DOCS_NY:43594.1 36027/002

D-CNL001990

Appx. 00674

transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement, (b) Dugaboy was not authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership, (c) Dugaboy otherwise had no right or authority to enter into the Alleged Agreement on behalf of the Partnership, and (d) the Alleged Agreement is null and void;

(vi)    On its Sixth Claim for Relief, actual damages from Dugaboy, in an amount to be determined at trial, that Debtor suffered as a result of Dugaboy's breach of fiduciary duty, and for punitive and exemplary damages;

(vii)    On its Seventh Claim for Relief, actual damages from the Donderos, jointly and severally, in an amount to be determined at trial, that Debtor suffered as a result of aiding and abetting Dugaboy's breaches of fiduciary duty, and for punitive and exemplary damages; and

Such other and further relief as this Court deems just and proper.

17

D-CNL001991

Appx. 00675

Dated:  As of July 13, 2021                    PACHULSKI STANG ZIEHL & JONES LLP
                                               Jeffrey N. Pomerantz (CA Bar No.143717)
                                               Ira D. Kharasch (CA Bar No. 109084)
                                               John A. Morris (NY Bar No. 2405397)
                                               Gregory V. Demo (NY Bar No. 5371992)
                                               Hayley R. Winograd (NY Bar No. 5612569)
                                               10100 Santa Monica Blvd., 13th Floor
                                               Los Angeles, CA 90067
                                               Telephone: (310) 277-6910
                                               Facsimile: (310) 201-0760
                                               E-mail:    jpomerantz@pszjlaw.com
                                                          ikharasch@pszjlaw.com
                                                          jmorris@pszjlaw.com
                                                          gdemo@pszjlaw.com
                                                          hwinograd@pszjlaw.com

                                               -and-

                                               */s/ Zachery Z. Annable*
                                               HAYWARD PLLC
                                               Melissa S. Hayward
                                               Texas Bar No. 24044908
                                               MHayward@HaywardFirm.com
                                               Zachery Z. Annable
                                               Texas Bar No. 24053075
                                               ZAnnable@HaywardFirm.com
                                               10501 N. Central Expy, Ste. 106
                                               Dallas, Texas 75231
                                               Tel: (972) 755-7100
                                               Fax: (972) 755-7110

                                               *Counsel for Highland Capital Management, L.P.*

DOCS_NY:43594.1 36027/002

D-CNL001992

Appx. 00676

# EXHIBIT 1

D-CNL001993

**Appx. 00677**

## PROMISSORY NOTE

$3,825,000                                                                February 2, 2018

     FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of THREE MILLION, EIGHT HUNDRED AND TWENTY-FIVE THOUSAND and 00/100 Dollars ($3,825,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.    Interest Rate. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.66%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

     2.    Payment of Principal and Interest. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

     3.    Prepayment Allowed; Renegotiation Discretionary. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.    Tax Loan. This Note is paid to the Maker to help satisfy any current tax obligations of a former partner or current partner.

     5.    Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     6.    Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     7.    Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other

amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

8.     Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

9.     Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

JAMES DONDERO

2

D-CNL001995

**Appx. 00679**

# EXHIBIT 2

# PROMISSORY NOTE

$2,500,000                                                          August 1, 2018

FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      Interest Rate.   The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.95%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.      Payment of Principal and Interest.   The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.      Prepayment Allowed; Renegotiation Discretionary.   Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      Acceleration Upon Default.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.      Waiver.   Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.      Attorneys' Fees.   If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

D-CNL001997

7.  Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.  Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

JAMES DONDERO

D-CNL001998

**Appx. 00682**

# EXHIBIT 3

D-CNL001999

**Appx. 00683**

# PROMISSORY NOTE

$2,500,000                                                          August 13, 2018

FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.     Interest Rate.   The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.95%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.     Payment of Principal and Interest.   The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.     Prepayment Allowed; Renegotiation Discretionary.   Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.     Acceleration Upon Default.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.     Waiver.   Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.     Attorneys' Fees.   If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

D-CNL002000

**Appx. 00684**

7.     Limitation on Agreements. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     Governing Law. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

JAMES DONDERO

2

D-CNL002001

**Appx. 00685**

# EXHIBIT 4

D-CNL002002

**Appx. 00686**

### HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

James Dondero
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

      Re:  Demand on Promissory Notes:

Dear Mr. Dondero,

You entered into the following promissory notes (collectively, the "Notes") in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 2/2/18 | $3,825,000 | $3,687,269.71 | $21,003.70 | $3,708,273.41 |
| 8/1/18 | $2,500,000 | $2,619,929.42 | $27,950.70 | $2,647,880.12 |
| 8/13/18 | $2,500,000 | $2,622,425.61 | $25,433.94 | $2,647,859.55 |
| **TOTALS** | **$16,725,000** | **$8,929,624.74** | **$74,388.33** | **$9,004,013.07** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee.  By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $9,004,013.07, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain your obligation.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

DOCS_NY:41660.1 36027/002

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       D. Michael Lynn

D-CNL002004

**Appx. 00688**

**Appendix A**

ABA #:          322070381
Bank Name:      East West Bank
Account Name:   Highland Capital Management, LP
Account #:      5500014686

# EXHIBIT 5

D-CNL002006

**Appx. 00690**

**FOURTH AMENDED AND RESTATED**

**AGREEMENT OF LIMITED PARTNERSHIP**

**OF**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THE PARTNERSHIP INTERESTS REPRESENTED BY THIS LIMITED PARTNERSHIP AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OP 1933 OR UNDER ANY STATE SECURITIES ACTS IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS. THE SALE OR OTHER DISPOSITION OF THE PARTNERSHIP INTERESTS IS PROHIBITED UNLESS THAT SALE OR DISPOSITION IS MADE IN COMPLIANCE WITH ALL SUCH APPLICABLE ACTS. ADDITIONAL RESTRICTIONS ON TRANSFER OF THE PARTNERSHIP INTERESTS ARE SET FORTH IN THIS AGREEMENT.

**FOURTH AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

TABLE OF CONTENTS

| | | |
|---|---|---|
| ARTICLE 1 | GENERAL | 1 |
| 1.1. | Continuation | 1 |
| 1.2. | Name | 1 |
| 1.3. | Purpose | 1 |
| 1.4. | Term. | 1 |
| 1.5. | Partnership Offices; Addresses of Partners. | 1 |
| | | |
| ARTICLE 2 | DEFINITIONS | 2 |
| 2.1. | Definitions | 2 |
| 2.2. | Other Definitions | 6 |
| | | |
| ARTICLE 3 | FINANCIAL MATTERS | 6 |
| 3.1. | Capital Contributions | 6 |
| 3.2. | Allocations of Profits and Losses | 8 |
| 3.3. | Allocations on Transfers | 9 |
| 3.4. | Special Allocations | 9 |
| 3.5. | Curative Allocations | 10 |
| 3.6. | Code Section 704(c) Allocations | 10 |
| 3.7. | Capital Accounts | 11 |
| 3.8. | Distributive Share for Tax Purpose | 12 |
| 3.9. | Distributions | 12 |
| 3.10. | Compensation and Reimbursement of General Partner | 14 |
| 3.11. | Books, Records, Accounting, and Reports | 14 |
| 3.12. | Tax Matters | 14 |
| | | |
| ARTICLE 4 | RIGHTS AND OBLIGATIONS OF PARTNERS | 15 |
| 4.1. | Rights and Obligations of the General Partner | 15 |
| 4.2. | Rights and Obligations of Limited Partners | 19 |
| 4.3. | Transfer of Partnership Interests | 19 |
| 4.4. | Issuances of Partnership Interests to New and Existing Partners | 21 |
| 4.5. | Withdrawal of General Partner | 21 |
| 4.6. | Admission of Substitute Limited Partners and Successor General Partner | 21 |
| | | |
| ARTICLE 5 | DISSOLUTION AND WINDING UP | 22 |
| 5.1. | Dissolution | 22 |
| 5.2. | Continuation of the Partnership | 23 |
| 5.3. | Liquidation | 23 |
| 5.4. | Distribution in Kind | 24 |
| 5.5. | Cancellation of Certificate of Limited Partnership | 24 |
| 5.6. | Return of Capital | 24 |
| 5.7. | Waiver of Partition. | 24 |
| | | |
| ARTICLE 6 | GENERAL PROVISIONS | 24 |
| 6.1. | Amendments to Agreement | 24 |

i

D-CNL002008

**Appx. 00692**

| 6.2. | Addresses and Notices | 25 |
| 6.3. | Titles and Captions | 25 |
| 6.4. | Pronouns and Plurals | 25 |
| 6.5. | Further Action | 25 |
| 6.6. | Binding Effect | 25 |
| 6.7. | Integration | 25 |
| 6.8. | Creditors | 25 |
| 6.9. | Waiver | 25 |
| 6.10. | Counterparts | 25 |
| 6.11. | Applicable Law | 25 |
| 6.12. | Invalidity of Provisions | 25 |
| 6.13. | Mandatory Arbitration | 26 |

ii

D-CNL002009

Appx. 00693

**FOURTH AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is entered into on this 24th day of December, 2015, to be effective as of December 24, 2015, by and among Strand Advisors, Inc., a Delaware corporation (*"Strand"*), as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner.

Certain terms used in this Agreement are defined in Article 2.

## ARTICLE 1

## GENERAL

**1.1.    Continuation.**  Subject to the provisions of this Agreement, the Partners hereby continue the Partnership as a limited partnership pursuant to the provisions of the Delaware Act.  Except as expressly provided herein, the rights and obligations of the Partners and the administration and termination of the Partnership shall be governed by the Delaware Act.

**1.2.    Name.**  The name of the Partnership shall be, and the business of the Partnership shall be conducted under the name of Highland Capital Management, L.P.  The General Partner, in its sole and unfettered discretion, may change the name of the Partnership at any time and from time to time and shall provide Limited Partners with written notice of such name change within twenty (20) days after such name change.

**1.3.    Purpose.**  The purpose and business of the Partnership shall be the conduct of any business or activity that may lawfully be conducted by a limited partnership organized pursuant to the Delaware Act.  Any or all of the foregoing activities may be conducted directly by the Partnership or indirectly through another partnership, joint venture, or other arrangement.

**1.4.    Term.**  The Partnership was formed as a limited partnership on July 7, 1997, and shall continue until terminated pursuant to this Agreement.

**1.5.    Partnership Offices; Addresses of Partners**.

(a)    Partnership Offices.  The registered office of the Partnership in the State of Delaware shall be 1013 Centre Road, Wilmington, Delaware 19805-1297, and its registered agent for service of process on the Partnership at that registered office shall be Corporation Service Company, or such other registered office or registered agent as the General Partner may from time to time designate.  The principal office of the Partnership shall be 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other place as the General Partner may from time to time designate.  The Partnership may maintain offices at such other place or places as the General Partner deems advisable.

(b)    Addresses of Partners.  The address of the General Partner is 300 Crescent Court, Suite 700, Dallas, Texas 75201.  The address of each Limited Partner shall be the address of that Limited Partner appearing on the books and records of the Partnership.  Each Limited Partner agrees to provide the General Partner with prompt written notice of any change in his/her/its address.

## ARTICLE 2

## DEFINITIONS

**2.1.    Definitions.**  The following definitions shall apply to the terms used in this Agreement, unless otherwise clearly indicated to the contrary in this Agreement:

"*Additional Capital Contribution*" has the meaning set forth in Section 3.1(b) of this Agreement.

"*Adjusted Capital Account Deficit*" means, with respect *to* any Partner, the deficit balance, if any, in the Capital Account of that Partner as of the end of the relevant Fiscal Year, or other relevant period, giving effect to all adjustments previously made thereto pursuant to Section 3.7 and further adjusted as follows: (i) credit to that Capital Account, any amounts which that Partner is obligated or deemed obligated to restore pursuant to any provision of this Agreement or pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c); (ii) debit to that Capital Account, the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6); and (iii) to the extent required under the Treasury Regulations, credit to that Capital Account (A) that Partner's share of "minimum gain" and (B) that Partner's share of "partner nonrecourse debt minimum gain." (Each Partner's share of the minimum gain and partner nonrecourse debt minimum gain shall be determined under Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5), respectively.)

"*Affiliate*" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question.  As used in this definition, the term "*control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting Securities, by contract or otherwise.

"*Agreement*" means this Fourth Amended and Restated Agreement of Limited Partnership, as it may be amended, supplemented, or restated from time to time.

"*Business Day*" means Monday through Friday of each week, except that a legal holiday recognized as such by the government of the United States or the State of Texas shall not be regarded as a Business Day.

"*Capital Account*" means the capital account maintained for a Partner pursuant to Section 3.7(a).

"*Capital Contribution*" means, with respect to any Partner, the amount of money or property contributed to the Partnership with respect to the interest in the Partnership held by that Person.

"*Certificate of Limited Partnership*" means the Certificate of Limited Partnership filed with the Secretary of State of Delaware by the General Partner, as that Certificate may be amended, supplemented or restated from time to time.

"*Class A Limited Partners*" means those Partners holding a Class A Limited Partnership Interest, as shown on Exhibit A.

"*Class A Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class A Limited Partner."

2

"*Class B Limited Partner*" means those Partners holding a Class B Limited Partnership Interest, as shown on Exhibit A.

"*Class B Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class B Limited Partner."

"*Class B NAV Ratio Trigger Period*" means any period during which the Class B Limited Partner's aggregate capital contributions, including the original principal balance of the Contribution Note, and reduced by the aggregate amount of distributions to the Class B Limited Partner, exceed 75 percent of the product of the Class B Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class B NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class B NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class B NAV Ratio Trigger Period.

"*Class C Limited Partner*" means those Partners holding a Class C Limited Partnership Interest, as shown on Exhibit A.

"*Class C Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class C Limited Partner."

"*Class C NAV Ratio Trigger Period*" means any period during which an amount equal to $93,000,000.00 reduced by the aggregate amount of distributions to the Class C Limited Partner after the Effective Date exceeds 75 percent of the product of the Class C Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class C NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class C NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class C NAV Ratio Trigger Period.

"*Code*" means the Internal Revenue Code of 1986, as amended and in effect from time to time.

"*Contribution Note*" means that certain Secured Promissory Note dated December 21, 2015 by and among Hunter Mountain Investment Trust, as maker, and the Partnership as Payee.

"*Default Loan*" has the meaning set forth in Section 3.1(c)(i).

"*Defaulting Partner*" has the meaning set forth in Section 3.1(c).

"*Delaware Act*" means the Delaware Revised Uniform Limited Partnership Act, Part IV, Title C, Chapter 17 of the Delaware Corporation Law Annotated, as it may be amended, supplemented or restated from time to time, and any successor to that Act.

"*Effective Date*" means the date first recited above.

"*Fiscal Year*" has the meaning set forth in Section 3.11(b).

3

D-CNL002012

**Appx. 00696**

"*Founding Partner Group*" means, all partners holding partnership interests in the Partnership immediately before the Effective Date.

"*General Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a General Partner pursuant to the terms of this Agreement; and (ii) has not ceased to be a General Partner pursuant to the terms of this Agreement.

"*Limited Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a Limited Partner pursuant to the terms of this Agreement, and (ii) has not ceased to be a Limited Partner pursuant to the terms of this Agreement.

"*Liquidator*" has the meaning set forth in Section 5.3.

"*Losses*" means, for each Fiscal Year, the losses and deductions of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any expenditures described in Code Section 705(a)(2)(B).

"*Majority Interest*" means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners.

"*NAV Ratio Trigger Period*" means a Class B NAV Ratio Trigger Period or a Class C NAV Ratio Trigger Period.

"*Net Increase in Working Capital Accounts*" means the excess of (i) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the end of the period being measured over (ii) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the beginning of the period being measured; provided, however, that amounts within each of the aforementioned categories shall be excluded from the calculation to the extent they are specifically identified as being derived from investing or financing activities. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership and appropriate adjustments may be made to the extent the Partnership adds new ledger accounts to its books and records that are current assets or current liabilities.

"*New Issues*" means Securities that are considered to be "new issues," as defined in the Conduct Rules of the National Association of Securities Dealers, Inc.

"*Nonrecourse Deduction*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1), as computed under Treasury Regulations Section 1.704-2(c).

"*Nonrecourse Liability*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"*Operating Cash Flow*" means Total Revenue less Total Operating Expenses plus Depreciation & Amortization less Net Increase in Working Capital Accounts year over year. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership.

4

D-CNL002013

**Appx. 00697**

"*Partner*" means a General Partner or a Limited Partner.

"*Partner Nonrecourse Debt*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"*Partner Nonrecourse Deductions*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"*Partner Nonrecourse Debt Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(5).

"*Partnership*" means Highland Capital Management, L.P., the Delaware limited partnership established pursuant to this Agreement.

"*Partnership Capital*" means, as of any relevant date, the net book value of the Partnership's assets.

"*Partnership Interest*" means the interest acquired by a Partner in the Partnership including, without limitation, that Partner's right: (a) to an allocable share of the Profits, Losses, deductions, and credits of the Partnership; (b) to a distributive share of the assets of the Partnership; (c) if a Limited Partner, to vote on those matters described in this Agreement; and (d) if the General Partner, to manage and operate the Partnership.

"*Partnership Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(d).

"*Percentage Interest*" means the percentage set forth opposite each Partner's name on Exhibit A as such Exhibit may be amended from time to time in accordance with this Agreement.

"*Person*" means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity.

"*Priority Distributions*" has the meaning set forth in Section 3.9(b).

"*Profits*" means, for each Fiscal Year, the income and gains of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any income described in Code Section 705(a)(1)(B).

"*Profits Interest Partner*" means any Person who is issued a Partnership Interest that is treated as a "profits interest" for federal income tax purposes.

"*Purchase Notes*" means those certain Secured Promissory Notes of even date herewith by and among Hunter Mountain Investment Trust, as maker, and The Dugaboy Investment Trust, The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #2, each as Payees of the respective Secured Promissory Notes.

D-CNL002014

**Appx. 00698**

"*Record Date*" means the date established by the General Partner for determining the identity of Limited Partners entitled to vote or give consent to Partnership action or entitled to exercise rights in respect of any other lawful action of Limited Partners.

"*Second Amended Buy-Sell and Redemption Agreement*" means that certain Second Amended and Restated Buy-Sell and Redemption Agreement, dated December 21, 2015, to be effective as of December 21, 2015 by and between the Partnership and its Partners, as may be amended, supplemented, or restated from time to time.

"*Securities*" means the following: (i) securities of any kind (including, without limitation, "securities" as that term is defined in Section 2(a)(1) of the Securities Act; (ii) commodities of any kind (as that term is defined by the U.S. Securities Laws and the rules and regulations promulgated thereunder); (iii) any contracts for future or forward delivery of any security, commodity or currency; (iv) any contracts based on any securities or group of securities, commodities or currencies; (v) any options on any contracts referred to in clauses (iii) or (iv); or (vi) any evidences of indebtedness (including participations in or assignments of bank loans or trade credit claims).  The items set forth in clauses (i) through (vi) herein include, but are not limited to, capital stock, common stock, preferred stock, convertible securities, reorganization certificates, subscriptions, warrants, rights, options, puts, calls, bonds, mutual fund interests, debentures, notes, certificates of deposit, letters of credit, bankers acceptances, trust receipts and other securities of any corporation or other entity, whether readily marketable or not, rights and options, whether granted or written by the Partnership or by others, treasury bills, bonds and notes, any securities or obligations issued or guaranteed by the United States or any foreign country or any state or possession of the United States or any foreign country or any political subdivision or agency or instrumentality of any of the foregoing, and derivatives of any of the foregoing.

"*Securities Act*" means the Securities Act of 1933, as amended, and any successor to such statute.

"*Substitute Limited Partner*" has the meaning set forth in Section 4.6(a).

"*Transfer*" or derivations thereof, of a Partnership Interest means, as a noun, the transfer, sale, assignment, exchange, pledge, hypothecation or other disposition of a Partnership Interest, or any part thereof, directly or indirectly, and as a verb, voluntarily or involuntarily to transfer, sell, assign, exchange, pledge, hypothecate or otherwise dispose of.

"*Treasury Regulations*" means the Department of Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of succeeding regulations).

**2.2.**    **Other Definitions**.  All terms used in this Agreement that are not defined in this Article 2 have the meanings contained elsewhere in this Agreement.

## ARTICLE 3

## FINANCIAL MATTERS

**3.1.**    **Capital Contributions**.

(a)    Initial Capital Contributions.  The initial Capital Contribution of each Partner shall be set forth in the books and records of the Partnership.

(b)    Additional Capital Contributions.

6

(i)      The General Partner, in its reasonable discretion and for a *bona fide* business purpose, may request in writing that the Founding Partner Group make additional Capital Contributions in proportion to their Percentage Interests (each, an "***Additional Capital Contribution***").

(ii)      Any failure by a Partner to make an Additional Capital Contribution requested under <u>Section 3.1(b)(i)</u> on or before the date on which that Additional Capital Contribution was due shall result in the Partner being in default.

(c)      <u>Consequences to Defaulting Partners</u>.  In the event a Partner is in default under <u>Section 3.1(b)</u> (a "***Defaulting Partner***"), the Defaulting Partner, in its sole and unfettered discretion, may elect to take either one of the option set forth below.

(i)      <u>Default Loans</u>.  If the Defaulting Partner so elects, the General Partner shall make a loan to the Defaulting Partner in an amount equal to that Defaulting Partner's additional capital contribution (a "***Default Loan***").  A Default Loan shall be deemed advanced on the date actually advanced.  Default Loans shall earn interest on the outstanding principal amount thereof at a rate equal to the Applicable Federal Mid-Term Rate (determined by the Internal Revenue Service for the month in which the loan is deemed made) from the date actually advanced until the same is repaid in full.  The term of any Default Loan shall be six (6) months, unless otherwise extended by the General Partner in its sole and unfettered discretion.  If the General Partner makes a Default Loan, the Defaulting Partner shall not receive any distributions pursuant to <u>Section 3.9(a)</u> or <u>Section 5.3</u> or any proceeds from the Transfer of all or any part of its Partnership Interest while the Default Loan remains unpaid.  Instead, the Defaulting Partner's share of distributions or such other proceeds shall (until all Default Loans and interest thereon shall have been repaid in full) first be paid to the General Partner.  Such payments shall be applied first to the payment of interest on such Default Loans and then to the repayment of the principal amounts thereof, but shall be considered, for all other purposes of this Agreement, to have been distributed to the Defaulting Partner.  The Defaulting Partner shall be liable for the reasonable fees and expenses incurred by the General Partner (including, without limitation, reasonable attorneys' fees and disbursements) in connection with any enforcement or foreclosure upon any Default Loan and such costs shall, to the extent enforceable under applicable law, be added to the principal amount of the applicable Default Loan.  In addition, at any time during the term of such Default Loan, the Defaulting Partner shall have the right to repay, in full, the Default Loan (including interest and any other charges).  If the General Partner makes a Default Loan, the Defaulting Partner shall be deemed to have pledged to the General Partner and granted to the General Partner a continuing first priority security interest in, all of the Defaulting Partner's Partnership Interest to secure the payment of the principal of, and interest on, such Default Loan in accordance with the provisions hereof, and for such purpose this Agreement shall constitute a security agreement.  The Defaulting Partner shall promptly execute, acknowledge and deliver such financing statements, continuation statements or other documents and take such other actions as the General Partner shall request in writing in order to perfect or continue the perfection of such security interest; and, if the Defaulting Partner shall fail to do so within seven (7) days after the Defaulting Partner's receipt of a notice making demand therefor, the General Partner is hereby appointed the attorney-in-fact of, and is hereby authorized on behalf of, the Defaulting Partner, to execute, acknowledge and deliver all such documents and take all such other actions as may be required to perfect such security interest.  Such appointment and authorization are coupled with an interest and shall be irrevocable.  The General Partner shall, prior to exercising any right or remedy (whether at law, in equity or pursuant to the terms hereof) available to it in connection with such security interest, provide to the Defaulting Partner a notice, in reasonable detail, of the right or remedy to be exercised and the intended timing of such exercise which shall not be less than five (5) days following the date of such notice.

D-CNL002016

**Appx. 00700**

          (ii)    <u>Reduction of Percentage Interest</u>.  If the Defaulting Partner does not elect to obtain a Default Loan pursuant to <u>Section 3.1(c)(i)</u>, the General Partner shall reduce the Defaulting Partner's Percentage Interest in accordance with the following formula:

> The Defaulting Partner's new Percentage Interest shall equal the product of (1) the Defaulting Partner's current Percentage Interest, multiplied by (2) the quotient of (a) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), divided by (b) the sum of (i) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), plus (ii) the amount of the additional capital contribution that such Defaulting Partner failed to make when due.

To the extent any downward adjustment is made to the Percentage Interest of a Partner pursuant to this <u>Section 3.1(c)(ii)</u>, any resulting benefit shall accrue to the Partners (other than the Defaulting Partner) in proportion to their respective Percentage Interests.

**3.2.**      **Allocations of Profits and Losses**.

          (a)    <u>Allocations of Profits</u>.  Except as provided in <u>Sections 3.4</u>, <u>3.5</u>, and <u>3.6</u>, Profits for any Fiscal Year will be allocated to the Partners as follows:

          (i)    <u>First</u>, to the Partners until cumulative Profits allocated under this <u>Section 3.2(a)(i)</u> for all prior periods equal the cumulative Losses allocated to the Partners under <u>Section 3.2(b)(iii)</u> for all prior periods in the inverse order in which such Losses were allocated; and

          (ii)    <u>Next</u>, to the Partners until cumulative Profits allocated under this <u>Section 3.2(a)(ii)</u> for all prior periods equal the cumulative Losses allocated to the Partners under <u>Section 3.2(b)(ii)</u> for all prior periods in the inverse order in which such Losses were allocated; and

          (iii)    <u>Then</u>, to all Partners in proportion to their respective Percentage Interests.

          (b)    <u>Allocations of Losses</u>.  Except as provided in <u>Sections 3.4</u>, <u>3.5</u>, and <u>3.6</u>, Losses for any Fiscal Year will be will be allocated as follows:

          (i)    <u>First</u>, to the Partners until cumulative Losses allocated under this <u>Section 3.2(b)(i)</u> for all prior periods equal the cumulative Profits allocated to the Partners under <u>Section 3.2(a)(iii)</u> for all prior periods in the inverse order in which such Profits were allocated; and

          (ii)    <u>Next</u>, to the Partners in proportion to their respective positive Capital Account balances until the aggregate Capital Account balances of the Partners (excluding any negative Capital Account balances) equal zero; *provided, however,* losses shall first be allocated to reduce amounts that were last allocated to the Capital Accounts of the Partners; and

          (iii)    <u>Then</u>, to all Partners in proportion to their respective Percentage Interests.

8

D-CNL002017

**Appx. 00701**

(c)     <u>Limitation on Loss Allocations</u>.  If any allocation of Losses would cause a Limited Partner to have an Adjusted Capital Account Deficit, those Losses instead shall be allocated to the General Partner.

**3.3.     Allocations on Transfers**.  Taxable items of the Partnership attributable to a Partnership Interest that has been Transferred (including the simultaneous decrease in the Partnership Interest of existing Partners resulting from the admission of a new Partner) shall be allocated in accordance with Section 4.3(d).

**3.4.     Special Allocations.**  If the requisite stated conditions or facts are present, the following special allocations shall be made in the following order:

(a)     <u>Partnership Minimum Gain Chargeback</u>.  Notwithstanding any other provision of this <u>Article 3</u>, if there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, prior to any other allocation under this Agreement, each Partner shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to that Partner's share of the net decrease in Partnership Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).   The items to be allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This <u>Section 3.4(a)</u> is intended to comply with the partnership minimum gain chargeback requirements of the Treasury Regulations and shall be subject to all exceptions provided therein.

(b)     <u>Partner Nonrecourse Debt Minimum Gain Chargeback</u>.  Notwithstanding any other provision of this <u>Article 3</u> (other than <u>Section 3.4(a)</u>), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Partner with a share of such Partner Nonrecourse Debt Minimum Gain as of the beginning of the year shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods in an amount equal to that Partner's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).   The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This <u>Section 3.4(b)</u> is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements of the Treasury Regulations, shall be interpreted consistently with the Treasury Regulations and shall be subject to all exceptions provided therein.

(c)     <u>Qualified Income Offset</u>.  If a Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), then items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible; *provided, however,* an allocation pursuant to this <u>Section 3.4(c)</u> shall be made if and only to the extent that the Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this <u>Article 3</u> have been tentatively made without considering this <u>Section 3.4(c)</u>.

(d)     <u>Gross Income Allocation</u>.  If a Partner has a deficit Capital Account at the end of any Fiscal Year of the Partnership that exceeds the sum of (i) the amount the Partner is obligated to restore, and (ii) the amount the Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), then each such Partner shall be specially allocated items of income and gain of the Partnership in the amount of the excess as quickly as possible; *provided, however,* an allocation pursuant to this <u>Section 3.4(d)</u> shall be made if and only to

9

the extent that the Partner would have a deficit Capital Account in excess of that sum after all other allocations provided for in this Article 3 have been tentatively made without considering Section 3.4(c) or 3.4(d).

      (e)    Nonrecourse Deductions.  Nonrecourse Deductions for any taxable year or other period for which allocations are made shall he allocated among the Partners in accordance with their Percentage interests.

      (f)    Partner Nonrecourse Deductions.  Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

      (g)    Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any asset of the Partnership under Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and that gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Treasury Regulations.

      (h)    Section 481 Adjustments.  Any allocable items of income, gain, expense, deduction or credit required to be made by Section 481 of the Code as the result of the sale, transfer, exchange or issuance of a Partnership Interest will be specially allocated to the Partner receiving said Partnership Interest whether such items are positive or negative in amount.

    **3.5.**    **Curative Allocations.**  The "***Basic Regulatory Allocations***" consist of (i) the allocations pursuant to Section 3.2(c), and (ii) the allocations pursuant to Sections 3.4.  Notwithstanding any other provision of this Agreement, the Basic Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of the allocations of other items and the Basic Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Basic Regulatory Allocations had not occurred.  For purposes of applying the foregoing sentence, allocations pursuant to this Section 3.5 shall be made with respect to allocations pursuant to Section 3.4 (g) and (h) only to the extent that it is reasonably determined that those allocations will otherwise be inconsistent with the economic agreement among the Partners. To the extent that a special allocation under Section 3.4 is determined not to comply with applicable Treasury Regulations, then the Partners intend that the items shall be allocated in accordance with the Partners' varying Percentage Interests throughout each tax year during which such items are recognized for tax purposes.

    **3.6.**    **Code Section 704(c) Allocations.**  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation at the time of the contribution between the tax basis of the property to the Partnership and the fair market value of that property.  Except as otherwise provided herein, any elections or other decisions relating to those allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intent of this Agreement.  Allocations of income, gain, loss and deduction pursuant to this Section 3.6 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, the Capital Account of any Partner or the share

D-CNL002019

**Appx. 00703**

of Profits, Losses, other tax items or distributions of any Partner pursuant to any provision of this Agreement.

**3.7.** **Capital Accounts**.

(a) <u>Maintenance of Capital Accounts</u>.  The Partnership shall establish and maintain a separate capital account (*"Capital Account"*) for each Partner in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), subject to and in accordance with the provisions set forth in this <u>Section 3.7</u>.

(i) The Capital Account balance of each Partner shall be credited (increased) by (A) the amount of cash contributed by that Partner to the capital of the Partnership, (B) the fair market value of property contributed by that Partner to the capital of the Partnership (net of liabilities secured by that contributed property that the Partnership assumes or takes subject to under Code Section 752), and (C) that Partner's allocable share of Profits and any items in the nature of income or gain which are specially allocated pursuant to <u>Sections 3.4</u> and <u>3.5</u>; and

(ii) The Capital Account balance of each Partner shall be debited (decreased) by (A) the amount of cash distributed to that Partner by the Partnership, (B) the fair market value of property distributed to that Partner by the Partnership (net of liabilities secured by that distributed property that such Partner assumes or takes subject to under Code Section 752), (C) that Partner's allocable share of expenditures of the Partnership described in Code Section 705(a)(2)(B), and (D) that Partner's allocable share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to <u>Sections 3.2</u>, <u>3.4</u> and <u>3.5</u>.

The provisions of this <u>Section 3.7</u> and the other provisions of this Agreement relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Code Section 704(b) and the Treasury Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions.  The General Partner may modify the manner in which the Capital Accounts are maintained under this <u>Section 3.7</u> in order to comply with those provisions, as well as upon the occurrence of events that might otherwise cause this Agreement not to comply with those provisions.

(b) <u>Negative Capital Accounts</u>.  If any Partner has a deficit balance in its Capital Account, that Partner shall have no obligation to restore that negative balance or to make any Capital Contribution by reason thereof, and that negative balance shall not be considered an asset of the Partnership or of any Partner.

(c) <u>Interest</u>.  No interest shall be paid by the Partnership on Capital Contributions or on balances in Capital Accounts.

(d) <u>No Withdrawal</u>.  No Partner shall be entitled to withdraw any part of his/her/its Capital Contribution or his/her/its Capital Account or to receive any distribution from the Partnership, except as provided in <u>Section 3.9</u> and <u>Article 5</u>.

(e) <u>Loans From Partners</u>.  Loans by a Partner to the Partnership shall not be considered Capital Contributions.

(f) <u>Revaluations</u>.  The Capital Accounts of the Partners shall not be "booked-up" or "booked-down" to their fair market values under Treasury Regulations Section 1.704(c)-1(b)(2)(iv)(f) or otherwise.

11

D-CNL002020

**Appx. 00704**

3.8.    **Distributive Share for Tax Purpose.**  All items of income, deduction, gain, loss or credit that are recognized for federal income tax purposes will be allocated among the Partners in accordance with the allocations of Profits and Losses hereunder as determined by the General Partner in its sole and unfettered discretion.  Notwithstanding the foregoing, the General Partner may (i) as to each New Issue, specially allocate to the Partners who were allocated New Issue Profit from that New Issue any short-term capital gains realized during the Fiscal Year upon the disposition of such New Issue during that Fiscal Year, and (ii) specially allocate items of gain (or loss) to Partners who withdraw capital during any Fiscal Year in a manner designed to ensure that each withdrawing Partner is allocated gain (or loss) in an amount equal to the difference between that Partner's Capital Account balance (or portion thereof being withdrawn) at the time of the withdrawal and the tax basis for his/her/ its Partnership Interest at that time (or proportionate amount thereof); *provided, however,* that the General Partner may, without the consent of any other Partner, (a) alter the allocation of any item of taxable income, gain, loss, deduction or credit in any specific instance where the General Partner, in its sole and unfettered discretion, determines such alteration to be necessary or appropriate to avoid a materially inequitable result *(e.g.,* where the allocation would create an inappropriate tax liability); and/or (b) adopt whatever other method of allocating tax items as the General Partner determines is necessary or appropriate in order to be consistent with the spirit and intent of the Treasury Regulations under Code Sections 704(b) and 704(c).

3.9.    **Distributions**.

(a)    <u>General</u>.  The General Partner may make such pro rata or non-pro rata distributions as it may determine in its sole and unfettered discretion, without being limited to current or accumulated income or gains, but no such distribution shall be made out of funds required to make current payments on Partnership indebtedness; provided, however, that the General Partner may not make non-pro rata distributions under this Section 3.9(a) during an NAV Ratio Trigger Period without the consent of the Class B Limited Partner (in the case of a Class B NAV Ratio Trigger Period) and/or the Class C Limited Partner (in the case of a Class C NAV Ratio Trigger Period); provided, further this provision should not be interpreted to limit in any way the General Partner's ability to make non-pro rata tax distributions under Section 3.9(c) and Section 3.9(f).  The Partnership has entered into one or more credit facilities with financial institutions that may limit the amount and timing of distributions to the Partners.  Thus, the Partners acknowledge that distributions from the Partnership may be limited. Any distributions made to the Class B Limited Partner or the Class C Limited Partner pursuant to Section 3.9(b) shall reduce distributions otherwise allocable to such Partners under this Section 3.9(a) until such aggregate reductions are equal to the aggregate distributions made to the Class B Partners and the Class C Partners under Section 3.9(b).

(b)    <u>Priority Distributions</u>.  Prior to the distribution of any amounts to Partners pursuant to Section 3.9(a), and notwithstanding any other provision in this Agreement to the contrary, the Partnership shall make the following distributions ("***Priority Distributions***") pro-rata among the Class B Limited Partner and the Class C Limited Partner in accordance with their relative Percentage Interests:

(i)    No later than March 31st of each calendar year, commencing March 31, 2017, an amount equal to $1,600,000.00;

(ii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to three percent (3%) of the Partnership's investment gain for the prior year, as reflected in the Partnership's books and records within ledger account number 90100 plus three percent (3%) of the gross realized investment gains for the prior year of Highland Select Equity Fund, as reflected in its books and records;

D-CNL002021

**Appx. 00705**

(iii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to ten percent (10%) of the Partnership's Operating Cash Flow for the prior year; and

(iv)    No later than December 24th of each year, commencing December 24, 2016, an amount equal to the aggregate annual principal and interest payments on the Purchase Notes for the then current year.

(c)    Tax Distributions.  The General Partner may, in its sole discretion, declare and make cash distributions pursuant hereto to the Partners to allow the federal and state income tax attributable to the Partnership's taxable income that is passed through the Partnership to the Partners to be paid by such Partners (a "*Tax Distribution*").  The General Partner may, in its discretion, make Tax Distributions to the Founding Partner Group without also making Tax Distributions to other Partners; provided, however, that if the General Partner makes Tax Distributions to the Founding Partner Group, Tax Distributions must also be made the Class B Limited Partner to the extent the Class B Limited Partner provides the Partnership with documentation showing it is subject to an entity-level federal income tax obligation.  Notwithstanding anything else in this Agreement, the General Partner may declare and pay Tax Distributions even if such Tax Distributions cause the Partnership to be unable to make Priority Distributions under Section 3.9(b).

(d)    Payments Not Deemed Distributions.    Any amounts paid pursuant to Sections 4.1(e) or 4.1(h) shall not be deemed to be distributions for purposes of this Agreement.

(e)    Withheld Amounts.  Notwithstanding any other provision of this Section 3.9 to the contrary, each Partner hereby authorizes the Partnership to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership with respect to that Partner as a result of that Partner's participation in the Partnership.  If and to the extent that the Partnership shall be required to withhold or pay any such taxes, that Partner shall be deemed for all purposes of this Agreement to have received a payment from the Partnership as of the time that withholding or tax is paid, which payment shall be deemed to be a distribution with respect to that Partner's Partnership Interest to the extent that the Partner (or any successor to that Partner's Partnership Interest) is then entitled to receive a distribution.  To the extent that the aggregate of such payments to a Partner for any period exceeds the distributions to which that Partner is entitled for that period, the amount of such excess shall be considered a loan from the Partnership to that Partner.  Such loan shall bear interest (which interest shall be treated as an item of income to the Partnership) at the "Applicable Federal Rate" (as defined in the Code), as determined hereunder from time to time, until discharged by that Partner by repayment, which may be made in the sole and unfettered discretion of the General Partner out of distributions to which that Partner would otherwise be subsequently entitled.  Any withholdings authorized by this Section 3.9(d) shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel or other evidence satisfactory to the General Partner to the effect that a lower rate is applicable, or that no withholding is applicable.

(f)    Special Tax Distributions.  The Partnership shall, upon request of such Founding Partner, make distributions to the Founding Partners (or loans, at the election of the General Partner) in an amount necessary for each of them to pay their respective federal income tax obligations incurred through the effective date of the Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., the predecessor to this Agreement.

(g)    Tolling of Priority Distributions.  In the event of a "Honis Trigger Event," as defined in the Second Amended Buy-Sell and Redemption Agreement, the Partnership shall not make any distributions, including priority distributions under Section 3.9(b), to the Class B Limited Partner or the Class C Limited Partner until such time as a replacement trust administrator, manager and general partner,

13

as applicable, acceptable to the Partnership in its sole discretion, as indicated by an affirmative vote of consent by a Majority Interest, shall be appointed to the Class B Limited Partner/Class C Limited Partner and any of its direct or indirect owners that have governing documents directly affected by a Honis Trigger Event.

    **3.10.** **Compensation and Reimbursement of General Partner**.

        (a)   <u>Compensation</u>. The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements unless approved by a Majority Interest; provided, however, that no compensation above five million dollars per year may be approved, even by a Majority Interest, during a NAV Ratio Trigger Period.

        (b)   <u>Reimbursement for Expenses</u>. In addition to amounts paid under other Sections of this Agreement, the General Partner and its Affiliates shall be reimbursed for all expenses, disbursements, and advances incurred or made, and all fees, deposits, and other sums paid in connection with the organization and operation of the Partnership, the qualification of the Partnership to do business, and all related matters.

    **3.11.** **Books, Records, Accounting, and Reports**.

        (a)   <u>Records and Accounting</u>. The General Partner shall keep or cause to be kept appropriate books and records with respect to the Partnership's business, which shall at all times be kept at the principal office of the Partnership or such other office as the General Partner may designate for such purpose. The books of the Partnership shall be maintained for financial reporting purposes on the accrual basis or on a cash basis, as the General Partner shall determine in its sole and unfettered discretion, in accordance with generally accepted accounting principles and applicable law. Upon reasonable request, the Class B Limited Partner or the Class C Limited Partner may inspect the books and records of the Partnership.

        (b)   <u>Fiscal Year</u>. The fiscal year of the Partnership shall be the calendar year unless otherwise determined by the General Partner in its sole and unfettered discretion.

        (c)   <u>Other Information</u>. The General Partner may release information concerning the operations of the Partnership to any financial institution or other Person that has loaned or may loan funds to the Partnership or the General Partner or any of its Affiliates, and may release such information to any other Person for reasons reasonably related to the business and operations of the Partnership or as required by law or regulation of any regulatory body.

        (d)   <u>Distribution Reporting to Class B Limited Partner and Class C Limited Partner</u>. Upon request, the Partnership shall provide the Class B Limited Partner and/or the Class C Limited Partner information on any non-pro rata distributions made under <u>Section 3.9</u> to Partners other than the Partner requesting the information.

    **3.12.** **Tax Matters**.

        (a)   <u>Tax Returns</u>. The General Partner shall arrange for the preparation and timely filing of all returns of Partnership income, gain, loss, deduction, credit and other items necessary for federal, state and local income tax purposes. The General Partner shall deliver to each Partner as copy of his/her/its IRS Form K-1 as soon as practicable after the end of the Fiscal Year, but in no event later than October 1. The classification, realization, and recognition of income, gain, loss, deduction, credit and

D-CNL002023

**Appx. 00707**

other items shall be on the cash or accrual method of accounting for federal income tax purposes, as the General Partner shall determine in its sole and unfettered discretion. The General Partner in its sole and unfettered discretion may pay state and local income taxes attributable to operations of the Partnership and treat such taxes as an expense of the Partnership.

(b)  Tax Elections. Except as otherwise provided herein, the General Partner shall, in its sole and unfettered discretion, determine whether to make any available tax election.

(c)  Tax Controversies. Subject to the provisions hereof, the General Partner is designated the Tax Matters Partner (as defined in Code Section 6231), and is authorized and required to represent the Partnership, at the Partnership's expense, in connection with all examinations of the Partnership's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith. Each Partner agrees to cooperate with the General Partner in connection with such proceedings.

(d)  Taxation as a Partnership. No election shall be made by the Partnership or any Partner for the Partnership to be excluded from the application of any of the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code or from any similar provisions of any state tax laws.

## ARTICLE 4

## RIGHTS AND OBLIGATIONS OF PARTNERS

**4.1. Rights and Obligations of the General Partner.** In addition to the rights and obligations set forth elsewhere in this Agreement, the General Partner shall have the following rights and obligations:

(a)  Management. The General Partner shall conduct, direct, and exercise full control of over all activities of the Partnership. Except as otherwise expressly provided in this Agreement, all management powers over the business and affairs of the Partnership shall be exclusively vested in the General Partner, and Limited Partners shall have no right of control over the business and affairs of the Partnership. In addition to the powers now or hereafter granted to a general partner of a limited partnership under applicable law or that are granted to the General Partner under any provision of this Agreement, the General Partner shall have full power and authority to do all things deemed necessary or desirable by it to conduct the business of the Partnership, including, without limitation: (i) the determination of the activities in which the Partnership will participate; (ii) the performance of any and all acts necessary or appropriate to the operation of any business of the Partnership (including, without limitation, purchasing and selling any asset, any debt instruments, any equity interests, any commercial paper, any note receivables and any other obligations); (iii) the procuring and maintaining of such insurance as may be available in such amounts and covering such risks as are deemed appropriate by the General Partner; (iv) the acquisition, disposition, sale, mortgage, pledge, encumbrance, hyphothecation, of exchange of any or all of the assets of the Partnership; (v) the execution and delivery on behalf of, and in the name of the Partnership, deeds, deeds of trust, notes, leases, subleases, mortgages, bills of sale and any and all other contracts or instruments necessary or incidental to the conduct of the Partnership's business; (vi) the making of any expenditures, the borrowing of money, the guaranteeing of indebtedness and other liabilities, the issuance of evidences of indebtedness, and the incurrence of any obligations it deems necessary or advisable for the conduct of the activities of the Partnership, including, without limitation, the payment of compensation and reimbursement to the General Partner and its Affiliates pursuant to Section 3.10; (vii) the use of the assets of the Partnership (including, without limitation, cash on hand) for any Partnership purpose on any terms it sees fit, including, without limitation, the financing of operations of the Partnership, the lending of funds to other Persons, and the repayment of obligations

15

of the Partnership; (viii) the negotiation, execution, and performance of any contracts that it considers desirable, useful, or necessary to the conduct of the business or operations of the Partnership or the implementation of the General Partner's powers under this Agreement; (ix) the distribution of Partnership cash or other assets; (x) the selection, hiring and dismissal of employees, attorneys, accountants, consultants, contractors, agents and representatives and the determination of their compensation and other teens of employment or hiring; (xi) the formation of any further limited or general partnerships, joint ventures, or other relationships that it deems desirable and the contribution to such partnerships, ventures, or relationships of assets and properties of the Partnership; and (xii) the control of any matters affecting the rights and obligations of the Partnership, including, without limitation, the conduct of any litigation, the incurring of legal expenses, and the settlement of claims and suits.

(b)     Certificate of Limited Partnership.  The General Partner caused the Certificate of Limited Partnership of the Partnership to be filed with the Secretary of State of Delaware as required by the Delaware Act and shall cause to be filed such other certificates or documents (including, without limitation, copies, amendments, or restatements of this Agreement) as may be determined by the General Partner to be reasonable and necessary or appropriate for the formation, qualification, or registration and operation of a limited partnership (or a partnership in which Limited Partners have limited liability) in the State of Delaware and in any other state where the Partnership may elect to do business.

(c)     Reliance by Third Parties.     Notwithstanding any other provision of this Agreement to the contrary, no lender or purchaser or other Person, including any purchaser of property from the Partnership or any other Person dealing with the Partnership, shall be required to verify any representation by the General Partner as to its authority to encumber, sell, or otherwise use any assess or properties of the Partnership, and any such lender, purchaser, or other Person shall be entitled to rely exclusively on such representations and shall be entitled to deal with the General Partner as if it were the sole party in interest therein, both legally and beneficially.  Each Limited Partner hereby waives any and all defenses or other remedies that may be available against any such lender, purchaser, or other Person to contest, negate, or disaffirm any action of the General Partner in connection with any such sale or financing.  In no event shall any Person dealing with the General Partner or the General Partner's representative with respect to any business or property of the Partnership be obligated to ascertain that the terms of this Agreement have been complied with, and each such Person shall be entitled to rely on the assumptions that the Partnership has been duly formed and is validly in existence.  In no event shall any such Person be obligated to inquire into the necessity or expedience of any act or action of the General Partner or the General Partner's representative, and every contract, agreement, deed, mortgage, security agreement, promissory note, or other instrument or document executed by the General Partner or the General Partner's representative with respect to any business or property of the Partnership shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (i), at the time of the execution and delivery thereof, this Agreement was in full force and effect; (ii) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Partnership; and (iii) the General Partner or the General Partner's representative was duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership.

(d)     Partnership Funds.  The funds of the Partnership shall be deposited in such account or accounts as are designated by the General Partner.  The General Partner may, in its sole and unfettered discretion, deposit funds of the Partnership in a central disbursing account maintained by or in the name of the General Partner, the Partnership, or any other Person into which funds of the General Partner, the Partnership, on other Persons are also deposited; *provided, however,* at all times books of account are maintained that show the amount of funds of the Partnership on deposit in such account and interest accrued with respect to such funds as credited to the Partnership.  The General Partner may use the funds of the Partnership as compensating balances for its benefit; *provided, however,* such funds do

16

not directly or indirectly secure, and are not otherwise at risk on account of, any indebtedness or other obligation of the General Partner or any director, officer, employee, agent, representative, or Affiliate thereof. Nothing in this Section 4.1(d) shall be deemed to prohibit or limit in any manner the right of the Partnership to lend funds to the General Partner or any Affiliate thereof pursuant to Section 4.1(e)(i). All withdrawals from or charges against such accounts shall be made by the General Partner or by its representatives. Funds of the Partnership may be invested as determined by the General Partner in accordance with the terms and provisions of this Agreement.

        (e)      Loans to or from General Partner: Contracts with Affiliates; Joint Ventures.

        (i)      The General Partner or any Affiliate of the General Partner may lend to the Partnership funds needed by the Partnership for such periods of time as the General Partner may determine; provided, however, the General Partner or its Affiliate may not charge the Partnership interest at a rate greater than the rate (including points or other financing charges or fees) that would be charged the Partnership (without reference to the General Partner's financial abilities or guaranties) by unrelated lenders on comparable loans. The Partnership shall reimburse the General Partner or its Affiliate, as the case may be, for any costs incurred by the General Partner or that Affiliate in connection with the borrowing of funds obtained by the General Partner or that Affiliate and loaned to the Partnership. The Partnership may loan funds to the General Partner and any member of the Founding Partner Group at the General Partner's sole and exclusive discretion.

        (ii)      The General Partner or any of its Affiliates may enter into an agreement with the Partnership to render services, including management services, for the Partnership. Any service rendered for the Partnership by the General Partner or any Affiliate thereof shall be on terms that are fair and reasonable to the Partnership.

        (iii)      The Partnership may Transfer any assets to joint ventures or other partnerships in which it is or thereby becomes a participant upon terms and subject to such conditions consistent with applicable law as the General Partner deems appropriate; provided, however, that the Partnership may not transfer any asset to the General Partner or one of its Affiliates during any NAV Ratio Trigger Period for consideration less than such asset's fair market value.

        (f)      Outside Activities' Conflicts of Interest. The General Partner or any Affiliate thereof and any director, officer, employee, agent, or representative of the General Partner or any Affiliate thereof shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Partnership, including, without limitation, business interests and activities in direct competition with the Partnership. Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement or the partnership relationship created hereby in any business ventures of the General Partner, any Affiliate thereof, or any director, officer, employee, agent, or representative of either the General Partner or any Affiliate thereof.

        (g)      Resolution of Conflicts of Interest. Unless otherwise expressly provided in this Agreement or any other agreement contemplated herein, whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Limited Partner, on the other hand, any action taken by the General Partner, in the absence of bad faith by the General Partner, shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein or under the Delaware Act or any other applicable law, rule, or regulation.

        (h)      Indemnification. The Partnership shall indemnify and hold harmless the General Partner and any director, officer, employee, agent, or representative of the General Partner (collectively,

<div align="center">17</div>

the "**GP Party**"*),* against all liabilities, losses, and damages incurred by any of them by reason of any act performed or omitted to be performed in the name of or on behalf of the Partnership, or in connection with the Partnership's business, including, without limitation, attorneys' fees and any amounts expended in the settlement of any claims or liabilities, losses, or damages, to the fullest extent permitted by the Delaware Act; *provided, however,* the Partnership shall have no obligation to indemnify and hold harmless a GP Party for any action or inaction that constitutes gross negligence or willful or wanton misconduct. The Partnership, in the sole and unfettered discretion of the General Partner, may indemnify and hold harmless any Limited Partner, employee, agent, or representative of the Partnership, any Person who is or was serving at the request of the General Partner acting through the General Partner as a director, officer, partner, trustee, employee, agent, or representative of another corporation, partnership, joint venture, trust, or other enterprise, and any other Person to the extent determined by the General Partner in its sole and unfettered discretion, but in no event shall such indemnification exceed the indemnification permitted by the Delaware Act. Notwithstanding anything to the contrary in this <u>Section 4.1(h)</u> or elsewhere in this Agreement, no amendment to the Delaware Act after the date of this Agreement shall reduce or limit in any manner the indemnification provided for or permitted by this <u>Section 4.1(h)</u> unless such reduction or limitation is mandated by such amendment for limited partnerships formed prior to the enactment of such amendment. In no event shall Limited Partners be subject to personal liability by reason of the indemnification provisions of this Agreement.

        (i)     <u>Liability of General Partner</u>.

        (i)     Neither the General Partner nor its directors, officers, employees, agents, or representatives shall be liable to the Partnership or any Limited Partner for errors in judgment or for any acts or omissions that do not constitute gross negligence or willful or wanton misconduct.

        (ii)     The General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its directors, officers, employees, agents, or representatives, and the General Partner shall not be responsible for any misconduct or negligence on the part of any agent or representative appointed by the General Partner.

        (j)     <u>Reliance by General Partner</u>.

        (i)     The General Partner may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

        (ii)     The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, and other consultants and advisers selected by it, and any opinion of any such Person as to matters which the General Partner believes to be within such Person's professional or expert competence shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by the General Partner hereunder in good faith and in accordance with such opinion.

        (k)     The General Partner may, from time to time, designate one or more Persons to be officers of the Partnership. No officer need be a Partner. Any officers so designated shall have such authority and perform such duties as the General Partner may, from time to time, delegate to them. The General Partner may assign titles to particular officers, including, without limitation, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer. Each officer shall hold office until such Person's successor shall be duly designated and shall qualify or until such Person's death or

D-CNL002027

**Appx. 00711**

until such Person shall resign or shall have been removed in the manner hereinafter provided. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Partnership shall be fixed from time to time by the General Partner. Any officer may be removed as such, either with or without cause, by the General Partner whenever in the General Partner's judgment the best interests of the Partnership will be served thereby. Any vacancy occurring in any office of the Partnership may be filled by the General Partner.

**4.2.    Rights and Obligations of Limited Partners**. In addition to the rights and obligations of Limited Partners set forth elsewhere in this Agreement, Limited Partners shall have the following rights and obligations:

(a)    <u>Limitation of Liability</u>. Limited Partners shall have no liability under this Agreement except as provided herein or under the Delaware Act.

(b)    <u>Management of Business</u>. No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

(c)    <u>Return of Capital</u>. No Limited Partner shall be entitled to the withdrawal or return of its Capital Contribution except to the extent, if any, that distributions made pursuant to this Agreement or upon termination of the Partnership may be considered as such by law and then only to the extent provided for in this Agreement.

(d)    <u>Second Amended Buy-Sell and Redemption Agreement</u>. Each Limited Partner shall comply with the terms and conditions of the Second Amended Buy-Sell and Redemption Agreement.

(e)    <u>Default on Priority Distributions</u>. If the Partnership fails to timely pay Priority Distributions pursuant to Section 3.9(b), and the Partnership does not subsequently make such Priority Distribution within ninety days of its due date, the Class B Limited Partner or the Class C Limited Partner may require the Partnership to liquidate publicly traded securities held by the Partnership or Highland Select Equity Master Fund, L.P., a Delaware limited partnership controlled by the Partnership; <u>provided</u>, <u>however</u>, that the General Partner may in its sole discretion elect instead to liquidate other non-publicly traded securities owned by the Partnership in order to satisfy the Partnership's obligations under <u>Section 3.9(b)</u> and this <u>Section 4.2(e)</u>. In either case, Affiliates of the General Partner shall have the right of first offer to purchase any securities liquidated under this <u>Section 4.2(e)</u>.

**4.3.    Transfer of Partnership Interests**.

(a)    <u>Transfer</u>. No Partnership Interest shall be Transferred, in whole or in part, except in accordance with the terms and conditions set forth in this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement. Any Transfer or purported Transfer of any Partnership Interest not made in accordance with this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement shall be null and void. An alleged transferee shall have no right to require any information or account of the Partnership's transactions or to inspect the Partnership's books. The Partnership shall be entitled to treat the alleged transferor of a Partnership Interest as the absolute owner thereof in all respects, and shall incur no liability to any alleged transferee for distributions to the Partner owning that Partnership Interest of record or for allocations of Profits, Losses, deductions or credits or for transmittal of reports and notices required to be given to holders of Partnership Interests.

19

(b)      Transfers by General Partner.  The General Partner may Transfer all, but not less than all, of its Partnership Interest to any Person only with the approval of a Majority Interest; provided, however, that the General Partner may not Transfer its Partnership Interest during any NAV Ratio Trigger Period except to the extent such Transfers are for estate planning purposes or resulting from the death of the individual owner of the General Partner.  Any Transfer by the General Partner of its Partnership Interest under this Section 4.3(b) to an Affiliate of the General Partner or any other Person shall not constitute a withdrawal of the General Partner under Section 4.5(a), Section 5.1(b), or any other provision of this Agreement.  If any such Transfer is deemed to constitute a withdrawal under such provisions or otherwise and results in the dissolution of the Partnership under this Agreement or the laws of any jurisdiction to which the Partnership of this Agreement is subject, the Partners hereby unanimously consent to the reconstitution and continuation of the Partnership immediately following such dissolution, pursuant to Section 5.2.

(c)      Transfers by Limited Partners.  The Partnership Interest of a Limited Partner may not be Transferred without the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), and in accordance with the Second Amended Buy-Sell and Redemption Agreement.

(d)      Distributions and Allocations in Respect of Transferred Partnership Interests.  If any Partnership Interest is Transferred during any Fiscal Year in compliance with the provisions of Article 4 and the Second Amended Buy-Sell and Redemption Agreement, Profits, Losses, and all other items attributable to the transferred interest for that period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner; provided that no allocations shall be made under this Section 4.3(d) that would affect any special allocations made under Section 3.4.  All distributions declared on or before the date of that Transfer shall be made to the transferor.  Solely for purposes of making such allocations and distributions, the Partnership shall recognize that Transfer not later than the end of the calendar month during which it is given notice of that Transfer; *provided, however,* if the Partnership does not receive a notice stating the date that Partnership Interest was Transferred and such other information as the General Partner may reasonably require within thirty (30) days after the end of the Fiscal Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the person who, according to the books and records of the Partnership, on the last day of the Fiscal Year during which the Transfer occurs, was the owner of the Partnership Interest.  Neither the Partnership nor any Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 4.3(d), whether or not any Partner or the Partnership has knowledge of any Transfer of ownership of any Partnership Interest.

(e)      Forfeiture of Partnership Interests Pursuant to the Contribution Note.  In the event any Class B Limited Partnership Interests are forfeited in favor of the Partnership as a result of any default on the Contribution Note, the Capital Accounts and Percentage Interests associated with such Class B Limited Partnership Interests shall be allocated pro rata among the Class A Partners.  The Priority Distributions in Section 3.9(b) made after the date of such forfeiture shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the Class B Limited Partnership Interest transferred pursuant to this Section 4.3(e) over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any forfeiture of such Class B Limited Partnership Interest.

(f)      Transfers of Partnership Interests Pursuant to the Purchase Notes.  Notwithstanding any other provision in this Agreement, the Partnership shall respect, and the General Partner hereby provides automatic consent for, any transfers (in whole or transfers of partial interests) of

20

the Class C Limited Partnership Interests, or a portion thereof, if such transfer occurs as a result of a default on the Purchase Notes. Upon the transfer of any Class C Limited Partnership Interest to any member of the Founding Partner Group (or their assigns), such Class C Limited Partnership Interest shall automatically convert to a Class A Partnership Interest. The Priority Distributions in <u>Section 3.9(b)</u> shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the transferred Class C Limited Partnership Interest over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any transfer of such Class C Limited Partnership Interest.

**4.4.    Issuances of Partnership Interests to New and Existing Partners**.

(a)    <u>Issuance of Partnership Interests to New Limited Partners</u>. The General Partner may admit one or more additional Persons as Limited Partners ("Additional Limited Partners") to the Partnership at such times and upon such terms as it deems appropriate in its sole and unfettered discretion; provided, however, that the General Partner may only admit additional Persons as Limited Partners in relation to the issuance of equity incentives to key employees of the Partnership; provided, further that the General Partner may not issue such equity incentives to the extent they entitle the holders, in the aggregate, to a Percentage Interest in excess of twenty percent without the consent of the Class B Limited Partner and the Class C Limited Partner. All Class A Limited Partners, the Class B Limited Partner and the Class C Limited Partner shall be diluted proportionately by the issuance of such limited partnership interests. No Person may be admitted to the Partnership as a Limited Partner until he/she/it executes an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.

(b)    <u>Issuance of an Additional Partnership Interest to an Existing Partner</u>. The General Partner may issue an additional Partnership Interest to any existing Partner at such times and upon such terms as it deems appropriate in its sole and unfettered discretion. Upon the issuance of an additional Partnership Interest to an existing Partner, the Percentage Interests of the members of the Founding Partner Group shall be diluted proportionately. Any additional Partnership Interest shall be subject to all the terms and conditions of this Agreement and the Second Amended Buy-Sell and Redemption Agreement.

**4.5.    Withdrawal of General Partner**

(a)    <u>Option</u>. In the event of the withdrawal of the General Partner from the Partnership, the departing General Partner (the "**_Departing Partner_**") shall, at the option of its successor (if any) exercisable prior to the effective date of the departure of that Departing Partner, promptly receive from its successor in exchange for its Partnership Interest as the General Partner, an amount in cash equal to its Capital Account balance, determined as of the effective date of its departure.

(b)    <u>Conversion</u>. If the successor to a Departing Partner does not exercise the option described in <u>Section 4.5(a)</u>, the Partnership Interest of the Departing Partner as the General Partner of the Partnership shall be converted into a Partnership Interest as a Limited Partner.

**4.6.    Admission of Substitute Limited Partners and Successor General Partner**.

(a)    <u>Admission of Substitute Limited Partners</u>. A transferee (which may be the heir or legatee of a Limited Partner) or assignee of a Limited Partner's Partnership Interest shall be entitled to receive only the distributive share of the Partnership's Profits, Losses, deductions, and credits attributable to that Partnership Interest. To become a substitute Limited Partner (a "**_Substitute Limited Partner_**"),

21

that transferee or assignee shall (1) obtain the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), (ii) comply with all the requirements of this Agreement and the Second Amended Buy-Sell and Redemption Agreement with respect to the Transfer of the Partnership Interest at issue, and (iii) execute an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement. Upon admission of a Substitute Limited Partner, that Limited Partner shall be subject to all of the restrictions applicable to, shall assume all of the obligations of, and shall attain the status of a Limited Partner under and pursuant to this Agreement with respect to the Partnership Interest held by that Limited Partner.

(b)     Admission of Successor General Partner.  A successor General Partner selected pursuant to Section 5.2 or the transferee of or successor to all of the Partnership Interest of the General Partner pursuant to Section 4.3(b) shall be admitted to the Partnership as the General Partner, effective as of the date of the withdrawal or removal of the predecessor General Partner or the date of Transfer of that predecessor's Partnership Interest.

(c)     Action by General Partner.  In connection with the admission of any substitute Limited Partner or successor General Partner or any additional Limited Partner, the General Partner shall have the authority to take all such actions as it deems necessary or advisable in connection therewith, including the amendment of Exhibit A and the execution and filing with appropriate authorities of any necessary documentation.

## ARTICLE 5

## DISSOLUTION AND WINDING UP

**5.1.     Dissolution.**  The Partnership shall be dissolved upon:

(a)     The withdrawal, bankruptcy, or dissolution of the General Partner, or any other event that results in its ceasing to be the General Partner (other than by reason of a Transfer pursuant to Section 4.3(b));

(b)     An election to dissolve the Partnership by the General Partner that is approved by the affirmative vote of a Majority Interest; *provided, however,* the General Partner may dissolve the Partnership without the approval of the Limited Partners in order to comply with Section 14 of the Second Amended Buy-Sell and Redemption Agreement; or

(c)     Any other event that, under the Delaware Act, would cause its dissolution.

For purposes of this Section 5.1, the bankruptcy of the General Partner shall be deemed to have occurred when the General Partner: (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding:  (iv) files a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the General Partner in a proceeding of the type described in clauses (i) through (iv) of this paragraph; (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties; or (vii) one hundred twenty (120) days expire after the date of the commencement of a proceeding against the General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or

22

similar relief under any law if the proceeding has not been previously dismissed, or ninety (90) days expire after the date of the appointment, without the General Partner's consent or acquiescence, of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties if the appointment has not previously been vacated or stayed, or ninety (90) days expire after the date of expiration of a stay, if the appointment has not previously been vacated.

**5.2.** **Continuation of the Partnership**. Upon the occurrence of an event described in Section 5.1(a), the Partnership shall be deemed to be dissolved and reconstituted if a Majority Interest elect to continue the Partnership within ninety (90) days of that event. If no election to continue the Partnership is made within ninety (90) days of that event, the Partnership shall conduct only activities necessary to wind up its affairs. If an election to continue the Partnership is made upon the occurrence of an event described in Section 5.1(a), then:

(a)    Within that ninety (90)-day period a successor General Partner shall be selected by a Majority Interest;

(b)    The Partnership shall be deemed to be reconstituted and shall continue until the end of the term for which it is formed unless earlier dissolved in accordance with this Article 5;

(c)    The interest of the former General Partner shall be converted to an interest as a Limited Partner; and

(d)    All necessary steps shall be taken to amend or restate this Agreement and the Certificate of Limited Partnership, and the successor General Partner may for this purpose amend this Agreement and the Certificate of Limited Partnership, as appropriate, without the consent of any Partner.

**5.3.** **Liquidation**. Upon dissolution of the Partnership, unless the Partnership is continued under Section 5.2, the General Partner or, in the event the General Partner has been dissolved, becomes bankrupt (as defined in Section 5.1), or withdraws from the Partnership, a liquidator or liquidating committee selected by a Majority Interest, shall be the Liquidator. The Liquidator (if other than the General Partner) shall be entitled to receive such compensation for its services as may be approved by a Majority Interest. The Liquidator shall agree not to resign at any time without fifteen (15) days' prior written notice and (if other than the General Partner) may be removed at any time, with or without cause, by notice of removal approved by a Majority Interest. Upon dissolution, removal, or resignation of the Liquidator, a successor and substitute Liquidator (who shall have and succeed to all rights, powers, and duties of the original Liquidator) shall within thirty (30) days thereafter be selected by a Majority Interest. The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the Liquidator shall be deemed to refer also to any such successor or substitute Liquidator appointed in the manner provided herein. Except as expressly provided in this Article 5, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the parties hereto, all of the powers conferred upon the General Partner under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Partnership as provided herein. The Liquidator shall liquidate the assets of the Partnership and apply and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

23

(a)     To the payment of the expenses of the terminating transactions including, without limitation, brokerage commission, legal fees, accounting fees and closing costs;

(b)     To the payment of creditors of the Partnership, including Partners, in order of priority provided by law;

(c)     To the Partners and assignees to the extent of, and in proportion to, the positive balances in their respective Capital Accounts as provided in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2); *provided, however,* the Liquidator may place in escrow a reserve of cash or other assets of the Partnership for contingent liabilities in an amount determined by the Liquidator to be appropriate for such purposes; and

(d)     To the Partners in proportion to their respective Percentage Interests.

**5.4.     Distribution in Kind.**  Notwithstanding the provisions of <u>Section 5.3</u> that require the liquidation of the assets of the Partnership, but subject to the order of priorities set forth therein, if on dissolution of the Partnership the Liquidator determines that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners and assignees, the Liquidator may defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Partnership (other than those to Partners) and/or may distribute to the Partners and assignees, in lieu of cash, as tenants in common and in accordance with the provisions of <u>Section 5.3</u>, undivided interests in such Partnership assets as the Liquidator deems not suitable for liquidation.  Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any joint operating agreements or other agreements governing the operation of such properties at such time.  The Liquidator shall determine the fair market value of any property distributed in kind using such reasonable method of valuation as it may adopt.

**5.5.     Cancellation of Certificate of Limited Partnership.**  Upon the completion of the distribution of Partnership property as provided in <u>Sections 5.3</u> and <u>5.4</u>, the Partnership shall be terminated, and the Liquidator (or the General Partner and Limited Partners if necessary) shall cause the cancellation of the Certificate of Limited Partnership in the State of Delaware and of all qualifications and registrations of the Partnership as a foreign limited partnership in jurisdictions other **than** the State of Delaware and shall take such other actions as may be necessary to terminate the Partnership.

**5.6.     Return of Capital.**  The General Partner shall not be personally liable for the return of the Capital Contributions of Limited Partners, or any portion thereof, it being expressly understood that any such return shall be **made** solely from Partnership assets.

**5.7.     Waiver of Partition.**  Each Partner hereby waives any rights to partition of the Partnership property.

<div align="center">

**ARTICLE 6**

**GENERAL PROVISIONS**

</div>

**6.1.     Amendments to Agreement.**  The General Partner may amend this Agreement without the consent of any Partner if the General Partner reasonably determines that such amendment is necessary and appropriate; *provided, however, any* action taken by the General Partner shall be subject to its fiduciary duties to the Limited Partners under the Delaware Act; provided further that any amendments

<div align="center">24</div>

D-CNL002033

that adversely affect the Class B Limited Partner or the Class C Limited Partner may only be made with the consent of such Partner adversely affected.

      **6.2.**     **Addresses and Notices.**  Any notice, demand, request, or report required or permitted to be given or made to a Partner under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by United States registered or certified mail to the Partner at his/her/its address as shown on the records of the Partnership, regardless of any claim of any Person who may have an interest in any Partnership Interest by reason of an assignment or otherwise.

      **6.3.**     **Titles and Captions.**  All article and section titles and captions in the Agreement are for convenience only, shall not be deemed part of this Agreement, and in no way shall define, limit, extend, or describe the scope or intent of any provisions hereof.  Except as specifically provided otherwise, references to "Articles," "Sections" and "Exhibits" are to "Articles," "Sections" and "Exhibits" of this Agreement.  All Exhibits hereto are incorporated herein by reference.

      **6.4.**     **Pronouns and Plurals.**  Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns, and verbs shall include the plural and vice versa.

      **6.5.**     **Further Action.**  The parties shall execute all documents, provide all information, and take or refrain from taking all actions as may be necessary or appropriate to achieve the purposes of this Agreement.

      **6.6.**     **Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns.

      **6.7.**     **Integration.**  This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

      **6.8.**     **Creditors.**  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership.

      **6.9.**     **Waiver.**  No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement, or condition.

      **6.10.**   **Counterparts.**  This agreement may be executed in counterparts, all of which together shall constitute one agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

      **6.11.**   **Applicable Law.**  This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to the principles of conflicts of law.

      **6.12.**   **Invalidity of Provisions.**  If any provision of this Agreement is declared or found to be illegal, unenforceable, or void, in whole or in part, then the parties shall be relieved of all obligations arising under that provision, but only to the extent that it is illegal, unenforceable, or void, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying that provision to the extent necessary to make it legal and enforceable while preserving its intent or, if that is

25

not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives.

**6.13.    General Partner Discretion.**  Whenever the General Partner may use its sole discretion, the General Partner may consider any items it deems relevant, including its own interest and that of its affiliates.

**6.14.    Mandatory Arbitration.**    In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief.  The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service.  A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas.  The discovery process shall be limited to the following:  Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.  The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law.  In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules.  All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site.  Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees.   The duty to arbitrate described above shall survive the termination of this Agreement.  Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury.  All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

26

D-CNL002035

**Appx. 00719**

*Remainder of Page intentionally Left Blank.*
*Signature Page Follows.*

D-CNL002036
**Appx. 00720**

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
    James D. Dondero,
    President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**MARK K. OKADA**
_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated
Agreement of Limited Partnership*

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
James D. Dondero,
President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated
Agreement of Limited Partnership*

**HUNTER MOUNTAIN INVESTMENT TRUST**
By: Beacon Mountain LLC, Administrator

By: _____
Name: John Honis
Its:     President

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

**EXHIBIT A**

| | Percentage Interest | |
| --- | --- | --- |
| **CLASS A PARTNERS** | **By Class** | **Effective %** |
| GENERAL PARTNER: | | |
| Strand Advisors | 0.5573% | 0.2508% |
| LIMITED PARTNERS: | | |
| The Dugaboy Investment Trust | 74.4426% | 0.1866% |
| Mark K. Okada | 19.4268% | 0.0487% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #1 | 3.9013% | 0.0098% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #2 | 1.6720% | 0.0042% |
| Total Class A Percentage Interest | 100.0000% | 0.500% |
| **CLASS B LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 55.0000% |
| **CLASS C LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 44.500% |
| **PROFIT AND LOSS AMONG CLASSES** | | |
| Class A Partners | 0.5000% | |
| Class B Partners | 55.0000% | |
| Class C Partners | 44.5000% | |

**EXHIBIT B**

**ADDENDUM**
**TO THE**
**FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS ADDENDUM (this "**Addendum**") to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, to be effective as of December 24, 2015, as amended from time to time (the "Agreement"), is made and entered into as of the ____ day of _____, 20_, by and between Strand Advisors, Inc., as the sole General Partner (the "**General Partner**") of Highland Capital Management, L.P. (the "**Partnership**") and _____ ("_____") (except as otherwise provided herein, all capitalized terms used herein shall have the meanings set forth in the Agreement).

RECITALS:

WHEREAS, the General Partner, in its sole and unfettered discretion, and without the consent of any Limited Partner, has the authority under (i) Section 4.4 of the Agreement to admit Additional Limited Partners, (ii) Section 4.6 of the Agreement to admit Substitute Limited Partners and (iii) Section 6.1 of the Agreement to amend the Agreement;

WHEREAS, the General Partner desires to admit _____ as a Class __ Limited Partner holding a __% Percentage Interest in the Partnership as of the date hereof;

WHEREAS, _____desires to become a Class __ Limited Partner and be bound by the terms and conditions of the Agreement; and

WHEREAS, the General Partner desires to amend the Agreement to add _____ as a party thereto.

AGREEMENT:

RESOLVED, as a condition to receiving a Partnership Interest in the Partnership, _____ acknowledges and agrees that he/she/it (i) has received and read a copy of the Agreement, (ii) shall be bound by the terms and conditions of the Agreement; and (iii) shall promptly execute an addendum to the Second Amended Buy-Sell and Redemption Agreement; and be it

FURTHER RESOLVED, the General Partner hereby amends the Agreement to add _____ as a Limited Partner, and the General Partner shall attach this Addendum to the Agreement and make it a part thereof; and be it

FURTHER RESOLVED, this Addendum may be executed in any number of counterparts, all of which together shall constitute one Addendum binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the day and year above written.

GENERAL PARTNER:

**STRAND ADVISORS, INC.**

By: _____
      Name: _____
      Title: _____


NEW LIMITED PARTNER:

[_____]

AGREED AND ACCEPTED:

In consideration of the terms of this Addendum and the Agreement, in consideration of the Partnership's allowing the above signed Person to become a Limited Partner of the Partnership, and for other good and valuable consideration receipt of which is hereby acknowledged, the undersigned shall be bound by the terms and conditions of the Agreement as though a party thereto.

SPOUSE OF NEW LIMITED PARTNER:

[_____]

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Highland Capital Management, L.P. | DEFENDANTS<br>James Dondero, Nancy Dondero, and<br>The Dugaboy Investment Trust |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Hayward PLLC<br>10501 N. Central Expressway, Suite 106<br>Dallas, Texas 75231  Tel.: (972) 755-7100 | ATTORNEYS (If Known)<br>Stinson LLP (for James Dondero and Nancy Dondero); Heller, Draper & Horn, L.L.C. (for The Dugaboy Investment Trust) |
| PARTY (Check One Box Only)<br>☑ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor      ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor      ☑ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Breach of Contract; Turnover Pursuant to 11 USC 542(b); Avoidance and Recovery of Actual Fraudulent Transfer under 11 USC 548(a)(1)(A) and 550; Avoidance and Recovery of Actual Fraudulent Transfer under 11 USC 544(b) and 550 and Tex. Bus. & C. Code 24.005(a)(1); Declaratory Relief; Breach of Fiduciary Duty; Aiding & Abetting Breach of Fiduciary Duty

**NATURE OF SUIT**

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

| | |
|---|---|
| **FRBP 7001(1) – Recovery of Money/Property**<br>☑2 11-Recovery of money/property - §542 turnover of property<br>☐ 12-Recovery of money/property - §547 preference<br>☑3 13-Recovery of money/property - §548 fraudulent transfer<br>☑4 14-Recovery of money/property - other<br><br>**FRBP 7001(2) – Validity, Priority or Extent of Lien**<br>☐ 21-Validity, priority or extent of lien or other interest in property<br><br>**FRBP 7001(3) – Approval of Sale of Property**<br>☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)<br><br>**FRBP 7001(4) – Objection/Revocation of Discharge**<br>☐ 41-Objection / revocation of discharge - §727(c),(d),(e)<br><br>**FRBP 7001(5) – Revocation of Confirmation**<br>☐ 51-Revocation of confirmation<br><br>**FRBP 7001(6) – Dischargeability**<br>☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims<br>☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation,<br>    actual fraud<br>☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny<br><br>**(continued next column)** | **FRBP 7001(6) – Dischargeability (continued)**<br>☐ 61-Dischargeability - §523(a)(5), domestic support<br>☐ 68-Dischargeability - §523(a)(6), willful and malicious injury<br>☐ 63-Dischargeability - §523(a)(8), student loan<br>☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation<br>    (other than domestic support)<br>☐ 65-Dischargeability - other<br><br>**FRBP 7001(7) – Injunctive Relief**<br>☐ 71-Injunctive relief – imposition of stay<br>☐ 72-Injunctive relief – other<br><br>**FRBP 7001(8) Subordination of Claim or Interest**<br>☐ 81-Subordination of claim or interest<br><br>**FRBP 7001(9) Declaratory Judgment**<br>☑5 91-Declaratory judgment<br><br>**FRBP 7001(10) Determination of Removed Action**<br>☐ 01-Determination of removed claim or cause<br><br>**Other**<br>☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.<br>☑1 02-Other (e.g. other actions that would have been brought in state court<br>    if unrelated to bankruptcy case) |

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ Damages in an amount to be determined at trial |

| Other Relief Sought | Turnover of amounts due under note, avoidance of transfers to defendants, declaratory relief, punitive and exemplary damages, costs, attorneys' fees |
|---|---|

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | | |
|---|---|---|---|
| NAME OF DEBTOR<br>Highland Capital Management, L.P. | | BANKRUPTCY CASE NO.<br>19-34054-sgj11 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | | DIVISION OFFICE<br>Dallas | NAME OF JUDGE<br>Stacey G. C. Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | | |
| PLAINTIFF | DEFENDANT | | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | | |
| DATE<br>August 27, 2021 | | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Zachery Z. Annable | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

D-CNL002044

**Appx. 00728**

**EXHIBIT 33**



June 3, 2019

PricewaterhouseCoopers LLP
2121 N Pearl, Suite 2000
Dallas, TX 75201

We are providing this letter in connection with your audit of the consolidated financial statements of Highland Capital Management, L.P. and its subsidiaries (Appendix 1), (hereinafter collectively referred to as the "Partnership") as of December 31, 2018 (hereinafter referred to as the "balance sheet date") and the related consolidated statements of income, of changes in partners' capital, and of cash flows for the year then ended (hereinafter referred to as the "period"), (hereinafter collectively referred to as the "consolidated financial statements"), for the purpose of expressing an opinion as to whether such consolidated financial statements present fairly, in all material respects, the financial position, results of operations, changes in partners' capital and cash flows of the Partnership in conformity with accounting principles generally accepted in the United States of America. We acknowledge and confirm that we have fulfilled our responsibility, as set out in our engagement letter of May 14, 2019, for the preparation and fair presentation in the consolidated financial statements of financial position, results of operations, changes in partners' capital and of cash flow in conformity with generally accepted accounting principles, including the appropriate selection of accounting policies.

Certain representations in this letter are described as being limited to those matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement. Materiality used for purposes of these representations is $1,700,000.

We confirm, to the best of our knowledge and belief, as of June 3, 2019, the date of your report, the following representations made to you during your audit:

**General**

1. The consolidated financial statements referred to above are fairly presented in conformity with accounting principles generally accepted in the United States of America (GAAP), and include all disclosures necessary for such fair presentation and disclosures otherwise required to be included therein by the laws and regulations to which the Partnership is subject. We have prepared the Partnership's consolidated financial statements on the basis that the Partnership is able to continue as a going concern. There are no conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern within one year after the date these consolidated financial statements are issued.

2. We have made available to you:

   a. All financial records and related data.

   b. Unconditional access to persons within the entity from whom you have requested audit evidence.

   c. All minutes of the meetings of committees or other governing bodies applicable to the Partnership, including but not limited to, investors, Partners and committees of Partners, including summaries

D-JDNL-033411
**Appx. 00730**

of actions of recent meetings for which minutes have not yet been prepared. The most recent meetings held were Pricing Committee, April 12, 2019.

d. Partnership agreements, Memoranda and Articles of Association, Confidential Offering Memoranda and amendments thereto (individually or collectively referred to hereinafter as the "Governing Documents"), and all other agreements to which the Partnership is subject.

e. Contracts or other agreements with the Partnership's service providers.

f. All official written reports, findings, recommendations and communications from specialists or professional advisors engaged to review investments, systems, processes, operations, or compliance programs of Partnership that are material to the Partnership, individually or in aggregate.

g. All side letter arrangements, whether written or oral, with any investors entered into or cancelled during the period for which noncompliance would have a material effect on the Partnership's consolidated financial statements. These side letters are allowed under the terms of the Governing Documents.

h. Withdrawal requests submitted or communicated by investors through the date of this letter.

3. We are responsible for all significant estimates and judgments affecting the consolidated financial statements. Significant estimates and judgments and their underlying assumptions, methods, procedures and the source and reliability of supporting data are reasonable and based on applicable guidance, are completely and appropriately disclosed in the consolidated financial statements, and appropriately reflect management's intent and ability to carry out specific courses of action, where relevant. The procedures and methods utilized in developing assumptions, estimates and judgments are appropriate and have been consistently applied in the periods presented. There have been no subsequent events which would require the adjustment of any significant estimate and related disclosures.

**Legal and Regulatory Compliance**

4. There have been no communications from regulatory agencies concerning the Partnership's noncompliance with or deficiencies in financial reporting practices.

5. There have been no violations or possible violations of laws or regulations whose effects should be considered for disclosure in the consolidated financial statements or as a basis for recording a loss contingency.

6. The Partnership has complied with all aspects of contractual agreements that would have a material effect on the consolidated financial statements in the event of noncompliance.

**Fraud**

7. We acknowledge our responsibility for the design and implementation of programs and controls to provide reasonable assurance that fraud is prevented and detected.

8. We have disclosed to you the results of our assessment of the risk that the consolidated financial statements may be materially misstated as a result of fraud and we have no knowledge of any fraud or suspected fraud affecting the Partnership involving:

a. Partnership management or its affiliates,

b. Employees who have significant roles in the Partnership's internal control over financial reporting, or

c. Others where the fraud could have a material effect on the consolidated financial statements.

9. Except for previously disclosed, we have no knowledge of any allegations of fraud or suspected fraud affecting the Partnership received in communications from employees, former employees, regulators, service providers, counterparties, current or former investors, or others.

(As to items 7, 8 and 9, we understand the term "fraud" to mean those matters described in AICPA AU-C 240.)

**Assets, Liabilities and Capital**

*Assets:*

10. The Partnership has satisfactory title to all owned assets, including investments, and there are no liens or encumbrances on such assets nor has any asset been pledged as collateral, including, but not limited to, assets pledged or assigned as security for liabilities and performance of contracts, except as disclosed in the consolidated financial statements. All deposit and brokerage accounts and all investments and other assets of the Partnership of which we are aware are included in the consolidated financial statements.

11. Receivables recorded in the consolidated financial statements represent bona fide claims against debtors for transactions arising on or before the balance sheet date. All receivables have been appropriately reduced to their estimated net realizable value. Receivables, if any, from shareholders/partners or their affiliates, have been collected before the date of this letter.

12. We have evaluated all transfers of financial assets during the period, including, but not limited to, transfers between the Partnership and other affiliates, to determine that control over the transferred assets has been surrendered and that all of the conditions in accordance with Accounting Standards Codification (ASC) 860, *Transfers and Servicing*, ASC 860-10-40-5 have been met.

*Investments:*

With respect to Partnership's investments:

13. Portfolio Investments included in the Partnership's consolidated financial statements have been stated at fair values as determined by Partnership management in accordance with the valuation methods set forth in the Governing Documents and related policies and procedures. Such policies are in accordance with GAAP (e.g., fair value of an investment is that price which would be received to sell or paid to transfer, respectively, those assets or liabilities in orderly transactions between market participants).

14. The valuation policies used for investments whose fair values have been estimated by Partnership management are appropriate and have been consistently applied and documented. The policies for fair value measurement are appropriately disclosed in the Partnership's consolidated financial statements. The methods, assumptions, and inputs used are appropriate and result in a fair value appropriate for financial statement measurement and disclosure purposes. As of the balance sheet

D-JDNL-033413
**Appx. 00732**

date, the investments for which fair value were determined by estimates made by Partnership are appropriately disclosed in the Partnership's consolidated financial statements.

15. We have informed you of any investments as of the balance sheet date that have restrictions on their sale or transferability. We have appropriately considered restrictions that are an attribute of the investment in our fair value determination.

16. The cost of portfolio securities was determined on the basis of FIFO method.

17. All Partnership investments made during the period were in accordance with the investment policies stated in the Governing Documents. All investments made during the period were authorized by appropriate personnel.

18. We have made available to you all information received from third party specialists engaged with respect to the valuation of investments. We believe that the data used in the work of the third-party specialists is accurate, complete, and relevant, and that our fair value determinations have been properly determined using such data and assumptions. We assume responsibility for, and are responsible for the evaluation of, the findings of third-party specialists in order to determine the fair value of the investments. We have adequately considered the qualifications of the third-party specialists in determining the amounts and disclosures used in the consolidated financial statements and underlying accounting records. We did not give nor cause any instructions to be given to third-party specialists with respect to the values or amounts derived in an attempt to bias their work, and we are not otherwise aware of any matters that have had an impact on the objectivity of the third-party specialists.

19. We evaluated all contracts and financial instruments to determine whether they meet the definition of a derivative under ASC 815, Derivatives and Hedging (ASC 815).

### *Liabilities:*

20. All liabilities of the Partnership of which we are aware are included in the consolidated financial statements at the balance sheet date. There are no other liabilities or gain or loss contingencies that are required to be recognized or disclosed by ASC 450, *Contingencies*, and no unasserted claims or assessments that the Partnership's legal counsel has advised us are probable of assertion and required to be disclosed in accordance with that Topic.

21. The Partnership is not an "SEC registrant" as that term is used in ASC 480, *Distinguishing Liabilities from Equity*, 480-10-65-1. The Partnership has properly classified and disclosed as liabilities its mandatorily redeemable securities and other financial instruments (e.g., payable) that are within the scope of ASC 480-10-65, *Effective Date, Disclosures, and Transition for Mandatorily Redeemable Financial Instruments of Certain Nonpublic Entities and Certain Mandatorily Redeemable Noncontrolling Interests,* in the consolidated financial statements.

22. The actuarial valuation of pension benefit obligations was determined using an acceptable methodology applied on a consistent basis and taking into account the individual characteristics of the plan and reasonable assumptions, including those for the discount rate, rate of return on plan assets, mortality rate and other demographic assumptions.

D-JDNL-033414

Appx. 00733

23. We accurately described the processes used by management to make investment decisions, including the target allocation percentages or range of percentages for each major category of plan assets, and to determine the overall expected long-term rate of return on assets.

24. The amounts of expected employer contributions to the benefit plan during the next fiscal year represent our best estimate.

25. We do not intend to compensate for the reduction of postretirement benefits by granting an increase in pension or other benefits.

26. We applied the recognition, disclosure and measurement date provisions of ASC 715, Compensation-Retirement Benefits (ASC 715). The resulting benefit asset represents the overfunded status of the plan, and accumulated other comprehensive income includes all previously unrecognized prior service costs and credits, net gains/losses and transition assets and obligations, net of taxes.

27. We measured and recognized all plan assets as of the plan's measurement date at fair value in accordance with ASC 715, Compensation- Retirement Benefits (ASC 715).

*Capital:*

28. Partner capital balances, including the allocation of income, gains and losses, the calculation of management fees and incentive fees/allocations have been properly calculated throughout the period in accordance with the Governing Documents, after giving consideration to the terms identified in each investor's subscription document. The methodology was consistently applied throughout the period and was correctly applied in the computation of contribution and withdrawal transactions during the period.

## Statement of Operations

29. All material expenses charged to the Partnership are permissible under the terms of the Governing Documents. All directed brokerage and other expense reimbursement agreements, if any, have been properly disclosed in the consolidated financial statements.

### Tax Matters

30. There are no material tax liabilities incurred by the Partnership under the provisions of ASC 740, *Income Taxes*. We have made the necessary provisions and disclosures in the consolidated financial statements as required by ASC 740, *Income Taxes*. The resulting liabilities are supported by specifically identified income tax exposures.

31. We have provided you with all information and our assessment related to all significant uncertain income tax positions that we have taken, or expect to take, of which we are aware. We have also provided you with access to all opinions, rulings, memoranda and analyses that relate to positions we have taken in regard to significant income tax matters. We are responsible for the accuracy and completeness of information provided to external counsel and we believe that the facts are consistent with any stated assumptions made by external counsel for purposes of forming such tax opinions. We have made you aware of and have disclosed all significant tax positions for which it is reasonably possible the amount of unrecognized tax benefit will either increase or decrease in the next 12 months.

**Disclosure and Presentation of Consolidated financial statements**

32. The effects of the uncorrected financial statement misstatements are immaterial, both individually and in the aggregate, to the consolidated financial statements taken as a whole.

33. We have appropriately reconciled the Partnership's books and records (including, but not limited to, general ledger accounts, financial accounts maintained outside the general ledger and trial balances) underlying the consolidated financial statements to their related supporting information (e.g., sub ledger, or third-party data). All related reconciling items considered to be material were identified and included on the reconciliations and were appropriately adjusted in the consolidated financial statements, as necessary. There were no material un-reconciled differences or material general ledger suspense account items that should have been adjusted or reclassified to another account balance. There were no material general ledger suspense account items written off to a balance sheet account, which should have been written off to a statement of operations account and vice versa. All consolidating entries have been properly recorded. All intra-entity accounts have been eliminated or appropriately measured and considered for disclosure in the consolidated financial statements.

34. There are no material transactions, agreements or accounts that have not been properly recorded in the accounting records underlying the consolidated financial statements.

35. The following, if material, have been properly recorded or disclosed in the consolidated financial statements:

   a. Agreements to repurchase assets previously sold.

   b. All pertinent rights and privileges of both general partner and limited partner interests in the Partnership.

   c. Fee income and expenses associated with stock lending and borrowing arrangements.

   d. Relationships and transactions with related parties, as described in ASC 850, *Related Party Disclosures*, including revenue, subadvisory fees, purchases and sales of securities, transfers, guarantees, other fees and expenses charged to the Partnership, and amounts receivable from or payable to related parties.

   e. Significant estimates and material concentrations known to us that are required to be disclosed in accordance with ASC 275, *Risks and Uncertainties*. (Significant estimates are estimates at the balance sheet date that could change materially within the next year. Concentrations refer to matters such as volume of investment activity, available sources of financing, markets or geographic areas for which events could occur that would significantly disrupt investment performance within the next year.)

   f. All cash and deposit accounts and all other properties and assets of the Partnership are included in the consolidated financial statements.

   g. All financial instruments, including those with off-balance-sheet risk (including, but not limited to, swaps, forwards and futures), as required under US GAAP. This includes the following information with respect to the off-balance-sheet risks and the concentrations of credit risk:

      i. The extent, nature, and terms of financial instruments with off-balance-sheet risk.

CONFIDENTIAL

    ii. The amount of credit risk of financial instruments with off-balance-sheet risk and information about the collateral supporting such financial instruments.

  h. Each significant concentration of credit risk arising from all financial instruments, and information about the collateral supporting such financial instruments, whether from an individual counterparty/prime broker or group of counterparties/prime brokers in accordance with ASC 825, *Financial Instruments*, and ASC 815, *Derivatives and Hedging* (ASC 815), 815-10-50.

  i. Commitments to purchase or sell financial instruments, commitments on certain debt instruments such as revolving credit facilities and obligations to Partnership capital calls.

  j. Fee income and expenses associated with stock lending and borrowing arrangements.

  k. Guarantees, whether written or oral, under which the Partnership is contingently liable.

  l. Transactions made in foreign currencies.

  m. Transactions made on margin or selling short.

36. We have disclosed to you the identity of the Partnership's related parties and all the related party relationships and transactions of which we are aware.

37. The Partnership has classified and disclosed financial assets and liabilities in the consolidated financial statements as Level 1, Level 2 and Level 3 in accordance with ASC 820, *Fair Value Measurement*, including a description of inputs and information used to develop valuation techniques as well as facts that required a change to such techniques, where applicable. We have made appropriate disclosures in accordance with Accounting Standards Update (ASU) 2011-11, *Disclosures about Offsetting Assets and Liabilities*, when the Partnership has the right of setoff in accordance with a master netting or similar agreement. The netting of assets and liabilities has been performed in accordance with the specific requirements of ASC 210, *Balance Sheet*, 210-20-45-1 and ASC 815-10-45-5.

38. The Partnership has properly recorded, classified and disclosed the prime broker margin collateral requirements in the consolidated financial statements in accordance with ASC 860, *Transfers and Servicing*, as to the recognition and reclassification of collateral and disclosures relating to securitization transactions and collateral.

39. We consistently applied our policy regarding classification of cash and cash equivalents, which are short-term, highly liquid investments that are readily convertible to known amounts of cash and are so near their maturity that there is insignificant risk of changes in value due to interest rate or other credit risk changes.

40. All borrowings and financial obligations of the Partnership have been disclosed to you and are properly recorded in the consolidated financial statements.

41. The Partnership has not made any commitments during the year as underwriter, nor did it engage in joint trading or a joint investment account.

**Other**

42. No contracts were executed outside of Texas or the U.S. on behalf of the Partnership during 2017.

D-JDNL-033417

43. The Partnership has no plans or intentions that may materially affect the Partnership's carrying value or classification of assets and liabilities. Partnership management has no plans or intentions to liquidate the Partnership or to cease operations.

44. Other than the litigation described in the Current Litigation Memo dated May 24, 2019 and disclosed in the consolidated financial statements, there is no other litigation that would materially impact the Partnership and the consolidated funds.

45. We acknowledge and confirm that we have fulfilled our responsibility, as set out in our engagement letter of May 14, 2019, for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error and we have disclosed to you all deficiencies in the design or operation of internal control over financial reporting of which we are aware. We have also disclosed to you which of these deficiencies we believe are significant deficiencies or material weaknesses in internal control over financial reporting. In addition, we are not aware of any deficiencies in the design or operation of internal control over financial reporting at the service providers.

46. We have notified you of (i) any current or planned offerings of securities on a regulated market in a non-U.S. country or (ii) when we have provided or plan to provide audited consolidated financial statements to a non-U.S. regulator or government in connection with our access to its public capital markets, whether or not we include or refer to your report or include reference to your Firm.

47. We identified all variable interests, determined whether each variable interest in an entity was a variable interest entity (VIE), consolidated the VIEs for which the Partnership was the primary beneficiary, considered reconsideration events and complied with the consolidated financial statement disclosure requirements, including those VIEs that were not consolidated, in accordance with the guidance of ASC 810, Consolidation (ASC 810), which was applicable to the period presented.

48. The Partnership, as general partner of limited partnerships (which are not subject to the consolidation guidance under the variable interest entity model), has evaluated consolidation in accordance with ASC 810-20-25-4 through 25-7, Evaluating Presumption of General Partner Control and has determined that the entities listed in Note 3 of the consolidated financial statements have been properly consolidated. For entities that have not been consolidated by the Partnership, as general partner, the Partnership has adequately overcome the presumption of consolidation by the general partner based on the guidance noted above.

49. The consolidated financial statements disclose all matters of which we are aware that are relevant to the Partnership's ability to continue as a going concern, including all significant conditions and events and management's plans. We have the intent and ability to take actions necessary for the Partnership to continue as a going concern and accordingly the Partnership's consolidated financial statements are prepared on a going concern basis. We made available to you all relevant information on the Partnership's ability to continue as a going concern that could affect the consolidated financial statements. We derecognize liabilities if and only if it has been extinguished. A liability has been extinguished when the debtor pays the creditor and is relieved from its obligation or when the debtor has been legally released from being the primary obligor under the liability, either judicially or by the creditor.

50. We acknowledge responsibility for the presentation of the Supplemental Consolidating Balance Sheet, Supplemental Consolidating Statement of Income, Supplemental Unconsolidated Balance Sheet and Supplemental Unconsolidated Statement of Income in accordance with US GAAP and we believe such information, including its form and content, is fairly presented in accordance with US

CONFIDENTIAL

GAAP. We have communicated to you all changes in measurement or presentation from those used in the prior period. We have informed you about any significant assumptions or interpretations underlying the measurement or presentation of the information.

To the best of our knowledge and belief, no events have occurred subsequent to the balance sheet date and through the date of this letter that would require adjustments to, or disclosure in, the aforementioned consolidated financial statements.

James Dondero, President
Highland Capital Management, L.P.
By: Strand Advisors, Inc., its general partner

Frank Waterhouse, Treasurer
Highland Capital Management, L.P.
By: Strand Advisors, Inc., its general partner

**Appendix 1**

**List of subsidiaries**

Highland Multi Strategy Credit Fund, L.P.

Highland Multi-Strategy Master Fund, L.P.

Highland Multi-Strategy Fund, L.P.

Highland Restoration Capital Partners Offshore, L.P.

Highland Restoration Capital Partners, L.P.

Highland Capital Special Allocation, LLC

Highland Receivables Finance 1, LLC

Highland Multi-Strategy Onshore Master SubFund, LLC

Highland Multi-Strategy Onshore Master Subfund II, LLC, LLC

Highland Brasil, LLC

Highland Capital Management (Singapore) Pte, Ltd.

Highland Capital Management Korea, Ltd.

Highland Capital Management Latin America, L.P.

HE Capital, LLC

De Kooning, Ltd.

Hirst, Ltd.

Hockney, Ltd.

Oldenburg, Ltd.

Eames, Ltd.

Penant Management, L.P.

Pollack, Ltd.

Warhol, Ltd.

HCREF- I Holding Corp.

HCREF-XI Holding Corp.

HCREF-XII Holding Corp.

**Appendix 1 (continued)**

Highland ERA Management, LLC

The Dondero Insurance Rabbi Trust

The Okada Insurance Rabbi Trust

Highland Employee Retention Assets, LLC

Highland Diversified Credit Fund, L.P.

Highland Select Equity Master Fund, L.P.

Highland Select Equity Fund, L.P.

Highland Fund Holdings, LLC

HCM Holdco, LLC

Maple Avenue Holdings, LLC

Highland HCF Advisor, Ltd.

Asury Holdings, LLC

Highland CLO Management, Ltd

CONFIDENTIAL

# EXHIBIT 34

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Financial Statements and**
**Supplemental Information**
**December 31, 2018**

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Index**
**December 31, 2018**

|  | Page |
|---|---|
| **Report of Independent Auditors** | 1 |
| **Consolidated Financial Statements** | |
| Consolidated Balance Sheet | 2 |
| Consolidated Statement of Income | 3 |
| Consolidated Statement of Changes in Partners' Capital | 4 |
| Consolidated Statement of Cash Flows | 5 |
| Notes to Consolidated Financial Statements | 6-39 |
| Supplemental Information | 40-44 |

D-CNL000213
Appx. 00743



Report of Independent Auditors

To the General Partner of Highland Capital Management, L.P.

We have audited the accompanying consolidated financial statements of Highland Capital Management, L.P. and its subsidiaries (collectively, the "Partnership"), which comprise the consolidated balance sheet as of December 31, 2018, and the related consolidated statements of income, of changes in partners' capital and of cash flows for the year then ended.

**Management's Responsibility for the Consolidated Financial Statements**

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

**Auditors' Responsibility**

Our responsibility is to express an opinion on the consolidated financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, we consider internal control relevant to the Partnership's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Partnership's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Highland Capital Management, L.P. and its subsidiaries as of December 31, 2018, and the results of their operations, changes in their partners' capital and their cash flows for the year then ended, in accordance with accounting principles generally accepted in the United States of America.

**Other Matter**

Our audit was conducted for the purpose of forming an opinion on the consolidated financial statements taken as a whole. The Supplemental Consolidating Balance Sheet, the Supplemental Consolidating Statement of Income, the Supplemental Unconsolidated Balance Sheet and the Supplemental Unconsolidated Statement of Income are presented for purposes of additional analysis and are not a required part of the consolidated financial statements. The information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the consolidated financial statements. The information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the consolidated financial statements or to the consolidated financial statements themselves and other additional procedures, in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information is fairly stated, in all material respects, in relation to the consolidated financial statements taken as a whole.

*PricewaterhouseCoopers LLP*

June 3, 2019

---

PricewaterhouseCoopers LLP, 2121 N Pearl Street, Suite 2000, Dallas, Texas 75201
T: (214) 999 1400, F: (214) 754 7991, www.pwc.com/us

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Consolidated Balance Sheet**
**December 31, 2018**

*(in thousands)*

**Assets**

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 5,034 |
| Investments at fair value (cost $922,027) | | 845,186 |
| Management and incentive fees receivable | | 2,393 |
| Due from broker for securities sold, not yet settled | | 598 |
| Other assets | | 9,255 |
| Notes and other amounts due from affiliates | | 173,398 |
| Intangible assets | | 3,022 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $11,197 | | 4,581 |
| **Total assets** | $ | 1,043,467 |

**Liabilities and partners' capital**

**Liabilities**

| | | |
|---|---|---:|
| Accounts payable | $ | 4,983 |
| Securities sold, not yet purchased (proceeds $26,135) | | 32,357 |
| Withdrawals payable | | 57,009 |
| Due to brokers | | 116,560 |
| Due to brokers for securities purchased, not yet settled | | 1,640 |
| Accrued and other liabilities | | 40,246 |
| Notes payable | | 55,752 |
| Investment liabilities | | 46,092 |
| **Total liabilities** | | 354,639 |
| Non-controlling interest | | 316,867 |
| **Partners' capital** | | 371,961 |
| **Total liabilities and partners' capital** | $ | 1,043,467 |

The accompanying notes are an integral part of these consolidated financial statements.

2

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Statement of Income**
**Year Ended December 31, 2018**

*(in thousands)*

| | | |
|---|---:|---:|
| **Revenue:** | | |
| Management fees | $ | 36,600 |
| Interest and investment income | | 15,831 |
| Incentive fees | | 70 |
| Shared services fees | | 9,187 |
| Other income | | 2,622 |
| Total revenue | | 64,310 |
| | | |
| **Expenses:** | | |
| Compensation and benefits | | 34,475 |
| Professional fees | | 17,679 |
| Interest expense | | 5,670 |
| Marketing and advertising expense | | 2,413 |
| Depreciation and amortization | | 1,317 |
| Investment and research consulting | | 1,082 |
| Bad debt expense | | 7,862 |
| Other operating expenses | | 10,027 |
| Total expenses | | 80,525 |
| | | |
| **Other Income/(Expense):** | | |
| Other income | | 9,826 |
| Impairment on intangible assets | | (2,830) |
| Total other income | | 6,996 |
| | | |
| Loss before investment and derivative activities | | (9,219) |
| | | |
| **Realized and unrealized loss on investments and derivatives:** | | |
| Net realized loss on investments and derivatives | | (31,517) |
| Net change in unrealized loss on investments and derivatives | | (93,755) |
| Net realized and unrealized loss on investments and derivatives | | (125,272) |
| | | |
| Net loss | | (134,491) |
| | | |
| Net loss attributable to non-controlling interest | | (61,313) |
| | | |
| Net loss attributable to Highland Capital Management, L.P. | $ | (73,178) |

The accompanying notes are an integral part of these consolidated financial statements.

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Statement of Changes in Partners' Capital**
**Year Ended December 31, 2018**

*(in thousands)*

|  | General Partner | Limited Partners | Total |
|---|---|---|---|
| Partners' capital, December 31, 2017 | $ 163 | $ 450,014 | $ 450,177 |
| Net loss attributable to Highland Capital Management, L.P. | $ (183) | $ (72,995) | $ (73,178) |
| Partner distributions | $ (13) | $ (5,025) | $ (5,038) |
| Partners' capital, December 31, 2018 | $ (33) | $ 371,994 | $ 371,961 |

The accompanying notes are an integral part of these consolidated financial statements.

4

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Consolidated Statement of Cash Flows**
**Year Ended December 31, 2018**

*(in thousands)*

| | | |
|---|---|---:|
| **Cash flows from operating activities:** | | |
| Net loss | $ | (134,491) |
| Adjustment to reconcile net loss to net cash | | |
| provided from operating activities: | | |
| Net realized loss on investments and derivative transactions | | 31,517 |
| Net change in unrealized loss on investments and derivative transactions | | 93,755 |
| Amortization and depreciation | | 1,317 |
| Changes in assets and liabilities: | | |
| Management and incentive fee receivable | | 9,468 |
| Due from brokers | | 1,689 |
| Due from affiliate | | (10,989) |
| Other assets | | 4,272 |
| Intangible assets | | 3,308 |
| Accounts payable | | 546 |
| Accrued and other liabilities | | 1,214 |
| Due to brokers for securities purchased, not yet settled | | 1,886 |
| Due to brokers | | 11,665 |
| Net cash provided from operating activities | | 15,157 |
| **Cash flows from investing activities:** | | |
| Purchases of fixed assets and leasehold improvements, net | | (67) |
| Purchases of investments | | (195,263) |
| Proceeds from dispositions of investments | | 258,858 |
| Proceeds from securities sold, not yet purchased | | 46,550 |
| Issuance of notes receivable to affiliates | | (2,400) |
| Proceeds from repayments of notes receivable from affiliates | | 3,395 |
| Purchases of investments to cover securities sold, not yet purchased | | (127,954) |
| Net cash used in investing activities | | (16,881) |
| **Cash flows from financing activities:** | | |
| Payments on notes payable & investment liabilities | | (2,743) |
| Proceeds from long-term debt | | 38,501 |
| Capital contributions from minority interest investors of consolidated entities | | 14,615 |
| Capital withdrawals by minority interest investors of consolidated entities | | (141,986) |
| Partner distributions | | (5,060) |
| Net cash used in financing activities | | (96,673) |
| Net decrease in cash and cash equivalents | | (98,397) |
| **Cash and cash equivalents** | | |
| Beginning of year | | 103,479 |
| De-consolidating funds adjustment | | (48) |
| End of year | $ | 5,034 |
| **Supplemental disclosure of cash flow information:** | | |
| Interest paid during the year | $ | (5,629) |
| Taxes paid during the year | | (510,961) |
| Investments acquired for non-cash consideration | | 26,018 |
| Investments disposed for non-cash consideration | | 116 |

The accompanying notes are an integral part of these consolidated financial statements.

5

HIGHLY CONFIDENTIAL

# Highland Capital Management, L.P.
## Notes to Consolidated Financial Statements
### December 31, 2018

1. **Description of Business**

   Highland Capital Management, L.P. (the "Partnership") was formed on July 7, 1997 as a limited partnership in the state of Delaware. The Partnership is a registered investment adviser under the Investment Advisers Act of 1940 that manages collateralized loan obligations ("CLOs"), hedge funds, private equity funds, and other leveraged loan transactions that are collateralized predominately by senior secured bank debt and high-yield bonds. The Partnership and its subsidiaries make direct investments in debt, equity, and other securities in the normal course of business. The Partnership's general partner is Strand Advisors, Inc. (the "General Partner"). The Partnership is owned by an unaffiliated (other than through its direct ownership) trust as well as affiliated trusts and personal holdings of the senior management of the Partnership.

   As of December 31, 2018, the Partnership provided investment advisory services for eighteen CLOs, five separate accounts, one master limited partnership, and nine hedge funds or private equity structures, with total fee-earning assets under management of approximately $3.1 billion. The Partnership also provides investment services on behalf of affiliate advisors.

2. **Summary of Significant Accounting Policies**

   The following is a summary of the significant accounting policies followed by the Partnership in preparation of its consolidated financial statements.

   **Basis of Accounting**
   The Partnership's consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles in the United States of America ("U.S. GAAP") as set forth in the Financial Accounting Standards Board's Accounting Standards Codification and are stated in the United States Dollar.

   **Use of Estimates**
   The preparation of the consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts and disclosures in the consolidated financial statements. Actual results could differ from those estimates and those differences could be material.

   **Principles of Consolidation**
   The consolidated financial statements include the accounts of the Partnership and the Partnership's consolidated subsidiaries ("Consolidated Entities"), which are comprised of (i) those entities in which it has controlling investment and has control over significant operating, financial and investing decisions, (ii) those entities in which it, as the general partner, has control over significant operating, financial and investing decisions, and (iii) variable interest entities ("VIEs") in which it is the primary beneficiary as described below.

   The Partnership determines whether an entity has equity investors who lack the characteristics of a controlling financial interest or does not have sufficient equity at risk to finance its expected activities without additional subordinated financial support from other parties. If an entity has either of these characteristics, it is considered a VIE and must be consolidated by its primary beneficiary, which is the party that, along with its affiliates and de facto agents, absorbs a majority of the VIEs' expected losses or receives a majority of the expected residual returns as a result of holding variable interests.

6

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Partnership assesses consolidation requirements pursuant to ASU 2015-02: Consolidation, which was adopted using the modified retrospective method and resulted in an effective date of adoption of January 1, 2016.

The Partnership and its affiliate's involvement with unconsolidated VIEs is generally limited to that of an advisory services provider, and their investment, if any, represents an insignificant interest in the relevant investment entities' assets under management. The Partnership's affiliate's exposure to risk in these entities is generally limited to any capital contribution it has made or is required to make and any earned but uncollected asset based and performance fees. The Partnership has not issued any investment performance guarantees to these VIEs or their investors, except that the Partnership has agreed to subject the full value of its equity interest in Highland Prometheus Fund to dollar-for-dollar reduction to the extent the third party investor in such fund does not achieve an annual target return.

As of December 31, 2018, the net assets of the unconsolidated VIEs and the Partnership's maximum risk of loss were as follows:

*(in thousands)*

|  | Unconsolidated VIE Net Assets | Carrying Value and Maximum Risk of Loss |
|---|---|---|
| Sponsored investment funds | $ 206,329 | $ 12,178 |

**Consolidation of Variable Interest Entities**

The Partnership consolidates the following VIEs (along with majority owned funds: Highland Diversified Credit Fund, L.P., and Highland Select Equity Fund, L.P., collectively the "Consolidated Investment Funds"), as the Partnership (or its wholly owned subsidiaries) controls the general partner of the respective entities and is responsible for the daily operations of the following entities:

- Highland Multi Strategy Credit Fund, L.P. ("Multi Strategy Master"), formerly Highland Credit Opportunities CDO, L.P., a Delaware limited partnership that commenced operations on December 15, 2005 and changed its name on August 26, 2014;

- Highland Multi-Strategy Master Fund, L.P. ("Multi-Strategy Master"), a Bermuda limited partnership that commenced operations on July 18, 2006;

- Highland Multi-Strategy Fund, L.P. ("Multi-Strat Domestic Feeder"), a Delaware limited partnership that commenced operations on July 6, 2006;

- Highland Restoration Capital Partners Offshore, L.P. ("Restoration Offshore"), a Cayman limited partnership that commenced operations on September 2, 2008;

- Highland Restoration Capital Partners, L.P. ("Restoration Onshore"), a Delaware limited partnership that commenced operations on September 2, 2008; and

7

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Consolidation of Majority Owned Entities**

The Partnership consolidates the following entities as it has a controlling majority interest:

- 100% interest in Highland Capital Special Allocation, LLC ("HCSA"), a Delaware limited liability company that commenced operations on December 21, 2006;

- 100% interest in Highland Receivables Finance 1, LLC, a Delaware limited liability company that commenced operations on December 29, 2006;

- 100% interest in Highland Multi-Strategy Onshore Master SubFund, LLC, a Delaware limited liability company that commenced operations on July 19, 2006;

- 100% interest in Highland Multi-Strategy Onshore Master Subfund II, LLC, LLC, a Delaware limited liability company that commenced operations on February 22, 2007;

- 100% interest in Highland Brasil, LLC, a Delaware limited liability company that commenced operations on January 28, 2014;

- 100% interest in Highland Capital Management (Singapore) Pte, Ltd. ("HCM Singapore"), a company organized in the Republic of Singapore that commenced operations on April 2, 2008;

- 100% interest in Highland Capital Management Korea, Ltd. ("HCM Korea"), a company organized in the Republic of Korea that commenced operations on August 2, 2012;

- 100% interest in Highland Capital Management Latin America, L.P., ("HCM Latin America"), a Cayman company that was formed on April 13, 2017;

- 100% interest in HE Capital, LLC, a Delaware limited liability company that was formed on March 22, 2007;

- 100% interest in De Kooning, Ltd, a Cayman company that was formed on December 1, 2012;

- 100% interest in Hirst, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Hockney, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Oldenburg, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Eames, Ltd, a Cayman company that was formed on December 12, 2012;

- 99.9% interest in Penant Management, L.P., a Delaware limited partnership that was formed on December 12, 2012;

- 100% interest in Pollack, Ltd., a Cayman company that was formed on December 1, 2012;

- 100% interest in Warhol, Ltd., a Cayman company that was formed on December 1, 2012;

8

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2018**

- 100% interest in HCREF-I Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in HCREF-XI Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in HCREF-XII Holding Corp., a Delaware company that was formed on December 13, 2012;

- 100% interest in Highland ERA Management, LLC, a Delaware limited liability company that was formed on February 1, 2013;

- 100% interest in The Dondero Insurance Rabbi Trust., a trust that was formed on May 27, 2004;

- 100% interest in The Okada Insurance Rabbi Trust, a trust that was formed on May 27, 2004;

- 100% interest in Highland Employee Retention Assets ("HERA"), LLC, a Delaware limited liability company that was formed on October 26, 2009;

- 100% interest in Highland Diversified Credit Fund, L.P. ("Highland Offshore Partners"), a Delaware limited partnership which began operations on February 29, 2000 and was organized for the sole purpose of investing substantially all of its assets in Highland Offshore Partners, L.P.;

- 99.6% interest in Highland Select Equity Master Fund, LP, and Highland Select Equity Fund, LP Delaware limited partnerships which began operations on January 1, 2002 and was organized for the purpose of investing and trading in large and small cap stocks that trade for less than intrinsic value;

- 100% interest in Highland Fund Holdings, LLC, a Delaware limited liability company that was formed on May 24, 2016;

- 100% interest in Maple Avenue Holdings, LLC, a Texas limited liability company formed on August 17, 2016;

- 100% interest in Highland HCF Advisor, Ltd., a Cayman company that was formed on October 27, 2017;

- 100% interest in Asury Holdings, LLC, a Delaware limited liability company formed on February 14, 2017 and;

- 100% interest in Highland CLO Management, Ltd., a Cayman company that was formed on October 27, 2017.

All inter-partnership and intercompany accounts and transactions involving the above listed Consolidated Entities have been eliminated in all of the aforementioned consolidating schedules. All the Consolidated Investment Funds are, for U.S. GAAP purposes, investment companies under the American Institute of Certified Public Accountants (AICPA) Audit and Accounting Guide - Investment Companies. The Partnership has retained the specialized accounting of these funds required under U.S. GAAP.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The following table includes a rollforward of non-controlling interests from December 31, 2017, to December 31, 2018.

*(in thousands)*

| | | |
|---|---|---:|
| Noncontrolling interest, December 31, 2017 | $ | 424,844 |
| Net loss attributable to noncontrolling interest | | (61,313) |
| Noncontrolling partner contributions | | 14,615 |
| Noncontrolling partner distributions | | (58,061) |
| Noncontrolling interest of deconsolidated entities | | (3,218) |
| Noncontrolling interest, December 31, 2018 | $ | 316,867 |

**Investment Transactions**
Investment transactions are recorded on a trade date basis. Investments in securities are valued at market or fair value at the date of the consolidated financial statements with the resulting net unrealized appreciation or depreciation reflected in the Consolidated Statement of Income. Realized gains and losses on the transactions are determined based on either the first-in, first-out or specific identification method.

See Note 5 for the Partnership's fair value process and hierarchy disclosures.

**Management and Incentive Fee Revenue**
The Partnership recognizes revenue as earned in connection with services provided under collateral and investment management agreements. Under these agreements, the Partnership earns management fees calculated as a percentage of assets under management or net asset value. The Partnership also has an opportunity to earn additional incentive fees and incentive allocations related to certain management agreements depending ultimately on the financial performance of the underlying assets the Partnership manages. During the year ended December 31, 2018, the Partnership and its Consolidated Entities recognized management fees and incentive fees of approximately $36.6 million and $0.1 million, respectively.

**Shared Services Revenue**
The Partnership recognizes revenue as earned in connection with services provided to related parties under various shared services agreements. Under these agreements, the Partnership earns fees for services including, but not limited to, back office support functions, marketing, and investment advisory services. During the year ended December 31, 2018, the Partnership and its Consolidated Entities recognized shared services revenue of approximately $9.2 million, which has been presented in *Shared services fees* in the Consolidated Statement of Income. See further discussion in Note 8.

10

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Income and Expense Recognition**
Interest on currently paying debt instruments is accrued as earned and dividend income and dividends on securities sold, not yet purchased are recorded on the ex-dividend date, net of withholding taxes. In certain instances where the asset has defaulted or some amount of the interest payment is deemed uncollectable, interest is recognized when received. Discounts and premiums associated with purchases of investments are accreted and amortized to interest income, except for deep-discounted debt where ultimate collection of interest and principal may be in doubt. Such accretion/amortization is calculated on an effective-yield basis over the life of the investment. Amendment fees are recognized when agreed to by the underlying company and all settlement contingencies are met. Operating expenses, including interest on securities sold short, not yet purchased, are recorded on the accrual basis as incurred.

**Income Taxes**
The Partnership is not subject to federal income taxes, and therefore, no provision has been made for such taxes in the accompanying consolidated financial statements. Income taxes are the responsibility of the partners. Certain consolidated subsidiaries are subject to federal income taxes.

Certain entities that are included in these consolidated financial statements are subject to federal and/or state income taxes. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the period that includes the enactment date. See further discussion in Note 13.

**Cash and Cash Equivalents**
Cash and cash equivalents consist of cash held at U.S. and foreign banks, deposits with original maturities of less than 90 days, and money market funds. Cash equivalents are carried at cost, which approximates market value. At December 31, 2018, the Partnership and Consolidated Entities held cash balances at certain financial institutions in excess of the federally insured limit of $0.3 million. The Partnership and Consolidated Entities regularly monitor the credit quality of these institutions.

**Notes Receivable**
Notes receivable consists of secured promissory notes with maturities greater than one year. When available, the Partnership uses observable market data, including pricing on recent closed transactions to value notes. When appropriate, these notes may be valued using collateral values. Adjustments to the value may be performed in circumstances where attributes specific to the collateral exist suggesting impairment.

**Other Intangible Assets**
Goodwill and other intangible assets are recorded on the Consolidated Balance Sheet at current carrying values. The Partnership and its Consolidated Entities perform an impairment test on an annual basis. Any impairment in the value of other intangible assets is accounted for in the year when it occurs.

**Fixed Assets and Leasehold Improvements**
Fixed assets and leasehold improvements are carried at cost, less accumulated depreciation. Depreciation is provided using the straight-line method over the shorter of the estimated useful life of the assets or the lease term.

11

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Partnership and its Consolidated Entities are depreciating fixed assets as follows:

|  | Period |
|---|---|
| Leasehold improvements | Lease term |
| Buildings | 29 - 40 years |
| Furniture and fixtures | 7 years |
| Computer and equipment | 3 - 5 years |
| Computer software | 3 years |

**Securities Sold, Not Yet Purchased**
Certain of the Partnership's Consolidated Investment Funds engage in "short sales" as part of their investment strategies. Short selling is the practice of selling securities that are borrowed from a third party. The Consolidated Investment Funds are required to return securities equivalent to those borrowed for the short sale at the lender's demand.

Pending the return of such securities, the Consolidated Investment Funds deposit with the lender as collateral the proceeds of the short sale plus additional cash. The amount of the required deposit, which earns interest, is adjusted periodically to reflect any change in the market price of the securities that the Consolidated Investment Funds are required to return to the lender. A gain (which cannot exceed the price at which the Consolidated Investment Funds sold the security short) or a loss (which theoretically could be unlimited in size) will be settled upon termination of a short sale.

**Due to/from Brokers**
Due to and from broker balances recorded on the Consolidated Balance Sheet include liquid assets maintained with brokers and counterparties for margin account balances and the amounts due for or due from the settlement of purchase and sales transactions. Certain due to and from broker balances have been reported on a net-by-counterparty basis where, in accordance with contractual rights and the Partnership's opinion, there is a right of offset in the event of bankruptcy or default by a counterparty.

**Options Contracts**
The Partnership and the Consolidated Entities may purchase and write call and put options to gain market exposure or to hedge investments. A call option gives the purchaser of the option the right (but not the obligation) to buy, and obligates the seller to sell (when the option is exercised), the underlying position at the exercise price at any time or at a specified time during the option period. A put option gives the holder the right to sell and obligates the writer to buy the underlying position at the exercise price at any time or at a specified time during the option period. When the Partnership or the Consolidated Entities purchase (write) an option, an amount equal to the premium paid (received) by the entity is reflected as an asset (liability). The amount of the asset (liability) is subsequently marked-to-market to reflect the current market value of the option purchased (written). When a security is purchased (or sold) through an exercise of an option, the related premium paid (or received) is added to (or deducted from) the basis of the security acquired or deducted from (or added to) the proceeds of the security sold. When an option expires (or the Partnership or the Consolidated Entities enter into a closing transaction), the entity realizes a gain or loss on the option to the extent of the premiums received or paid (or gain or loss to the extent the cost of the closing transaction exceeds the premium received or paid). Exercise of a written option could result in the Partnership or the Consolidated Entities purchasing a security at a price different from the current market value.

12

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Partnership and the Consolidated Entities are exposed to counterparty risk from the potential that a seller of an option contract does not sell or purchase the underlying asset as agreed under the terms of the option contract. The maximum risk of loss from counterparty risk to the Partnership and the Consolidated Entities is the greater of the fair value of its open option contracts or the premiums paid to purchase the open option contracts. The Partnership and the Consolidated Entities consider the credit risk of the intermediary counterparties to its option transactions in evaluating potential credit risk.

**Margin Transactions**
To obtain more investable cash, certain of the Consolidated Entities may use various forms of leverage including purchasing securities on margin. A margin transaction consists of purchasing an investment with money loaned by a broker and agreeing to repay the broker at a later date. Interest expense on the outstanding margin balance is based on market rates at the time of the borrowing.

**Withdrawals Payable**
Withdrawals are recognized as liabilities, net of incentive allocations, when the amount requested in the withdrawal notice becomes fixed and determinable. This generally may occur either at the time of receipt of the notice, or on the last day of a fiscal period, depending on the nature of the request. As a result, withdrawals paid after the end of the year, but based upon year-end capital balances are reflected as withdrawals payable at December 31, 2018. Withdrawal notices received for which the dollar amount is not fixed remains in capital until the amount is determined. At December 31, 2018, the Consolidated Investment Funds had withdrawals payable of $57.0 million.

**Foreign Currency Transactions**
The Partnership's subsidiaries HCM Singapore and HCM Korea use Singapore dollars and Korean won, respectively, as their functional currency. All foreign currency asset and liability balances are presented in U.S. dollars in the consolidated financial statements, translated using the exchange rate as of December 31, 2018. Revenues and expenses are recorded in U.S. dollars using an average exchange rate for the relative period. Foreign currency transaction gains and losses resulting from transactions outside of the functional currency of an entity are included in *Other income* on the Consolidated Statement of Income.

The Consolidated Entities do not isolate that portion of the results of operations resulting from changes in foreign exchange rates or investment or fluctuations from changes in market prices of securities held. Such fluctuations are included within the *Net realized and unrealized gains or loss from investments* on the Consolidated Statement of Income.

**Life Settlement Contracts**
One of the Consolidated Investment Funds, through a subsidiary, holds life settlement contracts and accounts for them using the fair value method. These contracts are recorded as a component of "Investments at fair value" on the Consolidated Balance Sheet. Realized and unrealized gains (losses) on the contracts are recorded in the Consolidated Income Statement. Cash flows relating to the purchase and sale of the contracts are recorded as a component of *Purchase of investments* and *Proceeds from dispositions of investments* on the Consolidated Statement of Cash Flows. At December 31, 2018, the Consolidated Investment Fund was invested in 13 policies, which had a total face value of approximately $145.3 million and a fair value of $35.7 million.

13

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Financing**

The Partnership and its Consolidated Entities may finance the acquisition of its investments in securities and loans through financing arrangements which are classified in Notes payable and Investment liabilities on the Consolidated Balance Sheet. The Partnership and its Consolidated Entities recognize interest expense on all borrowings on the accrual basis in the Consolidated Statement of Income.

**Financial Instruments**

The Partnership and its Consolidated Entities determine fair value of financial instruments as required by U.S. GAAP. The carrying amounts for cash and cash equivalents, receivables, accounts payable, withdrawals payable, debt and notes payable, due to brokers, investment liabilities and accrued liabilities approximate their fair values. For fair value of investment, see Note 5.

**Accounts Payable, Accrued and Other Liabilities**

Expenses are recorded on an accrual basis, as incurred. Current liabilities are included in Accounts payable. Long-term liabilities are included in Accrued and other liabilities.

**Partners' Capital**

The Partnership agreement requires that income or loss of the Partnership be allocated to the partners in accordance with their respective partnership interests.

14

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

3. **Fixed Assets and Leasehold Improvements**

Fixed assets and leasehold improvements are comprised of the following as of December 31, 2018:

*(in thousands)*

| | | |
|---|---|---:|
| Leasehold improvements | $ | 7,193 |
| Buildings | | 2,595 |
| Furniture and fixtures | | 2,796 |
| Computer and equipment | | 2,863 |
| Computer software | | 331 |
| Accumulated depreciation | | (11,197) |
| | $ | 4,581 |

Depreciation expense in 2018 totaled approximately $1.3 million for the Partnership and its subsidiaries.

4. **Investments**

Detailed below is a summary of the Partnership and its Consolidated Entities' investments at December 31, 2018:

| *(in thousands)* | Amortized Cost/Cost | | Fair Value | |
|---|---:|---|---:|---|
| Common equity securities | $ | 423,306 | $ | 535,374 |
| Closed-end mutual funds | | 100,788 | | 94,845 |
| Floating rate syndicated bank loans | | 142,586 | | 72,622 |
| Real Estate Investment Trusts | | 28,271 | | 57,475 |
| Life settlement contracts | | 65,276 | | 35,744 |
| Limited partnership interests | | 24,892 | | 30,521 |
| Rights & warrants | | 26,661 | | 7,446 |
| LLC interests | | 10,629 | | 2,775 |
| Preferred equity | | 258 | | 8,282 |
| Asset-backed securities | | 7,350 | | 102 |
| Participation interests | | 6,590 | | - |
| Corporate bonds | | 85,421 | | - |
| Total investments | $ | 922,027 | $ | 845,186 |

| | Proceeds | | Fair Value | |
|---|---:|---|---:|---|
| Securities sold, not yet purchased | $ | (26,135) | $ | (32,357) |

15

D-CNL000228

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

5. **Fair Value of Financial Instruments**

**Fair Value Measurement**
U.S. GAAP defines fair value as the price an entity would receive to sell an asset or pay to transfer a liability in an orderly transaction between market participants as of the measurement date. The standard requires fair value measurement techniques to reflect the assumptions market participants would use in pricing an asset or liability and, where possible, to maximize the use of observable inputs and minimize the use of unobservable inputs. It also establishes the following hierarchy that prioritizes the valuation inputs into three broad levels:

• Level 1 – Valuation based on unadjusted quoted prices in active markets for identical assets and liabilities that the Partnership and the Consolidated Entities have the ability to access as of the measurement date. Valuations utilizing Level 1 inputs do not require any degree of judgment.

• Level 2 – Valuations based on (a) quoted prices for similar instruments in active markets; (b) quoted prices for identical or similar instruments in markets that are not active that are reflective of recent market transactions; or (c) models in which all significant inputs are observable, either directly or indirectly.

• Level 3 – Valuations based on indicative quotes that do not reflect recent market transactions and models or other valuation techniques in which the inputs are unobservable and significant to the fair value measurement, which includes situations where there is little, if any, market activity for the asset or liability.

The availability of observable inputs varies among financial instruments and is affected by numerous factors, including the type of instruments, the period of time in which the instrument has been established in the marketplace, market liquidity for an asset class and other characteristics particular to a transaction. When the inputs used in a valuation model are unobservable, management is required to exercise a greater degree of judgment to determine fair value than it would for observable inputs. For certain instruments, the inputs used to measure fair value may fall into different levels of the hierarchy discussed above. In those cases, the instruments are categorized for disclosure purposes based on the lowest level of inputs that are significant to their fair value measurements.

The Partnership and Consolidated Entities use prices and inputs that are current as of the measurement dates. The Partnership also considers the counterparty's non-performance risk when measuring the fair value of its investments.

During periods of market dislocation, the ability to observe prices and inputs for certain instruments may change. These circumstances may result in the instruments being reclassified to different levels within the hierarchy over time. They also create an inherent risk in the estimation of fair value that could cause actual amounts to differ from management's estimates. Whenever possible, the Partnership and its Consolidated Entities use actual market prices or relevant observable inputs to establish the fair value of its assets and liabilities. In cases where observable inputs are not available, the Partnership and Consolidated Entities develop methodologies that provide appropriate fair value estimates. These methodologies are reviewed on a continuous basis to account for changing market conditions.

16

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Partnership has established policies, as described above, processes and procedures to ensure that valuation methodologies for investments and financial instruments that are categorized within all levels of the fair value hierarchy are fair and consistent. A Pricing Committee has been established to provide oversight of the valuation policies, processes and procedures, and is comprised of various personnel from the Partnership. The Pricing Committee meets monthly to review the proposed valuations for investments and financial instruments. The Pricing Committee is responsible for establishing the valuation policies and evaluating the overall fairness and consistent application of those policies.

As of December 31, 2018, the Partnership and its Consolidated Entities' investments consisted primarily of common equity securities, closed-end mutual funds, floating rate syndicated bank loans, real estate investment trusts, life settlement contracts, limited partnership interests, rights and warrants, LLC interests, asset-backed securities, and preferred equity. In addition, certain of the Consolidated Entities engage in short sale transactions. The majority of these financial instruments are not listed on national securities exchanges and management is required to use significant judgment to estimate their values.

**Public Equity Investments**
Publicly traded equities, including closed-end mutual funds and publicly traded REITs are valued at the closing price at the date of the financial statements. The fair value of equity investments that are not traded on national exchanges or through real-time quotation services are derived from methodologies that provide appropriate fair value estimates. Equity investments with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets.

**Private Equity Investments**
The Partnership and Consolidated Entities hold private equity investments which often resulted from the restructuring of other instruments which are classified as common equity securities. These assets are valued using market data obtained from a third-party pricing service and/or quotes from other parties dealing in the specific assets when available. In the event both a reliable market quote and third-party pricing service data are not available for such assets, the Partnership and Consolidated Entities will fair value the assets using various methodologies, as appropriate for individual investments, including comparable transaction multiples, comparable trading multiples, and/or discounted cash flow analysis. When utilizing comparable trading multiples, the Investment Manager determines comparable public companies (peers) based on industry, size, developmental stage, strategy, etc., and then calculates a trading multiple for each comparable company identified by using either a price to book ratio based on publically available information about the underlying comparable company or by dividing the enterprise value of the comparable company by its earnings before interest, taxes, depreciation and amortization (EBITDA) or similar metrics. In certain instances, the inputs used in the calculation of the trading multiples may vary based on the industry or development stage of the company. A multiple determined by the Investment Manager to be within a reasonable range as calculated amongst its peers is then applied to the underlying company's price to book ratio or EBITDA (which may be normalized to adjust for certain nonrecurring events), to calculate the fair value of the underlying company. The fair value may be further adjusted for entity specific facts and circumstances. Private equity investments with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Private equity investments that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

17

D-CNL000230
**Appx. 00760**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The Consolidated Entities also invest in warrant securities of publicly–traded companies. The fair value of these investments is based on an option pricing model. The option model bases warrant value on a number of factors including underlying equity price as of the valuation date, strike price, exercise date, time to expiration and volatility. Warrant investments that have observable volatility are classified as Level 2 assets. Warrant investments where volatility inputs are not observable are valued using an estimated volatility input, and are classified as Level 3 assets.

**Debt Securities**
The Partnership and Consolidated Entities invest in various types of debt, including floating rate syndicated bank loans, which are almost exclusively valued using market data obtained from one or more third-party pricing services or brokers. In instances where a third-party pricing service does not provide pricing for a specific asset, the Partnership and Consolidated Entities first seek to obtain reliable market quotes from other parties dealing in the specific asset. Loans and bonds with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Loans and bonds that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

Absent both a reliable market quote and third-party pricing service date, the Partnership and Consolidated Entities may use various models to establish an estimated exit price. These investments are classified as Level 3 assets. Models used for debt securities are primarily based on identifying comparable assets for which market data is available and pricing the target asset consistent with the yields of the comparable assets. As circumstances require, other industry accepted techniques may be used in modeling debt assets.

**Life Settlement Contracts**
Life Settlement contracts are valued using mortality tables and interest rate assumptions that are deemed by management to be appropriate for the demographic characteristics of the parties insured under the policies. Management generally utilizes an independent third party firm to perform these calculations and provide the relevant inputs. Management evaluates the results based on visible market activity and market research. Since these inputs are not readily observable, these contracts are classified as Level 3 assets.

At December 31, 2018, the Consolidated Entities' investments in life settlement contracts consisted of the following:

(U.S. dollars in thousands, except number of policies)

| Remaining Life Expectancy (in years) | Number of Policies | Face Value | Fair Value |
|---|---|---|---|
| 1-2 | - | $ - | $ - |
| 2-3 | 3 | 33,785 | 16,940 |
| 3-4 | - | - | - |
| 4-5 | - | - | - |
| Thereafter | 10 | 111,500 | 18,804 |
| Total | 13 | $ 145,285 | $ 35,744 |

18

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Asset-Backed Securities**

The Consolidated Entities invest in a variety of asset-backed securities. Asset-backed securities are generally valued based on complex cash flow models that analyze the cash flows generated by the investment's underlying assets after adjusting for expected default rates, prepayment rates, collateral quality, market liquidity among other factors. These models are then adjusted based on spreads available in the market place from various research firms, dealers, and trading activity. The Consolidated Entities generally utilize an independent third parties to provide the relevant inputs. The Consolidated Entities evaluate the results based on visible market activity and market research. When appropriate, the Consolidated Entities may apply other techniques based on a specific asset's characteristics. Asset-backed securities with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. Asset-backed securities that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

**Limited Partnership and LLC Interests**

The Partnership and its Consolidated Entities hold limited partnership and LLC interests in various entities. These assets are valued as the net asset value of the limited partnership interests because the entities utilize fair value accounting for their own financial statements. These interests are classified as Level 3 assets.

The Partnership categorizes investments recorded at fair value in accordance with the hierarchy established under U.S. GAAP. The following table provides a summary of the financial instruments recorded at fair value on a recurring basis by level within the hierarchy as of December 31, 2018:

*(in thousands)*

| Assets | Level 1 | Level 2 | Level 3 | Total Fair Value at 12/31/18 |
|---|---|---|---|---|
| Common equity securities | $ 139,236 | $ 296,695 | $ 99,443 | $ 535,374 |
| Closed-end mutual funds | 94,845 | - | - | 94,845 |
| Floating rate syndicated bank loans | - | 21 | 72,601 | 72,622 |
| Real Estate Investment Trusts | 46,594 | 10,881 | - | 57,475 |
| Life settlement contracts | - | - | 35,744 | 35,744 |
| Limited partnership interests | - | - | 30,521 | 30,521 |
| Rights & warrants | 20 | 123 | 7,303 | 7,446 |
| LLC interests | - | - | 2,775 | 2,775 |
| Preferred equity | 8,282 | - | - | 8,282 |
| Asset-backed securities | - | - | 102 | 102 |
| **Total** | $ 288,977 | $ 307,720 | $ 248,489 | $ 845,186 |

| Liabilities | | | | |
|---|---|---|---|---|
| Common stock & Options sold short | $ 32,357 | $ - | - | $ 32,357 |

19

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

The classification of a financial instrument within Level 3 is based on the significance of the unobservable inputs to the overall fair value measurement. The following table provides a roll forward of the investments classified within Level 3 for the year ended December 31, 2018:

(in thousands)

| | Fair Value at December 31, 2017 | Purchases | Sales and Maturities | Restructures | Transfers Into Level 3 | Net Realized Gains / (Losses) | Net Unrealized Gains / (Losses) | Fair Value at December 31, 2018 |
|---|---|---|---|---|---|---|---|---|
| Common equity securities | $ 141,201 | $ 1,058 | $ (116) | $ - | $ - | $ - | $ (42,700) | $ 99,443 |
| Floating rate syndicated bank loans | 64,307 | 12,146 | (1,952) | - | - | (2,799) | 899 | 72,601 |
| Life settlement contracts | 28,959 | 7,353 | - | - | - | - | (568) | 35,744 |
| Limited partnership interests | 27,863 | 4,600 | (4,766) | - | 928 | 351 | 1,545 | 30,521 |
| Rights & warrants | 8,013 | - | - | - | - | - | (710) | 7,303 |
| LLC interests | 3,352 | 165 | (1,312) | - | - | 985 | (415) | 2,775 |
| Asset-backed securities | 6,477 | 1 | (3,051) | (2,171) | (928) | (39,580) | 39,354 | 102 |
| | $ 280,172 | $ 25,323 | $ (11,197) | $ (2,171) | $ - | $ (41,043) | $ (2,595) | $ 248,489 |

All net realized and unrealized gains and losses in the tables above are reflected in the accompanying Consolidated Income Statement. Approximately $41.8 million of the net unrealized losses presented in the table above relate to investments held as of December 31, 2018.

The following page includes a summary of significant unobservable inputs used in the fair valuations of assets and liabilities categorized within Level 3 of the fair value hierarchy.

HIGHLY CONFIDENTIAL

D-CNL000233

**Appx. 00763**

# Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

| Category | Ending Balance at 12/31/2018 | Valuation Technique | Unobservable Inputs | Input Value(s) |
|---|---|---|---|---|
| Common equity securities | $ 99,443 | Multiples Analysis | Multiple of EBITDA | 2.5x - 7.0x |
| | | | Cap Rate | 8.0 - 10.0% |
| | | | Multiple of Revenue | 0.20x - 0.30x |
| | | | Liquidity Discount | 25% |
| | | Discounted Cash Flow | Discount Rate | 10.5 - 40.0% |
| | | | Terminal Multiple | 1.25x - 6.50x |
| | | | Long-Term Grow th Rate | 2% |
| | | Transaction Analysis | Multiple of EBITDA | 4.0x - 7.75x |
| | | | Cap Rate | 8 - 10% |
| | | Bid Indications | Enterprise Value ($mm) | $720.0 - $765.0 |
| | | Impairment Analysis | Recoverable Value | 0% |
| | | Appraisal | N/A | N/A |
| Floating rate syndicated bank loans | 72,601 | Multiples Analysis | Multiple of EBITDA | 2.0x - 5.0x |
| | | | Multiple of Revenue | 0.35x - 0.50x |
| | | Escrow Recovery Analysis | Risk Discount | 40% |
| | | Appraisal | NA | NA |
| | | Bid Indications | Transaction Price | 10% |
| | | Sales Proceeds Analysis | Discount Rate | 6.0% |
| | | Discounted Cash Flow | Discount Rate | 12.3% - 40.0% |
| | | | Terminal Multiple | 1.25x |
| | | | Spread Adjustment | 0.0% - 6.3% |
| Life settlement contracts | 35,744 | Discounted Cash Flow | Discount Rate | 15.0 - 16.0% |
| Limited partnership interests | 30,521 | Net Asset Value | Various models including liquidation analysis, and third-party pricing vendor | N/A |
| Rights & w arrants | 7,303 | Discounted Cash Flow | Discount Rate | 11.0% - 17.0% |
| | | | Terminal Multiple | 6.5 |
| | | Multiples Analysis | Multiple of EBITDA | 6.0x - 7.0x |
| | | Transaction Analysis | Multiple of EBITDA | 7.25x - 7.75x |
| | | Bid Indication of Value | Enterprise Value (in millions) | $720.0 - $765.0 |
| LLC interests | 2,775 | Discounted Cash Flow | Discount Rate | 6% |
| | | Adjusted Appraisal | Minority Discount | 25% |
| | | Bid Indication | Total Purchase Price (in millions) | $130.00 |
| Asset-backed securities | 102 | Adjusted NAV | N/A | N/A |
| **Total** | **$ 248,489** | | | |

In addition to the unobservable inputs utilized for various valuation methodologies, the Partnership often uses a combination of two or more valuation methodologies to determine fair value for a single holding. In such instances, the Partnership assesses the methodologies and ascribes weightings to each methodology. The selection of weightings is an inherently subjective process, dependent on professional judgement. These selections may have a material impact to the concluded fair value for such holdings.

The significant unobservable inputs used in the fair value measurement of the Partnership's assets could fluctuate significantly, resulting in a significantly higher or lower fair value measurement.

HIGHLY CONFIDENTIAL

D-CNL000234

**Appx. 00764**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

6. **Financial Instruments with Concentration of Credit and Other Risks**

**Financial Instruments**

The Partnership and its Consolidated Entities' investments include, among other things, equity securities, debt securities (both investment and non-investment grade) and bank loans. The Consolidated Entities may also invest in derivative instruments, including total return and credit default swaps. Investments in these derivative instruments throughout the year subject the Consolidated Entities to off-balance sheet market risk, where changes in the market or fair value of the financial instruments underlying the derivative instruments may be in excess of the amounts recognized in the Consolidated Balance Sheet.

**Market Risk**

Market risk represents the potential loss that may be incurred by the Partnership and its Consolidated Entities due to a change in the market value of its investments or the value of the investments underlying swap agreements. The Partnership and its Consolidated Entities' exposure to market risk is affected by a number of macroeconomic factors, such as interest rates, availability of credit, inflation rates, economic uncertainty and changes in laws and regulations. These factors may affect the level and volatility of securities prices and the liquidity of the Partnership and its Consolidated Entities investments. Volatility or illiquidity could impair the Partnership and its Consolidated Entities performance or result in losses. The Partnership and its Consolidated Entities may maintain substantial trading positions that can be adversely affected by the level of volatility in the financial markets. The performance of life settlement contracts may be adversely impacted by the under estimation of mortality and other rates.

**Credit Risk**

Credit risk is the potential loss the Partnership and its Consolidated Entities may incur as a result of the failure of a counterparty or an issuer to make payments according to the terms of a contract. Because the Consolidated Entities enter into over-the-counter derivatives such as swaps, it is exposed to the credit risk of their counterparties. To limit the credit risk associated with such transactions, the Consolidated Entities execute transactions with financial institutions that the Investment Manager believes to be financially viable.

**Liquidity Risk**

The Consolidated Entities' limited partner interests have not been registered under the Securities Act of 1933 or any other applicable securities law. There is no public market for the interests, and neither the Consolidated Entities nor their manager expects such a market to develop.

**Business Risk**

The Partnership provides advisory services to the Consolidated Entities. Consolidated Entities could be materially affected by the liquidity, credit and other events of the Partnership.

22

D-CNL000235

**Appx. 00765**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**High Yield Bonds and Loans**

The Partnership and its Consolidated Entities' investment portfolios consist of floating rate syndicated bank loans and fixed income securities that are not listed on a national securities exchange. These investments trade in a limited market and it may not be possible to immediately liquidate them if needed. In addition, certain of the Partnership and its Consolidated Entities' investments have resale or transfer restrictions that further reduce their liquidity. Because of the inherent uncertainty of these investments, the Investment Manager's best estimates may differ significantly from values that would have been used had a broader market for the investments existed.

When the Partnership and its Consolidated Entities purchase a senior secured syndicated bank loan, it enters into a contractual relationship directly with the corporate borrower, and as such, is exposed to certain degrees of risk, including interest rate risk, market risk and the potential non-payment of principal and interest, including default or bankruptcy of the corporate borrower or early payment by the corporate borrower. Typically, senior secured syndicated bank loans are secured by the assets of the corporate borrower and the Partnership and its Consolidated Entities have a policy of regularly reviewing the adequacy of each corporate borrower's collateral.

The Partnership and its Consolidated Entities may invest in high-yield bonds that have been assigned lower rating categories or are not rated by the various credit rating agencies. Bonds in the lower rating categories are generally considered to be speculative with respect to the issuer's ability to repay principal and pay interest. They are also subject to greater risks than bonds with higher ratings in the case of deterioration of general economic conditions. Due to these risks, the yields and prices of lower-rated bonds are generally volatile, and the market for them is limited, which may affect the ability to liquidate them if needed.

**Debt Obligations**

The Partnership and its Consolidated Entities' investment portfolio consists of collateralized loan obligations that are not listed on a national securities exchange. These investments trade in a limited market and it may not be possible to immediately liquidate them if needed. Because of the inherent uncertainty of these investments, the Partnership's best estimates may differ significantly from values that would have been used had broader market for the investments existed.

**Distressed Investments**

A portion of the high yield corporate bonds and senior secured syndicated bank loans in which the Partnership and its Consolidated Entities invest have been issued by distressed companies in an unstable financial condition that have experienced poor operating performance and may be involved in bankruptcy or other reorganization and liquidation proceedings. These investments have substantial inherent risks. Many of these distressed companies are likely to have significantly leveraged capital structures, which make them highly sensitive to declines in revenue and to increases in expenses and interest rates. The leveraged capital structure also exposes the companies to adverse economic factors, including macroeconomic conditions, which may affect their ability to repay borrowed amounts on schedule.

23

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Corporate Bonds, Preferred Securities, and Loans**
The Consolidated Entities may invest in corporate bonds, floating rate syndicated bank loans, and preferred securities which are rated in the lower rating categories by the various credit rating agencies (or in comparable non-rated securities). Securities in the lower rating categories are subject to greater risk of loss of principal and interest than higher-rated securities and are generally considered to be predominantly speculative with respect to the issuer's capacity to pay interest and repay principal. They are also subject to greater risks than securities with higher ratings in the case of deterioration of general economic conditions. Because of these greater risks associated with the lower-rated securities, the yields and prices of such securities may be more volatile than those for higher-rated securities. The market for lower-rated securities is thinner and less active than that for higher-rated securities, which could adversely affect the prices at which these securities may be sold by the Consolidated Entities.

**Limited Diversification**
The Investment Manager attempts to diversify the Consolidated Entities' investments. However, the Consolidated Entities' portfolios could become significantly concentrated in any one issuer, industry, sector strategy, country or geographic region, and such concentration of credit risk may increase the losses suffered by the Consolidated Entities. In addition, it is possible that the Investment Manager may select investments that are concentrated in certain classes of financial instruments. This limited diversity could expose the Consolidated Entities to losses that are disproportionate to market movements as a whole.

At December 31, 2018, the Consolidated Entities' investments were predominantly concentrated in the United States and Cayman Islands.

**Exit Difficulties**
The Partnership and its Consolidated Entities cannot assure investors that it will be able to exit its investments by sale or other disposition at attractive prices, if at all. The mergers and acquisitions and public securities markets are highly cyclical, which means that the Consolidated Entities' investments, even its best performing investments, may be illiquid for extended periods of time despite the Consolidated Entities' efforts to identify attractive exit opportunities. Additionally, a significant portion of the Consolidated Entities' assets at any time will likely consist of debt obligations and other securities that are thinly-traded, for which no market exists and/or are restricted as to their transferability under applicable law and/or documents governing particular transactions of the Consolidated Entities. In some cases, the Consolidated Entities may be unable to realize an investment prior to the date on which the Consolidated Entities are scheduled to terminate and/or have to sell or otherwise dispose of one or more investments on disadvantageous terms as a result of the Consolidated Entities' termination, or distribute such investments in kind.

**Custody Risk**
The clearing operations for the Partnership and its Consolidated Entities are provided by major financial institutions. In addition, all of the Partnership and its Consolidated Entities' cash and investments are held with banks or brokerage firms, which have worldwide custody facilities and are members of all major securities exchanges. The Partnership or its Consolidated Entities may lose all or a portion of the assets held by these banks or brokerage firms if they become insolvent or fail to perform pursuant to the terms of their obligations. While both the U.S. Bankruptcy Code and the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a broker-dealer's failure, insolvency or liquidation, the Partnership and its Consolidated Entities might be unable to recover the full value of their assets or incur losses due to their assets being unavailable for a period of time.

24

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Leverage Risk**
The Consolidated Entities may borrow funds from brokers, banks and other lenders to finance its trading operations. The use of leverage can, in certain circumstances, magnify the losses to which the Consolidated Entities' investment portfolio may be subject. The use of margin and short-term borrowings creates several risks for the Consolidated Entities. If the value of the Consolidated Entities' securities fall below the margin level required by a counterparty, additional margin deposits would be required. If the Consolidated Entities are unable to satisfy a margin call, the counterparty could liquidate the Consolidated Entities' positions in some or all of the financial instruments that are in the account at the prime broker and cause the Consolidated Entities to incur significant losses. In addition, to the extent the Consolidated Entities have posted excess collateral for margin transactions, there is a risk that the counterparty will fail to fulfill its obligation to return the full value of that collateral.

The failure to satisfy a margin call, or the occurrence of other material defaults under margin or other financing agreements, may trigger cross-defaults under the Consolidated Entities' agreements with other brokers, lenders, clearing firms or other counterparties, multiplying the adverse impact to the Consolidated Entities. In addition, because the use of leverage allows the Consolidated Entities to control positions worth significantly more than its investment in those positions, the amount that the Consolidated Entities may lose in the event of adverse price movements is high in relation to the amount of their investment.

In the event of a sudden drop in the value of the Consolidated Entities' assets, the Consolidated Entities may not be able to liquidate assets quickly enough to satisfy their margin or collateral requirements. As a result, the Consolidated Entities may become subject to claims of financial intermediaries, and such claims could exceed the value of its assets. The banks and dealers that provide financing to the Consolidated Entities have the ability to apply discretionary margin, haircut, and financing and collateral valuation policies. Changes by banks and dealers in any of the foregoing may result in large margin calls, loss of financing and forced liquidations of positions and disadvantageous prices.

**Foreign Currency Risk**
The Partnership and its Consolidated Entities may invest in securities or maintain cash denominated in currencies other than the U.S. dollar. The Partnership and its Consolidated Entities are exposed to risk that the exchange rate of the U.S. dollar relative to other currencies may change in a manner that has an adverse effect on the reported value of the Partnership and its Consolidated Entities' assets and liabilities denominated in currencies other than the U.S. dollar.

**Concentration of Investments**
At December 31, 2018, the Consolidated Entities' investments and derivative contracts were predominantly concentrated in the United States and Cayman Islands and across several industries.

**Litigation Risk**
The Partnership and its Consolidated Entities are periodically subject to legal actions arising from the ordinary course of business. The ultimate outcome of these cases is inherently uncertain and could result in additional losses to the Partnership and/or its Consolidated Entities. Refer to Note 14 for a discussion of open litigation.

HIGHLY CONFIDENTIAL

D-CNL000238

**Appx. 00768**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

7. **Intangible Assets**

On May 12, 2017, HCM Latin America, as manager, purchased all rights and obligations for management of a certain hedge fund. As of December 31, 2018, the current carrying value of these rights and obligations is $3.0 million, which consists of the original purchase price of $2.0 million and a deferred purchase price of $1.0 million and is reflected in the Consolidated Balance Sheet.

The Partnership and its Consolidated Entities perform an impairment test as required by U.S. GAAP on a yearly basis. The Partnership has determined that an impairment charge was necessary for the value obtained on December 19, 2017, for subadvisory and shared servicing rights from an affiliate. As of December 31, 2018, the asset was determined to be fully impaired and an impairment expense of $2.8 million is reflected in the Consolidated Statement of Income.

8. **Related Party Transactions**

**Investments Under Common Control**
Certain members of the Partnership's management serve as members on the Boards of Directors for some of the companies with which it invests. Because these individuals participate in the management of these companies, investments held by the Partnership and its subsidiaries in these companies may, from time to time, not be freely tradable. As of December 31, 2018, the Partnership and its Consolidated Entities held the following investments in these companies:

*(in thousands)*

| Issuer | Type of Investment | Fair Value |
|---|---|---|
| Metro-Goldwyn-Mayer, Inc. | Common Stock | 296,695 |
| Cornerstone Healthcare Group Holding, Inc. | Common Equity | 59,539 |
| OmniMax International, Inc. | Term Loan | 52,464 |
| JHT Holdings Inc. | Common Stock | 25,099 |
| OmniMax International, Inc. | Common Equity | 7,804 |
| Carey International, Inc. | Term Loan | 5,401 |
| CCS Medical, Inc. | Loan | 5,960 |
| Trussway Holdings, LLC | Common Equity | 4,582 |
| JHT Holdings Inc. | Term Loan | 4,160 |
| OmniMax International, Inc. | Warrants | 551 |

26

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Certain investments are issued and managed by affiliates of the Partnership. These investments are subject to the same valuation policies and procedures as similar investments within the same level of the fair value hierarchy. As of December 31, 2018, the Partnership and the Consolidated Entities held the following investments that were issued and managed by affiliates of the Partnership:

*(in thousands)*

| Issuer | Type of Investment | Fair Value |
|---|---|---|
| Harko, LLC | LLC Units | $ 2,721 |
| Highland CLO Funding | Partnership Interest | 610 |
| Highland Energy MLP Fund | Mutual Fund Shares | 1,363 |
| Highland Floating Rate Opportunities Fund | Closed-end mutual fund shares | 832 |
| Highland Global Allocation Fund | Mutual Fund Shares | 2,173 |
| Highland Long/Short Equity Fund | Mutual Fund Shares | 267 |
| Highland Long/Short Healthcare Fund | Mutual Fund Shares | 2,963 |
| Highland Master Loan Fund | Limited Partnership interest | 106 |
| Highland Merger Arbitrage Fund | Mutual Fund Shares | 1,321 |
| Highland Opportunistic Credit Fund | Mutual Fund Shares | 5,477 |
| Highland Premier Growth Equity Fund | Mutual Fund Shares | 64 |
| Highland Small Cap Equity Fund | Mutual Fund Shares | 465 |
| NexPoint Strategic Opportunities Fund | Mutual Fund Shares | 36,563 |
| NexPoint Multi Family Capital Trust | REIT | 10,881 |
| NexPoint Real Estate Strategies Fund | Closed-end mutual fund shares | 1,454 |
| NexPoint Residential Trust | REIT | 85,223 |

**Expenses Reimbursable by Funds Managed**

In the normal course of business, the Partnership typically pays invoices it receives from vendors for various services provided to the investment funds the Partnership manages. A summary of these eligible reimbursable expenses are then submitted to the trustee/administrator for each respective fund, typically on a quarterly basis, and the Partnership receives payment as reimbursement for paying the invoices on behalf of the respective funds. As of December 31, 2018, approximately $6.4 million in reimbursable expenses were due from various affiliated funds and entities for these eligible expenses, and is included in *Other Assets* in the accompanying Consolidated Balance Sheet.

**Accounts Held with Related Party**

During the year the Partnership and its Consolidated Entities maintained bank accounts at NexBank, SSB ("NexBank"), a related party by way of common control. As of December 31, 2018, balances in these accounts were approximately $0.5 million, a portion of which exceeds Federal deposit insurance limits.

**Investment in Affiliated Loans**

During the year, certain subsidiaries of the Partnership were invested in several bank loans in which NexBank was the agent bank. Interest earned on the loans during the year was approximately $10.4 million and is included in interest and investment income in the Consolidated Statement of Income. At December 31, 2018, these subsidiaries were invested in NexBank agented loans with commitments and market values totaling approximately $83.3 million and $56.5 million, respectively.

27

D-CNL000240

**Appx. 00770**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Notes and Other Amounts Due from Affiliates**

During the year ended December 31, 2018, Highland Capital Management Fund Advisors, L.P. ("HCMFA") did not issue any new promissory notes to the Partnership. The outstanding promissory notes accrue interest at a rate ranging from of 1.97 - 2.62%, the mid-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $5.3 million and is payable on demand. The Partnership will not demand payment on amounts owed that exceed HCMFA's excess cash availability prior to May 31, 2021. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, NexPoint Advisors, L.P. ("NPA") did not issue any new promissory notes to the Partnership. The outstanding promissory note accrues interest at a rate of 6.0%. As of December 31, 2018 total interest and principal due on the outstanding promissory note was approximately $28.6 million and is payable in annual installments throughout the term of the loan. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, HCRE Partners, LLC ("HCRE") issued a promissory note to the Partnership in the amount of $0.8 million. The note accrues interest at a rate of 8.0%. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $9.4 million and is generally payable in annual installments throughout the term of the note. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, Highland Capital Management Services, Inc. ("HCMSI") issued promissory notes to the Partnership in the aggregate amount of $0.4 million. All outstanding promissory notes accrue interest at a rate ranging from 2.75% – 3.05%, the long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $14.0 million and is generally payable in annual installments throughout the term of the notes. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, James Dondero ("Dondero") issued promissory notes to the Partnership in the aggregate amount of $14.9 million. The outstanding promissory notes accrue interest at a rate ranging from 2.03% – 2.95%, the average long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $29.2 million and is generally payable in annual installments throughout the term of the note. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

During the year ended December 31, 2018, Mark Okada ("Okada") did not issue any new promissory notes to the Partnership. All outstanding promissory notes accrue interest at a rate of 2.25%, the average long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $1.3 million and is payable on demand. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

HIGHLY CONFIDENTIAL

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

During the year ended December 31, 2018, The Dugaboy Investment Trust ("Dugaboy") did not issue any new promissory notes to the Partnership. All outstanding promissory notes accrue interest at a rate of 3.26%, the average long-term applicable federal rate as promulgated by the Internal Revenue Service. As of December 31, 2018 total interest and principal due on outstanding promissory notes was approximately $20.1 million and is payable in annual installments throughout the term of the note. The fair value of the Partnership's outstanding notes receivable approximates the carrying value of the notes receivable.

On December 21, 2015, the Partnership entered into a contribution agreement (the "Contribution Agreement") with an affiliated trust. Pursuant to the Contribution Agreement, a note (the "Note Receivable") in the amount of $63.0 million was due to the Partnership. The Note Receivable will mature on December 21, 2030. The Note Receivable accrues interest at a rate of 2.61% per annum. Accrued interest is paid-in-kind, with principal receipts occurring pursuant to a note amortization schedule, with such annual receipts commencing December 21, 2019. During the year, the trust pre-paid $2.1 million. As of December 31, 2018 total interest and principal due on the Note Receivable was approximately $60.2 million.

**Services Performed by or on Behalf of an Affiliate**
In March 2007, Highland Capital of New York, Inc. a New York corporation ("Highland New York"), was formed and has performed marketing services for the Partnership and its affiliates in connection with the Partnership's investment management and advising business, including, but not limited to, assisting Highland Capital in the marketing and sales of interests in investment pools for which Highland Capital serves as the investment manager. The Partnership is charged a marketing services fee for the services that Highland New York performs on the Partnership's behalf. Separately, the Partnership pays for, and seeks reimbursement for, various operating expenses on behalf of Highland New York. For the year ended December 31, 2018, total marketing fee expense charged to the Partnership by Highland New York was approximately $0.9 million. Because the Partnership funded Highland New York's operations, including amounts above the marketing fee, as of December 31, 2018, net amounts owed to the Partnership by Highland New York was approximately $4.9 million.

Effective December 15, 2011, the Partnership commenced performing services on behalf of HCMFA, a Delaware limited partnership and registered investment advisor. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to HCMFA was approximately $2.7 million and as of December 31, 2018, amount owed to the Partnership by HCMFA was approximately $0.2 million.

Effective July 29, 2010, the Partnership commenced performing services on behalf of Falcon E&P Opportunities GP, LLC. ("Falcon"), a Delaware limited liability company and registered investment advisor. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to Falcon was approximately $0.2 million and as of December 31, 2018, no amounts were owed to the Partnership by Falcon for services rendered.

29

D-CNL000242
**Appx. 00772**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Effective March 17, 2017, pursuant to the Third Amended and Restated Sub-Advisory Agreement and the Fourth Amended and Restated Shared Services Agreement, the Partnership continued performing services on behalf of Acis Capital Management, L.P. ("Acis"), a Delaware limited partnership and registered investment advisor. Subadvisory services include investment advisory services and shared services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fees charged by the Partnership to Acis for shared services and subadvisory fees were approximately $2.6 million and $3.4 million, respectively. As of December 31, 2018, amount owed to the Partnership by Acis was approximately $6.0 million. Although such fees were earned in 2018, all related revenues and receivables recorded by the Partnership have been fully reserved against based on estimated collectability.

Effective January 1, 2018, pursuant to the Third Amended and Restated Shared Services Agreement, the Partnership commenced performing services on behalf of NPA. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to NexPoint was approximately $2.0 million and as of December 31, 2018, no amounts were owed to the Partnership by NexPoint for services rendered.

Effective September 1, 2017, pursuant to the Third Amended and Restated Shared Services Agreement dated September 26, 2017, the Partnership commenced performing services on behalf of NexBank Capital, Inc. ("NexBank Capital"), financial services company. Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to NexBank Capital was approximately $0.2 million and as of December 31, 2018, $0.1 million was owed to the Partnership by NexBank Capital for services rendered.

Effective September 1, 2017, pursuant to the Third Amended and Restated Investment Advisory Agreement dated September 26, 2017, the Partnership commenced performing services on behalf of NexBank SSB, ("NexBank"), a Texas savings bank. Services include investment advisory services. The Partnership charges a fee for the services performed. For the year ended December 31, 2018, the total fee charged by the Partnership to NexBank was approximately $3.6 million and as of December 31, 2018, amounts owed by NexBank to the Partnership for services rendered were approximately $0.9 million.

Effective April 1, 2015, the Partnership commenced performing services on behalf of NexPoint Real Estate Advisors, L.P. ("NREA"). Services include, but are not limited to compliance, accounting, human resources, IT and other back office support functions. NREA is charged a fee for the services provided. For the year ended December 31, 2018, the total fee charged to NREA by the Partnership was approximately $1.0 million and as of December 31, 2018, no amounts were owed by NREA to the Partnership for services rendered.

Effective January 1, 2018, the Partnership entered in to a Payroll Reimbursement Agreement (the "Agreement") with HCMFA. Under the Agreement, HCMFA reimburses the Partnership for the cost of any dual employees of the Partnership and HCMFA and who provide advice to registered investment companies advised by HCMFA. For the year ended December 31, 2018, the total fees charged by the Partnership to HCMFA was approximately $6.2 million and as of December 31, 2018, no amounts were owed by HCMFA to the Partnership for services rendered.

30

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Effective January 1, 2018, the Partnership entered in to a Payroll Reimbursement Agreement (the "Agreement") with NPA. Under the Agreement, NPA reimburses the Partnership for the cost of any dual employees of the Partnership and NPA and who provide advice to registered investment companies advised by NPA. For the year ended December 31, 2018, the total fees charged by the Partnership to NPA was approximately $4.3 million and as of December 31, 2018, no amounts were owed by NPA to the Partnership for services rendered.

**Investment liability**
On December 28, 2016, the Partnership entered into a purchase and sale agreement with The Get Good Nonexempt Trust ("Get Good"). In consideration for a note receivable from an affiliate, the Partnership sold or participated certain investments that it already held, with the participated investments carrying an aggregate market value of $21.3 million as of the date of the transaction. The fair value of the Agreement will fluctuate with the fair value of the securities, throughout the term of the Agreement. As of December 31, 2018, the fair value of the participated investments was $12.1 million.

On December 5, 2016, Select entered in to Stock Purchase Agreements with two counterparties for shares of Trussway Industries ("Trussway"), in exchange for promissory notes in the aggregate amount of $15.4 million. The promissory notes accrue interest at a rate of 2.07%, the long-term Applicable Federal Rate, compounded annually. Select must pay one-twenty-fifth of the initial note amounts, plus any additional principal attributable to the sale of Trussway, along with accumulated interest on an annual basis. The promissory notes will mature on December 5, 2041. As of December 31, 2018 the remaining principal payable on the promissory notes was $14.8 million. The fair value of Select's outstanding notes payable approximates the carrying value of the notes payable.

During 2014 and 2015, Select received multiple master securities loan agreements (the "Securities Agreements") for securities borrowed from an affiliate. The Securities Agreements accrue interest at a rate ranging from 0.38 - 0.48%, the short term Applicable Federal Rate. The fair value of the securities loans will fluctuate with the fair value of the borrowed securities, throughout the term of the Securities Agreements. As of December 31, 2018, the fair value of the loans was $19.2 million. The fair value of Select's securities loans approximates the carrying value of the securities loans.

9.    **Notes Payable**

**Promissory Notes and Loan Agreements**
On August 17, 2015, the Partnership entered in to a promissory note with Frontier State Bank ("Frontier") in the amount of $9.5 million. Pursuant to the First Amended and Restated Loan Agreement, dated March 29, 2018, Frontier made an additional loan to the Partnership in the amount of $1.0 million. The promissory note accrues interest at the 3 month LIBOR rate plus 4.75%, adjusted each date of change, per annum. Accrued interest shall be paid quarterly. The promissory note is collateralized by shares of voting common stock of MGM Holdings, Inc and will mature on August 17, 2021. As of December 31, 2018 the remaining principal payable on the promissory note was $7.2 million. The fair value of the Partnership's outstanding notes payable approximates the carrying value of the notes payable.

On August 25, 2015, Highland Select Equity Fund, L.P. ("Select") entered in to a promissory note with Dugaboy in the amount of $1.0 million. The promissory note accrues interest at a rate of 2.82%, the long-term Applicable Federal Rate, compounded annually. The accrued interest and principal of the promissory note is due and payable on demand. As of December 31, 2018 the remaining principal payable on the promissory note was $1.0 million.  The fair value of Select's outstanding notes payable approximates the carrying value of the notes payable.

31

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

On October 7, 2016, the Partnership entered in to a promissory note with Acis in the amount of $12.7 million. The Partnership is required to make certain payments of the initial note amount, plus accumulated interest on May 31 of each year, until maturity. The promissory note is set to mature on May 31, 2020. The promissory note accrues interest at a rate of 3.00% per annum. Pursuant to an Assignment and Transfer Agreement dated November 3, 2017, between Acis and an affiliate of the Partnership, Acis transferred the promissory note to the affiliate. As of December 31, 2018 the remaining principal payable on the promissory note was $9.5 million.

On August 29, 2016, Maple Avenue Holdings, LLC ("Maple") entered in to a promissory note with Great Southern Bank in the amount of $3.9 million. Maple must pay principal and accrued interest installments on a monthly basis until maturity. The promissory note will mature on August 29, 2019. The promissory note accrues interest at a rate of 3.26% per annum. As of December 31, 2018 the remaining principal payable on the promissory note was $3.4 million. The fair value of Maple's outstanding notes payable approximates the carrying value of the notes payable.

On May 1, 2018, Multi Strategy Master executed a loan agreement (the "Loan Agreement") with NexBank SSB, an affiliate of the Partnership. The original principal borrowed under the Loan Agreement was $36.5 million. The loan bears interest at the 1-month LIBOR rate plus 3.25%. The maturity date is May 1, 2021. For the year ended December 31, 2018, the Multi Strategy Master incurred and paid approximately $1.3 million of interest expense, and made aggregate principal payments of approximately $1.9 million. Shares of Metro-Goldwyn Mayer, Inc. are pledged as collateral on the loan. The loan was used to purchase an outstanding redemption of $38.7 million at a discount resulting in a reallocation of partners' capital on the Statement of Changes in Partners' Capital. As of December 31, 2018 the remaining principal payable on the loan was $34.6 million. The fair value of Multi Strategy Master's outstanding loan approximates the carrying value of the loan.

10. **Due to Broker**

As of December 31, 2018 the due to broker balance of approximately $116.6 million is payable to financing counterparties for margin transactions.

11. **Commitments and Contingencies**

**Contracts in the Normal Course of Business**
In the normal course of business the Partnership and its subsidiaries may enter into contracts which provide general indemnifications and contain a variety of presentations and warranties that may expose the Partnership and its subsidiaries to some risk of loss. The Partnership regularly co-invests in vehicles it advises. The amounts committed are within the Partnerships capacity to fund when capital is called. In addition to the other financial commitments discussed in the consolidated financial statements, the amount of future losses arising from such undertakings, while not quantifiable, is not expected to be significant. Also refer to Note 8 for commitments of certain subsidiaries in affiliated loans.

**Loans as Co-Borrower**
The Partnership is a named co-borrower in a Bridge Loan Agreement ("Loan") dated September 26, 2018 with Key Bank for $556.3 million. The Loan accrues interest at the 3 month LIBOR rate plus 3.75%, per annum. Accrued interest shall be paid monthly by a borrower other than the Partnership ("Lead Borrower"). The Loan will mature on September 26, 2019. The carrying value of the Loan is reflected on the financial statements of the Lead Borrower.

32

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

**Legal Proceedings**

The Partnership is a party to various legal proceedings arising in the ordinary course of business. While any proceeding or litigation has an element of uncertainty, management believes that the final outcome will not have a materially adverse effect on the Partnership's Consolidated Balance Sheet, Consolidated statement of Income, or its liquidity. See Note 14.

**Operating Leases**

The Partnership has an operating lease and associated commitments related to its main office space. Future minimum lease payments under operating lease commitments with initial or non-cancelable terms in excess of one year, at inception, are as follows:

*(in thousands)*

| Years Ending December 31, | |
|---|---:|
| 2019 | 1,550 |
| 2020 | 1,566 |
| 2021 | 1,567 |
| 2022 | 522 |
| Total | $ 5,205 |

Total rental expense of the Partnership and its Consolidated Entities for operating leases was approximately $1.5 million for the year ended December 31, 2018.

**12.   Post Retirement Benefits**

In December 2006, the Partnership created a defined benefit plan to which all employees and certain affiliated persons could participate if they met the eligibility requirements. The Partnership uses a December 31 measurement date for its defined benefit plan.

Effective December 31, 2008, the Partnership amended the plan by freezing it to new participants and additional benefit accruals. A new amendment became effective on January 1, 2011 in which a named participant was admitted to the plan and is eligible to earn benefit accrual. 2018 expense reflects a service cost charge for the value of the new participant's benefit earned during 2018.

The Partnership's benefit plan obligation and plan assets for the year ended December 31, 2018 are reconciled in the tables below.

33

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

*(in thousands)*

| Change in projected benefit obligation | | 2018 |
|---|---|---|
| Benefit obligation at beginning of year | $ | 2,578 |
| Service cost | | 6 |
| Interest cost | | 80 |
| Plan participants' contributions | | - |
| Amendments | | - |
| Actuarial loss/(gain) | | 386 |
| Acquisition/(divestiture) | | - |
| Benefits paid | | (121) |
| Benefit obligation at end of year | $ | 2,929 |

| Change in plan assets | | 2018 |
|---|---|---|
| Fair value of plan assets at beginning of year | $ | 2,924 |
| Actual return on plan assets | | 449 |
| Acquisition/(divestiture) | | - |
| Employer contribution | | - |
| Plan participants' contributions | | - |
| Benefits paid | | (121) |
| Other increase/(decrease) | | - |
| Fair value of plan assets at year end | $ | 3,252 |

| Reconciliation of Funded Status | | 2018 |
|---|---|---|
| Accumulated benefit obligation at end of year | $ | 2,929 |
| Projected benefit obligation at end of year | | 2,929 |
| Fair value of assets at end of year | | 3,252 |
| Funded status at end of year | $ | 323 |

The Partnership did not contribute to the plan during 2018.

**Assumptions**

Weighted-average assumptions used to determine benefit obligations at December 31, 2018:

| | |
|---|---|
| Discount rate | 3.19% |
| Rate of compensation increase | N/A |

34

D-CNL000247

**Appx. 00777**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Weighted-average assumptions used to determine net periodic benefit cost at December 31, 2018:

| | |
|---|---|
| Discount rate | 3.19% |
| Expected long-term return on plan assets | 3.19% |
| Rate of compensation increase | N/A |

As of December 31, 2018, there were no plan assets categorized as Level 3.

13. **Income Taxes**

**The Partnership**
For U.S. income tax purposes, the Partnership is treated as a pass-through-entity, which means it is not subject to income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on their share of the Partnership's net taxable income.

The Partnership files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Partnership is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2018, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2015 forward (with limited exceptions).

Authoritative guidance on accounting for and disclosure of uncertainty in tax positions requires the General Partner to determine whether a tax position of the Partnership is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that as a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2018.

**Multi Strategy Master**
For U.S. income tax purposes, Multi Strategy Master is treated as a pass-through entity, which means it is not subject to federal income taxes under current Internal Revenue Service guidelines. However, each investor may be individually liable for income taxes, if any, on its share of the partnership's net taxable income.

Multi Strategy Master trades in senior secured syndicated bank loans for its own account and, as such, non-U.S. Investment Vehicle investors are generally not subject to U.S. tax on such earnings (other than certain withholding taxes indicated below). The Partnership intends to conduct Multi Strategy Master business in such a manner that it does not constitute a U.S. trade or business, nor does it create a taxable presence in any of the jurisdictions in which the Partnership has offices.

Dividends as well as certain interest and other income received by Multi Strategy Master from sources within the United States may be subject to, and reflected net of, United States withholding tax at a rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by Multi Strategy Master from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced. As of December 31, 2018, a minimal withholding tax liability of $0.9 million is classified within accrued and other liabilities on the Consolidated Balance Sheet.

35

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Multi Strategy Master applies authoritative guidance which requires management to determine whether a tax position Multi Strategy Master is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the consolidated financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relative taxing authority. Management does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2018.

Multi Strategy Master files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, Multi Strategy Master is subject to examination by federal and foreign jurisdictions, where applicable. As of December 31, 2018, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2015 forward (with limited exceptions).

**Restoration Onshore**

Restoration Onshore is treated as a pass-through entity for tax purposes, which means it is not subject to U.S. income taxes under current Internal Revenue Service or state and local guidelines. Each Partner is individually liable for income taxes, if any, on its share of the Restoration Onshore's net taxable income. Interest, dividends and other income realized by Restoration Onshore from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

Restoration Onshore applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions, which requires the General Partner to determine whether a tax position of Restoration Onshore is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authority.

The General Partner has determined that there was no effect on the financial statements from the Partnership's application of this authoritative guidance. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2018. Restoration Onshore files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Partnership is subject to examination by federal, state, local and foreign jurisdictions, where applicable. As of December 31, 2018, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the year 2015 forward (with limited exceptions).

**Restoration Offshore**

Restoration Offshore is a Cayman Islands exempted company. Under the current laws of the Cayman Islands, there is no income, estate, transfer, sales or other tax payable by Restoration Offshore. Restoration Offshore has elected to be treated as a corporation for U.S. tax purposes and files a protective 1120-F.

The General Partner intends to conduct the business of Restoration Offshore in such a way that Restoration Offshore's activities do not constitute a U.S. trade or business and any income or realized gains earned by Restoration Offshore do not become "effectively connected" with a trade or business carried on in the United States for U.S. federal income tax purposes.

36

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

Dividends as well as certain interest and other income received by the master partnership of Restoration Offshore from sources within the United States may be subject to, and reflected net of, United States withholding tax at a rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realized by the master partnership of Restoration Offshore from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

Restoration Offshore applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions, which requires the General Partner to determine whether a tax position of Restoration Offshore is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authority. The General Partner has determined that there was no effect on the financial statements from the Partnership's application of this authoritative guidance. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2018. As of December 31, 2018, the tax years that remain subject to examination by major tax jurisdictions under the statute of limitations is from the year 2015 forward (with limited exceptions).

The remaining entities consolidated by the Partnership had no uncertain tax positions which required accrual under U.S. GAAP.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**
(A Delaware Limited Partnership)
**Notes to Consolidated Financial Statements**
**December 31, 2018**

14. **Legal Proceedings**

The Partnership and certain affiliated investment vehicles are defendants in a complaint filed on February 24, 2009 New York state court by UBS Securities LLC and UBS AG, London Branch relating to a CLO warehouse facility with respect to which UBS is attempting to extend liability beyond the two entities that bore sole risk of loss under the governing documents. On February 19, 2010, the court dismissed all claims against the Partnership. UBS since has filed additional claims against the Partnership and certain additional investment vehicles. On July 21, 2011, the First Appellate Division again dismissed two of UBS's four claims against the Partnership, severely limiting the remaining two claims. Additional claims were dismissed in a further appellate ruling issued on October 31, 2017. Certain claims were tried in July 2018 against two Highland-affiliated defendants, but the trial court has neither ruled on those claims nor indicated when it will set UBS's remaining claims for trial. The second trial, if it occurs, will try all claims against the Partnership and certain affiliated investment vehicles.

From time to time the Partnership is party to disputes with disgruntled former employees. One such matter involves a former employee that improperly recorded internal conversations in violation of the Partnership's internal policies and procedures and potentially certain criminal and regulatory provisions. The former employee obtained a $7.9 million judgment against Highland affiliate Acis Capital Management, L.P. ("Acis"). The employee currently is attempting to collect this judgment through various proceedings in Texas state and federal court, including claims against Highland for receipt of assets from Acis.

In another matter, a Court ruled that a former employee breached his fiduciary duty to the Partnership, owed damages to the Partnership, and ordered the former employee to cease using or disclosing the Partnership's confidential information. Additionally, an award was entered in favor of the employee against a separate incentive compensation entity for an interest that was already escrowed in his name prior to trial and in which he was already vested. The dispute over the amount of his vested interest is on-going. Additionally, the Partnership from time to time must take action to enforce the permanent injunction against the former employee's continuing improper disclosures of the Partnership's confidential information.

The Partnership is engaged in litigation and arbitration with a group of investors relating to the post-financial crisis wind down and distribution of the remaining assets in the Crusader hedge fund vehicle.

The Partnership currently is and has been previously subject to various legal proceedings, many of which have been due to the nature of operating in the distressed loan business in the U.S. The legal process is often the route of last resort to recover amounts due from delinquent borrowers. We currently do not anticipate these proceedings will have a material negative impact to the Partnership.

15. **Subsequent Events**

On March 18, 2019, SSP Holdings, LLC issued a promissory note to the Partnership in the amount of $2.0 million. The note accrues interest at a rate of 18%.

On March 26, 2019, Trussway Holdings, LLC issued a promissory note to the Partnership in the amount of $1.0 million. The note accrues interest at a rate of 10%.

38

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Notes to Consolidated Financial Statements**
**December 31, 2018**

On March 28, 2019, the Partnership distributed equity to its partners in the aggregate amount of $3.7 million.

On March 28, 2019, the Partnership received a $3.7 million pay down on the outstanding Contribution Agreement.

Over the course of 2019, through the report date, HCMFA issued promissory notes to the Partnership in the aggregate amount of $7.4 million. The notes accrue interest at a rate of 2.39%.

The Partnership has performed an evaluation of subsequent events through June 3, 2019, which is the date the consolidated financial statements were available to be issued, and has determined that there are no other material subsequent events that would require disclosure in the Partnership's consolidated financial statements.

HIGHLY CONFIDENTIAL

**Highland Capital Management, L.P.**

**(A Delaware Limited Partnership)**

**As of And Year Ended December 31, 2018**

**Supplemental Information**

HIGHLY CONFIDENTIAL

D-CNL000253

**Appx. 00783**

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Supplemental Consolidating Balance Sheet**
**December 31, 2018**

| (in thousands) | Highland Capital Management, L.P. | All Other Consolidated Entities | Eliminations | Total Consolidated |
|---|---:|---:|---:|---:|
| **Assets** | | | | |
| Cash and cash equivalents | $ 2,567 | $ 2,467 | $ - | $ 5,034 |
| Investments at fair value (cost $922,027) | 161,939 | 683,247 | - | 845,186 |
| Equity method investees | 121,936 | - | (121,936) | - |
| Management and incentive fees receivable | 2,242 | 158 | (7) | 2,393 |
| Due from brokers | - | 598 | - | 598 |
| Other assets | 8,421 | 5,660 | (4,826) | 9,255 |
| Notes and other amounts due from affiliates | 176,963 | - | (3,565) | 173,398 |
| Intangible assets | - | 3,022 | - | 3,022 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $11,197 | 4,538 | 43 | - | 4,581 |
| **Total assets** | $ 478,606 | $ 695,195 | $ (130,334) | $ 1,043,467 |
| **Liabilities and partners' capital** | | | | |
| **Liabilities** | | | | |
| Accounts payable | $ 4,838 | $ 145 | $ - | $ 4,983 |
| Securities sold, not yet purchased (proceeds $26,135) | - | 32,357 | - | 32,357 |
| Withdrawals payable | - | 57,009 | - | 57,009 |
| Due to affiliates | 4,542 | - | (4,542) | - |
| Due to brokers | 31,194 | 86,108 | (742) | 116,560 |
| Due to brokers for securities purchased, not yet settled | 1,640 | - | - | 1,640 |
| Accrued and other liabilities | 35,574 | 4,276 | 396 | 40,246 |
| Notes payable | 16,722 | 42,540 | (3,510) | 55,752 |
| Investment liabilities | 12,135 | 33,957 | - | 46,092 |
| **Total liabilities** | 106,645 | 256,392 | (8,398) | 354,639 |
| Non-controlling interest | - | 316,867 | - | 316,867 |
| Commitments and contingencies | | | | |
| **Partners' capital** | 371,961 | 121,936 | (121,936) | 371,961 |
| **Total liabilities and partners' capital** | $ 478,606 | $ 695,195 | $ (130,334) | $ 1,043,467 |

HIGHLY CONFIDENTIAL

D-CNL000254

**Appx. 00784**

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Supplemental Consolidating Statement of Income**
**Year Ended December 31, 2018**

| (in thousands) | Highland Capital Management, L.P. | All Other Consolidated Entities | Eliminations | Total Consolidated |
|---|---|---|---|---|
| **Revenue:** | | | | |
| Management fees | $ 35,264 | $ 1,336 | $ - | $ 36,600 |
| Interest and investment income | 4,857 | 10,974 | - | 15,831 |
| Incentive fees | 17 | 53 | - | 70 |
| Shared services fees | 9,187 | - | - | 9,187 |
| Other income | 1,038 | 1,584 | - | 2,622 |
| Total revenue | 50,363 | 13,947 | - | 64,310 |
| **Expenses:** | | | | |
| Compensation and benefits | 33,670 | 805 | - | 34,475 |
| Professional fees | 14,624 | 3,055 | - | 17,679 |
| Interest expense | 1,695 | 3,975 | - | 5,670 |
| Marketing and advertising expense | 2,413 | - | - | 2,413 |
| Depreciation and amortization | 1,304 | 13 | - | 1,317 |
| Investment and research consulting | 1,082 | - | - | 1,082 |
| Bad debt expense | 7,862 | - | - | 7,862 |
| Other operating expenses | 6,786 | 3,241 | - | 10,027 |
| Total expenses | 69,436 | 11,089 | - | 80,525 |
| **Other Income/(Expense):** | | | | |
| Other income | 9,816 | 10 | - | 9,826 |
| Impairment on intangible assets | (2,830) | - | - | (2,830) |
| Total other income | 6,986 | 10 | - | 6,996 |
| Income/(loss) before investment and derivative activities | (12,087) | 2,868 | - | (9,219) |
| **Realized and unrealized gain/(loss) on investments and derivatives:** | | | | |
| Net realized gain/(loss) on investments and derivatives | 13,397 | (44,914) | - | (31,517) |
| Net change in unrealized loss on investments and derivatives | (406) | (93,349) | - | (93,755) |
| Net realized and unrealized loss on investments and derivatives | 12,991 | (138,263) | - | (125,272) |
| Net unrealized losses from equity method investees | (74,082) | - | 74,082 | - |
| Net loss | (73,178) | (135,395) | 74,082 | (134,491) |
| Net loss attributable to non-controlling interest | - | (61,313) | - | (61,313) |
| Net loss attributable to Highland Capital Management, L.P. | $ (73,178) | $ (74,082) | $ 74,082 | $ (73,178) |

42

## Highland Capital Management, L.P.
**(A Delaware Limited Partnership)**
**Supplemental Unconsolidated Balance Sheet**
**December 31, 2018**

*(in thousands)*

**Assets**

| | | |
|---|---|---:|
| Current assets: | | |
| Cash and cash equivalents | $ | 2,567 |
| Investments at fair value (cost $263,008*) | | 259,460 |
| Equity method investees | | 24,415 |
| Management and incentive fees receivable | | 2,242 |
| Intangible assets | | 8,421 |
| Notes and other amounts due from affiliates | | 176,963 |
| Fixed assets and leasehold improvements, net of accumulated depreciation of $11,177 | | 4,538 |
| **Total assets** | $ | 478,606 |

**Liabilities and partners' capital**

**Liabilities**

| | | |
|---|---|---:|
| Accounts payable | $ | 4,838 |
| Due to affiliate | | 4,542 |
| Due to brokers | | 31,194 |
| Due to brokers for securities purchased not yet settled | | 1,640 |
| Accrued and other liabilities | | 35,574 |
| Notes payable | | 16,722 |
| Investment liabilities | | 12,135 |
| Total liabilities | | 106,645 |
| Partners' capital | | 371,961 |
| **Total liabilities and partners' capital** | $ | 478,606 |

*Investments, at fair value includes $97.5 million of limited partnership interest ownership of Consolidated Investment Funds, which are discussed in Footnote 2. These entities are consolidated because the Partnership controls the general partner of the respective entities and is responsible for the daily operations of the entities.

The above information was derived from the audited December 31, 2018 consolidated financial statements of Highland Capital Management, L.P. This information should be read in conjunction with such audited financial statements.

HIGHLY CONFIDENTIAL

D-CNL000256

**Appx. 00786**

**Highland Capital Management, L.P.**
**(A Delaware Limited Partnership)**
**Supplemental Unconsolidated Statement of Income**
**Year Ended December 31, 2018**

*(in thousands)*

| | | |
|---|---:|---:|
| **Revenue:** | | |
| Management fees | $ | 35,264 |
| Incentive fees | | 17 |
| Shared services fees | | 9,187 |
| Interest and investment income | | 4,857 |
| Miscellaneous income | | 1,038 |
| Total revenue | | 50,363 |
| | | |
| **Expenses:** | | |
| Compensation and benefits | | 33,670 |
| Professional fees | | 14,624 |
| Marketing and advertising expense | | 2,413 |
| Interest expense | | 1,695 |
| Depreciation and amortization | | 1,304 |
| Investment and research consulting | | 1,082 |
| Bad debt expense | | 7,862 |
| Other operating expenses | | 6,786 |
| Total expenses | | 69,436 |
| | | |
| **Other Income/(Expense):** | | |
| Other income | | 9,816 |
| Impairment on intangible assets | | (2,830) |
| Total other income | | 6,986 |
| | | |
| Loss before investment activities | | (12,087) |
| | | |
| **Realized and unrealized gains/losses on investments:** | | |
| Net realized gain on sale of investments | | 13,397 |
| Net change in unrealized loss on investments* | | (56,529) |
| Total realized and unrealized loss on investments | | (43,132) |
| | | |
| Loss from equity method investees: | | (17,959) |
| | | |
| **Net loss** | $ | (73,178) |

*Net change in unrealized gain on investments includes $56.1 million of unrealized loss from holdings of limited partnership interests of Consolidated Investment Funds, which are discussed in Footnote 2. These entities are consolidated because the Partnership controls the general partner of the respective entities and is responsible for the daily operations of the entities.

The above information was derived from the audited December 31, 2018 consolidated financial statements of Highland Capital Management, L.P. This information should be read in conjunction with such audited consolidated financial statements.

44

# EXHIBIT 35

## HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.

### INCUMBENCY CERTIFICATE

I am the sole Director of STRAND ADVISORS XVI, INC., a Delaware corporation (the "*General Partner*"), the general partner of **HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**, a Delaware limited partnership (the "*Partnership*"). In that capacity, I certify that the persons listed below have been duly appointed and qualified as, and currently are, officers of the General Partner of the Partnership. I also certify that each person listed below holds the position that is listed opposite his or her name in the General Partner, and that the signatures attached are the genuine signatures of the persons indicated. I also certify that in their capacity as officers of the General Partner, the persons listed below are authorized to execute any and all agreements on behalf of the General Partner in its capacity as the general partner of the Partnership. I further certify that in their capacity as officers of the General Partner, the persons listed below are authorized to give any party on behalf of the Partnership all notices, orders, directions, or instructions (including but not limited to written, facsimile, or oral funds transfer instructions) in connection with any transaction to which the Partnership is or in the future may be a party to in any capacity.

| Name of Officer | Title | Signature |
|---|---|---|
| Dustin Norris | Executive Vice President | |
| Frank Waterhouse | Treasurer | |
| Lauren Thedford | Secretary | |

WITNESS my hand to be effective as of the 11th day of April, 2019.

HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.

By: Strand Advisors XVI, Inc., its general partner

By: _____
James D. Dondero, Sole Director

HIGHLY CONFIDENTIAL

# EXHIBIT 36

Appx. 00790

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Sent:** Tuesday, October 6, 2020 6:19 PM
**To:** Lauren Thedford <LThedford@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>; Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>; Jason Post <JPost@HighlandCapital.com>; Dustin Norris <DNorris@NexPointSecurities.com>; Will Mabry <WMabry@HighlandCapital.com>
**Subject:** RE: 15(c) Follow up (10_2_20).DOCX

No shared services outstanding.  The HCMFA note is a demand note.  The NexPoint note Kristin can give the end term.  There was an agreement between HCMLP and HCMFA the earliest they could demand is May 2021.  The attorneys think that BK doesn't change that but don't know for sure at the end of the day.  The response should include as I covered in the Board meeting that both entities have the full faith and backing from Jim Dondero and to my knowledge that hasn't changed.

---

**From:** Lauren Thedford <LThedford@HighlandCapital.com>
**Sent:** Tuesday, October 6, 2020 6:14 PM
**To:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>; Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>; Jason Post <JPost@HighlandCapital.com>; Dustin Norris <DNorris@NexPointSecurities.com>; Will Mabry <WMabry@HighlandCapital.com>
**Subject:** RE: 15(c) Follow up (10_2_20).DOCX

I see the below from the 6/30 financials –

NPA: Due to HCMLP and affiliates as of June 30, 2020 - 23,683,000
HCMFA: Due to HCMLP as of June 30, 2020 - 12,286

I expect the follow-up question will be regarding terms and structure of the notes and whether any of the shared services invoices are outstanding.

Draft answer below.

> Are there any material outstanding amounts currently payable or due in the future (*e.g.*, notes) to HCMLP by HCMFA or NexPoint Advisors or any other affiliate that provide services to the Funds?
>
> **Response**: As of June 30, 2020, $23,683,000 remains outstanding to HCMLP and its affiliates from NexPoint and $12,286,000 remains outstanding to HCMLP from HCMFA. The Notes between HCMLP and NexPoint come due on [DATE]. The Notes between HCMLP and HCMFA come due on [DATE]. All amounts owed by each of NexPoint and HCMFA pursuant to the shared services arrangement with HCMLP have been paid as of [DATE].

---

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Sent:** Tuesday, October 6, 2020 6:05 PM
**To:** Lauren Thedford <LThedford@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>; Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>; Jason Post <JPost@HighlandCapital.com>; Dustin Norris

CONFIDENTIAL

D-HCMFA290880

**Appx. 00791**

<DNorris@NexPointSecurities.com>; Will Mabry <WMabry@HighlandCapital.com>
**Subject:** RE: 15(c) Follow up (10_2_20).DOCX

It's on the balance sheet that was provided to the board as part of the 15c materials.

**From:** Lauren Thedford <LThedford@HighlandCapital.com>
**Sent:** Tuesday, October 6, 2020 6:04 PM
**To:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>; Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>; Jason Post <JPost@HighlandCapital.com>; Dustin Norris <DNorris@NexPointSecurities.com>; Will Mabry <WMabry@HighlandCapital.com>
**Subject:** RE: 15(c) Follow up (10_2_20).DOCX

Could you provide the amounts?

Thanks

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Sent:** Tuesday, October 6, 2020 5:53 PM
**To:** Lauren Thedford <LThedford@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>; Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>; Jason Post <JPost@HighlandCapital.com>; Dustin Norris <DNorris@NexPointSecurities.com>; Will Mabry <WMabry@HighlandCapital.com>
**Subject:** RE: 15(c) Follow up (10_2_20).DOCX

Yes

**From:** Lauren Thedford <LThedford@HighlandCapital.com>
**Sent:** Tuesday, October 6, 2020 5:52 PM
**To:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>; Kristin Hendrix <KHendrix@HighlandCapital.com>
**Cc:** Thomas Surgent <TSurgent@HighlandCapital.com>; Jason Post <JPost@HighlandCapital.com>; Dustin Norris <DNorris@NexPointSecurities.com>; Will Mabry <WMabry@HighlandCapital.com>
**Subject:** RE: 15(c) Follow up (10_2_20).DOCX

Good evening Frank, Klos, Kristin – please advise on the below in connection with the Board's follow-up request. Thanks!

Are there any material outstanding amounts currently payable or due in the future (*e.g.*, notes) to HLCMLP by HCMFA or NexPoint Advisors or any other affiliate that provide services to the Funds?

**From:** Lauren Thedford
**Sent:** Friday, October 2, 2020 2:50 PM
**To:** Thomas Surgent <TSurgent@HighlandCapital.com>
**Cc:** Jason Post <JPost@HighlandCapital.com>; Dustin Norris <DNorris@Nexpointsecurities.com>; Will Mabry <WMabry@HighlandCapital.com>; David Klos <DKlos@HighlandCapital.com>
**Subject:** FW: 15(c) Follow up (10_2_20).DOCX

Thomas – please see attached (and reproduced below) additional 15c follow-up questions from the Board.

2

1. Please provide, to the extent practicable, the contingency plans with respect to the services provided under the Shared Services Agreements in the event that the outcome of the HCMLP bankruptcy proceedings were to impact the current servicing structure. For example, has the Advisers considered any outside service providers if necessary?

   Note prior question and response on related topic:

   With respect to the Estimated Adviser Profitability chart (Item A.2.a in the Board book), is the "Shared Services" line the only expenses attributable to HCMLP? Has any work been done or consideration been given to the solicitation of a third party bid on performing these services or bringing them in house to HCMFA?

   **Response**: Shared services, along with a portion of the investment professional compensation & benefits lines, are the only allocations attributable to HCMLP employees' support of the Advisers. HCMFA does not have the resources to bring these services in-house at this time, but given that HCMLP staffing levels for the provision of the shared services have remained fairly consistent and HCMLP remains capable of providing such shared services on economically reasonable terms, outsourced third-party bids have not been solicited at this time.

2. Are there any material outstanding amounts currently payable or due in the future (*e.g.*, notes) to HLCMLP by HCMFA or NexPoint Advisors or any other affiliate that provide services to the Funds?

3. The Board notes the provision of the updated list of current co-investments provided by HCMFA/NexPoint Advisors and the Advisers' discussion, including the senior-level team in place, to address any potential conflicts of interest matters. With respect to the compliance function, please confirm that the Funds' Chief Compliance Officer overall will continue in his usual role with respect to the Funds. Are there any other potential conflicts outside of the specific co-investment matters identified?

Please let me know if you would like me to set up a call on Monday to discuss.

---

**From:** Louizos, Stacy <SLouizos@BlankRome.com>
**Sent:** Friday, October 2, 2020 1:54 PM
**To:** Dustin Norris <DNorris@NexPointSecurities.com>; Lauren Thedford <LThedford@HighlandCapital.com>
**Cc:** Jason Post <JPost@HighlandCapital.com>; Zornada, George <George.Zornada@klgates.com>; Charles.Miller@klgates.com; Jon-Luc.Dupuy@klgates.com
**Subject:** 15(c) Follow up (10_2_20).DOCX

Hi Dustin and Lauren—Please see attached follow up questions from the Trustees after the latest Board call. Happy to have a call to discuss if helpful.

Best,
Stacy

**Stacy H. Louizos** | BLANKROME
1271 Avenue of the Americas | New York, NY 10020
O: 212.885.5147 | F: 917.332.3028 | slouizos@blankrome.com
M: 203.918.3666

3

D-HCMFA290882
**Appx. 00793**

*************************************************************************************************************
*

This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the Blank Rome LLP or Blank Rome Government Relations LLC sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

*************************************************************************************************************
*

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Highland Capital Management. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Highland Capital Management.

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

CONFIDENTIAL

D-HCMFA290883

**Appx. 00794**

# EXHIBIT 37

## NEXPOINT ADVISORS, L.P.

### INCUMBENCY CERTIFICATE

I am the President of NEXPOINT ADVISORS GP, LLC, a Delaware limited liability company (the "*General Partner*"), the general partner of **NEXPOINT ADVISORS, L.P.**, a Delaware limited partnership (the "*Partnership*"). In that capacity, I certify that the persons listed below have been duly appointed and qualified as, and currently are, officers of the General Partner of the Partnership. I also certify that each person listed below holds the position that is listed opposite his or her name in the General Partner, and that the signatures attached are the genuine signatures of the persons indicated. I also certify that in their capacity as officers of the General Partner, the persons listed below are authorized to execute any and all agreements on behalf of the General Partner in its capacity as the general partner of the Partnership. I also certify that in their capacity as officers of the General Partner, the persons listed below are authorized to give any party on behalf of the Partnership all notices, orders, directions, or instructions (including but not limited to written, facsimile, or oral funds transfer instructions) in connection with any transaction to which the Partnership is or in the future may be a party to in any capacity.

| Name of Officer | Title | Signature |
|---|---|---|
| James Dondero | President | |
| Dustin Norris | Executive Vice President | |
| Frank Waterhouse | Treasurer | |
| Lauren Thedford | Secretary | |

WITNESS my hand to be effective as of the 11th day of April, 2019.

NEXPOINT ADVISORS, L.P.

By: NexPoint Advisors GP, LLC, its general partner

By: _____
James Dondero, President

HIGHLY CONFIDENTIAL

# EXHIBIT 38

**Cash payment history after 12/31/2018 - Other Notes subject to the Alleged Agreement**

**HCRE**

| Date | Cash receipt amount | "HCRE Restructure note" | | November 27, 2013 Note | | October 12, 2017 Note | | October 15, 2018 Note | | September 25, 2019 Note | | Total Received in respect of notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Principal | Interest | Principal | Interest | Principal | Interest | Principal | Interest | Principal | Interest | |
| 9/30/2019 | $ 341,758 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 204,733 | $ 986 | $ 205,719 |
| 12/30/2019 | 477,482 | 201,994 | 275,487 | - | - | - | - | - | - | - | - | 477,482 |
| 1/21/2021 | 665,811 | 30,542 | 301,847 | 171,452 | 2,067 | - | 69,730 | - | 18,794 | - | 71,380 | 665,811 |
| **Total** | **$ 1,485,051** | **$ 232,537** | **$ 577,334** | **$ 171,452** | **$ 2,067** | **$ -** | **$ 69,730** | **$ -** | **$ 18,794** | **$ 204,733** | **$ 72,366** | **1,349,012** |

\* Difference between cash receipt and total received in respect of the notes of $136,039 was returned to HCRE on September 30, 2019.

**HCMSI**

| Date | Cash receipt amount | "Services Restructure note" | | | Total Received in respect of notes |
|---|---|---|---|---|---|
| | | Principal | Interest | | |
| 3/5/2019 | $ 1,015,000 | $ 977,095 | $ 37,905 | | $ 1,015,000 |
| 8/9/2019 | 550,000 | 550,000 | - | | 550,000 |
| 8/21/2019 | 5,600,000 | 5,595,862 | 4,138 | | 5,600,000 |
| 12/30/2019 | 65,360 | - | 65,360 | | 65,360 |
| 1/21/2021 | 181,227 | - | 181,227 | | 181,227 |
| **Total** | **$ 7,411,587** | **$ 7,122,957** | **$ 288,630** | | **$ 7,411,587** |

**HCMFA**

| Date | Cash receipt amount | February 26, 2014 Note | | | Total Received in respect of notes |
|---|---|---|---|---|---|
| | | Principal | Interest | | |
| 5/29/2019 | $ 1,000,000 | $ 978,102 | $ 21,898 | | $ 1,000,000 |
| 6/4/2019 | 500,000 | 500,000 | - | | 500,000 |
| 9/5/2019 | 500,000 | 484,172 | 15,828 | | 500,000 |
| 10/3/2019 | 375,000 | 375,000 | - | | 375,000 |
| **Total** | **$ 2,375,000** | **$ 2,337,274** | **$ 37,726** | | **$ 2,375,000** |

**NexPoint**

| Date | Cash receipt amount | "NexPoint Restructure note" | | September 19, 2019 Note | | September 23, 2019 Note | | | Total Received in respect of notes |
|---|---|---|---|---|---|---|---|---|---|
| | | Principal | Interest | Principal | Interest | Principal | Interest | | |
| 3/29/2019 | $ 725,000 | $ 411,079 | $ 313,921 | - | - | - | - | | $ 725,000 |
| 4/16/2019 | 1,300,000 | 1,216,918 | 83,082 | - | - | - | - | | 1,300,000 |
| 6/4/2019 | 300,000 | 282,207 | 17,793 | - | - | - | - | | 300,000 |
| 6/19/2019 | 2,100,000 | 2,033,972 | 66,028 | - | - | - | - | | 2,100,000 |
| 7/9/2019 | 630,000 | 548,650 | 81,350 | - | - | - | - | | 630,000 |
| 8/13/2019 | 1,300,000 | 1,160,793 | 139,207 | - | - | - | - | | 1,300,000 |
| 12/9/2019 | 1,518,575 | - | - | 500,000 | 6,658 | 1,000,000 | 11,918 | | 1,518,575 |
| 12/30/2019 | 530,112 | - | 530,112 | - | - | - | - | | 530,112 |
| 1/14/2021 | 1,406,112 | 575,551 | 830,561 | - | - | - | - | | 1,406,112 |
| **Total** | **$ 9,809,800** | **$ 6,229,170** | **$ 2,062,054** | **$ 500,000** | **$ 6,658** | **$ 1,000,000** | **$ 11,918** | | **9,809,800** |

| Total of HCRE, HCMSI, HCMFA, NexPoint after December 31, 2018 | $ 20,945,399 |
|---|---|

# EXHIBIT 39



OPERATING RESULTS

**February 2018**

**Highland Capital Management, L.P.**
**Significant Items Impacting HCMLP's Balance Sheet**
**February 2018**

CLOs

████████████████████████

Operating Activities

██████████████████████
███████████████████
███████████████████████
███████████████████
████████████████████

Investments

███████████████
█████████████████
███████████████████
████████████████████████████
███████████████████
████████████████
████████████████████████████
███████████████████████████
█████████████████
██████████████████

Other
 - ($3.8M) partner loan

**Highland Capital Management, L.P.**
**Financial/Operational Highlights**
**February 2018 Close Package**
*(in millions)*

| | 11/30/2017 | 12/31/2017 | 1/31/2018 | 2/28/2018 |
|---|---|---|---|---|
| **Cash** | $ 6.4 | $ 10.2 | $ 2.2 | $ 9.6 |
| **Operating Revenue** | $ 4.3 | $ 13.9 | $ 4.2 | $ 4.4 |
| **Operating Expenses** [1] | (4.2) | (19.7) | (3.7) | (4.5) |
| **Operating Income** | $ 0.1 | $ (5.8) | $ 0.5 | $ (0.1) |
| **Add back: Non-Recurring Items** | $ - | $ - | $ - | $ - |
| **Adjusted Operating Income** | $ 0.1 | $ (5.8) | $ 0.5 | $ (0.1) |
| **Net Income/(Loss)** | $ 20.4 | $ 17.0 | $ 7.2 | $ (26.1) |

| | MTD | YTD | LTM |
|---|---|---|---|
| **Operating Cash Flow** [2] | $ (6.0) | $ (4.2) | $ (7.6) |
| Interest Expense | (0.1) | (0.2) | (1.6) |
| **Adjusted Operating Cash Flow** | $ (6.1) | $ (4.4) | $ (9.2) |

| **Assets Under Management (billions)** | 11/30/2017 | 12/31/2017 | 1/31/2018 |
|---|---|---|---|
| CLO 1.0 | $ 2.1 | $ 1.9 | $ 1.8 |
| Sep. Accounts | 1.9 | 2.0 | 2.0 |
| Hedge/PE | 1.1 | 1.1 | 1.1 |
| **Total** | $ 5.0 | $ 5.0 | $ 4.9 |

| **Headcount - including affiliates** | 11/30/2017 | 12/31/2017 | 1/31/2018 | 2/28/2018 |
|---|---|---|---|---|
| Front Office | 47 | 45 | 45 | 42 |
| Institutional Marketing and Client Service | 7 | 7 | 9 | 8 |
| Legal | 14 | 15 | 15 | 16 |
| Admin | 13 | 14 | 13 | 13 |
| Retail Operations (HCMLP) | 4 | 4 | 4 | 4 |
| Back Office | 41 | 38 | 39 | 39 |
| HCFD/NSI | 21 | 21 | 17 | 16 |
| HCMF Strategy/Marketing | 5 | 5 | 5 | 5 |
| Total | 152 | 149 | 147 | 143 |

**Notes:**

(1) Excludes deferred compensation MTM

(2) Operating Cash Flow = Operating Income + Dep. + Deferred Comp + Non-Cash Bonus Expense

**HCMLP Rolling Fee Earning AUM Schedule**
*(in millions)*

| | | 2/28/2017 | | 3/31/2017 | | 4/30/2017 | | 5/31/2017 | | 6/30/2017 | | 7/31/2017 | | 8/31/2017 | | 9/30/2017 | | 10/31/2017 | | 11/30/2017 | | 12/31/2017 | | 1/31/2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CLO 1 0 | $ | 3,396 | $ | 3,405 | $ | 3,402 | $ | 2,250 | $ | 2,250 | $ | 2,249 | $ | 2,063 | $ | 2,060 | $ | 2,072 | $ | 1,859 | $ | 1,827 | $ | 1,831 |
| Sep Accounts | | 2,251 | | 2,282 | | 1,538 | | 1,741 | | 1,732 | | 1,787 | | 1,823 | | 1,855 | | 1,905 | | 1,951 | | 1,987 | | 2,003 |
| Hedge/PE | | 1,189 | | 1,195 | | 1,213 | | 1,076 | | 1,065 | | 1,049 | | 1,058 | | 1,067 | | 1,072 | | 1,112 | | 1,073 | | 1,084 |
| Total | $ | 6,742 | $ | 6,882 | $ | 6,153 | $ | 5,067 | $ | 5,047 | $ | 5,085 | $ | 4,945 | $ | 4,981 | $ | 5,049 | $ | 4,922 | $ | 4,887 | $ | 4,917 |



Appx. 00803

**HCMLP Monthly Management Fees**
*(in thousands)*

| | 3/31/2017 | 4/30/2017 | 5/31/2017 | 6/30/2017 | 7/31/2017 | 8/31/2017 | 9/30/2017 | 10/31/2017 | 11/30/2017 | 12/31/2017 | 1/31/2018 | 2/28/2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CLO 1 0 | $ 1,433 | $ 1,081 | $ 961 | $ 961 | $ 1,644 | $ 793 | $ 802 | $ 1,082 | $ 768 | $ 765 | $ 817 | $ 713 |
| Sep  Accounts | 577 | 762 | 586 | 327 | 792 | 635 | 563 | 516 | 678 | 584 | 622 | 626 |
| Subadvised Account | 566 | 526 | 505 | 588 | 538 | 520 | 529 | 447 | 620 | 621 | 491 | 497 |
| Hedge/PE Funds | 414 | 446 | 409 | 2,617 | 797 | 837 | 831 | 814 | 818 | 817 | 1,177 | 1,138 |
| Total | $ 2,990 | $ 2,815 | $ 2,462 | $ 4,494 | $ 3,771 | $ 2,785 | $ 2,725 | $ 2,860 | $ 2,885 | $ 2,786 | $ 3,107 | $ 2,974 |



Highland Capital Management, LP



**HIGHLAND CAPITAL MANAGEMENT, LP**

Statement of Income
Twelve Months Ended February 2018
(in thousands)

| | Mar-17 | Apr-17 | May-17 | Jun-17 | Jul-17 | Aug-17 | Sep-17 | Oct-17 | Nov-17 | Dec-17 | Jan-18 | Feb-18 | LTM | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | | | | | | | | | |
| Management fees | $ 2,990 | $ 2,815 | $ 2,462 | $ 4,494 | $ 3,771 | $ 2,785 | $ 2,725 | $ 2,860 | $ 2,885 | $ 3,265 | $ 3,129 | $ 2,974 | $ 37,154 | 6,103 |
| Shared services fees | 817 | 871 | 794 | 620 | 779 | 803 | 757 | 732 | 871 | 873 | 930 | 866 | 9,713 | 1,796 |
| Incentive fees | - | - | - | - | - | - | - | - | - | 10,057 | - | - | 10,057 | - |
| Other income | 431 | 217 | 560 | 477 | 274 | 614 | 562 | 234 | 586 | 912 | 215 | 596 | 5,679 | 811 |
| **Total operating revenue** | 4,237 | 3,904 | 3,816 | 5,591 | 4,824 | 4,202 | 4,043 | 3,827 | 4,342 | 15,107 | 4,274 | 4,436 | 62,603 | 8,710 |
| **Operating expenses:** | | | | | | | | | | | | | | |
| Compensation and benefits | 2,769 | 2,539 | 2,495 | 2,702 | 2,885 | 2,800 | 2,368 | 2,308 | 2,795 | 2,692 | 2,755 | 2,769 | 31,876 | 5,524 |
| Deferred compensation | 222 | 243 | 157 | 214 | 426 | 50 | 297 | 286 | 755 | 291 | 159 | 101 | 3,201 | 260 |
| Professional services | 629 | 307 | 1,168 | 511 | 616 | 1,531 | 472 | 1,031 | 649 | 16,650 | 181 | 314 | 24,060 | 495 |
| Investment research and consulting | 226 | 175 | 8 | 208 | 14 | 15 | 160 | 22 | 8 | 242 | 13 | 20 | 1,111 | 33 |
| Depreciation | 110 | 110 | 110 | 114 | 112 | 112 | 113 | 112 | 112 | 108 | 109 | 108 | 1,328 | 217 |
| Other operating expenses | 875 | 684 | 702 | 1,021 | 645 | 988 | 805 | 723 | 497 | 662 | 580 | 683 | 8,866 | 1,263 |
| **Total operating expenses** | 4,831 | 4,057 | 4,640 | 4,770 | 4,697 | 5,495 | 4,216 | 4,482 | 4,816 | 20,646 | 3,798 | 3,995 | 70,442 | 7,793 |
| **Operating income** | (594) | (153) | (824) | 821 | 127 | (1,292) | (172) | (655) | (474) | (5,539) | 476 | 441 | (7,839) | 917 |
| **Other income/expense:** | | | | | | | | | | | | | | |
| Interest and investment income, net | 478 | 454 | 493 | 661 | 606 | 558 | 532 | 574 | 937 | 839 | 612 | 473 | 7,219 | 1,086 |
| Interest expense | (143) | (141) | (149) | (146) | (142) | (148) | (136) | (141) | (134) | (147) | (141) | (65) | (1,632) | (206) |
| Other income/expense | 59 | 170 | 4,060 | 947 | 39 | 13 | 63 | 77 | 64 | 19,147 | 81 | 64 | 24,784 | 145 |
| **Total other income/expense** | 394 | 484 | 4,405 | 1,462 | 503 | 424 | 459 | 510 | 867 | 19,839 | 552 | 472 | 30,370 | 1,024 |
| **Realized and unrealized gain/(loss) from investments:** | | | | | | | | | | | | | | |
| Net realized gain/(loss) on sale of investment transactions | 1,547 | (20) | 2,560 | 272 | 496 | 2,811 | - | 22 | - | (1,155) | - | - | 6,533 | - |
| Net change in unrealized gain/(loss) of investments | (189) | (460) | 4,729 | 4,338 | 3,144 | (9,361) | 9,180 | (1,004) | 6,375 | 2,170 | 10,678 | (10,201) | 19,398 | 477 |
| **Total realized and unrealized gain/(loss) from investments** | 1,358 | (480) | 7,290 | 4,610 | 3,640 | (6,550) | 9,180 | (982) | 6,375 | 1,015 | 10,678 | (10,201) | 25,931 | 477 |
| **Earnings and losses from equity method investees** | | | | | | | | | | | | | | |
| ▆▆▆ | 225 | 235 | (16) | 258 | 44 | (201) | 333 | 12 | 200 | 329 | 926 | (210) | 2,135 | 716 |
| ▆▆▆ | (2,857) | (558) | (624) | 818 | (1,908) | 1,709 | (1,136) | (203) | 4,333 | 529 | (1,674) | (5,137) | (6,708) | (6,811) |
| ▆▆▆ | (5,870) | (1,935) | (1,352) | 1,692 | (3,860) | 3,454 | (2,300) | (419) | 8,353 | 1,019 | (3,731) | (11,446) | (16,395) | (15,177) |
| ▆▆▆ | - | - | - | (6) | - | 9 | 0 | 15 | - | 18 | - | - | 42 | - |
| ▆▆▆ | - | (184) | - | (6) | (15) | - | (14) | (18) | 11 | 102 | - | - | (125) | - |
| ▆▆▆ | - | - | - | - | - | - | - | - | 768 | - | - | - | 768 | - |
| ▆▆▆ | - | - | (1,534) | - | - | - | - | - | - | - | - | - | (1,534) | - |
| **Total earnings/(loss) from equity method investees** | (8,502) | (2,441) | (3,525) | 2,762 | (5,740) | 4,971 | (3,118) | (613) | 13,664 | 1,996 | (4,479) | (16,794) | (21,817) | (21,273) |
| **Net income** | (7,345) | (2,591) | 7,345 | 9,655 | (1,470) | (2,447) | 6,348 | (1,739) | 20,432 | 17,311 | 7,227 | (26,081) | $ 26,645 | (18,854) |
| **Profit margin** | -173% | -66% | 192% | 173% | -30% | -58% | 157% | -45% | 471% | 115% | 169% | -588% | 43% | -216% |
| **Operating Cash Flow Calculation:** | | | | | | | | | | | | | | |
| Operating income | (594) | (153) | (824) | 821 | 127 | (1,292) | (172) | (655) | (474) | (5,539) | 476 | 441 | (7,839) | 917 |
| Add Depreciation expense | 110 | 110 | 110 | 114 | 112 | 112 | 113 | 112 | 112 | 108 | 109 | 108 | 1,328 | 217 |
| Adjustment Deferred compensation | (2,767) | 243 | 157 | 214 | 426 | 50 | 297 | 286 | 755 | 291 | 159 | (489) | (378) | (330) |
| Bonus awards | 1,000 | 956 | 1,000 | 1,000 | 1,000 | (5,190) | 986 | 1,000 | 1,300 | 1,300 | 1,000 | (6,049) | (696) | (5,049) |
| **Operating Cash Flow** | (2,251) | 1,155 | 442 | 2,149 | 1,664 | (6,320) | 1,224 | 743 | 1,693 | (3,840) | 1,744 | (5,989) | (7,585) | (4,245) |
| Less Interest expense | (143) | (141) | (149) | (146) | (142) | (148) | (136) | (141) | (134) | (147) | (141) | (65) | (1,632) | (206) |
| **Adjusted Operating Cash Flow** | (2,395) | 1,015 | 293 | 2,003 | 1,523 | (6,468) | 1,087 | 603 | 1,559 | (3,987) | 1,603 | (6,054) | (9,217) | (4,451) |
| Add cash bonus expense | 1,063 | 1,001 | 1,000 | 1,100 | 1,032 | 1,025 | 1,000 | 1,008 | 1,304 | 1,300 | 1,000 | 1,000 | 12,832 | 2,000 |
| Less cash bonuses paid | (63) | (45) | - | (100) | (32) | (6,215) | (14) | (8) | (4) | - | - | (7,049) | (13,528) | (7,049) |
| Non-cash bonus add-back | 1,000 | 956 | 1,000 | 1,000 | 1,000 | (5,190) | 986 | 1,000 | 1,300 | 1,300 | 1,000 | (6,049) | (696) | (5,049) |
| Add deferred compensation MTM | 222 | 243 | 157 | 214 | 426 | 50 | 297 | 286 | 755 | 291 | 159 | 101 | 3,201 | 260 |
| Less cash deferred awards paid | (2,989) | - | - | - | - | - | - | - | - | - | - | (590) | (3,579) | (590) |
| Non-cash deferred award add-back | (2,767) | 243 | 157 | 214 | 426 | 50 | 297 | 286 | 755 | 291 | 159 | (489) | (378) | (330) |



**Balance Sheet**
**February 2018 vs. January 2018**
**(in thousands)**

| | February 28, 2018 | January 31, 2018 | Increase/ (Decrease) $ | Increase/ (Decrease) % |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | $ 9,607 | $ 2,161 | $ 7,446 | 344.6% |
| Investments, at fair value | 266,615 | 277,888 | (11,273) | -4.1% |
| Equity method investees | 59,692 | 82,690 | (22,997) | -27.8% |
| Management and incentive fee receivable | 1,918 | 4,988 | (3,070) | -61.5% |
| Deferred incentive fees | - | 6,944 | (6,944) | 0.0% |
| Fixed assets, net | 5,557 | 5,665 | (109) | -1.9% |
| Due from affiliates | 181,222 | 175,605 | 5,617 | 3.2% |
| Other assets | 9,408 | 10,353 | (945) | -9.1% |
| **Total assets** | **$ 534,020** | **$ 566,295** | **$ (32,275)** | **(5.7%)** |
| | | | | |
| **Liabilities and Partners' Capital** | | | | |
| Accounts payable | $ 2,036 | $ 2,667 | $ (631) | -23.7% |
| Due to brokers | 35,777 | 35,842 | (64) | -0.2% |
| Accrued expenses and other liabilities | 54,361 | 59,860 | (5,498) | -9.2% |
| | | | | |
| Partners' capital | 441,846 | 467,927 | (26,081) | -5.6% |
| **Total liabilities and partners' capital** | **$ 534,020** | **$ 566,295** | **$ (32,275)** | **(5.7%)** |

**Partners' Capital Walk**

| | |
|---|---|
| Partners' capital at 1/31 | $ 467,927 |
| Net subscriptions/(redemptions) | - |
| Net income/(loss) | (26,081) |
| Partners' capital at 2/28 | $ 441,846 |



**HIGHLAND CAPITAL**
**M A N A G E M E N T , L P**

Income Statement
February 2018 YTD  vs. January 2017 YTD
(in thousands)

| | 2018 YTD | 2017 YTD | Increase/ (Decrease) $ | Increase/ (Decrease) % |
|---|---|---|---|---|
| **Revenue:** | | | | |
| Management fees | $      6,103 | $      6,106 | $          (3) | 0.0% |
| Shared services fees | 1,796 | 1,574 | 221 | 14.1% |
| Other income | 811 | 808 | 3 | 0.4% |
| **Total operating revenue** | **8,710** | **8,488** | **222** | **2.6%** |
| **Operating expenses:** | | | | |
| Salaries and overtime | 2,331 | 2,274 | 57 | 2.5% |
| Bonus | 2,000 | 1,995 | 5 | 0.2% |
| Other compensation and benefits | 1,193 | 1,125 | 68 | 6.1% |
| Deferred compensation | 260 | 666 | (406) | -61.0% |
| Professional services | 495 | 740 | (245) | -33.1% |
| Investment research and consulting | 33 | 23 | 10 | 45.5% |
| Marketing and advertising expense | 341 | 460 | (119) | -25.8% |
| Depreciation expense | 217 | 221 | (4) | -2.0% |
| Other operating expenses | 922 | 747 | 175 | 23.4% |
| **Total operating expenses** | **7,793** | **8,252** | **(460)** | **-5.6%** |
| **Operating income/(loss)** | **917** | **236** | **681** | **288.5%** |
| **Other income/expense:** | | | | |
| Interest income | 1,086 | 916 | 170 | 18.6% |
| Interest expense | (206) | (244) | 39 | -15.8% |
| Other income/expense | 145 | 251 | (106) | -42.3% |
| **Total other income/expense** | **1,024** | **922** | **103** | **11.1%** |
| **Realized and unrealized gains from investments:** | | | | |
| Net realized losses on sales of investment transactions | - | - | - | 0.0% |
| Net change in unrealized gains/(losses) of investments | 477 | 10,093 | (9,616) | 95.3% |
| **Total realized and unrealized gains from investments** | **477** | **10,093** | **(9,616)** | **-95.3%** |
| **Net earnings/(losses) from equity method investees** | (21,273) | 6,393 | (27,666) | 432.8% |
| **Net income/(loss)** | **$     (18,854)** | **$      17,644** | **$     (36,498)** | **206.9%** |
| **Profit margin** | **-216%** | **208%** | | |

| Other operating expenses detail | | | | |
|---|---|---|---|---|
| Rent expense | 258 | 196 | 61 | 31 2% |
| Fees and dues | 44 | 55 | (11) | -19 6% |
| Travel and entertainment | 137 | 201 | (63) | -31 6% |
| Insurance expense | 128 | 50 | 78 | 155 8% |
| Bad debt expense | - | - | - | 0 0% |
| Miscellaneous expenses | 354 | 245 | 110 | 44 9% |
| **Total other operating expenses** | **922** | **747** | **175** | **23.4%** |

7

**HCMLP Analytics**
*(in thousands)*

Accounts Payable Aging Analysis

| Vendor Type | Current | 30 Days | 45 Days | 90 Days | 120 Days | Greater Than 120 Days | Grand Total | % |
|---|---|---|---|---|---|---|---|---|
| Overhead | $ 678 | $ 45 | $ 433 | $ 86 | - | $ - | 1,242 | 61% |
| Legal | - | - | - | - | - | 794 | 794 | 39% |
| Grand Total | $ 678 | $ 45 | $ 433 | $ 86 | $ - | $ 794 | 2,036 | 100% |
| % Outstanding | 33% | 2% | 21% | 4% | 0% | 39% | | |



| Top 5 Legal Greater than 120 Days | February 2018 | Top 5 Overhead Greater than 120 Days* | February 2018 |
|---|---|---|---|
| | $ 292 | N/A | $ - |
| | 200 | | |
| | 180 | | |
| | 112 | | |
| | 10 | | |
| Total | $ 794 | Total | $ - |
| % Total of AP Outstanding | 39% | % Total of AP Outstanding | 0% |

**Fund Reimbursements**

| Funds | 2/28/2018 | 1/31/2018 | 2/28/2017 | Year-Over-Year $ Change | % Change |
|---|---|---|---|---|---|
| US CLOs | $ 851 | $ 1,893 | $ 633 | $ 217 | 34% |
| Hedge/Private Equity | 611 | 622 | 497 | 114 | 23% |
| Separate Accounts | 30 | 30 | 17 | 13 | 77% |
| Retail | 194 | 194 | 557 | (363) | -65% |
| International/Portfolio Co | 3,413 | 3,668 | 3,954 | (541) | -14% |
| Research Unallocated | 759 | 311 | 888 | (129) | -15% |
| Unallocated | 1,345 | 1,297 | 1,350 | - | 0% |
| Total | $ 7,202 | $ 8,015 | $ 7,896 | $ (688) | -9% |

| | 1/31/2018 | Net Additions | Receipts | 2/28/2018 |
|---|---|---|---|---|
| Month to Month Change | $ 8,015 | $ 330 | $ (1,143) | $ 7,202 |

| | 2/28/2017 | 2/28/2018 | 2017 YTD | 2018 YTD |
|---|---|---|---|---|
| Fund Reimbursement Receipts | $ 1,620 | $ 1,143 | $ 2,225 | $ 2,256 |

**HCMLP Invoice Metrics**

| | February 2018 | January 2018 |
|---|---|---|
| Invoices Processed: | 162 | 120 |
| $ Amount Processed: | $ 8,077 | $ 11,918 |
| # of Payments: | 166 | 152 |
| $ Amount of Payments: | $ 8,558 | $ 13,302 |

**Self-Insurance Summary**

| Entity | Premium Balance |
|---|---|
| | 693 |
| | 370 |
| | 89 |
| | 9 |
| | (156) |
| | (154) |
| | (197) |
| | (392) |
| | (258) |
| Total over/(under) funded | $ 4 |

**Shared Services Receivables Summary**

| Entity | Balance |
|---|---|
| | 3,730 |
| | 367 |
| | 200 |
| | 40 |
| | 54 |
| | - |
| | - |
| Total | $ 4,391 |

**Highland Capital Management, LP**
**Schedule of Investments**
**As of February 2018**



**Historical Legal Summary through February 28, 2018**
**Includes only matters allocated to HCMLP**
**in thousands**

**HCMLP Legal by Matter**

**HCMLP Legal by Vendor**



| HCMLP Legal by Matter | | | | | HCMLP Legal by Vendor | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Sub-Total Top 25 Matters | 3,469 | 3,513 | 8,039 | 512 | Sub-Total Top 25 Vendors | 2,865 | 3,045 | 7,450 | 450 |
| Sub-Total Other Matters | 31 | 1 | - | - | Sub-Total Other Vendors | 635 | 469 | 589 | 61 |
| Total Matters | 3,500 | 3,514 | 8,039 | 512 | Total Vendors | 3,500 | 3,514 | 8,039 | 512 |

Sorted largest to smallest Matter by 2018 dollars invoiced

Sorted largest to smallest Vendor by cumulative dollars invoiced ('12 - YTD '18)

**Employee Expenses through February 28, 2018**
**Excludes all Dondero Reimbursements**
**HCMLP & Certain Affiliated Advisors**
**in thousands**

**Employee Expenses - Including Reimbursable**

| Company | 2015 | 2016 | 2017 | 2018 | 2018 Annualized |
|---|---|---|---|---|---|
| ▬▬▬ | $ 838 | $ 707 | $ 818 | $ 93 | $ 557 |
| ▬▬▬ | 2,447 | 1,860 | 1,041 | 85 | 509 |
| ▬▬ | 742 | 511 | 292 | 23 | 139 |
| ▬ | - | 57 | 141 | 18 | 108 |
| Total | $ 4,027 | $ 3,135 | $ 2,293 | $ 219 | $ 1,312 |

**Employee Expenses - Non-Reimbursable Only**

| Company | 2015 | 2016 | 2017 | 2018 | 2018 Annualized |
|---|---|---|---|---|---|
| HCMLP | $ 387 | $ 174 | $ 396 | $ 61 | $ 363 |
| HCFD | 2,219 | 933 | 543 | 39 | 231 |
| HCMFA | 450 | 380 | 256 | 18 | 110 |
| NPA | - | 16 | 61 | 9 | 55 |
| Total | $ 3,056 | $ 1,503 | $ 1,257 | $ 127 | $ 759 |

# EXHIBIT 40

**Fill in this information to identify the case:**

Debtor name    **Highland Capital Management, L.P.**

United States Bankruptcy Court for the:    NORTHERN DISTRICT OF TEXAS

Case number (if known)    **19-34054-SGJ**

☐ Check if this is an
amended filing

## Official Form 206Sum
## Summary of Assets and Liabilities for Non-Individuals          12/15

| Part 1: | Summary of Assets |
|---|---|

1. ***Schedule A/B: Assets-Real and Personal Property*** (Official Form 206A/B)

   1a. **Real property:**
   Copy line 88 from *Schedule A/B*.................................................................................... $    **523,970.00**

   1b. **Total personal property:**
   Copy line 91A from *Schedule A/B*.................................................................................. $    **409,580,813.30**

   1c. **Total of all property:**
   Copy line 92 from *Schedule A/B*.................................................................................... $    **410,104,783.30**

| Part 2: | Summary of Liabilities |
|---|---|

2. ***Schedule D: Creditors Who Have Claims Secured by Property*** (Official Form 206D)
   Copy the total dollar amount listed in Column A, *Amount of claim,* from line 3 of *Schedule D*...................... $    **34,862,225.94**

3. ***Schedule E/F: Creditors Who Have Unsecured Claims*** (Official Form 206E/F)

   3a. **Total claim amounts of priority unsecured claims:**
   Copy the total claims from Part 1 from line 5a of *Schedule E/F*............................................... $    **Unknown**

   3b. **Total amount of claims of nonpriority amount of unsecured claims:**
   Copy the total of the amount of claims from Part 2 from line 5b of *Schedule E/F*............................. +$    **244,455,350.78**

4. **Total liabilities** ........................................................................................................
   Lines 2 + 3a + 3b          $    **279,317,576.72**

**Appx. 00813**

| Debtor | **Highland Capital Management, L.P.** | Case number *(if known)* | **19-34054-SGJ** |
|---|---|---|---|
| | Name | | |

| | General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 60. | **Patents, copyrights, trademarks, and trade secrets** | | | |
| 61. | **Internet domain names and websites** **139 Domain Names** | **$0.00** | **N/A** | **Unknown** |
| 62. | **Licenses, franchises, and royalties** **3rd Party Private Equity Management Company** | **$0.00** | **N/A** | **Unknown** |
| 63. | **Customer lists, mailing lists, or other compilations** | | | |
| 64. | **Other intangibles, or intellectual property** | | | |
| 65. | **Goodwill** | | | |

66. **Total of Part 10.**
Add lines 60 through 65. Copy the total to line 89.

| | | **Unknown** |
|---|---|---|

67. **Do your lists or records include personally identifiable information of customers** (as defined in 11 U.S.C.§§ 101(41A) and 107**?**
☐ No
☑ Yes

68. **Is there an amortization or other similar schedule available for any of the property listed in Part 10?**
☑ No
☐ Yes

69. **Has any of the property listed in Part 10 been appraised by a professional within the last year?**
☑ No
☐ Yes

| Part 11: | All other assets |
|---|---|

70. **Does the debtor own any other assets that have not yet been reported on this form?**
Include all interests in executory contracts and unexpired leases not previously reported on this form.

☐ No. Go to Part 12.
☑ Yes Fill in the information below.

| | Current value of debtor's interest |
|---|---|

| | | | Current value of debtor's interest |
|---|---|---|---|
| 71. | **Notes receivable** Description (include name of obligor) **Notes Receivable (Exhibit D)** | **150,331,222.61** Total face amount - **Unknown** doubtful or uncollectible amount = | **Unknown** |

72. **Tax refunds and unused net operating losses (NOLs)**
Description (for example, federal, state, local)

73. **Interests in insurance policies or annuities**

74. **Causes of action against third parties (whether or not a lawsuit has been filed)**

Software Copyright (c) 1996-2019 Best Case, LLC - www.bestcase.com     Best Case Bankruptcy

**Appx. 00814**

**Highland Capital Management LP**
**Case # 19-34054-SGJ**
**Exhibit D - Schedule 71A**

| Notes Receivable | Total Face Amount [1] |
|---|---|
| Hunter Mountain Investment Trust | $        56,873,209.22 |
| Affiliate Note Receivable - A | 24,534,644.03 |
| The Dugaboy Investment Trust | 18,286,268.16 |
| Affiliate Note Receivable - B | 10,413,539.53 |
| Affiliate Note Receivable - C | 10,394,680.47 |
| James Dondero | 9,334,012.00 |
| Highland Capital Management Services, Inc. | 7,482,480.88 |
| Siepe | 2,019,256.35 |
| Highland Mult Strategy Credit Fund, LP | 3,269,000.00 |
| Highland Capital Management Korea Ltd. [2] | 3,132,278.05 |
| Private Portfolio Company - A | 2,198,610.05 |
| Mark Okada | 1,336,287.84 |
| Private Portfolio Company - B | 1,056,956.03 |
| **Total** | **$        150,331,222.61** |

*[1]Doubtful or Uncollectible accounts are evaluated at year end.*
*[2] Includes $72,278.05 of intercompany receivable.*

**Appx. 00815**

# EXHIBIT 41

Appx. 00816

<div style="text-align:right">

**Monthly Operating Report**
ACCRUAL BASIS
</div>

| | |
|---|---|
| **CASE NAME:** | Highland Capital Management |
| **CASE NUMBER:** | 19-34054 |
| **JUDGE:** Stacey Jernigan | |

## UNITED STATES BANKRUPTCY COURT

## NORTHERN & EASTERN DISTRICTS OF TEXAS

## REGION 6

## MONTHLY OPERATING REPORT

**MONTH ENDING:** ___December___   ___2019___
                          MONTH                        YEAR

IN ACCORDANCE WITH TITLE 28, SECTION 1746, OF THE UNITED STATES CODE, I DECLARE UNDER PENALTY OF PERJURY THAT I HAVE EXAMINED THE FOLLOWING MONTHLY OPERATING REPORT (ACCRUAL BASIS-1 THROUGH ACCRUAL BASIS-7) AND THE ACCOMPANYING ATTACHMENTS AND, TO THE BEST OF MY KNOWLEDGE, THESE DOCUMENTS ARE TRUE, CORRECT, AND COMPLETE. DECLARATION OF THE PREPARER (OTHER THAN RESPONSIBLE PARTY) IS BASED ON ALL INFORMATION OF WHICH PREPARER HAS ANY KNOWLEDGE.

**RESPONSIBLE PARTY:**

_____          Chief Restructuring Officer
ORIGINAL SIGNATURE OF RESPONSIBLE PARTY          TITLE

Bradley Sharp                                      1/31/2020
PRINTED NAME OF RESPONSIBLE PARTY          DATE


**PREPARER:**

_____          Chief Financial Officer
ORIGINAL SIGNATURE OF PREPARER          TITLE

Frank Waterhouse                          _____
PRINTED NAME OF PREPARER          DATE

<div style="text-align:right">

**Appx. 00817**
</div>

**Monthly Operating Report**
**ACCRUAL BASIS-1**

| CASE NAME: | Highland Capital Management, LP |
|---|---|
| CASE NUMBER: | 19-12239-CSS |

**Comparative Balance Sheet**
(in thousands)

| | 10/15/2019 | 10/31/2019 | 11/30/2019 | 12/31/2019 [6] |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | 2,529 | 2,286 | 6,343 | 9,501 |
| Investments, at fair value [3] | 232,620 | 235,144 | 233,776 | 235,054 |
| Equity method investees [3] | 161,819 | 161,813 | 175,381 | 174,815 |
| Management and incentive fee receivable | 2,579 | 3,202 | 1,223 | 1,828 |
| Fixed assets, net | 3,754 | 3,672 | 3,601 | 3,521 |
| Due from affiliates [1] | 151,901 | 152,124 | 152,523 | 146,245 |
| Reserve against notes recievable | | | | (57,963) |
| Other assets | 11,311 | 11,260 | 10,621 | 10,663 |
| **Total assets** | $   566,513 | $   569,501 | $   583,468 | $   523,664 |
| | | | | |
| **Liabilities and Partners' Capital** | | | | |
| Pre-petition accounts payable [4] | 1,176 | 1,135 | 1,250 | 1,068 |
| Post-petition accounts payable [4] | - | 102 | 236 | 624 |
| Secured debt: | | | | |
| Frontier | 5,195 | 5,195 | 5,195 | 5,195 |
| Jefferies | 30,328 | 30,315 | 30,268 | 30,020 |
| Accrued expenses and other liabilities [4] | 59,203 | 59,184 | 60,848 | 66,423 |
| Accrued re-organization related fees [5] | - | - | - | 5,693 |
| Claim accrual [2] | 73,997 | 73,997 | 73,997 | 73,997 |
| Partners' capital | 396,614 | 399,573 | 411,674 | 340,644 |
| **Total liabilities and partners' capital** | $   566,513 | $   569,501 | $   583,468 | $   523,664 |

[1] Includes various notes receivable at carrying value, except note due from Hunter Mountain Investment Trust which is fully reserved against ($58M reserve). Fair value has not been determined with respect to any of the notes.

[2] Uncontested portion of Redeemer claim less appplicable offsets. Potential for additional liability based on future events. No interest has been accrued beyond petition date.

[3] Mark to market gains/(losses) on investments include pricing updates for publicly traded securities and other positions with readily available market price information.  Limited partnership interests normally marked to a NAV statement have been updated based upon the most recent statement available, or marked to an estimate to the extent available.

[4] Note on accruals: expenses recorded in Accounts Payable and Accrued Expenses and Other Liabilities reflect invoices recorded through accounts payable, legal invoice accruals, and normal course operating accruals, but do not reflect estimates for other incurred, but not yet received invoices.  For balance sheet dates other than the Petition Date, amounts include both pre-petition and post-petition liabilities.

[5] At December 31st, 2019, Debtor accrued for post-petition re-organization fees based upon an estimate of fees incurred to date.

[6] All balances are preliminary, unaudited, and subject to further year-end closing entries pursuant to the normal year-end closing process.

<div align="right">

**Monthly Operating Report**
**ACCRUAL BASIS-2**

</div>

| CASE NAME: | Highland Capital Management, LP |
|---|---|
| CASE NUMBER: | 19-12239-CSS |

**Income Statement** [1]
(in thousands)

| | Date | Month ended | Month ended [4] | Filing to Date |
|---|---|---|---|---|
| | 10/16/19 - 10/31/19 | 11/30/2019 | 12/31/2019 | |
| **Revenue:** | | | | |
| Management fees | 975 | 1,638 | 1,804 | 4,417 |
| Shared services fees | 283 | 709 | 596 | 1,588 |
| Other income | 99 | 418 | 1,032 | 1,549 |
| **Total operating revenue** | **1,357** | **2,765** | **3,433** | **7,555** |
| **Operating expenses:** | | | | |
| Compensation and benefits | 997 | 1,936 | 2,256 | 5,188 |
| Professional services | 256 | 90 | 354 | 700 |
| Investment research and consulting | 10 | 34 | 10 | 54 |
| Marketing and advertising expense | - | 35 | (15) | 20 |
| Depreciation expense | 82 | 82 | 80 | 244 |
| Bad debt expense reserve | - | - | 8,420 | 8,420 |
| Other operating expenses | 201 | 480 | 310 | 991 |
| **Total operating expenses** | **1,545** | **2,657** | **11,415** | **15,617** |
| **Operating income/(loss)** | **(188)** | **108** | **(7,982)** | **(8,062)** |
| **Other income/expense:** | | | | |
| Interest income | 250 | 484 | 495 | 1,230 |
| Interest expense | (107) | (103) | (135) | (346) |
| Reserve against notes receivable | - | - | (57,963) | (57,963) |
| Re-org related expenses [2] | - | - | (5,693) | (5,693) |
| Other income/expense | 32 | - | - | 32 |
| **Total other income/expense** | **175** | **381** | **(63,296)** | **(62,741)** |
| Net realized gains/(losses) on investments | 339 | 279 | - | 618 |
| Net change in unrealized gains/(losses) of investments [3] | 2,654 | (2,004) | 988 | 1,638 |
| | **2,993** | **(1,725)** | **988** | **2,256** |
| **Net earnings/(losses) from equity method investees** [3] | **(20)** | **13,468** | **(692)** | **12,756** |
| **Net income/(loss)** | **$ 2,959** | **$ 12,232** | **$ (70,982)** | **$ (55,791)** |

(1) Note on accruals: expenses recorded in the Income Statement reflect invoices recorded through accounts payable, legal invoice accruals, and normal course operating accruals, but do not reflect estimates for other incurred, but not yet received invoices.

(2) Debtor funded various retainers totaling $790k prior to the petition date, which were entirely expensed as of the petition date. At December 31st, 2019, Debtor accrued for post-petition re-organization fees based upon an estimate of fees incurred to date.

(3) Mark to market gains/(losses) on investments include pricing updates for publicly traded securities and other positions with readily available market price information. Limited partnership interests normally marked to a NAV statement have been updated based upon the most recent statement available, or marked to an estimate to the extent available.

(4) All balances are preliminary, unaudited, and subject to further year-end closing entries pursuant to the normal year-end closing process.

**Monthly Operating Report**
**ACCRUAL BASIS-3A**

| CASE NAME: | Highland Capital Management |
|---|---|
| CASE NUMBER: | 19-34054 |

| CASH RECEIPTS AND DISBURSEMENTS | OCTOBER | NOVEMBER | DECEMBER | QUARTER |
|---|---|---|---|---|
| 1. CASH - BEGINNING OF MONTH [2] | $ 2,554,230 | $ 2,286,160 | $ 6,342,598 | $ 2,554,230 |
| **RECEIPTS FROM OPERATIONS** | | | | |
| 2. OTHER OPERATING RECEIPTS | $ 6,912 | $ 972,733 | $ 883,113 | $ 1,862,757 |
| 3 MANAGEMENT FEES AND OTHER RELATED RECEIPTS | $ 15,000 | $ 1,764,749 | $ 1,376,993 | $ 3,156,742 |
| **COLLECTION OF ACCOUNTS RECEIVABLE** | | | | |
| 4 PREPETITION | $ 46,425 | $ 2,962,108 | $ 584,575 | $ 3,593,108 |
| 5 POSTPETITION [1] | $ - | $ - | $ - | $ - |
| 6 TOTAL OPERATING RECEIPTS | $ 68,337 | $ 5,699,590 | $ 2,844,680 | $ 8,612,608 |
| **NON-OPERATING RECEIPTS** | | | | |
| 7 THIRD PARTY FUND ACTUAL/EXPECTED DISTRIBUTIONS | $ 79,266 | $ 320,836 | $ 23,365 | $ 423,468 |
| 8 DIVS, PAYDOWNS, MISC FROM INVESTMENT ASSETS | $ 410,189 | $ 501,983 | $ 425,897 | $ 1,338,069 |
| 9 OTHER (ATTACH LIST) | | | $ 3,390,286 | $ 3,390,286 |
| 10 TOTAL NON-OPERATING RECEIPTS | $ 489,456 | $ 822,820 | $ 3,839,547 | $ 5,151,822 |
| 11 TOTAL RECEIPTS | $ 557,793 | $ 6,522,410 | $ 6,684,227 | $ 13,764,430 |
| 12 TOTAL CASH AVAILABLE | $ 3,112,023 | $ 8,808,570 | $ 13,026,825 | |
| **OPERATING DISBURSEMENTS** | | | | |
| 13 PAYROLL, BENEFITS, AND TAXES + EXP REIMB [3] | $ 737,588 | $ 961,282 | $ 2,077,577 | $ 3,776,446 |
| 14 SINGAPORE SERVICE FEES | $ 34,633 | $ 32,555 | $ 27,930 | $ 95,118 |
| 15 HCM LATIN AMERICA | | $ 100,000 | $ 100,000 | $ 200,000 |
| 16 THIRD PARTY FUND CAPITAL CALL OBLIGATION | | $ 967,555 | $ 459,432 | $ 1,426,987 |
| 17 UTILITIES | | | | $ - |
| 18 INSURANCE | | | | $ - |
| 19 INVENTORY PURCHASES | | | | $ - |
| 20 VEHICLE EXPENSES | | | | $ - |
| 21 TRAVEL | | | | $ - |
| 22 ENTERTAINMENT | | | | $ - |
| 23 REPAIRS & MAINTENANCE | | | | $ - |
| 24 SUPPLIES | | | | $ - |
| 25 ADVERTISING | | | | $ - |
| 26 OTHER (ATTACH LIST) | $ 53,642 | $ 404,581 | $ 860,477 | $ 1,318,700 |
| 27 TOTAL OPERATING DISBURSEMENTS | $ 825,863 | $ 2,465,973 | $ 3,525,415 | $ 6,817,251 |
| **REORGANIZATION EXPENSES** | | | | |
| 28 PROFESSIONAL FEES | | | | $ - |
| 29 U.S. TRUSTEE FEES | | | | $ - |
| 30 OTHER (ATTACH LIST) | | | | $ - |
| 31 TOTAL REORGANIZATION EXPENSES | $ - | $ - | $ - | $ - |
| 32 TOTAL DISBURSEMENTS | $ 825,863 | $ 2,465,973 | $ 3,525,415 | $ 6,817,251 |
| 33 NET CASH FLOW | $ (268,070) | $ 4,056,437 | $ 3,158,812 | $ 6,947,179 |
| 34 CASH - END OF MONTH | $ 2,286,160 | $ 6,342,598 | $ 9,501,409 | $ 9,501,409 |

1 All postpetition receipts are included in line 3, Management Fees and Other Related Recepits.
2 Beginning cash in October represents the bank balance as of the filing date, while the cash amount shown on the balance sheet includes any outstanding checks.
3 November 30th, 2019 payroll in the amount of $478,337 did not debit the account until December 2nd, 2019. For comparability purposes this $478,337 amount should be added to the November total and subtracted from the December total.

**Monthly Operating Report**
ACCRUAL BASIS-3B

| CASE NAME: | Highland Capital Management |
|---|---|
| CASE NUMBER: | 19-34054 |

**NON-OPERATING RECEIPTS - OTHER**

| Date | Amount | Description |
|---|---|---|
| 12/9/2019 | 1,518,575.34 | Note principal or interest |
| 12/9/2019 | 739.72 | Note principal or interest |
| 12/23/2019 | 783,011.86 | Note principal or interest |
| 12/30/2019 | 530,112.36 | Note principal or interest |
| 12/30/2019 | 65,360.49 | Note principal or interest |
| 12/30/2019 | 201,994.40 | Note principal or interest |
| 12/30/2019 | 275,487.21 | Note principal or interest |
| 12/31/2019 | 15,004.30 | Voided Checks |
| | $3,390,285.68 | |

**OPERATING DISBURSMENTS - OTHER**

| Date | Amount | Vendor |
|---|---|---|
| 12/2/2019 | 155,084.39 | Crescent TC Investors LP |
| 12/3/2019 | 18,289.49 | Platinum Parking |
| 12/3/2019 | 672.72 | ProStar Services, Inc |
| 12/3/2019 | 1,191.25 | Gold's Gym International |
| 12/3/2019 | 1,021.44 | Chick-fil-A |
| 12/3/2019 | 5,052.88 | Iron Mountain Records Management |
| 12/3/2019 | 1,472.00 | Platinum Parking |
| 12/5/2019 | 110.00 | FINRA |
| 12/11/2019 | 5,780.50 | Third Party Consultant |
| 12/13/2019 | 110.00 | FINRA |
| 12/13/2019 | 163.35 | Arkadin Inc |
| 12/13/2019 | 356.00 | Jordan Fraker Photography |
| 12/13/2019 | 480.00 | Action Shred of Texas |
| 12/13/2019 | 1,023.67 | UPS Small Package |
| 12/13/2019 | 1,489.20 | Canteen |
| 12/13/2019 | 3,032.73 | Greenwood Office Outfitters, Inc. |
| 12/13/2019 | 3,659.07 | Third Party Consultant |
| 12/13/2019 | 2,887.50 | Centroid Systems, Inc. |
| 12/13/2019 | 2,394.28 | Thomson Reuters West |
| 12/13/2019 | 8,642.37 | Concur Technologies Inc |
| 12/13/2019 | 23,950.60 | Flexential Colorado Corp |
| 12/13/2019 | 3,234.81 | ICE Data Pricing Ref Data LLC |
| 12/13/2019 | 226.25 | Third Party Consultant |
| 12/13/2019 | 1,155.00 | Centroid Systems, Inc. |
| 12/13/2019 | 4,788.56 | Thomson Reuters West |
| 12/13/2019 | 4,090.46 | Concur Technologies Inc |
| 12/16/2019 | 155,452.35 | Bloomberg Finance LP |
| 12/16/2019 | 1,582.66 | Compass Bank Oper |
| 12/16/2019 | 32,508.98 | Bloomberg Finance LP |
| 12/17/2019 | 259.60 | East West Bank |
| 12/17/2019 | 13,516.50 | ATT Mobility |
| 12/17/2019 | 516.91 | DIRECTV |
| 12/19/2019 | 477.59 | PITNEY BOWES |
| 12/19/2019 | 400.00 | PITNEY BOWES |
| 12/19/2019 | 1,611.00 | PITNEY BOWES |
| 12/20/2019 | 348.00 | Visix, Inc. |
| 12/20/2019 | 1,000.00 | Marco Quintana |
| 12/20/2019 | 21.40 | CHASE COURIERS, INC |
| 12/20/2019 | 751.26 | Four Seasons Plantscaping, LLC |
| 12/20/2019 | 36,084.06 | SIEPE SOFTWARE |
| 12/20/2019 | 248,637.49 | SIEPE SERVICES |
| 12/20/2019 | 31,050.00 | McLagan |
| 12/20/2019 | 6,495.61 | ATT Mobility |
| 12/23/2019 | 27,891.43 | Third Party Consultant |
| 12/23/2019 | 6,942.54 | TW Telecom |
| 12/23/2019 | 6,934.01 | TW Telecom |
| 12/24/2019 | 398.22 | Xerox |
| 12/26/2019 | 548.83 | Pitney Bowes |
| 12/27/2019 | 5,076.50 | Third Party Consultant |
| 12/31/2019 | 17,147.40 | Wolters Kluwer |
| 12/31/2019 | 1,419.08 | Oracle America, Inc. |
| 12/31/2019 | 2,047.22 | Zayo Group |
| 12/31/2019 | 11,000.00 | Third Party Consultant |
| | $ 860,477.16 | |

**Monthly Operating Report**
ACCRUAL BASIS-4

| CASE NAME: | Highland Capital Management |
|---|---|
| CASE NUMBER: | 19-34054 |

| MGMT FEE RECEIVABLE AGING [2] | SCHEDULE AMOUNT | October | November | December |
|---|---|---|---|---|
| 1. | 0-30 | $ 2,578,744 | $ 3,201,548 | $ 1,222,880 | $1,828,180 |
| 2. | 31-60 | | | | |
| 3. | 61-90 | | | | |
| 4. | 91+ | | | | |
| 5. | TOTAL MGMT FEE RECEIVABLE | $ 2,578,744 | $ 3,201,548 | $ 1,222,880 | $1,828,180 |
| 6. | AMOUNT CONSIDERED UNCOLLECTIBLE | | | | |
| 7. | MGMT FEE RECEIVABLE (NET) | $ 2,578,744 | $ 3,201,548 | $ 1,222,880 | $1,828,180 |

**AGING OF POSTPETITION TAXES AND PAYABLES**     MONTH:    December 2019

| TAXES PAYABLE | 0-30 DAYS | 31-60 DAYS | 61-90 DAYS | 91+ DAYS | TOTAL |
|---|---|---|---|---|---|
| 1. FEDERAL | | | | | $0 |
| 2. STATE | | | | | $0 |
| 3. LOCAL | | | | | $0 |
| 4. OTHER (ATTACH LIST) | | | | | $0 |
| 5. TOTAL TAXES PAYABLE | $0 | $0 | $0 | $0 | $0 |
| | | | | | |
| 6. ACCOUNTS PAYABLE | $413,201 | $60,483 | $150,355 | | $624,038 |

**STATUS OF POSTPETITION TAXES [1]**     MONTH:    December 2019

| FEDERAL | BEGINNING TAX LIABILITY | AMOUNT WITHHELD AND/ OR ACCRUED | AMOUNT PAID | ENDING TAX LIABILITY |
|---|---|---|---|---|
| 1. WITHHOLDING | | | | $0 |
| 2. FICA-EMPLOYEE | | | | $0 |
| 3. FICA-EMPLOYER | | | | $0 |
| 4. UNEMPLOYMENT | | | | $0 |
| 5. INCOME | | | | $0 |
| 6. OTHER (ATTACH LIST) | | | | $0 |
| 7. TOTAL FEDERAL TAXES | $0 | $0 | $0 | $0 |
| **STATE AND LOCAL** | | | | |
| 8. WITHHOLDING | | | | $0 |
| 9. SALES | | | | $0 |
| 10. EXCISE | | | | $0 |
| 11. UNEMPLOYMENT | | | | $0 |
| 12. REAL PROPERTY | $0 | $0 | $0 | $0 |
| 13. PERSONAL PROPERTY | | | | $0 |
| 14. OTHER (ATTACH LIST) | | | | $0 |
| 15. TOTAL STATE & LOCAL | $0 | $0 | $0 | $0 |
| 16. TOTAL TAXES | $0 | $0 | $0 | $0 |

1   The Debtor funds all state and federal employment taxes to Paylocity, who files all required federal and state related employment reports and withholdings.

2   Aging based on when management fee is due and payable.

| | | | | | | | Monthly Operating Report |
|---|---|---|---|---|---|---|---|
| | | | | | | | ACCRUAL BASIS-5 |

| CASE NAME: | Highland Capital Management |
|---|---|
| CASE NUMBER: | 19-34054 |

MONTH: December     2019

| BANK RECONCILIATIONS | Account #1 | Account #2 | Account #3 | Account #4 | Account #5 | Account #6 | TOTAL |
|---|---|---|---|---|---|---|---|
| A.   BANK: | BBVA Compass | East West Bank | East West Bank | Maxim Group | Jefferies LLC | Nexbank | |
| B.   ACCOUNT NUMBER: | x6342 | x4686 | x4693 | x1885 | x0932 | x5891 | |
| C.   PURPOSE (TYPE): | Operating | Operating | Insurance | Brokerage | Brokerage | CD | |
| 1.   BALANCE PER BANK STATEMENT [1] | $ 15,004 | $ 8,562,272 | $ 132,822 | $ 245,849 | $ 410,108 | $ 136,105 | $ 9,502,160 |
| 2.   ADD: TOTAL DEPOSITS NOT CREDITED | | | | | | | $ - |
| 3.   SUBTRACT: OUTSTANDING CHECKS | | $ 751 | | | | | $ 751 |
| 4.   OTHER RECONCILING ITEMS | | | | | | | $ - |
| 5.   MONTH END BALANCE PER BOOKS | $ 15,004 | $ 8,561,521 | $ 132,822 | $ 245,849 | $ 410,108 | $ 135,205 | $ 9,501,409 |
| 6.   NUMBER OF LAST CHECK WRITTEN | 18133 | 100009 | n/a | n/a | n/a | n/a | |

| INVESTMENT ACCOUNTS | DATE OF PURCHASE | TYPE OF INSTRUMENT | PURCHASE PRICE | | | | CURRENT VALUE |
|---|---|---|---|---|---|---|---|
| BANK, ACCOUNT NAME & NUMBER | | | | | | | |
| 7. | | | | | | | |
| 8. | | | | | | | |
| 9. | | | | | | | |
| 10. | | | | | | | |
| 11.   TOTAL INVESTMENTS | | | $0 | | | | $0 |

| CASH | | |
|---|---|---|
| 12.   CURRENCY ON HAND | | $0 |
| 13.   TOTAL CASH - END OF MONTH | | $9,501,409 |

1   For Compass account x6342, subsequent to year end balance was transferred to the East West operating account and the account was closed.

Case 19-34054-sgj11 Doc 148 Filed 03/30/20   Entered 03/30/20 11:32:27   Page 98 of 19

**Monthly Operating Report**
ACCRUAL BASIS-6

| CASE NAME: | Highland Capital Management |
|---|---|
| CASE NUMBER: | 19-34054 |

MONTH:   December 2019

**PAYMENTS TO INSIDERS AND PROFESSIONALS**

| | INSIDERS | | | |
|---|---|---|---|---|
| | NAME | TYPE OF PAYMENT | AMOUNT PAID | TOTAL PAID POST PETITION |
| 1 | Frank Waterhouse | Salary | $29,167 | $72,917 |
| 2 | Frank Waterhouse | Expense Reimbursement | $1,003 | $1,508 |
| 3 | Scott Ellington | Salary | $37,500 | $93,750 |
| 4 | Scott Ellington | Expense Reimbursement | $24 | $2,034 |
| 5 | James Dondero | Salary | $46,875 | $117,188 |
| 6 | James Dondero | Expense Reimbursement [1] | $1,077 | $16,346 |
| 7 | Thomas Surgent | Salary | $33,333 | $83,333 |
| 8 | Thomas Surgent | Expense Reimbursement | $1,007 | $1,254 |
| 9 | Trey Parker | Salary | $29,167 | $72,917 |
| 10 | Trey Parker | Expense Reimbursement | $240 | $665 |
| | TOTAL PAYMENTS TO INSIDERS | | $179,393 | $461,911 |

[1] The total amount of reimbursements during the reporting month also included $24,556 for use of the credit card by the Debtor for office related expenses such as subscriptions, employee lunches, vending supplies, IT equipment/software, employee gifts/awards, non-employee related travel, training and postage.

| | PROFESSIONALS [2] | | | | |
|---|---|---|---|---|---|
| | NAME | DATE OF COURT ORDER AUTHORIZING PAYMENT | AMOUNT APPROVED | AMOUNT PAID | TOTAL PAID TO DATE | TOTAL INCURRED & UNPAID |
| 1. | | | | | | |
| 2. | | | | | | |
| 3. | | | | | | |
| 4. | | | | | | |
| 5. | | | | | | |
| 6. | TOTAL PAYMENTS TO PROFESSIONALS | | | $0 | $0 | $0 |

2 Does not include payments to ordinary course professionals.

**POSTPETITION STATUS OF SECURED NOTES, LEASES PAYABLE AND ADEQUATE PROTECTION PAYMENTS**

| | NAME OF CREDITOR | SCHEDULED MONTHLY PAYMENTS DUE | AMOUNTS PAID DURING MONTH | TOTAL UNPAID POSTPETITION |
|---|---|---|---|---|
| 1. | Crescent TC Investors LP (rent portion only) | 130,364 | 130,364 | - |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| 6. | TOTAL | 130,364 | $130,364 | $0 |

**Monthly Operating Report**
ACCRUAL BASIS-7

| CASE NAME: | Highland Capital Management |
|---|---|

| CASE NUMBER: | 19-34054 |
|---|---|

**MONTH:**  December 2019

| QUESTIONNAIRE | | YES | NO |
|---|---|---|---|
| 1. | HAVE ANY ASSETS BEEN SOLD OR TRANSFERRED OUTSIDE THE NORMAL COURSE OF BUSINESS THIS REPORTING PERIOD? | | x |
| 2. | HAVE ANY FUNDS BEEN DISBURSED FROM ANY ACCOUNT OTHER THAN A DEBTOR IN POSSESSION ACCOUNT? | x | |
| 3. | ARE ANY POSTPETITION RECEIVABLES (ACCOUNTS, NOTES, OR LOANS) DUE FROM RELATED PARTIES? | x | |
| 4. | HAVE ANY PAYMENTS BEEN MADE ON PREPETITION LIABILITIES THIS REPORTING PERIOD? | x | |
| 5. | HAVE ANY POSTPETITION LOANS BEEN RECEIVED BY THE DEBTOR FROM ANY PARTY? | | x |
| 6. | ARE ANY POSTPETITION PAYROLL TAXES PAST DUE? | | x |
| 7. | ARE ANY POSTPETITION STATE OR FEDERAL INCOME TAXES PAST DUE? | | x |
| 8. | ARE ANY POSTPETITION REAL ESTATE TAXES PAST DUE? | | x |
| 9. | ARE ANY OTHER POSTPETITION TAXES PAST DUE? | | x |
| 10. | ARE ANY AMOUNTS OWED TO POSTPETITION CREDITORS DELINQUENT? | | x |
| 11. | HAVE ANY PREPETITION TAXES BEEN PAID DURING THE REPORTING PERIOD? | | x |
| 12. | ARE ANY WAGE PAYMENTS PAST DUE? | | x |

IF THE ANSWER TO ANY OF THE ABOVE QUESTIONS IS "YES," PROVIDE A DETAILED EXPLANATION OF EACH ITEM. ATTACH ADDITIONAL SHEETS IF NECESSARY.

2   $272,727 of funds transferred from non-debtor-in-possession accounts to debtor-in-possession account.

3   Debtor generates fee income and other receipts from various related parties in normal course, see cash management motion for further discussion.

4   Payments have been made on prepetition liabilities, as approved in the critical vendor motion.

| INSURANCE | | YES | NO |
|---|---|---|---|
| 1. | ARE WORKER'S COMPENSATION, GENERAL LIABILITY AND OTHER NECESSARY INSURANCE COVERAGES IN EFFECT? | x | |
| 2. | ARE ALL PREMIUM PAYMENTS PAID CURRENT? | x | |
| 3. | PLEASE ITEMIZE POLICIES BELOW. | | |

IF THE ANSWER TO ANY OF THE ABOVE QUESTIONS IS "NO," OR IF ANY POLICIES HAVE BEEN CANCELLED OR NOT RENEWED DURING THIS REPORTING PERIOD, PROVIDE AN EXPLANATION BELOW. ATTACH ADDITIONAL SHEETS IF NECESSARY.

| INSTALLMENT PAYMENTS | | | |
|---|---|---|---|
| TYPE OF POLICY | CARRIER | PERIOD COVERED | PAYMENT AMOUNT & FREQUENCY |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

# EXHIBIT 42

<div style="text-align:right">

**Monthly Operating Report**
ACCRUAL BASIS

</div>

| | |
|---|---|
| **CASE NAME:** | Highland Capital Management |
| **CASE NUMBER:** | 19-34054 |
| **JUDGE:** Stacey Jernigan | |

# UNITED STATES BANKRUPTCY COURT

## NORTHERN & EASTERN DISTRICTS OF TEXAS

### REGION 6

### MONTHLY OPERATING REPORT

**MONTH ENDING:**     September     2020

MONTH     YEAR

**IN ACCORDANCE WITH TITLE 28, SECTION 1746, OF THE UNITED STATES CODE, I DECLARE UNDER PENALTY OF PERJURY THAT I HAVE EXAMINED THE FOLLOWING MONTHLY OPERATING REPORT (ACCRUAL BASIS-1 THROUGH ACCRUAL BASIS-7) AND THE ACCOMPANYING ATTACHMENTS AND, TO THE BEST OF MY KNOWLEDGE, THESE DOCUMENTS ARE TRUE, CORRECT, AND COMPLETE. DECLARATION OF THE PREPARER (OTHER THAN RESPONSIBLE PARTY) IS BASED ON ALL INFORMATION OF WHICH PREPARER HAS ANY KNOWLEDGE.**

**RESPONSIBLE PARTY:**

_____        Chief Restructuring Officer/ Chief Executive Officer
ORIGINAL SIGNATURE OF RESPONSIBLE PARTY        TITLE

James Seery
PRINTED NAME OF RESPONSIBLE PARTY        DATE

**PREPARER:**

_____        Chief Financial Officer
ORIGINAL SIGNATURE OF PREPARER        TITLE

Frank Waterhouse
PRINTED NAME OF PREPARER        DATE

**Monthly Operating Report**
ACCRUAL BASIS-1

| CASE NAME: | Highland Capital Management, LP |
|---|---|
| CASE NUMBER: | 19-12239-CSS |

**Comparative Balance Sheet**
(in thousands)

|  | 10/15/2019 | 12/31/2019 [6] | 9/30/2020 [6] |
|---|---|---|---|
| **Assets** |  |  |  |
| Cash and cash equivalents | 2,529 | 9,501 | 5,888 |
| Investments, at fair value [3] | 232,620 | 232,820 | 109,479 |
| Equity method investees [3] | 161,819 | 183,529 | 101,213 |
| Management and incentive fee receivable | 2,579 | 1,929 | 3,350 |
| Fixed assets, net | 3,754 | 3,521 | 2,823 |
| Due from affiliates [1] | 151,901 | 146,276 | 152,585 |
| Reserve against notes recievable | | (57,963) | (59,140) |
| Other assets | 11,311 | 11,463 | 12,105 |
| **Total assets** | $    566,513 | $    531,076 | $    328,302 |
|  |  |  |  |
| **Liabilities and Partners' Capital** |  |  |  |
| Pre-petition accounts payable [4] | 1,176 | 1,141 | 1,051 |
| Post-petition accounts payable [4] | - | 2,042 | 583 |
| Secured debt: |  |  |  |
| Frontier | 5,195 | 5,195 | 5,195 |
| Jefferies | 30,328 | 30,020 | - |
| Accrued expenses and other liabilities [4] | 59,203 | 63,275 | 58,733 |
| Accrued re-organization related fees [5] | - | 5,547 | 5,922 |
| Claim accrual [2] | 73,997 | 73,997 | 73,997 |
| Partners' capital | 396,614 | 349,857 | 182,821 |
| **Total liabilities and partners' capital** | $    566,513 | $    531,076 | $    328,302 |

[1] Includes various notes receivable at carrying value, except note due from Hunter Mountain Investment Trust which is fully reserved against ($59M reserve). Fair value has not been determined with respect to any of the notes.

[2] Uncontested portion of Redeemer claim less appplicable offsets. Potential for additional liability based on future events. No interest has been accrued beyond petition date. No additional accruals will be made on settlement claims until further approval by the court.

[3] Mark to market gains/(losses) on investments include pricing updates for publicly traded securities and other positions with readily available market price information. Certain limited partnership interests normally marked to a NAV statement have not been updated as of period end as statements are generally available on a one-month lag.

[4] Note on accruals: expenses recorded in Accounts Payable and Accrued Expenses and Other Liabilities reflect invoices recorded through accounts payable, legal invoice accruals, and normal course operating accruals, but do not reflect estimates for other incurred, but not yet received invoices.  For balance sheet dates other than the Petition Date, amounts include both pre-petition and post-petition liabilities.

[5] Beginning December 31st, 2019, Debtor accrued for post-petition re-organization fees based upon an estimate of fees incurred to date.

[6] All balances at December 31st, 2019 are preliminary, unaudited, and subject to further year-end closing entries pursuant to the normal year-end closing process. As a result, balances for subsequent months have and will fluctuate.

**Monthly Operating Report**
**ACCRUAL BASIS-2**

| CASE NAME: | Highland Capital Management, LP | |
|---|---|---|
| CASE NUMBER: | 19-12239-CSS | |

**Income Statement[1]**
(in thousands)

| | Date | Filing to Year Ended [4] | Month ended [4] | Filing to date [4] |
|---|---|---|---|---|
| | 10/16/19 - 10/31/19 | 2019 | 9/30/2020 | |
| **Revenue:** | | | | |
| Management fees | 975 | 4,528 | 1,495 | 18,993 |
| Shared services fees | 283 | 1,588 | 645 | 7,248 |
| Other income | 99 | 1,582 | 401 | 5,058 |
| **Total operating revenue** | 1,357 | 7,697 | 2,541 | 31,299 |
| **Operating expenses:** | | | | |
| Compensation and benefits | 997 | 1,498 | 1,668 | 15,778 |
| Professional services | 256 | 64 | 190 | 2,167 |
| Investment research and consulting | 10 | 266 | 241 | 960 |
| Marketing and advertising expense | - | 370 | 36 | 521 |
| Depreciation expense | 82 | 244 | 76 | 940 |
| Bad debt expense reserve | - | 8,410 | 124 | 9,586 |
| Other operating expenses | 201 | 1,265 | 463 | 4,665 |
| **Total operating expenses** | 1,545 | 12,118 | 2,799 | 34,617 |
| **Operating income/(loss)** | (188) | (4,421) | (258) | (3,318) |
| **Other income/expense:** | | | | |
| Interest income | 250 | 1,230 | 488 | 5,616 |
| Interest expense | (107) | (286) | (21) | (675) |
| Reserve against notes receivable | - | (57,963) | - | (57,963) |
| Re-org related expenses [2] | - | (5,547) | (3,816) | (28,800) |
| Independent director fees | - | - | (30) | (1,977) |
| Other income/expense | 32 | 32 | (6) | (144) |
| **Total other income/expense** | 175 | (62,534) | (3,386) | (83,943) |
| Net realized gains/(losses) on investments | 339 | 618 | 1,133 | (27,738) |
| Net change in unrealized gains/(losses) of investments [3] | 2,654 | (955) | 1,480 | (36,847) |
| | 2,993 | (337) | 2,613 | (64,585) |
| **Net earnings/(losses) from equity method investees** [3] | (20) | 14,918 | 337 | (67,564) |
| **Net income/(loss)** | $ 2,959 | $ (52,374) | $ (694) | $ (219,410) |

(1) Note on accruals: expenses recorded in the Income Statement reflect invoices recorded through accounts payable, legal invoice accruals, and normal course operating accruals, but do not reflect estimates for other incurred, but not yet received invoices.

(2) Debtor funded various retainers totaling $790k prior to the petition date, which were entirely expensed as of the petition date.

(3) Mark to market gains/(losses) on investments include pricing updates for publicly traded securities and other positions with readily available market price information. Certain limited partnership interests normally marked to a NAV statement have not been updated as of period end as statements are generally available on a one-month lag.

(4) All balances are preliminary, unaudited, and subject to further year-end closing entries pursuant to the normal year-end closing process. As a result, operating results will change as these entries are made.

| CASE NAME: | Highland Capital Management | | | | |
|---|---|---|---|---|---|
| CASE NUMBER: | 19-34054 | | | | |

**Monthly Operating Report**
**ACCRUAL BASIS-3A**

| CASH RECEIPTS AND DISBURSEMENTS | | FILING TO YEAR END 2019 | QUARTER 1 | QUARTER 2 | SEPTEMBER | QUARTER 3 |
|---|---|---|---|---|---|---|
| 1. | CASH - BEGINNING OF MONTH | $ 2,554,230 | $ 9,501,409 | $ 12,532,467 | $ 10,025,528 | $ 14,993,872 |
| **RECEIPTS FROM OPERATIONS** | | | | | | |
| 2. | OTHER OPERATING RECEIPTS | $ 1,862,757 | $ 1,379,338 | $ 2,983,221 | $ 716,191 | $ 2,259,736 |
| 3 | MANAGEMENT FEES AND OTHER RELATED RECEIPTS | $ 3,156,742 | $ 7,555,297 | $ 6,179,437 | $ 1,515,102 | $ 5,575,680 |
| **COLLECTION OF ACCOUNTS RECEIVABLE** | | | | | | |
| 4 | PREPETITION | $ 3,593,108 | $ 76,569 | $ 3,727 | $ - | $ - |
| 5 | POSTPETITION [1] | $ - | $ - | $ - | $ - | $ - |
| 6 | TOTAL OPERATING RECEIPTS | $ 8,612,608 | $ 9,011,204 | $ 9,166,385 | $ 2,231,293 | $ 7,835,415 |
| **NON-OPERATING RECEIPTS** | | | | | | |
| 7 | THIRD PARTY FUND ACTUAL/EXPECTED DISTRIBUTIONS | $ 423,468 | $ 18,992,786 | $ 797,571 | $ 389,357 | $ 610,254 |
| 8 | DIVS, PAYDOWNS, MISC FROM INVESTMENT ASSETS | $ 1,338,069 | $ 477,479 | $ 74,376 | $ 1,769 | $ 5,311 |
| 9 | OTHER (ATTACH LIST) | $ 3,390,286 | $ 1,407,103 | $ 10,010,000 | $ 67,099 | $ 8,817,099 |
| 10 | TOTAL NON-OPERATING RECEIPTS | $ 5,151,822 | $ 20,877,369 | $ 10,881,947 | $ 458,225 | $ 9,432,664 |
| 11 | TOTAL RECEIPTS | $ 13,764,430 | $ 29,888,573 | $ 20,048,331 | $ 2,689,517 | $ 17,268,080 |
| 12 | TOTAL CASH AVAILABLE | | | | $ 12,715,045 | $ 32,261,951 |
| **OPERATING DISBURSEMENTS** | | | | | | |
| 13 | PAYROLL, BENEFITS, AND TAXES + EXP REIMB | $ 3,776,446 | $ 8,825,042 | $ 4,886,314 | $ 1,428,122 | $ 8,806,880 |
| 14 | SINGAPORE SERVICE FEES | $ 95,118 | $ 58,129 | $ 2,965 | $ - | $ - |
| 15 | HCM LATIN AMERICA | $ 200,000 | $ 100,000 | $ - | $ - | $ - |
| 16 | THIRD PARTY FUND CAPITAL CALL OBLIGATION | $ 1,426,987 | $ 7,812,469 | $ 3,087,163 | $ - | $ 979,631 |
| 17 | UTILITIES | $ - | $ - | $ - | $ - | $ - |
| 18 | INSURANCE | $ - | $ 533,940 | $ 376,376 | $ - | $ 163,400 |
| 19 | INVENTORY PURCHASES | $ - | $ - | $ - | $ - | $ - |
| 20 | VEHICLE EXPENSES | $ - | $ - | $ - | $ - | $ - |
| 21 | TRAVEL | $ - | $ - | $ - | $ - | $ - |
| 22 | ENTERTAINMENT | $ - | $ - | $ - | $ - | $ - |
| 23 | REPAIRS & MAINTENANCE | $ - | $ - | $ - | $ - | $ - |
| 24 | SUPPLIES | $ - | $ - | $ - | $ - | $ - |
| 25 | ADVERTISING | $ - | $ - | $ - | $ - | $ - |
| 26 | OTHER (ATTACH LIST) | $ 1,318,700 | $ 3,283,898 | $ 3,195,054 | $ 1,286,630 | $ 3,633,331 |
| 27 | TOTAL OPERATING DISBURSEMENTS | $ 6,817,251 | $ 20,613,478 | $ 11,547,870 | $ 2,714,752 | $ 13,583,243 |
| **REORGANIZATION EXPENSES** | | | | | | |
| 28 | PROFESSIONAL FEES | $ - | $ 5,460,546 | $ 5,572,032 | $ 3,902,480 | $ 11,551,682 |
| 29 | U.S. TRUSTEE FEES | $ - | $ 68,173 | $ 167,025 | $ - | $ 277,924 |
| 30 | OTHER (ATTACH LIST) | $ - | $ 715,317 | $ 300,000 | $ 210,000 | $ 961,289 |
| 31 | TOTAL REORGANIZATION EXPENSES | $ - | $ 6,244,037 | $ 6,039,057 | $ 4,112,480 | $ 12,790,896 |
| 32 | TOTAL DISBURSEMENTS | $ 6,817,251 | $ 26,857,515 | $ 17,586,927 | $ 6,827,232 | $ 26,374,138 |
| 33 | NET CASH FLOW | $ 6,947,179 | $ 3,031,058 | $ 2,461,404 | $ (4,137,715) | $ (9,106,059) |
| 34 | CASH - END OF MONTH | $ 9,501,409 | $ 12,532,467 | $ 14,993,872 | $ 5,887,813 | $ 5,887,813 |

1    All postpetition receipts are included in line 3, Management Fees and Other Related Receipts.



**Monthly Operating Report**
ACCRUAL BASIS-JB

| CASE NAME: | Highland Capital Management |
| CASE NUMBER: | 19-34054 |

**OPERATING RECEIPTS - OTHER**

| Date | Amount | Type |
|---|---|---|
| | 67,098.85 | Nexpoint Real Estate Strategies Fund redemption |

**OPERATING DISBURSMENTS - INVESTMENT**

| Date | Amount | Type |
|---|---|---|
| | 383,041.29 | Carey term-loan purchase |

**OPERATING DISBURSMENTS - OTHER**

| Date | Amount | Vendor |
|---|---|---|
| 9/1/2020 | 18,412.07 | Ace Parking Management Inc. |
| 9/1/2020 | 2,257.01 | Bloomberg Finance LP |
| 9/1/2020 | 3,009.00 | Brighthouse Life Insurance Company |
| 9/1/2020 | 10,611.00 | Brighthouse Life Insurance Company |
| 9/1/2020 | 1,889.22 | Canteen Vending Services |
| 9/1/2020 | 145.20 | Chase Couriers, Inc |
| 9/1/2020 | 950.00 | Crescent Research |
| 9/1/2020 | 144,048.21 | Crescent TC Investors LP |
| 9/1/2020 | 2,067.50 | CT Corporation System |
| 9/1/2020 | 37,583.75 | Third Party Consultant |
| 9/1/2020 | 1,548.97 | GRUBHUB for Work |
| 9/1/2020 | 47,654.00 | Houlihan Lokey |
| 9/1/2020 | 7,617.26 | ICE Data Pricing & Reference Data, LLC |
| 9/1/2020 | 9,500.00 | Ipreo Data Inc |
| 9/1/2020 | 89.24 | Iron Mountain Records Management |
| 9/1/2020 | 495.86 | Jordan Fraker Photography |
| 9/1/2020 | 3,392.01 | NYSE MARKET, INC |
| 9/1/2020 | 3,051.14 | Oak Cliff Office Products |
| 9/1/2020 | 1,625.00 | Paessler |
| 9/1/2020 | 441.34 | ProStar Services, Inc |
| 9/1/2020 | 107.15 | UPS Supply Chain Solutions |
| 9/9/2020 | 5,884.76 | ABM |
| 9/9/2020 | 432.00 | Ace Parking Management Inc. |
| 9/9/2020 | 600.00 | Action Shred of Texas |
| 9/9/2020 | 1,492.38 | Canteen Vending Services |
| 9/9/2020 | 510.61 | CDW Direct |
| 9/9/2020 | 11,131.97 | CT Corporation System |
| 9/9/2020 | 1,617.81 | GRUBHUB for Work |
| 9/9/2020 | 47,470.00 | Houlihan Lokey |
| 9/9/2020 | 35,200.00 | Intex Solutions, Inc. |
| 9/9/2020 | 2,668.57 | Iron Mountain Records Management |
| 9/9/2020 | 7,500.00 | MacroMavens, LLC |
| 9/9/2020 | 1,570.00 | MICRO-TEL |
| 9/9/2020 | 507.47 | ProStar Services, Inc |
| 9/9/2020 | 16,335.06 | S&P Global Market Intelligence |
| 9/9/2020 | 151,448.26 | Siepe Services, LLC |
| 9/9/2020 | 18,042.03 | Siepe Software, LLC |
| 9/9/2020 | 535.34 | Standard Insurance Company |
| 9/9/2020 | 6,369.17 | TW Telecom Holdings, llc |
| 9/9/2020 | 6,866.42 | Willis of Texas, Inc. |
| 9/11/2020 | 263.81 | Directv, LLC |
| 9/11/2020 | 1,000.00 | Pitney Bowes- Purchase Power |
| 9/11/2020 | 4,335.10 | Third Party Consultant |
| 9/14/2020 | 500.00 | Pitney Bowes |
| 9/17/2020 | 2,082.70 | Zayo Group, LLC |
| 9/18/2020 | 253.94 | Arkadin, Inc |
| 9/18/2020 | 4,192.71 | Third Party Consultant |
| 9/18/2020 | 2,955.06 | AT&T |
| 9/18/2020 | 137.50 | AT&T |
| 9/18/2020 | 768.58 | Audio Visual Innovations, Inc |
| 9/18/2020 | 8,140.16 | Bloomberg Finance LP |
| 9/18/2020 | 1,636.20 | Canteen Vending Services |
| 9/18/2020 | 21,863.25 | CDW Direct |
| 9/18/2020 | 700.00 | Centroid |
| 9/18/2020 | 4,059.81 | Concur Technologies, Inc. |
| 9/18/2020 | 369.00 | CT Corporation System |
| 9/18/2020 | 3,031.00 | Daltex Janitorial Services, LLC |
| 9/18/2020 | 859.36 | DTCC ITP LLC |
| 9/18/2020 | 11,887.73 | Flexential Colorado Corp. |
| 9/18/2020 | 2,162.11 | Grubhub for Work |
| 9/18/2020 | 3,762.48 | ICE Data Pricing & Reference Data, LLC |
| 9/18/2020 | 112.21 | Iron Mountain Records Management |
| 9/18/2020 | 3,766.00 | MacroView Business Technology |
| 9/18/2020 | 2,128.81 | NYSE Market, Inc |
| 9/18/2020 | 548.32 | Pitney Bowes Financial Services |
| 9/18/2020 | 6,757.16 | Proofpoint |
| 9/18/2020 | 2,466.10 | Thomson West |
| 9/18/2020 | 301.48 | UPS Supply Chain Solutions |
| 9/18/2020 | 259.80 | Venture Mechanical, Inc. |
| 9/18/2020 | 273.47 | Verity Group |
| 9/18/2020 | 416.57 | Analysis Charge |
| 9/18/2020 | 23.00 | Chase Couriers |
| 9/25/2020 | 16,750.65 | Ace Parking Management Inc. |
| 9/25/2020 | 1,740.82 | AT&T |
| 9/25/2020 | 763.22 | AT&T |
| 9/25/2020 | 7,147.16 | AT&T |
| 9/25/2020 | 1,431.77 | Canteen Vending Services |
| 9/25/2020 | 2,491.11 | CDW Direct |
| 9/25/2020 | 15,000.00 | Centroid |
| 9/25/2020 | 58.62 | Chase Couriers |
| 9/25/2020 | 320.70 | CT Corporation System |
| 9/25/2020 | 7,752.34 | Fitch Solutions, Inc. |
| 9/25/2020 | 484.96 | Four Seasons Plantscaping, LLC |
| 9/25/2020 | 1,480.74 | Grubhub for Work |
| 9/25/2020 | 4,840.01 | Liberty Life Assurance Company of Boston - Group Benefits |
| 9/25/2020 | 562.50 | Maples & Calder |
| 9/25/2020 | 124,634.61 | Siepe Services, LLC |
| 9/28/2020 | 1,412.83 | Southland Property Tax Consultants, Inc |
| 9/29/2020 | 980.96 | Xerox Corporation |
| 9/30/2020 | 11,000.00 | Third Party Consultant |
| 9/30/2020 | 25.00 | Bank fees returned Foley Wire |
| | 903,589 | |

**REORGANIZATION EXPENSES - OTHER**

| Date | Amount | Description |
|---|---|---|
| 9/1/2020 | 30,000 | Dubel & Associates, L.L.C. |
| 9/1/2020 | 150,000 | J.P. Sserry & Co. LLC |
| 9/1/2020 | 30,000 | Nelms and Associates |
| | 210,000 | |

**Monthly Operating Report**
ACCRUAL BASIS-4

| CASE NAME: | Highland Capital Management |
|---|---|
| CASE NUMBER: | 19-34054 |

| MGMT FEE RECEIVABLE AGING [2] | | June [3] | July [3] | August [3] | September [3] |
|---|---|---|---|---|---|
| 1. | 0-30 | $  1,813,292 | $2,428,715 | $1,768,818 | $2,577,696 |
| 2. | 31-60 | | $1,163,000 | $1,285,718 | $772,384 | |
| 3. | 61-90 | | | | $772,384 |
| 4. | 91+ | | | | |
| 5. | TOTAL MGMT FEE RECEIVABLE | $  2,976,292 | $  3,714,432 | $  2,541,202 | $3,350,080 |
| 6. | AMOUNT CONSIDERED UNCOLLECTIBLE | | | | |
| 7. | MGMT FEE RECEIVABLE (NET) | $  2,976,292 | $  3,714,432 | $  2,541,202 | $3,350,080 |

**AGING OF POSTPETITION TAXES AND PAYABLES**          MONTH:          September 2020

| TAXES PAYABLE | 0-30 DAYS | 31-60 DAYS | 61-90 DAYS | 91+ DAYS | TOTAL |
|---|---|---|---|---|---|
| 1. FEDERAL | | | | | $0 |
| 2. STATE | | | | | $0 |
| 3. LOCAL | | | | | $0 |
| 4. OTHER (ATTACH LIST) | | | | | $0 |
| 5.   TOTAL TAXES PAYABLE | $0 | $0 | $0 | $0 | $0 |

| 6. | ACCOUNTS PAYABLE | $418,457 | $16,057 | $0 | $320,995 | $755,509 |
|---|---|---|---|---|---|---|

**STATUS OF POSTPETITION TAXES [1]**          MONTH:          September 2020

| FEDERAL | BEGINNING TAX LIABILITY | AMOUNT WITHHELD AND/ 0R ACCRUED | AMOUNT PAID | ENDING TAX LIABILITY |
|---|---|---|---|---|
| 1. WITHHOLDING | | | | $0 |
| 2. FICA-EMPLOYEE | | | | $0 |
| 3. FICA-EMPLOYER | | | | $0 |
| 4. UNEMPLOYMENT | | | | $0 |
| 5. INCOME | | | | $0 |
| 6. OTHER (ATTACH LIST) | | | | $0 |
| 7. TOTAL FEDERAL TAXES | $0 | $0 | $0 | $0 |
| STATE AND LOCAL | | | | |
| 8. WITHHOLDING | | | | $0 |
| 9. SALES | | | | $0 |
| 10. EXCISE | | | | $0 |
| 11. UNEMPLOYMENT | | | | $0 |
| 12. REAL PROPERTY | $0 | $0 | $0 | $0 |
| 13. PERSONAL PROPERTY | | | | $0 |
| 14. OTHER (ATTACH LIST) | | | | $0 |
| 15. TOTAL STATE & LOCAL | $0 | $0 | $0 | $0 |
| 16. TOTAL TAXES | $0 | $0 | $0 | $0 |

1   The Debtor funds all state and federal employment taxes to Paylocity, who files all required federal and state related employment reports and withholdings.
2   Aging based on when management fee is due and payable.
3   All balances are preliminary, unaudited, and subject to further year-end closing entries pursuant to the normal year-end closing process.

Case 19-34054-sgj11 Doc 1129 Filed 03/03/20    Entered 03/03/20 15:44:31    Page 7 of 19

**Monthly Operating Report**
ACCRUAL BASIS-5

| CASE NAME: | Highland Capital Management |
|---|---|
| CASE NUMBER: | 19-34054 |

**MONTH:** September          2020

| BANK RECONCILIATIONS | | Account #1 | Account #2 | Account #3 | Account #4 | Account #5 | Account #6 | |
|---|---|---|---|---|---|---|---|---|
| A. | BANK: | East West Bank | East West Bank | Maxim Group | Jefferies LLC | Nexbank | East West Bank | |
| B. | ACCOUNT NUMBER: | x4686 | x4693 | x1885 | x0932 | x5891 | x5848 | TOTAL |
| C. | PURPOSE (TYPE): | Operating | Insurance | Brokerage | Brokerage | CD | Prepaid Card | |
| 1. | BALANCE PER BANK STATEMENT [1] | $ 5,617,167 | $ 32,373 | $ 30 | $ - | $ 138,190 | $ 100,052 | $ 5,887,812 |
| 2. | ADD: TOTAL DEPOSITS NOT CREDITED | | | | | | | $ - |
| 3. | SUBTRACT: OUTSTANDING CHECKS | | | | | | | $ - |
| 4. | OTHER RECONCILING ITEMS | | | | | | | $ - |
| 5. | MONTH END BALANCE PER BOOKS | $ 5,617,167 | $ 32,373 | $ 30 | $ - | $ 138,190 | $ 100,052 | $ 5,887,812 |
| 6. | NUMBER OF LAST CHECK WRITTEN | 100510 | n/a | n/a | n/a | n/a | n/a | |

| INVESTMENT ACCOUNTS | | DATE OF PURCHASE | TYPE OF INSTRUMENT | PURCHASE PRICE | | | | CURRENT VALUE |
|---|---|---|---|---|---|---|---|---|
| | BANK, ACCOUNT NAME & NUMBER | | | | | | | |
| 7. | | | | | | | | |
| 8. | | | | | | | | |
| 9. | | | | | | | | |
| 10. | | | | | | | | |
| 11. | TOTAL INVESTMENTS | | | $0 | | | | $0 |

| CASH | | | |
|---|---|---|---|
| 12. | CURRENCY ON HAND | | $0 |

| 13. | TOTAL CASH - END OF MONTH | $5,887,812 |
|---|---|---|

1    Account x6342 is now closed.

**Monthly Operating Report**
ACCRUAL BASIS-6

| CASE NAME: | Highland Capital Management |
|---|---|
| CASE NUMBER: | 19-34054 |

MONTH:   September 2020

**PAYMENTS TO INSIDERS AND PROFESSIONALS**

| | | INSIDERS | | |
|---|---|---|---|---|
| | NAME | TYPE OF PAYMENT | AMOUNT PAID | TOTAL PAID POST PETITION |
| 1 | Frank Waterhouse | Salary | $33,333 | $360,417 |
| 2 | Frank Waterhouse | Expense Reimbursement | $807 | $5,918 |
| 3 | Scott Ellington | Salary | $37,500 | $431,250 |
| 4 | Scott Ellington | Expense Reimbursement | $252 | $6,095 |
| 5 | James Dondero | Salary | $0 | $129,972 |
| 6 | James Dondero | Expense Reimbursement [1] | $0 | $16,918 |
| 7 | Thomas Surgent | Salary | $33,333 | $383,333 |
| 8 | Thomas Surgent | Expense Reimbursement | $456 | $4,222 |
| 9 | Trey Parker | Salary | $0 | $131,250 |
| 10 | Trey Parker | Expense Reimbursement | $0 | $6,212 |
| | TOTAL PAYMENTS TO INSIDERS | | $105,681 | $1,475,585 |

[1] The total amount of reimbursements during the reporting month also included $5,675 for use of the credit card by the Debtor for office related expenses such as subscriptions, vending supplies, and IT equipment/software.

| | | PROFESSIONALS [2] | | | |
|---|---|---|---|---|---|
| | NAME | DATE OF MONTHLY FEE APPLICATION | AMOUNT APPROVED | AMOUNT PAID | TOTAL PAID TO DATE | TOTAL INCURRED & UNPAID |
| 1. | Kurtzman Carson Consultants LLC | | 41,966 | 41,966 | 532,521 | 95,605 |
| 2. | Sidley Austin LLP | | 814,318 | 814,318 | 5,807,091 | 1,333,420 |
| 3. | Young Conaway Stargatt & Taylor LLP | | - | | 281,156 | - |
| 4. | FTI Consulting, Inc. | | 626,333 | 626,333 | 3,607,292 | 559,823 |
| 5. | Pachulski Stang Ziehl & Jones LLP | | 1,283,329 | 1,283,329 | 8,435,219 | 1,512,143 |
| 6. | Hayward & Associates PLLC | | 60,736 | 60,736 | 256,412 | 10,828 |
| 7. | Development Specialists, Inc. | | 237,828 | 237,828 | 2,351,224 | 249,129 |
| 8. | Foley & Lardner LLP | | - | | 464,294 | 119,516 |
| 9. | Mercer (US) Inc. | | 54,328 | 54,328 | 170,284 | - |
| 10 | Wilmer Cutler Pickering Hale and Dorr LLP | | 618,643 | 618,643 | 618,643 | |
| 11 | Meta-e Discovery LLC | | 165,000 | 165,000 | 165,000 | |
| | TOTAL PAYMENTS TO PROFESSIONALS | | 3,902,480 | | 22,689,136 | 3,880,463 |

2 Does not include payments to ordinary course professionals.

**POSTPETITION STATUS OF SECURED NOTES, LEASES PAYABLE AND ADEQUATE PROTECTION PAYMENTS**

| | NAME OF CREDITOR | SCHEDULED MONTHLY PAYMENTS DUE | AMOUNTS PAID DURING MONTH | TOTAL UNPAID POSTPETITION |
|---|---|---|---|---|
| 1. | Crescent TC Investors LP (rent portion only) | 130,364 | 130,364 | - |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| 6. | TOTAL | 130,364 | $130,364 | $0 |

<div align="right">

**Monthly Operating Report**
ACCRUAL BASIS-7

</div>

| CASE NAME: | Highland Capital Management |
|---|---|

| CASE NUMBER: | 19-34054 |
|---|---|

MONTH:    September 2020

### QUESTIONNAIRE

| | | YES | NO |
|---|---|:---:|:---:|
| 1. | HAVE ANY ASSETS BEEN SOLD OR TRANSFERRED OUTSIDE THE NORMAL COURSE OF BUSINESS THIS REPORTING PERIOD? | | x |
| 2. | HAVE ANY FUNDS BEEN DISBURSED FROM ANY ACCOUNT OTHER THAN A DEBTOR IN POSSESSION ACCOUNT? | | x |
| 3. | ARE ANY POSTPETITION RECEIVABLES (ACCOUNTS, NOTES, OR LOANS) DUE FROM RELATED PARTIES? | x | |
| 4. | HAVE ANY PAYMENTS BEEN MADE ON PREPETITION LIABILITIES THIS REPORTING PERIOD? | | x |
| 5. | HAVE ANY POSTPETITION LOANS BEEN RECEIVED BY THE DEBTOR FROM ANY PARTY? | | x |
| 6. | ARE ANY POSTPETITION PAYROLL TAXES PAST DUE? | | x |
| 7. | ARE ANY POSTPETITION STATE OR FEDERAL INCOME TAXES PAST DUE? | | x |
| 8. | ARE ANY POSTPETITION REAL ESTATE TAXES PAST DUE? | | x |
| 9. | ARE ANY OTHER POSTPETITION TAXES PAST DUE? | | x |
| 10. | ARE ANY AMOUNTS OWED TO POSTPETITION CREDITORS DELINQUENT? | | x |
| 11. | HAVE ANY PREPETITION TAXES BEEN PAID DURING THE REPORTING PERIOD? | | x |
| 12. | ARE ANY WAGE PAYMENTS PAST DUE? | | x |

IF THE ANSWER TO ANY OF THE ABOVE QUESTIONS IS "YES," PROVIDE A DETAILED
EXPLANATION OF EACH ITEM. ATTACH ADDITIONAL SHEETS IF NECESSARY.

| 3 | Debtor generates fee income and other receipts from various related parties in normal course, see cash management motion for further discussion. |
|---|---|

### INSURANCE

| | | YES | NO |
|---|---|:---:|:---:|
| 1. | ARE WORKER'S COMPENSATION, GENERAL LIABILITY AND OTHER NECESSARY INSURANCE COVERAGES IN EFFECT? | x | |
| 2. | ARE ALL PREMIUM PAYMENTS PAID CURRENT? | x | |
| 3. | PLEASE ITEMIZE POLICIES BELOW. | | |

IF THE ANSWER TO ANY OF THE ABOVE QUESTIONS IS "NO," OR IF ANY POLICIES HAVE BEEN
CANCELLED OR NOT RENEWED DURING THIS REPORTING PERIOD, PROVIDE AN EXPLANATION
BELOW.  ATTACH ADDITIONAL SHEETS IF NECESSARY.

| INSTALLMENT PAYMENTS | | | |
|---|---|---|---|
| TYPE OF POLICY | CARRIER | PERIOD COVERED | PAYMENT AMOUNT & FREQUENCY |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

# EXHIBIT 43

Appx. 00836

# PROMISSORY NOTE

$7,900,000                                                                                 January 18, 2018

        FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of SEVEN MILLION, NINE HUNDRED THOUSAND and 00/100 Dollars ($7,900,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

        1.     <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.59%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

        2.     <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

        3.     <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

        4.     <u>Tax Loan</u>. This Note is paid to the Maker to help satisfy any current tax obligations of a former partner or current partner.

        5.     <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

        6.     <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

        7.     <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

CONFIDENTIAL

8.      <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

9.      <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
JAMES DONDERO

2

CONFIDENTIAL

# EXHIBIT 44

# INTENTIONALLY

# OMITTED

# EXHIBIT 45

# TO BE FILED

# UNDER SEAL

**EXHIBIT 46**

# TO BE FILED

# UNDER SEAL

# EXHIBIT 47

Appx. 00842

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005 |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

**PLAINTIFF'S AMENDED NOTICE OF RULE 30(b)(6) DEPOSITION
TO NEXPOINT ADVISORS, L.P.**

**PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, made applicable herein pursuant to Rules 7030 and 9014 of the Federal Rules of Bankruptcy Procedure, Highland Capital Management, L.P. ("Highland"), the plaintiff in the above-referenced adversary proceeding in the above-captioned chapter 11 case, shall take the deposition of NexPoint Advisors, L.P. ("NexPoint") by the person(s) most qualified to testify on NexPoint's behalf with respect to the topics described in **Exhibit A** attached hereto on **October 20, 2021**, commencing at 9:30 a.m. Central Time or at such other day and time as the Plaintiff may agree in writing.  The deposition will be taken under oath before a notary public or other person authorized by law to administer oaths and will be visually recorded by video or otherwise.

The deposition will be taken remotely via an online platform due to the coronavirus pandemic such that no one will need to be in the same location as anyone else in order to participate in the deposition and by use of Interactive Realtime.  Parties who wish to participate in the deposition should contact **John A. Morris**, Pachulski Stang Ziehl & Jones LLP, at jmorris@pszjlaw.com **no fewer than 72 hours before the start of the deposition** for more information regarding participating in this deposition remotely.

Dated:  October 8, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ John A. Morris*
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**EXHIBIT A**

**DEFINITIONS**

1.        "Answer" means *Defendant NexPoint Advisors, L.P.'s Answer to Amended Complaint*, lodged in Adv. Proc. 21-03005 at Docket No. 64.

2.        "Communications" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) and includes all oral and written communications of any nature, type or kind including, but not limited to, any ESI (and any attachments thereto), Documents, telephone conversations, text messages, discussions, meetings, facsimiles, e-mails, pagers, memoranda, and any other medium through which any information is conveyed or transmitted.

3.        "Concerning" means and includes relating to, constituting, defining, evidencing, mentioning, containing, describing, discussing, embodying, reflecting, edifying, analyzing, stating, referring to, dealing with, or in any way pertaining to the subject matter.

4.        "Discovery Requests" means *Plaintiff's Requests for Admission, Interrogatories, and Requests for Production Directed to NexPoint Advisors, L.P.* served on Your counsel by e-mail on September 7, 2021.

5.        "Document" means and includes all written, recorded, transcribed or graphic matter of every nature, type and kind, however and by whoever produced, reproduced, disseminated or made.  This includes, but is not limited to, Communications, ESI, "writings" as defined by Rule 1001 of the Federal Rules of Evidence, copies or drafts, and any tangible or intangible thing or item that contains any information.  Any Document that contains any comment, notation, addition, insertion or marking of any type or kind which is not part of another Document, is to be considered a separate Document.

6.      "Note" shall have the meaning ascribed to that term in paragraph 21 of the the *Amended Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty*, filed by Highland at Adv. Pro. 21-03005, Docket No. 63.

7.      "You" or "Your" means NexPoint Advisors, L.P., and anyone authorized to act on its behalf.

### Rule 30(b)6) Topics

**Topic No. 1:**

Your Answer.

**Topic No. 2:**

Each Affirmative Defense asserted in Your Answer, including but not limited to all facts and circumstances, Communications, and Documents Concerning each Affirmative Defense. *See* Answer ¶¶ 80-86.

**Topic No. 3:**

The Note, including but not limited to (a) the negotiation of the Note, (b) the terms of the Note, (c) Communications Concerning the Note, (d) any payments of principal or interest made by You or on Your behalf with respect to the Note; (e) the use of the proceeds of the Note, (f) Your communications with Your outside auditors Concerning the Note and the obligations thereunder, and (g) all agreements Concerning the Note.

**Topic No. 4:**

Your responses to the Discovery Requests.

DOCS_NY:44182.4 36027/003

**Appx. 00847**

**EXHIBIT 48**

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03006 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

**PLAINTIFF'S AMENDED NOTICE OF RULE 30(b)(6) DEPOSITION
TO HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.**

**PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, made applicable herein pursuant to Rules 7030 and 9014 of the Federal Rules of Bankruptcy Procedure, Highland Capital Management, L.P. ("Highland"), the plaintiff in the above-referenced adversary proceeding in the above-captioned chapter 11 case, shall take the deposition of Highland Capital Management Services, Inc. ("HCMS") by the person(s) most qualified to testify on HCMS's behalf with respect to the topics described in **Exhibit A** attached hereto on **October 20, 2021**, commencing at 9:30 a.m. Central Time or at such other day and time as the Plaintiff may agree in writing.  The deposition will be taken under oath before a notary public or other person authorized by law to administer oaths and will be visually recorded by video or otherwise.

The deposition will be taken remotely via an online platform due to the coronavirus pandemic such that no one will need to be in the same location as anyone else in order to participate in the deposition and by use of Interactive Realtime.  Parties who wish to participate in the deposition should contact **John A. Morris**, Pachulski Stang Ziehl & Jones LLP, at jmorris@pszjlaw.com **no fewer than 72 hours before the start of the deposition** for more information regarding participating in this deposition remotely.

Appx. 00850

Dated:  October 8, 2021.                **PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ John A. Morris*

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:     jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**EXHIBIT A**

**DEFINITIONS**

1.      "Answer" means *Defendant Defendant Highland Capital Management Services, Inc.'s Answer to Amended Complaint*, lodged in Adv. Proc. 21-03006 at Docket No. 73.

2.      "Communications" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) and includes all oral and written communications of any nature, type or kind including, but not limited to, any ESI (and any attachments thereto), Documents, telephone conversations, text messages, discussions, meetings, facsimiles, e-mails, pagers, memoranda, and any other medium through which any information is conveyed or transmitted.

3.      "Concerning" means and includes relating to, constituting, defining, evidencing, mentioning, containing, describing, discussing, embodying, reflecting, edifying, analyzing, stating, referring to, dealing with, or in any way pertaining to the subject matter.

4.      "Discovery Requests" means *Plaintiff's Requests for Admission, Interrogatories, and Requests for Production Directed to Highland Capital Management Services, Inc.* served on Your counsel by e-mail on September 7, 2021.

5.      "Document" means and includes all written, recorded, transcribed or graphic matter of every nature, type and kind, however and by whoever produced, reproduced, disseminated or made.  This includes, but is not limited to, Communications, ESI, "writings" as defined by Rule 1001 of the Federal Rules of Evidence, copies or drafts, and any tangible or intangible thing or item that contains any information.  Any Document that contains any comment, notation, addition, insertion or marking of any type or kind which is not part of another Document, is to be considered a separate Document.

6.     "Demand Notes" shall have the meaning ascribed to that term in paragraph 24 of the the *Amended Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty*, filed by Highland at Adv. Pro. 21-03006, Docket No. 68.

7.     "You" or "Your" means Highland Capital Management Services, Inc., and anyone authorized to act on its behalf.

### Rule 30(b)6) Topics

**Topic No. 1:**

Your Answer.

**Topic No. 2:**

Each Affirmative Defense asserted in Your Answer, including but not limited to all facts and circumstances, Communications, and Documents Concerning each Affirmative Defense. *See* Answer ¶¶ 94-102.

**Topic No. 3:**

The Demand Notes, including but not limited to (a) the negotiation of the Demand Notes, (b) the terms of the Demand Notes, (c) Communications Concerning the Demand Notes, (d) any payments of principal or interest made by You or on Your behalf with respect to the Demand Notes; (e) the use of the proceeds of the Demand Notes, (f) Your communications with Your outside auditors Concerning the Demand Notes and the obligations thereunder, and (g) all agreements Concerning the Demand Notes.

**Topic No. 4:**

Your responses to the Discovery Requests.

2

**Appx. 00853**

# EXHIBIT 49

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03007 |
| | § | |
| HCRE PARTNERS LLC (N/K/A NEXPOINT REAL ESTATE PARTNERS LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § | |
| | § | |
| Defendants. | § § | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

**PLAINTIFF'S AMENDED NOTICE OF RULE 30(b)(6) DEPOSITION
TO HCRE PARTNERS LLC (N/K/A NEXPOINT REAL ESTATE PARTNERS, LLC).**

      **PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, made applicable herein pursuant to Rules 7030 and 9014 of the Federal Rules of Bankruptcy Procedure, Highland Capital Management, L.P. ("Highland"), the plaintiff in the above-referenced adversary proceeding in the above-captioned chapter 11 case, shall take the deposition of HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) ("HCRE") by the person(s) most qualified to testify on HCRE's behalf with respect to the topics described in **Exhibit A** attached hereto on **October 20, 2021**, commencing at 9:30 a.m. Central Time or at such other day and time as the Plaintiff may agree in writing.  The deposition will be taken under oath before a notary public or other person authorized by law to administer oaths and will be visually recorded by video or otherwise.

      The deposition will be taken remotely via an online platform due to the coronavirus pandemic such that no one will need to be in the same location as anyone else in order to participate in the deposition and by use of Interactive Realtime.  Parties who wish to participate in the deposition should contact **John A. Morris**, Pachulski Stang Ziehl & Jones LLP, at jmorris@pszjlaw.com **no fewer than 72 hours before the start of the deposition** for more information regarding participating in this deposition remotely.

Dated: October 8, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ John A. Morris*

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:     jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## EXHIBIT A

## DEFINITIONS

1. "<u>Answer</u>" means *Defendant HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)'s Answer to Amended Complaint*, lodged in Adv. Proc. 21-03007 at Docket No. 68.

2. "<u>Communications</u>" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) and includes all oral and written communications of any nature, type or kind including, but not limited to, any ESI (and any attachments thereto), Documents, telephone conversations, text messages, discussions, meetings, facsimiles, e-mails, pagers, memoranda, and any other medium through which any information is conveyed or transmitted.

3. "<u>Concerning</u>" means and includes relating to, constituting, defining, evidencing, mentioning, containing, describing, discussing, embodying, reflecting, edifying, analyzing, stating, referring to, dealing with, or in any way pertaining to the subject matter.

4. "<u>Discovery Requests</u>" means *Plaintiff's Requests for Admission, Interrogatories, and Requests for Production Directed to HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners LLC)* served on Your counsel by e-mail on September 7, 2021.

5. "<u>Document</u>" means and includes all written, recorded, transcribed or graphic matter of every nature, type and kind, however and by whoever produced, reproduced, disseminated or made. This includes, but is not limited to, Communications, ESI, "writings" as defined by Rule 1001 of the Federal Rules of Evidence, copies or drafts, and any tangible or intangible thing or item that contains any information. Any Document that contains any comment, notation, addition, insertion or marking of any type or kind which is not part of another Document, is to be considered a separate Document.

6.      "Demand Notes" shall have the meaning ascribed to that term in paragraph 24 of the the *Amended Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty*, filed by Highland at Adv. Pro. 21-03006, Docket No. 63.

7.      "You" or "Your" means HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC), and anyone authorized to act on its behalf.

### Rule 30(b)6) Topics

**Topic No. 1:**

Your Answer.

**Topic No. 2:**

Each Affirmative Defense asserted in Your Answer, including but not limited to all facts and circumstances, Communications, and Documents Concerning each Affirmative Defense.  *See* Answer ¶¶ 96-104.

**Topic No. 3:**

The Demand Notes, including but not limited to (a) the negotiation of the Demand Notes, (b) the terms of the Demand Notes, (c) Communications Concerning the Demand Notes, (d) any payments of principal or interest made by You or on Your behalf with respect to the Demand Notes; (e) the use of the proceeds of the Demand Notes, (f) Your communications with Your outside auditors Concerning the Demand Notes and the obligations thereunder; and (g) any agreements Concerning the Demand Notes.

**Topic No. 4:**

Your responses to the Discovery Requests.

DOCS_NY:44184.3 36027/003

**Appx. 00859**

# EXHIBIT 50

Appx. 00860

## James Dondero
## Compensation and Benefit Statement

Job Title: Partner
Department: Executive

**EARNINGS AND AWARDS**

| | |
|---|---|
| 2017 Base Salary (as of 12/31/17) | $2,500,024 |

2017 Other Awards
| | |
|---|---|
| 401(k) Match | $ 4,800 |
| Estimated 2017 Profit Sharing (will be contributed in 2018) | $ 20,250 |
| *Final profit sharing award subject to passing IRS mandated testing | |
| 2018 NXRT RSU Award | $1,550,250 |

- You have been granted 65,772 restricted stock units of NXRT for the 2017 performance year

| | |
|---|---|
| ***2017 Total Earnings and Awards*** | **$4,075,324** |

**HIGHLAND PAID BENEFITS**

| | |
|---|---|
| Medical & Dental Insurance | $ 14,134 |
| Life, AD&D and Disability Insurance | $   968 |
| Executive Long Term Disability | $ 1,260 |
| Daily Catered Lunches | $ 3,000 |
| Parking | $ 2,160 |
| Cell Phone | $ 1,680 |

| | |
|---|---|
| ***2017 Estimated Total Value of Highland Paid Benefits*** | **$ 23,203** |

| | |
|---|---|
| **TOTAL COMPENSATION PACKAGE** | **$4,098,527** |

HIGHLY CONFIDENTIAL

# EXHIBIT 51

**James Dondero**
**Compensation and Benefit Statement**

Job Title: Partner
Department: Executive

| EARNINGS AND AWARDS | |
|---|---|

| | |
|---|---|
| 2018 Base Salary (as of 12/31/18) | $2,500,000 |

| | |
|---|---|
| 2018 Other Awards | |
| 401(k) Match | $ 4,800 |
| Estimated 2018 Profit Sharing (will be contributed in 2019) | $ 20,625 |
| *Final profit sharing award subject to passing IRS mandated testing | |
| 2019 NXRT RSU Award | $1,669,500 |
| • You have been granted 44,520 restricted stock units of NXRT for the 2018 performance year | |

| *2018 Total Earnings and Awards* | **$4,194,925** |
|---|---|

| HIGHLAND PAID BENEFITS | |
|---|---|
| Medical & Dental Insurance | $ 14,192 |
| Life, AD&D and Disability Insurance | $ 1,044 |
| Executive Long Term Disability | $ 1,260 |
| Daily Catered Lunches | $ 3,000 |
| Parking | $ 2,160 |
| Cell Phone | $ 1,680 |

| *2018 Estimated Total Value of Highland Paid Benefits* | **$ 23,336** |
|---|---|

| TOTAL COMPENSATION PACKAGE | $4,218,262 |
|---|---|

HIGHLY CONFIDENTIAL

**EXHIBIT 52**

## James Dondero
## Compensation and Benefit Statement

Job Title: Partner
Department: Executive

### EARNINGS AND AWARDS

| | |
|---|---|
| 2019 Base Salary (as of 12/31/19) | $2,500,000 |
| | |
| 2019 Other Awards | |
| 401(k) Match | $ 5,000 |
| Estimated 2019 Profit Sharing (will be contributed in 2020) | $ 21,000 |
| *Final profit sharing award subject to passing IRS mandated testing | |
| 2019 Deferred Compensation Award | $5,608,500 |
| • $2,465,000 grant amount in NXRT; 5-year vesting period | |
| • $850,500 grant amount in NREF; 4-year vesting period | |
| • $1,771,000 grant amount in VineBrook; 4-year vesting period | |
| ***2019 Total Earnings and Awards*** | **$8,134,500** |

### HIGHLAND PAID BENEFITS

| | |
|---|---|
| Medical & Dental Insurance | $ 14,417 |
| Life, AD&D and Disability Insurance | $ 1,044 |
| Executive Long Term Disability | $ 1,260 |
| Daily Catered Lunches | $ 3,000 |
| Parking | $ 2,160 |
| Cell Phone | $ 1,680 |
| ***2019 Estimated Total Value of Highland Paid Benefits*** | **$ 23,562** |

### TOTAL COMPENSATION PACKAGE | $8,158,062

HIGHLY CONFIDENTIAL

# EXHIBIT 53

**From:** David Klos
**Sent:** Thursday, May 02, 2019 3:54 PM
**To:** Blair Roeber <BRoeber@HighlandCapital.com>
**Cc:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** FW: Calc

$2,398,842 – Please send to GAF asap per Frank.

**From:** Frank Waterhouse
**Sent:** Thursday, May 2, 2019 2:23 PM
**To:** David Klos ; Kristin Hendrix
**Subject:** FW: Calc

Here is the support for the payment to GAF from HCMFA. As soon as I hear from Thomas I will let you know.

**From:** Will Mabry <WMabry@HighlandCapital.com>
**Sent:** Thursday, May 2, 2019 2:18 PM
**To:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Cc:** Clifford Stoops <CStoops@HighlandCapital.com>
**Subject:** RE: Calc

It's available now. The amount is per the response $2,398,842 calc. Support attached.

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Sent:** Thursday, May 2, 2019 2:15 PM
**To:** Will Mabry <WMabry@HighlandCapital.com>
**Cc:** Clifford Stoops <CStoops@HighlandCapital.com>
**Subject:** Calc

Will-

Do you have an eta of when you will have?

Thanks
Frank

**FRANK WATERHOUSE | PARTNER & CHIEF FINANCIAL OFFICER**

1

D-CNL003768

**Appx. 00867**



300 Crescent Court | Suite 700 | Dallas, Texas 75201
O: 972.419.2538 | F: 972.628.4147
fwaterhouse@highlandcapital.com | www.highlandcapital.com

D-CNL003769
**Appx. 00868**

**Numerical summary as set forth in the 4/7/19 amended memorandum of TerreStar Equity NAV Error**

|  | Transaction Date(s) | Loss to Fund | Estimated Loss to Shareholders [3] | Totals |
|---|---|---|---|---|
| Estimated Net Loss | 3/14/18 thru 1/7/19 | (6,068,851) | (1,373,272) | (7,442,123) |
| Processing, Fees, Interest | 3/14/18 thru 1/7/19 | (375,000) | - | (375,000) |
| Insurance Proceeds | 2/15/2019 | 3,566,248 | 1,373,272 | 4,939,520 |
| Insurance deductible paid by Adviser | 2/15/2019 | 246,976 | - | 246,976 |
| Management fee offset | 4/1/2019 | 47,000 | - | 47,000 |
| Additional payment from Adviser | 5/2/2019 | 2,339,627 [2] | - | 2,339,627 |
| Reimbursement of Processing costs from Adviser | Note 1 | 244,000 | - | 244,000 |
| Total |  | - | - | - |

**Supplemental Numerical Update**

|  |  |  |
|---|---|---|
| Additional estimated loss to fund and shareholders | 1/8/19 thru 1/28/19 [5] | (19,789) |
| Additional processing, management fees, and interest | Note 4 | (39,426) |
| Additional payment from Adviser | 5/2/2019 | 59,215 |
| **Total additional payment from Adviser** | **5/2/2019** | **2,398,842** |

**Notes**

1 - Expected to be incurred thru 12/31/19, and will be reimbursed by Adviser as incurred.

2 - Includes $2,255,628 of previously outstanding balance, and $84,000 of interest calculated through 1/7/19, which was the "as of date" used for the calculations in the OCA submission.

3 - Represents the estimated losses to shareholder subscribing into the fund during the NAV Restatement Period and estimated losses to be determined after reprocessing individual capital activity that was held in Omnibus accounts.

4 - Proposal from service provider was higher than original estimate, and includes interest thru date of final payment made by Adviser.

5 - This includes the calculations subsequent to 1/7/19 (which was the "as of date" used for the calculations in the OCA submission) "through date" 1/28/19, which the final date in which the revised mark was fully reflected in the NAV.

D-CNL003770

# EXHIBIT 54

**From:** Kristin Hendrix
**Sent:** Thursday, May 02, 2019 12:33 PM
**To:** Hayley Eliason <HEliason@HighlandCapital.com>; Blair Roeber <BRoeber@HighlandCapital.com>
**Subject:** FW: HCMLP to HCMFA loan

Blair,

Here is a copy of the note for support.

Hayley – FYI for your loan tracker.

**From:** David Klos
**Sent:** Thursday, May 02, 2019 11:24 AM
**To:** Corporate Accounting
**Subject:** HCMLP to HCMFA loan

Blair,
Please send $2,400,000 from HCMLP to HCMFA. This is a new interco loan. Kristin, can you or Hayley please prep a note for execution. I'll have further instructions later today, but please process this payment as soon as possible.

**DAVID KLOS | CONTROLLER**



300 Crescent Court | Suite 700 | Dallas, Texas 75201
C: 214.674.2926 | O: 972.419.4478 | F: 972 628.4147
dklos@highlandcapital.com | www.highlandcapital.com

1

D-CNL003777

**Appx. 00871**

# PROMISSORY NOTE

$2,400,000.00                                                                                     May 2, 2019

      FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("**_Maker_**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("**_Payee_**"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION FOUR HUNDRED THOUSAND and 00/100 Dollars ($2,400,000.00), together with interest, on the terms set forth below (the "**_Note_**"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

      1.   <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "**_applicable federal rate_**" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

      2.   <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand.

      3.   <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      4.   <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

      5.   <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

      6.   <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

FRANK WATERHOUSE

2

D-CNL003779

**Appx. 00873**

# EXHIBIT 55

### 5/2/2019 Wires

|  |  |  | Description | Notes |
|---|---|---|---|---|
| **HCM** |  |  |  |  |
| HCMFA | USD | 2,400,000.00 | Loan |  |
| Siepe Services | USD | 187,856.26 | March |  |
| HCM *513 | USD | 123,842.97 | May 2019 BCBS |  |
| Select | USD | 100,000.00 | Margin Call |  |
| CDW | USD | 4,145.57 |  |  |
| CT Corp | USD | 1,077.75 |  |  |
|  |  |  |  |  |
| **HCMFA** |  |  |  |  |
| Highland Opp Credit Fund | USD | 27,694.31 |  |  |
| HCM *513 | USD | 19,968.45 | May 2019 BCBS |  |
| Highland Merger Arb | USD | 18,494.04 | April 2019 Advisory Fees |  |
| Highland Tax Exempt | USD | 12,783.25 |  |  |
| Morgan Stanley | USD | 11,107.39 |  |  |
| Highland MLP Fund | USD | 10,354.06 |  |  |
| Wells Fargo | USD | 7,814.20 |  |  |
| Pershing | USD | 5,719.83 |  |  |
| Highland Commissions DDA | USD | 5,000.00 | DST Daily Commissions Debit Account Funding |  |
| Financial Data Services | USD | 277.66 |  |  |

D-CNL003772

**Appx. 00875**

# EXHIBIT 56

**From:** Kristin Hendrix
**Sent:** Friday, May 03, 2019 3:06 PM
**To:** Corporate Accounting <CorporateAccounting@hcmlp.com>
**Subject:** HCMLP Loan to HCMFA

Blair,

Please set up a wire from HCMLP to HCMFA for $5M as a new loan ($4.4M should be coming in from Jim soon).

Hayley, please add this to your loan tracker. I will paper the loan.

Thanks,

Kristin Hendrix, CPA | Manager, Corporate Accounting



300 Crescent Court | Suite 700 | Dallas, Texas 75201
O: 972.628.4127 | F: 972.628.4147
khendrix@highlandcapital.com | www.highlandcapital.com



D-CNL003763

**Appx. 00877**

# EXHIBIT 57

# PROMISSORY NOTE

$5,000,000.00                                                                                          May 3, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of FIVE MILLION and 00/100 Dollars ($5,000,000.00), together with interest, on the terms set forth below (the "**Note**"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      Interest Rate.   The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.      Payment of Principal and Interest.   The accrued interest and principal of this Note shall be due and payable on demand.

3.      Prepayment Allowed; Renegotiation Discretionary.   Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      Acceleration Upon Default.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.      Waiver.   Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.      Attorneys' Fees.   If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

FRANK WATERHOUSE

D-CNL003765

**Appx. 00880**

# EXHIBIT 58

Highland Capital Management, L.P. - Cash

**Highland Capital Management, L.P. - Cash**
Next 13 Weeks Commencing December 14, 2020
*(in thousands)*
CONFIDENTIAL DRAFT FOR ILLUSTRATIVE PURPOSES ONLY - NOT FINAL OR APPROVED FOR FURTHER DISTRIBUTION

|  | Actual | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week beginning** | 12/7 | 12/14 | 12/21 | 12/28 | 1/4 | 1/11 | 1/18 | 1/25 | 2/1 | 2/8 | 2/15 | 2/22 | 3/1 | 3/8 |
| **Beginning unrestricted operating cash** | $ 12,537 | $ 11,948 | $ 10,684 | $ 11,051 | $ 11,771 | $ 11,048 | $ 11,188 | $ 11,353 | $ 10,486 | $ 11,445 | $ 10,860 | $ 10,279 | $ 8,145 | 8,381 |
| **Operating Receipts** | | | | | | | | | | | | | | |
| Management fees | | | | | | | | | | | | | | |
| CLOs | - | - | - | - | - | - | - | - | - | 676 | - | - | - | - |
| Hedge funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Private Equity, PetroCap, Port Co's | - | - | - | - | 63 | - | - | - | - | - | - | 270 | - | - |
| Separate accounts | - | - | 776 | - | - | - | - | 750 | 165 | - | 579 | - | - | - |
| Management fees - managed funds | $ - | $ - | $ 776 | $ - | $ 63 | $ - | $ - | $ 750 | $ 841 | $ - | $ 849 | $ - | $ - | - |
| HCMFA / NPA investment support | - | - | 668 | - | - | 668 | - | - | 668 | - | - | - | 668 | - |
| Shared services receipts | 39 | - | 168 | 385 | - | 168 | 290 | 135 | - | 290 | 60 | 15 | - | - |
| Intercompany and shared services revenue | 39 | $ - | $ 836 | $ 385 | $ - | $ 836 | $ 290 | $ 135 | $ 668 | $ 290 | $ 60 | $ 15 | $ 668 | - |
| Fund reimbursements | - | - | 60 | - | - | - | 100 | - | - | - | 100 | - | - | - |
| Interest receipts on notes receivable | - | - | - | 2,051 | - | - | - | - | - | - | - | - | - | - |
| Dividend receipts (unencumbered) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other miscellaneous receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total other receipts | $ - | $ - | $ 60 | $ 2,051 | $ - | $ - | $ 100 | $ - | $ - | $ - | $ 100 | $ - | $ - | - |
| **Total operating receipts** | $ 39 | $ - | $ 1,672 | $ 2,436 | $ 63 | $ 836 | $ 390 | $ 885 | $ 1,509 | $ 290 | $ 1,009 | $ 15 | $ 668 | - |
| **Compensation and benefits** | | | | | | | | | | | | | | |
| Payroll, benefits, and taxes + exp reimb | (408) | (31) | - | (556) | - | (471) | - | (561) | - | (535) | - | (625) | - | (460) |
| Cash bonuses | - | - | - | - | - | - | - | - | - | - | - | (3,394) | - | - |
| **Total compensation and benefits** | $ (408) | $ (31) | $ - | $ (556) | $ - | $ (471) | $ - | $ (561) | $ - | $ (535) | $ - | $ (4,019) | $ - | (460) |
| **General overhead** | | | | | | | | | | | | | | |
| Outside legal (ordinary course) | (62) | - | (499) | - | (560) | - | - | (560) | - | - | - | (560) | - | - |
| Independent director fees | - | - | - | (210) | - | - | - | - | (210) | - | - | - | (210) | - |
| General overhead - critical vendors (pre-petition) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| General overhead - post-petition vendors | (158) | (1,233) | (275) | (275) | (225) | (225) | (225) | (225) | (340) | (340) | (340) | (340) | (222) | (222) |
| **Total general overhead** | $ (220) | $ (1,233) | $ (774) | $ (485) | $ (785) | $ (225) | $ (225) | $ (785) | $ (550) | $ (340) | $ (340) | $ (900) | $ (432) | (222) |
| **Net change in cash due to operating activity** | **(589)** | **(1,264)** | **898** | **1,395** | **(723)** | **140** | **165** | **(461)** | **959** | **(585)** | **669** | **(4,904)** | **236** | **(682)** |
| **Re-org related - payments direct to professionals** | | | | | | | | | | | | | | |
| Debtor bankruptcy counsel | - | - | - | (300) | - | - | - | (720) | - | - | - | (720) | - | - |
| Debtor FA/CRO | - | - | - | - | - | - | - | (300) | - | - | - | (300) | - | - |
| Compensation consultant | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Committee counsel | - | - | (359) | (339) | - | - | - | (600) | - | - | - | (600) | - | - |
| Committee FA | - | - | (172) | (138) | - | - | - | (480) | - | - | - | (480) | - | - |
| Claims / noticing agent | - | - | - | - | - | - | - | (30) | - | - | - | (30) | - | - |
| Regulatory & compliance counsel | - | - | - | (100) | - | - | - | (100) | - | - | - | (100) | - | - |
| Mediation | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| US Trustee | - | - | - | - | - | - | - | (175) | - | - | - | - | - | - |
| **Total re-org related** | $ - | $ - | $ (531) | $ (877) | $ - | $ - | $ - | $ (2,405) | $ - | $ - | $ - | $ (2,230) | $ - | - |
| **Net change in cash from ops + reorg costs** | **(589)** | **(1,264)** | **367** | **518** | **(723)** | **140** | **165** | **(2,866)** | **959** | **(585)** | **669** | **(7,134)** | **236** | **(682)** |
| **Investing cash flows (principal only on notes)** | | | | | | | | | | | | | | |
| Jefferies prime brokerage, net or Select Equity Fund funding | - | - | - | - | - | - | - | 2,000 | - | - | 5,000 | - | - | - |
| Third party fund capital call obligations | - | - | - | - | - | - | - | - | - | - | (1,650) | - | - | - |
| Third party fund expected distributions | - | - | - | - | - | - | - | - | - | - | 400 | - | - | - |
| Highland Capital Management Korea (capital call funding) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Multi Strategy Credit Fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Highland Capital Management Latin America | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Proceeds from outstanding notes | - | - | - | 202 | - | - | - | - | - | - | - | - | - | - |
| Divs, paydowns, misc from non-PB assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Purchases of other investments (non-PB) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Proceeds from other investments (non-PB) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net change in cash due to investing activities** | **-** | **-** | **-** | **202** | **-** | **-** | **-** | **2,000** | **-** | **-** | **(1,250)** | **5,000** | **-** | **-** |
| **Financing cash flows** | | | | | | | | | | | | | | |
| Required equity distributions | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Equity contributions | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Existing debt paydowns | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net change in cash due to financing activities** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Ending unrestricted operating cash** | $ 11,948 | $ 10,684 | $ 11,051 | $ 11,771 | $ 11,048 | $ 11,188 | $ 11,353 | $ 10,486 | $ 11,445 | $ 10,860 | $ 10,279 | $ 8,145 | $ 8,381 | 7,699 |

D-CNL003810
**Appx. 00882**

# EXHIBIT 59

 

| | |
|---|---|
| **TO:** | Board of Trustees or Board of Directors (as the case may be) (collectively, the "Board") of Highland Funds I, Highland Funds II, Highland Income Fund, Highland Global Allocation Fund, NexPoint Strategic Opportunities Fund, NexPoint Real Estate Strategies Fund and NexPoint Capital, Inc. |
| **FROM:** | Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. and NexPoint Securities, Inc. |
| **RE:** | Supplemental 15(c) Information Request |
| **DATE:** | October 23, 2020 |

Pursuant to your supplemental request dated October 2, 2020, Highland Capital Management Fund Advisors, L.P. ("HCMFA"), NexPoint Advisors, L.P. ("NexPoint", and with HCMFA, each, an "Adviser", and together, the "Advisers") and NexPoint Securities, Inc. ("NSI" the "Distributor") submit the following supplemental information to the Board in order to assist the Board in fulfilling its obligations under Section 15(c) of the Investment Company Act of 1940, as amended (the "1940 Act"), and to assist in the Board's consideration of the investment advisory, and other contractual arrangements, for the funds listed on Appendix A (each, a "Fund" and, collectively, the "Funds"). References to the 2020 15(c) Response dated August 13, 2020 and the supplemental response dated September 17-18, 2020 are referred to as the "2020 15(c) Response" and "2020 Supplemental 15(c) Response", respectively.

Your requests have been noted below, each of which is followed by our response. Unless otherwise specified, reference documents are located on Director's Desk at the following location: Home > Documents > Corporate Documents > 15c Reference Documents.

**A.**     *Nature, Extent and Quality of Services*

1.     Please provide, to the extent practicable, the contingency plans with respect to the services provided under the Shared Services Agreements in the event that the outcome of the HCMLP bankruptcy proceedings were to impact the current servicing structure. For example, has the Advisers considered any outside service providers if necessary?

    **Response**: As a result of the Highland Capital Management, L.P. ("HCMLP") bankruptcy, NexPoint's senior management's plan as a backup/contingency plan is to extend employment offers to the vast majority of HCMLP's employees by December 31, 2020. This will help ensure that there is no disruption in services to the Funds. Once we have further details of this we will advise. In the interim, the plan is to continue with existing shared services.

    Representatives of HCMLP and NexPoint will be available to discuss the structure of these contingency plans, relevant employees, and communications

to current employees regarding these matters. Representatives of HCMLP and NexPoint are working to facilitate the shared use of and/or transfer of services such as the intranet, shared computer drives, and third-party contracts.

2.  Are there any material outstanding amounts currently payable or due in the future (*e.g.*, notes) to HLCMLP by HCMFA or NexPoint Advisors or any other affiliate that provide services to the Funds?

    **Response**: As of June 30, 2020, $23,683,000 remains outstanding to HCMLP and its affiliates from NexPoint and $12,286,000 remains outstanding to HCMLP from HCMFA. The Note between HCMLP and NexPoint comes due on December 31, 2047. The earliest the Note between HCMLP and HCMFA could come due is in May 2021. All amounts owed by each of NexPoint and HCMFA pursuant to the shared services arrangement with HCMLP have been paid as of the date of this letter. The Adviser notes that both entities have the full faith and support of James Dondero.

3.  The Board notes the provision of the updated list of current co-investments provided by HCMFA/NexPoint Advisors and the Advisers' discussion, including the senior-level team in place, to address any potential conflicts of interest matters. With respect to the compliance function, please confirm that the Funds' Chief Compliance Officer overall will continue in his usual role with respect to the Funds. Are there any other potential conflicts outside of the specific co-investment matters identified?

    **Response**: The Advisers confirm that the Funds' Chief Compliance Officer overall will continue in his usual role with respect to the Funds. As of October 14, 2020, the Funds' Chief Compliance Officer is an employee of NexPoint. Please see <u>Exhibit A</u> for a list of current co-investments and cross-held positions where a future conflict may arise together with <u>Exhibit B</u> for the list of non-HCMLP employees available to assist the Board in any future conflicts.

**Exhibit A**

**Co-Investment Analysis**

HCMFAS 000027

Highland Capital Management, LP ("HCMLP")
Condensed Co-Investment Analysis
As of 9/30/20

Condensed Co-Investments [1]

| | Investment | HCMLP MV | Funds Managed by HCMLP MV | Retail Funds | Non-HCMLP Investment Coverage |
|---|---|---|---|---|---|
| 1 | Metro-Goldwyn-Mayer Inc. Class A Common Stock | $13,085,369 | $418,019,027 | $61,820,908 | Dondero |
| 2 | CCS Medical, Inc. (Chronic Care) Loan 1st Lien @ PRIME 7% 7/31/2021 | - | 121,166,994 | 47,510,599 | Dondero |
| 3 | TerreStar Corporation Term Loan A @ LIBOR 11% 2/28/2022 | - | 49,742,043 | 40,159,485 | Dondero |
| 4 | VST US Equity | - | 41,904,280 | 24,381,982 | Sowin |
| 5 | NXRT | 10,799,003 | 2,228,410 | 21,256,955 | McGraner |
| 6 | Grayson CLO, Ltd. Class II Preference Shares | - | 2,201,500 | 18,861,500 | Sowin |
| 7 | NHT/U CN | 2,028,793 | - | 18,524,594 | McGraner |
| 8 | NHF | 2,208,872 | 2,954,619 | 15,808,648 | Dondero |
| 9 | Advantage Sales & Marketing Inc. Term Loan (Second Lien) @ LIBOR 6.5% 7/25/2022 | - | 1,940,140 | 13,784,695 | Sowin |
| 10 | Procera Networks, Inc. (aka Sandvine Corp) Initial Term Loan (First Lien) @ LIBOR 4.5% 10/3 | - | 1,367,373 | 13,681,487 | Sowin |
| 11 | Gruden Acquisition, Inc. (aka Quality Distribution) ITL (First Lien) @ LIBOR 5.5% 8/18/2022 | - | 2,568,463 | 11,124,738 | Sowin |
| 12 | Westchester CLO, Ltd Class I Preference Shares 144A | - | 3,373,333 | 10,888,813 | Sowin |
| 13 | HRTX | - | 81,510 | 10,686,168 | Dondero |
| 14 | Vistra Energy Corp. (fka TCEH Corp.) TXU TRA rights | - | 3,494,825 | 10,476,054 | Sowin |
| 15 | American Banknote Common | 693,467 | - | 1,843,371 | Dondero |
| 16 | American Airlines Escrow | 154,650 | 630,365 | 1,444,839 | Dondero |
| 17 | Ginn LA Conduit Lender, Inc. 1st Lien A CL Deposit @ PRIME 4.5% 6/8/2011 | 68,860 | 812,716 | 846,955 | Sowin |
| 18 | TerreStar Corporation TL C @ LIBOR 11% 2/28/2022 | - | 25,418 | 553,282 | Dondero |
| 19 | CCS Medical, Inc. (Chronic Care) Common | - | 6,008 | 5,797 | Dondero |
| | Sub-Total | $29,039,013 | $652,517,024 | $323,660,869 | |

Additional HCMLP Ownership of Retail Funds (non-co-investments) [2]

| Investment | HCMLP MV | Retail Fund MV | Funds Managed by HCMLP MV |
|---|---|---|---|
| Highland Opportunistic Credit Fund (HNRZX) | $2,911,923 | - | - |
| NexPoint Real Estate Strategies Fund (NRSZX) | 663,982 | - | - |
| Sub-Total | $3,575,905 | $0 | $0 |

Footnote:
1 - Listing includes the following: 1) all investments held by both HCMLP and retail funds, regardless of materiality 2) investments for which retail funds hold $10 million or greater in the aggregate and are also held by funds advised by HCMLP 3) investments for which retail funds hold ownership less than $10 million in the aggregate, the position is private and fair valued, and are also held by funds advised by HCMLP.
2 - 'Additional HCMLP Ownership of Retail Funds' does not reflect other immaterial holdings of investments below $5,000.

HCMFAS 000028

**Highland Capital Management, LP ("HCMLP")**
**Co-Investment Analysis**
**As of 9/30/20**

### Co-Investments, excluding holdings with zero market value

| | Investment | HCMLP MV | Funds Managed by HCMLP MV | Retail Funds |
|---|---|---|---|---|
| 1 | Metro-Goldwyn-Mayer Inc. Class A Common Stock | $13,085,369 | $418,010,027 | $61,820,908 |
| 2 | CCS Medical, Inc. (Chronic Care) Loan 1st Lien @ PRIME 7% 7/31/2021 | - | 121,166,994 | 47,510,599 |
| 3 | TerreStar Corporation Term Loan A @ LIBOR 11% 2/28/2022 | - | 69,742,043 | 40,159,485 |
| 4 | VST US Equity | - | 41,904,280 | 24,381,982 |
| 5 | NXRT | 10,799,003 | 2,228,410 | 21,256,955 |
| 6 | Grayson CLO, Ltd. Class II Preference Shares | - | 2,201,500 | 18,861,500 |
| 7 | NHT/U CN | 2,028,793 | - | 18,524,594 |
| 8 | NHF | 2,208,872 | 2,954,619 | 15,808,648 |
| 9 | Advantage Sales & Marketing Inc. Term Loan (Second Lien) @ LIBOR 6.5% 7/25/2022 | - | 1,940,140 | 13,784,695 |
| 10 | Procera Networks, Inc. (aka Sandvine Corp) Initial Term Loan (First Lien) @ LIBOR 4.5% 10/31/2025 | - | 1,367,373 | 13,681,487 |
| 11 | Gruden Acquisition, Inc. (aka Quality Distribution) ITL (First Lien) @ LIBOR 5.5% 8/18/2022 | - | 2,568,463 | 11,124,738 |
| 12 | Westchester CLO, Ltd Class I Preference Shares 144A | - | 3,373,333 | 10,888,813 |
| 13 | HRTX | - | 81,510 | 10,686,168 |
| 14 | Vistra Energy Corp. (fka TCEH Corp.) TXU TRA rights | - | 3,494,825 | 10,476,054 |
| 15 | Traverse Midstream Partners LLC Advance @ LIBOR 5.5% 9/27/2024 | - | 25,916,705 | 9,945,051 |
| 16 | VM Consolidated, Inc. (fka Verifone Traffic Solutions) B-1 1st Lien Non-ext @ LIBOR 3.25% 2/28/2025 | - | 2,719,702 | 9,594,505 |
| 17 | Edelman Financial Center, LLC, The (fka Flight Debt Merger Sub Inc.) Initial Term Loan (Second Lien) @ LIBOR 6.75% 7/20/2026 | - | 125,340 | 9,078,334 |
| 18 | Forest City Enterprises, L.P. Replacement TL @ LIBOR 3.5% 12/8/2025 | - | 2,222,324 | 8,889,297 |
| 19 | Avaya Inc. B TL @ LIBOR 4.25% 12/15/2024 | - | 1,357,685 | 8,802,760 |
| 20 | MPMQ Appraisal Rights Claims | - | 527,460 | 8,224,455 |
| 21 | USS Ultimate Holdings, Inc. (aka United Site Services, Inc.) Initial Term Loan (First Lien) @ LIBOR 3.75% 8/25/2024 | - | 2,877,263 | 6,691,414 |
| 22 | PSC Industrial Holdings Corp. Term Loan (First Lien) @ LIBOR 3.75% 10/11/2024 | - | 3,685,775 | 6,511,970 |
| 23 | EnergySolutions, LLC (aka Envirocare of Utah, LLC) Initial Term Loan @ LIBOR 3.75% 5/9/2025 | - | 7,194,271 | 5,678,112 |
| 24 | Truck Hero, Inc. Initial TL 2nd Len @ LIBOR 8.25% 4/21/2025 | - | 645,557 | 5,561,471 |
| 25 | Envision Healthcare Corporation Initial Term Loan @ LIBOR 3.75% 10/10/2025 | - | 2,854,870 | 5,502,657 |
| 26 | AERI | - | 35,310 | 5,211,756 |
| 27 | MDPK 2014-15A Float - 01/2026 - DR - 55818WAG0 @ LIBOR 5.4400 1/27/2026 | - | 1,249,500 | 4,774,875 |
| 28 | Brentwood CLO Ltd Class II Preference Shares | - | 7,424,000 | 4,416,000 |
| 29 | Jo-Ann Stores, LLC Initial Loan @ LIBOR 5% 10/20/2023 | - | 2,354,854 | 4,384,100 |
| 30 | Advantage Sales & Marketing Inc. Initial Term Loan @ LIBOR 3.25% 7/23/2021 | - | 1,896,829 | 3,571,805 |
| 31 | Radnet Management, Inc. T B-1 L @ LIBOR 3.75% 6/30/2023 | - | 1,601,339 | 3,479,728 |
| 32 | Fort Dearborn Holding Company, Inc. Initial Term Loan (First Lien) @ LIBOR 4% 10/19/2023 | - | 1,394,305 | 3,406,180 |
| 33 | Sound Inpatient Physicians, Inc. Initial Term Loan (Second Lien) @ LIBOR 6.75% 6/26/2026 | - | 326,460 | 3,264,600 |
| 34 | Liberty CLO, Ltd. Preferred | - | 8,339,310 | 2,989,000 |
| 35 | UDFI | - | 1,291,306 | 2,801,645 |
| 36 | Auris Luxembourg III S.a r.l. Facility B2 @ LIBOR 3.75% 2/27/2026 | - | 1,891,886 | 2,364,858 |
| 37 | BIO | - | 171,133 | 2,319,570 |
| 38 | Dayco Products LLC - (Mark IV Industries, Inc.) Term Loan @ LIBOR 4.25% 5/19/2023 | - | 1,587,518 | 2,121,554 |
| 39 | Rockwall CDO, Ltd. Preferred Shares | - | 5,211,000 | 2,026,500 |
| 40 | AVYA | - | 30,877,250 | 1,911,598 |
| 41 | RWIC NOT LISTED | - | 579,000 | 1,852,800 |
| 42 | American Banknote Common | 693,467 | - | 1,843,371 |
| 43 | TCW 2019-2A D2A Float - 10/02032 - 87242BAS9 @ 4.89 10/20/2032 | - | 1,250,000 | 1,750,000 |
| 44 | Red River CLO, Ltd. Red River CLO | - | 3,797,722 | 1,744,900 |
| 45 | American Airlines Escrow | 154,650 | 630,365 | 1,444,839 |
| 46 | Refinitiv US Holdings Inc. (fka Financial & Risk US Holdings, Inc.) Initial Dollar Term Loan @ LIBOR 3.25% 10/1/2025 | - | 1,950,070 | 1,231,425 |
| 47 | Scientific Games International, Inc. Initial Term B-5 Loan @ LIBOR 2.75% 8/14/2024 | - | 3,715,025 | 1,213,050 |
| 48 | ACIS 2015-6A Zero Coupon - 05/2027 - SUB - 004524AD6 @ Zero Coupon 0.0000 5/1/2027 | - | 8,296,000 | 1,200,000 |
| 49 | CIFC 2015-5A DR Float - 10/02027 - 12550NAI7 @ 5.55 10/25/2027 | - | 1,109,375 | 1,158,325 |
| 50 | General Nutrition Centers, Inc. FILO Term Loan @ PRIME 8% 12/31/2022 | - | 487,190 | 1,148,178 |
| 51 | Change Healthcare Holdings, LLC closing date TL @ LIBOR 2.5% 3/1/2024 | - | 2,709,671 | 991,845 |
| 52 | CIFC 2016-1A D2R Float - 10/02031 - 17180TAW2 @ 4.43 10/21/2031 | - | 980,000 | 980,000 |
| 53 | TMO | - | 201,775 | 927,192 |
| 54 | ACIS 2015-6A Float - 05/2027 - D - 00452PAR8 @ LIBOR 3.7700 5/1/2027 | - | 1,810,000 | 905,000 |
| 55 | Edelman Financial Center, LLC, The (fka Flight Debt Merger Sub Inc.) Initial Term Loan (First Lien) @ LIBOR 3% 7/21/2025 | - | 3,329,415 | 903,218 |
| 56 | AHT1 2018-KEYS E Float - 05/02035 - 04410CAN0 @ 4.15 05/15/2035 | - | 695,663 | 850,255 |
| 57 | ABERD | - | 905,975 | 847,525 |
| 58 | Ginn LA Conduit Lender, Inc. 1st Lien A CL Deposit @ PRIME 4.5% 6/8/2011 | 68,860 | 812,716 | 846,955 |
| 59 | Bausch Health Companies Inc. (fka Valeant Pharmaceuticals International, Inc.) Initial Term Loan @ LIBOR 3% 6/2/2025 | - | 3,010,042 | 825,922 |
| 60 | CSC Holdings, LLC (fka CSC Holdings Inc. (Cablevision)) March 2017 Refinancing Term Loan @ LIBOR 2.25% 7/17/2025 | - | 1,142,030 | 824,572 |
| 61 | Hub International Limited Initial Term Loan @ LIBOR 3% 4/25/2025 | - | 1,270,064 | 819,121 |
| 62 | Nielsen Finance LLC (VNU, Inc.) Class B-4 Term Loan @ LIBOR 2% 10/4/2023 | - | 480,085 | 813,503 |
| 63 | PRTK | - | 100,626 | 757,508 |
| 64 | MPH Acquisition Holdings LLC Initial Term Loan @ LIBOR 2.75% 6/7/2023 | - | 3,767,027 | 739,421 |
| 65 | VICI Properties 1 LLC Term B Loan @ LIBOR 1.75% 12/20/2024 | - | 969,035 | 726,776 |
| 66 | McAfee, LLC Term B USD Loan @ LIBOR 3.75% 9/30/2024 | - | 1,469,387 | 722,848 |
| 67 | IRB Holding Corp. (aka Arby's / Buffalo Wild Wings) 2020 Replacement Term B Loan @ Libor 2.75% 2/5/2025 | - | 531,087 | 716,184 |
| 68 | Global Medical Response, Inc. (aka Air Medical) 2018 Term Loan @ LIBOR 3.25% 4/28/2022 | - | 969,179 | 699,346 |
| 69 | CityCenter Holdings, LLC Term B Loan @ LIBOR 2.25% 4/18/2024 | - | 344,250 | 694,346 |
| 70 | Missy Limited (aka Almonde/Tahoe, Finastra USA) Dollar Term Loan (First Lien) @ LIBOR 3.5% 6/13/2024 | - | 920,265 | 693,200 |
| 71 | Golden Nugget, Inc. (aka Landry's Inc.) TL @ LIBOR 2.5% 10/4/2023 | - | 383,374 | 671,846 |
| 72 | H.B. Fuller Company Commitment @ LIBOR 2% 10/20/2024 | - | 250,488 | 638,664 |
| 73 | Lightstone Holdco LLC Refinancing Term B Loan @ LIBOR 3.75% 1/30/2024 | - | 4,262,832 | 616,367 |
| 74 | ACHC | - | 73,700 | 589,600 |
| 75 | Crown Finance US, Inc. (aka Cineworld Group plc) Initial Dollar Tranche Term Loan @ LIBOR 2.5% 2/28/2025 | - | 11,999,814 | 572,658 |
| 76 | Calpine Corporation Term Loan (2015) @ LIBOR 2.25% 1/15/2024 | - | 375,085 | 567,158 |
| 77 | TerreStar Corporation TL C @ LIBOR 11% 2/28/2022 | - | 25,418 | 553,282 |
| 78 | TransDigm Inc. Tranche E Refinancing Term Loan @ LIBOR 2.25% 5/30/2025 | - | 6,149,465 | 542,437 |
| 79 | Tronox Finance LLC Initial Dollar Term Loan (First Lien) @ LIBOR 3% 9/23/2024 | - | 3,327,701 | 493,305 |
| 80 | Solera, LLC (Solera Finance, Inc.) Dollar TL @ LIBOR 2.75% 3/3/2023 | - | 446,555 | 490,314 |
| 81 | AlixPartners, LLP 2017 Refinancing Term Loan @ LIBOR 2.5% 4/4/2024 | - | 3,254,084 | 481,887 |
| 82 | iHeartCommunications, Inc. (fka Clear Channel Communications, Inc.) 6.375% - 05/2026 - 45174HBC0 FIX 6.375% 5/1/2026 | - | 1,446 | 482,002 |
| 83 | Fieldwood Energy LLC Closing date Loan (First Lien) @ LIBOR 5.25% 4/11/2022 | - | 10,941,771 | 479,396 |
| 84 | HLF 1X Floating - 08/2014 - C1 - 43037QAE9 @ LIBOR 0.0000 8/2/2018 | - | 318,583 | 477,874 |
| 85 | Ineos US Finance LLC New 2024 Dollar Term Loan @ LIBOR 2% 4/1/2024 | - | 2,131,748 | 474,805 |
| 86 | CGMS 2019-4A D Float - 01/02033 - 14317WAA6 @ 7.65 01/15/2033 | - | 930,500 | 465,250 |
| 87 | BJ's Wholesale Club, Inc. Tranche B Term Loan (First Lien) @ LIBOR 2% 2/3/2024 | - | 515,535 | 460,180 |
| 88 | Titan Acquisition Limited (aka Husky IMS International Ltd.) Initial Term Loan @ LIBOR 3% 3/28/2025 | - | 923,108 | 459,071 |
| 89 | Plantronics, Inc. Initial Term B Loan @ LIBOR 2.5% 7/2/2025 | - | 12,145,824 | 376,874 |
| 90 | SS&C Technologies Holdings, Inc. Term B-5 Loan @ LIBOR 2.25% 4/16/2025 | - | 952,120 | 264,538 |
| 91 | Berry Global, Inc. (fka Berry Plastics Corporation) Term W Loan @ LIBOR 2% 10/1/2022 | - | 339,055 | 248,184 |
| 92 | Applied Systems, Inc. Closing Date Term Loan (First Lien) @ LIBOR 3.25% 9/19/2024 | - | 1,693,433 | 245,795 |
| 93 | SolarWinds Holdings, Inc. 2018 Refinancing Term Loan (First Lien) @ LIBOR 2.75% 2/5/2024 | - | 956,532 | 243,383 |
| 94 | VAHA 2004-1A Variable - 08/2012 - 91914QAA4 @ Variable 0.0000 8/1/2012 | - | 375,000 | 225,000 |
| 95 | SRC | - | 1,212 | 220,219 |
| 96 | COLL | - | 62,398 | 166,456 |
| 97 | Texas Competitive Electric Holdings Company LLC (TXU) Escrow Loan Extended @ LIBOR 0% | - | 2,079 | 151,087 |
| 98 | AAMRQ escrow Common Stock | - | 57,400 | 123,000 |
| 99 | Tecton 9 PERP | - | 467,201 | 114,573 |
| 100 | ACRG/A/U CN | - | 41,887 | 111,422 |
| 101 | NRG | - | 26,498 | 83,767 |
| 102 | FGI Operating Company, LLC Common | - | 51,252 | 68,932 |
| 103 | Fieldwood Energy LLC Common1 | - | 15,420 | 56,288 |
| 104 | ACRG/B/U CN | - | 15,022 | 39,960 |
| 105 | Lightstone Holdco LLC Refinancing Term C Loan @ LIBOR 3.75% 1/30/2024 | - | 240,430 | 34,764 |
| 106 | SMTA (Delisted 01/02/2020) | - | 93,852 | 7,880 |
| 107 | CCS Medical, Inc. (Chronic Care) Common | - | 6,008 | 5,797 |
| | **Total** | **$29,039,013** | **$878,908,335** | **$495,707,848** |

### Additional HCMLP Ownership of Retail Funds (non-co-investments)[1]

| | Investment | HCMLP MV | Retail Fund MV | Funds Managed by HCMLP MV |
|---|---|---|---|---|
| | Highland Opportunistic Credit Fund (HNRZX) | $2,911,923 | - | - |
| | NexPoint Real Estate Strategies Fund (NRSZX) | 663,982 | - | - |
| | **Total** | **$3,575,905** | **0.00** | **$0** |

**Footnote:**
1 - 'Additional HCMLP Ownership of Retail Funds' does not reflect other immaterial holdings of investments below $5,000.

HCMFAS 000029
**Appx. 00888**

**Exhibit B**

**Non-HCMLP Employees**

| Name | Role | Current Title | Employed By |
|------|------|---------------|-------------|
| Jim Dondero | Senior Investment Team Member | Partner | NPA |
| Jason Post | Chief Compliance Officer | Chief Compliance Officer | NPA |
| Joe Sowin | Senior Investment Team Member | Co-CIO and Head of Global Equity Trading | HCMFA |
| Brad Heiss | Senior Investment Team Member | Managing Director | HCMFA |
| Matt McGraner | Senior Investment Team Member | Managing Director | NPA |
| Dustin Norris | Fund Officer/Liaison | Head of Distribution and Chief Product Strategist | NPA |
| DC Sauter | Legal | General Counsel | NPA |
| Eric Holt | Compliance | Chief Compliance Officer, Affiliated Broker Dealers | NSI |
| David Willmore | Accounting/Operations | Senior Manager, Real Estate Accounting | NXRT |
| Paul Richards | Valuation | Director, Real Estate | NPA |
| Jackie Graham | PR/Marketing | Investor Relations Manager | NPA |

| | |
|---|---|
| HCMFA | Highland Capital Management Fund Advisors, L.P. |
| NPA | NexPoint Advisors, L.P. |
| NSI | NexPoint Securities, Inc. |
| NXRT | NexPoint Residential Trust, Inc. |

.

CONFIDENTIAL

HCMFAS 000030

## Appendix A

**Open-End Funds**

Highland Funds I:

1. Highland Healthcare Opportunities Fund
2. Highland/iBoxx Senior Loan ETF
3. Highland Opportunistic Credit Fund (*in liquidation*)
4. Highland Merger Arbitrage Fund

Highland Funds II:

5. Highland Small-Cap Equity Fund
6. Highland Socially Responsible Equity Fund
7. Highland Fixed Income Fund (*sub-advised*)
8. Highland Total Return Fund (*sub-advised*)

**Closed-End Funds**

9. NexPoint Capital, Inc.
   a. BDC REIT Sub, LLC                              (*REIT Subsidiary*)
10. NexPoint Strategic Opportunities Fund
    a. NexPoint Real Estate Opportunities, LLC       (*REIT Subsidiary*)
    b. NexPoint Real Estate Capital, LLC             (*REIT Subsidiary*)
11. Highland Income Fund
    a. HFRO Sub, LLC                                 (*Credit Subsidiary*)
    b. NFRO REIT Sub, LLC                            (*REIT Subsidiary*)
12. Highland Global Allocation Fund
    a. GAF REIT, LLC                                 (*REIT Subsidiary*)

**Interval Funds:**

13. NexPoint Real Estate Strategies Fund
    a. NRESF REIT Sub, LLC                           (*REIT Subsidiary*)

CONFIDENTIAL

# EXHIBIT 60

**From:** Kristin Hendrix
**Sent:** Saturday, August 29, 2020 2:47 PM
**To:** Jim Dondero <JDondero@HighlandCapital.com>
**Cc:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Subject:** 7/31/2020 HCMLP Requests

Hi Jim,

Please see attached data you had requested for HCMLP.

- 7/31/2020 SOI
- 7/31/2020 affiliate notes
- Oct 2019 – July 2020 equity balances

Please let us know if you have any questions or need anything else.

Thanks,
Kristin

**Kristin Hendrix, CPA** | Assistant Controller



300 Crescent Court | Suite 700 | Dallas, Texas 75201
O: 972.628.4127 | F: 972.628.4147
khendrix@highlandcapital.com | www.highlandcapital.com

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

D-CNL003795

**Appx. 00892**

**Highland Capital Management, LP**
**Schedule of Investments, net**

| Fund | Ticker | 7/31/2020 FMV |
|------|--------|---------------|
| **INVESTMENTS, AT FAIR VALUE:** | | |
| **HEDGE FUNDS:** | | |
| Multi-Strategy Credit Fund [4] | | $ 7,026,019 |
| Highland Dynamic Income Fund | | - |
| Highland Select Equity Fund - Jefferies | | $ - |
| SUBTOTAL | | 7,026,019 |
| | | |
| **PRIVATE EQUITY FUNDS:** | | |
| Highland Select Equity Fund - PE [4] | | $ 95,472,589 |
| Restoration Capital Partners [4] | | 27,626,237 |
| Petrocap Partners II [1] | | 10,142,249 |
| Petrocap Partners III [1] | | 2,725,623 |
| Highland CLO Funding [1] | | 269,275 |
| SUBTOTAL | | 136,235,973 |
| | | |
| **CORPORATE SECURITIES - PUBLIC:** | | |
| Public securities - Jefferies account, net of borrow [3] | | 20,949,643 |
| NexPoint Hospitality Trust | NHT (TSX) | 4,458,885 |
| NexPoint Real Estate Strategies Fund (custodied at AST) | NRSZX | 225,302 |
| NexPoint Residental Trust (custodied at Maxim) | NXRT | - |
| NexPoint Strategic Opportunities Fund (custodied at Maxim) | NHF | - |
| Minerva Neuroscience Inc. | NERV | - |
| SUBTOTAL | | 25,633,830 |
| | | |
| **CORPORATE SECURITIES - PRIVATE/OTC:** | | |
| MGM Common Stock [2] | | 8,085,367 |
| JHT Holdings, Inc. Common | | 5,102,801 |
| Cornerstone Common | | 2,967,377 |
| NHT Holdco | | 2,069,886 |
| HE Capital Asante, LLC Loan C | | 1,215,531 |
| American Banknote Corp. | | 837,564 |
| Goldfield Ranch Realty Holdings, LLC Loan | | 832,048 |
| American Airlines Escrow | | 113,410 |
| BEA CBO | | 100,000 |
| Ginn LA Conduit Lender, Inc. 1st Lien | | 68,860 |
| Goldfield Ranch Realty Holdings, LLC Incremental TL | | 66,516 |
| Turtle Bay Units | | 56,934 |
| Progenics Pharmaceuticals Contingent Rights | | 42,560 |
| Carey International, Inc. Term Loan | | 268,095 |
| Romacorp Common Stock | | 120,796 |
| OmniMax International, Inc. Common | | 171 |
| SUBTOTAL | | 21,947,915 |
| | | |
| **OTHER:** | | |
| Little Terrell Land | | 398,450 |
| SUBTOTAL | | 398,450 |
| | | |
| **TOTAL INVESTMENTS, AT FAIR VALUE** | | $ 191,242,187 |
| | | |
| **SUBSIDIARIES:** | | |
| Highland Capital Management Korea Limited | | $ 968,322 |
| Maple Avenue Holdings | | 586,989 |
| Penant, Ltd. | | 417,366 |
| SUBTOTAL | | $ 1,972,678 |
| | | |
| **TOTAL INVESTMENTS** | | $ 193,214,865 |

[1] 7/31/20 FMV carried forward from 3/31/20, as that is the most recent available information
[2] MVs represents a value, net of $5.2mm Frontier borrow
[3] MV represents value of Jefferies account
[4] 7/31/20 FMV is as of 6/30/20, as that is the most recent available information

**HCMLP Equity**
**10/31/19 - 7/31/20**
**(all values in millions)**

| | |
|---|---|
| 10/31/19 | 399,573 |
| 11/30/19 | 411,674 |
| 12/31/19 | 349,812 |
| 1/31/20 | 347,150 |
| 2/29/20 | 323,569 |
| 3/31/20 | 181,954 |
| 4/30/20 | 182,351 |
| 5/31/20 | 195,713 |
| 6/30/20 | 199,105 |
| 7/31/20 | 247,665 |

**HCMLP Notes Receivable**
**As of 7/31/2020**

| | | |
|---|---:|---|
| NexPoint Advisors | $  23,846,944 | 30 yr Amort (issued 2017) |
| Dugaboy | 17,788,532 | 30 yr Amort (issued 2017) |
| Highland Capital Management Services | 6,677,529 | 30 yr Amort (issued 2017) |
| HCRE | 5,938,670 | 30 yr Amort (issued 2017) |
| Trussway | 1,004,993 | Due upon maturity -  11/1/2021 |
| SSP Holdings, LLC | 2,037,898 | Due upon maturity -  11/22/2022 |
| Siepe | 2,334,606 | Equity conversion option |
| Highland Capital Management Fund Advisors | 10,530,971 | Demand |
| James Dondero | 8,911,977 | Demand |
| Multi-Strategy Credit Fund | 1,269,000 | Demand |
| HCRE | 4,859,929 | Demand |
| Highland Select Equity Fund | 3,000,000 | Demand |
| Highland Capital Management Korea | 3,760,000 | Due upon maturity -  4/21/2037 |
| Highland Capital Management Services | 934,331 | Demand |
| **Total Notes Receivable** | **$     92,895,380** | |

**Demand**                                       29,506,208