# EXHIBIT 201

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Maxim B. Litvak (Texas Bar No. 24002482)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | § | |
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | § | |

## MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES"

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

OCS_NY:40032.1 36027/002

The above-captioned debtor and debtor-in-possession (the "Debtor") files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, authorizing, but not directing, the Debtor, or its relying adviser, as appropriate, to cause the distribution of assets, in the ordinary course of its business, to certain Related Entities that have invested in Dynamic, AROF, and RCP (each as defined below).  In support of this Motion, the Debtor respectfully states as follows:

### Jurisdiction and Venue

1.      The United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court"), has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested in this Motion are sections 105(a) and 363 of the Bankruptcy Code.

### Summary of Relief Requested

4.      In this Motion, the Debtor, through its Independent Board (defined below), seeks this Court's authorization, indeed its direction, to meet its obligations to the funds managed by the Debtor.  These obligations exist under contract and according to applicable law.  In the ordinary course of its business, the Debtor is routinely called upon to liquidate or wind down the assets held by the funds under its direct or indirect management and then to distribute the proceeds of such liquidations to the investors in the funds.  Normally, these obligations – that is to liquidate and distribute – are neither disputed nor controversial.

5.      And yet, because of the history of this case, one of these duties – that is the duty to distribute – is now contested.  The Committee (defined below) has voiced no objection to

the liquidation of the assets subject to this Motion, but it does object to certain of the distributions. The Committee says that any distributions to James Dondero, Mark Okada, or any entities related to them should be withheld. The Debtor understands the reasons for the Committee's objection, but not the legal basis for it.

6. Everyone would agree that the Independent Board must act in accordance with the law in fulfilling its obligations to the Debtor's estate. That means dealing with creditors in the manner prescribed by Bankruptcy Code. The Independent Board takes its obligations under the Bankruptcy Code seriously. But, the Independent Board takes just as seriously its obligations to the funds managed by the Debtor. The Debtor is no more free to unilaterally change the obligations it has to those funds under their operative documents and applicable law – especially considering that many of the investors in those funds are complete strangers to this case – than it is to unilaterally modify its obligations to creditors under the Bankruptcy Code. This is so even if some creditors view some of the Debtor's investors as suspicious or unworthy.

7. The Debtor asks this Court to affirm that in the absence of specific injunctive relief entered by this Court or any other court of appropriate jurisdiction, the Debtor must fulfill its obligations under contract and according to applicable law.

## **Background**

8. On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

9. On October 29, 2019, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

DOCS_NY:40032.1 36027/002

10.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's Bankruptcy Case to this Court [Docket No. 186].[2]

11.     On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion").  This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

12.     The Settlement Order approved, among other things, certain operating and reporting protocols [Docket Nos. 354, 466] (as amended, the "Protocols"), which, in certain circumstances, require the Debtor to seek the approval of its Chief Restructuring Officer[3] and/or the Committee prior to engaging in "Transactions" (as defined in the Protocols).

13.     In connection with the Settlement Order, an independent board of directors was appointed on January 9, 2020, at the Debtor's general partner, Strand Advisors, Inc. (the "Independent Board")

14.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

---

[2] All docket numbers refer to the docket maintained by this Court.

[3] The Debtor's retention of Development Specialists, Inc. as the Debtor's Chief Restructuring Officer (the "CRO") was approved by this Court on January 10, 2020 [Docket No. 342].

## Background to the Relief Requested

### A.    The Debtor's Business Generally

15.    On October 29, 2019, the Debtor filed that certain *Precautionary Motion of the Debtor for Order Approving Protocols for the Debtor to Implement Certain Transactions in the Ordinary Course of Business* [Docket No. 76] (the "Precautionary Motion").  As described in the Precautionary Motion, the Debtor, as a registered investment adviser, provides in the ordinary course of its business, investment management services to its clients, which include, among others, hedge funds and private equity style funds.

16.    Hedge funds and private equity style funds are types of pooled investment vehicles in which third-party investors subscribe for equity interests.  These funds are governed by a board of directors or general partner, depending on the corporate form of the fund entity, and retain an investment manager pursuant to an investment management agreement to oversee their investments.  The fund itself, and the relationship of the investors in the fund, is governed by a contractual governing document (e.g., a limited partnership agreement or articles of association), and the board of directors or the general partner, as applicable – as well as the investment manager – have fiduciary obligations to the fund entity.  Further, while the investment manager may have investment discretion under the investment management agreement, the investment manager is also required to comply with the terms of the fund's contractual governing documents, including the investment management agreement, and the investment manager has fiduciary and other obligations imposed on the investment manager by applicable law, including, the Advisers Act. These types of funds are also often organized as two-tiered structures with a single "master" fund that trades and holds the fund's investment portfolio and multiple "feeder funds" that invest in the master fund.

DOCS_NY:40032.1 36027/002

**Appx. 03264**

17.     Investors in a hedge fund generally can redeem their interests in the fund on periodic redemption dates.  Redemptions occur in the ordinary course for all hedge funds, and hedge funds manage their liquidity on an ongoing basis, by selling assets to satisfy these investor redemptions in the ordinary course.  Similarly, upon a determination by a hedge fund's governing body that the fund should be liquidated, the fund sells its remaining portfolio holdings in an orderly manner and distributes the proceeds to its investors.  Common reasons for a hedge fund to liquidate include, among other things, the fund no longer being viable as a result of significant investor redemptions.

18.     Private equity style funds, on the other hand, generally have a set term after which they are required to liquidate and distribute their assets to their investors (although they may under certain circumstances be wound down prior to the expiration of their term).  Further, investors in private equity style funds are generally not permitted to redeem their interests or withdraw their capital from the fund.  The term of a private equity style fund may, subject to the fund's governing documents, be extendable.

## B.     Distributions from Dynamic, AROF, and RCP

### *Dynamic Distribution and AROF Distribution*

19.     The Debtor manages (a) Highland Dynamic Income Fund, L.P., a Delaware limited partnership, (b) Highland Dynamic Income Fund, Ltd., a Cayman Islands exempted company, and (c) Highland Dynamic Income Master Fund, L.P., a Cayman Islands exempted limited partnership (collectively, "Dynamic").  Dynamic consists of three entities: a "master fund" (which is a Cayman exempted limited partnership) owned by two "feeder funds" (one being a Delaware limited partnership and the other being a Cayman Islands exempted company).[4]  The

---

[4] The documents governing Dynamic are (i) the Amended and Restated Limited Partnership Agreement of Highland Dynamic Income Fund, L.P., dated April 1, 2018; (ii) the Amended and Restated Memorandum and Articles of

DOCS_NY:40032.1 36027/002

master funds and the Delaware feeder funds are managed by their applicable general partner, which in each case is a wholly-owned affiliate of the Debtor. The Cayman feeder fund is governed by a board consisting of an employee of the Debtor. The Debtor's direct relationship with each of the three Dynamic entities is governed by an investment management agreement under which the Debtor serves as investment adviser to such entities. Accordingly, Dynamic is an investment advisory client of the Debtor. An organizational chart for Dynamic is attached hereto as **Exhibit B**.

20. Highland Capital Management Latin America, L.P. ("HCM Latin America"), which is an indirect wholly owned subsidiary of the Debtor that is registered as a relying adviser of the Debtor, manages (a) Highland Argentina Regional Opportunity Fund, L.P., a Delaware limited partnership, (b) Highland Argentina Regional Opportunity Fund, Ltd., a Cayman Islands exempted company, and (c) Highland Argentina Regional Opportunity Master Fund, L.P., a Cayman Islands exempted limited partnership (collectively, "AROF"). The Debtor has entered into a services agreement pursuant to which the Debtor provides certain back- and middle-office services and administrative, infrastructure and other services to HCM Latin America. AROF consists of three entities: a "master fund" (which is a Cayman exempted limited partnership) owned by two "feeder funds" (one being a Delaware limited partnership and the other being a Cayman Islands exempted company).[5] The master fund and the Delaware feeder fund are

---

Association of Highland Dynamic Income Fund, Ltd., adopted on 8 May 2018; (iii) the Second Amended and Restated Exempted Limited Partnership Agreement of Highland Dynamic Income Master Fund, L.P., dated April 1, 2018; and (iv) the Investment Management Agreement, dated March 28, 2013, by and among Dynamic, Highland Dynamic Income Fund GP, LLC (f/k/a Highland Capital Loan GP, LLC) and the Debtor; (v) the Confidential Private Placement Memorandum of Highland Dynamic Income Fund, L.P., dated April 2018; and (vi) the Confidential Private Offering Memorandum of Highland Dynamic Income Fund, Ltd., dated April 2018 ((i) – (vi) collectively, the "Dynamic Fund Documents"). True and accurate copies of the Dynamic Fund Documents are attached hereto as **Exhibit C**.

[5] The documents governing AROF are (i) the Amended and Restated Limited Partnership Agreement of Highland Argentina Regional Opportunity Fund, L.P., dated November 1, 2017; (ii) the Amended and Restated Memorandum and Articles of Association of Highland Argentina Regional Opportunity Fund, Ltd., adopted on 8 November 2017; (iii) the Amended and Restated Exempted Limited Partnership Agreement of Highland Argentina Regional

7

managed by their applicable general partner, which in each case is a wholly-owned affiliate of the Debtor. The Cayman feeder fund is managed by an independent board of Cayman-based directors unaffiliated with the Debtor. HCM Latin America's relationship with each of the three AROF entities is governed by an investment management agreement under which HCM Latin America serves as investment adviser to such entities. Accordingly, AROF is an investment advisory client of HCM Latin America. An organizational chart for AROF is attached hereto as **Exhibit D**.

21.     Each of Dynamic and AROF received significant redemption requests from limited partners both before and after the Petition Date. Following those requests – and as disclosed in the Precautionary Motion – each of Dynamic and AROF began winding down. These funds' governing bodies (general partner and board of directors), as well as the Debtor, concluded that Dynamic and AROF were no longer viable following such redemptions and therefore should be liquidated in an orderly manner.

22.     Further, the Debtor believed (and continues to believe) that its fiduciary and contractual obligations to Dynamic and AROF mandated an orderly liquidation and distribution of assets to investors given that such funds were no longer viable. When a significant redemption request is made, a fund typically is required to liquidate its assets to satisfy the redemption request, which in turn both decreases the total assets available to satisfy later redemption requests and may result in a fund's costs being allocated disproportionately to the remaining investors. An orderly liquidation helps ensure that all investors are treated in the same manner, bear the same costs, and

---

Opportunity Master Fund, L.P., dated November 1, 2017, as amended; (iv) the Amended and Restated Investment Management Agreement, dated November 1, 2017, by and among AROF, Highland Argentina Regional Opportunity Fund GP, LLC, and HCM Latin America; (v) the Confidential Private Placement Memorandum of Highland Argentina Regional Opportunity Fund, L.P., dated March 2019, as supplemented; and (vi) the Offering Memorandum of Highland Argentina Regional Opportunity Fund, Ltd., dated March 2019, as supplemented ((i) – (vi) collectively, the "AROF Fund Documents"). True and accurate copies of the AROF Fund Documents are attached hereto as **Exhibit E**.

receive distributions on a pro rata basis.  Otherwise, liquidation costs and proceeds could adversely impact some investors (likely the investors that have not submitted a redemption or withdrawal request).

23.     The Debtor disclosed the proposed liquidation of Dynamic and AROF to the Committee, and the Committee did not object.

24.     As such, since the Petition Date, the Debtor has taken steps to liquidate the investments held by Dynamic and AROF and is seeking to distribute the cash to those funds' respective investors/redeemers in accordance with the documents governing the funds.[6] Distribution of the cash to investors/redeemers is a necessary step in liquidating the funds; Dynamic and AROF cannot close unless all assets have been distributed in accordance with the Dynamic Fund Documents and the AROF Fund Documents, respectively.

25.     On January 24, 2020, the Debtor notified the Committee that it intended to distribute (i) approximately $35 million in cash to investors/redeemers in Dynamic (the "Dynamic Distribution") and (ii) approximately $22 million in cash to investors/redeemers in AROF (the "AROF Distribution").  In that notice, the Debtor disclosed that:

- (i) CLO Holdco, Ltd. ("CLOH"),[7] (ii) Mark Okada,[8] and (iii) Highland Dynamic Income Fund GP, LLC (the "Dynamic GP")[9] are investors in Dynamic[10] and that (a)

---

[6] In the case of AROF, all redemptions were suspended and the Fund was placed in liquidation.  In the case of Dynamic, all investors were subject to compulsory redemptions and the fund was placed in liquidation.

[7] The limited partnership interests in Dynamic held by CLOH were originally held by the Debtor.  The Debtor transferred those interests to The Get Good Nonexempt Trust ("Get Good") on December 28, 2016, in exchange for 97.6835% of Get Good's interest in a promissory note in original principal amount of approximately $24 million issued by The Dugaboy Investment Trust.  Get Good subsequently transferred its interests in Dynamic to the Highland Dallas Foundation, Inc., which transferred those interests to CLOH.  The Dugaboy Investment Trust has been paying amounts due under the $24 million note, and the current principal amount is approximately $17.5 million.

[8] Mr. Okada is an investor in the Debtor and has an interest in the Debtor's Class A limited partnership interests.  Mr. Okada resigned from his position with the Debtor prior to the Petition Date.

[9] The Dynamic GP is wholly owned by the Debtor.

[10] The Debtor is also a limited partner in Dynamic and will receive its applicable share of the Dynamic Distribution.

CLOH's share of the Dynamic Distribution was $872,194.00; (b) Mr. Okada's share was $4,176,774.74; and (c) the Dynamic GP's share was $137,182.03; and

- CLOH is an investor in AROF, and its share of the AROF Distribution was $1,516,354.38.

The Debtor further disclosed that it intended to distribute to CLOH, Mr. Okada, and the Dynamic GP their pro rata share of the Distributions in the same manner as distributions were being made to other investors.

### *RCP Distribution*

26.     In the ordinary course of its business, the Debtor also manages (a) Highland Restoration Capital Partners, L.P., a Delaware limited partnership, (b) Highland Restoration Capital Partners Offshore, L.P., a Cayman exempted limited partnership, and (c) Highland Restoration Capital Partners Master, L.P., a Delaware limited partnership (collectively, "RCP"). RCP consists of a "parallel" fund structure that invests side-by-side in the same investments on a proportional basis. The domestic side consists of a Delaware limited partnership, and the parallel Cayman side consists of a Cayman exempted limited partnership that feeds into a separate Delaware limited partnership. Each fund is managed by the same general partner, which is a wholly owned subsidiary of the Debtor. The Debtor's direct relationship with each of the three RCP entities, like its relationship with Dynamic, is governed by an investment management agreement under which the Debtor serves as investment adviser to such entities. Accordingly, RCP is an investment advisory client of the Debtor. An organizational chart for RCP is attached hereto as **Exhibit F**.

27.     RCP is a private equity style fund, and, as a private equity fund, RCP has a set term after which it is required to liquidate and distribute its assets to its investors. Investors are not permitted to withdraw their capital from the fund. In this case, RCP had an original term of ten years (the "Term") with the potential to extend the Term for two additional one year periods

10

if RCP's independent advisory board (the "<u>Advisory Board</u>")[11] consented to such extensions. RCP's initial ten-year term expired in April 2018. The Advisory Board agreed to extend the term for one additional year to April 2019. However, following that one year extension, the Advisory Board did not consent to an additional one-year extension, and instead allowed RCP to continue month-to-month with the Advisory Board reserving the right to approve each additional monthly extension. As a condition to receiving these monthly extensions, the Debtor agreed to waive its management fees.

28.     The Advisory Board has not granted any additional extensions of the Term since November 2019. Because RCP is past its Term, RCP has gone into orderly liquidation under the terms of its governing documents.[12] As a result of that liquidation, RCP has substantial assets to distribute to its limited partners (the "<u>RCP Distribution</u>," and together with the Dynamic Distribution and the AROF Distribution, the "<u>Distributions</u>").

29.     The RCP Distribution comes from RCP's sale of 1,700,000 shares of common stock in MGM Holdings, Inc. ("<u>MGM</u>"), which trade was disclosed to the Committee on February 7, 2020 (the "MGM Sale"). The MGM Sale generated $123.25 million in proceeds, all of which is subject to distribution to RCP's limited partners, including the Debtor, which will receive approximately $18.5 million from the MGM Sale proceeds.

---

[11] None of the Advisory Board members are affiliated with or related in any way to the Debtor, James Dondero, or Mark Okada.

[12] The documents governing RCP are (i) Second Amended and Restated Agreement of Limited Partnership of Highland Restoration Capital Partners Offshore, L.P. dated April 18, 2008; (ii) the Limited Partnership Agreement of Highland Restoration Capital Partners, L.P., dated April 18, 2008; (iii) Amended and Restated Agreement of Limited Partnership of Highland Restoration Capital Partners Master, L.P., dated April 18, 2008; and (iv) the Investment Management Agreement, dated November 15, 2007, by and among Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Restoration Capital Partners Master, L.P., each parallel vehicle that may be formed from time to time, Highland Restoration Capital Partners GP, LLC, and Highland Capital Management, L.P. ((i) – (iv) collectively, the "<u>RCP Fund Documents</u>"). True and accurate copies of the RCP Fund Documents are attached hereto as **Exhibit G**.

30.     The MGM Sale was originally part of a much larger liquidating transaction that was being discussed last November 2019, long before the appointment of the Independent Board.  In late November 2019, the Debtor requested the Committee's authorization to proceed first with the larger transactions and then solely the MGM Sale, but the Committee rejected both of these transactions.

31.     After the appointment of the Independent Board, the Debtor asked the Independent Board to re-assess the larger transaction, and while the Independent Board was reviewing the transaction, the Independent Board determined that the MGM Sale had been agreed to in November 2019 but had not yet closed.  Subsequently, the Independent Board spent substantial time and resources considering the Debtor's fiduciary duties to the investors in RCP and the benefits and risks of the transaction, the Independent Board ultimately decided not to proceed with the larger transaction.  However, the Independent Board determined to close the MGM Sale in accordance with its terms, and the Independent Board notified the Committee on February 7, 2020, of its intention to close the MGM Sale and followed with a presentation to the full Committee on February 14, 2020, and with the Committee's consent, the MGM Sale closed on February 24, 2020.

32.     Also on February 7, 2020, the Debtor notified the Committee that it intended to distribute the RCP Distribution as soon as practicable following their receipt by RCP of such liquidation proceeds.  The Debtor also disclosed that Highland Capital Management Services, Inc. ("HCM Services"),[13] would receive a share of the RCP Distribution of approximately $2.1 million in the same manner as all other limited partners in RCP.[14]  HCM

---

[13] HCM Services received its interests in RCP from the Debtor over eleven years ago.  Additional materials will be provided concerning HCM Services' ownership interest.

[14] The Debtor is also a limited partner in RCP and would receive approximately $18.5 million from the RCP Distribution.

Services is owned 75% by James Dondero and 25% by Mark Okada, and HCM Services is considered a "Related Entity"[15] under the Protocols.

### *The Committee's Objections to the Distributions*

33.     On January 30, 2020, the Debtor, through counsel, received notice that the Committee objected to Dynamic and AROF making distributions to the Related Entity investors under the Protocols unless the Debtor satisfied three demands:  (1) no part of the foregoing distributions are to be made to any Related Entities; (2) Dynamic and AROF must provide an unredacted list of all their investors; and (3) the Debtor must make demand for payment on all demand notes held by the Debtor.  The Committee also requested information regarding how CLOH obtained its limited partnership interest in Dynamic.[16]  The Committee has not objected to either Dynamic or AROF making distributions to non-Related Entity Investors.

34.     On February 14, 2020, the Debtor, through counsel, also received notice that the Committee objected to RCP making distributions to HCM Services, as a Related Entity. The Committee has not objected to RCP making distributions to its non-Related Entity investors.

35.     Under the applicable governing documents, the rights and obligations of Related Entity investors in Dynamic, AROF, RCP, and the Debtor's other managed investment

---

[15] A "Related Entity," as defined in the Protocols, means "collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or  Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld)."

[16] *See* note 7, *supra*.

13

vehicles as applicable, are the same as those of other investors in the applicable funds. Further, at this time, the Debtor is not aware of any claims that Dynamic, AROF, or RCP have against their Related Entity investors. However, the Debtor understands that the Committee has started its investigation with respect to claims against the Related Entities but does not believe that there is cause to delay otherwise payable distributions to Related Entities until the Committee has completed its review. As such, and as discussed at greater length below, the Debtor believes that failing to provide such parties their pro rata share of the Distributions based upon the potential that the Debtor (not Dynamic, AROF, or RCP) might assert claims against the Related Entities at some point in the future could potentially subject the Debtor, as well as the applicable fund, to claims for, among other things, breach of contract and breach of fiduciary duty under applicable state law, federal law, and Cayman law.

36.     Consequently, the Debtor is filing this Motion and seeking an order from this Court authorizing the Debtor to cause Distributions to be made to the Related Entity investors in Dynamic, AROF, and RCP (collectively, the "Funds").

## Relief Requested

37.     By this Motion, the Debtor seeks the entry of an order authorizing, but not directing: (i) the Dynamic Distribution to the Related Entity investors in Dynamic, in accordance with the Dynamic Fund Documents, (ii) the AROF Distribution to the Related Entity investors in AROF in accordance with the AROF Fund Documents, and (iii) the RCP Distribution to the Related Entity investors in RCP in accordance with the RCP Fund Documents.

14

### Basis for the Relief Requested

**A.    The Governing Documents for the Funds Do Not Give Discretion Regarding Fund Distributions**

38.    Each Fund is a distinct legal entity with its own property rights in its own assets.  Further, each entity in each Fund is governed by its own set of governing documents, which govern how distributions are to be made to investors in the applicable Fund.  As set forth below, because certain of the Related Entities have invested through the Cayman entities and others have invested through the Delaware entities, only certain documents apply to each Related Entity investors.  The Related Entities and their applicable funds are set forth below:

### Dynamic

| Related Entity | Applicable Entity |
| --- | --- |
| CLOH | Dynamic Master Fund & Dynamic Domestic Feeder Fund |
| Mark Okada | Dynamic Master Fund & Dynamic Domestic Feeder Fund |
| Dynamic GP | Dynamic Master Fund & Dynamic Domestic Feeder Fund |

### AROF

| Related Entity | Applicable Entity |
| --- | --- |
| CLOH | AROF Master Fund & AROF Cayman Feeder Fund |

### RCP

| | |
| --- | --- |
| HCM Services | RCP Domestic Fund |

39.    Because the Dynamic and AROF funds are structured as "master/feeder" funds, investors invest by subscribing for limited partnership interests or shares in the feeder funds; however, the feeder funds do not own interests in underlying portfolio investments.  Those investments are held by the master funds, and the feeder funds are the master fund's limited partners.  As such, the master fund is the entity that receives the proceeds from any investment and then distributes those proceeds to its limited partners – the feeder funds – pursuant to the master fund's governing documents.  The feeder funds in turn distribute those proceeds to their limited

15

partners or shareholders – the third-party investors – pursuant to the feeder fund's governing documents. As, and by way of example, if an investor is invested in a Delaware feeder fund, the documents governing its distributions are the documents governing both the master fund and the documents governing the Delaware feeder fund. The documents governing the Cayman fund are, in these circumstances, generally immaterial.

40. RCP is structured as a "parallel fund." This structure is similar to the master/feeder structure discussed above. RCP has a master fund incorporated in Delaware; however, the RCP master fund only has one limited partner – the Cayman fund. The domestic RCP fund invests in the same portfolio investments as the RCP master fund but is not a limited partner of the RCP master fund. Instead, the RCP domestic fund is a standalone entity, which owns its own assets, receives the proceeds of those assets directly, and distributes those proceeds directly to its limited partners. The RCP domestic fund does not rely on distributions from the RCP master fund, and, consequently, for purposes of distributions to investors in the RCP domestic fund, the documents governing the RCP master fund and RCP Cayman fund are largely immaterial.

41. The relevant documents are discussed below. Because of their similarities, the Dynamic Fund Documents and Argentina Fund Documents are addressed together.

### *Dynamic Fund Documents and AROF Fund Documents*

42. **The Dynamic and AROF Master Fund**. Because on November 15, 2019, and November 20, 2019, respectively, the general partners of the Dynamic and AROF master funds elected to terminate Dynamic and AROF, respectively, Dynamic and AROF entered wind up as of those respective dates.[17] Upon such dates, the general partners of Dynamic and AROF became

---

[17] Amended and Restated Exempted Limited Partnership Agreement of Highland Argentina Regional Opportunity Master Fund, L.P., dated 1 November 2017 § 6.1(a); Second Amended and Restated Exempted Limited Partnership

obligated to "promptly liquidate the business and administrative affairs of the Partnership to the extent feasible."[18] Section 6.2 of each of the Dynamic and AROF master fund partnership agreements also provides that the limited partners in the master funds, i.e. their feeder funds, "shall… be paid liquidating distributions" after applicable debts are repaid.[19] Such funds' general partners, therefore, have an obligation to promptly liquidate their assets and distribute the proceeds to such funds' limited partners – their respective feeder funds. Generally, the failure to distribute such proceeds could give rise to a claim for breach of contract under Cayman law.[20]

43. **The Dynamic and AROF Domestic Feeder Fund**. Again because each of Dynamic and AROF are in wind up, they are required to "promptly liquidate" their business and affairs, and their investors, including the Related Entity investors – CLOH, Mr. Okada, and Dynamic GP – are required to "be paid liquidating distributions. . . *pro rata* in accordance with, and up to the positive balances of their respective Capital Accounts."[21] Section 6.2 of the applicable documents, however, does *not* state that the Debtor can withhold any individual investor's pro rata distribution.[22] Consequently, the Debtor believes it is obligated, under its

---

Agreement of Highland Dynamic Income Master Fund, L.P., dated 1 April 2018 § 6.1(a); Exempted Limited Partnership Law (2018 Revision) § 36(10)(d).

[18] Amended and Restated Exempted Limited Partnership Agreement of Highland Argentina Regional Opportunity Master Fund, L.P., dated 1 November 2017 § 6.2; Second Amended and Restated Exempted Limited Partnership Agreement of Highland Dynamic Income Master Fund, L.P., dated 1 April 2018 § 6.2.

[19] *Id.*

[20] Section 6.2 of each fund's partnership agreement provides that distributions to the feeder funds only need to be made to the "extent feasible." The Debtor believes that this exception does not apply here as distributions are "feasible" if authorized by this Court and that such exception cannot be relied on to excuse the relevant master funds from distributing proceeds to their feeder funds.

[21] Amended and Restated Limited Partnership Agreement of Highland Argentina Regional Opportunity Fund, L.P., § 6.2(a)(iii); Amended and Restated Limited Partnership Agreement of Highland Dynamic Income Fund, L.P., § 6.2(a)(iii)

[22] In a separate section of the applicable limited partnership agreements unrelated to liquidation, there is a provision requiring that Dynamic and AROF refrain from making a distribution "if such distribution would violate. . . applicable law." (Amended and Restated Limited Partnership Agreement of Highland Dynamic Income Fund, L.P., § 3.13(b); Amended and Restated Limited Partnership Agreement of Highland Argentina Regional Opportunity Fund, L.P., § 3.12(b).) There is currently no "applicable law" prohibiting the distributions. The Debtor still has the right to make the distributions if authorized by this Court.

contractual and fiduciary duties, to petition this Court for authority to make distributions to the Related Entity investors.

44. **The Dynamic and AROF Cayman Feeder Fund**. There are no Related Entity investors in the Dynamic Cayman feeder fund and, therefore, the documents governing the Dynamic Cayman feeder fund are not relevant with respect to any distributions to Related Entities investors.

45. CLOH is invested in the AROF Cayman feeder fund. That fund suspended all rights of its shareholders to redeem (as well as all redemption payments) on October 30, 2019, to enable an orderly realization of assets following receipt of very significant redemption requests. While the directors of the AROF Cayman feeder fund have discretion with respect to the imposition (and the lifting) of the suspension of redemptions, that discretion must, as a matter of Cayman law, be exercised for a proper purpose in the best interests of the company and consistent with the directors' fiduciary duties and fund documents. The assets of AROF have been liquidated, and there is no longer a reason to suspend redemptions.[23] Furthermore, since CLOH – the Related Party investor in the AROF Cayman feeder fund – has not yet been redeemed, it is eligible (as a member of a particular class and/or series of issued shares) to be paid distributions under the fund's articles of association.[24] Therefore, the Debtor believes that, if the suspension of redemptions is

---

[23] It may be argued that the suspension was automatically justified by the like suspension of withdrawals by the AROF master fund on October 30, 2019 (Offering Memorandum of Highland Argentina Regional Opportunity Fund, Ltd., at p. 75.), but it is also arguable that that condition fell away with the termination of the AROF master fund on November 15, 2019. Further, it may be arguable that under section 12.5 of the AROF feeder articles of association the directors might be entitled to withhold redemption amounts payable to the Related Parties if required by U.S. law, but it may equally be arguable that that provision applies only to tax withholdings.

[24] Amended and Restated Memorandum and Articles of Association of Highland Argentina Regional Opportunity Fund, Ltd. § 45.1. In the interests of full disclosure, such distributions to shareholders of a particular class and/or series are in the "absolute discretion" of the board of Cayman-based directors and, further, directors can hold distributions due to a particular member in abeyance in a separate account if such distributions "cannot be paid" to a particular member, though they will retain their status as a debt owed to that member. For these purposes, it might be arguable that a distribution "cannot be paid" if its payment is prohibited by applicable law or by an order of a court of competent

18

maintained and distributions are not paid to CLOH, there may be claims that the continuance of the suspension of redemptions and failure to pay distributions constitutes a breach of the AROF Cayman feeder fund's articles of association and of the Cayman directors' fiduciary duties. The Cayman-based directors are independent of the Debtor and are not required to take the Debtor's direction, and if the AROF Cayman feeder fund receives assets from its master fund, the Debtor has no control over how the Cayman directors will treat those assets, including whether the Cayman directors will cause those assets to be distributed to CLOH as a Related Entity investor. As such, the Debtor is asking this Court to authorize distributions to the Related Entity investor in AROF to protect the Debtor from any liability based on the Cayman directors' actions or inactions.

### *RCP Fund Documents*

46. **The RCP Domestic Fund.** As set forth above, the RCP domestic fund has the same general partner as the other RCP funds but holds its own investments in parallel with such funds. Further, distributions to investors in the RCP domestic fund are governed a limited partnership agreement specific to the domestic fund. The RCP domestic fund's distributions are not contingent on distributions from the RCP master fund. Under the documents governing the RCP domestic fund, the general partner is required to distribute assets proportionally based on each investor's funded commitments as of the date of distribution, and the documents do not provide that a distribution can be made to one investor but not another.[25] Because the RCP domestic fund governing documents do not allow the general partner to select which investors are to receive a distribution, the Debtor believes that it is not permitted under those documents to make distributions to some but not all of the investors and that if the Debtor were to make a distribution

---

jurisdiction. (Amended and Restated Memorandum and Articles of Association of Highland Argentina Regional Opportunity Fund, Ltd., Art. 45.1; 45.7.)

[25] Limited Partnership Agreement of Highland Restoration Capital Partners, L.P., § 3.3(a); *see also* § 3.2 (requiring short term investment gains to be allocated proportionally to investors).

to a subset of investors only, it may be exposed to liability. Accordingly, the Debtor is seeking authority to make Distributions to the Related Entity investors as part of a liquidating distribution made to all investors on a pro rata basis.

47. **The RCP Master Fund & RCP Cayman Fund.** There are no Related Entity investors in in RCP's Cayman fund and, therefore, the documents governing the RCP master fund and the RCP Cayman fund are not currently relevant with respect to any distributions to Related Entities.

### *Potential Fiduciary and Common Law Obligations*

48. The obligations of the Funds' domestic governing entities (general partners and directors) are also governed by Delaware fiduciary duties. Under the laws of the State of Delaware, a general partner to a limited partnership owes duties of good faith, fairness and loyalty to its limited partners. *Boxer v. Husky Oil*, 329 A.2d 995, 997 (1981). Pursuant to Delaware law, subject to certain limitations, a general partner can limit its fiduciary duties by contract. Specifically, 6 Del. C. § 17-1101(d), allows for a general partner to expand, restrict or even eliminate its fiduciary duties, so long as the general partner's duties of fair dealing and good faith are unaffected. The governing documents for the Delaware-domiciled Funds do not include a waiver or disclaimer of fiduciary duties that generally apply to general partners.[26]

49. Further, the conduct and activities of the Debtor and HCM Latin America as investment manager to the Funds are governed by the Advisers Act and the relevant investment management agreements. An investment adviser (such as the Debtor and HCM Latin America),

---

[26] The only language that acts as a waiver of fiduciary duties is very narrow and does not apply to general fiduciary duties under state law or securities law. Specifically, there is a disclaimer of the general partner's status as a fiduciary under the Employee Retirement Income Security Act of 1974 and language that limits the general partner's liability for breach of fiduciary duty in connection with the use of "soft dollars" generated from brokerage transactions. There are also typical "standard of care" and indemnity provisions that limit liability of the general partner, but these do not specifically address or provide a waiver of fiduciary duties.

20

in managing client accounts (such as those of the Fund) or otherwise providing investment advice, is subject to fiduciary duties. The Supreme Court has held that Section 206 of the Advisers Act imposes fiduciary duties on an investment adviser by operation of law. *See SEC v. Capital Gains Research Bureau, Inc.*, 375 US 180, 191 (1963). Under Section 206 of the Advisers Act, an investment adviser has a fiduciary duty of loyalty. This duty, among other things, requires that an investment adviser, as is the Debtor, ensure that it does not benefit one client (such as a Fund) to the disadvantage of another or to itself.[27] Relatedly, an investment adviser to pooled investment vehicles, such as the Funds, must comply with Advisers Act Rule 206(4)-8. Advisers Act Rule 206(4)-8 prohibits investment advisers from defrauding investors in pooled investment vehicles they advise.[28] Rule 206(4)-8 extends, in part, the Debtor's fiduciary obligations to the investors in such Funds.

      50.    As set forth above, the Committee has objected to distributions being made to Related Entity investors because the Committee believes that the Debtor and its estate may have claims against such Related Entities. Although the Debtor understands that the Committee has commenced its investigation into potential claims against Related Entities, no claims against such Related Entities have been articulated and no allegations have been made that any of Dynamic, AROF, or RCP have claims against the Related Entities or that there is any other reason to treat the respective distributions to those investors differently than those being made to non-Related Entity investors.

      51.    Accordingly, absent an express ability to withhold or offset distributions on a non-pro rata basis, the failure to make distributions otherwise due to the Related Entity investors

---

[27] *Proposed Commission Interpretation Regarding Standard of Conduct for Investment Advisers; Request for Comment on Enhancing Investment Adviser Regulation*, Release No. IA-4889 (Apr. 18, 2018).

[28] *Rule 206(4)-8*; *Prohibition of Fraud By Advisers to Certain Pooled Investment Vehicles*, Advisers Act Rel. No. 2628 (Aug. 3, 2007).

could be a potential violation of (i) the Funds' governing documents, (ii) Delaware and/or Cayman fiduciary law, and (iii) the Advisers Act (to the extent the Debtor, HCM Latin America, or any affiliate of the Debtor has a role in causing such distributions to be withheld). Moreover, the potential for a violation of the Advisers Act, Rule 206(4)-8 and the Delaware fiduciary duties is substantially greater if such delay has the intention of, or results in, favorable treatment to the Debtor or any of its affiliates in a manner that was not expressly contemplated at the time of investment. Because of those fiduciary obligations, the Debtor believes that it has a duty to seek this Court's authority to cause each of Dynamic, AROF, and RCP to make distributions to each such Fund's Related Entity investors in accordance with the applicable Fund's governing documents.

**B.      Section 363(c)(1) of the Bankruptcy Code Authorizes the Debtor to Make the Distributions**

52.      The Debtor believes that, but for the Protocols, Court approval of the Distributions to the Related Entities would not be required for the Funds to make distributions to their investors. However, even if Court approval were required, making the Distributions to the Related Entities is an ordinary course transaction authorized under section 363(c)(1). Specifically, section 363(c)(1) provides:

> [i]f the business of the debtor is authorized to be operated under section. . . 1108. . . of this title. . . the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1). As such, a debtor may engage in postpetition actions if the debtor is authorized to operate its business under section 1108 and such transactions are "in the ordinary course of business."

22

53.     An activity is "ordinary course" if it satisfies both the "horizontal test" and the "vertical test." *See, e.g., Denton Cty. Elec. Coop. v. Eldorado Ranch, Ltd.* (*In re Denton Cty. Elec. Coop.*), 281 B.R. 876, 882 n.12 (Bankr. N.D. Tex. 2002); *see also In re Roth American, Inc.*, 975 F.2d 949, 952 (3d Cir. 1992).  The vertical test looks to "whether the transaction subjects a hypothetical creditor to a different economic risk than existed when the creditor originally extended credit." *In re Patriot Place, Ltd.*, 486 B.R. 773, 793 (Bankr. W.D. Tex. 2013).  The horizontal test considers "whether the transaction was of the sort commonly undertaken by companies in the industry." *Id.*  Here, both the vertical test and horizontal test are satisfied.

54.     First, the vertical test is satisfied.  The Distributions will be made in accordance with the applicable Fund's governing documents, which govern the making of all distributions to investors, including Related Entity investors.  The Distributions will thus be consistent with the types of distributions routinely made to investors in the Funds prior to the Petition Date.  Because the Debtor is engaging in the same conduct postpetition as it did prepetition, the Debtor's creditors are incurring no additional risk from the Distributions.  In fact, the risks to the Debtor's creditors may very well increase if the Distributions are not made as the Funds' investors may, as discussed above, have various claims against both the Funds and the Debtor, as the investment manager.

55.     Second, the horizontal test is satisfied.  The Debtor is an investment manager.  Investment managers manage hedge funds, private equity funds, and other investment vehicles, which funds by definition distribute the proceeds of their investments to investors.  Assuming the Debtor has any role in the Distributions, the Debtor and the Funds are simply attempting to do postpetition what was done prepetition and to distribute investment gains and losses to the Funds' investors.  A fund that sequesters gains and refuses to distribute profits would

23

be more than an anomaly; it would arguably be a fraud. Consequently, the horizontal test is satisfied as making the Distributions is entirely consistent with the operation of investment managers and hedge funds throughout the industry.

**C.**     **Making the Distributions is a Sound Exercise of the Debtors' Business Judgment.**

56.     Although the Debtor believes that the Distributions are ordinary course pursuant to section 363(c)(1), and that, but for the Protocols, this Court's approval of the Distributions to the Related Entities would not be required. However, even if Court approval were required, the Debtor submits that the Distributions also satisfy section 363(b) of the Bankruptcy Code. Section 363(b)(1) of the Bankruptcy Code authorizes a debtor-in-possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing. It is well established in this jurisdiction that a debtor may use property of the estate outside the ordinary course of business under this provision if there is a good business reason for doing so. *See, e.g., ASARCO, Inc. v. Elliott Management. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors, and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (*quoting In re Continental Air Lines, Inc.*, 780 F.3d 1223, 1226 (5th Cir. 1986)); 441 B.R. 813, 830 (Bankr. S.D. Tex. 2010); *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Building Group, Ltd.)*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005).

57.     Here, making Distributions to the Related Entities is in the exercise of the Debtor's sound business judgment. As an initial matter, and as set forth above, Dynamic, AROF, and RCP are in liquidation because the Debtor (or, in the case of AROF, the Debtor's relying adviser) has determined, in its business judgment, that continuing the existence of those funds in the face of substantial redemptions, on the one hand, and the expiration of the Term, on the other,

24

is not practicable and not in the interest of those funds or their investors. In addition, failing to liquidate those funds in an orderly manner could result in some investors being disadvantaged. In order to liquidate, Dynamic, AROF, and RCP, by definition, must sell their assets, which sales generate cash. Under their relevant governing documents, that cash is to be distributed to investors in those Funds, and returning that cash to investors is how the Funds actually liquidate; the Funds cannot wind-down without distributing their assets to their investors. Further, the failure to distribute cash in accordance with the Fund Documents to all investors, including Related Entities, could subject the Debtor to claims for breach of contract and fiduciary duty. As such, the decision to liquidate Dynamic, AROF, and RCP is in the sound business judgment of the Debtor as is the distribution of the cash received as a result of that liquidation. Making the Distribution is the necessary and logical corollary to liquidating these funds and squarely within the Debtor's business judgment; they cannot be wound down without making the Distribution to all investors, including Related Entities.

## **No Prior Request**

58.     No previous request for the relief sought in this Motion has been made to this, or any other, Court.

## **Notice**

59.     Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) the Office of the United States Attorney for the Northern District of Texas; (c) the Debtor's principal secured parties; (d) counsel to the Committee; and (e) parties requesting notice pursuant to Bankruptcy

Rule 2002.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtor respectfully requests that the Court (a) grant the Motion, (b) enter an order, substantially in the form attached hereto as **Exhibit A**, and (c) grant such other relief as is just and proper.

*[Remainder of Page Intentionally Blank]*

26

Dated: February 24, 2020.

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
Maxim B. Litvak (Texas Bar No. 24002482)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:  jpomerantz@pszjlaw.com
ikharasch@pcszjlaw.com
mlitvak@pszjlaw.com
gdemo@pszjlaw.com

-and-

*/s/ Zachery Z. Annable*

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and*
*Debtor-in-Possession*

## EXHIBIT A

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

——————————————————————————

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | Related to Docket No. _____ |

## ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES"

Having considered the *Motion of the Debtor for Entry of an Order Authorizing, but Not Directing, the Debtor to Cause Distributions to Certain "Related Entities"* (the "Motion")[2] filed by the Debtor seeking entry of an order authorizing, but not directing, the Debtor to cause the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

DOCS_NY:40220.3 36027/002

**Appx. 03288**

distribution of assets in the ordinary course of its business to certain Related Entities that have invested in Dynamic, AROF, and RCP, as more fully set forth in the Motion, and having heard the statements in support of the relief requested in the Motion at a hearing before this Court (the "Hearing"), the Court finds that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (ii) the Motion involves a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (iii) venue of the Bankruptcy Case in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; (iv) the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; (v) the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no further or additional notice need be provided; and (vi) the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein. Accordingly, **IT IS HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      The Debtor is authorized, but not directed, to distribute or to cause the distribution of:

a.      the Dynamic Distribution to the Related Entity investors in Dynamic, in accordance with the Dynamic Fund Documents,

b.      the AROF Distribution to the Related Entity investors in AROF in accordance with the AROF Fund Documents, and

c.      the RCP Distribution to the Related Entity investors in RCP in accordance with the RCP Fund Documents.

3.      Notwithstanding any stay under applicable Bankruptcy Rules, this Order shall be effective immediately upon entry.

2

**Appx. 03289**

4.      The Court shall retain jurisdiction over all matters arising from or related to

the interpretation and implementation of this Order.

### END OF ORDER ###

DOCS_NY:40220.3 36027/002

**Appx. 03290**

# EXHIBIT "B"

# Highland Dynamic Income Fund



# EXHIBIT "C"

**HIGHLAND DYNAMIC INCOME FUND, L.P.**

**A Delaware Limited Partnership**

**Amended and Restated Limited Partnership Agreement**

**April 1, 2018**

## NOTICE

NEITHER HIGHLAND DYNAMIC INCOME FUND, L.P. NOR THE LIMITED PARTNER INTERESTS THEREIN HAVE BEEN OR WILL BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED, OR THE SECURITIES LAWS OF ANY OF THE STATES OF THE UNITED STATES.  THE OFFERING OF SUCH LIMITED PARTNER INTERESTS IS BEING MADE IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT FOR OFFERS AND SALES OF SECURITIES WHICH DO NOT INVOLVE ANY PUBLIC OFFERING, AND ANALOGOUS EXEMPTIONS UNDER STATE SECURITIES LAWS.

THE DELIVERY OF THIS AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR SHALL THERE BE ANY OFFER, SOLICITATION OR SALE OF LIMITED PARTNER INTERESTS IN HIGHLAND DYNAMIC INCOME FUND, L.P. IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OR SALE.

THE LIMITED PARTNER INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM AND MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REQUIREMENTS AND CONDITIONS SET FORTH IN THIS AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT.

Appx. 03295

# TABLE OF CONTENTS

**Page**

Article I DEFINITIONS ...........................................................................................................1

Article II ORGANIZATION..................................................................................................8
2.1    Continuation of Limited Partnership .................................................8
2.2    Name of Partnership ...........................................................................9
2.3    Principal Office; Registered Office.....................................................9
2.4    Term of Partnership............................................................................9
2.5    Object and Powers of Partnership......................................................9
2.6    Liability of Partners ..........................................................................10
2.7    Actions by Partnership......................................................................11
2.8    Reliance by Third Parties ..................................................................11
2.9    UCC Status of Limited Partner Interests .........................................11
2.10   Series of Interests .............................................................................11

Article III CAPITAL.............................................................................................................12
3.1    Contributions to Capital....................................................................12
3.2    Rights of Partners in Capital ............................................................12
3.3    Capital Accounts...............................................................................13
3.4    Allocation of Net Profit and Net Loss .............................................13
3.5    Allocation of Management Fees, Withholding Taxes and Certain Other Expenditures..................................................................................14
3.6    Reserves; Adjustments for Certain Future Events ...........................15
3.7    Performance Allocation ....................................................................15
3.8    Limited Participation Investments ...................................................16
3.9    Allocation to Avoid Capital Account Deficits .................................16
3.10   Allocations for Income Tax Purposes ..............................................16
3.11   Curative Allocations.........................................................................19
3.12   Individual Partners' Tax Treatment..................................................19
3.13   Distributions.....................................................................................19

Article IV MANAGEMENT.................................................................................................20
4.1    Duties and Powers of the General Partner .......................................20
4.2    Expenses ...........................................................................................21
4.3    Rights of Limited Partners ...............................................................24
4.4    Other Activities of Partners..............................................................24
4.5    Duty of Care; Indemnification .........................................................26
4.6    Advisory Committee.........................................................................27
4.7    Pricing Committee ............................................................................28

Article V ADMISSIONS, TRANSFERS AND WITHDRAWALS ............................................29
5.1    Admission of Limited Partners.........................................................29
5.2    Admission of Additional General Partners.......................................29
5.3    Transfer of Interests of Limited Partners .........................................29
5.4    Transfer of Interest of the General Partner ......................................32
5.5    Withdrawal of Interests of Partners .................................................32

ii

Article VI DISSOLUTION AND LIQUIDATION ........................................................................36
    6.1    Dissolution of Partnership ..........................................................................................36
    6.2    Liquidation of Assets .................................................................................................36
Article VII ACCOUNTING AND VALUATION; BOOKS AND RECORDS ...........................37
    7.1    Accounting and Reports .............................................................................................37
    7.2    Certain Tax Matters ...................................................................................................38
    7.3    Valuation of Partnership Assets and Interests ...........................................................39
    7.4    Determinations by the General Partner ......................................................................40
    7.5    Books and Records ....................................................................................................40
    7.6    Confidentiality ..........................................................................................................40
Article VIII GENERAL PROVISIONS .......................................................................................42
    8.1    Amendment of Partnership Agreement ......................................................................42
    8.2    Special Power-of-Attorney ........................................................................................44
    8.3    Notices ......................................................................................................................45
    8.4    Agreement Binding Upon Successors and Assigns; Delegation .........................45
    8.5    Governing Law ..........................................................................................................46
    8.6    Not for Benefit of Creditors .......................................................................................46
    8.7    Consents and Voting ..................................................................................................46
    8.8    Merger and Consolidation ..........................................................................................46
    8.9    Interpretation of Partnership Accounting Systems and Terminology ...................47
    8.10   Miscellaneous ...........................................................................................................47
    8.11   BHCA Subject Persons ..............................................................................................47
    8.12   RIC Limited Partners ................................................................................................48
    8.13   Bad Actor Limited Partners .......................................................................................48
    8.14   Survival .....................................................................................................................49
    8.15   Entire Agreement ......................................................................................................49

Appx. 03297

THIS AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT of Highland Dynamic Income Fund, L.P. is dated effective as of April 1, 2018 by and among Highland Dynamic Income Fund GP, LLC, the Limited Partners, and those Persons who are hereafter admitted as additional Limited Partners in accordance with this Agreement. This Agreement amends and restates in its entirety the Limited Partnership Agreement of the Partnership dated March 28, 2013 (the "***Prior Agreement***").

---

## Article I
## DEFINITIONS

---

For purposes of this Agreement:

"***Act***" means the Delaware Revised Uniform Limited Partnership Act, 6 Del. C. §§ 17-101, et seq., as in effect on the date hereof and as amended from time to time, or any successor law.

"***Administrator***" means such Person as the General Partner may designate from time to time, in its sole discretion, to serve as administrator to the Partnership.

"***Advisory Committee***" has the meaning set forth in Section 4.6.

"***Affiliate***" means, with respect to any Person, a Person which controls, is controlled by, or is under common control with, such Person. For these purposes, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"***Affiliated Investors***" means the Investment Manager, the General Partner and their respective Affiliates, Principals, employees, partners, agents, the respective family members of such personnel and trusts and other entities established primarily for their benefit or for charitable purposes.

"***Agreement***" means this Amended and Restated Limited Partnership Agreement, as amended from time to time.

"***Authorized Representative***" has the meaning set forth in Section 7.6(a).

"***Bad Actor Limited Partner***" means a Limited Partner that (a) would cause the disqualification of the Partnership from using Rule 506 under the Securities Act due to the operation of paragraph (d) thereof (or its successor) if such Limited Partner were to beneficially own 20% or more of the outstanding voting interests of all of the Partners (excluding any other Interests that are Non-Voting Interests) or (b) the General Partner determines is likely to become subject to a conviction, order, judgment or finding that would be likely to cause the disqualification described in clause (a).

1

Appx. 03298

"**BBA**" means Subchapter C of Chapter 63 of the Code (Sections 6221 through 6241 of the Code), as enacted by the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, as amended from time to time, and the Regulations thereunder (whether proposed, temporary or final), including any subsequent amendments, successor provisions or other guidance thereunder, and any equivalent provisions for state, local or non-U.S. tax purposes.

"**BBA Effective Period**" means any taxable year commencing after 2017, taking into account any extensions of the effective date set forth in the BBA.

"**BHCA**" means the Bank Holding Company Act of 1956, as amended.

"**BHCA Subject Person**" means any Limited Partner that is subject, directly or indirectly, to the provisions of Section 4 of the BHCA and the regulations of the Board of Governors of the Federal Reserve System promulgated thereunder.

"**Business Day**" means any day or days on which banks are open for business in the city of New York, NY and/or such other place or places as the General Partner may determine.

"**Capital Account**" has the meaning set forth in Section 3.3(a).

"**Certificate**" means the Certificate of Limited Partnership of the Partnership referred to in Section 2.1(b).

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended, and as hereafter amended, or any successor law.

"**Designated Individual**" has the meaning set forth in Section 7.2(a).

"**Election Notice**" has the meaning set forth in Section 8.11(c).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"**ERISA Partner**" means a Limited Partner which is (a) an employee benefit plan subject to the fiduciary provisions of ERISA, (b) a "plan" subject to Section 4975 of the Code, (c) an entity whose underlying assets include "plan assets" for purposes of ERISA by reason of a Plan's investment in the entity, or (d) an entity that otherwise constitutes a "benefit plan investor" within the meaning of Section 3(42) of ERISA or any regulation promulgated thereunder.

"**FATCA**" means Sections 1471 through 1474 of the Code, as amended, and any Regulations thereunder or official interpretations or other official guidance thereof, including any successor Regulations or interpretations, and any intergovernmental agreement and any regulations with respect thereto or official interpretations or other official guidance thereof implementing the foregoing.

"**Fiscal Period**" means each period that starts at the opening of business on the Commencement Date (in the case of the initial Fiscal Period) and thereafter on the day

2

immediately following the last day of the preceding Fiscal Period, and that ends at the close of business on the earliest of the following dates:

(a)  the last day of a calendar month;

(b)  any date as of which any withdrawal or distribution of capital is made with respect to any Capital Account or as of which this Agreement provides for any amount to be credited to or debited against a Capital Account, other than a withdrawal or distribution by or to, or an allocation to, all Capital Accounts that does not result in any change of the Partnership Percentage relating to any Capital Account;

(c)  the date which immediately precedes any day as of which a capital contribution is accepted by the General Partner from any new or existing Partner; or

(d)  any other date which the General Partner selects.

"*Fiscal Year*" means the period commencing on the Commencement Date and ending on December 31 of the year of commencement, and thereafter each period commencing on January 1 of each year and ending on December 31 of such year, unless the General Partner shall elect another fiscal year; *provided* that any such other fiscal year shall be permissible for U.S. federal income tax purposes. In the case of the Fiscal Year in which the Partnership is terminated in accordance with Article VI, "*Fiscal Year*" means the portion of the calendar year ending on the date on which the Partnership is terminated.

"*GAAP*" means generally accepted accounting principles in the United States.

"*General Partner*" means Highland Dynamic Income Fund GP, LLC, a Delaware limited liability company, any successor thereto, and any Person hereafter admitted as an additional general partner, in its capacity as general partner of the Partnership.

"*Indemnified Person*" means each of the General Partner, the Investment Manager, any member, shareholder, partner, manager, director, officer, employee or agent of, or any person who controls, the General Partner, each of the respective affiliates of the foregoing, members of the Advisory Committee or the Pricing Committee, their respective affiliates, or any of the legal representatives of any of the foregoing.

"*Interest*" means the entire ownership interest of a Partner in the Partnership at the relevant time, including the right of such Partner to any and all benefits to which a Partner may be entitled as provided in this Agreement, together with the obligations of such Partner to comply with all the terms and provisions of this Agreement.

"*Investment Company Act*" means the U.S. Investment Company Act of 1940, as amended, and the regulations promulgated thereunder.

"*Investment Management Agreement*" means the investment management agreement by and among the Investment Manager, the General Partner, the Partnership, the Master Fund and the Offshore Fund.

Appx. 03300

"***Investment Manager***" means Highland Capital Management, L.P., a Delaware limited partnership, or any successor thereto, or any Person thereafter appointed as an investment manager of the Partnership in accordance with the Investment Management Agreement.

"***Investments***" means investments in securities or other financial or intangible investment instruments, contracts or products, whether made directly by the Partnership or through the Master Fund, as described in the Partnership's offering memorandum.

"***Limited Participation Investment***" means an Investment which, as determined by the General Partner, is suitable for some but not all of the Partners, or of which certain Partners should receive a reduced participation, for legal, tax, regulatory or other bona fide reasons.

"***Limited Participation Sub-Accounts***" means memorandum accounts to be maintained in the accounting records of the Partnership on a Partner-by-Partner basis with respect to each particular Limited Participation Investment to reflect the entitlement of each Partner (other than a Partner who does not have any credit balance in its Capital Account at the time of the establishment of the Limited Participation Sub-Account that is unrelated to a pre-existing Limited Participation Sub-Account) to allocations and distributions attributable to Master Fund transactions involving such Limited Participation Investments.

"***Limited Partner***" means any Person admitted to the Partnership as a limited partner, until the entire Interest of such Person has been withdrawn pursuant to Section 5.5 or a substitute Limited Partner or Limited Partners are admitted with respect to such Person's entire Interest.

"***Majority of Limited Partners***" means Limited Partners whose Partnership Percentages represent more than 50% of the aggregate Partnership Percentages of all Limited Partners.

"***Management Fee***" means the management fee, as defined in the Master Fund Partnership Agreement, payable by the Master Fund to the Investment Manager pursuant to the Investment Management Agreement.

"***Master Fund***" means Highland Dynamic Income Master Fund, L.P., a collective investment vehicle formed as an exempted limited partnership under the laws of the Cayman Islands in which the Partnership and the Offshore Fund place their assets and conduct their investment and trading activities.

"***Master Fund Partnership Agreement***" means the amended and restated agreement of limited partnership of the Master Fund, as the same may be amended or restated from time to time in accordance with the terms thereof.

"***Negative Basis***" means, with respect to any Partner and as of any time of calculation, the excess of such Partner's "adjusted tax basis" in its Interest for U.S. federal income tax purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer or assignment of such Interest, including by reason of death) over the amount that such Partner is entitled to receive upon withdrawal from or liquidation of the Partnership.

"***Negative Basis Partner***" means any Partner who withdraws all or a portion of its Interest from the Partnership and who has a Negative Basis as of the Withdrawal Date, but such Partner

Appx. 03301

shall cease to be a Negative Basis Partner at such time as it shall have received allocations pursuant to Section 3.10(d) equal to such Partner's Negative Basis as of the Withdrawal Date and without regard to such Partner's share of the liabilities of the Partnership under Section 752 of the Code.

"**Net Assets**" means the total value, as determined by the General Partner or its delegate(s) in accordance with Section 7.3, of all Investments and other assets of the Partnership (including net unrealized appreciation or depreciation of the assets and accrued interest and dividends receivable net of any withholding taxes), less an amount equal to all accrued debts, liabilities and obligations of the Partnership (including any reserves for contingencies accrued pursuant to Section 3.6).  Except as otherwise expressly provided herein, Net Assets as of the first day of any Fiscal Period shall be determined on the basis of the valuation of assets conducted as of the close of the immediately preceding Fiscal Period but after giving effect to any capital contributions made by any Partner subsequent to the last day of such immediately preceding Fiscal Period and after giving effect to Management Fee charges (borne indirectly at the Master Fund level) and Net Assets as of the last day of any Fiscal Period shall be determined before giving effect to any of the following amounts payable by the Partnership generally or in respect of any Investment which are effective as of the date on which such determination is made:

      (a)      any Performance Allocation (borne indirectly at the Master Fund level) as of the date on which such determination is made;

      (b)      any withdrawals or distributions payable to any Partner which are effective as of the date on which such determination is made; and

      (c)      withholding or other taxes (including any amounts under any BBA provision), expenses of processing withdrawals and other items payable, any increases or decreases in any reserves or other amounts recorded pursuant to Section 3.6 and any increases or decreases in the value of any Limited Participation Investments during the Fiscal Period ending as of the date on which such determination is made, to the extent the General Partner determines that, pursuant to any provisions of this Agreement, such items are not to be charged ratably among the Capital Accounts of all Partners on the basis of their respective Partnership Percentages as of the commencement of the Fiscal Period.

"**Net Loss**" means any amount by which the Net Assets as of the first day of a Fiscal Period exceed the Net Assets as of the last day of the same Fiscal Period.

"**Net Profit**" means any amount by which the Net Assets as of the last day of a Fiscal Period exceed the Net Assets as of the first day of the same Fiscal Period.

"**Nonaffiliated Limited Partners**" means Limited Partners that are not affiliates or employees of the Investment Manager.

"**Non-Voting Interests**" means an Interest, the holder of which is not entitled to vote, consent or withhold consent with respect to any Partnership matter (including, but not limited to, mergers, sales of substantially all assets or consolidations of the Partnership), except as otherwise expressly provided in this Agreement.

Appx. 03302

"***Offshore Fund***" means Highland Dynamic Income Fund, Ltd., a Cayman Islands exempted company.

"***Other Account***" means any assets or investment of the General Partner, or any assets managed by the General Partner or any Affiliate of the General Partner for the account of any Person or entity (including investment vehicles) other than the Partnership, which are invested or which are available for investment in securities or other instruments or for trading activities whether or not of the specific type being conducted by the Partnership.

"***Other Agreement***" has the meaning set forth in Section 8.12.

"***Partner***" means the General Partner or any of the Limited Partners, except as otherwise expressly provided herein, and "***Partners***" means the General Partner and all of the Limited Partners.

"***Partnership***" means the limited partnership formed pursuant to this Agreement.

"***Partnership Minimum Gain***" has the meaning set forth in Regulations Section 1.704-2(b)(2) and (d).

"***Partnership Percentage***" means a percentage established for each Partner on the Partnership's books as of the first day of each Fiscal Period.  The Partnership Percentage of a Partner for a Fiscal Period shall be determined by dividing the amount of such Partner's Capital Account as of the beginning of the Fiscal Period (after crediting all capital contributions to such Capital Account which are effective as of such date, net of all deductions, including Management Fees borne at the Master Fund level) by the sum of the Capital Accounts of all of the Partners as of the beginning of the Fiscal Period (after crediting all capital contributions to the Partnership which are effective as of such date, net of all deductions, including Management Fees borne at the Master Fund level).  The sum of the Partnership Percentages of all Capital Accounts for each Fiscal Period shall equal 100%.

"***Performance Allocation***" means the performance allocation, as defined in the Master Fund Partnership Agreement, allocated to the General Partner pursuant to the Master Fund Partnership Agreement.

"***Person***" means any individual, partnership, corporation, limited liability company, trust, or other entity.

"***Plan Assets***" means assets of the Partnership that are considered to be assets of an ERISA Partner, pursuant to Section 3(42) of ERISA or otherwise.

"***Positive Basis***" means, with respect to any Partner and as of any time of calculation, the excess of the amount that such Partner is entitled to receive upon withdrawal from or liquidation of the Partnership over such Partner's "adjusted tax basis" in its Interest for U.S. federal income tax purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer or assignment of such Interest, including by reason of death).

Appx. 03303

"*Positive Basis Partner*" means any Partner who withdraws all or a portion of its Interest from the Partnership and who has a Positive Basis as of the Withdrawal Date, but such Partner shall cease to be a Positive Basis Partner at such time as it shall have received allocations pursuant to Section 3.10(c) equal to such Partner's Positive Basis as of the Withdrawal Date and without regard to such Partner's share of the liabilities of the Partnership under Section 752 of the Code.

"*Pricing Committee*" has the meaning set forth in Section 4.7.

"*Principals*" means James D. Dondero and Mark K. Okada.

"*Prior Agreement*" has the meaning set forth in the preamble hereto.

"*Regulations*" means the proposed, temporary and final U.S. Treasury Regulations promulgated under the Code, including any successor regulations.

"*Regulatory Allocations*" has the meaning set forth in Section 3.11.

"*Revocation Notice*" has the meaning set forth in Section 8.11(c).

"*RIC Limited Partner*" means a Limited Partner that is registered as an investment company under the Investment Company Act.

"*Schedule of Partners*" means a schedule to be maintained by the General Partner containing the following information with respect to each Partner: (a) name; (b) address; (c) date of admission; (d) amount and date of all capital contributions and withdrawals; and (e) the amount and date of any permitted Transfers.

"*Securities Act*" means the U.S. Securities Act of 1933, as amended from time to time.

"*Series*" means a designated series of Interests established in accordance with this Agreement and having such terms as the General Partner determines.

"*Tax Matters Partner*" has the meaning set forth in Section 7.2(a).

"*Transfer*" means any direct or indirect sale, exchange, transfer, assignment, pledge, encumbrance, charge, exchange, hypothecation, placing of a lien or a security interest on an Interest or any other disposition by a Partner of its Interest to or in favor of another party, whether voluntary or involuntary (including, but not limited to, being offered or listed on or through any placement agent, intermediary, online service, site, agent or similar Person).

"*Withdrawal Date*" has the meaning set forth in Section 5.5(a).

"*Withdrawal Gate*" has the meaning set forth in 5.5(d).

"*Withdrawal Notice*" has the meaning set forth in Section 5.5(a).

Appx. 03304

---

**Article II**
**ORGANIZATION**

---

**2.1   Continuation of Limited Partnership**

(a)      The General Partner and the Limited Partners hereby agree to continue the Partnership as a limited partnership under and pursuant to the Act and this Agreement.

(b)      The General Partner has executed and filed with the Secretary of State of the State of Delaware an Amended Certificate of Limited Partnership of the Partnership (the "*Certificate*"), and shall execute, acknowledge and file with the Secretary of State of the State of Delaware any further amendments thereto as may be required by the Act, and any other instruments, documents and certificates which, in the opinion of the Partnership's legal counsel, may from time to time be required by the laws of the United States of America, the State of Delaware or any other jurisdiction in which the Partnership determines to do business, or any political subdivision or agency thereof or which such legal counsel may deem necessary or appropriate to effectuate, implement and continue the valid and subsisting existence and business of the Partnership.  The General Partner shall cause any required amendment to the Certificate to be filed promptly following the event requiring such amendment. All amendments may be signed by the General Partner (as required by the Act) and may be signed either personally or by an attorney-in-fact.

(c)      The parties hereto agree to operate the Partnership as a limited partnership pursuant to the provisions of the Act and of this Agreement and agree that the rights and liabilities of the Limited Partners and the General Partner shall be as provided in the Act for limited partners and the general partner except as provided herein.

(d)      The General Partner may change the domicile of the Partnership to another state, country or other jurisdiction where advisable due to legal, tax or other considerations; *provided* that no such change of domicile would reasonably be expected to have a material adverse effect on the Limited Partners.

(e)      The parties acknowledge that they intend that the Partnership be taxed in the United States as a partnership and not as an association taxable as a corporation for U.S. federal income tax purposes.  No election may be made to treat the Partnership as other than a partnership for U.S. federal income tax purposes.  Each Partner agrees not to treat, on any income tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with the treatment of such item by the Partnership.

8

**2.2     Name of Partnership**

(a)     The name of the Partnership is Highland Dynamic Income Fund, L.P. or such other name as the General Partner may hereafter adopt, subject to causing an amendment to the Certificate to be filed with the Secretary of State of the State of Delaware in accordance with the Act.  The Partnership commenced operations in 2013 as Highland Capital Loan Fund, L.P., and pursuant to Section 2.1(b), the General Partner filed an amended Certificate with the Secretary of State of the State of Delaware to affect the change of name.   The General Partner will send a notice of any change of name to the Limited Partners.   All business of the Partnership will be conducted under such name or under such other name as the General Partner deems appropriate.

(b)     The Partnership shall have the exclusive ownership and right to use the Partnership name so long as the Partnership continues, despite the withdrawal, expulsion, resignation or removal of any Limited Partner, but upon the Partnership's termination or at such time as there ceases to be a general partner, the Partnership shall assign the name and the goodwill attached thereto to the General Partner without payment by the assignee(s) of any consideration therefor.

**2.3     Principal Office; Registered Office**

(a)     The Partnership shall have its principal office at such location as the General Partner shall designate from time to time.

(b)     The Partnership shall have its registered office at c/o The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801, unless a different registered office or agent is designated from time to time by the General Partner.

**2.4     Term of Partnership**

The term of the Partnership commenced on the date on which the Certificate was filed with the office of the Secretary of State of the State of Delaware and will continue until dissolved pursuant to Section 6.1 (unless its term is extended pursuant to Section 6.1).  The legal existence of the Partnership as a separate legal entity shall continue until the cancellation of the Certificate.

**2.5     Object and Powers of Partnership**

(a)     The Partnership is formed solely for the object and purpose of indirectly investing in Investments by subscribing for and holding a limited partner interest in, and investing all of its investible assets in, the Master Fund.  The Partnership is a directed feeder fund for the Limited Partners with respect to the Master Fund. Notwithstanding any other provision of this Agreement, the Partnership shall perform no other business and shall not make directly any Investments as such Investments will be made by the Master Fund.

9

Appx. 03306

(b)    Notwithstanding any other provision of this Agreement, the Partnership, and the General Partner on behalf of the Partnership, may execute, deliver and perform any agreement with any Limited Partner or prospective Limited Partner without any further act, vote or approval of any Partner. The General Partner is hereby authorized to enter into the agreements described in the preceding sentence on behalf of the Partnership, but such authorization should not be deemed a restriction on the power of the General Partner to enter into other agreements on behalf of the Partnership. In furtherance of this purpose, the Partnership shall have all powers necessary, suitable or convenient for the accomplishment of the aforesaid purpose, subject to the limitations and restrictions set forth herein alone or with others, as principal or agent.

(c)    Each Limited Partner hereby acknowledges that the Partnership is not expected to qualify as an "operating company" for purposes of ERISA, and the assets of the Partnership may therefore constitute Plan Assets of ERISA Partners; and that the Partnership is therefore intended to be structured as a directed feeder fund through which the Limited Partners may participate in an investment in the Master Fund and with respect to which the General Partner is not, except as expressly provided under the terms of this Agreement, intended to have any discretionary authority or control with respect to the investment of the assets of the Partnership. Each Limited Partner (i) shall by making a capital contribution to the Partnership with respect to the Partnership's underlying interests in the Master Fund, be deemed to direct the General Partner to invest the amount of such capital contribution in the Master Fund and (ii) acknowledges that during any period when the underlying interests of the Partnership in the Master Fund are deemed to constitute Plan Assets, the General Partner will act as a custodian with respect to the assets of such Limited Partner, but is not intended to be a fiduciary with respect to the assets of such Limited Partner for purposes of ERISA, the Code or any applicable similar law. No provision of this Agreement shall create any obligation of the general partner of the Master Fund and the general partner of the Master Fund will not have any fiduciary obligations to any person, under ERISA or otherwise, pursuant to this Agreement. Any action or determination of the general partner of the Master Fund referenced herein shall only regard such action or determination made by the general partner of the Master Fund solely in their capacity as the general partner thereof.

**2.6**    **Liability of Partners**

In no event shall any Limited Partner (or former Limited Partner) be obligated to make any contribution to the Partnership in addition to its agreed capital contribution (or other payments provided for herein) or have any liability for the repayment or discharge of the debts and obligations of the Partnership except to the extent provided herein or as required by the Act.

Appx. 03307

**2.7    Actions by Partnership**

The Partnership may execute, deliver and perform all contracts, agreements and other undertakings and engage in all activities and transactions as may in the opinion of the General Partner be necessary or advisable to carry out its objects as set forth in Section 2.5 above.

**2.8    Reliance by Third Parties**

Persons dealing with the Partnership are entitled to rely conclusively upon the power and authority of the General Partner as herein set forth.

**2.9    UCC Status of Limited Partner Interests**

(a)    For purposes of the grant, pledge, attachment or perfection of a security interest in an Interest or otherwise, the Interests shall be deemed to be "securities" within the meaning of Section 8-102(a)(15) and as provided by Section 8-103(c) of the Uniform Commercial Code as in effect from time to time in the State of Delaware or analogous provisions in the Uniform Commercial Code in effect in any other jurisdiction.

(b)    Any Interest may be evidenced by a certificate of partnership interest issued by the Partnership in such form as the General Partner may approve. Every certificate representing an Interest shall bear a legend substantially in the following form:

"For the purposes of Section 8-103 of the Uniform Commercial Code of the United States of America in effect in any relevant jurisdiction, the certificates representing an interest in the Limited Partnership shall constitute "securities" within the meaning of Section 8-102 and Section 8-103 of the Uniform Commercial Code."

**2.10    Series of Interests**

The General Partner, at any time, may without notification to or consent of the other Limited Partners, create and offer different Series of Interests in the Partnership with such rights, obligations, liabilities, privileges, designations and preferences (including different investment strategies, underlying investments, degrees of leverage, management fees, performance allocations, brokerage commissions, transparency, withdrawal rights, co-investment opportunities, and other differences) as the General Partner may determine upon the issuance of such Series; provided that such Series would not reasonably be expected to have a material adverse effect on the existing Limited Partners. The terms and rights of such Series may be set forth in the Partnership's offering memorandum, supplement thereto or a "side letter" or other agreement, which the General Partner may incorporate by reference. The General Partner, in its sole discretion, shall choose which Limited Partners may join a Series. Although the Partnership may offer more than one Series of Interests, the Partnership is not a Delaware series limited partnership and the assets and liabilities of the Partnership are not segregated by Series.

**Appx. 03308**

---

### Article III
### CAPITAL

---

**3.1     Contributions to Capital**

(a)     The minimum required initial capital contribution of each Limited Partner to the Partnership shall be $1,000,000, or such lesser amount as the General Partner may permit.  The General Partner may change the required minimum initial contribution amount at any time.

(b)     The Partnership may accept additional contributions at such times as the General Partner may permit, but no Limited Partner shall be obligated to make any additional capital contribution to the Partnership, subject to the provisions of Section 3.5 and any contrary provision of the Act.

(c)     The General Partner or an Affiliate has made a capital contribution to the Partnership as set forth in the Schedule of Partners.  Except as required by the Act, the General Partner shall not be required to make any additional capital contributions to the Partnership.  The General Partner may, however, make capital contributions to the Partnership in such amounts and at such times as it may determine.  The General Partner or any of its Affiliates shall have the right at any time to make additional capital contributions as a Limited Partner or General Partner.  If the General Partner or any of its Affiliates or Affiliated Investors makes a capital contribution as a Limited Partner, the General Partner will have authority to waive or reduce the Management Fee or the Performance Allocation with respect to such Limited Partner.

(d)     The Partnership may enter into placement agent agreements providing compensation to unaffiliated third parties to assist in obtaining subscriptions for Interests, but such placement agent fees will not affect the subscription amount and will not be collected by or from the Partnership.  Placement agents may be paid a portion of the Management Fee attributable to the investors solicited by such placement agents thereby reducing the compensation received by the Investment Manager.  Placement agents may be indemnified by the Partnership.

(e)     Except as otherwise permitted by the General Partner (i) initial or additional capital contributions by each Partner shall be payable in cash and in one installment, and (ii) initial contributions shall be due as of the date of admission of such Person as a Limited Partner of the Partnership.

**3.2     Rights of Partners in Capital**

(a)     No Partner shall be entitled to interest on its capital contributions to the Partnership.  For the avoidance of doubt, interest income, if any, earned on

12

subscription amounts remitted to the Partnership prior to the date an Interest is issued to a Partner will be payable to the Partnership and not applied toward the purchase of an Interest.

(b)     No Partner shall have the right to the return of any capital contribution to the Partnership except (i) upon withdrawal of such Partner pursuant to Section 5.5 or (ii) upon the dissolution of the Partnership pursuant to Section 6.1. The entitlement to any such return shall be limited to the value of the Capital Account of the Partner. The General Partner shall not be liable for the return of any such amounts.

**3.3     Capital Accounts**

(a)     The Partnership maintains a separate capital account (each a "***Capital Account***") on the books and records of the Partnership for each Partner. The General Partner may, in its discretion, maintain separate memorandum sub-accounts related to a Capital Account for such purposes as the General Partner may determine appropriate, including for recordkeeping, accounting or reporting or to otherwise give effect to the provisions of this Agreement, and, if so determined by the General Partner, with each memorandum sub-account being maintained as if it were the Capital Account of a separate Partner for all purposes of this Agreement unless the context requires otherwise. References herein to a "Capital Account" shall be deemed to refer to such a capital memorandum sub-account where the context admits. Each Capital Account must reflect the aggregate sum of the balances of memorandum sub-accounts in such Partner's Capital Account.

(b)     Each Capital Account shall have an initial balance equal to the amount of any cash and the net value of any property constituting the relevant Partner's initial capital contribution to the Partnership.

(c)     Each Capital Account shall be increased by the amount of any cash and the net value of any property constituting additional contributions to such Partner's Capital Account permitted pursuant to Section 3.1.

(d)     Each Capital Account shall be reduced by the amount of any cash and the net value of any property withdrawn by or distributed to the relevant Partner pursuant to Sections 5.5 or 6.3, including any amount deducted from any such withdrawal or distribution pursuant to Section 5.5(f).

(e)     Each Capital Account (including any corresponding capital sub-accounts) shall be adjusted to reflect allocations and other changes in the value of such Capital Account in the manner specified in the remaining provisions of this Article III.

**3.4     Allocation of Net Profit and Net Loss**

(a)     Subject to the remaining provisions of this Article III, as of the last day of each Fiscal Period, any Net Profit or Net Loss for such Fiscal Period shall be separately allocated among and credited to or debited against the Capital Accounts of the

**Appx. 03310**

Partners in proportion to their respective Partnership Percentages for such Fiscal Period.

(b)     Notwithstanding Section 3.4(a), items of income, gain, loss, deduction, credit and expenses for a Fiscal Period that are not allocable to specific Investments of the Master Fund, including short term interest income, receipt of any withdrawal charges by the Partnership, and audit, administration and legal expenses, shall be credited to or debited against the Capital Accounts of the Partners *pro rata* in accordance with their Partnership Percentages for such Fiscal Period.

(c)     Notwithstanding Section 3.4(a), items of income, gain, loss, deduction, credit and expenses that relate to a Limited Participation Investment shall be allocated exclusively to Partners who, as the General Partner determines, are eligible to participate in such Limited Participation Investment on a *pro rata* basis based on their relative participation in such Investment.

## 3.5     Allocation of Management Fees, Withholding Taxes and Certain Other Expenditures

(a)     The Partnership shall bear its allocable portion of the Management Fees in accordance with the Master Fund Partnership Agreement. The Management Fees borne by the Partnership shall be allocated to the Capital Accounts of the relevant Limited Partners subject to the Management Fee, and such Capital Accounts shall be subject to the corresponding adjustments. The Management Fee shall be charged at the Master Fund level through the use of capital sub-accounts in the Master Fund that correspond to the Capital Accounts in the Partnership.

(b)     Notwithstanding anything to the contrary herein, to the extent the General Partner or the Partnership is required by law (including under circumstances where the General Partner or the Partnership is unable to rely conclusively on any withholding certification provided by a Partner) to withhold or to make tax payments, including any interest or penalties, on behalf of or with respect to any Partner or Partners (including, without limitation, any amount attributable to an actual or imputed underpayment of taxes under any BBA provision, backup withholding or FATCA withholding), the General Partner or the Partnership may withhold such amounts and make such tax payments as so required. If the Partnership directly or indirectly pays or incurs any withholding tax or other tax obligation (including any amount under any BBA provision), or otherwise incurs a tax payment with respect to the income allocable or distributable to, or otherwise attributable to, one or more Partners, then the amount of such withholding tax, tax obligation or payment will be treated as a distribution to such Partner or Partners, as applicable, pursuant to the terms of this Agreement. Such amount will be debited against the Capital Account(s) of such Partner or Partners as of the close of the Fiscal Period during which the Partnership so withholds, pays or incurs such obligation. If the amount so withheld, paid or incurred is greater than the balance of the Capital Account(s) of the relevant Partner or Partners, as applicable, then such Partner or Partners and any successors must make a contribution to the capital of the Partnership within 10 business days after notification and demand by the

14

General Partner in the amount of such excess.  The General Partner is not obligated to apply for or obtain a refund, or reduction of or exemption from withholding tax on behalf of any Partner that may be eligible for such refund, reduction or exemption, or otherwise obligated to structure Investments so as to reduce or avoid any such withholding tax. Each Limited Partner agrees to repay to the Partnership and the General Partner and each of the partners and former partners of the General Partner, any liability for taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Limited Partner.

(c)     Except as otherwise provided for in this Agreement, any expenditures payable by the Partnership, to the extent determined by the General Partner to have been paid or withheld on behalf of, or by reason of particular circumstances applicable to, one or more but fewer than all of the Partners, shall be charged only to the relevant Capital Accounts of those Partners on whose behalf such payments are made or whose particular circumstances gave rise to such payments.  Such charges shall be debited from the relevant Capital Accounts of such Partners as of the close of the Fiscal Period during which any such items were accrued by the Partnership.

**3.6     Reserves; Adjustments for Certain Future Events**

(a)     The General Partner may cause appropriate reserves to be created, accrued and charged against Net Assets including Limited Participation Investments and proportionately against the Capital Accounts for contingent liabilities or probable losses, such reserves to be in the amounts which the General Partner deems necessary or appropriate.  The General Partner may increase or reduce any such reserve from time to time by such amounts as the General Partner deems necessary or appropriate.  The amount of any such reserve, or any increase or decrease therein, may, at the election of the General Partner, be charged or credited, as the General Partner deems appropriate, to the Capital Accounts of those parties that were Partners at the time when such reserve was created, increased, or decreased, as the case may be, or alternatively may be charged or credited to those parties that were Partners at the time of the act or omission giving rise to the contingent liability for which the reserve was established by the General Partner.

(b)     If the General Partner determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then all or a portion of such amount may be proportionately charged or credited, as appropriate, in proportion to the Capital Account balances of the current Partners as such balances existed during any such prior period.

**3.7     Performance Allocation**

The Partnership bears its allocable portion of the Performance Allocation in accordance with the Master Fund Partnership Agreement.  The Performance Allocation borne by the Partnership shall be specially allocated to the Capital Accounts of the relevant Limited Partners,

**Appx. 03312**

and such Capital Accounts shall be subject to the corresponding adjustments. The Performance Allocation shall be debited at the Master Fund level.

**3.8     Limited Participation Investments**

Whenever the Partnership indirectly makes a Limited Participation Investment through the Master Fund, a Limited Participation Sub-Account shall be established for each Partner participating in such Limited Participation Investment to reflect such Partner's *pro rata* share of all allocations and distributions attributable to transactions involving such Limited Participation Investment (and any related follow-on Investment, unless the General Partner determines to treat such follow-on Investment as a new Limited Participation Investment). Thereafter, all credits and debits relating to such Limited Participation Investment (including those specifically referred to herein) shall be allocated among the Limited Participation Sub-Accounts for such Limited Participation Investment on a *pro rata* basis in accordance with each Partner's interest in such Limited Participation Investment. Expenses that relate to a Limited Participation Investment shall be allocated exclusively among the Limited Participation Sub-Accounts for such Limited Participation Investment on a *pro rata* basis in accordance with each Partner's interest in such Limited Participation Investment.

**3.9     Allocation to Avoid Capital Account Deficits**

To the extent that any debits pursuant to this Article III would reduce the balance of the Capital Account of any Limited Partner below zero, that portion of any such debits shall instead be allocated to the Capital Account of the General Partner. Any credits in any subsequent Fiscal Period which would otherwise be allocable pursuant to this Article III to a Capital Account of any Limited Partner previously affected by the application of this Section 3.9 shall instead be allocated to the Capital Account of the General Partner in such amounts as are necessary to offset all previous debits attributable to such Limited Partner pursuant to this Section 3.9 not previously recovered.

**3.10    Allocations for Income Tax Purposes**

Notwithstanding anything to the contrary in this Agreement:

(a)     <u>Income Tax Allocations</u>. Except as otherwise required by Code Section 704(c), items of income, gain, deduction, loss, or credit that are recognized for income tax purposes in each Fiscal Year will be allocated among the Partners in such manner as to reflect equitably amounts credited to or debited against each Partner's Capital Account, whether in such Fiscal Year or in prior Fiscal Years. To this end, the Partnership will establish and maintain records which shall show the extent to which the Capital Account of each Partner will, as of the last day of each Fiscal Year, comprise amounts that have not been reflected in the taxable income of such Partner. To the extent deemed by the General Partner to be feasible and equitable, taxable income and gains in each Fiscal Year shall be allocated among the Partners who have enjoyed the related credits to their Capital Accounts, and items of deduction, loss and credit in each Fiscal Year shall be allocated among the Partners who have borne the burden of the related debits to their Capital Accounts. Foreign

16

tax credits attributable to taxes incurred by the Partnership shall be allocated in a manner consistent with Section 1.704-1(b)(4)(viii) of the Regulations. All matters concerning allocations for U.S. federal, state and/or local income tax purposes, including accounting procedures, not expressly provided for in this Agreement will be determined by the General Partner.

(b)    <u>Basis Adjustments</u>. To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Section 734(b) of the Code or Section 743(b) of the Code is required under Section 1.704-1(b)(2)(iv)(m) of the Regulations to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Regulations; *provided* that in the event that an adjustment to the book value of Partnership property is made as a result of an adjustment pursuant to Section 734(b) of the Code, items of income, gain, loss, or deduction, as computed for book and tax purposes, will be specially allocated among the Partners so that the effect of any such adjustment shall benefit (or be borne by) the Partner(s) receiving the distribution that caused such adjustment.

(c)    <u>Positive Basis Allocations</u>. If the Partnership realizes gains or items of gross income (including short term capital gain) from the sale of Partnership assets for U.S. federal income tax purposes for any Fiscal Year in which one or more Positive Basis Partners withdraws all or a portion of its Interest from the Partnership pursuant to Section 5.5, the General Partner may elect: (i) to allocate such gains or items of gross income among such Positive Basis Partners, *pro rata* in proportion to the respective Positive Basis of each such Positive Basis Partner, until either the full amount of such gains or items of gross income shall have been so allocated or the Positive Basis of each such Positive Basis Partner shall have been eliminated; and (ii) to allocate any gains or items of gross income not so allocated to Positive Basis Partners to the other Partners in such manner as shall reflect equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; *provided*, *however*, that if, following such Fiscal Year, the Partnership realizes gains or items of gross income from a sale of an Investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the liquidating share of any Positive Basis Partner that continues to be a Partner in the Partnership following such withdrawal (*i.e.,* such Positive Basis Partner effected a partial, and not a complete, withdrawal of its Interest), there shall be allocated to such Positive Basis Partner an amount of such gains or items of gross income equal to the amount, if any, by which its Positive Basis as of the Withdrawal Date exceeds the amount allocated to such Partner pursuant to clause (i) of this sentence.

(d)    <u>Negative Basis Allocations</u>. If the Partnership realizes net losses or items of gross loss or deduction (including short term capital loss) from the sale of Partnership assets for U.S. federal income tax purposes for any Fiscal Year in which one or

Appx. 03314

more Negative Basis Partners withdraws all or a portion of its Interest from the Partnership pursuant to Section 5.5, the General Partner may elect: (i) to allocate such net losses or items of gross loss or deduction among such Negative Basis Partners, *pro rata* in proportion to the respective Negative Basis of each such Negative Basis Partners, until either the full amount of such losses or items of loss or deduction shall have been so allocated or the Negative Basis of each such Negative Basis Partner shall have been eliminated; and (ii) to allocate any net losses or items of gross loss or deduction not so allocated to Negative Basis Partners to the other Partners in such manner as shall reflect equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; *provided, however*, that if, following such Fiscal Year, the Partnership realizes net losses or items of gross loss and deduction from a sale of an Investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the liquidating share of any Negative Basis Partner that continues to be a Partner in the Partnership following such withdrawal (*i.e.*, such Negative Basis Partner effected a partial, and not a complete, withdrawal of its Interest), there shall may be allocated to such Negative Basis Partner an amount of such net losses or items of gross loss or deduction equal to the amount, if any, by which its Negative Basis as of the Withdrawal Date exceeds the amount allocated to such Partner pursuant to clause (i) of this Section 3.10(d).

(e) <u>Qualified Income Offset</u>. In the event any Limited Partner unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Partnership income and gain will be specially allocated to each such Limited Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the deficit balance in the Capital Account of such Limited Partner as quickly as possible; *provided* that an allocation pursuant to this Section 3.10(e) may be made only if and to the extent that such Limited Partner would have a deficit balance in its Capital Account after all other allocations provided for in this Article III have been tentatively made as if this Section 3.9(e) were not in this Agreement. This Section 3.10(e) is intended to constitute a "qualified income offset" within the meaning of Section 1.704-1(b)(2)(ii) of the Regulations and shall be interpreted consistently therewith.

(f) <u>Minimum Gain Chargeback</u>. Notwithstanding any other provision of this Section 3.10, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, the Partners will be specially allocated items of Partnership income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to the portion of any such Partner's share of the net decrease in Partnership Minimum Gain, determined in accordance with Regulations Sections 1.704-2(f) and (g). This Section 3.10(f) is intended to comply with the minimum gain chargeback requirement in such sections of the Regulations and must be interpreted consistently therewith.

(g) <u>Gross Income Allocation</u>. In the event any Limited Partner has a deficit Capital Account at the end of any Fiscal Year that is in excess of the sum of (i) the amount

18

such Limited Partner is obligated to restore pursuant to any provision of this Agreement and (ii) the amount such Limited Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, each such Limited Partner will be specially allocated items of Partnership gross income and gain in the amount of such excess as quickly as possible; *provided* that an allocation pursuant to this Section 3.10(g) may be made only if and to the extent that such Limited Partner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article III have been made as if Section 3.10(e) and this Section 3.10(g) were not in this Agreement.

(h)     Section 704(b) Compliance.  The allocations provided in this Section 3.10 are intended to comply with the Regulations under Section 704(b) of the Code and may, as determined by the General Partner, be interpreted and applied in a manner consistent therewith.

**3.11    Curative Allocations**

The allocations set forth in Sections 3.10(b), (e), (f) and (g) (the "***Regulatory Allocations***") are intended to comply with certain requirements of the Regulations.  It is the intent of the Partners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Partnership income, gain, loss, or deduction pursuant to this Section 3.11.  Therefore, notwithstanding any other provision of this Article III (other than the Regulatory Allocations), the General Partner shall make such offsetting special allocations of the Partnership income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Partner's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Partner would have had if the Regulatory Allocations were not part of this Agreement and all Partnership items were allocated pursuant to other provisions of this Article III (other than the Regulatory Allocations).

**3.12    Individual Partners' Tax Treatment**

Each Partner agrees not to treat, on any U.S. federal, state, local and/or non-U.S. income tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with the treatment of such item by the Partnership.

**3.13    Distributions**

(a)     The amount and timing of any distributions from the Partnership shall be determined by the General Partner.  Distributions will generally be made in proportion to the Capital Account balances of the Partners at the beginning of the Fiscal Period when made; *provided* that distributions related to Limited Participation Investments will be made based on the proportionate interests of the Capital Accounts participating in such Investments.   Any distributions may be paid in cash, in kind or partly in cash and partly in kind.

19

(b)     Notwithstanding any provision to the contrary contained in this Agreement, the Partnership, and the General Partner on behalf of the Partnership, may not make a distribution to any Partner on any account of its Interest if such distribution would violate Section 17-607 of the Act or other applicable law.

_____

**Article IV**
**MANAGEMENT**

_____

**4.1     Duties and Powers of the General Partner**

(a)     Subject to the terms and conditions of this Agreement, the General Partner shall have complete and exclusive power and responsibility, to the fullest extent permitted by the Act, for managing and administering the affairs of the Partnership (other than any investment or trading activities, which are entered into at the Master Fund level and managed by the Investment Manager), and shall have the power and authority to do all things that the General Partner considers necessary or desirable to carry out its duties hereunder and to achieve the purposes of the Partnership.

(b)     The General Partner shall have the right, without the notification to or consent of any Limited Partner or other Person, to make adjustments to the structure of the Partnership in order to address applicable structural, ownership, legal, or regulatory issues, or to improve overall tax efficiency; *provided* that no such adjustment would cause any material adverse consequences to the Limited Partners.

(c)     Without limiting the generality of the General Partner's duties and powers hereunder and notwithstanding anything to the contrary contained herein, the General Partner shall have full power and authority, subject to the other terms and provisions of this Agreement, to execute, deliver and perform such contracts, agreements and other undertakings on behalf of the Partnership, without the consent or approval of any other Person, and to engage in all activities and transactions, as it may deem necessary or advisable for, or as may be incidental to, the conduct of the business contemplated by this Section 4.1, including, without in any manner limiting the generality of the foregoing, (i) contracts, agreements, undertakings and transactions with any Partner or with any other Person, firm or corporation having any business, financial or other relationship with any Partner or Partners, (ii) agreements with each Limited Partner in connection with its purchase of an Interest, including a subscription agreement wherein such Limited Partner agrees to be bound by the terms of this Agreement, (iii) any agreements to induce any Person to purchase an Interest and (iv) the Investment Management Agreement delegating to the Investment Manager certain of the powers and authority vested by this Agreement in the General Partner as the General Partner and the Investment Manager may agree from time to time, each without any further act, approval or vote of any Person.

20

(d)　　The General Partner may terminate or replace the Investment Manager in accordance with the terms of the Investment Management Agreement. The General Partner may delegate to any other Person any power and authority vested in the General Partner pursuant to this Agreement that is not otherwise delegated to the Investment Manager.

(e)　　Every power vested in the General Partner pursuant to this Agreement shall be construed as a power to act (or not to act) in its sole and absolute discretion, except as otherwise expressly provided herein. No provision of this Agreement shall be construed to require the General Partner to violate the Act or any other law, regulation or rule of any self-regulatory organization.

(f)　　Notwithstanding any other provision of this Agreement or otherwise applicable provision of law or equity, whenever in this Agreement, the General Partner is permitted or required to make a decision (i) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, the General Partner shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall, to the fullest extent permitted by applicable law, have no duty or obligation to give any consideration to any interest of or factors affecting the Partnership or the Limited Partners, or (ii) in its "good faith" or under another expressed standard, the General Partner shall act under such express standard and shall not be subject to any other or different standards. Unless otherwise expressly stated, for purposes of this Section 4.1(g), the General Partner shall be deemed to be permitted or required to make all decisions hereunder in its sole discretion.

(g)　　If requested by the General Partner, each Limited Partner shall deliver to the General Partner: (i) an affidavit in form satisfactory to the General Partner that the applicable Limited Partner (and its partners, shareholders, members, and/or beneficial owners, and/or controlling persons, as the case may be) is not subject to withholding under the provisions of any United States federal, state, local or non-U.S. laws; (ii) any certificate that the General Partner may reasonably request with respect to any such laws; (iii) any other form or instrument reasonably requested by the General Partner relating to such Limited Partner's status under such laws; and/or (iv) any information or documentation prescribed under FATCA or as may be necessary for the Partnership to comply with its obligations, or to avoid withholding, under FATCA or any other automatic exchange of information agreement or arrangement, including, without limitation, the Organisation for Economic Cooperation and Development's Common Reporting Standard. In the event that a Limited Partner fails or is unable to deliver to the General Partner an affidavit described in Section 4.1(g), the General Partner may withhold amounts from such Partner in accordance with Section 3.5(b).

**4.2　　Expenses**

(a)　　Subject to Section 4.2(f), each of the General Partner and the Investment Manager pays all of its own operating and overhead costs without reimbursement by the Partnership (except liability insurance and items described in Section

21

4.2(b)(iv)). The Partnership will not have its own separate employees or officers, and it will not reimburse the General Partner or the Investment Manager for salaries, office rent and other general overhead expenses of the General Partner or the Investment Manager.

(b)    The Partnership, and not the General Partner or the Investment Manager, will pay, or reimburse the General Partner and the Investment Manager for, all other costs, fees and expenses arising in connection with the Partnership's operations, including, without duplication, its *pro rata* share of the Master Fund's expenses. Such expenses payable by the Partnership include the following:

(i)    the Partnership's *pro rata* share of all investment-related expenses (including those related to identifying and evaluating contemplated investments, whether or not such contemplated investments are actually made), including, but not limited to, brokerage commissions and other transaction costs, expenses related to short sales, clearing and settlement charges, expenses related to proxies, underwriting and private placements, custodial fees, transfer agent fees, bank service fees, any governmental, regulatory, licensing, filing or registration fees incurred in compliance with the rules of any self-regulatory organization or any federal, state or local laws, consulting and any other professional fees or compensation (including investment banking expenses) relating to particular investments or contemplated investments, appraisal fees and expenses, investment-related travel and lodging expenses and research-related expenses (including, without limitation, news and quotation equipment and services), fees to third-party providers of risk-monitoring services, investment and trading-related computer hardware and software, including, without limitation, trade order management software (i.e., software used to route trade orders);

(ii)    accounting (including accounting software), audit and tax preparation expenses;

(iii)    costs and expenses associated with reporting and providing information to existing and prospective investors;

(iv)    any legal fees and costs (including indemnification expenses, regulatory costs and settlement costs) arising in connection with any litigation or regulatory investigation instituted against the Partnership, the General Partner, the Investment Manager or any of their respective affiliates in their capacity as such, subject to Section 4.5;

(v)    except as otherwise provided in Section 3.5, any withholding, transfer or other taxes imposed or assessed upon, or payable by, the Partnership (including interest and penalties);

(vi)     costs of any meeting of the Partners (or of obtaining the consent of the Partners in lieu of meeting);

(vii)    expenses related to the Advisory Committee and the Pricing Committee;

(viii)   premiums for directors' and officers' liability insurance (if any) and any other insurance benefiting the Partnership;

(ix)     Management Fees;

(x)      administrative expenses (including, without limitation, the fees and expenses of the Administrator in relation to its services provided pursuant to the administration agreement);

(xi)     fees relating to valuing the Partnership's assets;

(xii)    expenses related to the maintenance of the Partnership's registered office;

(xiii)   corporate licensing expenses;

(xiv)    extraordinary expenses; and

(xv)     any costs or expenses of winding up and liquidating the Partnership.

(xvi)    a *pro rata* portion of similar costs and expenses with respect to the Master Fund.

(c)     Expenses generally will be borne *pro rata* by the Partners in accordance with their respective Capital Account balances; *provided* that expenses may be specially allocated among the Partners as follows:

(i)      with respect to expenses related to Investments (other than Limited Participation Investments), *pro rata* in accordance with their respective Capital Account balances exclusive of the value of any Limited Participation Sub-Account; and

(ii)     as provided elsewhere in this Agreement, including Sections 3.4, 3.5, 3.6, 3.8 and 5.5.

(d)     Each of the General Partner and the Investment Manager, as appropriate, shall be entitled to reimbursement from the Partnership for any of the expenses paid by it on behalf of the Partnership pursuant to Section 4.2(b); *provided* that the General Partner may absorb any or all of such expenses incurred on behalf of the Partnership. The Investment Manager may retain, in connection with its responsibilities hereunder, the services of others to assist in the investment advice to be given to the Partnership, including, but not limited to, any affiliate of the Investment Manager, but payment for any such services shall be assumed by the Investment Manager and the Partnership shall not have any liability therefor;

Appx. 03320

*provided, however*, that the Investment Manager, in its sole discretion, may retain the services of independent third party professionals, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the Partnership hereunder, and the Partnership shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

(e)     If the General Partner or the Investment Manager, as appropriate, shall incur any of the expenses referred to in Section 4.2(b) for the account or for the benefit of, or in connection with its activities or those of its Affiliates on behalf of, both the Partnership and any Other Account, the General Partner or the Investment Manager, as appropriate, will allocate such expense among the Partnership and each such Other Account in proportion to the size of the Investment made by each in the activity or entity to which the expense relates, or in such other manner as the General Partner considers fair and reasonable.

(f)     Each of the General Partner and the Investment Manager is entitled to use "soft dollars" generated by the Master Fund to pay for certain investment research and brokerage services that provide lawful and appropriate assistance to the General Partner or the Investment Manager in the performance of investment decision-making responsibilities to the extent such use falls within the safe harbor afforded by Section 28(e) of the Securities Exchange Act of 1934, as amended, or is otherwise reasonably related to the investment decision-making process, or to cover certain Partnership expenses described in Section 4.2(b). Use of "soft dollars" by the General Partner or the Investment Manager as described herein shall not constitute a breach by the either the General Partner or the Investment Manager of any fiduciary or other duty which the General Partner or the Investment Manager may be deemed to owe to the Partnership or its Partners.

## 4.3    Rights of Limited Partners

The Limited Partners shall take no part in the management, control or operation of the Partnership's business, and shall have no right or authority to act for the Partnership or to vote on matters other than the matters set forth in this Agreement or as required by applicable law. Except as otherwise provided herein or required by law, a Limited Partner shall have no liability for the debts or obligations of the Partnership.

## 4.4    Other Activities of Partners

(a)     The General Partner shall not be required to devote any specific amount of its time to the affairs of the Partnership, but shall devote such of its time to the business and affairs of the Partnership as it shall determine in good faith to be necessary to conduct the affairs of the Partnership for the benefit of the Partnership and the Partners.

(b)     Each Partner agrees that any other Partner, and any partner, director, officer, shareholder, member, Affiliate or employee of any other Partner, may engage in or

Appx. 03321

possess an interest in other business ventures or commercial dealings of every kind and description, independently or with others, including, but not limited to, management of other accounts, investment in, or financing, acquisition and disposition of, securities, investment and management counseling, brokerage services, serving as directors, officers, advisers or agents of other companies, partners of any partnership, or trustee of any trust, or entering into any other commercial arrangements, and will not be disqualified solely on the basis that any such activities may conflict with any interest of the parties with respect to the Partnership. Without in any way limiting the foregoing, each Partner hereby acknowledges that (i) none of the Partners or their respective partners, directors, officers, shareholders, members, Affiliates or employees shall have any obligation or responsibility to disclose or refer any of the investment or other opportunities obtained through activities contemplated by this Section 4.4(b) to the General Partner or the Limited Partners, but may refer the same to any other party or keep such opportunities for their own benefit; and (ii) the Partners and their respective partners, directors, officers, shareholders, members, Affiliates and employees are hereby authorized to engage in activities contemplated by this Section 4.4(b) with, or to purchase, sell or otherwise deal or invest in Investments issued by, companies in which the General Partner might from time to time invest or be able to invest or otherwise have any interest on behalf of the Partnership, without the consent or approval of the Partnership or any other Partner. The Partners expressly agree that no other Partner shall have any rights in or to such other activities, or any profits derived therefrom.

(c) The General Partner and its Affiliates shall allocate investment opportunities to the Partnership and any Other Account fairly and equitably over time. Notwithstanding the foregoing, the General Partner is under no obligation to accord exclusivity or priority to the Partnership in the event of limited investment opportunities. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) whether the risk-return profile of the proposed Investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific Investment under consideration or in the context of the portfolio's overall holdings; (ii) the potential for the proposed Investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (iii) liquidity requirements of the account; (iv) potentially adverse tax consequences; (v) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed Investment; and (vi) the need to re-size risk in the account's portfolio. The General Partner has the authority to allocate trades to multiple accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the General Partner may allocate the trades among different accounts on a basis it considers fair and equitable over time.

(d) The Principals of the General Partner, as well as the employees and officers thereof and of organizations affiliated with the General Partner, may buy and sell securities

25

for their own account or the account of others, but may not buy securities from or sell securities to the Partnership (such prohibition does not extend to the purchase or sale of Interests) unless appropriate approval of the Advisory Committee is obtained and such purchase or sale is in compliance with the applicable provisions of the Advisers Act or such purchase or sale is otherwise in compliance with the applicable provisions of the Advisers Act.

(e)     Each Partner hereto hereby waives, and covenants not to bring a cause of action in law or equity on the basis of, any law (statutory, common law or otherwise) respecting the rights and obligations of the Partners which is or may be inconsistent with this Section 4.4.

(f)     The General Partner and its Affiliates reserve the right to establish collective investment vehicles that have stated investment programs or terms that differ from those of the Partnership or that are targeted primarily to investors for which the Partnership is not designed to be a suitable investment vehicle. The General Partner and its Affiliates also reserve the right to establish and provide management or advisory services pursuant to separate Other Accounts for significant investors, whether or not such accounts have the same investment program as the Partnership.

**4.5     Duty of Care; Indemnification**

(a)     None of the Indemnified Persons will be liable to the Partnership or any Limited Partner or any other person for mistakes of judgment or for action or inaction that did not constitute gross negligence, willful misconduct or bad faith, or for losses due to such mistakes, action or inaction or to the negligence, dishonesty or bad faith of any broker or agent of the Partnership, provided that such broker or agent was selected, engaged or retained by the Indemnified Person in accordance with the standard of care set forth above. No Indemnified Person shall be liable to the Partnership or any Limited Partner or any other person for any amount in excess of the amount of Management Fees received by the Investment Manager, to the extent permitted under applicable law. In addition, in no event shall any Indemnified Person be liable for any special, indirect, exemplary, consequential or punitive losses or damages. An Indemnified Person may consult with counsel and accountants in respect of the Partnership's affairs and will be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants, provided that they were selected in accordance with the standard of care set forth above. The foregoing provisions, however, shall not be construed so as to provide for the exculpation of an Indemnified Person of any liability (including liability under U.S. Federal securities laws which, under certain circumstances, impose liability even on persons acting in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law (including liability under U.S. Federal securities laws which, under certain circumstances, impose liability even on persons acting in good faith), but shall be construed so as to effectuate the abovementioned provisions to the fullest extent permitted by law.

26

(b)    The Partnership shall, to the fullest extent permitted by law, indemnify and hold harmless each Indemnified Person from and against any and all loss, cost or expense suffered or sustained by an Indemnified Person by reason of the fact that it, he or she is or was an Indemnified Person, including, without limitation, any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, suit or proceeding, provided that such liability, damage loss, cost or expense resulted from a mistake of judgment on the part of an Indemnified Person or from action or inaction that did not constitute gross negligence, willful misconduct or bad faith, or from the negligence, dishonesty or bad faith of a broker or other agent of an Indemnified Person, provided that such broker or agent was selected, engaged or retained by the Indemnified Person in accordance with the standard of care set forth above.   The Partnership will, in the sole discretion of the General Partner, advance to any Indemnified Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action, suit or proceeding which arises out of such conduct.   In the event that such an advance is made by the Partnership, the Indemnified Person will agree to reimburse the Partnership to the extent that it is finally determined that it was not entitled to indemnification in respect thereof.

(c)    Notwithstanding any of the foregoing, the provisions of this Section 4.5 do not provide for the indemnification of any Indemnified Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the above provisions to the fullest extent permitted by law.

(d)    Pursuant to the foregoing indemnification and exculpation provisions applicable to each Indemnified Person, the Partnership (and not the applicable Indemnified Person) will be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence, bad faith or willful misconduct of any Indemnified Person.

(e)    The above-mentioned Indemnified Persons are also indemnified by each Limited Partner for any amounts of tax withheld or required to be withheld with respect to that Limited Partner, and also for any amounts of interest, additions to tax, penalties and other costs borne by any such persons in connection therewith to the extent that the balance of the Limited Partner's Capital Account is insufficient to fully compensate the General Partner the Investment Manager for such costs.

**4.6**    **Advisory Committee**

(a)    The General Partner and/or the Investment Manager may appoint a committee (the "***Advisory Committee***") composed of one or more individuals selected by the General Partner and/or the Investment Manager from time to time, none of whom is affiliated with the General Partner or the Investment Manager.

(b)      The General Partner and/or the Investment Manager may in its/their discretion seek the approval of the Advisory Committee or establish any other reasonable mechanism in connection with (i) approvals that are or would be required under the Investment Advisers Act of 1940, as amended (including Section 206(3)), or (ii) any other matter deemed appropriate by the General Partner and/or the Investment Manager. Each Limited Partner agrees that, except as otherwise specifically provided herein and to the extent permitted by applicable law, the approval of a majority of the members of the Advisory Committee at such time is binding upon the Partnership and each Partner with respect to any approval sought under this Section 4.6(b).

(c)      Subject to the foregoing, any recommendations of or actions taken by the Advisory Committee are advisory only and the General Partner and the Investment Manager are not required or otherwise bound to act in accordance with any such recommendations or actions.

(d)      As determined by the General Partner and/or the Investment Manager, meetings of the Advisory Committee may be held in person or by telephone. Approval of the Advisory Committee is deemed to have been given if given by a majority of those members present at a meeting or by a majority of all members of the Advisory Committee if given pursuant to a written consent without a meeting.

(e)      The Partnership agrees to reimburse members of the Advisory Committee for their reasonable out-of-pocket expenses and to indemnify them to the maximum extent permitted by law.

**4.7     Pricing Committee**

The General Partner and/or the Investment Manager shall appoint a committee (a "***Pricing Committee***") whose quorum consists of at least a majority of the following individuals: the Chief Financial Officer of the Investment Manager, the Chief Compliance Officer of the Investment Manager and one or more traders of the Investment Manager. The Pricing Committee meets on at least a monthly basis to review, confirm and agree on all pricing information established by the Investment Manager in respect of the Partnership's assets that are fair valued. The final pricing or valuation of such Partnership assets shall require the approval of a majority in number of the members of the Pricing Committee constituting a quorum as of a relevant valuation date. In lieu of meeting, the Pricing Committee may take action by written consent signed by a majority of the committee members. The Pricing Committee may, at the Partnership's expense, engage third-party experts and consultants to provide services in connection with any determination to be made by the Pricing Committee. The General Partner and/or the Investment Manager may replace members of the Pricing Committee or change the composition of the Pricing Committee, in their sole discretion.

Appx. 03325

_____

**Article V**
**ADMISSIONS, TRANSFERS AND WITHDRAWALS**

_____

**5.1    Admission of Limited Partners**

The General Partner may, on the first Business Day of each calendar month, or at such other times as the General Partner may determine, without advance notice to or consent from the Limited Partners, admit to the Partnership any Person who shall execute this Agreement or any other writing evidencing the intent of such Person to become a Limited Partner.  Such admission shall be effective when the General Partner enters the name of such Person on the Schedule of Partners and does not require the consent or approval of any other Partner.  The General Partner shall have the authority to reject subscriptions for Limited Partner Interests in whole or in part.

**5.2    Admission of Additional General Partners**

(a)    Except as provided in Section 5.2(b), the General Partner may admit one or more Persons as additional general partners to the Partnership.  No additional general partner shall be added unless such additional general partner agrees to be bound by all of the terms of this Agreement or if adding such additional general partner would have any of the effects described in clauses (i) through (iv) of Section 5.3(c) (except as specifically set forth therein).

(b)    Any Person to whom the General Partner has transferred its general partner interest in accordance with Section 5.4 will be admitted to the Partnership as a substitute General Partner without the consent of the Limited Partners.

**5.3    Transfer of Interests of Limited Partners**

(a)    Each Limited Partner agrees with all other Partners that it shall not make or attempt to make any Transfer of its Interest which will violate this Section 5.3.   In the event of any attempted Transfer of any Limited Partner's Interest in violation of the provisions of this Section 5.3, without limiting any other rights of the Partnership, the General Partner shall have the right to require the withdrawal of such Limited Partner's Interest from the Partnership as provided by Section 5.5(j).

(b)    No Transfer of any Limited Partner's Interest, whether voluntary or involuntary, shall be valid or effective, and no transferee shall become a substituted Limited Partner, unless the prior written consent of the General Partner has been obtained, which consent may be granted, withheld or conditioned for any reason by the General Partner.  In the event of any Transfer, all of the conditions of the remainder of this Section 5.3 must also be satisfied.

(c)    Without limiting the General Partner's discretion pursuant to the preceding paragraph, the General Partner expects to withhold consent to any Transfer of any

**Appx. 03326**

Limited Partner's Interest, whether voluntary or involuntary, if the General Partner has reason to believe that such Transfer may:

(i)      require registration of any Interest under any securities laws of the United States of America, any state thereof or any other jurisdiction;

(ii)     subject the Partnership or the General Partner to a requirement to register, or to additional disclosure or other requirements, under any securities or commodities laws of the United States of America, any state thereof or any other jurisdiction;

(iii)    cause the Partnership to be treated as a "publicly traded partnership" for U.S. federal income tax purposes under Section 7704(b) of the Code or cause the Partnership not to qualify for one of the safe harbors under Section 1.7704 1(e), (f), (g), (h) or (j) of the Regulations;

(iv)    result in the Partnership being considered an investment company within the meaning of the Investment Company Act;

(v)     result in violation of any anti-money laundering rules or regulations applicable to the Partnership, the Investment Manager or the General Partner;

(vi)    violate or be inconsistent with any representation or warranty made by the transferring Limited Partner at the time the Limited Partner subscribed to purchase an Interest; or

(vii)   cause all or any portion of the assets of the Master Fund to constitute Plan Assets of any ERISA Partner for purposes of ERISA or to be subject to the provisions of ERISA to substantially the same extent as if owned directly by an ERISA Partner.

The transferring Limited Partner, or its legal representative, must give the General Partner written notice before making any voluntary Transfer and after any involuntary Transfer and must provide sufficient information to allow legal counsel acting for the Partnership to make the determination that the proposed Transfer would not result in any of the consequences referred to in clauses (i) through (vi) above. If an assignment, Transfer or disposition occurs by reason of the death of a Limited Partner or assignee, the notice may be given by the duly authorized representative of the estate of the Limited Partner or assignee. The notice must be supported by proof of legal authority and valid assignment acceptable to the General Partner.

(d)    In the event any Transfer permitted by this Section 5.3 shall result in multiple ownership of any Limited Partner's Interest, the General Partner may require one or more trustees or nominees to be designated to represent a portion of or the entire Interest transferred for the purpose of receiving all notices which may be given and all payments which may be made under this Agreement, and for the purpose of

30

exercising the rights which the transferor as a Limited Partner had pursuant to the provisions of this Agreement.

(e)     Subsequent to receipt of the consent of the General Partner (which consent may be withheld by the General Partner), an authorized transferee shall be entitled to the allocations and distributions attributable to the Interest transferred to such transferee and to transfer such Interest in accordance with the terms of this Agreement; *provided*, *however*, that such transferee shall not be entitled to the other rights of a Limited Partner as a result of such Transfer until it becomes a substituted Limited Partner. No transferee may become a substituted Limited Partner without the consent of the General Partner (which consent may be withheld for any reason or no reason by the General Partner). If the General Partner withholds consent to such substitution, a transferee will not have any of the rights of a Limited Partner, except that the transferee will be entitled, unless prohibited by law, to receive that share of capital or profits and to have the right of withdrawal to which its transferor would have been entitled and will be subject to the other terms of this Agreement. A transferring Limited Partner will remain liable to the Partnership as provided under applicable law and this Agreement regardless of whether its transferee becomes a substituted Limited Partner. Notwithstanding the above, the Partnership and the General Partner shall incur no liability for allocations and distributions made in good faith to the transferring Limited Partner until a written instrument of transfer has been received by the Partnership and recorded on its books and the effective date of the Transfer has passed.

(f)     Any other provision of this Agreement to the contrary notwithstanding, a transferee shall be bound by the provisions hereof. Prior to recognizing any Transfer in accordance with this Section 5.3, the General Partner may require the transferring Limited Partner to execute and acknowledge an instrument of Transfer in form and substance satisfactory to the General Partner, and may require the transferee to make certain representations and warranties to the Partnership and Partners and to accept, adopt and approve in writing all of the terms and provisions of this Agreement. A transferee shall become a substituted Limited Partner and shall succeed to the portion of the transferor's Capital Account relating to the Interest transferred effective upon the satisfaction of all of the conditions for such Transfer contained in this Section 5.3.

(g)     In the event of a Transfer or in the event of a distribution of assets of the Partnership to any Partner, the Partnership may, but shall not be required to, file an election under Section 754 of the Code and in accordance with the applicable Regulations, to cause the basis of the Partnership's assets to be adjusted for U.S. federal income tax purposes as provided by Section 734 or 743 of the Code and shall make any mandatory adjustments to the basis of the Partnership's assets as required by Section 734 or 743 of the Code. If the Partnership does not file an election under Section 754 in connection with a Transfer and if the transferring Limited Partner is a Negative Basis Partner, the General Partner may elect to allocate to the transferring Limited Partner pursuant to Section 3.10(d) net losses or items of loss and deduction realized by the Partnership for the Fiscal Year in which the Transfer

Appx. 03328

occurs as if the transferring Limited Partner were withdrawing from the Partnership pursuant to Section 5.5.

(h)     In the event of a Transfer at any time other than the end of a Fiscal Year, items of income, gain, loss, deduction or credit recognized by the Partnership for U.S. federal income tax purposes will be allocated between the transferring parties, as determined by the General Partner, using any permissible method under Code Section 706(d) and the Regulations thereunder.  The transferring parties agree to reimburse the General Partner and the Partnership for any incidental accounting fees and other expenses incurred by the General Partner and the Partnership in making allocations pursuant to this Section 5.3(h).

## 5.4     Transfer of Interest of the General Partner

The General Partner may not Transfer its Interest as a General Partner in the Partnership other than (a) to one or more of its direct or indirect beneficial owners or their Affiliates, (b) pursuant to a transaction not deemed to involve an assignment of its investment management obligations within the meaning of the Investment Advisers Act of 1940, as amended, or (c) with the approval of a Majority of Limited Partners.  By executing this Agreement, each Limited Partner shall be deemed to have consented to any such Transfer made in accordance with this Section 5.4.

## 5.5     Withdrawal of Interests of Partners

(a)     Except as provided in this Section 5.5, a Limited Partner may voluntarily withdraw all or part of its Capital Account effective as of the last Business Day of each calendar quarter and/or such other days as the General Partner may determine in its sole discretion (such date, a "***Withdrawal Date***") upon not less than 45 calendar days' prior written notice ("***Withdrawal Notice***") to the General Partner.  Any notice of withdrawal shall be irrevocable by the Limited Partner, unless otherwise agreed by the General Partner.  The General Partner may waive the notice requirements of this Section 5.5(a).  Notwithstanding anything herein to the contrary, the General Partner may agree with certain Limited Partners to provide for different withdrawal terms and notice periods.

(b)     For the purposes of this Section 5.5 (and as described in Section 3.3(a)), each capital contribution shall be accounted for using a separate sub-account, and, in the case of a Limited Partner for which more than one sub-account is maintained, the withdrawals of the balance of any such sub-accounts shall be processed on a "first-in, first-out" basis based upon the date on which each capital contribution was made, unless otherwise agreed between the General Partner and such Limited Partner.  Each sub-account related to a contribution of capital from a Limited Partner will be treated as if it were the separate Capital Account of a separate Partner for the purposes of applying the withdrawal provisions of this Section 5.5.

(c)     Any Withdrawal Notice shall be irrevocable by the Limited Partner, unless otherwise agreed by the General Partner.  For the avoidance of doubt, if a Limited

Partner notifies the General Partner of its intent to withdraw and later chooses not to withdraw (with the General Partner's consent), any transaction costs incurred by the Partnership or the General Partner in connection therewith may, in the discretion of the General Partner, be charged to such withdrawing Limited Partner. The General Partner may refuse to honor any Limited Partner's request for a full or partial withdrawal if such request is not accompanied by such additional information as the General Partner may reasonably require.

(d)     If, for any Withdrawal Date, (i) Limited Partners submit withdrawal notices that, when combined, are in excess of 25% of the Partnership's net asset value, or (ii) withdrawal requests are received by the Master Fund from any or all feeder vehicles in the Master Fund in excess of 25% of the Master Fund's net asset value, then the General Partner may determine, in its sole discretion, to reduce all such requests proportionately (based on the net asset value of each Limited Partner's Interest) so that the aggregate amount of such withdrawals does not exceed 25% of the Partnership's net asset value or such greater amount if the General Partner so determines (such restriction is referred to herein as the "*Withdrawal Gate*"). If withdrawals are subject to the Withdrawal Gate, withdrawal requests are carried over to the next Withdrawal Date (and, if not fully satisfied as of that date because of the Withdrawal Gate, then as of the next, and, if necessary, successive Withdrawal Dates), except to the extent Limited Partners rescind their withdrawal request(s). Any remaining amount of a withdrawal request that is not satisfied due to the Withdrawal Gate (i) remains at risk as per other amounts invested in the Partnership and subject to the applicable Management Fee, if any, until such amount is finally and fully withdrawn, (ii) is considered requested as of the next Withdrawal Date without further action by the withdrawing Limited Partner, (iii) is not entitled to priority over withdrawal requests on any subsequent Withdrawal Date, and (iv) remains subject to further application of the Withdrawal Gate on subsequent Withdrawal Dates. Notwithstanding anything herein to the contrary, the General Partner may waive the application of the Withdrawal Gate with respect to certain Limited Partners.

(e)     Except as otherwise provided herein, payment of the estimated amount due will generally be made within 30 Business Days of the Withdrawal Date, *provided* that (i) the General Partner may delay such payment if such delay is reasonably necessary to prevent such withdrawal from having a material adverse impact on the Partnership or the remaining Partners and (ii) in the event that a distribution from a Capital Account to a withdrawing Limited Partner during a Fiscal Year would reduce the balance of the Capital Account below 10% of the Capital Account's balance as of the beginning of such Fiscal Year, excess requested amounts will be held back and distributed, without interest thereon, within 30 Business Days following completion of the audit of the Partnership's financial statements for such Fiscal Year. Amounts withdrawn by a Limited Partner will not earn interest for the period from the effective Withdrawal Date through the settlement date.

(f)     The General Partner may deduct from any withdrawal proceeds due to any Limited Partner pursuant to this Section 5.5 an amount representing the Partnership's actual

Appx. 03330

or estimated expenses, as determined by the General Partner in good faith, associated with processing the withdrawal. Any such withdrawal deduction will be retained by the Partnership for the benefit of the remaining Partners.

(g) Upon receipt by the Partnership of a Limited Partner's Withdrawal Notice, the General Partner will have the discretion to manage the Partnership's assets in a manner that would provide for cash being available to satisfy such Limited Partner's withdrawal request, but the General Partner shall be under no obligation to effect sales of Partnership assets if the General Partner determines that such transactions might be detrimental to the interest of the other Partners or that such transactions are not reasonably practicable. The General Partner may effect withdrawal payments (i) in cash, (ii) in kind, by transfer of marketable or non-marketable Investments received from the Master Fund to the Limited Partner, the value of which, as determined in accordance with Section 7.3, would satisfy the Limited Partner's request for withdrawal, or (iii) in any combination of the foregoing.

(h) The General Partner may postpone or suspend (a) the calculation of the net asset value of the Partnership (and the applicable valuation date); (b) the issuance of Interests, (c) the withdrawal by Limited Partners (and the applicable Withdrawal Date); and/or (d) the payment of withdrawal proceeds (even if the calculation dates and Withdrawal Dates are not postponed) if it determines that such a suspension is warranted by extraordinary circumstances, including: (i) during any period when any stock exchange or over-the-counter market on which the Master Fund's Investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended; (ii) during the existence of any state of affairs as a result of which, in the reasonable opinion of the General Partner, disposal of Investments by the Partnership, or the determination of the value of the assets of the Partnership, would not be reasonably practicable or would be seriously prejudicial to the non-redeeming partners; (iii) during any breakdown in the means of communication normally employed in determining the price or value of the Partnership's assets or liabilities, or of current prices in any stock market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Partnership cannot reasonably be accurately ascertained within a reasonable time frame; (iv) during any period when the transfer of funds involved in the realization or acquisition of any Investments cannot, in the reasonable opinion of the General Partner, be effected at normal rates of exchange; (v) automatically upon termination of the Partnership as described in Section 6.1, or (vi) automatically upon any suspension of withdrawals by the Master Fund.

(i) The General Partner will promptly notify each Limited Partner who has submitted a withdrawal request and to whom payment in full of the amount being withdrawn has not yet been remitted of any suspension of withdrawals or suspension of the payment of withdrawal proceeds pursuant to Section 5.5(h). Any remaining amount of a withdrawal request that is not satisfied due to such a suspension remains at risk as per other amounts invested in the Partnership and subject to the

applicable Management Fee until such amount is finally and fully withdrawn. Such Limited Partners will not be given any priority with respect to the withdrawal of Interests after the cause for such suspension or limitation ceases to exist.  The General Partner may in its sole discretion, however, permit such Limited Partners to withdraw their withdrawal requests to the extent that the relevant Withdrawal Date has not yet passed.  For the avoidance of doubt, where a suspension of the payment of withdrawal proceeds is declared between the relevant Withdrawal Date and the remittance of such payment proceeds, affected Limited Partners shall not have any right to withdraw their withdrawal requests.  Upon the reasonable determination by the General Partner that conditions leading to suspension no longer apply, any such suspended payments shall generally be paid in accordance with the normal process for making such payments, withdrawal rights shall be promptly reinstated, and any pending withdrawal requests which were not withdrawn (or new, timely withdrawal requests) will be effected as of the first Withdrawal Date following the removal of the suspension, subject to the foregoing restrictions on withdrawals.  For the avoidance of doubt, the terms of Section 5.5(h) and this Section 5.5(i) shall not affect the discretion of the General Partner to compel the withdrawal of the Interest of any Limited Partner pursuant to Section 5.5(j).

(j)     The General Partner may, upon not less than five days' prior written notice (or immediately if the General Partner determines its sole discretion that such Limited Partner's continued participation in the Partnership may cause the Partnership, the Master Fund, the General Partner or the Investment Manager to violate any applicable law), require any Limited Partner's Interest to be withdrawn in part or in its entirety from the Partnership and for the Limited Partner to cease to be a Limited Partner of the Partnership (in the case of a withdrawal of a Limited Partner's Interest in its entirety) pursuant to this Section 5.5(j).  The amount due to any such Partner required to withdraw from the Partnership shall be equal to the value of such Partner's Capital Account as of the Withdrawal Date determined by the General Partner, net of any deductions imposed pursuant to Section 5.5(f).

(k)     The right of any Partner to withdraw or receive distributions pursuant to the provisions of this Section 5.5 is subject to all Capital Account allocations and adjustments contemplated by this Agreement and to the provision by the General Partner for all Partnership liabilities and for reserves for contingencies provided in Section 3.6.  Notwithstanding anything to the contrary herein, the General Partner may establish reserves and holdbacks for estimated accrued expenses, liabilities and contingencies, including, without limitation, general reserves for unspecified contingencies (even if such reserves or holdbacks are not otherwise required by GAAP) or liabilities stemming from tax obligations (as such may be determined in the sole discretion of the General Partner and whether or not incurred directly or indirectly), which could reduce the amount of a distribution upon a Limited Partner's withdrawal.

(l)     With respect to any amounts withdrawn, a withdrawing Partner shall not share in the income, gains and losses of the Partnership or have any other rights as a Partner

35

(in the case of a complete withdrawal) after the applicable Withdrawal Date except as provided in Section 3.6. For the avoidance of doubt, none of the Partnership, the General Partner or the Investment Manager will be liable to a Limited Partner for interest on the proceeds of any withdrawal.

(m) The Interest of a Limited Partner may not be withdrawn from the Partnership prior to its dissolution except as provided in this Section 5.5.

_____

**Article VI**
**DISSOLUTION AND LIQUIDATION**

_____

**6.1    Dissolution of Partnership**

(a)    The Partnership shall be dissolved upon the first to occur of the following dates:

(i)    any date on which the General Partner shall elect in writing to dissolve the Partnership;

(ii)    the occurrence of any other event causing (A) the General Partner (or a successor to its business) to cease to be the general partner of the Partnership or (B) the dissolution of the Partnership under the Act; or

(b)    The parties agree that irreparable damage would be done to the goodwill and reputation of the Partners if any Limited Partner should bring an action in court to dissolve the Partnership. Care has been taken in this Agreement to provide for fair and just payment in liquidation of the Interests of all Partners. Accordingly, each Limited Partner hereby waives and renounces its right to such a court decree of dissolution or to seek the appointment by the court of a liquidator for the Partnership except as provided herein.

**6.2    Liquidation of Assets**

(a)    Upon dissolution of the Partnership, the General Partner shall promptly liquidate the business and administrative affairs of the Partnership to the extent feasible, except that if the General Partner is unable to perform this function, a liquidator elected by a Majority of Limited Partners shall liquidate the business and administrative affairs of the Partnership. Net Profit and Net Loss and any balances in Limited Participation Sub-Accounts during the Fiscal Periods, which includes the period of liquidation, shall be allocated pursuant to Article III. The proceeds from liquidation shall be divided in the following manner, subject to the Act:

(i)    the debts, liabilities and obligations of the Partnership, other than any debts to the Partners as Partners, and the expenses of liquidation (including legal, administrative and accounting expenses incurred in connection therewith),

up to and including the date that distribution of the Partnership's assets to the Partners has been completed, shall first be satisfied (whether by payment or the making of reasonable provision for payment thereof);

(ii)   such debts as are owing to the Partners as Partners are next paid; and

(iii)   the Partners shall next be paid liquidating distributions (in cash or in securities or other assets, whether or not readily marketable) *pro rata* in accordance with, and up to the positive balances of their respective Capital Accounts, as adjusted pursuant to Article III to reflect allocations for the Fiscal Period ending on the date of the distributions under this Section 6.2(a)(iii).

(b)   Notwithstanding this Section 6.2 and the priorities set forth in the Act, the General Partner or liquidator may distribute ratably in kind rather than in cash, upon dissolution, any assets of the Partnership; *provided*, *however*, that if any in kind distribution is to be made, (i) the assets distributed in kind shall be valued pursuant to Section 7.3, and charged as so valued and distributed against amounts to be paid under Section 6.2(a) and (ii) any gain or loss (as computed for book purposes) attributable to property distributed in kind shall be included in the Net Profit, Net Loss or Limited Participation Sub-Accounts for the Fiscal Period ending on the date of such distribution.

―――――――――

**Article VII
ACCOUNTING AND VALUATION; BOOKS AND RECORDS**

―――――――――

**7.1   Accounting and Reports**

(a)   The Partnership may adopt for tax accounting purposes any accounting method that the General Partner shall decide is in the best interests of the Partnership and that is permissible for U.S. federal income tax purposes.

(b)   As soon as practicable after the end of each Fiscal Year, the General Partner shall cause an audit of the financial statements of the Partnership as of the end of such period to be made by a firm of independent accountants selected by the General Partner. Within 120 days of the end of each year (or as soon as practicable thereafter), but subject to Section 7.5, the General Partner shall furnish to each Limited Partner a copy of the set of audited financial statements prepared in accordance with GAAP, with such adjustments thereto as the General Partner determines appropriate, including a statement of profit and loss for such Fiscal Year and an unaudited status of each such Partner's holdings in the Partnership at such time. The General Partner may elect not to reserve certain amounts that may be required by GAAP and not to provide certain portfolio disclosure required by GAAP to investors and may capitalize and amortize certain of its organizational

expenses in deviation from GAAP. Such deviations from GAAP may result in a qualified opinion rendered on the financial statements of the Partnership.

(c)    As soon as practicable after the end of each fiscal month, but subject to Section 7.5, the General Partner shall arrange for the preparation and delivery to each Limited Partner of unaudited monthly statements of the estimated net asset value of the Partnership, monthly performance and portfolio reports.

(d)    As soon as practicable after the end of each taxable year, the General Partner shall furnish to each Limited Partner such information as may be required to enable each Limited Partner properly to report for U.S. federal, state and local income tax purposes its distributive share of each Partnership item of income, gain, loss, deduction or credit for such year. The General Partner shall have discretion as to how to report Partnership items of income, gain, loss, deduction or credit on the Partnership's tax returns, and the Limited Partners shall treat such items consistently on their own tax returns.

**7.2**    **Certain Tax Matters**

(a)    By joining this Agreement, each Limited Partner appoints and designates the General Partner (i) as the "tax matters partner," within the meaning of Section 6231(a)(7) of the Code, and, (ii) for any BBA Effective Period, as the "partnership representative" within the meaning of Section 6223 of the Code (as applicable, the "*Tax Matters Partner*"), or, in each case, under any similar state or local law, and, if the "partnership representative" is an entity, the General Partner shall have the exclusive authority to appoint and designate the individual through whom such partnership representative will act for all purposes under subchapter C of chapter 63 of the Code and, if applicable, any similar state or local law (the "*Designated Individual*"). All references to the Tax Matters Partner herein shall include the Designated Individual, unless the context requires otherwise. The Tax Matters Partner shall have any powers necessary to perform fully in such capacity, and shall be permitted to take any and all actions, to the extent permitted by law, in consultation with the General Partner if the General Partner is not the Tax Matters Partner. The General Partner shall have the exclusive authority to appoint and designate the Investment Manager, or an Affiliate of the General Partner or the Investment Manager, as a successor Tax Matters Partner for any BBA Effective Period. The Tax Matters Partner shall be reimbursed by the Partnership for all costs and expenses incurred by it, and to be indemnified by the Partnership with respect to any action brought against it, in its capacity as the Tax Matters Partner.

(b)    The Limited Partners agree that any and all actions taken by the Tax Matters Partner shall be binding on the Partnership and all of the Limited Partners and the Limited Partners shall reasonably cooperate with the Partnership or the General Partner, and undertake any action reasonably requested by the Partnership or the General Partner, in connection with any elections made by the Tax Matters Partner or as determined to be reasonably necessary by the Tax Matters Partners under any BBA provision.

Appx. 03335

(c)      Each Limited Partner further agrees that such Limited Partner will not independently act with respect to tax audits or tax litigation affecting the Partnership, unless the prior written consent of the General Partner has been obtained.

(d)      The General Partner may in its sole discretion cause the Partnership to make all elections not otherwise expressly provided for in this Agreement required or permitted to be made by the Partnership under the Code and any state, local or non-U.S. tax laws.

(e)      To the fullest extent permitted by law, each Limited Partner agrees to (i) provide such cooperation and assistance, including executing and filing forms or other statements and providing information about the Limited Partner, as is reasonably requested by the Tax Matters Partner, to enable the Partnership to satisfy any applicable tax reporting or compliance requirements, to make any tax election or to qualify for an exception from or reduced rate of tax or other tax benefit or be relieved of liability for any tax regardless of whether such requirement, tax benefit or tax liability existed on the date such Partner was admitted to the Partnership, (ii) amend the Limited Partner's tax returns and pay any resulting taxes, interest and penalties in connection with the Partnership's electing under Section 6225(a) of the Code, as amended by the BBA, (iii) take into account any adjustments and pay any taxes, interest and penalties that result from the Partnership's electing under Section 6226 of the Code, as amended by the BBA, and/or (iv) indemnify and hold harmless the Partnership, the Tax Matters Partner and any other individual designated to interact with tax authorities on behalf of the Partnership from and against any liability with respect to the Limited Partner's share of any tax deficiency (including any interest and penalties associated therewith) paid or payable by the Partnership that is (a) allocable to such Limited Partner (as reasonably determined by the General Partner in accordance with this Agreement) with respect to an audited or reviewed taxable year for which such Partner was a Partner in the Partnership or (b) attributable (as reasonably determined by the General Partner) to the failure of such Limited Partner to cooperate with or provide any such forms, statements, or other information as requested by the Tax Matters Partner pursuant to clause (i) above.

(f)      The obligations and covenants of the Limited Partners set forth in Sections 3.5 and 7.2 hereof shall apply jointly and severally to each Limited Partner and any direct or indirect transferee of or successor to such Limited Partner's interest and shall survive such Limited Partner's ceasing to be a Partner in the Partnership and/or the termination, dissolution, liquidation and winding up of the Partnership.

**7.3**      **Valuation of Partnership Assets and Interests**

(a)      The Partnership's assets are valued as of the close of each Fiscal Period and on any other date selected by the General Partner in its sole discretion in accordance with the valuation of the Master Fund's assets. The Partnership shall utilize the Master Fund's valuations for all purposes in connection with the Partnership.

39

(b)  The value of the assets of the Partnership and the net worth of the Partnership as a whole determined pursuant to this Section 7.3 are conclusive and binding on all of the Partners and all parties claiming through or under them.

## 7.4  Determinations by the General Partner

(a)  All matters concerning the determination and allocation among the Partners of the amounts to be determined and allocated pursuant to this Agreement, including Article III and accounting procedures applicable thereto, shall be determined by the General Partner, unless specifically and expressly otherwise provided for by the provisions of this Agreement, and such determinations and allocations shall be final and binding on all the Partners; provided, however, that all calculations of the Performance Allocation will be made on the basis of, or subject to correction based on, the annual audit of the Partnership's financial statements and appropriate adjustments will be made to all such calculations and related allocations to the extent necessary as a result of that audit.

(b)  The General Partner may make such adjustments to the computation of Net Profit or Net Loss or any other allocations with respect to any Limited Partner, or any component items comprising any of the foregoing, as it considers appropriate to reflect the financial results of the Partnership and the intended allocation thereof among the Partners in a reasonably accurate, fair and efficient manner. Without limiting the generality of the foregoing, any provision of this Agreement that requires an adjustment to be made to any Capital Account or sub-account as of any mid-month or mid-quarter date may be made as of the most recent preceding or succeeding date when a regular valuation is being conducted.

## 7.5  Books and Records

(a)  The General Partner shall keep books and records pertaining to the Partnership's affairs showing all of its assets and liabilities, receipts and disbursements, realized income, gains, deductions and losses, Partners' Capital Accounts and all transactions entered into by the Partnership. The General Partner shall afford to the Partnership's independent auditors reasonable access to such documents during customary business hours and shall permit the Partnership's auditors to make copies thereof or extracts therefrom at the expense of the Partnership.

(b)  The General Partner shall establish such standards as it deems appropriate regarding the access of Limited Partners to the books and records of the Partnership and shall not be obliged to permit access by a Limited Partner to the name or address of any other Limited Partner.

## 7.6  Confidentiality

(a)  Each Limited Partner agrees to keep confidential, and not to make any use of (other than for purposes reasonably related to its Interest or for purposes of filing such Limited Partner's tax returns) or disclose to any Person, any information or matter relating to the Partnership and its affairs and any information or matter related to

Appx. 03337

any Investment (other than disclosure to such Limited Partner's directors, employees, agents, advisors, or representatives responsible for matters relating to the Partnership or to any other Person approved in writing by the General Partner (each such Person being hereinafter referred to as an "*Authorized Representative*")); *provided* that (i) such Limited Partner and its Authorized Representatives may make such disclosure to the extent that (A) the information to be disclosed is publicly available at the time of proposed disclosure by such Limited Partner or Authorized Representative, (B) the information otherwise is or becomes legally available to such Limited Partner other than through disclosure by the Partnership or the General Partner, or (C) such disclosure is required by law or in response to any governmental agency request or in connection with an examination by any regulatory authorities; *provided* that such governmental agency, regulatory authorities or association is aware of the confidential nature of the information disclosed; (ii) such Limited Partner and its Authorized Representatives may make such disclosure to its beneficial owners to the extent required under the terms of its arrangements with such beneficial owners; and (iii) each Limited Partner will be permitted, after written notice to the General Partner, to correct any false or misleading information which becomes public concerning such Limited Partner's relationship to the Partnership or the General Partner. Prior to making any disclosure required by law, each Limited Partner shall use its best efforts to notify the General Partner of such disclosure. Prior to any disclosure to any Authorized Representative or beneficial owner, each Limited Partner shall advise such Authorized Representative or beneficial owner of the obligations set forth in this Section 7.6(a) and each such Authorized Representative or beneficial owner shall agree to be bound by such obligations.

(b)     The General Partner shall have the right to keep confidential from the Limited Partners, for such period of time as the General Partner deems reasonable, any information, including the identity of the Partners or information regarding the Partners or Investments, which the General Partner reasonably believes to be in the nature of trade secrets or other information the disclosure of which the General Partner believes is not in the best interests of the Partnership or could damage the Partnership or its business or which the Partnership is required by law or agreement with a third party to keep confidential.

(c)     Subject to applicable legal, fiscal and regulatory considerations, the General Partner shall use reasonable efforts to keep confidential any information relating to a Limited Partner obtained by the General Partner in connection with or arising out of the Partnership which the Limited Partner requests be kept confidential.

(d)     Notwithstanding the provisions of this Section 7.6, Partners (and their employees, representatives and other agents) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the Partnership and its transactions and all materials of any kind (including tax opinions or other tax analyses) that are provided to such Person by, or on behalf of the Partnership. For this purpose, "tax treatment" is the purported or claimed U.S. federal income tax treatment of a transaction and "tax structure" is limited to any fact that may be

41

relevant to understanding the purported or claimed U.S. federal income tax treatment of a transaction. For this purpose, the names of the Partnership, the Partners, their affiliates, the names of their partners, members or equity holders and the representatives, agents and tax advisors of any of the foregoing are not items of tax structure.

(e) The General Partner may disclose to prospective investors such information relating to the Partnership or the Investments as it believes in good faith will benefit the Partnership and facilitate investment in the Partnership by such prospective investors.

(f) The Investment Manager and a Person acting as a service provider to the Partnership shall have the right to access all information belonging to the Partnership.

———————

**Article VIII**
**GENERAL PROVISIONS**

———————

**8.1 Amendment of Partnership Agreement**

(a) Except as otherwise provided in this Section 8.1, this Agreement may be amended, in whole or in part, with the written consent of (i) the General Partner and (ii) the consent of a Majority of Limited Partners (which approval may be obtained by negative consent affording the Limited Partners 30 calendar days to object).

(b) Notwithstanding anything in this Section 8.1 to the contrary, any amendment to Section 2.5 requires the prior written consent of ERISA Partners whose Partnership Percentages represent more than 50% of the aggregate Partnership Percentages of all ERISA Partners.

(c) Any amendment that would:

(i) increase the obligation of a Partner to make any contribution to the capital of the Partnership;

(ii) reduce the Capital Account of a Partner other than in accordance with Article III;

(iii) adversely alter any Partner's rights with respect to the allocation of Net Profit or Net Loss or with respect to distributions and withdrawals; or

(iv) change the respective liabilities of the General Partner and the Limited Partners;

Appx. 03339

may only be made if the prior written consent of each Partner adversely affected thereby is obtained.

(d) Notwithstanding paragraphs (a) and (c) of this Section 8.1, this Agreement may be amended by the General Partner without the consent of the Limited Partners, at any time and without limitation, if any Limited Partner whose contractual rights as a Limited Partner would be materially and adversely changed by such amendment has an opportunity to withdraw from the Partnership as of a date determined by the General Partner that is not less than 45 calendar days after the General Partner has furnished written notice of such amendment to each affected Limited Partner and that is prior to the effective date of the amendment. The admission and withdrawal of Limited Partners will not require notice or disclosure to, or the approval of, the other Limited Partners.

(e) The General Partner may at any time without the consent of the other Partners:

(i) add to the representations, duties or obligations of the General Partner or surrender any right or power granted to the General Partner under this Agreement, for the benefit of the Limited Partners;

(ii) cure any ambiguity or correct or supplement any conflicting provisions of this Agreement;

(iii) change the name of the Partnership;

(iv) make any changes required by governmental body or agency which is deemed to be for the benefit or protection of the Limited Partners, *provided*, *however*, that no such amendment may be made unless such change (A) is for the benefit of, or not adverse to, the interests of Limited Partners, (B) does not affect the right of the General Partner to manage and control the Partnership's business, (C) does not affect the allocation of profits and losses among the Partners and (D) does not affect the limited liability of the Limited Partners;

(v) amend this Agreement to reflect a change in the identity of the General Partner which has been made in accordance with this Agreement;

(vi) amend this Agreement (other than with respect to the matters set forth in Section 8.1(c)) to effect compliance with any applicable laws, regulations or administrative actions, or to reflect any change made in accordance with Section 4.1(b);

(vii) subject to Section 8.1(c), amend this Agreement to reflect the creation, and terms, of any new Series of Limited Partner Interests in the Partnership;

(viii) effect any other amendment which would not, in the good faith judgment of the General Partner, adversely affect any of the existing Limited Partners; and

43

Appx. 03340

(ix)    restate this Agreement together with any amendments hereto which have been duly adopted in accordance herewith to incorporate such amendments in a single, integrated document.

(f)    The General Partner shall have the authority to agree with a Limited Partner to waive or modify the application of any provision of this Agreement with respect to such Limited Partner without notifying or obtaining the consent of any other Limited Partner (other than a Limited Partner whose rights as a Limited Partner pursuant to this Agreement would be materially and adversely changed by such waiver or modification).  Any such waiver or modification may be evidenced by a "side letter" or other document, and the form thereof shall not impair its binding effect as if incorporated in this Agreement.

**8.2    Special Power-of-Attorney**

(a)    Each Partner hereby irrevocably makes, constitutes and appoints the General Partner (and each of its successors and permitted assigns), with full power of substitution, the true and lawful representative and attorney-in-fact of, and in the name, place and stead of, such Partner with the power from time to time to make, execute, sign, acknowledge, swear to, verify, deliver, record, file or publish:

(i)    an amendment to this Agreement that complies with the provisions of this Agreement (including the provisions of Section 8.1);

(ii)    the Certificate and any amendment thereof required because this Agreement is amended, including an amendment to effectuate any change in the membership of the Partnership or in the capital contributions of the Partners;

(iii)    any financing statement or other filing or document required or permitted to perfect the security interests contemplated by any provision hereof; and

(iv)    all such other instruments, documents and certificates which, in the opinion of legal counsel to the Partnership, may from time to time be required by the laws of the United States of America, the State of Delaware, or any other jurisdiction in which the Partnership determines to do business, or any political subdivision or agency thereof, or which such legal counsel may deem necessary or appropriate to effectuate, implement and continue the valid and subsisting existence and business of the Partnership as a limited partnership, adjust the structure of the Partnership in accordance with Sections 4.1(b) or 8.8, or to effect the dissolution or termination of the Partnership.

(b)    Each Limited Partner is aware that the terms of this Agreement permit certain amendments to this Agreement to be effected and certain other actions to be taken or omitted by or with respect to the Partnership without that Limited Partner's consent.  If an amendment of the Certificate or this Agreement or any action by or with respect to the Partnership is taken by the General Partner in the manner

44

contemplated by this Agreement, each Limited Partner agrees that, notwithstanding any objection which such Limited Partner may assert with respect to such action, the General Partner in its sole discretion is authorized and empowered, with full power of substitution, to exercise the authority granted above in any manner which may be necessary or appropriate to permit such amendment to be made or action to be lawfully taken or omitted. Each Partner is fully aware that each other Partner relies on the effectiveness of this special power-of-attorney with a view to the orderly administration of the affairs of the Partnership. This power-of-attorney is a special power-of-attorney and is coupled with an interest in favor of the General Partner and as such:

(i)    is irrevocable and continues in full force and effect notwithstanding the subsequent death or incapacity of any party granting this power-of-attorney, regardless of whether the Partnership or the General Partner has had notice thereof; and

(ii)    survives the delivery of an assignment by a Limited Partner of the whole or any portion of such Limited Partner's Interest, except that where the assignee thereof has been approved by the General Partner for admission to the Partnership as a substituted Limited Partner, this power-of-attorney given by the assignor survives the delivery of such agreement for the sole purpose of enabling the General Partner to execute, acknowledge and file any instrument necessary to effect such substitution.

## 8.3   Notices

Notices which may be or are required to be given under this Agreement by any party to another shall be given by hand delivery, transmitted by facsimile, transmitted electronically to an address that has been previously provided or verified through another form of notice or sent by registered or certified mail, return receipt requested or internationally recognized courier service, and shall be addressed to the respective parties hereto at their addresses as set forth on the register of Partners maintained by the General Partner or to such other addresses, facsimile numbers or electronic addresses as may be designated by any party hereto by notice addressed to (a) the General Partner, in the case of notice given by any Limited Partner, and (b) each of the Limited Partners, in the case of notice given by the General Partner. Notices shall be deemed to have been given (i) when delivered by hand, transmitted by facsimile or transmitted electronically or (ii) on the date indicated as the date of receipt on the return receipt when delivered by mail or courier service.

## 8.4   Agreement Binding Upon Successors and Assigns; Delegation

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, but the rights and obligations of the Partners hereunder shall not be assignable, transferable or delegable except as provided in Sections 4.1(d), 5.3 and 5.4, and any attempted assignment, transfer or delegation thereof which is not made pursuant to the terms of such Sections shall be void.

Appx. 03342

**8.5** **Governing Law**

This Agreement is, and the rights of the Partners hereunder are, governed by and shall be construed in accordance with the laws of the State of Delaware, without regard to the conflict of laws rule thereof which would result in the application of the laws of a different jurisdiction. The parties hereby consent to the exclusive jurisdiction and venue for any action arising out of this Agreement in Dallas, Texas. Each Partner consents to service of process in any action or proceeding involving the Partnership by the mailing thereof by registered or certified mail, postage prepaid, to such Partner's mailing address set forth in the Schedule of Partners maintained by the General Partner.

**8.6** **Not for Benefit of Creditors**

The provisions of this Agreement are intended only for the regulation of relations among Partners and between Partners and former or prospective Partners and the Partnership. Except for the rights of the Indemnified Persons hereunder, this Agreement is not intended for the benefit of non-Partner creditors and no rights are granted to non-Partner creditors under this Agreement.

**8.7** **Consents and Voting**

(a) Except as provided in Section 5.4, Limited Partners do not have any right to vote for the admission or removal of any General Partner and, except for the right to vote on certain amendments proposed by the General Partner, have no other voting rights. Upon the request of any Limited Partner, including pursuant to Section 8.11 hereof, the General Partner may designate an Interest as a Non-Voting Interest, in which case the Limited Partner shall not have the right to vote on any matter including amendments.

(b) Any and all consents, agreements or approvals provided for or permitted by this Agreement shall be in writing and a copy thereof shall be filed and kept with the books of the Partnership. (For the avoidance of doubt, an amendment made pursuant to Section 8.1(d) or pursuant to negative consent under Section 8.1(a) shall not require any affirmative written response by any Limited Partner who is not electing to withdraw from the Partnership.)

**8.8** **Merger and Consolidation**

(a) The Partnership may merge or consolidate with or into one or more limited partnerships formed under the Act or other business entities pursuant to an agreement of merger or consolidation which has been approved in the manner contemplated by Section 17-211(b) of the Act.

(b) Notwithstanding anything to the contrary contained elsewhere in this Agreement, an agreement of merger or consolidation approved in accordance with Section 17-211(b) of the Act may, to the extent permitted by Section 17-211(g) of the Act, (i) effect any amendment to this Agreement, (ii) effect the adoption of a new limited partnership agreement for the Partnership if it is the surviving or resulting limited partnership in the merger or consolidation, or (iii) provide that the limited

46

partnership agreement of any other constituent partnership to the merger or consolidation (including a limited partnership formed for the purpose of consummating the merger or consolidation) shall be the limited partnership agreement of the surviving or resulting limited partnership.

## 8.9 Interpretation of Partnership Accounting Systems and Terminology

In the event that the Partnership employs an accounting system which is different from the accounting system of the General Partner or whose terminology does not conform precisely to the terminology in this Agreement, the General Partner shall have the authority to interpret such accounting system and/or terminology in a manner which it, in its sole discretion, determines to be consistent with the objectives of this Agreement.

## 8.10 Miscellaneous

(a) The captions and titles preceding the text of each Section hereof shall be disregarded in the construction of this Agreement. Use of the word "including" in this Agreement means in each case "without limitation," whether or not such term is explicitly stated.

(b) This Agreement may be executed in counterparts, each of which shall be deemed to be an original hereof.

(c) If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

## 8.11 BHCA Subject Persons

Notwithstanding any other provision of this Agreement to the contrary:

(a) Solely for purposes of any provision of this Agreement that confers voting rights on the Limited Partners and any other provisions hereof regarding consents of or action by the Limited Partners, any BHCA Subject Person that shall have given the General Partner an Election Notice and shall not thereafter have given the General Partner a Revocation Notice, and that at any time has an Partnership Percentage in excess of 4.9 percent of the aggregate Partnership Percentages of the Limited Partners entitled to participate in such voting or the giving of any consent or the taking of any action, shall be deemed to hold an Partnership Percentage of only 4.9 percent of the aggregate Partnership Percentages of the Limited Partners (after giving effect to the limitations imposed by this Section 8.11 on all such Limited Partners), and such Partnership Percentage in excess of said 4.9 percent shall be deemed held by the Limited Partners who are not BHCA Subject Persons, *pro rata* in proportion to their respective Partnership Percentages; *provided* that this limitation shall not prohibit a Limited Partner from voting or participating in giving or withholding consent or taking any action under any provision of this Agreement

47

up to the full amount of its Partnership Percentage in situations where such Limited Partner's vote or consent or action is of the type customarily provided by statute or stock exchange rules with regard to matters that would significantly and adversely affect the rights or preference of the Limited Partner's Interest. The foregoing voting restriction shall continue to apply with respect to any assignee or other transferee of such BHCA Subject Person's Interest; *provided*, *however*, that the foregoing voting restriction shall not continue to apply if the Interest is transferred: (i) to the Partnership; (ii) to the public in an offering registered under the Securities Act; (iii) in a transaction pursuant to Rule 144 or Rule 144A under the Securities Act in which no Person acquires more than 2% of the Partnership's outstanding Interests; or (iv) in a single transaction to a third party who acquires at least a majority of the Partnership's outstanding Interests without regard to the Transfer of such Interests.

(b)     Except as specifically provided otherwise in this Agreement, a Limited Partner that is a BHCA Subject Person that shall have given the General Partner an Election Notice, and shall not thereafter have given the General Partner a Revocation Notice, shall not be entitled to exercise any rights to consent to actions to be taken with respect to the Partnership, including rights conferred by any applicable law. Such right to consent shall be deemed granted to the Limited Partners who are not BHCA Subject Persons, *pro rata* in proportion to their respective Partnership Percentages.

(c)     A Limited Partner that is a BHCA Subject Person and that elects to be subject to Section 8.11(a) and (b) shall notify the General Partner thereof (an "***Election Notice***") and, on the General Partner's receipt of such Election Notice, such Limited Partner shall be subject to Section 8.11(a) and (b) until 30 calendar days after such Limited Partner notifies the General Partner that it elects no longer to be subject to Section 8.11(a) and (b) (a "***Revocation Notice***"), which period may be reduced by the General Partner.

## 8.12     RIC Limited Partners

An Interest of a RIC Limited Partner does not entitle the RIC Limited Partner to vote or consent with respect to any Partnership matter unless the RIC Limited Partner's vote or consent with respect to its Interest would not be considered to be "voting securities" as defined under Section 2(a)(42) of the Investment Company Act. Except as provided in this Section 8.12, an Interest held by a RIC Limited Partner as a Non-Voting Interest is identical in all regards to all other Interests held by Limited Partners.

## 8.13     Bad Actor Limited Partners

Under Rule 506(d) under the Securities Act, the Partnership may be banned from selling Interests under Rule 506 if a Limited Partner beneficially owning 20% or more of the Partnership's voting securities engages in a "bad act" set forth in Rule 506. Accordingly, each Limited Partner agrees that the General Partner may deem the portion of any Bad Actor Limited Partner's Interest to be, or convert any Bad Actor Limited Partner's Interest into, a Non-Voting Interest (except for

Appx. 03345

the purposes of voting on any amendment to this Agreement that would materially and adversely change the Bad Actor Limited Partner's rights and preferences as a Limited Partner other than pursuant to an amendment under Section 8.1(d)) to the extent that the General Partner determines that such portion is in excess of 19.99% of the outstanding aggregate voting Interests of all Partners excluding any Interests that are Non-Voting Interests.

**8.14    Survival**

The obligations and covenants of the Limited Partners set forth in Sections 3.5 and 3.13 hereof shall apply jointly and severally to each Limited Partner and any direct or indirect transferee of or successor to such Limited Partner's interest and will survive such Partner's ceasing to be a partner of the Partnership and/or the termination, dissolution, liquidation and winding up of the Partnership.

**8.15    Entire Agreement**

The parties acknowledge and agree that, subject to Section 8.1(f), the General Partner without the approval of any other Partner may enter into a written agreement on behalf of the Partnership with any Limited Partner affecting the terms hereof in order to meet certain requirements of the Limited Partner (each an "***Other Agreement***"), and the terms of such Other Agreement shall govern with respect to such Limited Partner notwithstanding the provisions of this Agreement.   This Agreement and each Other Agreement constitute the entire agreement among the parties hereto pertaining to the subject matter hereof and supersede all prior agreements and understandings pertaining thereto.

[Signature Page Follows]

Appx. 03346

The parties hereto have executed this Agreement as of the day and year first above written.

General Partner:

On behalf of itself and as attorney-in-fact for the Limited Partners:

HIGHLAND DYNAMIC INCOME FUND GP, LLC
By:   Highland Capital Management, L.P., its sole member
By:   Strand Advisors, Inc., its general partner

By: _____
Name:   Trey Parker
Title:    Assistant Secretary

*Signature Page to the Amended and Restated Limited Partnership Agreement of Highland Dynamic Income Fund, L.P.*

Registrar of Companies
Government Administration Building
133 Elgin Avenue
George Town
Grand Cayman

**Highland Loan Fund, Ltd. (ROC #275693)** (the "**Company**")

**TAKE NOTICE** that by written resolution of the shareholders of the Company dated 8th May 2018, the following special resolution was passed:

**THAT** the name of the Company is changed from **Highland Loan Fund, Ltd.** to **Highland Dynamic Income Fund Ltd.** .

**THAT** the Memorandum and Articles of Association of the Company currently in effect be amended and restated by the deletion in their entirety and the substitution in their place of the Amended and Restated Memorandum and Articles of Association annexed hereto.

_____

Allema Ramoon
Corporate Administrator
for and on behalf of
Maples Corporate Services Limited

Dated this 9th day of May 2018

**THE COMPANIES LAW (2016 REVISION)**

**OF THE CAYMAN ISLANDS**

**COMPANY LIMITED BY SHARES**


**AMENDED AND RESTATED**

**MEMORANDUM AND ARTICLES OF ASSOCIATION**


**OF**


**HIGHLAND DYNAMIC INCOME FUND, LTD.**

**(AS ADOPTED BY SPECIAL RESOLUTION OF THE SUBSCRIBER DATED 8 MAY 2018)**



**THE COMPANIES LAW (2016 REVISION)**

**OF THE CAYMAN ISLANDS**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM OF ASSOCIATION**

**OF**

**HIGHLAND DYNAMIC INCOME FUND, LTD.**

**(AS ADOPTED BY SPECIAL RESOLUTION OF THE SUBSCRIBER DATED 8 MAY 2018)**

1    The name of the Company is **Highland Dynamic Income Fund, Ltd.**.

2    The Registered Office of the Company shall be at the offices of Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, or at such other place within the Cayman Islands as the Directors may decide.

3    The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by the laws of the Cayman Islands.

4    The liability of each Member is limited to the amount unpaid on such Member's Shares.

5    The share capital of the Company is US$50,000 divided into 100 Management Shares of US$1.00 par value each and 4,990,000 Participating Shares of US$0.01 par value each.

6    The Company has power to register by way of continuation as a body corporate limited by shares under the laws of any jurisdiction outside the Cayman Islands and to be deregistered in the Cayman Islands.

7    Capitalised terms that are not defined in this Memorandum of Association bear the respective meanings given to them in the Articles of Association of the Company.



*Filed: 09-May-2018 11:17 EST*
*Auth Code: J73514153444*

**Appx. 03350**

**THE COMPANIES LAW (2016 REVISION)**

**OF THE CAYMAN ISLANDS**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**ARTICLES OF ASSOCIATION**

**OF**

**HIGHLAND DYNAMIC INCOME FUND, LTD.**

**(AS ADOPTED BY SPECIAL RESOLUTION OF THE SUBSCRIBER DATED 8 MAY 2018)**


**1      Interpretation**

1.1      In these Articles, Table A in the First Schedule to the Statute does not apply and unless there is something in the subject or context inconsistent therewith:

| | |
|---|---|
| "**Administrator**" | means the person, firm or corporation appointed and from time to time acting as administrator of the Company. |
| "**Articles**" | means these articles of association of the Company. |
| "**Auditor**" | means the person (if any) for the time being performing the duties of auditor of the Company. |
| "**Business Day**" | means any day normally treated as a business day in such places and/or on such markets as the Directors may from time to time determine. |
| "**Cayman Islands**" | means the British Overseas Territory of the Cayman Islands. |
| "**Class**" | means a separate class of Participating Share (and includes any sub-class of any such class). |
| "**Company**" | means the above-named Company. |
| "**Directors**" | means the directors for the time being of the Company. |
| "**Dollars**" or "**US$**" | refers to the currency of the United States. |
| "**Electronic Record**" | has the same meaning as in the Electronic Transactions Law. |
| "**Electronic Transactions Law**" | means the Electronic Transactions Law (2003 Revision) of the Cayman Islands. |
| "**Eligible Investor**" | means a person eligible to hold Participating Shares, as determined from time to time by the Directors. |

*Filed: 09-May-2018 11:17 EST*
*Auth Code: J73514153444*

**Appx. 03351**

| | |
|---|---|
| "**Investment Manager**" | means the person, firm or corporation appointed and for the time being acting as the investment manager of the Company. |
| "**Management Share**" | means a voting non participating Share in the capital of the Company of US$1.00 par value designated as a Management Share and having the rights provided for in these Articles. |
| "**Member**" | means each person whose name is, from time to time and for the time being, entered in the Register of Members as the holder of one or more Shares. |
| "**Memorandum**" | means the memorandum of association of the Company. |
| "**Net Asset Value**" | means the value of the assets less the liabilities of the Company, or of a Separate Account (as the context may require), calculated in accordance with these Articles. |
| "**Net Asset Value per Participating Share**" | means the amount determined in accordance with these Articles as being the Net Asset Value per Participating Share of a particular Class and/or Series. |
| "**Offering Memorandum**" | means an offering memorandum relating to Participating Shares of any Class and/or Series as amended or supplemented from time to time subject to and in accordance with these Articles. |
| "**Ordinary Resolution**" | means a resolution passed by a simple majority of the votes of such Members as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting, and includes a unanimous written resolution. |
| "**Participating Share**" | means a participating redeemable Share in the capital of the Company of US$0.01 par value and having the rights provided for in these Articles. Participating Shares may be divided into Classes in the discretion of the Directors in accordance with the provisions of these Articles and each Class may be further divided into different Series of Participating Shares and the term "Participating Share" shall include all such Classes and Series of Participating Share. |
| "**Redemption Date**" | means, in relation to any Class and/or Series of Participating Shares, such day or days as are set out in the Offering Memorandum or as may be specified by the Directors from time to time, upon which a Member is entitled to require the redemption of Participating Shares of that Class and/or Series. |
| "**Redemption Fee**" | means such fee (if any) payable by a Member to the Company on a redemption of Participating Shares, as the same may be determined by the Directors and disclosed to the Member at the time of its subscription for such Participating Shares. |
| "**Redemption Notice**" | means a notice in a form approved by the Directors by which a holder |

www.verify.gov.ky File#: 275693

Filed: 09-May-2018 11:17 EST
Auth Code: J73514153444

**Appx. 03352**

of Participating Shares is entitled to require the Company to redeem its Participating Shares.

| | |
|---|---|
| "**Redemption Price**" | means the price determined in accordance with these Articles at which redeemable Participating Shares of the relevant Class and/or Series may be redeemed. |
| "**Register of Members**" | means the register of Members, which shall be maintained in accordance with the Statute and includes (except where otherwise stated) any branch or duplicate Register of Members. |
| "**Registered Office**" | means the registered office for the time being of the Company. |
| "**Sales Charge**" | means such sales charge (if any) determined by the Directors as being payable by a subscriber on a subscription for Participating Shares of any Class and/or Series. |
| "**Seal**" | means the common seal of the Company and includes every duplicate seal. |
| "**Separate Account**" | means a separate internal account of the Company which the Directors may establish and cause to be maintained in accordance with these Articles. |
| "**Series**" | means a separate series of Participating Share (and includes any sub-series of any such series). |
| "**Share**" and "**Shares**" | means a share or shares of any class or series in the Company, including a Management Share or a Participating Share, as well as any fraction of a Share. |
| "**Share Rights**" | means, with respect to the Participating Shares of any Class or Series in issue, the class rights for the time being applicable to such Participating Shares or other terms of offer for the time being applicable to such Participating Shares whether set out in the Offering Memorandum, any subscription agreement or otherwise (including any representations, warranties or other disclosure relating to the offer or holding of such Participating Shares). |
| "**Special Resolution**" | has the same meaning as in the Statute and includes a unanimous written resolution. |
| "**Statute**" | means the Companies Law (2012 Revision) of the Cayman Islands. |
| "**Subscriber**" | means the subscriber to the Memorandum. |
| "**Subscription Date**" | means, in relation to Participating Shares of any Class and/or Series, such day or days as are set out in the Offering Memorandum or as may be specified by the Directors from time to time upon which a person may subscribe for Participating Shares of that Class and/or |

Series.

| | |
|---|---|
| "**Subscription Price**" | means the price determined in accordance with these Articles at which Participating Shares of the relevant Class and/or Series may be subscribed. |
| "**Suspension**" | means a determination by the Directors to postpone or suspend (i) the calculation of the Net Asset Value of Participating Shares of any one or more Classes and/or Series (and the applicable Valuation Date) (a "**Calculation Suspension**"); (ii) the issue of Participating Shares of any one or more Classes and/or Series (and the applicable Subscription Date) (an "**Issue Suspension**"); (iii) the redemption by Members (in whole or in part) of Participating Shares of any one or more Classes and/or Series (and the applicable Redemption Date) (a "**Redemption Suspension**"); and/or (iv) the payment (in whole or in part) of any redemption proceeds (even if Valuation Dates and Redemption Dates are not postponed) (a "**Payment Suspension**"). |
| "**Transfer**" | means, in respect of any Share, any sale, assignment, exchange, transfer, pledge, encumbrance or other disposition of that Share, and "**Transferred**" shall be construed accordingly. |
| "**Treasury Share**" | means a Share held in the name of the Company as a treasury share in accordance with the Statute. |
| "**Valuation Date**" | means, in relation to each Class and/or Series of Participating Shares, the day or days determined from time to time by the Directors to be the day or days on which the Net Asset Value per Participating Share of that Class and/or Series is calculated. |
| "**Valuation Point**" | means, with respect to any Class and/or Series, the time or times on the Valuation Date of such Class and/or Series at which the Directors determine that the Net Asset Value per Participating Share of that Class and/or Series shall be calculated. |

1.2    In these Articles:

(a)    the singular number includes the plural number and vice versa;

(b)    the masculine gender includes the feminine gender;

(c)    persons includes corporations;

(d)    "written" and "in writing" include all modes of representing or reproducing words in visible form, including in the form of an Electronic Record;

(e)    "shall" shall be construed as imperative and "may" shall be construed as permissive;

(f)    references to provisions of any law or regulation shall be construed as references to those provisions as amended, modified, re-enacted or replaced from time to time;

(g)     any phrase introduced by the terms "including", "include", "in particular" or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms;

(h)     the term "and/or" is used herein to mean both "and" as well as "or."  The use of "and/or" in certain contexts in no respects qualifies or modifies the use of the terms "and" or "or" in others.  "Or" shall not be interpreted to be exclusive, and "and" shall not be interpreted to require the conjunctive — in each case, unless the context otherwise requires;

(i)     any reference to the powers of the Directors shall include, when the context admits, the service providers or any other person to whom the Directors may delegate their powers;

(j)     any requirements as to delivery under the Articles include delivery in the form of an Electronic Record;

(k)     any requirements as to execution or signature under the Articles including the execution of the Articles themselves can be satisfied in the form of an electronic signature as defined in the Electronic Transactions Law;

(l)     sections 8 and 19(3) of the Electronic Transactions Law shall not apply; and

(m)     headings are inserted for reference only and shall be ignored in construing these Articles.

## 2     Commencement of Business

2.1     The business of the Company may be commenced as soon after incorporation as the Directors shall see fit.

2.2     The Directors may pay, out of the capital or any other monies of the Company, all expenses incurred in or about the formation and operation of the Company, including the expenses of registration and the initial offering of Participating Shares.

## 3     Service Providers

3.1     The Directors may appoint any person, firm or corporation to act as a service provider to the Company (whether in general or in respect of any Class and/or Series of Shares) and may entrust to and confer upon any such service providers any of the functions, duties, powers and discretions exercisable by them as Directors, upon such terms and conditions (including as to remuneration payable by the Company) and with such powers of delegation, but subject to such restrictions, as they think fit. Without limiting the generality of the foregoing, such service providers may include managers, investment advisers, administrators, registrars, transfer agents, custodians and prime brokers.

3.2     Without prejudice to the generality of the preceding Article, the Directors may appoint any person, firm or corporation to act as the Investment Manager with respect to the assets of the Company (whether in general or in respect of any Class and/or Series of Shares).  The Directors may entrust to and confer upon the Investment Manager any of the functions, duties, powers and discretions exercisable by them as Directors upon such terms and conditions (including as to remuneration payable by the Company) and with such powers of delegation, but subject to such restrictions, as they think fit.



**4    Rights attaching to Shares**

4.1    The Management Shares shall have the following rights:

    (a)    as to voting: the holder of a Management Share shall (in respect of such Management Share) have the right to receive notice of, attend at and vote as a Member at any general meeting of the Company; and

    (b)    as to capital: a Management Share shall confer upon the holder the right in a winding up to repayment of capital as provided in these Articles but shall confer no other right to participate in the profits or assets of the Company; and

    (c)    as to income: no dividends shall be payable on the Management Shares.

4.2    The Participating Shares shall have the following rights:

    (a)    as to voting: the holder of a Participating Share shall not (in respect of such Participating Share) have the right to receive notice of, attend at or vote as a Member at any general meeting of the Company, but may vote at a separate Class meeting convened in accordance with these Articles; and

    (b)    as to capital: a Participating Share shall confer upon the holder thereof the right in a winding up to participate in the surplus assets of the Company by reference to the Separate Account attributable to the relevant Class or Series of Participating Shares as provided in these Articles; and

    (c)    as to income: the Participating Shares shall confer on the holders thereof the right to receive dividends as provided in these Articles.

**5    Share Capital**

5.1    Subject to these Articles, the Directors may allot, issue, grant options or warrants over, or otherwise dispose of Shares in separate classes and/or series with different terms, preferences, privileges or special rights including, without limitation, with respect to investment strategy and/or policy, participation in assets, profits and losses of the Company, voting, fees charged (including management, performance and incentive fees), redemption privileges, allocation of costs and expenses (including, without limitation, the costs and expenses incurred in any hedging activities and any profits and losses arising therefrom) as they think proper. Subject to the Statute, these Articles and any applicable subscription agreement, any Share Rights (other than those set out in these Articles or set out in a Special Resolution) may be varied by either the Directors or by Ordinary Resolution. Notwithstanding the foregoing, the Subscriber shall have the power to:

    (a)    issue one Share to itself;

    (b)    transfer that Share by an instrument of transfer to any person; and

    (c)    update the Register of Members in respect of the issue and transfer of that Share.

5.2    On or before the allotment of any Participating Share the Directors shall resolve the Class and/or Series to which such Participating Share shall be classified and may, prior to the issue of any Participating Share, reclassify such Participating Share. Each Class and/or Series shall be

specifically identified. Subject to the Statute and these Articles, the Directors may at any time re-name any Participating Share.

5.3 Notwithstanding the currency in which the par value of the Participating Shares is denominated, the Directors may specify any currency as the currency in which the Subscription Price, Redemption Price and Net Asset Value of Participating Shares of a Class and/or Series is calculated.

5.4 The Company shall not issue Shares to bearer.

5.5 Fractional Shares may be issued.

5.6 Unless the Directors determine otherwise, Shares shall only be issued as fully paid-up.

5.7 Unless the Directors determine otherwise No right of pre-emption or first refusal shall attach to any Shares.

## 6 Allotment and Issue of Participating Shares

6.1 The Directors may from time to time allot and issue Participating Shares of any Class and/or Series. The Directors may, in their discretion, refuse to allot and issue any Participating Shares, and shall not issue any Participating Shares to or for the account of an investor who is not an Eligible Investor. If the Directors have declared a Calculation Suspension or Issue Suspension, no Participating Shares of that Class or Series (as appropriate) shall be issued until the relevant Suspension has ended.

6.2 The Directors shall determine the Subscription Price at the time of issue of the first issue of Participating Shares of any Class and/or Series. Thereafter, the Directors may allot and issue Participating Shares of the same Class and/or Series on any Subscription Date provided that such additional Participating Shares are issued at a Subscription Price equal to not less than the Net Asset Value per Participating Share of such Class and/or Series calculated on the relevant Subscription Date (or if the Subscription Date is not also a Valuation Date then on the immediately preceding Valuation Date).

6.3 The Directors may add to the Subscription Price per Participating Share (before making any rounding adjustment) an amount which they consider to be an appropriate allowance to reflect fiscal and purchase charges which would be incurred for the account of the Company in investing an amount equal to the Subscription Price. The Directors may also add, in their discretion, a Sales Charge and/or an amount equal to any stamp duty and any other governmental taxes or charges payable by the Company with respect to the issue of such Participating Shares.

6.4 An applicant for Participating Shares shall pay for such Participating Shares in such currencies, in such manner, at such time, in such place and to such person acting on behalf of the Company as the Directors may from time to time determine.

6.5 Subject to the terms of any subscription agreement, an application for Participating Shares shall be irrevocable by an applicant for Participating Shares once it has been received by the Company. Participating Shares shall be treated as having been issued with effect from the relevant Subscription Date notwithstanding that the subscriber for those Participating Shares may not be entered in the Register of Members until after the Subscription Date.



6.6     Participating Shares shall be issued in such minimum numbers as the Directors may specify either generally or in any particular case; likewise the Directors may from time to time prescribe an amount as the minimum subscription amount.

6.7     The Directors may resolve to accept non-cash assets in satisfaction (in whole or in part) of the Subscription Price.

6.8     The Directors may require an applicant for Participating Shares to pay to the Company for the benefit of any selling agent such selling commissions or such organisational charges as may have been disclosed to such applicant.  The Directors may differentiate between applicants as to the amount of such selling commissions or such organisational charges.

6.9     The Company may, in so far as the Statute permits, pay a commission to any person in consideration of that person subscribing or agreeing to subscribe whether absolutely or conditionally for any Participating Shares.  Such commissions may be satisfied by the payment of cash and/or the issue of fully or partly paid-up Participating Shares.  The Company may also on any issue of Participating Shares pay such brokerage as may be lawful.

**7       Separate Accounts**

7.1     The Directors shall have the power to establish and maintain, with respect to Participating Shares of any Class and/or Series, a Separate Account, to record (purely as an internal accounting matter) the allocation, on a differentiated basis, of the assets and liabilities of the Company to the holders of Participating Shares of any such Class and/or a Series in a manner consistent with the methodology set forth in the Offering Memorandum and the rights otherwise attaching to the Participating Shares.

7.2     The proceeds from the issue of Participating Shares of any Class and/or Series shall be applied in the books of the Company to the Separate Account established for Participating Shares of that Class and/or Series.  The assets and liabilities and income and expenditure attributable to that Separate Account shall be applied to such Separate Account and, subject to the provisions of these Articles, to no other Separate Account.  In the event that the assets of a Separate Account referable to any Class and/or Series are exhausted, any and all unsatisfied claims which any Members or former Members referable to that Class and/or Series have against the Company shall be extinguished.  The Members or former Members referable to a Class and/or Series shall have no recourse against the assets of any other Separate Account established by the Company.

7.3     Where any asset is derived from another asset (whether cash or otherwise), such derivative asset shall be applied in the books of the Company to the same Separate Account as the asset from which it was derived, and on each revaluation of an asset the increase or diminution in value shall be applied to the same Separate Account and, subject to the provisions of these Articles, to no other Separate Account.

7.4     In the case of any asset or liability of the Company which the Directors do not consider is attributable to a particular Separate Account, the Directors shall have discretion to determine the basis upon which any such asset or liability shall be allocated between or among Separate Accounts.

7.5     The Directors may, in the books of the Company, allocate assets and liabilities to and from Separate Accounts if, as a result of a creditor proceeding against certain of the assets of the



www.verify.gov.ky File#: 275693

Filed: 09-May-2018 11:17 EST
Auth Code: J73514153444

**Appx. 03358**

Company or otherwise, a liability would be borne in a different manner from that in which it would have been borne if applied under the foregoing Articles.

7.6 The Directors may from time to time transfer, allocate or exchange an asset or liability from one Separate Account to another Separate Account provided that at the time of such transfer, allocation or exchange the Directors form the opinion (in good faith) that the value in money or money's worth of each such asset or liability transferred, allocated or exchanged is not significantly less or more than the value in money or money's worth (referred to in these Articles as "proper value") received by the Separate Account from which such asset or liability is transferred, allocated or exchanged except only as is otherwise provided by these Articles.

## 8 Determination of Net Asset Value

8.1 The Net Asset Value and Net Asset Value per Participating Share of each Class and/or Series shall be determined by or on behalf of the Directors as at the relevant Valuation Point on each relevant Valuation Date.

8.2 In calculating the Net Asset Value and the Net Asset Value per Participating Share, the Directors shall apply such generally accepted accounting principles as they may determine.

8.3 The assets and liabilities of the Company shall be valued in accordance with such policies as the Directors may determine. Absent bad faith or manifest error, any valuation made pursuant to these Articles shall be binding on all persons.

8.4 Unless otherwise determined by the Directors in any resolution creating a Class and/or Series of Participating Shares or as otherwise disclosed in any Offering Memorandum, the Net Asset Value per Participating Share of each Class (or Series) shall be determined by allocating *pro rata* the Net Asset Value, as at the relevant Valuation Point, of the Company and/or of the relevant Separate Account among each Class and/or Series, adjusting the amount so calculated to reflect any fees, costs, foreign exchange items or other assets or liabilities which are properly attributable to a specific Class and/or Series and then by dividing the resultant amount by the number of Participating Shares of such Class and/or Series then in issue.

8.5 The Directors may determine that the Net Asset Value of any Class and/or Series shall be definitively determined on the basis of estimates and that such determination shall not be modified to reflect final valuations.

8.6 Any expense or liability may be amortised over such period as the Directors may determine.

8.7 The Directors may establish such reserves as they deem reasonably necessary for Company expenses and any other contingent Company assets or liabilities, and may, upon the reversal or release of such reserves, apply any monies resulting therefrom in such manner as they may, in their absolute discretion, determine.

8.8 Net Asset Value per Participating Share shall be rounded to the nearest cent or such other amount as the Directors may determine and the benefit of any such roundings may be retained by the Company.

8.9 The Directors may cause the Company to issue new Participating Shares at par or to compulsorily redeem at par such number of Participating Shares as they consider necessary to address, in such manner as they consider equitable, any prior miscalculation of Net Asset Value

Filed: 09-May-2018 11:17 EST
Auth Code: J73514153444

**Appx. 03359**

or Net Asset Value per Participating Share.  The Company shall not be required to pay to the holder the redemption proceeds of any such compulsorily redeemed Participating Shares, which proceeds shall be retained by the Company.

## 9      Suspensions

9.1      The Directors may, from time to time, in the circumstances disclosed in the Offering Memorandum, declare a Suspension with respect to any one or more Classes and/or Series of Participating Shares.

9.2      The Directors shall promptly notify all affected Members of any such Suspension and shall promptly notify such Members upon termination of such Suspension.

## 10      Transfer of Shares

10.1      Subject to Article 5.1, Shares may not be Transferred without the prior written approval of the Directors (which may be withheld for any or no reason) provided that the Directors may waive this requirement to the extent that they deem appropriate in connection with the listing of any Class or Series of Share on a stock exchange.

10.2      The Directors shall not register any Transfer of any Share to any person who is, in the opinion of the Directors, not an Eligible Investor.

10.3      Any proposed transferee shall provide to the Directors such information and documents as the Directors may request, including, without limitation, such documents or information as the Directors deem necessary or desirable:

(a)      to enable the Directors to determine that the proposed transferee is an Eligible Investor; and

(b)      to enable the Company to comply with all applicable laws, including anti-money laundering laws.

10.4      The instrument of Transfer of any Share shall be in writing and shall be executed by or on behalf of the transferor (and, if the Directors so require, signed by or on behalf of the transferee). The transferor shall be deemed to remain the holder of a Share until the name of the transferee is entered in the Register of Members.

## 11      Transmission of Shares

11.1      If a Member dies, the survivor or survivors (where the Member was a joint holder) or his or her legal personal representatives (where the Member was a sole holder) shall be the only persons recognised by the Company as having any title to the Member's interest in the Company.  The death of any Member shall not operate to relieve, waive or reduce any liabilities attaching to the Member's Shares at the time of death and such liabilities shall continue to bind any survivor or survivors, or any personal representative, as the case may be.

11.2      Any person becoming entitled to a Share in consequence of the death or bankruptcy, or the liquidation or dissolution, of a Member (or in any other way than by Transfer) and who is an Eligible Investor may, upon delivery to the Directors of such evidence as may from time to time be required by them of:

(a)    such person's entitlement to such Shares; and/or

(b)    such person's status as an Eligible Investor,

elect, either to become the holder of such Share or to have such Share Transferred to another Eligible Investor nominated by such person.  If such person elects to become the holder of such Share, such person shall give notice in writing to the Directors to that effect, but the Directors shall, in either case, have the same right to decline registration of such person as a holder of such Share as they would have had in the case of a Transfer of the Share by that Member before his or her death or bankruptcy, or liquidation or dissolution, as the case may be.

11.3    Any person becoming entitled to a Share in consequence of the death or bankruptcy, or the liquidation or dissolution, of a Member (or in any other way than by Transfer) and who is not an Eligible Investor shall not be registered as the holder of such Share and shall promptly Transfer such Share to an Eligible Investor in accordance with these Articles.

11.4    A person becoming entitled to a Share by reason of the death or bankruptcy or liquidation or dissolution of the holder (or in any other case than by Transfer), and who is an Eligible Investor, shall be entitled to the same dividends and other advantages to which such person would be entitled if such person were the registered holder of such Share. However, the person shall not, before becoming a Member in respect of a Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company and the Directors may at any time give notice requiring any such person to elect either to be registered himself or to have some person nominated by him become the holder of the Share (but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the relevant Member before his death or bankruptcy or liquidation or dissolution or any other case than by transfer, as the case may be). If the notice is not complied with within ninety days the Directors may thereafter withhold payment of all dividends, bonuses or other monies payable in respect of the Share until the requirements of the notice have been complied with.

## 12    Redemption of Shares

12.1    Subject to any provisions relating to a specific Class and/or Series as set out in the Offering Memorandum or these Articles or in any resolution constituting a Class and/or Series or otherwise forming part of the special rights of such Participating Shares, a Member may require the redemption of all or any of such Member's Participating Shares by serving a Redemption Notice on the Company. Unless timely receipt is waived by the Directors in a particular case, a Redemption Notice shall be required to be received on or before a Redemption Date with respect to such Participating Shares (or such number of days prior to such Redemption Date as may be determined by the Directors).  Any Member redeeming Participating Shares shall submit to the Directors the share certificate (if any) issued in respect of those Participating Shares.  The Company shall redeem such Participating Shares at the Redemption Price, being an amount equal to the Net Asset Value per Participating Share of the relevant Class and/or Series calculated on the relevant Redemption Date (or if the Redemption Date is not a Valuation Date then on the immediately preceding Valuation Date) subject to any deductions, holdbacks or adjustments provided for in these Articles and/or the Offering Memorandum.

12.2    The Directors may deduct any Redemption Fee from the Redemption Price.  The Directors may also deduct such amount which they consider to be an appropriate allowance to reflect fiscal and



sale charges which would be incurred for the account of the Company in realising assets or closing out positions to provide funds to meet any redemption request.

12.3    A Member may not withdraw a Redemption Notice once submitted to the Company unless (a) the Directors shall have declared a Calculation Suspension or Redemption Suspension or (b) the Directors determine (in their sole discretion) to permit the withdrawal of such redemption request (which they may do in whole or in part). If a relevant Suspension has been declared by the Directors, the right of a Member to have its Participating Shares redeemed shall be suspended and during the period of Suspension the Member may withdraw its Redemption Notice. Any withdrawal of the Redemption Notice shall be made in writing and shall only be effective if actually received by the Company before the termination of the period of the Redemption Suspension or Calculation Suspension, as applicable. If the Redemption Notice is not withdrawn, any Participating Shares the redemption of which has been suspended shall be redeemed once the relevant Suspension has ended at the Redemption Price for Participating Shares of the relevant Class and/or Series calculated on the next Redemption Date following the end of the relevant Suspension.

12.4    The Directors may impose a gate the effect of which is to limit the redemptions of Participating Shares of any Class and/or Series or to limit the redemptions of Participating Shares held by any Member or Members as of any Redemption Date to such extent and in such manner as is disclosed in the Offering Memorandum. If the Directors determine to limit redemptions, the Directors may determine the manner in which such gated redemption requests will be dealt with on any subsequent Redemption Date.

12.5    If the Company is required by the laws of any relevant jurisdiction to make a withholding from any redemption monies payable to the holder of Participating Shares the amount of such withholding shall be deducted from the redemption monies otherwise payable to such person.

12.6    No redemption of part of a Member's holding of Participating Shares of any one Class and/or Series may be made if, as a result thereof, such Member would hold fewer Participating Shares of such Class and/or Series than such minimum number or value of Participating Shares of such Class and/or Series as may from time to time be specified (either generally or in any particular case or cases) by the Directors. If such partial redemption would reduce such Member's holding of Participating Shares to less than such minimum holding, the Directors may, in their discretion, elect to compulsorily redeem all of such Member's Participating Shares.

12.7    The Company may, in the absolute discretion of the Directors, refuse to make a redemption payment to a Member if the Directors suspect or are advised that the payment of any redemption proceeds to such Member may result in a breach or violation of any anti-money laundering law by any person in any relevant jurisdiction, or if such refusal is necessary to ensure the compliance by the Company, its Directors, the Administrator or any other service provider of the Company with any anti-money laundering law in any relevant jurisdiction.

12.8    Any amount payable to a Member for the redemption of Participating Shares shall be paid in such currency or currencies as the Directors may determine. Subject to any Payment Suspension, the Company shall remit redemption proceeds (net of the costs of remittance) by cheque or wire transfer within such period or periods as the Directors shall have disclosed to the Member at the time of its subscription for Participating Shares or, in the absence of any such disclosure, within such period or periods as the Directors shall determine. In the absence of directions as to payment the Company may remit redemption proceeds by cheque to the address of the Member appearing on the Register of Members or by wire transfer to such account as the Directors deem

appropriate in the circumstances. The Company shall not be liable for any loss resulting from this procedure.

12.9    On any redemption of Participating Shares the Directors shall have the power to satisfy (in whole or in part) the Redemption Price (and any other sums payable on redemption as provided in these Articles) owing on the redemption of such Participating Shares by dividing *in specie* the whole or any part of the assets of the Company (including, without limitation, shares, debentures, or securities of any other company whether or not held by the Company on the Redemption Date in question) and either (i) distributing such assets directly to the redeeming shareholder, and/or (ii) distributing or allocating such assets to a liquidating account or other similar mechanism to be managed and/or liquidated at the discretion of the Directors.

12.10   Participating Shares shall be treated as having been redeemed with effect from the relevant Redemption Date irrespective of whether or not a Member has been removed from the Register of Members or the Redemption Price has been determined or remitted. Accordingly, on and from the relevant Redemption Date, Members in their capacity as such will not be entitled to or be capable of exercising any rights arising under these Articles with respect to Participating Shares being redeemed (including any right to receive notice of, attend or vote at any meeting of the Company) save the right to receive the Redemption Price and any dividend which has been declared prior to the relevant Redemption Date but not yet paid (in each case with respect to the Participating Shares being redeemed). Such Members will be treated as creditors of the Company with respect to the Redemption Price and will rank accordingly in the priority of the Company's creditors.

12.11   Once a Participating Share is redeemed it shall be available for re issue and, until re issue, shall form part of the authorised and unissued share capital of the Company.

12.12   Upon the written request of a Member or prospective Member in a form acceptable to the Directors, the Company may, in the discretion of the Directors, accept a standing redemption request from such Member or prospective Member pursuant to which the Company shall agree (without assuming any liability for failing to do so) to use its commercially reasonable efforts to redeem such Member's Participating Shares to the extent necessary to ensure that such Member does not own over a specified percentage of the outstanding Participating Shares of the Company or any Class and/or Series thereof; such percentage to be the percentage identified by such Member or prospective Member in such written request as being the percentage which such Member's or prospective Member's ownership cannot exceed without material risk of such Member or prospective Member being in violation of applicable law or regulation. Any such written request may be revoked by notice in writing to the Company from the affected Member.

12.13   No amendment to these Articles made after a Redemption Date shall affect a Member with respect to Participating Shares of that Member which have been redeemed, or are being treated as redeemed, on or prior to that Redemption Date.

12.14   Unless otherwise provided in the Offering Memorandum, unremitted redemption proceeds shall not bear interest against the Company and redeemed Participating Shares shall not participate in the profits and losses of the Company with effect from the relevant Redemption Date.

## 13    Compulsory Redemption

13.1    The Directors may cause the Company to redeem any or all of the Participating Shares held by any person at the appropriate Redemption Price in the circumstances disclosed in the Offering

*www.verify.gov.ky File#: 275693*

*Filed: 09-May-2018 11:17 EST*
*Auth Code: J73514153444*

**Appx. 03363**

Memorandum. If the Directors determine compulsorily to redeem any Participating Shares under this Article they shall give the holder of the Participating Shares such notice of the redemption as they shall have disclosed to the Member at the time of its subscription for Participating Shares or, in the absence of any such disclosure, within such period as the Directors shall determine.

13.2 The Directors may cause a compulsory redemption during any period for which a Redemption Suspension has been declared.

13.3 Without prejudice to the generality of the foregoing, the Company may (without notice) compulsorily redeem the Participating Shares of any Member and, on behalf of such Member, apply the proceeds of redemption in paying for new Participating Shares to give effect to any exchange, conversion or roll-up policy disclosed to Members pursuant to which Participating Shares of one Class or Series (the "**Old Shares**") may, at the option of the Company, be exchanged for Participating Shares of another Class or Series (the "**New Shares**") by means of the redemption of the Old Shares and the immediate re-subscription of the redemption proceeds in paying up the New Shares.

## 14 Purchase and Surrender of Shares

14.1 Subject to the provisions of the Statute and without prejudice to these Articles, the Company may purchase its own Shares (including any redeemable Shares) in such manner and on such other terms as the Directors may agree with the relevant Member.

14.2 The Company may make a payment in respect of the redemption or purchase of its own Shares in any manner permitted by the Statute, including out of capital.

14.3 The Directors may accept the surrender for no consideration of any fully paid Share.

## 15 Treasury Shares

15.1 The Directors may, prior to the purchase, redemption or surrender of any Share, determine that such Share shall be held as a Treasury Share.

15.2 The Directors may determine to cancel a Treasury Share or transfer a Treasury Share on such terms as they think proper (including, without limitation, for nil consideration).

## 16 Variation of Share Rights

16.1 Subject to the Statute and these Articles, all or any of the Share Rights applicable to any Class or Series of Participating Shares in issue (unless otherwise provided by the terms of issue of those Participating Shares) may (whether or not the Company is being wound up) be varied without the consent of the holders of the issued Participating Shares of that Class or Series where such variation is considered by the Directors not to have a material adverse effect upon such holders' Share Rights; otherwise, any such variation may be made only with the prior consent in writing of the holders of not less than two-thirds by Net Asset Value of such Participating Shares, or with the sanction of a resolution passed by a majority of at least two-thirds of the votes cast in person or by proxy at a separate meeting of the holders of such Participating Shares. For the avoidance of doubt, the Directors reserve the right, notwithstanding that any such variation may not have a material adverse effect, to obtain consent from the holders of such Participating Shares. To any such meeting all the provisions of these Articles as to general meetings shall *mutatis mutandis* apply, but so that any holder of a Participating Share present in person or by proxy may demand

a poll, and the quorum for any such meeting shall be Members holding not less than twenty per cent. By Net Asset Value of the issued Participating Shares of the relevant Class or Series. At any Class meeting, the voting rights attributable to each Participating Share shall be calculated by reference to the Net Asset Value per Participating Share (calculated as at the most recent Valuation Date) and not on the basis of one Participating Share, one vote.

16.2    For the purposes of a Class consent, the Directors may treat two or more or all the Classes or Series of Participating Shares as forming one Class or Series if the Directors consider that such Classes or Series would be affected in the same way by the proposals under consideration, but in any other case shall treat them as separate Classes or Series.

16.3    Where the Shares of any Class or Series (the "**First Class**") rank, or will on issue rank, pari passu with the Shares of another Class or Series (the "**Second Class**") with respect to participation in the same pool of profits or assets of the Company on a winding up, the rights of the First Class shall be deemed to be varied by any variation of or creation of rights in the Second Class (including on initial issue) which gives the Second Class priority over the First Class on a winding up of the Company.

16.4    In relation to any Class or Series consent required pursuant to Article 16.1, the Directors in their discretion may invoke the following procedure (the "**Negative Consent Procedure**"). The Directors shall provide written notice of the proposed variation (the "**Proposal**") to the Members of the affected Class or Series and shall specify a deadline (the "**Redemption Request Date**"), which shall be no earlier than 30 days after the date of giving such notice, by which date such Members may submit a written request for redemption of some or all of their Participating Shares of the affected Class and/or Series on the Redemption Date (the "**Specified Redemption Date**") specified by the Directors in such notice. The terms of the Proposal shall be such that its specified effective date (the "**Effective Date**") shall not be on or prior to the Specified Redemption Date. Such notice shall further provide that the holders of any Participating Shares in respect of which a request for redemption has not been received by the Redemption Request Date (the "**Affected Shares**") shall, in the absence of express written refusal to consent, be deemed to have consented in writing to the Proposal (such Affected Shares being the "Negative Consent Shares"). In the event that the Negative Consent Procedure is followed, only the Affected Shares shall be considered for the purposes of determining whether the written consent majority has been obtained under Article 16.1 with the holders of the Negative Consent Shares being deemed to have submitted a written consent in favour of the Proposal on the Effective Date.

16.5    Subject to the foregoing Articles, the Share Rights applicable to any Class or Series of Shares in issue shall (unless otherwise expressly provided by the conditions of issue of such Shares) be deemed not to be varied by:

(a)    the creation, allotment or issue of further Shares ranking pari passu therewith and which may be issued with the benefit of the terms referred to below;

(b)    the purchase or redemption of any Shares;

(c)    the exercise of the powers to allocate assets and charge liabilities to the various Separate Accounts or any of them and to transfer the same to and from the various Separate Accounts or any of them, as provided for in these Articles;

(d)    any reduction or waiver of any fees (including early redemption, management or performance fees) chargeable or allocable to any Class or Series of Shares;

(e)     any reduction or waiver of any redemption notice, gate or lock-up period applicable to any Class or Series of Shares; or

(f)     any variation or waiver contemplated by or provided for in the Offering Memorandum applicable to the relevant Class and/or Series.

**17      Variation of Terms**

The Directors, with the consent of the Investment Manager, shall have the absolute discretion to agree with a Member to waive or modify the terms applicable to such Member's subscription for Participating Shares (including those relating to management and performance fees and redemption terms) without obtaining the consent of any other Member; provided that such waiver or modification does not amount to a variation of the rights attaching to the Participating Shares of such other Members.

**18      Certificates for Shares**

18.1    A Member shall only be entitled to a share certificate if the Directors resolve that share certificates shall be issued. Share certificates representing Shares, if any, shall be in such form as the Directors may determine.  Share certificates shall be signed by one or more Directors or another person authorised by the Directors. The Directors may authorise certificates to be issued with the authorised signature(s) affixed by mechanical process.  All certificates for Shares shall be consecutively numbered or otherwise identified and shall specify the Shares to which they relate.  All certificates surrendered to the Company for transfer shall be cancelled and, subject to these Articles, no new certificate shall be issued until the former certificate representing a like number of relevant Shares shall have been surrendered and cancelled.

18.2    The Company shall not be bound to issue more than one certificate for Shares held jointly by more than one person and delivery of a certificate to one joint holder shall be a sufficient delivery to all of them.

18.3    If a share certificate is defaced, worn out, lost or destroyed, it may be renewed on such terms (if any) as to evidence and indemnity and on the payment of such expenses reasonably incurred by the Company in investigating evidence, as the Directors may prescribe, and (in the case of defacement or wearing out) on delivery up of the old certificate.

**19      Register of Members**

19.1    The Company shall maintain or cause to be maintained the Register of Members.

19.2    The Directors may determine that the Company shall maintain one or more branch registers of Members in accordance with the Statute. The Directors may also determine which register of Members shall constitute the principal register and which shall constitute the branch register or registers, and to vary such determination from time to time.

**20      Closing Register of Members and Fixing Record Date**

20.1    For the purpose of determining Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any dividend, or in order to make a determination of Members for any other proper purpose, the Directors may



www.verify.gov.ky File#: 275693

Filed: 09-May-2018 11:17 EST
Auth Code: J73514153444

**Appx. 03366**

provide that the Register of Members shall be closed for transfers for a stated period which shall not in any case exceed thirty days.

20.2 In lieu of, or apart from, closing the Register of Members, the Directors may fix in advance or arrears a date as the record date for any such determination of Members entitled to notice of, or to vote at any meeting of the Members or any adjournment thereof, or for the purpose of determining the Members entitled to receive payment of any dividend or in order to make a determination of Members for any other proper purpose.

20.3 If the Register of Members is not so closed and no record date is fixed for the determination of Members entitled to notice of, or to vote at, a meeting of Members or Members entitled to receive payment of a dividend, the date on which notice of the meeting is sent or the date on which the resolution of the Directors declaring such dividend is passed, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## 21 Non Recognition of Trusts

The Company shall not be bound by or compelled to recognise in any way (even when notified) any equitable, contingent, future or partial interest in any Share, or (except only as is otherwise provided by these Articles or the Statute) any other rights in respect of any Share other than an absolute right to the entirety thereof in the registered holder.

## 22 Lien on Shares

22.1 The Company shall have a first and paramount lien on all Shares (whether fully paid-up or not) registered in the name of a Member (whether solely or jointly with others) for all debts, liabilities or engagements to or with the Company (whether presently payable or not) by such Member or such Member's estate, either alone or jointly with any other person, whether a Member or not, but the Directors may at any time declare any Share to be wholly or in part exempt from the provisions of this Article. The registration of a Transfer of any such Share shall operate as a waiver of the Company's lien thereon. The Company's lien on a Share shall also extend to any amount payable in respect of that Share.

22.2 The Company may sell, in such manner as the Directors think fit, any Shares on which the Company has a lien, if a sum in respect of which the lien exists is presently payable, and is not paid within fourteen clear days after notice has been given to the holder of the Shares, or to the person entitled to it in consequence of the death or bankruptcy of the holder, demanding payment and stating that if the notice is not complied with the Shares may be sold.

22.3 To give effect to any such sale the Directors may authorise any person to execute an instrument of Transfer of the Shares sold to, or in accordance with the directions of, the purchaser. The purchaser or such purchaser's nominee shall be registered as the holder of the Shares comprised in any such Transfer, and the purchaser shall not be bound to see to the application of the purchase money, nor shall the purchaser's title to the Shares be affected by any irregularity or invalidity in the sale or the exercise of the Company's power of sale under these Articles.

22.4 The net proceeds of such sale after payment of costs, shall be applied in payment of such part of the amount in respect of which the lien exists as is presently payable and any balance shall

www.verify.gov.ky File#: 275693



Filed: 09-May-2018 11:17 EST
Auth Code: J73514153444

**Appx. 03367**

(subject to a like lien for sums not presently payable as existed upon the Shares before the sale) be paid to the person entitled to the Shares at the date of the sale.

## 23    Amendments of Memorandum and Articles and Alteration of Capital

23.1    The Company may, by Ordinary Resolution:

(a)    increase its share capital by such sum and with such rights, priorities and privileges annexed thereto, as the resolution shall prescribe;

(b)    consolidate and divide all or any of its share capital into Shares of larger amount than its existing Shares;

(c)    by subdivision of its existing Shares or any of them divide the whole or any part of its share capital into Shares of smaller amount than is fixed by the Memorandum; and

(d)    cancel any Shares that at the date of the passing of the resolution have not been taken or agreed to be taken by any person.

23.2    All new Shares created in accordance with the provisions of the preceding Article shall be subject to the same provisions of these Articles with reference to liens, Transfer, transmission and otherwise as the Shares in the original share capital.

23.3    Subject to the provisions of the Statute and the provisions of these Articles as regards the matters to be dealt with by Ordinary Resolution the Company may, by Special Resolution:

(a)    change its name;

(b)    alter or add to these Articles;

(c)    alter or add to the Memorandum with respect to any objects, powers or other matters specified therein; and

(d)    reduce its share capital or any capital redemption reserve fund.

## 24    Registered Office

Subject to the provisions of the Statute, the Company may by resolution of the Directors change the location of its Registered Office.  The Company may, in addition to its Registered Office, maintain such other offices or places of business as the Directors determine.

## 25    General Meetings

25.1    All general meetings other than annual general meetings shall be called extraordinary general meetings.  The Directors may call general meetings.

25.2    The Company may but shall not be obliged to hold a general meeting in each year as its annual general meeting, and shall specify the meeting as such in the notice calling it.  Any annual general meeting shall be held at such time and place as the Directors shall determine.



25.3 The Directors shall, on a Members' requisition, forthwith proceed to convene an extraordinary general meeting of the Company. A Members' requisition is a requisition of Members of the Company holding at the date of deposit of the requisition not less than ten per cent. in Net Asset Value of the Shares as at that date which carry the right to vote at general meetings of the Company.

25.4 The requisition must state the objects of the meeting and must be signed by the requisitionists and deposited at the Registered Office, and may consist of several documents in like form each signed by one or more requisitionists.

25.5 If the Directors do not, within twenty-one days from the date of the deposit of the requisition, duly proceed to convene a general meeting to be held within a further twenty-one days, the requisitionists, or any of them representing more than one-half of the total voting rights of all of them, may themselves convene a general meeting, but any meeting so convened shall not be held after the expiration of three months after the expiration of the first above-mentioned twenty-one days.

25.6 A general meeting convened as aforesaid by requisitionists shall be convened in the same manner, as nearly as possible, as that in which general meetings are to be convened by Directors.

## 26 Notice of General Meetings

26.1 At least five Business Days' notice shall be given of any general meeting. Every notice shall be exclusive of the day on which it is given or deemed to be given and of the day on which the meeting is to be held and shall specify the place, the day and the hour of the meeting and the general nature of the business and shall be given in the manner hereinafter mentioned or in such other manner if any as may be prescribed by the Company, provided that a general meeting of the Company shall, whether or not the notice specified in this Article has been given and whether or not the provisions of these Articles regarding general meetings have been complied with, be deemed to have been duly convened if it is so agreed:

(a) in the case of an annual general meeting, by all the Members entitled to attend and vote thereat; and

(b) in the case of an extraordinary general meeting, by a majority in number of the Members having the right to attend and vote at the meeting, being a majority together holding not less than ninety five per cent. in Net Asset Value of the Shares giving that right.

26.2 The accidental omission to give notice of a general meeting to, or the non receipt of notice of a meeting by, any person entitled to receive notice thereof shall not invalidate the proceedings of that meeting.

## 27 Proceedings at General Meetings

27.1 No business shall be transacted at any general meeting unless a quorum is present. A quorum shall be one or more Members (present in person, by proxy or authorised corporate representative, as the case may be) entitled to attend and vote and representing not less than twenty per cent. in Net Asset Value of all of the Shares in issue and carrying the right to vote at the meeting.

27.2 A person may, with the consent of the Directors, participate at a general meeting by conference telephone or other communications equipment by means of which all the persons participating in the meeting can communicate with each other. Participation by a person in a general meeting in this manner is treated as presence in person at that meeting.

27.3 A resolution (including a Special Resolution) in writing (in one or more counterparts) signed by all Members for the time being entitled to receive notice of and to attend and vote at general meetings (or, being corporations or other non-natural persons, signed by their duly authorised representatives) shall be as valid and effective as if the resolution had been passed at a general meeting of the Company duly convened and held.

27.4 If a quorum is not present within half an hour from the time appointed for the meeting or if during such a meeting a quorum ceases to be present, the meeting, if convened upon the requisition of Members, shall be dissolved and in any other case it shall stand adjourned to the same day in the next week at the same time and place or to such other day, time or such other place as the Directors may determine, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Members present shall be a quorum.

27.5 The chairman, if any, of the board of Directors shall preside as chairman at every general meeting of the Company, or if there is no such chairman, or if the chairman shall not be present within fifteen minutes after the time appointed for the holding of the meeting, or is unwilling to act, the Directors present shall elect one of their number to be chairman of the meeting.

27.6 If no Director is willing to act as chairman, or if no Director is present within fifteen minutes after the time appointed for holding the meeting, the Members present shall choose one of their number to be chairman of the meeting.

27.7 The chairman may, with the consent of a meeting at which a quorum is present (and shall if so directed by the meeting) adjourn the meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a general meeting is adjourned for thirty days or more, notice of the adjourned meeting shall be given as in the case of an original meeting. Otherwise it shall not be necessary to give any such notice.

27.8 A resolution put to the vote of a meeting shall be decided on a show of hands unless before, or on the declaration of the result of, the show of hands, the chairman or any Member present in person or by proxy (or in the case of a non-natural person, by its duly authorised representative or by proxy) demands a poll.

27.9 Unless a poll is duly demanded a declaration by the chairman that a resolution has been carried or carried unanimously, or by a particular majority, or lost or not carried by a particular majority, an entry to that effect in the minutes of the proceedings of the meeting shall be conclusive evidence of that fact without proof of the number or proportion of the votes recorded in favour of or against such resolution.

27.10 The demand for a poll may be withdrawn.

27.11 Except on a poll demanded on the election of a chairman or on a question of adjournment, a poll shall be taken as the chairman directs, and the result of the poll shall be deemed to be the resolution of the general meeting at which the poll was demanded.



27.12 A poll demanded on the election of a chairman or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the general meeting directs, and any business other than that upon which a poll has been demanded or is contingent thereon may proceed pending the taking of the poll.

27.13 In the case of an equality of votes, whether on a show of hands or on a poll, the chairman shall not be entitled to a second or casting vote.

## 28 Votes of Members

28.1 Subject to any rights or restrictions attached to any Shares, on a show of hands every Member holding Shares carrying the right to vote on the matter in question who (being an individual) is present in person or by proxy or (if a corporation or other non-natural person) is present by its duly authorised representative or by proxy, shall have one vote and on a poll the voting rights attributable to each Share carrying the right to vote on the matter in question shall be calculated by reference to the Net Asset Value per Share (calculated as at the most recent Valuation Date) and not on the basis of one Share, one vote.

28.2 In the case of joint holders of record, the vote of the senior holder who tenders a vote, whether in person or by proxy, shall be accepted to the exclusion of the votes of the other joint holders. Seniority among joint holders shall be determined by the order in which the names of the holders stand in the Register of Members.

28.3 A Member of unsound mind, or in respect of whom an order has been made by any court or authority having jurisdiction in lunacy, may vote, whether on a show of hands or on a poll, by the Member's committee, receiver, curator bonis, or other similar person appointed on such Member's behalf by that court or authority and any such committee, receiver, curator bonis or other similar person may vote by proxy.

28.4 No person shall be entitled to vote at any general meeting unless such person is registered as a Member on the record date for such meeting, nor unless all calls or other monies then payable by such person in respect of such Shares have been paid.

28.5 No objection shall be raised to the qualification of any voter except at the general meeting or adjourned general meeting at which the vote objected to is purported to be given or tendered and every vote not disallowed at the meeting shall be valid. Any objection made in due time shall be referred to the chairman whose decision shall be final and conclusive.

28.6 On a poll or on a show of hands votes may be cast either personally or by proxy. A Member may appoint more than one proxy or the same proxy under one or more instruments to attend and vote at a meeting. Where a Member appoints more than one proxy the instrument of proxy shall state which proxy is entitled to vote on a show of hands.

28.7 A Member holding more than one Share need not cast the votes in respect of its Shares in the same way on any resolution and therefore may vote a Share or some or all such Shares either for or against a resolution and/or abstain (any such abstentions to count neither for nor against the resolution) from voting a Share or some or all of the Shares and, subject to the terms of the instrument appointing it, a proxy appointed under one or more instruments may vote a Share or some or all of the Shares in respect of which such proxy is appointed either for or against a resolution and/or abstain from voting.



www.verify.gov.ky File#: 275693

Filed: 09-May-2018 11:17 EST
Auth Code: J73514153444

**Appx. 03371**

## 29      Proxies

29.1    The instrument appointing a proxy shall be in writing, be executed under the hand of the appointor or of such appointor's attorney duly authorised in writing or, if the appointor is a corporation or other non-natural person, under the hand of an officer or other person duly authorised for that purpose.  A proxy need not be a Member of the Company.

29.2    The Directors may, in the notice convening any meeting or adjourned meeting, or in an instrument of proxy sent out by the Company, specify the place and the time (being not later than the time for holding the meeting or adjourned meeting to which the proxy relates) at which the instrument appointing a proxy shall be deposited.  In the absence of any such direction from the Directors in the notice convening any meeting or adjourned meeting, the instrument appointing a proxy shall be deposited at the Registered Office not less than 48 hours before the time for holding the meeting or adjourned meeting at which the person named in the instrument proposes to vote.

29.3    The chairman may in any event, at the chairman's discretion, declare that an instrument of proxy shall be deemed to have been duly deposited.  An instrument of proxy that is not deposited in the manner permitted and which has not been declared to have been duly deposited by the chairman, shall be invalid.

29.4    The instrument appointing a proxy may be in any usual or common form and may be incorporated within any subscription agreement or other document signed by or on behalf of the Member.  An instrument appointing a proxy may be expressed to be for a particular meeting or any adjournment thereof or generally until revoked.  An instrument appointing a proxy shall be deemed to include the power to demand or join or concur in demanding a poll.

29.5    Votes given in accordance with the terms of an instrument of proxy shall be valid notwithstanding the previous death or insanity of the principal or revocation of the proxy or of the authority under which the proxy was executed, or the Transfer of the Share in respect of which the proxy is given unless notice in writing of such death, insanity, revocation or Transfer was received by the Company at the Registered Office before the commencement of the general meeting, or adjourned meeting at which it is sought to use the proxy.

## 30      Corporate Members

Any corporation or other non-natural person which is a Member of the Company may in accordance with its constitutional documents, or in the absence of such provision by resolution of its directors or other governing body, authorise such person as it thinks fit to act as its representative at any meeting of the Company or of any Class of Members, and the person so authorised shall be entitled to exercise the same powers on behalf of the corporation which such person represents as the corporation could exercise if it were an individual Member.

## 31      Shares Beneficially Owned by the Company

Shares of the Company that are beneficially owned by the Company shall not be voted, directly or indirectly, at any meeting and shall not be counted in determining the total number of outstanding Shares at any given time.



22

*www.verify.gov.ky File#: 275693*

*Filed: 09-May-2018 11:17 EST*
*Auth Code: J73514153444*

**Appx. 03372**

**32      Directors**

There shall be a board of Directors consisting of not less than one person (exclusive of alternate Directors) provided however that the Company may from time to time by Ordinary Resolution increase or reduce the limits in the number of Directors. The first Directors of the Company shall be determined in writing by, or appointed by a resolution of, the Subscriber.

**33      Powers of Directors**

33.1    Subject to the provisions of the Statute, the Memorandum and the Articles and to any directions given by Special Resolution, the business of the Company shall be managed by the Directors who may exercise all the powers of the Company. No alteration of the Memorandum or these Articles and no such direction shall invalidate any prior act of the Directors which would have been valid if that alteration had not been made or that direction had not been given. A duly convened meeting of Directors at which a quorum is present may exercise all powers exercisable by the Directors.

33.2    All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for monies paid to the Company shall be signed, drawn, accepted, endorsed or otherwise executed as the case may be in such manner as the Directors shall determine by resolution.

33.3    The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof and to issue debentures, debenture stock, mortgages, bonds and other such securities whether outright or as security for any debt, liability or obligation of the Company or of any third party. Notwithstanding the foregoing, the Directors shall not exercise the powers specified in this Article in breach of any limits or restrictions specified in the Offering Memorandum.

**34      Appointment and Removal of Directors**

34.1    The Company may, by Ordinary Resolution, appoint any person to be a Director and may, by Ordinary Resolution, remove any Director.

34.2    The Directors may appoint any person to be a Director, either to fill a vacancy or as an additional Director provided that the appointment does not cause the number of Directors to exceed any number fixed by or in accordance with these Articles as the maximum number of Directors.

**35      Vacation of Office of Director**

The office of a Director shall be vacated if:

(a)     the Director gives notice in writing to the Company that such Director resigns the office of Director;

(b)     the Director is absent (without being represented by proxy or an alternate Director appointed by such Director) from three consecutive meetings of the board of Directors without special leave of absence from the Directors, and they pass a resolution that such Director has by reason of such absence vacated office;

(c)     the Director dies, becomes bankrupt or makes any arrangement or composition with such Director's creditors generally;

(d)     the Director is or becomes of unsound mind;

(e)     the Director ceases to be a Director by virtue of, or is prohibited from being a Director by, an order made pursuant to any law or regulation binding on the Company; or

(f)     all the other Directors of the Company (being not less than two in number) resolve that such Director should be removed as a Director.

## 36     Proceedings of Directors

36.1     The quorum for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed shall be two if there are two or more Directors, and shall be one if there is only one Director.  A person who holds office as an alternate Director shall, if such person's appointor is not present, be counted in the quorum.  A Director who also acts as an alternate Director shall, if such Director's appointor is not present, count twice towards the quorum.

36.2     Subject to the provisions of these Articles, the Directors may regulate their proceedings as they think fit.  Questions arising at any meeting shall be decided by a majority of votes.  In the case of an equality of votes, the chairman shall not have a second or casting vote.  A Director who is also an alternate Director shall be entitled in the absence of such Director's appointor to a separate vote on behalf of such Director's appointor in addition to such Director's own vote.

36.3     A person may participate in a meeting of the Directors or committee of Directors by conference telephone or other communications equipment by means of which all the persons participating in the meeting can communicate with each other at the same time. Participation by a person in a meeting in this manner is treated as presence in person at that meeting.  Unless otherwise determined by the Directors, the meeting shall be deemed to be held at the place where the chairman is located at the start of the meeting.

36.4     A resolution in writing (in one or more counterparts) signed by all the Directors or all the members of a committee of Directors (an alternate Director being entitled to sign such a resolution on behalf of such alternate Director's appointor) shall be as valid and effectual as if it had been passed at a meeting of the Directors, or committee of Directors as the case may be, duly convened and held.

36.5     A Director or alternate Director may, or other officer of the Company at the direction of a Director or alternate Director may call a meeting of the Directors by at least two days' notice in writing to every Director and alternate Director which notice shall set forth the general nature of the business to be considered unless notice is waived by all the Directors (or their alternates) either at, before or after the meeting is held.

36.6     The continuing Directors may act notwithstanding any vacancy in their body, but if and so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors the continuing Directors or Director may act for the purpose of increasing the number of Directors to that number, or of summoning a general meeting of the Company, but for no other purpose.

36.7     The Directors may elect a chairman of their board and determine the period for which the chairman is to hold office; but if no such chairman is elected, or if at any meeting the chairman is not present within five minutes after the time appointed for holding the same, the Directors present may choose one of their number to be chairman of the meeting.

36.8 All acts done by any meeting of the Directors or of a committee of Directors (including any person acting as an alternate Director) shall, notwithstanding that it be afterwards discovered that there was some defect in the appointment of any Director or alternate Director, or that they or any of them were disqualified, be as valid as if every such person had been duly appointed and qualified to be a Director or alternate Director as the case may be.

36.9 A Director but not an alternate Director may be represented at any meetings of the board of Directors by a proxy appointed in writing by such Director. The proxy shall count towards the quorum and the vote of the proxy shall for all purposes be deemed to be that of the appointing Director.

**37 Presumption of Assent**

A Director who is present at a meeting of the board of Directors at which action on any Company matter is taken shall be presumed to have assented to the action taken unless the Director's dissent shall be entered in the minutes of the meeting or unless the Director shall file such Director's written dissent from such action with the person acting as the chairman or secretary of the meeting before the close or adjournment thereof or shall forward such dissent by personal delivery, courier or registered post to such person immediately after the close or adjournment of the meeting. Such right to dissent shall not apply to a Director who voted in favour of such action.

**38 Directors' Interests**

38.1 A Director may hold any other office or place of profit under the Company (other than the office of Auditor) in conjunction with such Director's office of Director for such period and on such terms as to remuneration and otherwise as the Directors may determine.

38.2 A Director may act alone or by such Director's firm in a professional capacity for the Company and the Director or such Director's firm shall be entitled to remuneration for professional services as if such Director were not a Director or alternate Director.

38.3 A Director or alternate Director of the Company may be or become a director or other officer of or otherwise interested in any company promoted by the Company or in which the Company may be interested as shareholder or otherwise, and no such Director or alternate Director shall be accountable to the Company for any remuneration or other benefits received by such Director or alternate Director as a director or officer of, or from such Director or alternate Director's interest in, such other company.

38.4 No person shall be disqualified from the office of Director or alternate Director or prevented by such office from contracting with the Company, either as vendor, purchaser or otherwise, nor shall any such contract or any contract or transaction entered into by or on behalf of the Company in which any Director or alternate Director shall be in any way interested be or be liable to be avoided, nor shall any Director or alternate Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or transaction by reason of such Director holding office or of the fiduciary relationship thereby established. A Director (or such Director's alternate Director in such Director's absence) shall be at liberty to vote in respect of any contract or transaction in which such Director is interested provided that the nature of the interest of any Director or alternate Director in any such contract or transaction shall be disclosed by such Director at or prior to such Director's consideration and any vote thereon.



38.5 A general notice that a Director or alternate Director is a shareholder, director, officer or employee of any specified firm or company and is to be regarded as interested in any transaction with such firm or company shall be sufficient disclosure for the purposes of voting on a resolution in respect of a contract or transaction in which such Director has an interest, and after such general notice it shall not be necessary to give special notice relating to any particular transaction.

## 39 Minutes

The Directors shall cause minutes to be made in books kept for the purpose of all appointments of officers made by the Directors, all proceedings at meetings of the Company or the holders of any Class of Shares and of the Directors, and of committees of Directors including the names of the Directors or alternate Directors present at each meeting.

## 40 Delegation of Directors' Powers

40.1 The Directors may delegate any of their powers to any committee consisting of one or more Directors or such other persons as the Directors may designate. They may also delegate to any managing director or any Director holding any other executive office such of their powers as they consider desirable to be exercised by such managing director or any Director provided that an alternate Director may not act as managing director and the appointment of a managing director shall be revoked forthwith if such managing director ceases to be a Director. Any such appointment may be made subject to any conditions the Directors may impose, and either collaterally with or to the exclusion of their own powers, and may be revoked or altered. Subject to any such conditions, the proceedings of a committee of Directors shall be governed by these Articles regulating the proceedings of Directors, so far as they are capable of applying.

40.2 The Directors may establish any committees, local boards or agencies or appoint any person to be a manager or agent for managing the affairs of the Company and may appoint any person to be a member of such committees or local boards. Any such appointment may be made either collaterally with or to the exclusion of the Directors' powers, shall be subject to any conditions the Directors may impose, and may be revoked or altered. Subject to any such conditions, the proceedings of any such committee, local board or agency shall be governed by these Articles regulating the proceedings of Directors, so far as they are capable of applying.

40.3 The Directors may by power of attorney or otherwise appoint any company, firm, person or body of persons to be the attorney or authorised signatory of the Company for such purpose and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such powers of attorney or other appointment may contain such provisions for the protection and convenience of persons dealing with any such attorneys or authorised signatories as the Directors may think fit and may also authorise any such attorney or authorised person to delegate all or any of the powers, authorities and discretions vested in such attorney or authorised person.

40.4 The Directors may appoint such officers as they consider necessary on such terms, at such remuneration (if any) and to perform such duties, and subject to such provisions as to disqualification and removal as the Directors may think fit. Unless otherwise specified in the terms of such officer's appointment an officer may be removed by resolution of the Directors or Members.



www.verify.gov.ky File#: 275693

Filed: 09-May-2018 11:17 EST
Auth Code: J73514153444

**Appx. 03376**

**41 Alternate Directors**

41.1 Any Director (other than an alternate Director) may by written notice to the Company appoint any other Director, or any other person willing to act, to be an alternate Director and by written notice to the Company may remove from office an alternate Director so appointed by the Director.

41.2 An alternate Director shall be entitled to receive notice of all meetings of Directors and of meetings of committees of Directors of which such alternate Director's appointor is a member, to attend and vote at every such meeting at which the Director appointing such alternate Director is not personally present, and generally to perform all the functions of such alternate Director's appointor as a Director in such Director's absence.

41.3 An alternate Director shall cease to be an alternate Director if such alternate Director's appointor ceases to be a Director.

41.4 Any appointment or removal of an alternate Director shall be by notice to the Company signed by the Director making or revoking the appointment or in any other manner approved by the Directors.

41.5 Subject to the provisions of the Articles, an alternate Director shall be deemed for all purposes to be a Director and shall alone be responsible for such alternate Director's own acts and defaults and shall not be deemed to be the agent of the Director appointing such alternate Director.

**42 No Minimum Shareholding for Directors**

The Company in general meeting may fix a minimum shareholding required to be held by a Director, but unless and until such a shareholding qualification is fixed a Director shall not be required to hold Shares.

**43 Remuneration of Directors**

43.1 The remuneration to be paid to the Directors, if any, shall be such remuneration as the Directors shall determine. The Directors shall also be entitled to be paid all travelling, hotel and other expenses properly incurred by them in connection with their attendance at meetings of Directors or committees of Directors, or general meetings of the Company, or separate meetings of the holders of any Class of Shares or debentures of the Company, or otherwise in connection with the business of the Company, or to receive a fixed allowance in respect thereof as may be determined by the Directors, or a combination partly of one such method and partly the other.

43.2 The Directors may by resolution approve additional remuneration to any Director for any services other than such Director's ordinary routine work as a Director. Any fees paid to a Director who is also counsel to the Company, or otherwise serves it in a professional capacity, shall be in addition to such Director's remuneration as a Director.

**44 Seal**

The Company may, if the Directors so determine, have a Seal, which shall only be used by the authority of the Directors or of a committee of the Directors authorised by the Directors. Every instrument to which the Seal has been affixed shall be signed by at least one person who shall be either a Director or some officer or other person authorised by the Directors for the purpose.



**45    Dividends, Distributions and Reserves**

45.1    Subject to the Statute, these Articles, and the special rights attaching to Participating Shares of any Class and/or Series, the Directors may, in their absolute discretion, declare dividends and distributions on Participating Shares of any Class and/or Series in issue and authorise payment of the dividends or distributions out of the relevant Separate Account in respect of such Participating Shares.  No dividend or distribution shall be paid except out of the realised or unrealised profits of the Company, or out of the share premium account attributable to Participating Shares of the Class and/or Series in respect of which the dividend or distribution is proposed to be paid, or as otherwise permitted by the Statute.

45.2    Except as otherwise provided by the rights attached to Participating Shares, or as otherwise determined by the Directors, all dividends and distributions in respect of Participating Shares of a particular Class and/or Series shall be declared and paid according to the Net Asset Value of the Participating Shares of the Class and/or Series that a Member holds. If any Participating Share is issued on terms providing that it shall rank for dividend or distribution as from a particular date, that Participating Share shall rank for dividend or distribution accordingly.

45.3    The Directors may deduct and withhold from any dividend or distribution otherwise payable to any Member all sums of money (if any) then payable by it to the Company on account of calls or otherwise or any monies which the Company is obliged by law to pay to any taxing or other authority.

45.4    Under no circumstances may the assets (or the income derived from such assets) attributed to a Separate Account in respect of any Class and/or Series be used to pay a dividend in respect of a Separate Account that is attributed to any other Class and/or Series.

45.5    The Directors may declare that any dividend or distribution be paid wholly or partly by the distribution of specific assets and in particular of shares, debentures or securities of any other company or in any one or more of such ways and, where any difficulty arises in regard to such distribution, the Directors may settle the same as they think expedient and in particular may issue fractional Shares and fix the value for distribution of such specific assets or any part thereof and may determine that cash payments shall be made to any Members upon the basis of the value so fixed in order to adjust the rights of all Members and may vest any such specific assets in trustees as may seem expedient to the Directors.

45.6    Any dividend, distribution, interest or other monies payable in cash in respect of Participating Shares may be paid by wire transfer to the holder or by cheque or warrant sent through the post directed to the registered address of the holder or, in the case of joint holders, to the registered address of the holder who is first named on the Register of Members or to such person and to such address as such holder or joint holders may in writing direct.  Every such cheque or warrant shall (unless the Directors in their sole discretion otherwise determine) be made payable to the order of the person to whom it is sent.  Any one of two or more joint holders may give effectual receipts for any dividends, bonuses, or other monies payable in respect of the Participating Share held by them as joint holders.

45.7    Any dividend or distribution which cannot be paid to a Member and/or which remains unclaimed after six months from the date of declaration of such dividend or distribution may, in the discretion of the Directors, be paid into a separate account in the Company's name, provided that the Company shall not be constituted as a trustee in respect of that account and the dividend or distribution shall remain as a debt due to the Member.  Any dividend or distribution which remains

*www.verify.gov.ky File#: 275693*

*Filed: 09-May-2018 11:17 EST*
*Auth Code: J73514153444*

**Appx. 03378**

unclaimed after a period of six years from the date of declaration of such dividend or distribution shall be forfeited and shall revert to the Company.

45.8 No dividend or distribution shall bear interest against the Company.

## 46 Capitalisation

The Directors may capitalise any sum standing to the credit of any of the Company's reserve accounts (including share premium account and capital redemption reserve) or any sum standing to the credit of profit and loss account or otherwise available for distribution and to appropriate such sum to Members of any Class and/or Series in the proportions in which such sum would have been divisible amongst them had the same been a distribution of profits by way of dividend and to apply such sum on their behalf in paying up in full unissued Participating Shares for allotment and distribution credited as fully paid-up to and amongst them in the proportion aforesaid. In such event the Directors shall do all acts and things required to give effect to such capitalisation, with full power to the Directors to make such provisions as they think fit for the case of Participating Shares becoming distributable in fractions (including provisions whereby the benefit of fractional entitlements accrue to the Company rather than to the Members concerned). The Directors may authorise any person to enter into an agreement with the Company, on behalf of all of the Members interested, providing for such capitalisation and matters incidental thereto and any agreement made under such authority shall be effective and binding on all concerned.

## 47 Books of Account

47.1 The Directors shall cause proper books of account (including, where applicable, material underlying documentation including contracts and invoices) to be kept with respect to all sums of money received and expended by the Company and the matters in respect of which the receipt or expenditure takes place, all sales and purchases of goods by the Company and the assets and liabilities of the Company. Such books of account must be retained for a minimum period of five years from the date on which they are prepared. Proper books shall not be deemed to be kept if there are not kept such books of account as are necessary to give a true and fair view of the state of the Company's affairs and to explain its transactions.

47.2 The Directors shall from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Members not being Directors and no Member (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by Statute, or authorised by the Directors or by the Company in general meeting.

47.3 The Directors may from time to time cause to be prepared and to be laid before the Company in general meeting profit and loss accounts, balance sheets, group accounts (if any) and such other reports and accounts as may be required by law.

## 48 Audit

48.1 The Directors may appoint an Auditor of the Company who shall hold office on such terms as the Directors determine.

48.2 Every Auditor of the Company shall have a right of access at all times to the books and accounts and vouchers of the Company and shall be entitled to require from the Directors and officers of

www.verify.gov.ky File#: 275693

Filed: 09-May-2018 11:17 EST
Auth Code: J73514153444

**Appx. 03379**

the Company such information and explanation as may be necessary for the performance of the duties of the Auditor.

48.3    Any Auditors of the Company shall, if so required by the Directors, make a report on the accounts of the Company during their tenure of office at the next annual general meeting following their appointment in the case of a company which is registered with the Registrar of Companies as an ordinary company, and at the next extraordinary general meeting following their appointment in the case of a company which is registered with the Registrar of Companies as an exempted company, and at any other time during their term of office, upon request of the Directors or any general meeting of the Members.

## 49    Notices

49.1    Notices shall be in writing and may be given by the Company to any Member either personally or by sending it by courier, post, cable, telex, fax or e-mail to the Member or to the address as shown in the Register of Members (or where the notice is given by e-mail by sending it to the e-mail address provided by such Member). Any notice, if posted from one country to another, is to be sent airmail.

49.2    Where a notice is sent by courier, service of the notice shall be deemed to be effected by delivery of the notice to a courier company, and shall be deemed to have been received on the third day (not including Saturdays or Sundays or public holidays) following the day on which the notice was delivered to the courier. Where a notice is sent by post, service of the notice shall be deemed to be effected by properly addressing, pre paying and posting a letter containing the notice, and shall be deemed to have been received on the fifth day (not including Saturdays or Sundays or public holidays in the Cayman Islands) following the day on which the notice was posted. Where a notice is sent by cable, telex or fax, service of the notice shall be deemed to be effected by properly addressing and sending such notice and shall be deemed to have been received on the same day that it was transmitted. Where a notice is given by e-mail service shall be deemed to be effected by transmitting the e-mail to the e-mail address provided by the intended recipient and shall be deemed to have been received on the same day that it was sent, and it shall not be necessary for the receipt of the e-mail to be acknowledged by the recipient.

49.3    A notice may be given by the Company to the person or persons which the Company has been advised are entitled to a Share or Shares in consequence of the death or bankruptcy of a Member in the same manner as other notices which are required to be given under these Articles and shall be addressed to them by name, or by the title of representatives of the deceased, or trustee of the bankrupt, or by any like description at the address supplied for that purpose by the persons claiming to be so entitled, or at the option of the Company by giving the notice in any manner in which the same might have been given if the death or bankruptcy had not occurred.

49.4    Notice of every general meeting shall be given in the manner authorised by these Articles to every person shown as holding Shares carrying an entitlement to receive such notice in the Register of Members on the record date for such meeting except that in the case of joint holders the notice shall be sufficient if given to the joint holder first named in the Register of Members and every person upon whom the ownership of a Share devolves by reason of such person being a legal personal representative or a trustee in bankruptcy of a Member where the Member but for such Member's death or bankruptcy would be entitled to receive notice of the meeting, and no other person shall be entitled to receive notices of general meetings.



www.verify.gov.ky File#: 275693

Filed: 09-May-2018 11:17 EST
Auth Code: J73514153444

**Appx. 03380**

## 50 Winding Up

50.1 If the Company shall be wound up the liquidator shall apply the assets of the Company in satisfaction of creditors' claims in such manner and order as such liquidator thinks fit. The liquidator shall in relation to the assets available for distribution among the Members make in the books of the Company such transfers thereof to and from Separate Accounts as may be necessary in order that the effective burden of such creditors' claims may be shared among the holders of Participating Shares of different Classes and/or Series in such proportions as the liquidator in such liquidator's absolute discretion may think equitable.

50.2 Subject to the special rights attaching to Participating Shares of any Class or Series, the balance shall then be applied in the following priority:

(a) first, to the holders of Management Shares, an amount equal to the par value of such Management Shares; and

(b) second, the balance shall be paid to the holders of Participating Shares in proportion to the Net Asset Value of Participating Shares held, subject to a deduction from those Participating Shares in respect of which there are monies due, of all monies due to the Company for unpaid calls, or otherwise.

50.3 If the Company shall be wound up (whether the liquidation is voluntary or by or under the supervision of the Court) the liquidator may, with the authority of a resolution or resolutions passed by the holders of Participating Shares (whether as a whole or at separate Class meetings), divide among the Members in specie the whole or any part of the assets of the Company, and whether or not the assets shall consist of property of one kind or shall consist of property of different kinds, and may for such purposes set such value as the liquidator deems fair upon any one or more class or classes of property, and may determine how such division shall be carried out as between the Members or different classes of Members. The liquidator may, with the like authority, vest any part of the assets in trustees upon such trusts for the benefit of Members as the liquidator, with the like authority, shall think fit, and the liquidation of the Company may be closed and the Company dissolved, but so that no Member shall be compelled to accept any shares or other property in respect of which there is a liability.

## 51 Indemnity and Insurance

51.1 Every Director and officer of the Company (which for the avoidance of doubt, shall not include any Auditor), together with every former Director and former officer of the Company (each an "**Indemnified Person**") shall be indemnified out of the assets of the Company against any liability, action, proceeding, claim, demand, costs, damages or expenses, including legal expenses, whatsoever which they or any of them may incur as a result of any act or failure to act in carrying out their functions other than such liability (if any) that they may incur by reason of their own actual fraud or wilful default. No Indemnified Person shall be liable to the Company for any loss or damage incurred by the Company as a result (whether direct or indirect) of the carrying out of their functions unless that liability arises through the actual fraud or wilful default of such Indemnified Person. No person shall be found to have committed actual fraud or wilful default under this Article unless or until a court of competent jurisdiction shall have made a finding to that effect.

51.2 The Company shall advance to each Indemnified Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defence of any action, suit, proceeding or

www.verify.gov.ky File#: 275693

Filed: 09-May-2018 11:17 EST
Auth Code: J73514153444

Appx. 03381

investigation involving such Indemnified Person for which indemnity will or could be sought. In connection with any advance of any expenses hereunder, the Indemnified Person shall execute an undertaking to repay the advanced amount to the Company if it shall be determined by final judgment or other final adjudication that such Indemnified Person was not entitled to indemnification pursuant to this Article. If it shall be determined by a final judgment or other final adjudication that such Indemnified Person was not entitled to indemnification with respect to such judgment, costs or expenses, then such party shall not be indemnified with respect to such judgment, costs or expenses and any advancement shall be returned to the Company (without interest) by the Indemnified Person.

51.3    The Directors, on behalf of the Company, may purchase and maintain insurance for the benefit of any Director or other officer of the Company against any liability which, by virtue of any rule of law, would otherwise attach to such person in respect of any negligence, default, breach of duty or breach of trust of which such person may be guilty in relation to the Company.

51.4    Pursuant to the foregoing provisions, the Company may enter into a service or other agreement with any Director (or any entity providing one or more persons to the Company to act as Directors) upon such terms and conditions (including as to indemnification and exculpation) as the Directors shall, in their absolute discretion, determine. Any such indemnification and exculpation provisions may be specified to a standard equal to or more favourable (but not less favourable) to the Company than any standard specified in these Articles.

## 52    Disclosure

If required to do so under the laws of any jurisdiction to which the Company, the Investment Manager, the Administrator or any other service provider is subject, or in compliance with the rules of any stock exchange upon which the Company's Shares are listed, or to ensure the compliance by any person with any anti-money laundering law in any relevant jurisdiction, any Director, Officer, the Investment Manager, the Administrator or Auditor of the Company shall be entitled to release or disclose any information in its possession regarding the affairs of the Company or a Member including, without limitation, any information contained in the Register of Members or subscription documentation of the Company relating to any Member.

## 53    Financial Year

Unless the Directors otherwise prescribe, the financial year of the Company shall end on 31st December in each year and, following the year of incorporation, shall begin on 1st January in each year.

## 54    Transfer by way of Continuation

The Company shall, subject to the provisions of the Statute and with the approval of a Special Resolution, have the power to register by way of continuation as a body corporate under the laws of any jurisdiction outside the Cayman Islands and to be deregistered in the Cayman Islands.

## 55    Mergers and Consolidations

The Company shall, with the approval of a Special Resolution, have the power to merge or consolidate with one or more constituent companies (as defined in the Statute), upon such terms as the Directors may determine.





# HIGHLAND DYNAMIC INCOME MASTER FUND, L.P.

*A Cayman Islands Exempted Limited Partnership*

**Second Amended and Restated Exempted Limited Partnership Agreement**

**April 1, 2018**

203398308 v14

## NOTICE

NEITHER HIGHLAND DYNAMIC INCOME MASTER FUND, L.P. NOR THE LIMITED PARTNER INTERESTS THEREIN HAVE BEEN OR WILL BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED, OR THE SECURITIES LAWS OF ANY OF THE STATES OF THE UNITED STATES. THE OFFERING OF SUCH LIMITED PARTNER INTERESTS IS BEING MADE IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT FOR OFFERS AND SALES OF SECURITIES WHICH DO NOT INVOLVE ANY PUBLIC OFFERING, AND ANALOGOUS EXEMPTIONS UNDER STATE SECURITIES LAWS.

THE DELIVERY OF THIS AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR SHALL THERE BE ANY OFFER, SOLICITATION OR SALE OF LIMITED PARTNER INTERESTS IN HIGHLAND DYNAMIC INCOME MASTER FUND, L.P. IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OR SALE.

THE LIMITED PARTNER INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM AND MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REQUIREMENTS AND CONDITIONS SET FORTH IN THIS AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT.

**Appx. 03384**

## Table of Contents

*Page*

Article I DEFINITIONS ................................................................................................1

Article II ORGANIZATION ..........................................................................................8
    2.1    Continuation of Limited Partnership ................................................8
    2.2    Name of Partnership ..........................................................................9
    2.3    Registered Office ...............................................................................9
    2.4    Term of Partnership...........................................................................9
    2.5    Object and Powers of Partnership...................................................10
    2.6    Liability of Partners ........................................................................10
    2.7    Actions by Partnership ....................................................................10
    2.8    Reliance by Third Parties ................................................................10
    2.9    Filings .............................................................................................11
    2.10   Series of Interests ...........................................................................11

Article III CAPITAL ...................................................................................................11
    3.1    Contributions to Capital .................................................................11
    3.2    Rights of Partners in Capital ..........................................................12
    3.3    Capital Accounts .............................................................................12
    3.4    Allocation of Net Profit and Net Loss ............................................13
    3.5    Allocation of Management Fees, Withholding Taxes and Certain Other Expenditures ................................................................13
    3.6    Reserves; Adjustments for Certain Future Events ..........................15
    3.7    Performance Allocation ...................................................................15
    3.8    Limited Participation Investments ..................................................16
    3.9    Allocation to Avoid Capital Account Deficits ................................16
    3.10   Allocations for Income Tax Purposes .............................................16
    3.11   Curative Allocations .......................................................................19
    3.12   Individual Partners' Tax Treatment .................................................20
    3.13   Distributions....................................................................................20
    3.14   Other Matters ..................................................................................20

Article IV MANAGEMENT .......................................................................................20
    4.1    Duties and Powers of the General Partner ......................................20
    4.2    Expenses .........................................................................................22
    4.3    Rights of Limited Partners ..............................................................25
    4.4    Other Activities of Partners.............................................................25
    4.5    Duty of Care; Indemnification ........................................................26
    4.6    Advisory Committee .......................................................................28
    4.7    Pricing Committee ..........................................................................29

Article V ADMISSIONS, TRANSFERS AND WITHDRAWALS ...........................30
    5.1    Admission of Partners.....................................................................30
    5.2    Transfer and Withdrawal of the General Partner ............................30
    5.3    Transfer and Withdrawal of Interests of Limited Partners..............30

Article VI LIQUIDATION AND TERMINATION .....................................................31

ii

6.1    Termination of Partnership ......................................................................31
6.2    Liquidation of Assets .............................................................................32
Article VII ACCOUNTING AND VALUATION; BOOKS AND RECORDS ...........................33
7.1    Accounting and Reports..........................................................................33
7.2    Certain Tax Matters................................................................................34
7.3    AEOI ......................................................................................................35
7.4    Valuation of Partnership Assets and Interests .......................................37
7.5    Determinations by the General Partner...................................................37
7.6    Books and Records ................................................................................37
Article VIII GENERAL PROVISIONS....................................................................38
8.1    Amendment of Partnership Agreement...................................................38
8.2    Special Power-of-Attorney .....................................................................38
8.3    Notices ...................................................................................................40
8.4    Agreement Binding Upon Successors and Assigns; Delegation ............40
8.5    Governing Law .......................................................................................40
8.6    Interpretation of Partnership Accounting Systems and Terminology ...................41
8.7    Miscellaneous ........................................................................................41

iii

THIS SECOND AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT of Highland Dynamic Income Master Fund, L.P. is made on April 1, 2018 by and among Highland Dynamic Income Fund GP, LLC, as General Partner, those Persons who are listed on Exhibit A as Limited Partners and any other Persons who are admitted, from time to time, as Limited Partners of the Partnership, in accordance with this Agreement. This Agreement amends and restates in its entirety the Amended and Restated Exempted Limited Partnership Agreement of the Partnership dated March 28, 2013 (the "***Prior Agreement***").

---

## Article I  DEFINITIONS

---

For purposes of this Agreement:

"***Act***" means the Exempted Limited Partnership Law, 2014 of the Cayman Islands, as amended, supplemented or replaced from time to time.

"***Administrator***" means such Person as the General Partner may designate from time to time, in its sole discretion, to serve as administrator to the Partnership.

"***Advisory Committee***" has the meaning set forth in Section 4.6.

"***AEOI***" means:

    (i)        Sections 1471 through 1474 of the Code and any associated legislation, regulations or guidance, and any other similar legislation, regulations or guidance enacted in any other jurisdiction which seeks to implement similar financial account information reporting and/or withholding tax regimes;

    (ii)      the OECD Standard for Automatic Exchange of Financial Account Information in Tax Matters – the Common Reporting Standard and any associated guidance;

    (iii)     any intergovernmental agreement, treaty, regulation, guidance, standard or other agreement between the Cayman Islands (or any Cayman Islands government body) and any other jurisdiction (including any government bodies in such jurisdiction), entered into in order to comply with, facilitate, supplement or implement the legislation, regulations, guidance or standards described in sub-paragraphs (a) and (b); and

    (iv)     any legislation, regulations or guidance in the Cayman Islands that give effect to the matters outlined in the preceding sub-paragraphs.

"***Affiliate***" means, with respect to any Person, a Person which controls, is controlled by, or is under common control with, such Person. For these purposes, "control" means the

1

Appx. 03387

possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"*Agreement*" means this Second Amended and Restated Exempted Limited Partnership Agreement, as amended from time to time.

"*Automatic Dissolution Date*" has the meaning set forth in Section 6.1(a)(ii).

"*BBA*" means Subchapter C of Chapter 63 of the Code (Sections 6221 through 6241 of the Code), as enacted by the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, as amended from time to time, and the Regulations thereunder (whether proposed, temporary or final), including any subsequent amendments, successor provisions or other guidance thereunder, and any equivalent provisions for state, local or non-U.S. tax purposes.

"*BBA Effective Period*" means any taxable year commencing after 2017, taking into account any extensions of the effective date set forth in the BBA.

"*Business Day*" means any day or days on which banks are open for business in the city of New York, NY and the Cayman Islands and/or such other place or places as the General Partner may determine.

"*Calculation Period*" means, with respect to each Capital Account of a Limited Partner, the period commencing as of the date of the establishment of the Capital Account (in the case of the initial Calculation Period) and thereafter each period commencing as of the day following the last day of the preceding Calculation Period with respect to such Capital Account, and ending as of the close of business on the first to occur of the following:

(a)      the last day of a calendar year;

(b)      the withdrawal of all or a portion of the Interest attributable to such Capital Account (but only with respect to such withdrawn amount);

(c)      the permitted transfer of all or any portion of such Capital Account; or

(d)      the final distribution with respect to such Capital Account to such Limited Partner following the dissolution of the Partnership.

"*Capital Account*" has the meaning set forth in Section 3.3(a).

"*Code*" means the U.S. Internal Revenue Code of 1986, as amended, and as hereafter amended, or any successor law.

"*Commencement Date*" means the first date on or as of which a Limited Partner makes a capital contribution to the Partnership.

"*Designated Individual*" has the meaning set forth in Section 7.2(a).

Appx. 03388

"***Domestic Fund***" means Highland Dynamic Income Fund, L.P., a Delaware limited partnership.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"***ERISA Partner***" means a Limited Partner which is (a) an employee benefit plan subject to the fiduciary provisions of ERISA, (b) a "plan" subject to Section 4975 of the Code, (c) an entity whose underlying assets include "plan assets" for purposes of ERISA by reason of a Plan's investment in the entity, or (d) an entity that otherwise constitutes a "benefit plan investor" within the meaning of Section 3(42) of ERISA or any regulation promulgated thereunder.

"***Feeder Fund Investor***" means an investor in one of the Feeder Funds.

"***Feeder Funds***" means the Domestic Fund and the Offshore Fund.

"***Fiscal Period***" means each period that starts at the opening of business on the Commencement Date (in the case of the initial Fiscal Period) and thereafter on the day immediately following the last day of the preceding Fiscal Period, and that ends at the close of business on the earliest of the following dates:

(a)     the last day of a calendar month;

(b)     any date as of which any withdrawal or distribution of capital is made with respect to any Capital Account or as of which this Agreement provides for any amount to be credited to or debited against a Capital Account, other than a withdrawal or distribution by or to, or an allocation to, all Capital Accounts that does not result in any change of the Partnership Percentage relating to any Capital Account;

(c)     the date which immediately precedes any day as of which a capital contribution is accepted by the General Partner from any new or existing Partner; or

(d)     any other date which the General Partner selects.

"***Fiscal Year***" means the period commencing on the Commencement Date and ending on December 31 of the year of commencement, and thereafter each period commencing on January 1 of each year and ending on December 31 of such year, unless the General Partner shall elect another fiscal year, *provided* that any such other fiscal year shall be permissible for U.S. federal income tax purposes.  In the case of the Fiscal Year in which the Partnership is terminated in accordance with Article VI, "***Fiscal Year***" means the portion of the calendar year ending on the date on which the Partnership is terminated.

"***GAAP***" means generally accepted accounting principles in the United States.

"***General Partner***" means Highland Dynamic Income Fund GP, LLC, a Delaware limited liability company registered as a foreign company in the Cayman Islands, any successor thereto,

3

and any Persons hereafter admitted as additional general partners, in its capacity as general partner of the Partnership.

"*Gross Negligence*" means "gross negligence" as such term is defined and interpreted in accordance with the laws of the State of Delaware.

"*Indemnified Person*" means each of the General Partner, the Investment Manager, any member, shareholder, partner, manager, director, officer, employee or agent of, or any person who controls, the General Partner, each of the respective affiliates of the foregoing, members of the Advisory Committee or the Pricing Committee, their respective affiliates, or any of the legal representatives of any of the foregoing.

"*Index Return Amount*" means the amount that would have been credited or debited to such Capital Account for the Calculation Period if the rate of return had been equal to the return of the S&P/LSTA Leveraged Loan Total Return Index for such Calculation Period.

"*Interest*" means the entire ownership interest of a Partner in the Partnership at the relevant time, including the right of such Partner to any and all benefits to which a Partner may be entitled as provided in this Agreement, together with the obligations of such Partner to comply with all the terms and provisions of this Agreement.

"*Investment Management Agreement*" means the Investment Management Agreement by and among the Investment Manager, the General Partner, the Feeder Funds and the Partnership.

"*Investment Manager*" means Highland Capital Management, L.P., a Delaware limited partnership, or any successor thereto, or any Person thereafter appointed as an investment manager of the Partnership in accordance with the Investment Management Agreement.

"*Investments*" means investments in securities or other financial or intangible investment instruments, contracts or products made by the Partnership, as more fully described in the Feeder Funds' offering memoranda (as may be amended, updated or supplemented from time to time).

"*Limited Participation Investment*" means an Investment which, as determined by the General Partner, is suitable for some but not all of the Capital Accounts, or of which certain Capital Accounts should receive a reduced participation, for legal, tax, regulatory or other *bona fide* reasons.

"*Limited Participation Sub-Accounts*" means memorandum accounts to be maintained in the accounting records of the Partnership on a Capital Account-by-Capital Account basis with respect to each particular Limited Participation Investment to reflect the entitlement of each Capital Account (other than a Capital Account that does not have any credit balance at the time of the establishment of the Limited Participation Sub-Account that is unrelated to a pre-existing Limited Participation Sub-Account) to allocations and distributions attributable to Partnership transactions involving such Limited Participation Investments.

"*Limited Partner*" means each of the Persons set forth on Exhibit A and any Person who has become a Limited Partner pursuant to the terms of this Agreement, in each case in such

Appx. 03390

Person's capacity as a limited partner of the Partnership. The General Partner may subdivide the Interests into separate series and establish new series pursuant to Section 2.10; *provided, that*, except as expressly set forth in this Agreement, for all purposes of the Act, the Limited Partners constitute a single class or group of limited partners.

"*Liquidator*" has the meaning set forth in Section 6.1(b).

"*Management Fee*" means an amount calculated at an annual rate of (i) 0.75% of each Capital Account of a Limited Partner. The Management Fee is calculated and payable quarterly in advance as further described in Section 3.5(a).

"*Negative Basis*" means, with respect to any Partner and as of any time of calculation, the excess of such Partner's "adjusted tax basis" in its Interest for U.S. federal income tax purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer or assignment of such Interest, including by reason of death) over the amount that such Partner is entitled to receive upon withdrawal from or liquidation of the Partnership.

"*Negative Basis Partner*" means any Partner who withdraws all or a portion of its Interest from the Partnership and who has a Negative Basis as of the effective date of withdrawal, but such Partner shall cease to be a Negative Basis Partner at such time as it shall have received allocations pursuant to Section 3.10(d) equal to such Partner's Negative Basis as of the effective date of withdrawal and without regard to such Partner's share of the liabilities of the Partnership under Section 752 of the Code.

"*Net Assets*" means the total value, as determined by the General Partner or its delegate(s) in accordance with Section 7.3, of all Investments and other assets of the Partnership (including net unrealized appreciation or depreciation of the assets and accrued interest and dividends receivable net of any withholding taxes), less an amount equal to all accrued debts, liabilities and obligations of the Partnership (including any reserves for contingencies accrued pursuant to Section 3.6). Except as otherwise expressly provided herein, Net Assets as of the first day of any Fiscal Period shall be determined on the basis of the valuation of assets conducted as of the close of the immediately preceding Fiscal Period but after giving effect to any capital contributions made by any Partner subsequent to the last day of such immediately preceding Fiscal Period and after giving effect to Management Fee charges and Net Assets as of the last day of any Fiscal Period shall be determined before giving effect to any of the following amounts payable by the Partnership generally or in respect of any Investment which are effective as of the date on which such determination is made:

(a) any withdrawals or distributions payable to any Partner which are effective as of the date on which such determination is made; and

(b) withholding or other taxes (including any amounts under any BBA provision), expenses of processing withdrawals and other items payable, any increases or decreases in any reserves or other amounts recorded pursuant to Section 3.6 and any increases or decreases in the value of any Limited Participation Investments during the Fiscal Period ending as of the date on which such determination is

5

made, to the extent the General Partner determines that, pursuant to any provisions of this Agreement, such items are not to be charged ratably among the Capital Accounts of all Partners on the basis of their respective Partnership Percentages as of the commencement of the Fiscal Period.

"***Net Loss***" means any amount by which the Net Assets as of the first day of a Fiscal Period exceed the Net Assets as of the last day of the same Fiscal Period.

"***Net Profit***" means any amount by which the Net Assets as of the last day of a Fiscal Period exceed the Net Assets as of the first day of the same Fiscal Period.

"***New Limited Partner***" has the meaning assigned to such term in Section 8.2(a)(vi).

"***Offshore Fund***" means Highland Dynamic Income Fund, Ltd., a Cayman Islands exempted company.

"***Other Account***" means any assets or investment of the General Partner, or any assets managed by the General Partner or any Affiliate of the General Partner for the account of any Person or entity (including investment vehicles) other than the Partnership, which are invested or which are available for investment in securities or other instruments or for trading activities whether or not of the specific type being conducted by the Partnership.

"***Partner***" means the General Partner or any of the Limited Partners, except as otherwise expressly provided herein, and "Partners" means the General Partner and all of the Limited Partners.

"***Partnership***" means the exempted limited partnership formed upon the filing of a statement under Section 9 of the Act with the Registrar on February 26, 2013, pursuant to the Prior Agreement and registered with the name "Highland Dynamic Income Master Fund, L.P."

"***Partnership Minimum Gain***" has the meaning set forth in Regulations Section 1.704-2(b)(2) and (d).

"***Partnership Percentage***" means a percentage established for each Capital Account on the Partnership's books as of the first day of each Fiscal Period. The Partnership Percentage of a Capital Account for a Fiscal Period shall be determined by dividing the amount of such Capital Account as of the beginning of the Fiscal Period (after crediting all capital contributions to such Capital Account which are effective as of such date, net of all deductions, including Management Fees) by the sum of all Capital Accounts as of the beginning of the Fiscal Period (after crediting all capital contributions to the Partnership which are effective as of such date, net of all deductions, including Management Fees). The sum of the Partnership Percentages of all Capital Accounts for each Fiscal Period shall equal 100%.

Appx. 03392

"*Performance Allocation*" means, with respect to each Capital Account of a Limited Partner, 10% of the amount, determined as of the close of each Calculation Period with respect to such Capital Account, by which the Performance Change amount (positive and negative) for such Calculation Period exceeds the Index Return Amount (positive and negative) for such Capital Account for such Calculation Period.

"*Performance Change*" means, with respect to each Capital Account of a Limited Partner for each Calculation Period, the difference between:

(a) the sum of (a) the balance of such Capital Account as of the close of the Calculation Period (after giving effect to all allocations to be made to such Capital Account as of such date other than any Performance Allocation to be debited against such Capital Account), plus (b) any debits to such Capital Account during the Calculation Period to reflect any actual or deemed distributions or withdrawals with respect to such Capital Account, plus (c) any debits to such Capital Account during the Calculation Period to reflect any items allocable to such Capital Account pursuant to Section 3.5(b) or 3.5(c) hereof; and

(b) the sum of (a) the balance of such Capital Account as of the commencement of the Calculation Period, plus (b) any credits to such Capital Account during the Calculation Period to reflect any contributions by such Limited Partner to the Capital Account.

"*Person*" means any individual, partnership, corporation, limited liability company, trust, or other entity.

"*Plan Assets*" means assets of the Partnership that are considered to be assets of an ERISA Partner, as determined pursuant to Section 3(42) of ERISA.

"*Positive Basis*" means, with respect to any Partner and as of any time of calculation, the excess of the amount that such Partner is entitled to receive upon withdrawal from or liquidation of the Partnership over such Partner's "adjusted tax basis" in its Interest for U.S. federal income tax purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer or assignment of such Interest, including by reason of death).

"*Positive Basis Partner*" means any Partner who withdraws all or a portion of its Interest from the Partnership and who has a Positive Basis as of the effective date of withdrawal, but such Partner shall cease to be a Positive Basis Partner at such time as it shall have received allocations pursuant to Section 3.10(c) equal to such Partner's Positive Basis as of the effective date of withdrawal and without regard to such Partner's share of the liabilities of the Partnership under Section 752 of the Code.

"*Pricing Committee*" has the meaning set forth in Section 4.7.

"*Prior Agreement*" has the meaning set forth in the recitals hereto.

"*Registrar*" means the Registrar of Exempted Limited Partnerships of the Cayman Islands.

Appx. 03393

"***Regulations***" means the proposed, temporary and final U.S. Treasury Regulations promulgated under the Code, including any successor regulations.

"***Regulatory Allocations***" has the meaning set forth in Section 3.11.

"***Section 9 Statement***" has the meaning set forth in Section 2.1(a).

"***Section 10 Statement***" has the meaning set forth in Section 2.1(b).

"***Tax Matters Partner***" has the meaning set forth in Section 7.2(a).

"***Termination Date***" has the meaning assigned to such term in Section 6.1(a).

"***Transfer***" means any sale, exchange, transfer, assignment or other disposition by a Partner of its Interest to another party, whether voluntary or involuntary, including a transfer by operation of law, but not including a pledge of or a granting of another form of security interest in any such Interest.

---

## Article II  ORGANIZATION

**2.1    Continuation of Limited Partnership**

(a)    The General Partner and Offshore Fund established the Partnership upon filing a statement under section 9 of the Act (the "***Section 9 Statement***") with the Registrar on February 26, 2013, pursuant to the Prior Agreement, which Prior Agreement has governed the operation of the Partnership since that date.  The General Partner hereby admits the Limited Partners who are a party to this Agreement (provided that the Initial Limited Partner (as defined in the Prior Agreement) is not hereby admitted but shall continue as a Limited Partner) and the General Partner and the Limited Partners hereby amend and restate the Prior Agreement in its entirety on the terms of this Agreement.

(b)    If requested by the General Partner, the Limited Partners will promptly execute all certificates and other documents consistent with the terms of this Agreement necessary for the General Partner to accomplish all filings, recordings, publishings and other acts as may be appropriate to comply with all requirements for (i) the formation and operation of an exempted limited partnership under the laws of the Cayman Islands, (ii) if the General Partner deems it advisable, the operation of the Partnership as an exempted limited partnership, or partnership in which the Limited Partners have limited liability, in all jurisdictions where the Partnership proposes to operate and (iii) all other filings required by the Act to be made by the Partnership.   The General Partner shall cause any required amendment to the Section 9 Statement, which shall be effected by way of the execution by the General Partner of a statement under Section 10 of the Act (the "***Section 10 Statement***") with such statement to be filed promptly following the

8

event requiring such amendment.   All Section 10 Statements or any such amendments may be signed by the General Partner (as required by the Act), and may be signed either personally or by an attorney-in-fact or agent of the General Partner.

(c)    The Partnership received an undertaking from the Governor-in-Cabinet of the Cayman Islands to the effect that, for a period of 50 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits or income or gains or appreciations shall apply to the Partnership or to any Partner in respect of the operations or assets of the Partnership or the Interest of a Partner.  The parties hereto acknowledge that they intend that the Partnership be taxed in the United States as a partnership and not as an association taxable as a corporation for U.S. federal income tax purposes. No election may be made to treat the Partnership as other than a partnership for U.S. federal income tax purposes.

**2.2**    **Name of Partnership**

(a)    The name of the Partnership shall be Highland Dynamic Income Master Fund, L.P. or such other name as the General Partner may hereafter adopt upon (i) causing a statement pursuant to Section 10 of the Act to be filed with the Registrar and (ii) giving notice thereof to the Limited Partners.

(b)    The Partnership shall have the exclusive ownership and right to use the Partnership name so long as the Partnership continues, despite the withdrawal, expulsion, resignation or removal of any Limited Partner, but upon the Partnership's winding up or at such time as there ceases to be a General Partner, the Partnership shall assign the name and the goodwill attached thereto to the General Partner without payment by the assignee(s) of any consideration therefor.

**2.3**    **Registered Office**

(a)    The registered office address of the Partnership in the Cayman Islands is at c/o Maples Corporate Services Limited, P.O. Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands.

(b)    The General Partner may at any time change the location of the Partnership's registered office or registered agent in its sole discretion, provided that the registered office of the Partnership shall be in the Cayman Islands.

**2.4**    **Term of Partnership**

The term of the Partnership commenced on the date of formation and continues until wound up and dissolved pursuant to Section 6.1 (unless its term is extended pursuant to Section 6.1).

Appx. 03395

**2.5 Object and Powers of Partnership**

    (a)    The object and business of the Partnership is to (1) purchase, sell (including short sales), invest and trade in Investments (2) engage in financial transactions, including borrowing, financing, pledging, hedging and other derivative transactions relating thereto for the benefit of the Partnership, (3) engage in any lawful act or activity for which exempted limited partnerships may be formed under the Act and (4) engage in any and all activities necessary or incidental to the foregoing; provided that the Partnership shall not undertake business with the public in the Cayman Islands other than so far as is necessary for the carrying on of the business of the Partnership exterior to the Cayman Islands.

    (b)    The Partnership possesses and the General Partner on behalf of the Partnership may exercise all such powers and privileges as the General Partner considers necessary, convenient or incidental to the conduct, promotion or attainment of the objects of the Partnership.

**2.6 Liability of Partners**

    (a)    The liability of the Limited Partners is limited to their obligations under this Agreement and the Act. The General Partner is liable for all of the debts and obligations of the Partnership to the extent that the Partnership has insufficient assets. The General Partner shall not be personally liable for the withdrawal, payment or distribution of all or any part of any Interest, it being expressly agreed that any such withdrawal, payment or distribution to be made pursuant to this Agreement shall be made solely from the assets of the Partnership (which shall not include the General Partner's capital contributions) and on the terms and subject to the conditions contained in this Agreement.

    (b)    In no event shall any Limited Partner (or former Limited Partner) be obligated to make any contribution to the Partnership in addition to its agreed capital contribution (or other payments provided for herein) or have any personal liability for the repayment or discharge of the debts and obligations of the Partnership except to the extent provided herein or as required by the Act or other applicable law.

**2.7 Actions by Partnership**

    The General Partner on behalf of the Partnership may execute, deliver and perform all contracts, agreements and other undertakings and engage in all activities and transactions as may in the opinion of the General Partner be necessary or advisable to carry out the objects of the Partnership as set forth in Section 2.5 above. Notwithstanding the foregoing, the Partnership shall not issue any securities other than Interests in the Partnership.

**2.8 Reliance by Third Parties**

    Persons dealing with the Partnership are entitled to rely conclusively upon the power and authority of the General Partner as herein set forth.

Appx. 03396

2.9    **Filings**

(a)    The General Partner shall take any and all other actions as may be reasonably necessary to perfect and maintain the status of the Partnership as an exempted limited partnership under the Act and other laws of the Cayman Islands, including the filing of a notice pursuant to Section 10 of the Act with the Registrar signed by the General Partner upon the occurrence of certain amendments to the Section 9 Statement of the Partnership, and any other states or jurisdictions in which the Partnership engages in business.

(b)    Following the winding up of the Partnership and to effect the dissolution of the same, the General Partner or any duly appointed liquidator shall promptly (i) comply with the applicable provisions of Section 15 of the Act, (ii) execute and cause to be filed a notice of dissolution in accordance with Section 15(3) of the Act and (iii) file any certificates of cancellation in accordance with the laws of any states or jurisdictions in which the Partnership has filed certificates.

2.10    **Series of Interests**

The General Partner, at any time, may without notification to or consent of the other Limited Partners, create and offer different classes or series of Interests in the Partnership with such rights, obligations, liabilities, privileges, designations and preferences (including different investment strategies, underlying investments, degrees of leverage, management fees, performance allocations, brokerage commissions, transparency, withdrawal rights, co-investment opportunities, and other differences) as the General Partner may determine upon the issuance of such class or series; *provided* that such class or series would not reasonably be expected to have a material adverse effect on the existing Limited Partners.

---

### Article III  CAPITAL

---

3.1    **Contributions to Capital**

(a)    Each Partner is permitted to make contributions to the capital of the Partnership at such times and in such amounts as the General Partner, in its sole discretion, may determine.    The Limited Partners are not required to make any additional contributions to the Partnership, subject to the provisions of Section 3.5(b) and any contrary provision of the Act.

(b)    Each Person admitted as a General Partner agrees to make and maintain a capital contribution as a General Partner of at least U.S.$1.00.  Except as provided above or in the Act, the General Partner is not required or obligated to make any additional contributions to the capital of the Partnership.  The General Partner or an Affiliate shall have the right at any time to make additional capital contributions as a Limited Partner or General Partner.

Appx. 03397

3.2 **Rights of Partners in Capital**

(a) No Partner shall be entitled to interest on its capital contributions to the Partnership.

(b) No Partner shall have the right to the return of any capital contribution to the Partnership except, subject to the Act, (i) upon withdrawal by such Partner of all or part of its Interest pursuant to Section 5.3 or (ii) upon the winding up and dissolution of the Partnership pursuant to Section 6.1. The entitlement to any such return shall be limited to the value of the Capital Account of the Partner. The General Partner shall not be liable for the return of any such amounts.

3.3 **Capital Accounts**

(a) The Partnership maintains a separate capital account (each a "***Capital Account***") on the books and records of the Partnership for each Partner. The General Partner may, in its discretion, maintain separate memorandum sub-accounts related to a Capital Account for such purposes as the General Partner may determine appropriate, including for recordkeeping, accounting or reporting or to otherwise give effect to the provisions of this Agreement, and, if so determined by the General Partner, with each memorandum sub-account being maintained as if it were the Capital Account of a separate Partner for all purposes of this Agreement unless the context requires otherwise. References herein to a "Capital Account" shall be deemed to refer to such a capital memorandum sub-account where the context admits. Each Capital Account must reflect the aggregate sum of the balances of memorandum sub-accounts in such Partner's Capital Account. Without limiting the foregoing:

(i) with respect to the Domestic Fund, the Partnership maintains a separate memorandum sub-account with respect to the Domestic Fund's Capital Account with respect to the capital account (and applicable memorandum sub-account) of each partner of such Domestic Fund;

(ii) in the case of the Offshore Fund, the Partnership maintains a separate memorandum sub-account with respect to each class and series of shares of the Offshore Fund attributable to a shareholder; and

(iii) Any separate memorandum sub-accounts established for a Limited Partner's Capital Account may be consolidated at the beginning of each Calculation Period, as determined by the General Partner.

(b) Each Capital Account shall have an initial balance equal to the amount of any cash and the net value of any property constituting the relevant Partner's initial capital contribution to the Partnership.

Appx. 03398

(c)    Each Capital Account shall be increased by the amount of any cash and the net value of any property constituting additional contributions to such Capital Account permitted pursuant to Section 3.1.

(d)    Each Capital Account shall be reduced by the amount of any cash and the net value of any property withdrawn by or distributed to the relevant Partner pursuant to Sections 5.3 or 6.2.

(e)    The Capital Account of the General Partner will be increased by the amount of the Performance Allocation allocated to such Capital Account and the investment gains thereon pursuant to Section 3.7(a).

(f)    Each Capital Account, including any related Limited Participation Sub-Accounts, shall be adjusted to reflect allocations and other changes in the value of such Capital Account in the manner specified in the remaining provisions of this Article III.

**3.4    Allocation of Net Profit and Net Loss**

(a)    Subject to the remaining provisions of this Article III, as of the last day of each Fiscal Period, any Net Profit or Net Loss for such Fiscal Period shall be separately allocated among and credited to or debited against the Capital Accounts of the Partners in proportion to their respective Partnership Percentages for such Fiscal Period.

(b)    Notwithstanding Section 3.4(a), items of income, gain, loss, deduction, credit and expenses for a Fiscal Period that are not allocable to specific Investments of the Partnership, including short term interest income, and audit, administration and legal expenses, shall be credited to or debited against the Capital Accounts of the Partners *pro rata* in accordance with their Partnership Percentages for such Fiscal Period.

(c)    Notwithstanding Section 3.4(a), items of income, gain, loss, deduction, credit and expenses that relate to a Limited Participation Investment shall be allocated exclusively to those Capital Accounts that the General Partner determines are eligible to participate in such Limited Participation Investment on a *pro rata* basis based on their relative participation in such Limited Participation Investment.

**3.5    Allocation of Management Fees, Withholding Taxes and Certain Other Expenditures**

(a)    As of the first Business Day of each calendar quarter, and in the case of any Limited Partner who makes a capital contribution as of any other date, as of the date of such capital contribution, the Management Fee applicable to each Capital Account for such calendar quarter will be debited against the relevant Capital Account. Capital contributions accepted after the commencement of the calendar quarter shall be subject to a prorated Management Fee reflecting the time remaining during such calendar quarter. The General Partner may waive or

13

decrease the Management Fee with respect to any Limited Partner and any Capital Account.  The General Partner may delay the timing or alter the structure of fees payable to the Investment Manager so long as such changes are not materially adverse to the Limited Partners.

(b)     Notwithstanding anything to the contrary herein, to the extent the General Partner or the Partnership is required by law (including under circumstances where the General Partner or the Partnership is unable to rely conclusively on any withholding certification provided by a Partner) to withhold or to make tax payments, including any interest or penalties, on behalf of or with respect to any Partner or Partners (including, without limitation, any amount attributable to an actual or imputed underpayment of taxes under any BBA provision, backup withholding or AEOI withholding), the General Partner or the Partnership may withhold such amounts and make such tax payments as so required.  If the Partnership directly or indirectly pays or incurs any withholding tax or other tax obligation (including any amount under any BBA provision), or otherwise incurs a tax payment with respect to the income allocable or distributable to, or otherwise attributable to, one or more Partners, then the amount of such withholding tax, tax obligation or payment will be treated as a distribution to such Partner or Partners, as applicable, pursuant to the terms of this Agreement.  Such amount will be debited against the Capital Account(s) of such Partner or Partners as of the close of the Fiscal Period during which the Partnership so withholds, pays or incurs such obligation.  If the amount so withheld, paid or incurred is greater than the balance of the Capital Account(s) of the relevant Partner or Partners, as applicable, then such Partner or Partners and any successors must make a contribution to the capital of the Partnership within 10 business days after notification and demand by the General Partner in the amount of such excess.  The General Partner is not obligated to apply for or obtain a refund, or reduction of or exemption from withholding tax on behalf of any Partner that may be eligible for such refund, reduction or exemption, or otherwise obligated to structure Investments so as to reduce or avoid any such withholding tax. Each Limited Partner agrees to repay to the Partnership and the General Partner and each of the partners and former partners of the General Partner, any liability for taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Limited Partner.

(c)     Except as otherwise provided for in this Agreement, any expenditures payable by the Partnership, to the extent determined by the General Partner to have been paid or withheld on behalf of, or by reason of particular circumstances applicable to, one or more but fewer than all of the Partners, shall be charged only to the relevant Capital Accounts of those Partners on whose behalf such payments are made or whose particular circumstances gave rise to such payments. Such charges shall be debited from the relevant Capital Accounts of such Partners as of the close of the Fiscal Period during which any such items were accrued by the Partnership.

Appx. 03400

### 3.6 Reserves; Adjustments for Certain Future Events

(a) The General Partner may cause appropriate reserves to be created, accrued and charged against Net Assets including Limited Participation Investments and proportionately against the Capital Accounts for contingent liabilities or probable losses, such reserves to be in the amounts which the General Partner deems necessary or appropriate. The General Partner may increase or reduce any such reserve from time to time by such amounts as the General Partner deems necessary or appropriate. The amount of any such reserve, or any increase or decrease therein, may, at the election of the General Partner, be charged or credited, as the General Partner deems appropriate, to the Capital Accounts of those parties that were Partners at the time when such reserve was created, increased, or decreased, as the case may be, or alternatively may be charged or credited to those parties that were Partners at the time of the act or omission giving rise to the contingent liability for which the reserve was established by the General Partner.

(b) If the General Partner determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then all or a portion of such amount may be proportionately charged or credited, as appropriate, in proportion to the Capital Account balances of the current Partners as such balances existed during any such prior period.

### 3.7 Performance Allocation

(a) The Performance Allocation will be debited against each Capital Account of each Limited Partner as of the last day of each Calculation Period with respect to such Capital Account, and the amount so debited will simultaneously be credited to the Capital Account of the General Partner pursuant to Section 3.3(e).

(b) The General Partner may waive or decrease the Performance Allocation with respect to any Limited Partner and any Capital Account.

(c) Net Profit for each year shall be allocated to the Capital Account of the General Partner from the Capital Accounts of the Limited Partners pro rata in accordance with their share of Net Profits for such Calculation Period determined prior to the application of this Section 3.7 in an amount equal to the Performance Allocation for such Calculation Period. If the Performance Allocation for the Calculation Period is greater than the aggregate net profits realized by the Partnership allocable to the Capital Accounts bearing the Performance Allocation for such Calculation Period, the Capital Account of the General Partner will be allocated, in addition to the Net Profits, additional items of gross income realized by the Partnership allocable to the Capital Accounts bearing the Performance Allocation during such year sufficient to credit the Capital Account of the General Partner with the full Performance Allocation. If such special allocations of items of gross income cannot be made in an amount equal to such shortfall, the excess amounts shall be treated as a guaranteed payment for services pursuant to Section 707(c) of

15

the Code. Appropriate adjustments will be made to the Capital Accounts bearing the Performance Allocation to reflect allocations of gross income described in the preceding sentence. The parties agree that, to the extent permitted by applicable law, for all federal income tax purposes, the Performance Allocation shall be treated as an allocation of profits of the partnership for purposes of Section 704(b) of the Code and the Regulations promulgated thereunder.

**3.8    Limited Participation Investments**

Whenever the Partnership makes a Limited Participation Investment, a Limited Participation Sub-Account shall be established for each Capital Account participating in such Limited Participation Investment to reflect such Capital Account's *pro rata* share of the Partnership's portion of all allocations and distributions attributable to transactions involving such Limited Participation Investment (and any related follow-on Investments, unless the General Partner determines to treat such follow-on Investment as a new Limited Participation Investment). Thereafter, the Partnership's portion of all credits and debits relating to such Limited Participation Investment (including those specifically referred to herein) shall be allocated among the Limited Participation Sub-Accounts for such Limited Participation Investment on a *pro rata* basis in accordance with each Capital Account's interest in such Limited Participation Investment. Expenses that relate to a Limited Participation Investment shall be allocated exclusively among the Limited Participation Sub-Accounts for such Limited Participation Investment on a *pro rata* basis in accordance with each Capital Account's interest in such Limited Participation Investment.

**3.9    Allocation to Avoid Capital Account Deficits**

To the extent that any debits pursuant to this Article III would reduce the balance of the Capital Account of any Limited Partner below zero, that portion of any such debits shall instead be allocated to the Capital Account of the General Partner. Any credits in any subsequent Fiscal Period which would otherwise be allocable pursuant to this Article III to a Capital Account of any Limited Partner previously affected by the application of this Section 3.9 shall instead be allocated to the Capital Account of the General Partner in such amounts as are necessary to offset all previous debits attributable to such Limited Partner pursuant to this Section 3.9 not previously recovered.

**3.10    Allocations for Income Tax Purposes**

Notwithstanding anything to the contrary in this Agreement:

(a)    <u>Income Tax Allocations</u>. Except as otherwise required by Code Section 704(c), items of income, gain, deduction, loss, or credit that are recognized for income tax purposes in each Fiscal Year will be allocated among the Partners (and among such Partner's Capital Accounts) in such manner as to reflect equitably amounts credited to or debited against each Partner's Capital Accounts, whether in such Fiscal Year or in prior Fiscal Years. To this end, the Partnership will establish and maintain records which shall show the extent to which the Capital Accounts of each Partner will, as of the last day of each Fiscal Year, comprise amounts that

16

have not been reflected in the taxable income of such Partner. To the extent deemed by the General Partner to be feasible and equitable, taxable income and gains in each Fiscal Year shall be allocated among the Partners who have enjoyed the related credits to their Capital Accounts, and items of deduction, loss and credit in each Fiscal Year shall be allocated among the Partners who have borne the burden of the related debits to their Capital Accounts. Non-U.S. tax credits attributable to taxes incurred by the Partnership shall be allocated in a manner consistent with Section 1.704-1(b)(4)(viii) of the Regulations. All matters concerning allocations for U.S. federal, state and/or local income tax purposes, including accounting procedures, not expressly provided for in this Agreement will be determined by the General Partner.

(b)     <u>Basis Adjustments</u>. To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Section 734(b) of the Code or Section 743(b) of the Code is required under Section 1.704-1(b)(2)(iv)(m) of the Regulations to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations; *provided* that in the event that an adjustment to the book value of Partnership property is made as a result of an adjustment pursuant to Section 734(b) of the Code, items of income, gain, loss, or deduction, as computed for book and tax purposes, will be specially allocated among the Partners so that the effect of any such adjustment shall benefit (or be borne by) the Partner(s) receiving the distribution that caused such adjustment.

(c)     <u>Positive Basis Allocations</u>. If the Partnership realizes gains or items of gross income (including short term capital gain) from the sale of Partnership assets for U.S. federal income tax purposes for any Fiscal Year in which one or more Positive Basis Partners withdraws all or a portion of its Interest from the Partnership pursuant to Section 5.3, the General Partner may elect: (i) to allocate such gains or items of gross income among such Positive Basis Partners, pro rata in proportion to the respective Positive Basis of each such Positive Basis Partner, until either the full amount of such gains or items of gross income shall have been so allocated or the Positive Basis of each such Positive Basis Partner shall have been eliminated; and (ii) to allocate any gains or items of gross income not so allocated to Positive Basis Partners to the other Partners in such manner as shall reflect equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; provided, however, that if, following such Fiscal Year, the Partnership realizes gains or items of gross income from a sale of an Investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the liquidating share of any Positive Basis Partner that continues to be a Partner in the Partnership following such withdrawal (*i.e.,* such Positive Basis Partner effected a partial, and not a complete, withdrawal of its Interest), there shall be allocated to such Positive Basis Partner

17

an amount of such gains or items of gross income equal to the amount, if any, by which its Positive Basis as of the effective date of withdrawal exceeds the amount allocated to such Partner pursuant to clause (i) of this sentence. For the avoidance of doubt, the General Partner may also, in its sole discretion, to apply the Positive Basis definitions and the provisions of this Section 3.10(c) to a withdrawal from a Capital Account.

(d)  <u>Negative Basis Allocations</u>.  If the Partnership realizes net losses or items of gross loss or deduction (including short term capital loss) from the sale of Partnership assets for U.S. federal income tax purposes for any Fiscal Year in which one or more Negative Basis Partners withdraws all or a portion of its Interest from the Partnership pursuant to Section 5.3, the General Partner may elect:  (i) to allocate such net losses or items of gross loss or deduction among such Negative Basis Partners, pro rata in proportion to the respective Negative Basis of each such Negative Basis Partners, until either the full amount of such losses or items of loss or deduction shall have been so allocated or the Negative Basis of each such Negative Basis Partner shall have been eliminated; and (ii) to allocate any net losses or items of gross loss or deduction not so allocated to Negative Basis Partners to the other Partners in such manner as shall reflect equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; provided, however, that if, following such Fiscal Year, the Partnership realizes net losses or items of gross loss and deduction from a sale of an Investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the liquidating share of any Negative Basis Partner that continues to be a Partner in the Partnership following such withdrawal (*i.e.*, such Negative Basis Partner effected a partial, and not a complete, withdrawal of its Interest), there shall may be allocated to such Negative Basis Partner an amount of such net losses or items of gross loss or deduction equal to the amount, if any, by which its Negative Basis as of the effective date of withdrawal exceeds the amount allocated to such Partner pursuant to clause (i) of this sentence. For the avoidance of doubt, the General Partner may also, in its sole discretion, to apply the Negative Basis definitions and the provisions of this Section 3.10(d) to a withdrawal from a Capital Account.

(e)  <u>Qualified Income Offset</u>.  In the event any Limited Partner unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4),  1.704-1(b)(2)(ii)(d)(5),  or  1.704-1(b)(2)(ii)(d)(6)  of the Regulations, items of Partnership income and gain will be specially allocated to each such Limited Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the deficit balance in the Capital Account of such Limited Partner as quickly as possible; provided that an allocation pursuant to this Section 3.10(e) may be made only if and to the extent that such Limited Partner would have a deficit balance in its Capital Account after all other allocations provided for in this Article III have been tentatively made as if this Section 3.10(e) were not in this Agreement.  This Section 3.10(e) is intended to constitute a "qualified income offset" within the meaning of Section 1.704-1(b)(2)(ii) of the Regulations and shall be interpreted consistently therewith.

(f)    <u>Minimum Gain Chargeback</u>. Notwithstanding any other provision of this Section 3.10, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, the Partners will be specially allocated items of Partnership income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to the portion of any such Partner's share of the net decrease in Partnership Minimum Gain, determined in accordance with Regulations Sections 1.704-2(f) and (g). This Section 3.10(f) is intended to comply with the minimum gain chargeback requirement in such sections of the Regulations and must be interpreted consistently therewith.

(g)    <u>Gross Income Allocation</u>. In the event any Limited Partner has a deficit Capital Account at the end of any Fiscal Year that is in excess of the sum of (i) the amount such Limited Partner is obligated to restore pursuant to any provision of this Agreement and (ii) the amount such Limited Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, each such Limited Partner will be specially allocated items of Partnership gross income and gain in the amount of such excess as quickly as possible; provided that an allocation pursuant to this Section 3.10(g) may be made only if and to the extent that such Limited Partner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article III have been made as if Section 3.10(e) and this Section 3.10(g) were not in this Agreement.

(h)    <u>Section 704(b) Compliance</u>. The allocations provided in this Section 3.10 are intended to comply with the Regulations under Section 704(b) of the Code and may, as determined by the General Partner, be interpreted and applied in a manner consistent therewith.

## 3.11   Curative Allocations

The allocations set forth in Sections 3.10(b), (e), (f) and (g) (the "***Regulatory Allocations***") are intended to comply with certain requirements of the Regulations. It is the intent of the Partners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Partnership income, gain, loss, or deduction pursuant to this Section 3.11. Therefore, notwithstanding any other provision of this Article III (other than the Regulatory Allocations), the General Partner shall make such offsetting special allocations of the Partnership income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Partner's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Partner would have had if the Regulatory Allocations were not part of this Agreement and all Partnership items were allocated pursuant to other provisions of this Article III (other than the Regulatory Allocations).

Appx. 03405

### 3.12    Individual Partners' Tax Treatment

Each Partner agrees not to treat, on any U.S. federal, state, local and/or non-U.S. income tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with the treatment of such item by the Partnership.

### 3.13    Distributions

(a)    The amount and timing of any distributions from the Partnership shall be determined by the General Partner. Distributions will generally be made in proportion to the Capital Account balances of the Partners at the beginning of the Fiscal Period when made; *provided* that distributions related to Limited Participation Investments will be made based on the proportionate interests of the Capital Accounts participating in such Limited Participation Investments. Any distributions may be paid in cash, in kind or partly in cash and partly in kind.

(b)    Notwithstanding any provision to the contrary contained in this Agreement, the Partnership, and the General Partner on behalf of the Partnership, may not make a distribution to any Partner on any account of its Interest if such distribution would violate the Act or other applicable law.

### 3.14    Other Matters

(a)    The General Partner does not have any personal liability for the repayment of any capital contribution of any Partner.

(b)    Subject only to the relevant provisions of the Act, the Limited Partners are not personally liable for the debts, liabilities, contracts or other obligations of the Partnership except to the extent of their respective capital contributions; provided, however, that the foregoing is not to be construed as relieving any Partner of any obligations arising under Section 3.1 of this Agreement.

(c)    The Limited Partners shall not participate in the conduct of the Partnership's business nor shall they transact business for the Partnership, nor shall they have the power to sign for or bind the Partnership, said powers being vested exclusively in the General Partner.

---

## Article IV  MANAGEMENT

---

### 4.1    Duties and Powers of the General Partner

(a)    Subject to the terms and conditions of this Agreement, the General Partner shall have complete and exclusive power and responsibility, to the fullest extent permitted by the Act, for (i) all investment and investment management decisions to be undertaken on behalf of the Partnership and (ii) managing and administering

Appx. 03406

the affairs of the Partnership, and shall have the power and authority to do all things that the General Partner considers necessary or desirable to carry out its duties hereunder and to achieve the purposes of the Partnership.

(b) The General Partner shall have the right, without the notification to or consent of any Limited Partner or other Person, to make adjustments to the structure of the Partnership in order to address applicable structural, ownership, legal, or regulatory issues, or to improve overall tax efficiency; *provided* that no such adjustment would cause any material adverse consequences to the Limited Partners.

(c) Without limiting the generality of the General Partner's duties and powers hereunder and notwithstanding anything to the contrary contained herein, the General Partner shall have full power and authority, subject to the other terms and provisions of this Agreement, to execute, deliver and perform such contracts, agreements and other undertakings on behalf of the Partnership, without the consent or approval of any other Person, and to engage in all activities and transactions, as it may deem necessary or advisable for, or as may be incidental to, the conduct of the business contemplated by this Section 4.1, including, without in any manner limiting the generality of the foregoing, (i) contracts, agreements, undertakings and transactions with any Partner or with any other Person, firm or corporation having any business, financial or other relationship with any Partner or Partners, (ii) agreements with each Limited Partner in connection with its purchase of an Interest, (iii) any agreements to induce any Person to purchase an Interest, and (iv) the Investment Management Agreement delegating to the Investment Manager certain of the powers and authority vested by this Agreement in the General Partner as the General Partner and the Investment Manager may agree from time to time, each without any further act, approval or vote of any Person.

(d) The General Partner may terminate or replace the Investment Manager in accordance with the terms of the Investment Management Agreement. The General Partner may delegate to any other Person any power and authority vested in the General Partner pursuant to this Agreement that is not otherwise delegated to the Investment Manager.

(e) Every power vested in the General Partner pursuant to this Agreement shall be construed as a power to act (or not to act) in its sole and absolute discretion, except as otherwise expressly provided herein. No provision of this Agreement shall be construed to require the General Partner to violate the Act or any other law, regulation or rule of any self-regulatory organization.

(f) Notwithstanding any other provision of this Agreement or otherwise applicable provision of law or equity, whenever in this Agreement, the General Partner is permitted or required to make a decision (i) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, the General Partner shall be entitled to consider only such interests and factors as it desires, including its own

**Appx. 03407**

interests, and shall, to the fullest extent permitted by applicable law, have no duty or obligation to give any consideration to any interest of or factors affecting the Partnership or the Limited Partners, or (ii) in its "good faith" or under another expressed standard, the General Partner shall act under such express standard and shall not be subject to any other or different standards. Unless otherwise expressly stated, for purposes of this Section 4.1(f), the General Partner shall be deemed to be permitted or required to make all decisions hereunder in its sole discretion.

(g)     The General Partner must cause the Partnership to conduct its dealings with third parties in its own name.

(h)     The General Partner must, throughout the term of the Partnership as set out in Section 2.4, take all actions that may be necessary or appropriate for the continuation of the Partnership's valid existence as an exempted limited partnership under the laws of the Cayman Islands.

**4.2     Expenses**

(a)     Subject to Section 4.2(f), each of the General Partner and the Investment Manager pays all of its own operating and overhead costs without reimbursement by the Partnership (except liability insurance and items described in Section 4.2(b)(iv)). The Partnership will not have its own separate employees or officers, and it will not reimburse the General Partner or the Investment Manager for salaries, office rent and other general overhead expenses of the General Partner or the Investment Manager.

(b)     The Partnership, and not the General Partner or the Investment Manager, will pay, or reimburse the General Partner and the Investment Manager for, all other costs, fees and expenses arising in connection with the Partnership's operations. Such expenses payable by the Partnership include the following:

(i)     all investment-related expenses (including those related to identifying and evaluating contemplated investments, whether or not such contemplated investments are actually made), including, but not limited to, brokerage commissions and other transaction costs, expenses related to short sales, clearing and settlement charges, expenses related to proxies, underwriting and private placements, custodial fees, transfer agent fees, bank service fees, any governmental, regulatory, licensing, filing or registration fees incurred in compliance with the rules of any self-regulatory organization or any federal, state or local laws, consulting and any other professional fees or compensation (including investment banking expenses) relating to particular investments or contemplated investments, appraisal fees and expenses, investment-related travel and lodging expenses and research-related expenses (including, without limitation, news and quotation equipment and services), fees to third-party providers of risk-monitoring services, investment and trading-related computer hardware and software,

22

including, without limitation, trade order management software (i.e., software used to route trade orders);

(ii) accounting (including accounting software), audit and tax preparation expenses;

(iii) costs and expenses associated with reporting and providing information to existing and prospective investors;

(iv) any legal fees and costs (including indemnification expenses, regulatory costs and settlement costs) arising in connection with any litigation or regulatory investigation instituted against the Partnership, the General Partner, the Investment Manager or any of their respective affiliates in their capacity as such, subject to Section 4.5;

(v) except as otherwise provided in Section 3.5, any taxes imposed or assessed upon, or payable by, the Partnership (including interest and penalties);

(vi) costs of any meeting of the Partners (or of obtaining the consent of the Partners in lieu of meeting);

(vii) expenses related to the Advisory Committee and the Pricing Committee;

(viii) premiums for directors' and officers' liability insurance (if any) and any other insurance benefiting the Partnership;

(ix) Management Fees;

(x) administrative expenses (including, without limitation, the fees and expenses of the Administrator in relation to its services provided pursuant to the administration agreement);

(xi) fees relating to valuing the Partnership's assets;

(xii) expenses related to the maintenance of the Partnership's registered office;

(xiii) corporate licensing expenses;

(xiv) extraordinary expenses; and

(xv) any costs or expenses of winding up and liquidating the Partnership.

(c) Expenses generally will be borne *pro rata* by the Partners in accordance with the balances of their respective Capital Accounts; *provided* that expenses may be specially allocated among the Capital Accounts as follows:

(i) with respect to expenses related to Investments (other than Limited Participation Investments), *pro rata* in accordance with the balances of

23

their respective Capital Accounts exclusive of the value of any Limited Participation Sub-Account; and

(ii)     as provided elsewhere in this Agreement, including Sections 3.4, 3.5, 3.6, 3.8 and 5.3.

(d)     Each of the General Partner and the Investment Manager, as appropriate, shall be entitled to reimbursement from the Partnership for any of the expenses paid by it on behalf of the Partnership pursuant to Section 4.2(b); *provided* that the General Partner may absorb any or all of such expenses incurred on behalf of the Partnership. The Investment Manager may retain, in connection with its responsibilities hereunder, the services of others to assist in the investment advice to be given to the Partnership, including, but not limited to, any affiliate of the Investment Manager, but payment for any such services shall be assumed by the Investment Manager and the Partnership shall not have any liability therefor; *provided, however*, that the Investment Manager, in its sole discretion, may retain the services of independent third party professionals, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the Partnership hereunder, and the Partnership shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

(e)     If the General Partner or the Investment Manager, as appropriate, shall incur any of the expenses referred to in Section 4.2(b) for the account or for the benefit of, or in connection with its activities or those of its Affiliates on behalf of, both the Partnership and any Other Account, the General Partner or the Investment Manager, as appropriate, will allocate such expense among the Partnership and each such Other Account in proportion to the size of the Investment made by each in the activity or entity to which the expense relates, or in such other manner as the General Partner considers fair and reasonable.

(f)     Each of the General Partner and the Investment Manager is entitled to use "soft dollars" generated by the Partnership to pay for certain investment research and brokerage services that provide lawful and appropriate assistance to the General Partner or the Investment Manager in the performance of investment decision-making responsibilities to the extent such use falls within the safe harbor afforded by Section 28(e) of the Securities Exchange Act of 1934, as amended, or is otherwise reasonably related to the investment decision-making process, or to cover certain Partnership expenses described in Section 4.2(b). Use of "soft dollars" by the General Partner or the Investment Manager as described herein shall not constitute a breach by the either the General Partner or the Investment Manager of any fiduciary or other duty which the General Partner or the Investment Manager may be deemed to owe to the Partnership or its Partners.

Appx. 03410

**4.3    Rights of Limited Partners**

The Limited Partners shall take no part in the management, control or operation of the Partnership's business, and shall have no right or authority to act for the Partnership or to vote on matters other than the matters set forth in this Agreement or as required by applicable law. Except as otherwise provided herein or required by law, a Limited Partner shall have no liability for the debts or obligations of the Partnership.

**4.4    Other Activities of Partners**

(a)    The General Partner shall not be required to devote any specific amount of its time to the affairs of the Partnership, but shall devote such of its time to the business and affairs of the Partnership as it shall determine in good faith to be necessary to conduct the affairs of the Partnership for the benefit of the Partnership and the Partners.

(b)    Each Partner agrees that any other Partner, and any partner, director, officer, shareholder, member, Affiliate or employee of any other Partner, may engage in or possess an interest in other business ventures or commercial dealings of every kind and description, independently or with others, including, but not limited to, management of other accounts, investment in, or financing, acquisition and disposition of, securities, investment and management counseling, brokerage services, serving as directors, officers, advisers or agents of other companies, partners of any partnership, or trustee of any trust, or entering into any other commercial arrangements, and will not be disqualified solely on the basis that any such activities may conflict with any interest of the parties with respect to the Partnership. Without in any way limiting the foregoing, each Partner hereby acknowledges that (i) none of the Partners or their respective partners, directors, officers, shareholders, members, Affiliates or employees shall have any obligation or responsibility to disclose or refer any of the investment or other opportunities obtained through activities contemplated by this Section 4.4(b) to the General Partner or the Limited Partners, but may refer the same to any other party or keep such opportunities for their own benefit; and (ii) the Partners and their respective partners, directors, officers, shareholders, members, Affiliates and employees are hereby authorized to engage in activities contemplated by this Section 4.4(b) with, or to purchase, sell or otherwise deal or invest in Investments issued by, companies in which the General Partner might from time to time invest or be able to invest or otherwise have any interest on behalf of the Partnership, without the consent or approval of the Partnership or any other Partner. The Partners expressly agree that no other Partner shall have any rights in or to such other activities, or any profits derived therefrom.

(c)    The General Partner and its Affiliates shall allocate investment opportunities to the Partnership and any Other Account fairly and equitably over time. Notwithstanding the foregoing, the General Partner is under no obligation to accord exclusivity or priority to the Partnership in the event of limited investment opportunities. This means that such opportunities will be allocated among those

Appx. 03411

accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) whether the risk-return profile of the proposed Investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific Investment under consideration or in the context of the portfolio's overall holdings; (ii) the potential for the proposed Investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (iii) liquidity requirements of the account; (iv) potentially adverse tax consequences; (v) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed Investment; and (vi) the need to re-size risk in the account's portfolio. The General Partner has the authority to allocate trades to multiple accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the General Partner may allocate the trades among different accounts on a basis it considers fair and equitable over time.

(d)     The principals of the General Partner, as well as the employees and officers thereof and of organizations affiliated with the General Partner, may buy and sell securities for their own account or the account of others, but may not buy securities from or sell securities to the Partnership (such prohibition does not extend to the purchase or sale of Interests) unless appropriate approval of the Advisory Committee is obtained and such purchase or sale is in compliance with the applicable provisions of the Advisers Act or such purchase or sale is otherwise in compliance with the applicable provisions of the Advisers Act.

(e)     Each Partner hereto hereby waives, and covenants not to bring a cause of action in law or equity on the basis of, any law (statutory, common law or otherwise) respecting the rights and obligations of the Partners which is or may be inconsistent with this Section 4.4.

(f)     The General Partner and its Affiliates reserve the right to establish collective investment vehicles that have stated investment programs or terms that differ from those of the Partnership or that are targeted primarily to investors for which the Partnership is not designed to be a suitable investment vehicle. The General Partner and its Affiliates also reserve the right to establish and provide management or advisory services pursuant to separate Other Accounts for significant investors, whether or not such accounts have the same investment program as the Partnership.

## 4.5     Duty of Care; Indemnification

(a)     None of the Indemnified Persons will be liable to the Partnership or any Limited Partner or any other person for mistakes of judgment or for action or inaction that did not constitute Gross Negligence, willful misconduct or bad faith, or for losses due to such mistakes, action or inaction or to the negligence, dishonesty or bad faith of any broker or agent of the Partnership, provided that such broker or agent

was selected, engaged or retained by the Indemnified Person in accordance with the standard of care set forth above. No Indemnified Person shall be liable to the Partnership or any Limited Partner or any other person for any amount in excess of the amount of Management Fees received by the Investment Manager, to the extent permitted under applicable law. In addition, in no event shall any Indemnified Person be liable for any special, indirect, exemplary, consequential or punitive losses or damages. An Indemnified Person may consult with counsel and accountants in respect of the Partnership's affairs and will be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants, provided that they were selected in accordance with the standard of care set forth above. The foregoing provisions, however, shall not be construed so as to provide for the exculpation of an Indemnified Person of any liability (including liability under U.S. Federal securities laws which, under certain circumstances, impose liability even on persons acting in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law (including liability under U.S. Federal securities laws which, under certain circumstances, impose liability even on persons acting in good faith), but shall be construed so as to effectuate the abovementioned provisions to the fullest extent permitted by law.

(b)     The Partnership shall, to the fullest extent permitted by law, indemnify and hold harmless each Indemnified Person from and against any and all loss, cost or expense suffered or sustained by an Indemnified Person by reason of the fact that it, he or she is or was an Indemnified Person, including, without limitation, any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, suit or proceeding, provided that such liability, damage loss, cost or expense resulted from a mistake of judgment on the part of an Indemnified Person or from action or inaction that did not constitute Gross Negligence, willful misconduct or bad faith, or from the negligence, dishonesty or bad faith of a broker or other agent of an Indemnified Person, provided that such broker or agent was selected, engaged or retained by the Indemnified Person in accordance with the standard of care set forth above. The Partnership will, in the sole discretion of the General Partner, advance to any Indemnified Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action, suit or proceeding which arises out of such conduct. In the event that such an advance is made by the Partnership, the Indemnified Person will agree to reimburse the Partnership to the extent that it is finally determined that it was not entitled to indemnification in respect thereof.

(c)     Notwithstanding any of the foregoing, the provisions of this Section 4.5 do not provide for the indemnification of any Indemnified Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the above provisions to the fullest extent permitted by law.

Appx. 03413

(d)     Pursuant to the foregoing indemnification and exculpation provisions applicable to each Indemnified Person, the Partnership (and not the applicable Indemnified Person) will be responsible for any losses resulting from trading errors and similar human errors, absent Gross Negligence, bad faith or willful misconduct of any Indemnified Person.

(e)     The above-mentioned Indemnified Persons are also indemnified by each Limited Partner for any amounts of tax withheld or required to be withheld with respect to that Limited Partner, and also for any amounts of interest, additions to tax, penalties and other costs borne by any such persons in connection therewith to the extent that the balance of the Limited Partner's Capital Account is insufficient to fully compensate the General Partner or the Investment Manager for such costs.

(f)     The General Partner may make, execute, record and file on its own behalf and on behalf of the Partnership all instruments and other documents (including one or more deed polls in favor of categories of Indemnified Persons and/or one or more separate indemnification agreements between the Partnership and individual Indemnified Persons) that the General Partner deems necessary or appropriate in order to extend the benefit of the provisions of Sections 4.5(a) and 4.5(b) to the Indemnified Persons; provided, that, such other instruments and documents authorized hereunder shall be on the same terms as provided for in Sections 4.5(a) and 4.5(b) except as otherwise may be required by applicable law.

**4.6     Advisory Committee**

(a)     The General Partner and/or the Investment Manager may appoint a committee (the "*Advisory Committee*") composed of one or more individuals selected by the General Partner and/or the Investment Manager from time to time, none of whom is affiliated with the General Partner or the Investment Manager.

(b)     The General Partner and/or the Investment Manager may in its/their discretion seek the approval of the Advisory Committee or establish any other reasonable mechanism in connection with (i) approvals that are or would be required under the Investment Advisers Act of 1940, as amended (including Section 206(3)), or (ii) any other matter deemed appropriate by the General Partner and/or the Investment Manager.  Each Limited Partner agrees that, except as otherwise specifically provided herein and to the extent permitted by applicable law, the approval of a majority of the members of the Advisory Committee at such time is binding upon the Partnership and each Partner with respect to any approval sought under this Section 4.6(b).

(c)     Subject to the foregoing, any recommendations of or actions taken by the Advisory Committee are advisory only and the General Partner and the Investment Manager are not required or otherwise bound to act in accordance with any such recommendations or actions.

**Appx. 03414**

(d)     As determined by the General Partner and/or the Investment Manager, meetings of the Advisory Committee may be held in person or by telephone. Approval of the Advisory Committee is deemed to have been given if given by a majority of those members present at a meeting or by a majority of all members of the Advisory Committee if given pursuant to a written consent without a meeting.

(e)     The Partnership agrees to reimburse members of the Advisory Committee for their reasonable out-of-pocket expenses and to indemnify them to the maximum extent permitted by law.

**4.7     Pricing Committee**

(a)     The General Partner and/or the Investment Manager shall appoint a committee (a "***Pricing Committee***") whose quorum consists of at least a majority of the following individuals: the Chief Financial Officer of the Investment Manager, the Chief Compliance Officer of the Investment Manager and one or more traders of the Investment Manager. The Pricing Committee meets on at least a monthly basis to review, confirm and agree on all pricing information established by the Investment Manager in respect of the Partnership's assets that are fair valued. The final pricing or valuation of such Partnership assets shall require the approval of a majority in number of the members of the Pricing Committee constituting a quorum as of a relevant valuation date. In lieu of meeting, the Pricing Committee may take action by written consent signed by a majority of the committee members. The Pricing Committee may, at the Partnership's expense, engage third-party experts and consultants to provide services in connection with any determination to be made by the Pricing Committee. The General Partner and/or the Investment Manager may replace members of the Pricing Committee or change the composition of the Pricing Committee, in their sole discretion.

(b)     In connection with the valuation of Partnership assets, the General Partner shall:

(i)      with respect to the Partnership's assets that are tracked by third party pricing services to which the Investment Manager's data administrator currently subscribes, use reasonable efforts to cause the Administrator (if any) to obtain independent pricing on at least a monthly basis from such data administrator;

(ii)     with respect to the Partnership's assets that are not tracked by third party pricing services, but for which the Investment Manager obtains pricing information from third party brokerage firms, require that the Investment Manager provide copies of such brokerage pricing to the Administrator on at least a monthly basis; and

(iii)    with respect to the Partnership's assets that are neither tracked by a third party pricing service nor for which the Investment Manager obtains pricing information from third party brokerage firms, require the Investment Manager to calculate pricing in its reasonable discretion and

29

will provide all such pricing information directly to the Administrator on at least a monthly basis.

---

## Article V  ADMISSIONS, TRANSFERS AND WITHDRAWALS

### 5.1     Admission of Partners

The General Partner may, without the consent of any existing Partners, admit any Person who agrees to be bound by all of the terms of this Agreement as a General Partner or a Limited Partner upon the execution by or on behalf of it and the acceptance by the General Partner of a deed of adherence to this Agreement in form satisfactory to the General Partner. The amount of any initial capital contribution to be made by such additional Partner is determined by the General Partner (in its sole discretion). Effective upon such admission, the Partnership Percentage of each existing Partner is adjusted pro rata to reflect the Partnership Percentage of the additional Partner, and the Partnership's records are revised to reflect such adjusted Partnership Percentages, as well as the name, initial capital contribution and Partnership Percentage of such additional Partner. No Limited Partner may Transfer all or any portion of its Interest without the prior written consent of the General Partner.

### 5.2     Transfer and Withdrawal of the General Partner

Without the consent of a majority in number of the Limited Partners, the General Partner shall not have the right to assign or otherwise transfer its Interest as the general partner of the Partnership, and the General Partner shall not have the right to withdraw from the Partnership without the consent of the Limited Partners. In the event of an assignment or transfer of all of its Interest as a general partner of the Partnership in accordance with this clause, the new general partner will immediately notify the Registrar in the Cayman Islands in accordance with Section 10 of the Act and the outgoing General Partner will take such actions as may be necessary to novate and assign all contracts signed on behalf of the Partnership to the new general partner whereupon the new general partner will be substituted as general partner of the Partnership in place of the outgoing General Partner and immediately thereafter the outgoing General Partner will cease to be the general partner of the Partnership.

### 5.3     Transfer and Withdrawal of Interests of Limited Partners

(a)     The General Partner shall have the right, in its sole discretion, to (i) prohibit Transfers of Limited Partner Interests, (ii) compel withdrawals of Limited Partner Interests and (iii) take such other actions as the General Partner deems necessary to ensure that the assets of the Partnership do not constitute Plan Assets for purposes of ERISA.

(b)     Subject to obtaining the General Partner's consent, each of the Limited Partners may voluntarily withdraw all or part of its Interest at such times and in such amounts as such Limited Partner may determine.

30

(c)    The General Partner may postpone or suspend (a) the calculation of the net asset value of the Partnership (and the applicable valuation date); (b) the issuance of Interests, (c) the withdrawal by Limited Partners (and the applicable withdrawal date); and/or (d) the payment of withdrawal proceeds (even if the calculation dates and withdrawal dates are not postponed) if it determines that such a suspension is warranted by extraordinary circumstances, including: (i) during any period when any stock exchange or over-the-counter market on which the Partnership's investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended; (ii) during the existence of any state of affairs as a result of which, in the reasonable opinion of the General Partner, disposal of investments by the Partnership, or the determination of the value of the assets of the Partnership, would not be reasonably practicable or would be seriously prejudicial to the non-redeeming partners; (iii) during any breakdown in the means of communication normally employed in determining the price or value of the Partnership's assets or liabilities, or of current prices in any stock market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Partnership cannot reasonably be accurately ascertained within a reasonable time frame; (iv) during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the reasonable opinion of the General Partner, be effected at normal rates of exchange; or (v) automatically upon termination of the Partnership as described in Section 6.1.

---

## Article VI  LIQUIDATION AND TERMINATION

---

**6.1**    **Termination of Partnership**

(a)    The Partnership shall be wound up and dissolved upon the first to occur of the following dates (each, a "***Termination Date***") and Sections 36(1)(b), 36(9) and 36(12) of the Act shall not apply to the Partnership:

    (i)    any date on which the General Partner shall elect in writing to terminate the Partnership;

    (ii)    if the General Partner is the sole or last remaining general partner, the date (the "***Automatic Dissolution Date***") falling 90 days after the date of the service of a notice by the General Partner (or its legal representative) on all the Limited Partners informing the Limited Partners of:

        (1)    the commencement of liquidation or bankruptcy proceedings in relation to the General Partner; or

        (2)    the withdrawal, removal or making of a winding up or dissolution order in relation to the General Partner;

Appx. 03417

*provided that*, if a majority in number of the Limited Partners elects one or more new general partners before the Automatic Dissolution Date, the business of the Partnership shall be resumed and continued. If a new general partner is not elected by the Automatic Dissolution Date, the Partnership shall be wound up and dissolved in accordance with terms of this Agreement and the Act.

(b)     Upon such Termination Date, the Partnership shall be wound up in accordance with the Act by the General Partner or if the General Partner is unable to perform this function, a liquidator elected by a Majority of the Limited Partners (a "*Liquidator*"), which shall take all steps necessary or appropriate to wind up the affairs of the Partnership as promptly as practicable thereafter. Neither the admission of Partners nor the withdrawal, bankruptcy, death, legal incapacity or disability of a Limited Partner shall terminate the Partnership.

(c)     The parties agree that irreparable damage would be done to the goodwill and reputation of the Partners if any Limited Partner should bring an action in court to dissolve the Partnership. Care has been taken in this Agreement to provide for fair and just payment in liquidation of the Interests of all Partners. Accordingly, to the fullest extent permitted by law, each Limited Partner hereby waives and renounces its right to such a court decree of dissolution or to seek the appointment by the court of a liquidator for the Partnership except as provided herein, and no Limited Partner may present a winding up petition against the Partnership without the prior written consent of the General Partner.

**6.2     Liquidation of Assets**

(a)     Upon the Termination Date of the Partnership, the General Partner or Liquidator (as applicable) shall promptly liquidate the business and administrative affairs of the Partnership to the extent feasible. Net Profit and Net Loss and any balances in Limited Participation Sub-Accounts during the Fiscal Periods, which includes the period of liquidation, shall be allocated pursuant to Article III. The proceeds from liquidation shall be divided in the following manner, subject to the Act:

    (i)     the debts, liabilities and obligations of the Partnership, other than any debts to the Partners as Partners, and the expenses of liquidation (including legal, administrative and accounting expenses incurred in connection therewith), up to and including the date that distribution of the Partnership's assets to the Partners has been completed, shall first be satisfied (whether by payment or the making of reasonable provision for payment thereof);

    (ii)     such debts as are owing to the Partners as Partners are next paid; and

    (iii)     the Partners shall next be paid liquidating distributions (in cash or in securities or other assets, whether or not readily marketable) *pro rata* in accordance with, and up to the positive balances of their respective Capital Accounts, as adjusted pursuant to Article III to reflect allocations for the

Fiscal Period ending on the date of the distributions under this Section 6.2(a)(iii).

(b)     Notwithstanding this Section 6.2 and the priorities set forth in the Act, the General Partner or Liquidator may distribute ratably in-kind rather than in cash, upon dissolution, any assets of the Partnership; *provided*, *however*, that if any in-kind distribution is to be made, (i) the assets distributed in-kind shall be valued pursuant to Section 7.3, and charged as so valued and distributed against amounts to be paid under Section 6.2(a) and (ii) any gain or loss (as computed for book purposes) attributable to property distributed in-kind shall be included in the Net Profit, Net Loss or Limited Participation Sub-Accounts for the Fiscal Period ending on the date of such distribution.

(c)     The General Partner shall, pursuant to Section 36(2) of the Act, file a notice of dissolution with the Registrar upon completion of the winding up of the Partnership.

—————

## Article VII  ACCOUNTING AND VALUATION; BOOKS AND RECORDS

—————

**7.1     Accounting and Reports**

(a)     The Partnership may adopt for tax accounting purposes any accounting method which the General Partner shall decide is in the best interests of the Partnership and which is permissible for U.S. federal income tax purposes.

(b)     As soon as practicable after the end of each Fiscal Year, the General Partner shall cause an audit of the financial statements of the Partnership as of the end of each such period to be made by a firm of independent accountants selected by the General Partner.  As soon as is practicable thereafter the General Partner shall furnish to each Limited Partner a copy of the set of financial statements prepared in accordance with GAAP (subject to this Agreement), with such adjustments thereto as the General Partner determines appropriate, including the report of such independent accountants. The General Partner may elect not to reserve certain amounts that may be required by GAAP and not to provide certain portfolio disclosure required by GAAP to investors and may capitalize and amortize certain of its organizational expenses in deviation from GAAP.  Such deviations from GAAP may result in a qualified opinion rendered on the financial statements of the Partnership.

(c)     As soon as practicable after the end of each taxable year, the General Partner shall furnish to each Limited Partner such information as may be required to enable each Limited Partner properly to report for U.S. federal, state, local or other income tax purposes its distributive share of each Partnership item of income, gain, loss, deduction or credit for such year. The General Partner shall have discretion as to how to report Partnership items of income, gain, loss, deduction or

33

credit on the Partnership's tax returns, and the Limited Partners shall treat such items consistently on their own tax returns.

## 7.2 Certain Tax Matters

(a) By joining this Agreement, each Limited Partner appoints and designates the General Partner (i) as the "tax matters partner," within the meaning of Section 6231(a)(7) of the Code, and, (ii) for any BBA Effective Period, as the "partnership representative" within the meaning of Section 6223 of the Code (as applicable, the "*Tax Matters Partner*"), or, in each case, under any similar state or local law, and, if the "partnership representative" is an entity, the General Partner shall have the exclusive authority to appoint and designate the individual through whom such partnership representative will act for all purposes under subchapter C of chapter 63 of the Code and, if applicable, any similar state or local law (the "*Designated Individual*"). All references to the Tax Matters Partner herein shall include the Designated Individual, unless the context requires otherwise. The Tax Matters Partner shall have any powers necessary to perform fully in such capacity, and shall be permitted to take any and all actions, to the extent permitted by law, in consultation with the General Partner if the General Partner is not the Tax Matters Partner. The General Partner shall have the exclusive authority to appoint and designate the Investment Manager, or an Affiliate of the General Partner or the Investment Manager, as a successor Tax Matters Partner for any BBA Effective Period. The Tax Matters Partner shall be reimbursed by the Partnership for all costs and expenses incurred by it, and to be indemnified by the Partnership with respect to any action brought against it, in its capacity as the Tax Matters Partner.

(b) The Limited Partners agree that any and all actions taken by the Tax Matters Partner shall be binding on the Partnership and all of the Limited Partners and the Limited Partners shall reasonably cooperate with the Partnership or the General Partner, and undertake any action reasonably requested by the Partnership or the General Partner, in connection with any elections made by the Tax Matters Partner or as determined to be reasonably necessary by the Tax Matters Partners under any BBA provision.

(c) Each Limited Partner further agrees that such Limited Partner will not independently act with respect to tax audits or tax litigation affecting the Partnership, unless the prior written consent of the General Partner has been obtained.

(d) The General Partner may in its sole discretion cause the Partnership to make all elections not otherwise expressly provided for in this Agreement required or permitted to be made by the Partnership under the Code and any state, local or non-U.S. tax laws.

(e) To the fullest extent permitted by law, each Limited Partner agrees to (i) provide such cooperation and assistance, including executing and filing forms or other

34

statements and providing information about the Limited Partner, as is reasonably requested by the Tax Matters Partner, to enable the Partnership to satisfy any applicable tax reporting or compliance requirements, to make any tax election or to qualify for an exception from or reduced rate of tax or other tax benefit or be relieved of liability for any tax regardless of whether such requirement, tax benefit or tax liability existed on the date such Partner was admitted to the Partnership, (ii) amend the Limited Partner's tax returns and pay any resulting taxes, interest and penalties in connection with the Partnership's electing under Section 6225(a) of the Code, as amended by the BBA, (iii) take into account any adjustments and pay any taxes, interest and penalties that result from the Partnership's electing under Section 6226 of the Code, as amended by the BBA, and/or (iv) indemnify and hold harmless the Partnership, the Tax Matters Partner and any other individual designated to interact with tax authorities on behalf of the Partnership from and against any liability with respect to the Limited Partner's share of any tax deficiency (including any interest and penalties associated therewith) paid or payable by the Partnership that is (a) allocable to such Limited Partner (as reasonably determined by the General Partner in accordance with this Agreement) with respect to an audited or reviewed taxable year for which such Partner was a Partner in the Partnership or (b) attributable (as reasonably determined by the General Partner) to the failure of such Limited Partner to cooperate with or provide any such forms, statements, or other information as requested by the Tax Matters Partner pursuant to clause (i) above.

(f)     The obligations and covenants of the Limited Partners set forth in Sections 3.5, 7.2 and 7.3 hereof shall apply jointly and severally to each Limited Partner and any direct or indirect transferee of or successor to such Limited Partner's interest and shall survive such Limited Partner's ceasing to be a Partner in the Partnership and/or the termination, dissolution, liquidation and winding up of the Partnership.

## 7.3   AEOI

Each Partner acknowledges and agrees that:

(a)     the Partnership is required to comply with the provisions of AEOI;

(b)     it will provide, in a timely manner, such information regarding the Partner and its beneficial owners and such forms or documentation as may be requested from time to time by the Partnership (whether by its General Partner or other agents such as the Investment Manager or the Administrator) to enable the Partnership to comply with the requirements and obligations imposed on it pursuant to AEOI, specifically, but not limited to, forms and documentation which the Partnership may require to determine whether or not the Partner's relevant investment is a "Reportable Account" (under any AEOI regime) and to comply with the relevant due diligence procedures in making such determination;

(c)     any such forms or documentation requested by the Partnership or its agents pursuant to paragraph (b), or any financial or account information with respect to

35

the Partner's investment in the Partnership, may be disclosed to the Cayman Islands Tax Information Authority (or any other Cayman Islands governmental body which collects information in accordance with AEOI) and to any withholding agent where the provision of that information is required by such agent to avoid the application of any withholding tax on any payments to the Partnership;

(d)     it waives, and/or shall cooperate with the Partnership to obtain a waiver of, the provisions of any law which:

 (i)     prohibit the disclosure by the Partnership, or by any of its agents, of the information or documentation requested from the Partner pursuant to paragraph (b);

 (ii)     prohibit the reporting of financial or account information by the Partnership or its agents required pursuant to AEOI; or

 (iii)     otherwise prevent compliance by the Partnership with its obligations under AEOI;

(e)     if it provides information and documentation that is in anyway misleading, or it fails to provide the Partnership or its agents with the requested information and documentation necessary in either case to satisfy the Partnership's obligations under AEOI, the General Partner reserves the right (whether or not such action or inaction leads to compliance failures by the Partnership, or a risk of the Partnership or its investors being subject to withholding tax or other costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Partnership) (together, "*costs*") under AEOI), in its sole discretion, to take any action and/or pursue all remedies at its disposal including, without limitation:

 (i)     to establish separate sub-accounts within a Partner's Capital Account for the purpose of calculating AEOI related costs; and/or

 (ii)     to allocate any or all AEOI costs among Capital Accounts on a basis determined solely by the General Partner; and/or

 (iii)     to compulsory withdraw such Partner from the Partnership; and/or

 (iv)     to hold back or deduct from any withdrawal proceeds or from any other payments or distributions due to such Partner any costs caused (directly or indirectly) by the Partner's action or inaction;

(f)     it shall have no claim against the Partnership, the General Partner or any of its or their agents, for any form of damages or liability as a result of actions taken or remedies pursued by or on behalf of the Partnership in order to comply with AEOI; and

(g)     it hereby indemnifies the Partnership, the General Partner and each of their respective principals, members, partners, managers, officers, directors,

36

stockholders, employees and agents and holds them harmless from and against any AEOI related liability, action, proceeding, claim, demand, costs, damages, expenses (including legal expenses) penalties or taxes whatsoever which such parties may incur as a result of any action or inaction (directly or indirectly) of such Partner (or any related person) described in the preceding paragraphs. This indemnification shall survive the disposition of such Partner's Interest in the Partnership.

**7.4     Valuation of Partnership Assets and Interests**

(a)     The Partnership's assets are valued as of the close of each Fiscal Period and on any other date selected by the General Partner in its sole discretion in accordance with its valuation policies and procedures.

(b)     The value of the assets of the Partnership and the net worth of the Partnership as a whole determined pursuant to this Section 7.3 are conclusive and binding on all of the Partners and all parties claiming through or under them.

**7.5     Determinations by the General Partner**

(a)     All matters concerning the determination and allocation among the Partners and their respective Capital Accounts of the amounts to be determined and allocated pursuant to this Agreement, including Article III and accounting procedures applicable thereto, shall be determined by the General Partner, unless specifically and expressly otherwise provided for by the provisions of this Agreement, and such determinations and allocations shall be final and binding on all the Partners; provided, however, that all calculations of the Performance Allocation will be made on the basis of, or subject to correction based on, the annual audit of the Partnership's financial statements and appropriate adjustments will be made to all such calculations and related allocations to the extent necessary as a result of that audit.

(b)     The General Partner may make such adjustments to the computation of Net Profit or Net Loss or any other allocations with respect to any Limited Partner and their respective Capital Accounts, or any component items comprising any of the foregoing, as it considers appropriate to reflect the financial results of the Partnership and the intended allocation thereof among the Partners and their respective Capital Accounts in a reasonably accurate, fair and efficient manner. Without limiting the generality of the foregoing, any provision of this Agreement that requires an adjustment to be made to any Capital Account or sub-account as of any mid-month or mid-quarter date may be made as of the most recent preceding or succeeding date when a regular valuation is being conducted.

**7.6     Books and Records**

The General Partner shall keep books and records pertaining to the Partnership's affairs showing all of its assets and liabilities, receipts and disbursements, realized income, gains, deductions and losses, Partners' Capital Accounts and all transactions entered into by the

Appx. 03423

Partnership. Subject to the documentation requirements of the Act, such books and records of the Partnership must be kept at the Partnership's office or at the office of an agent.

---

## Article VIII  GENERAL PROVISIONS

**8.1     Amendment of Partnership Agreement**

(a)     Except as required by law, this Agreement may be amended, in whole or in part, by an instrument in writing signed by each of the Limited Partners and the General Partners.

(b)     The General Partner may amend this Agreement without the consent of the Limited Partners in order:

(i)     to make consequential amendments following any amendment made pursuant to this Section 8.1;

(ii)     to clarify any manifest or clerical inaccuracy, ambiguity or reconcile any inconsistency in this Agreement;

(iii)     to add to the representations, duties or obligations of the General Partner or waive any right or power of the General Partner for the benefit of the Limited Partners;

(iv)     so as to qualify or maintain the qualification of the Partnership as a limited partnership in any jurisdiction;

(v)     to change the name of the Partnership;

(vi)     to admit any new Limited Partners or to carry out the Transfer of any Interests;

(vii)     to make any other amendment whatsoever to this Agreement which the General Partner deems advisable, provided that it does not adversely affect any rights of the Limited Partners; or

(viii)     to create separate classes or sub-classes or series or sub-series of Partnership Interests.

**8.2     Special Power-of-Attorney**

(a)     Each Limited Partner hereby appoints the General Partner for the time being, with power of substitution, as his lawful attorney in his name to execute, acknowledge, swear to (and deliver as may be appropriate) on his behalf and file and record in

38

the appropriate public offices and publish (as may in the reasonable judgment of the General Partner be required by law):

(i)     any amendments to this Agreement made in accordance with the terms hereof;

(ii)    any instruments or documents which the General Partner determines in its sole discretion are required to admit any new Limited Partners or to carry out the Transfer of any Interests;

(iii)   declarations of limited partnership in various jurisdictions and amendments thereto;

(iv)    all deeds, agreements and other documents which the General Partner deems appropriate to conduct and carry on the business of the Partnership, including without limitation to qualify or continue the Partnership as an exempted limited partnership in the Cayman Islands and as required in the jurisdictions in which the Partnership may conduct business, or which may be required to be filed by the Partnership or the Partners under the laws of any jurisdiction or under any amendments or successor statute to the Act, to reflect the dissolution or termination of the Partnership or the Partnership being governed by any amendments or successor statutes to the Act or to reorganize or refile the Partnership in a different jurisdiction, provided that such reorganization or refiling does not result in a material change in the rights of the Partners;

(v)     to file, prosecute, defend, settle or compromise litigation, claims or arbitration on behalf of the Partnership;

(vi)    one or more subscription agreements (or other agreements or documents) on behalf of such Limited Partner between the Partnership, the General Partner and any Person (a "***New Limited Partner***") being admitted by the General Partner to the Partnership as a limited partner thereof (or such other parties as may be appropriate) in such form and on such terms and conditions as the General Partner considers in its absolute discretion necessary or appropriate, including reference to this Agreement and its novation and agreeing and covenanting with such New Limited Partner on behalf of such Limited Partner that the Limited Partner will from the effective date of such subscription agreement or agreements comply with and observe the terms of this Agreement.

(b)     The above power of attorney shall be irrevocable and deemed to be given to secure a proprietary interest of the donee of the power or performance of an obligation owed to the donee and shall survive and shall not be affected by the subsequent death, lack of capacity, insolvency, bankruptcy or dissolution of any Limited Partner.

Appx. 03425

(c)     Each Limited Partner shall, at the request of the General Partner, execute additional powers of attorney on a document separate from this Agreement. In the event of any conflict between this Agreement and any instruments executed, delivered, or filed by the General Partner (and any successor thereto) pursuant to this power of attorney, this Agreement shall prevail.

(d)     The General Partner may exercise this power of attorney by listing all of the Partners executing any agreement, certificate, instrument, or document with the single signature of the General Partner as attorney-in-fact for all Partners.

(e)     Each Limited Partner hereby appoints the General Partner by any one or more of its directors or officers in office from time to time, acting singly, to be the Limited Partner's agent and attorney-in-fact.

## 8.3     Notices

Notices which may be or are required to be given under this Agreement by any party to another shall be given by hand delivery, transmitted by facsimile or telecopier facsimile, transmitted electronically to an address that has been previously provided or verified through another form of notice or sent by registered or certified mail, return receipt requested or internationally recognized courier service, and shall be addressed to the respective parties hereto at their addresses as set forth on the register of Partners maintained by the General Partner or to such other addresses or facsimile numbers as may be designated by any party hereto by notice addressed to (i) the General Partner, in the case of notice given by any Limited Partner, and (ii) each of the Limited Partners, in the case of notice given by the General Partner. Notices shall be deemed to have been given (A) when delivered by hand, transmitted by facsimile or transmitted electronically or (B) on the date indicated as the date of receipt on the return receipt when delivered by mail or courier service. Sections 8 and 19 of the Electronic Transactions Law (2003 Revision) of the Cayman Islands shall not apply to this Agreement.

## 8.4     Agreement Binding Upon Successors and Assigns; Delegation

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, but the rights and obligations of the Partners hereunder shall not be assignable, transferable or delegable except as provided in Section 4.1(d) and any attempted assignment, transfer or delegation thereof which is not made pursuant to the terms of such Sections shall be void.

## 8.5     Governing Law

This Agreement is, and the rights of the Partners hereunder are, governed by and shall be construed in accordance with the laws of the Cayman Islands, without regard to the conflict of laws rule thereof which would result in the application of the laws of a different jurisdiction. The parties hereby consent to the exclusive jurisdiction and venue for any action arising out of this Agreement in Dallas, Texas. Each Partner consents to service of process in any action or proceeding involving the Partnership by the mailing thereof by registered or certified mail, postage prepaid, to such Partner's mailing address set forth in the register of limited partnership interests maintained by the General Partner in accordance with the Act.

Appx. 03426

**8.6     Interpretation of Partnership Accounting Systems and Terminology**

In the event that the Partnership employs an accounting system which is different from the accounting system of the General Partner or whose terminology does not conform precisely to the terminology in this Agreement, the General Partner shall have the authority to interpret such accounting system and/or terminology in a manner which it, in its sole discretion, determines to be consistent with the objectives of this Agreement.

**8.7     Miscellaneous**

(a)     The captions and titles preceding the text of each Section hereof shall be disregarded in the construction of this Agreement. Use of the word "including" in this Agreement means in each case "without limitation," whether or not such term is explicitly stated.

(b)     This Agreement may be executed in counterparts, each of which shall be deemed to be an original hereof.

*[Signature Page Follows]*

The parties hereto have executed and unconditionally delivered this Agreement as a deed on the day and year first above written.

**General Partner:**

**Highland Dynamic Income Fund GP, LLC**

By: Highland Capital Management, L.P., its sole member
    By: Strand Advisors, Inc., its general partner

By: _____
Name: Trey Parker
Title: Assistant Secretary

Witness:

By: _____
Name: HELEN KIM
Title: PARALEGAL

**Limited Partners:**

**Highland Dynamic Income Fund, L.P.**

By: Highland Dynamic Income Fund GP, LLC, its general partner
    By: Highland Capital Management, L.P., its sole member
        By: Strand Advisors, Inc., its general partner

By: _____
Name: Trey Parker
Title: Assistant Secretary

Witness:

By: _____
Name: HELEN KIM
Title: PARALEGAL

*Signature Page to Second Amended and Restated Exempted Limited Partnership Agreement of Highland Dynamic Income Master Fund, L.P.*

**Highland Dynamic Income Fund, Ltd.**

By:

Name: Trey Parker

Title:   Director

Witness:

By:

Name:   HELEN KIM

Title:   PARALEGAL

*Signature Page to Second Amended and Restated Exempted Limited Partnership Agreement of Highland Dynamic Income Master Fund, L.P.*

## EXHIBIT A

General Partner:
Highland Dynamic Income Fund GP, LLC

Limited Partners:
Highland Dynamic Income Fund, L.P.
Highland Dynamic Income Fund, Ltd.

# INVESTMENT MANAGEMENT AGREEMENT

**by and among**

**HIGHLAND LOAN FUND, LTD.**

**HIGHLAND CAPITAL LOAN FUND, L.P.**

**HIGHLAND LOAN MASTER FUND, L.P.**

**HIGHLAND CAPITAL LOAN GP, LLC**

**and**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

**March 28, 2013**

203404989 v4

**INVESTMENT MANAGEMENT AGREEMENT** ("*Agreement*"), dated effective as of March 28, 2013, by and among:

HIGHLAND LOAN FUND, LTD., an exempted company incorporated in the Cayman Islands with limited liability (the "*Offshore Fund*");

HIGHLAND CAPITAL LOAN FUND, L.P., a Delaware limited partnership (the "*Domestic Fund*");

HIGHLAND LOAN MASTER FUND, L.P., a Cayman Islands exempted limited partnership (the "*Master Fund*" and, together with the Domestic Fund and the Offshore Fund, the "*Clients*");

HIGHLAND CAPITAL LOAN GP, LLC, a Delaware limited liability company as the general partner of each of the Domestic Fund and the Master Fund (the "*General Partner*"); and

HIGHLAND CAPITAL MANAGEMENT, L.P., a Delaware limited partnership (the "*Investment Manager*").

**Preliminary Statements**

A.     The Domestic Fund and the Offshore Fund each invest all of their investable assets in the Master Fund.  The Investment Manager will exercise no discretion with respect to the investment of the assets of the Offshore Fund or the Domestic Fund and will serve merely as a steward thereof and the investment activities of the Investment Manager will be conducted at the Master Fund level as the Investment Manager to the Master Fund.

B.     The Clients desire to retain the Investment Manager to provide certain discretionary advisory services relating to the assets and liabilities of the Master Fund, and the Investment Manager desires to accept such appointment, all subject to the terms and conditions hereinafter set forth.

In consideration of the mutual covenants herein contained, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

**Agreement**

For good and valuable consideration, the sufficiency and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.     **Appointment**.

The Clients hereby appoint the Investment Manager as investment manager with respect to the assets and liabilities of the Master Fund, and to provide certain custodial services in respect of the Domestic Fund and the Offshore Fund, and the Investment Manager hereby accepts such appointment and agrees to perform its obligations in accordance with the terms hereof and of the Amended and Restated Exempted Limited Partnership Agreement of the Master Fund, as amended from time to time (the "*Master Fund*

**Appx. 03432**

*Partnership Agreement*") and the investment objectives, policies, guidelines and restrictions that from time to time are set forth in the confidential private placement memorandum of the Domestic Fund, as supplemented or superseded from time to time (the "*PPM*"), the confidential private offering memorandum of the Offshore Fund, as supplemented or superseded from time to time (the "*POM*"), the Memorandum and Articles of Association of the Offshore Fund (the "*Articles*") and the Limited Partnership Agreement of the Domestic Fund, as amended from time to time (the "*Domestic Fund Partnership Agreement*" and, together with the Master Fund Partnership Agreement, the "*Partnership Agreements*" and, the Partnership Agreements collectively with the PPM, the POM and the Articles, the "*Governing Documents*"). Any capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Governing Documents.

2.     **Authority and Duties of the Investment Manager**.

(a)     All of the assets of the Domestic Fund and the Offshore Fund shall be invested in the Master Fund. The Investment Manager will exercise no discretion with respect to the investment of the assets of the Offshore Fund or the Domestic Fund and will serve merely as a steward thereof and the investment activities of the Investment Manager will be conducted at the Master Fund level as the Investment Manager to the Master Fund.

(b)     Subject to 2(a), the Investment Manager shall serve as the investment manager to the Master Fund and shall in that capacity have full discretion and authority, without obtaining the prior approval of any officer or other agent of the Master Fund: (i) to effect any and all transactions in securities, currencies and other financial instruments (and options and other contracts thereon), and everything connected therewith in the broadest sense; (ii) to determine all matters relating to the manner, method and timing of portfolio transactions and to engage consultants and analysts in connection therewith; (iii) to select brokers, dealers, banks and other intermediaries by or through whom such transactions will be executed or carried out; (iv) to make short sales; (v) to purchase or write options (including uncovered options); (vi) to direct the administrator of the Master Fund, banks, brokers or other custodians to effect deliveries of funds or assets, but only in the course of effecting portfolio transactions for the account of the Master Fund; (vii) to exercise all voting and other powers and privileges attributable to any securities or other property held for the Master Fund's account hereunder; (viii) to authorize remuneration for the Directors of the Offshore Fund other than Directors of the Offshore Fund who are principals or employees of the Investment Manager; and (ix) to make and execute all such documents and to take all such other actions as the Investment Manager considers necessary or appropriate to carry out its investment management duties hereunder.

(c)     In furtherance of the foregoing, the Clients hereby designate and appoint the Investment Manager as its agent and attorney-in-fact, with full power and authority and without the need for further approval of the Clients (except as may be required by law) to complete and execute all such documents and to take any and all actions that the Investment Manager, in its discretion, shall deem advisable to carry out the foregoing with respect to the assets of the Clients; provided,

Appx. 03433

however, that the Investment Manager is not intended to have actual or constructive custody of any securities or other assets of the Clients. In connection with any of the foregoing, the Investment Manager is further authorized to transfer or tender for cash or exchange such securities. In all such purchases, sales or trades the Clients authorize the Investment Manager to act for the Clients, and at their risk, and in their name and on their behalf, in the same manner and with the same force and effect as the Clients might or could do with respect to such purchases, sales or trades without prior consultation with the Clients. The Clients also appoint the Investment Manager as their agent and attorney-in-fact to vote, and to execute proxies, waivers, consents and other instruments with respect to, the securities and other assets of the Clients.

(d)     In connection with the execution of transactions on behalf of the Master Fund, the Master Fund hereby acknowledges and agrees that in the course of selecting brokers, dealers, banks and financial intermediaries to effect transactions for the Master Fund's account, the Investment Manager may agree to such commissions, fees and other charges on behalf of the Master Fund's account as it shall deem reasonable in the circumstances, taking into consideration all such factors as the Investment Manager deems relevant, including the following: price quotes; the size of the transaction; the nature of the market for the financial instrument; the timing of the transaction; difficulty of execution; the broker-dealer's expertise in the specific financial instrument or sector in which the Master Fund seeks to trade; the extent to which the broker-dealer makes a market in the financial instrument involved or has access to such markets; the broker-dealer's skill in positioning the financial instruments involved; the broker-dealer's promptness of execution; the broker-dealer's financial stability, reputation for diligence, fairness and integrity; quality of service rendered by the broker-dealer in other transactions for the Investment Manager and its respective affiliates; confidentiality considerations; the quality and usefulness of research services and investment ideas presented by the broker-dealer; the broker-dealer's willingness to correct errors; the broker-dealer's ability to accommodate any special execution or order handling requirements that may surround the particular transaction; and other factors deemed appropriate by the Investment Manager. The Investment Manager need not solicit competitive bids and does not have an obligation to seek the lowest available commission cost or spread. It is understood that the costs of such services will not necessarily represent the lowest costs available and that the Investment Manager is under no obligation to combine or arrange orders so as to obtain reduced charges.

(e)     At the request of a Client, in any wind down of such Client, the Investment Manager will manage the realization of the Client's assets and the distribution thereof to investors.

(f)     The General Partner, on behalf of the Domestic Fund and the Master Fund, agrees that the Investment Manager shall be entitled to all of the benefits of the Partnership Agreements applicable to it as a delegate of the General Partner, including, without limitation, the right to reimbursement of expenses provided under the Partnership Agreements and the right to indemnification provided under

Appx. 03434

the Partnership Agreements, and such sections are hereby incorporated by reference as if set forth in full herein; provided, however, this proviso shall not operate to provide duplicative amounts to any reimbursement or payment received pursuant to Sections 4 and 8 of this Agreement.

3.    **Management Fees.**

Pursuant to this Agreement, the Investment Manager is entitled to be paid management fees by the Master Fund, which shall be calculated with the methodology set out in the Master Fund Partnership Agreement.

4.    **Expenses.**

(a)    The Clients will pay, or will reimburse the Investment Manager, for all costs and expenses arising in connection with their administration and operations, including without limitation, the following expenses:

(i)    all investment-related expenses (including those related to identifying and evaluating contemplated investments, whether or not such contemplated investments are actually made), including, but not limited to, brokerage commissions and other transaction costs, expenses related to short sales, clearing and settlement charges, expenses related to proxies, underwriting and private placements, custodial fees, transfer agent fees, bank service fees, any governmental, regulatory, licensing, filing or registration fees incurred in compliance with the rules of any self-regulatory organization or any federal, state or local laws, consulting and any other professional fees or compensation (including investment banking expenses) relating to particular investments or contemplated investments, appraisal fees and expenses, investment-related travel and lodging expenses and research-related expenses (including, without limitation, news and quotation equipment and services), fees to third-party providers of risk-monitoring services, and investment and trading-related computer hardware and software, including, without limitation, trade order management software (i.e., software used to route trade orders);

(ii)    accounting (including accounting software), audit and tax preparation expenses;

(iii)    costs and expenses associated with reporting and providing information to existing and prospective investors;

(iv)    any legal fees and costs (including indemnification expenses, regulatory costs and settlement costs) arising in connection with any litigation or regulatory investigation instituted against any of the Clients, the General Partner, the Investment Manager or any of their respective affiliates in their capacity as such, subject to the indemnification provisions of the Partnership Agreements and Section 8 below;

(v)    any taxes imposed upon the Clients;

4

Appx. 03435

(vi)     costs of any meeting of investors (or of obtaining the consent of investors in lieu of meeting);

(vii)     expenses related to the Advisory Committee and the Pricing Committee;

(viii)     premiums for directors' and officers' liability insurance (if any) and any other insurance benefiting the Clients;

(ix)     administrative expenses (including, without limitation, the fees and expenses of any administration in relation to its services provided pursuant to an administration agreement);

(x)     fees relating to valuing the Clients' assets;

(xi)     expenses related to the maintenance of the Clients' registered offices;

(xii)     corporate licensing expenses;

(xiii)     extraordinary expenses; and

(xiv)     any costs or expenses of winding up and liquidating any of the Clients.

(b)     The Investment Manager will pay all of its own operating and overhead costs (except liability insurance and items described in Section 4(a)(iv) above) without reimbursement by the Clients, and any expenses arising in connection with the Investment Manager's services to the Clients, other than those specified in this Agreement to be the obligation of the Clients and the fees payable to the Investment Manager, shall be the responsibility of the Investment Manager.

(c)     The Investment Manager shall be entitled to reimbursement from the Clients for any of the expenses mentioned in Section 4(a) above paid by it on behalf of the Clients; provided that, the Investment Manager in its sole discretion may absorb any or all of such expenses incurred on behalf of the Clients. The Investment Manager may retain, in connection with its responsibilities hereunder, the services of others to assist in the investment advice to be given to the Master Fund, including, but not limited to, any affiliate of the Investment Manager, but payment for any such services shall be assumed by the Investment Manager and the Clients shall not have any liability therefor; *provided, however*, that the Investment Manager, in its sole discretion, may retain the services of independent third party professionals, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the Clients hereunder, and the Clients shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

(d)     If the Investment Manager shall incur any of the expenses mentioned in Section 4(a) above for the account of the Clients and any Other Accounts (as defined in Section 5(c) hereof), the Investment Manager will allocate such expense among the Clients and each such Other Account in proportion to the size of the

Appx. 03436

investment made by each in the activity or entity to which the expense relates, or in such other manner as the Investment Manager in its sole discretion considers fair and reasonable.

(a)     The Investment Manager is entitled to use "soft dollars" generated by the Master Fund to pay for certain investment research and brokerage services that provide lawful and appropriate assistance to the Investment Manager in the performance of investment decision-making responsibilities to the extent such use falls within the safe harbor afforded by Section 28(e) of the Securities Exchange Act of 1934, as amended, or is otherwise reasonably related to the investment decision-making process, or to cover certain Client expenses described in Section 4(a).  Use of "soft dollars" by the Investment Manager as described herein shall not constitute a breach by the Investment Manager of any fiduciary or other duty which the Investment Manager may be deemed to owe to the Clients.

5.     **Other Activities and Investments.**

(a)     The Investment Manager shall not be required to devote any specific amount of its time to the affairs of the Clients, but shall devote such of its time to the business and affairs of the Clients as it shall determine in good faith to be necessary to conduct the affairs of the Clients for the benefit of the Clients.

(b)     Each of the Clients agree that the Investment Manager, and any partner, director, officer, shareholder, member, affiliate or employee of the Investment Manager, may engage in or possess an interest in other business ventures or commercial dealings of every kind and description, independently or with others, including, but not limited to, management of other accounts, investment in, or financing, acquisition and disposition of, securities, investment and management counseling, brokerage services, serving as directors, officers, advisers or agents of other companies, partners of any partnership, or trustee of any trust, or entering into any other commercial arrangements, and will not be disqualified solely on the basis that any such activities may conflict with any interest of the parties with respect to the Clients.  Without in any way limiting the foregoing, each Clients hereby acknowledge that (i) none of the Investment Manager or its partners, directors, officers, shareholders, members, affiliates or employees shall have any obligation or responsibility to disclose or refer any of the investment or other opportunities obtained through activities contemplated by this Section 5 to the Clients, but may refer the same to any other party or keep such opportunities for their own benefit; and (ii) the Investment Manager and its partners, directors, officers, shareholders, members, affiliates and employees are hereby authorized to engage in activities contemplated by this Section 5 with, or to purchase, sell or otherwise deal or invest in investments issued by, companies in which the Investment Manager might from time to time invest or be able to invest or otherwise have any interest on behalf of the Clients, without the consent or approval of the Clients.

(c)     The Investment Manager shall act allocate investment opportunities to the Master Fund and any Other Account fairly and equitably over time.  "***Other Account***" means any assets or investment of the Investment Manager, or any assets managed by the Investment Manager or any affiliate of the Investment Manager

Appx. 03437

for the account of any person or entity (including investment vehicles) other than the Clients, which are invested or which are available for investment in securities or other instruments or for trading activities whether or not of the specific type being conducted by the Clients. The Investment Manager is under no obligation to accord exclusivity or priority to the Master Fund in the event of limited investment opportunities. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) whether the risk-return profile of the proposed investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (ii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (iii) liquidity requirements of the account; (iv) potentially adverse tax consequences; (v) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (vi) the need to re-size risk in the account's portfolio. The Investment Manager has the authority to allocate trades to multiple accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the Investment Manager may allocate the trades among different accounts on a basis it considers fair and equitable over time.

(d)   The principals of the Investment Manager, as well as the employees and officers thereof and of organizations affiliated with the Investment Manager, may buy and sell securities for their own account or the account of others, but may not buy securities from or sell securities to the Clients (such prohibition does not extend to the purchase or sale of limited partner interests or shares, as applicable, in any of the Clients) unless appropriate approval of the Advisory Committee is obtained and such purchase or sale is in compliance with the applicable provisions of the Investment Advisers Act of 1940, as amended (the "*Advisers Act*") or such purchase or sale is otherwise in compliance with the applicable provisions of the Advisers Act.

(e)   Each Client hereby waives, and covenants not to bring a cause of action in law or equity on the basis of, any law (statutory, common law or otherwise) respecting the rights and obligations of the Clients which is or may be inconsistent with this Section 5.

(f)   The Investment Manager and its affiliates reserve the right to establish collective investment vehicles that have stated investment programs or terms that differ from those of the Clients or that are targeted primarily to investors for which the Clients are not designed to be suitable investment vehicles. The Investment Manager and its affiliates also reserve the right to establish and provide management or advisory services pursuant to separate Other Accounts for significant investors, whether or not such accounts have the same investment program as the Clients.

7

6.      **Custody.**

The assets of the Clients shall be held in the custody of one or more qualified custodians (or other independent institutions performing the functions of custodian, with respect to the assets which are held by such institutions) selected by the Investment Manager.

7.      **Scope of Liability.**

None of the Investment Manager, nor any member, shareholder, partner, manager, director, officer, employee or agent of, or any person who controls, the Investment Manager, each of the respective affiliates of the foregoing, or any of the legal representatives of any of the foregoing (collectively, the "***Indemnified Persons***") will be liable to the Clients or any other person for mistakes of judgment or for action or inaction that did not constitute gross negligence, willful misconduct or bad faith, or for losses due to such mistakes, action or inaction or to the negligence, dishonesty or bad faith of any broker or agent of the Clients, provided that such broker or agent was selected, engaged or retained by the Indemnified Person in accordance with the standard of care set forth above.  No Indemnified Person shall be liable to the Clients or any other person for any amount in excess of the amount of Management Fees received by the Investment Manager, to the extent permitted under applicable law.  In addition, in no event shall any Indemnified Person be liable for any special, indirect, exemplary, consequential or punitive losses or damages.  An Indemnified Person may consult with counsel and accountants in respect of the Clients' affairs and will be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants, provided that they were selected in accordance with the standard of care set forth above.  The foregoing provisions, however, shall not be construed so as to provide for the exculpation of an Indemnified Person of any liability (including liability under U.S. Federal securities laws which, under certain circumstances, impose liability even on persons acting in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law (including liability under U.S. Federal securities laws which, under certain circumstances, impose liability even on persons acting in good faith), but shall be construed so as to effectuate the abovementioned provisions to the fullest extent permitted by law.

8.      **Indemnification.**

(a)     The Clients shall, to the fullest extent permitted by law, indemnify and hold harmless each Indemnified Person from and against any and all loss, cost or expense suffered or sustained by an Indemnified Person by reason of the fact that it, he or she is or was an Indemnified Person, including, without limitation, any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, suit or proceeding, provided that such liability, damage, loss, cost or expense resulted from a mistake of judgment on the part of an Indemnified Person or from action or inaction that did not constitute gross negligence, willful misconduct or bad faith, or from the negligence, dishonesty or bad faith of a broker or other agent of an Indemnified Person, provided that such broker or agent was selected, engaged or retained by the Indemnified Person in accordance with the standard of care set forth above.  Each of the Clients shall, in the sole discretion of the General Partner or the Directors, as applicable, advance to any Indemnified Person reasonable attorneys' fees and other costs and expenses incurred in connection

8

with the defense of any action, suit or proceeding which arises out of such conduct. In the event that such an advance is made by the Client(s), the Indemnified Person will agree to reimburse the Client(s) to the extent that it is finally determined that it was not entitled to indemnification in respect thereof.

(b) Notwithstanding any of the foregoing, the provisions of this Section 8 do not provide for the indemnification of any Indemnified Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the above provisions to the fullest extent permitted by law.

(c) Pursuant to the foregoing indemnification and exculpation provisions applicable to each Indemnified Person, the Clients (and not the applicable Indemnified Person) will be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence, bad faith or willful misconduct of any Indemnified Person.

(d) To the extent that the indemnity under this Section 8 inures for the benefit of the Investment Manager or of any Indemnified Person (whether existing or in the future) and for the benefit of any successor of the Investment Manager or any Indemnified Person, the General Partner, on behalf of the Master Fund, declares that it holds the benefit of that promise on trust for that person.

9. **Committees.**

(a) The Investment Manager may appoint a committee (the "*Advisory Committee*") consisting of one or more individuals selected by the Investment Manager, none of whom is affiliated with the Investment Manager (except as an investor in one of the Clients or an affiliate of the Clients). If established, the Advisory Committee will have the authority, at the request of the Investment Manager, to consult with the Investment Manager on any matters that may involve a conflict of interest between the Investment Manager (and its affiliates) on the one hand and the Clients on the other. The Advisory Committee may also grant approvals required under the Advisers Act or related to any other matter deemed appropriate by the Investment Manager. Any such approval given by the Advisory Committee is binding on the Clients. The Clients will have the authority to agree to reasonably compensate members of the Advisory Committee for their services and to agree to reimburse them for their out-of-pocket expenses and to indemnify them to the maximum extent permitted by law. In the event an Advisory Committee is not appointed, the Investment Manager may obtain the approval of an unaffiliated third party, as is determined advisable by the Investment Manager, and any such approval by such third party shall, to the extent permitted under applicable law, serve as the approval of the Advisory Committee and shall be binding on the Clients.

(b) The Investment Manager may appoint a committee (the "*Pricing Committee*") whose quorum consists of at least a majority of the following individuals: the

Appx. 03440

Chief Financial Officer of the Investment Manager, the Chief Compliance Officer of the Investment Manager and one or more traders of the Investment Manager. The Pricing Committee will meet on at least a monthly basis to review, confirm and agree on all pricing information established by the Investment Manager in respect of the Master Fund's assets that are fair valued or which the Investment Manager believes should require review. The final pricing or valuation of such Master Fund assets will require the approval of a majority in number of the members of the Pricing Committee constituting a quorum. In lieu of meeting, the Pricing Committee may take action by written consent signed by a majority of the committee members. The Pricing Committee may, at the Master Fund's expense, engage third-party experts and consultants to provide services in connection with any determination to be made by the Pricing Committee. The Investment Manager may replace members of the Pricing Committee or change the composition of the Pricing Committee, in its sole discretion.

10.     **Independent Contractor.**

For all purposes of this Agreement, the Investment Manager shall be an independent contractor and not an employee or dependent agent of the Clients, nor shall anything herein be construed as making the Clients a partner or co-venturer with the Investment Manager or any of its affiliates or Other Accounts. Except as provided in this Agreement, the Investment Manager shall have no authority to bind, obligate or represent the Clients.

11.     **Acknowledgement.**

The Clients certify and acknowledge to the Investment Manager that the Clients:

> (i)     have fully disclosed to potential investors the fee provisions and other arrangements relating to the Clients' accounts with the Investment Manager and are satisfied that the potential investors have received sufficient information from the Investment Manager to enable them to evaluate the terms of this Agreement; and

> (ii)    fully understand the method of compensation provided herein and its associated risks, and that such risks have been disclosed to potential investors.

12.     **Entire Agreement.**

This instrument, together with the Governing Documents, contains the entire agreement between the parties hereto relating to the subject matter hereof. No provision of this Agreement may be amended without the written consent of the Investment Manager and the Clients.

**Appx. 03441**

13.     **Amendment; Modification; Waiver.**

Except as otherwise expressly provided herein, this Agreement shall not be amended, nor shall any provision of this Agreement be considered modified or waived, unless evidenced by a writing signed by all parties hereto.

14.     **Binding Effect; Assignment.**

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors.  The rights and obligations hereunder shall not, except as otherwise expressly provided herein, be assignable, transferable or delegable by the Investment Manager without the written consent of the Clients, and any attempted assignment, transfer or delegation thereof without such consent shall be void.  The rights and obligations hereunder shall not, except as otherwise expressly provided herein, be assignable, transferable or delegable by the Clients without the written consent of the Investment Manager, and any attempted assignment, transfer or delegation thereof without such consent shall be void.  The Investment Manager agrees to notify the Clients in writing within thirty (30) days after any change in control of the Investment Manager.

15.     **Termination.**

This Agreement shall become effective on the date hereof and shall continue in effect until the earlier of the dissolution (or in the case of the Offshore Fund, the liquidation) of the Clients, or the termination by any of the Investment Manager, the Offshore Fund or the General Partner on behalf of the Domestic Fund or the Master Fund upon at least seventy-five (75) days' prior written notice.

16.     **Governing Law.**

This Agreement shall be governed by and construed in accordance with the substantive laws of the State of Delaware which are applicable to contracts made and entirely to be performed therein, without regard to the place of performance hereunder.

[Signature Page Follows]

11

**Appx. 03442**

The parties have executed this Agreement to be effective as of the day and year first above written.

**HIGHLAND CAPITAL LOAN FUND, L.P.**
By:    Highland Loan GP, LLC, its general partner
By:    Highland Capital Management, L.P., its sole member
By:    Strand Advisors, Inc., its general partner

By:
Name:    James D. Dondero
Title:    President

**HIGHLAND LOAN FUND, LTD.**

By:
Name:  Trey Parker
Title:   Director

**HIGHLAND LOAN MASTER FUND, L.P.**
By:    Highland Loan GP, LLC, its general partner
By:    Highland Capital Management, L.P., its sole member
By:    Strand Advisors, Inc., its general partner

By:
Name:    James D. Dondero
Title:    President

**HIGHLAND CAPITAL LOAN GP, LLC**
By:    Highland Capital Management, L.P., its sole member
By:    Strand Advisors, Inc., its general partner

By:
Name:    James D. Dondero
Title:    President

*Signature Page to Investment Management Agreement*

**Appx. 03443**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:    Strand Advisors, Inc., its general partner

By:    _____

Name:    James D. Dondero

Title:    President

*Signature Page to Investment Management Agreement*

**Memorandum Number _____**

# Confidential Private Offering Memorandum

*Shares*

*of*

# Highland Dynamic Income Fund, Ltd.

*Investment Manager*

## Highland Capital Management, L.P.

## April 2018

4255; 7296'x55

## **TABLE OF CONTENTS**

Rci g

PQVKEG.........................................................................................................kk

FKTGEVQT[..................................................................................................kk

GZGEWVKXG'UWOOCT[.............................................................................3

RPXGUVOGPV'RTQITCO..........................................................................4

OCPCIGOGPV.............................................................................................9

UWOOCT['QH'VGTOU.............................................................................34

UJCTGU'QH'VJG'HWPF................................................................................4;

VJG'OCUVGT'HWPF.....................................................................................55

TKUM'HCEVQTU'CPF'RQVGPVKCN'EQPHNKEVU'QH'RPVGTGUV...........................59

DTQMGTCIG'CPF'EWUVQF[........................................................................92

VCZ'EQPUKFGTCVKQPU..............................................................................95

GTKUC'CPF'QVJGT'TGIWNCVQT['EQPUKFGTCVKQPU..................................305

Appx. 03446

## NOTICE

This Confidential Private Offering Memorandum (this "***Memorandum***") is being furnished on a confidential basis solely to selected qualified investors for the purpose of enabling the recipient to evaluate an investment in Highland Dynamic Income Fund, Ltd. (the "***Fund***"). This Memorandum is not to be reproduced or distributed to others, at any time, without the prior written consent of the board of directors of the Fund. Each recipient agrees to keep confidential all information contained herein not already in the public domain and will use this Memorandum for the sole purpose of evaluating a possible investment in the Fund. Notwithstanding anything herein to the contrary, each investor (and each employee, representative, or other agent of the investor) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of an investment in the Fund and all materials of any kind (including opinions or other tax analyses) that are provided to the investor relating to such tax treatment and tax structure. Acceptance of this Memorandum by prospective investors constitutes an agreement to be bound by the foregoing terms.

Prospective investors should not construe the contents of this Memorandum as legal, tax or financial advice. Each prospective investor should consult its own professional advisors as to the legal, financial, tax, ERISA (as defined herein) or other matters relevant to the suitability of an investment in the Fund for such investor.

In making an investment decision, investors must rely on their own examination of the Fund and the terms of the offering contemplated by this Memorandum. The participating non-voting shares of the Fund (the "***Shares***") have not been recommended by any U.S. federal or state, or any non-U.S., securities commission or regulatory authority. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this Memorandum. Any representation to the contrary is a criminal offense.

Neither this Memorandum nor the Shares described herein have been qualified for offer, sale or distribution under the laws of any jurisdiction governing the offer or sale of mutual fund shares or other securities. This Memorandum does not constitute an offer to sell, or the solicitation of an offer to buy, any Shares in any state or other jurisdiction where, or to or from any person to or from whom, such offer or solicitation is unlawful or not authorized.

The Shares have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "***Securities Act***"), or the securities laws of any of the states of the United States, and the Fund has not been and will not be registered under the U.S. Investment Company Act of 1940, as amended. Direct or indirect acquisition or ownership of Shares by "***United States Persons***" (as defined in Annex A) without compliance with applicable U.S. securities laws or in contravention of the relevant provisions of the constituent documents of the Fund is prohibited. The offering and any potential sale contemplated by this Memorandum will be made in reliance upon an exemption from the registration requirements of the Securities Act for offers and sales of securities which do not involve any public offering and analogous exemptions under state securities laws. There will be no public market for the Shares, and there is no obligation on the part of any person to register the Shares under the Securities Act or any state securities laws.

Pursuant to an exemption from the Commodity Futures Trading Commission (the "***CFTC***"), Highland Capital Management, L.P., the investment manager to the Fund (the "***Investment Manager***"), is not registered with the CFTC as a commodity pool operator ("***CPO***") and therefore,

ii

Appx. 03447

unlike a registered CPO, is not required to deliver a disclosure document or a certified annual report to participants in this pool.  Among other things, the exemption requires the filing of a claim of exemption with the National Futures Association.  It is also required that at all times either: (a) the aggregate initial margin and premiums required to establish commodity interest positions does not exceed 5% of the liquidation value of the Fund's portfolio; or (b) the aggregate net notional value of the Fund's commodity interest positions does not exceed 100% of the liquidation value of the Fund's portfolio and further that all pool participants are required to be accredited investors or certain other qualified investors.  The Investment Manager qualifies for an exemption from registration as a commodity trading advisor pursuant to CFTC Rule 4.14(a)(8).

In each European Economic Area member state (each a "**Relevant Member State**") that has implemented Directive 2011/61/EU of the European Parliament and the Council of the European Union on Alternative Investment Fund Managers and applicable implementing legislation, including Commission Delegated Regulation (EU) No 231/2013 (the "**AIFMD**"), the Fund may only be offered to investors in accordance with local measures implementing AIFMD.  Investors, together with any relevant person making or assisting in the decision to invest in the Fund, who are situated, domiciled or who have a registered office, in a Relevant Member State where the Fund is not being offered pursuant to private placement rules implementing AIFMD may invest, or effect an investment in the Fund, but only in circumstances where they do so at their own initiative.  The Memorandum may only be issued to "Professional Clients" within the meaning of Directive 200439/EC on Markets in Financial Instruments. At the date hereof, the Investment Manager has not registered and does not intend to register the Fund for marketing in any Relevant Member State.  It may register the Fund in Relevant Member States in the future.

NO OFFER OR INVITATION TO SUBSCRIBE FOR SHARES MAY BE MADE TO THE PUBLIC IN THE CAYMAN ISLANDS.

Highland Dynamic Income Master Fund, L.P. (the "**Master Fund**") is not hereby offering any securities and accordingly this Memorandum is not to be regarded as having been authorised or issued by the Master Fund.  The Master Fund does not have an offering document or equivalent document.

Any information forwarded to the Fund by any potential shareholder will be treated on a confidential basis except that such information may be passed on to a relevant third party by the Fund where so required by law or regulation and each shareholder, upon subscribing for Shares, shall be deemed to have consented to such release of such confidential information pursuant to the terms of the Confidential Information Disclosure Law, 2016 of the Cayman Islands (as amended).

An investment in the Fund involves significant risk.  Potential investors should pay particular attention to the information in "*Risk Factors and Potential Conflicts of Interest*."  Investment in the Fund is suitable only for sophisticated investors and requires the financial ability and willingness to accept the high risks inherent in an investment in the Fund.  An investment in the Fund does not constitute a complete investment program.  No assurance can be given that the Fund's investment objectives will be achieved or that investors will receive a return of their capital.

The Shares are offered subject to the right of the Fund to reject any subscription in whole or in part.

This Memorandum does not purport to be, and should not be construed as, a complete description of the Fund's Memorandum of Association and Articles of Association, as may be

Appx. 03448

amended from time to time (together, the "*Articles of Association*") or the exempted limited partnership agreement, as may be amended from time to time (the "*Master Fund Partnership Agreement*"), of the Master Fund.  Each prospective investor in the Fund is encouraged to review the Articles of Association and the Master Fund Partnership Agreement carefully, in addition to consulting appropriate legal and tax advisors.  To the extent of any inconsistency between this Memorandum and the Articles of Association or the Master Fund Partnership Agreement, the terms of the Articles of Association or the Master Fund Partnership Agreement (as applicable) shall control.  A copy of the Master Fund Partnership Agreement is available upon request from the Investment Manager.

The Fund and the Master Fund are regulated under the Mutual Funds Law (2015 Revision) of the Cayman Islands (the "*Mutual Funds Law*").  The Cayman Islands Monetary Authority (the "*Authority*") has supervisory and enforcement powers to ensure compliance with the Mutual Funds Law.  Regulation under the Mutual Funds Law entails the filing of prescribed details and audited accounts annually with the Authority.  As a regulated mutual fund, the Authority may at any time instruct the Fund or the Master Fund to have its or their accounts audited and to submit them to the Authority within such time as the Authority specifies.  Failure to comply with these requests by the Authority may result in substantial fines on the part of the directors of the Fund or the Master Fund, as applicable, and may result in the Authority applying to the court to have the Fund or the Master Fund wound up.

Neither the Fund nor the Master Fund are, however, subject to supervision in respect of their investment activities or the constitution of the Master Fund's portfolio by the Authority or any other governmental authority in the Cayman Islands, although the Authority does have power to investigate the activities of the Fund and the Master Fund in certain circumstances. Neither the Authority nor any other governmental authority in the Cayman Islands has commented upon or approved the terms or merits of this document. There is no investment compensation scheme available to investors in the Cayman Islands.

The Authority may take certain actions if it is satisfied that a regulated mutual fund is or is likely to become unable to meet its obligations as they fall due or is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors.  The powers of the Authority include the power to require the substitution of the directors of the Fund or the Master Fund, to appoint a person to advise the Fund or the Master Fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of the Fund or the Master Fund, as the case may be.  There are other remedies available to the Authority including the ability to apply to court for approval of other actions.

The delivery of this Memorandum does not, under any circumstances, create any implication that there has been no change in the circumstances affecting the Fund or the Master Fund since the date hereof.  An amended or updated Memorandum will be provided to reflect any material changes to the information contained herein.

Certain information contained in this Memorandum constitutes "forward-looking statements," which can be identified by the use of forward-looking terminology such as "may," "will," "should," "expect," "anticipate," "project," "estimate," "intend," or "believe" or the negatives thereof or other variations thereon or comparable terminology.  Due to various risks and uncertainties, including those described in "*Risk Factors and Potential Conflicts of Interest*," actual events or results or the actual performance of the Fund may differ materially from those reflected or contemplated in such forward-looking statements.

Appx. 03449

All references herein to "$" refer to U.S. dollars.  All references to day, month, quarter and year are to calendar day, calendar month, calendar quarter and calendar year, unless otherwise specified or the context so requires.  Except as the context otherwise requires, references to the term "Fund" in this Memorandum shall be deemed to include the Master Fund.

v

## DIRECTORY

| | |
|---|---|
| **Registered Office** | Highland Dynamic Income Fund, Ltd.<br>PO Box 309, Ugland House<br>Grand Cayman, KY1-1104<br>Cayman Islands |
| **Investment Manager** | Highland Capital Management, L.P.<br>300 Crescent Court, Suite 700<br>Dallas, TX 75201 |
| **Administrator** | SEI Alternative Investment Fund Services<br>One Freedom Valley Drive<br>Oaks, PA 19456 |
| **Directors** | Mark Okada<br>Trey Parker |
| **Auditors** | PricewaterhouseCoopers LLP<br>Strathvale House<br>90 North Church Street<br>PO Box 258<br>Grand Cayman KY1-1104<br>Cayman Islands |
| **Custodian** | US Bank, N.A.<br>190 South LaSalle, 10th Floor<br>Chicago, Illinois 60603 |
| **Legal Counsel** | *In the United States:*<br>Akin Gump Strauss Hauer & Feld LLP<br>1700 Pacific Avenue<br>Suite 4100<br>Dallas, TX 75201<br><br>*In the Cayman Islands:*<br>Maples and Calder<br>PO Box 309, Ugland House<br>Grand Cayman, KY1-1104<br>Cayman Islands |

Appx. 03451

## EXECUTIVE SUMMARY

Highland Dynamic Income Fund, Ltd., a Cayman Islands exempted company with limited liability (the "***Fund***"), seeks to generate returns that exceed the S&P/LSTA Leveraged Loan Total Return Index[1] by investing all of its investable assets in Highland Dynamic Income Master Fund, L.P., a Cayman Islands exempted limited partnership (the "***Master Fund***"), which provides exposure to the broader bank loan market.

Highland Dynamic Income Fund GP, LLC, a Delaware limited liability company (the "***Master Fund GP***"), acts as general partner of the Master Fund and is registered as a foreign company in the Cayman Islands.  Highland Capital Management, L.P., a Delaware limited partnership (the "***Investment Manager***" and, together with its affiliates, shareholders, directors, members, partners, officers and employees, the "***Advisory Parties***"), serves as investment manager to the Fund and the Master Fund and manages the Master Fund's investment program.  Each of the Master Fund GP and the Investment Manager are ultimately controlled by James D. Dondero (the "***Principal***").

In order to facilitate investments by U.S. investors, the Investment Manager has sponsored the formation of Highland Dynamic Income Fund, L.P., a Delaware limited partnership of which the Master Fund GP also serves as the general partner  (the "***Domestic Fund***" and, together with the Fund, the "***Feeder Funds***").  The Feeder Funds place all of their investable assets in, and conduct all of their investment and trading activities in parallel through, the Master Fund.  References in this Memorandum to the Fund shall include the Master Fund, unless otherwise specified or the context so requires.

The Fund is seeking subscriptions for participating non-voting shares of the Fund (the "***Shares***") from eligible investors.  The minimum initial investment is $1,000,000, although the Fund may accept investments in a lesser amount, subject to an absolute minimum of $100,000, or such other sum as may be required from time to time by applicable law.  The Fund generally accepts subscriptions on the first business day of each month.

For its services to the Master Fund, the Investment Manager is generally entitled to a management fee (the "***Management Fee***"), which is calculated and paid quarterly in advance at the Master Fund level, and the Master Fund GP is entitled to an annual performance-based allocation, at the Master Fund level, essentially to the extent that the return of a Share (positive or negative) outperforms the hypothetical return of the capital account based on the S&P/LSTA Leveraged Loan Total Return Index for such year.  Please see "*Summary of Terms – Management Fee*" and "*Summary of Terms – Performance Allocation*."

A shareholder is generally permitted to redeem all or a portion of its Shares on 45 days' prior written notice on the last business day of each quarter.  Redemptions may be subject to reserves for contingencies, hold-back pending audit, gating and suspension restrictions as discussed further in this Memorandum.

The Fund may agree with certain shareholders to a variation of the terms set forth in this Memorandum or establish additional series of Shares that have terms that differ from those described herein, including, without limitation, different management fees and redemption rights.

---

[1] The S&P/LSTA Leveraged Loan Total Return Index (the "***Index***") is used only for purposes of calculating performance fees.  The Fund will not directly invest in the Index nor seek to replicate the Index, and there might or might not be a close correlation between the performance of the Fund and that of the Index.  The Index does not reflect the investment strategy of the Fund.

1

**Appx. 03452**

## INVESTMENT PROGRAM

### Investment Objective

The Fund's investment objective is to seek high current income and capital appreciation by maximizing risk-adjusted returns as measured against the S&P/LSTA Leveraged Loan Total Return Index.[2]

### Investment Strategy

The Master Fund's net assets will be invested and traded primarily in senior secured floating rate bank loans ("**Bank Loans**"), high yield debt securities and structured credit products denominated in U.S. dollars. The Master Fund's investments will be subject to the following restrictions:

(a)     a minimum of 50% (measured at the time of settlement) of the Master Fund's gross assets will be invested in loans, and no more than 5% (measured at the time of settlement) of the Master Fund's gross assets will be invested in a single loan instrument;

(b)     no more than 50% (measured at the time of settlement) of the Master Fund's gross assets will be invested in collateralized loan obligations ("**CLO**" or "**CLO Securities**") and structured credit products, and no more than 5% (measured at the time of settlement) of the Master Fund's gross assets will be invested in a single CLO issuer;

(c)     no more than 10% (measured at the time of settlement) of the Master Fund's gross assets will be invested in high yield bonds;

(d)     no more than 10% (measured at the time of settlement) of the Master Fund's gross assets will be invested in equity securities, which equity securities are primarily issued in connection with a reorganization or restructuring of a borrower or debt positions of the Master Fund that convert into equity securities ("**Re-Org Equities**");

(e)     the top 3 industries in which the Master Fund holds positions will comprise no more than 50% (measured at the time of settlement) of the Master Fund's gross assets, and no more than 20% (measured at the time of settlement) of the Master Fund's gross assets will be invested in a single industry; and

(f)     the minimum weighted average rating of the Master Fund's entire portfolio will be B+, the minimum weighted average rating of the Master Fund's holdings that are loans will be B, and the minimum weighted average rating of the Master Fund's holdings that are CLOs will be BB (in each case, measured at the time of settlement).

### Bank Loans

Bank Loans represent amounts borrowed by corporate entities from banks and other lenders. In many cases, they are issued in connection with recapitalizations, acquisitions, leveraged buyouts and refinancings. Most, if not all, of the Bank Loans in which the Master Fund invests will have a below

---

[2] The S&P/LSTA Leveraged Loan Total Return Index (the "**Index**") is used only for purposes of calculating performance fees. The Fund will not directly invest in the Index nor seek to replicate the Index, and there might or might not be a close correlation between the performance of the Fund and that of the Index. The Index does not reflect the investment strategy of the Fund.

Appx. 03453

investment-grade credit rating or will not be rated by a major credit rating agency. The Bank Loans in which the Master Fund invests are often referred to as "leveraged loans" because the borrowing companies have significantly more debt than equity.

Bank Loans have the highest seniority within a borrower's capital structure. Therefore, in the event of a bankruptcy, holders of Bank Loans are typically paid (to the extent assets are available) before certain other creditors, such as bond and equity holders. Bank Loan maturities typically range from 5 to 8 years, although loan prepayments and refinancings generally result in effective average lives of approximately 3 years depending on market conditions.

Bank Loans generally pay interest at rates that are determined periodically by reference to a base lending rate plus a premium. These rates often are re-determined daily, monthly, quarterly or semi-annually. As a result, the Investment Manager believes the Master Fund should experience less sensitivity to changes in market interest rates and lower volatility than if the Master Fund invested exclusively in fixed rate obligations.

The Bank Loan market has grown significantly in recent years, as investors have been drawn into the market by the advantageous characteristics of Bank Loans, which include floating interest rates, senior secured status, lower volatility, growing liquidity, greater control over an issuer in times of stress, and lower correlation with other asset classes.

*Collateralized Loan Obligations*

An investment in CLO tranches represents varying levels of exposure primarily to credit performance of the underlying assets (i.e., bank loans, which comprise the primary asset class of the Master Fund's portfolio) and is characterized by a combination of expected significant current cash flow as well as the opportunity for positive returns through long-term gains on the underlying portfolios. Investments in CLO Securities often have a relatively short expected duration (usually less than 10 years), as a typical CLO distributes excess cash flows quarterly or semi-annually concurrent with the payment of interest on its liabilities subject to compliance with overall collateral quality tests and other performance criteria.

*High Yield Bonds*

The price and yield of lower-quality (high yield, high-risk) bonds, commonly referred to as "junk bonds," can be expected to fluctuate more than the price and yield of higher-quality bonds. Because these bonds are rated below BBB or are in default, they are regarded as predominantly speculative with respect to the issuer's continuing ability to meet principal and interest payments. Successful investment in lower-medium- and low-quality bonds involves greater investment risk and is highly dependent on the Advisory Parties' credit analysis. A real or perceived economic downturn could cause a decline in high yield bond prices by lessening the ability of issuers to make principal and interest payments. These bonds can be more difficult to sell and value accurately than high-quality bonds. Because objective pricing data may be less available, judgment may play a greater role in the valuation process. In addition, the entire high yield bond market can experience sudden and sharp price swings due to a variety of factors, including changes in economic forecasts, stock market activity, large or sustained sales by major investors, a high-profile default, or just a change in the market's psychology. This type of volatility is usually associated more with stocks than bonds, but junk bond investors should be prepared for it.

*Reorganization Equities*

3

Re-Org Equity refers to equity securities that are issued in connection with a reorganization or restructuring of a borrower, including both registered and non-registered securities under Section 12 of the Securities Exchange Act of 1934 and therefore are not traded on an exchange or inter-dealer quotation system, and debt positions of the Master Fund that convert into equity securities. The Master Fund may receive Re-Org Equities as a loan marker participant and/or trade such securities on a stand-alone basis.

*Cash Positions and Money Market Instruments*

From time to time, subject to the investment limitations set forth above, the Investment Manager may maintain cash positions and invest some of the Master Fund's assets in short-term U.S. Government obligations, certificates of deposit, commercial paper and other money market instruments. A greater percentage of Master Fund assets may be invested in such obligations if the Investment Manager believes that a defensive position is appropriate because of expected economic or business conditions or the outlook for security prices. From time to time, in the sole discretion of the Investment Manager, cash balances in the Master Fund's brokerage account may be placed in a money-market fund or other cash equivalents.

*Derivative Transactions*

The Master Fund may enter into derivative transactions, including options, futures, credit default swaps and other derivatives transactions to hedge the market risk or express market views of its portfolio.

*Foreign Investments*

Although the Investment Manager intends to focus primarily on the U.S. marketplace, it may invest in dollar-denominated securities of foreign issuers or loans of foreign borrowers. Investing in foreign securities and loans of foreign borrowers involve special risks that can increase the potential for losses. These include exposure to potentially adverse local, political, and economic developments such as war, political instability, hyperinflation, currency devaluations, and overdependence on particular industries; government interference in markets such as nationalization and exchange controls, expropriation of assets, or imposition of punitive taxes; potentially lower liquidity and higher volatility; possible problems arising from accounting, disclosure, settlement, and regulatory practices and legal rights that differ from U.S. standards; and the chance that fluctuations in foreign exchange rates will decrease the investment's value (favorable changes can increase its value). In addition, information with respect to foreign borrowers may differ from that available for U.S. borrowers because foreign companies are not generally subject to accounting, auditing and financial reporting standards, practices and requirements comparable to those applicable to U.S. borrowers. These risks are heightened for investments in emerging markets.

## Risk Management and Hedging Activity

*Risk Management*

Risk management is integrated into all levels of the investment process, from due diligence to portfolio construction and management to ongoing monitoring. The process addresses factors including credit risk, liquidity risk and volatility risk. The Investment Manager conducts extensive position and portfolio monitoring activities on a daily basis. Portfolio risk is reviewed using internally generated daily, weekly and monthly reports which measure transaction compliance including metrics

**Appx. 03455**

such as portfolio concentrations or required test scores, as well as compliance with evolving internal positioning targets. Individual position risk is monitored in a number of ways, including the extensive proprietary intranet system (Highland Online Management Engine or "*HOME*"), which pulls together data from our various data providers (Wall Street Office, LPC, Moody's, S&P, MarkIt, S&P LCD, CSFB Index) to provide a comprehensive portfolio/risk management system. The system allows the Investment Manager to monitor metrics at any level of aggregation (instrument, issuer, portfolio, fund and across the platform). Additionally, the system is designed to be scalable with flexibility to enable future data inputs and reporting requirements.

For both CLOs and for the underlying loans, the HOME intranet system allows the Investment Manager to monitor portfolios on a real-time, ongoing basis by receiving alerts showing positions with the largest daily/weekly/monthly mark change, as well as alerts on downgrades/upgrades and when the Investment Manager has changed the opinion on a broadly syndicated loan. The Investment Manager monitors existing positions by receiving monthly Trustee Reports and other data feeds to track the ongoing metrics of each particular investment, looking for trends and comparing current deal statistics to original expectations when the investment was made.

Certain of the Investment Manager's employees meet every morning to discuss current events in the market and meet weekly and monthly to take detailed looks at current economic data and leading indicators such as jobless claims and consumer expectations, consumer confidence, employment, industrial production and manufacturing, inflation, business conditions/confidence, construction/housing and commodity prices. The Investment Manager also determines risk-on/risk-off parameters, which allow it to adjust holdings and exposures accordingly.

*Hedging Activity*

The Investment Manager may, from time to time, employ its differentiated and sophisticated quasi-systematic hedging programs for the Master Fund. Such hedging programs may be customized for the Master Fund and may employ derivatives to partially or fully hedge the following risks:

- Tail Risk – The risk that the Master Fund's portfolio value declines by 2 standard deviations or more over a 1-month period.

- Systematic Risk – Undiversifiable risk of the Master Fund's portfolio.

- Catalyst/Event Risk – The risk that a catalyst or an event results in losses to the Master Fund's portfolio.

- Currency Risk – The downside sensitivity of the Master Fund's portfolio value to changes in exchange rates.

- Interest Rate Risk – The downside sensitivity of the Master Fund's portfolio value to changes in interest rates.

- Credit Risk – The downside sensitivity of the Master Fund's portfolio value.

The Investment Manager may employ derivative instruments to structure a "net" buyer of protection profile for the Master Fund. The Investment Manager classifies the risks arising from the use of derivatives into the following categories:

5

- Delta – The change in value of the derivative instrument due to a unit change in the underlying security.

- Gamma – The change in the delta due to a unit change in the underlying security.

- Vega – The change in value of the derivative instrument due to a unit change in volatility.

- Theta – The change in value of the derivative instrument due to the passage of time.

- Rates DV01 – The change in value of the derivative instrument due to a 1 basis point increase in interest rates.

- Credit DV01 – The change in value of the derivative instrument due to a 1 basis point increase in credit spreads.

The Investment Manager may monitor these risks associated with the use of derivative instruments on a real-time basis.  In addition, the Investment Manager may perform scenario analyses on such derivative instruments to assess the payouts for market fluctuations up and down.  The Investment Manager also may monitor such scenarios on a real-time basis.

Although the Investment Manager expects to maintain a diversified portfolio of investments, it does not intend to limit itself to any one particular investment theme or asset class.

*The investment objectives and methods summarized above represent the Investment Manager's current intentions.  The foregoing discussion includes and is based upon numerous assumptions and opinions of the Investment Manager concerning world financial markets and other matters, the accuracy of which cannot be assured.  There can be no assurance that the Fund's investment strategy will achieve profitable results.*

Appx. 03457

# MANAGEMENT

**The Master Fund GP and the Investment Manager**

Highland Dynamic Income Fund GP, LLC, a Delaware limited liability company (the "***Master Fund GP***"), acts as the general partner of the Master Fund and is registered as a foreign company in the Cayman Islands.

Highland Capital Management, L.P., a Delaware partnership (the "***Investment Manager***"), serves as the investment manager of the Fund and the Master Fund and has responsibility for the Master Fund's investment program.

Each of the Master Fund GP and the Investment Manager are ultimately controlled by James D. Dondero (the "***Principal***").

**The Investment Management Agreement**

The Investment Manager was appointed as the investment manager to the Fund, the Domestic Fund and the Master Fund pursuant to an investment management agreement (the "***Investment Management Agreement***"). Under the Investment Management Agreement, the Investment Manager has full discretion to invest the assets of the Master Fund in pursuit of the investment objective and strategy described in this Memorandum. **For its services, the Investment Manager is entitled to the management fee as well as reimbursement for any Fund or Master Fund expenses incurred by the Investment Manager.**

**The Investment Management Agreement provides that, in the absence of gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or bad faith, each of the Investment Manager, its members, shareholders, partners, managers, directors, officers, employees or agents, any person who controls the Investment Manager, each of the respective affiliates of the foregoing, and any of the legal representatives of any of the foregoing, will be indemnified by the Fund, the Domestic Fund and/or the Master Fund, to the extent permitted by law, against any loss or liability incurred by any of such persons in performing their duties under the Investment Management Agreement.**

**Key Investment Personnel**

The key investment professionals of the Investment Manager who will be responsible for the Master Fund's investments are described below.

**Mark Okada, CFA, *Co-Founder*, *Chief Investment Officer***

Mark Okada is Co-founder and Chief Investment Officer of Highland Capital Management, L.P., a Dallas-based alternative investment firm with approximately $15 billion in assets under management. In his role, Mr. Okada oversees Highland's broad investment activities for both the institutional and retail investment platforms, which include hedge funds, separate accounts, special situation private equity, collateralized loan obligations (CLOs), mutual funds, and ETFs. He also remains portfolio manager of the Highland Floating Rate Opportunities Fund. With more than 30 years of experience in credit markets, Mr. Okada is widely regarded as an industry innovator in alternative credit investing; he is responsible for structuring one of the industry's first non-bank CLOs and is a

Appx. 03458

pioneer in the development of the bank loan market. Mr. Okada is on the board of directors at NexBank Capital, Inc., a Dallas-based financial services company. He received a B.A. in both economics and psychology, cum laude, from the University of California, Los Angeles and has earned the right to use the Chartered Financial Analyst (CFA) designation. Mr. Okada is a regular guest on Bloomberg Television and CNBC, and is frequently quoted in the financial and business press. He is also devoted to a number of philanthropic and civic causes with a particular focus on education, faith-based service, and Japanese-American relations. He is chairman of the board of directors of Education Is Freedom, a Dallas-based nonprofit that provides college preparatory services for underserved students. Mr. Okada is also chairman of the board for Common Grace Ministries, Inc. and is a board member of the Japanese Evangelical Missionary Society. Additionally, he serves on the executive board of Dedman College Humanities and Sciences at Southern Methodist University and is a council leader at the U.S.-Japan Council.

**Trey Parker,** *Co-Chief Investment Officer, Partner, Portfolio Manager*

Trey Parker is a Partner and Co-Chief Investment Officer at Highland Capital Management, L.P. Prior to his current role, Mr. Parker was responsible for managing the Credit Team/Platform; he also worked as a Managing Director covering a number of the industrial verticals, as well as parts of tech, media and telecom; he started his tenure at Highland as a Senior Portfolio Analyst on the Distressed & Special Situations investment team. Prior to joining Highland in March 2007, Mr. Parker was a Senior Associate at Hunt Special Situations Group, L.P., a Private Equity group focused on distressed and special situation investing. Mr. Parker was responsible for sourcing, executing and monitoring control Private Equity investments across a variety of industries. Prior to joining Hunt in 2004, Mr. Parker was an analyst at BMO Merchant Banking, a Private Equity group affiliated with the Bank of Montreal. While at BMO, Mr. Parker completed a number of LBO and mezzanine investment transactions. Prior to joining BMO, Mr. Parker worked in sales and trading for First Union Securities and Morgan Stanley. Mr. Parker received an MBA with concentrations in Finance, Strategy and Entrepreneurship from the University of Chicago Booth School of Business and a BA in Economics and Business from the Virginia Military Institute. Mr. Parker serves on the Board of Directors of Euramax Holdings, Inc., TerreStar Corporation, JHT Holdings, Inc., and a non-profit organization, the Juvenile Diabetes Research Foundation (Dallas chapter).

**Jon Poglitsch, CFA,** *Managing Director, Head of Credit Research*

Jon Poglitsch is a Managing Director and Head of Credit Research at Highland Capital Management, L.P. His previous roles at Highland include Managing Director, Senior Portfolio Analyst and Director on both the Institutional and Retail research teams. Prior to joining Highland in September 2007, Mr. Poglitsch was a consultant for Muse Stancil and Co., where he provided mergers & acquisition, valuation, and strategic advisory services to a variety of clients in the energy sector, including integrated oil, pipeline, power, and renewable fuel companies. Prior to Muse, Mr. Poglitsch was a senior financial analyst for American Airlines. He received an MBA with a concentration in Finance from the University of Texas at Austin and a BS in Chemical Engineering from the University of Oklahoma. Mr. Poglitsch is a holder of the right to use the Chartered Financial Analyst designation.

**Neil Desai,** *Managing Director*

Mr. Desai is a Managing Director and Portfolio Manager at Highland Capital Management, L.P. He is responsible for CLO trading, portfolio management, and risk management of over $1bn in CLO securities across the firm's hedge funds, mutual funds and separate accounts. Prior to joining

Highland in 2015, Mr. Desai was a Director in Pfizer Inc.'s Treasury organization where he built and ran Pfizer's structured products business. Prior to Pfizer, Mr. Desai spent several years structuring and trading various structured products at Credit Suisse, Barclays Capital, and its spin-off hedge fund, C12 capital. Mr. Desai received both a Bachelor's and Master's degree in Computer Science & Electrical Engineering from MIT.

**Other Key Investment Manager Personnel**

**James Dondero, CFA, CMA,** *President, Co-Founder*

James Dondero is Co-founder and President of Highland Capital Management, L.P. Mr. Dondero has over 30 years of experience in the credit and equity markets, focused largely on high-yield and distressed investing. Under Mr. Dondero's leadership, Highland has been a pioneer in both developing the collateralized loan obligation (CLO) market and advancing credit-oriented solutions for institutional and retail investors worldwide. Highland's product offerings include institutional separate accounts, CLOs, hedge funds, private equity funds, mutual funds, REITs, and ETFs.

Mr. Dondero is the Chairman and President of NexPoint Residential Trust, Inc. (NYSE:NXRT), is Chairman of NexBank Capital, Inc., Cornerstone Healthcare Group Holding, Inc., and CCS Medical, Inc., and a board member of Jernigan Capital, Inc. (NYSE:JCAP), and MGM Holdings, Inc. He also serves on the Southern Methodist University Cox School of Business Executive Board.

A dedicated philanthropist, Mr. Dondero actively supports initiatives in education, veterans' affairs, and public policy.

Prior to founding Highland in 1993, Mr. Dondero was involved in creating the GIC subsidiary of Protective Life, where as Chief Investment Officer he helped take the company from inception to over $2 billion between 1989 and 1993. Between 1985 and 1989, Mr. Dondero was a corporate bond analyst and then portfolio manager at American Express. Mr. Dondero began his career in 1984 as an analyst in the JP Morgan training program.

Mr. Dondero graduated from the University of Virginia where he earned highest honors (Beta Gamma Sigma, Beta Alpha Psi) from the McIntire School of Commerce with dual majors in accounting and finance. He has received certification as a Certified Public Accountant (CPA) and a Certified Managerial Accountant (CMA) and has earned the right to use the Chartered Financial Analyst (CFA) designation.

**Hunter Covitz, CFA,** *Head of Structured Products*

Mr. Covitz is Head of Structured Products and Portfolio Manager at Highland Capital Management, L.P. He is responsible for all CLOs and CLO investments managed by Highland. Mr. Covitz serves on Highland's investment committee and leads the structured products investment team. Since joining Highland in 2003, Mr. Covitz has been instrumental in the structuring, warehousing, ramping, and ongoing portfolio management of over 30 Highland-originated CLOs. Prior to joining Highland, Mr. Covitz served as a tax consultant at Deloitte & Touche and KBA Group LLP, where he focused on high-net worth individuals and middle-market companies. He received both his MS and BBA in Accounting from the University of Oklahoma, where he played baseball. Mr. Covitz is a licensed Certified Public Accountant.

**Appx. 03460**

**Advisory Committee**

The Master Fund GP and/or the Investment Manager may appoint a committee (the "*Advisory Committee*") consisting of one or more individuals selected by the Master Fund GP and/or the Investment Manager, none of whom is affiliated with the Master Fund GP or the Investment Manager (except as an investor in the Fund or an affiliate of the Fund). If established, the Advisory Committee will have the authority, at the request of the Master Fund GP and/or Investment Manager, to consult with the Master Fund GP and/or Investment Manager on any matters that may involve a conflict of interest between the Investment Manager (and its affiliates) on the one hand and the shareholders and the Fund on the other. The Advisory Committee may also grant approvals required under the Advisers Act or related to any other matter deemed appropriate by the Investment Manager. Any such approval given by a majority of the members of the Advisory Committee is binding on the Fund and the shareholders. Meetings of the Advisory Committee may be held in person or by telephone. The Fund will have the authority to agree to reasonably compensate members of the Advisory Committee for their services and to agree to reimburse them for their out-of-pocket expenses and to indemnify them to the maximum extent permitted by law.

**Pricing Committee**

The Master Fund GP and/or the Investment Manager may appoint a committee (the "*Pricing Committee*") consisting of the following individuals: the Chief Financial Officer of the Investment Manager, the Chief Compliance Officer of the Investment Manager and one or more traders of the Investment Manager. The Pricing Committee will meet on at least a monthly basis to review, confirm and agree on all pricing information established by the Investment Manager in respect of the Master Fund's assets that are fair valued. The final pricing or valuation of such assets will require the approval of a majority in number of the members of the Pricing Committee constituting a quorum. In lieu of meeting, the Pricing Committee may take action by written consent signed by a majority of the committee members. The Pricing Committee may, at the Master Fund's expense, engage third-party experts and consultants to provide services in connection with any determination to be made by the Pricing Committee. The Master Fund GP and/or the Investment Manager may replace members of the Pricing Committee or change the composition of the Pricing Committee in its sole discretion.

**Board of Directors**

The Fund's board of directors (the "*Board of Directors*") currently consists of two directors (each, a "*Director*" and, collectively, the "*Directors*"). The current members of the Board of Directors are Mark Okada and Trey Parker. The biographies of Mark Okada and Trey Parker are set forth above.

**The Administrator and Administration Agreement**

The Master Fund has entered into an Administration Agreement (the "*Administration Agreement*"), with SEI Global Services, Inc. (the "*Administrator*") pursuant to which the Administrator performs certain administrative and accounting services for the Fund and the Master Fund, subject to the oversight and control of the Investment Manager. SEI Investments Global (Cayman), Limited ("*SEI Cayman*"), an affiliate of the Administrator, will also be a party to the Administration Agreement in a limited capacity pursuant to which SEI Cayman provides certain investor servicing and transfer agency services (including anti-money laundering services) directly to the Fund.

Pursuant to the Administration Agreement, the Administrator is responsible, under the overall supervision of the Investment Manager, for certain matters pertaining to the day-to-day administration of the Fund including, but not limited to: (a) maintaining books and records related to Fund and Master Fund cash and position reconciliations, and portfolio transactions; (b) preparation of financial statements and other reports for the Fund and the Master Fund; (c) calculating the net asset value of the Master Fund (in accordance with the Investment Manager's valuation policies and procedures); (d) preparing certain reports to investors; (e) calculating fees payable or allocable to the Investment Manager (as applicable); (f) reviewing Subscription Documents and withdrawal requests and performing various other transfer agency and investor services; and (g) performing certain other administrative and clerical services in connection with the administration of the Fund and the Master Fund pursuant to the terms of the Administration Agreement. For purposes of determining net asset value, the Administrator will follow the valuation policies and procedures adopted by the Master Fund and the Investment Manager.

The fees payable to the Administrator will be based on the schedule of fees charged by the Administrator and as detailed in the Administration Agreement. The Master Fund may elect to terminate the Administration Agreement (in accordance with the terms thereof) and enter into a new agreement with a new administrator on behalf of the Master Fund and the Fund, in its discretion and on such terms as it deems advisable, without prior notice to, or approval of, investors.

The Administration Agreement provides that the Administrator may delegate some or all of its administrative functions on behalf of the Fund to one or more third parties, and also provides for certain limitations of the Administrator's liability and indemnification of the Administrator by the Fund.

The Administrator does not have a direct contractual relationship with the investors. The Administrator, however, has entered into a contractual relationship with the Fund in relation to the performance of the services described herein. The Fund will enforce its contractual rights with respect to the Administrator as necessary to protect the interests of the Fund (and, therefore, the interest of investors).

The Administrator in no way acts or will act as guarantor or offeror of interests in the Fund or any underlying investment, nor will it be responsible for the actions of the Fund's sales agents, its brokers, its custodians, any other brokers or the Investment Manager. The Administrator will not be responsible for any trading decisions of the Investment Manager or the Master Fund. The Administrator will not be responsible in any way for the Master Fund's selection or ongoing monitoring of its brokers, custodians or other counterparties. The decision to select any counterparties on behalf of the Master Fund will be made solely by the Investment Manager.

THE ADMINISTRATOR WILL NOT PROVIDE ANY INVESTMENT ADVISORY OR INVESTMENT MANAGEMENT SERVICES TO THE FUND AND, THEREFORE, WILL NOT BE IN ANY WAY RESPONSIBLE FOR THE FUND'S PERFORMANCE. THE ADMINISTRATOR WILL NOT BE RESPONSIBLE FOR MONITORING ANY INVESTMENT RESTRICTIONS OR COMPLIANCE WITH ANY INVESTMENT RESTRICTIONS APPLICABLE TO THE FUND AND THEREFORE WILL NOT BE LIABLE FOR ANY BREACH THEREOF.

## SUMMARY OF TERMS

*The following Summary of Terms summarizes the principal terms governing an investment in the Fund, and is subject, and qualified in its entirety by reference, to the Fund's Articles of Association, the Master Fund Partnership Agreement and the Fund's subscription documents (the "**Subscription Documents**"). This summary is intended to be brief and does not purport to provide a comprehensive explanation of the Articles of Association, the Master Fund Partnership Agreement and the Subscription Documents. Accordingly, statements made in this Memorandum are subject to the detailed provisions of those agreements. Prospective investors are urged to review those agreements in their entirety prior to determining whether to invest in the Fund.*

| | |
|---|---|
| **The Fund** | Highland Dynamic Income Fund, Ltd. (formerly known as Highland Capital Loan Fund, Ltd.) an exempted company incorporated in the Cayman Islands with limited liability (the "**Fund**"), primarily seeks to maximize risk adjusted absolute returns, and secondarily seeks to preserve capital by investing all of its investable assets in Highland Dynamic Income Master Fund, L.P., a Cayman Islands exempted limited partnership (the "**Master Fund**"), which provides exposure to the broader bank loan market. |
| **Master Fund GP** | Highland Dynamic Income Fund GP, LLC, a Delaware limited liability company (the "**Master Fund GP**"), acts as the general partner of the Master Fund and is registered as a foreign company in the Cayman Islands. James D. Dondero (the "**Principal**") ultimately controls the Master Fund GP. |
| **Investment Manager** | Highland Capital Management, L.P., a Delaware limited partnership controlled by the Principal (the "**Investment Manager**"), serves as investment manager to the Fund and the Master Fund and has responsibility for the Master Fund's investments. |
| **Directors** | The Fund's board of directors (the "**Board of Directors**") currently consists of two directors (each, a "**Director**" and, collectively, the "**Directors**"). The current members of the Board of Directors are Mark Okada and Trey Parker. The Directors are responsible for the overall management and control of the Fund in accordance with its Articles of Association; however, the Directors have delegated the day-to-day operation of the Fund to service providers, including the Investment Manager and the Administrator. References herein to the "Board of Directors" shall mean the Board of Directors acting in consultation with the Investment Manager. |
| **Master-Feeder Structure** | In order to facilitate investments by U.S. investors, the Master Fund GP has sponsored the formation of Highland Dynamic Income Fund, L.P., a Delaware limited partnership (the "**Domestic Fund**" and, together with the Fund, the "**Feeder Funds**"). The Feeder Funds place all of their investible assets in, and conduct all of their investment and trading activities in parallel through, the Master Fund. Accordingly, references herein to the investment activity of the Fund should be construed to refer to the Fund's investment activities through the Master Fund. The Feeder |

12

**Appx. 03463**

Funds share all items of profit, loss, income and expense of the Master Fund on a *pro rata* basis in accordance with their respective capital account balances in the Master Fund.  Except as the context otherwise requires, the term "Fund" also includes the Master Fund.

The Investment Manager or an affiliate may also sponsor one or more additional investment funds or accounts.

**Eligible Investors**  Participating non-voting shares of the Fund (the "***Shares***") may be purchased only by eligible investors.  Subscribers will be required to complete the Fund's Subscription Documents consisting of the subscription agreement and the subscriber information form to determine their eligibility.  The Board of Directors reserves the right to reject any investor for any reason or for no reason in its sole discretion.

No Shares may be offered to the public in the Cayman Islands.  Shares may be purchased only by eligible investors who are sophisticated individual or institutional investors.  Each subscriber for Shares must certify that the beneficial owner of such Shares will not be a United States Person (as defined in Appendix A); provided, however, that subscriptions for Shares may also be accepted from certain qualified U.S. tax-exempt organizations.

An investment in the Fund is suitable only for persons that have adequate means of providing for their current needs and personal contingencies and have no need for liquidity in their investments.  An investment in the Fund should not be made by any person that (a) cannot afford a total loss of its principal, or (b) has not carefully read or does not understand this Memorandum, including the portions concerning the risks and the income tax consequences of an investment in the Fund.

**Series of Shares**  The Fund may create and offer various classes or series of Shares with different terms and conditions than those described in this Memorandum, including, without limitation, fees, performance allocations and redemption rights.  New classes or series of Shares may be established by the Board of Directors without notice to or approval of the shareholders.

**Share Sub-Series**  Shares are offered in a separate series to each shareholder on each subscription date (each, a "***Sub-Series***") at $1,000 per Share. The Fund issues Shares as a separate Sub-Series for the purposes, among others, of accounting for any profits and losses attributable to each individual shareholder to reflect different returns achieved as a result of subscriptions received from shareholders at different times in order to calculate the Performance Allocation (as defined below) at the Master Fund level.  Each separate Sub-Series of Shares will be identified and referable to each shareholder.

**Appx. 03464**

| | |
|---|---|
| **Subscriptions** | Subscriptions for Shares may be accepted as of the first Business Day of each month and/or such other days as the Board of Directors may determine from time to time, generally subject to the receipt of cleared funds on or before the acceptance date. The initial minimum investment is $1,000,000, although the Fund may accept investments in a lesser amount, subject to an absolute minimum of $100,000 or such other amount as may, from time to time, be prescribed by the Mutual Funds Law or other applicable law. |
| | "***Business Day***" is defined as any day on which commercial banks are open in New York City and the Cayman Islands, or such other day as the Board of Directors may determine from time to time. |
| | All subscriptions for Shares will be subject to applicable anti-money laundering regulations. As part of the Fund's responsibility to comply with regulations aimed at the prevention of money laundering, the Board of Directors or its delegate may require verification of identity from all prospective investors. Depending on the circumstances of each subscription, it may not be necessary to obtain full documentary evidence of identity. |
| | Where a subscription for Shares is accepted, the Shares will be treated as having been issued with effect from the relevant subscription date notwithstanding that the subscriber for those Shares may not be entered in the Fund's register of members until after the relevant subscription date. The subscription monies paid by a subscriber for Shares will accordingly be subject to investment risk in the Fund from the relevant subscription date. |
| **Placement Agents** | There will be no sales charge payable by or to the Fund in connection with the offering of Shares. However, the Investment Manager may enter into arrangements with placement agents (which may include its affiliates) to solicit investors in the Fund, and such arrangements, may provide for the compensation of such placements agents for their services at the Investment Manager's expense. |
| | Accordingly, investors should recognize that a placement agent's or distributor's participation in this offering may be influenced by its interest in such current or future fees and compensation. Investors should consider these potential conflicts of interest in making their investment decisions. |
| | Each placement agent shall comply with the legal requirements of the jurisdictions within which it offers and sells Shares. |
| **Affiliated Investors** | The Investment Manager, the Master Fund GP and their respective affiliates, principals, employees, partners, agents, the respective family members of such personnel and trusts and other entities established primarily for their benefit or for charitable purposes ("***Affiliated Investors***") may not be subject to restrictions on redemptions or be |

14

assessed the Management Fee or the Performance Allocation (each as defined below) that are applicable to other investors in the Fund, but do share *pro rata* in all other applicable expenses of the Fund.

**Borrowing and Leverage**

The Master Fund may buy securities or commodities on margin and arrange with banks, brokers and others to borrow money against a pledge of securities or commodities in order to employ leverage when the Master Fund GP deems such action appropriate.

**Management Fee**

For its services to the Master Fund, the Investment Manager is entitled to a management fee (the "***Management Fee***") calculated and payable quarterly in advance at an annual rate of 2.75% of the net asset value of each Sub-Series Account (as defined below). The Management Fee is paid at the Master Fund level. The Management Fee will be prorated for any period that is less than a full quarter.

The Investment Manager may elect to reduce, waive or calculate differently the Management Fee with respect to any shareholder, including, without limitation, Affiliated Investors.

The Fund and/or the Investment Manager may delay the timing or alter the structure of fees payable to the Investment Manager so long as such changes are not materially adverse to the shareholders. The Investment Manager may also assign all or any portion of fees payable to the Investment Manager to any affiliate thereof in its sole discretion.

**Performance Allocation**

Pursuant to the Master Fund Partnership Agreement, generally, as of the close of each year and subject to the limitations described below, a performance-based allocation (the "***Performance Allocation***") is debited against the Sub-Series Account relating to each Sub-Series of Shares attributable to a shareholder and simultaneously credited to the Master Fund capital account of the Master Fund GP. The Performance Allocation is calculated and allocated at the Master Fund level, but is equal to 10% of the amount by which the Performance Change Amount (positive and negative) for such fiscal year exceeds the Index Return Amount (positive and negative) for such fiscal year.

A Sub-Series Account's "***Performance Change Amount***" for any fiscal year equals such Sub-Series Account's pro rata allocation of net profit or net loss, plus or minus the Sub-Series Account's share items that are allocated on a Sub-Series Account-by- Sub-Series Account basis, such as the Management Fee. Net profit and net loss includes unrealized appreciation or depreciation of the Master Fund's assets and accrued applicable expenses of the Fund and the Master Fund for the applicable fiscal year.

The "***Index Return Amount***" is the amount that would have been credited or debited to such Sub-Series Account for the fiscal year if the rate of return had been equal to the return of the S&P/LSTA Leveraged Loan

Appx. 03466

Total Return Index for such fiscal year.[3]

The Performance Allocation is generally allocable to the Master Fund GP at the end of each fiscal year.  The Performance Allocation is also calculated and charged with respect to any Sub-Series Account with respect to Shares redeemed as of any time other than the close of a fiscal year on the basis of the Performance Change Amount with respect to such Shares through the Redemption Date (as defined below).  In the case of a partial redemption, the Performance Allocation is calculated and charged only with respect to the portion of the Sub-Series Account related to such Shares being redeemed.

The Performance Allocation with respect to any shareholder may be fully or partially waived or rebated by the Master Fund GP in its sole discretion.

The Performance Allocation is calculated and allocated at the Master Fund level through the use of separate memorandum sub-accounts with respect to the Fund's capital account in the Master Fund that correspond to each Sub-Series of Shares attributable to a shareholder (each a "***Sub-Series Account***").  No separate Performance Allocation will be charged at the Fund level.

**Other Fees and Expenses**

The Fund bears the expenses of the organization of the Fund and the offering of Shares (including legal and accounting fees, printing costs, travel, "blue sky" filing fees and expenses and out-of-pocket expenses).  In general, the Fund's financial statements will be prepared in accordance with accounting principles generally accepted in the United States ("***GAAP***").  However, the Fund intends to amortize its organizational expenses over a period of 60 months from the date the Fund commenced operations because it believes such treatment is more equitable than expensing the entire amount of the organizational expenses in the Fund's first year of operation, as is required by GAAP.  The Fund may, however, limit the amount of start-up and organizational expenses that the Fund amortizes so that the audit opinion issued with respect to the Fund's financial statements will not be qualified.

The Fund bears its own operating, administrative and other expenses, as well as a *pro rata* portion of the Master Fund's expenses, including, but not limited to, investment-related expenses (including those related to identifying and evaluating contemplated investments, whether or not such contemplated investments are actually made), brokerage commissions and other transaction costs, expenses related to short sales, clearing and settlement charges, expenses related to proxies, underwriting and private placements, custodial fees, transfer agent fees, bank service fees, any

---

[3] The S&P/LSTA Leveraged Loan Total Return Index is used only for purposes of establishing the Index Return Amount. The Partnership will not directly invest in the Index nor seek to replicate the Index, and there might or might not be a close correlation between the performance of the Fund and that of the Index.  The Index does not reflect the investment strategy of the Fund.

16

governmental, regulatory, licensing, filing or registration fees incurred in compliance with the rules of any self-regulatory organization or any federal, state or local laws, consulting and any other professional fees or compensation (including investment banking expenses) relating to particular investments or contemplated investments, appraisal fees and expenses, investment-related travel and lodging expenses and research-related expenses (including, without limitation, news and quotation equipment and services), fees to third-party providers of risk-monitoring services, investment and trading-related computer hardware and software, including, without limitation, trade order management software (*i.e.*, software used to route trade orders), accounting (including accounting software), audit and tax preparation expenses, organizational expenses, expenses relating to the offer and sale of Shares and interests of the Master Fund (including the legal and other expenses associated with preparing and updating offering materials), costs and expenses associated with reporting and providing information to existing and prospective investors, any legal fees and costs (including indemnification expenses, regulatory costs and settlement costs) arising in connection with any litigation or regulatory investigation instituted against the Fund, the Master Fund, the Master Fund GP, the Investment Manager or any of their respective affiliates in their capacity as such unless a final determination was made by a court of competent jurisdiction that any of the foregoing indemnified parties was grossly negligent or acted in bad faith, except as otherwise provided in the Articles of Association and/or the Master Fund Partnership Agreement, any withholding, transfer or other taxes imposed or assessed upon, or payable by, the Fund (including any interest and penalties), costs of any meeting of the shareholders (or in obtaining the consent of shareholders in lieu of meeting), expenses related to the Advisory Committee and the Pricing Committee, premiums for directors' and officers' liability insurance (if any) and any other insurance benefiting the Fund, the Management Fee, administrative expenses (including, without limitation, the fees and expenses of the Administrator in relation to its services provided pursuant to the Administration Agreement), fees relating to valuing the Fund's assets, expenses related to the maintenance of the Fund's registered office, corporate licensing expenses, and extraordinary expenses.

The Investment Manager may retain, in connection with its responsibilities under the Investment Management Agreement, the services of others to assist in the investment advice to be given to the Master Fund, including, but not limited to, any affiliate of the Investment Manager, but payment for any such services will be assumed by the Investment Manager. However, the Investment Manager, in its sole discretion, may retain the services of independent third party professionals, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the Master Fund, and the Master Fund will bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

17

The Fund and the Master Fund do not have their own separate employees or office, and neither the Fund nor the Master Fund reimburse the Master Fund GP or the Investment Manager for salaries, office rent and other general overhead costs of the Master Fund GP or the Investment Manager. A portion of the commissions generated on the Master Fund's brokerage transactions may generate soft dollar credits that the Investment Manager is authorized to use to pay for research and other research-related services and products used by the Investment Manager. It is the current policy of the Investment Manager to limit such use of soft dollars to fall within the safe harbor of Section 28(e) of the Securities Exchange Act of 1934, as amended, or to be otherwise reasonably related to the investment decision-making process or for Master Fund expenses. See "*Brokerage and Custody*."

**Certain Fees**

The Investment Manager, including, without limitation, the employees of the Investment Manager, may serve on the board of directors or committees thereof and/or provide financial advisory, consulting and/or as officers or otherwise provide management services, in each case for a fee to portfolio companies in which the Master Fund may have an interest. Such services are provided only after approval by the board of directors of such portfolio companies (or after approval of a court of appropriate jurisdiction with respect to bankruptcy proceedings or other appropriate approval) and based on "arm's length" negotiations of terms and conditions. Any fees earned pursuant to any such agreements for services will be retained by the Investment Manager.

**Distributions**

Subject to the quarterly redemption privilege described below, all earnings of the Fund are ordinarily retained for investment. Shareholders should not expect the Fund to make any distributions.

**Redemptions Generally**

Subject to certain redemption restrictions described below, a shareholder is generally permitted to redeem all or a portion of its Shares as of the last Business Day of each quarter (and/or such other days as the Board of Directors may determine in its sole discretion) (each, a "***Redemption Date***"). Written notice of any redemption request must be received in writing by the Administrator at least 45 days prior to the requested Redemption Date. The Board of Directors may waive such notice requirements, or permit redemptions under such other circumstances as it, in its sole discretion, deems appropriate.

**Settlement of Redemption Proceeds**

A redemption request is normally settled in cash or, subject to the sole discretion of the Board of Directors, wholly or partially with securities or other assets of the Fund (received from the Master Fund), whether or not readily marketable, generally within 30 days after the Redemption Date; provided that the Board of Directors may delay such payment if such delay is reasonably necessary to prevent such redemption from having a material adverse impact on the Fund.

In the event that distributions during a fiscal year to a redeeming

18

shareholder would exceed 90% of the value of such shareholder's Shares as of the beginning of such fiscal year, excess requested amounts will be held back and distributed (without interest thereon) within 30 days following completion of the audit of the Fund's financial statements for the year.

Notwithstanding anything to the contrary herein, the Board of Directors may establish reserves and holdbacks for estimated accrued expenses, liabilities and contingencies, including, without limitation, general reserves for unspecified contingencies (even if such reserves or holdbacks are not otherwise required by GAAP) or liabilities stemming from tax obligations (as such may be determined in the sole discretion of the Board of Directors and whether or not incurred directly or indirectly), which could reduce the amount of a distribution upon a shareholder's redemption of Shares. The Board of Directors may withhold for the benefit of the Fund from any distribution to a redeeming shareholder an amount representing the actual or estimated costs incurred by the Fund with respect to such redemption.

**Redemption Gate**    If, for any Redemption Date, (i) shareholders submit redemption notices that, when combined, are in excess of 25% of the Fund's net asset value, or (ii) redemption requests are received by the Master Fund from any or all feeder vehicles in the Master Fund in excess of 25% of the Master Fund's net asset value, then the Board of Directors may determine, in its sole discretion, to reduce all such requests proportionately (based on the net asset value of each shareholder's Shares) so that the aggregate amount of such redemptions does not exceed 25% of the Fund's net asset value or such greater amount if the Board of Directors so determines (such restriction is referred to herein as the "***Redemption Gate***"). If redemptions are subject to the Redemption Gate, redemption requests are carried over to the next Redemption Date (and, if not fully satisfied as of that date because of the Redemption Gate, then as of the next, and, if necessary, successive Redemption Dates), except to the extent shareholders rescind their redemption request(s).

Any remaining amount of a redemption request that is not satisfied due to the Redemption Gate (i) remains at risk as per other amounts invested in the Fund and subject to the applicable Management Fee, if any, until such amount is finally and fully redeemed, (ii) is considered requested as of the next Redemption Date without further action by the redeeming shareholder, (iii) is not entitled to priority over redemption requests on any subsequent Redemption Date, and (iv) remains subject to further application of the Redemption Gate on subsequent Redemption Dates.

**Redemption Conditions**    The Fund or the Administrator may refuse to accept a redemption request if it is not accompanied by such additional information as the Fund or the Administrator may reasonably require. This power may, without limitation to the generality of the foregoing, be exercised where proper information has not been provided for money laundering verification purposes. In addition, where redemption proceeds are requested to be

19

remitted to an account which is not in the name of the investor, the Fund and the Administrator reserve the right to request such information as may be reasonably necessary in order to verify the identity of the investor and the owner of the account to which the redemption proceeds will be paid. The redemption proceeds will not be paid to a third-party account if the investor and/or owner of the account fails to provide such information.

Redemption payments will be made by wire transfer only to a bank account in the name of the shareholder located at a recognized financial institution which is regulated by a recognized regulatory authority and carries on business in a country recognized in Schedule 3 of the Money Laundering Regulations (2017 Revision) of the Cayman Islands (the "***Money Laundering Regulations***").

**Compulsory Redemptions**

The Board of Directors reserves the right, in its sole discretion, to compel the redemption of a shareholder's Shares at any time and for any reason on not less than five days' prior written notice (or immediately if the Directors, in their sole discretion, determine that such shareholder's continued investment in the Fund may cause the Fund or the Investment Manager to violate any applicable law). Settlements are made in the same manner as voluntary redemptions, but without application of the Redemption Gate.

**Suspension of Redemptions and Redemption Payments**

The Board of Directors may postpone or suspend (a) the calculation of the net asset value of the Shares (and the applicable valuation date); (b) the issuance of Shares, (c) the redemption by shareholders of Shares (and the applicable Redemption Date); and/or (d) the payment of redemption proceeds (even if the calculation dates and Redemptions Dates are not postponed) (each, a "***Suspension***") if it determines that such a Suspension is warranted by extraordinary circumstances, including: (i) during any period when any stock exchange or over-the-counter market on which the Master Fund's investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended; (ii) during the existence of any state of affairs as a result of which, in the reasonable opinion of the Board of Directors, disposal of investments by the Fund, or the determination of the value of the assets of the Fund, would not be reasonably practicable or would be seriously prejudicial to the non-redeeming shareholders; (iii) during any breakdown in the means of communication normally employed in determining the price or value of the Fund's assets or liabilities, or of current prices in any stock market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Fund cannot reasonably be accurately ascertained within a reasonable time frame; (iv) during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the reasonable opinion of the Board of Directors, be effected at normal rates of exchange; (v) automatically upon liquidation of the Fund; or (vi) automatically upon any suspension of redemptions by the Master Fund

20

for similar reasons as described in "*The Master Fund*," below.

The Fund will promptly notify each shareholder who has submitted a redemption request and to whom payment in full of the amount being redeemed has not yet been remitted of any Suspension of redemptions or Suspension of the payment of redemption proceeds. Any remaining amount of a redemption request that is not satisfied due to such a Suspension remains at risk as per other amounts invested in the Fund and subject to the applicable Management Fee until such amount is finally and fully redeemed. Such shareholders will not be given any priority with respect to the redemption of Shares after the cause for such Suspension or limitation ceases to exist. The Board of Directors may in their sole discretion, however, permit such shareholders to withdraw their redemption requests to the extent that the relevant Redemption Date has not yet passed. For the avoidance of doubt, where a suspension of the payment of redemption proceeds is declared between the relevant Redemption Date and the remittance of such payment proceeds, affected shareholders shall not have any right to withdraw their redemption requests. Upon the reasonable determination by the Board of Directors that conditions leading to Suspension no longer apply, any such suspended payments shall generally be paid in accordance with the normal process for making such payments, redemption rights shall be promptly reinstated, and any pending redemption requests which were not withdrawn (or new, timely redemption requests) will be effected as of the first Redemption Date following the removal of the Suspension, subject to the foregoing restrictions on redemptions.

The Directors have the power, in the circumstances described above, to effect a Suspension. It is anticipated that any Suspension would ordinarily be temporary. However, there may be situations in which the circumstances giving rise to the Suspension continue to be present for a considerable period of time with the result that the Directors, in consultation with the Investment Manager, consider it appropriate to keep the Suspension in place indefinitely. In certain circumstances, even where a Suspension has not been declared, the Directors may, in consultation with the Investment Manager, make a determination that the investment strategy should no longer be continued. During any such period of Suspension or having made such determination that the investment strategy should no longer be continued, the Investment Manager may recommend to the Directors that the Fund be managed with the objective of returning the Fund's assets to shareholders in an orderly manner (an "***Orderly Realization***"). The Directors may, in such circumstances, resolve to effect an Orderly Realization should they determine that doing so is in the best interests of the Fund's stakeholders. Such Orderly Realization shall not constitute a dissolution or winding up of the Fund for any purposes, but rather only the continued management of the Fund's portfolio so as to reduce such portfolio to cash (to the extent reasonably practicable, as advised by the Investment Manager) and return such cash as well as all other assets of the Fund to the shareholders. The

Appx. 03472

Directors shall promptly communicate to shareholders any resolution to proceed with an Orderly Realization of the Fund. During an Orderly Realization, the Investment Manager may, in consultation with the Directors, take such steps as are considered appropriate in the best interests of the Fund's stakeholders to effect the Orderly Realization. The Directors, in consultation with the Investment Manager shall establish what they consider to be a reasonable time by which the Orderly Realization should be effected (the "***Realization Period***"). Any resolution to undertake an Orderly Realization and the process thereof shall be deemed to be integral to the business of the Fund and may be carried out without recourse to a formal process of liquidation under the Companies Law (2016 Revision) of the Cayman Islands (the "***Companies Law***") or any other applicable bankruptcy or insolvency regime. The Directors, in consultation with the Investment Manager, may resolve to cease the Orderly Realization within the Realization Period and recommence active trading if the circumstances permit a lifting of any applicable Suspension or, where no Suspension is in effect, if the circumstances are such that the investment strategy can then be continued. The Management Fee shall be payable during an Orderly Realization on the same basis as described herein.

**Transfers**

Shares are not transferable except with the prior written consent of the Board of Directors, which consent may be withheld in its sole discretion. The Board of Directors will require any transferee or assignee of any shareholder to execute the Subscription Documents.

**Duty of Care; Indemnification**

Pursuant to the Master Fund Partnership Agreement and the Investment Management Agreement, the Master Fund GP, the Investment Manager, each member, shareholder, partner, manager, director, officer, employee and agent of, and any person who controls, the Master Fund GP or the Investment Manager, each of the respective affiliates of the foregoing, members of the Advisory Committee and Pricing Committee, their respective affiliates, and any of the legal representatives of any of the foregoing (each such person, an "***Indemnified Party***") shall not be liable to the Master Fund, Fund or the shareholders for any loss or damage arising by reason of being or having been the Master Fund GP or the Investment Manager or from any acts or omissions in the performance of its services as the Master Fund GP or the Investment Manager in the absence of gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or bad faith, or as otherwise required by law. No Indemnified Party shall be liable to the Master Fund, the Fund, any shareholder or any other person for any amount in excess of the amount of the Management Fee received by the Investment Manager, to the extent permitted under applicable law. In addition, in no event shall any Indemnified Party be liable for any special, indirect, exemplary, consequential or punitive losses or damages.

The Master Fund Partnership Agreement and Investment Management Agreement contain provisions for the indemnification of the Indemnified Parties by the Master Fund and the Fund (but not by the shareholders

22

Appx. 03473

individually) against any liabilities arising by reason of being or having been the Master Fund GP or the Investment Manager or in connection with the Master Fund Partnership Agreement, the Investment Management Agreement, or the Master Fund or the Fund's business or affairs to the fullest extent permitted by law. The Investment Manager is not personally liable to any shareholder for the repayment of any redemption proceeds or for contributions by such shareholder to the capital of the Fund or by reason of any change in the U.S. federal or state income tax laws applicable to the Fund or its investors.

Every Director and officer of the Fund, together with every former Director and former officer of the Fund, shall be indemnified out of the assets of the Fund against any liability, action, proceeding, claim, demand, costs, damages or expenses, including legal expenses, whatsoever which they or any of them may incur as a result of any act or failure to act in carrying out their functions other than such liability (if any) that they may incur by reason of their own actual fraud or willful default. No Director or officer of the Fund shall be liable to the Fund for any loss or damage incurred by the Fund as a result (whether direct or indirect) of the carrying out of their functions unless that liability arises through the actual fraud or willful default of such Indemnified Party. No person shall be found to have committed actual fraud or willful default under the Articles of Association unless or until a court of competent jurisdiction shall have made a finding to that effect.

**Non-Exclusivity; Allocation of Opportunities**

The partners, officers, managers, members, employees and affiliates of the Master Fund GP and the Investment Manager are not precluded from engaging in or owning an interest in other business ventures or investment activities of any kind, whether or not such ventures are competitive with the Fund. See "*Risk Factors and Potential Conflicts of Interest – Allocation of Trading Opportunities*" below.

**Affiliated Service Providers**

NexBank, SSB ("*NexBank SSB*") is an affiliate of the Investment Manager and may, from time to time, provide banking and/or agency services to the Investment Manager, clients of the Investment Manager or collective investment vehicles for which the Investment Manager provides investment advisory services (including the Fund and other vehicles in which the Fund may invest) or third parties engaged in transactions involving the Investment Manager. NexBank SSB may also act as an agent in connection with certain securities transactions involving the Investment Manager's client accounts (including the Master Fund and other vehicles in which the Master Fund may invest). Principals of the Investment Manager own a majority of the equity interests in NexBank SSB and employees or affiliates of the Investment Manager own or may own a substantial equity interest in NexBank SSB. Certain Master Fund investment transactions may be executed through NexBank Securities, Inc., an affiliate of the Investment Manager and a registered broker-dealer.

Additionally, the Investment Manager or affiliates of the Investment

23

Manager, including, without limitation, Nexbank SSB, NexBank Securities, Inc., NexBank Capital Advisors and Governance Re, Ltd. may provide financial advisory, management, insurance, title insurance or other services for a fee to portfolio companies in which the Master Fund may have an interest. See "*Risk Factors and Potential Conflicts of Interest*" below.

**Valuations**    In general, the Fund's financial statements will be prepared in accordance with GAAP. The Board of Directors has delegated the valuation of the Fund's assets, based on the Master Fund's assets, to the Investment Manager who values the Fund's assets as of the close of each fiscal period in accordance with its valuation policies and procedures.

**Reserves**    Appropriate reserves may be accrued and charged against net assets and proportionately against the Shares of the shareholders for contingent liabilities, such reserves to be in the amounts (subject to increase or reduction) that the Board of Directors in its sole discretion deems necessary or appropriate. At the sole discretion of the Board of Directors, the amount of any such reserve (or any increase or decrease therein) may be charged or credited, as appropriate, to the Shares of those investors who are shareholders at the time when such reserve is created, increased, or decreased, as the case may be, or alternatively may be charged or credited to those investors who were shareholders at the time of the act or omission giving rise to the contingent liability for which the reserve was established.

If the Board of Directors determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then such amount may be proportionately charged or credited, as appropriate, to those persons who were shareholders during any such prior period.

**Fiscal Year**    The Fund has a fiscal year ending on December 31 of each year.

**Reports to Shareholders**    Shareholders will receive unaudited monthly statements of the estimated net asset value of the Fund, monthly performance and portfolio reports, and an annual financial report of the Fund audited by the Fund's independent auditors. The Fund may elect not to reserve certain amounts that may be required by GAAP and not to provide certain portfolio disclosure required by GAAP to investors and may capitalize and amortize certain of its organizational expenses in deviation from GAAP. Such deviations from GAAP may result in a qualified opinion rendered on the financial statements of the Fund. In addition, the Fund may provide certain information to certain shareholders, but not to all shareholders.

**Tax Status**    The Government of the Cayman Islands will not, under existing legislation, impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Fund or the shareholders. The Cayman Islands are not party to a double tax treaty with any country that is applicable to any payments made to or by the Fund.

24

The Fund has applied for and can expect to receive an undertaking from the Governor-in-Cabinet of the Cayman Islands that, in accordance with section 6 of the Tax Concessions Law (2011 Revision) of the Cayman Islands, for a period of 20 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Fund or its operations and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable (i) on or in respect of the shares, debentures or other obligations of the Fund or (ii) by way of the withholding in whole or in part of a payment of dividend or other distribution of income or capital by the Fund to its members or a payment of principal or interest or other sums due under a debenture or other obligation of the Fund.

The Investment Manager believes that the Fund will be treated as a non-U.S. corporation for U.S. federal income tax purposes. The Fund generally does not expect to be subject to U.S. federal income tax on its capital gains from securities trading. Dividends (including certain dividend equivalent amounts) and certain interest received by the Fund may be subject to withholding at the source. See "*Tax Considerations.*"

**ERISA**

The Investment Manager intends to limit investment in the Master Fund by "benefit plan investors" so that the assets of the Master Fund will not be considered "plan assets" for purposes of the Employee Retirement Income Security Act of 1974, as amended ("*ERISA*"). It is anticipated that the assets of the Fund may constitute "plan assets" for purposes of ERISA. See "*ERISA and Other Regulatory Considerations*."

**Variation of Terms**

The Fund may enter into agreements with certain shareholders pursuant to which such shareholders will invest in the Fund on different terms, and in some cases, more favorable terms (including with respect to information and reporting, the Management Fee, the Performance Allocation and redemption rights), than those described herein, without the consent of, or notice to, the other shareholders.

The Articles of Association provide that, subject to the Companies Law of the Cayman Islands and the other provisions of the Articles of Association, all or any of the series rights or other terms of offer whether set out in the Memorandum, the Subscription Documents or otherwise (including any representations, warranties or other disclosure relating to the offer or holding of Shares) (collectively referred to as "*Share Rights*") for the time being applicable to any class or series of Shares in issue (unless otherwise provided by the terms of issue of those Shares) may (whether or not the Fund is being wound up) be varied without the consent of the holders of the issued Shares of that class or series where such variation is considered by the Directors, not to have a material adverse effect upon such holders' Share Rights; otherwise, any such variation shall be made only with the prior consent in writing of the

25

holders of not less than two-thirds by net asset value of such Shares, or with the sanction of a resolution passed by a majority of at least two-thirds of the votes cast in person or by proxy at a separate meeting of the holders of such Shares. For the avoidance of doubt, the Directors reserve the right, notwithstanding that any such variation may not have a material adverse effect, to obtain consent from the holders of such Shares. At any class meeting, the voting rights attributable to each Share shall be calculated by reference to the net asset value per Share and not on the basis of one Share, one vote. Each subscriber for Shares will be required to agree that the terms of offer set out in the applicable Subscription Documents and the rights attaching to the Shares can be varied in accordance with the provisions of the Articles of Association.

| | |
|---|---|
| **Dissolution Right** | Shareholders that are not affiliates or employees of the Investment Manager ("*Nonaffiliated Shareholders*") may cause the dissolution of the Fund upon the affirmative vote of shareholders holding Shares representing more than 50% of the net asset value of all Shares attributable to Non-Affiliated Shareholders at a special meeting of shareholders duly called by the Board of Directors pursuant to a notice circulated by the Board of Directors at the written request of shareholders holding Shares representing 20% or more of the net asset value of all Shares attributable to Non-Affiliated Shareholders. In the event of a dissolution of the Fund effected pursuant to the Articles, the Master Fund will make an in-kind distribution to the Fund (to the extent such in-kind distribution is reasonably practicable) and the Fund will distribute its assets to the shareholders in kind (to the extent such in-kind distribution is reasonably practicable). |

A petition to submit to shareholders a proposal to dissolve the Fund (any such petition, a "*Dissolution Petition*") may be submitted to the Board of Directors by any Nonaffiliated Shareholders holding Shares representing 2% or more of the net asset value of all Shares attributable to Non-Affiliated Shareholders. The Board of Directors shall have the power and duty to determine whether a Dissolution Petition was properly made in accordance with the Articles. If a Dissolution Petition was not properly made in accordance with the Articles, the Board of Directors shall so notify the requesting Nonaffiliated Shareholder(s) in writing of any procedural or eligibility deficiencies and such Dissolution Petition shall be disregarded. If the Dissolution Petition is properly made in accordance with the Articles, the Board of Directors shall within 30 days after receipt of the Dissolution Petition mail the Dissolution Petition to all Nonaffiliated Shareholder(s) together with written instructions specifying that a special meeting of shareholders will be called to dissolve the Fund if the Dissolution Petition is signed by Nonaffiliated Shareholders holding Shares representing 20% or more of the net asset value of all Shares attributable to Non-Affiliated Shareholders and returned to the Fund within 60 days after the date of such mailing. To be properly made, a Dissolution Petition must be received in writing by the Board of Directors at the principal place of business of the Fund, request that the Board of

Appx. 03477

Directors mail the Dissolution Petition to all Nonaffiliated Shareholders and set forth as to the Nonaffiliated Shareholder(s) making the Dissolution Petition: (i) each such Nonaffiliated Shareholder's name and address, as they appear on the Fund's books, (ii) the net asset value of each such Nonaffiliated Shareholder's Shares as of the most recent month-end (which in the aggregate must represent at least 2% of the net asset value of all Shares attributable to Non-Affiliated Shareholders), and (iii) a representation that at least one shareholder from the group of shareholders that will sign the Dissolution Petition (or a qualified representative of at least one such shareholder) intends to appear in person at the special meeting of shareholders to determine whether to dissolve the Fund.

The Dissolution Petition may not set forth any proposal regarding the Fund other than the dissolution of the Fund. The Dissolution Petition shall be improper if it contains any false or misleading statements. The Board of Directors may, in its sole and absolute discretion, deem a Dissolution Petition improper if another proposal to dissolve the Fund was previously submitted by one or more of the same shareholders (or an affiliate or immediate family member thereof) during the preceding two years.

Upon receipt of the Dissolution Petition, signed by Nonaffiliated Shareholders holding Shares representing 20% or more of the net asset value of all Shares attributable to Non-Affiliated Shareholders and returned to the Fund within 60 days after the date on which the Dissolution Petition was mailed, the Board of Directors shall, by written notice to each shareholder of record within 15 days after such receipt, call such a special meeting of shareholders to vote (in person or by proxy) on the dissolution of the Fund. Such meeting shall be held at least 30 but not more than 60 days after the mailing of such notice, and such notice shall specify the date, a reasonable place (which shall include, for avoidance of doubt, the principal place of business of the Fund or the Board of Directors), and time for such meeting, as well as its purpose, and include a form of proxy.

Except as otherwise required by the Articles of Association, neither the Fund nor the Board of Directors shall have any obligation to forward any communication received by a shareholder to any other shareholder or to call a meeting of shareholders. Nothing herein shall in any way limit or restrict the ability of the Fund or the Board of Directors to solicit votes or consents in opposition of any Dissolution Petition. If no shareholder from the group of shareholders that signed the Dissolution Petition (or any qualified representative of at least one such shareholder) appears in person at the special meeting of shareholders, then no vote on the dissolution of the Fund will be taken at such meeting. In order to be considered a qualified representative of the shareholder, a person must be authorized by a written instrument executed by such shareholder or an electronic transmission delivered by such shareholder to act for such shareholder as proxy at the meeting of shareholders and such person must

Appx. 03478

produce such written instrument or electronic transmission, or a reliable reproduction of the written instrument or electronic transmission, at the meeting of shareholders.  By submitting a Dissolution Petition to the Board of Directors, the Nonaffiliated Shareholder(s) shall be deemed to consent to the Board of Director's mailing of the Dissolution Petition to all Nonaffiliated Shareholders for all purposes, including without limitation for purposes of Regulation S-P under section 504 of the Gramm-Leach-Bliley Act, as amended, and other applicable privacy laws.

**Appx. 03479**

# SHARES OF THE FUND

**The Fund's Share Capital**

The Fund has an authorized share capital of U.S.$50,000 divided into 100 management shares ("***Management Shares***") of a nominal par value of U.S.$1.00 each and 4,990,000 participating non-voting shares (the "***Shares***") of a nominal par value of U.S.$0.01. The Directors may by resolution divide the Shares into separate series (each, a "***Series***") which may be subject to different rights, restrictions, preferences, privileges and payment obligations as between the different Series and further into separate Sub-Series within such Series. The different Series and Sub-Series thereof shall be established and designated, and the variations in the relative rights and preferences as between the different Series and Sub-Series thereof shall be fixed and determined by the Board of Directors. Sub-Series of Shares of each Series are issued for the purposes, among others, of accounting for any profits and losses attributable to each individual shareholder to reflect different returns achieved as a result of subscriptions received at different times.

Each separate Sub-Series of Shares is identified by the investor to whom it was issued and its date of issue. Shares are issued to shareholders in Sub-Series at $1,000 per Share. Immediately following the close of any fiscal year, each such Sub-Series of Shares may be redeemed and the proceeds applied to the subscription for an earlier Sub-Series of Shares of such Series.

The Shares are being offered pursuant to this Memorandum. The Shares generally will be entitled to all rights and privileges of Share ownership (including the right to receive dividends when declared and distributions of assets, net of all final fees and expenses, upon winding up) other than voting rights, except under limited circumstances.

The Management Shares will carry all the voting rights but will have no right to participate in the assets of the Fund (other than to a return of the par value on a winding up). The Management Shares will be held by the Investment Manager or an affiliate, and will be voted in accordance with the instructions of the Investment Manager.

The holders of Shares will only be entitled to vote at class meetings of shareholders to the extent that the matter considered thereat would materially adversely vary or abrogate the existing class rights attaching to the Shares. The holders of Shares have no other voting rights.

The Articles of Association provide that, subject to the Companies Law and the other provisions of the Articles of Association, all or any of the class and/or Series rights or other terms of offer, whether set out in this Memorandum, the Subscription Documents or otherwise (including any representations, warranties or other disclosures relating to the offer or holding of Shares) (collectively referred to as "***Share Rights***"), for the time being applicable to any class or Series of Shares in issue (unless otherwise provided by the terms of issue of those Shares) may (whether or not the Fund is being wound up) be varied without the consent of the holders of the issued Shares of that class or Series where such variation is considered by the Directors not to have a material adverse effect upon such holders' Share Rights; otherwise, any such variation shall be made only with the prior consent in writing of the holders of not less than two-thirds by net asset value of such Shares, or with the sanction of a resolution passed by a majority of at least two-thirds of the votes cast in person or by proxy at a separate meeting of the holders of such Shares. For the avoidance of doubt, the Directors reserve the right, notwithstanding that any such variation might not have a material adverse effect, to obtain consent from the holders of such Shares. At any class meeting, the voting rights attributable to each

**Appx. 03480**

Share shall be calculated by reference to the net asset value per Share and not on the basis of one Share, one vote. Each subscriber for Shares will be required to agree that the terms of offer set out in the Subscription Documents and the rights attaching to the Shares can be varied in accordance with the provisions of the Articles of Association. The Articles of Association provide that, in relation to any class or Series consent required pursuant to the "Variation of Share Rights" Article, the Directors in their discretion may invoke the following procedure (the "*Negative Consent Procedure*"). The Directors shall provide written notice in respect of the proposed variation (the "*Proposal*") to the members of the affected class or Series and shall specify a deadline (the "*Redemption Request Date*"), which shall be no earlier than 30 days after the date of giving such notice, by which date such members may submit a written request for redemption of some or all of their Shares of the affected class and/or Series on the Redemption Date (the "*Specified Redemption Date*") specified by the Directors in such notice. The terms of the Proposal shall be such that its specified effective date (the "*Effective Date*") shall not be on or prior to the Specified Redemption Date. Such notice shall further provide that the holders of any Shares in respect of which a request for redemption has not been received by the Redemption Request Date (the "*Affected Shares*") shall, in the absence of express written refusal to consent, be deemed to have consented in writing to the Proposal (such Affected Shares being the "*Negative Consent Shares*"). In the event that the Negative Consent Procedure is followed, only the Affected Shares shall be considered for the purposes of determining whether the written consent majority has been obtained under the "*Variation of Share Rights*" Article with the holders of the Negative Consent Shares being deemed to have submitted a written consent in favor of the Proposal on the Effective Date.

The rights conferred upon the holders of the Shares of any class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Shares, be deemed to be materially adversely varied or abrogated by, inter alia, the creation, allotment or issue of further Shares ranking *pari passu* with or subsequent to them, the redemption or purchase of any Shares or by the passing of any Directors' resolution to change or vary any investment objective, investment technique and strategy and/or investment policy in relation to the Shares or any modification of the fees payable to any service provider to the Fund.

In general, each Share will participate in the Fund's profits and losses attributable to the relevant class in the same manner. Each of the Shares will participate ratably with all other outstanding Shares in the Fund's assets and earnings and will have the redemption rights discussed above.

The Directors may impose such restrictions as they think necessary for the purpose of ensuring that no Shares in the Fund are held by (i) any person in breach of the laws or requirements of any country or governmental authority or (ii) any person or persons in circumstances which, in the opinion of the Directors, might result in the Fund incurring any liability of taxation or suffering any other pecuniary disadvantage which the Fund might not otherwise have incurred or suffered. A person who becomes aware that he or she is holding or owning Shares in breach of any restriction mentioned in the Articles of Association shall promptly either deliver to the Fund a written request for redemption of his or her Shares or transfer the same to a person who would not thereby be a non-qualified person.

**Management Shares**

The Fund will have a single class of Management Shares that is not entitled to participate in the Fund's assets, earnings and distributions, other than with respect to a return of their par value on a winding up of the Fund. The Management Shares are issued at par value at U.S.$1.00 per share.

Appx. 03481

General meetings of the holders of Management Shares may be held to vote on various matters including to elect the Directors and to attend to such other business as may properly be placed before the meeting. At any such general meeting, the favorable vote of a majority of the Management Shares present is sufficient for the approval of any action, unless such action is a matter requiring a special resolution, in which case two-thirds of the Management Shares shall be required, in each case as further detailed in the Articles of Association.

### Registration of Management Shares and Shares and Share Certificates

Management Shares and Shares of the Fund are issued only in registered form; the Fund will not issue bearer shares. A current register of the names and addresses of the Fund's shareholders and their shareholdings is maintained at the office of the Administrator. Management Shares and Shares are registered only in book entry form. No share certificates have been or will be issued.

### Other Rights and Liabilities

Under the terms of the Articles of Association, the liability of the shareholders of the Fund is limited, and shareholders will not be liable for any debt, obligation or default of the Fund in excess of the amounts unpaid on their Shares.

The Fund and the Investment Manager may agree with certain investors to a fee structure, redemption rights or other terms that differ from the fee structure, redemption rights and other terms that are set forth in this Memorandum. Such different rights may, subject to applicable law, be effected by issuance of a separate Series of Shares or any other permissible means. Such rights may not be offered to all investors.

### Calculation of Fund Net Asset Value

The Directors have delegated to the Administrator the calculation of the net asset value of the Fund and the net asset value per Share of each Series and, if applicable, Sub-Series, subject to the overall supervision and direction of the Directors. Net asset valuations of the Fund and each Sub-Series of each Series of Shares will be calculated as of the close of business on the last day of each month, or such other days as may from time to time be determined by the Fund (each, a "*Valuation Date*") in accordance with United States generally accepted accounting principles. To the extent feasible, liabilities are accrued as of each Valuation Date.

The Fund's assets are valued based on the Master Fund's assets. The net asset value of the Fund is determined by taking the amount of all cash and credit balances plus the market value of all commodities and other assets comprising the Fund's assets (including any interest and dividends receivable but excluding any subscription amounts committed to the Fund from time to time to the extent such amounts are not held by or on behalf of the Fund), as valued by the Investment Manager and the Administrator, minus all debit balances and other liabilities and obligations of the Fund (including any liability for the payment of the Management Fee and Performance Allocation hereunder). Net asset value in respect of any Series or Sub-Series of participating Share is calculated by dividing the value of the account relating to that Series or Sub-Series of participating Share by the number of participating Shares of that Series or Sub-Series in issue. For the sole purpose of determining the number of participating Shares of a Series or Sub-Series in issue, participating Shares of that Series or Sub-Series which are to be redeemed on the relevant Valuation Date shall be deemed to be in issue until and including the close of business on the applicable Valuation Date.

Appx. 03482

Based on the Master Fund's assets, assets of the Fund will be valued by both the Investment Manager, who will provide such valuations to the Administrator, and independently by the Administrator.  The Administrator will then calculate and disseminate the net asset value of the Fund and each Sub-Series of each Series of Shares.

Appx. 03483

## THE MASTER FUND

### The Master Fund's Limited Partner Interests

The Master Fund's partnership interests are currently held exclusively by the Fund and the Domestic Fund as limited partners, as well as the Master Fund GP, as the general partner of the Master Fund pursuant to the Master Fund Partnership Agreement.  The Master Fund GP is registered as a foreign company in the Cayman Islands pursuant to Part IX of the Companies Law (2016 Revision) of the Cayman Islands (the "***Companies Law***").

### The Master Fund Partnership Agreement

The Master Fund is constituted as a Cayman Islands exempted limited partnership under the Exempted Limited Partnership Law, 2014 (the "***Exempted Limited Partnership Law***").  A Cayman Islands exempted limited partnership is constituted by the signing of the relevant partnership agreement and its registration with the Registrar of Exempted Limited Partnerships in the Cayman Islands.

A Cayman Islands exempted limited partnership is not a separate legal person distinct from its partners.  Under the Exempted Limited Partnership Law, any property which is conveyed into or vested in the name of the exempted limited partnership shall be held or deemed to be held by the general partner, and if more than one, then by the general partners jointly upon trust, as an asset of the partnership in accordance with the terms of the partnership agreement.  Any debt or obligation incurred by a general partner in the conduct of the business of an exempted limited partnership shall be a debt or obligation of the exempted limited partnership.  Registration under the Exempted Limited Partnership Law entails that the partnership becomes subject to, and the limited partners therein are afforded the limited liability and other benefits of, the Exempted Limited Partnership Law (subject to compliance therewith).

*Liability of Partners and Indemnification of the Master Partnership GP and Others*.  The business of a Cayman Islands exempted limited partnership will be conducted by its general partner(s) who will be liable for all debts and obligations of the exempted limited partnership to the extent that the partnership has insufficient assets.  As a general matter, a limited partner of a Cayman Islands partnership will not be liable for the debts and obligations of the exempted limited partnership, other than:

(i)     as expressed in the partnership agreement,

(ii)    if such limited partner takes part in the conduct of the business of an exempted limited partnership in its dealings with persons who are not partners, then that limited partner shall be liable, in the event of the insolvency of the exempted limited partnership, for all debts and obligations of that exempted limited partnership incurred during the period that he so participates in the conduct of the business as though he were, for such period, a general partner, provided always that he shall be rendered liable pursuant to the foregoing provision only to a person who transacts business with the exempted limited partnership during such period with actual knowledge of such participation and who then reasonably believed such limited partner to be a general partner, or

(iii)   if such limited partner is obligated pursuant to Section 34(1) of the Exempted Limited Partnership Law to return a distribution made to it (with interest at a rate of 10% per

annum, unless otherwise specified in the Master Fund Partnership Agreement) when the exempted limited partnership is insolvent or within six months prior to such insolvency.

The Master Fund Partnership Agreement provides that none of the Indemnified Parties will be liable to the Master Fund or any limited partner of the Master Fund (including the Feeder Funds) or any other person for mistakes of judgment or for action or inaction that did not constitute gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or bad faith, or for losses due to such mistakes, action or inaction or to the negligence, dishonesty or bad faith of any broker or agent of the Master Fund, provided that such broker or agent was selected, engaged or retained by the Indemnified Party in accordance with the standard of care set forth above. An Indemnified Party may consult with counsel and accountants in respect of the Master Fund's affairs and will be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants, provided that they were selected in accordance with the standard of care set forth above. The foregoing provisions, however, shall not be construed so as to provide for the exculpation of an Indemnified Party of any liability (including liability under U.S. Federal securities laws which, under certain circumstances, impose liability even on persons acting in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law (including liability under U.S. Federal securities laws which, under certain circumstances, impose liability even on persons acting in good faith), but shall be construed so as to effectuate the abovementioned provisions to the fullest extent permitted by law. The Master Fund Partnership Agreement also limits the liability of any Indemnified Party to the amount of the Management Fee received, to the extent permitted under applicable law. In addition, in no event shall any Indemnified Party be liable for any special, indirect, exemplary, consequential or punitive losses or damages.

The Master Fund Partnership Agreement provides that the Master Fund shall, to the fullest extent permitted by law, indemnify and hold harmless each Indemnified Party from and against any and all loss, cost or expense suffered or sustained by an Indemnified Party by reason of the fact that it, he or she is or was an Indemnified Party, including, without limitation, any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, suit or proceeding, provided that such liability, damage loss, cost or expense resulted from a mistake of judgment on the part of an Indemnified Party or from action or inaction that did not constitute gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or bad faith, or from the negligence, dishonesty or bad faith of a broker or other agent of an Indemnified Party, provided that such broker or agent was selected, engaged or retained by the Indemnified Party in accordance with the standard of care set forth above. The Master Fund Partnership Agreement also provides that the Master Fund will, in the sole discretion of the Master Fund GP, advance to any Indemnified Party reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action, suit or proceeding which arises out of such conduct. In the event that such an advance is made by the Master Fund, the Indemnified Party will agree to reimburse the Master Fund to the extent that it is finally determined that it was not entitled to indemnification in respect thereof.

Notwithstanding any of the foregoing, the provisions of the Master Fund Partnership Agreement do not provide for the indemnification of any Indemnified Party for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the above provisions to the fullest extent permitted by law.

Appx. 03485

Pursuant to the foregoing indemnification and exculpation provisions applicable to each Indemnified Party, the Master Fund (and not the applicable Indemnified Party) will be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or bad faith. Given the volume of transactions executed on behalf of the Master Fund, trading errors (and similar errors) will occur and the Master Fund will be responsible for any resulting losses, even if such losses result from the negligence (but not gross negligence) of any Indemnified Party.

The Indemnified Parties will also be indemnified by each limited partner of the Master Fund for any amounts of tax withheld or required to be withheld with respect to that limited partner, and also for any amounts of interest, additions to tax, penalties and other costs borne by any such persons in connection therewith to the extent that the balance of the limited partner's capital account is insufficient to fully compensate the Master Fund GP ad the Investment Manager for such costs.

*Contributions and Withdrawals by the Fund*. Limited partners of the Master Fund may make contributions at such times and in such amounts as the Master Fund GP determines. As a limited partner of the Master Fund, the Fund may, subject to the consent of the Master Fund GP, voluntarily request a withdrawal of all or part of its capital in the Master Fund at such times and in such amounts as it may determine. The Master Fund GP may postpone or suspend (a) the calculation of the net asset value of the Master Fund (and the applicable valuation date); (b) the issuance of limited partner interests, (c) the withdrawal by limited partners (and the applicable withdrawal date); and/or (d) the payment of withdrawal proceeds (even if the calculation dates and withdrawal dates are not postponed) if it determines that such a suspension is warranted by extraordinary circumstances, including: (i) during any period when any stock exchange or over-the-counter market on which the Master Fund's investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended; (ii) during the existence of any state of affairs as a result of which, in the reasonable opinion of the Master Fund GP, disposal of investments by the Master Fund, or the determination of the value of the assets of the Master Fund, would not be reasonably practicable or would be seriously prejudicial to the non-withdrawing partners; (iii) during any breakdown in the means of communication normally employed in determining the price or value of the Master Fund's assets or liabilities, or of current prices in any stock market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Master Fund cannot reasonably be accurately ascertained within a reasonable time frame; (iv) during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the reasonable opinion of the Master Fund GP, be effected at normal rates of exchange; or (v) automatically upon liquidation of the Master Fund.

*Amendment of the Master Fund Partnership Agreement*. The Master Fund Partnership Agreement may be amended by the Master Fund GP without the consent of the limited partners in any manner that does not materially adversely affect any limited partner.

*Dissolution of the Master Fund*. The Master Fund shall be wound up and dissolved upon the first to occur of any of the following liquidating events, and Sections 36(1)(b), 36(9) and 36(12) of the Exempted Limited Partnership Law shall not apply to the Master Fund:

(i)     the written election of the Master Fund GP to dissolve the Master Fund; or

(ii)    if the Master Fund GP is the sole or last remaining general partner, the date (the "***Automatic Dissolution Date***") falling 90 days after the date of the service of a notice

35

by the Master Fund GP (or its legal representative) on all the limited partners informing the limited partners of:

(1) the commencement of liquidation or bankruptcy proceedings in relation to the Master Fund GP; or

(2) the withdrawal, removal or making of a winding up or dissolution order in relation to the Master Fund GP;

*provided that*, if a majority in number of the limited partners elects one or more new general partners before the Automatic Dissolution Date, the business of the Master Fund shall be resumed and continued. If a new general partner is not elected by the Automatic Dissolution Date, the Master Fund shall be wound up and dissolved in accordance with terms of the Master Fund Partnership Agreement and the Exempted Limited Partnership Law.

*Power of Attorney*. Each limited partner of the Master Fund shall make, constitute and appoint the Master Fund GP its true and lawful attorney to make, sign, execute, certify, acknowledge, file and record any instrument deemed necessary or appropriate by the Master Fund GP to carry out fully the provisions of the Master Fund Partnership Agreement, including the admission of any new partners of the Master Fund and any amendments to the Master Fund Partnership Agreement. Each limited partner of the Master Fund shall authorize the Master Fund GP to take any further action that the Master Fund GP considers necessary or advisable in connection with the foregoing. Such power of attorney granted is intended to secure an interest in property and, in addition, the obligation of each relevant limited partner of the Master Fund under the Master Fund Partnership Agreement shall be irrevocable and shall survive and not be affected by the subsequent death, lack of capacity, insolvency, bankruptcy or dissolution of any limited partner of the Master Fund.

**Valuation of Assets**

The Master Fund GP (meaning for the purposes of the valuation of assets described herein, the Master Fund GP itself, the Investment Manager or the Administrator under the ultimate supervision of the Master Fund GP) will generally compute the value of the securities and other assets of the Master Fund as of the close of business on the last day of each fiscal period and on any other date selected by the Master Fund GP in its sole discretion. In addition, the Master Fund GP must compute the value of the securities that are being distributed in-kind as of their date of distribution in accordance with the Master Fund Partnership Agreement. In determining the value of the assets of the Master Fund, no value is placed on the goodwill or name of the Master Fund, or the office records, files, statistical data or any similar intangible assets of the Master Fund not normally reflected in the Master Fund's accounting records, but there must be taken into consideration any related items of income earned but not received, expenses incurred but not yet paid, liabilities fixed or contingent, prepaid expenses to the extent not otherwise reflected in the books of account, and the value of options or commitments to purchase or sell securities pursuant to agreements entered into on or prior to such valuation date.

A copy of the Master Fund's valuation policy is available upon request from the Master Fund GP.

The value of each security and other asset of the Master Fund and the net worth of the Master Fund as a whole determined pursuant Master Fund Partnership Agreement are conclusive and binding on all of the partners of the Master Fund and all persons claiming through or under them.

Appx. 03487

## RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST

*Investment in the Fund is speculative and involves substantial risks, including, but not limited to, those summarized below. The Fund is not suitable for all investors and is intended for sophisticated investors who can accept the risks associated with their investments. Prospective investors should carefully consider the risk factors described in this section, among others, in determining whether an investment in the Fund is suitable for them. There can be no assurance that the Fund's program will be successful or that investments purchased by the Fund will increase in value. An investor must be prepared to bear capital losses that might result from an investment in the Fund, including a complete loss of the investor's invested capital. All investors in the Fund should consult their own legal, tax and financial advisors prior to investing in the Fund.*

*For purposes of this section, references to the "Fund" should be understood to mean each of the Fund and the Master Fund, as applicable, and each of the risk factors set forth herein, while not exhaustive, shall apply equally to each of the Fund and the Master Fund, as applicable.*

**General Risks**

*Limited Operating History.* The Fund, the Master Fund and the Master Fund GP have limited operating histories upon which investors can evaluate the anticipated performance of the Fund. The Investment Manager has been in operation since 1993. However, the past performance of the Investment Manager and its officers and personnel is not an indication of future success of the Fund.

*Risks Associated With Investments in Securities.* Any investment in securities carries market risks. An investment in the Fund is highly speculative and involves a high degree of risk due to the nature of the Fund's investments and the strategies to be employed. An investment in the Fund should not in itself be considered a balanced investment program, but rather is intended to provide diversification in a more complete investment portfolio.

*Investment Judgment; Market Risk.* The profitability of a significant portion of the Master Fund's investment program depends to a great extent upon correctly assessing the future course of the price movements of securities and other investments. There can be no assurance that the Investment Manager will be able to predict accurately these price movements. With respect to the investment strategy utilized by the Master Fund, there is always some, and occasionally a significant, degree of market risk.

*Limited Liquidity; Additional Information.* An investment in the Fund provides limited liquidity since the Shares are not freely transferable and may only be redeemed at such times as set forth in this Memorandum. The Board of Directors may suspend redemptions, in whole or in part, when, in the sole discretion of the Board of Directors, such a suspension is warranted by extraordinary circumstances. The Board of Directors may also delay the payment of redemption proceeds as more fully described elsewhere in this Memorandum. Investments that remain in the Fund are subject to all risks related to an investment in the Fund as described in this Memorandum.

Also, certain shareholders (including, without limitation, the Affiliated Investors), may invest on terms that provide access to information that is not generally available to other shareholders of the Fund and, as a result, may be able to act on such additional information (e.g., redeem their Shares) that other shareholders do not receive. An investment in the Fund is suitable only for sophisticated investors who have no need for current liquidity.

Appx. 03488

*Effect of Substantial Redemptions.* Several factors make substantial redemptions (and possibly substantial withdrawals from the Domestic Fund) a risk factor for shareholders. The Master Fund will pursue a variety of investment strategies that will take time to develop and implement. The Master Fund may not be able to readily dispose of such financial instruments and, in some cases, may be contractually prohibited from disposing of such financial instruments for a period of time. Substantial redemptions (and possibly substantial withdrawals from the Domestic Fund) could be triggered by a number of events, including, for example, unsatisfactory performance or a significant change in personnel or management of the Investment Manager, investor reaction to redemptions or withdrawals from other investment funds sponsored by the Investment Manager, legal or regulatory issues that investors perceive to have a bearing on the Fund or the Investment Manager, or other factors. Actions taken to meet substantial redemption requests from the Fund (as well as similar actions taken simultaneously in other investment funds sponsored by the Investment Manager) could result in prices of financial instruments held by the Master Fund decreasing and in Master Fund expenses increasing (e.g., transaction costs and the costs of terminating agreements). The overall value of the Master Fund also may decrease because the liquidation value of certain assets may be materially less than their mark-to-market value. The Master Fund may be forced to sell its more liquid positions while maintaining a relatively concentrated portfolio of illiquid assets. Substantial redemptions could also significantly restrict the Master Fund's ability to obtain financing or derivatives counterparties needed for its investment and trading strategies, which would have a further material adverse effect on the Master Fund's performance.

Substantial redemptions from the Fund within a short period of time could require the Master Fund to liquidate securities positions more rapidly than would otherwise be desirable, possibly reducing the value of the Fund's assets and/or disrupting the Investment Manager's investment strategy. Reduction in the size of the Fund could make it more difficult to generate a positive return or to recoup losses due to, among other things, reductions in the Master Fund's ability to take advantage of particular investment opportunities or decreases in the ratio of its income to its expenses.

*Master-Feeder Structure.* The Fund will invest all of its investable assets in the Master Fund. The "master-feeder" fund structure presents certain risks to the shareholders. Smaller feeder funds may be materially affected by the actions of larger feeder funds.

While the Investment Manager, as investment manager of the Master Fund, generally will not consider tax issues applicable to any particular investors, it generally will take into account the tax positions of the Fund and the Domestic Fund that invest in the Master Fund. However, the use of a "master-feeder" structure may create a conflict of interest in that different tax considerations for the Fund and the Domestic Fund may cause or result in the Master Fund structuring or disposing of an investment in a manner or at a time that is more advantageous (or disadvantageous) for tax purposes to one Feeder Fund or its investors.

*Management Fee and Performance Allocations.* As described above, the Master Fund Partnership Agreement provides for the payment of the Management Fee to the Investment Manager and the Performance Allocation to the Master Fund GP. The Performance Allocation may create an incentive for the Investment Manager, an affiliate of the Master Fund GP, to make investments that are riskier or more speculative than would be the case in the absence of such Performance Allocation.

*Side Letters.* The Fund may from time to time enter into letter agreements or other similar agreements (collectively, "**Side Letters**") with one or more shareholders which provide such shareholder(s) with additional and/or different rights (including, without limitation, with respect to access to information, the Management Fee, the Performance Allocation, minimum investment

38

amounts, voting rights and liquidity terms) than such shareholder(s) have pursuant to this Memorandum.  As a result of such Side Letters, certain shareholders may receive additional benefits (including, but not limited to, reduced fee obligations, the ability to redeem Shares on shorter notice and/or expanded informational rights) which other shareholders will not receive.  For example, a Side Letter may permit a shareholder to redeem its Shares on less notice and/or at different times than other shareholders.  As a result, should the Fund experience a decline in performance over a period of time, a shareholder who is party to a Side Letter that permits less notice and/or different redemption times may be able to redeem its Shares prior to other shareholders.  In general, the Fund and/or the Investment Manager will not be required to notify any or all of the other shareholders of any such Side Letters or any of the rights and/or terms or provisions thereof, nor will the Fund and/or the Investment Manager be required to offer such additional and/or different rights and/or terms to any or all of the other shareholders.  The Fund and/or the Investment Manager may cause the Fund to enter into such Side Letters with any party as the Fund and/or the Investment Manager may determine in its sole discretion at any time.  The other shareholders will have no recourse against the Fund and/or the Investment Manager in the event certain shareholders receive additional and/or different rights and/or terms as a result of such Side Letters.  A shareholder will be required to enter into such undertakings with respect to maintaining the confidentiality of any such additional information as the Fund and/or the Investment Manager may in their sole discretion determine.

*Net Asset Value Considerations*.  The net asset value of the Fund is expected to fluctuate over time with the performance of the Master Fund's investments.  A shareholder may not fully recover its investment when it chooses to redeem its Shares from the Fund or upon a compulsory redemption if the net asset value of the shareholder's Shares at the time of such redemption is less than the share price of such Shares or if there remain any unamortized costs and expenses of establishing the Fund.

*No Participation by Investors*.  All decisions with respect to the management of the day-to-day affairs of the Fund are made exclusively by the Board of Directors and the Investment Manager.  Shareholders have no right or power to take part in the management of the Fund.  The Investment Manager makes all of the trading and investment decisions of the Fund.  In the event of the withdrawal of the Investment Manager, generally the Fund will be liquidated.

*Investment Strategies*.  The Investment Manager will seek to engage in the investment activities that have been discussed in "*Investment Program*" herein.  There can be no assurance that the Investment Manager will be successful in applying any such strategy and that losses will be avoided.

*Competition*.  The markets in which the Master Fund invests are competitive and some of the opportunities that the Investment Manager may explore may be pursued by better known investors or investment funds.  There can be no assurance that the Investment Manager will be able to identify or successfully pursue such opportunities in this environment.  The Investment Manager competes with many firms that may have greater financial resources, more extensive development, better marketing and service capabilities, more favorable financing arrangements, larger research staffs and more securities traders than are available to the Investment Manager.

*In-Kind Distributions*.  A redeeming shareholder may, in the discretion of the Fund and/or Investment Manager, receive securities owned by the Fund in lieu of, or in combination with, cash.  The value of securities distributed may increase or decrease before the securities can be sold, and the shareholder will incur transaction costs in connection with the sale of such securities.  Additionally, securities distributed with respect to a redemption by a shareholder may not be readily marketable.  The risk of loss and delay in liquidating these securities will be borne by the shareholder, with the

Appx. 03490

result that such shareholder may receive less cash than it would have received on the date of redemption.

*No Current Income*.   Since the Fund does not generally intend to pay distributions, an investment in the Fund is not suitable for investors seeking current income.

*Terrorist Action*.   There is a risk of terrorist attacks on the United States and elsewhere causing significant loss of life and property damage and disruptions in the global market.   Economic and diplomatic sanctions may be in place or imposed on certain states and military action may be commenced.   The impact of such events is unclear, but could have a material effect on general economic conditions and market liquidity.

*Unforeseen Events*.   The Master Fund may be adversely affected by unforeseen events involving such matters as changes in interest rates or the credit status of an issuer, forced redemptions of securities or acquisition proposals, break-up of planned mergers, unexpected changes in relative value or changes in tax treatment.

*Cybersecurity*.   Information and technology systems may be vulnerable to damage or interruption from computer viruses, network failures, computer and telecommunication failures, infiltration by unauthorized persons and security breaches, usage errors by their respective professionals, power outages and catastrophic events such as fires, tornadoes, floods, hurricanes and earthquakes. Although the Investment Manager has implemented various measures to manage risks relating to these types of events, if these systems are compromised, become inoperable for extended periods of time or cease to function properly, the Investment Manager, the Master Fund and/or the Fund may have to make a significant investment to fix or replace them, which expense may be borne in whole or in part by the Fund. The failure of these systems and/or of disaster recovery plans for any reason could cause significant interruptions in the Investment Manager's, the Master Fund's and/or the Fund's operations and result in a failure to maintain the security, confidentiality or privacy of sensitive data, including personal information relating to investors.   Such interruptions could harm the Investment Manager's, the Master Fund's and/or the Fund's reputation, subject any such entity and their respective affiliates to legal claims and otherwise affect their business and financial performance. The foregoing risks and consequences are also extant at any issuer in which the Master Fund invests and could manifest as adverse performance of such investment.

*Accounting Rules*.   The Fund's and the Master Fund's assets and liabilities are valued in accordance with the Articles of Association or the Master Fund Partnership Agreement (collectively, the "***Operating Agreements***"), as applicable.   However, for purposes of preparing the Fund's and the Master Fund's annual audited financial statements, which are prepared in accordance with U.S. generally accepted accounting principles ("***GAAP***"), certain of the Fund's and the Master Fund's assets and liabilities may be valued in a manner that, while consistent with GAAP, is different from the manner in which such assets are valued pursuant to the Operating Agreements.

Accordingly, to the extent that GAAP would require any of the Fund's assets or liabilities to be valued in a manner that differs from the valuation procedures set forth in the Operating Agreements, such assets or liabilities will be valued in accordance with GAAP, solely for purposes of preparing the Fund's GAAP-compliant annual audited financial statements, and in accordance with the Operating Agreements (without regard to any GAAP requirements relating to the determination of fair value), for all other purposes.

Generally, GAAP and other related accounting rules applicable to investment funds and various assets they invest in are evolving. Such changes may adversely affect the Fund and the Master Fund. For example, the evolution of rules governing the determination of the fair market value of assets to the extent such rules become more stringent would tend to increase the cost and/or reduce the availability of third-party determinations of fair market value. This may in turn increase the costs associated with selling assets or affect their liquidity due to an inability to obtain a third-party determination of fair market value.

*Valuations.* From time to time, certain situations affecting the valuation of the Master Fund's investments (such as limited liquidity, unavailability or unreliability of third-party pricing information and acts or omissions of service providers to the Master Fund) could have an impact on the net asset value of the Fund, particularly if prior judgments as to the appropriate valuation of an investment should later prove to be incorrect after a net asset value-related calculation or transaction is completed. The Fund is not required to make retroactive adjustments to prior subscription or redemption transactions or the Management Fee or Performance Allocations based on subsequent valuation data.

*Trade Errors.* The Investment Manager, on behalf of the Fund, may from time to time make trade errors. Trade errors are not errors in judgment, strategy, market analysis, economic outlook or the like, but rather errors in implementing specific trades which the Investment Manager has determined (rightly or wrongly) to make. Examples of trade errors would be: buying 10,000 shares of an issue, rather than the 1,000 that was intended or taking a short, rather than the intended long, position in a particular issue. Trade errors can result from clerical mistakes, miscommunications between the Investment Manager's personnel and other reasons. Importantly, however, trade errors are not the function of poor strategies, valuation models, economic expectations, undue speculation, unauthorized trades or the like, but rather of the physical implementation of specific trades on which the Investment Manager had decided. The Investment Manager will determine whether to have the costs arising from trade errors borne by the Fund or the Investment Manager by applying the pertinent standard of liability for the Investment Manager in its management of the Fund's capital — i.e., the same standard of liability which would apply to any other action or omission by the Investment Manager in the course of such management. The Investment Manager will, accordingly, be obligated to reimburse the Fund for any trade error resulting from the Investment Manager's willful misconduct, bad faith or gross negligence (as interpreted in accordance with the laws of the State of Delaware), and not otherwise. The Investment Manager will itself determine in good faith whether or not a given trade error is required to be reimbursed under the general liability and exculpation standards applicable to the Fund. The Investment Manager has a conflict of interest in determining whether a trade error should be for the account of the Fund or the Investment Manager and will attempt to resolve such conflict by an objective determination of the status of such trade error under the applicable liability standard. Trade error costs can be significant — including market losses resulting from the position incorrectly acquired as well as the additional brokerage costs of closing out or reversing the error. The opportunity cost (lost profits) of not having made the trade intended to be made is not considered a trade error cost. Any gains recognized on trade errors will be for the benefit of the Fund; none will be retained by the Investment Manager.

**Investment Strategy and Investment Risks**

<u>Risks Associated with Investing in CLOs</u>

*Dependence Upon Other Unrelated Managers.* The success of a collateralized loan obligation ("*CLO*" or "*CLO Securities*") may depend on the management talents and efforts of one person or a small group of persons whose management could adversely affect the CLO and, accordingly, the

Appx. 03492

Master Fund as an investor in such CLO. Given that the Investment Manager will not have an active role in the management of these CLOs, the return on the Master Fund's investments in such CLOs will depend on the performance of unrelated managers.

*Investments in CLOs Managed by the Investment Manager or its Affiliates*. The Master Fund may invest a significant portion of its capital in structured investments, including CLO tranches originated and managed by third parties and CLO tranches managed by the Investment Manager or its affiliates (the "***Affiliated CLOs***"); provided, however, that the Master Fund will only invest in Affiliated CLOs in secondary transactions, and not primary issuance. The Investment Manager or its affiliates will receive senior and subordinated management fees and, in some cases, a performance-based allocation or fee with respect to its role as general partner and/or manager of the Affiliated CLOs. The Investment Manager will have conflicting division of loyalties and responsibilities regarding the Master Fund and an Affiliated CLO, and certain other conflicts of interest would be inherent in the situation. There can be no assurance that the interests of the Master Fund would not be subordinated to those of an Affiliated CLO or to other interests of the Investment Manager.

*Multiple Levels of Fees*. The Master Fund and the CLOs (including Affiliated CLOs) are expected to impose management fees, other administrative fees, carried interest and other performance allocations on realized and unrealized appreciation in the value of the assets managed and other income. This may result in greater expense than if Limited Partners were able to invest directly in the CLOs or underlying investments. Limited Partners should take into account that the return on their investment will be reduced to the extent of both levels of fees. The general partner or manager of a CLO may receive the economic benefit of certain fees from its portfolio companies for services and in connection with unconsummated transactions (*e.g.*, break-up, placement, monitoring, directors', organizational and set-up fees and financial advisory fees). Additionally, the Investment Manager may receive fees from certain CLOs in connection with its role as "backup manager" for the CLOs.

*Limited Diversification*. CLOs may invest in concentrated portfolios of assets. The concentration of an underlying portfolio in any one obligor would subject the related CLO Securities to a greater degree of risk with respect to defaults by such obligor and the concentration of a portfolio in any one industry would subject the related CLOs to a greater degree of risk with respect to economic downturns relating to such industry. The Master Fund may have a concentrated exposure to a particular type of CLO.

*Risks of Investment Focus*. The Master Fund's portfolio will primarily consist of CLO Securities. CLO Securities are subject to, among other risks, credit, liquidity and interest rate risks.

The value of the CLO Securities that the Master Fund may own generally will fluctuate with, among other things, the financial condition of the obligors or issuers of the CLO Securities' underlying portfolio of assets ("***CLO Collateral***"), general economic conditions, the condition of certain financial markets, political events, developments or trends in any particular industry and changes in prevailing interest rates. CLO Securities are issued on a non-recourse basis and holders of CLO Securities must rely solely on distributions on the CLO Collateral or proceeds thereof for payment in respect thereof. If distributions on the CLO Collateral are insufficient to make payments on the CLO Securities, no other assets will be available for payment of the deficiency and following realization of the CLO Securities, the obligations of such issuer to pay such deficiency generally will be extinguished.

Issuers of CLO Securities may acquire interests in loans and other debt obligations by way of sale, assignment or participation ("***CLO Debt***"). The purchaser of an assignment typically succeeds to all the rights and obligations of the assigning institution and becomes a lender under the credit

agreement with respect to the loan or debt obligation; however, its rights can be more restricted than those of the assigning institution.

CLO Collateral may consist of corporate loans, leveraged loans and other instruments, which often are rated below investment grade (or of equivalent credit quality). Loans may be unsecured and may be subordinated to certain other obligations of the issuer thereof. The lower ratings of below investment grade loans reflect a greater possibility that adverse changes in the financial condition of an issuer or in general economic conditions or both may impair the ability of the related issuer or obligor to make payments of principal or interest. Such investments may be speculative.

*Interest Rate Mismatch.* CLOs may be subject to interest rate risk. The CLO Collateral of an issuer of a CLO may bear interest at a fixed or floating rate, while the CLO Debt may bear interest at a floating or fixed rate. As a result, there could be a floating/fixed rate or basis mismatch between such CLO Debt and the CLO Collateral which bears interest at a fixed rate ("**Fixed Rate Assets**"), and there may be a timing mismatch between such CLO Debt and the assets that are not Fixed Rate Assets ("**Floating Rate Assets**"). In addition, the interest rate on Floating Rate Assets may adjust more frequently or less frequently, on different dates and based on different indices than the interest rates on the CLO Debt. As a result of such mismatches, an increase or decrease in the level of the floating rate indices could adversely impact the ability to make payments on such CLO Debt. Although many CLOs attempt to hedge this interest rate risk, the hedges may not eliminate this risk and payments by the CLO under the hedges may significantly reduce the distributions on the CLO Securities. In addition, these hedges may have additional risks, such as counterparty risk, that are not present without these hedges.

*Defaulted Assets Underlying CLO Securities*. If the assets underlying a CLO Security become defaulted assets, such defaulted assets may become subject to either substantial workout negotiations or restructuring, which may entail, among other things, a substantial reduction in the interest rate, a substantial write-down of principal, and a substantial change in the terms, conditions and covenants with respect to such defaulted asset. In addition, such negotiations or restructuring may be quite extensive and protracted over time, and therefore may result in substantial uncertainty with respect to the ultimate recovery on such defaulted asset. The liquidity for defaulted assets may be limited, and to the extent that defaulted assets are sold, it is highly unlikely that the proceeds from such sale will be equal to the amount of unpaid principal and interest thereon. Furthermore, there can be no assurance that the ultimate recovery on any defaulted assets will be at least equal to either the minimum recovery rate assumed by any rating agency that rates the notes of the CLO Security. Therefore, if any CLO Security has defaulted assets which correspond to the exposure of the Master Fund's interest in the CLO Security, the Fund may be adversely affected.

There exist significant additional risks for CLO Securities and investors in such securities as a result of the current liquidity crisis. Those risks include, among others, (i) the likelihood that the issuer of the CLO Security will find it harder to sell any of its assets in the secondary market, thus rendering it more difficult to dispose of assets which it has the discretion to manage, including credit risk obligations, credit improved obligations or defaulted obligations, (ii) the possibility that the price at which assets can be sold by the issuer of the CLO Security will have deteriorated from their effective purchase price and (iii) the increased illiquidity of the notes issued by the CLO Security. These additional risks may affect the returns on the investments in the Master Fund's portfolio.

*Subordination of CLO Debt and CLO Equity.* The Master Fund's portfolio may consist of CLO Equity and subordinate CLO Debt. Subordinate CLO Debt generally is fully subordinated to the related CLO senior tranches. CLO Equity generally is fully subordinated to any related CLO Debt.

43

Thus, some of the investments of the Master Fund in a CLO may rank behind other creditors of the CLO and an investment by the Master Fund in the equity tranche of a CLO may rank behind all creditors of the CLO. To the extent that any losses are incurred by a CLO in respect of its related CLO Collateral, such losses are likely to be borne first by the holders of the related CLO Equity, next by the holders of any related subordinated CLO debt and finally by the holders of the related CLO senior tranches. In addition, if an event of default occurs under the governing instrument or underlying investment, as long as any CLO senior tranches are outstanding, the holders thereof generally are likely to be entitled to determine the remedies to be exercised under the instrument governing the CLO. Remedies pursued by such holders could be adverse to the interests of the holders of any related subordinated CLO Debt and/or the holders of the related CLO Equity, as applicable. Investments of the Master Fund may be the first to absorb any losses by the CLO on its underlying portfolio. This may result in losses on the invested proceeds of the Master Fund and could result in the complete loss of invested proceeds.

*Mandatory Redemption of CLO Senior Tranches and CLO Debt.* Under certain circumstances, cash flows from CLO Collateral that otherwise would have been paid to the holders of any related CLO Debt will be used to redeem the related CLO senior tranches. This could result in an elimination, deferral or reduction in the interest payments, principal repayments or other payments made to the holders of such CLO Debt, which could adversely impact the returns to the holders of such CLO Debt.

*Optional Redemption of CLO Senior Tranches and CLO Debt.* An optional redemption by a CLO of its securities and, in particular, the exercise of rights by the holders of one or more classes of its securities (or the requisite percentages thereof) so as to effect any such optional redemption, could require the collateral or portfolio manager of the related CLO to liquidate positions more rapidly than would otherwise be desirable, which is likely to materially and adversely affect the realized value of the items of CLO Collateral sold (and which in turn is likely to materially and adversely impact the holders of any related CLO Securities, including the Master Fund). As a result of any such rapid liquidation of a CLO, a holder of the related CLO Securities (including the Master Fund) could lose all or a substantial portion of its investment in such CLO Securities.

*Insolvency Risks.* Various laws enacted for the protection of creditors may apply to the issuers of the CLO Collateral (solely for purposes of this risk factor, an "***Insolvent Company***"). The information in this paragraph and the following paragraph is applicable with respect to U.S. issuers of CLO Collateral. Insolvency considerations may differ with respect to non-U.S. issuers of CLO Collateral. If a court in a lawsuit brought by an unpaid creditor or representative of creditors of an Insolvent Company, such as a trustee in bankruptcy, were to find that the issuer did not receive fair consideration or reasonably equivalent value for incurring the indebtedness constituting the CLO or CLO Collateral (as applicable) and, after giving effect to such indebtedness, the Insolvent Company (i) was insolvent, (ii) was engaged in a business for which the remaining assets of the Insolvent Company constituted unreasonably small capital or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature, such court could determine to invalidate, in whole or in part, such indebtedness as a fraudulent conveyance, to subordinate such indebtedness to existing or future creditors of the Insolvent Company or to recover amounts previously paid by such issuer in satisfaction of such indebtedness. The measure of insolvency for purposes of the foregoing will vary. Generally, an Insolvent Company would be considered insolvent at a particular time if the sum of its debts were then greater than all of its property at a fair valuation or if the present fair saleable value of its assets were then less than the amount that would be required to pay its probable liabilities on its existing debts as they became absolute and matured. There can be no assurance as to what standard a court would apply in order to determine whether the Insolvent Company was "insolvent" after giving effect to the incurrence of the indebtedness constituting the CLO or CLO Collateral (as applicable) or

44

that, regardless of the method of valuation, a court would not determine that the Insolvent Company was "insolvent" upon giving effect to such incurrence.  In addition, in the event of the insolvency of an Insolvent Company, payments made on such CLO or CLO Collateral (as applicable) could be subject to avoidance as a "preference" if made within a certain period of time (which may be as long as one year) before insolvency.

In general, if payments on a CLO or CLO Collateral (as applicable) are avoidable, whether as fraudulent conveyances or preferences, such payments can be recaptured either from the initial recipient (such as the Master Fund) or from subsequent transferees of such payments (such as the Limited Partners).  However, a court in a bankruptcy or insolvency proceeding would be able to direct the recapture of any such payment from a Limited Partner only to the extent that such court has jurisdiction over such holder or its assets.  Moreover, it is likely that avoidable payments could not be recaptured directly from a holder that has given value in exchange for its interest, in good faith and without knowledge that the payments were avoidable.  Nevertheless, there can be no assurance that a Limited Partner will be able to avoid recapture on this or any other basis.

The preceding discussion is based upon principles of United States Federal and state laws.  Insofar as the Master Fund's portfolio consists of the obligations of non-United States obligors, the laws of certain foreign jurisdictions may provide for avoidance remedies under factual circumstances similar to those described above or under different circumstances, with consequences that may or may not be analogous to those described above under United States Federal and state laws.

*"Widening" Risk*.  For reasons not necessarily attributable to any of the risks set forth herein (for example, supply/demand imbalances or other market forces), the prices of the CLO Securities in which the Master Fund invests may decline substantially.  In particular, purchasing assets at what may appear to be "undervalued" levels is no guarantee that these assets will not be trading at even lower levels at a time of valuation or at the time of sale.  It may not be possible to predict, or to hedge against, such "spread widening" risk.

*There Is Limited Disclosure About the CLO Securities and the Underlying CLO Collateral in this Memorandum.*  The Investment Manager will not be required to provide the investors in the Fund with financial or other information (which may include material non-public information) it receives related to the CLO Securities.  The Investment Manager also may not disclose to investors notices the Investment Manager receives and it will not have any obligation to keep investors informed as to defaults in the CLO Securities, failure by the Master Fund to receive any payment of principal, interest, or other amounts or to disclose the portfolio or the decisions of which CLO Securities were not purchased in general to any investor.  In addition, the investors will not have any right to inspect any records relating to the CLO Securities, and the Investment Manager will not be obligated to disclose any further information or evidence regarding the existence or terms of, or the identity of any obligor on, any CLO Securities.

*Impact of the Volcker Rule on the Liquidity of the Notes*.  Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("**Dodd-Frank**") added a provision, commonly referred to (together with the final regulations with respect thereto adopted on December 10, 2013) as the Volcker Rule, to federal banking laws to generally prohibit various covered banking entities from engaging in proprietary trading or acquiring or retaining an ownership interest in "covered funds" which generally include, sponsoring or having certain relationships with a hedge fund or private equity fund (defined in final regulations adopted on December 10, 2013 as any entity relying on Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act to be exempt from registration under the Investment Company Act), subject to certain exemptions.  The Volcker Rule also provides for certain supervised nonbank

45

financial companies that engage in such activities or have such interests or relationships to be subject to additional capital requirements, quantitative limits or other restrictions. The conformance period for the Volcker Rule ended July 21, 2017 for CLOs. Certain CLOs may be considered "covered funds" under the Volcker rule and therefore the most senior tranche of the CLO may be a restricted security for various banking and nonbanking entities. This may restrict the liquidity of certain non-Volcker compliant CLOs in the future and may affect the Master Fund's ability to liquidate these positions on a timely basis.

<u>Investment Strategy and Investment Risks</u>

*General Economic and Market Conditions*. The success of the Master Fund's activities will be affected by general economic and market conditions, such as interest rates, availability of credit, inflation rates, economic uncertainty, changes in laws (including laws relating to taxation of the Master Fund's investments), trade barriers, currency exchange controls, and national and international political circumstances (including wars, terrorist acts or security operations). These factors may affect the level and volatility of securities prices and the liquidity of the Master Fund's investments. Volatility or illiquidity could impair the Master Fund's profitability or result in losses. The Master Fund may maintain substantial trading positions that can be adversely affected by the level of volatility in the financial markets; the larger the positions, the greater the potential for loss.

Unpredictable or unstable market conditions may result in reduced opportunities to find suitable investments to deploy capital or make it more difficult to exit and realize value (or avoid significant losses) from the Master Fund's existing investments. This sort of instability occurred in late 2008 and continued into 2009 when markets experienced significant losses arising largely because global credit spreads widened materially, equity index levels declined, and many funds liquidated assets. It is important to understand that the Master Fund can incur material losses even if it reacts quickly to difficult market conditions and there can be no assurance that the Master Fund will not suffer material adverse effects from broad and rapid changes in market conditions.

*Foreign Currencies and Investments*. Investing in foreign issuers involves certain considerations comprising of both risks and opportunities not typically associated with investing in United States issuers. These considerations include changes in exchange control regulations, political and social instability, expropriation, imposition of withholding and other foreign taxes, less liquid markets and less available information than is generally the case in the United States, higher transaction costs, less government supervision of exchanges, brokers and issuers, different legal systems with less developed bankruptcy laws, difficulty in enforcing contractual obligations, lack of uniform accounting and auditing standards and greater price volatility.

Although the Master Fund intends that most of its investments will be U.S. dollar denominated, Master Fund investments that are denominated in a foreign currency are subject to the risk that the value of a particular currency will change in relation to one or more other currencies. Among the factors that may affect currency values are trade balances, the level of interest rates, differences in relative values of similar assets in different currencies, long-term opportunities for investment and capital appreciation and political developments. The Investment Manager intends, but is under no obligation, to employ hedging techniques to reduce these risks, but there can be no assurance that such strategies will be effective.

*Diversification*. Since the Master Fund's portfolio will not necessarily be widely diversified, the investment portfolio of the Master Fund may be subject to more rapid changes in value than would

**Appx. 03497**

be the case if the Master Fund were required to maintain a wide diversification among companies, securities and types of securities.

*Volatility Risk*.  The Master Fund's investment program may involve the purchase and sale of relatively volatile instruments.  Fluctuations or prolonged changes in the volatility of such instruments, therefore, can adversely affect the value of investments held by the Master Fund.  In addition, many non-U.S. financial markets are not as developed or as efficient as those in the U.S., and as a result, price volatility may be higher for the Master Fund's investments.

*Illiquid Securities*.  From time to time, the Master Fund may invest in financial instruments that are not publicly traded.  The Master Fund may also invest in securities and other financial instruments that trade regularly but may be only thinly traded, either periodically or on an on-going basis.  The Master Fund may not be able to readily dispose of such financial instruments and, in some cases, may be contractually prohibited from disposing of such financial instruments for a specified period of time.  Accordingly, the Master Fund may be forced to sell its more liquid positions at a disadvantageous time, resulting in a greater percentage of the portfolio consisting of illiquid securities.  In addition, the market prices, if any, for such financial instruments tend to be volatile, and the Master Fund may not be able to sell them when it desires to do so or to realize what it perceives to be their fair value in the event of a sale.  The sale of illiquid securities also often requires more time and results in higher brokerage charges or dealer discounts and other selling expenses than does the sale of securities eligible for trading on national securities exchanges or in the over-the-counter markets.  Furthermore, there may be limited information available about the assets of such issuers of the financial instruments which may make valuation of such financial instruments difficult or uncertain.  It also should be noted that, even those markets which the Investment Manager expects to be liquid can experience periods, possibly extended periods, of illiquidity.

*Market Liquidity*.  The Master Fund may be adversely affected by a decrease in market liquidity for the instruments in which it invests, which may impair the Master Fund's ability to adjust its positions.  The size of the Master Fund's positions may magnify the effect of a decrease in market liquidity for such instruments.  Changes in overall market leverage, or the liquidation by other market participants of the same or similar positions, may also adversely affect the Master Fund's portfolio.

*Reinvestment Risk*.  The Master Fund reinvests the cash flows received from a security.  The additional income from such reinvestment, sometimes called interest-on-interest, is reliant on the prevailing interest rate levels at the time of reinvestment.  There is a risk that the interest rate at which interim cash flows can be reinvested will fall.  Reinvestment risk is greater for longer holding periods and for securities with large, early cash flows such as high-coupon bonds.  Reinvestment risk also applies generally to the reinvestment of the proceeds the Master Fund receives upon the maturity or sale of a portfolio security.

*Leverage*.  The Master Fund may seek to maximize its investment position by purchasing securities on margin or by arranging with banks, brokers and others to borrow money against a pledge of securities or commodities.  As a result, the possibilities of profit and loss will be increased.  Borrowing money to purchase securities will provide the Master Fund with advantages of leverage, but exposes it to capital risk, interest rate risk and higher current expenses.  Any gain in the value of securities purchased with borrowed money or income earned from these securities that exceeds interest paid on the amount borrowed would cause the Master Fund's net profit to increase faster than would otherwise be the case.  Conversely, any decline in the value of the securities purchased would cause the Master Fund's net loss to increase faster than would otherwise be the case.  In addition to purchasing securities on margin, the Master Fund will engage in short selling of securities.  A short sale will result

47

in a gain if the price of the securities sold declines sufficiently between the time of the short sale and the time at which securities are purchased to replace those borrowed. A short sale will result in a loss if the price of the securities sold short increases or does not decline sufficiently to cover transaction costs. Any gain would be decreased and any loss would be increased by the amount of any premium or interest which the Master Fund may be required to pay with respect to the borrowed securities.

*Inflation Risk*. Inflation risk results from the variation in the value of cash flows from a security due to inflation, as measured in terms of purchasing power. For example, if the Master Fund purchases a five (5) year bond in which it can realize a coupon rate of five percent (5%), but the rate of inflation is six percent (6%), then the purchasing power of the cash flow has declined. For all but adjustable securities or floating rate securities, the Master Fund is exposed to inflation risk because the interest rate the issuer promises to make is fixed for the life of the security. To the extent that interest rates reflect the expected inflation rate, floating rate securities have a lower level of inflation risk.

*Over-the-Counter-Trading*. Financial instruments that may be purchased or sold by the Master Fund may include instruments not traded on an exchange. The risk of nonperformance by the obligor on such an instrument may be greater and the ease with which the Master Fund can dispose of or enter into closing transactions with respect to such an instrument may be less than in the case of an exchange-traded instrument. In addition, significant disparities may exist between "bid" and "asked" prices for financial instruments that are not traded on an exchange. Financial instruments not traded on exchanges are also not subject to the same type of government regulation as exchange traded instruments, and many of the protections afforded to participants in a regulated environment may not be available in connection with such transactions. To the extent that the Master Fund engages in these transactions, the Master Fund must rely on the creditworthiness of its counterparty.

*Position Limits*. "Position limits" imposed by various regulators or regulations may also limit the Master Fund's ability to effect desired trades. Position limits are the maximum amounts of gross, net long or net short positions that any one person or entity may own or control in a particular financial instrument. All positions owned or controlled by the same person or entity, even if in different accounts, may be aggregated for purposes of determining whether the applicable position limits have been exceeded. Thus, even if the Master Fund does not intend to exceed applicable position limits, it is possible that different accounts managed by the Investment Manager or its affiliates may be aggregated. If at any time positions managed by the Investment Manager were to exceed applicable position limits, the Investment Manager would be required to liquidate positions, which might include positions of the Master Fund, to the extent necessary to come within those limits. Further, to avoid exceeding the position limits, the Master Fund might have to forgo or modify certain of its contemplated trades.

Dodd-Frank significantly expanded the scope of the CFTC's authority and obligation to require reporting of, and adopt limits on, the size of positions that market participants may own or control in commodity futures and futures options contracts and swaps. Dodd-Frank also narrowed existing exemptions from such position limits for a broad range of risk management transactions.

In accordance with the requirements of Dodd-Frank, the CFTC has proposed speculative position limits on listed futures and options on physical commodities and economically equivalent over-the-counter derivatives; position limits applicable to swaps that are economically equivalent to United States listed futures and futures options contracts, including contracts on non-physical commodities, such as rates, currencies, equities and credit default swaps; and aggregate position limits for a broad range of derivatives contracts based on the same underlying commodity, including swaps and futures and futures options contracts. While certain persons, contracts or transactions or classes

thereof are exempt from the speculative position limit requirements, such position aggregation requirements may further restrict the swap positions that the Master Fund may enter into or require additional filings, policies and monitoring.

The full impact of these recent changes to aggregation and whether the proposed changes to position limits themselves will take effect are not known at this time. Individually and collectively, if these changes take effect, they could increase the costs to the Master Fund of maintaining positions in commodity futures and futures option contracts and swaps, reduce the level of exposure the Master Fund is able to obtain (whether for risk management or investment purposes) through commodity futures and futures option contracts and swaps. These changes could also impair liquidity in certain swaps and adversely affect the quality of execution pricing obtained by the Master Fund, all of which could adversely impact the Master Fund's investment returns.

*Prime Brokers*. The Master Fund will rank as an unsecured creditor to each of its prime brokers in relation to assets that each such prime broker borrows, lends or otherwise uses and, in the event of the insolvency of a prime broker, the Master Fund might not be able to recover equivalent assets in full. In addition, if applicable law permits, cash that a prime broker holds or receives on the Master Fund's behalf may not be treated by the prime broker as client money, may not be segregated from the prime broker's own cash and may be used by the prime broker in the course of its investment business. In such event, the Master Fund will rank as one of the prime broker's general creditors.

*Counterparty Risk*. Some of the markets in which the Master Fund may effect transactions are "over-the-counter" or "interdealer" markets. The participants in such markets are typically not subject to credit evaluation and regulatory oversight as are members of "exchange-based" markets. This exposes the Master Fund to the risk that a counterparty will not settle a transaction in accordance with its terms and conditions because of a dispute over the terms of the contract (whether or not bona fide) or because of a credit or liquidity problem, thus causing the Master Fund to suffer a loss. Such "counterparty risk" is accentuated for contracts with longer maturities where events may intervene to prevent settlement, or where the Master Fund has concentrated its transactions with a single or small group of counterparties. The Master Fund is not restricted from dealing with any particular counterparty or from concentrating any or all of its transactions with one counterparty. Moreover, the Master Fund's internal credit function, which evaluates the creditworthiness of its counterparties, may prove insufficient. The lack of a complete and "foolproof" evaluation of the financial capabilities of the Master Fund's counterparties and the absence of a regulated market to facilitate settlement may increase the potential for losses by the Master Fund.

*Undervalued Securities*. The Master Fund may invest in undervalued securities. The identification of investment opportunities in misvalued securities is a difficult task, and there can be no assurance that such opportunities will be successfully recognized. While purchases of undervalued securities offer opportunities for above-average capital appreciation, these investments involve a high degree of financial risk and can result in substantial losses. Returns generated from the investments of the Master Fund may not adequately compensate for the business and financial risks assumed.

The Master Fund may make certain speculative investments in securities which the Investment Manager believes to be misvalued; however, there can be no assurance that the securities purchased and sold will in fact be misvalued. In addition, the Master Fund may be required to maintain positions in such securities for a substantial period of time before realizing their anticipated value. During this period, a portion of the capital of the Master Fund may be committed to the securities, thus possibly preventing the Master Fund from investing in other opportunities.

*Small and Medium Capitalization Companies*.  While the Investment Manager believes securities in companies with small and medium capitalizations often provide significant potential for appreciation, the securities of certain companies, particularly smaller-capitalization companies, involve higher risks in some respects than do investments in securities of larger companies.  For example, prices of small-capitalization and even medium-capitalization securities are often more volatile than prices of large-capitalization securities and the risk of bankruptcy or insolvency of many smaller companies (with the attendant losses to investors) is higher than for larger, "blue-chip" companies.  In addition, due to thin trading in the securities of some small-capitalization companies, an investment in those companies may be illiquid.

*Senior Loans Risk*.  Senior loans are usually rated below investment grade or may also be unrated.  As a result, the risks associated with senior loans are similar to the risks of below investment grade fixed income instruments, although senior loans are senior and secured in contrast to other below investment grade fixed income instruments, which are often subordinated or unsecured.  Investment in senior loans rated below investment grade is considered speculative because of the credit risk of their issuers.  Such companies are more likely than investment grade issuers to default on their payments of interest and principal owed to the Master Fund, and such defaults could have a materially adverse effect on the Master Fund's performance.  An economic downturn would generally lead to a higher non-payment rate, and a senior loan may lose significant market value before a default occurs.  Moreover, any specific collateral used to secure a senior loan may decline in value or become illiquid, which would adversely affect the senior loan's value.  Senior loans are subject to a number of risks described elsewhere in this Memorandum, including liquidity risk and the risk of investing in below investment grade fixed income instruments.

There may be less readily available and reliable information about most senior loans than is the case for many other types of securities, including securities issued in transactions registered under the Securities Act of 1933, as amended, or registered under the Exchange Act of 1934, as amended.  As a result, the Investment Manager will rely primarily on its own evaluation of a borrower's credit quality rather than on any available independent sources. Therefore, the Master Fund will be particularly dependent on the analytical abilities of the Investment Manager.

In general, the secondary trading market for senior loans is not well developed.  No active trading market may exist for certain senior loans, which may make it difficult to value them. Illiquidity and adverse market conditions may mean that the Master Fund may not be able to sell senior loans quickly or at a fair price.  To the extent that a secondary market does exist for certain senior loans the market for them may be subject to irregular trading activity, wide bid/ask spreads and extended trade settlement periods.

*Variable Interest Rate Risk*.  Because senior loans with floating or variable rates reset their interest rates periodically, changes in prevailing interest rates can be expected to cause some fluctuations in the value of the Master Fund's investments.  Similarly, a sudden and significant increase in market interest rates may cause a decline in the value of the Master Fund's investments.  In addition, senior loans or similar securities may allow the borrower or issuer to opt between LIBOR-based interest rates and interest rates based on bank prime rates, which may have an impact on value of the Master Fund's investments.

*Bank Loans*.  The Master Fund's investment program will include investments in significant amounts of Bank Loans and participations.  These obligations are subject to unique risks, including: (i) the possible invalidation of an investment transaction as a fraudulent conveyance under relevant creditors' rights laws; (ii) so-called lender-liability claims by the issuer of the obligations; (iii)

environmental liabilities that may arise with respect to collateral securing the obligations; and (iv) limitations on the ability of the Master Fund to directly enforce its rights with respect to participations. In analyzing each Bank Loan or participation, the Investment Manager compares the relative significance of the risks against the expected benefits of the investment. Successful claims by third parties arising from these and other risks will be borne by the Master Fund.

*DIP Loans*. From time to time, the Master Fund may invest in loans to companies that have filed for protection under Chapter 11 of the U.S. Bankruptcy Code, as amended. DIP loans are typically asset-based, revolving working-capital facilities put into place at the outset of a Chapter 11 bankruptcy to provide both immediate cash as well as ongoing working capital during the reorganization process. Such loans are risky and present significant exposure for default risk to the Master Fund.

*Adjustments to Terms of Fund Investments*. The terms and conditions of loan agreements and related assignments may be amended, modified or waived only by the agreement of the lenders. Generally, any such agreement must include a majority or a super majority (measured by outstanding loans or commitments) or, in certain circumstances, a unanimous vote of the lenders. Consequently, the terms and conditions of the payment obligation arising from loan agreements could be modified, amended or waived in a manner contrary to the preferences of the Master Fund if a sufficient number of the other lenders concurred with such modification, amendment or waiver. There can be no assurance that any obligations arising from a loan agreement will maintain the terms and conditions to which the Master Fund originally agreed.


The exercise of remedies may also be subject to the vote of a specified percentage of the lenders thereunder. The Investment Manager will have the authority to cause the Master Fund to consent to certain amendments, waivers or modifications to the Master Fund's investments requested by obligors or the lead agents for loan syndication agreements. The Investment Manager may, in accordance with its investment management standards, cause the Master Fund to extend or defer the maturity, adjust the outstanding balance of any investment, reduce or forgive interest or fees, release material collateral or guarantees, or otherwise amend, modify or waive the terms of any related loan agreement, including the payment terms thereunder. The Investment Manager will make such determinations in accordance with its investment management standards. Any amendment, waiver or modification of the terms of an investment could adversely impact the Master Fund's investment returns.

*Prepayments*. Certain of the Master Fund's investments may be prepaid more quickly than expected. Prepayment rates are influenced by changes in interest rates and a variety of economic, geographic and other factors beyond the Master Fund's control and consequently cannot be predicted with certainty. Early prepayments give rise to increased re-investment risk, as the Master Fund might realize excess cash earlier than it expected. If the Master Fund is unable to reinvest the principle portion of a prepayment in a new investment with an expected rate of return at least equal to that of the investment repaid, this may reduce the Master Fund's net investment income and, consequently, could have an adverse impact on the Fund's ability to make distributions.

*Investments in Loans Secured by Real Estate*. While direct real estate investment is not intended to be the focus of the Master Fund, it is possible that, from time to time, the Master Fund may, as a result of default, foreclosure or otherwise, hold real estate assets. Special risks associated with such investments include changes in the general economic climate or local conditions (such as an oversupply of space or a reduction in demand for space), competition based on rental rates,

51

attractiveness and location of the properties, changes in the financial condition of tenants, and changes in operating costs. Real estate values are also affected by such factors as government regulations (including those governing usage, improvements, zoning and taxes), interest rate levels, the availability of financing and potential liability under changing environmental and other laws. Of particular concern may be those mortgaged properties which are, or have been, the site of manufacturing, industrial or disposal activity. Such environmental risks may give rise to a diminution in the value of property (including real property securing any portfolio investment) or liability for cleanup costs or other remedial actions, which liability could exceed the value of such property or the principal balance of the related portfolio investment. In certain circumstances, a lender may choose not to foreclose on contaminated property rather than risk incurring liability for remedial actions.

*Limitations on the Enforcement of Creditor's Rights.* The Master Fund's investments may or may not be secured by mortgages, charges, pledges, liens or other security interests. Depending on the jurisdiction in which such security interests are created, enforcement of such security interests may be a complicated and difficult process. Any attempt by the Fund to enforce its rights against the obligor or to realize value from any security interests in connection with a credit investment will be subject to numerous risks, delays and uncertainties, including those related to the validity or enforceability of the Fund's claims, the maintenance of the anticipated priority and perfection of any security interests, the effect of any bankruptcy or insolvency laws, disputes among different classes of creditors, the possibility of counterclaims or defenses, practical difficulties and costs in litigating and enforcing claims in foreign jurisdictions, unfriendly venues for litigation and many others. All of these risks are magnified by the political and legal environment in many emerging markets. As a result, there can be no assurance that the Fund will be able to enforce its legal rights to the extent expected.

*Environmental Hazards.* Under environmental laws enacted by the United States and the various states, owners of property may be liable for the cleanup and removal of hazardous substances even where the owner was not responsible for placing the hazardous substances on the property or where the property was contaminated prior to the time the owner took title. The kinds of hazardous substances for which liability may be incurred include, among other things, chemicals and other materials commonly used by small businesses and manufacturing operations. The costs of removal and clean-up of hazardous substances and wastes can be extremely expensive and, in some cases, can exceed the value of a property. If any property acquired by the Master Fund through foreclosure or otherwise subsequently were found to have an environmental problem, such acquiring entity could incur substantial costs and suffer a complete loss of its investment in such property as well as of other assets. Similarly, real estate is subject to loss due to so-called "special hazards" (e.g., floods, earthquakes and hurricanes). It may be impractical or impossible to fully insure against such events and, should such an event occur, the Master Fund could incur substantial costs and suffer a loss of its investment in such property.

*Fraud.* Of paramount concern in lending is the possibility of material misrepresentation or omission on the part of the borrower. Such inaccuracy or incompleteness may adversely affect the valuation of the collateral underlying the loans or may adversely affect the ability of the Master Fund to perfect or effectuate a lien on the collateral securing the loan. The Master Fund will rely upon the accuracy and completeness of representations made by borrowers to the extent reasonable, but cannot guarantee such accuracy or completeness. Under certain circumstances, payments to the Master Fund may be reclaimed if any such payment or distribution is later determined to have been a fraudulent conveyance or a preferential payment.

*Debt Securities*. The Master Fund intends to invest in bonds or other fixed income securities, including, without limitation, commercial paper and "higher yielding" (and, therefore, higher risk) debt securities.  It is likely that a major economic recession could disrupt severely the market for such securities and may have an adverse impact on the value of such securities.  In addition, it is likely that any such economic downturn could adversely affect the ability of the issuers of such securities to repay principal and pay interest thereon and increase the incidence of default for such securities.

*Investing in High Yield Securities*.  The Master Fund intends to invest in high-yield securities.  Such securities are generally not exchange traded and, as a result, these instruments trade in the over-the-counter marketplace, which is less transparent than the exchange-traded marketplace.  In addition, the Master Fund will invest in bonds of issuers that do not have publicly traded equity securities, making it more difficult to hedge the risks associated with such investments.  High-yield securities face ongoing uncertainties and exposure to adverse business, financial or economic conditions which could lead to the issuer's inability to meet timely interest and principal payments.  The market values of certain of these lower-rated and unrated debt securities tend to reflect individual corporate developments to a greater extent than do higher-rated securities which react primarily to fluctuations in the general level of interest rates, and tend to be more sensitive to economic conditions than are higher-rated securities.  Companies that issue such securities are often highly leveraged and may not have available to them more traditional methods of financing.  It is possible that a major economic recession could disrupt severely the market for such securities and may have an adverse impact on the value of such securities.  In addition, it is possible that any such economic downturn could adversely affect the ability of the issuers of such securities to repay principal and pay interest thereon and increase the incidence of default of such securities.

*Timing Risk*.  Many agency, corporate and municipal bonds, and all mortgage-backed securities, contain a provision that allows the issuer to "call" all or part of the issue before the bond's maturity date.  The issuer usually retains the right to refinance the bond in the future if market interest rates decline below the coupon rate.  There are three disadvantages to the call provision.  First, the cash flow pattern of a callable bond is not known with certainty.  Second, because the issuer will call the bonds when interest rates have dropped, the Master Fund is exposed to reinvestment rate risk, i.e., the Master Fund will have to reinvest the proceeds received when the bond is called at lower interest rates.  Finally, the capital appreciation potential of a bond will be reduced because the price of a callable bond may not rise much above the price at which the issuer may call the bond.

*Maturity Risk*.  In certain situations, the Master Fund may purchase a bond of a given maturity as an alternative to another bond of a different maturity.  Ordinarily, under these circumstances, the Master Fund will make an adjustment to account for the differential interest rate risks in the two bonds.  This adjustment, however, makes an assumption about how the interest rates at different maturities will move.  To the extent that the yield movements deviate from this assumption, there is a yield-curve or maturity risk.  Another situation where yield-curve risk should be considered is in the analysis of bond swap transactions where the potential incremental returns are dependent entirely on the parallel shift assumption for the yield curve.

*Revolving Credit Facilities*.  From time to time the Master Fund may incur contingent liabilities in connection with an investment.  For example, the Master Fund may purchase from a lender a revolving credit facility that has not yet been fully drawn.  If the borrower subsequently draws down on the facility, the Master Fund would be obligated to fund the amounts due.

*Investments in Stressed Debt*.  The Master Fund is authorized to invest in securities and other obligations of stressed issuers.  Stressed issuers are issuers that are not yet deemed distressed or

bankrupt and whose debt securities are trading at a discount to par, but not yet at distressed levels.  An example would be an issuer that is in technical default of its credit agreement, or undergoing strategic or operational changes, which results in market pricing uncertainty.

*Investments in Distressed Securities*.  The Master Fund may invest in securities and obligations of issuers in weak financial condition, experiencing poor operating results, having substantial capital needs or negative net worth, facing special competitive or product obsolescence problems, including companies involved in bankruptcy or other reorganization and liquidation proceedings.  These securities are likely to be particularly risky investments although they also may offer the potential for correspondingly high returns.  Among the risks inherent in investments in troubled entities is the fact that it frequently may be difficult to obtain information as to the true condition of such issuers.  Such investments may also be adversely affected by laws relating to, among other things, fraudulent transfers and other voidable transfers or payments, lender liability and the bankruptcy court's power to disallow, reduce, subordinate or disenfranchise particular claims.  Such companies' securities may be considered speculative, and the ability of such companies to pay their debts on schedule could be affected by adverse interest rate movements, changes in the general economic climate, economic factors affecting a particular industry or specific developments within such companies.  In addition, there is no minimum credit standard that is a prerequisite to the Master Fund's investment in any instrument, and a significant portion of the obligations and securities in which the Master Fund invests may be less than investment grade.  The level of analytical sophistication, both financial and legal, necessary for successful investment in companies experiencing significant business and financial difficulties is unusually high.  There is no assurance that the Investment Manager will correctly evaluate the value of the assets collateralizing the Master Fund's loans or the prospects for a successful reorganization or similar action.  In any reorganization or liquidation proceeding relating to a company in which the Master Fund invests, the Master Fund may lose its entire investment, may be required to accept cash or securities with a value less than the Master Fund's original investment and/or may be required to accept payment over an extended period of time.  Under such circumstances, the returns generated from the Master Fund's investments may not compensate the investors adequately for the risks assumed.

In liquidation (both in and out of bankruptcy) and other forms of corporate reorganization, there exists the risk that the reorganization either will be unsuccessful (due to, for example, failure to obtain requisite approvals), will be delayed (for example, until various liabilities, actual or contingent, have been satisfied) or will result in a distribution of cash or a new security the value of which will be less than the purchase price to the Master Fund of the security in respect to which such distribution was made.

*Troubled Origination*.  The investments chosen by the Investment Manager may have been originated by financial institutions or other entities that are, or may in the future be, insolvent, in serious financial difficulty, or no longer in existence.  As a result, the standards by which such investments were originated, the recourse to the selling institution, or the standards by which such investments are being serviced or operated may be adversely affected.

*Issuer Default Risk; Negative Loan Performance*.  There are varying sources of statistical default and recovery rate data for commercial loans and numerous methods for measuring default and recovery rates. The levels of defaults and delinquencies with respect to loans have been increasing, and slowing economic activity continues to contribute to a decline in overall credit quality.  The historical performance of the loan market is not necessarily indicative of its future performance, and there is no way to determine whether such trends in the credit markets will improve or worsen in the future.

A substantial portion of the Master Fund's income is expected to be derived, directly or indirectly, from repayments of principal and interest received in respect of debt securities. A wide range of factors may adversely affect an obligor's ability to make repayments, including: adverse changes in the financial condition of such obligor or the industries or regions in which it operates; the obligor's exposure to counterparty risk; systemic risk in the financial system and settlement; changes in law or taxation; changes in governmental regulations or other policies; natural disasters; terrorism; social unrest, civil disturbances; or general economic conditions. Default rates tend to accelerate during economic downturns. A continuing decreased ability of borrowers to obtain refinancing may result in a further economic decline that could delay an economic recovery and cause a further deterioration in loan performance generally.

To the extent the Master Fund invests in debt securities secured by collateral, there can be no assurance that the liquidation of any collateral securing any of the Master Fund's investments would satisfy the borrower's obligation in the event of non-payment of scheduled interest or principal payments, or that the collateral could be readily liquidated. In the event of bankruptcy or insolvency of a borrower, the Master Fund could experience delays or limitations with respect to its ability to realize the benefits of the collateral securing such investment. The collateral securing an investment may lose all or substantially all of its value in the event of the bankruptcy or insolvency of a borrower.

Any defaults will have a negative impact on the value of the Master Fund's investments and may reduce the return that such Master Fund receives from its investments in certain circumstances. While some amount of defaults is expected to occur in the Master Fund's portfolio, in the event that the Master Fund elects to apply leverage to an investment, defaults in or declines in the value of the portfolio investments in excess of these expected amounts may result in breaches of covenants under applicable financing arrangements, triggering credit enhancement requirements or accelerated repayment provisions and, if not cured within the relevant grace periods, permitting the finance provider to enforce its security over all the assets of the Master Fund.

In the case of debt ranking equally with the loans or debt securities in which the Master Fund invests, the Master Fund would have to share on an equal basis any distributions with other creditors holding such debt in the event of an insolvency, liquidation, dissolution, reorganization or bankruptcy of the relevant company's debt securities. Each jurisdiction in which the Master Fund invests has its own insolvency laws. As a result, investments in similarly situated companies in different jurisdictions may confer different rights in the event of insolvency.

*Post-Reorganization Securities*. The Master Fund will hold debt and equity of companies as a result of the recapitalization or restructuring of debt obligations. Investments in the debt or equity of companies involved in reorganization proceedings typically entail a number of risks that do not normally apply to investments in financially sound companies. For example, if the Investment Manager's evaluation of the anticipated outcome of a reorganization or the timing of such outcome should prove incorrect, the Master Fund could experience losses. Moreover, post-reorganization securities can be subject to heavy selling or downward pricing pressure after the completion of a bankruptcy reorganization or restructuring. A wide variety of considerations make any evaluation of the outcome of an investment in such a company uncertain. Such considerations include, for example, the possibility of litigation between the participants in a reorganization or liquidation proceeding or a requirement to obtain mandatory or discretionary consents from various governmental authorities or others. The uncertainties inherent in evaluating such investments may be increased by legal and practical considerations which limit the access of the Investment Manager to reliable and timely information concerning material developments affecting a company, or which cause lengthy delays in the completion of a reorganization or liquidation proceeding. Competition from other investors may

55

also render it difficult or impossible for the Master Fund to achieve intended results or promptly effect transactions.

*Insolvency and Enforceability of Security*.  The Master Fund's investments may be secured by mortgages, charges, pledges, liens or other security interests.  Depending on the jurisdiction in which such security interests are created, enforcement of such security interests may be a complicated and difficult process.  For example, enforcement of security interests in certain jurisdictions may require a court order and a sale of the secured property through public bidding or auction.  In addition, some jurisdictions grant courts the power to declare security interest arrangements to be void if they deem the security interest to be excessive.

*Risks Associated with Bankruptcy Cases*.  Many of the events within a bankruptcy case are adversarial and often beyond the control of the creditors.  While creditors generally are afforded an opportunity to object to significant actions, there can be no assurance that a bankruptcy court would not approve actions which may be contrary to the interests of the Master Fund.  Furthermore, there are instances where creditors and equity holders lose their ranking and priority as such if they are considered to have taken over management and functional operating control of a debtor.

Generally, the duration of a bankruptcy case can only be roughly estimated.  The reorganization of a company usually involves the development and negotiation of a plan of reorganization, plan approval by creditors and confirmation by the bankruptcy court.  This process can involve substantial legal, professional and administrative costs to the company and the Master Fund; it is subject to unpredictable and lengthy delays; and during the process the company's competitive position may erode, key management may depart and the company may not be able to invest adequately.  In some cases, the company may not be able to reorganize and may be required to liquidate assets.  Although the Master Fund intends to invest primarily in debt, the debt of companies in financial reorganization will, in most cases, not pay current interest, may not accrue interest during reorganization and may be adversely affected by an erosion of the issuer's fundamental value.  Such investments can result in a total loss of principal.

U.S. bankruptcy law permits the classification of "substantially similar" claims in determining the classification of claims in a reorganization for purpose of voting on a plan of reorganization.  Because the standard for classification is vague, there exists a significant risk that the Master Fund's influence with respect to a class of securities can be lost by the inflation of the number and the amount of claims in, or other gerrymandering of, the class.  In addition, certain administrative costs and claims that have priority by law over the claims of certain creditors (for example, claims for taxes) may be quite high.

Furthermore, there are instances where creditors and equity holders lose their ranking and priority as such when they take over management and functional operating control of a debtor.  In those cases where the Master Fund, by virtue of such action, is found to exercise "domination and control" of a debtor, the Master Fund may lose its priority if the debtor can demonstrate that its business was adversely impacted or other creditors and equity holders were harmed by the Master Fund.

The Master Fund may invest in companies based outside the United States.  Investment in the debt of financially distressed companies domiciled outside the United States involves additional risks. Bankruptcy law and process may differ substantially from that in the United States, resulting in greater uncertainty as to the rights of creditors, the enforceability of such rights, reorganization timing and the

Appx. 03507

classification, seniority and treatment of claims.  In certain developing countries, although bankruptcy laws have been enacted, the process for reorganization remains highly uncertain.

The Investment Manager, on behalf of the Master Fund, may elect to serve on creditors' committees, equity holders' committees or other groups to ensure preservation of the Master Fund's position as a creditor or equity holder.  A member of any such committee or group may owe certain obligations generally to all parties similarly situated that the committee represents.  If the Investment Manager concludes that its obligations owed to the other parties as a committee or group member conflict with its duties owed to the Master Fund, it will resign from that committee or group, and the Master Fund may not realize the benefits, if any, of participation on the committee or group.  In addition, and also as discussed above, if the Master Fund is represented on a committee or group, it may be restricted or prohibited under applicable law from disposing of or increasing its investments in such company while it continues to be represented on such committee or group.

The Master Fund may purchase creditor claims subsequent to the commencement of a bankruptcy case.  Under judicial decisions, it is possible that such purchase may be disallowed by the bankruptcy court if the court determines that the purchaser has taken unfair advantage of an unsophisticated seller, which may result in the rescission of the transaction (presumably at the original purchase price) or forfeiture by the purchaser.

*Equitable Subordination*.  Under common law principles that in some cases form the basis for lender liability claims, if a lender (a) intentionally takes an action that results in the undercapitalization of a borrower or issuer to the detriment of other creditors of such borrower or issuer, (b) engages in other inequitable conduct to the detriment of such other creditors, (c) engages in fraud with respect to, or makes misrepresentations to, such other creditors or (d) uses its influence as a stockholder to dominate or control a borrower or issuer to the detriment of other creditors of such borrower or issuer, a court may elect to subordinate the claim of the offending lender or bondholder to the claims of the disadvantaged creditor or creditors (a remedy called "equitable subordination").  The Master Fund does not intend to engage in conduct that would form the basis for a successful cause of action based upon the equitable subordination doctrine; however, because of the nature of the debt obligations, the Master Fund may be subject to claims from creditors of an obligor that debt obligations of such obligor which are held by the issuer should be equitably subordinated.

*Liability Following the Disposal of Investments*.  While the Master Fund may hold certain of its investments to maturity, the Master Fund may dispose of investments in some circumstances prior to termination and, in connection therewith, may be required to pay damages to the extent that any representations or warranties given in connection with such investments turn out to be inaccurate.  The Master Fund may become involved in disputes or litigation concerning such representations and warranties and may be required to make payments to third parties as a result of such disputes or litigation.  In the event the Master Fund does not have cash available to conduct such litigation or make such payments, it may be forced to sell investments to obtain funds.  Such sales may be effected on unsatisfactory terms.

*Potential Involvement in Litigation*.  In the event that the Master Fund holds investments in distressed investments, there is a possibility that the Investment Manager may participate in restructuring activities, it is possible that the Master Fund may become involved in litigation respecting creditor disputes and similar issues among classes of claimants.  Litigation entails expense and the possibility of counterclaims against the Master Fund including the Master Fund GP and the Investment Manager and ultimately judgments may be rendered against the Master Fund for which the Master Fund does not carry insurance.

Appx. 03508

*Directorships on Boards of Portfolio Companies*. The Principal and other members and employees of the Investment Manager or its designees may serve as directors of companies the securities of which are purchased or sold on behalf of the Master Fund and may be compensated for such service. In the event that material non-public information obtained with respect to such companies becomes subject to trading restrictions pursuant to the internal trading policies of such companies or as a result of applicable law or regulations, the Master Fund may be prohibited for a period of time from purchasing or selling the securities of such companies, which prohibition may have an adverse effect on the Master Fund.

*Material, Nonpublic Information*. From time to time, certain personnel of the Investment Manager may come into possession of material, nonpublic information (including in connection with other investments or proposed investments not intended to benefit the Master Fund) that would limit the Investment Manager's ability to buy and sell investments. The Master Fund's investment flexibility may be constrained as a consequence of the Investment Manager's inability to take certain actions because of such information. The Master Fund may experience losses if it is unable to sell an investment that it holds because certain personnel of the Investment Manager have obtained material, nonpublic information about such investment.

*Investments in Structured Products*: The Master Fund may invest in securities backed by, or representing interests in, certain underlying instruments ("***Structured Products***"). The cash flow on the underlying instruments may be apportioned among the Structured Products to create securities with different investment characteristics such as varying maturities, payment priorities and interest rate provisions, and the extent of the payments made with respect to the Structured Products is dependent on the extent of the cash flow on the underlying instruments. The Master Fund may invest in Structured Products that represent derived investment positions based on relationships among different markets or asset classes.

The performance of a Structured Product will be affected by a variety of factors, including its priority in the capital structure of the issuer, the availability of any credit enhancement, the level and timing of payments and recoveries on and the characteristics of the underlying receivables, loans or other assets that are being securitized, remoteness of those assets from the originator or transferor, the adequacy of and ability to realize upon any related collateral and the capability of the servicer of the securitized assets.

*Investments in Collateralized Loan Obligations*. The Master Fund may look to invest in CLOs diversified across maturities, underlying assets, tranches (debt, mezzanine and equity) and managers. In addition to implementing its investment process and utilizing proprietary analytical tools to evaluate and select investments for the Master Fund, the Investment Manager uses its market knowledge and industry position to add value by addressing what it believes are material inefficiencies of the existing CLO execution process. For example, within the primary new issuance market the Investment Manager will look to invest in CLOs where it can leverage its expertise and market relationships to achieve the timing, structural and financial terms especially advantageous to the Investment Manager's investments. In addition, the Investment Manager will look to assess value dislocations of CLO and other structured investments within the secondary market, as the Investment Manager believes structured products markets have inherent inefficiencies which often cause significant differentials between intrinsic value and market value. Such inefficiencies are typically driven by factors such as (i) little secondary market liquidity, (ii) complex valuation requirements for both underlying collateral as well as derivative instruments, and (iii) explosive growth of the market.

*Short-Swing Liability and Other Limitations*.  From time to time, the Master Fund, acting alone or as part of a group, may acquire beneficial ownership of more than 10% of a certain class of securities of a public company, or may place a director on the board of directors of such a company. As a result, under Section 16 of the Securities Exchange Act of 1934, as amended, the Master Fund may be subject to certain additional reporting requirements and may be required to disgorge certain short-swing profits arising from purchases and sales of such securities.  In addition, in such circumstances the Master Fund will be prohibited from entering into a short position in such issuer's securities, and therefore limited in its ability to hedge such investments.

*Fixed Interest Rate Risk*.  The value of the fixed rate securities in which the Master Fund may invest generally will have an inverse relationship with interest rates.  Accordingly, if interest rates rise the value of such securities may decline.  In addition, to the extent that the receivables or loans underlying specific securities are prepayable without penalty or premium, the value of such securities may be negatively affected by increasing prepayments, which generally occur when interest rates decline.

*Other Instruments*.  The Master Fund may take advantage of opportunities with respect to certain other instruments that are not presently contemplated for use or that are currently not available, but that may be developed, to the extent such opportunities are both consistent with the investment objective of the Master Fund and legally permissible.  Special risks may apply to instruments that are invested in by the Master Fund in the future that cannot be determined at this time or until such instruments are developed or invested in by the Master Fund.

*Long-Biased Investment Program.*  The Master Fund expects that its strategy will have a long bias.  Therefore, any decline in the overall market may result in a decline in the value of the Master Fund's assets.

**Certain Regulatory Risks**

*Regulatory Risks of Commingled Loan Funds*.  Legal, tax and regulatory changes could occur that may adversely affect the Fund.  The regulatory environment for commingled loan funds is evolving and changes in the regulation of such funds may adversely affect the value of investments held by the Master Fund.  In addition, the securities markets are subject to comprehensive statutes, regulations and margin requirements.  The United States Securities and Exchange Commission, other regulators and self-regulatory organizations and exchanges are authorized to take extraordinary actions in the event of market emergencies.  The effect of any future regulatory change on the Fund could be substantial and adverse.

The Fund and/or the Investment Manager also may be subject to regulation in jurisdictions in which the Fund and the Investment Manager engage in business.  Investors should understand that the Fund's business is dynamic and is expected to change over time.  Therefore, the Fund may be subject to new or additional regulatory constraints in the future.  This Memorandum cannot address or anticipate every possible current or future regulation that may affect the Investment Manager, the Fund or their businesses.  Such regulations may have a significant impact on shareholders or the operations of the Fund, including, without limitation, restricting the types of investments the Fund may make, preventing the Fund from exercising its voting rights with regard to certain financial instruments, requiring the Fund to disclose the identity of its investors or otherwise.  The Investment Manager may, in its sole discretion, cause the Fund to be subject to such regulations if it believes that an investment or business activity is in the Fund's interest, even if such regulations may have a detrimental effect on

one or more shareholders. Prospective investors are encouraged to consult their own advisors regarding an investment in the Fund.

*Absence of Regulatory Oversight*. While the Fund may be considered similar to an investment company, it is not required and does not intend to register as such under the U.S. Investment Company Act of 1940, as amended (the "**Company Act**"), and, accordingly, the provisions of the Company Act (which may provide certain regulatory safeguards to investors) are not applicable to investors in the Fund. The Fund will not maintain custody of its securities or place its securities in the custody of a bank or a member of a national securities exchange in the manner required of registered investment companies under rules promulgated by the SEC. A registered investment company which places its securities in the custody of a member of a national securities exchange is required to have a written custodian agreement, which provides that securities held in custody will be at all times individually segregated from the securities of any other person and marked to clearly identify such securities as the property of such investment company, and which contains other provisions complying with SEC regulations. The Fund generally will maintain such accounts at brokerage firms that do not separately segregate such assets as would be required in the case of registered investment companies. Under the provisions of the Securities Investor Protection Act of 1970, as amended, the bankruptcy of any such brokerage firm might have a greater adverse effect on the Fund than would be the case if the accounts were maintained to meet the requirements applicable to registered investment companies.

*Forward-Looking Statements*. Certain statements contained in this Memorandum, including without limitation, statements containing the words "believes," "anticipates," "intends," "expects," and words of similar import constitute "forward-looking statements." Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance or achievements of the Fund to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. Certain of these factors are discussed in more detail elsewhere in this Memorandum, including without limitation under "*Summary of Terms*," "*Certain Risk Factors*," and "*Investment Program*." Given these uncertainties, prospective investors are cautioned not to place undue reliance on such forward-looking statements. The Investment Manager and the Fund disclaim any obligation to update any such factors or to announce the result of any revisions to any of the forward-looking statements contained herein to reflect future events or developments.

*Impact of U.S. Presidential Election.* On January 20, 2017, Donald Trump became President of the United States of America. President Trump and other members of the Republican Party have proposed to reverse some of the recent regulation of the financial industry and to change tax policy. If some of these proposals were enacted, banks could dramatically increase their lending practices and accept additional types of collateral, borrowers could reduce their demand for debt financing, certain investment advisers could de-register with SEC and portfolio companies that are net importers or hold significant assets outside of the United States could be subject to increased tax liability. The effect of any such regulatory or tax changes on the Master Fund and the markets in which it trades and invests is uncertain.

*Evolving Regulatory Risks of Private Investment Funds.* The regulatory environment for private investment funds is evolving, and changes in the regulation of private investment funds and their advisers may adversely affect the value of investments held by the Master Fund.

Dodd-Frank, which was enacted in July 2010, regulates markets, market participants and financial instruments that were historically unregulated and has substantially altered the regulation of many other markets, market participants and financial instruments. Certain provisions of Dodd-Frank

**Appx. 03511**

subject registered investment advisers to requirements to keep records and to report information to the SEC, which could in turn be supplied to the Board of Governors of the Federal Reserve, a new Financial Services Oversight Council or other U.S. governmental agencies or Congress. Under Dodd-Frank, the information includes, among other things, the amount of assets under management, use of leverage (including off-balance sheet leverage), counterparty credit risk exposures, trading and investment positions, and trading practices. All such records are subject to examination by the SEC at any time. It is anticipated that there may be significant changes to the financial regulatory environment as a result of the outcome of the recent U.S. elections. There is currently pending legislation in U.S. Congress which if enacted would result in the repeal of portions of Dodd-Frank which in turn would have a significant impact on the regulatory environment for private investment funds. In addition, the impact of the legislation on current and future rulemaking by various regulators under Dodd-Frank is difficult to predict. It is possible that rules that have been proposed by various regulators, which had been anticipated to take effect previously, may no longer be implemented in their proposed form or at all. Further, there may also be substantial changes in the enforcement and interpretation of existing statutes and rules by governmental regulatory authorities or self-regulatory organizations that supervise the financial markets. The effect of future regulatory change on the Fund and the Master Fund and their operations is uncertain. Prospective investors should seek, and must rely on, the advice of their own advisers with respect to the possible impact on its investment of any future proposed legislation or administrative or judicial action.

*Enhanced Regulation of Swaps*. The recently enacted Wall Street Transparency and Accountability Act of 2010 (the "**WSTAA**") will, subject to exceptions for certain hedgers, (1) require swaps accepted for clearing by a derivatives clearing organization (a "**DCO**") or for trading through a designated contract market or swaps-execution facility to be so cleared and traded, (2) require margin for almost all swap transactions, (3) subject traders with a "substantial position" in swaps to registration and regulation requirements as a "major swap participant" or "swap dealer" and (4) impose position limits on swaps either individually or in the aggregate with respect to positions in commodity-futures contracts. Due to the new requirements imposed by the WSTAA, the Master Fund may experience increased transaction costs to pay for the clearing, execution and segregation obligations. In addition, margin requirements may increase once margin is set by DCOs with input from the CFTC, which may limit the Master Fund's ability to engage in leverage and limit the Master Fund's return. The application of position limits to swap contracts may also limit the Master Fund's ability to concentrate in any particular contract or exposure to an underlying commodity and may negatively impact the Master Fund's ability to take advantage of current market trends or conditions. Any tightening in the market for swaps may significantly impact the Master Fund and its returns. In addition, if the Master Fund were deemed to be a swap dealer or a major swap participant under WSTAA, the Master Fund may be required to register with the CFTC and would be subject to a number of regulatory requirements that would significantly impact the Master Fund's legal obligations and its returns.

*Contagion Risk Factor*. The Fund has the power to issue Shares in classes or series. The Articles provide for the manner in which the liabilities are to be attributed across the various classes or series (liabilities are to be attributed to the specific class or series in respect of which the liability was incurred). However, the Fund is a single legal entity and there is no limited recourse protection for any class or series. Accordingly, all of the assets of the Fund will be available to meet all of its liabilities regardless of the class or series to which such assets or liabilities are attributable. In practice, cross-class or cross-series liability is only expected to arise where liabilities referable to one class or series are in excess of the assets referable to such class or series and it is unable to meet all liabilities attributed to it. In such a case, the assets of the Fund attributable to other classes or series may be

61

applied to cover such liability excess and the value of the contributing classes or series will be reduced as a result.

*Handling of mail*.  Mail addressed to the Fund and/or the Master Fund and received at its registered office will be forwarded unopened to the forwarding address supplied by the Investment Manager to be dealt with.  None of the Fund and/or the Master Fund, its directors, officers, advisors or service providers (including the organization which provides registered office services in the Cayman Islands) will bear any responsibility for any delay howsoever caused in mail reaching the forwarding address.  In particular the Directors will only receive, open or deal directly with mail which is addressed to them personally (as opposed to mail which is addressed just to the Fund and/or the Master Fund).

*Subscription Monies*.  Where a subscription for Shares is accepted, the Shares will be treated as having been issued with effect from the relevant subscription date notwithstanding that the subscriber for those Shares may not be entered in the Fund's register of members until after the relevant subscription date. The subscription monies paid by a subscriber for Shares will accordingly be subject to investment risk in the Fund from the relevant subscription date.

**Tax Related Risks**

*Uncertainty and Complexity of Tax Treatment*.  The tax aspects of an investment in the Fund are complicated and complex and, in many cases, uncertain.  Statutory provisions and administrative regulations have been interpreted inconsistently by the courts.  Additionally, some statutory provisions remain to be interpreted by administrative regulations.  Investors will thus be subject to the risk caused by the uncertainty of the tax consequences with respect to an investment in the Fund.  Each prospective investor should have the tax aspects of an investment in the Fund reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and private investment vehicles.  Prospective investors are strongly urged to review the discussion below under "*Tax Considerations*" and "*ERISA and Other Regulatory Considerations*" for a more complete discussion of certain of the tax risks inherent in the acquisition of Shares and to consult their own independent tax advisors.

*Risk of Adverse Determination*.  There can be no assurance that the conclusions set forth in this Memorandum will not be challenged successfully by the U.S. Internal Revenue Service (the "*Service*") or other applicable taxing authority, or significantly modified by new legislation, changes in a taxing authority's positions, or court decisions.  The Fund has not applied for, nor does it expect to apply for, any advance rulings from the Service with respect to any of the U.S. federal income tax consequences described in this Memorandum.  No representation or warranty of any kind is made by the Fund or the Investment Manager with respect to the U.S. federal income tax consequences relating to an investment in the Fund.  The Master Fund may take positions with respect to certain tax issues which depend on legal conclusions not yet resolved by the courts or other applicable taxing authority.  Should any such positions be successfully challenged by the Service or other applicable taxing authority, there could be a materially adverse effect on the Master Fund and consequently, the Fund.

*Tax Audit*.  An audit of the Fund by the Service or another taxing authority could result in adjustments to the tax consequences initially reported by the Fund, which examination could affect the after-tax returns of a shareholder's investment in the Fund.  If such audit adjustments result in an increase in the Fund's U.S. federal income tax liability for any year, the Fund may also be liable for interest and penalties with respect to the amount of underpayment.  The legal and accounting costs incurred in connection with any audit of the Fund's tax returns will be borne by the Fund.

62

*Tax Considerations Taken into Account.*  The Investment Manager may take tax considerations into account in determining when the Master Fund's investments should be sold or otherwise disposed of, and may assume certain market risk and incur certain expenses in this regard to achieve favorable tax treatment of a transaction.

*Tax-Exempt Entities.*  Certain prospective investors that are tax-exempt for U.S. income tax purposes may be subject to U.S. federal and state laws, rules and regulations that regulate their participation in the Fund, or their engaging directly or indirectly through an investment in the Fund, in certain investment strategies that the Master Fund may utilize from time-to-time (e.g., short-sales of securities and the use of leverage, the purchase and sale of options and limited diversification).  While the Fund believes its investment program is generally appropriate for U.S. tax-exempt investors for which an investment in the Fund would otherwise be suitable, each type of tax-exempt organization may be subject to different laws, rules and regulations, and prospective investors should consult with their own advisers as to the advisability and tax consequences of an investment in the Fund. Investments in the Fund by entities subject to ERISA, and other tax-exempt entities, require special consideration.  Trustees or administrators of such entities are urged to review carefully the matters discussed in this Memorandum.

*Non-U.S. Taxation.*  With respect to certain countries, there is a possibility of expropriation, confiscatory taxation, imposition of withholding or other taxes on dividends, interest, capital gains or other income, limitations on the removal of funds or other assets of the Master Fund, political or social instability or diplomatic developments that could affect investments in those countries.  An issuer of securities may be domiciled in a country other than the country in whose currency the instrument is denominated.  The values and relative yields of investments in the securities markets of different countries, and their associated risks, are expected to change independently of each other.

*Shareholder Level Taxation.*  Tax consequences to each shareholder will depend on tax laws in that shareholder's jurisdiction.  Shareholders should consult their professional advisors as to the possible tax consequences of subscribing for, buying, holding, selling, transferring or redeeming Shares under the laws of their country of citizenship, residence or domicile.

*Tax Changes.*  Investors will be subject to the risk that changes to the tax law may adversely affect the federal income tax consequences of their investment in the Fund.  Changes in existing tax laws or regulations and their interpretation may be enacted after the date of this Memorandum, possibly with retroactive effect, and could alter the income tax consequences of an investment in the Fund.  Certain provisions of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**"), may be further amended or interpreted in a manner adverse to the Fund or the Master Fund, in which event any benefits derived from an investment in the Fund may be adversely affected.  In addition, significant legislative and budgetary proposals affecting tax laws have been made by the legislative and executive branches of the U.S. federal government.  The likelihood of enactment of any such proposals, or any similar proposals, into law is uncertain.  The enactment of any such proposals, including subsequent proposals, into law could have material adverse effects on the Fund and/or its shareholders.  Enactment of such legislation, or similar legislation, could require significant restructuring of the Fund in order to mitigate such effects.

*Recently Enacted Tax Reform Legislation.*  Recently enacted H.R. 1 (Pub. L. No. 115-97) makes significant changes to the rules potentially applicable to the Fund and/or its investors. Certain of these new rules are complex and, pending guidance that may be forthcoming, the impact on the Fund and its investors may be unclear. Prospective investors should consult their own tax advisers regarding potential changes in any tax laws, potentially with retroactive effect.

Appx. 03514

*The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Fund.  Prospective investors should read this entire Memorandum and consult with their own advisers before deciding to invest in the Fund.  In addition, as the investment program of the Fund develops and changes over time, an investment in the Fund may be subject to additional and different risk factors.  No assurance can be made that profits will be achieved or that substantial losses will not be incurred.*

*In view of the foregoing considerations, an investment in Shares is suitable only for investors who are capable of bearing the relevant investment risks.*

**Potential Conflicts of Interest**

Given the nature and size of Highland Capital Management, L.P.'s ("**Highland Capital**") operations, various potential conflicts of interest arise in connection with its advisory services and the advisory services provided by its affiliates.  Information about Highland Capital and its potential conflicts of interest is provided in Highland Capital's Form ADV Part 2 Brochure that can be found by going to https://adviserinfo.sec.gov/IAPD/Default.aspx, searching by firm name and selecting the Part 2 Brochure to be viewed.  The Fund is subject to these conflicts of interest, as well as the other items discussed below.

None of the Investment Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees (collectively, the "**Highland Group**") is precluded from engaging in or owning an interest in other business ventures or investment activities of any kind, whether or not such ventures are competitive with the Fund or the Master Fund. The Investment Manager is permitted to manage other client accounts, and does manage other client accounts, some of which may have objectives similar or identical to those of the Master Fund, including other collective investment vehicles that may be managed by the Highland Group and in which the Investment Manager or any of its affiliates may have an equity interest.

The Fund will be subject to a number of actual and potential conflicts of interest involving the Highland Group including, among other things, the fact that: (i) the Highland Group conducts substantial investment activities for accounts, funds, collateralized debt obligations that invest in leveraged loans (collectively, "**CDOs**") and other vehicles managed by members of the Highland Group ("**Highland Accounts**") in which the Fund has no interest; (ii) the Highland Group advises Highland Accounts, which utilize the same, similar or different methodologies as the Fund and may have financial incentives (including, without limitation, as it relates to the composition of investors in such funds and accounts or to the Highland Group's compensation arrangements) to favor certain Highland Accounts over the Fund and the Master Fund; (iii) the Highland Group may use the strategy described herein in certain Highland Accounts; (iv) the Investment Manager may give advice and recommend securities to, or buy or sell securities for, the Master Fund, which advice or securities may differ from advice given to, or securities recommended or bought or sold for, Highland Accounts; (v) the Investment Manager has the discretion, to the extent permitted under applicable law, to use its affiliates as service providers to the Fund and the Master Fund and the Master Fund's portfolio investments; (vi) certain investors affiliated with the Highland Group may choose to personally invest only in certain funds advised by the Highland Group and the amounts invested by them in such funds is expected to vary significantly; (vii) the Highland Group and Highland Accounts may actively engage in transactions in the same securities sought by the Master Fund and, therefore, may compete with the Master Fund for investment opportunities or may hold positions opposite to positions maintained on behalf of the Master Fund; and (viii) the Investment Manager will devote to the Master

Appx. 03515

Fund and the Fund only as much time as the Investment Manager deems necessary and appropriate to manage the Master Fund's and the Fund's business.

The Investment Manager undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Fund's investors.

*Allocation of Trading Opportunities*

It is the policy of the Investment Manager to allocate investment opportunities fairly and equitably over time. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) fiduciary duties owed to the accounts; (ii) the primary mandate of the accounts; (iii) the capital available to the accounts; (iv) any restrictions on the accounts and the investment opportunity; (v) the sourcing of the investment, size of the investment and amount of follow-on available related to the investment; (vi) whether the risk-return profile of the proposed investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (vii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (viii) liquidity requirements of the account; (ix) potentially adverse tax consequences; (x) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (xi) the need to re-size risk in the account's portfolio.

The Investment Manager has the authority to allocate trades to multiple Highland Accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the Investment Manager may allocate the trades among different accounts on a basis it considers fair and equitable over time. One or more of the foregoing considerations may (and are often expected to) result in allocations among the Master Fund and one or more Highland Accounts on other than a *pari passu* basis. The Investment Manager will allocate investment opportunities across its accounts for which the opportunities are appropriate, consistent with (i) its internal conflict of interest and allocation policies and (ii) the requirements of the Investment Advisers Act of 1940, as amended. The Investment Manager will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy, a copy of which will be provided upon request. However, there is no assurance that such investment opportunities will be allocated to the Master Fund fairly or equitably in the short-term or over time and there can be no assurance that the Master Fund will be able to participate in all investment opportunities that are suitable for it

The Investment Manager may open "average price" accounts with brokers. In an "average price" account, purchase and sale orders placed during a trading day on behalf of the Investment Manager, the Master Fund and other accounts managed by the Investment Manager are combined, and securities bought and sold pursuant to such orders are allocated among such accounts on an average price basis.

*Cross Transactions and Principal Transactions*

As further described below, the Investment Manager may effect client cross-transactions where the Investment Manager causes a transaction to be effected between the Master Fund and another client advised by it or any of its affiliates. The Investment Manager may engage in a client cross-transaction involving the Master Fund any time that the Investment Manager believes such transaction

Appx. 03516

to be fair to the Master Fund and such other client. By subscribing for an Interest, a Limited Partner is deemed to have consented to such client cross-transactions between the Master Fund and another client of the Investment Manager or one of its affiliates.

The Investment Manager may direct the Master Fund to acquire or dispose of securities in cross trades between the Master Fund and other clients of the Investment Manager or its affiliates in accordance with applicable legal and regulatory requirements. In addition, the Master Fund may invest in securities of obligors or issuers in which the Investment Manager and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Master Fund may enhance the profitability of the Investment Manager's own investments in such companies. Moreover, the Master Fund may invest in assets originated by the Investment Manager or its affiliates. In each such case, the Investment Manager and such affiliates may have a potentially conflicting division of loyalties and responsibilities regarding the Master Fund and the other parties to such trade. Under certain circumstances, the Investment Manager and its affiliates may determine that it is appropriate to avoid such conflicts by selling a security at a fair value that has been calculated pursuant to the Investment Manager's valuation procedures to another client managed or advised by the Investment Manager or such affiliates. In addition, the Investment Manager may enter into agency cross-transactions where it or any of its affiliates acts as broker for the Master Fund and for the other party to the transaction, to the extent permitted under applicable law.

The Principal, as well as the employees and officers of the Investment Manager and of organizations affiliated with the Investment Manager, may buy and sell securities for their own account or the account of others, but may not buy securities from or sell securities to the Master Fund (such prohibition does not extend to the purchase or sale of Interests in the Fund), unless appropriate approval of the Advisory Committee is obtained and such purchase or sale is in compliance with the applicable provisions of the Investment Advisers Act of 1940, as amended.

*Conflicts Relating to Equity and Debt Ownership by the Master Fund and Affiliates*

In certain circumstances, the Master Fund and other client accounts may invest in securities or other instruments of the same issuer (or affiliated group of issuers) having a different seniority in the issuer's capital structure. If the issuer becomes insolvent, restructures or suffers financial distress, there may be a conflict between the interests in the Master Fund and those other accounts insofar as the issuer may be unable (or in the case of a restructuring prior to bankruptcy may be expected to be unable) to satisfy the claims of all classes of its creditors and security holders and the Master Fund and such other accounts may have competing claims for the remaining assets of such issuers. Under these circumstances it may not be feasible for the Investment Manager to reconcile the conflicting interests in the Master Fund and such other accounts in a way that protects the Master Fund's interests. Additionally, the Investment Manager or its nominees may in the future hold board or creditors' committee memberships which may require them to vote or take other actions in such capacities that might be conflicting with respect to certain funds managed by the Investment Manager in that such votes or actions may favor the interests of one account over another account. Furthermore, the Investment Manager's fiduciary responsibilities in these capacities might conflict with the best interests of the investors.

*Affiliated Entity Services*

Affiliated entities of the Investment Manager may provide services with respect to the Investment Manager, the Master Fund or the Fund. NexBank, SSB ("*NexBank SSB*") is an affiliate of the Investment Manager and may, from time to time, provide banking and/or agency services to the

Appx. 03517

Investment Manager, clients of the Investment Manager or collective investment vehicles for which the Investment Manager provides investment advisory services (including the Fund, the Master Fund and other vehicles in which the Fund (through the Master Fund) may invest) or third parties engaged in transactions involving the Investment Manager.  NexBank SSB may also act as an agent in connection with certain securities transactions involving the Investment Manager's client accounts (including the Master Fund and other vehicles in which the Master Fund may invest).  Principals of the Investment Manager own a majority of the equity interests in NexBank SSB and employees or affiliates of the Investment Manager own or may own a substantial equity interest in NexBank SSB.  Certain Master Fund investment transactions may be executed through NexBank Securities, Inc., an affiliate of the Investment Manager and a registered broker-dealer.

Additionally, the Investment Manager or affiliates of the Investment Manager, including, without limitation, Nexbank SSB, NexBank Securities, Inc., NexBank Capital Advisors and Governance Re, Ltd., may provide financial advisory, management, insurance, title insurance or other services for a fee to portfolio companies in which the Master Fund may have an interest.  Highland Latin America Consulting, Ltd., an affiliate of the Investment Manager, has been engaged to provide certain administrative and consulting services to the Investment Manager, as more fully described below in "*Management –Services Agreement*."

*Management Fee*

A portion of any Management Fee may be paid to broker-dealers, placement agents or independent third parties, other than the Investment Manager, for services provided in connection with the solicitation of subscriptions from investors.  Accordingly, investors should recognize that a placement agent's or distributor's participation in this offering may be influenced by its interest in such current or future fees and compensation.  Investors should consider these potential conflicts of interest in making their investment decisions.  Each placement agent shall comply with the legal requirements of the jurisdictions within which it offers and sells Interests.

*Diverse Membership*

The Limited Partners are expected to include entities, persons, or entities organized in various jurisdictions and subject to different tax and regulatory regimes.  Such diverse investors may thus have conflicting investment, tax and other interests, relating to, among other things, the nature of investments made by the Master Fund, the structuring or the acquisition of investments and the timing of disposition of investments.  As a result, conflicts of interest may arise in connection with decisions made by the Investment Manager including as to the nature and structure of investments that may be more beneficial for one type of Limited Partner than for another type of Limited Partner, including Limited Partners affiliated with the Investment Manager.  The results of the Fund's activities may affect individual Limited Partners differently, depending upon their individual financial and tax situations because, for instance, of the timing of an event of realization of gain or loss and its characterization as long-term or short-term gain or loss.  In addition, the Master Fund may make investments that may have a negative impact on related investments made by the Limited Partners in separate transactions.  In selecting, structuring and managing investments appropriate for the Master Fund, the Investment Manager will consider the investment and tax objectives of the Master Fund and the Feeder Funds as a whole, not the investment, tax, or other objectives of any Limited Partner individually.  However, there can be no assurance that a result will not be more advantageous to some Limited Partners than to others or to the Investment Manager and/or its affiliates than to a particular Limited Partner.

*Soft Dollars*

The Investment Manager's authority to use "soft dollar" credits generated by the Master Fund's securities transactions to pay for expenses that might otherwise have been borne by the Investment Manager or the Master Fund GP may give the Investment Manager an incentive to select brokers or dealers for Master Fund transactions, or to negotiate commission rates or other execution terms, in a manner that takes into account the soft dollar benefits received by the Investment Manager rather than giving exclusive consideration to the interests in the Master Fund. See "*Brokerage and Custody*."

*No Separate Counsel*

Akin Gump Strauss Hauer & Feld LLP ("***Akin Gump***") serves as counsel to the Fund, the Master Fund, the Investment Manager, the Master Fund GP and certain of their Affiliates (the "***Clients***") in connection with the formation of the Fund and certain other Clients, the offering of Shares as well as certain other matters for which the Clients may engage Akin Gump from time to time. Akin Gump disclaims any obligation to verify the Clients' compliance with their obligations either under applicable law or the governing documents of the Fund. In acting as counsel to the Clients, Akin Gump has not represented and will not represent any shareholders nor does it purport to represent their interests. No independent counsel has been retained to represent the shareholders. In assisting in the preparation of this Memorandum, Akin Gump has relied on information provided by the Fund, the Investment Manager and the Master Fund GP and certain of the Fund's other service providers (including, without limitation, the Principal's biographical data, summaries of market conditions, the planned investment strategy of the Master Fund and the performance of the Master Fund, its investments or any predecessor Fund) without verification and does not express a view as to whether such information is accurate or complete.

Maples and Calder, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, acts as Cayman Islands legal counsel to the Fund, the Master Fund and the Master Fund GP. In connection with the offering of shares and/or interests and subsequent advice to the Fund, the Master Fund and the Master Fund GP, Maples and Calder will not be representing shareholders and/or limited partners. No independent legal counsel has been retained to represent the shareholders and/or limited partners. Maples and Calder's representation of the Master Fund GP is limited to specific matters as to which it has been consulted by the Master Fund GP. There may exist other matters that could have a bearing on the Master Fund as to which Maples and Calder has not been consulted. In addition, Maples and Calder does not undertake to monitor compliance by the Master Fund GP and its affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does Maples and Calder monitor ongoing compliance with applicable laws. In connection with the preparation of this Memorandum, Maples and Calder's responsibility is limited to matters of Cayman Islands law and it does not accept responsibility in relation to any other matters referred to or disclosed in this Memorandum. In the course of advising the Master Fund GP, there are times when the interests of the shareholders/limited partners may differ from those of the Fund, Master Fund and/or the Master Fund GP. Maples and Calder does not represent the shareholders and/or limited partners' interests in resolving these issues. In reviewing this Memorandum, Maples and Calder has relied upon information furnished to it by the Master Fund GP and has not investigated or verified the accuracy and completeness of information set forth herein concerning the Fund, Master Fund and/or the Master Fund GP.

**Appx. 03519**

*Non-Public Information*

From time to time, the Investment Manager may come into possession of non-public information concerning specific companies although internal structures are in place to prevent the receipt of such information.  Under applicable securities laws, this may limit the Investment Manager's flexibility to buy or sell portfolio securities issued by such companies.  The Master Fund's investment flexibility may be constrained as a consequence of the Investment Manager's inability to use such information for investment purposes.

*The foregoing list of risk factors and potential conflicts of interest do not purport to be a complete enumeration or explanation of the risks involved in an investment in the Fund.  Prospective investors should read this entire Memorandum and consult with their own legal, tax and financial advisers before deciding to invest in the Fund.*

**Appx. 03520**

# BROKERAGE AND CUSTODY

**Brokerage Arrangements**

The Investment Manager will be responsible for the placement of the portfolio transactions of the Master Fund and the negotiation of any commissions or spreads paid on such transactions. Portfolio transactions normally will be effected through brokers on securities exchanges or directly with the issuer, or through an underwriter, or market maker or other dealer for the investments. Portfolio transactions through brokers involve a commission to the broker. Portfolio transactions with dealers typically are priced to include a spread between the bid and the asked price to compensate the dealer. Portfolio transactions will be executed by brokers selected solely by the Investment Manager in its absolute discretion. The Investment Manager is not required to weigh any of these factors equally.

Substantially all of the Master Fund's investments in marketable securities, as well as its cash and cash equivalents, are expected to be held with brokers or custodians selected by the Investment Manager. Instruments not constituting marketable securities generally are recorded through book entry by the borrower or by an agent for the borrower or the creditors. Documentary evidence of the acquisition, ownership and disposition of these assets typically will be held by the Investment Manager.

Brokers or their affiliates may provide capital introduction or other placement services to the Fund and the Investment Manager (with or without separate charges for such other services). In determining which broker-dealer generally provides the best available price and most favorable execution, the Investment Manager considers a totality of circumstances, including price quotes, the size of the transaction, the nature of the market for the financial instrument, the timing of the transaction, difficulty of execution, the broker-dealer's expertise in the specific financial instrument or sector in which the Master Fund seeks to trade, the extent to which the broker-dealer makes a market in the financial instrument involved or has access to such markets, the broker-dealer's skill in positioning the financial instruments involved, the broker-dealer's promptness of execution, the broker-dealer's financial stability, reputation for diligence, fairness and integrity, quality of service rendered by the broker-dealer in other transactions for the Investment Manager and its respective affiliates, confidentiality considerations, the quality and usefulness of research services and investment ideas presented by the broker-dealer, the broker-dealer's willingness to correct errors, the broker-dealer's ability to accommodate any special execution or order handling requirements that may surround the particular transaction, and other factors deemed appropriate by the Investment Manager. The Investment Manager need not solicit competitive bids and does not have an obligation to seek the lowest available commission cost or spread.

Accordingly, if the Investment Manager concludes that the commissions charged by a broker or the spreads applied by a dealer are reasonable in relation to the quality of services rendered by such broker or dealer (including, without limitation, the value of the brokerage and research products or services provided by such broker or dealer), the Master Fund may pay commissions to, or be subject to spreads applied by, such broker-dealer in an amount greater than the amount another broker-dealer might charge or apply.

The Investment Manager may also execute trades with brokers and dealers with whom the Fund, the Master Fund or the Investment Manager has other business relationships, including prime brokerage, credit relationships and capital introduction or investments by affiliates of the broker-

dealers in the Fund or other entities managed by the Investment Manager.  However, the Investment Manager does not believe that these other relationships will influence the choice of brokers and dealers who execute trades for the Master Fund.

Research-related goods and services provided by brokers and dealers through which portfolio transactions for the Master Fund are executed, settled and cleared may include research reports on particular industries and companies, economic surveys and analyses, recommendations as to specific securities, certain research services, and other goods and services providing lawful and appropriate assistance to the Investment Manager in the performance of investment decision-making responsibilities on behalf of the Master Fund and related accounts (collectively, "*soft dollar items*").

Soft dollar items may be provided directly by brokers and dealers, by third parties at the direction of brokers and dealers or purchased on behalf of the Master Fund with credits or rebates provided by brokers and dealers.  Soft dollar items may arise from over-the-counter principal transactions, as well as exchange traded agency transactions.  Brokers and dealers sometimes suggest a level of business they would like to receive in return for the various services they provide.  Actual business received by any broker or dealer may be less than the suggested allocations, but can (and often does) exceed the suggestions, because total transaction volume is allocated on the basis of all the considerations described above.  A broker or dealer will not be excluded from executing transactions for the Master Fund because it has not been identified as providing soft dollar items.

The use of commissions or "soft dollars" if any, generated by the Master Fund through agency and certain riskless principal transactions to pay for research and research-related products or services, if any, will fall within the safe harbor created by Section 28(e) of the Securities Exchange Act of 1934, as amended.  Under Section 28(e), research products or services obtained with soft dollars generated by the Master Fund may be used by the Investment Manager to service accounts other than the Master Fund.  Soft dollars generated in respect of futures, currency and derivatives transactions and principal transactions (that are not riskless principal transactions) do not generally fall within the safe harbor created by Section 28(e) and will be utilized only with respect to research-related products and services for the benefit of the account generating such soft dollars.

Research and brokerage products and services may be used by the Investment Manager in servicing some or all of the Investment Manager's clients.  In addition, some research and brokerage may not be used by the Investment Manager in servicing the clients whose commission dollars provided for the research or brokerage.  Clients may not, in any particular instance, be the direct or indirect beneficiaries of the research or brokerage provided.  Certain clients, who are the beneficiaries of research or brokerage, may have an investment style which results in the generation of a small amount of brokerage commissions due to a lack of active trading for their accounts. As a result, clients who generate sizeable commissions subsidize research or brokerage provided to clients whose accounts generate minimal brokerage commissions since the commission dollars generated by transactions for such clients are not sufficient to pay for research or brokerage that may be received by such clients from other brokers.

In selecting broker-dealers on the basis of the foregoing factors, the Investment Manager may pay a brokerage commission in excess of that which another broker might have charged for effecting the same transaction.  In connection therewith, the Investment Manager will make a good faith determination that the amount of commission is reasonable in relation to the value of the research or brokerage services received, viewed in terms of either the specific transaction or the Investment Manager's overall responsibility to its clients.  The Investment Manager will regularly evaluate the placement of brokerage services and the reasonableness of commissions paid.  Research received from

Appx. 03522

brokers will be supplemental to the Investment Manager's own research efforts. While the receipt of research will not reduce the Investment Manager's normal research activities, the Investment Manager's expenses could increase materially if it attempted to generate such additional research or brokerage services through its own staff, and the Management Fee will not be reduced as a consequence of the receipt of such research or brokerage services or products. As such, the Investment Manager's arrangements for the receipt of research and brokerage services from brokers may create a conflict of interest, in that the Investment Manager may have an incentive to choose a broker-dealer that provides research and brokerage services, instead of one that does not but charges a lower commission rate. In some instances, the Investment Manager receives products and services that may be used for both research and non-research purposes. In such instances, the Investment Manager will make a good faith effort to determine the relative proportion of the products and services used to assist the Investment Manager in carrying out its investment decision-making responsibilities or order execution, including research and brokerage, and the relative proportion used for administrative or other non-research purposes. The proportionate amount of the research attributable to assisting the Investment Manager in carrying out its investment decision-making responsibilities or order execution will be paid through brokerage commissions generated by the Master Fund's and other client's transactions; the proportionate amount attributable to administrative or other non-research purposes will be paid for by the Investment Manager from its own resources. The receipt of "mixed-use" research and the determination of the appropriate allocation may result in a potential conflict of interest between the Investment Manager and its clients, including the Master Fund.

**Custody**

U.S. Bank has been retained to perform certain custodial services for the Fund and the Master Fund (in such capacity, the "***Custodian***"). In its capacity as Custodian, it will receive customary fees that will be paid out of the assets of the Fund. The Custodian will also be reimbursed for all reasonable out-of-pocket expenses.

The Custodian does not have a direct contractual relationship with the investors. The Custodian has, however, entered into a contractual relationship with the Fund in relation to the performance of the services described herein. The Fund will enforce its contractual rights with respect to the Custodian as necessary to protect the interests of the Fund (and, therefore, the interest of investors).

Appx. 03523

## TAX CONSIDERATIONS

**General**

The following is a general discussion of certain of the anticipated U.S. federal and Cayman Islands income tax considerations applicable to the Fund's activities and those relevant to "Non-U.S. Shareholders" (as defined below) and "Tax-Exempt U.S. Shareholders" (as defined below) arising from the purchase, ownership and disposition of Shares. The discussion that follows is based on the provisions of the Code and the U.S. Treasury regulations promulgated thereunder (the "***Treasury Regulations***") as in effect on the date hereof and on existing judicial and administrative interpretations thereof. These authorities are subject to change and to differing interpretations, which could apply retroactively.

This discussion does not address all tax consequences that may be applicable to a beneficial owner of Shares, nor does it address, unless specifically indicated, the tax consequences to, among others (i) persons that may be subject to special treatment under U.S. federal income tax law, including, but not limited to, banks, insurance companies, thrift institutions, regulated investment companies, real estate investment trusts and dealers in securities or currencies, (ii) persons that will hold Shares as part of a position in a "straddle" or as part of a "hedging," "conversion" or other integrated investment transaction for U.S. federal income tax purposes, (iii) persons whose functional currency is not the U.S. dollar or (iv) persons that do not hold Shares as capital assets within the meaning of Code Section 1221.

If a partnership holds Shares of the Fund, the tax treatment of a partner in such partnership will generally depend upon the status of the partner and the activities of the Fund. Prospective investors who are partners of a partnership should consult their own tax advisors.

In addition, this summary does not address U.S. federal alternative minimum or estate and gift tax consequences or consequences under the tax laws of any non-U.S. jurisdiction. The Fund has not sought any ruling from the Service with respect to the statements made and the conclusions reached in this summary, and cannot assure any investor that the Service will agree with such statements and conclusions. As with any investment, potential investors should consult their own tax advisors in determining the U.S. federal, state, local, non-U.S. and any other tax consequences to them of the purchase, ownership and disposition of Shares.

In view of the number of different jurisdictions where local laws may apply to shareholders, the discussion below does not address the local tax consequences to prospective investors of the purchase, ownership and disposition of Shares. Prospective investors are urged to consult their own tax advisors in determining the possible tax, exchange control or other consequences to them under the laws of the jurisdictions of which they are citizens, residents or domiciliaries or in which they conduct business.

This summary assumes that only persons that are *not* "United States persons" as defined in Code Section 7701(a)(30) (such investors, "***Non-U.S. Shareholders***") and organizations that are exempt from U.S. federal income tax under the Code (such investors, "***Tax-Exempt U.S. Shareholders***") will invest in the Fund. Therefore, this summary does not address the U.S. tax consequences to U.S. taxable investors. The Fund is expected to constitute a "passive foreign investment company" (a "***PFIC***") for U.S. federal income tax purposes. Potential U.S. investors should be aware that the Fund does not intend to provide information to any U.S. person for purposes of such person qualifying to make an election to treat the Fund as a "qualified electing fund" (a

"*QEF*") for U.S. federal income tax purposes under Code Section 1295. Accordingly, potential U.S. investors are urged to consult their tax advisors in this regard.

EACH PROSPECTIVE INVESTOR IS URGED TO CONSULT ITS OWN TAX ADVISOR IN ORDER TO UNDERSTAND FULLY THE U.S. FEDERAL, STATE AND LOCAL AND ANY NON-U.S. TAX CONSEQUENCES OF AN INVESTMENT IN ITS PARTICULAR SITUATION, INCLUDING CONSEQUENCES TO THEM UNDER THE LAWS OF THE JURISDICTIONS OF WHICH THEY ARE OR WERE CITIZENS, RESIDENTS OR DOMICILIARIES, OR IN WHICH THEY CONDUCT BUSINESS.

**Material U.S. Federal Income Taxation Matters**

Classification and Taxation of the Fund and the Master Fund

For U.S. federal income tax purposes, the Fund is expected to be treated as a corporation and the Master Fund is expected to be treated as a partnership. The Fund and the Master Fund will make any necessary entity classification elections for U.S. tax purposes.

The following discussion assumes that the Master Fund will be treated as a partnership for U.S. federal income tax purposes. Unless otherwise indicated, references in the following discussion to the tax consequences of Fund investments, activities, income, gain and loss include the indirect investments, activities, income, gain and loss attributable to the Fund as a result of being a limited partner of the Master Fund.

Under Code Section 864, a safe harbor (the "*Safe Harbor*") applies to a non-U.S. corporation (other than a dealer in securities or commodities) that engages in trading securities (including contracts or options to buy or sell securities) and commodities (including derivatives) for its own account within the United States, pursuant to which such a non-U.S. corporation will not be deemed to be engaged in a U.S. trade or business by reason of such trading activities. If certain of the activities of the Fund were determined not to be of the type described in the Safe Harbor, the activities of the Fund could constitute a U.S. trade or business, in which case the Fund would be subject to U.S. income and branch profits tax on the income and gain treated as connected with those activities. Although there is a risk that certain of the Fund's investments could fall outside of the Safe Harbor and constitute a trade or business (e.g., a lending business), the Fund intends to take the position that it is not engaged in trade or business.

The Fund also may be deemed to be engaged in a U.S. trade or business by attribution from a pass-through entity in which it owns an interest and which is so engaged. In this circumstance, the Fund's share of any income and gain that is effectively connected with such U.S. trade or business will be subject to regular U.S. federal income taxation (currently imposed at a maximum rate of 21%) on a net basis and an additional 30% U.S. branch profits tax on certain of its after-tax earnings and profits that are not reinvested in a U.S. business, and the Fund will be required to file U.S. federal (and potentially, state and local) income tax returns in connection with such trade or business. Such a pass-through entity would also be required (and would be legally liable) to withhold and pay over to the Service on behalf of the Fund an amount equal to 21% of the Fund's share of such entity's effectively connected income. Any amount so withheld would be creditable against the Fund's ultimate U.S. federal income tax liability, and the Fund would be entitled to a refund to the extent that the amount withheld exceeded the Fund's U.S. federal income tax liability for the taxable year. Further, if the Fund holds certain property (or is deemed to hold certain property as the result of its investments), such property could be treated as U.S. real property interests. Upon the disposition of any such U.S.

74

real property interest, the Fund would be subject to tax on any gain recognized as though such gain were effectively connected with a U.S. trade or business of the Fund. Gains from the disposition by the Fund of securities that are not (and are not deemed to be) effectively connected with a U.S. trade or business of the Fund would generally be free from U.S. federal income and withholding tax. The Fund may, however, also be subject to U.S. federal income tax on any gain realized, or deemed realized, upon a sale or exchange of an interest in a partnership directly or indirectly held which is engaged in a U.S. trade or business (including, without limitation, certain gains realized upon a redemption of interests from the Master Fund). In such case, U.S. withholding tax may be incurred (or required to be deducted by the Master Fund, as applicable) equal to 10% of the amount realized. Any amounts so withheld would generally be creditable (subject to certain limitations) against the Fund's ultimate U.S. federal income tax liability, and the Fund would be entitled to a refund to the extent that amount withheld exceeded the Fund's U.S. federal income tax liability for the taxable year. In addition, it is possible the Fund could be subject to taxation on a net basis by state and local jurisdictions within the United States. Any such taxation could materially adversely affect the Fund's investment returns.

In general, under Section 881 of the Code, a non-U.S. corporation which does not conduct a U.S. trade or business is nonetheless subject to tax at a flat rate of 30% (or lower tax treaty rate) on the gross amount of certain U.S. source income which is not effectively connected with a U.S. trade or business, generally payable through withholding under Section 1442 of the Code. Income subject to such a flat tax rate is of a fixed or determinable annual or periodical nature, including dividends (including "dividend equivalent" income under Section 871(m) of the Code) and certain interest income. There is presently no tax treaty between the United States and the Cayman Islands.

Certain types of income are specifically exempted from the 30% tax and thus withholding is not required on payments of such income to a non-U.S. corporation. The 30% tax does not apply to U.S. source capital gains (whether long or short-term) or to interest paid to a non-U.S. corporation on its deposits with U.S. banks. The 30% tax also does not apply to interest which qualifies as portfolio interest. The term "portfolio interest" generally includes interest (including original issue discount) on an obligation in registered form which has been issued after July 18, 1984 that is paid to persons with limited ownership in the obligor and with respect to which the person who would otherwise be required to deduct and withhold the 30% tax receives the required statement that the beneficial owner of the obligation is not a U.S. person within the meaning of the Code. Also exempt from the 30% tax is income from original issue discount obligations which are payable no more than 183 days from the date of issue. Interest on corporate obligations will not qualify as "portfolio interest" to a non-U.S. person that owns (directly and under certain constructive ownership rules) 10% or more of the total combined voting power of the corporation paying the interest, or, with respect to certain obligations issued after April 7, 1993, if and to the extent the interest is determined by reference to certain economic attributes of the debtor (or a person related thereto).

As indicated above, certain investments by the Fund could result in the Fund being deemed to be engaged in a U.S. trade or business, including, without limitation, direct investments by the Fund in U.S. real estate or real estate acquired in foreclosures on mortgages held by the Fund. The Fund may conduct such activities through U.S. corporate entities, in order for the Fund to avoid filing a U.S. income tax return and directly paying tax on such investments. Each such investment may be made in a separate U.S. corporation directly owned by the Fund (a "***U.S. Subsidiary***"). Each U.S. Subsidiary will be subject to U.S. income tax on its net taxable income at regular U.S. federal corporate income tax rates. Dividend distributions from the U.S. Subsidiary to the Fund will be subject to a 30% U.S. withholding tax. However, cash distributions by the U.S. Subsidiary upon its complete liquidation will generally not be subject to taxation or to U.S. withholding tax.

## Taxation of Non-U.S. Shareholders

For U.S. federal income tax purposes, a Non-U.S. Shareholder will not be subject to U.S. federal income taxation on amounts paid by the Fund in respect of Shares or gains recognized on the sale, exchange or redemption of Shares, provided that such income and gains are not considered to be effectively connected with the conduct of a trade or business by the shareholder in the United States. In limited circumstances, an individual Non-U.S. Shareholder who is present in the United States for 183 days or more during a taxable year may be subject to U.S. income tax at a flat rate of 30% on gains realized on a disposition of Shares in such year. Individual shareholders who at the time of their death are not citizens, former citizens or residents of the United States should not be subject, by reason of the ownership of Shares, to any U.S. federal gift or estate taxes.

Special rules may apply in the case of non-U.S. persons that (i) conduct a trade or business in the United States or that have an office or fixed place of business in the United States, (ii) have a tax home in the United States, (iii) are former citizens or long-term residents of the United States or (iv) are controlled foreign corporations, PFICs, foreign insurance companies ("**CFCs**") that hold Shares in connection with their U.S. business or corporations which accumulate earnings to avoid U.S. federal income tax. Such persons are urged to consult their U.S. tax advisors before investing in the Fund.

In the case of Shares held in the United States by a custodian or nominee for a non-U.S. person, U.S. "backup" withholding taxes may apply to distributions in respect of Shares held by such shareholder unless such shareholder properly certifies as to its non-U.S. status or otherwise establishes an exemption from "backup" withholding. Backup withholding is not an additional tax. Rather, the U.S. federal income tax liability of non-U.S. persons subject to backup withholding will be reduced by the amount of tax withheld. If backup withholding results in an overpayment of U.S. federal income taxes, a refund may be obtained, provided the required documents are timely filed with the Service.

## Taxation of Tax-Exempt U.S. Shareholders

Tax-Exempt U.S. Shareholders are subject to U.S. tax on their "unrelated business taxable income" ("**UBTI**") as defined in Section 512 of the Code. UBTI is generally the excess of gross income from any unrelated trade or business conducted by a tax-exempt entity over the deductions attributable to such trade or business, with certain modifications. These modifications provide that UBTI generally does not include interest, dividends or gains from the sale of securities not held as either inventory or primarily for sale to customers in the ordinary course of business, except to the extent that any such item of income is deemed to constitute "unrelated debt financed income" within the meaning of Section 514 of the Code and the Treasury Regulations, and certain other requirements are met. The ability to offset deductions or losses realized in respect of one "unrelated trade or business" against income or gains from other "unrelated trades or businesses" is subject to certain limitations. Income that a U.S. tax-exempt entity derives from an investment in Shares generally should not give rise to UBTI, except to the extent that such entity's acquisition of Shares is debt financed.

The Fund will constitute a PFIC for U.S. federal income tax purposes. Under the Treasury Regulations, a tax-exempt entity is generally not considered to be a shareholder in a PFIC. Therefore, the tax-exempt entity would generally not be subject to the PFIC tax rules, except to the extent that a "dividend" paid by such PFIC would be taxable under subchapter F of the Code. Hence, a tax-exempt entity would be subject to tax under the PFIC regime in respect of an excess distribution from, or any gain realized on the sale of, the shares of a PFIC in only limited circumstances. Additionally, the

Appx. 03527

Treasury Regulations provide that a tax-exempt entity that is not taxable under the PFIC rules may not make a QEF election under Section 1295 of the Code and the Fund will not provide any QEF information to investors.

The Fund may be classified as a CFC for U.S. federal income tax purposes if U.S. persons who own (actually or constructively) 10% or more of either voting interest or the value of the Fund hold 50% or more of the vote or value of the Fund, as determined under the Code. However, a Tax-Exempt U.S. Shareholder's share of the Fund's "subpart F income" generally would not be treated as UBTI (provided that such investor has not debt-financed its investment in the Fund) except in the case of certain insurance- and reinsurance-related income. In addition, if the Fund is classified as a CFC, U.S. tax-exempt investors may be subject to special information reporting requirements. Prospective investors are urged to consult their own tax advisors as to the U.S. federal income tax consequences in this regard, including with respect to certain other types of income, and with respect to complex attribution rules that may apply.

Moreover, different rules may apply to certain types of tax-exempt entities, such as charitable remainder trusts. Accordingly, potential tax-exempt investors are urged to consult their own tax advisors regarding the tax consequences of an investment in the Fund.

**Prospective Tax-Exempt U.S. Shareholders are urged to consult their own tax advisors regarding the tax consequences of the purchase, ownership and disposition of Shares.**

Information Reporting Requirements

A U.S. person (including in certain circumstances a Tax-Exempt U.S. Shareholder) that transfers property (including cash) to the Fund in exchange for Shares will be required to file a Form 926 or a similar form with the Service. In the event a U.S. shareholder fails to file any required form, such shareholder could be subject to a penalty of up to 10% of the value of the property transferred, subject to a $100,000 limit so long as the failure was not due to intentional disregard.

Under the Treasury Regulations, any U.S. person, within the meaning of the Code, owning 10% or more (taking certain attribution rules into account) of either the total combined voting power or total value of all classes of the shares of a non-U.S. corporation, or whose ownership interest changes by a statutorily specified amount, may be required to file an information return with the Service containing certain disclosures concerning the filing shareholder, other U.S. shareholders and the corporation. The determination of whether a U.S. person is a 10% U.S. shareholder for purposes of this filing requirement may be made by reference to such shareholder's percentage ownership of Shares within each class rather than that of all Shares of the Fund. The Fund has not committed to provide all of the information about the Fund or its shareholders necessary to complete such an information return. Prospective investors should consult their tax advisors about such information return filing requirements.

Certain U.S. persons are required to file Financial Crimes Enforcement Network ("***FinCEN***") Form 114 with the Service with respect to financial interests in foreign financial accounts held by such U.S. persons during the previous year if the aggregate value of such accounts exceeds $10,000 at any time during the year. Significant penalties may apply in respect of the failure to file FinCEN Form 114 in respect of foreign financial accounts. Thus, potential Tax-Exempt U.S. Shareholders should consult their tax advisors as to whether to file FinCEN Form 114 in respect of ownership of Shares.

Investor Tax Filings and Record Retention

The United States Department of the Treasury has adopted Treasury Regulations designed to assist the Service in identifying abusive tax shelter transactions. In general, these Treasury Regulations require investors in specified transactions (including certain shareholders in non-U.S. corporations and partners in partnerships that engage in such transactions) to satisfy certain special tax filing and record retention requirements. Significant monetary penalties may be imposed (in addition to penalties that generally may be applicable as a result of a failure to comply with applicable Treasury Regulations) for failure to comply with these tax filing and record retention rules.

These Treasury Regulations are broad in scope and it is conceivable that the Master Fund may enter into transactions that will subject the Fund and certain investors in the Fund to the special tax filing and record retention rules. The Fund and the Investment Manager intend to use reasonable efforts to obtain and provide information to investors necessary to enable investors to satisfy any tax filing and record retention requirements that may arise as a result of any transactions entered into by the Master Fund.

Reporting Under FATCA

Sections 1471 through 1474 of the Code, known as the U.S. Foreign Account Tax Compliance Act (together with any regulations, rules and other guidance implementing such Code sections and any applicable intergovernmental agreement ("*IGA*") or information exchange agreement and related statutes, regulations, rules and other guidance thereunder, "*FATCA*") impose a withholding tax of 30% on (i) certain U.S. source interest, dividends and other types of income, and (ii) the gross proceeds from the sale or disposition of certain assets of a type that can produce U.S. source interest and dividends, which are received by a foreign financial institution ("*FFI*"), unless such FFI enters into an agreement with the Service, and/or complies with an applicable IGA, to obtain certain information as to the identity of the direct and indirect owners of accounts in such institution. In addition, a withholding tax may be imposed on payments to certain non-financial foreign entities that do not obtain and provide information as to their direct and indirect owners. These rules generally apply to payments of U.S. source interest, dividends and certain other types of income from U.S. sources and, after December 31, 2018, are expected to apply to payments of gross proceeds from the sale or disposition of assets of a type that can produce U.S. source interest or dividends.

The Service has released temporary and final Treasury Regulations and other guidance to implement FATCA, which contain a number of phase-in dates for FATCA compliance. In addition, the Cayman Islands has entered into a Model 1 IGA with the United States (the "*Cayman-U.S. IGA*") and has issued the Tax Information Authority (International Tax Compliance) (United States of America) Regulations 2014, and guidance notes thereunder, each as updated from time to time.

Both the Fund and the Master Fund are likely to be considered FFIs. In order to avoid incurring U.S. withholding under FATCA, the Master Fund and the Fund each are generally required to register with the Service and to comply with the Cayman-U.S. IGA and any guidance thereunder. The Fund and the Master Fund each have registered with the Service and expect that they will be required to identify and report on certain direct and indirect U.S. owners in order to comply with the Cayman-U.S. IGA. Therefore, the Fund and the Master Fund generally do not expect to become subject to U.S. withholding under FATCA. An investor may be required to provide to the Fund information which identifies its direct and indirect ownership. Any such information provided to the Fund may ultimately be shared with the Cayman Islands Tax Information Authority ("*TIA*") and transmitted to the Service and, potentially, certain other authorities and withholding agents, as applicable.

## CAYMAN ISLANDS LEGAL, REGULATORY AND TAX MATTERS

It is the responsibility of all persons interested in purchasing Shares to inform themselves as to any tax consequences from their investing in the Fund and the Fund's operations or management, as well as any foreign exchange or other fiscal or legal restrictions, which are relevant to their particular circumstances in connection with the acquisition, holding or disposition of Shares. Investors should therefore seek their own separate tax advice in relation to their holding of Shares and accordingly none of the Fund, the Investment Manager or the Administrator accepts any responsibility for the taxation consequences of any investment in the Fund by an investor.

### Taxation of the Fund

The Government of the Cayman Islands will not, under existing legislation, impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Fund or the shareholders. The Cayman Islands are not party to a double tax treaty with any country that is applicable to any payments made to or by the Fund.

The Fund has received an undertaking from the Governor-in-Cabinet of the Cayman Islands that, in accordance with section 6 of the Tax Concessions Law (2011 Revision) of the Cayman Islands, for a period of 20 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Fund or its operations and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable (i) on or in respect of the shares, debentures or other obligations of the Fund or (ii) by way of the withholding in whole or in part of a payment of dividend or other distribution of income or capital by the Fund to its members or a payment of principal or interest or other sums due under a debenture or other obligation of the Fund.

### Taxation of the Master Fund

The Government of the Cayman Islands will not, under existing legislation, impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Master Fund or the limited partners of the Master Fund (the "*Master Fund Limited Partners*"). Interest, dividends and gains payable to the Master Fund and all distributions by the Master Fund to Master Fund Limited Partners will be received free of any Cayman Islands income or withholding taxes. The Master Fund has registered as an exempted limited partnership under Cayman Islands law and the Master Fund has received an undertaking from the Governor in Cabinet of the Cayman Islands to the effect that, for a period of 50 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits or income or gains or appreciations shall apply to the Master Fund or to any partner thereof in respect of the operations or assets of the Master Fund or the interest of a partner therein; and may further provide that any such taxes or any tax in the nature of estate duty or inheritance tax shall not be payable in respect of the obligations of the Master Fund or the interests of the partners therein. The Cayman Islands are not party to a double tax treaty with any country that is applicable to any payments made to or by the Master Fund.

### Cayman Islands – Automatic Exchange of Financial Account Information

The Cayman Islands has signed two inter-governmental agreements to improve international tax compliance and the exchange of information - one with the United States, the Cayman-U.S. IGA, and one with the United Kingdom (the "*Cayman-U.K. IGA*"). The Cayman Islands has also signed, along with over 80 other countries, a multilateral competent authority agreement to implement the

79

OECD Standard for Automatic Exchange of Financial Account Information – Common Reporting Standard (the "**CRS**" and together with the Cayman-U.S. IGA and the Cayman-U.K. IGA, "**AEOI**").

Cayman Islands regulations were issued on 4 July 2014 to give effect to the Cayman-U.S. IGA and the Cayman-U.K. IGA, and on 16 October 2015 to give effect to the CRS (collectively, the "**AEOI Regulations**").  Pursuant to the AEOI Regulations, the TIA has published guidance notes on the application of the Cayman-U.S. IGA and Cayman-U.K. IGAs and the CRS.  It is anticipated that the Cayman-U.K. IGA related regulations and relevant provisions of the guidance notes will be phased out and replaced with CRS.

All Cayman Islands "Financial Institutions" will be required to comply with the registration, due diligence and reporting requirements of the AEOI Regulations, except to the extent that they can rely on an exemption that allows them to become a "Non-Reporting Financial Institution" (as defined in the relevant AEOI Regulations) with respect to one or more of the AEOI regimes.  The Fund does not propose to rely on any reporting exemption and therefore intends to comply with the requirements of the AEOI Regulations.

The AEOI Regulations require the Fund to, amongst other things (i) register with the Service to obtain a Global Intermediary Identification Number (in the context of the Cayman-U.S. IGA only), (ii) register with the TIA, and thereby notify the TIA of its status as a "Reporting Financial Institution"; (iii) conduct due diligence on its accounts to identify whether any such accounts are considered "Reportable Accounts", and (iv) report information on such Reportable Accounts to the TIA.  The TIA will transmit the information reported to it to the overseas fiscal authority relevant to a reportable account (i.e. the Service in the case of a US Reportable Account, HMRC in the case of a UK Reportable Account, etc.) annually on an automatic basis.

By investing (or continuing to invest) in the Fund (and indirectly investing in the Master Fund), investors will be deemed to have acknowledged, and to have given their consent to, the following:

(i)     the Fund (or its agent) may be required to disclose to the TIA and withholding agents certain information (which could otherwise be deemed to be confidential) in relation to the investor or its direct or indirect owners, including the investor's name, address, date of birth, tax identification number (if any), social security or national insurance number (if any) and certain additional information or documentation relating to the investor's investment or identity, and the investor may be required to provide any such information or documentation;

(ii)    the TIA may be required to automatically exchange information with, among other authorities, the Service, and to provide additional information to such authorities, and the Master Fund or the Fund (or its agent) may be required to disclose certain information (including information that could otherwise be deemed to be confidential) when registering with such authorities and in response to a request by any such authority for further information;

(iii)   in the event an investor's failure to comply with any AEOI related reporting requirements gives rise to any withholding tax or other liabilities the Fund reserves the right to ensure that any such withholding tax and or any related cost, interest, penalties and other losses or liabilities suffered by the Fund, the Master Fund, the Master Fund GP, the Administrator or any other investor, or any agent, delegate, employee, director,

80

officer or affiliate of any of the foregoing persons, arising from such investor's failure to provide information to the Fund, is economically borne by such investor;

(iv)     in the event an investor does not provide the information and/or documentation necessary for the Fund's (or the Master Fund's) satisfaction of its AEOI related reporting requirements, whether or not that actually leads to compliance failures by the Fund, or a risk of the Fund (or the Master Fund) or its investors being subject to U.S. withholding under FATCA or other liabilities under AEOI generally, the Fund reserves the right to take any action and/or pursue all remedies at its disposal to mitigate the consequences of the investor's failure to comply with the requirements described above, including compulsory redemption or withdrawal of the investor concerned; and

(v)      no investor affected by any such action or remedy shall have any claim against the Fund, the Master Fund, the Master Fund GP, the Administrator (or their agents, delegates, employees, directors, officers or affiliates) for any damages or liability as a result of actions taken or remedies pursued by or on behalf of the Fund in order to comply with AEOI.

Shareholders should consult their tax advisors as to the filing and information requirements that may be imposed on them in respect of their ownership of Shares of the Fund.

**The European Union Savings Directive**

On November 10, 2015, the European Council repealed the EU Council Directive 2003/48/EC of June 3, 2003 on taxation of savings income in the form of interest payments (the "*EUSD*") with effect from January 1, 2016 (January 1, 2017 in the case of Austria) in order to avoid overlap with the requirements of the CRS and other tax information reporting regimes. It is anticipated that the Cayman Islands, together with those other jurisdictions which have adopted EUSD-equivalent legislation, will also give consideration in due course to the repeal of their EUSD-equivalent legislation in the light of the introduction of the CRS regime.

**Future Changes in Applicable Law**

The foregoing description of U.S. and Cayman Islands income tax consequences of an investment in, and the operations of, the Fund are based on laws and Treasury Regulations that are subject to change through legislative, judicial or administrative action. There can be no assurance that the U.S. or Cayman Islands tax laws will not be changed adversely with respect to the Fund and its shareholders, or that the Fund's income tax status will not be successfully challenged by such authorities. In addition, future amendments to the Code, other legislation, new or amended Treasury Regulations, administrative rulings or decisions by the Service or judicial decisions may adversely affect the U.S. federal income tax aspects of an investment in the Fund, with or without advance notice, retroactively or prospectively.

**Other Taxation**

A portion of the Master Fund's investments may be made in non-U.S. jurisdictions. With respect to certain countries, there is a possibility of expropriation, confiscatory taxation and imposition of withholding or other taxes on dividends, interest, capital gains or other income, limitations on the removal of funds or other assets of the Fund and political or social instability or diplomatic developments that could affect investments in those countries. An issuer of securities may be

81

domiciled in a country other than the country in whose currency the instrument is denominated. The values and relative yields of investments in the securities markets of different countries, and their associated risks, are expected to change independently of each other.

**Future Tax Legislation; Necessity of Obtaining Professional Advice**

Future amendments to the Code, other legislation, new or amended Treasury Regulations, administrative rulings or decisions by the Service or judicial decisions may adversely affect the U.S. federal income tax aspects of an investment in the Fund, with or without advance notice, retroactively or prospectively. The foregoing analysis is not intended as a substitute for careful tax planning. The tax matters relating to the Fund and the Master Fund are complex and are subject to varying interpretations. There can be no assurance that the Service will agree with each position taken by the Fund or the Master Fund with respect to the tax treatment of Fund items and transactions. Moreover, the effect of existing income tax laws and of proposed changes in income tax laws on shareholders will vary with the particular circumstances of each shareholder and, in reviewing this Memorandum and any exhibits hereto, these matters should be considered.

It is the responsibility of all persons interested in purchasing Shares to inform themselves as to any tax consequences from their investing in the Fund and the Fund's operations or management, as well as any foreign exchange or other fiscal or legal restrictions, which are relevant to their particular circumstances in connection with the acquisition, holding or disposition of Shares. Accordingly, each prospective investor should therefore consult their own advisors regarding tax treatment by the jurisdiction applicable to them in relation to their holding of Shares. Shareholders should rely only upon advice received from their own tax advisors based upon their own individual circumstances and the laws applicable to them. In no event will the Fund, the Master Fund, the Master Fund GPs, the Investment Manager, the Principal, the Directors or their principals, affiliates, counsel or other professional advisers be liable to any shareholder for any tax consequences of an investment in the Fund, whether or not such consequences are as described above.

*The foregoing is a summary of some of the important tax rules and considerations affecting the shareholders, the Fund, and the Fund's proposed operations. This summary does not purport to be a complete analysis of all relevant tax rules and considerations, which will vary with the particular circumstances of each shareholder, nor does it purport to be a complete listing of all potential tax risks inherent in purchasing or holding Shares. Each prospective investor in the Fund is urged to consult its own tax advisor in order to understand fully the U.S. federal, state, local and any non-U.S. tax consequences of such an investment in its particular situation.*

Appx. 03533

## ERISA AND OTHER REGULATORY CONSIDERATIONS

### ERISA Considerations

### General

Fiduciaries and other persons who are proposing to invest in Shares on behalf of retirement plans, IRAs and other employee benefit plans ("***Plans***") covered by the U.S. Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), or the Internal Revenue Code of 1986, as amended (the "***Code***"), must give appropriate consideration to, among other things, the role that an investment in the Fund plays in the Plan's portfolio, taking into consideration whether the investment is designed to reasonably further the Plan's purposes, the investment's risk and return factors, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the Plan, the projected return of the total portfolio relative to the Plan's objectives, the limited right of shareholders to redeem all or any part of their Shares or to transfer their Shares and whether investment in the Fund constitutes a direct or indirect transaction with a party in interest (under ERISA) or a disqualified person (under the Code).

### Plan Asset Regulations and Benefit Plan Investors

The United States Department of Labor ("***DOL***") has adopted regulations that treat the assets of certain pooled investment vehicles, such as the Fund, as "plan assets" for purposes of Title I of ERISA and Section 4975 of the Code ("***Plan Assets***").  Section 3(42) of ERISA defines the term "Plan Assets" to mean plan assets as defined by such regulations as the DOL may prescribe, except that under such regulations the assets of an entity shall not be treated as Plan Assets if, immediately after the most recent acquisition of an equity interest in the entity, less than 25% of the total value of each class of equity interest in the entity is held by "Benefit Plan Investors" (the "***significant participation test***"). For purposes of this determination, the value of any equity interest held by a person (other than such a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, shall be disregarded.  An entity shall be considered to hold Plan Assets only to the extent of the percentage of the equity interest held by Benefit Plan Investors.  The term "Benefit Plan Investors" means any employee benefit plan subject to part 4 of subtitle B of Title I of ERISA (i.e., plans subject to the fiduciary provisions of ERISA), any plan to which the prohibited transaction provisions of Section 4975 of the Code apply (e.g., IRAs), and any entity whose underlying assets include Plan Assets by reason of a plan's investment in such entity (a "***Plan Asset Entity***").

In order to prevent the assets of the Master Fund from being considered Plan Assets under ERISA, it is the intention of the Master Fund to monitor the investments in the Master Fund and prohibit the acquisition, withdrawal or transfer of any limited partner interests of the Master Fund by any investor, including a Benefit Plan Investor, unless, after giving effect to such an acquisition, withdrawal or transfer, the total proportion of limited partner interests of each class of the Master Fund owned by Benefit Plan Investors would be less than 25% of the aggregate value of that class of limited partner interests (determined, as described above, by excluding certain limited partner interests held by the Master Fund GP, other fiduciaries and affiliates).

Without limiting the generality of the foregoing, in order to limit equity participation in any class of limited partner interests of the Master Fund by Benefit Plan Investors to less than 25%, the Fund may require the compulsory redemption of Shares.  Each shareholder that is an insurance company acting on behalf of its general account or a Plan Asset Entity will be required to represent and

83

warrant as of the date it acquires Shares the maximum percentage of such general account or Plan Asset Entity (as reasonably determined by such insurance company or Plan Asset Entity) that will constitute Plan Assets (the "*Maximum Percentage*") so such percentage can be calculated in determining the percentage of Plan Assets invested in the Master Fund. Further, each such insurance company and Plan Asset Entity will be required to covenant that if, after its initial acquisition of Shares, the Maximum Percentage is exceeded at any time, then such insurance company or Plan Asset Entity shall immediately notify the Fund of that occurrence and shall, if and as directed by the Fund, in a manner consistent with the restrictions on transfer set forth herein, redeem or dispose of some or all of the Shares held in its general account or Plan Asset Entity.

It is anticipated that investment in the Fund by benefit plan investors may be "significant" for purposes of the regulations. In such event, the underlying assets of the Fund would be deemed to constitute "plan assets" for purposes of ERISA. As a general rule, if the assets of the Fund were regarded as "plan assets" of a benefit plan investor, the Investment Manager would be deemed a fiduciary with respect to each Plan investing in the Fund. However, the Investment Manager believes that, given the limited purpose and role of the Fund and given the requirement that the Investment Manager follow the directions of the fiduciaries of each benefit plan investor investing in the Fund, as set forth in each such investor's subscription agreement, with respect to the investment by the Fund in the Master Fund, neither the Investment Manager nor any other entity providing services to the Fund would be exercising any discretionary authority or control with respect to the Fund. Accordingly, the Investment Manager believes that neither the Investment Manager nor any other entity providing services to the Fund will act as a fiduciary (as defined in Section 3(21) of ERISA) with respect to the assets of the Fund or any benefit plan investor. Rather, the Investment Manager believes that, given the limited purpose and role of the Fund and given the requirement that the Investment Manager follow the directions of the fiduciaries of each benefit plan investor investing in the Fund, as set forth in each such investor's subscription agreement, with respect to the investment by the Fund in the Master Fund, the fiduciary of each such benefit plan investor has retained the fiduciary authority and responsibility with respect to the investor's initial and continuing investment in the Fund as though the benefit plan investor is investing directly in the Master Fund.

**Representation by Plans**

The fiduciaries of each Plan proposing to invest in the Fund will be required to represent that they have been informed of and understand the Fund's investment objectives, policies and strategies and that the decision to invest Plan Assets in the Fund is consistent with the provisions of ERISA and/or the Code that require diversification of Plan Assets and impose other fiduciary responsibilities. By its purchase, each investor will be deemed to have represented that either (a) it is not a Plan that is subject to the prohibited transaction rules of ERISA or the Code, (b) it is not an entity whose assets include Plan Assets or (c) its investment in the Fund will not constitute a non-exempt prohibited transaction under ERISA or the Code.

In addition, each Plan proposing to invest in the Fund will be required to represent that, in connection with its decision to invest in the Fund, it is and will remain represented by a party independent of the Master Fund GP, the Investment Manager and each of their affiliates and employees and such party (A) is described in 29 CFR §2510.3-21(c)(1)(i); (B) is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies; (C) acknowledges that it has been informed that none of the Master Fund GP, the Investment Manager or any of their affiliates or employees is undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the Plan's investment in the Fund; and (D) is acting as a fiduciary under ERISA with respect to the Plan's investment in the

84

Fund and is responsible for exercising independent judgment in evaluating such investment. If a Plan cannot make the representations set forth in the preceding sentence, it must contact the Investment Manager and its subscription will not be accepted unless specifically agreed to by the Investment Manager.

**Ineligible Purchasers**

Limited partner interests may not be purchased with Plan Assets if the Investment Manager, any selling agent, finder, any of their respective affiliates or any of their respective employees: (a) has investment discretion with respect to the investment of such Plan Assets; (b) has authority or responsibility to give or regularly gives investment advice with respect to such Plan Assets, for a fee, and pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to such Plan Assets and that such advice will be based on the particular investment needs of the Plan; or (c) is an employer maintaining or contributing to such Plan. A party that is described in clause (a) or (b) of the preceding sentence is a fiduciary under ERISA and the Code with respect to the Plan, and any such purchase might result in a "prohibited transaction" under ERISA and the Code.

**Plans' Reporting Obligations**

The information contained herein and in the other documentation provided to investors in connection with an investment in the Fund is intended to satisfy the alternative reporting option for "eligible indirect compensation" on Schedule C of the Form 5500, in addition to the other purposes for which such documents were created.

*Whether or not the underlying assets of the Fund are deemed Plan Assets, an investment in the Fund by a Plan is subject to ERISA and the Code. Accordingly, Plan fiduciaries should consult their own counsel as to the consequences under ERISA and the Code of an investment in the Fund. Note that similar laws governing the investment and management of the assets of governmental or non-U.S. plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code. Accordingly, fiduciaries of such governmental or non-U.S. plans, in consultation with their counsel, should consider the impact of their respective laws and regulations on an investment in the Fund.*

*Other Regulatory Matters*

Securities Act of 1933

Shares will not be registered under the U.S. Securities Act of 1933, as amended, any state "blue sky" laws or the securities laws of any other jurisdiction. Shares may be offered privately (i) outside the United States of America, its territories or possessions or areas subject to its jurisdiction (the "*United States*"), or to or for the benefit of an investor that is not a United States Person, only in accordance with relevant laws of the jurisdiction where the offer is made or (ii) within the United States or to a United States Person only in a transaction that does not require the registration of the Shares or the Fund under applicable U.S. federal or state securities laws.

Investment Company Act of 1940

The Fund is exempt from the provisions of the U.S. Investment Company Act of 1940, as amended, pursuant to the exemption contained in Section 3(c)(7) thereunder.

Appx. 03536

Investment Adviser Registration

The Investment Manager is registered as an investment adviser with the Securities and Exchange Commission under the U.S. Investment Advisers Act of 1940, as amended.

Commodity Exchange Act

Neither the Master Fund GP nor the Investment Manager is required to register as a commodity pool operator ("**CPO**") or commodity trading advisor under the U.S. Commodity Exchange Act and each has filed a notice of claim effectuating exemption. As such, the Master Fund GP and the Investment Manager will operate the Fund and the Master Fund pursuant to such exemption. Unlike a registered CPO, the Master Fund GP and the Investment Manager are not required to deliver a disclosure document and a certified annual report to participants in the Fund. Among other things, the exemption requires the Master Fund GP and the Investment Manager to file a claim of exemption with the National Futures Association. The Investment Manager qualifies for an exemption from registration with the CFTC as a commodity trading adviser pursuant to CFTC Rule 4.14(a)(8).

Cayman Islands Mutual Fund Law

The Fund and the Master Fund are regulated under the Mutual Funds Law (2015 Revision) of the Cayman Islands ("**Mutual Funds Law**"). The Cayman Islands Monetary Authority (the "**Authority**") has supervisory and enforcement powers to ensure compliance with the Mutual Funds Law. Regulation under the Mutual Funds Law entails the filing of prescribed details and audited accounts annually with the Authority. As a regulated mutual fund, the Authority may at any time instruct the Fund or the Master Fund to have its or their accounts audited and to submit them to the Authority within such time as the Authority specifies. Failure to comply with these requests by the Authority may result in substantial fines on the part of the directors of the Fund or the Master Fund, as applicable, and may result in the Authority applying to the court to have the Fund or the Master Fund wound up.

Neither the Fund nor the Master Fund are, however, subject to supervision in respect of their investment activities or the constitution of the Master Fund's portfolio by the Authority or any other governmental authority in the Cayman Islands, although the Authority does have power to investigate the activities of the Fund and the Master Fund in certain circumstances. Neither the Authority nor any other governmental authority in the Cayman Islands has commented upon or approved the terms or merits of this document. There is no investment compensation scheme available to investors in the Cayman Islands.

The Authority may take certain actions if it is satisfied that a regulated mutual fund is or is likely to become unable to meet its obligations as they fall due or is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors. The powers of the Authority include the power to require the substitution of the directors of the Fund or the Master Fund, to appoint a person to advise the Fund or the Master Fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of the Fund or the Master Fund, as the case may be. There are other remedies available to the Authority including the ability to apply to court for approval of other actions.

Appx. 03537

Anti-Money Laundering Regulations

**Cayman Islands**

In order to comply with legislation or regulations aimed at the prevention of money laundering the Fund is required to adopt and maintain anti-money laundering procedures, and may require subscribers to provide evidence to verify their identity and source of funds. Where permitted, and subject to certain conditions, the Fund may also delegate the maintenance of its anti-money laundering procedures (including the acquisition of due diligence information) to a suitable person.

The Fund, and the Administrator on the Fund's behalf, reserve the right to request such information as is necessary to verify the identity of a shareholder (i.e. a subscriber or a transferee) and the identity of their beneficial owners/controllers (where applicable). Where the circumstances permit, the Fund, or the Administrator on the Fund's behalf, may be satisfied that full due diligence may not be required at subscription where an exemption applies under the Anti-Money Laundering Regulations, 2017 of the Cayman Islands, as amended and revised from time to time or any other applicable law. However, detailed verification information may be required prior to the payment of any proceeds from or any transfer of an interest in Shares. Depending on the circumstances of each application, a detailed verification of identity might not be required where:

(a) the subscriber makes the payment for their investment from an account held in the subscriber's name at a recognized financial institution and redemptions/dividends are repaid directly to the subscriber; or

(b) the subscriber is regulated by a recognized regulatory authority or listed on a recognized stock exchange (or is a subsidiary of either) and is based or incorporated in, or formed under the law of, a recognized jurisdiction; or

(c) the application is made through an intermediary which is regulated by a recognized regulatory authority and is based in or incorporated in, or formed under the law of a recognized jurisdiction and an assurance is provided in relation to the procedures undertaken on the underlying investors.

For the purposes of these exceptions, recognition of a financial institution, regulatory authority, stock exchange or jurisdiction will be determined in accordance with the Money Laundering Regulations by reference to those jurisdictions recognized by the Cayman Islands Monetary Authority as having equivalent anti-money laundering regulations to the Cayman Islands.

In the event of delay or failure on the part of the subscriber in producing any information required for verification purposes, the Fund, or the Administrator on the Fund's behalf, may refuse to accept the application, in which case any funds received will be returned without interest to the account from which they were originally debited.

The Fund, and the Administrator on the Fund's behalf, also reserve the right to refuse to make any redemption or dividend payment to a shareholder if the Directors or the Administrator suspect or are advised that the payment of redemption or dividend proceeds to such shareholder may be non-compliant with applicable laws or regulations, or if such refusal is considered necessary or appropriate to ensure the compliance by the Fund or the Administrator with any applicable laws or regulations.

If any person resident in the Cayman Islands knows or suspects or has reasonable grounds for knowing or suspecting that another person is engaged in criminal conduct or is involved with terrorism or terrorist property and the information for that knowledge or suspicion came to their attention in the course of business in the regulated sector, or other trade, profession, business or employment, the person will be required to report such knowledge or suspicion to (i) the Financial Reporting Authority of the Cayman Islands, pursuant to the Proceeds of Crime Law, 2016 Revision of the Cayman Islands if the disclosure relates to criminal conduct or money laundering, or (ii) a police officer of the rank of constable or higher, or the Financial Reporting Authority, pursuant to the Terrorism Law (2015 Revision) of the Cayman Islands, if the disclosure relates to involvement with terrorism or terrorist financing and property.  Such a report shall not be treated as a breach of confidence or of any restriction upon the disclosure of information imposed by any enactment or otherwise.

As a regulated mutual fund in the Cayman Islands, the Master Fund is also subject to the same legislation and regulations aimed at the prevention of money laundering that are applicable to the Fund.  The Master Fund will discharge its obligations by implementing procedures substantially similar to the Fund.

**Requests for Information**

The Fund and the Master Fund, or any of its or their directors or agents domiciled in the Cayman Islands, may be compelled to provide information, subject to a request for information made by a regulatory or governmental authority or agency under applicable law; e.g. by the Cayman Islands Monetary Authority, either for itself or for a recognized overseas regulatory authority, under the Monetary Authority Law (2016 Revision), or by the Tax Information Authority, under the Tax Information Authority Law (2017 Revision) or Reporting of Savings Income information (European Union) Law (2014 Revision) and associated regulations, agreements, arrangements and memoranda of understanding. Disclosure of confidential information under such laws shall not be regarded as a breach of any duty of confidentiality and, in certain circumstances, the Fund, the Master Fund and any of its or their directors or agents, may be prohibited from disclosing that the request has been made.

**United States**

All subscriptions for Shares will be subject to applicable anti-money laundering regulations.  Investors will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001 (Pub. L. No. 107-56).

As part of the Fund's responsibility to comply with regulations aimed at the prevention of money laundering, the Fund or its delegate may require verification of identity from all prospective investors.  Depending on the circumstances of each subscription, it may not be necessary to obtain full documentary evidence of identity.

The Fund reserves the right to request such information as is necessary to verify the identity of a prospective investor.  The Fund also reserves the right to request such identification evidence in respect of a transferee of Shares.  In the event of delay or failure by the prospective investor or transferee to produce any information required for verification purposes, the Fund may refuse to accept the application or (as the case may be) to register the relevant transfer and (in the case of a subscription of Shares) any funds received will be returned without interest to the account from which the monies were originally debited.

Appx. 03539

The Fund also reserves the right to refuse to make any redemption payment or distribution to a shareholder, if the Fund suspects or is advised that the payment of any redemption or distribution moneys to such shareholder might result in a breach or violation of any applicable anti-money laundering or other laws or regulations by any person in any relevant jurisdiction, or such refusal is considered necessary or appropriate to ensure the compliance by the Fund and the Investment Manager with any such laws or regulations in any relevant jurisdiction.

**Beneficial Ownership Regime**

The Fund is regulated as a mutual fund under the Mutual Funds Law and, accordingly, does not fall within the scope of the primary obligations under Part XVIIA of the Companies Law (the "*Beneficial Ownership Regime*").   The Fund is therefore not required to maintain a beneficial ownership register.   The Fund may, however, be required from time to time to provide, on request, certain particulars to other Cayman Islands entities which are within the scope of the Beneficial Ownership Regime and which are therefore required to maintain beneficial ownership registers under the Beneficial Ownership Regime.   It is anticipated that such particulars will generally be limited to the identity and certain related particulars of (i) any person holding (or controlling through a joint arrangement) a majority of the voting rights in respect of the Fund; (ii) any person who is a member of the Fund and who has the right to appoint and remove a majority of the board of directors of the Fund; and (iii) any person who has the right to exercise, or actually exercises, dominant direct influence or control over the Fund.

**Legal Implications of Investment in the Fund**

The Fund is incorporated under the laws of the Cayman Islands and has its registered office in the Cayman Islands.  In summary, the main Cayman Islands legal implications of investing in the Fund are as follows:

(a) by submitting the Subscription Documents to the Administrator, the prospective investor makes an offer to subscribe for the Shares which, once accepted by the Fund, has the effect of a binding contract. The terms of such contract are governed by the Subscription Documents (read together with the Memorandum);

(b) upon the issue of the Shares, such prospective investor becomes a shareholder of the Fund, and the Articles of Association of the Fund take effect as a contract between the shareholders and the Fund by operation of law;

(c) the Articles of Association may only be amended by way of a special resolution in accordance with the Cayman Islands Companies Law (as amended);

(d) subject to any separate contractual arrangements agreed to by a shareholder with the Fund and the indemnity provisions of the Subscription Documents, a shareholder's liability to the Fund will generally be limited to the amount, if any, unpaid on the Shares held by such shareholder;

(e) the Articles of Association are governed by, and construed in accordance with, the laws of the Cayman Islands. The Subscription Documents are expressed to be governed by, and construed in accordance with, the laws of the Cayman Islands;

(f) the rights and restrictions that apply to a shareholder's Shares may be modified and/or additional terms agreed by way of side letters (subject to such terms being consistent with the

Appx. 03540

Articles of Association). As a matter of Cayman Islands law, side letters may not contravene the terms of the Articles of Association or Cayman Islands law generally; and

(g) although there is no statutory enforcement in the Cayman Islands of judgments obtained in a foreign jurisdiction (other than judgments rendered by an Australian superior court which may be enforced under the Cayman Islands Foreign Judgments Reciprocal Enforcement Law (1996 Revision)), a judgment obtained in such jurisdiction will be recognized and enforced in the courts of the Cayman Islands at common law, without any re-examination of the merits of the underlying dispute, by an action commenced on the foreign judgment debt in the Grand Court of the Cayman Islands, provided such judgment satisfies certain criteria.

90

## Appendix A

**Definition of "United States Person"**

For purposes of the applicable prohibitions against ownership and transfer of Shares of the Fund, the term "***United States Person***" and "***U.S. Person***" means:

(1)  a resident or citizen of the United States;

(2)  a partnership or corporation organized under the laws of the United States;

(3)  any entity not organized under the laws of the United States:

    (a)  that has its principal office or place of business in the United States; or

    (b)  (i)  in which citizens or residents of or entities organized under the laws of or existing in the United States directly or indirectly hold in the aggregate 50% or more of the beneficial interests; and

        (ii)  that will own directly or indirectly, either alone or together with affiliated persons, an aggregate of more than 9.9% of the Fund's outstanding Shares; or

    (c)  (i)  that is organized principally for passive investment (such as an investment company, a commodity pool or other similar vehicle); and

        (ii)  (A)  in which the amount of units of participation held by United States Persons (other than "qualified eligible participants" as defined in Rule 4.7(a)(2) under the United States Commodity Exchange Act) represents in the aggregate 10% or more of the beneficial interest in the entity;

            (B)  that was formed for the purpose of facilitating investment by United States Persons in the Fund, or in any other commodity pool with respect to which the operator is exempt from certain requirements of Part 4 of the regulations promulgated by the United States Commodity Futures Trading Commission by virtue of its participants being non-United States Persons; or

            (C)  that was formed by United States Persons principally for the purpose of investing in securities not registered under the United States Securities Act of 1933, as amended, unless it is formed and owned by "accredited investors" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) who are not natural persons, estates or trusts;

(4)  an estate or trust:

    (a)  of which an executor, administrator or trustee is a United States Person, unless:

        (i)  an executor, administrator or trustee who is not a United States Person has sole or shared investment discretion with respect to the assets of the estate or trust; and

        (ii)  (A)  in the case of an estate, it is governed by non-U.S. law; or

1

     (B)    in the case of a trust, no beneficiary (and no settlor if the trust is revocable) is a United States Person; or

(b)    the income of which is subject to United States income tax regardless of source;

(5)    any agency or branch of a foreign entity located in the United States;

(6)    any non-discretionary account or similar account (other than an estate or trust) held for the benefit or account of one or more United States Persons; and

(7)    any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States, unless it is held by a dealer or other professional fiduciary exclusively for the benefit or account of one or more non-United States Persons.

For purposes of the foregoing, the term "***United States***" or "***U.S.***" means the United States of America, its territories and possessions, any state of the United States, and the District of Columbia. Persons requiring details regarding other terms used in the foregoing definition (such as "qualified eligible participant" and "accredited investor") should contact the Fund or the Administrator.

Appx. 03543

**Memorandum Number** _____

# Confidential Private Placement Memorandum

*Series A Interests*
*Series B Interests*
*Series C Interests*
*in*

# Highland Argentina Regional Opportunity Fund, L.P.

*General Partner*

## Highland Argentina Regional Opportunity Fund GP, LLC

*Investment Manager*

## Highland Capital Management Latin America, L.P.

**March 2019**

208786464 v12

# TABLE OF CONTENTS

Page

NOTICE.................................................................................................................................. ii

DIRECTORY .......................................................................................................................... v

EXECUTIVE SUMMARY ...................................................................................................1

INVESTMENT PROGRAM ..................................................................................................3

MANAGEMENT AND ADMINISTRATION .........................................................................6

SUMMARY OF TERMS .......................................................................................................10

THE MASTER FUND ..........................................................................................................25

RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST.........................................29

BROKERAGE AND CUSTODY ...........................................................................................47

TAX CONSIDERATIONS .....................................................................................................50

ERISA AND OTHER REGULATORY CONSIDERATIONS ....................................................63

i

# NOTICE

This Confidential Private Placement Memorandum (this "**Memorandum**") is being furnished on a confidential basis solely to selected qualified investors considering the purchase of limited partner interests (the "**Interests**") in Highland Argentina Regional Opportunity Fund, L.P. (the "**Fund**"). This Memorandum is not to be reproduced or distributed to others, at any time, without the prior written consent of Highland Argentina Regional Opportunity Fund GP, LLC (the "**General Partner**"). Each recipient agrees to keep confidential all information contained herein not already in the public domain and will use this Memorandum for the sole purpose of evaluating a possible investment in the Fund. Notwithstanding anything herein to the contrary, each investor (and each employee, representative, or other agent of the investor) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of an investment in the Fund and all materials of any kind (including opinions or other tax analyses) that are provided to the investor relating to such tax treatment and tax structure. Acceptance of this Memorandum by prospective investors constitutes an agreement to be bound by the foregoing terms.

Prospective investors should not construe the contents of this Memorandum as legal, tax or financial advice. Each prospective investor should consult its own professional advisors as to the legal, financial, tax, ERISA (as defined herein) or other matters relevant to the suitability of an investment in the Fund for such investor.

In making an investment decision, investors must rely on their own examination of the Fund and the terms of the offering contemplated by this Memorandum. The Interests have not been recommended by any U.S. federal or state, or any non-U.S., securities commission or regulatory authority. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this Memorandum. Any representation to the contrary is a criminal offense.

The Interests have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "**Securities Act**"), or the securities laws of any of the states of the United States. The offering and any potential sale contemplated by this Memorandum will be made in reliance upon an exemption from the registration requirements of the Securities Act for offers and sales of securities which do not involve any public offering and analogous exemptions under state securities laws. There will be no public market for the Interests, and there is no obligation on the part of any person to register the Interests under the Securities Act or any state securities laws.

The Fund has not been and will not be registered under the U.S. Investment Company Act of 1940, as amended (the "**Investment Company Act**"), since Interests will only be sold to persons who are "qualified purchasers," as defined in the Investment Company Act.

Each subscriber for an Interest will be required to certify that it is an "accredited investor" as defined in Regulation D under the Securities Act and a "qualified purchaser," as defined in the Investment Company Act.

Pursuant to an exemption from the Commodity Futures Trading Commission (the "**CFTC**"), Highland Capital Management Latin America, L.P., the investment manager to the Fund (the "**Investment Manager**"), is not registered with the CFTC as a commodity pool operator ("**CPO**") and therefore, unlike a registered CPO, is not required to deliver a disclosure document or a certified annual report to participants in this pool. Among other things, the exemption requires the filing of a claim of exemption with the National Futures Association. It is also required that at all times either: (a) the

ii

aggregate initial margin and premiums required to establish commodity interest positions does not exceed 5% of the liquidation value of the Fund's portfolio; or (b) the aggregate net notional value of the Fund's commodity interest positions does not exceed 100% of the liquidation value of the Fund's portfolio and further that all pool participants are required to be accredited investors or certain other qualified investors. The Investment Manager qualifies for an exemption from registration as a commodity trading advisor pursuant to CFTC Rule 4.14(a)(8).

Interests are suitable only for sophisticated investors who do not require immediate liquidity for their investments, for whom an investment in the Fund does not constitute a complete investment program and who fully understand and are willing to assume the risks involved in the Fund's investment program. The Fund's investment practices, by their nature, may be considered to involve a substantial degree of risk. See "*Risk Factors and Potential Conflicts of Interest*." No assurance can be given that the Fund's investment objectives will be achieved or that investors will receive a return of their capital.

The Interests are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and any applicable state or other securities laws, pursuant to registration or an exemption therefrom. The transferability of the Interests will be further restricted by the terms of the limited partnership agreement of the Fund, as amended (the "*Partnership Agreement*"). Investors should be aware that they will be required to bear the financial risks of an investment in the Interests for an extended period of time.

This Memorandum does not constitute an offer to sell, or the solicitation of an offer to buy, any Interests in any state or other jurisdiction where, or to or from any person to or from whom, such offer or solicitation is unlawful or not authorized.

No person has been authorized to give any information or to make any representation concerning the Fund or the offering of the Interests other than the information contained in this Memorandum and, if given or made, such information or representation must not be relied upon as having been authorized by the Fund or the General Partner.

The Interests are offered subject to the right of the General Partner to reject any subscription in whole or in part.

This Memorandum is intended solely for the use of the person to whom it has been delivered by the General Partner or its authorized representative for the purpose of evaluating a possible investment by the recipient in the Interests described herein, and is not to be reproduced or distributed to any other persons (other than professional advisors of the prospective investor receiving this Memorandum from the General Partner or its authorized representative).

This Memorandum does not purport to be, and should not be construed as, a complete description of the Partnership Agreement or the investment management agreement by and among the Investment Manager, the General Partner, the Master Fund, the Offshore Fund (each as defined below) and the Fund (the "*Investment Management Agreement*"). Each prospective investor in the Fund is encouraged to review the Partnership Agreement carefully, in addition to consulting appropriate legal and tax advisors. To the extent of any inconsistency between this Memorandum and the Partnership Agreement, the terms of the Partnership Agreement shall control.

The delivery of this Memorandum does not, under any circumstances, create any implication that there has been no change in the circumstances affecting the Fund or Highland Argentina Regional

Appx. 03547

Opportunity Master Fund, L.P. (the "**Master Fund**") since the date hereof.  An amended or updated Memorandum will be provided to reflect any material changes to the information contained herein.

Certain information contained in this Memorandum constitutes "forward-looking statements," which can be identified by the use of forward-looking terminology such as "may," "will," "should," "expect," "anticipate," "project," "estimate," "intend," or "believe" or the negatives thereof or other variations thereon or comparable terminology.  Due to various risks and uncertainties, including those described in "*Risk Factors and Potential Conflicts of Interest*," actual events or results or the actual performance of the Fund may differ materially from those reflected or contemplated in such forward-looking statements.

All references herein to "$" refer to U.S. dollars.  Except as the context otherwise requires, references to the term "Fund" in this Memorandum shall be deemed to include the Master Fund.

## DIRECTORY

| | |
|---|---|
| **General Partner** | Highland Argentina Regional Opportunity Fund GP, LLC<br>300 Crescent Court, Suite 700<br>Dallas, TX 75201 |
| **Investment Manager** | Highland Capital Management Latin America, L.P.<br>c/o Highland Capital Management, L.P.<br>300 Crescent Court, Suite 700<br>Dallas, TX 75201 |
| **Administrator** | MUFG Fund Services (Cayman) Limited<br>2nd Floor, Strathvale House<br>90 North Church Street<br>P.O. Box 609<br>Grand Cayman  KY1-1107<br>Cayman Islands |
| **Auditor** | PricewaterhouseCoopers LLP<br>5th Floor Strathvale House<br>P.O. Box 258<br>Grand Cayman  KY1-1104<br>Cayman Islands |
| **Prime Brokers** | Société Générale<br>440 S. LaSalle St., Suite 2400<br>Chicago, IL 60605<br><br>BNP Paribas Prime Brokerage, Inc.<br>787 Seventh Avenue<br>The Equitable Tower<br>New York, NY 10019 |
| **Legal Counsel** | *In the United States:*<br>Akin Gump Strauss Hauer & Feld LLP<br>1700 Pacific Avenue<br>Suite 4100<br>Dallas, TX 75201 |

v

# EXECUTIVE SUMMARY

Highland Argentina Regional Opportunity Fund, L.P., a Delaware limited partnership (the "***Fund***"), seeks to maximize the total return of its assets through capital appreciation by investing all of its investable assets in Highland Argentina Regional Opportunity Master Fund, L.P., a Cayman Islands exempted limited partnership (the "***Master Fund***"), which intends to hold primarily a portfolio of investments in securities of Latin American corporate and sovereign issuers as well as non-Latin American issuers that derive a portion of their revenues from business activities in Latin America, in each case with a primary focus on Argentina.

Highland Argentina Regional Opportunity Fund GP, LLC, a Delaware limited liability company (the "***General Partner***"), acts as general partner of the Fund and the Master Fund and is registered as a foreign company in the Cayman Islands.  Highland Capital Management Latin America, L.P., a Cayman Islands exempted limited partnership (the "***Investment Manager***" and, together with its affiliates, shareholders, directors, members, partners, officers and employees, the "***Advisory Parties***"), serves as investment manager to the Fund, the Offshore Fund (as defined below) and the Master Fund and manages the Master Fund's investment program.  Each of the General Partner and the Investment Manager is ultimately controlled by James D. Dondero (the "***Principal***").

In order to facilitate investments by non-U.S. and certain U.S. tax-exempt investors, the Investment Manager and its affiliates recently assumed the management of an existing investment fund, Highland Argentina Regional Opportunity Fund, Ltd., a Cayman Islands exempted company (the "***Offshore Fund***" and, together with the Fund, the "***Feeder Funds***").  The Feeder Funds will place all of their investable assets in, and conduct all of their investment and trading activities in parallel through, the Master Fund.  References in this Memorandum to the Fund shall include the Master Fund, unless otherwise specified or the context so requires.

The Fund (but not the Master Fund) is seeking subscriptions from investors who qualify as both "accredited investors" and "qualified purchasers" (each as defined in the Fund's subscription materials).  The minimum initial investment is $500,000, and thereafter, the minimum subsequent investment is $500,000, although, in each case, the Fund may accept investments in a lesser amount, but no less than $100,000 with respect to Series B Interests.  The Fund generally accepts subscriptions on the first day of each calendar month.  A subscriber admitted to the Fund as a limited partner (each, a "***Limited Partner***") will receive, in exchange for its initial capital contribution and any subsequent capital contribution, a limited partner interest representing a proportionate share of the net assets of the Fund at that time.

The Fund intends to issue multiple series of limited partner interests ("***Interests***") over time.  Not all series of Interests will be available for subscription at the same time and the terms among the series of Interests will vary.  The Fund is currently offering Series A Interests, Series B Interests and Series C Interests pursuant to this Memorandum.

For its services to the Master Fund, the Investment Manager is generally entitled to a management fee (the "***Management Fee***"), which is calculated monthly and paid quarterly in arrears at the Master Fund level.  The Management Fee is calculated at an annual rate of (i) 1.75% of each Limited Partner's capital account that is attributable to a Series A Interest, (ii) 1.25% of each Limited Partner's capital account that is attributable to a Series B Interest, and (iii) 1.00% of each Limited Partner's capital account that is attributable to a Series C Interest.

1

Appx. 03550

In addition, the Investment Manager, in its capacity as the special limited partner of the Master Fund (the "***Special Limited Partner***"), is entitled to a quarterly performance-based profits allocation (the "***Performance Allocation***") at the end of each fiscal quarter.  The Performance Allocation is calculated and allocated at the Master Fund level, but is effectively equal to (i) 20.0% of the amount by which the net asset value of each Series A Interest on the last day of a fiscal quarter exceeds the "high water mark" for such Series A Interest, if any, (ii) 17.5% of the amount by which the net asset value of each Series B Interest on the last day of a fiscal quarter exceeds the "high water mark" for such Series B Interest, if any, and (iii) 15.0% of the amount by which the net asset value of each Series C Interest on the last day of a fiscal quarter exceeds the "high water mark" for such Series C Interest, if any.

Subject to a one-year "soft lock-up" with an early withdrawal reduction attributable to Series B Interests only and a two-year "soft lock-up" with an early withdrawal reduction attributable to Series C Interests only, a Limited Partner is generally permitted to withdraw all or a portion of its Interest on 30 calendar days' prior written notice on the last business day of each calendar month.  Withdrawals may be subject to reserves for contingencies and suspension restrictions as discussed further in this Memorandum.

The Fund may agree with certain Limited Partners to a variation of the terms set forth in this Memorandum or establish additional series of Interests that have terms that differ from those described herein, including, without limitation, different management fees, performance allocations and withdrawal rights.

Appx. 03551

# INVESTMENT PROGRAM

## INVESTMENT OBJECTIVE

The investment objective of the Fund is to maximize the total return of its assets through capital appreciation by investing all of its investable assets in the Master Fund, which intends to hold primarily a portfolio of investments in securities of Latin American corporate and sovereign issuers as well as non-Latin American issuers that derive a portion of their revenues from business activities in Latin America, in each case with a primary focus on Argentina, and that the Investment Manager believes would provide profitable investment opportunities for the Master Fund. The Master Fund will invest in a single portfolio of assets and does not currently intend to have a separate portfolio of assets for each of its series, each of which will correspond to a series of limited partner interests in the Fund.

## INVESTMENT STRATEGY

The Master Fund is a multi-strategy investment fund and there is no limit on the investment strategies that may be utilized. The Investment Manager believes that focusing on a multi-strategy approach will enable the Master Fund to enhance results by compounding returns generated by each strategy and at the same time have the needed flexibility to adjust to potentially changing regulations and market conditions.

The Investment Manager will be focused on identifying assets that are mispriced against similar assets and/or against the Investment Manager's expectations for assets' fair values and market movements, special situations, such as mergers, financial restructurings, hostile takeovers, or leveraged buy-outs. There is no set allocation among these and any other strategies that the Investment Manager may use.

The Master Fund may hold long and short positions in a wide range of liquid or illiquid fixed income securities including, but not limited to, sovereign and private debt, distressed debt, secured and unsecured debt, structured debt, loans, asset-backed securities and collateralized debt obligations. Furthermore, the Master Fund may invest, both long and short, in a wide range of liquid or illiquid equity-related instruments including, but not limited to, equities, convertible bonds, options, equity-linked notes, preferred shares and warrants, whether or not listed or traded on one or more exchanges.

The Master Fund may hold any of these positions indirectly by entering into swaps, options, futures, forward contracts or similar derivative transactions.

The Master Fund may hold both U.S. dollar and non-U.S. dollar denominated securities.

The Master Fund may leverage its investment portfolio by up to 100% of the Master Fund's net asset value (calculated at the time of investment) by borrowing for investment purposes and by using leverage techniques and products. It is anticipated that by doing so the performance of the Master Fund will be enhanced. While the use of the leverage may improve the return on invested capital, leverage may also significantly increase the impact of adverse movement in the value of the Master Fund.

The Master Fund may also utilize hedging strategies in order to maximize returns and reduce the risk to principal or the volatility associated with its holdings. As part of these hedging strategies, the Master Fund may hedge any of its investments with long or short positions in any financial instrument, which the Investment Manager deems appropriate. The Master Fund may utilize U.S. and European securities for hedging purposes.

Appx. 03552

The Master Fund may invest through one or more subsidiaries established in an appropriate jurisdiction in order to take advantage of applicable tax treaties or increase the tax efficiency of the Master Fund's investments, or in such other circumstances as the General Partner, in its capacity as the general partner of the Master Fund, following consultation with the Investment Manager, deem appropriate, including compliance with local investment laws.

The Master Fund may maintain assets in cash or cash equivalent instruments, money market funds, repurchase agreements, or other cash management vehicles pending investment, for defensive purposes, to fund withdrawals requested by the limited partners of the Master Fund or otherwise at the discretion of the Investment Manager. The Master Fund may hold with no limitation U.S. and European AAA fixed income securities for defensive purposes.

## INVESTMENT RESTRICTIONS

In deploying the investment strategy, the Master Fund will observe the following investment restrictions. The Master Fund will not at the time of investment:

1. Invest more than 50 percent of its gross assets in its net holdings of equities;

2. Borrow more than 100 percent of its net assets;

3. Invest more than 20 percent of its gross assets in a single equity position;

4. Invest more than 20 percent of its gross assets in a single corporate issuer position;

5. Invest more than 30 percent of its gross assets in a single GDP-linked warrant position; and

6. Invest more than 30 percent of its gross assets in a single sovereign issuer security position; and

7. Invest more than 30 percent of its gross assets in a single provincial issuer.

If a percentage limitation on investment or use of assets set forth above is adhered to at the time a transaction is effected, later changes in percentage resulting from changing values will not be considered a violation.

In the event that the Investment Manager discovers that a violation of any of the Master Fund's investment limitations has occurred (the date of such discovery being the "***Discovery Date***"), the Investment Manager shall inform the limited partners of the Master Fund, including the Fund, who shall: (i) notify each of their limited partners or shareholders, as applicable, in writing within 30 business days after the Discovery Date of the nature of the violation, the steps taken, or to be taken, to remedy the violation and the reason the violation occurred and (ii) use reasonable commercial efforts to cause the Investment Manager to remedy such violation within 90 business days after the Discovery Date (the "***Remedy Date***"). If such violation has not been remedied on or before the Remedy Date, the limited partners of the Master Fund, including the Fund, shall: (i) notify each of their limited partners or shareholders, as applicable, in writing, 30 business days after the Remedy Date, of the steps taken to remedy the violation and the reason that the violation has not been remedied by the Remedy Date (the "***Remedy Notice***") and (ii) use reasonable commercial efforts to cause the Master Fund's portfolio to be examined by an independent auditor other than PricewaterhouseCoopers LLP and shall request that such independent auditor issue a report to the investors in each of the Master Fund's limited partners as to its

Appx. 03553

concurrence or disagreement with the statements in the Remedy Notice. The Investment Manager shall pay for the costs of such audit and the costs of the Remedy Notice if the violation that was the subject of the Remedy Notice occurred as a result of the Investment Manager's willful misfeasance, bad faith or gross negligence. In addition, the failure to remedy the violation in a timely manner may give rise to special withdrawal rights. See "*Summary of Terms – Withdrawals; Lock-Ups*."

## DISTRIBUTION POLICY

The Fund's objective is to maximize capital appreciation and accordingly it is not envisaged that any income or gains derived from the investments made by the Master Fund will be distributed by way of dividend. This does not preclude the General Partner from declaring a dividend at any time in the future if it considers it appropriate to do so. To the extent that a dividend may be declared, it will be paid in compliance with any applicable laws.

*The investment objectives and strategies summarized herein represent the Investment Manager's current intentions. Depending on conditions and trends in the securities markets and the economy in general, the Investment Manager may pursue any strategies, employ any investment techniques or purchase any type of security that it considers appropriate, whether or not described in this section, subject to any applicable law or regulation. The discussion herein includes and is based upon numerous assumptions and opinions of the Investment Manager concerning world financial markets and other matters, the accuracy of which cannot be assured. There can be no assurance that the investment strategy of the Master Fund will achieve the intended investment objective. The Master Fund's investment program is speculative and involves a high degree of risk, including, without limitation, the risk of loss of the entire amount invested.*

Appx. 03554

## MANAGEMENT AND ADMINISTRATION

**The General Partner and the Investment Manager**

Highland Argentina Regional Opportunity Fund GP, LLC, a Delaware limited liability company (the "***General Partner***"), acts as the general partner of the Fund and the Master Fund and is registered as a foreign company in the Cayman Islands.

Highland Capital Management Latin America, L.P., a Cayman Islands exempted limited partnership (the "***Investment Manager***"), serves as the investment manager of the Fund, the Offshore Fund and the Master Fund and has responsibility for the Master Fund's investment program.

Each of the General Partner and the Investment Manager is ultimately controlled by James D. Dondero (the "***Principal***").

**The Investment Management Agreement**

The Investment Manager was appointed as the investment manager to the Fund, the Offshore Fund and the Master Fund pursuant to an investment management agreement (the "***Investment Management Agreement***"). Under the Investment Management Agreement, the Investment Manager has full discretion to invest the assets of the Master Fund in pursuit of the investment objective and strategy described in this Memorandum. For its services, the Investment Manager is entitled to the Management Fee, as well as reimbursement for any Feeder Fund or Master Fund expenses incurred by the Investment Manager.

The Investment Management Agreement provides that, in the absence of gross negligence, willful misconduct or fraud, each of the Investment Manager, its members, shareholders, partners, managers, directors, any person who controls the Investment Manager, each of the respective affiliates of the foregoing, and each of their respective executors, heirs, assigns, successors and other legal representatives, will be indemnified by the Fund, the Offshore Fund and/or the Master Fund, to the extent permitted by law, against any loss or liability incurred by any of such persons in performing their duties under the Investment Management Agreement.

**Services Agreement**

The Investment Manager engaged Highland Latin America Consulting, Ltd., a Cayman Islands exempted company and a wholly-owned subsidiary of the Investment Manager ("***Highland Latin America***"), pursuant to a services agreement (the "***Services Agreement***") to provide certain administrative and consulting services to the Investment Manager related to its management of the Fund, the Offshore Fund and the Master Fund, including back- and middle-office services; credit analysis; investment vehicle management; valuation; execution and documentation; marketing; reporting; administrative services; and other ancillary services.

The Services Agreement provides that in the absence of bad faith, gross negligence, fraud or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment), the Investment Manager will, to the extent permitted by law, indemnify and hold harmless Highland Latin America, any of its affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities incurred by such person in performing their duties under the Services Agreement. The

6

Fund will not be liable for any consulting services provided by Highland Latin America or any consultants or service providers that Highland Latin America engages, and the Fund will not bear any costs or expenses related to the services provided by Highland Latin America.

**Investment Personnel**

The key investment professionals of the Investment Manager and Highland Latin America who will be responsible for the Master Fund's investments are described below:

***James Dondero, CFA, CMA, President, Co-Founder***. Mr. Dondero is Co-Founder and President of Highland Capital Management, L.P. and a Director of Highland Latin America GP, Ltd., the general partner of the Investment Manager. Mr. Dondero has over 30 years of experience in the credit and equity markets, focused largely on high-yield and distressed investing. Mr. Dondero is the Chairman and President of NexPoint Residential Trust, Inc. (NYSE:NYRT), Chairman of NexBank Capital, Inc., Cornerstone Healthcare Group Holding, Inc., and CCS Medical, Inc., and a board member of Jernigan Capital, Inc. (NYSE:JCAP), and MGM Holdings, Inc. He also serves on the Southern Methodist University Cox School of Business Executive Board. A dedicated philanthropist, Mr. Dondero actively supports initiatives in education, veterans affairs, and public policy. Prior to founding Highland in 1993, Mr. Dondero was involved in creating the GIC subsidiary of Protective Life, where as Chief Investment Officer he helped take the company from inception to over $2 billion between 1989 and 1993. Between 1985 and 1989, Mr. Dondero was a corporate bond analyst and then portfolio manager at American Express. Mr. Dondero began his career in 1984 as an analyst in the JP Morgan training program. Mr. Dondero graduated from the University of Virginia where he earned highest honors (Beta Gamma Sigma, Beta Alpha Psi) from the McIntire School of Commerce with dual majors in accounting and finance. He has received certification as Certified Public Accountant (CPA) and Certified Managerial Accountant (CMA) and has earned the right to use the Chartered Financial Analyst (CFA) designation.

***Gustavo Prilick***. Mr. Prilick is a Managing Partner at Highland Capital Brasil and a registered asset manager in Brazil, and is a Director of Highland Latin America GP, Ltd., the general partner of the Investment Manager. He has extensively worked in several of Highland Capital Brasil's portfolio companies in the US mainly as CEO. Prior to his involvement with Highland Capital Brasil, he was a Partner at South America Fund, a private equity firm, mainly focused on providing financial services to export companies in Argentina and Uruguay. Prior to South America Fund, he was the Chief Operating Officer of Millicom International Cellular for 7 years, serving Latin America, Asia, Africa and ten operations in Russia. Prior to Millicom, he served as the Director of International Business for Oracle Corporation where he was responsible for the establishment of most of Oracle's International Subsidiaries on several continents, including the Brazilian operation. Later he became President of Oracle South America with oversight of several countries in South America. He also served as CEO of Nacion Factoring, a subsidiary of Banco Nacion in Argentina building its operations to reach one of the leading positions in the country. Mr. Prilick received an MBA from the Stanford University Graduate School of Business and a degree in Electrical Engineering from Universidad de Buenos Aires. He has also held teaching positions as a visiting professor in several leading Business Schools in Argentina.

Highland Latin America will enter into relationships and agreements with Argentine relevant parties and/or individuals to obtain supporting services for the management of the Fund, the Offshore Fund and the Master Fund, and will enter into consulting agreements with Andrés Pitchón, Julieta Prieto and Javier Casabal pursuant to which these consultants will provide investment and related services to the Feeder Funds and the Master Fund. Mr. Pitchón will provide portfolio management services to the Master Fund under the overall supervision of the Investment Manager.

Appx. 03556

*Andrés Pitchón*. Mr. Pitchón, through a consulting arrangement with Highland Latin America Consulting, Ltd., provides portfolio management services to the Master Fund. Mr. Pitchón began his career in 1993 as Head of Equity Research for Argentina for MBA-Salomon Brothers and later he also became responsible for Fixed income. As Head of the Research Department, his work was recognized by international publications such as Institutional Investor, Latin Finance, The Reuters Survey and The Greenwich Survey. Since 1997 and 1999, he has managed the Offshore Fund's equity and fixed income mutual funds. Since 2003, Mr. Pitchón had been Senior Portfolio Manager of the Offshore Fund's hedge funds. Mr. Pitchón received a BA degree in IT, focused on Business Administration from the University of Belgrano (1989), together with an academic merit medal for highest GPA in the School of Technology. Mr. Pitchón also received a Master's degree in Business Administration from Anderson Graduate School of Business at UCLA in 1992.

## The Administrator

The Master Fund has entered into an Administration Agreement (the "***Administration Agreement***") with MUFG Fund Services (Cayman) Limited (the "***Administrator***") pursuant to which the Administrator performs certain administrative and accounting services for the Feeder Funds and the Master Fund, subject to the oversight and control of the General Partner, in its capacity as the general partner of the Master Fund.

Pursuant to the Administration Agreement, the Administrator is responsible, under the overall supervision of the General Partner, in its capacity as the general partner of the Master Fund, for certain matters pertaining to the administration for the Fund, including: (i) maintaining the accounts of the Fund and the Master Fund, (ii) calculating the Master Fund's net asset value, (iii) maintaining the principal corporate records of the Fund and the Master Fund, (iv) communicating with Limited Partners, (v) accepting the subscriptions of new Limited Partners, (vi) effecting withdrawals of Interests, (vii) maintaining the register of sub-fund investments, (viii) executing sub-fund subscriptions and withdrawals as instructed by the Fund, and (ix) ensuring compliance with applicable law and regulation (including anti-money laundering regulations). For its services, the Administrator receives a fee from the Master Fund.

The Administration Agreement may be terminated by the Administrator or the Master Fund upon ninety (90) days' written notice or, under certain circumstances, shorter notice. In such event, the Master Fund may enter into a new agreement with a new administrator on behalf of the Master Fund and the Feeder Funds, in its discretion and on such terms as it deems advisable, without prior notice to, or approval of, investors.

Under the Administration Agreement, the Master Fund agrees to indemnify and hold harmless the Administrator and its affiliated persons and delegates, as well as their respective officers, directors, employees and agents for, and to defend and hold each such person harmless from, any and all taxes, claims, demands, actions, suits, judgments, liabilities, losses, damages, costs, charges, counsel fees (on a solicitor and his own client basis), fines, assessments, amounts paid in settlement and expenses imposed on, incurred by, or asserted against the person which may arise out of or in connection with the Administration Agreement. The Administrator or any other indemnified person will not be indemnified for their own gross negligence, wilful default or fraud.

The Administrator is not responsible for valuing the Master Fund's investments, monitoring any investment restrictions of the Master Fund, determining compliance by the Master Fund with its investment restrictions, the Master Fund's trading activities, the management or performance of the

Appx. 03557

Master Fund or the accuracy or adequacy of this Memorandum. In addition, the Administrator does not assume any liability to any person or entity, including Limited Partners, except as specifically provided in the Administration Agreement. The Administrator may delegate certain services and share information concerning the Fund and its Limited Partners with its various non-United States affiliates subject to applicable confidentiality provisions.

**The Administrator has no responsibility with respect to trading activities, the Investment Manager, the management or performance of the Master Fund, or the accuracy or adequacy of this Memorandum**.

**Appx. 03558**

## SUMMARY OF TERMS

*The following Summary of Terms summarizes the principal terms governing an investment in the Fund, and is subject, and qualified in its entirety by reference, to the Partnership Agreement, the exempted limited partnership agreement of the Master Fund, as amended (the "**Master Fund Partnership Agreement**"), and the Fund's subscription documents (the "**Subscription Documents**"). This summary is intended to be brief and does not purport to provide a comprehensive explanation of the Partnership Agreement, the Master Fund Partnership Agreement and the Subscription Documents. Accordingly, statements made in this Memorandum are subject to the detailed provisions of those agreements. Prospective investors are urged to review those agreements in their entirety prior to determining whether to invest in the Fund.*

| | |
|---|---|
| **The Fund** | Highland Argentina Regional Opportunity Fund, L.P., a Delaware limited partnership (the "***Fund***"), primarily seeks to maximize the total return of its assets through capital appreciation by investing all of its investable assets in Highland Argentina Regional Opportunity Master Fund, L.P., a Cayman Islands exempted limited partnership (the "***Master Fund***"), which intends to hold primarily a portfolio of investments in securities of Latin American corporate and sovereign issuers as well as non-Latin American issuers that derive a portion of their revenues from business activities in Latin America, in each case with a primary focus on Argentina. |
| **General Partner** | Highland Argentina Regional Opportunity Fund GP, LLC, a Delaware limited liability company (the "***General Partner***"), acts as the general partner of the Fund and the Master Fund and is registered as a foreign company in the Cayman Islands.  James D. Dondero (the "***Principal***") ultimately controls the General Partner. |
| **Investment Manager** | Highland Capital Management Latin America, L.P., a Cayman Islands exempted limited partnership controlled by the Principal (the "***Investment Manager***"), serves as investment manager to the Feeder Funds (as defined below) and the Master Fund and has responsibility for the Master Fund's investments. |
| **Master-Feeder Structure** | In order to facilitate investments by non-U.S. and certain U.S. tax-exempt investors, the Investment Manager and its affiliates recently assumed the management of an existing investment fund, Highland Argentina Regional Opportunity Fund, Ltd., a Cayman Islands exempted company (the "***Offshore Fund***" and, together with the Fund, the "***Feeder Funds***"). The Feeder Funds will place all of their investable assets in, and conduct all of their investment and trading activities in parallel through, the Master Fund.  Accordingly, references herein to the investment activity of the Fund should be construed to refer to the Fund's investment activities through the Master Fund.  The Feeder Funds share all items of profit, loss, income and expense of the Master Fund on a *pro rata* basis in accordance with their respective capital account balances in the Master Fund.  Except as the context otherwise requires, the term "Fund" also includes the Master Fund. |

|  | The Investment Manager or an affiliate may also sponsor one or more additional investment funds or accounts. |
|---|---|

**Eligible Investors**  Limited partner interests ("*Interests*") may be purchased only by investors who qualify as both "accredited investors" and "qualified purchasers," each as defined in the Fund's Subscription Documents. Subscribers will be required to complete the Fund's Subscription Documents consisting of the subscription agreement and the subscriber information form to determine their eligibility. The General Partner reserves the right to reject any investor for any reason or for no reason in its sole discretion.

An investment in the Fund is suitable only for persons that have adequate means of providing for their current needs and personal contingencies and have no need for liquidity in their investments. An investment in the Fund should not be made by any person that (a) cannot afford a total loss of its principal, or (b) has not carefully read or does not understand this Memorandum, including the portions concerning the risks and the income tax consequences of an investment in the Fund.

**Series of Interests**  The Fund intends to issue multiple series of Interests over time. Not all series of Interests will be available for subscription at the same time and the terms among the series of Interests will vary. Each series will have separate rights and preferences, including, without limitation, with respect to fees and withdrawal rights. The Fund is currently offering Series A Interests, Series B Interests and Series C Interests (each, a "*Series*").

New series of Interests may be established by the General Partner without notice to or approval of the Limited Partners (defined below). References herein to "Interests" or "Limited Partners" shall include all Series and Limited Partners unless otherwise specified or context so requires.

**Subscriptions**  Subscriptions for Interests may be accepted as of the first day of each calendar month and/or such other days as the General Partner may determine in its discretion from time to time, generally subject to the receipt of cleared funds no later than the Business Day immediately preceding the acceptance date. The initial minimum investment is $500,000, and thereafter, a Limited Partner may make additional investments, with the consent of the General Partner, in increments of not less than $500,000; provided that, in each case, the Fund may accept investments in a lesser amount, but no less than $100,000 with respect to Series B Interests.

"*Business Day*" is defined as any day on which banks in the Cayman Islands, Buenos Aires and New York City are authorized to open for

11

business or such other days as the General Partner may determine generally, or in any particular case.

A subscriber admitted to the Fund (a "***Limited Partner***") receives, in exchange for its initial capital contribution and any subsequent capital contribution, an Interest representing a proportionate share of the net assets of the Fund at that time.

All subscribers will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001 (Pub. L. No. 107-56) and other applicable anti-money laundering regulations as further described in this Memorandum and the Subscription Documents.

**Placement Agents**

There will be no sales charge payable by or to the Fund in connection with the offering of Interests. However, the General Partner and/or the Investment Manager may enter into arrangements with placement agents (which may include its affiliates) to solicit investors in the Fund, and such arrangements may provide for the compensation of such placements agents for their services at the General Partner's and/or the Investment Manager's expense or such placement agents may be paid a portion of the Management Fee. For the avoidance of doubt, the Fund will not bear any placement agent fees.

Accordingly, investors should recognize that a placement agent's or distributor's participation in this offering may be influenced by its interest in such current or future fees and compensation. Investors should consider these potential conflicts of interest in making their investment decisions.

Each placement agent shall comply with the legal requirements of the jurisdictions within which it offers and sells Interests.

**Capital Accounts**

The Fund will maintain a book capital account (a "***Capital Account***"), which may be divided into capital sub-accounts, for the General Partner and each Limited Partner (each, a "***Partner***" and together, the "***Partners***") to reflect contributions, withdrawals, distributions and allocations of net profit and net loss, with each sub-account being maintained as if it were the Capital Account of a separate Partner in order to calculate the Series B Early Withdrawal Reduction and Series C Early Withdrawal Reduction (each as defined below), as applicable, and the Performance Allocation (as defined below) for each capital contribution. The initial balance of each Partner's Capital Account will be equal to the amount of cash or net value of any property contributed to the Fund by such Partner.

If a Partner invests in more than one Series, the Fund will maintain a separate Capital Account on behalf of such Partner with respect to each such Series and each Capital Account will be treated as if it were the

12

Capital Account of a separate Partner for purposes of determining the Management Fee (as defined below) and Performance Allocation applicable to each Capital Account.

The Master Fund will issue to the Fund a limited partner interest in the Master Fund and will maintain capital accounts and sub-accounts that correspond to Limited Partners' Capital Accounts in the Fund.

**Affiliated Investors**    The Investment Manager, the General Partner and their respective affiliates, principals, employees, partners, agents, the respective family members of such personnel and trusts and other entities established primarily for their benefit or for charitable purposes ("***Affiliated Investors***") may not be subject to restrictions on withdrawals or be assessed the Management Fee or the Performance Allocation that are applicable to other investors in the Fund, but do share *pro rata* in all other applicable expenses of the Fund; provided that, the Special Limited Partner may, unless prohibited by law, make withdrawals of all or any part of its Performance Allocation and gains thereon from its capital account in the Master Fund as of any Withdrawal Date (as defined below).

**Borrowing and Leverage**    The Master Fund may buy securities or commodities on margin and arrange with banks, brokers and others to borrow money against a pledge of securities or commodities in order to employ leverage when the Investment Manager deems such action appropriate. The Master Fund may not borrow more than 100% of its net assets as described in "*Investment Program – Investment Restrictions*" above.

**Management Fee**    For its services to the Master Fund, the Investment Manager is entitled to a management fee (the "***Management Fee***") calculated monthly and payable quarterly in arrears at an annual rate of (i) 1.75% of each Limited Partner's Capital Account balance that is attributable to a Series A Interest, (ii) 1.25% of each Limited Partner's Capital Account balance that is attributable to a Series B Interest, and (iii) 1.00% of each Limited Partner's Capital Account balance that is attributable to a Series C Interest. The Management Fee is paid at the Master Fund level. The Management Fee will be prorated for any period that is less than a full calendar quarter.

The General Partner or the Investment Manager may elect to reduce, waive or calculate differently the Management Fee with respect to any Limited Partner, including, without limitation, Affiliated Investors. To effect such reduction, waiver or difference in calculation, the Fund may issue a separate series of Interests.

The General Partner may delay the timing or alter the structure of fees payable to the Investment Manager so long as such changes are not materially adverse to the Limited Partners. The Investment Manager may also assign all or any portion of fees payable to the Investment Manager,

13

including the Management Fee and the Performance Allocation, to any affiliate thereof or any third party in its sole discretion.

**Performance Allocation**

Pursuant to the Master Fund Partnership Agreement, generally, as of the close of each fiscal quarter and subject to the limitations described below, a performance-based profits allocation (the "***Performance Allocation***") is debited against the Master Fund capital sub-account relating to each Series attributable to a Limited Partner and simultaneously credited to the Master Fund capital account of the Special Limited Partner. The Performance Allocation is calculated and allocated at the Master Fund level, but is effectively equal to (i) 20.0% of the Net Capital Appreciation (as defined below) of each Series A Interest for such fiscal quarter, (ii) 17.5% of the Net Capital Appreciation of each Series B Interest for such fiscal quarter, and (iii) 15.0% of the Net Capital Appreciation of each Series C Interest for such fiscal quarter.

The "***Net Capital Appreciation***" applicable to an Interest shall mean the amount by which the net asset value of such Interest on the last day of the fiscal quarter (or on the Withdrawal Date, if applicable) exceeds the higher of the following amounts: (i) the highest net asset value of such Interest as of the commencement of any fiscal quarter and (ii) the issue price of such Interest. All such calculations include realized and unrealized gains and losses and are made before deduction of the Performance Allocation, but after deduction of the accrued applicable expenses of the Fund and the Master Fund for the applicable period, and in each case adjusted for any subscriptions and withdrawals made during the quarter.

The Performance Allocation is calculated and allocated at the Master Fund level through the use of separate memorandum sub-accounts with respect to the Fund's capital account in the Master Fund that correspond to each Series attributable to a Limited Partner. No separate Performance Allocation will be charged at the Fund level.

The Performance Allocation generally will be allocable to the Special Limited Partner after the end of each fiscal quarter and as of any Withdrawal Date occurring prior to the end of any fiscal quarter. The Performance Allocation payable with respect to any Interests withdrawn prior to the end of a fiscal quarter will be determined solely by reference to such withdrawn Interests and will be allocable to the Special Limited Partner on the Withdrawal Date. The Performance Allocation with respect to any Limited Partner may be fully or partially waived or rebated by the General Partner in its sole discretion.

**Other Fees and Expenses**

The Fund bears all of its own initial organizational expenses and its *pro rata* share of the initial organizational expenses of the Master Fund. In general, the Fund's financial statements will be prepared in accordance with generally accepted accounting principles in the United States ("***GAAP***"). However, the General Partner intends to amortize the Fund's

14

organizational expenses over a period of 60 calendar months from the date the Fund commenced operations because it believes such treatment is more equitable than expensing the entire amount of the organizational expenses in the Fund's first year of operation, as is required by GAAP. The General Partner may, however, limit the amount of start-up and organizational expenses that the Fund amortizes so that the audit opinion issued with respect to the Fund's financial statements will not be qualified.

The Fund pays all costs, fees and expenses arising in connection with the Fund's operations. The Fund also bears its *pro rata* share of the cost of the Master Fund's operations and investments as provided in the Master Fund Partnership Agreement. Expenses payable by the Fund in connection with the Master Fund's investment program, include, but are not limited to, brokerage commissions, other expenses related to buying and selling securities (including trading errors that are not the result of the Investment Manager's gross negligence, willful misconduct or fraud), costs of due diligence regardless of whether a particular transaction is consummated, the costs of attending shareholder meetings, research expenses and costs related to monitoring investments. Expenses payable by the Fund in connection with its operations include, but are not limited to, fees and expenses of advisers and consultants; the Management Fee; fees and expenses of any custodians, escrow or transfer agents or other investment-related service providers; indemnification expenses and the cost of insurance against potential indemnification liabilities; interest and other borrowing expenses; legal, administrative, accounting, tax, audit and insurance expenses; expenses of preparing and distributing reports, financial statements and notices to Limited Partners; litigation or other extraordinary expenses; any withholding, transfer or other taxes payable by the Fund (including any interest and penalties), and the cost of periodically updating this Memorandum and the Partnership Agreement.

The Investment Manager may retain, in connection with its responsibilities under the Investment Management Agreement, the services of others to assist in the investment advice to be given to the Master Fund, including, but not limited to, any affiliate of the Investment Manager. Payment for any such services will be assumed by the Investment Manager. However, the Investment Manager, in its sole discretion, may retain the services of independent third party professionals on behalf of the Master Fund, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the Master Fund, and the Master Fund will bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

The Fund and the Master Fund do not have their own separate employees or office, and neither the Fund nor the Master Fund will reimburse the General Partner or the Investment Manager for salaries, office rent and other general overhead costs of the General Partner or the Investment

Appx. 03564

Manager.  A portion of the commissions generated on the Master Fund's brokerage transactions may generate soft dollar credits that the Investment Manager is authorized to use to pay for research and other research-related services and products used by the Investment Manager. It is the current policy of the Investment Manager to limit such use of soft dollars to fall within the safe harbor of Section 28(e) of the Securities Exchange Act of 1934, as amended, or to be otherwise reasonably related to the investment decision-making process or for Master Fund expenses. See "*Brokerage and Custody*."

If the General Partner or the Investment Manager, as appropriate, incurs any expenses for both the Master Fund and one or more Other Accounts (as defined herein), the General Partner or the Investment Manager, as appropriate, will allocate such expenses among the Master Fund and each such Other Account in proportion to the size of the investment made by each in the activity or entity to which the expenses relate, or in such other manner as the General Partner considers fair and reasonable.

**Allocation of Net Profit and Loss**

Net profit or net loss of the Fund is allocated among the Capital Accounts of the Partners as of the close of each calendar month, at any other time when the Fund receives an additional capital contribution or effects a withdrawal or distribution, or at such other times as the General Partner may determine (each, a "***Fiscal Period***").

The net profit or net loss of the Fund for any calendar month or other valuation period will reflect, with respect to all positions:

(a)    the dividends and interest accrued during the period;

(b)    the net realized gains or losses from the sale or other disposition of investments during the period allocated by the Fund;

(c)    the net change in the unrealized appreciation or depreciation of investments during the period held at the close of the period (*i.e.*, the difference between the fair market value of each investment at the end of the period compared with either the fair market value at the commencement of the period or, in the case of any investment made after the commencement of the period, the cost); and

(d)    the expenses of the Fund incurred or accrued during the period (other than the Management Fee and any other items that are charged on a Partner-by-Partner basis).

As of the close of each Fiscal Period, the net profit or net loss (subject to any applicable Performance Allocation paid at the Master Fund level) will be allocated *pro rata* among the Capital Accounts of the Partners in proportion to their percentage interests in the Fund as of the commencement of the period.  Each Partner's percentage interest in the Fund as of the commencement of any period is based on the value of the

16

Partner's Capital Account at such time in relation to the sum of the Capital Accounts of all of the Partners at such time.

The Management Fee will be calculated separately with respect to each Limited Partner and will be debited from the capital sub-account at the Master Fund level corresponding to each Limited Partner's Capital Account.

**Distributions**

Subject to the monthly withdrawal privilege described below, all earnings of the Fund are ordinarily retained for investment.  Limited Partners should not expect the Fund to make any dividend distributions.

**Withdrawals; Lock-Up**

Subject to certain withdrawal restrictions described below, a Limited Partner is generally permitted to withdraw all or a portion of its Capital Account as of the last Business Day of each calendar month (and/or such other Business Days as the General Partner may determine in its sole discretion) (each, a "***Withdrawal Date***"); provided that, any partial withdrawals may only be made in minimum amounts of $100,000. Notwithstanding the foregoing, any Limited Partner that withdraws all or a portion of its Capital Account with respect to a Series B Interest prior to the one-year anniversary of the date such capital was contributed to the Fund is subject to an early withdrawal reduction of up to 3.0% of the net asset value of the portion of the Series B Interest being withdrawn, as determined at the close of business of such Withdrawal Date (such fee, the "***Series B Early Withdrawal Reduction***").  In addition, any Limited Partner that withdraws all or a portion of its Capital Account with respect to a Series C Interest prior to the:

(i) one-year anniversary of the date such capital was contributed to the Fund is subject to an early withdrawal reduction of 5.0% of the net asset value of the portion of the Series C Interest being withdrawn, as determined at the close of business of such Withdrawal Date, and

(ii) two-year anniversary, but on or after the one-year anniversary, of the date such capital was contributed to the Fund is subject to an early withdrawal reduction of 3.0% of the net asset value of the portion of the Series C Interest being withdrawn, as determined at the close of business of such Withdrawal Date (such fees with respect to Series C Interests, the "***Series C Early Withdrawal Reduction***" and together with the Series B Early Withdrawal Reduction, the "***Early Withdrawal Reduction***").

The Early Withdrawal Reduction is retained by the Fund (and generally invested in the Master Fund) and deducted from the withdrawal proceeds of the withdrawing Limited Partner.  The Early Withdrawal Reduction will not apply in the event of a Compulsory Withdrawal (defined below).

17

Written notice of any withdrawal request must be received in writing by the Administrator at least 30 calendar days prior to the requested Withdrawal Date. The General Partner may waive such notice requirements, or permit withdrawals under such other circumstances, if, in its sole discretion, it determines that, under the circumstances, to waive such requirement will not have an adverse effect on the Master Fund's portfolio.

If the Master Fund violates the investment restrictions and fails to remedy the violation on or before the Remedy Date (as described in "*Investment Program – Investment Restrictions*"), any Limited Partner may withdraw all or part of its Capital Account on the next Withdrawal Date and will not be subject to the Early Withdrawal Reduction; provided that, such Limited Partner has requested such withdrawal in writing within 30 Business Days after the Remedy Date.

**Settlement of Withdrawal Proceeds**

A withdrawal request is normally settled in cash or, subject to the sole discretion of the General Partner, wholly or partially with securities or other assets of the Fund (received from the Master Fund), whether or not readily marketable, generally within 10 Business Days after the Withdrawal Date; provided that the General Partner may delay such payment if such delay is reasonably necessary to prevent such withdrawal from having a material adverse impact on the Fund. In the event that the General Partner satisfies a withdrawal request with assets in kind, such securities may be transferred to a liquidating account and sold by the Fund for the benefit of the withdrawing Limited Partner, in which case, payment of the withdrawal proceeds attributable to such investments will be delayed until such investments are sold. The amount payable in respect of such investments will depend on the performance of such investments through to the date on which they are sold. The cost of operating the liquidating account and selling the investment(s) will be deducted from the proceeds of sale paid to the withdrawing Limited Partner.

Notwithstanding anything to the contrary herein, the General Partner may establish reserves and holdbacks for estimated accrued expenses, liabilities and contingencies, including, without limitation, general reserves for unspecified contingencies (even if such reserves or holdbacks are not otherwise required by GAAP) or liabilities stemming from tax obligations (as such may be determined in the sole discretion of the General Partner and whether or not incurred directly or indirectly), which could reduce the amount of a distribution upon a Limited Partner's withdrawal. The General Partner may withhold for the benefit of the Fund from any distribution to a withdrawing Limited Partner an amount representing the actual or estimated costs incurred by the Fund with respect to such withdrawal, as well as any Early Withdrawal Reduction described above.

Appx. 03567

| | |
|---|---|
| **Withdrawal Conditions** | The General Partner or the Administrator may refuse to accept a withdrawal request if it is not accompanied by such additional information as the General Partner or the Administrator may reasonably require. This power may, without limitation to the generality of the foregoing, be exercised where proper information has not been provided for money laundering verification purposes. In addition, where withdrawal proceeds are requested to be remitted to an account which is not in the name of the Limited Partner, the General Partner and the Administrator reserve the right to request such information as may be reasonably necessary in order to verify the identity of the Limited Partner and the owner of the account to which the withdrawal proceeds will be paid. The withdrawal proceeds will not be paid to a third-party account if the Limited Partner and/or owner of the account fails to provide such information. |
| **Compulsory Withdrawals** | The General Partner reserves the right, in its sole discretion, to compel the withdrawal of a Limited Partner's Interest at any time and for any reason on not less than seven days' prior written notice (or immediately if the General Partner, in its sole discretion, determines that such Limited Partner's continued investment in the Fund may cause the Fund, the Master Fund, the General Partner or the Investment Manager to violate any applicable law) (a "***Compulsory Withdrawal***"). The General Partner will compel the withdrawal of a Limited Partner's Interest in its entirety if a Limited Partner requests a withdrawal that would cause its total investment with respect to a particular Series to fall below a minimum of $100,000 (a "***Minimum Required Withdrawal***"). In either case, settlements are made in the same manner as voluntary withdrawals, except that the Early Withdrawal Reduction will not apply in the event of a Compulsory Withdrawal, but will apply to any Minimum Required Withdrawal. |
| **Suspension of Withdrawals and Withdrawal Payments** | The General Partner may, at any time, suspend (a) the calculation of the net asset value of the Interests (and the applicable valuation date); (b) the issuance of Interests, (c) the withdrawal by Limited Partners of Interests (and the applicable Withdrawal Date); and/or (d) the payment of withdrawal proceeds (even if the calculation dates and Withdrawals Dates are not postponed) (each, a "***Suspension***") during any period which: (i) any stock exchange on which a substantial part of investments owned by the Fund (through the Master Fund) are traded is closed, other than for ordinary holidays, or dealings thereon are restricted or suspended; (ii) there exists any state of affairs as a result of which (A) disposal of a substantial part of the investments owned by the Fund (through the Master Fund) would not be reasonably practicable and might seriously prejudice the Limited Partners, or (B) it is not reasonably practicable for the Fund fairly to determine the value of its net assets; (iii) none of the withdrawal requests which have been made may lawfully be satisfied by the Fund; (iv) there is a breakdown in the means of communication normally employed in determining the prices of a substantial part of the |

19

investments of the Fund (through the Master Fund); (v) in the sole discretion of the General Partner, it is necessary to preserve the Fund's assets; or (vi) automatically upon any suspension of withdrawals by the Master Fund for similar reasons as described in "*The Master Fund*," below.

The Administrator will promptly notify each Limited Partner who has submitted a withdrawal request and to whom payment in full of the amount being withdrawn has not yet been remitted of any Suspension of withdrawals or Suspension of the payment of withdrawal proceeds. Any remaining amount of a withdrawal request that is not satisfied due to such a Suspension remains at risk as per other amounts invested in the Fund and subject to the applicable Management Fee until such amount is finally and fully withdrawn. Such Limited Partners will not be given any priority with respect to the withdrawal of Interests after the cause for such Suspension or limitation ceases to exist. The General Partner may in its sole discretion, however, permit such Limited Partners to withdraw their withdrawal requests to the extent that the relevant Withdrawal Date has not yet passed. For the avoidance of doubt, where a suspension of the payment of withdrawal proceeds is declared between the relevant Withdrawal Date and the remittance of such payment proceeds, affected Limited Partners shall not have any right to withdraw their withdrawal requests. Upon the reasonable determination by the General Partner that conditions leading to a Suspension no longer apply, the Administrator will notify the Limited Partners of the end of the Suspension. At such time, any such suspended payments shall generally be paid in accordance with the normal process for making such payments, withdrawal rights shall be promptly reinstated and any pending withdrawal requests which were not withdrawn (or new, timely withdrawal requests) will be effected as of the first Withdrawal Date following the removal of the Suspension, subject to the foregoing restrictions on withdrawals.

| | |
|---|---|
| **Transfers** | Interests are not transferable except with the prior written consent of the General Partner, which consent may be withheld in its sole discretion. The General Partner will require any transferee or assignee of any Limited Partner to execute the Subscription Documents. |
| **Duty of Care; Indemnification** | Pursuant to the Partnership Agreement, the Master Fund Partnership Agreement and the Investment Management Agreement, the General Partner, the Investment Manager, each member, shareholder, partner, manager and director of, and any person who controls, the General Partner or the Investment Manager, each of the respective affiliates of the foregoing and each of their respective executors, heirs, assigns, successors and other legal representatives (each such person, an "***Indemnified Party***") shall not be liable to the Master Fund, the Fund or the Limited Partners for any loss or damage arising by reason of being or having been an Indemnified Party or from any acts or omissions in the performance of its services as an Indemnified Party in the absence of gross negligence, willful misconduct or fraud, or as otherwise required by |

Appx. 03569

law. In no event shall any Indemnified Party be liable for any consequential damages, special or indirect damages or lost profits.

The Partnership Agreement, the Master Fund Partnership Agreement and the Investment Management Agreement contain provisions for the indemnification of the Indemnified Parties by the Master Fund and the Fund (but not by the Limited Partners individually) against any liabilities arising by reason of being or having been an Indemnified Party or in connection with the Partnership Agreement, the Master Fund Partnership Agreement, the Investment Management Agreement, or the Master Fund's or the Fund's business or affairs to the fullest extent permitted by law in the absence of gross negligence, willful misconduct or fraud. The General Partner is not personally liable to any Limited Partner for the repayment of any withdrawal proceeds or for contributions by such Limited Partner to the capital of the Fund or by reason of any change in the U.S. federal or state income tax laws applicable to the Fund or its investors.

|                              |                                                                                                                                                                                                                                                                                                                                    |
| ---------------------------- | ---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
| **Non-Exclusivity; Allocation of Opportunities** | None of the Investment Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees is precluded from engaging in or owning an interest in other business ventures or investment activities of any kind, whether or not such ventures are competitive with the Fund or the Master Fund. |

The Master Fund Partnership Agreement requires the General Partner, and the Investment Manager as delegatee of the General Partner, to act in a manner that it considers fair and equitable over time in allocating investment opportunities to the Master Fund. Although the General Partner and the Investment Manager consider certain factors set forth in the Investment Manager's policies to determine how to allocate trades, the Investment Manager's policies and the Master Fund Partnership Agreement do not otherwise impose any specific obligations or requirements concerning the allocation of time, effort or investment opportunities to the Master Fund or any restrictions on the nature or timing of investments for the account of the Master Fund and for the General Partner's or the Investment Manager's own accounts or for other accounts that the General Partner, the Investment Manager or their affiliates may manage (each, an "*Other Account*"). The General Partner and the Investment Manager are not obligated to devote any specific amount of time to the affairs of the Master Fund and are not required to accord exclusivity or priority to the Master Fund in the event of limited investment opportunities arising from the application of speculative position limits or other factors.

The Principal, as well as the employees and officers of the Investment Manager and of organizations affiliated with the Investment Manager, may buy and sell securities for their own account or the account of others, but may not buy securities from or sell securities to the Master Fund (such prohibition does not extend to the purchase or sale of interests in the

21

Fund), unless such purchase or sale is in compliance with the applicable provisions of the Investment Advisers Act of 1940, as amended.

The Investment Manager undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Fund's investors.

It is the policy of the Investment Manager to allocate investment opportunities fairly and equitably over time. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate. The Investment Manager has the authority to allocate trades to multiple accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the Investment Manager may allocate the trades among different accounts on a basis it considers fair and equitable over time. One or more of the foregoing considerations may (and are often expected to) result in allocations among the Master Fund and one or more accounts on other than a *pari passu* basis. See "*Risk Factors and Potential Conflicts of Interest*" below.

**Affiliated Service Providers**

NexBank, SSB ("***NexBank SSB***") is an affiliate of the Investment Manager and may, from time to time, provide banking and/or agency services to the Investment Manager, clients of the Investment Manager or collective investment vehicles for which the Investment Manager provides investment advisory services (including the Fund and other vehicles in which the Fund, through the Master Fund, may invest) or third parties engaged in transactions involving the Investment Manager. NexBank SSB may also act as an agent in connection with certain securities transactions involving the Investment Manager's client accounts (including the Master Fund and other vehicles in which the Master Fund may invest). Principals of the Investment Manager own a majority of the equity interests in NexBank SSB and employees or affiliates of the Investment Manager own or may own a substantial equity interest in NexBank SSB. Certain Master Fund investment transactions may be executed through NexBank Securities, Inc., an affiliate of the Investment Manager and a registered broker-dealer.

Additionally, the Investment Manager or affiliates of the Investment Manager, including, without limitation, Nexbank SSB, NexBank Securities, Inc.,NexBank Capital Advisors and Governance Re, Ltd., may provide financial advisory, management, insurance, title insurance or other services for a fee to portfolio companies in which the Master Fund may have an interest. Highland Latin America, an affiliate of the Investment Manager, has been engaged to provide certain administrative and consulting services to the Investment Manager. See "*Risk Factors and Potential Conflicts of Interest*" below.

| | |
|---|---|
| **Valuations** | In general, the Fund's financial statements will be prepared in accordance with GAAP. The General Partner has delegated the valuation of the Fund's assets, based on the Master Fund's assets, to the Administrator who values the Fund's assets as of the close of each Fiscal Period in accordance with the Investment Manager's valuation policies and procedures. |
| **Reserves** | Appropriate reserves may be accrued and charged against net assets and proportionately against the Capital Accounts of the Partners for contingent liabilities, such reserves to be in the amounts (subject to increase or reduction) that the General Partner in its sole discretion deems necessary or appropriate. At the sole discretion of the General Partner, the amount of any such reserve (or any increase or decrease therein) may be charged or credited, as appropriate, to the Capital Accounts of those investors who are Limited Partners at the time when such reserve is created, increased or decreased, as the case may be, or alternatively may be charged or credited to those investors who were Limited Partners at the time of the act or omission giving rise to the contingent liability for which the reserve was established. |
| | If the General Partner determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then such amount may be proportionately charged or credited, as appropriate, to those persons who were Limited Partners during any such prior period(s). |
| **Fiscal Year** | The Fund has a fiscal year ending on December 31 of each calendar year. |
| **Reports to Limited Partners** | The Fund furnishes to its Partners as soon as practicable after the end of each taxable year (or as otherwise required by law) such tax information as is necessary for each Partner to complete U.S. federal and state income tax or information returns, along with any other tax information required by law. Within 120 days of the end of each year (or as soon as practicable thereafter), the Fund distributes to each Partner audited financial statements of the Fund, including a statement of profit or loss for such fiscal year and an unaudited status of each such Partner's holdings in the Fund at such time. Partners will also receive, upon request to the Administrator, copies of semi-annual financial statements of the Fund. |
| **Tax Status** | The General Partner believes that the Fund should be treated as a partnership for U.S. federal income tax purposes and should not itself be subject to U.S. federal income taxation. Each Limited Partner otherwise subject to U.S. federal income tax is required to include in such Limited Partner's taxable income such Limited Partner's share of the Fund's income and gains, when realized by the Fund (regardless of cash distributions from the Fund to such investor), and may claim, to the extent allowable, such Limited Partner's share of the Fund's losses and deductions. Due to the nature of the Fund's activities, the Fund's income or loss for U.S. federal income tax purposes for a particular taxable period |

**Appx. 03572**

|  | may differ from its financial or economic results.  The deductibility of a Limited Partner's share of any Fund losses or deductions may be limited.  See "*Tax Considerations*." |
|---|---|
| **ERISA** | The Investment Manager intends to limit investment in the Master Fund by "benefit plan investors" so that the assets of the Master Fund will not be considered "plan assets" for purposes of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***").  It is anticipated that the assets of the Fund may constitute "plan assets" for purposes of ERISA.  See "*ERISA and Other Regulatory Considerations*." |
| **Amendment of the Limited Partnership Agreement** | The Partnership Agreement may be amended by the General Partner with the consent of a majority in interest of the Limited Partners, which consent may be obtained through negative consent.  However, the Fund may not: (a) increase the obligation of a Limited Partner to make any contribution to the capital of the Fund; (b) reduce the Capital Account of any Limited Partner other than as contemplated by the Partnership Agreement; or (c) reduce any Limited Partner's right to share in net profits or assets of the Fund, in each case, without the consent of each Limited Partner adversely affected thereby.  The above consent may be obtained by negative consent. |
|  | Notwithstanding the foregoing, the General Partner may amend the Partnership Agreement at any time without the consent of any Limited Partner: (a) to comply with applicable laws and regulations; (b) to make changes that do not adversely affect the rights or obligations of any Limited Partner; (c) to cure any ambiguity or correct or supplement any conflicting provisions of the Partnership Agreement; or (d) with respect to any other amendment, if any Limited Partner whose contractual rights as a Limited Partner would be materially and adversely changed by such amendment has an opportunity to withdraw from the Fund (without being subject to the Early Withdrawal Reduction) as of a date that is not less than 30 days after the General Partner has furnished written notice of such amendment to each Limited Partner and that is prior to the effective date of the amendment. |
| **Variation of Terms** | The General Partner or the Investment Manager, in its sole discretion, may enter into a side letter or similar agreement to or with one or more Limited Partners that has the effect of establishing rights under, or altering or supplementing the terms of, the Partnership Agreement or of any Subscription Documents (including those relating to access to information, the Management Fee, the Performance Allocation, minimum investment amount, voting rights and withdrawal rights) with respect to such Limited Partner(s). |

**Appx. 03573**

## THE MASTER FUND

### The Master Fund's Partnership Interests

The Master Fund's partnership interests are currently held exclusively by the Fund and the Offshore Fund as limited partners, the Investment Manager as the special limited partner of the Master Fund, and the General Partner as the general partner of the Master Fund, pursuant to the Master Fund Partnership Agreement. The General Partner is registered as a foreign company in the Cayman Islands pursuant to Part IX of the Companies Law (2016 Revision).

### The Master Fund Partnership Agreement

The Master Fund is constituted as a Cayman Islands exempted limited partnership under the Exempted Limited Partnership Law, 2014 (the "***Exempted Limited Partnership Law***"). A Cayman Islands exempted limited partnership is constituted by the signing of the relevant partnership agreement and its registration with the Registrar of Exempted Limited Partnerships in the Cayman Islands.

A Cayman Islands exempted limited partnership is not a separate legal person distinct from its partners. Under the Exempted Limited Partnership Law, any property which is conveyed into or vested in the name of the exempted limited partnership shall be held or deemed to be held by the general partner, and if more than one, then by the general partners jointly upon trust, as an asset of the partnership in accordance with the terms of the partnership agreement. Any debt or obligation incurred by a general partner in the conduct of the business of an exempted limited partnership shall be a debt or obligation of the exempted limited partnership. Registration under the Exempted Limited Partnership Law entails that the partnership becomes subject to, and the limited partners therein are afforded the limited liability and other benefits of, the Exempted Limited Partnership Law (subject to compliance therewith).

*Liability of Partners and Indemnification of the General Partner and Others*. The business of a Cayman Islands exempted limited partnership will be conducted by its general partner(s) who will be liable for all debts and obligations of the exempted limited partnership to the extent that the partnership has insufficient assets. As a general matter, a limited partner of a Cayman Islands partnership will not be liable for the debts and obligations of the exempted limited partnership, other than:

(i)     as expressed in the partnership agreement,

(ii)    if such limited partner takes part in the conduct of the business of an exempted limited partnership in its dealings with persons who are not partners, then that limited partner shall be liable, in the event of the insolvency of the exempted limited partnership, for all debts and obligations of that exempted limited partnership incurred during the period that he so participates in the conduct of the business as though he were, for such period, a general partner, provided always that he shall be rendered liable pursuant to the foregoing provision only to a person who transacts business with the exempted limited partnership during such period with actual knowledge of such participation and who then reasonably believed such limited partner to be a general partner, or

(iii)   if such limited partner is obligated pursuant to Section 34(1) of the Exempted Limited Partnership Law to return a distribution made to it (with interest at a rate of 10% per annum, unless otherwise specified in the Master Fund Partnership Agreement) when the exempted limited partnership is insolvent or within six months prior to such insolvency.

Appx. 03574

The Master Fund Partnership Agreement provides that none of the Indemnified Parties will be liable to the Master Fund or any limited partner of the Master Fund (including the Feeder Funds) for any loss or damage arising by reason of being or having been an Indemnified Party or from any acts or omissions in the performance of its services as an Indemnified Party in the absence of gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud, or as otherwise required by law.  An Indemnified Party may consult with counsel and accountants in respect of the Master Fund's affairs and will be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants, provided that they were selected in accordance with the standard of care set forth above.  In addition, in no event shall any Indemnified Party be liable for any consequential damages, special or indirect damages or lost profits.

The Master Fund Partnership Agreement provides that the Master Fund shall, to the fullest extent permitted by law, indemnify and hold harmless each Indemnified Party from and against any and all liabilities suffered or sustained by an Indemnified Party by reason of the fact that it, he or she is or was an Indemnified Party or in connection with the Master Fund Partnership Agreement or the Master Fund's business or affairs, including, without limitation, any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, suit or proceeding, provided that such liability did not result from the gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud of such Indemnified Party.  The Master Fund Partnership Agreement also provides that the Master Fund will, in the sole discretion of the General Partner, advance to any Indemnified Party reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action, suit or proceeding which arises out of such conduct, subject to receiving a written undertaking from the Indemnified Party to repay such amounts if and to the extent that it is finally determined that the Indemnified Party was not entitled to indemnification in respect thereof.

Notwithstanding any of the foregoing, the provisions of the Master Fund Partnership Agreement do not provide for the exculpation or indemnification of any Indemnified Party for any liability (including liability under U.S. federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the above provisions to the fullest extent permitted by law.

Pursuant to the foregoing indemnification and exculpation provisions applicable to each Indemnified Party, the Master Fund (and not the applicable Indemnified Party) will be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud.  Given the volume of transactions executed on behalf of the Master Fund, trading errors (and similar errors) will occur and the Master Fund will be responsible for any resulting losses, even if such losses result from the negligence (but not gross negligence) of any Indemnified Party.

The Indemnified Parties will also be indemnified by each limited partner of the Master Fund for any amounts of tax withheld or required to be withheld with respect to that limited partner, and also for any amounts of interest, additions to tax, penalties and other costs borne by any such persons in connection therewith to the extent that the balance of the limited partner's capital account is insufficient to fully compensate the General Partner and the Investment Manager for such costs.

*Contributions and Withdrawals by the Fund*. Limited partners of the Master Fund may make contributions at such times and in such amounts as the General Partner determines. As a limited partner of the Master Fund, the Fund may, subject to the consent of the General Partner, voluntarily request a withdrawal of all or part of its capital in the Master Fund at such times and in such amounts as it may determine. The General Partner may, at any time, suspend (a) the calculation of the net asset value of the Master Fund (and the applicable valuation date); (b) the issuance of limited partner interests in the Master Fund; (c) the withdrawal by limited partners of their interests (and the applicable withdrawal date); and/or (d) the payment of withdrawal proceeds (even if the calculation dates and withdrawal dates are not postponed) during any period which: (i) any stock exchange on which a substantial part of investments owned by the Master Fund are traded is closed, other than for ordinary holidays, or dealings thereon are restricted or suspended; (ii) there exists any state of affairs as a result of which (A) disposal of a substantial part of the investments owned by the Master Fund would not be reasonably practicable and might seriously prejudice the limited partners of the Master Fund, or (B) it is not reasonably practicable for the Master Fund fairly to determine the value of its net assets; (iii) none of the withdrawal requests which have been made may lawfully be satisfied by the Master Fund; (iv) there is a breakdown in the means of communication normally employed in determining the prices of a substantial part of the investments of the Master Fund; or (v) in the sole discretion of the General Partner, it is necessary to preserve the Master Fund's assets.

*Amendment of the Master Fund Partnership Agreement*. The Master Fund Partnership Agreement may be amended by an instrument in writing signed by each of the limited partners of the Master Fund and the General Partner; provided that, the General Partner may amend the Master Fund Partnership Agreement without the consent of the limited partners so long as the amendment does not adversely affect any rights of the limited partners.

*Dissolution of the Master Fund*. The Master Fund shall be wound up and dissolved upon the first to occur of any of the following liquidating events, and Sections 36(1)(b), 36(9) and 36(12) of the Exempted Limited Partnership Law shall not apply to the Master Fund:

(i)     the written election of the General Partner to terminate the Master Fund; or

(ii)    if the General Partner is the sole or last remaining general partner, the date (the "***Automatic Dissolution Date***") falling 90 days after the date of the service of a notice by the General Partner (or its legal representative) on all the limited partners informing the limited partners of:

> (1)    the commencement of liquidation or bankruptcy proceedings in relation to the General Partner; or

> (2)    the withdrawal, removal or making of a winding up or dissolution order in relation to the General Partner;

*provided that*, if a majority in number of the limited partners elects one or more new general partners before the Automatic Dissolution Date, the business of the Master Fund shall be resumed and continued. If a new general partner is not elected by the Automatic Dissolution Date, the Master Fund shall be wound up and dissolved in accordance with terms of the Master Fund Partnership Agreement and the Exempted Limited Partnership Law.

**Appx. 03576**

*Power of Attorney.*  Each limited partner of the Master Fund shall make, constitute and appoint the General Partner (and each of its successors and permitted assigns) for the time being, with full power of substitution, as its true and lawful agent and attorney-in-fact of, and in the name, place and stead of, such Partner with the power from time to time to make, execute, sign, acknowledge, swear to (and deliver as may be appropriate) on its behalf and file and record in the appropriate public offices and publish (as may in the reasonable judgment of the General Partner be required by law), including the admission of any new partners of the Master Fund and any amendments to the Master Fund Partnership Agreement. Each limited partner of the Master Fund shall authorize the General Partner to take any further action that the General Partner considers necessary or advisable in connection with the foregoing.  Such power of attorney granted is intended to secure a proprietary interest of the General Partner and the performance by each limited partner of the Master Fund of its obligations under the Master Fund Partnership Agreement and shall be irrevocable and shall survive and not be affected by the subsequent death, lack of capacity, insolvency, bankruptcy or dissolution of any limited partner of the Master Fund.

**Valuation of Assets**

The General Partner has delegated the valuation of the Master Fund's assets to the Administrator, which will generally compute the value of the securities and other assets of the Master Fund as of the close of business on the last day of each fiscal period and on any other date selected by the General Partner in its sole discretion.  In addition, the Administrator must compute the value of the securities that are being distributed in-kind as of their date of distribution in accordance with the Master Fund Partnership Agreement.  In determining the value of the assets of the Master Fund, no value is placed on the goodwill or name of the Master Fund, or the office records, files, statistical data or any similar intangible assets of the Master Fund not normally reflected in the Master Fund's accounting records, but there must be taken into consideration any related items of income earned but not received, expenses incurred but not yet paid, liabilities fixed or contingent, prepaid expenses to the extent not otherwise reflected in the books of account, and the value of options or commitments to purchase or sell securities pursuant to agreements entered into on or prior to such valuation date.

A copy of the Investment Manager's valuation policy is available upon request from the General Partner.

The value of each security and other asset of the Master Fund and the net worth of the Master Fund as a whole determined pursuant Master Fund Partnership Agreement are conclusive and binding on all of the partners of the Master Fund and all persons claiming through or under them.

**Appx. 03577**

## RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST

*Investment in the Fund is speculative and involves substantial risks, including, but not limited to, those summarized below. The Fund is not suitable for all investors and is intended for sophisticated investors who can accept the risks associated with their investments. Prospective investors should carefully consider the risk factors described in this section, among others, in determining whether an investment in the Fund is suitable for them. There can be no assurance that the Master Fund's program will be successful or that investments purchased by the Master Fund will increase in value. An investor must be prepared to bear capital losses that might result from an investment in the Fund, including a complete loss of the investor's invested capital. All investors in the Fund should consult their own legal, tax and financial advisors prior to investing in the Fund.*

*For purposes of this section, references to the "Fund" should be understood to mean each of the Fund and the Master Fund, as applicable, and each of the risk factors set forth herein, while not exhaustive, shall apply equally to each of the Fund and the Master Fund, as applicable.*

**General Risks**

*Lack of Operating History*. The Fund, the Master Fund and the General Partner do not have operating histories upon which investors can evaluate the anticipated performance of the Fund. Although the principals of the Investment Manager have extensive prior experience in Latin America, past performance of the Investment Manager should not be construed as an indication of the future results of an investment in the Fund. The Master Fund's investment program should be evaluated on the basis that there can be no assurance that the Investment Manager's assessment of the short-term or long-term prospects of its investment strategy will prove accurate, or that the Master Fund will achieve its investment objectives.

*Risks Associated With Investments in Securities*. Any investment in securities carries market risks. An investment in the Fund is highly speculative and involves a high degree of risk due to the nature of the Master Fund's investments and the strategies to be employed. An investment in the Fund should not in itself be considered a balanced investment program, but rather is intended to provide diversification in a more complete investment portfolio.

*Investment Judgment; Market Risk*. The profitability of a significant portion of the Master Fund's investment program depends to a great extent upon correctly assessing the future course of the price movements of securities and other investments. There can be no assurance that the Investment Manager will be able to predict accurately these price movements. With respect to the investment strategy utilized by the Master Fund, there is always some, and occasionally a significant, degree of market risk.

*Limited Liquidity; Additional Information*. An investment in the Fund provides limited liquidity since the Interests are not freely transferable and may only be withdrawn at such times as set forth in this Memorandum. The General Partner may suspend withdrawals, in whole or in part, when such a suspension is warranted by extraordinary circumstances described in "*Summary of Terms – Suspension of Withdrawals and Withdrawal Payments*" above. The General Partner may also delay the payment of withdrawal proceeds as more fully described elsewhere in this Memorandum. Investments that remain in the Fund are subject to all risks related to an investment in the Fund as described in this Memorandum.

Also, certain Limited Partners (including, without limitation, the Affiliated Investors), may invest on terms that provide access to information that is not generally available to other Limited Partners and,

29

as a result, may be able to act on such additional information (e.g., withdraw their Interests) that other Limited Partners do not receive. An investment in the Fund is suitable only for sophisticated investors who have no need for current liquidity.

*Effect of Substantial Withdrawals*. Substantial withdrawals from the Fund could require the Master Fund to liquidate its positions more rapidly than otherwise desired in order to raise the cash necessary to fund the withdrawals at the Fund level. Illiquidity in certain securities could make it difficult for the Master Fund to liquidate positions on favorable terms, which could result in losses or a decrease in the net asset value of the Master Fund, and thus, the Fund. The Master Fund is permitted to borrow cash necessary to make payments in connection with withdrawals from the Fund when the Investment Manager determines that it would not be advisable to liquidate portfolio assets for that purpose. The Master Fund is also authorized to pledge portfolio assets as collateral security for the repayment of such loans. In these circumstances, the continuing Limited Partners will bear the risk of any subsequent decline in the value of the Fund's assets.

*Effect of Withdrawal by Limited Partner on its Investment*. Where a withdrawal request is accepted, an Interest will be treated as having been withdrawn effective as of the relevant Withdrawal Date, irrespective of whether or not such withdrawing Limited Partner has been removed from the Fund's books and records or the withdrawal proceeds have been determined or remitted. Accordingly, on and from the relevant Withdrawal Date, Limited Partners in their capacity as such will not be entitled to or be capable of exercising any rights arising under the Partnership Agreement or Subscription Documents with respect to the Interest being withdrawn, save the right to receive the withdrawal proceeds. Such withdrawing Limited Partners will be creditors of the Fund with respect to the withdrawal proceeds. In an insolvent liquidation, withdrawing Limited Partners will rank behind ordinary creditors but ahead of existing Limited Partners.

*Master-Feeder Structure*. The Fund will invest all of its investable assets in the Master Fund. The "master-feeder" fund structure presents certain risks to the Limited Partners. Smaller feeder funds may be materially affected by the actions of larger feeder funds.

While the Investment Manager, as investment manager of the Master Fund, generally will not consider tax issues applicable to any particular investors, it generally will take into account the tax positions of the Fund and the Offshore Fund that invest in the Master Fund. However, the use of a "master-feeder" structure may create a conflict of interest in that different tax considerations for the Fund and the Offshore Fund may cause or result in the Master Fund structuring or disposing of an investment in a manner or at a time that is more advantageous (or disadvantageous) for tax purposes to one Feeder Fund or its investors.

*Management Fee and Performance Allocations*. As described above, the Master Fund Partnership Agreement provides for the payment of the Management Fee to the Investment Manager and the Performance Allocation to the Investment Manager, in its capacity as the Special Limited Partner. The Performance Allocation may create an incentive for the Investment Manager, as the Special Limited Partner, to make investments that are riskier or more speculative than would be the case in the absence of such Performance Allocation.

*Side Letters*. The Investment Manager or the Fund may from time to time enter into letter agreements or other similar agreements (collectively, "***Side Letters***") with one or more Limited Partners which provide such Limited Partner(s) with additional and/or different rights (including, without limitation, with respect to access to information, the Management Fee, the Performance Allocation,

**Appx. 03579**

minimum investment amounts, voting rights and withdrawal rights) than such Limited Partner(s) have pursuant to this Memorandum. As a result of such Side Letters, certain Limited Partners may receive additional benefits (including, but not limited to, reduced fee obligations, the ability to withdraw Interests on shorter notice and/or expanded informational rights) which other Limited Partners will not receive. For example, a Side Letter may permit a Limited Partner to withdraw its Interest on less notice and/or at different times than other Limited Partners. As a result, should the Fund experience a decline in performance over a period of time, a Limited Partner who is party to a Side Letter that permits less notice and/or different withdrawal times may be able to withdraw its Interest prior to other Limited Partners. In general, the Fund and/or the Investment Manager will not be required to notify any or all of the other Limited Partners of any such Side Letters or any of the rights and/or terms or provisions thereof, nor will the Fund and/or the Investment Manager be required to offer such additional and/or different rights and/or terms to any or all of the other Limited Partners. The Fund and/or the Investment Manager may cause the Fund to enter into such Side Letters with any party as the Fund and/or the Investment Manager may determine in its sole discretion at any time. The other Limited Partners will have no recourse against the Fund and/or the Investment Manager in the event certain Limited Partners receive additional and/or different rights and/or terms as a result of such Side Letters. A Limited Partner will be required to enter into such undertakings with respect to maintaining the confidentiality of any such additional information as the Fund and/or the Investment Manager may in their sole discretion determine.

*Valuation Considerations*. Valuation of the Master Fund's securities and other investments may involve uncertainties and judgmental determinations, and if such valuations should prove to be incorrect, the net asset value of the Master Fund and the Fund could be adversely affected. Independent pricing information may not at times be available or otherwise utilized regarding certain of the Master Fund's securities and other investments. Valuation determinations will be made in good faith in accordance with the policies of the Investment Manager in effect from time to time, a copy of which will be made available upon request.

The Master Fund may have some of its assets in investments, which by their very nature may be extremely difficult to accurately value. To the extent that the value assigned by the Administrator to any such investment differs from the actual value, the net asset value of the Master Fund and the Fund may be understated or overstated, as the case may be. In light of the foregoing, there is a risk that a Limited Partner that withdraws all or part of its Interests while the Master Fund holds such investments will be paid an amount less than it would otherwise be paid if the actual value of such investments is higher than the value designated by the Administrator. Similarly, there is a risk that such Limited Partner might, in effect, be overpaid if the actual value of such investments is lower than the value designated by the Administrator. In addition, there is risk that an investment in the Fund by a new Limited Partner (or an additional investment by an existing Limited Partner) could dilute the value of such investments for the other Limited Partners if the designated value of such investments is higher than the value designated by the Administrator. Further, there is risk that a new Limited Partner (or an existing Limited Partner that makes an additional investment) could pay more than it might otherwise if the actual value of such investments is lower than the value designated by the Administrator. The Administrator does not intend to adjust the net asset value of the Master Fund and the Fund retroactively.

None of the Fund, the Master Fund, the General Partner, the Investment Manager or the Administrator shall have any liability in the event that any price or valuation, used in good faith in connection with the above procedures, proves to be an incorrect or an inaccurate estimate or determination of the price or value of any part of the property of the Master Fund, subject to the standard of care set forth in "*Summary of Terms – Duty of Care; Indemnification*" above.

Appx. 03580

*No Participation by Investors*. All decisions with respect to the management of the day-to-day affairs of the Fund are made exclusively by the General Partner and the Investment Manager. Limited Partners have no right or power to take part in the management of the Fund. The Investment Manager makes all of the trading and investment decisions of the Master Fund. In the event of the withdrawal of the Investment Manager, generally the Fund will be liquidated.

*Investment Strategies*. The Investment Manager will seek to engage in the investment activities that have been discussed in "*Investment Program*" herein. There can be no assurance that the Investment Manager will be successful in applying any such strategy and that losses will be avoided.

*Competition*. The markets in which the Master Fund invests are competitive and some of the opportunities that the Investment Manager may explore may be pursued by better known investors or investment funds. There can be no assurance that the Investment Manager will be able to identify or successfully pursue such opportunities in this environment. The Investment Manager competes with many firms that may have greater financial resources, more extensive development, better marketing and service capabilities, more favorable financing arrangements, larger research staffs and more securities traders than are available to the Investment Manager.

*In-Kind Distributions*. A withdrawing Limited Partner may, in the discretion of the General Partner and/or Investment Manager, receive securities owned by the Fund (through the Master Fund) in lieu of, or in combination with, cash. The value of securities distributed may increase or decrease before the securities can be sold (either by the Limited Partner or by the Fund if the General Partner establishes a liquidating account on behalf of the Limited Partner to sell such assets), and the Limited Partner will incur transaction costs in connection with the sale of such securities. Additionally, securities distributed with respect to a withdrawal by a Limited Partner may not be readily marketable. The risk of loss and delay in liquidating these securities will be borne by the Limited Partner, with the result that such Limited Partner may receive less cash than it would have received on the date of withdrawal.

*No Current Income*. Since the Fund does not generally intend to pay distributions, an investment in the Fund is not suitable for investors seeking current income. Moreover, an investor is required to report and pay taxes on his allocable share of income from the Fund, even though no cash is distributed by the Fund.

*Cybersecurity*. Information and technology systems may be vulnerable to damage or interruption from computer viruses, network failures, computer and telecommunication failures, infiltration by unauthorized persons and security breaches, usage errors by their respective professionals, power outages and catastrophic events such as fires, tornadoes, floods, hurricanes and earthquakes. Although the Investment Manager has implemented various measures to manage risks relating to these types of events, if these systems are compromised, become inoperable for extended periods of time or cease to function properly, the Investment Manager, the Master Fund and/or the Fund may have to make a significant investment to fix or replace them, which expense may be borne in whole or in part by the Fund. The failure of these systems and/or of disaster recovery plans for any reason could cause significant interruptions in the Investment Manager's, the Master Fund's and/or the Fund's operations and result in a failure to maintain the security, confidentiality or privacy of sensitive data, including personal information relating to investors. Such interruptions could harm the Investment Manager's, the Master Fund's and/or the Fund's reputation, subject any such entity and their respective affiliates to legal claims and otherwise affect their business and financial performance. The foregoing risks and consequences are also extant at any issuer in which the Master Fund invests and could manifest as adverse performance of such investment.

## Investment Strategy and Investment Risks

*Changes in Strategy.* The Investment Manager has the power to expand, revise or alter its trading strategies on behalf of the Master Fund without prior approval by, or notice to, the Fund or the Limited Partners. Any such change could result in exposure of the Fund's assets (through the Master Fund) to additional risks, which may be substantial. The Investment Manager may also invest in additional instruments than those specifically identified in the "*Investment Program*" section.

*Latin America Investments.* The Master Fund invests in securities of companies based in Latin America or issued by Latin American governments, or in the securities of companies which are not incorporated in Latin America, but which derive some of their revenues from business activities conducted in Latin America. Such investment involves certain considerations not usually associated with investing in securities of developed countries or of companies located in developed countries, including political and economic consideration, such as greater risks of expatriation, nationalization and general, political, and economic instability, the small size of the securities markets in such countries and the low volume of trading, resulting in potential lack of liquidity and substantially greater price volatility, fluctuations in the rate of exchange between currencies, and costs associated with currency conversions, certain government policies that may restrict the Master Fund's investment opportunities and problems that may arise in connection with the clearance and settlements of trades. In addition, accounting and financial reporting standards that prevail in such countries are not equivalent to standards in more developed countries, consequently, less information is available to investors in companies located in more developed countries. There is also less regulation, generally, of the securities markets in Latin American countries than there is in more developed countries.

*Risks Related to Investing in Argentina.* Argentina has experienced high interest rates, economic volatility, inflation, currency devaluations and high unemployment rates. The economy is heavily dependent on exports and commodities. Argentina's default on its debt in 2001, and its past nationalization of private pensions and national oil company YPF, continues to impact the confidence of investors in Argentina, which might adversely impact returns in the Master Fund, and thus, the Fund.

*Argentina's Economy.* Argentina's economy could grow at a lower rate than in past years, or could contract. Factors that could negatively affect Argentina's rate of economic growth, its public finances and Argentina's ability to service its debt include: the competitiveness of Argentine exports, which are influenced by the peso's value relative to the value of the currencies of Argentina's trading partners and trade competitors; the level of inflation in Argentina; international commodities prices, foreign currency exchange rates and the levels of consumer consumption and foreign and domestic investment; negative economic developments in Argentina's major trading partners, or "contagion" effects more generally; and Argentina's ability to meet its energy requirements.

*Uncertainty of Economic Reforms.* A runoff election on November 22, 2015 resulted in Mr. Mauricio Macri being elected President of Argentina. The Macri administration assumed office on December 10, 2015. Since assuming office on December 10, 2015, the Macri administration has announced several significant economic and policy reforms, including methodological reforms with respect to the calculation of certain macroeconomic statistics, the loosening of foreign exchange controls, reduction of tariffs, other easing of international trade restrictions, infrastructure reforms and reopened negotiation with holders of debt in default since 2001. The impact that these measures and any future measures taken by the new administration will have on the Argentine economy as a whole and the financial sector in particular cannot be predicted. The Investment Manager believes that the effect of the planned liberalization of the economy and renewed access to capital markets will be positive for the

Master Fund's intended investments by stimulating economic activity, but it is not possible to predict such effect with certainty and such liberalization could also be disruptive to the economy and fail to benefit or harm companies in Argentina. The Investment Manager cannot predict how the Macri administration will address certain other political and economic issues that were central during the 2015 presidential election campaign, such as the financing of public expenditures, public service subsidies and tax reforms, the resolution of holdout debt or the impact that any measures related to these issues that are implemented by the Macri administration will have on the Argentine economy as a whole.

*Currency Controls*. In the past, Argentina imposed exchange controls and transfer restrictions substantially limiting the ability of companies to retain foreign currency or make payments abroad. Although the Macri government lifted exchange controls and liberalized capital controls, there can be no assurances regarding future modifications to exchange and capital controls. Exchange and capital controls could adversely affect the financial condition or results of operations of issuers in whose securities the Master Fund intends to invest, as well as their ability to meet foreign currency obligations and to execute financing plans.

*Challenges to Argentina's Debt Payments.* Argentina's payments in connection with a debt offering may be attached, enjoined or otherwise challenged. In recent years, hold-out creditors have used litigation against sovereign debtors, most prominently Peru and Nicaragua, to attach or interrupt payments made by these sovereign debtors to, among others, bondholders who have agreed to a debt restructuring and accepted new securities in an exchange offer. Argentina has been subjected to suits to collect on amounts due on defaulted bonds, including actions in the United States, the United Kingdom, Italy and Germany. Some of these actions have resulted in judgments against Argentina. There can be no assurance that a creditor will not be able to interfere, through an attachment of assets, injunction, temporary restraining order or otherwise, with payments made in connection with a debt offering.

*Pro Rata Payment Litigation.* Argentina's defaults with respect to the payment of its foreign debt could prevent the government and the private sector from accessing the international capital markets, which could adversely affect the financial condition of sovereign and corporate issuers in which the Master Fund invests. In September 2014, the Argentine Congress passed a law to restructure foreign-law bonds held by exchange bondholders to allow the payment in Argentina and to appoint a new paying agent. On September 29, 2014, the U.S. District Court for the Southern District of New York held Argentina in contempt of court as a result of this law. The U.S. District Court authorized limited exceptions to the injunction allowing certain custodians of Argentine law-governed bonds to process payments in August 2014, September 2014 and December 2014.

On May 11, 2015, the plaintiffs that obtained pari passu injunctions asked the U.S. district court to amend their complaints to include claims alleging that Argentina's issuance and servicing of its 2024 dollar-denominated bonds, and its external indebtedness in general, would violate the pari passu clause. On June 5, 2015, the Second Circuit granted partial summary judgment to a group of 526 "me-too" plaintiffs in 36 separate lawsuits, finding that, consistent with the previous ruling of such court, Argentina violated a pari passu clause in bonds issued to the "me-too" bondholders. The decision obligates Argentina to pay the plaintiffs $5.4 billion before it can make payments on restructured debt.

In 2016, the Argentine government working under a court appointed mediator, entered into settlement agreements with a large portion of hold-out debt holders contingent on Argentina repealing laws that prevented the country from complying with rulings by U.S. courts. In this context Judge Thomas Griesa ruled he would lift the injunctions preventing Argentina from serving post-2005 exchange debt if these laws are repealed. Argentina's lower chamber approved the repeal of these laws

**Appx. 03583**

and Argentina's senate voted to approve the same in March 2016.  In April 2016, the Second Circuit Court of Appeals in the United States upheld Judge Griesa's ruling, finding that he did not abuse his discretion in lifting the pari passu injunctions.

The repercussions of restructuring Argentina's bond debts are ongoing.  The 2016 U.S. court rulings only settled claims of certain bondholders.  Argentina reached a $475 million settlement with other bondholders in November 2016.  Financial indices have only just started moving Argentina back to "emerging market" status, where it had been before 2009.

Argentina's default with respect to the payment of its foreign debt, its delay in completing the debt restructuring process with creditors that did not participate in the related exchange offers, the complaints filed against Argentina discussed above, the U.S. Supreme Court's decision not to hear Argentina's appeal, the declaration of contempt, and the long-term difficulty of reestablishing itself in the global marketplace could prevent Argentina's government from obtaining international private financing or receiving direct foreign investment, as well as private sector companies in Argentina from accessing the international capital markets. Without access to international private financing, Argentina may not be able to finance its obligations, and financing from multilateral financial institutions may be limited or not available. Without access to direct foreign investment, the government may not have sufficient financial resources to foster economic growth and the performance of the Master Fund's investments in Argentina could be materially and adversely affected.

*Derivative Instruments.*  The Investment Manager may use various derivative instruments, including futures, options, forward contracts, swaps and other derivatives which may be volatile and speculative.  Certain positions may be subject to wide and sudden fluctuations in market value, with a resulting fluctuation in the amount of profits and losses.  Use of derivative instruments presents various risks, including the following:

- *Tracking* – When used for hedging purposes, an imperfect or variable degree of correlation between price movements of the derivative instrument and the underlying investment sought to be hedged may prevent the Investment Manager from achieving the intended hedging effect or expose the portfolio to the risk of loss.

- *Liquidity* – Derivative instruments, especially when traded in large amounts, may not be liquid in all circumstances, so that in volatile markets the Investment Manager may not be able to close out a position without incurring a loss.  In addition, daily limits on price fluctuations and speculative positions limits on exchanges on which the Investment Manager may conduct its transactions in certain derivative instruments may prevent prompt liquidation of positions, subjecting the portfolio to the potential of greater losses.

- *Leverage* – Trading in derivative instruments can result in large amounts of leverage.  Thus, the leverage offered by trading in derivative instruments may magnify the gains and losses experienced by the Master Fund and could cause the Master Fund's net asset value to be subject to wider fluctuations than would be the case if the Investment Manager did not use the leverage feature in derivative instruments.

- *Over-the-Counter-Trading* – Derivative instruments that may be purchased or sold for the portfolio may include instruments not traded on an exchange.  Over-the-counter options, unlike exchanged-traded options, are two-party contracts with price and other terms negotiated by the buyer and seller.  The risk of non-performance by the obligor on such an instrument may be

greater and the ease with which the Investment Manager can dispose of or enter into closing transactions with respect to such an instrument may be less than in the case of an exchange-traded instrument. In addition, significant disparities may exist between "bid" and "asked" prices for derivative instruments that are not traded on an exchange. Derivative instruments not traded on exchanges are also not subject to the same type of government regulation as exchange traded instruments, and many of the protections afforded to participants in a regulated environment may not be available in connection with such transactions.

*Short Sales.* Short sales by the Master Fund that are not made "against the box" create opportunities to increase the Master Fund's return but, at the same time, involve special risk considerations and may be considered a speculative technique. Since the Master Fund, in effect, profits from a decline in the price of the securities sold short without the need to invest the full purchase price of the securities on the date of the short sale, the value of the Master Fund will tend to increase more when the securities it has sold short decrease in value, and to decrease more when the securities it has sold short increase in value, than otherwise would be the case if it had not engaged in such short sales. Short sales theoretically involve unlimited loss potential, as the market price of securities sold short may increase continuously, although the Master Fund may mitigate such losses by replacing the securities sold short before the market price has increased significantly. Under adverse market conditions the Master Fund might have difficulty purchasing securities to meet its short sale delivery obligations, and might have to sell portfolio securities to raise the capital necessary to meet its short sale obligations at a time when fundamental investment considerations would not favor such sales. Short sales may be used with the intent of hedging against the risk of declines in the market value of the Master Fund's long portfolio, but there can be no assurance that such hedging operations will be successful.

*Risks of Execution of Investment Strategies.* The Master Fund will invest in a number of securities and obligations that entail substantial inherent risks. Although the Master Fund will attempt to manage those risks through careful research, ongoing monitoring of investments and appropriate hedging techniques, there can be no assurance that the securities and other instruments purchased by the Master Fund will in fact increase in value or that the Master Fund will not incur significant losses.

*Market Risks and Liquidity.* The profitability of a significant portion of the Master Fund's investment program depends to a great extent upon correctly assessing the future course of the price movements of securities and other investments. There can be no assurance that the Master Fund will be able to predict accurately these price movements. Although the Master Fund may attempt to mitigate market risk through the use of long and short positions or other methods, there is always some, and occasionally a significant, degree of market risk.

Furthermore, the Master Fund may be adversely affected by a decrease in market liquidity for the instruments in which they invest, which may impair the Master Fund's ability to adjust their position. The size of the Master Fund's positions may magnify the effect of a decrease in market liquidity for such instruments. Changes in overall market leverage, deleveraging as a consequence of a decision by a broker to reduce the level of leverage available, or the liquidation by other market participants of the same or similar positions, may also adversely affect the Master Fund's portfolio. Some of the underlying investments of the Master Fund may not be actively traded and there may be uncertainties involved in the valuation of such investments. Potential investors should be warned that under such circumstances, the net asset value of the Master Fund may be adversely affected.

*Hedging.* Although the Master Fund will attempt to hedge its exposure to specific arbitrage positions, it will not always be possible fully to hedge risk from such positions or any other position. In

addition, the Master Fund may take positions based on the expected future direction of the markets without fully hedging the market risks.

*Currency Risks.* A portion of the Master Fund's assets may be invested in securities denominated in various currencies and in other financial instruments, the price of which is determined with reference to such currencies. The account of the Master Fund will, however, be valued in U.S. Dollars. To the extent unhedged, the value of the net assets of the Master Fund will fluctuate with U.S. Dollars exchange rates as well as with price changes of their investments in the various local markets and currencies. Forward currency contracts and options may be utilized by the Master Fund to hedge against currency fluctuations, but there can be no assurance that such hedging transactions will be effective.

*Counterparty and Settlement Risk.* Due to the nature of some of the investments which the Master Fund may make, the Master Fund may rely on the ability of the counterparty to a transaction to perform its obligations. In the event that any such party fails to complete its obligations for any reason, the Master Fund may suffer losses. The Master Fund will therefore be exposed to a credit risk on the counterparties with which it trades. The Master Fund will also bear the risk of settlement default by clearing houses and exchanges. Any default by a counterparty or on settlement could have a material adverse effect on the Master Fund.

*Borrowing.* The Master Fund is permitted to finance its operations with secured and unsecured borrowing up to 100% of its net assets, to the extent allowable under applicable credit regulations. Like other forms of leverage, the use of borrowing can enhance the risk of capital loss in the event of adverse changes in the level of market prices of the assets being financed with the borrowings.

*Concentration of Investments.* Although the Investment Manager will follow a general policy of seeking to spread the Master Fund's capital among a number of investments, the Investment Manager may depart from such policy from time to time and may hold a few, relatively large securities positions in relation to the Master Fund's capital. The result of such concentration of investments is that a loss in any such position could materially reduce the Master Fund's capital.

*Difficult Market for Investment Opportunities.* The activity of identifying, completing and realizing on attractive investments involves a high degree of uncertainty. There can be no assurance that the Master Fund will be able to locate and complete investments which satisfy the Master Fund's rate of return objective or realize upon their values or that the Master Fund will be able to invest fully its subscribed capital in a manner consistent with its investment strategy.

## Certain Regulatory Risks

*Absence of Regulatory Oversight.* While the Fund may be considered similar to an investment company, it is not required and does not intend to register as such under the Investment Company Act of 1940, as amended (the "***Investment Company Act***"), and, accordingly, the provisions of the Investment Company Act (which may provide certain regulatory safeguards to investors) are not applicable to investors in the Fund. Neither the Fund nor the Master Fund will maintain custody of its securities or place its securities in the custody of a bank or a member of a national securities exchange in the manner required of registered investment companies under rules promulgated by the Securities and Exchange Commission (the "***SEC***"). A registered investment company which places its securities in the custody of a member of a national securities exchange is required to have a written custodian agreement, which provides that securities held in custody will be at all times individually segregated from the securities of any other person and marked to clearly identify such securities as the property of such investment

37

company, and which contains other provisions complying with SEC regulations.  The Master Fund generally will maintain such accounts at brokerage firms that do not separately segregate such assets as would be required in the case of registered investment companies.  Under the provisions of the Securities Investor Protection Act of 1970, as amended, the bankruptcy of any such brokerage firm might have a greater adverse effect on the Master Fund and the Fund than would be the case if the accounts were maintained to meet the requirements applicable to registered investment companies.

*Forward-Looking Statements*.  Certain statements contained in this Memorandum, including without limitation, statements containing the words "believes," "anticipates," "intends," "expects," and words of similar import constitute "forward-looking statements."  Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance or achievements of the Fund to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements.  Certain of these factors are discussed in more detail elsewhere in this Memorandum, including without limitation under "*Summary of Terms*," "*Certain Risk Factors*," and "*Investment Program*."  Given these uncertainties, prospective investors are cautioned not to place undue reliance on such forward-looking statements.  The Investment Manager and the Fund disclaim any obligation to update any such factors or to announce the result of any revisions to any of the forward-looking statements contained herein to reflect future events or developments.

*Impact of U.S. Presidential Election.*  On January 20, 2017, Donald Trump became President of the United States of America.  President Trump and other members of the Republican Party have proposed to reverse some of the recent regulation of the financial industry and to change tax policy.  If some of these proposals were enacted, banks could dramatically increase their lending practices and accept additional types of collateral, borrowers could reduce their demand for debt financing, certain investment advisers could de-register with SEC and portfolio companies that are net importers or hold significant assets outside of the United States could be subject to increased tax liability.  The effect of any such regulatory or tax changes on the Master Fund and the markets in which it trades and invests is uncertain.

*Evolving Regulatory Risks of Private Investment Funds.*  The regulatory environment for private investment funds is evolving, and changes in the regulation of private investment funds and their advisers may adversely affect the value of investments held by the Master Fund.

The Dodd-Frank Wall Street Reform and Consumer Protection Act ("**Dodd-Frank**"), which was enacted in July 2010, regulates markets, market participants and financial instruments that were historically unregulated and has substantially altered the regulation of many other markets, market participants and financial instruments.  Certain provisions of Dodd-Frank subject registered investment advisers to requirements to keep records and to report information to the SEC, which could in turn be supplied to the Board of Governors of the Federal Reserve, a new Financial Services Oversight Council or other U.S. governmental agencies or Congress.  Under Dodd-Frank, the information includes, among other things, the amount of assets under management, use of leverage (including off-balance sheet leverage), counterparty credit risk exposures, trading and investment positions, and trading practices.  All such records are subject to examination by the SEC at any time.  It is anticipated that there may be significant changes to the financial regulatory environment as a result of the outcome of the recent U.S. elections.  There is currently pending legislation in U.S. Congress which if enacted would result in the repeal of portions of Dodd-Frank which in turn would have a significant impact on the regulatory environment for private investment funds.  In addition, the impact of the legislation on current and future rulemaking by various regulators under Dodd-Frank is difficult to predict.  It is possible that rules that

38

have been proposed by various regulators, which had been anticipated to take effect previously, may no longer be implemented in their proposed form or at all. Further, there may also be substantial changes in the enforcement and interpretation of existing statutes and rules by governmental regulatory authorities or self-regulatory organizations that supervise the financial markets. The effect of future regulatory change on the Fund and the Master Fund and their operations is uncertain. Prospective investors should seek, and must rely on, the advice of their own advisers with respect to the possible impact on its investment of any future proposed legislation or administrative or judicial action.

**Tax Related Risks**

*Uncertainty and Complexity of Tax Treatment.* The tax aspects of an investment in a partnership are complicated and complex and, in many cases, uncertain. Statutory provisions and administrative regulations have been interpreted inconsistently by the courts. Additionally, some statutory provisions remain to be interpreted by administrative regulations. Investors will thus be subject to the risk caused by the uncertainty of the tax consequences with respect to an investment in the Fund. Each prospective investor should have the tax aspects of an investment in the Fund reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and private investment vehicles. Prospective investors are strongly urged to review the discussion below under "*Tax Considerations*" and "*ERISA and Other Regulatory Considerations*" for a more complete discussion of certain of the tax risks inherent in the acquisition of Interests and to consult their own independent tax advisors.

*Risk of Adverse Determination.* There can be no assurance that the conclusions set forth in this Memorandum will not be challenged successfully by the U.S. Internal Revenue Service (the "**Service**") or other applicable taxing authority, or significantly modified by new legislation, changes in the Service's positions or court decisions. The Fund has not applied for, nor does it expect to apply for, any advance rulings from the Service with respect to any of the federal income tax consequences described in this Memorandum. No representation or warranty of any kind is made by the General Partner with respect to the tax consequences relating to an investment in the Fund. The Fund may take positions with respect to certain tax issues which depend on legal conclusions not yet resolved by the courts. Should any such positions be successfully challenged by the Service or other applicable taxing authority, there could be a materially adverse effect on the Fund, and a Limited Partner might be found to have a different tax liability for that year than that reported on its income tax returns.

*Risk of Tax Audit.* An audit of the Fund by the Service or another taxing authority could result in adjustments to the tax consequences initially reported by the Fund and may result in an audit of the returns of some or all of the Limited Partners, which examination could affect items not related to a Limited Partner's investment in the Fund. If audit adjustments result in an increase in a Limited Partner's income tax liability for any year, such Limited Partner may also be liable for interest and penalties with respect to the amount of underpayment. The legal and accounting costs incurred in connection with any audit of the Fund's tax returns be borne by the Fund. The cost of any audit of a Limited Partner's tax return will be borne solely by that Limited Partner.

*Entity-Level Audits.* Pursuant to the Bipartisan Budget Act of 2015, for taxable years beginning after December 31, 2017, the Service generally will be permitted to determine adjustments to items of income, gain, deduction, loss or credit of the Fund, and assess and collect taxes attributable thereto (including any applicable penalties and interest), at the Fund level. If this new regime applies to the Fund (which depends, among other things, on whether the Fund has more than 100 partners or has any partner that is itself classified as a partnership for U.S. federal income tax purposes), then any person

39

who is a partner of the Fund in the relevant year of the adjustment may indirectly bear the economic burden of any such taxes assessed or collected (initially determined at the highest rate of tax applicable to an individual or corporation in effect for the reviewed year), regardless of whether such person was a Limited Partner during any reviewed year.  It is expected that guidance will be issued that permits the Fund to reduce the underpayment of taxes owed by the Fund, including to the extent that the Fund demonstrates such taxes are allocable to a Limited Partner that would not owe any tax by reason of its status as a "tax-exempt entity" or the character of income is subject to a lower rate of tax.  The Fund may under certain circumstances have the ability to avoid such entity-level tax assessment or collection by electing to issue a statement to each partner of any reviewed year with its share of such adjustment, resulting in such partner being required to take into account any such adjustment for the taxable year which includes the date such statement was furnished.  In such case, the partners of the reviewed year would also incur a two-percentage point increase on the interest rate that would otherwise have been imposed on any underpayment of taxes.  There can be no assurances, however, that the Fund will avoid, or be able to avoid, any entity-level determination, assessment or collection.  Limited Partners should note that there is substantial uncertainty regarding the implementation of these rules and the impact on any current or future allocations made or cash available for distributions or withdrawals by the Fund. The Fund may also be exposed to the risk that these rules apply to any lower-tier entity in which the Fund directly or indirectly invests and that is treated as a partnership for U.S. federal income tax purposes.  If this new legislation applies to the Fund, the Fund will designate a tax representative, which is expected to be the General Partner, the Investment Manager, or an affiliate thereof, who shall have the sole authority to act on behalf of the Fund with respect to dealings with the Service under these new procedures.  Prospective Limited Partners should consult their own tax advisors regarding this new legislation.

*Tax Considerations Taken into Account*.  The General Partner may take tax considerations into account in determining when the Fund's investments should be sold or otherwise disposed of, and may assume certain market risk and incur certain expenses in this regard to achieve favorable tax treatment of a transaction.

*Foreign Taxation*.  With respect to certain countries, there is a possibility of expropriation, confiscatory taxation, and imposition of withholding or other taxes on dividends, interest, capital gains or other income, limitations on the removal of funds or other assets of the Fund, political or social instability or diplomatic developments that could affect investments in those countries.  An issuer of securities may be domiciled in a country other than the country in whose currency the instrument is denominated.  The values and relative yields of investments in the securities markets of different countries, and their associated risks, are expected to change independently of each other.

*Tax Liabilities Without Distributions*.  If the Fund has taxable income in a fiscal year, each Limited Partner will be taxed on that income in accordance with its allocable share of the Fund's profits, whether or not such profits have been distributed.  Because the General Partner anticipates that there will be no cash distributions to the Limited Partners, an investor may incur tax liability with respect to activities of the Fund without receiving sufficient distributions from the Fund to defray such tax liabilities.  In order to satisfy its tax liability in such a case, a Limited Partner would need sufficient funds from sources other than the Fund.  Furthermore, the Fund may make investments with respect to which the Fund recognizes income for U.S. federal income tax purposes prior to receiving the cash or realizing the income as an economic matter.  In addition, the Fund may recognize income for U.S. federal income tax purposes that does not reflect income as an economic matter.  Such recognition of income prior to receipt of an economic benefit, if any, may result in increased tax liability for the Partners.

*Delayed Schedules K-1.*  The Fund will provide Schedules K-1 as soon as practicable after receipt of all of the necessary information.  However, the Fund may be unable to provide final Schedules K-1 to Limited Partners for any given tax year until significantly after April 15 of the following year.  The General Partner will endeavor to provide Limited Partners with estimates of the taxable income or loss allocated to their investment in the Fund on or before such date, but final Schedules K-1 may not be available until completion of the Fund's annual audit.  Limited Partners should be prepared to obtain extensions of the filing date for their income tax returns at the federal, state and local levels.

*Unrelated Business Taxable Income.*  The Fund may make investments or engage in activities that will give rise to unrelated business taxable income ("***UBTI***") under Sections 512 and 514 of the U.S. Internal Revenue Code of 1986, as amended (the "***Code***").  Thus, an investment in the Fund may be less desirable for certain tax-exempt investors.  For example, the Fund may incur leverage giving rise to UBTI or may participate in investments that give rise to UBTI through entities that are treated as partnerships for U.S. federal income tax purposes.  Because of the "flow-through" principles applicable to partnerships, if UBTI is earned by the Fund, a tax-exempt investor in the Fund will realize UBTI. Because of the General Partner's objective of maximizing the pre-tax returns of all the Limited Partners, the General Partner may be required to make certain decisions to maximize pre-tax returns that result in tax-exempt investors recognizing more UBTI than might otherwise be the case.  In some cases, the General Partner may forgo actions with regard to the acquisition, financing, management and disposition of assets that would reduce UBTI because such actions would reduce the overall pre-tax returns to all the Limited Partners.

*Tax Changes.*  Investors will be subject to the risk that changes to the tax law may adversely affect the federal income tax consequences of their investment in the Fund.  Changes in existing tax laws or regulations and their interpretation may be enacted after the date of this Memorandum, possibly with retroactive effect, and could alter the income tax consequences of an investment in the Fund.  Certain provisions of the Code may be further amended or interpreted in a manner adverse to the Fund, in which event any benefits derived from an investment in the Fund may be adversely affected.  In addition, significant legislative and budgetary proposals affecting tax laws have been made by the legislative and executive branches of the U.S. federal government.  The likelihood of enactment of any such proposals, or any similar proposals, into law is uncertain.  The enactment of any such proposals, including subsequent proposals, into law could have material adverse effects on the Fund and/or the Limited Partners.  Enactment of such legislation, or similar legislation, could require significant restructuring of the Fund in order to mitigate such effects.

*The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Fund.  Prospective investors should read this entire Memorandum and consult with their own advisers before deciding to invest in the Fund.  In addition, as the investment program of the Fund develops and changes over time, an investment in the Fund may be subject to additional and different risk factors.  No assurance can be made that profits will be achieved or that substantial losses will not be incurred.*

*In view of the foregoing considerations, an investment in Interests is suitable only for investors who are capable of bearing the relevant investment risks.*

## Potential Conflicts of Interest

Given the nature and size of Highland Capital Management, L.P.'s ("***Highland Capital***") operations, various potential conflicts of interest arise in connection with its advisory services and the

**Appx. 03590**

advisory services provided by its affiliates. Information about Highland Capital and its potential conflicts of interest is provided in Highland Capital's Form ADV Part 2 Brochure that can be found by going to https://adviserinfo.sec.gov/IAPD/Default.aspx, searching by firm name and selecting the Part 2 Brochure to be viewed. The Fund is subject to these conflicts of interest, as well as the other items discussed below.

None of the Investment Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees (collectively, the "***Highland Group***") is precluded from engaging in or owning an interest in other business ventures or investment activities of any kind, whether or not such ventures are competitive with the Fund or the Master Fund. The Investment Manager is permitted to manage other client accounts, and does manage other client accounts, some of which may have objectives similar or identical to those of the Master Fund, including other collective investment vehicles that may be managed by the Highland Group and in which the Investment Manager or any of its affiliates may have an equity interest.

The Fund will be subject to a number of actual and potential conflicts of interest involving the Highland Group including, among other things, the fact that: (i) the Highland Group conducts substantial investment activities for accounts, funds, collateralized debt obligations that invest in leveraged loans (collectively, "***CDOs***") and other vehicles managed by members of the Highland Group ("***Highland Accounts***") in which the Fund has no interest; (ii) the Highland Group advises Highland Accounts, which utilize the same, similar or different methodologies as the Fund and may have financial incentives (including, without limitation, as it relates to the composition of investors in such funds and accounts or to the Highland Group's compensation arrangements) to favor certain Highland Accounts over the Fund and the Master Fund; (iii) the Highland Group may use the strategy described herein in certain Highland Accounts; (iv) the Investment Manager may give advice and recommend securities to, or buy or sell securities for, the Master Fund, which advice or securities may differ from advice given to, or securities recommended or bought or sold for, Highland Accounts; (v) the Investment Manager has the discretion, to the extent permitted under applicable law, to use its affiliates as service providers to the Fund and the Master Fund and the Master Fund's portfolio investments; (vi) certain investors affiliated with the Highland Group may choose to personally invest only in certain funds advised by the Highland Group and the amounts invested by them in such funds is expected to vary significantly; (vii) the Highland Group and Highland Accounts may actively engage in transactions in the same securities sought by the Master Fund and, therefore, may compete with the Master Fund for investment opportunities or may hold positions opposite to positions maintained on behalf of the Master Fund; and (viii) the Investment Manager will devote to the Master Fund and the Fund only as much time as the Investment Manager deems necessary and appropriate to manage the Master Fund's and the Fund's business.

The Investment Manager undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Fund's investors.

*Allocation of Trading Opportunities*

It is the policy of the Investment Manager to allocate investment opportunities fairly and equitably over time. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) fiduciary duties owed to the accounts; (ii) the primary mandate of the accounts; (iii) the capital available to the accounts; (iv) any restrictions on the accounts and the investment opportunity; (v) the sourcing of the investment, size of the investment and amount of follow-on available related to the investment; (vi) whether the risk-return profile of the proposed investment is consistent with the

Appx. 03591

account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (vii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (viii) liquidity requirements of the account; (ix) potentially adverse tax consequences; (x) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (xi) the need to re-size risk in the account's portfolio.

The Investment Manager has the authority to allocate trades to multiple Highland Accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the Investment Manager may allocate the trades among different accounts on a basis it considers fair and equitable over time. One or more of the foregoing considerations may (and are often expected to) result in allocations among the Master Fund and one or more Highland Accounts on other than a *pari passu* basis. The Investment Manager will allocate investment opportunities across its accounts for which the opportunities are appropriate, consistent with (i) its internal conflict of interest and allocation policies and (ii) the requirements of the Investment Advisers Act of 1940, as amended. The Investment Manager will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy, a copy of which will be provided upon request. However, there is no assurance that such investment opportunities will be allocated to the Master Fund fairly or equitably in the short-term or over time and there can be no assurance that the Master Fund will be able to participate in all investment opportunities that are suitable for it

The Investment Manager may open "average price" accounts with brokers. In an "average price" account, purchase and sale orders placed during a trading day on behalf of the Investment Manager, the Master Fund and other accounts managed by the Investment Manager are combined, and securities bought and sold pursuant to such orders are allocated among such accounts on an average price basis.

*Cross Transactions and Principal Transactions*

As further described below, the Investment Manager may effect client cross-transactions where the Investment Manager causes a transaction to be effected between the Master Fund and another client advised by it or any of its affiliates. The Investment Manager may engage in a client cross-transaction involving the Master Fund any time that the Investment Manager believes such transaction to be fair to the Master Fund and such other client. By subscribing for an Interest, a Limited Partner is deemed to have consented to such client cross-transactions between the Master Fund and another client of the Investment Manager or one of its affiliates.

The Investment Manager may direct the Master Fund to acquire or dispose of securities in cross trades between the Master Fund and other clients of the Investment Manager or its affiliates in accordance with applicable legal and regulatory requirements. In addition, the Master Fund may invest in securities of obligors or issuers in which the Investment Manager and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Master Fund may enhance the profitability of the Investment Manager's own investments in such companies. Moreover, the Master Fund may invest in assets originated by the Investment Manager or its affiliates. In each such case, the Investment Manager and such affiliates may have a potentially conflicting division of loyalties and responsibilities regarding the Master Fund and the other parties to such trade. Under certain circumstances, the Investment Manager and its affiliates may determine that it is appropriate to avoid such conflicts by selling a security at a fair value that has been calculated pursuant to the Investment Manager's valuation procedures to another client managed or advised by the Investment Manager or

43

such affiliates. In addition, the Investment Manager may enter into agency cross-transactions where it or any of its affiliates acts as broker for the Master Fund and for the other party to the transaction, to the extent permitted under applicable law.

The Principal, as well as the employees and officers of the Investment Manager and of organizations affiliated with the Investment Manager, may buy and sell securities for their own account or the account of others, but may not buy securities from or sell securities to the Master Fund (such prohibition does not extend to the purchase or sale of interests in the Fund), unless such purchase or sale is in compliance with the applicable provisions of the Investment Advisers Act of 1940, as amended.

*Conflicts Relating to Equity and Debt Ownership by the Master Fund and Affiliates*

In certain circumstances, the Master Fund and other client accounts may invest in securities or other instruments of the same issuer (or affiliated group of issuers) having a different seniority in the issuer's capital structure. If the issuer becomes insolvent, restructures or suffers financial distress, there may be a conflict between the interests in the Master Fund and those other accounts insofar as the issuer may be unable (or in the case of a restructuring prior to bankruptcy may be expected to be unable) to satisfy the claims of all classes of its creditors and security holders and the Master Fund and such other accounts may have competing claims for the remaining assets of such issuers. Under these circumstances it may not be feasible for the Investment Manager to reconcile the conflicting interests in the Master Fund and such other accounts in a way that protects the Master Fund's interests. Additionally, the Investment Manager or its nominees may in the future hold board or creditors' committee memberships which may require them to vote or take other actions in such capacities that might be conflicting with respect to certain funds managed by the Investment Manager in that such votes or actions may favor the interests of one account over another account. Furthermore, the Investment Manager's fiduciary responsibilities in these capacities might conflict with the best interests of the investors.

*Affiliated Entity Services*

Affiliated entities of the Investment Manager may provide services with respect to the Investment Manager, the Master Fund or the Fund. NexBank, SSB ("*NexBank SSB*") is an affiliate of the Investment Manager and may, from time to time, provide banking and/or agency services to the Investment Manager, clients of the Investment Manager or collective investment vehicles for which the Investment Manager provides investment advisory services (including the Fund, the Master Fund and other vehicles in which the Fund (through the Master Fund) may invest) or third parties engaged in transactions involving the Investment Manager. NexBank SSB may also act as an agent in connection with certain securities transactions involving the Investment Manager's client accounts (including the Master Fund and other vehicles in which the Master Fund may invest). Principals of the Investment Manager own a majority of the equity interests in NexBank SSB and employees or affiliates of the Investment Manager own or may own a substantial equity interest in NexBank SSB. Certain Master Fund investment transactions may be executed through NexBank Securities, Inc., an affiliate of the Investment Manager and a registered broker-dealer.

Additionally, the Investment Manager or affiliates of the Investment Manager, including, without limitation, Nexbank SSB, NexBank Securities, Inc., NexBank Capital Advisors and Governance Re, Ltd., may provide financial advisory, management, insurance, title insurance or other services for a fee to portfolio companies in which the Master Fund may have an interest. Highland Latin America Consulting, Ltd., an affiliate of the Investment Manager, has been engaged to provide certain

Appx. 03593

administrative and consulting services to the Investment Manager, as more fully described below in "*Management –Services Agreement.*"

*Management Fee*

A portion of any Management Fee may be paid to broker-dealers, placement agents or independent third parties, other than the Investment Manager, for services provided in connection with the solicitation of subscriptions from investors. Accordingly, investors should recognize that a placement agent's or distributor's participation in this offering may be influenced by its interest in such current or future fees and compensation. Investors should consider these potential conflicts of interest in making their investment decisions. Each placement agent shall comply with the legal requirements of the jurisdictions within which it offers and sells Interests.

*Diverse Membership*

The Limited Partners are expected to include entities, persons, or entities organized in various jurisdictions and subject to different tax and regulatory regimes. Such diverse investors may thus have conflicting investment, tax and other interests, relating to, among other things, the nature of investments made by the Master Fund, the structuring or the acquisition of investments and the timing of disposition of investments. As a result, conflicts of interest may arise in connection with decisions made by the Investment Manager including as to the nature and structure of investments that may be more beneficial for one type of Limited Partner than for another type of Limited Partner, including Limited Partners affiliated with the Investment Manager. The results of the Fund's activities may affect individual Limited Partners differently, depending upon their individual financial and tax situations because, for instance, of the timing of an event of realization of gain or loss and its characterization as long-term or short-term gain or loss. In addition, the Master Fund may make investments that may have a negative impact on related investments made by the Limited Partners in separate transactions. In selecting, structuring and managing investments appropriate for the Master Fund, the Investment Manager will consider the investment and tax objectives of the Master Fund and the Feeder Funds as a whole, not the investment, tax, or other objectives of any Limited Partner individually. However, there can be no assurance that a result will not be more advantageous to some Limited Partners than to others or to the Investment Manager and/or its affiliates than to a particular Limited Partner.

*Soft Dollars*

The Investment Manager's authority to use "soft dollar" credits generated by the Master Fund's securities transactions to pay for expenses that might otherwise have been borne by the Investment Manager or the General Partner may give the Investment Manager an incentive to select brokers or dealers for Master Fund transactions, or to negotiate commission rates or other execution terms, in a manner that takes into account the soft dollar benefits received by the Investment Manager rather than giving exclusive consideration to the interests in the Master Fund. See "*Brokerage and Custody.*"

*No Separate Counsel*

Akin Gump Strauss Hauer & Feld LLP ("*Akin Gump*") serves as counsel to the Fund, the Master Fund, the Investment Manager, the General Partner and certain of their Affiliates (the "*Clients*") in connection with the formation of the Fund and certain other Clients, the offering of Interests as well as certain other matters for which the Clients may engage Akin Gump from time to time. Akin Gump disclaims any obligation to verify the Clients' compliance with their obligations either under applicable

45

law or the governing documents of the Fund.  In acting as counsel to the Clients, Akin Gump has not represented and will not represent any Limited Partners nor does it purport to represent their interests.  No independent counsel has been retained to represent the Limited Partners.  In assisting in the preparation of this Memorandum, Akin Gump has relied on information provided by the Fund, the Investment Manager and the General Partner and certain of the Fund's other service providers (including, without limitation, the Principal's biographical data, summaries of market conditions, the planned investment strategy of the Master Fund and the performance of the Master Fund, its investments or any predecessor Fund) without verification and does not express a view as to whether such information is accurate or complete.

Maples and Calder, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, acts as Cayman Islands legal counsel to the Offshore Fund, the Master Fund and the General Partner.  In connection with the offering of interests and subsequent advice to the Offshore Fund, the Master Fund and the General Partner, Maples and Calder will not be representing shareholders and/or limited partners.  No independent legal counsel has been retained to represent the shareholders and/or limited partners.  Maples and Calder's representation of the General Partner is limited to specific matters as to which it has been consulted by the General Partner.  There may exist other matters that could have a bearing on the Master Fund as to which Maples and Calder has not been consulted.  In addition, Maples and Calder does not undertake to monitor compliance by the General Partner and its affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does Maples and Calder monitor ongoing compliance with applicable laws.  In connection with the preparation of this Memorandum, Maples and Calder's responsibility is limited to matters of Cayman Islands law and it does not accept responsibility in relation to any other matters referred to or disclosed in this Memorandum. In the course of advising the General Partner, there are times when the interests of the shareholders/limited partners may differ from those of the Offshore Fund, Master Fund and/or the General Partner.  Maples and Calder does not represent the shareholders and/or limited partners' interests in resolving these issues.  In reviewing this Memorandum, Maples and Calder has relied upon information furnished to it by the General Partner and has not investigated or verified the accuracy and completeness of information set forth herein concerning the Offshore Fund, Master Fund and/or the General Partner.

*Non-Public Information*

From time to time, the Investment Manager may come into possession of non-public information concerning specific companies although internal structures are in place to prevent the receipt of such information.  Under applicable securities laws, this may limit the Investment Manager's flexibility to buy or sell portfolio securities issued by such companies.  The Master Fund's investment flexibility may be constrained as a consequence of the Investment Manager's inability to use such information for investment purposes.

*The foregoing list of risk factors and potential conflicts of interest do not purport to be a complete enumeration or explanation of the risks involved in an investment in the Fund.  Prospective investors should read this entire Memorandum and consult with their own legal, tax and financial advisers before deciding to invest in the Fund.*

## BROKERAGE AND CUSTODY

**Brokerage Arrangements**

The Investment Manager will be responsible for the placement of the portfolio transactions of the Master Fund and the negotiation of any commissions or spreads paid on such transactions. Portfolio transactions normally will be effected through brokers on securities exchanges or directly with the issuer, or through an underwriter, or market maker or other dealer for the investments. Portfolio transactions through brokers involve a commission to the broker. Portfolio transactions with dealers typically are priced to include a spread between the bid and the asked price to compensate the dealer. Portfolio transactions will be executed by brokers selected solely by the Investment Manager in its absolute discretion. The Investment Manager is not required to weigh any of these factors equally.

Substantially all of the Master Fund's investments in marketable securities, as well as its cash and cash equivalents, are expected to be held at Société Générale and BNP Paribas Prime Brokerage, Inc. or other prime brokers or custodians selected by the Investment Manager. Instruments not constituting marketable securities generally are recorded through book entry by the borrower or by an agent for the borrower or the creditors. Documentary evidence of the acquisition, ownership and disposition of these assets typically will be held by the Administrator.

Société Générale and BNP Paribas Prime Brokerage, Inc. and other prime brokers or their affiliates may provide capital introduction or other placement services to the Fund and the Investment Manager (with or without separate charges for such other services). In determining which broker-dealer generally provides the best available price and most favorable execution, the Investment Manager considers a totality of circumstances, including price quotes, the size of the transaction, the nature of the market for the financial instrument, the timing of the transaction, difficulty of execution, the broker-dealer's expertise in the specific financial instrument or sector in which the Master Fund seeks to trade, the extent to which the broker-dealer makes a market in the financial instrument involved or has access to such markets, the broker-dealer's skill in positioning the financial instruments involved, the broker-dealer's promptness of execution, the broker-dealer's financial stability, reputation for diligence, fairness and integrity, quality of service rendered by the broker-dealer in other transactions for the Investment Manager and its respective affiliates, confidentiality considerations, the quality and usefulness of research services and investment ideas presented by the broker-dealer, the broker-dealer's willingness to correct errors, the broker-dealer's ability to accommodate any special execution or order handling requirements that may surround the particular transaction, and other factors deemed appropriate by the Investment Manager. The Investment Manager need not solicit competitive bids and does not have an obligation to seek the lowest available commission cost or spread.

Accordingly, if the Investment Manager concludes that the commissions charged by a broker or the spreads applied by a dealer are reasonable in relation to the quality of services rendered by such broker or dealer (including, without limitation, the value of the brokerage and research products or services provided by such broker or dealer), the Master Fund may pay commissions to, or be subject to spreads applied by, such broker-dealer in an amount greater than the amount another broker-dealer might charge or apply.

The Investment Manager may also execute trades with brokers and dealers with whom the Fund, the Master Fund or the Investment Manager has other business relationships, including prime brokerage, credit relationships and capital introduction or investments by affiliates of the broker-dealers in the Fund or other entities managed by the Investment Manager. However, the Investment Manager does not

47

**Appx. 03596**

believe that these other relationships will influence the choice of brokers and dealers who execute trades for the Master Fund.

Research-related goods and services provided by brokers and dealers through which portfolio transactions for the Master Fund are executed, settled and cleared may include research reports on particular industries and companies, economic surveys and analyses, recommendations as to specific securities, certain research services, and other goods and services providing lawful and appropriate assistance to the Investment Manager in the performance of investment decision-making responsibilities on behalf of the Master Fund and related accounts (collectively, "*soft dollar items*").

Soft dollar items may be provided directly by brokers and dealers, by third parties at the direction of brokers and dealers or purchased on behalf of the Master Fund with credits or rebates provided by brokers and dealers. Soft dollar items may arise from over-the-counter principal transactions, as well as exchange traded agency transactions. Brokers and dealers sometimes suggest a level of business they would like to receive in return for the various services they provide. Actual business received by any broker or dealer may be less than the suggested allocations, but can (and often does) exceed the suggestions, because total transaction volume is allocated on the basis of all the considerations described above. A broker or dealer will not be excluded from executing transactions for the Master Fund because it has not been identified as providing soft dollar items.

The use of commissions or "soft dollars" if any, generated by the Master Fund through agency and certain riskless principal transactions to pay for research and research-related products or services, if any, will fall within the safe harbor created by Section 28(e) of the Securities Exchange Act of 1934, as amended. Under Section 28(e), research products or services obtained with soft dollars generated by the Master Fund may be used by the Investment Manager to service accounts other than the Master Fund. Soft dollars generated in respect of futures, currency and derivatives transactions and principal transactions (that are not riskless principal transactions) do not generally fall within the safe harbor created by Section 28(e) and will be utilized only with respect to research-related products and services for the benefit of the account generating such soft dollars.

Research and brokerage products and services may be used by the Investment Manager in servicing some or all of the Investment Manager's clients. In addition, some research and brokerage may not be used by the Investment Manager in servicing the clients whose commission dollars provided for the research or brokerage. Clients may not, in any particular instance, be the direct or indirect beneficiaries of the research or brokerage provided. Certain clients, who are the beneficiaries of research or brokerage, may have an investment style which results in the generation of a small amount of brokerage commissions due to a lack of active trading for their accounts. As a result, clients who generate sizeable commissions subsidize research or brokerage provided to clients whose accounts generate minimal brokerage commissions since the commission dollars generated by transactions for such clients are not sufficient to pay for research or brokerage that may be received by such clients from other brokers.

In selecting broker-dealers on the basis of the foregoing factors, the Investment Manager may pay a brokerage commission in excess of that which another broker might have charged for effecting the same transaction. In connection therewith, the Investment Manager will make a good faith determination that the amount of commission is reasonable in relation to the value of the research or brokerage services received, viewed in terms of either the specific transaction or the Investment Manager's overall responsibility to its clients. The Investment Manager will regularly evaluate the placement of brokerage services and the reasonableness of commissions paid. Research received from brokers will be

supplemental to the Investment Manager's own research efforts.  While the receipt of research will not reduce the Investment Manager's normal research activities, the Investment Manager's expenses could increase materially if it attempted to generate such additional research or brokerage services through its own staff, and the Management Fee will not be reduced as a consequence of the receipt of such research or brokerage services or products.  As such, the Investment Manager's arrangements for the receipt of research and brokerage services from brokers may create a conflict of interest, in that the Investment Manager may have an incentive to choose a broker-dealer that provides research and brokerage services, instead of one that does not but charges a lower commission rate.  In some instances, the Investment Manager receives products and services that may be used for both research and non-research purposes. In such instances, the Investment Manager will make a good faith effort to determine the relative proportion of the products and services used to assist the Investment Manager in carrying out its investment decision-making responsibilities or order execution, including research and brokerage, and the relative proportion used for administrative or other non-research purposes.  The proportionate amount of the research attributable to assisting the Investment Manager in carrying out its investment decision-making responsibilities or order execution will be paid through brokerage commissions generated by the Master Fund's and other client's transactions; the proportionate amount attributable to administrative or other non-research purposes will be paid for by the Investment Manager from its own resources.  The receipt of "mixed-use" research and the determination of the appropriate allocation may result in a potential conflict of interest between the Investment Manager and its clients, including the Master Fund.

## Custody

The majority of the Master Fund's securities are held in the custody of its prime brokers.  The Master Fund is eligible for insurance coverage against loss with respect to assets held in the custody of the prime brokers in the event of the bankruptcy or liquidation of either of the prime brokers to the same extent as that broker's other customers.  The Master Fund's and the Fund's cash may be held at banks as well as the prime brokers.  Ownership interests which are not represented by certificates generally will be recorded through book-entry systems maintained by the issuer or its agent, and the underlying documentation relating to the acquisition and disposition of these assets for the account of the Master Fund will be held at the business offices of the Investment Manager.

Appx. 03598

# TAX CONSIDERATIONS

**Introduction**

The following is a summary of certain aspects of the U.S. federal income taxation of the Fund and its Limited Partners arising from the purchase, ownership and disposition of an Interest that should be considered by a prospective Limited Partner. The Fund has not sought a ruling from the Service or any similar state, local or foreign authority with respect to any of the tax issues affecting Limited Partners or the Fund, nor has it obtained an opinion of counsel with respect to any U.S. federal, state, local or foreign tax issues.

This summary is based on the Code, the U.S. Treasury regulations promulgated under the Code (the "***Treasury Regulations***"), judicial decisions, administrative rulings, and state and local tax laws in force on the date of this Memorandum, all of which are subject to change (possibly with retroactive effect). Changes in existing laws or regulations and their interpretation may occur after the date of this Memorandum and could alter the income tax consequences of an investment in the Fund. This discussion does not address all of the tax consequences that may be relevant to a particular investor, nor does it address, unless specifically indicated, the tax consequences to, among others (i) persons that may be subject to special treatment under U.S. federal income tax law, including, but not limited to, banks, insurance companies, thrift institutions, regulated investment companies, real estate investment trusts and dealers in securities or currencies, (ii) persons that will hold Interests as part of a position in a "straddle" or as part of a "hedging," "conversion" or other integrated investment transaction for U.S. federal income tax purposes, (iii) persons whose functional currency is not the U.S. dollar or (iv) persons that do not hold Interests as capital assets within the meaning of Code Section 1221.

Further, this summary does not address the tax considerations relevant to an investment in the Fund by a person that is not a "United States person" as defined in Section 7701(a)(30) of the Code because this summary assumes that all such persons will invest in the Offshore Fund.

If a partnership holds an Interest in the Fund, the tax treatment of a partner in such partnership will generally depend upon the status of the partner and the activities of the Fund. Prospective investors who are partners of a partnership should consult their own tax advisors.

Unless otherwise expressly provided herein, this discussion does not address possible state, local or foreign tax consequences of the purchase, ownership or disposition of Interests, some or all of which may be material to particular investors. This discussion also does not address the potential application of the U.S. federal alternative minimum tax ("***AMT***") to the Limited Partners. There is uncertainty concerning certain tax aspects of the Fund, and there can be no assurance that the Service will not challenge the positions taken by the Fund.

**THE TAX CONSEQUENCES OF AN INVESTMENT IN THE FUND ARE PARTICULARLY COMPLEX. ACCORDINGLY, PROSPECTIVE INVESTORS SHOULD NOT CONSIDER THIS DISCUSSION AS A SUBSTITUTE FOR CAREFUL TAX PLANNING. PROSPECTIVE INVESTORS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS, ATTORNEYS OR ACCOUNTANTS ON MATTERS RELATING TO AN INVESTMENT IN THE FUND WITH SPECIAL REFERENCE TO SUCH INVESTOR'S PARTICULAR SITUATION.**

Appx. 03599

**Certain United States Taxation Matters**

<u>U.S. Entity Classification of the Fund</u>

The General Partner believes that, under the provisions of the Code and the Treasury Regulations as currently in effect, each of the Fund and the Master Fund should be treated for U.S. federal income tax purposes as a partnership and not as an association taxable as a corporation.

Certain "publicly traded partnerships" are treated as associations that are taxable as corporations for U.S. federal income tax purposes. A publicly traded partnership is any partnership the interests in which are traded on an established securities market or which are readily tradable on a secondary market (or the substantial equivalent thereof). Interests in the Fund are not and will not be traded on an established securities market. Treasury Regulations concerning the classification of partnerships as publicly traded partnerships provide certain safe harbors under which interests in a partnership will not be considered readily tradable on a secondary market (or the substantial equivalent thereof). The General Partner believes that the Fund may qualify for an exemption from the publicly traded partnership rules, although there is no assurance that the Fund will so qualify.

The remainder of this discussion assumes that the Fund and the Master Fund will each be treated as a partnership for U.S. federal income tax purposes and not as a publicly-traded partnership treated as an association that is taxable as a corporation. Unless the context requires otherwise, references to the Fund in the following discussion include the Master Fund.

<u>Taxation of the Master Fund</u>

The Government of the Cayman Islands will not, under existing legislation, impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Master Fund or the limited partners of the Master Fund. Interest, dividends and gains payable to the Master Fund and all distributions by the Master Fund to its limited partners will be received free of any Cayman Islands income or withholding taxes. The Master Fund has registered as an exempted limited partnership under Cayman Islands law and the Master Fund has received an undertaking from the Governor in Cabinet of the Cayman Islands to the effect that, for a period of 50 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits or income or gains or appreciations shall apply to the Master Fund or to any partner thereof in respect of the operations or assets of the Master Fund or the interest of a partner therein; and may further provide that any such taxes or any tax in the nature of estate duty or inheritance tax shall not be payable in respect of the obligations of the Master Fund or the interests of the partners therein. The Cayman Islands are not party to a double tax treaty with any country that is applicable to any payments made to or by the Master Fund.

<u>U.S. Federal Income Taxation of the Fund and Partners Generally</u>

As a partnership, the Fund will not be subject to U.S. federal income tax. Each Limited Partner otherwise subject to tax will be required to report separately on its U.S. federal income tax return its distributive share of the Fund's net long-term capital gain or loss, net short-term capital gain or loss, and net ordinary income and deductions and credits in accordance with the allocations set forth in the Partnership Agreement. Each Limited Partner will be liable for any taxes owed upon its distributive share of the income or gains realized by the Fund, and may claim deductions for its distributive share of the Fund's losses and deductions and credits for its distributive share of the Fund's credits, to the extent allowed under the Code. Each Limited Partner will be taxed on its distributive share of the Fund's

taxable income and gain regardless of whether it has received or will receive a distribution from the Fund.  Consequently, a Limited Partner may be subject to tax with respect to its share of the taxable income of the Fund for a taxable year and may not receive a corresponding distribution of cash from the Fund in such year with which to satisfy its tax liability in respect of such taxable income.

The Fund will file an annual partnership information return with the Service that reports the results of its operations for the taxable year, and will distribute annually to each Limited Partner a form showing its distributive share of the Fund's items of income, gain, loss, deduction or credit.  The General Partner will have the authority to decide how to report these items on the Fund's tax returns, and all Limited Partners will be required under the Partnership Agreement to treat the items consistently on their own returns.  Under current law, an audit by the Service of the tax treatment of the Fund's income and deductions generally will be determined at the Fund level in a single proceeding rather than by individual audits of the Limited Partners.  For tax years beginning before January 1, 2018 (and absent an election by the Fund to apply the new partnership tax audit rules described in more detail below), the administrative proceeding is managed by the "*Tax Matters Partner*." For tax years beginning on or after January 1, 2018 (or in the case of an election by the Fund to apply the new partnership tax audit rules), the Fund will be required to appoint one person as the "*Partnership Representative*" to act on its behalf in connection with an audit by the Service and related proceedings. Pursuant to the Partnership Agreement, the General Partner or its delegate will be designated as the Tax Matters Partner and/or the Partnership Representative. The Partnership Representative's actions, including the Partnership Representative's agreement to adjustments of the Fund's income in settlement of an audit by the Service of the Fund, will bind all Limited Partners, and opt-out rights available to certain Limited Partners in connection with certain actions of the Tax Matters Partner under the current partnership tax audit rules for tax years beginning before January 1, 2018 will no longer be available.

In certain cases, the Fund may be required to file a statement with the Service, disclosing one or more positions taken on its tax return, generally where the tax law is uncertain or a position lacks clear authority.  All Partners are required under the Code to treat the partnership items consistently on their own returns, unless they file a statement with the Service disclosing the inconsistency.  Given the uncertainty and complexity of the tax laws, it is possible that the Service may not agree with the manner in which the Fund's items have been reported.

Under the Partnership Agreement, for U.S. federal income tax purposes, the General Partner has the discretion to allocate specially an amount of the Fund's net gains or net losses (or items of gross income or losses or deduction) to a withdrawing Partner to the extent that the Partner's Capital Account differs either positively or negatively from its U.S. federal income tax basis in its Interest.  There can be no assurance that, if the General Partner makes such a special allocation, the Service will accept such allocation.  If such allocation is successfully challenged by the Service, the Fund's allocations to the remaining Partners would be affected as well.

The Fund expects to act as a trader or an investor, and not as a dealer, with respect to its securities transactions.  Generally, the gains and losses realized by a trader or an investor on the sale of securities are capital gains and losses.  Thus, the Fund expects that its gains and losses from its securities transactions typically will be capital gains and capital losses.  These capital gains and losses may be long-term or short-term depending, in general, upon the length of time the Fund maintains a particular investment position and, in some cases, upon the nature of the transaction.  An investment held for more than one year generally will be eligible for long-term capital gain or loss treatment. The Fund may also realize income from dividends, which will generally be taxed at either ordinary income rates or, if they are eligible for treatment as "qualified dividend income," at applicable long-term capital gains rates.

**Appx. 03601**

Dividends from Argentine corporations are generally expected to be treated as "qualified dividend income" only to the extent that the stock for which the dividend is paid is readily tradable on an established securities market in the United States. Limited Partners should consult with their own tax advisors to determine the tax rates applicable to them in their particular tax situations.

In addition, individuals with "modified adjusted gross income" that exceeds certain thresholds (e.g., $250,000 for married individuals filing jointly and $200,000 for single individuals) are subject to a Medicare tax of 3.8% on the lesser of: (i) their investment income, net of deductions properly allocable to such income, and (ii) the excess of their "modified adjusted gross income" above the applicable threshold. It is expected that most or all of the Fund's income will be treated as investment income for this purpose, and as a result Limited Partners receiving allocations of income from the Fund for these taxable years may be subject to this tax. This tax will be in addition to any U.S. federal income tax imposed on Limited Partners with respect to their allocable share of income of the Fund. Trusts and estates also may be subject to this additional tax. Prospective investors should consult their own tax advisors regarding the application of this Medicare tax to their investment in the Fund.

The Fund may be involved in a variety of hedging transactions to reduce the risk of changes in value in the Fund's investments. Special rules may apply to determine the tax treatment of such hedging transactions, which may affect the Fund's holding period attributable to such property, the characterization of gain or loss as ordinary or capital and, if capital, as long-term or short-term, and the timing of the realization of gains or losses on the actual or deemed sale of the property, including, in some cases, property owned by a Limited Partner outside of the Fund. For instance, gain or loss from a short sale of property generally will be considered as capital gain or loss to the extent the property used to close the short sale constitutes a capital asset in the Fund's hands. Except with respect to certain situations where the property used by the Fund to close a short sale has a long-term holding period on the date of the short sale, gains on short sales will be treated as short-term capital gains. These rules also may terminate the running of the holding period of "substantially identical property" held by the Fund. Moreover, a loss on a short sale will be treated as a long-term capital loss if, on the date of the short sale, "substantially identical property" has been held by the Fund for more than one year. Certain hedging transactions also may cause a constructive sale of the Fund's long position that is the subject of the hedge.

Special "mark to market" rules apply to the Fund's investment in "Section 1256 Contracts." Section 1256 Contracts include certain regulated futures contracts, certain foreign currency forward contracts and certain options contracts. Capital gains and losses from qualifying Section 1256 Contracts generally are characterized as short-term capital gains or losses to the extent of 40% thereof and as long-term capital gains or losses to the extent of 60% thereof.

The Fund may derive ordinary interest income and dividends on securities, and may be required to recognize income in respect of certain securities prior to receipt of any payment in respect of such securities. For instance, the Fund may hold debt obligations with "original issue discount." In such case, the Fund will be required to include a portion of such discount in its taxable income on a current basis, and allocate such income to the Limited Partners, even though receipt of such amounts by the Fund may occur in a subsequent tax year. The Fund also may acquire debt obligations with "market discount." Upon disposition of such an obligation, which might include the receipt of securities of the issuer in a recapitalization exchange, the Fund generally will be required to treat any gain realized (and required to be recognized) as ordinary interest income to the extent of the market discount that accrued during the period the debt obligation was held by the Fund. Recapitalization exchanges involving

securities held by the Fund also may result in the recognition of taxable gains prior to the receipt of cash or readily tradable property.

If the Fund is treated as a trader, it may, in its discretion, make an election under Code section 475(f) to apply a mark to market system of recognizing unrealized gains and losses on securities as if the securities were sold for fair market value at the close of any taxable year of the Fund. The amount recognized when gain or loss is subsequently realized would be adjusted for amounts recognized in marking to market. The election would apply with respect to securities held in connection with the Fund's trade or business as a trader in securities. The election would not apply to any securities with respect to which the Fund could demonstrate, to the satisfaction of the Service, that they are held for investment. In the event that the Fund makes such an election, the Fund's gains and losses from marking securities to market (and gain or loss recognized before the end of the taxable year with respect to any security that would have been marked to market) would be treated as ordinary income and losses. The rules relating to appreciated financial positions under Code section 1259 and wash sales under Code section 1091 would not apply to the securities to which the election applies and the Code section 1092 straddle rules would not have any effect where all the offsetting positions of a straddle are marked to market.

The Fund may be required to purchase foreign currency with which to make its investments and may receive foreign currency when a security is sold or when an interest payment is made on a security. These transactions may give rise to gains and losses because of fluctuations in the value of the foreign currency relative to the U.S. dollar during the Fund's holding period of an investment. Foreign currency gain or loss in respect of certain types of transactions must be accounted for separately, apart from any gain or loss on the underlying transaction, and the Code contains special rules which treat, in most circumstances, such gains and losses as ordinary income or losses rather than capital gains or losses.

The U.S. federal income tax treatment of the Fund's investment in swaps or other derivatives is subject to significant uncertainty and depends in large part on the terms of the specific swap or other derivative. In particular, it is possible that the Fund may enter into so-called "bullet swaps" or other swaps that provide for non-periodic payments. In certain circumstances, income from a swap can be treated as ordinary income and not capital gain if the swap is treated as a "constructive ownership transaction" under Code section 1260. The Fund intends to take positions that are reasonable under the law that provide for optimal tax treatment of the Limited Partners. However, there can be no assurance that the Service or a court would agree with the Fund's position. Moreover, the Service might take the contrary position that the Fund is subject to U.S. federal income tax in respect of some or all of the income earned from the swap investments on the theory that the Fund should be treated as the owner for U.S. federal income tax purposes of the property underlying certain swaps, in which case the after-tax return on the swap investments could be significantly reduced.

Pursuant to various "anti-deferral" provisions of the Code (*e.g.*, the "Subpart F" and "passive foreign investment company" provisions), any investments by the Fund in certain foreign corporations may cause a Limited Partner to (i) recognize taxable income prior to the Fund's receipt of distributable proceeds, (ii) pay an interest charge on receipts that are deemed as having been deferred, (iii) recognize ordinary income that, but for the "anti-deferral" provisions, would have been treated as long-term or short-term capital gain, or (iv) become subject to certain reporting requirements with respect to such investments. There can be no assurance that the General Partner or the Fund will mitigate, or be able to mitigate, the application of these provisions, or provide certain information with respect to such foreign corporations or such filing requirements. Potential investors are advised to consult with their own tax

advisors with respect to the application of these "anti-deferral provisions" in their particular circumstances.

Under the Partnership Agreement, the General Partner has the authority to elect on behalf of the Fund, under Code section 754, to adjust the tax basis of the Fund's assets in connection with certain distributions to Limited Partners or certain transfers of Interests. Such an election, if made, could affect the amount of a Limited Partner's distributive share of the gain or loss recognized by the Fund upon the disposition of its assets. Because of the complexity and additional expense involved in making a section 754 election, the General Partner has no present intention to make such election on behalf of the Fund.

Prospective investors that are subject to the AMT should consider the tax consequences of an investment in the Fund in view of their AMT position, taking into account the special rules that apply in computing the AMT.

<u>Taxation of Distributions and Withdrawals</u>

Cash nonliquidating distributions and withdrawals, to the extent they do not exceed a Limited Partner's basis in its Interest, will not result in taxable income to that Limited Partner, but will reduce its tax basis in its Interest by the amount distributed or withdrawn. Cash distributed to a Limited Partner in excess of the basis of its Interest is generally taxable as capital gain. Conversely, if the cash distributed by the Fund to a Partner for any year exceeds the taxable income of the Fund allocated to such Partner for that year, the excess will be treated as a return of capital for U.S. federal income tax purposes to the extent of a Limited Partner's tax basis in its Interest. To the extent that cash distributions are treated as a return of capital and to the extent that any tax losses are allocated to the Limited Partners, the tax bases of the Limited Partners in their Interests will be reduced (but not below zero). Because of such basis adjustments, any tax that is avoided in the early years of a Limited Partner's investment in the Fund may become due later through the realization of gain upon the sale of assets of the Fund, the liquidation of the Fund or the sale of Interests.

Prospective Limited Partners should be aware that a Limited Partner's share of the taxable income of the Fund for any year may exceed the amount of cash distributed to such Limited Partner for that year, which may require that the Limited Partner make an out-of-pocket expenditure to cover its tax liability. Conversely, if the cash distributed by the Fund to a Partner for any year exceeds the taxable income of the Fund allocated to such Partner for that year, the excess will be treated as a return of capital for U.S. federal income tax purposes to the extent of a Limited Partner's tax basis of its Interest. To the extent that cash distributions are treated as a return of capital and to the extent that any tax losses are allocated to the Limited Partners, the tax bases of the Limited Partners in their Interests will be reduced (but not below zero). Because of such basis adjustments, any tax that is avoided in the early years of a Limited Partner's investment in the Fund may become due later through the realization of gain upon the sale of assets of the Fund, the liquidation of the Fund or the sale of Interests.

The Fund's ability to make cash distributions to a withdrawing Limited Partner or to the Partners, if applicable, may be limited by, among other things, the terms of the investment leverage entered into by the Fund for the purpose of making portfolio investments on a leveraged basis.

Upon the withdrawal of a Limited Partner receiving a cash liquidating distribution from the Fund, such Limited Partner generally will recognize capital gain or loss to the extent of the difference between the proceeds received by the withdrawing Limited Partner and such Partner's adjusted tax basis in its Interest. Such capital gain or loss will be short-term or long-term depending upon the Partner's holding

Appx. 03604

period (or holding periods) for its Interest. However, a withdrawing Limited Partner will recognize ordinary income to the extent such Partner's allocable share of the Fund's "unrealized receivables" exceeds the Partner's basis in such unrealized receivables (as determined pursuant to the Treasury Regulations). For these purposes, accrued but untaxed market discount, if any, on securities held by the Fund will be treated as an unrealized receivable, with respect to which a withdrawing Partner would recognize ordinary income.

Distributions of property other than cash, whether in complete or partial liquidation of a Limited Partner's Interest, generally will not result in the recognition of taxable income or loss to the Limited Partner (except to the extent such distribution is treated as made in exchange for such Limited Partner's share of the Fund's unrealized receivables). However, a distribution of marketable securities will be treated as a distribution of cash (which, as described above, can require the recognition of gain by the recipient Limited Partner), unless the distributing partnership is an "investment partnership" and the recipient is an "eligible partner" as defined in Code section 731(c). Although the General Partner cannot provide any assurances of whether the Fund is an "investment partnership" for these purposes, the General Partner anticipates that the Fund should qualify as an "investment partnership." Thus, if a Limited Partner is an "eligible partner," which term should include a Limited Partner whose sole contributions to the Fund consisted of cash, a distribution of marketable securities to such Limited Partner should not require the recognition of gain by such Limited Partner.

As discussed above, under the Partnership Agreement, the General Partner has the discretion to allocate specially an amount of the Fund's net gains or net losses (or items of gross income or losses or deductions) for U.S. federal income tax purposes to a withdrawing Partner to the extent that the Partner's capital account differs from its U.S. federal income tax basis in its Interest. Such a special allocation may result in the withdrawing Partner recognizing more or less taxable income, which may include short-term gain, in the Partner's last taxable year in the Fund, thereby reducing, or increasing, as applicable, the amount of long-term capital gain recognized during the tax year in which it receives its liquidating distribution upon withdrawal. In certain circumstances, special allocations of net gains (or items of income or gain) to a withdrawing Partner may result in a greater allocation of losses, or a lower allocation of taxable income or gain, to the remaining Partners. Likewise, special allocations of net losses (or items of expense, loss or deduction) to a withdrawing Partner may result in a greater allocation of taxable income or gain, or a lower allocation of losses, to the remaining Partners.

Assuming the Fund has not made an election pursuant to Code Section 754 and the General Partner does not exercise its discretion to specially allocate losses to a withdrawing Limited Partner, distributions of property or cash by the Fund to a Limited Partner in redemption of its Interest in certain circumstances where the Fund has a substantial built-in loss may require the Fund to reduce the tax basis of its remaining property.

<u>Limitations on Losses, Deductions and Credits</u>

Limited Partners who are individuals or which are certain types of corporations may be limited in their ability to deduct expenses or losses of the Fund. For instance, if or to the extent that the Fund's operations do not constitute a "trade or business" within the meaning of Section 162 and other provisions of the Code, an individual Limited Partner's distributive share of the Fund's expenses (including any amounts that are treated for tax purposes as expenses of the Fund, such as the Management Fee) would be deductible only as itemized deductions, subject to the limitations of Sections 67 and 68 of the Code. In this regard, if all or a portion of the Performance Allocation to the Special Limited Partner were re-characterized for tax purposes as an expense of the Fund, each non-corporate Limited Partner's share of

**Appx. 03605**

such expense could be subject to such limitations. Itemized deductions are non-deductible in computing such Limited Partner's AMT income and AMT liability.

Further, income, gains and losses of the Fund generally will not be treated as passive income or losses for purposes of the passive activity loss limitations of Section 469 of the Code. Accordingly, individuals, personal service corporations and certain closely-held corporations that have passive activity losses from other activities are restricted in their ability to use such losses to offset income and gains from the Fund, although losses of the Fund will not be subject to the passive activity loss limitation.

For each taxable year, Section 1277 of the Code limits the deduction of the portion of any interest expense on indebtedness incurred by a taxpayer to purchase or carry a security with market discount which exceeds the amount of interest (including original issue discount) includible in the taxpayer's gross income for such taxable year with respect to such security ("***Net Interest Expense***"). Net Interest Expense in any taxable year is deductible only to the extent it exceeds the amount of market discount which accrued on the security during the taxable year or portion of the taxable year during which the taxpayer held the security. Net Interest Expense that is non-deductible under the rules described above is carried forward and deducted in the year in which the taxpayer disposes of the security. Alternatively, at the taxpayer's election, such Net Interest Expense can be carried forward and deducted in a year prior to the disposition of the security, if any, in which the taxpayer has net interest income from the security.

Section 1277 would apply to a Limited Partner's share of the Fund's Net Interest Expense attributable to a security held by the Fund (through the Master Fund) with market discount. In such case, a Limited Partner would be denied a current deduction for all or part of that portion of its distributive share of the Fund's ordinary losses attributable to such Net Interest Expense and such losses would be carried forward to future years, in each case as described above. Although no guidance has been issued regarding the election to deduct previously disallowed Net Interest Expense prior to the year of disposition of the bond, it appears that the election would be made by the Fund rather than by the Limited Partner. Section 1277 would also apply to the portion of interest paid by a Limited Partner on money borrowed to finance its investment in the Fund to the extent such interest was allocable to securities held by the Fund (through the Master Fund) with market discount.

The ability of a non-corporate Limited Partner to deduct its share of the Fund's ordinary losses attributable to interest and certain short sale expenses may be subject to the "investment interest limitation" under Section 163(d) of the Code. In general, a non-corporate taxpayer's investment interest (including interest and certain short sale expenses) in the current year is not deductible to the extent it exceeds its "net investment income", consisting of net gain and ordinary income derived from investments in the current year less certain directly connected expenses (other than interest or short sale expenses). For this purpose, any long-term capital gain is excluded from net investment income unless the taxpayer elects to pay tax on such amount at ordinary income tax rates. The Fund's activities are expected to be treated as giving rise to investment income for a Limited Partner, and the investment interest limitation would apply to a non-corporate Limited Partner's share of the interest and short sale expenses attributable to the Fund's operation. Accordingly, a non-corporate Limited Partner would be denied a deduction for all or a part of its distributive share of the Fund's ordinary losses attributable to interest and short sale expenses unless it has sufficient investment income from all sources, including the Fund. Any amount not deductible as a result of the applicability of Section 163(d) may be carried forward to future years, subject to certain limitations.

Limited Partners may be entitled to a foreign tax credit with respect to creditable foreign taxes paid on the income and gains of the Fund. There are complex rules contained in the Code that may,

depending on each Limited Partner's particular circumstances, limit the availability or use of foreign tax credits. For example, a Limited Partner's share of gain realized by the Fund will generally be treated as U.S. source income. Consequently, a Limited Partner may not be able to use the foreign tax credit relating to foreign taxes, if any, imposed on such gains unless such credit can be applied against the U.S. tax due on other income derived from foreign sources. Limited Partners should contact their own tax advisors with respect to the availability of any foreign tax credits.

The consequences of these limitations will vary depending upon the particular tax situation of each taxpayer. Accordingly, non-corporate Limited Partners should consult their tax advisors with respect to the application of these limitations.

The Fund may incur certain expenses in connection with its organization and the marketing of its Interests. Amounts paid or incurred to organize a partnership are not deductible, but generally may, by election of the Fund, be capitalized and amortized for U.S. federal income tax purposes over a period of not less than 180 months. Amounts paid or incurred to market interests in the Fund that qualify as "syndication expenses" are not deductible or amortizable.

Tax Consequences for Tax-Exempt U.S. Investors

A Limited Partner that is an organization exempt from tax under Code section 501(a) (a "***Tax-Exempt U.S. Investor***") will be subject to tax on its allocable share of the Fund's income that is considered to be "unrelated business taxable income" ("***UBTI***") as defined in Code section 512, and may be subject to the AMT with respect to items of tax preference which enter into the computation of UBTI. Code section 512(b) provides that UBTI generally does not include dividends, interest, and gain or loss from the disposition of property other than stock in trade or property held for sale in the ordinary course of the unrelated trade or business. The Fund may invest in entities that are treated as partnerships or other pass-through entities. UBTI generated by such entities would generally flow up to Tax-Exempt U.S. Investors, causing the realization of UBTI by such investors. A Tax-Exempt U.S. Investor should not realize UBTI to the extent that its distributive share of the Fund's income consists of dividends, interest, capital gains and certain other items which are excluded from UBTI under Code section 512(b) (except to the extent any such income constitutes "UDFI," as discussed in the next paragraph). Prospective Tax-Exempt U.S. Investors should be aware that it is unclear under current law whether income from certain swaps or derivative transactions that the Fund may invest or hold a position in, may be excluded from UBTI.

A Tax-Exempt U.S. Investor is also subject to tax with respect to its, and its allocable share of the Fund's, "unrelated debt-financed income" pursuant to Code section 514 ("***UDFI***"). In general, UDFI consists of (i) income derived by a tax-exempt organization (directly or through a partnership) from income-producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year and (ii) gains derived by a tax-exempt organization (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness." In addition, a tax-exempt organization that borrows money to finance its investment in the Fund would be subject to tax on the portion of its income that is UDFI. Income and gains derived by a tax-exempt organization from the ownership and sale of debt-financed property is taxable in the proportion to which such property is financed by acquisition indebtedness during the relevant period of time. For these purposes, a Limited Partner is deemed to own a proportionate share of the Fund's debt-financed property and the income attributable thereto, and a short sale of publicly traded stock will not create "acquisition indebtedness" unless the Fund borrows funds to post collateral against such short sale.

58

Appx. 03607

The Fund expects to generate income attributable to debt-financed property which will be attributed to the Partners, including any Tax-Exempt U.S. Investors. A Tax-Exempt U.S. Investor's share of the Fund's income that is treated as UBTI may be significant (depending upon the degree of leverage utilized by the Fund). In addition to other relevant considerations, fiduciaries of employee pension trusts and other prospective tax-exempt investors should consider the consequences of realizing UBTI in making a decision whether to invest in the Fund.

***We urge prospective Tax-Exempt U.S. Investors that are sensitive to UBTI or UDFI to consult their tax advisors as to the tax consequences of investing in the Fund and as to the comparative tax treatment of an investment in the Offshore Fund.***

Investor Tax Filings and Record Retention.

The U.S. Department of the Treasury has adopted Treasury Regulations designed to assist the Service in identifying abusive tax shelter transactions. In general, the Treasury Regulations require investors in specified transactions (including certain investors in partnerships that engage in such transactions) to satisfy certain special tax filing and record retention requirements. Significant monetary penalties may be applicable as a result of a failure to comply with these tax filing and record retention rules.

The Treasury Regulations are broad in scope and it is conceivable that the Fund may enter into transactions that will subject the Fund and certain Limited Partners to the special tax filing and record retention rules. Additionally, a Limited Partner's recognition of a loss on its disposition of its Interest in the Fund could in certain circumstances subject such Limited Partner to these rules.

Reporting Under FATCA.

Sections 1471 through 1474 of the Code, known as the U.S. Foreign Account Tax Compliance Act (together with any regulations, rules and other guidance implementing such Code sections and any applicable intergovernmental agreement ("***IGA***") or information exchange agreement and related statutes, regulations, rules and other guidance thereunder, "***FATCA***") impose a withholding tax of 30% on (i) certain U.S. source interest, dividends and other types of income, and (ii) the gross proceeds from the sale or disposition of certain assets of a type that can produce U.S. source interest and dividends, which are received by a foreign financial institution ("***FFI***"), unless such FFI enters into an agreement with the Service (an "***FFI Agreement***"), and/or complies with an applicable IGA, to obtain certain information as to the identity of the direct and indirect owners of accounts in such institution. In addition, a withholding tax may be imposed on payments to certain non-financial foreign entities that do not obtain and provide information as to their direct and indirect owners. These rules generally apply to payments of U.S. source interest, dividends and certain other types of income from U.S. sources and, after December 31, 2018, are expected to apply to payments of gross proceeds from the sale or disposition of assets of a type that can produce U.S. source interest or dividends.

The Service has released temporary and final Treasury Regulations and other guidance that will be used in implementing FATCA, which contain a number of phase-in dates for FATCA compliance. In addition, the Cayman Islands has entered into a Model 1 IGA with the United States (the "***Cayman-U.S. IGA***"), which is treated as in effect, and has issued the Tax Information Authority (International Tax Compliance) (United States of America) Regulations 2014 and guidance notes thereunder, each as updated from time to time.

The Master Fund is likely to be considered an FFI. In order to avoid incurring U.S. withholding under FATCA, the Master Fund is generally required to register with the Service and to comply with the Cayman-U.S. IGA and any guidance thereunder. The Master Fund expects to register with the Service and expects to comply with the Cayman-U.S. IGA and, therefore, generally does not expect to become subject to U.S. withholding under FATCA.

In addition, the Fund may be required to act as a withholding agent under FATCA and therefore be required to withhold on income and proceeds paid or allocated to an investor that fails to comply with FATCA, which could occur if an investor that is an FFI does not enter into an FFI Agreement, is not otherwise exempt from such withholding, and/or does not provide the appropriate information and documentation to the Fund or its agents showing its exemption from such withholding or compliance with FATCA. The General Partner intends to collect the appropriate documentation from all investors in the Fund in order to determine whether it is required to withhold under FATCA with respect to distributions or allocations made to investors.

The General Partner, the Investment Manager and the Fund reserve the right to take any action and/or pursue all remedies at their disposal to avoid withholding requirements or otherwise to mitigate the consequences of an investor's failure to comply with FATCA, including compulsory redemption or withdrawal of the investor concerned. In this regard, the General Partner, the Investment Manager and the Fund have certain rights to request, and the investors have certain obligations to provide, information and documentation that may be used by the General Partner, the Investment Manager and the Fund in complying with their obligations under FATCA. In addition, no investor affected by any action or remedy by the Fund shall have any claim against the Fund, the Administrator, the Investment Manager, the Master Fund or the General Partner (or their agents, delegates, employees, directors, officers or affiliates) for any form of damages or liability as a result of actions taken or remedies pursued by or on behalf of the Fund in order to comply with FATCA.

The Cayman Islands has also signed, along with over 80 other countries, a multilateral competent authority agreement to implement the OECD Standard for Automatic Exchange of Financial Account Information – Common Reporting Standard ("*CRS*" and together with the Cayman-U.S. IGA, "*AEOI*").

Cayman Islands regulations have been issued to give effect to the Cayman-U.S. IGA and CRS (collectively, the "*AEOI Regulations*"). Pursuant to the AEOI Regulations, the Cayman Islands Tax Information Authority (the "*TIA*") has published guidance notes on the application of the Cayman-U.S. IGA and CRS.

All Cayman Islands "Financial Institutions" are required to comply with the registration, due diligence and reporting requirements of the AEOI Regulations, unless they are able to rely on an exemption that allows them to become a "Non-Reporting Financial Institution" (as defined in the relevant AEOI Regulations) with respect to one or more of the AEOI regimes, in which case only the registration requirement would apply under CRS. The Master Fund does not propose to rely on any Non-Reporting Financial Institution exemption and therefore intends to comply with all of the requirements of the AEOI Regulations.

The AEOI Regulations require the Master Fund and/or the General Partner (as applicable) to, amongst other things (i) register with the Service to obtain a GIIN (in the context of the U.S. IGA only), (ii) register with the TIA, and thereby notify the TIA of its status as a "Reporting Financial Institution", (iii) adopt and implement written policies and procedures setting out how it will address its obligations under CRS, (iv) conduct due diligence on its accounts to identify whether any such accounts are

considered "Reportable Accounts", and (v) report information on such Reportable Accounts to the TIA. The TIA will transmit the information reported to it to the overseas fiscal authority relevant to a reportable account (e.g. the Service in the case of a US Reportable Account) annually on an automatic basis.

Investors should consult their tax advisors as to the withholding, filing and information reporting requirements that may be imposed on them in respect of their ownership of Interests.

<u>State and Local Taxes</u>

In addition to the U.S. federal income tax consequences described above, prospective investors should consider potential state and local tax consequences of an investment in the Fund. State and local laws often differ from U.S. federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit. A Partner's distributive share of the taxable income or loss of the Fund generally will be required to be included in determining its reportable income for state and local tax purposes in the jurisdiction in which it is a resident.

Limited Partners or the Fund may be subject to state and/or local franchise, withholding, income, capital gain or other tax payment obligations and filing requirements in those jurisdictions where the Fund owns real estate assets or is otherwise regarded as doing business or earning income. Credits for these taxes may not be available (or may be subject to limitations) in the jurisdictions in which Limited Partners, or the Fund, as applicable, are residents. Each potential investor is urged to consult with its own tax advisor in this regard.

***<u>Each prospective Limited Partner should consult its own tax advisor with respect to its state and local tax consequences and filing obligations as a result of an investment in the Fund.</u>***

<u>Other Taxes</u>

The Fund and its Limited Partners may be subject to other taxes, such as the AMT, and estate, inheritance or intangible property taxes that may be imposed by various domestic jurisdictions, as well as foreign withholding or gains taxes. Each prospective investor should consider the potential consequences of such taxes on an investment in the Fund. It is the responsibility of each prospective investor to satisfy itself as to, among other things, the legal and tax consequences of an investment in the Fund, under the laws of the various jurisdictions of its domicile and its residence, by obtaining advice from its own tax counsel or other advisor, and to file all appropriate tax returns that may be required.

**Other Income Taxation**

Although there can be no assurance, it is intended that the affairs of the Fund will be conducted such that the Fund will not be subject to regular income taxation in any foreign jurisdiction. However, income and gains from investments held by the Fund may be subject to withholding taxes or taxes in jurisdictions other than those described herein, subject to the possibility of reduction under applicable tax treaties. Limited Partners generally may be entitled, subject to applicable limitations, to a credit against U.S. income tax for creditable foreign income taxes paid on the foreign source income and gains of the Fund (which may not include all of the Fund's gains). The foreign tax credit rules are complex, and may, depending on each Limited Partner's particular circumstances, limit the availability or use of foreign tax credits. Prospective investors are advised to consult their own tax advisors regarding the application of the foreign tax credit rules.

**Future Tax Legislation; Necessity of Obtaining Professional Advice**

Future amendments to the Code, other legislation, new or amended Treasury Regulations, administrative rulings or decisions by the Service or judicial decisions may adversely affect the U.S. federal income tax aspects of an investment in the Fund, with or without advance notice, retroactively or prospectively. The foregoing analysis is not intended as a substitute for careful tax planning. The tax matters relating to the Fund are complex and are subject to varying interpretations. There can be no assurance that the Service will agree with each position taken by the Fund with respect to the tax treatment of Fund items and transactions. Moreover, the effect of existing income tax laws and of proposed changes in income tax laws on Limited Partners will vary with the particular circumstances of each Limited Partner and, in reviewing this Memorandum and any exhibits hereto, these matters should be considered.

Accordingly, each prospective investor must consult with and rely solely on its professional tax advisors with respect to the tax results of its investment in the Fund. In no event will the Fund, the General Partner, the Investment Manager, or their Affiliates, counsel or other professional advisors be liable to any Limited Partner for any U.S. federal, state, local or foreign tax consequences of an investment in the Fund, whether or not such consequences are as described above.

*The foregoing is a summary of some of the important tax rules and considerations affecting the Limited Partners, the Fund, and the Fund's proposed operations. This summary does not purport to be a complete analysis of all relevant tax rules and considerations, which will vary with the particular circumstances of each Limited Partner, nor does it purport to be a complete listing of all potential tax risks inherent in purchasing or holding Interests. Each prospective investor in the Fund is urged to consult its own tax advisor in order to understand fully the U.S. federal, state, local and any non-U.S. tax consequences of such an investment in its particular situation.*

Appx. 03611

# ERISA AND OTHER REGULATORY CONSIDERATIONS

## ERISA Considerations

### General

Fiduciaries and other persons who are proposing to invest in Interests on behalf of retirement plans, IRAs and other employee benefit plans ("***Plans***") covered by the U.S. Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), or the Code, must give appropriate consideration to, among other things, the role that an investment in the Fund plays in the Plan's portfolio, taking into consideration whether the investment is designed to reasonably further the Plan's purposes, the investment's risk and return factors, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the Plan, the projected return of the total portfolio relative to the Plan's objectives, the limited right of Limited Partners to withdraw all or any part of their Interests or to transfer their Interests and whether investment in the Fund constitutes a direct or indirect transaction with a party in interest (under ERISA) or a disqualified person (under the Code).

### Plan Asset Regulations and Benefit Plan Investors

The United States Department of Labor ("***DOL***") has adopted regulations that treat the assets of certain pooled investment vehicles, such as the Fund, as "plan assets" for purposes of Title I of ERISA and Section 4975 of the Code ("***Plan Assets***"). Section 3(42) of ERISA defines the term "Plan Assets" to mean plan assets as defined by such regulations as the DOL may prescribe, except that under such regulations the assets of an entity shall not be treated as Plan Assets if, immediately after the most recent acquisition of an equity interest in the entity, less than 25% of the total value of each class of equity interest in the entity is held by "Benefit Plan Investors" (the "***significant participation test***"). For purposes of this determination, the value of any equity interest held by a person (other than such a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, shall be disregarded. An entity shall be considered to hold Plan Assets only to the extent of the percentage of the equity interest held by Benefit Plan Investors. The term "Benefit Plan Investors" means any employee benefit plan subject to part 4 of subtitle B of Title I of ERISA (i.e., plans subject to the fiduciary provisions of ERISA), any plan to which the prohibited transaction provisions of Section 4975 of the Code apply (e.g., IRAs), and any entity whose underlying assets include Plan Assets by reason of a plan's investment in such entity (a "***Plan Asset Entity***").

In order to prevent the assets of the Master Fund from being considered Plan Assets under ERISA, it is the intention of the Master Fund to monitor the investments in the Master Fund and prohibit the acquisition, withdrawal or transfer of any limited partner interests of the Master Fund by any investor, including a Benefit Plan Investor, unless, after giving effect to such an acquisition, withdrawal or transfer, the total proportion of limited partner interests of each class of the Master Fund owned by Benefit Plan Investors would be less than 25% of the aggregate value of that class of limited partner interests (determined, as described above, by excluding certain limited partner interests held by the General Partner, other fiduciaries and affiliates).

Without limiting the generality of the foregoing, in order to limit equity participation in any class of limited partner interests of the Master Fund by Benefit Plan Investors to less than 25%, the Fund may require the Compulsory Withdrawal of Interests. Each Limited Partner that is an insurance company

Appx. 03612

acting on behalf of its general account or a Plan Asset Entity will be required to represent and warrant as of the date it acquires Interests the maximum percentage of such general account or Plan Asset Entity (as reasonably determined by such insurance company or Plan Asset Entity) that will constitute Plan Assets (the "***Maximum Percentage***") so such percentage can be calculated in determining the percentage of Plan Assets invested in the Master Fund. Further, each such insurance company and Plan Asset Entity will be required to covenant that if, after its initial acquisition of Interests, the Maximum Percentage is exceeded at any time, then such insurance company or Plan Asset Entity shall immediately notify the Fund of that occurrence and shall, if and as directed by the Fund, in a manner consistent with the restrictions on transfer set forth herein, withdraw or dispose of some or all of the Interests held in its general account or Plan Asset Entity.

It is anticipated that investment in the Fund by benefit plan investors may be "significant" for purposes of the regulations. In such event, the underlying assets of the Fund would be deemed to constitute "plan assets" for purposes of ERISA. As a general rule, if the assets of the Fund were regarded as "plan assets" of a benefit plan investor, the Investment Manager would be deemed a fiduciary with respect to each Plan investing in the Fund. However, the Investment Manager believes that, given the limited purpose and role of the Fund and given the requirement that the Investment Manager follow the directions of the fiduciaries of each benefit plan investor investing in the Fund, as set forth in each such investor's subscription agreement, with respect to the investment by the Fund in the Master Fund, neither the Investment Manager nor any other entity providing services to the Fund would be exercising any discretionary authority or control with respect to the Fund. Accordingly, the Investment Manager believes that neither the Investment Manager nor any other entity providing services to the Fund will act as a fiduciary (as defined in Section 3(21) of ERISA) with respect to the assets of the Fund or any benefit plan investor. Rather, the Investment Manager believes that, given the limited purpose and role of the Fund and given the requirement that the Investment Manager follow the directions of the fiduciaries of each benefit plan investor investing in the Fund, as set forth in each such investor's subscription agreement, with respect to the investment by the Fund in the Master Fund, the fiduciary of each such benefit plan investor has retained the fiduciary authority and responsibility with respect to the investor's initial and continuing investment in the Fund as though the benefit plan investor is investing directly in the Master Fund.

**Representation by Plans**

The fiduciaries of each Plan proposing to invest in the Fund will be required to represent that they have been informed of and understand the Fund's investment objectives, policies and strategies and that the decision to invest Plan Assets in the Fund is consistent with the provisions of ERISA and/or the Code that require diversification of Plan Assets and impose other fiduciary responsibilities. By its purchase, each investor will be deemed to have represented that either (a) it is not a Plan that is subject to the prohibited transaction rules of ERISA or the Code, (b) it is not an entity whose assets include Plan Assets or (c) its investment in the Fund will not constitute a non-exempt prohibited transaction under ERISA or the Code.

**Ineligible Purchasers**

Limited partner interests may not be purchased with Plan Assets if the Investment Manager, any selling agent, finder, any of their respective affiliates or any of their respective employees: (a) has investment discretion with respect to the investment of such Plan Assets; (b) has authority or responsibility to give or regularly gives investment advice with respect to such Plan Assets, for a fee, and pursuant to an agreement or understanding that such advice will serve as a primary basis for

64

investment decisions with respect to such Plan Assets and that such advice will be based on the particular investment needs of the Plan; or (c) is an employer maintaining or contributing to such Plan. A party that is described in clause (a) or (b) of the preceding sentence is a fiduciary under ERISA and the Code with respect to the Plan, and any such purchase might result in a "prohibited transaction" under ERISA and the Code.

**Plans' Reporting Obligations**

The information contained herein and in the other documentation provided to investors in connection with an investment in the Fund is intended to satisfy the alternative reporting option for "eligible indirect compensation" on Schedule C of the Form 5500, in addition to the other purposes for which such documents were created.

*Whether or not the underlying assets of the Fund are deemed Plan Assets, an investment in the Fund by a Plan is subject to ERISA and the Code. Accordingly, Plan fiduciaries should consult their own counsel as to the consequences under ERISA and the Code of an investment in the Fund. Note that similar laws governing the investment and management of the assets of governmental or non-U.S. plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code. Accordingly, fiduciaries of such governmental or non-U.S. plans, in consultation with their counsel, should consider the impact of their respective laws and regulations on an investment in the Fund.*

**Other Regulatory Matters**

Securities Act of 1933

Interests are not registered under the U.S. Securities Act of 1933, as amended (the "**Securities Act**"), or any other securities law, including state securities or blue sky laws. Interests are offered without registration in reliance upon the exemption contained in Regulation D of the Securities Act and/or rules and regulations of the Securities and Exchange Commission applicable to transactions not involving a public offering. Each investor is required, in the Fund's Subscription Documents pursuant to which such investor subscribes for an Interest, to make customary Regulation D representations.

Investment Company Act of 1940

The Fund is not registered under the U.S. Investment Company Act of 1940, as amended (the "**Investment Company Act**"), in reliance upon relief from registration afforded to collective investment vehicles whose outstanding securities are not publicly offered and are beneficially owned exclusively by investors that are considered "qualified purchasers" within the meaning of the Investment Company Act. "Qualified purchasers" generally include individuals and certain family-owned companies owning total investments in excess of $5 million and entities owning total investments in excess of $25 million. Each investor will be required to complete the Fund's Subscription Documents to enable the Fund to determine its eligibility.

Investment Adviser Registration

The Investment Manager is registered as relying adviser to Highland Capital Management, L.P., an investment adviser registered with the Securities and Exchange Commission under the U.S. Investment Advisers Act of 1940, as amended.

Appx. 03614

Commodity Exchange Act

Neither the General Partner nor the Investment Manager is required to register as a commodity pool operator ("**CPO**") or commodity trading advisor under the U.S. Commodity Exchange Act and each has filed a notice of claim effectuating exemption. As such, the General Partner and the Investment Manager will operate the Fund and the Master Fund pursuant to such exemption. Unlike a registered CPO, the General Partner and the Investment Manager are not required to deliver a disclosure document and a certified annual report to participants in the Fund. Among other things, the exemption requires the General Partner and the Investment Manager to file a claim of exemption with the National Futures Association. The Investment Manager qualifies for an exemption from registration with the CFTC as a commodity trading adviser pursuant to CFTC Rule 4.14(a)(8).

Cayman Islands Mutual Fund Law

The Offshore Fund and the Master Fund are regulated under the Mutual Funds Law (2015 Revision) of the Cayman Islands ("**Mutual Funds Law**"). The Cayman Islands Monetary Authority (the "**Authority**") has supervisory and enforcement powers to ensure compliance with the Mutual Funds Law. Regulation under the Mutual Funds Law entails the filing of prescribed details and audited accounts annually with the Authority. As a regulated mutual fund, the Authority may at any time instruct the Offshore Fund or the Master Fund to have its or their accounts audited and to submit them to the Authority within such time as the Authority specifies. Failure to comply with these requests by the Authority may result in substantial fines on the part of the directors of the Offshore Fund or the Master Fund, as applicable, and may result in the Authority applying to the court to have the Offshore Fund or the Master Fund wound up.

Neither the Offshore Fund nor the Master Fund is, however, subject to supervision in respect of their investment activities or the constitution of the Master Fund's portfolio by the Authority or any other governmental authority in the Cayman Islands, although the Authority does have power to investigate the activities of the Offshore Fund and the Master Fund in certain circumstances. Neither the Authority nor any other governmental authority in the Cayman Islands has commented upon or approved the terms or merits of this document. There is no investment compensation scheme available to investors in the Cayman Islands.

The Authority may take certain actions if it is satisfied that a regulated mutual fund is or is likely to become unable to meet its obligations as they fall due or is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors. The powers of the Authority include the power to require the substitution of the directors of the Offshore Fund or the Master Fund, to appoint a person to advise the Offshore Fund or the Master Fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of the Offshore Fund or the Master Fund, as the case may be. There are other remedies available to the Authority including the ability to apply to court for approval of other actions.

The Master Fund and the General Partner or any of its members or agents domiciled in the Cayman Islands may be compelled to provide information, subject to a request for information made by a regulatory or governmental authority or agency under applicable law; e.g. by the Cayman Islands Monetary Authority, either for itself or for a recognised overseas regulatory authority, under the Monetary Authority Law (2016 Revision), or by the Tax Information Authority, under the Tax Information Authority Law (2017 Revision) or Reporting of Savings Income Information (European Union) Law (2014 Revision) and associated regulations, agreements, arrangements and memoranda of

Appx. 03615

understanding. Disclosure of confidential information under such laws shall not be regarded as a breach of any duty of confidentiality and, in certain circumstances, the Master Fund, and the General Partner or any of its or their directors or agents, may be prohibited from disclosing that the request has been made.

<u>Anti-Money Laundering Regulations</u>

All subscriptions for Interests will be subject to applicable anti-money laundering regulations.  Investors will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act) Act of 2001 (Pub. L. No. 107-56).

As part of the Fund's responsibility to comply with regulations aimed at the prevention of money laundering, the Fund or its delegate may require verification of identity from all prospective investors.  Depending on the circumstances of each subscription, it may not be necessary to obtain full documentary evidence of identity.

The Fund reserves the right to request such information as is necessary to verify the identity of a prospective investor.  The Fund also reserves the right to request such identification evidence in respect of a transferee of Interests.  In the event of delay or failure by the prospective investor or transferee to produce any information required for verification purposes, the Fund may refuse to accept the application or (as the case may be) to register the relevant transfer and (in the case of a subscription of Interests) any funds received will be returned without interest to the account from which the monies were originally debited.

The Fund also reserves the right to refuse to make any withdrawal payment or distribution to a Limited Partner, if the Fund suspects or is advised that the payment of any withdrawal or distribution moneys to such Limited Partner might result in a breach or violation of any applicable anti-money laundering or other laws or regulations by any person in any relevant jurisdiction, or such refusal is considered necessary or appropriate to ensure the compliance by the Fund and the Investment Manager with any such laws or regulations in any relevant jurisdiction.

Appx. 03616

# EXHIBIT "D"



**Highland Capital Management Latin America, L.P.**

Highland Capital Management, L.P. (DE)

Highland Latin America LP, Ltd. (Cayman)

Directors
James Dondero
Gustavo Prilick

Trustee

Services
Agreement

Highland Latin America Trust (Cayman)

LP

Highland Latin America GP, Ltd. (Cayman)

Directors
James Dondero
Gustavo Prilick

GP

Highland Capital Management Latin America, L.P. * (Cayman)

Sub- Advisory
Agreement

Highland Latin America Consulting, Ltd. (Cayman)

Independent
Directors
Claire Kasumba
Martin Laufer

Consulting
Agreements

Argentine Consultants

*SEC Relying Adviser of Highland Capital Management, L.P.

**Appx. 03618**

## Highland Argentina Regional Opportunity Fund



# EXHIBIT "E"

**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND, L.P.**

**A Delaware Limited Partnership**

**Amended and Restated Limited Partnership Agreement**

**November 1, 2017**

208797907 v11

## NOTICE

NEITHER HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND, L.P. NOR THE LIMITED PARTNER INTERESTS THEREIN HAVE BEEN OR WILL BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "***SECURITIES ACT***"), THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED, OR THE SECURITIES LAWS OF ANY OF THE STATES OF THE UNITED STATES. THE OFFERING OF SUCH LIMITED PARTNER INTERESTS IS BEING MADE IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT FOR OFFERS AND SALES OF SECURITIES WHICH DO NOT INVOLVE ANY PUBLIC OFFERING, AND ANALOGOUS EXEMPTIONS UNDER STATE SECURITIES LAWS.

THE DELIVERY OF THIS AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR SHALL THERE BE ANY OFFER, SOLICITATION OR SALE OF LIMITED PARTNER INTERESTS IN HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND, L.P. IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OR SALE.

THE LIMITED PARTNER INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM AND MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REQUIREMENTS AND CONDITIONS SET FORTH IN THIS AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT.

i

# TABLE OF CONTENTS

**Page**

Article I DEFINITIONS ................................................................................................1

Article II ORGANIZATION.........................................................................................9
    2.1     Continuation of Limited Partnership ............................................9
    2.2     Name of Partnership ....................................................................10
    2.3     Principal Office; Registered Office.............................................10
    2.4     Term of Partnership.....................................................................11
    2.5     Object and Powers of Partnership...............................................11
    2.6     Liability of Partners ....................................................................12
    2.7     Actions by Partnership.................................................................12
    2.8     Reliance by Third Parties ............................................................12
    2.9     UCC Status of Limited Partner Interests ....................................12
    2.10   Series of Interests ........................................................................13

Article III CAPITAL....................................................................................................13
    3.1     Contributions to Capital..............................................................13
    3.2     Rights of Partners in Capital .......................................................14
    3.3     Capital Accounts .........................................................................14
    3.4     Allocation of Net Profit and Net Loss ........................................15
    3.5     Allocation of Management Fees, Withholding Taxes and Certain Other
             Expenditures ...............................................................................16
    3.6     Reserves; Adjustments for Certain Future Events ......................17
    3.7     Performance Allocation ...............................................................17
    3.8     Allocation to Avoid Capital Account Deficits ...........................18
    3.9     Allocations for U.S. Federal Income Tax Purposes ...................18
    3.10   Curative Allocations....................................................................20
    3.11   Tax Matters .................................................................................21
    3.12   Distributions................................................................................21

Article IV MANAGEMENT .........................................................................................22
    4.1     Duties and Powers of the General Partner ..................................22
    4.2     Expenses .....................................................................................23
    4.3     Rights of Limited Partners...........................................................26
    4.4     Other Activities of Partners.........................................................26
    4.5     Duty of Care; Indemnification ....................................................28

Article V ADMISSIONS, TRANSFERS AND WITHDRAWALS ...............................29
    5.1     Admission of Limited Partners ....................................................29
    5.2     Admission of Additional General Partners..................................29
    5.3     Transfer of Interests of Limited Partners ....................................29
    5.4     Transfer of Interest of the General Partner ..................................32
    5.5     Withdrawal of Interests of Partners .............................................32
    5.6     Withdrawal of Original Limited Partner ......................................36

Article VI DISSOLUTION AND LIQUIDATION........................................................36
    6.1     Dissolution of Partnership............................................................36

ii

| | | |
|---|---|---|
| 6.2 | Liquidation of Assets | 37 |
| Article VII ACCOUNTING AND VALUATION; BOOKS AND RECORDS | | 38 |
| 7.1 | Accounting and Reports | 38 |
| 7.2 | Certain Tax Matters | 38 |
| 7.3 | Valuation of Partnership Assets and Interests | 39 |
| 7.4 | Determinations by the General Partner | 39 |
| 7.5 | Books and Records | 40 |
| 7.6 | Confidentiality | 40 |
| Article VIII GENERAL PROVISIONS | | 42 |
| 8.1 | Amendment of Partnership Agreement | 42 |
| 8.2 | Special Power-of-Attorney | 44 |
| 8.3 | Notices | 45 |
| 8.4 | Agreement Binding Upon Successors and Assigns; Delegation | 45 |
| 8.5 | Governing Law | 46 |
| 8.6 | Not for Benefit of Creditors | 46 |
| 8.7 | Consents and Voting | 46 |
| 8.8 | Merger and Consolidation | 46 |
| 8.9 | Miscellaneous | 47 |
| 8.10 | BHCA Subject Persons | 47 |
| 8.11 | RIC Limited Partners | 48 |
| 8.12 | Bad Actor Limited Partners | 48 |
| 8.13 | Survival | 49 |
| 8.14 | Entire Agreement | 49 |

THIS AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT of Highland Argentina Regional Opportunity Fund, L.P. is dated effective as of November 1, 2017 by and among Highland Argentina Regional Opportunity Fund GP, LLC, as General Partner, Highland Capital Management Latin America, L.P., as withdrawing Original Limited Partner, and those Persons who are admitted as Limited Partners in accordance with this Agreement.  This Agreement amends and restates in its entirety the Limited Partnership Agreement of the Partnership dated September 11, 2017 (the "*Prior Agreement*").

## PRELIMINARY STATEMENTS

(A)   The General Partner and the Original Limited Partner formed this limited partnership under the Act by entering into the Prior Agreement and causing the Certificate to be filed with the Secretary of State of the State of Delaware.

(B)   The parties hereto desire to continue the Partnership as a limited partnership under the Act and to make certain modifications to the Prior Agreement, as hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants expressed herein and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto hereby agree that the Prior Agreement is amended and restated in its entirety to read as follows:

---

**Article I
DEFINITIONS**

---

For purposes of this Agreement:

"*Act*" means the Delaware Revised Uniform Limited Partnership Act, 6 Del. C. §§ 17-101, et seq., as in effect on the date hereof and as amended from time to time, or any successor law.

"*Administrator*" means such Person as the General Partner may designate from time to time, in its sole discretion, to serve as administrator to the Partnership.

"*Advisers Act*" means the U.S. Investment Advisers Act of 1940, as amended, and the rules promulgated thereunder.

"*Affiliate*" means, with respect to any Person, a Person which controls, is controlled by, or is under common control with, such Person.  For these purposes, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"*Affiliated Investors*" means the Investment Manager, the General Partner and their respective Affiliates, principals, employees, partners, agents, the respective family members of

1

such personnel and trusts and other entities established primarily for their benefit or for charitable purposes.

"*Agreement*" means this Amended and Restated Limited Partnership Agreement of the Partnership, as amended from time to time.

"*Authorized Representative*" has the meaning set forth in Section 7.6(a).

"*Bad Actor Limited Partner*" means a Limited Partner that (a) would cause the disqualification of the Partnership from using Rule 506 under the Securities Act due to the operation of paragraph (d) thereof (or its successor) if such Limited Partner were to beneficially own 20% or more of the outstanding voting interests of all of the Partners (excluding any other Interests that are Non-Voting Interests) or (b) the General Partner determines is likely to become subject to a conviction, order, judgment or finding that would be likely to cause the disqualification described in clause (a).

"*BBA*" means Subchapter C of Chapter 63 of the Code (Sections 6221 through 6241 of the Code), as enacted by the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, as amended from time to time, and the Regulations thereunder (whether proposed, temporary or final), including any subsequent amendments, successor provisions or other guidance thereunder, and any equivalent provisions for state, local or non-U.S. tax purposes.

"*BBA Effective Period*" means any taxable year commencing after 2017, taking into account any extensions of the effective date set forth in the BBA.

"*BHCA*" means the Bank Holding Company Act of 1956, as amended.

"*BHCA Subject Person*" means any Limited Partner that is subject, directly or indirectly, to the provisions of Section 4 of the BHCA and the regulations of the Board of Governors of the Federal Reserve System promulgated thereunder.

"*Business Day*" means any day or days on which banks in the Cayman Islands, Buenos Aires and New York City are authorized to open for business or such other days as the General Partner may determine generally, or in any particular case.

"*Capital Account*" means, with respect to each Partner, the capital account (including any memorandum sub-accounts) established and maintained on behalf of such Partner as described in Section 3.3.

"*Capital Sub-Account*" means, with respect to each Investor, a separate capital sub-account within the Partnership's or the Offshore Fund's (or any Other Feeder Fund's) capital account, as applicable, in the Master Fund that corresponds to such Investor's Capital Account in the Partnership or the series of shares held by such Investor in the Offshore Fund (or capital account or the series of shares in an Other Feeder Fund), as applicable; provided that, the Master Fund will maintain a separate Capital Sub-Account for each Series held by a Partner.

"*Certificate*" means the Certificate of Limited Partnership of the Partnership referred to in Section 2.1(b).

2

"***Code***" means the U.S. Internal Revenue Code of 1986, as amended, and as hereafter amended, or any successor law.

"***Commencement Date***" means the first date on or as of which a Limited Partner, other than the Original Limited Partner, makes a capital contribution to the Partnership.

"***Compulsory Withdrawal***" has the meaning set forth in Section 5.5(j).

"***Discovery Date***" means the date on which the Investment Manager discovers that a violation of any of the Master Fund's investment restrictions set forth in the Master Fund Partnership Agreement has occurred.

"***Early Withdrawal Reduction***" means:

(a)     with respect to a Series B Interest, up to 3.0% of the net asset value of the portion of the Series B Interest being withdrawn in any withdrawal occurring prior to the end of the applicable Soft Lock-up Period;

(b)     with respect to a Series C Interest, 5.0% of the net asset value of the portion of the Series C Interest being withdrawn in any withdrawal occurring prior to the end of the applicable Soft Lock-up Period; and

(c)     with respect to a Series C Interest, 3.0% of the net asset value of the portion of the Series C Interest being withdrawn in any withdrawal occurring on or after the Soft Lock-up Period with respect to Series C Interests, but prior to the end of the Second Soft Lock-up Period;

provided that, in each case, such amount is determined at the close of business of the relevant Withdrawal Date, is retained by the Partnership for the benefit of the Partners and is deducted from the withdrawal proceeds of the withdrawing Limited Partner.

"***Election Notice***" has the meaning set forth in Section 8.10(c).

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"***ERISA Partner***" means a Limited Partner which is (a) an employee benefit plan subject to the fiduciary provisions of ERISA, (b) a "plan" subject to Section 4975 of the Code, (c) an entity whose underlying assets include "plan assets" for purposes of ERISA by reason of a Plan's investment in the entity, or (d) an entity that otherwise constitutes a "benefit plan investor" within the meaning of Section 3(42) of ERISA or any regulation promulgated thereunder.

"***FATCA***" means Sections 1471 through 1474 of the Code, as amended, and any Regulations thereunder or official interpretations or other official guidance thereof, including any successor Regulations or interpretations, and any intergovernmental agreement and any regulations with respect thereto or official interpretations or other official guidance thereof implementing the foregoing.

Appx. 03627

"***Fiscal Period***" means each period that starts at the opening of business on the Commencement Date (in the case of the initial Fiscal Period) and thereafter on the day immediately following the last day of the preceding Fiscal Period, and that ends at the close of business on the earliest of the following dates:

(a)     the last day of a calendar month;

(b)     any date as of which any withdrawal or distribution of capital is made with respect to any Capital Account or as of which this Agreement provides for any amount to be credited to or debited against a Capital Account, other than a withdrawal or distribution by or to, or an allocation to, all Capital Accounts that does not result in any change of the Partnership Percentage relating to any Capital Account;

(c)     the date which immediately precedes any day as of which a capital contribution is accepted by the General Partner from any new or existing Partner; or

(d)     any other date which the General Partner selects.

"***Fiscal Year***" means the period commencing on the Commencement Date and ending on December 31 of the same year, and thereafter each period commencing on January 1 of each year and ending on December 31 of such year, unless the General Partner shall elect another fiscal year; *provided* that any such other fiscal year shall be permissible for U.S. federal income tax purposes.  In the case of the Fiscal Year in which the Partnership is terminated in accordance with Article VI, "***Fiscal Year***" means the period commencing on January 1 of that year and ending on the date on which the Partnership is terminated.

"***GAAP***" means generally accepted accounting principles in the United States.

"***General Partner***" means Highland Argentina Regional Opportunity Fund GP, LLC, a Delaware limited liability company, any successor thereto, and any Person hereafter admitted as an additional general partner, in its capacity as general partner of the Partnership.

"***Indemnified Person***" means each of the General Partner, the Investment Manager, each member, shareholder, partner, manager and director of, and any person who controls, the General Partner or the Investment Manager, each of the respective affiliates of the foregoing and each of their respective executors, heirs, assigns, successors and other legal representatives.

"***Interest***" means the entire ownership interest of a Partner in the Partnership at the relevant time, including the right of such Partner to any and all benefits to which a Partner may be entitled as provided in this Agreement, together with the obligations of such Partner to comply with all the terms and provisions of this Agreement and, for clarity, is cumulative of such Partner's interests in all Series, to the extent such Partner has an interest in more than one Series.

"***Investment Company Act***" means the U.S. Investment Company Act of 1940, as amended, and the regulations promulgated thereunder.

Appx. 03628

"*Investment Management Agreement*" means the investment management agreement by and among the Investment Manager, the General Partner, the Partnership, the Master Fund and the Offshore Fund, as amended from time to time.

"*Investment Manager*" means Highland Capital Management Latin America, L.P., a Cayman Islands exempted limited partnership, or any successor thereto, or any Person thereafter appointed as an investment manager of the Partnership.

"*Investments*" means investments in securities or other financial or intangible investment instruments, contracts or products made by the Master Fund, as described in the Partnership's offering memorandum.

"*Investor*" means any Partner, any shareholder of the Offshore Fund or any beneficial owner of any Other Feeder Fund.

"*Limited Partner*" means any Person admitted to the Partnership as a limited partner, until the entire Interest of such Person has been withdrawn pursuant to Section 5.5 or a substitute Limited Partner or Limited Partners are admitted with respect to such Person's entire Interest.  The General Partner may subdivide the Interests into separate Series and establish new Series pursuant to Section 2.10; *provided* that for all purposes of the Act, the Limited Partners constitute a single class or group of limited partners.

"*Majority of Limited Partners*" means Limited Partners whose Partnership Percentages represent more than 50% of the aggregate Partnership Percentages of all Limited Partners or the Series of Limited Partners, as applicable.

"*Management Fee*" means the management fee, as defined in the Master Fund Partnership Agreement, payable by the Master Fund to the Investment Manager, any of its Affiliates or any other Person designated by the Investment Manager pursuant to the Investment Management Agreement.

"*Master Fund*" means Highland Argentina Regional Opportunity Master Fund, L.P., a collective investment vehicle formed as an exempted limited partnership under the laws of the Cayman Islands in which the Partnership, the Offshore Fund and any other co-investment vehicle (such as an Other Feeder Fund) invest all of their investible assets and conduct their investment and trading activities.

"*Master Fund Partnership Agreement*" means the amended and restated exempted limited partnership agreement of the Master Fund, as the same may be amended or restated from time to time in accordance with the terms thereof.

"*Minimum Required Withdrawal*" has the meaning set forth in Section 5.5(j)

"*Negative Basis*" means, with respect to any Partner and as of any time of calculation, the excess of such Partner's "adjusted tax basis" in its Interest for U.S. federal income tax purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer or assignment of such Interest, including by reason of death) over the amount that such Partner is entitled to receive upon withdrawal from or liquidation of the Partnership.

Appx. 03629

"*Negative Basis Partner*" means any Partner who withdraws all or a portion of its Interest from the Partnership and who has a Negative Basis as of the Withdrawal Date, but such Partner shall cease to be a Negative Basis Partner at such time as it shall have received allocations pursuant to Section 3.9(d) equal to such Partner's Negative Basis as of the Withdrawal Date and without regard to such Partner's share of the liabilities of the Partnership under Section 752 of the Code.

"*Net Assets*" means the total value, as determined by the Administrator in accordance with Section 7.3, of all Investments and other assets of the Partnership (including net unrealized appreciation or depreciation of the assets and accrued interest and dividends receivable net of any withholding taxes), less an amount equal to all accrued debts, liabilities and obligations of the Partnership (including any reserves for contingencies accrued pursuant to Section 3.6). Except as otherwise expressly provided herein, Net Assets as of the first day of any Fiscal Period shall be determined on the basis of the valuation of assets conducted as of the close of the immediately preceding Fiscal Period but after giving effect to any capital contributions made by any Partner subsequent to the last day of such immediately preceding Fiscal Period and after giving effect to Management Fees (borne indirectly at the Master Fund level), and Net Assets as of the last day of any Fiscal Period shall be determined before giving effect to any of the following amounts payable by the Partnership generally or in respect of any Investment which are effective as of the date on which such determination is made:

(a)     any Performance Allocation (borne indirectly at the Master Fund level) as of the date on which such determination is made;

(b)     any withdrawals or distributions payable to any Partner which are effective as of the date on which such determination is made; and

(c)     withholding or other taxes (including any amounts payable under any BBA provision), expenses of processing withdrawals and other items payable, and any increases or decreases in any reserves, holdbacks or other amounts recorded pursuant to Section 3.6 during the Fiscal Period ending as of the date on which such determination is made, to the extent the General Partner determines that, pursuant to any provisions of this Agreement, such items are not to be charged ratably among the Capital Accounts of all Partners on the basis of their respective Partnership Percentages as of the commencement of the Fiscal Period.

"*Net Loss*" means any amount by which the Net Assets as of the first day of a Fiscal Period exceed the Net Assets as of the last day of the same Fiscal Period.

"*Net Profit*" means any amount by which the Net Assets as of the last day of a Fiscal Period exceed the Net Assets as of the first day of the same Fiscal Period.

"*Non-Voting Interests*" means an Interest, the holder of which is not entitled to vote, consent or withhold consent with respect to any Partnership matter (including, but not limited to, mergers, sales of substantially all assets or consolidations of the Partnership), except as otherwise expressly provided in this Agreement.

"*Offshore Fund*" means Highland Argentina Regional Opportunity Fund, Ltd., a Cayman Islands exempted company.

Appx. 03630

"*Original Limited Partner*" means Highland Capital Management Latin America, L.P., in its capacity as the original limited partner.

"*Other Account*" means any assets or investment of the General Partner or the Investment Manager, or any assets managed by the General Partner, the Investment Manager or any of their respective Affiliates for the account of any Person or entity (including investment vehicles) other than the Partnership, which are invested or which are available for investment in securities or other instruments or for trading activities whether or not of the specific type being conducted by the Partnership.

"*Other Agreement*" has the meaning set forth in Section 8.1.

"*Other Feeder Fund*" means any other investment vehicle sponsored by the Investment Manager or one of its Affiliates that invests in parallel with the Partnership and the Offshore Fund in the Master Fund.

"*Partner*" means the General Partner or any of the Limited Partners, except as otherwise expressly provided herein, and "*Partners*" means the General Partner and all of the Limited Partners.

"*Partnership*" means the limited partnership formed pursuant to this Agreement.

"*Partnership Percentage*" means a percentage established for each Partner on the Partnership's books as of the first day of each Fiscal Period. The Partnership Percentage of a Partner for a Fiscal Period shall be determined by dividing the amount of such Partner's Capital Account as of the beginning of the Fiscal Period (after crediting all capital contributions to such Capital Account which are effective as of such date, net of all deductions, including Management Fees borne at the Master Fund level) by the sum of the Capital Accounts of all of the Partners as of the beginning of the Fiscal Period (after crediting all capital contributions to the Partnership which are effective as of such date, net of all deductions, including Management Fees borne at the Master Fund level). The sum of the Partnership Percentages of all Capital Accounts for each Fiscal Period shall equal 100%.

"*Performance Allocation*" means the performance allocation, as defined in the Master Fund Partnership Agreement, allocated to the Special Limited Partner, any of its Affiliates or any other Person designated by the Special Limited Partner pursuant to the Master Fund Partnership Agreement.

"*Person*" means any individual, partnership, corporation, limited liability company, trust, or other entity.

"*Plan Assets*" means assets of the Partnership that are considered to be assets of an ERISA Partner, pursuant to Section 3(42) of ERISA or otherwise.

"*Positive Basis*" means, with respect to any Partner and as of any time of calculation, the excess of the amount that such Partner is entitled to receive upon withdrawal from or liquidation of the Partnership over such Partner's "adjusted tax basis" in its Interest for U.S. federal income tax

Appx. 03631

purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer or assignment of such Interest, including by reason of death).

"***Positive Basis Partner***" means any Partner who withdraws all or a portion of its Interest from the Partnership and who has a Positive Basis as of the Withdrawal Date, but such Partner shall cease to be a Positive Basis Partner at such time as it shall have received allocations pursuant to Section 3.9(c) equal to such Partner's Positive Basis as of the Withdrawal Date and without regard to such Partner's share of the liabilities of the Partnership under Section 752 of the Code.

"***Principal***" means James D. Dondero.

"***Prior Agreement***" has the meaning set forth in the preamble hereto.

"***Regulations***" means the proposed, temporary and final U.S. Treasury Regulations promulgated under the Code, including any successor regulations.

"***Regulatory Allocations***" has the meaning set forth in Section 3.10.

"***Remedy Date***" means the period commencing on the Discovery Date and ending 90 Business Days thereafter.

"***Revocation Notice***" has the meaning set forth in Section 8.10(c).

"***RIC Limited Partner***" means a Limited Partner that is registered as an investment company under the Investment Company Act.

"***Schedule of Partners***" means a schedule to be maintained by the General Partner containing the following information with respect to each Partner: (a) name; (b) address; (c) date of admission; (d) amount and date of all capital contributions and withdrawals; and (e) the amount and date of any permitted Transfers.

"***Second Soft Lock-up Period***" means, with respect to a Series C Interest, a period commencing on the one-year anniversary of the date that a capital contribution was made to the Capital Account associated with such Series C Interest and ending on the two-year anniversary of the date of such capital contribution. The General Partner may waive the Second Soft Lock-up Period with respect to any Capital Account.

"***Securities Act***" means the U.S. Securities Act of 1933, as amended from time to time.

"***Series***" means a designated series of Interests established in accordance with this Agreement and having such terms as the General Partner determines.

"***Series A Interests***" means a Series having the rights and obligations applicable to Series A Interests as set forth in this Agreement and which correspond to the "Series A Capital Sub-Accounts" of the Master Fund.

Appx. 03632

"***Series B Interests***" means a Series having the rights and obligations applicable to Series B Interests as set forth in this Agreement and which correspond to the "Series B Capital Sub-Accounts" of the Master Fund.

"***Series C Interests***" means a Series having the rights and obligations applicable to Series C Interests as set forth in this Agreement and which correspond to the "Series C Capital Sub-Accounts" of the Master Fund.

"***Soft Lock-up Period***" means, with respect to a Series B Interest or a Series C Interest, a period commencing on the date that a capital contribution was made to the Capital Account associated with such Series and ending on the one-year anniversary of the date of such capital contribution. The General Partner may waive the Soft Lock-up Period with respect to any Capital Account.

"***Special Limited Partner***" means Highland Capital Management Latin America, L.P., in its capacity as a special limited partner of the Master Fund for purposes of the receipt of the Performance Allocation.

"***Transfer***" means any direct or indirect sale, exchange, transfer, assignment, pledge, encumbrance, charge, exchange, hypothecation, placing of a lien or a security interest on an Interest or any other disposition by a Partner of its Interest to or in favor of another party, whether voluntary or involuntary (including, but not limited to, being offered or listed on or through any placement agent, intermediary, online service, site, agent or similar Person).

"***Withdrawal Date***" has the meaning set forth in Section 5.5(a).

"***Withdrawal Notice***" has the meaning set forth in Section 5.5(a).

––––––––––––––

## Article II
## ORGANIZATION

––––––––––––––

**2.1** **Continuation of Limited Partnership**

(a)    The General Partner and the Original Limited Partner hereby agree to continue the Partnership as a limited partnership under and pursuant to the Act and this Agreement.

(b)    The General Partner has executed and filed with the Secretary of State of the State of Delaware a Certificate of Limited Partnership of the Partnership (the "***Certificate***"), and shall execute, acknowledge and file with the Secretary of State of the State of Delaware any further amendments thereto as may be required by the Act, and any other instruments, documents and certificates which, in the opinion of the Partnership's legal counsel, may from time to time be required by the laws of the United States of America, the State of Delaware or any other jurisdiction in

Appx. 03633

which the Partnership determines to do business, or any political subdivision or agency thereof or which such legal counsel may deem necessary or appropriate to effectuate, implement and continue the valid and subsisting existence and business of the Partnership. The General Partner shall cause any required amendment to the Certificate to be filed promptly following the event requiring such amendment. All amendments may be signed by the General Partner (as required by the Act) and may be signed either personally or by an attorney-in-fact.

(c)     The parties hereto agree to operate the Partnership as a limited partnership pursuant to the provisions of the Act and of this Agreement and agree that the rights and liabilities of the Limited Partners and the General Partner shall be as provided in the Act for limited partners and the general partner, except as provided herein.

(d)     The General Partner may change the domicile of the Partnership to another state, country or other jurisdiction where advisable due to legal, tax or other considerations; *provided* that no such change of domicile would reasonably be expected to have a material adverse effect on the Limited Partners.

(e)     The parties acknowledge and agree that the Partnership is intended to be taxed in the United States as a partnership and not as an association taxable as a corporation for U.S. federal, state and/or local income tax purposes. No election may be made to treat the Partnership as other than a partnership for U.S. federal, state and/or local income tax purposes. Each Partner agrees not to treat, on any income tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with the treatment of such item by the Partnership.

**2.2     Name of Partnership**

(a)     The name of the Partnership is Highland Argentina Regional Opportunity Fund, L.P. or such other name as the General Partner may hereafter adopt, subject to causing an amendment to the Certificate to be filed with the Secretary of State of the State of Delaware in accordance with the Act. The General Partner will send a notice of any change of name to the Limited Partners. All business of the Partnership will be conducted under such name or under such other name as the General Partner deems appropriate.

(b)     The Partnership shall have the exclusive ownership and right to use the Partnership name so long as the Partnership continues, despite the withdrawal, expulsion, resignation or removal of any Limited Partner, but upon the Partnership's termination or at such time as there ceases to be a general partner, the Partnership shall assign the name and the goodwill attached thereto to the General Partner without payment by the assignee(s) of any consideration therefor.

**2.3     Principal Office; Registered Office**

(a)     The Partnership shall have its principal office at such location as the General Partner shall designate from time to time.

Appx. 03634

(b)    The Partnership shall have its registered office at c/o The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801, unless a different registered office or agent is designated from time to time by the General Partner.

## 2.4    Term of Partnership

The term of the Partnership commenced on the date on which the Certificate was filed with the office of the Secretary of State of the State of Delaware and will continue until dissolved pursuant to Section 6.1 (unless its term is extended pursuant to Section 6.1). The legal existence of the Partnership as a separate legal entity shall continue until the cancellation of the Certificate.

## 2.5    Object and Powers of Partnership

(a)    The Partnership is formed solely for the object and purpose of indirectly investing in Investments by subscribing for and holding a limited partner interest in, and investing all of its investible assets in, the Master Fund. The Partnership is a directed feeder fund for the Limited Partners with respect to the Master Fund. Notwithstanding any other provision of this Agreement, the Partnership shall perform no other business and shall not make directly any Investments as such Investments will be made by the Master Fund.

(b)    Notwithstanding any other provision of this Agreement, the Partnership, and the General Partner on behalf of the Partnership, may execute, deliver and perform any agreement with any Limited Partner or prospective Limited Partner without any further act, vote or approval of any Partner. The General Partner is hereby authorized to enter into the agreements described in the preceding sentence on behalf of the Partnership, but such authorization should not be deemed a restriction on the power of the General Partner to enter into other agreements on behalf of the Partnership. In furtherance of this purpose, the Partnership shall have all powers necessary, suitable or convenient for the accomplishment of the aforesaid purpose, subject to the limitations and restrictions set forth herein alone or with others, as principal or agent.

(c)    Each Limited Partner hereby acknowledges that the Partnership is not expected to qualify as an "operating company" for purposes of ERISA, and the assets of the Partnership may therefore constitute Plan Assets of ERISA Partners; and that the Partnership is therefore intended to be structured as a directed feeder fund through which the Limited Partners may participate in an investment in the Master Fund and with respect to which the General Partner is not, except as expressly provided under the terms of this Agreement, intended to have any discretionary authority or control with respect to the investment of the assets of the Partnership. Each Limited Partner (i) shall by making a capital contribution to the Partnership with respect to the Partnership's underlying interests in the Master Fund, be deemed to direct the General Partner to invest the amount of such capital contribution in the Master Fund and (ii) acknowledges that during any period when the underlying interests of the Partnership in the Master Fund are deemed to constitute Plan

11

Appx. 03635

Assets, the General Partner will act as a custodian with respect to the assets of such Limited Partner, but is not intended to be a fiduciary with respect to the assets of such Limited Partner for purposes of ERISA, the Code or any applicable similar law. No provision of this Agreement shall create any obligation of the General Partner, in its capacity as the general partner of the Master Fund, and the General Partner, in such capacity, will not have any fiduciary obligations to any person, under ERISA or otherwise, pursuant to this Agreement. Any action or determination of the General Partner, as the general partner of the Master Fund, referenced herein shall only regard such action or determination made by the General Partner solely in its capacity as the general partner thereof.

## 2.6    Liability of Partners

In no event shall any Limited Partner (or former Limited Partner) be obligated to make any contribution to the Partnership in addition to its agreed capital contribution (or other payments provided for herein) or have any liability for the repayment or discharge of the debts and obligations of the Partnership, except to the extent provided herein or as required by the Act or other applicable law.

## 2.7    Actions by Partnership

The Partnership may execute, deliver and perform all contracts, agreements and other undertakings and engage in all activities and transactions as may in the opinion of the General Partner be necessary or advisable to carry out its objects as set forth in Section 2.5 above.

## 2.8    Reliance by Third Parties

Persons dealing with the Partnership are entitled to rely conclusively upon the power and authority of the General Partner as herein set forth.

## 2.9    UCC Status of Limited Partner Interests

(a)    For purposes of the grant, pledge, attachment or perfection of a security interest in an Interest or otherwise, the Interests shall be deemed to be "securities" within the meaning of Section 8-102(a)(15) and as provided by Section 8-103(c) of the Uniform Commercial Code as in effect from time to time in the State of Delaware or analogous provisions in the Uniform Commercial Code in effect in any other jurisdiction.

(b)    Any Interest may be evidenced by a certificate of partnership interest issued by the Partnership in such form as the General Partner may approve. Every certificate representing an Interest shall bear a legend substantially in the following form:

"For the purposes of Section 8-103 of the Uniform Commercial Code of the United States of America in effect in any relevant jurisdiction, the certificates representing an interest in the Limited Partnership shall constitute "securities" within the meaning of Section 8-102 and Section 8-103 of the Uniform Commercial Code."

Appx. 03636

**2.10    Series of Interests**

The General Partner may, at any time, without notification to or consent of the other Limited Partners, create and offer different Series with such rights, obligations, liabilities, privileges, designations and preferences (including different investment strategies, underlying investments, degrees of leverage, management fees, performance allocations, brokerage commissions, transparency, withdrawal rights, co-investment opportunities, and other differences) as the General Partner may determine upon the issuance of such Series; *provided* that such Series would not reasonably be expected to have a material adverse effect on the existing Limited Partners.   The terms and rights of each such Series may be set forth in the Partnership's offering memorandum, any supplement thereto or a "side letter" or other agreement, which the General Partner may incorporate by reference.   Although the Partnership may offer more than one Series, the Partnership is not a Delaware series limited partnership and the assets and liabilities of the Partnership are not segregated by Series.   As of the effective date of this Agreement, the Partnership has three Series: Series A Interests, Series B Interests and Series C Interests.

_____

**Article III
CAPITAL**

_____

**3.1    Contributions to Capital**

(a)    The minimum required initial capital contribution with respect to each Series is $500,000, or such lesser amount as the General Partner may permit; provided that, the minimum required initial capital contribution with respect to a Series B Interest is no less than $100,000.  Subject to the restriction with respect to any Series B Interest in the immediately preceding sentence, the General Partner may change the required minimum initial capital contribution amount at any time.

(b)    The Partnership may accept additional contributions at such times as the General Partner may permit, but no Limited Partner shall be obligated to make any additional capital contribution to the Partnership, subject to the provisions of Section 3.5 and any contrary provision of the Act.  The minimum required additional capital contribution with respect to each Series is $500,000, or such lesser amount as the General Partner may permit; provided that, the minimum required additional capital contribution with respect to a Series B Interest is no less than $100,000.   Subject to the restriction with respect to any Series B Interest in the immediately preceding sentence, the General Partner may change the required minimum additional capital contribution amount at any time.

(c)    The General Partner or an Affiliate has made a capital contribution to the Partnership as set forth in the Schedule of Partners.  Except as required by the Act, the General Partner (or such Affiliate) shall not be required to make any additional capital contributions to the Partnership.  The General Partner (or such Affiliate) may, however, make capital contributions to the Partnership in such amounts and at

13

such times as it may determine. The General Partner or any of its Affiliates shall have the right at any time to make additional capital contributions as a Limited Partner or General Partner. If an Affiliated Investor makes a capital contribution as a Limited Partner, the General Partner, in its capacity as the general partner of the Master Fund, will have authority to waive or reduce the Management Fee or the Performance Allocation with respect to such Limited Partner.

(d)     The General Partner or the Investment Manager may enter into placement agent agreements with placement agents (which may be Affiliates of the General Partner or the Investment Manager) to assist in obtaining subscriptions for Interests in exchange for compensation; provided that, the Partnership will not bear any such placement agent fees. Placement agents may be paid a portion of the Management Fee attributable to the investors solicited by such placement agents, thereby reducing the compensation received by the Investment Manager.

(e)     Except as otherwise permitted by the General Partner, (i) initial or additional capital contributions by each Partner shall be payable in cash and/or Investments having an aggregate value as set forth in the Partnership's books and records in one installment, and (ii) initial contributions shall be due no later than the Business Day immediately preceding the date of admission of such Person as a Limited Partner.

**3.2     Rights of Partners in Capital**

(a)     No Partner shall be entitled to interest on its capital contributions to the Partnership. For the avoidance of doubt, interest income, if any, earned on subscription amounts remitted to the Partnership prior to the date an Interest is issued to a Partner will be payable to the Partnership and not applied toward the purchase of an Interest.

(b)     No Partner shall have the right to the return of any capital contribution to the Partnership, except (i) upon the withdrawal of such Partner pursuant to Section 5.5 or (ii) upon the dissolution of the Partnership pursuant to Section 6.1. The entitlement to any such return shall be limited to the value of the Capital Account of the Partner. The General Partner shall not be liable for the return of any such amounts.

**3.3     Capital Accounts**

(a)     The Partnership will maintain a separate Capital Account for each Partner. In the event a Limited Partner invests in more than one Series, the Partnership will maintain a separate Capital Account with respect to each Series held by such Limited Partner, with each such Capital Account being treated as if it were the Capital Account of a separate Partner for purposes of this Agreement, including for purposes of the Management Fee and the Performance Allocation, each borne indirectly at the Master Fund level. The General Partner may, in its discretion, maintain separate memorandum sub-accounts with respect to each such Capital Account for purposes of this Agreement, including to reflect additional capital

Appx. 03638

contributions, withdrawal terms, the Performance Allocation and the application of an Early Withdrawal Reduction. Each Capital Account will reflect the aggregate sum of the balances in all memorandum sub-accounts associated with each such Capital Account.

(b)     Each Capital Account shall have an initial balance equal to the amount of any cash and the net value of any property constituting the relevant Partner's initial capital contribution to the Partnership.

(c)     Each Capital Account shall be increased by (i) the amount of any cash and the net value of any property constituting additional contributions to such Capital Account permitted pursuant to Section 3.1 and (ii) such Capital Account's allocable share of the Net Profits allocated by the Partnership to such Capital Account pursuant to Section 3.4.

(d)     Each Capital Account shall be reduced by (i) the amount of any cash and the net value of any property withdrawn by or distributed to the relevant Partner pursuant to Sections 3.12(a), 5.5 or 6.2, including any amount deducted from any such withdrawal or distribution pursuant to Section 5.5(c) or 5.5(f), (ii) such Capital Account's allocable share of the Net Losses allocated by the Partnership to such Capital Account pursuant to Section 3.4, (iii) such Capital Account's *pro rata* portion of the expenses allocable (or specially allocable) by the Partnership pursuant to Section 3.5, (iv) such Capital Account's allocable share of the Performance Allocation allocable pursuant to Section 3.7 (borne indirectly at the Master Fund level), and (v) such Capital Account's *pro rata* portion of the expenses payable by the Partnership pursuant to Section 4.2 (b) and (c).

(e)     Each Capital Account (including any corresponding memorandum sub-accounts) shall be adjusted to reflect allocations and other changes in the value of such Capital Account in the manner specified in the remaining provisions of this Article III.

(f)     The Master Fund maintains Capital Sub-Accounts within the Partnership's capital account at the Master Fund level that correspond to the Capital Accounts (and any corresponding memorandum sub-accounts) of the Partners.

## 3.4     Allocation of Net Profit and Net Loss

(a)     Subject to the remaining provisions of this Article III, as of the last day of each Fiscal Period, any Net Profit or Net Loss for such Fiscal Period shall be separately allocated among and credited to or debited against the Capital Accounts of the Partners in proportion to their respective Partnership Percentages for such Fiscal Period.

(b)     Notwithstanding Section 3.4(a), items of income, gain, loss, deduction, credit and expenses for a Fiscal Period that are not allocable to specific Investments of the Master Fund, including short term interest income, receipt of any withdrawal charges by the Partnership, and audit, administration and legal expenses, shall be

separately allocated among and credited to or debited against the Capital Accounts of the Partners *pro rata* in accordance with their Partnership Percentages for such Fiscal Period.

**3.5** **Allocation of Management Fees, Withholding Taxes and Certain Other Expenditures**

(a) The Partnership shall bear its allocable portion of the Management Fees in accordance with the Master Fund Partnership Agreement. The Management Fees borne by the Partnership shall be allocated to the Capital Sub-Accounts of the relevant Limited Partners who are subject to the Management Fee based upon the Series they hold, and such Capital Sub-Accounts shall be subject to the corresponding adjustments. The Management Fee shall be charged at the Master Fund level through the use of Capital Sub-Accounts that correspond to each Capital Account of a Limited Partner. The Management Fee will be prorated for any period that is less than a full calendar quarter. The General Partner or the Investment Manager (as the general partner or the investment manager, respectively, of the Master Fund) may reduce, waive or calculate differently the Management Fee with respect to any Capital Sub-Account of a Limited Partner in its discretion.

(b) Notwithstanding anything to the contrary herein, to the extent the General Partner or the Partnership is required by law (including under circumstances where the General Partner or the Partnership is unable to rely conclusively on any withholding certification provided by a Partner) to withhold or to make tax payments, including any interest or penalties, on behalf of or with respect to any Partner or Partners (including, without limitation, any amount attributable to an actual or imputed underpayment of taxes under any BBA provision, backup withholding or FATCA withholding), the General Partner or the Partnership may withhold such amounts and make such tax payments as so required. If the Partnership directly or indirectly pays or incurs any withholding tax or other tax obligation (including any amount under any BBA provision), or otherwise incurs a tax payment with respect to the income allocable or distributable to, or otherwise attributable to, one or more Partners, then the amount of such withholding tax, tax obligation or payment will be treated as a distribution to such Partner or Partners, as applicable, pursuant to the terms of this Agreement. Such amount will be debited against the Capital Account(s) of such Partner or Partners as of the close of the Fiscal Period during which the Partnership so withholds, pays or incurs such obligation. If the amount so withheld, paid or incurred is greater than the balance of the Capital Account(s) of the relevant Partner or Partners, as applicable, then such Partner or Partners and any successors must make a contribution to the capital of the Partnership within 10 Business Days after notification and demand by the General Partner in the amount of such excess. The General Partner is not obligated to apply for or obtain a refund, or reduction of or exemption from withholding tax or other tax obligation (including any amount under any BBA provision) on behalf of any Partner that may be eligible for such refund, reduction or exemption, or otherwise obligated to structure Investments so as to reduce or avoid any withholding tax. Each Limited Partner agrees to repay to the Partnership and the

16

General Partner and each of the partners and former partners of the General Partner, any liability for taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Limited Partner.

(c)     Except as otherwise provided for in this Agreement, any expenditures payable by the Partnership (including any taxes imposed on the Partnership pursuant to Section 6225 of the Code, as amended by the BBA), to the extent determined by the General Partner to have been paid or withheld on behalf of, or by reason of particular circumstances applicable to, one or more but fewer than all of the Partners, shall be specially allocated only to the Capital Accounts of those Partners on whose behalf such payments are made or whose particular circumstances gave rise to such payments.  Such allocations shall be debited from the relevant Capital Accounts of such Partners as of the close of the Fiscal Period during which any such items were accrued by the Partnership.

**3.6     Reserves; Adjustments for Certain Future Events**

(a)     The General Partner may cause appropriate reserves to be created, accrued and charged against Net Assets and proportionately against the Capital Accounts (and the corresponding Capital Sub-Accounts) for contingent liabilities, such reserves to be in the amounts which the General Partner deems necessary or appropriate.  The General Partner may increase or reduce any such reserve from time to time by such amounts as the General Partner deems necessary or appropriate.  The amount of any such reserve, or any increase or decrease therein, may, at the election of the General Partner, be charged or credited, as the General Partner deems appropriate, to the Capital Accounts of those parties that are Partners at the time when such reserve is created, increased, or decreased, as the case may be, or alternatively may be charged or credited to those parties that were Partners at the time of the act or omission giving rise to the contingent liability for which the reserve was established by the General Partner.

(b)     If the General Partner determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then all or a portion of such amount may be proportionately charged or credited, as appropriate, in proportion to the Capital Account balances of the current Partners as such balances existed during any such prior period(s).

**3.7     Performance Allocation**

The Partnership bears its allocable portion of the Performance Allocation in accordance with the Master Fund Partnership Agreement.  The Performance Allocation borne by the Partnership shall be specially allocated to the Capital Sub-Accounts of the relevant Limited Partners who are subject to the Performance Allocation based upon the Series they hold, and such Capital Sub-Accounts shall be subject to the corresponding adjustments.  The Performance Allocation shall be debited at the Master Fund level through the use of Capital Sub-Accounts that correspond to each Capital Account of a Limited Partner.  The General Partner (as the general

Appx. 03641

partner of the Master Fund) may waive or reduce the Performance Allocation with respect to any Capital Sub-Account of a Limited Partner.

### 3.8 Allocation to Avoid Capital Account Deficits

To the extent that any debits pursuant to this Article III would reduce the balance of the Capital Account of any Limited Partner below zero, that portion of any such debits shall instead be allocated to the Capital Account of the General Partner. Any credits in any subsequent Fiscal Period which would otherwise be allocable pursuant to this Article III to a Capital Account of any Limited Partner previously affected by the application of this Section 3.8 shall instead be allocated to the Capital Account of the General Partner in such amounts as are necessary to offset all previous debits attributable to such Limited Partner pursuant to this Section 3.8 not previously recovered.

### 3.9 Allocations for U.S. Federal Income Tax Purposes

Notwithstanding anything to the contrary in this Agreement:

(a)  Income Tax Allocations. Except as otherwise required by Code Section 704(c), items of income, gain, deduction, loss, or credit that are recognized for income tax purposes in each Fiscal Year will be allocated among the Partners in such manner as to reflect equitably amounts credited to or debited against each Partner's Capital Account, whether in such Fiscal Year or in prior Fiscal Years. To this end, the Partnership will establish and maintain records which shall show the extent to which the Capital Account of each Partner will, as of the last day of each Fiscal Year, comprise amounts that have not been reflected in the taxable income of such Partner. To the extent deemed by the General Partner to be feasible and equitable, taxable income and gains in each Fiscal Year shall be allocated among the Partners who have enjoyed the related credits to their Capital Accounts, and items of deduction, loss and credit in each Fiscal Year shall be allocated among the Partners who have borne the burden of the related debits to their Capital Accounts. Foreign tax credits attributable to taxes incurred by the Partnership shall be allocated in a manner consistent with Section 1.704-1(b)(4)(viii) of the Regulations. All matters concerning allocations for U.S. federal, state and/or local income tax purposes, including accounting procedures, not expressly provided for in this Agreement will be determined by the General Partner.

(b)  Basis Adjustments. To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Section 734(b) of the Code or Section 743(b) of the Code is required under Section 1.704-1(b)(2)(iv)(m) of the Regulations to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Regulations; *provided* that in the event that an adjustment to the book value of Partnership property is made as a result of an adjustment pursuant to

18

Section 734(b) of the Code, items of income, gain, loss, or deduction, as computed for book and tax purposes, will be specially allocated among the Partners so that the effect of any such adjustment shall benefit (or be borne by) the Partner(s) receiving the distribution that caused such adjustment.

(c)    <u>Positive Basis Allocations</u>.  If the Partnership realizes gains or items of gross income (including short term capital gain) from the sale of Partnership assets for U.S. federal income tax purposes for any Fiscal Year in which one or more Positive Basis Partners withdraws all or a portion of its Interest from the Partnership pursuant to Section 5.5, the General Partner may elect:  (i) to allocate such gains or items of gross income among such Positive Basis Partners, *pro rata* in proportion to the respective Positive Basis of each such Positive Basis Partner, until either the full amount of such gains or items of gross income shall have been so allocated or the Positive Basis of each such Positive Basis Partner shall have been eliminated; and (ii) to allocate any gains or items of gross income not so allocated to Positive Basis Partners to the other Partners in such manner as shall reflect equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; *provided*, *however*, that if, following such Fiscal Year, the Partnership realizes gains or items of gross income from a sale of an Investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the liquidating share of any Positive Basis Partner that continues to be a Partner in the Partnership following such withdrawal (*i.e.,* such Positive Basis Partner effected a partial, and not a complete, withdrawal of its Interest), there shall be allocated to such Positive Basis Partner an amount of such gains or items of gross income equal to the amount, if any, by which its Positive Basis as of the Withdrawal Date exceeds the amount allocated to such Partner pursuant to clause (i) of this sentence.

(d)    <u>Negative Basis Allocations</u>.  If the Partnership realizes net losses or items of gross loss or deduction (including short term capital loss) from the sale of Partnership assets for U.S. federal income tax purposes for any Fiscal Year in which one or more Negative Basis Partners withdraws all or a portion of its Interest from the Partnership pursuant to Section 5.5, the General Partner may elect:  (i) to allocate such net losses or items of gross loss or deduction among such Negative Basis Partners, *pro rata* in proportion to the respective Negative Basis of each such Negative Basis Partners, until either the full amount of such losses or items of loss or deduction shall have been so allocated or the Negative Basis of each such Negative Basis Partner shall have been eliminated; and (ii) to allocate any net losses or items of gross loss or deduction not so allocated to Negative Basis Partners to the other Partners in such manner as shall reflect equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; *provided*, *however*, that if, following such Fiscal Year, the Partnership realizes net losses or items of gross loss and deduction from a sale of an Investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the liquidating share of any Negative Basis Partner that continues to be a Partner in the Partnership following such withdrawal (*i.e.*, such Negative Basis Partner effected a partial, and not a complete, withdrawal of its

Appx. 03643

Interest), there shall may be allocated to such Negative Basis Partner an amount of such net losses or items of gross loss or deduction equal to the amount, if any, by which its Negative Basis as of the Withdrawal Date exceeds the amount allocated to such Partner pursuant to clause (i) of this Section 3.9(d).

(e) <u>Qualified Income Offset</u>. In the event any Limited Partner unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Partnership income and gain will be specially allocated to each such Limited Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the deficit balance in the Capital Account of such Limited Partner as quickly as possible; *provided* that an allocation pursuant to this Section 3.9(e) may be made only if and to the extent that such Limited Partner would have a deficit balance in its Capital Account after all other allocations provided for in this Article III have been tentatively made as if this Section 3.9(e) were not in this Agreement. This Section 3.9(e) is intended to constitute a "qualified income offset" within the meaning of Section 1.704-1(b)(2)(ii) of the Regulations and shall be interpreted consistently therewith.

(f) <u>Gross Income Allocation</u>. In the event any Limited Partner has a deficit Capital Account at the end of any Fiscal Year that is in excess of the sum of (i) the amount such Limited Partner is obligated to restore pursuant to any provision of this Agreement and (ii) the amount such Limited Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, each such Limited Partner will be specially allocated items of Partnership gross income and gain in the amount of such excess as quickly as possible; *provided* that an allocation pursuant to this Section 3.9(f) may be made only if and to the extent that such Limited Partner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article III have been made as if Section 3.9(e) and this Section 3.9(f) were not in this Agreement.

(g) <u>Section 704(b) Compliance</u>. The allocations provided in this Section 3.9 are intended to comply with the Regulations under Section 704(b) of the Code and may, as determined by the General Partner, be interpreted and applied in a manner consistent therewith.

## 3.10   Curative Allocations

The allocations set forth in Sections 3.9(b), (e) and (f) (the "***Regulatory Allocations***") are intended to comply with certain requirements of the Regulations. It is the intent of the Partners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Partnership income, gain, loss, or deduction pursuant to this Section 3.10. Therefore, notwithstanding any other provision of this Article III (other than the Regulatory Allocations), the General Partner shall make such offsetting special allocations of the Partnership income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Partner's Capital

Appx. 03644

Account balance is, to the extent possible, equal to the Capital Account balance such Partner would have had if the Regulatory Allocations were not part of this Agreement and all Partnership items were allocated pursuant to other provisions of this Article III (other than the Regulatory Allocations).

### 3.11 Tax Matters

(a) Each Partner agrees not to treat, on any U.S. federal, state, local and/or non-U.S. income tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with the treatment of such item by the Partnership or which would result in inconsistent treatment, and each Partner further agrees to treat, on any U.S. federal, state, local and/or non-U.S. income tax return in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner consistent with the treatment of such item by the Partnership.

(b) To the fullest extent permitted by law, each Limited Partner agrees to (i) provide such cooperation and assistance, including executing and filing forms or other statements and providing information about the Limited Partner, as is reasonably requested by the Tax Matters Partner, to enable the Partnership to satisfy any applicable tax reporting or compliance requirements, to make any tax election or to qualify for an exception from or reduced rate of tax or other tax benefit or be relieved of liability for any tax regardless of whether such requirement, tax benefit or tax liability existed on the date such Partner was admitted to the Partnership, (ii) amend the Limited Partner's tax returns and pay any resulting taxes, interest and penalties in connection with an election by the Partnership under Section 6225(a) of the Code, as amended by the BBA, (iii) take into account any adjustments and pay any taxes, interest and penalties that result from an election by the Partnership under Section 6226 of the Code, as amended by the BBA, and/or (iv) indemnify and hold harmless the Partnership from and against any liability with respect to the Limited Partner's share of any tax deficiency (including any interest and penalties associated therewith) paid or payable by the Partnership that is (A) allocable to such Limited Partner (as reasonably determined by the General Partner in accordance with this Agreement) with respect to an audited or reviewed taxable year for which such Partner was a partner in the Partnership or (B) attributable (as reasonably determined by the General Partner) to the failure of such Limited Partner to cooperate with or provide any such forms, statements, or other information as requested by the Tax Matters Partner pursuant to clause (i) above.

### 3.12 Distributions

(a) The Partnership will make distributions in respect of withdrawals in accordance with Section 5.5 and liquidation in accordance with Section 6.2. The amount and timing of any other distributions from the Partnership shall be determined by the General Partner. Distributions will generally be made in proportion to the respective Partnership Percentages of the Partners for the Fiscal Period when made. Any distributions may be paid in cash, in kind or partly in cash and partly in kind.

21

**Appx. 03645**

(b)     Notwithstanding any provision to the contrary contained in this Agreement, the Partnership, and the General Partner on behalf of the Partnership, may not make a distribution to any Partner from any account in connection with its Interest if such distribution would violate Section 17-607 of the Act or other applicable law.

––––––––––––

**Article IV**
**MANAGEMENT**

––––––––––––

**4.1     Duties and Powers of the General Partner**

(a)     Subject to the terms and conditions of this Agreement, the General Partner shall have complete and exclusive power and responsibility, to the fullest extent permitted by the Act, for managing and administering the affairs of the Partnership (other than any investment or trading activities, which are entered into at the Master Fund level and managed by the Investment Manager), and shall have the power and authority to do all things that the General Partner considers necessary or desirable to carry out its duties hereunder and to achieve the purposes of the Partnership.

(b)     The General Partner shall have the right, without the notification to or consent of any Limited Partner or other Person, to make adjustments to the structure of the Partnership in order to address applicable structural, ownership, legal, or regulatory issues, or to improve overall tax efficiency; *provided* that no such adjustment would cause any material adverse consequences to the Limited Partners.

(c)     Without limiting the generality of the General Partner's duties and powers hereunder and notwithstanding anything to the contrary contained herein, the General Partner shall have full power and authority, subject to the other terms and provisions of this Agreement, to execute, deliver and perform such contracts, agreements and other undertakings on behalf of the Partnership, without the consent or approval of any other Person, and to engage in all activities and transactions, as it may deem necessary or advisable for, or as may be incidental to, the conduct of the business contemplated by this Section 4.1, including, without in any manner limiting the generality of the foregoing, (i) contracts, agreements, undertakings and transactions with any Partner or with any other Person, firm or corporation having any business, financial or other relationship with any Partner or Partners, (ii) agreements with each Limited Partner in connection with its purchase of an Interest, including a subscription agreement wherein such Limited Partner agrees to be bound by the terms of this Agreement, (iii) any agreements to induce any Person to purchase an Interest and (iv) the Investment Management Agreement delegating to the Investment Manager certain of the powers and authority vested by this Agreement in the General Partner as the General Partner and the Investment Manager may agree from time to time, each without any further act, approval or vote of any Person.

Appx. 03646

(d)     The General Partner may terminate or replace the Investment Manager in accordance with the terms of the Investment Management Agreement. The General Partner may delegate to any other Person (including any of its Affiliates) any power and authority vested in the General Partner pursuant to this Agreement that is not otherwise delegated to the Investment Manager.

(e)     Every power vested in the General Partner pursuant to this Agreement shall be construed as a power to act (or not to act) in its sole and absolute discretion, except as otherwise expressly provided herein. No provision of this Agreement shall be construed to require the General Partner to violate the Act, the Advisers Act or any other law, regulation or rule of any self-regulatory organization.

(f)     Notwithstanding any other provision of this Agreement or otherwise applicable provision of law or equity, whenever in this Agreement, the General Partner is permitted or required to make a decision (i) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, the General Partner shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall, to the fullest extent permitted by applicable law, have no duty or obligation to give any consideration to any interest of or factors affecting the Partnership or the Limited Partners, or (ii) in its "good faith" or under another expressed standard, the General Partner shall act under such express standard and shall not be subject to any other or different standards. Unless otherwise expressly stated, for purposes of this Section 4.1(f), the General Partner shall be deemed to be permitted or required to make all decisions hereunder in its sole discretion.

(g)     If requested by the General Partner, each Limited Partner shall deliver to the General Partner: (i) an affidavit in form satisfactory to the General Partner that the applicable Limited Partner (and its partners, shareholders, members, and/or beneficial owners, and/or controlling persons, as the case may be) is not subject to withholding under the provisions of any United States federal, state, local or non-U.S. laws; (ii) any certificate that the General Partner may reasonably request with respect to any such laws; (iii) any other form or instrument reasonably requested by the General Partner relating to such Limited Partner's status under such laws; and/or (iv) any information or documentation prescribed under FATCA or as may be necessary for the Partnership to comply with its obligations, or to avoid withholding, under FATCA or any other automatic exchange of information agreement or arrangement, including, without limitation, the Organisation for Economic Cooperation and Development's Common Reporting Standard. In the event that a Limited Partner fails or is unable to deliver to the General Partner an affidavit described in Section 4.1(g), the General Partner may withhold amounts from such Partner in accordance with Section 3.5(b).

**4.2     Expenses**

(a)     Subject to Section 4.2(f), each of the General Partner and the Investment Manager pays all of its own operating and overhead costs without reimbursement by the Partnership. The Partnership will not have its own separate employees or office,

and it will not reimburse the General Partner or the Investment Manager for salaries, office rent and other general overhead expenses of the General Partner or the Investment Manager.

(b)    The Partnership, and not the General Partner or the Investment Manager, will pay, or reimburse the General Partner and the Investment Manager for, all costs, fees and expenses arising in connection with the Partnership's operations, as well as its *pro rata* share of the cost of the Master Fund's initial organization, operations and Investment-related expenses.  Such expenses payable by the Partnership include the following:

(i)    the Partnership's *pro rata* share of the cost of the Master Fund's investment program, including, without limitation, brokerage commissions, other expenses related to buying and selling securities (including trading errors that are not the result of the Investment Manager's gross negligence, willful misconduct or fraud), costs of due diligence regardless of whether a particular transaction is consummated, the costs of attending shareholder meetings, research expenses and costs related to monitoring Investments;

(ii)    initial organizational expenses of the Partnership; provided that, such organizational costs may be expensed immediately, or in the General Partner's discretion, amortized in whole or in part and capitalized over a period of 60 calendar months from the date the Partnership commences operations, which may result in an exception to GAAP;

(iii)    fees and expenses of advisers and consultants;

(iv)    Management Fees (charged at the Master Fund level);

(v)    fees and expenses of any custodians, escrow or transfer agents or other investment-related service providers;

(vi)    indemnification expenses incurred in connection with Section 4.5 and the cost of insurance against potential indemnification liabilities;

(vii)    interest and other borrowing expenses;

(viii)    legal, administrative, accounting, tax, audit and insurance expenses;

(ix)    expenses of preparing and distributing reports, financial statements and notices to Limited Partners;

(x)    litigation or other extraordinary expenses;

(xi)    any withholding, transfer or other taxes imposed or assessed on, or payable by, the Partnership (including any interest and penalties); and

24

(xii)   the cost of periodically updating the Partnership's offering memorandum and this Agreement.

(c)   Expenses generally will be borne *pro rata* by the Partners in accordance with their respective Partnership Percentages; *provided* that expenses may be specially allocated among the Partners as follows:

   (i)   with respect to expenses related to Investments (other than taxes), *pro rata* in accordance with their respective Partnership Percentages; and

   (ii)   as provided elsewhere in this Agreement, including Sections 3.4, 3.5, 3.6 and 5.5.

(d)   Each of the General Partner and the Investment Manager, as appropriate, shall be entitled to reimbursement from the Partnership for any of the expenses paid by it on behalf of the Partnership pursuant to Section 4.2(b); *provided* that the General Partner or the Investment Manager may absorb any or all of such expenses incurred on behalf of the Partnership. The Investment Manager may retain, in connection with its responsibilities hereunder as a delegatee of the General Partner, the services of others to assist in the investment advice to be given to the Master Fund, including, but not limited to, any Affiliate of the Investment Manager, but payment for any such services shall be assumed by the Investment Manager and neither the Master Fund nor the Partnership shall have any liability therefor; *provided, however*, that the Investment Manager, in its sole discretion, may retain the services of independent third party professionals on behalf of the Master Fund, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the Master Fund, and the Master Fund shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

(e)   If the General Partner or the Investment Manager, as appropriate, shall incur any of the expenses referred to in Section 4.2(b) for the account or for the benefit of, or in connection with its activities or those of its Affiliates on behalf of, both the Master Fund and any Other Account, the General Partner or the Investment Manager, as appropriate, will allocate such expense among the Master Fund and each such Other Account in proportion to the size of the Investment made by each in the activity or entity to which the expense relates, or in such other manner as the General Partner considers fair and reasonable.

(f)   Each of the General Partner and the Investment Manager is entitled to use "soft dollars" generated by the Master Fund to pay for certain investment research and brokerage services that provide lawful and appropriate assistance to the General Partner or the Investment Manager in the performance of investment decision-making responsibilities to the extent such use falls within the safe harbor afforded by Section 28(e) of the Securities Exchange Act of 1934, as amended, or is otherwise reasonably related to the investment decision-making process, or to cover certain Master Fund expenses. Use of "soft dollars" by the General Partner

25

or the Investment Manager as described herein shall not constitute a breach by the either the General Partner or the Investment Manager of any fiduciary or other duty which the General Partner or the Investment Manager may be deemed to owe to the Partnership or its Partners.

## 4.3 Rights of Limited Partners

The Limited Partners shall take no part in the management, control or operation of the Partnership's business, and shall have no right or authority to act for the Partnership or to vote on matters other than the matters set forth in this Agreement or as required by applicable law. Except as otherwise provided herein or required by law, a Limited Partner shall have no liability for the debts or obligations of the Partnership.

## 4.4 Other Activities of Partners

(a)  The General Partner shall not be required to devote any specific amount of its time to the affairs of the Partnership, but shall devote such of its time to the business and affairs of the Partnership as it shall determine in good faith to be necessary to conduct the affairs of the Partnership for the benefit of the Partnership and the Partners.

(b)  Each Partner acknowledges and agrees that any other Partner, its Affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees, may engage in or possess an interest in other business ventures or commercial dealings of every kind and description, independently or with others, including, but not limited to, management of other accounts, investment in, or financing, acquisition and disposition of, securities, investment and management counseling, brokerage services, serving as directors, officers, advisers or agents of other companies, partners of any partnership, or trustees of any trust, or entering into any other commercial arrangements, and will not be disqualified solely on the basis that any such activities may conflict with any interest of the parties with respect to the Partnership or the Master Fund. Without in any way limiting the foregoing, each Partner hereby acknowledges that (i) none of the Partners, their Affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees shall have any obligation or responsibility to disclose or refer any of the investment or other opportunities obtained through activities contemplated by this Section 4.4(b) to the General Partner or the Limited Partners, but may refer the same to any other party or keep such opportunities for their own benefit; and (ii) the Partners, their Affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees are hereby authorized to engage in activities contemplated by this Section 4.4(b) with, or to purchase, sell or otherwise deal or invest in investments issued by, companies in which the General Partner might from time to time invest or be able to invest or otherwise have any interest on behalf of the Master Fund, without the consent or approval of the Partnership or any other Partner. The Partners expressly agree that no other Partner shall have any rights in or to such other activities, or any profits derived therefrom.

26

(c)    The General Partner and its Affiliates shall allocate investment opportunities to the Master Fund and any Other Account fairly and equitably over time. Notwithstanding the foregoing, the General Partner is under no obligation to accord exclusivity or priority to the Master Fund in the event of limited investment opportunities. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) fiduciary duties owed to the accounts; (ii) the primary mandate of the accounts; (iii) the capital available to the accounts; (iv) any restrictions on the accounts and the investment opportunity; (v) the sourcing of the investment, size of the investment and amount of follow-on available related to the investment; (vi) whether the risk-return profile of the proposed investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (vii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (viii) liquidity requirements of the account; (ix) potentially adverse tax consequences; (x) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (xi) the need to re-size risk in the account's portfolio. The General Partner has the authority to allocate trades to multiple accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the General Partner may allocate the trades among different accounts on a basis it considers fair and equitable over time.

(d)    The Principal, as well as the employees and officers of the Investment Manager and of organizations affiliated with the Investment Manager, may buy and sell securities for their own account or the account of others, but may not buy securities from or sell securities to the Master Fund (such prohibition does not extend to the purchase or sale of Interests), unless such purchase or sale is in compliance with the applicable provisions of the Advisers Act.

(e)    Each Partner hereto hereby waives, and covenants not to bring a cause of action in law or equity on the basis of, any law (statutory, common law or otherwise) respecting the rights and obligations of the Partners which is or may be inconsistent with this Section 4.4.

(f)    The General Partner and its Affiliates reserve the right to establish collective investment vehicles that have stated investment programs or terms that differ from those of the Partnership or that are targeted primarily to investors for which the Partnership is not designed to be a suitable investment vehicle. The General Partner and its Affiliates also reserve the right to establish and provide management or advisory services to Other Accounts for significant investors, whether or not such accounts have the same investment program as the Partnership.

Appx. 03651

(g)    Each Limited Partner acknowledges that the General Partner or the Investment Manager may engage one or more of their respective Affiliates to provide services to the Partnership or the Master Fund for compensation.

## 4.5    Duty of Care; Indemnification

(a)    None of the Indemnified Persons will be liable to the Partnership or any Limited Partner for any loss or damage arising by reason of being or having been an Indemnified Person or from any acts or omissions in the performance of its services as an Indemnified Person in the absence of gross negligence, willful misconduct or fraud, or as otherwise required by law.   In no event shall any Indemnified Person be liable for any consequential damages, special or indirect damages or lost profits. An Indemnified Person may consult with counsel and accountants in respect of the Partnership's affairs and will be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants, provided that they were selected in accordance with the standard of care set forth above.

(b)    The Partnership shall, to the fullest extent permitted by law, indemnify and hold harmless each Indemnified Person from and against any and all liabilities suffered or sustained by an Indemnified Person by reason of the fact that it, he or she is or was an Indemnified Person or in connection with this Agreement or the Partnership's business or affairs, including, without limitation, any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, suit or proceeding, provided that such liability did not result from the gross negligence, willful misconduct or fraud of such Indemnified Person.   The Partnership will, in the sole discretion of the General Partner, advance to any Indemnified Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action, suit or proceeding which arises out of such conduct.   In the event that such an advance is made by the Partnership, the Indemnified Person will agree to reimburse the Partnership to the extent that it is finally determined that the Indemnified Person was not entitled to indemnification in respect thereof.

(c)    Notwithstanding any of the foregoing, the provisions of this Section 4.5 do not provide for the exculpation or indemnification of any Indemnified Person for any liability (including liability under U.S. federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the above provisions to the fullest extent permitted by law.

(d)    Pursuant to the indemnification and exculpation provisions above and as set forth in the Master Fund Partnership Agreement, the Master Fund (and not the applicable Indemnified Person) will be responsible for any losses resulting from trading errors and similar human errors, and the Partnership will bear its *pro rata* portion thereof, absent gross negligence, willful misconduct or fraud of any Indemnified Person.

(e)    The above-mentioned Indemnified Persons are also indemnified by each Limited Partner for any amounts of tax withheld or required to be withheld with respect to that Limited Partner, and also for any amounts of interest, additions to tax, penalties and other costs borne by any such persons in connection therewith to the extent that the balance of the Limited Partner's Capital Account is insufficient to fully compensate the General Partner or the Investment Manager for such costs.

————————

## Article V
## ADMISSIONS, TRANSFERS AND WITHDRAWALS

————————

### 5.1    Admission of Limited Partners

The General Partner may, on the first day of each calendar month, or at such other times as the General Partner may determine, without advance notice to or consent of the Limited Partners, admit to the Partnership any Person who shall execute this Agreement or any other writing evidencing the intent of such Person to become a Limited Partner.  Such admission shall be effective when the General Partner enters the name of such Person on the Schedule of Partners and does not require the consent or approval of any other Partner.  The General Partner shall have the authority to reject subscriptions for Interests in whole or in part.

### 5.2    Admission of Additional General Partners

(a)    Except as provided in Section 5.2(b), the General Partner may admit one or more Persons as additional general partners to the Partnership.  No additional general partner shall be added unless such additional general partner agrees to be bound by all of the terms of this Agreement and adding such additional general partner would not have any of the effects described in clauses (i) through (iv) of Section 5.3(c) (except as specifically set forth therein).

(b)    Any Person to whom the General Partner has transferred its general partner interest in accordance with Section 5.4 will be admitted to the Partnership as a substitute General Partner without the consent of the Limited Partners unless otherwise provided for in Section 5.4.

### 5.3    Transfer of Interests of Limited Partners

(a)    Each Limited Partner agrees with all other Partners that it shall not make or attempt to make any Transfer of its Interest which will violate this Section 5.3.  In the event of any attempted Transfer of any Limited Partner's Interest in violation of the provisions of this Section 5.3, without limiting any other rights of the Partnership, the General Partner shall have the right to require the withdrawal of such Limited Partner's Interest from the Partnership as provided by Section 5.5(j).

29

(b)    No Transfer of any Limited Partner's Interest, whether voluntary or involuntary, shall be valid or effective, and no transferee shall become a substituted Limited Partner, unless the prior written consent of the General Partner has been obtained, which consent may be granted, withheld or conditioned for any reason by the General Partner. In the event of any Transfer, all of the conditions of the remainder of this Section 5.3 must also be satisfied.

(c)    Without limiting the General Partner's discretion pursuant to the preceding paragraph, the General Partner expects to withhold consent to any Transfer of any Limited Partner's Interest, whether voluntary or involuntary, if the General Partner has reason to believe that such Transfer may:

(i)    require registration of any Interest under any securities laws of the United States of America, any state thereof or any other jurisdiction;

(ii)    subject the Partnership or the General Partner to a requirement to register, or to additional disclosure or other requirements, under any securities or commodities laws of the United States of America, any state thereof or any other jurisdiction;

(iii)    result in a termination of the Partnership for U.S. federal income tax purposes under Section 708(b)(1)(B) of the Code, or cause the Partnership to be treated as a "publicly traded partnership" for U.S. federal income tax purposes under Section 7704(b) of the Code or cause the Partnership not to qualify for one of the safe harbors under Section 1.7704 1(e), (f), (g), (h) or (j) of the Regulations;

(iv)    result in the Partnership being considered an investment company within the meaning of the Investment Company Act;

(v)    result in violation of any anti-money laundering rules or regulations applicable to the Partnership, the Investment Manager or the General Partner;

(vi)    violate or be inconsistent with any representation or warranty made by the transferring Limited Partner at the time the Limited Partner subscribed to purchase an Interest; or

(vii)    cause all or any portion of the assets of the Master Fund to constitute Plan Assets of any ERISA Partner for purposes of ERISA or to be subject to the provisions of ERISA to substantially the same extent as if owned directly by an ERISA Partner.

The transferring Limited Partner, or its legal representative, must give the General Partner written notice before making any voluntary Transfer and after any involuntary Transfer and must provide sufficient information to allow legal counsel acting for the Partnership to make the determination that the proposed Transfer would not result in any of the consequences referred to in clauses (i) through (vii)

30

above.  If an assignment, Transfer or disposition occurs by reason of the death of a Limited Partner or assignee, the notice may be given by the duly authorized representative of the estate of the Limited Partner or assignee.  The notice must be supported by proof of legal authority and valid assignment acceptable to the General Partner.

(d)    In the event any Transfer permitted by this Section 5.3 shall result in multiple ownership of any Limited Partner's Interest, the General Partner may require one or more trustees or nominees to be designated to represent a portion of or the entire Interest transferred for the purpose of receiving all notices which may be given and all payments which may be made under this Agreement, and for the purpose of exercising the rights which the transferor as a Limited Partner had pursuant to the provisions of this Agreement.

(e)    Subsequent to receipt of the consent of the General Partner (which consent may be withheld by the General Partner), an authorized transferee shall be entitled to the allocations and distributions attributable to the Interest transferred to such transferee and to transfer such Interest in accordance with the terms of this Agreement; *provided*, *however*, that such transferee shall not be entitled to the other rights of a Limited Partner as a result of such Transfer until it becomes a substituted Limited Partner.  No transferee may become a substituted Limited Partner without the consent of the General Partner (which consent may be withheld for any reason or no reason by the General Partner).  If the General Partner withholds consent to such substitution, a transferee will not have any of the rights of a Limited Partner, except that the transferee will be entitled, unless prohibited by law, to receive that share of capital or profits and to have the right of withdrawal to which its transferor would have been entitled and will be subject to the other terms of this Agreement.  A transferring Limited Partner will remain liable to the Partnership as provided under applicable law and this Agreement regardless of whether its transferee becomes a substituted Limited Partner.  Notwithstanding the above, the Partnership and the General Partner shall incur no liability for allocations and distributions made in good faith to the transferring Limited Partner until a written instrument of transfer has been received by the Partnership and recorded on its books and the effective date of the Transfer has passed.

(f)    Any other provision of this Agreement to the contrary notwithstanding, a transferee shall be bound by the provisions hereof.  Prior to recognizing any Transfer in accordance with this Section 5.3, the General Partner may require the transferring Limited Partner to execute and acknowledge an instrument of Transfer in form and substance satisfactory to the General Partner, and may require the transferee to make certain representations and warranties to the Partnership and Partners and to accept, adopt and approve in writing all of the terms and provisions of this Agreement.  A transferee shall become a substituted Limited Partner and shall succeed to the portion of the transferor's Capital Account relating to the Interest transferred effective upon the satisfaction of all of the conditions for such Transfer contained in this Section 5.3.

Appx. 03655

(g)    In the event of a Transfer or in the event of a distribution of assets of the Partnership to any Partner, the Partnership may, but shall not be required to, file an election under Section 754 of the Code and in accordance with the applicable Regulations, to cause the basis of the Partnership's assets to be adjusted for U.S. federal income tax purposes as provided by Section 734 or 743 of the Code and shall make any mandatory adjustments to the basis of the Partnership's assets as required by Section 734 or 743 of the Code. If the Partnership does not file an election under Section 754 in connection with a Transfer and if the transferring Limited Partner is a Negative Basis Partner, the General Partner may elect to allocate to the transferring Limited Partner pursuant to Section 3.9(d) net losses or items of loss and deduction realized by the Partnership for the Fiscal Year in which the Transfer occurs as if the transferring Limited Partner were withdrawing from the Partnership pursuant to Section 5.5.

(h)    In the event of a Transfer at any time other than the end of a Fiscal Year, items of income, gain, loss, deduction or credit recognized by the Partnership for U.S. federal income tax purposes will be allocated between the transferring parties, as determined by the General Partner, using any permissible method under Code Section 706(d) and the Regulations thereunder. The transferring parties agree to reimburse the General Partner and the Partnership for any incidental accounting fees and other expenses incurred by the General Partner and the Partnership in making allocations pursuant to this Section 5.3(h).

**5.4    Transfer of Interest of the General Partner**

The General Partner may not Transfer its Interest as a general partner of the Partnership other than (a) to one or more of its direct or indirect beneficial owners or their Affiliates, or (b) with the approval of a Majority of Limited Partners. Each Limited Partner shall be deemed to have consented to any such Transfer made in accordance with this Section 5.4.

**5.5    Withdrawal of Interests of Partners**

(a)    Except as provided in this Section 5.5, a Limited Partner may voluntarily withdraw all or part of its Capital Account effective as of the last Business Day of each calendar month and/or such other Business Days as the General Partner may determine in its sole discretion (such date, a "*Withdrawal Date*") upon not less than 30 calendar days' prior written notice ("*Withdrawal Notice*") to the Administrator; provided that, any partial withdrawals may only be made in minimum amounts of $100,000. Any notice of withdrawal shall be irrevocable by the Limited Partner, unless otherwise agreed by the General Partner. The General Partner may waive the notice requirements of this Section 5.5(a), including with respect to the Capital Accounts of the Affiliated Investors. Notwithstanding anything herein to the contrary, the General Partner may agree with certain Limited Partners to provide for different withdrawal terms and notice periods.

(b)    For the purposes of this Section 5.5 (and as described in Section 3.3(a)), each capital contribution shall be accounted for using a separate memorandum

Appx. 03656

sub-account, and, in the case of a Limited Partner for which more than one memorandum sub-account is maintained, the withdrawals of the balance of any such sub-accounts shall be processed on a "first-in, first-out" basis based upon the date on which each capital contribution was made, unless otherwise agreed between the General Partner and such Limited Partner.   Each memorandum sub-account related to a contribution of capital from a Limited Partner will be treated as if it were the separate Capital Account of a separate Partner for the purposes of applying the withdrawal provisions of this Section 5.5.

(c)     A withdrawal of capital from a Capital Account that occurs during an applicable Soft Lock-up Period or Second Soft Lock-up Period is subject to the applicable Early Withdrawal Reduction.   The General Partner may waive the Soft Lock-up Period or the Second Soft Lock-up Period with respect to any Capital Account of a Limited Partner.

(d)     Any Withdrawal Notice shall be irrevocable by the Limited Partner, unless otherwise agreed by the General Partner.   For the avoidance of doubt, if a Limited Partner notifies the General Partner of its intent to withdraw and later chooses not to withdraw (with the General Partner's consent), any transaction costs incurred by the Partnership or the General Partner in connection therewith may, in the discretion of the General Partner, be charged to such withdrawing Limited Partner.   The General Partner or the Administrator may refuse to honor any Limited Partner's request for a full or partial withdrawal if such request is not accompanied by such additional information as the General Partner or the Administrator may reasonably require.

(e)     Payment of the estimated amount due with respect to any permitted withdrawal pursuant to this Section 5.5 will generally be made within 10 Business Days of the Withdrawal Date, *provided* that, the General Partner may delay such payment if such delay is reasonably necessary to prevent such withdrawal from having a material adverse impact on the Partnership.   Amounts withdrawn by a Limited Partner will not earn interest for the period from the effective Withdrawal Date through the settlement date.

(f)     The General Partner may deduct from any withdrawal proceeds due to any Limited Partner pursuant to this Section 5.5 an amount representing the Partnership's actual or estimated expenses, as determined by the General Partner in good faith, associated with processing the withdrawal, as well as any Early Withdrawal Reduction.   Any such withdrawal deduction will be retained for the benefit of the Partnership.

(g)     Upon receipt by the Partnership of a Limited Partner's Withdrawal Notice, the General Partner, in its capacity as the general partner of the Master Fund, will have the discretion to manage the Master Fund's assets in a manner that would provide for cash being available to the Partnership to satisfy such Limited Partner's withdrawal request, but the General Partner shall be under no obligation to effect sales of Master Fund assets if the General Partner determines that such transactions

Appx. 03657

might be detrimental to the interest of the other Investors or that such transactions are not reasonably practicable. The General Partner may effect withdrawal payments (i) in cash, (ii) in kind, by transfer of marketable or non-marketable Investments received from the Master Fund or other assets of the Partnership, the value of which, as determined in accordance with Section 7.3, would satisfy the Limited Partner's request for withdrawal, or (iii) in any combination of the foregoing. In the event that the General Partner satisfies a withdrawal request with Investments or assets in kind, such securities may be transferred to a liquidating account and sold by the Partnership for the benefit of the withdrawing Limited Partner, in which case, payment of the withdrawal proceeds attributable to such Investments will be delayed until such Investments are sold. The amount payable in respect of such Investments will depend on the performance of such Investments through to the date on which they are sold. The cost of operating the liquidating account and selling the Investment(s) will be deducted from the proceeds of sale paid to the withdrawing Limited Partner.

(h)     The General Partner may, at any time, suspend (a) the calculation of the net asset value of the Interests (and the applicable valuation date); (b) the issuance of Interests; (c) the withdrawal by Limited Partners of their Interests (and the applicable Withdrawal Date); and/or (d) the payment of withdrawal proceeds (even if the calculation dates and Withdrawal Dates are not postponed), during any period which: (i) any stock exchange on which a substantial part of Investments owned by the Partnership (through the Master Fund) are traded is closed, other than for ordinary holidays, or dealings thereon are restricted or suspended; (ii) there exists any state of affairs as a result of which (A) disposal of a substantial part of the Investments owned by the Partnership (through the Master Fund) would not be reasonably practicable and might seriously prejudice the Limited Partners, or (B) it is not reasonably practicable for the Partnership fairly to determine the value of its net assets; (iii) none of the withdrawal requests which have been made may lawfully be satisfied by the Partnership; (iv) there is a breakdown in the means of communication normally employed in determining the prices of a substantial part of the Investments of the Partnership (through the Master Fund); (v) in the sole discretion of the General Partner, it is necessary to preserve the Partnership's assets; or (vi) automatically upon any suspension of withdrawals by the Master Fund for similar reasons.

(i)     The Administrator will promptly notify each Limited Partner who has submitted a withdrawal request and to whom payment in full of the amount being withdrawn has not yet been remitted of any suspension of withdrawals or suspension of the payment of withdrawal proceeds pursuant to Section 5.5(h). Any remaining amount of a withdrawal request that is not satisfied due to such a suspension remains at risk as per other amounts invested in the Partnership and subject to the applicable Management Fee until such amount is finally and fully withdrawn. Such Limited Partners will not be given any priority with respect to the withdrawal of Interests after the cause for such suspension or limitation ceases to exist. The General Partner may in its sole discretion, however, permit such Limited Partners to withdraw their withdrawal requests to the extent that the relevant Withdrawal

34

Date has not yet passed.  For the avoidance of doubt, where a suspension of the payment of withdrawal proceeds is declared between the relevant Withdrawal Date and the remittance of such payment proceeds, affected Limited Partners shall not have any right to withdraw their withdrawal requests.  Upon the reasonable determination by the General Partner that conditions leading to a suspension no longer apply, the Administrator will notify the Limited Partners of the end of the suspension.  At such time, any such suspended payments shall generally be paid in accordance with the normal process for making such payments, withdrawal rights shall be promptly reinstated, and any pending withdrawal requests which were not withdrawn (or new, timely withdrawal requests) will be effected as of the first Withdrawal Date following the removal of the suspension, subject to the foregoing restrictions on withdrawals.  For the avoidance of doubt, the terms of Section 5.5(h) and this Section 5.5(i) shall not affect the discretion of the General Partner to compel the withdrawal of the Interest of any Limited Partner pursuant to Section 5.5(j).

(j)    The General Partner may, upon not less than seven days' prior written notice (or immediately if the General Partner determines in its sole discretion that such Limited Partner's continued participation in the Partnership may cause the Partnership, the Master Fund, the General Partner or the Investment Manager to violate any applicable law), require any Limited Partner's Interest to be withdrawn in part or in its entirety from the Partnership and for the Limited Partner to cease to be a limited partner of the Partnership (in the case of a withdrawal of the Limited Partner's Interest in its entirety) pursuant to this Section 5.5(j) (a "***Compulsory Withdrawal***").  The General Partner will compel the withdrawal of a Limited Partner's Interest in its entirety if a Limited Partner requests a withdrawal that would cause its total investment with respect to a particular Series to fall below a minimum of $100,000 (a "***Minimum Required Withdrawal***").   In either case, the amount due to any such Partner required to withdraw from the Partnership shall be equal to the value of such Partner's Capital Account as of the Withdrawal Date determined by the General Partner, net of any deductions imposed pursuant to Section 5.5(f).  Except as otherwise provided herein, settlements pursuant to this Section 5.5(j) will be made in the same manner as voluntary withdrawals, but the Early Withdrawal Reduction will not apply in the event of a Compulsory Withdrawal.  However, for purposes of clarity, the Early Withdrawal Reduction will apply to any Minimum Required Withdrawal.

(k)    The right of any Partner to withdraw or receive distributions pursuant to the provisions of this Section 5.5 is subject to all Capital Account allocations and adjustments contemplated by this Agreement and to the provision by the General Partner for all Partnership liabilities and for reserves for contingencies provided in Section 3.6.   Notwithstanding anything to the contrary herein, the General Partner may establish reserves and holdbacks for estimated accrued expenses, liabilities and contingencies, including, without limitation, general reserves for unspecified contingencies (even if such reserves or holdbacks are not otherwise required by GAAP) or liabilities stemming from tax obligations (as such may be determined in the sole discretion of the General Partner and whether or not incurred directly or

**Appx. 03659**

indirectly), which could reduce the amount of a distribution upon a Limited Partner's withdrawal.

(l)    With respect to any amounts withdrawn, a withdrawing Partner shall not share in the income, gains and losses of the Partnership or have any other rights as a Partner (in the case of a complete withdrawal) after the applicable Withdrawal Date, except as provided in Section 3.6. For the avoidance of doubt, none of the Partnership, the General Partner or the Investment Manager will be liable to a Limited Partner for interest on the proceeds of any withdrawal.

(m)    The Interest of a Limited Partner may not be withdrawn from the Partnership prior to its dissolution, except as provided in this Section 5.5.

(n)    Unless prohibited by law, the Special Limited Partner, its Affiliates and any other Person that is entitled to any portion of the Performance Allocation may make withdrawals of all or any portion of the amount of the Performance Allocation from their capital accounts in the Master Fund as of any Withdrawal Date.

(o)    If the Master Fund violates the investment restrictions set forth in the Master Fund Partnership Agreement and fails to remedy the violation on or before the Remedy Date, any Limited Partner may withdraw all or part of its Capital Account (and corresponding Capital Sub-Account) on the next Withdrawal Date and will not be subject to the Early Withdrawal Reduction; provided that, such Limited Partner has requested such withdrawal in writing within 30 Business Days after the Remedy Date.

**5.6    Withdrawal of Original Limited Partner**

The Original Limited Partner (in its capacity as the original limited partner of the Partnership) hereby withdraws from the Partnership and is entitled to the return of any capital contribution, without interest or deduction, upon the Commencement Date.

————————

**Article VI
DISSOLUTION AND LIQUIDATION**

————————

**6.1    Dissolution of Partnership**

(a)    The Partnership shall be dissolved upon the first to occur of the following dates:

(i)    any date on which the General Partner shall elect in writing to dissolve the Partnership; or

Appx. 03660

(ii)    the occurrence of any other event causing (A) the General Partner (or a successor to its business) to cease to be the general partner of the Partnership or (B) the dissolution of the Partnership under the Act.

(b)    The parties agree that irreparable damage would be done to the goodwill and reputation of the Partners if any Limited Partner should bring an action in court to dissolve the Partnership. Care has been taken in this Agreement to provide for fair and just payment in liquidation of the Interests of all Partners. Accordingly, each Limited Partner hereby waives and renounces its right to such a court decree of dissolution or to seek the appointment by the court of a liquidator for the Partnership except as provided herein.

## 6.2    Liquidation of Assets

(a)    Upon dissolution of the Partnership, the General Partner shall promptly liquidate the business and administrative affairs of the Partnership to the extent feasible, except that if the General Partner is unable to perform this function, a liquidator elected by a Majority of Limited Partners shall liquidate the business and administrative affairs of the Partnership. Net Profit and Net Loss during the Fiscal Periods, which includes the period of liquidation, shall be allocated pursuant to Article III. The proceeds from liquidation shall be divided in the following manner, subject to the Act:

(i)    the debts, liabilities and obligations of the Partnership, other than any debts to the Partners as Partners, and the expenses of liquidation (including legal, administrative and accounting expenses incurred in connection therewith), up to and including the date that distribution of the Partnership's assets to the Partners has been completed, shall first be satisfied (whether by payment or the making of reasonable provision for payment thereof);

(ii)    such debts as are owing to the Partners as Partners are next paid; and

(iii)    the Partners shall next be paid liquidating distributions (in cash or in securities or other assets, whether or not readily marketable) *pro rata* in accordance with, and up to the positive balances of their respective Capital Accounts, as adjusted pursuant to Article III to reflect allocations for the Fiscal Period ending on the date of the distributions under this Section 6.2(a)(iii).

(b)    Notwithstanding this Section 6.2 and the priorities set forth in the Act, the General Partner or liquidator may distribute ratably in kind rather than in cash, upon dissolution, any assets of the Partnership; *provided*, *however*, that if any in kind distribution is to be made, (i) the assets distributed in kind shall be valued pursuant to Section 7.3, and charged as so valued and distributed against amounts to be paid under Section 6.2(a) and (ii) any gain or loss (as computed for book purposes) attributable to property distributed in kind shall be included in the Net Profit or Net Loss for the Fiscal Period ending on the date of such distribution.

37

———————

**Article VII**
**ACCOUNTING AND VALUATION; BOOKS AND RECORDS**

———————

**7.1**     **Accounting and Reports**

(a)     The Partnership may adopt for tax accounting purposes any accounting method that the General Partner shall decide is in the best interests of the Partnership and that is permissible for U.S. federal income tax purposes.

(b)     As soon as practicable after the end of each Fiscal Year, the General Partner shall cause an audit of the financial statements of the Partnership as of the end of such period to be made by a firm of independent accountants selected by the General Partner. Within 120 days of the end of each year (or as soon as practicable thereafter), but subject to Section 7.5, the General Partner shall furnish to each Limited Partner a copy of the set of audited financial statements prepared in accordance with GAAP, with such adjustments thereto as the General Partner determines appropriate, including a statement of profit and loss for such Fiscal Year and an unaudited status of each such Partner's holdings in the Partnership at such time. The General Partner may elect not to reserve certain amounts that may be required by GAAP and not to provide certain portfolio disclosure required by GAAP to investors and may capitalize and amortize certain of its organizational expenses in deviation from GAAP. Such deviations from GAAP may result in a qualified opinion rendered on the financial statements of the Partnership.

(c)     Upon request to the Administrator, each Partner may receive copies of semi-annual financial statements of the Partnership.

(d)     As soon as practicable after the end of each taxable year, the General Partner shall furnish to each Limited Partner such information as may be required to enable each such Limited Partner properly to report for U.S. federal, state and local income tax purposes its distributive share of each Partnership item of income, gain, loss, deduction or credit for such year. The General Partner shall have discretion as to how to report Partnership items of income, gain, loss, deduction or credit on the Partnership's tax returns, and the Limited Partners shall treat such items consistently on their own tax returns.

**7.2**     **Certain Tax Matters**

(a)     By joining this Agreement, each Limited Partner appoints and designates the General Partner (i) as the "tax matters partner," within the meaning of Section 6231(a)(7) of the Code, and, (ii) for any BBA Effective Period, as the "partnership representative" within the meaning of Section 6223 of the Code (as applicable, the "***Tax Matters Partner***"), or, in each case, under any similar state or local law. The Tax Matters Partner shall have any powers necessary to perform fully in such

38

capacity, and shall be permitted to take any and all actions, to the extent permitted by law, in consultation with the General Partner if the General Partner is not the Tax Matters Partner. The General Partner shall have the exclusive authority to appoint and designate the Investment Manager, or an Affiliate of the General Partner or the Investment Manager, as a successor Tax Matters Partner for any BBA Effective Period. The Tax Matters Partner shall be reimbursed by the Partnership for all costs and expenses incurred by it, and to be indemnified by the Partnership with respect to any action brought against it, in its capacity as the Tax Matters Partner.

(b)     The Limited Partners agree that any and all actions taken by the Tax Matters Partner shall be binding on the Partnership and all of the Limited Partners and the Limited Partners shall reasonably cooperate with the Partnership or the General Partner, and undertake any action reasonably requested by the Partnership or the General Partner, in connection with any elections made by the Tax Matters Partner or as determined to be reasonably necessary by the Tax Matters Partners under any BBA provision.

(c)     Each Limited Partner further agrees that such Limited Partner will not treat any Partnership item inconsistently on such Limited Partner's U.S. federal, state, local and/or non-U.S. tax returns or in any claim for a refund with the treatment of the item on the Partnership's tax returns and that such Limited Partner will not independently act with respect to tax audits or tax litigation affecting the Partnership, unless the prior written consent of the General Partner has been obtained.

(d)     The General Partner may in its sole discretion cause the Partnership to make all elections not otherwise expressly provided for in this Agreement required or permitted to be made by the Partnership under the Code and any state, local or non-U.S. tax laws.

**7.3     Valuation of Partnership Assets and Interests**

(a)     The Partnership's assets are valued as of the close of each Fiscal Period and on any other date selected by the General Partner in its sole discretion in accordance with the valuation of the Master Fund's assets. The Partnership shall utilize the Master Fund's valuations for all purposes in connection with the Partnership.

(b)     The value of the assets of the Partnership and the net worth of the Partnership as a whole determined pursuant to this Section 7.3 are conclusive and binding on all of the Partners and all parties claiming through or under them.

**7.4     Determinations by the General Partner**

(a)     All matters concerning the determination and allocation among the Partners of the amounts to be determined and allocated pursuant to this Agreement, including Article III and accounting procedures applicable thereto, shall be determined by the General Partner, unless specifically and expressly otherwise provided for by the

Appx. 03663

provisions of this Agreement, and such determinations and allocations shall be final and binding on all the Partners; provided, however, that all calculations of the Performance Allocation will be made on the basis of, or subject to correction based on, the annual audit of the Partnership's financial statements and appropriate adjustments will be made to all such calculations and related allocations to the extent necessary as a result of that audit.

(b)     The General Partner may make such adjustments to the computation of Net Profit or Net Loss or any other allocations with respect to any Limited Partner, or any component items comprising any of the foregoing, as it considers appropriate to reflect the financial results of the Partnership and the intended allocation thereof among the Partners in a reasonably accurate, fair and efficient manner. Without limiting the generality of the foregoing, any provision of this Agreement that requires an adjustment to be made to any Capital Account or Capital Sub-Account (or other memorandum sub-account) as of any mid-month or mid-quarter date may be made as of the most recent preceding or succeeding date when a regular valuation is being conducted.

**7.5     Books and Records**

(a)     The General Partner shall keep books and records pertaining to the Partnership's affairs showing all of its assets and liabilities, receipts and disbursements, realized income, gains, deductions and losses, Partners' Capital Accounts and all transactions entered into by the Partnership. The General Partner shall afford to the Partnership's independent auditors reasonable access to such documents during customary business hours and shall permit the Partnership's auditors to make copies thereof or extracts therefrom at the expense of the Partnership.

(b)     The General Partner shall establish such standards as it deems appropriate regarding the access of Limited Partners to the books and records of the Partnership and shall not be obliged to permit access by a Limited Partner to the name or address of any other Limited Partner.

**7.6     Confidentiality**

(a)     Each Limited Partner agrees to keep confidential, and not to make any use of (other than for purposes reasonably related to its Interest or for purposes of filing such Limited Partner's tax returns) or disclose to any Person, any information or matter relating to the Partnership and its affairs and any information or matter related to any Investment (other than disclosure to such Limited Partner's directors, employees, agents, advisors, or representatives responsible for matters relating to the Partnership or to any other Person approved in writing by the General Partner (each such Person being hereinafter referred to as an "***Authorized Representative***")); *provided* that (i) such Limited Partner and its Authorized Representatives may make such disclosure to the extent that (A) the information to be disclosed is publicly available at the time of proposed disclosure by such Limited Partner or Authorized Representative, (B) the information otherwise is or

40

becomes legally available to such Limited Partner other than through disclosure by the Partnership or the General Partner, or (C) such disclosure is required by law or in response to any governmental agency request or in connection with an examination by any regulatory authorities; *provided* that such governmental agency, regulatory authorities or association is aware of the confidential nature of the information disclosed; (ii) such Limited Partner and its Authorized Representatives may make such disclosure to its beneficial owners to the extent required under the terms of its arrangements with such beneficial owners; and (iii) each Limited Partner will be permitted, after written notice to the General Partner, to correct any false or misleading information which becomes public concerning such Limited Partner's relationship to the Partnership or the General Partner. Prior to making any disclosure required by law, each Limited Partner shall use its best efforts to notify the General Partner of such disclosure. Prior to any disclosure to any Authorized Representative or beneficial owner, each Limited Partner shall advise such Authorized Representative or beneficial owner of the obligations set forth in this Section 7.6(a) and each such Authorized Representative or beneficial owner shall agree to be bound by such obligations.

(b)     The General Partner shall have the right to keep confidential from the Limited Partners, for such period of time as the General Partner deems reasonable, any information, including the identity of the Partners or information regarding the Partners or Investments, which the General Partner reasonably believes to be in the nature of trade secrets or other information the disclosure of which the General Partner believes is not in the best interests of the Partnership or could damage the Partnership or its business or which the Partnership is required by law or agreement with a third party to keep confidential.

(c)     Subject to applicable legal, fiscal and regulatory considerations, the General Partner shall use reasonable efforts to keep confidential any information relating to a Limited Partner obtained by the General Partner in connection with or arising out of the Partnership which the Limited Partner requests to be kept confidential.

(d)     Notwithstanding the provisions of this Section 7.6, Partners (and their employees, representatives and other agents) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the Partnership and its transactions and all materials of any kind (including tax opinions or other tax analyses) that are provided to such Person by, or on behalf of the Partnership. For this purpose, "tax treatment" is the purported or claimed U.S. federal income tax treatment of a transaction and "tax structure" is limited to any fact that may be relevant to understanding the purported or claimed U.S. federal income tax treatment of a transaction. For this purpose, the names of the Partnership, the Partners, their Affiliates, the names of their partners, members or equity holders and the representatives, agents and tax advisors of any of the foregoing are not items of tax treatment or tax structure.

(e)     The General Partner may disclose to prospective investors such information relating to the Partnership or the Investments as it believes in good faith will benefit

41

the Partnership and facilitate investment in the Partnership by such prospective investors.

(f)     The Investment Manager and any other Person acting as a service provider to the Partnership shall have the right to access all information belonging to the Partnership.

--------------

## Article VIII
## GENERAL PROVISIONS

--------------

**8.1     Amendment of Partnership Agreement**

(a)     Except as otherwise provided in this Section 8.1, this Agreement may be amended, in whole or in part, with the written consent of (i) the General Partner and (ii) the consent of a Majority of Limited Partners (which approval may be obtained by negative consent affording the Limited Partners 30 calendar days to object).

(b)     Any amendment that would:

(i)     increase the obligation of a Partner to make any contribution to the capital of the Partnership;

(ii)     reduce the Capital Account of a Partner other than in accordance with Article III;

(iii)     adversely alter any Partner's rights with respect to the allocation of Net Profit or Net Loss or with respect to distributions and withdrawals; or

(iv)     change the respective liabilities of the General Partner and the Limited Partners;

may only be made if the prior written consent of each Partner adversely affected thereby is obtained (which consent may be obtained by negative consent affording the Limited Partners 30 calendar days to object).

(c)     Notwithstanding paragraphs (a) and (b) of this Section 8.1, this Agreement may be amended by the General Partner without the consent of the Limited Partners, at any time and without limitation, if any Limited Partner whose contractual rights as a Limited Partner would be materially and adversely changed by such amendment has an opportunity to withdraw from the Partnership (without being subject to the Early Withdrawal Reduction) as of a date determined by the General Partner that is not less than 30 calendar days after the General Partner has furnished written notice of such amendment to each affected Limited Partner and that is prior to the effective date of the amendment.  The admission and withdrawal of Limited

42

Partners will not require notice or disclosure to, or the approval of, the other Limited Partners.

(d)    The General Partner may at any time without the consent of the other Partners:

(i)    add to the representations, duties or obligations of the General Partner or surrender any right or power granted to the General Partner under this Agreement, for the benefit of the Limited Partners;

(ii)    cure any ambiguity or correct or supplement any conflicting provisions of this Agreement;

(iii)    change the name of the Partnership;

(iv)    make any changes required by a governmental body or agency which is deemed to be for the benefit or protection of the Limited Partners, *provided*, *however*, that no such amendment may be made unless such change (A) is for the benefit of, or not adverse to, the interests of Limited Partners, (B) does not affect the right of the General Partner to manage and control the Partnership's business, (C) does not affect the allocation of profits and losses among the Partners and (D) does not affect the limited liability of the Limited Partners;

(v)    amend this Agreement to reflect a change in the identity of the General Partner which has been made in accordance with this Agreement;

(vi)    amend this Agreement (other than with respect to the matters set forth in Section 8.1(b)) to effect compliance with any applicable laws, regulations or administrative actions, or to reflect any change made in accordance with Section 4.1(b);

(vii)    subject to Section 8.1(b), amend this Agreement to reflect the creation, and terms, of any new Series;

(viii)    effect any other amendment which would not, in the good faith judgment of the General Partner, adversely affect any of the existing Limited Partners;

(ix)    enable the Partnership or the Tax Matters Partner to comply with BBA provisions, or to make any elections or take any other actions available thereunder; and

(x)    restate this Agreement together with any amendments hereto which have been duly adopted in accordance herewith to incorporate such amendments in a single, integrated document.

(e)    The General Partner and the Investment Manager shall have the authority to agree with a Limited Partner to waive, modify or supplement the application of any provision of this Agreement or any subscription agreement with respect to such

43

Limited Partner without notifying or obtaining the consent of any other Limited Partner (other than a Limited Partner whose rights as a Limited Partner pursuant to this Agreement would be materially and adversely changed by such waiver or modification). Any such waiver, modification or supplementation may be evidenced by a "side letter" or other agreement, and the form thereof shall not impair its binding effect as if incorporated in this Agreement.

(f)   Notwithstanding anything in this Section 8.1 to the contrary, any amendment to Section 2.5 requires the prior written consent of ERISA Partners whose Partnership Percentages represent more than 50% of the aggregate Partnership Percentages of all ERISA Partners.

**8.2   Special Power-of-Attorney**

(a)   Each Partner hereby irrevocably makes, constitutes and appoints the General Partner (and each of its successors and permitted assigns), with full power of substitution, as the true and lawful representative and attorney-in-fact of, and in the name, place and stead of, such Partner with the power from time to time to make, execute, sign, acknowledge, swear to, verify, deliver, record, file or publish:

(i)   an amendment to this Agreement that complies with the provisions of this Agreement (including the provisions of Section 8.1);

(ii)   the Certificate and any amendment thereof required because this Agreement is amended, including an amendment to effectuate any change in the membership of the Partnership or in the capital contributions of the Partners;

(iii)   any financing statement or other filing or document required or permitted to perfect the security interests contemplated by any provision hereof; and

(iv)   all such other instruments, documents and certificates which, in the opinion of legal counsel to the Partnership, may from time to time be required by the laws of the United States of America, the State of Delaware, or any other jurisdiction in which the Partnership determines to do business, or any political subdivision or agency thereof, or which such legal counsel may deem necessary or appropriate to effectuate, implement and continue the valid and subsisting existence and business of the Partnership as a limited partnership, adjust the structure of the Partnership in accordance with Sections 4.1(b) or 8.8, or to effect the dissolution or termination of the Partnership.

(b)   Each Limited Partner is aware that the terms of this Agreement permit certain amendments to this Agreement to be effected and certain other actions to be taken or omitted by or with respect to the Partnership without that Limited Partner's consent. If an amendment of the Certificate or this Agreement or any action by or with respect to the Partnership is taken by the General Partner in the manner contemplated by this Agreement, each Limited Partner agrees that, notwithstanding

44

any objection which such Limited Partner may assert with respect to such action, the General Partner in its sole discretion is authorized and empowered, with full power of substitution, to exercise the authority granted above in any manner which may be necessary or appropriate to permit such amendment to be made or action to be lawfully taken or omitted. Each Partner is fully aware that each other Partner relies on the effectiveness of this special power-of-attorney with a view to the orderly administration of the affairs of the Partnership. This power-of-attorney is a special power-of-attorney and is coupled with an interest in favor of the General Partner and as such:

(i)     is irrevocable and continues in full force and effect notwithstanding the subsequent death or incapacity of any party granting this power-of-attorney, regardless of whether the Partnership or the General Partner has had notice thereof; and

(ii)    survives the delivery of an assignment by a Limited Partner of the whole or any portion of such Limited Partner's Interest, except that where the assignee thereof has been approved by the General Partner for admission to the Partnership as a substituted Limited Partner, this power-of-attorney given by the assignor survives the delivery of such agreement for the sole purpose of enabling the General Partner to execute, acknowledge and file any instrument necessary to effect such substitution.

**8.3     Notices**

Notices which may be or are required to be given under this Agreement by any party to another shall be given by hand delivery, transmitted by facsimile, transmitted electronically to an address that has been previously provided or verified through another form of notice or sent by registered or certified mail, return receipt requested or internationally recognized courier service, and shall be addressed to the respective parties hereto at their addresses as set forth on the Schedule of Partners maintained by the General Partner or to such other addresses, facsimile numbers or electronic addresses as may be designated by any party hereto by notice addressed to (a) the General Partner, in the case of notice given by any Limited Partner, and (b) each of the Limited Partners, in the case of notice given by the General Partner. Notices shall be deemed to have been given (i) when delivered by hand, transmitted by facsimile or transmitted electronically or (ii) on the date indicated as the date of receipt on the return receipt when delivered by mail or courier service.

**8.4     Agreement Binding Upon Successors and Assigns; Delegation**

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, but the rights and obligations of the Partners hereunder shall not be assignable, transferable or delegable except as provided in Sections 4.1(d), 5.3 and 5.4, and any attempted assignment, transfer or delegation thereof which is not made pursuant to the terms of such Sections shall be null and void *ab initio*.

8.5    **Governing Law**

This Agreement is, and the rights of the Partners hereunder are, governed by and shall be construed in accordance with the laws of the State of Delaware, without regard to the conflict of laws rule thereof which would result in the application of the laws of a different jurisdiction. The parties hereby consent to the exclusive jurisdiction and venue for any action arising out of this Agreement in Dallas, Texas. Each Partner consents to service of process in any action or proceeding involving the Partnership by the mailing thereof by registered or certified mail, postage prepaid, to such Partner's mailing address set forth in the Schedule of Partners maintained by the General Partner.

8.6    **Not for Benefit of Creditors**

The provisions of this Agreement are intended only for the regulation of relations among Partners and between Partners and former or prospective Partners and the Partnership. Except for the rights of the Indemnified Persons hereunder, this Agreement is not intended for the benefit of non-Partner creditors and no rights are granted to non-Partner creditors under this Agreement.

8.7    **Consents and Voting**

(a)    Except as provided in Section 5.4, Limited Partners do not have any right to vote for the admission or removal of any General Partner and, except for the right to vote on certain amendments proposed by the General Partner, have no other voting rights. Upon the request of any Limited Partner, including pursuant to Section 8.10 hereof, the General Partner may designate an Interest as a Non-Voting Interest, in which case the Limited Partner shall not have the right to vote on any matter, including amendments.

(b)    Any and all consents, agreements or approvals provided for or permitted by this Agreement shall be in writing and a copy thereof shall be filed and kept with the books of the Partnership. (For the avoidance of doubt, an amendment made pursuant to Section 8.1(c) or (d) or pursuant to negative consent under Section 8.1(a) or (b) shall not require any affirmative written response by any Limited Partner who is not electing to withdraw from the Partnership.)

8.8    **Merger and Consolidation**

(a)    The Partnership may merge or consolidate with or into one or more limited partnerships formed under the Act or other business entities pursuant to an agreement of merger or consolidation which has been approved in the manner contemplated by Section 17-211(b) of the Act.

(b)    Notwithstanding anything to the contrary contained elsewhere in this Agreement, an agreement of merger or consolidation approved in accordance with Section 17-211(b) of the Act may, to the extent permitted by Section 17-211(g) of the Act, (i) effect any amendment to this Agreement, (ii) effect the adoption of a new limited partnership agreement for the Partnership if it is the surviving or resulting limited partnership in the merger or consolidation, or (iii) provide that the limited

Appx. 03670

partnership agreement of any other constituent partnership to the merger or consolidation (including a limited partnership formed for the purpose of consummating the merger or consolidation) shall be the limited partnership agreement of the surviving or resulting limited partnership.

**8.9    Miscellaneous**

(a)    The captions and titles preceding the text of each Section hereof shall be disregarded in the construction of this Agreement.  Use of the word "including" in this Agreement means in each case "without limitation," whether or not such term is explicitly stated.

(b)    This Agreement may be executed in counterparts, each of which shall be deemed to be an original hereof.

(c)    If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**8.10    BHCA Subject Persons**

Notwithstanding any other provision of this Agreement to the contrary:

(a)    Solely for purposes of any provision of this Agreement that confers voting rights on the Limited Partners and any other provisions hereof regarding consents of or action by the Limited Partners, any BHCA Subject Person that shall have given the General Partner an Election Notice and shall not thereafter have given the General Partner a Revocation Notice, and that at any time has a Partnership Percentage in excess of 4.9 percent of the aggregate Partnership Percentages of the Limited Partners entitled to participate in such voting or the giving of any consent or the taking of any action, shall be deemed to hold an Partnership Percentage of only 4.9 percent of the aggregate Partnership Percentages of the Limited Partners (after giving effect to the limitations imposed by this Section 8.10 on all such Limited Partners), and such Partnership Percentage in excess of said 4.9 percent shall be deemed held by the Limited Partners who are not BHCA Subject Persons, *pro rata* in proportion to their respective Partnership Percentages; *provided* that this limitation shall not prohibit a Limited Partner from voting or participating in giving or withholding consent or taking any action under any provision of this Agreement up to the full amount of its Partnership Percentage in situations where such Limited Partner's vote or consent or action is of the type customarily provided by statute or stock exchange rules with regard to matters that would significantly and adversely affect the rights or preference of the Limited Partner's Interest.  The foregoing voting restriction shall continue to apply with respect to any assignee or other transferee of such BHCA Subject Person's Interest; *provided*, *however*, that the foregoing voting restriction shall not continue to apply if the Interest is transferred:

Appx. 03671

(i) to the Partnership; (ii) to the public in an offering registered under the Securities Act; (iii) in a transaction pursuant to Rule 144 or Rule 144A under the Securities Act in which no Person acquires more than 2% of the Partnership's outstanding Interests; or (iv) in a single transaction to a third party who acquires at least a majority of the Partnership's outstanding Interests without regard to the Transfer of such Interests.

(b)     Except as specifically provided otherwise in this Agreement, a Limited Partner that is a BHCA Subject Person that shall have given the General Partner an Election Notice, and shall not thereafter have given the General Partner a Revocation Notice, shall not be entitled to exercise any rights to consent to actions to be taken with respect to the Partnership, including rights conferred by any applicable law.   Such right to consent shall be deemed granted to the Limited Partners who are not BHCA Subject Persons, *pro rata* in proportion to their respective Partnership Percentages.

(c)     A Limited Partner that is a BHCA Subject Person and that elects to be subject to Section 8.10(a) and (b) shall notify the General Partner thereof (an "***Election Notice***") and, on the General Partner's receipt of such Election Notice, such Limited Partner shall be subject to Section 8.10(a) and (b) until 30 calendar days after such Limited Partner notifies the General Partner that it elects no longer to be subject to Section 8.10(a) and (b) (a "***Revocation Notice***"), which period may be reduced by the General Partner.

## 8.11    RIC Limited Partners

An Interest of a RIC Limited Partner does not entitle the RIC Limited Partner to vote or consent with respect to any Partnership matter unless the RIC Limited Partner's vote or consent with respect to its Interest would not be considered to be "voting securities" as defined under Section 2(a)(42) of the Investment Company Act.   Except as provided in this Section 8.11, an Interest held by a RIC Limited Partner as a Non-Voting Interest is identical in all regards to all other Interests held by Limited Partners.

## 8.12    Bad Actor Limited Partners

Under Rule 506(d) under the Securities Act, the Partnership may be banned from selling Interests under Rule 506 if a Limited Partner beneficially owning 20% or more of the Partnership's voting securities engages in a "bad act" set forth in Rule 506.   Accordingly, each Limited Partner agrees that the General Partner may deem the portion of any Bad Actor Limited Partner's Interest to be, or convert any Bad Actor Limited Partner's Interest into, a Non-Voting Interest (except for the purposes of voting on any amendment to this Agreement that would materially and adversely change the Bad Actor Limited Partner's rights and preferences as a Limited Partner other than pursuant to an amendment under Section 8.1(c)) to the extent that the General Partner determines that such portion is in excess of 19.99% of the outstanding aggregate voting Interests of all Partners excluding any Interests that are Non-Voting Interests.

Appx. 03672

### 8.13 Survival

The obligations and covenants of the Limited Partners set forth in Sections 3.5 and 3.12 hereof shall apply jointly and severally to each Limited Partner and any direct or indirect transferee of or successor to such Limited Partner's interest and will survive such Partner's ceasing to be a partner of the Partnership and/or the termination, dissolution, liquidation and winding up of the Partnership.

### 8.14 Entire Agreement

The parties acknowledge and agree that, subject to Section 8.1(f), the General Partner without the approval of any other Partner may enter into a written agreement on behalf of the Partnership with any Limited Partner affecting the terms hereof in order to meet certain requirements of the Limited Partner (each an "***Other Agreement***"), and the terms of such Other Agreement shall govern with respect to such Limited Partner notwithstanding the provisions of this Agreement. This Agreement and each Other Agreement constitute the entire agreement among the parties hereto pertaining to the subject matter hereof and supersede all prior agreements and understandings pertaining thereto.

[Signature Page Follows]

The parties hereto have executed this Agreement as of the day and year first above written.

**GENERAL PARTNER:**

*On behalf of itself and as attorney-in-fact for the Limited Partners*

**Highland Argentina Regional Opportunity Fund GP, LLC**

By:     Highland Capital Management Latin America, L.P., its sole member
By:     Highland Latin America GP, Ltd., its general partner

By: _____
Name: Gustavo Prilick
Title:   Director

**ORIGINAL LIMITED PARTNER:**

**Highland Capital Management Latin America, L.P.**

By:     Highland Latin America GP, Ltd., its general partner

By: _____
Name: Gustavo Prilick
Title:   Director

*Signature Page to the Amended and Restated Limited Partnership Agreement of Highland Argentina Regional Opportunity Fund, L.P.*

**THE COMPANIES LAW (2016 REVISION)**

**OF THE CAYMAN ISLANDS**

**COMPANY LIMITED BY SHARES**


**AMENDED AND RESTATED**

**MEMORANDUM AND ARTICLES OF ASSOCIATION**


**OF**


**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND, LTD.**

**(AS ADOPTED BY SPECIAL RESOLUTION ON 8 NOVEMBER 2017)**

**THE COMPANIES LAW (2016 REVISION)**

**OF THE CAYMAN ISLANDS**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM OF ASSOCIATION**

**OF**

**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND, LTD.**

**(AS ADOPTED BY SPECIAL RESOLUTION ON 8 NOVEMBER 2017)**

1    The name of the Company is Highland Argentina Regional Opportunity Fund, Ltd..

2    The Registered Office of the Company shall be at the offices of Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, or at such other place within the Cayman Islands as the Directors may decide.

3    The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by the laws of the Cayman Islands.

4    The liability of each Member is limited to the amount unpaid on such Member's Shares.

5    The share capital of the Company is US$50,000 divided into 100 Management Shares of US$1.00 par value each and 999,900 Participating Shares of US$0.01 par value each.

6    The Company has power to register by way of continuation as a body corporate limited by shares under the laws of any jurisdiction outside the Cayman Islands and to be deregistered in the Cayman Islands.

7    Capitalised terms that are not defined in this Memorandum of Association bear the respective meanings given to them in the Articles of Association of the Company.

**THE COMPANIES LAW (2016 REVISION)**

**OF THE CAYMAN ISLANDS**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**ARTICLES OF ASSOCIATION**

**OF**

**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND, LTD.**

**(AS ADOPTED BY SPECIAL RESOLUTION ON 8 NOVEMBER 2017)**

## 1      Interpretation

1.1     In these Articles, Table A in the First Schedule to the Statute does not apply and unless there is something in the subject or context inconsistent therewith:

| | |
|---|---|
| "**Administrator**" | means the person, firm or corporation appointed and from time to time acting as administrator of the Company. |
| "**AEOI**" | means: |

    (i)    sections 1471 to 1474 of the US Internal Revenue Code of 1986 and any associated legislation, regulations or guidance, and any other similar legislation, regulations or guidance enacted in any other jurisdiction which seeks to implement similar financial account information reporting and/or withholding tax regimes;

    (ii)    the OECD Standard for Automatic Exchange of Financial Account Information in Tax Matters – the Common Reporting Standard and any associated guidance;

    (iii)    any intergovernmental agreement, treaty, regulation, guidance, standard or other agreement between the Cayman Islands (or any Cayman Islands government body) and any other jurisdiction (including any government bodies in such jurisdiction), entered into in order to comply with, facilitate, supplement or implement the legislation,

|  | regulations or guidance described in sub-paragraphs (i) and (ii); and |
|---|---|
| (iv) | any legislation, regulations or guidance in the Cayman Islands that give effect to the matters outlined in the preceding sub-paragraphs. |

| "**Articles**" | means these articles of association of the Company. |
|---|---|
| "**Auditor**" | means the person (if any) for the time being performing the duties of auditor of the Company. |
| "**Business Day**" | means any day normally treated as a business day in such places and/or on such markets as the Directors may from time to time determine. |
| "**Cayman Islands**" | means the British Overseas Territory of the Cayman Islands. |
| "**Class**" | means a separate class of Participating Share. |
| "**Company**" | means the above-named Company. |
| "**Directors**" | means the directors for the time being of the Company. |
| "**Dollars**" or "**US$**" | refers to the currency of the United States. |
| "**Electronic Record**" | has the same meaning as in the Electronic Transactions Law. |
| "**Electronic Transactions Law**" | means the Electronic Transactions Law (2003 Revision) of the Cayman Islands. |
| "**Eligible Investor**" | means a person eligible to hold Participating Shares, as determined from time to time by the Directors. |
| "**Gross Negligence**" | in relation to a person means a standard of conduct beyond negligence whereby a person acts with reckless disregard for the consequences of his action or inaction. |
| "**Investment Manager**" | means the person, firm or corporation appointed and for the time being acting as the investment manager of the Company. |
| "**Management Share**" | means a voting non participating Share in the capital of the Company of US$0.01 par value designated as a Management Share and having the rights provided for in these Articles. |

**Appx. 03678**

| | |
|---|---|
| "**Member**" | means each person whose name is, from time to time and for the time being, entered in the Register of Members as the holder of one or more Shares. |
| "**Memorandum**" | means the memorandum of association of the Company. |
| "**Net Asset Value**" | means the value of the assets less the liabilities of the Company, or of a Separate Account (as the context may require), calculated in accordance with these Articles. |
| "**Net Asset Value per Participating Share**" | means the amount determined in accordance with these Articles as being the Net Asset Value per Participating Share of a particular Class, and/or Series. |
| "**Offering Memorandum**" | means an offering memorandum relating to Participating Shares of any Class, and/or Series as amended or supplemented from time to time subject to and in accordance with these Articles. |
| "**Ordinary Resolution**" | A resolution passed at a quorate meeting of the Fund by a simple majority of the votes cast in its favour by the holders of the Management Shares or a resolution approved in writing by all such holders of Management Shares expressed to be an ordinary resolution. |
| "**Participating Share**" | means a participating redeemable Share in the capital of the Company of US$0.01 par value and having the rights provided for in these Articles. Participating Shares may be divided into Classes in the discretion of the Directors in accordance with the provisions of these Articles and each Class may be further divided into different Series of Participating Shares and the term "Participating Share" shall include all such Classes and/or Series of Participating Share. |
| "**Redemption Date**" | means, in relation to any Class and/or Series of Participating Shares, such day or days as are set out in the Offering Memorandum or as may be specified by the Directors from time to time, upon which a Member is entitled to require the redemption of Participating Shares of that Class and/or Series. |
| "**Redemption Fee**" | means such fee (if any) payable by a Member to the Company on a redemption of Participating Shares, as the same may be determined by the Directors and disclosed to the Member at the time of its subscription for such Participating Shares. |

| | |
|---|---|
| "**Redemption Notice**" | means a notice in a form approved by the Directors by which a holder of Participating Shares is entitled to require the Company to redeem its Participating Shares. |
| "**Redemption Price**" | means the price determined in accordance with these Articles at which redeemable Participating Shares of the relevant Class and/or Series may be redeemed. |
| "**Register of Members**" | means the register of Members, which shall be maintained in accordance with the Statute and includes (except where otherwise stated) any branch or duplicate Register of Members. |
| "**Registered Office**" | means the registered office for the time being of the Company. |
| "**Sales Charge**" | means such sales charge (if any) determined by the Directors as being payable by a subscriber on a subscription for Participating Shares of any Class and/or Series. |
| "**Seal**" | means the common seal of the Company and includes every duplicate seal. |
| "**Separate Account**" | means a separate internal account of the Company which the Directors may establish and cause to be maintained in accordance with these Articles. |
| "**Series**" | means a separate series of Participating Share (and includes any sub-series of any such series). |
| "**Share**" and "**Shares**" | means a share or shares of any class or series in the Company, including a Management Share or a Participating Share, as well as any fraction of a Share. |
| "**Special Resolution**" | has the same meaning as in the Statute, and includes a unanimous written resolution. |
| "**Statute**" | means the Companies Law (2016 Revision) of the Cayman Islands. |
| "**Subscriber**" | means the subscriber to the Memorandum. |
| "**Subscription Date**" | means, in relation to Participating Shares of any Class and/or Series, such day or days as are set out in the Offering Memorandum or as may be specified by the Directors from time to time upon which a |

person may subscribe for Participating Shares of that Class and/or Series.

"**Subscription Price**"     means the price determined in accordance with these Articles at which Participating Shares of the relevant Class and/or Series may be subscribed.

"**Suspension**"     means a determination by the Directors to postpone or suspend (i) the calculation of the Net Asset Value of Participating Shares of any one or more Classes and/or Series (and the applicable Valuation Date) (a "**Calculation Suspension**"); (ii) the issue of Participating Shares of any one or more Classes and/or Series (and the applicable Subscription Date) (an "**Issue Suspension**"); (iii) the redemption by Members (in whole or in part) of Participating Shares of any one or more Classes and/or Series (and the applicable Redemption Date) (a "**Redemption Suspension**"); and/or (iv) the payment (in whole or in part) of any redemption proceeds (even if Valuation Dates and Redemption Dates are not postponed) (a "**Payment Suspension**").

"**Transfer**"     means, in respect of any Share, any sale, assignment, exchange, transfer, pledge, encumbrance or other disposition of that Share, and "**Transferred**" shall be construed accordingly.

"**Treasury Share**"     means a Share held in the name of the Company as a treasury share in accordance with the Statute.

"**Valuation Date**"     means, in relation to each Class and/or Series of Participating Shares, the day or days determined from time to time by the Directors to be the day or days on which the Net Asset Value per Participating Share of that Class and/or Series and/or Series is calculated.

"**Valuation Point**"     means, with respect to any Class and/or Series, the time or times on the Valuation Date of such Class and/or Series at which the Directors determine that the Net Asset Value per Participating Share of that Class and/or Series shall be calculated.

1.2     In these Articles:

(a)     the singular number includes the plural number and vice versa;

(b)     the masculine gender includes the feminine gender;

(c)     persons includes corporations;

**Appx. 03681**

(d)     "written" and "in writing" include all modes of representing or reproducing words in visible form, including in the form of an Electronic Record;

(e)     "shall" shall be construed as imperative and "may" shall be construed as permissive;

(f)     references to provisions of any law or regulation shall be construed as references to those provisions as amended, modified, re-enacted or replaced from time to time;

(g)     any phrase introduced by the terms "including", "include", "in particular" or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms;

(h)     the term "and/or" is used herein to mean both "and" as well as "or."  The use of "and/or" in certain contexts in no respects qualifies or modifies the use of the terms "and" or "or" in others.  "Or" shall not be interpreted to be exclusive, and "and" shall not be interpreted to require the conjunctive — in each case, unless the context otherwise requires;

(i)     any reference to the powers of the Directors shall include, when the context admits, the service providers or any other person to whom the Directors may delegate their powers;

(j)     any requirements as to delivery under the Articles include delivery in the form of an Electronic Record;

(k)     any requirements as to execution or signature under the Articles including the execution of the Articles themselves can be satisfied in the form of an electronic signature as defined in the Electronic Transactions Law;

(l)     sections 8 and 19(3) of the Electronic Transactions Law shall not apply; and

(m)     headings are inserted for reference only and shall be ignored in construing these Articles.

## 2     Commencement of Business

2.1     The business of the Company may be commenced as soon after incorporation as the Directors shall see fit.

2.2     The Directors may pay, out of the capital or any other monies of the Company, all expenses incurred in or about the formation and operation of the Company, including the expenses of registration and the initial offering of Participating Shares.

## 3     Service Providers

3.1     The Directors may appoint any person, firm or corporation to act as a service provider to the Company (whether in general or in respect of any Class and/or Series of Shares) and may entrust

**Appx. 03682**

to and confer upon any such service providers any of the functions, duties, powers and discretions exercisable by them as Directors, upon such terms and conditions (including as to remuneration payable by the Company) and with such powers of delegation, but subject to such restrictions, as they think fit. Without limiting the generality of the foregoing, such service providers may include managers, investment advisers, administrators, registrars, transfer agents, custodians and prime brokers.

3.2     Without prejudice to the generality of the preceding Article, the Directors may appoint any person, firm or corporation to act as the Investment Manager with respect to the assets of the Company (whether in general or in respect of any Class and/or Series of Shares).  The Directors may entrust to and confer upon the Investment Manager any of the functions, duties, powers and discretions exercisable by them as Directors upon such terms and conditions (including as to remuneration payable by the Company) and with such powers of delegation, but subject to such restrictions, as they think fit.

**4     Rights attaching to Shares**

4.1     The Management Shares shall have the following rights:

(a)     as to voting: the holder of a Management Share shall (in respect of such Management Share) have the right to receive notice of, attend at and vote as a Member at any general meeting of the Company; and

(b)     as to capital: a Management Share shall confer upon the holder the right in a winding up to repayment of capital as provided in these Articles but shall confer no other right to participate in the profits or assets of the Company; and

(c)     as to income: no dividends shall be payable on the Management Shares.

4.2     The Participating Shares shall have the following rights:

(a)     as to voting: the holder of a Participating Share shall not (in respect of such Participating Share) have the right to receive notice of, attend at or vote as a Member at any general meeting of the Company, but may vote at a separate Class meeting convened in accordance with these Articles; and

(b)     as to capital: a Participating Share shall confer upon the holder thereof the right in a winding up to participate in the surplus assets of the Company by reference to the Separate Account attributable to the relevant Class or Series of Participating Shares as provided in these Articles; and

(c)     as to income: the Participating Shares shall confer on the holders thereof the right to receive dividends as provided in these Articles.

**Appx. 03683**

**5      Share Capital**

5.1     Subject to these Articles, the Directors may allot, issue, grant options or warrants over, or otherwise dispose of Shares in separate classes and/or series with different terms, preferences, privileges or special rights including, without limitation, with respect to investment strategy and/or policy, participation in assets, profits and losses of the Company, voting, fees charged (including management, performance and incentive fees), redemption privileges, allocation of costs and expenses (including, without limitation, the costs and expenses incurred in any hedging activities and any profits and losses arising therefrom) as they think proper.  Subject to the Statute, these Articles and any applicable subscription agreement, any Share Rights (other than those set out in these Articles or set out in a Special Resolution) may be varied by either the Directors or by Ordinary Resolution.

5.2     On or before the allotment of any Participating Share the Directors shall resolve the Class and/or Series to which such Participating Share shall be classified and may, prior to the issue of any Participating Share, reclassify such Participating Share.  Each Class and/or Series shall be specifically identified.  Subject to the Statute and these Articles, the Directors may at any time re-name any Participating Share.

5.3     Notwithstanding the currency in which the par value of the Participating Shares is denominated, the Directors may specify any currency as the currency in which the Subscription Price, Redemption Price and Net Asset Value of Participating Shares of a Class and/or Series is calculated.

5.4     The Company shall not issue Shares to bearer.

5.5     Fractional Shares may be issued.

5.6     Unless the Directors determine otherwise, shares shall only be issued as fully paid-up.

5.7     Unless the Directors determine otherwise, no right of pre-emption or first refusal shall attach to any Shares.

**6      Allotment and Issue of Participating Shares**

6.1     The Directors may from time to time allot and issue Participating Shares of any Class and/or Series. The Directors may, in their discretion, refuse to allot and issue any Participating Shares, and shall not issue any Participating Shares to or for the account of an investor who is not an Eligible Investor. If the Directors have declared a Calculation Suspension or Issue Suspension, no Participating Shares of that Class or Series (as appropriate) shall be issued until the relevant Suspension has ended.

6.2     The Directors shall determine the Subscription Price at the time of issue of the first issue of Participating Shares of any Class and/or Series.  Thereafter, the Directors may allot and issue

**Appx. 03684**

Participating Shares of the same Class and/or Series on any Subscription Date provided that such additional Participating Shares are issued at a Subscription Price equal to not less than the Net Asset Value per Participating Share of such Class and/or Series calculated on the relevant Subscription Date (or if the Subscription Date is not also a Valuation Date then on the immediately preceding Valuation Date).

6.3     The Directors may add to the Subscription Price per Participating Share (before making any rounding adjustment) an amount which they consider to be an appropriate allowance to reflect fiscal and purchase charges which would be incurred for the account of the Company in investing an amount equal to the Subscription Price.  The Directors may also add, in their discretion, a Sales Charge and/or an amount equal to any stamp duty and any other governmental taxes or charges payable by the Company with respect to the issue of such Participating Shares.

6.4     An applicant for Participating Shares shall pay for such Participating Shares in such currencies, in such manner, at such time, in such place and to such person acting on behalf of the Company as the Directors may from time to time determine.

6.5     Subject to the terms of any subscription agreement, an application for Participating Shares shall be irrevocable by an applicant for Participating Shares once it has been received by the Company. Participating Shares shall be treated as having been issued with effect from the relevant Subscription Date notwithstanding that the subscriber for those Participating Shares may not be entered in the Register of Members until after the Subscription Date.

6.6     Participating Shares shall be issued in such minimum numbers as the Directors may specify either generally or in any particular case; likewise the Directors may from time to time prescribe an amount as the minimum subscription amount.

6.7     The Directors may resolve to accept non-cash assets in satisfaction (in whole or in part) of the Subscription Price.

6.8     The Directors may require an applicant for Participating Shares to pay to the Company for the benefit of any selling agent such selling commissions or such organisational charges as may have been disclosed to such applicant.  The Directors may differentiate between applicants as to the amount of such selling commissions or such organisational charges.

6.9     The Company may, in so far as the Statute permits, pay a commission to any person in consideration of that person subscribing or agreeing to subscribe whether absolutely or conditionally for any Participating Shares.  Such commissions may be satisfied by the payment of cash and/or the issue of fully or partly paid-up Participating Shares.  The Company may also on any issue of Participating Shares pay such brokerage as may be lawful.

**7      Separate Accounts**

7.1      The Directors shall have the power to establish and maintain, with respect to Participating Shares of any Class and/or Series, a Separate Account, to record (purely as an internal accounting matter) the allocation, on a differentiated basis, of the assets and liabilities of the Company to the holders of Participating Shares of any such Class and/or a Series in a manner consistent with the methodology set forth in the Offering Memorandum and the rights otherwise attaching to the Participating Shares.

7.2      The proceeds from the issue of Participating Shares of any Class and/or Series shall be applied in the books of the Company to the Separate Account established for Participating Shares of that Class and/or Series.  The assets and liabilities and income and expenditure attributable to that Separate Account shall be applied to such Separate Account and, subject to the provisions of these Articles, to no other Separate Account.  In the event that the assets of a Separate Account referable to any Class and/or Series are exhausted, any and all unsatisfied claims which any Members or former Members referable to that Class and/or Series have against the Company shall be extinguished.  The Members or former Members referable to a Class and/or Series shall have no recourse against the assets of any other Separate Account established by the Company.

7.3      Where any asset is derived from another asset (whether cash or otherwise), such derivative asset shall be applied in the books of the Company to the same Separate Account as the asset from which it was derived, and on each revaluation of an asset the increase or diminution in value shall be applied to the same Separate Account and, subject to the provisions of these Articles, to no other Separate Account.

7.4      In the case of any asset or liability of the Company which the Directors do not consider is attributable to a particular Separate Account, the Directors shall have discretion to determine the basis upon which any such asset or liability shall be allocated between or among Separate Accounts.

7.5      The Directors may, in the books of the Company, allocate assets and liabilities to and from Separate Accounts if, as a result of a creditor proceeding against certain of the assets of the Company or otherwise, a liability would be borne in a different manner from that in which it would have been borne if applied under the foregoing Articles.

7.6      The Directors may from time to time transfer, allocate or exchange an asset or liability from one Separate Account to another Separate Account provided that at the time of such transfer, allocation or exchange the Directors form the opinion (in good faith) that the value in money or money's worth of each such asset or liability transferred, allocated or exchanged is not significantly less or more than the value in money or money's worth (referred to in these Articles as "proper value") received by the Separate Account from which such asset or liability is transferred, allocated or exchanged except only as is otherwise provided by these Articles.

**Appx. 03686**

## 8    Determination of Net Asset Value

8.1    The Net Asset Value and Net Asset Value per Participating Share of each Class and/or Series shall be determined by or on behalf of the Directors as at the relevant Valuation Point on each relevant Valuation Date.

8.2    In calculating the Net Asset Value and the Net Asset Value per Participating Share, the Directors shall apply such generally accepted accounting principles as they may determine.

8.3    The assets and liabilities of the Company shall be valued in accordance with such policies as the Directors may determine. Absent bad faith or manifest error, any valuation made pursuant to these Articles shall be binding on all persons.

8.4    Unless otherwise determined by the Directors in any resolution creating a Class and/or Series of Participating Shares or as otherwise disclosed in any Offering Memorandum, the Net Asset Value per Participating Share of each Class (or Series) shall be determined by allocating *pro rata* the Net Asset Value, as at the relevant Valuation Point, of the Company and/or of the relevant Separate Account among each Class and/or Series, adjusting the amount so calculated to reflect any fees, costs, foreign exchange items or other assets or liabilities which are properly attributable to a specific Class and/or Series and then by dividing the resultant amount by the number of Participating Shares of such Class and/or Series then in issue.

8.5    The Directors may determine that the Net Asset Value of any Class and/or Series shall be definitively determined on the basis of estimates and that such determination shall not be modified to reflect final valuations.

8.6    Any expense or liability may be amortised over such period as the Directors may determine.

8.7    The Directors may establish such reserves as they deem reasonably necessary for Company expenses and any other contingent Company assets or liabilities, and may, upon the reversal or release of such reserves, apply any monies resulting therefrom in such manner as they may, in their absolute discretion, determine.

8.8    Net Asset Value per Participating Share shall be rounded to the nearest cent or such other amount as the Directors may determine and the benefit of any such roundings may be retained by the Company.

8.9    The Directors may cause the Company to issue new Participating Shares at par or to compulsorily redeem at par such number of Participating Shares as they consider necessary to address, in such manner as they consider equitable, any prior miscalculation of Net Asset Value or Net Asset Value per Participating Share. The Company shall not be required to pay to the holder the redemption proceeds of any such compulsorily redeemed Participating Shares, which proceeds shall be retained by the Company.

Appx. 03687

**9       Suspensions**

9.1     The Directors may, from time to time, in the circumstances disclosed in the Offering Memorandum, declare a Suspension with respect to any one or more Classes and/or Series of Participating Shares.

9.2     The Directors shall promptly notify all affected Members of any such Suspension and shall promptly notify such Members upon termination of such Suspension.

**10      Transfer of Shares**

10.1    Subject to Article 5.1, Shares may not be Transferred without the prior written approval of the Directors (which may be withheld for any or no reason) provided that the Directors may waive this requirement to the extent that they deem appropriate in connection with the listing of any Class or Series of Share on a stock exchange.

10.2    The Directors shall not register any Transfer of any Share to any person who is, in the opinion of the Directors, not an Eligible Investor.

10.3    Any proposed transferee shall provide to the Directors such information and documents as the Directors may request, including, without limitation, such documents or information as the Directors deem necessary or desirable:

(a)     to enable the Directors to determine that the proposed transferee is an Eligible Investor; and

(b)     to enable the Company to comply with all applicable laws, including anti-money laundering laws.

10.4    The instrument of Transfer of any Share shall be in writing and shall be executed by or on behalf of the transferor (and, if the Directors so require, signed by or on behalf of the transferee). The transferor shall be deemed to remain the holder of a Share until the name of the transferee is entered in the Register of Members.

**11      Transmission of Shares**

11.1    If a Member dies, the survivor or survivors (where the Member was a joint holder) or his or her legal personal representatives (where the Member was a sole holder) shall be the only persons recognised by the Company as having any title to the Member's interest in the Company.  The death of any Member shall not operate to relieve, waive or reduce any liabilities attaching to the Member's Shares at the time of death and such liabilities shall continue to bind any survivor or survivors, or any personal representative, as the case may be.

Appx. 03688

11.2    Any person becoming entitled to a Share in consequence of the death or bankruptcy, or the liquidation or dissolution, of a Member (or in any other way than by Transfer) and who is an Eligible Investor may, upon delivery to the Directors of such evidence as may from time to time be required by them of:

(a)        such person's entitlement to such Shares; and/or

(b)        such person's status as an Eligible Investor,

elect, either to become the holder of such Share or to have such Share Transferred to another Eligible Investor nominated by such person.  If such person elects to become the holder of such Share, such person shall give notice in writing to the Directors to that effect, but the Directors shall, in either case, have the same right to decline registration of such person as a holder of such Share as they would have had in the case of a Transfer of the Share by that Member before his or her death or bankruptcy, or liquidation or dissolution, as the case may be.

11.3    Any person becoming entitled to a Share in consequence of the death or bankruptcy, or the liquidation or dissolution, of a Member (or in any other way than by Transfer) and who is not an Eligible Investor shall not be registered as the holder of such Share and shall promptly Transfer such Share to an Eligible Investor in accordance with these Articles.

11.4    A person becoming entitled to a Share by reason of the death or bankruptcy or liquidation or dissolution of the holder (or in any other case than by Transfer), and who is an Eligible Investor, shall be entitled to the same dividends and other advantages to which such person would be entitled if such person were the registered holder of such Share. However, the person shall not, before becoming a Member in respect of a Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company and the Directors may at any time give notice requiring any such person to elect either to be registered himself or to have some person nominated by him become the holder of the Share (but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the relevant Member before his death or bankruptcy or liquidation or dissolution or any other case than by transfer, as the case may be). If the notice is not complied with within ninety days the Directors may thereafter withhold payment of all dividends, bonuses or other monies payable in respect of the Share until the requirements of the notice have been complied with.

## 12    Redemption of Shares

12.1    Subject to any provisions relating to a specific Class and/or Series as set out in the Offering Memorandum or these Articles or in any resolution constituting a Class and/or Series or otherwise forming part of the special rights of such Participating Shares, a Member may require the redemption of all or any of such Member's Participating Shares by serving a Redemption Notice on the Company. Unless timely receipt is waived by the Directors in a particular case, a Redemption Notice shall be required to be received on or before a Redemption Date with respect to such Participating Shares (or such number of days prior to such Redemption Date as may be determined

by the Directors).  Any Member redeeming Participating Shares shall submit to the Directors the share certificate (if any) issued in respect of those Participating Shares.  The Company shall redeem such Participating Shares at the Redemption Price, being an amount equal to the Net Asset Value per Participating Share of the relevant Class and/or Series prevailing on the relevant Redemption Date (or if the Redemption Date is not a Valuation Date then on the immediately preceding Valuation Date) subject to any deductions, holdbacks or adjustments provided for in these Articles and/or the Offering Memorandum.

12.2    The Directors may deduct any Redemption Fee from the Redemption Price.  The Directors may also deduct such amount which they consider to be an appropriate allowance to reflect fiscal and sale charges which would be incurred for the account of the Company in realising assets or closing out positions to provide funds to meet any redemption request.

12.3    A Member may not withdraw a Redemption Notice once submitted to the Company unless (a) the Directors shall have declared a Suspension or (b) the Directors determine (in their sole discretion) to permit the withdrawal of such redemption request (which they may do in whole or in part).  If a relevant Suspension has been declared by the Directors, the right of a Member to have its Participating Shares redeemed shall be suspended and during the period of Suspension the Member may withdraw its Redemption Notice.  Any withdrawal of the Redemption Notice shall be made in writing and shall only be effective if actually received by the Company before the termination of the period of the Redemption Suspension or Calculation Suspension, as applicable.  If the Redemption Notice is not withdrawn, any Participating Shares the redemption of which has been suspended shall be redeemed once the relevant Suspension has ended at the Redemption Price for Participating Shares of the relevant Class and/or Series calculated on the next Redemption Date following the end of the relevant Suspension.

12.4    If one or more redemption requests are received in respect of any one Redemption Day that would, if satisfied, result in the redemptions of an amount equal to more than 15% of the total net asset value of the Company, the Directors may determine in their discretion to reduce the amount of each redemption request pro rata so that redemption requests represent in aggregate an amount equal to no more than 15% of the total net asset value of the Company.  The partial amounts of the redemption requests which remain unsatisfied shall be carried forward to the next Redemption Day and satisfied in priority to any redemption requests received in relation to such subsequent Redemption Day until the prior redemption requests shall have been satisfied in full.

12.5    If the Company is required by the laws of any relevant jurisdiction to make a withholding from any redemption monies payable to the holder of Participating Shares the amount of such withholding shall be deducted from the redemption monies otherwise payable to such person.

12.6    The Directors may deduct any Redemption Fee from the Redemption Price.  The Directors may also deduct such amount which they consider to be an appropriate allowance to reflect fiscal and sale charges which would be incurred for the account of the Company in realising assets or closing out positions to provide funds to meet any redemption request.

12.7    No redemption of part of a Member's holding of Participating Shares of any one Class and/or Series may be made if, as a result thereof, such Member would hold fewer Participating Shares of such Class and/or Series than such minimum number or value of Participating Shares of such Class and/or Series as may from time to time be specified (either generally or in any particular case or cases) by the Directors.  If such partial redemption would reduce such Member's holding of Participating Shares to less than such minimum holding, the Directors may, in their discretion, elect to compulsorily redeem all of such Member's Participating Shares.

12.8    The Company may, in the absolute discretion of the Directors, refuse to make a redemption payment to a Member if the Directors suspect or are advised that the payment of any redemption proceeds to such Member may result in a breach or violation of any anti-money laundering law by any person in any relevant jurisdiction, or if such refusal is necessary to ensure the compliance by the Company, its Directors, the Administrator or any other service provider of the Company with any anti-money laundering law in any relevant jurisdiction.

12.9    Any amount payable to a Member for the redemption of Participating Shares shall be paid in such currency or currencies as the Directors may determine.  Subject to any Payment Suspension, the Company shall remit redemption proceeds (net of the costs of remittance) by cheque or wire transfer within such period or periods as the Directors shall have disclosed to the Member at the time of its subscription for Participating Shares or, in the absence of any such disclosure, within such period or periods as the Directors shall determine.  In the absence of directions as to payment the Company may remit redemption proceeds by cheque to the address of the Member appearing on the Register of Members or by wire transfer to such account as the Directors deem appropriate in the circumstances.  The Company shall not be liable for any loss resulting from this procedure.

12.10   On any redemption of Participating Shares the Directors shall have the power to satisfy (in whole or in part) the Redemption Price (and any other sums payable on redemption as provided in these Articles) owing on the redemption of such Participating Shares by dividing *in specie* the whole or any part of the assets of the Company (including, without limitation, shares, debentures, or securities of any other company whether or not held by the Company on the Redemption Date in question) and either (i) distributing such assets directly to the redeeming shareholder, and/or (ii) distributing or allocating such assets to a liquidating account or other similar mechanism to be managed and/or liquidated at the discretion of the Directors.

12.11   Participating Shares shall be treated as having been redeemed with effect from the relevant Redemption Date irrespective of whether or not a Member has been removed from the Register of Members or the Redemption Price has been determined or remitted. Accordingly, on and from the relevant Redemption Date, Members in their capacity as such will not be entitled to or be capable of exercising any rights arising under these Articles with respect to Participating Shares being redeemed (including any right to receive notice of, attend or vote at any meeting of the Company) save the right to receive the Redemption Price and any dividend which has been declared prior to the relevant Redemption Date but not yet paid (in each case with respect to the Participating Shares being redeemed). Such redeemed Members will be creditors of the Company with respect to the

Redemption Price. In an insolvent liquidation, redeemed Members will rank behind ordinary creditors but ahead of Members.

12.12    Once a Participating Share is redeemed it shall be available for re issue and, until re issue, shall form part of the authorised and unissued share capital of the Company.

12.13    Upon the written request of a Member or prospective Member in a form acceptable to the Directors, the Company may, in the discretion of the Directors, accept a standing redemption request from such Member or prospective Member pursuant to which the Company shall agree (without assuming any liability for failing to do so) to use its commercially reasonable efforts to redeem such Member's Participating Shares to the extent necessary to ensure that such Member does not own over a specified percentage of the outstanding Participating Shares of the Company or any Class and/or Series thereof; such percentage to be the percentage identified by such Member or prospective Member in such written request as being the percentage which such Member's or prospective Member's ownership cannot exceed without material risk of such Member or prospective Member being in violation of applicable law or regulation.  Any such written request may be revoked by notice in writing to the Company from the affected Member.

12.14    No amendment to these Articles made after a Redemption Date shall affect a Member with respect to Participating Shares of that Member which have been redeemed, or are being treated as redeemed, on or prior to that Redemption Date.

12.15    Unless otherwise provided in the Offering Memorandum, unremitted redemption proceeds shall not bear interest against the Company and redeemed Participating Shares shall not participate in the profits and losses of the Company with effect from the relevant Redemption Date.

## 13    Compulsory Redemption

13.1    The Directors may at any time by notice in writing to any Non-qualified Person compulsorily redeem all or any of the Participating Shares held by such person upon a day which shall be not less than, nor more than, such number of days as the Directors may, in their discretion, from time to time determine, from the date of such notice.  Upon such day, such Participating Shares shall be redeemed in all respects as if the holder thereof had submitted a Redemption Request whether or not the Company shall have received any certificate(s) in respect of such Participating Shares.

13.2    The Directors, in their discretion, with or without cause, may at any time by notice in writing to any Member compulsorily redeem all or any of a Member's Participating Shares on any Redemption Day which shall be not less than such number of days as the Directors may, in their discretion, from time to time determine from the date of the notice.  Upon such day, such Participating Shares shall be redeemed in all respects as if the holder thereof had submitted a Redemption Request whether or not the Company shall have received any certificate(s) in respect of such Participating Shares.

13.3    The Directors may at any time redeem Participating Shares to effect a conversion in the manner described in these Articles, including pursuant to Article 15.

**Appx. 03692**

13.4    Subject to Article 12.6, any restrictions imposed pursuant to these Articles on redemptions made at the option of the Members shall not apply to any compulsory redemption of Participating Shares by the Company.

13.5    All costs incurred in a compulsory redemption of Participating Shares shall be for the account of the Member thereof and may be deducted from the proceeds of the redemption.

13.6    The procedure for determining which Participating Shares will be compulsorily redeemed in any particular case is subject to change at the discretion of the Directors. In exercising discretion and in making determinations as to whether to compulsorily redeem Participating Shares, and in determining which Members shall be subject to compulsory redemption, the Directors may act upon the basis of such information as may be known to them, without any obligation to make special enquiries, and may rely upon the advice of counsel. In no event shall the Company be liable to any Member for any consequence of any determination made by the Directors with respect to such compulsory redemption.

13.7    Without prejudice to the generality of the foregoing, the Company may (without notice) compulsorily redeem the Participating Shares of any Member and, on behalf of such Member, apply the proceeds of redemption in paying for new Participating Shares to give effect to any exchange, conversion or roll up policy disclosed to Members pursuant to which Participating Shares of one Class or Series (the "**Old Shares**") may, at the option of the Company, be exchanged for Participating Shares of another Class or Series (the "**New Shares**") by means of the redemption of the Old Shares and the immediate re-subscription of the redemption proceeds in paying up the New Shares.

## 14    AEOI

14.1    Notwithstanding any other Article, in order to comply with AEOI, any Director shall be entitled to release and/or disclose on behalf of the Company to the Cayman Islands Tax Information Authority or equivalent authority (the "**TIA**") and any other foreign government body as required by AEOI, any information in its or its agents' or delegates' possession regarding a Member including, without limitation, financial information concerning the Member's investment in the Company, and any information relating to any shareholders, principals, partners, beneficial owners (direct or indirect) or controlling persons (direct or indirect) of such Member. Any such Director may also authorise any third party agent, including but not limited to, the Investment Manager or Administrator, to release and/or disclose such information on behalf of the Company.

14.2    In order to comply with AEOI and, if necessary, to reduce or eliminate any risk that the Company or its Members are subject to withholding taxes pursuant to AEOI or incur any costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Company) (together, "**costs**") associated with AEOI, the Directors may cause the Company to undertake any of the following actions:

**Appx. 03693**

(a)    compulsorily redeem any or all of the Shares held by a Member either (i) where the Member fails to provide (in a timely manner) to the Company, or any agent or delegate of the Company, including but not limited to, the Investment Manager or the Administrator, any information requested by the Company or such agent or delegate pursuant to AEOI; or (ii) where there has otherwise been non-compliance by the Company with AEOI whether caused, directly or indirectly, by the action or inaction of such Member, or any related person, or otherwise;

(b)    deduct from, or hold back, redemption or repurchase proceeds, dividend payments or any other distributions, in order to:

    (i)    comply with any applicable requirement to apply and collect withholding tax pursuant to AEOI;

    (ii)    allocate to a Member an amount equal to any withholding tax imposed on the Company as a result of the Member's, or any related person's, action or inaction (direct or indirect), or where there has otherwise been non-compliance by the Company with AEOI;

    (iii)    ensure that any AEOI related costs are recovered from the Member(s) whose action or inaction (directly or indirectly, including the action or inaction of any person related to such Member) gave rise or contributed to such costs.

14.3    In order to give effect to the requirements imposed upon the Company by AEOI, as well as any of the actions contemplated by Articles 14.2(a) and 14.2(b), the Directors may undertake any of the following actions:

(a)    create separate classes and/or series of Shares ("**AEOI Shares**"), with such rights and terms as the Directors may in their sole discretion determine, and following the compulsory redemption of some or all of a Member's Shares may immediately apply such redemption proceeds in subscribing for such number of AEOI Shares as the Directors determine;

(b)    may re-name any number of Shares (whether issued or unissued) as AEOI Shares, create a Separate Account with respect to such AEOI Shares and apply any AEOI related costs or withholding taxes to such Separate Account;

(c)    allocate any AEOI costs or withholding tax among Separate Accounts on a basis determined solely by the Directors;

(d)    adjust the Net Asset Value per Share of any relevant Shares (including any AEOI Share).

**Appx. 03694**

**15      Purchase and Surrender of Shares**

15.1    Subject to the provisions of the Statute and without prejudice to these Articles, the Company may purchase its own Shares (including any redeemable Shares) in such manner and on such other terms as the Directors may agree with the relevant Member.

15.2    The Company may make a payment in respect of the redemption or purchase of its own Shares in any manner permitted by the Statute, including out of capital.

15.3    The Directors may accept the surrender for no consideration of any fully paid Share.

**16      Treasury Shares**

16.1    The Directors may, prior to the purchase, redemption or surrender of any Share, determine that such Share shall be held as a Treasury Share.

16.2    The Directors may determine to cancel a Treasury Share or transfer a Treasury Share on such terms as they think proper (including, without limitation, for nil consideration).

**17      Modification of Rights**

17.1    Subject to the following Article, the rights attached to any Series of Participating Shares may be varied or abrogated either whilst the Company is a going concern or during or in contemplation of a winding up, with the consent in writing of two thirds of the issued Shares of that Series or with the sanction of a resolution passed by a two-thirds majority of the holders of the issued Participating Shares of that Series, at a separate meeting of the holders of the Participating Shares of that Series. For such purposes the Directors may, in their discretion, treat all Series of Participating Shares as forming one Series, if they consider that they would all be affected in the same way by the proposals under consideration and that there would be no conflict of interest between them, but in any other case shall treat them as separate Series, as the case may be. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, mutatis mutandis, apply except that the necessary quorum shall be one person holding or representing by proxy at least one-third in nominal amount of the issued Participating Shares of the Series (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those holders who are present shall be a quorum) and that every holder of Participating Shares of the Series shall on a poll have one vote for each Participating Share of the Series held by him.

17.2    The rights conferred upon the holders of the Participating Shares shall be deemed to be varied by the creation or issue of any Participating Shares ranking ahead of the Participating Shares with regard to participation in the profits or assets of the Company. A Series to which different levels of fees are payable to the Manager or different redemption rights apply (including the imposition of, absence of, or different level of, a redemption fee) shall not be deemed to rank in priority to any other Series as regards shareholder rights or participating in the profits or assets of the Company.

**Appx. 03695**

17.3    The rights attached to the Participating Shares shall be deemed not to be varied or abrogated by:

(a)     the creation, allotment or issue of Management Shares;

(b)     the creation, allotment or issue of Participating Shares of any Series;

(c)     the redemption or repurchase of any Participating Share;

(d)     the conversion of Participating Shares of one Series into Participating Shares of another Series at the request of a Member pursuant to Article 13.3;

(e)     the redesignation of a Series of Participating Share by the Directors pursuant to these Articles;

(f)     the exercise by the Directors or any liquidator of any of their discretions specified in these Articles; or

(g)     the Company entering into any written agreement with a prospective member providing for offering terms that vary from those applicable to other Members of the same Series.

## 18    Variation of Terms

The Directors, with the consent of the Investment Manager, shall have the absolute discretion to agree with a Member to waive or modify the terms applicable to such Member's subscription for Participating Shares (including those relating to management and performance fees and redemption terms) without obtaining the consent of any other Member; provided that such waiver or modification does not amount to a variation of the rights attaching to the Participating Shares of such other Members.

## 19    Certificates for Shares

19.1    A Member shall only be entitled to a share certificate if the Directors resolve that share certificates shall be issued. Share certificates representing Shares, if any, shall be in such form as the Directors may determine. Share certificates shall be signed by one or more Directors or another person authorised by the Directors. The Directors may authorise certificates to be issued with the authorised signature(s) affixed by mechanical process. All certificates for Shares shall be consecutively numbered or otherwise identified and shall specify the Shares to which they relate. All certificates surrendered to the Company for transfer shall be cancelled and, subject to these Articles, no new certificate shall be issued until the former certificate representing a like number of relevant Shares shall have been surrendered and cancelled.

19.2    The Company shall not be bound to issue more than one certificate for Shares held jointly by more than one person and delivery of a certificate to one joint holder shall be a sufficient delivery to all of them.

Appx. 03696

19.3   If a share certificate is defaced, worn out, lost or destroyed, it may be renewed on such terms (if any) as to evidence and indemnity and on the payment of such expenses reasonably incurred by the Company in investigating evidence, as the Directors may prescribe, and (in the case of defacement or wearing out) on delivery up of the old certificate.

## 20   Register of Members

20.1   The Company shall maintain or cause to be maintained the Register of Members.

20.2   The Directors may determine that the Company shall maintain one or more branch registers of Members in accordance with the Statute. The Directors may also determine which register of Members shall constitute the principal register and which shall constitute the branch register or registers, and to vary such determination from time to time.

## 21   Closing Register of Members and Fixing Record Date

21.1   For the purpose of determining Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any dividend, or in order to make a determination of Members for any other proper purpose, the Directors may provide that the Register of Members shall be closed for transfers for a stated period which shall not in any case exceed thirty days.

21.2   In lieu of, or apart from, closing the Register of Members, the Directors may fix in advance or arrears a date as the record date for any such determination of Members entitled to notice of, or to vote at any meeting of the Members or any adjournment thereof, or for the purpose of determining the Members entitled to receive payment of any dividend or in order to make a determination of Members for any other proper purpose.

21.3   If the Register of Members is not so closed and no record date is fixed for the determination of Members entitled to notice of, or to vote at, a meeting of Members or Members entitled to receive payment of a dividend, the date on which notice of the meeting is sent or the date on which the resolution of the Directors declaring such dividend is passed, as the case may be, shall be the record date for such determination of Members.  When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## 22   Non Recognition of Trusts

The Company shall not be bound by or compelled to recognise in any way (even when notified) any equitable, contingent, future or partial interest in any Share, or (except only as is otherwise provided by these Articles or the Statute) any other rights in respect of any Share other than an absolute right to the entirety thereof in the registered holder.

**Appx. 03697**

**23      Amendments of Memorandum and Articles and Alteration of Capital**

23.1    The Company may, by Ordinary Resolution:

(a)      increase its share capital by such sum and with such rights, priorities and privileges annexed thereto, as the resolution shall prescribe;

(b)      consolidate and divide all or any of its share capital into Shares of larger amount than its existing Shares;

(c)      by subdivision of its existing Shares or any of them divide the whole or any part of its share capital into Shares of smaller amount than is fixed by the Memorandum; and

(d)      cancel any Shares that at the date of the passing of the resolution have not been taken or agreed to be taken by any person.

23.2    All new Shares created in accordance with the provisions of the preceding Article shall be subject to the same provisions of these Articles with reference to liens, Transfer, transmission and otherwise as the Shares in the original share capital.

23.3    Subject to the provisions of the Statute and the provisions of these Articles as regards the matters to be dealt with by Ordinary Resolution the Company may, by Special Resolution:

(a)      change its name;

(b)      alter or add to these Articles;

(c)      alter or add to the Memorandum with respect to any objects, powers or other matters specified therein;

(d)      reduce its share capital or any capital redemption reserve fund; and

(e)      wind up the Company.

**24      Registered Office**

Subject to the provisions of the Statute, the Company may by resolution of the Directors change the location of its Registered Office.  The Company may, in addition to its Registered Office, maintain such other offices or places of business as the Directors determine.

**25      General Meetings**

25.1    All general meetings other than annual general meetings shall be called extraordinary general meetings.  The Directors may call general meetings.

**Appx. 03698**

25.2 The Company may but shall not be obliged to hold a general meeting in each year as its annual general meeting, and shall specify the meeting as such in the notice calling it. Any annual general meeting shall be held at such time and place as the Directors shall determine.

## 26 Notice of General Meetings

26.1 At least seven Business Days' notice shall be given of any general meeting. Every notice shall be exclusive of the day on which it is given or deemed to be given and of the day on which the meeting is to be held and shall specify the place, the day and the hour of the meeting and the general nature of the business and shall be given in the manner hereinafter mentioned or in such other manner if any as may be prescribed by the Company, provided that a general meeting of the Company shall, whether or not the notice specified in this Article has been given and whether or not the provisions of these Articles regarding general meetings have been complied with, be deemed to have been duly convened if it is so agreed:

(a) in the case of an annual general meeting, by all the Members entitled to attend and vote thereat; and

(b) in the case of an extraordinary general meeting, by a majority in number of the Members having the right to attend and vote at the meeting, being a majority together holding not less than ninety per cent. in par value of the Shares giving that right.

26.2 The accidental omission to give notice of a general meeting to, or the non receipt of notice of a meeting by, any person entitled to receive notice thereof shall not invalidate the proceedings of that meeting.

## 27 Proceedings at General Meetings

27.1 No business shall be transacted at any general meeting unless a quorum is present. A quorum shall be one or more Members (present in person, by proxy or authorised corporate representative, as the case may be) entitled to attend and vote and representing not less than one third of the Management Shares present in person or by proxy and carrying the right to vote at the meeting.

27.2 A person may, with the consent of the Directors, participate at a general meeting by conference telephone or other communications equipment by means of which all the persons participating in the meeting can communicate with each other. Participation by a person in a general meeting in this manner is treated as presence in person at that meeting.

27.3 A resolution (including a Special Resolution) in writing (in one or more counterparts) signed by all Members for the time being entitled to receive notice of and to attend and vote at general meetings (or, being corporations or other non-natural persons, signed by their duly authorised representatives) shall be as valid and effective as if the resolution had been passed at a general meeting of the Company duly convened and held.

27.4 If a quorum is not present within half an hour from the time appointed for the meeting or if during such a meeting a quorum ceases to be present, the meeting, if convened upon the requisition of Members, shall be dissolved and in any other case it shall stand adjourned to the same day in the next week at the same time and place or to such other day, time or such other place as the Directors may determine, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Members present shall be a quorum.

27.5 The chairman, if any, of the board of Directors shall preside as chairman at every general meeting of the Company, or if there is no such chairman, or if the chairman shall not be present within fifteen minutes after the time appointed for the holding of the meeting, or is unwilling to act, the Directors present shall elect one of their number to be chairman of the meeting.

27.6 If no Director is willing to act as chairman, or if no Director is present within fifteen minutes after the time appointed for holding the meeting, the Members present shall choose one of their number to be chairman of the meeting.

27.7 The chairman may, with the consent of a meeting at which a quorum is present (and shall if so directed by the meeting) adjourn the meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.  When a general meeting is adjourned for thirty days or more, notice of the adjourned meeting shall be given as in the case of an original meeting. Otherwise it shall not be necessary to give any such notice.

27.8 A resolution put to the vote of a meeting shall be decided on a show of hands unless before, or on the declaration of the result of, the show of hands, the chairman or any Member present in person or by proxy (or in the case of a non-natural person, by its duly authorised representative or by proxy) demands a poll.

27.9 Unless a poll is duly demanded a declaration by the chairman that a resolution has been carried or carried unanimously, or by a particular majority, or lost or not carried by a particular majority, an entry to that effect in the minutes of the proceedings of the meeting shall be conclusive evidence of that fact without proof of the number or proportion of the votes recorded in favour of or against such resolution.

27.10 The demand for a poll may be withdrawn.

27.11 Except on a poll demanded on the election of a chairman or on a question of adjournment, a poll shall be taken as the chairman directs, and the result of the poll shall be deemed to be the resolution of the general meeting at which the poll was demanded.

27.12 A poll demanded on the election of a chairman or on a question of adjournment shall be taken forthwith.  A poll demanded on any other question shall be taken at such time as the chairman of the general meeting directs, and any business other than that upon which a poll has been demanded or is contingent thereon may proceed pending the taking of the poll.

**Appx. 03700**

27.13   In the case of an equality of votes, whether on a show of hands or on a poll, the chairman shall not be entitled to a second or casting vote.

## 28    Votes of Members

28.1   Subject to any rights or restrictions attached to any Shares, on a show of hands every Member holding Shares carrying the right to vote on the matter in question who (being an individual) is present in person or by proxy or (if a corporation or other non-natural person) is present by its duly authorised representative or by proxy, shall have one vote and on a poll every such Member shall have one vote for every Share of which he is the holder.

28.2   In the case of joint holders of record, the vote of the senior holder who tenders a vote, whether in person or by proxy, shall be accepted to the exclusion of the votes of the other joint holders. Seniority among joint holders shall be determined by the order in which the names of the holders stand in the Register of Members.

28.3   A Member of unsound mind, or in respect of whom an order has been made by any court or authority having jurisdiction in lunacy, may vote, whether on a show of hands or on a poll, by the Member's committee, receiver, curator bonis, or other similar person appointed on such Member's behalf by that court or authority and any such committee, receiver, curator bonis or other similar person may vote by proxy.

28.4   No person shall be entitled to vote at any general meeting unless such person is registered as a Member on the record date for such meeting, nor unless all calls or other monies then payable by such person in respect of such Shares have been paid.

28.5   No objection shall be raised to the qualification of any voter except at the general meeting or adjourned general meeting at which the vote objected to is purported to be given or tendered and every vote not disallowed at the meeting shall be valid.  Any objection made in due time shall be referred to the chairman whose decision shall be final and conclusive.

28.6   On a poll or on a show of hands votes may be cast either personally or by proxy. A Member may appoint more than one proxy or the same proxy under one or more instruments to attend and vote at a meeting. Where a Member appoints more than one proxy the instrument of proxy shall state which proxy is entitled to vote on a show of hands.

28.7   On a poll, a Member holding more than one Share need not cast the votes in respect of its Shares in the same way on any resolution and therefore may vote a Share or some or all such Shares either for or against a resolution and/or abstain (any such abstentions to count neither for nor against the resolution) from voting a Share or some or all of the Shares and, subject to the terms of the instrument appointing it, a proxy appointed under one or more instruments may vote a Share or some or all of the Shares in respect of which such proxy is appointed either for or against a resolution and/or abstain from voting.

**Appx. 03701**

**29      Proxies**

29.1    The instrument appointing a proxy shall be in writing, be executed under the hand of the appointor or of such appointor's attorney duly authorised in writing or, if the appointor is a corporation or other non-natural person, under the hand of an officer or other person duly authorised for that purpose. A proxy need not be a Member of the Company.

29.2    The Directors may, in the notice convening any meeting or adjourned meeting, or in an instrument of proxy sent out by the Company, specify the place and the time (being not later than the time for holding the meeting or adjourned meeting to which the proxy relates) at which the instrument appointing a proxy shall be deposited. In the absence of any such direction from the Directors in the notice convening any meeting or adjourned meeting, the instrument appointing a proxy shall be deposited at the Registered Office not less than 48 hours before the time for holding the meeting or adjourned meeting at which the person named in the instrument proposes to vote.

29.3    The chairman may in any event, at the chairman's discretion, declare that an instrument of proxy shall be deemed to have been duly deposited. An instrument of proxy that is not deposited in the manner permitted and which has not been declared to have been duly deposited by the chairman, shall be invalid.

29.4    The instrument appointing a proxy may be in any usual or common form and may be incorporated within any subscription agreement or other document signed by or on behalf of the Member. An instrument appointing a proxy may be expressed to be for a particular meeting or any adjournment thereof or generally until revoked. An instrument appointing a proxy shall be deemed to include the power to demand or join or concur in demanding a poll.

29.5    Votes given in accordance with the terms of an instrument of proxy shall be valid notwithstanding the previous death or insanity of the principal or revocation of the proxy or of the authority under which the proxy was executed, or the Transfer of the Share in respect of which the proxy is given unless notice in writing of such death, insanity, revocation or Transfer was received by the Company at the Registered Office before the commencement of the general meeting, or adjourned meeting at which it is sought to use the proxy.

**30      Corporate Members**

Any corporation or other non-natural person which is a Member of the Company may in accordance with its constitutional documents, or in the absence of such provision by resolution of its directors or other governing body, authorise such person as it thinks fit to act as its representative at any meeting of the Company or of any Class of Members, and the person so authorised shall be entitled to exercise the same powers on behalf of the corporation which such person represents as the corporation could exercise if it were an individual Member.

**31    Shares Beneficially Owned by the Company**

Shares of the Company that are beneficially owned by the Company shall not be voted, directly or indirectly, at any meeting and shall not be counted in determining the total number of outstanding Shares at any given time.

**32    Directors**

There shall be a board of Directors consisting of not less than one person (exclusive of alternate Directors) provided however that the Company may from time to time by Ordinary Resolution increase or reduce the limits in the number of Directors.  The first Directors of the Company shall be determined in writing by, or appointed by a resolution of, the Subscriber.

**33    Powers of Directors**

33.1    Subject to the provisions of the Statute, the Memorandum and the Articles and to any directions given by Special Resolution, the business of the Company shall be managed by the Directors who may exercise all the powers of the Company.  No alteration of the Memorandum or these Articles and no such direction shall invalidate any prior act of the Directors which would have been valid if that alteration had not been made or that direction had not been given.  A duly convened meeting of Directors at which a quorum is present may exercise all powers exercisable by the Directors.

33.2    All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for monies paid to the Company shall be signed, drawn, accepted, endorsed or otherwise executed as the case may be in such manner as the Directors shall determine by resolution.

33.3    The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof and to issue debentures, debenture stock, mortgages, bonds and other such securities whether outright or as security for any debt, liability or obligation of the Company or of any third party.  Notwithstanding the foregoing, the Directors shall not exercise the powers specified in this Article in breach of any limits or restrictions specified in the Offering Memorandum.

**34    Appointment and Removal of Directors**

34.1    The Company may, by Ordinary Resolution, appoint any person to be a Director and may, by Ordinary Resolution, remove any Director.

34.2    The Directors may appoint any person to be a Director, either to fill a vacancy or as an additional Director provided that the appointment does not cause the number of Directors to exceed any number fixed by or in accordance with these Articles as the maximum number of Directors.

**35    Vacation of Office of Director**

The office of a Director shall be vacated if:

**Appx. 03703**

(a)     he becomes prohibited by law from being a Director;

(b)     he becomes bankrupt or makes any arrangement or composition with his creditors generally;

(c)     he dies, or is, in the opinion of all his co-Directors, incapable by reason in mental disorder of discharging his duties as a Director;

(d)     he resigns the office of Director by notice to the Company;

(e)     he has for more than six consecutive months been absent without permission of the Directors from meetings of Directors held during that period and his alternate Director (if any) has not during such period attended any such meetings in his stead, and the Directors resolve that his office be vacated; or

(f)     he is removed from the office of Director by notice addressed to him at his last known address and signed by all his co-Directors.

## 36      Proceedings of Directors

36.1    The quorum for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed shall be two if there are two or more Directors, and shall be one if there is only one Director.  A person who holds office as an alternate Director shall, if such person's appointor is not present, be counted in the quorum.  A Director who also acts as an alternate Director shall, if such Director's appointor is not present, count twice towards the quorum.

36.2    Subject to the provisions of these Articles, the Directors may regulate their proceedings as they think fit.  Questions arising at any meeting shall be decided by a majority of votes.  In the case of an equality of votes, the chairman shall not have a second or casting vote.  A Director who is also an alternate Director shall be entitled in the absence of such Director's appointor to a separate vote on behalf of such Director's appointor in addition to such Director's own vote.

36.3    A person may participate in a meeting of the Directors or any committee of Directors by conference telephone or other communications equipment by means of which all the persons participating in the meeting can communicate with each other at the same time. Participation by a person in a meeting in this manner is treated as presence in person at that meeting.  Unless otherwise determined by the Directors, the meeting shall be deemed to be held at the place where the chairman is located at the start of the meeting.

36.4    A resolution in writing (in one or more counterparts) signed by all the Directors or all the members of a committee of Directors (an alternate Director being entitled to sign such a resolution on behalf of such alternate Director's appointor) shall be as valid and effectual as if it had been passed at a meeting of the Directors, or committee of Directors as the case may be, duly convened and held.

36.5    A Director or alternate Director may, or other officer of the Company at the direction of a Director or alternate Director may call a meeting of the Directors by at least two days' notice in writing to every Director and alternate Director which notice shall set forth the general nature of the business to be considered unless notice is waived by all the Directors (or their alternates) either at, before or after the meeting is held.

36.6    The continuing Directors may act notwithstanding any vacancy in their body, but if and so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors the continuing Directors or Director may act for the purpose of increasing the number of Directors to that number, or of summoning a general meeting of the Company, but for no other purpose.

36.7    The Directors may elect a chairman of their board and determine the period for which the chairman is to hold office; but if no such chairman is elected, or if at any meeting the chairman is not present within five minutes after the time appointed for holding the same, the Directors present may choose one of their number to be chairman of the meeting.

36.8    All acts done by any meeting of the Directors or of a committee of Directors (including any person acting as an alternate Director) shall, notwithstanding that it be afterwards discovered that there was some defect in the appointment of any Director or alternate Director, or that they or any of them were disqualified, be as valid as if every such person had been duly appointed and qualified to be a Director or alternate Director as the case may be.

36.9    A Director but not an alternate Director may be represented at any meetings of the board of Directors by a proxy appointed in writing by such Director.  The proxy shall count towards the quorum and the vote of the proxy shall for all purposes be deemed to be that of the appointing Director.

## 37    Presumption of Assent

A Director who is present at a meeting of the board of Directors at which action on any Company matter is taken shall be presumed to have assented to the action taken unless the Director's dissent shall be entered in the minutes of the meeting or unless the Director shall file such Director's written dissent from such action with the person acting as the chairman or secretary of the meeting before the close or adjournment thereof or shall forward such dissent by personal delivery, courier or registered post to such person immediately after the close or adjournment of the meeting.  Such right to dissent shall not apply to a Director who voted in favour of such action.

## 38    Directors' Interests

38.1    A Director may hold any other office or place of profit under the Company (other than the office of Auditor) in conjunction with such Director's office of Director for such period and on such terms as to remuneration and otherwise as the Directors may determine.

**Appx. 03705**

38.2    A Director may act alone or by such Director's firm in a professional capacity for the Company and the Director or such Director's firm shall be entitled to remuneration for professional services as if such Director were not a Director or alternate Director.

38.3    A Director or alternate Director of the Company may be or become a director or other officer of or otherwise interested in any company promoted by the Company or in which the Company may be interested as shareholder or otherwise, and no such Director or alternate Director shall be accountable to the Company for any remuneration or other benefits received by such Director or alternate Director as a director or officer of, or from such Director or alternate Director's interest in, such other company.

38.4    No person shall be disqualified from the office of Director or alternate Director or prevented by such office from contracting with the Company, either as vendor, purchaser or otherwise, nor shall any such contract or any contract or transaction entered into by or on behalf of the Company in which any Director or alternate Director shall be in any way interested be or be liable to be avoided, nor shall any Director or alternate Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or transaction by reason of such Director holding office or of the fiduciary relationship thereby established.  A Director (or such Director's alternate Director in such Director's absence) shall be at liberty to vote in respect of any contract or transaction in which such Director is interested provided that the nature of the interest of any Director or alternate Director in any such contract or transaction shall be disclosed by such Director at or prior to such Director's consideration and any vote thereon.

38.5    A general notice that a Director or alternate Director is a shareholder, director, officer or employee of any specified firm or company and is to be regarded as interested in any transaction with such firm or company shall be sufficient disclosure for the purposes of voting on a resolution in respect of a contract or transaction in which such Director has an interest, and after such general notice it shall not be necessary to give special notice relating to any particular transaction.

## 39    Minutes

The Directors shall cause minutes to be made in books kept for the purpose of recording all appointments of officers made by the Directors, all proceedings at meetings of the Company or the holders of any Class of Shares and of the Directors, and of committees of Directors including the names of the Directors or alternate Directors present at each meeting.

## 40    Delegation of Directors' Powers

40.1    The Directors may delegate any of their powers to any committee consisting of one or more Directors or such other persons as the Directors may designate. They may also delegate to any managing director or any Director holding any other executive office such of their powers as they consider desirable to be exercised by such managing director or any Director provided that an alternate Director may not act as managing director and the appointment of a managing director shall be revoked forthwith if such managing director ceases to be a Director.  Any such appointment may be made subject to any conditions the Directors may impose, and either collaterally with or to

the exclusion of their own powers, and may be revoked or altered.  Subject to any such conditions, the proceedings of a committee of Directors shall be governed by these Articles regulating the proceedings of Directors, so far as they are capable of applying.

40.2    The Directors may establish any committees, local boards or agencies or appoint any person to be a manager or agent for managing the affairs of the Company and may appoint any person to be a member of such committees or local boards.  Any such appointment may be made either collaterally with or to the exclusion of the Directors' powers, shall be subject to any conditions the Directors may impose, and may be revoked or altered.  Subject to any such conditions, the proceedings of any such committee, local board or agency shall be governed by these Articles regulating the proceedings of Directors, so far as they are capable of applying.

40.3    The Directors may by power of attorney or otherwise appoint any company, firm, person or body of persons to be the attorney or authorised signatory of the Company for such purpose and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such powers of attorney or other appointment may contain such provisions for the protection and convenience of persons dealing with any such attorneys or authorised signatories as the Directors may think fit and may also authorise any such attorney or authorised person to delegate all or any of the powers, authorities and discretions vested in such attorney or authorised person.

40.4    The Directors may appoint such officers as they consider necessary on such terms, at such remuneration (if any) and to perform such duties, and subject to such provisions as to disqualification and removal as the Directors may think fit.  Unless otherwise specified in the terms of such officer's appointment an officer may be removed by resolution of the Directors or Members.

## 41    Alternate Directors

41.1    Any Director (other than an alternate Director) may by written notice to the Company appoint any other Director, or any other person willing to act, to be an alternate Director and by written notice to the Company may remove from office an alternate Director so appointed by the Director.

41.2    An alternate Director shall be entitled to receive notice of all meetings of Directors and of meetings of committees of Directors of which such alternate Director's appointor is a member, to attend and vote at every such meeting at which the Director appointing such alternate Director is not personally present, and generally to perform all the functions of such alternate Director's appointor as a Director in such Director's absence.

41.3    An alternate Director shall cease to be an alternate Director if such alternate Director's appointor ceases to be a Director.

41.4    Any appointment or removal of an alternate Director shall be by notice to the Company signed by the Director making or revoking the appointment or in any other manner approved by the Directors.

**Appx. 03707**

41.5   Subject to the provisions of the Articles, an alternate Director shall be deemed for all purposes to be a Director and shall alone be responsible for such alternate Director's own acts and defaults and shall not be deemed to be the agent of the Director appointing such alternate Director.

## 42   No Minimum Shareholding for Directors

The Company in general meeting may fix a minimum shareholding required to be held by a Director, but unless and until such a shareholding qualification is fixed a Director shall not be required to hold Shares.

## 43   Remuneration of Directors

43.1   The remuneration to be paid to the Directors, if any, shall be such remuneration as the Directors shall determine.  The Directors shall also be entitled to be paid all travelling, hotel and other expenses properly incurred by them in connection with their attendance at meetings of Directors or committees of Directors, or general meetings of the Company, or separate meetings of the holders of any Class of Shares or debentures of the Company, or otherwise in connection with the business of the Company, or to receive a fixed allowance in respect thereof as may be determined by the Directors, or a combination partly of one such method and partly the other.

43.2   The Directors may by resolution approve additional remuneration to any Director for any services other than such Director's ordinary routine work as a Director.  Any fees paid to a Director who is also counsel to the Company, or otherwise serves it in a professional capacity, shall be in addition to such Director's remuneration as a Director.

## 44   Seal

The Company may, if the Directors so determine, have a Seal, which shall only be used by the authority of the Directors or of a committee of the Directors authorised by the Directors.  Every instrument to which the Seal has been affixed shall be signed by at least one person who shall be either a Director or some officer or other person authorised by the Directors for the purpose.

## 45   Dividends, Distributions and Reserves

45.1   Subject to the Statute, these Articles, and the special rights attaching to Participating Shares of any Class and/or Series, the Directors may, in their absolute discretion, declare dividends and distributions on Participating Shares of any Class and/or Series in issue and authorise payment of the dividends or distributions out of the relevant Separate Account in respect of such Participating Shares.  No dividend or distribution shall be paid except out of the realised or unrealised profits of the Company, or out of the share premium account attributable to Participating Shares of the Class and/or Series in respect of which the dividend or distribution is proposed to be paid, or as otherwise permitted by law.

45.2   Except as otherwise provided by the rights attached to Participating Shares, or as otherwise determined by the Directors, all dividends and distributions in respect of Participating Shares of a

particular Class and/or Series shall be declared and paid according to the Net Asset Value of the Participating Shares of the Class and/or Series that a Member holds. If any Participating Share is issued on terms providing that it shall rank for dividend or distribution as from a particular date, that Participating Share shall rank for dividend or distribution accordingly.

45.3    The Directors may deduct and withhold from any dividend or distribution otherwise payable to any Member all sums of money (if any) then payable by it to the Company on account of calls or otherwise or any monies which the Company is obliged by law to pay to any taxing or other authority.

45.4    Under no circumstances may the assets (or the income derived from such assets) attributed to a Separate Account in respect of any Class and/or Series be used to pay a dividend in respect of a Separate Account that is attributed to any other Class and/or Series.

45.5    The Directors may declare that any dividend or distribution be paid wholly or partly by the distribution of specific assets and in particular of shares, debentures or securities of any other company or in any one or more of such ways and, where any difficulty arises in regard to such distribution, the Directors may settle the same as they think expedient and in particular may issue fractional Shares and fix the value for distribution of such specific assets or any part thereof and may determine that cash payments shall be made to any Members upon the basis of the value so fixed in order to adjust the rights of all Members and may vest any such specific assets in trustees as may seem expedient to the Directors.

45.6    Any dividend, distribution, interest or other monies payable in cash in respect of Participating Shares may be paid by wire transfer to the holder or by cheque or warrant sent through the post directed to the registered address of the holder or, in the case of joint holders, to the registered address of the holder who is first named on the Register of Members or to such person and to such address as such holder or joint holders may in writing direct.  Every such cheque or warrant shall (unless the Directors in their sole discretion otherwise determine) be made payable to the order of the person to whom it is sent.  Any one of two or more joint holders may give effectual receipts for any dividends, bonuses, or other monies payable in respect of the Participating Share held by them as joint holders.

45.7    Any dividend or distribution which cannot be paid to a Member and/or which remains unclaimed after six months from the date of declaration of such dividend or distribution may, in the discretion of the Directors, be paid into a separate account in the Company's name, provided that the Company shall not be constituted as a trustee in respect of that account and the dividend or distribution shall remain as a debt due to the Member.  Any dividend or distribution which remains unclaimed after a period of six years from the date of declaration of such dividend or distribution shall be forfeited and shall revert to the Company.

45.8    No dividend or distribution shall bear interest against the Company.

**46 Capitalisation**

The Directors may capitalise any sum standing to the credit of any of the Company's reserve accounts (including share premium account and capital redemption reserve) or any sum standing to the credit of profit and loss account or otherwise available for distribution and to appropriate such sum to Members of any Class and/or Series in the proportions in which such sum would have been divisible amongst them had the same been a distribution of profits by way of dividend and to apply such sum on their behalf in paying up in full unissued Participating Shares for allotment and distribution credited as fully paid-up to and amongst them in the proportion aforesaid. In such event the Directors shall do all acts and things required to give effect to such capitalisation, with full power to the Directors to make such provisions as they think fit for the case of Participating Shares becoming distributable in fractions (including provisions whereby the benefit of fractional entitlements accrue to the Company rather than to the Members concerned). The Directors may authorise any person to enter into an agreement with the Company, on behalf of all of the Members interested, providing for such capitalisation and matters incidental thereto and any agreement made under such authority shall be effective and binding on all concerned.

**47 Books of Account**

47.1 The Directors shall cause proper books of account (including, where applicable, material underlying documentation including contracts and invoices) to be kept with respect to all sums of money received and expended by the Company and the matters in respect of which the receipt or expenditure takes place, all sales and purchases of goods by the Company and the assets and liabilities of the Company. Such books of account must be retained for a minimum period of five years from the date on which they are prepared. Proper books shall not be deemed to be kept if there are not kept such books of account as are necessary to give a true and fair view of the state of the Company's affairs and to explain its transactions.

47.2 The Directors shall from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Members not being Directors and no Member (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by Statute, or authorised by the Directors or by the Company in general meeting.

47.3 The Directors may from time to time cause to be prepared and to be laid before the Company in general meeting profit and loss accounts, balance sheets, group accounts (if any) and such other reports and accounts as may be required by law.

**48 Audit**

48.1 The Directors shall appoint an Auditor of the Company who shall hold office on such terms as the Directors determine.

**Appx. 03710**

48.2   Every Auditor of the Company shall have a right of access at all times to the books and accounts and vouchers of the Company and shall be entitled to require from the Directors and officers of the Company such information and explanation as may be necessary for the performance of the duties of the Auditor.

48.3   Any Auditors of the Company shall, if so required by the Directors, make a report on the accounts of the Company during their tenure of office at the next annual general meeting following their appointment in the case of a company which is registered with the Registrar of Companies as an ordinary company, and at the next extraordinary general meeting following their appointment in the case of a company which is registered with the Registrar of Companies as an exempted company, and at any other time during their term of office, upon request of the Directors or any general meeting of the Members.

## 49   Notices

49.1   Notices shall be in writing and may be given by the Company to any Member either personally or by sending it by courier, post, cable, telex, fax or e-mail to the Member or to the address as shown in the Register of Members (or where the notice is given by e-mail by sending it to the e-mail address provided by such Member).  Any notice, if posted from one country to another, is to be sent airmail.

49.2   Where a notice is sent by courier, service of the notice shall be deemed to be effected by delivery of the notice to a courier company, and shall be deemed to have been received on the third day (not including Saturdays or Sundays or public holidays) following the day on which the notice was delivered to the courier.  Where a notice is sent by post, service of the notice shall be deemed to be effected by properly addressing, pre paying and posting a letter containing the notice, and shall be deemed to have been received on the fifth day (not including Saturdays or Sundays or public holidays in the Cayman Islands) following the day on which the notice was posted.  Where a notice is sent by cable, telex or fax, service of the notice shall be deemed to be effected by properly addressing and sending such notice and shall be deemed to have been received on the same day that it was transmitted.  Where a notice is given by e-mail service shall be deemed to be effected by transmitting the e-mail to the e-mail address provided by the intended recipient and shall be deemed to have been received on the same day that it was sent, and it shall not be necessary for the receipt of the e-mail to be acknowledged by the recipient.

49.3   A notice may be given by the Company to the person or persons which the Company has been advised are entitled to a Share or Shares in consequence of the death or bankruptcy of a Member in the same manner as other notices which are required to be given under these Articles and shall be addressed to them by name, or by the title of representatives of the deceased, or trustee of the bankrupt, or by any like description at the address supplied for that purpose by the persons claiming to be so entitled, or at the option of the Company by giving the notice in any manner in which the same might have been given if the death or bankruptcy had not occurred.

49.4 Notice of every general meeting shall be given in the manner authorised by these Articles to every person shown as holding Shares carrying an entitlement to receive such notice in the Register of Members on the record date for such meeting except that in the case of joint holders the notice shall be sufficient if given to the joint holder first named in the Register of Members and every person upon whom the ownership of a Share devolves by reason of such person being a legal personal representative or a trustee in bankruptcy of a Member where the Member but for such Member's death or bankruptcy would be entitled to receive notice of the meeting, and no other person shall be entitled to receive notices of general meetings.

## 50 Winding Up

(a) If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

(b) The assets available for distribution to the Members shall be distributed in the following manner and priority:

    (i) first, in the payment to the holders of the Participating Shares of each Class of a sum as nearly as possible equal to the nominal amount of the Participating Shares of that Class held by such holders respectively; and

    (ii) second, in the payment to the holders of Management Shares of an amount equal to the nominal amount of such Management Shares; and

    (iii) third, in the payment to the holders of each Class of Participating Shares of any remaining balance then attributable to the relevant Record, such payment being made in proportion to the number of Participating Shares of that Class held (adjusted to give effect to any equalisation arising by reason of the winding up pursuant to any equalisation policy adopted by the Directors pursuant to Article 29).

If the Company is wound up (whether the liquidation is voluntary, or under supervision by the Court) the liquidator may, with the sanction of a Special Resolution and any other sanction required by the Law, divide among the Members in specie the whole or any part of the assets of the Company and whether or not the assets shall consist of property of a single kind, and may for such purposes set such value as he deemed fair upon any one or more class or classes of property, and may determine how such division shall be carried out as between the Members or different classes of Members. The liquidator may, with the like sanction, vest the whole or any part of the assets in trustees upon such trusts for the benefit of Members as the liquidator, with the like authority, shall think fit, and the liquidation of the Company may be closed and the Company dissolved, but so that no Member shall be compelled to accept any shares in respect of which there is a liability.

**51      Indemnity and Insurance**

51.1    Every Director (including for the purposes of this Article, any alternate Director appointed pursuant to the provisions of these Articles), managing Director, agent, Secretary, or other officer for the time being and from time to time of the Company and the personal representatives of the same shall be indemnified and secured harmless out of the assets and funds of the Company against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by him otherwise than by reason of his own Gross Negligence or wilful default in or about the conduct of the Company's business or affairs or in the execution or discharge of his duties, powers, authorities or discretions, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by him in defending (whether successfully or otherwise) any civil proceedings concerning the Company or its affairs in any court whether in the Islands or elsewhere.

51.2    The Administrator, the Manager and any other agent which the Company has appointed shall be entitled to such indemnity from the Company under such terms and subject to such conditions and exceptions and with such entitlement to have recourse to the assets of the Company with a view to meeting and discharging the cost thereof as shall be specified in the relevant contract or instrument appointing such agent.

51.3    No such Director, alternate Director, managing Director, agent, Secretary, or other officer of the Company and the personal representatives of the same shall be liable (i) for the acts, receipts, neglects, defaults or omissions of any other such Director or officer or agent of the Company, (ii) by reason of his having joined in any receipt for money not received by him personally or in any other act to which he was not a direct party for conformity, (iii) for any loss on account of defect of title to any property of the Company, (iv) on account of the insufficiency of any security in or upon which any money of the Company shall be invested, (v) for any loss incurred through any bank, broker or other agent or any other party with whom any of the Company's property may be deposited or (vi) for any loss, damage or misfortune whatsoever which may happen in or arise from the execution or discharge of the duties, powers, authorities or discretions of his office or in relation thereto unless the same shall happen through his own Gross Negligence or wilful default.

51.4    The Directors may exercise all the powers of the Company to purchase and maintain insurance for the benefit of a person who is or was a Director, alternate Director, Secretary or auditor of the Company indemnifying him against any liability which may lawfully be insured against by the Company:

**52      Disclosure**

If required to do so under the laws of any jurisdiction to which the Company, the Investment Manager, the Administrator or any other service provider is subject, or in compliance with the rules of any stock exchange upon which the Company's Shares are listed, or to ensure the compliance by any person with any anti-money laundering law in any relevant jurisdiction, any Director, Officer, the Investment Manager, the Administrator or Auditor of the Company shall be entitled to release or disclose any information in its possession regarding the affairs of the Company or a Member

including, without limitation, any information contained in the Register of Members or subscription documentation of the Company relating to any Member.

**53      Financial Year**

Unless the Directors otherwise prescribe, the financial year of the Company shall end on 31st December in each year and, following the year of incorporation, shall begin on 1st January in each year.

**54      Transfer by way of Continuation**

The Company shall, subject to the provisions of the Statute and with the approval of a Special Resolution, have the power to register by way of continuation as a body corporate under the laws of any jurisdiction outside the Cayman Islands and to be deregistered in the Cayman Islands.

**55      Mergers and Consolidations**

The Company shall have the power to merge or consolidate with one or more other constituent companies (as defined in the Statute) upon such terms as the Directors may determine and (to the extent required by the Statute) with the approval of a Special Resolution.

**Appx. 03714**

# AMENDMENT
## TO
## AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT
### OF
### HIGHLAND ARGENTINA REGIONAL OPPORTUNITY MASTER FUND, L.P.

THIS AMENDMENT (this "*Amendment*") to the Amended and Restated Exempted Limited Partnership Agreement (the "*Partnership Agreement*") dated November 1, 2017 (the "*Effective Date*") of Highland Argentina Opportunity Master Fund, L.P., a Cayman Islands exempted limited partnership (the "*Partnership*"), is entered into to be effective as of the Effective Date by Highland Argentina Opportunity Fund GP, LLC, as the General Partner, and as the true and lawful agent and attorney-in-fact on behalf of each of the Limited Partners. All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Partnership Agreement.

WHEREAS, due to a scrivener's error, the definition of "*Calculation Period*" under subsection (a) of Article I of the Partnership Agreement incorrectly provided that the Calculation Period with respect to Capital Sub-Account of a Feeder Fund, after the initial Calculation Period, shall commence as of the day following the last day of the preceding Calculation Period and end as of the close of business on the last day of a calendar year;

WHEREAS, at all times the Calculation Period was intended to end as of the close of business on the last day of a fiscal quarter;

WHEREAS, pursuant to the authority granted under Sections 8.1 and 8.2 of the Partnership Agreement, the General Partner, on behalf of itself and on behalf of each of the Limited Partners, now desires to correct the definition of "*Calculation Period*" under subsection (a) of Article I of the Partnership Agreement to provide that the Calculation Period shall end as of the close of business on the last day of a fiscal quarter.

NOW, THEREFORE, in consideration of the premises and the agreements contained herein and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the General Partner, on behalf of itself and on behalf of each of the Limited Partners, hereby amends the Partnership Agreement as follows:

1. The definition of "*Calculation Period*" in the Partnership Agreements is hereby amended and replaced in its entirety to read as follows:

"*Calculation Period*" means, with respect to each Capital Sub-Account of a Feeder Fund, the period commencing as of the date of the establishment of the Capital Sub-Account (in the case of the initial Calculation Period) and thereafter each period commencing as of the day following the last day of the preceding Calculation Period with respect to such Capital Sub-Account, and ending as of the close of business on the first to occur of the following:

(a) the last day of a fiscal quarter;

(b) the withdrawal of all or a portion of the Capital Sub-Account, including as a result of a distribution (but only with respect to the amount withdrawn in the event of a partial withdrawal);

(c) the permitted Transfer of all or any portion of the Capital Sub-Account (but only with respect to the amount withdrawn in the event of a partial permitted Transfer); or

(d) the final distribution with respect to the Capital Sub-Account following the dissolution of the Partnership.

If a Calculation Period ends solely due to a partial withdrawal or a partial Transfer from the Capital Sub-Account, the Calculation Period is deemed to have ended only with respect to that particular Capital Sub-Account and only with respect to the portion of such Capital Sub-Account withdrawn or transferred. Thus, the Performance Allocation for such withdrawn or transferred amount shall be determined by multiplying the Performance Allocation attributable to the entire Capital Sub-Account at such time by a fraction (i) the numerator of which is equal to the amount so withdrawn or transferred from such Capital Sub-Account and (ii) the denominator of which is equal to the balance of such Capital Sub-Account immediately before giving effect to such withdrawal or Transfer."

2. This Amendment shall be governed by and construed in accordance with the laws of the Cayman Islands, without regard to the conflict of laws rule thereof which would result in the application of the laws of a different jurisdiction.

3. This Amendment may be executed in multiple counterparts, each of which, when assembled to include an original or faxed signature for each party contemplated to sign this Amendment, will constitute a complete and fully executed agreement. All such fully executed original or faxed counterparts will collectively constitute a single agreement.

4. Except as modified hereby, the Partnership Agreement shall remain in full force and effect and the Amendment shall be binding upon the parties and their respective successors and assigns. If any inconsistency exists or arises between the terms of the Amendment and the terms of the Partnership Agreements, the Amendment shall prevail.

Appx. 03716

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed to be effective as of the Effective Date.

**GENERAL PARTNER:**

**Highland Argentina Regional Opportunity Fund GP, LLC**

By:      Highland Capital Management Latin America, L.P., its sole member

By:      Highland Latin America GP, Ltd., its general partner

By: _____

Name:      Gustavo Prilick

Title:      Director

3

# HIGHLAND ARGENTINA REGIONAL OPPORTUNITY MASTER FUND, L.P.

*A Cayman Islands Exempted Limited Partnership*

**Amended and Restated Exempted Limited Partnership Agreement**

**November 1, 2017**

## NOTICE

NEITHER HIGHLAND ARGENTINA REGIONAL OPPORTUNITY MASTER FUND, L.P. NOR THE LIMITED PARTNER INTERESTS THEREIN HAVE BEEN OR WILL BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED, THE SECURITIES LAWS OF ANY OF THE STATES OF THE UNITED STATES OR THE SECURITIES LAWS OF ANY NON-U.S. JURISDICTION. THE OFFERING OF SUCH LIMITED PARTNER INTERESTS IS BEING MADE IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT FOR OFFERS AND SALES OF SECURITIES WHICH DO NOT INVOLVE ANY PUBLIC OFFERING, AND ANALOGOUS EXEMPTIONS UNDER STATE SECURITIES LAWS.

THE DELIVERY OF THIS AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR SHALL THERE BE ANY OFFER, SOLICITATION OR SALE OF LIMITED PARTNER INTERESTS IN HIGHLAND ARGENTINA REGIONAL OPPORTUNITY MASTER FUND, L.P. IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OR SALE.

THE LIMITED PARTNER INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE OR NON-U.S. SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM AND MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REQUIREMENTS AND CONDITIONS SET FORTH IN THIS AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT.

**Appx. 03719**

## Table of Contents

*Page*

Article I DEFINITIONS ....................................................................................................1

Article II ORGANIZATION.............................................................................................12
    2.1    Continuation of Exempted Limited Partnership .................................12
    2.2    Name of Partnership ...........................................................................13
    2.3    Registered Office ................................................................................13
    2.4    Term of Partnership............................................................................13
    2.5    Object and Powers of Partnership......................................................13
    2.6    Liability of Partners ...........................................................................14
    2.7    Actions by Partnership.......................................................................14
    2.8    Reliance by Third Parties...................................................................14
    2.9    Filings ................................................................................................14
    2.10   Series of Interests ..............................................................................15

Article III CAPITAL........................................................................................................15
    3.1    Contributions to Capital.....................................................................15
    3.2    Rights of Partners in Capital ..............................................................15
    3.3    Capital Accounts ................................................................................16
    3.4    Allocation of Net Profit and Net Loss ...............................................17
    3.5    Allocation of Management Fees, Withholding Taxes and Certain Other
            Expenditures ......................................................................................17
    3.6    Reserves; Adjustments for Certain Future Events .............................19
    3.7    Performance Allocation ......................................................................19
    3.8    Allocation to Avoid Capital Account Deficits ...................................19
    3.9    Allocations for U.S. Federal Income Tax Purposes ...........................20
    3.10   Curative Allocations...........................................................................23
    3.11   Tax Matters ........................................................................................23
    3.12   Distributions.......................................................................................24
    3.13   Other Matters .....................................................................................24

Article IV MANAGEMENT.............................................................................................24
    4.1    Duties and Powers of the General Partner .........................................24
    4.2    Expenses ............................................................................................26
    4.3    Rights of Limited Partners .................................................................28
    4.4    Other Activities of Partners ...............................................................28
    4.5    Duty of Care; Indemnification ...........................................................30
    4.6    Investment Restrictions......................................................................31

Article V ADMISSIONS, TRANSFERS AND WITHDRAWALS ...................................32
    5.1    Admission of Partners........................................................................32
    5.2    Transfer and Withdrawal of the General Partner ...............................32
    5.3    Transfer and Withdrawal of Interests of Limited Partners.................33

Article VI LIQUIDATION AND TERMINATION ...........................................................34
    6.1    Termination of Partnership.................................................................34
    6.2    Liquidation of Assets .........................................................................35

Appx. 03720

Article VII ACCOUNTING AND VALUATION; BOOKS AND RECORDS ............................36
    7.1    Accounting and Reports.........................................................................36
    7.2    Certain Tax Matters.............................................................................36
    7.3    AEOI...................................................................................................37
    7.4    Valuation of Partnership Assets and Interests ......................................39
    7.5    Determinations by the General Partner.................................................39
    7.6    Books and Records .............................................................................39
Article VIII GENERAL PROVISIONS.................................................................................40
    8.1    Amendment of Partnership Agreement..................................................40
    8.2    Special Power-of-Attorney ...................................................................40
    8.3    Notices ...............................................................................................42
    8.4    Agreement Binding Upon Successors and Assigns; Delegation.............42
    8.5    Governing Law ...................................................................................42
    8.6    Interpretation of Partnership Accounting Systems and Terminology ....43
    8.7    Miscellaneous ....................................................................................43
    8.8    Survival .............................................................................................43
    8.9    Entire Agreement ...............................................................................43

Appx. 03721

THIS AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT of Highland Argentina Regional Opportunity Master Fund, L.P. is made on November 1, 2017 by and among Highland Argentina Regional Opportunity Fund GP, LLC, as General Partner, Gustavo Prilick, as withdrawing Original Limited Partner, those Persons who are listed on Exhibit A as Limited Partners and any other Persons who are admitted, from time to time, as limited partners of the Partnership, in accordance with this Agreement. This Agreement amends and restates in its entirety the Initial Exempted Limited Partnership Agreement of the Partnership, dated September 21, 2017 (the "***Prior Agreement***").

---

## Article I  DEFINITIONS

---

For purposes of this Agreement:

"***Act***" means the Exempted Limited Partnership Law, 2014 of the Cayman Islands, as amended, supplemented or replaced from time to time.

"***Administrator***" means such Person as the General Partner may designate from time to time, in its sole discretion, to serve as administrator to the Partnership.

"***Advisers Act***" means the U.S. Investment Advisers Act of 1940, as amended, and the rules promulgated thereunder.

"***AEOI***" means:

(i)     Sections 1471 to 1474 of the Code and any associated legislation, regulations or guidance, and any other similar legislation, regulations or guidance enacted in any other jurisdiction which seeks to implement similar financial account information reporting and/or withholding tax regimes;

(ii)    the OECD Standard for Automatic Exchange of Financial Account Information in Tax Matters – the Common Reporting Standard and any associated guidance;

(iii)   any intergovernmental agreement, treaty, regulation, guidance, standard or other agreement between the Cayman Islands (or any Cayman Islands government body) and any other jurisdiction (including any government bodies in such jurisdiction), entered into in order to comply with, facilitate, supplement or implement the legislation, regulations, guidance or standards described in sub-paragraphs (a) and (b); and

(iv)    any legislation, regulations or guidance in the Cayman Islands that give effect to the matters outlined in the preceding sub-paragraphs.

1

**Appx. 03722**

"**_Affiliate_**" means, with respect to any Person, a Person which controls, is controlled by, or is under common control with, such Person. For these purposes, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**_Affiliated Investor_**" means the Investment Manager, the General Partner and their respective Affiliates, principals, employees, partners, agents, the respective family members of such personnel and trusts and other entities established primarily for their benefit or for charitable purposes.

"**_Agreement_**" means this Amended and Restated Exempted Limited Partnership Agreement of the Partnership, as amended from time to time.

"**_Automatic Dissolution Date_**" has the meaning set forth in Section 6.1(a)(ii).

"**_BBA_**" means Subchapter C of Chapter 63 of the Code (Sections 6221 through 6241 of the Code), as enacted by the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, as amended from time to time, and the Regulations thereunder (whether proposed, temporary or final), including any subsequent amendments, successor provisions or other guidance thereunder, and any equivalent provisions for state, local or non-U.S. tax purposes.

"**_BBA Effective Period_**" means any taxable year commencing after 2017, taking into account any extensions of the effective date set forth in Bipartisan Budget Act Section 1101(g)(1), as applicable, or in any other BBA guidance.

"**_Business Day_**" means any day or days on which banks in the Cayman Islands, Buenos Aires and New York City are authorized to open for business or such other days as the General Partner may determine generally, or in any particular case.

"**_Calculation Period_**" means, with respect to each Capital Sub-Account of a Feeder Fund, the period commencing as of the date of the establishment of the Capital Sub-Account (in the case of the initial Calculation Period) and thereafter each period commencing as of the day following the last day of the preceding Calculation Period with respect to such Capital Sub-Account, and ending as of the close of business on the first to occur of the following:

(a)     the last day of a calendar year;

(b)     the withdrawal of all or a portion of the Capital Sub-Account, including as a result of a distribution (but only with respect to the amount withdrawn in the event of a partial withdrawal);

(c)     the permitted Transfer of all or any portion of the Capital Sub-Account (but only with respect to the amount withdrawn in the event of a partial permitted Transfer); or

(d)     the final distribution with respect to the Capital Sub-Account following the dissolution of the Partnership.

2

If a Calculation Period ends solely due to a partial withdrawal or a partial Transfer from the Capital Sub-Account, the Calculation Period is deemed to have ended only with respect to that particular Capital Sub-Account and only with respect to the portion of such Capital Sub-Account withdrawn or transferred. Thus, the Performance Allocation for such withdrawn or transferred amount shall be determined by multiplying the Performance Allocation attributable to the entire Capital Sub-Account at such time by a fraction (i) the numerator of which is equal to the amount so withdrawn or transferred from such Capital Sub-Account and (ii) the denominator of which is equal to the balance of such Capital Sub-Account immediately before giving effect to such withdrawal or Transfer.

"*Capital Account*" means, with respect to each Partner, the capital account (including any related Capital Sub-Accounts) established and maintained on behalf of such Partner as described in Section 3.3.

"*Capital Sub-Account*" means, with respect to each Feeder Fund, the separate memorandum account to be recorded in the books and records of the Partnership as a sub-account within such Feeder Fund's Capital Account that corresponds to each series or sub-series of interests held by each Feeder Fund Investor, including Series A Capital Sub-Accounts, Series B Capital Sub-Accounts and Series C Capital Sub-Accounts. Each Capital Sub-Account with respect to the Capital Account of the Domestic Fund shall correspond to the beneficial interest of each partner in the Domestic Fund; and each Capital Sub-Account with respect to the Capital Account of the Offshore Fund shall correspond to each Sub-Series of shares of the Offshore Fund. The Partnership will also maintain Capital Sub-Accounts to reflect varied ownership interests in a Feeder Fund. The aggregate of the balances of all Capital Sub-Accounts with respect to each Feeder Fund shall equal the balance of each such Feeder Fund's Capital Account. Except as the context otherwise requires, the term Capital Account includes any Capital Sub-Account of a Feeder Fund.

"*Carryforward Account*" means a memorandum account to be recorded in the books and records of the Partnership with respect to each Capital Sub-Account of a Feeder Fund. The Carryforward Account with respect to each Capital Sub-Account of any Feeder Fund will have an initial balance of zero and will be adjusted as follows:

(a) As of the first day after the close of each Calculation Period for such Capital Sub-Account, the balance of the Carryforward Account is (i) increased by the amount, if any, of the Negative Performance Change with respect to such Capital Sub-Account for such Calculation Period and (ii) reduced (but not below zero) by the amount, if any, of the Positive Performance Change with respect to such Capital Sub-Account for such Calculation Period.

(b) As of the close of the Calculation Period, any positive balance of the Carryforward Account is further adjusted if such Capital Sub-Account has been reduced during such Calculation Period as a result of a distribution or withdrawal, by reducing such positive balance (but not below zero) by an amount determined by multiplying (i) such positive balance by (ii) a fraction, of which (A) the numerator is equal to the amount so distributed

3

or withdrawn, and (B) the denominator is equal to the balance of such Capital Sub-Account immediately before giving effect to such distribution or withdrawal.

"*Carrying Value*" means, with respect to any Investment, except as set forth herein, the asset's adjusted tax basis for United States federal income tax purposes, except that the Carrying Values of all Investments may, in the discretion of the General Partner, be adjusted to equal their respective fair market values (as determined by the General Partner), in accordance with the rules set forth in Regulation Section 1.704-1(b)(2)(iv)(f). In the case of any Investment that has a Carrying Value that differs from its adjusted tax basis, Carrying Value shall be adjusted by the amount of depreciation, depletion and amortization calculated for purposes of the definition of Net Profit and Net Loss rather than the amount of depreciation, depletion and amortization determined for United States federal income tax purposes.

"*Code*" means the U.S. Internal Revenue Code of 1986, as amended, and as hereafter amended, or any successor law.

"*Commencement Date*" means the first date on or as of which a Limited Partner, other than the Original Limited Partner, makes a capital contribution to the Partnership.

"*Domestic Fund*" means Highland Argentina Regional Opportunity Fund, L.P., a Delaware limited partnership that invests in the Partnership as a Limited Partner.

"*Domestic Fund LPA*" means the Amended and Restated Limited Partnership Agreement of the Domestic Fund, dated November 1, 2017, as may be amended from time to time.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"*ERISA Partner*" means a Limited Partner which is (a) an employee benefit plan subject to the fiduciary provisions of ERISA, (b) a "plan" subject to Section 4975 of the Code, (c) an entity whose underlying assets include "plan assets" for purposes of ERISA by reason of a Plan's investment in the entity, or (d) an entity that otherwise constitutes a "benefit plan investor" within the meaning of Section 3(42) of ERISA or any regulation promulgated thereunder.

"*FATCA*" means legislation known as the U.S. Foreign Account Tax Compliance Act, Sections 1471 through 1474 of the Code and any Regulations thereunder, including any subsequent amendments, and administrative guidance promulgated thereunder (or which may be promulgated in the future), any applicable intergovernmental agreements and related statutes, regulations or rules and other guidance thereunder, any governmental authority pursuant to the foregoing authorities, and any agreement entered into with respect thereto.

"*Feeder Fund Investor*" means an investor in one of the Feeder Funds.

"*Feeder Funds*" means the Domestic Fund, the Offshore Fund and any other investment vehicle(s) sponsored by the Investment Manager or one of its Affiliates that invests in parallel with the Domestic Fund and the Offshore Fund in the Partnership.

Appx. 03725

"*Fiscal Period*" means each period that starts at the opening of business on the Commencement Date (in the case of the initial Fiscal Period) and thereafter on the day immediately following the last day of the preceding Fiscal Period, and that ends at the close of business on the earliest of the following dates:

(a)     the last day of a calendar month;

(b)     any date as of which any withdrawal or distribution of capital is made with respect to any Capital Account or as of which this Agreement provides for any amount to be credited to or debited against a Capital Account, other than a withdrawal or distribution by or to, or an allocation to, all Capital Accounts that does not result in any change of the Partnership Percentage relating to any Capital Account;

(c)     the date which immediately precedes any day as of which a capital contribution is accepted by the General Partner from any new or existing Partner; or

(d)     any other date which the General Partner selects.

"*Fiscal Year*" means the period commencing on the Commencement Date and ending on December 31 of the same year, and thereafter each period commencing on January 1 of each year and ending on December 31 of such year, unless the General Partner shall elect another fiscal year; *provided* that any such other fiscal year shall be permissible for U.S. federal income tax purposes. In the case of the Fiscal Year in which the Partnership is terminated in accordance with Article VI, "*Fiscal Year*" means the period commencing on January 1 of that year and ending on the date on which the Partnership is terminated.

"*GAAP*" means generally accepted accounting principles in the United States.

"*General Partner*" means Highland Argentina Regional Opportunity Fund GP, LLC, a Delaware limited liability company registered as a foreign company in the Cayman Islands, any successor thereto, and any Person hereafter admitted as an additional general partner, in its capacity as general partner of the Partnership.

"*Gross Negligence*" means "gross negligence" as such term is defined and interpreted in accordance with the laws of the State of Delaware, United States.

"*IFRS*" means the International Financial Reporting Standards issued by the International Accounting Standards Board.

"*Indemnified Person*" means each of the General Partner, the Investment Manager, each member, shareholder, partner, manager and director of, and any person who controls, the General Partner or the Investment Manager, each of the respective Affiliates of the foregoing and each of their respective executors, heirs, assigns, successors and other legal representatives.

"*Interest*" means the entire ownership interest of a Partner in the Partnership at the relevant time, including the right of such Partner to any and all benefits to which a Partner may

5

be entitled as provided in this Agreement, together with the obligations of such Partner to comply with all the terms and provisions of this Agreement.

"*Investment Management Agreement*" means the investment management agreement by and among the Investment Manager, the General Partner, the Domestic Fund, the Offshore Fund and the Partnership, as amended from time to time.

"*Investment Manager*" means Highland Capital Management Latin America, L.P., a Cayman Islands exempted limited partnership, or any successor thereto, or any Person thereafter appointed as an investment manager of the Partnership in accordance with the Investment Management Agreement.

"*Investments*" means investments in securities or other financial or intangible investment instruments, contracts or products made by the Partnership, as more fully described in the Feeder Funds' offering memoranda (as may be amended, updated or supplemented from time to time).

"*Limited Partner*" means each of the Persons set forth on Exhibit A, other than the General Partner, and any Person who hereafter becomes a Limited Partner pursuant to the terms of this Agreement, in each case in such Person's capacity as a limited partner of the Partnership. The General Partner may subdivide the Interests into separate series and establish new series pursuant to Section 2.10; *provided, that*, except as expressly set forth in this Agreement, for all purposes of the Act, the Limited Partners constitute a single class or group of limited partners.

"*Liquidator*" has the meaning set forth in Section 6.1(b).

"*Majority of Limited Partners*" means Limited Partners whose Partnership Percentages represent more than 50% of the aggregate Partnership Percentages of all Limited Partners or the series of Limited Partners, as applicable.

"*Management Fee*" means an amount calculated at an annual rate of (a) 1.75% of each Series A Capital Sub-Account, (b) 1.25% of each Series B Capital Sub-Account, and (c) 1.00% of each Series C Capital Sub-Account. The Management Fee accrues from the date a Capital Sub-Account is created, is calculated monthly based on the Capital Sub-Account balance on the last day of each calendar month (before giving effect to any withdrawals from such Capital Sub-Account during such calendar month) and is payable quarterly in arrears on the last day of each calendar quarter. The General Partner or the Investment Manager may reduce, waive or calculate differently the Management Fee with respect to any Limited Partner and any Capital Sub-Account.

"*Negative Basis*" means, with respect to any Partner and as of any time of calculation, the excess of such Partner's "adjusted tax basis" in its Interest for U.S. federal income tax purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer of such Interest) over the amount that such Partner is entitled to receive upon withdrawal from or the winding up and subsequent dissolution of the Partnership.

"*Negative Basis Partner*" means any Partner who withdraws all or a portion of its Interest from the Partnership and who has a Negative Basis as of the effective date of

Appx. 03727

withdrawal, but such Partner will cease to be a Negative Basis Partner at such time as it has received allocations pursuant to Section 3.9(d) equal to such Partner's Negative Basis as of the effective date of withdrawal and without regard to such Partner's share of the liabilities of the Partnership under Section 752 of the Code.

"*Net Assets*" means the total value, as determined by the Administrator in accordance with Section 7.3, of all Investments and other assets of the Partnership (including net unrealized appreciation or depreciation of the assets and accrued interest and dividends receivable net of any withholding taxes), less an amount equal to all accrued debts, liabilities and obligations of the Partnership (including any reserves for contingencies accrued pursuant to Section 3.6). Except as otherwise expressly provided herein, Net Assets as of the first day of any Fiscal Period shall be determined on the basis of the valuation of assets conducted as of the close of the immediately preceding Fiscal Period but after giving effect to any capital contributions made by any Partner subsequent to the last day of such immediately preceding Fiscal Period and after giving effect to Management Fee charges and Net Assets as of the last day of any Fiscal Period shall be determined before giving effect to any of the following amounts payable by the Partnership generally or in respect of any Investment which are effective as of the date on which such determination is made:

(a) any Performance Allocation as of the date on which such determination is made;

(b) any withdrawals or distributions payable to any Partner which are effective as of the date on which such determination is made; and

(c) withholding or other taxes (including any amounts payable under any BBA provision), expenses of processing withdrawals and other items payable and any increases or decreases in any reserves, holdbacks or other amounts recorded pursuant to Section 3.6 during the Fiscal Period ending as of the date on which such determination is made, to the extent the General Partner determines that, pursuant to any provisions of this Agreement, such items are not to be charged ratably among the Capital Accounts of all Partners on the basis of their respective Partnership Percentages as of the commencement of the Fiscal Period.

"*Net Profit or Net Loss*" means, for each Fiscal Year or other period, the taxable income or loss of the Partnership, or particular items thereof, determined in accordance with the accounting method used by the Partnership for United States federal income tax purposes with the following adjustments: (a) all items of income, gain, loss or deduction specially allocated pursuant to Section 3.9 shall not be taken into account in computing such Net Profit or Net Loss; (b) any income of the Partnership that is exempt from United States federal income taxation and not otherwise taken into account in computing Net Profit and Net Loss shall be added to such taxable income or loss; (c) if the Carrying Value of any asset differs from its adjusted tax basis for United States federal income tax purposes, any gain or loss resulting from a disposition of such asset shall be calculated with reference to such Carrying Value; (d) if the Carrying Value of any asset differs from its adjusted tax basis for United States federal income tax purposes, the amount of depreciation, amortization or cost recovery deductions with respect to such asset shall, for purposes of determining Net Profit and Net Loss, be an amount that bears the same ratio to such Carrying Value as the United States federal income tax depreciation, amortization or other

Appx. 03728

cost recovery deductions bears to such adjusted tax basis (provided, that, if the United States federal income tax depreciation, amortization or other cost recovery deduction is zero (0), the General Partner may use any reasonable method for purposes of determining depreciation, amortization or other cost recovery deductions in calculating Net Profit and Net Loss); (e) any expenditures of the Partnership that are described in Section 705(a)(2)(B) of the Code or are treated as described in Section 705(a)(2)(B) of the Code pursuant to Regulation Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Net Profit and Net Loss shall be treated as deductible items; (f) any deduction or debit of the Partnership attributable to Management Fees, placement fees or Organizational Expenses, as the case may be, shall not be taken into account in computing such Net Profit or Net Loss; and (g) if the Carrying Value of any Partnership property is adjusted as provided in the definition of Carrying Value, the amount of such adjustment shall be taken into account, as and if appropriate, immediately prior to the event giving rise to such adjustment, as gain or loss from the hypothetical disposition of such property.

"*New Limited Partner*" has the meaning assigned to such term in Section 8.2(a)(vi).

"*Offshore Fund*" means Highland Argentina Regional Opportunity Fund, Ltd., a Cayman Islands exempted company that invests in the Partnership as a Limited Partner.

"*Offshore Fund POM*" means the Offering Memorandum of the Offshore Fund, dated October 2017, as may be modified or supplemented from time to time.

"*Original Limited Partner*" means Gustavo Prilick, in his capacity as the original limited partner of the Partnership.

"*Other Account*" means any assets or investment of the General Partner or the Investment Manager, or any assets managed by the General Partner, the Investment Manager or any of their respective Affiliates for the account of any Person or entity (including investment vehicles) other than the Partnership, which are invested or which are available for investment in securities or other instruments or for trading activities whether or not of the specific type being conducted by the Partnership.

"*Partner*" means the General Partner or any of the Limited Partners, except as otherwise expressly provided herein, and "Partners" means the General Partner and all of the Limited Partners.

"*Partnership*" means the exempted limited partnership formed upon the filing of a statement under Section 9 of the Act with the Registrar on September 21, 2017, pursuant to the Prior Agreement and registered with the name "Highland Argentina Regional Opportunity Master Fund, L.P."

"*Partnership Percentage*" means a percentage established for each Capital Account on the Partnership's books as of the first day of each Fiscal Period. The Partnership Percentage of a Capital Account for a Fiscal Period shall be determined by dividing the amount of such Capital Account as of the beginning of the Fiscal Period (after crediting all capital contributions to such Capital Account which are effective as of such date, net of all deductions, including Management Fees) by the sum of all Capital Accounts as of the beginning of the Fiscal Period (after crediting

Appx. 03729

all capital contributions to the Partnership which are effective as of such date, net of all deductions, including Management Fees). The sum of the Partnership Percentages of all Capital Accounts for each Fiscal Period shall equal 100%.

"*Performance Allocation*" means:

(a)     with respect to each Series A Capital Sub-Account, 20.0% of the amount, determined as of the close of each Calculation Period with respect to such Capital Sub-Account, by which (i) such Capital Sub-Account's Positive Performance Change for such Calculation Period, if any, exceeds (ii) any positive balance in such Capital Sub-Account's Carryforward Account as of the most recent prior date as of which any adjustment has been made thereto;

(b)     with respect to each Series B Capital-Sub Account, 17.5% of the amount, determined as of the close of each Calculation Period with respect to such Capital Sub-Account, by which (i) such Capital Sub-Account's Positive Performance Change for such Calculation Period, if any, exceeds (ii) any positive balance in such Capital Sub-Account's Carryforward Account as of the most recent prior date as of which any adjustment has been made thereto; and

(c)     with respect to each Series C Capital Sub-Account, 15.0% of the amount, determined as of the close of each Calculation Period with respect to such Capital Sub-Account, by which (i) such Capital Sub-Account's Positive Performance Change for such Calculation Period, if any, exceeds (ii) any positive balance in such Capital Sub-Account's Carryforward Account as of the most recent prior date as of which any adjustment has been made thereto.

The General Partner has the discretion to fully or partially waive or decrease the Performance Allocation with respect to any Capital Sub-Account. For the avoidance of doubt, if and for so long as Capital Sub-Accounts are maintained for any Limited Partner, the Performance Allocation shall be calculated separately with respect to each such Capital Sub-Account as if such Capital Sub-Account was the sole Capital Account of a Person admitted as a Limited Partner upon establishment of such Capital Sub-Account. In such event, the Performance Allocation for such Limited Partner shall be the total of the Performance Allocations as calculated with respect to each such Capital Sub-Account.

"*Performance Change*" means, with respect to each Capital Sub-Account for each Calculation Period, the difference between:

(a)     the sum of (i) the balance of such Capital Sub-Account as of the close of the Calculation Period (after giving effect to Management Fees and all allocations to be made to such Capital Sub-Account as of such date other than any Performance Allocation to be debited against such Capital Sub-Account), plus (ii) any debits to such Capital Sub-Account during the Calculation Period to reflect any actual or deemed distributions or withdrawals with respect to such Capital Sub-Account, plus (iii) any debits to such Capital Sub-Account during the Calculation Period to

9

reflect any items allocable to such Capital Sub-Account pursuant to Section 3.5(b) or (c); and

(b) the sum of (i) the balance of such Capital Sub-Account as of the commencement of the Calculation Period, plus (ii) any credits to such Capital Sub-Account during the Calculation Period to reflect any contributions by such Limited Partner to the Capital Sub-Account.

If there is any change in the Net Assets associated with such Capital Sub-Account during a relevant Calculation Period that is not reflected in the Carrying Value of the Partnership's Investment, the General Partner shall be permitted, in its sole discretion, to adjust the Performance Change with respect to such Capital Sub-Account as if such change had been (i) reflected in the Carrying Value of the Partnership's Investments in respect of the relevant Calculation Period and (ii) allocated among the Capital Sub-Accounts in the manner prescribed for comparable items by this Agreement.

The calculation of the Performance Change will take into account all expenses of the relevant Feeder Fund incurred with respect to such Capital Sub-Account as of such calculation date. If the amount specified in clause (a) exceeds the amount specified in clause (b), such difference is a "*Positive Performance Change*," and if the amount specified in clause (b) exceeds the amount specified in clause (a), such difference is a "*Negative Performance Change*."

For the avoidance of doubt, if and for so long as Capital Sub-Accounts are maintained for any Limited Partner, the Performance Change for each Calculation Period shall be computed separately with respect to each such Capital Sub-Account and the resulting "Positive Performance Changes" and "Negative Performance Changes" shall be separately allocated to such Capital Sub-Accounts and shall not be netted against each other.

"*Person*" means any individual, partnership, corporation, limited liability company, trust, or other entity.

"*Plan Assets*" means assets of the Partnership that are considered to be assets of an ERISA Partner, as determined pursuant to Section 3(42) of ERISA.

"*Positive Basis*" means, with respect to any Partner and as of any time of calculation, the excess of the amount that such Partner is entitled to receive upon withdrawal from or the winding up and subsequent dissolution of the Partnership over such Partner's "adjusted tax basis" in its Interest for U.S. federal income tax purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer of such Interest).

"*Positive Basis Partner*" means any Partner who withdraws all or a portion of its Interest from the Partnership and who has a Positive Basis as of the effective date of withdrawal, but such Partner shall cease to be a Positive Basis Partner at such time as it shall have received allocations pursuant to Section 3.9(c) equal to such Partner's Positive Basis as of the effective date of withdrawal and without regard to such Partner's share of the liabilities of the Partnership under Section 752 of the Code.

Appx. 03731

"***Prior Agreement***" has the meaning set forth in the recitals hereto.

"***Registrar***" means the Registrar of Exempted Limited Partnerships of the Cayman Islands.

"***Regulations***" means the proposed, temporary and final U.S. Treasury Regulations promulgated under the Code, including any successor regulations.

"***Regulatory Allocations***" has the meaning set forth in Section 3.10.

"***Section 9 Statement***" has the meaning set forth in Section 2.1(a).

"***Series A Capital Sub-Account***" means a Capital Sub-Account that corresponds to a holder of Series A Interests (as defined in the Domestic Fund LPA) in the Domestic Fund or a holder of a Sub-Series of Series A Shares (as defined in the Offshore Fund POM) in the Offshore Fund, as applicable.

"***Series B Capital Sub-Account***" means a Capital Sub-Account that corresponds to a holder of Series B Interests (as defined in the Domestic Fund LPA) in the Domestic Fund or a holder of a Sub-Series of Series B Shares (as defined in the Offshore Fund POM) in the Offshore Fund, as applicable.

"***Series C Capital Sub-Account***" means a Capital Sub-Account that corresponds to a holder of Series C Interests (as defined in the Domestic Fund LPA) in the Domestic Fund or a holder of a Sub-Series of Series C Shares (as defined in the Offshore Fund POM) in the Offshore Fund, as applicable.

"***Special Limited Partner***" means Highland Capital Management Latin America, L.P., in its capacity as a special limited partner of the Partnership for purposes of the receipt of the Performance Allocation.

"***Sub-Series***" means sub-series of shares of the Offshore Fund, as created from time to time, for purposes of accounting for any profits and losses attributable to each individual shareholder and of permitting the Performance Allocation to be calculated separately with respect to each shareholder to reflect different returns achieved as a result of subscriptions received from shareholders at different times.

"***Termination Date***" has the meaning assigned to such term in Section 6.1(a).

"***Transfer***" means any direct or indirect sale, exchange, transfer, assignment, pledge, encumbrance, charge, exchange, hypothecation, placing of a lien or a security interest on an Interest or any other disposition by a Partner of its Interest to or in favor of another party, whether voluntary or involuntary (including, but not limited to, being offered or listed on or through any placement agent, intermediary, online service, site, agent or similar Person).

**Appx. 03732**

## Article II  ORGANIZATION

**2.1**    **Continuation of Exempted Limited Partnership**

(a)    The General Partner and the Original Limited Partner established the Partnership upon filing a statement under Section 9 of the Act (the "*Section 9 Statement*") with the Registrar on September 21, 2017, pursuant to the Prior Agreement, which Prior Agreement has governed the operation of the Partnership since that date.   The Original Limited Partner hereby withdraws as a Limited Partner immediately following the admission of any additional Limited Partner and thereafter shall have no further rights, interest or obligations of any kind whatsoever under or in respect of this Agreement or as the Original Limited Partner.   The General Partner hereby admits the Limited Partners who are a party to this Agreement (excluding the Original Limited Partner) and the General Partner and the Limited Partners hereby amend and restate the Prior Agreement in its entirety on the terms of this Agreement.

(b)    If requested by the General Partner, the Limited Partners will promptly execute all certificates and other documents consistent with the terms of this Agreement necessary for the General Partner to accomplish all filings, recordings, publishings and other acts as may be appropriate to comply with all requirements for (i) the formation and operation of an exempted limited partnership under the laws of the Cayman Islands, (ii) if the General Partner deems it advisable, the operation of the Partnership as an exempted limited partnership, or partnership in which the Limited Partners have limited liability, in all jurisdictions where the Partnership proposes to operate and (iii) all other filings required by the Act to be made by the Partnership.   The General Partner shall cause any required amendment to the Section 9 Statement or any other amendment requiring filing under the Act to be filed promptly following the event requiring such amendment. All such amendments may be signed by the General Partner (as required by the Act), and may be signed either personally or by an attorney-in-fact or agent of the General Partner.

(c)    The Partnership expects to receive an undertaking from the Governor-in-Cabinet of the Cayman Islands to the effect that, for a period of 50 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits or income or gains or appreciations shall apply to the Partnership or to any Partner in respect of the operations or assets of the Partnership or the Interest of a Partner.   The parties hereto acknowledge that they intend that the Partnership be taxed in the United States as a partnership and not as an association taxable as a corporation for U.S. federal income tax purposes. No election may be made to treat the Partnership as other than a partnership for U.S. federal income tax purposes.

Appx. 03733

## 2.2 Name of Partnership

(a) The name of the Partnership is Highland Argentina Regional Opportunity Master Fund, L.P. or such other name as the General Partner may hereafter adopt upon (i) causing a statement pursuant to Section 10 of the Act to be filed with the Registrar and (ii) giving notice thereof to the Limited Partners.

(b) The Partnership shall have the exclusive ownership and right to use the Partnership name so long as the Partnership continues, despite the withdrawal, expulsion, resignation or removal of any Limited Partner, but upon the Partnership's winding up or at such time as there ceases to be a general partner, the Partnership shall assign the name and the goodwill attached thereto to the General Partner or one of its Affiliates without payment by the assignee(s) of any consideration therefor.

## 2.3 Registered Office

(a) The registered office address of the Partnership in the Cayman Islands is at c/o Maples Corporate Services Limited, P.O. Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands.

(b) The General Partner may at any time change the location of the Partnership's registered office or registered agent in its sole discretion, provided that the registered office of the Partnership shall be in the Cayman Islands.

## 2.4 Term of Partnership

The term of the Partnership commenced on the date of formation and continues until wound up and dissolved pursuant to Section 6.1 (unless its term is extended pursuant to Section 6.1).

## 2.5 Object and Powers of Partnership

(a) The object and business of the Partnership is to (1) purchase, sell (including short sales), invest and trade in the Investments, (2) engage in financial transactions, including borrowing, financing, pledging, hedging and other derivative transactions relating thereto for the benefit of the Partnership, (3) engage in any other lawful act or activity for which exempted limited partnerships may be formed under the Act and (4) engage in any and all activities necessary or incidental to the foregoing; provided that the Partnership shall not undertake business with the public in the Cayman Islands other than so far as is necessary for the carrying on of the business of the Partnership exterior to the Cayman Islands.

(b) The Partnership possesses and the General Partner on behalf of the Partnership may exercise all such powers and privileges as the General Partner considers necessary, convenient or incidental to the conduct, promotion or attainment of the objects of the Partnership.

**2.6 Liability of Partners**

(a) The liability of the Limited Partners is limited to their obligations under this Agreement and the Act. The General Partner is liable for all of the debts and obligations of the Partnership to the extent that the Partnership has insufficient assets. The General Partner shall not be personally liable for the withdrawal, payment or distribution of all or any part of any Interest, it being expressly agreed that any such withdrawal, payment or distribution to be made pursuant to this Agreement shall be made solely from the assets of the Partnership (which shall not include the General Partner's capital contributions) and on the terms and subject to the conditions contained in this Agreement.

(b) In no event shall any Limited Partner (or former Limited Partner) be obligated to make any contribution to the Partnership in addition to its agreed capital contribution (or other payments provided for herein) or have any personal liability for the repayment or discharge of the debts and obligations of the Partnership except to the extent provided herein or as required by the Act or other applicable law.

**2.7 Actions by Partnership**

The General Partner on behalf of the Partnership may execute, deliver and perform all contracts, agreements and other undertakings and engage in all activities and transactions as may in the opinion of the General Partner be necessary or advisable to carry out the objects of the Partnership as set forth in Section 2.5 above. Notwithstanding the foregoing, the Partnership shall not issue any securities other than interests in the Partnership.

**2.8 Reliance by Third Parties**

Persons dealing with the Partnership are entitled to rely conclusively upon the power and authority of the General Partner as herein set forth.

**2.9 Filings**

(a) The General Partner shall take any and all other actions as may be reasonably necessary to perfect and maintain the status of the Partnership as an exempted limited partnership under the Act and other laws of the Cayman Islands, including the filing of a notice pursuant to Section 10 of the Act with the Registrar signed by the General Partner upon the occurrence of certain amendments to the Section 9 Statement of the Partnership, and any other states or jurisdictions in which the Partnership engages in business.

(b) Following the winding up of the Partnership in accordance with the terms of this Agreement and to effect the dissolution of the same, the General Partner or any duly appointed liquidator shall promptly (i) comply with the applicable provisions of Section 15 of the Act, (ii) execute and cause to be filed a notice of dissolution in accordance with Section 15(3) of the Act and (iii) file any certificates of

14

cancellation in accordance with the laws of any states or jurisdictions in which the Partnership has filed certificates.

**2.10    Series of Interests**

The General Partner, at any time, may without notification to or consent of the other Limited Partners, create and offer different series of Interests with such rights, obligations, liabilities, privileges, designations and preferences (including different investment strategies, underlying investments, degrees of leverage, management fees, performance allocations, brokerage commissions, transparency, withdrawal rights, co-investment opportunities, and other differences) as the General Partner may determine upon the issuance of such series of Interests; *provided* that such series of Interests would not reasonably be expected to have a material adverse effect on the existing Feeder Fund Investors.  The terms and rights of each such series of Interests may be set forth in the Feeder Funds' offering memoranda, any supplement thereto or a "side letter" or other agreement, which the General Partner may incorporate by reference.

---

### Article III  CAPITAL

---

**3.1    Contributions to Capital**

(a)    Each Partner is permitted to make contributions to the capital of the Partnership at such times and in such amounts as the General Partner, in its sole discretion, may determine.  The Limited Partners are not required to make any additional capital contributions to the Partnership, subject to the provisions of Section 3.5(b) and any contrary provision of the Act.

(b)    Each Person admitted as a general partner of the Partnership agrees to make and maintain a capital contribution as a general partner of at least U.S.$1.00.  Except as provided above or in the Act, the General Partner is not required or obligated to make any additional contributions to the capital of the Partnership.  However, the General Partner or an Affiliate shall have the right at any time to make additional capital contributions as a Limited Partner or General Partner in such amounts as it may determine.  If an Affiliated Investor makes a capital contribution as a Feeder Fund Investor or a Limited Partner, the General Partner has the authority to waive the Management Fee and/or Performance Allocation with respect to such Feeder Fund Investor or Limited Partner, respectively.

**3.2    Rights of Partners in Capital**

(a)    No Partner shall be entitled to interest on its capital contributions to the Partnership.

(b)    No Partner shall have the right to the return of any capital contribution to the Partnership except, subject to the Act, (i) upon withdrawal by such Partner of all or part of its Interest pursuant to Section 5.3 or (ii) upon the winding up and

Appx. 03736

dissolution of the Partnership pursuant to Section 6.1. The entitlement to any such return shall be limited to the value of the Capital Account, including corresponding Capital Sub-Accounts, of the Partner. The General Partner shall not be liable for the return of any such amounts.

**3.3     Capital Accounts**

(a)     The Partnership shall maintain a separate Capital Account for each Partner. The General Partner may, in its discretion, maintain separate memorandum sub-accounts with respect to each such Capital Account for purposes of this Agreement. Each Capital Account will reflect the aggregate sum of the balances of all memorandum sub-accounts associated with each such Capital Account. Without limiting the foregoing, the Partnership shall also maintain separate Capital Sub-Accounts within the Capital Account of each Feeder Fund relating to the beneficial interest of each Feeder Fund Investor therein. If a Feeder Fund Investor invests in more than one series of limited partner interests in the Domestic Fund, the Partnership will maintain a separate Capital Sub-Account on behalf of such Feeder Fund Investor with respect to each series. The Partnership will maintain a separate Capital Sub-Account corresponding to each Sub-Series of shares held by a Feeder Fund Investor in the Offshore Fund. Each Capital Sub-Account will be treated as if it were the Capital Account of a separate Partner for purposes of this Agreement, unless otherwise determined by the General Partner, including, without limitation, for purposes of determining the Management Fee and the Performance Allocation applicable to each such Capital Sub-Account. References herein to a "Capital Account" shall be deemed to refer to such a Capital Sub-Account where the context admits.

(b)     Each Capital Account shall have an initial balance equal to the amount of any cash and the net value of any property constituting the relevant Partner's initial capital contribution to the Partnership.

(c)     Each Capital Account shall be increased by (i) the amount of any cash and the net value of any property constituting additional contributions to such Capital Account permitted pursuant to Section 3.1 and (ii) such Capital Account's allocable share of the Net Profits allocated by the Partnership to such Capital Account pursuant to Section 3.4.

(d)     Each Capital Account shall be reduced by (i) the amount of any cash and the net value of any property withdrawn by or distributed to the relevant Partner pursuant to Sections 5.3 or 6.2, (ii) such Capital Account's allocable share of the Net Losses allocated by the Partnership to such Capital Account pursuant to Section 3.4, (iii) such Capital Account's *pro rata* portion of the expenses allocable (or specially allocable) by the Partnership pursuant to Section 3.5, (iv) such Capital Account's allocable share of the Performance Allocation allocable pursuant to Section 3.7, and (v) such Capital Account's *pro rata* portion of the expenses payable by the Partnership pursuant to Section 4.2(b).

Appx. 03737

(e) The Capital Account of the Special Limited Partner will be increased by the amount of the Performance Allocation allocated to such Capital Account and the investment gains thereon pursuant to Section 3.7(a).

(f) Each Capital Account shall be adjusted to reflect all other allocations and other changes in the value of such Capital Account not otherwise described in this Section 3.3 in the manner specified in the remaining provisions of this Article III.

## 3.4 Allocation of Net Profit and Net Loss

(a) Except as otherwise provided in this Agreement, Net Profits, Net Losses and, to the extent necessary, individual items of income, gain, loss, deduction or credit of the Partnership shall be allocated among the Partners in a manner that, after giving effect to the special allocations set forth in Section 3.5, give economic effect to the provisions of this Agreement taking into account such facts and circumstances as the General Partner deems reasonably necessary or appropriate for this purpose. For the avoidance of doubt and solely for the purposes of applying the preceding sentence, the General Partner shall be permitted, in its sole discretion, to cause the Carrying Value of the Partnership's Investments to be adjusted, as described in the definition of "Carrying Value", on a *mutatis mutandis* basis, at the time at which such allocations are made.

(b) Notwithstanding Section 3.4(a), items of income, gain, loss, deduction, credit and expenses for a Fiscal Period that are not allocable to specific Investments of the Partnership, including short term interest income, and audit, administration and legal expenses, shall be separately allocated among and credited to or debited against the Capital Accounts of the Partners *pro rata* in accordance with their Partnership Percentages for such Fiscal Period.

## 3.5 Allocation of Management Fees, Withholding Taxes and Certain Other Expenditures

(a) As of the last day of each calendar quarter, the Management Fee applicable to each Capital Account for such calendar quarter will be debited against the relevant Capital Account. Capital contributions accepted after the commencement of the calendar quarter shall be subject to a prorated Management Fee reflecting the time remaining during such calendar quarter. The General Partner or the Investment Manager may reduce, waive or calculate differently the Management Fee with respect to any Limited Partner and any Capital Sub-Account. For the avoidance of doubt, if and for so long as Capital Sub-Accounts are maintained for any Limited Partner, the Management Fee shall be calculated separately with respect to each such Capital Sub-Account as if such Capital Sub-Account was the sole Capital Account of a Person admitted as a Limited Partner upon establishment of such Capital Sub-Account. The General Partner may delay the timing or alter the structure of fees payable to the Investment Manager so long as such changes are not materially adverse to the Feeder Fund Investors. The Investment Manager may also assign all or any portion of fees payable to the

17

Investment Manager to any Affiliate thereof or any third party in its sole discretion.

(b)     Notwithstanding anything to the contrary herein, to the extent the General Partner or the Partnership is required by law (including under circumstances where the General Partner or the Partnership is unable to rely conclusively on any withholding certification provided by a Partner) to withhold or to make tax payments, including any interest or penalties, on behalf of or with respect to any Partner or Partners (including, without limitation, any amount attributable to an actual or imputed underpayment of taxes under any BBA provision, backup withholding or FATCA withholding), the General Partner or the Partnership may withhold such amounts and make such tax payments as so required. If the Partnership directly or indirectly pays or incurs any withholding tax or other tax obligation (including any amount under any BBA provision), or otherwise incurs a tax payment with respect to the income allocable or distributable to, or otherwise attributable to, one or more Partners, then the amount of such withholding tax, tax obligation or payment will be treated as a distribution to such Partner or Partners, as applicable, pursuant to the terms of this Agreement. Such amount will be debited against the Capital Account(s) of such Partner or Partners as of the close of the Fiscal Period during which the Partnership so withholds, pays or incurs such obligation. If the amount so withheld, paid or incurred is greater than the balance of the Capital Account(s) of the relevant Partner or Partners, as applicable, then such Partner or Partners and any successors must make a contribution to the capital of the Partnership within 10 Business Days after notification and demand by the General Partner in the amount of such excess. The General Partner is not obligated to apply for or obtain a refund, or reduction of or exemption from withholding tax or other tax obligation (including any amount under any BBA provision) on behalf of any Partner that may be eligible for such refund, reduction or exemption, or otherwise obligated to structure Investments so as to reduce or avoid any withholding tax. Each Limited Partner agrees to repay to the Partnership and the General Partner and each of the partners and former partners of the General Partner, any liability for taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Limited Partner.

(c)     Except as otherwise provided for in this Agreement, any expenditures payable by the Partnership (including any taxes imposed on the Partnership pursuant to Section 6225 of the Code, as amended by the BBA), to the extent determined by the General Partner to have been paid or withheld on behalf of, or by reason of particular circumstances applicable to, one or more but fewer than all of the Partners, shall be specially allocated only to the Capital Accounts of those Partners on whose behalf such payments are made or whose particular circumstances gave rise to such payments. Such allocations shall be debited from the relevant Capital Accounts of such Partners as of the close of the Fiscal Period during which any such items were accrued by the Partnership.

18

3.6 **Reserves; Adjustments for Certain Future Events**

(a)     The General Partner may cause appropriate reserves to be created, accrued and charged against Net Assets and proportionately against the Capital Accounts (and the corresponding Capital Sub-Accounts) for contingent liabilities, such reserves to be in the amounts which the General Partner deems necessary or appropriate. The General Partner may increase or reduce any such reserve from time to time by such amounts as the General Partner deems necessary or appropriate. The amount of any such reserve, or any increase or decrease therein, may, at the election of the General Partner, be charged or credited, as the General Partner deems appropriate, to the Capital Accounts of those parties that are Partners at the time when such reserve is created, increased, or decreased, as the case may be, or alternatively may be charged or credited to those parties that were Partners at the time of the act or omission giving rise to the contingent liability for which the reserve was established by the General Partner.

(b)     If the General Partner determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then all or a portion of such amount may be proportionately charged or credited, as appropriate, in proportion to the Capital Account balances of the current Partners as such balances existed during any such prior period(s).

3.7 **Performance Allocation**

(a)     The Performance Allocation is debited against each applicable Capital Sub-Account as of the last day of each Calculation Period with respect to such Capital Sub-Account, and the amount so debited is simultaneously credited to the Capital Account of the Special Limited Partner pursuant to Section 3.3(e). Notwithstanding anything herein to the contrary, the Special Limited Partner may assign all or any portion of the Performance Allocation to its Affiliates or any other Person.

(b)     The General Partner may fully or partially waive or decrease the Performance Allocation with respect to any Limited Partner and any Capital Sub-Account.

3.8 **Allocation to Avoid Capital Account Deficits**

     To the extent that any debits pursuant to this Article III would reduce the balance of the Capital Account of any Limited Partner below zero, that portion of any such debits shall instead be allocated to the Capital Account of the General Partner. Any credits in any subsequent Fiscal Period which would otherwise be allocable pursuant to this Article III to a Capital Account of any Limited Partner previously affected by the application of this Section 3.8 shall instead be allocated to the Capital Account of the General Partner in such amounts as are necessary to offset all previous debits attributable to such Limited Partner pursuant to this Section 3.8 not previously recovered.

Appx. 03740

**3.9**      **Allocations for U.S. Federal Income Tax Purposes**

Notwithstanding anything to the contrary in this Agreement:

(a)      <u>Income Tax Allocations</u>. Except as otherwise required by Code Section 704(c), items of income, gain, deduction, loss, or credit that are recognized for income tax purposes in each Fiscal Year will be allocated among the Partners (and among such Partner's Capital Accounts) in such manner as to reflect equitably amounts credited to or debited against each Partner's Capital Accounts, whether in such Fiscal Year or in prior Fiscal Years. To this end, the Partnership will establish and maintain records which shall show the extent to which the Capital Accounts of each Partner will, as of the last day of each Fiscal Year, comprise amounts that have not been reflected in the taxable income of such Partner. To the extent deemed by the General Partner to be feasible and equitable, taxable income and gains in each Fiscal Year shall be allocated among the Partners who have enjoyed the related credits to their Capital Accounts, and items of deduction, loss and credit in each Fiscal Year shall be allocated among the Partners who have borne the burden of the related debits to their Capital Accounts. Non-U.S. tax credits attributable to taxes incurred by the Partnership shall be allocated in a manner consistent with Section 1.704-1(b)(4)(viii) of the Regulations. All matters concerning allocations for U.S. federal, state and/or local income tax purposes, including accounting procedures, not expressly provided for in this Agreement will be determined by the General Partner.

(b)      <u>Basis Adjustments</u>. To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Section 734(b) of the Code or Section 743(b) of the Code is required under Section 1.704-1(b)(2)(iv)(m) of the Regulations to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations; *provided* that in the event that an adjustment to the book value of Partnership property is made as a result of an adjustment pursuant to Section 734(b) of the Code, items of income, gain, loss, or deduction, as computed for book and tax purposes, will be specially allocated among the Partners so that the effect of any such adjustment shall benefit (or be borne by) the Partner(s) receiving the distribution that caused such adjustment.

(c)      <u>General Partner Special Allocations</u>. Notwithstanding anything to the contrary in this Agreement, if the General Partner withdraws (or is otherwise entitled to withdraw) all or a portion of its Capital Account during any Fiscal Year, the General Partner, in its sole discretion, may specially allocate items of income, gain, deduction, loss or credit that are recognized for U.S. federal income tax purposes to itself equal to the amount by which the withdrawn amount exceed its

20

adjusted tax basis, for U.S. federal income tax purposes, in its Partnership interest (determined prior to any such special allocations).

(d)    <u>Positive Basis Allocations</u>.  If the Partnership realizes gains or items of gross income (including short term capital gain) from the sale of Partnership assets for U.S. federal income tax purposes for any Fiscal Year in which one or more Positive Basis Partners withdraws all or a portion of its Interest from the Partnership pursuant to Section 5.3, the General Partner may elect: (i) to allocate such gains or items of gross income among such Positive Basis Partners, pro rata in proportion to the respective Positive Basis of each such Positive Basis Partner, until either the full amount of such gains or items of gross income shall have been so allocated or the Positive Basis of each such Positive Basis Partner shall have been eliminated; and (ii) to allocate any gains or items of gross income not so allocated to Positive Basis Partners to the other Partners in such manner as shall reflect equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; provided, however, that if, following such Fiscal Year, the Partnership realizes gains or items of gross income from a sale of an Investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the liquidating share of any Positive Basis Partner that continues to be a Partner in the Partnership following such withdrawal (*i.e.,* such Positive Basis Partner effected a partial, and not a complete, withdrawal of its Interest), there shall be allocated to such Positive Basis Partner an amount of such gains or items of gross income equal to the amount, if any, by which its Positive Basis as of the effective date of withdrawal exceeds the amount allocated to such Partner pursuant to clause (i) of this sentence. For the avoidance of doubt, the General Partner may also, in its sole discretion, to apply the Positive Basis definitions and the provisions of this Section 3.9(c) to a withdrawal from a Capital Sub-Account.

(e)    <u>Negative Basis Allocations</u>.  If the Partnership realizes net losses or items of gross loss or deduction (including short term capital loss) from the sale of Partnership assets for U.S. federal income tax purposes for any Fiscal Year in which one or more Negative Basis Partners withdraws all or a portion of its Interest from the Partnership pursuant to Section 5.3, the General Partner may elect:  (i) to allocate such net losses or items of gross loss or deduction among such Negative Basis Partners, pro rata in proportion to the respective Negative Basis of each such Negative Basis Partners, until either the full amount of such losses or items of loss or deduction shall have been so allocated or the Negative Basis of each such Negative Basis Partner shall have been eliminated; and (ii) to allocate any net losses or items of gross loss or deduction not so allocated to Negative Basis Partners to the other Partners in such manner as shall reflect equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; provided, however, that if, following such Fiscal Year, the Partnership realizes net losses or items of gross loss and deduction from a sale of an Investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the liquidating share of any Negative Basis Partner that continues to be a Partner in the Partnership following such

21

withdrawal (*i.e.*, such Negative Basis Partner effected a partial, and not a complete, withdrawal of its Interest), there shall may be allocated to such Negative Basis Partner an amount of such net losses or items of gross loss or deduction equal to the amount, if any, by which its Negative Basis as of the effective date of withdrawal exceeds the amount allocated to such Partner pursuant to clause (i) of this sentence. For the avoidance of doubt, the General Partner may also, in its sole discretion, to apply the Negative Basis definitions and the provisions of this Section 3.9(d) to a withdrawal from a Capital Sub-Account.

(f)　　Qualified Income Offset.　In the event any Limited Partner unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Partnership income and gain will be specially allocated to each such Limited Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the deficit balance in the Capital Account of such Limited Partner as quickly as possible; provided that an allocation pursuant to this Section 3.9(e) may be made only if and to the extent that such Limited Partner would have a deficit balance in its Capital Account after all other allocations provided for in this Article III have been tentatively made as if this Section 3.9(e) were not in this Agreement.　This Section 3.9(e) is intended to constitute a "qualified income offset" within the meaning of Section 1.704-1(b)(2)(ii) of the Regulations and shall be interpreted consistently therewith.

(g)　　Gross Income Allocation.　In the event any Limited Partner has a deficit Capital Account at the end of any Fiscal Year that is in excess of the sum of (i) the amount such Limited Partner is obligated to restore pursuant to any provision of this Agreement and (ii) the amount such Limited Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, each such Limited Partner will be specially allocated items of Partnership gross income and gain in the amount of such excess as quickly as possible; provided that an allocation pursuant to this Section 3.9(f) may be made only if and to the extent that such Limited Partner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article III have been made as if Section 3.9(e) and this Section 3.9(f) were not in this Agreement.

(h)　　Section 704(b) Compliance.　The allocations provided in this Section 3.9 are intended to comply with the Regulations under Section 704(b) of the Code and may, as determined by the General Partner, be interpreted and applied in a manner consistent therewith.　In the event the General Partner determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are determined (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Partnership or any Partners), the General Partner may make such modification, provided that it is not likely to have a material adverse effect on the amounts distributed to any Partner pursuant to Sections 3.12 and 6.2 hereof. The General Partner also shall (i) make any adjustments that are necessary or

Appx. 03743

appropriate to maintain equality between the Capital Accounts of the Partners and the amount of capital reflected on the Partnership's balance sheet, as computed for book purposes, in accordance with Regulations Section 1.704-1(b)(2)(iv)(q) and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b).

### 3.10   Curative Allocations

The allocations set forth in Sections 3.9(b), (e) and (f) (the "***Regulatory Allocations***") are intended to comply with certain requirements of the Regulations.  It is the intent of the Partners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Partnership income, gain, loss, or deduction pursuant to this Section 3.10.  Therefore, notwithstanding any other provision of this Article III (other than the Regulatory Allocations), the General Partner shall make such offsetting special allocations of the Partnership income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Partner's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Partner would have had if the Regulatory Allocations were not part of this Agreement and all Partnership items were allocated pursuant to other provisions of this Article III (other than the Regulatory Allocations).

### 3.11   Tax Matters

(a)   Each Partner agrees not to treat, on any U.S. federal, state, local and/or non-U.S. income tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with the treatment of such item by the Partnership or which would result in inconsistent treatment, and each Partner further agrees to treat, on any U.S. federal, state, local and/or non-U.S. income tax return in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner consistent with the treatment of such item by the Partnership.

(b)   To the fullest extent permitted by law, each Limited Partner agrees to (i) provide such cooperation and assistance, including executing and filing forms or other statements and providing information about the Limited Partner, as is reasonably requested by the Tax Matters Partner, to enable the Partnership to satisfy any applicable tax reporting or compliance requirements, to make any tax election or to qualify for an exception from or reduced rate of tax or other tax benefit or be relieved of liability for any tax regardless of whether such requirement, tax benefit or tax liability existed on the date such Partner was admitted to the Partnership, (ii) amend the Limited Partner's tax returns and pay any resulting taxes, interest and penalties in connection with an election by the Partnership under Section 6225(a) of the Code, as amended by the BBA, (iii) take into account any adjustments and pay any taxes, interest and penalties that result from an election by the Partnership under Section 6226 of the Code, as amended by the BBA, and/or (iv) indemnify and hold harmless the Partnership from and against any liability with respect to the Limited Partner's share of any tax deficiency

23

(including any interest and penalties associated therewith) paid or payable by the Partnership that is (A) allocable to such Limited Partner (as reasonably determined by the General Partner in accordance with this Agreement) with respect to an audited or reviewed taxable year for which such Partner was a partner in the Partnership or (B) attributable (as reasonably determined by the General Partner) to the failure of such Limited Partner to cooperate with or provide any such forms, statements, or other information as requested by the Tax Matters Partner pursuant to clause (i) above.

### 3.12   Distributions

(a)    The amount and timing of any distributions from the Partnership shall be determined by the General Partner. Distributions will generally be made in proportion to the respective Partnership Percentages of the Partners for the Fiscal Period when made.  Any distributions may be paid in cash, in kind or partly in cash and partly in kind.

(b)    Notwithstanding any provision to the contrary contained in this Agreement, the Partnership, and the General Partner on behalf of the Partnership, may not make a distribution to any Partner from any account in connection with its Interest if such distribution would violate the Act or other applicable law.

### 3.13   Other Matters

(a)    The General Partner does not have any personal liability for the repayment of any capital contribution of any Partner.

(b)    Subject only to the relevant provisions of the Act, the Limited Partners are not personally liable for the debts, liabilities, contracts or other obligations of the Partnership except to the extent of their respective capital contributions; provided, however, that the foregoing is not to be construed as relieving any Partner of any obligations arising under Section 3.1 of this Agreement.

(c)    The Limited Partners shall not participate in the conduct of the Partnership's business nor shall they transact business for the Partnership, nor shall they have the power to sign for or bind the Partnership, said powers being vested exclusively in the General Partner.

---

### Article IV  MANAGEMENT

---

### 4.1   Duties and Powers of the General Partner

(a)    Subject to the terms and conditions of this Agreement, the General Partner shall have complete and exclusive power and responsibility, to the fullest extent permitted by the Act, for (i) all investment and investment management decisions

24

to be undertaken on behalf of the Partnership and (ii) managing and administering the conduct of the business and the affairs of the Partnership, and shall have the power and authority to do all things that the General Partner considers necessary or desirable to carry out its duties hereunder and to achieve the purposes of the Partnership. Without limiting the generality of the foregoing, the General Partner's powers include the power to borrow, obtain leverage or otherwise incur indebtedness with respect to the Partnership's capital. The General Partner has delegated (and the Investment Manager has agreed to assume) its rights and responsibilities with respect to making Investments and the operation of the Partnership to the Investment Manager.

(b)     The General Partner shall have the right, without the notification to or consent of any Limited Partner or other Person, to make adjustments to the structure of the Partnership in order to address applicable structural, ownership, legal, or regulatory issues, or to improve overall tax efficiency; *provided* that no such adjustment would cause any material adverse consequences to the Feeder Fund Investors.

(c)     Without limiting the generality of the General Partner's duties and powers hereunder and notwithstanding anything to the contrary contained herein, the General Partner shall have full power and authority, subject to the other terms and provisions of this Agreement, to execute, deliver and perform such contracts, agreements and other undertakings on behalf of the Partnership, without the consent or approval of any other Person, and to engage in all activities and transactions, as it may deem necessary or advisable for, or as may be incidental to, the conduct of the business contemplated by this Section 4.1, including, without in any manner limiting the generality of the foregoing, (i) contracts, agreements, undertakings and transactions with any Partner or with any other Person, firm or corporation having any business, financial or other relationship with any Partner or Partners, (ii) agreements with each Limited Partner in connection with its purchase of an Interest, (iii) any agreements to induce any Person to purchase an Interest, and (iv) the Investment Management Agreement delegating to the Investment Manager certain of the powers and authority vested by this Agreement in the General Partner as the General Partner and the Investment Manager may agree from time to time, each without any further act, approval or vote of any Person.

(d)     The General Partner may terminate or replace the Investment Manager in accordance with the terms of the Investment Management Agreement. The General Partner may delegate to any other Person (including any of its Affiliates) any power and authority vested in the General Partner pursuant to this Agreement that is not otherwise delegated to the Investment Manager.

(e)     Every power vested in the General Partner pursuant to this Agreement shall be construed as a power to act (or not to act) in its sole and absolute discretion, except as otherwise expressly provided herein. No provision of this Agreement

Appx. 03746

shall be construed to require the General Partner to violate the Act or any other law, regulation or rule of any self-regulatory organization.

(f)   Notwithstanding any other provision of this Agreement or otherwise applicable provision of law or equity, whenever in this Agreement, the General Partner is permitted or required to make a decision (i) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, the General Partner shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall, to the fullest extent permitted by applicable law, have no duty or obligation to give any consideration to any interest of or factors affecting the Partnership or the Limited Partners, or (ii) in its "good faith" or under another expressed standard, the General Partner shall act under such express standard and shall not be subject to any other or different standards.  Unless otherwise expressly stated, for purposes of this Section 4.1(f), the General Partner shall be deemed to be permitted or required to make all decisions hereunder in its sole discretion.

(g)   The General Partner must cause the Partnership to conduct its dealings with third parties in its own name.

(h)   The General Partner must, throughout the term of the Partnership as set out in Section 2.4, take all actions that may be necessary or appropriate for the continuation of the Partnership's valid existence as an exempted limited partnership under the laws of the Cayman Islands.

## 4.2   Expenses

(a)   Subject to Section 4.2(f), each of the General Partner and the Investment Manager pays all of its own operating and overhead costs without reimbursement by the Partnership (except liability insurance).  The Partnership will not have its own separate employees or office, and it will not reimburse the General Partner or the Investment Manager for salaries, office rent and other general overhead expenses of the General Partner or the Investment Manager.

(b)   The Partnership, and not the General Partner or the Investment Manager, will pay, or reimburse the General Partner and the Investment Manager for, all costs, fees and expenses arising in connection with the Partnership's operations.  Such expenses payable by the Partnership include the following:

(i)   all costs related to the Partnership's investment program, including, without limitation, brokerage commissions, other expenses related to buying and selling securities (including trading errors that are not the result of the Investment Manager's Gross Negligence, willful misconduct or fraud), costs of due diligence regardless of whether a particular transaction is consummated, the costs of attending shareholder meetings, research expenses and costs related to monitoring Investments;

26

(ii) initial organizational expenses of the Partnership; provided that, such organizational costs may be expensed immediately, or in the General Partner's discretion, amortized in whole or in part and capitalized over a period of 60 calendar months from the date the Partnership commences operations, which may result in an exception to IFRS;

(iii) fees and expenses of advisers and consultants;

(iv) Management Fees;

(v) fees and expenses of any custodians, escrow or transfer agents or other investment-related service providers;

(vi) indemnification expenses incurred in connection with Section 4.5 and the cost of insurance against potential indemnification liabilities;

(vii) interest and other borrowing expenses;

(viii) legal, administrative, accounting, tax, audit and insurance expenses;

(ix) expenses of preparing and distributing reports, financial statements and notices to Limited Partners;

(x) litigation or other extraordinary expenses;

(xi) any withholding, transfer or other taxes imposed or assessed on, or payable by, the Partnership (including any interest and penalties); and

(xii) the cost of periodically updating this Agreement.

(c) Expenses generally will be borne *pro rata* by the Partners in accordance with their respective Partnership Percentages; *provided* that expenses may be specially allocated among the Partners as follows:

(i) with respect to expenses related to Investments (other than taxes), *pro rata* in accordance with their respective Partnership Percentages; and

(ii) as provided elsewhere in this Agreement, including Sections 3.4, 3.5, 3.6 and 5.3.

(d) Each of the General Partner and the Investment Manager, as appropriate, shall be entitled to reimbursement from the Partnership for any of the expenses paid by it on behalf of the Partnership pursuant to Section 4.2(b); *provided* that the General Partner or the Investment Manager may absorb any or all of such expenses incurred on behalf of the Partnership. The Investment Manager may retain, in connection with its responsibilities hereunder as a delegate of the General Partner, the services of others to assist in the investment advice to be given to the Partnership, including, but not limited to, any Affiliate of the Investment

27

Manager, but payment for any such services shall be assumed by the Investment Manager and the Partnership shall not have any liability therefor; *provided, however*, that the Investment Manager, in its sole discretion, may retain the services of independent third party professionals on behalf of the Partnership, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the Partnership hereunder, and the Partnership shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

(e)     If the General Partner or the Investment Manager, as appropriate, shall incur any of the expenses referred to in Section 4.2(b) for the account or for the benefit of, or in connection with its activities or those of its Affiliates on behalf of, both the Partnership and any Other Account, the General Partner or the Investment Manager, as appropriate, will allocate such expense among the Partnership and each such Other Account in proportion to the size of the Investment made by each in the activity or entity to which the expense relates, or in such other manner as the General Partner considers fair and reasonable.

(f)     Each of the General Partner and the Investment Manager is entitled to use "soft dollars" generated by the Partnership to pay for certain investment research and brokerage services that provide lawful and appropriate assistance to the General Partner or the Investment Manager in the performance of investment decision-making responsibilities to the extent such use falls within the safe harbor afforded by Section 28(e) of the Securities Exchange Act of 1934, as amended.  Use of "soft dollars" by the General Partner or the Investment Manager as described herein shall not constitute a breach by the either the General Partner or the Investment Manager of any fiduciary or other duty which the General Partner or the Investment Manager may be deemed to owe to the Partnership or its Partners.

## 4.3     Rights of Limited Partners

The Limited Partners shall take no part in the management, control or operation of the Partnership's business, and shall have no right or authority to act for the Partnership or to vote on matters other than the matters set forth in this Agreement or as required by applicable law.  Except as otherwise provided herein or required by law, a Limited Partner shall have no liability for the debts or obligations of the Partnership.

## 4.4     Other Activities of Partners

(a)     The General Partner shall not be required to devote any specific amount of its time to the affairs of the Partnership, but shall devote such of its time to the business and affairs of the Partnership as it shall determine in good faith to be necessary to conduct the affairs of the Partnership for the benefit of the Partnership and the Partners.

(b)     Each Partner acknowledges and agrees that any other Partner, its Affiliates and their respective officers, directors, shareholders, members, partners, personnel and

Appx. 03749

employees, may engage in or possess an interest in other business ventures or commercial dealings of every kind and description, independently or with others, including, but not limited to, management of other accounts, investment in, or financing, acquisition and disposition of, securities, investment and management counseling, brokerage services, serving as directors, officers, advisers or agents of other companies, partners of any partnership, or trustees of any trust, or entering into any other commercial arrangements, and will not be disqualified solely on the basis that any such activities may conflict with any interest of the parties with respect to the Partnership. Without in any way limiting the foregoing, each Partner hereby acknowledges that (i) none of the Partners, their Affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees shall have any obligation or responsibility to disclose or refer any of the investment or other opportunities obtained through activities contemplated by this Section 4.4(b) to the General Partner or the Limited Partners, but may refer the same to any other party or keep such opportunities for their own benefit; and (ii) the Partners, their Affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees are hereby authorized to engage in activities contemplated by this Section 4.4(b) with, or to purchase, sell or otherwise deal or invest in investments issued by, companies in which the General Partner might from time to time invest or be able to invest or otherwise have any interest on behalf of the Partnership, without the consent or approval of the Partnership or any other Partner. The Partners expressly agree that no other Partner shall have any rights in or to such other activities, or any profits derived therefrom.

(c)     The General Partner and its Affiliates shall allocate investment opportunities to the Partnership and any Other Account fairly and equitably over time. Notwithstanding the foregoing, the General Partner is under no obligation to accord exclusivity or priority to the Partnership in the event of limited investment opportunities. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) fiduciary duties owed to the accounts; (ii) the primary mandate of the accounts; (iii) the capital available to the accounts; (iv) any restrictions on the accounts and the investment opportunity; (v) the sourcing of the investment, size of the investment and amount of follow-on available related to the investment; (vi) whether the risk-return profile of the proposed investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (vii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (viii) liquidity requirements of the account; (ix) potentially adverse tax consequences; (x) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (xi) the need to re-size risk in the account's portfolio. The General Partner has the authority to allocate trades to multiple accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts

29

cannot be fully allocated under prevailing market conditions, the General Partner may allocate the trades among different accounts on a basis it considers fair and equitable over time.

(d)    The principal of the General Partner, as well as the employees and officers of the Investment Manager and of organizations affiliated with the Investment Manager, may buy and sell securities for their own account or the account of others, but may not buy securities from or sell securities to the Partnership (such prohibition does not extend to the purchase or sale of Interests) unless such purchase or sale is in compliance with the applicable provisions of the Advisers Act.

(e)    Each Partner hereto hereby waives, and covenants not to bring a cause of action in law or equity on the basis of, any law (statutory, common law or otherwise) respecting the rights and obligations of the Partners which is or may be inconsistent with this Section 4.4.

(f)    The General Partner and its Affiliates reserve the right to establish collective investment vehicles that have stated investment programs or terms that differ from those of the Partnership or that are targeted primarily to investors for which the Partnership is not designed to be a suitable investment vehicle. The General Partner and its Affiliates also reserve the right to establish and provide management or advisory services to Other Accounts for significant investors, whether or not such accounts have the same investment program as the Partnership.

(g)    Each Limited Partner acknowledges that the General Partner or the Investment Manager may engage one or more of their respective Affiliates to provide services to the Partnership for compensation.

## 4.5    Duty of Care; Indemnification

(a)    None of the Indemnified Persons will be liable to the Partnership or any Limited Partner (or any Feeder Fund Investors) for any loss or damage arising by reason of being or having been an Indemnified Person or from any acts or omissions in the performance of its services as an Indemnified Person in the absence of Gross Negligence, willful misconduct or fraud, or as otherwise required by law. In no event shall any Indemnified Person be liable for any consequential damages, special or indirect damages or lost profits. An Indemnified Person may consult with counsel and accountants in respect of the Partnership's affairs and will be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants, provided that they were selected in accordance with the standard of care set forth above.

(b)    The Partnership shall, to the fullest extent permitted by law, indemnify and hold harmless each Indemnified Person from and against any and all liabilities suffered or sustained by an Indemnified Person by reason of the fact that it, he or she is or was an Indemnified Person or in connection with this Agreement or the

Partnership's business or affairs, including, without limitation, any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, suit or proceeding, provided that such liability did not result from the Gross Negligence, willful misconduct or fraud of such Indemnified Person.  The Partnership will, in the sole discretion of the General Partner, advance to any Indemnified Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action, suit or proceeding which arises out of such conduct.  In the event that such an advance is made by the Partnership, the Indemnified Person will agree to reimburse the Partnership to the extent that it is finally determined that the Indemnified Person was not entitled to indemnification in respect thereof.

(c)     Notwithstanding any of the foregoing, the provisions of this Section 4.5 do not provide for the exculpation or indemnification of any Indemnified Person for any liability (including liability under U.S. federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the above provisions to the fullest extent permitted by law.

(d)     Pursuant to the foregoing indemnification and exculpation provisions applicable to each Indemnified Person, the Partnership (and not the applicable Indemnified Person) will be responsible for any losses resulting from trading errors and similar human errors, absent Gross Negligence, willful misconduct or fraud of any Indemnified Person.

(e)     The above-mentioned Indemnified Persons are also indemnified by each Limited Partner for any amounts of tax withheld or required to be withheld with respect to that Limited Partner, and also for any amounts of interest, additions to tax, penalties and other costs borne by any such persons in connection therewith to the extent that the balance of the Limited Partner's Capital Account is insufficient to fully compensate the General Partner or the Investment Manager for such costs.

(f)     The General Partner may make, execute, record and file on its own behalf and on behalf of the Partnership all instruments and other documents (including one or more deed polls in favor of categories of Indemnified Persons and/or one or more separate indemnification agreements between the Partnership and individual Indemnified Persons) that the General Partner deems necessary or appropriate in order to extend the benefit of the provisions of Sections 4.5(a) and 4.5(b) to the Indemnified Persons; provided, that, such other instruments and documents authorized hereunder shall be on the same terms as provided for in Sections 4.5(a) and 4.5(b) except as otherwise may be required by applicable law.

**4.6     Investment Restrictions**

Notwithstanding anything in this Agreement to the contrary, the Partnership may not at the time of investment:

Appx. 03752

(a)     invest more than 50% of its gross assets in its net holdings of equities;

(b)     borrow more than 100% of its Net Assets;

(c)     invest more than 20% of its gross assets in a single equity position;

(d)     invest more than 20% of its gross assets in a single corporate issuer;

(e)     invest more than 30% of its gross assets in GDP-linked warrants; and

(f)     invest more than 30% of its gross assets in a single sovereign or provincial issuer.

---

## Article V  ADMISSIONS, TRANSFERS AND WITHDRAWALS

### 5.1     Admission of Partners

The General Partner may, without the consent of any existing Partners, admit any Person to the Partnership who agrees to adhere to and be bound by all of the terms of this Agreement as a General Partner or a Limited Partner upon the execution by or on behalf of it and the acceptance by the General Partner of a deed of adherence to this Agreement in form satisfactory to the General Partner.  The amount of any initial capital contribution to be made by such additional Partner is determined by the General Partner (in its sole discretion).  Effective upon such admission, the Partnership Percentage of each existing Partner is adjusted pro rata to reflect the Partnership Percentage of the additional Partner, and the Partnership's records are revised to reflect such adjusted Partnership Percentages, as well as the name, initial capital contribution and Partnership Percentage of such additional Partner.

### 5.2     Transfer and Withdrawal of the General Partner

Without the consent of a Majority of the Limited Partners, the General Partner shall not have the right to assign or otherwise transfer its Interest as the general partner of the Partnership, and the General Partner shall not have the right to withdraw from the Partnership without the consent of the Limited Partners; provided in each case that, the Feeder Funds must vote their Interests proportionately based on the votes of their respective Feeder Fund Investors.  In the event of an assignment or Transfer of all of its Interest as a general partner of the Partnership in accordance with this clause, the new general partner will immediately notify the Registrar in the Cayman Islands in accordance with Section 10 of the Act and the outgoing General Partner will take such actions as may be reasonably necessary to novate and assign all contracts signed on behalf of the Partnership to the new general partner whereupon the new general partner will be substituted as general partner of the Partnership in place of the outgoing General Partner and immediately thereafter the outgoing General Partner will cease to be the general partner of the Partnership.

Appx. 03753

5.3    **Transfer and Withdrawal of Interests of Limited Partners**

(a)    The General Partner shall have the right, in its sole discretion, to (i) prohibit Transfers of Interests by Limited Partners, (ii) compel withdrawals of Interests and (iii) take such other actions as the General Partner deems necessary to ensure that the assets of the Partnership do not constitute Plan Assets for purposes of ERISA.

(b)    Subject to obtaining the General Partner's consent, each Limited Partner may voluntarily withdraw all or part of its Interest at such times and in such amounts as such Limited Partner may determine.

(c)    The General Partner may, at any time, suspend (a) the calculation of the net asset value of the Partnership (and the applicable valuation date); (b) the issuance of Interests; (c) the withdrawal by Limited Partners of their Interests (and the applicable withdrawal date); and/or (d) the payment of withdrawal proceeds (even if the calculation dates and withdrawal dates are not postponed), during any period which: (i) any stock exchange on which a substantial part of Investments owned by the Partnership are traded is closed, other than for ordinary holidays, or dealings thereon are restricted or suspended; (ii) there exists any state of affairs as a result of which (A) disposal of a substantial part of the Investments owned by the Partnership would not be reasonably practicable and might seriously prejudice the Limited Partners, or (B) it is not reasonably practicable for the Partnership fairly to determine the value of its Net Assets; (iii) none of the withdrawal requests which have been made may lawfully be satisfied by the Partnership; (iv) there is a breakdown in the means of communication normally employed in determining the prices of a substantial part of the Investments of the Partnership; or (v) in the sole discretion of the General Partner, it is necessary to preserve the Partnership's assets.

(d)    The Administrator will promptly notify each Limited Partner and each Feeder Fund Investor who, directly or indirectly through a Limited Partner, has submitted a withdrawal request and to whom payment in full of the amount being withdrawn has not yet been remitted of any suspension of withdrawals or suspension of the payment of withdrawal proceeds pursuant to Section 5.3(c). Any remaining amount of a withdrawal request that is not satisfied due to such a suspension remains at risk as per other amounts invested in the Partnership and subject to the applicable Management Fee until such amount is finally and fully withdrawn. Such Limited Partners and Feeder Fund Investors will not be given any priority with respect to the withdrawal of Interests after the cause for such suspension or limitation ceases to exist. The General Partner may in its sole discretion, however, permit such Limited Partners or Feeder Fund Investors (through a Limited Partner) to withdraw their withdrawal requests to the extent that the relevant withdrawal date has not yet passed. For the avoidance of doubt, where a suspension of the payment of withdrawal proceeds is declared between the relevant withdrawal date and the remittance of such payment proceeds, affected Limited Partners and Feeder Fund Investors shall not have any right to withdraw

33

their withdrawal requests. Upon the reasonable determination by the General Partner that conditions leading to a suspension no longer apply, the Administrator will notify the Limited Partners and Feeder Fund Investors of the end of the suspension. At such time, any such suspended payments shall generally be paid in accordance with the normal process for making such payments, withdrawal rights shall be promptly reinstated, and any pending withdrawal requests which were not withdrawn (or new, timely withdrawal requests) will be effected as of the first withdrawal date following the removal of the suspension, subject to the foregoing restrictions on withdrawals.

(e) Unless prohibited by law, the Special Limited Partner, its Affiliates and any other Person that is entitled to any portion of the Performance Allocation may make withdrawals of all or any portion of the amount of the Performance Allocation from their Capital Accounts as of the last Business Day of any calendar month and/or such other Business Days as the General Partner may determine in its sole discretion.

---

## Article VI  LIQUIDATION AND TERMINATION

### 6.1    Termination of Partnership

(a) The Partnership shall be wound up and dissolved upon the first to occur of any of the following dates (each, a "***Termination Date***") and Sections 36(1)(b), 36(9) and 36(12) of the Act shall not apply to the Partnership:

    (i) any date on which the General Partner shall elect in writing to terminate the Partnership; and

    (ii) if the General Partner is the sole or last remaining general partner, the date (the "***Automatic Dissolution Date***") falling 90 days after the date of the service of a notice by the General Partner (or its legal representative) on all the Limited Partners informing the Limited Partners of:

        (1) the commencement of liquidation or bankruptcy proceedings in relation to the General Partner; or

        (2) the withdrawal, removal or making of a winding up or dissolution order in relation to the General Partner;

*provided that*, if a majority in number of the Limited Partners elects one or more new general partners before the Automatic Dissolution Date, the business of the Partnership shall be resumed and continued. If a new general partner is not elected by the Automatic Dissolution Date, the Partnership shall be wound up and dissolved in accordance with terms of this Agreement and the Act.

Appx. 03755

(b)    Upon such Termination Date, the Partnership shall be wound up in accordance with the Act by the General Partner or if the General Partner is unable to perform this function, a liquidator elected by a Majority of the Limited Partners (a "*Liquidator*"), which shall take all steps necessary or appropriate to wind up the affairs of the Partnership as promptly as practicable thereafter.  Neither the admission of Partners nor the withdrawal, bankruptcy, death, legal incapacity or disability of a Limited Partner shall terminate the Partnership.

(c)    The parties agree that irreparable damage would be done to the goodwill and reputation of the Partners if any Limited Partner should bring an action in court to dissolve the Partnership.  Care has been taken in this Agreement to provide for fair and just payment in liquidation of the Interests of all Partners.  Accordingly, to the fullest extent permitted by law, each Limited Partner hereby waives and renounces its right to such a court decree of dissolution or to seek the appointment by the court of a liquidator for the Partnership except as provided herein, and no Limited Partner may present a winding up petition against the Partnership without the prior written consent of the General Partner.

**6.2**    **Liquidation of Assets**

(a)    Upon the Termination Date of the Partnership, the General Partner or Liquidator (as applicable) shall promptly liquidate the business and administrative affairs of the Partnership to the extent feasible.  Net Profit and Net Loss during the Fiscal Periods, which includes the period of liquidation, shall be allocated pursuant to Article III.  The proceeds from liquidation shall be divided in the following manner, subject to the Act:

(i)    the debts, liabilities and obligations of the Partnership, other than any debts to the Partners as Partners, and the expenses of liquidation (including legal, administrative and accounting expenses incurred in connection therewith), up to and including the date that distribution of the Partnership's assets to the Partners has been completed, shall first be satisfied (whether by payment or the making of reasonable provision for payment thereof);

(ii)    such debts as are owing to the Partners as Partners are next paid; and

(iii)    the Partners shall next be paid liquidating distributions (in cash or in securities or other assets, whether or not readily marketable) *pro rata* in accordance with, and up to the positive balances of their respective Capital Accounts, as adjusted pursuant to Article III to reflect allocations for the Fiscal Period ending on the date of the distributions under this Section 6.2(a)(iii).

(b)    Notwithstanding this Section 6.2 and the priorities set forth in the Act, the General Partner or Liquidator may distribute ratably in kind rather than in cash, upon dissolution, any assets of the Partnership; *provided*, *however*, that if any in

Appx. 03756

kind distribution is to be made, (i) the assets distributed in kind shall be valued pursuant to Section 7.3, and charged as so valued and distributed against amounts to be paid under Section 6.2(a) and (ii) any gain or loss (as computed for book purposes) attributable to property distributed in kind shall be included in the Net Profit or Net Loss for the Fiscal Period ending on the date of such distribution.

## Article VII ACCOUNTING AND VALUATION; BOOKS AND RECORDS

### 7.1 Accounting and Reports

(a) The Partnership may adopt for tax accounting purposes any accounting method which the General Partner shall decide is in the best interests of the Partnership and which is permissible for U.S. federal income tax purposes.

(b) As soon as practicable after the end of each Fiscal Year, the General Partner shall cause an audit of the financial statements of the Partnership as of the end of such period to be made by a firm of independent accountants selected by the General Partner. As soon as is practicable thereafter, the General Partner shall furnish to each Limited Partner a copy of the set of audited financial statements prepared in accordance with IFRS (subject to this Agreement) with GAAP reconciliation and such adjustments thereto as the General Partner determines appropriate, including a statement of profit and loss for such Fiscal Year and an unaudited status of each such Partner's holdings in the Partnership at such time.

(c) As soon as practicable after the end of each taxable year, the General Partner shall furnish to each Limited Partner such information as may be required to enable each such Limited Partner properly to report for U.S. federal, state and local income tax purposes its distributive share of each Partnership item of income, gain, loss, deduction or credit for such year. The General Partner shall have discretion as to how to report Partnership items of income, gain, loss, deduction or credit on the Partnership's tax returns, and the Limited Partners shall treat such items consistently on their own tax returns.

### 7.2 Certain Tax Matters

(a) By joining this Agreement, each Limited Partner appoints and designates the General Partner (i) as the "tax matters partner," within the meaning of Section 6231(a)(7) of the Code, and, (ii) for any BBA Effective Period, as the "partnership representative" within the meaning of Section 6223 of the Code (as applicable, the "***Tax Matters Partner***"), or, in each case, under any similar state or local law. The Tax Matters Partner shall have any powers necessary to perform fully in such capacity, and shall be permitted to take any and all actions, to the extent permitted by law, in consultation with the General Partner if the General Partner is not the Tax Matters Partner. The General Partner shall have the exclusive authority to appoint and designate the Investment Manager, or an

Appx. 03757

Affiliate of the General Partner or the Investment Manager, as a successor Tax Matters Partner for any BBA Effective Period. The Tax Matters Partner shall be reimbursed by the Partnership for all costs and expenses incurred by it, and to be indemnified by the Partnership with respect to any action brought against it, in its capacity as the Tax Matters Partner.

(b)    The Limited Partners agree that any and all actions taken by the Tax Matters Partner shall be binding on the Partnership and all of the Limited Partners and the Limited Partners shall reasonably cooperate with the Partnership or the General Partner, and undertake any action reasonably requested by the Partnership or the General Partner, in connection with any elections made by the Tax Matters Partner or as determined to be reasonably necessary by the Tax Matters Partners under any BBA provision.

(c)    Each Limited Partner further agrees that such Limited Partner will not treat any Partnership item inconsistently on such Limited Partner's U.S. federal, state, local and/or non-U.S. tax returns or in any claim for a refund with the treatment of the item on the Partnership's tax returns and that such Limited Partner will not independently act with respect to tax audits or tax litigation affecting the Partnership, unless the prior written consent of the General Partner has been obtained.

(d)    The General Partner may in its sole discretion cause the Partnership to make all elections not otherwise expressly provided for in this Agreement required or permitted to be made by the Partnership under the Code and any state, local or non-U.S. tax laws.

## 7.3   AEOI

Each Partner acknowledges and agrees that:

(a)    the Partnership is required to comply with the provisions of AEOI;

(b)    it will provide, in a timely manner, such information regarding the Partner and its beneficial owners and such forms or documentation as may be requested from time to time by the Partnership (whether by its General Partner or other agents such as the Investment Manager or the Administrator) to enable the Partnership to comply with the requirements and obligations imposed on it pursuant to AEOI, specifically, but not limited to, forms and documentation which the Partnership may require to determine whether or not the Partner's relevant investment is a "Reportable Account" (under any AEOI regime) and to comply with the relevant due diligence procedures in making such determination;

(c)    any such forms or documentation requested by the Partnership or its agents pursuant to paragraph (b), or any financial or account information with respect to the Partner's investment in the Partnership, may be disclosed to the Cayman Islands Tax Information Authority (or any other Cayman Islands governmental body which collects information in accordance with AEOI) and to any

withholding agent where the provision of that information is required by such agent to avoid the application of any withholding tax on any payments to the Partnership;

(d) it waives, and/or shall cooperate with the Partnership to obtain a waiver of, the provisions of any law which:

    (i) prohibit the disclosure by the Partnership, or by any of its agents, of the information or documentation requested from the Partner pursuant to paragraph (b);

    (ii) prohibit the reporting of financial or account information by the Partnership or its agents required pursuant to AEOI; or

    (iii) otherwise prevent compliance by the Partnership with its obligations under AEOI;

(e) if it provides information and documentation that is in anyway misleading, or it fails to provide the Partnership or its agents with the requested information and documentation necessary in either case to satisfy the Partnership's obligations under AEOI, the General Partner reserves the right (whether or not such action or inaction leads to compliance failures by the Partnership, or a risk of the Partnership or its investors being subject to withholding tax or other costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Partnership) (together, "*costs*") under AEOI), in its sole discretion, to take any action and/or pursue all remedies at its disposal including, without limitation:

    (i) to establish separate sub-accounts within a Partner's Capital Account for the purpose of calculating AEOI related costs; and/or

    (ii) to allocate any or all AEOI costs among Capital Accounts (or Capital Sub-Accounts within a Partner's Capital Account) on a basis determined solely by the General Partner; and/or

    (iii) to compulsory withdraw such Partner from the Partnership; and/or

    (iv) to hold back or deduct from any withdrawal proceeds or from any other payments or distributions due to such Partner any costs caused (directly or indirectly) by the Partner's action or inaction;

(f) it shall have no claim against the Partnership, the General Partner or any of its or their agents, for any form of damages or liability as a result of actions taken or remedies pursued by or on behalf of the Partnership in order to comply with AEOI; and

(g) it hereby indemnifies the Partnership, the General Partner and each of their respective principals, members, partners, managers, officers, directors, stockholders, employees and agents and holds them harmless from and against any AEOI related liability, action, proceeding, claim, demand, costs, damages,

expenses (including legal expenses) penalties or taxes whatsoever which such parties may incur as a result of any action or inaction (directly or indirectly) of such Partner (or any related person) described in the preceding paragraphs. This indemnification shall survive the disposition of such Partner's Interest in the Partnership.

**7.4 Valuation of Partnership Assets and Interests**

(a)     The Partnership's assets are valued as of the close of each Fiscal Period and on any other date selected by the General Partner in its sole discretion in accordance with the Investment Manager's valuation policies and procedures.

(b)     The value of the assets of the Partnership and the net worth of the Partnership as a whole determined pursuant to this Section 7.3 are conclusive and binding on all of the Partners and all parties claiming through or under them.

**7.5 Determinations by the General Partner**

(a)     All matters concerning the determination and allocation among the Partners and their respective Capital Accounts of the amounts to be determined and allocated pursuant to this Agreement, including Article III and accounting procedures applicable thereto, shall be determined by the General Partner, unless specifically and expressly otherwise provided for by the provisions of this Agreement, and such determinations and allocations shall be final and binding on all the Partners; provided, however, that all calculations of the Performance Allocation will be made on the basis of, or subject to correction based on, the annual audit of the Partnership's financial statements and appropriate adjustments will be made to all such calculations and related allocations to the extent necessary as a result of that audit.

(b)     The General Partner may make such adjustments to the computation of Net Profit or Net Loss, the Performance Change and the Carryforward Account or any other allocations with respect to any Limited Partner and their respective Capital Accounts, or any component items comprising any of the foregoing, as it considers appropriate to reflect the financial results of the Partnership and the intended allocation thereof among the Partners and their respective Capital Accounts in a reasonably accurate, fair and efficient manner. Without limiting the generality of the foregoing, any provision of this Agreement that requires an adjustment to be made to any Capital Account or Capital Sub-Account (or other memorandum sub-account) as of any mid-month or mid-quarter date may be made as of the most recent preceding or succeeding date when a regular valuation is being conducted.

**7.6 Books and Records**

The General Partner shall keep books and records pertaining to the Partnership's affairs showing all of its assets and liabilities, receipts and disbursements, realized income, gains, deductions and losses, Partners' Capital Accounts and associated Capital Sub-Accounts and all

**Appx. 03760**

transactions entered into by the Partnership.  Subject to the documentation requirements of the Act, such books and records of the Partnership (and/or copies thereof, as appropriate) must be kept at the Partnership's principal office, at the registered office of the Partnership or at the office of an agent of the Partnership.

---

## Article VIII  GENERAL PROVISIONS

**8.1    Amendment of Partnership Agreement**

(a)    Except as required by law, this Agreement may be amended, in whole or in part, by an instrument in writing signed by each of the Limited Partners and the General Partner.

(b)    Notwithstanding the foregoing or anything in this Agreement to the contrary, the General Partner may amend this Agreement without the consent of the Limited Partners in order:

(i)    to make consequential amendments following any amendment made pursuant to this Section 8.1;

(ii)    to clarify any manifest or clerical inaccuracy, ambiguity or reconcile any inconsistency in this Agreement;

(iii)    to add to the representations, duties or obligations of the General Partner or waive any right or power of the General Partner under this Agreement for the benefit of the Limited Partners;

(iv)    so as to qualify or maintain the qualification of the Partnership as a limited partnership in any jurisdiction;

(v)    to change the name of the Partnership;

(vi)    to admit any new Limited Partners or to carry out the Transfer of any Interests;

(vii)    to make any other amendment whatsoever to this Agreement which the General Partner deems advisable, provided that it does not adversely affect any rights of the Limited Partners; or

(viii)    to create separate classes or sub-classes or series or sub-series of Interests.

**8.2    Special Power-of-Attorney**

(a)    Each Partner hereby irrevocably makes, constitutes and appoints the General Partner (and each of its successors and permitted assigns) for the time being, with

40

Appx. 03761

full power of substitution, as the true and lawful agent and attorney-in-fact of, and in the name, place and stead of, such Partner with the power from time to time to make, execute, sign, acknowledge, swear to (and deliver as may be appropriate) on its behalf and file and record in the appropriate public offices and publish (as may in the reasonable judgment of the General Partner be required by law):

(i)     any amendments to this Agreement made in accordance with the terms hereof;

(ii)    any instruments or documents which the General Partner determines in its sole discretion are required to admit any new Limited Partners or to carry out the Transfer of any Interests;

(iii)   declarations of limited partnership in various jurisdictions and amendments thereto;

(iv)    all deeds, agreements and other documents which the General Partner deems appropriate to conduct and carry on the business of the Partnership, including, without limitation, to qualify or continue the Partnership as an exempted limited partnership in the Cayman Islands and as required in the jurisdictions in which the Partnership may conduct business, or which may be required to be filed by the Partnership or the Partners under the laws of any jurisdiction or under any amendments or successor statute to the law, to reflect the dissolution or termination of the Partnership or the Partnership being governed by any amendments or successor statutes to the law or to reorganize or refile the Partnership in a different jurisdiction, provided that such reorganization or refiling does not result in a material change in the rights of the Partners;

(v)     to file, prosecute, defend, settle or compromise litigation, claims or arbitration on behalf of the Partnership;

(vi)    one or more subscription agreements (or other agreements or documents) on behalf of such Limited Partner between the Partnership, the General Partner and any Person (a "***New Limited Partner***") being admitted by the General Partner to the Partnership as a limited partner thereof (or such other parties as may be appropriate) in such form and on such terms and conditions as the General Partner considers in its absolute discretion necessary or appropriate, including reference to this Agreement and its novation and agreeing and covenanting with such New Limited Partner on behalf of such Limited Partner that the Limited Partner will from the effective date of such subscription agreement or agreements comply with and observe the terms of this Agreement.

(b)     The above power of attorney shall be irrevocable and deemed to be given to secure a proprietary interest of the donee of the power or performance of an obligation owed to the donee and shall survive and shall not be affected by the

Appx. 03762

subsequent death, lack of capacity, insolvency, bankruptcy or dissolution of any Limited Partner.

(c) Each Limited Partner shall, at the request of the General Partner, execute additional powers of attorney on a document separate from this Agreement. In the event of any conflict between this Agreement and any instruments executed, delivered, or filed by the General Partner (and any successor thereto) pursuant to this power of attorney, this Agreement shall prevail.

(d) The General Partner may exercise this power of attorney by listing all of the Partners executing any agreement, certificate, instrument, or document with the single signature of the General Partner as attorney-in-fact for all Partners.

(e) Each Limited Partner hereby appoints the General Partner by any one or more of its directors or officers in office from time to time, acting singly, to be the Limited Partner's agent and attorney-in-fact.

## 8.3 Notices

Notices which may be or are required to be given under this Agreement by any party to another shall be given by hand delivery, transmitted by facsimile or telecopier facsimile, transmitted electronically to an address that has been previously provided or verified through another form of notice or sent by registered or certified mail, return receipt requested or internationally recognized courier service, and shall be addressed to the respective parties hereto at their addresses as set forth on the register of Partners maintained by the General Partner or to such other addresses, facsimile numbers or electronic addresses as may be designated by any party hereto by notice addressed to (a) the General Partner, in the case of notice given by any Limited Partner, and (b) each of the Limited Partners, in the case of notice given by the General Partner. Notices shall be deemed to have been given (i) when delivered by hand, transmitted by facsimile or transmitted electronically or (ii) on the date indicated as the date of receipt on the return receipt when delivered by mail or courier service. Sections 8 and 19 of the Electronic Transactions Law (2003 Revision) of the Cayman Islands shall not apply to this Agreement.

## 8.4 Agreement Binding Upon Successors and Assigns; Delegation

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, but the rights and obligations of the Partners hereunder shall not be assignable, transferable or delegable except as provided in Section 4.1(d), 5.3 and 5.4 and any attempted assignment, transfer or delegation thereof which is not made pursuant to the terms of such Sections shall be null and void *ab initio*.

## 8.5 Governing Law

This Agreement is, and the rights of the Partners hereunder are, governed by and shall be construed in accordance with the laws of the Cayman Islands, without regard to the conflict of laws rule thereof which would result in the application of the laws of a different jurisdiction. The parties hereby consent to the exclusive jurisdiction and venue for any action arising out of this Agreement in Dallas, Texas. Each Partner consents to service of process in

Appx. 03763

any action or proceeding involving the Partnership by the mailing thereof by registered or certified mail, postage prepaid, to such Partner's mailing address set forth in the register of limited partnership interests maintained by the General Partner in accordance with the Act.

### 8.6 Interpretation of Partnership Accounting Systems and Terminology

In the event that the Partnership employs an accounting system which is different from the accounting system of the General Partner or whose terminology does not conform precisely to the terminology in this Agreement, the General Partner shall have the authority to interpret such accounting system and/or terminology in a manner which it, in its sole discretion, determines to be consistent with the objectives of this Agreement.

### 8.7 Miscellaneous

(a) The captions and titles preceding the text of each Section hereof shall be disregarded in the construction of this Agreement. Use of the word "including" in this Agreement means in each case "without limitation," whether or not such term is explicitly stated.

(b) This Agreement may be executed in counterparts, each of which shall be deemed to be an original hereof.

(c) If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

### 8.8 Survival

The obligations and covenants of the Limited Partners set forth in Sections 3.5 and 3.11 hereof shall apply jointly and severally to each such Limited Partner and any direct or indirect transferee of or successor to such Limited Partner's interest and will survive such Partner's ceasing to be a partner in the Partnership and/or the termination, dissolution, liquidation and winding up of the Partnership.

### 8.9 Entire Agreement

The parties acknowledge and agree that this Agreement, together with any other agreement with a Limited Partner, constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

*[Signature Page Follows]*

Appx. 03764

The parties hereto have executed and unconditionally delivered this Agreement as a deed on the day and year first above written.

**General Partner:**

**Highland Argentina Regional Opportunity Fund GP, LLC**

By:     Highland Capital Management Latin America, L.P., its sole member
By:     Highland Latin America GP, Ltd., its general partner

By:     _____
Name:     Gustavo Prilick
Title:     Director

Witness:

By:     _____
Name:     Timothy J. Cournoyer
Title:

**Limited Partners:**

**Highland Argentina Regional Opportunity Fund, L.P.**

By:     Highland Argentina Regional Opportunity Fund GP, LLC, its general partner
By:     Highland Capital Management Latin America, L.P., its sole member
By:     Highland Latin America GP, Ltd., its general partner

By:     _____
Name:     Gustavo Prilick
Title:     Director

Witness:

By:     _____
Name:     Timothy J. Cournoyer
Title:

*Signature Page to Amended and Restated Exempted Limited Partnership Agreement of Highland Argentina Regional Opportunity Master Fund, L.P.*

**Highland Argentina Regional Opportunity Fund, Ltd.**

By:     Highland Capital Management Latin America, L.P.,
        its managing shareholder

By:     Highland Latin America GP, Ltd., its general
        partner

By: _____

Name:       Gustavo Prilick
Title:      Director

Witness:

By: _____

Name:     *Timothy J. Cournoyer*
Title:

**Special Limited Partner:**

**Highland Capital Management Latin America, L.P.**

By:     Highland Latin America GP, Ltd., its general partner

By: _____

Name:       Gustavo Prilick
Title:      Director

Witness:

By: _____

Name:     *Timothy J. Cournoyer*
Title:

*Signature Page to Amended and Restated Exempted Limited Partnership Agreement of Highland Argentina
Regional Opportunity Master Fund, L.P.*

## EXHIBIT A

General Partner:
Highland Argentina Regional Opportunity Fund GP, LLC

Limited Partners:
Highland Argentina Regional Opportunity Fund, L.P.
Highland Argentina Regional Opportunity Fund, Ltd.

Special Limited Partner:
Highland Capital Management Latin America, L.P.

# AMENDED AND RESTATED

# INVESTMENT MANAGEMENT AGREEMENT

**by and among**

**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND, L.P.,**

**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND, LTD.,**

**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY MASTER FUND, L.P.,**

**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND GP, LLC**

**and**

**HIGHLAND CAPITAL MANAGEMENT LATIN AMERICA, L.P.**

**November 1, 2017**

209063837 v4

This **AMENDED AND RESTATED INVESTMENT MANAGEMENT AGREEMENT** (this "***Agreement***"), dated as of November 1, 2017, is by and among:

**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND, L.P.**, a Delaware limited partnership (the "***Domestic Fund***"), acting through its general partner, Highland Argentina Regional Opportunity Fund GP, LLC, a Delaware limited liability company (the "***General Partner***");

**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND, LTD.**, a Cayman Islands exempted company (the "***Offshore Fund***" and together with the Domestic Fund, the "***Feeder Funds***");

**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY MASTER FUND, L.P.**, a Cayman Islands exempted limited partnership (the "***Master Fund***," and together with the Feeder Funds, the "***Clients***") acting by its general partner, the General Partner;

**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND GP, LLC**, a Delaware limited liability company, as the general partner of the Domestic Fund and the Master Fund; and

**HIGHLAND CAPITAL MANAGEMENT LATIN AMERICA, L.P.**, a Cayman Islands exempted limited partnership, as the investment manager of each of the Clients (the "***Investment Manager***");

### Preliminary Statements

A.    The Investment Manager and the Offshore Fund entered into an Investment Management Agreement dated as of June 28, 2017 (the "***Original Agreement***").

B.    The Offshore Fund has re-organized into a master-feeder structure together with the Master Fund and the Domestic Fund.  As a result, the Investment Manager and the Offshore Fund desire to amend and restate the Original Agreement in its entirety to give effect to this re-structuring and to admit the Master Fund, the General Partner and the Domestic Fund as parties to this Agreement.

C.    Each of the Feeder Funds is required to invest all of its investable assets in the Master Fund.  The Investment Manager exercises no discretion with respect to the investment of the assets of the Feeder Funds and will serve merely as a steward thereof.  All investment activities of the Investment Manager are conducted at the Master Fund level in the Investment Manager's role as investment manager to the Master Fund.

D.    The Clients desire to retain the Investment Manager to provide certain discretionary advisory services relating to the assets and liabilities of the Master Fund and certain custodial services in respect of the Feeder Funds, and the Investment Manager desires to accept such appointment, all subject to the terms and conditions hereinafter set forth.

**Appx. 03769**

### Agreement

For good and valuable consideration, the sufficiency and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. **Appointment.**

The Investment Manager will serve as investment manager with respect to the assets and liabilities of the Master Fund, and will provide certain administrative services in respect of the Domestic Fund and the Offshore Fund, and the Investment Manager hereby agrees to perform its obligations in accordance with the terms hereof and of the Amended and Restated Exempted Limited Partnership Agreement of the Master Fund, as amended from time to time (the "***Master Fund Partnership Agreement***"), and the investment objectives, policies, guidelines and restrictions that from time to time are set forth in the Governing Documents of the Clients, as applicable. "***Governing Documents***" means, with respect to:

(a) the Domestic Fund: the confidential private placement memorandum of the Domestic Fund, as supplemented or superseded from time to time (the "***PPM***"), and the Amended and Restated Limited Partnership Agreement of the Domestic Fund, as amended from time to time (the "***Domestic Fund Partnership Agreement***" and, together with the Master Fund Partnership Agreement, the "***Partnership Agreements***");

(b) the Offshore Fund: the offering memorandum of the Offshore Fund, as supplemented or superseded from time to time (the "***POM***"), and the Memorandum and Articles of Association of the Offshore Fund, as amended and restated from time to time (the "***Articles***" and, together with the POM, the "***Offshore Governing Documents***"); and

(c) the Master Fund: the Master Fund Partnership Agreement.

Any capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Governing Documents, as applicable.

2. **Authority and Duties of the Investment Manager.**

(a) All of the investable assets of the Feeder Funds shall be invested in, and the investment program of the Feeder Funds is to be conducted by the Investment Manager through, the Master Fund. The Investment Manager shall exercise no discretion with respect to the investments or the assets of the Feeder Funds and the investment activities of the Investment Manager shall be conducted at the Master Fund level in the Investment Manager's role as investment manager to the Master Fund.

(b) The Master Fund's investment program will be conducted by the Investment Manager in accordance with the PPM and the POM.

2

Appx. 03770

(c) The Investment Manager serves as the investment manager to the Master Fund and, in that capacity, has full discretion and authority, without obtaining the prior approval of any officer or other agent of the Master Fund, but subject to the investment restrictions set forth in the Governing Documents:  (i) to effect any and all transactions and investments on behalf of the Master Fund; (ii) to determine all matters relating to the manner, method and timing of transactions and to engage consultants and analysts in connection therewith; (iii) to select brokers, dealers, futures commission merchants, banks and other intermediaries by or through whom such transactions will be executed or carried out; (iv) to trade on margin; (v) to borrow funds from banks, futures commission merchants, brokers and other lenders and pledge the securities or other portfolio assets as collateral therefor, and otherwise to utilize any lines of credit, credit balances or overdraft privileges available to the Master Fund; (vi) to direct banks, brokers or other custodians to effect deliveries of funds or assets, but only in the course of effecting portfolio transactions for the account of the Master Fund; (vii) to exercise all voting and other powers and privileges attributable to any investments held for the Master Fund's account hereunder; (viii)  to authorize remuneration for the directors of the Offshore Fund (the "*Directors*") who are not principals or employees of the Investment Manager; and (ix) to make and execute all such documents and to take all such other actions as the Investment Manager considers necessary or appropriate to carry out its investment management duties hereunder (including, but not limited to, the engagement of third party service providers on behalf of the Clients).

(d) Subject to the terms and conditions of this Agreement, the authority granted hereby to the Investment Manager shall include, without limitation, the power and authority to:

 (i) with respect to the Offshore Fund and in consultation with the Directors, approve the rescission of a request for voluntary redemption submitted by a shareholder of the Offshore Fund (each, a "*Shareholder*"); waive any applicable requirements and restrictions in relation to the redemption of shares of the Offshore Fund ("*Shares*") by any Shareholder; waive certain eligibility requirements with respect to any new subscription for participating Shares or the transfer of Shares; waive any of the subscription requirements as set out in the POM with respect to any new subscription for Shares; permit a Shareholder to redeem its Shares at any time in the event that continuing to hold the Shares becomes impractical or illegal, upon a Shareholder's death or total disability, or in order for a Shareholder to avoid materially adverse tax or regulatory consequences; make in-kind distributions of Offshore Fund assets; approve the establishment of reserves for contingencies and distribution holdbacks; approve Side Letters (as defined in the POM); accept subscriptions below the minimum subscription amount; accept redemptions of Shares outside the frequency established by the Articles; and cause the Offshore Fund to invest all of its investable assets in the Master Fund;

3

    (ii)    with respect to the Domestic Fund, consent to or advise the Domestic Fund with respect to any actions of the Domestic Fund for which its consent or advice is required, as outlined in the PPM; make and execute all such documents and take all such other actions as the Investment Manager considers necessary or appropriate to carry out its duties hereunder; and cause the Domestic Fund to invest all of its investable assets in the Master Fund, in each case to the extent permitted under the Domestic Fund Partnership Agreement; and

    (iii)    deposit and withdraw the funds of each Client in the name of such Client in any bank or trust company and to entrust such bank or trust company with any of the securities, monies, documents and papers belonging to or relating to such Client; or to deposit in and entrust to any brokerage firm that is a member of any U.S. national securities exchange any of said funds, securities, monies, documents and papers belonging to or relating to such Client.

(e)    Each Client hereby designates the Investment Manager as the commodity pool operator (the "*CPO*") for such Client with complete authority and responsibility for compliance with the U.S. Commodity Exchange Act and the regulations promulgated thereunder, including the authority to perform any and all duties required of a CPO (i) that is exempt from registration under the regulations of the U.S. Commodity Futures Trading Commission (the "*CFTC*") and (ii) that is in compliance with CFTC Rule 4.13(a)(3), including the filing of a notice of exemption under Rule 4.13(a)(3) with the CFTC.

(f)    Additionally, each of the Clients hereby designates and appoints the Investment Manager as its agent and attorney-in-fact, with full power and authority and without the need for further approval of the Clients (except as may be required by law), to complete and execute all such documents and to take any and all actions that the Investment Manager, in its discretion, may deem advisable to carry out the foregoing with respect to the assets of the Clients; provided, however, that the Investment Manager is not intended to have actual or constructive custody of any securities or other assets of the Clients. In connection with any of the foregoing, the Investment Manager is further authorized to transfer or tender for cash or exchange such securities or other assets. In all such purchases, sales or trades, the Clients authorize the Investment Manager to act for the Clients, at their risk, in their name and on their behalf, in the same manner and with the same force and effect as the Clients might or could do with respect to such purchases, sales or trades without prior consultation with the Clients. The Clients also appoint the Investment Manager as their agent and attorney-in-fact to vote, and to execute proxies, waivers, consents and other instruments with respect to, the securities and other assets of the Clients.

(g)    At the request of a Client, in any wind down of such Client, the Investment Manager will manage the realization of the Client's assets and the distribution thereof to investors.

4

(h)  In connection with the execution of transactions on behalf of the Master Fund, the Master Fund hereby acknowledges and agrees that in the course of selecting brokers, dealers, futures commission merchants, banks and financial intermediaries to effect transactions for the Master Fund's account, the Investment Manager may agree to such commissions, fees and other charges on behalf of the Master Fund's account as it may deem reasonable in the circumstances, taking into consideration all such factors as the Investment Manager deems relevant, including, without limitation, the following: price quotes, the size of the transaction, the nature of the market for the financial instrument, the timing of the transaction, difficulty of execution, the broker-dealer's expertise in the specific financial instrument or sector in which the Master Fund seeks to trade, the extent to which the broker-dealer makes a market in the financial instrument involved or has access to such markets, the broker-dealer's skill in positioning the financial instruments involved, the broker-dealer's promptness of execution, the broker-dealer's financial stability, reputation for diligence, fairness and integrity, quality of service rendered by the broker-dealer in other transactions for the Investment Manager and its respective affiliates, confidentiality considerations, the quality and usefulness of research services and investment ideas presented by the broker-dealer, the broker-dealer's willingness to correct errors, the broker-dealer's ability to accommodate any special execution or order handling requirements that may surround the particular transaction, and other factors deemed appropriate by the Investment Manager.  It is understood that the Investment Manager need not solicit competitive bids and does not have an obligation to seek the lowest available commission cost or spread.

3.    **Fees, Expenses and Indemnification.**

(a)  The Investment Manager shall be paid the Management Fee by the Master Fund in accordance with the Master Fund Partnership Agreement.

(b)  The Investment Manager agrees to be bound by all of the terms and provisions of the Partnership Agreements applicable to it, as a delegatee of the General Partner, as though expressly made a party thereto, and shall be governed by the same standard of care applicable to the General Partner in connection therewith.  The General Partner, on behalf of each of the Domestic Fund and the Master Fund, agrees that the Investment Manager shall be entitled to all of the benefits of the Partnership Agreements applicable to it as a delegatee of the General Partner, including, without limitation, the right to reimbursement of expenses provided under Section 4.2 of the Master Fund Partnership Agreement and Section 4.2 of the Domestic Fund Partnership Agreement, and the right to limitation of liability and indemnification provided under Section 4.5 of the Master Fund Partnership Agreement and Section 4.5 of the Domestic Fund Partnership Agreement, and such sections are hereby incorporated by reference as if set forth in full herein.

(c)  With respect to the reimbursement of expenses directly attributable to the Offshore Fund separate and apart from the Master Fund, the Offshore Fund agrees that it will pay the Investment Manager's expenses as follows:

5

**Appx. 03773**

(i)    In accordance with and subject to the Offshore Governing Documents, the Offshore Fund will pay, or will reimburse the Investment Manager for, all costs, fees and expenses arising in connection with the Offshore Fund's operations and its *pro rata* share of the cost of the Master Fund's operations and investments.   Expenses payable by the Offshore Fund include the following:

    (A)    the Offshore Fund's *pro rata* share of the cost of the Master Fund's investment program, including, without limitation, brokerage commissions, other expenses related to buying and selling securities (including trading errors that are not the result of the Investment Manager's gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud), costs of due diligence regardless of whether a particular transaction is consummated, the costs of attending shareholder meetings, research expenses and costs related to monitoring investments;

    (B)    initial organizational expenses of the Offshore Fund;

    (C)    fees and expenses of advisers and consultants;

    (D)    fees and expenses of any custodians, escrow or transfer agents or other investment-related service providers;

    (E)    indemnification expenses incurred in connection with the Offshore Governing Documents and the cost of insurance against potential indemnification liabilities;

    (F)    interest and other borrowing expenses;

    (G)    legal, administrative, accounting, tax, audit and insurance expenses;

    (H)    expenses of preparing and distributing reports, financial statements and notices to Shareholders;

    (I)    litigation or other extraordinary expenses;

    (J)    any withholding, transfer or other taxes imposed or assessed on, or payable by, the Offshore Fund (including any interest and penalties); and

    (K)    the cost of periodically updating the POM.

(ii)    Except as set forth herein or in the POM, in accordance with and subject to the Offshore Governing Documents, the Investment Manager will pay all of its own operating and overhead costs (including salaries, office rent

Appx. 03774

and other general overhead expenses), without reimbursement by the Offshore Fund.

(iii)    The Investment Manager shall be entitled to reimbursement from the Offshore Fund for any expenses paid by it on behalf of the Offshore Fund; provided that, the Investment Manager in its sole discretion may absorb any or all of such expenses incurred on behalf of the Offshore Fund. The Investment Manager may retain, in connection with its responsibilities hereunder as a delegatee of the General Partner, the services of others to assist in the investment advice to be given to the Master Fund, including, but not limited to, any affiliate of the Investment Manager, but payment for any such services shall be assumed by the Investment Manager and neither the Master Fund nor the Offshore Fund shall have any liability therefor; provided, however, that the Investment Manager, in its sole discretion, may retain the services of independent third party professionals on behalf of the Master Fund, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the Master Fund, and the Master Fund shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

(d)    With respect to the right to indemnification directly attributable to the Offshore Fund separate and apart from the Master Fund:

(i)    The Offshore Fund agrees that the Investment Manager, its members, shareholders, partners, managers, directors, any person who controls the Investment Manager, each of the respective affiliates of the foregoing, and each of their respective executors, heirs, assigns, successors and other legal representatives (each an "***Indemnified Person***") shall not be liable to the Offshore Fund or to any of the Shareholders for any loss or damage arising by reason of being or having been an Indemnified Person or from any acts or omissions in the performance of its services as an Indemnified Person in the absence of gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud, or as otherwise required by law. In no event shall any Indemnified Person be liable for any consequential damages, special or indirect damages or lost profits. An Indemnified Person may consult with counsel and accountants in respect of the Offshore Fund's affairs and will be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants, provided that they were selected in accordance with the standard of care set forth above.

(ii)    The Offshore Fund shall, to the fullest extent permitted by law, indemnify and hold harmless each Indemnified Person from and against any and all liabilities suffered or sustained by an Indemnified Person by reason of the fact that it, he or she is or was an Indemnified Person or in connection

7

with this Agreement or the Offshore Fund's business or affairs, including, without limitation, any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, suit or proceeding, provided that such liability did not result from the gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud of such Indemnified Person. The Offshore Fund will, in the sole discretion of the Directors, advance to any Indemnified Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action, suit or proceeding which arises out of such conduct. In the event that such an advance is made by the Offshore Fund, the Indemnified Person will agree to reimburse the Offshore Fund to the extent that it is finally determined that the Indemnified Person was not entitled to indemnification in respect thereof.

(iii)    Notwithstanding any of the foregoing, the provisions of this Section 3(d) do not provide for the exculpation or indemnification of any Indemnified Person for any liability (including liability under U.S. federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the above provisions to the fullest extent permitted by law.

(iv)    Pursuant to the indemnification and exculpation provisions above and as set forth in the Master Fund Partnership Agreement, the Master Fund (and not the applicable Indemnified Person) will be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud of any Indemnified Person.

(v)    The above-mentioned Indemnified Persons are also indemnified by each Shareholder for any amounts of tax withheld or required to be withheld with respect to that Shareholder, and also for any amounts of interest, additions to tax, penalties and other costs borne by any such persons in connection therewith.

(vi)    Each Indemnified Person shall be deemed a third-party beneficiary (to the extent not a direct party hereto) of this Agreement and, in particular, the provisions of this Section 3(d). The Investment Manager may enter into agreements on behalf of the Offshore Fund with an Indemnified Person to provide an indemnity to the same extent provided in this Section 3(d).

Appx. 03776

4. **Termination.**

This Agreement shall become effective on the date hereof and shall continue in effect until the earlier of the dissolution of a Client or termination by either the Investment Manager, the Offshore Fund or the General Partner, on behalf of the Domestic Fund or the Master Fund, upon at least 90 days' prior notice.

5. **Other Activities and Investments.**

(a) Each party hereto acknowledges and agrees that the Investment Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees, may engage in or possess an interest in other business ventures or commercial dealings of every kind and description, independently or with others, including, but not limited to, management of other accounts, investment in, or financing, acquisition and disposition of, securities, investment and management counseling, brokerage services, serving as directors, officers, advisers or agents of other companies, partners of any partnership, or trustees of any trust, or entering into any other commercial arrangements, and will not be disqualified solely on the basis that any such activities may conflict with any interest of the parties to this Agreement. Without in any way limiting the foregoing, each party hereto hereby acknowledges that (i) none of the Investment Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees shall have any obligation or responsibility to disclose or refer any of the investment or other opportunities obtained through activities contemplated by this Section 5(a) to any Client or its investors, but may refer the same to any other party or keep such opportunities for their own benefit; and (ii) the Investment Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees are hereby authorized to engage in activities contemplated by this Section 5(a) with, or to purchase, sell or otherwise deal or invest in investments issued by, companies in which the Master Fund might from time to time invest or be able to invest or otherwise have any interest, without the consent or approval of the Clients or their investors. The parties hereto expressly agree that neither the Clients nor their investors shall have any rights in or to such other activities, or any profits derived therefrom.

(b) The Investment Manager and its affiliates shall allocate investment opportunities to the Master Fund and any Other Account (as defined below) fairly and equitably over time. Notwithstanding the foregoing, the Investment Manager is under no obligation to accord exclusivity or priority to the Master Fund in the event of limited investment opportunities. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) fiduciary duties owed to the accounts; (ii) the primary mandate of the accounts; (iii) the capital available to the accounts; (iv) any restrictions on the accounts and the investment opportunity; (v) the sourcing of the investment, size of the investment and amount of follow-on available related to the

9

investment; (vi) whether the risk-return profile of the proposed investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (vii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (viii) liquidity requirements of the account; (ix) potentially adverse tax consequences; (x) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (xi) the need to re-size risk in the account's portfolio. The Investment Manager has the authority to allocate trades to multiple accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the Investment Manager may allocate the trades among different accounts on a basis it considers fair and equitable over time. For purposes of this Agreement, "*Other Account*" means any assets or investment of the Investment Manager, or any assets managed by the Investment Manager or any of its affiliates for the account of any person or entity (including investment vehicles) other than the Clients, which are invested or which are available for investment in securities or other instruments or for trading activities whether or not the specific type being conducted by the Clients.

(c)     The Principal (as defined in the Domestic Fund Partnership Agreement), as well as the employees and officers of the Investment Manager and of organizations affiliated with the Investment Manager, may buy and sell securities for their own account or the account of others, but may not buy securities from or sell securities to the Master Fund (such prohibition does not extend to the purchase or sale of limited partner interests in the Master Fund), unless such purchase or sale is in compliance with the applicable provisions of the U.S. Investment Advisers Act of 1940, as amended.

(d)     The Investment Manager and its affiliates reserve the right to establish collective investment vehicles that have stated investment programs or terms that differ from those of the Clients or that are targeted primarily to investors for which none of the Clients are designed to be a suitable investment vehicle. The Investment Manager and its affiliates also reserve the right to establish and provide management or advisory services to Other Accounts for significant investors, whether or not such accounts have the same investment program as the Clients.

## 6.     Complete Agreement; Amendment.

(a)     This Agreement, together with the Governing Documents, contains the entire agreement between the parties hereto relating to the subject matter hereof. No provision of this Agreement may be amended without the written consent of the Investment Manager and the Clients.

(b)     This Agreement shall automatically and immediately terminate in the event of its assignment by the Investment Manager other than in accordance with Section 7.

Appx. 03778

(c)      The expiration or termination of this Agreement shall not extinguish the obligations of the Clients for the payment of fees and expenses in respect of services rendered by the Investment Manager prior to the effective date of such expiration or termination.

**7.**      **Binding Effect; Assignment.**

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, but the rights and obligations hereunder shall not, except as otherwise expressly provided herein, be assignable, transferable or delegable without the written consent of the other parties hereto, and any attempted assignment, transfer or delegation thereof without such consent shall be void.

**8.**      **Counterparts.**

This Agreement may be executed in one or more counterparts all of which taken together shall be deemed to constitute one and the same instrument.

**9.**      **Notice by Investment Manager.**

To the extent required by law, the Investment Manager agrees to notify the Clients in writing within 30 days after any change in the membership of the Investment Manager.

**10.**      **Severability.**

If any provision herein is deemed invalid or unenforceable, such provision shall be deemed modified and limited to the extent necessary to make it valid and enforceable.

**11.**      **Independent Contractor.**

For all purposes of this Agreement, the Investment Manager shall be an independent contractor and not an employee or dependent agent of the Clients, nor shall anything herein be construed as making the Clients partners or co-venturers with the Investment Manager or any of its affiliates or customers. Except as provided in this Agreement, the Investment Manager shall have no authority to bind, obligate or represent the Clients.

**12.**      **Governing Law.**

This Agreement shall be governed by and construed in accordance with the substantive laws of the Cayman Islands, which are applicable to contracts made and entirely to be performed therein, without regard to the place of performance hereunder.

[Signature Page Follows]

11

The parties hereto have executed this Agreement as of the day and year first above written.

**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND, L.P.**

By: Highland Argentina Regional Opportunity Fund GP, LLC, its general partner

By: Highland Capital Management Latin America, L.P., its sole member

By: Highland Latin America GP, Ltd., its general partner

By: _____

Name: Gustavo Prilick

Title: Director

**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND, LTD.**

By: Highland Capital Management Latin America, L.P., its managing shareholder

By: Highland Latin America GP, Ltd., its general partner

By: _____

Name: Gustavo Prilick

Title: Director

**HIGHLAND ARGENTINA REGIONAL OPPORTUNITY MASTER FUND, L.P.**

By: Highland Argentina Regional Opportunity Fund GP, LLC, its general partner

By: Highland Capital Management Latin America, L.P., its sole member

By: Highland Latin America GP, Ltd., its general partner

By: _____

Name: Gustavo Prilick

Title: Director

*Signature Page—Amended and Restated Investment Management Agreement*

**ARGENTINA REGIONAL OPPORTUNITY FUND GP, LLC**

By: Highland Capital Management Latin America, L.P., its sole member

By: Highland Latin America GP, Ltd., its general partner

By: _____

Name: Gustavo Prilick

Title: Director

**HIGHLAND CAPITAL MANAGEMENT LATIN AMERICA, L.P.**

By: Highland Latin America GP, Ltd., its general partner

By: _____

Name: Gustavo Prilick

Title: Director

*Signature Page – Amended and Restated Investment Management Agreement*

Appx. 03781

**OFFERING MEMORANDUM**

Copy No: _____

Furnished to: _____

# HIGHLAND ARGENTINA REGIONAL OPPORTUNITY FUND, LTD.

**an exempted company incorporated with limited liability under the laws of the Cayman Islands offering for subscription up to 4,999,900 Shares designated as Series A Shares and Series B Shares**

# Investment Manager
## Highland Capital Management Latin America, L.P.

## March 2019

Prospective investors should review this Offering Memorandum carefully and consult with their legal and financial advisers to determine possible tax or other consequences of purchasing, holding or redeeming Shares (as defined herein).

The distribution of this Offering Memorandum and the offering or purchase of the Shares may be restricted in certain jurisdictions. No persons receiving a copy of this Offering Memorandum or the accompanying subscription documents in any such jurisdiction may treat this Offering Memorandum or such subscription documents as constituting an invitation to them to subscribe for Shares, nor should they in any event use such subscription documents, unless in the relevant jurisdiction such an invitation could lawfully be made to them and such subscription documents could lawfully be used without compliance with any registration or other legal requirements.

Application has previously been made on 16 June 2006 to The International Stock Exchange (the "Exchange"), which has approved the listing of up to 4,999,900 Series A Shares of US$0.01 each to be issued by Highland Argentina Regional Opportunity Fund, Ltd. (the "Fund") to be admitted to the Official List. The Series B Shares are not listed on any stock-exchange. This document will comprise listing particulars for the purpose of the listing of the Shares on that Exchange. It is not presently proposed to seek an admission to listing on any other stock exchange. The Directors do not anticipate that an active secondary market will develop in any of the Shares of the Fund. Ogier Corporate Finance Limited is acting for the Fund and for no one else in connection with the listing of the Shares and will not be responsible to anyone other than the Fund.

This Offering Memorandum includes particulars given in compliance with the Listing Rules of the Exchange for the purpose of giving information with regard to the Fund. The Directors, whose names appear on page 39, accept full responsibility for the information contained in this Offering Memorandum and confirm, having made all reasonable enquiries, that to the best of their knowledge and belief there are no other facts the omission of which would make any statement herein misleading.

Neither the admission of the Shares to the Official List nor the approval of the Offering Memorandum pursuant to the listing requirements of the Exchange shall constitute a warranty or representation by the Exchange as to the competence of the service providers to or any other party connected with the listed fund, the adequacy and accuracy of the information contained in the Offering Memorandum or the suitability of the issuer for investment or for any other purpose.

208629007 v23

**Appx. 03782**

# TABLE OF CONTENTS

PAGE

DIRECTORY ..................................................................................................................4

NOTICE .......................................................................................................................5
    THIS OFFERING MEMORANDUM .................................................................5
    INVESTOR RESPONSIBILITY .......................................................................5
    DISTRIBUTION AND SELLING RESTRICTIONS ........................................6
    RELIANCE ON THIS MEMORANDUM ..........................................................8
    RISKS 9
    REGULATION ....................................................................................................9
    CONFIDENTIALITY ..........................................................................................9

DEFINITIONS ..............................................................................................................10

THE FUND ...................................................................................................................21
    STRUCTURE ......................................................................................................21
    REGULATION ....................................................................................................21
    ADDITIONAL INFORMATION ........................................................................22

THE MASTER FUND ...................................................................................................23

INVESTMENT OBJECTIVE AND STRATEGY ........................................................28
    INVESTMENT OBJECTIVE ..............................................................................28
    INVESTMENT STRATEGY ...............................................................................28
    INVESTMENT RESTRICTIONS .......................................................................29
    DISTRIBUTION POLICY ..................................................................................30

CERTAIN RISK FACTORS .........................................................................................31
    RISK FACTORS SPECIFIC TO THE INVESTMENT OBJECTIVE AND
        STRATEGY ............................................................................................31
    INVESTMENT AND TRADING RISKS ...........................................................38
    TAX RELATED RISKS ......................................................................................41
    POTENTIAL CONFLICTS OF INTEREST .......................................................43

MANAGEMENT AND ADMINISTRATION ...............................................................50
    BOARD OF DIRECTORS ..................................................................................50
    INVESTMENT MANAGER ...............................................................................53
    ADMINISTRATOR ............................................................................................59
    BROKERAGE AND CUSTODY ........................................................................60
    PAYMENTS TO SERVICE PROVIDERS OF THE FUND ...............................63
    EXPENSES .........................................................................................................63

DESCRIPTION OF THE FUND'S SHARES ................................................................65
    GENERAL ...........................................................................................................65
    MANAGEMENT SHARES ................................................................................65
    SHARES ..............................................................................................................65
    RECORDS ...........................................................................................................66
    RIGHTS OF SHAREHOLDERS .......................................................................66

Appx. 03783

SUBSCRIPTION, REDEMPTION AND TRANSFER OF SHARES ............................................. 68
    SUBSCRIPTION FOR SHARES .................................................................................. 68
    REDEMPTION OF SHARES ....................................................................................... 71
    DETERMINATION OF NET ASSET VALUE ............................................................ 73
    TEMPORARY SUSPENSION OF DEALINGS ........................................................... 75
    TRANSFER OF SHARES ........................................................................................... 76

FINANCIAL INFORMATION AND REPORTS ................................................................... 77
    FISCAL YEAR ........................................................................................................... 77
    FISCAL PERIODS ..................................................................................................... 77
    FINANCIAL STATEMENTS ..................................................................................... 77
    AUDITORS ................................................................................................................. 77
    REPORTS TO SHAREHOLDERS ............................................................................. 77

TAXATION ........................................................................................................................... 78
    GENERAL .................................................................................................................. 78
    ***UNITED STATES*** .............................................................................................. 79
    CAYMAN ISLANDS .................................................................................................. 84
    OTHER JURISDICTIONS .......................................................................................... 84

ERISA CONSIDERATIONS ................................................................................................. 85

GENERAL ............................................................................................................................. 88
    DIRECTORS' REPORT .............................................................................................. 88
    MATERIAL CONTRACTS ........................................................................................ 88
    DOCUMENTS AVAILABLE FOR INSPECTION ..................................................... 88
    INQUIRIES ................................................................................................................. 89

Appx. 03784

# DIRECTORY

## Highland Argentina Regional Opportunity Fund, Ltd.

**Directors:**

Claire Kasumba
Martin Laufer
Sophia Dilbert

**Registered Office:**

Maples Corporate Services Limited
P.O. Box 309
Ugland House
Grand Cayman KY1-1104
Cayman Islands

**Investment Manager:**

Highland Capital Management Latin America, L.P.
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX 75201

**Administrator and Principal Office:**

MUFG Fund Services (Cayman) Limited
2nd Floor, Strathvale House
90 North Church Street
P.O. Box 609
Grand Cayman KY1-1107
Cayman Islands

**Auditors:**

PricewaterhouseCoopers LLP
5th Floor Strathvale House
P.O. Box 258
Grand Cayman KY1-1104
Cayman Islands

**Sponsor:**

Ogier Corporate Finance Limited
44 Esplanade, St. Helier
Jersey JE4 9WG
Channel Islands

**Legal Advisor as to Cayman Islands Law:**

Maples and Calder
P.O. Box 309
Ugland House
Grand Cayman KY1-1104
Cayman Islands

**Legal Advisor as to United States Law:**

Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Avenue
Suite 4100
Dallas, TX 75201

**Prime Broker:**

Société Générale
440 S. LaSalle St., Suite 2400
Chicago, IL 60605

BNP Paribas Prime Brokerage, Inc.
787 Seventh Avenue
The Equitable Tower
New York, NY 10019

**Appx. 03785**

# NOTICE

### *THIS OFFERING MEMORANDUM*

This Offering Memorandum ("Memorandum") relates to the offering of Series A and Series B Shares of Highland Argentina Regional Opportunity Fund, Ltd. (the "Fund"), a company incorporated under the Companies Law (Revised) of the Cayman Islands as an exempted company limited by shares and of unlimited duration.

This Memorandum is confidential and intended solely for the use of the person to whom it has been delivered by the Fund for the purpose of enabling the recipient to evaluate an investment in the Fund, and it is not to be reproduced or distributed to any other persons. Notwithstanding anything herein to the contrary, each investor (and each employee, representative, or other agent of the investor) may disclose to its tax and other professional advisors, the tax treatment and tax structure of an investment in the Fund and all materials of any kind (including opinions or other tax analyses) that are provided to the investor relating to such tax treatment and tax structure.

The Directors of the Fund whose names appear in the Directory accept responsibility for the information contained in this document. To the best of the knowledge and belief of the Directors (who have taken all reasonable care to ensure that such is the case) the information contained in this document is in accordance with the facts and does not omit anything likely to affect the import of such information.

### *INVESTOR RESPONSIBILITY*

No representations or warranties of any kind are intended or should be inferred with respect to the economic return from, or the tax consequences of, an investment in the Fund. No assurance can be given that existing laws will not be changed or interpreted adversely. Prospective investors are not to construe this Memorandum as legal, investment or tax advice. No person is authorized to make any representations concerning the Fund which are inconsistent with those contained in this Memorandum. This Memorandum supersedes all prior versions thereof and should be reviewed prior to making an investment decision.

Prospective investors should review this Memorandum carefully and in its entirety and consult with their legal, tax and financial advisors in relation to (i) the legal and regulatory requirements within their own countries for the purchase, holding, redemption or disposal of shares of the Fund ("Shares"); (ii) any foreign exchange restrictions to which they are subject in their own countries in relation to the purchase, holding, redemption or disposal of Shares; and (iii) the legal, tax, financial or other consequences of subscribing for, purchasing, holding, redeeming or disposing of Shares.

### *DISTRIBUTION AND SELLING RESTRICTIONS*

Neither this Memorandum nor the Shares described herein have been qualified for offer, sale or distribution under the laws of any jurisdiction governing the offer or sale of mutual fund shares or other securities. The distribution of this Memorandum and the offering or purchase of the Shares may be restricted in certain jurisdictions. No persons receiving a copy of this Memorandum or the accompanying Subscription Documents (as defined herein) in any such jurisdiction may treat this Memorandum or such Subscription Documents as constituting an invitation to them to subscribe for Shares, nor should they in any event use such Subscription Documents, unless in the relevant jurisdiction such an invitation could lawfully be made to them and such Subscription Documents could lawfully be used without compliance with any registration or other legal requirements. Accordingly, this Memorandum does not constitute an offer or solicitation by anyone in any jurisdiction in which such offer or solicitation is not lawful or in which the person making such offer or solicitation is not qualified to do so or to anyone to whom it is unlawful to make such offer or solicitation. It is the responsibility of any persons in possession of this Memorandum and any persons wishing to apply for Shares pursuant to this Memorandum to inform themselves of and to observe all applicable laws and regulations of any relevant jurisdiction.

The Fund may not make an invitation to the public in the Cayman Islands to subscribe for the Shares unless the Fund is listed on the Cayman Islands Stock Exchange. For these purposes, "public" has the same meaning as "public in the Islands" as defined in the Mutual Funds Law (Revised) of the Cayman Islands. Apart from this restriction, persons resident, domiciled, established, incorporated or registered pursuant to the laws of the Cayman Islands may beneficially own Shares.

The Fund does not constitute a recognized collective investment scheme for the purposes of the Financial Services and Markets Act 2000 of the United Kingdom (the "Act"). In addition, the Investment Manager is not authorized or supervised by the United Kingdom Financial Conduct Authority ("FCA") as an "alternative investment fund manager" or "AIFM", as defined in the Financial Services and Markets Act 2000 (Alternative Investment Fund Managers) Regulations 2013 (SI 2013/1773) ("UK AIFMD Regulations"). The promotion and offering or placement of the Fund and the distribution of this Memorandum in the United Kingdom are accordingly restricted by law. The distribution of this Memorandum in the United Kingdom:

(a) if made by a person who is not an authorized person under the Act, must be made to, and/or directed at, only persons (A) who are professional investors, as defined in the UK AIFMD Regulations; or (B) to whom it may lawfully be made or directed at under the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (as amended), including persons who are authorized under the Act ("authorized persons"), certain persons having professional experience in matters relating to investments, high net worth companies, high net worth unincorporated associations or partnerships, trustees of high value trusts and persons who qualify as certified sophisticated investors; and

(b) if made by a person who is an authorized person under the Act must be made to, and/or directed at, only persons (A) who are professional investors, as defined in the UK AIFMD Regulations; or (B) to whom it may lawfully be made or directed at under the

Financial Services and Markets Act 2000 (Promotion of Collective Investment Schemes) (Exemptions) Order 2001 (as amended) or chapter 4, section 4.12 of the FCA's Conduct of Business Sourcebook, including authorized persons, certain persons having professional experience of participating in unregulated schemes, high net worth companies, high net worth unincorporated associations or partnerships, trustees of high value trusts, persons who qualify as certified sophisticated investors and clients of the person making the distribution for whom that person has taken reasonable steps to ensure that the investment in the Fund is suitable.

All such persons in (a) and (b) above together are referred to as "Relevant Persons." Any investment or investment activity to which this communication relates must only be made available to Relevant Persons in the United Kingdom and this Memorandum must not be distributed to or relied on or acted upon by any other persons in the United Kingdom.

The Shares of the Fund have not been admitted for marketing in Germany. The Shares have only been admitted for marketing to professional investors in the territory of Germany. Accordingly, the Shares may not be offered and marketed to semi-professional and retail investors within the meaning of section 1(19) no. 31 and 33 German Capital Investment Act (Kapitalanlagege-Setzbuch) in the territory of Germany. The Memorandum may not be passed on to semi-professional and retail investors in Germany.

The Shares described in this Memorandum have not been, and will not be, registered under the United States Securities Act of 1933, as amended, or any similar law, rule or regulation in any other jurisdiction (including without limitation any law, rule or regulation of England and Wales, the Cayman Islands or any of the states of the United States of America). Shares of the Fund may not be directly or indirectly offered or sold to or for the benefit of any United States Person (as defined herein) except pursuant to placements exempt from registration under the United States Securities Act of 1933, as amended.  In addition, the Fund has not been and will not be registered under the United States Investment Company Act of 1940, as amended, or any similar law, rule or regulation in any other jurisdiction (including without limitation any law, rule or regulation of England and Wales, the Cayman Islands or any of the states of the United States of America).

The Shares offered hereby may not be publicly offered, sold or advertised in Switzerland pursuant to Article 2 of the Swiss Investment Fund Act 1995 and this Memorandum may only be circulated to a limited number of persons in Switzerland.  Therefore, no steps have been taken to register the Fund and/or this Memorandum as a prospectus in Switzerland.

## ADDITIONAL INFORMATION CONCERNING THE DISTRIBUTION OF THE FUND IN SWITZERLAND

The Shares of the Fund can be distributed in Switzerland exclusively to qualified investors as defined by Article 10 § 3 of the Collective Investment Scheme Act (CISA) and Article 6 of the Collective Investment Scheme Ordinance (CISO) (Qualified Investors). The Fund has not been and will not be registered with the Swiss Financial Market Supervisory Authority (FINMA). This offering memorandum and/or any other offering materials relating to the Shares may be made available in Switzerland solely to Qualified Investors.

The Representative of the Fund in Switzerland is Hugo Fund Services SA, with its registered office at 6 Cours de Rive, CH-1204 Geneva. The offering documents and annual or semi-annual reports can be obtained free of charge from the Representative. The place of performance for Shares of the Fund offered or distributed in or from Switzerland are the registered office of the Representative. The courts of the canton of Geneva shall have jurisdiction in relation to any disputes arising out of the duties of the Representative. Any dispute related to the distribution of Shares of the Fund in and from Switzerland shall be subject to the jurisdiction of the registered office of the distributor. The Paying Agent in Switzerland is Banque Heritage SA, 61 Route de Chêne, CH-1208 Geneva, Switzerland. Shares may be subscribed and/or redeemed with the Paying Agent. A handling commission will be charged by the Paying Agent and deducted from the subscription or redemption amount paid or received. If a subscription or redemption is made through the Paying Agent, instructions and money must be received by the paying agent at least 24 hours before the appropriate dealing cut-off time.

The fees and expenses associated with the representation, paying agency and other distribution items may be charged to the Fund. As applicable, the actual amount of such fees and expenses will be disclosed in the audited annual report.

In distributing shares of the Fund in Switzerland, the Fund is authorised to pass on distribution fees to the distributors and sales partners listed below:

- Distributors subject to authorization as defined in Article 19 al. 1 of the CISA (Swiss or foreign distributors regulated in their home jurisdiction)
- Distributors that are not required to obtain an authorization as defined under Article 19 al 1 of the CISA and article 8 of CISO (financial intermediaries regulated by FINMA, banks, insurance companies, fund managers, representatives
- Sales partners who place shares in the Fund with their customers exclusively through a written commission-based investment management or advisory mandate (e.g. independent asset managers or advisors).

When a retrocession payment may give rise to a conflict of interest, the recipient of the retrocession must ensure transparent disclosure and inform investors, unsolicited and free of charge, of the amount of retrocession it may receive for distribution. Upon request, the recipient must disclose the actual amount of retrocession received for distributing the Fund to the investor requiring information.

### RELIANCE ON THIS MEMORANDUM

The Shares are offered only on the basis of the information contained in this Memorandum and the latest audited annual accounts of the Fund. Any further information or representations given or made by any dealer, broker or other person should be disregarded and, accordingly, should not be relied upon. No person has been authorized to give any information or to make any representations in connection with the offering of Shares in the Fund other than those contained in this Memorandum and in any subsequent annual report for the Fund and, if given or made, such information or representations must not be relied on as having been authorized by the Fund, the Directors, the Investment Manager or the Administrator (each as defined herein). Statements in this Memorandum are based on the law and practice currently in force in the Cayman Islands

at the date hereof and are subject to change. Neither the delivery of this Memorandum nor the issue of Shares shall under any circumstance create any implication or constitute any representation that the affairs of the Fund have not changed since the date of this Memorandum.

## *RISKS*

Investment in the Fund carries with it a degree of risk. The value of Shares and the income from them may go down as well as up, and investors may not get back the amount invested. Because of the risks involved, investment in the Fund is only suitable for sophisticated investors who are able to bear the loss of a substantial portion or even all of the money they invest in the Fund, who understand the high degree of risk involved, believe that investment in the Fund is suitable for them based on their investment objectives and financial needs and have no need of liquidity of investment. Investors are therefore advised to seek independent professional advice on the implications of investing in the Fund. Certain risk factors for an investor to consider are set out in the Section headed "Certain Risk Factors."

There is no public market for the Shares and no active secondary trading market is expected to develop in the future.

## *REGULATION*

The Fund is a regulated mutual fund for the purposes of the Mutual Funds Law (Revised) of the Cayman Islands. The Fund is registered with the Cayman Islands Monetary Authority pursuant to section 4(3) of that Law and this Memorandum has been filed with the Monetary Authority. Such registration does not imply that the Monetary Authority or any other regulatory authority in the Cayman Islands has approved this Memorandum or the offering of the Shares. For a summary of the continuing regulatory obligations of the Fund and a description of the regulatory powers of the Monetary Authority, see the Section headed "The Fund– Regulations."

## *CONFIDENTIALITY*

Any information forwarded to the Fund by any potential investors will be treated on a confidential basis except as outlined in the Data Protection policy in the accompanying Subscription Documents and that such information may be passed on to a relevant third party by the Fund where so required by law or regulation and each investor upon subscribing for Shares shall be deemed to have consented to such release of such confidential information pursuant to the terms of Clause 3(2)(b)(i) (or any amendment thereto) of the Confidential Relationships (Preservation) Law (Revised) of the Cayman Islands.

# DEFINITIONS

In this Memorandum, the following words and phrases have the meanings set forth below:

| | |
|---|---|
| "Administration Agreement" | the agreement between the Master Fund and the Administrator referred to in the Section headed "Management and Administration" below; |
| "Administrator" | MUFG Fund Services (Cayman) Limited or such other person as may be appointed administrator of the Feeder Funds and the Master Fund from time to time; |
| "Articles" | the articles of association of the Fund for the time being in force and as may be amended from time to time; |
| "Auditors" | PricewaterhouseCoopers LLP or such other person as may be appointed auditor of the Master Fund from time to time; |
| "Business Day" | a day on which banks in the Cayman Islands, Buenos Aires and New York City are authorized to open for business or such other day or days in addition thereto or in substitution therefor as the Directors may determine generally, or in any particular case; |
| "Companies Law" | the Companies Law (Revised) of the Cayman Islands as amended or re-enacted from time to time; |
| "Directors" | The directors of the Fund for the time being and any duly constituted committee thereof; |
| "Domestic Fund" | Highland Argentina Regional Opportunity Fund, L.P., a Delaware limited partnership; |
| "Eligible Investors" | has the meaning set forth in the Subscription Documents; |
| "Exchange" | The International Stock Exchange; |
| "Feeder Funds" | means the Fund and the Domestic Fund, each of which places all of its investable assets in, and conducts all of its investment and trading activities in parallel through, the Master Fund; |
| "Fund" | Highland Argentina Regional Opportunity Fund, Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands with registration number CR-162177; |

| | |
|---|---|
| "IFRS" | International Financial Reporting Standards issued by the International Accounting Standards Board; |
| "Investments" | investments in securities or other financial or intangible investment instruments, contracts or products made by the Master Fund, as described in this Memorandum; |
| "Investment Management Agreement" | the agreement between the Feeder Funds, the Master Fund, the Master Fund General Partner and the Investment Manager referred to in the Section headed "Management and Administration" below; |
| "Investment Manager" | Highland Capital Management Latin America, L.P. or such other person as may be appointed investment manager of the Feeder Funds and the Master Fund from time to time; |
| "Latin America" | the countries of Central and South America, of the Caribbean and Mexico; |
| "Management Fee" | the management fee payable to the Investment Manager (at the Master Fund level) in respect of each Series pursuant to the Investment Management Agreement; |
| "Management Share" | a voting, non-participating management share of US$0.01 par value in the capital of the Fund; |
| "Master Fund" | Highland Argentina Regional Opportunity Master Fund, L.P., a Cayman Islands exempted limited partnership; |
| "Master Fund General Partner" | Highland Argentina Regional Opportunity Fund GP, LLC, a Delaware limited liability company and the general partner of the Domestic Fund and the Master Fund; |
| "Master Fund Partnership Agreement" | an exempted limited partnership agreement of the Master Fund, as may be amended from time to time; |
| "Material Contracts" | the Administration Agreement and the Investment Management Agreement; |
| "Memorandum" | this offering memorandum and the Fund's most recent annual report and accounts or, if more recent, its interim report and accounts; |
| "Monetary Authority" | the Cayman Islands Monetary Authority; |

"Mutual Funds Law"          the Mutual Funds Law (Revised) of the Cayman Islands as from time to time modified or re-enacted or consolidated, and shall include any subordinate legislation made from time to time under that law;

"Net Asset Value"           in respect of the Master Fund, the Fund or each Series of Shares, the Net Asset Value of the Master Fund, the Fund or that Series determined using the valuation principles described in the Section headed "Subscription, Redemption and Transfer of Shares" below;

"Net Asset Value per Share"  in respect of a Share of any Series, the Net Asset Value for the relevant Series divided by the number of Shares of such Series then in issue;

"Ordinary Resolution"       a resolution passed at a quorate meeting of the Fund by a simple majority of the votes cast in its favor by the holders of the Management Shares or a resolution approved in writing by all such holders of Management Shares expressed to be an ordinary resolution;

"Performance Allocation"    the performance allocation allocable to the Special Limited Partner at the Master Fund level in respect of each sub-series of Shares pursuant to the Master Fund Partnership Agreement;

"Recognized Exchange"       any regulated market or exchange (which is an exchange within the meaning of the law of the country concerned relating to exchanges) in the United States of America, member states of the European Union or the Organization for Economic Co-operation and Development or any other regulated exchange or market;

"Redemption Day"            the last Business Day of each calendar month or such additional Business Day or Business Days as the Directors may in their sole discretion determine, either in any particular case or generally;

"Redemption Request"        a redemption request form in the terms set out in the Subscription Documents;

"Redemption Price"          the redemption price of a Share as calculated in accordance with the Articles and described herein;

"Series"                    any series of Shares designated by the Directors pursuant to the Articles;

**Appx. 03793**

| | |
|---|---|
| "Series A Shares" | the Shares designated as "A" Shares being offered pursuant to this Memorandum; |
| "Series B Shares" | the Shares designated as "B" Shares being offered pursuant to this Memorandum; |
| "Services Agreement" | an agreement by and between the Investment Manager and Highland Latin America Consulting, Ltd. referred to in the Section headed "Management and Administration" below; |
| "Share" | a non-voting, participating, redeemable share of US$0.01 par value each in the capital of the Fund.  The use of the term "Share" in this Memorandum excludes the Management Shares; |
| "Shareholder" | a holder of Shares; |
| "Special Limited Partner" | Highland Capital Management Latin America, L.P., in its capacity as the special limited partner of the Master Fund; |
| "Special Resolution" | a resolution passed at a quorate meeting of the Fund by a two-thirds majority of the holders of the Management Shares thereat or approved in writing by all of such holders of Management Shares and expressed to be a special resolution; |
| "Subscription Day" | the first day of each calendar month or such additional day or days as the Directors may in their sole discretion determine, either in any particular case or generally; |
| "Subscription Documents" | the subscription documents of the Fund; |
| "Subscription Price" | the Subscription Price for Series A Shares and Series B Shares will be based on the Net Asset Value per Share of such Series on the Valuation Day that occurs after notice of the subscription is received and approved by the Fund and immediately preceding the applicable Subscription Day, as calculated in accordance with the Articles and described herein; |
| "US$" or "U.S. Dollars" | the lawful currency of the United States of America; |
| "United States" or "U.S." | the United States of America, its territories and possessions or areas subject to its jurisdiction; |
| "U.S. Person" | as defined under Regulation S under the United States Securities Act of 1933, as amended; and |

"Valuation Day"  with respect to a Share, each Redemption Day, the Business Day immediately preceding each Subscription Day and/or such other day or days as the Directors may determine generally or in any particular case.

# EXECUTIVE SUMMARY

The following summary should be read in conjunction with the full text of this Memorandum, the Articles, the Master Fund Partnership Agreement and other Material Contracts disclosed in this Memorandum and is qualified in its entirety by reference to such documents:

| | |
|---|---|
| **The Fund** | Highland Argentina Regional Opportunity Fund, Ltd. is incorporated under the provisions of the Companies Law (Revised) of the Cayman Islands as an exempted company with limited liability. It was incorporated on February 8, 2006, as MBA Latin America Opportunity Fund, Ltd. The Fund's name was changed to Highland Argentina Regional Opportunity Fund, Ltd. on July 28, 2017. |
| | It has an authorized share capital of US$50,000 made up of 100 Management Shares and 4,999,900 Shares. The Directors have designated two Series of Shares, Series A Shares and Series B Shares. The Directors may also designate further Series of Shares in the future that will be attributable to the single underlying portfolio of the Fund. Each additional Series of Shares may be offered on different terms and in such different currencies as the Directors may determine. |
| | See the Section headed "Description of the Fund's Shares" below for full details. |
| **Investment Objective and Strategies** | The investment objective of the Fund is to maximize the total return of its assets in US Dollars through capital appreciation by investing all of its investable assets in the Master Fund, which intends to hold primarily a portfolio of investments in securities of Latin American corporate and sovereign issuers as well as non-Latin American issuers that derive a portion of their revenues from business activities in Latin America, in each case with a primary focus on Argentina, and that the Investment Manager believes would provide profitable investment opportunities for the Master Fund. The Master Fund will invest in a single portfolio of assets and does not currently intend to have a separate portfolio of assets for each of its series of limited partner interests, each of which will correspond to a Series of Shares. |
| | The Master Fund is a multi-strategy investment fund and there is no limit on the investment strategies that may be utilized. The Investment Manager will be focused on identifying assets |

that are mispriced against similar assets and/or against the Investment Manager's expectations for assets' fair values and market movements, special situations, such as mergers, financial restructurings, hostile takeovers, or leveraged buy-outs. There is no set allocation among these and any other strategies that the Investment Manager may use.

**Master-Feeder Structure**    In order to facilitate investments by U.S. taxable and certain U.S. tax-exempt investors, the Investment Manager and its affiliates recently sponsored Highland Argentina Regional Opportunity Fund, L.P., a Delaware limited partnership. The Feeder Funds will place all of their investable assets in, and conduct all of their investment and trading activities in parallel through, the Master Fund. Accordingly, references herein to the investment activity of the Fund should be construed to refer to the Fund's investment activities through the Master Fund. The Feeder Funds share all items of profit, loss, income and expense of the Master Fund on a *pro rata* basis in accordance with their respective capital account balances in the Master Fund. Except as the context otherwise requires, the term "Fund" also includes the Master Fund.

The Investment Manager or an affiliate may also sponsor one or more additional investment funds or accounts.

**Management**    The Directors of the Fund are Claire Kasumba, Martin Laufer and Sophia Dilbert.

Highland Capital Management Latin America, L.P., a Cayman Islands exempted limited partnership, is the investment manager of the Feeder Funds and the Master Fund with responsibility for overseeing the investment of the Fund's assets (through the Master Fund) and the distribution of the Shares in accordance with the investment objective and policies of the Master Fund. With the approval of the Master Fund General Partner, the Investment Manager may delegate certain of its duties to other companies and entities, which may be affiliated with, or independent of, the Investment Manager.

MUFG Fund Services (Cayman) Limited, a company formed under the laws of the Cayman Islands, has been appointed as the administrator of the Feeder Funds and the Master Fund pursuant to the Administration Agreement. The Administrator is responsible for conducting the day-to-day administration, including processing subscriptions, transfers and redemptions of Shares, net asset value calculation and coordinating the payment of the Fund's and Master Fund's expenses.

See the Section headed "Management and Administration" below for full details.

**Offering**

The Series A Shares and Series B Shares offered pursuant to this Memorandum are available for issue to Eligible Investors at a Subscription Price based on the Net Asset Value per Share of such Series on the Valuation Day that occurs after the Subscription Documents are received and approved by the Fund and immediately preceding the relevant Subscription Day, as calculated in accordance with the Articles and described herein.

The Fund reserves the right to reject an application for Shares.

See the Section headed "Subscription, Redemption and Transfer of Shares" below for full details.

**Minimum Investment**

The minimum initial investment for the Series A Shares and Series B Shares is US$500,000. The minimum subsequent investment for the Series A Shares and Series B Shares is US$500,000. In each case, the Investment Manager may in its sole discretion determine other minimum investment amounts in respect of a particular Shareholder or group of Shareholders, subject to the Listing Rules of the Exchange but not below US$100,000 in respect of the Series B Shares.

**Eligible Investors**

Only Eligible Investors may subscribe for Shares. See the Subscription Documents.

**Redemptions**

Shares generally may be redeemed as of the last Business Day of any calendar month, on 30 calendar days' prior written notice, at Net Asset Value per Share prevailing at the close of business of such Redemption Day.

Partial redemptions will only be accepted in minimum amounts of US$100,000.

The Fund may also compulsorily redeem Shares in certain circumstances.

Redemption proceeds will be paid in cash (in US$) by electronic transfer at the Shareholder's risk and expense or, in certain circumstances, in securities, or partly in cash and partly in securities. Except as set forth above, no redemption charges will apply to the Shares.

Any Shareholder who redeems Series B Shares prior to the first anniversary of its purchase of such Series B Shares may be assessed an early redemption fee of up to 3% of the Net Asset Value per Series B Share prevailing at the close of business of such Redemption Day, payable to the Fund. For purposes hereof, an anniversary shall occur on the 365th consecutive day (counting the closing date as the first day) or, if such 365th day is not a Business Day, the immediately preceding Business Day.

See the Section headed "Subscription, Redemption and Transfer of Shares – Redemption of Shares" below for full details.

**Transfers**                Shares may not be transferred without the prior written consent of the Directors. See Section headed "Subscription, Redemption and Transfer of Shares – Transfer of Shares" below for full details.

**Dividends**                The Fund may pay dividends or other distributions to Shareholders in the sole and exclusive discretion of the Directors, although generation of income is not a principal objective of the Fund.

**Fees and Expenses**        Series A Shares

The Investment Manager will receive a quarterly Management Fee in respect of the Series A Shares at an annual rate equal to 1.75% of the net assets of the Fund attributable to each Series A Share, calculated monthly and payable quarterly in arrears. The Management Fee is paid at the Master Fund level.

The Special Limited Partner will be entitled to a quarterly Performance Allocation in respect of each sub-series of Series A Shares calculated and allocated at the Master Fund level, but is effectively equal to 20% of the net profits (including unrealized gains), if any, applicable to each Series A Share for each fiscal quarter; but only to the extent that such profits exceed any losses carried forward from prior years.

Series B Shares

The Investment Manager will receive a quarterly Management Fee in respect of the Series B Shares at an annual rate equal to 1.25% of the net assets of the Fund attributable to each Series B Share, calculated monthly and payable quarterly in arrears. The Management Fee is paid at the Master Fund level.

The Special Limited Partner will be entitled to a quarterly Performance Allocation in respect of each sub-series of Series B Shares calculated and allocated at the Master Fund level, but is effectively equal to 17.5% of the net profits (including unrealized gains), if any, applicable to each Series B Share for each fiscal quarter; but only to the extent that such profits exceed any losses carried forward from prior years.

Series A and Series B Shares

The Investment Manager pays all the fees and expenses of the Investment Manager and certain other service providers out of the Management Fee and Performance Allocation (it receives in its capacity as the Special Limited Partner) it receives from the Master Fund.  The Fund shall have no obligation to the Investment Manager for any such fees.

The Administrator is entitled to fees as agreed under the Administration Agreement.

The Fund bears all costs, fees and expenses arising in connection with the Fund's operations.   The Fund also bears its *pro rata* share of the cost of the Master Fund's operations and investments as provided in the Master Fund Partnership Agreement.  The Fund is responsible for paying its own initial organizational expenses and its *pro rata* share of the initial organizational expenses of the Master Fund.  See the Section headed "Management and Administration – Fees and Expenses" below.

|  |  |
|---|---|
| **Risk Factors** | An investment in the Fund entails certain risks.  Prospective investors should review carefully the discussion under the Section headed "Certain Risk Factors" below. |
| **Reporting** | The Fund will furnish to each Shareholder an annual report that will include audited financial statements as of the end of each fiscal year.  In accordance with and to the extent required by the Exchange listing rules, the Fund will also provide Shareholders with interim unaudited reports made up to June 30 in each year, including income statements and a statement of charges included in the calculation of the Net Asset Value of the Fund, and quarterly statements of the Net Asset Value of the Fund. |
| **Fiscal Year** | December 31. |
| **Tax** | The Government of the Cayman Islands will not, under existing legislation, impose any income, corporate or capital |

gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Fund, the Master Fund or the Shareholders. The Cayman Islands are not party to a double tax treaty with any country that is applicable to any payments made to or by the Fund and/or the Master Fund. The Fund and the Master Fund generally do not expect to be subject to United States federal income tax, except potential U.S. federal withholding with respect to U.S. source dividends (including certain dividend equivalent amounts) and certain interest from U.S. sources.

The Fund has received an undertaking from the Governor-in-Cabinet of the Cayman Islands that, in accordance with section 6 of the Tax Concessions Law (Revised) of the Cayman Islands, for a period of 20 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Fund or its operations and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable (i) on or in respect of the Shares, debentures or other obligations of the Fund or (ii) by way of the withholding in whole or in part of a payment of dividend or other distribution of income or capital by the Fund to its shareholders or a payment of principal or interest or other sums due under a debenture or other obligation of the Fund.

See the Section headed "Taxation" below.

**Application Procedure**    To participate, an investor must complete and return the Subscription Documents and arrange for the transfer of their funds to the bank account of the Fund.

# THE FUND

## *STRUCTURE*

The Fund is an exempted company limited by shares and is of unlimited duration.  It was incorporated under the provisions of the Companies Law (Revised) of the Cayman Islands on February 8, 2006, as MBA Latin America Opportunity Fund, Ltd.  The Fund's name was changed to Highland Argentina Regional Opportunity Fund, Ltd. on July 28, 2017.  The location of the Fund's principal office and its registered office are listed in the Directory.  The Fund has been structured as an investment fund to allow its Shareholders to indirectly invest in the Master Fund pursuant to its investment objectives and strategies set out herein.  The Fund will only accept subscriptions for Shares from Eligible Investors and reserves the right to reject any subscriptions.

## *REGULATION*

The Fund is regulated as a mutual fund under the Mutual Funds Law (Revised) of the Cayman Islands (the "Mutual Funds Law").  The Cayman Islands Monetary Authority (the "Monetary Authority") has supervisory and enforcement powers to ensure compliance with the Mutual Funds Law.  Regulation under the Mutual Funds Law entails the filing of prescribed details and audited accounts annually with the Monetary Authority.  As a regulated mutual fund, the Monetary Authority may at any time instruct the Fund to have its accounts audited and to submit them to the Monetary Authority within such time as the Monetary Authority specifies.  Failure to comply with these requests by the Monetary Authority may result in substantial fines on the part of the Directors and may result in the Monetary Authority applying to the court to have the Fund wound up.

The Fund will not, however, be subject to supervision in respect of its investment activities or the constitution of the Fund's portfolio (in each case through the Master Fund) by the Monetary Authority or any other governmental authority in the Cayman Islands, although the Monetary Authority does have power to investigate the activities of the Fund in certain circumstances. Neither the Monetary Authority nor any other governmental authority in the Cayman Islands has commented upon or approved the terms or merits of this document. There is no investment compensation scheme available to investors in the Cayman Islands.

The Monetary Authority may take certain actions if it is satisfied that a regulated mutual fund is or is likely to become unable to meet its obligations as they fall due or is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors.  The powers of the Monetary Authority include the power to require the substitution of Directors, to appoint a person to advise the Fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of the Fund.  There are other remedies available to the Monetary Authority including the ability to apply to court for approval of other actions.

The Fund, or any Directors or agents domiciled in the Cayman Islands, may be compelled to provide information, subject to a request for information made by a regulatory or governmental authority or agency under applicable law; e.g. by the Cayman Islands Monetary Authority, either for itself or for a recognised overseas regulatory authority, under the Monetary Authority Law (Revised), or by the Tax Information Authority, under the Tax Information Authority Law (Revised) or Reporting of Savings Income Information (European Union) Law (Revised) and associated regulations, agreements, arrangements and memoranda of understanding. Disclosure of confidential information under such laws shall not be regarded as a breach of any duty of confidentiality and, in certain circumstances, the Fund, Director or agent, may be prohibited from disclosing that the request has been made.

### *ADDITIONAL INFORMATION*

This Memorandum does not purport to be and should not be construed as a complete description of the Memorandum and Articles of Association of the Fund, the Master Fund Partnership Agreement or the Material Contracts. Before investing in the Fund, each prospective investor should examine this Memorandum, the Subscription Documents, the Memorandum of Association and Articles of the Fund, the Master Fund Partnership Agreement and the Material Contracts and satisfy itself that an investment in the Fund is appropriate. Additionally, and prior to the sale of any Shares, the Fund will make available to each subscriber or his or her representative the opportunity to ask questions of and receive written answers from representatives of the Fund concerning any aspect of the investment and to obtain any additional information, to the extent that the Fund possesses such information or can acquire it without unreasonable effort or expense.

**An investment in the Fund may be deemed speculative and is not intended as a complete investment program. It is designed only for experienced and sophisticated persons who are able to bear the risk of the substantial impairment or total loss of their investment in the Fund.**

# THE MASTER FUND

## *THE MASTER FUND'S PARTNERSHIP INTERESTS*

The Master Fund's partnership interests are currently held exclusively by the Fund and the Domestic Fund as limited partners, the Investment Manager as the special limited partner of the Master Fund, and the Master Fund General Partner as the general partner of the Master Fund, pursuant to the Master Fund Partnership Agreement. The Master Fund General Partner is registered as a foreign company in the Cayman Islands pursuant to Part IX of the Companies Law (2016 Revision).

## *THE MASTER FUND PARTNERSHIP AGREEMENT*

The Master Fund is constituted as a Cayman Islands exempted limited partnership under the Exempted Limited Partnership Law, 2014 (the "Exempted Limited Partnership Law"). A Cayman Islands exempted limited partnership is constituted by the signing of the relevant partnership agreement and its registration with the Registrar of Exempted Limited Partnerships in the Cayman Islands.

A Cayman Islands exempted limited partnership is not a separate legal person distinct from its partners. Under the Exempted Limited Partnership Law, any property which is conveyed into or vested in the name of the exempted limited partnership shall be held or deemed to be held by the general partner, and if more than one, then by the general partners jointly upon trust, as an asset of the partnership in accordance with the terms of the partnership agreement. Any debt or obligation incurred by a general partner in the conduct of the business of an exempted limited partnership shall be a debt or obligation of the exempted limited partnership. Registration under the Exempted Limited Partnership Law entails that the partnership becomes subject to, and the limited partners therein are afforded the limited liability and other benefits of, the Exempted Limited Partnership Law (subject to compliance therewith).

**Liability of Partners and Indemnification of the Master Fund General Partner and Others.** The business of a Cayman Islands exempted limited partnership will be conducted by its general partner(s) who will be liable for all debts and obligations of the exempted limited partnership to the extent that the partnership has insufficient assets. As a general matter, a limited partner of a Cayman Islands partnership will not be liable for the debts and obligations of the exempted limited partnership, other than:

    (i)      as expressed in the partnership agreement,

    (ii)     if such limited partner takes part in the conduct of the business of an exempted limited partnership in its dealings with persons who are not partners, then that limited partner shall be liable, in the event of the insolvency of the exempted limited partnership, for all debts and obligations of that exempted limited

partnership incurred during the period that he so participates in the conduct of the business as though he were, for such period, a general partner, provided always that he shall be rendered liable pursuant to the foregoing provision only to a person who transacts business with the exempted limited partnership during such period with actual knowledge of such participation and who then reasonably believed such limited partner to be a general partner, or

(iii)    if such limited partner is obligated pursuant to Section 34(1) of the Exempted Limited Partnership Law to return a distribution made to it (with interest at a rate of 10% per annum, unless otherwise specified in the Master Fund Partnership Agreement) when the exempted limited partnership is insolvent or within six months prior to such insolvency.

The Master Fund Partnership Agreement provides that none of the Master Fund General Partner, the Investment Manager, each member, shareholder, partner, manager and director of, and any person who controls, the Master Fund General Partner or the Investment Manager, each of the respective affiliates of the foregoing and each of their respective executors, heirs, assigns, successors and other legal representatives (each such person, an "Indemnified Party") will be liable to the Master Fund or any limited partner of the Master Fund (including the Feeder Funds) for any loss or damage arising by reason of being or having been an Indemnified Party or from any acts or omissions in the performance of its services as an Indemnified Party in the absence of gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud, or as otherwise required by law. An Indemnified Party may consult with counsel and accountants in respect of the Master Fund's affairs and will be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants, provided that they were selected in accordance with the standard of care set forth above. In addition, in no event shall any Indemnified Party be liable for any consequential damages, special or indirect damages or lost profits.

The Master Fund Partnership Agreement provides that the Master Fund shall, to the fullest extent permitted by law, indemnify and hold harmless each Indemnified Party from and against any and all liabilities suffered or sustained by an Indemnified Party by reason of the fact that it, he or she is or was an Indemnified Party or in connection with the Master Fund Partnership Agreement or the Master Fund's business or affairs, including, without limitation, any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, suit or proceeding, provided that such liability did not result from the gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud of such Indemnified Party. The Master Fund Partnership Agreement also provides that the Master Fund will, in the sole discretion of the Master Fund General Partner, advance to any Indemnified Party reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action, suit or proceeding which arises out of such conduct, subject to receiving a written undertaking from the Indemnified Party to repay such amounts if and to the extent that it is finally determined that the Indemnified Party was not entitled to indemnification in respect thereof.

Notwithstanding any of the foregoing, the provisions of the Master Fund Partnership Agreement do not provide for the exculpation or indemnification of any Indemnified Party for any liability

(including liability under U.S. federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the above provisions to the fullest extent permitted by law.

Pursuant to the foregoing indemnification and exculpation provisions applicable to each Indemnified Party, the Master Fund (and not the applicable Indemnified Party) will be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud. Given the volume of transactions executed on behalf of the Master Fund, trading errors (and similar errors) will occur and the Master Fund will be responsible for any resulting losses, even if such losses result from the negligence (but not gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware)) of any Indemnified Party.

The Indemnified Parties will also be indemnified by each limited partner of the Master Fund for any amounts of tax withheld or required to be withheld with respect to that limited partner, and also for any amounts of interest, additions to tax, penalties and other costs borne by any such persons in connection therewith to the extent that the balance of the limited partner's capital account is insufficient to fully compensate the Master Fund General Partner and the Investment Manager for such costs.

**Contributions and Withdrawals by the Fund.**  Limited partners of the Master Fund may make contributions at such times and in such amounts as the Master Fund General Partner determines. As a limited partner of the Master Fund, the Fund may, subject to the consent of the Master Fund General Partner, voluntarily request a withdrawal of all or part of its capital in the Master Fund at such times and in such amounts as it may determine.  The Master Fund General Partner may, at any time, suspend (a) the calculation of the net asset value of the Master Fund (and the applicable valuation date); (b) the issuance of limited partner interests in the Master Fund; (c) the withdrawal by limited partners of their interests (and the applicable withdrawal date); and/or (d) the payment of withdrawal proceeds (even if the calculation dates and withdrawal dates are not postponed) during any period which: (i) any stock exchange on which a substantial part of investments owned by the Master Fund are traded is closed, other than for ordinary holidays, or dealings thereon are restricted or suspended; (ii) there exists any state of affairs as a result of which (A) disposal of a substantial part of the investments owned by the Master Fund would not be reasonably practicable and might seriously prejudice the limited partners of the Master Fund, or (B) it is not reasonably practicable for the Master Fund fairly to determine the value of its net assets; (iii) none of the withdrawal requests which have been made may lawfully be satisfied by the Master Fund; (iv) there is a breakdown in the means of communication normally employed in determining the prices of a substantial part of the investments of the Master Fund; or (v) in the sole discretion of the Master Fund General Partner, it is necessary to preserve the Master Fund's assets.

**Amendment of the Master Fund Partnership Agreement.**  The Master Fund Partnership Agreement may be amended by an instrument in writing signed by each of the limited partners of the Master Fund and the Master Fund General Partner; provided that, the Master Fund General

Partner may amend the Master Fund Partnership Agreement without the consent of the limited partners so long as the amendment does not adversely affect any rights of the limited partners.

**Dissolution of the Master Fund.** The Master Fund shall be wound up and dissolved upon the first to occur of any of the following liquidating events, and Sections 36(1)(b), 36(9) and 36(12) of the Exempted Limited Partnership Law shall not apply to the Master Fund:

(i)     the written election of the Master Fund General Partner to terminate the Master Fund; or

(ii)    if the Master Fund General Partner is the sole or last remaining general partner, the date (the "Automatic Dissolution Date") falling 90 days after the date of the service of a notice by the Master Fund General Partner (or its legal representative) on all the limited partners informing the limited partners of:

(1)     the commencement of liquidation or bankruptcy proceedings in relation to the Master Fund General Partner; or

(2)     the withdrawal, removal or making of a winding up or dissolution order in relation to the Master Fund General Partner;

*provided that*, if a majority in number of the limited partners elects one or more new general partners before the Automatic Dissolution Date, the business of the Master Fund shall be resumed and continued. If a new general partner is not elected by the Automatic Dissolution Date, the Master Fund shall be wound up and dissolved in accordance with terms of the Master Fund Partnership Agreement and the Exempted Limited Partnership Law.

**Power of Attorney.** Each limited partner of the Master Fund shall make, constitute and appoint the Master Fund General Partner (and each of its successors and permitted assigns) for the time being, with full power of substitution, as its true and lawful agent and attorney-in-fact of, and in the name, place and stead of, such partner with the power from time to time to make, execute, sign, acknowledge, swear to (and deliver as may be appropriate) on its behalf and file and record in the appropriate public offices and publish (as may in the reasonable judgment of the Master Fund General Partner be required by law), including the admission of any new partners of the Master Fund and any amendments to the Master Fund Partnership Agreement. Each limited partner of the Master Fund shall authorize the Master Fund General Partner to take any further action that the Master Fund General Partner considers necessary or advisable in connection with the foregoing. Such power of attorney granted is intended to secure a proprietary interest of the Master Fund General Partner and the performance by each limited partner of the Master Fund of its obligations under the Master Fund Partnership Agreement and shall be irrevocable and shall survive and not be affected by the subsequent death, lack of capacity, insolvency, bankruptcy or dissolution of any limited partner of the Master Fund.

## *VALUATION OF ASSETS*

The Master Fund General Partner has delegated the valuation of the Master Fund's assets to the Administrator, which will generally compute the value of the securities and other assets of the Master Fund as of the close of business on the last day of each fiscal period and on any other date selected by the Master Fund General Partner in its sole discretion.   In addition, the Administrator must compute the value of the securities that are being distributed in-kind as of their date of distribution in accordance with the Master Fund Partnership Agreement.   In determining the value of the assets of the Master Fund, no value is placed on the goodwill or name of the Master Fund, or the office records, files, statistical data or any similar intangible assets of the Master Fund not normally reflected in the Master Fund's accounting records, but there must be taken into consideration any related items of income earned but not received, expenses incurred but not yet paid, liabilities fixed or contingent, prepaid expenses to the extent not otherwise reflected in the books of account, and the value of options or commitments to purchase or sell securities pursuant to agreements entered into on or prior to such valuation date.

A copy of the Investment Manager's valuation policy is available upon request from the Master Fund General Partner.

The value of each security and other asset of the Master Fund and the net worth of the Master Fund as a whole determined pursuant Master Fund Partnership Agreement are conclusive and binding on all of the partners of the Master Fund and all persons claiming through or under them.

# INVESTMENT OBJECTIVE AND STRATEGY

## *INVESTMENT OBJECTIVE*

The investment objective of the Fund is to maximize the total return of its assets in US Dollars through capital appreciation by investing all of its investable assets in the Master Fund, which intends to hold primarily a portfolio of investments in securities of Latin American corporate and sovereign issuers as well as non-Latin American issuers that derive a portion of their revenues from business activities in Latin America, in each case with a primary focus on Argentina, and that the Investment Manager believes would provide profitable investment opportunities for the Master Fund. The Master Fund will invest in a single portfolio of assets and does not currently intend to have a separate portfolio of assets for each of its series of limited partner interests, each of which will correspond to a Series of Shares.

The objects for which the Fund is established are unrestricted and the Fund shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Law.

## *INVESTMENT STRATEGY*

The Master Fund is a multi-strategy investment fund and there is no limit on the investment strategies that may be utilized. The Investment Manager believes that focusing on a multi-strategy approach will enable the Master Fund to enhance results by compounding returns generated by each strategy and at the same time have the needed flexibility to adjust to potentially changing regulations and market conditions.

The Investment Manager will be focused on identifying assets that are mispriced against similar assets and/or against the Investment Manager's expectations for assets' fair values and market movements, special situations, such as mergers, financial restructurings, hostile takeovers, or leveraged buy-outs. There is no set allocation among these and any other strategies that the Investment Manager may use.

The Master Fund may hold long and short positions in a wide range of liquid or illiquid fixed income securities including, but not limited to, sovereign and private debt, distressed debt, secured and unsecured debt, structured debt, loans, asset-backed securities and collateralized debt obligations. Furthermore, the Master Fund may invest, both long and short, in a wide range of liquid or illiquid equity-related instruments including, but not limited to, equities, convertible bonds, options, equity-linked notes, preferred shares and warrants, whether or not listed or traded on one or more Recognized Exchanges.

The Master Fund may hold any of these positions indirectly by entering into swaps, options, futures, forward contracts or similar derivative transactions.

The Master Fund may hold both US Dollar and non US Dollar denominated securities.

The Master Fund may leverage its investment portfolio by up to 100% of the Master Fund's Net Asset Value (calculated at the time of investment) by borrowing for investment purposes and by using leverage techniques and products.  It is anticipated that by doing so the performance of the Master Fund will be enhanced.   While the use of the leverage may improve the return on invested capital, leverage may also significantly increase the impact of adverse movement in the value of the Master Fund.

The Master Fund may also utilize hedging strategies in order to maximize returns and reduce the risk to principal or the volatility associated with its holdings.  As part of these hedging strategies, the Master Fund may hedge any of its investments with long or short positions in any financial instrument, which the Investment Manager deems appropriate.  The Master Fund may utilize US and European securities for hedging purposes.

The Master Fund may invest through one or more subsidiaries established in an appropriate jurisdiction in order to take advantage of applicable tax treaties or increase the tax efficiency of the Master Fund's investments, or in such other circumstances as the Master Fund General Partner, following consultation with the Investment Manager, deem appropriate, including compliance with local investment laws.

The Master Fund may maintain assets in cash or cash equivalent instruments, money market funds, repurchase agreements, or other cash management vehicles pending investment, for defensive purposes, to fund withdrawals requested by the limited partners of the Master Fund or otherwise at the discretion of the Investment Manager. The Master Fund may hold with no limitation US and European AAA fixed income securities for defensive purposes.

## *INVESTMENT RESTRICTIONS*

In deploying the investment strategy, the Master Fund will observe the following investment restrictions.  The Master Fund will not at the time of investment:

1. Invest more than 50 percent of its gross assets in its net holdings of equities;

2. Borrow more than 100 percent of its net assets;

3. Invest more than 20 percent of its gross assets in a single equity position;

4. Invest more than 20 percent of its gross assets in a single corporate issuer position;

5. Invest more than 30 percent of its gross assets in a single GDP-linked warrant position;

6. Invest more than 30 percent of its gross assets in a single sovereign issuer security position; and

7.  Invest more than 30 percent of its gross assets in a single provincial issuer.

If a percentage limitation on investment or use of assets set forth above is adhered to at the time a transaction is effected, later changes in percentage resulting from changing values will not be considered a violation.

In the event that the Investment Manager discovers that a violation of any of the Master Fund's investment limitations has occurred (the date of such discovery being the "Discovery Date"), the Investment Manager shall inform the limited partners of the Master Fund, including the Fund, who shall: (i) notify each of their limited partners or shareholders, as applicable, in writing within 30 Business Days after the Discovery Date of the nature of the violation, the steps taken, or to be taken, to remedy the violation and the reason the violation occurred and (ii) use reasonable commercial efforts to cause the Investment Manager to remedy such violation within 90 Business Days after the Discovery Date (the "Remedy Date"). If such violation has not been remedied on or before the Remedy Date, the limited partners of the Master Fund, including the Fund, shall: (i) notify each of their limited partners or shareholders, as applicable, in writing, 30 Business Days after the Remedy Date, of the steps taken to remedy the violation and the reason that the violation has not been remedied by the Remedy Date (the "Remedy Notice") and (ii) use reasonable commercial efforts to cause the Master Fund's portfolio to be examined by an independent auditor other than the Auditors and shall request that such independent auditor issue a report to the investors in each of the Master Fund's limited partners as to its concurrence or disagreement with the statements in the Remedy Notice. The Investment Manager shall pay for the costs of such audit and the costs of the Remedy Notice if the violation that was the subject of the Remedy Notice occurred as a result of the Investment Manager's willful misfeasance, bad faith or gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware). In addition, the failure to remedy the violation in a timely manner may give rise to special redemption rights. See "Redemption of Shares - General."

### *DISTRIBUTION POLICY*

The Fund's objective is to maximize capital appreciation and accordingly it is not envisaged that any income or gains derived from the investments made by the Master Fund will be distributed by way of dividend. This does not preclude the Directors from declaring a dividend at any time in the future if they consider it appropriate to do so. To the extent that a dividend may be declared, it will be paid in compliance with any applicable laws.

*The investment objectives and strategies summarized herein represent the Investment Manager's current intentions. Depending on conditions and trends in the securities markets and the economy in general, the Investment Manager may pursue any strategies, employ any investment techniques or purchase any type of security that it considers appropriate, whether or not described in this section, subject to any applicable law or regulation. The discussion herein includes and is based upon numerous assumptions and opinions of the Investment Manager concerning world financial markets and other matters, the accuracy of which cannot be assured. There can be no assurance that the investment strategy of the Master Fund will achieve the intended investment objective. The Master Fund's investment program is speculative and involves a high degree of risk, including, without limitation, the risk of loss of the entire amount invested.*

# CERTAIN RISK FACTORS

An investment in the Fund entails substantial risks, including, but not limited to, those listed below, and prospective investors should carefully consider the following factors, among others, in determining whether an investment in the Fund is suitable for them. There can be no assurance that the Master Fund's program will be successful or that investments purchased by the Master Fund will increase in value. An investor must be prepared to bear capital losses that might result from an investment in the Fund, including a complete loss of the investor's invested capital. All investors in the Fund should consult their own legal, tax and financial advisors prior to investing in the Fund.

For purposes of this section, references to the "Fund" should be understood to mean each of the Fund and the Master Fund, as applicable, and each of the risk factors set forth herein, while not exhaustive, shall apply equally to each of the Fund and the Master Fund, as applicable.

### *RISK FACTORS SPECIFIC TO THE INVESTMENT OBJECTIVE AND STRATEGY*

**Changes in Strategy.** The Investment Manager has the power to expand, revise or alter its trading strategies on behalf of the Master Fund without prior approval by, or notice to, the Fund or the Shareholders. Any such change could result in exposure of the Fund's assets (through the Master Fund) to additional risks, which may be substantial. The Investment Manager may also invest in additional instruments than those specifically identified in the "Investment Objective and Strategy" section.

**Latin America Investments.** The Master Fund invests in securities of companies based in Latin America or issued by Latin American governments, or in the securities of companies which are not incorporated in Latin America, but which derive some of their revenues from business activities conducted in Latin America. Such investment involves certain considerations not usually associated with investing in securities of developed countries or of companies located in developed countries, including political and economic consideration, such as greater risks of expatriation, nationalization and general, political, and economic instability, the small size of the securities markets in such countries and the low volume of trading, resulting in potential lack of liquidity and substantially greater price volatility, fluctuations in the rate of exchange between currencies, and costs associated with currency conversions, certain government policies that may restrict the Master Fund's investment opportunities and problems that may arise in connection with the clearance and settlements of trades. In addition, accounting and financial reporting standards that prevail in such countries are not equivalent to standards in more developed countries, consequently, less information is available to investors in companies located in more developed countries. There is also less regulation, generally, of the securities markets in Latin American countries than there is in more developed countries.

**Risks Related to Investing in Argentina**. Argentina has experienced high interest rates, economic volatility, inflation, currency devaluations and high unemployment rates. The

economy is heavily dependent on exports and commodities. Argentina's default on its debt in 2001, and its past nationalization of private pensions and national oil company YPF, continues to impact the confidence of investors in Argentina, which might adversely impact returns in the Master Fund, and thus, the Fund.

**Argentina's Economy**. Argentina's economy could grow at a lower rate than in past years, or could contract. Factors that could negatively affect Argentina's rate of economic growth, its public finances and Argentina's ability to service its debt include: the competitiveness of Argentine exports, which are influenced by the peso's value relative to the value of the currencies of Argentina's trading partners and trade competitors; the level of inflation in Argentina; international commodities prices, foreign currency exchange rates and the levels of consumer consumption and foreign and domestic investment; negative economic developments in Argentina's major trading partners, or "contagion" effects more generally; and Argentina's ability to meet its energy requirements.

**Uncertainty of Economic Reforms**. A runoff election on November 22, 2015 resulted in Mr. Mauricio Macri being elected President of Argentina. The Macri administration assumed office on December 10, 2015. Since assuming office on December 10, 2015, the Macri administration has announced several significant economic and policy reforms, including methodological reforms with respect to the calculation of certain macroeconomic statistics, the loosening of foreign exchange controls, reduction of tariffs, other easing of international trade restrictions, infrastructure reforms and reopened negotiation with holders of debt in default since 2001. The impact that these measures and any future measures taken by the new administration will have on the Argentine economy as a whole and the financial sector in particular cannot be predicted. The Investment Manager believes that the effect of the planned liberalization of the economy and renewed access to capital markets will be positive for the Master Fund's intended investments by stimulating economic activity, but it is not possible to predict such effect with certainty and such liberalization could also be disruptive to the economy and fail to benefit or harm companies in Argentina. The Investment Manager cannot predict how the Macri administration will address certain other political and economic issues that were central during the 2015 presidential election campaign, such as the financing of public expenditures, public service subsidies and tax reforms, the resolution of holdout debt or the impact that any measures related to these issues that are implemented by the Macri administration will have on the Argentine economy as a whole.

**Currency Controls**. In the past, Argentina imposed exchange controls and transfer restrictions substantially limiting the ability of companies to retain foreign currency or make payments abroad. Although the Macri government lifted exchange controls and liberalized capital controls, there can be no assurances regarding future modifications to exchange and capital controls. Exchange and capital controls could adversely affect the financial condition or results of operations of issuers in whose securities the Master Fund intends to invest, as well as their ability to meet foreign currency obligations and to execute financing plans.

**Challenges to Argentina's Debt Payments**. Argentina's payments in connection with a debt offering may be attached, enjoined or otherwise challenged. In recent years, hold-out creditors have used litigation against sovereign debtors, most prominently Peru and Nicaragua, to attach or interrupt payments made by these sovereign debtors to, among others, bondholders who have

agreed to a debt restructuring and accepted new securities in an exchange offer. Argentina has been subjected to suits to collect on amounts due on defaulted bonds, including actions in the United States, the United Kingdom, Italy and Germany. Some of these actions have resulted in judgments against Argentina. There can be no assurance that a creditor will not be able to interfere, through an attachment of assets, injunction, temporary restraining order or otherwise, with payments made in connection with a debt offering.

**Pro Rata Payment Litigation**. Argentina's defaults with respect to the payment of its foreign debt could prevent the government and the private sector from accessing the international capital markets, which could adversely affect the financial condition of sovereign and corporate issuers in which the Master Fund invests. In September 2014, the Argentine Congress passed a law to restructure foreign-law bonds held by exchange bondholders to allow the payment in Argentina and to appoint a new paying agent. On September 29, 2014, the U.S. District Court for the Southern District of New York held Argentina in contempt of court as a result of this law. The U.S. District Court authorized limited exceptions to the injunction allowing certain custodians of Argentine law-governed bonds to process payments in August 2014, September 2014 and December 2014.

On May 11, 2015, the plaintiffs that obtained pari passu injunctions asked the U.S. district court to amend their complaints to include claims alleging that Argentina's issuance and servicing of its 2024 dollar-denominated bonds, and its external indebtedness in general, would violate the pari passu clause. On June 5, 2015, the Second Circuit granted partial summary judgment to a group of 526 "me-too" plaintiffs in 36 separate lawsuits, finding that, consistent with the previous ruling of such court, Argentina violated a pari passu clause in bonds issued to the "me-too" bondholders. The decision obligates Argentina to pay the plaintiffs $5.4 billion before it can make payments on restructured debt.

In 2016, the Argentine government working under a court appointed mediator, entered into settlement agreements with a large portion of hold-out debt holders contingent on Argentina repealing laws that prevented the country from complying with rulings by U.S. courts. In this context Judge Thomas Griesa ruled he would lift the injunctions preventing Argentina from serving post-2005 exchange debt if these laws are repealed. Argentina's lower chamber approved the repeal of these laws and Argentina's senate voted to approve the same in March 2016. In April 2016, the Second Circuit Court of Appeals in the United States upheld Judge Griesa's ruling, finding that he did not abuse his discretion in lifting the pari passu injunctions.

The repercussions of restructuring Argentina's bond debts are ongoing. The 2016 U.S. court rulings only settled claims of certain bondholders. Argentina reached a $475 million settlement with other bondholders in November 2016. Financial indices have only just started moving Argentina back to "emerging market" status, where it had been before 2009.

Argentina's default with respect to the payment of its foreign debt, its delay in completing the debt restructuring process with creditors that did not participate in the related exchange offers, the complaints filed against Argentina discussed above, the U.S. Supreme Court's decision not to hear Argentina's appeal, the declaration of contempt, and the long-term difficulty of reestablishing itself in the global marketplace could prevent Argentina's government from

obtaining international private financing or receiving direct foreign investment, as well as private sector companies in Argentina from accessing the international capital markets. Without access to international private financing, Argentina may not be able to finance its obligations, and financing from multilateral financial institutions may be limited or not available. Without access to direct foreign investment, the government may not have sufficient financial resources to foster economic growth and the performance of the Master Fund's investments in Argentina could be materially and adversely affected.

### GENERAL RISK FACTORS

**Overall Investment Risk**. All securities investments risk the loss of capital. The nature of the securities to be purchased and traded by the Master Fund and the investment techniques and strategies to be employed in an effort to increase profits may increase this risk. While the Investment Manager will devote its commercially reasonable best efforts to the management of the Master Fund's portfolio, there can be no assurance that the Master Fund, and thus, the Fund will not incur losses. Many unforeseeable events, including actions by various government agencies, and domestic and international political events, may cause sharp market fluctuations.

**Limited Operating History.** The Fund has limited operating history and the Master Fund and the Master Fund General Partner do not have operating histories upon which prospective investors can evaluate the anticipated performance of the Fund. Although the principals of the Investment Manager have extensive prior experience in Latin America, past performance of the Investment Manager should not be construed as an indication of the future results of an investment in the Fund. The Master Fund's investment program should be evaluated on the basis that there can be no assurance that the Investment Manager's assessment of the short-term or long-term prospects of its investment strategy will prove accurate, or that the Master Fund will achieve its investment objectives.

**Illiquidity of Shares**. Shares are not transferable without the approval of the Directors, and there will be no secondary market for Shares. Consequently, Shareholders may not be able to dispose of their Shares except by means of the redemption privilege and may receive securities rather than cash in exchange for their Shares.

**Possible Effect of Substantial Redemptions**. Substantial redemptions of Shares from the Fund could require the Master Fund to liquidate its positions more rapidly than otherwise desired in order to raise the cash necessary to fund the redemptions. Illiquidity in certain securities could make it difficult for the Master Fund to liquidate positions on favorable terms, which could result in losses or a decrease in the Net Asset Value of the Master Fund, and thus, the Fund. The Master Fund is permitted to borrow cash necessary to make payments in connection with redemption of Shares from the Fund when the Investment Manager determines that it would not be advisable to liquidate portfolio assets for that purpose. The Master Fund is also authorized to pledge portfolio assets as collateral security for the repayment of such loans. In these circumstances, the continuing Shareholders will bear the risk of any subsequent decline in the value of the Fund's assets.

**Master-Feeder Structure.** The Fund will invest all of its investable assets in the Master Fund. The "master-feeder" fund structure presents certain risks to the Shareholders. Smaller feeder funds may be materially affected by the actions of larger feeder funds.

While the Investment Manager, as investment manager of the Master Fund, generally will not consider tax issues applicable to any particular investors, it generally will take into account the tax positions of the Fund and the Domestic Fund that invest in the Master Fund. However, the use of a "master-feeder" structure may create a conflict of interest in that different tax considerations for the Fund and the Domestic Fund may cause or result in the Master Fund structuring or disposing of an investment in a manner or at a time that is more advantageous (or disadvantageous) for tax purposes to one Feeder Fund or its investors.

**Absence of Regulatory Oversight.** Although the Fund is a regulated mutual fund under the Mutual Funds Law (Revised) of the Cayman Islands, the Fund is not required to, and does not intend to, register under the laws of any other jurisdiction, and, accordingly, the provisions of statutes of certain jurisdictions (which may provide certain regulatory safeguards to investors) are not applicable. For example, neither the Fund nor the Master Fund is required to maintain custody of its securities or place its securities in the custody of a bank or a member of a recognized securities exchange in the manner required under the statutes of certain jurisdictions. A registered investment company that places its securities in the custody of a member of a recognized securities exchange is generally required to have a written custodian agreement, which provides that securities held in custody will be at all times individually segregated from the securities of any other person and marked to clearly identify such securities as the property of such investment company and which contains other provisions complying with applicable regulations. The Master Fund may maintain such accounts at brokerage firms that do not separately segregate such assets as would be required in the case of registered investment companies. The bankruptcy of any such brokerage firms might have a greater adverse effect on the Master Fund and the Fund than would be the case if the accounts were maintained to meet the requirements applicable to registered investment companies.

**Handling of Mail.** Mail addressed to the Fund and received at its registered office will be forwarded unopened to the forwarding address supplied by the Investment Manager to be dealt with. None of the Fund, its Directors, officers, advisors or service providers (including the organisation which provides registered office services in the Cayman Islands) will bear any responsibility for any delay howsoever caused in mail reaching the forwarding address. In particular, the Directors will only receive, open or deal directly with mail which is addressed to them personally (as opposed to mail which is addressed just to the Fund).

**Subscription Monies.** Where a subscription for Shares is accepted, the Shares will be treated as having been issued with effect from the relevant Subscription Day notwithstanding that the subscriber for those Shares may not be entered in the Fund's register of members until after the relevant Subscription Day. The subscription monies paid by a subscriber for Shares will accordingly be subject to investment risk in the Fund from the relevant Subscription Day.

**Effect of Redemptions.** Where a redemption request is accepted, the Shares will be treated as having been redeemed with effect from the relevant Redemption Day irrespective of whether or not such redeeming Shareholder has been removed from the Fund's register of members or the

Redemption Price has been determined or remitted. Accordingly, on and from the relevant Redemption Day, Shareholders in their capacity as such will not be entitled to or be capable of exercising any rights arising under the Articles with respect to Shares being redeemed (including any right to receive notice of, attend or vote at any meeting of the Fund) save the right to receive the Redemption Price and any dividend which has been declared prior to the relevant Redemption Day but not yet paid (in each case with respect to the Shares being redeemed). Such redeemed Shareholders will be creditors of the Fund with respect to the Redemption Price. In an insolvent liquidation, redeemed Shareholders will rank behind ordinary creditors but ahead of Shareholders.

**Limited Rights of Shareholders**.  Shareholders holding Shares will have no right to participate in the day to day operations of the Fund and will not be entitled to receive notice of, nor attend or vote at, general meetings of the Fund other than general meetings to vote upon a variation of the rights of the Shares.  Consequently, Shareholders will not have any control over the management of the Fund or the appointment and removal of its Directors and service providers.   The Investment Manager, as holder of all the Management Shares, control all of the voting interests in the Fund, except on proposals to vary the rights of the Shares, and may make such changes to the Memorandum of Association and Articles of the Fund as it deems appropriate, including increasing the share capital, consolidating the Shares and sub-dividing the Shares.  Accordingly, only the Investment Manager can appoint and remove the Directors of the Fund and only the Directors may terminate the services of the Investment Manager, the Administrator and other agents of the Fund.  An investment in the Fund should be regarded as a passive investment.

**Valuation of the Master Fund's Investments**.  Valuation of the Master Fund's securities and other investments may involve uncertainties and judgmental determinations, and if such valuations should prove to be incorrect, the Net Asset Value of the Master Fund and the Fund could be adversely affected.  Independent pricing information may not at times be available or otherwise utilized regarding certain of the Master Fund's securities and other investments. Valuation determinations will be made in good faith in accordance with the policies of the Investment Manager in effect from time to time, a copy of which will be made available upon request.

The Master Fund may have some of its assets in investments, which by their very nature may be extremely difficult to accurately value.   To the extent that the value assigned by the Administrator to any such investment differs from the actual value, the Net Asset Value of the Master Fund and the Fund may be understated or overstated, as the case may be.  In light of the foregoing, there is a risk that a Shareholder who redeems all or part of its Shares while the Master Fund holds such investments will be paid an amount less than it would otherwise be paid if the actual value of such investments is higher than the value designated by the Administrator. Similarly, there is a risk that such Shareholder might, in effect, be overpaid if the actual value of such investments is lower than the value designated by the Administrator.  In addition, there is risk that an investment in the Fund by a new Shareholder (or an additional investment by an existing Shareholder) could dilute the value of such investments for the other Shareholders if the designated value of such investments is higher than the value designated by the Administrator. Further, there is risk that a new Shareholder (or an existing Shareholder that makes an additional investment) could pay more than it might otherwise if the actual value of such investments is

lower than the value designated by the Administrator. The Administrator does not intend to adjust the Net Asset Value of the Master Fund and the Fund retroactively.

None of the Directors, the Fund, the Master Fund, the Master Fund General Partner or the Administrator shall have any liability in the event that any price or valuation, used in good faith in connection with the above procedures, proves to be an incorrect or an inaccurate estimate or determination of the price or value of any part of the property of the Master Fund.

**In-Kind Distributions.** A redeeming Shareholder may, in the discretion of the Directors, receive securities owned by the Fund (through the Master Fund) in lieu of, or in combination with, cash. The value of securities distributed may increase or decrease before the securities can be sold (either by the Shareholder or by the Fund if the Directors establishes a liquidating account on behalf of the Shareholder to sell such assets), and the investor will incur transaction costs in connection with the sale of such securities. Additionally, securities distributed with respect to a redemption by a Shareholder may not be readily marketable. The risk of loss and delay in liquidating these securities will be borne by the investor, with the result that such investor may receive less cash than it would have received on the date of redemption.

**Business and Regulatory Risks of Hedge Funds.** Legal, tax and regulatory changes could occur during the term of the Fund that may adversely affect the Fund. The regulatory environment for hedge funds is evolving, and changes in the regulation of hedge funds may adversely affect the value of investments held by the Master Fund and the ability of the Master Fund to obtain the leverage it might otherwise obtain or to pursue its trading strategies. In addition, securities and futures markets are subject to comprehensive statutes, regulations and margin requirements. Regulators and self-regulatory organizations and exchanges are authorized to take extraordinary actions in the event of market emergencies. The regulation of derivative transactions and funds that engage in such transactions is an evolving area of law and is subject to modification by government and judicial actions. The effect of any future regulatory change on the Fund could be substantial and adverse.

**Side Letters**. The Investment Manager, in consultation with the Directors, or the Fund may from time to time enter into letter agreements or other similar agreements (collectively, "Side Letters") with one or more Shareholders which provide such Shareholder(s) with additional and/or different rights (including, without limitation, with respect to access to information, the Management Fee, the Performance Allocation, minimum investment amounts, voting rights and liquidity terms) than such Shareholder(s) have pursuant to this Memorandum. As a result of such Side Letters, certain Shareholders may receive additional benefits (including, but not limited to, reduced fee obligations, the ability to redeem Shares on shorter notice and/or expanded informational rights) which other Shareholders will not receive. For example, a Side Letter may permit a Shareholder to redeem its Shares on less notice and/or at different times than other Shareholders. As a result, should the Fund experience a decline in performance over a period of time, a Shareholder who is party to a Side Letter that permits less notice and/or different redemption times may be able to redeem its Shares prior to other Shareholders. In general, the Fund and/or the Investment Manager will not be required to notify any or all of the other Shareholders of any such Side Letters or any of the rights and/or terms or provisions thereof, nor will the Fund and/or the Investment Manager be required to offer such additional

and/or different rights and/or terms to any or all of the other Shareholders. The Fund and/or the Investment Manager may cause the Fund to enter into such Side Letters with any party as the Fund and/or the Investment Manager may determine in its sole discretion at any time. The other Shareholders will have no recourse against the Fund and/or the Investment Manager in the event certain Shareholders receive additional and/or different rights and/or terms as a result of such Side Letters. A Shareholder will be required to enter into such undertakings with respect to maintaining the confidentiality of any such additional information as the Fund and/or the Investment Manager may in their sole discretion determine.

**Competition**. The markets in which the Master Fund invests are competitive and some of the opportunities that the Investment Manager may explore may be pursued by better known investors or investment funds. There can be no assurance that the Investment Manager will be able to identify or successfully pursue such opportunities in this environment. The Investment Manager competes with many firms that may have greater financial resources, more extensive development, better marketing and service capabilities, more favorable financing arrangements, larger research staffs and more securities traders than are available to the Investment Manager.

**Cybersecurity**. Information and technology systems may be vulnerable to damage or interruption from computer viruses, network failures, computer and telecommunication failures, infiltration by unauthorized persons and security breaches, usage errors by their respective professionals, power outages and catastrophic events such as fires, tornadoes, floods, hurricanes and earthquakes. Although the Investment Manager has implemented various measures to manage risks relating to these types of events, if these systems are compromised, become inoperable for extended periods of time or cease to function properly, the Investment Manager, the Master Fund and/or the Fund may have to make a significant investment to fix or replace them, which expense may be borne in whole or in part by the Fund. The failure of these systems and/or of disaster recovery plans for any reason could cause significant interruptions in the Investment Manager's, the Master Fund's and/or the Fund's operations and result in a failure to maintain the security, confidentiality or privacy of sensitive data, including personal information relating to investors. Such interruptions could harm the Investment Manager's, the Master Fund's and/or the Fund's reputation, subject any such entity and their respective affiliates to legal claims and otherwise affect their business and financial performance. The foregoing risks and consequences are also extant at any issuer in which the Master Fund invests and could manifest as adverse performance of such investment.

### *INVESTMENT AND TRADING RISKS*

**Derivative Instruments**. The Investment Manager may use various derivative instruments, including futures, options, forward contracts, swaps and other derivatives which may be volatile and speculative. Certain positions may be subject to wide and sudden fluctuations in market value, with a resulting fluctuation in the amount of profits and losses. Use of derivative instruments presents various risks, including the following:

- *Tracking* – When used for hedging purposes, an imperfect or variable degree of correlation between price movements of the derivative instrument and the underlying investment sought to be hedged may prevent the Investment Manager

from achieving the intended hedging effect or expose the portfolio to the risk of loss.

- *Liquidity* – Derivative instruments, especially when traded in large amounts, may not be liquid in all circumstances, so that in volatile markets the Investment Manager may not be able to close out a position without incurring a loss. In addition, daily limits on price fluctuations and speculative positions limits on exchanges on which the Investment Manager may conduct its transactions in certain derivative instruments may prevent prompt liquidation of positions, subjecting the portfolio to the potential of greater losses.

- *Leverage* – Trading in derivative instruments can result in large amounts of leverage. Thus, the leverage offered by trading in derivative instruments may magnify the gains and losses experienced by the Master Fund and could cause the Master Fund's net asset value to be subject to wider fluctuations than would be the case if the Investment Manager did not use the leverage feature in derivative instruments.

- *Over-the-Counter-Trading* – Derivative instruments that may be purchased or sold for the portfolio may include instruments not traded on an exchange. Over-the-counter options, unlike exchanged-traded options, are two-party contracts with price and other terms negotiated by the buyer and seller. The risk of non-performance by the obligor on such an instrument may be greater and the ease with which the Investment Manager can dispose of or enter into closing transactions with respect to such an instrument may be less than in the case of an exchange-traded instrument. In addition, significant disparities may exist between "bid" and "asked" prices for derivative instruments that are not traded on an exchange. Derivative instruments not traded on exchanges are also not subject to the same type of government regulation as exchange traded instruments, and many of the protections afforded to participants in a regulated environment may not be available in connection with such transactions.

**Short Sales**. Short sales by the Master Fund that are not made "against the box" create opportunities to increase the Master Fund's return but, at the same time, involve special risk considerations and may be considered a speculative technique. Since the Master Fund, in effect, profits from a decline in the price of the securities sold short without the need to invest the full purchase price of the securities on the date of the short sale, the value of the Master Fund will tend to increase more when the securities it has sold short decrease in value, and to decrease more when the securities it has sold short increase in value, than otherwise would be the case if it had not engaged in such short sales. Short sales theoretically involve unlimited loss potential, as the market price of securities sold short may increase continuously, although the Master Fund may mitigate such losses by replacing the securities sold short before the market price has increased significantly. Under adverse market conditions the Master Fund might have difficulty purchasing securities to meet its short sale delivery obligations, and might have to sell portfolio securities to raise the capital necessary to meet its short sale obligations at a time when fundamental investment considerations would not favor such sales. Short sales may be used with the intent of hedging against the risk of

declines in the market value of the Master Fund's long portfolio, but there can be no assurance that such hedging operations will be successful.

**Risks of Execution of Investment Strategies**.  The Master Fund will invest in a number of securities and obligations that entail substantial inherent risks.  Although the Master Fund will attempt to manage those risks through careful research, ongoing monitoring of investments and appropriate hedging techniques, there can be no assurance that the securities and other instruments purchased by the Master Fund will in fact increase in value or that the Master Fund will not incur significant losses.

**Market Risks and Liquidity.**  The profitability of a significant portion of the Master Fund's investment program depends to a great extent upon correctly assessing the future course of the price movements of securities and other instruments.  There can be no assurance that the Master Fund will be able to predict accurately these price movements.  Although the Master Fund may attempt to mitigate market risk through the use of long and short positions or other methods, there is always some, and occasionally a significant, degree of market risk.

Furthermore, the Master Fund may be adversely affected by a decrease in market liquidity for the instruments in which they invest, which may impair the Master Fund's ability to adjust their position.  The size of the Master Fund's positions may magnify the effect of a decrease in market liquidity for such instruments.  Changes in overall market leverage, deleveraging as a consequence of a decision by a broker to reduce the level of leverage available, or the liquidation by other market participants of the same or similar positions, may also adversely affect the Master Fund's portfolio.  Some of the underlying investments of the Master Fund may not be actively traded and there may be uncertainties involved in the valuation of such investments.  Potential investors should be warned that under such circumstances, the Net Asset Value of the Master Fund may be adversely affected.

**Hedging.**  Although the Master Fund will attempt to hedge its exposure to specific arbitrage positions, it will not always be possible fully to hedge risk from such positions or any other position.  In addition, the Master Fund may take positions based on the expected future direction of the markets without fully hedging the market risks.

**Currency Risks**.  A portion of the Master Fund's assets may be invested in securities denominated in various currencies and in other financial instruments, the price of which is determined with reference to such currencies.  The account of the Master Fund will, however, be valued in U.S. Dollars.  To the extent unhedged, the value of the net assets of the Master Fund will fluctuate with U.S. Dollars exchange rates as well as with price changes of their investments in the various local markets and currencies.  Forward currency contracts and options may be utilized by the Master Fund to hedge against currency fluctuations, but there can be no assurance that such hedging transactions will be effective.

**Counterparty and Settlement Risk.**  Due to the nature of some of the investments which the Master Fund may make, the Master Fund may rely on the ability of the counterparty to a transaction to perform its obligations.  In the event that any such party fails to complete its obligations for any reason, the Master Fund may suffer losses.  The Master Fund will therefore be exposed to a credit risk on the counterparties with which it trades.  The Master Fund will also

bear the risk of settlement default by clearing houses and exchanges. Any default by a counterparty or on settlement could have a material adverse effect on the Master Fund.

**Borrowing**. The Master Fund is permitted to finance its operations with secured and unsecured borrowing up to 100% of its net assets, to the extent allowable under applicable credit regulations. Like other forms of leverage, the use of borrowing can enhance the risk of capital loss in the event of adverse changes in the level of market prices of the assets being financed with the borrowings.

**Distributions**. Since the Fund will not ordinarily make distributions by way of dividends to the Shareholders, all earnings of the Fund are expected to be retained for reinvestment (through the Master Fund).

**Discretion of the Investment Manager; Concentration of Investments**. The Investment Manager will seek to engage in the investment activities described herein. Nonetheless, the Master Fund's portfolio may be altered at any time in the sole discretion of the Investment Manager and without the approval of any investors in the limited partners of the Master Fund, including the Shareholders. Although the Investment Manager will follow a general policy of seeking to spread the Master Fund's capital among a number of investments, the Investment Manager may depart from such policy from time to time and may hold a few, relatively large securities positions in relation to the Master Fund's capital. The result of such concentration of investments is that a loss in any such position could materially reduce the Master Fund's capital.

**Difficult Market for Investment Opportunities**. The activity of identifying, completing and realizing on attractive investments involves a high degree of uncertainty. There can be no assurance that the Master Fund will be able to locate and complete investments which satisfy the Master Fund's rate of return objective or realize upon their values or that the Master Fund will be able to invest fully its subscribed capital in a manner consistent with its investment strategy.

### *TAX RELATED RISKS*

**Uncertainty and Complexity of Tax Treatment**. The tax aspects of an investment in the Fund are complicated and complex and, in many cases, uncertain. Statutory provisions and administrative regulations have been interpreted inconsistently by the courts. Additionally, some statutory provisions remain to be interpreted by administrative regulations. Investors will thus be subject to the risk caused by the uncertainty of the tax consequences with respect to an investment in the Fund. Each prospective investor should have the tax aspects of an investment in the Fund reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and private investment vehicles. Prospective investors are strongly urged to review the discussion below under "*Taxation*" for a more complete discussion of certain of the tax risks inherent in the acquisition of Shares and to consult their own independent tax advisors.

**Risk of Adverse Determination**. There can be no assurance that the conclusions set forth in this Memorandum will not be challenged successfully by the U.S. Internal Revenue Service (the "Service") or another applicable taxing authority, or significantly modified by new legislation, changes in the Service's positions, or court decisions. The Fund has not applied for, nor does it expect to apply for, any advance rulings from the Service or any other applicable taxing authority

with respect to any of the tax consequences described in this Memorandum. No representation or warranty of any kind is made by the Fund or the Investment Manager with respect to the tax consequences relating to an investment in the Fund. The Fund may take positions with respect to certain tax issues which depend on legal conclusions not yet resolved by the Service, other applicable taxing authorities or courts. Should any such positions be successfully challenged by the Service or any other applicable taxing authority, there could be a materially adverse effect on the Fund.

**Tax Audit**. An audit of the Fund by the Service or any other applicable taxing authority could result in adjustments to the tax consequences initially reported by the Fund, which examination could affect the after-tax returns of a shareholder's investment in the Fund. If such audit adjustments result in an increase in the Fund's tax liability for any year, the Fund may also be liable for interest and penalties with respect to the amount of underpayment. The legal and accounting costs incurred in connection with any audit of the Fund's tax returns will be borne by the Fund.

**Tax-Exempt Entities**. Certain prospective investors may be subject to U.S. federal and state laws, rules and regulations that regulate their participation in the Fund, or their engaging directly or indirectly through an investment in the Fund, in certain investment strategies that the Fund (through the Master Fund) may utilize from time-to-time (e.g., short-sales of securities and the use of leverage, the purchase and sale of options and limited diversification). While the Master Fund believes its investment program is generally appropriate for U.S. tax-exempt organizations for which an investment in the Fund would otherwise be suitable, each type of exempt organization may be subject to different laws, rules and regulations, and prospective investors should consult with their own advisers as to the advisability and tax consequences of an investment in the Fund. Investments in the Fund by entities subject to ERISA (as defined below), and other tax-exempt entities, require special consideration. Trustees or administrators of such entities are urged to review carefully the matters discussed in this Memorandum.

**Tax Considerations Taken into Account**. The Investment Manager may take tax considerations into account in determining when the Fund's investments should be sold or otherwise disposed of, and may assume certain market risk and incur certain expenses in this regard to achieve favorable tax treatment of a transaction.

**Adverse Taxation Events**. With respect to certain countries, there is a possibility of expropriation, confiscatory taxation, imposition of withholding or other taxes on dividends, interest, capital gains or other income, limitations on the removal of funds or other assets of the Fund, political or social instability or diplomatic developments that could affect investments in those countries. An issuer of securities may be domiciled in a country other than the country in whose currency the instrument is denominated. The values and relative yields of investments in the securities markets of different countries, and their associated risks, are expected to change independently of each other.

**Shareholder Level Taxation**. Tax consequences to each shareholder will depend on tax laws in that shareholder's jurisdiction. Shareholders should consult their professional advisors as to the possible tax consequences of subscribing for, buying, holding, selling, transferring or redeeming Shares under the laws of their country of citizenship, residence or domicile.

**Possible Law Changes**. No assurance can be given that legislative, administrative or judicial changes that could alter, either prospectively or retroactively, the U.S. tax considerations or risk factors discussed in this Memorandum will not occur. Currently, various proposals in the U.S. Congress, possibly with retroactive effect, are pending which, if enacted, could result in changes in U.S. federal income tax laws that may adversely affect the federal income tax consequences of an investment in the Fund. Prospective investors should seek, and must rely on, the advice of their own advisors with respect to the possible impact on its investment of any future proposed legislation or administrative or judicial action.

*The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Fund. Prospective investors should read this entire Memorandum and consult with their own advisers before deciding to invest in the Fund. In addition, as the investment program of the Master Fund develops and changes over time, an investment in the Fund may be subject to additional and different risk factors. No assurance can be made that profits will be achieved or that substantial losses will not be incurred.*

*In view of the foregoing considerations, an investment in Shares is suitable only for investors who are capable of bearing the relevant investment risks.*

## POTENTIAL CONFLICTS OF INTEREST

### Highland Group & Highland Accounts

Given the nature and size of Highland Capital Management, L.P.'s ("Highland Capital") operations, various potential conflicts of interest arise in connection with its advisory services and the advisory services provided by its affiliates. Information about Highland Capital and its potential conflicts of interest is provided in Highland Capital's Form ADV Part 2 Brochure that can be found by going to https://adviserinfo.sec.gov/IAPD/Default.aspx, searching by firm name and selecting the Part 2 Brochure to be viewed. The Fund is subject to these conflicts of interest, as well as the other items discussed below.

None of the Investment Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees (collectively, the "Highland Group") is precluded from engaging in or owning an interest in other business ventures or investment activities of any kind, whether or not such ventures are competitive with the Fund or the Master Fund. The Investment Manager is permitted to manage other client accounts, and does manage other client accounts, some of which may have objectives similar or identical to those of the Master Fund, including other collective investment vehicles that may be managed by the Highland Group and in which the Investment Manager or any of its affiliates may have an equity interest.

The Fund will be subject to a number of actual and potential conflicts of interest involving the Highland Group including, among other things, the fact that: (i) the Highland Group conducts substantial investment activities for accounts, funds, collateralized debt obligations that invest in leveraged loans (collectively, "CDOs") and other vehicles managed by members of the Highland Group ("Highland Accounts") in which the Fund has no interest; (ii) the Highland Group advises Highland Accounts, which utilize the same, similar or different methodologies as the Fund and may have financial incentives (including, without limitation, as it relates to the composition of

investors in such funds and accounts or to the Highland Group's compensation arrangements) to favor certain Highland Accounts over the Fund and the Master Fund; (iii) the Highland Group may use the strategy described herein in certain Highland Accounts; (iv) the Investment Manager may give advice and recommend securities to, or buy or sell securities for, the Master Fund, which advice or securities may differ from advice given to, or securities recommended or bought or sold for, Highland Accounts; (v) the Investment Manager has the discretion, to the extent permitted under applicable law, to use its affiliates as service providers to the Fund and the Master Fund and the Master Fund's portfolio investments; (vi) certain investors affiliated with the Highland Group may choose to personally invest only in certain funds advised by the Highland Group and the amounts invested by them in such funds is expected to vary significantly; (vii) the Highland Group and Highland Accounts may actively engage in transactions in the same securities sought by the Master Fund and, therefore, may compete with the Master Fund for investment opportunities or may hold positions opposite to positions maintained on behalf of the Master Fund; and (viii) the Investment Manager will devote to the Master Fund and the Fund only as much time as the Investment Manager deems necessary and appropriate to manage the Master Fund's and the Fund's business.

The Investment Manager undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Fund's investors.

**Allocation of Trading Opportunities**

It is the policy of the Investment Manager to allocate investment opportunities fairly and equitably over time. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) fiduciary duties owed to the accounts; (ii) the primary mandate of the accounts; (iii) the capital available to the accounts; (iv) any restrictions on the accounts and the investment opportunity; (v) the sourcing of the investment, size of the investment and amount of follow-on available related to the investment; (vi) whether the risk-return profile of the proposed investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (vii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (viii) liquidity requirements of the account; (ix) potentially adverse tax consequences; (x) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (xi) the need to re-size risk in the account's portfolio.

The Investment Manager has the authority to allocate trades to multiple Highland Accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the Investment Manager may allocate the trades among different accounts on a basis it considers fair and equitable over time. One or more of the foregoing considerations may (and are often expected to) result in allocations among the Master Fund and one or more Highland Accounts on other than a *pari passu* basis. The Investment Manager will allocate investment opportunities across its accounts for which the opportunities are appropriate, consistent with (i) its internal conflict of interest and allocation policies and (ii) the requirements of the Investment Advisers Act of 1940, as amended. The Investment Manager will seek to allocate investment opportunities among such entities in a

manner that is fair and equitable over time and consistent with its allocation policy, a copy of which will be provided upon request. However, there is no assurance that such investment opportunities will be allocated to the Master Fund fairly or equitably in the short-term or over time and there can be no assurance that the Master Fund will be able to participate in all investment opportunities that are suitable for it

The Investment Manager may open "average price" accounts with brokers. In an "average price" account, purchase and sale orders placed during a trading day on behalf of the Investment Manager, the Master Fund, and other accounts managed by the Investment Manager are combined, and securities bought and sold pursuant to such orders are allocated among such accounts on an average price basis.

## Cross Transactions and Principal Transactions

As further described below, the Investment Manager may effect client cross-transactions where the Investment Manager causes a transaction to be effected between the Master Fund and another client advised by it or any of its affiliates. The Investment Manager may engage in a client cross-transaction involving the Master Fund any time that the Investment Manager believes such transaction to be fair to the Master Fund and such other client. By purchasing Shares, a Shareholder is deemed to have consented to such client cross-transactions between the Master Fund and another client of the Investment Manager or one of its affiliates.

The Investment Manager may direct the Master Fund to acquire or dispose of securities in cross trades between the Master Fund and other clients of the Investment Manager or its affiliates in accordance with applicable legal and regulatory requirements. In addition, the Master Fund may invest in securities of obligors or issuers in which the Investment Manager and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Master Fund may enhance the profitability of the Investment Manager's own investments in such companies. Moreover, the Master Fund may invest in assets originated by the Investment Manager or its affiliates. In each such case, the Investment Manager and such affiliates may have a potentially conflicting division of loyalties and responsibilities regarding the Master Fund and the other parties to such trade. Under certain circumstances, the Investment Manager and its affiliates may determine that it is appropriate to avoid such conflicts by selling a security at a fair value that has been calculated pursuant to the Investment Manager's valuation procedures to another client managed or advised by the Investment Manager or such affiliates. In addition, the Investment Manager may enter into agency cross-transactions where it or any of its affiliates acts as broker for the Master Fund and for the other party to the transaction, to the extent permitted under applicable law.

The principal of the Investment Manager, as well as the employees and officers of the Investment Manager and of organizations affiliated with the Investment Manager, may buy and sell securities for their own account or the account of others, but may not buy securities from or sell securities to the Master Fund (such prohibition does not extend to the purchase or sale of Shares of the Fund), unless such purchase or sale is in compliance with the applicable provisions of the Investment Advisers Act of 1940, as amended.

**Conflicts Relating to Equity and Debt Ownership by the Master Fund and Affiliates**

In certain circumstances, the Master Fund and other client accounts may invest in securities or other instruments of the same issuer (or affiliated group of issuers) having a different seniority in the issuer's capital structure. If the issuer becomes insolvent, restructures or suffers financial distress, there may be a conflict between the interests in the Master Fund and those other accounts insofar as the issuer may be unable (or in the case of a restructuring prior to bankruptcy may be expected to be unable) to satisfy the claims of all classes of its creditors and security holders and the Master Fund and such other accounts may have competing claims for the remaining assets of such issuers. Under these circumstances it may not be feasible for the Investment Manager to reconcile the conflicting interests in the Master Fund and such other accounts in a way that protects the Master Fund's interests. Additionally, the Investment Manager or its nominees may in the future hold board or creditors' committee memberships which may require them to vote or take other actions in such capacities that might be conflicting with respect to certain funds managed by the Investment Manager in that such votes or actions may favor the interests of one account over another account. Furthermore, the Investment Manager's fiduciary responsibilities in these capacities might conflict with the best interests of the investors.

**Affiliated Entity Services**

Affiliated entities of the Investment Manager may provide services with respect to the Investment Manager, the Master Fund or the Fund. NexBank, SSB ("NexBank SSB") is an affiliate of the Investment Manager and may, from time to time, provide banking and/or agency services to the Investment Manager, clients of the Investment Manager or collective investment vehicles for which the Investment Manager provides investment advisory services (including the Fund, the Master Fund and other vehicles in which the Fund (through the Master Fund) may invest) or third parties engaged in transactions involving the Investment Manager. NexBank SSB may also act as an agent in connection with certain securities transactions involving the Investment Manager's client accounts (including the Master Fund and other vehicles in which the Master Fund may invest). Principals of the Investment Manager own a majority of the equity interests in NexBank SSB and employees or affiliates of the Investment Manager own or may own a substantial equity interest in NexBank SSB. Certain Master Fund investment transactions may be executed through NexBank Securities, Inc., an affiliate of the Investment Manager and a registered broker-dealer.

Additionally, the Investment Manager or affiliates of the Investment Manager, including, without limitation, Nexbank SSB, NexBank Securities, Inc.,NexBank Capital Advisors and Governance Re, Ltd., may provide financial advisory, management, insurance, title insurance or other services for a fee to portfolio companies in which the Master Fund may have an interest. Highland Latin America Consulting, Ltd., an affiliate of the Investment Manager, has been engaged to provide certain administrative and consulting services to the Investment Manager, as more fully described below in "*Management and Administration – Investment Manager.*"

**Management Fees**

A portion of any Management Fee may be paid to broker-dealers, placement agents or independent third parties, other than the Investment Manager, for services provided in connection with the solicitation of subscriptions from investors. Accordingly, investors should recognize that a

placement agent's or distributor's participation in this offering may be influenced by its interest in such current or future fees and compensation. Investors should consider these potential conflicts of interest in making their investment decisions. Each placement agent shall comply with the legal requirements of the jurisdictions within which it offers and sells Interests.

## Diverse Membership

The Shareholders are expected to include entities, persons, or entities organized in various jurisdictions and subject to different tax and regulatory regimes. Such diverse investors may thus have conflicting investment, tax and other interests, relating to, among other things, the nature of investments made by the Master Fund, the structuring or the acquisition of investments and the timing of disposition of investments. As a result, conflicts of interest may arise in connection with decisions made by the Investment Manager including as to the nature and structure of investments that may be more beneficial for one type of Shareholder than for another type of Shareholder, including Shareholders affiliated with the Investment Manager. The results of the Fund's activities may affect individual Shareholders differently, depending upon their individual financial and tax situations because, for instance, of the timing of an event of realization of gain or loss and its characterization as long-term or short-term gain or loss. In addition, the Master Fund may make investments that may have a negative impact on related investments made by the Shareholders in separate transactions. In selecting, structuring and managing investments appropriate for the Master Fund, the Investment Manager will consider the investment and tax objectives of the Master Fund and the Feeder Funds as a whole, not the investment, tax, or other objectives of any Shareholder individually. However, there can be no assurance that a result will not be more advantageous to some Shareholders than to others or to the Investment Manager and/or its affiliates than to a particular Shareholder.

## Performance Allocation

As described herein, the Master Fund Partnership Agreement provides for the payment of the Management Fee to the Investment Manager and the Performance Allocation to the Investment Manager, in its capacity as the Special Limited Partner. The Performance Allocation may create an incentive for the Investment Manager, as the Special Limited Partner, to make investments that are riskier or more speculative than would be the case in the absence of such Performance Allocation.

## Soft Dollars

The Investment Manager's authority to use "soft dollar" credits generated by the Master Fund's securities transactions to pay for expenses that might otherwise have been borne by the Investment Manager or the Master Fund General Partner may give the Investment Manager an incentive to select brokers or dealers for Master Fund transactions, or to negotiate commission rates or other execution terms, in a manner that takes into account the soft dollar benefits received by the Investment Manager rather than giving exclusive consideration to the interests in the Master Fund. See "*Brokerage and Custody*."

**No Separate Counsel**

Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") serves as counsel to the Fund, the Master Fund, the Investment Manager, the Master Fund General Partner and certain of their Affiliates (the "Clients") in connection with the formation of certain Clients, the offering of Shares as well as certain other matters for which the Clients may engage Akin Gump from time to time. Akin Gump disclaims any obligation to verify the Clients' compliance with their obligations either under applicable law or the governing documents of the Fund. In acting as counsel to the Clients, Akin Gump has not represented and will not represent any shareholders nor does it purport to represent their interests. No independent counsel has been retained to represent the shareholders. In assisting in the preparation of this Memorandum, Akin Gump has relied on information provided by the Fund, the Investment Manager and the Master Fund General Partner and certain of the Fund's other service providers (including, without limitation, biographical data, summaries of market conditions, the planned investment strategy of the Master Fund and the performance of the Master Fund, its investments or any predecessor Fund) without verification and does not express a view as to whether such information is accurate or complete.

Maples and Calder, P.O. Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, acts as Cayman Islands legal counsel to the Fund, the Master Fund and the Master Fund General Partner. In connection with the Fund's offering of Shares and subsequent advice to the Fund, the Master Fund and the Master Fund General Partner, Maples and Calder will not be representing shareholders and/or limited partners. No independent legal counsel has been retained to represent the shareholders and/or limited partners. Maples and Calder's representation of the Fund is limited to specific matters as to which it has been consulted by the Fund. There may exist other matters that could have a bearing on the Master Fund as to which Maples and Calder has not been consulted. In addition, Maples and Calder does not undertake to monitor compliance by the Investment Manager and its affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does Maples and Calder monitor ongoing compliance with applicable laws. In connection with the preparation of this Memorandum, Maples and Calder's responsibility is limited to matters of Cayman Islands law and it does not accept responsibility in relation to any other matters referred to or disclosed in this Memorandum. In the course of advising the Fund, there are times when the interests of shareholders/limited partners may differ from those of the Fund, the Master Fund and/or the Master Fund General Partner. Maples and Calder does not represent the shareholders' and/or the limited partners' interests in resolving these issues. In reviewing this Memorandum, Maples and Calder has relied upon information furnished to it by the Fund and has not investigated or verified the accuracy and completeness of information set forth herein concerning the Fund, the Master Fund and/or the Master Fund General Partner.

**Non-Public Information**

From time to time, the Investment Manager may come into possession of non-public information concerning specific companies although internal structures are in place to prevent the receipt of such information. Under applicable securities laws, this may limit the Investment Manager's flexibility to buy or sell portfolio securities issued by such companies. The Master Fund's investment flexibility may be constrained as a consequence of the Investment Manager's inability to use such information for investment purposes.

**Directors**

The Directors will at all times have regard to their obligations to act in the best interests of the Fund and its Shareholders so far as practicable.  The Directors will seek to ensure that any conflict of interest is resolved fairly and in the interests of the Fund and its Shareholders.

**The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Fund.  Prospective investors should read this entire Memorandum and consult with their own legal, tax and financial advisers before deciding to invest in the Fund.**

# MANAGEMENT AND ADMINISTRATION

## *BOARD OF DIRECTORS*

The Directors are responsible for the overall management and control of the Fund in accordance with its Memorandum and Articles of Association. However, the Directors are not responsible for the day-to-day operations and administration of the Fund, nor are they responsible for making or approving any investment decisions having delegated such investment responsibilities to the Investment Manager pursuant to the Investment Management Agreement, and the day-to-day administrative functions to the Administrator pursuant to the Administration Agreement in accordance with their powers of delegation as set out in the Articles. The Directors will review, on a periodic basis, the performance of the Investment Manager and the Administrator.

Biographical information for each Director is set forth below.

**Claire Kasumba**. Claire serves as an independent director on a wide range of investment structures, including hedge funds, private equity funds, fund of funds and segregated portfolio companies. Claire joined Maples Fiduciary Services (Cayman) Limited ("Maples Fiduciary"), a regulated entity in the Cayman Islands, in 2016 and has over 10 years' legal experience. Claire previously worked as an Associate in the Investment Funds team at Maples and Calder from 2011 where she focused on hedge fund and private equity structuring and formation. Prior to joining Maples and Calder, Claire worked at Nabarro LLP in London in the Funds and Indirect Real Estate team for over five years. During Claire's time at Nabarro LLP, she also completed a six month secondment in the legal department at Aviva Investors. Claire received a Bachelor of Arts degree with first class honours majoring in Economics and Law from the University of Leicester, UK and Göteborgs Universitet, Sweden in 2003. She received a Master of Laws in Commercial and Corporate Law from the University College London, UK. Claire completed her Legal Practice Course in 2005 from BPP Law School, UK. She has been admitted to practice law in England and Wales and the Cayman Islands. Claire also holds an Accredited Director designation from the Institute of Chartered Secretaries and Administrators Canada.

**Martin Laufer**. Martin works at Maples Fiduciary and serves as an independent director on a wide range of alternative investment funds, including fund of funds, hedge funds and unit trusts. Prior to joining Maples Fiduciary, Martin worked for BNY Mellon Fund Management (Cayman) Limited where he was the Financial Fund Manager from 2010 to 2016, providing fiduciary services to a multi-billion dollar portfolio of unit trusts operating as investment funds as well as administration services to a large portfolio of Cayman Islands domiciled hedge funds and fund of funds. Prior to that, Martin worked for CIBC Bank and Trust Company (Cayman) Limited as a Senior Client Accountant. From 2003 to 2007 Martin worked for KPMG Argentina as a Senior Consultant. Martin graduated from Buenos Aires University as a Certified Public Accountant and holds a Master of Business Administration from the International College of the Cayman Islands. He is a CFA Charterholder and a qualified Trust and Estate Practitioner. Martin is a

member of the Society of Trust and Estate Practitioners (STEP), the Cayman Islands CFA Society and the Cayman Islands Institute of Professional Accountants (CIIPA).

**Sophia Dilbert**. Sophia Dilbert serves as an independent director on a wide range of alternative investment funds, including fund of funds, hedge funds, private equity funds and segregated portfolio companies. Sophia works at Maples Fiduciary, which she joined in 2012. Prior to joining Maples Fiduciary, Sophia was Global Head of Legal at Admiral Administration Ltd. in the Cayman Islands, starting there in 2007, where she was responsible for advising on all legal and regulatory matters. Sophia was also responsible for the implementation of global policies and procedures. Prior to that, Sophia worked for Stuart Walker Hersant as a senior associate in the Cayman Islands, specializing in investment funds and general corporate law. Sophia commenced her career with Maples and Calder where she spent eight years as an associate attorney specializing in capital markets and investment funds. Her area of practice also included general corporate and commercial law, real estate, immigration and employment matters. Sophia graduated from the University of Liverpool with a Bachelor of Laws with Honours. She is an Attorney-at-Law and is a member of the Caymanian Bar Association, the Cayman Islands Law Society and the Honourable Society of Middle Temple in the United Kingdom. Sophia has also received the Accredited Director designation from the Chartered Secretaries Canada and is a member of the Cayman Islands Directors Association and the Council of the Cayman Islands Stock Exchange.

The services of Claire Kasumba, Martin Laufer and Sophia Dilbert will be provided by Maples Fiduciary. Maples Fiduciary is an affiliate of Maples and Calder, who will be engaged as the Fund's legal counsel. Maples Fiduciary will enter into a Director Services Agreement with the Fund which sets out the terms on which it will provide the services of Claire Kasumba, Martin Laufer and Sophia Dilbert.

Maples Fiduciary will be entitled to remuneration from the Fund at its customary rates and for reimbursement of its out-of-pocket expenses, including all travelling, hotel and other expenses properly incurred by the Directors supplied by Maples Fiduciary in attending meetings of the Directors or any shareholders meeting held in connection with the business of the Fund.

The Directors provided by Maples Fiduciary are non-executive Directors of the Fund and are not required to devote their full time and attention to the business of the Fund. They may be engaged in any other business and/or be concerned or interested in or act as directors or officers of any other company or entity. Neither Maples Fiduciary nor any of the Directors supplied by Maples Fiduciary will be responsible for (i) the commercial structuring of the Fund or the Master Fund or the Master Fund's investment strategy, (ii) the purchase or sale of any investment on behalf of the Master Fund (which will be the responsibility solely of the Investment Manager), (iii) the valuation of the assets of the Master Fund and the Fund, or (iv) any loss or damage caused by the acts or omissions of the Investment Manager, the Administrator or any of their delegates or sub-delegates unless any such loss or damage is actually occasioned by the actual fraud, willful default or Gross Negligence (as defined in the Director Services Agreement) of the Directors supplied by Maples Fiduciary.

The Director Services Agreement provides that none of Maples Fiduciary nor any of the Directors provided by the Maples Group shall be liable to the Fund under or in connection with the Director Services Agreement in an amount of more than US$5,000,000, except in circumstances where such liability was caused by the actual fraud of Maples Fiduciary or, as the case may be, any of the Directors provided by the Maples Group.

The Articles do not stipulate a retirement age for the Directors and do not provide for retirement of the Directors by rotation. There is no shareholding qualification for the Directors. The Directors are empowered to exercise all of the borrowing powers of the Fund. The borrowing powers of the Fund may be varied by the Directors or by an amendment to the Articles.

The Articles provide that the Fund may, by Ordinary Resolution, remove a Director from office and may, by Ordinary Resolution, appoint a person who is willing to act to be a Director either to fill a vacancy or as an additional Director. The Directors may appoint any person who is willing to act to be a Director, either to fill a vacancy or as an additional Director, provided that the appointment does not cause the number of Directors to exceed any number fixed by or in accordance with the Articles as the maximum number of Directors.

The Articles further provide that the office of a Director shall be vacated if: (a) he becomes prohibited by law from being a Director; (b) he becomes bankrupt or makes any arrangement or composition with his creditors generally; (c) he dies, or is, in the opinion of all his co-Directors, incapable by reason of mental disorder of discharging his duties as Director; (d) he resigns his office by notice to the Company; (e) he has for more than six consecutive months been absent without permission of the Directors from meetings of Directors held during that period and his alternate Director (if any) has not during such period attended any such meetings instead of him, and the Directors resolve that his office be vacated; or (f) he is removed from office by notice addressed to him at his last known address and signed by all his co-Directors.

The Articles provide that, so long as the nature of their interest is or has been declared at the earliest opportunity, a Director or prospective Director may enter into any contract or arrangement with the Fund and such contract or arrangement shall not be liable to be avoided and the Director concerned shall not be liable to account to the Fund for any profit realized by any such contract or arrangement by reason of his holding of that office or the fiduciary relationship so established and may hold any other office or place of profit with the Fund (except that of auditor) in conjunction with the office of Director on such terms as to tenure of office and otherwise as the Directors may determine. Provided that a Director has disclosed his material interest pursuant to the Articles, a Director may vote at any meeting of Directors or of a committee of Directors on any resolution concerning a matter in which he has, directly or indirectly, an interest or duty. The Director shall be counted in the quorum present at a meeting when any such resolution is under consideration and if he votes his vote shall be counted.

As at the date of this Memorandum, no Director nor any connected person has any interest, beneficial or non-beneficial, in the share capital of the Fund nor any material interest in the Shares of the Fund nor any options in respect of such Shares nor in any agreement or arrangement with the Fund. Other than the Investment Management Agreement, there are no contracts or arrangements subsisting at the date of this Memorandum in which a Director of the

Fund is materially interested and which is significant in relation to the business of the Fund. There are no loans or guarantees provided by the Fund to or for the benefit of the Directors as at the date of this Memorandum.

Other than the Investment Management Agreement, no Director has any direct or indirect interest in any contract or arrangement that was either unusual in its nature or significant to the business of the Fund in previous years and remains outstanding.

The Articles provide certain rights of exculpation and indemnification in favor of Directors and officers of the Fund against legal liability and expenses if such persons did not, in connection with the matter giving rise to a particular claim, engage in gross negligence or willful default in the performance of their duties.

The Directors may change any of the Fund's service providers, including the Fund's auditors, without the consent of the Shareholders. In addition, the remuneration being paid to service providers by the Fund (and any other term of their respective service agreements) may be amended by the mutual consent of the Directors and the relevant service providers. This may be necessary from time to time to keep such remuneration in line with the prevailing market rates being charged.

### *INVESTMENT MANAGER*

The Fund's Investment Manager is Highland Capital Management Latin America, L.P., a Cayman Islands exempted limited partnership formed on April 13, 2017. The Investment Manager is responsible for overseeing the investment of the Fund's assets (through the Master Fund) and the distribution of the Shares, subject to the overall control of the Master Fund General Partner. With the approval of the Master Fund General Partner, the Investment Manager may delegate certain of its duties to other companies and entities, which may be affiliated with, or independent of, the Investment Manager. The Investment Manager has power to terminate such appointments and to make other appointments in place of them.

The Investment Manager is a wholly-owned subsidiary of Highland Capital Management, L.P., a Delaware limited partnership and a registered investment adviser with the U.S. Securities Exchange Commission (CRD# 110126 / SEC# 801-54874). As an advisory affiliate of Highland Capital Management, L.P., the Investment Manager is also subject to compliance with the provisions of the U.S. Investment Advisers Act of 1940, as amended.

The Investment Manager is not required to be licensed in the Cayman Islands because it is providing investment management services exclusively to persons that fall within an exemption under the Securities Investment Business Law (Revised) of the Cayman Islands. Accordingly, the Investment Manager has filed an initial declaration of exemption with the Cayman Islands Monetary Authority and will update that filing on an annual basis. The Investment Manager will not provide investment services to any class of person that would require it to be licensed under the Securities Investment Business Law (Revised) without first obtaining such a license. The Investment Manager does not envisage obtaining such a license.

The Investment Manager engaged Highland Latin America Consulting, Ltd., a Cayman Islands exempted company ("Highland Latin America"), a wholly-owned subsidiary of the Investment Manager, to provide certain administrative and consulting services to the Investment Manager related to its management of the Fund, subject to the Services Agreement. The Fund will not be liable for any consulting services provided by Highland Latin America or any consultants or service providers that Highland Latin America engages.

The key investment professionals of the Investment Manager and Highland Latin America who are responsible for the Master Fund's investment activities are described below:

***James Dondero, CFA, CMA, President, Co-Founder***. Mr. Dondero is Co-Founder and President of Highland Capital Management, L.P. and a Director of Highland Latin America GP, Ltd., the general partner of the Investment Manager. Mr. Dondero has over 30 years of experience in the credit and equity markets, focused largely on high-yield and distressed investing. Mr. Dondero is the Chairman and President of NexPoint Residential Trust, Inc. (NYSE:NYRT), Chairman of NexBank Capital, Inc., Cornerstone Healthcare Group Holding, Inc., and CCS Medical, Inc., and a board member of Jernigan Capital, Inc. (NYSE:JCAP), and MGM Holdings, Inc. He also serves on the Southern Methodist University Cox School of Business Executive Board. A dedicated philanthropist, Mr. Dondero actively supports initiatives in education, veterans affairs, and public policy. Prior to founding Highland in 1993, Mr. Dondero was involved in creating the GIC subsidiary of Protective Life, where as Chief Investment Officer he helped take the company from inception to over $2 billion between 1989 and 1993. Between 1985 and 1989, Mr. Dondero was a corporate bond analyst and then portfolio manager at American Express. Mr. Dondero began his career in 1984 as an analyst in the JP Morgan training program. Mr. Dondero graduated from the University of Virginia where he earned highest honors (Beta Gamma Sigma, Beta Alpha Psi) from the McIntire School of Commerce with dual majors in accounting and finance. He has received certification as Certified Public Accountant (CPA) and Certified Managerial Accountant (CMA) and has earned the right to use the Chartered Financial Analyst (CFA) designation.

***Gustavo Prilick.*** Mr. Prilick is a Managing Partner at Highland Capital Brasil and a registered asset manager in Brazil, and is a Director of Highland Latin America GP, Ltd., the general partner of the Investment Manager. He has extensively worked in several of Highland Capital Brasil's portfolio companies in the US mainly as CEO. Prior to his involvement with Highland Capital Brasil, he was a Partner at South America Fund, a private equity firm, mainly focused on providing financial services to export companies in Argentina and Uruguay. Prior to South America Fund, he was the Chief Operating Officer of Millicom International Cellular for 7 years, serving Latin America, Asia, Africa and ten operations in Russia. Prior to Millicom, he served as the Director of International Business for Oracle Corporation where he was responsible for the establishment of most of Oracle's International Subsidiaries on several continents, including the Brazilian operation. Later he became President of Oracle South America with oversight of several countries in South America. He also served as CEO of Nacion Factoring, a subsidiary of Banco Nacion in Argentina building its operations to reach one of the leading positions in the country. Mr. Prilick received an MBA from the Stanford University Graduate School of Business and a degree in Electrical Engineering from Universidad de Buenos Aires. He has also held teaching positions as a visiting professor in several leading Business Schools in Argentina.

Highland Latin America will enter into relationships and agreements with Argentine relevant parties and/or individuals to obtain supporting services for the management of the Fund, the Domestic Fund and the Master Fund, and will enter into consulting agreements with Andrés Pitchón, Julieta Prieto and Javier Casabal pursuant to which these consultants will provide investment and related services to the Feeder Funds and the Master Fund. Mr. Pitchón will provide portfolio management services to the Master Fund under the overall supervision of the Investment Manager.

***Andrés Pitchón***. Mr. Pitchón, through a consulting arrangement with Highland Latin America Consulting, Ltd., provides portfolio management services to the Master Fund. Mr. Pitchón began his career in 1993 as Head of Equity Research for Argentina for MBA-Salomon Brothers and later he also became responsible for Fixed income. As Head of the Research Department his work was recognized by international publications such as Institutional Investor, Latin Finance, The Reuters Survey and The Greenwich Survey. Since 1997 and 1999 he has managed the Fund's equity and fixed income mutual funds. Since 2003 Mr. Pitchón had been Senior Portfolio Manager of the Fund's hedge funds. Mr. Pitchón received a BA degree in IT, focused on Business Administration from the University of Belgrano (1989), together with an academic merit medal for highest GPA in the School of Technology. Mr. Pitchón also received a Master's degree in Business Administration from Anderson Graduate School of Business at UCLA in 1992.

**Investment Management Agreement**

Under the Investment Management Agreement among the Investment Manager, the Master Fund General Partner, the Feeder Funds and the Master Fund, the Investment Manager has agreed to provide investment management and distribution services to the Feeder Funds and the Master Fund in accordance with the investment objective and strategies of the Master Fund, and the selling restrictions, set forth above. The Directors have delegated the following list of authorities to the Investment Manager under the Investment Management Agreement (to be exercised in consultation with the Directors): (i) authority to approve the rescission of a request for voluntary redemption submitted by a Shareholder; (ii) authority to waive any applicable requirements and restrictions in relation to the redemption of Shares by any Shareholder; (iii) authority to waive certain eligibility requirements with respect to any new subscription for participating shares or the transfer of Shares; (iv) authority to waive any of the subscription requirements as set out in this Memorandum with respect to any new subscription for Shares; (v) authority to permit a Shareholder to redeem its Shares at any time in the event that continuing to hold the Shares becomes impractical or illegal, upon a Shareholder's death or total disability, or in order for a Shareholder to avoid materially adverse tax or regulatory consequences; (vi) authority to make in-kind distributions of Fund assets; (vii) authority to approve the establishment of reserves for contingencies and distribution holdbacks; (viii) authority to approve Side Letters; (ix) authority to accept subscriptions below the minimum subscription amount; and (x) authority to accept redemptions of Shares outside the frequency established by the Memorandum and Articles of the Fund.

Under the terms of the Investment Management Agreement, the Fund pays to the Investment Manager, for its services as Investment Manager, a quarterly "Management Fee" as described below.

Management Fee for Series A Shares

The Management Fee is an amount equal to 1.75% per annum of the Net Asset Value of each Series A Share. The Management Fee is calculated monthly based on the Net Asset Value of each Series A Share on the last day of each calendar month (before issuing new Series A Shares related to subscriptions made as of the first day of the immediately succeeding month and before redemptions, if any, made during such calendar month and before deduction of the Management Fee for such quarter) and is payable quarterly in arrears on the last day of each calendar quarter. The Management Fee is paid at the Master Fund level.  The Master Fund will pay the Management Fee in U.S. Dollars promptly following the end of each calendar quarter.  The Management Fee will be deducted in computing the net profit or net loss of the Fund attributed to the Series A Shares.  In the event that the Investment Manager is not acting as Investment Manager for an entire calendar quarter, the Management Fee payable by the Master Fund for such calendar quarter will be prorated to reflect the portion of such calendar quarter in which the Investment Manager is acting as such under the Investment Management Agreement.

The Master Fund General Partner or the Investment Manager may elect to reduce, waive or calculate differently the Management Fee with respect to any Shareholder.  The Investment Manager may assign all or any portion of the Management Fee to any of its affiliates or any other person designated by the Investment Manager in its discretion.

Management Fee for Series B Shares

The Management Fee is an amount equal to 1.25% per annum of the Net Asset Value of each Series B Share. The Management Fee is calculated monthly based on the Net Asset Value of each Series B Share on the last day of each calendar month (before issuing new Series B Shares related to subscriptions made as of the first day of the immediately succeeding month and before redemptions, if any, made during such calendar month and before deduction of the Management Fee for such quarter) and is payable quarterly in arrears on the last day of each calendar quarter. The Management Fee is paid at the Master Fund level.  The Master Fund will pay the Management Fee in U.S. Dollars promptly following the end of each calendar quarter.  The Management Fee will be deducted in computing the net profit or net loss of the Fund attributed to the Series B Shares.  In the event that the Investment Manager is not acting as Investment Manager for an entire calendar quarter, the Management Fee payable by the Master Fund for such calendar quarter will be prorated to reflect the portion of such calendar quarter in which the Investment Manager is acting as such under the Investment Management Agreement.

The Master Fund General Partner or the Investment Manager may elect to reduce, waive or calculate differently the Management Fee with respect to any Shareholder.  The Investment Manager may assign all or any portion of the Management Fee to any of its affiliates or any other person designated by the Investment Manager in its discretion.

<u>Performance Allocation for Series A Shares</u>

Generally, as of the close of each fiscal quarter and subject to the limitations described below, the Performance Allocation is debited against each applicable Master Fund capital sub-account relating to a sub-series of Series A Shares attributable to a Shareholder and simultaneously credited to the Master Fund capital account of the Special Limited Partner. The Performance Allocation is calculated and allocated at the Master Fund level, but is effectively equal to 20.0% of the Net Capital Appreciation (as defined below) of each Series A Share for such fiscal quarter.

The "Net Capital Appreciation" applicable to a Series A Share means the amount by which the Net Asset Value of such Series A Share on the last day of the fiscal quarter (or on the Redemption Day, if applicable) exceeds the higher of the following amounts: (i) the highest Net Asset Value of such Series A Share as of the commencement of any fiscal quarter and (ii) the issue price of such Series A Share (the amount set forth in clause (i) or clause (ii), whichever is higher, the "High Water Mark"). All such calculations include realized and unrealized gains and losses and are made before deduction of the Performance Allocation, but after deduction of the accrued applicable expenses of the Fund and the Master Fund for the applicable period, and in each case adjusted for any subscriptions and redemptions made during the quarter.

Once the Performance Allocation is made to the Special Limited Partner, it will not be returned to the Master Fund if the Net Asset Value of the Series A Shares on which a Performance Allocation has previously been made subsequently declines. The Performance Allocation is allocated based on both realized and unrealized appreciation.

<u>Performance Allocation for Series B Shares</u>

Generally, as of the close of each fiscal quarter and subject to the limitations described below, the Performance Allocation is debited against each applicable Master Fund capital sub-account relating to a sub-series of Series B Shares attributable to a Shareholder and simultaneously credited to the Master Fund capital account of the Special Limited Partner. The Performance Allocation is calculated and allocated at the Master Fund level, but is effectively equal to 17.5% of the Net Capital Appreciation (as defined below) of each Series B Share for such fiscal quarter.

The "Net Capital Appreciation" applicable to a Series B Share means the amount by which the Net Asset Value of such Series B Share on the last day of the fiscal quarter (or on the Redemption Day, if applicable) exceeds the higher of the following amounts: (i) the highest Net Asset Value of such Series B Share as of the commencement of any fiscal quarter and (ii) the issue price of such Series B Share (the amount set forth in clause (i) or clause (ii), whichever is higher, the "High Water Mark"). All such calculations include realized and unrealized gains and losses and are made before deduction of the Performance Allocation, but after deduction of the accrued applicable expenses of the Fund and the Master Fund for the applicable period, and in each case adjusted for any subscriptions and redemptions made during the quarter.

Once the Performance Allocation is made to the Special Limited Partner, it will not be returned to the Master Fund if the Net Asset Value of the Series B Shares on which a Performance

Allocation has previously been made subsequently declines.  The Performance Allocation is allocated based on both realized and unrealized appreciation.

<u>Performance Allocation – General</u>

The Special Limited Partner may assign all or any portion of the Performance Allocation to any of its affiliates or any other person designated by the Special Limited Partner in its discretion.

The Performance Allocation is calculated and allocated at the Master Fund level through the use of separate memorandum sub-accounts with respect to the Fund's capital account in the Master Fund that correspond to each sub-series of the relevant Series of Shares attributable to a Shareholder.  No separate Performance Allocation will be charged at the Fund level.

The Performance Allocation generally will be allocable to the Special Limited Partner after the end of each fiscal quarter and as of any Redemption Day occurring prior to the end of any fiscal quarter.  The Performance Allocation allocated with respect to any Series of Shares redeemed prior to the end of a fiscal quarter will be determined solely by reference to such redeemed Shares and will be allocable to the Special Limited Partner on the Redemption Day.  The Performance Allocation with respect to any Shareholder may be fully or partially waived or rebated by the Master Fund General Partner in its sole discretion.

The Investment Management Agreement provides that, in the absence of gross negligence (as defined under the laws of the State of Delaware), willful misconduct or fraud, each of the Investment Manager, its members, shareholders, partners, managers, directors, any person who controls the Investment Manager, each of the respective affiliates of the foregoing, and each of their respective executors, heirs, assigns, successors and other legal representatives, will be indemnified by the Fund, the Domestic Fund and/or the Master Fund, to the extent permitted by law, against any loss or liability incurred by any of such persons in performing their duties under the Investment Management Agreement.

The Investment Management Agreement is terminable upon the dissolution of any Feeder Fund or the Master Fund or by the holder of the management shares of the Fund upon at least 90 days' prior notice.

**Services Agreement**

Under the Services Agreement between Highland Latin America and the Investment Manager, Highland Latin America has agreed to provide certain administrative and consulting services to the Investment Manager related to its management of the Fund, the Domestic Fund and the Master Fund.  These services include: back- and middle-office services; credit analysis; investment vehicle management; valuation; execution and documentation; marketing; reporting; administrative services; and other ancillary services.

The Services Agreement provides that in the absence of bad faith, gross negligence, fraud or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment), the Investment Manager will, to the extent permitted by law, indemnify and hold

harmless Highland Latin America, any of its affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities incurred by such person in performing their duties under the Services Agreement. The Fund will not be liable for any consulting services provided by Highland Latin America or any consultants or service providers that Highland Latin America engages, and the Fund will not bear any costs or expenses related to the services provided by Highland Latin America.

The Services Agreement will terminate (i) automatically upon the dissolution of the Investment Manager or (ii) at the election of either the Investment Manager or Highland Latin America upon 30 days' notice to the other party.

### *ADMINISTRATOR*

Pursuant to an administration agreement ("Administration Agreement"), the Master Fund has appointed MUFG Fund Services (Cayman) Limited as administrator of the Feeder Funds and the Master Fund (the "Administrator").

MUFG Fund Services is a leading, independent administrator for the alternative investment industry. The Administrator is a Cayman Islands company that is licensed as a Mutual Fund Administrator in the Cayman Islands. It is an indirect wholly owned subsidiary of MUFG Fund Services (Bermuda) Group Limited. The registered office of the Administrator is 2nd Floor Strathvale House, 90 North Church Street, P.O. Box 609, George Town, Grand Cayman KY1-1107, Cayman Islands.

Pursuant to the Administration Agreement, the Administrator is responsible, under the overall supervision of the Master Fund General Partner, for certain matters pertaining to the administration for the Fund, including: (i) maintaining the accounts of the Fund and the Master Fund, (ii) calculating the Master Fund's net asset value, (iii) maintaining the principal corporate records of the Fund and the Master Fund, (iv) communicating with Shareholders, (v) accepting the subscriptions of new Shareholders, (vi) making redemptions of Shares, (vii) maintaining the register of sub-fund investments, (viii) executing sub-fund subscriptions and redemptions as instructed by the Fund, and (ix) ensuring compliance with Cayman Islands law and regulation (including anti-money laundering regulations). For its services, the Administrator receives a fee from the Master Fund.

The Administration Agreement is governed by the law of the Cayman Islands and is subject to termination by the Administrator or the Master Fund upon ninety (90) days' written notice or, under certain circumstances, shorter notice. In such event, the Master Fund may enter into a new agreement with a new administrator on behalf of the Master Fund and the Feeder Funds, in its discretion and on such terms as it deems advisable, without prior notice to, or approval of, investors. Under the Administration Agreement, the Master Fund agrees to indemnify and hold harmless the Administrator and its affiliated persons and delegates, as well as their respective officers, directors, employees and agents for, and to defend and hold each such person harmless from, any and all taxes, claims, demands, actions, suits, judgments, liabilities, losses, damages, costs, charges, counsel fees (on a solicitor and his own client basis), fines, assessments, amounts

paid in settlement and expenses imposed on, incurred by, or asserted against the person which may arise out of or in connection with the Administration Agreement. The Administrator or any other indemnified person will not be indemnified for their own gross negligence, wilful default or fraud.

The Administrator is not responsible for valuing the Master Fund's investments, monitoring any investment restrictions of the Master Fund, determining compliance by the Master Fund with its investment restrictions, the Master Fund's trading activities, the management or performance of the Master Fund, or the accuracy or adequacy of this Memorandum. In addition, the Administrator does not assume any liability to any person or entity, including Shareholders, except as specifically provided in the Administration Agreement. The Administrator may delegate certain services and share information concerning the Fund and its Shareholders with its various non-United States affiliates subject to applicable confidentiality provisions.

**The Administrator has no responsibility with respect to trading activities, the Investment Manager, the management or performance of the Fund, or the accuracy or adequacy of this Memorandum.**

## *BROKERAGE AND CUSTODY*

### Brokerage Arrangements

The Investment Manager will be responsible for the placement of the portfolio transactions of the Master Fund and the negotiation of any commissions or spreads paid on such transactions. Portfolio transactions normally will be effected through brokers on securities exchanges or directly with the issuer, or through an underwriter, or market maker or other dealer for the investments. Portfolio transactions through brokers involve a commission to the broker. Portfolio transactions with dealers typically are priced to include a spread between the bid and the asked price to compensate the dealer. Portfolio transactions will be executed by brokers selected solely by the Investment Manager in its absolute discretion. The Investment Manager is not required to weigh any of these factors equally.

Substantially all of the Master Fund's investments in marketable securities, as well as its cash and cash equivalents, are expected to be held at Société Générale and BNP Paribas Prime Brokerage, Inc. or other prime brokers or custodians selected by the Investment Manager. Instruments not constituting marketable securities generally are recorded through book entry by the borrower or by an agent for the borrower or the creditors. Documentary evidence of the acquisition, ownership and disposition of these assets typically will be held by the Administrator.

Société Générale and BNP Paribas Prime Brokerage, Inc. and other prime brokers or their affiliates may provide capital introduction or other placement services to the Fund and the Investment Manager (with or without separate charges for such other services). In determining which broker-dealer generally provides the best available price and most favorable execution, the Investment Manager considers a totality of circumstances, including price quotes, the size of the transaction, the nature of the market for the financial instrument, the timing of the transaction, difficulty of execution, the broker-dealer's expertise in the specific financial instrument or sector in which the Master Fund seeks to trade, the extent to which the broker-dealer makes a market in

the financial instrument involved or has access to such markets, the broker-dealer's skill in positioning the financial instruments involved, the broker-dealer's promptness of execution, the broker-dealer's financial stability, reputation for diligence, fairness and integrity, quality of service rendered by the broker-dealer in other transactions for the Investment Manager and its respective affiliates, confidentiality considerations, the quality and usefulness of research services and investment ideas presented by the broker-dealer, the broker-dealer's willingness to correct errors, the broker-dealer's ability to accommodate any special execution or order handling requirements that may surround the particular transaction, and other factors deemed appropriate by the Investment Manager. The Investment Manager need not solicit competitive bids and does not have an obligation to seek the lowest available commission cost or spread.

Accordingly, if the Investment Manager concludes that the commissions charged by a broker or the spreads applied by a dealer are reasonable in relation to the quality of services rendered by such broker or dealer (including, without limitation, the value of the brokerage and research products or services provided by such broker or dealer), the Master Fund may pay commissions to, or be subject to spreads applied by, such broker-dealer in an amount greater than the amount another broker-dealer might charge or apply.

The Investment Manager may also execute trades with brokers and dealers with whom the Fund, the Master Fund or the Investment Manager has other business relationships, including prime brokerage, credit relationships and capital introduction or investments by affiliates of the broker-dealers in the Fund or other entities managed by the Investment Manager. However, the Investment Manager does not believe that these other relationships will influence the choice of brokers and dealers who execute trades for the Master Fund.

Research-related goods and services provided by brokers and dealers through which portfolio transactions for the Master Fund are executed, settled and cleared may include research reports on particular industries and companies, economic surveys and analyses, recommendations as to specific securities, certain research services, and other goods and services providing lawful and appropriate assistance to the Investment Manager in the performance of investment decision-making responsibilities on behalf of the Master Fund and related accounts (collectively, "***soft dollar items***").

Soft dollar items may be provided directly by brokers and dealers, by third parties at the direction of brokers and dealers or purchased on behalf of the Master Fund with credits or rebates provided by brokers and dealers. Soft dollar items may arise from over-the-counter principal transactions, as well as exchange traded agency transactions. Brokers and dealers sometimes suggest a level of business they would like to receive in return for the various services they provide. Actual business received by any broker or dealer may be less than the suggested allocations, but can (and often does) exceed the suggestions, because total transaction volume is allocated on the basis of all the considerations described above. A broker or dealer will not be excluded from executing transactions for the Master Fund because it has not been identified as providing soft dollar items.

The use of commissions or "soft dollars" if any, generated by the Master Fund through agency and certain riskless principal transactions to pay for research and research-related products or

services, if any, will fall within the safe harbor created by Section 28(e) of the Securities Exchange Act of 1934, as amended. Under Section 28(e), research products or services obtained with soft dollars generated by the Master Fund may be used by the Investment Manager to service accounts other than the Master Fund. Soft dollars generated in respect of futures, currency and derivatives transactions and principal transactions (that are not riskless principal transactions) do not generally fall within the safe harbor created by Section 28(e) and will be utilized only with respect to research-related products and services for the benefit of the account generating such soft dollars.

Research and brokerage products and services may be used by the Investment Manager in servicing some or all of the Investment Manager's clients. In addition, some research and brokerage may not be used by the Investment Manager in servicing the clients whose commission dollars provided for the research or brokerage. Clients may not, in any particular instance, be the direct or indirect beneficiaries of the research or brokerage provided. Certain clients, who are the beneficiaries of research or brokerage, may have an investment style which results in the generation of a small amount of brokerage commissions due to a lack of active trading for their accounts. As a result, clients who generate sizeable commissions subsidize research or brokerage provided to clients whose accounts generate minimal brokerage commissions since the commission dollars generated by transactions for such clients are not sufficient to pay for research or brokerage that may be received by such clients from other brokers.

In selecting broker-dealers on the basis of the foregoing factors, the Investment Manager may pay a brokerage commission in excess of that which another broker might have charged for effecting the same transaction. In connection therewith, the Investment Manager will make a good faith determination that the amount of commission is reasonable in relation to the value of the research or brokerage services received, viewed in terms of either the specific transaction or the Investment Manager's overall responsibility to its clients. The Investment Manager will regularly evaluate the placement of brokerage services and the reasonableness of commissions paid. Research received from brokers will be supplemental to the Investment Manager's own research efforts. While the receipt of research will not reduce the Investment Manager's normal research activities, the Investment Manager's expenses could increase materially if it attempted to generate such additional research or brokerage services through its own staff, and the Management Fee will not be reduced as a consequence of the receipt of such research or brokerage services or products. As such, the Investment Manager's arrangements for the receipt of research and brokerage services from brokers may create a conflict of interest, in that the Investment Manager may have an incentive to choose a broker-dealer that provides research and brokerage services, instead of one that does not but charges a lower commission rate. In some instances, the Investment Manager receives products and services that may be used for both research and non-research purposes. In such instances, the Investment Manager will make a good faith effort to determine the relative proportion of the products and services used to assist the Investment Manager in carrying out its investment decision-making responsibilities or order execution, including research and brokerage, and the relative proportion used for administrative or other non-research purposes. The proportionate amount of the research attributable to assisting the Investment Manager in carrying out its investment decision-making responsibilities or order execution will be paid through brokerage commissions generated by the Master Fund's

and other client's transactions; the proportionate amount attributable to administrative or other non-research purposes will be paid for by the Investment Manager from its own resources. The receipt of "mixed-use" research and the determination of the appropriate allocation may result in a potential conflict of interest between the Investment Manager and its clients, including the Master Fund.

**Custody**

The majority of the Master Fund's securities are held in the custody of its prime brokers. The Master Fund is eligible for insurance coverage against loss with respect to assets held in the custody of the prime brokers in the event of the bankruptcy or liquidation of either of the prime brokers to the same extent as that broker's other customers. The Master Fund's and the Fund's cash may be held at banks as well as the prime brokers. Ownership interests which are not represented by certificates generally will be recorded through book-entry systems maintained by the issuer or its agent, and the underlying documentation relating to the acquisition and disposition of these assets for the account of the Master Fund will be held at the business offices of the Investment Manager.

## *PAYMENTS TO SERVICE PROVIDERS OF THE FUND*

The Investment Manager may pay (or cause to be paid) fees to persons (whether or not affiliated with the Investment Manager) who are instrumental in the sale of Shares in the Fund. Any such fees will in no event be payable by or chargeable to the Fund or any Shareholder or prospective Shareholder.

## *EXPENSES*

### Operating Expenses

The Fund will bear all costs, fees and expenses arising in connection with the Fund's operations. The Fund also bears its *pro rata* share of the cost of the Master Fund's operations and investments as provided in the Master Fund Partnership Agreement. Expenses payable by the Fund in connection with the Master Fund's investment program, include, but are not limited to, brokerage commissions, other expenses related to buying and selling securities (including trading errors that are not the result of the Investment Manager's gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud), costs of due diligence regardless of whether a particular transaction is consummated, the costs of attending shareholder meetings, research expenses, and costs related to monitoring investments (collectively, the "investment-related expenses"). Expenses payable by the Fund in connection with its operations include, but are not limited to, fees and expenses of advisers and consultants; the Management Fee; fees and expenses of any custodians, escrow or transfer agents or other investment-related service providers; indemnification expenses and the cost of insurance against potential indemnification liabilities; interest and other borrowing expenses; legal, administrative, accounting, tax, audit and insurance expenses; expenses of preparing and distributing reports, financial statements and notices to Shareholders; litigation or other extraordinary expenses; any withholding, transfer or other taxes payable by the Fund (including

any interest and penalties); and the cost of periodically updating the Memorandum.  The Fund will not bear any placement agent fees.

If the Master Fund General Partner or the Investment Manager, as appropriate, incurs any expenses for both the Master Fund and one or more Other Accounts (as defined below), the Master Fund General Partner or the Investment Manager, as appropriate, will allocate such expenses among the Master Fund and each such Other Account in proportion to the size of the investment made by each in the activity or entity to which the expenses relate, or in such other manner as the Master General Partner considers fair and reasonable.

"Other Account" means any assets or investment of the Master Fund General Partner or the Investment Manager, or any assets managed by the Master Fund General Partner, the Investment Manager or any of their respective affiliates for the account of any person or entity (including investment vehicles) other than the Master Fund, which are invested or which are available for investment in securities or other instruments or for trading activities whether or not of the specific type being conducted by the Master Fund.

# DESCRIPTION OF THE FUND'S SHARES

## *GENERAL*

The authorized share capital of the Fund is US$50,000 divided into 100 Management Shares and 4,999,900 Shares, which may be issued in Series. Subject to the provisions of the Articles, the unissued Shares of the Fund are under the control of the Directors who may issue, allot and dispose of or grant options over them to such persons, or on such terms and in such manner as they may think fit and no member has any pre-emptive right to purchase such Shares.

## *MANAGEMENT SHARES*

100 Management Shares are in issue, fully paid and held by the Investment Manager. The Management Shares are not transferable without the prior written consent of the Directors, who do not intend to give such consent except in respect of transfers to affiliates of the Investment Manager. The Management Shares have the entire voting power of the Fund except on a variation of rights issue. However, they do not entitle the holder to participate in the Fund's profits and losses and they are not redeemable. Upon the winding up of the Fund, the holders of Management Shares are entitled to receive their paid in capital of US$0.01 per Management Share.

## *SHARES*

The holders of the Shares have no right to receive notice of or to attend or to vote at general meetings of the Fund and have no other voting rights (except on a variation of rights issue – see the Section below entitled "Rights of Shareholders") but they are entitled to receive, to the exclusion of the holders of the Management Shares, any dividends that may be declared by the Fund and, upon the winding up of the Fund, the full amount of the assets of the Fund available for the distribution (after all debts and liabilities of the Fund have been paid) will be distributed to registered holders of Shares other than the paid in capital in respect of the Management Shares of US$0.01 per Management Share. Shares, when issued, will be fully paid. Within each Series, all Shares (excluding Management Shares) of the Fund have equal dividend, distribution and liquidation rights.

Any dividend which cannot be paid to a Shareholder and/or which remains unclaimed after six months from the date of declaration of such dividend may, in the discretion of the Directors, be paid into a separate account in the Fund's name, provided that the Fund shall not be constituted as a trustee in respect of that account and the dividend shall remain as a debt due to the Shareholder. Any dividend which remains unclaimed after a period of six years from the date of declaration of such dividend shall be forfeited and shall revert to the Fund.

The issue of the Series A Shares was authorized by resolution of the Directors passed on May 22, 2006. The Series A Shares each have a par value of US$0.01 per share and carry identical rights.

The issue of the Series B Shares was authorized by resolution of the Directors passed on February 28, 2013. The Series B Shares each have a par value of US$0.01 per share and carry identical rights.

The Directors may designate further Series of Shares in the future that will be attributable to the single underlying portfolio of the Fund (held through the Master Fund). Each additional Series of Shares may be offered on different terms from the Shares being offered pursuant to this Memorandum (including the offering of Shares in a different currency) and any additional Series of Shares may rank in priority to, or equally with, the outstanding Series of Shares, but within each new Series, all Shares will have equal dividend, distribution and liquidation rights. Additionally, the Fund may, for administrative convenience, issue sub-series of Shares, and in this Memorandum, unless the context requires otherwise, references in this Memorandum to the term "Series" shall include any sub-series derived from that Series.

### RECORDS

The Fund shall establish in its books a separate record with its own distinct designation for each Series of Shares. The proceeds from the allotment and issue of each Series of Shares shall be applied in the books of the Fund to the record established for that Series of Shares. The assets, profits, gains, income and liabilities, losses and expenses attributable to a particular Series shall be applied to the record relating to such Series at the end of each fiscal period – see the Section headed "Financial Information and Reports – Fiscal Periods" below.

### RIGHTS OF SHAREHOLDERS

All shareholders are entitled to the benefit of, are bound by and are deemed to have notice of the provisions of the Memorandum and Articles of the Fund.

Under the terms of the Fund's Memorandum of Association and Articles, the liability of the Shareholders is limited to any amount unpaid on their Shares. As the Shares can only be issued if they are fully paid, the Shareholders will not be liable for any debt, obligation or default of the Fund beyond their interest in the Fund.

The Fund's objects are set out in clause 3 of its Memorandum of Association and are unrestricted.

The Fund's Articles have been drafted in broad and flexible terms to allow the Directors the authority to, in their discretion, determine a number of issues including the period of notice to be given for redemptions and whether or not to charge subscription or redemption fees, generally or in any particular case. In approving the offering of Shares on the terms set out in this Memorandum, the Directors have exercised a number of these discretions in accordance with the Fund's Articles.

As an exempted company, the Fund is not required to hold scheduled annual general meetings of Shareholders. General meetings of the holders of Management Shares may be called by the Directors and will be called at the request of the holders of Management Shares holding a simple

majority of the outstanding Management Shares in issue. All meetings of the holders of Management Shares will be held in the Cayman Islands, or such other location as the Directors will determine. All meetings of the holders of Management Shares require 7 days' prior notice. Notice may be sent by hand, mail, fax or email, or alternatively, where the recipient has agreed, by posting the notice on a secure nominated web-site.

Except where a Special Resolution is otherwise required by the Companies Law, all decisions of the holders of Management Shares will be made by an Ordinary Resolution, provided that a quorum of the holders of one-third of the Management Shares is present by proxy or in person at the meeting. Any matter referred to herein may also be adopted by resolution in writing of all the holders of Management Shares.

The rights attaching to any Series of Shares may, whether or not the Fund is being wound up, be varied with the consent in writing of the holders of two-thirds of the issued Shares of that Series, or with the sanction of a resolution passed by a two-thirds majority of the holders of the issued Shares of that Series, at a separate meeting of the holders of the Shares of that Series.

Any Series of Shares may be converted into a different Series of Shares with the consent in writing of the holders of two-thirds of the issued Shares of that Series, or with the sanction of a resolution passed by a two-thirds majority of the holders of the issued Shares of that Series, at a separate meeting of the holders of the Shares of that Series.

Further, subject to and in so far as permitted by the provisions of the Companies Law, the Fund may from time to time by Ordinary Resolution alter or amend its memorandum of association to: increase its share capital by such sum as the resolution shall prescribe and with such rights, priorities and privileges annexed thereto as set out in such Ordinary Resolution; consolidate and divide all or any of its share capital into shares of larger amounts than its existing shares; convert all or any of its paid-up shares into stock and reconvert that stock into paid-up shares of any denomination; sub-divide its existing shares, or any of them, into shares of smaller amounts than is fixed by the Memorandum; and cancel any shares which, at the date of the passing of the resolution, have not been taken or agreed to be taken by any person, and diminish the amount of its share capital by the amount of the shares so cancelled.

The Shares have no conversion or pre-emptive rights. All Shares of the Fund, when duly issued, will be fully paid and non-assessable.

From time to time, the Fund, by an Ordinary Resolution, may increase its authorized share capital in order to have a substantial number of Shares available at all times for issuance.

The Memorandum of Association and the Articles may be amended, and the Fund may be wound up at any time, upon the passing of a Special Resolution by the holders of the Management Shares.

# SUBSCRIPTION, REDEMPTION AND TRANSFER OF SHARES

## *SUBSCRIPTION FOR SHARES*

### Offering of Shares

The Fund is conducting an offering of its Series A Shares and Series B Shares to a limited number of experienced and sophisticated investors who are Eligible Investors. The purchase of Series A Shares and Series B Shares is not open to the general public and Series A Shares and Series B Shares will be privately offered only to Eligible Investors. The description of an Eligible Investor is set forth in the Subscription Documents.

The minimum initial and subsequent investment for the Series A Shares and Series B Shares is US$500,000 or, in each case, such other amount as the Investment Manager may in its sole discretion determine in respect of a particular Shareholder or group of Shareholders, subject to the Listing Rules of the Exchange but not below US$100,000 in respect of Series B Shares.

The Series A Shares are to be listed on the Exchange by way of an offer for subscription.

The Fund has not applied for the Series B Shares to be admitted to: (i) the Official List of The International Stock Exchange; or (ii) listing on any other stock exchange, and no such application is proposed or expected to be made.

### Offer Price, Initial and Subsequent Issuance

The Series A Shares and Series B Shares offered pursuant to this Memorandum are available for issue to Eligible Investors at a Subscription Price based on the Net Asset Value per Share of such Series on the Valuation Day that occurs after the Subscription Documents are received and approved by the Fund and immediately preceding the relevant Subscription Day, as calculated in accordance with the Articles and described herein.

Shares will be issued on each Subscription Day at the Directors' sole discretion. Applications for Shares must be received by 5 pm (Cayman Islands time) no later than the first Business Day before each Subscription Day and payment for such subscriptions (inclusive of any initial charge) must be received by the Administrator in cleared funds in U.S. Dollars at least no later than the Business Day before each Subscription Day in order for Shares to be issued on such Subscription Day. If any application or payment is received late it will be dealt with on the next Subscription Day.

**Payment**

Payment for Shares must be made in cash by electronic transfer, net of bank charges, and is due in cleared funds in U.S. Dollars.  Payment must be sent to the bank details noted on the Subscription Documents.

The Directors may however accept subscriptions in kind.  No subscriptions in kind will be accepted unless the Directors are satisfied that:

(i)      the investments to be transferred are valued in accordance with the valuation provisions set out in the Articles and summarized herein; and

(ii)     the terms of any such transfer shall not materially prejudice the remaining Shareholders.

In the event that subscription monies are received in any currency other than U.S. Dollars, conversion into U.S. Dollars will be arranged by the Administrator at the risk and expense of the applicant.  Any bank charges in respect of electronic transfers will be deducted from subscriptions and the net amount only invested in Shares.

**Prevention of Money Laundering**

 In order to comply with legislation or regulations aimed at the prevention of money laundering, the Fund is required to adopt and maintain anti-money laundering procedures, and may require subscribers to provide evidence to verify their identity and source of funds.  Where permitted, and subject to certain conditions, the Fund may also delegate the maintenance of its anti-money laundering procedures (including the acquisition of due diligence information) to a suitable person.

The Fund, and the Administrator on the Fund's behalf, reserve the right to request such information as is necessary to verify the identity of a Shareholder (i.e. a subscriber or a transferee).  Where the circumstances permit, the Fund, or the Administrator on the Fund's behalf, may be satisfied that full due diligence may not be required where an exemption applies under the Money Laundering Regulations (Revised) of the Cayman Islands, as amended and revised from time to time or any other applicable law.

In the event of delay or failure on the part of the subscriber in producing any information required for verification purposes, the Fund, or the Administrator on the Fund's behalf, may refuse to accept the application, in which case any funds received will be returned without interest to the account from which they were originally debited.

The Fund, and the Administrator on the Fund's behalf, also reserve the right to refuse to make any redemption or dividend payment to a Shareholder if the Directors or the Administrator suspect or are advised that the payment of redemption or dividend proceeds to such Shareholder may be non-compliant with applicable laws or regulations, or if such refusal is considered necessary or appropriate to ensure the compliance by the Fund or the Administrator with any applicable laws or regulations.

If any person resident in the Cayman Islands knows or suspects or has reasonable grounds for knowing or suspecting that another person is engaged in criminal conduct or money laundering or is involved with terrorism or terrorist financing and property and the information for that knowledge or suspicion came to their attention in the course of business in the regulated sector, or other trade, profession, business or employment, the person will be required to report such knowledge or suspicion to (i) the Financial Reporting Authority of the Cayman Islands, pursuant to the Proceeds of Crime Law (Revised) of the Cayman Islands if the disclosure relates to criminal conduct or money laundering, or (ii) a police officer of the rank of constable or higher, or the Financial Reporting Authority, pursuant to the Terrorism Law (Revised) of the Cayman Islands, if the disclosure relates to involvement with terrorism or terrorist financing and property. Such a report shall not be treated as a breach of confidence or of any restriction upon the disclosure of information imposed by any enactment or otherwise.

**Procedure for the Purchase of Shares**

Applications are subject to the terms of this Memorandum, the Memorandum of Association and Articles of the Fund, the accompanying Subscription Documents and the Master Fund Partnership Agreement.

Only Eligible Investors may subscribe for Shares. Shares may only be issued in the names of companies, partnerships or individuals.  Further, Shares purchased for those under 18 years of age must be registered in the name of the parent or legal guardian.

Application must be made in the form of the accompanying Subscription Documents, which should be sent to the Administrator at the address or facsimile number set forth in the Subscription Documents.

Where applications are made by facsimile, the original written form should be forwarded without delay to the Administrator.  Shares will not be issued until the original Subscription Documents and all other relevant due diligence documents have been received by the Administrator.

Shares will be issued to two decimal places and any smaller fractions of a Share that would otherwise arise will be rounded down, with the relevant subscription monies being retained for the benefit of the Fund.

Any application may be rejected or scaled down in the absolute discretion of the Directors. Where applications are scaled down or rejected, subscription monies received by the Fund will be returned to the account from where the monies were initially remitted, without interest.

**Form of Shareholding**

Shares will be held in registered form.  Share certificates will generally not be issued nor will any other documentation be issued, other than confirmation notices.  Confirmation notices will include a Shareholder Identification number and details of the Shares that have been allotted. However, confirmation notices will be sent to subscribers only after approval of their

Subscription Documents and satisfactory completion of due diligence. Share certificates will only be issued if an investor can demonstrate to the Directors or any authorised agent of the Fund that he is legally required to hold certificated shares. Certificates will be issued in registered form only. If a valid request for share certificates is made, certificates representing Shares will normally be dispatched at the applicant's risk within 28 days to the address specified in the Subscription Documents. Temporary certificates of title will not be issued.

### *REDEMPTION OF SHARES*

### General

Series A Shares and Series B Shares may be redeemed on any Redemption Day at the Redemption Price; provided that partial redemptions may be made only in minimum amounts of US$100,000.

If a holder of Series A Shares or Series B Shares requests a redemption that would cause its total investment in the Series A Shares or Series B Shares to fall below a minimum of US$100,000, such shareholder will be required by the Investment Manager to redeem all of its Series A Shares or Series B Shares.

Shareholders wishing to redeem their Series A Shares or Series B Shares should deliver an executed Redemption Request to the Administrator, at the address specified in the Redemption Request. The completed Redemption Request must be actually received by the Administrator no later than the 30th calendar day before the Redemption Day on which the redemption is to be effected, and if received thereafter will be held over and dealt with on the next Redemption Day. The Directors may provide for a redemption notice period of less than 30 calendar days in a particular case or generally if, in their discretion, they determine that, under the circumstances, to waive such requirement will not have an adverse effect on the Master Fund's portfolio. In no event, however, will redemption requests be accepted for processing as of a particular Redemption Day if the Redemption Form is received by the Administrator after 5 pm (Cayman Islands time) on such Redemption Day.

The Redemption Request may be delivered to the Administrator by facsimile, so long as the original Redemption Request is immediately forwarded to the Administrator. None of the Fund, the Directors, the Administrator or any other agents of the Fund accepts any responsibility for any errors in facsimile transmissions. Where a Redemption Request is forwarded by facsimile, no redemption proceeds will be paid to the Shareholder until the original Redemption Request for the Shares being redeemed has been received by the Administrator.

Cayman Islands law imposes certain restrictions on the redemption of Shares, particularly where the Fund is not funding such redemption out of profits or the proceeds of fresh issues of Shares made for the purposes of redemption. In particular, any redemption payment out of capital will only be possible if the Fund remains able to pay its debts as they fall due in the ordinary course of business after such redemption payment is made out of capital.

The Fund, or the Administrator on its behalf, also reserves the right to refuse to make any redemption payment or distribution to a Shareholder if any of the Directors of the Fund or the

Administrator suspects or is advised that the payment of any redemption or distribution moneys to such Shareholder might result in a breach or violation of any applicable anti-money laundering or other laws or regulations by any person in any relevant jurisdiction, or such refusal is considered necessary or appropriate to ensure the compliance by the Fund, its Directors or the Administrator with any such laws or regulations in any relevant jurisdiction.

Once given, a Redemption Request may not be revoked by the Shareholder save where determination of the Net Asset Value is suspended by the Directors in the circumstances set out below or except as otherwise agreed by the Directors.

Notwithstanding anything herein to the contrary, the Special Limited Partner may, unless prohibited by law, make withdrawals of all or any part of its Performance Allocation and gains thereon from its capital account in the Master Fund as of any Redemption Day.

On giving at least 30 calendar days' notice to Shareholders, the Directors may amend the frequency of redemptions, provided that such change shall only take effect following the Redemption Day next succeeding such notice.

Should any violation of any of the Master Fund's investment limitations fail to be remedied on or before the Remedy Date, any Shareholder may redeem all or part of its Shares on the next Redemption Day and will not be subject to any early redemption fee, provided that such Shareholder has requested such a redemption in writing within 30 Business Days after the Remedy Date.  See "Investment Restrictions."

**Soft Lock-Up Period and Early Redemption Fee**

Any Shareholder who redeems Series B Shares prior to the first anniversary of its purchase of such Series B Shares may be assessed an early redemption fee of up to 3% of the Net Asset Value per Series B Share prevailing at the close of business of such Redemption Day, payable to the Fund.  For purposes hereof, an anniversary shall occur on the 365th consecutive day (counting the closing date as the first day) or, if such 365th day is not a Business Day, the immediately preceding Business Day.

**Redemption Proceeds**

At redemption, Shareholders will be paid the Redemption Price, which is calculated in accordance with the Articles and is based on the Net Asset Value per Share on the applicable Redemption Day.

The Redemption Price will be paid in U.S. Dollars by electronic transfer at the request and expense of the redeeming Shareholder usually within 10 Business Days of the relevant Redemption Day.

The Fund aims to effect the payment of all redemption proceeds in cash.  However, the Directors under circumstances of low liquidity or adverse market conditions may elect to effect the payment of the redemptions in assets of the Fund (received from the Master Fund).  No Investment will be transferred to a Shareholder unless the Directors are satisfied that:

(i)     the value of the investments to be transferred, calculated in accordance with the valuation provisions set out in the Articles and summarized herein, is equal to and does not exceed the Net Asset Value of the Shares to be redeemed less all fiscal duties and charges arising in connection with the vesting of such Investments in the Shareholder; and

(ii)    the terms of any such transfer do not materially prejudice the interests of the remaining Shareholders.

Investments may be transferred directly to the redeeming Shareholder or may be transferred to a liquidating account and sold by the Fund for the benefit of the redeeming Shareholder, in which case payment of that proportion of the Redemption Price attributable to such investments will be delayed until such Investments are sold and the amount payable in respect of such Investments will depend on the performance of such Investments through to the date on which they are sold. The cost of operating the liquidating account and selling the Investment(s) will be deducted from the proceeds of sale paid to the redeeming Shareholder.

**Compulsory Redemption**

Shareholders are required to notify the Fund and the Administrator immediately in the event that they cease to be Eligible Investors whereupon they may be required to, and the Fund shall be entitled to redeem their Shares at the Net Asset Value per Share as at the next Redemption Day succeeding the date of such notification. The Fund reserves the right to redeem any Shares that are or become owned, directly or indirectly, by or for the benefit of any person who is not an Eligible Investor.

Further, the Fund shall be entitled, with or without cause, by notice in writing to the Shareholders being redeemed, to redeem all or any Shares on any day designated by the Directors, provided that any such Redemption Day shall be not less than 7 days from the date of such notice (or immediately if the Fund, in its sole discretion, determines that such Shareholder's continued investment in the Fund may cause the Fund, the Master Fund, the Master Fund General Partner or the Investment Manager to violate any applicable law).

For the avoidance of doubt, no early redemption fee will apply in the event of a compulsory redemption.

### *DETERMINATION OF NET ASSET VALUE*

The Net Asset Value of each Series and the Net Asset Value per Share will be calculated, based on the calculation of the Master Fund's assets, by the Administrator as of the close of business on each Valuation Day in accordance with the valuation policies of the Investment Manager in effect from time to time, as summarized below, a copy of which will be made available upon request. The Net Asset Value of a Share of the relevant Series will be calculated by dividing the assets of the Fund attributable to the Series to which such Share belongs, less the liabilities attributable to such Series, by the number of Shares of such Series in issue.

The value of the assets of the Fund will be determined on the accrual basis of accounting using IFRS (except for amortization of organizational costs) as a guideline, unless otherwise deemed appropriate in the discretion of the Directors, and in accordance with the principles set out in the Articles and summarized below.

**Assets**

The assets of the Fund shall be deemed to include, without limitation, (1) all cash on hand or on deposit, including any interest accrued thereon, (2) all bills and demand notes and accounts receivable (including proceeds of investments and other assets sold but not delivered), (3) all investments and other assets owned or contracted for by the Fund (through the Master Fund), (4) all dividends and distributions payable in stock, cash or other property receivable by the Fund (through the Master Fund), provided that the Administrator may make adjustments with respect to fluctuations in the market value of investments caused by trading ex-dividend or ex-rights or by similar practices, (5) all interest accrued on any interest-bearing instruments owned by the Fund (through the Master Fund), except to the extent that the same is included or reflected in the valuation of such instruments, and (6) all other assets of every kind and nature, including prepaid expenses (it being understood that goodwill shall be deemed to have no value).

**Liabilities**

The liabilities of the Fund shall be deemed to include, without limitation, (1) all loans, bills and accounts payable, (2) all accrued or payable expenses and fees chargeable to the Fund including dividends declared but unpaid and amortized organizational expenses (provided that expenses of a regular or recurring nature may be calculated on an estimated figure for yearly or other periods in advance and accrued over any such period) and accrued Management Fees and Performance Allocations (each borne at the Master Fund level), (3) its *pro rata* portion of gross acquisition cost of Investments and other property contracted to be purchased by the Master Fund, (4) such sum (if any) as the Directors consider appropriate to allow for brokerage, stamp duty and any other governmental tax or charges, (5) dividends declared on the Shares, but not yet paid, and (6) all other liabilities, including unknown or unfixed contingencies and such reserves as the Directors may reasonably deem advisable.

**Valuations**

Positions in Investments held by the Master Fund shall be valued in accordance with the valuation policies of the Investment Manager, as amended from time to time, a copy of which will be provided upon request.

Values of assets expressed in a currency other than U.S. Dollars will be converted into U.S. Dollars at the latest available exchange rate.

The Administrator will notify the Exchange, immediately upon calculation, of the Net Asset Value per Share on each Valuation Day.

### *TEMPORARY SUSPENSION OF DEALINGS*

The Directors may, at any time, suspend (i) the calculation of Net Asset Value of the Shares (and the applicable Valuation Day); (ii) the issuance of Shares; (iii) the redemption by Shareholders of Shares (and the applicable Redemption Day); and/or (iv) the payment of redemption proceeds (even if the Valuation Days and Redemption Days are not postponed) (each, a "Suspension") during any period which:

(a)     any stock exchange on which a substantial part of Investments owned by the Fund (through the Master Fund) are traded is closed, other than for ordinary holidays, or dealings thereon are restricted or suspended;

(b)     there exists any state of affairs as a result of which (i) disposal of a substantial part of the Investments owned by the Fund (through the Master Fund) would not be reasonably practicable and might seriously prejudice the Shareholders or (ii) it is not reasonably practicable for the Fund fairly to determine the value of its net assets;

(c)     none of the Redemption Requests which have been made may lawfully be satisfied by the Fund in U.S. Dollars;

(d)     there is a breakdown in the means of communication normally employed in determining the prices of a substantial part of the Investments of the Fund (through the Master Fund);

(e)     in the sole discretion of the Directors, it is necessary to preserve the Fund's assets; or

(f)     automatically upon any suspension of withdrawals by the Master Fund for similar reasons.

During such period, the valuation, sale, purchase and redemption of Shares will be suspended. The Administrator will promptly notify each Shareholder who has submitted a Redemption Request and to whom payment in full of the amount being redeemed has not yet been remitted of any Suspension of redemptions or Suspension of the payment of redemption proceeds.  Any remaining amount of a Redemption Request that is not satisfied due to such a Suspension remains at risk as per other amounts invested in the Fund and subject to the applicable Management Fee until such amount is finally and fully withdrawn.  Such Shareholders will not be given any priority with respect to the redemption of Shares after the cause for such Suspension or limitation ceases to exist.  The Directors may in their sole discretion, however, permit such Shareholders to withdraw their Redemption Requests to the extent that the relevant Redemption Day has not yet passed.  For the avoidance of doubt, where a Suspension of the payment of redemption proceeds is declared between the relevant Redemption Day and the remittance of such payment proceeds, affected Shareholders shall not have any right to withdraw their Redemption Requests.  Upon the reasonable determination by the Directors that conditions leading to a Suspension no longer apply, the Administrator will notify the Shareholders of the end of the Suspension.  At such time, any such suspended payments shall generally be paid in accordance with the normal process for making such payments, redemption rights shall be promptly reinstated and any pending Redemption Requests which were not withdrawn (or new,

timely Redemption Requests) will be effected as of the first Redemption Day following the removal of the Suspension, subject to the foregoing restrictions on redemptions.

In addition, the Directors have the right to postpone the calculation of the Net Asset Value date up to one Business Day without the requirement to give notice to Shareholders when, in the opinion of the Directors, a significant proportion of the assets (which is five percent or more) of the Fund cannot be valued on an equitable basis and such difficulty is expected by the Directors to be overcome within that period.

### *TRANSFER OF SHARES*

Shares may not be transferred without the prior written consent of the Directors, which consent may be withheld by the Directors in their absolute discretion.  Furthermore, transfers of Shares may only be conducted in accordance with the anti-money laundering policies and procedures of the Administrator.  A transferee will be required to complete the Subscription Documents and will be subject to the requirements set forth for Eligible Investors in the Fund.

# FINANCIAL INFORMATION AND REPORTS

### *FISCAL YEAR*

The fiscal year of the Fund ends on December 31 of each year.

### *FISCAL PERIODS*

Since Shares may be issued and redeemed, and dividends may be declared on Shares, during the course of a fiscal year, the Fund's Articles of Association provide for fiscal periods, which are portions of a fiscal year, for the purpose of allocating net profits and net losses to the records maintained for each Series. A new fiscal period will commence on the date next following the date of any redemption of Shares, the date of any issuance of Shares and the date established by the Directors for determining the record ownership of Shares of any Series for the payment of dividends, and the prior fiscal period will terminate on the date immediately preceding the first day of a new fiscal period.

### *FINANCIAL STATEMENTS*

The Fund's financial statements will be prepared using IFRS as a guideline, unless otherwise deemed appropriate in the sole discretion of the Directors. The books and records of the Fund will be audited at the end of each fiscal year by auditors selected by the Directors.

As a regulated mutual fund, the Fund is required to file copies of its audited financial statements with the Monetary Authority within 180 days of the end of each financial year.

### *AUDITORS*

PricewaterhouseCoopers LLP are the auditors for the Fund and have consented in writing to their appointment as auditors of the Fund and to all references to them as such in this Memorandum. The Directors may replace the auditors without prior notice to the Shareholders.

### *REPORTS TO SHAREHOLDERS*

Each year, Shareholders will be sent audited financial statements of the Fund within 120 days of the end of the year (or as soon as practicable thereafter) including a statement of profit or loss for such fiscal year and of an unaudited status of such Shareholder's holdings in the Fund at such time. Shareholders will also receive, upon making a request to the Administrator, copies of semi-annual financial statements of the Fund. In addition, the Net Asset Value of the Fund's listed Shares will be notified to the Exchange monthly and these net asset valuations are available to subscribers to the Reuters network.

# TAXATION

### *GENERAL*

The following is a general discussion of certain of the anticipated income tax considerations relevant to Non-U.S. Shareholders (as defined below) and to certain Tax-Exempt U.S. Shareholders (as defined below) arising from the purchase, ownership and disposition of Shares. Prospective investors should consult their own tax advisors to determine the application and effect of tax laws with respect to their own particular circumstances. This discussion is based on the U.S. Internal Revenue Code of 1986, as amended (the "Code"), Treasury Regulations (the "Treasury Regulations") promulgated thereunder in force on the date of this Memorandum, and administrative and judicial interpretations thereof, all as currently in effect, all of which may change or be subject to different interpretations, possibly with retroactive effect. The Fund does not intend to seek a ruling from the Service, or any similar state or local authority, with respect to any of the tax issues affecting the Fund.

In view of the number of different jurisdictions where local laws may apply to Shareholders, the discussion below does not address all the tax consequences to potential investors of the purchase, ownership, and disposition of Shares. Prospective investors are urged to consult their own tax advisors in determining the possible tax consequences to them under the laws of the jurisdictions of which they are citizens, residents or domiciliaries, jurisdictions in which they conduct business and jurisdictions in which they hold Shares. This discussion does not constitute tax advice.

This summary does not address all of the tax consequences that may be relevant to a particular investor, nor does it address, unless specifically indicated, the tax consequences to, among others (i) persons that may be subject to special treatment under U.S. federal income tax law, including, but not limited to, banks, insurance companies, thrift institutions, regulated investment companies, real estate investment trusts and dealers in securities or currencies, (ii) persons that will hold Shares as part of a position in a "straddle" or as part of a "hedging," "conversion" or other integrated investment transaction for U.S. federal income tax purposes, (iii) persons whose functional currency is not the U.S. Dollar or (iv) persons that do not hold Shares as capital assets within the meaning of Code Section 1221.

If a partnership holds Shares, the tax treatment of a partner in such partnership will generally depend upon the status of the partner and the activities of the partnership. Prospective investors who are partners of a partnership should consult their own tax advisors.

This summary assumes that only persons that are *not* "United States persons" as defined in Code Section 7701(a)(30) (such investors, "Non-U.S. Shareholders") and organizations that are exempt from U.S. federal income tax under Section 501(a) of the Code (such investors, "Tax-Exempt U.S. Shareholders") will invest in the Fund.

The summary assumes that no U.S. taxable investors will invest in the Fund and, therefore, does not address the U.S. tax consequences to such investors. Potential U.S. taxable investors should be aware that the Fund is expected to be a passive foreign investment company for U.S. federal income tax purposes (a "PFIC") and does not intend to provide information to any U.S. person for purposes of such person qualifying to make an election to treat the Fund as a "qualifying electing fund" ("QEF") for U.S. federal income tax purposes. Accordingly, potential U.S. investors are urged to consult their own tax advisors in this regard.

Unless the context indicates otherwise, the activities and tax items of the Fund will include the activities of the Master Fund, and the Fund's distributive share of the Master Fund's tax items, as applicable.

EACH PROSPECTIVE INVESTOR IS URGED TO CONSULT ITS TAX ADVISOR IN ORDER TO FULLY UNDERSTAND THE U.S. FEDERAL, STATE, LOCAL AND/OR NON-U.S. TAX CONSEQUENCES OF AN INVESTMENT IN THE FUND.

## *UNITED STATES*

### Classification and Taxation of the Fund and the Master Fund

The Fund is expected to be treated as a non-U.S. corporation for U.S. federal income tax purposes. The Master Fund is expected to be treated as a partnership, and not as an association taxable as a corporation, for U.S. federal income tax purposes. The following discussion assumes that, for U.S. federal income tax purposes, the Fund will be treated as a non-U.S. corporation and the Master Fund will be treated as a partnership.

As a non-U.S. corporation, the U.S. federal income tax treatment of the Fund will vary depending on whether the Fund derives income or gains that are treated as effectively connected with the conduct of a trade or business in the United States. It is intended that the Fund's affairs will generally be conducted in a manner such that no income realized by the Fund is expected to be effectively connected with the conduct of a U.S. trade or business or otherwise subject to regular U.S. federal income taxation on a net basis. As a result, it is anticipated that no gains realized by the Fund (other than gains, if any, realized on the disposition of U.S. real property interests) will be subject to U.S. federal income taxation, but generally dividends, dividend equivalent amounts and certain interest income from U.S. sources will be subject to U.S. federal withholding tax as discussed further below.

In general, under Section 881 of the Code, a non-U.S. corporation which does not conduct a U.S. trade or business is nonetheless subject to withholding tax at a flat rate of 30% (or lower tax treaty rate) on the gross amount of certain U.S. source income which is not effectively connected with a U.S. trade or business. Income subject to such a flat tax rate is of a fixed or determinable annual or periodical nature, including dividends and certain interest income. Therefore, to the extent that the Fund receives dividend income (including "dividend equivalent" income under Section 871(m) of the Code) through the Master Fund from U.S. sources, the Fund will be subject to U.S. withholding tax at a 30% rate. U.S. source interest income received by the Fund through the Master Fund generally will be exempt from U.S. federal income and withholding tax to the extent such interest qualifies as "portfolio interest," or qualifies under another statutory

exemption. Interest on corporate obligations will not qualify as "portfolio interest" to a non-U.S. person that owns (directly and under certain constructive ownership rules) 10% or more of the total combined voting power of the corporation paying the interest, or, with respect to certain obligations issued after April 7, 1993, if and to the extent the interest is determined by reference to certain economic attributes of the debtor (or a person related thereto). In addition, interest on U.S. bank deposits, certificates of deposit and certain obligations with maturities of 183 days or less (from original issuance) will not be subject to withholding tax. Interest (including original issue discount) derived by the Fund or the Master Fund from U.S. sources not qualifying as "portfolio interest" or not otherwise exempt under U.S. law will be subject to U.S. withholding tax at a rate of 30%. Capital gains from the sale of stock or other capital assets such as commodities generally are not subject to U.S. withholding tax.

**Taxation of Non-U.S. Shareholders**

For U.S. federal income tax purposes, a Non-U.S. Shareholder will not be subject to U.S. federal income taxation on amounts paid by the Fund in respect of the Shares or gains recognized on the sale, exchange or redemption of the Shares, provided that such income and gains are not considered to be effectively connected with the conduct of a trade or business by the Shareholder in the United States. In limited circumstances, an individual Non-U.S. Shareholder who is present in the United States for 183 days or more during a taxable year may be subject to U.S. income tax at a flat rate of 30% on gains realized on a disposition of the Shares in such year. Individual Shareholders who at the time of their death are not citizens, former citizens or residents of the United States should not be subject, by reason of the ownership of the Shares, to any U.S. federal gift or estate taxes.

Special rules may apply in the case of non-U.S. persons that (i) conduct a trade or business in the United States or that have an office or fixed place of business in the United States, (ii) have a tax home in the United States, (iii) are former citizens or long-term residents of the United States or (iv) are controlled foreign corporations, PFICs, foreign insurance companies that hold the Shares in connection with their U.S. business or corporations which accumulate earnings to avoid U.S. federal income tax. Such persons are urged to consult their U.S. tax advisors before investing in the Fund.

In the case of the Shares held in the United States by a custodian or nominee for a non-U.S. person, U.S. "backup" withholding taxes may apply to distributions in respect of the Shares held by such Shareholder unless such Shareholder properly certifies as to its non-U.S. status or otherwise establishes an exemption from "backup" withholding. Backup withholding is not an additional tax. Rather, the U.S. federal income tax liability of non-U.S. persons subject to backup withholding will be reduced by the amount of tax withheld. If backup withholding results in an overpayment of U.S. federal income taxes, a refund may be obtained, provided the required documents are timely filed with the Service.

**Taxation of Tax-Exempt U.S. Shareholders**

Tax-Exempt U.S. Shareholders are subject to U.S. tax on their "unrelated business taxable income" ("UBTI") as defined in Section 512 of the Code. UBTI is generally the excess of gross income from any unrelated trade or business conducted by a tax-exempt entity over the

deductions attributable to such trade or business, with certain modifications. These modifications provide that UBTI generally does not include interest, dividends or gains from the sale of securities not held as either inventory or primarily for sale to customers in the ordinary course of business, except to the extent that any such item of income is deemed to constitute "unrelated debt financed income" within the meaning of Section 514 of the Code and the Treasury Regulations, and certain other requirements are met. Income that a Tax-Exempt U.S. Shareholder derives from an investment in the Shares generally should not give rise to UBTI, except to the extent that such Shareholder's acquisition of the Shares is debt financed.

The Fund expects to be classified as a PFIC for U.S. federal income tax purposes. Under the Treasury Regulations, a U.S. tax-exempt entity is generally not subject to the PFIC rules, except to the extent that a "dividend" from such PFIC would be taxable as income under subchapter F of the Code, for example, as unrelated debt-financed income. Hence, a tax-exempt entity would be subject to tax under the PFIC regime in respect of an excess distribution from, or any gain realized on the sale of, the interests of a PFIC in only limited circumstances. Additionally, the Treasury Regulations provide that a tax-exempt entity that is not taxable under the PFIC rules may not make a QEF election under Section 1295 of the Code and the Fund will not provide any QEF information to investors. Moreover, different rules may apply to certain types of tax-exempt entities, such as charitable remainder trusts. Accordingly, potential Tax-Exempt U.S. Shareholders are urged to consult their own tax advisors regarding the tax consequences of an investment in the Fund.

**Prospective Tax-Exempt U.S. Shareholders are urged to consult their own tax advisors regarding the tax consequences of the purchase, ownership and disposition of the Shares.**

### Information Reporting Requirements

A U.S. person, within the meaning of the Code, (including in certain circumstances a Tax-Exempt U.S. Shareholder) that transfers property (including cash) to the Fund in exchange for Shares will be required to file a Form 926 or a similar form with the Service. In the event a U.S. Shareholder fails to file any required form, such Shareholder could be subject to a penalty of up to 10% of the value of the property transferred, subject to a $100,000 limit so long as the failure was not due to intentional disregard.

Under the Treasury Regulations, a U.S. person, within the meaning of the Code (including a Tax-Exempt U.S. Shareholder), owning 10% or more (taking certain attribution rules into account) of either the total combined voting power or total value of all classes of the interests of a non-U.S. entity that is treated as a non-U.S. corporation for U.S. federal income tax purposes, such as the Fund, or whose ownership interest changes by a statutorily specified amount, may be required to file an information return with the Service containing certain disclosures concerning the filing shareholder, other U.S. shareholders and the non-U.S. entity. The Fund has not committed to provide all of the information about the Fund or its Shareholders necessary to complete such an information return. Prospective investors should consult their tax advisors about such information return filing requirements.

Certain U.S. Persons are required to file FinCEN Form 114 with the Service with respect to financial interests in foreign financial accounts held by such U.S. Persons during the previous

calendar year if the aggregate value of such accounts exceeds $10,000 at any time during the calendar year. Significant penalties may apply in respect of the failure to file FinCEN Form 114 in respect of foreign financial accounts. Thus, potential Tax-Exempt U.S. Shareholders should consult their tax advisors as to whether to file FinCEN Form 114 in respect of ownership of Shares.

**Investor Tax Filings and Record Retention.**

The U.S. Department of the Treasury has adopted Treasury Regulations designed to assist the Service in identifying abusive tax shelter transactions. In general, these Treasury Regulations require investors in specified transactions (including certain shareholders in foreign corporations and partners in partnerships that engage in such transactions) to satisfy certain special tax filing and record retention requirements. Significant monetary penalties (in addition to penalties that generally may be applicable as a result of a failure to comply with the applicable Treasury Regulations) may be imposed for failure to comply with these tax filing and record retention rules.

These Treasury Regulations are broad in scope, and it is conceivable that the Fund may enter into transactions that will subject the Fund and certain investors to the special tax filing and record retention rules. Investors should consult their own tax advisors in this regard.

**Reporting Under FATCA**

Sections 1471 through 1474 of the Code, known as the U.S. Foreign Account Tax Compliance Act (together with any regulations, rules and other guidance implementing such Code sections and any applicable intergovernmental agreement ("IGA") or information exchange agreement and related statutes, regulations, rules and other guidance thereunder, "FATCA") impose a withholding tax of 30% on (i) certain U.S. source interest, dividends and other types of income, and (ii) the gross proceeds from the sale or disposition of certain assets of a type that can produce U.S. source interest and dividends, which are received by a foreign financial institution ("FFI"), unless such FFI enters into an agreement with the Service, and/or complies with an applicable IGA, to obtain certain information as to the identity of the direct and indirect owners of accounts in such institution. In addition, a withholding tax may be imposed on payments to certain non-financial foreign entities that do not obtain and provide information as to their direct and indirect owners. These rules generally apply to payments of U.S. source interest, dividends and certain other types of income from U.S. sources and, after December 31, 2018, are expected to apply to payments of gross proceeds from the sale or disposition of assets of a type that can produce U.S. source interest or dividends.

The Service has released temporary and final Treasury Regulations and other guidance that will be used in implementing FATCA, which contain a number of phase-in dates for FATCA compliance. In addition, the Cayman Islands has entered into a Model 1 IGA with the United States (the "Cayman-U.S. IGA"), which is treated as in effect, and has issued the Tax Information Authority (International Tax Compliance) (United States of America) Regulations 2014, and guidance notes thereunder, each as updated from time to time.

Both the Fund and the Master Fund are likely to be considered FFIs. In order to avoid incurring U.S. withholding under FATCA, the Master Fund and the Fund each are generally required to register with the Service and to comply with the Cayman-U.S. IGA and any guidance thereunder. The Fund has registered with the Service and the Master Fund intends to register with the Service, and expect that they will be required to identify and report on certain direct and indirect U.S. owners in order to comply with the Cayman-U.S. IGA. Therefore, the Fund and the Master Fund generally do not expect to become subject to U.S. withholding under FATCA. An investor may be required to provide to the Fund information which identifies its direct and indirect ownership. Any such information provided to the Fund may ultimately be shared with the Cayman Islands Tax Information Agency ("Cayman TIA") and transmitted to the Service and, potentially, certain other authorities and withholding agents, as applicable.

By investing (or continuing to invest) in the Fund (and indirectly invest in the Master Fund), investors shall be deemed to have acknowledged, and to have given their consent to, the following:

    (i)    the Fund (or its agent) may be required to disclose to the Cayman TIA and withholding agents certain information (which could otherwise be deemed to be confidential) in relation to the investor or its direct or indirect owners, including the investor's name, address, date of birth, tax identification number (if any), social security or national insurance number (if any) and certain additional information or documentation relating to the investor's investment or identity, and the investor may be required to provide any such information or documentation;

    (ii)    the Cayman TIA may be required to automatically exchange information with, among other authorities, the Service, and to provide additional information to such authorities, and the Master Fund or the Fund (or its agents) may be required to disclose certain information (including information that could otherwise be deemed to be confidential) when registering with such authorities and in response to a request by any such authority for further information;

    (iii)    in the event an investor's failure to comply with any FATCA related reporting requirements gives rise to any withholding tax, the Fund reserves the right to ensure that any such withholding tax and any related cost, interest, penalties and other losses or liabilities suffered by the Fund, the Master Fund, the Master Fund General Partner, the Administrator or any other investor, or any agent, delegate, employee, director, officer or affiliate of any of the foregoing persons, arising from such investor's failure to provide information to the Fund, is economically borne by such investor;

    (iv)    in the event an investor does not provide the information and/or documentation necessary for the Fund's (or the Master Fund's) satisfaction of its FATCA related reporting requirements, whether or not that actually leads to compliance failures by the Fund, or a risk of the Fund (or the Master Fund) or its investors being subject to U.S. withholding under FATCA, the Fund reserves the right to take any action and/or pursue all remedies at its disposal to mitigate the consequences of

the investor's failure to comply with the requirements described above, including compulsory redemption or withdrawal of the investor concerned; and

(v)    no investor affected by any such action or remedy shall have any claim against the Fund, the Master Fund, the Master Fund General Partner, the Administrator (or their agents, delegates, employees, directors, officers or affiliates) for any damages or liability as a result of actions taken or remedies pursued by or on behalf of the Fund in order to comply with FATCA.

**Investors should consult their tax advisors as to the withholding, filing and information reporting requirements that may be imposed on them in respect of their ownership of Shares.**

## *CAYMAN ISLANDS*

### Fund Level

The Government of the Cayman Islands will not, under existing legislation, impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Fund or the Shareholders. The Cayman Islands are not party to a double tax treaty with any country that is applicable to any payments made to or by the Fund.

The Fund has received an undertaking from the Governor-in-Cabinet of the Cayman Islands that, in accordance with section 6 of the Tax Concessions Law (Revised) of the Cayman Islands, for a period of 20 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Fund or its operations and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable (i) on or in respect of the shares, debentures or other obligations of the Fund or (ii) by way of the withholding in whole or in part of a payment of dividend or other distribution of income or capital by the Fund to its members or a payment of principal or interest or other sums due under a debenture or other obligation of the Fund.

### Shareholder Level

Shareholders will not be subject to any income, withholding or capital gains taxes in the Cayman Islands, with respect to the Shares owned by them and dividends received on such Shares, nor will they be subject to any estate or inheritance taxes in the Cayman Islands.

## *OTHER JURISDICTIONS*

It is possible that certain dividends, interest and other income received by the Fund from sources within certain countries will be subject to withholding taxes imposed by such countries. In addition, the Fund may also be subject to capital gains taxes or other taxes in some of the countries where it purchases and sells securities or otherwise conducts business. It is impossible to predict the rate of tax that the Fund will pay in advance since the amount of the Fund's assets to be invested in various countries is not known.

# ERISA CONSIDERATIONS

***GENERAL***

Fiduciaries and other persons who are proposing to purchase Shares on behalf of retirement plans, investment retirement accounts ("IRAs") and other employee benefit plans ("Plans") covered by the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or the Code, must give appropriate consideration to, among other things, the role that an investment in the Fund plays in the Plan's portfolio, taking into consideration whether the investment is designed to reasonably further the Plan's purposes, the investment's risk and return factors, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the Plan, the projected return of the total portfolio relative to the Plan's objectives, the limited right of Shareholders to redeem all or any part of their Shares or to transfer their Shares and whether investment in the Fund constitutes a direct or indirect transaction with a party in interest (under ERISA) or a disqualified person (under the Code).

***PLAN ASSET REGULATIONS AND BENEFIT PLAN INVESTORS***

The United States Department of Labor ("DOL") has adopted regulations that treat the assets of certain pooled investment vehicles, such as the Fund, as "plan assets" for purposes of Title I of ERISA and Section 4975 of the Code ("Plan Assets"). Section 3(42) of ERISA defines the term "Plan Assets" to mean plan assets as defined by such regulations as the DOL may prescribe, except that under such regulations the assets of an entity shall not be treated as Plan Assets if, immediately after the most recent acquisition of an equity interest in the entity, less than 25% of the total value of each class of equity interest in the entity is held by "Benefit Plan Investors" (the "significant participation test"). For purposes of this determination, the value of any equity interest held by a person (other than such a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, shall be disregarded. An entity shall be considered to hold Plan Assets only to the extent of the percentage of the equity interest held by Benefit Plan Investors. The term "Benefit Plan Investors" means any employee benefit plan subject to part 4 of subtitle B of Title I of ERISA (i.e., plans subject to the fiduciary provisions of ERISA), any plan to which the prohibited transaction provisions of Section 4975 of the Code apply (e.g., IRAs), and any entity whose underlying assets include Plan Assets by reason of a plan's investment in such entity (a "Plan Asset Entity").

In order to prevent the assets of the Master Fund from being considered Plan Assets under ERISA, it is the intention of the Master Fund to monitor the investments in the Master Fund and prohibit the acquisition, withdrawal or transfer of any limited partner interests of the Master Fund by any investor, including a Benefit Plan Investor, unless, after giving effect to such an acquisition, withdrawal or transfer, the total proportion of limited partner interests of each class

of the Master Fund owned by Benefit Plan Investors would be less than 25% of the aggregate value of that class of limited partner interests (determined, as described above, by excluding certain limited partner interests held by the Master Fund General Partner, other fiduciaries and affiliates).

Without limiting the generality of the foregoing, in order to limit equity participation in any class of limited partner interests of the Master Fund by Benefit Plan Investors to less than 25%, the Fund may require the compulsory redemption of Shares. Each Shareholder that is an insurance company acting on behalf of its general account or a Plan Asset Entity will be required to represent and warrant as of the date it acquires Shares the maximum percentage of such general account or Plan Asset Entity (as reasonably determined by such insurance company or Plan Asset Entity) that will constitute Plan Assets (the "Maximum Percentage") so such percentage can be calculated in determining the percentage of Plan Assets invested in the Master Fund. Further, each such insurance company and Plan Asset Entity will be required to covenant that if, after its initial acquisition of Shares, the Maximum Percentage is exceeded at any time, then such insurance company or Plan Asset Entity shall immediately notify the Fund of that occurrence and shall, if and as directed by the Fund, in a manner consistent with the restrictions on transfer set forth herein, redeem or dispose of some or all of the Shares held in its general account or Plan Asset Entity.

It is anticipated that investment in the Fund by benefit plan investors may be "significant" for purposes of the regulations. In such event, the underlying assets of the Fund would be deemed to constitute "plan assets" for purposes of ERISA. As a general rule, if the assets of the Fund were regarded as "plan assets" of a benefit plan investor, the Investment Manager would be deemed a fiduciary with respect to each Plan investing in the Fund. However, the Investment Manager believes that, given the limited purpose and role of the Fund and given the requirement that the Investment Manager follow the directions of the fiduciaries of each benefit plan investor investing in the Fund, as set forth in each such investor's subscription agreement, with respect to the investment by the Fund in the Master Fund, neither the Investment Manager nor any other entity providing services to the Fund would be exercising any discretionary authority or control with respect to the Fund. Accordingly, the Investment Manager believes that neither the Investment Manager nor any other entity providing services to the Fund will act as a fiduciary (as defined in Section 3(21) of ERISA) with respect to the assets of the Fund or any benefit plan investor. Rather, the Investment Manager believes that, given the limited purpose and role of the Fund and given the requirement that the Investment Manager follow the directions of the fiduciaries of each benefit plan investor investing in the Fund, as set forth in each such investor's subscription agreement, with respect to the investment by the Fund in the Master Fund, the fiduciary of each such benefit plan investor has retained the fiduciary authority and responsibility with respect to the investor's initial and continuing investment in the Fund as though the benefit plan investor is investing directly in the Master Fund.

### REPRESENTATION BY PLANS

The fiduciaries of each Plan proposing to invest in the Fund will be required to represent that they have been informed of and understand the Fund's investment objectives, policies and strategies and that the decision to invest Plan Assets in the Fund is consistent with the provisions

of ERISA and/or the Code that require diversification of Plan Assets and impose other fiduciary responsibilities. By its purchase, each investor will be deemed to have represented that either (a) it is not a Plan that is subject to the prohibited transaction rules of ERISA or the Code, (b) it is not an entity whose assets include Plan Assets or (c) its investment in the Fund will not constitute a non-exempt prohibited transaction under ERISA or the Code.

## *INELIGIBLE PURCHASERS*

Shares may not be purchased with Plan Assets if the Investment Manager, any selling agent, finder, any of their respective affiliates or any of their respective employees: (a) has investment discretion with respect to the investment of such Plan Assets; (b) has authority or responsibility to give or regularly gives investment advice with respect to such Plan Assets, for a fee, and pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to such Plan Assets and that such advice will be based on the particular investment needs of the Plan; or (c) is an employer maintaining or contributing to such Plan. A party that is described in clause (a) or (b) of the preceding sentence is a fiduciary under ERISA and the Code with respect to the Plan, and any such purchase might result in a "prohibited transaction" under ERISA and the Code.

## *PLANS' REPORTING OBLIGATIONS*

The information contained herein and in the other documentation provided to investors in connection with an investment in the Fund is intended to satisfy the alternative reporting option for "eligible indirect compensation" on Schedule C of the Form 5500, in addition to the other purposes for which such documents were created.

***Whether or not the underlying assets of the Fund are deemed Plan Assets, an investment in the Fund by a Plan is subject to ERISA and the Code. Accordingly, Plan fiduciaries should consult their own counsel as to the consequences under ERISA and the Code of an investment in the Fund. Note that similar laws governing the investment and management of the assets of governmental or non-U.S. plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code. Accordingly, fiduciaries of such governmental or non-U.S. plans, in consultation with their counsel, should consider the impact of their respective laws and regulations on an investment in the Fund.***

# GENERAL

### *DIRECTORS' REPORT*

As at the date of this Memorandum, the Fund has not, nor has it since its date of incorporation, declared any dividends. The Fund does not have, nor has it had since its incorporation, and is not expected to have, any employees.

The Fund is not, nor has it been, engaged in any legal or arbitration proceedings (including any such proceedings which are pending or threatened of which the Fund is aware) which may have or have had since its incorporation a significant effect on its financial position.

As at the date of this Memorandum, the Fund has not issued any debt securities, incurred any other indebtedness or borrowings or granted any mortgages, charges, guarantees or other contingent liabilities.

### *MATERIAL CONTRACTS*

The following contracts, which are summarized in the Section "Management and Administration" above, have been entered into and are, or may be, material:

(i)     Investment Management Agreement among the Feeder Funds, the Master Fund, the Master Fund General Partner and the Investment Manager pursuant to which the Investment Manager was appointed to provide certain investment management services to the Feeder Funds and the Master Fund; and

(ii)    Administration Agreement between the Master Fund and the Administrator pursuant to which the Administrator was appointed administrator and registrar and transfer agent of the Feeder Funds and the Master Fund.

(iii)   Services Agreement between the Investment Manager and Highland Latin America pursuant to which Highland Latin America was appointed to provide certain administrative and consulting services to the Investment Manager.

### *DOCUMENTS AVAILABLE FOR INSPECTION*

The following documents are available for inspection and copies may be obtained free of charge during the normal business hours, on weekdays (Saturdays, Sundays and public holidays excepted) at the registered office of the Fund:

(a)     the Memorandum of Association and Articles of the Fund;

(b)     the Companies Law (Revised) and the Mutual Funds Law (Revised) of the Cayman Islands;

(c)     the Material Contracts referred to above; and

(d)     the Master Fund Partnership Agreement.

The statutory records of the Fund are kept at its registered office, which is located at:

Maples Corporate Services Limited
P.O. Box 309
Ugland House
Grand Cayman KY1-1104
Cayman Islands

The offices of the Sponsor are located at:

Ogier Corporate Finance Limited
44 Esplanade, St. Helier
Jersey JE4 9WG
Channel Islands

### *INQUIRIES*

Inquiries concerning the Fund and this offering (including information concerning subscription procedures) should be directed to:

MUFG Fund Services (Cayman) Limited
2nd Floor Strathvale House
90 North Church Street
P.O. Box 609
Grand Cayman KY1-1107
Cayman Islands
Facsimile: (345) 745 7690
Telephone: (345) 745 7600
Email: investorserviceshalifax@mfsadmin.com

**Memorandum Number** _____

# Confidential Private Placement Memorandum

*Series A Interests*
*Series B Interests*
*Series C Interests*
*in*

# Highland Argentina Regional Opportunity Fund, L.P.

*General Partner*

**Highland Argentina Regional Opportunity Fund GP, LLC**

*Investment Manager*

**Highland Capital Management Latin America, L.P.**

**March 2019**

208786464 v12

# **TABLE OF CONTENTS**

Page

NOTICE.................................................................................................................... ii

DIRECTORY ............................................................................................................v

EXECUTIVE SUMMARY ........................................................................................1

INVESTMENT PROGRAM .......................................................................................3

MANAGEMENT AND ADMINISTRATION ............................................................6

SUMMARY OF TERMS ..........................................................................................10

THE MASTER FUND ..............................................................................................25

RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST.........................29

BROKERAGE AND CUSTODY ..............................................................................47

TAX CONSIDERATIONS .......................................................................................50

ERISA AND OTHER REGULATORY CONSIDERATIONS ...................................63

Appx. 03872

## NOTICE

This Confidential Private Placement Memorandum (this "*Memorandum*") is being furnished on a confidential basis solely to selected qualified investors considering the purchase of limited partner interests (the "*Interests*") in Highland Argentina Regional Opportunity Fund, L.P. (the "*Fund*"). This Memorandum is not to be reproduced or distributed to others, at any time, without the prior written consent of Highland Argentina Regional Opportunity Fund GP, LLC (the "*General Partner*"). Each recipient agrees to keep confidential all information contained herein not already in the public domain and will use this Memorandum for the sole purpose of evaluating a possible investment in the Fund. Notwithstanding anything herein to the contrary, each investor (and each employee, representative, or other agent of the investor) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of an investment in the Fund and all materials of any kind (including opinions or other tax analyses) that are provided to the investor relating to such tax treatment and tax structure. Acceptance of this Memorandum by prospective investors constitutes an agreement to be bound by the foregoing terms.

Prospective investors should not construe the contents of this Memorandum as legal, tax or financial advice. Each prospective investor should consult its own professional advisors as to the legal, financial, tax, ERISA (as defined herein) or other matters relevant to the suitability of an investment in the Fund for such investor.

In making an investment decision, investors must rely on their own examination of the Fund and the terms of the offering contemplated by this Memorandum. The Interests have not been recommended by any U.S. federal or state, or any non-U.S., securities commission or regulatory authority. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this Memorandum. Any representation to the contrary is a criminal offense.

The Interests have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "*Securities Act*"), or the securities laws of any of the states of the United States. The offering and any potential sale contemplated by this Memorandum will be made in reliance upon an exemption from the registration requirements of the Securities Act for offers and sales of securities which do not involve any public offering and analogous exemptions under state securities laws. There will be no public market for the Interests, and there is no obligation on the part of any person to register the Interests under the Securities Act or any state securities laws.

The Fund has not been and will not be registered under the U.S. Investment Company Act of 1940, as amended (the "*Investment Company Act*"), since Interests will only be sold to persons who are "qualified purchasers," as defined in the Investment Company Act.

Each subscriber for an Interest will be required to certify that it is an "accredited investor" as defined in Regulation D under the Securities Act and a "qualified purchaser," as defined in the Investment Company Act.

Pursuant to an exemption from the Commodity Futures Trading Commission (the "*CFTC*"), Highland Capital Management Latin America, L.P., the investment manager to the Fund (the "*Investment Manager*"), is not registered with the CFTC as a commodity pool operator ("*CPO*") and therefore, unlike a registered CPO, is not required to deliver a disclosure document or a certified annual report to participants in this pool. Among other things, the exemption requires the filing of a claim of exemption with the National Futures Association. It is also required that at all times either: (a) the

ii

aggregate initial margin and premiums required to establish commodity interest positions does not exceed 5% of the liquidation value of the Fund's portfolio; or (b) the aggregate net notional value of the Fund's commodity interest positions does not exceed 100% of the liquidation value of the Fund's portfolio and further that all pool participants are required to be accredited investors or certain other qualified investors. The Investment Manager qualifies for an exemption from registration as a commodity trading advisor pursuant to CFTC Rule 4.14(a)(8).

Interests are suitable only for sophisticated investors who do not require immediate liquidity for their investments, for whom an investment in the Fund does not constitute a complete investment program and who fully understand and are willing to assume the risks involved in the Fund's investment program. The Fund's investment practices, by their nature, may be considered to involve a substantial degree of risk. See "*Risk Factors and Potential Conflicts of Interest*." No assurance can be given that the Fund's investment objectives will be achieved or that investors will receive a return of their capital.

The Interests are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and any applicable state or other securities laws, pursuant to registration or an exemption therefrom. The transferability of the Interests will be further restricted by the terms of the limited partnership agreement of the Fund, as amended (the "***Partnership Agreement***"). Investors should be aware that they will be required to bear the financial risks of an investment in the Interests for an extended period of time.

This Memorandum does not constitute an offer to sell, or the solicitation of an offer to buy, any Interests in any state or other jurisdiction where, or to or from any person to or from whom, such offer or solicitation is unlawful or not authorized.

No person has been authorized to give any information or to make any representation concerning the Fund or the offering of the Interests other than the information contained in this Memorandum and, if given or made, such information or representation must not be relied upon as having been authorized by the Fund or the General Partner.

The Interests are offered subject to the right of the General Partner to reject any subscription in whole or in part.

This Memorandum is intended solely for the use of the person to whom it has been delivered by the General Partner or its authorized representative for the purpose of evaluating a possible investment by the recipient in the Interests described herein, and is not to be reproduced or distributed to any other persons (other than professional advisors of the prospective investor receiving this Memorandum from the General Partner or its authorized representative).

This Memorandum does not purport to be, and should not be construed as, a complete description of the Partnership Agreement or the investment management agreement by and among the Investment Manager, the General Partner, the Master Fund, the Offshore Fund (each as defined below) and the Fund (the "***Investment Management Agreement***"). Each prospective investor in the Fund is encouraged to review the Partnership Agreement carefully, in addition to consulting appropriate legal and tax advisors. To the extent of any inconsistency between this Memorandum and the Partnership Agreement, the terms of the Partnership Agreement shall control.

The delivery of this Memorandum does not, under any circumstances, create any implication that there has been no change in the circumstances affecting the Fund or Highland Argentina Regional

iii

Opportunity Master Fund, L.P. (the "***Master Fund***") since the date hereof. An amended or updated Memorandum will be provided to reflect any material changes to the information contained herein.

Certain information contained in this Memorandum constitutes "forward-looking statements," which can be identified by the use of forward-looking terminology such as "may," "will," "should," "expect," "anticipate," "project," "estimate," "intend," or "believe" or the negatives thereof or other variations thereon or comparable terminology. Due to various risks and uncertainties, including those described in "*Risk Factors and Potential Conflicts of Interest*," actual events or results or the actual performance of the Fund may differ materially from those reflected or contemplated in such forward-looking statements.

All references herein to "$" refer to U.S. dollars. Except as the context otherwise requires, references to the term "Fund" in this Memorandum shall be deemed to include the Master Fund.

**Appx. 03875**

# DIRECTORY

| | |
|---|---|
| **General Partner** | Highland Argentina Regional Opportunity Fund GP, LLC<br>300 Crescent Court, Suite 700<br>Dallas, TX 75201 |
| **Investment Manager** | Highland Capital Management Latin America, L.P.<br>c/o Highland Capital Management, L.P.<br>300 Crescent Court, Suite 700<br>Dallas, TX 75201 |
| **Administrator** | MUFG Fund Services (Cayman) Limited<br>2nd Floor, Strathvale House<br>90 North Church Street<br>P.O. Box 609<br>Grand Cayman  KY1-1107<br>Cayman Islands |
| **Auditor** | PricewaterhouseCoopers LLP<br>5th Floor Strathvale House<br>P.O. Box 258<br>Grand Cayman  KY1-1104<br>Cayman Islands |
| **Prime Brokers** | Société Générale<br>440 S. LaSalle St., Suite 2400<br>Chicago, IL 60605<br><br>BNP Paribas Prime Brokerage, Inc.<br>787 Seventh Avenue<br>The Equitable Tower<br>New York, NY 10019 |
| **Legal Counsel** | *In the United States:*<br>Akin Gump Strauss Hauer & Feld LLP<br>1700 Pacific Avenue<br>Suite 4100<br>Dallas, TX 75201 |

Appx. 03876

# EXECUTIVE SUMMARY

Highland Argentina Regional Opportunity Fund, L.P., a Delaware limited partnership (the "***Fund***"), seeks to maximize the total return of its assets through capital appreciation by investing all of its investable assets in Highland Argentina Regional Opportunity Master Fund, L.P., a Cayman Islands exempted limited partnership (the "***Master Fund***"), which intends to hold primarily a portfolio of investments in securities of Latin American corporate and sovereign issuers as well as non-Latin American issuers that derive a portion of their revenues from business activities in Latin America, in each case with a primary focus on Argentina.

Highland Argentina Regional Opportunity Fund GP, LLC, a Delaware limited liability company (the "***General Partner***"), acts as general partner of the Fund and the Master Fund and is registered as a foreign company in the Cayman Islands. Highland Capital Management Latin America, L.P., a Cayman Islands exempted limited partnership (the "***Investment Manager***" and, together with its affiliates, shareholders, directors, members, partners, officers and employees, the "***Advisory Parties***"), serves as investment manager to the Fund, the Offshore Fund (as defined below) and the Master Fund and manages the Master Fund's investment program. Each of the General Partner and the Investment Manager is ultimately controlled by James D. Dondero (the "***Principal***").

In order to facilitate investments by non-U.S. and certain U.S. tax-exempt investors, the Investment Manager and its affiliates recently assumed the management of an existing investment fund, Highland Argentina Regional Opportunity Fund, Ltd., a Cayman Islands exempted company (the "***Offshore Fund***" and, together with the Fund, the "***Feeder Funds***"). The Feeder Funds will place all of their investable assets in, and conduct all of their investment and trading activities in parallel through, the Master Fund. References in this Memorandum to the Fund shall include the Master Fund, unless otherwise specified or the context so requires.

The Fund (but not the Master Fund) is seeking subscriptions from investors who qualify as both "accredited investors" and "qualified purchasers" (each as defined in the Fund's subscription materials). The minimum initial investment is $500,000, and thereafter, the minimum subsequent investment is $500,000, although, in each case, the Fund may accept investments in a lesser amount, but no less than $100,000 with respect to Series B Interests. The Fund generally accepts subscriptions on the first day of each calendar month. A subscriber admitted to the Fund as a limited partner (each, a "***Limited Partner***") will receive, in exchange for its initial capital contribution and any subsequent capital contribution, a limited partner interest representing a proportionate share of the net assets of the Fund at that time.

The Fund intends to issue multiple series of limited partner interests ("***Interests***") over time. Not all series of Interests will be available for subscription at the same time and the terms among the series of Interests will vary. The Fund is currently offering Series A Interests, Series B Interests and Series C Interests pursuant to this Memorandum.

For its services to the Master Fund, the Investment Manager is generally entitled to a management fee (the "***Management Fee***"), which is calculated monthly and paid quarterly in arrears at the Master Fund level. The Management Fee is calculated at an annual rate of (i) 1.75% of each Limited Partner's capital account that is attributable to a Series A Interest, (ii) 1.25% of each Limited Partner's capital account that is attributable to a Series B Interest, and (iii) 1.00% of each Limited Partner's capital account that is attributable to a Series C Interest.

1

In addition, the Investment Manager, in its capacity as the special limited partner of the Master Fund (the "***Special Limited Partner***"), is entitled to a quarterly performance-based profits allocation (the "***Performance Allocation***") at the end of each fiscal quarter.  The Performance Allocation is calculated and allocated at the Master Fund level, but is effectively equal to (i) 20.0% of the amount by which the net asset value of each Series A Interest on the last day of a fiscal quarter exceeds the "high water mark" for such Series A Interest, if any, (ii) 17.5% of the amount by which the net asset value of each Series B Interest on the last day of a fiscal quarter exceeds the "high water mark" for such Series B Interest, if any, and (iii) 15.0% of the amount by which the net asset value of each Series C Interest on the last day of a fiscal quarter exceeds the "high water mark" for such Series C Interest, if any.

Subject to a one-year "soft lock-up" with an early withdrawal reduction attributable to Series B Interests only and a two-year "soft lock-up" with an early withdrawal reduction attributable to Series C Interests only, a Limited Partner is generally permitted to withdraw all or a portion of its Interest on 30 calendar days' prior written notice on the last business day of each calendar month.  Withdrawals may be subject to reserves for contingencies and suspension restrictions as discussed further in this Memorandum.

The Fund may agree with certain Limited Partners to a variation of the terms set forth in this Memorandum or establish additional series of Interests that have terms that differ from those described herein, including, without limitation, different management fees, performance allocations and withdrawal rights.

Appx. 03878

## INVESTMENT PROGRAM

## INVESTMENT OBJECTIVE

The investment objective of the Fund is to maximize the total return of its assets through capital appreciation by investing all of its investable assets in the Master Fund, which intends to hold primarily a portfolio of investments in securities of Latin American corporate and sovereign issuers as well as non-Latin American issuers that derive a portion of their revenues from business activities in Latin America, in each case with a primary focus on Argentina, and that the Investment Manager believes would provide profitable investment opportunities for the Master Fund.  The Master Fund will invest in a single portfolio of assets and does not currently intend to have a separate portfolio of assets for each of its series, each of which will correspond to a series of limited partner interests in the Fund.

## INVESTMENT STRATEGY

The Master Fund is a multi-strategy investment fund and there is no limit on the investment strategies that may be utilized.  The Investment Manager believes that focusing on a multi-strategy approach will enable the Master Fund to enhance results by compounding returns generated by each strategy and at the same time have the needed flexibility to adjust to potentially changing regulations and market conditions.

The Investment Manager will be focused on identifying assets that are mispriced against similar assets and/or against the Investment Manager's expectations for assets' fair values and market movements, special situations, such as mergers, financial restructurings, hostile takeovers, or leveraged buy-outs.  There is no set allocation among these and any other strategies that the Investment Manager may use.

The Master Fund may hold long and short positions in a wide range of liquid or illiquid fixed income securities including, but not limited to, sovereign and private debt, distressed debt, secured and unsecured debt, structured debt, loans, asset-backed securities and collateralized debt obligations.  Furthermore, the Master Fund may invest, both long and short, in a wide range of liquid or illiquid equity-related instruments including, but not limited to, equities, convertible bonds, options, equity-linked notes, preferred shares and warrants, whether or not listed or traded on one or more exchanges.

The Master Fund may hold any of these positions indirectly by entering into swaps, options, futures, forward contracts or similar derivative transactions.

The Master Fund may hold both U.S. dollar and non-U.S. dollar denominated securities.

The Master Fund may leverage its investment portfolio by up to 100% of the Master Fund's net asset value (calculated at the time of investment) by borrowing for investment purposes and by using leverage techniques and products.  It is anticipated that by doing so the performance of the Master Fund will be enhanced.  While the use of the leverage may improve the return on invested capital, leverage may also significantly increase the impact of adverse movement in the value of the Master Fund.

The Master Fund may also utilize hedging strategies in order to maximize returns and reduce the risk to principal or the volatility associated with its holdings.  As part of these hedging strategies, the Master Fund may hedge any of its investments with long or short positions in any financial instrument, which the Investment Manager deems appropriate.  The Master Fund may utilize U.S. and European securities for hedging purposes.

Appx. 03879

The Master Fund may invest through one or more subsidiaries established in an appropriate jurisdiction in order to take advantage of applicable tax treaties or increase the tax efficiency of the Master Fund's investments, or in such other circumstances as the General Partner, in its capacity as the general partner of the Master Fund, following consultation with the Investment Manager, deem appropriate, including compliance with local investment laws.

The Master Fund may maintain assets in cash or cash equivalent instruments, money market funds, repurchase agreements, or other cash management vehicles pending investment, for defensive purposes, to fund withdrawals requested by the limited partners of the Master Fund or otherwise at the discretion of the Investment Manager.  The Master Fund may hold with no limitation U.S. and European AAA fixed income securities for defensive purposes.

**INVESTMENT RESTRICTIONS**

In deploying the investment strategy, the Master Fund will observe the following investment restrictions.  The Master Fund will not at the time of investment:

1. Invest more than 50 percent of its gross assets in its net holdings of equities;

2. Borrow more than 100 percent of its net assets;

3. Invest more than 20 percent of its gross assets in a single equity position;

4. Invest more than 20 percent of its gross assets in a single corporate issuer position;

5. Invest more than 30 percent of its gross assets in a single GDP-linked warrant position; and

6. Invest more than 30 percent of its gross assets in a single sovereign issuer security position; and

7.  Invest more than 30 percent of its gross assets in a single provincial issuer.

If a percentage limitation on investment or use of assets set forth above is adhered to at the time a transaction is effected, later changes in percentage resulting from changing values will not be considered a violation.

In the event that the Investment Manager discovers that a violation of any of the Master Fund's investment limitations has occurred (the date of such discovery being the "***Discovery Date***"), the Investment Manager shall inform the limited partners of the Master Fund, including the Fund, who shall: (i) notify each of their limited partners or shareholders, as applicable, in writing within 30 business days after the Discovery Date of the nature of the violation, the steps taken, or to be taken, to remedy the violation and the reason the violation occurred and (ii) use reasonable commercial efforts to cause the Investment Manager to remedy such violation within 90 business days after the Discovery Date (the "***Remedy Date***").  If such violation has not been remedied on or before the Remedy Date, the limited partners of the Master Fund, including the Fund, shall: (i) notify each of their limited partners or shareholders, as applicable, in writing, 30 business days after the Remedy Date, of the steps taken to remedy the violation and the reason that the violation has not been remedied by the Remedy Date (the "***Remedy Notice***") and (ii) use reasonable commercial efforts to cause the Master Fund's portfolio to be examined by an independent auditor other than PricewaterhouseCoopers LLP and shall request that such independent auditor issue a report to the investors in each of the Master Fund's limited partners as to its

Appx. 03880

concurrence or disagreement with the statements in the Remedy Notice.  The Investment Manager shall pay for the costs of such audit and the costs of the Remedy Notice if the violation that was the subject of the Remedy Notice occurred as a result of the Investment Manager's willful misfeasance, bad faith or gross negligence.  In addition, the failure to remedy the violation in a timely manner may give rise to special withdrawal rights.  See "*Summary of Terms – Withdrawals; Lock-Ups*."

**DISTRIBUTION POLICY**

The Fund's objective is to maximize capital appreciation and accordingly it is not envisaged that any income or gains derived from the investments made by the Master Fund will be distributed by way of dividend.  This does not preclude the General Partner from declaring a dividend at any time in the future if it considers it appropriate to do so.  To the extent that a dividend may be declared, it will be paid in compliance with any applicable laws.

*The investment objectives and strategies summarized herein represent the Investment Manager's current intentions.  Depending on conditions and trends in the securities markets and the economy in general, the Investment Manager may pursue any strategies, employ any investment techniques or purchase any type of security that it considers appropriate, whether or not described in this section, subject to any applicable law or regulation.  The discussion herein includes and is based upon numerous assumptions and opinions of the Investment Manager concerning world financial markets and other matters, the accuracy of which cannot be assured.  There can be no assurance that the investment strategy of the Master Fund will achieve the intended investment objective.  The Master Fund's investment program is speculative and involves a high degree of risk, including, without limitation, the risk of loss of the entire amount invested.*

**Appx. 03881**

## MANAGEMENT AND ADMINISTRATION

**The General Partner and the Investment Manager**

Highland Argentina Regional Opportunity Fund GP, LLC, a Delaware limited liability company (the "*General Partner*"), acts as the general partner of the Fund and the Master Fund and is registered as a foreign company in the Cayman Islands.

Highland Capital Management Latin America, L.P., a Cayman Islands exempted limited partnership (the "*Investment Manager*"), serves as the investment manager of the Fund, the Offshore Fund and the Master Fund and has responsibility for the Master Fund's investment program.

Each of the General Partner and the Investment Manager is ultimately controlled by James D. Dondero (the "*Principal*").

**The Investment Management Agreement**

The Investment Manager was appointed as the investment manager to the Fund, the Offshore Fund and the Master Fund pursuant to an investment management agreement (the "*Investment Management Agreement*"). Under the Investment Management Agreement, the Investment Manager has full discretion to invest the assets of the Master Fund in pursuit of the investment objective and strategy described in this Memorandum. For its services, the Investment Manager is entitled to the Management Fee, as well as reimbursement for any Feeder Fund or Master Fund expenses incurred by the Investment Manager.

The Investment Management Agreement provides that, in the absence of gross negligence, willful misconduct or fraud, each of the Investment Manager, its members, shareholders, partners, managers, directors, any person who controls the Investment Manager, each of the respective affiliates of the foregoing, and each of their respective executors, heirs, assigns, successors and other legal representatives, will be indemnified by the Fund, the Offshore Fund and/or the Master Fund, to the extent permitted by law, against any loss or liability incurred by any of such persons in performing their duties under the Investment Management Agreement.

**Services Agreement**

The Investment Manager engaged Highland Latin America Consulting, Ltd., a Cayman Islands exempted company and a wholly-owned subsidiary of the Investment Manager ("*Highland Latin America*"), pursuant to a services agreement (the "*Services Agreement*") to provide certain administrative and consulting services to the Investment Manager related to its management of the Fund, the Offshore Fund and the Master Fund, including back- and middle-office services; credit analysis; investment vehicle management; valuation; execution and documentation; marketing; reporting; administrative services; and other ancillary services.

The Services Agreement provides that in the absence of bad faith, gross negligence, fraud or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment), the Investment Manager will, to the extent permitted by law, indemnify and hold harmless Highland Latin America, any of its affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities incurred by such person in performing their duties under the Services Agreement. The

6

Fund will not be liable for any consulting services provided by Highland Latin America or any consultants or service providers that Highland Latin America engages, and the Fund will not bear any costs or expenses related to the services provided by Highland Latin America.

**Investment Personnel**

The key investment professionals of the Investment Manager and Highland Latin America who will be responsible for the Master Fund's investments are described below:

***James Dondero, CFA, CMA, President, Co-Founder***. Mr. Dondero is Co-Founder and President of Highland Capital Management, L.P. and a Director of Highland Latin America GP, Ltd., the general partner of the Investment Manager. Mr. Dondero has over 30 years of experience in the credit and equity markets, focused largely on high-yield and distressed investing. Mr. Dondero is the Chairman and President of NexPoint Residential Trust, Inc. (NYSE:NYRT), Chairman of NexBank Capital, Inc., Cornerstone Healthcare Group Holding, Inc., and CCS Medical, Inc., and a board member of Jernigan Capital, Inc. (NYSE:JCAP), and MGM Holdings, Inc. He also serves on the Southern Methodist University Cox School of Business Executive Board. A dedicated philanthropist, Mr. Dondero actively supports initiatives in education, veterans affairs, and public policy. Prior to founding Highland in 1993, Mr. Dondero was involved in creating the GIC subsidiary of Protective Life, where as Chief Investment Officer he helped take the company from inception to over $2 billion between 1989 and 1993. Between 1985 and 1989, Mr. Dondero was a corporate bond analyst and then portfolio manager at American Express. Mr. Dondero began his career in 1984 as an analyst in the JP Morgan training program. Mr. Dondero graduated from the University of Virginia where he earned highest honors (Beta Gamma Sigma, Beta Alpha Psi) from the McIntire School of Commerce with dual majors in accounting and finance. He has received certification as Certified Public Accountant (CPA) and Certified Managerial Accountant (CMA) and has earned the right to use the Chartered Financial Analyst (CFA) designation.

***Gustavo Prilick***. Mr. Prilick is a Managing Partner at Highland Capital Brasil and a registered asset manager in Brazil, and is a Director of Highland Latin America GP, Ltd., the general partner of the Investment Manager. He has extensively worked in several of Highland Capital Brasil's portfolio companies in the US mainly as CEO. Prior to his involvement with Highland Capital Brasil, he was a Partner at South America Fund, a private equity firm, mainly focused on providing financial services to export companies in Argentina and Uruguay. Prior to South America Fund, he was the Chief Operating Officer of Millicom International Cellular for 7 years, serving Latin America, Asia, Africa and ten operations in Russia. Prior to Millicom, he served as the Director of International Business for Oracle Corporation where he was responsible for the establishment of most of Oracle's International Subsidiaries on several continents, including the Brazilian operation. Later he became President of Oracle South America with oversight of several countries in South America. He also served as CEO of Nacion Factoring, a subsidiary of Banco Nacion in Argentina building its operations to reach one of the leading positions in the country. Mr. Prilick received an MBA from the Stanford University Graduate School of Business and a degree in Electrical Engineering from Universidad de Buenos Aires. He has also held teaching positions as a visiting professor in several leading Business Schools in Argentina.

Highland Latin America will enter into relationships and agreements with Argentine relevant parties and/or individuals to obtain supporting services for the management of the Fund, the Offshore Fund and the Master Fund, and will enter into consulting agreements with Andrés Pitchón, Julieta Prieto and Javier Casabal pursuant to which these consultants will provide investment and related services to the Feeder Funds and the Master Fund. Mr. Pitchón will provide portfolio management services to the Master Fund under the overall supervision of the Investment Manager.

Appx. 03883

*Andrés Pitchón*. Mr. Pitchón, through a consulting arrangement with Highland Latin America Consulting, Ltd., provides portfolio management services to the Master Fund. Mr. Pitchón began his career in 1993 as Head of Equity Research for Argentina for MBA-Salomon Brothers and later he also became responsible for Fixed income. As Head of the Research Department, his work was recognized by international publications such as Institutional Investor, Latin Finance, The Reuters Survey and The Greenwich Survey. Since 1997 and 1999, he has managed the Offshore Fund's equity and fixed income mutual funds. Since 2003, Mr. Pitchón had been Senior Portfolio Manager of the Offshore Fund's hedge funds. Mr. Pitchón received a BA degree in IT, focused on Business Administration from the University of Belgrano (1989), together with an academic merit medal for highest GPA in the School of Technology. Mr. Pitchón also received a Master's degree in Business Administration from Anderson Graduate School of Business at UCLA in 1992.

## The Administrator

The Master Fund has entered into an Administration Agreement (the "***Administration Agreement***") with MUFG Fund Services (Cayman) Limited (the "***Administrator***") pursuant to which the Administrator performs certain administrative and accounting services for the Feeder Funds and the Master Fund, subject to the oversight and control of the General Partner, in its capacity as the general partner of the Master Fund.

Pursuant to the Administration Agreement, the Administrator is responsible, under the overall supervision of the General Partner, in its capacity as the general partner of the Master Fund, for certain matters pertaining to the administration for the Fund, including: (i) maintaining the accounts of the Fund and the Master Fund, (ii) calculating the Master Fund's net asset value, (iii) maintaining the principal corporate records of the Fund and the Master Fund, (iv) communicating with Limited Partners, (v) accepting the subscriptions of new Limited Partners, (vi) effecting withdrawals of Interests, (vii) maintaining the register of sub-fund investments, (viii) executing sub-fund subscriptions and withdrawals as instructed by the Fund, and (ix) ensuring compliance with applicable law and regulation (including anti-money laundering regulations). For its services, the Administrator receives a fee from the Master Fund.

The Administration Agreement may be terminated by the Administrator or the Master Fund upon ninety (90) days' written notice or, under certain circumstances, shorter notice. In such event, the Master Fund may enter into a new agreement with a new administrator on behalf of the Master Fund and the Feeder Funds, in its discretion and on such terms as it deems advisable, without prior notice to, or approval of, investors.

Under the Administration Agreement, the Master Fund agrees to indemnify and hold harmless the Administrator and its affiliated persons and delegates, as well as their respective officers, directors, employees and agents for, and to defend and hold each such person harmless from, any and all taxes, claims, demands, actions, suits, judgments, liabilities, losses, damages, costs, charges, counsel fees (on a solicitor and his own client basis), fines, assessments, amounts paid in settlement and expenses imposed on, incurred by, or asserted against the person which may arise out of or in connection with the Administration Agreement. The Administrator or any other indemnified person will not be indemnified for their own gross negligence, wilful default or fraud.

The Administrator is not responsible for valuing the Master Fund's investments, monitoring any investment restrictions of the Master Fund, determining compliance by the Master Fund with its investment restrictions, the Master Fund's trading activities, the management or performance of the

Appx. 03884

Master Fund or the accuracy or adequacy of this Memorandum.  In addition, the Administrator does not assume any liability to any person or entity, including Limited Partners, except as specifically provided in the Administration Agreement.  The Administrator may delegate certain services and share information concerning the Fund and its Limited Partners with its various non-United States affiliates subject to applicable confidentiality provisions.

**The Administrator has no responsibility with respect to trading activities, the Investment Manager, the management or performance of the Master Fund, or the accuracy or adequacy of this Memorandum**.

**Appx. 03885**

## SUMMARY OF TERMS

*The following Summary of Terms summarizes the principal terms governing an investment in the Fund, and is subject, and qualified in its entirety by reference, to the Partnership Agreement, the exempted limited partnership agreement of the Master Fund, as amended (the "**Master Fund Partnership Agreement**"), and the Fund's subscription documents (the "**Subscription Documents**"). This summary is intended to be brief and does not purport to provide a comprehensive explanation of the Partnership Agreement, the Master Fund Partnership Agreement and the Subscription Documents. Accordingly, statements made in this Memorandum are subject to the detailed provisions of those agreements. Prospective investors are urged to review those agreements in their entirety prior to determining whether to invest in the Fund.*

| | |
|---|---|
| **The Fund** | Highland Argentina Regional Opportunity Fund, L.P., a Delaware limited partnership (the "***Fund***"), primarily seeks to maximize the total return of its assets through capital appreciation by investing all of its investable assets in Highland Argentina Regional Opportunity Master Fund, L.P., a Cayman Islands exempted limited partnership (the "***Master Fund***"), which intends to hold primarily a portfolio of investments in securities of Latin American corporate and sovereign issuers as well as non-Latin American issuers that derive a portion of their revenues from business activities in Latin America, in each case with a primary focus on Argentina. |
| **General Partner** | Highland Argentina Regional Opportunity Fund GP, LLC, a Delaware limited liability company (the "***General Partner***"), acts as the general partner of the Fund and the Master Fund and is registered as a foreign company in the Cayman Islands. James D. Dondero (the "***Principal***") ultimately controls the General Partner. |
| **Investment Manager** | Highland Capital Management Latin America, L.P., a Cayman Islands exempted limited partnership controlled by the Principal (the "***Investment Manager***"), serves as investment manager to the Feeder Funds (as defined below) and the Master Fund and has responsibility for the Master Fund's investments. |
| **Master-Feeder Structure** | In order to facilitate investments by non-U.S. and certain U.S. tax-exempt investors, the Investment Manager and its affiliates recently assumed the management of an existing investment fund, Highland Argentina Regional Opportunity Fund, Ltd., a Cayman Islands exempted company (the "***Offshore Fund***" and, together with the Fund, the "***Feeder Funds***"). The Feeder Funds will place all of their investable assets in, and conduct all of their investment and trading activities in parallel through, the Master Fund. Accordingly, references herein to the investment activity of the Fund should be construed to refer to the Fund's investment activities through the Master Fund. The Feeder Funds share all items of profit, loss, income and expense of the Master Fund on a *pro rata* basis in accordance with their respective capital account balances in the Master Fund. Except as the context otherwise requires, the term "Fund" also includes the Master Fund. |

Appx. 03886

The Investment Manager or an affiliate may also sponsor one or more additional investment funds or accounts.

| | |
|---|---|
| **Eligible Investors** | Limited partner interests ("**Interests**") may be purchased only by investors who qualify as both "accredited investors" and "qualified purchasers," each as defined in the Fund's Subscription Documents. Subscribers will be required to complete the Fund's Subscription Documents consisting of the subscription agreement and the subscriber information form to determine their eligibility. The General Partner reserves the right to reject any investor for any reason or for no reason in its sole discretion. |

An investment in the Fund is suitable only for persons that have adequate means of providing for their current needs and personal contingencies and have no need for liquidity in their investments. An investment in the Fund should not be made by any person that (a) cannot afford a total loss of its principal, or (b) has not carefully read or does not understand this Memorandum, including the portions concerning the risks and the income tax consequences of an investment in the Fund.

**Series of Interests**     The Fund intends to issue multiple series of Interests over time. Not all series of Interests will be available for subscription at the same time and the terms among the series of Interests will vary. Each series will have separate rights and preferences, including, without limitation, with respect to fees and withdrawal rights. The Fund is currently offering Series A Interests, Series B Interests and Series C Interests (each, a "**Series**").

New series of Interests may be established by the General Partner without notice to or approval of the Limited Partners (defined below). References herein to "Interests" or "Limited Partners" shall include all Series and Limited Partners unless otherwise specified or context so requires.

**Subscriptions**     Subscriptions for Interests may be accepted as of the first day of each calendar month and/or such other days as the General Partner may determine in its discretion from time to time, generally subject to the receipt of cleared funds no later than the Business Day immediately preceding the acceptance date. The initial minimum investment is $500,000, and thereafter, a Limited Partner may make additional investments, with the consent of the General Partner, in increments of not less than $500,000; provided that, in each case, the Fund may accept investments in a lesser amount, but no less than $100,000 with respect to Series B Interests.

"**Business Day**" is defined as any day on which banks in the Cayman Islands, Buenos Aires and New York City are authorized to open for

Appx. 03887

business or such other days as the General Partner may determine generally, or in any particular case.

A subscriber admitted to the Fund (a "***Limited Partner***") receives, in exchange for its initial capital contribution and any subsequent capital contribution, an Interest representing a proportionate share of the net assets of the Fund at that time.

All subscribers will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001 (Pub. L. No. 107-56) and other applicable anti-money laundering regulations as further described in this Memorandum and the Subscription Documents.

|                     |                                                                 |
|---------------------|-----------------------------------------------------------------|
| **Placement Agents** | There will be no sales charge payable by or to the Fund in connection with the offering of Interests.  However, the General Partner and/or the Investment Manager may enter into arrangements with placement agents (which may include its affiliates) to solicit investors in the Fund, and such arrangements may provide for the compensation of such placements agents for their services at the General Partner's and/or the Investment Manager's expense or such placement agents may be paid a portion of the Management Fee.  For the avoidance of doubt, the Fund will not bear any placement agent fees. |

Accordingly, investors should recognize that a placement agent's or distributor's participation in this offering may be influenced by its interest in such current or future fees and compensation.  Investors should consider these potential conflicts of interest in making their investment decisions.

Each placement agent shall comply with the legal requirements of the jurisdictions within which it offers and sells Interests.

|                     |                                                                 |
|---------------------|-----------------------------------------------------------------|
| **Capital Accounts** | The Fund will maintain a book capital account (a "***Capital Account***"), which may be divided into capital sub-accounts, for the General Partner and each Limited Partner (each, a "***Partner***" and together, the "***Partners***") to reflect contributions, withdrawals, distributions and allocations of net profit and net loss, with each sub-account being maintained as if it were the Capital Account of a separate Partner in order to calculate the Series B Early Withdrawal Reduction and Series C Early Withdrawal Reduction (each as defined below), as applicable, and the Performance Allocation (as defined below) for each capital contribution.  The initial balance of each Partner's Capital Account will be equal to the amount of cash or net value of any property contributed to the Fund by such Partner. |

If a Partner invests in more than one Series, the Fund will maintain a separate Capital Account on behalf of such Partner with respect to each such Series and each Capital Account will be treated as if it were the

Appx. 03888

Capital Account of a separate Partner for purposes of determining the Management Fee (as defined below) and Performance Allocation applicable to each Capital Account.

The Master Fund will issue to the Fund a limited partner interest in the Master Fund and will maintain capital accounts and sub-accounts that correspond to Limited Partners' Capital Accounts in the Fund.

**Affiliated Investors**      The Investment Manager, the General Partner and their respective affiliates, principals, employees, partners, agents, the respective family members of such personnel and trusts and other entities established primarily for their benefit or for charitable purposes ("***Affiliated Investors***") may not be subject to restrictions on withdrawals or be assessed the Management Fee or the Performance Allocation that are applicable to other investors in the Fund, but do share *pro rata* in all other applicable expenses of the Fund; provided that, the Special Limited Partner may, unless prohibited by law, make withdrawals of all or any part of its Performance Allocation and gains thereon from its capital account in the Master Fund as of any Withdrawal Date (as defined below).

**Borrowing and**      The Master Fund may buy securities or commodities on margin and
**Leverage**      arrange with banks, brokers and others to borrow money against a pledge of securities or commodities in order to employ leverage when the Investment Manager deems such action appropriate. The Master Fund may not borrow more than 100% of its net assets as described in "*Investment Program – Investment Restrictions*" above.

**Management Fee**      For its services to the Master Fund, the Investment Manager is entitled to a management fee (the "***Management Fee***") calculated monthly and payable quarterly in arrears at an annual rate of (i) 1.75% of each Limited Partner's Capital Account balance that is attributable to a Series A Interest, (ii) 1.25% of each Limited Partner's Capital Account balance that is attributable to a Series B Interest, and (iii) 1.00% of each Limited Partner's Capital Account balance that is attributable to a Series C Interest. The Management Fee is paid at the Master Fund level. The Management Fee will be prorated for any period that is less than a full calendar quarter.

The General Partner or the Investment Manager may elect to reduce, waive or calculate differently the Management Fee with respect to any Limited Partner, including, without limitation, Affiliated Investors. To effect such reduction, waiver or difference in calculation, the Fund may issue a separate series of Interests.

The General Partner may delay the timing or alter the structure of fees payable to the Investment Manager so long as such changes are not materially adverse to the Limited Partners. The Investment Manager may also assign all or any portion of fees payable to the Investment Manager,

13

|  | including the Management Fee and the Performance Allocation, to any affiliate thereof or any third party in its sole discretion. |
|---|---|
| **Performance Allocation** | Pursuant to the Master Fund Partnership Agreement, generally, as of the close of each fiscal quarter and subject to the limitations described below, a performance-based profits allocation (the "***Performance Allocation***") is debited against the Master Fund capital sub-account relating to each Series attributable to a Limited Partner and simultaneously credited to the Master Fund capital account of the Special Limited Partner.   The Performance Allocation is calculated and allocated at the Master Fund level, but is effectively equal to (i) 20.0% of the Net Capital Appreciation (as defined below) of each Series A Interest for such fiscal quarter, (ii) 17.5% of the Net Capital Appreciation of each Series B Interest for such fiscal quarter, and (iii) 15.0% of the Net Capital Appreciation of each Series C Interest for such fiscal quarter. |

The "***Net Capital Appreciation***" applicable to an Interest shall mean the amount by which the net asset value of such Interest on the last day of the fiscal quarter (or on the Withdrawal Date, if applicable) exceeds the higher of the following amounts: (i) the highest net asset value of such Interest as of the commencement of any fiscal quarter and (ii) the issue price of such Interest.   All such calculations include realized and unrealized gains and losses and are made before deduction of the Performance Allocation, but after deduction of the accrued applicable expenses of the Fund and the Master Fund for the applicable period, and in each case adjusted for any subscriptions and withdrawals made during the quarter.

The Performance Allocation is calculated and allocated at the Master Fund level through the use of separate memorandum sub-accounts with respect to the Fund's capital account in the Master Fund that correspond to each Series attributable to a Limited Partner.  No separate Performance Allocation will be charged at the Fund level.

The Performance Allocation generally will be allocable to the Special Limited Partner after the end of each fiscal quarter and as of any Withdrawal Date occurring prior to the end of any fiscal quarter.  The Performance Allocation payable with respect to any Interests withdrawn prior to the end of a fiscal quarter will be determined solely by reference to such withdrawn Interests and will be allocable to the Special Limited Partner on the Withdrawal Date.   The Performance Allocation with respect to any Limited Partner may be fully or partially waived or rebated by the General Partner in its sole discretion.

| **Other Fees and Expenses** | The Fund bears all of its own initial organizational expenses and its *pro rata* share of the initial organizational expenses of the Master Fund.  In general, the Fund's financial statements will be prepared in accordance with generally accepted accounting principles in the United States ("***GAAP***").  However, the General Partner intends to amortize the Fund's |
|---|---|

14

organizational expenses over a period of 60 calendar months from the date the Fund commenced operations because it believes such treatment is more equitable than expensing the entire amount of the organizational expenses in the Fund's first year of operation, as is required by GAAP. The General Partner may, however, limit the amount of start-up and organizational expenses that the Fund amortizes so that the audit opinion issued with respect to the Fund's financial statements will not be qualified.

The Fund pays all costs, fees and expenses arising in connection with the Fund's operations.   The Fund also bears its *pro rata* share of the cost of the Master Fund's operations and investments as provided in the Master Fund Partnership Agreement.   Expenses payable by the Fund in connection with the Master Fund's investment program, include, but are not limited to, brokerage commissions, other expenses related to buying and selling securities (including trading errors that are not the result of the Investment Manager's gross negligence, willful misconduct or fraud), costs of due diligence regardless of whether a particular transaction is consummated, the costs of attending shareholder meetings, research expenses and costs related to monitoring investments.  Expenses payable by the Fund in connection with its operations include, but are not limited to, fees and expenses of advisers and consultants; the Management Fee; fees and expenses of any custodians, escrow or transfer agents or other investment-related service providers; indemnification expenses and the cost of insurance against potential indemnification liabilities; interest and other borrowing expenses; legal, administrative, accounting, tax, audit and insurance expenses; expenses of preparing and distributing reports, financial statements and notices to Limited Partners; litigation or other extraordinary expenses; any withholding, transfer or other taxes payable by the Fund (including any interest and penalties), and the cost of periodically updating this Memorandum and the Partnership Agreement.

The Investment Manager may retain, in connection with its responsibilities under the Investment Management Agreement, the services of others to assist in the investment advice to be given to the Master Fund, including, but not limited to, any affiliate of the Investment Manager.   Payment for any such services will be assumed by the Investment Manager.  However, the Investment Manager, in its sole discretion, may retain the services of independent third party professionals on behalf of the Master Fund, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the Master Fund, and the Master Fund will bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

The Fund and the Master Fund do not have their own separate employees or office, and neither the Fund nor the Master Fund will reimburse the General Partner or the Investment Manager for salaries, office rent and other general overhead costs of the General Partner or the Investment

15

Appx. 03891

Manager.  A portion of the commissions generated on the Master Fund's brokerage transactions may generate soft dollar credits that the Investment Manager is authorized to use to pay for research and other research-related services and products used by the Investment Manager. It is the current policy of the Investment Manager to limit such use of soft dollars to fall within the safe harbor of Section 28(e) of the Securities Exchange Act of 1934, as amended, or to be otherwise reasonably related to the investment decision-making process or for Master Fund expenses. See "*Brokerage and Custody*."

If the General Partner or the Investment Manager, as appropriate, incurs any expenses for both the Master Fund and one or more Other Accounts (as defined herein), the General Partner or the Investment Manager, as appropriate, will allocate such expenses among the Master Fund and each such Other Account in proportion to the size of the investment made by each in the activity or entity to which the expenses relate, or in such other manner as the General Partner considers fair and reasonable.

**Allocation of Net Profit and Loss**

Net profit or net loss of the Fund is allocated among the Capital Accounts of the Partners as of the close of each calendar month, at any other time when the Fund receives an additional capital contribution or effects a withdrawal or distribution, or at such other times as the General Partner may determine (each, a "***Fiscal Period***").

The net profit or net loss of the Fund for any calendar month or other valuation period will reflect, with respect to all positions:

(a)   the dividends and interest accrued during the period;

(b)   the net realized gains or losses from the sale or other disposition of investments during the period allocated by the Fund;

(c)   the net change in the unrealized appreciation or depreciation of investments during the period held at the close of the period (*i.e.*, the difference between the fair market value of each investment at the end of the period compared with either the fair market value at the commencement of the period or, in the case of any investment made after the commencement of the period, the cost); and

(d)   the expenses of the Fund incurred or accrued during the period (other than the Management Fee and any other items that are charged on a Partner-by-Partner basis).

As of the close of each Fiscal Period, the net profit or net loss (subject to any applicable Performance Allocation paid at the Master Fund level) will be allocated *pro rata* among the Capital Accounts of the Partners in proportion to their percentage interests in the Fund as of the commencement of the period.  Each Partner's percentage interest in the Fund as of the commencement of any period is based on the value of the

16

<table>
<tr><td></td><td>Partner's Capital Account at such time in relation to the sum of the Capital Accounts of all of the Partners at such time.</td></tr>
</table>

Partner's Capital Account at such time in relation to the sum of the Capital Accounts of all of the Partners at such time.

The Management Fee will be calculated separately with respect to each Limited Partner and will be debited from the capital sub-account at the Master Fund level corresponding to each Limited Partner's Capital Account.

**Distributions**   Subject to the monthly withdrawal privilege described below, all earnings of the Fund are ordinarily retained for investment.  Limited Partners should not expect the Fund to make any dividend distributions.

**Withdrawals; Lock-Up**   Subject to certain withdrawal restrictions described below, a Limited Partner is generally permitted to withdraw all or a portion of its Capital Account as of the last Business Day of each calendar month (and/or such other Business Days as the General Partner may determine in its sole discretion) (each, a "***Withdrawal Date***"); provided that, any partial withdrawals may only be made in minimum amounts of $100,000.  Notwithstanding the foregoing, any Limited Partner that withdraws all or a portion of its Capital Account with respect to a Series B Interest prior to the one-year anniversary of the date such capital was contributed to the Fund is subject to an early withdrawal reduction of up to 3.0% of the net asset value of the portion of the Series B Interest being withdrawn, as determined at the close of business of such Withdrawal Date (such fee, the "***Series B Early Withdrawal Reduction***").  In addition, any Limited Partner that withdraws all or a portion of its Capital Account with respect to a Series C Interest prior to the:

(i)   one-year anniversary of the date such capital was contributed to the Fund is subject to an early withdrawal reduction of 5.0% of the net asset value of the portion of the Series C Interest being withdrawn, as determined at the close of business of such Withdrawal Date, and

(ii)   two-year anniversary, but on or after the one-year anniversary, of the date such capital was contributed to the Fund is subject to an early withdrawal reduction of 3.0% of the net asset value of the portion of the Series C Interest being withdrawn, as determined at the close of business of such Withdrawal Date (such fees with respect to Series C Interests, the "***Series C Early Withdrawal Reduction***" and together with the Series B Early Withdrawal Reduction, the "***Early Withdrawal Reduction***").

The Early Withdrawal Reduction is retained by the Fund (and generally invested in the Master Fund) and deducted from the withdrawal proceeds of the withdrawing Limited Partner.  The Early Withdrawal Reduction will not apply in the event of a Compulsory Withdrawal (defined below).

17

**Appx. 03893**

Written notice of any withdrawal request must be received in writing by the Administrator at least 30 calendar days prior to the requested Withdrawal Date. The General Partner may waive such notice requirements, or permit withdrawals under such other circumstances, if, in its sole discretion, it determines that, under the circumstances, to waive such requirement will not have an adverse effect on the Master Fund's portfolio.

If the Master Fund violates the investment restrictions and fails to remedy the violation on or before the Remedy Date (as described in "*Investment Program – Investment Restrictions*"), any Limited Partner may withdraw all or part of its Capital Account on the next Withdrawal Date and will not be subject to the Early Withdrawal Reduction; provided that, such Limited Partner has requested such withdrawal in writing within 30 Business Days after the Remedy Date.

|  |  |
|---|---|
| **Settlement of Withdrawal Proceeds** | A withdrawal request is normally settled in cash or, subject to the sole discretion of the General Partner, wholly or partially with securities or other assets of the Fund (received from the Master Fund), whether or not readily marketable, generally within 10 Business Days after the Withdrawal Date; provided that the General Partner may delay such payment if such delay is reasonably necessary to prevent such withdrawal from having a material adverse impact on the Fund. In the event that the General Partner satisfies a withdrawal request with assets in kind, such securities may be transferred to a liquidating account and sold by the Fund for the benefit of the withdrawing Limited Partner, in which case, payment of the withdrawal proceeds attributable to such investments will be delayed until such investments are sold. The amount payable in respect of such investments will depend on the performance of such investments through to the date on which they are sold. The cost of operating the liquidating account and selling the investment(s) will be deducted from the proceeds of sale paid to the withdrawing Limited Partner. |

Notwithstanding anything to the contrary herein, the General Partner may establish reserves and holdbacks for estimated accrued expenses, liabilities and contingencies, including, without limitation, general reserves for unspecified contingencies (even if such reserves or holdbacks are not otherwise required by GAAP) or liabilities stemming from tax obligations (as such may be determined in the sole discretion of the General Partner and whether or not incurred directly or indirectly), which could reduce the amount of a distribution upon a Limited Partner's withdrawal. The General Partner may withhold for the benefit of the Fund from any distribution to a withdrawing Limited Partner an amount representing the actual or estimated costs incurred by the Fund with respect to such withdrawal, as well as any Early Withdrawal Reduction described above.

Appx. 03894

| | |
|---|---|
| **Withdrawal Conditions** | The General Partner or the Administrator may refuse to accept a withdrawal request if it is not accompanied by such additional information as the General Partner or the Administrator may reasonably require. This power may, without limitation to the generality of the foregoing, be exercised where proper information has not been provided for money laundering verification purposes. In addition, where withdrawal proceeds are requested to be remitted to an account which is not in the name of the Limited Partner, the General Partner and the Administrator reserve the right to request such information as may be reasonably necessary in order to verify the identity of the Limited Partner and the owner of the account to which the withdrawal proceeds will be paid. The withdrawal proceeds will not be paid to a third-party account if the Limited Partner and/or owner of the account fails to provide such information. |
| **Compulsory Withdrawals** | The General Partner reserves the right, in its sole discretion, to compel the withdrawal of a Limited Partner's Interest at any time and for any reason on not less than seven days' prior written notice (or immediately if the General Partner, in its sole discretion, determines that such Limited Partner's continued investment in the Fund may cause the Fund, the Master Fund, the General Partner or the Investment Manager to violate any applicable law) (a "***Compulsory Withdrawal***"). The General Partner will compel the withdrawal of a Limited Partner's Interest in its entirety if a Limited Partner requests a withdrawal that would cause its total investment with respect to a particular Series to fall below a minimum of $100,000 (a "***Minimum Required Withdrawal***"). In either case, settlements are made in the same manner as voluntary withdrawals, except that the Early Withdrawal Reduction will not apply in the event of a Compulsory Withdrawal, but will apply to any Minimum Required Withdrawal. |
| **Suspension of Withdrawals and Withdrawal Payments** | The General Partner may, at any time, suspend (a) the calculation of the net asset value of the Interests (and the applicable valuation date); (b) the issuance of Interests, (c) the withdrawal by Limited Partners of Interests (and the applicable Withdrawal Date); and/or (d) the payment of withdrawal proceeds (even if the calculation dates and Withdrawals Dates are not postponed) (each, a "***Suspension***") during any period which: (i) any stock exchange on which a substantial part of investments owned by the Fund (through the Master Fund) are traded is closed, other than for ordinary holidays, or dealings thereon are restricted or suspended; (ii) there exists any state of affairs as a result of which (A) disposal of a substantial part of the investments owned by the Fund (through the Master Fund) would not be reasonably practicable and might seriously prejudice the Limited Partners, or (B) it is not reasonably practicable for the Fund fairly to determine the value of its net assets; (iii) none of the withdrawal requests which have been made may lawfully be satisfied by the Fund; (iv) there is a breakdown in the means of communication normally employed in determining the prices of a substantial part of the |

Appx. 03895

investments of the Fund (through the Master Fund); (v) in the sole discretion of the General Partner, it is necessary to preserve the Fund's assets; or (vi) automatically upon any suspension of withdrawals by the Master Fund for similar reasons as described in "*The Master Fund*," below.

The Administrator will promptly notify each Limited Partner who has submitted a withdrawal request and to whom payment in full of the amount being withdrawn has not yet been remitted of any Suspension of withdrawals or Suspension of the payment of withdrawal proceeds. Any remaining amount of a withdrawal request that is not satisfied due to such a Suspension remains at risk as per other amounts invested in the Fund and subject to the applicable Management Fee until such amount is finally and fully withdrawn. Such Limited Partners will not be given any priority with respect to the withdrawal of Interests after the cause for such Suspension or limitation ceases to exist. The General Partner may in its sole discretion, however, permit such Limited Partners to withdraw their withdrawal requests to the extent that the relevant Withdrawal Date has not yet passed. For the avoidance of doubt, where a suspension of the payment of withdrawal proceeds is declared between the relevant Withdrawal Date and the remittance of such payment proceeds, affected Limited Partners shall not have any right to withdraw their withdrawal requests. Upon the reasonable determination by the General Partner that conditions leading to a Suspension no longer apply, the Administrator will notify the Limited Partners of the end of the Suspension. At such time, any such suspended payments shall generally be paid in accordance with the normal process for making such payments, withdrawal rights shall be promptly reinstated and any pending withdrawal requests which were not withdrawn (or new, timely withdrawal requests) will be effected as of the first Withdrawal Date following the removal of the Suspension, subject to the foregoing restrictions on withdrawals.

**Transfers**

Interests are not transferable except with the prior written consent of the General Partner, which consent may be withheld in its sole discretion. The General Partner will require any transferee or assignee of any Limited Partner to execute the Subscription Documents.

**Duty of Care; Indemnification**

Pursuant to the Partnership Agreement, the Master Fund Partnership Agreement and the Investment Management Agreement, the General Partner, the Investment Manager, each member, shareholder, partner, manager and director of, and any person who controls, the General Partner or the Investment Manager, each of the respective affiliates of the foregoing and each of their respective executors, heirs, assigns, successors and other legal representatives (each such person, an "***Indemnified Party***") shall not be liable to the Master Fund, the Fund or the Limited Partners for any loss or damage arising by reason of being or having been an Indemnified Party or from any acts or omissions in the performance of its services as an Indemnified Party in the absence of gross negligence, willful misconduct or fraud, or as otherwise required by

Appx. 03896

law. In no event shall any Indemnified Party be liable for any consequential damages, special or indirect damages or lost profits.

The Partnership Agreement, the Master Fund Partnership Agreement and the Investment Management Agreement contain provisions for the indemnification of the Indemnified Parties by the Master Fund and the Fund (but not by the Limited Partners individually) against any liabilities arising by reason of being or having been an Indemnified Party or in connection with the Partnership Agreement, the Master Fund Partnership Agreement, the Investment Management Agreement, or the Master Fund's or the Fund's business or affairs to the fullest extent permitted by law in the absence of gross negligence, willful misconduct or fraud. The General Partner is not personally liable to any Limited Partner for the repayment of any withdrawal proceeds or for contributions by such Limited Partner to the capital of the Fund or by reason of any change in the U.S. federal or state income tax laws applicable to the Fund or its investors.

**Non-Exclusivity; Allocation of Opportunities**

None of the Investment Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees is precluded from engaging in or owning an interest in other business ventures or investment activities of any kind, whether or not such ventures are competitive with the Fund or the Master Fund.

The Master Fund Partnership Agreement requires the General Partner, and the Investment Manager as delegatee of the General Partner, to act in a manner that it considers fair and equitable over time in allocating investment opportunities to the Master Fund. Although the General Partner and the Investment Manager consider certain factors set forth in the Investment Manager's policies to determine how to allocate trades, the Investment Manager's policies and the Master Fund Partnership Agreement do not otherwise impose any specific obligations or requirements concerning the allocation of time, effort or investment opportunities to the Master Fund or any restrictions on the nature or timing of investments for the account of the Master Fund and for the General Partner's or the Investment Manager's own accounts or for other accounts that the General Partner, the Investment Manager or their affiliates may manage (each, an "*Other Account*"). The General Partner and the Investment Manager are not obligated to devote any specific amount of time to the affairs of the Master Fund and are not required to accord exclusivity or priority to the Master Fund in the event of limited investment opportunities arising from the application of speculative position limits or other factors.

The Principal, as well as the employees and officers of the Investment Manager and of organizations affiliated with the Investment Manager, may buy and sell securities for their own account or the account of others, but may not buy securities from or sell securities to the Master Fund (such prohibition does not extend to the purchase or sale of interests in the

21

Fund), unless such purchase or sale is in compliance with the applicable provisions of the Investment Advisers Act of 1940, as amended.

The Investment Manager undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Fund's investors.

It is the policy of the Investment Manager to allocate investment opportunities fairly and equitably over time. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate. The Investment Manager has the authority to allocate trades to multiple accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the Investment Manager may allocate the trades among different accounts on a basis it considers fair and equitable over time. One or more of the foregoing considerations may (and are often expected to) result in allocations among the Master Fund and one or more accounts on other than a *pari passu* basis. See "*Risk Factors and Potential Conflicts of Interest*" below.

**Affiliated Service Providers**

NexBank, SSB ("*NexBank SSB*") is an affiliate of the Investment Manager and may, from time to time, provide banking and/or agency services to the Investment Manager, clients of the Investment Manager or collective investment vehicles for which the Investment Manager provides investment advisory services (including the Fund and other vehicles in which the Fund, through the Master Fund, may invest) or third parties engaged in transactions involving the Investment Manager. NexBank SSB may also act as an agent in connection with certain securities transactions involving the Investment Manager's client accounts (including the Master Fund and other vehicles in which the Master Fund may invest). Principals of the Investment Manager own a majority of the equity interests in NexBank SSB and employees or affiliates of the Investment Manager own or may own a substantial equity interest in NexBank SSB. Certain Master Fund investment transactions may be executed through NexBank Securities, Inc., an affiliate of the Investment Manager and a registered broker-dealer.

Additionally, the Investment Manager or affiliates of the Investment Manager, including, without limitation, Nexbank SSB, NexBank Securities, Inc.,NexBank Capital Advisors and Governance Re, Ltd., may provide financial advisory, management, insurance, title insurance or other services for a fee to portfolio companies in which the Master Fund may have an interest. Highland Latin America, an affiliate of the Investment Manager, has been engaged to provide certain administrative and consulting services to the Investment Manager. See "*Risk Factors and Potential Conflicts of Interest*" below.

| | |
|---|---|
| **Valuations** | In general, the Fund's financial statements will be prepared in accordance with GAAP. The General Partner has delegated the valuation of the Fund's assets, based on the Master Fund's assets, to the Administrator who values the Fund's assets as of the close of each Fiscal Period in accordance with the Investment Manager's valuation policies and procedures. |
| **Reserves** | Appropriate reserves may be accrued and charged against net assets and proportionately against the Capital Accounts of the Partners for contingent liabilities, such reserves to be in the amounts (subject to increase or reduction) that the General Partner in its sole discretion deems necessary or appropriate. At the sole discretion of the General Partner, the amount of any such reserve (or any increase or decrease therein) may be charged or credited, as appropriate, to the Capital Accounts of those investors who are Limited Partners at the time when such reserve is created, increased or decreased, as the case may be, or alternatively may be charged or credited to those investors who were Limited Partners at the time of the act or omission giving rise to the contingent liability for which the reserve was established. |
| | If the General Partner determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then such amount may be proportionately charged or credited, as appropriate, to those persons who were Limited Partners during any such prior period(s). |
| **Fiscal Year** | The Fund has a fiscal year ending on December 31 of each calendar year. |
| **Reports to Limited Partners** | The Fund furnishes to its Partners as soon as practicable after the end of each taxable year (or as otherwise required by law) such tax information as is necessary for each Partner to complete U.S. federal and state income tax or information returns, along with any other tax information required by law. Within 120 days of the end of each year (or as soon as practicable thereafter), the Fund distributes to each Partner audited financial statements of the Fund, including a statement of profit or loss for such fiscal year and an unaudited status of each such Partner's holdings in the Fund at such time. Partners will also receive, upon request to the Administrator, copies of semi-annual financial statements of the Fund. |
| **Tax Status** | The General Partner believes that the Fund should be treated as a partnership for U.S. federal income tax purposes and should not itself be subject to U.S. federal income taxation. Each Limited Partner otherwise subject to U.S. federal income tax is required to include in such Limited Partner's taxable income such Limited Partner's share of the Fund's income and gains, when realized by the Fund (regardless of cash distributions from the Fund to such investor), and may claim, to the extent allowable, such Limited Partner's share of the Fund's losses and deductions. Due to the nature of the Fund's activities, the Fund's income or loss for U.S. federal income tax purposes for a particular taxable period |

23

|                                          | may differ from its financial or economic results. The deductibility of a Limited Partner's share of any Fund losses or deductions may be limited. See *Tax Considerations*." |
|---|---|
| **ERISA** | The Investment Manager intends to limit investment in the Master Fund by "benefit plan investors" so that the assets of the Master Fund will not be considered "plan assets" for purposes of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"). It is anticipated that the assets of the Fund may constitute "plan assets" for purposes of ERISA. See "*ERISA and Other Regulatory Considerations*." |
| **Amendment of the Limited Partnership Agreement** | The Partnership Agreement may be amended by the General Partner with the consent of a majority in interest of the Limited Partners, which consent may be obtained through negative consent. However, the Fund may not: (a) increase the obligation of a Limited Partner to make any contribution to the capital of the Fund; (b) reduce the Capital Account of any Limited Partner other than as contemplated by the Partnership Agreement; or (c) reduce any Limited Partner's right to share in net profits or assets of the Fund, in each case, without the consent of each Limited Partner adversely affected thereby. The above consent may be obtained by negative consent.

Notwithstanding the foregoing, the General Partner may amend the Partnership Agreement at any time without the consent of any Limited Partner: (a) to comply with applicable laws and regulations; (b) to make changes that do not adversely affect the rights or obligations of any Limited Partner; (c) to cure any ambiguity or correct or supplement any conflicting provisions of the Partnership Agreement; or (d) with respect to any other amendment, if any Limited Partner whose contractual rights as a Limited Partner would be materially and adversely changed by such amendment has an opportunity to withdraw from the Fund (without being subject to the Early Withdrawal Reduction) as of a date that is not less than 30 days after the General Partner has furnished written notice of such amendment to each Limited Partner and that is prior to the effective date of the amendment. |
| **Variation of Terms** | The General Partner or the Investment Manager, in its sole discretion, may enter into a side letter or similar agreement to or with one or more Limited Partners that has the effect of establishing rights under, or altering or supplementing the terms of, the Partnership Agreement or of any Subscription Documents (including those relating to access to information, the Management Fee, the Performance Allocation, minimum investment amount, voting rights and withdrawal rights) with respect to such Limited Partner(s). |

24

# THE MASTER FUND

## The Master Fund's Partnership Interests

The Master Fund's partnership interests are currently held exclusively by the Fund and the Offshore Fund as limited partners, the Investment Manager as the special limited partner of the Master Fund, and the General Partner as the general partner of the Master Fund, pursuant to the Master Fund Partnership Agreement.  The General Partner is registered as a foreign company in the Cayman Islands pursuant to Part IX of the Companies Law (2016 Revision).

## The Master Fund Partnership Agreement

The Master Fund is constituted as a Cayman Islands exempted limited partnership under the Exempted Limited Partnership Law, 2014 (the "***Exempted Limited Partnership Law***").  A Cayman Islands exempted limited partnership is constituted by the signing of the relevant partnership agreement and its registration with the Registrar of Exempted Limited Partnerships in the Cayman Islands.

A Cayman Islands exempted limited partnership is not a separate legal person distinct from its partners.  Under the Exempted Limited Partnership Law, any property which is conveyed into or vested in the name of the exempted limited partnership shall be held or deemed to be held by the general partner, and if more than one, then by the general partners jointly upon trust, as an asset of the partnership in accordance with the terms of the partnership agreement.  Any debt or obligation incurred by a general partner in the conduct of the business of an exempted limited partnership shall be a debt or obligation of the exempted limited partnership.  Registration under the Exempted Limited Partnership Law entails that the partnership becomes subject to, and the limited partners therein are afforded the limited liability and other benefits of, the Exempted Limited Partnership Law (subject to compliance therewith).

*Liability of Partners and Indemnification of the General Partner and Others*.  The business of a Cayman Islands exempted limited partnership will be conducted by its general partner(s) who will be liable for all debts and obligations of the exempted limited partnership to the extent that the partnership has insufficient assets.  As a general matter, a limited partner of a Cayman Islands partnership will not be liable for the debts and obligations of the exempted limited partnership, other than:

(i)     as expressed in the partnership agreement,

(ii)    if such limited partner takes part in the conduct of the business of an exempted limited partnership in its dealings with persons who are not partners, then that limited partner shall be liable, in the event of the insolvency of the exempted limited partnership, for all debts and obligations of that exempted limited partnership incurred during the period that he so participates in the conduct of the business as though he were, for such period, a general partner, provided always that he shall be rendered liable pursuant to the foregoing provision only to a person who transacts business with the exempted limited partnership during such period with actual knowledge of such participation and who then reasonably believed such limited partner to be a general partner, or

(iii)   if such limited partner is obligated pursuant to Section 34(1) of the Exempted Limited Partnership Law to return a distribution made to it (with interest at a rate of 10% per annum, unless otherwise specified in the Master Fund Partnership Agreement) when the exempted limited partnership is insolvent or within six months prior to such insolvency.

The Master Fund Partnership Agreement provides that none of the Indemnified Parties will be liable to the Master Fund or any limited partner of the Master Fund (including the Feeder Funds) for any loss or damage arising by reason of being or having been an Indemnified Party or from any acts or omissions in the performance of its services as an Indemnified Party in the absence of gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud, or as otherwise required by law.  An Indemnified Party may consult with counsel and accountants in respect of the Master Fund's affairs and will be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants, provided that they were selected in accordance with the standard of care set forth above.  In addition, in no event shall any Indemnified Party be liable for any consequential damages, special or indirect damages or lost profits.

The Master Fund Partnership Agreement provides that the Master Fund shall, to the fullest extent permitted by law, indemnify and hold harmless each Indemnified Party from and against any and all liabilities suffered or sustained by an Indemnified Party by reason of the fact that it, he or she is or was an Indemnified Party or in connection with the Master Fund Partnership Agreement or the Master Fund's business or affairs, including, without limitation, any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, suit or proceeding, provided that such liability did not result from the gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud of such Indemnified Party.  The Master Fund Partnership Agreement also provides that the Master Fund will, in the sole discretion of the General Partner, advance to any Indemnified Party reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action, suit or proceeding which arises out of such conduct, subject to receiving a written undertaking from the Indemnified Party to repay such amounts if and to the extent that it is finally determined that the Indemnified Party was not entitled to indemnification in respect thereof.

Notwithstanding any of the foregoing, the provisions of the Master Fund Partnership Agreement do not provide for the exculpation or indemnification of any Indemnified Party for any liability (including liability under U.S. federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the above provisions to the fullest extent permitted by law.

Pursuant to the foregoing indemnification and exculpation provisions applicable to each Indemnified Party, the Master Fund (and not the applicable Indemnified Party) will be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud.  Given the volume of transactions executed on behalf of the Master Fund, trading errors (and similar errors) will occur and the Master Fund will be responsible for any resulting losses, even if such losses result from the negligence (but not gross negligence) of any Indemnified Party.

The Indemnified Parties will also be indemnified by each limited partner of the Master Fund for any amounts of tax withheld or required to be withheld with respect to that limited partner, and also for any amounts of interest, additions to tax, penalties and other costs borne by any such persons in connection therewith to the extent that the balance of the limited partner's capital account is insufficient to fully compensate the General Partner and the Investment Manager for such costs.

26

*Contributions and Withdrawals by the Fund*. Limited partners of the Master Fund may make contributions at such times and in such amounts as the General Partner determines. As a limited partner of the Master Fund, the Fund may, subject to the consent of the General Partner, voluntarily request a withdrawal of all or part of its capital in the Master Fund at such times and in such amounts as it may determine. The General Partner may, at any time, suspend (a) the calculation of the net asset value of the Master Fund (and the applicable valuation date); (b) the issuance of limited partner interests in the Master Fund; (c) the withdrawal by limited partners of their interests (and the applicable withdrawal date); and/or (d) the payment of withdrawal proceeds (even if the calculation dates and withdrawal dates are not postponed) during any period which: (i) any stock exchange on which a substantial part of investments owned by the Master Fund are traded is closed, other than for ordinary holidays, or dealings thereon are restricted or suspended; (ii) there exists any state of affairs as a result of which (A) disposal of a substantial part of the investments owned by the Master Fund would not be reasonably practicable and might seriously prejudice the limited partners of the Master Fund, or (B) it is not reasonably practicable for the Master Fund fairly to determine the value of its net assets; (iii) none of the withdrawal requests which have been made may lawfully be satisfied by the Master Fund; (iv) there is a breakdown in the means of communication normally employed in determining the prices of a substantial part of the investments of the Master Fund; or (v) in the sole discretion of the General Partner, it is necessary to preserve the Master Fund's assets.

*Amendment of the Master Fund Partnership Agreement*. The Master Fund Partnership Agreement may be amended by an instrument in writing signed by each of the limited partners of the Master Fund and the General Partner; provided that, the General Partner may amend the Master Fund Partnership Agreement without the consent of the limited partners so long as the amendment does not adversely affect any rights of the limited partners.

*Dissolution of the Master Fund*. The Master Fund shall be wound up and dissolved upon the first to occur of any of the following liquidating events, and Sections 36(1)(b), 36(9) and 36(12) of the Exempted Limited Partnership Law shall not apply to the Master Fund:

(i)     the written election of the General Partner to terminate the Master Fund; or

(ii)    if the General Partner is the sole or last remaining general partner, the date (the "***Automatic Dissolution Date***") falling 90 days after the date of the service of a notice by the General Partner (or its legal representative) on all the limited partners informing the limited partners of:

        (1)     the commencement of liquidation or bankruptcy proceedings in relation to the General Partner; or

        (2)     the withdrawal, removal or making of a winding up or dissolution order in relation to the General Partner;

*provided that*, if a majority in number of the limited partners elects one or more new general partners before the Automatic Dissolution Date, the business of the Master Fund shall be resumed and continued. If a new general partner is not elected by the Automatic Dissolution Date, the Master Fund shall be wound up and dissolved in accordance with terms of the Master Fund Partnership Agreement and the Exempted Limited Partnership Law.

**Appx. 03903**

*Power of Attorney*.  Each limited partner of the Master Fund shall make, constitute and appoint the General Partner (and each of its successors and permitted assigns) for the time being, with full power of substitution, as its true and lawful agent and attorney-in-fact of, and in the name, place and stead of, such Partner with the power from time to time to make, execute, sign, acknowledge, swear to (and deliver as may be appropriate) on its behalf and file and record in the appropriate public offices and publish (as may in the reasonable judgment of the General Partner be required by law), including the admission of any new partners of the Master Fund and any amendments to the Master Fund Partnership Agreement. Each limited partner of the Master Fund shall authorize the General Partner to take any further action that the General Partner considers necessary or advisable in connection with the foregoing.  Such power of attorney granted is intended to secure a proprietary interest of the General Partner and the performance by each limited partner of the Master Fund of its obligations under the Master Fund Partnership Agreement and shall be irrevocable and shall survive and not be affected by the subsequent death, lack of capacity, insolvency, bankruptcy or dissolution of any limited partner of the Master Fund.

**Valuation of Assets**

The General Partner has delegated the valuation of the Master Fund's assets to the Administrator, which will generally compute the value of the securities and other assets of the Master Fund as of the close of business on the last day of each fiscal period and on any other date selected by the General Partner in its sole discretion.  In addition, the Administrator must compute the value of the securities that are being distributed in-kind as of their date of distribution in accordance with the Master Fund Partnership Agreement.  In determining the value of the assets of the Master Fund, no value is placed on the goodwill or name of the Master Fund, or the office records, files, statistical data or any similar intangible assets of the Master Fund not normally reflected in the Master Fund's accounting records, but there must be taken into consideration any related items of income earned but not received, expenses incurred but not yet paid, liabilities fixed or contingent, prepaid expenses to the extent not otherwise reflected in the books of account, and the value of options or commitments to purchase or sell securities pursuant to agreements entered into on or prior to such valuation date.

A copy of the Investment Manager's valuation policy is available upon request from the General Partner.

The value of each security and other asset of the Master Fund and the net worth of the Master Fund as a whole determined pursuant Master Fund Partnership Agreement are conclusive and binding on all of the partners of the Master Fund and all persons claiming through or under them.

Appx. 03904

### RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST

*Investment in the Fund is speculative and involves substantial risks, including, but not limited to, those summarized below. The Fund is not suitable for all investors and is intended for sophisticated investors who can accept the risks associated with their investments. Prospective investors should carefully consider the risk factors described in this section, among others, in determining whether an investment in the Fund is suitable for them. There can be no assurance that the Master Fund's program will be successful or that investments purchased by the Master Fund will increase in value. An investor must be prepared to bear capital losses that might result from an investment in the Fund, including a complete loss of the investor's invested capital. All investors in the Fund should consult their own legal, tax and financial advisors prior to investing in the Fund.*

*For purposes of this section, references to the "Fund" should be understood to mean each of the Fund and the Master Fund, as applicable, and each of the risk factors set forth herein, while not exhaustive, shall apply equally to each of the Fund and the Master Fund, as applicable.*

**General Risks**

*Lack of Operating History*. The Fund, the Master Fund and the General Partner do not have operating histories upon which investors can evaluate the anticipated performance of the Fund. Although the principals of the Investment Manager have extensive prior experience in Latin America, past performance of the Investment Manager should not be construed as an indication of the future results of an investment in the Fund. The Master Fund's investment program should be evaluated on the basis that there can be no assurance that the Investment Manager's assessment of the short-term or long-term prospects of its investment strategy will prove accurate, or that the Master Fund will achieve its investment objectives.

*Risks Associated With Investments in Securities*. Any investment in securities carries market risks. An investment in the Fund is highly speculative and involves a high degree of risk due to the nature of the Master Fund's investments and the strategies to be employed. An investment in the Fund should not in itself be considered a balanced investment program, but rather is intended to provide diversification in a more complete investment portfolio.

*Investment Judgment; Market Risk*. The profitability of a significant portion of the Master Fund's investment program depends to a great extent upon correctly assessing the future course of the price movements of securities and other investments. There can be no assurance that the Investment Manager will be able to predict accurately these price movements. With respect to the investment strategy utilized by the Master Fund, there is always some, and occasionally a significant, degree of market risk.

*Limited Liquidity; Additional Information*. An investment in the Fund provides limited liquidity since the Interests are not freely transferable and may only be withdrawn at such times as set forth in this Memorandum. The General Partner may suspend withdrawals, in whole or in part, when such a suspension is warranted by extraordinary circumstances described in "*Summary of Terms – Suspension of Withdrawals and Withdrawal Payments*" above. The General Partner may also delay the payment of withdrawal proceeds as more fully described elsewhere in this Memorandum. Investments that remain in the Fund are subject to all risks related to an investment in the Fund as described in this Memorandum.

Also, certain Limited Partners (including, without limitation, the Affiliated Investors), may invest on terms that provide access to information that is not generally available to other Limited Partners and,

**Appx. 03905**

as a result, may be able to act on such additional information (e.g., withdraw their Interests) that other Limited Partners do not receive.  An investment in the Fund is suitable only for sophisticated investors who have no need for current liquidity.

*Effect of Substantial Withdrawals*.  Substantial withdrawals from the Fund could require the Master Fund to liquidate its positions more rapidly than otherwise desired in order to raise the cash necessary to fund the withdrawals at the Fund level.  Illiquidity in certain securities could make it difficult for the Master Fund to liquidate positions on favorable terms, which could result in losses or a decrease in the net asset value of the Master Fund, and thus, the Fund.  The Master Fund is permitted to borrow cash necessary to make payments in connection with withdrawals from the Fund when the Investment Manager determines that it would not be advisable to liquidate portfolio assets for that purpose.  The Master Fund is also authorized to pledge portfolio assets as collateral security for the repayment of such loans.  In these circumstances, the continuing Limited Partners will bear the risk of any subsequent decline in the value of the Fund's assets.

*Effect of Withdrawal by Limited Partner on its Investment*.  Where a withdrawal request is accepted, an Interest will be treated as having been withdrawn effective as of the relevant Withdrawal Date, irrespective of whether or not such withdrawing Limited Partner has been removed from the Fund's books and records or the withdrawal proceeds have been determined or remitted. Accordingly, on and from the relevant Withdrawal Date, Limited Partners in their capacity as such will not be entitled to or be capable of exercising any rights arising under the Partnership Agreement or Subscription Documents with respect to the Interest being withdrawn, save the right to receive the withdrawal proceeds.  Such withdrawing Limited Partners will be creditors of the Fund with respect to the withdrawal proceeds.  In an insolvent liquidation, withdrawing Limited Partners will rank behind ordinary creditors but ahead of existing Limited Partners.

*Master-Feeder Structure*.  The Fund will invest all of its investable assets in the Master Fund. The "master-feeder" fund structure presents certain risks to the Limited Partners.  Smaller feeder funds may be materially affected by the actions of larger feeder funds.

While the Investment Manager, as investment manager of the Master Fund, generally will not consider tax issues applicable to any particular investors, it generally will take into account the tax positions of the Fund and the Offshore Fund that invest in the Master Fund.  However, the use of a "master-feeder" structure may create a conflict of interest in that different tax considerations for the Fund and the Offshore Fund may cause or result in the Master Fund structuring or disposing of an investment in a manner or at a time that is more advantageous (or disadvantageous) for tax purposes to one Feeder Fund or its investors.

*Management Fee and Performance Allocations*.  As described above, the Master Fund Partnership Agreement provides for the payment of the Management Fee to the Investment Manager and the Performance Allocation to the Investment Manager, in its capacity as the Special Limited Partner. The Performance Allocation may create an incentive for the Investment Manager, as the Special Limited Partner, to make investments that are riskier or more speculative than would be the case in the absence of such Performance Allocation.

*Side Letters*.  The Investment Manager or the Fund may from time to time enter into letter agreements or other similar agreements (collectively, "***Side Letters***") with one or more Limited Partners which provide such Limited Partner(s) with additional and/or different rights (including, without limitation, with respect to access to information, the Management Fee, the Performance Allocation,

minimum investment amounts, voting rights and withdrawal rights) than such Limited Partner(s) have pursuant to this Memorandum.  As a result of such Side Letters, certain Limited Partners may receive additional benefits (including, but not limited to, reduced fee obligations, the ability to withdraw Interests on shorter notice and/or expanded informational rights) which other Limited Partners will not receive.  For example, a Side Letter may permit a Limited Partner to withdraw its Interest on less notice and/or at different times than other Limited Partners.  As a result, should the Fund experience a decline in performance over a period of time, a Limited Partner who is party to a Side Letter that permits less notice and/or different withdrawal times may be able to withdraw its Interest prior to other Limited Partners.  In general, the Fund and/or the Investment Manager will not be required to notify any or all of the other Limited Partners of any such Side Letters or any of the rights and/or terms or provisions thereof, nor will the Fund and/or the Investment Manager be required to offer such additional and/or different rights and/or terms to any or all of the other Limited Partners.  The Fund and/or the Investment Manager may cause the Fund to enter into such Side Letters with any party as the Fund and/or the Investment Manager may determine in its sole discretion at any time.  The other Limited Partners will have no recourse against the Fund and/or the Investment Manager in the event certain Limited Partners receive additional and/or different rights and/or terms as a result of such Side Letters.  A Limited Partner will be required to enter into such undertakings with respect to maintaining the confidentiality of any such additional information as the Fund and/or the Investment Manager may in their sole discretion determine.

*Valuation Considerations*.  Valuation of the Master Fund's securities and other investments may involve uncertainties and judgmental determinations, and if such valuations should prove to be incorrect, the net asset value of the Master Fund and the Fund could be adversely affected.  Independent pricing information may not at times be available or otherwise utilized regarding certain of the Master Fund's securities and other investments.  Valuation determinations will be made in good faith in accordance with the policies of the Investment Manager in effect from time to time, a copy of which will be made available upon request.

The Master Fund may have some of its assets in investments, which by their very nature may be extremely difficult to accurately value.  To the extent that the value assigned by the Administrator to any such investment differs from the actual value, the net asset value of the Master Fund and the Fund may be understated or overstated, as the case may be.  In light of the foregoing, there is a risk that a Limited Partner that withdraws all or part of its Interests while the Master Fund holds such investments will be paid an amount less than it would otherwise be paid if the actual value of such investments is higher than the value designated by the Administrator.  Similarly, there is a risk that such Limited Partner might, in effect, be overpaid if the actual value of such investments is lower than the value designated by the Administrator.  In addition, there is risk that an investment in the Fund by a new Limited Partner (or an additional investment by an existing Limited Partner) could dilute the value of such investments for the other Limited Partners if the designated value of such investments is higher than the value designated by the Administrator.  Further, there is risk that a new Limited Partner (or an existing Limited Partner that makes an additional investment) could pay more than it might otherwise if the actual value of such investments is lower than the value designated by the Administrator.  The Administrator does not intend to adjust the net asset value of the Master Fund and the Fund retroactively.

None of the Fund, the Master Fund, the General Partner, the Investment Manager or the Administrator shall have any liability in the event that any price or valuation, used in good faith in connection with the above procedures, proves to be an incorrect or an inaccurate estimate or determination of the price or value of any part of the property of the Master Fund, subject to the standard of care set forth in "*Summary of Terms – Duty of Care; Indemnification*" above.

*No Participation by Investors*.  All decisions with respect to the management of the day-to-day affairs of the Fund are made exclusively by the General Partner and the Investment Manager.  Limited Partners have no right or power to take part in the management of the Fund.  The Investment Manager makes all of the trading and investment decisions of the Master Fund.  In the event of the withdrawal of the Investment Manager, generally the Fund will be liquidated.

*Investment Strategies*.  The Investment Manager will seek to engage in the investment activities that have been discussed in "*Investment Program*" herein.  There can be no assurance that the Investment Manager will be successful in applying any such strategy and that losses will be avoided.

*Competition*.  The markets in which the Master Fund invests are competitive and some of the opportunities that the Investment Manager may explore may be pursued by better known investors or investment funds.  There can be no assurance that the Investment Manager will be able to identify or successfully pursue such opportunities in this environment.  The Investment Manager competes with many firms that may have greater financial resources, more extensive development, better marketing and service capabilities, more favorable financing arrangements, larger research staffs and more securities traders than are available to the Investment Manager.

*In-Kind Distributions*.  A withdrawing Limited Partner may, in the discretion of the General Partner and/or Investment Manager, receive securities owned by the Fund (through the Master Fund) in lieu of, or in combination with, cash.  The value of securities distributed may increase or decrease before the securities can be sold (either by the Limited Partner or by the Fund if the General Partner establishes a liquidating account on behalf of the Limited Partner to sell such assets), and the Limited Partner will incur transaction costs in connection with the sale of such securities.  Additionally, securities distributed with respect to a withdrawal by a Limited Partner may not be readily marketable.  The risk of loss and delay in liquidating these securities will be borne by the Limited Partner, with the result that such Limited Partner may receive less cash than it would have received on the date of withdrawal.

*No Current Income*.  Since the Fund does not generally intend to pay distributions, an investment in the Fund is not suitable for investors seeking current income.  Moreover, an investor is required to report and pay taxes on his allocable share of income from the Fund, even though no cash is distributed by the Fund.

*Cybersecurity*.  Information and technology systems may be vulnerable to damage or interruption from computer viruses, network failures, computer and telecommunication failures, infiltration by unauthorized persons and security breaches, usage errors by their respective professionals, power outages and catastrophic events such as fires, tornadoes, floods, hurricanes and earthquakes.  Although the Investment Manager has implemented various measures to manage risks relating to these types of events, if these systems are compromised, become inoperable for extended periods of time or cease to function properly, the Investment Manager, the Master Fund and/or the Fund may have to make a significant investment to fix or replace them, which expense may be borne in whole or in part by the Fund. The failure of these systems and/or of disaster recovery plans for any reason could cause significant interruptions in the Investment Manager's, the Master Fund's and/or the Fund's operations and result in a failure to maintain the security, confidentiality or privacy of sensitive data, including personal information relating to investors.  Such interruptions could harm the Investment Manager's, the Master Fund's and/or the Fund's reputation, subject any such entity and their respective affiliates to legal claims and otherwise affect their business and financial performance.  The foregoing risks and consequences are also extant at any issuer in which the Master Fund invests and could manifest as adverse performance of such investment.

Appx. 03908

**Investment Strategy and Investment Risks**

*Changes in Strategy.* The Investment Manager has the power to expand, revise or alter its trading strategies on behalf of the Master Fund without prior approval by, or notice to, the Fund or the Limited Partners. Any such change could result in exposure of the Fund's assets (through the Master Fund) to additional risks, which may be substantial. The Investment Manager may also invest in additional instruments than those specifically identified in the "*Investment Program*" section.

*Latin America Investments.* The Master Fund invests in securities of companies based in Latin America or issued by Latin American governments, or in the securities of companies which are not incorporated in Latin America, but which derive some of their revenues from business activities conducted in Latin America. Such investment involves certain considerations not usually associated with investing in securities of developed countries or of companies located in developed countries, including political and economic consideration, such as greater risks of expatriation, nationalization and general, political, and economic instability, the small size of the securities markets in such countries and the low volume of trading, resulting in potential lack of liquidity and substantially greater price volatility, fluctuations in the rate of exchange between currencies, and costs associated with currency conversions, certain government policies that may restrict the Master Fund's investment opportunities and problems that may arise in connection with the clearance and settlements of trades. In addition, accounting and financial reporting standards that prevail in such countries are not equivalent to standards in more developed countries, consequently, less information is available to investors in companies located in more developed countries. There is also less regulation, generally, of the securities markets in Latin American countries than there is in more developed countries.

*Risks Related to Investing in Argentina.* Argentina has experienced high interest rates, economic volatility, inflation, currency devaluations and high unemployment rates. The economy is heavily dependent on exports and commodities. Argentina's default on its debt in 2001, and its past nationalization of private pensions and national oil company YPF, continues to impact the confidence of investors in Argentina, which might adversely impact returns in the Master Fund, and thus, the Fund.

*Argentina's Economy.* Argentina's economy could grow at a lower rate than in past years, or could contract. Factors that could negatively affect Argentina's rate of economic growth, its public finances and Argentina's ability to service its debt include: the competitiveness of Argentine exports, which are influenced by the peso's value relative to the value of the currencies of Argentina's trading partners and trade competitors; the level of inflation in Argentina; international commodities prices, foreign currency exchange rates and the levels of consumer consumption and foreign and domestic investment; negative economic developments in Argentina's major trading partners, or "contagion" effects more generally; and Argentina's ability to meet its energy requirements.

*Uncertainty of Economic Reforms.* A runoff election on November 22, 2015 resulted in Mr. Mauricio Macri being elected President of Argentina. The Macri administration assumed office on December 10, 2015. Since assuming office on December 10, 2015, the Macri administration has announced several significant economic and policy reforms, including methodological reforms with respect to the calculation of certain macroeconomic statistics, the loosening of foreign exchange controls, reduction of tariffs, other easing of international trade restrictions, infrastructure reforms and reopened negotiation with holders of debt in default since 2001. The impact that these measures and any future measures taken by the new administration will have on the Argentine economy as a whole and the financial sector in particular cannot be predicted. The Investment Manager believes that the effect of the planned liberalization of the economy and renewed access to capital markets will be positive for the

Appx. 03909

Master Fund's intended investments by stimulating economic activity, but it is not possible to predict such effect with certainty and such liberalization could also be disruptive to the economy and fail to benefit or harm companies in Argentina. The Investment Manager cannot predict how the Macri administration will address certain other political and economic issues that were central during the 2015 presidential election campaign, such as the financing of public expenditures, public service subsidies and tax reforms, the resolution of holdout debt or the impact that any measures related to these issues that are implemented by the Macri administration will have on the Argentine economy as a whole.

*Currency Controls*. In the past, Argentina imposed exchange controls and transfer restrictions substantially limiting the ability of companies to retain foreign currency or make payments abroad. Although the Macri government lifted exchange controls and liberalized capital controls, there can be no assurances regarding future modifications to exchange and capital controls. Exchange and capital controls could adversely affect the financial condition or results of operations of issuers in whose securities the Master Fund intends to invest, as well as their ability to meet foreign currency obligations and to execute financing plans.

*Challenges to Argentina's Debt Payments.* Argentina's payments in connection with a debt offering may be attached, enjoined or otherwise challenged. In recent years, hold-out creditors have used litigation against sovereign debtors, most prominently Peru and Nicaragua, to attach or interrupt payments made by these sovereign debtors to, among others, bondholders who have agreed to a debt restructuring and accepted new securities in an exchange offer. Argentina has been subjected to suits to collect on amounts due on defaulted bonds, including actions in the United States, the United Kingdom, Italy and Germany. Some of these actions have resulted in judgments against Argentina. There can be no assurance that a creditor will not be able to interfere, through an attachment of assets, injunction, temporary restraining order or otherwise, with payments made in connection with a debt offering.

*Pro Rata Payment Litigation.* Argentina's defaults with respect to the payment of its foreign debt could prevent the government and the private sector from accessing the international capital markets, which could adversely affect the financial condition of sovereign and corporate issuers in which the Master Fund invests. In September 2014, the Argentine Congress passed a law to restructure foreign-law bonds held by exchange bondholders to allow the payment in Argentina and to appoint a new paying agent. On September 29, 2014, the U.S. District Court for the Southern District of New York held Argentina in contempt of court as a result of this law. The U.S. District Court authorized limited exceptions to the injunction allowing certain custodians of Argentine law-governed bonds to process payments in August 2014, September 2014 and December 2014.

On May 11, 2015, the plaintiffs that obtained pari passu injunctions asked the U.S. district court to amend their complaints to include claims alleging that Argentina's issuance and servicing of its 2024 dollar-denominated bonds, and its external indebtedness in general, would violate the pari passu clause. On June 5, 2015, the Second Circuit granted partial summary judgment to a group of 526 "me-too" plaintiffs in 36 separate lawsuits, finding that, consistent with the previous ruling of such court, Argentina violated a pari passu clause in bonds issued to the "me-too" bondholders. The decision obligates Argentina to pay the plaintiffs $5.4 billion before it can make payments on restructured debt.

In 2016, the Argentine government working under a court appointed mediator, entered into settlement agreements with a large portion of hold-out debt holders contingent on Argentina repealing laws that prevented the country from complying with rulings by U.S. courts. In this context Judge Thomas Griesa ruled he would lift the injunctions preventing Argentina from serving post-2005 exchange debt if these laws are repealed. Argentina's lower chamber approved the repeal of these laws

and Argentina's senate voted to approve the same in March 2016. In April 2016, the Second Circuit Court of Appeals in the United States upheld Judge Griesa's ruling, finding that he did not abuse his discretion in lifting the pari passu injunctions.

The repercussions of restructuring Argentina's bond debts are ongoing. The 2016 U.S. court rulings only settled claims of certain bondholders. Argentina reached a $475 million settlement with other bondholders in November 2016. Financial indices have only just started moving Argentina back to "emerging market" status, where it had been before 2009.

Argentina's default with respect to the payment of its foreign debt, its delay in completing the debt restructuring process with creditors that did not participate in the related exchange offers, the complaints filed against Argentina discussed above, the U.S. Supreme Court's decision not to hear Argentina's appeal, the declaration of contempt, and the long-term difficulty of reestablishing itself in the global marketplace could prevent Argentina's government from obtaining international private financing or receiving direct foreign investment, as well as private sector companies in Argentina from accessing the international capital markets. Without access to international private financing, Argentina may not be able to finance its obligations, and financing from multilateral financial institutions may be limited or not available. Without access to direct foreign investment, the government may not have sufficient financial resources to foster economic growth and the performance of the Master Fund's investments in Argentina could be materially and adversely affected.

*Derivative Instruments.* The Investment Manager may use various derivative instruments, including futures, options, forward contracts, swaps and other derivatives which may be volatile and speculative. Certain positions may be subject to wide and sudden fluctuations in market value, with a resulting fluctuation in the amount of profits and losses. Use of derivative instruments presents various risks, including the following:

- *Tracking* – When used for hedging purposes, an imperfect or variable degree of correlation between price movements of the derivative instrument and the underlying investment sought to be hedged may prevent the Investment Manager from achieving the intended hedging effect or expose the portfolio to the risk of loss.

- *Liquidity* – Derivative instruments, especially when traded in large amounts, may not be liquid in all circumstances, so that in volatile markets the Investment Manager may not be able to close out a position without incurring a loss. In addition, daily limits on price fluctuations and speculative positions limits on exchanges on which the Investment Manager may conduct its transactions in certain derivative instruments may prevent prompt liquidation of positions, subjecting the portfolio to the potential of greater losses.

- *Leverage* – Trading in derivative instruments can result in large amounts of leverage. Thus, the leverage offered by trading in derivative instruments may magnify the gains and losses experienced by the Master Fund and could cause the Master Fund's net asset value to be subject to wider fluctuations than would be the case if the Investment Manager did not use the leverage feature in derivative instruments.

- *Over-the-Counter-Trading* – Derivative instruments that may be purchased or sold for the portfolio may include instruments not traded on an exchange. Over-the-counter options, unlike exchanged-traded options, are two-party contracts with price and other terms negotiated by the buyer and seller. The risk of non-performance by the obligor on such an instrument may be

greater and the ease with which the Investment Manager can dispose of or enter into closing transactions with respect to such an instrument may be less than in the case of an exchange-traded instrument. In addition, significant disparities may exist between "bid" and "asked" prices for derivative instruments that are not traded on an exchange. Derivative instruments not traded on exchanges are also not subject to the same type of government regulation as exchange traded instruments, and many of the protections afforded to participants in a regulated environment may not be available in connection with such transactions.

*Short Sales.* Short sales by the Master Fund that are not made "against the box" create opportunities to increase the Master Fund's return but, at the same time, involve special risk considerations and may be considered a speculative technique. Since the Master Fund, in effect, profits from a decline in the price of the securities sold short without the need to invest the full purchase price of the securities on the date of the short sale, the value of the Master Fund will tend to increase more when the securities it has sold short decrease in value, and to decrease more when the securities it has sold short increase in value, than otherwise would be the case if it had not engaged in such short sales. Short sales theoretically involve unlimited loss potential, as the market price of securities sold short may increase continuously, although the Master Fund may mitigate such losses by replacing the securities sold short before the market price has increased significantly. Under adverse market conditions the Master Fund might have difficulty purchasing securities to meet its short sale delivery obligations, and might have to sell portfolio securities to raise the capital necessary to meet its short sale obligations at a time when fundamental investment considerations would not favor such sales. Short sales may be used with the intent of hedging against the risk of declines in the market value of the Master Fund's long portfolio, but there can be no assurance that such hedging operations will be successful.

*Risks of Execution of Investment Strategies.* The Master Fund will invest in a number of securities and obligations that entail substantial inherent risks. Although the Master Fund will attempt to manage those risks through careful research, ongoing monitoring of investments and appropriate hedging techniques, there can be no assurance that the securities and other instruments purchased by the Master Fund will in fact increase in value or that the Master Fund will not incur significant losses.

*Market Risks and Liquidity.* The profitability of a significant portion of the Master Fund's investment program depends to a great extent upon correctly assessing the future course of the price movements of securities and other investments. There can be no assurance that the Master Fund will be able to predict accurately these price movements. Although the Master Fund may attempt to mitigate market risk through the use of long and short positions or other methods, there is always some, and occasionally a significant, degree of market risk.

Furthermore, the Master Fund may be adversely affected by a decrease in market liquidity for the instruments in which they invest, which may impair the Master Fund's ability to adjust their position. The size of the Master Fund's positions may magnify the effect of a decrease in market liquidity for such instruments. Changes in overall market leverage, deleveraging as a consequence of a decision by a broker to reduce the level of leverage available, or the liquidation by other market participants of the same or similar positions, may also adversely affect the Master Fund's portfolio. Some of the underlying investments of the Master Fund may not be actively traded and there may be uncertainties involved in the valuation of such investments. Potential investors should be warned that under such circumstances, the net asset value of the Master Fund may be adversely affected.

*Hedging.* Although the Master Fund will attempt to hedge its exposure to specific arbitrage positions, it will not always be possible fully to hedge risk from such positions or any other position. In

36

addition, the Master Fund may take positions based on the expected future direction of the markets without fully hedging the market risks.

*Currency Risks*.  A portion of the Master Fund's assets may be invested in securities denominated in various currencies and in other financial instruments, the price of which is determined with reference to such currencies.  The account of the Master Fund will, however, be valued in U.S. Dollars.  To the extent unhedged, the value of the net assets of the Master Fund will fluctuate with U.S. Dollars exchange rates as well as with price changes of their investments in the various local markets and currencies. Forward currency contracts and options may be utilized by the Master Fund to hedge against currency fluctuations, but there can be no assurance that such hedging transactions will be effective.

*Counterparty and Settlement Risk*.  Due to the nature of some of the investments which the Master Fund may make, the Master Fund may rely on the ability of the counterparty to a transaction to perform its obligations.  In the event that any such party fails to complete its obligations for any reason, the Master Fund may suffer losses.  The Master Fund will therefore be exposed to a credit risk on the counterparties with which it trades.  The Master Fund will also bear the risk of settlement default by clearing houses and exchanges.  Any default by a counterparty or on settlement could have a material adverse effect on the Master Fund.

*Borrowing*.  The Master Fund is permitted to finance its operations with secured and unsecured borrowing up to 100% of its net assets, to the extent allowable under applicable credit regulations.  Like other forms of leverage, the use of borrowing can enhance the risk of capital loss in the event of adverse changes in the level of market prices of the assets being financed with the borrowings.

*Concentration of Investments*.  Although the Investment Manager will follow a general policy of seeking to spread the Master Fund's capital among a number of investments, the Investment Manager may depart from such policy from time to time and may hold a few, relatively large securities positions in relation to the Master Fund's capital.  The result of such concentration of investments is that a loss in any such position could materially reduce the Master Fund's capital.

*Difficult Market for Investment Opportunities*.  The activity of identifying, completing and realizing on attractive investments involves a high degree of uncertainty.  There can be no assurance that the Master Fund will be able to locate and complete investments which satisfy the Master Fund's rate of return objective or realize upon their values or that the Master Fund will be able to invest fully its subscribed capital in a manner consistent with its investment strategy.

**Certain Regulatory Risks**

*Absence of Regulatory Oversight*.  While the Fund may be considered similar to an investment company, it is not required and does not intend to register as such under the Investment Company Act of 1940, as amended (the "***Investment Company Act***"), and, accordingly, the provisions of the Investment Company Act (which may provide certain regulatory safeguards to investors) are not applicable to investors in the Fund.  Neither the Fund nor the Master Fund will maintain custody of its securities or place its securities in the custody of a bank or a member of a national securities exchange in the manner required of registered investment companies under rules promulgated by the Securities and Exchange Commission (the "***SEC***").  A registered investment company which places its securities in the custody of a member of a national securities exchange is required to have a written custodian agreement, which provides that securities held in custody will be at all times individually segregated from the securities of any other person and marked to clearly identify such securities as the property of such investment

37

company, and which contains other provisions complying with SEC regulations. The Master Fund generally will maintain such accounts at brokerage firms that do not separately segregate such assets as would be required in the case of registered investment companies. Under the provisions of the Securities Investor Protection Act of 1970, as amended, the bankruptcy of any such brokerage firm might have a greater adverse effect on the Master Fund and the Fund than would be the case if the accounts were maintained to meet the requirements applicable to registered investment companies.

*Forward-Looking Statements*. Certain statements contained in this Memorandum, including without limitation, statements containing the words "believes," "anticipates," "intends," "expects," and words of similar import constitute "forward-looking statements." Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance or achievements of the Fund to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. Certain of these factors are discussed in more detail elsewhere in this Memorandum, including without limitation under "*Summary of Terms*," "*Certain Risk Factors*," and "*Investment Program*." Given these uncertainties, prospective investors are cautioned not to place undue reliance on such forward-looking statements. The Investment Manager and the Fund disclaim any obligation to update any such factors or to announce the result of any revisions to any of the forward-looking statements contained herein to reflect future events or developments.

*Impact of U.S. Presidential Election.* On January 20, 2017, Donald Trump became President of the United States of America. President Trump and other members of the Republican Party have proposed to reverse some of the recent regulation of the financial industry and to change tax policy. If some of these proposals were enacted, banks could dramatically increase their lending practices and accept additional types of collateral, borrowers could reduce their demand for debt financing, certain investment advisers could de-register with SEC and portfolio companies that are net importers or hold significant assets outside of the United States could be subject to increased tax liability. The effect of any such regulatory or tax changes on the Master Fund and the markets in which it trades and invests is uncertain.

*Evolving Regulatory Risks of Private Investment Funds.* The regulatory environment for private investment funds is evolving, and changes in the regulation of private investment funds and their advisers may adversely affect the value of investments held by the Master Fund.

The Dodd-Frank Wall Street Reform and Consumer Protection Act ("***Dodd-Frank***"), which was enacted in July 2010, regulates markets, market participants and financial instruments that were historically unregulated and has substantially altered the regulation of many other markets, market participants and financial instruments. Certain provisions of Dodd-Frank subject registered investment advisers to requirements to keep records and to report information to the SEC, which could in turn be supplied to the Board of Governors of the Federal Reserve, a new Financial Services Oversight Council or other U.S. governmental agencies or Congress. Under Dodd-Frank, the information includes, among other things, the amount of assets under management, use of leverage (including off-balance sheet leverage), counterparty credit risk exposures, trading and investment positions, and trading practices. All such records are subject to examination by the SEC at any time. It is anticipated that there may be significant changes to the financial regulatory environment as a result of the outcome of the recent U.S. elections. There is currently pending legislation in U.S. Congress which if enacted would result in the repeal of portions of Dodd-Frank which in turn would have a significant impact on the regulatory environment for private investment funds. In addition, the impact of the legislation on current and future rulemaking by various regulators under Dodd-Frank is difficult to predict. It is possible that rules that

Appx. 03914

have been proposed by various regulators, which had been anticipated to take effect previously, may no longer be implemented in their proposed form or at all. Further, there may also be substantial changes in the enforcement and interpretation of existing statutes and rules by governmental regulatory authorities or self-regulatory organizations that supervise the financial markets. The effect of future regulatory change on the Fund and the Master Fund and their operations is uncertain. Prospective investors should seek, and must rely on, the advice of their own advisers with respect to the possible impact on its investment of any future proposed legislation or administrative or judicial action.

**Tax Related Risks**

*Uncertainty and Complexity of Tax Treatment*. The tax aspects of an investment in a partnership are complicated and complex and, in many cases, uncertain. Statutory provisions and administrative regulations have been interpreted inconsistently by the courts. Additionally, some statutory provisions remain to be interpreted by administrative regulations. Investors will thus be subject to the risk caused by the uncertainty of the tax consequences with respect to an investment in the Fund. Each prospective investor should have the tax aspects of an investment in the Fund reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and private investment vehicles. Prospective investors are strongly urged to review the discussion below under "*Tax Considerations*" and "*ERISA and Other Regulatory Considerations*" for a more complete discussion of certain of the tax risks inherent in the acquisition of Interests and to consult their own independent tax advisors.

*Risk of Adverse Determination*. There can be no assurance that the conclusions set forth in this Memorandum will not be challenged successfully by the U.S. Internal Revenue Service (the "***Service***") or other applicable taxing authority, or significantly modified by new legislation, changes in the Service's positions or court decisions. The Fund has not applied for, nor does it expect to apply for, any advance rulings from the Service with respect to any of the federal income tax consequences described in this Memorandum. No representation or warranty of any kind is made by the General Partner with respect to the tax consequences relating to an investment in the Fund. The Fund may take positions with respect to certain tax issues which depend on legal conclusions not yet resolved by the courts. Should any such positions be successfully challenged by the Service or other applicable taxing authority, there could be a materially adverse effect on the Fund, and a Limited Partner might be found to have a different tax liability for that year than that reported on its income tax returns.

*Risk of Tax Audit*. An audit of the Fund by the Service or another taxing authority could result in adjustments to the tax consequences initially reported by the Fund and may result in an audit of the returns of some or all of the Limited Partners, which examination could affect items not related to a Limited Partner's investment in the Fund. If audit adjustments result in an increase in a Limited Partner's income tax liability for any year, such Limited Partner may also be liable for interest and penalties with respect to the amount of underpayment. The legal and accounting costs incurred in connection with any audit of the Fund's tax returns will be borne by the Fund. The cost of any audit of a Limited Partner's tax return will be borne solely by that Limited Partner.

*Entity-Level Audits*. Pursuant to the Bipartisan Budget Act of 2015, for taxable years beginning after December 31, 2017, the Service generally will be permitted to determine adjustments to items of income, gain, deduction, loss or credit of the Fund, and assess and collect taxes attributable thereto (including any applicable penalties and interest), at the Fund level. If this new regime applies to the Fund (which depends, among other things, on whether the Fund has more than 100 partners or has any partner that is itself classified as a partnership for U.S. federal income tax purposes), then any person

39

who is a partner of the Fund in the relevant year of the adjustment may indirectly bear the economic burden of any such taxes assessed or collected (initially determined at the highest rate of tax applicable to an individual or corporation in effect for the reviewed year), regardless of whether such person was a Limited Partner during any reviewed year.  It is expected that guidance will be issued that permits the Fund to reduce the underpayment of taxes owed by the Fund, including to the extent that the Fund demonstrates such taxes are allocable to a Limited Partner that would not owe any tax by reason of its status as a "tax-exempt entity" or the character of income is subject to a lower rate of tax.  The Fund may under certain circumstances have the ability to avoid such entity-level tax assessment or collection by electing to issue a statement to each partner of any reviewed year with its share of such adjustment, resulting in such partner being required to take into account any such adjustment for the taxable year which includes the date such statement was furnished.  In such case, the partners of the reviewed year would also incur a two-percentage point increase on the interest rate that would otherwise have been imposed on any underpayment of taxes.  There can be no assurances, however, that the Fund will avoid, or be able to avoid, any entity-level determination, assessment or collection.  Limited Partners should note that there is substantial uncertainty regarding the implementation of these rules and the impact on any current or future allocations made or cash available for distributions or withdrawals by the Fund.  The Fund may also be exposed to the risk that these rules apply to any lower-tier entity in which the Fund directly or indirectly invests and that is treated as a partnership for U.S. federal income tax purposes.  If this new legislation applies to the Fund, the Fund will designate a tax representative, which is expected to be the General Partner, the Investment Manager, or an affiliate thereof, who shall have the sole authority to act on behalf of the Fund with respect to dealings with the Service under these new procedures.  Prospective Limited Partners should consult their own tax advisors regarding this new legislation.

*Tax Considerations Taken into Account*.  The General Partner may take tax considerations into account in determining when the Fund's investments should be sold or otherwise disposed of, and may assume certain market risk and incur certain expenses in this regard to achieve favorable tax treatment of a transaction.

*Foreign Taxation*.  With respect to certain countries, there is a possibility of expropriation, confiscatory taxation, and imposition of withholding or other taxes on dividends, interest, capital gains or other income, limitations on the removal of funds or other assets of the Fund, political or social instability or diplomatic developments that could affect investments in those countries.  An issuer of securities may be domiciled in a country other than the country in whose currency the instrument is denominated.  The values and relative yields of investments in the securities markets of different countries, and their associated risks, are expected to change independently of each other.

*Tax Liabilities Without Distributions*.  If the Fund has taxable income in a fiscal year, each Limited Partner will be taxed on that income in accordance with its allocable share of the Fund's profits, whether or not such profits have been distributed.  Because the General Partner anticipates that there will be no cash distributions to the Limited Partners, an investor may incur tax liability with respect to activities of the Fund without receiving sufficient distributions from the Fund to defray such tax liabilities.  In order to satisfy its tax liability in such a case, a Limited Partner would need sufficient funds from sources other than the Fund.  Furthermore, the Fund may make investments with respect to which the Fund recognizes income for U.S. federal income tax purposes prior to receiving the cash or realizing the income as an economic matter.  In addition, the Fund may recognize income for U.S. federal income tax purposes that does not reflect income as an economic matter.  Such recognition of income prior to receipt of an economic benefit, if any, may result in increased tax liability for the Partners.

Appx. 03916

*Delayed Schedules K-1.* The Fund will provide Schedules K-1 as soon as practicable after receipt of all of the necessary information. However, the Fund may be unable to provide final Schedules K-1 to Limited Partners for any given tax year until significantly after April 15 of the following year. The General Partner will endeavor to provide Limited Partners with estimates of the taxable income or loss allocated to their investment in the Fund on or before such date, but final Schedules K-1 may not be available until completion of the Fund's annual audit. Limited Partners should be prepared to obtain extensions of the filing date for their income tax returns at the federal, state and local levels.

*Unrelated Business Taxable Income.* The Fund may make investments or engage in activities that will give rise to unrelated business taxable income ("***UBTI***") under Sections 512 and 514 of the U.S. Internal Revenue Code of 1986, as amended (the "***Code***"). Thus, an investment in the Fund may be less desirable for certain tax-exempt investors. For example, the Fund may incur leverage giving rise to UBTI or may participate in investments that give rise to UBTI through entities that are treated as partnerships for U.S. federal income tax purposes. Because of the "flow-through" principles applicable to partnerships, if UBTI is earned by the Fund, a tax-exempt investor in the Fund will realize UBTI. Because of the General Partner's objective of maximizing the pre-tax returns of all the Limited Partners, the General Partner may be required to make certain decisions to maximize pre-tax returns that result in tax-exempt investors recognizing more UBTI than might otherwise be the case. In some cases, the General Partner may forgo actions with regard to the acquisition, financing, management and disposition of assets that would reduce UBTI because such actions would reduce the overall pre-tax returns to all the Limited Partners.

*Tax Changes.* Investors will be subject to the risk that changes to the tax law may adversely affect the federal income tax consequences of their investment in the Fund. Changes in existing tax laws or regulations and their interpretation may be enacted after the date of this Memorandum, possibly with retroactive effect, and could alter the income tax consequences of an investment in the Fund. Certain provisions of the Code may be further amended or interpreted in a manner adverse to the Fund, in which event any benefits derived from an investment in the Fund may be adversely affected. In addition, significant legislative and budgetary proposals affecting tax laws have been made by the legislative and executive branches of the U.S. federal government. The likelihood of enactment of any such proposals, or any similar proposals, into law is uncertain. The enactment of any such proposals, including subsequent proposals, into law could have material adverse effects on the Fund and/or the Limited Partners. Enactment of such legislation, or similar legislation, could require significant restructuring of the Fund in order to mitigate such effects.

*The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Fund. Prospective investors should read this entire Memorandum and consult with their own advisers before deciding to invest in the Fund. In addition, as the investment program of the Fund develops and changes over time, an investment in the Fund may be subject to additional and different risk factors. No assurance can be made that profits will be achieved or that substantial losses will not be incurred.*

*In view of the foregoing considerations, an investment in Interests is suitable only for investors who are capable of bearing the relevant investment risks.*

**Potential Conflicts of Interest**

Given the nature and size of Highland Capital Management, L.P.'s ("***Highland Capital***") operations, various potential conflicts of interest arise in connection with its advisory services and the

**Appx. 03917**

advisory services provided by its affiliates. Information about Highland Capital and its potential conflicts of interest is provided in Highland Capital's Form ADV Part 2 Brochure that can be found by going to https://adviserinfo.sec.gov/IAPD/Default.aspx, searching by firm name and selecting the Part 2 Brochure to be viewed. The Fund is subject to these conflicts of interest, as well as the other items discussed below.

None of the Investment Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees (collectively, the "*Highland Group*") is precluded from engaging in or owning an interest in other business ventures or investment activities of any kind, whether or not such ventures are competitive with the Fund or the Master Fund. The Investment Manager is permitted to manage other client accounts, and does manage other client accounts, some of which may have objectives similar or identical to those of the Master Fund, including other collective investment vehicles that may be managed by the Highland Group and in which the Investment Manager or any of its affiliates may have an equity interest.

The Fund will be subject to a number of actual and potential conflicts of interest involving the Highland Group including, among other things, the fact that: (i) the Highland Group conducts substantial investment activities for accounts, funds, collateralized debt obligations that invest in leveraged loans (collectively, "*CDOs*") and other vehicles managed by members of the Highland Group ("*Highland Accounts*") in which the Fund has no interest; (ii) the Highland Group advises Highland Accounts, which utilize the same, similar or different methodologies as the Fund and may have financial incentives (including, without limitation, as it relates to the composition of investors in such funds and accounts or to the Highland Group's compensation arrangements) to favor certain Highland Accounts over the Fund and the Master Fund; (iii) the Highland Group may use the strategy described herein in certain Highland Accounts; (iv) the Investment Manager may give advice and recommend securities to, or buy or sell securities for, the Master Fund, which advice or securities may differ from advice given to, or securities recommended or bought or sold for, Highland Accounts; (v) the Investment Manager has the discretion, to the extent permitted under applicable law, to use its affiliates as service providers to the Fund and the Master Fund and the Master Fund's portfolio investments; (vi) certain investors affiliated with the Highland Group may choose to personally invest only in certain funds advised by the Highland Group and the amounts invested by them in such funds is expected to vary significantly; (vii) the Highland Group and Highland Accounts may actively engage in transactions in the same securities sought by the Master Fund and, therefore, may compete with the Master Fund for investment opportunities or may hold positions opposite to positions maintained on behalf of the Master Fund; and (viii) the Investment Manager will devote to the Master Fund and the Fund only as much time as the Investment Manager deems necessary and appropriate to manage the Master Fund's and the Fund's business.

The Investment Manager undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Fund's investors.

*Allocation of Trading Opportunities*

It is the policy of the Investment Manager to allocate investment opportunities fairly and equitably over time. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) fiduciary duties owed to the accounts; (ii) the primary mandate of the accounts; (iii) the capital available to the accounts; (iv) any restrictions on the accounts and the investment opportunity; (v) the sourcing of the investment, size of the investment and amount of follow-on available related to the investment; (vi) whether the risk-return profile of the proposed investment is consistent with the

Appx. 03918

account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (vii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (viii) liquidity requirements of the account; (ix) potentially adverse tax consequences; (x) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (xi) the need to re-size risk in the account's portfolio.

The Investment Manager has the authority to allocate trades to multiple Highland Accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the Investment Manager may allocate the trades among different accounts on a basis it considers fair and equitable over time. One or more of the foregoing considerations may (and are often expected to) result in allocations among the Master Fund and one or more Highland Accounts on other than a *pari passu* basis. The Investment Manager will allocate investment opportunities across its accounts for which the opportunities are appropriate, consistent with (i) its internal conflict of interest and allocation policies and (ii) the requirements of the Investment Advisers Act of 1940, as amended. The Investment Manager will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy, a copy of which will be provided upon request. However, there is no assurance that such investment opportunities will be allocated to the Master Fund fairly or equitably in the short-term or over time and there can be no assurance that the Master Fund will be able to participate in all investment opportunities that are suitable for it

The Investment Manager may open "average price" accounts with brokers. In an "average price" account, purchase and sale orders placed during a trading day on behalf of the Investment Manager, the Master Fund and other accounts managed by the Investment Manager are combined, and securities bought and sold pursuant to such orders are allocated among such accounts on an average price basis.

*Cross Transactions and Principal Transactions*

As further described below, the Investment Manager may effect client cross-transactions where the Investment Manager causes a transaction to be effected between the Master Fund and another client advised by it or any of its affiliates. The Investment Manager may engage in a client cross-transaction involving the Master Fund any time that the Investment Manager believes such transaction to be fair to the Master Fund and such other client. By subscribing for an Interest, a Limited Partner is deemed to have consented to such client cross-transactions between the Master Fund and another client of the Investment Manager or one of its affiliates.

The Investment Manager may direct the Master Fund to acquire or dispose of securities in cross trades between the Master Fund and other clients of the Investment Manager or its affiliates in accordance with applicable legal and regulatory requirements. In addition, the Master Fund may invest in securities of obligors or issuers in which the Investment Manager and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Master Fund may enhance the profitability of the Investment Manager's own investments in such companies. Moreover, the Master Fund may invest in assets originated by the Investment Manager or its affiliates. In each such case, the Investment Manager and such affiliates may have a potentially conflicting division of loyalties and responsibilities regarding the Master Fund and the other parties to such trade. Under certain circumstances, the Investment Manager and its affiliates may determine that it is appropriate to avoid such conflicts by selling a security at a fair value that has been calculated pursuant to the Investment Manager's valuation procedures to another client managed or advised by the Investment Manager or

Appx. 03919

such affiliates. In addition, the Investment Manager may enter into agency cross-transactions where it or any of its affiliates acts as broker for the Master Fund and for the other party to the transaction, to the extent permitted under applicable law.

The Principal, as well as the employees and officers of the Investment Manager and of organizations affiliated with the Investment Manager, may buy and sell securities for their own account or the account of others, but may not buy securities from or sell securities to the Master Fund (such prohibition does not extend to the purchase or sale of interests in the Fund), unless such purchase or sale is in compliance with the applicable provisions of the Investment Advisers Act of 1940, as amended.

*Conflicts Relating to Equity and Debt Ownership by the Master Fund and Affiliates*

In certain circumstances, the Master Fund and other client accounts may invest in securities or other instruments of the same issuer (or affiliated group of issuers) having a different seniority in the issuer's capital structure. If the issuer becomes insolvent, restructures or suffers financial distress, there may be a conflict between the interests in the Master Fund and those other accounts insofar as the issuer may be unable (or in the case of a restructuring prior to bankruptcy may be expected to be unable) to satisfy the claims of all classes of its creditors and security holders and the Master Fund and such other accounts may have competing claims for the remaining assets of such issuers. Under these circumstances it may not be feasible for the Investment Manager to reconcile the conflicting interests in the Master Fund and such other accounts in a way that protects the Master Fund's interests. Additionally, the Investment Manager or its nominees may in the future hold board or creditors' committee memberships which may require them to vote or take other actions in such capacities that might be conflicting with respect to certain funds managed by the Investment Manager in that such votes or actions may favor the interests of one account over another account. Furthermore, the Investment Manager's fiduciary responsibilities in these capacities might conflict with the best interests of the investors.

*Affiliated Entity Services*

Affiliated entities of the Investment Manager may provide services with respect to the Investment Manager, the Master Fund or the Fund. NexBank, SSB ("***NexBank SSB***") is an affiliate of the Investment Manager and may, from time to time, provide banking and/or agency services to the Investment Manager, clients of the Investment Manager or collective investment vehicles for which the Investment Manager provides investment advisory services (including the Fund, the Master Fund and other vehicles in which the Fund (through the Master Fund) may invest) or third parties engaged in transactions involving the Investment Manager. NexBank SSB may also act as an agent in connection with certain securities transactions involving the Investment Manager's client accounts (including the Master Fund and other vehicles in which the Master Fund may invest). Principals of the Investment Manager own a majority of the equity interests in NexBank SSB and employees or affiliates of the Investment Manager own or may own a substantial equity interest in NexBank SSB. Certain Master Fund investment transactions may be executed through NexBank Securities, Inc., an affiliate of the Investment Manager and a registered broker-dealer.

Additionally, the Investment Manager or affiliates of the Investment Manager, including, without limitation, Nexbank SSB, NexBank Securities, Inc., NexBank Capital Advisors and Governance Re, Ltd., may provide financial advisory, management, insurance, title insurance or other services for a fee to portfolio companies in which the Master Fund may have an interest. Highland Latin America Consulting, Ltd., an affiliate of the Investment Manager, has been engaged to provide certain

Appx. 03920

administrative and consulting services to the Investment Manager, as more fully described below in "*Management –Services Agreement*."

*Management Fee*

A portion of any Management Fee may be paid to broker-dealers, placement agents or independent third parties, other than the Investment Manager, for services provided in connection with the solicitation of subscriptions from investors. Accordingly, investors should recognize that a placement agent's or distributor's participation in this offering may be influenced by its interest in such current or future fees and compensation. Investors should consider these potential conflicts of interest in making their investment decisions. Each placement agent shall comply with the legal requirements of the jurisdictions within which it offers and sells Interests.

*Diverse Membership*

The Limited Partners are expected to include entities, persons, or entities organized in various jurisdictions and subject to different tax and regulatory regimes. Such diverse investors may thus have conflicting investment, tax and other interests, relating to, among other things, the nature of investments made by the Master Fund, the structuring or the acquisition of investments and the timing of disposition of investments. As a result, conflicts of interest may arise in connection with decisions made by the Investment Manager including as to the nature and structure of investments that may be more beneficial for one type of Limited Partner than for another type of Limited Partner, including Limited Partners affiliated with the Investment Manager. The results of the Fund's activities may affect individual Limited Partners differently, depending upon their individual financial and tax situations because, for instance, of the timing of an event of realization of gain or loss and its characterization as long-term or short-term gain or loss. In addition, the Master Fund may make investments that may have a negative impact on related investments made by the Limited Partners in separate transactions. In selecting, structuring and managing investments appropriate for the Master Fund, the Investment Manager will consider the investment and tax objectives of the Master Fund and the Feeder Funds as a whole, not the investment, tax, or other objectives of any Limited Partner individually. However, there can be no assurance that a result will not be more advantageous to some Limited Partners than to others or to the Investment Manager and/or its affiliates than to a particular Limited Partner.

*Soft Dollars*

The Investment Manager's authority to use "soft dollar" credits generated by the Master Fund's securities transactions to pay for expenses that might otherwise have been borne by the Investment Manager or the General Partner may give the Investment Manager an incentive to select brokers or dealers for Master Fund transactions, or to negotiate commission rates or other execution terms, in a manner that takes into account the soft dollar benefits received by the Investment Manager rather than giving exclusive consideration to the interests in the Master Fund. See "*Brokerage and Custody*."

*No Separate Counsel*

Akin Gump Strauss Hauer & Feld LLP ("*Akin Gump*") serves as counsel to the Fund, the Master Fund, the Investment Manager, the General Partner and certain of their Affiliates (the "*Clients*") in connection with the formation of the Fund and certain other Clients, the offering of Interests as well as certain other matters for which the Clients may engage Akin Gump from time to time. Akin Gump disclaims any obligation to verify the Clients' compliance with their obligations either under applicable

Appx. 03921

law or the governing documents of the Fund.  In acting as counsel to the Clients, Akin Gump has not represented and will not represent any Limited Partners nor does it purport to represent their interests.  No independent counsel has been retained to represent the Limited Partners.  In assisting in the preparation of this Memorandum, Akin Gump has relied on information provided by the Fund, the Investment Manager and the General Partner and certain of the Fund's other service providers (including, without limitation, the Principal's biographical data, summaries of market conditions, the planned investment strategy of the Master Fund and the performance of the Master Fund, its investments or any predecessor Fund) without verification and does not express a view as to whether such information is accurate or complete.

Maples and Calder, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, acts as Cayman Islands legal counsel to the Offshore Fund, the Master Fund and the General Partner.  In connection with the offering of interests and subsequent advice to the Offshore Fund, the Master Fund and the General Partner, Maples and Calder will not be representing shareholders and/or limited partners.  No independent legal counsel has been retained to represent the shareholders and/or limited partners.  Maples and Calder's representation of the General Partner is limited to specific matters as to which it has been consulted by the General Partner.  There may exist other matters that could have a bearing on the Master Fund as to which Maples and Calder has not been consulted.  In addition, Maples and Calder does not undertake to monitor compliance by the General Partner and its affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does Maples and Calder monitor ongoing compliance with applicable laws.  In connection with the preparation of this Memorandum, Maples and Calder's responsibility is limited to matters of Cayman Islands law and it does not accept responsibility in relation to any other matters referred to or disclosed in this Memorandum. In the course of advising the General Partner, there are times when the interests of the shareholders/limited partners may differ from those of the Offshore Fund, Master Fund and/or the General Partner.  Maples and Calder does not represent the shareholders and/or limited partners' interests in resolving these issues.  In reviewing this Memorandum, Maples and Calder has relied upon information furnished to it by the General Partner and has not investigated or verified the accuracy and completeness of information set forth herein concerning the Offshore Fund, Master Fund and/or the General Partner.

*Non-Public Information*

From time to time, the Investment Manager may come into possession of non-public information concerning specific companies although internal structures are in place to prevent the receipt of such information.  Under applicable securities laws, this may limit the Investment Manager's flexibility to buy or sell portfolio securities issued by such companies.  The Master Fund's investment flexibility may be constrained as a consequence of the Investment Manager's inability to use such information for investment purposes.

*The foregoing list of risk factors and potential conflicts of interest do not purport to be a complete enumeration or explanation of the risks involved in an investment in the Fund.  Prospective investors should read this entire Memorandum and consult with their own legal, tax and financial advisers before deciding to invest in the Fund.*

**Appx. 03922**

## BROKERAGE AND CUSTODY

**Brokerage Arrangements**

The Investment Manager will be responsible for the placement of the portfolio transactions of the Master Fund and the negotiation of any commissions or spreads paid on such transactions. Portfolio transactions normally will be effected through brokers on securities exchanges or directly with the issuer, or through an underwriter, or market maker or other dealer for the investments. Portfolio transactions through brokers involve a commission to the broker. Portfolio transactions with dealers typically are priced to include a spread between the bid and the asked price to compensate the dealer. Portfolio transactions will be executed by brokers selected solely by the Investment Manager in its absolute discretion. The Investment Manager is not required to weigh any of these factors equally.

Substantially all of the Master Fund's investments in marketable securities, as well as its cash and cash equivalents, are expected to be held at Société Générale and BNP Paribas Prime Brokerage, Inc. or other prime brokers or custodians selected by the Investment Manager. Instruments not constituting marketable securities generally are recorded through book entry by the borrower or by an agent for the borrower or the creditors. Documentary evidence of the acquisition, ownership and disposition of these assets typically will be held by the Administrator.

Société Générale and BNP Paribas Prime Brokerage, Inc. and other prime brokers or their affiliates may provide capital introduction or other placement services to the Fund and the Investment Manager (with or without separate charges for such other services). In determining which broker-dealer generally provides the best available price and most favorable execution, the Investment Manager considers a totality of circumstances, including price quotes, the size of the transaction, the nature of the market for the financial instrument, the timing of the transaction, difficulty of execution, the broker-dealer's expertise in the specific financial instrument or sector in which the Master Fund seeks to trade, the extent to which the broker-dealer makes a market in the financial instrument involved or has access to such markets, the broker-dealer's skill in positioning the financial instruments involved, the broker-dealer's promptness of execution, the broker-dealer's financial stability, reputation for diligence, fairness and integrity, quality of service rendered by the broker-dealer in other transactions for the Investment Manager and its respective affiliates, confidentiality considerations, the quality and usefulness of research services and investment ideas presented by the broker-dealer, the broker-dealer's willingness to correct errors, the broker-dealer's ability to accommodate any special execution or order handling requirements that may surround the particular transaction, and other factors deemed appropriate by the Investment Manager. The Investment Manager need not solicit competitive bids and does not have an obligation to seek the lowest available commission cost or spread.

Accordingly, if the Investment Manager concludes that the commissions charged by a broker or the spreads applied by a dealer are reasonable in relation to the quality of services rendered by such broker or dealer (including, without limitation, the value of the brokerage and research products or services provided by such broker or dealer), the Master Fund may pay commissions to, or be subject to spreads applied by, such broker-dealer in an amount greater than the amount another broker-dealer might charge or apply.

The Investment Manager may also execute trades with brokers and dealers with whom the Fund, the Master Fund or the Investment Manager has other business relationships, including prime brokerage, credit relationships and capital introduction or investments by affiliates of the broker-dealers in the Fund or other entities managed by the Investment Manager. However, the Investment Manager does not

47

believe that these other relationships will influence the choice of brokers and dealers who execute trades for the Master Fund.

Research-related goods and services provided by brokers and dealers through which portfolio transactions for the Master Fund are executed, settled and cleared may include research reports on particular industries and companies, economic surveys and analyses, recommendations as to specific securities, certain research services, and other goods and services providing lawful and appropriate assistance to the Investment Manager in the performance of investment decision-making responsibilities on behalf of the Master Fund and related accounts (collectively, "*soft dollar items*").

Soft dollar items may be provided directly by brokers and dealers, by third parties at the direction of brokers and dealers or purchased on behalf of the Master Fund with credits or rebates provided by brokers and dealers. Soft dollar items may arise from over-the-counter principal transactions, as well as exchange traded agency transactions. Brokers and dealers sometimes suggest a level of business they would like to receive in return for the various services they provide. Actual business received by any broker or dealer may be less than the suggested allocations, but can (and often does) exceed the suggestions, because total transaction volume is allocated on the basis of all the considerations described above. A broker or dealer will not be excluded from executing transactions for the Master Fund because it has not been identified as providing soft dollar items.

The use of commissions or "soft dollars" if any, generated by the Master Fund through agency and certain riskless principal transactions to pay for research and research-related products or services, if any, will fall within the safe harbor created by Section 28(e) of the Securities Exchange Act of 1934, as amended. Under Section 28(e), research products or services obtained with soft dollars generated by the Master Fund may be used by the Investment Manager to service accounts other than the Master Fund. Soft dollars generated in respect of futures, currency and derivatives transactions and principal transactions (that are not riskless principal transactions) do not generally fall within the safe harbor created by Section 28(e) and will be utilized only with respect to research-related products and services for the benefit of the account generating such soft dollars.

Research and brokerage products and services may be used by the Investment Manager in servicing some or all of the Investment Manager's clients. In addition, some research and brokerage may not be used by the Investment Manager in servicing the clients whose commission dollars provided for the research or brokerage. Clients may not, in any particular instance, be the direct or indirect beneficiaries of the research or brokerage provided. Certain clients, who are the beneficiaries of research or brokerage, may have an investment style which results in the generation of a small amount of brokerage commissions due to a lack of active trading for their accounts. As a result, clients who generate sizeable commissions subsidize research or brokerage provided to clients whose accounts generate minimal brokerage commissions since the commission dollars generated by transactions for such clients are not sufficient to pay for research or brokerage that may be received by such clients from other brokers.

In selecting broker-dealers on the basis of the foregoing factors, the Investment Manager may pay a brokerage commission in excess of that which another broker might have charged for effecting the same transaction. In connection therewith, the Investment Manager will make a good faith determination that the amount of commission is reasonable in relation to the value of the research or brokerage services received, viewed in terms of either the specific transaction or the Investment Manager's overall responsibility to its clients. The Investment Manager will regularly evaluate the placement of brokerage services and the reasonableness of commissions paid. Research received from brokers will be

supplemental to the Investment Manager's own research efforts.  While the receipt of research will not reduce the Investment Manager's normal research activities, the Investment Manager's expenses could increase materially if it attempted to generate such additional research or brokerage services through its own staff, and the Management Fee will not be reduced as a consequence of the receipt of such research or brokerage services or products.  As such, the Investment Manager's arrangements for the receipt of research and brokerage services from brokers may create a conflict of interest, in that the Investment Manager may have an incentive to choose a broker-dealer that provides research and brokerage services, instead of one that does not but charges a lower commission rate.  In some instances, the Investment Manager receives products and services that may be used for both research and non-research purposes. In such instances, the Investment Manager will make a good faith effort to determine the relative proportion of the products and services used to assist the Investment Manager in carrying out its investment decision-making responsibilities or order execution, including research and brokerage, and the relative proportion used for administrative or other non-research purposes.  The proportionate amount of the research attributable to assisting the Investment Manager in carrying out its investment decision-making responsibilities or order execution will be paid through brokerage commissions generated by the Master Fund's and other client's transactions; the proportionate amount attributable to administrative or other non-research purposes will be paid for by the Investment Manager from its own resources.  The receipt of "mixed-use" research and the determination of the appropriate allocation may result in a potential conflict of interest between the Investment Manager and its clients, including the Master Fund.

## Custody

The majority of the Master Fund's securities are held in the custody of its prime brokers.  The Master Fund is eligible for insurance coverage against loss with respect to assets held in the custody of the prime brokers in the event of the bankruptcy or liquidation of either of the prime brokers to the same extent as that broker's other customers.  The Master Fund's and the Fund's cash may be held at banks as well as the prime brokers.  Ownership interests which are not represented by certificates generally will be recorded through book-entry systems maintained by the issuer or its agent, and the underlying documentation relating to the acquisition and disposition of these assets for the account of the Master Fund will be held at the business offices of the Investment Manager.

Appx. 03925

# TAX CONSIDERATIONS

## Introduction

The following is a summary of certain aspects of the U.S. federal income taxation of the Fund and its Limited Partners arising from the purchase, ownership and disposition of an Interest that should be considered by a prospective Limited Partner.  The Fund has not sought a ruling from the Service or any similar state, local or foreign authority with respect to any of the tax issues affecting Limited Partners or the Fund, nor has it obtained an opinion of counsel with respect to any U.S. federal, state, local or foreign tax issues.

This summary is based on the Code, the U.S. Treasury regulations promulgated under the Code (the "*Treasury Regulations*"), judicial decisions, administrative rulings, and state and local tax laws in force on the date of this Memorandum, all of which are subject to change (possibly with retroactive effect).  Changes in existing laws or regulations and their interpretation may occur after the date of this Memorandum and could alter the income tax consequences of an investment in the Fund.  This discussion does not address all of the tax consequences that may be relevant to a particular investor, nor does it address, unless specifically indicated, the tax consequences to, among others (i) persons that may be subject to special treatment under U.S. federal income tax law, including, but not limited to, banks, insurance companies, thrift institutions, regulated investment companies, real estate investment trusts and dealers in securities or currencies, (ii) persons that will hold Interests as part of a position in a "straddle" or as part of a "hedging," "conversion" or other integrated investment transaction for U.S. federal income tax purposes, (iii) persons whose functional currency is not the U.S. dollar or (iv) persons that do not hold Interests as capital assets within the meaning of Code Section 1221.

Further, this summary does not address the tax considerations relevant to an investment in the Fund by a person that is not a "United States person" as defined in Section 7701(a)(30) of the Code because this summary assumes that all such persons will invest in the Offshore Fund.

If a partnership holds an Interest in the Fund, the tax treatment of a partner in such partnership will generally depend upon the status of the partner and the activities of the Fund.  Prospective investors who are partners of a partnership should consult their own tax advisors.

Unless otherwise expressly provided herein, this discussion does not address possible state, local or foreign tax consequences of the purchase, ownership or disposition of Interests, some or all of which may be material to particular investors.  This discussion also does not address the potential application of the U.S. federal alternative minimum tax ("*AMT*") to the Limited Partners.  There is uncertainty concerning certain tax aspects of the Fund, and there can be no assurance that the Service will not challenge the positions taken by the Fund.

**THE TAX CONSEQUENCES OF AN INVESTMENT IN THE FUND ARE PARTICULARLY COMPLEX.  ACCORDINGLY, PROSPECTIVE INVESTORS SHOULD NOT CONSIDER THIS DISCUSSION AS A SUBSTITUTE FOR CAREFUL TAX PLANNING. PROSPECTIVE INVESTORS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS, ATTORNEYS OR ACCOUNTANTS ON MATTERS RELATING TO AN INVESTMENT IN THE FUND WITH SPECIAL REFERENCE TO SUCH INVESTOR'S PARTICULAR SITUATION.**

Appx. 03926

**Certain United States Taxation Matters**

<u>U.S. Entity Classification of the Fund</u>

The General Partner believes that, under the provisions of the Code and the Treasury Regulations as currently in effect, each of the Fund and the Master Fund should be treated for U.S. federal income tax purposes as a partnership and not as an association taxable as a corporation.

Certain "publicly traded partnerships" are treated as associations that are taxable as corporations for U.S. federal income tax purposes. A publicly traded partnership is any partnership the interests in which are traded on an established securities market or which are readily tradable on a secondary market (or the substantial equivalent thereof). Interests in the Fund are not and will not be traded on an established securities market. Treasury Regulations concerning the classification of partnerships as publicly traded partnerships provide certain safe harbors under which interests in a partnership will not be considered readily tradable on a secondary market (or the substantial equivalent thereof). The General Partner believes that the Fund may qualify for an exemption from the publicly traded partnership rules, although there is no assurance that the Fund will so qualify.

The remainder of this discussion assumes that the Fund and the Master Fund will each be treated as a partnership for U.S. federal income tax purposes and not as a publicly-traded partnership treated as an association that is taxable as a corporation. Unless the context requires otherwise, references to the Fund in the following discussion include the Master Fund.

<u>Taxation of the Master Fund</u>

The Government of the Cayman Islands will not, under existing legislation, impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Master Fund or the limited partners of the Master Fund. Interest, dividends and gains payable to the Master Fund and all distributions by the Master Fund to its limited partners will be received free of any Cayman Islands income or withholding taxes. The Master Fund has registered as an exempted limited partnership under Cayman Islands law and the Master Fund has received an undertaking from the Governor in Cabinet of the Cayman Islands to the effect that, for a period of 50 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits or income or gains or appreciations shall apply to the Master Fund or to any partner thereof in respect of the operations or assets of the Master Fund or the interest of a partner therein; and may further provide that any such taxes or any tax in the nature of estate duty or inheritance tax shall not be payable in respect of the obligations of the Master Fund or the interests of the partners therein. The Cayman Islands are not party to a double tax treaty with any country that is applicable to any payments made to or by the Master Fund.

<u>U.S. Federal Income Taxation of the Fund and Partners Generally</u>

As a partnership, the Fund will not be subject to U.S. federal income tax. Each Limited Partner otherwise subject to tax will be required to report separately on its U.S. federal income tax return its distributive share of the Fund's net long-term capital gain or loss, net short-term capital gain or loss, and net ordinary income and deductions and credits in accordance with the allocations set forth in the Partnership Agreement. Each Limited Partner will be liable for any taxes owed upon its distributive share of the income or gains realized by the Fund, and may claim deductions for its distributive share of the Fund's losses and deductions and credits for its distributive share of the Fund's credits, to the extent allowed under the Code. Each Limited Partner will be taxed on its distributive share of the Fund's

51

taxable income and gain regardless of whether it has received or will receive a distribution from the Fund.  Consequently, a Limited Partner may be subject to tax with respect to its share of the taxable income of the Fund for a taxable year and may not receive a corresponding distribution of cash from the Fund in such year with which to satisfy its tax liability in respect of such taxable income.

The Fund will file an annual partnership information return with the Service that reports the results of its operations for the taxable year, and will distribute annually to each Limited Partner a form showing its distributive share of the Fund's items of income, gain, loss, deduction or credit.  The General Partner will have the authority to decide how to report these items on the Fund's tax returns, and all Limited Partners will be required under the Partnership Agreement to treat the items consistently on their own returns.  Under current law, an audit by the Service of the tax treatment of the Fund's income and deductions generally will be determined at the Fund level in a single proceeding rather than by individual audits of the Limited Partners.  For tax years beginning before January 1, 2018 (and absent an election by the Fund to apply the new partnership tax audit rules described in more detail below), the administrative proceeding is managed by the "*Tax Matters Partner*." For tax years beginning on or after January 1, 2018 (or in the case of an election by the Fund to apply the new partnership tax audit rules), the Fund will be required to appoint one person as the "*Partnership Representative*" to act on its behalf in connection with an audit by the Service and related proceedings. Pursuant to the Partnership Agreement, the General Partner or its delegate will be designated as the Tax Matters Partner and/or the Partnership Representative. The Partnership Representative's actions, including the Partnership Representative's agreement to adjustments of the Fund's income in settlement of an audit by the Service of the Fund, will bind all Limited Partners, and opt-out rights available to certain Limited Partners in connection with certain actions of the Tax Matters Partner under the current partnership tax audit rules for tax years beginning before January 1, 2018 will no longer be available.

In certain cases, the Fund may be required to file a statement with the Service, disclosing one or more positions taken on its tax return, generally where the tax law is uncertain or a position lacks clear authority.  All Partners are required under the Code to treat the partnership items consistently on their own returns, unless they file a statement with the Service disclosing the inconsistency.  Given the uncertainty and complexity of the tax laws, it is possible that the Service may not agree with the manner in which the Fund's items have been reported.

Under the Partnership Agreement, for U.S. federal income tax purposes, the General Partner has the discretion to allocate specially an amount of the Fund's net gains or net losses (or items of gross income or losses or deduction) to a withdrawing Partner to the extent that the Partner's Capital Account differs either positively or negatively from its U.S. federal income tax basis in its Interest.  There can be no assurance that, if the General Partner makes such a special allocation, the Service will accept such allocation.  If such allocation is successfully challenged by the Service, the Fund's allocations to the remaining Partners would be affected as well.

The Fund expects to act as a trader or an investor, and not as a dealer, with respect to its securities transactions.  Generally, the gains and losses realized by a trader or an investor on the sale of securities are capital gains and losses.  Thus, the Fund expects that its gains and losses from its securities transactions typically will be capital gains and capital losses.  These capital gains and losses may be long-term or short-term depending, in general, upon the length of time the Fund maintains a particular investment position and, in some cases, upon the nature of the transaction.  An investment held for more than one year generally will be eligible for long-term capital gain or loss treatment. The Fund may also realize income from dividends, which will generally be taxed at either ordinary income rates or, if they are eligible for treatment as "qualified dividend income," at applicable long-term capital gains rates.

Appx. 03928

Dividends from Argentine corporations are generally expected to be treated as "qualified dividend income" only to the extent that the stock for which the dividend is paid is readily tradable on an established securities market in the United States. Limited Partners should consult with their own tax advisors to determine the tax rates applicable to them in their particular tax situations.

In addition, individuals with "modified adjusted gross income" that exceeds certain thresholds (e.g., $250,000 for married individuals filing jointly and $200,000 for single individuals) are subject to a Medicare tax of 3.8% on the lesser of: (i) their investment income, net of deductions properly allocable to such income, and (ii) the excess of their "modified adjusted gross income" above the applicable threshold. It is expected that most or all of the Fund's income will be treated as investment income for this purpose, and as a result Limited Partners receiving allocations of income from the Fund for these taxable years may be subject to this tax. This tax will be in addition to any U.S. federal income tax imposed on Limited Partners with respect to their allocable share of income of the Fund. Trusts and estates also may be subject to this additional tax. Prospective investors should consult their own tax advisors regarding the application of this Medicare tax to their investment in the Fund.

The Fund may be involved in a variety of hedging transactions to reduce the risk of changes in value in the Fund's investments. Special rules may apply to determine the tax treatment of such hedging transactions, which may affect the Fund's holding period attributable to such property, the characterization of gain or loss as ordinary or capital and, if capital, as long-term or short-term, and the timing of the realization of gains or losses on the actual or deemed sale of the property, including, in some cases, property owned by a Limited Partner outside of the Fund. For instance, gain or loss from a short sale of property generally will be considered as capital gain or loss to the extent the property used to close the short sale constitutes a capital asset in the Fund's hands. Except with respect to certain situations where the property used by the Fund to close a short sale has a long-term holding period on the date of the short sale, gains on short sales will be treated as short-term capital gains. These rules also may terminate the running of the holding period of "substantially identical property" held by the Fund. Moreover, a loss on a short sale will be treated as a long-term capital loss if, on the date of the short sale, "substantially identical property" has been held by the Fund for more than one year. Certain hedging transactions also may cause a constructive sale of the Fund's long position that is the subject of the hedge.

Special "mark to market" rules apply to the Fund's investment in "Section 1256 Contracts." Section 1256 Contracts include certain regulated futures contracts, certain foreign currency forward contracts and certain options contracts. Capital gains and losses from qualifying Section 1256 Contracts generally are characterized as short-term capital gains or losses to the extent of 40% thereof and as long-term capital gains or losses to the extent of 60% thereof.

The Fund may derive ordinary interest income and dividends on securities, and may be required to recognize income in respect of certain securities prior to receipt of any payment in respect of such securities. For instance, the Fund may hold debt obligations with "original issue discount." In such case, the Fund will be required to include a portion of such discount in its taxable income on a current basis, and allocate such income to the Limited Partners, even though receipt of such amounts by the Fund may occur in a subsequent tax year. The Fund also may acquire debt obligations with "market discount." Upon disposition of such an obligation, which might include the receipt of securities of the issuer in a recapitalization exchange, the Fund generally will be required to treat any gain realized (and required to be recognized) as ordinary interest income to the extent of the market discount that accrued during the period the debt obligation was held by the Fund. Recapitalization exchanges involving

Appx. 03929

securities held by the Fund also may result in the recognition of taxable gains prior to the receipt of cash or readily tradable property.

If the Fund is treated as a trader, it may, in its discretion, make an election under Code section 475(f) to apply a mark to market system of recognizing unrealized gains and losses on securities as if the securities were sold for fair market value at the close of any taxable year of the Fund. The amount recognized when gain or loss is subsequently realized would be adjusted for amounts recognized in marking to market. The election would apply with respect to securities held in connection with the Fund's trade or business as a trader in securities. The election would not apply to any securities with respect to which the Fund could demonstrate, to the satisfaction of the Service, that they are held for investment. In the event that the Fund makes such an election, the Fund's gains and losses from marking securities to market (and gain or loss recognized before the end of the taxable year with respect to any security that would have been marked to market) would be treated as ordinary income and losses. The rules relating to appreciated financial positions under Code section 1259 and wash sales under Code section 1091 would not apply to the securities to which the election applies and the Code section 1092 straddle rules would not have any effect where all the offsetting positions of a straddle are marked to market.

The Fund may be required to purchase foreign currency with which to make its investments and may receive foreign currency when a security is sold or when an interest payment is made on a security. These transactions may give rise to gains and losses because of fluctuations in the value of the foreign currency relative to the U.S. dollar during the Fund's holding period of an investment. Foreign currency gain or loss in respect of certain types of transactions must be accounted for separately, apart from any gain or loss on the underlying transaction, and the Code contains special rules which treat, in most circumstances, such gains and losses as ordinary income or losses rather than capital gains or losses.

The U.S. federal income tax treatment of the Fund's investment in swaps or other derivatives is subject to significant uncertainty and depends in large part on the terms of the specific swap or other derivative. In particular, it is possible that the Fund may enter into so-called "bullet swaps" or other swaps that provide for non-periodic payments. In certain circumstances, income from a swap can be treated as ordinary income and not capital gain if the swap is treated as a "constructive ownership transaction" under Code section 1260. The Fund intends to take positions that are reasonable under the law that provide for optimal tax treatment of the Limited Partners. However, there can be no assurance that the Service or a court would agree with the Fund's position. Moreover, the Service might take the contrary position that the Fund is subject to U.S. federal income tax in respect of some or all of the income earned from the swap investments on the theory that the Fund should be treated as the owner for U.S. federal income tax purposes of the property underlying certain swaps, in which case the after-tax return on the swap investments could be significantly reduced.

Pursuant to various "anti-deferral" provisions of the Code (*e.g.*, the "Subpart F" and "passive foreign investment company" provisions), any investments by the Fund in certain foreign corporations may cause a Limited Partner to (i) recognize taxable income prior to the Fund's receipt of distributable proceeds, (ii) pay an interest charge on receipts that are deemed as having been deferred, (iii) recognize ordinary income that, but for the "anti-deferral" provisions, would have been treated as long-term or short-term capital gain, or (iv) become subject to certain reporting requirements with respect to such investments. There can be no assurance that the General Partner or the Fund will mitigate, or be able to mitigate, the application of these provisions, or provide certain information with respect to such foreign corporations or such filing requirements. Potential investors are advised to consult with their own tax

Appx. 03930

advisors with respect to the application of these "anti-deferral provisions" in their particular circumstances.

Under the Partnership Agreement, the General Partner has the authority to elect on behalf of the Fund, under Code section 754, to adjust the tax basis of the Fund's assets in connection with certain distributions to Limited Partners or certain transfers of Interests. Such an election, if made, could affect the amount of a Limited Partner's distributive share of the gain or loss recognized by the Fund upon the disposition of its assets. Because of the complexity and additional expense involved in making a section 754 election, the General Partner has no present intention to make such election on behalf of the Fund.

Prospective investors that are subject to the AMT should consider the tax consequences of an investment in the Fund in view of their AMT position, taking into account the special rules that apply in computing the AMT.

<u>Taxation of Distributions and Withdrawals</u>

Cash nonliquidating distributions and withdrawals, to the extent they do not exceed a Limited Partner's basis in its Interest, will not result in taxable income to that Limited Partner, but will reduce its tax basis in its Interest by the amount distributed or withdrawn. Cash distributed to a Limited Partner in excess of the basis of its Interest is generally taxable as capital gain. Conversely, if the cash distributed by the Fund to a Partner for any year exceeds the taxable income of the Fund allocated to such Partner for that year, the excess will be treated as a return of capital for U.S. federal income tax purposes to the extent of a Limited Partner's tax basis in its Interest. To the extent that cash distributions are treated as a return of capital and to the extent that any tax losses are allocated to the Limited Partners, the tax bases of the Limited Partners in their Interests will be reduced (but not below zero). Because of such basis adjustments, any tax that is avoided in the early years of a Limited Partner's investment in the Fund may become due later through the realization of gain upon the sale of assets of the Fund, the liquidation of the Fund or the sale of Interests.

Prospective Limited Partners should be aware that a Limited Partner's share of the taxable income of the Fund for any year may exceed the amount of cash distributed to such Limited Partner for that year, which may require that the Limited Partner make an out-of-pocket expenditure to cover its tax liability. Conversely, if the cash distributed by the Fund to a Partner for any year exceeds the taxable income of the Fund allocated to such Partner for that year, the excess will be treated as a return of capital for U.S. federal income tax purposes to the extent of a Limited Partner's tax basis of its Interest. To the extent that cash distributions are treated as a return of capital and to the extent that any tax losses are allocated to the Limited Partners, the tax bases of the Limited Partners in their Interests will be reduced (but not below zero). Because of such basis adjustments, any tax that is avoided in the early years of a Limited Partner's investment in the Fund may become due later through the realization of gain upon the sale of assets of the Fund, the liquidation of the Fund or the sale of Interests.

The Fund's ability to make cash distributions to a withdrawing Limited Partner or to the Partners, if applicable, may be limited by, among other things, the terms of the investment leverage entered into by the Fund for the purpose of making portfolio investments on a leveraged basis.

Upon the withdrawal of a Limited Partner receiving a cash liquidating distribution from the Fund, such Limited Partner generally will recognize capital gain or loss to the extent of the difference between the proceeds received by the withdrawing Limited Partner and such Partner's adjusted tax basis in its Interest. Such capital gain or loss will be short-term or long-term depending upon the Partner's holding

period (or holding periods) for its Interest.  However, a withdrawing Limited Partner will recognize ordinary income to the extent such Partner's allocable share of the Fund's "unrealized receivables" exceeds the Partner's basis in such unrealized receivables (as determined pursuant to the Treasury Regulations).  For these purposes, accrued but untaxed market discount, if any, on securities held by the Fund will be treated as an unrealized receivable, with respect to which a withdrawing Partner would recognize ordinary income.

Distributions of property other than cash, whether in complete or partial liquidation of a Limited Partner's Interest, generally will not result in the recognition of taxable income or loss to the Limited Partner (except to the extent such distribution is treated as made in exchange for such Limited Partner's share of the Fund's unrealized receivables).  However, a distribution of marketable securities will be treated as a distribution of cash (which, as described above, can require the recognition of gain by the recipient Limited Partner), unless the distributing partnership is an "investment partnership" and the recipient is an "eligible partner" as defined in Code section 731(c).  Although the General Partner cannot provide any assurances of whether the Fund is an "investment partnership" for these purposes, the General Partner anticipates that the Fund should qualify as an "investment partnership."  Thus, if a Limited Partner is an "eligible partner," which term should include a Limited Partner whose sole contributions to the Fund consisted of cash, a distribution of marketable securities to such Limited Partner should not require the recognition of gain by such Limited Partner.

As discussed above, under the Partnership Agreement, the General Partner has the discretion to allocate specially an amount of the Fund's net gains or net losses (or items of gross income or losses or deductions) for U.S. federal income tax purposes to a withdrawing Partner to the extent that the Partner's capital account differs from its U.S. federal income tax basis in its Interest.  Such a special allocation may result in the withdrawing Partner recognizing more or less taxable income, which may include short-term gain, in the Partner's last taxable year in the Fund, thereby reducing, or increasing, as applicable, the amount of long-term capital gain recognized during the tax year in which it receives its liquidating distribution upon withdrawal.  In certain circumstances, special allocations of net gains (or items of income or gain) to a withdrawing Partner may result in a greater allocation of losses, or a lower allocation of taxable income or gain, to the remaining Partners.  Likewise, special allocations of net losses (or items of expense, loss or deduction) to a withdrawing Partner may result in a greater allocation of taxable income or gain, or a lower allocation of losses, to the remaining Partners.

Assuming the Fund has not made an election pursuant to Code Section 754 and the General Partner does not exercise its discretion to specially allocate losses to a withdrawing Limited Partner, distributions of property or cash by the Fund to a Limited Partner in redemption of its Interest in certain circumstances where the Fund has a substantial built-in loss may require the Fund to reduce the tax basis of its remaining property.

<u>Limitations on Losses, Deductions and Credits</u>

Limited Partners who are individuals or which are certain types of corporations may be limited in their ability to deduct expenses or losses of the Fund.  For instance, if or to the extent that the Fund's operations do not constitute a "trade or business" within the meaning of Section 162 and other provisions of the Code, an individual Limited Partner's distributive share of the Fund's expenses (including any amounts that are treated for tax purposes as expenses of the Fund, such as the Management Fee) would be deductible only as itemized deductions, subject to the limitations of Sections 67 and 68 of the Code.  In this regard, if all or a portion of the Performance Allocation to the Special Limited Partner were re-characterized for tax purposes as an expense of the Fund, each non-corporate Limited Partner's share of

Appx. 03932

such expense could be subject to such limitations. Itemized deductions are non-deductible in computing such Limited Partner's AMT income and AMT liability.

Further, income, gains and losses of the Fund generally will not be treated as passive income or losses for purposes of the passive activity loss limitations of Section 469 of the Code. Accordingly, individuals, personal service corporations and certain closely-held corporations that have passive activity losses from other activities are restricted in their ability to use such losses to offset income and gains from the Fund, although losses of the Fund will not be subject to the passive activity loss limitation.

For each taxable year, Section 1277 of the Code limits the deduction of the portion of any interest expense on indebtedness incurred by a taxpayer to purchase or carry a security with market discount which exceeds the amount of interest (including original issue discount) includible in the taxpayer's gross income for such taxable year with respect to such security ("***Net Interest Expense***"). Net Interest Expense in any taxable year is deductible only to the extent it exceeds the amount of market discount which accrued on the security during the taxable year or portion of the taxable year during which the taxpayer held the security. Net Interest Expense that is non-deductible under the rules described above is carried forward and deducted in the year in which the taxpayer disposes of the security. Alternatively, at the taxpayer's election, such Net Interest Expense can be carried forward and deducted in a year prior to the disposition of the security, if any, in which the taxpayer has net interest income from the security.

Section 1277 would apply to a Limited Partner's share of the Fund's Net Interest Expense attributable to a security held by the Fund (through the Master Fund) with market discount. In such case, a Limited Partner would be denied a current deduction for all or part of that portion of its distributive share of the Fund's ordinary losses attributable to such Net Interest Expense and such losses would be carried forward to future years, in each case as described above. Although no guidance has been issued regarding the election to deduct previously disallowed Net Interest Expense prior to the year of disposition of the bond, it appears that the election would be made by the Fund rather than by the Limited Partner. Section 1277 would also apply to the portion of interest paid by a Limited Partner on money borrowed to finance its investment in the Fund to the extent such interest was allocable to securities held by the Fund (through the Master Fund) with market discount.

The ability of a non-corporate Limited Partner to deduct its share of the Fund's ordinary losses attributable to interest and certain short sale expenses may be subject to the "investment interest limitation" under Section 163(d) of the Code. In general, a non-corporate taxpayer's investment interest (including interest and certain short sale expenses) in the current year is not deductible to the extent it exceeds its "net investment income", consisting of net gain and ordinary income derived from investments in the current year less certain directly connected expenses (other than interest or short sale expenses). For this purpose, any long-term capital gain is excluded from net investment income unless the taxpayer elects to pay tax on such amount at ordinary income tax rates. The Fund's activities are expected to be treated as giving rise to investment income for a Limited Partner, and the investment interest limitation would apply to a non-corporate Limited Partner's share of the interest and short sale expenses attributable to the Fund's operation. Accordingly, a non-corporate Limited Partner would be denied a deduction for all or a part of its distributive share of the Fund's ordinary losses attributable to interest and short sale expenses unless it has sufficient investment income from all sources, including the Fund. Any amount not deductible as a result of the applicability of Section 163(d) may be carried forward to future years, subject to certain limitations.

Limited Partners may be entitled to a foreign tax credit with respect to creditable foreign taxes paid on the income and gains of the Fund. There are complex rules contained in the Code that may,

Appx. 03933

depending on each Limited Partner's particular circumstances, limit the availability or use of foreign tax credits. For example, a Limited Partner's share of gain realized by the Fund will generally be treated as U.S. source income. Consequently, a Limited Partner may not be able to use the foreign tax credit relating to foreign taxes, if any, imposed on such gains unless such credit can be applied against the U.S. tax due on other income derived from foreign sources. Limited Partners should contact their own tax advisors with respect to the availability of any foreign tax credits.

The consequences of these limitations will vary depending upon the particular tax situation of each taxpayer. Accordingly, non-corporate Limited Partners should consult their tax advisors with respect to the application of these limitations.

The Fund may incur certain expenses in connection with its organization and the marketing of its Interests. Amounts paid or incurred to organize a partnership are not deductible, but generally may, by election of the Fund, be capitalized and amortized for U.S. federal income tax purposes over a period of not less than 180 months. Amounts paid or incurred to market interests in the Fund that qualify as "syndication expenses" are not deductible or amortizable.

<u>Tax Consequences for Tax-Exempt U.S. Investors</u>

A Limited Partner that is an organization exempt from tax under Code section 501(a) (a "***Tax-Exempt U.S. Investor***") will be subject to tax on its allocable share of the Fund's income that is considered to be "unrelated business taxable income" ("***UBTI***") as defined in Code section 512, and may be subject to the AMT with respect to items of tax preference which enter into the computation of UBTI. Code section 512(b) provides that UBTI generally does not include dividends, interest, and gain or loss from the disposition of property other than stock in trade or property held for sale in the ordinary course of the unrelated trade or business. The Fund may invest in entities that are treated as partnerships or other pass-through entities. UBTI generated by such entities would generally flow up to Tax-Exempt U.S. Investors, causing the realization of UBTI by such investors. A Tax-Exempt U.S. Investor should not realize UBTI to the extent that its distributive share of the Fund's income consists of dividends, interest, capital gains and certain other items which are excluded from UBTI under Code section 512(b) (except to the extent any such income constitutes "UDFI," as discussed in the next paragraph). Prospective Tax-Exempt U.S. Investors should be aware that it is unclear under current law whether income from certain swaps or derivative transactions that the Fund may invest or hold a position in, may be excluded from UBTI.

A Tax-Exempt U.S. Investor is also subject to tax with respect to its, and its allocable share of the Fund's, "unrelated debt-financed income" pursuant to Code section 514 ("***UDFI***"). In general, UDFI consists of (i) income derived by a tax-exempt organization (directly or through a partnership) from income-producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year and (ii) gains derived by a tax-exempt organization (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness." In addition, a tax-exempt organization that borrows money to finance its investment in the Fund would be subject to tax on the portion of its income that is UDFI. Income and gains derived by a tax-exempt organization from the ownership and sale of debt-financed property is taxable in the proportion to which such property is financed by acquisition indebtedness during the relevant period of time. For these purposes, a Limited Partner is deemed to own a proportionate share of the Fund's debt-financed property and the income attributable thereto, and a short sale of publicly traded stock will not create "acquisition indebtedness" unless the Fund borrows funds to post collateral against such short sale.

**Appx. 03934**

The Fund expects to generate income attributable to debt-financed property which will be attributed to the Partners, including any Tax-Exempt U.S. Investors. A Tax-Exempt U.S. Investor's share of the Fund's income that is treated as UBTI may be significant (depending upon the degree of leverage utilized by the Fund). In addition to other relevant considerations, fiduciaries of employee pension trusts and other prospective tax-exempt investors should consider the consequences of realizing UBTI in making a decision whether to invest in the Fund.

***We urge prospective Tax-Exempt U.S. Investors that are sensitive to UBTI or UDFI to consult their tax advisors as to the tax consequences of investing in the Fund and as to the comparative tax treatment of an investment in the Offshore Fund.***

Investor Tax Filings and Record Retention.

The U.S. Department of the Treasury has adopted Treasury Regulations designed to assist the Service in identifying abusive tax shelter transactions. In general, the Treasury Regulations require investors in specified transactions (including certain investors in partnerships that engage in such transactions) to satisfy certain special tax filing and record retention requirements. Significant monetary penalties may be applicable as a result of a failure to comply with these tax filing and record retention rules.

The Treasury Regulations are broad in scope and it is conceivable that the Fund may enter into transactions that will subject the Fund and certain Limited Partners to the special tax filing and record retention rules. Additionally, a Limited Partner's recognition of a loss on its disposition of its Interest in the Fund could in certain circumstances subject such Limited Partner to these rules.

Reporting Under FATCA.

Sections 1471 through 1474 of the Code, known as the U.S. Foreign Account Tax Compliance Act (together with any regulations, rules and other guidance implementing such Code sections and any applicable intergovernmental agreement ("***IGA***") or information exchange agreement and related statutes, regulations, rules and other guidance thereunder, "***FATCA***") impose a withholding tax of 30% on (i) certain U.S. source interest, dividends and other types of income, and (ii) the gross proceeds from the sale or disposition of certain assets of a type that can produce U.S. source interest and dividends, which are received by a foreign financial institution ("***FFI***"), unless such FFI enters into an agreement with the Service (an "***FFI Agreement***"), and/or complies with an applicable IGA, to obtain certain information as to the identity of the direct and indirect owners of accounts in such institution. In addition, a withholding tax may be imposed on payments to certain non-financial foreign entities that do not obtain and provide information as to their direct and indirect owners. These rules generally apply to payments of U.S. source interest, dividends and certain other types of income from U.S. sources and, after December 31, 2018, are expected to apply to payments of gross proceeds from the sale or disposition of assets of a type that can produce U.S. source interest or dividends.

The Service has released temporary and final Treasury Regulations and other guidance that will be used in implementing FATCA, which contain a number of phase-in dates for FATCA compliance. In addition, the Cayman Islands has entered into a Model 1 IGA with the United States (the "***Cayman-U.S. IGA***"), which is treated as in effect, and has issued the Tax Information Authority (International Tax Compliance) (United States of America) Regulations 2014 and guidance notes thereunder, each as updated from time to time.

Appx. 03935

The Master Fund is likely to be considered an FFI.  In order to avoid incurring U.S. withholding under FATCA, the Master Fund is generally required to register with the Service and to comply with the Cayman-U.S. IGA and any guidance thereunder.  The Master Fund expects to register with the Service and expects to comply with the Cayman-U.S. IGA and, therefore, generally does not expect to become subject to U.S. withholding under FATCA.

In addition, the Fund may be required to act as a withholding agent under FATCA and therefore be required to withhold on income and proceeds paid or allocated to an investor that fails to comply with FATCA, which could occur if an investor that is an FFI does not enter into an FFI Agreement, is not otherwise exempt from such withholding, and/or does not provide the appropriate information and documentation to the Fund or its agents showing its exemption from such withholding or compliance with FATCA.  The General Partner intends to collect the appropriate documentation from all investors in the Fund in order to determine whether it is required to withhold under FATCA with respect to distributions or allocations made to investors.

The General Partner, the Investment Manager and the Fund reserve the right to take any action and/or pursue all remedies at their disposal to avoid withholding requirements or otherwise to mitigate the consequences of an investor's failure to comply with FATCA, including compulsory redemption or withdrawal of the investor concerned.  In this regard, the General Partner, the Investment Manager and the Fund have certain rights to request, and the investors have certain obligations to provide, information and documentation that may be used by the General Partner, the Investment Manager and the Fund in complying with their obligations under FATCA.  In addition, no investor affected by any action or remedy by the Fund shall have any claim against the Fund, the Administrator, the Investment Manager, the Master Fund or the General Partner (or their agents, delegates, employees, directors, officers or affiliates) for any form of damages or liability as a result of actions taken or remedies pursued by or on behalf of the Fund in order to comply with FATCA.

The Cayman Islands has also signed, along with over 80 other countries, a multilateral competent authority agreement to implement the OECD Standard for Automatic Exchange of Financial Account Information – Common Reporting Standard ("**CRS**" and together with the Cayman-U.S. IGA, "**AEOI**").

Cayman Islands regulations have been issued to give effect to the Cayman-U.S. IGA and CRS (collectively, the "**AEOI Regulations**").  Pursuant to the AEOI Regulations, the Cayman Islands Tax Information Authority (the "**TIA**") has published guidance notes on the application of the Cayman-U.S. IGA and CRS.

All Cayman Islands "Financial Institutions" are required to comply with the registration, due diligence and reporting requirements of the AEOI Regulations, unless they are able to rely on an exemption that allows them to become a "Non-Reporting Financial Institution" (as defined in the relevant AEOI Regulations) with respect to one or more of the AEOI regimes, in which case only the registration requirement would apply under CRS.  The Master Fund does not propose to rely on any Non-Reporting Financial Institution exemption and therefore intends to comply with all of the requirements of the AEOI Regulations.

The AEOI Regulations require the Master Fund and/or the General Partner (as applicable) to, amongst other things (i) register with the Service to obtain a GIIN (in the context of the U.S. IGA only), (ii) register with the TIA, and thereby notify the TIA of its status as a "Reporting Financial Institution", (iii) adopt and implement written policies and procedures setting out how it will address its obligations under CRS, (iv) conduct due diligence on its accounts to identify whether any such accounts are

Appx. 03936

considered "Reportable Accounts", and (v) report information on such Reportable Accounts to the TIA. The TIA will transmit the information reported to it to the overseas fiscal authority relevant to a reportable account (e.g. the Service in the case of a US Reportable Account) annually on an automatic basis.

Investors should consult their tax advisors as to the withholding, filing and information reporting requirements that may be imposed on them in respect of their ownership of Interests.

State and Local Taxes

In addition to the U.S. federal income tax consequences described above, prospective investors should consider potential state and local tax consequences of an investment in the Fund.  State and local laws often differ from U.S. federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit.  A Partner's distributive share of the taxable income or loss of the Fund generally will be required to be included in determining its reportable income for state and local tax purposes in the jurisdiction in which it is a resident.

Limited Partners or the Fund may be subject to state and/or local franchise, withholding, income, capital gain or other tax payment obligations and filing requirements in those jurisdictions where the Fund owns real estate assets or is otherwise regarded as doing business or earning income.  Credits for these taxes may not be available (or may be subject to limitations) in the jurisdictions in which Limited Partners, or the Fund, as applicable, are residents.  Each potential investor is urged to consult with its own tax advisor in this regard.

***Each prospective Limited Partner should consult its own tax advisor with respect to its state and local tax consequences and filing obligations as a result of an investment in the Fund.***

Other Taxes

The Fund and its Limited Partners may be subject to other taxes, such as the AMT, and estate, inheritance or intangible property taxes that may be imposed by various domestic jurisdictions, as well as foreign withholding or gains taxes.  Each prospective investor should consider the potential consequences of such taxes on an investment in the Fund.  It is the responsibility of each prospective investor to satisfy itself as to, among other things, the legal and tax consequences of an investment in the Fund, under the laws of the various jurisdictions of its domicile and its residence, by obtaining advice from its own tax counsel or other advisor, and to file all appropriate tax returns that may be required.

**Other Income Taxation**

Although there can be no assurance, it is intended that the affairs of the Fund will be conducted such that the Fund will not be subject to regular income taxation in any foreign jurisdiction.  However, income and gains from investments held by the Fund may be subject to withholding taxes or taxes in jurisdictions other than those described herein, subject to the possibility of reduction under applicable tax treaties.  Limited Partners generally may be entitled, subject to applicable limitations, to a credit against U.S. income tax for creditable foreign income taxes paid on the foreign source income and gains of the Fund (which may not include all of the Fund's gains).  The foreign tax credit rules are complex, and may, depending on each Limited Partner's particular circumstances, limit the availability or use of foreign tax credits.  Prospective investors are advised to consult their own tax advisors regarding the application of the foreign tax credit rules.

Appx. 03937

**Future Tax Legislation; Necessity of Obtaining Professional Advice**

Future amendments to the Code, other legislation, new or amended Treasury Regulations, administrative rulings or decisions by the Service or judicial decisions may adversely affect the U.S. federal income tax aspects of an investment in the Fund, with or without advance notice, retroactively or prospectively. The foregoing analysis is not intended as a substitute for careful tax planning. The tax matters relating to the Fund are complex and are subject to varying interpretations. There can be no assurance that the Service will agree with each position taken by the Fund with respect to the tax treatment of Fund items and transactions. Moreover, the effect of existing income tax laws and of proposed changes in income tax laws on Limited Partners will vary with the particular circumstances of each Limited Partner and, in reviewing this Memorandum and any exhibits hereto, these matters should be considered.

Accordingly, each prospective investor must consult with and rely solely on its professional tax advisors with respect to the tax results of its investment in the Fund. In no event will the Fund, the General Partner, the Investment Manager, or their Affiliates, counsel or other professional advisors be liable to any Limited Partner for any U.S. federal, state, local or foreign tax consequences of an investment in the Fund, whether or not such consequences are as described above.

*The foregoing is a summary of some of the important tax rules and considerations affecting the Limited Partners, the Fund, and the Fund's proposed operations. This summary does not purport to be a complete analysis of all relevant tax rules and considerations, which will vary with the particular circumstances of each Limited Partner, nor does it purport to be a complete listing of all potential tax risks inherent in purchasing or holding Interests. Each prospective investor in the Fund is urged to consult its own tax advisor in order to understand fully the U.S. federal, state, local and any non-U.S. tax consequences of such an investment in its particular situation.*

Appx. 03938

## ERISA AND OTHER REGULATORY CONSIDERATIONS

**ERISA Considerations**

**General**

Fiduciaries and other persons who are proposing to invest in Interests on behalf of retirement plans, IRAs and other employee benefit plans ("***Plans***") covered by the U.S. Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), or the Code, must give appropriate consideration to, among other things, the role that an investment in the Fund plays in the Plan's portfolio, taking into consideration whether the investment is designed to reasonably further the Plan's purposes, the investment's risk and return factors, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the Plan, the projected return of the total portfolio relative to the Plan's objectives, the limited right of Limited Partners to withdraw all or any part of their Interests or to transfer their Interests and whether investment in the Fund constitutes a direct or indirect transaction with a party in interest (under ERISA) or a disqualified person (under the Code).

**Plan Asset Regulations and Benefit Plan Investors**

The United States Department of Labor ("***DOL***") has adopted regulations that treat the assets of certain pooled investment vehicles, such as the Fund, as "plan assets" for purposes of Title I of ERISA and Section 4975 of the Code ("***Plan Assets***"). Section 3(42) of ERISA defines the term "Plan Assets" to mean plan assets as defined by such regulations as the DOL may prescribe, except that under such regulations the assets of an entity shall not be treated as Plan Assets if, immediately after the most recent acquisition of an equity interest in the entity, less than 25% of the total value of each class of equity interest in the entity is held by "Benefit Plan Investors" (the "***significant participation test***"). For purposes of this determination, the value of any equity interest held by a person (other than such a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, shall be disregarded. An entity shall be considered to hold Plan Assets only to the extent of the percentage of the equity interest held by Benefit Plan Investors. The term "Benefit Plan Investors" means any employee benefit plan subject to part 4 of subtitle B of Title I of ERISA (i.e., plans subject to the fiduciary provisions of ERISA), any plan to which the prohibited transaction provisions of Section 4975 of the Code apply (e.g., IRAs), and any entity whose underlying assets include Plan Assets by reason of a plan's investment in such entity (a "***Plan Asset Entity***").

In order to prevent the assets of the Master Fund from being considered Plan Assets under ERISA, it is the intention of the Master Fund to monitor the investments in the Master Fund and prohibit the acquisition, withdrawal or transfer of any limited partner interests of the Master Fund by any investor, including a Benefit Plan Investor, unless, after giving effect to such an acquisition, withdrawal or transfer, the total proportion of limited partner interests of each class of the Master Fund owned by Benefit Plan Investors would be less than 25% of the aggregate value of that class of limited partner interests (determined, as described above, by excluding certain limited partner interests held by the General Partner, other fiduciaries and affiliates).

Without limiting the generality of the foregoing, in order to limit equity participation in any class of limited partner interests of the Master Fund by Benefit Plan Investors to less than 25%, the Fund may require the Compulsory Withdrawal of Interests. Each Limited Partner that is an insurance company

**Appx. 03939**

acting on behalf of its general account or a Plan Asset Entity will be required to represent and warrant as of the date it acquires Interests the maximum percentage of such general account or Plan Asset Entity (as reasonably determined by such insurance company or Plan Asset Entity) that will constitute Plan Assets (the "***Maximum Percentage***") so such percentage can be calculated in determining the percentage of Plan Assets invested in the Master Fund. Further, each such insurance company and Plan Asset Entity will be required to covenant that if, after its initial acquisition of Interests, the Maximum Percentage is exceeded at any time, then such insurance company or Plan Asset Entity shall immediately notify the Fund of that occurrence and shall, if and as directed by the Fund, in a manner consistent with the restrictions on transfer set forth herein, withdraw or dispose of some or all of the Interests held in its general account or Plan Asset Entity.

It is anticipated that investment in the Fund by benefit plan investors may be "significant" for purposes of the regulations. In such event, the underlying assets of the Fund would be deemed to constitute "plan assets" for purposes of ERISA. As a general rule, if the assets of the Fund were regarded as "plan assets" of a benefit plan investor, the Investment Manager would be deemed a fiduciary with respect to each Plan investing in the Fund. However, the Investment Manager believes that, given the limited purpose and role of the Fund and given the requirement that the Investment Manager follow the directions of the fiduciaries of each benefit plan investor investing in the Fund, as set forth in each such investor's subscription agreement, with respect to the investment by the Fund in the Master Fund, neither the Investment Manager nor any other entity providing services to the Fund would be exercising any discretionary authority or control with respect to the Fund. Accordingly, the Investment Manager believes that neither the Investment Manager nor any other entity providing services to the Fund will act as a fiduciary (as defined in Section 3(21) of ERISA) with respect to the assets of the Fund or any benefit plan investor. Rather, the Investment Manager believes that, given the limited purpose and role of the Fund and given the requirement that the Investment Manager follow the directions of the fiduciaries of each benefit plan investor investing in the Fund, as set forth in each such investor's subscription agreement, with respect to the investment by the Fund in the Master Fund, the fiduciary of each such benefit plan investor has retained the fiduciary authority and responsibility with respect to the investor's initial and continuing investment in the Fund as though the benefit plan investor is investing directly in the Master Fund.

**Representation by Plans**

The fiduciaries of each Plan proposing to invest in the Fund will be required to represent that they have been informed of and understand the Fund's investment objectives, policies and strategies and that the decision to invest Plan Assets in the Fund is consistent with the provisions of ERISA and/or the Code that require diversification of Plan Assets and impose other fiduciary responsibilities. By its purchase, each investor will be deemed to have represented that either (a) it is not a Plan that is subject to the prohibited transaction rules of ERISA or the Code, (b) it is not an entity whose assets include Plan Assets or (c) its investment in the Fund will not constitute a non-exempt prohibited transaction under ERISA or the Code.

**Ineligible Purchasers**

Limited partner interests may not be purchased with Plan Assets if the Investment Manager, any selling agent, finder, any of their respective affiliates or any of their respective employees: (a) has investment discretion with respect to the investment of such Plan Assets; (b) has authority or responsibility to give or regularly gives investment advice with respect to such Plan Assets, for a fee, and pursuant to an agreement or understanding that such advice will serve as a primary basis for

investment decisions with respect to such Plan Assets and that such advice will be based on the particular investment needs of the Plan; or (c) is an employer maintaining or contributing to such Plan.  A party that is described in clause (a) or (b) of the preceding sentence is a fiduciary under ERISA and the Code with respect to the Plan, and any such purchase might result in a "prohibited transaction" under ERISA and the Code.

**Plans' Reporting Obligations**

The information contained herein and in the other documentation provided to investors in connection with an investment in the Fund is intended to satisfy the alternative reporting option for "eligible indirect compensation" on Schedule C of the Form 5500, in addition to the other purposes for which such documents were created.

*Whether or not the underlying assets of the Fund are deemed Plan Assets, an investment in the Fund by a Plan is subject to ERISA and the Code.  Accordingly, Plan fiduciaries should consult their own counsel as to the consequences under ERISA and the Code of an investment in the Fund. Note that similar laws governing the investment and management of the assets of governmental or non-U.S. plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code.  Accordingly, fiduciaries of such governmental or non-U.S. plans, in consultation with their counsel, should consider the impact of their respective laws and regulations on an investment in the Fund.*

**Other Regulatory Matters**

Securities Act of 1933

Interests are not registered under the U.S. Securities Act of 1933, as amended (the "***Securities Act***"), or any other securities law, including state securities or blue sky laws.  Interests are offered without registration in reliance upon the exemption contained in Regulation D of the Securities Act and/or rules and regulations of the Securities and Exchange Commission applicable to transactions not involving a public offering.  Each investor is required, in the Fund's Subscription Documents pursuant to which such investor subscribes for an Interest, to make customary Regulation D representations.

Investment Company Act of 1940

The Fund is not registered under the U.S. Investment Company Act of 1940, as amended (the "***Investment Company Act***"), in reliance upon relief from registration afforded to collective investment vehicles whose outstanding securities are not publicly offered and are beneficially owned exclusively by investors that are considered "qualified purchasers" within the meaning of the Investment Company Act.  "Qualified purchasers" generally include individuals and certain family-owned companies owning total investments in excess of $5 million and entities owning total investments in excess of $25 million.  Each investor will be required to complete the Fund's Subscription Documents to enable the Fund to determine its eligibility.

Investment Adviser Registration

The Investment Manager is registered as relying adviser to Highland Capital Management, L.P., an investment adviser registered with the Securities and Exchange Commission under the U.S. Investment Advisers Act of 1940, as amended.

Appx. 03941

Commodity Exchange Act

Neither the General Partner nor the Investment Manager is required to register as a commodity pool operator ("**CPO**") or commodity trading advisor under the U.S. Commodity Exchange Act and each has filed a notice of claim effectuating exemption. As such, the General Partner and the Investment Manager will operate the Fund and the Master Fund pursuant to such exemption. Unlike a registered CPO, the General Partner and the Investment Manager are not required to deliver a disclosure document and a certified annual report to participants in the Fund. Among other things, the exemption requires the General Partner and the Investment Manager to file a claim of exemption with the National Futures Association. The Investment Manager qualifies for an exemption from registration with the CFTC as a commodity trading adviser pursuant to CFTC Rule 4.14(a)(8).

Cayman Islands Mutual Fund Law

The Offshore Fund and the Master Fund are regulated under the Mutual Funds Law (2015 Revision) of the Cayman Islands ("**Mutual Funds Law**"). The Cayman Islands Monetary Authority (the "**Authority**") has supervisory and enforcement powers to ensure compliance with the Mutual Funds Law. Regulation under the Mutual Funds Law entails the filing of prescribed details and audited accounts annually with the Authority. As a regulated mutual fund, the Authority may at any time instruct the Offshore Fund or the Master Fund to have its or their accounts audited and to submit them to the Authority within such time as the Authority specifies. Failure to comply with these requests by the Authority may result in substantial fines on the part of the directors of the Offshore Fund or the Master Fund, as applicable, and may result in the Authority applying to the court to have the Offshore Fund or the Master Fund wound up.

Neither the Offshore Fund nor the Master Fund is, however, subject to supervision in respect of their investment activities or the constitution of the Master Fund's portfolio by the Authority or any other governmental authority in the Cayman Islands, although the Authority does have power to investigate the activities of the Offshore Fund and the Master Fund in certain circumstances. Neither the Authority nor any other governmental authority in the Cayman Islands has commented upon or approved the terms or merits of this document. There is no investment compensation scheme available to investors in the Cayman Islands.

The Authority may take certain actions if it is satisfied that a regulated mutual fund is or is likely to become unable to meet its obligations as they fall due or is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors. The powers of the Authority include the power to require the substitution of the directors of the Offshore Fund or the Master Fund, to appoint a person to advise the Offshore Fund or the Master Fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of the Offshore Fund or the Master Fund, as the case may be. There are other remedies available to the Authority including the ability to apply to court for approval of other actions.

The Master Fund and the General Partner or any of its members or agents domiciled in the Cayman Islands may be compelled to provide information, subject to a request for information made by a regulatory or governmental authority or agency under applicable law; e.g. by the Cayman Islands Monetary Authority, either for itself or for a recognised overseas regulatory authority, under the Monetary Authority Law (2016 Revision), or by the Tax Information Authority, under the Tax Information Authority Law (2017 Revision) or Reporting of Savings Income Information (European Union) Law (2014 Revision) and associated regulations, agreements, arrangements and memoranda of

66

understanding. Disclosure of confidential information under such laws shall not be regarded as a breach of any duty of confidentiality and, in certain circumstances, the Master Fund, and the General Partner or any of its or their directors or agents, may be prohibited from disclosing that the request has been made.

<u>Anti-Money Laundering Regulations</u>

All subscriptions for Interests will be subject to applicable anti-money laundering regulations. Investors will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act) Act of 2001 (Pub. L. No. 107-56).

As part of the Fund's responsibility to comply with regulations aimed at the prevention of money laundering, the Fund or its delegate may require verification of identity from all prospective investors. Depending on the circumstances of each subscription, it may not be necessary to obtain full documentary evidence of identity.

The Fund reserves the right to request such information as is necessary to verify the identity of a prospective investor. The Fund also reserves the right to request such identification evidence in respect of a transferee of Interests. In the event of delay or failure by the prospective investor or transferee to produce any information required for verification purposes, the Fund may refuse to accept the application or (as the case may be) to register the relevant transfer and (in the case of a subscription of Interests) any funds received will be returned without interest to the account from which the monies were originally debited.

The Fund also reserves the right to refuse to make any withdrawal payment or distribution to a Limited Partner, if the Fund suspects or is advised that the payment of any withdrawal or distribution moneys to such Limited Partner might result in a breach or violation of any applicable anti-money laundering or other laws or regulations by any person in any relevant jurisdiction, or such refusal is considered necessary or appropriate to ensure the compliance by the Fund and the Investment Manager with any such laws or regulations in any relevant jurisdiction.

Appx. 03943

# EXHIBIT "F"



## Highland Restoration Fund Structure with Parallel Vehicle*

**Key**

Taxed as partnership for US purposes

Taxed as corporation for US purposes

Not a Fund entity

– – – – GP Carried/Capital Interest. Control, nominal economics

– – – –► Management Fee

LP Interest

* Parallel Vehicle will be formed offshore as a limited partnership and will elect to be taxed as a corporation. ECI, if any, generated by portfolio investments will be taxed to the Parallel Vehicle, not to the Limited Partners. Limited Partners may elect to make a commitment to either the Main Fund or the Parallel Vehicle.

5183267

US Investors

LP

Management Fee

Manager

Highland Restoration Capital Partners, L.P. (Delaware L.P.) Main Fund

GP

Highland Restoration Capital Partners GP, LLC GP

Management Fee

Investments

GP

GP

Highland Restoration Capital Partners Offshore, L.P. (Cayman L.P.) Parallel Vehicle

Highland Restoration Capital Partners Master, L.P. (Delaware L.P.)

LP

LP

Non-US Investors

# EXHIBIT "G"

SECOND AMENDED AND RESTATED

AGREEMENT OF LIMITED PARTNERSHIP

OF

HIGHLAND RESTORATION CAPITAL PARTNERS OFFSHORE, L.P.

17475053

**Appx. 03947**

# TABLE OF CONTENTS

Page

| ARTICLE I | GENERAL PROVISIONS | 1 |
|---|---|---|
| Section 1.1 | Formation | 1 |
| Section 1.2 | Name | 1 |
| Section 1.3 | Purpose | 1 |
| Section 1.4 | Place of Business | 2 |
| ARTICLE II | DEFINITIONS; DETERMINATIONS; CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS | 2 |
| Section 2.1 | Definitions; Determinations | 2 |
| Section 2.2 | Capital Contribution Commitment; Key Person Provision | 17 |
| Section 2.3 | Capital Accounts | 20 |
| Section 2.4 | Distributions in Kind | 21 |
| Section 2.5 | Determination of Voting Thresholds | 22 |
| ARTICLE III | DISTRIBUTIONS | 22 |
| Section 3.1 | Distribution Policy | 22 |
| Section 3.2 | Distribution of Short-Term Investment Income | 23 |
| Section 3.3 | Distributions of Current Cash Income and Proceeds From Dispositions of or Partial Realizations with Respect to Investments and In Kind Distributions | 23 |
| Section 3.4 | Foreign Taxes | 24 |
| ARTICLE IV | MANAGEMENT FEE AND ORGANIZATIONAL EXPENSES | 24 |
| Section 4.1 | Management Fee | 24 |
| Section 4.2 | Organizational and Partnership Expenses | 26 |
| Section 4.3 | Ordinary Operating Expenses | 26 |
| ARTICLE V | GENERAL PARTNER | 26 |
| Section 5.1 | Investment Opportunities; Devotion of Time; Management Authority | 26 |
| Section 5.2 | Use of Affiliates | 27 |
| Section 5.3 | Indebtedness | 27 |
| Section 5.4 | Limitation on Investments | 28 |
| Section 5.5 | UBTI; USRPI; ECI | 29 |

17475053

-i-

## TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| Section 5.6 | ERISA Matters | 29 |
| Section 5.7 | Conflicts of Interest | 31 |
| Section 5.8 | Transfer of General Partnership Interest; No Withdrawal or Loans | 32 |
| Section 5.9 | Removal of the General Partner | 32 |
| Section 5.10 | No Liability to Limited Partners | 33 |
| Section 5.11 | Indemnification of General Partner, the Manager and Advisory Committee | 33 |
| Section 5.12 | Formation of New Fund or Business Endeavor | 34 |
| Section 5.13 | Interest as a Limited Partner | 35 |
| Section 5.14 | Parallel Vehicles | 35 |
| Section 5.15 | Separate Investment Entities | 36 |
| Section 5.16 | Media Company Investments | 37 |
| Section 5.17 | Co-investment Funds | 38 |
| Section 5.18 | Bridge Leveraging | 39 |
| ARTICLE VI | LIMITED PARTNERS | 41 |
| Section 6.1 | Limited Liability | 41 |
| Section 6.2 | Transfer of Limited Partnership Interests | 41 |
| Section 6.3 | No Withdrawal | 43 |
| Section 6.4 | No Termination | 43 |
| Section 6.5 | Subsequent Limited Partners | 43 |
| Section 6.6 | Regulatory Matters | 44 |
| Section 6.7 | Indemnification and Reimbursement for Payments on Behalf of a Partner/Partner Clawback | 45 |
| Section 6.8 | Section 754 Election | 47 |
| Section 6.9 | BHCA Partners | 47 |
| Section 6.10 | Excused Investments | 48 |
| Section 6.11 | Limited Partner's Default on Commitment | 48 |
| Section 6.12 | Investment Company Act Limitations | 50 |
| ARTICLE VII | ADVISORY COMMITTEE | 51 |
| Section 7.1 | Advisory Committee | 51 |

Appx. 03949

## TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| **ARTICLE VIII** | DURATION AND TERMINATION | 52 |
| Section 8.1 | Duration | 52 |
| Section 8.2 | Early Termination | 52 |
| Section 8.3 | Termination and Liquidation of Partnership Interests; Annual Determination of General Partner Give Back | 53 |
| **ARTICLE IX** | VALUATION OF PARTNERSHIP ASSETS | 53 |
| Section 9.1 | Normal Valuation | 53 |
| Section 9.2 | Restrictions on Transfer or Blockage | 53 |
| Section 9.3 | Objection to Valuation | 53 |
| Section 9.4 | Write-down to Value | 54 |
| **ARTICLE X** | BOOKS OF ACCOUNTS; MEETINGS | 54 |
| Section 10.1 | Books | 54 |
| Section 10.2 | Fiscal Year | 54 |
| Section 10.3 | Reports | 54 |
| Section 10.4 | Certain Tax Elections | 55 |
| Section 10.5 | Annual Meeting | 55 |
| **ARTICLE XI** | MAINTENANCE OF REGISTRATION OF LIMITED PARTNERSHIP; POWER OF ATTORNEY | 55 |
| Section 11.1 | Maintenance of Registration of Limited Partnership | 55 |
| Section 11.2 | Power of Attorney | 55 |
| **ARTICLE XII** | MISCELLANEOUS | 56 |
| Section 12.1 | Amendments | 56 |
| Section 12.2 | Successors | 57 |
| Section 12.3 | Governing Law; Severability | 57 |
| Section 12.4 | Notices | 57 |
| Section 12.5 | Legal Counsel | 58 |
| Section 12.6 | Miscellaneous | 58 |

Appx. 03950

Schedule 1      Limited Partners/Commitments/Notice Information
Exhibit A       Master Partnership Agreement

Appx. 03951

**SECOND AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND RESTORATION CAPITAL PARTNERS OFFSHORE, L.P.**

THIS SECOND AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP (this "Agreement") is dated April 18, 2008 between Highland Restoration Capital Partners GP, LLC, a Delaware limited liability company (in its capacity as general partner of the Partnership, the "General Partner") and the limited partners listed in Schedule 1 attached hereto (in their capacities as limited partners of the Partnership, the "Limited Partners") (the General Partner and the Limited Partners being herein collectively called the "Partners"). Capitalized terms not otherwise defined shall have the meanings ascribed to such terms in Section 2.1(a).

Highland Restoration Capital Partners Offshore, L.P., is an exempted limited partnership (the "Partnership") registered under the Exempted Limited Partnership Law (as amended) of the Cayman Islands (the "ELP Law") on the 12th day of November 2007.

The General Partner and the Initial Limited Partner entered into an Agreement of Limited Partnership, dated as of November 9, 2007 (the "Original Agreement"). The Original Agreement was subsequently amended and restated on November 15, 2007 (the "Amended and Restated Agreement").

The parties hereto wish to amend and restate the Amended and Restated Agreement in the manner set forth herein.

**ARTICLE I**

**GENERAL PROVISIONS**

Section 1.1  Formation.  The Partners hereby agree to amend and restate the Amended and Restated Agreement which is replaced and superseded in its entirety by this Agreement.

Section 1.2  Name.  The name of the Partnership will be "Highland Restoration Capital Partners Offshore, L.P." or such other name or names as the General Partner may from time to time designate.  The General Partner will notify Limited Partners in writing of any change to the name of the Partnership.

Section 1.3  Purpose.  Subject to the express limitations set forth herein, the Partnership is organized for the object and purpose of (i) investing in senior secured bank loans, debt obligations, trade claims and equity securities of middle market Distressed Companies primarily based in the United States generally consistent with the investment strategy described in the Partnership's Confidential Private Placement Memorandum, including, without limitation, privately placed or publicly traded debt securities and other debt obligations, senior and subordinated debt obligations, secured and unsecured debt obligations, privately placed or

17475053

publicly traded equity securities including common stock, preferred stock and warrants (all of which investments will be made through the Master Partnership (other than investments made through a Separate Investment Entity pursuant to Section 5.15)), (ii) managing and monitoring such investments and (iii) engaging in such activities incidental or ancillary thereto and otherwise permitted by the ELP Law as the General Partner deems necessary or advisable.

Section 1.4  Place of Business.  The Partnership maintains a registered office at Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9002, Cayman Islands or at such other place in the Cayman Islands as the General Partner may from time to time designate, and its principal place of business is at Two Galleria Tower, 13455 Noel Road, Dallas, TX 75240, or at such other place or places in the United States as the General Partner may from time to time designate; provided, however, that if the General Partner designates different places of business, it shall promptly notify the Limited Partners in writing.

## ARTICLE II

## DEFINITIONS; DETERMINATIONS;
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

Section 2.1  Definitions; Determinations.

(a)  For purposes of this Agreement the following capitalized terms shall have the meanings set forth below:

"Additional Limited Partners" has the meaning set forth in Section 6.5(a).

"Advisory Committee" has the meaning set forth in Section 7.1(a).

"Affiliate" has the meaning set forth in Rule 405 promulgated under the Securities Act.

"Agent" has the meaning set forth in Section 2.4(b).

"Agreement" has the meaning set forth in the introduction.

"Allocated Expenses" means, for any Partner as of any date with respect to any Portfolio Investment, such Partner's Capital Contributions applied to pay Management Fees, Organizational Expenses and Uncapitalized Partnership Expenses that have been allocated pursuant to Section 3.3(b) to such Portfolio Investment as of such date.

"Amended and Restated Agreement" has the meaning set forth in the introduction.

"Basis" of any security means the basis of such security as determined in accordance with the Code less the amount of any write-down pursuant to Section 9.4 and as further adjusted by the General Partner in its reasonable discretion to reverse the effects of any exchange of securities that would result in an increase in tax basis pursuant to the Code.

Appx. 03953

"Benefit Plan Investor" means any Partner that is a "benefit plan investor" as defined in Section 3(42) of ERISA and any regulations promulgated thereunder.

"BHC Act" means the U.S. Bank Holding Company Act of 1956, as amended.

"BHCA Partner" means a Limited Partner that is a bank holding company, as defined in Section 2(a) of the BHC Act, or a non-bank subsidiary of such bank holding company, provided, that such Limited Partner shall not be a BHC Partner if (i) it is a financial holding company, as defined in Section 2(p) of the BHC Act, or a non-bank subsidiary thereof and is acting pursuant to Section 4(k)(4)(h) or Section 4(k)(4)(i) of the BHC Act as set forth in a notice to such effect to the General Partner; or (ii) it is a small business investment company licensed as such under the Small Business Investment Act of 1958, as amended.

"Bridge Financing" means, with respect to the Partnership's investment in a Portfolio Company, that portion of the investment that the Partnership provides as interim financing (including guarantees of debt financing) in anticipation of, or to support, a permanent investment by the Partnership in such Portfolio Company and that the Partnership intends to cause the Portfolio Company to repay or refinance within 18 months after the date of such investment in the Portfolio Company and which the General Partner designates in the Capital Call Notice therefor. During the first 18 months following a Bridge Financing, such Bridge Financing shall be treated as a Short-Term Investment. A Bridge Financing that is outstanding 18 months following the making of such Bridge Financing, shall be treated by the Partnership as a permanent investment in a Portfolio Company.

"Bridge Leveraging" means indebtedness incurred by the Partnership to fund the acquisition of a Portfolio Investment pending receipt of Capital Contributions (including as a result of any default by any Limited Partner or limited partner of a Parallel Vehicle in the making of Capital Contributions) pursuant to a Capital Call Notice that the Partnership anticipates issuing pursuant to Section 2.2(a), provided that the Capital Contributions made with respect to such Capital Call Notice are applied by the Partnership upon receipt thereof to repay such indebtedness.

"Business Day" means any day other than (i) Saturday or Sunday or (ii) any other day on which banks located in New York City generally are closed for business.

"Capital Account" has the meaning set forth in Section 2.3.

"Capital Call" has the meaning set forth in Section 2.2(a).

"Capital Call Notice" has the meaning set forth in Section 2.2(a).

"Capital Contribution" of any Partner means the amount received by the Partnership from such Partner as an actual contribution.

"Capitalized Partnership Expenses" means Partnership Expenses that are reflected in the Basis of Portfolio Investments.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

Appx. 03954

"Co-Investment Opportunity" has the meaning set forth in Section 5.17(a).

"Co-Investment Fund" means any partnership, limited liability company or other entity that is an Affiliate of the General Partner or the Manager, is not a Parallel Vehicle or a Separate Investment Entity, and is organized to invest in Portfolio Investments pursuant to a Co-Investment Opportunity.

"Co-Investor" has the meaning set forth in Section 5.17(a).

"Commitment" (a) with respect to each Limited Partner means the aggregate amount of cash agreed to be contributed as capital to the Partnership by such Limited Partner as specified in Schedule 1 attached hereto as the same may be modified from time to time under the terms of this Agreement, and (b) with respect to the General Partner means the aggregate amount of cash the General Partner has agreed to contribute as capital to the Partnership and Master Partnership as specified in Schedule 1 attached hereto, as the same may be modified from time to time under the terms of this Agreement.

"Commitment Period" has the meaning set forth in Section 2.2(b).

"Continuity Period" has the meaning set forth in Section 2.2(d).

"Credit Support" has the meaning set forth in Section 5.3.

"Crusader" means Highland Crusader Fund, L.P., and its successors.

"Current Cash Income" means all Current Income paid in cash or cash equivalents.

"Current Income" means all interest and dividend income (including from original issue discount, purchases or investments at a market discount, and payment of in-kind income and other non-cash current income) from a Portfolio Company.

"Defaulting Partner" has the meaning set forth in Section 6.11(a).

"Director Fees" means directors, consulting, monitoring or similar fees in respect of a Portfolio Company, including options, warrants or other non-cash compensation received by a director or officer of a Portfolio Company which shall be valued at the earlier of (v) the time of exercise of such instrument, (w) three years after the underlying security of such instrument becomes a Marketable Security, (x) the dissolution of the Partnership, (y) the date the Partnership disposes of the Portfolio Investment that gave rise to such fee or (z) the date such option, warrant or other non-cash compensation was disposed of by the General Partner, the Manager, the Principals or their Affiliates and thereafter credited against Management Fees pursuant to Section 4.1(c), in each such case to the extent actually paid by a Portfolio Company and received by the General Partner, the Manager, the Principals, employees of the Manager or their Affiliates in respect of Portfolio Investments; provided, however, that (A) such fees shall not include, in each case, any such amounts that are applied to cover amounts paid by the General Partner, the Manager, the Principals or their Affiliates that constitute unreimbursed (i) out-of-pocket expenses of such persons incurred in generating such fees, and (ii) Partnership Expenses incurred in generating such fees, and (B) to the extent that the General Partner, the

Appx. 03955

Manager, the Principals, employees of the Manager or their Affiliates were actually reimbursed by the Partnership for any Partnership Expenses incurred in generating such fees, such fees will first be applied to repay the Partnership for such Partnership Expenses.

"Disposition" or "Disposed of" means, with respect to all or a portion of a Portfolio Investment, (i) except as provided in the next sentence, the sale, exchange or other disposition by the Partnership of all or a portion of the securities or other interests constituting that Portfolio Investment for cash, securities or other property, (ii) the receipt by the Partnership of a distribution of the proceeds of the sale of all or substantially all of the assets of the Portfolio Company in complete liquidation of the Partnership's entire direct or indirect interest in the Portfolio Investment and (iii) an in-kind distribution of all or part of a Portfolio Investment that has not previously been deemed to have been Disposed of, as of the date of and to the extent of such distribution. A "Disposition" does not include (i) a recapitalization that consists of an exchange of a Portfolio Investment for other securities of or claims against the issuing Portfolio Company, (ii) a business combination that consists of an exchange of substantially all of the Partnership's direct or indirect interest in a Portfolio Investment for securities issued by an acquiring entity, (iii) a business combination that consists of the exchange of all or substantially all of the assets of a Portfolio Company or one or more divisions or operating units of a Portfolio Company for securities issued by an acquiring entity or (iv) a sale, exchange or other disposition that does not constitute a pro rata disposition of a portion of each class of securities or other interests constituting such Portfolio Investment.

"Distressed Companies" shall mean persons that, in the opinion of the General Partner, (a) are or have been in financial or other stress; (b) are restructuring, are considered likely to be restructured, or have been restructured in an out-of-court process or in a proceeding under the Federal bankruptcy laws or state insolvency laws or similar laws in or outside of the United States; (c) are being, are considered likely to be or have been reorganized within or outside of a proceeding under federal bankruptcy laws or state insolvency laws or similar laws in or outside of the United States; or (d) are engaged, are considered likely to engage or have been engaged in other extraordinary transactions, such as debt restructurings, reorganizations and liquidations outside of bankruptcy.

"ECI" means income that is effectively connected with a United States trade or business within the meaning of Section 864(c) of the Code and the Treasury Regulations promulgated thereunder, but not including any income or gain attributable to the disposition of a "United States real property interest" as defined for purposes of Section 897(c) of the Code.

"Electing Limited Partner" has the meaning set forth in Section 2.4(b).

"ELP Law" has the meaning set forth in the introduction.

"ERISA" means the U.S. Employee Retirement Income Security Act of 1974, as amended.

"Existing Partners" has the meaning set forth in Section 6.5(c).

"FCC" shall mean the U.S. Federal Communications Commission.

"FCC Attribution Rules" shall mean the ownership attribution rules of the FCC, including, but not limited to, 47 C.F.R. §§ 21.912, Note 1; 24-709; 24.720; 26.101(b), (c); 73.3555, Note 2; 76.501, Note 2; 76.503, Note 2; 76-504, Note 1; Attribution Reconsideration Order, 58 Radio Regulation 2nd 604 (1985); Further Attribution Reconsideration Order, 1 FCC Rcd 802 (1986); Report and Order, 14 FCC Rcd 12559 (1999); Report and Order, 14 FCC Rcd 19014 (1999); Memorandum Opinion and Second Order in Reconsideration, FCC 00-431 (released Jan. 19, 2001); and Memorandum and Opinion and Order on Reconsideration, FCC-00-438 (released Jan. 19, 2001), all as the same may be amended or supplemented from time to time.

"Final Closing" means the final closing of subscriptions by Limited Partners pursuant to Subscription Agreements, which, in any event, shall take place no later than the fourteen month anniversary of the First Closing.

"First Closing" means the first closing of subscriptions by Limited Partners pursuant to Subscription Agreements.

"Follow-on Investment" means investments made after the termination of the Commitment Period in securities of an existing Portfolio Company that are appropriate or necessary in the opinion of the General Partner to preserve, protect or enhance the investment in such Portfolio Company that was made by the Partnership during the Commitment Period.

"Fund Group" means the Partnership, Parallel Vehicles, Separate Investment Entities and their respective Portfolio Investments.

"Funded Commitment" (A) means as to any Limited Partner as of any date, that portion of a Limited Partner's Commitment that has been contributed (or "deemed contributed") to the Partnership to meet a Capital Call (including any amounts contributed pursuant to Section 6.5(b)), reduced by (a) any amounts which are distributed (or "deemed distributed") to such Limited Partner in respect of a proposed Portfolio Investment (or portion thereof) that was not consummated, (b) any amounts which are distributed (or "deemed distributed") to such Limited Partner in respect of a Bridge Financing (or portion thereof) that was sold, refinanced, redeemed or otherwise disposed of within 18 months from the Investment Date of such Bridge Financing in an amount not to exceed the Limited Partner's portion of Funded Commitments used to acquire such Bridge Financing, (c) any amounts paid by such Limited Partner pursuant to subclauses (B) and (C) of the third sentence of Section 6.5(b), (d) any amounts distributed (or "deemed distributed") to such Limited Partner pursuant to Section 6.5 (other than amounts attributable to payments by an Additional Limited Partner pursuant to subclauses (B) and (C) of the third sentence of Section 6.5(b)), and (e) in the sole discretion of the General Partner, any amounts distributed (or "deemed distributed") to such Limited Partner with respect to a Portfolio Investment that was sold, refinanced, redeemed or otherwise disposed of within 48 months after the Investment Date for such Portfolio Investment in an amount not to exceed the portion of such Limited Partner's Funded Commitments used to acquire such Portfolio Investment, all as determined in good faith by the General Partner and (B) as to the General Partner as of any date, that portion of the General Partner's Commitment that has been either (i) contributed (or "deemed contributed") to the Partnership (including any amounts contributed pursuant to Section 6.5(b)) or (ii) contributed (or "deemed contributed") to the Master Partnership (including

Appx. 03957

the aggregate amount of all Deemed Contributions (as defined in the Master Partnership Agreement treated as made to the Master Partnership on or prior to such date), reduced by (w) any amounts which are distributed (or "deemed distributed") to the General Partner by the Master Partnership in respect of a proposed investment in a Portfolio Company (or portion thereof) that was not consummated, (x) any amounts which are distributed to the General Partner by the Master Partnership in respect of a Bridge Financing (or portion thereof) that was sold, refinanced, redeemed or otherwise disposed of within 18 months after the date such Bridge Financing was made, in an amount not to exceed the General Partner's portion of Funded Commitments used to acquire such Bridge Financing, (y) any amounts distributed (or "deemed distributed") to the General Partner pursuant to Section 6.5 (other than amounts attributable to payments by a Limited Partner pursuant to subclause (B) and (C) of the third sentence of Section 6.5(b)), and (z) in the sole discretion of the General Partner, (A) any amounts distributed (or "deemed distributed") to the General Partner by the Master Partnership with respect to a Portfolio Investment that was sold, refinanced, redeemed or otherwise disposed of within 18 months after the Investment Date for such Portfolio Investment in an amount not to exceed the portion of the General Partner's Funded Commitment used to acquire such Portfolio Investment, all as determined in good faith by the General Partner. For the purposes of this definition, those proceeds otherwise distributable to a Partner that are retained for reinvestment or application to a Capital Call in accordance with the proviso to Section 3.1(b) or the proviso to the second to last sentence in Section 6.5(b) (or, in the case of the General Partner, the corresponding provisions of the Master Partnership Agreement), shall be "deemed distributed" to such Partner by the Partnership (or the Master Partnership, as applicable) and "deemed contributed" by such Partner to the Partnership (or the Master Partnership, as applicable). The General Partner, in its discretion, may reduce the 48 month period referenced above at any time during the Commitment Period.

"GAAP" means U.S. generally accepted accounting principles as in effect from time to time.

"General Partner" has the meaning set forth in the introduction to this Agreement and includes any successor general partner of the Partnership appointed in accordance with this Agreement.

"GP's Counsel" has the meaning set forth in Section 12.5.

"gross negligence" when used in this Agreement shall be interpreted in accordance with the laws of the U.S. State of Delaware.

"Gross-up Percentage" means the percentage determined by dividing (i) the aggregate Commitments of all Partners by (ii) the aggregate Commitments of all Partners with respect to whom the Management Fee is payable pursuant to Section 4.1(b).

"Guaranty Agreement" shall mean the Guaranty Agreement, dated as of the date hereof, by and among the Partnership, the General Partner and the guarantors party thereto, substantially in the form of the agreement set forth in Exhibit A hereto, as amended from time to time in accordance with its terms.

-7-

"Highland" shall mean Highland Capital Management, L.P., a Delaware limited partnership.

"Highland Accounts" means collectively funds, accounts and vehicles managed by Highland from time to time.

"Highland Investment Allocation Policy" shall mean the investment allocation policy of Highland described in the Partnership's Confidential Private Placement Memorandum and as in effect or modified from time to time.

"Highland Portfolio Company" means each portfolio company (and each of their subsidiaries) as to which Highland and/or the Principals and/or their respective Affiliates have completed, or are in the process of completing, an investment or acquisition or receipt of a debt or equity ownership position therein, including, without limitation through Crusader and other Highland Accounts, at the time of the First Closing, together with follow-on or other additional investments and acquisitions from time to time after the First Closing in or by such companies so long as such investments and acquisitions are reasonably determined by the Principals to be primarily within the general lines or areas of business of such companies as of the First Closing or incidental or related thereto.

"Indemnifying Partner" has the meaning set forth in Section 6.7(a).

"Initial Fee Period" means the period starting on the First Closing and ending on the earlier of (i) the termination of the Commitment Period, and (ii) the date on which the Manager, the General Partner or an Affiliate thereof closes subscriptions of capital commitments by investors of a Successor Fund.

"Initial Limited Partner" means Virginia Czarnocki an attorney with Walkers, a law firm located in the Cayman Islands.

"Insulated Partner" has the meaning set forth in Section 5.16(a).

"Insulated Partner Affiliate" has the meaning set forth in Section 5.16(a).

"Investment Company Act" means the U.S. Investment Company Act of 1940, as amended.

"Investment Date" means, with respect to any Portfolio Investment, the date such Portfolio Investment was acquired by the Partnership.

"Investment Income and Gain" means, with respect to a Portfolio Investment, (i) the excess, if any, of the proceeds from the Disposition of such Portfolio Investment or portion thereof or Partial Realization with respect to such Portfolio Investment or portion thereof that does not give rise to Current Income over the Basis of such Portfolio Investment or portion thereof, (ii) to the extent all or any portion of such Portfolio Investment is distributed to the Partners in kind as contemplated by Section 2.3, the excess, if any, of the value (as determined pursuant to Article IX) of the portion of such Portfolio Investment distributed to the Partners

Appx. 03959

over the Basis of such portion of such Portfolio Investment, and (iii) Current Income attributable to such Portfolio Investment.

"Investment Loss" means, with respect to a Portfolio Investment, (i) the deficiency, if any, of the proceeds from the Disposition of such Portfolio Investment or portion thereof or Partial Realization with respect to such Portfolio Investment or portion thereof that does not give rise to Current Income as compared to the Basis of such Portfolio Investment or portion thereof, (ii) to the extent all or any portion of such Portfolio Investment is distributed to the Partners in kind as contemplated by Section 2.4, the deficiency, if any, of the value (as determined pursuant to Article IX) of the portion of such Portfolio Investment distributed to the Partners as compared to the Basis of such portion of such Portfolio Investment, and (iii) the amount, as reasonably determined by the General Partner in accordance with Section 9.4, by which such Portfolio Investment has permanently declined in value below the Basis of such Portfolio Investment immediately prior to such determination.

"Keyman Group" means James Dondero, Pat Daugherty and John Honis; provided, that the Keyman Group will include replacements chosen pursuant to Section 2.2(d) if a Triggering Event occurs pursuant to clauses (ii) or (iii) therein; provided, further, that, if any one of the members of the Keyman Group ceases to be actively involved, including in a supervisory role, on an ongoing basis with respect to the business, operations or investment decisions of Highland, the Manager and General Partner, the Keyman Group will include such replacement person that is proposed by the General Partner to the Advisory Committee and who is approved to serve as a member of the Keyman Group by the consent of a majority of the members of the Advisory Committee.

"Limited Partners" means the persons listed in Schedule 1 hereto in their capacity as limited partners of the Partnership (including each person admitted to the Partnership in accordance with Section 6.5) and each person who is admitted to the Partnership as a substitute limited partner pursuant to Section 6.2 or 6.5, so long as each such person continues to be a limited partner of the Partnership hereunder.

"Main Fund" means Highland Restoration Capital Partners, L.P., a Delaware limited partnership.

"Main Fund Agreement" means the Agreement of Limited Partnership of the Main Fund, as amended from time to time.

"Majority in Interest of the Limited Partners" means Limited Partners with Commitments and limited partners in Parallel Vehicles with capital commitments to Parallel Vehicles totaling more than 50% of the aggregate Commitments of all Limited Partners and capital commitments of limited partners in Parallel Vehicles.

"Management Fee" has the meaning set forth in Section 4.1(a).

"Management Fee Period" has the meaning set forth in Section 4.1(a).

Appx. 03960

"Manager" means Highland Capital Management, L.P., a Delaware limited partnership, or other entity controlled by James Dondero and Mark Okada, and appointed as Manager by the General Partner on behalf of the Partnership from time to time.

"Marketable Securities" means securities that (A) (i) are (x) listed on a national securities exchange in the United States, (y) quoted on the NMS or (z) listed on a securities exchange or quoted on an established quotation system within or without the United States that in the opinion of the General Partner after consultation with the Advisory Committee supports sufficient trading activity and volume to allow for the orderly disposition of such securities by the Partners following a distribution thereof in accordance with Sections 2.4 and 3.3, and (ii) are not subject to restrictions on transfer as a result of applicable contract provisions, the provisions of the Securities Act or regulations thereunder (other than the volume, manner-of-sale and notice restrictions of Rule 144 promulgated thereunder or any successor rule thereto; provided, that if such securities are subject to volume limitations under Rule 144 and distributed in kind to Limited Partners, each Limited Partner would be able to sell such securities promptly after the distribution thereof in accordance with Sections 2.4 and 3.3 (notwithstanding volume limitations)), or other applicable law, or (B) are immediately convertible, exchangeable or exercisable by the holder thereof into securities that meet the requirements of the foregoing clause (A).

"Master Partnership" means Highland Restoration Capital Partners Master, L.P., a Delaware limited partnership entered into by the General Partner and the Partnership to make and hold Portfolio Investments.

"Master Partnership Agreement" means the Agreement of Limited Partnership of the Master Partnership, as amended from time to time, substantially in the form of Exhibit A hereto.

"Media Company" shall mean any entity in which the Partnership has or acquires an investment and that directly or indirectly owns, controls or operates any: (i) broadcast radio or television station licensed by the FCC; (ii) U.S. cable television system; (iii) daily newspaper (as such term is defined in Section 73.3555 of the Ownership Rules); (iv) multipoint multichannel distribution system licensed by the FCC; (v) other communications facility the ownership or operation of which is subject to regulation by the FCC under (x) the Communications Act of 1934, as amended, (y) the FCC Attribution Rules, or (z) the FCC Ownership Rules; and (vi) other business or activity that is subject to ownership restrictions imposed by the FCC from time to time.

"Net Funded Commitment" means, in respect of any Partner and as of the first day of any Management Fee Period, such Partner's Funded Commitment as of such date less (i) such Partner's Capital Contributions (or portion thereof, in the case of a partial Disposition) applied by the Partnership to make all Portfolio Investments that have been Disposed of on or prior to such date and applied to pay Capitalized Partnership Expenses relating to such Portfolio Investments and Allocated Expenses with respect to such Portfolio Investment as of such date, (ii) all write downs pursuant to Section 9.4 in respect of Portfolio Investments that have not been Disposed of by the Partnership on or prior to such date multiplied by such Partner's Partner Interest in each such Portfolio Investment, and (iii) such Partner's Capital Contributions in

-10-

respect of Management Fees and Partnership Expenses allocable to Portfolio Investments that have not been Disposed of on or prior to such date.

"NMS" means the National Market System of the National Association of Securities Dealers, Inc.

"Non-Marketable Securities" means all securities which are not Marketable Securities.

"Non-U.S. Partner" means with respect to any determination hereunder, (i) any Limited Partner that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code, or (ii) any Limited Partner that has a direct or indirect beneficial owner that (x) is not a "United States person" within the meaning of Section 7701(a)(30) of the Code and (y) would be required to report on a United States federal income tax return or report ECI that would be derived from the Partnership if the Partnership were classified as a partnership for U.S. federal income tax purposes, to the extent of such beneficial owner's pro rata share of such income, but in each case, only if such Limited Partner has notified the General Partner of such status at any time prior to such determination, by providing the General Partner an IRS Form W-8BEN or by some other method satisfactory to the General Partner.

"Non-Voting Interest" means any interest of a Limited Partner in the Partnership, and if applicable, any interest of a limited partner in a Parallel Vehicle (or portion thereof) with respect to which a Limited Partner or limited partner in a Parallel Vehicle has, or elects to have, no or limited voting rights pursuant to Section 6.9 or a similar provision in the agreement of limited partnership of the Parallel Vehicles, as the case may be.

"Non-Voting Partnership Interests" has the meaning set forth in Section 6.9(b).

"Operating Company" means an "operating company" within the meaning of the Plan Asset Regulation, including a "venture capital operating company."

"Opinion of the Partnership's Counsel" means an opinion of Mayer Brown LLP or other counsel selected by the General Partner and reasonably acceptable (by reason of experience in the area of law involved) to the Limited Partner affected by such opinion or, if more than one Limited Partner is affected by such opinion, a Majority in Interest of the Limited Partners so affected.

"Organizational Expenses" means the reasonable out-of-pocket expenses (including, without limitation, travel, printing, legal and accounting fees and other expenses) of the General Partner, the Manager, the Principals and their respective Affiliates (but not including any Placement Fees) incurred in the formation of the Partnership, any Parallel Vehicle or any Separate Investment Entity or incurred in connection with the organization and funding of the Partnership, any Parallel Vehicle, Separate Investment Entity and the General Partner.

"Original Agreement" has the meaning set forth in the introduction.

"Other Permitted Investment Activities" means the continuing involvement of the Principals, subject to compliance with the devotion of time covenant in Section 5.1(a), (i) in the full range of their activities in connection with their duties and responsibilities as members,

Appx. 03962

owners, partners, directors, officers, employees, shareholders, or consultants of the Manager and Highland Accounts, including Crusader, (ii) in acquisitions and follow-on investments by Highland Portfolio Companies reasonably determined by the Principals to be primarily within the general area of business of a Highland Portfolio Company or incidental or related thereto, (iii) as passive owners, stockholders, debtholders and investors in professionally managed hedge funds, fund of funds and other private investment entities and vehicles, (iv) in investments which do not otherwise meet the investment objectives of the Partnership, and (v) in a Successor Fund organized in accordance with <u>Section 5.12</u>; <u>provided</u>, that none of the activities described in clauses (i) through (v) above shall unreasonably affect the ability of the Principals to fulfill their duties to the Limited Partners and to be actively involved in the business of the Fund Group.

"<u>Ownership Rules</u>" means the multiple and cross-ownership rules of the FCC including, but not limited to, 47 C.F.R. §§ 21.912; 24-709; 24.720; 26.101(a); 73.3555; 74.931(h); 76.501; 76.503; 76.504, and other regulations or written policies of the FCC which limit or restrict ownership in Media Companies, all as the same may be amended or supplemented from time to time.

"<u>Parallel Vehicle</u>" means any entity that is organized pursuant to <u>Section 5.14</u> and designated a Parallel Vehicle by the General Partner, but solely for purposes of this Agreement, the Partnership is not a Parallel Vehicle, and the Main Fund is a Parallel Vehicle.

"<u>Partial Realization</u>" means, with respect to any Portfolio Investment, the realization by the Partnership of Current Income or of proceeds from a recapitalization, extraordinary dividend, sale, redemption or other disposition of less than all of such Portfolio Investment (other than a <u>pro rata</u> disposition of a portion of each class of securities or other interests constituting such Portfolio Investment) or any other similar event that does not constitute a Disposition of such Portfolio Investment.

"<u>Participating Partner</u>" means, with respect to any Portfolio Investment, any Limited Partner who made a Capital Contribution (other than solely a Waiver Contribution) that was applied to such Portfolio Investment.

"<u>Partner Interest</u>" means for any Partner that is a Participating Partner with respect to any Portfolio Investment, the proportion that such Participating Partner's Capital Contributions that were applied to such Portfolio Investment bears to the aggregate Capital Contributions of all Partners that were applied to such Portfolio Investment.

"<u>Partner Share</u>" means, for any Partner, and for any period, the amount of Investment Income and Gain, Investment Loss, Current Cash Income, proceeds from the Disposition of or Partial Realization with respect to a Portfolio Investment for such period or Portfolio Investments distributed in kind, as the case may be, or items of Partnership income or expense (other than Management Fees or Placement Fees, if any), in each case for such period multiplied by such Partner's Partner Interest in the Portfolio Investments giving rise to such items or to which such items are allocable pursuant to <u>Section 3.3(b)</u>.

"<u>Partners</u>" means the General Partner and the Limited Partners, collectively.

"<u>Partnership</u>" has the meaning set forth in <u>Section 1.1</u>.

17475053                                          -12-

"Partnership Expenses" means all reasonable costs and expenses relating to the Partnership's activities, investments and business (to the extent not borne or reimbursed by a Portfolio Company or proposed Portfolio Company), including, but not limited to, (i) all costs and out-of-pocket fees and expenses attributable to acquiring, investing, holding, monitoring and disposing of the Partnership's investments, (ii) all other out-of-pocket costs and out-of-pocket fees and expenses attributable to unconsummated transactions or investment strategies (but excluding marketing strategies) that do not lead to consummated acquisitions, (iii) legal, accounting, auditing, administrative, consulting and other fees and expenses (including, but not limited to, fees of the administrator of the Partnership and insurance and other out-of-pocket expenses associated with negotiating, consummating, monitoring and disposing of the Partnership's investments and the preparation of Partnership financial statements, tax returns and forms K-1), (iv) expenses of the Advisory Committee incurred in accordance with Article VII, (v) extraordinary expenses, liabilities, indemnities and other obligations of the Partnership (including, but not limited to, litigation and indemnification costs and expenses, judgments and settlements (including, but not limited to, costs and expenses payable under Section 5.11)), and (vi) all debt service obligations, including interest, premium, if any, fees, expenses and other amounts payable in respect of indebtedness of the Partnership incurred in accordance with Section 5.3, but in each case, not including Organizational Expenses in excess of $1,250,000, Management Fees, Placement Fees and those expenses borne by the Manager pursuant to Section 4.3.

"Partnership Legal Matters" has the meaning set forth in Section 12.5.

"Permitted GP Transferee" means, as to any membership or other ownership interest in the General Partner, of or held by any Principal or other member or investor in the General Partner (a) any family member of such person provided the transferor retains all voting control with respect to the interest, (b) any other partner or investor in the General Partner who was a partner or investor in the General Partner as of the Final Closing, and (c) any trust, partnership, foundation corporation or other entity that is either controlled by such person or is primarily for the benefit of such person and/or their family members.

"Person" means an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a governmental entity (or any department, agency or political subdivision thereof).

"Placement Fees" means the fees and expenses and any interest on any deferred fees and expenses charged by or paid to any placement agency designated by the Partnership or the General Partner for the marketing and sale of interests in the Partnership and the Parallel Vehicles. The Partnership's pro rata share of any Placement Fees shall be the amount of such fees multiplied by a fraction, the numerator of which is the aggregate Commitments of the Limited Partners giving rise to such fees, and the denominator of which is the sum of the aggregate Commitments of the Limited Partners and the aggregate capital commitments of all limited partners in all Parallel Vehicles giving rise to such fees.

"Plan Assets" means "plan assets" as defined in the Plan Asset Regulation.

"Plan Asset Event" has the meaning set forth in Section 5.6(e).

"Plan Asset Regulation" means the U.S. Department of Labor regulation located at 29 C.F.R. Section 2510.3-101, or any successor regulation thereto, as in effect at the time of reference, as modified by Section 3(42) of ERISA.

"Portfolio Company" means any corporation, partnership, limited liability, company or other entity in which the Partnership has directly or indirectly made an investment, other than Short-Term Investments.

"Portfolio Investments" means any investments held directly or indirectly by the Partnership, other than Short-Term Investments. If the Partnership holds multiple classes of securities or other interests that were issued by a Portfolio Company in a single closing or series of related closings, all of such securities or interests in the aggregate shall constitute one Portfolio Investment.

"Principals" means the following senior investment professionals who are partners or members of the General Partner or are employed by the Manager, for so long as such persons have not voluntarily resigned from, or been terminated by, the General Partner or Manager, and any other senior investment professionals from time to time who are designated as such by the General Partner: James Dondero, Mark Okada, Patrick Daugherty and John Honis.

"Qualified Purchaser" has the meaning set forth in Section 2(a)(51) of the Investment Company Act and the regulations promulgated thereunder.

"Redeemed Limited Partner" has the meaning set forth in Section 6.6(c).

"Redemption Effective Date" has the meaning set forth in Section 6.6(c).

"Redemption Value" means, with respect to any interest in the Partnership, or such portion thereof in the case of a partial withdrawal, being redeemed because of a Plan Asset Event or Regulatory Issue, the fair market value of such interest as of the applicable Redemption Effective Date, as determined in good faith by the General Partner; provided that, if the Plan Asset Event or the Regulatory Issue is a result of a breach of a representation, warranty or covenant made by the Redeemed Limited Partner, the Redemption Value shall be (in each case as determined in good faith by the General Partner) the lesser of (i) the fair market value of such Redeemed Limited Partner's interest in the Partnership on the applicable Redemption Effective Date and (ii) the fair market value of the applicable portion of the Redeemed Limited Partner's interest in the Partnership being redeemed on the date on which cash is allocated to make redemption payments. In making such determination of fair market value, the General Partner shall assume that all of the assets of the Partnership will be sold on the applicable date in a commercially reasonable manner and the proceeds of such sale, net of estimated closing costs, as reasonably determined by the General Partner, and all obligations of the Partnership (other than the redemption of the interest or interests in the Partnership being redeemed as of such date), will be distributed to the Partners pursuant to this Agreement. With respect to a Plan Asset Event or Regulatory Issue that is not a result of a breach of a representation or warranty made by the Redeemed Limited Partner, if the majority of such Redeemed Limited Partners disagree with the General Partner's determination of the Redemption Value of the applicable interests in the Partnership, such Redeemed Limited Partners shall negotiate in good faith to resolve such

Appx. 03965

disagreement, and if such Redeemed Limited Partners continue to disagree after negotiations are held, either side may request that an independent evaluator (who must be reasonably acceptable to the other party) be retained, whose valuation shall be final and binding on the Partnership and all of the Partners.  The Partnership will bear the cost of the independent evaluator.

"Registration" has the meaning set forth in Section 11.1.

"Regulated Investor" has the meaning set forth in Section 6.6(b).

"Regulatory Issue" has the meaning set forth in Section 6.6(b).

"Securities Act" means the U.S. Securities Act of 1933, as amended.

"Separate Investment Entity" has the meaning set forth in Section 5.15.

"Seventy-Five Percent in Interest of the Limited Partners" means Limited Partners with Commitments and limited partners in Parallel Vehicles with capital commitments to Parallel Vehicles totaling 75% of the aggregate Commitments of all Limited Partners and capital commitments of limited partners in Parallel Vehicles.

"Short-Term Investment Income" means the income earned on Short-Term Investments including in any event any gains and net of any losses from dispositions of Short-Term Investments and also net of any costs and expenses directly attributable thereto.

"Short-Term Investments" means investments in (a) cash, (b) obligations of, or fully guaranteed as to timely payment of principal and interest by, the United States of America and with a maturity date not in excess of 12 months from the date of purchase by the Partnership, (c) interest-bearing accounts and/or certificates of deposit of any U.S. bank with capital and surplus in excess of $500 million and whose short-term debt securities are rated not lower than P-1 by Moody's Investor Services, Inc. and A-1+ by Standard & Poor's Corporation and whose long term unsecured debt securities, or the long term unsecured debt securities of its affiliated holding company, are rated no lower than A1 by Moody's Investor Services, Inc. and A+ by Standard & Poor's Corporation, (d) reverse repurchase agreements using U.S. Treasury securities and entered into with any U.S. bank with capital and surplus in excess of $500 million and whose short-term debt securities are rated not lower than P-1 by Moody's Investor Services, Inc. and A-1+ by Standard & Poor's Corporation and whose long term unsecured debt securities, or the long term unsecured debt securities of its affiliated holding company, are rated no lower than A1 by Moody's Investor Services, Inc. and A+ by Standard & Poor's Corporation, and (e) money market mutual funds with assets of not less than $500 million, substantially all of which assets are reasonably believed by the General Partner to consist of items described in one or more of the foregoing clauses (b), (c) and (d).

"Subscription Agreement" means the Subscription Agreements (including a Subscriber Information Form) executed and delivered by Partners investing in the Partnership substantially in the form of the Subscription Agreement, dated as of the date hereof.

"Successor Fund" has the meaning set forth in Section 5.12.

17475053

-15-

"Tax Exempt Partner" means (i) a Limited Partner that is exempt from tax under Section 501 of the Code or (ii) a Limited Partner that has a direct or indirect beneficial owner that (x) is exempt from tax under Section 501 of the Code and (y) would be required to report on a United States federal income tax return or report UBTI that would be derived from the Partnership if the Partnership were classified as a partnership for U.S. federal income tax purposes, to the extent of such beneficial owner's pro rata share of such income, but only in each case if such Limited Partner has notified the General Partner in writing regarding the status of such direct or indirect beneficial owner.

"Topping and Break-up Fees" means topping, break-up or similar fees in connection with prospective Portfolio Investments that are not completed, in each case to the extent actually paid by a prospective Portfolio Company and received by the General Partner, the Manager, the Principals, employees of the Manager or their Affiliates; provided, however, that (A) such fees shall not include, in each case, any such amounts that are applied to cover amounts paid by the General Partner, the Manager, the Principals, employees of the Manager or their Affiliates that constitute unreimbursed (i) out-of-pocket expenses of such persons incurred in generating such fees, and (ii) Partnership Expenses incurred in generating such fees, and (B) to the extent that the General Partner, the Manager, the Principals or their Affiliates were actually reimbursed by the Partnership for any Partnership Expenses incurred in generating such fees, such fees will first be applied to repay the Partnership for such Partnership Expenses.

"Transaction and Monitoring Fees" means commitment, transaction, closing, merger and acquisition, divestiture, financing, monitoring and similar advisory fees in respect of a Portfolio Company, in each case to the extent actually paid by a Portfolio Company and received by the General Partner, the Manager, the Principals, employees of the Manager or their Affiliates; provided, however, that (A) such fees shall not include, in each case, any such amounts that are applied to cover amounts paid by the General Partner, the Manager, the Principals, employees of the Manager or their Affiliates that constitute unreimbursed (i) out-of-pocket expenses of such persons incurred in generating such fees, and (ii) Partnership Expenses incurred in generating such fees, and (B) to the extent that the General Partner, the Manager, the Principals or their Affiliates were actually reimbursed by the Partnership for any Partnership Expenses incurred in generating such fees, such fees will first be applied to repay the Partnership for such Partnership Expenses.

"Triggering Event" has the meaning set forth in Section 2.2(d).

"Two-Thirds in Interest of the Limited Partners" means Limited Partners with Commitments and limited partners in Parallel Vehicles with capital commitments to Parallel Vehicles totaling more than $66^{2/3}\%$ of the aggregate Commitments of all Limited Partners and capital commitments of limited partners in Parallel Vehicles.

"UBTI" means unrelated business taxable income and unrelated debt financed taxable income, as defined in Sections 512 and 514 of the Code, respectively.

"Unapplied Waived Fee Amounts" has the meaning set forth in the Master Partnership Agreement.

17475053                                -16-

"Uncapitalized Partnership Expenses" means Partnership Expenses that are not Capitalized Partnership Expenses.

"Unfunded Commitment" means that portion of a Partner's Commitment that is not a Funded Commitment.

"U.S." means the United States of America.

"Waived Fee Amount" has the meaning set forth in Section 4.1(d).

"Waived Fee Notice" has the meaning set forth in Section 4.1(d).

"Waiver Contribution" has the meaning set forth in Section 2.2(a)(ii).

Section 2.2 Capital Contribution Commitment; Key Person Provision. Subject to Section 5.6(b):

(a) (i) Each Partner agrees to make contributions in cash to the capital of the Partnership pro rata based upon such Partner's respective Unfunded Commitment in an aggregate amount up to its Unfunded Commitment when and as called by the General Partner ("Capital Call") upon at least ten Business Days written notice (the "Capital Call Notice"); provided, however, that the General Partner shall contribute its share of any contribution to be used to make a Portfolio Investment directly to the Master Partnership in lieu of making a Capital Contribution to the Partnership for such amount. The General Partner shall not be obligated to make Capital Contributions to be used to pay the Management Fee or Placement Fees, and Capital Contributions to pay the Management Fee will be made by each Limited Partner based on the amount of each payment of the Management Fee that is borne by such Limited Partner pursuant to Section 4.1(b). Any Capital Contributions made by the Limited Partners to pay the Partnership's pro rata share of any Placement Fees shall be made by the Limited Partners whose Commitments gave rise to such fees, pro rata in accordance with their respective Commitments. The aggregate Commitments and capital commitments to all Parallel Vehicles of the General Partner, the Principals, Highland and their Affiliates, shall be pro rata and shall equal the lesser of 5.0% of aggregate Commitments and capital commitments to all Parallel Vehicles and $50 million. In the event of the election described in Section 2.2(a)(ii), each Limited Partner required to make a Waiver Contribution pursuant to Section 2.2(a)(ii) shall make the Waiver Contribution specified in the Capital Call Notice. Each Portfolio Investment shall be made through the Master Partnership (other than investments made through a Separate Investment Entity pursuant to Section 5.15), and the Master Partnership shall call capital from the Partnership and the General Partner in the manner set forth in the Master Partnership Agreement for purposes of making such Portfolio Investment. Each Capital Contribution shall be made by Partners in cash either by delivery to the Partnership of a certified check or wire transfer of immediately available funds to an account designated by the General Partner, provided, however, that the Capital Contributions of the General Partner may be made by cash contributions or by Deemed Contributions as set forth in Section 2.2(a)(ii).

A Capital Call Notice shall: (i) specify the purpose for which the Capital Contributions are required to be made (including a breakdown of the amounts called in respect of Portfolio Investments, Partnership Expenses, Organizational Expenses, Management Fees or Placement

17475053                                    -17-

Appx. 03968

Fees); (ii) in the case of a Capital Call Notice with respect to the anticipated making of a Portfolio Investment, include: (A) a brief description of the identity, nature and business of such Portfolio Investment; (B) a statement as to whether the Portfolio Investment might be structured through a Separate Investment Entity; (C) a designation as such of any Bridge Financing to be made as part of such Portfolio Investment, and (D) a statement as to whether the Portfolio Investment is an investment in a Media Company or could, in the reasonable judgment of the General Partner, cause a Limited Partner to recognize UBTI; and (iii) specify a Limited Partner's pro rata share of the Capital Contributions required to be made by such Limited Partner, the portion of the Capital Contribution to be applied towards the payment of Management Fees, and the amount of a Limited Partner's Unfunded Commitment remaining following the funding of such Capital Contribution.

(ii)     Notwithstanding Section 2.2(a)(i) above, at such time as the General Partner delivers any Capital Call Notice, the General Partner's required contribution to the Master Partnership in respect of anticipated or actual Portfolio Investment and/or expenses incurred directly in connection with the making, maintaining or disposing of such Portfolio Investment, at the General Partner's election, shall be reduced by an amount up to the lesser of (A) the amount of the contribution to the Master Partnership otherwise required to be made by the General Partner pursuant to Section 2.2(a)(i), or (B) the amount of any existing Unapplied Waived Fee Amounts, and such amount shall instead be funded through Capital Contributions to the Partnership by the Participating Partners with respect to whom the Management Fee is payable pursuant to Section 4.1(b), pro rata according to their respective Commitments (for any Partner, a "Waiver Contribution"). If, as of any date, the aggregate amounts described in clause (i) of the definition of "Deemed Contribution" in the Master Partnership Agreement exceed the sum of the amounts described in clause (i) of the definition of "Unapplied Waived Fee Amounts," in the Master Partnership Agreement, the General Partner shall, within ten Business Days after such date, make a Capital Contribution equal to the amount of such excess. Such amount shall be distributed to the Partners as a return of their Capital Contributions, in proportion to their respective Waiver Contributions.

(b)     Each Partner's Commitment will commence on the date of the First Closing and will expire on the earlier of (i) five years from the Final Closing, (ii) the date after the second anniversary of the Final Closing on which the Commitment Period is terminated with the consent of Seventy-Five Percent in Interest of the Limited Partners, (iii) the date on which the General Partner determines that 90% of the aggregate Commitments of the Partners have been funded or are needed for purposes described in clauses (i) through (iii) of the next sentence below, or (iv) the date that the Commitment Period is terminated pursuant to Section 2.2(d), (such period being referred to as the "Commitment Period"). Notwithstanding the expiration or the termination of the Commitment Period, the Partners will remain obligated to make cash contributions throughout the duration of the Partnership pursuant to their respective Unfunded Commitments to the extent needed (i) to make Follow-on Investments; provided, however, that the aggregate of all Follow-on Investments made after the termination of the Commitment Period shall not exceed 15% of the aggregate Commitments, (ii) to make investments that were the subject of written agreements in process or under active consideration prior to or on the date of termination of the Commitment Period and which are consummated within 120 days of the date of termination of the Commitment Period, subject to extension, if necessary, in order to obtain requisite regulatory approvals, and (iii) to pay Partnership Expenses and the Management Fee. The General Partner

shall notify the Limited Partners within 30 days of the termination of the Commitment Period as to all in process investments that were the subject of written agreements in process and investments under active consideration to the extent the General Partner is not bound by confidentiality obligations related thereto.

(c)    Subject to the ELP Law, the General Partner shall cause the Partnership to return to the Partners all or any portion of any Capital Contribution to the Partnership which is not invested directly or indirectly in a Portfolio Investment or used to pay Partnership Expenses, Management Fees, Placement Fees or Organizational Expenses or which has been contributed in order to fund a Bridge Financing which is refinanced.  Subject to the ELP Law, each such return of Capital Contributions shall be made pro rata among all Partners in the same proportion as the Partners made such Capital Contributions and shall be made on or before the sixtieth (60th) day following the date such Capital Contributions were due (as set forth in the Capital Call Notice pursuant to which such Capital Contributions were made by the Partners to the Partnership), provided, however, that such Capital Contributions may be retained and applied with respect to another outstanding Capital Call Notice and may also be retained if the General Partner determines in good faith that there will be a Capital Call within thirty (30) days after the date that such Capital Contributions would otherwise be required to be returned, and if not so applied and retained, may be called again by the General Partner according to the provisions of this Section 2.2 as if such returned Capital Contributions had not been previously called.

(d)    If:

(i)    James Dondero and Mark Okada both cease to be actively involved, including in a supervisory role, on an ongoing basis with respect to the business, operations or investment decisions of Highland, the Manager and General Partner,

(ii)    the Keyman Group, together with the Principals as of the Final Closing and Permitted GP Transferees thereof, are no longer entitled to receive, directly or indirectly, in the aggregate at least 50% of the Carried Interest (as defined in the Master Partnership Agreement) payable to the General Partner, or

(iii)    any two or more of the members of the Keyman Group cease to be actively involved, including in a supervisory role, on an ongoing basis with respect to the business, operations or investment decisions of Highland, the Manager and General Partner,

(the circumstances specified in each of clauses (i), (ii), and (iii), above being referred to herein as a "Triggering Event"), then the Partnership shall automatically enter into a 120 day period (subject to extension for an additional 120 day period as described below) in which the Commitment Period will be suspended (a "Continuity Period").

The Partnership shall not make any new investments during the Continuity Period, except to the extent such investments (a) were the subject of written agreements, (b) were in process or (c) under active consideration prior to the commencement of the Continuity Period, and in each such case, are consummated within 120 days of the commencement of the Continuity Period, subject to extension, if necessary, in order to obtain requisite regulatory approvals for such investments.  The pursuit of Other Permitted Investment Activities by the Principals and the

17475053                                          -19-

members of the Keyman Group will not give rise to a Triggering Event. The General Partner will promptly notify the Limited Partners of the occurrence of a Triggering Event.

During a Continuity Period, if a Triggering Event described in clause (i) above has occurred, the General Partner, after consultation with the Advisory Committee, will prepare for and provide to the Limited Partners within 60 days of the Triggering Event a program recommended by the General Partner for resumption by the Partnership of its full range of activities at the end of such Continuity Period. Prior to the end of the Continuity Period, but within a reasonable time period following the delivery of a program recommended by the General Partner, the General Partner will arrange for a vote of all Limited Partners. By consent of Two-Thirds in Interest of the Limited Partners, the Limited Partners may cause an early termination of the Commitment Period, such termination to commence on the date such Continuity Period expires. If a Continuity Period expires without the occurrence of an effective consent of the requisite Limited Partners to terminate the Commitment Period, the Partnership, and the General Partner on its behalf, shall be authorized and entitled to resume the Partnership's full range of activities.

During a Continuity Period, if a Triggering Event described in clauses (ii) or (iii) above has occurred, within 90 days of the Triggering Event the General Partner may propose to the Advisory Committee one or more replacements to serve as members of the Keyman Group for purposes of this Section 2.2(d); if a majority of the members of the Advisory Committee approve of such replacement or replacements, such replacement person or persons shall thereafter be members of the Keyman Group and the Partnership, and the General Partner on its behalf, shall be authorized and entitled to resume the Partnership's full range of activities. If the Advisory Committee does not approve of such replacement person or persons within 30 days following the delivery of the General Partner proposal to the Advisory Committee, the Continuity Period shall be extended for an additional 120 day period. The General Partner may propose to the Advisory Committee, within 90 days after the rejection by the Advisory Committee of the initial replacement person or persons, a different replacement or replacements than originally proposed to serve as members of the Keyman Group for purposes of this Section 2.2(d); if a majority of the members of the Advisory Committee approve of such replacement or replacements within 30 days following delivery of the new General Partner proposal, such replacement person or persons shall thereafter be members of the Keyman Group and the Partnership, and the General Partner on its behalf, shall be authorized and entitled to resume the Partnership's full range of activities. If the Advisory Committee does not approve of such replacement person or persons within such thirty day period, the General Partner will arrange for a vote of all Limited Partners. By consent of Two-Thirds in Interest of the Limited Partners, the Limited Partners may cause an early termination of the Commitment Period, such termination to commence on the date the Continuity Period expires.

Section 2.3  Capital Accounts. A capital account ("Capital Account") will be established for each Partner on the books of the Partnership and will be adjusted as follows:

(a)    Capital Contributions and Allocations. A Partner's Capital Contribution will be credited to its Capital Account when received by the Partnership.

17475053                                                    -20-

(b)    <u>Short-Term Investment Income</u>.  Short-Term Investment Income earned in each quarterly period with respect to Capital Contributions that have not yet been invested in Portfolio Investments or used to pay fees and expenses of the Partnership will be credited to the Capital Accounts of the Partners <u>pro rata</u> according to their respective Partner Capital Contributions to which such Short-Term Investment Income is attributable.  Short-Term Investment Income on undistributed proceeds from Portfolio Investments shall be credited to the Capital Accounts of the Partners ratably in proportion to their respective shares of such undistributed amounts.

(c)    <u>Investment Income and Gain and Investment Loss</u>.  Taking into account <u>Section 6.6(d)</u> and except as otherwise provided in this <u>Section 2.3(c)</u>, Investment Income and Gain or Investment Loss shall be allocated among the Partners for each taxable period in such a manner that, as of the end of such taxable period, and to the extent possible, the Capital Account of each Partner shall be equal to the net amount, positive or negative, which would be distributed to each Partner or for which such Partner would be liable to the Partnership under this Agreement, determined as if the Partnership were to liquidate the assets of the Partnership for an amount equal to their Basis, reduced, but not below zero, by the amount of nonrecourse debt, if any, to which such Partnership assets are subject, and distribute the proceeds in liquidation after the payment of all liabilities (other than nonrecourse liabilities) in accordance with <u>Sections 3.2</u> and <u>3.3</u>.  For purposes of the foregoing determination, any increase in the Basis of a Portfolio Investment shall be taken into account for this purpose in the same manner as proceeds of a Partial Realization.

(d)    <u>Organizational Expenses, Management Fee</u>.  Organizational Expenses that are borne by the Partnership will be apportioned to the Partners <u>pro rata</u> according to their respective Capital Contributions to pay Organizational Expenses.  Organizational Expenses that are described in Section 705(a)(2)(B) of the Code will be debited against the Capital Accounts of the Partners in the fiscal period in which they are incurred, and Organizational Expenses that are described in Section 709(b) of the Code will be debited against the Capital Accounts of the Partners over a 180-month period.  The Management Fee for any Management Fee Period shall be debited against the Capital Account of each Limited Partner in the amount that is borne by such Limited Partner pursuant to <u>Section 4.1(b)</u> for such Management Fee Period.

(e)    <u>Distributions</u>.  Any amounts distributed to the Partners will be debited against their Capital Accounts.

(f)    <u>Partnership Expenses</u>.  Uncapitalized Partnership Expenses shall be debited against the Capital Accounts of the Partners in proportion to their respective Commitments.

(g)    <u>Placement Fees</u>.  Placement Fees, shall be debited against the Capital Accounts of the Limited Partners whose Commitments gave rise to such fees, in proportion to their respective Commitments.

Section 2.4  <u>Distributions in Kind</u>.

(a)    If any securities are to be distributed in kind to the Partners as provided in <u>Article III</u>, such securities will first be written up or down to their value (as determined pursuant to <u>Article IX</u> as of the date of such distribution), thus creating Investment Income or Gain or

Investment Loss, which shall be allocated in accordance with <u>Section 2.3</u> to the Capital Accounts of the Partners, and upon the distribution (or deemed distribution pursuant to <u>Section 2.4(b)</u>) of such securities to the Partners, the value of such securities shall be debited, in accordance with <u>Section 2.3(e)</u>, against the Capital Accounts of the Partners.

(b)     The General Partner shall give at least ten Business Days prior notice to the Limited Partners of any proposed distribution of securities pursuant to this <u>Section 2.4</u> and the date of such proposed distribution. In connection with any distribution of securities in kind, the General Partner shall offer each Limited Partner the right to elect to receive a distribution of securities or to have the Partnership dispose of all or any portion of such securities for the account of such Limited Partner. At the election of a Limited Partner (an "<u>Electing Limited Partner</u>"), all distributions of securities that otherwise would be made to the Electing Limited Partner by the Partnership shall be made, as determined by the General Partner, to the General Partner or an independent escrow agent or custodian as agent for the Limited Partner (the "<u>Agent</u>") and, unless otherwise specified in writing, an Electing Limited Partner shall be deemed to have chosen to have the Partnership sell its share of securities in full. An Electing Limited Partner shall bear all expenses (including, without limitation, underwriting costs and brokerage commissions) relating to the sale by the Partnership of such securities. The General Partner may require the Electing Limited Partner to make any representations, warranties and covenants as the General Partner shall reasonably determine are necessary or desirable in order to dispose of the securities. For all purposes of this Agreement, the Limited Partner shall be deemed to have received such distribution of securities on the date that such securities are delivered to the Agent. Immediately following a distribution to the Agent pursuant to this <u>Section 2.4(b)</u>, the General Partner shall notify the Limited Partner of the type and quantity of securities distributed. The Agent shall thereafter hold such securities for a period of 10 Business Days following which the Agent shall use its reasonable efforts to promptly sell such securities and deliver the net proceeds therefrom to the Limited Partner; <u>provided</u>, <u>however</u>, that the Agent shall not sell such securities and shall instead promptly deliver such securities to the Limited Partner following the conclusion of such 10 Business Day period if, prior to the conclusion of such period, the Limited Partner notifies the Agent that the receipt of such securities would not violate any law, regulation or governmental order applicable to the Limited Partner. The Agent shall use good faith efforts in selling such securities at the highest available price, but shall not be liable to an Electing Limited Partner in any manner in connection with such sale in the absence of gross negligence or willful misconduct, including for any claim that the Agent was unable to effect any such sale (for any reason) or failed to obtain the highest possible sale price for such securities.

(c)     An Electing Limited Partner's election pursuant to <u>Section 2.4(b)</u> may be revoked by the Electing Limited Partner at any time upon notice to the General Partner; <u>provided</u>, <u>however</u>, that an election may not be revoked with respect to securities if the Agent has entered into a binding commitment to sell securities on behalf of the Electing Limited Partner.

Section 2.5  <u>Determination of Voting Thresholds</u>. Any vote, approval or consent that is to be based upon a specified proportion of the interests in the Partnership held by the limited partners shall be based upon the Limited Partners' Commitments and the capital commitments of limited partners in Parallel Vehicles, excluding (i) except as specifically provided in <u>Section 6.9</u>, that portion of each Limited Partner's Commitment and the capital commitment of each limited partner in a Parallel Vehicle that represents a Non-Voting Interest, (ii) except as otherwise set

-22-

forth in <u>Section 12.1(b)</u>, limited partner interests in the Partnership or in any Parallel Vehicle held by a Defaulting Partner or a defaulting partner of a Parallel Vehicle, and (iii) limited partner interests in the Partnership or in any Parallel Vehicle held, directly or indirectly, by the General Partner, Highland, the Principals or any of their respective Affiliates prior to any removal of the General Partner pursuant to <u>Section 5.9</u>, and (iv) in the case of any particular matter that affects or pertains only to the Partners and not to any partner of a Parallel Vehicle, limited partner interests in such Parallel Vehicle held, directly or indirectly, by the General Partner or by any limited partner of such Parallel Vehicle.

**ARTICLE III**

**DISTRIBUTIONS**

Section 3.1 <u>Distribution Policy</u>.

(a) The General Partner may in its sole discretion make distributions of cash or Marketable Securities at any time and from time to time subject to the remaining provisions of this <u>Section 3.1</u>; <u>provided</u>, <u>however</u>, that no securities will be distributed in kind to the Partners that are not Marketable Securities until the final distribution of the assets of the Partnership to the Partners pursuant to <u>Section 8.3(b)</u>.

(b) The General Partner will cause the Partnership to distribute (i) Current Cash Income at least semi-annually unless reinvested as described in this <u>Section 3.1(b)</u>, (ii) Short-Term Investment Income at least quarterly, and (iii) the net cash proceeds received from Dispositions of or Partial Realizations with respect to Portfolio Investments within 60 days of the receipt thereof unless reinvested as described in this <u>Section 3.1(b)</u>, after, in each case, the setting aside by the General Partner, in its discretion, of reasonable reserves for anticipated obligations and commitments of the Partnership as well as any required tax withholdings; <u>provided</u>, <u>however</u>, that if the General Partner determines in good faith that there will be a Capital Call within 30 days after the date that an amount that would otherwise be distributed that would be described in <u>clauses (a)</u>, <u>(b)</u> and <u>(d)</u> of the definition of Funded Commitment, or if there is an outstanding Capital Call Notice the General Partner may, in its discretion, retain such amount and reduce the amount required to be contributed with respect to such Capital Call.

Section 3.2 <u>Distribution of Short-Term Investment Income</u>. Short-Term Investment Income will be distributed among the Partners in the same proportions as Short-Term Investment Income was credited to the Partners' Capital Accounts.

Section 3.3 <u>Distributions of Current Cash Income and Proceeds From Dispositions of or Partial Realizations with Respect to Investments and In Kind Distributions</u>.

(a) Distributions not attributable to a Portfolio Investment shall be distributed to the Limited Partners in proportion to their Funded Commitments as of the date of such distribution. All distributions of Current Cash Income and all distributions out of net proceeds from Dispositions of or Partial Realizations with respect to Portfolio Investments (in each case, net of Partnership Expenses) and all distributions of Portfolio Investments shall be distributed to the

**Appx. 03974**

Participating Partners in proportion to their respective Partner Interests with respect to the Portfolio Investment that gave rise to such Current Cash Income or net proceeds or that is being distributed in kind.

(b)    A Partner's Capital Contributions used to pay Organizational Expenses, Management Fees, Placement Fees and Uncapitalized Partnership Expenses that are to be allocated to a Portfolio Investment shall be determined on the date such Portfolio Investment is Disposed of, and shall equal the product of (i) such Capital Contributions not theretofore allocated to Portfolio Investments that have been Disposed of multiplied by (ii) a fraction, the numerator of which shall equal such Partner's Capital Contributions in respect of such Portfolio Investment and the denominator of which shall equal such Partner's Capital Contributions in respect of such Portfolio Investment and all Portfolio Investments that have not been Disposed of on or prior to the date such allocation is effected.  For purposes of the determinations described in clause (b)(i) of the definition of "Excess Partial Realization Proceeds" in the Master Partnership Agreement, such Capital Contributions shall be tentatively allocated to the Portfolio Investment giving rise to such Partial Realization proceeds as though such Portfolio Investment had been Disposed of on the date such proceeds were realized.

Section 3.4  Foreign Taxes.  The amount of any foreign taxes paid by the Partnership (or by an entity in which the Partnership holds an interest, either directly or indirectly through one or more such entities, that is treated as a partnership or is disregarded for federal income tax purposes) or withheld from receipts of the Partnership or such entity from a Portfolio Investment shall be allocated among the Partners as reasonably determined by the General Partner (taking into account any allocation of taxes under Section 6.7) and, for purposes of Sections 3.3(a)(i) – (iii) of the Master Partnership Agreement, shall be deemed to have been distributed to each Partner as Current Cash Income or proceeds from the Disposition of a Portfolio Investment to the extent that the payment or withholding of such foreign taxes reduced Current Cash Income or the proceeds from the Disposition of a Portfolio Investment, as the case may be, otherwise distributable to such Partner as provided herein (for this purpose taking into account with respect to each Partner any reduction in such foreign taxes that occurs by reason of such Partner's status); provided that the General Partner may deem foreign taxes paid by or withheld from receipts of the Partnership and allocable to a Tax Exempt Partner to have been distributed to such Tax Exempt Partner as described above only to the extent that such Tax Exempt Partner incurs and is subject to tax on UBTI relating to such Tax Exempt Partner's Interest in the Partnership, as determined by the General Partner.

# ARTICLE IV

# MANAGEMENT FEE AND ORGANIZATIONAL EXPENSES

Section 4.1  Management Fee.

(a)    During each quarterly period beginning on each January 1, April 1, July 1 and October 1 from and after the First Closing (each such quarterly period, a "Management Fee Period") until the termination of the Partnership, the Partnership will pay the Manager a

17475053                                    -24-

quarterly fee as calculated below (the "<u>Management Fee</u>"), in advance on each January 1, April 1, July 1 and October 1, as compensation for managing the affairs of the Partnership, <u>provided, however</u>, that the initial payment of the Management Fee shall be for the period from the First Closing to December 31, 2007.

(b)     The Management Fee payable by the Partnership shall be the sum of the amounts determined for each Limited Partner pursuant to this <u>Section 4.1</u>. No Management Fee shall be payable with respect to the General Partner and their Affiliates. Subject to <u>Sections 4.1(c)</u> and <u>4.1(d)</u>, the quarterly Management Fee payable with respect to a Limited Partner during the Initial Fee Period shall be 0.4375% of the Commitments of such Limited Partner resulting in an aggregate annual Management Fee of 1.75%. Following the expiration of the Initial Fee Period, the quarterly Management Fee payable with respect to a Limited Partner shall be 0.4375% of the aggregate Net Funded Commitment of such Limited Partner as reduced by any writedowns or writeoffs pursuant to <u>Section 9.4</u> in respect of Portfolio Investments that have not been Disposed of on or prior to such date (resulting in an aggregate annual Management Fee of 1.75%). The Management Fee in any partial quarterly period will be pro rated on a daily basis according to the actual number of days in such period.

(c)     The Management Fee payable with respect to any Management Fee Period and with respect to a Limited Partner will be reduced (but not below zero) by such Limited Partner's Partner Share of eighty-five percent (85%) of the Partnership's <u>pro rata</u> share of all Topping and Break-up Fees, Transaction and Monitoring Fees, and Director Fees. The Management Fee shall also be reduced, but not below zero, by such Limited Partner's Capital Contributions used pursuant to <u>Section 2.2(a)(i)</u> to pay (x) any Placement Fees and (y) any Organizational Expenses in excess of $1,250,000, paid or payable by the Partnership. To the extent that such Limited Partner's share of the Management Fee in any Management Fee Period is reduced to zero as a result of the reduction for Placement Fees, Organizational Expenses in excess of $1,250,000, Director Fees, Topping and Break-up Fees and Transaction and Monitoring Fees, the excess shall be carried forward to the next Management Fee Period (and, if necessary, to one or more subsequent Management Fee Periods) and applied as a reduction of the Management Fee, but not below zero, for such succeeding Management Fee Period (or a subsequent Management Fee Period). To the extent that Director Fees, Topping and Break Up Fees and Transaction and Monitoring Fees exceed or cannot be applied as a reduction of Management Fees for succeeding Management Fee Periods, then such excess will first be applied to reimburse the Partnership for any previously unreimbursed Management Fees paid by the Partnership for prior Management Fee Periods (with such amounts being treated for purposes of <u>Section 3.3(a)</u> as distributions in return of the Capital Contributions made to pay such Management Fees), and the remainder of such excess will be paid or contributed to the Partnership and will be distributed pursuant to <u>Section 3.3(a)</u> as if net proceeds from the Disposition of a Portfolio Investment; <u>provided, however</u>, that in the event that any Partner desires not to receive any such excess fee offsets upon the termination of the Partnership, such Partner may elect in writing at any time prior to the termination of the Partnership to waive receipt of any such fee offsets, in which case the amount of fee offsets that would otherwise have been allocated and distributed to such Partner shall instead be allocated and distributed to the other non-waiving Partners on a <u>pro rata</u> basis in accordance with their respective Commitments. The Partnership's <u>pro rata</u> share of all Topping and Break-up Fees, Transaction and Monitoring Fees and Director Fees shall be the amount of such fees multiplied by a fraction, the numerator of which is the Partnership's investment in the

Portfolio Investment (or proposed investment in the proposed Portfolio Investment) giving rise to such fee and the denominator of which is the aggregate investment or proposed investment in such Portfolio Investment or proposed Portfolio Investment by the Partnership, all Parallel Vehicles, all Separate Investment Entities, all Co-investment Funds and all other co-investment arrangements arranged by the Manager with respect to such Portfolio Investment or proposed Portfolio Investment (provided, that for the avoidance of doubt, any such Co-Investment Funds or other co-investment arrangements will not receive any amount of fee offsets).

(d)     After taking into account any reduction in the Management Fee payable for any Management Fee Period with respect to a Limited Partner pursuant to Section 4.1(c), the Management Fee payable for any Management Fee Period with respect to such Limited Partner shall be further reduced by an amount (the "Waived Fee Amount") equal to the lesser of (i) the amount of the Management Fee to which the Manager would otherwise be entitled pursuant to this Section 4.1 that the Manager has irrevocably elected to waive in a written notice (a "Waived Fee Notice") delivered to the Partnership with respect to each Management Fee Period, at least 15 days prior to the end of the calendar year immediately preceding the calendar year in which such Management Fee Period begins, and with respect to each Management Fee Period in the first calendar year of the term of the Partnership, such Waived Fee Notice delivered on or prior to the delivery of the first Capital Call Notice in respect of Management Fees and (ii) the amount that would be payable to the Manager on such Management Fee Period pursuant to this Section 4.1 in the absence of this Section 4.1(d). A Limited Partner's share of the Waived Fee Amount for any Management Fee Period is equal to the Waived Fee Amount for such Management Fee Period multiplied by the quotient determined by dividing (i) the Management Fee that would be payable for such Management Fee Period with respect to such Limited Partner in the absence of this Section 4.1(d) by (ii) the total Management Fee that would be payable for such Management Fee Period in the absence of this Section 4.1(d). If the Manager delivers a Waived Fee Notice with respect to any Management Fee Period that begins before the date of the Final Closing, (i) if such Waived Fee Notice specifies that a percentage of the Management Fee otherwise payable for such Management Fee Period be waived, the Manager shall be deemed to have waived a proportionate amount of the Management Fee otherwise payable for such Management Fee Period by all Additional Limited Partners whose subscriptions are accepted after the date of such Waived Fee Notice and (ii) if such Waived Fee Notice specifies that a fixed dollar amount of such Management Fee otherwise payable for such Management Fee Period be waived, the reduction in the Management Fee for such Management Fee Period shall be allocated to all Limited Partners in the same proportion as the Management Fee is borne by the Limited Partners for such Management Fee Period.

(e)     For purposes of Section 4.1(c), a Limited Partner's share of Director Fees and Transaction and Monitoring Fees is equal to the amount of the Partnership's pro rata share of such fees multiplied by the Limited Partner's Partner Interest in the Portfolio Investment to which such Director Fees and Transaction and Monitoring Fees are attributable, and a Limited Partner's share of Topping and Break-up Fees is equal to the amount of such fees multiplied by the proportion of such Limited Partner's Commitment to the Commitments of all Partners on the first day of the Management Fee Period in which such Topping and Break-up Fees are paid.

Section 4.2 Organizational and Partnership Expenses. The Partnership will reimburse the General Partner or the Manager for all Organizational Expenses incurred by the General

Appx. 03977

Partner or the Manager on behalf of the Partnership. The Partnership will pay all Partnership Expenses.

Section 4.3 <u>Ordinary Operating Expenses</u>. The Manager shall pay all ordinary overhead expenses of the Partnership, the General Partner, the Manager, the Separate Investment Entities and the Parallel Vehicles (including salaries, rent, overhead, travel expenses and similar expenses), other than Partnership Expenses, Organizational Expenses and Placement Fees.

# ARTICLE V

# GENERAL PARTNER

Section 5.1 <u>Investment Opportunities; Devotion of Time; Management Authority</u>.

(a)     The Principals shall each be actively involved in the business of the Fund Group and shall devote such amount of their business time and attention in order to fulfill their fiduciary duties to the Limited Partners in accordance with the ELP Law; provided, however, that the Principals may engage and be involved in Other Permitted Investment Activities. Subject to the foregoing and to <u>Section 5.12(a)</u> and the Highland Investment Allocation Policy, during the Commitment Period, the General Partner, the Manager and the Principals will present all investment opportunities to the Partnership which they believe in good faith are suitable for the Partnership and fit the investment objective of the Partnership. However, the Principals and the Manager will not be restricted from pursuing, engaging in and completing acquisitions and investments in, through or by Highland Portfolio Companies in connection with Other Permitted Investment Activities and other investments through other Highland Accounts, in each such case, in accordance with the Highland Investment Allocation Policy.

(b)     The General Partner will have full control over the business and affairs of the Partnership consistent with its duties arising under the ELP Law. The General Partner will have the power on behalf and in the name of the Partnership to carry out any and all of the objects and purposes of the Partnership and to perform all acts and enter into and perform all contracts and other undertakings which, in its sole discretion, are necessary or advisable or incidental thereto, including the power to acquire or dispose of any security (including Marketable Securities). Notwithstanding the foregoing, the management of the Partnership will vest in the Manager which will provide the Partnership with portfolio management and administrative services, including investigating, analyzing, structuring and negotiating potential investments, monitoring the performance of Portfolio Companies and advising as to disposition opportunities. In no event shall the Manager, which has been engaged by the Partnership, be treated as an agent or partner of the General Partner.

(c)     Except to the extent otherwise provided in this Agreement, all matters concerning (i) the allocation of Short-Term Investment Income, Current Income, Investment Income and Gain, Investment Loss, Partnership Expenses, Organizational Expenses, and the distribution of net proceeds and the return of capital among the Partners, including the taxes thereon, (ii) accounting procedures and determinations, estimates of the amount of Management Fees or Placement Fees payable by any Defaulting Partner, (iii) the calculation of the Management Fee

(including Director Fees, Topping and Break-up Fees and Transaction and Monitoring Fees ), and (iv) the reinvestment of any amounts distributed in respect of a Bridge Financing (or portion thereof) that was sold, refinanced or otherwise disposed of within eighteen (18) months from the Investment Date of such Bridge Financing, shall be determined by the General Partner in accordance with its reasonable interpretation of the provisions of this Agreement made in good faith.

Section 5.2  Use of Affiliates.  The General Partner shall retain the services of the Manager and any officers, directors or Affiliates thereof in connection with the operation of the Partnership, and the compensation of the Manager and such persons shall be as provided in Section 4.1 hereof; provided, however, that nothing contained in this Section 5.2 shall be construed to relieve the General Partner of its responsibilities under this Agreement or the duties and limitations set forth in this Article V.

Section 5.3  Indebtedness.  Subject to Section 5.5 and Section 5.4, the Partnership may incur indebtedness consisting of Bridge Leveraging or the issuance of credit support of the obligations of Portfolio Companies or their subsidiaries, which may be in the form of guarantees, letters of credit or pledges of a portion of the Commitments ("Credit Support").  Any such indebtedness will not be considered as Capital Contributions by the Partners unless, until and to the extent the General Partner calls for Capital Contributions in connection therewith pursuant to a Capital Call Notice pursuant to this Agreement.

Section 5.4  Limitation on Investments.

(a)     The Partnership will not invest (including through Credit Support) more than twenty five percent (25%) of the aggregate Commitments in any single Portfolio Company together with any of its Affiliates (valued at original cost).  A Bridge Financing, when added to the amount of permanent investment by the Partnership in the Portfolio Investment that is the subject of the Bridge Financing, may not exceed twenty five percent (25%) of the aggregate Commitments.

(b)     The aggregate amount of Bridge Financings outstanding at any one time shall not exceed fifteen percent (15%) of the aggregate Commitments.

(c)     Subject to Section 5.5, the Partnership may issue Credit Support, which does not at any one time exceed Unfunded Commitments.

(d)     The Partnership shall invest cash in Short-Term Investments.

(e)     The aggregate investments (valued at cost) by the Partnership in Portfolio Companies organized and with principal executive offices outside the United States shall not exceed thirty percent (30%) of the aggregate Commitments.  The Partnership will not invest in Portfolio Companies that are organized or with principal executive offices in countries that are not within the Organization for Economic Cooperation and Development as of the date of the First Closing.

(f)     The Partnership will not invest as a partner or member in any pooled investment fund or "fund of funds" in which an investment adviser or manager of such fund (other than the

Partnership) receives management fees or the right to carried interest distributions on the Partnership's investment or interest therein unless the amount of any such management fee is considered part of the Capital Contribution relating to such Portfolio Investment and the amounts distributable to the General Partner under Sections 3.3(a)(ii) and 3.3(a)(iii) of the Master Partnership Agreement are reduced by the amount of any carried interest payable to such sponsor or investment manager.

(g)    In connection with a Portfolio Investment in any non-U.S. jurisdiction, the General Partner shall obtain an opinion of counsel with respect to such jurisdiction to the effect that (i) no Limited Partner, solely as a result of the Partnership making such investments, will be required either (x) to file an income tax return in such jurisdiction (other than in connection with an application for a refund of withholding or similar taxes) or (y) to pay income tax in such jurisdiction with respect to income not derived from the Partnership, and (ii) no Limited Partner shall be personally liable for any debts or losses of the Partnership in such jurisdiction in excess of such Limited Partner's Unfunded Commitment. The General Partner shall use commercially reasonable efforts to ensure that any opinion obtained pursuant to this Section 5.4(i) will permit the Limited Partners to rely thereon. The General Partner shall ask local counsel to confirm and/or update periodically as it deems necessary any opinion it obtains pursuant to this Section 5.4(i). The Partnership will use commercially reasonable efforts to prepare all tax rebate, reduction or reclaim forms or other filings or elections that are required to obtain any available exemption from, reduction in, or refund of, any withholding or other taxes required in any taxing jurisdiction on behalf of each Limited Partner, for signature by such Limited Partner, and to assist each Limited Partner, at such Limited Partner's expense, to obtain refunds for taxes withheld or paid with respect to such Limited Partner as to which a refund is obtainable. Each Partner agrees that it will cooperate with the General Partner in making any such filings or elections to the extent the General Partner determines that such cooperation is necessary or desirable.

(h)    The Partnership will not invest (including through Credit Support) more than twenty percent (20%) of the aggregate Commitments in Persons that are not Distressed Companies; provided that the General Partner in its good faith discretion believes that an investment in such Persons is consistent with the Partnership's investment objective.

Section 5.5  UBTI; USRPI; ECI. The General Partner shall use commercially reasonable efforts not to (i)  structure the Fund's Portfolio Investments in a manner that would result in the realization by a Tax Exempt Partner of a substantial amount of UBTI, (ii) take any action that would cause any Non-U.S. Partner to recognize ECI, (iii) cause the Partnership to acquire a Portfolio Investment that the General Partner reasonably believes at the time of such acquisition is or is likely to become a "United States real property interest" ("USRPI") within the meaning of Section 897(c) of the Code or (iv) take any action that would cause any Non-U.S. Partner to which Section 892 of the Code applies to be considered or deemed to be engaged in a commercial activity for purposes of Section 892 of the Code; provided, however, that the use of Bridge Leveraging and the use of Director Fees, Topping and Break-up Fees, Transaction Fees and Monitoring Fees, and Placement Fees to offset the Management Fee, as described in Section 4.1(c) will not be deemed a violation of this Section 5.5. The General Partner will consider the economic consequences of the manner in which it structures Portfolio Investments, and will use commercially reasonable efforts to make such Portfolio Investments through structures that are

intended to minimize the tax cost that will be economically borne by the Limited Partners as a result of such structures, including, where appropriate, making Portfolio Investments through a "blocker" structure, to the extent consistent with applicable law.

Section 5.6  <u>ERISA Matters</u>.

(a)     The General Partner will use reasonable efforts to conduct the affairs and operations of the Partnership in such a manner that the Partnership will qualify as an Operating Company or for another exception from being deemed to hold Plan Assets of any Benefit Plan Investor.  As of the initial Capital Contribution date, the General Partner shall deliver to each Benefit Plan Investor either (i) an opinion from the General Partner's counsel to the effect that the Partnership should qualify as an Operating Company as of the initial Capital Contribution date or (ii) a certificate, based on consultation with the General Partner's counsel, to the effect that the Partnership should qualify for another exemption from being deemed to hold Plan Assets of any Benefit Plan Investor as of the initial Capital Contribution date.  Annually thereafter, the General Partner will provide a certificate to Benefit Plan Investors confirming that the Partnership continues to qualify for an exception from being deemed to hold Plan Assets of any Benefit Plan Investor and specifying which exception from Plan Assets is available to the Partnership as of the date of the certificate.

(b)     Notwithstanding <u>Section 2.2</u>, until such time as the General Partner delivers to each Benefit Plan Investor (and the escrow agent, if any) either the opinion or the certificate described above in <u>Section 5.6(a)</u>, the initial Capital Contribution required to be made to the Partnership by a Benefit Plan Investor shall, at the request of the General Partner, instead be deposited directly by such Benefit Plan Investor into an escrow account that is intended to comply with Department of Labor Advisory Opinion 95-04A.

(c)     Each Partner that is or will be a Benefit Plan Investor on the Closing Date when it is admitted to the Partnership shall so notify the General Partner in writing prior to such Closing Date.  Any Limited Partner which has not indicated in its Subscription Agreement that it is a Benefit Plan Investor hereby represents, warrants and covenants that it is not, it is not acting on behalf of and, so long as it holds an interest in the Partnership, it will not be and will not be acting on behalf of a Benefit Plan Investor.

(d)     It is intended that none of the Partnership, the General Partner, the Manager or any of their Affiliates will act as or be deemed to be a fiduciary under ERISA with respect to any Benefit Plan Investor or the assets of the Partnership; <u>provided</u>, <u>however</u>, that this provision is not intended to negate the fiduciary duties imposed upon a general partner under the ELP Law.  Notwithstanding any other provision of this Agreement, the General Partner is authorized to take any action or refrain from taking any action which in its judgment is necessary or desirable in order to prevent any Partnership assets from being deemed to constitute Plan Assets of any Benefit Plan Investor.

(e)     Should the General Partner reasonably determine that the continued participation of a Benefit Plan Investor would result in the assets of the Partnership being deemed Plan Assets of such Benefit Plan Investor (a "<u>Plan Asset Event</u>"), the General Partner shall so notify, each of the Benefit Plan Investors in writing within 30 days of such determination.  Thereafter, the

General Partner shall take reasonable steps to correct or cure the Plan Asset Event and, if the General Partner determines that it is not reasonably likely that the Partnership's Plan Asset Event can be reasonably corrected or cured, taking into account the overall interest of the Partnership, the General Partner shall dissolve the Partnership and wind up its affairs in accordance with Sections 8.2 and 8.3. In connection with the foregoing obligation, in addition to any other powers the General Partner may have, the General Partner shall have the authority to take any of the following actions, in its sole discretion: (i) any action necessary or desirable, in the General Partner's reasonable judgment, to cure the Partnership's failure to qualify as an Operating Company, if applicable; (ii) in accordance with the provisions of Section 12.1, amend this Agreement to cure any illegality or other material adverse consequences to the Partnership; (iii) amend, terminate or restructure any then existing or contemplated arrangements with third parties to cure any illegality or other adverse consequences to the Partnership so long as such action would not have a material adverse effect on the Limited Partners; (iv) redeem any Limited Partner's interest in the Partnership, in whole or in part, in a manner consistent with the procedures in Section 6.6(d); (v) force the sale of all or any portion of any Benefit Plan Investor's interest in the Partnership to one or more Limited Partners at the Redemption Value or (vi) dissolve the Partnership and wind up its affairs in accordance with Sections 8.2 and 8.3.

Section 5.7 Conflicts of Interest.

(a)     The Limited Partners hereby acknowledge and agree that the General Partner and its Affiliates currently manage and may in the future manage Highland Accounts that invest in securities that may be eligible for purchase by the Partnership, which presents the potential for conflicts of interest. While the General Partner and the Manager intend to manage potential conflicts of interest, as Highland has in the past, by following certain guidelines, and to avoid where practicable situations involving conflicts of interest in a portfolio company or otherwise, each Limited Partner acknowledges that there may be situations in which the interests of the Partnership in a portfolio company or otherwise may conflict with the interests of other Highland Accounts, the General Partner, the Manager, the Principals or their respective Affiliates. On any matter involving a conflict of interest not otherwise provided for in this Agreement, the General Partner shall be guided by its good faith judgment as to the best interests of the Partnership and shall take such actions as are determined by the General Partner and Highland to be appropriate and in compliance with the Highland Investment Allocation Policy. Each Limited Partner agrees that the activities of any other Highland Account, the General Partner, the Manager, the Principals and their Affiliates, including Other Permitted Investment Activities, authorized by this Agreement or conducted consistently with this Agreement and the Highland Investment Allocation Policy may be engaged in by such other Highland Accounts, the General Partner, the Manager, the Principals and their Affiliates, as the case may be, and will not, in any case or in the aggregate, be deemed a breach of this Agreement or any duty that might be owed by any such person to the Partnership or to any Partner.

(b)     Except as permitted by Sections 5.12(a) and 5.17(a), without the prior approval of either (i) a majority of the members of the Advisory Committee or (ii) a Majority in Interest of the Limited Partners, none of the General Partner, the Manager, the Principals, or any of their respective Affiliates will invest in any securities of any company in which the Partnership either is actively considering making a Portfolio Investment or has an investment; provided, that (x) the foregoing will not apply to Other Permitted Investment Activities or investments made in

Appx. 03982

accordance with the Highland Investment Allocation Policy, (y) each such person will be permitted to hold securities which such person received in a distribution by the Partnership and (z) any Parallel Vehicles or Separate Investment Entities will be permitted to invest in Portfolio Companies in accordance with this Agreement.

(c)    Except as permitted by Sections 5.12(a) and 5.17(a), without the prior approval of either (i) a majority of the members of the Advisory Committee or (ii) a Majority in Interest of the Limited Partners, the Partnership will not invest in any securities issued by, acquire investments from, sell investments to, or enter into any transaction with an entity in which the General Partner, the Manager, the Principals, or their respective Affiliates has a material financial interest in respect of such entity; provided that the foregoing will not apply to (w) Other Permitted Investment Activities, (x) investments by the Partnership in Portfolio Companies in which the Parallel Vehicles, Separate Investment Entities or Co-Investment Funds invest in accordance with this Agreement; (y) investments by the Partnership in Portfolio Companies in which the General Partner, the Manager, the Principals or their respective Affiliates have a material interest that have been made in accordance with the Highland Investment Allocation Policy, or (z) investments by the Partnership in publicly traded securities of Portfolio Companies in which a Highland Account has a material financial interest that are made on arms length terms at prevailing market prices; provided, further, that  the Partnership will not be precluded from investing in securities of a company in which the General Partner, the Manager, the Principals, or their respective Affiliates either (A) in the case of public companies, owns securities issued by such company representing one percent (1%) or less of the outstanding equity securities, or (B) own only securities which such Persons received in a distribution by the Partnership.

(d)    The General Partner will furnish to the Advisory Committee annually at the time annual financial statements of the Partnership are furnished pursuant to Section 10.3(b) a report of each acquisition or investment by the Partnership in Portfolio Companies in which the General Partner, the Manager, the Principals or their respective Affiliates have a material financial interest that have been made in accordance with the Highland Investment Allocation Policy.

Section 5.8  Transfer of General Partnership Interest; No Withdrawal or Loans.  The General Partner generally may not sell, assign, pledge, mortgage or otherwise dispose of its General Partner interest in the Partnership; provided, however, that the General Partner may transfer its General Partner interest in the Partnership (or consent to the transfer of an interest in the General Partner) in a derivative transaction if the transferor maintains the economic attributes of the interest and voting control of the interest.  The General Partner will not borrow or withdraw any amount from the Partnership or voluntarily withdraw from the Partnership.

Section 5.9  Removal of the General Partner.  By consent of Two-Thirds in Interest of the Limited Partners, the General Partner may be removed in the event of (a) the General Partner's or any member of the Keyman Group's conviction of (or plea of nolo contendere (that is, neither admitting nor denying the charges) to), a material violation of U.S. federal or U.S. state securities law or a U.S. felony criminal violation, (b) the General Partner's adjudication in a final judgment by a court of competent jurisdiction as having committed in respect of the Partnership an act or omission of a material nature involving gross negligence, bad faith, willful misconduct or fraud, or (c) the General Partner's violation of this Agreement which has a material and adverse effect on the Partnership and which remains uncured for 30 days.  Notwithstanding the foregoing, if an

17475053                                        -32-

event described in clause (a) above has occurred and the event relates to a violation or act of a member of the Keyman Group, the Limited Partners may remove the General Partner only if such violation or act (i) relates to the Partnership or a Portfolio Company, (ii) has a material adverse effect on the Partnership, (iii) such member of the Keyman Group is not terminated as a member of the General Partner and the Manager within 45 days, and (iv) such member of the Keyman Group does not cease to own any interest in the future carried interest or voting interests in the General Partner following termination. The General Partner will provide the Limited Partners with written notice of the occurrence of any event described in clauses (a), (b) or (c) above. Concurrently with the removal of the General Partner, the Manager shall be removed as manager of the Partnership unless re-appointed by the successor general partner of the Partnership. Upon removal of the General Partner, the Limited Partners may elect to continue the Partnership and appoint a new duly authorized general partner of the Partnership and all Parallel Vehicles with the consent of all of the Limited Partners of the Partnership and each Parallel Vehicle and such election shall be deemed to have occurred as of the date of the removal of the former General Partner. In such an event, the former General Partner shall be entitled to receive distributions equal to any amounts it would have been entitled to had the Partnership been dissolved and wound up in accordance with Sections 8.3(a) and (b) and distributed in kind all Partnership assets as of the date of the election of the Limited Partners to continue the Partnership. The Partnership shall issue an unsecured non-interest bearing promissory note to the former General Partner in the face amount of the liquidating distribution determined in accordance with this Section 5.9, such note to be payable upon the final liquidation of the Partnership. All such distributions shall be subject to the obligations set forth in Section 8.3(c) and (d) of the Master Partnership Agreement; provided, however, that the General Partner's obligation, if any, to fund Commitments in respect of its obligations in Section 8.3(c) of the Master Partnership Agreement relating to such liquidating distribution shall be satisfied by a reduction to the principal amount of the unsecured non-interest bearing promissory note described in this Section 5.9 in the amount of such obligation. For purposes of determining allocation and distributions pursuant to the preceding sentence, securities and other property held by the Partnership shall be valued pursuant to the procedures set forth in Article IX.

Section 5.10 No Liability to Limited Partners.

(a) None of the General Partner, the Manager, the Principals or their Affiliates, officers, directors, members, partners, shareholders, employees or agents will be liable to any Limited Partner or to the Partnership for any action taken, or omitted to be taken, as General Partner with respect to the Partnership, or for any action taken, or omitted to be taken, by any member, partner, director, officer, employee or agent of the General Partner or Manager in connection with its activities for or on behalf of the Partnership so long as such person (i) acted in good faith, (ii) acted in a manner reasonably believed to be in the best interests of the Partnership, (iii) was neither grossly negligent nor engaged in willful malfeasance, fraud or reckless disregard of fiduciary duties, (iv) did not materially breach this Agreement, and (v) with respect to any criminal action, such person is not finally determined to be and does not admit to be guilty or enter a plea of nolo contendere (including as part of a settlement) by a court of competent jurisdiction.

(b) No member of the Advisory Committee, or any Affiliate or employer of any member of the Advisory Committee or any Limited Partner represented on the Advisory

Appx. 03984

Committee by any member (as the case may be) will be liable to any Partner or the Partnership for any action taken, or omitted to be taken, in good faith on behalf of the Advisory Committee (as the case may be) with respect to the Partnership and in accordance with the provisions of this Agreement.

(c)     If any Limited Partner obtains a final judgment in a court of competent jurisdiction against the General Partner for matters relating to the Partnership, the General Partner shall pursue against its members the remedies (if any) that it has against such member relating to such claim.

Section 5.11 <u>Indemnification of General Partner, the Manager and Advisory Committee</u>. (a) The Partnership will indemnify (A) the Principals, the General Partner, the Manager and each of their respective members, partners, shareholders, directors, officers, employees, agents and Affiliates against any losses, liabilities, damages or expenses (including amounts paid for attorneys' fees, judgments and settlements in connection with any threatened, pending or completed action, suit or proceeding) to which any of such persons may become subject in connection with such person's activities on behalf of the Partnership or in connection with any involvement with a Portfolio Company (including serving as an officer, director, consultant or employee of any Portfolio Company) directly or indirectly on behalf of the Partnership and (B) the members of the Advisory Committee, any Affiliate or employer of any such members and any Limited Partner represented on the Advisory Committee by any member, in connection with any involvement with the Advisory Committee, respectively, but, in the case of members of the Advisory Committee or their Affiliates and employers or any Limited Partner represented on the Advisory Committee by any member, only to the extent that such person acted in good faith and, in the case of the Principals, the General Partner, the manager and each of their respective members, partners, shareholders, directors, officers, employees, agents and Affiliates, only to the extent that such person (i) acted in good faith, (ii) acted in a manner reasonably believed to be in the best interests of the Partnership or the Portfolio Company (as the case may be), (iii) was neither grossly negligent nor engaged in willful malfeasance, fraud or reckless disregard of fiduciary duties, (iv) did not materially breach this Agreement, and (v) with respect to any criminal action, such person is not finally determined to be and does not admit to be guilty or enter a plea of <u>nolo contendre</u> (including as part of a settlement) by a court of competent jurisdiction.  Any person described in clause (A) of this <u>Section 5.11(a)</u> entitled to seek indemnification hereunder shall first use reasonable efforts to seek indemnification from other available sources, if any, prior to obtaining indemnification hereunder; <u>provided</u> that any such person may seek and obtain indemnification hereunder if at any time such person reasonably believes that such person will not receive timely indemnification on terms reasonably acceptable to such person from such other sources; and <u>provided</u>, <u>further</u>, that such person shall continue to use reasonable efforts to seek such indemnification from such other sources and, to the extent any such indemnification is obtained, reimburse the Partnership for any such recovery.  The Partnership may, in the sole judgment of the General Partner, pay the expenses of any person indemnifiable under this <u>Section 5.11</u> in advance of the final disposition of any proceeding, so long as (w) with respect to any derivative action brought by any Limited Partner, the person receiving the advance is not the subject of such derivative action, (x) the proceeding is not instituted by a Majority in Interest of the Limited Partners against the General Partner or the Manager, (y) General Partner has a good faith belief such expenses are indemnifiable, and (z) the General Partner receives a written undertaking by such person for the benefit of the Partnership

17475053

-34-

to repay the full amount advanced if (A) there is a final determination that such person did not satisfy the standards set forth in underlined clauses (i) through underlined (v) immediately above, (B) with respect to any criminal action, such person is finally determined to be or admits to being guilty or enters a plea of underlined nolo underlined contendere (including as part of a settlement) by a court of competent jurisdiction, or (C) such person is not otherwise entitled to indemnification as provided herein. Notwithstanding the foregoing, no person will be exculpated or exonerated from liability or indemnified against loss for violations of federal or state securities laws, or for any other intentional or criminal wrongdoing. No person shall be indemnifiable under this Section 5.11 in respect of losses, liabilities, damages or expenses to which any such person may become subject in connection with (x) such person's activities with any Portfolio Company if such losses arise after the Partnership's final disposition of such Portfolio Company or (y) a dispute among the General Partner, the Manager, their respective members and employees, and the Principals.

(b)     No Limited Partner shall have any obligation or liability, including any obligation to make a Capital Contribution to the Partnership, in respect of an indemnity obligation arising from a Portfolio Investment with respect to which such Limited Partner is not a Participating Partner.

(c)     The General Partner will use reasonable efforts to cause each Portfolio Company for which any Affiliate of the General Partner serves as an officer or director to adopt organizational documents which provide mandatory indemnification to directors, officers, and managers to the fullest extent permitted by applicable law.

Section 5.12  Formation of New Fund or Business Endeavor. (a)  Subject to the other provisions of this Article V, each Partner's interest in the business endeavors of the other Partners is limited to his, her or its interest in the Partnership and no Partner's future business activities are restricted. Notwithstanding the foregoing, unless consented to by Two-Thirds in Interest of the Limited Partners or approved by a majority vote of the Advisory Committee, neither the General Partner, nor the Manager or any of their Affiliates will close and make investments, or act as general partner, managing member, advisor, employee, agent, or the primary source of transactions on behalf of another private equity investment vehicle or pooled investment vehicle (other than Crusader, a Parallel Vehicle or Separate Investment Entity) that has primary investment objectives substantially similar to those of the Partnership (a "Successor Fund") until the earlier of (i) the date on which at least 75% of the Commitments have been invested or committed for investment in Portfolio Companies or otherwise set aside for Follow-on Investments, Partnership Expenses or Management Fees, and (ii) the end of the Commitment Period; provided, however, that this Section 5.12 shall not prohibit the formation of one or more Co-investment Funds, and Co-investment Funds shall not be considered Successor Funds. If a Successor Fund is organized prior to the termination of the Commitment Period of the Partnership, as permitted under the previous sentence, the Successor Fund may only coinvest in investments made by the Partnership alongside the Partnership, on the same terms and conditions in all material respects, with amounts for investment allocated between the Partnership and the Successor Fund, subject to available capital or other investment limitations on the Partnership and the Successor Fund, as determined by the General Partner. Any Successor Fund will dispose of securities of a Portfolio Company that are of the same class as those purchased by the Partnership at the same time as the Partnership, and on the same economic and other terms.

Section 5.13 <u>Interest as a Limited Partner</u>. To the extent that the General Partner acquires the interest of a Defaulting Partner or any other Limited Partner, the General Partner will (subject to <u>Section 2.5</u>) be deemed to be a Limited Partner with respect to such interest for all purposes of this Agreement.

Section 5.14 <u>Parallel Vehicles</u>. The General Partner has organized the Main Fund as a Parallel Vehicle, and may organize additional Parallel Vehicles (or series of related Parallel Vehicles), for purposes of facilitating investments in Portfolio Companies by non-U.S. investors and certain accredited investors that are not qualified purchasers (as defined in the Investment Company Act) in the Fund Group. If any Parallel Vehicles are organized, then the Partnership and each Parallel Vehicle (a) will invest in each Portfolio Company in direct proportion to their respective available capital commitments so that the Partnership will invest in each Portfolio Company an amount equal to the total investment by the Partnership and any Parallel Vehicle multiplied by a fraction, the numerator of which is the aggregate Commitments, and the denominator of which is the sum of the aggregate Commitments plus the aggregate capital commitments by investors in the Parallel Vehicles, <u>provided</u> that such proportion may be modified by the General Partner with the prior approval of the Advisory Committee or a Majority in Interest of the Limited Partners in order to reflect the available commitments and any tax, regulatory or other legal aspects of any Parallel Vehicle and its investors and (b) invest in and dispose of Portfolio Company at the same time and on effectively the same economic terms and conditions. Any item of income, fees, reimbursement or expense that relates to a Portfolio Company in which the Partnership and one or more Parallel Vehicles are investors or to a potential investment that is considered on behalf of the Partnership and any Parallel Vehicles by the General Partner, the Manager or the general partners or managers of any Parallel Vehicles shall, to the extent that any such item is not directly attributable to the Partnership or a Parallel Vehicle, be pro rated among the Partnership and the Parallel Vehicles based on their respective investments in such Portfolio Company or the portions of such potential investment that would have been made available to the Partnership in accordance with the preceding sentence, as applicable. Organizational Expenses shall be borne by the Partnership and each Parallel Vehicle in proportion to their respective aggregate capital commitments, except the Partnership and each Parallel Vehicle shall separately bear the Organizational Expenses that are directly attributed to each such entity. Each Parallel Vehicle shall reimburse the Partnership for such Parallel Vehicle's share of Organizational Expenses that were paid by the Partnership. Investments in Parallel Vehicles by investors shall be on substantially the same terms and conditions as investments in the Partnership by Limited Partners. For the avoidance of doubt, all references to Portfolio Investments shall include investments made by the Partnership, all Parallel Vehicles and all Separate Investment Entities. To the extent that this Agreement provides that the Limited Partners shall vote together with the investors of any Parallel Vehicle, the General Partner agrees (i) that the relevant documentation of any such Parallel Vehicle shall contain comparable voting provisions to the extent applicable, (ii) that any combined vote of the Limited Partners and the investors in any Parallel Vehicle on any such matter for the purposes of this Agreement shall constitute a combined vote on the matter for the purposes of the Parallel Vehicles, and (iii) each such matter shall, if approved by such vote, be equally applicable to the Partnership and all Parallel Vehicles.

Section 5.15 <u>Separate Investment Entities</u>. If the General Partner determines for legal, tax, regulatory or other reasons, in its sole discretion that it is in the best interests of the Partners

-36-

to invest in one or more Portfolio Companies through an entity other than the Partnership, such investment or investments shall not be made by the Partnership but shall instead be made, either in lieu of in conjunction with, the Partnership, by one or more limited partnerships, limited liability companies, corporations or similar entities (each a "Separate Investment Entity") owned in the aggregate by all of the Partners and managed by the General Partner or an Affiliate thereof controlled by the Principals. Each Separate Investment Entity shall receive an opinion of counsel for the benefit of the Limited Partners (x) regarding its classification for United States Federal income tax purposes and the limited liability of the Separate Investment Entity and (y) to the effect that no Limited Partner shall be personally liable for any debts or losses of the Separate Investment Entity in such jurisdiction in excess of such Limited Partner's Unfunded Commitment. The Partnership and each Separate Investment Entity will invest in and dispose of Portfolio Investments at the same time and on effectively the same economic terms and conditions. To the extent that Benefit Plan Investors participate in a Separate Investment Entity, such Separate Investment Entity shall be (i) structured so that it will not be deemed to hold Plan Assets and shall provide the same ERISA protections to those Benefit Plan Investors that are provided under this Agreement, and (ii) established on substantially the same terms and conditions in all material respects as Partners are required to make Capital Contributions to the Partnership, and such capital contributions shall be deemed to reduce the Unfunded Commitment of each Partner to the same extent that it would be reduced if made to the Partnership. The provisions and economic terms of each such Separate Investment Entity shall be substantially the same in all material respects as those of the Partnership, except to the extent such terms are required to differ from the economic and other material arrangements reflected in the terms of this Agreement in order to accomplish the purposes of such Separate Investment Entity (including, for example, different economic treatment of different Partners resulting solely from the consequences of a structure created to minimize the amount of UBTI recognized by a Tax Exempt Partner). The gains and losses of any such Separate Investment Entity shall be treated as having been realized by the Partnership for all economic calculations under this Agreement, and there will be no duplication of the management fees. The Partners having interests in the Separate Investment Entity (including the General Partner and its Affiliates with respect to their Commitments as Partners) shall contribute to each Separate Investment Entity the amounts required to fund such Separate Investment Entity, with each such Partner contributing its pro rata portion of such amounts (based on the relative Unfunded Commitments of the Partners as of the date of such contributions) up to such Partner's remaining Unfunded Commitment and such amounts will reduce such Partner's Unfunded Commitment. Each Limited Partner hereby agrees and consents to the formation of each Separate Investment Entity and hereby covenants and agrees that it will execute and deliver any agreements, documents and certificates as reasonably necessary for, or incidental to, the formation and continuation of each such Separate Investment Entity and its participation as a limited partner, member or participant in each such Separate Investment Entity established in accordance with this Section 5.15.

Section 5.16 Media Company Investments.

(a) In the event and for so long as, and only during periods from time to time in which, the Partnership shall directly or indirectly hold (or otherwise have attributed to it) an ownership or other interest in a Media Company that is "attributed" to the Partnership under the rules and regulations of the FCC relating to the particular FCC service in which the Media Company operates, no Limited Partner (an "Insulated Partner"), or any person that is a director,

officer, equivalent non-corporate official, partner, member or 5% or greater shareholder or other direct or indirect owner of an Insulated Partner such that the ownership interests of the Insulated Partner, are "attributed" to such owner, director, officer, equivalent non-corporate officer, partner or member (an "Insulated Partner Affiliate"), to the extent reasonably determined by the General Partner (with the advice of GP's Counsel) to be necessary to have such ownership or interest not be attributable to the Limited Partners for purposes of the FCC Attribution Rules and the Ownership Rules, shall do any of the following:

(i)     act as an employee of the Partnership or any Media Company if such Insulated Partner's or Insulated Partner Affiliate's functions, directly or indirectly, relate to the media or common carrier enterprises of the Partnership or any Media Company;

(ii)     serve, in any material capacity, as an independent contractor or agent of the Partnership or any Media Company with respect to the media or common carrier enterprises of the Partnership or any such Media Company;

(iii)     communicate with the General Partner or any Portfolio Company on matters pertaining to the day-to-day operations of any Media Company;

(iv)     to the extent Partners have the power under this Agreement to admit additional General Partners, vote to admit any additional General Partner to the Partnership unless such addition is subject to the veto of the General Partner;

(v)     to the extent Partners have the power under this Agreement, except as permitted under Sections 5.9 and 8.2, vote on the removal of the General Partner;

(vi)     perform any services for the Partnership or any Media Company materially relating to the media or common carrier enterprises of the Partnership or such Media Company, with the exception of making loans to, or acting as a surety for, such Media Company or the Partnership to the extent consistent with the "equity or debt plus" component of the FCC Attribution Rules; or

(vii)     become actively involved in the management or operation of any Media Company.

(viii)     serve as a member or otherwise participate in the activities of the Advisory Committee if, in the determination of the Insulated Partner, such membership or participation would cause the Insulated Partner to lose its insulated status under the Attribution Rules.

(b)     An Insulated Partner may, upon five Business Days' prior written notice to the General Partner, relinquish its status as an Insulated Partner, in which case the provisions of this Section 5.16 shall no longer apply to such Limited Partner; provided, that such relinquishment shall not be effective until the General Partner has received an opinion of special counsel to the Partnership on FCC matters stating that such relinquishment will not (1) cause the Partnership or any of its Affiliates to violate any law, regulation, rule or policy applicable to matters currently subject to FCC jurisdiction or (2) in any way limit or restrict the activities of the Partnership or any of its Affiliates. To the extent that issuance of such an opinion requires the filing of any notices with the FCC or the issuance of any approvals by the FCC, the General Partner and the

Insulated Partner seeking to relinquish its insulated status shall reasonably cooperate in making any such filing or obtaining any such approval, and the General Partner shall seek the opinion of special counsel to the Partnership on FCC matters with respect to the making of any such filing or the obtaining of any such approval.

(c)     Nothing in this Section 5.16 shall be interpreted to restrict the activities of (A) the Limited Partners or (B) the beneficial interest holders of any Limited Partner during the period that it is an Insulated Partner so long as such Limited Partner's partnership or other governing agreement contains language reasonably designed to insulate such Limited Partner's unaffiliated limited partners or beneficial interest holders, as the case may be, from having the Partnership's interest in any Media Company being attributed under the FCC attribution rules to such beneficial owners, as necessary pursuant to the FCC attribution rules.

(d)     Upon written request by an Insulated Partner, the General Partner shall, prior to the Partnership consummating an investment in a Media Company, cause the legal counsel to the Partnership to deliver an opinion reasonably acceptable to such Insulated Partner to the effect that such investment shall not be "attributed" to the Insulated Partner under the rules and regulations of the FCC relating to the particular FCC service in which such Media Company operates.

Section 5.17  Co-investment Funds.

(a)     Where possible and appropriate, the General Partner may, in its discretion, provide co-investment opportunities to invest in a Portfolio Company (each a "Co-Investment Opportunity") to one or more Limited Partners, strategic investors, lenders, or members, investors, Affiliates or employees of the General Partner and Manager or, other accounts managed by Highland (each a "Co-Investor"). Notwithstanding the foregoing, investment opportunities allocated to Affiliates of the Manager or the General Partner or client accounts managed by the Manager, in accordance with the Highland Investment Allocation Policy, shall not be deemed Co-Investment Opportunities. The General Partner, the Manager, and their respective Affiliates will not receive any carried interest in any Co-Investment Opportunity provided to Limited Partners or receive management fees from Limited Partners in respect of Co-Investment Opportunities provided to Limited Partners. The General Partner intends to not provide Co-Investment Opportunities to Benefit Plan Investors to the extent necessary to prevent such Co-Investment Opportunity from being deemed to be Plan Assets of the related Benefit Plan Investor.

(b)     The General Partner may, as a condition to any Co-Investment Opportunity, (i) require any or all Co-Investors to execute a confidentiality agreement relating to such Co-Investment Opportunity in form and substance acceptable to the General Partner, and (ii) require Co-Investors electing to participate in a Co-Investment Opportunity to coinvest through a Co-Investment Fund, which may have investors other than Limited Partners.

(c)     Each Limited Partner shall treat the information provided to it pursuant to this Section 5.17 as confidential, shall use such information solely for the purpose of considering the offer made pursuant to this Section, shall, upon the request of the General Partner, promptly return to the General Partner any written information provided it pursuant to this Section, and

-39-

shall not disclose the identity of the securities or issuer to any person other than (i) its employees, counsel or advisors, solely on a need to know and confidential basis, (ii) any governmental authority or regulatory authority which regulates such Limited Partner's ability to engage in any of its businesses under U.S. or foreign law to the extent such information is required by such governmental authority or regulatory authority, as the case may be, and (iii) to the extent such Limited Partner is required by law or regulation to disclose such information.

(d) If Co-Investment Funds or Co-Investors purchase securities of a Portfolio Company that are of the same class as securities of a Portfolio Company purchased by the Partnership, the Co-Investment Funds or Co-Investors shall purchase such securities on terms that are no less advantageous than the terms on which the Partnership purchases such securities. Each Co-Investment Fund and Co-Investor will dispose of securities of a Portfolio Company that are of the same class as securities of a Portfolio Company purchased by the Partnership at the same time and on substantially the same terms (including price) as the Partnership.

Section 5.18 Bridge Leveraging. (a) The Partnership is authorized to enter into one or more credit facilities (each, a "Bridge Leveraging/Credit Support Facility") in order to (i) borrow money for the purpose of (A) Bridge Leveraging, and (B) paying Partnership Expenses; and/or (ii) provide Credit Support for the obligations of Portfolio Companies or their subsidiaries as described in Section 5.4(c); provided, however, that in no event shall the aggregate amount of Bridge Leveraging outstanding at any time under any Bridge Leveraging/Credit Support Facility exceed the aggregate amount of Unfunded Commitments as of such date and provided, further, that in no event shall the maturity date of an individual borrowing under any Bridge Leveraging/Credit Support Facility be later than the 45th day following the incurrence of such debt under a Bridge Leveraging/Credit Support Facility. A Bridge Leveraging/Credit Support Facility may be secured by (x) a pledge by the Partnership of all or a portion of the aggregate Unfunded Commitments of the Partners, and (y) a pledge and assignment by the General Partner of the rights of the General Partner contained herein, including, without limitation, the right to deliver Capital Call Notices and enforce all remedies against Partners that fail to fund their respective Unfunded Commitments pursuant thereto and in accordance with the terms hereof. The Partnership and any Parallel Vehicles may be co-borrowers under any Bridge Leveraging/Credit Support Facility, in which event the Partnership and the Parallel Vehicles may be jointly and severally liable for all obligations under such Bridge Leveraging/Credit Support Facility. In the event such a Bridge Leveraging/Credit Support Facility is so secured by Commitments, and to the extent funds are advanced against the Commitment of a particular Partner or partner of a Parallel Vehicle because such Person is late in funding or defaults on a Capital Call Notice delivered hereunder or by the Parallel Vehicle, each Limited Partner understands, acknowledges and agrees that (i) it may be required to make a Capital Contribution in respect of its pro rata share of such late or defaulted contribution amount, provided, however, that in no event shall any Partner be required to make Capital Contributions in excess of its Unfunded Commitment, and (ii) as a result of such default or late payment, the allocation between the Partnership and each Parallel Vehicle of a Portfolio Investment (together with any item of income, fees, reimbursement or expense that relates to such Portfolio Investment) with respect to which there has occurred a shortfall in contributions made by the Partners or the partners in a Parallel Vehicle shall be made by the General Partner based on the total amount of Capital Contributions of the Partners and the partners in each Parallel Vehicle actually funded to acquire such Portfolio Investment. In addition to the rights and remedies of the General Partner

in respect of a Defaulting Partner pursuant to Section 6.11, any Partner that is late in funding or defaults on a Capital Call Notice shall be responsible for any interest or other expenses incurred in connection with such advance. Any such expenses shall be withheld from distributions otherwise to be made to such Defaulting Partner, and, to the extent such expenses exceed such distributions, such Defaulting Partner shall pay the amount of such excess to the Partnership in the manner and at the time or times required by the General Partner. Any such excess shall not be credited to such Defaulting Partner's Capital Account. For purposes of this Agreement, any amount withheld from a Defaulting Partner and paid to a lender shall be paid to the lender on behalf of such Defaulting Partner and shall be treated as if distributed to such Defaulting Partner.

(b)     Each Limited Partner understands, acknowledges and agrees, in connection with any such Bridge Leveraging/Credit Support Facility and for the benefit of any lender thereunder, as follows: (i) that the General Partner may from time to time request a certificate confirming (x) the remaining amount of such Limited Partner's Unfunded Commitment or (y) that the Limited Partner has not and will not pledge, collaterally assign, encumber or otherwise grant a security interest in its limited partnership interest in the Partnership, and (ii) that the General Partner may from time to time request such other information as may be reasonably required by the lender(s) under the terms of the Bridge Leveraging/Credit Support Facility. Each Limited Partner agrees to comply with such requests to the extent they are reasonable.

(c)     To induce any such lender to enter into a Bridge Leveraging/Credit Support Facility with the Partnership, each Limited Partner hereby: (i) acknowledges that the Partnership has informed such Limited Partner that the Partnership may pledge to a lender the right to call all Unfunded Commitments to secure all obligations made under the Bridge Leveraging/Credit Support Facility (collectively, the "Obligations"), the terms of which are in accordance with this Agreement, and, in connection therewith, grant to such lender the right to issue Capital Call Notices pursuant to the terms of this Agreement when an event of default under such Bridge Leveraging/Credit Support Facility exists, including an event of default resulting from the failure of a partner of a Parallel Vehicle to fund any capital contributions when required, which each Limited Partner shall fund, in accordance with the terms hereof and its rights and obligations hereunder; and (ii) acknowledges that the Partnership has informed such Limited Partner that for so long as the Bridge Leveraging/Credit Support Facility is in place, the General Partner and the Partnership may agree with the lender not to amend, modify, supplement, cancel, terminate, reduce (other than with respect to Funded Commitments) or suspend any of such Limited Partner's obligations to fund its Unfunded Commitment pursuant hereto, subject to excuse provisions set forth herein, without the lender's prior written consent.

## ARTICLE VI

## LIMITED PARTNERS

Section 6.1 Limited Liability. The Limited Partners will not be personally liable for any obligations of the Partnership and will have no obligation (including with respect to a deficit balance in their Capital Account) to make contributions to the Partnership in excess of their respective Commitments specified in Schedule 1 attached hereto in accordance with this

Appx. 03992

Agreement, except to the extent set forth in Section 6.7 or the ELP Law. The Limited Partners will take no part in the conduct of the business, to include, without limitation, the control, direction or operation of the affairs of the Partnership and will have no power to bind the Partnership.

Section 6.2 Transfer of Limited Partnership Interests.

(a) A Limited Partner may not sell, assign, transfer, pledge, mortgage or otherwise dispose of all or any of its interest in the Partnership unless the General Partner has consented to such transfer or assignment in writing; provided, that with regard to an assignment by a Limited Partner to an Affiliate of such Limited Partner, such consent shall not be unreasonably withheld. Any transfer shall be effected in accordance with the provisions of this Agreement, by execution of an assignment in writing and by entry of the name of the new limited partner in the register of limited partners.

(b) A Limited Partner which is a trust under an employee benefit plan may, upon prior written notice to the General Partner, assign a beneficial interest in all or a portion of its interest in the Partnership to any other trust under such employee benefit plan or to any other employee benefit plan having the same sponsor (provided that income and loss allocable to the Limited Partner of the Partnership will continue to be included in the same filings under the same employer identification number with the U.S. Internal Revenue Service). Such assignment to another trust under such employee benefit plan or to any other employee benefit plan having the same sponsor will not be deemed to be an assignment or transfer of a limited partnership interest pursuant to this Agreement (and therefore will not require the General Partner's consent pursuant to Section 6.2(a)). In addition, a change in any trustee or fiduciary of a Limited Partner will not be deemed to be an assignment or transfer of a limited partnership interest pursuant to this Agreement (and therefore not require the General Partner's consent pursuant to Section 6.2(e)), so long as any such replacement trustee or fiduciary is also a fiduciary as defined under applicable law, that income and loss allocable to the Limited Partner of the Partnership will continue to be included in the same filings under the same employer identification number with the Internal Revenue Service, and the General Partner receives prior written notice of such change in trustee or fiduciary. In connection with any assignment of interest or change in trustee or fiduciary under this Section 6.2(b), the Limited Partner shall provide such documentation as the General Partner shall reasonably request.

(c) The voting rights of any Limited Partner's interest shall automatically terminate upon any transfer of such interest to a trust, heir, beneficiary, executor, personal representative, guardian or conservator or upon any other transfer if the transferor no longer retains control over such voting rights and the General Partner has not consented pursuant to Section 6.2(e) to such transferee becoming a substitute Limited Partner. No consent of any other Limited Partner will be required as a condition precedent to any such transfer or substitution.

(d) As a condition to any transfer of a Limited Partner's interest pursuant to Section 6.2(a), the transferor and the transferee shall provide such legal opinions and documentation as the General Partner shall reasonably request; provided that if the transfer is to be made from a Limited Partner to a co-trustee or trustee as contemplated above or to an Affiliate pursuant to Section 6.2(a), an officer's certificate in form reasonably satisfactory to the

17475053                                          -42-

General Partner may be delivered by the Limited Partner in lieu of such legal opinions and other documentation.

(e)     Notwithstanding anything to the contrary contained in this Section 6.2 or 6.11, a transferee or assignee will not become a substitute Limited Partner (i.e., a transfer other than as described in Section 6.2(b)) without the consent of the General Partner, which consent may be granted or withheld in its sole and absolute discretion (except for a disposition by a Limited Partner to an Affiliate permitted by Section 6.2(a), for which such consent shall not be unreasonably withheld), and without executing (i) a copy of this Agreement or amendment hereto, and (ii) a Subscription Agreement in form and substance satisfactory to the General Partner in its sole discretion. Any substitute Limited Partner admitted to the Partnership with the consent of the General Partner will succeed to all rights and be subject to all the obligations of the transferring or assigning Limited Partner with respect to the interest to which such Limited Partner was substituted, but any transferee or assignee that does not become a substitute Limited Partner shall have the right to receive allocations pursuant to Section 2.3 and distributions pursuant to Article III and Article VIII, but shall have no other rights under this Agreement.

(f)     The transferor and transferee of any Limited Partner's interest shall be jointly and severally obligated to reimburse the General Partner and the Partnership for all reasonable expenses (including attorneys' fees and expenses) of any transfer or proposed transfer of a Limited Partner's interest, whether or not consummated.

(g)     The transferee of any Limited Partner's interest shall be treated as having made all of the Capital Contributions made by, and received all of the distributions received by, the transferor of such interest.

(h)     Anything in this Agreement to the contrary notwithstanding, no admission (or purported admission) of a Partner, and no transfer (or purported transfer) of all or any part of a Partner's interest in the Partnership (or any economic interest therein) whether to another Partner or to a person who is not a Partner, shall be effective, and any such admission or transfer (or purported admission or transfer) shall be void ab initio, and no person shall otherwise become a Partner if after such admission or transfer (or purported admission or transfer) the Partnership would be subject to the registration or reporting requirements of the Investment Company Act or in the General Partner's good faith determination, such transfer would cause the assets of the Partnership to be deemed Plan Assets. Each transferee that is or will be a Benefit Plan Investor as of the transfer effective date shall so notify the General Partner in writing prior to the transfer effective date. Any transferee that has not so indicated in writing its status as a Benefit Plan Investor hereby represents, warrants and covenants that it is not, it is not acting on behalf of and, so long as it holds an interest in the Partnership, it will not be and will not be acting on behalf of a Benefit Plan Investor.

Section 6.3  No Withdrawal. Subject to the provisions of Sections 6.2, 6.6 and 6.11, no Limited Partner may withdraw as a Partner of the Partnership, nor may a Limited Partner be required to withdraw, nor may a Limited Partner borrow or withdraw any portion of its Capital Account from the Partnership.

17475053

-43-

Appx. 03994

Section 6.4 <u>No Termination</u>. The substitution, death, insanity, dissolution (whether voluntary or involuntary) or bankruptcy of a Limited Partner will not affect the existence of the Partnership, and the Partnership will continue for the term of this Agreement until its existence is terminated as provided herein.

Section 6.5 <u>Subsequent Limited Partners</u>.

(a)     The General Partner may accept additional Limited Partners ("<u>Additional Limited Partners</u>") subsequent to the First Closing of the Partnership up to and including the date fourteen months after the First Closing. Any Additional Limited Partners will be treated as having been a party to this Agreement and have made its Commitment as of the date hereof for all purposes, and such Additional Limited Partners will be required to bear a portion of the Management Fee, Organizational Expenses and Partnership Expenses equivalent to that which would have been borne by such Additional Limited Partner had such Limited Partner been a Limited Partner from the date of the First Closing.

(b)     Such Additional Limited Partners shall contribute to the Partnership, on the date of their admission to the Partnership, an amount of their Commitments equal to their portion (based on the Commitments of all Partners) determined pursuant to this <u>Section 6.5(b)</u>. The initial drawdown for each Limited Partner will include such Limited Partner's proportionate share of (i) Management Fees retroactive to the First Closing; (ii) Placement Fees, if any, retroactive to the First Closing, (iii) Organizational Expenses (to the extent provided in <u>Section 4.2</u>) and Partnership Expenses attributable to the Partnership; and (iv) Capital Contributions made at or prior to such drawdown to fund any Portfolio Investment, other than Capital Contributions that have been returned prior to such drawdown to the Partners who made such Capital Contributions. In addition, Additional Limited Partners will be required to pay to the Partnership, with respect to the period from the date of the applicable Capital Contributions made by the Partners who were admitted pursuant to the First Closing to the date of their admission to the Partnership: (A) interest at the rate of 10% on their proportionate share of Management Fees retroactive to the First Closing; (B) interest at the rate of 10% on their proportionate share of Organizational Expenses (to the extent provided in <u>Section 4.2</u>), Placement Fees and Partnership Expenses attributable to the Partnership; and (C) interest at the rate of 10% on their proportionate share of the Capital Contributions made prior to such drawdown (other than Capital Contributions that have been returned prior to such drawdown to the Partners who make such Capital Contributions), to fund any Portfolio Investment; <u>provided</u>, <u>however</u>, that interest payable pursuant to <u>sub-clauses (B)</u> and <u>(C)</u> above shall be reduced, but not below zero, by each Additional Limited Partner's <u>pro rata</u> portion (based on Commitments of all Partners) of all distributions made prior to the date of such drawdown to all Partners pursuant to <u>Sections 3.3(a)(i)</u>, <u>3.3(a)(ii)(B)</u> and <u>3.3(a)(iii)(A)</u> of the Master Partnership Agreement, to the extent such distributions exceed the aggregate amount of Capital Contributions to make Portfolio Investments that have been Disposed of prior to the date of such drawdown. Any amounts paid to the Partnership under <u>clause (i)</u> and <u>subclause (A)</u> above will be paid to the Manager (and to the extent the General Partner has waived all or part of such Management Fees, such Waived Fee Amount shall not be paid to the Manager or the General Partner but will instead increase the Unapplied Waived Fee Amounts). Any amounts paid to the Partnership under <u>clause (ii)</u> above shall be paid to the applicable placement agency if applicable to such Limited Partner. Any amounts paid to the Partnership under <u>clauses (iii)</u> and <u>(iv)</u> above, and <u>subclauses (B)</u> and <u>(C)</u>

above shall be distributed to the Partners that participated in the earlier Capital Contributions based upon their relative shares of each earlier Capital Contribution, and any such returned Capital Contributions (but not amounts referred to in subclauses (B) and (C) above) may be recalled by the General Partner pursuant to Section 2.2(a) above as if such returned Capital Contributions had not previously been called; provided, that if the General Partner determines in good faith that there will be a Capital Call within 30 days after the contribution of such amounts to the Partnership, the General Partner may, in its discretion, retain such amounts and reduce the Capital Call with respect to such other Partners (in which event the Funded Commitments of such other Partners shall be increased by their pro rata share of that portion of such amounts referred to in subclauses (B) and (C) above). For purposes of this Section 6.5, a Limited Partner that increases its Commitment shall be treated as an Additional Limited Partner with respect to the amount by which its Commitment increased.

(c)      Each Additional Limited Partner admitted to the Partnership pursuant to this Section 6.5 shall be treated as purchasing a pro rata share of the interests in the Partnership of the Partners to whom amounts are distributed pursuant to this Section 6.5 ("Existing Partners"), and a portion of the Capital Account of each Existing Partner shall be allocated to such Additional Limited Partner so that after such allocation the Capital Accounts and Capital Contributions of such Additional Limited Partner and Existing Partners attributable to each Portfolio Investment and to the payment of Organizational Expenses, Management Fees, Placement Fees and Partnership Expenses are as equal as practicable to what their Capital Accounts and Capital Contributions attributable to each Portfolio Investment and to the payment of Organizational Expenses, Management Fees, Placement Fees and Partnership Expenses would have been if such Additional Limited Partner had been admitted to the Partnership at the First Closing.

Section 6.6  Regulatory Matters.

(a)      Each Limited Partner acknowledges that the assets of the Partnership are not intended to constitute plan assets of such Limited Partner for purposes of any applicable non-U.S., state or local law governing the investment and management of the assets of that Limited Partner, and that, as a result, none of the Partnership, the General Partner, the Manager or any of their Affiliates intend to be acting as a fiduciary within the meaning of any applicable non-U.S., state or local law relating to governmental plans or foreign plans with respect to such Limited Partner or the Partnership assets; provided, however, that this provision is not intended to negate the fiduciary duties imposed upon a general partner under the ELP Law.

(b)      In the event that the General Partner determines in good faith that (i) the investment in the Partnership by a Limited Partner which is a governmental plan, foreign plan or other regulated entity (each, a "Regulated Investor") is reasonably likely to result in (A) any violation of any provision of law applicable to such Regulated Investor, (B) the treatment of the assets of the Partnership as assets of such Regulated Investor or (C) the treatment of the Partnership, the General Partner or the Manager as a fiduciary under such provisions of law applicable to such Regulated Investor and (ii) if, in the reasonable judgment of the General Partner, any of the foregoing conditions result in or are reasonably likely to result in any material adverse consequences to the Partnership or the General Partner (both of (i) and (ii), a "Regulatory Issue"), then the General Partner shall use its reasonable best efforts to work with the Regulated Investor to cure the Regulatory Issue. The General Partner, in its sole discretion,

Appx. 03996

may require that such Regulated Investor provide (at such Regulated Investor's expense) an opinion of counsel, reasonably acceptable to the General Partner in form and substance, that no Regulatory Issue exists or, in the event such an opinion is not delivered within a reasonable time after being requested, may cause the Partnership to redeem such Regulated Investor's interest in the Partnership, in whole or in part.

(c)     Effective upon the date specified by the General Partner in the notice sent to a Limited Partner, notifying such Limited Partner of the General Partner's determination to completely or partially redeem such Limited Partner's interest in the Partnership pursuant to Section 5.6(e) or Section 6.6(b) (the "Redemption Effective Date"), such Limited Partner (the "Redeemed Limited Partner") shall cease to be a Partner of the Partnership for purposes of the withdrawn portion of its interest only and, in addition to its right to receive payment for its withdrawn interest in the Partnership as provided in Section 6.6(d), shall continue to be entitled, with respect to its remaining interest only, if any, to the rights of a Partner under this Agreement (including, without limitation, the right to have any allocations made to its Capital Account (as such may be adjusted) pursuant to Article II, the right to receive distributions pursuant to Article III and upon dissolution of the Partnership pursuant to Article VIII and the right to vote on matters as provided in this Agreement).

(d)     The Redemption Value shall be paid by the Partnership to such Redeemed Limited Partner in cash by paying to such Limited Partner a "pro rata portion" of each distribution payable to the Redeemed Limited Partners until the Redemption Value has been fully paid; provided, that the General Partner shall be under no obligation to sell, finance or refinance any Partnership property or assets or to take any other action to effect such redemption which, in the judgment of the General Partner, may affect adversely the Partnership (taking into account the liquidity needs of the Partnership) or any Partner. For purposes of the preceding sentence, a Redeemed Limited Partner's "pro rata portion" of a distribution shall be an amount equal to the amount such Redeemed Limited Partner would have received in respect of the redeemed interest had such interest not been redeemed.

Section 6.7  Indemnification and Reimbursement for Payments on Behalf of a Partner/Partner Clawback.

(a)     If the Partnership is obligated to pay any amount to a governmental agency or to any other person (or otherwise makes a payment) in respect of any tax because of a Partner's status or otherwise specifically attributable to a Partner (including, without limitation, federal withholding taxes with respect to foreign partners, state personal property taxes, state unincorporated business taxes, etc.), then such Partner (the "Indemnifying Partner") shall indemnify the Partnership in full for the entire amount paid (including, without limitation, any interest, and any penalties and expenses associated with such payment to the extent such penalties and expenses are attributable to such Partner's actions or failure to act). At the option of the General Partner, the amount to be indemnified may be charged against the Capital Account of the Indemnifying Partner, and, at the option of the General Partner, either:

(i)     promptly upon notification of an obligation to indemnify the Partnership, the Indemnifying Partner shall make a cash payment to the Partnership equal to the full amount

-46-

to be indemnified (and the amount paid shall be added to the Indemnifying Partner's Capital Account but shall not be deemed a Capital Contribution hereunder), or

(ii)    the Partnership shall reduce subsequent distributions which would otherwise be made to the Indemnifying Partner until the Partnership has recovered the amount to be indemnified (provided, that the amount of such reduction shall be deemed to have been distributed for all purposes of this Agreement, but such deemed distribution shall not further reduce the Indemnifying Partner's Capital Account).  If the General Partner reasonably expects that subsequent distributions to such Partner will be sufficient to satisfy such Partner's obligation to pay such amount, the General Partner shall not seek a payment pursuant to clause (i) above, until the General Partner reasonably believes such distributions will not be sufficient.

(b)    A Partner's obligation to make contributions to the Partnership under this Section 6.7 shall, subject to the limitations set forth in Section 6.7(c), survive the termination, dissolution, liquidation and winding up of the Partnership until the third (3rd) anniversary of the date of the final distribution made in connection with the complete liquidation of the assets of the Partnership and, for purposes of this Section 6.7, the Partnership shall be treated as continuing in existence.  The General Partner may pursue and enforce all rights and remedies the Partnership may have against each Partner under this Section 6.7, including instituting a lawsuit to collect such contribution with interest equal to the prime or base rate then in effect (as announced by Citibank, N.A., New York, New York) plus six percentage points per annum (but not in excess of the highest rate per annum permitted by law).

(c)    At any time and from time to time prior to the third (3rd) anniversary of the date of receipt thereof, the General Partner may require each Partner to return distributions (including distributions made in connection with the complete liquidation of the assets of the Partnership) to the Partnership in an amount sufficient to satisfy all or any portion of (i) such Partner's indemnification obligations pursuant to Section 6.7(a), or (ii) any liability which the Partnership would be required by this Agreement or otherwise to pay if it had adequate funds, including but not limited to (A) the expenses of investigating, defending or handling any pending or threatened litigation or claim arising out of the Partnership's activities, investments or business, (B) the amount of any judgment or settlement arising out of such litigation or claim, and (C) the Partnership's obligation to indemnify any Partner or other Person pursuant to Section 5.11 (a "Liability"), whether such obligations arise before or after the last day of the Partnership or, with respect to any Partner, before or after such Partner's withdrawal from the Partnership; provided, that (x) each Partner will return distributions in respect of its share of any such indemnification payment in proportion to the aggregate amount of distributions received by such Partner that have not previously been returned to the Partnership by such Partner pursuant to this Section 6.7(c); and (y) Partner's maximum liability under this Section 6.7 is limited to an amount equal to the lesser of (1) 33$^{1/3}$% of such Partner's Commitment, and (2) 50% of the aggregate amount of distributions received by such Partner as of such date.  Any distributions returned pursuant to this Section 6.7(c) shall not be treated as Capital Contributions, but shall be treated as returns of distributions in making subsequent distributions pursuant to Section 3.3 and in determining the amount that the General Partner is required to contribute to the Partnership pursuant to Section 8.3(c) of the Master Partnership Agreement.  Nothing in this Section 6.7(c), express or implied, is intended or shall be construed to give any person other than the Partnership or the Partners any legal or equitable right, remedy or claim under or in respect of this Section 6.7(c) or any

17475053                                    -47-

provision contained herein. If a Limited Partner returns an amount to the Partnership under Section 6.7(c)(ii) after the final distribution of the assets of the Partnership, the amount the General Partner is required to contribute to the Partnership with respect to such Limited Partner pursuant to Section 8.3(c) of the Master Partnership Agreement shall be re-determined, taking into account the return of such amount to the Partnership. The provisions of Section 8.3(c) of the Master Partnership Agreement shall apply, and the payments required thereby shall be made, in the same manner as if the return of such amount to the Partnership had occurred prior to the final distribution of the assets of the Partnership.

Section 6.8 Section 754 Election. Upon the written request of a Majority in Interest of the Limited Partners, that an election provided for in Section 754 of the Code be made, the General Partner shall, if then permitted by applicable law, make such election.

Section 6.9 BHCA Partners.

(a) Any Limited Partner may, upon notice to the General Partner, elect to hold all or any fraction of such Limited Partner's interest in the Partnership as a Non-Voting Interest, in which case such Limited Partner shall not be entitled to vote or otherwise participate in any consent of the Limited Partners with respect to the portion of its interest which is held as a Non-Voting Interest (and such Non-Voting Interest shall not be counted in determining the giving or withholding of any such consent or whether the requisite percentage of the Limited Partners or Partners, as the case may be, have consented to, approved, adopted or taken any other action hereunder). Except as provided in this Section 6.9, an interest held as a Non-Voting Interest shall be identical in all regards to all other interests held by Limited Partners. Any such election shall be irrevocable and shall bind the assignees of such Limited Partner's interest.

(b) Any interest in the Partnership held for its own account by a BHCA Partner, that is determined at the time of admission of such BHCA Partner, the complete or partial withdrawal of another Limited Partner or any other adjustment of the interests of the Partners pursuant to this Agreement to be in excess of 4.99% (or such other amount as may be permitted by applicable regulation to be held by a BHCA Partner as voting securities, but not including Section 4(k) of the BHC Act or any successor provision thereto) of the interests of the Limited Partners, excluding for purposes of calculating this percentage portions of any other interests that are Non-Voting Interests pursuant to this Section 6.9 and any other Section of this Agreement (collectively the "Non-Voting Partnership Interests"), shall be a Non-Voting Partnership Interest (whether or not subsequently transferred in whole or in part to any other person) and shall not be included in determining whether the requisite percentage of the Partners have consented to, approved, adopted or taken any action hereunder; provided, that such Non-Voting Partnership Interest shall be permitted to vote on any proposal to continue the business of the Partnership under Section 8.2(a) but not on the selection of a General Partner pursuant to Section 8.2(a). Each BHCA Partner hereby further irrevocably waives its corresponding right to vote for a successor general partner with respect to any Non-Voting Partnership Interest, which waiver shall be binding upon such BHCA Partner and any entity which succeeds to its interest. Upon the occurrence of a subsequent closing or any event specified in the second preceding sentence, a recalculation of the interest held by all BHC Partners shall be made, and only that portion of the total interest held by each BHC Partner that is determined as of the date of such recalculation to

Appx. 03999

be in excess of 4.99% (or such other amount) of the interests of the Limited Partners, excluding Non-Voting Partnership Interests as of such date, shall be a Non-Voting Partnership Interest.

Section 6.10  Excused Investments.  In the event that (a) the Partnership makes or proposes to make a Portfolio Investment which the General Partner reasonably determines could result in a material violation by any Limited Partner (or any of its Affiliates) of any law, order, decree or judgment of any court or governmental agency applicable to such Limited Partner (or any of its Affiliates), or (b) the General Partner reasonably determines that a Limited Partner's participation in a proposed Portfolio Investment of the Partnership could have a material adverse effect on the Partnership, the entity in which such investment is to be made, such Limited Partner, or the General Partner and its Affiliates, the General Partner may, in its sole discretion, and subject to Section 5.6(a), (x) reduce or eliminate the interest of such Limited Partner with respect to such Portfolio Investment and the distributions with respect thereto (provided that any Capital Contributions made by such Limited Partner with respect to such Portfolio Investment shall be promptly returned to such Limited Partner) and correspondingly increase the interest of the other Limited Partners with respect to such Portfolio Investment and/or (y) increase the interest of such Limited Partner in future Portfolio Investments of the Partnership and such Limited Partner's interest in the distributions with respect thereto and correspondingly decrease the interests of the other Limited Partners in such Portfolio Investments.  All determinations necessary to reflect the operation of this Section 6.10 and not otherwise explicitly provided for in this Section 6.10 shall be made on an equitable basis as determined by the General Partner in good faith, whose decision thereon shall be final and binding on all Limited Partners. Determinations by the General Partner pursuant to clauses (a) and (b) above may be made on its own initiative or after considering the request of any Limited Partner, including any supporting legal analysis or other documentation submitted by such Limited Partner.

Section 6.11  Limited Partner's Default on Commitment.

(a)    If any Limited Partner fails to make full payment of any portion of its Commitment when due (a "Defaulting Partner") and such failure is not cured within five Business Days after receipt by such Limited Partner of written notice from the General Partner with respect to such failure to pay, the General Partner may in its discretion and subject to Section 5.6(a), undertake any one or more of the following steps:

(i)    The General Partner may assist the Defaulting Partner in finding a buyer for the Defaulting Partner's Partnership interest (provided, that the General Partner will have no obligation to contact any particular Limited Partner or other person with regard to such sale).

(ii)    The Partnership may pursue and enforce all rights and remedies the Partnership may have against such Defaulting Partner with respect thereto, including a lawsuit to collect the overdue portion of the Commitment and any other amounts due the Partnership or General Partner hereunder, with interest at a rate equal to the prime or base rate then in effect (as announced by Citibank, N.A., New York, New York) plus six percentage points (but not in excess of the highest rate per annum permitted by law).

(iii)    The General Partner may offer the Defaulting Partner's interest to the Partners and the partners in the Parallel Vehicles (other than any Defaulting Partners) pro rata in

Appx. 04000

accordance with their Commitments and their capital commitments to Parallel Vehicles on the terms set forth below.  If any Partner or partner in a Parallel Vehicle does not elect to purchase the entire interest offered to it, the remaining interest allocable to the Partners and the partners in the Parallel Vehicles will be reoffered pro rata to the Partners and the partners in Parallel Vehicles who have purchased the entire interest offered to them until either all of such interest is acquired or no Partner or partner in a Parallel Vehicle wishes to make a further investment.  At the closing of such purchase (on a date and at a place designated by the General Partner), each purchasing Partner shall (A) deliver a non-interest bearing, non-recourse (except to the extent of the Partnership interest purchased and the proceeds therefrom) ten-year promissory note (in a form approved by the General Partner) payable to the Defaulting Partner in an amount equal to the portion of the Defaulting Partner's Capital Account being purchased by such Partner, (B) assume the portion of the Defaulting Partner's obligation to make both defaulted and further Capital Contributions pursuant to its Commitment which is equal to the portion of the Defaulting Partner's interest being purchased by such Partner, and (C) be entitled to have his name entered in the register of limited partners held by the Partnership.  In the case of a purchase of a portion of a Defaulted Partner's Capital Account by one or more partners in a Parallel Vehicle, such Parallel Vehicle shall deliver a note in the same form as the note described above to the Partnership for the aggregate portion of the Defaulted Partner's Capital Account being purchased by the limited partners in such Parallel Vehicle, the Partnership shall make the adjustments described in Section 6.5 of the Master Partnership Agreement with respect to such purchase and the Partnership shall distribute such note to the Defaulting Partner.  If a Partner purchases a portion of the interest of a defaulting partner of a Parallel Vehicle, the Partner purchasing such interest shall increase its Commitments as described above with respect to purchases of an interest of a Defaulting Partner, and shall guarantee the note delivered to the Parallel Vehicle, and the Partnership shall make such other adjustments as are required by Section 6.5 of the Master Partnership Agreement.  The General Partner will handle the mechanics of making the offers set forth herein and will in its discretion impose time limits for acceptance.

(iv)     If the entire Defaulting Partner's interest is not purchased in the manner set forth in (iii) above, the General Partner in its sole discretion may offer the remaining interest either (A) to a third party or parties on the same terms as originally offered to the Partners pursuant to (iii) above (in which case such third party or parties will, as a condition of purchasing such interest, become a party to this Agreement), or (B) to the Partners and the partners in Parallel Vehicles in the manner provided in (iii) above, but with no requirement to assume the Defaulting Partner's obligation to make further capital contributions pursuant to its Commitment, in which case the Defaulting Partner's Commitment shall be deemed reduced (effective on the date of the default) to the amount actually paid in and the aggregate Commitments of the Partnership shall be reduced by the amount of such Defaulting Partner's remaining contributions to be made pursuant to its Commitment.

(v)     In addition to, or instead of, the other remedies and undertakings available to the General Partner pursuant to this Section 6.11(a), the General Partner may, in its sole discretion, reduce (effective on the date of the default, after giving effect to the 5-day cure period) any portion of such Defaulting Partner's Commitment (which has not been assumed by another Partner) to the amount of the Capital Contributions (which have not been purchased by another Partner) made by such Defaulting Partner (net of distributions pursuant to Section 6.5(b)) and the aggregate Commitments of the Partnership shall be commensurately reduced.

17475053                                        -50-

Appx. 04001

(vi)     Notwithstanding anything contained herein to the contrary, from and after any date on which a Defaulting Partner's Commitment is reduced pursuant to subparagraph (v) above, (A) such Defaulting Partner will have no right to receive any distributions, except for distributions made upon the Partnership's liquidation, (B) such Defaulting Partner's Capital Account will not be credited with any Investment Income and Gain or Short-Term Investment Income which shall instead be allocated to the Partners (other than any Defaulting Partners) in accordance with Section 2.3(b) and (c), as appropriate (and as adjusted to treat the Defaulting Partner's Capital Contribution as equal to zero), (C) until such Defaulting Partner's Capital Account is reduced to zero, (1) such Defaulting Partner's Capital Account shall continue to be debited in accordance with Sections 2.3(c), (d), (f), and (g) for such Defaulting Partner's share of Investment Loss, Organizational Expenses, Placement Fees and Uncapitalized Partnership Expenses as if there had been no reduction in such Defaulting Partner's Commitment or Capital Contributions and (2) the Management Fee payable by the Defaulting Partner shall be calculated as if there had been no reduction in such Defaulting Partner's Commitment, and (D) once such Defaulting Partner's Capital Account is reduced to zero, (1) such Defaulting Partner's Commitment shall be reduced to zero for all purposes of the Agreement, including the calculation of the Partnership's aggregate Commitments and determination of the Management Fee and (2) such Defaulting Partner (and not the Partnership or any other Limited Partner) shall be liable each quarterly period to the General Partner for an amount equal to its portion of the Management Fee for such period as if there had been no reduction in such Defaulting Partner's Commitment.

(vii)     No consent of any Limited Partner shall be required as a condition precedent to any transfer, assignment or other disposition of a Defaulting Partner's interest pursuant to this Section 6.11.

(b)     Additionally, the Defaulting Partner shall indemnify and hold harmless the General Partner and the Partnership against any losses, damages and expenses (including attorneys' fees) incurred by the General Partner and the Partnership in enforcing or attempting to enforce the provisions of this Section 6.11 or resulting from the Partnership failing to meet its obligations with respect to any Portfolio Investment by reason of any such default.

Section 6.12 Investment Company Act Limitations.  Notwithstanding anything to the contrary contained in this Agreement, (i) no person shall be admitted to the Partnership as Limited Partner, an Additional Limited Partner or a substitute Limited Partner unless such person is a Qualified Purchaser, and (ii) no sale, assignment, transfer, pledge, mortgage or other disposition of any or all of a Limited Partner's interest in the Partnership shall be effective unless the assignee of any beneficial interest in the Partnership is a Qualified Purchaser.

# ARTICLE VII

# ADVISORY COMMITTEE

Section 7.1 Advisory Committee.  (a) A committee (an "Advisory Committee") of not fewer than three individuals and not more than seven individuals who are affiliated with or

-51-

officers, employees, representatives or designees of Limited Partners or limited partners of Parallel Vehicles (but are not affiliated with the General Partner, the Manager, the Principals or any Affiliates thereof) will be appointed by the General Partner. The General Partner will not appoint to the Advisory Committee any individual who is an officer, employee or representative of a BHC Partner whose Partner Interest in the Partnership is over 4.99%. The Advisory Committee will meet at least semi-annually with the Manager and will perform such duties as is contemplated by this Agreement and provide such advice and counsel, including advice and counsel as to general economic and financial trends, portfolio investments and valuations, as is requested by the General Partner in connection with the investments of the Partnership, the Parallel Vehicles and the Separate Investment Entities, and other matters related thereto; provided, that the General Partner will retain ultimate responsibility for all decisions relating to the operation and management of the Partnership, including all investment decisions. The Advisory Committee will be consulted on potential conflicts involving the Partnership and will perform the duties contemplated by this Agreement and all transactions between the Partnership and the General Partner, the Manager and their Affiliates not specifically contemplated by this Agreement must be approved by the Advisory Committee. Notwithstanding the foregoing, the Advisory Committee will not consult with the General Partner on allocations of investment opportunities to Affiliates of the Manager or client accounts managed by the Manager if such allocations are made in accordance with the Highland Investment Allocation Policy. The Manager shall be entitled to remove a member of the Advisory Committee selected by the Manager from among the Limited Partners (or their representatives) upon at least 15 days prior written notice to the Limited Partners, provided, however, that the Manager may not remove a member of the Advisory Committee designated by a Limited Partner without the consent of 75% of the other members of the Advisory Committee. The Limited Partner that had the right to designate the removed member of the Advisory Committee shall have the right to designate a replacement. The Partnership will reimburse each member of the Advisory Committee for such member's reasonable out-of-pocket expenses incurred in attending meetings of the Advisory Committee. Such reimbursements shall be Partnership Expenses. The Advisory Committee shall act by affirmative vote or written consent of a majority of its members.

(b)    Neither the members of the Advisory Committee, nor the Limited Partners on behalf of whom such members act as representatives, shall owe any duties (fiduciary or otherwise) to the Partnership or any other Limited Partner in respect of the activities of the Advisory Committee, other than the duty to act in good faith.

## ARTICLE VIII

## DURATION AND TERMINATION

Section 8.1 Duration. The General Partner shall cause the Partnership to be dissolved and the Partnership will terminate on the tenth anniversary of the Final Closing and the General Partner will take all necessary steps pursuant to the ELP Law to dissolve the Partnership, except that the term of the Partnership may be extended by the General Partner, with the approval of the Advisory Committee, for up to two consecutive one-year extensions.

17475053

-52-

Section 8.2 <u>Early Termination</u>.

(a)     Subject to the ELP Law, the Partnership shall terminate on:

(i)     the bankruptcy of the General Partner or on the happening of any other event that would cause a dissolution of the Partnership under the ELP Law, <u>unless</u>, within 90 days after the occurrence of such event, the Limited Partners and limited partners of all Parallel Vehicles unanimously elect a new general partner pursuant to the ELP Law and resolve to continue the business of the Partnership;

(ii)     a good faith determination upon receipt of written legal advice of counsel by the General Partner that dissolution of the Partnership is necessary or desirable (A) as a result of a Plan Asset Event or (B) to avoid any material adverse consequences to the Partnership or the General Partner as a result of any law applicable to a Regulated Investor;

(iii)     the removal of the General Partner pursuant to <u>Section 5.9</u> unless all of the Limited Partners and limited partners of all Parallel Vehicles elect a new General Partner and resolve to continue the business of the Partnership; or

(iv)     at any time after the second anniversary of the Final Closing upon the consent of Seventy-Five Percent in Interest of the Limited Partners and the filing of a notice of dissolution by the General Partner.

(b)     As promptly as possible following the election by the Limited Partners of a successor General Partner pursuant to <u>Section 8.2(a)(i)</u>, there shall be distributed to the former General Partner, in full payment and satisfaction of its interest in the Partnership, a Limited Partnership Interest in the Partnership. The Limited Partnership Interest of the former General Partner shall entitle the former General Partner to the same distributions and allocations in respect of Portfolio Investments made prior to the termination of the former General Partner it would have received had it remained the General Partner, subject to the obligations set forth in Section 8.3(c) of the Master Partnership Agreement, and to the rights of a Limited Partner hereunder with a Commitment equal to the Commitment of the former General Partner, but shall not entitle it to any other rights to participate in the management of the Partnership. After its withdrawal as General Partner, a former General Partner shall only be liable under this Agreement for actions taken and investments in Portfolio Companies made prior to the date of such withdrawal. If the Limited Partners elect to continue the Partnership's business pursuant to <u>Section 8.2(a)(i)</u>, an appropriate amendment to this Agreement and to the Registration shall be made within 90 days after the event giving rise to such election.

Section 8.3 <u>Termination and Liquidation of Partnership Interests; Annual Determination of General Partner Give Back</u>.

(a)     <u>Liquidation</u>. Upon dissolution, the Partnership will be dissolved and wound up in accordance with the ELP Law.

(b)     <u>Final Allocation and Distribution</u>. Upon termination of the Partnership (whether or not an early termination), the General Partner shall approve a plan of dissolution in

accordance with the ELP Law and take all steps necessary to appoint a liquidator and otherwise to dissolve and wind up the Partnership in accordance with the ELP Law.

## ARTICLE IX

## VALUATION OF PARTNERSHIP ASSETS

Section 9.1  Normal Valuation.  For purposes of this Agreement, the value of any security as of any date (or in the event such date is a holiday or other day which is not a Business Day, as of the next preceding Business Day) will be determined as follows:

(a)      a Marketable Security which is listed on a recognized securities exchange or the NMS will be valued at the average of the last sales prices (or, if no sale occurred on such date, at the last "bid" price thereon) for the five consecutive trading days before such date and the five consecutive trading days after such date;

(b)      a Marketable Security which is traded over-the-counter (other than on the NMS) will be valued at the average of the last "bid" prices for the five consecutive trading days before such date and the five consecutive trading days after such date;

(c)      subject to Section 9.3, all Non-Marketable Securities will be valued on such date by the General Partner at fair market value in such manner as it may determine; and

(d)      a Marketable Security which meets clause (ii), but not clause (i) of the definition of "Marketable Securities" will be valued as if it had been converted, exchanged or exercised as of such date.

Section 9.2  Restrictions on Transfer or Blockage.  Any security which is held under a representation that it has been acquired for investment and not with a view to public sale or distribution, or which is held subject to any other restriction, or where the size of the Partnership's holdings compared to the trading volume would affect its marketability, will, subject to the provisions of Section 9.3, be valued at such discount from the value determined under Section 9.1 above as the General Partner deems necessary to reflect properly the marketability of such security.

Section 9.3  Objection to Valuation.  Prior to acting upon its final valuation of any security pursuant to Sections 9.1 or 9.2 or its determination of written down value pursuant to Section 9.4, the General Partner shall provide the members of the Advisory Committee with notice and backup support of the General Partner's valuation of such security.  If within 30 days after delivery of such notice a majority of the members of the Advisory Committee delivers written notice to the General Partner objecting to the valuation of such security and if, within 15 days from the date on which the General Partner receives such notice from a majority of the Advisory Committee, the General Partner and the Advisory Committee cannot agree on the valuation of such security, then the General Partner will (at the Partnership's expense) cause an independent securities expert mutually acceptable to the General Partner and the Advisory

Appx. 04005

Committee to review such valuation, and such expert's determination will be binding on the parties.

Section 9.4 <u>Write-down to Value</u>. Any Portfolio Investment that has permanently declined in value as determined by the General Partner will be written down to its value (or, if applicable, written off) pursuant to the provisions of this <u>Article IX</u>, including the valuation provisions of <u>Section 9.3</u>, as of the date of such determination. The General Partner shall provide the Advisory Committee at least annually with the then current valuation of all Portfolio Investments.

## ARTICLE X

## BOOKS OF ACCOUNTS; MEETINGS

Section 10.1 <u>Books</u>. The Partnership will maintain complete and accurate books of account of the Partnership's affairs at the Partnership's principal office, which books will be open to inspection by any Partner (or its authorized representative) at any time during ordinary business hours.

Section 10.2 <u>Fiscal Year</u>. The fiscal year of the Partnership will be the calendar year, unless otherwise determined by the General Partner.

Section 10.3 <u>Reports</u>. The General Partner will furnish the Limited Partners:

(a) within 60 days after the end of each of the first three quarters of each fiscal year beginning with fiscal year 2008, and with respect to the fourth quarter in each fiscal year at the time of delivery of the annual financial statements under <u>Section 10.3(c)</u>, (i) unaudited quarterly financial statements (including balance sheet and income statement (including additions, dispositions and write-offs)) showing each Partner's Capital Account prepared in accordance with GAAP, applied on a consistent basis (except that, in accordance with GAAP, such quarterly financial reports may omit footnotes and year-end adjustments, accruals and reserves), and (ii) a schedule of investments including the Partnership's cost and the value of such investments prepared in accordance with <u>Article IX</u>;

(b) within 60 days after the end of each of the first three quarters of each fiscal year beginning with fiscal year 2008, and with respect to the fourth quarter in each fiscal year at the time of delivery of the annual financial statements under <u>Section 10.3(c)</u>, unaudited quarterly descriptive investment information for each Portfolio Company and narrative summary financial information for each Portfolio Company, including revenues, EBITDA and net debt; and

(c) within 90 days after the end of each fiscal year beginning with fiscal year 2008, (i) financial statements for such year prepared, in accordance with GAAP, applied on a consistent basis (certified by a firm of independent certified public accountants of recognized national standing selected by the General Partner), (ii) valuations of the Partnership's investments as of the end of such year (including a statement of each Partner's closing Capital Account) prepared in accordance with <u>Article IX</u>, and (iii) the certification to Benefit Plan

-55-

Investors confirming that the Partnership continues to qualify for an exception from Plan Assets described in the last sentence of Section 5.6(a) and a certification regarding the Partnership's compliance in all material respects with Article III hereof.

Section 10.4 <u>Certain Tax Elections</u>. The Partnership shall file an election effective as of the date of its formation pursuant to U.S. Treasury Regulation §301.7701-3(c) to be treated as an association taxable as a corporation.

Section 10.5 <u>Annual Meeting</u>. The General Partner will hold annual general informational meetings for the Limited Partners until such time, after the termination of the Commitment Period, that substantially all of the Portfolio Investments have been Disposed.

## ARTICLE XI

## MAINTENANCE OF REGISTRATION OF LIMITED PARTNERSHIP; POWER OF ATTORNEY

Section 11.1 <u>Maintenance of Registration of Limited Partnership</u>. The General Partner has caused to be filed, recorded and published such statements, notices, certificates or other instruments required by any provision of any applicable law which governs the formation of the Partnership or the conduct of its business from time to time (collectively, the "<u>Registration</u>").

Section 11.2 <u>Power of Attorney</u>. Each of the undersigned does hereby constitute and appoint each member of the General Partner and each person who hereafter becomes a member of the General Partner with full power to act without the others, as his, her or its true and lawful representative and attorney-in-fact, in her, his or its name, place and stead, to make, execute, sign, acknowledge and deliver or file (a) the Registration, (b) any amendment to or cancellation of the Registration or any amendment to, or waiver of, this Agreement effected in accordance with Section 12.1, (c) all instruments, documents and certificates which may from time to time be required by any law to effectuate, implement and continue the valid and subsisting existence of the Partnership, (d) all instruments, documents and certificates which may be required to effectuate the dissolution and termination of the Partnership, and (e) in the case of a Defaulting Partner any bills of sale or other appropriate transfer documents necessary to effectuate transfers of such Defaulting Partner's interest pursuant to Section 6.11 above. The powers of attorney granted herein are intended to secure an interest in property and the obligations of each relevant Limited Partner under this Agreement and shall be irrevocable and will survive the death, incompetency, disability or dissolution of a Limited Partner. Without limiting the foregoing, the powers of attorney granted herein will not be deemed to constitute the written consent of any Limited Partner for purposes of Section 12.1. Each Limited Partner hereby agrees not to revoke this power of attorney and further agrees that this power of attorney shall survive and shall not be affected by its dissolution, bankruptcy or legal disability and shall extend to its successors and assigns whomsoever. Any attempted revocation by a Limited Partner of any power of attorney granted herein shall constitute a breach of this Agreement by such Limited Partner. Further, each Limited Partner agrees that at any time, upon request by the General Partner, it will confirm in writing that the power of attorney granted herein has not been revoked. Notwithstanding the

-56-

foregoing or anything contained in this Agreement to the contrary, the foregoing power of attorney may not be exercised by the General Partner after the occurrence of an event specified in Section 8.2 or the removal of the General Partner pursuant to Section 5.9.

## ARTICLE XII

## MISCELLANEOUS

Section 12.1 <u>Amendments</u>.

(a)    This Agreement may be amended only by the written consent of the General Partner and, except as otherwise provided in this Section 12.1, a Majority in Interest of the Limited Partners.

(b)    Notwithstanding anything in this Section 12.1 to the contrary, no amendment will be valid as to any Limited Partner (including a Defaulting Partner) which (i) increases or decreases such Limited Partner's Commitment without the written consent of such Limited Partner or (ii) amends the provisions of this Section 12.1(b).

(c)    Notwithstanding anything in this Section 12.1 to the contrary, no amendment will be valid as to any Limited Partner (including a Defaulting Partner) which alters (i) the provisions of Sections 2.3, 3.3, 4.1, 6.1 or the provisions of this Section 12.1(c), (ii) the provisions of Section 6.7(c) in a manner that increases a Limited Partner's potential obligations, or (iii) any other provision of this Agreement, in a manner adverse to such Limited Partner, without the written consent of such Limited Partner; provided, however, that with respect to clause (iii), if such Limited Partner is not treated differently in any material respect from any other Limited Partner then such amendment will be valid with only the written consent of the General Partner and the Limited Partners representing at least a Majority in Interest of the Limited Partners.

(d)    Notwithstanding anything in this Section 12.1 to the contrary, no amendment will be valid as to any Limited Partner (including a Defaulting Partner), which alters the provisions of Sections 1.3, 5.4, 5.10, 5.11, 12.1 or any provision which requires the consent or vote of at least Two-Thirds in Interest of the Limited Partners without the written consent of the General Partner and at least Two-Thirds in Interest of the Limited Partners.

(e)    Notwithstanding anything in this Section 12.1 to the contrary, no amendment which would alter the provisions of Sections 5.5, 6.6 and the provisions of this Section 12.1(e), or, with respect to Benefit Plan Investors, Sections 5.6, 12.1(e), and the provisions in Section 5.15 relating to Benefit Plan Investors or the definitions of Benefit Plan Investor or Redemption Value, will be valid without the written consent of at least a Majority in Interest of the Limited Partners that are materially and adversely affected by such amendment (including Limited Partners whose direct or indirect beneficial owners would be so affected).

(f)    Notwithstanding anything in this Section 12.1 to the contrary, no amendment will be valid as to any Limited Partner (including a Defaulting Partner), which alters any provision which requires the consent or vote of at least Seventy-Five Percent in Interest of the Limited

Partners or the provisions of this Section 12.1(f) without the written consent of the General Partner and at least Seventy-Five Percent in Interest of the Limited Partners.

(g)     Notwithstanding anything in this Section 12.1 to the contrary, no amendment shall be made which would amend the provisions hereof relating to the rights of BHCA Partners without the consent of each BHCA Partner affected thereby.

(h)     Notwithstanding anything in this Section 12.1 to the contrary, the General Partner may amend any provisions of this Agreement solely as it relates to a Limited Partner pursuant to one or more side letters with such Limited Partner without the consent of the Limited Partners not party to such side letters.

(i)     Subject to Section 12.1 of the Master Partnership Agreement, no amendment or waiver of the provisions of the Master Partnership Agreement shall be made without the written consent of a Majority in Interest of the Limited Partners.

(j)     In addition to any amendments or waivers otherwise authorized hereby, this Agreement may be amended from time to time by the General Partner without the consent of any of the Limited Partners (i) to add to the representations, duties or obligations of the General Partner or surrender any right or power (but not responsibilities) granted to the General Partner herein; (ii) to cure any ambiguity or correct any provisions hereof which may be inconsistent with any other provisions hereof, or correct any printing, stenographic or clerical errors or omissions; (iii) to admit one or more Additional Limited Partners, or withdraw one or more Limited Partners, in accordance with the terms of this Agreement, and (iv) with the consent of the Advisory Committee, to take such actions contemplated in Section 5.6(e) or avoid any material adverse consequences to the Partnership or the General Partner as a result of any change in law or interpretation of law applicable to a Regulated Investor. The General Partner shall promptly send each Limited Partner a copy of any amendment adopted pursuant to Section 12.1.

Section 12.2  Successors.  Except as otherwise provided herein, this Agreement will inure to the benefit of and be binding upon the Partners and their legal representatives, heirs, successors and assigns.

Section 12.3  Governing Law; Severability.  This Agreement will be construed in accordance with the laws of the Cayman Islands and, to the maximum extent possible, in such manner as to comply with all the terms and conditions of the ELP Law.  If it is determined by a court of competent jurisdiction that any provision of this Agreement is invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

Section 12.4  Notices.  All notices, demands and other communications to be given and delivered under or by reason of provisions under this Agreement will be in writing and will be deemed to have been given when personally delivered, sent by telecopy (with hard copy to follow by reputable overnight courier) or sent by reputable overnight courier service (charges prepaid) or mailed by first class mail (with a copy sent by telecopy) to the addresses or telecopy numbers set forth in Schedule 1 hereto or to such other address or telecopy number as has been indicated to all Partners.

-58-

Appx. 04009

Section 12.5 <u>Legal Counsel</u>. Each Partner hereby agrees and acknowledges that:

(a)        The law firm retained by the General Partner, the Partnership and any Parallel Vehicle or Separate Investment Entity (the "<u>GP's Counsel</u>") in connection with the formation of the Partnership, the offering of Limited Partner interests and the management and operation of the Partnership does not and will not represent the Limited Partners in connection with any such matter or in connection with any dispute which may arise between the Limited Partners on one hand and the General Partner, the Partnership and any Parallel Vehicle or Separate Investment Entity on the other (the "<u>Partnership Legal Matters</u>").

(b)        Each Limited Partner will, if it wishes counsel on a Partnership Legal Matter, retain its own independent counsel with respect to each of the foregoing matters described in <u>Section 12.5(a)</u>.

(c)        Each Limited Partner hereby agrees that the GP's Counsel may represent (i) the General Partner and the Partnership and any Parallel Vehicle or Separate Investment Entity in connection with any and all Partnership Legal Matters (including any dispute between the General Partner and one or more Limited Partners, but excluding a Limited Partner's derivative action brought against the General Partner).

Section 12.6 <u>Miscellaneous</u>. This document and the schedules, exhibits and side letter agreements between the Partnership and certain of the Limited Partners in connection herewith and the Subscription Agreements contain the entire Agreement among the parties and supersede all prior arrangements or understanding with respect thereto. Descriptive headings are for convenience only and will not control or affect the meaning or construction of any provision of this Agreement. This Agreement may be executed in any number of counterparts, any one of which need not contain the signatures of more than one party, but all of such counterparts together will constitute one agreement.

Appx. 04010

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed as of the date first above written.

Executed as a Deed by:

**GENERAL PARTNER:**

HIGHLAND RESTORATION CAPITAL PARTNERS GP, LLC

By: _____

Name: James Dondero
Title: President

In the presence of:

_____
Witness

_Meredith etheredge_
Name

_18455 Noel Road, STE 800, Dallas, TX 75240_
Address

_Notary_
Occupation

MEREDITH ETHEREDGE
Notary Public, State of Texas
My Commission Expires
May 20, 2009

17475053

*Highland Restoration Capital Partners Offshore, L.P. – Second*
*Amended and Restated Agreement of Limited Partnership*

Executed as a Deed by:

**LIMITED PARTNER:**

1397225 ONTARIO LIMITED

By: _____

    Name: _____ ASO

    Title:

In the presence of:

_____

Witness

_____

Name  CYNTHIA TUCCIARONE

_____

Address  5650 Yonge Street, Toronto, M2N4H5 Canada

_____

Occupation  Senior Law Clerk – Investments & Contracts

17475053

*Highland Restoration Capital Partners Offshore, L.P. – Second*
*Amended and Restated Agreement of Limited Partnership*

Appx. 04012

# LIMITED PARTNERS

*Highland Restoration Capital Partners Offshore, L.P. – Second*
*Amended and Restated Agreement of Limited Partnership*

Executed as a Deed on behalf of each of the parties
named above

By: HIGHLAND RESTORATION CAPITAL
PARTNERS GP, LLC as Attorney-in-Fact
pursuant to Section 14 of each of the
Subscription Agreements, dated April 18,
2008, between each of the above named
parties and Highland Restoration Capital
Partners GP, LLC as General Partner of
Highland Restoration Capital Partners
Offshore, L.P.

By: _____
Name: James Dondero
Title: President

In the presence of:

_____
Witness

_____
Name


Address

_____
Occupation

*MEREDITH ETHEREDGE*
*Notary Public, State of Texas*
*My Commission Expires*
*May 20, 2009*

17475053

*Highland Restoration Capital Partners Offshore, L.P. – Second*
*Amended and Restated Agreement of Limited Partnership*

AGREEMENT OF LIMITED PARTNERSHIP

OF

HIGHLAND RESTORATION CAPITAL PARTNERS, L.P.

17461908

## TABLE OF CONTENTS

**Page**

ARTICLE I      GENERAL PROVISIONS ................................................................ 1

     Section 1.1      Formation ................................................................................. 1

     Section 1.2      Name ....................................................................................... 1

     Section 1.3      Purpose ................................................................................... 1

     Section 1.4      Place of Business ................................................................... 1

ARTICLE II      DEFINITIONS; DETERMINATIONS; CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS ............................. 2

     Section 2.1      Definitions; Determinations .................................................... 2

     Section 2.2      Capital Contribution Commitment; Key Person Provision ............... 18

     Section 2.3      Capital Accounts .................................................................. 21

     Section 2.4      Distributions in Kind ............................................................ 22

     Section 2.5      Determination of Voting Thresholds ................................... 23

ARTICLE III      DISTRIBUTIONS ..................................................................... 24

     Section 3.1      Distribution Policy ............................................................... 24

     Section 3.2      Distribution of Short-Term Investment Income ................ 24

     Section 3.3      Distributions of Current Cash Income and Proceeds From Dispositions of or Partial Realizations with Respect to Investments and In Kind Distributions ............................... 24

     Section 3.4      Foreign Taxes ...................................................................... 26

ARTICLE IV      MANAGEMENT FEE AND ORGANIZATIONAL EXPENSES ............... 27

     Section 4.1      Management Fee ................................................................... 27

     Section 4.2      Organizational and Partnership Expenses ......................... 29

     Section 4.3      Ordinary Operating Expenses ............................................. 29

ARTICLE V      GENERAL PARTNER ............................................................... 29

     Section 5.1      Investment Opportunities; Devotion of Time; Management Authority ............................................................................. 29

     Section 5.2      Use of Affiliates .................................................................. 30

     Section 5.3      Indebtedness ......................................................................... 30

     Section 5.4      Limitation on Investments ................................................... 31

     Section 5.5      UBTI; USRPI ....................................................................... 32

Appx. 04016

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---:|
| Section 5.6 | ERISA Matters | 32 |
| Section 5.7 | Conflicts of Interest | 33 |
| Section 5.8 | Transfer of General Partnership Interest; No Withdrawal or Loans | 35 |
| Section 5.9 | Removal of the General Partner | 35 |
| Section 5.10 | No Liability to Limited Partners | 36 |
| Section 5.11 | Indemnification of General Partner, the Manager and Advisory Committee | 36 |
| Section 5.12 | Formation of New Fund or Business Endeavor | 37 |
| Section 5.13 | Interest as a Limited Partner | 38 |
| Section 5.14 | Parallel Vehicles | 38 |
| Section 5.15 | Separate Investment Entities | 39 |
| Section 5.16 | Media Company Investments | 40 |
| Section 5.17 | Co-investment Funds | 41 |
| Section 5.18 | Bridge Leveraging | 42 |
| ARTICLE VI | LIMITED PARTNERS | 44 |
| Section 6.1 | Limited Liability | 44 |
| Section 6.2 | Transfer of Limited Partnership Interests | 44 |
| Section 6.3 | No Withdrawal | 46 |
| Section 6.4 | No Termination | 46 |
| Section 6.5 | Subsequent Limited Partners | 46 |
| Section 6.6 | Regulatory Matters | 48 |
| Section 6.7 | Indemnification and Reimbursement for Payments on Behalf of a Partner/Partner Clawback | 49 |
| Section 6.8 | Section 754 Election | 51 |
| Section 6.9 | BHCA Partners | 51 |
| Section 6.10 | Excused Investments | 52 |
| Section 6.11 | Limited Partner's Default on Commitment | 52 |
| Section 6.12 | Investment Company Act Limitations | 54 |
| ARTICLE VII | ADVISORY COMMITTEE | 55 |
| Section 7.1 | Advisory Committee | 55 |

Appx. 04017

## TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| **ARTICLE VIII** | DURATION AND TERMINATION | 56 |
| Section 8.1 | Duration | 56 |
| Section 8.2 | Early Termination | 56 |
| Section 8.3 | Termination and Liquidation of Partnership Interests; Annual Determination of General Partner Give Back | 57 |
| **ARTICLE IX** | VALUATION OF PARTNERSHIP ASSETS | 58 |
| Section 9.1 | Normal Valuation | 58 |
| Section 9.2 | Restrictions on Transfer or Blockage | 59 |
| Section 9.3 | Objection to Valuation | 59 |
| Section 9.4 | Write-down to Value | 59 |
| **ARTICLE X** | BOOKS OF ACCOUNTS; MEETINGS | 59 |
| Section 10.1 | Books | 59 |
| Section 10.2 | Fiscal Year | 59 |
| Section 10.3 | Reports | 59 |
| Section 10.4 | Tax Allocation | 60 |
| Section 10.5 | Tax Controversies | 61 |
| Section 10.6 | Certain Tax Elections | 61 |
| Section 10.7 | Code Section 83 Safe Harbor Election. | 61 |
| Section 10.8 | Tax Basis Elections | 62 |
| Section 10.9 | Annual Meeting | 63 |
| **ARTICLE XI** | CERTIFICATE OF LIMITED PARTNERSHIP; POWER OF ATTORNEY | 63 |
| Section 11.1 | Certificate of Partnership | 63 |
| Section 11.2 | Power of Attorney | 63 |
| **ARTICLE XII** | MISCELLANEOUS | 64 |
| Section 12.1 | Amendments | 64 |
| Section 12.2 | Successors | 65 |
| Section 12.3 | Governing Law; Severability | 65 |
| Section 12.4 | Notices | 65 |
| Section 12.5 | Legal Counsel | 65 |

Appx. 04018

## TABLE OF CONTENTS
(continued)

                                                                        **Page**

Section 12.6    Miscellaneous ...................................................................... 66

Appx. 04019

Schedule 1    Limited Partners/Commitments/Notice Information
Exhibit A     Form of Guaranty Agreement

17461908

## AGREEMENT OF LIMITED PARTNERSHIP
## OF
## HIGHLAND RESTORATION CAPITAL PARTNERS, L.P.

THIS AGREEMENT OF LIMITED PARTNERSHIP (this "Agreement") is dated effective as of April 18, 2008 between Highland Restoration Capital Partners GP, LLC, a Delaware limited liability company (in its capacity as general partner of the Partnership, the "General Partner"), and the limited partners listed in Schedule 1 attached hereto (in their capacities as limited partners of the Partnership, the "Limited Partners") (the General Partner and the Limited Partners being herein collectively called the "Partners"). Capitalized terms not otherwise defined shall have the meanings ascribed to such terms in Section 2.1(a).

## ARTICLE I

## GENERAL PROVISIONS

Section 1.1 Formation. The Partners hereby agree to form a limited partnership (the "Partnership") pursuant to and in accordance with the Delaware Revised Uniform Limited Partnership Act (the "Delaware Partnership Act").

Section 1.2 Name. The name of the Partnership will be "Highland Restoration Capital Partners, L.P." or such other name or names as the General Partner may from time to time designate. The General Partner will notify Limited Partners in writing of any change to the name of the Partnership.

Section 1.3 Purpose. Subject to the express limitations set forth herein, the Partnership is organized for the object and purpose of (i) investing in senior secured bank loans, debt obligations, trade claims and equity securities of middle market Distressed Companies primarily based in the United States generally consistent with the investment strategy described in the Partnership's Confidential Private Placement Memorandum, including, without limitation, privately placed or publicly traded debt securities and other debt obligations, senior and subordinated debt obligations, secured and unsecured debt obligations, privately placed or publicly traded equity securities including common stock, preferred stock and warrants, and (ii) managing and monitoring such investments and engaging in such activities incidental or ancillary thereto and otherwise permitted by the Delaware Partnership Act as the General Partner deems necessary or advisable.

Section 1.4 Place of Business. The Partnership will maintain offices and places of business at Two Galleria Tower, 13455 Noel Road, Dallas, TX 75240, or at such other place or places in the United States as the General Partner may from time to time designate; provided, however, that if the General Partner designates different places of business, it shall promptly notify the Limited Partners in writing.

17461908

**Appx. 04021**

## ARTICLE II

## DEFINITIONS; DETERMINATIONS;
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

Section 2.1  Definitions; Determinations.

(a)  For purposes of this Agreement the following capitalized terms shall have the meanings set forth below:

"Additional Limited Partners" has the meaning set forth in Section 6.5(a).

"Advisory Committee" has the meaning set forth in Section 7.1(a).

"Affiliate" has the meaning set forth in Rule 405 promulgated under the Securities Act.

"Agent" has the meaning set forth in Section 2.4(b).

"Agreement" has the meaning set forth in the introduction.

"Allocated Expenses" means, for any Partner as of any date with respect to any Portfolio Investment, such Partner's Capital Contributions applied to pay Management Fees, Organizational Expenses and Uncapitalized Partnership Expenses that have been allocated pursuant to Section 3.3(c) to such Portfolio Investment as of such date.

"Available Profits" means, with respect to a Waived Fee Amount, the cumulative amount of items of Partnership income and gain (such items being "Partnership Profits") realized after the Waived Fee Notice giving rise to such Waived Fee Amount.  The amount of Partnership Profits realized after a Waived Fee Notice for the purpose of this Available Profits definition shall equal the amount of Partnership income and gain realized after the Waived Fee Notice for purposes of maintaining Capital Accounts; provided, however, the amount of Partnership gain realized after a Waived Fee Notice that is attributable to any Portfolio Investment held by the Partnership at the time of such Waived Fee Notice that is taken into account in calculating Partnership Profits shall equal the excess, if any, of (1) the amount the Partnership realizes on the sale, transfer, or other disposition of such Portfolio Investment or its assets over (2) the fair market value (as determined by the General Partner) of such Portfolio Investment or its assets, as applicable, on the date of such Waived Fee Notice.  Notwithstanding the two preceding sentences, the aggregate amount of all items of Partnership Profits for any taxable year included in Available Profits shall not exceed the total amount of the Partnership's net income and gain for such taxable year as determined for federal income tax purposes, except that gain attributable to a Portfolio Investment shall be determined as described in the proviso to the preceding sentence.  Notwithstanding the three preceding sentences, to the extent of the amount by which the Special Profit Interest with respect to a Portfolio Investment exceeds the Deemed Contribution with respect to such Portfolio Investment, Available Profits includes an allocable share of all items of income or gain realized by the Partnership with respect to such Portfolio Investment.

Appx. 04022

"Basis" of any security means the basis of such security as determined in accordance with the Code less the amount of any write-down pursuant to Section 9.4 and as further adjusted by the General Partner in its reasonable discretion to reverse the effects of any exchange of securities that would result in an increase in tax basis pursuant to the Code.

"Benefit Plan Investor" means any Partner that is a "benefit plan investor" as defined in Section 3(42) of ERISA and any regulations promulgated thereunder.

"BHC Act" means the Bank Holding Company Act of 1956, as amended.

"BHCA Partner" means a Limited Partner that is a bank holding company, as defined in Section 2(a) of the BHC Act, or a non-bank subsidiary of such bank holding company, provided, that such Limited Partner shall not be a BHC Partner if (i) it is a financial holding company, as defined in Section 2(p) of the BHC Act, or a non-bank subsidiary thereof and is acting pursuant to Section 4(k)(4)(h) or Section 4(k)(4)(i) of the BHC Act as set forth in a notice to such effect to the General Partner; or (ii) it is a small business investment company licensed as such under the Small Business Investment Act of 1958, as amended.

"Bridge Financing" means, with respect to the Partnership's investment in a Portfolio Company, that portion of the investment that the Partnership provides as interim financing (including guarantees of debt financing) in anticipation of, or to support, a permanent investment by the Partnership in such Portfolio Company and that the Partnership intends to cause the Portfolio Company to repay or refinance within 18 months after the date of such investment in the Portfolio Company and which the General Partner designates in the Capital Call Notice therefor. During the first 18 months following a Bridge Financing, such Bridge Financing shall be treated as a Short-Term Investment. A Bridge Financing that is outstanding 18 months following the making of such Bridge Financing, shall be treated by the Partnership as a permanent investment in a Portfolio Company.

"Bridge Leveraging" means indebtedness incurred by the Partnership to fund the acquisition of a Portfolio Investment pending receipt of Capital Contributions (including as a result of any default by any Limited Partner or limited partner of a Parallel Vehicle in the making of Capital Contributions) pursuant to a Capital Call Notice that the Partnership anticipates issuing pursuant to Section 2.2(a), provided that the Capital Contributions made with respect to such Capital Call Notice are applied by the Partnership upon receipt thereof to repay such indebtedness.

"Built-In Tax Amount" means, with respect to any distribution of securities in-kind received by the General Partner, an amount equal to the taxes that would be payable by the General Partner (and its direct and indirect members), assuming (i) such securities were sold in a taxable transaction immediately after their receipt by the General Partner for an amount equal to their value and (ii) any gains were taxed at the highest marginal rates applicable to any of the General Partner's members or former members, applying the assumptions set forth in Section 3.3(b) in the same manner as if such securities had been sold by the Partnership immediately before such distribution.

Appx. 04023

"Business Day" means any day other than (i) Saturday or Sunday or (ii) any other day on which banks located in New York City generally are closed for business.

"Capital Account" has the meaning set forth in Section 2.3.

"Capital Call" has the meaning set forth in Section 2.2(a).

"Capital Call Notice" has the meaning set forth in Section 2.2(a).

"Capital Contribution" of any Partner means the amount received by the Partnership from such Partner as an actual contribution.

"Capitalized Partnership Expenses" means Partnership Expenses that are reflected in the Basis of Portfolio Investments.

"Carried Interest" means the General Partner's 20% interest in the Partnership's distributions specified in Section 3.3(a)(ii)(A) and Section 3.3(a)(iii)(B).

"Certificate" has the meaning set forth in Section 11.1.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Co-Investment Opportunity" has the meaning set forth in Section 5.17(a).

"Co-Investment Fund" means any partnership, limited liability company or other entity that is an Affiliate of the General Partner or the Manager, is not a Parallel Vehicle or a Separate Investment Entity, and is organized to invest in Portfolio Investments pursuant to a Co-Investment Opportunity.

"Co-Investor" has the meaning set forth in Section 5.17(a).

"Commitment" with respect to each Partner means the aggregate amount of cash agreed to be contributed as capital to the Partnership by such Partner (as determined with respect to the General Partner without regard to Section 2.2(a)(ii)) as specified in Schedule 1 attached hereto as the same may be modified from time to time under the terms of this Agreement.

"Commitment Period" has the meaning set forth in Section 2.2(b).

"Continuity Period" has the meaning set forth in Section 2.2(d).

"Credit Support" has the meaning set forth in Section 5.3.

"Crusader" means Highland Crusader Fund, L.P., and its successors.

"Current Cash Income" means all Current Income paid in cash or cash equivalents.

"Current Income" means all interest and dividend income (including from original issue discount, purchases or investments at a market discount, and payment of in-kind income and other non-cash current income) from a Portfolio Company.

17461908 -4-

"Deemed Contribution" means, as of any date, for any Portfolio Investment or the payment of expenses incurred directly in connection with the making, maintaining or disposing of such Portfolio Investment, the Gross-up Percentage multiplied by the product of (i) the amount by which the Capital Contributions required from the General Partner are reduced pursuant to Section 2.2(a)(ii) with respect to such Portfolio Investment or the payment of related expenses, multiplied by (ii) (1) with respect to the General Partner, the quotient determined by dividing (x) the aggregate Commitments of all Partners (including the General Partner) other than Limited Partners as to whom no Management Fee is payable pursuant to Section 4.1(b) by (y) the aggregate Commitments of all Partners, and (2) with respect to each Limited Partner as to whom no Management Fee is payable pursuant to Section 4.1(b), the quotient determined by dividing (x) the Commitment of such Limited Partner by (y) the aggregate Commitments of all Partners.

"Defaulting Partner" has the meaning set forth in Section 6.11(a).

"Delaware Partnership Act" has the meaning set forth in Section 1.1.

"Determination Date" has the meaning set forth in Section 8.3(c).

"Director Fees" means directors, consulting, monitoring or similar fees in respect of a Portfolio Company, including options, warrants or other non-cash compensation received by a director or officer of a Portfolio Company which shall be valued at the earlier of (v) the time of exercise of such instrument, (w) three years after the underlying security of such instrument becomes a Marketable Security, (x) the dissolution of the Partnership, (y) the date the Partnership disposes of the Portfolio Investment that gave rise to such fee or (z) the date such option, warrant or other non-cash compensation was disposed of by the General Partner, the Manager, the Principals or their Affiliates and thereafter credited against Management Fees pursuant to Section 4.1(c), in each such case to the extent actually paid by a Portfolio Company and received by the General Partner, the Manager, the Principals, employees of the Manager or their Affiliates in respect of Portfolio Investments; provided, however, that (A) such fees shall not include, in each case, any such amounts that are applied to cover amounts paid by the General Partner, the Manager, the Principals or their Affiliates that constitute unreimbursed (i) out-of-pocket expenses of such persons incurred in generating such fees, and (ii) Partnership Expenses incurred in generating such fees, and (B) to the extent that the General Partner, the Manager, the Principals, employees of the Manager or their Affiliates were actually reimbursed by the Partnership for any Partnership Expenses incurred in generating such fees, such fees will first be applied to repay the Partnership for such Partnership Expenses.

"Disposition" or "Disposed of" means, with respect to all or a portion of a Portfolio Investment, (i) except as provided in the next sentence, the sale, exchange or other disposition by the Partnership of all or a portion of the securities or other interests constituting that Portfolio Investment for cash, securities or other property, (ii) the receipt by the Partnership of a distribution of the proceeds of the sale of all or substantially all of the assets of the Portfolio Company in complete liquidation of the Partnership's entire interest in the Portfolio Investment and (iii) an in-kind distribution of all or part of a Portfolio Investment that has not previously been deemed to have been Disposed of, as of the date of and to the extent of such distribution. A "Disposition" does not include (i) a recapitalization that consists of an exchange of a Portfolio

Investment for other securities of or claims against the issuing Portfolio Company, (ii) a business combination that consists of an exchange of substantially all of the Partnership's remaining interest in a Portfolio Investment for securities issued by an acquiring entity, (iii) a business combination that consists of the exchange of all or substantially all of the assets of a Portfolio Company or one or more divisions or operating units of a Portfolio Company for securities issued by an acquiring entity or (iv) a sale, exchange or other disposition that does not constitute a pro rata disposition of a portion of each class of securities or other interests constituting such Portfolio Investment.

"Distressed Companies" shall mean persons that, in the opinion of the General Partner, (a) are or have been in financial or other stress; (b) are restructuring, are considered likely to be restructured, or have been restructured in an out-of-court process or in a proceeding under the Federal bankruptcy laws or state insolvency laws or similar laws in or outside of the United States; (c) are being, are considered likely to be or have been reorganized within or outside of a proceeding under federal bankruptcy laws or state insolvency laws or similar laws in or outside of the United States; or (d) are engaged, are considered likely to engage or have been engaged in other extraordinary transactions, such as debt restructurings, reorganizations and liquidations outside of bankruptcy.

"ECI" means income that is effectively connected with a United States trade or business within the meaning of Section 864(c) of the Code and the Treasury Regulations promulgated thereunder, but not including any income or gain attributable to the disposition of a "United States real property interest" as defined for purposes of Section 897(c) of the Code.

"Electing Limited Partner" has the meaning set forth in Section 2.4(b).

"ERISA" means the U.S. Employee Retirement Income Security Act of 1974, as amended.

"Excess Partial Realization Proceeds" means, for any Partner and as of any date, the sum of the positive amounts determined with respect to each Portfolio Investment (or portion thereof) that has not been Disposed of as of such date and as to which there have been proceeds from a Partial Realization as of such date, equal to the excess of (a) such Partner's Partner Share of aggregate proceeds that have been distributed as of such date of all Partial Realizations with respect to such Portfolio Investment or portion thereof over (b) the sum of (i) such Partner's Capital Contributions applied to make such Portfolio Investment or portion thereof, including Capitalized Partnership Expenses attributed to such Portfolio Investment or portion thereof and any Allocated Expenses with respect to such Portfolio Investment as of such date, plus (ii) an amount that would be equal to such Partner's Preferred Amount if such Partner's Preference Base were only the amounts described in clause (i).

"Existing Partners" has the meaning set forth in Section 6.5(c).

"FCC" shall mean the U.S. Federal Communications Commission.

"FCC Attribution Rules" shall mean the ownership attribution rules of the FCC, including, but not limited to, 47 C.F.R. §§ 21.912, Note 1; 24-709; 24.720; 26.101(b), (c);

Appx. 04026

73.3555, Note 2; 76.501, Note 2; 76.503, Note 2; 76-504, Note 1; Attribution Reconsideration Order, 58 Radio Regulation 2nd 604 (1985); Further Attribution Reconsideration Order, 1 FCC Rcd 802 (1986); Report and Order, 14 FCC Rcd 12559 (1999); Report and Order, 14 FCC Rcd 19014 (1999); Memorandum Opinion and Second Order in Reconsideration, FCC 00-431 (released Jan. 19, 2001); and Memorandum and Opinion and Order on Reconsideration, FCC-00-438 (released Jan. 19, 2001), all as the same may be amended or supplemented from time to time.

"Final Closing" means the final closing of subscriptions by Limited Partners pursuant to Subscription Agreements, which, in any event, shall take place no later than the fourteen month anniversary of the First Closing.

"First Closing" means the first closing of subscriptions by Limited Partners pursuant to Subscription Agreements.

"Follow-on Investment" means investments made after the termination of the Commitment Period in securities of an existing Portfolio Company that are appropriate or necessary in the opinion of the General Partner to preserve, protect or enhance the investment in such Portfolio Company that was made by the Partnership during the Commitment Period.

"Fund Group" means the Partnership, Parallel Vehicles, Separate Investment Entities and their respective Portfolio Investments.

"Funded Commitment" means as to any Partner as of any date, that portion of a Partner's Commitment that has been contributed (or "deemed contributed") to the Partnership to meet a Capital Call (including any amounts contributed pursuant to Section 6.5(b)), reduced by (a) any amounts which are distributed (or "deemed distributed") to such Partner in respect of a proposed Portfolio Investment (or portion thereof) that was not consummated, (b) any amounts which are distributed (or "deemed distributed") to such Partner in respect of a Bridge Financing (or portion thereof) that was sold, refinanced, redeemed or otherwise disposed of within 18 months from the Investment Date of such Portfolio Investment in an amount not to exceed the Partner's portion of Funded Commitments used to acquire such Bridge Financing, (c) any amounts paid by such Partner pursuant to subclauses (A), (B) and (C) of the third sentence of Section 6.5(b), (d) any amounts distributed (or "deemed distributed") to such Partner pursuant to Section 6.5 (other than amounts attributable to payments by an Additional Limited Partner pursuant to subclauses (A), (B) and (C) of the third sentence of Section 6.5(b)), and (e) in the sole discretion of the General Partner, any amounts distributed (or "deemed distributed") to such Partner with respect to a Portfolio Investment that was sold, refinanced, redeemed or otherwise disposed of within 48 months after the Investment Date for such Portfolio Investment in an amount not to exceed the portion of such Partner's Funded Commitments used to acquire such Portfolio Investment, all as determined in good faith by the General Partner. For the purposes of this definition, those proceeds otherwise distributable to a Partner that are retained for reinvestment or application to a Capital Call in accordance with the proviso to Section 3.1(b) or the proviso to the second to last sentence in Section 6.5(b), shall be "deemed distributed" to such Partner by the Partnership and "deemed contributed" by such Partner to the Partnership. The General Partner, in its discretion, may reduce the 48 month period referenced above at any time during the Commitment Period.

Appx. 04027

"GAAP" means U.S. generally accepted accounting principles as in effect from time to time.

"General Partner" has the meaning set forth in the introduction to this Agreement and includes any successor general partner of the Partnership appointed in accordance with this Agreement.

"GP's Counsel" has the meaning set forth in Section 12.5.

"Gross-up Percentage" means the percentage determined by dividing (i) the aggregate Commitments of all Partners by (ii) the aggregate Commitments of all Partners with respect to whom the Management Fee is payable pursuant to Section 4.1(b).

"Guaranty Agreement" shall mean the Guaranty Agreement, dated as of the date hereof, by and among the Partnership, the General Partner and the guarantors party thereto, substantially in the form of the agreement set forth in Exhibit A hereto, as amended from time to time in accordance with its terms.

"Highland" shall mean Highland Capital Management, L.P., a Delaware limited partnership.

"Highland Accounts" means collectively funds, accounts and vehicles managed by Highland from time to time.

"Highland Investment Allocation Policy" shall mean the investment allocation policy of Highland described in the Partnership's Confidential Private Placement Memorandum and as in effect or modified from time to time.

"Highland Portfolio Company" means each portfolio company (and each of their subsidiaries) as to which Highland and/or the Principals and/or their respective Affiliates have completed, or are in the process of completing, an investment or acquisition or receipt of a debt or equity ownership position therein, including, without limitation through Crusader and other Highland Accounts, at the time of the First Closing, together with follow-on or other additional investments and acquisitions from time to time after the First Closing in or by such companies so long as such investments and acquisitions are reasonably determined by the Principals to be primarily within the general lines or areas of business of such companies as of the First Closing or incidental or related thereto.

"Indemnifying Partner" has the meaning set forth in Section 6.7(a).

"Initial Fee Period" means the period starting on the First Closing and ending on the earlier of (i) the termination of the Commitment Period, and (ii) the date on which the Manager, the General Partner or an Affiliate thereof closes subscriptions of capital commitments by investors of a Successor Fund.

"Insulated Partner" has the meaning set forth in Section 5.16(a).

"Insulated Partner Affiliate" has the meaning set forth in Section 5.16(a).

17461908

-8-

"Investment Company Act" means the Investment Company Act of 1940, as amended.

"Investment Date" means, with respect to any Portfolio Investment, the date such Portfolio Investment was acquired by the Partnership.

"Investment Income and Gain" means, with respect to a Portfolio Investment, (i) the excess, if any, of the proceeds from the Disposition of such Portfolio Investment or portion thereof or Partial Realization with respect to such Portfolio Investment or portion thereof that does not give rise to Current Income over the Basis of such Portfolio Investment or portion thereof, (ii) to the extent all or any portion of such Portfolio Investment is distributed to the Partners in kind as contemplated by Section 2.3, the excess, if any, of the value (as determined pursuant to Article IX) of the portion of such Portfolio Investment distributed to the Partners over the Basis of such portion of such Portfolio Investment, and (iii) Current Income attributable to such Portfolio Investment.

"Investment Loss" means, with respect to a Portfolio Investment, (i) the deficiency, if any, of the proceeds from the Disposition of such Portfolio Investment or portion thereof or Partial Realization with respect to such Portfolio Investment or portion thereof that does not give rise to Current Income as compared to the Basis of such Portfolio Investment or portion thereof, (ii) to the extent all or any portion of such Portfolio Investment is distributed to the Partners in kind as contemplated by Section 2.4, the deficiency, if any, of the value (as determined pursuant to Article IX) of the portion of such Portfolio Investment distributed to the Partners as compared to the Basis of such portion of such Portfolio Investment, and (iii) the amount, as reasonably determined by the General Partner in accordance with Section 9.4, by which such Portfolio Investment has permanently declined in value below the Basis of such Portfolio Investment immediately prior to such determination.

"Keyman Group" means James Dondero, Pat Daugherty and John Honis; provided, that the Keyman Group will include replacements chosen pursuant to Section 2.2(d) if a Triggering Event occurs pursuant to clauses (ii) or (iii) therein; provided, further, that, if any one of the members of the Keyman Group ceases to be actively involved, including in a supervisory role, on an ongoing basis with respect to the business, operations or investment decisions of Highland, the Manager and General Partner, the Keyman Group will include such replacement person that is proposed by the General Partner to the Advisory Committee and who is approved to serve as a member of the Keyman Group by the consent of a majority of the members of the Advisory Committee.

"Limited Partners" means the persons listed in Schedule 1 hereto in their capacity as limited partners of the Partnership (including each person admitted to the Partnership in accordance with Section 6.5) and each person who is admitted to the Partnership as a substitute limited partner pursuant to Section 6.2 or 6.5, so long as each such person continues to be a limited partner of the Partnership hereunder.

"Majority in Interest of the Limited Partners" means Limited Partners with Commitments and limited partners in Parallel Vehicles with capital commitments to Parallel Vehicles totaling more than 50% of the aggregate Commitments of all Limited Partners and capital commitments of limited partners in Parallel Vehicles.

"<u>Management Fee</u>" has the meaning set forth in <u>Section 4.1(a)</u>.

"<u>Management Fee Period</u>" has the meaning set forth in <u>Section 4.1(a)</u>.

"<u>Manager</u>" means Highland Capital Management, L.P., a Delaware limited partnership, or other entity controlled by James Dondero and Mark Okada, and appointed as Manager by the General Partner on behalf of the Partnership from time to time.

"<u>Marketable Securities</u>" means securities that (A) (i) are (x) listed on a national securities exchange in the United States, (y) quoted on the NMS or (z) listed on a securities exchange or quoted on an established quotation system within or without the United States that in the opinion of the General Partner after consultation with the Advisory Committee supports sufficient trading activity and volume to allow for the orderly disposition of such securities by the Partners following a distribution thereof in accordance with <u>Sections 2.4</u> and <u>3.3</u>, and (ii) are not subject to restrictions on transfer as a result of applicable contract provisions, the provisions of the Securities Act or regulations thereunder (other than the volume, manner-of-sale and notice restrictions of Rule 144 promulgated thereunder or any successor rule thereto; <u>provided</u>, that if such securities are subject to volume limitations under Rule 144 and distributed in kind to Limited Partners, each Limited Partner would be able to sell such securities promptly after the distribution thereof in accordance with <u>Sections 2.4</u> and <u>3.3</u> (notwithstanding volume limitations)), or other applicable law, or (B) are immediately convertible, exchangeable or exercisable by the holder thereof into securities that meet the requirements of the foregoing <u>clause (A)</u>.

"<u>Media Company</u>" shall mean any entity in which the Partnership has or acquires an investment and that directly or indirectly owns, controls or operates any: (i) broadcast radio or television station licensed by the FCC; (ii) U.S. cable television system; (iii) daily newspaper (as such term is defined in Section 73.3555 of the Ownership Rules); (iv) multipoint multichannel distribution system licensed by the FCC; (v) other communications facility the ownership or operation of which is subject to regulation by the FCC under (x) the Communications Act of 1934, as amended, (y) the FCC Attribution Rules, or (z) the FCC Ownership Rules; and (vi) other business or activity that is subject to ownership restrictions imposed by the FCC from time to time.

"<u>Net Funded Commitment</u>" means, in respect of any Partner and as of the first day of any Management Fee Period, such Partner's Funded Commitment as of such date <u>less</u> (i) such Partner's Capital Contributions (or portion thereof, in the case of a partial Disposition) applied by the Partnership to make all Portfolio Investments that have been Disposed of on or prior to such date and applied to pay Capitalized Partnership Expenses relating to such Portfolio Investments and Allocated Expenses with respect to such Portfolio Investment as of such date, (ii) all write downs pursuant to <u>Section 9.4</u> in respect of Portfolio Investments that have not been Disposed of by the Partnership on or prior to such date multiplied by such Partner's Partner Interest in each such Portfolio Investment, and (iii) such Partner's Capital Contributions in respect of Management Fees and Partnership Expenses allocable to Portfolio Investments that have not been Disposed of on or prior to such date.

**Appx. 04030**

"NMS" means the National Market System of the National Association of Securities Dealers, Inc.

"Non-Marketable Securities" means all securities which are not Marketable Securities.

"Non-U.S. Partner" means with respect to any determination hereunder, (i) any Limited Partner that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code, or (ii) any Limited Partner that has a direct or indirect beneficial owner that (x) is not a "United States person" within the meaning of Section 7701(a)(30) of the Code and (y) is required to report on a United States federal income tax return or report any taxable income allocated to such Limited Partner pursuant to Section 10.4, to the extent of such beneficial owner's pro rata share of such income, but in each case, only if such Limited Partner has notified the General Partner of such status at any time prior to such determination, by providing the General Partner an IRS Form W-8BEN or by some other method satisfactory to the General Partner.

"Non-Voting Interest" means any interest of a Limited Partner in the Partnership, and if applicable, any interest of a limited partner in a Parallel Vehicle (or portion thereof) with respect to which a Limited Partner or limited partner in a Parallel Vehicle has, or elects to have, no or limited voting rights pursuant to Section 6.9 or a similar provision in the agreement of limited partnership of the Parallel Vehicles, as the case may be.

"Non-Voting Partnership Interests" has the meaning set forth in Section 6.9(b).

"Operating Company" means an "operating company" within the meaning of the Plan Asset Regulation, including a "venture capital operating company."

"Opinion of the Partnership's Counsel" means an opinion of Mayer Brown LLP or other counsel selected by the General Partner and reasonably acceptable (by reason of experience in the area of law involved) to the Limited Partner affected by such opinion or, if more than one Limited Partner is affected by such opinion, a Majority in Interest of the Limited Partners so affected.

"Organizational Expenses" means the reasonable out-of-pocket expenses (including, without limitation, travel, printing, legal and accounting fees and other expenses) of the General Partner, the Manager, the Principals and their respective Affiliates (but not including any Placement Fees) incurred in the formation of the Partnership, any Parallel Vehicle or any Separate Investment Entity or incurred in connection with the organization and funding of the Partnership, any Parallel Vehicle, Separate Investment Entity and the General Partner.

"Other Permitted Investment Activities" means the continuing involvement of the Principals, subject to compliance with the devotion of time covenant in Section 5.1(a), (i) in the full range of their activities in connection with their duties and responsibilities as members, owners, partners, directors, officers, employees, shareholders, or consultants of the Manager and Highland Accounts, including Crusader, (ii) in acquisitions and follow-on investments by Highland Portfolio Companies reasonably determined by the Principals to be primarily within the general area of business of a Highland Portfolio Company or incidental or related thereto, (iii) as passive owners, stockholders, debtholders and investors in professionally managed hedge

17461908                                    -11-

funds, fund of funds and other private investment entities and vehicles, (iv) in investments which do not otherwise meet the investment objectives of the Partnership, and (v) in a Successor Fund organized in accordance with Section 5.12; provided, that none of the activities described in clauses (i) through (v) above shall unreasonably affect the ability of the Principals to fulfill their duties to the Limited Partners and to be actively involved in the business of the Fund Group.

"Ownership Rules" means the multiple and cross-ownership rules of the FCC including, but not limited to, 47 C.F.R. §§ 21.912; 24-709; 24.720; 26.101(a); 73.3555; 74.931(h); 76.501; 76.503; 76.504, and other regulations or written policies of the FCC which limit or restrict ownership in Media Companies, all as the same may be amended or supplemented from time to time.

"Parallel Vehicle" means any entity that is organized pursuant to Section 5.14 and designated a Parallel Vehicle by the General Partner, including Highland Restoration Capital Partners Offshore, L.P., a Cayman exempted limited partnership, but solely for purposes of this Agreement, the Partnership is not a Parallel Vehicle.

"Partial Realization" means, with respect to any Portfolio Investment, the realization by the Partnership of Current Income or of proceeds from a recapitalization, extraordinary dividend, sale, redemption or other disposition of less than all of such Portfolio Investment (other than a pro rata disposition of a portion of each class of securities or other interests constituting such Portfolio Investment) or any other similar event that does not constitute a Disposition of such Portfolio Investment.

"Participating Partner" means, with respect to any Portfolio Investment, any Limited Partner who made a Capital Contribution (other than solely a Waiver Contribution) that was applied to such Portfolio Investment.

"Partner Interest" means for any Partner that is a Participating Partner with respect to any Portfolio Investment (i) for each Partner as to which there is a Deemed Contribution, the proportion that the sum of such Partner's Capital Contributions and allocable share of Deemed Contributions that were applied to such Portfolio Investment bears to the aggregate Capital Contributions and Deemed Contributions of all Partners that were applied to such Portfolio Investment, and (ii) for any Partner other than Partners described in clause (i), the proportion that such Partner's Capital Contributions that were applied to such Portfolio Investment bears to the aggregate Capital Contributions and Deemed Contributions of all Partners that were applied to such Portfolio Investment.

"Partner Share" means, for any Partner, and for any period, the amount of Investment Income and Gain, Investment Loss, Current Cash Income, proceeds from the Disposition of or Partial Realization with respect to a Portfolio Investment for such period or Portfolio Investments distributed in kind, as the case may be, or items of Partnership income or expense (other than Management Fees or Placement Fees, if any), in each case for such period multiplied by such Partner's Partner Interest in the Portfolio Investments giving rise to such items or to which such items are allocable pursuant to Section 3.3(c).

"Partners" means the General Partner and the Limited Partners, collectively.

-12-

Appx. 04032

"Partnership" has the meaning set forth in Section 1.1.

"Partnership Expenses" means all reasonable costs and expenses relating to the Partnership's activities, investments and business (to the extent not borne or reimbursed by a Portfolio Company or proposed Portfolio Company), including, but not limited to, (i) all costs and out-of-pocket fees and expenses attributable to acquiring, investing, holding, monitoring and disposing of the Partnership's investments, (ii) all other out-of-pocket costs and out-of-pocket fees and expenses attributable to unconsummated transactions or investment strategies (but excluding marketing strategies) that do not lead to consummated acquisitions, (iii) legal, accounting, auditing, administrative, consulting and other fees and expenses (including, but not limited to, fees of the administrator of the Partnership and insurance and other out-of-pocket expenses associated with negotiating, consummating, monitoring and disposing of the Partnership's investments and the preparation of Partnership financial statements, tax returns and forms K-1), (iv) expenses of the Advisory Committee incurred in accordance with Article VII, (v) extraordinary expenses, liabilities, indemnities and other obligations of the Partnership (including, but not limited to, litigation and indemnification costs and expenses, judgments and settlements (including, but not limited to, costs and expenses payable under Section 5.11)), and (vi) all debt service obligations, including interest, premium, if any, fees, expenses and other amounts payable in respect of indebtedness of the Partnership incurred in accordance with Section 5.3, but in each case, not including Organizational Expenses in excess of $1,250,000, Management Fees, Placement Fees and those expenses borne by the Manager pursuant to Section 4.3.

"Partnership Legal Matters" has the meaning set forth in Section 12.5.

"Permitted GP Transferee" means, as to any membership or other ownership interest in the General Partner, of or held by any Principal or other member or investor in the General Partner (a) any family member of such person provided the transferor retains all voting control with respect to the interest, (b) any other partner or investor in the General Partner who was a partner or investor in the General Partner as of the Final Closing, and (c) any trust, partnership, foundation corporation or other entity that is either controlled by such person or is primarily for the benefit of such person and/or their family members.

"Person" means an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a governmental entity (or any department, agency or political subdivision thereof).

"Placement Fees" means the fees and expenses and any interest on any deferred fees and expenses charged by or paid to any placement agency designated by the Partnership or the General Partner for the marketing and sale of interests in the Partnership and the Parallel Vehicles. The Partnership's pro rata share of any Placement Fees shall be the amount of such fees multiplied by a fraction, the numerator of which is the aggregate Commitments of the Limited Partners giving rise to such fees, and the denominator of which is the sum of the aggregate Commitments of the Limited Partners and the aggregate capital commitments of all limited partners in all Parallel Vehicles giving rise to such fees.

"Plan Assets" means "plan assets" as defined in the Plan Asset Regulation.

17461908                                          -13-

"Plan Asset Event" has the meaning set forth in Section 5.6(e).

"Plan Asset Regulation" means the U.S. Department of Labor regulation located at 29 C.F.R. Section 2510.3-101, or any successor regulation thereto, as in effect at the time of reference, as modified by Section 3(42) of ERISA.

"Portfolio Company" means any corporation, partnership, limited liability, company or other entity in which the Partnership has made an investment, other than Short-Term Investments.

"Portfolio Investments" means any investments held by the Partnership, other than Short-Term Investments. If the Partnership holds multiple classes of securities or other interests that were issued by a Portfolio Company in a single closing or series of related closings, all of such securities or interests in the aggregate shall constitute one Portfolio Investment.

"Preference Base" means for any Partner and as of any date (a) with respect to any distribution of the proceeds of a Disposition, the sum of (i) such Partner's Capital Contributions applied to make Portfolio Investments that have been Disposed of on or prior to such date or applied to pay Capitalized Partnership Expenses with respect to such Portfolio Investments, (ii) such Partner's Partner Share of all writedowns (including write-offs) pursuant to Section 9.4 in respect of Portfolio Investments that have not been Disposed of by the Partnership on or prior to such date and (iii) such Partner's Capital Contributions applied to pay Allocated Expenses with respect to Portfolio Investments that have been Disposed of, written down or written off on or prior to such date, and (b) with respect to any distribution of proceeds of a Partial Realization, the amounts determined pursuant to clause (a), plus such Partner's Capital Contributions applied to make the Portfolio Investment to which such proceeds are attributable, including Capitalized Partnership Expenses attributable to such Portfolio Investment and Allocated Expenses with respect to such Portfolio Investment as of such date. For purposes of determining a Partner's Preferred Amount, a Partner's Preference Base shall not include any Capital Contributions returned to such Partner pursuant to Section 2.2(c).

"Preferred Amount" means, for any Partner and as of any date, the amount, if any, that would be required to be distributed on such date so that the aggregate distributions pursuant to Section 3.3 (including distributions pursuant to Sections 8.3(b) and (c)), to such Partner in excess of such Partner's Preference Base provide a return of 8% per annum (compounded annually) on such Partner's Preference Base. For purposes of determining a Partner's Preferred Amount with respect to a Disposition of a Portfolio Investment, no proceeds of Partial Realizations with respect to Portfolio Investments or portions thereof that have not been Disposed of as of such date shall be taken into account, other than Excess Partial Realization Proceeds realized as of such date. A Partner's Preferred Amount shall be calculated on the basis of the actual number of days elapsed from and including the date on which each Capital Contribution is invested in a Portfolio Company or is contributed to the Partnership for the purpose of paying Management Fees, Organizational Expenses and Partnership Expenses, as applicable, to, but not including, the date that distributions constituting a return of such Capital Contributions were made by the Partnership to the Partners pursuant to Section 3.3(a)(i).

"Principals" means the following senior investment professionals who are partners or members of the General Partner or are employed by the Manager, for so long as such persons have not voluntarily resigned from, or been terminated by, the General Partner or Manager, and any other senior investment professionals from time to time who are designated as such by the General Partner: James Dondero, Mark Okada, Patrick Daugherty and John Honis.

"Qualified Purchaser" has the meaning set forth in Section 2(a)(51) of the Investment Company Act and the regulations promulgated thereunder.

"Redeemed Limited Partner" has the meaning set forth in Section 6.6(c).

"Redemption Effective Date" has the meaning set forth in Section 6.6(c).

"Redemption Value" means, with respect to any interest in the Partnership, or such portion thereof in the case of a partial withdrawal, being redeemed because of a Plan Asset Event or Regulatory Issue, the fair market value of such interest as of the applicable Redemption Effective Date, as determined in good faith by the General Partner; provided that, if the Plan Asset Event or the Regulatory Issue is a result of a breach of a representation, warranty or covenant made by the Redeemed Limited Partner, the Redemption Value shall be (in each case as determined in good faith by the General Partner) the lesser of (i) the fair market value of such Redeemed Limited Partner's interest in the Partnership on the applicable Redemption Effective Date and (ii) the fair market value of the applicable portion of the Redeemed Limited Partner's interest in the Partnership being redeemed on the date on which cash is allocated to make redemption payments. In making such determination of fair market value, the General Partner shall assume that all of the assets of the Partnership will be sold on the applicable date in a commercially reasonable manner and the proceeds of such sale, net of estimated closing costs, as reasonably determined by the General Partner, and all obligations of the Partnership (other than the redemption of the interest or interests in the Partnership being redeemed as of such date), will be distributed to the Partners pursuant to this Agreement. With respect to a Plan Asset Event or Regulatory Issue that is not a result of a breach of a representation or warranty made by the Redeemed Limited Partner, if the majority of such Redeemed Limited Partners disagree with the General Partner's determination of the Redemption Value of the applicable interests in the Partnership, such Redeemed Limited Partners shall negotiate in good faith to resolve such disagreement, and if such Redeemed Limited Partners continue to disagree after negotiations are held, either side may request that an independent evaluator (who must be reasonably acceptable to the other party) be retained, whose valuation shall be final and binding on the Partnership and all of the Partners. The Partnership will bear the cost of the independent evaluator.

"Regulated Investor" has the meaning set forth in Section 6.6(b).

"Regulatory Issue" has the meaning set forth in Section 6.6(b).

"Securities Act" means the Securities Act of 1933, as amended.

"Separate Investment Entity" has the meaning set forth in Section 5.15.

"Seventy-Five Percent in Interest of the Limited Partners" means Limited Partners with Commitments and limited partners in Parallel Vehicles with capital commitments to Parallel

17461908                                    -15-

Vehicles totaling 75% of the aggregate Commitments of all Limited Partners and capital commitments of limited partners in Parallel Vehicles.

"Short-Term Investment Income" means the income earned on Short-Term Investments including in any event any gains and net of any losses from dispositions of Short-Term Investments and also net of any costs and expenses directly attributable thereto.

"Short-Term Investments" means investments in (a) cash, (b) obligations of, or fully guaranteed as to timely payment of principal and interest by, the United States of America and with a maturity date not in excess of 12 months from the date of purchase by the Partnership, (c) interest-bearing accounts and/or certificates of deposit of any U.S. bank with capital and surplus in excess of $500 million and whose short-term debt securities are rated not lower than P-1 by Moody's Investor Services, Inc. and A-1+ by Standard & Poor's Corporation and whose long term unsecured debt securities, or the long term unsecured debt securities of its affiliated holding company, are rated no lower than A1 by Moody's Investor Services, Inc. and A+ by Standard & Poor's Corporation, (d) reverse repurchase agreements using U.S. Treasury securities and entered into with any U.S. bank with capital and surplus in excess of $500 million and whose short-term debt securities are rated not lower than P-1 by Moody's Investor Services, Inc. and A-1+ by Standard & Poor's Corporation and whose long term unsecured debt securities, or the long term unsecured debt securities of its affiliated holding company, are rated no lower than A1 by Moody's Investor Services, Inc. and A+ by Standard & Poor's Corporation, and (e) money market mutual funds with assets of not less than $500 million, substantially all of which assets are reasonably believed by the General Partner to consist of items described in one or more of the foregoing clauses (b), (c) and (d).

"Special Profit Interest" means (i) the General Partner's right to receive distributions pursuant to the first two sentences of Section 3.3(a), but only to the extent such distributions exceed the distributions that would have been made to the General Partner pursuant to the first two sentences of Section 3.3(a) if such distributions had been made pro rata according to each Partner's Capital Contributions to the Partnership, and (ii) the General Partner's right to receive distributions pursuant to Section 3.3(e).

"Subscription Agreement" means the Subscription Agreements (including a Subscriber Information Form) executed and delivered by Partners investing in the Partnership substantially in the form of the Subscription Agreement, dated as of the date hereof.

"Successor Fund" has the meaning set forth in Section 5.12.

"Tax Distributions" means the aggregate amount of distributions that would be made to the General Partner if the General Partner received no distributions other than those required pursuant to Section 3.3(b).

"Tax Exempt Partner" means (i) a Limited Partner that is exempt from tax under Section 501 of the Code or (ii) a Limited Partner that has a direct or indirect beneficial owner that (x) is exempt from tax under Section 501 of the Code and (y) is required to report on a United States federal income tax return or report any taxable income allocated to such Limited Partner pursuant to Section 10.4, to the extent of such beneficial owner's pro rata share of such income,

but only in each case if such Limited Partner has notified the General Partner in writing regarding the status of such direct or indirect beneficial owner.

"Topping and Break-up Fees" means topping, break-up or similar fees in connection with prospective Portfolio Investments that are not completed, in each case to the extent actually paid by a prospective Portfolio Company and received by the General Partner, the Manager, the Principals, employees of the Manager or their Affiliates; provided, however, that (A) such fees shall not include, in each case, any such amounts that are applied to cover amounts paid by the General Partner, the Manager, the Principals, employees of the Manager or their Affiliates that constitute unreimbursed (i) out-of-pocket expenses of such persons incurred in generating such fees, and (ii) Partnership Expenses incurred in generating such fees, and (B) to the extent that the General Partner, the Manager, the Principals or their Affiliates were actually reimbursed by the Partnership for any Partnership Expenses incurred in generating such fees, such fees will first be applied to repay the Partnership for such Partnership Expenses.

"Transaction and Monitoring Fees" means commitment, transaction, closing, merger and acquisition, divestiture, financing, monitoring and similar advisory fees in respect of a Portfolio Company, in each case to the extent actually paid by a Portfolio Company and received by the General Partner, the Manager, the Principals, employees of the Manager or their Affiliates; provided, however, that (A) such fees shall not include, in each case, any such amounts that are applied to cover amounts paid by the General Partner, the Manager, the Principals, employees of the Manager or their Affiliates that constitute unreimbursed (i) out-of-pocket expenses of such persons incurred in generating such fees, and (ii) Partnership Expenses incurred in generating such fees, and (B) to the extent that the General Partner, the Manager, the Principals or their Affiliates were actually reimbursed by the Partnership for any Partnership Expenses incurred in generating such fees, such fees will first be applied to repay the Partnership for such Partnership Expenses.

"Triggering Event" has the meaning set forth in Section 2.2(d).

"Two-Thirds in Interest of the Limited Partners" means Limited Partners with Commitments and limited partners in Parallel Vehicles with capital commitments to Parallel Vehicles totaling more than $66^{2/3}\%$ of the aggregate Commitments of all Limited Partners and capital commitments of limited partners in Parallel Vehicles.

"UBTI" means unrelated business taxable income and unrelated debt financed taxable income, as defined in Sections 512 and 514 of the Code, respectively.

"Unapplied Waived Fee Amounts" means, as of the date of determination, the excess, if any, of (i) the sum of (A) the aggregate Waived Fee Amount for all Management Fee Periods, beginning on or before the date of determination (B) the aggregate amount described in clause (i) of the definition of "Deemed Contribution" relating to the aggregate Capital Contributions previously returned to the Partners pursuant to Section 2.2(c) (including, without limitation, in respect of Bridge Financings) and (C) amounts added to the Unapplied Waived Fee Amounts pursuant to Section 6.5(b) over (ii) the aggregate amount described in clause (i) of the definition of "Deemed Contribution" as of such date.

"Uncapitalized Partnership Expenses" means Partnership Expenses that are not Capitalized Partnership Expenses.

"Unfunded Commitment" means that portion of a Partner's Commitment that is not a Funded Commitment.

"Waived Fee Amount" has the meaning set forth in Section 4.1(d).

"Waived Fee Notice" has the meaning set forth in Section 4.1(d).

"Waiver Contribution" has the meaning set forth in Section 2.2(a)(ii).

Section 2.2  Capital Contribution Commitment; Key Person Provision.  Subject to Section 5.6(b):

(a)    (i)  Each Partner agrees to make contributions in cash to the capital of the Partnership pro rata based upon such Partner's respective Unfunded Commitment in an aggregate amount up to its Unfunded Commitment when and as called by the General Partner ("Capital Call") upon at least ten Business Days written notice (the "Capital Call Notice"); provided, however, that the General Partner shall not be obligated to make Capital Contributions to be used to pay the Management Fee or Placement Fees, and Capital Contributions to pay the Management Fee will be made by each Limited Partner based on the amount of each payment of the Management Fee that is borne by such Limited Partner pursuant to Section 4.1(b).  Any Capital Contributions made by the Limited Partners to pay the Partnership's pro rata share of any Placement Fees shall be made by the Limited Partners whose Commitments gave rise to such fees, pro rata in accordance with their respective Commitments.  The aggregate Commitments and capital commitments to all Parallel Vehicles of the General Partner, the Principals, Highland and their Affiliates, shall be pro rata and shall equal the lesser of 5.0% of aggregate Commitments and capital commitments to all Parallel Vehicles and $50 million.  In the event of the election described in Section 2.2(a)(ii), each Limited Partner required to make a Waiver Contribution pursuant to Section 2.2(a)(ii) shall make the Waiver Contribution specified in the Capital Call Notice.  Each Capital Contribution shall be made by Partners in cash either by delivery to the Partnership of a certified check or wire transfer of immediately available funds to an account designated by the General Partner, provided, however, that the Capital Contributions of the General Partner may be made by cash contributions or by Deemed Contributions as set forth in Section 2.2(a)(ii).

A Capital Call Notice shall: (i) specify the purpose for which the Capital Contributions are required to be made (including a breakdown of the amounts called in respect of Portfolio Investments, Partnership Expenses, Organizational Expenses, Management Fees or Placement Fees); (ii) in the case of a Capital Call Notice with respect to the anticipated making of a Portfolio Investment, include: (A) a brief description of the identity, nature and business of such Portfolio Investment; (B) a statement as to whether the Portfolio Investment might be structured through a Separate Investment Entity; (C) a designation as such of any Bridge Financing to be made as part of such Portfolio Investment, and (D) a statement as to whether the Portfolio Investment is an investment in a Media Company or could, in the reasonable judgment of the General Partner, cause a Limited Partner to recognize UBTI; and (iii) specify a Limited Partner's

pro rata share of the Capital Contributions required to be made by such Limited Partner, the portion of the Capital Contribution to be applied towards the payment of Management Fees, and the amount of a Limited Partner's Unfunded Commitment remaining following the funding of such Capital Contribution.

(ii)    Notwithstanding Section 2.2(a)(i) above, at such time as the General Partner delivers any Capital Call Notice, the General Partner's required Capital Contributions in respect of anticipated or actual Portfolio Investment and/or expenses incurred directly in connection with the making, maintaining or disposing of such Portfolio Investment, at the General Partner's election, shall be reduced by an amount up to the lesser of (A) the amount of Capital Contributions otherwise required to be made by the General Partner pursuant to Section 2.2(a)(i), or (B) the amount of any existing Unapplied Waived Fee Amounts, and such amount shall instead be funded by the Participating Partners with respect to whom the Management Fee is payable pursuant to Section 4.1(b), pro rata according to their respective Commitments (for any Partner, a "Waiver Contribution"). If, as of any date, the aggregate amounts described in clause (i) of the definition of "Deemed Contribution" exceed the sum of the amounts described in clause (i) of the definition of "Unapplied Waived Fee Amounts," the General Partner shall, within ten Business Days after such date, make a Capital Contribution equal to the amount of such excess. Such amount shall be distributed to the Partners as a return of their Capital Contributions, in proportion to their respective Waiver Contributions. Corresponding adjustments shall be made to the Special Profits Interest.

(b)    Each Partner's Commitment will commence on the date of the First Closing and will expire on the earlier of (i) five years from the Final Closing, (ii) the date after the second anniversary of the Final Closing on which the Commitment Period is terminated with the consent of Seventy-Five Percent in Interest of the Limited Partners, (iii) the date on which the General Partner determines that 90% of the aggregate Commitments of the Partners have been funded or are needed for purposes described in clauses (i) through (iii) of the next sentence below, or (iv) the date that the Commitment Period is terminated pursuant to Section 2.2(d), (such period being referred to as the "Commitment Period"). Notwithstanding the expiration or the termination of the Commitment Period, the Partners will remain obligated to make cash contributions throughout the duration of the Partnership pursuant to their respective Unfunded Commitments to the extent needed (i) to make Follow-on Investments; provided, however, that the aggregate of all Follow-on Investments made after the termination of the Commitment Period shall not exceed 15% of the aggregate Commitments, (ii) to make investments that were the subject of written agreements in process or under active consideration prior to or on the date of termination of the Commitment Period and which are consummated within 120 days of the date of termination of the Commitment Period, subject to extension, if necessary, in order to obtain requisite regulatory approvals, and (iii) to pay Partnership Expenses and the Management Fee. The General Partner shall notify the Limited Partners within 30 days of the termination of the Commitment Period as to all in process investments that were the subject of written agreements in process and investments under active consideration to the extent the General Partner is not bound by confidentiality obligations related thereto.

(c)    The General Partner shall cause the Partnership to return to the Partners all or any portion of any Capital Contribution to the Partnership which is not invested in a Portfolio Investment or used to pay Partnership Expenses, Management Fees, Placement Fees or

Organizational Expenses or which has been contributed in order to fund a Bridge Financing which is refinanced. Each such return of Capital Contributions shall be made pro rata among all Partners in the same proportion as the Partners made such Capital Contributions and shall be made on or before the sixtieth (60th) day following the date such Capital Contributions were due (as set forth in the Capital Call Notice pursuant to which such Capital Contributions were made by the Partners to the Partnership), provided, however, that such Capital Contributions may be retained and applied with respect to another outstanding Capital Call Notice and may also be retained if the General Partner determines in good faith that there will be a Capital Call within thirty (30) days after the date that such Capital Contributions would otherwise be required to be returned, and if not so applied and retained, may be called again by the General Partner according to the provisions of this Section 2.2 as if such returned Capital Contributions had not been previously called.

(d)    If:

(i)    James Dondero and Mark Okada both cease to be actively involved, including in a supervisory role, on an ongoing basis with respect to the business, operations or investment decisions of Highland, the Manager and General Partner,

(ii)    the Keyman Group, together with the Principals as of the Final Closing and Permitted GP Transferees thereof, are no longer entitled to receive, directly or indirectly, in the aggregate at least 50% of the Carried Interest (as defined in the Master Partnership Agreement) payable to the General Partner, or

(iii)    any two or more of the members of the Keyman Group cease to be actively involved, including in a supervisory role, on an ongoing basis with respect to the business, operations or investment decisions of Highland, the Manager and General Partner,

(the circumstances specified in each of clauses (i), (ii), and (iii), above being referred to herein as a "Triggering Event"), then the Partnership shall automatically enter into a 120 day period (subject to extension for an additional 120 day period as described below) in which the Commitment Period will be suspended (a "Continuity Period").

The Partnership shall not make any new investments during the Continuity Period, except to the extent such investments (a) were the subject of written agreements, (b) were in process or (c) under active consideration prior to the commencement of the Continuity Period, and in each such case, are consummated within 120 days of the commencement of the Continuity Period, subject to extension, if necessary, in order to obtain requisite regulatory approvals for such investments. The pursuit of Other Permitted Investment Activities by the Principals and the members of the Keyman Group will not give rise to a Triggering Event. The General Partner will promptly notify the Limited Partners of the occurrence of a Triggering Event.

During a Continuity Period, if a Triggering Event described in clause (i) above has occurred, the General Partner, after consultation with the Advisory Committee, will prepare for and provide to the Limited Partners within 60 days of the Triggering Event a program recommended by the General Partner for resumption by the Partnership of its full range of activities at the end of such Continuity Period. Prior to the end of the Continuity Period, but

17461908                                        -20-

Appx. 04040

within a reasonable time period following the delivery of a program recommended by the General Partner, the General Partner will arrange for a vote of all Limited Partners. By consent of Two-Thirds in Interest of the Limited Partners, the Limited Partners may cause an early termination of the Commitment Period, such termination to commence on the date such Continuity Period expires. If a Continuity Period expires without the occurrence of an effective consent of the requisite Limited Partners to terminate the Commitment Period, the Partnership, and the General Partner on its behalf, shall be authorized and entitled to resume the Partnership's full range of activities.

During a Continuity Period, if a Triggering Event described in clauses (ii) or (iii) above has occurred, within 90 days of the Triggering Event the General Partner may propose to the Advisory Committee one or more replacements to serve as members of the Keyman Group for purposes of this Section 2.2(d); if a majority of the members of the Advisory Committee approve of such replacement or replacements, such replacement person or persons shall thereafter be members of the Keyman Group and the Partnership, and the General Partner on its behalf, shall be authorized and entitled to resume the Partnership's full range of activities. If the Advisory Committee does not approve of such replacement person or persons within 30 days following the delivery of the General Partner proposal to the Advisory Committee, the Continuity Period shall be extended for an additional 120 day period. The General Partner may propose to the Advisory Committee, within 90 days after the rejection by the Advisory Committee of the initial replacement person or persons, a different replacement or replacements than originally proposed to serve as members of the Keyman Group for purposes of this Section 2.2(d); if a majority of the members of the Advisory Committee approve of such replacement or replacements within 30 days following delivery of the new General Partner proposal, such replacement person or persons shall thereafter be members of the Keyman Group and the Partnership, and the General Partner on its behalf, shall be authorized and entitled to resume the Partnership's full range of activities. If the Advisory Committee does not approve of such replacement person or persons within such thirty day period, the General Partner will arrange for a vote of all Limited Partners. By consent of Two-Thirds in Interest of the Limited Partners, the Limited Partners may cause an early termination of the Commitment Period, such termination to commence on the date the Continuity Period expires.

Section 2.3 Capital Accounts. A capital account ("Capital Account") will be established for each Partner on the books of the Partnership and will be adjusted as follows:

(a) Capital Contributions and Allocations. A Partner's Capital Contribution will be credited to its Capital Account when received by the Partnership.

(b) Short-Term Investment Income. Short-Term Investment Income earned in each quarterly period with respect to Capital Contributions that have not yet been invested in Portfolio Investments or used to pay fees and expenses of the Partnership will be credited to the Capital Accounts of the Partners pro rata according to their respective Partner Capital Contributions to which such Short-Term Investment Income is attributable. Short-Term Investment Income on undistributed proceeds from Portfolio Investments shall be credited to the Capital Accounts of the Partners ratably in proportion to their respective shares of such undistributed amounts.

Appx. 04041

(c)  <u>Investment Income and Gain and Investment Loss</u>.  Taking into account <u>Section 6.6(d)</u> and except as otherwise provided in this <u>Section 2.3(c)</u>, Investment Income and Gain or Investment Loss shall be allocated among the Partners for each taxable period in such a manner that, as of the end of such taxable period, and to the extent possible, the Capital Account of each Partner shall be equal to the net amount, positive or negative, which would be distributed to each Partner or for which such Partner would be liable to the Partnership under this Agreement (including <u>Sections 8.3(c)</u> and <u>(e)</u>), determined as if the Partnership were to liquidate the assets of the Partnership for an amount equal to their Basis, reduced, but not below zero, by the amount of nonrecourse debt, if any, to which such Partnership assets are subject, and distribute the proceeds in liquidation after the payment of all liabilities (other than nonrecourse liabilities) in accordance with <u>Sections 3.2</u> and <u>3.3</u>.  For purposes of the foregoing determination, no amount shall be treated as distributable pursuant to <u>subclause (z)</u> of <u>clause (A)</u> of <u>Section 3.3(a)(i)</u> by virtue of <u>clause (a)(ii)</u> of the definition of Preference Base or <u>clause (B)</u> of <u>Section 3.3(a)(i)</u> with respect to any Portfolio Investment or portion thereof solely because of the deemed liquidation of such Portfolio Investment; <u>provided</u>, <u>however</u>, that any increase in the Basis of a Portfolio Investment shall be taken into account for this purpose in the same manner as proceeds of a Partial Realization.  Investment Income and Gain or Investment Loss attributable to Portfolio Investments retained by the Partnership pursuant to <u>Section 3.3(e)(ii)</u> shall be allocated 100% to the General Partner.

(d)  <u>Organizational Expenses, Management Fee</u>.  Organizational Expenses that are borne by the Partnership will be apportioned to the Partners <u>pro rata</u> according to their respective Capital Contributions to pay Organizational Expenses.  Organizational Expenses that are described in Section 705(a)(2)(B) of the Code will be debited against the Capital Accounts of the Partners in the fiscal period in which they are incurred, and Organizational Expenses that are described in Section 709(b) of the Code will be debited against the Capital Accounts of the Partners over a 180-month period.  The Management Fee for any Management Fee Period shall be debited against the Capital Account of each Limited Partner in the amount that is borne by such Limited Partner pursuant to <u>Section 4.1(b)</u> for such Management Fee Period.

(e)  <u>Distributions</u>.  Any amounts distributed to the Partners will be debited against their Capital Accounts.

(f)  <u>Partnership Expenses</u>.  Uncapitalized Partnership Expenses shall be debited against the Capital Accounts of the Partners in proportion to their respective Commitments.

(g)  <u>Placement Fees</u>.  Placement Fees, shall be debited against the Capital Accounts of the Limited Partners whose Commitments gave rise to such fees, in proportion to their respective Commitments.

Section 2.4  <u>Distributions in Kind</u>.

(a)  If any securities are to be distributed in kind to the Partners as provided in <u>Article III</u>, such securities will first be written up or down to their value (as determined pursuant to <u>Article IX</u> as of the date of such distribution), thus creating Investment Income or Gain or Investment Loss, which shall be allocated in accordance with <u>Section 2.3</u> to the Capital Accounts of the Partners, and upon the distribution (or deemed distribution pursuant to <u>Section 2.4(b)</u>) of

-22-

such securities to the Partners, the value of such securities shall be debited, in accordance with Section 2.3(e), against the Capital Accounts of the Partners.

(b)     The General Partner shall give at least ten Business Days prior notice to the Limited Partners of any proposed distribution of securities pursuant to this Section 2.4 and the date of such proposed distribution. In connection with any distribution of securities in kind, the General Partner shall offer each Limited Partner the right to elect to receive a distribution of securities or to have the Partnership dispose of all or any portion of such securities for the account of such Limited Partner. At the election of a Limited Partner (an "Electing Limited Partner"), all distributions of securities that otherwise would be made to the Electing Limited Partner by the Partnership shall be made, as determined by the General Partner, to the General Partner or an independent escrow agent or custodian as agent for the Limited Partner (the "Agent") and, unless otherwise specified in writing, an Electing Limited Partner shall be deemed to have chosen to have the Partnership sell its share of securities in full. An Electing Limited Partner shall bear all expenses (including, without limitation, underwriting costs and brokerage commissions) relating to the sale by the Partnership of such securities. The General Partner may require the Electing Limited Partner to make any representations, warranties and covenants as the General Partner shall reasonably determine are necessary or desirable in order to dispose of the securities. For all purposes of this Agreement, the Limited Partner shall be deemed to have received such distribution of securities on the date that such securities are delivered to the Agent. Immediately following a distribution to the Agent pursuant to this Section 2.4(b), the General Partner shall notify the Limited Partner of the type and quantity of securities distributed. The Agent shall thereafter hold such securities for a period of 10 Business Days following which the Agent shall use its reasonable efforts to promptly sell such securities and deliver the net proceeds therefrom to the Limited Partner; provided, however, that the Agent shall not sell such securities and shall instead promptly deliver such securities to the Limited Partner following the conclusion of such 10 Business Day period if, prior to the conclusion of such period, the Limited Partner notifies the Agent that the receipt of such securities would not violate any law, regulation or governmental order applicable to the Limited Partner. The Agent shall use good faith efforts in selling such securities at the highest available price, but shall not be liable to an Electing Limited Partner in any manner in connection with such sale in the absence of gross negligence or willful misconduct, including for any claim that the Agent was unable to effect any such sale (for any reason) or failed to obtain the highest possible sale price for such securities.

(c)     An Electing Limited Partner's election pursuant to Section 2.4(b) may be revoked by the Electing Limited Partner at any time upon notice to the General Partner; provided, however, that an election may not be revoked with respect to securities if the Agent has entered into a binding commitment to sell securities on behalf of the Electing Limited Partner.

Section 2.5 Determination of Voting Thresholds. Any vote, approval or consent that is to be based upon a specified proportion of the interests in the Partnership held by the limited partners shall be based upon the Limited Partners' Commitments and the capital commitments of limited partners in Parallel Vehicles, excluding (i) except as specifically provided in Section 6.9, that portion of each Limited Partner's Commitment and the capital commitment of each limited partner in a Parallel Vehicle that represents a Non-Voting Interest, (ii) except as otherwise set forth in Section 12.1(b), limited partner interests in the Partnership or in any Parallel Vehicle held by a Defaulting Partner or a defaulting partner of a Parallel Vehicle, (iii) limited partner

interests in the Partnership or in any Parallel Vehicle held, directly or indirectly, by the General Partner, Highland, the Principals or any of their respective Affiliates prior to any removal of the General Partner pursuant to Section 5.9, and (iv) in the case of any particular matter that affects or pertains only to the Partners and not to any partner of a Parallel Vehicle, limited partner interests in such Parallel Vehicle held, directly or indirectly, by the General Partner or by any limited partner of such Parallel Vehicle.

## ARTICLE III

### DISTRIBUTIONS

Section 3.1 Distribution Policy.

(a)     The General Partner may in its sole discretion make distributions of cash or Marketable Securities at any time and from time to time subject to the remaining provisions of this Section 3.1; provided, however, that no securities will be distributed in kind to the Partners that are not Marketable Securities until the final distribution of the assets of the Partnership to the Partners pursuant to Section 8.3(b).

(b)     The General Partner will cause the Partnership to distribute (i) Current Cash Income at least semi-annually unless reinvested as described in this Section 3.1(b), (ii) Short-Term Investment Income at least quarterly, and (iii) the net cash proceeds received from Dispositions of or Partial Realizations with respect to Portfolio Investments within 60 days of the receipt thereof unless reinvested as described in this Section 3.1(b), after, in each case, the setting aside by the General Partner, in its discretion, of reasonable reserves for anticipated obligations and commitments of the Partnership as well as any required tax withholdings; provided, however, that if the General Partner determines in good faith that there will be a Capital Call within 30 days after the date that an amount that would otherwise be distributed that would be described in clauses (a), (b) and (d) of the definition of Funded Commitment, or if there is an outstanding Capital Call Notice the General Partner may, in its discretion, retain such amount and reduce the amount required to be contributed with respect to such Capital Call.

Section 3.2 Distribution of Short-Term Investment Income.  Short-Term Investment Income will be distributed among the Partners in the same proportions as Short-Term Investment Income was credited to the Partners' Capital Accounts.

Section 3.3 Distributions of Current Cash Income and Proceeds From Dispositions of or Partial Realizations with Respect to Investments and In Kind Distributions.

(a)     Distributions not attributable to a Portfolio Investment shall be distributed to the Partners in proportion to their Funded Commitments as of the date of such distribution.  All distributions of Current Cash Income and all distributions out of net proceeds from Dispositions of or Partial Realizations with respect to Portfolio Investments (in each case, net of Partnership Expenses) and all distributions of Portfolio Investments shall be apportioned in proportion to their respective Partner Interests among the General Partner and the Participating Partners with respect to the Portfolio Investment that gave rise to such Current Cash Income or net proceeds or

17461908                                           -24-

that is being distributed in kind. The General Partner's Partner Share of such distributions shall be distributed 100% to the General Partner. Each Participating Partner's Partner Share shall be distributed to such Participating Partner and the General Partner as follows:

(i)    First, 100% to such Participating Partner until (A) the aggregate amount distributed to such Participating Partner in accordance with this Section 3.3(a) equals such Participating Partner's Preference Base as of the date of such distribution and (B) the aggregate amount distributed to such Participating Partner in accordance with this Section 3.3(a) (other than clause (A) of this paragraph) equals such Participating Partner's Preferred Amount as of such date. Solely for purposes of determining how proceeds of a Disposition of a Portfolio Investment are to be distributed pursuant to this Section 3.3(a) no proceeds of Partial Realizations with respect to Portfolio Investments or portions thereof that have not been Disposed of as of such date shall be taken into account, other than Excess Partial Realization Proceeds realized as of such date.

(ii)    Second, (A) 50% to the General Partner and (B) 50% to such Participating Partner until the aggregate distributions to the General Partner with respect to such Participating Partner pursuant to this paragraph (ii) and paragraph (iii), reduced by any amounts contributed to the Partnership by the General Partner with respect to such Participating Partner pursuant to Section 8.3(c), equal 20% of the aggregate distributions of such Participating Partner's Partner Share of such amounts to the General Partner, reduced by any amounts contributed to the Partnership by the General Partner with respect to such Participating Partner pursuant to Section 8.3(c), and to such Participating Partner pursuant to this paragraph (ii) and paragraph (iii), and clause (B) of the immediately preceding paragraph.

(iii)    Third, (A) 80% to such Participating Partner and (B) 20% to the General Partner.

For purposes of this Section 3.3(a), amounts distributed to a Participating Partner pursuant to Section 8.3(c) shall be treated as having been distributed pursuant to this Section 3.3(a).

(b)    Anything contained herein to the contrary notwithstanding, the General Partner shall be entitled to receive cash distributions from the Partnership (after taking into account any other distributions received by the General Partner in such fiscal year pursuant to Sections 3.3(a)(ii)(A) and 3.3(a)(iii)(B)) in amounts sufficient to enable the General Partner and the individual members of the General Partner to discharge any federal, state and local tax liability (excluding penalties) arising as a result of the allocation of Investment Income and Gain pursuant to Section 2.3(c) attributable to the General Partner's Carried Interest in the Partnership, determined by assuming the applicability of the highest combined effective marginal federal, state and local income tax rates applicable to an individual resident in New York, New York. The amount of such tax liability shall be calculated taking into account (i) the deductibility (to the extent allowed) of state and local income taxes for United States Federal income tax purposes, (ii) the amount of net cumulative tax loss previously allocated to the General Partner in prior fiscal years with respect to the Carried Interest and not used in prior fiscal years to reduce taxable income for the purpose of making distributions under this subsection (b) and (iii) the character of any income or gain and the income tax rates applicable thereto. The calculation shall be made on the assumption that taxable income or tax loss from the Partnership with

Appx. 04045

respect to the Carried Interest is the General Partner's only taxable income or tax loss. Such distributions shall be debited to the General Partner's Capital Account, as provided in Section 2.3(e). Any amounts distributed pursuant to this subsection (b) shall be considered an advance against the next distribution of Carried Interest distributable to the General Partner, and shall offset such distributions.

(c)    A Partner's Capital Contributions used to pay Organizational Expenses, Management Fees, Placement Fees and Uncapitalized Partnership Expenses that are to be allocated to a Portfolio Investment shall be determined on the date such Portfolio Investment is Disposed of, and shall equal the product of (i) such Capital Contributions not theretofore allocated to Portfolio Investments that have been Disposed of multiplied by (ii) a fraction, the numerator of which shall equal such Partner's Capital Contributions in respect of such Portfolio Investment and the denominator of which shall equal such Partner's Capital Contributions in respect of such Portfolio Investment and all Portfolio Investments that have not been Disposed of on or prior to the date such allocation is effected. For purposes of the determinations described in clause (b)(i) of the definition of Excess Partial Realization Proceeds, such Capital Contributions shall be tentatively allocated to the Portfolio Investment giving rise to such Partial Realization proceeds as though such Portfolio Investment had been Disposed of on the date such proceeds were realized.

(d)    In the event of a partial Disposition of a Portfolio Investment, the unreturned Capital Contributions and remaining Preferred Amount with respect to such Portfolio Investment shall be allocated between the Disposed portion and retained portion of such Portfolio Investment, pro rata, based on the relative amounts that are Disposed of and retained, respectively, of that portion of such Portfolio Investment held by the Partnership immediately prior to such Disposition.

(e)    (i)    Notwithstanding anything in this Agreement to the contrary, the General Partner may at any time elect not to receive all or any portion of any distribution that otherwise would be made to it with respect to its Carried Interest.

(ii)    Any amount of cash which is not distributed to the General Partner pursuant to Section 3.3(e)(i) shall, in the General Partner's sole discretion, either be retained by the Partnership or distributed to the Partners (other than to the General Partner) in accordance with Section 3.3(a). Any amount of securities not distributed in-kind to the General Partner pursuant to Section 3.3(e)(i) shall be retained by the Partnership.

(iii)    If the General Partner elects to distribute cash to the other Partners pursuant to Section 3.3(e)(ii), 100% of any or all subsequent cash distributions by the Partnership shall be distributed to the General Partner until the General Partner has received the same aggregate amount of cash distributions it would have received had it not waived receipt of certain distributions pursuant to Section 3.3(e)(i) (without regard to the distribution of any Short-Term Investment Income earned on such retained amounts).

(iv)    All Current Cash Income attributable to, and distributions out of net proceeds from the Disposition or Partial Realization of, Portfolio Investments retained by the Partnership pursuant to Section 3.3(e)(ii) and all cash retained by the Partnership pursuant to

17461908                                   -26-

Appx. 04046

Section 3.3(e)(ii) shall be distributed to the General Partner as of the date determined by the General Partner in its sole discretion. The General Partner shall not be entitled to any additional distributions in respect of such retained amounts, other than Short-Term Investment Income earned on such retained amounts.

(f) Notwithstanding anything to the contrary in this Agreement, if at the expiration of the Commitment Period, there are Unapplied Waived Fee Amounts, the General Partner shall, in its sole discretion, prior to any other distribution pursuant to this Article III, be entitled to a distribution of cash equal to the Unapplied Waived Fee Amount.

Section 3.4 Foreign Taxes. The amount of any foreign taxes paid by the Partnership (or by an entity in which the Partnership holds an interest, either directly or indirectly through one or more such entities, that is treated as a partnership or is disregarded for federal income tax purposes) or withheld from receipts of the Partnership or such entity from a Portfolio Investment shall be allocated among the Partners as reasonably determined by the General Partner (taking into account any allocation of taxes under Section 6.7) and, for purposes of Sections 3.3(a)(i) – (iii), shall be deemed to have been distributed to each Partner as Current Cash Income or proceeds from the Disposition of a Portfolio Investment to the extent that the payment or withholding of such foreign taxes reduced Current Cash Income or the proceeds from the Disposition of a Portfolio Investment, as the case may be, otherwise distributable to such Partner as provided herein (for this purpose taking into account with respect to each Partner any reduction in such foreign taxes that occurs by reason of such Partner's status); provided that the General Partner may deem foreign taxes paid by or withheld from receipts of the Partnership and allocable to a Tax Exempt Partner to have been distributed to such Tax Exempt Partner as described above only to the extent that such Tax Exempt Partner incurs and is subject to tax on UBTI relating to such Tax Exempt Partner's Interest in the Partnership, as determined by the General Partner.

# ARTICLE IV

# MANAGEMENT FEE AND ORGANIZATIONAL EXPENSES

Section 4.1 Management Fee.

(a) During each quarterly period beginning on each January 1, April 1, July 1 and October 1 from and after the First Closing (each such quarterly period, a "Management Fee Period") until the termination of the Partnership, the Partnership will pay the Manager a quarterly fee as calculated below (the "Management Fee"), in advance on each January 1, April 1, July 1 and October 1, as compensation for managing the affairs of the Partnership, provided, however, that the initial payment of the Management Fee shall be for the period from the First Closing to December 31, 2007.

(b) The Management Fee payable by the Partnership shall be the sum of the amounts determined for each Limited Partner pursuant to this Section 4.1. No Management Fee shall be payable with respect to the General Partner and their Affiliates. Subject to Sections 4.1(c) and 4.1(d), the quarterly Management Fee payable with respect to a Limited Partner during the Initial

Appx. 04047

Fee Period shall be 0.4375% of the Commitments of such Limited Partner resulting in an aggregate annual Management Fee of 1.75%. Following the expiration of the Initial Fee Period, the quarterly Management Fee payable with respect to a Limited Partner shall be 0.4375% of the aggregate Net Funded Commitment of such Limited Partner as reduced by any writedowns or writeoffs pursuant to <u>Section 9.4</u> in respect of Portfolio Investments that have not been Disposed of on or prior to such date (resulting in an aggregate annual Management Fee of 1.75%). The Management Fee in any partial quarterly period will be pro rated on a daily basis according to the actual number of days in such period.

 (c) The Management Fee payable with respect to any Management Fee Period and with respect to a Limited Partner will be reduced (but not below zero) by such Limited Partner's Partner Share of eighty-five percent (85%) of the Partnership's <u>pro rata</u> share of all Topping and Break-up Fees, Transaction and Monitoring Fees, and Director Fees. The Management Fee shall also be reduced, but not below zero, by such Limited Partner's Capital Contributions used pursuant to <u>Section 2.2(a)(i)</u> to pay (x) any Placement Fees and (y) any Organizational Expenses in excess of $1,250,000, paid or payable by the Partnership. To the extent that such Limited Partner's share of the Management Fee in any Management Fee Period is reduced to zero as a result of the reduction for Placement Fees, Organizational Expenses in excess of $1,250,000, Director Fees, Topping and Break-up Fees and Transaction and Monitoring Fees, the excess shall be carried forward to the next Management Fee Period (and, if necessary, to one or more subsequent Management Fee Periods) and applied as a reduction of the Management Fee, but not below zero, for such succeeding Management Fee Period (or a subsequent Management Fee Period). To the extent that Director Fees, Topping and Break Up Fees and Transaction and Monitoring Fees exceed or cannot be applied as a reduction of Management Fees for succeeding Management Fee Periods, then such excess will first be applied to reimburse the Partnership for any previously unreimbursed Management Fees paid by the Partnership for prior Management Fee Periods (with such amounts being treated for purposes of <u>Section 3.3(a)</u> as distributions in return of the Capital Contributions made to pay such Management Fees), and the remainder of such excess will be paid or contributed to the Partnership and will be distributed pursuant to <u>Section 3.3(a)</u> as if net proceeds from the Disposition of a Portfolio Investment; <u>provided, however,</u> that in the event that any Partner desires not to receive any such excess fee offsets upon the termination of the Partnership, such Partner may elect in writing at any time prior to the termination of the Partnership to waive receipt of any such fee offsets, in which case the amount of fee offsets that would otherwise have been allocated and distributed to such Partner shall instead be allocated and distributed to the other non-waiving Partners on a <u>pro rata</u> basis in accordance with their respective Commitments. The Partnership's <u>pro rata</u> share of all Topping and Break-up Fees, Transaction and Monitoring Fees and Director Fees shall be the amount of such fees multiplied by a fraction, the numerator of which is the Partnership's investment in the Portfolio Investment (or proposed investment in the proposed Portfolio Investment) giving rise to such fee and the denominator of which is the aggregate investment or proposed investment in such Portfolio Investment or proposed Portfolio Investment by the Partnership, all Parallel Vehicles, all Separate Investment Entities, all Co-investment Funds and all other co-investment arrangements arranged by the Manager with respect to such Portfolio Investment or proposed Portfolio Investment (<u>provided,</u> that for the avoidance of doubt, any such Co-Investment Funds or other co-investment arrangements will not receive any amount of fee offsets).

(d)     After taking into account any reduction in the Management Fee payable for any Management Fee Period with respect to a Limited Partner pursuant to Section 4.1(c), the Management Fee payable for any Management Fee Period with respect to such Limited Partner shall be further reduced by an amount (the "Waived Fee Amount") equal to the lesser of (i) the amount of the Management Fee to which the Manager would otherwise be entitled pursuant to this Section 4.1 that the Manager has irrevocably elected to waive in a written notice (a "Waived Fee Notice") delivered to the Partnership with respect to each Management Fee Period, at least 15 days prior to the end of the calendar year immediately preceding the calendar year in which such Management Fee Period begins, and with respect to each Management Fee Period in the first calendar year of the term of the Partnership, such Waived Fee Notice delivered on or prior to the delivery of the first Capital Call Notice in respect of Management Fees and (ii) the amount that would be payable to the Manager on such Management Fee Period pursuant to this Section 4.1 in the absence of this Section 4.1(d). A Limited Partner's share of the Waived Fee Amount for any Management Fee Period is equal to the Waived Fee Amount for such Management Fee Period multiplied by the quotient determined by dividing (i) the Management Fee that would be payable for such Management Fee Period with respect to such Limited Partner in the absence of this Section 4.1(d) by (ii) the total Management Fee that would be payable for such Management Fee Period in the absence of this Section 4.1(d). If the Manager delivers a Waived Fee Notice with respect to any Management Fee Period that begins before the date of the Final Closing, (i) if such Waived Fee Notice specifies that a percentage of the Management Fee otherwise payable for such Management Fee Period be waived, the Manager shall be deemed to have waived a proportionate amount of the Management Fee otherwise payable for such Management Fee Period by all Additional Limited Partners whose subscriptions are accepted after the date of such Waived Fee Notice and (ii) if such Waived Fee Notice specifies that a fixed dollar amount of such Management Fee otherwise payable for such Management Fee Period be waived, the reduction in the Management Fee for such Management Fee Period shall be allocated to all Limited Partners in the same proportion as the Management Fee is borne by the Limited Partners for such Management Fee Period.

(e)     For purposes of Section 4.1(c), a Limited Partner's share of Director Fees and Transaction and Monitoring Fees is equal to the amount of the Partnership's pro rata share of such fees multiplied by the Limited Partner's Partner Interest in the Portfolio Investment to which such Director Fees and Transaction and Monitoring Fees are attributable, and a Limited Partner's share of Topping and Break-up Fees is equal to the amount of such fees multiplied by the proportion of such Limited Partner's Commitment to the Commitments of all Partners on the first day of the Management Fee Period in which such Topping and Break-up Fees are paid.

Section 4.2 Organizational and Partnership Expenses. The Partnership will reimburse the General Partner or the Manager for all Organizational Expenses incurred by the General Partner or the Manager on behalf of the Partnership. The Partnership will pay all Partnership Expenses.

Section 4.3 Ordinary Operating Expenses. The Manager shall pay all ordinary overhead expenses of the Partnership, the General Partner, the Manager, the Separate Investment Entities and the Parallel Vehicles (including salaries, rent, overhead, travel expenses and similar expenses), other than Partnership Expenses, Organizational Expenses and Placement Fees.

Appx. 04049

## ARTICLE V

## GENERAL PARTNER

Section 5.1 <u>Investment Opportunities; Devotion of Time; Management Authority</u>.

(a)      The Principals shall each be actively involved in the business of the Fund Group and shall devote such amount of their business time and attention in order to fulfill their fiduciary duties to the Limited Partners in accordance with the Delaware Partnership Act; <u>provided, however</u>, that the Principals may engage and be involved in Other Permitted Investment Activities.  Subject to the foregoing and to <u>Section 5.12(a)</u> and the Highland Investment Allocation Policy, during the Commitment Period, the General Partner, the Manager and the Principals will present all investment opportunities to the Partnership which they believe in good faith are suitable for the Partnership and fit the investment objective of the Partnership.  However, the Principals and the Manager will not be restricted from pursuing, engaging in and completing acquisitions and investments in, through or by Highland Portfolio Companies in connection with Other Permitted Investment Activities and other investments through other Highland Accounts, in each such case, in accordance with the Highland Investment Allocation Policy.

(b)      Subject to the retention of the Manager, the General Partner will have full control over the business and affairs of the Partnership consistent with its fiduciary duties arising under the Delaware Partnership Act.  The General Partner will have the power on behalf and in the name of the Partnership to carry out any and all of the objects and purposes of the Partnership and to perform all acts and enter into and perform all contracts and other undertakings which, in its sole discretion, are necessary or advisable or incidental thereto, including the power to acquire or dispose of any security (including Marketable Securities).  Notwithstanding the foregoing, the management of the Partnership will vest in the Manager which will provide the Partnership with portfolio management and administrative services, including investigating, analyzing, structuring and negotiating potential investments, monitoring the performance of Portfolio Companies and advising as to disposition opportunities.  In no event shall the Manager, which has been engaged by the Partnership, be treated as an agent or partner of the General Partner.

(c)      Except to the extent otherwise provided in this Agreement, all matters concerning (i) the allocation of Short-Term Investment Income, Current Income, Investment Income and Gain, Investment Loss, Partnership Expenses, Organizational Expenses, Carried Interest, and the distribution of net proceeds and the return of capital among the Partners, including the taxes thereon, (ii) accounting procedures and determinations (including the determination of the Preferred Amount), estimates of the amount of Management Fees or Placement Fees payable by any Defaulting Partner, (iii) the calculation of the Management Fee (including Director Fees, Topping and Break-up Fees and Transaction and Monitoring Fees ), and (iv) the reinvestment of any amounts distributed in respect of a Bridge Financing (or portion thereof) that was sold, refinanced or otherwise disposed of within eighteen (18) months from the Investment Date of such Bridge Financing, shall be determined by the General Partner in accordance with its reasonable interpretation of the provisions of this Agreement made in good faith.

Appx. 04050

Section 5.2  <u>Use of Affiliates</u>.  The General Partner shall retain the services of the Manager and any officers, directors or Affiliates thereof in connection with the operation of the Partnership, and the compensation of the Manager and such persons shall be as provided in <u>Section 4.1</u> hereof; <u>provided</u>, <u>however</u>, that nothing contained in this <u>Section 5.2</u> shall be construed to relieve the General Partner of its responsibilities under this Agreement or the duties and limitations set forth in this <u>Article V</u>.

Section 5.3  <u>Indebtedness</u>.  Subject to <u>Section 5.5</u> and <u>Section 5.4</u>, the Partnership may incur indebtedness consisting of Bridge Leveraging or the issuance of credit support of the obligations of Portfolio Companies or their subsidiaries, which may be in the form of guarantees, letters of credit or pledges of a portion of the Commitments ("<u>Credit Support</u>").  Any such indebtedness will not be considered as Capital Contributions by the Partners unless, until and to the extent the General Partner calls for Capital Contributions in connection therewith pursuant to a Capital Call Notice pursuant to this Agreement.

Section 5.4  <u>Limitation on Investments</u>.

(a)     The Partnership will not invest (including through Credit Support) more than twenty five percent (25%) of the aggregate Commitments in any single Portfolio Company together with any of its Affiliates (valued at original cost).  A Bridge Financing, when added to the amount of permanent investment by the Partnership in the Portfolio Investment that is the subject of the Bridge Financing, may not exceed twenty five percent (25%) of the aggregate Commitments.

(b)     The aggregate amount of Bridge Financings outstanding at any one time shall not exceed fifteen percent (15%) of the aggregate Commitments.

(c)     Subject to <u>Section 5.5</u>, the Partnership may issue Credit Support, which does not at any one time exceed Unfunded Commitments.

(d)     The Partnership shall invest cash in Short-Term Investments.

(e)     The aggregate investments (valued at cost) by the Partnership in Portfolio Companies organized and with principal executive offices outside the United States shall not exceed thirty percent (30%) of the aggregate Commitments.  The Partnership will not invest in Portfolio Companies that are organized or with principal executive offices in countries that are not within the Organization for Economic Cooperation and Development as of the date of the First Closing.

(f)     The Partnership will not invest as a partner or member in any pooled investment fund or "fund of funds" in which an investment adviser or manager of such fund (other than the Partnership) receives management fees or the right to carried interest distributions on the Partnership's investment or interest therein unless the amount of any such management fee is considered part of the Capital Contribution relating to such Portfolio Investment and the amounts distributable to the General Partner under <u>Sections 3.3(a)(ii)</u> and <u>3.3(a)(iii)</u> are reduced by the amount of any carried interest payable to such sponsor or investment manager.

Appx. 04051

(g)    In connection with a Portfolio Investment in any non-U.S. jurisdiction, the General Partner shall obtain an opinion of counsel with respect to such jurisdiction to the effect that (i) no Limited Partner, solely as a result of the Partnership making such investments, will be required either (x) to file an income tax return in such jurisdiction (other than in connection with an application for a refund of withholding or similar taxes) or (y) to pay income tax in such jurisdiction with respect to income not derived from the Partnership, and (ii) no Limited Partner shall be personally liable for any debts or losses of the Partnership in such jurisdiction in excess of such Limited Partner's Unfunded Commitment. The General Partner shall use commercially reasonable efforts to ensure that any opinion obtained pursuant to this Section 5.4(i) will permit the Limited Partners to rely thereon. The General Partner shall ask local counsel to confirm and/or update periodically as it deems necessary any opinion it obtains pursuant to this Section 5.4(i). The Partnership will use commercially reasonable efforts to prepare all tax rebate, reduction or reclaim forms or other filings or elections that are required to obtain any available exemption from, reduction in, or refund of, any withholding or other taxes required in any taxing jurisdiction on behalf of each Limited Partner, for signature by such Limited Partner, and to assist each Limited Partner, at such Limited Partner's expense, to obtain refunds for taxes withheld or paid with respect to such Limited Partner as to which a refund is obtainable. Each Partner agrees that it will cooperate with the General Partner in making any such filings or elections to the extent the General Partner determines that such cooperation is necessary or desirable.

(h)    The Partnership will not invest (including through Credit Support) more than twenty percent (20%) of the aggregate Commitments in Persons that are not Distressed Companies; provided that the General Partner in its good faith discretion believes that an investment in such Persons is consistent with the Partnership's investment objective.

Section 5.5  UBTI; USRPI. The General Partner shall use commercially reasonable efforts not to (i) structure the Fund's Portfolio Investments in a manner that would result in the realization by a Tax Exempt Partner of a substantial amount of UBTI or (ii) cause the Partnership to acquire a Portfolio Investment that the General Partner reasonably believes at the time of such acquisition is or is likely to become a "United States real property interest" ("USRPI") within the meaning of Section 897(c) of the Code. In addition, if the Partnership makes an investment in a pass-through entity that could give rise to UBTI or income effectively connected with a U.S. trade or business, the Partnership may make available a "blocker" structure through which Tax-Exempt and non-U.S. Partners can invest. However, the use of Bridge Leveraging and the use of Director Fees, Topping and Break-up Fees, Transaction and Monitoring Fees and Placement Fees to offset the Management Fee, as described in Section 4.1(c), will not be deemed a violation of this Section 5.5.

Section 5.6  ERISA Matters.

(a)    The General Partner will use reasonable efforts to conduct the affairs and operations of the Partnership in such a manner that the Partnership will qualify as an Operating Company or for another exception from being deemed to hold Plan Assets of any Benefit Plan Investor. As of the initial Capital Contribution date, the General Partner shall deliver to each Benefit Plan Investor either (i) an opinion from the General Partner's counsel to the effect that the Partnership should qualify as an Operating Company as of the initial Capital Contribution

date or (ii) a certificate, based on consultation with the General Partner's counsel, to the effect that the Partnership should qualify for another exemption from being deemed to hold Plan Assets of any Benefit Plan Investor as of the initial Capital Contribution date. Annually thereafter, the General Partner will provide a certificate to Benefit Plan Investors confirming that the Partnership continues to qualify for an exception from being deemed to hold Plan Assets of any Benefit Plan Investor and specifying which exception from Plan Assets is available to the Partnership as of the date of the certificate.

(b)     Notwithstanding Section 2.2, until such time as the General Partner delivers to each Benefit Plan Investor (and the escrow agent, if any) either the opinion or the certificate described above in Section 5.6(a), the initial Capital Contribution required to be made to the Partnership by a Benefit Plan Investor shall, at the request of the General Partner, instead be deposited directly by such Benefit Plan Investor into an escrow account that is intended to comply with Department of Labor Advisory Opinion 95-04A.

(c)     Each Partner that is or will be a Benefit Plan Investor on the Closing Date when it is admitted to the Partnership shall so notify the General Partner in writing prior to such Closing Date. Any Limited Partner which has not indicated in its Subscription Agreement that it is a Benefit Plan Investor hereby represents, warrants and covenants that it is not, it is not acting on behalf of and, so long as it holds an interest in the Partnership, it will not be and will not be acting on behalf of a Benefit Plan Investor.

(d)     It is intended that none of the Partnership, the General Partner, the Manager or any of their Affiliates will act as or be deemed to be a fiduciary under ERISA with respect to any Benefit Plan Investor or the assets of the Partnership; provided, however, that this provision is not intended to negate the fiduciary duties imposed upon a general partner under the Delaware Partnership Act. Notwithstanding any other provision of this Agreement, the General Partner is authorized to take any action or refrain from taking any action which in its judgment is necessary or desirable in order to prevent any Partnership assets from being deemed to constitute Plan Assets of any Benefit Plan Investor.

(e)     Should the General Partner reasonably determine that the continued participation of a Benefit Plan Investor would result in the assets of the Partnership being deemed Plan Assets of such Benefit Plan Investor (a "Plan Asset Event"), the General Partner shall so notify, each of the Benefit Plan Investors in writing within 30 days of such determination. Thereafter, the General Partner shall take reasonable steps to correct or cure the Plan Asset Event and, if the General Partner determines that it is not reasonably likely that the Partnership's Plan Asset Event can be reasonably corrected or cured, taking into account the overall interest of the Partnership, the General Partner shall terminate the Partnership and wind up its affairs in accordance with Sections 8.2 and 8.3. In connection with the foregoing obligation, in addition to any other powers the General Partner may have, the General Partner shall have the authority to take any of the following actions, in its sole discretion: (i) any action necessary or desirable, in the General Partner's reasonable judgment, to cure the Partnership's failure to qualify as an Operating Company, if applicable; (ii) in accordance with the provisions of Section 12.1, amend this Agreement to cure any illegality or other material adverse consequences to the Partnership; (iii) amend, terminate or restructure any then existing or contemplated arrangements with third parties to cure any illegality or other adverse consequences to the Partnership so long as such

action would not have a material adverse effect on the Limited Partners; (iv) redeem any Limited Partner's interest in the Partnership, in whole or in part, in a manner consistent with the procedures in Section 6.6(d); (v) force the sale of all or any portion of any Benefit Plan Investor's interest in the Partnership to one or more Limited Partners at the Redemption Value or (vi) terminate the Partnership and wind up its affairs in accordance with Sections 8.2 and 8.3.

Section 5.7  Conflicts of Interest.

(a)  The Limited Partners hereby acknowledge and agree that the General Partner and its Affiliates currently manage and may in the future manage Highland Accounts that invest in securities that may be eligible for purchase by the Partnership, which presents the potential for conflicts of interest. While the General Partner and the Manager intend to manage potential conflicts of interest, as Highland has in the past, by following certain guidelines, and to avoid where practicable situations involving conflicts of interest in a portfolio company or otherwise, each Limited Partner acknowledges that there may be situations in which the interests of the Partnership in a portfolio company or otherwise may conflict with the interests of other Highland Accounts, the General Partner, the Manager, the Principals or their respective Affiliates. On any matter involving a conflict of interest not otherwise provided for in this Agreement, the General Partner shall be guided by its good faith judgment as to the best interests of the Partnership and shall take such actions as are determined by the General Partner and Highland to be appropriate and in compliance with the Highland Investment Allocation Policy. Each Limited Partner agrees that the activities of any other Highland Account, the General Partner, the Manager, the Principals and their Affiliates, including Other Permitted Investment Activities, authorized by this Agreement or conducted consistently with this Agreement and the Highland Investment Allocation Policy may be engaged in by such other Highland Accounts, the General Partner, the Manager, the Principals and their Affiliates, as the case may be, and will not, in any case or in the aggregate, be deemed a breach of this Agreement or any duty that might be owed by any such person to the Partnership or to any Partner.

(b)  Except as permitted by Sections 5.12(a) and 5.17(a), without the prior approval of either (i) a majority of the members of the Advisory Committee or (ii) a Majority in Interest of the Limited Partners, none of the General Partner, the Manager, the Principals, or any of their respective Affiliates will invest in any securities of any company in which the Partnership either is actively considering making a Portfolio Investment or has an investment; provided, that (x) the foregoing will not apply to Other Permitted Investment Activities or investments made in accordance with the Highland Investment Allocation Policy, (y) each such person will be permitted to hold securities which such person received in a distribution by the Partnership and (z) any Parallel Vehicles or Separate Investment Entities will be permitted to invest in Portfolio Companies in accordance with this Agreement.

(c)  Except as permitted by Sections 5.12(a) and 5.17(a), without the prior approval of either (i) a majority of the members of the Advisory Committee or (ii) a Majority in Interest of the Limited Partners, the Partnership will not invest in any securities issued by, acquire investments from, sell investments to, or enter into any transaction with an entity in which the General Partner, the Manager, the Principals, or their respective Affiliates has a material financial interest in respect of such entity; provided that the foregoing will not apply to (w) Other Permitted Investment Activities, (x) investments by the Partnership in Portfolio Companies in

which the Parallel Vehicles, Separate Investment Entities or Co-Investment Funds invest in accordance with this Agreement; (y) investments by the Partnership in Portfolio Companies in which the General Partner, the Manager, the Principals or their respective Affiliates have a material interest that have been made in accordance with the Highland Investment Allocation Policy, or (z) investments by the Partnership in publicly traded securities of Portfolio Companies in which a Highland Account has a material financial interest that are made on arms length terms at prevailing market prices; provided, further, that the Partnership will not be precluded from investing in securities of a company in which the General Partner, the Manager, the Principals, or their respective Affiliates either (A) in the case of public companies, owns securities issued by such company representing one percent (1%) or less of the outstanding equity securities, or (B) own only securities which such Persons received in a distribution by the Partnership.

(d)      The General Partner will furnish to the Advisory Committee annually at the time annual financial statements of the Partnership are furnished pursuant to Section 10.3(b) a report of each acquisition or investment by the Partnership in Portfolio Companies in which the General Partner, the Manager, the Principals or their respective Affiliates have a material financial interest that have been made in accordance with the Highland Investment Allocation Policy.

Section 5.8 Transfer of General Partnership Interest; No Withdrawal or Loans. The General Partner generally may not sell, assign, pledge, mortgage or otherwise dispose of its General Partner interest in the Partnership; provided, however, that the General Partner may transfer its General Partner interest in the Partnership (or consent to the transfer of an interest in the General Partner) in a derivative transaction if the transferor maintains the economic attributes of the interest and voting control of the interest. The General Partner will not borrow or withdraw any amount from the Partnership or voluntarily withdraw from the Partnership.

Section 5.9 Removal of the General Partner. By consent of Two-Thirds in Interest of the Limited Partners, the General Partner may be removed in the event of (a) the General Partner's or any member of the Keyman Group's conviction of (or plea of nolo contendere to), a material violation of federal or state securities law or a felony criminal violation, (b) the General Partner's adjudication in a final judgment by a court of competent jurisdiction as having committed in respect of the Partnership an act or omission of a material nature involving gross negligence, bad faith, willful misconduct or fraud, or (c) the General Partner's violation of this Agreement which has a material and adverse effect on the Partnership and which remains uncured for 30 days. Notwithstanding the foregoing, if an event described in clause (a) above has occurred and the event relates to a violation or act of a member of the Keyman Group, the Limited Partners may remove the General Partner only if such violation or act (i) relates to the Partnership or a Portfolio Company, (ii) has a material adverse effect on the Partnership, (iii) such member of the Keyman Group is not terminated as a member of the General Partner and the Manager within 45 days, and (iv) such member of the Keyman Group does not cease to own any interest in the future carried interest or voting interests in the General Partner following termination. The General Partner will provide the Limited Partners with written notice of the occurrence of any event described in clauses (a), (b) or (c) above. Concurrently with the removal of the General Partner, the Manager shall be removed as manager of the Partnership unless re-appointed by the successor general partner of the Partnership. Upon removal of the General Partner, the Limited Partners may elect to continue the Partnership and appoint a new duly authorized general partner of the Partnership and all Parallel Vehicles with the consent of all of the Limited Partners of the

Appx. 04055

Partnership and each Parallel Vehicle and such election shall be deemed to have occurred as of the date of the removal of the former General Partner.  In such an event, the former General Partner shall be entitled to receive distributions equal to any amounts it would have been entitled to had the Partnership been dissolved and wound up in accordance with Sections 8.3(a) and (b) and distributed in kind all Partnership assets as of the date of the election of the Limited Partners to continue the Partnership.  The Partnership shall issue an unsecured non-interest bearing promissory note to the former General Partner in the face amount of the liquidating distribution determined in accordance with this Section 5.9, such note to be payable upon the final liquidation of the Partnership.  All such distributions shall be subject to the obligations set forth in Section 8.3(c) and (d); provided, however, that the General Partner's obligation, if any, to fund Commitments in respect of its obligations in Section 8.3(c) relating to such liquidating distribution shall be satisfied by a reduction to the principal amount of the unsecured non-interest bearing promissory note described in this Section 5.9 in the amount of such obligation.  For purposes of determining allocation and distributions pursuant to the preceding sentence, securities and other property held by the Partnership shall be valued pursuant to the procedures set forth in Article IX.

Section 5.10  No Liability to Limited Partners.

(a)    None of the General Partner, the Manager, the Principals or their Affiliates, officers, directors, members, partners, shareholders, employees or agents will be liable to any Limited Partner or to the Partnership for any action taken, or omitted to be taken, as General Partner with respect to the Partnership, or for any action taken, or omitted to be taken, by any member, partner, director, officer, employee or agent of the General Partner or Manager in connection with its activities for or on behalf of the Partnership so long as such person (i) acted in good faith, (ii) acted in a manner reasonably believed to be in the best interests of the Partnership, (iii) was neither grossly negligent nor engaged in willful malfeasance, fraud or reckless disregard of fiduciary duties, (iv) did not materially breach this Agreement, and (v) with respect to any criminal action, such person is not finally determined to be and does not admit to being guilty or enter a plea of nolo contendere (including as part of a settlement) by a court of competent jurisdiction.

(b)    No member of the Advisory Committee, or any Affiliate or employer of any member of the Advisory Committee or any Limited Partner represented on the Advisory Committee by any member (as the case may be) will be liable to any Partner or the Partnership for any action taken, or omitted to be taken, in good faith on behalf of the Advisory Committee (as the case may be) with respect to the Partnership and in accordance with the provisions of this Agreement.

(c)    If any Limited Partner obtains a final judgment in a court of competent jurisdiction against the General Partner for matters relating to the Partnership, the General Partner shall pursue against its members the remedies (if any) that it has against such member relating to such claim.

Section 5.11  Indemnification of General Partner, the Manager and Advisory Committee. (a) The Partnership will indemnify (A) the Principals, the General Partner, the Manager and each of their respective members, partners, shareholders, directors, officers, employees, agents and

Affiliates against any losses, liabilities, damages or expenses (including amounts paid for attorneys' fees, judgments and settlements in connection with any threatened, pending or completed action, suit or proceeding) to which any of such persons may become subject in connection with such person's activities on behalf of the Partnership or in connection with any involvement with a Portfolio Company (including serving as an officer, director, consultant or employee of any Portfolio Company) directly or indirectly on behalf of the Partnership and (B) the members of the Advisory Committee, any Affiliate or employer of any such members and any Limited Partner represented on the Advisory Committee by any member, in connection with any involvement with the Advisory Committee, respectively, but, in the case of members of the Advisory Committee or their Affiliates and employers or any Limited Partner represented on the Advisory Committee by any member, only to the extent that such person acted in good faith and, in the case of the Principals, the General Partner, the manager and each of their respective members, partners, shareholders, directors, officers, employees, agents and Affiliates, only to the extent that such person (i) acted in good faith, (ii) acted in a manner reasonably believed to be in the best interests of the Partnership or the Portfolio Company (as the case may be), (iii) was neither grossly negligent nor engaged in willful malfeasance, fraud or reckless disregard of fiduciary duties, (iv) did not materially breach this Agreement, and (v) with respect to any criminal action, such person is not finally determined to be and does not admit to being guilty or enter a plea of <u>nolo contendere</u> (including as part of a settlement) by a court of competent jurisdiction. Any person described in clause (A) of this <u>Section 5.11(a)</u> entitled to seek indemnification hereunder shall first use reasonable efforts to seek indemnification from other available sources, if any, prior to obtaining indemnification hereunder; <u>provided</u> that any such person may seek and obtain indemnification hereunder if at any time such person reasonably believes that such person will not receive timely indemnification on terms reasonably acceptable to such person from such other sources; and <u>provided, further,</u> that such person shall continue to use reasonable efforts to seek such indemnification from such other sources and, to the extent any such indemnification is obtained, reimburse the Partnership for any such recovery. The Partnership may, in the sole judgment of the General Partner, pay the expenses of any person indemnifiable under this <u>Section 5.11</u> in advance of the final disposition of any proceeding, so long as (w) with respect to any derivative action brought by any Limited Partner, the person receiving the advance is not the subject of such derivative action, (x) the proceeding is not instituted by a Majority in Interest of the Limited Partners against the General Partner or the Manager, (y) General Partner has a good faith belief such expenses are indemnifiable, and (z) the General Partner receives a written undertaking by such person for the benefit of the Partnership to repay the full amount advanced if (A) there is a final determination that such person did not satisfy the standards set forth in <u>clauses (i)</u> through <u>(v)</u> immediately above, (B) with respect to any criminal action, such person is finally determined to be or admits to being guilty or enters a plea of <u>nolo contendere</u> (including as part of a settlement) by a court of competent jurisdiction, or (C) such person is not otherwise entitled to indemnification as provided herein. Notwithstanding the foregoing, no person will be exculpated or exonerated from liability or indemnified against loss for violations of federal or state securities laws, or for any other intentional or criminal wrongdoing. No person shall be indemnifiable under this <u>Section 5.11</u> in respect of losses, liabilities, damages or expenses to which any such person may become subject in connection with (x) such person's activities with any Portfolio Company if such losses arise after the Partnership's final disposition of such Portfolio Company or (y) a dispute among the General Partner, the Manager, their respective members and employees, and the Principals.

17461908
-37-

(b)      No Limited Partner shall have any obligation or liability, including any obligation to make a Capital Contribution to the Partnership, in respect of an indemnity obligation arising from a Portfolio Investment with respect to which such Limited Partner is not a Participating Partner.

(c)      The General Partner will use reasonable efforts to cause each Portfolio Company for which any Affiliate of the General Partner serves as an officer or director to adopt organizational documents which provide mandatory indemnification to directors, officers, and managers to the fullest extent permitted by applicable law.

Section 5.12  Formation of New Fund or Business Endeavor. (a) Subject to the other provisions of this Article V, each Partner's interest in the business endeavors of the other Partners is limited to his, her or its interest in the Partnership and no Partner's future business activities are restricted.  Notwithstanding the foregoing, unless consented to by Two-Thirds in Interest of the Limited Partners or approved by a majority vote of the Advisory Committee, neither the General Partner, nor the Manager or any of their Affiliates will close and make investments, or act as general partner, managing member, advisor, employee, agent, or the primary source of transactions on behalf of another private equity investment vehicle or pooled investment vehicle (other than Crusader, a Parallel Vehicle or Separate Investment Entity) that has primary investment objectives substantially similar to those of the Partnership (a "Successor Fund") until the earlier of (i) the date on which at least 75% of the Commitments have been invested or committed for investment in Portfolio Companies or otherwise set aside for Follow-on Investments, Partnership Expenses or Management Fees, and (ii) the end of the Commitment Period; provided, however, that this Section 5.12 shall not prohibit the formation of one or more Co-investment Funds, and Co-investment Funds shall not be considered Successor Funds.  If a Successor Fund is organized prior to the termination of the Commitment Period of the Partnership, as permitted under the previous sentence, the Successor Fund may only coinvest in investments made by the Partnership alongside the Partnership, on the same terms and conditions in all material respects, with amounts for investment allocated between the Partnership and the Successor Fund, subject to available capital or other investment limitations on the Partnership and the Successor Fund, as determined by the General Partner.  Any Successor Fund will dispose of securities of a Portfolio Company that are of the same class as those purchased by the Partnership at the same time as the Partnership, and on the same economic and other terms.

Section 5.13  Interest as a Limited Partner.  To the extent that the General Partner acquires the interest of a Defaulting Partner or any other Limited Partner, the General Partner will (subject to Section 2.5) be deemed to be a Limited Partner with respect to such interest for all purposes of this Agreement.

Section 5.14  Parallel Vehicles.  The General Partner and the Manager may organize and capitalize Parallel Vehicles for purposes of facilitating investments in Portfolio Companies by non-U.S. investors and certain accredited investors that are not qualified purchasers (as defined in the Investment Company Act) in the Fund Group.  If any Parallel Vehicles are organized, then the Partnership and each Parallel Vehicle (a) will invest in each Portfolio Company in direct proportion to their respective available capital commitments so that the Partnership will invest in each Portfolio Company an amount equal to the total investment by the Partnership and any Parallel Vehicle multiplied by a fraction, the numerator of which is the aggregate Commitments,

17461908                                        -38-

and the denominator of which is the sum of the aggregate Commitments plus the aggregate capital commitments by investors in the Parallel Vehicles, provided that such proportion may be modified by the General Partner with the prior approval of the Advisory Committee or a Majority in Interest of the Limited Partners in order to reflect the available commitments and any tax, regulatory or other legal aspects of any Parallel Vehicle and its investors and (b) invest in and dispose of Portfolio Company at the same time and on effectively the same economic terms and conditions. Any item of income, fees, reimbursement or expense that relates to a Portfolio Company in which the Partnership and one or more Parallel Vehicles are investors or to a potential investment that is considered on behalf of the Partnership and any Parallel Vehicles by the General Partner, the Manager or the general partners or managers of any Parallel Vehicles shall, to the extent that any such item is not directly attributable to the Partnership or a Parallel Vehicle, be pro rated among the Partnership and the Parallel Vehicles based on their respective investments in such Portfolio Company or the portions of such potential investment that would have been made available to the Partnership in accordance with the preceding sentence, as applicable. Organizational Expenses shall be borne by the Partnership and each Parallel Vehicle in proportion to their respective aggregate capital commitments, except the Partnership and each Parallel Vehicle shall separately bear the Organizational Expenses that are directly attributed to each such entity. Each Parallel Vehicle shall reimburse the Partnership for such Parallel Vehicle's share of Organizational Expenses that were paid by the Partnership. Investments in Parallel Vehicles by investors shall be on substantially the same terms and conditions as investments in the Partnership by Limited Partners. For the avoidance of doubt, all references to Portfolio Investments shall include investments made by the Partnership, all Parallel Vehicles and all Separate Investment Entities. To the extent that this Agreement provides that the Limited Partners shall vote together with the investors of any Parallel Vehicle, the General Partner agrees (i) that the relevant documentation of any such Parallel Vehicle shall contain comparable voting provisions to the extent applicable, (ii) that any combined vote of the Limited Partners and the investors in any Parallel Vehicle on any such matter for the purposes of this Agreement shall constitute a combined vote on the matter for the purposes of the Parallel Vehicles, and (iii) each such matter shall, if approved by such vote, be equally applicable to the Partnership and all Parallel Vehicles.

Section 5.15  Separate Investment Entities. If the General Partner determines for legal, tax, regulatory or other reasons, in its sole discretion that it is in the best interests of the Partners to invest in one or more Portfolio Companies through an entity other than the Partnership, such investment or investments shall not be made by the Partnership but shall instead be made, either in lieu of or in conjunction with, the Partnership, by one or more limited partnerships, limited liability companies, corporations or similar entities (each a "Separate Investment Entity") owned in the aggregate by all of the Partners and managed by the General Partner or an Affiliate thereof controlled by the Principals. Each Separate Investment Entity shall receive an opinion of counsel for the benefit of the Limited Partners (x) regarding its classification for United States Federal income tax purposes and the limited liability of the Separate Investment Entity and (y) to the effect that no Limited Partner shall be personally liable for any debts or losses of the Separate Investment Entity in such jurisdiction in excess of such Limited Partner's Unfunded Commitment. The Partnership and each Separate Investment Entity will invest in and dispose of Portfolio Investments at the same time and on effectively the same economic terms and conditions. To the extent that Benefit Plan Investors participate in a Separate Investment Entity, such Separate Investment Entity shall be (i) structured so that it will not be deemed to hold Plan

-39-

Assets and shall provide the same ERISA protections to those Benefit Plan Investors that are provided under this Agreement, and (ii) established on substantially the same terms and conditions in all material respects as Partners are required to make Capital Contributions to the Partnership, and such capital contributions shall be deemed to reduce the Unfunded Commitment of each Partner to the same extent that it would be reduced if made to the Partnership.  The provisions and economic terms of each such Separate Investment Entity shall be substantially the same in all material respects as those of the Partnership, except to the extent such terms are required to differ from the economic and other material arrangements reflected in the terms of this Agreement in order to accomplish the purposes of such Separate Investment Entity (including, for example, different economic treatment of different Partners resulting solely from the consequences of a structure created to minimize the amount of UBTI recognized by a Tax Exempt Partner).  The gains and losses of any such Separate Investment Entity shall be treated as having been realized by the Partnership for all economic calculations under this Agreement (including, without limitation, the calculation of the General Partner give back obligation pursuant to Section 8.3(c)), and there will be no duplication of management fees or Carried Interest.  The Partners having interests in the Separate Investment Entity (including the General Partner and its Affiliates with respect to their Commitments as Partners) shall contribute to each Separate Investment Entity the amounts required to fund such Separate Investment Entity, with each such Partner contributing its pro rata portion of such amounts (based on the relative Unfunded Commitments of the Partners as of the date of such contributions) up to such Partner's remaining Unfunded Commitment and such amounts will reduce such Partner's Unfunded Commitment.  Each Limited Partner hereby agrees and consents to the formation of each Separate Investment Entity and hereby covenants and agrees that it will execute and deliver any agreements, documents and certificates as reasonably necessary for, or incidental to, the formation and continuation of each such Separate Investment Entity and its participation as a limited partner, member or participant in each such Separate Investment Entity established in accordance with this Section 5.15.

Section 5.16  Media Company Investments.

(a)    In the event and for so long as, and only during periods from time to time in which, the Partnership shall directly or indirectly hold (or otherwise have attributed to it) an ownership or other interest in a Media Company that is "attributed" to the Partnership under the rules and regulations of the FCC relating to the particular FCC service in which the Media Company operates, no Limited Partner (an "Insulated Partner"), or any person that is a director, officer, equivalent non-corporate official, partner, member or 5% or greater shareholder or other direct or indirect owner of an Insulated Partner such that the ownership interests of the Insulated Partner, are "attributed" to such owner, director, officer, equivalent non-corporate officer, partner or member (an "Insulated Partner Affiliate"), to the extent reasonably determined by the General Partner (with the advice of GP's Counsel) to be necessary to have such ownership or interest not be attributable to the Limited Partners for purposes of the FCC Attribution Rules and the Ownership Rules, shall do any of the following:

(i)    act as an employee of the Partnership or any Media Company if such Insulated Partner's or Insulated Partner Affiliate's functions, directly or indirectly, relate to the media or common carrier enterprises of the Partnership or any Media Company;

(ii)     serve, in any material capacity, as an independent contractor or agent of the Partnership or any Media Company with respect to the media or common carrier enterprises of the Partnership or any such Media Company;

(iii)     communicate with the General Partner or any Portfolio Company on matters pertaining to the day-to-day operations of any Media Company;

(iv)     to the extent Partners have the power under this Agreement to admit additional General Partners, vote to admit any additional General Partner to the Partnership unless such addition is subject to the veto of the General Partner;

(v)     to the extent Partners have the power under this Agreement, except as permitted under Sections 5.9 and 8.2, vote on the removal of the General Partner;

(vi)     perform any services for the Partnership or any Media Company materially relating to the media or common carrier enterprises of the Partnership or such Media Company, with the exception of making loans to, or acting as a surety for, such Media Company or the Partnership to the extent consistent with the "equity or debt plus" component of the FCC Attribution Rules; or

(vii)     become actively involved in the management or operation of any Media Company.

(viii)     serve as a member or otherwise participate in the activities of the Advisory Committee if, in the determination of the Insulated Partner, such membership or participation would cause the Insulated Partner to lose its insulated status under the Attribution Rules.

(b)     An Insulated Partner may, upon five Business Days' prior written notice to the General Partner, relinquish its status as an Insulated Partner, in which case the provisions of this Section 5.16 shall no longer apply to such Limited Partner; provided, that such relinquishment shall not be effective until the General Partner has received an opinion of special counsel to the Partnership on FCC matters stating that such relinquishment will not (1) cause the Partnership or any of its Affiliates to violate any law, regulation, rule or policy applicable to matters currently subject to FCC jurisdiction or (2) in any way limit or restrict the activities of the Partnership or any of its Affiliates. To the extent that issuance of such an opinion requires the filing of any notices with the FCC or the issuance of any approvals by the FCC, the General Partner and the Insulated Partner seeking to relinquish its insulated status shall reasonably cooperate in making any such filing or obtaining any such approval, and the General Partner shall seek the opinion of special counsel to the Partnership on FCC matters with respect to the making of any such filing or the obtaining of any such approval.

(c)     Nothing in this Section 5.16 shall be interpreted to restrict the activities of (A) the Limited Partners or (B) the beneficial interest holders of any Limited Partner during the period that it is an Insulated Partner so long as such Limited Partner's partnership or other governing agreement contains language reasonably designed to insulate such Limited Partner's unaffiliated limited partners or beneficial interest holders, as the case may be, from having the Partnership's interest in any Media Company being attributed under the FCC attribution rules to such beneficial owners, as necessary pursuant to the FCC attribution rules.

17461908

-41-

(d)     Upon written request by an Insulated Partner, the General Partner shall, prior to the Partnership consummating an investment in a Media Company, cause the legal counsel to the Partnership to deliver an opinion reasonably acceptable to such Insulated Partner to the effect that such investment shall not be "attributed" to the Insulated Partner under the rules and regulations of the FCC relating to the particular FCC service in which such Media Company operates.

Section 5.17 <u>Co-investment Funds</u>.

(a)     Where possible and appropriate, the General Partner may, in its discretion, provide co-investment opportunities to invest in a Portfolio Company (each a "<u>Co-Investment Opportunity</u>") to one or more Limited Partners, strategic investors, lenders, or members, investors, Affiliates or employees of the General Partner and Manager or, other accounts managed by Highland (each a "<u>Co-Investor</u>"). Notwithstanding the foregoing, investment opportunities allocated to Affiliates of the Manager or the General Partner or client accounts managed by the Manager, in accordance with the Highland Investment Allocation Policy, shall not be deemed Co-Investment Opportunities. The General Partner, the Manager, and their respective Affiliates will not receive any carried interest in any Co-Investment Opportunity provided to Limited Partners or receive management fees from Limited Partners in respect of Co-Investment Opportunities provided to Limited Partners. The General Partner intends to not provide Co-Investment Opportunities to Benefit Plan Investors to the extent necessary to prevent such Co-Investment Opportunity from being deemed to be Plan Assets of the related Benefit Plan Investor.

(b)     The General Partner may, as a condition to any Co-Investment Opportunity, (i) require any or all Co-Investors to execute a confidentiality agreement relating to such Co-Investment Opportunity in form and substance acceptable to the General Partner, and (ii) require Co-Investors electing to participate in a Co-Investment Opportunity to coinvest through a Co-Investment Fund, which may have investors other than Limited Partners.

(c)     Each Limited Partner shall treat the information provided to it pursuant to this <u>Section 5.17</u> as confidential, shall use such information solely for the purpose of considering the offer made pursuant to this Section, shall, upon the request of the General Partner, promptly return to the General Partner any written information provided it pursuant to this Section, and shall not disclose the identity of the securities or issuer to any person other than (i) its employees, counsel or advisors, solely on a need to know and confidential basis, (ii) any governmental authority or regulatory authority which regulates such Limited Partner's ability to engage in any of its businesses under U.S. or foreign law to the extent such information is required by such governmental authority or regulatory authority, as the case may be, and (iii) to the extent such Limited Partner is required by law or regulation to disclose such information.

(d)     If Co-Investment Funds or Co-Investors purchase securities of a Portfolio Company that are of the same class as securities of a Portfolio Company purchased by the Partnership, the Co-Investment Funds or Co-Investors shall purchase such securities on terms that are no less advantageous than the terms on which the Partnership purchases such securities. Each Co-Investment Fund and Co-Investor will dispose of securities of a Portfolio Company that

are of the same class as securities of a Portfolio Company purchased by the Partnership at the same time and on substantially the same terms (including price) as the Partnership.

Section 5.18  Bridge Leveraging.  (a)  The Partnership is authorized to enter into one or more credit facilities (each, a "Bridge Leveraging/Credit Support Facility") in order to (i) borrow money for the purpose of (A) Bridge Leveraging, and (B) paying Partnership Expenses; and/or (ii) provide Credit Support for the obligations of Portfolio Companies or their subsidiaries as described in Section 5.4(c); provided, however, that in no event shall the aggregate amount of Bridge Leveraging outstanding at any time under any Bridge Leveraging/Credit Support Facility exceed the aggregate amount of Unfunded Commitments as of such date and provided, further, that in no event shall the maturity date of an individual borrowing under any Bridge Leveraging/Credit Support Facility be later than the 45th day following the incurrence of such debt under a Bridge Leveraging/Credit Support Facility.  A Bridge Leveraging/Credit Support Facility may be secured by (x) a pledge by the Partnership of all or a portion of the aggregate Unfunded Commitments of the Partners, and (y) a pledge and assignment by the General Partner of the rights of the General Partner contained herein, including, without limitation, the right to deliver Capital Call Notices and enforce all remedies against Partners that fail to fund their respective Unfunded Commitments pursuant thereto and in accordance with the terms hereof. The Partnership and any Parallel Vehicles may be co-borrowers under any Bridge Leveraging/Credit Support Facility, in which event the Partnership and the Parallel Vehicles may be jointly and severally liable for all obligations under such Bridge Leveraging/Credit Support Facility.  In the event such a Bridge Leveraging/Credit Support Facility is so secured by Commitments, and to the extent funds are advanced against the Commitment of a particular Partner or partner of a Parallel Vehicle because such Person is late in funding or defaults on a Capital Call Notice delivered hereunder or by the Parallel Vehicle, each Limited Partner understands, acknowledges and agrees that (i) it may be required to make a Capital Contribution in respect of its pro rata share of such late or defaulted contribution amount, provided, however, that in no event shall any Partner be required to make Capital Contributions in excess of its Unfunded Commitment, and (ii) as a result of such default or late payment, the allocation between the Partnership and each Parallel Vehicle of a Portfolio Investment (together with any item of income, fees, reimbursement or expense that relates to such Portfolio Investment) with respect to which there has occurred a shortfall in contributions made by the Partners or the partners in a Parallel Vehicle shall be made by the General Partner based on the total amount of Capital Contributions of the Partners and the partners in each Parallel Vehicle actually funded to acquire such Portfolio Investment.  In addition to the rights and remedies of the General Partner in respect of a Defaulting Partner pursuant to Section 6.11, any Partner that is late in funding or defaults on a Capital Call Notice shall be responsible for any interest or other expenses incurred in connection with such advance.  Any such expenses shall be withheld from distributions otherwise to be made to such Defaulting Partner, and, to the extent such expenses exceed such distributions, such Defaulting Partner shall pay the amount of such excess to the Partnership in the manner and at the time or times required by the General Partner.  Any such excess shall not be credited to such Defaulting Partner's Capital Account.  For purposes of this Agreement, any amount withheld from a Defaulting Partner and paid to a lender shall be paid to the lender on behalf of such Defaulting Partner and shall be treated as if distributed to such Defaulting Partner.

(b)  Each Limited Partner understands, acknowledges and agrees, in connection with any such Bridge Leveraging/Credit Support Facility and for the benefit of any lender thereunder,

17461908                                                    -43-

as follows: (i) that the General Partner may from time to time request a certificate confirming (x) the remaining amount of such Limited Partner's Unfunded Commitment or (y) that the Limited Partner has not and will not pledge, collaterally assign, encumber or otherwise grant a security interest in its limited partnership interest in the Partnership, and (ii) that the General Partner may from time to time request such other information as may be reasonably required by the lender(s) under the terms of the Bridge Leveraging/Credit Support Facility. Each Limited Partner agrees to comply with such requests to the extent they are reasonable.

(c)     To induce any such lender to enter into a Bridge Leveraging/Credit Support Facility with the Partnership, each Limited Partner hereby: (i) acknowledges that the Partnership has informed such Limited Partner that the Partnership may pledge to a lender the right to call all Unfunded Commitments to secure all obligations made under the Bridge Leveraging/Credit Support Facility (collectively, the "Obligations") the terms of which are in accordance with this Agreement, and, in connection therewith, grant to such lender the right to issue Capital Call Notices pursuant to the terms of this Agreement when an event of default under such Bridge Leveraging/Credit Support Facility exists, including an event of default resulting from the failure of a partner of a Parallel Vehicle to fund any capital contributions when required, which each Limited Partner shall fund, in accordance with the terms hereof and its rights and obligations hereunder; and (ii) acknowledges that the Partnership has informed such Limited Partner that for so long as the Bridge Leveraging/Credit Support Facility is in place, the General Partner and the Partnership may agree with the lender not to amend, modify, supplement, cancel, terminate, reduce (other than with respect to Funded Commitments) or suspend any of such Limited Partner's obligations to fund its Unfunded Commitment pursuant hereto, subject to excuse provisions set forth herein, without the lender's prior written consent.

## ARTICLE VI

## LIMITED PARTNERS

Section 6.1     Limited Liability. The Limited Partners will not be personally liable for any obligations of the Partnership and will have no obligation (including with respect to a deficit balance in their Capital Account) to make contributions to the Partnership in excess of their respective Commitments specified in Schedule 1 attached hereto in accordance with this Agreement, except to the extent set forth in Section 6.7 or the Delaware Partnership Act. The Limited Partners will take no part in the control, direction or operation of the affairs of the Partnership and will have no power to bind the Partnership.

Section 6.2     Transfer of Limited Partnership Interests.

(a)     A Limited Partner may not sell, assign, transfer, pledge, mortgage or otherwise dispose of all or any of its interest in the Partnership unless the General Partner has consented to such transfer or assignment in writing; provided, that with regard to an assignment by a Limited Partner to an Affiliate of such Limited Partner, such consent shall not be unreasonably withheld.

(b)     A Limited Partner which is a trust under an employee benefit plan may, upon prior written notice to the General Partner, assign a beneficial interest in all or a portion of its

17461908                                    -44-

interest in the Partnership to any other trust under such employee benefit plan or to any other employee benefit plan having the same sponsor (provided that income and loss allocable to the Limited Partner of the Partnership will continue to be included in the same filings under the same employer identification number with the Internal Revenue Service). Such assignment to another trust under such employee benefit plan or to any other employee benefit plan having the same sponsor will not be deemed to be an assignment or transfer of a limited partnership interest pursuant to this Agreement (and therefore will not require the General Partner's consent pursuant to Section 6.2(a)). In addition, a change in any trustee or fiduciary of a Limited Partner will not be deemed to be an assignment or transfer of a limited partnership interest pursuant to this Agreement (and therefore not require the General Partner's consent pursuant to Section 6.2(e)), so long as any such replacement trustee or fiduciary is also a fiduciary as defined under applicable law, that income and loss allocable to the Limited Partner of the Partnership will continue to be included in the same filings under the same employer identification number with the Internal Revenue Service, and the General Partner receives prior written notice of such change in trustee or fiduciary. In connection with any assignment of interest or change in trustee or fiduciary under this Section 6.2(b), the Limited Partner shall provide such documentation as the General Partner shall reasonably request.

(c)     The voting rights of any Limited Partner's interest shall automatically terminate upon any transfer of such interest to a trust, heir, beneficiary, executor, personal representative, guardian or conservator or upon any other transfer if the transferor no longer retains control over such voting rights and the General Partner has not consented pursuant to Section 6.2(e) to such transferee becoming a substitute Limited Partner. No consent of any other Limited Partner will be required as a condition precedent to any such transfer or substitution.

(d)     As a condition to any transfer of a Limited Partner's interest pursuant to Section 6.2(a), the transferor and the transferee shall provide such legal opinions and documentation as the General Partner shall reasonably request; provided that if the transfer is to be made from a Limited Partner to a co-trustee or trustee as contemplated above or to an Affiliate pursuant to Section 6.2(a), an officer's certificate in form reasonably satisfactory to the General Partner may be delivered by the Limited Partner in lieu of such legal opinions and other documentation.

(e)     Notwithstanding anything to the contrary contained in this Section 6.2 or 6.11, a transferee or assignee will not become a substitute Limited Partner (i.e., a transfer other than as described in Section 6.2(b)) without the consent of the General Partner, which consent may be granted or withheld in its sole and absolute discretion (except for a disposition by a Limited Partner to an Affiliate permitted by Section 6.2(a), for which such consent shall not be unreasonably withheld), and without executing (i) a copy of this Agreement or amendment hereto, and (ii) a Subscription Agreement in form and substance satisfactory to the General Partner in its sole discretion. Any substitute Limited Partner admitted to the Partnership with the consent of the General Partner will succeed to all rights and be subject to all the obligations of the transferring or assigning Limited Partner with respect to the interest to which such Limited Partner was substituted, but any transferee or assignee that does not become a substitute Limited Partner shall have the right to receive allocations pursuant to Section 2.3 and distributions pursuant to Article III and Article VIII, but shall have no other rights under this Agreement.

Appx. 04065

(f)     The transferor and transferee of any Limited Partner's interest shall be jointly and severally obligated to reimburse the General Partner and the Partnership for all reasonable expenses (including attorneys' fees and expenses) of any transfer or proposed transfer of a Limited Partner's interest, whether or not consummated.

(g)     The transferee of any Limited Partner's interest shall be treated as having made all of the Capital Contributions made by, and received all of the distributions received by, the transferor of such interest.

(h)     Anything in this Agreement to the contrary notwithstanding, no admission (or purported admission) of a Partner, and no transfer (or purported transfer) of all or any part of a Partner's interest in the Partnership (or any economic interest therein) whether to another Partner or to a person who is not a Partner, shall be effective, and any such admission or transfer (or purported admission or transfer) shall be void ab initio, and no person shall otherwise become a Partner if after such admission or transfer (or purported admission or transfer) the Partnership would have more than one hundred (100) Partners, unless the General Partner determines in its sole discretion that the Partnership will meet the requirements set forth in Treasury Regulation § 1.7704-1(j)(1) for the taxable year of such transfer and all subsequent taxable years.  In determining whether the Partnership will have more than one hundred (100) Partners for purposes of this Section 6.2(h), each person indirectly owning an interest in the Partnership through a partnership (including any entity treated as a partnership for federal income tax purposes), a grantor trust or an S corporation (each such entity a "flow-through entity") shall be treated as a Partner unless the General Partner determines in its sole discretion, after consulting with qualified tax counsel, that less than substantially all of the value of the beneficial owner's interest in the flow-through entity is attributable to the flow-through entity's interest (direct or indirect) in the Partnership.

(i)     Anything in this Agreement to the contrary notwithstanding, no admission (or purported admission) of a Partner, and no transfer (or purported transfer) of all or any part of a Partner's interest in the Partnership (or any economic interest therein) whether to another Partner or to a person who is not a Partner, shall be effective, and any such admission or transfer (or purported admission or transfer) shall be void ab initio, and no person shall otherwise become a Partner if after such admission or transfer (or purported admission or transfer) the Partnership would be subject to the registration or reporting requirements of the Investment Company Act or in the General Partner's good faith determination, such transfer would cause the assets of the Partnership to be deemed Plan Assets. Each transferee that is or will be a Benefit Plan Investor as of the transfer effective date shall so notify the General Partner in writing prior to the transfer effective date.  Any transferee that has not so indicated in writing its status as a Benefit Plan Investor hereby represents, warrants and covenants that it is not, it is not acting on behalf of and, so long as it holds an interest in the Partnership, it will not be and will not be acting on behalf of a Benefit Plan Investor.

Section 6.3  No Withdrawal.  Subject to the provisions of Sections 6.2, 6.6 and 6.11, no Limited Partner may withdraw as a Partner of the Partnership, nor may a Limited Partner be required to withdraw, nor may a Limited Partner borrow or withdraw any portion of its Capital Account from the Partnership.

17461908                                                    -46-

Section 6.4 <u>No Termination</u>. The substitution, death, insanity, dissolution (whether voluntary or involuntary) or bankruptcy of a Limited Partner will not affect the existence of the Partnership, and the Partnership will continue for the term of this Agreement until its existence is terminated as provided herein.

Section 6.5 <u>Subsequent Limited Partners</u>.

(a)     The General Partner may accept additional Limited Partners ("<u>Additional Limited Partners</u>") subsequent to the First Closing of the Partnership up to and including the date fourteen months after the First Closing. Any Additional Limited Partners will be treated as having been a party to this Agreement and have made its Commitment as of the date hereof for all purposes, and such Additional Limited Partners will be required to bear a portion of the Management Fee, Organizational Expenses and Partnership Expenses equivalent to that which would have been borne by such Additional Limited Partner had such Limited Partner been a Limited Partner from the date of the First Closing.

(b)     Such Additional Limited Partners shall contribute to the Partnership, on the date of their admission to the Partnership, an amount of their Commitments equal to their portion (based on the Commitments of all Partners) determined pursuant to this <u>Section 6.5(b)</u>. The initial drawdown for each Limited Partner will include such Limited Partner's proportionate share of (i) Management Fees retroactive to the First Closing; (ii) Placement Fees, if any, retroactive to the First Closing, (iii) Organizational Expenses (to the extent provided in <u>Section 4.2</u>) and Partnership Expenses attributable to the Partnership; and (iv) Capital Contributions made at or prior to such drawdown to fund any Portfolio Investment, other than Capital Contributions that have been returned prior to such drawdown to the Partners who made such Capital Contributions. In addition, Additional Limited Partners will be required to pay to the Partnership, with respect to the period from the date of the applicable Capital Contributions made by the Partners who were admitted pursuant to the First Closing to the date of their admission to the Partnership: (A) interest at the rate of 10% on their proportionate share of Management Fees retroactive to the First Closing; (B) interest at the rate of 10% on their proportionate share of Organizational Expenses (to the extent provided in <u>Section 4.2</u>), Placement Fees and Partnership Expenses attributable to the Partnership; and (C) interest at the rate of 10% on their proportionate share of the Capital Contributions made prior to such drawdown (other than Capital Contributions that have been returned prior to such drawdown to the Partners who make such Capital Contributions), to fund any Portfolio Investment; <u>provided, however</u>, that interest payable pursuant to <u>sub-clauses (B)</u> and <u>(C)</u> above shall be reduced, but not below zero, by each Additional Limited Partner's <u>pro rata</u> portion (based on Commitments of all Partners) of all distributions made prior to the date of such drawdown to all Partners pursuant to <u>Sections 3.3(a)(i)</u>, <u>3.3(a)(ii)(B)</u> and <u>3.3(a)(iii)(A)</u>, to the extent such distributions exceed the aggregate amount of Capital Contributions to make Portfolio Investments that have been Disposed of prior to the date of such drawdown. Any amounts paid to the Partnership under <u>clause (i)</u> and <u>subclause (A)</u> above will be paid to the Manager (and to the extent the General Partner has waived all or part of such Management Fees, such Waived Fee Amount shall not be paid to the Manager or the General Partner but will instead increase the Unapplied Waived Fee Amounts). Any amounts paid to the Partnership under <u>clause (ii)</u> above shall be paid to the applicable placement agency if applicable to such Limited Partner. Any amounts paid to the Partnership under <u>clauses (iii)</u> and <u>(iv)</u> above, and <u>subclauses (B)</u> and <u>(C)</u> above shall be

distributed to the Partners that participated in the earlier Capital Contributions based upon their relative shares of each earlier Capital Contribution, and any such returned Capital Contributions (but not amounts referred to in subclauses (B) and (C) above) may be recalled by the General Partner pursuant to Section 2.2(a) above as if such returned Capital Contributions had not previously been called; provided, that if the General Partner determines in good faith that there will be a Capital Call within 30 days after the contribution of such amounts to the Partnership, the General Partner may, in its discretion, retain such amounts and reduce the Capital Call with respect to such other Partners (in which event the Funded Commitments of such other Partners shall be increased by their pro rata share of that portion of such amounts referred to in subclauses (B) and (C) above). For purposes of this Section 6.5, a Limited Partner that increases its Commitment shall be treated as an Additional Limited Partner with respect to the amount by which its Commitment increased.

(c)     Each Additional Limited Partner admitted to the Partnership pursuant to this Section 6.5 shall be treated as purchasing a pro rata share of the interests in the Partnership of the Partners to whom amounts are distributed pursuant to this Section 6.5 ("Existing Partners"), and a portion of the Capital Account of each Existing Partner shall be allocated to such Additional Limited Partner so that after such allocation the Capital Accounts and Capital Contributions of such Additional Limited Partner and Existing Partners attributable to each Portfolio Investment and to the payment of Organizational Expenses, Management Fees, Placement Fees and Partnership Expenses are as equal as practicable to what their Capital Accounts and Capital Contributions attributable to each Portfolio Investment and to the payment of Organizational Expenses, Management Fees, Placement Fees and Partnership Expenses would have been if such Additional Limited Partner had been admitted to the Partnership at the First Closing.

(d)     If the admission of Additional Limited Partners to the Partnership or of investors in Parallel Vehicles or the purchase by a limited partner in a Parallel Vehicle of a portion of the interest of a Defaulting Partner pursuant to Section 6.11 would result in the Partnership and the Parallel Vehicles not having reimbursed the General Partner and its Affiliates for Organizational Expenses in the proportions contemplated by Section 4.2 hereof or would result in the Partnership and the Parallel Vehicles not owning investments in Portfolio Companies in the proportions contemplated by Sections 5.14 or 5.15 hereof, the General Partner shall have the authority:

(i)     to effect transfers of funds and of Portfolio Company to Parallel Vehicles and to effect transfers of funds and portfolio investments of Parallel Vehicles to the Partnership for the purpose of reallocating the ownership of investments in Portfolio Companies and the reimbursements of Organizational Expenses by the Partnership and the Parallel Vehicles, and

(ii)     to make allocations to, or to reallocate, the Capital Accounts and Capital Contributions attributable to each Portfolio Investment and to the payment of Organizational Expenses, Management Fees, Placement Fees and Partnership Expenses of the Existing Partners and the Additional Limited Partners in the manner contemplated by the previous provisions of this Section 6.5,

17461908                                              -48-

in each case to achieve allocations and distributions as close as practicable to those that would have obtained had such Additional Limited Partners or investors been admitted to the Partnership or to Parallel Vehicles, respectively, at the First Closing or had such purchased interest of a Defaulting Partner been issued to the purchaser at the First Closing. Any distribution of cash made by the Partnership in connection with a reallocation under this Section 6.5(d) representing a return of Capital Contributions may be recalled by the General Partner pursuant to Section 2.2(a) as if such returned Capital Contributions had not previously been called.

Section 6.6 <u>Regulatory Matters</u>.

(a)     Each Limited Partner acknowledges that the assets of the Partnership are not intended to constitute plan assets of such Limited Partner for purposes of any applicable non-U.S., state or local law governing the investment and management of the assets of that Limited Partner, and that, as a result, none of the Partnership, the General Partner, the Manager or any of their Affiliates intend to be acting as a fiduciary within the meaning of any applicable non-U.S., state or local law relating to governmental plans or foreign plans with respect to such Limited Partner or the Partnership assets; provided, however, that this provision is not intended to negate the fiduciary duties imposed upon a general partner under the Delaware Partnership Act.

(b)     In the event that the General Partner determines in good faith that (i) the investment in the Partnership by a Limited Partner which is a governmental plan, foreign plan or other regulated entity (each, a "<u>Regulated Investor</u>") is reasonably likely to result in (A) any violation of any provision of law applicable to such Regulated Investor, (B) the treatment of the assets of the Partnership as assets of such Regulated Investor or (C) the treatment of the Partnership, the General Partner or the Manager as a fiduciary under such provisions of law applicable to such Regulated Investor and (ii) if, in the reasonable judgment of the General Partner, any of the foregoing conditions result in or are reasonably likely to result in any material adverse consequences to the Partnership or the General Partner (both of (i) and (ii), a "<u>Regulatory Issue</u>"), then the General Partner shall use its reasonable best efforts to work with the Regulated Investor to cure the Regulatory Issue. The General Partner, in its sole discretion, may require that such Regulated Investor provide (at such Regulated Investor's expense) an opinion of counsel, reasonably acceptable to the General Partner in form and substance, that no Regulatory Issue exists or, in the event such an opinion is not delivered within a reasonable time after being requested, may cause the Partnership to redeem such Regulated Investor's interest in the Partnership, in whole or in part.

(c)     Effective upon the date specified by the General Partner in the notice sent to a Limited Partner, notifying such Limited Partner of the General Partner's determination to completely or partially redeem such Limited Partner's interest in the Partnership pursuant to Section 5.6(e) or Section 6.6(b) (the "<u>Redemption Effective Date</u>"), such Limited Partner (the "<u>Redeemed Limited Partner</u>") shall cease to be a Partner of the Partnership for purposes of the withdrawn portion of its interest only and, in addition to its right to receive payment for its withdrawn interest in the Partnership as provided in Section 6.6(d), shall continue to be entitled, with respect to its remaining interest only, if any, to the rights of a Partner under this Agreement (including, without limitation, the right to have any allocations made to its Capital Account (as such may be adjusted) pursuant to Article II, the right to receive distributions pursuant to Article

III and upon dissolution of the Partnership pursuant to Article VIII and the right to vote on matters as provided in this Agreement).

(d)     The Redemption Value shall be paid by the Partnership to such Redeemed Limited Partner in cash by paying to such Limited Partner a "pro rata portion" of each distribution payable to the Redeemed Limited Partners until the Redemption Value has been fully paid; provided, that the General Partner shall be under no obligation to sell, finance or refinance any Partnership property or assets or to take any other action to effect such redemption which, in the judgment of the General Partner, may affect adversely the Partnership (taking into account the liquidity needs of the Partnership) or any Partner.  For purposes of the preceding sentence, a Redeemed Limited Partner's "pro rata portion" of a distribution shall be an amount equal to the amount such Redeemed Limited Partner would have received in respect of the redeemed interest had such interest not been redeemed.

Section 6.7  Indemnification and Reimbursement for Payments on Behalf of a Partner/Partner Clawback.

(a)     If the Partnership is obligated to pay any amount to a governmental agency or to any other person (or otherwise makes a payment) in respect of any tax because of a Partner's status or otherwise specifically attributable to a Partner (including, without limitation, federal withholding taxes with respect to foreign partners, state personal property taxes, state unincorporated business taxes, etc.), then such Partner (the "Indemnifying Partner") shall indemnify the Partnership in full for the entire amount paid (including, without limitation, any interest, and any penalties and expenses associated with such payment to the extent such penalties and expenses are attributable to such Partner's actions or failure to act).  At the option of the General Partner, the amount to be indemnified may be charged against the Capital Account of the Indemnifying Partner, and, at the option of the General Partner, either:

(i)     promptly upon notification of an obligation to indemnify the Partnership, the Indemnifying Partner shall make a cash payment to the Partnership equal to the full amount to be indemnified (and the amount paid shall be added to the Indemnifying Partner's Capital Account but shall not be deemed a Capital Contribution hereunder), or

(ii)     the Partnership shall reduce subsequent distributions which would otherwise be made to the Indemnifying Partner until the Partnership has recovered the amount to be indemnified (provided, that the amount of such reduction shall be deemed to have been distributed for all purposes of this Agreement, but such deemed distribution shall not further reduce the Indemnifying Partner's Capital Account).  If the General Partner reasonably expects that subsequent distributions to such Partner will be sufficient to satisfy such Partner's obligation to pay such amount, the General Partner shall not seek a payment pursuant to clause (i) above, until the General Partner reasonably believes such distributions will not be sufficient.

(b)     A Partner's obligation to make contributions to the Partnership under this Section 6.7 shall, subject to the limitations set forth in Section 6.7(c), survive the termination, dissolution, liquidation and winding up of the Partnership until the third (3rd) anniversary of the date of the final distribution made in connection with the complete liquidation of the assets of the Partnership and, for purposes of this Section 6.7, the Partnership shall be treated as continuing in

Appx. 04070

existence.  The Partnership may pursue and enforce all rights and remedies it may have against each Partner under this Section 6.7, including instituting a lawsuit to collect such contribution with interest equal to the prime or base rate then in effect (as announced by Citibank, N.A., New York, New York) plus six percentage points per annum (but not in excess of the highest rate per annum permitted by law).

(c)    At any time and from time to time prior to the third (3rd) anniversary of the date of receipt thereof, the General Partner may require each Partner to return distributions (including distributions made in connection with the complete liquidation of the assets of the Partnership) to the Partnership in an amount sufficient to satisfy all or any portion of (i) such Partner's indemnification obligations pursuant to Section 6.7(a), or (ii) any liability which the Partnership would be required by this Agreement or otherwise to pay if it had adequate funds, including but not limited to (A) the expenses of investigating, defending or handling any pending or threatened litigation or claim arising out of the Partnership's activities, investments or business, (B) the amount of any judgment or settlement arising out of such litigation or claim, and (C) the Partnership's obligation to indemnify any Partner or other Person pursuant to Section 5.11 (a "Liability"), whether such obligations arise before or after the last day of the Partnership or, with respect to any Partner, before or after such Partner's withdrawal from the Partnership; provided, that (x) each Partner will return distributions in respect of its share of any such indemnification payment in proportion to the aggregate amount of distributions received by such Partner that have not previously been returned to the Partnership by such Partner pursuant to this Section 6.7(c); and (y) Partner's maximum liability under this Section 6.7 is limited to an amount equal to the lesser of (1) $33^{1/3}$% of such Partner's Commitment, and (2) 50% of the aggregate amount of distributions received by such Partner as of such date.  Any distributions returned pursuant to this Section 6.7(c) shall not be treated as Capital Contributions, but shall be treated as returns of distributions in making subsequent distributions pursuant to Section 3.3 and in determining the amount that the General Partner is required to contribute to the Partnership pursuant to Section 8.3(c) (other than for purposes of computing a Partner's Preferred Amount, which shall be computed based on actual Capital Contributions made and distributions received).  Nothing in this Section 6.7(c), express or implied, is intended or shall be construed to give any person other than the Partnership or the Partners any legal or equitable right, remedy or claim under or in respect of this Section 6.7(c) or any provision contained herein.  If a Limited Partner returns an amount to the Partnership under Section 6.7(c)(ii) after the final distribution of the assets of the Partnership, the amount the General Partner is required to contribute to the Partnership with respect to such Limited Partner pursuant to Section 8.3(c) shall be re-determined, taking into account the return of such amount to the Partnership.  The provisions of Section 8.3(c) shall apply, and the payments required thereby shall be made, in the same manner as if the return of such amount to the Partnership had occurred prior to the final distribution of the assets of the Partnership.

Section 6.8  Section 754 Election.  Upon the written request of a Majority in Interest of the Limited Partners, that an election provided for in Section 754 of the Code be made, the General Partner shall, if then permitted by applicable law, make such election.

17461908                                                -51-

Section 6.9  <u>BHCA Partners</u>.

(a)    Any Limited Partner may, upon notice to the General Partner, elect to hold all or any fraction of such Limited Partner's interest in the Partnership as a Non-Voting Interest, in which case such Limited Partner shall not be entitled to vote or otherwise participate in any consent of the Limited Partners with respect to the portion of its interest which is held as a Non-Voting Interest (and such Non-Voting Interest shall not be counted in determining the giving or withholding of any such consent or whether the requisite percentage of the Limited Partners or Partners, as the case may be, have consented to, approved, adopted or taken any other action hereunder).  Except as provided in this <u>Section 6.9</u>, an interest held as a Non-Voting Interest shall be identical in all regards to all other interests held by Limited Partners.  Any such election shall be irrevocable and shall bind the assignees of such Limited Partner's interest.

(b)    Any interest in the Partnership held for its own account by a BHCA Partner, that is determined at the time of admission of such BHCA Partner, the complete or partial withdrawal of another Limited Partner or any other adjustment of the interests of the Partners pursuant to this Agreement to be in excess of 4.99% (or such other amount as may be permitted by applicable regulation to be held by a BHCA Partner as voting securities, but not including Section 4(k) of the BHC Act or any successor provision thereto) of the interests of the Limited Partners, excluding for purposes of calculating this percentage portions of any other interests that are Non-Voting Interests pursuant to this <u>Section 6.9</u> and any other Section of this Agreement (collectively the "<u>Non-Voting Partnership Interests</u>"), shall be a Non-Voting Partnership Interest (whether or not subsequently transferred in whole or in part to any other person) and shall not be included in determining whether the requisite percentage of the Partners have consented to, approved, adopted or taken any action hereunder; <u>provided</u>, that such Non-Voting Partnership Interest shall be permitted to vote on any proposal to continue the business of the Partnership under <u>Section 8.2(a)</u> but not on the selection of a General Partner pursuant to <u>Section 8.2(a)</u>. Each BHCA Partner hereby further irrevocably waives its corresponding right to vote for a successor general partner under Section 17-801 of the Delaware Partnership Act with respect to any Non-Voting Partnership Interest, which waiver shall be binding upon such BHCA Partner and any entity which succeeds to its interest.  Upon the occurrence of a subsequent closing or any event specified in the second preceding sentence, a recalculation of the interest held by all BHC Partners shall be made, and only that portion of the total interest held by each BHC Partner that is determined as of the date of such recalculation to be in excess of 4.99% (or such other amount) of the interests of the Limited Partners, excluding Non-Voting Partnership Interests as of such date, shall be a Non-Voting Partnership Interest.

Section 6.10  <u>Excused Investments</u>.  In the event that (a) the Partnership makes or proposes to make a Portfolio Investment which the General Partner reasonably determines could result in a material violation by any Limited Partner (or any of its Affiliates) of any law, order, decree or judgment of any court or governmental agency applicable to such Limited Partner (or any of its Affiliates), or (b) the General Partner reasonably determines that a Limited Partner's participation in a proposed Portfolio Investment of the Partnership could have a material adverse effect on the Partnership, the entity in which such investment is to be made, such Limited Partner, or the General Partner and its Affiliates, the General Partner may, in its sole discretion, and subject to <u>Section 5.6(a)</u>, (x) reduce or eliminate the interest of the such Limited Partner with respect to such Portfolio Investment and the distributions with respect thereto (provided that any

Appx. 04072

Capital Contributions made by such Limited Partner with respect to such Portfolio Investment shall be promptly returned to such Limited Partner) and correspondingly increase the interest of the other Limited Partners with respect to such Portfolio Investment and/or (y) increase the interest of such Limited Partner in future Portfolio Investments of the Partnership and such Limited Partner's interest in the distributions with respect thereto and correspondingly decrease the interests of the other Limited Partners in such Portfolio Investments. All determinations necessary to reflect the operation of this Section 6.10 and not otherwise explicitly provided for in this Section 6.10 shall be made on an equitable basis as determined by the General Partner in good faith, whose decision thereon shall be final and binding on all Limited Partners. Determinations by the General Partner pursuant to clauses (a) and (b) above may be made on its own initiative or after considering the request of any Limited Partner, including any supporting legal analysis or other documentation submitted by such Limited Partner.

Section 6.11  Limited Partner's Default on Commitment.

(a)    If any Limited Partner fails to make full payment of any portion of its Commitment when due (a "Defaulting Partner") and such failure is not cured within five Business Days after receipt by such Limited Partner of written notice from the General Partner with respect to such failure to pay, the General Partner may in its discretion and subject to Section 5.6(a), undertake any one or more of the following steps:

(i)    The General Partner may assist the Defaulting Partner in finding a buyer for the Defaulting Partner's Partnership interest (provided, that the General Partner will have no obligation to contact any particular Limited Partner or other person with regard to such sale).

(ii)    The Partnership may pursue and enforce all rights and remedies the Partnership may have against such Defaulting Partner with respect thereto, including a lawsuit to collect the overdue portion of the Commitment and any other amounts due the Partnership or General Partner hereunder, with interest at a rate equal to the prime or base rate then in effect (as announced by Citibank, N.A., New York, New York) plus six percentage points (but not in excess of the highest rate per annum permitted by law).

(iii)    The General Partner may offer the Defaulting Partner's interest to the Partners and the partners in the Parallel Vehicles (other than any Defaulting Partners) pro rata in accordance with their Commitments and their capital commitments to Parallel Vehicles on the terms set forth below. If any Partner or partner in a Parallel Vehicle does not elect to purchase the entire interest offered to it, the remaining interest allocable to the Partners and the partners in the Parallel Vehicles will be reoffered pro rata to the Partners and the partners in Parallel Vehicles who have purchased the entire interest offered to them until either all of such interest is acquired or no Partner or partner in a Parallel Vehicle wishes to make a further investment. At the closing of such purchase (on a date and at a place designated by the General Partner), each purchasing Partner shall (A) deliver a non-interest bearing, non-recourse (except to the extent of the Partnership interest purchased and the proceeds therefrom) ten-year promissory note (in a form approved by the General Partner) payable to the Defaulting Partner in an amount equal to the portion of the Defaulting Partner's Capital Account being purchased by such Partner, and (B) assume the portion of the Defaulting Partner's obligation to make both defaulted and further Capital Contributions pursuant to its Commitment which is equal to the portion of the Defaulting

Appx. 04073

Partner's interest being purchased by such Partner. In the case of a purchase of a portion of a Defaulted Partner's Capital Account by one or more partners in a Parallel Vehicle, such Parallel Vehicle shall deliver a note in the same form as the note described above to the Partnership for the aggregate portion of the Defaulted Partner's Capital Account being purchased by the limited partners in such Parallel Vehicle, the Partnership shall make the adjustments described in Section 6.5(d) with respect to such purchase and the Partnership shall distribute such note to the Defaulting Partner. If a Partner purchases a portion of the interest of a defaulting partner of a Parallel Vehicle, the Partner purchasing such interest shall increase its Commitments as described above with respect to purchases of an interest of a Defaulting Partner, and shall guarantee the note delivered to the Parallel Vehicle, and the Partnership shall make such other adjustments as are required by Section 6.5(d). The General Partner will handle the mechanics of making the offers set forth herein and will in its discretion impose time limits for acceptance.

(iv)     If the entire Defaulting Partner's interest is not purchased in the manner set forth in (iii) above, the General Partner in its sole discretion may offer the remaining interest either (A) to a third party or parties on the same terms as originally offered to the Partners pursuant to (iii) above (in which case such third party or parties will, as a condition of purchasing such interest, become a party to this Agreement), or (B) to the Partners and the partners in Parallel Vehicles in the manner provided in (iii) above, but with no requirement to assume the Defaulting Partner's obligation to make further capital contributions pursuant to its Commitment, in which case the Defaulting Partner's Commitment shall be deemed reduced (effective on the date of the default) to the amount actually paid in and the aggregate Commitments of the Partnership shall be reduced by the amount of such Defaulting Partner's remaining contributions to be made pursuant to its Commitment.

(v)     In addition to, or instead of, the other remedies and undertakings available to the General Partner pursuant to this Section 6.11(a), the General Partner may, in its sole discretion, reduce (effective on the date of the default, after giving effect to the 5-day cure period) any portion of such Defaulting Partner's Commitment (which has not been assumed by another Partner) to the amount of the Capital Contributions (which have not been purchased by another Partner) made by such Defaulting Partner (net of distributions pursuant to Section 6.5(b)) and the aggregate Commitments of the Partnership shall be commensurately reduced.

(vi)     Notwithstanding anything contained herein to the contrary, from and after any date on which a Defaulting Partner's Commitment is reduced pursuant to subparagraph (v) above, (A) such Defaulting Partner will have no right to receive any distributions, except for distributions made upon the Partnership's liquidation, (B) such Defaulting Partner's Capital Account will not be credited with any Investment Income and Gain or Short-Term Investment Income which shall instead be allocated to the Partners (other than any Defaulting Partners) in accordance with Section 2.3(b) and (c), as appropriate (and as adjusted to treat the Defaulting Partner's Capital Contribution as equal to zero), (C) until such Defaulting Partner's Capital Account is reduced to zero, (1) such Defaulting Partner's Capital Account shall continue to be debited in accordance with Sections 2.3(c), (d), (f), and (g) for such Defaulting Partner's share of Investment Loss, Organizational Expenses, Placement Fees and Uncapitalized Partnership Expenses as if there had been no reduction in such Defaulting Partner's Commitment or Capital Contributions and (2) the Management Fee payable by the Defaulting Partner shall be calculated as if there had been no reduction in such Defaulting Partner's Commitment, and (D) once such

17461908                                          -54-

Defaulting Partner's Capital Account is reduced to zero, (1) such Defaulting Partner's Commitment shall be reduced to zero for all purposes of the Agreement, including the calculation of the Partnership's aggregate Commitments and determination of the Management Fee and (2) such Defaulting Partner (and not the Partnership or any other Limited Partner) shall be liable each quarterly period to the General Partner for an amount equal to its portion of the Management Fee for such period as if there had been no reduction in such Defaulting Partner's Commitment.

(vii)    No consent of any Limited Partner shall be required as a condition precedent to any transfer, assignment or other disposition of a Defaulting Partner's interest pursuant to this <u>Section 6.11</u>.

(b)    Additionally, the Defaulting Partner shall indemnify and hold harmless the General Partner and the Partnership against any losses, damages and expenses (including attorneys' fees) incurred by the General Partner and the Partnership in enforcing or attempting to enforce the provisions of this <u>Section 6.11</u> or resulting from the Partnership failing to meet its obligations with respect to any Portfolio Investment by reason of any such default.

Section 6.12  <u>Investment Company Act Limitations</u>.  Notwithstanding anything to the contrary contained in this Agreement, (i) no person shall be admitted to the Partnership as Limited Partner, an Additional Limited Partner or a substitute Limited Partner unless such person is a Qualified Purchaser, and (ii) no sale, assignment, transfer, pledge, mortgage or other disposition of any or all of a Limited Partner's interest in the Partnership shall be effective unless the assignee of any beneficial interest in the Partnership is a Qualified Purchaser.

## ARTICLE VII

## ADVISORY COMMITTEE

Section 7.1  <u>Advisory Committee</u>.  (a) A committee (an "<u>Advisory Committee</u>") of not fewer than three individuals and not more than seven individuals who are affiliated with or officers, employees, representatives or designees of Limited Partners or limited partners of Parallel Vehicles (but are not affiliated with the General Partner, the Manager, the Principals or any Affiliates thereof) will be appointed by the General Partner.  The General Partner will not appoint to the Advisory Committee any individual who is an officer, employee or representative of a BHC Partner whose Partner Interest in the Partnership is over 4.99%.  The Advisory Committee will meet at least semi-annually with the Manager and will perform such duties as is contemplated by this Agreement and provide such advice and counsel, including advice and counsel as to general economic and financial trends, portfolio investments and valuations, as is requested by the General Partner in connection with the investments of the Partnership, the Parallel Vehicles and the Separate Investment Entities, and other matters related thereto; <u>provided</u>, that the General Partner will retain ultimate responsibility for all decisions relating to the operation and management of the Partnership, including all investment decisions.  The Advisory Committee will be consulted on potential conflicts involving the Partnership and will perform the duties contemplated by this Agreement and all transactions between the Partnership

-55-

and the General Partner, the Manager and their Affiliates not specifically contemplated by this Agreement must be approved by the Advisory Committee. Notwithstanding the foregoing, the Advisory Committee will not consult with the General Partner on allocations of investment opportunities to Affiliates of the Manager or client accounts managed by the Manager if such allocations are made in accordance with the Highland Investment Allocation Policy. The Manager shall be entitled to remove a member of the Advisory Committee selected by the Manager from among the Limited Partners (or their representatives) upon at least 15 days prior written notice to the Limited Partners, provided, however, that the Manager may not remove a member of the Advisory Committee designated by a Limited Partner without the consent of 75% of the other members of the Advisory Committee. The Limited Partner that had the right to designate the removed member of the Advisory Committee shall have the right to designate a replacement. The Partnership will reimburse each member of the Advisory Committee for such member's reasonable out-of-pocket expenses incurred in attending meetings of the Advisory Committee. Such reimbursements shall be Partnership Expenses. The Advisory Committee shall act by affirmative vote or written consent of a majority of its members.

(b)    Neither the members of the Advisory Committee, nor the Limited Partners on behalf of whom such members act as representatives, shall owe any duties (fiduciary or otherwise) to the Partnership or any other Limited Partner in respect of the activities of the Advisory Committee, other than the duty to act in good faith.

# ARTICLE VIII

## DURATION AND TERMINATION

Section 8.1 Duration. The Partnership will terminate on the tenth anniversary of the Final Closing, except that the term of the Partnership may be extended by the General Partner, with the approval of the Advisory Committee, for up to two consecutive one-year extensions.

Section 8.2 Early Termination.

(a)    The Partnership shall terminate on:

(i)    the bankruptcy of the General Partner or on the happening of any other event that would cause a dissolution of the Partnership under the Delaware Partnership Act unless, within 90 days after notice is given to the Limited Partners of the occurrence of such event, the Limited Partners and limited partners of all Parallel Vehicles unanimously select a new general partner and resolve to continue the business of the Partnership;

(ii)    a good faith determination upon receipt of written legal advice of counsel by the General Partner that dissolution of the Partnership is necessary or desirable (A) as a result of a Plan Asset Event or (B) to avoid any material adverse consequences to the Partnership or the General Partner as a result of any law applicable to a Regulated Investor;

17461908

Appx. 04076

(iii)    the removal of the General Partner pursuant to Section 5.9 unless all of the Limited Partners and all limited partners of Parallel Vehicles select a successor general partner and resolve to continue the business of the Partnership pursuant to Section 5.9; or

(iv)    at any time after the second anniversary of the Final Closing upon the consent of Seventy-Five Percent in Interest of the Limited Partners.

(b)    As promptly as possible following the election by the Limited Partners of a successor General Partner pursuant to Section 8.2(a)(i), there shall be distributed to the former General Partner, in full payment and satisfaction of its interest in the Partnership, a Limited Partnership Interest in the Partnership. The Limited Partnership Interest of the former General Partner shall entitle the former General Partner to the same distributions and allocations in respect of Portfolio Investments made prior to the termination of the former General Partner it would have received had it remained the General Partner, subject to the obligations set forth in Section 8.3(c), and to the rights of a Limited Partner hereunder with a Commitment equal to the Commitment of the former General Partner, but shall not entitle it to any other rights to participate in the management of the Partnership. After its withdrawal as General Partner, a former General Partner shall only be liable under this Agreement for actions taken and investments in Portfolio Companies made prior to the date of such withdrawal. If the Limited Partners elect to continue the Partnership's business pursuant to Section 8.2(a)(i), an appropriate amendment to this Agreement and to the Certificate shall be made within 90 days after the event giving rise to such election.

Section 8.3  Termination and Liquidation of Partnership Interests; Annual Determination of General Partner Give Back.

(a)    Liquidation. Upon termination, the Partnership will be liquidated in an orderly manner. The General Partner (or, in the absence, bankruptcy or removal under Section 5.9, of the General Partner, the party selected by a Majority in Interest of the Limited Partners) will be the liquidator to wind up the affairs of the Partnership pursuant to this Agreement.

(b)    Final Allocation and Distribution. Upon termination of the Partnership (whether or not an early termination), the General Partner will make a final allocation of all kinds of income, loss and expense in accordance with Article II hereof and the Partnership's liabilities and obligations to its creditors shall be paid or adequately provided for prior to any distributions to the Partners. After payment or provision for payment of all debts of the Partnership, the remaining assets, if any, will be distributed among the Partners as provided in Sections 3.2 and 3.3.

(c)    General Partner Give Back. Within 90 days after the termination of the Commitment Period and after the final distribution of the assets of the Partnership among the Partners as provided in Sections 3.2 and 3.3 (each of the termination of the Commitment Period and the final distribution of the assets of the Partnership, a "Determination Date"), the General Partner will make a Capital Contribution to the Partnership with respect to each Limited Partner (and such amount will be distributed to the Limited Partners in proportion to the amounts determined with respect to each Limited Partner pursuant to this Section 8.3(c)), equal to the greater of:

17461908                                    -57-

Appx. 04077

(i)      the amount by which (A) (x) the aggregate distributions to the General Partner pursuant to Sections 3.3(a)(ii) and 3.3(a)(iii) (including amounts initially distributed pursuant to Section 3.3(b)) with respect to such Limited Partner's Partner Share of distributions pursuant to Section 3.3(a) as of the applicable Determination Date less (y) all amounts previously contributed by the General Partner pursuant to this Section 8.3(c) with respect to such Limited Partner, exceed (B) 20% of the excess of (x) such Limited Partner's Partner Share of all distributions pursuant to Section 3.3(a) from the Partnership as of the applicable Determination Date (including amounts distributed to the General Partner pursuant to Sections 3.3(a)(ii) and 3.3(a)(iii), but reduced by any amounts previously contributed by the General Partner pursuant to this Section 8.3(c)) over (y) the aggregate Capital Contributions made by such Limited Partner to the Partnership as of the applicable Determination Date; and

(ii)      the amount by which all distributions received by such Limited Partner as of the applicable Determination Date are less than the sum of such Limited Partner's Capital Contributions as of the applicable Determination Date, plus such Limited Partner's aggregate Preferred Amount as of the applicable Determination Date; provided, however, that the aggregate General Partner Capital Contributions pursuant to this Section 8.3(c) will not exceed the excess, if any, of (x) an amount equal to 100% of the net amount distributed to the General Partner with respect to such Limited Partner over the entire term of the Partnership (other than Tax Distributions) pursuant to Sections 3.3(a)(ii) and 3.3(a)(iii) over (y) the Built-In Tax Amount with respect to any distribution of securities in-kind received by the General Partner with respect to such Limited Partner.

(d)     The General Partner hereby covenants and agrees that each of the members of the General Partner entitled to receive Carried Interest distributions from the General Partner has guaranteed and will guaranty severally, but not jointly, the payment of his, her or its pro rata share of the payments required by Section 8.3(c) to the extent and on the terms set forth in the Guaranty Agreement.

(e)     Special Profit Interest Give Back. After the final distribution of the assets of the Partnership among the Partners as provided in this Section 8.3 (and Article III hereof), but prior to the application of Section 8.3(c), the General Partner shall be obligated to make aggregate Capital Contributions to the Partnership, within 30 days after the date of such final distribution, in an amount equal to the sum of the excess, if any, of (i) the distributions received by the General Partner on account of the Special Profit Interest attributable to each Waived Fee Amount over (ii) the Available Profits with respect to such Waived Fee Amount. The distributions described in clause (i) of the preceding sentence with respect to a Waived Fee Amount are the Special Profit Interest distributions attributable to the Portfolio Company with respect to which the General Partner applied such Waived Fee Amount pursuant to Section 2.2(a)(ii), treating the Waived Fee Amounts as having been applied on a "first-in, first-out" basis. Amounts distributed to the General Partner pursuant to Section 3.3(f) shall be treated for this purpose as proceeds from Portfolio Company made on the date of each Waived Fee Notice giving rise to Waived Fee Amounts that are not applied to Portfolio Company pursuant to Section 2.2(a)(ii). For purposes of applying the first sentence of this Section 8.3(e), Partnership Profits shall not be treated as Available Profits with respect to more than one Waived Fee Amount. All such amounts returned to the Partnership shall be distributed to the Partners (other than a Defaulting Partner or the General Partner) in accordance with the provisions of Section 3.3. All determinations and

Appx. 04078

calculations pursuant to this Section 8.3(e) shall be made by the General Partner in its sole discretion.

## ARTICLE IX

## VALUATION OF PARTNERSHIP ASSETS

Section 9.1  Normal Valuation.  For purposes of this Agreement, the value of any security as of any date (or in the event such date is a holiday or other day which is not a Business Day, as of the next preceding Business Day) will be determined as follows:

(a)      a Marketable Security which is listed on a recognized securities exchange or the NMS will be valued at the average of the last sales prices (or, if no sale occurred on such date, at the last "bid" price thereon) for the five consecutive trading days before such date and the five consecutive trading days after such date;

(b)      a Marketable Security which is traded over-the-counter (other than on the NMS) will be valued at the average of the last "bid" prices for the five consecutive trading days before such date and the five consecutive trading days after such date;

(c)      subject to Section 9.3, all Non-Marketable Securities will be valued on such date by the General Partner at fair market value in such manner as it may determine; and

(d)      a Marketable Security which meets clause (ii), but not clause (i) of the definition of "Marketable Securities" will be valued as if it had been converted, exchanged or exercised as of such date.

Section 9.2  Restrictions on Transfer or Blockage.  Any security which is held under a representation that it has been acquired for investment and not with a view to public sale or distribution, or which is held subject to any other restriction, or where the size of the Partnership's holdings compared to the trading volume would affect its marketability, will, subject to the provisions of Section 9.3, be valued at such discount from the value determined under Section 9.1 above as the General Partner deems necessary to reflect properly the marketability of such security.

Section 9.3  Objection to Valuation.  Prior to acting upon its final valuation of any security pursuant to Sections 9.1 or 9.2 or its determination of written down value pursuant to Section 9.4, the General Partner shall provide the members of the Advisory Committee with notice and backup support of the General Partner's valuation of such security.  If within 30 days after delivery of such notice a majority of the members of the Advisory Committee delivers written notice to the General Partner objecting to the valuation of such security and if, within 15 days from the date on which the General Partner receives such notice from a majority of the Advisory Committee, the General Partner and the Advisory Committee cannot agree on the valuation of such security, then the General Partner will (at the Partnership's expense) cause an independent securities expert mutually acceptable to the General Partner and the Advisory

Committee to review such valuation, and such expert's determination will be binding on the parties.

Section 9.4  <u>Write-down to Value</u>.  Any Portfolio Investment that has permanently declined in value as determined by the General Partner will be written down to its value (or, if applicable, written off) pursuant to the provisions of this <u>Article IX</u>, including the valuation provisions of <u>Section 9.3</u>, as of the date of such determination.  The General Partner shall provide the Advisory Committee at least annually with the then current valuation of all Portfolio Investments.

# ARTICLE X

# BOOKS OF ACCOUNTS; MEETINGS

Section 10.1  <u>Books</u>.  The Partnership will maintain complete and accurate books of account of the Partnership's affairs at the Partnership's principal office, which books will be open to inspection by any Partner (or its authorized representative) at any time during ordinary business hours.

Section 10.2  <u>Fiscal Year</u>.  The fiscal year of the Partnership will be the calendar year, unless otherwise determined by the General Partner.

Section 10.3  <u>Reports</u>.  The General Partner will furnish the Limited Partners:

(a)    within 60 days after the end of each of the first three quarters of each fiscal year beginning with fiscal year 2008, and with respect to the fourth quarter in each fiscal year at the time of delivery of the annual financial statements under <u>Section 10.3(c)</u>, (i) unaudited quarterly financial statements (including balance sheet and income statement (including additions, dispositions and write-offs)) showing each Partner's Capital Account prepared in accordance with GAAP, applied on a consistent basis (except that, in accordance with GAAP, such quarterly financial reports may omit footnotes and year-end adjustments, accruals and reserves), and (ii) a schedule of investments including the Partnership's cost and the value of such investments prepared in accordance with <u>Article IX</u>;

(b)    within 60 days after the end of each of the first three quarters of each fiscal year beginning with fiscal year 2008, and with respect to the fourth quarter in each fiscal year at the time of delivery of the annual financial statements under <u>Section 10.3(c)</u>, unaudited quarterly descriptive investment information for each Portfolio Company and narrative summary financial information for each Portfolio Company, including revenues, EBITDA and net debt;

(c)    within 90 days after the end of each fiscal year beginning with fiscal year 2008, (i) financial statements for such year prepared in accordance with GAAP, applied on a consistent basis (certified by a firm of independent certified public accountants of recognized national standing selected by the General Partner), (ii) valuations of the Partnership's investments as of the end of such year (including a statement of each Partner's closing Capital Account) prepared in accordance with <u>Article IX</u>, and (iii) the certification to Benefit Plan Investors confirming that

-60-

the Partnership continues to qualify for an exception from Plan Assets described in the last sentence of <u>Section 5.6(a)</u> and a certification regarding the Partnership's compliance in all material respects with <u>Article III</u> hereof; and

(d)    within 90 days after the end of each fiscal year beginning with fiscal year 2008, (subject to reasonable delays in the event of late receipt of any necessary financial statements or other information necessary to prepare tax returns in respect of any Portfolio Investment), the Partnership's tax return and the Limited Partners' respective forms K-1.

Section 10.4  <u>Tax Allocation</u>.

(a)    Except as otherwise set forth in this <u>Section 10.4(a)</u>, the income, gains, losses, deductions and credits of the Partnership will be allocated, for federal, state and local income tax purposes, among the Partners in accordance with the allocation of such income, gains, losses, deductions and credits among the Partners for computing their Capital Accounts, <u>except that</u> if any such allocation is not permitted by the Code or other applicable law, the Partnership's subsequent income, gains, losses, deductions and credits will be allocated among the Partners so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.  Notwithstanding the preceding sentence, in the event the Basis of any asset of the Partnership differs from its adjusted tax basis for federal income tax purposes, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Basis in the same manner as under Section 704(c) of the Code and the Regulations thereunder.

(b)    If any Partner is treated for income tax purposes as realizing ordinary income because of receipt of his, her or its Partnership interest (whether under Section 83 of the Code or any similar provisions of any law, rule or regulation or any other applicable law, rule, regulation or doctrine) and the Partnership is entitled to any offsetting deduction, the Partnership's deduction will be allocated among the Partners in such manner as to, as nearly as possible, offset such ordinary income realized by such Partner.  If the Internal Revenue Service successfully asserts an adjustment to the taxable income of a Partner and, as a result of such adjustment, the Partnership is entitled to a deduction for federal income tax purposes in excess of any gain recognized by the Partnership, such excess deduction shall be allocated to such Partner.  If the Internal Revenue Service successfully asserts an adjustment to the taxable income of the Partnership and, as a result of such adjustment, any Partner is entitled to a deduction for federal income tax purposes in excess of any gain recognized by such Partner, the additional Partnership taxable income shall be allocated to such Partner.  If the Internal Revenue Service successfully asserts an adjustment to the taxable income of the Partnership disallowing deductions for any of the fees paid or payable to the General Partner, then additional Partnership taxable income allocable to the Partners as a result of such disallowance shall be reallocated to the General Partner.

(c)    Notwithstanding any other provision of this Agreement, if a Partner unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation § 1.704-1(b)(2)(ii) (d)(4), (5) or (6) which gives rise to a negative Capital Account (or which would give rise to a negative Capital Account when added to expected adjustments, allocations or distributions of the same type), such Partner will be allocated items of income and gain in an

amount and manner sufficient to eliminate such deficit balance as quickly as possible; provided that the Partnership's subsequent income, gains, losses, deductions and credits will be allocated among the Partners so as to achieve as nearly as possible the results that would have been achieved if this Section 10.4(c) had not been in this Agreement, except that no such allocation shall be made which would violate the provisions or purposes of Treasury Regulation § 1.704-1(b).

Section 10.5  Tax Controversies.  The General Partner is hereby designated the "Tax Matters Partner" (as defined in Section 6231 of the Code), and is authorized and required to represent the Partnership (at the Partnership's expense) in connection with all examinations of the Partnership's business and affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith.  Each Limited Partner agrees to cooperate with the General Partner and to do or refrain from doing any or all things reasonably requested by the General Partner with respect to the conduct of such proceedings.  The General Partner shall provide the Limited Partners with all notices required to be provided to them by law in connection with such proceedings, and shall otherwise keep the Limited Partners reasonably informed of the progress thereof.

Section 10.6  Certain Tax Elections.  The Partnership shall not, without the consent of all Partners, file an election (i) pursuant to Section 761 of the Code not to be treated as a partnership, or (ii) pursuant to Treasury Regulation §301.7701-3(c) to be treated as an association taxable as a corporation.

Section 10.7  Code Section 83 Safe Harbor Election.

(a)    Notice 2005-43.  By executing this Agreement, each Partner authorizes and directs the Partnership to elect to have the "Safe Harbor" described in the proposed Revenue Procedure set forth in Internal Revenue Service Notice 2005-43 (the "Notice") apply to any interest in the Partnership transferred to a service provider by the Partnership on or after the effective date of such Revenue Procedure in connection with services provided to the Partnership.  For purposes of making such Safe Harbor election, the General Partner is hereby designated as the "partner who has responsibility for federal income tax reporting" by the Partnership and, accordingly, execution of such Safe Harbor election by the General Partner constitutes execution of a "Safe Harbor Election" in accordance with section 3.03(1) of the Notice.  The Partnership and each Partner hereby agrees to comply with all requirements of the Safe Harbor described in the Notice, including, without limitation, the requirement that each Partner shall prepare and file all federal income tax returns reporting the income tax effects of each "Safe Harbor Partnership Interest" (as described in Section 3.02 of the Notice) issued by the Partnership in a manner consistent with the requirements of the Notice.

(b)    Amendment.  Each Partner authorizes the General Partner to amend Section 10.7(a) to the extent necessary to achieve substantially the same tax treatment with respect to any interest in the Partnership transferred to a service provider by the Partnership in connection with services provided to the Partnership as set forth in section 4 of the Notice (e.g., to reflect changes from the rules set forth in the Notice in subsequent Internal Revenue Service guidance), provided that such amendment is not materially adverse to any Partner (as compared with the after-tax

Appx. 04082

consequences that would result if the provisions of the Notice applied to all interests in the Partnership transferred to a service provider by the Partnership in connection with services provided to the Partnership).

Section 10.8 <u>Tax Basis Elections</u>. Each Limited Partner hereby agrees and covenants that, with respect to such Partner's interest in the Partnership, it shall not make an election under Section 732(d) of the Code without the prior written consent of the General Partner. Each Limited Partner hereby acknowledges and agrees that the Partnership may, but shall not be obligated to, elect to be treated as an electing investment Partnership under Section 743(e) of the Code in the event the Partnership qualifies to do so. In such event, each transferring Limited Partner hereby agrees to provide the Partnership and its transferee with the timely notice required in IRS Notice 2005-32, or any successor guidance or interpretations(s), including such information as is necessary to enable such transferee to compute the amount of losses disallowed under Section 743(e) of the Code. Alternatively, in the event that the Partnership elects or is required to adjust the basis of the Partnership property under Section 743 of the Code, each Limited Partner hereby agrees to promptly provide the General Partner with any information reasonably requested by the General Partner in connection with such adjustment to the basis of Partnership property. In addition, to the extent that the transfer to a Limited Partner (or the transfer of interests in a Limited Partner) results in the Partnership adjusting the basis of Partnership property, each Limited Partner that received an interest in the Partnership by reason of such transfer (or, in the case of the transfer of interest in a Limited Partner, such Limited Partner) hereby agrees to reimburse the Partnership and/or the General Partner within 10 Business Days for any expenses (including without limitation accounting fees) reasonably incurred by the Partnership and/or the General Partner (and their respective affiliates) in connection with effecting such adjustments to the basis of Partnership property as it relates to such transfer. The General Partner is hereby authorized by each Limited Partner, with respect to any distribution to which such Limited Partner might otherwise be entitled, to defer making such distribution to such Limited Partner, if at the time such distribution would otherwise be effected, such Limited Partner has not satisfied its obligation to make the reimbursements provided for in the preceding sentence within the period specified therein.

Section 10.9 <u>Annual Meeting</u>. The General Partner will hold annual general informational meetings for the Limited Partners until such time, after the termination of the Commitment Period, that substantially all of the Portfolio Investments have been Disposed..

# ARTICLE XI

## CERTIFICATE OF LIMITED PARTNERSHIP;
## POWER OF ATTORNEY

Section 11.1 <u>Certificate of Partnership</u>. A certificate of Limited Partnership within the meaning of the Delaware Partnership Act (the "<u>Certificate</u>") will be prepared upon the execution and delivery of this Agreement. The General Partner will cause the Certificate to be filed and recorded in the office of the Secretary of State of the State of Delaware and, to the extent required by local law, in the appropriate place in each state in which the Partnership may

Appx. 04083

hereafter establish a place of business; provided, however, that the Partnership will not be obligated to provide the Limited Partners with a copy of any amendment to or restatement of the Certificate other than any amendment or restatement required to be filed in connection with an amendment of this Agreement pursuant to Section 12.1. The General Partner will also cause to be filed, recorded and published such statements, notices, certificates or other instruments required by any provision of any applicable law which governs the formation of the Partnership or the conduct of its business from time to time.

Section 11.2 Power of Attorney. Each of the undersigned does hereby constitute and appoint each member of the General Partner and each person who hereafter becomes a member of the General Partner with full power to act without the others, as his, her or its true and lawful representative and attorney-in-fact, in her, his or its name, place and stead, to make, execute, sign, acknowledge and deliver or file (a) the Certificate, (b) any amendment to or cancellation of the Certificate or any amendment to, or waiver of, this Agreement effected in accordance with Section 12.1, (c) all instruments, documents and certificates which may from time to time be required by any law to effectuate, implement and continue the valid and subsisting existence of the Partnership, (d) all instruments, documents and certificates which may be required to effectuate the dissolution and termination of the Partnership, and (e) in the case of a Defaulting Partner any bills of sale or other appropriate transfer documents necessary to effectuate transfers of such Defaulting Partner's interest pursuant to Section 6.11 above. The powers of attorney granted herein will be deemed to be coupled with an interest, will be irrevocable and will survive the death, incompetency, disability or dissolution of a Limited Partner. Without limiting the foregoing, the powers of attorney granted herein will not be deemed to constitute the written consent of any Limited Partner for purposes of Section 12.1. Notwithstanding the foregoing or anything contained in this Agreement to the contrary, the foregoing power of attorney may not be exercised by the General Partner after the occurrence of an event specified in Section 8.2 or the removal of the General Partner pursuant to Section 5.9.

## ARTICLE XII

## MISCELLANEOUS

Section 12.1 Amendments.

(a)     This Agreement may be amended only by the written consent of the General Partner and, except as otherwise provided in this Section 12.1, a Majority in Interest of the Limited Partners.

(b)     Notwithstanding anything in this Section 12.1 to the contrary, no amendment will be valid as to any Limited Partner (including a Defaulting Partner) which (i) increases or decreases such Limited Partner's Commitment without the written consent of such Limited Partner or (ii) amends the provisions of this Section 12.1(b).

(c)     Notwithstanding anything in this Section 12.1 to the contrary, no amendment will be valid as to any Limited Partner (including a Defaulting Partner) which alters (i) the provisions of Sections 2.3, 3.3, 4.1, 6.1, 8.3(c) or the provisions of this Section 12.1(c), (ii) the provisions of

17461908                                            -64-

Section 6.7(c) in a manner that increases a Limited Partner's potential obligations, or (iii) any other provision of this Agreement, in a manner adverse to such Limited Partner, without the written consent of such Limited Partner; provided, however, that with respect to clause (iii), if such Limited Partner is not treated differently in any material respect from any other Limited Partner then such amendment will be valid with only the written consent of the General Partner and the Limited Partners representing at least a Majority in Interest of the Limited Partners.

(d)     Notwithstanding anything in this Section 12.1 to the contrary, no amendment will be valid as to any Limited Partner (including a Defaulting Partner), which alters the provisions of Sections 1.3, 5.4, 5.10, 5.11, 12.1 or any provision which requires the consent or vote of at least Two-Thirds in Interest of the Limited Partners without the written consent of the General Partner and at least Two-Thirds in Interest of the Limited Partners.

(e)     Notwithstanding anything in this Section 12.1 to the contrary, no amendment which would alter the provisions of Sections 5.5, 6.6 and the provisions of this Section 12.1(e), or, with respect to Benefit Plan Investors, Sections 5.6, 12.1(e), and the provisions in Section 5.15 relating to Benefit Plan Investors or the definitions of Benefit Plan Investor or Redemption Value, will be valid without the written consent of at least a Majority in Interest of the Limited Partners that are materially and adversely affected by such amendment (including Limited Partners whose direct or indirect beneficial owners would be so affected).

(f)     Notwithstanding anything in this Section 12.1 to the contrary, no amendment will be valid as to any Limited Partner (including a Defaulting Partner), which alters any provision which requires the consent or vote of at least Seventy-Five Percent in Interest of the Limited Partners or the provisions of this Section 12.1(f) without the written consent of the General Partner and at least Seventy-Five Percent in Interest of the Limited Partners.

(g)     Notwithstanding anything in this Section 12.1 to the contrary, no amendment shall be made which would amend the provisions hereof relating to the rights of BHCA Partners without the consent of each BHCA Partner affected thereby.

(h)     Notwithstanding anything in this Section 12.1 to the contrary, the General Partner may amend any provisions of this Agreement solely as it relates to a Limited Partner pursuant to one or more side letters with such Limited Partner without the consent of the Limited Partners not party to such side letters.

(i)     In addition to any amendments or waivers otherwise authorized hereby, this Agreement may be amended from time to time by the General Partner without the consent of any of the Limited Partners (i) to add to the representations, duties or obligations of the General Partner or surrender any right or power (but not responsibilities) granted to the General Partner herein; (ii) to cure any ambiguity or correct any provisions hereof which may be inconsistent with any other provisions hereof, or correct any printing, stenographic or clerical errors or omissions; (iii) to admit one or more Additional Limited Partners, or withdraw one or more Limited Partners, in accordance with the terms of this Agreement, and (iv) with the consent of the Advisory Committee, to take such actions contemplated in Section 5.6(e) or avoid any material adverse consequences to the Partnership or the General Partner as a result of any change

17461908                                            -65-

in law or interpretation of law applicable to a Regulated Investor. The General Partner shall promptly send each Limited Partner a copy of any amendment adopted pursuant to Section 12.1.

Section 12.2 Successors. Except as otherwise provided herein, this Agreement will inure to the benefit of and be binding upon the Partners and their legal representatives, heirs, successors and assigns.

Section 12.3 Governing Law; Severability. This Agreement will be construed in accordance with the laws of the State of Delaware and, to the maximum extent possible, in such manner as to comply with all the terms and conditions of the Delaware Partnership Act. If it is determined by a court of competent jurisdiction that any provision of this Agreement is invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

Section 12.4 Notices. All notices, demands and other communications to be given and delivered under or by reason of provisions under this Agreement will be in writing and will be deemed to have been given when personally delivered, sent by telecopy (with hard copy to follow by reputable overnight courier) or sent by reputable overnight courier service (charges prepaid) or mailed by first class mail (with a copy sent by telecopy) to the addresses or telecopy numbers set forth in Schedule 1 hereto or to such other address or telecopy number as has been indicated to all Partners.

Section 12.5 Legal Counsel. Each Partner hereby agrees and acknowledges that:

(a)     The law firm retained by the General Partner, the Partnership and any Parallel Vehicle or Separate Investment Entity (the "GP's Counsel") in connection with the formation of the Partnership, the offering of Limited Partner interests and the management and operation of the Partnership does not and will not represent the Limited Partners in connection with any such matter or in connection with any dispute which may arise between the Limited Partners on one hand and the General Partner, the Partnership and any Parallel Vehicle or Separate Investment Entity on the other (the "Partnership Legal Matters").

(b)     Each Limited Partner will, if it wishes counsel on a Partnership Legal Matter, retain its own independent counsel with respect to each of the foregoing matters described in Section 12.5(a).

(c)     Each Limited Partner hereby agrees that the GP's Counsel may represent (i) the General Partner and the Partnership and any Parallel Vehicle or Separate Investment Entity in connection with any and all Partnership Legal Matters (including any dispute between the General Partner and one or more Limited Partners, but excluding a Limited Partner's derivative action brought against the General Partner).

Section 12.6 Miscellaneous. This document and the schedules, exhibits and side letter agreements between the Partnership and certain of the Limited Partners in connection herewith and the Subscription Agreements contain the entire Agreement among the parties and supersede all prior arrangements or understanding with respect thereto. Descriptive headings are for convenience only and will not control or affect the meaning or construction of any provision of this Agreement. This Agreement may be executed in any number of counterparts, any one of

17461908                                    -66-

which need not contain the signatures of more than one party, but all of such counterparts together will constitute one agreement.

**[Remainder of page intentionally left blank]**

17461908

Appx. 04087

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed as of the date first above written.

**GENERAL PARTNER:**

HIGHLAND RESTORATION CAPITAL PARTNERS GP, LLC

By: _____
   Name:  James Dondero
   Title:   President

*Highland Restoration Capital Partners, L.P. –*
*Agreement of Limited Partnership*

# LIMITED PARTNERS

On behalf of each of the parties named above

By: HIGHLAND RESTORATION CAPITAL
PARTNERS GP, LLC as Attorney-in-Fact
pursuant to <u>Section 14</u> of each of the
Subscription Agreements, dated April 18,
2008, between each of the above named
parties and Highland Restoration Capital
Partners GP, LLC as General Partner of
Highland Restoration Capital Partners, L.P.

By: _____
Name: James Dondero
Title: President

17461908

*Highland Restoration Capital Partners, L.P. –*
*Agreement of Limited Partnership*

AMENDED AND RESTATED

AGREEMENT OF LIMITED PARTNERSHIP

OF

HIGHLAND RESTORATION CAPITAL PARTNERS MASTER, L.P.

17475136

# TABLE OF CONTENTS

<strong>Page</strong>

**ARTICLE I**      **GENERAL PROVISIONS** ..................................................................... 1

    Section 1.1      Formation .......................................................................................... 1

    Section 1.2      Name ................................................................................................. 1

    Section 1.3      Purpose .............................................................................................. 1

    Section 1.4      Place of Business ............................................................................... 1

**ARTICLE II**      **DEFINITIONS; DETERMINATIONS; CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS** ......................................... 2

    Section 2.1      Definitions; Determinations .............................................................. 2

    Section 2.2      Capital Contribution Commitment .................................................... 9

    Section 2.3      Capital Accounts ............................................................................... 9

    Section 2.4      Distributions in Kind ....................................................................... 11

**ARTICLE III**      **DISTRIBUTIONS** ................................................................................ 11

    Section 3.1      Distribution Policy .......................................................................... 11

    Section 3.2      Distribution of Short-Term Investment Income .............................. 11

    Section 3.3      Distributions of Current Cash Income and Proceeds From Dispositions of or Partial Realizations with Respect to Investments and In Kind Distributions .............................................. 12

    Section 3.4      Foreign Taxes .................................................................................. 14

**ARTICLE IV**      **PARTNERSHIP EXPENSES** .............................................................. 14

    Section 4.1      Partnership Expenses ....................................................................... 14

**ARTICLE V**      **GENERAL PARTNER** ........................................................................ 14

    Section 5.1      Management Authority .................................................................... 14

    Section 5.2      Use of Affiliates .............................................................................. 15

    Section 5.3      Transfer of General Partnership Interest; No Withdrawal or Loans ................................................................................................ 15

    Section 5.4      Removal of the General Partner ...................................................... 15

    Section 5.5      No Liability to Limited Partners ..................................................... 16

    Section 5.6      Indemnification ............................................................................... 16

**ARTICLE VI**      **LIMITED PARTNERS** ........................................................................ 17

    Section 6.1      Limited Liability ............................................................................. 17

**Appx. 04092**

## TABLE OF CONTENTS
(continued)

Page

Section 6.2     Transfer of Limited Partnership Interests ........................................... 17

Section 6.3     No Withdrawal ..................................................................................... 18

Section 6.4     No Termination ..................................................................................... 18

Section 6.5     Additional Investors ............................................................................ 18

Section 6.6     Section 754 Election ............................................................................ 19

ARTICLE VII     [RESERVED] ............................................................................ 19

ARTICLE VIII     DURATION AND TERMINATION ......................................... 19

Section 8.1     Duration ............................................................................................... 19

Section 8.2     Early Termination ............................................................................... 19

Section 8.3     Termination and Liquidation of Partnership Interests; Annual Determination of General Partner Give Back .................................... 20

ARTICLE IX     [RESERVED] ............................................................................ 21

ARTICLE X     BOOKS OF ACCOUNTS; MEETINGS .................................. 21

Section 10.1     Books .................................................................................................... 21

Section 10.2     Fiscal Year ........................................................................................... 22

Section 10.3     Tax Allocation ..................................................................................... 22

Section 10.4     Tax Controversies ............................................................................... 23

Section 10.5     Certain Tax Elections .......................................................................... 23

Section 10.6     Code Section 83 Safe Harbor Election. .............................................. 23

ARTICLE XI     REGISTRATION OF LIMITED PARTNERSHIP ....................... 24

Section 11.1     Registration of Limited Partnership .................................................... 24

ARTICLE XII     MISCELLANEOUS ................................................................ 24

Section 12.1     Amendments ........................................................................................ 24

Section 12.2     Successors ............................................................................................ 24

Section 12.3     Governing Law; Severability ............................................................... 24

Section 12.4     Notices ................................................................................................. 24

Section 12.5     Miscellaneous ...................................................................................... 24

Schedule 1     Limited Partners/Partnership Percentage Interest/Notice Information

Appx. 04093

# AMENDED AND RESTATED
## AGREEMENT OF LIMITED PARTNERSHIP
### OF
## HIGHLAND RESTORATION CAPITAL PARTNERS MASTER, L.P.

THIS AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP (this "Agreement") is dated effective as of April 18, 2008 between Highland Restoration Capital Partners GP, LLC, a Delaware limited liability company (in its capacity as general partner of the Partnership, the "General Partner"), and the limited partners listed in Schedule 1 attached hereto (in their capacities as limited partners of the Partnership, the "Limited Partners") (the General Partner and the Limited Partners being herein collectively called the "Partners"). Capitalized terms not otherwise defined shall have the meanings ascribed to such terms in Section 2.1(a).

The General Partner and certain of the Limited Partners entered into an Agreement of Limited Partnership, dated as of November 15, 2007 (the "Original Agreement"). The parties hereto wish to amend and restate the Original Agreement in the manner set forth herein.

# ARTICLE I

## GENERAL PROVISIONS

Section 1.1  Formation.  The Partners hereby agree to form a limited partnership (the "Partnership") pursuant to and in accordance with the Delaware Revised Uniform Limited Partnership Act (the "Delaware Partnership Act").

Section 1.2  Name.  The name of the Partnership will be "Highland Restoration Capital Partners Master, L.P." or such other name or names as the General Partner may from time to time designate.  The General Partner will notify Limited Partners in writing of any change to the name of the Partnership.

Section 1.3  Purpose.  Subject to the express limitations set forth herein and in the Offshore Fund Agreement, the Partnership is organized for the object and purpose of (i) investing in senior secured bank loans, debt obligations, trade claims and equity securities of middle market Distressed Companies primarily based in the United States generally consistent with the investment strategy described in the Partnership's Confidential Private Placement Memorandum, including, without limitation, privately placed or publicly traded debt securities and other debt obligations, senior and subordinated debt obligations, secured and unsecured debt obligations, privately placed or publicly traded equity securities including common stock, preferred stock and warrants, (ii) managing and monitoring such investments and (iii) engaging in such activities incidental or ancillary thereto and otherwise permitted by the Delaware Partnership Act as the General Partner deems necessary or advisable.

Section 1.4  Place of Business.  The Partnership will maintain offices and places of business at Two Galleria Tower, 13455 Noel Road, Dallas, TX 75240, or at such other place or places in the United States as the General Partner may from time to time designate; provided,

17475136

**Appx. 04094**

<u>however</u>, that if the General Partner designates different places of business, it shall promptly notify the Limited Partners in writing.

## ARTICLE II

## DEFINITIONS; DETERMINATIONS;
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

Section 2.1 <u>Definitions; Determinations</u>.

(a) For purposes of this Agreement the following capitalized terms shall have the meanings set forth below:

"<u>Affiliate</u>" has the meaning set forth in the Offshore Fund Agreement.

"<u>Agreement</u>" has the meaning set forth in the introduction.

"<u>Allocated Expenses</u>" has the meaning set forth in the Offshore Fund Agreement.

"<u>Available Profits</u>" means, with respect to a Waived Fee Amount, the cumulative amount of items of Partnership income and gain (such items being "<u>Partnership Profits</u>") realized after the Waived Fee Notice giving rise to such Waived Fee Amount. The amount of Partnership Profits realized after a Waived Fee Notice for the purpose of this Available Profits definition shall equal the amount of Partnership income and gain realized after the Waived Fee Notice for purposes of maintaining Capital Accounts; <u>provided</u>, <u>however</u>, the amount of Partnership gain realized after a Waived Fee Notice that is attributable to any Portfolio Investment held by the Partnership at the time of such Waived Fee Notice that is taken into account in calculating Partnership Profits shall equal the excess, if any, of (1) the amount the Partnership realizes on the sale, transfer, or other disposition of such Portfolio Investment or its assets <u>over</u> (2) the fair market value (as determined by the General Partner) of such Portfolio Investment or its assets, as applicable, on the date of such Waived Fee Notice. Notwithstanding the two preceding sentences, the aggregate amount of all items of Partnership Profits for any taxable year included in Available Profits shall not exceed the total amount of the Partnership's net income and gain for such taxable year as determined for federal income tax purposes, except that gain attributable to a Portfolio Investment shall be determined as described in the proviso to the preceding sentence. Notwithstanding the three preceding sentences, to the extent of the amount by which the Special Profit Interest with respect to a Portfolio Investment exceeds the Deemed Contribution with respect to such Portfolio Investment, Available Profits includes an allocable share of all items of income or gain realized by the Partnership with respect to such Portfolio Investment.

"<u>Basis</u>" of any security means the basis of such security as determined in accordance with the Code less the amount of any write-down pursuant to Section 9.4 of the Offshore Fund Agreement and as further adjusted by the General Partner in its reasonable discretion to reverse the effects of any exchange of securities that would result in an increase in tax basis pursuant to the Code.

17475136                                    -2-

"Bridge Financing" has the meaning set forth in the Offshore Fund Agreement.

"Built-In Tax Amount" means, with respect to any distribution of securities in-kind received by the General Partner, an amount equal to the taxes that would be payable by the General Partner (and its direct and indirect members), assuming (i) such securities were sold in a taxable transaction immediately after their receipt by the General Partner for an amount equal to their value and (ii) any gains were taxed at the highest marginal rates applicable to any of the General Partner's members or former members, applying the assumptions set forth in Section 3.3(b) in the same manner as if such securities had been sold by the Partnership immediately before such distribution.

"Business Day" means any day other than (i) Saturday or Sunday or (ii) any other day on which banks located in New York City generally are closed for business.

"Capital Account" has the meaning set forth in Section 2.3.

"Capital Contribution" of any Partner means the amount received by the Partnership from such Partner as an actual contribution.

"Capitalized Partnership Expenses" means Partnership Expenses that are reflected in the Basis of Portfolio Investments.

"Carried Interest" means the General Partner's 20% interest in the Partnership's distributions specified in Section 3.3(a)(ii)(A) and Section 3.3(a)(iii)(B).

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Commitment" has the meaning set forth in the Offshore Fund Agreement.

"Commitment Period" has the meaning set forth in the Offshore Fund Agreement.

"Current Cash Income" means all Current Income paid in cash or cash equivalents.

"Current Income" means all interest and dividend income (including from original issue discount, purchases or investments at a market discount, and payment of in-kind income and other non-cash current income) from a Portfolio Company.

"Deemed Contribution" means, as of any date, for any Portfolio Investment or the payment of expenses incurred directly in connection with the making, maintaining or disposing of such Portfolio Investment, the Gross-up Percentage multiplied by the product of (i) the amount by which the Capital Contributions required from the General Partner pursuant to the Offshore Fund Agreement are reduced pursuant to Section 2.2(a)(ii) of the Offshore Fund Agreement with respect to such Portfolio Investment or the payment of related expenses, multiplied by (ii) (1) with respect to the General Partner, the quotient determined by dividing (x) the aggregate Commitments of all Partners in the Offshore Fund (including the General Partner) other than Limited Partners as to whom no Management Fee is payable pursuant to Section 4.1(b) by (y) the aggregate Commitments of all Partners in the Offshore Fund, and (2) with respect to each Limited Partner as to whom no Management Fee is payable pursuant to Section

4.1(b), the quotient determined by dividing (x) the Commitment of such Limited Partner by (y) the aggregate Commitments of all Partners.

"Delaware Partnership Act" has the meaning set forth in Section 1.1.

"Determination Date" has the meaning set forth in Section 8.3(c).

"Disposition" or "Disposed of" means, with respect to all or a portion of a Portfolio Investment, (i) except as provided in the next sentence, the sale, exchange or other disposition by the Partnership of all or a portion of the securities or other interests constituting that Portfolio Investment for cash, securities or other property, (ii) the receipt by the Partnership of a distribution of the proceeds of the sale of all or substantially all of the assets of the Portfolio Company in complete liquidation of the Partnership's entire interest in the Portfolio Investment and (iii) an in-kind distribution of all or part of a Portfolio Investment that has not previously been deemed to have been Disposed of, as of the date of and to the extent of such distribution. A "Disposition" does not include (i) a recapitalization that consists of an exchange of a Portfolio Investment for other securities of or claims against the issuing Portfolio Company, (ii) a business combination that consists of an exchange of substantially all of the Partnership's remaining interest in a Portfolio Investment for securities issued by an acquiring entity, (iii) a business combination that consists of the exchange of all or substantially all of the assets of a Portfolio Company or one or more divisions or operating units of a Portfolio Company for securities issued by an acquiring entity or (iv) a sale, exchange or other disposition that does not constitute a pro rata disposition of a portion of each class of securities or other interests constituting such Portfolio Investment.

"Distressed Companies" shall mean persons that, in the opinion of the General Partner, (a) are or have been in financial or other stress; (b) are restructuring, are considered likely to be restructured, or have been restructured in an out-of-court process or in a proceeding under the Federal bankruptcy laws or state insolvency laws or similar laws in or outside of the United States; (c) are being, are considered likely to be or have been reorganized within or outside of a proceeding under federal bankruptcy laws or state insolvency laws or similar laws in or outside of the United States; or (d) are engaged, are considered likely to engage or have been engaged in other extraordinary transactions, such as debt restructurings, reorganizations and liquidations outside of bankruptcy.

"Excess Partial Realization Proceeds" means, for any Partner and as of any date, the sum of the positive amounts determined with respect to each Portfolio Investment (or portion thereof) that has not been Disposed of as of such date and as to which there have been proceeds from a Partial Realization as of such date, equal to the excess of (a) such Partner's Partner Share of aggregate proceeds that have been distributed as of such date of all Partial Realizations with respect to such Portfolio Investment or portion thereof over (b) the sum of (i) such Partner's Capital Contributions applied to make such Portfolio Investment or portion thereof, including Capitalized Partnership Expenses attributed to such Portfolio Investment or portion thereof and any Allocated Expenses with respect to such Portfolio Investment as of such date, plus (ii) an amount that would be equal to such Partner's Preferred Amount if such Partner's Preference Base were only the amounts described in clause (i).

17475136                                    -4-

"Final Closing" has the meaning set forth in the Offshore Fund Agreement.

"First Closing" has the meaning set forth in the Offshore Fund Agreement.

"General Partner" has the meaning set forth in the introduction to this Agreement and includes any successor general partner of the Partnership appointed in accordance with this Agreement.

"Guaranty Agreement" shall mean the Guaranty Agreement, dated as of the date hereof, by and among the Partnership, the General Partner and the guarantors party thereto, substantially in the form of the agreement set forth in Exhibit A to the Offshore Fund Agreement, as amended from time to time in accordance with its terms.

"Initial Limited Partner" has the meaning set forth in the introduction.

"Interest" means a partnership interest in the Partnership.

"Investment Company Act" means the Investment Company Act of 1940, as amended.

"Investment Date" means, with respect to any Portfolio Investment, the date such Portfolio Investment was acquired by the Partnership.

"Investment Income and Gain" means, with respect to a Portfolio Investment, (i) the excess, if any, of the proceeds from the Disposition of such Portfolio Investment or portion thereof or Partial Realization with respect to such Portfolio Investment or portion thereof that does not give rise to Current Income over the Basis of such Portfolio Investment or portion thereof, (ii) to the extent all or any portion of such Portfolio Investment is distributed to the Partners in kind as contemplated by Section 2.3, the excess, if any, of the value (as determined pursuant to Article IX) of the portion of such Portfolio Investment distributed to the Partners over the Basis of such portion of such Portfolio Investment, and (iii) Current Income attributable to such Portfolio Investment.

"Investment Loss" means, with respect to a Portfolio Investment, (i) the deficiency, if any, of the proceeds from the Disposition of such Portfolio Investment or portion thereof or Partial Realization with respect to such Portfolio Investment or portion thereof that does not give rise to Current Income as compared to the Basis of such Portfolio Investment or portion thereof, (ii) to the extent all or any portion of such Portfolio Investment is distributed to the Partners in kind as contemplated by Section 2.4, the deficiency, if any, of the value (as determined pursuant to Article IX) of the portion of such Portfolio Investment distributed to the Partners as compared to the Basis of such portion of such Portfolio Investment, and (iii) the amount, as reasonably determined by the General Partner in accordance with Section 9.4 of the Offshore Fund Agreement, by which such Portfolio Investment has permanently declined in value below the Basis of such Portfolio Investment immediately prior to such determination.

"Limited Partners" means the persons listed in Schedule 1 hereto in their capacity as limited partners of the Partnership and each person who is admitted to the Partnership as a substitute limited partner pursuant to Section 6.2, so long as each such person continues to be a limited partner of the Partnership hereunder.

"Majority in Interest of the Offshore Fund Limited Partners" means limited partners of the Offshore Fund with aggregate percentage interests in the Offshore Fund in excess of 50%.

"Manager" has the meaning set forth in the Offshore Fund Agreement.

"Marketable Securities" has the meaning set forth in the Offshore Fund Agreement.

"Notice" has the meaning set forth in Section 10.6(a).

"Offshore Fund" means Highland Restoration Capital Partners Offshore, L.P., a Cayman exempted limited partnership.

"Offshore Fund Agreement" means Amended and Restated Agreement of Limited Partnership of the Offshore Fund, dated as of November 15, 2007, as amended from time to time in accordance with its terms.

"Parallel Vehicle" has the meaning set forth in the Offshore Fund Agreement.

"Partial Realization" means, with respect to any Portfolio Investment, the realization by the Partnership of Current Income or of proceeds from a recapitalization, extraordinary dividend, sale, redemption or other disposition of less than all of such Portfolio Investment (other than a pro rata disposition of a portion of each class of securities or other interests constituting such Portfolio Investment) or any other similar event that does not constitute a Disposition of such Portfolio Investment.

"Participating Partner" means, with respect to any Portfolio Investment, any Limited Partner who made a Capital Contribution (other than solely a Waiver Contribution) that was applied to such Portfolio Investment.

"Partner Interest" means, for any Partner that is a Participating Partner with respect to any Portfolio Investment (i) for each Partner as to which there is a Deemed Contribution, the proportion that the sum of such Partner's Capital Contributions and allocable share of Deemed Contributions that were applied to such Portfolio Investment bears to the aggregate Capital Contributions and Deemed Contributions of all Partners that were applied to such Portfolio Investment, and (ii) for any Partner other than Partners described in clause(i), the proportion that such Partner's Capital Contributions that were applied to such Portfolio Investment bears to the aggregate Capital Contributions and Deemed Contributions of all Partners that were applied to such Portfolio Investment.

"Partner Share" means, for any Partner, and for any period, the amount of Investment Income and Gain, Investment Loss, Current Cash Income, proceeds from the Disposition of or Partial Realization with respect to such Portfolio Investment for such period or distribution in kind with respect to such Portfolio Investment, as the case may be, or items of Partnership income or expense generated by such Portfolio Investment or allocable to such Portfolio Investment pursuant to Section 3.3(b) of the Offshore Fund Agreement, in each case for such period multiplied by such Partner's Partner Interest in such Portfolio Investment.

"Partners" means the General Partner and the Limited Partners, collectively.

"Partnership" has the meaning set forth in Section 1.1.

"Partnership Expenses" means all reasonable costs and expenses relating to the Partnership's activities, investments and business (to the extent not borne or reimbursed by a Portfolio Company or proposed Portfolio Company), including, but not limited to, (i) all costs and out-of-pocket fees and expenses attributable to acquiring, investing, holding, monitoring and disposing of the Partnership's investments, (ii) all other out-of-pocket costs and out-of-pocket fees and expenses attributable to unconsummated transactions or investment strategies (but excluding marketing strategies) that do not lead to consummated acquisitions, (iii) legal, accounting, auditing, administrative, consulting and other fees and expenses (including, but not limited to, fees of the administrator of the Partnership and insurance and other out-of-pocket expenses associated with negotiating, consummating, monitoring and disposing of the Partnership's investments and the preparation of Partnership financial statements, tax returns and forms K-1), (iv) extraordinary expenses, liabilities, indemnities and other obligations of the Partnership (including, but not limited to, litigation and indemnification costs and expenses, judgments and settlements (including, but not limited to, costs and expenses payable under Section 5.6)), and (v) all debt service obligations, including interest, premium, if any, fees, expenses and other amounts payable in respect of indebtedness of the Partnership.

"Partnership Percentage Interest" shall mean in respect of each Partner, the percentage designated as such Partner's Partnership Percentage Interest in Schedule 1 attached hereto, as the same shall be amended from time to time in order to reflect transfers of Interests.  The General Partner's Partnership Percentage Interest shall be the percentage determined by dividing the General Partner's Commitment as of the date of determination by the aggregate Commitments of all partners in the Offshore Fund (including the General Partner) as of such date.

"Person" means an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a governmental entity (or any department, agency or political subdivision thereof).

"Portfolio Company" means any corporation, partnership, limited liability, company or other entity in which the Partnership has made an investment, other than Short-Term Investments.

"Portfolio Investments" means any investments held by the Partnership, other than Short-Term Investments.  If the Partnership holds multiple classes of securities or other interests that were issued by a Portfolio Company in a single closing or series of related closings, all of such securities or interests in the aggregate shall constitute one Portfolio Investment.

"Preference Base" means for any Partner and, as of any date, (a) with respect to any distribution of the proceeds of a Disposition, the sum of (i) the Limited Partners' aggregate Capital Contributions applied to make Portfolio Investments that have been Disposed of on or prior to such date or applied to pay Capitalized Partnership Expenses with respect to such Portfolio Investments, (ii) the Limited Partners' aggregate Partner Share of all writedowns (including write-offs) pursuant to Section 9.4 of the Offshore Fund Agreement in respect of Portfolio Investments that have not been Disposed of by the Partnership on or prior to such date and (iii) the Limited Partners' aggregate Capital Contributions applied to pay Allocated

Appx. 04100

Expenses with respect to Portfolio Investments that have been Disposed of, written down or written off on or prior to such date, and (b) with respect to any distribution of proceeds of a Partial Realization, the amounts determined pursuant to clause (a), plus the Limited Partners' aggregate Capital Contributions applied to make the Portfolio Investment to which such proceeds are attributable, including Capitalized Partnership Expenses attributable to such Portfolio Investment and Allocated Expenses with respect to such Portfolio Investment as of such date. For purposes of determining a Partner's Preferred Amount, a Partner's Preference Base shall not include any Capital Contributions returned to such Partner pursuant to Section 2.2(c).

"Preferred Amount" means, for any Partner and as of any date, the amount, if any, that would be required to be distributed on such date so that the aggregate distributions pursuant to Section 3.3 (including distributions pursuant to Sections 8.3(b) and (c)), to such Partner in excess of such Partner's Preference Base provide a return of 8% per annum (compounded annually) on such Partner's Preference Base. For purposes of determining a Partner's Preferred Amount with respect to a Disposition of a Portfolio Investment, no proceeds of Partial Realizations with respect to Portfolio Investments or portions thereof that have not been Disposed of as of such date shall be taken into account, other than Excess Partial Realization Proceeds realized as of such date. A Partner's Preferred Amount shall be calculated on the basis of the actual number of days elapsed from and including the date on which each Capital Contribution is invested in a Portfolio Company or contributions are made to the Offshore Fund for the purpose of paying Management Fees, Organizational Expenses and Partnership Expenses (as such terms are defined in the Offshore Fund Agreement), as applicable, to, but not including, the date that distributions constituting a return of such Capital Contributions were made by the Offshore Fund to the Partners thereof pursuant to Section 3.3(a)(i).

"Principals" has the meaning set forth in the Offshore Fund Agreement.

"Short-Term Investment Income" means the income earned on Short-Term Investments including in any event any gains and net of any losses from dispositions of Short-Term Investments and also net of any costs and expenses directly attributable thereto.

"Short-Term Investments" means investments in (a) cash, (b) obligations of, or fully guaranteed as to timely payment of principal and interest by, the United States of America and with a maturity date not in excess of 12 months from the date of purchase by the Partnership, (c) interest-bearing accounts and/or certificates of deposit of any U.S. bank with capital and surplus in excess of $500 million and whose short-term debt securities are rated not lower than P-1 by Moody's Investor Services, Inc. and A-1+ by Standard & Poor's Corporation and whose long term unsecured debt securities, or the long term unsecured debt securities of its affiliated holding company, are rated no lower than A1 by Moody's Investor Services, Inc. and A+ by Standard & Poor's Corporation, (d) reverse repurchase agreements using U.S. Treasury securities and entered into with any U.S. bank with capital and surplus in excess of $500 million and whose short-term debt securities are rated not lower than P-1 by Moody's Investor Services, Inc. and A-1+ by Standard & Poor's Corporation and whose long term unsecured debt securities, or the long term unsecured debt securities of its affiliated holding company, are rated no lower than A1 by Moody's Investor Services, Inc. and A+ by Standard & Poor's Corporation, and (e) money market mutual funds with assets of not less than $500 million, substantially all of

which assets are reasonably believed by the General Partner to consist of items described in one or more of the foregoing clauses (b), (c) and (d).

"Special Profit Interest" means (i) the General Partner's right to receive distributions pursuant to the first two sentences of Section 3.3(a), but only to the extent such distributions exceed the distributions that would have been made to the General Partner pursuant to the first two sentences of Section 3.3(a) if such distributions had been made pro rata according to each Partner's Capital Contributions to the Partnership, and (ii) the General Partner's right to receive distributions pursuant to Section 3.3(e).

"Tax Distributions" means the aggregate amount of distributions that would be made to the General Partner if the General Partner received no distributions other than those required pursuant to Section 3.3(b).

"Unapplied Waived Fee Amounts" means, as of the date of determination, the excess, if any, of (i) the sum of (A) the aggregate Waived Fee Amount for all Management Fee Periods (as defined in the Offshore Fund Agreement), beginning on or before the date of determination (B) the aggregate amount described in clause (i) of the definition of "Deemed Contribution" relating to the aggregate Waiver Contributions previously returned to the limited partners of the Offshore Fund pursuant to Section 2.2(c) of the Offshore Fund Agreement (including, without limitation, in respect of Bridge Financings) and (C) amounts added to the Unapplied Waived Fee Amounts pursuant to Section 6.5(b) of the Offshore Fund Agreement over (ii) the aggregate amount described in clause (i) of the definition of "Deemed Contribution" as of such date.

"Uncapitalized Partnership Expenses" means Partnership Expenses that are not Capitalized Partnership Expenses.

"Unfunded Commitment" has the meaning set forth in the Offshore Fund Agreement.

"Waived Fee Amount" has the meaning set forth in the Offshore Fund Agreement.

"Waived Fee Notice" has the meaning set forth in the Offshore Fund Agreement.

"Waiver Contribution" has the meaning set forth in the Offshore Fund Agreement.

Section 2.2  Capital Contribution Commitment.  The General Partner shall make Capital Contributions to the Partnership as provided in Section 2.2(a)(i) of the Offshore Fund Agreement, taking into account any reduction in such Capital Contributions as provided in Section 2.2(a)(ii) of the Offshore Fund Agreement.  The remaining capital requirements of the Partnership shall be funded through Capital Contributions by the Limited Partners pro rata in accordance with their respective Partnership Percentage Interests.  Each Capital Contribution shall be made by the Partners in cash either by delivery to the Partnership of a certified check or wire transfer of immediately available funds to an account designated by the General Partner.

Section 2.3  Capital Accounts.  A capital account ("Capital Account") will be established for each Partner on the books of the Partnership and will be adjusted as follows:

Appx. 04102

    (a)    <u>Capital Contributions and Allocations</u>.  A Partner's Capital Contribution will be credited to its Capital Account when received by the Partnership.

    (b)    <u>Short-Term Investment Income</u>.  Short-Term Investment Income earned in each quarterly period with respect to Capital Contributions that have not yet been invested in Portfolio Investments or used to pay fees and expenses of the Partnership will be credited to the Capital Accounts of the Partners <u>pro rata</u> according to their respective Partner Capital Contributions to which such Short-Term Investment Income is attributable.  Short-Term Investment Income on undistributed proceeds from Portfolio Investments shall be credited to the Capital Accounts of the Partners ratably in proportion to their respective shares of such undistributed amounts.

    (c)    <u>Investment Income and Gain and Investment Loss</u>.  Except as otherwise provided in this <u>Section 2.3(c)</u>, Investment Income and Gain or Investment Loss shall be allocated among the Partners for each taxable period in such a manner that, as of the end of such taxable period, and to the extent possible, the Capital Account of each Partner shall be equal to the net amount, positive or negative, which would be distributed to each Partner or for which such Partner would be liable to the Partnership under this Agreement (including <u>Sections 8.3(c)</u> and <u>(e)</u>), determined as if the Partnership were to liquidate the assets of the Partnership for an amount equal to their Basis, reduced, but not below zero, by the amount of nonrecourse debt, if any, to which such Partnership assets are subject, and distribute the proceeds in liquidation after the payment of all liabilities (other than nonrecourse liabilities) in accordance with <u>Sections 3.2</u> and <u>3.3</u>.  For purposes of the foregoing determination, no amount shall be treated as distributable pursuant to <u>clause (A)</u> of <u>Section 3.3(a)(i)</u> by virtue of <u>clause (a)(iii)</u> of the definition of Preference Base or <u>clause (B)</u> of <u>Section 3.3(a)(i)</u> with respect to any Portfolio Investment or portion thereof solely because of the deemed liquidation of such Portfolio Investment; <u>provided</u>, <u>however</u>, that any increase in the Basis of a Portfolio Investment shall be taken into account for this purpose in the same manner as proceeds of a Partial Realization.  Investment Income and Gain or Investment Loss attributable to Portfolio Investments retained by the Partnership pursuant to <u>Section 3.3(e)(ii)</u> shall be allocated 100% to the General Partner.

    (d)    <u>Distributions</u>.  Any amounts distributed to the Partners will be debited against their Capital Accounts.

    (e)    <u>Partnership Expenses</u>.  Uncapitalized Partnership Expenses shall be debited against the Capital Accounts of the Partners in proportion to their respective Commitments.

Section 2.4 <u>Distributions in Kind</u>.

(a)     If any securities are to be distributed in kind to the Partners as provided in <u>Article III</u>, such securities will first be written up or down to their value (as determined pursuant to Article IX of the Offshore Fund Agreement as of the date of such distribution), thus creating Investment Income or Gain or Investment Loss, which shall be allocated in accordance with <u>Section 2.3</u> to the Capital Accounts of the Partners, and upon the distribution of such securities to the Partners, the value of such securities shall be debited, in accordance with <u>Section 2.3(e)</u>, against the Capital Accounts of the Partners.

## ARTICLE III

## DISTRIBUTIONS

Section 3.1 <u>Distribution Policy</u>.

(a)     The General Partner may in its sole discretion make distributions of cash, property and securities.

(b)     The General Partner will cause the Partnership to distribute (i) Current Cash Income at least semi-annually unless reinvested as described in this <u>Section 3.1(b)</u>, (ii) Short-Term Investment Income at least quarterly, and (iii) the net cash proceeds received from Dispositions of or Partial Realizations with respect to Portfolio Investments within 60 days of the receipt thereof unless reinvested as described in this <u>Section 3.1(b)</u>, after, in each case, the setting aside by the General Partner, in its discretion, of appropriate reserves for anticipated obligations and commitments of the Partnership as well as any required tax withholdings; <u>provided</u>, <u>however</u>, that if the General Partner determines in good faith that the Partnership will require additional capital within 30 days after the date that an amount that would otherwise be distributed that would be described in <u>clauses (a)</u>, <u>(b)</u> and <u>(d)</u> of the definition of "Funded Commitment" in the Offshore Fund Agreement, the General Partner may, in its discretion, retain such amount and reduce the amount required to be contributed by the applicable Partners.

(c)     If any Marketable Security is distributed in kind, such Marketable Security shall be valued pursuant to Section 9.1 of the Offshore Fund Agreement as of the date of such distribution and shall be distributed in accordance with <u>Section 3.3</u>.

(d)     The General Partner may, immediately prior to the Disposition of any Portfolio Investment, cause such Portfolio Investment to be distributed in accordance with <u>Section 3.3</u> based on the value of the Portfolio Investment at such time, as determined by the consideration to be received in connection with such Disposition.

Section 3.2 <u>Distribution of Short-Term Investment Income</u>.  Short-Term Investment Income will be distributed among the Partners in the same proportions as Short-Term Investment Income was credited to the Partners' Capital Accounts.

Appx. 04104

Section 3.3 <u>Distributions of Current Cash Income and Proceeds From Dispositions of or Partial Realizations with Respect to Investments and In Kind Distributions</u>.

(a) All distributions of Current Cash Income and all distributions out of net proceeds from Dispositions of or Partial Realizations with respect to Portfolio Investments (in each case, net of Partnership Expenses) and all distributions of Portfolio Investments shall be apportioned in proportion to their respective Partner Interests among the General Partner and the Participating Partners with respect to the Portfolio Investment that gave rise to such Current Cash Income or net proceeds or that is being distributed in kind. The General Partner's Partner Share of such distributions shall be distributed 100% to the General Partner. Each Participating Partner's Partner Share shall be distributed to such Participating Partner and the General Partner as follows:

(i) <u>First</u>, 100% to such Participating Partner until (A) the aggregate amount distributed to such Participating Partner in accordance with this <u>Section 3.3(a)</u> equals such Participating Partner's Preference Base as of the date of such distribution and (B) the aggregate amount distributed to such Participating Partner in accordance with this <u>Section 3.3(a)</u> (other than <u>clause (A)</u> of this paragraph) equals such Participating Partner's Preferred Amount as of such date. Solely for purposes of determining how proceeds of a Disposition of a Portfolio Investment are to be distributed pursuant to this <u>Section 3.3(a)</u> no proceeds of Partial Realizations with respect to Portfolio Investments or portions thereof that have not been Disposed of as of such date shall be taken into account, other than Excess Partial Realization Proceeds realized as of such date.

(ii) <u>Second</u>, (A) 50% to the General Partner and (B) 50% to such Participating Partner until the aggregate distributions to the General Partner with respect to such Participating Partner pursuant to this <u>paragraph (ii)</u> and <u>paragraph (iii)</u>, reduced by any amounts contributed to the Partnership by the General Partner with respect to such Participating Partner pursuant to <u>Section 8.3(c)</u>, equal 20% of the aggregate distributions of such Participating Partner's Partner Share of such amounts to the General Partner, reduced by any amounts contributed to the Partnership by the General Partner with respect to such Participating Partner pursuant to <u>Section 8.3(c)</u>, and to such Participating Partner pursuant to this <u>paragraph (ii)</u> and <u>paragraph (iii)</u>, and <u>clause (B)</u> of the immediately preceding paragraph.

(iii) <u>Third</u>, (A) 80% to such Participating Partner and (B) 20% to the General Partner.

For purposes of this <u>Section 3.3(a)</u>, amounts distributed to a Participating Partner pursuant to <u>Section 8.3(c)</u> shall be treated as having been distributed pursuant to this <u>Section 3.3(a)</u>.

(b) Anything contained herein to the contrary notwithstanding, the General Partner shall be entitled to receive cash distributions from the Partnership (after taking into account any other distributions received by the General Partner in such fiscal year pursuant to <u>Sections 3.3(a)(ii)(A)</u> and <u>3.3(a)(iii)(B)</u>) in amounts sufficient to enable the General Partner and the individual members of the General Partner to discharge any federal, state and local tax liability (excluding penalties) arising as a result of the allocation of Investment Income and Gain pursuant to <u>Section 2.3(c)</u> attributable to the General Partner's Carried Interest in the Partnership,

17475136

-12-

determined by assuming the applicability of the highest combined effective marginal federal, state and local income tax rates applicable to an individual resident in New York, New York. The amount of such tax liability shall be calculated taking into account (i) the deductibility (to the extent allowed) of state and local income taxes for United States Federal income tax purposes, (ii) the amount of net cumulative tax loss previously allocated to the General Partner in prior fiscal years with respect to the Carried Interest and not used in prior fiscal years to reduce taxable income for the purpose of making distributions under this subsection (b) and (iii) the character of any income or gain and the income tax rates applicable thereto. The calculation shall be made on the assumption that taxable income or tax loss from the Partnership with respect to the Carried Interest is the General Partner's only taxable income or tax loss. Such distributions shall be debited to the General Partner's Capital Account, as provided in Section 2.3(e). Any amounts distributed pursuant to this subsection (b) shall be considered an advance against the next distribution of Carried Interest distributable to the General Partner, and shall offset such distributions.

(c)     In the event of a partial Disposition of a Portfolio Investment, the unreturned Capital Contributions and remaining Preferred Amount with respect to such Portfolio Investment shall be allocated between the Disposed portion and retained portion of such Portfolio Investment, pro rata, based on the relative amounts that are Disposed of and retained, respectively, of that portion of such Portfolio Investment held by the Partnership immediately prior to such Disposition.

(d)     (i)     Notwithstanding anything in this Agreement to the contrary, the General Partner may at any time elect not to receive all or any portion of any distribution that otherwise would be made to it with respect to its Carried Interest.

(ii)     Any amount of cash which is not distributed to the General Partner pursuant to Section 3.3(d)(i) shall, in the General Partner's sole discretion, either be retained by the Partnership or distributed to the Partners (other than to the General Partner) in accordance with Section 3.3(a). Any amount of securities not distributed in-kind to the General Partner pursuant to Section 3.3(d)(i) shall be retained by the Partnership.

(iii)     If the General Partner elects to distribute cash to the other Partners pursuant to Section 3.3(d)(ii), 100% of any or all subsequent cash distributions by the Partnership shall be distributed to the General Partner until the General Partner has received the same aggregate amount of cash distributions it would have received had it not waived receipt of certain distributions pursuant to Section 3.3(d)(i) (without regard to the distribution of any Short-Term Investment Income earned on such retained amounts).

(iv)     All Current Cash Income attributable to, and distributions out of net proceeds from the Disposition or Partial Realization of, Portfolio Investments retained by the Partnership pursuant to Section 3.3(d)(ii) and all cash retained by the Partnership pursuant to Section 3.3(d)(ii) shall be distributed to the General Partner as of the date determined by the General Partner in its sole discretion. The General Partner shall not be entitled to any additional distributions in respect of such retained amounts, other than Short-Term Investment Income earned on such retained amounts.

(e)      Notwithstanding anything to the contrary in this Agreement, if at the expiration of the Commitment Period, there are Unapplied Waived Fee Amounts, the General Partner shall, in its sole discretion, prior to any other distribution pursuant to this Article III, be entitled to a distribution of cash equal to the Unapplied Waived Fee Amount.

Section 3.4 <u>Foreign Taxes</u>. The amount of any foreign taxes paid by the Partnership (or by an entity in which the Partnership holds an interest, either directly or indirectly through one or more such entities, that is treated as a partnership or is disregarded for federal income tax purposes) or withheld from receipts of the Partnership or such entity from a Portfolio Investment shall be allocated among the Partners as reasonably determined by the General Partner and, for purposes of <u>Sections 3.3(a)(i)</u> – <u>(iii)</u>, shall be deemed to have been distributed to each Partner as Current Cash Income or proceeds from the Disposition of a Portfolio Investment to the extent that the payment or withholding of such foreign taxes reduced Current Cash Income or the proceeds from the Disposition of a Portfolio Investment, as the case may be, otherwise distributable to such Partner as provided herein (for this purpose taking into account with respect to each Partner any reduction in such foreign taxes that occurs by reason of such Partner's status).

# ARTICLE IV

# PARTNERSHIP EXPENSES

Section 4.1 <u>Partnership Expenses</u>. The Partnership will pay all Partnership Expenses.

# ARTICLE V

# GENERAL PARTNER

Section 5.1 <u>Management Authority</u>.

(a)      Subject to the retention of the Manager, the General Partner will have full control over the business and affairs of the Partnership consistent with its duties arising under the Delaware Partnership Act. The General Partner will have the power on behalf and in the name of the Partnership to carry out any and all of the objects and purposes of the Partnership and to perform all acts and enter into and perform all contracts and other undertakings which, in its sole discretion, are necessary or advisable or incidental thereto, including the power to acquire or dispose of any security. Notwithstanding the foregoing, the management of the Partnership will vest in the Manager which will provide the Partnership with portfolio management and administrative services, including investigating, analyzing, structuring and negotiating potential investments, monitoring the performance of Portfolio Companies and advising as to disposition opportunities. In no event shall the Manager, which has been engaged by the Partnership, be treated as an agent or partner of the General Partner.

17475136

-14-

(b)      Except to the extent otherwise provided in this Agreement, all matters concerning (i) the allocation of Short-Term Investment Income, Current Income, Investment Income and Gain, Investment Loss, Partnership Expenses, and the distribution of net proceeds and the return of capital among the Partners, including the taxes thereon, (ii) accounting procedures and determinations (including the determination of the Preferred Amount and (iii) other determinations not specifically and expressly provided for by the terms of this Agreement, shall be determined by the General Partner in accordance with its reasonable interpretation of the provisions of this Agreement made in good faith.

(c)      The General Partner shall have the authority to admit additional Limited Partners in connection with making a Portfolio Investment.

Section 5.2  <u>Use of Affiliates</u>. The General Partner shall retain the services of the Manager and any officers, directors or Affiliates thereof in connection with the operation of the Partnership, and the compensation of the Manager and such persons shall be as provided in Section 4.1 of the Offshore Fund Agreement.

Section 5.3  <u>Transfer of General Partnership Interest; No Withdrawal or Loans</u>. The General Partner generally may not sell, assign, pledge, mortgage or otherwise dispose of its General Partner interest in the Partnership; <u>provided</u>, <u>however</u>, that the General Partner may transfer its General Partner interest in the Partnership (or consent to the transfer of an interest in the General Partner) in a derivative transaction if the transferor maintains the economic attributes of the interest and voting control of the interest. The General Partner will not borrow or withdraw any amount from the Partnership or voluntarily withdraw from the Partnership.

Section 5.4  <u>Removal of the General Partner</u>. In the event that the General Partner is removed as general partner of the Offshore Fund pursuant to Section 5.9 of the Offshore Fund Agreement, the General Partner shall also be removed as general partner of the Partnership. If the Offshore Fund has appointed another Person to act as general partner of the Offshore Fund and the limited partners of the Offshore Fund have consented to continue the Offshore Fund pursuant to Section 5.9 of the Offshore Fund Agreement, such Person shall also be appointed to act as General Partner of the Partnership and the Partnership shall also be continued. In such an event, the former General Partner shall be entitled to receive distributions equal to any amounts it would have been entitled to had the Partnership been dissolved and wound up in accordance with <u>Sections 8.3(a)</u> and <u>(b)</u> and distributed in kind all Partnership assets as of the date of the election of the Limited Partners to continue the Partnership. The Partnership shall issue an unsecured non-interest bearing promissory note to the former General Partner in the face amount of the liquidating distribution determined in accordance with this <u>Section 5.4</u>, such note to be payable upon the final liquidation of the Partnership. All such distributions shall be subject to the obligations set forth in <u>Section 8.3(c)</u> and <u>(d)</u>; <u>provided</u>, <u>however</u>, that the General Partner's obligation, if any, to fund Commitments in respect of its obligations in <u>Section 8.3(c)</u> relating to such liquidating distribution shall be satisfied by a reduction to the principal amount of the unsecured non-interest bearing promissory note described in this <u>Section 5.4</u> in the amount of such obligation. For purposes of determining allocation and distributions pursuant to the preceding sentence, securities and other property held by the Partnership shall be valued pursuant to the procedures set forth in <u>Article IX</u>.

Section 5.5 <u>No Liability to Limited Partners</u>.

(a)    None of the General Partner, the Manager, the Principals or their Affiliates, officers, directors, members, partners, shareholders, employees or agents will be liable to any Limited Partner or to the Partnership for any action taken, or omitted to be taken, as General Partner with respect to the Partnership, or for any action taken, or omitted to be taken, by any member, partner, director, officer, employee or agent of the General Partner or Manager in connection with its activities for or on behalf of the Partnership so long as such person (i) acted in good faith, (ii) acted in a manner reasonably believed to be in the best interests of the Partnership, (iii) was neither grossly negligent nor engaged in willful malfeasance, fraud or reckless disregard of fiduciary duties, (iv) did not materially breach this Agreement, and (v) with respect to any criminal action, such person is not finally determined to be and does not admit to be guilty or enter a plea of <u>nolo</u> <u>contendre</u> (including as part of a settlement) by a court of competent jurisdiction.

(b)    If any Limited Partner obtains a final judgment in a court of competent jurisdiction against the General Partner for matters relating to the Partnership, the General Partner shall pursue against its members the remedies (if any) that it has against such member relating to such claim.

Section 5.6 <u>Indemnification</u>. The Partnership will indemnify the Principals, the General Partner, the Manager and each of their respective members, partners, shareholders, directors, officers, employees, agents and Affiliates against any losses, liabilities, damages or expenses (including amounts paid for attorneys' fees, judgments and settlements in connection with any threatened, pending or completed action, suit or proceeding) to which any of such persons may become subject in connection with such person's activities on behalf of the Partnership or in connection with any involvement with a Portfolio Company (including serving as an officer, director, consultant or employee of any Portfolio Company) directly or indirectly on behalf of the Partnership, but only to the extent that such person (i) acted in good faith, (ii) acted in a manner reasonably believed to be in the best interests of the Partnership or the Portfolio Company (as the case may be), (iii) was neither grossly negligent nor engaged in willful malfeasance, fraud or reckless disregard of fiduciary duties, (iv) did not materially breach this Agreement, and (v) with respect to any criminal action, such person is not finally determined to be and does not admit to be guilty or enter a plea of <u>nolo</u> <u>contendre</u> (including as part of a settlement) by a court of competent jurisdiction. Any person described in this <u>Section 5.6</u> entitled to seek indemnification hereunder shall first use reasonable efforts to seek indemnification from other available sources, if any, prior to obtaining indemnification hereunder; <u>provided</u> that any such person may seek and obtain indemnification hereunder if at any time such person reasonably believes that such person will not receive timely indemnification on terms reasonably acceptable to such person from such other sources; and <u>provided</u>, <u>further</u>, that such person shall continue to use reasonable efforts to seek such indemnification from such other sources and, to the extent any such indemnification is obtained, reimburse the Partnership for any such recovery. The Partnership may, in the sole judgment of the General Partner, pay the expenses of any person indemnifiable under this <u>Section 5.6</u> in advance of the final disposition of any proceeding, so long as (w) with respect to any derivative action brought by any Limited Partner, the person receiving the advance is not the subject of such derivative action, (x) the proceeding is not instituted by a Majority in Interest of the

Offshore Fund Limited Partners against the General Partner or the Manager, (y) General Partner has a good faith belief such expenses are indemnifiable, and (z) the General Partner receives a written undertaking by such person for the benefit of the Partnership to repay the full amount advanced if (A) there is a final determination that such person did not satisfy the standards set forth in clauses (i) through (v) immediately above, (B) with respect to any criminal action, such person is finally determined to be or admits to being guilty or enters a plea of nolo contendere (including as part of a settlement) by a court of competent jurisdiction, or (C) such person is not otherwise entitled to indemnification as provided herein. Notwithstanding the foregoing, no person will be exculpated or exonerated from liability or indemnified against loss for violations of federal or state securities laws, or for any other intentional or criminal wrongdoing. No person shall be indemnifiable under this Section 5.6 in respect of losses, liabilities, damages or expenses to which any such person may become subject in connection with (x) such person's activities with any Portfolio Company if such losses arise after the Partnership's final disposition of such Portfolio Company or (y) a dispute among the General Partner, the Manager, their respective members and employees, and the Principals.

## ARTICLE VI

## LIMITED PARTNERS

Section 6.1  Limited Liability. The Limited Partners will not be personally liable for any obligations of the Partnership and will have no obligation (including with respect to a deficit balance in their Capital Account) to make contributions to the Partnership in excess of their respective capital commitments to the Partnership, except to the extent set forth under the Delaware Partnership Act. The Limited Partners will take no part in the control, direction or operation of the affairs of the Partnership and will have no power to bind the Partnership.

Section 6.2  Transfer of Limited Partnership Interests.

(a)  A Limited Partner may not sell, assign, transfer, pledge, mortgage or otherwise dispose of all or any of its interest in the Partnership unless the General Partner has consented to such transfer or assignment in writing. Any transfer shall be effected in accordance with the provisions of this Agreement, by execution of an assignment in writing and by entry of the name of the new limited partner in the register of limited partners. A transferee or assignee will not become a substitute Limited Partner without the consent of the General Partner in writing, and without executing a copy of this Agreement or amendment hereto.

(b)  Anything in this Agreement to the contrary notwithstanding, no admission (or purported admission) of a Partner, and no transfer (or purported transfer) of all or any part of a Partner's interest in the Partnership (or any economic interest therein) whether to another Partner or to a person who is not a Partner, shall be effective, and any such admission or transfer (or purported admission or transfer) shall be void ab initio, and no person shall otherwise become a Partner if after such admission or transfer (or purported admission or transfer) the Partnership would have more than one hundred (100) Partners, unless the General Partner determines in its sole discretion that the Partnership will meet the requirements set forth in Treasury Regulation

§ 1.7704-1(j)(1) for the taxable year of such transfer and all subsequent taxable years. In determining whether the Partnership will have more than one hundred (100) Partners for purposes of this Section 6.2(b), each person indirectly owning an interest in the Partnership through a partnership (including any entity treated as a partnership for federal income tax purposes), a grantor trust or an S corporation (each such entity a "flow-through entity") shall be treated as a Partner unless the General Partner determines in its sole discretion, after consulting with qualified tax counsel, that less than substantially all of the value of the beneficial owner's interest in the flow-through entity is attributable to the flow-through entity's interest (direct or indirect) in the Partnership.

(c)    Anything in this Agreement to the contrary notwithstanding, no admission (or purported admission) of a Partner, and no transfer (or purported transfer) of all or any part of a Partner's interest in the Partnership (or any economic interest therein) whether to another Partner or to a person who is not a Partner, shall be effective, and any such admission or transfer (or purported admission or transfer) shall be void ab initio, and no person shall otherwise become a Partner if after such admission or transfer (or purported admission or transfer) the Partnership would be subject to the registration or reporting requirements of the Investment Company Act.

Section 6.3  No Withdrawal.  Subject to the provisions of Section 6.2, no Limited Partner may withdraw as a Partner of the Partnership, nor may a Limited Partner be required to withdraw, nor may a Limited Partner borrow or withdraw any portion of its Capital Account from the Partnership.

Section 6.4  No Termination.  The substitution, death, insanity, dissolution (whether voluntary or involuntary) or bankruptcy of a Limited Partner will not affect the existence of the Partnership, and the Partnership will continue for the term of this Agreement until its existence is terminated as provided herein.

Section 6.5  Additional Investors.  If the admission of investors in Parallel Vehicles or the purchase by a limited partner in a Parallel Vehicle of a portion of the interest of a Defaulting Partner (as defined in the Offshore Fund Agreement) pursuant to Section 6.11 of the Offshore Fund Agreement would result in the Partnership, the Offshore Fund and the Parallel Vehicles not having reimbursed the General Partner and its Affiliates for Organizational Expenses (as defined in the Offshore Fund Agreement) in the proportions contemplated by Section 4.2 of the Offshore Fund Agreement or would result in the Partnership, the Offshore Fund and the Parallel Vehicles not owning investments in Portfolio Companies in the proportions contemplated by Sections 5.14 or 5.15 of the Offshore Fund Agreement, the General Partner shall have the authority to effect transfers of funds and of Portfolio Investments to Parallel Vehicles and to effect transfers of funds and portfolio investments of Parallel Vehicles to the Partnership for the purpose of reallocating the ownership of investments in Portfolio Companies and the reimbursements of Organizational Expenses (as defined in the Offshore Fund Agreement) by the Partnership, the Offshore Fund and the Parallel Vehicles, to achieve allocations and distributions as close as practicable to those that would have obtained had such investors been admitted to the Partnership, the Offshore Fund or to Parallel Vehicles, respectively, at the First Closing or had such purchased interest of a Defaulting Partner (as defined in the Offshore Fund Agreement) been issued to the purchaser at the First Closing.

Appx. 04111

Section 6.6  <u>Section 754 Election</u>.  Upon the written request of a Majority in Interest of the Limited Partners, that an election provided for in Section 754 of the Code be made, the General Partner shall, if then permitted by applicable law, make such election.

## ARTICLE VII

## [RESERVED]

## ARTICLE VIII

## DURATION AND TERMINATION

Section 8.1  <u>Duration</u>.  The Partnership will terminate on the tenth anniversary of the Final Closing, <u>except</u> that in the event that the term of the Offshore Fund is extended pursuant to Section 8.1 of the Offshore Fund Agreement, the term of the Partnership shall be extended for the same period.

Section 8.2  <u>Early Termination</u>.

(a)    The Partnership shall terminate on:

(i)    the bankruptcy of the General Partner or on the happening of any other event that would cause a dissolution of the Partnership under the Delaware Partnership Act (other than removal of the General Partner for Cause pursuant to <u>Section 5.4</u>), unless, within 90 days after notice is given to the Offshore Fund Limited Partners of the occurrence of such event, the Offshore Fund Limited Partners and limited partners of all Parallel Vehicles unanimously select a new general partner and resolve to continue the business of the Partnership;

(ii)    the removal of the General Partner pursuant to <u>Section 5.4</u> unless all of the Limited Partners and all limited partners of Parallel Vehicles select a successor general partner and resolve to continue the business of the Partnership pursuant to <u>Section 5.4</u>; or

(iii)    the date that the Offshore Fund is terminated.

(b)    As promptly as possible following the election by the Limited Partners of a successor General Partner pursuant to <u>Section 8.2(a)(i)</u>, there shall be distributed to the former General Partner, in full payment and satisfaction of its interest in the Partnership, a Limited Partnership Interest in the Partnership.  The Limited Partnership Interest of the former General Partner shall entitle the former General Partner to the same distributions and allocations in respect of Portfolio Investments made prior to the termination of the former General Partner it would have received had it remained the General Partner, subject to the obligations set forth in <u>Section 8.3(c)</u>, and to the rights of a Limited Partner hereunder with a Commitment equal to the Commitment of the former General Partner, but shall not entitle it to any other rights to participate in the management of the Partnership.  After its withdrawal as General Partner, a

Appx. 04112

former General Partner shall only be liable under this Agreement for actions taken and investments in Portfolio Companies made prior to the date of such withdrawal. If the Limited Partners elect to continue the Partnership's business pursuant to Section 8.2(a)(i), an appropriate amendment to this Agreement and to the Certificate shall be made within 90 days after the event giving rise to such election.

Section 8.3  Termination and Liquidation of Partnership Interests; Annual Determination of General Partner Give Back.

(a)  Liquidation. Upon termination, the Partnership will be liquidated in an orderly manner. The General Partner (or, in the absence, bankruptcy or removal under Section 5.4, of the General Partner, the party selected by a Majority in Interest of the Offshore Fund Limited Partners) will be the liquidator to wind up the affairs of the Partnership pursuant to this Agreement.

(b)  Final Allocation and Distribution. Upon termination of the Partnership (whether or not an early termination), the General Partner will make a final allocation of all kinds of income, loss and expense in accordance with Article II hereof and the Partnership's liabilities and obligations to its creditors shall be paid or adequately provided for prior to any distributions to the Partners. After payment or provision for payment of all debts of the Partnership, the remaining assets, if any, will be distributed among the Partners as provided in Sections 3.2 and 3.3.

(c)  General Partner Give Back. Within 90 days after the termination of the Commitment Period and after the final distribution of the assets of the Partnership among the Partners as provided in Sections 3.2 and 3.3 (each of the termination of the Commitment Period and the final distribution of the assets of the Partnership, a "Determination Date"), the General Partner will make a Capital Contribution to the Partnership (and such amount will be distributed to the Offshore Fund), equal to the greater of:

(i)  the amount by which (A) (x) the aggregate distributions to the General Partner pursuant to Sections 3.3(a)(ii) and 3.3(a)(iii) (including amounts initially distributed pursuant to Section 3.3(b)) with respect to such Limited Partner's Partner Share of distributions pursuant to Section 3.3(a) as of the applicable Determination Date less (y) all amounts previously contributed by the General Partner pursuant to this Section 8.3(c) with respect to such Limited Partner, exceed (B) 20% of the excess of (x) such Limited Partner's Partner Share of all distributions pursuant to Section 3.3(a) from the Partnership as of the applicable Determination Date (including amounts distributed to the General Partner pursuant to Sections 3.3(a)(ii) and 3.3(a)(iii), but reduced by any amounts previously contributed by the General Partner pursuant to this Section 8.3(c)) over (y) the aggregate Capital Contributions made by such Limited Partner to the Partnership as of the applicable Determination Date; and

(ii)  the amount by which all distributions received by such Limited Partner as of the applicable Determination Date are less than the sum of such Limited Partner's Capital Contributions as of the applicable Determination Date, plus such Limited Partner's aggregate Preferred Amount as of the applicable Determination Date; provided, however, that the aggregate General Partner Capital Contributions pursuant to this Section 8.3(c) will not exceed

17475136                                                    -20-

Appx. 04113

the excess, if any, of (x) an amount equal to 100% of the net amount distributed to the General Partner with respect to such Limited Partner over the entire term of the Partnership (other than Tax Distributions) pursuant to Sections 3.3(a)(ii) and 3.3(a)(iii) over (y) the Built-In Tax Amount with respect to any distribution of securities in-kind received by the General Partner with respect to such Limited Partner.

(d)     The General Partner hereby covenants and agrees that each of the members of the General Partner entitled to receive Carried Interest distributions from the General Partner has guaranteed and will guaranty severally, but not jointly, the payment of his, her or its pro rata share of the payments required by Section 8.3(c) to the extent and on the terms set forth in the Guaranty Agreement.

(e)     Special Profit Interest Give Back. After the final distribution of the assets of the Partnership among the Partners as provided in this Section 8.3 (and Article III hereof), but prior to the application of Section 8.3(c), the General Partner shall be obligated to make aggregate Capital Contributions to the Partnership, within 30 days after the date of such final distribution, in an amount equal to the sum of the excess, if any, of (i) the distributions received by the General Partner on account of the Special Profit Interest attributable to each Waived Fee Amount over (ii) the Available Profits with respect to such Waived Fee Amount. The distributions described in clause (i) of the preceding sentence with respect to a Waived Fee Amount are the Special Profit Interest distributions attributable to the Portfolio Company with respect to which the General Partner applied such Waived Fee Amount pursuant to Section 2.2(a)(ii) of the Offshore Fund Agreement, treating the Waived Fee Amounts as having been applied on a "first-in, first-out" basis. Amounts distributed to the General Partner pursuant to Section 3.3(f) shall be treated for this purpose as proceeds from Portfolio Company made on the date of each Waived Fee Notice giving rise to Waived Fee Amounts that are not applied to Portfolio Company pursuant to Section 2.2(a)(ii) of the Offshore Fund Agreement. For purposes of applying the first sentence of this Section 8.3(e), Partnership Profits shall not be treated as Available Profits with respect to more than one Waived Fee Amount. All such amounts returned to the Partnership shall be distributed to the Partners (other than the General Partner) in accordance with the provisions of Section 3.3. All determinations and calculations pursuant to this Section 8.3(e) shall be made by the General Partner in its sole discretion.

# ARTICLE IX

# [RESERVED]

# ARTICLE X

# BOOKS OF ACCOUNTS; MEETINGS

Section 10.1 Books. The Partnership will maintain complete and accurate books of account of the Partnership's affairs at the Partnership's principal office, which books will be

Appx. 04114

open to inspection by any Partner (or its authorized representative) at any time during ordinary business hours.

Section 10.2 <u>Fiscal Year</u>. The fiscal year of the Partnership will be the calendar year, unless otherwise determined by the General Partner.

Section 10.3 <u>Tax Allocation</u>.

(a)     Except as otherwise set forth in this <u>Section 10.3(a)</u>, the income, gains, losses, deductions and credits of the Partnership will be allocated, for federal, state and local income tax purposes, among the Partners in accordance with the allocation of such income, gains, losses, deductions and credits among the Partners for computing their Capital Accounts, <u>except that</u> if any such allocation is not permitted by the Code or other applicable law, the Partnership's subsequent income, gains, losses, deductions and credits will be allocated among the Partners so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts. Notwithstanding the preceding sentence, in the event the Basis of any asset of the Partnership differs from its adjusted tax basis for federal income tax purposes, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Basis in the same manner as under Section 704(c) of the Code and the Regulations thereunder.

(b)     If any Partner is treated for income tax purposes as realizing ordinary income because of receipt of his, her or its Partnership interest (whether under Section 83 of the Code or any similar provisions of any law, rule or regulation or any other applicable law, rule, regulation or doctrine) and the Partnership is entitled to any offsetting deduction, the Partnership's deduction will be allocated among the Partners in such manner as to, as nearly as possible, offset such ordinary income realized by such Partner. If the Internal Revenue Service successfully asserts an adjustment to the taxable income of a Partner and, as a result of such adjustment, the Partnership is entitled to a deduction for federal income tax purposes in excess of any gain recognized by the Partnership, such excess deduction shall be allocated to such Partner. If the Internal Revenue Service successfully asserts an adjustment to the taxable income of the Partnership and, as a result of such adjustment, any Partner is entitled to a deduction for federal income tax purposes in excess of any gain recognized by such Partner, the additional Partnership taxable income shall be allocated to such Partner. If the Internal Revenue Service successfully asserts an adjustment to the taxable income of the Partnership disallowing deductions for any of the fees paid or payable to the General Partner, then additional Partnership taxable income allocable to the Partners as a result of such disallowance shall be reallocated to the General Partner.

(c)     Notwithstanding any other provision of this Agreement, if a Partner unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation § 1.704-1(b)(2)(ii) (d)(4), (5) or (6) which gives rise to a negative Capital Account (or which would give rise to a negative Capital Account when added to expected adjustments, allocations or distributions of the same type), such Partner will be allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible; <u>provided</u> that the Partnership's subsequent income, gains, losses, deductions and credits will be allocated among the Partners so as to achieve as nearly as possible the results that would have been

17475136                                                -22-

achieved if this Section 10.3(c) had not been in this Agreement, except that no such allocation shall be made which would violate the provisions or purposes of Treasury Regulation § 1.704-1(b).

Section 10.4 Tax Controversies. The General Partner is hereby designated the "Tax Matters Partner" (as defined in Section 6231 of the Code), and is authorized and required to represent the Partnership (at the Partnership's expense) in connection with all examinations of the Partnership's business and affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith. Each Limited Partner agrees to cooperate with the General Partner and to do or refrain from doing any or all things reasonably requested by the General Partner with respect to the conduct of such proceedings. The General Partner shall provide the Limited Partners with all notices required to be provided to them by law in connection with such proceedings, and shall otherwise keep the Limited Partners reasonably informed of the progress thereof.

Section 10.5 Certain Tax Elections. The Partnership shall not, without the consent of all Partners, file an election (i) pursuant to Section 761 of the Code not to be treated as a partnership, or (ii) pursuant to Treasury Regulation §301.7701-3(c) to be treated as an association taxable as a corporation.

Section 10.6 Code Section 83 Safe Harbor Election.

(a) Notice 2005-43. By executing this Agreement, each Partner authorizes and directs the Partnership to elect to have the "Safe Harbor" described in the proposed Revenue Procedure set forth in Internal Revenue Service Notice 2005-43 (the "Notice") apply to any interest in the Partnership transferred to a service provider by the Partnership on or after the effective date of such Revenue Procedure in connection with services provided to the Partnership. For purposes of making such Safe Harbor election, the General Partner is hereby designated as the "partner who has responsibility for federal income tax reporting" by the Partnership and, accordingly, execution of such Safe Harbor election by the General Partner constitutes execution of a "Safe Harbor Election" in accordance with section 3.03(1) of the Notice. The Partnership and each Partner hereby agrees to comply with all requirements of the Safe Harbor described in the Notice, including, without limitation, the requirement that each Partner shall prepare and file all federal income tax returns reporting the income tax effects of each "Safe Harbor Partnership Interest" (as described in Section 3.02 of the Notice) issued by the Partnership in a manner consistent with the requirements of the Notice.

(b) Amendment. Each Partner authorizes the General Partner to amend Section 10.6(a) to the extent necessary to achieve substantially the same tax treatment with respect to any interest in the Partnership transferred to a service provider by the Partnership in connection with services provided to the Partnership as set forth in section 4 of the Notice (e.g., to reflect changes from the rules set forth in the Notice in subsequent Internal Revenue Service guidance), provided that such amendment is not materially adverse to any Partner (as compared with the after-tax consequences that would result if the provisions of the Notice applied to all interests in the Partnership transferred to a service provider by the Partnership in connection with services provided to the Partnership).

17475136

-23-

## ARTICLE XI

## REGISTRATION OF LIMITED PARTNERSHIP

Section 11.1 <u>Registration of Limited Partnership</u>. The General Partner will cause to be filed, recorded and published such statements, notices, certificates or other instruments required by any provision of any applicable law which governs the formation of the Partnership or the conduct of its business from time to time.

## ARTICLE XII

## MISCELLANEOUS

Section 12.1 <u>Amendments</u>. This Agreement may be amended, and waivers hereunder may be given, only by the written consent of the General Partner and a Majority in Interest of the Offshore Fund Limited Partners, provided, however, that notwithstanding the foregoing, the provisions of this Agreement may be amended or waived from time to time by the General Partner without the consent of a Majority in Interest of the Offshore Fund Limited Partners (i) to add to the representations, duties or obligations of the General Partner or surrender any right or power (but not responsibilities) granted to the General Partner herein; (ii) to cure any ambiguity or correct any provisions hereof which may be inconsistent with any other provisions hereof, or correct any printing, stenographic or clerical errors or omissions; and (iii) to admit one or more additional Limited Partners, or withdraw one or more Limited Partners, in accordance with the terms of this Agreement.

Section 12.2 <u>Successors</u>. Except as otherwise provided herein, this Agreement will inure to the benefit of and be binding upon the Partners and their legal representatives, heirs, successors and assigns.

Section 12.3 <u>Governing Law; Severability</u>. This Agreement will be construed in accordance with the laws of the State of Delaware and, to the maximum extent possible, in such manner as to comply with all the terms and conditions of the Delaware Partnership Act. If it is determined by a court of competent jurisdiction that any provision of this Agreement is invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

Section 12.4 <u>Notices</u>. All notices, demands and other communications to be given and delivered under or by reason of provisions under this Agreement will be in writing and will be deemed to have been given when personally delivered, sent by telecopy (with hard copy to follow by reputable overnight courier) or sent by reputable overnight courier service (charges prepaid) or mailed by first class mail (with a copy sent by telecopy) to the addresses or telecopy numbers set forth in <u>Schedule 1</u> hereto or to such other address or telecopy number as has been indicated to all Partners.

Section 12.5 <u>Miscellaneous</u>. This document and its schedules and exhibits contain the entire Agreement among the parties and supersede all prior arrangements or understanding with

respect thereto. Descriptive headings are for convenience only and will not control or affect the meaning or construction of any provision of this Agreement. This Agreement may be executed in any number of counterparts, any one of which need not contain the signatures of more than one party, but all of such counterparts together will constitute one agreement.

*[Remainder of page intentionally left blank]*

17475136

-25-

**Appx. 04118**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed as of the date first above written.

**GENERAL PARTNER:**

HIGHLAND RESTORATION CAPITAL
PARTNERS GP, LLC

By: _____
     Name:  James Dondero
     Title:   President

**LIMITED PARTNER:**

HIGHLAND RESTORATION CAPITAL
PARTNERS OFFSHORE, L.P.

By: Highland Restoration Capital Partners GP,
    LLC, its general partner

By: _____
     Name:  James Dondero
     Title:   President

17475136

*Highland Restoration Capital Partners Master, L.P. –*
*Amended and Restated Agreement of Limited Partnership*

**SCHEDULE 1**

**Limited Partners/ Partnership Percentage Interest/Notice Information**

| **Limited Partner** | **Partnership Percentage Interest** | **Notice Information** |
|---|---|---|

17475136

**Appx. 04120**

## MANAGEMENT AGREEMENT

This Management Agreement (this "Agreement") is made as of November 15, 2007, between Highland Restoration Capital Partners, L.P., a Delaware limited partnership (the "Partnership"), Highland Restoration Capital Partners Offshore, L.P., a Cayman exempted limited partnerships (the "Offshore Partnership"), Highland Restoration Capital Partners Master, L.P., a Delaware limited partnership (the "Master Partnership"), each Parallel Vehicle that may be formed from time to time (the "Parallel Vehicles", and, together with the Partnership, the Offshore Partnership, and the Master Partnership, the "Highland Partnerships"), Highland Restoration Capital Partners GP, LLC, a Delaware limited liability company, the general partner of each of the Highland Partnerships (the "General Partner"), and Highland Capital Management, L.P., a Delaware limited partnership (the "Manager").

W I T N E S S E T H:

WHEREAS, the General Partner desires to engage the Manager on behalf of each of the Highland Partnerships to advise the General Partner and each of the Highland Partnerships with respect to the Highland Partnerships' investments as hereinafter set forth;

WHEREAS, the Manager is willing to render such advice on the terms and conditions hereinafter set forth; and

WHEREAS, capitalized terms used herein and not defined herein have the meanings set forth in the Agreement of Limited Partnership of each of the Highland Partnerships, as amended from time to time (the "Partnership Agreements").

NOW THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto hereby agree as follows:

1.     Services to be Rendered by the Manager.  Each of the Highland Partnerships and the General Partner hereby appoint the Manager, and the Manager hereby accepts such appointment, as the Manager for each of the Highland Partnerships on the terms and conditions set forth herein.  To the extent requested and determined by the General Partner to be necessary or appropriate, the Manager shall advise and consult with the General Partner concerning the general and day-to-day operations of the Highland Partnerships and the acquisition and disposal of, and dealings with, investments by or for the account of the Highland Partnerships.  The provisions of this Agreement shall not, however, confer any power or authority on the Manager to enter into any transaction on behalf of or in any way bind the Highland Partnerships except as expressly conferred upon the Manager by the General Partner and only in accordance with the terms and provisions of the Partnership Agreements.  In performing its duties hereunder, the Manager shall act in accordance with the Partnership Agreements.  In no event shall the Manager, which has been engaged on behalf of the Highland Partnerships, be treated as an agent or partner of the General Partner.

2.     Manager's Fees.  As compensation for services to be rendered hereunder, each of the Highland Partnerships shall pay, or cause to be paid, to the Manager the Management Fee (as

17457439

defined in Section 4.1 of the Partnership Agreements) on the terms, and subject to the conditions, set forth in Section 4.1 and the other provisions of the Partnership Agreements.

3.     Expenses.  The Manager shall pay all expenses that the Manager is required to pay under the Partnership Agreements out of the Management Fee received by the Manager. The Highland Partnerships shall bear and pay Partnership Expenses and Organizational Expenses during the term of this Agreement in accordance with the Partnership Agreements.

4.     Use of Affiliates.  The parties hereto agree that any member, director, officer, employee or agent of the Manager may be a partner, director, officer, employee or agent of the Highland Partnerships or a member, director, officer, employee or agent of the General Partner.

5.     Indemnification and Exculpation.

(a)     The Manager and any delegate of the Manager shall not be liable and shall be exculpated and indemnified by the Highland Partnerships for any liabilities incurred by the Manager to the full extent provided in Sections 5.10 and 5.11 of the Partnership Agreements.

(b)     The term "liability," as used in this Section 5, shall include any losses, liabilities, claims, damages of any kind or expenses (including amounts paid for attorneys' fees, judgments and settlements in connection with any threatened, pending or completed action, suit or proceeding and other reasonable costs and expenses incurred by the Manager or its delegate(s) in the course of defending itself) or other liabilities arising for any reason under this Agreement.

6.     Amendments; Termination.  No provision of this Agreement may be amended, altered or modified unless in a writing executed by the parties hereto and a Majority in Interest of the Limited Partners.  This Agreement shall become effective with respect to each Highland Partnership commencing as of the date set forth on its respective signature page hereto and shall continue until the earlier of (a) the date that such Highland Partnership is finally terminated and its liquidation completed under the applicable Partnership Agreement, (b) the effective date of the removal of the General Partner under the applicable Partnership Agreement, or (c) the effective date of termination of this Agreement by the General Partner, in its sole discretion; provided, however, that the provisions of Section 5 will survive the termination of this Agreement with respect to any actions taken by the Manager prior to any such date.

7.     Notice.  Any notice under this Agreement shall be given in writing, addressed and delivered by first class mail, postage paid, and shall be deemed to be effective upon receipt, if to the Highland Partnerships, or the Manager:

(i)     if to the General Partner or any of the Highland Partnerships:

Highland Restoration Capital Partners GP, LLC
c/o Highland Capital Management, L.P.
Two Galleria Tower
13455 Noel Road
Dallas, Texas 75240

or to such other address specified for this purpose in the Partnership Agreements;

17457439

**Appx. 04122**

(ii)    if to the Manager:

Highland Capital Management, L.P.
Two Galleria Tower
13455 Noel Road
Dallas, Texas 75240

or at such other address as such party shall have specified in writing to the other parties hereto.

8.    Assignment. This Agreement may not be assigned by any of the parties hereto, unless agreed to by all other parties, provided, that the Manager may assign this Agreement to an affiliate of the Manager to the extent permitted by the Partnership Agreements.

9.    Governing Law. This Agreement shall be construed and interpreted in accordance with the laws of the State of Delaware, without reference to principles of conflicts of law.

10.    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same agreement.

11.    Entire Agreement. There are no oral agreements or understandings with respect to or affecting this Agreement, and this Agreement and the Partnership Agreements constitute the entire agreement between the parties hereto with regard to the subject hereof.

12.    Partnership Agreements. This Agreement will be subject to the terms and provisions of the Partnership Agreements, and in the event of any conflict between this Agreement and the Partnership Agreements, the Partnership Agreements will supersede and control such conflict.

*[Remainder of page intentionally left blank]*

17457439

**Appx. 04123**

IN WITNESS WHEREOF, the parties hereto have caused this Management Agreement to be duly executed as of the date first above written.

**MANAGER:**

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:   Strand Advisors, Inc., its general partner

By: _____
   Name:   James Dondero
   Title:   President


**GENERAL PARTNER:**

HIGHLAND RESTORATION CAPITAL
PARTNERS GP, LLC

By: _____
   Name:   James Dondero
   Title:   President


**PARTNERSHIP:**

HIGHLAND RESTORATION CAPITAL
PARTNERS, L.P.

By:   Highland Restoration Capital Partners GP,
   LLC, its general partner

By: _____
   Name:   James Dondero
   Title:   President


17457439                                                    *Management Agreement*

**Appx. 04124**

**OFFSHORE PARTNERSHIP:**

HIGHLAND RESTORATION CAPITAL
PARTNERS OFFSHORE, L.P.

By:  Highland Restoration Capital Partners GP,
LLC, its general partner

By:_____
Name:  James Dondero
Title:  President

**MASTER PARTNERSHIP:**

HIGHLAND RESTORATION CAPITAL
PARTNERS MASTER, L.P.

By:  Highland Restoration Capital Partners GP,
LLC, its general partner

By:_____
Name:  James Dondero
Title:  President

17457439

*Management Agreement*

**Appx. 04125**