# EXHIBIT 202

Appx. 04126

Docket #0487  Date Filed: 03/02/2020

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| Debtor. | ) | |
| | ) | **Docket Ref. No. 474** |

## OBJECTION OF THE OFFICIAL
## COMMITTEE OF UNSECURED CREDITORS TO THE MOTION OF THE
## DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING,
## THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES"

The official committee of unsecured creditors (the "Committee") of Highland Capital Management, L.P. (the "Debtor"), hereby submits this objection (this "Objection") to the *Motion of the Debtor for Entry of an Order Authorizing, But Not Directing, the Debtor to Cause Distributions to Certain "Related Entities"* [Docket No.474] (the "Distribution Motion").[2]  In support of this Objection, the Committee respectfully states as follows:

### PRELIMINARY STATEMENT

1.       The Committee's objection focuses on a very limited portion of the transaction currently proposed by the Debtor – namely, proposed distributions of approximately $8.6 million (the "Proposed Insider Distributions") to several insiders who not only owe money to the Debtor but also may be the target of avoidance and other litigation brought by the Committee on behalf

---

[1]    The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2]    All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Distribution Motion.



1934054200302000000000002

**Appx. 04127**

of the Debtor's estate - Mark Okada and two entities owned and/or controlled by James Dondero and/or Mark Okada (such entities, together with Messrs. Dondero and Okada, the "Insider Parties").  As this Court is aware, Messrs. Dondero and Okada owned and controlled the Debtor for most of the past 30 years.  During that time, the Debtor repeatedly breached fiduciary duties and contractual obligations, leading to hundreds of millions of dollars in judgments against the Debtor and certain affiliates.  The Committee is currently investigating a variety of significant potential estate claims against the Insider Parties.  For example, certain of the interests held by the Insider Parties, which form the basis for a portion of the Proposed Insider Distributions, were once owned by the Debtor – the Committee is investigating, among other things, the propriety of the transfers of these interests from the Debtor to the Insider Parties.  In addition, Messrs. Dondero and Okada currently owe the Debtor over $10.6 million in demand notes and another Insider Party owes the Debtor nearly $7.5 million in notes receivable, some of which also are demand notes.  In light of these and other potential claims, which are only now the subject of review by a party other than the Debtor, the Committee believes the Proposed Insider Distributions to the Insider Parties should be reserved in segregated accounts pending resolution of the issues under investigation by the Committee and repayment of all amounts owed to the Debtor by the Insider Parties.

2.      This Court's order granting the relief requested by the Committee would shield the Debtor from any purported legal risks associated with withholding the Proposed Insider Distributions.  Similarly, the Debtor and Independent Board would not breach their fiduciary duties by complying with this Court's order to withhold the Proposed Insider Distributions.[3]

---

[3] Even absent court order, the Committee is highly skeptical of the legal merit of any such legal claims by Messrs. Dondero and Okada and related damages for any alleged breach of contract and/or fiduciary duty by the Debtor.

Appx. 04128

3.      Temporarily withholding and segregating the proposed distributions would greatly facilitate the Debtor's interests while causing little harm to the Insider Parties.  It would facilitate repayment of over $18 million in notes payable to the Debtor by the Insider Parties.  Moreover, delay in the distribution will allow the Committee an adequate opportunity to investigate potential estate claims against the Insider Parties, including claims arising from the very transactions pursuant to which the Debtor transferred certain of the interests at issue to such parties.

4.      While the Debtor and Independent Board have taken the position that they cannot affirmatively seek this relief, clearly both should be supportive of this outcome which preserves claims of the Debtor's estate and a ready source of recovery for the outstanding demand notes. Moreover, the Proposed Insider Distributions will be temporarily placed in segregated, interest bearing accounts, compensating the Insider Parties for any material injury from the mere passage of time.  To the extent Messrs. Dondero and Okada believe they would incur additional harm of which the Committee is not aware, they – not the Debtor – should bring those concerns directly to this Court.

## OBJECTION

5.      Through the Distribution Motion, the Debtor seeks authority to make redemption payments and other distributions to investors in certain funds managed by the Debtor.  Specifically, as part of the Debtor's plan to distribute (i) approximately $123.25 million to investors of RCP, (ii) $21.8 million to investors of AROF in connection with the wind up of such fund, and (iii) $34.8 million to investors in Dynamic in connection with the wind up of such fund – the Debtor seeks authority for some of the foregoing distributions to be made to the Insider Parties.  Of the almost $180 million in distributions, the Committee only objects to the distribution of a total of $8.6 million to be distributed to three Insider Parties.  Specifically, the Committee objects to the request

to make distributions to Mark Okada, Highland Capital Management Services, Inc. ("HCM Services," owned by James Dondero, and Mark Okada), and CLO Holdco Ltd. ("CLOH").[4]  To be clear, the Committee does not object to the Debtor's orderly liquidation of Dynamic or AROF, or to the distributions from AROF, Dynamic, and RCP to any third-party, non-affiliated investors. However, in light of the significant amounts of money owed to the Debtor by Mr. Okada, Mr. Dondero and HCM Services, the Committee's ongoing investigation of the Debtor's insiders and related entities (including with respect to the propriety of how the Insider Parties obtained the interests which form the basis of the Proposed Insider Distributions (such interests, the "Insider Interests")), and the well-documented fraudulent and improper activities engaged in by the Debtor's insiders, the Committee requests that the Court order the Debtor to hold the Proposed Insider Distributions in a reserve for a limited period of time.

     **I.**     **The Proposed Insider Distributions Should Be Reserved Pending the Repayment of Insiders Parties' Obligations Owed to the Debtor and the Committee Investigation**

     6.     Through the Distribution Motion, the Debtor seeks to make the following Proposed Insider Distributions:

| Investor | Distribution Amount | Fund |
|---|---|---|
| CLO HoldCo, Ltd. | $872,000 | AROF |
| CLO HoldCo, Ltd. | $1,521,000 | Dynamic |
| Mark Okada | $4,185,000 | Dynamic |
| Highland Capital Management Services, Inc. | $2,085,000 | RCP |
| **Total** | **$8,663,000** | |

These Proposed Insider Distributions are a small portion of the $180 million to be distributed from Dynamic, AROF and RCP.

---

[4] The Distribution Motion also seeks authority to make distributions to Highland Dynamic Income Fund GP, LLC. The Committee does not object to such distribution.

*The Insider Parties Owe the Debtor Money*

7.     It is undisputed that James Dondero, Mark Okada, and HCM Services owe the Debtor significant amounts of money.  The Debtor's schedule of assets and liabilities [Docket No. 247] discloses that, as of the Petition Date, the Debtor holds notes receivable from (i) James Dondero, in the principle amount of $9,334,012 (the "Dondero Note")[5]; (ii) HCM Services in the aggregate principle amount of $7,482,480.88 (the "HCM Services Notes"), and (iii) Mark Okada, in the principle amount of $1,336,287.84 (the "Okada Note", and with the Dondero Note and the HCM Services Notes, the "Notes").  The Dondero Note, the Okada Note, and four of the five HCM Services Notes are demand notes, payable upon the request of the Debtor.  These Notes should be repaid before the Debtor makes any distributions to these insiders.

*The Insider Parties Have Engaged in a Pattern of Fraudulent Activities to the Detriment of Creditors*

8.     Further, as this Court is well-aware, the Debtor has a documented history of engaging in misconduct, breaches of fiduciary duty and fraudulent transactions in multiple settings, which ultimately led to the commencement of this bankruptcy case.  At all relevant times, Mr. Dondero and Mr. Okada, as co-founders and executive officers, managed and controlled the Debtor and were ultimately responsible for the Debtor's pattern of misconduct, breaches of fiduciary duty and fraudulent activities.

9.     As examples of the extensive misconduct, in 2014, the Securities and Exchange Commission ("SEC") determined (i) that the Debtor knowingly engaged in multiple transactions with its client advisory accounts without disclosing that the Debtor was acting as principal, or obtaining client consent, before the trades were completed, and (ii) that the debtor failed to

---

[5] The Dondero Note is in addition to $18.3 million owed to the Debtor under a demand note made by The Dugaboy Investment Trust, of which Mr. Dondero is a beneficiary.

maintain sufficient documentation with respect to certain transactions. *See* SEC Order ¶¶ 6-7, *In the Matter of Highland Capital Mgmt., L.P.*, File No. 3-16169 [Docket No. 130. Ex. A].  As established in the Redeemer Committee litigation, the Debtor, under the control of Mr. Dondero and Mr. Okada, was found to have covertly and improperly taken $32.3 million in cash out of the a fund for which the Debtor acted as investment manager (the "Crusader Fund"), and was found to have made decisions with the "willful intent" to benefit itself and not the parties to whom the Debtor owed fiduciary duties.  An arbitration panel unanimously found that the Debtor, Mr. Dondero, and Highland's in-house lawyers violated their fiduciary duties to the Crusader Fund, engaged in willful misconduct, self-dealing, and secrecy, and made multiple misrepresentations to the Crusader Fund's investors as well as the Debtor's auditors.

        10.    In the Acis Capital Management bankruptcy case, this Court found that there was a "legitimate prospect" that the Debtor "would continue dismantling [Acis], to the detriment of [Acis] creditors." *In re Acis Capital Mgmt., L.P.*, 584 B.R. 115, 147, 149 (Bankr. N.D. Tex. 2018). Following an arbitration award against Acis, Mr. Dondero and other members of the Debtor's management transferred tens of millions of dollars in assets out of Acis into newly-formed Cayman Islands-based Highland affiliates. *Id.* at 127-130.  This Court ultimately concluded that the "record contain[ed] substantial evidence of both intentional and constructive fraudulent transfers," and "[t]he numerous prepetition transfers that occurred around the time of and after the Terry Arbitration Award appear[ed] more likely than not to have been made to deprive the Debtor-Acis of value and with the actual intent to hinder, delay, or defraud the Debtors' creditors." *See In re Acis Capital Mgmt., L.P.*, No. 18-30264, 2019 WL 417149, at *11 (Bankr. N.D. Tex. Jan. 31, 2019), *aff'd* 604 B.R. 484 (N.D. Tex. 2019).  In both the Acis bankruptcy case and the Crusader Fund arbitration, the Debtor's management were found to have manufactured dishonest and

**Appx. 04132**

illegitimate defenses and provided unreliable and incredible testimony regarding the Debtor's actions.

11. Each of the Insider Parties are closely affiliated with Mr. Dondero and/or the fraudulent actions that led the Debtor to bankruptcy:

- *Mark Okada*: Mr. Okada is the co-founder of the Debtor, and was the Chief Investment Officer until shortly before the commencement of this chapter 11 case. As Chief Investment Officer, Mr. Okada was responsible for overseeing the Debtor's investment activities across all investment platforms. Mr. Okada was an executive officer of the Debtor (i) when the Debtor was found by the SEC to have engaged in wrongful transactions without disclosing important information to clients, (ii) when the Debtor stripped Acis of its assets – CLO portfolio management contracts – and transferred to them a newly formed Cayman entity, and (iii) when the Debtor engaged in misconduct and breached fiduciary duties with respect to the Crusader Fund. Mr. Okada was the beneficial owner of 25% of Acis Capital Management, L.P. when Mr. Dondero and the Debtor transferred assets away from Acis, and this Court found that Mr. Dondero and Mr. Okada were the individuals making decisions for Highland CLO Funding Ltd. ("<u>HCLOF Guernsey</u>") in connection with the events leading to the Acis bankruptcy litigation.[6]

- *HCM Services* – As the Debtor disclosed, HCM Services is owned 75% by Mr. Dondero and 25% by Mr. Okada. HCM Services appears to have received its interests in RCP from the Debtor, but the circumstances of such transaction have yet to be fully investigated by the Committee. HCM Services owes the Debtor $7,482,481, of which $900,000 is payable on demand. The Committee understands that Mr. Dondero remains in complete control of HCM Services.

- *CLOH* – CLOH is an entity owned by Charitable DAF Fund, LP (the "<u>DAF</u>"), which was seeded with contributions from the Debtor; the consideration for such contributions has yet to be fully investigated by the Committee. The DAF is managed and advised by the Debtor, and its trustee is a long-time friend of Mr. Dondero.[7] The trustee for the DAF has also served as trustee for The Get Good Trust, The Dugaboy Investment Trust, and the SLHC Trust, of which Mr. Dondero

---

[6] *In re Acis Capital Management, L.P.*, 2019 WL 417149, at *7, *9 (Bankr. N.D. Tex. January 31, 2019) (observing (i) that Mr. Okada owed 25% of Acis until the day after Mr. Terry obtained his arbitration judgement against Acis, at which point Mr. Okada conveyed his interests in Acis to Neutra, Ltd. for no consideration, and that (ii) Mr. Dondero, Mr. Okada, and another Highland employee made decisions for HCLOF Guernsey regarding the optional redemptions of the Acis CLOs).

[7] *See In re Acis Capital Management, L.P.*, 2019 WL 417149, at *6 (Bankr. N.D. Tex. January 31, 2019) (noting that one of the three equity owners of HCLOF Guernsey was the DAF, which was "seeded with contributions from **Highland**, is managed/advised by **Highland**, and whose ***independent trustee is a long-time friend of Highland's chief executive officer, Mr. Dondero***" (emphasis in original)).

Appx. 04133

is a beneficiary.  The Distribution Motion discloses that the interests in Dynamic currently held by CLOH were originally held by the Debtor, and were transferred to The Get Good Nonexempt Trust, in exchange for Get Good's interest in a promissory note made by The Dugaboy Investment Trust, and then from Get Good to Mr. Dondero's Highland Dallas Foundation, Inc. and then to CLOH.  The Distribution Motion does not disclose how or when CLOH obtained its interests in AROF.  The Committee is investigating CLOH's relationship to and transactions with Mr. Dondero and other entities controlled by or otherwise benefitting Mr. Dondero.

*The Committee is Investigating Claims Against the Insider Parties, Including Transfers the Transfers of the Insider Interest*

12.    Pursuant to the Term Sheet outlining the agreement between the Debtor and the Committee, the Committee has standing to pursue any and all estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of the Debtor and the Debtor's related entities (which include the DAF and CLOH), "including any promissory notes held by any of the foregoing." [Docket No. 354] This part of the settlement with the Debtor was a critical component of the Committee's agreement to the governance structure in lieu of seeking appointment of a chapter 11 trustee.  The Committee has begun its investigation and served document production requests to the Debtor.  Among other claims and causes of action, the Committee is investigating potential preferential transfers, fraudulent transfers, breaches of fiduciary duties, usurpation of corporate opportunities, misappropriation of assets, and abuses of the corporate form.  The Committee's investigation includes fully exploring the circumstances and transactions through which HCM Services, CLOH and Mr. Okada obtained the Insider Interests.

13.    The Debtor's history of self-dealing and improper or fraudulent activities suggests that the Committee's investigation is likely to uncover similar inappropriate activities with respect to the Debtor's assets, including the Insider Interests.  The Debtor's statements of financial affairs [Docket No. 248] disclosed that the Debtor made significant payments to affiliates through purported intercompany funding and affiliate loans in the 90 days prior to the filing date, along

**Appx. 04134**

with significant other insider transfers in the one year before the filing date (including very large expense reimbursement payments to Mr. Dondero). The Committee must have the opportunity to fully investigate the insider and affiliate transactions, including those that gave rise to the Insider Interests, that may be the subject of valuable estate causes of action before transactions distributing funds to those same insiders and affiliates can be consummated.

14.     This is all the more true because the evidence is that, even during this bankruptcy case, Mr. Dondero continues to engage in secretive and potentially improper transactions. The Distribution Motion fails to highlight that the MGM Sale was negotiated by Mr. Dondero without the knowledge or approval of Debtor's counsel or the Debtor's financial advisors. Specifically, at the very same time that the Debtor's counsel and financial advisors were attempting to persuade the Committee to approve certain transactions with respect to RCP, Mr. Dondero, unbeknownst to any Debtor professional, committed the Debtor to executing the MGM Sale. The Independent Directors, the Debtor's counsel and the Debtor's CRO and financial advisors were not made aware of the MGM Sale until *two months* after Mr. Dondero allegedly committed to the transaction on behalf of the Debtor. While the Committee has decided not to object to the MGM Sale itself (based, in significant part, on feedback from the Independent Board regarding its concern about the alleged binding nature of Mr. Dondero's secretive agreement with MGM), the circumstances surrounding Mr. Dondero's negotiation of and entry into the transaction are alarming at best, and the Committee has not waived any rights to fully investigate that transaction and any related potential causes of action against Mr. Dondero or others.

15.     In addition to its concern that some or all of the Proposed Insider Distributions may be on account of otherwise avoidable transactions, based upon the Interested Parties' long history of transferring assets and taking other actions to hinder, delay, and defraud creditors, the

Committee is also seriously concerned that the Insider Parties will swiftly place these distributions out of reach of the Debtor's estate while refusing to satisfy their obligations to the Debtor. Such actions would jeopardize the estate's ability to recover amounts owed to it and any future judgments against the Insider Parties, and would waste estate resources by forcing the Debtor to incur additional litigation costs to recover such debts and judgments.

## II.    The Court Has Authority to Direct the Debtor to Withhold the Proposed Insider Distributions

16.    The Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). "Courts interpret Section 105 liberally." *King Louie Mining, LLC v. Comu (In re Comu)*, Nos. 09-38820-SGJ-7, 10-03269-SGJ, 2014 Bankr. LEXIS 2969, at *264 (Bankr. N.D. Tex. July 8, 2014) (citing *Momentum Mfg. Corp. v. Employee Creditors Committee (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994)). While the Supreme Court has found that section 105(a) does not give the bankruptcy court the ability to take any actions explicitly prohibited by another provision of the Bankruptcy Code, it does grant "extensive equitable powers that bankruptcy courts need in order to be able to perform their statutory duties." *Caesars Entm't Operating Co. v. BOKF, N.A. (In re Caesars Entm't Operating Co.)*, 808 F.3d 1186, 1188 (7th Cir. 2015) (citing *Law v. Siegel*, 571 U.S. 415, 420 (2014). Section 105 has been the source of authority for courts to, among other things, enjoin third parties, substantively consolidate non-debtors, and extend the automatic stay. *See e.g., Celotex Corp. v. Edwards*, 514 U.S. 300, 303 (1995) (holding that an injunction issued under § 105 was an appropriate use of the court's powers); *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 769 (9th Cir. 2000) (holding that the court's power to substantively consolidate non-debtors was found in § 105); *In re DeLorean Motor Co.*, 755 F.2d 1223, 1230

(6th Cir. 1985) (holding that a preliminary injunction issued to bar distributions from a non-debtor to third parties was an appropriate use of the court's equitable power under § 105).

17.    Temporarily withholding the Proposed Insider Distributions and placing the corresponding funds in segregated accounts is well within the authority of this Court under section 105 of the Bankruptcy Code.  The Insider Parties are current and former affiliates and/or insiders of the Debtor and creditors of the Debtor.  The order requested by the Committee will allow full investigation of the claims and causes of action against the Insider Parties that was integral to the settlement approved by this Court in connection with approval of the Term Sheet. Furthermore, the Committee submits (and the Debtor has not asserted otherwise) that the relief sought by the Committee would not violate any explicit or implicit requirements of the Bankruptcy Code. Therefore, the Court need only consider the equitable nature of the relief that the Committee seeks, and its appropriateness in the context of furthering the goals of this bankruptcy.  *See In re Caesars Entm't Operating Co.*, 808 F.3d at 1188.

18.    The equitable argument for temporarily withholding the Proposed Insider Distributions and segregating such funds is straightforward.  These actions merely maintain the status quo.  The Committee is not requesting that the Debtor effectuate a set-off or take possession of the Proposed Insider Distribution.  No party has asserted that any economic harm (much less any significant harm) will be done to the Insider Parties by holding the Proposed Insider Distributions in segregated interest bearing accounts pending further order of this Court.  On the other hand, the withholding of the Proposed Insider Distributions (and the resulting leverage that creates against the Insider Parties) may be the only chance for the Debtor to receive any value for the amounts it is owed (or potentially owed) by the Insider Parties or obtaining redress for fraudulent or improper transactions involving those parties, including with respect to the Insider

**Appx. 04137**

Interest.  As set forth above, the Insider Parties and the persons controlling them have repeatedly engaged in schemes and other behavior designed to evade creditors.  It should not surprise this Court to learn that, after making demand for payment on the demand note from Mr. Okada as of February 13th at the urging of the Committee, the Debtor still has yet to receive any payment from Mr. Okada.  Absent approval of the Committee's request, the Debtor's efforts to collect from the Insider Parties may be extremely cost intensive and time-consuming.  It is fair and equitable for this Court to temporarily prevent money from flowing to the Insider Parties in order to facilitate the Debtor's efforts to recover amounts owed to it.  Furthermore, the Committee should be given the opportunity to investigate the propriety of the Debtor's transfers of its interests in the underlying funds to the Insider Parties, including the Insider Interests.  Maintaining the status quo until the Committee has investigated those transfers is fair and equitable and falls well within this Court's authority under section 105.

19.     Moreover, the relief sought by the Committee would further the goals of this bankruptcy case and would allow the Debtor to fulfill its duties to creditors by maximizing the value of the estate.  The Debtor contends, and the Committee does not disagree, that the Debtor has certain contractual and fiduciary duties to the investors in the funds that it manages.  The Debtor asserts that those duties compelled the Debtor to file the Distribution Motion.  *Distribution Motion* ¶ 7.  The Debtor also has duties to its creditors, however, and the Committee, for the reasons set forth above, asserts that such duties require the Debtor to avoid making the Proposed Insider Distributions at this time.  Filing the Distribution Motion should fulfill any duties the Debtor may have to the Insider Parties in respect of the Proposed Insider Distributions.  An order from this Court providing that the Proposed Insider Distributions should be temporarily withheld

**Appx. 04138**

and segregated fully addresses any conflict of duties the Debtor otherwise may have, and would allow the Debtor to more effectively carry out its duty to maximize the value of the estate.

20.    Accordingly, the Committee believes that the Court should order the Debtor to withhold and segregate the Proposed Insider Distributions until (i) the Insider Parties repay the Notes that are currently due and payable and (ii) the Committee has an opportunity to fully investigate estate causes of action against such Insider Parties.  The Committee does not propose that the Debtor effectuate a setoff or take possession of the Proposed Insider Distributions; rather the Committee requests that the Court order the Debtor to segregate and hold the Proposed Insider Distributions in reserve for a limited period of time in order to avoid the significant prejudice to the estate in allowing cash distributions to be paid to Insider Parties and beneficiaries that owe the Debtor money, and then forcing the estate to spend resources recovering assets from these parties.

*[Remainder of Page Intentionally Left Blank]*

Appx. 04139

WHEREFORE, the Committee respectfully requests that the Court deny the Distribution Motion and direct the Debtor to hold the Proposed Insider Distributions in segregated interest bearing accounts pending further order of the Court.

Dated: March 2, 2020            SIDLEY AUSTIN LLP
Dallas, Texas            /s/ *Juliana Hoffman*
                    Penny P. Reid
                    Paige Holden Montgomery
                    Juliana L. Hoffman
                    2021 McKinney Avenue
                    Suite 2000
                    Dallas, Texas 74201
                    Telephone: (214) 981-3300
                    Facsimile: (214) 981-3400

                        -and-

                    Bojan Guzina (admitted *pro hac vice*)
                    Matthew A. Clemente (admitted *pro hac vice*)
                    Dennis M. Twomey (admitted *pro hac vice*)
                    Alyssa Russell (admitted *pro hac vice*)
                    One South Dearborn Street
                    Chicago, Illinois 60603
                    Telephone:  (312) 853-7000
                    Facsimile:  (312) 853-7036

                    COUNSEL FOR THE OFFICIAL COMMITTEE OF
                    UNSECURED CREDITORS

Appx. 04140

# EXHIBIT 203

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone:  (214) 745-5400
Facsimile:   (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
achiarello@winstead.com

Brian P. Shaw – State Bar No. 24053473
**ROGGE DUNN GROUP, PC**
500 N. Akard Street, Suite 1900
Dallas, Texas 75201
Telephone: (214) 888-5000
Facsimile:   (214) 220-3833
shaw@roggedunngroup.com

**COUNSEL FOR ACIS CAPITAL MANAGEMENT,
L.P AND ACIS CAPITAL MANAGEMENT GP,
LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 19-34054** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| | § | |
| **DEBTOR.** | § | **Chapter 11** |

### JOINDER OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC TO THE COMMITTEE'S OBJECTION TO THE MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES," AND COMMENT TO THE SAME

Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC

("Acis GP," together with Acis LP, "Acis") file this joinder (this "Joinder") to the Committee's

objection (the "Objection") to the *Motion of the Debtor for an Order Authorizing, but not*

*Directing, the Debtor to Cause Distributions to Certain "Related Entities"* [Docket No. 474] (the

"Distribution Motion") and comment to the Distribution Motion, and respectfully state as

follows:[1]

---

[1] Any capitalized term not otherwise defined in this Joinder shall have the meaning ascribed to such term in the Objection.

**JOINDER OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC
TO THE COMMITTEE'S OBJECTION TO THE MOTION TO THE DEBTOR FOR ENTRY OF AN
ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR ~~CERTAIN "RELATED ENTITIES," AND COMMENT TO THE SA~~**

## I.    INTRODUCTION

1.      Acis wants the Court to know the whole story.  After the Debtor filed for bankruptcy—and after the Debtor filed its initial motion to approve protocols for certain "ordinary course" transactions—James Dondero purportedly entered into a *rogue oral trade* of $123.25 million in thinly-traded stock of MGM, a private company of which Dondero is on the board of directors, and thus privy to unique information. Upon information and belief, Dondero did so unbeknownst to Debtor's bankruptcy counsel or the newly-installed chief restructuring officer and his staff; however, there is a question whether Debtor's in-house legal team was aware of Dondero's actions.  Like so many prior transactions, Dondero was on both sides of the deal. To make things worse, after the purported oral trade, MGM's stock price appreciated significantly in value.  Moreover, other Dondero-controlled entities have not sold their pro-rata positions in MGM, calling into question why doing so for this Debtor-controlled fund was in the various stakeholders' best interests, and consequently in the estate's best interests.

2.      While the Committee did not ultimately object to the underlying transaction, Acis objected in the strongest terms.  This was not an "ordinary course" transaction, and much is to be learned about the circumstances surrounding Dondero's purported $123.25 million oral trade. Even if the trade really happened and was proper, it does not reflect sound business judgment for the Debtor to allow millions of dollars go out the door to insiders when those same insiders will likely owe much, much more to the estate.  Rather than authorizing the Debtor to reward Dondero and other insiders for his misfeasance, the Court should sustain the Committee's Objection.

**JOINDER OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC TO THE COMMITTEE'S OBJECTION TO THE MOTION TO THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES," AND COMMENT TO THE SAME                    Page 2 of 9**

Appx. 04143

## II.    <u>RELEVANT FACTS</u>

3.      On October 16, 2019, the Debtor filed the above-captioned bankruptcy case (this "<u>Bankruptcy Case</u>").

4.      On October 24, 2019, the Debtor filed its *Precautionary Motion of the Debtor for Order Approving Protocols for the Debtor to Implement Certain Transactions in the Ordinary Course of Business* [Docket No. 76] (the "<u>Initial Protocols Motion</u>"), whereby the Debtor requested that the Court approve certain protocols with respect to "ordinary course" services and intercompany transactions.

5.      Also on October 24, 2019, the U.S. Trustee appointed the Committee, of which Acis is a member. *See* Docket No. 64.

6.      In November 2019, as described in the Distribution Motion, prior to the appointment of the Independent Board, "the Debtor requested the Committee's authorization to proceed first with the larger transactions and then solely the MGM Sale, but the Committee rejected both of these transactions."  Distribution Motion ¶ 30.

7.      Sometime in late November 2019, *after* the Committee rejected the proposed MGM Sale, and without approval of the Debtor's counsel or financial advisors (or their knowledge), Dondero purportedly orally entered into the clandestine, rogue trade of 1.7 million shares of MGM stock for $123.25 million, or for $72.50 per share. *See id*. ¶ 29. While Dondero was still controlling the Debtor, he was also on the board of directors of MGM. Upon information and belief, Dondero engaged in this purported trade just after MGM reported earnings, and most likely before the market absorbed the reported earnings.[2] These

---

[2] Also disturbing, just prior to the purported trade, the Debtor's CRO, Bradley Sharp, was deposed and testified that, under his engagement letter, Dondero was required to obtain his approval for such related-party transactions.

**JOINDER OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC TO THE COMMITTEE'S OBJECTION TO THE MOTION TO THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES," AND COMMENT TO THE SAME**                    **Page 3 of 9**

circumstances reflect the continuation of Dondero's pattern of flouting his duties in connection with the Debtor or this Bankruptcy Case.

8.      As explained by the Committee in its Objection, the Independent Board, Debtor's counsel, and the Debtor's CRO and financial advisors were not made aware of the MGM Sale until over two months after Dondero purportedly committed to the transaction on behalf of the Debtor. Likewise, the MGM Sale was not disclosed to the Committee until February 7, 2020. *Id*.

9.      On January 14, 2020, the Debtor filed its *Notice of Final Term Sheet* [Docket No. 354] (the "Term Sheet"), which set out proposed terms of a settlement between the Debtor and the Committee related to the Debtor's corporate governance and operating protocols.  The next day, on January 15, 2020, the Debtor withdrew the Initial Protocols Motion. *See* Docket No. 360.

10.      On February 21, 2020, the Debtor filed its *Notice of Debtor's Amended Operating Protocols* [Docket No. 466] (the "Protocols"). Under the Protocols (amended slightly from the Term Sheet), the operating requirements for "Ordinary Course Transactions" (which do not require Court approval) differ significantly from "Related Entity Transactions," which likely do require Court approval if the Committee objects. *See* Protocols Ex. A at 2-6.  Under the Protocols, MGM Holdings, Inc. is specifically defined as a "Related Entity." *Id*. at 1.

### III.      JOINDER AND COMMENT

11.      Acis expressly joins the Committee's Objection and hereby incorporates the Objection as if set forth in full and for all purposes herein.

**JOINDER OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC TO THE COMMITTEE'S OBJECTION TO THE MOTION TO THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES," AND COMMENT TO THE SAME**          **Page 4 of 9**

**Appx. 04145**

A.     **The Court should not allow Dondero and other Insider Parties to benefit from the rogue MGM Sale by allowing the Debtor to make the Proposed Insider Distributions.**

12.     The MGM Sale is just a continuation of Dondero's self-dealing—even during this Bankruptcy Case—to enrich himself (or other entities he controls), at the expense of the estate. Now the Debtor seeks "authority" to approve Dondero's misfeasance.  At a minimum, it is only proper for this Court to sustain the Committee's Objection and prevent distribution of any of the Proposed Insider Distributions.

13.     The MGM Sale continues a familiar pattern.  Like many prior transactions, Dondero was on both sides of the MGM Sale. While acting as a director on MGM's board, he was also acting on behalf of the Debtor.  Further, even though this transaction required CRO oversight under the proposed protocols (which were contemplated at the time of or soon after the bankruptcy filing), Dondero engaged in the purported rogue MGM Sale without knowledge of the Debtor's counsel or the CRO.

14.     Since Dondero entered into this clandestine, rogue trade at $72.50 a share, on information and belief, MGM shares have recently traded in the $90s. Moreover, other Dondero-controlled entities have not sold their pro-rata positions in MGM, which calls into question whether this transaction was in the best interest of the Debtor and the various stakeholders in this Debtor-controlled fund.

15.     After the Committee learned of the transaction, Acis strenuously objected to its approval. The Committee nevertheless voted to approve it.  Still, by its Objection, the Committee requests that the Court direct the Debtor to withhold any Proposed Insider Distributions until the Insider Parties repay Notes that are currently due and payable to the

**JOINDER OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC TO THE COMMITTEE'S OBJECTION TO THE MOTION TO THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES," AND COMMENT TO THE SAME                Page 5 of 9**

Appx. 04146

Debtor and the Committee can fully investigate causes of action against the Insider Parties. Acis joins in this request.

**B.    The MGM Sale was not in the ordinary course and distributing its proceeds to the Insider Parties is not in the Debtors' sound business judgment.**

16.    The Debtor first asserts that the Distributions, including those from the MGM Sale, are in the ordinary course pursuant to section 363(c)(1) of the Bankruptcy Code. The Protocols themselves belie this assertion. The Protocols specifically carve out "Related Entity" Transactions," such as the MGM Sale, from "Ordinary Course Transactions," which do not require Court approval.  Now arguing that these Related Entity Transactions should simply be rubber stamped because they are ordinary course under section 363(c) defeats the purpose of Court approval and undermines the Protocols.

17.    Alternatively, the Debtor argues that if the Distributions are not ordinary course, they are within the exercise of the Debtor's sound business judgment, and therefore allowed under section 363(b)(1) of the Bankruptcy Code. *See* Distribution Motion ¶ 56-57.

18.    When exercising its business judgment pursuant to section 363(b), the trustee or debtor in possession has a duty to maximize value for the estate and its creditors.  *See Gluckstadt Holdings, L.L.C. v. VCR I, L.L.C. (In re VCR I, L.L.C.)*, 922 F.3d 323, 326-27 (5th Cir. 2019) (noting that, under section 363(b), a "'trustee as a duty to maximize the value of the estate'") (*quoting Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010)); *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) (affirming the bankruptcy court's finding that the "proposed reimbursement of expenses was designed to maximize the value of [the] estate, and was fair, reasonable, and appropriate").

19.    Accordingly, when the Debtor uses property of the estate, which here are the Debtor's contract rights in connection with making the Distributions, outside of the ordinary

**JOINDER OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC TO THE COMMITTEE'S OBJECTION TO THE MOTION TO THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES," AND COMMENT TO THE SAME**                    **Page 6 of 9**

Appx. 04147

course, the Debtor has a duty maximize value for the estate. As expressed by the Committee in its Objection, it does not reflect sound business judgment for the Debtor to pay millions of dollars in cash distributions to insiders when those same insiders likely owe much more to the estate.

20. As a court of equity, and pursuant to sections 105 and 363 of the Bankruptcy Code, at a minimum this Court should prevent the Debtor from making any Proposed Insider Distributions, as set forth in the Objection, until the Committee has the opportunity to fully investigate estate causes of action against Dondero and other Insider Parties.

## IV. __PRAYER__

Acis respectfully requests that this Court sustain the Committee's Objection and grant Acis such other and further relief to which it may show itself to be justly entitled.

**DATED: March 2, 2020.**

*[Remainder of Page Intentionally Left Blank]*

**JOINDER OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC TO THE COMMITTEE'S OBJECTION TO THE MOTION TO THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES," AND COMMENT TO THE SAME** **Page 7 of 9**

**Appx. 04148**

Respectfully submitted,


By: */s/ Rakhee V. Patel*
    Rakhee V. Patel
    State Bar No. 00797213
    Phillip Lamberson
    State Bar No. 00794134
    Annmarie Chiarello
    State Bar No. 24097496
    **WINSTEAD PC**
    500 Winstead Building
    2728 N. Harwood Street
    Dallas, Texas 75201
    Telephone: (214) 745-5400
    Facsimile: (214) 745-5390
    rpatel@winstead.com
    plamberson@winstead.com
    achiarello@winstead.com

    -and-

    Brian P. Shaw
    State Bar No. 24053473
    **ROGGE DUNN GROUP, PC**
    500 N. Akard Street, Suite 1900
    Dallas, Texas 75201
    Telephone: (214) 888-5000
    Facsimile: (214) 220-3833
    shaw@roggedunngroup.com

**COUNSEL FOR ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC**


**JOINDER OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC TO THE COMMITTEE'S OBJECTION TO THE MOTION TO THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES," AND COMMENT TO THE SAME**    **Page 8 of 9**

**Appx. 04149**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 2, 2020, notice of this document will be electronically mailed to the parties that are registered or otherwise entitled to receive electronic notices in this case pursuant to the Electronic Filing Procedures in this District.

*/s/ Rakhee V. Patel*
One of Counsel

**JOINDER OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC TO THE COMMITTEE'S OBJECTION TO THE MOTION TO THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES," AND COMMENT TO THE SAME** **Page 9 of 9**
4846-1397-8038v.2

# EXHIBIT 204

Docket #0499  Date Filed: 03/04/2020

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Maxim B. Litvak (Texas Bar No. 24002482)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |

## DEBTOR'S REPLY IN SUPPORT OF MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES"

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054200304000000000001

**Appx. 04152**

The above-captioned debtor and debtor-in-possession (the "Debtor") files this reply (the "Reply") in support of the *Motion of the Debtor for Entry of an Order Authorizing but Not Directing the Debtor to Cause Distributions to Certain "Related Entities"* [Docket No. 474] (the "Motion").[2]

In further support of the Motion, the Debtor respectfully states as follows:

**Preliminary Statement**

1.     In the Motion, the Debtor disclosed that certain "Related Entities" (the "Related Entity Investors") had invested in three funds – Dynamic, AROF, and RCP (collectively, the "Funds") – and that the Debtor was seeking authority from this Court to distribute funds owned by the Funds – not the Debtor – to the Related Entity Investors that they are contractually entitled to receive under the Funds' governing documents.  The Committee objected to the relief sought in the Motion,[3] and Acis Capital Management, L.P., and Acis Capital Management GP, LLC (collectively, "Acis," and together with the Committee, the "Objecting Parties") filed a joinder to the Committee Objection.[4]  In their objections, the Objecting Parties – citing only to Section 105(a) of the Bankruptcy Code as authority – requested that this Court order the Debtor to "withhold and segregate" the proceeds due to the Related Entity Investors.  (Committee Objection, § 20.)  That relief amounts to a request for a preliminary injunction and a prejudgment attachment without filing any underlying action or otherwise complying with the procedural and substantive requirements to obtain a prejudgment attachment under applicable law.  As set forth below, the

---

[2] All capitalized terms used but not defined herein shall have the meanings given to them in the Motion.

[3] *Objection of the Official Committee of Unsecured Creditors to the Motion of the Debtor for Entry of an Order Authorizing, but Not Directing, the Debtor to Cause Distributions to Certain "Related Entities."* [Docket No. 487] (the "Committee Objection").

[4] *Joinder of Acis Capital Management, L.P., and Acis Capital Management GP, LLC to the Committee's Objection to the Motion of the Debtor for Entry of an Order Authorizing, but Not Directing, the Debtor to Cause Distributions to Certain "Related Entities," and Comment to the Same* [Docket No. 489] (the "Joinder").

2

existence of potential claims against the Related Parties are not, in and of themselves, sufficient to justify such extraordinary relief.

2.     As the Debtor disclosed in the Motion it, or in the case of AROF, one of its subsidiaries manage the Funds and that the Debtor's Independent Board (after consultation with outside counsel) believes that, as a registered investment adviser, the Debtor has certain duties to the funds that it manages, including the Funds.  Those duties exist regardless of whether the investors in those funds are Related Entities or otherwise and are based on contract and on the laws of the United States, Delaware, and the Cayman Islands.  Importantly, applicable law prohibits the Debtor from asserting its own interest ahead of those of investors.  In the Motion, the Debtor further disclosed that it did not have the contractual or legal authority to withhold or cause the Funds to withhold distributions from the Related Entity Investors or to treat the Related Entity Investors differently than non-Related Entity Investors.

3.     Because of those duties – duties which both the Debtor and the Independent Board take seriously – the Debtor sought the relief requested in the Motion.  Although the Committee and Acis objected to that relief, notably, neither the Committee nor Acis have alleged that any of the Debtor, the Funds, or any other entity can without violating their contractual and fiduciary obligations elect *not* to distribute to the Related Entity Investors their allocable portion of the distributions being made to the investors in the Funds.  Nor has any party alleged that any of the Funds' assets are property of the Debtor's estate or that any of the Funds have claims against their Related Entity Investors.  Instead, the Objecting Parties have asked this Court to use its equitable powers under Section 105(a) of the Bankruptcy Code to cause the Debtor to withhold distributions to the Related Entity Investors because of certain alleged bad acts and potential claims that may exist against those Related Entities.

DOCS_NY:40258.9 36027/002

4.      The Independent Board respects the Committee's intention to investigate claims against the Related Entity Investors and insiders as contemplated by the Term Sheet, approved by this Court on January 9, 2020, which led to the installation of the Independent Board. The Independent Board intends to cooperate with the Committee in its efforts.  At the same time, the Independent Board was installed to revamp the Debtor's prior culture, including to ensure obligations to the investors in the funds managed by the Debtor are being appropriately honored. The Independent Board believes this is essential to rebuilding the Debtor's reputation in the marketplace and the investor community, and to prospectively protect the Debtor from liability. However, neither Section 105(a) nor any other provision of the Bankruptcy Code allows this Court to grant the relief that the Objecting Parties are actually requesting – an injunction and prejudgment attachment against third parties not currently before the Court.

### Reply

5.      The Debtor, or with respect to AROF, its subsidiary, is the investment adviser to each of the Funds.  As the investment adviser, the Debtor has contractual discretion over the selection and disposition of the Funds' investments, but does not serve in a governance role. Rather, the governing body of each Fund is either a board of directors or a general partner.  And the terms of each of the Funds is governed by its applicable governing documents, which each investor was furnished and relied upon when subscribing for an interest in the Fund.  The Dynamic Fund Documents govern Dynamic; the AROF Fund Documents govern AROF; and the RCP Fund Documents govern RCP (the Dynamic Fund Documents, the AROF Fund Documents, and the RCP Fund Documents, collectively, the "Fund Documents").  Each of the Fund Documents is in turn governed, as applicable, by U.S. and Delaware or Cayman law.

DOCS_NY:40258.9 36027/002

**Appx. 04155**

6.      As discussed at length in the Motion, each of the Funds is its own separate

legal entity which owns its own assets, and none of the Fund Documents allow the Debtor to treat

the Related Entity Investors – regardless of who such investors happen to be or by whom they are

owned – differently than non-Related Entity Investors.  (Motion, ¶¶ 42-47.)  Importantly, neither

the Committee nor Acis has stated or alleged that:  (a) any of the Funds is a debtor in the

Bankruptcy Case or subject to this Court's jurisdiction; (b) the assets held by the Funds are

property of the Debtor's estate; (c) the Debtor does *not* have contractual and fiduciary obligations

to the Funds; or (d) any provision in any of the Fund Documents allows the Debtor to treat the

Related Entity Investors in the Funds differently than the non-Related Entity Investors in the

manner being requested.

7.      Instead, the Objecting Parties rely on alleged bad acts by the Debtor and

certain of the Debtor's employees and principals[5] and the Committee's potential, but inchoate,

causes of action against such parties to seek what amounts to an injunction from this Court under

Section 105(a) and a prejudgment attachment against the proceeds that the Related Entity Investors

in the Funds are contractually entitled to receive – not from the Debtor – but from the Funds.

However, those alleged bad acts – regardless of whether they occurred pre- or postpetition – and

---

[5] The Debtor does not believe that the provenance of the $123.25 million in proceeds from the MGM Sale or Mr. Dondero's role in the MGM Sale is relevant to the Motion.  What the Debtor does believe is relevant is that (a) RCP is currently in liquidation and is required to liquidate its assets in an orderly manner and (b) RCP's investors, such as the California Public Employees' Retirement System ("CalPERS"), have requested that the Debtor disburse the proceeds of the MGM Sale as quickly as possible in the manner required by the RCP Fund Documents.  *See, e.g., Response by CalPERS to Motion by the Debtor for Entry of an Order Authorizing, but Not Directing, the Debtor to Cause Distributions to Certain "Related Entities"* [Docket No. 486].

Whether or not Mr. Mr. Dondero had the authority to bind RCP to sell the MGM common stock is not relevant to the Motion.  When the Independent Board and the Debtor's professionals found out that Mr. Dondero had agreed to the MGM Sale, they reviewed the MGM Sale and independently determined that it was in the best interests of the Debtor's estate to close that sale.  The Independent Board disclosed their reasoning to the Committee, and the Committee did not object to the MGM Sale.  (Committee Objection, § 14.)  Consequently, the MGM Sale closed on February 24, 2020.  To the extent the Committee seeks to investigate further the circumstances surrounding the MGM Sale, the Independent Board will ensure that the Debtor cooperates with such investigation.  However, that issue is not relevant to the relief the Debtor is seeking here.

DOCS_NY:40258.9 36027/002

potential causes of action are *not* the subject of the Motion.  And if either the Committee or Acis believe that such claims exist, the Committee, at least, has been granted standing to pursue those claims (and Acis has shown itself more than capable of standing up for its rights).  Further, the Committee's and Acis's request is procedurally and substantively improper.  To obtain a pre-judgment writ or attachment, they are required to commence an action and seek such remedy in accordance with due process and to prove the substantive elements that support such relief.  The Objecting Parties have done neither.

8.    First, assuming, *arguendo*, that Texas state law applies to the Related Entity Investors (although the law of other States and the Cayman Islands may also apply), the burden associated with seeking a prejudgment attachment is a significant one, and it is placed on the moving party – in this case the Objecting Parties.  *See S.R.S. World Wheels v. Enlow*, 946 S.W.2d 574, 575 (Tex. Civ. App. - Ft. Worth 1997) ("[a]ttachment is a harsh, oppressive remedy; therefore, attachment is not available unless statutory safeguards are strictly observed.").  To get a prejudgment attachment, the Objecting Parties would first be required to commence an action articulating the nature and extent of the claims supporting such attachment.  Next, the Committee would be required to file and serve a request for a prejudgment attachment with appropriate notice to the defendant.  Finally, to obtain that relief under Texas law, the Committee would have to prove the following elements:  (a) defendant is justly indebted to the plaintiff; (b) attachment is not sought for purposes of harassment or injury; (c) plaintiff will probably lose his debt if there is no attachment; and (d) specific grounds for the attachment exist.[6]  Tex. Civ. Prac. & Rem. Code.

---

[6] Specific grounds for attachment under Texas law exist if:  (a) the defendant is not a resident of this state or is a foreign corporation or is acting as such; (b) the defendant is about to move from this state permanently and has refused to pay or secure the debt due the plaintiff; (c) the defendant is in hiding so that ordinary process of law cannot be served on him; (d) the defendant has hidden or is about to hide his property for the purpose of defrauding his creditors; (e) the defendant is about to remove his property from this state without leaving an amount sufficient to pay his debts; (f) the defendant is about to remove all or part of his property from the county in which the suit is brought with the intent to defraud his creditors; (g) the defendant has disposed of or is about to dispose of all or part of his property

**Appx. 04157**

§ 61.001. Neither Objecting Party has pled any of the foregoing statutory elements let alone carried its burden.

9. Second, Section 105(a) of the Bankruptcy Code – which is the only provision cited by the Objecting Parties to justify their position – does not allow this Court to grant the Objecting Parties' request. As a general matter, Section 105(a) does not create a "roving commission" for a court "to do equity." *See, e.g., United States v. Sutton,* 786 F.2d 1305, 1308 (5th Cir. 1986); *see also New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 92 (2nd Cir. 2003). Rather, relief under Section 105(a) must be tethered to some provision of the Bankruptcy Code. *See, e.g., Law v. Siegel*, 571 U.S. 415, 421 (2014) ("We have long held that 'whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy Code.") (citing cases); *New England Dairies*, 351 F.3d at 91-92 ("[S]ection 105(a) [confers] the power to exercise equity in carrying out the *provisions* of the Bankruptcy Code. . . This language 'suggests that an exercise of section 105 power be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective.'") (citations omitted) (emphasis in original). Here, the Committee has not cited to any provision under the Bankruptcy Code justifying its request besides the general powers available under Section 105(a).

10. Instead, the Committee has requested that this Court cause the "[temporary] withholding" of distributions to Related Entity Investors in Dynamic, AROF, and RCP. (Committee Objection, ¶¶ 16-20.) As such, the Committee and Acis, through the Joinder, are asking this Court for an injunction only under Section 105(a) ordering "the Debtor to withhold and

---

with the intent to defraud his creditors; (h) the defendant is about to convert all or part of his property into money for the purpose of placing it beyond the reach of his creditors; or (i) the defendant owes the plaintiff for property obtained by the defendant under false pretenses. *See* Tex. Civ. Prac. & Rem. Code. § 61.002. There is no factual record before the Court to support any of these required findings.

segregate the Proposed Insider Distributions." (*Id.*, ¶ 20.)  However, because the Related Entity

Investors in the Funds have a contractual right to their distributions from the Funds – not from the

Debtor – any order from this Court enjoining the "Proposed Insider Distributions" would also, by

necessity, be an order from this Court enjoining such Related Entity Investors from asserting their

contractual rights against the Funds and enjoining the Funds from making distributions to the

Related Entity Investors.[7]  Such injunction would therefore be an order enjoining third party action

and require the Committee to satisfy the standards for a preliminary injunction.  *Feld v. Zale Corp.*

*(in Re Zale Corp.)*, 62 F.3d 746, 765 (5th Cir. 1995) (citing *In re Eagle-Picher Industries, Inc.*,

963 F.2d 855, 858 (6th Cir. 1992) ("When issuing a preliminary injunction pursuant to its powers

set forth in section 105(a), a bankruptcy court must consider the traditional factors governing

preliminary injunctions issued pursuant to Federal Rule of Civil Procedure 65.").

   11. Here, however, the Objecting Parties have not followed the procedural or

substantive requirements to obtain a pre-judgment remedy: a proper complaint providing the

Related Parties with the opportunity to respond as well as a separate application for prejudgment

attachment is required.  Only then would the Court be in a position to evaluate whether the

Committee can establish: (a) substantial likelihood of success on the merits; (b) substantial threat

of irreparable injury; (c) the threatened injury outweighs the harm of the injunction; and (d) the

injunction will not disserve the public interest.  *Id.*  The Committee has not carried its burden.

Section 105(a) does not allow the Objecting Parties to bootstrap their objections into a prejudgment

---

[7] CLOH is invested in the AROF Cayman feeder fund.  The AROF Cayman feeder fund is managed by an independent board of Cayman-based directors.  The Debtor, as a matter of Cayman law, has no ability to compel those independent directors to "withhold and segregate the Proposed Insider Distributions," and while the Cayman directors may have some ability to treat certain investors differently than others, the Debtor has no right to direct the Cayman directors. Consequently, any order from this Court seeking to require the Debtor to withhold distributions made to CLOH by the AROF Cayman feeder fund will be an order with which the Debtor simply cannot comply.  As such, any order enjoining payments on account of CLOH's interest in the AROF Cayman feeder fund will need to be an order compelling the Cayman directors to take or not to take action; however, for such an order to be binding in the Cayman Islands, it must first be recognized by a Cayman court of competent jurisdiction.

attachment against assets that are not property of the Debtor's estate and that contractually are owed to parties not currently before this Court, i.e., Mr. Okada, CLOH, and HCM Services. If the Objecting Parties desire such relief, they should bring a procedurally appropriate motion instead of seeking an ex parte injunction and prejudgment attachment.[8]

12.     In sum, it is uncontroverted that (a) the Funds are not debtors in this Bankruptcy Case; (b) the Funds' assets are not property of the Debtor; (c) the Fund Documents do not allow the Debtor to cause the Funds to *not* make certain distributions that they would otherwise be required to make to their Related Entity Investors; and (d) there are no provisions in the Fund Documents – or applicable law – that would allow the Debtor to do what the Objecting Parties are demanding. It is also uncontroverted that the Independent Board determined that (i), after seeking advice from U.S. and Cayman-based fund and regulatory counsel, as the parties in control of a registered investment advisor, they have obligations to the Debtor's managed funds and, by extension, the investors in such funds and (ii) those obligations required the Independent Board to file and prosecute the Motion.

*[Remainder of Page Intentionally Blank]*

---

[8] The Committee cannot argue it was unaware of the procedural deficiencies in the Committee Objection as one of the cases cited by the Committee – *In re DeLorean Motors Co.* – lays out the appropriate way to use Section 105(a). 755 F.2d 1223 (6th Cir. 1985). In *DeLorean*, the unsecured creditors committee (and later the trustee) believed certain assets were property of the debtor's estate. To secure those assets, the committee filed an adversary proceeding seeking a declaration that the assets were estate property and could not be removed from the estate. In reviewing the case, the Sixth Circuit first noted that committee was not seeking an attachment. "The preliminary injunction in the present case is similarly not for the purpose of securing satisfaction of the judgment ultimately to be entered in the action. The trustee does not seek to attach. . . assets in order to satisfy a possible damage award. The relief sought is merely a declaration that the assets are a part of the bankruptcy estate."). *DeLorean*, 755 F.3d at 1227. Because the moving party was not seeking attachment, but rather a preliminary injunction, the Sixth Circuit found that Rule 64 of the Federal Rules of Civil Procedure did not apply but that to get an injunction that the moving party had to satisfy Rule 65 and its traditional four part test. *Id.*

Consequently, *DeLorean* highlights the appropriate way to use Section 105(a). Section 105(a) is to be paired with another section of the Bankruptcy Code (in *DeLorean*, Section 541), and if an injunction and attachment is sought, (a) an adversary proceeding should be filed, (b) the appropriate parties noticed, and (c) the requirements of Rules 64 and 65 of the Federal Rules of Civil Procedure satisfied. The Committee, however, has failed to abide by any of the procedural or statutory requirements laid out in *DeLorean*.

9

WHEREFORE, for the reasons set forth above and in the Motion, the Committee Objection and the Acis Objection should be overruled in all respects and the relief requested in the Motion should be granted.

Dated: March 4, 2020

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
Maxim B. Litvak (Texas Bar No. 24002482)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:     jpomerantz@pszjlaw.com
            ikharasch@pcszjlaw.com
            mlitvak@pszjlaw.com
            gdemo@pszjlaw.com

-and-

*/s/  Melissa S. Hayward.*
HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and
Debtor-in-Possession*

DOCS_NY:40258.9 36027/002

**Appx. 04161**

# EXHIBIT 205

Appx. 04162

## AMENDED AND RESTATED SHARED SERVICES AGREEMENT

This Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated effective as of January 1, 2018, is entered into by and between NexPoint Advisors, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

### R E C I T A L S

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Parties entered into that certain Shared Services Agreement, dated effective as of January 1, 2013 (the "Original Agreement");

WHEREAS, the Parties desire to amend and restated the Original Agreement and the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company, in each case, on the terms and conditions hereof;

WHEREAS, the Management Company may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company; and

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee"), if any, is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree, and the Original Agreement is hereby amended, restated and replaced in its entirety as follows.

### ARTICLE I

### DEFINITIONS

Section 1.01   Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

Exhibit A

"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person.  The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"Client or Account" shall mean any fund, client or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission, corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) all capital lease obligations; (e) all indebtedness guaranteed by such Person or any of its subsidiaries; and (f) all indebtedness guaranteed by such Person or any of its subsidiaries.

2

Appx. 04164

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a Client or Account.

"Portfolio" means the portfolio of securities and other assets, including without limitation, financial instruments, equity investments, collateral loan obligations, debt securities, preferred return notes and other similar obligations held directly or indirectly by, or on behalf of, Clients and Accounts from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

Section 1.02    Interpretation.  The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

## SERVICES

Section 2.01    General Authority.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and if applicable, to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02    Provision of Services.  Without limiting the generality of Section 2.01 and subject to Section 2.04 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)    *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, investment research, trade desk services,

including trade execution and settlement, finance and accounting, payments, operations, book keeping, cash management, cash forecasting, accounts payable, accounts receivable, expense reimbursement, vendor management, and information technology (including, without limitation, general support and maintenance (OMS, development, support), telecom (cellphones, telephones and broadband) and WSO);

        (b)   *Legal/Compliance/Risk Analysis.* Assistance and advice with respect to legal issues, litigation support, management of outside counsel, compliance support and implementation and general risk analysis;

        (c)   *Tax.* Assistance and advice with respect to tax audit support, tax planning and tax preparation and filing.

        (d)   *Management of Clients and Accounts.* Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any Client or Account from time to time.

        (e)   *Valuation.* Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

        (f)   *Execution and Documentation.* Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a Client or Account managed by the Management Company, transactions involving the Management Company or a Client or Account managed by the Management Company, and any other rights and obligations of the Management Company or a Client or Account managed by the Management Company;

        (g)   *Marketing.* Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified Clients or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

        (h)   *Reporting.* Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any Client or Account, including reports relating to (i) credit facility reporting and purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

> (i)     *Administrative Services.*    The provision of office space, information technology services and equipment, infrastructure, rent and parking and other related services requested or utilized by the Management Company from time to time;

> (j)     *Shared Employees.*    To the extent applicable, the provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of Section 2.03 hereof;

> (k)     *Ancillary Services.*    Assistance and advice on all things ancillary or incidental to the foregoing; and

> (l)     *Other.*    Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any Client or Account or similar securitization, (c) the substantive investment management decisions with respect to any Client or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

Section 2.03    Shared Employees.

> (a)     The Staff and Services Provider hereby agrees and consents that each Shared Employee, if any, shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.  Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.  To the extent applicable, the Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder.  The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

5

(b)     Notwithstanding that the Shared Employees, if any, shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)     To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)     Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)     Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)     The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)     The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any Client or Account, and regulators, as applicable.  To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)     The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

Appx. 04168

(i)     The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)     The Staff and Services Provider shall require that each Shared Employee:

(i)     certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)     be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)     provide services hereunder and take actions hereunder only as approved by the Management Company;

(iv)     provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)     to the extent authorized to transact on behalf of the Management Company or a Client or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)     act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a Client or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)     Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04    Applicable Asset Criteria and Concentrations. The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.02 above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05    Compliance with Management Company Policies and Procedures. The Management Company will from time to time provide the Staff and Services Provider and the

7

Shared Employees, if any, with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06    Authority. The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement.  The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party.  Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time.   The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Section 2.07    Third Parties.

(a)    The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)    In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a Client or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08    Management Company to Cooperate with the Staff and Services Provider. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09    Power of Attorney. If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company

8

and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments). Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01    Consideration. As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive a flat fee of $168,000 per month (the "Staff and Services Fee"), payable monthly in advance on the first business day of each month.

Section 3.02    Costs and Expenses. Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.03    Deferral. Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01    Representations. Each of the Parties hereto represents and warrants that:

(a)    It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)    this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)    no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)    neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms

9

of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01 <u>Compliance; Advisory Restrictions</u>.

(a) The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider. Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b) This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof. It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "<u>Advisory Restrictions</u>"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02 <u>Records; Confidentiality</u>.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its

10

Appx. 04172

rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Client or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such information as is routinely disclosed to the trustee, custodian or collateral administrator of any Client or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such Client or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the Clients or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Clients or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01    Standard of Care.   Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder.  No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account.  Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

11

Section 6.02    Exculpation.  To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless it is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.  The exculpations set forth in this Section 6.02 shall exculpate any Covered Person regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03    Indemnification by the Management Company.    The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, causes of action (including, but not limited to, strict liability, negligence, statutory violation, regulatory violation, breach of contract, and all other torts and claims arising under common law), demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or

12

arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons. Any Covered Person shall be indemnified under the terms of this Section 6.03 regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder shall be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04    Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the Clients or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

Appx. 04175

Section 6.05    Rights of Heirs, Successors and Assigns. The indemnification rights provided by Section 6.03 shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06    Reliance. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01    Termination. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01    Amendments. This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02    Assignment and Delegation.

(a)    Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this Section 8.02, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)    Except as otherwise provided in this Section 8.02, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)    The Staff and Services Provider may, without satisfying any of the conditions of Section 8.02(a) other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; provided that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; provided that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has

14

substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03    Non-Recourse; Non-Petition.

(a)    The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)    Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)    Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)    The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)    The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

15

Section 8.04    Governing Law.

(a)    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)    The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "Proceedings") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05    WAIVER OF JURY TRIAL.    EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06    Severability.    The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07    No Waiver.    The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties. Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party. Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08    Counterparts.    This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

16

Section 8.09 <u>Third Party Beneficiaries</u>. This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, Client or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10 <u>No Partnership or Joint Venture</u>. Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties. Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11 <u>Independent Contractor</u>. Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12 <u>Written Disclosure Statement</u>. The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13 <u>Headings</u>. The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14 <u>Entire Agreement</u>. This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15 <u>Notices</u>. Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

        (a)    If to the Management Company:

            NexPoint Advisors, L.P.
            200 Crescent Court
            Suite 700
            Dallas, TX 75201

Appx. 04179

(b)    If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.


*[The remainder of this page intentionally left blank.]*

18

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed as of the date hereof by its duly authorized representative.

**NEXPOINT ADVISORS, L.P.**

By:  NexPoint Advisors GP, LLC, its General Partner

By:_____

Name: Frank Waterhouse
Title: Treasurer

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:  Strand Advisors, Inc., its General Partner

By:_____

Name: Frank Waterhouse
Title: Treasurer

# EXHIBIT 206

```
 1                    IN THE UNITED STATES BANKRUPTCY COURT
                      FOR THE NORTHERN DISTRICT OF TEXAS
 2                              DALLAS DIVISION

 3                                   )    Case No. 19-34054-sgj-11
        In Re:                       )    Chapter 11
                                     )
 4      HIGHLAND CAPITAL             )    Dallas, Texas
        MANAGEMENT, L.P.,            )    Tuesday, February 2, 2021
 5                                   )    9:30 a.m. Docket
                                     )
 6            Debtor.                )
                                     )    CONFIRMATION HEARING [1808]
 7      _____ )    AGREED MOTION TO ASSUME [1624]

 8                         TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
 9                    UNITED STATES BANKRUPTCY JUDGE.

10      WEBEX APPEARANCES:

11      For the Debtor:              Jeffrey Nathan Pomerantz
                                     PACHULSKI STANG ZIEHL & JONES, LLP
12                                   10100 Santa Monica Blvd.,
                                       13th Floor
13                                   Los Angeles, CA  90067-4003
                                     (310) 277-6910
14
        For the Debtor:              John A. Morris
15                                   Gregory V. Demo
                                     PACHULSKI STANG ZIEHL & JONES, LLP
16                                   780 Third Avenue, 34th Floor
                                     New York, NY  10017-2024
17                                   (212) 561-7700

18      For the Debtor:              Ira D. Kharasch
                                     PACHULSKI STANG ZIEHL & JONES, LLP
19                                   10100 Santa Monica Blvd.,
                                       13th Floor
20                                   Los Angeles, CA  90067-4003
                                     (310) 277-6910
21
        For the Official Committee   Matthew A. Clemente
22      of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                     One South Dearborn Street
23                                   Chicago, IL  60603
                                     (312) 853-7539
24

25
```

2

| | |
|---|---|
| 1 | APPEARANCES, cont'd.: |

APPEARANCES, cont'd.:

For Redeemer Committee of     Terri L. Mascherin
the Highland Crusader          JENNER & BLOCK, LLP
Fund:                          353 N. Clark Street
                               Chicago, IL  60654-3456
                               (312) 923-2799

For Acis Capital               Rakhee V. Patel
Management GP, LLC:            WINSTEAD, P.C.
                               2728 N. Harwood Street, Suite 500
                               Dallas, TX  75201
                               (214) 745-5250

For UBS Securities, LLC:      Andrew Clubok
                               LATHAM & WATKINS, LLP
                               555 Eleventh Street, NW,
                                 Suite 1000
                               Washington, DC  20004
                               (202) 637-2200

For Patrick Daugherty:        Jason Patrick Kathman
                               PRONSKE & KATHMAN, P.C.
                               2701 Dallas Parkway, Suite 590
                               Plano, TX  75093
                               (214) 658-6500

For HarbourVest, et al.:      Erica S. Weisgerber
                               DEBEVOISE & PLIMPTON, LLP
                               919 Third Avenue
                               New York, NY  10022
                               (212) 909-6000

For James Dondero:            Clay M. Taylor
                               John Y. Bonds, III
                               D. Michael Lynn
                               Bryan C. Assink
                               BONDS ELLIS EPPICH SCHAFER
                                 JONES, LLP
                               420 Throckmorton Street,
                                 Suite 1000
                               Fort Worth, TX  76102
                               (817) 405-6900

For Get Good Trust and        Douglas S. Draper
Dugaboy Investment Trust:     HELLER, DRAPER & HORN, LLC
                               650 Poydras Street, Suite 2500
                               New Orleans, LA  70130
                               (504) 299-3300

3

APPEARANCES, cont'd.:

| | |
|---|---|
| For Certain Funds and Advisors: | Davor Rukavina<br>Julian Vasek<br>MUNSCH, HARDT, KOPF & HARR<br>500 N. Akard Street, Suite 3800<br>Dallas, TX 75201-6659<br>(214) 855-7587 |
| For Certain Funds and Advisors: | A. Lee Hogewood, III<br>K&L GATES, LLP<br>4350 Lassiter at North Hills<br>  Avenue, Suite 300<br>Raleigh, NC 27609<br>(919) 743-7306 |
| For the NexPoint Parties: | Lauren K. Drawhorn<br>WICK PHILLIPS<br>3131 McKinney Avenue, Suite 100<br>Dallas, TX 75204<br>(214) 692-6200 |
| For Scott Ellington, Isaac Leventon, Thomas Surgent, and Frank Waterhouse: | Frances A. Smith<br>ROSS & SMITH, P.C.<br>Plaza of the Americas<br>700 N. Pearl Street, Suite 1610<br>Dallas, TX 75201<br>(214) 593-4976 |
| For Scott Ellington, Isaac Leventon, Thomas Surgent, and Frank Waterhouse: | Debra A. Dandeneau<br>BAKER & MCKENZIE, LLP<br>452 Fifth Avenue<br>New York, NY 10018<br>(212) 626-4875 |
| For CLO Holdco, Ltd.: | John J. Kane<br>KANE RUSSELL COLEMAN LOGAN, P.C.<br>901 Main Street, Suite 5200<br>Dallas, TX 75202<br>(214) 777-4261 |
| For Davis Deadman, Todd Travers, and Paul Kauffman: | Jason Patrick Kathman<br>PRONSKE & KATHMAN, P.C.<br>2701 Dallas Parkway, Suite 590<br>Plano, TX 75093<br>(214) 658-6500 |

4

APPEARANCES, cont'd.:

| | |
|---|---|
| For the United States of America (IRS): | David G. Adams<br>U.S. STATES DEPARTMENT OF JUSTICE,<br>  TAX DIVISION<br>717 N. Harwood Street, Suite 400<br>Dallas, TX 75201<br>(214) 880-2432 |
| For Highland CLO Funding, Ltd.: | Rebecca Matsumura<br>KING & SPALDING, LLP<br>500 West 2nd Street, Suite 1800<br>Austin, TX 78701<br>(512) 457-2024 |
| For Crescent TC Investors: | Michael S. Held<br>JACKSON WALKER, LLP<br>2323 Ross Avenue, Suite 600<br>Dallas, TX 75201<br>(214) 953-5859 |
| For the Issuer Group: | Amy K. Anderson<br>JONES WALKER, LLP<br>811 Main Street, Suite 2900<br>Houston, TX 77002<br>(713) 437-1866 |
| Recorded by: | Michael F. Edmond, Sr.<br>UNITED STATES BANKRUPTCY COURT<br>1100 Commerce Street, 12th Floor<br>Dallas, TX 75242<br>(214) 753-2062 |
| Transcribed by: | Kathy Rehling<br>311 Paradise Cove<br>Shady Shores, TX 76208<br>(972) 786-3063 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

5

1          <u>DALLAS, TEXAS - FEBRUARY 2, 2021 - 9:38 A.M.</u>

2          THE COURT:  Good morning.  Please be seated.  All

3   right.  We are ready to get started now in Highland Capital.

4   We have a confirmation hearing as well as a motion to assume

5   the non-residential real property lease at the headquarters.

6   All right.  This is Case No. 19-34054.  I know we're going to

7   have a lot of appearances today.  I think we're just down to a

8   handful of objections, but I'm nevertheless going to go ahead

9   and get formal appearances from our key parties that we've had

10  historically in this case.

11     First, for the Debtor team, do we have Mr. Pomerantz and

12  your crew?

13          MR. POMERANTZ:  Yes.  Good morning, Your Honor.  Jeff

14  Pomerantz, along with John Morris, Ira Kharasch, and Greg

15  Demo, on behalf of the Debtor-in-Possession, Highland Capital.

16          THE COURT:  All right.  Good morning.  All right.

17  For the Unsecured Creditors' Committee team, do we have Mr.

18  Clemente and others?

19          MR. CLEMENTE:  Yes.  Good morning, Your Honor.

20  Matthew Clements; Sidley Austin; on behalf of the Official

21  Committee of Unsecured Creditors.

22          THE COURT:  All right.  I'm actually going to call a

23  roll call for the Committee members who have obviously been

24  very active during this case.  For the Redeemer Committee and

25  Crusader Fund, do we have Ms. Mascherin and her team?

6

1  (Pause.)  Okay.  We're -- if -- you must be on mute.

2              MS. MASCHERIN:  Your Honor, I apologize.

3              THE COURT:  Okay.  Go ahead.

4              MS. MASCHERIN:  I apologize, Your Honor.  I was on

5  mute and could not figure out how to unmute myself quickly.

6  Terri Mascherin; Jenner & Block; on behalf of the Redeemer

7  Committee.

8              THE COURT:  All right.  Good morning.

9      All right.  What about Acis?  Do we have Ms. Patel and

10 others for the Acis team?

11             MS. PATEL:  Good morning, Your Honor.  Rakhee Patel

12 on behalf of Acis Capital Management.

13             THE COURT:  Good morning.

14     All right.  Mr. Clubok, I see you there for the UBS team,

15 correct?

16             MR. CLUBOK:  Yes.  Good morning, Your Honor.

17             THE COURT:  Good morning.

18     All right.  For Patrick Daugherty, I think I see Mr.

19 Kathman out there, correct?

20             MR. KATHMAN:  Good morning, Your Honor.  Jason

21 Kathman on behalf of Patrick Daugherty.

22             THE COURT:  All right.  Good morning.

23     All right.  What about HarbourVest?  Anyone on the line

24 for HarbourVest?

25             MS. WEISGERBER:  Good morning, Your Honor.  Erica

7

1 | Weisgerber for HarbourVest.

2 |         THE COURT:  All right.  Very good.

3 |     All right.  Well, I'll now, I guess, turn to some of the

4 | Objectors that I haven't hit yet.  Who do we have appearing

5 | for Mr. Dondero this morning?

6 |         MR. TAYLOR:  Good morning, Your Honor.  Clay Taylor

7 | of the law firm of Bonds Ellis Eppich Schaefer & Jones

8 | appearing on behalf of Mr. Dondero.  I have with me, of

9 | course, Mr. Dondero, who is in the room with me.  Dennis

10 | Michael Lynn, John Bonds, and Bryan Assink are also appearing

11 | on behalf of Mr. Dondero.

12 |         THE COURT:  All right.  Thank you, Mr. Taylor.

13 |     All right.  For the Dugaboy Trust and Get Good Trust, do

14 | we have Mr. Draper and others?

15 |         MR. DRAPER:  Yes, Your Honor.  This is Douglas Draper

16 | on the line.

17 |         THE COURT:  All right.  Good morning.

18 |         MR. DRAPER:  Good morning, Your Honor.

19 |         THE COURT:  All right.  What about what I'll call

20 | Highland Fund, the Highland Funds and Advisors?  Do we have

21 | Mr. Rukavina this morning, or who do we have?

22 |         MR. RUKAVINA:  Your Honor, good morning.  Davor

23 | Rukavina and Julian Vasek for the Funds and Advisors.  I can

24 | make a full appearance, but it's the parties listed on Docket

25 | 1670.

8

```
 1          THE COURT:  All right.  Thank you, Mr. Rukavina.

 2      All right.  What about --

 3          MR. HOGEWOOD:  Your Honor?

 4          THE COURT:  Go ahead.

 5          MR. HOGEWOOD:  Your Honor, Lee Hogewood.  I'm sorry,

 6  Your Honor.  Lee Hogewood is also here on behalf of the same

 7  parties.

 8          THE COURT:  All right.  Thank you, sir.

 9      All right.  What about NexPoint Real Estate Partners, HCRE

10  Partners?

11          MS. DRAWHORN:  Good morning, Your Honor.  Lauren

12  Drawhorn with Wick Phillips on behalf of NexPoint Real Estate

13  Partners, LLC.  I'm also here on behalf of the NexPoint Real

14  Estate entities which are listed on Docket 1677, and NexBank,

15  which is -- their objection is 1676.

16          THE COURT:  All right.  Thank you.

17      All right.  Let's cover some of the employees.  I think I

18  see Ms. Smith out there.  Are you appearing for Mr. Ellington

19  and Mr. Leventon?

20          MS. SMITH:  Yes, Your Honor.  Frances Smith with Ross

21  & Smith, along with Debra Dandeneau of Baker McKenzie, on

22  behalf of Scott Ellington, Isaac Leventon, Thomas Surgent, and

23  Frank Waterhouse.

24          THE COURT:  All right.  Could you spell the last name

25  of your co-counsel from Baker McKenzie?  I didn't clearly get
```

9

 1 | that.

 2 |         MS. SMITH:  Yes, Your Honor.  It's Debra Dandeneau,

 3 | D-A-N-D-E-N-N-A-U [sic].

 4 |         THE COURT:  Okay.  Thank you.

 5 |    All right.  CLO Holdco, do we have you appearing this

 6 | morning?

 7 |         MR. KANE:  Your Honor, John Kane on behalf of CLO

 8 | Holdco.

 9 |         THE COURT:  Thank you, Mr. Kane.

10 |    All right.  I know we had a different group of current or

11 | former employees -- Brad Borud, Jack Yang -- and some joining

12 | parties:  Kauffman, Travers, Deadman.  Who do we have

13 | appearing for those?  (Pause.)  Anyone?  If you're appearing,

14 | we're not hearing you.  Go ahead.

15 |         MR. KATHMAN:  Good morning, Your Honor.  Jason

16 | Kathman.  I represent Mr. Deadman, Mr. Travers, and Mr.

17 | Kauffman as well.

18 |         THE COURT:  Okay.  Thank you.  And I can't remember

19 | who represents Mr. Borud and Yang.  Someone separately.

20 |         MR. KATHMAN:  It's Mr. Winikka, Your Honor.

21 |         THE COURT:  Oh, Mr. Winikka.

22 |         MR. KATHMAN:  And I haven't scrolled through to see

23 | whether he's with -- in the 120 people signed in this morning.

24 | But I believe that objection has been resolved.  I think Mr.

25 | Pomerantz will probably address that later.  So Mr. Winikka

10

1   may not be appearing.

2             THE COURT:  Okay.  All right.  Well, anyone for the

3   IRS?

4             MR. ADAMS:  Good morning, Your Honor.  David Adams,

5   Department of Justice, on behalf of the United States and its

6   agency, the Internal Revenue Service.

7             THE COURT:  Thank you, Mr. Adams.

8       For the U.S. Trustee, who do we have appearing this

9   morning?  (No response.)  I'm not hearing you.  If you're

10  trying to appear, you must be on mute.  (No response.)  All

11  right.  Well, I suspect at some point we'll hear from the U.S.

12  Trustee, even though I don't hear anyone now.

13      At this point, I will open it up to anyone else who wishes

14  to appear who I failed to call.

15            MS. MATSUMURA:  Your Honor, this is Rebecca Matsumura

16  from King & Spalding representing Highland CLO Funding, Ltd.

17  Thank you.

18            THE COURT:  All right.  Thank you, Ms. Matsumura.

19  HCLOF.

20      Anyone else?

21            MR. HELD:  Your Honor, this is Michael Held with the

22  law firm of Jackson Walker, LLP on behalf of the office

23  landlord, Crescent TC Investors, LP.

24            THE COURT:  All right.  Thank you, Mr. Held.

25            MR. HELD:  Thank you, Your Honor.

1              THE COURT:  Okay.  Any other lawyer appearances?

2         All right.  Well, again, if there's anyone out there who

3    did not get to appear, maybe we'll hear from you at some point

4    as the day goes on.

5         All right.  Mr. Pomerantz, this is an important day,

6    obviously.  How did you want to begin things?

7              MR. POMERANTZ:  So, Your Honor, I have a brief

8    opening to talk about what I plan to do, and a little more

9    lengthy opening, and it'll be come clear.  So if I may

10   proceed, Your Honor?

11             THE COURT:  You may.

12             MR. POMERANTZ:  Your Honor, we're here to request

13   that the Court confirm the Debtor's Fifth Amended Plan of

14   Reorganization, as modified.  The operative documents before

15   Your Honor are the Fifth Amended Plan, as modified, that was

16   filed along with our pleadings in support of confirmation on

17   January 22nd and the minor amendments that we filed on

18   February 1st.

19        Here is my proposal on how we can proceed this morning.  I

20   would intend to provide the Court with an opening statement

21   that would last approximately 20 minutes.  And then after any

22   other party who desires to make an opening statement, I would

23   propose that the Debtor put on its evidence that it intends to

24   rely on in support of confirmation.  The evidence consists of

25   the exhibits that the Debtor filed with its witness and

12

1  exhibit list on January 22nd and certain amendments that we

2  filed yesterday.

3      We would also put on the testimony of the following

4  witnesses: Jim Seery, the Debtor's chief executive officer,

5  who Your Honor is very familiar with, and also a member of

6  Strand's board of directors; John Dubel, a member of Strand's

7  board of directors; and Mark Tauber, a vice president with Aon

8  Financial Services, the Debtor's D&O broker.

9      We have also submitted the declaration of Patrick Leatham,

10 who is with KCC, the Debtor's balloting agent. And we don't

11 intend to put Mr. Leatham on the stand, but he is available on

12 the WebEx for cross-examination, to the extent necessary.

13     I propose that I would leave the bulk of my argument,

14 which includes going through the Section 1129 requirements for

15 plan confirmation, as well as responding to the remaining

16 outstanding objections, until my closing argument.

17     With that, Your Honor, I will pause and ask the Court if

18 Your Honor has any questions before I proceed.

19         THE COURT: I do not have questions, so your method

20 of going forward sounds appropriate. You may go ahead.

21         MR. POMERANTZ: Thank you, Your Honor.

22          OPENING STATEMENT ON BEHALF OF THE DEBTOR

23         MR. POMERANTZ: As I indicated, Your Honor, we stand

24 here side by side with the Creditors' Committee asking that

25 the Court confirm the Debtor's plan of reorganization.

13

1    As Your Honor is well aware, this case started in December

2   in -- October 2019, was transferred to Your Honor's court in

3   December 2019, and has been pending for approximately 15

4   months.

5    On January 9, 2020, I stood before Your Honor seeking the

6   approval of the independent board of directors of Strand, the

7   general partner of the Debtor, pursuant to a heavily-

8   negotiated agreement with the Committee.  And as the Court has

9   remarked on occasions throughout the case, the economic

10   stakeholders in this case believed that the installation of a

11   new board consisting of highly-qualified restructuring

12   professionals and a bankruptcy judge, a former bankruptcy

13   judge, was far more attractive than the alternative, which was

14   appointment of a trustee.  And upon approval of the

15   settlement, members of the board -- principally, Mr. Seery --

16   testified that one of the board's goals was to change the

17   culture of litigation that plagued Highland in the decade

18   before filing and threatened to embroil the Debtor in

19   continued litigation if changes were not made.

20    And as Your Honor is well aware, the last 14 months have

21   not been easy.  The board took its role as an independent

22   fiduciary extremely seriously, much to the consternation of

23   the Committee at times, and more recently, to the

24   consternation of Mr. Dondero and his affiliated entities.

25    And what has the Debtor, under the leadership of the

14

1 board, been able to accomplish during this case?  The answer

2 is a lot more than many parties believed when the board was

3 installed.

4     The Debtor reached a settlement with the Redeemer

5 Committee, resolving disputes that had been litigated for many

6 years, in many forums, and that resulted in an arbitration

7 award that was the catalyst for the bankruptcy filing.

8     Participating in a court-ordered mediation at the end of

9 August 2020 and September, the Debtor reached agreement with

10 Acis and Josh Terry.  The Court is all too familiar with the

11 years of disputes between the Debtor and Acis and Josh Terry,

12 which spanned arbitration proceedings and an extremely

13 combative Chapter 11 that Your Honor presided over.

14     The Debtor next reached an agreement with HarbourVest

15 regarding their assertion of over $300 million of claims

16 against the estate.  The HarbourVest litigation stemmed from

17 its investment in the Acis CLOs and would have resulted in

18 complex, fact-intensive litigation which would have forced the

19 Court to revisit many of the issues addressed in the Acis

20 case.

21     And perhaps most significantly, Your Honor, the Debtor was

22 able to resolve disputes with UBS, disputes which took the

23 most time of any claim in this case, through a contested stay

24 relief motion, a hotly-contested summary judgment motion, and

25 a Rule 3018 motion.

15

1    While the Debtor and UBS hoped to file a 9019 motion prior

2    to the commencement of the hearing, they were not able to do

3    so.  However, I am now in a position to disclose to the Court

4    the terms of the settlement, which is the subject of

5    documentation acceptable to the Debtor and UBS.  The

6    settlement provides for, among other things, the following

7    terms:

8        UBS will receive a $50 million Class 8 general unsecured

9    claim against the Debtor.

10       UBS will receive a $25 million Class 9 subordinated

11   general unsecured claim against the Debtor.

12       UBS will receive a cash payment of $18.5 million from

13   Multi-Strat, which was a defendant and the subject of

14   fraudulent transfer claims.

15       The Debtor will use reasonable efforts to assist UBS to

16   collect its Phase I judgment against CDL Fund and assets CDL

17   Fund may have.

18       The parties will also agree to mutual and general

19   releases, subject to agreed carve-outs.

20       And, of course, the parties will not be bound until the

21   Court approves the settlement pursuant to a 9019 motion we

22   would hope to get on file shortly.

23       I am also pleased to let the Court know -- breaking news

24   -- that this morning we reached an agreement to settle Patrick

25   Daugherty's claims.  I would now like to, at the request of

16

1  Mr. Kathman, read into the record the Patrick Daugherty

2  settlement.

3      Under the Patrick Daugherty settlement, Mr. Daugherty will

4  receive a $750,000 cash payment on the effective date.  He

5  will receive an $8.25 million general unsecured claim, and he

6  will receive a $2.75 million Class 9 subordinated claim.

7      The settlement of all claims against the Debtor and its

8  affiliates -- and affiliates will be defined in the documents

9  -- with the exception of the tax claim against the Debtor, Mr.

10  Dondero, and Mr. Okada -- and for the avoidance of doubt,

11  except as I describe below, nothing in the settlement is

12  intended to affect any pending litigation Mr. Daugherty has

13  against Mr. Dondero, Scott Ellington, Isaac Leventon, Marc

14  Katz, Michael Hurst, and Hunton Andrew Kurth.

15      Mr. Daugherty will release the Debtor and its affiliates

16  and current employees for all claims and causes of action,

17  except for the agreements I identify below, and dismiss all

18  current employees as to pending actions.  We believe this only

19  applies to Thomas Surgent and no other employee is implicated.

20      Mr. Surgent and other employees, including but not limited

21  to David Klos, Frank Waterhouse, Brian Collins, Lucy Bannon,

22  and Matt Diorio, will receive releases similar to the covenant

23  in Paragraph 1D of the Acis settlement agreement, which

24  essentially provided the release would go away if they

25  assisted anyone in pursuing claims against Mr. Daugherty.

17

1     Highland and the above-mentioned parties will accept

2 service of any subpoenas and acknowledge the jurisdiction of

3 the Delaware Chancery Court for the purposes of accepting any

4 subpoenas. And for the avoidance of doubt, Highland will

5 accept service on behalf of the employees only in their

6 capacity as such.

7     Highland will also use material -- will use reasonable

8 efforts at no material cost to assist Daugherty in vacating a

9 Texas judgment that was issued against him. We've also looked

10 at a form of the motion and believe we have agreed on the form

11 of the motion.

12     Highland, its affiliates, and current employees will

13 covenant and agree they will not pursue or seek to enforce the

14 injunction and the Texas judgment against Daugherty.

15     And lastly, Daugherty will not be able to settle any

16 claims for negligence or other claims that might be subject to

17 indemnification by the Debtor or any successor.

18     Accordingly, Your Honor, other than the claims of Mr.

19 Dondero and his related entities, and the unliquidated claims

20 of certain employees, substantially all claims have been

21 resolved in this case, a truly remarkable achievement.

22     Separate and apart, Your Honor, from the work done

23 resolving the claims, the Debtor, under the direction of the

24 independent board, has worked extremely hard to develop a plan

25 of reorganization.

18

1      After the independent board got its bearings, it started

2   to work on various plan alternatives.  And the board received

3   a lot of pressure from the Committee to go straight to a plan

4   seeking to monetize assets like the one before Your Honor

5   today.  However, the board believed that before proceeding to

6   do so and go down an asset monetization path, it should

7   adequately diligence all alternatives, including a

8   continuation of the current business model, a reorganization

9   sponsored by Mr. Dondero and his affiliates, a sale of the

10  Debtor's assets, including a sale to Mr. Dondero.

11      In June 2020, plan negotiations proceeded in earnest, and

12  the Debtor started to negotiate an asset monetization plan

13  with the Committee, while still pursuing other alternatives.

14      Preparation of an asset monetization plan is not typically

15  a complicated process.  However, creating the appropriate

16  structure for a business like the Debtor's was extremely

17  complicated, because of the contractual, regulatory, tax, and

18  governance issues that had to be carefully considered.

19      At the same time the Committee negotiations were

20  proceeding down that path, Mr. Seery continued to spend

21  substantial time trying to negotiate a grand bargain plan with

22  Mr. Dondero.  It is not an exaggeration to say that over the

23  last several months Mr. Seery has dedicated hundreds of hours

24  towards a potential grand bargain plan.

25      And why did he do it?  Because he has always believed that

19

1   a global restructuring among all parties was the best

2   opportunity to fully and finally resolve the acrimony that

3   continued to plague the Debtor.

4       Notwithstanding Mr. Seery's and the independent board's

5   best efforts, they were not able to reach consensus on a grand

6   bargain plan, and the Debtor filed the plan, the initial plan,

7   on August 12th, which ultimately evolved into the plan before

8   the Court today.

9       The Court conducted an initial hearing on the disclosure

10  statement on October 27th, and then ultimately approved -- the

11  Court approved the disclosure statement at a hearing on

12  November 23rd.

13      While the Debtor continued to work towards resolving

14  issues with the Committee with the filed plan, Mr. Dondero,

15  beginning to finally see that the train was leaving the

16  station, started to do whatever he could to get in the way of

17  plan confirmation.

18      He objected to the Acis settlement.  When his objection

19  was overruled, he filed an appeal.

20      He objected to the HarbourVest settlement.  When his

21  objection was overruled, he had Dugaboy file an appeal.

22      He started to interfere with the Debtor's management of

23  its CLOs, stopping trades, refusing to provide support, and

24  threatening Mr. Seery and the Debtor's employees.

25      He had his Advisors and Funds that he owned and controlled

20

1  file motions that Your Honor said was a waste of time.

2      He had those same Funds and Advisors threaten to terminate

3  the Debtor as a manager, in blatant violation of the Court's

4  January 9, 2020 order.

5      His conduct was so egregious that it warranted entry of a

6  temporary restraining order and preliminary injunction against

7  him.  And of course, he has appealed that ruling as well.

8      But that was not all.  He brazenly threw out his phone, in

9  what the Court has remarked was spoliation of evidence, and he

10  violated the TRO in other ways, actions for which he will

11  answer for at the contempt hearing scheduled later this week.

12      And, of course, he and his pack of related entities have

13  filed a series of objections.  We have received 12 objections

14  to the plan, Your Honor, excluding three joinders.  And as I

15  mentioned, we have been pleased to report that we've been able

16  to resolve six of them:  those of the Senior Employees, those

17  of Patrick Daugherty, those of CLO Holdco, those of the IRS,

18  those of Texas Taxing Authorities, and those of Jack Young and

19  Brad Borud.

20      The CLO Holdco objection was withdrawn in connection with

21  the settlement reached with them in connection with the

22  preliminary injunction hearing that the Court heard -- started

23  to hear last week.

24      The Taxing Authorities' objections have been resolved by

25  the Debtor agreeing to make certain modifications to the plan

1   that were included in our filing yesterday and to include

2   certain provisions in the confirmation order to address other

3   concerns.

4        The group of employees who are referred to as the Senior

5   Employee are comprised of four individuals -- Frank

6   Waterhouse, Thomas Surgent, Scott Ellington, and Isaac

7   Leventon -- although Mr. Ellington and Mr. Leventon are no

8   longer employed by the Debtor.

9        On January 22nd, Your Honor, we filed executed

10  stipulations with Frank Waterhouse and Thomas Surgent.  These

11  stipulations were essentially the Senior Employee stipulations

12  that were referred to in the plan and the disclosure

13  statement.

14       And as part of those stipulations, the Debtor, in

15  consultation with and agreement from the Committee, agreed to

16  certain modifications of the prior version of the Senior

17  Employee stipulation with both Mr. Waterhouse and Mr. Surgent

18  that effectively reduced the compensation they needed to

19  provide for the release from 40 percent to five percent of

20  their claims.

21       The Debtor and the Committee believed the resolution with

22  Mr. Surgent and with Mr. Waterhouse was fair, given the

23  importance of these two people to the transition effort and

24  the increased reliance upon them that the Debtor would have

25  with the departure of Mr. Ellington and Mr. Leventon.  And as

22

 1 | a result of that agreement, Your Honor, on January 27th, Mr.

 2 | Waterhouse and Mr. Surgent withdrew from the Senior Employee

 3 | objection.

 4 |     Subsequently, we reached agreement with Mr. Ellington and

 5 | Mr. Leventon to resolve the objections they raised with

 6 | confirmation.  And at Ms. Dandeneau's request, I would like to

 7 | read into the record the agreement reached with both of them,

 8 | and I know she will correct me if I get anything wrong.

 9 |         THE COURT:  Okay.

10 |         MR. POMERANTZ:  Among other things, Mr. Ellington and

11 | Mr. Leventon asserted in their objection that they were

12 | entitled to have their liquidated bonus claims treated as

13 | Class 7 convenience claims under the plan, under their reading

14 | of the plan, and their understanding of communications with

15 | Mr. Seery.  The Debtor disputed the entitlement to elect Class

16 | 7 based upon the terms of the plan, the disclosure statement,

17 | and applicable law.  But as I said, the parties have resolved

18 | this dispute.

19 |     Mr. Ellington asserts liquidated bonus claims in the

20 | aggregate amount of $1,367,197, which, to receive convenience

21 | class treatment under anybody's analysis, would have had to be

22 | reduced to a million dollars.

23 |     Mr. Leventon asserts a liquidated bonus claim in the

24 | amount of $598,198.

25 |     If Mr. Ellington and Mr. Leventon were entitled to be

1   included in the convenience class, as they claimed, they would

2   be entitled to receive 85 percent of their claim as and when

3   the claims were allowed under the plan.

4       To settle the dispute regarding whether, in fact, they

5   would be entitled to the convenience class treatment, they

6   have agreed to reduce the percentage they would otherwise be

7   entitled to receive from 85 percent to 70.125 percent.  And as

8   a result, Mr. Ellington's Class 7 convenience claim would be

9   entitled to receive $701,250 if allowed, and Mr. Leventon's

10  Class 7 convenience claim would be entitled to receive

11  $413,175.10 if allowed.

12      Mr. Ellington and Mr. Leventon would reserve the right to

13  assert that a hundred percent of their liquidated bonus claims

14  are entitled to administrative priority, and the Debtor, the

15  Committee, the estate and their successors, would reserve all

16  rights to object.

17      If anyone did object to the allowance of the liquidated

18  bonus claims and Mr. Ellington and/or Mr. Leventon prevailed

19  in such disputes, then the discount that was previously agreed

20  to -- 85 percent to 70.125 percent -- would go away and they

21  would be entitled to receive the full 85 percent payout as

22  essentially a penalty for litigating against them on their

23  allowed claims and losing.

24      As an alternative to the estate preserving the right to

25  object to the allowance of Mr. Ellington and Mr. Leventon's

24

1  liquidated bonus claims, the Debtor and the Committee have an

2  option to be exercised before the effective date to just agree

3  that both their claims will be allowed, and allowed as Class 7

4  convenience claims.  And if that agreement was reached, then

5  the amount of such liquidated bonus claims, they would receive

6  a payment equal to 60 percent of their allowed convenience

7  class claim.

8      In exchange, Mr. Ellington and Mr. Leventon would waive

9  their right to assert payment of a hundred percent of their

10  liquidated bonus claims as an administrative expense.

11      So, under this circumstance, Mr. Ellington would receive

12  an allowed claim of $600,000, which is 60 percent of a million

13  dollars, and Mr. Leventon will receive a payment on account of

14  his Class 7 claim of $358,918.80.

15      Under both scenarios, Mr. Ellington and Mr. Leventon would

16  preserve their paid time off claims that are treated in Class

17  6, and they would preserve their other claims in Class 8,

18  largely unliquidated indemnification claims, subject to the

19  rights of any party in interest to object to those claims.

20      Mr. Ellington will change his vote in Class 8 from

21  rejecting the plan to accepting the plan, and Mr. Leventon

22  would change his votes in Class 8 and Class 7 from rejecting

23  the plan to accepting the plan.  And Mr. Ellington and Mr.

24  Leventon would withdraw any remaining objections to

25  confirmation of the plan, and we intend to put this settlement

25

1   in the confirmation order.

2       Your Honor, six objections to the plan remain outstanding.

3   One objection was filed by the Office of the United States

4   Trustee, and the remaining five objections are from Mr.

5   Dondero and his related entities. And I would like to put up

6   a demonstrative on the screen which shows how all of these

7   objections lead back to Jim Dondero.

8           THE COURT: All right.

9           MR. POMERANTZ: You see on the top left, Your Honor,

10  there's a box in white that says A through E, which are the

11  five remaining objections. And you can see how they relate.

12  But all of it goes back to that orange box in the middle, Jim

13  Dondero.

14      These objections, which I will address in my closing

15  argument in detail, are not really focused on concerns that

16  creditors are being treated unfairly, and that's because Mr.

17  Dondero and his entities don't really have any valid claims.

18  Mr. Dondero owns no equity in the Debtor. He owns the

19  Debtor's general partner, Strand, which in turn owns a quarter

20  percent of the total equity in the Debtor. Mr. Dondero's only

21  other claim is a claim for indemnification. And as Your Honor

22  would expect, the Debtor intends to fight that claim

23  vigorously.

24      Dugaboy and Get Good have asserted frivolous

25  administrative and unsecured claims, which I will discuss in

26

1    more detail later.

2        Dugaboy does have an equity interest in the Debtor, but it

3    represents eighteen-hundredths of a percent of the Debtor's

4    total equity.

5        And Mr. Rukavina's clients similarly have no general

6    unsecured claims against the Debtor.  Either his clients did

7    not file proofs of claim or filed claims and then agreed to

8    have them expunged.  The only claims that his clients assert

9    is a disputed administrative claim filed by NexPoint Advisors.

10       And the objections aren't legitimately concerned about the

11   post-confirmation operations of the estate, to preserve equity

12   value, how much people are getting, whether Mr. Seery is

13   really the right person to run these estates.  That's because

14   Mr. Dondero has repeatedly told the Court that he believes his

15   offer, which doesn't come close to satisfying claims in full

16   in this case, is for fair value and that creditors, who are

17   owed more than $280 million, will not receive anywhere close

18   to the amount of their claims.

19       Rather, Mr. Dondero and his entities are concerned with

20   one thing and one thing only:  how to preserve their rights to

21   continue their frivolous litigation after confirmation against

22   the independent directors, the Claimant Trustee, the

23   Litigation Trustee, the employees, the Claimant Trust

24   Oversight Board, and anyone who will stand in their way.  For

25   Mr. Dondero, the decision is binary:  Either give him what he

1   wants, or as he has told Mr. Seery, he will burn down the

2   place.

3       Your Honor will hear a lot of argument today about how the

4   -- and tomorrow, in closing -- about how the injunction, the

5   gatekeeper, and the exculpation provisions of the plan are not

6   appropriate under applicable law.  The Debtor, of course,

7   disagrees with these arguments, and I will address them in

8   detail in my closing argument.

9       But I do think it's important to focus the Court at the

10  outset on the January 9, 2020 order that the Court entered

11  which addressed some of these issues.  This order, which has

12  not been appealed, which was actually agreed to by Mr.

13  Dondero, has no expiration by its terms and will continue

14  post-confirmation, did some things that the Objectors just

15  refuse to recognize and accept.

16      It approved an exculpation for negligence for the

17  independent directors and their agents.  It provided that the

18  Court would be the gatekeeper to determine whether any claims

19  asserted for them -- against them for gross negligence and

20  willful misconduct could be pursued, and if so, provided that

21  this Court would have exclusive jurisdiction to adjudicate

22  those claims.  And it prevented Mr. Dondero and his related

23  entities from causing any related entity to terminate any

24  agreements with the Debtor.

25      I also note, Your Honor, that the Court's July 16, 2020

1  order approving Mr. Seery as chief executive officer and chief

2  restructuring officer included the same exculpation and

3  gatekeeping provision as contained in the January 29th --

4  January 9th order.

5      Your Honor, we have all come too far to allow Mr. Dondero

6  to make good on his promise to Mr. Seery to burn down the

7  place if he didn't get what he wanted.  The Debtor deserves

8  better, the creditors deserve better, and this Court deserves

9  better.

10      That concludes my opening argument, Your Honor.

11          THE COURT:  All right.  Thank you.  I had one follow-

12 up question about the Daugherty settlement.  You did not

13 mention, is it going to be reflected in the confirmation

14 order, is it going to be the subject of a 9019 motion, or

15 something else?

16          MR. POMERANTZ:  It'll be subject to a -- it'll be

17 subject to a 9019 motion, Your Honor.

18          THE COURT:  All right.

19          MR. POMERANTZ:  I apologize for leaving that out.

20          THE COURT:  All right.  Thank you.  Well, --

21          MR. KATHMAN:  Your --

22          THE COURT:  -- I appreciate that you stuck closely to

23 your 20-minute time estimate.

24      As far as other opening statements today, I'm going to

25 start with the objections that were resolved.  Mr. Kathman, I

29

1   see you there.  Who will speak on behalf of Patrick Daugherty

2   and the announced settlement?

3           OPENING STATEMENT ON BEHALF OF PATRICK DAUGHERTY

4               MR. KATHMAN:  Good morning, Your Honor.  Jason

5   Kathman on behalf of Mr. Daugherty.

6       Mr. Pomerantz correctly recited the bullet points of the

7   settlement that we agreed to in principle this morning.  There

8   was one that he did leave off that I do want to make sure that

9   I mention and that it's read into the record.  And he read at

10  the top end that Mr. Daugherty does maintain his ability to

11  pursue his 2008 tax refund bonus claim, or tax refund

12  compensation claim.  If the Court will recall, there's a

13  contingent liability out there based on how compensation was

14  paid back in 2008 that's the subject of an IRS audit.  And so

15  the settlement expressly contemplates that those -- that that

16  claim will be preserved and Mr. Daugherty may pursue that

17  claim.  Should the IRS have an adverse ruling and we have to

18  pay money back, we get to preserve that claim.

19      And so the one thing that is preserved, Your Honor -- and

20  the same way that Mr. Pomerantz read verbatim the words, I'm

21  going to read verbatim the words that we've agreed to:

22  Daugherty maintains and may pursue the 2008 tax refund

23  compensation portion of his claim that is currently a disputed

24  contingent liability.  The Debtor and all successors reserve

25  the right to assert any and all defenses to this portion of

30

1   the Daugherty claim.  The litigation of this claim shall be

2   stayed until the IRS makes a final determination, provided,

3   however, Daugherty may file a motion with the Bankruptcy Court

4   seeking to have the amount of his tax claim determined for

5   reservation purposes as a "disputed claim" under the Debtor's

6   plan.  The Debtor and all successors reserve the right to

7   assert any and all defenses to any such motion.

8        So the Debtor's plan says that they can make estimations

9   for disputed claims.  There is not currently something

10  reserving this particular claim, so we wanted to make sure we

11  reserve our rights to be able to have that amount reserved

12  under the Debtor's plan.  And the Debtor obviously preserves

13  their ability to object to that.

14       With that, Your Honor, it is going to be papered up in a

15  9019, and we'll have some further things to say at the 9019

16  hearing, but didn't want to derail the Debtor's confirmation

17  hearing this morning.

18            THE COURT:  All right.  And --

19            MR. POMERANTZ:  And Mr. Kathman is -- Mr. Kathman is

20  correct.  I neglected to mention that provision, but he is --

21  he read it, and that's agreed to.

22            THE COURT:  All right.  And I did not hear anything

23  about Mr. Daugherty's vote on the plan.  Is there an agreement

24  to change or a motion to change the vote from no to yes?

25            MR. KATHMAN:  Your Honor, that wasn't, I think,

31

1   directly -- and Mr. Pomerantz can correct me if I'm wrong, or

2   Mr. Morris, actually, probably more could -- that wasn't

3   directly addressed, but I think the answer to that is probably

4   they don't need our vote.

5           THE COURT:  Okay.

6           MR. KATHMAN:  I think they have enough votes in that

7   class to carry.

8           THE COURT:  Okay.

9           MR. KATHMAN:  But the answer directly is that that

10  wasn't specifically addressed one way or the other.

11          THE COURT:  All right.

12          MR. POMERANTZ:  That is correct, Your Honor.  We

13  would, of course, not oppose Mr. Daugherty changing his vote,

14  but as Your Honor saw in the ballot summary, we are way over

15  the amount in dollar amounts of claims.  But if they wanted to

16  change their vote, we wouldn't oppose.

17          THE COURT:  All right.  Well, --

18          MR. KATHMAN:  Your Honor, I have -- I have the

19  benefit of Mr. Daugherty.  He is on -- I should note, Mr.

20  Daugherty is on the hearing this morning.  He just let me know

21  that he is willing to change his vote.  If the Debtor were to

22  so make a motion, we're fine changing our vote to in favor of

23  the plan.

24          THE COURT:  All right.  All right.  Well, we'll get

25  the ballot agent declaration or testimony later.  At one time

32

```
 1   when I had checked, there was a numerosity problem but not a
 2   dollar amount problem.  And it sounds like that is no longer
 3   an issue, perhaps because of the employee votes, or I don't
 4   know.
 5       But, all right.  Well, thank you.
 6           MR. POMERANTZ:  Your Honor, there is still a
 7   numerosity problem.
 8           THE COURT:  Okay.
 9           MR. POMERANTZ:  There's not a dollar amount problem.
10           THE COURT:  Okay.
11           MR. POMERANTZ:  But we'll address that and cram-down
12   in closing.
13           THE COURT:  All right.  Very good.
14       All right.  Well, I want to hear from the -- what we've
15   called the Senior Employee group.  Is Ms. Dandeneau going to
16   confirm the announcement of Mr. Pomerantz?
17           MS. DANDENEAU:  Yes, Your Honor.  I confirm that Mr.
18   Pomerantz's recitation of the terms to which we've agreed is
19   accurate.
20           THE COURT:  All right.  Very good.
21       All right.  I suppose I should circle back to UBS.  We've,
22   of course, heard in prior hearings the past few weeks that
23   there was a settlement with UBS, but Mr. Clubok, could I get
24   you to confirm what Mr. Pomerantz announced earlier about the
25   UBS settlement?
```

1          MR. CLUBOK:  Yes.  Good morning again, Your Honor.

2       Yes, we have reached a settlement, and it's just -- and

3    it's been approved internally at UBS and obviously by the

4    Debtor.  It's just subject to the final documentation.  And we

5    are working very closely with the Debtor to try to do that as

6    quickly as possible.

7          THE COURT:  All right.  Thank you.

8       All right.  Well, let me go, then, to other opening

9    statements.  Is there anyone else who at this time wishes to

10   make an opening statement?  And, you know, for the pending

11   objectors, please, no more than 20 minutes.

12         MR. CLEMENTE:  Your Honor?  Your Honor, if I may,

13   it's Matt Clemente on behalf of the Committee.

14         THE COURT:  Okay.

15         MR. CLEMENTE:  I'd be very brief, but I would like to

16   make some remarks to Your Honor.  It'll be less than five

17   minutes.

18         THE COURT:  All right.  Go ahead.

19         MR. CLEMENTE:  Thank you, Your Honor.

20   OPENING STATEMENT ON BEHALF OF THE UNSECURED CREDITORS' COMMITTEE

21         MR. CLEMENTE:  Again, for the record, Matt Clemente;

22   Sidley Austin; on behalf of the Official Committee of

23   Unsecured Creditors.

24      Your Honor, to be clear, the Committee fully supports

25   confirmation of the Debtor's plan and believes the plan is

1  confirmable and should be confirmed.

2      Although it has taken us quite some time to get to this

3  point, Your Honor, and as Mr. Pomerantz referred, the Debtor's

4  business is somewhat complex, the plan is remarkably

5  straightforward, Your Honor, and has only been made

6  complicated by the various objections filed by Mr. Dondero's

7  tentacles.

8      At bottom, Your Honor, the plan is designed to recognize

9  the reality of the situation that the Committee has

10  continually been expressing to Your Honor, and that is the

11  overwhelming amount of creditors in terms of dollars are

12  litigation creditors, creditors who are here entirely because

13  of the fraudulent and other conduct of Mr. Dondero and his

14  tentacles.

15      The other third-party creditors, Your Honor, by and large

16  are those collateral to these litigation claims in terms of

17  true trade creditors and service providers.

18      Recognizing this fact, Your Honor, the plan contains an

19  appropriate convenience class, which, in the Committee's view,

20  provides a fair way to capture a large number of claims and

21  appropriately recognizes the distinction between those claims

22  and the large litigation claims.  And the holders of these

23  large litigation claims, including now Mr. Daugherty, have

24  voted in favor of allowing this convenience class treatment.

25      Your Honor, after distributions are made to the

35

1  administrative creditors, the priority creditors, the secured

2  creditors, and the convenience creditors, the remainder goes

3  to general unsecured creditors who will control how this value

4  is realized.  These are the large litigation creditors.

5      Additionally, Your Honor, recognizing the possibility of

6  recovery in excess of general unsecured claims plus interest,

7  and to thwart, from the Committee's perspective, what would

8  have undoubtedly been an argument by one of the Dondero

9  tentacles that the general unsecured creditors could be paid

10 more than they are owed, the plan provides for a contingent

11 interest to kick in after payment in full for interests of all

12 prior claims.

13      Your Honor, this is the sum and substance of the plan.  At

14 bottom, fairly straightforward.  And the true creditors, Your

15 Honor, have voted overwhelmingly in favor of the plan.  Class

16 8 has voted to support the plan.  Class 7 has voted to accept

17 the plan.  And now I believe, with Mr. Daugherty's settlement,

18 one hundred percent in amount of Class 8, non-insider, non-

19 Dondero-controlled or (audio gap) have voted in favor of the

20 plan.

21      To be clear, as Your Honor pointed out and as Mr.

22 Pomerantz referenced, there is not numerosity in Class 8, Your

23 Honor, but that is driven, as Your Honor will see, from

24 approximately 30 no-votes of current employees who the

25 Committee believes are not owed any amounts and therefore they

 1   will not be receiving payments under the plan, yet they voted

 2   against the plan.  So although we have a technical cram-down

 3   plan from the Class 8 perspective, Your Honor, the plan voting

 4   reflects the reality that the economic parties in interest

 5   overwhelmingly support the plan.

 6        So, Your Honor, cutting through the machinations of the

 7   Dondero tentacles, we do have a fairly straightforward plan

 8   and a plan that the Committee believes is confirmable and

 9   should be confirmed.

10        Your Honor, since I've been in front of you for over a

11   year now, I've referred to the goals of the Committee in this

12   case, and the goals are straightforward in terms of expressing

13   them but can be difficult in reality to implement them.  The

14   Committee's goals have been two-fold:  to maximize the value

15   of the estate and therefore the recoveries for its

16   constituency, and to disentangle from the Dondero (audio gap).

17        As with all things Highland, although these goals are

18   straightforward, they're remarkably difficult to achieve,

19   given the Dondero tentacles.  However, the Committee strongly

20   believes the plan achieves these two goals.

21        First, the plan provides a credible path to maximize

22   recovery with Mr. Seery, who has gotten to know the assets and

23   who has performed skillfully and credibly throughout this very

24   difficult process.  It is a difficult set of assets and

25   complex set of assets, as Your Honor knows very well.

1      To be sure, there is uncertainty associated with the

2  Debtor's projections, but that is inherent in the nature of

3  the assets of the Debtor, and frankly, is inherent in the

4  nature of projections themselves.  And Mr. Dondero and his

5  tentacles will point to the downside, potentially, in those

6  projections, but the Court will be reminded that there is also

7  potential upside in those projections, an upside that would

8  inure to the benefit of the general unsecured claims.

9      Second, Your Honor, although it is seemingly impossible to

10  free yourself from the Dondero web until every single one of

11  the 2,000 barbed tentacles is painfully removed, if that's

12  even possible, Your Honor, the Reorganized Debtor, the

13  Claimant Trust, the Claimant Trustee, the Litigation Sub-

14  Trust, the Litigation Trustee, and the Oversight Board

15  construct and mechanisms is a structure that the Committee

16  believes provides the creditors with the best possibility to

17  do so, and that is to deal with what will undoubtedly be a

18  flurry of attacks from Mr. Dondero and his tentacles.

19      This is a virtual certainty, Your Honor.  The creditors

20  have seen this movie before and Your Honor has seen this movie

21  before.  They have seen Mr. Dondero make and break promises.

22  They have seen Mr. Dondero attempt to bludgeon adversaries

23  into submission in order to accept his offerings, and they

24  have heard Mr. Dondero say that which he has said in this

25  court during the preliminary injunction hearing --

38

1   specifically, that the Debtor's plan "is going to end up in a

2   myriad of litigation."

3       The creditors are steeled in their will to be rid of Mr.

4   Dondero, and they're confident in this structure to do so.

5       To be clear, Your Honor, what is before the Court today

6   for confirmation is the Debtor's plan, not some other plan

7   that no one supports other than Mr. Dondero and his tentacles.

8   The question isn't whether Mr. Dondero has a better proposal

9   -- and footnote, Your Honor, the answer is he does not, both

10  from a qualitative and quantitative perspective -- but whether

11  the plan before the Court is in the best interest of creditors

12  and should be confirmed.  The Committee strongly believes it

13  is, and should, and all the Committee members support

14  confirmation of the Debtor's plan.

15      Recognizing Mr. Dondero's behavior, Your Honor, and

16  threats regarding how he will behave in the future, there are

17  certain provisions in the plan that are of critical importance

18  to the creditors.  Of course, all provisions in the plan are

19  extremely important, Your Honor, but as Mr. Pomerantz

20  referenced, the creditors need the gatekeeper, exculpation,

21  and injunction provisions.

22      The reason is obvious, and is emphasized by the

23  supplemental objection filed just yesterday by some of Mr.

24  Dondero's tentacles -- namely, the Dugaboy and the Get Good

25  Trusts.  And I quote, Your Honor:  "It is virtually certain

1  that, under the Debtor's plan, there will be years of

2  litigation in multiple adversary proceedings, appeals, and

3  collection activities, all adding substantial uncertainty and

4  delay."

5      Additionally, Your Honor has seen from the proceedings in

6  this case and has expressed frustration at numerous times at

7  the myriad and at times baseless and borderline frivolous and

8  out of touch with reality suits and objections and proceedings

9  that the Dondero tentacles bring.  The creditors need the

10 gatekeeper, exculpation, and injunction provisions to preserve

11 and protect value.  And the record, I think, to this point is

12 clear, and will be further made clear through the confirmation

13 proceedings, that the protections are appropriate and entirely

14 within this Court's authority to grant.

15     In sum, Your Honor, the Committee fully supports

16 confirmation of the plan.  The Committee believes it is

17 confirmable and should be confirmed, and two classes of

18 creditors and the overwhelming amount of creditors in terms of

19 dollars agree.

20     That's it, Your Honor.  Unless you have questions for me,

21 I have nothing further at this time.

22          THE COURT:  All right.  Thank you, Mr. Clemente.

23          MR. CLEMENTE:  Thank you, Your Honor.

24          THE COURT:  All right.  Who else wishes to be heard?

25          MR. DRAPER:  Your Honor, this is Douglas Draper.  I'd

40

1  like to be heard.  I have a few -- I'll take five minutes, at

2  most --

3          THE COURT:  All right.  Go ahead.

4          MR. DRAPER:  -- and just focus on a few things.

5   OPENING STATEMENT ON BEHALF OF THE GET GOOD TRUST AND DUGABOY

6                       INVESTMENT TRUST

7          MR. DRAPER:  I'm going to focus my opening remarks on

8  the releases, the exculpations, and channeling injunctions in

9  the plan.  I'm not waiving my other objections, but, rather,

10 trying not to subject the Court to hearing the same argument

11 from multiple lawyers.

12     The good thing about the law is that it's absolute in

13 certain respects.  It does not matter who is asserting a legal

14 protection, the law applies it.  For example, a serial killer

15 is entitled to a *Miranda* warning and a protection against

16 unlawful search and seizure.  The law does not allow tainted

17 evidence or an unlawful admission into evidence,

18 notwithstanding the fact that the lack of admission of that

19 evidence may lead to the freeing of that serial killer.

20     Today, you must make an independent evaluation as to

21 whether the plan complies with 1129 and applicable law.  The

22 decision must be made notwithstanding the fact that it is

23 being made by a Dondero entity.  It's not being -- it must be

24 applied notwithstanding the fact that it's being made by me.

25     We contend that the plan does not meet the hurdle and

41

1   confirmation should be denied, notwithstanding the fact that

2   the infirmity with the plan is asserted by me and

3   notwithstanding the fact that Mr. Pomerantz and the unsecured

4   creditors have overwhelming support.

5       We all know 1141, the Barton Doctrine, and 544 -- 524

6   provide injunctions and protections for certain parties

7   associated with the Debtor.  Had the plan merely referenced

8   these sections and stated that the injunction, et cetera,

9   shall not exceed those allowed pursuant to *Pacific Lumber*, I

10   would not be making this argument.

11       Instead, we see a plan that has a definition of Exculpated

12   Parties, Released Parties, Related Parties, that exceed the

13   protections afforded by the Bankruptcy Code, the Barton

14   Doctrine, and 524.

15       We have a grant of jurisdiction and oversight that exceeds

16   that allowed under *Craig's Store*, the *Craig's Store* line of

17   cases.

18       We have releases of claims against non-debtor parties,

19   such as Strand, who is, under the Bankruptcy Code, under 723,

20   liable for the debts of the Debtor.

21       The plan, with its expansive releases, released parties,

22   grant of injunctions, exculpations and channeling injunctions,

23   are impermissible under Fifth Circuit case law.  And I would

24   ask the Court to look closely at those definitions, who is --

25   who the law allows to be exculpated and released and who the

42

1  law specifically prohibits being exculpated and released, and,

2  in fact, apply the *Pacific Lumber* line of -- case, as well as

3  524 and the Bankruptcy Code when you look at these issues.

4      Notwithstanding the overwhelming so-called support by the

5  creditors at issue, the law must be applied, and it must be

6  applied pursuant to what the Fifth Circuit requires.

7          THE COURT:  All right.  Thank you, Mr. Draper.

8      Other Objectors with opening statements?

9          MR. RUKAVINA:  Your Honor, Davor Rukavina.  Briefly?

10          THE COURT:  Okay.

11   OPENING STATEMENT ON BEHALF OF CERTAIN FUNDS AND ADVISORS

12          MR. RUKAVINA:  Your Honor, I represent various funds,

13  including three of which have independent boards.  The Debtor

14  manages more than $140 million of those funds, and the Debtor

15  manages around a billion dollars in CLOs.

16      Whether I am a tentacle of Mr. Dondero or not -- I'm not,

17  since there's an independent board -- the fact remains that

18  the Debtor wants to manage these assets and my clients' money

19  post-assumption and post-confirmation with effective judicial

20  immunity.  So our fundamental problem with this plan is the

21  assumption of those contracts under 365(c) and (b).  I think

22  we'll have to wait for the evidence to see what the Debtor

23  proposes and has, and I will reserve, I guess, the balance of

24  my arguments on that to closing, depending on what the

25  evidence is.

43

1      But I don't want the Court to lose sight of the fact that

2   what the Debtor wants to do is, in contravention of our

3   desires, continue managing our assets post-confirmation, even

4   as it liquidates, just to make a buck.  It's our money, Your

5   Honor, and whether we're Dondero or not, we're a couple

6   hundred million, probably, or more, of third-party investment

7   professionals, pension funds, et cetera, and we should not be

8   all tainted without evidence as a tentacle of someone whom,

9   I'll remind everyone here, built a multi-billion dollar

10  company and made a lot of money for people.

11     The second objection, Your Honor, goes to the Class 8

12  rejection.  It sounds like there's still a problem with the

13  number of creditors, even though certain creditors have

14  switched their votes.  That raises now the fair and equitable

15  standard, together with the undue discrimination and the

16  absolute priority rule.  I think we'll have to let the

17  evidence play out, and I'll reserve the balance of my closing

18  or the balance of my remarks to closing on that issue.

19     The third issue, Your Honor, is the same exculpation and

20  release and injunction provisions that Mr. Draper raised.

21  Those are legal matters that I'll discuss at closing, but I do

22  note that the Debtor purports to prevent my clients from

23  exercising post-assumption post-confirmation rights, period.

24  And that's just inappropriate, because if the Debtor wants the

25  benefits of these agreements, well, then of course it has to

44

1    comply with the burdens.  And to say *a priori* that anything

2    that my clients might do post-confirmation would be the result

3    of a bad-faith Mr. Dondero strategy, there's no basis for that

4    and that's not the basis on which my clients' rights in the

5    future, when there is no bankruptcy estate and there is no

6    bankruptcy jurisdiction, can be enjoined.

7        And the final point, Your Honor, entails this channeling

8    injunction.  I'll talk about it during closing.  It is

9    inappropriate under 28 U.S.C. 959.  This is not a Barton

10   Doctrine trustee issue, this is a debtor-in-possession, and a

11   channeling injunction, the Court will have no jurisdiction

12   post-confirmation.

13       Thank you, Your Honor.

14           THE COURT:  All right.  Thank you.

15       Does Mr. Dondero's counsel have an opening statement?

16           MR. TAYLOR:  I do, Your Honor.  I'll keep it brief.

17   This is Clay Taylor on behalf of Mr. Dondero.

18           THE COURT:  Okay.

19           OPENING STATEMENT ON BEHALF OF JAMES D. DONDERO

20           MR. TAYLOR:  Your Honor, the plan is clear in some

21   respects, and I'm not going to belabor these points, as other

22   objecting counsel have already addressed this.  But the plan

23   does provide for non-debtor releases, and it provides for non-

24   debtor releases for parties beyond that which is allowed by

25   *Pacific Lumber* and under the Code.

45

1      It also provides for exculpations of non-debtor parties in

2    excess of that which is allowed under the Code and applicable

3    case law.

4      Finally -- or, not finally, but third, it requires this

5    Court to keep a broad retention of post-confirmation

6    jurisdiction that could go on for years, and that is improper.

7      Finally, it requires the parties to submit to the

8    jurisdiction of this Court via a channeling injunction, which

9    we believe is beyond that which is allowed under applicable

10   Fifth Circuit precedent.

11     What is clear, what the evidence will show -- and I

12   thought it was interesting that none of the proponents of plan

13   confirmation ever talk about what the evidence is going to

14   show.  They testified a lot before Your Honor, but they didn't

15   ever talk about what the evidence would show.  What the

16   evidence will show is this plan was solicited via a disclosure

17   statement that told all the unsecured creditors, we project

18   that you're going to receive 87 cents on the dollar on your

19   claim.

20     About two months later, and this was Friday of this past

21   week, they changed those projections, and those projections

22   then showed unsecured creditors, under a plan analysis, that

23   they were going to receive 62 cents on the dollar.  That is in

24   contrast to the liquidation analysis that had been prepared

25   just two months prior showing that, under a hypothetical

46

1   Chapter 7 liquidation analysis, that the unsecured creditors
2   would receive 65 cents on the dollar.  Obviously, 62 cents is
3   less than 65 percent.

4       Realizing they had a problem, I guess, over the weekend,
5   they changed last night, the night before confirmation, and
6   sent us some new projections that now show that the unsecured
7   creditors under a plan would receive 71 cents on the dollar.

8       Your Honor, what the evidence will show, and it is
9   Highland's burden to show this, is that -- that they meet the
10  best interests of the creditors.  And part of that is that
11  they will do better under a plan rather than under a
12  hypothetical Chapter 7.

13      Quite simply, they don't have the evidence, nor have they
14  done the analysis to be able to prove that to this Court.

15      What the evidence will also show is clear is that Mr.
16  Seery, under the plan analysis, is scheduled to receive at
17  least $3.6 million over just the first two years of this plan
18  if it doesn't go any further.  And that's just for monthly
19  payouts of $150,000 per month.  That's not including a to-be-
20  agreed-upon success fee structure, which hasn't been
21  negotiated yet.  And if it hasn't been negotiated yet, it
22  can't be analyzed yet to see if those costs would exceed their
23  benefits and therefore drive the return down such that a
24  hypothetical Chapter 7 trustee could do better.

25      There is also going to be additional costs for the

47

1  Litigation Trustee and the fees that they are going to charge.

2  There's going to be an Oversight Committee, and those fees are

3  also to be negotiated.  There's also U.S. Trustee fees, which

4  Mr. Seery tells us that he has calculated within the

5  liquidation and plan analysis numbers, albeit both myself and

6  Mr. Draper, as the evidence will show, have asked for the

7  rollups that come behind the liquidation and plan analysis in

8  each instance of the three iterations that have been done in

9  two months, and we have been denied that information.  That

10  evidence is not going to come in before this Court, and

11  without that rollup information, this Court can't make an

12  independent verification that this meets the best interests of

13  the creditor and better than a hypothetical Chapter 7 trustee.

14      What the evidence will also show, make an assumption that,

15  under a plan analysis, that Mr. Seery will be able to generate

16  higher returns on the sale of the assets of the Highland

17  debtor and its subsidiaries, to the neighborhood of $60

18  million higher.  There is no independent verification of this.

19  There has been no due diligence done.  It was merely an

20  assumption done by Mr. Seery and his advisors, and we submit

21  that they will not have the evidence to show that they can

22  beat a Chapter 7 trustee.

23      This Court does have an alternative before it.  There is

24  an alternative plan that has been filed under seal.  The Court

25  is aware of it.  And it guarantees that creditors will receive

48

1  at least 65 cents on the dollar.  Moreover, those claims are

2  guaranteed -- and they're going to be secured that they will

3  be paid that money.

4          MR. POMERANTZ:  Your Honor, this is under -- this is

5  under seal.  And I never interrupt somebody's argument, but

6  this plan is under seal for a reason, Your Honor, and I object

7  to any description of the terms of a plan that's not before

8  Your Honor and is under seal.

9          THE COURT:  Okay.  I sustain that objection.

10         MR. TAYLOR:  Your Honor has a means to cut the

11 Gordian knot of the litigation and appeals before it and to

12 ensure that there is certainty for creditors.  It would

13 massively reduce the administrative fee burn that is

14 contemplated under the proposed plan before the Court.  As

15 I've mentioned, it's at least $3.6 million just in monthly

16 fees for Mr. Seery alone.  All of the rest of the fees are yet

17 to be determined and to be negotiated.  I don't see how any

18 analysis could have been done regarding the administrative fee

19 burn that is going to happen over the two years and

20 potentially much further as this case draws on.

21     For those reasons alone, Your Honor, we believe that the

22 plan confirmation should be denied and this Court should look

23 at the alternatives before it.

24         MR. KATHMAN:  Can I say something before --

25         MR. TAYLOR:  Thank you, Your Honor.

49

1          THE COURT:  All right.  Thank you.

2      All right.  Have I missed any Objectors?

3          MR. KATHMAN:  Your Honor?

4          MS. DRAWHORN:  Yes, Your Honor.

5          THE COURT:  Okay.  Ms. --

6          MR. KATHMAN:  Your Honor, if I could spend just one

7   minute, and I -- we -- I -- we filed a joinder on behalf of

8   Mr. -- or, Jason Kathman on behalf of Davis Deadman, Todd

9   Travers, and Paul Kauffman.

10          THE COURT:  Uh-huh.

11    OPENING STATEMENT ON BEHALF OF DAVIS DEADMAN, TODD TRAVERS,

12                      AND PAUL KAUFFMAN

13          MR. KATHMAN:  Mr. Pomerantz had noted, I think, at

14   the front end that the Debtor amended their plan that resolved

15   those objections.  I just want to say for the record that

16   those had been resolved.

17      And with that, Your Honor, may I be dismissed?

18          THE COURT:  Yes, you may.  Thank you.

19          MR. KATHMAN:  Thank you, Your Honor.

20          THE COURT:  All right.  Was Ms. Drawhorn speaking up

21   to make an opening statement?

22          MS. DRAWHORN:  Yes.

23          THE COURT:  Go ahead.

24          MS. DRAWHORN:  Yes, Your Honor.

25          THE COURT:  Go ahead.

1    OPENING STATEMENT ON BEHALF OF THE NEXPOINT PARTIES

2        MS. DRAWHORN:  Just very briefly, Lauren Drawhorn on

3  behalf of NexPoint Real Estate Partners, the NexPoint Real

4  Estate entities, and NexBank.

5    Just a very brief opening.  Just wanted to note that it

6  seems that the Debtor's and the Committee's position seems to

7  be if there's some way, any way, to connect an entity to Mr.

8  Dondero, then they don't need to perform any true evaluation

9  of potential claims or that party's rights or their concerns,

10  and that results in ignoring not only the merits of many

11  claims but also the basic requirements of due process and the

12  statutes, the Bankruptcy Code, and the case law.

13    We filed objections that were focused largely on the

14  injunctions and the releases, and then also the proposed

15  subordination provisions.

16    Two of my clients, one of them has a proof of claim, and

17  while it is being disputed, that claim is out there and should

18  get -- be entitled to be pursued and defended, and many of the

19  injunctions appear to prevent my client from doing so.

20    Similarly, it was mentioned that NexBank, in the

21  demonstrative, had a terminated service agreement, but there's

22  periods of time for which no services were provided but

23  payment was made, and that's a potential admin claim that has

24  been raised.  And the injunction, again, appears to prevent my

25  clients from pursuing these claims.

51

1    So I think, despite the general response to any connection

2    to Dondero means there's no merit, that's not what we're here

3    for today.  We need to really look at the merits of all

4    potential claims and all -- the rights of all parties and the

5    -- how the injunction and release provisions prevent that and

6    how they don't comply with the required law.

7        And, of course, we join in with many of the other

8    objections, but that's my main point for the opening today.

9            THE COURT:  All right.  Thank you.

10    All right.  I think I have covered all of the at least

11   pending objections except the U.S. Trustee.  I'll check again

12   to see if someone is out there for the U.S. Trustee.  (No

13   response.)  All right.  If you're there, we're not hearing

14   you.  You're on mute.

15    Okay.  Any other attorneys out there who wish to make an

16   opening statement?

17    All right.  Well, I'll turn back to Mr. Pomerantz.  You

18   may call your first witness.

19            MR. POMERANTZ:  Okay.  I will turn the virtual podium

20   over to my partner, John Morris, who will be putting on our

21   witnesses.

22            THE COURT:  All right.  Mr. Morris, you may call your

23   first witness.

24            MR. MORRIS:  Good morning, Your Honor.  John Morris

25   from Pachulski Stang Ziehl & Jones on behalf of the Debtor.

52

1   Can you hear me okay?

2          THE COURT:  I can.

3          MR. MORRIS:  Okay.  Thank you very much.

4      The Debtor calls James Seery as its first witness.

5          THE COURT:  All right.  Mr. Seery, if you could say,

6   "Testing, one, two," please.

7          MR. SEERY:  Testing, one, two.

8          THE COURT:  All right.  Hmm, I've not picked up your

9   video yet.  Let's try it again.

10         MR. SEERY:  Testing, one, two.  Testing.

11         MR. MORRIS:  We have the audio.

12         THE COURT:  We have the audio.

13         MR. SEERY:  Oh.

14         MR. MORRIS:  There we go.

15         THE COURT:  There you are.

16         MR. SEERY:  The video should be working.

17         THE COURT:  All right.

18         MR. POMERANTZ:  Yeah.  Actually, one -- Your Honor,

19  one thing before we start.  We have Patrick Leatham from KCC.

20  He is prepared to sit on the line for the whole day until his

21  time comes.  I would just like to know if anyone intends to

22  cross-examine him or object to his declaration.  Because if

23  they don't, we could excuse Mr. Leatham.

24         THE COURT:  All right.  What about that?  Anyone

25  want to cross-examine the balloting agent?

53

1          MR. RUKAVINA:  Your Honor, Davor Rukavina.  I do not.

2    If the Debtor would just state, with the change of votes in

3    Class 8, what the final tally is, I see no reason to dispute

4    that, and then we can dismiss this gentleman.  But I do think

5    that we should all know, with the change of votes, what it now

6    is.

7          THE COURT:  All right.

8          MR. POMERANTZ:  We will -- we will work on that, Your

9    Honor, with the changes as a result of the settlements today,

10   and including Mr. Daugherty's client.  We can get that

11   information sometime today.

12         THE COURT:  All right.  So, Mr. Rukavina, do you

13   agree that he can be excused with that representation, or do

14   you want --

15         MR. RUKAVINA:  Yes, Your Honor.

16         THE COURT:  Okay.  All right.  So, it's Mr. Leatham?

17   You are excused if you want to drop off this video.

18      All right.  Mr. Seery, please raise your right hand.

19             JAMES P. SEERY, DEBTOR'S WITNESS, SWORN

20         THE COURT:  All right.  Thank you.  Mr. Morris, go

21   ahead.

22         MR. MORRIS:  Thank you, Your Honor.

23      If I may, I'd like to just begin by moving my exhibits

24   into evidence so that it'll make this all go a little bit

25   smoother.

54

1          THE COURT:  All right.

2          MR. MORRIS:  And if you'll indulge me just a little

3   patience, please, because the Debtor's exhibits are found in

4   three separate places.

5          THE COURT:  Uh-huh.

6          MR. MORRIS:  And I would just take them one at a

7   time.

8      First, at Docket No. 1822, the Court will find Debtor's

9   Exhibits A through what I'm referring to as 6Z.  Six Zs.  So

10  the Debtor respectfully moves into evidence Exhibits A through

11  6Z on Docket No. 1822.

12         THE COURT:  All right.  Are there any objections?

13         MR. RUKAVINA:  Your Honor, I have a number of

14  targeted objections to all of the exhibits.  Did I hear Mr.

15  Morris say 6Z?

16         THE COURT:  Yes.

17         MR. MORRIS:  Yes.

18         MR. RUKAVINA:  Or six -- then, Your Honor, I can go

19  through my limited objections, if that pleases the Court.

20         THE COURT:  All right.  Go ahead.

21         MR. RUKAVINA:  Your Honor, Exhibit B, a transcript, B

22  as in boy.  Exhibit D, an email, D as in dog.  Exhibit E as in

23  Edward.  Moving on, Your Honor, 4D as in dog.  4E as in

24  Edward.

25         MR. MORRIS:  Slow down, please.

55

1          THE COURT:  Okay.

2          MR. RUKAVINA:  I'm sorry.

3          THE COURT:  You said 4D as in dog, correct?

4          MR. RUKAVINA:  Then -- yes, Your Honor.  Then 4E as

5   in Edward.

6          THE COURT:  Okay.

7          MR. RUKAVINA:  4G as in George.  Your Honor, one,

8   two, three, four, five T.  5T as in Tom.  And then, Your

9   Honor, one, two -- 6R.  6S.  6T as in Tom.  And 6U as in

10  under.  That's it.

11         THE COURT:  All right.  Well, Mr. Morris, do you want

12  to carve those out for now and just offer them the old-

13  fashioned way and I can rule on the objections then?

14         MR. MORRIS:  Why don't we do that?  I may just deal

15  with it at the end of the case.  But subject to those

16  objections, the Debtor then moves into evidence the balance of

17  the exhibits on Docket 1822.

18         THE COURT:  All right.  So, for the record, the Court

19  will admit all exhibits at Docket No. 1822 at this time except

20  B, D, E, 4D, 4E, 4G, 5T, 6R, 6S, 6T, and 6U.

21      (Debtor's Docket 1822 exhibits, exclusive of Exhibits B,

22  D, E, 4D, 4E, 4G, 5T, 6R, 6S, 6T, and 6U, are received into

23  evidence.)

24         THE COURT:  All right.  Mr. Morris, continue.

25         MR. MORRIS:  Thank you, Your Honor.

56

1        Next, at Docket 1866, you'll find Debtor's Exhibits 7A

2    through 7E, and the Debtor respectfully moves those dockets --

3    documents into evidence.

4            THE COURT:  All right.  Any objection?  (No

5    response.)  Are there any objections?

6            MR. RUKAVINA:  Your Honor, not from -- not from me.

7            THE COURT:  All right.  Hearing no objections, the

8    Court will admit all Debtor exhibits appearing at Docket Entry

9    No. 1866.

10           MR. MORRIS:  Thank you, Your Honor.

11        (Debtor's Docket 1866 exhibits are received into

12    evidence.)

13           MR. MORRIS:  And finally, at Docket 1877, the Court

14    will find Debtor's Exhibits 7F through 7Q, and the Debtor

15    respectfully moves for the admission of those documents into

16    evidence.

17           THE COURT:  All right.  Any objection?

18           MR. RUKAVINA:  Your Honor, I might have to talk about

19    this with Mr. Morris, but I have 7F as any document entered in

20    the case, 7G as any document to be filed, et cetera.  Mr.

21    Morris, am I wrong about that?

22           MR. MORRIS:  I don't have that list in front of me.

23    So I'll reserve on those documents and we can talk about them

24    at a break, Your Honor.

25           THE COURT:  All right.

57

```
1            MR. DRAPER:  Your Honor, this is Douglas Draper.  I
2    object, and I don't have the number in front of me, it's the
3    liquidation analysis and the plan summary.  It's a summary
4    exhibit, and we've not been given the underlying documentation
5    with respect to them.  I'd ask Mr. Morris to deal with that
6    separately also.
7            MR. MORRIS:  All right.  Well, we're certainly going
8    to be moving that into evidence, so we can deal with that at
9    the time, Your Honor.
10           THE COURT:  Okay.  Which documents are they?  Which
11   exhibits are those?
12           MR. DRAPER:  I don't have the number in front -- Mr.
13   Morris, do you have the number for that exhibit?
14           MR. MORRIS:  I do, but why don't we just deal with it
15   when I -- when I get into --
16           THE COURT:  Okay.
17           MR. MORRIS:  -- into the testimony?
18           THE COURT:  I just wanted the record clear what I am
19   admitting at this time at Docket Entry No. 1877.  Or do you
20   want to just --
21           MR. MORRIS:  Okay.
22           THE COURT:  -- hold all those --
23           MR. MORRIS:  Mr. Rukavina, other than F and G, which
24   you noted, is there any objection to any of the other
25   documents on that witness and exhibit list?
```

Seery - Direct                                    58

1           MR. RUKAVINA:  Well, I also have H as impeachment/

2    rebuttal, I as any document offered by any other party.  So I

3    would suggest, Mr. Morris, that I have my associate confirm

4    that I have the right -- the right stuff here, and we can take

5    it up maybe during a break.  But I have F, G, H, I as so-

6    called catchalls, not any discrete exhibits.

7           MR. MORRIS:  All right.  All right, Your Honor.

8    Let's, let's just proceed.  We've got -- we took care of

9    Docket No. 1822 and 1866, and the balance we'll deal with at a

10   break, --

11          THE COURT:  All right.

12          MR. MORRIS:  -- unless they come up through

13   testimony.

14          THE COURT:  All right.  That sounds good.

15          MR. MORRIS:  Okay.  Thank you very much.  May I

16   proceed?

17          THE COURT:  You may.

18          MR. MORRIS:  Okay.

19                    DIRECT EXAMINATION

20   BY MR. MORRIS:

21   Q   Good morning, Mr. Seery.

22   A   (no response)

23   Q   Can you hear me?

24   A   Apologies.  I went on mute.  Can you hear me now?  I

25   apologize.

Seery - Direct                                59

1  Q   Yes.  Good morning.

2           MR. MORRIS:  So, let's begin, Your Honor, with just a

3  little bit of background of Mr. Seery and how he got involved

4  in the case.

5  BY MR. MORRIS:

6  Q   Mr. Seery, what's your current position with the Debtor?

7  A   I am the CEO, the CRO -- the chief restructuring officer

8  -- as well as an independent director on the Strand Advisors

9  board of directors.

10 Q   Okay.

11          MR. MORRIS:  Your Honor, I'm going to ask Mr. Seery

12 to describe a bit for his background.  For the record, you'll

13 find that Exhibits 6X, 6Y, and 6Z, on the Debtor's exhibit

14 list at Docket 1822, the resumes and *C.V.s* of the three

15 independent members of the board.  If Your Honor has any

16 question about their qualifications and their experience, that

17 evidence is already in the record.

18          THE COURT:  Okay.

19 BY MR. MORRIS:

20 Q   But Mr. Seery, without going into the detail of everything

21 that's on your *C.V.*, can you just describe for the Court

22 generally your professional background, starting, well, with

23 your time as a lawyer?

24 A   I've been involved in the restructuring, finance,

25 investing and managing of assets and banking-type assets for

Seery - Direct                           60

1   over 30 years.

2       I began in restructuring in real estate.  Became a lawyer,

3   and was a lawyer in private practice dealing with

4   restructuring and finance for approximately ten years, in

5   addition to time before that on the real estate side.

6       I joined Lehman Brothers on the business side in 1999,

7   where I immediately began working on the -- with a distress

8   team as a team member investing off the balance sheet, Lehman

9   Brothers assets in various types of distressed financing

10  investments.  Bonds, loans, equities.  In addition, then I

11  became the head of Lehman's loan business globally.  I ran

12  that business for the number of years.  Was one of the key

13  players in selling Lehman Brothers to Barclays in a very

14  difficult situation and structure.

15      After that, joined some of my partners, we formed a hedge

16  fund called RiverBirch Capital, about a billion and a half

17  dollar hedge fund in -- operating in -- globally, but mostly

18  U.S. stressed/distressed assets that we invested in.

19  Oftentimes, though, we would run from high-grade assets all

20  the way down to equities, different types of investors,

21  different types of investments.

22      Thereafter, I left -- was -- joined Guggenheim.  I left

23  Guggenheim, and shortly thereafter became a director at

24  Strand.

25  Q   Prior to acceptance of the positions that you described

Seery - Direct                              61

1   earlier, were you at all familiar with Highland or Mr.

2   Dondero?

3   A    Yeah.  I was, yes.

4   Q    Can you just describe for the Court how you became

5   familiar with Highland and Mr. Dondero?

6   A    Highland was a customer of Lehman Brothers, and it was --

7   particularly in the loan business.  And the CLO businesses.

8   Highland was run by Mr. Dondero, and I knew of that business

9   through that --

10      (Interruption.)

11          MR. MORRIS:  Can somebody please put their device on

12  mute?

13          A VOICE:  That's Mr. Taylor.

14          THE COURT:  Mr. Taylor, you were off mute,

15  apparently, for a moment.  Make sure you're staying on mute.

16  Thank you.

17          MR. TAYLOR:  Yes.  Sorry, Your Honor.  I thought we

18  might have a hearsay objection.  I wasn't sure what the answer

19  was going to be, so I wanted to be prepared to object.

20          THE COURT:  All right.  Thank you.

21  BY MR. MORRIS:

22  Q    Did you know or meet Mr. Dondero in the course of what you

23  just described?

24  A    Yes, I did.  I believe we met once or twice over the

25  years.  There was a senior team member who handled the

Seery - Direct                                    62

1    Highland relationship.  He was quite good, quite experienced,

2    and he handled most of the Highland relationship issues.  But

3    Highland, we came across a number of times, whether it be in

4    -- I came across a number of times, whether it be in specific

5    investments we had where they would be either a competing

6    party or holding a similar interest, whether they were a

7    customer purchasing loans or securities, whether they were a

8    potential CLO customer where we were structuring some assets

9    for them.

10   Q    Okay.  And who are the two other members of the

11   independent board at Strand?

12   A    John Dubel and Russel Nelms.

13   Q    And had you had any personal experience with either of

14   those gentleman prior to this case?

15   A    I knew of Mr. Nelms and his experience as a bankruptcy

16   judge in the Northern District of Texas, and I had worked on

17   one matter with Mr. Dubel, but very, very briefly, while he

18   was the CEO of FGIC, which is a large insurer in the financial

19   insurance space that he was responsible for reorganizing and

20   ultimately winding down.

21   Q    Okay.  How did you learn about this particular case?  How

22   did you learn about the opportunity or the possibility of

23   becoming an independent director?

24   A    Initially, I was contacted by some of the creditors and

25   asked whether I was interested, and I indicated that I was.

Seery - Direct                        63

1    Subsequently, I received a call from the Debtor's

2    representatives as well meeting the counsel as well as the

3    financial advisor as well as specific members of the Debtor's

4    senior management.

5    Q    Do you know how long in advance of the January 9th

6    settlement you were first contacted?

7    A    Probably four, four or five days at the most, but started

8    working immediately at that time because it was a pretty

9    complicated matter and the interview process would be quick

10   because of the hearing date that was coming up.

11   Q    Do you recall the names of any of the creditors who

12   reached out to you?

13   A    I spoke to counsel for UBS.  Certainly, Committee counsel.

14   I don't recall if I spoke to anybody from Jenner Block in the

15   initial interview.  And then I spoke to representatives from

16   your firm as well as Mr. Leventon and ultimately Mr.

17   Ellington.

18   Q    Did you do any due diligence before accepting the

19   appointment?

20   A    I did, yes.

21   Q    Can you describe for the Court the due diligence you did

22   before accepting your appointment as independent director?

23   A    Well, I got the petition, I read the petition, as well as

24   the first day, as well as the venue-changing motion.  In

25   addition, I went through the schedules.  Ultimately, I took a

Seery - Direct                    64

1  look at and examined the limited partnership agreement of the

2  Debtor, with particular focus on the indemnity provisions.  I

3  then sat down with the Committee to get their views as part of

4  the interview process, as well as the Debtor's counsel and

5  Debtor's representatives.

6  Q    Did you -- in the course of your diligence, did you come

7  to an understanding or did you form a view as to why an

8  independent board was being sought at that time?

9  A    Yes, I did.

10 Q    And what view or understanding did you come to?

11 A    There was extreme antipathy from the creditors, as

12 evidenced by the venue motion and the documents around that

13 venue motion.

14      In addition, in the first day order, or affidavit, you

15 could see the issues related to Redeemer and the length of

16 time that litigation has been gone on, going on.

17      The creditors became extremely concern with Mr. Dondero

18 having any control over the operations of the Debtor and

19 wanted to make sure that either he was removed from that or

20 that -- and someone else was brought in, or that the case was

21 somehow taken over by a trustee.

22 Q    Did you form any views as to the causes of the Debtor's

23 bankruptcy filing?

24 A    The initial cause was the entry or the soon-to-be-entered

25 order related to the arbitration with Redeemer, but it was

Seery - Direct                              65

1   pretty clear from looking at the first day that there was a

2   number of litigations.  The bulk of the creditor body was made

3   up of -- on the liquidated side was made up of litigation

4   creditors.  And then the other creditors, the Committee

5   members, other than Meta-e, were significant litigation

6   creditors.

7           MR. MORRIS:  Your Honor, I think Mr. Seery was sworn

8   in, but unless -- unless you -- if you think there's a need,

9   I'm happy to have you swear Mr. Seery in again just to make

10  sure his testimony is under oath.

11          THE WITNESS:  I was sworn in.

12          THE COURT:  Yes, I swore him in.

13          MR. MORRIS:  That's what I thought.  That's what I

14  thought.  Somebody had made the suggestion to me, so I was

15  just trying to make sure, because I didn't want any unsworn

16  testimony here today.

17          THE COURT:  We did.

18          MR. MORRIS:  Okay.

19          THE COURT:  We did.

20          MR. MORRIS:  Thank you.  Thank you.

21  BY MR. MORRIS:

22  Q   Ultimately, sir, just to move this along a little bit, do

23  you recall that an agreement was reached with the UCC and Mr.

24  Dondero and the Debtor concerning governance issues?

25  A   Yes, I do.

Seery - Direct                              66

1  Q    And did you accept your position as an independent
2  director at Strand as part of that corporate governance
3  settlement?
4  A    That, that was part of the appointment.  We -- the
5  independent directors were brought in to take -- really, to
6  take control of the company as independent fiduciaries.  And
7  the idea, I think, was that there was a Chapter 7 motion that
8  was about to be filed by the Committee, or at least that was
9  the representation, and the Debtor had a choice, they could
10 either accept the independent directors or they could face the
11 motion.
12     What actually happened was a little bit more complicated.
13 The creditors and the Debtor agreed on the selection of Mr.
14 Dubel and myself.  And then because they couldn't agree on the
15 third member of the independent board, they left it to Mr.
16 Dubel and myself to actually come up with a process, interview
17 candidates, and make that selection, which we did, which
18 ultimately became Mr. Nelms.
19 Q    And did all of this take place during that four- or five-
20 day period prior to January 9th?
21 A    It did, yes.
22 Q    Okay.  And let's talk about the makeup of the board.
23 You've identified the other individuals.  How would you
24 characterize the skillset and the capability of the
25 individual?

Seery - Direct                           67

1  A    Well, on paper, I think it's a pretty uniquely-constructed

2  board for this type of asset management business with the

3  diversity of these types of assets and the diversity of issues

4  that we had.

5      So, former Judge Nelms, obviously skilled in bankruptcy

6  and the law around bankruptcy, but also very skilled in

7  mediation, conflict resolution, and in particular his

8  prepetition or maybe pre-judicial experience in litigation and

9  litigation involving fiduciary duties we thought could be

10 very, very important because of the myriad of interrelated

11 issues that we could see that might arise.

12     John Dubel is an extremely well-known and respected

13 restructuring professional.  He has been dealing these kinds

14 of assignments as an independent fiduciary for, gosh, as long

15 as I can recall, but at least going back 15 to 20 years.  He

16 had experience in accounting, but he's also been the leader of

17 these kinds of organizations going through restructuring in

18 many operational type roles, and so he was a perfect fit.

19     And my experience in both restructuring as well as asset

20 management and investment I think dovetailed nicely with the

21 experience that Mr. Nelms and Mr. Dubel have.

22 Q    Okay.  Let's talk for just a moment at a high level of the

23 agreement that was reached.  Do you remember that there were

24 several documents that embodied the terms of the agreement?

25 A    Yes, I do.

Seery - Direct                                    68

1  Q    And do you remember one of them was an order that the

2  Court entered on January 9th?

3  A    Yes.

4           MR. MORRIS:  All right.  Your Honor, just for the

5  record, and we'll be looking at this, but that would be

6  document Exhibit 5Q as in queen, and that's at Docket No.

7  1822.

8  BY MR. MORRIS:

9  Q    Do you remember there was a separate term sheet, Mr.

10  Seery, that was also part of the agreement among the

11  constituents?

12  A    Yes.  There were -- I think there were a couple of term

13  sheets and stipulations, but I do recall that there was some

14  very specific term sheets with the terms.

15           MR. MORRIS:  All right.  And we'll look at that one

16  as well, Your Honor, but that can be found at Exhibit 5O as in

17  Oscar.

18  BY MR. MORRIS:

19  Q    And then, finally, do you recall that Mr. Dondero signed a

20  stipulation that was also part of the agreement?

21  A    Yes.  That was absolutely key to the agreement for the

22  creditors and perhaps the Court.  But it was really -- it

23  needed to be clear that he was signed on to this transaction.

24           MR. MORRIS:  Okay.  And we'll look at that as well.

25  That's Exhibit 7Q.  And remind me, we'll move that one into

1  evidence.

2  BY MR. MORRIS:

3  Q   Did you and the other prospective independent directors

4  actually participate in the negotiation of any aspect of this

5  agreement that you've generally described?

6  A   Absolutely.  Although we hadn't been appointed yet, these

7  agreements were going to be the structure with which -- or

8  under which we would come in as independent fiduciaries.  They

9  would govern a lot of our relationships.  They would provide

10 for the protections that we required and that I required.  So

11 they were exceedingly important to me.

12 Q   Can you describe for the Court at a general level your

13 understanding of the overall structure of the corporate

14 governance settlement?

15 A   From a very high level, the settlement was -- Highland

16 Capital Partners is a limited partnership.  It's managed by

17 its general partner, Strand Advisors.  Although Strand is the

18 GP, its effective interest in Highland is minimal, about .25

19 percent of the effective partnership interest.  But it is the

20 general partner.  So it does govern the -- the partnership.

21      We came in as an independent board that would oversee and

22 control Strand Advisors and thereby, through the general

23 partner position, oversee and control HCMLP, the Debtor.

24      In addition, the Committee then overlaid what we could do

25 with respect to how we operated the business in the ordinary

Seery - Direct                                    70

1  course in Chapter 11 with a specific set of protocols that

2  governed certain transactions that we would have to get

3  permission from either the Committee or the Court to engage

4  in.

5      And in addition, Mr. Dondero, notwithstanding the

6  insertion of the independent board at Strand, also had a set

7  of restrictions around him, because, of course, not only was

8  he the former control entity at Highland and Strand, he also

9  had a hundred percent of the ownership -- indirectly, of

10 course -- of Strand and could have removed the board.  So

11 there were restrictions around what he could do with respect

12 to the board.  There were also restrictions around what he

13 could do through various entities to terminate contracts and

14 --

15 Q   All right.  We'll look at some of those in detail.  Did,

16 to the best of your recollection, did Mr. Dondero give up his

17 position as president or CEO of the Debtor?

18 A   He did, yes.

19 Q   And did he nevertheless stay on as an employee of the

20 Debtor and retain a position as portfolio manager?

21 A   He did.  At the last second, I believe it was the night

22 before, when we were actually in Dallas preparing for the

23 hearing, but Mr. Ellington raised the concern that if Dondero

24 was removed from not only the presidency but also the

25 portfolio management position, potentially there would be some

Seery - Direct                    71

1  agreements that might or might not be subject to Court

2  approval that could be terminated and value would be lost.  So

3  this was a very last-second provision.  Obviously, the -- as

4  new estate fiduciaries, we didn't want value to be lost

5  instantly for key man or some other reason.  And the Committee

6  ultimately, or I guess you'd say reluctantly, agreed to that

7  because we just didn't have time to look at any of -- any such

8  agreements.

9        MR. MORRIS:  All right.  Let's -- can we put up on

10  the screen, Ms. Canty, Debtor's Exhibit 5Q?

11      And this is in evidence, Your Honor.  This is the January

12  9th order.

13      And can we please go to Paragraph 8?

14  BY MR. MORRIS:

15  Q   Mr. Seery, you had mentioned just a few minutes ago that

16  there were certain restrictions that were placed on Mr.

17  Dondero.  Does Paragraph 8, to the best of your recollection,

18  provide for the substance of at least some of those

19  restrictions?

20  A   It does, yes.

21  Q   And can you just describe for the Court your understanding

22  of the restrictions that were imposed on Mr. Dondero pursuant

23  to Paragraph 8?

24  A   Well, as I recall, when Mr. Ellington came in with the

25  last-minute request, the Committee was extremely upset about

                              Seery - Direct                    72

1    it.  We talked about it.  Obviously, we, as an independent

2    board that was going to come in, didn't know the underlying

3    contracts and couldn't really render any judgment as to

4    whether there would be value lost.  So, the Committee agreed,

5    but they wanted to make sure that Mr. Dondero still reported

6    to -- directly to the board, and if the board asked Mr.

7    Dondero to leave, he would do so.

8    Q    Okay.  Just looking at this paragraph, is it your

9    understanding that the scope and responsibilities of Mr.

10   Dondero would be determined by the board?

11   A    Yes.

12   Q    And was it your understanding that Mr. Dondero would serve

13   without compensation?

14   A    Yes.

15             MR. DRAPER:  Objection.  Leading, Your Honor.

16             THE COURT:  Overruled.

17   BY MR. MORRIS:

18   Q    Was it your understanding that Mr. Dondero's role would be

19   subject to the direct supervision, direction, and authority of

20   the board?

21   A    That's, you know, that's what the order says and that's

22   what the agreement was.  In practice, that was really going to

23   have to evolve because we were coming in very cold and

24   obviously he'd been there for --

25        (Interruption.)

Seery - Direct                        73

1            THE COURT:  All right.  Someone needs to put their

2       phone on mute.  I don't know who it is.

3       BY MR. MORRIS:

4       Q    Was it also part of the agreement that Mr. Dondero would

5       (garbled) upon the board's request?

6       A    I think I got you, but yes, that's contained in this

7       paragraph, and Mr. Dondero agreed to that.

8            THE COURT:  All right.  Whoever LC is, your phone

9       needs to be put on mute.  Okay.  Please be sensitive to

10      keeping your device on mute except for Mr. Morris and Mr.

11      Seery.

12           All right.  Go ahead.

13      BY MR. MORRIS:

14      Q    Do you recall, Mr. Seery, whether there were any

15      restrictions placed on Mr. Dondero's ability to terminate

16      agreements with the Debtor?

17      A    Yes.  That was a very specific provision as well.

18      Q    Can we take a look at Paragraph 9 below?  Is that the

19      provision that you're referring to?

20      A    That's the provision in the order.  I believe there were

21      other agreements -- certainly, discussion around it -- because

22      it was an important provision because it had been borne out of

23      some experience that Acis and Mr. Terry had had in particular.

24      So it was supposed to be broad and prevent both direct and

25      indirect termination of agreements.

Seery - Direct                              74

1   Q    Okay.  And do you know, do you recall that the definition

2   of related entity is contained within the term sheet that you

3   referred to earlier?

4   A    It's a pretty extensive -- I recall the definition not

5   specifically, but it's a pretty extensive definition.  It

6   includes any of the entities that he owns, that Mr. Dondero

7   owns, that Mr. Dondero controls, that Mr. Dondero manages,

8   that Mr. Dondero owns indirectly, that Mr. Dondero manages

9   indirectly, and it really covers a wide swath of those

10  entities in which he has interests and control.

11        MR. MORRIS:  All right.  Let's see if we could just

12  look at the definition specifically at Exhibit 5O as in Oscar.

13  And if we could just scroll down to the next page.

14      Now, this was -- this is part of the term sheet that was

15  filed at Docket 354.

16  BY MR. MORRIS:

17  Q    At Definition I(d), is that the definition of related

18  entity that you were referring to?

19  A    That's correct.

20  Q    Okay.  In addition to what you've described, I think you

21  also mentioned that there was a separate stipulation that Mr.

22  Dondero entered into as part of the corporate governance

23  settlement.  Do I have that right?

24  A    That's my recollection, yes.  And I believe he signed it,

25  and that was a key gating issue to the hearing that we had on

Seery - Direct                          75

1   January 9th.

2   Q   And what do you recall about that document as being a key

3   gating issue?

4   A   The key gating issue that I recall is that it had to be

5   signed.  And I don't believe it was signed until that very

6   morning.

7         MR. MORRIS:  All right.  Can we call up Exhibit 7Q as

8   in queen?

9   BY MR. MORRIS:

10  Q   All right.  Is this the stipulation that you were

11  referring to?  We can scroll down to any portion you want.

12  A   I believe that is, yes.

13        MR. MORRIS:  Okay.  Can we just scroll down to see

14  Mr. Dondero's signature?  Yeah.  That's -- okay.

15      So, that's dated January 9th.  This was filed at Docket

16  338.  It's on the Debtor's exhibit list as Exhibit 7Q.  And

17  the Debtor would respectfully move Exhibit 7Q into evidence.

18        THE COURT:  Any objection?  All right.  7Q is

19  admitted.

20      (Debtor's Exhibit 7Q is received into evidence.)

21        MR. MORRIS:  Okay.  And if we could just scroll up a

22  page or two to the four bullet points.  Yeah, right there.  A

23  little more.

24  BY MR. MORRIS:

25  Q   Okay.  So, do you see Paragraph 10 contains the

Seery - Direct                          76

1   stipulation?

2   A    Yes.

3   Q    And as you recall, Mr. Seery, in the events leading up to

4   the entry of the order approving the settlement, was this one

5   of the documents that was being negotiated among -- among the

6   parties?

7   A    Yes, it was.

8   Q    Okay.  You mentioned that there were certain provisions of

9   the January 9th order that were important to you and the other

10  independent directors.  Do I have that right?

11  A    Yes.

12       MR. MORRIS:  Let's see if we can back to Exhibit 5Q,

13  please, Paragraph 4.

14  BY MR. MORRIS:

15  Q    Okay.  Paragraph 4, can you tell me what Paragraph -- what

16  Paragraph 4 is and why it was important to you?

17  A    Well, there really were four key, I guess I'll use the

18  term gating items again, for my involvement, and ultimately in

19  discussions with Mr. Nelms and Mr. Dondero -- Mr. Dubel, their

20  involvement in the matter.

21       Because of the litigious nature of the Highland operations

22  and the expectations we had for more litigation after taking a

23  look at the Acis case, we wanted to make sure that, as

24  independents coming into a situation with really no stake in

25  the particular outcome, other than trying to achieve a

1  successful reorganization, that we were protected.  So, number

2  one, I looked at the limited partnership agreement.  I wanted

3  to make sure that the LPA contained broad and at least

4  standard indemnification provisions and that they would apply

5  to the board.

6      Number two, because -- that then requires you to look at

7  the indemnification provisions at Strand, because you're a

8  director of Strand, the GP.  So then we looked at those.  I

9  took a close examination of those.  They looked okay, except

10  Strand didn't have any assets other than its equity interest

11  in Highland, and if that equity interest turned out to be

12  zero, that indemnity wouldn't be very valuable.

13      So I wanted to make sure that Highland, the Debtor,

14  guaranteed the indemnity (garbled) on a postpetition basis, so

15  that if there were a failure of D&O, which I'll get to in a

16  second, or it wasn't enough, that we would have a senior claim

17  in the case, an admin claim in the case.

18      I then, of course, wanted to make sure that we had D&O

19  insurance.  This was very difficult to get, because, frankly,

20  there's a Dondero exclusion in some of the markets, we've been

21  told by our insurance brokers, and so getting the right policy

22  that would cover the independent board was difficult.  We did

23  get that.

24      And then ultimately there'll be another provision in the

25  agreement here -- I don't see it off the top of my head -- but

Seery - Direct                              78

1   a gatekeeper provision.  And that provision --

2   Q    Hold on one second, Mr. Seery, because we'd want to

3   scroll.  So Paragraph 4 and Paragraph 5, were those, were

4   those provisions put in there at the insistence of the

5   prospective independent directors?

6   A    Yes.  And remember, so the Paragraph 4, as I said, is the

7   guarantee of Strand's obligations for its indemnity.  Again,

8   Strand didn't have any money, so the Debtor had to be the one

9   purchasing the D&O for the directors and for Strand.  So those

10  are the two provisions that really worked to address my

11  concerns about the indemnities and then the D&O.

12          MR. MORRIS:  Okay.  Can we go to Paragraph 10,

13  please?  There you go.

14  BY MR. MORRIS:

15  Q    Is this the other provision that you were referring to?

16  A    This is.  It's come to be known as the gatekeeper

17  provision, but it's a provision that I actually got from other

18  cases.  Again, another very litigious case that I thought it

19  was appropriate to bring in to this case.

20      And the concept here is that when you're dealing with

21  parties that seem to be willing to engage in decade-long

22  litigation in multiple forums, not only domestically but even

23  throughout the world, it seemed important and prudent for me

24  and a requirement that I set out that somebody would have to

25  come to this Court, the court with jurisdiction over these

Seery - Direct                              79

1  matters, to determine whether there was a colorable claim.

2  And that colorable claim would have to show gross negligence

3  and willful misconduct, *i.e.*, something that would not

4  otherwise be indemnified.

5       So it basically sets an exculpation standard for

6  negligence.  It exculpates the directors from negligence.  And

7  if somebody wants to bring a cause against the directors, they

8  have to come to this Court first and get a finding that

9  there's a colorable claim for gross negligence or willful

10  misconduct.

11  Q    Would you have accepted the engagement as an independent

12  director without the Paragraphs 4, 5, and 10 that we just

13  looked at?

14  A    No.  These were very specific requests.  The language here

15  has been 'smithed, to be sure, but I provided the original

16  language for 10 and insisted on the guaranty provision above

17  to assure that the indemnity would have some support.

18  Q    And ultimately, did the Committee and the Debtor agree to

19  provide all of the protection afforded by Paragraphs 4, 5, and

20  10?

21  A    Yes.

22  Q    Okay.

23       MR. MORRIS:  Your Honor, we're going to move on now

24  to good faith, Section 1129(e)(3), just to give you a little

25  bit of a roadmap of where we're going.

Seery - Direct                                     80

1  BY MR. MORRIS:

2  Q    Let's talk about the process that led to the plan that the

3  Debtor is asking the Court to confirm today.  Real basic stuff

4  at the beginning.  Can you tell me your understanding of the

5  makeup of the UCC, of the Creditors' Committee?

6  A    The Creditors' Committee in this case has four members.

7  It's UBS, the Redeemer Committee, which are former holders of

8  interests in a fund called the Crusader Fund, which was a

9  Highland fund, who had redeemed and then had a dispute with

10 Highland.

11     And the next creditor is Mr. Terry and Acis.  We generally

12 group them as one, but the creditor is Acis.

13     And the fourth creditor is an entity called Meta-e, and

14 they provide litigation support and technical support and

15 discovery support in litigations for the Debtor, including in

16 this case now.

17 Q    All right.  Just focusing really on the early period, the

18 first few months, can you describe the early stages of the

19 negotiations with the UCC as best as you can recall?

20 A    Well, I think the early stage of the case wasn't directly

21 a negotiation; it was really trying to understand as best we

22 could the myriad of assets that we had here, the various

23 businesses that the Debtor either owned, controlled, or

24 managed, as well as the claims.

25     We went through a process of trying to understand each of

Seery - Direct                                        81

1   the claims that the Debtor -- or against the Debtor that were

2   represented by the Committee, as well as some other claims

3   that were not on the Committee.

4   Q    Was the Debtor -- I mean, was the Committee initially

5   pushing the independent board to go to a monetization plan, an

6   asset monetization plan?

7   A    Very quickly and early on, the Debtor -- the Committee

8   took a pretty aggressive approach with the Debtor and the

9   independent board.  I think the Committee's perspective, as

10  articulated to me, and where -- at least how we took it, was

11  that they'd been litigating for years and they sort of knew

12  the situation and the value of their claims, that the Debtor

13  was insolvent, in their view, and that we should be operating

14  the estate in essence for the benefit of the creditors.

15  Q    And what was the board's view in reaction to that?

16  A    We disputed it.  And the reason we disputed it was very

17  straightforward.  Save for the Redeemer claim, which at least

18  had an arbitration award, Acis and Mr. Terry didn't have any

19  specific awards, notwithstanding the results of the Acis

20  bankruptcy, and UBS, while it had a judgment, that judgment

21  was not against the Debtor.

22       So our view was, until we have our hands around these

23  claims and we determine what the validity is in our estate,

24  that we would treat the Debtor as if it were solvent.  We also

25  wanted to assess the value of the assets.  So, looking at the

Seery - Direct                                    82

1   assets not just from a book value but what they might be

2   really worth in the market.

3   Q    And did the board in the early portion of the case

4   consider all strategic alternatives?

5   A    I don't know if we considered every strategic alternative,

6   but we certainly considered a lot of alternatives.

7   Q    Can you describe for the Court the alternatives that were

8   considered by the board before settling on the asset

9   monetization plan?

10  A    Well, early on, you know, we looked at each of the -- what

11  we would think of the large category types of ways to resolve

12  a case.  Number one, could we go through a very traditional

13  reorganization with either stretching out claims to creditors

14  after settlement or converting some of those to equity,

15  getting new equity infusions?  We considered those

16  alternatives.

17      Number two, we considered whether we should simply sell

18  the assets.  That's one of the things that the Committee was

19  pushing for.  They could be sold to third parties.  They could

20  be sold individually.  Mr. Dondero potentially could buy some

21  of the assets.  That'd be a reasonable reorganization in this

22  case.

23      We also considered whether that, you know, we would just

24  do a straight liquidation.  Is there some value to doing --

25  converting the case to a 7 and doing a straight liquidation?

1    We also considered a grand bargain plan, and this was

2   something that I worked on quite a bit.  The phrase is mine,

3   although no pride of authorship, certainly, since it didn't

4   work out.  But that perhaps we could come to an agreement with

5   the major creditors and with Mr. Dondero and then shift some

6   of the expenses in the case out further to litigate some of

7   the other claims while reorganizing around the base business.

8    And then, finally, we considered the asset monetization

9   plan, and ultimately that evolved into what we have today.

10  Q    Were there guiding principles or factors that the board

11  was focused on as it assessed these different options?

12  A    Well, the number one guiding principle was overall

13  fairness and equitable treatment of the various stakeholders.

14  So, again, at that point, we didn't know exactly what, if

15  anything, we would owe to claimants like UBS or HarbourVest or

16  even Mr. Terry and Acis.  We had a good sense of where we

17  would end up with Redeemer, I think, but we still had some

18  options and wanted to negotiate the issues related to

19  potential appeal rights that we had.  So I think that was the

20  number one overall concern.

21   But that did evolve over time.  Costs of the case were

22  exceptionally high.  And the reason they're so high is that

23  Highland was run for a long time, at least from what we can

24  tell, at an operating deficit.  Typically, what it would do is

25  run at a deficit and then sell assets to cover the shortfall,

Seery - Direct                          84

1  and it would defer a whole bunch of employee -- potential

2  employee compensation.  And because of the way the environment

3  was going, particularly in the first half of the year, it

4  didn't look to us like there was going to be any great asset

5  increase that would somehow save us from the hole that was

6  being dug, the considerable amount of expenses to run the

7  case.

8  Q   Did changing the culture of litigation factor into the

9  path that the board considered?

10  A   Well, we certainly looked at the way the company had run

11  and why it got to where it is in terms of litigating.  And not

12  just litigating valid claims, but litigating any claim to the

13  *nth* degree.  And stories are legion, I won't talk about them,

14  but of Highland taking outrageous positions and then pursuing

15  them, hoping that the other side caves.

16      We determined that this estate couldn't bear that kind of

17  expense, and it wasn't fair and equitable to do that anyway.

18  So we wanted to attack the claims that we could -- and I say

19  attack; try to resolve them as swiftly as we could --

20  protecting the Debtor's interests but trying to find an

21  equitable resolution.

22      I'm not averse to litigating.  And I think when there are

23  claims that are legitimate, the Debtor should pursue them.

24  There's always -- a good settlement is always better than a

25  bad litigation.  But if there (indecipherable) to resolve

Seery - Direct                                    85

1   them, we should -- we should pursue those.  And if we have

2   defenses, we should pursue those, and not just be held up

3   because someone else is willing to, you know, take a more

4   difficult position than we are.

5       But in this case, it really did cry out for some sort of

6   resolution on many of these cases because they were far beyond

7   -- far beyond the facts and far beyond the dollars.  There was

8   personal antipathy involved in virtually every one of the

9   unlitigated or unliquidated Committee cases.

10  Q   Did the board, as it was assessing the various strategic

11  alternatives, consider maximization of the value?

12  A   Always number one was, can we maximize value?  But that

13  has to be done within the context of the risk you're taking

14  and the time it takes.  So, not all wine ages well in a cave

15  and not all investments get to be more valuable over time.  We

16  wanted to look at each individual asset that the Debtor had,

17  each claim that the Debtor had, each defense that the Debtor

18  had, and consider the time and the costs and then try to find

19  the best way to maximize value with those multiple

20  considerations.

21  Q   How about the role and support of the UCC, how did that

22  factor into the decision-making, the Debtor's decision-making

23  as to what plan to pursue?

24  A   Well, you know, the decision-making with the UCC was

25  cumbersome and oftentimes difficult.  Sometimes our relations

Seery - Direct                                    86

1    were very contentious, and sometimes they continue to be.  But

2    the Committee had significant oversight because of the

3    protocols that had been agreed to.  Some of the disputes we

4    had with the Committee found their way into the court.  Those

5    time and that cost, some of which we won, some of which we

6    lost, but those factored into our analysis.

7         But eventually we knew that we were going to need to get,

8    you know, some significant portion of the Committee to agree,

9    because, at minimum, Meta-e had a liquidated claim, and

10   Redeemer was very close to fully liquidated, so we were going

11   to need support from the Committee with whatever we tried to

12   push through.  And so that's how we negotiated with the

13   Committee from that perspective.

14   Q   Is it fair to say that the Debtor and the Committee's

15   interests because aligned upon approval of the disclosure

16   statement back at the end of November?

17   A   I don't think they became perfectly aligned, because we

18   still have, you know, some disputes around, you know,

19   implementation and things like the employee releases, which

20   were very important to me.  But I think we're largely aligned

21   and that the Committee is supportive, as Mr. Clemente said at

22   the start of this hearing, of the plan.  We negotiated at

23   arm's length with them about most of the provisions.  I would

24   say virtually everything was a relatively significant

25   negotiation, or at least there was a good faith exchange of

Seery - Direct                                87

1  views on each side and assessment of legal and financial

2  risks.  And I think at this point they're largely in support

3  of the plan.

4  Q    All right.  Let's -- you mentioned the grand bargain, and

5  I just want to spend a few minutes talking about that, how

6  that evolved.  Focusing your attention in the kind of late

7  spring/early summer, can you tell me what efforts you and the

8  board made in trying to achieve a grand bargain in that early

9  part of the case?

10 A    Well, we had -- at that point, we had reached agreement,

11 at least in principle, with Redeemer.  And the thought was --

12 my thought was that we could construct a plan, understanding

13 what the cash flows looked like and what we thought the base

14 value of the asset looked like -- and those are not just the

15 assets that are tangible assets, but the notes that are

16 collectible by the Debtor as well -- and then engage with UBS

17 in particular.  Redeemer.  To some degree, Mr. Terry.  We had

18 not yet reached any agreement with him.  But UBS, we thought

19 of as a slightly -- I don't mean this to be disparaging -- but

20 a slightly more commercial player than Acis because of the

21 history that Acis had to deal with and endure.

22      And we were hoping that we could get some sort of

23 coalescence around an agreed distribution that would require

24 those creditors to take a lot less than they might have

25 otherwise agreed, Mr. Dondero to put in more than he otherwise

Seery - Direct                                        88

 1  thought he could put in or would be willing to put in, and

 2  then we would get out to Acis and the other creditors with a

 3  plan.

 4       And so I built, with the team at DSI, a detailed model on

 5  how the distributions could work and what the potential timing

 6  could be, trying to, each time, move in a multidimensional way

 7  with UBS, Redeemer, Mr. Dondero, and to some degree Acis,

 8  around the respective issues for their claims.

 9       Again, UBS and Acis had not been resolved and weren't

10  close, but the thought was if we could get dollar agreements

11  for distribution, perhaps we could then figure out how to

12  construct settlements of their claims.

13  Q    During this time period, did you work directly with Mr.

14  Dondero in the formulation of a potential grand bargain?

15  A    I did, yes.

16  Q    And the model that you described, did that go through a

17  number of iterations?

18  A    It went through multiple iterations.  I don't believe I

19  ever shared the model with anybody.  One of the reasons for

20  that is I didn't want -- I felt I had -- if I was going to

21  share it with Mr. Dondero, for example, I'd have to share it

22  with UBS and I'd have to share it with Redeemer.  And I wanted

23  it to be -- I wanted it to be a working model with the team at

24  DSI.  In particular, we would make, you know, adjustments on

25  an almost-daily basis.

Seery - Direct                                    89

1    Mr. Dondero had -- remember, he was still portfolio

2    manager at that time.  He also had a related-party interest,

3    as people have seen from some of the litigation around the

4    sales of securities.  He had access and was receiving emails

5    from the team as well as from the finance team.  So he had

6    access to the information at that point and had a view around

7    the value.  And this was more trying to adjust what those

8    distributions would look like depending on the amounts that he

9    would be willing to contribute.

10   Q    Moving on in time, did there come a time when the Debtor

11   participated in a mediation with certain of the major

12   constituents in the case?

13   A    Yes.  That was towards the end of the summer.

14   Q    And during that mediation, did the concept of a grand

15   bargain, was that put on the table?  Without discussing any

16   particulars about it, just as a matter of process, was the

17   grand bargain subject to the mediation discussions?

18   A    Well, the mediation had multiple components, so the answer

19   to the question in short is yes, but I'll go longer because I

20   tend to.  The grand bargain plan stayed in place, and that was

21   going to be an overall settlement.  The mediation was

22   initially, I think, as a main course, focused on Acis, UBS,

23   and then the third piece being the grand bargain.  And if you

24   could settle one of those claims, perhaps -- obviously, if you

25   could settle both of them, you could get to then focusing on

Seery - Direct                                    90

1    the grand bargain.

2        But even before we got to mediation, the idea of the

3    monetization plan had also been put forth.  Notwithstanding

4    that it wasn't my idea, I actually thought that it was a good

5    idea, ultimately.  Didn't initially.  And the reason for that

6    is that it set a marker for what a base expectation could be

7    for the creditors and just for Mr. Dondero.  And knowing that

8    that was out there, at least with them, that could hopefully

9    be a catalyst in the mediation for folks to say, let's see if

10   we can get our claims done and get a grand bargain done,

11   because if we don't we have this Debtor monetization plan.

12   And by that -- at that point, I don't think we had much

13   agreement with the Committee on anything, and certainly with

14   Mr. Dondero, on -- on a monetization plan.

15   Q   All right.  And let's just bring it forward from the fall,

16   post-mediation, to the present.  Has -- has -- have you and

17   the board continued discussing with Mr. Dondero the

18   possibility of a grand bargain?

19   A   Well, it's shifted.  So, the grand bargain discussions

20   really -- you had multiple phases.  So, you had pre-mediation.

21   There was the grand bargain discussions that I just described

22   previously that also involved UBS and Redeemer, and to some

23   degree Acis and Mr. Terry.  Then you have the mediation, which

24   is much more focused on the claims and whether they can fit

25   into the grand bargain with Mr. Dondero.

Seery - Direct                                    91

1    And the way that was conducted was a little bit more

2    separated, meaning the parties would talk to the mediator, the

3    mediator would then go and talk to other parties and try to

4    work a settlement on each of those components.

5        Subsequent to the mediation where we reached the agreement

6    with Acis and Mr. Terry, and we ultimately in that timeframe

7    banged out the final terms of our agreement with Redeemer, we

8    engaged with Mr. Dondero around -- I wouldn't call it the

9    grand bargain, but a different plan.  By that point, the

10   monetization plan had started to gain some traction with the

11   creditor group, and Mr. Dondero and his counsel, I believe,

12   focused on the potential of what was referred to as a pot

13   plan.  And while it has the -- it could have the ability of

14   being a resolution plan, it wasn't the grand bargain plan that

15   I had initially envisioned.  And pot plan was really a

16   misnomer, because it didn't have a whole pot, so -- so it's a

17   little bit of a hybrid.

18   Q    Did the board spend time during its meetings discussing

19   various pot plan proposals that had been put forth by Mr.

20   Dondero?

21   A    Oh, absolutely.  And not only the board.  I mean, we did

22   our own work as an independent board and then brought in our

23   professional advisors, both your firm and the DSI folks, to go

24   through analytics around the pot plan, and even before that,

25   the other plan alternatives, but we had direct discussions

Seery - Direct                                    92

1  with Mr. Dondero and his counsel.

2  Q    And in the last couple of months, has the board listened

3  to presentations that were made by Mr. Dondero and his counsel

4  concerning various forms of the pot plan?

5  A    Yes.  At least two or three.

6  Q    And during this time, has the board and the Debtor

7  communicated with the Committee concerning different

8  iterations of the proposed pot plan?

9  A    Yes.  We've had continual discussions with the Committee

10 regarding the various iterations of the potential grand

11 bargain all the way through the pot plan.

12 Q    And during this process, did the Debtor provide Mr.

13 Dondero and his counsel with certain financial information

14 that had been requested?

15 A    Yes.  As I said, up 'til the point where he resigned and

16 was then ultimately, at the end of the year, removed from the

17 office, he had access to financial information related to the

18 Debtor and even got the information from the financial group.

19 Subsequent to that, we've provided him with requests -- with

20 financial information that was requested by his counsel.

21 Q    Okay.  Were your efforts at the grand bargain or the

22 pursuit of the pot plan successful?

23 A    No, they were not.

24 Q    Do you have an understanding as to -- just, again, without

25 going into -- into details about any particular proposal, do

Seery - Direct                        93

1  you have an understanding as to what the barrier was to

2  success?

3  A    The grand bargain, we just never got the traction that we

4  needed to get that going and the sides were just far -- too

5  far apart.  And the pot plan, similarly.  Our discussions with

6  Mr. Dondero and the Committee, they're -- they're very far

7  apart.

8  Q    And is it fair to say that the Committee's lack of support

9  in either the grand bargain or the pot plan is the principal

10  cause as to why we're not talking about that today?

11  A    Well, it's -- it -- right now, we've got the plan that's

12  on file, the monetization plan.  The monetization plan has

13  gone out for creditor vote and has received support.  It

14  distributes, we think, equitably, as well as a significant

15  amount of distributions to unsecured creditors.  And there

16  really isn't an alternative that we see, based upon the

17  numbers I've seen, that competes with it or has any traction

18  with the largest creditors.

19  Q    All right.  So, now we've talked about various proposals

20  or alternatives that were considered by the board, including

21  the grand bargain and the pot plan.  Let's spend some time

22  talking about the plan that is before the Court today and how

23  we got here.  And I'd like to take you really back to the

24  beginning, if I may.

25     Tell us, tell the Court just what the board was doing in

Seery - Direct                                          94

1  the early months after getting appointed, because I think

2  context is important here.  What were you all doing the first

3  few months of the case?

4  A    Well, the first few months, we really were drinking from

5  the proverbial fire hose, trying to get an understanding of

6  the business, how it had been managed previously, what the

7  issues related to the different parts of the business were.

8  And then an understanding of each of the employees that were

9  working under us, what their roles were, how they performed

10 them, who sat where with respect to each of the assets, what

11 the contracts looked like, whether they be shared service or

12 management agreements.  And then we started looking at the

13 individual assets in terms of value.

14      At the same time, we were trying to get up to speed on the

15 complex nature of the claims that were in the case.  The

16 liquidated claims were relatively easy, but there had been a

17 significant amount of transfers in and out of the Debtor, and

18 then there's a myriad of relationships involving related

19 entities that we had to understand, both with respect to the

20 claims as well as with respect to the assets.

21      And so that -- those were the main things we were doing

22 for those first few months in the case.

23 Q    Just a couple months into the case, the COVID pandemic

24 reared its head.  Do you recall that?

25 A    Yes.  We had been in Dallas every day working up 'til the

Seery - Direct                                          95

1  time of the COVID and some of the shutdown orders,

2  particularly in the Northeast, and so that changed the dynamic

3  of how we could function every day.

4      Notwithstanding that, we -- we were able to manage from

5  afar, and ultimately, when there were some cases in the office

6  of COVID, we -- on the Highland side, not the related entity

7  side, but on the Highland side -- we determined that the staff

8  and the team should work from home, which they were able to do

9  quite well.

10 Q   Okay.  In those early months, do you recall that there was

11 a substantial erosion of value, at least as of the time you

12 were appointed in those first three or four months?

13 A   There was.  And I think we've heard some -- some noise

14 about what that value was and the drop in the asset value as

15 opposed to net value.  But the asset value did, did drop

16 significantly.

17 Q   Can you describe for the Court your recollection as to the

18 causes of the drop in the value that you just descried?

19 A   Yes.  The number one drop was a reservation that the board

20 took for a receivable from an entity called Hunter Mountain.

21 The quick version of this is that Hunter Mountain owns

22 Highland.  As I mentioned, while Strand is the GP, it only has

23 a quarter-percent interest in Highland.  The vast majority of

24 the interests are owned by an entity called the Hunter

25 Mountain Investment Trust in a very complicated, tax-driven

Seery - Direct                                            96

1   structure.

2       Dondero and Okada transferred their interests in Highland

3   at a high valuation to Hunter Mountain.  Hunter Mountain then

4   didn't have the money, so it, in essence, borrowed the money

5   from the Debtor in a note to pay for those interests.  There's

6   a circular running of the cash, but we were not sure where, if

7   any, where any assets are, if they would be sufficient.  So we

8   took a reservation of $58 million for that note.

9       The second biggest piece of the reduction in value was the

10  equity that was lost in the Select Equity account.  This is a

11  Debtor trading account that was managed by Mr. Dondero.  $54

12  million was lost in that account.  Basically, it was really

13  highly margined, very high leverage in that account when the

14  market volatility came in.  As it grew through January,

15  February, March, more and more margin calls.  Ultimately,

16  Jefferies, which had Safe Harbor protections -- technically,

17  the account was not a Debtor account, but they would have had

18  it anyway -- they seized that account.  $54 million in equity

19  was lost in that account.

20      The next highest amount is about $35 million, but it's

21  higher now.  That's just the bankruptcy costs, where we have

22  spent cash and Debtor assets in the case.  It was about $36 to

23  $40 million through the end of the year.  That's now higher.

24      About $30 million was lost in paying back Jefferies on the

25  asset side of the ledger in the Highland internal equity

Seery - Direct                                    97

1  account.  This was similar to the equity -- the Select Equity

2  account, also managed by Mr. Dondero.  Extremely highly-

3  levered coming into the market volatility of the first

4  quarter, which was exacerbated, obviously, by the COVID.  That

5  was about $30 million that was repaid in margin loan in that

6  account.

7      In addition, $25 million of equity was lost in that

8  account while Mr. Dondero was managing it.  I took over

9  effectively managing it in mid-March and worked with Jefferies

10 to keep them from seizing the account.  We've since gotten a

11 bunch of value coming back from that account, but that was the

12 amount that was lost.

13     About $10 million was lost in the Carey Limousine loan

14 transaction.  That is a -- an interesting little company.  Has

15 done a nice job -- management did a very good job coming into

16 the year, and it actually had real value, notwithstanding the

17 changeover to Uber in people's preferences.  But with the

18 COVID, it really relied on events, airport travel, executive

19 travel, and that really took a bite out of it, although, you

20 know, we're hoping to be able to restructure, we have

21 restructured it to some degree, and we're hoping that there

22 could be value there.

23     And then about $7 million was lost in equity in an entity

24 called NexPoint Hospitality Trust.  This is another extremely

25 highly-levered hospitality REIT that NexPoint manages.  It

Seery - Direct                                98

1  trades on the Toronto Stock Exchange.  And I think likely that
2  -- it's got a lot of issues with respect to its mortgage debt.
3  And because it was hospitality, it was really hurt by the
4  COVID.
5      And I think that's probably -- those numbers add up to
6  north of $200 million of the loss.
7  Q   All right.  Thank you for that recitation, Mr. Seery.  So,
8  turning to the spring, after all of those issues were
9  addressed, at the same time you were working on the grand
10 bargain, did the Debtor and its professionals begin
11 formulating the monetization plan that we have today?
12 A   I'm sorry, in the spring?  I lost that question.  I
13 apologize.
14 Q   That's okay.  After you dealt with everything that you
15 just described, were you doing two things at once?  Were you
16 working on the grand bargain and the asset monetization plan
17 at the same time?
18 A   Yes, that's correct.
19 Q   All right.  Can you just describe for the Court kind of,
20 you know, how the asset monetization plan evolved up until the
21 point of the mediation?
22 A   Yes.  I alluded to it earlier, but because the Debtor was
23 running an operating deficit, we were very concerned about
24 liquidity.  Highland typically runs, from a liquidity
25 perspective and a cash perspective, very close to the edge.  I

Seery - Direct                                              99

 1  don't feel particularly comfortable helping lead an
 2  organization that's running that close to the edge.  And I was
 3  very focused on the burn that we had on an operating basis, as
 4  well as the professional cost burn, because for a case this
 5  size it was significant.
 6      The rest of the board felt similarly, and one of the
 7  directors, and I'm not sure if it was Mr. Nelms or Mr. Dubel,
 8  came up with the idea that we needed an alternative to
 9  continuing to just burn assets while we were in this case.
10  There had to be some sort of catalyst to get the parties, both
11  Mr. Dondero as well as the creditors -- at that point, as I
12  said, we weren't settled with Acis or UBS, and we weren't,
13  frankly, close with either of them.  And so we needed what --
14  what I think the -- the idea was that we needed a catalyst to
15  have people focus on what the alternative was.  Because
16  continuing to run the case until we ran out of money was not
17  an acceptable alternative.
18      What I didn't like about the plan was it didn't have
19  anybody's support, and so I wasn't sure how we made progress
20  with it without having some Committee member or Mr. Dondero in
21  support of it.  I was outvoted, although maybe I came around
22  in the actual vote.  But ultimately, I think it was actually a
23  quite smart idea, because it did set the basis for what the
24  case would be.  Either there would be some resolution or it
25  would push towards the monetization plan, and parties could

Seery - Direct                                                100

1  then assess whether they liked the monetization plan or not.

2  That if I was going to be the Claimant Trustee or the --

3  defending the, you know, against the claims, they would have

4  the pleasure of litigating with me for some period of time.

5  Or they could come to some either grand bargain or ultimately

6  some other resolution.

7       And as we started to develop a plan and put more of a

8  framework -- more flesh around the framework, it actually

9  started to look more and more like a real viable alternative

10  to either long-term litigation or some other grand bargain if

11  we couldn't get there.

12  Q   And ultimately, did the board authorize the Debtor to file

13  its initial version of the asset monetization plan at around

14  the time of the mediation?

15  A   Yeah.  We developed it over the summer and really fleshed

16  it out in terms of how the structure would work, what the tax

17  issues were, what the governance issues were.  We did that

18  largely negotiating with ourselves, so we -- we were extremely

19  successful.  And then we filed, we filed that plan right

20  before the mediation.

21       And my recollection is that there was some concern from

22  the mediators that they thought that putting that plan out in

23  the public could upset the possibility of a grand bargain, so

24  we ended up filing that under seal.

25  Q   Do you recall what the Committee's initial reaction was to

1  the asset monetization plan that you filed under seal?

2  A    Well, initially, they -- the Committee didn't like it.

3  They didn't like the governance.  They didn't like the fact

4  that it set up for those creditors who didn't litigate the

5  prospect of litigations to try to resolve their claims.  It

6  effectively cut out some of the advisory that the Committee

7  currently had.  The -- one of the driving forces behind the

8  asset monetization plan and how we initially started it is we

9  can't continue these costs, as I said.  Well, an easy way to

10 get rid of -- to reduce the costs is to get rid of half of

11 them.

12     So if you could get rid of the Committee, effectively, and

13 coalesce around an asset monetization vehicle, then if folks

14 wanted to resolve their claim, you could.  If you had to

15 litigate it, you could, but you'd have one set of lawyers that

16 the estate was paying for, one set of financial advisors the

17 estate was paying for, as opposed to multiple sets.

18 Q    In addition to the corporate governance issues that you

19 just described, did the Committee and the Debtor quickly reach

20 an agreement on the terms of the treatment of employee claims

21 and the scope of the releases for the employees?

22 A    No.  Not very quickly at all.

23 Q    Yeah.

24 A    You know, again, one of the issues in this case that

25 drives perspectives is the history that creditors have in

Seery - Direct                                    102

1   dealing with Highland and in dealing with many of the

2   employees at Highland, you know, who had worked for Mr.

3   Dondero and served at his pleasure for a long time, and how

4   they had been treated in various of their attempts to collect

5   their claims.  So the idea of giving any sort of releases to

6   the employees was anathema to -- to many of the Committee

7   members.

8        From my perspective, you know, releases are particularly

9   important because there's a *quid pro quo* leading up to the

10  confirmation of a plan, particularly with a monetization plan

11  where it's clear that the employees are all going to be or

12  largely going to be either transitioned or terminated.  If

13  they're going to keep working towards that, we either have to

14  have some sort of financial incentive or some sort of

15  assurance that their actions which are done in good faith to

16  try to pursue this give them the benefit of more than just

17  their paycheck.

18       And so we thought we were setting up the *quid pro quo* in

19  terms of work towards the monetization, bring the case home,

20  and you're entitled to a release, so long as you haven't done

21  something that was grossly negligent or willful misconduct.

22  And the Committee, I think, wanted to have a more aggressive

23  posture.

24  Q   And did those disagreements over corporate governance and

25  the employee releases kind of spill out into the public at

Seery - Direct                                    103

1   that disclosure statement hearing in October?

2   A    I think they spilled out at that hearing as well as in the

3   hearing either the next day or two days later around Mr.

4   Daugherty's claim.  And again, it was -- it was contentious.

5   I tend to try to reach resolution, but I tend to hold firm

6   when I think that there's a good reason, an equitable reason

7   to do so, and compromising that issue was very difficult for

8   me.

9   Q    But in the weeks that followed, did the Committee and the

10  Debtor indeed negotiate to resolve to their mutual

11  satisfaction the issues surrounding corporate governance and

12  employee releases?

13  A    We did, yes.

14  Q    And were -- was the Debtor able to get its disclosure

15  statement approved with Committee support in late November?

16  A    We did, yes.

17  Q    Can you describe for the Court generally kind of the

18  process by which the Debtor negotiated with the Committee?

19  I'll ask it as broadly as I can, and I'll focus if I need to.

20  A    Yeah.  The process was usually in group settings with the

21  independent directors, professionals, and the Committee

22  members and their professionals.  Oftentimes, then, there

23  would be certain one-off conversations if there was a

24  particular issue that was more important to one Committee

25  member or another, or if they were designated by the Committee

Seery - Direct                                104

1   to be the point on that.  And so I negotiated on behalf of the

2   Debtor, both collectively and individually, around these

3   points.

4       The biggest issues related to governance of the Claimant

5   Trust, the separation of the Claimant Trust and the Litigation

6   Trust, which was important to me, the treatment of employees

7   between the filing -- the time we came up with the case and

8   when we were going to exit, and then how that release

9   provision would work.

10  Q   Is it fair to say that numerous iterations of the various

11  documents that embodied the plan were exchanged between the

12  Debtor and the Committee?

13  A   Yes.  There were -- there were dozens.

14  Q   Fair to say that the negotiations were arm's length?

15  A   Absolutely.  Often contentious, always professional, but I

16  do think that there were, you know, well -- good-faith views

17  held by folks on both sides.  And I think we were fortunate to

18  be able to get resolution of those, because they were

19  strongly-held views.

20  Q   Okay.  And ultimately, I think you've already testified,

21  and Mr. Clemente certainly made it clear:  Is the Debtor --

22  does the Debtor have the Committee on board for their plan

23  today?

24  A   My understanding is again -- and you heard Mr. Clemente --

25  both the Committee and each of the individual members are

Seery - Direct                                    105

1   supportive of the plan.

2   Q    All right.  Let's switch to Mr. Dondero and his reaction

3   to the asset monetization plan.  Can you describe for the

4   Court based on your experience and your interaction with him

5   what you interpreted Mr. Dondero's position to be?

6           A VOICE:  Objection, hearsay, or --

7           MR. DRAPER:  Objection, hearsay.  Calls for

8   speculation, Your Honor.

9           THE COURT:  Overruled.

10          THE WITNESS:  Yeah.  I had direct discussions with

11  Mr. Dondero regarding the plan, the asset monetization plan,

12  as I mentioned, direct discussions regarding a potential grand

13  bargain.  The initial view from Mr. Dondero was, and he told

14  me, that if he didn't get a plan that he agreed to, if he

15  didn't have a specific control or agreement around what got

16  paid to Acis and Mr. Terry and what got paid to Redeemer

17  specifically, that he would, quote, burn the place down.  I

18  know that because it is, excuse the pun, seared into my mind,

19  but I also wrote it down.  And that was, you know, in the

20  early summer.

21      We had subsequent discussions around the plan, and as we

22  were talking about the -- about the grand bargain or -- the

23  pot plan hadn't come out at that point -- even on a large call

24  -- the plan initially called for a transition, and still does,

25  of employees of the Debtor to a related entity to continue

Seery - Direct                                    106

1  performing services that were under the prior shared service

2  agreements that we were going to terminate.

3      But that transition is wholly dependent on Mr. Dondero.

4  And we had a call with at least five to seven people on it

5  where I said to Mr. Dondero, look, this is going to be in your

6  financial interest to agree to a smooth transition.  These

7  people have worked for you for a long time.  It's for their

8  benefit.  You portfolio-manage these funds.  It's to the

9  benefit of those funds to do this smoothly.  And if there's

10  litigation between you and the estate later, then those chips

11  will fall where they may.

12      And he told me to be prepared for a much more difficult

13  transition than I envisioned.

14      And I specifically said to him, and this one sticks in my

15  mind because I recall it, I said, don't worry, Mr. Dondero --

16  I think I used Jim -- I will be prepared.  I was a Boy Scout

17  and we spend time preparing for these kinds of things.  So

18  we're -- we would love to get done the best transition we can,

19  but we will be prepared for a difficult one.

20      So, from the start, the idea of the monetization plan was

21  not something that obviously he supported.  We did agree with

22  -- after his inquiry or request with the mediators, to file it

23  under seal while we went into the mediation.

24  BY MR. MORRIS:

25  Q    And after, after that was filed in September, early

Seery - Direct                                        107

1  October, did Mr. Dondero start to act in a way that the board

2  perceived to be against the Debtor's interests?

3  A   Certainly.  I mean, he previously had shown inclinations

4  of that, but that -- it got very aggressive as he interfered

5  with the trades we were trying to do in terms of managing the

6  CLO assets.  He took a position that postpetition, which was

7  really one of his entities taking a position, that

8  postposition a sale of life policy assets was somehow not in

9  the best interests of the funds and that we had abused our

10 position, notwithstanding that he turned it over to us with no

11 liquidity to maintain those life policies.  There were several

12 other instances.  And those led to the decision to, one, have

13 him resign, and then ultimately, after the text to me that I

14 perceived as threatening, and we've had subsequent hearings on

15 it, we asked him to leave the office.

16 Q   Okay.  Let's move back to the plan here.  Can you

17 describe, you know, generally, if you can, the purpose and

18 intent of the asset monetization plan?

19 A   Well, very simply, the main purpose is to maximize value.

20 This is not a competition between Mr. Dondero and myself.  I

21 have no stake in getting more money out of the maximization

22 other than my duty to do the job that I was hired to do.

23      So our goal is to manage the assets in what we think is

24 the best way to do that over time, and find opportunities

25 where the market is right to monetize the assets, primarily

Seery - Direct                                    108

1   through sales.  There may be other instances, depending on the
2   type of asset, whether a sale makes sense, if we can structure
3   it through some kind of distribution that's more structured.
4   Q   We've used the phrase a bunch of times already.  Can you
5   describe in your own words what an asset monetization plan is
6   in the context of the Debtor's proposal?
7   A   Well, it may be slightly an awkward moniker, but I think
8   it's not completely different than what you'd see, in some
9   respects, to a regular plan, where you equitize debt and you
10  operate the business for the benefit of the equitized debt.
11  Here, it's a little different in that we know exactly how
12  we're going to move forward.  We've effectively -- we'll
13  effectively turn the debt obligations into trust interests and
14  we will pay those as we sell down assets.  So we've got it
15  structured in a way where we can pivot depending on market
16  conditions and we'll be managing certain funds that the assets
17  sit in.
18      So there's really four assets where the assets sit, and
19  we'll manage those.  First are the ones that the Debtor owns
20  directly.  Second will be the ones that are in Restoration
21  Capital -- Restoration Capital Partners.  Third are the assets
22  in a fund called Multi-Strat.  Fourth is the direct ownership
23  interest in Cornerstone, and technically (garbled) would be
24  the -- would be the next one.
25      So we have the ability to manage these individual assets

Seery - Direct                                       109

1  and then be able to sell them in what we determine to be the

2  best way to maximize value, depending on the timing.

3  Q   And when you say that you're going to continue to operate

4  the business, do you mean that the Debtor will continue to

5  manage the assets you've just described in the same way that

6  it had prior to the petition date?

7  A   It'll be a smaller team, but that's the Debtor's business.

8  So what we won't be doing are the shared services anymore.

9  That was part of the Debtor's business.  But we will be

10  managing the assets.  So the 1.0 CLOs, we'll manage those

11  assets.  The RCP assets, we'll manage those assets.  The

12  Trussway Holdings assets, we'll managing those assets.  Each

13  of them is a little bit different.  There's things as diverse

14  as operating companies to real estate.  We'll operate, subject

15  to final agreement, but the Longhorn A and B, which are

16  separate accounts that are -- were funded and are controlled

17  by the largest -- one of the largest investors in the world.

18  And so they have agreed that we should manage those assets for

19  them.

20       So we're -- that's the business that the Debtor is in.  It

21  won't be doing all of the businesses that the Debtor was in

22  before, like the shared services, but the management of the

23  assets will be very similar.

24  Q   And why do these funds and these assets need continued

25  management?  Why aren't you just selling them?

Seery - Direct                          110

1   A    Well, in some respects, they could just be sold, but the

2   -- we believe that the value would be a lot lower.  So, a lot

3   of them are complex.  The time to sell them may not be now.

4   Some will require restructuring in some way, whether -- not

5   through a reorganization process, but some sort of structural

6   treatment to how the obligations at the individual asset are

7   treated, or the equity at the individual asset.  So we're

8   going to manage each of them and look for market opportunities

9   where we think the value can be maximized.

10           MR. MORRIS:  Your Honor, I'm about to switch to

11  another topic.  We have been going for a little bit more than

12  two and a half hours.  I'm happy to just continue if you and

13  the witness are, but I just wanted to give you a head's up

14  that I'm about to switch topics.  If you wanted to take a

15  short break, we could.  If you want me to continue, I'm happy

16  to do that, too.

17           THE COURT:  Well, let me ask you, how much longer do

18  you think you're going to take overall with Mr. Seery?

19           MR. MORRIS:  I think I'll probably have another hour

20  to an hour and a half, Your Honor.  We want to make a complete

21  factual record here.

22           THE COURT:  All right.  Well, it's 12:07 Central

23  time.  Why don't we take a 30-minute lunch break, okay?  Can

24  everybody do their lunch snack that fast?

25           MR. MORRIS:  Sure.

Seery - Direct                               111

1          THE COURT:  I think that would probably be the way to

2     go.  So we'll come back -- it's now 12:08.  We'll come back at

3     12:38 Central time and resume --

4          MR. MORRIS:  Okay.

5          THE COURT:  -- resume this direct testimony, okay?

6     So, see you in 30 minutes.

7          MR. MORRIS:  Thank you very much.

8          THE COURT:  Okay.

9          THE CLERK:  All rise.

10       (A recess ensued from 12:08 p.m. to 12:44 p.m.)

11         THE COURT:  We are going back on the record in the

12    Highland confirmation hearing.  It's 12:44 Central time.  I

13    took a little bit longer break than I said we would.

14       Mr. Morris and Mr. Seery, are you ready to resume?

15         MR. MORRIS:  I am, Your Honor.

16         THE WITNESS:  Yes, Your Honor.

17         THE COURT:  Okay, good.  A couple of things.  I'm

18    required to remind you you're still under oath, Mr. Seery.

19    And also, just for people's planning purposes, what I intend

20    to do is, when the direct examination of Mr. Seery is

21    finished, I'm going to allow cross-examination of the

22    Objectors in the same amount of time in the aggregate that the

23    Debtor got, okay?  So, Objectors, in the aggregate, you can

24    spend as long cross-examining as the Debtor spent examining.

25    I can figure out this is the most significant witness, so I'm

Seery - Direct                                    112

1   assuming that Debtor's other witnesses are going to be a lot

2   shorter than this, but --

3           MR. MORRIS:  Yes, I promise.

4           THE COURT:  -- that's how we'll proceed.  And I

5   expect to finish Mr. Seery today.

6       So, all right.  With that, you may proceed, Mr. Morris.

7           MR. MORRIS:  Okay.

8                   DIRECT EXAMINATION, RESUMED

9   BY MR. MORRIS:

10  Q   Can you hear me okay, Mr. Seery?

11  A   Yes, sir.

12  Q   Okay.  Before we move on to the next topic, you spent some

13  time describing the asset monetization plan.  Would it be fair

14  to describe that as a long-term going-concern liquidation?

15  A   Long-term is subjective.  We anticipate that we'll be able

16  to monetize the assets in two years.  We could go out longer

17  to three.  There's no absolute restriction that we couldn't

18  take longer, depending on what we see in the market, but the

19  objective would be to find maximization opportunities within

20  that time period.

21  Q   Okay.  So let's turn now to the post-confirmation

22  corporate governance structure.

23      (Interruption.)

24          THE WITNESS:  Mr. Golub (phonetic), you should mute.

25          THE COURT:  Yes.  I don't know -- I didn't catch who

Seery - Direct                                   113

1    that was.  But anyway, anyone other than --

2             A VOICE:  It's someone named Garrett Golub.

3             THE COURT:  -- Morris and Seery, please mute.  All

4    right.  Go ahead.

5             MR. MORRIS:  Okay.

6    BY MR. MORRIS:

7    Q    At a high level, Mr. Seery, can you please describe for

8    the Court the post-confirmation structure that's envisioned

9    under the proposed plan?

10   A    At a high level, we anticipate reorganizing HCMLP such

11   that the current parties of interest will be extinguished and,

12   in exchange, creditors will get trust interests.  There'll be

13   a trust that will sit on top of HCMLP and it will have an

14   overall responsibility for the Claimant Trust, which will be

15   the HCMLP assets plus the assets that we move into the

16   Claimant Trust, depending on structural considerations.  And

17   then a Litigation Trust, which will be a separate trust, and

18   that will roll up into the main trust.  And the main trust

19   will be where the creditors hold their interests.  And those

20   interests take the form of senior interests or junior

21   interests.

22   Q    All right.  You mentioned a Claimant Trust.  Who is

23   proposed to serve as the Claimant Trustee?

24   A    I am.

25   Q    And you mentioned a Litigation Trust.  Is there someone

Seery - Direct                                    114

1  proposed to serve as the Litigation Trustee?

2  A    A gentleman named Marc Kirschner.  He's been doing these

3  kinds of things for a long time.

4  Q    Is there going to be any kind of oversight group or

5  committee?

6  A    There is an oversight committee that sits at the main

7  trust.  Into it will report Mr. Kirschner and myself.  It has

8  oversight responsibilities similar to a board of directors in

9  terms of the operations of the Claimant Trust and the

10 Litigation Trust.

11 Q    Do you have an understanding as to who the initial members

12 of the Claimant Oversight Committee?

13 A    The initial members will be each of the members of the

14 Creditors' Committee.  So, UBS, Acis, Redeemer, a

15 representative from Redeemer, and Meta-e, as well as an

16 independent named David Pauker.  So that's the initial

17 structure.

18 Q    And can you describe for the Court, how did Mr. Pauker get

19 involved in this?

20 A    He was selected by the Committee.

21 Q    Okay.  Is there -- Meta-e is a convenience class claim

22 holder.  Do I have that right?

23 A    Yeah.  They're -- they -- as I went through earlier, they

24 had a liquidated claim for litigation services.  So we

25 expected that they'll be paid off rather early in the process.

Seery - Direct                                    115

1   At that point, we suspect they wouldn't -- they would no

2   longer be an Oversight Committee member and they would be

3   replaced by an independent.

4   Q   And do you have any understanding as to how that

5   independent will be chosen?

6   A   I believe it's chosen by the other members.

7   Q   Okay.  Can you describe your proposed compensation

8   structure as the proposed Claimant Trustee?

9   A   My compensation will be $150,000 a month, which is the

10  same compensation I have now.  In addition, we'll negotiate a

11  bonus structure with the Oversight Committee.  And that will

12  likely be a bonus not just for myself but for the entire team,

13  depending on performance.

14  Q   Okay.  And that -- and who is that negotiation going to be

15  had with?

16  A   The Oversight Committee.

17  Q   Okay.  Are you familiar with Mr. Pauker's compensation

18  structure?

19  A   I -- I've seen it.  I don't recall specifically.  I think

20  his -- from the models, I think he's about 40 or 50 grand a

21  month, something along those lines.

22  Q   Okay.  How about Mr. Kirschner?  Do you recall -- let me

23  just ask you this.  Does it refresh your recollection at all

24  if I said that 250 in year one for Mr. Pauker?

25  A   Yeah.  So maybe closer to $20,000 to $25,000 a month.  And

Seery - Direct                                    116

1   then Mr. Kirschner is a lower amount, but he would get a

2   contingency fee arrangement somewhere dependent on the

3   recoveries from his litigations.

4   Q    Okay.  You mentioned earlier that the Debtor intends to

5   continue operations at least for some period of time post-

6   effective date.  Do you have a view as to whether the post-

7   confirmation entity will have sufficient personnel to manage

8   the business?

9   A    I do, yes.

10  Q    And why is that?  What makes you believe that the Debtor

11  will have -- the post-confirmation Debtor will have sufficient

12  personnel to manage the business?

13  A    Well, we've gone through and looked at each of the assets

14  and what is required to manage those assets.  We have a lot of

15  experience doing it during the case.  The bulk of the

16  employees, who do a fine job, are really doing shared service

17  arrangements.  The direct asset management group is a smaller

18  group, and we'll be able to manage those with the team we're

19  putting together.

20  Q    Okay.  How does the ten employees compare to the original

21  plan that was set forth in the disclosure statement, if you

22  recall?

23  A    Well, we had less, and I believe the number was either two

24  or three, along with me, and then using a lot of outside

25  professional help.  But we determined that we wanted to have a

Seery - Direct                                    117

1   much more robust team, based on the litigation that we're

2   seeing around the case and we expect to continue post-exit, so

3   that the team can manage those assets unfettered.

4       In addition, we were taking on the CLO management, the 1.0

5   CLO contracts.  These one -- as I've mentioned before, they're

6   not traditional CLOs in the sense that they require the same

7   hands-on management, but they do require an experienced team

8   to help manage the exposures, most of which are cross-holdings

9   in different -- in different entities or different investments

10  that Highland also has exposure to.

11  Q    In addition to the assumption of the CLO management

12  agreements, has the Debtor made any decisions regarding the

13  possibility of hiring a sub-servicer?

14  A    We have, yes.

15  Q    And did that factor into the Debtor's decision to increase

16  the number of personnel it was going to retain?

17  A    Well, we determined we weren't going to hire a sub-

18  servicer.  And I'm not sure exactly when we made that

19  determination.  We do have a TPA, which is SEI, and that's a

20  third-party administrator, to sift through the funds and

21  provide accounting supporting to those, to those funds.  So

22  that -- they will help.  We also have an outside consultant

23  that we're using, Experienced Advisory Consultants, who are

24  financial consultants who've worked in the business.  So we do

25  have those.

Seery - Direct                              118

1    But we didn't think that we would get a third-party sub-

2    servicer, as was the case in Acis, and determined that wasn't

3    in the best interest of the estate.

4    Q   Can you just shed a little light on what factors the

5    Debtor took into account in deciding not to hire a sub-

6    servicer?

7    A   Well, we primarily looked at cost, as well as control of

8    the assets, and determined that that was -- those were in the

9    best interests of the estate, to keep them managed internally.

10   We reviewed that with the Committee, and they agreed.

11   Q   Okay.

12        MR. MORRIS:  Let's turn now to the best interests of

13   creditors' test, Your Honor, 1129(a)(7), and let's talk about

14   whether the plan is in the best interests of creditors.

15   BY MR. MORRIS:

16   Q   Has the Debtor done any analysis to determine the likely

17   value to be realized in a Chapter 7 liquidation?

18   A   We have, yes.

19   Q   And has the Debtor done any analysis to determine the

20   likely recoveries under the plan?

21   A   Yes.

22   Q   Okay.  Do you recall when these projections were first

23   prepared?

24   A   We started working on projections in the fall, as we were

25   developing the monetization plan.  We filed projections, I

Seery - Direct                                    119

1   believe, in November.  We've subsequently updated those

2   projections based on the claims, market condition, and value

3   of the assets.

4   Q    And were those updates provided to plan objectors last

5   week?

6   A    Yes, they were.

7   Q    Okay.  Can we refer to the projections that were in the

8   disclosure statement as the November projections?

9   A    That'd be fine.

10  Q    And can we refer to the projections that were provided to

11  the objectors last week as the January projections?

12  A    Yes.

13  Q    And as --

14  A    I think they're actually -- I think they're actually dated

15  February 1, is the most recent update.

16  Q    Okay.  And then was a further update provided yesterday

17  and filed on the docket, to the best of your knowledge?

18  A    Yes.

19  Q    All right.  We'll talk about some of the changes in those

20  projections.

21          MR. MORRIS:  Can we call up on the screen Debtor's

22  Exhibit 7D as in dog?  And this document is in evidence.  Um,

23  --

24          THE COURT:  No, this is -- oh, wait.  How many Ds is

25  it?  Seven?

Seery - Direct                                          120

1          MR. MORRIS:  It's 7D, so that would be on Docket

2   1866, all of which has been admitted.

3          THE COURT:  Okay.  You're right.

4          MR. MORRIS:  Okay.

5      And if we could just, I'm sorry, go to Page 3.

6   BY MR. MORRIS:

7   Q    Is there any way to look at this, Mr. Seery?  Is this the

8   January projections that were provided last week?

9   A    Yes.

10  Q    Okay.  Can you describe for the Court the process by which

11  this set of projections and the November projections were

12  prepared?  How did the Debtor go about preparing these

13  projections?

14  A    Yeah.  These are prepared what I would call bottoms-up.

15  So what we did was we looked at each of the assets that the

16  Debtor owns or manages or has a direct or indirect interest

17  in, used the values that we have for those assets, because we

18  do keep valuations for each of the assets that the Debtor owns

19  or manages in the ordinary course of business.  We then

20  adjusted those depending on what we saw as the outcomes for

21  the case, either a plan outcome or a liquidation outcome, and

22  then rolled those into the -- into the numbers that you see

23  here.

24      So the 257 and change.  And please excuse my eyesight.

25  I'm going to make this bigger.  The 257 is the estimated

Seery - Direct                                         121

1  proceeds from monetization.  Above that, you see cash.  That's

2  our estimated cash at 131.  And we monitor those, those values

3  daily.

4  Q    And were these projections prepared under your

5  supervision?

6  A    They were, yes.

7  Q    Okay.  And who was involved in the preparation of this

8  document and other iterations of the projections?

9  A    The team at DSI.  Obviously, myself; the team at DSI; as

10  well as the, at least from a review perspective, counsel.

11  Q    All of these contain various assumptions.  Do I have that

12  right?

13  A    Yes.

14         MR. MORRIS:  Can we go to the prior page, please, I

15  think is where the assumptions are?  And let's just look at a

16  few of them.  Okay.  Can we make that a little bigger, La

17  Asia?  Okay.  Good.

18  BY MR. MORRIS:

19  Q    Why does the Debtor's projections and liquidation analysis

20  contain any assumptions?  Why, why include assumptions?

21  A    Well, all projections contain assumptions.  So an

22  assumption -- I was strangely asked the question at

23  deposition, what does that mean?  It's a thing or fact that

24  one accepts as true for the purposes of analysis.  And so in

25  terms of looking out into the future as to what the potential

Seery - Direct                           122

1  operation expenses will be and what the potential recoveries

2  will be, one has to make assumptions in order to be able to

3  compare apples to apples.

4  Q    And do you believe that these assumptions are reasonable?

5  A    Yes.  It would make no sense to have assumptions that

6  aren't reasonable.  I mean, and we've all seen that with

7  analysis through our respective careers.  It really should be

8  grounded in some fact and a reasonable projection on what can

9  happen in the future, based upon experience.

10 Q    Okay.  And have you personally vetted each of the

11 assumptions on this page?

12 A    Yes.

13 Q    Okay.  Let's just look at a few of them.  Let's start with

14 B.  It says, All investment assets are sold by December 31,

15 2022.  Do you see that?

16 A    Yes.

17 Q    Why did the Debtor make that assumption?

18 A    We looked at a two-year projection horizon.  We thought

19 that that was a reasonable amount of time, looking at these

20 assets, to monetize the assets.  Remember that we did go

21 through a process of the case over the last year, and we did

22 consider monetization asset events for certain of the assets

23 throughout the case, some of which we were successful on, some

24 of which we weren't, some we just determined to pull back.

25 But we do believe that, based upon our view of the market and

Seery - Direct                                          123

1  where we think these assets will be positioned, that

2  monetizing them over a two-year period makes sense.

3  Q   And is it possible that it takes longer than that?

4  A   It's possible.  The -- you know, we would be wrong about

5  the market.  The -- we could go into a full-blown recession.

6  Capital could dry up.  The financing markets could turn

7  negative.  But they're extremely positive right now.  Those

8  things could happen.  But we're assuming that they won't.

9  Q   And is it possible that you complete the process on a more

10 accelerated timeframe?

11 A   That's always possible.  It's not, in my experience, a

12 good way to plan.  Luck really isn't a business strategy.  But

13 if good opportunity shows up and folks want to pay full value

14 for an asset, we certainly wouldn't turn them away just so we

15 could stretch out the time period.

16 Q   Is it fair to say that this projected time period is your

17 best estimate on the most likely timeframe needed?

18 A   It's -- I think it's the best estimate that we have based

19 upon our experience with the assets, again, and our projection

20 of the marketplace that we see now.  If things change, we'll

21 adjust it, but this is a fair estimate of when we can get the

22 monetization accomplished.

23 Q   Okay.  The next assumption relates to certain demand

24 notes.  Do you see that?

25 A   Yes.

**Appx. 04305**

Seery - Direct                                    124

1   Q    Can you explain to the Court what that assumption is and

2   why the Debtor believed that it was reasonable?

3   A    Well, the Debtor has certain notes that are demand notes.

4   These are all from related entities.  Most of the notes, the

5   demand notes, we have demanded, and we've commenced litigation

6   to collect.  And we assume that we're going to be able to

7   collect those.

8        Three notes that were long-term notes -- these were notes

9   with maturities in 2047 that had been stretched out a couple

10  years ago -- were defaulted recently.  And we have accelerated

11  those notes and we've asserted demands and we have commenced

12  litigation, I believe, on each of those last week to collect.

13  So we do estimate that we will collect on all of the notes

14  that we've demanded and that we've commenced action on.  So

15  the demand notes as well as the accelerated notes.

16       The next, the next bullet shows there's one Dugaboy note

17  that has not defaulted.  That also has a 2047 maturity.  I

18  believe it's about $18 million.  And we expect that one to

19  stay current, because now I think the relater parties learned

20  that when you don't pay a long-dated note, it accelerates,

21  provided the holder, which is us, wishes to accelerate it,

22  which we did.  And so that note we do not expect to be

23  collected in the time period.

24  Q    Okay.

25            MR. MORRIS:  Let's go down to M.

                              Seery - Direct                    125

1   BY MR. MORRIS:

2   Q    M relates to certain claims.  Do you see that?

3   A    Yes.

4   Q    Can you just describe at a high level what assumption was

5   made with which -- with respect to which particular claims?

6   A    Well, we've summarized them there.  And what we've assumed

7   is that, with respect to Class 8, IFA, which is a derivative

8   litigation claim that seeks to hold, loosely, HCMLP liable for

9   obligations of NexBank, is worth zero.  I think that's pretty

10  close to settling.  We assumed here $94.8 million for UBS,

11  which was the estimated amount, and $45 million for

12  HarbourVest.

13  Q    And when you say the estimated amount, are you referring

14  to the 3018 order on voting?

15  A    Yes.  We just use the estimated amount in this projection

16  based upon the 3018 order.

17  Q    Okay.  And finally, let's look at P.  P has a payout

18  schedule.  Do I have that right?

19  A    That's an estimated payout schedule, yes.

20  Q    And what do you mean by that, that it's estimated?

21  A    Based upon our projections and how we perceive being able

22  to monetize the assets and reach the valuations that we want

23  to reach, we believe we could make these distributions.

24  However, there's no requirement to make them.

25       So the first and foremost objective we have, as I said

Seery - Direct                                126

1   earlier, is to maximize value, and not -- it's not based on a

2   payment schedule, it's based upon the market opportunity.  And

3   we've estimated for our purposes here that we'll be able to

4   meet these distribution amounts, but there's no requirement to

5   do so.

6   Q   Okay.

7            MR. MORRIS:  Let's go to Page 3 of the document,

8   please.

9   BY MR. MORRIS:

10  Q   Can you just describe generally what this page reflects?

11  A   This is a comparison of the plan analysis and what we

12  expect to achieve under the plan and the liquidation analysis

13  if a trustee, a Chapter 7 trustee, were to take over.  And it

14  compares those two distribution amounts based upon the

15  assumptions on the prior page.

16  Q   All right.  Let's just look at some of the -- some of the

17  data points on here.  If we look at the plan analysis, what is

18  -- what is projected to be available for distribution, the

19  value that's available for distribution?

20  A   $222.6 million.

21  Q   Okay.  So, 222?  And on a claims pool that's estimated to

22  be, for this purpose, how much?

23  A   $313 million.

24  Q   And what is the distribution, the projected distribution

25  to general unsecured creditors on a percentage basis?

Seery - Direct                              127

1    A    On this analysis, to general unsecured creditors, it's

2    62.14 percent.  But remember, that backs out the payment to

3    the Class 7 creditors of 85 cents above.

4    Q    Okay.  And does this plan analysis include any value for

5    litigation claims?

6    A    No, it does not.

7    Q    And is that true for all forms of the Debtor's

8    projections?

9    A    That's correct, yes.

10   Q    Okay.  And let's look at the right-hand column for a

11   moment.  It says, Liquidation Analysis.  What does that column

12   represent?

13   A    That represents our estimate of what a Chapter 7 trustee

14   could achieve if it were to take over the assets, sell them,

15   and make distributions.

16   Q    Okay.  And let's just look at the comparable data points

17   there.  Under the liquidation analysis, as of -- the January

18   liquidation analysis as of last week, what was projected to be

19   available for distribution?

20   A    A hundred and -- approximately $175 million.

21   Q    Okay.  And what was the claims pool?

22   A    The claims pool was $326 million.  Recall that that's a

23   slightly larger claims pool because it doesn't back out the

24   Class 7 claims.

25   Q    Okay.  The convenience class claims?

Seery - Direct                           128

1   A    Correct.

2   Q    Okay.  And what's the projected recovery for general

3   unsecured claims under the liquidation analysis?

4   A    Based on this analysis and the assumptions, 48 (audio

5   gap).

6   Q    Okay.  Based on the Debtor's analysis, are creditors

7   expected to do better under this analysis in the -- under the

8   Debtor's plan versus the hypothetical Chapter 7 liquidation?

9   A    Yes.  Both -- both Class 7 and Class 8.

10  Q    Okay.  Now, this set of projections differs from the

11  projections that were included in the disclosure statement; is

12  that right?

13  A    That's correct.

14  Q    Okay.  Can we just talk about what the differences are

15  between the November projections that were in the disclosure

16  statement and the January projections that are up on the

17  screen?  Let's start with the monetization of assets, the

18  second line.  Do you recall if there was an increase, a

19  decrease, or did the value from the monetization of assets

20  stay the same between the November projections and the January

21  projections?

22  A    They increased from November 'til -- 'til now.

23  Q    Okay.  Can you explain to the judge why the value from the

24  monetization of assets increased from November to January?

25  A    Well, really, it's the composition of the assets and their

Seery - Direct                                    129

1  value.  So there's four main drivers.

2      The first is HarbourVest.  We had a settlement with

3  HarbourVest, which include HarbourVest transferring to the

4  Debtor $22-1/2 million of HCLOF interests.  Those have a real

5  value, and we've now included them in the -- in the asset

6  pool.  We've also included HarbourVest in the claims pool.

7      The second was we talked a little bit earlier on the

8  assumptions on the notes.  We previously had anticipated that,

9  on the long-dated notes, a collection, we -- we'd receive

10  principal and interest currently, but we wouldn't receive the

11  full amount of the principal that was due well off in the

12  future, and we would sell it a discount.

13      So the amount of the asset pool has been increased by $24

14  million, and that reflects the delta between or the change

15  between what was in the prior plan, the notes paying and then

16  being sold at a discount, and what's in the current plan,

17  which include the accelerated notes, which is a $24 million

18  note that Advisors defaulted on that we have accelerated and

19  brought action on, as well as two six -- roughly $6 million

20  notes, one from Highland Capital Real Estate and the other

21  from HCM Services.  So that's, that's additional 24.

22      In addition, Trussway, we've reexamined where Trussway is

23  in the market, both its marketplace and its performance, and

24  reassessed where the value is.  So that has increased by about

25  $10.6 million.

Seery - Direct                    130

1    That doesn't mean that we would sell it today.  It means

2    that, when you look at the performance of the company, what we

3    think are the best opportunities in the market.  As we see the

4    marketplace with managing the company over time, we think that

5    that asset has appreciated considerably since November.

6        And then, finally, there were additional revenues that

7    flow into the model from the November analysis which would be

8    distributable, and those include revenues from the 1.0 CLOs.

9    Q    Okay.  So that accounts for the difference and the

10   increase in value from the monetization of assets.  Is there

11   also an increase in expenses from the November projections to

12   the January projections?

13   A    Yeah.  It's -- it's about -- it's around $25 million

14   additional increase.

15   Q    And can you explain to the Court what is the driver behind

16   that increase in expenses?

17   A    Yeah.  There's several drivers to that.  The first one is

18   head count.  So our head count, we've increased.  As I

19   mentioned earlier, we determined that we wanted to have a much

20   more robust management presence.  So we've increased the head

21   count, so we have a base comp, compensation, about $5 million

22   more than we initially thought.

23       Secondly, we have bonus comp.  So we've back-ended --

24   structured a backend bonus performance bonus for the team, and

25   that will run another $5 million, roughly.

Seery - Direct                    131

1    Previously, we had thought about, as you mentioned

2   earlier, the sub-servicing, but we've now talked about and we

3   have engaged a TPA, SEI, as well as experienced advisors.

4   That's another $1 to $2 million.

5    Operating expenses have increased by about $8 million,

6   based upon our assessment.  The biggest driver there is D&O,

7   which is up about $3 million.  In addition, we've gotten -- we

8   determined to keep a bunch of agreements related to data

9   collection and operations.  Those were requested by the

10  Committee, but they also serve us in performing our functions.

11  That's another couple million dollars.

12   My comp, my bonus comp was not in the prior model.  So I

13  have a bonus that has not been agreed to by the Court for the

14  bankruptcy performance.  This is not a future bonus.  And we

15  built that into the model.  Obviously, it's subject to Court

16  approval and Committee objection, and I suppose anybody else's

17  objection, but we'll -- we'll be before the Court for that.

18  But we wanted to build that into the model so that we had it

19  covered in the event that it was approved.

20  Q   Was there also a change in the assumption from November to

21  January with respect to the size of the general unsecured

22  claim pool?

23  A   Yes.  There have been -- there have been several changes

24  that have happened, and we've added those and refined the

25  claim pool numbers.

1  Q   And are those changes reflected in the assumption we

2  looked at earlier, Exhibit -- Assumption M, which went through

3  certain claims that have been liquidated?

4  A   Some, some are.  That assumption, I don't believe, was --

5  it's not in front of me, but wasn't up to date.  So, that one,

6  for example, assumed UBS at the 3018 estimated amount.  We've

7  since refined that number to reflect the agreed-upon

8  transaction with UBS, which is subject to Court approval.

9  Q   Right.  But before we get to that, for purposes of the

10  January model, the one that's up on the page -- and if we need

11  to look at the prior page --

12        MR. MORRIS:  Let's go to the prior page, the

13  assumption.  Assumption M.

14  BY MR. MORRIS:

15  Q   Assume the UBS, the UBS claim at the $94.8 million, the

16  3018 number.  Do you remember that?

17  A   Yeah.  That's, that -- that's the assumption in this

18  model.  I think back in November we assumed HarbourVest at

19  zero and UBS at zero.  So we've since -- we've since refined

20  those numbers, obviously, through both the 3018 process as

21  well as the settlement with HarbourVest.

22  Q   And did the -- did the inclusion -- withdrawn.  At the

23  time that you prepared the November model -- withdrawn.  At

24  the time the Debtor prepared the November model, did it know

25  what the UBS or the HarbourVest claims would be valued at?

Seery - Direct                            133

1   A    No.  We just had our assumption back then, which was zero.

2   And now, obviously, we know.

3   Q    And so the January model took into account the settlement

4   with HarbourVest and the 3018 motion; do I have that right?

5   A    That's correct.  That's in the assumptions.

6   Q    And what was the impact on the projected recoveries to

7   general unsecured creditors from the changes that you've just

8   described, including the increase in the claims amount?

9   A    Well, when -- like any fraction, the distribution will go

10  down if the claimant pool goes up.  So, with the denominator

11  going up by the UBS and the UBS amount -- the UBS and the

12  HarbourVest amounts, the distribution percentage went down.

13  Q    Okay.  I want to focus your attention on the second line

14  where we've got the monetization of assets under the plan at

15  $258 million but under the liquidation analysis it's $192

16  million.  Do you see that?

17  A    Yes.

18  Q    Can you tell Judge Jernigan why the Debtor believes that

19  under the plan the Debtor or the post-confirmation Debtor is

20  likely to receive or recover more for the --

21       (Interruption.)

22            THE COURT:  All right.  Hang on a minute.  Where is

23  that coming from, Mike?

24            THE CLERK:  Someone is calling in.

25            THE COURT:  Okay.

                              Seery - Direct                    134

1            MR. MORRIS:  Thank you.

2            THE COURT:  Mr. --

3            MR. MORRIS:  Let me restate the question.

4            THE COURT:  Yes.  Restate.

5    BY MR. MORRIS:

6    Q    Can you explain to Judge Jernigan why the Debtor believes

7    that the -- under the plan corporate structure, the Debtor is

8    likely to recover more from the monetization of assets than a

9    Chapter 7 liquidation trustee would?

10   A    Sure.  My experience is that Chapter 7 trustees will

11   generally try to move quickly to monetize assets.  They will

12   retain their own professionals, they will examine the assets,

13   and they will look to sell those assets swiftly.

14        The monetization plan does not plan to do that.  I've got

15   a year's of experience -- a year now of experience with these

16   assets, as well as we'll have a team with several years at

17   least each of experience with the assets.  We intend to look

18   for market opportunities, and think we'll be able to do it in

19   a much better fashion than a liquidating Chapter 7 trustee.

20        The nature of these assets is complex.  Many of them are

21   private equity investments in operating businesses.  Certain

22   of them are complicated real estate structures that need to be

23   dealt with.  Some of them are securities that, depending on

24   when you want to sell them, we believe there'll be better

25   times than moving quickly forward to sell them now.

1      So, with each of them, we think that we'll be able to do

2  better than a Chapter 7 trustee based upon our experience.

3  The only thing that we're level-set with a Chapter 7 trustee

4  on is that cash is cash.

5  Q   Do you have any concerns that a Chapter 7 trustee might

6  not be able to retain the same personnel that the Debtor is

7  projected to retain?

8  A   Well, again, in my experience, it would be very difficult

9  for a Chapter 7 trustee to retain the same professionals, and

10  typically they don't.

11      Secondly, retaining the individuals, I think, would be

12  very difficult for a Chapter 7 trustee, would not have a

13  relationship with them, and that gap of time and the risks

14  that they would have to take to join a Chapter 7 trustee I

15  think would lead most of them to look for different

16  opportunities.

17  Q   Okay.  One of the other things, one of the other changes I

18  think you mentioned between the November and the January

19  projections was the decision to assume the CLO management

20  contracts.  Do I have that right?

21  A   That's correct.

22  Q   And why has the Debtor decided to assume the CLO

23  management contracts?  How does that impact the analysis on

24  the screen?

25  A   Well, it does add to the expense, but it also adds to the

Seery - Direct                                          136

1   proceeds.

2       When we did the HarbourVest settlement, we ended up with

3   the first significant interest in HCLOF.  HCLOF owns the vast

4   majority of the equity in Acis 7, and also owns significant

5   preferred share interests in the 1.0 CLOs.  And we think it's

6   in the best interest of the estate to keep the management of

7   those assets where we have an interest in the outcome of

8   maximizing value with the estate.

9       In addition, we're going to have employees who are going

10  to work with us to manage those specific assets, so we feel

11  like that will be something where we can control the

12  disposition much better.

13      There's also cross-interests that these CLOs have in --

14  the 1.0 CLOs have in a number of other investments that

15  Highland has.  As in all things Highland, it's interrelated,

16  and so many of the companies have direct loans from the CLOs.

17  We intend to refinance that, but we feel much more comfortable

18  and feel that there would be value maximization if we're able

19  to work directly with the Issuers as a manager while we seek

20  in those underlying investments to refinance the CLO debt.

21  Q   Has the Debtor -- has the Debtor reached an agreement with

22  the Issuers on the assumption of the CLO management

23  agreements?

24  A   Yes, we have.

25  Q   Can you describe for the Court the terms of the

                              Seery - Direct                    137

1   assumption?

2              MR. RUKAVINA:  Your Honor, this --

3              THE WITNESS:  Yes.

4              MR. RUKAVINA:  Your Honor, this is Davor Rukavina.  I

5   would object to this as hearsay.

6              THE COURT:  Well, he has not --

7              MR. MORRIS:  It's --

8              THE COURT:  He's not said an out-of-court statement

9   yet, so I overrule.

10      Go ahead.

11             THE WITNESS:  Yeah, we -- we are going to assume the

12  CLO contracts.  We have had direct discussions with the

13  Issuers.  They have agreed.

14      The basic terms are that we're going to cure them by

15  satisfying about $500,000 of cure costs related to costs that

16  the CLO Issuers have incurred in respect of the case, and

17  we'll be able to pay that over time.

18             MR. RUKAVINA:  Your Honor, this is Davor Rukavina.  I

19  would renew my objection and move to strike his answer that

20  they've agreed.  That is hearsay, an out-of-court statement

21  offered to prove the truth of the matter asserted.

22             THE COURT:  Okay.  Mr. Morris, what is your response?

23             MR. MORRIS:  He's describing an agreement.  I

24  actually think it's in the Debtor's plan that's on file

25  already.  But he's describing the terms of an agreement.  He's

1  not saying what anybody said.  There's no out-of-court

2  statement.  It's an agreement that's being described.

3           THE COURT:  All right.  Thank you.  I overrule the

4  objection.

5           MR. MORRIS:  Okay.

6  BY MR. MORRIS:

7  Q    Does the Debtor believe that the CLO agreements will be

8  profitable?

9  A    Yes.

10 Q    And why does the Debtor believe that the CLO agreements

11 will be profitable to the post-confirmation estate?

12 A    Well, we don't -- we don't break out profitability on a

13 line-by-line basis.  But the simple math is that the revenues

14 from the CLO contracts which will roll in to the Debtor from

15 the management fees are more than what we anticipate the

16 actual direct costs of monitoring and managing those assets

17 would be.

18 Q    Okay.  Are you aware that yesterday the Debtor filed a

19 further revised set of projections?

20 A    I am, yes.

21 Q    All right.  Let's call those the February projections.

22           MR. MORRIS:  Can we put those on the screen?

23       It's Exhibit 7P, Your Honor.

24           THE COURT:  Okay.

25           MR. MORRIS:  All right.  I think that for some reason

Seery - Direct                               139

1    -- yeah, okay.  There we go.  Perfect.  Right there.

2        Your Honor, these are the projections that were filed

3    yesterday.  I'm going to move for the admission into evidence

4    of these projections.

5            THE COURT:  All right.

6            MR. TAYLOR:  Your Honor, this is Clay Taylor.

7            THE COURT:  Go ahead.

8            MR. TAYLOR:  We object.  These were -- these were not

9    previously provided.  They were provided on the eve of the

10   confirmation hearing, after the Debtors had already revised

11   them once and provided those on -- after close of business on

12   a Friday before Mr. Seery's deposition.  And these were

13   provided even later, certainly not within the three days

14   required by the Rule.  And therefore we move to -- that these

15   should not be allowed into evidence.

16           THE COURT:  Mr. Morris, what is your response to

17   that?

18           MR. MORRIS:  Your Honor, first of all, the January

19   projections were provided in advance of Mr. Seery's deposition

20   and he was questioned extensively on it.  These projections

21   have been updated since then, I think for the singular purpose

22   of reflecting the UBS settlement.

23       As Your Honor just saw, the prior projections included an

24   assumption based on the 3018 motion.  Since Mr. Seery's

25   deposition, UBS and the Debtor have agreed to publicly

Seery - Direct                    140

1   disclose the terms of the settlement, and that's reflected in

2   these revised numbers.  I think there was one other change

3   that Mr. Seery can testify to, but those are the only changes

4   that were made.

5          THE COURT:  All right.  Mr. Seery, what besides the

6   UBS settlement do you think was put in these overnight ones?

7          THE WITNESS:  I believe the only other change, Your

8   Honor, was correcting a mistake.  In Assumption M, the second

9   line is assumes RCP claims will offset against HCMLP's

10  interest in the fund and will not be paid from the Debtor's

11  assets.  That hasn't changed.

12     Basically, the Debtor got an advance from RCP that was to

13  -- for tax distributions, and did not repay it.  The RCP

14  investors are entitled to recovery of that.  So we had

15  previously backed that out.  It's about four million bucks.

16  What happened was it was just double-counted.

17          THE COURT:  Okay.

18          THE WITNESS:  So, as an additional claim, it was

19  counted as $8 million.  I think that's the only other change.

20          THE COURT:  All right.  I overrule the objection.

21  You may go forward.  I admit 7P.

22      MR. MORRIS:  Thank you, Your Honor.

23     (Debtor's Exhibit 7P is received into evidence.)

24          MR. MORRIS:  Can you just -- if we can go to the next

25  page, please.

Seery - Direct                                    141

1   BY MR. MORRIS:

2   Q    So, with -- seeing that the claims pool under the plan

3   previously was $313 million, and what's the claims pool under

4   the projections up on the screen under the plan?

5   A    Two -- well, remember, there's 273 for Class 8, and then

6   you'd add in the Class 7 as well, which is the $10.2 million.

7   So the 273 went from 313 to 273 with that settlement.

8   Q    And is there any -- is there any reason for the decrease

9   other than the change from the 3018 settlement -- order figure

10  to the actual settlement amount?

11  A    For the UBS piece, no.  And then, as I mentioned, I

12  believe the other piece would have been that four million --

13  that additional $4 million that was taken out.

14  Q    And did those two changes have a -- did those two changes

15  have an impact on the projected recoveries under the plan?

16  A    Sure, particularly with respect to -- to the Class 8.

17  Those recoveries went up significantly because the denominator

18  went up.

19  Q    Okay.  Does the Debtor believe that its plan is feasible?

20  A    Yes, absolutely.

21  Q    And do you know whether the administrative priority and

22  convenience class claims will be paid in full under the

23  Debtor's plan?

24  A    Yes.  We monitor the cash very closely, so we do have

25  additional cash to raise, but we're set to reach or exceed

Seery - Direct                                            142

1   that target, so we do believe we'll be able to pay all the

2   administrative claims when they come in.  Obviously, we have

3   to see what they are.  We will be able to pay Class 7 on the

4   effective date.  Any other distributions, we expect to be able

5   to make as well.

6        So, and then it's -- then it's a question of going forward

7   with a few other claims that we have to pay over time.  We

8   have the cash flow to pay those.  Frontier, for example, we'll

9   be able to pay that claim over time in accordance with the

10  restructured terms.  If the assets that secure that claim are

11  sold, they would be paid when those assets are sold.

12  Q   Frontier, will the plan enable the Debtor to pay off the

13  Frontier secured claim?

14  A   Yes.  That's what I was explaining.  The cash flow is

15  sufficient to support the current P&I on that claim.  We will

16  be able to satisfy it from other assets if we determine not to

17  sell the asset securing the Frontier claim, or if we sell the

18  asset securing the Frontier claim we could satisfy that claim.

19  The asset far exceeds the value of the claim.

20  Q   Has the plan been proposed for the purpose of avoiding the

21  payment of any taxes?

22  A   No.  We expect all tax claims to be paid in accordance

23  with the Code, and to the extent that there are additional

24  taxes generated, we would pay them.

25  Q   Okay.  Let's just talk about Mr. Dondero for a moment

Seery - Direct                                143

1  before we move on.  Are you aware that Mr. Dondero's counsel

2  has requested the backup to, you know, these numbers,

3  including the asset values?

4  A    It -- I'm not sure if it was his counsel or one of the

5  other related-entity counsels.

6  Q    Okay.  But you're aware that a request was made for the

7  details regarding the asset values and the other aspects of

8  this?

9  A    Yes.

10 Q    Those were -- were those formal requests or informal

11 requests?

12 A    They were certainly at my deposition.

13 Q    Right.  But you haven't seen a document request or

14 anything like that, have you?

15 A    No.

16 Q    Did the Debtor make a decision as to whether or not to

17 provide the rollup, the backup information to Mr. Dondero or

18 the entities acting on his behalf?

19 A    Yes.

20 Q    And what did the Debtor decide?

21 A    We would not do that.

22 Q    And why did the Debtor decide that?

23 A    Well, I think that's pretty standard.  The underlying

24 documentation and the specific terms of the model are very

25 specific, and they are -- they are confidential business

Seery - Direct                                    144

1  information that runs through what we expect to spend and what

2  we expect to receive and when we expect to sell assets and

3  then receive proceeds, and the prices at which we expect to

4  sell them.

5      To the extent that any entity wants to have that

6  information as a potential bidder, that would be very

7  detrimental to our ability to maximize value.  So, typically,

8  I wouldn't expect that to be given out, and I would not

9  approve it to be given out here.

10 Q   Did the Debtor disclose to Mr. Dondero's counsel or

11 counsel for one of his entities the agreement in principle

12 with UBS before the updated plan analysis was filed last

13 night?

14 A   I believe that disclosure was done a while ago, to Mr.

15 Lynn.

16 Q   So, to the best of your -- so, to the best of your

17 knowledge, the Debtor actually shared the specifics of the

18 agreement with UBS with Mr. Dondero and his counsel before

19 last night?

20 A   Yes.  I have specific personal knowledge of it because we

21 had to ask UBS for their permission, and they agreed.

22 Q   Okay.

23     MR. MORRIS:  All right.  Let's move on to 1129(b),

24 Your Honor, the cram-down portion.

25 BY MR. MORRIS:

Seery - Direct                    145

1    Q    Are you aware, Mr. Seery, how various classes have voted

2    under the plan?

3    A    I am generally, yes.

4    Q    Okay.  Did any class vote to reject the plan, to the best

5    of your knowledge?

6    A    I don't -- I guess it depends on how you define the class.

7    I think the answer is that I don't believe that, when you

8    count the full votes of the -- the allowed claims and the

9    votes in any class, I don't believe any of the classes voted

10   to reject the plan.

11   Q    What type of claims are in Class 8?

12   A    General unsecured claims.

13   Q    And what percentage of the dollar amount of Class 8 voted

14   to accept?

15   A    It's -- I think it's near -- now with the Daugherty

16   agreements, it's near a hundred percent of the third-party

17   dollars.  I don't know the individual employees' claims off

18   the top of my head.

19   Q    All right.  And what about the number in Class 8?  Have a

20   majority voted to accept or reject in Class 8?

21   A    If you include the employee claims -- which, again, we

22   think have no dollar amounts -- then I think it's a majority

23   would have rejected.  The vast dollar amounts did accept.

24   Q    Okay.  Let's talk about those employees claims for a

25   moment.  Do you have an understanding as to the basis of the

Seery - Direct                                           146

1    claims?

2    A    Yes.

3    Q    What's your understanding of the basis of the claims?

4    A    Most of the claims are based on deferred compensation, and

5    that's the 2005 Highland Capital Management bonus plan.  And

6    that bonus plan provides certain deferred payment amounts to

7    the employees to be paid over multiple-year periods, provided

8    that they are in the seat when the payment is due.  That's the

9    vesting date.

10   Q    Okay.

11         MR. MORRIS:  Your Honor, just as a note-keeping

12   matter, the deferred compensation plan and the annual bonus

13   plan are Exhibits 6F and 6G, respectively, and they're on

14   Docket 1822.

15         THE COURT:  All right.

16   BY MR. MORRIS:

17   Q    And Mr. Seery, are you generally familiar with those

18   plans?

19   A    I am, yes.

20   Q    In order to receive benefits under the plans, are the

21   employees required to be employed at the time of vesting?

22   A    Yeah.  Our counsel refers to them, various terms, but

23   generally -- our outside labor counsel.  They're referred to

24   as seat-in-the-seat plans, meaning that your seat has to be in

25   a seat at the office at the day that the payment is due.  If

Seery - Direct                                   147

1  you're terminated for cause or if you resign, you're not

2  entitled to any payment.

3      So either you're there and you receive it or you're not

4  and you don't.  The only exception to that, I believe, is

5  death and disability.  Or disability.

6  Q   All right.  Did the Debtor terminate the annual bonus

7  plan?

8  A   Yes, we did.

9  Q   And in what context did the Debtor terminate the annual

10 bonus plan?

11 A   Well, we had discussion on it last week.  As Mr. Dondero

12 had also testified, the plan was to terminate all the

13 employees prior to the transition.  That's well known among

14 the employees.  The board terminated the 2005 bonus plan and

15 instead replaced it with a KERP plan that was approved by this

16 Court.

17 Q   And what was your understanding of the consequences of the

18 termination of the bonus plan for -- for purposes of the

19 claims that have been asserted by the employees who rejected

20 in Class 8?

21 A    It's clear that, under the 2005 HCMLP bonus plan, no

22 amounts are due because the plan has been terminated.

23 Q    All right.  Do you have an understanding as to when

24 payments become due under the deferred compensation -- under

25 the compensation plan?

Seery - Direct                                148

1   A    I do, yes.

2   Q    And when are they due?

3   A    The next payments are due in May.

4   Q    And what is the Debtor intending to do with respect to the

5   objecting employees?

6   A    The Debtor will have terminated all those employees before

7   that date.

8   Q    All right.  So, what's -- what are the consequences of

9   their termination vis-à-vis their claims under the deferred

10  compensation plan?

11  A    They won't have any claims.

12  Q    Okay.  So is it the Debtor's view that the employees who

13  voted to reject in Class 8 have no valid claims under the

14  annual comp -- annual bonus plan or the deferred compensation

15  plan?

16          MR. RUKAVINA:  Your Honor, this is Davor Rukavina.

17  With due respect, Your Honor, these employees have voted.  The

18  voting is on file.  There has been no claim objections to

19  their claims filed.  There's been no motion to designate their

20  votes filed.  So Mr. Seery's answer to this is irrelevant.

21  They have votes -- pursuant to this Court's disclosure

22  statement order, they have votes and they have counted, and

23  now Mr. Seery is attempting to basically impeach his own

24  balloting summary.

25          THE COURT:  Mr. Morris, what is your response?

Seery - Direct                              149

1          MR. MORRIS:  The point of cram-down, Your Honor, is

2   it fair and equitable.  Does -- does -- is it really fair and

3   equitable to the 99 percent of the economic interests to allow

4   24 employees who have no valid claims to carry the day here?

5   And this is -- that's what cram-down is about, Your Honor.

6          THE COURT:  All right.  I overrule the objection.

7   BY MR. MORRIS:

8   Q    Let's talk about Class 7 for a moment, Mr. Seery.  That's

9   the convenience class; is that right?

10  A    That's correct.

11  Q    How and why was that created?

12  A    Well, initially, that was created because we had two types

13  of creditors in the case, broadly speaking.  We had liquidated

14  claims, which were primarily trade-type creditors, and we had

15  unliquidated claims, which were the litigation-type creditors.

16  And so that class was created to deal with the liquidated

17  claims, and the Class 8 would deal with the unliquidated

18  claims, which were expected to, as we talked about earlier

19  with respect to the monetization plan, take some time to

20  resolve.

21  Q    Was the creation of the convenience class a product of

22  negotiations with the Committee?

23  A    The initial discussion on how we set it up I believe was

24  generated by the Debtor's side, but how it evolved and who

25  would be in it and how it was treated in terms of

Seery - Direct                    150

1   distributions was a product of negotiation with the Committee.

2   Q    Okay.  So how was the dollar threshold figure arrived at?

3   How did you actually determine to create a convenience class

4   at a million dollars?

5   A    It was through negotiation with the Committee.  So this

6   was one of those items that moved a fair bit, in my

7   recollection, through the many negotiations we had, heated

8   negotiations on some of these items, with the Committee.

9   Q    And are all convenience class -- all holders of

10  convenience class claims holders of claims that were

11  liquidated at the time the decision was made to create the

12  class?

13  A    I believe so.  I don't think there's been -- other than --

14  well, there -- we just had some settlements today, and I think

15  that relates to the employees, but those would be the only

16  ones that there would be disputes about, and that would roll

17  into the liquidat... the convenience class.

18  Q    Okay.  Finally, is there any circumstance under which

19  holders of Class 10 or 11, Class 10 or Class 11 claims will be

20  able to obtain a recovery under the plan?

21  A    Theoretically, there's a circumstance, and that is if

22  every other creditor in the case were to be paid in full, with

23  interest at the federal judgment rate, including Class 9,

24  which are the subordinated claims.  If those all got paid in

25  full, then theoretically the junior interest holders could

Seery - Direct                    151

1  receive distributions.

2      However, based upon our projections, that would be wholly

3  dependent on a significant recovery in the Litigation -- by

4  the Litigation Trustee.

5  Q    Okay.  Let's move now to questions of the Debtor release

6  and the plan injunction.  Is the Debtor providing a release

7  under the plan?

8  A    Yes.

9  Q    Is anyone other than the Debtor providing a release under

10 the plan?

11 A    No.

12 Q    Who is the Debtor proposing to release under the plan?

13 A    The release parties are pretty similar to what you

14 typically would see, in my experience, in most plans.  You

15 have the independent board, myself as CEO and CRO, the

16 professional -- the Committee members, the professionals in

17 the case, and the employees that we reached agreement with

18 respect to certain of them who have signed on to a

19 stipulation, and others, get a broader release for negligence.

20 Q    Okay.  Is the Debtor aware of any facts that might give

21 rise to a colorable claim against any of the proposed release

22 parties?

23 A    Not with respect to any of the release parties.  So the --

24 obviously, I don't think there's any claims against me.  But

25 the same is true with respect to the oversight board, the

Seery - Direct                              152

1  independent board.

2      The Committee has been, you know, working with us hand-in-

3  glove, and I think if they thought we -- there was something

4  there, we would have heard it.

5      With respect to the professionals, we haven't seen

6  anything as an independent board.

7      And with respect to the employees' that -- general

8  negligence release, these are current employees and we have

9  been monitoring them for a year and we don't have any evidence

10  or anything to suggest that there would be a claim against

11  them.

12  Q   Are there conditions to the employees' release?

13  A   There are.  So, the employee release, as we talked about

14  earlier, was highly negotiated with the Committee.  It

15  requires that employees assist in the monetization efforts,

16  which is really on the transition and the monetization.  They

17  don't have to assist in bringing litigations against anybody,

18  so that's not part of what the provision requires.  But it

19  does require that they assist generally in our efforts to

20  monetize assets.

21      We don't think that's going to be significant, but if

22  there are individual questions or help we need, we certainly

23  would reach out to them.  If it's significant time, that will

24  be a different discussion.

25      And then with respect to the two senior employees who

Seery - Direct                                153

1  signed the stipulation, they have to give up a part of their

2  distribution for their release.

3  Q   All right.  I think you just alluded to this, but has the

4  release been the subject of negotiation with the Creditors'

5  Committee?

6  A   Yeah.  We've touched on it a bunch of times, and we

7  certainly, unfortunately, let it spill over into the court a

8  couple times.  It was a hotly-negotiated piece of the plan.

9  Q   Okay.  Has the Committee indicated to the Debtor in any

10 way that anybody subject to the release is the subject of a

11 colorable claim?

12 A   Anyone subject to the release?  No.

13 Q   Yeah.  All right.  Let's talk about the plan injunction

14 for a moment.  Are you familiar with the plan injunction?

15 A   Broadly, yes.

16 Q   And what is your broad understanding of the plan

17 injunction?

18 A   Anybody who has a claim or thinks they have a claim will

19 broadly be enjoined from bringing that, other than as it's

20 satisfied under the plan or else ultimately bringing it before

21 this Court.  And that's the gatekeeper part, which is a little

22 bit of combining the two pieces.

23 Q   And what's your understanding of the purpose of the

24 injunction?

25 A   It's really to prevent vexatious litigation.  We, as

Seery - Direct                                    154

1  independent directors, stepped into what I think most people

2  would fairly say is one of the more litigious businesses and

3  enterprises that they've seen.  And we have a plan that will

4  allow us to monetize assets for the benefit of the creditor

5  body, provided we're able to do that and not have to put out

6  fires every day on different fronts.  So what we're hoping to

7  do with the injunction is ensure that we can actually fulfill

8  the purposes of the plan.

9  Q    All right.  Let's talk about some of the litigation that

10 you're referring to.

11        MR. MORRIS:  Can we put up on the screen the

12 demonstrative for the Crusader litigation?

13 BY MR. MORRIS:

14 Q    And Mr. Seery, I would just ask you to kind of describe

15 your understanding in a general way about the history of the

16 Crusader litigation.

17        MR. MORRIS:  And, Your Honor, just to be clear here,

18 this is a demonstrative exhibit.  As you can see in the

19 footnotes, it's heavily footnoted to the documents and to --

20 and, really, to the court cases themselves.  The documents on

21 the exhibit list include the dockets from each of the

22 underlying litigations.  And I just want to just have Mr.

23 Seery describe at an extremely high level some of the

24 litigation that the Debtor has confronted over the years, you

25 know, as the driver, as he just testified to, for the decision

Seery - Direct                    155

1   to seek this gatekeeper injunction.

2          THE COURT:  All right.

3   BY MR. MORRIS:

4   Q    So, Mr. Seery, can you just describe kind of in general

5   terms the Crusader litigation?

6   A    Yeah.  I apologize to the Redeemer team for maybe not

7   doing this justice.  But this is litigation that came out of a

8   financial crisis upheaval related to this fund.  Disputes

9   arose with respect to the holders of the interests, which were

10  the -- ultimately became the Redeemers, and Highland as the

11  manager.

12         That went through initial litigation, and then into the

13  Bermuda courts, where it was subject to a scheme.  The scheme

14  required or allowed for the liquidation of the fund and then

15  distributions to the -- to the holders, and then deferred many

16  of the payments to Highland.

17         At some point, Highland, frustrated that it wasn't able to

18  get the payments, decided to just take them, and I think, you

19  know, fairly -- can be fairly described, at least by the

20  arbitration panel, as coming up with reasons that may not have

21  been wholly anchored in reality as to what its reasons were

22  for taking that money.

23         That led to further disputes with the Redeemers, who then

24  terminated Highland and brought an arbitration action against

25  Highland.  They were successful in that arbitration and

Seery - Direct                                     156

1  received a $137 arbitration award.  And right up to the

2  petition date, that arbitration pursued.  When they finally

3  got their -- the arbitration award, they were going to

4  Delaware Chancery Court to file it and perfect it, and the

5  Debtor filed.

6  Q    Okay.

7          MR. MORRIS:  Let's go to the next slide, the Terry/

8  Acis slide.  If we could just open that up a little bit.  It's

9  -- as you can imagine, Your Honor, it's a little difficult to

10 kind of summarize the Acis/Terry saga in one slide, but we've

11 done the best we can.

12 BY MR. MORRIS:

13 Q    Mr. Seery, can you describe generally for Judge Jernigan,

14 who is well-versed in the matter, the broad overview of this

15 litigation?

16 A    There's clearly nothing I can tell the Court about the

17 bankruptcy that it doesn't already know.  But very quickly,

18 for the record, Mr. Terry was an employee at Highland.  He

19 also has a partnership interest in Acis, which was, in

20 essence, the Highland CLO business.  He -- and he got into a

21 dispute with Mr. Dondero regarding certain transactions that

22 Mr. Dondero wanted to enter into and Mr. Terry didn't believe

23 were appropriate for the investors.

24     Strangely, the assets that underlie that dispute are still

25 in the Highland portfolio, both Targa (phonetic) and Trussway.

Seery - Direct                                    157

1  Mr. Terry was terminated, or quit, depending on whose side of

2  the argument you take.  Mr. Terry then sought compensation in

3  the arbitration pursuant to the partnership agreement.

4  Ultimately, he was awarded an arbitration award of roughly $8

5  million.

6      When he went to enforce that -- that was against Acis.

7  When he went to enforce that against Acis, which had all the

8  contracts, Highland went about, I think, terribly denuding

9  Acis and moving value.  Mr. Terry ultimately was able to file

10  an involuntary against Acis, and after a tremendous amount of

11  litigation had a plan confirmed that gave him certain rights

12  in Acis and any ability to challenge certain transactions with

13  respect to Highland that formed the basis of his claims in the

14  Highland bankruptcy.

15      That wasn't the end of the saga, because Highland

16  commenced a litigation -- well, not Highland, but HCLOF and

17  others, directed by others -- commenced litigation against Mr.

18  Terry in Guernsey, an island in the English Channel.  That

19  litigation wound its way for a couple -- probably close to two

20  years, at least a year and a half, and ultimately was -- it

21  was dismissed in Mr. Terry's favor.

22      While that was pending, litigation was commenced in New

23  York Supreme Court against Mr. Terry and virtually anybody who

24  had ever associated with him in the business, including --

25  including some of the rating agencies.  That was withdrawn as

Seery - Direct                                   158

1  part of our efforts working with DAF to try to bring a little

2  bit of sanity to the case.  But it was withdrawn without

3  prejudice.

4      But ultimately, you know, we've agreed to a claims

5  settlement, which was approved by this Court, with Acis and

6  Mr. Terry.

7  Q   All right.

8           MR. MORRIS:  How about UBS?  Can we get the UBS

9  slide?

10          THE WITNESS:  I should mention that there's other

11 litigations involving Mr. Terry and Highland individuals that

12 are outstanding, I believe, in Texas court.  We have not yet

13 had to deal with those.

14 BY MR. MORRIS:

15 Q   Okay.  Can you describe for the Court your general

16 understanding of the UBS litigation?

17 A   Again, UBS comes out of the financial crisis.  It was a

18 warehouse facility that UBS had established for Highland.  It

19 actually was a pre-crisis facility that was restructured in

20 early '08, while the markets were starting to slide but before

21 they really collapsed.  That litigation started after Highland

22 failed to make a margin call.  UBS foreclosed out -- or it

23 wasn't really a foreclosure, because it's a warehouse

24 facility, but basically closed out all the interest and sought

25 recovery from Highland for the shortfall.

Seery - Direct                              159

1      Highland was one of the defendants, but there are numerous

2   defendants, including some foreign subsidiaries of Highland.

3      That case wend its way through the New York Supreme Court,

4   up and down between the Supreme and the Appellate Division,

5   which is the intermediate appellate court in New York.

6   Incredibly litigious effort over virtually every single item

7   you could possibly think of.

8      Ultimately, UBS got a judgment for $500-plus million and

9   -- plus prejudgment interest against two of the Highland

10  subsidiaries.  It then sought to commence action up -- enforce

11  its judgment through various theories against Highland.  That

12  is part of the settlement that we have -- it's been part of

13  the lift stay motion here, the 3019, as well as the 3018, and

14  as well as the ultimate settlement we've discussed today.

15  Q    Okay.  Moving on to Mr. Daugherty, can you describe for

16  the Court your understanding of the Daugherty litigation?

17  A    The Daugherty litigation goes back even further.  It did

18  -- I think the original disputes were -- or, again, started to

19  happen between Mr. Daugherty and Mr. Dondero even prior to the

20  crisis, but Mr. Dondero -- Daugherty certainly stayed with

21  Highland post-crisis.  And then when Mr. Daugherty was severed

22  or either resigned or terminated from his position, there was

23  various litigations that began between the parties very

24  intensely in state court, one of the more nasty litigations

25  that you can imagine, replete with salacious allegations and

Seery - Direct                              160

1   press releases.

2       That litigation then led to an award originally for Mr.

3   Daugherty from HERA, which was an entity that had assets that

4   Mr. Daugherty alleges were stripped.  Mr. Daugherty had to pay

5   a judgment against Highland.  Ultimately, litigations were

6   commenced in both the state court and the Delaware Chancery

7   Court.  Those litigations, many of those continue, because

8   they're not just against the entities but specific

9   individuals.  Mr. Daugherty got a voting -- a claim allowed

10  for voting purposes in our case of $9.1 million, and we've

11  since reached an agreement with Mr. Daugherty on his claim,

12  save for a tax case which we announced earlier that relates to

13  compensation, claimed compensation with respect to a tax

14  distribution, which we have defenses for and he has claims

15  for.

16          MR. MORRIS:  All right.  We can take that down,

17  please.

18  BY MR. MORRIS:

19  Q   And let's just talk for a few minutes about some of the

20  things that have happened in this case.  Did Mr. Dondero

21  engage in conduct that caused the Debtor to seek and obtain a

22  temporary restraining order?

23  A   Yes, he did.

24  Q   And did the Debtor -- did Mr. Dondero engage in conduct

25  that caused the Debtor to seek and obtain a preliminary

Seery - Direct                              161

1  injunction against him?

2  A    Yes.

3  Q    And has the Debtor filed a motion to hold Mr. Dondero in

4  contempt for violation of the TRO?

5  A    Yes.

6  Q    Are you aware that -- of the CLO-related motion that was

7  filed in mid-December?

8  A    It's similar in that these are controlled entities that

9  brought similar types of claims against the Debtor and

10 interfered in similar ways, albeit not as directly threatening

11 with respect to the personnel of the Debtor.

12 Q    Okay.  And you're aware of how that -- that motion was

13 resolved?

14 A    I know we resolved it, and I'm drawing a blank on that.

15 But --

16 Q    All right.  Are you aware, did Mr. Daugherty also object

17 to the Acis and HarbourVest settlements, or at least either

18 him or entities acting on his behalf?

19 A    I think you meant Mr. Dondero.  I don't believe Mr.

20 Daugherty did.

21 Q    You're right.  Thank you.  Let me ask the question again.

22 Thank you for the clarification.  We're almost done.  To the

23 best of your knowledge, did Mr. Dondero or entities that he

24 controls file objections to the Acis and HarbourVest

25 settlements?

Seery - Direct                                   162

1  A    Yes, they did.

2  Q    And we're here today with this long recitation because the

3  remaining objectors are all Mr. Dondero or entities owned or

4  controlled by him; is that right?

5  A    That's correct.

6  Q    All right.

7           MR. RUKAVINA:  Your Honor, I didn't have a chance to

8  object in time.  Entities owned or controlled by Mr. Dondero.

9  There's no evidence of that with respect to at least three of

10 my clients, and this witness has not been asked predicate

11 questions to lay a foundation.  Mr. Dondero does not own or

12 control the three retail (inaudible).  So I move to strike

13 that answer.

14          MR. MORRIS:  Your Honor, I withdraw with respect to

15 the three funds.  It's fine.

16          THE COURT:  All right.  With that withdrawal, then I

17 think that resolves the objection.

18          MR. MORRIS:  Uh, --

19          THE COURT:  Or I overrule the remaining portion.

20    Okay.  Go ahead.

21          MR. RUKAVINA:  That does, Your Honor.  Thank you.

22 BY MR. MORRIS:

23 Q    Are -- are -- is everything that you just described, Mr.

24 Seery, the basis for the Debtor's request for the gatekeeper

25 and injunction features of the plan?

Seery - Direct                                        163

1  A    Well, everything I described are a part of the basis for
2  that.  I didn't describe every single basis with respect to
3  why those --
4  Q    So what are -- what are the other reasons that the Debtor
5  is seeking the gatekeeper and injunction provisions in the
6  plan?
7  A    We really do need to be able to operate the business and
8  monetize the assets without direct interference and litigation
9  threats.  We didn't go through some of the specifics, and I
10 hesitate to burden the Court again, but the email to me, the
11 email to Mr. Surgent, the testimony threatening -- effectively
12 threatening Mr. Surgent, in my opinion, by Mr. Dondero, in the
13 court in previous weeks, statements by his counsel indicating
14 that Mr. Dondero is going to sue me for hundreds of millions
15 of dollars down the road.
16     I mean, this is nonstop.  I'm an independent fiduciary.
17 I'm trying to maximize value for the estate.  I've got some
18 guy who's threatening to sue me?  It's absurd.
19        MR. MORRIS:  Your Honor, I have no further questions,
20 but what I would respectfully request is that we take just a
21 short five-minute break.  I'd like to just confer with my
22 colleagues before I pass the witness.
23        THE COURT:  All right.  Five-minute break.
24        MR. MORRIS:  Thank you, Your Honor.
25        THE CLERK:  All rise.

                              Seery - Direct                    164

1          (A recess ensued from 1:58 p.m. to 2:06 p.m.)

2              THE CLERK:  All rise.

3              THE COURT:  All right.  Please be seated.  We're back

4    on the record in Highland.  Mr. Morris, anything else?

5              MR. MORRIS:  All right, Your Honor.  Can you hear me?

6              THE COURT:  I can, uh-huh.

7              MR. MORRIS:  Okay.  Mr. Seery, are you there?

8              THE WITNESS:  I am, yes.

9              MR. MORRIS:  I just have a few follow-up questions,

10   Your Honor, if I may.

11             THE COURT:  Okay.

12                  DIRECT EXAMINATION, RESUMED

13   BY MR. MORRIS:

14   Q   Okay.  Mr. Seery, we talked for a bit about the difference

15   between the convenience class and the general unsecured

16   claims.  Do you recall that?

17   A   Yes.

18   Q   And that's the difference between Class 7 and 8; do I have

19   that right?

20   A   Yes.

21   Q   And what is the recovery for claimants in Class 7, to the

22   best of your recollection, the convenience class?

23   A   It's 85 cents.

24   Q   And under --

25   A   On the dollar.

Seery - Direct                    165

1    Q   And under the projections that were filed last night, and

2    we can call them up on the screen if you don't have total

3    recall, do you recall what Class 8 is projected to recover now

4    that we've taken into account the UBS settlement?

5    A   Approximately 71.

6    Q   Okay.

7    A   Percent.  71 cents on the dollar.

8            THE COURT:  Okay.  The answer --

9    BY MR. MORRIS:

10   Q   Okay.  Do I this right --

11           THE COURT:  The answer was a little garbled.  Can you

12   repeat the answer, Mr. Seery?

13           THE WITNESS:  Approximately 71 cents on the dollar,

14   Your Honor.

15           THE COURT:  Okay.  Thank you.

16   BY MR. MORRIS:

17   Q   Okay.  And do I have that right, that that 71 cents

18   includes no value for potential litigation claims?

19   A   That's correct.  We didn't even put that in our

20   projections at all.

21   Q   So is it possible, depending on Mr. Kirschner's work, that

22   holders of Class 8 claims could recover an amount in excess of

23   85 percent?

24   A   It's possible, yes.

25   Q   Okay.  Are you aware that Dugaboy has suggested that the

Seery - Direct                          166

1   Debtor should resolicit because their -- their -- the

2   projections in the November disclosure statement were

3   misleading?

4   A    I'm aware that they've made allegations along those lines,

5   yes.

6   Q    Okay.  Do you think the November projections were

7   misleading in any way?

8   A    No, not at all.

9   Q    And why not?

10  A    Well, the plan was -- the projections are for the plan,

11  and they contain assumptions.  And it was clear in the plan

12  that those assumptions could change.  So the value of the

13  assets, which aren't static, does change.  The costs aren't

14  static.  They do change.  The amount of the claims, the

15  denominator, was not static and would change.

16  Q    Okay.  And were the -- were the changes in the claims, for

17  example, changes that were all subject to public viewing, as

18  the Court ruled on 3018, as the settlement with HarbourVest

19  was announced?

20  A    Well, the plan -- the terms of the plan made clear that

21  the Class 8 claims would -- would be whatever the final

22  amounts of those claims were going to be.  We did resolve the

23  claims of HarbourVest and then ultimately the settlement

24  announced today, but in front of -- in front of the world, in

25  front of the Court, with a 9019 motion.

Seery - Direct                                  167

1   Q    Okay.  We had finished up with some questioning about the

2   gatekeeper and the injunction provision.  Do you recall that?

3   A    Yes, I do.

4   Q    And you had testified as to the reasons why the Debtor was

5   seeking that particular protection.  Do you recall that?

6   A    Yes.

7   Q    In the absence of that protection, does the Debtor have

8   any concerns that interference by Mr. Dondero could adversely

9   impact the timing of the Debtor's plan?

10  A    Well, that's my opinion and what I testified to before.  I

11  think the -- the injunction -- the exculpation, the

12  injunction, and the gatekeeper are really critical and

13  essential elements of this plan, because we have to have the

14  ability, unfettered by litigation, particularly vexatious

15  litigation in multiple jurisdictions, we have to be able to

16  avoid that and be able to focus on monetizing the assets and

17  try to maximize value.

18  Q    Is there a concern that that value would erode if

19  resources and time and attention are diverted to the

20  litigation you've just described?

21  A    Absolutely.  The focus of the team has to be on the

22  assets' monetization, creative ways to get the most value out

23  of those assets, and not on defending itself, trying to paper

24  up some sort of litigation defense against vexatious

25  litigation, and also spending time actually defending

Seery - Direct                                         168

1  ourselves in various courts.

2  Q    Okay.  Last couple of questions.  If there was no

3  gatekeeper provision in the plan, would you accept appointment

4  as the Claimant Trustee?

5  A    You broke up.  No which provision?

6  Q    If there was no gatekeeper provision in the -- in the

7  confirmation order, would you accept the position as Claimant

8  Trustee?

9  A    No, I wouldn't.  Just -- just like when I came on, there

10 were -- there are some pretty essential elements that I

11 mentioned before.  One is indemnification.  Two is directors

12 and officers insurance.  And three was a gatekeeper function.

13 I want to make sure that we're not at risk, that I'm not at

14 risk, for doing my job.

15 Q    And I think you just said it, but if you were unable to

16 obtain D&O insurance, would you accept the position as

17 Claimant Trustee?

18 A    No, I would not.

19         MR. MORRIS:  I have no further questions, Your Honor.

20         THE COURT:  All right.  So, you went two hours and 34

21 minutes in total with your direct.  So we'll now pass the

22 witness for cross.  And the Objectors get an aggregate of two

23 hours and 34 minutes.

24    Who's going to go first?

25         MR. RUKAVINA:  Your Honor, Davor Rukavina.  I will.

Seery - Direct                                          169

 1          THE COURT:  Okay.  Go ahead.

 2          MR. RUKAVINA:  Mr. Vasek, if you can pull up Exhibit

 3   6N, the ballot summary, Page 7 of 15 on the top.

 4          MR. POMERANTZ:  Mr. Morris, you're not on mute.

 5          MR. MORRIS:  Thank you, sir.

 6          MR. RUKAVINA:  Mr. Vasek, did you hear me?  There it

 7   is.

 8                          CROSS-EXAMINATION

 9   BY MR. RUKAVINA:

10   Q    Mr. Seery, are you familiar with this ballot tabulation

11   that was filed with the Court and that has been admitted into

12   evidence?

13   A    Yes, I believe I've seen this.

14   Q    Okay.  And this says that 31 Class 8 creditors rejected

15   and 12 Class 8 creditors accepted the plan, correct?

16   A    That's correct.

17   Q    And since then, I think we've heard that Mr. Daugherty and

18   maybe two other employees have changed their vote to an

19   accept; is that correct?

20   A    That's correct, yes.

21   Q    Okay.  Other than three, those three employees that are

22   changing, do you know of any other Class 8 creditors that are

23   changing their votes?

24   A    Mr. Daugherty is not an employee.

25   Q    I apologize.  Other than those three Class 8 creditors

Seery - Cross                                    170

1   that are changing their votes, do you know of any other ones

2   that are changing their votes?

3   A    No.

4   Q    Okay.  You didn't tabulate the ballots, did you?

5   A    No, I did not.

6   Q    Do you have any reason to question the accuracy of this

7   ballot summary that's been filed with the Court?

8   A    No, I do not.

9   Q    Okay.  You mentioned that many of the people that rejected

10  the plan are former employees who you don't think will

11  ultimately have allowed claims, correct?

12  A    Not ultimately.  I said they don't have them now.

13  Q    Okay.  Are you aware that the Court ordered that

14  contingent unliquidated claims be allowed to vote in an

15  estimated amount of one dollar?

16  A    I'm aware of that, yes.

17  Q    Okay.  All right.  Now, no motion to reconsider that order

18  has been filed, correct?

19  A    Not to my knowledge.

20  Q    Okay.  No objection to these rejecting employees' claims

21  have been filed yet, correct?

22  A    Correct.

23  Q    Okay.  And no motion to strike or designate their vote has

24  been filed as of now, correct?

25  A    Correct.

Seery - Cross                              171

1            MR. RUKAVINA:  You can take down that exhibit, Mr.

2     Vasek.

3     BY MR. RUKAVINA:

4     Q    Mr. Seery, the Debtor itself is a limited partnership; I

5     think you confirmed that earlier, correct?

6     A    Correct.

7     Q    And its sole general partner is Strand Advisors, Inc.,

8     correct?

9     A    Correct.

10    Q    And to your understanding, the Debtor, as a limited

11    partnership, is managed by its general partner, correct?

12    A    Correct.

13    Q    Okay.  And Strand, that's where the independent board of

14    you, Mr. Nelms, and Mr. Dubel -- or I apologize if I'm

15    misspelling, misstating his name -- that's where the board

16    sits, at Strand, correct?

17    A    Yes.

18    Q    Okay.  And that board has been in place since about

19    January 9, 2020?

20    A    Yes.

21    Q    Okay.  Strand is not a debtor in bankruptcy, correct?

22    A    No.

23    Q    Okay.  Do you have any understanding as to whether, under

24    non-bankruptcy law, a general partner is liable for the debts

25    of the limited partnership that it manages?

Seery - Cross                                     172

1   A    I do.

2   Q    Okay.  What's your understanding?

3   A    Typically, a general partner is liable for the debts of

4   the partnership.

5   Q    Okay.  And under the plan, Strand itself is an exculpated

6   party and a protected party and a released party for matters

7   arising after January 9, 2020, correct?

8   A    Yes.

9   Q    Okay.  You mentioned that you're the chief executive

10  officer and chief restructuring officer in this case for the

11  Debtor, correct?

12  A    For the Debtor, yes.

13  Q    Yeah.  You are not a Chapter 11 trustee, right?

14  A    No.

15  Q    Okay.  You are one of the principal authors of this plan,

16  correct?

17  A    Consultant.

18            MR. MORRIS:  Objection to the form of the question.

19            THE COURT:  Sustained.

20  BY MR. RUKAVINA:

21  Q    You are --

22            THE COURT:  Sustained.

23  BY MR. RUKAVINA:

24  Q    You are --

25            THE COURT:  Rephrase.

Seery - Cross                          173

1  BY MR. RUKAVINA:

2  Q   -- one of the principal --

3       MR. RUKAVINA:  I apologize.

4  BY MR. RUKAVINA:

5  Q   You had input in creating this plan, didn't you?

6  A   I did, yes.

7  Q   Okay.  And you're familiar with the plan's provisions,

8  aren't you?

9  A   Yes.

10 Q   Okay.  And you, of course, approve of the plan, correct?

11 A   Yes.

12 Q   Okay.  And you are, of course, familiar generally with

13 what the property of the estate currently is, correct?

14 A   Yes.

15 Q   Okay.  And part of the purpose of the plan, I take it, is

16 to vest that property in the Claimant Trust in some respects

17 and the Reorganized Debtor in some respects, correct?

18 A   I don't -- I don't know if that's a fair characterization.

19 Some property -- maybe some property will stay with the

20 Debtor, some will be transferred directly to the Trust.

21 Q   Okay.  All property of the estate as it currently exists

22 will stay with the Debtor or go to the Trust, correct?

23 A   Yes.

24 Q   Okay.  And under the plan, the Creditor Trust will be

25 responsible for payment of prepetition claims, correct?

1  A    Yes.

2  Q    And under the plan, the Creditor Trust will be responsible

3  for the payment of postpetition pre-confirmation claims,

4  correct?

5  A    Do you mean admin claims?  I don't --

6  Q    Sure.

7  A    I don't understand your question.  I'm sorry.

8  Q    Yes.  We can call them admin claims.

9  A    Yeah.  Those -- they'll be -- they will be paid on the

10 effective date or in and around that time.  So I'm not sure if

11 that's actually going to be from the Trust, but I think it's

12 actually from the Debtor, as opposed to from the Trust.

13 Q    Okay.  But after the creation of the Claimant Trust, --

14 A    Uh-huh.

15 Q    -- whatever administrative claims are not paid by that

16 time will be assumed by and paid from the Claimant Trust,

17 correct?

18 A    I don't recall that specifically.

19 Q    Is it your testimony that the Reorganized Debtor will be

20 obligated post-effective date of the plan to pay any admin

21 claims that are then unpaid?

22        MR. MORRIS:  Objection to the form of the question.

23        THE COURT:  Sustained.  Rephrase.

24 BY MR. RUKAVINA:

25 Q    Who pays unpaid admin claims under the plan once the plan

Seery - Cross                            175

1   goes effective?

2   A    I believe the Debtor does.  The Reorganized Debtor.

3   Q    Okay.  The Reorganized Debtor also gets a discharge,

4   correct?

5   A    Yes.

6   Q    Okay.  And there is no bankruptcy estate left after the

7   plan goes effective, correct?

8            MR. MORRIS:  Objection to the form of the question.

9            THE COURT:  Overruled.

10           MR. RUKAVINA:  Your Honor, I have the right to know

11  what the objection to my question is.

12           THE COURT:  I overruled.

13           MR. MORRIS:  Okay.

14           THE COURT:  I overruled the objection.

15           MR. RUKAVINA:  Thank you.

16  BY MR. RUKAVINA:

17  Q    Mr. Seery, do you remember my question?

18  A    That whether there was a bankruptcy estate after the

19  effective date?

20  Q    Yes.

21  A    There wouldn't be a bankruptcy estate anymore, no.

22  Q    Okay.  Under the plan, the creditors, to the extent that

23  they have their claims allowed, the prepetition creditors,

24  they're the beneficiaries of the Claimant Trust, correct?

25  A    They are some of the beneficiaries, yes.

Seery - Cross                                  176

1  Q    Okay.  And you would be the Trustee, I think you said, of

2  the Claimant Trust?

3  A    Of the Claimant Trust, yes.

4  Q    Okay.  And you will have fiduciary duties to the

5  beneficiaries of the Claimant Trust, correct?

6  A    I believe I have some, yes.

7  Q    Okay.  Well, as the Trustee, you will have some fiduciary

8  duties; you do agree with that?

9  A    That's what I said, yes.

10 Q    Okay.  What's your understanding of what those fiduciary

11 duties to the beneficiaries of the Claimant Trust will be?

12 A    I think they'll be -- they are cabined to some degree by

13 the provisions of the agreement, but generally there will be a

14 duty of care and a duty of loyalty.

15 Q    Do you feel like you'll have a duty to try to maximize

16 their recoveries?

17 A    That depends.

18 Q    On what?

19 A    My judgment on what's the -- if I'm exercising my duty of

20 care and my duty of loyalty.

21 Q    Okay.  But surely you'd like to, whether you have a duty

22 or not, you'd like to maximize their recoveries as Trustee,

23 wouldn't you?

24 A    Yes.

25 Q    Okay.  Now, in addition to the beneficiaries, which I

Seery - Cross                            177

1   believe are the Class 8 and Class 9 creditors, the plan

2   proposes to give non-vested contingent interests in the Trust

3   to certain holders of limited partnership interests, correct?

4   A    Yes.

5   Q    Okay.  And those non-vested contingent interests would

6   only be paid and would only vest if and when all unsecured

7   creditors and subordinated creditors are paid in full, with

8   interest, correct?

9   A    Yes.

10  Q    Okay.  And those non-vested contingent interests are a

11  property interest, although they're an inchoate property

12  interest, correct?

13  A    I don't know.  I think I testified in my deposition that I

14  -- I reached for inchoate, but I'm not an expert in the

15  definitions of property interests.  I don't know if they're

16  too ethereal to be considered a property interest.

17  Q    Okay.

18        MR. RUKAVINA:  Mr. Vasek, will you please pull up Mr.

19  Seery's deposition at Page 215?  And if you'll go to Page 200

20  -- can you zoom -- can you zoom that in a little bit?  Mr.

21  Vasek, can you zoom on that?

22        MR. VASEK:  Just a moment.  There's some sort of

23  issue here.

24        MR. RUKAVINA:  Okay.  And then go to Page 216.

25  Scroll down to 216, please.

1           MR. VASEK:  Okay.  I can't see it, so --

2           MR. RUKAVINA:  Okay.  Stay, stay where you are.  Go

3    down one more row.

4    BY MR. RUKAVINA:

5    Q    Okay.  Mr. Seery, can you see this?

6    A    Yes.

7    Q    Okay.  So, I ask you on Line 21, "They may be a property

8    interest, but inchoate only, correct?"  And you answer, "That

9    is my belief.  I don't claim to be an expert on the different

10   types of property interests," --

11          MR. RUKAVINA:  Mr. Vasek, can you go to the next

12   page?

13   BY MR. RUKAVINA:

14   Q    (continues) "-- whether they be inchoate, reversionary,

15   ethereal.  I don't claim to be an expert on the different

16   types of property interests."

17        Do you see that answer, sir?

18   A    Yes.

19   Q    And do you stand by your answer given on Lines 23 through

20   Line 4 of the next page?

21   A    Yes.

22   Q    Okay.  And these non-vested contingency -- contingent

23   interests in the Claimant Trust, they may have some value in

24   the future, correct?

25   A    Yes.

Seery - Cross                                       179

1           MR. RUKAVINA:  Okay.  You can take that down, Mr.

2    Vasek.

3    BY MR. RUKAVINA:

4    Q    Have you tried to see whether anyone outside this case, or

5    anyone at all, would pay anything for those unvested

6    contingent interests to the Claimant Trust?

7    A    No.

8    Q    Okay.  Now, the Debtor is a registered investment advisor

9    under the Investment Advisers Act of 1940; is that correct?

10   A    That's correct.

11   Q    And under that Act, the Debtor owes a fiduciary duty to

12   the funds that it manages and to the investors of those funds,

13   correct?

14   A    Clearly to the funds, and generally to the investors more

15   broadly, yes.

16   Q    Okay.  And would you agree that that duty compels the

17   Debtor to look for the interests of the funds and the

18   investors of those funds ahead of its own interests?

19   A    Generally, but it's a much more fine line than what you're

20   describing.  It means you can't -- the manager can't put its

21   own interests in front of the investors and the funds.  It

22   doesn't mean that the manager subordinates its interest in the

23   -- to the investors and the funds.

24           MR. RUKAVINA:  Well, Mr. Vasek, please pull up the

25   October 20th transcript at Page 233.

Seery - Cross                                180

1          MR. MORRIS:  What transcript is this?

2          MR. RUKAVINA:  October 20, 2019.  Mr. Vasek has the

3    docket entry.

4          MR. MORRIS:  Oh, so it's the -- Your Honor, I just do

5    want to point out that Mr. Rukavina objected, in fact, to the

6    use of trial transcripts, but we'll get to that when we put on

7    our evidence, when we finish up.

8          MR. RUKAVINA:  Well, Your Honor, I believe that

9    you're allowed to use a trial transcript to impeach testimony,

10   which is what I'm going to do now.

11      So, for that purpose, Mr. Vasek, if you could -- are you

12   on Page 233?

13          THE COURT:  And just so the record is clear, this is

14   from October 2020, not October 2019, which is, I think, what I

15   heard.  Continue.

16          MR. MORRIS:  Your --

17          MR. RUKAVINA:  Your Honor, I apologize, you did hear

18   that and I did make a mistake.  Yes, this is at Docket 1271.

19      Mr. Vasek, if you'll scroll down, please.  Okay.  No, stop

20   there.

21   BY MR. RUKAVINA:

22   Q    And you see on Line 16, sir, you're asked your

23   understanding, and then you answer, "Okay."  "And in

24   exercising those duties, the manager, under the Advisers Act,

25   has a duty to subordinate its interests to the interests of

Seery - Cross                                    181

1   those investors in the CLOs, correct?"  And you answer --

2              MR. RUKAVINA:  Go down, Mr. Vasek.

3   BY MR. RUKAVINA:

4   Q    -- "I think -- I think, generally, when you think about

5   the fiduciary duty, and I think that we -- I want to make sure

6   I'm very specific about this, is that the manager has a duty,

7   fiduciary duties -- there's a whole bunch of legal analysis of

8   what they are, but they are significant -- that the manager

9   owes to the investors.  And to the extent" --

10             MR. RUKAVINA:  Scroll down, please.

11  BY MR. RUKAVINA:

12  Q    "And to the extent that the manager's interests would

13  somehow be -- somehow interfere with the investors' in the

14  CLO, he is supposed to -- he or she is supposed to subordinate

15  those to the benefit of the investors."

16       Did I read that accurately, Mr. Seery?

17  A    You did.

18  Q    Was that your testimony on October 20th last?

19  A    Yes.

20  Q    Okay.  Are you willing to revise your testimony from a few

21  minutes ago that the manager does not have to subordinate its

22  interests to the interests of the investors?

23  A    No.  I think that's very similar.

24  Q    Okay.

25  A    You left out the part about garbled up top where I said it

Seery - Cross                           182

1   was nuanced, almost exactly what I just said.  On Line 9, I

2   believe, on the prior page.

3   Q    Well, I heard you say a couple of minutes ago, and maybe I

4   misunderstood because of the WebEx nature, that the manager

5   does not have to subordinate its interests to the interests of

6   the investors.  Did I misheard you say that a few minutes ago?

7   A    I think you misheard it.  I said it's a nuanced analysis,

8   and it's -- it's pretty significant.  But the manager does

9   subordinate his general interest and assures that the CLO or

10  any of the investors' interests are paramount, but he doesn't

11  subordinate every single interest.

12      For example, and I think it's in this testimony, the

13  manager, if the fund isn't doing well, doesn't just have to

14  take his fee and not get paid.  He's allowed -- entitled to

15  take his fee.  He doesn't subordinate every single interest of

16  his.  He doesn't give up his home and his family.  So it's --

17  it's a nuanced analysis.  The interests of the manager are

18  subordinated to the interests of the investors and the fund.

19  I don't -- I don't disagree with anything I said there.  I

20  think I'm consistent.

21  Q    Okay.

22          MR. RUKAVINA:  You can take that down, Mr. Vasek.

23  BY MR. RUKAVINA:

24  Q    So, how do you describe, sir, the fiduciary duty that the

25  Debtor owes to the funds that it manages and to the investors

Seery - Cross                    183

1  in those funds?

2          MR. MORRIS:  Objection to the -- to the extent it

3  calls for a legal conclusion, Your Honor.  I just want to make

4  sure we're -- we're asking a witness for his lay views.

5          THE COURT:  Okay.  I overrule the objection.  He can

6  answer.

7          THE WITNESS:  Yes.  As a manager of a fund, the

8  manager is a fiduciary to the fund, and sometimes to the

9  investors, depending on the structure of the fund.  Some funds

10 are purposely set up where the investors are actually debt-

11 holders, and their interests are much more cabined by the

12 terms of the contract, as opposed to straight equity holders.

13 But the manager has a duty to seek to maximize value of the

14 assets in the best interests of the underlying -- of the fund

15 and the underlying investors, to the extent that it can,

16 within the confines and structure of the fund.

17 BY MR. RUKAVINA:

18 Q   Okay.  And these duties as you just described them, they

19 would apply to the Reorganized Debtor, correct?

20 A   They would apply to the Reorganized Debtor to the extent

21 that it's a manager for a fund, not, for example, with respect

22 to necessarily interests -- the inchoate interests that we

23 talked about earlier.

24 Q   Sure.  And I apologize, I meant just for the fund.  And if

25 the manager, the Reorganized Debtor, breaches those duties,

Seery - Cross                                              184

1  then it's possible that there's going to be liability,

2  correct?

3  A    It's possible.

4  Q    Okay.  Now, under the plan, the limited partnership

5  interests in the Reorganized Debtor will be owned by the

6  Claimant Trust, correct?

7  A    Yes.

8  Q    Okay.  And there's a new entity called New GP, LLC that

9  will be created or already has been created, correct?

10 A    Yes.

11 Q    Okay.  And that entity will hold the general partnership

12 interest in the Reorganized Debtor, correct?

13 A    I believe that's correct.

14 Q    Okay.  And that entity -- that being New GP, LLC -- will

15 also be owned by the Claimant Trust, correct?

16 A    Yes.

17 Q    Okay.  Who will manage the Reorganized Debtor?

18 A    The G -- the GP will manage the Reorganized Debtor.

19 Q    Okay.  And will there be an officer or officers of the

20 Reorganized Debtor, or will it all be managed through the GP?

21 A    It'll be managed through the GP.

22 Q    Okay.  And who will manage the GP?

23 A    Likely, I will.

24 Q    Okay.  That's the current plan, that you will?

25 A    I'll be the Claimant Trustee, and I believe that I'll be

Seery - Cross                                185

1   responsible for any assets that remain in the Reorganized

2   Debtor, yes.

3   Q   Okay.  Right now, the Debtor is managing its own assets as

4   the Debtor-in-Possession, right?

5   A   Yes.

6   Q   And it is managing various funds and CLOs, right?

7   A   Yes.

8   Q   Okay.  And right now, the Debtor is attempting to reduce

9   some of its assets to money, like the promissory notes that

10  you mentioned earlier that the Debtor filed suit on, correct?

11  A   Yes.

12  Q   And the Debtor is trying to reduce some of its assets to

13  money, like the promissory notes, to benefit its creditors,

14  correct?

15  A   Yes.

16  Q   Okay.  And correct me if I'm wrong, but the Committee has

17  filed various claims and causes of action against Mr. Dondero,

18  correct?

19  A   They -- they've filed some.  I haven't -- I haven't looked

20  at their (indecipherable) closely, but --

21  Q   Okay.

22  A   -- some are preserved in the case.

23  Q   You understand --

24  A   In the plan.  I'm sorry.

25  Q   You understand that the Committee is doing that for the

Seery - Cross                                  186

1   benefit of the estate, correct?

2   A    Yes.

3   Q    And you understand that they're also doing that for the

4   benefit of creditors, correct?

5   A    Yes.

6   Q    Okay.  And under the plan, just so that I'm clear, those

7   claims that the Committee has asserted will be preserved and

8   will vest in either the Claimant Trust or the Litigation Sub-

9   Trust, correct?

10  A    Yes.

11  Q    Okay.  And under the plan, the Reorganized Debtor would

12  continue to manage its assets, correct?

13  A    Yes.

14  Q    And it would continue to manage the Funds and the CLOs,

15  correct?

16  A    Yes.

17  Q    And the Claimant Trust would attempt to liquidate and

18  distribute to its beneficiaries the assets that are

19  transferred to it, correct?

20  A    Yes.

21  Q    Okay.  And you mentioned that the Claimant Trust will have

22  an Oversight Board comprised of five members, right?

23  A    Yes.

24  Q    And four of them will be the people that are currently on

25  the Committee, right?

Seery - Cross                            187

1   A    Yes.

2   Q    And the fifth is David Pauker, and I think you mentioned

3   that he's independent.  David Pauker is the fifth member,

4   right?

5   A    Yes.

6   Q    Who -- who is he?

7   A    David Pauker is a very well-known professional in the

8   restructuring world.  He's a long-time financial advisor in --

9   in reorganizations.  He's served on numerous boards in

10  restructuring -- restructurings.

11  Q    Okay.  So, other than a different corporate structure and

12  the Claimant Trust, the monetization of assets for the benefit

13  of creditors would continue post-confirmation as now, correct?

14  A    I -- I believe so.  I'm not exactly sure what you asked

15  there.

16  Q    No one is putting in any new money under the plan, are

17  they?

18  A    No.  No.

19  Q    Okay.  There's no exit financing contingent on the plan

20  being confirmed, right?

21  A    You mean no exit -- the plan is not contingent on exit

22  financing.  I think you just mixed up your -- your financing

23  and your plan.

24  Q    I apologize.  There's no exit financing in place today,

25  correct?

Seery - Cross                           188

1   A    No.
2   Q    Okay.  So, post-confirmation, you are basically going to
3   continue managing the CLOs and funds and trying to monetize
4   assets for creditors the same as you are today, correct?
5   A    Similar, yes.
6   Q    Okay.  And just like the Committee has some oversight role
7   in the case, the members of the Oversight Board will have some
8   oversight role post-confirmation, correct?
9   A    Yes.
10  Q    Okay.  You don't need anything in the plan itself to
11  enable you to continue managing the Debtor and its assets,
12  correct?
13  A    I don't need anything in the plan?
14  Q    Correct.
15  A    I don't -- I don't understand the question.  Can you
16  rephrase it?
17  Q    Well, you are managing the Debtor and its assets today,
18  correct?
19  A    Yes.
20  Q    Okay.  Nothing in the plan is going to change that,
21  correct?
22  A    Well, it's going to change it a lot.
23  Q    Okay.  Well, with respect to you managing the Funds and
24  the CLOs, you don't need anything in the plan that you don't
25  have today to keep managing them, do you?

Seery - Cross                                    189

1   A    No.  The Debtor manages them, and I will -- I'm the CEO

2   and I'll be in a similar position with a different team.

3   Q    Okay.  And I believe you told me that you expect the

4   Debtor to administer the CLOs for two or three years, maybe?

5   A    However long it takes, but we expect -- our projections

6   are that we'd be able to monetize most of the assets within

7   two years.

8   Q    Does that include the CLOs?

9   A    It does, yes.

10  Q    Okay.  Now, you're going to be the person for the

11  Reorganized Debtor in charge of managing the CLOs, correct?

12  A    I'll be the person responsible for managing the

13  Reorganized Debtor.  The Reorganized Debtor will be the

14  manager of the CLOs.

15  Q    Okay.  But the buck will stop with you at the Reorganized

16  Debtor, right?

17  A    Yes.

18  Q    Okay.  You're going to have a team of employees and

19  outside professionals helping you, but ultimately, on behalf

20  of the Reorganized Debtor, you're going to be the one in

21  charge of managing the CLOs, correct?

22  A    Yes.

23  Q    Okay.  That means that you'll also be making decisions as

24  to when to sell assets of the CLOs, correct?

25  A    Yes.

Seery - Cross                                    190

1  Q    Okay.  And to be clear, the CLOs, they own their own

2  assets, whatever they are, and the Debtor just manages those

3  assets, right?

4  A    Correct.

5  Q    The Debtor doesn't directly own those assets, right?

6  A    No.

7  Q    And currently there's more than one billion dollars in CLO

8  assets that the Debtor manages?

9  A    Approximately.

10 Q    Yeah.  And the Debtor receives fees for its services,

11 correct?

12 A    Yes.

13 Q    Can you generally describe how the amount of those fees is

14 calculated and paid, if you have an understanding?

15 A    How the fees are calculated and paid?

16 Q    Yes, sir.

17 A    It's a percentage of the assets.

18 Q    Assets administered or assets sold in any given time

19 period?

20 A    Administered.

21 Q    Okay.  So the sale of CLO assets does not affect the fees

22 that the Reorganized Debtor would receive under these

23 agreements?

24         MR. MORRIS:  Objection to the form of the question.

25         THE COURT:  Over --

Seery - Cross                                191

1          THE WITNESS:  That's not correct.

2          THE COURT:  Overruled.

3   BY MR. RUKAVINA:

4   Q   Okay.  What is not correct about that?

5   A   When you sell the assets, the amount administered shrinks,

6   so you have less fees.

7          MR. RUKAVINA:  Your Honor, the answer cut out at the

8   very end.  You have less--?

9          THE WITNESS:  Fees.

10  BY MR. RUKAVINA:

11  Q   Fees?  I understand.  Okay.  So are you saying that there

12  is a disincentive to the Reorganized Debtor to sell assets in

13  the CLOs?

14  A   No.

15  Q   Okay.  Is there an incentive to the Reorganized Debtor to

16  sell assets in the CLOs?

17  A   To do their job correctly, yes.

18  Q   Okay.  And the Debtor wishes to assume those contracts

19  because the Debtor will get those fees going forward and

20  there'll be a profit, even after the expenses of servicing

21  those contracts are taken out, correct?

22  A   They are profitable. That's one of the reasons that we're

23  assuming, yes.

24  Q   Okay.  Now, over my objection, you testified that the CLOs

25  have agreed to the assumption of these contracts, right?

                    Seery - Cross                    192

1   A    Yes.

2   Q    Okay.  Is there anything in the record other than your

3   testimony here today demonstrating that?

4   A    I believe there is, yes.

5   Q    What do you believe there is in the record other than your

6   testimony?

7   A    I believe we filed a notice of assumption.

8   Q    Okay.  My question is a little bit different.  You

9   testified that the CLOs, over my objection, have agreed to the

10  assumption.  You did testify so, right?

11  A    Yes.

12  Q    Okay.  What is there in the record, sir, from the CLOs

13  confirming that?

14  A    You mean today's record?

15  Q    Yes, sir.

16  A    I'm the only one who's testified so far.

17  Q    Okay.  Are you aware of anything in the exhibits that

18  would confirm your testimony?

19  A    Not that I know of.

20  Q    Has there been an agreement with the CLOs that's been

21  reduced to writing?

22  A    Yes.

23  Q    So there is a written agreement with the CLOs providing

24  for assumption?

25  A    Yes.

Seery - Cross                          193

1  Q    A signed, written agreement?

2  A    No, it's -- it's email.

3  Q    Okay.  When was this email agreement reached?

4  A    Within the last couple weeks.  There's a number of back

5  and forths where that was agreed to, and I believe we filed a

6  notice of assumption.

7          MR. RUKAVINA:  Mr. Vasek, if you will please pull up

8  Mr. Seery's January 29th deposition.

9  BY MR. RUKAVINA:

10  Q    Mr. Seery, you remember me deposing you last Friday,

11  correct?

12  A    Yes.

13  Q    And you remember me asking you if there was a written

14  agreement in place with the CLOs?

15  A    I don't recall specifically.

16          MR. RUKAVINA:  Okay.  Mr. Vasek, if you would please

17  scroll to that.  Okay.  Stop there.

18  BY MR. RUKAVINA:

19  Q    Sir, you'll recall I also deposed you January 20th, right?

20  A    Yes.

21  Q    Okay.  And do you remember that we had some discussion

22  regarding whether the CLOs would consent or not?

23  A    Yes.

24  Q    Okay.  And do you remember telling me something like that

25  like you think that they will and that's still in the works on

Seery - Cross                                194

1  January 20th?

2  A   I don't recall specifically, but if you say that's what it

3  says.

4  Q   Okay.  Well, here I'm asking you on January 29th, Line 17,

5  "I asked you before and you didn't have anything in writing by

6  then, so let me ask now.  As of today, do you have anything in

7  writing from the CLOs consenting to the assumption of those

8  management agreements?"  I'm sorry.  Contracts.  Answer, "I

9  don't believe that I do.  It could be on my email I opened.  I

10 don't recall."

11        MR. RUKAVINA:  Scroll down, Mr. Vasek.

12 BY MR. RUKAVINA:

13 Q   Okay.  Then I ask, "Do you have an understanding of

14 whether those CLOs have consented in writing to the assumption

15 of the management agreements?"  And you answer, "I believe

16 they have.  The actual final docs haven't been completed, but

17 I believe they have agreed in writing, yes."

18        Then I ask --

19        MR. RUKAVINA:  Scroll down a little bit more.

20 BY MR. RUKAVINA:

21 Q   I ask, "Do you expect the final docs to be completed

22 before Tuesday's confirmation hearing?"  Answer, "I don't know

23 whether they will be done by Tuesday."

24        Did I read all of that correctly, sir?

25 A   Other than your misstatement.  The word was "unopened."

Seery - Cross                                    195

1  Q    Thank you.  So, let me ask you again today.  As of today,

2  is there a written agreement that has been signed by the

3  parties providing for the assumption of the CLO agreements?

4  A    When phrased the way you did, is it signed by the parties,

5  no.

6  Q    Okay.

7          MR. RUKAVINA:  You can take that down, Mr. Vasek.

8  BY MR. RUKAVINA:

9  Q    I think -- I'm not sure if you quantified this earlier,

10 but it might help.  I believe that the Reorganized Debtor

11 projects that it will generate revenue of $8.269 million post-

12 reorganization from managing the CLO contracts, correct?

13 A    It's in that neighborhood.  I did not testify to that

14 earlier.

15 Q    That's what I meant.  And when I asked you at deposition,

16 you were able to give me an estimate of how much it would cost

17 to generate that revenue, correct?

18 A    I was not?

19 Q    You were?  I'm sorry.  Let me --

20 A    Did you say I wasn't or I was?

21 Q    Let me -- I apologize.  Let me ask again.  I talk too fast

22 and I have an accent.  You have been able to give an estimate

23 of how much the Reorganized Debtor will expend to generate

24 that revenue, correct?

25 A    Yes.

Seery - Cross                                    196

1   Q    Okay.  Do you remember what your estimate is?

2   A    I -- I think it was around $2 million a year.  It was a

3   portion of our employees plus the contracts.

4   Q    Okay.  So, over the life of the projection at $8.2

5   million, do you remember that you projected costs of about

6   $3.5 to $4 million to generate that revenue?

7   A    If -- if you are representing that to me, I'd accept it.

8   Yes, that sounds about right.

9   Q    Well, suffice it to say you're projecting at least $4

10  million in net profit over the next two years for the

11  Reorganized Debtor from managing the CLO agreements, correct?

12  A    Net profit is not a fair, fair way to analyze it, no.

13  Q    Okay.  Are you projecting any profit for the Reorganized

14  Debtor from managing the CLO agreements post-confirmation?

15  A    Yes.

16  Q    Okay.  Do you have an estimate of what that profit is?

17  A    General overview are the contracts are profitable to about

18  the tune of $4 million over that period.

19  Q    Okay.  Thank you.  If the Reorganized Debtor makes a

20  profit post-confirmation, is it fair to say that that would

21  then be dividended up or distributed up to the partners,

22  ultimately to the Claimant Trust?

23  A    I don't think that's fair to say, no.

24  Q    Okay.  So, if the Reorganized Debtor makes a profit post-

25  confirmation, where does that profit go?

Seery - Cross                          197

1  A    The Reorganized Debtor -- what kind of profit?  I don't

2  understand your question.

3  Q    Okay.  I apologize if I'm being too simplistic about it.

4  If a business, after it takes account of its expenses to

5  generate revenue, has any money left over, would that be

6  profit to you?

7  A    Yes.

8  Q    Okay.  Do you think that the Reorganized Debtor, post-

9  confirmation, will make a profit?

10  A    I don't know.

11  Q    Okay.  Do you think that the Reorganized Debtor, post-

12  confirmation, will lose money?

13  A    I think there will be costs, and the costs will exceed the

14  -- the amount that it generates on an income basis, yes.

15  Q    Okay.  Thank you.

16        MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

17  the plan, the injunctions, and releases.  9F.

18      (Pause.)

19  BY MR. RUKAVINA:

20  Q    I apologize, Mr. Seery.

21        MR. RUKAVINA:  So, Mr. Vasek, if you'll go to the

22  bottom of the Page 51.  Stop there.

23  BY MR. RUKAVINA:

24  Q    So, I'm going to read just the first couple sentences

25  here, Mr. Seery, if you'll read it along with me.  Subject --

Seery - Cross                                      198

1   this is the bottom paragraph:  Subject in all respects to

2   Article 12(b), no enjoined party may commence or pursue a

3   claim or cause of action of any kind against any protected

4   party that arose or arises from or is related to the Chapter

5   11 case, the negotiation of the plan, the administration of

6   the plan, or property to be distributed under the plan, the

7   wind-down of the business of the Debtor or Reorganized Debtor.

8        I'd like to stop there.  Do you see that clause there, Mr.

9   Seery, talking about the wind-down of the business of the

10  Debtor or Reorganized Debtor?  Do you see that, sir?

11  A    Yes.

12  Q    Okay.  Do I understand correctly that this provision we've

13  just read means that, upon the assumption of these CLO

14  management agreements, if the counterparties to those

15  agreements want to take any action against the Reorganized

16  Debtor, they first have to go through this channeling

17  injunction?

18  A    I believe that's what it says, yes.

19  Q    Okay.  Because the wind-down of the business of the

20  Reorganized Debtor will include the management of these CLO

21  portfolio management agreements, correct?

22  A    Yes.

23  Q    Okay.  As well as the management of various funds that the

24  Debtor owns, correct?

25  A    Yes.

Seery - Cross                              199

1  Q    Okay.  And would you agree with me that the new general

2  partner, New GP, LLC, is also a protected party under the

3  plan?

4  A    I assume it is.  I don't recall specifically.

5  Q    I believe you discussed to some degree postpetition

6  losses.  I'd like to visit a little bit about those.  Since

7  January 9th, 2020, Mr. Dondero was not an officer of the

8  Debtor, correct?

9  A    Correct.

10  Q    And since January 9th, 2020, he was no longer a director

11  of Strand, correct?

12  A    That's correct.

13  Q    Since January 9th, 2020, until he was asked to resign, he

14  was an employee, correct?

15  A    Yes.

16  Q    And about -- I'm trying to remember.  About when did he

17  resign?  October something of 2020?  Do you remember?

18  A    I don't recall.

19  Q    Okay.  Do you recall if it was in October 2020?

20  A    It was in the fall.

21  Q    Okay.  And he resigned because the independent board asked

22  him to resign, correct?

23  A    Yes.

24  Q    Okay.  And you mentioned that the estate has had a

25  postpetition drop in the value of its assets and the assets

Seery - Cross                                    200

1   that it manages.  Right?

2   A    I believe I went through the estate's assets.  The only

3   asset that wasn't a direct estate asset was the hundred

4   percent control of Select Equity Fund.  I didn't talk about

5   the Fund assets.

6   Q    Okay.  Do you recall that the disclosure statement that

7   the Court approved states that, postpetition, there was a drop

8   from approximately $566 million to $328 million in the value

9   of Debtor assets and assets under Debtor management?

10  A    Yes.  That's the $200 million I walked through earlier.

11  Q    Okay.  And I believe you mentioned some of it was due to

12  the pandemic, right?

13  A    It certainly impacted the markets.  The pandemic didn't

14  cause a specific loss.  It impacted the markets and the

15  ability to work within those markets.

16  Q    But you also believe that Mr. Dondero was responsible for

17  something like a hundred million dollars of these losses,

18  right?

19  A    Probably more.

20  Q    Okay.  Mr. Dondero is not being released or exculpated for

21  that, is he?

22  A    No.

23  Q    And while Mr. Dondero was an employee during the period of

24  these losses, he answered to you as CEO and CRO, correct?

25  A    Not during that period.  I wasn't (audio gap) until later.

Seery - Cross                                    201

1   Q    I'm sorry.  As of January 9th, 2020, were you the CEO of

2   the Debtor?

3   A    No.

4   Q    When did you become the CEO of the Debtor?

5   A    I believe the order was July 9th, retroactive to a date in

6   March.

7   Q    July 9th, 2020?

8   A    Correct.

9   Q    Okay.  And when did you become the CRO of the Debtor?

10  A    At the same time.

11  Q    Okay.  So, between January and July 2020, you were one of

12  the independent directors, correct?

13  A    Yes.

14  Q    Okay.  So, during that period of time, would Mr. Dondero

15  have answered to that independent board?

16  A    Yes.

17  Q    Okay.  Now, if someone alleges that that independent board

18  has any liability on account of Mr. Dondero's losses, that's

19  released under this plan, isn't it?

20  A    Yes.

21  Q    Okay.  And if someone alleges that Strand has any

22  liability on account of Mr. Dondero's losses, that's released

23  under this plan, correct?

24  A    Yes.

25  Q    Okay.  And if someone believes that the Debtor -- that the

Seery - Cross                                    202

1   way that the Debtor has managed the CLOs or its funds

2   postpetition gives rise to a cause of action in negligence,

3   that's also released and exculpated in the plan, correct?

4   A    I believe it would be.  I'm not positive, but I believe it

5   would be.

6   Q    Well, let's be clear.  The plan does not release or

7   exculpate you or Strand or the board for willful misconduct,

8   gross negligence, fraud, or criminal conduct, correct?

9   A    No, it does not.

10  Q    Okay.  And I'm not, just so we're clear, I'm not alleging

11  that, okay?  So I want the judge to understand I'm not

12  alleging that.  But the plan does release and exculpate for

13  negligence, right?

14  A    Yes.

15  Q    Okay.  Where do you have an understanding a cause of

16  action for breach of fiduciary duty lies on the spectrum of

17  negligence all the way to criminal conduct?

18  A    It's -- it's not -- generally not criminal, although I

19  suppose that breach of fiduciary duty could be criminal.

20  Typically, it's negligence, and that you would breach a duty

21  for either duty of care, duty of loyalty.  But it could slide

22  to willful.  And probably most of the instances where they

23  come up are where someone has done something willfully or

24  grossly negligent.

25  Q    Okay.  But -- and I would agree with you.  But there are

Seery - Cross                                    203

1  certain breaches of fiduciary duty that are possible based on

2  simple negligence, correct?

3  A    They are, and in these instances, they don't -- they don't

4  rise to actionable claims because they're indemnified by the

5  funds.

6  Q    Okay.  You have to explain that to me.  So, the negligence

7  claim is not actionable because someone is indemnifying it?

8  A    Typically, there's no way to recover because it's

9  indemnified by the fund that the investor might be in.  If it

10 goes beyond that, then it wouldn't be.

11 Q    Okay.  So there are potential negligence breach of

12 fiduciary duty claims that might be subject to these

13 exculpations and releases that would not be indemnified?

14 A    Gross negligence and willful misconduct, certainly.

15 Q    Okay.  Now, post-confirmation, post-confirmation, if the

16 Debtor, or the Reorganized Debtor, rather, engages in

17 negligence or any actionable conduct, that's when the

18 channeling injunction comes into play, right?

19 A    I don't quite understand your question.

20 Q    Okay.

21 A    Can you repeat that?

22 Q    Sure.  To your understanding, does the channeling

23 injunction we're looking at right now -- and you can read it

24 if you need to -- does it apply to purely post-confirmation

25 alleged causes of action?

Seery - Cross                                          204

1   A    It does apply to those, yes.

2   Q    Okay.  And it says that the Bankruptcy Court will have

3   sole and exclusive jurisdiction to determine whether a claim

4   or cause of action is colorable, and, only to the extent

5   legally permissible and as provided for in Article 11, shall

6   have jurisdiction to adjudicate the underlying colorable claim

7   or cause of action.

8        Do you see that, sir?

9   A    I do.

10  Q    Okay.  And this -- the Bankruptcy Court's exclusive

11  jurisdiction here, that would continue after confirmation?  Is

12  that the intent behind the plan?

13  A    It has -- it says what it says.  Will have the sole and

14  exclusive jurisdiction to determine whether a claim is

15  colorable, and then, to the extent permissible, it'll have

16  jurisdiction to adjudicate.

17  Q    Okay.  Nothing in this plan limits the period of the

18  Bankruptcy Court's inquiry to the pre-confirmation time frame,

19  correct?

20  A    I don't believe it does, no.

21  Q    Okay.  Have you taken into account the potential that this

22  bankruptcy case will eventually be closed with a final decree?

23  A    Have I taken that into account?

24  Q    Well, do you know what a final decree in Chapter 11 is?

25  A    I do.

Seery - Cross                          205

1   Q    Okay.  So, help me understand.  If there's a final decree

2   and the bankruptcy case is closed, then who do I go to,

3   because the Bankruptcy Court has exclusive jurisdiction, to

4   get this clearing injunction cleared?

5             MR. MORRIS:  Objection to the form of the question,

6   Your Honor.

7             THE COURT:  Sustained.  Rephrase.

8             MR. RUKAVINA:  Okay.

9   BY MR. RUKAVINA:

10  Q    Is it the plan's intent, Mr. Seery, that this channeling

11  injunction that we just looked at would continue to apply even

12  after a point in time in which the bankruptcy case is closed?

13  A    I don't believe so.

14            MR. RUKAVINA:  Again, Your Honor, someone -- I heard

15  someone's phone right when he answered, and I didn't hear his

16  answer, if he could please re-answer.

17            THE WITNESS:  I don't -- I don't think if the case is

18  closed that's the intention.

19  BY MR. RUKAVINA:

20  Q    Okay.  What about if there's a final decree entered?

21            MR. MORRIS:  Objection, Your Honor.  You know, the

22  document kind of speaks for itself.

23            THE COURT:  Overruled.  He can answer if he knows.

24            THE WITNESS:  Yeah.  I don't -- I don't -- I'm not

25  making a distinction between the case being closed and the

 1  final decree.  I believe in both instances they'll be pretty

 2  close to the same time and we'll make a judgment then as to

 3  how to close the case in accordance --

 4  Q   Okay.

 5  A   -- with the rules.

 6        MR. RUKAVINA:  Mr. Vasek, if you'll please scroll up

 7  to the beginning of this injunction.  A little bit higher.

 8  Right there.  Right there.

 9  BY MR. RUKAVINA:

10  Q   The very first clause, Mr. Seery, if you'll read with me,

11  says, Upon entry of the confirmation order -- pardon me --

12  all enjoined parties are and shall be permanently enjoined on

13  and after the effective date from taking any actions to

14  interfere with the implementation or consummation of the

15  plan.

16        Do you see that, sir?

17  A   I do, yes.

18  Q   What does interfering with the implementation or

19  consummation of the plan mean?

20  A   It means in some way taking actions to upset, distract,

21  stop, or otherwise prohibit or hurt the estate from

22  implementing or consummating the plan.

23  Q   Okay.  And is that intended -- is that clause we just

24  read and you described intended to be very broad?

25  A   I -- I think it's -- if the words have meaning, yes, that

Seery - Cross                                    207

1   it should -- it's pretty broad.

2   Q    Okay.  Is the Debtor not able to state with more

3   specificity what it would believe interference with the

4   implementation or consummation of the plan would mean?

5            MR. MORRIS:  Objection to the form of the question.

6            THE COURT:  Sustained.

7            THE WITNESS:  I think it's -- I think it's --

8            THE COURT:  Sustained.

9            MR. RUKAVINA:  Okay.

10           THE WITNESS:  I'm sorry.

11  BY MR. RUKAVINA:

12  Q    Well, you just gave us four or five examples of what

13  interfering with the implementation or consummation of the

14  plan might be.  Why isn't that, those four or five examples,

15  why aren't they listed here?

16           MR. MORRIS:  Object to the form of the question.

17           MR. RUKAVINA:  Well, Your Honor, I'll withdraw it

18  and I'll argue this at closing argument.

19           THE COURT:  Okay.

20  BY MR. RUKAVINA:

21  Q    When did the Committee agree to you serving as the

22  Claimant Trustee?

23  A    In the late -- in the late fall.  I've been contemplated

24  to be the Claimant Trustee.  I'm willing to take -- if we can

25  come to an agreement.  They have their options open if we

Seery - Cross                                            208

1  can't come to an agreement on compensation.

2  Q   Okay.  And since the Committee agreed to you being the

3  Claimant Trustee, you have reached a resolution with UBS,

4  correct?

5  A   I don't think so.  I think that that was before UBS, the

6  UBS resolution was reached.

7  Q   I'm sorry.  When did you reach the UBS resolution in

8  principle with UBS?

9  A   I don't recall the exact date, but I do recall specific

10  conversations where some of the Committee members were

11  supportive.  I didn't know that UBS wasn't, but I assumed

12  that some meant not all.  And that was UBS, because I don't

13  think we had a deal yet.

14  Q   Well, let me ask the question in a little bit of a

15  different way.  Whenever the Debtor reached the agreement in

16  principle with UBS that your counsel described this morning,

17  whenever that point in time was, the Committee had already

18  agreed before that point in time to you serving as Claimant

19  Trustee, correct?

20  A   I believe so, yes.

21  Q   And is the answer the same with respect to the

22  HarbourVest settlement?

23  A   I believe so.  With HarbourVest, I believe so as well,

24  yes.

25  Q   What about the Acis settlement?

Seery - Cross                            209

1   A   I don't believe so.  I think Acis came first.  I don't

2   think we settled on an agreement on Claimant Trustee until

3   after the Acis -- certainly after the Acis agreement, maybe

4   not after the Acis 9019.  I just don't recall.

5   Q   Okay.  And the million-dollar cutoff for convenience

6   class creditors, that number was a negotiated amount with the

7   Committee, correct?

8   A   Yes.

9   Q   Okay.  Thank you, Mr. Seery.

10          MR. RUKAVINA:  Your Honor, I'll pass the witness.

11          THE COURT:  All right.  Just for purposes of time,

12  it's 3:00 o'clock, so you went 48 minutes.

13      Who's next?

14          MR. DRAPER:  Mr. Taylor is.

15          THE COURT:  All right.  Mr. Taylor, go ahead.

16          MR. TAYLOR:  Yes, Your Honor.  At this time, what we

17  would like the Court to do, we are asking for a brief

18  continuance and to go into tomorrow, and there is a reason

19  for that and I would like to explain it.

20      Mr. Dondero has communicated an offer which we believe to

21  be a higher and better offer than what the plan analysis,

22  even in its most recent iteration that was just changed last

23  night, will yield significantly higher recoveries.  Those are

24  guaranteed recoveries.  There is a cash component to that

25  offer.  There are some debt components, but they would be

Seery - Cross                    210

1    secured by substantially all of the assets of Highland.

2        We believe it's a higher and better offer, that the

3    creditors and the Creditors' Committee, Mr. Seery, who

4    obviously has been testifying all day on the stand, may have

5    heard some -- some inkling of it via a text or an email he

6    might have been able to glance at, or maybe not, because he's

7    been too busy, and that's understandable.

8        But we do believe it is a material offer.  It is a real

9    offer.  And for that reason, we would like to request the

10   Court's indulgence.  This has gone rather fast.  We believe

11   that in the event that it does not gain any traction, then we

12   could complete this confirmation hearing tomorrow, or it's

13   more than likely that we could.  And therefore we would

14   request a continuance until tomorrow morning beginning at

15   9:30 so all the parties can confer, consider that offer, and

16   see if it gains any traction.

17             THE COURT:  All right.

18             MR. POMERANTZ:  Your -- Your --

19             THE COURT:  Go ahead.  Mr. Morris?  Or who is going

20   to respond --

21             MR. POMERANTZ:  Your --

22             THE COURT:  -- to that?

23             MR. POMERANTZ:  Your Honor, this is Jeff --

24             THE COURT:  Mr. Pomerantz?

25             MR. POMERANTZ:  This is Jeff Pomerantz. I will

Seery - Cross                                         211

1  respond.

2      I think right at the beginning of the hearing, or

3  slightly after, I did receive an email from Michael Lynn

4  extending this offer.  The email was also addressed to Mr.

5  Clemente.  As we have told Your Honor before, if the Committee

6  is interested in continuing negotiations with Mr. Dondero, far

7  be it from us to stand in the way.

8      So what I would really ask is for Mr. Clemente to respond

9  to think if -- to see if he thinks that this offer is worthy.

10 If it's worthy and the Committee wants to consider it, we

11 would by all means support a continuance.  If it is not, I

12 think this is just a last-minute delay without a reason.  And

13 if there is no likelihood of that being acceptable or the

14 Committee wanting to engage, we would want to continue on.

15          THE COURT:  All right.  Mr. Clemente, what say you?

16          MR. CLEMENTE:  Yes.  Yes, Your Honor.  Matt Clemente

17 on behalf of the Committee.

18     Obviously, I haven't had a chance to confer with my

19 Committee members, but there's no reason to not continue the

20 confirmation hearing today.  I will be able to confer with

21 them over email, et cetera, this evening.  There's simply no

22 reason to not continue going forward at this particular point

23 in time, Your Honor.

24     So, although I haven't conferred with the Committee

25 members, that would be what I would recommend to them.  And so

Seery - Cross                                    212

1  my view, the Committee's view, I believe, would be let's

2  continue forward and we'll discuss Mr. Dondero's proposal that

3  I know came across after opening statements this morning, you

4  know, in due course. But I do not believe that a continuance

5  here is necessary or appropriate.

6          THE COURT: All right. Mr. Taylor, that request is

7  denied, so you may cross-examine.

8          MR. TAYLOR: Yes. (Pause.) I'm sorry, Your Honor.

9  I have a couple people that are in my ear. But yes, I'm ready

10 to proceed.

11         THE COURT: Okay.

12                    CROSS-EXAMINATION

13 BY MR. TAYLOR:

14 Q   Mr. Seery, I believe you can probably largely testify from

15 your memory of the various iterations of the plan analysis

16 versus the liquidation analysis. But to the extent that

17 you're unable to, we can certainly pull those up.

18     Mr. Seery, you put forth or Highland put forth on November

19 24th of 2020 a plan analysis versus a liquidation analysis,

20 correct?

21 A   I think that's the approximate date, yes.

22 Q   Okay. And do you recall what the plan analysis predicted

23 the recovery to general unsecured creditors in Class 8 would

24 be at that time?

25 A   I believe it was in the 80s.

Seery - Cross                                    213

1  Q    And approximately 87.44 percent?

2  A    That sounds close, yes.

3  Q    Okay.  And then just right before -- the evening before

4  your deposition that took place on January 29th, I believe a

5  revised plan analysis versus a liquidation analysis was

6  provided.  Do you remember that?

7  A    Yes.

8  Q    Okay.  And what was the predicted recovery to general

9  unsecured creditors under that analysis?

10 A    I believe that was --

11         MR. MORRIS:  Object to the form of the question.  I

12 just want to make sure that we're talking about the -- and

13 maybe I misunderstood the question -- plan versus liquidation.

14         THE COURT:  Okay.  Could you restate --

15         MR. TAYLOR:  I said plan analysis.

16         THE COURT:  Plan.

17         THE WITNESS:  I believe that that initially was in

18 the -- in the high 60s.

19 BY MR. TAYLOR:

20 Q    It was --

21 A    Might have been --

22 Q    -- 62.14 percent; is that correct?

23 A    Okay.  Yeah.  That sounds -- I'll take your

24 representation.  That's fine.

25 Q    Okay.  And going back to the November 28th liquidation

Seery - Cross                                          214

1    analysis, what did Highland believe that creditors in Class 8

2    would get under a liquidation analysis?

3    A    I don't recall the -- if you just tell me, I'll -- I'll --

4    if you're reading it, I'll agree with -- because I -- from my

5    memory.

6    Q    62.6 percent?  Is that correct?

7    A    That sounds about right.

8    Q    You would agree with me, would you not, that 62.6 cents on

9    the dollar is higher than 62.14 cents, correct?

10   A    Yes.

11   Q    And so at least comparing the January 28th versus -- of

12   2021 versus the November 24th of 2020, the liquidation

13   analysis actually ended up being higher than the plan

14   analysis, correct?

15   A    Yes.

16   Q    But there was -- there was some changes also in the plan

17   analysis.  I'm sorry.  There were some subsequent changes that

18   were done over the weekend that were provided on February 1st.

19   Is that correct?

20   A    Yes.

21   Q    Okay.  And what were -- give us an overview of what those

22   changes were.

23   A    What are -- what are you comparing?  What would you like

24   me to compare?

25   Q    Okay.  The January to February plan analysis, what were

Seery - Cross                                    215

1   the changes?  Why did it go up from 62.6 to 71.3?

2   A    The main changes, as we discussed earlier, and maybe the

3   only major change, was the UBS claim amount, which went down

4   significantly from the earlier iteration.  And then there was

5   the small change related to the RCP recovery, which was a

6   double-count.

7   Q    Okay.  And you talked about earlier about what assumptions

8   went into these analyses, correct?

9   A    Yes.

10  Q    And you said these assumptions were always done after

11  careful consideration.  Is that a correct summation of what

12  you said?

13  A    I think that's fair.

14  Q    Okay.

15        MR. TAYLOR:  Mr. Assink, could you pull up the

16  November assumptions?

17  BY MR. TAYLOR:

18  Q    I believe that's coming up, Mr. Seery.  The Court.

19        (Pause.)

20        MR. TAYLOR:  And go down one page, please, Mr.

21  Assink.  Roll up.  The Assumption L.

22  BY MR. TAYLOR:

23  Q    So, these are the November assumptions, correct, Mr.

24  Seery?

25  A    I believe so, yes.

                              Seery - Cross                      216

1  Q    Okay.  And what was the assumption that you made after

2  careful consideration regarding the claims for UBS and

3  HarbourVest?

4  A    The plan assumes zero, that was L, for those claims.

5  Q    Okay.  And ultimately what did -- and I believe you just

6  announced this today and made this public today -- what is

7  UBS's claim?  What are you proposing that it be allowed at?

8  A    $50 million in Class 8, and then they have a junior claim

9  as well.

10  Q    Okay.  And what about HarbourVest?  What kind of allowed

11  claim did they end up with?

12  A    $45 million in Class 8 and a $35 million junior claim.

13  Q    So your well-reasoned assumption, carefully considered,

14  was off by $95 million; is that correct?

15          MR. MORRIS:  Objection to the form of the question.

16          THE COURT:  Overruled.

17          THE WITNESS:  The difference between zero and those

18  numbers is $95 million, yes.

19  BY MR. TAYLOR:

20  Q    You solicited creditors of the Highland estate based upon

21  the November plan analysis and liquidation analysis that was

22  provided and that we're looking at right now, correct?

23  A    It was one of the bases, yes.  It's the plan is what --

24  what we solicited votes for, not the projections.

25  Q    But this was included within the disclosure statement; is

Seery - Cross                          217

1   that correct?

2   A    It's one of the bases.  It was included, yes.

3   Q    And this is the bases by which you believe that the best

4   interests of the creditors have been met better than a Chapter

5   7 liquidation, correct?

6   A    I believe this evidences that the best interest test would

7   be satisfied, yes.

8   Q    And so the record is very clear, for this Court and

9   anybody looking at the record, no solicitation was done of the

10  creditor body after the disclosure statement was sent out?  No

11  updates were sent, correct?

12  A    Updated projections were filed, but no solicitation was --

13  was -- there was only one solicitation.  We did not resolicit.

14  That's correct.

15  Q    Okay.  Mr. Seery, how much are you -- after this plan, or

16  if this plan is confirmed, how much are you going to be paid

17  per month to be the Trustee?

18  A    For the Trustee role, $150,000 per month is the base.

19  Q    It's a base amount?  On top of that, you're going to

20  receive some sort of bonus amount, correct?

21  A    There's two bonuses.  There's a bonus for the bankruptcy

22  case, which I'd need Court approval for, and then I'm going to

23  seek a bonus for the Trustee work, which would be a

24  combination of myself and the team for a performance bonus.

25  That's to be negotiated.

                            Seery - Cross                      218

 1        To be fair, the Committee or the Oversight Group may not

 2   agree to any change, in which case we would not have an

 3   agreement.

 4   Q    And what would happen if you don't come to an agreement,

 5   Mr. Seery?

 6   A    They would have to get a different Plan Trustee.

 7   Q    Okay.  So it's certainly going to have to be greater than

 8   zero, correct?

 9   A    Typically.

10   Q    Is it going to be in the nature of three or four percent

11   of the sales proceeds, or have you considered that?

12   A    Oh, I'm sorry.  Yeah, you mean the bonus?  No.  I've been

13   thinking -- my apologies.  I misunderstood.  I thought you

14   meant any number.  I haven't -- I haven't had negotiation with

15   them.  I'm thinking about looking at the full recovery of the

16   team -- for the team, looking at expected performance numbers,

17   and then trying to negotiate a structure of bonus compensation

18   that would be payable to the whole team, and then allocated by

19   the CEO (garbled) which would be made.

20   Q    When predicting the expenses of the Trust going forward in

21   your projections, did you build in an amount for a bonus fee?

22   A    No.  It wouldn't be part of the expenses.  It would come

23   out at the end.

24   Q    Okay.  So those additional expenses are not shown in the

25   plan analysis, correct?

Seery - Cross                                    219

1    A    No, they're not.  It's just not going to be an expense.

2    It'll be a -- as an operating expense.  It'll be an

3    expenditure at the end out of distributions.

4    Q    Okay.  And did you subtract those from the distributions?

5    A    No.

6    Q    Okay.  A Chapter 7 trustee is not going to charge $150,000

7    or more to monetize these assets, is he?

8    A    No.

9    Q    Have you priced how much D&O insurance is going to be on a

10   go-forward basis post-confirmation?

11   A    I'm sorry.  I couldn't -- couldn't hear you.

12   Q    Sorry.  Let me get closer to my mic.  Have you priced what

13   D&O insurance is going to run the Trust on a go-forward basis

14   post-confirmation?

15   A    Yes.

16   Q    Okay.  And what are you projecting that to run?

17   A    About $3-1/2 million.

18   Q    And is that per annum for over the two-year life of this

19   plan?

20   A    Well, it's the two-year projection period, not life.  But

21   I expect that that's for the two-year projection period.

22   Q    Okay.  So approximately one point -- I'm sorry, you said

23   $3.5 million, correct?

24   A    Yes.

25   Q    Okay.  So, $1.75 million per year?

Seery - Cross                                220

1  A    Yes.

2  Q    On top of the minimum $1.8 million per year that you're

3  going to be paid, correct?

4  A    Well, that's -- that's the base compensation.  But, again,

5  to be fair to the Oversight Committee, they haven't approved

6  it yet.  So the Committee, the Committee reserves their rights

7  to negotiate a total package.

8  Q    And there's going to be a Litigation Trustee, correct?

9  A    Yes.

10 Q    And that Litigation Trustee is going to be paid some

11 amount of compensation, correct?

12 A    Yes.

13 Q    That has not been negotiated yet, correct?

14 A    No, I believe -- I believe the base piece has.  But his --

15 I don't know what the contingency fee or if that's been

16 negotiated yet.  I don't know.

17 Q    And what is the base fee for the Litigation Trustee?

18 A    My recollection is it was about $250,000 a year, some

19 number in that area.

20 Q    Thank you.  So, at this point, over the two-year period,

21 we're looking at approximately $3.6 million to you, $3.5

22 million to the D&O insurance, and approximately $500,000 base

23 fee to the Litigation Trustee, plus a contingency.  Is that

24 correct?

25 A    That's probably real close, yes.

Seery - Cross                    221

1   Q    Okay.  And how about U.S. Trustee fees?  You've estimated

2   of how much those are going to be during the two-year period,

3   correct?

4   A    They're built into the plan up 'til -- I think it's only

5   up until the actual effective date, but I don't recall the

6   specifics.

7   Q    Okay.  And U.S. Trustee fees, the case is going to stay

8   open and those are going to continue to have to be paid, even

9   after confirmation, correct?

10  A    Yes.

11  Q    Okay.  And do you have an estimate of how much those are

12  going to run per annum or over that two-year period?

13  A    I don't recall, no.

14  Q    Okay.  Well, they're provided within your projections,

15  correct?

16  A    Yes.

17  Q    Okay.  A Chapter 7 trustee would not have to incur any of

18  these costs, would they?

19  A    I don't think they'll have to incur Chapter -- U.S.

20  Trustee fees.  I don't know whether they would bring on a

21  litigation trustee or not.  I would assume, since there's --

22  appear to be valuable claims, they probably would, but perhaps

23  they would do it themselves.  So I don't know the specifics of

24  what they would do.

25  Q    In preparing your liquidation analysis, did you ask

Seery - Cross                        222

1   Pachulski if they would be willing to work for a Chapter 7

2   trustee if one was appointed?

3   A    I didn't specifically ask, no.

4   Q    Did you ask DIS, your, for lack of a better word,

5   financial advisors in this case, if they would be willing to

6   work with a Chapter 7 trustee?

7   A    DSI.  No, I did not specifically ask them.

8   Q    Okay.  All right.  Any of the accountants that you're

9   working with, did you ask them if they would be willing to

10  work with a Chapter 7 trustee?

11  A    I didn't specifically ask them, no.

12  Q    Okay.  The proposed plan has no requirements that you

13  notice any potential sale of either Highland assets or

14  Highland subsidiary assets; is that correct?

15  A    Do you mean after the effective date?

16  Q    Yes.

17  A    No, it does not.

18  Q    In the SSP sale, which is a subsidiary of Trussway, which

19  is a subsidiary of Highland, or actually it's a sub of a sub

20  of Highland, you conducted the sale of SSP, correct?

21  A    The team did, yes.  I was part.

22  Q    All right.  That was not noticed to the creditor body; is

23  that correct?

24  A    That's correct.

25  Q    And it is the Debtor's and your position that no notice

Seery - Cross                                     223

1  was required because this was a sub of a sub and therefore

2  this was in the ordinary course?

3  A    Not exactly, no.

4  Q    Okay.  Then what is your position?

5  A    It was in the ordinary course.  It was -- I believe it's a

6  sub of a sub of a sub, and a significant portion of the

7  interests are owned by third parties.

8  Q    It is possible, is it not, that had you noticed this to

9  the larger creditor body, that you might have engendered a

10 competitive bidding situation that might have reached a higher

11 return for investors, correct?

12 A    The same possibility is it could have gone lower.

13 Q    But it is possible, correct?

14 A    Certainly possible.

15 Q    In fact, there is normally requirements under the

16 Bankruptcy Code and the Rules that asset sales are noticed out

17 to the creditor body, correct?

18 A    Asset sales that -- property of the estate, yes.  Other

19 than in the ordinary course, of course.

20 Q    I believe you have described Mr. Dondero as being very

21 litigious within this case; is that correct?

22 A    I believe so, yes.

23 Q    Okay.  Did Mr. Dondero initiate any litigation in this

24 case prior to September 2020?

25 A    Prior to September?  I don't believe so.  I don't know

Seery - Cross                                    224

1   when he filed the claim from NexPoint.  It certainly indicated

2   that -- I believe it was from NexPoint.  My memory is slightly

3   off here.  He filed a claim in -- administrative claim, which

4   effectively is like you're bringing a complaint, against HCMLP

5   for the management of Multi-Strat and the sale of the life

6   settlement policies out of Multi-Strat, which was conducted in

7   the spring.

8   Q    And wasn't Mr. Dondero seeking document production related

9   to that sale?

10  A    No.

11  Q    Okay.  I believe that the preliminary injunction that you

12  talked about and were questioned earlier, the plan asks to

13  enjoin (garbled) party from allowing the plan to go effective.

14  Is that correct?

15  A    I'm sorry.  I didn't understand you question.  There was a

16  -- there was a bunch of interference.

17  Q    Okay.  Sure.  I'm sorry about that.  I don't know if

18  that's -- I don't think that's me, but --

19  A    It may not be.  It sounded like someone else.

20  Q    The injunction prohibits anybody from interfering with the

21  plan going effective, correct?

22  A    The plan injunction?

23  Q    Yes.

24  A    Yes.

25  Q    Okay.  Just so I'm clear, is the plan injunction

Seery - Cross                                    225

1   attempting to strip appellate rights of Mr. Dondero?

2   A    No.

3   Q    Okay.  So, if, for instance, if he were to file any appeal

4   of an order confirming this plan, he wouldn't be in violation

5   of that plan injunction?

6   A    I don't think so, because the order wouldn't be final.

7   Q    Okay.  But it -- it says upon entry of a confirmation

8   order, you're enjoined from doing so.  So that's not the

9   intent?

10  A    It certainly would not be my intent.  I don't think that

11  anybody had that in mind.

12  Q    Okay.  And if Mr. Dondero were to seek a stay pending

13  appeal either during that 14-day period or afterwards, is that

14  plan injunction attempting to stop that -- that sort of

15  action?

16  A    I apologize.  You're breaking up.  But I think I

17  understood your question.  No, it was -- it was your screen as

18  well.  No.  If either this Court stays its own order or a

19  higher court says that the order is stayed, then there would

20  be no way there could be any allegation that it's interfering

21  with an order if it's not effective.

22  Q    Mr. Dondero opposed the Acis sale, correct?

23  A    The Acis settlement?

24  Q    Correct.

25  A    Yes.

Seery - Cross                                        226

1  Q    After he opposed the Acis settlement, the next filing Mr.

2  Dondero made was requesting that the Debtor notice the sale of

3  any assets or any major subsidiary assets.  Is that correct?

4  A    I don't recall the sequence of his filings.  I think that

5  Judge Lynn at least sent a letter to that effect.  I don't

6  recall if there is a filing to that effect.

7  Q    Did Mr. Dondero, through his counsel, attempt to resolve

8  that motion without filing anything further?

9  A    I don't recall the specifics of the motion.  I know they

10 asked for some sort of relief that -- that we thought was

11 inappropriate.

12 Q    When the Court postponed any hearing on Mr. Dondero's

13 request for relief until the eve of the confirmation hearing,

14 and Mr. Pomerantz announced that no sales were expected before

15 confirmation, did Mr. Dondero withdraw his motion?

16 A    Again, I don't recall the specifics of the motion.  I only

17 recall the letter from Judge Lynn.

18 Q    Did Mr. Dondero do anything more than object to the

19 HarbourVest deal?

20 A    Not that I know of.

21 Q    Did Mr. Dondero do anything more than respond to the

22 Defendants' injunction suit?

23        MR. MORRIS:  Objection to the form of the question.

24 I mean, -- objection to the form.

25        THE COURT:  Overruled.

Seery - Cross                                      227

1           MR. TAYLOR:  I apologize.  I should have said the

2    Debtor's injunction suit.

3           THE WITNESS:  Yeah, the -- I'm not sure of the

4    specific order, but certainly the communications with me,

5    which I think are prior to the order.  The communications with

6    Mr. Surgent, which I believe are after the order.  Certain

7    communications with Mr. Waterhouse, which were oral.  Those

8    were all similarly difficult and obstreperous actions.

9    BY MR. TAYLOR:

10   Q   Has Mr. Dondero commenced any adversary proceeding or

11   litigation in this case other than filing a competing plan?

12          MR. MORRIS:  Objection to the form of the question.

13          THE COURT:  Over --

14          THE WITNESS:  Yeah, I don't --

15          THE COURT:  -- ruled.

16          THE WITNESS:  I don't believe he's commenced an

17   adversary.  I'm sorry, Judge.  I don't believe he's commenced

18   an adversary proceeding, no.

19   BY MR. TAYLOR:

20   Q   Mr. Dondero didn't file any opposition to the life

21   settlement sale, did he?

22   A   We didn't do the life settlement (garbled) Court.

23   Q   Right.  Again, that wasn't noticed through the -- this

24   Court, was it?

25   A   It was an -- the reason was it was an asset of Multi-Strat

Seery - Cross                                        228

1   Fund.  It wasn't an asset of the Debtor's.

2   Q    Okay.  Mr. Dondero did have concerns regarding the life

3   settlement sale, correct?

4   A    Yes.

5   Q    In fact, he believed that they were being sold for

6   substantially less than what could have otherwise been

7   received, correct?

8   A    He may have.

9   Q    And if you conduct any subsequent sales for less than

10  market value that might ultimately prevent the waterfall from

11  ever reaching Mr. Dondero, he would have no recourse under

12  this proposed plan to object to this sale or otherwise have

13  any comment on it.  Is that correct?

14  A    I clearly object to the thinking that that was less than

15  market value.  It was -- it was more than market value.  So I

16  don't -- I disagree with the premise of your question.

17  Q    So, I don't believe that was the question that was asked.

18  The question that was asked is, as you move forward with your

19  -- what I will characterize as a wind-down plan, not putting

20  that word in your mouth -- but as you execute forward on your

21  plan, as these sales of these assets go through, no notice is

22  going to be provided, correct?

23  A    Not necessarily.  It depends on the asset and what we

24  think of the, you know, the -- the position of the parties at

25  the time.

1    If we have a -- if we have a transaction that's pending

2  that wouldn't be hurt by a notice and that we'd be able to get

3  the Court's imprimatur to maybe more better insulate, if you

4  will, against Mr. Dondero's attacks, then we may well come to

5  the Court to seek that.

6    The problem with noticing sales is that -- that it often

7  depresses value.  That's just not the way folks outside of the

8  bankruptcy world (audio gap) sales.

9  Q   So there's no requirement that either public or private

10 notice be provided, correct?

11 A   No.  Meaning it is correct.

12 Q   Okay.  And if Mr. Dondero had objections either to the

13 pricing of the sale or the manner and means by which the sale

14 was being conducted, he would be prohibited by the plan

15 injunction from bringing any objection to such sale, correct?

16 A   I believe so, yes.

17 Q   Mr. Dondero also had concerns regarding the OmniMax sale,

18 correct?

19 A   Mr. Dondero did not go along with the OmniMax sale with

20 the assets that he managed.  I don't know if he had concerns

21 with -- with our sale or OmniMax's interests.

22 Q   Did Mr. Dondero ever express to you any concern that the

23 value wasn't being maximized regarding the sale of those

24 assets?

25 A   He thought he could get more.  I don't know that he

Seery - Cross                           230

1    thought that he could get more for his assets that he was

2    managing or whether he thought he could get more for all of

3    the assets.

4    Q    Other than voicing those concerns, did Mr. Dondero file

5    any pleading with this Court attempting to block that sale?

6    A    Pleading with the Court?  No.

7              MR. TAYLOR:  Your Honor, I would like to confer with

8    my colleagues just very briefly and see if they have anything

9    further.  And even if they don't, Mr. Lynn of my firm would

10   like a very brief moment to address the Court prior to me

11   passing the witness.

12       So, if I may have a literally hopefully one-minute break

13   where I can turn my camera off and my microphone off to confer

14   with my colleagues, and then move forward?

15             THE COURT:  Okay.  Well, you can have a one-minute

16   break, but we're going to continue on with cross-examination

17   at this point.  Okay?  I'm not sure what you meant by Mr. Lynn

18   wants to raise an issue at this point.  Could you elaborate?

19             MR. TAYLOR:  I will get some elaboration during our

20   30-second to one-minute break, Your Honor.  I was just passed

21   a note.

22             THE COURT:  All right.  So, but I'll just you know,

23   --

24             A VOICE:  Your Honor?

25             THE COURT:  -- I'm inclined to continue with the

Seery - Cross                                    231

1  cross-examination.  You know, this isn't a time for, you know,

2  arguments or anything like that.  All right?

3      So, we'll take a one-minute break.  You can turn off your

4  audio and video for one minute, and come back.

5      (Off the record, 3:33 p.m. to 3:34 p.m.)

6          THE WITNESS:  Your Honor?

7          THE COURT:  Yes?

8          THE WITNESS:  It's Jim Seery.  Can I turn it into

9  just a two-minute break, since I've sat in my seat, and it

10 would be better for him to just continue straight through.  I

11 could use one or two minutes.

12          THE COURT:  Okay.

13          THE WITNESS:  I apologize.

14          THE COURT:  All right.  Well, it's been more than

15 minute.  Let's just say a five-minute break for everyone, and

16 we'll come back at 3:39 Central time.  Okay.

17          THE WITNESS:  Okay.  Thank you, Your Honor.  I

18 appreciate that.

19      (A recess ensued from 3:35 p.m. until 3:40 p.m.)

20          THE CLERK:  All rise.

21          THE COURT:  Please be seated.  All right.  We are

22 back on the record.  Mr. Taylor, are you there?

23          MR. TAYLOR:  I am, Your Honor.  My video is not

24 wanting to start, but my -- I believe my audio is on.

25          THE COURT:  Okay.  After you went offline for your

Seery - Cross                                   232

1   one-minute break, Mr. Seery asked for a five-minute bathroom

2   break, or a couple-minute.  Anyway, we've been gone on a

3   bathroom break.  We're back now.

4           MR. TAYLOR:  Thank you.  I was actually -- I was

5   still listening with one ear, --

6           THE COURT:  Okay.

7           MR. TAYLOR:  -- Your Honor, so I understand.

8           THE COURT:  All right.

9           MR. TAYLOR:  So, thank you.

10          THE COURT:  Are you finished with cross, or no?

11          MR. TAYLOR:  Just a little bit of a follow-up.

12                   CROSS-EXAMINATION, RESUMED

13  BY MR. TAYLOR:

14  Q   Mr. Seery, you had previously testified that Mr. Dondero's

15  counsel had threatened you and/or the independent board, I was

16  not exactly sure who you were referring to, with suits, and I

17  believe you said a hundred million dollars' worth of suits and

18  getting dragged into litigation.

19      Is that still your testimony today, that you were -- you

20  were threatened with suit by this firm of a suit of over a

21  hundred million dollars?

22  A   I believe what I was told by my counsel was that, not Mr.

23  Dondero's, but one of the other counsel, who I can name, said

24  specifically that Dondero will sue Seery for hundreds of

25  millions of dollars.  We're going to take it up to the Fifth

Seery - Cross                                      233

1  Circuit, get it reversed, and he'll go after him.

2  Q   Okay.  So it was not Mr. Dondero's counsel, and you were

3  not -- is that correct?

4  A   No.  It was one of the other counsel on the phone today.

5  Q   Okay.  And you base that not upon your own personal

6  knowledge but based on some -- something else that you were

7  told, correct?

8  A   Yes.  By my counsel.

9  Q   Thank you.

10        MR. TAYLOR:  Yes, Your Honor.  We can pass the

11 witness.

12        THE COURT:  Okay.  So, you've gone, or you and Mr.

13 Rukavina collectively have gone one hour and 17 minutes.  Mr.

14 Draper, you're next.

15        MR. DRAPER:  Yes, Your Honor.  Thank you.  I

16 basically have no more than ten questions, so I gather the

17 Court will welcome that.

18        THE COURT:  Okay.

19                   CROSS-EXAMINATION

20 BY MR. DRAPER:

21 Q   Mr. Seery, has the new general partner been formed yet?

22 A   I don't know if they've been -- we've actually done the

23 formation, but it -- it would be in process.

24 Q   So it either has been formed or has not been formed?

25 A   I don't -- I don't know the answer.

Seery - Cross                        234

1   Q    Okay.  Now, going forward, Judge Nelms and Mr. Dubel will

2   have nothing to do with the Reorganized Debtor, correct?

3   A    Not necessarily, but they don't have a specific role at

4   this time.

5   Q    They won't be officers or directors of the new general

6   partner or the Reorganized Debtor, correct?

7   A    I don't -- I don't believe so, but it's not set in stone.

8   Q    All right.  Has any finance -- has any party who is the

9   beneficiary of an exculpation, a release, or the channeling

10  injunction contributed anything to this plan of reorganization

11  in terms of money?

12  A    No.

13  Q    Have you ever interviewed a trustee as to how they would

14  liquidate the assets or monetize the assets in this case?

15  A    No.

16  Q    And last question is, is there any bankruptcy prohibition

17  that you're aware of that a Chapter 7 trustee could not do

18  what you're doing?

19  A    Which -- which -- what do you mean, under the plan?

20  Q    No.  Could not monetize the assets of the estate in the

21  manner that you're attempting to monetize them.

22  A    I don't think there's a specific rule, but I just haven't

23  -- I haven't seen that before, no.  So I don't think there's a

24  specific rule that I know of.

25  Q    Okay.

Seery - Cross                                    235

1          MR. DRAPER:  I have nothing further for this witness.

2          THE COURT:  All right.  I should have asked, we had a

3  couple of other objectors.  Ms. Drawhorn, did you have any

4  questions?

5          MS. DRAWHORN:  I have no questions, Your Honor.

6          THE COURT:  All right.  Were there any other

7  objectors out there that I missed that might have questions?

8       All right.  Any redirect?

9          MR. MORRIS:  Your Honor, if I may, can I -- can I

10 just take a short minute to confer with my colleagues?

11         THE COURT:  Sure.  You can --

12         MR. MORRIS:  Thank you.

13         THE COURT:  -- put you --

14         MR. MORRIS:  Two -- two minutes, Your Honor.

15         THE COURT:  Okay.

16      (Pause, 3:45 p.m. until 3:48 p.m.)

17         THE COURT:  All right.  We've been a couple of

18 minutes.  Mr. Morris?

19         MR. MORRIS:  Yes, Your Honor.

20         THE COURT:  What are --

21         MR. MORRIS:  Just, just a few points, Your Honor.

22         THE COURT:  Okay.

23         MR. MORRIS:  Hold on a sec.  You ready, Mr. Seery?

24         THE WITNESS:  I am, yes.

25                      REDIRECT EXAMINATION

Seery - Redirect                          236

1  BY MR. MORRIS:

2  Q    You were asked a number of questions about your

3  compensation.  Do you recall all that?

4  A    Yes, I do.

5  Q    And you testified to the $150,000 a month.  Do you recall

6  that?

7  A    Yes.

8  Q    Under the -- under the documentation right now, your

9  compensation is still subject to negotiation with the

10 Committee; is that right?

11 A    Yes, it is.

12 Q    Okay.  You were asked a couple of questions about the

13 conduct of Mr. Dondero.  Earlier, you testified that the

14 monetization plan was filed under seal at around the time of

15 the mediation.  Do I have that right?

16 A    Yes.  Right at the start of the mediation.

17 Q    Okay.  And is that the first time that the Debtor made the

18 constituents aware, including Mr. Dondero, that it intended to

19 use that as a catalyst towards getting to a plan?

20 A    That's the first time that we filed it, but that plan had

21 been discussed prior to that.

22 Q    And do you recall that there came a point in time where

23 you -- when the Debtor gave notice that it intended to

24 terminate the shared services agreements with the Dondero-

25 related entities?

Seery - Redirect                    237

1   A    Yes.

2   Q    And when did that happen?

3   A    That was about 60 -- now it's like 62 days ago.

4   Q    Uh-huh.  And you know, from your perspective, from the

5   filing of the monetization plan in August through the notice

6   of shared services, is that what you believe has contributed

7   to the resistance by Mr. Dondero to the Debtor's pursuit of

8   this plan?

9   A    Well, I think there's a number of factors that

10  contributed, but the evidence that I've seen is that when we

11  started talking about a transition, if there wasn't going to

12  be a deal, if Mr. Dondero couldn't reach a deal with the

13  creditors, we were going to push forward with the monetization

14  plan.  And the monetization plan required the transition of

15  the employees.  And indeed, it called specifically, and we had

16  testimony regarding it all through the case, about the

17  employees being terminated or transferred.

18       In order to transfer them over to an entity that's

19  related, Mr. Dondero pulls all of those strings.  And he

20  refused to engage on that.  We started in the fall.  We

21  specifically told employees of the Debtor not to engage.  They

22  couldn't spend his money, which made sense --

23            MR. TAYLOR:  Objection, Your Honor.

24            THE WITNESS:  So, very -- that --

25            THE COURT:  Just -- there's an objection.

                    Seery - Redirect                    238

1           MR. MORRIS:  There's an objection.

2           THE WITNESS:  I'm sorry.

3           THE COURT:  There was an objection.

4           MR. TAYLOR:  Yes, Your Honor.  Object --

5           THE COURT:  Go ahead.

6           MR. TAYLOR:  Yes, Your Honor.  This is Clay, Clay

7    Taylor.  Objection.  He's directly said Mr. Dondero told other

8    employees $x$, and that is purely hearsay, not based upon his

9    personal opinion, or his personal knowledge, and therefore

10   that part of the answer should be struck.

11          MR. MORRIS:  Your Honor, it's a statement against

12   interest.

13          THE COURT:  Overrule the objection.  Go ahead.

14          THE WITNESS:  Yeah.  The difficulty of transitioning

15   this business, I've equated it to doing a corporate carve-out

16   transaction on an M&A side.  It's hard, and you need

17   counterparties on the other side willing to engage.  And what

18   we went through over the weekend, on Friday, was seemingly

19   that the Funds, you know, directed by Mr. Dondero, just

20   haven't engaged.

21      We actually gave them an extra two weeks to engage,

22   because it's -- they've really been unable to do anything.  I

23   mean, hopefully, we've got the employees working in a way that

24   can -- that can foster and get around some of this

25   obstreperousness, and I've used that word before, but that's

Seery - Redirect                              239

1   what it is.  It's really an attempt to just prevent the plan
2   from going forward.
3       And at some point, the plan will go forward.  And if we
4   are unable to transition people, we will simply have to
5   terminate them.  And that is not a good outcome for those
6   employees, but it's not a good outcome for the Funds, either.
7   And the Funds, Mr. Dondero, the Advisors, the boards, nobody
8   wants to do anything except come in this court.
9   BY MR. MORRIS:
10  Q   Do you recall being asked about Mr. Dondero and certain
11  things that he didn't do and certain actions that he hadn't
12  taken?
13  A   Yes.
14  Q   By Mr. Taylor?  To the best of your recollection, did Mr.
15  Dondero personally object to the HarbourVest settlement?
16  A   I -- I don't recall if he did or if it was one of the
17  entities.
18  Q   It was Dugaboy.  Does that refresh your recollection?
19  A   Dugaboy certainly objected, yes.
20  Q   And do you understand that Dugaboy has appealed the
21  granting of the 9019 order in the HarbourVest settlement?
22  A   Yes.
23  Q   And Mr. Taylor asked you to confirm that Mr. Dondero
24  hadn't taken any action with respect to the life settlement
25  deal.  Do you remember that?

297 of 610

Seery - Redirect                          240

1  A    I do.

2  Q    But are you aware that Dugaboy actually filed an

3  administrative claim relating to the alleged mismanagement of

4  the life settlement sale?

5  A    Yes, I did, I did allude to that.  I wasn't sure it was

6  Dugaboy, but -- but that was very --

7  Q    Uh-huh.

8  A    -- very early on, an objection filed in the form of an

9  administrative claim or complaint against, if you will,

10  against Highland for the management of Multi-Strat.

11  Q    Uh-huh.  And Mr. Dondero didn't personally file any motion

12  seeking to inhibit the Debtor from managing the CLO assets; is

13  that right?

14  A    No, not the CLO assets, no.

15  Q    Yeah.  But the Funds and the Advisors did.  That was the

16  hearing on December 16th.  Do you recall that?

17  A    Yeah.  That was the -- the Funds.  K&L Gates, the Funds,

18  and the various Advisors.

19  Q    All right.  Do you recall Mr. Rukavina asking you whether

20  there was any evidence in the record to support your testimony

21  that there was an agreement in place to assume the CLO

22  management agreements?

23  A    I recall the question, yes.

24  Q    Okay.

25         MR. MORRIS:  Your Honor, I'm going to ask Ms. Canty

Seery - Redirect                                    241

1   to put up on the screen the Debtor's omnibus reply to the plan

2   objections.

3            THE COURT:  Okay.

4            MR. MORRIS:  It was filed -- it was filed on January

5   22nd.  And if we can go, I think, to -- I think it's Paragraph

6   -- I think it's Paragraph 135 on Page 71.  Yeah.  Okay.

7   BY MR. MORRIS:

8   Q   Take a look at that, Mr. Seery.  Does that -- does that

9   statement in Paragraph 135 accurately reflect the

10  understanding that's been reached between the Debtor and the

11  CLO Issuers with respect to the Debtor's assumption of the CLO

12  management agreements?

13  A   Yes.  I think that's consistent with what I testified to

14  earlier, the substance of the agreement.

15           MR. MORRIS:  And if we can just scroll to the top,

16  just to see the date.  Or the bottom.  I guess the top.

17           THE WITNESS:  Do you mean the date of this pleading?

18  BY MR. MORRIS:

19  Q   Yeah.  So, it was filed on January 22nd, right, ten days

20  ago?  Okay.

21  A   That's correct.

22           MR. MORRIS:  I'd like to put up on the screen an

23  email, Your Honor, that I'd like to mark as Debtor's Exhibit

24  10A.  And this is --

25  BY MR. MORRIS:

Seery - Redirect                                242

1  Q   Do you recall, Mr. Seery, you testified that the agreement

2  was reflected in an email?

3  A   Yes.

4  Q   Is this the email that you're referring to?

5        MR. MORRIS:  If we could scroll down.  Right there.

6        THE WITNESS:  Yes.

7        MR. MORRIS:  Okay.  One -- the email below.  Okay.

8  Right there.

9  BY MR. MORRIS:

10 Q   Is that the -- is that the email you had in mind?

11 A    It was the series of emails.  We -- we had a -- I think I

12 testified in the prior testimony, or my -- one of my

13 depositions, that we had had a number of conversations with

14 the Issuers and their counsel, and this was the summary of the

15 agreement that was contained in these emails.

16 Q   Okay.  And this is, this is the same date as the omnibus

17 reply that we just looked at, right, January 22nd?

18 A   That's correct.

19 Q   Okay.  You were asked a question, I think, late in your

20 cross-examination about a Chapter 7 trustee's ability to sell

21 the assets in the same way as you are proposing to do.  Do you

22 recall that testimony?

23 A   Yes.

24 Q   And I think, if I understood correctly, the question was

25 narrowly tailored to whether there was any legal impediment to

Seery - Redirect                                    243

1  a trustee doing -- performing the same functions as you.  Do I

2  have that right?

3  A    That's the question I was asked, whether the Bankruptcy

4  Code had a specific prohibition.

5  Q    Okay.  And I think, I think you testified that you weren't

6  aware of anything.  Is that right?

7  A    That's correct.

8  Q    All right.  But let's talk about practice.  Do you think a

9  Chapter 7 trustee will realize the same value as you and the

10 team that you're assembling will, in terms of maximizing value

11 and getting the maximum recovery for the assets?

12 A    No.  As I testified earlier, you know, I've been working

13 with these assets now for a year.  It's a complicated

14 structure.  The assets are all slightly different.  And

15 sometimes much more than slightly.  And the team that we're

16 going to have helping managing is familiar with the assets as

17 well.  We believe we'll be able to execute very well in the

18 markets that we (garbled).

19 Q    Do you think a Chapter 7 trustee will have a steep

20 learning curve in trying to even begin to understand the

21 nature of the assets and how to market and sell them?

22 A    I think anybody coming into this, the way this company is

23 set up, as an asset manager, and the diversity of the assets,

24 would have a steep learning curve, yes.

25 Q    Do you have any view as to whether the perception in the

Seery - Redirect                                  244

1  marketplace of a Chapter 7 trustee taking over to sell the
2  assets will have an impact on value as compared to a post-
3  confirmation estate of the type that's being proposed under
4  the plan?
5  A   Yes, I do, and it certainly would be negative, in my
6  experience.  Typically, assets are not conducted -- asset
7  sales are not conducted through a bankruptcy court, and
8  certainly not with a Chapter 7 trustee that has to sell them,
9  and generally is viewed as having to sell them quickly.  So we
10 -- we approach each asset differently, but certainly in a way
11 that would be much more conducive to maximizing value than a
12 Chapter 7 trustee could, just by the nature of their role.
13 Q   Is it -- is it your understanding that, under the proposed
14 plan and under the proposed corporate governance structure,
15 that the Claims Oversight Committee will -- will manage you?
16 That you'll report to that Committee and that they'll have the
17 opportunity to make their assessment as to the quality of your
18 work?
19 A   Yeah, absolutely.  And that's consistent with what we've
20 done before in this case.  Even where it wasn't an asset of
21 the estate or was being sold in the ordinary course, we spent
22 time with the Committee and the Committee professionals before
23 selling assets.
24 Q   And you've worked with the Committee for over -- for a
25 year now, right?

Seery - Redirect                          245

1   A    It's over a year.

2   Q    And the Committee is comfortable with you taking this

3   role; is that right?

4   A    I think they're supportive of it.  Comfortable might be

5   not the right word choice.

6   Q    Okay.  I appreciate the clarification.  And do you have

7   any reason to believe that the -- that the Oversight Committee

8   is going to allow you the unfettered discretion to do whatever

9   you want with the assets of the Trust?

10  A    Not a chance.  Not with this group.  Nor would I want to.

11  There's no right or wrong answer for most of these things, and

12  the collaborative views from professionals and people who have

13  an economic stake in the outcome will be helpful.

14  Q    Okay.  You were asked some questions about the November

15  projections and the -- and the assumption that was made that

16  valued the HarbourVest and the UBS claims at zero.  Do you

17  recall that?

18  A    Yes.

19  Q    As of that time, was the Debtor still in active litigation

20  with both of those claim holders?

21  A    Very much so.

22  Q    And after the disclosure statement was issued, do you

23  recall that the Court entered its order on UBS's Rule 3018

24  motion?

25  A    Yes.

Seery - Redirect                    246

1   Q    And do you recall what the -- what the claims estimate was

2   for voting purposes under that order?

3   A    It was about $95 million.  That was -- it was together

4   with the summary judgment orders of that date.  They were

5   separate orders, but that was the lone hearing.

6   Q    And was that public information, that order was publicly

7   filed on the docket; isn't that right?

8   A    Yes, it was.

9   Q    Is there anything in the world that you can think of that

10  would have prevented any claim holder from doing the math to

11  try to figure out the impact on the estimated recoveries from

12  the -- by using that 3018 claims estimate?

13  A    No.  It would have -- it would have been quite easy to do.

14  Q    And, in fact, that's what you wound up doing with respect

15  to the January projections, right?

16  A    That's correct.

17  Q    And do you recall when the HarbourVest settlement, when

18  the 9019 motion was filed?

19  A    I don't recall the actual filing.  It was subsequent to

20  the UBS, though.

21       MR. MORRIS:  Ms. Canty, if you have it, can we just

22  put it on the screen, to see if we can refresh Mr. Seery's

23  recollection?  If we could just look at the very top.

24  BY MR. MORRIS:

25  Q    Does that refresh your recollection that the 9019 motion

1   was filed on December 23rd?

2   A    Yes, it does.  The agreement was reached before that, but

3   it took a little bit of time to document the particulars and

4   then to -- to get it filed.

5   Q    And this wasn't filed under seal, to the best of your

6   recollection, was it?

7   A    No, no.  This was -- this was open, and we had a very open

8   hearing about it, because it was a related-party objection.

9   Q    And to the best of your recollection, did this 9019 motion

10  publicly disclose all of the material terms of the proposed

11  settlement?

12  A    Yes, it did.

13  Q    Can you think of anything in the world that would have

14  prevented any interested party from doing the math to figure

15  out how this particular settlement would impact the claim

16  recoveries set forth in the Debtor's disclosure statement?

17  A    No.  And just again, to be clear, the plan and the

18  projections had assumptions, but the plan was very clear that

19  the denominator was going to be determined by the total amount

20  of allowed claims.

21  Q    And, again, at the time that that was filed, you hadn't

22  reached a settlement with HarbourVest, had you?

23  A    No.

24  Q    And the order on the 3018 motion hadn't yet been filed; is

25  that right?

Seery - Redirect                              248

1  A    That's correct.

2  Q    Okay.  Has -- are you aware of any creditor expressing any

3  interest in trying to change their vote as a result of the

4  updates of the forecasts?

5  A    Only Mr. Daugherty.  And actually, they have a stipulation

6  with the two -- the two former employees.

7  Q    All right.  But to be fair, that wasn't -- had nothing to

8  do with the revisions to the projections?  That was just in

9  connection with their settlement; is that right?

10 A    That's correct.  As was, I suspect, Mr. Daugherty's, but

11 he'd been aware of the settlements, just like everyone else.

12 Q    Okay.  You were asked a couple of questions, I think, by

13 Mr. Rukavina about whether there is anything that you need to

14 do your job on a go-forward basis.  And I think you said no.

15 Do I -- do I have that right?  Nothing further that you need?

16 A    I -- I'm not really sure what your question means, to be

17 honest.

18 Q    Okay.  Fair enough.  To be clear, is there any chance that

19 you would accept the position as the Claimant Trustee if the

20 gatekeeper and injunction provisions of the proposed plan were

21 extracted from those documents?

22 A    No.  As I said earlier, they're integral in my view to the

23 entire plan, but they're absolutely essential to my bottom.

24 Q    Okay.  And through -- through the date of the effective

25 date, are you relying on the exculpation clause of the -- have

Seery - Redirect                                    249

1   you been relying on the exculpation clause in the January 9th

2   order that you testified to at the beginning of this hearing?

3   A    Yeah.  Both the January 9th order as well as the July

4   order with respect to my CEO/CRO positions.

5   Q    Okay.

6           MR. MORRIS:  I've got nothing further, Your Honor.

7           THE COURT:  All right.  Any recross on that redirect?

8           A VOICE:  I believe Mr. Rukavina is speaking but is

9   muted, Your Honor.

10          THE COURT:  Mr. Rukavina, do you have any recross?

11          MR. RUKAVINA:  Your Honor, I do, yes.  Thank you.  I

12  apologize.

13          THE COURT:  Okay.

14          MR. RUKAVINA:  Can you hear me now?

15          THE COURT:  Yes.

16          THE WITNESS:  Yes.

17          MR. RUKAVINA:  Thank you.

18      Mr. Vasek, if you'll please pull up the Debtor's Omnibus

19  Reply, Docket 1807.  And if you'll go to Exhibit C.  Do a word

20  search for Exhibit C.  It's attached to it.  Okay.  Now scroll

21  down.  Stop there.

22                      RECROSS-EXAMINATION

23  BY MR. RUKAVINA:

24  Q    Mr. Seery, do you see what's attached as Exhibit C to the

25  Omnibus Reply, which is proposed language in the confirmation

Seery - Recross                                    250

1   order?

2   A    I see the exhibit.  I didn't know if this was -- I don't

3   know exactly what it's for.  If it's proposed language, I'll

4   accept your representation.

5        MR. RUKAVINA:  Well, scroll back up to Exhibit C, Mr.

6   Vasek.  I want to make sure that I understand what you're

7   saying.  Scroll back up.  Do the word search for where Exhibit

8   C appears first.  Start again.  Okay.  So scroll up.

9   BY MR. RUKAVINA:

10  Q    So, you'll recall Mr. Morris was asking you about the

11  paragraph in here where you outlined the terms of the

12  agreement with the CLOs.  Do you recall that testimony?

13  A    Yes.

14  Q    Okay.  And then you see it says, The Debtor and the CLOs

15  agreed to seek approval of this compromise by adding language

16  to the confirmation order.  A copy of that language is

17  attached hereto as Exhibit C and will be included in the

18  confirmation order.

19       Do you see that, sir?

20  A    I do.

21  Q    Okay.

22       MR. RUKAVINA:  Mr. Vasek, go back to Exhibit C.

23  BY MR. RUKAVINA:

24  Q    So it's correct that this Exhibit C is the referenced

25  agreement that the Debtor and the CLOs will seek approval of,

Seery - Recross                          251

1  correct?

2  A    The -- the -- it may be word-splitting, but I believe it

3  says that they've reached agreement and this is the language

4  that will evidence that agreement or embody that agreement.

5  Q    Okay.

6           MR. RUKAVINA:  Scroll down, Ms. Vasek, to the next

7  page, please.

8  BY MR. RUKAVINA:

9  Q    Real quick, do the CLOs owe the Debtor any money for the

10  management fees?

11  A    I don't -- well, the answer is there are accrued fees that

12  haven't been paid, but when they have cash they run through

13  the waterfall and pay them.

14  Q    And I believe you mentioned to me those accrued fees

15  before.  They're several million dollars, correct?

16  A    It -- I don't know right off the top of my head.  They can

17  aggregate and then they get paid down in the quarter depending

18  on the waterfall.  And it's -- it's not a fair statement by

19  either of us to say the CLOs, as if they're all the same.

20  Each one is different.

21  Q    I understand.  But as of today, you agree that the CLOs

22  collectively owe some amount of money to the Debtor in accrued

23  and unpaid management fees?

24  A    I believe that's the case.

25  Q    Okay.  And do you believe it's north of a million dollars?

Seery - Recross                          252

1    A    I don't recall.

2    Q    Okay.

3         MR. RUKAVINA:  Well, scroll down a couple of more

4    lines, Mr. Vasek.  Stay there.

5    BY MR. RUKAVINA:

6    Q    Sir, if you'll read with me, isn't the Debtor releasing

7    each Issuer, which is the CLOs, for and from any and all

8    claims, debts, et cetera, by this provision?

9    A    Claims.  Not -- not fees, but claims.  I don't believe

10   there's any release of fees that the CLOs might owe and would

11   run through the waterfall here.

12   Q    Okay.  For and from any and all claims, debts,

13   liabilities, demands, obligations, promises, acts, agreements,

14   liens, losses, costs, and expenses, including without

15   limitation attorneys' fees and related costs, damages,

16   injuries, suits, actions, and causes of action, of whatever

17   kind or nature, whether known or unknown, suspected or

18   unsuspected, matured or unmatured, liquidated or unliquidated,

19   contingent or fixed.

20        Are you saying that that does not release whatever fees

21   have accrued and the CLOs owe?

22   A    I don't believe it would.  If it did, your client should

23   be ecstatic.  But I don't believe it does that.

24   Q    And you don't believe that it releases the CLOs of any and

25   all other obligations that they may have to the Debtor and the

1  estate?

2  A    I -- again, I don't believe there are any, but I think

3  it's a broad release of claims away from the actual fees that

4  are generated by the Debtor.  I don't believe there's an

5  intention to release fees that have accrued.

6  Q    Have you seen this language before I showed it to you

7  right now?

8  A    I believe I have, yes.

9  Q    Okay.  Take a minute.  Can you point the Court to anywhere

10  where present or future fees under the CLO agreements are

11  excepted from the release?

12  A    I could go through, I'll take your representation, but I

13  don't believe that that's what it -- it's supposed to release

14  fees.  Again, if the fees are owed, they get paid, if there

15  are assets there to pay them.

16  Q    Okay.  This release and this settlement was never noticed

17  out as part of a 9019, was it?

18  A    I don't believe so, no.

19  Q    Okay.  So, other than bringing it up here today, this is

20  the first that the Court, at least, has heard of this,

21  correct?

22  A    Yeah, again, I don't --

23          MR. MORRIS:  Objection to the form of the question.

24          THE WITNESS:  Yeah.  I just stated before that I

25  don't think this is a -- that there claims.

Seery - Recross                                254

1           THE COURT:  Wait.  Slow down.  I think --

2           MR. SEERY:  Oh, I'm sorry, Your Honor.

3           THE COURT:  -- there was an objection.  Go ahead, Mr.

4   Morris.

5           MR. MORRIS:  The notion that this is the first time

6   the Court has heard of this is just factually incorrect.

7   First of all, it's in the document from January 22nd.  Second

8   of all, Mr. Seery testified to it last week at the preliminary

9   injunction hearing.  I mean, --

10          THE COURT:  I -- I --

11          MR. MORRIS:  -- I don't know what the point of the

12  inquiry is, but there's -- this is not new news.

13          THE COURT:  Okay.  I sustain the objection.

14  BY MR. RUKAVINA:

15  Q   And Mr. Seery, can you point me to any document where

16  counsel for the CLOs has signed this particular confirmation

17  order or any other document agreeing to this language in the

18  confirmation order?

19  A   I don't think there's any document that's signed.  I think

20  we already went over that.  I think the email is evidence

21  their agreement to the general terms.  I don't see any

22  agreement with respect to this particular language.

23  Q   Well, you have no personal information?  You're going on

24  what your lawyers told you that the CLOs agreed to, correct?

25  A   That's correct.

Seery - Recross                                    255

1    Q    Okay.  You didn't personally --

2    A    Excuse me.  That's correct with respect to this language,

3    not with respect to the agreement.  I was on the phone when

4    they agreed.

5    Q    Okay.  And they agreed orally, you're saying, to basically

6    the assumption of the CLO management agreements?

7    A    Correct.

8    Q    Okay.

9         MR. RUKAVINA:  Thank you, Your Honor.  I'll pass the

10   witness.

11        THE COURT:  All right.  Other recross?

12        MR. TAYLOR:  Yes, Your Honor, I do.

13        THE COURT:  Go ahead.

14                         RECROSS-EXAMINATION

15   BY MR. TAYLOR:

16   Q    Mr. Seery, Clay Taylor again.  You worked -- I'm sorry,

17   let me restart.  I believe you testified earlier, in response

18   to questions by Mr. Morris, that you didn't believe a Chapter

19   7 trustee would be very effective in monetizing these assets,

20   correct?

21   A    I think I said I didn't believe that the Chapter 7 trustee

22   would be as effective at monetizing the assets as the

23   Reorganized Debtor would be, and me in the role as Claimant

24   Trustee.

25   Q    And one of the reasons that you gave is you believe that

Seery - Recross                                    256

1    the Chapter 7 trustee had to liquidate assets so quickly that
2    it could not be effective; is that correct?
3    A    Typically, that's the case, yes.
4    Q    You worked for the Lehman trustee, correct?
5    A    That's incorrect.
6    Q    Okay.  Did you work on the Lehman case?
7    A    Did I work in the case?  No.
8    Q    Okay.  Did you -- how were you involved within -- within
9    the Lehman case?
10   A    It's a long history, but I was a relatively senior person,
11   not senior level, not senior management level person at
12   Lehman.  I ran the loan businesses and I helped a number of
13   other places and I -- in the organization.  I helped construct
14   the sale of Lehman to Barclays out of the broker-dealer and
15   then helped consummate that sale.
16   Q    Okay.  I believe, in that case, it was a SIPC -- the
17   trustee was a SIPC trustee, correct?
18   A    With respect to the broker-dealer.
19   Q    Okay.  And you believe that a SIPC trustee is very -- has
20   very similar rules with respect to asset sales; is that
21   correct?
22   A    There are some similarities, absolutely.
23   Q    Okay.  And so in that case, the trustee was in place for
24   seven years, yet you believe -- you want this Court to believe
25   that a Chapter 7 trustee has to liquidate assets in a very

                              Seery - Recross                    257

1  short time frame, is that correct?

2              MR. MORRIS:  Objection to the form of the question.

3              THE WITNESS:  Yeah, in the Lehman case, --

4              THE COURT:  Overruled.

5              THE WITNESS:  I'm sorry, Judge.

6              THE COURT:  Go ahead.

7              THE WITNESS:  In the Lehman case, the SIPC trustee

8  spent years litigating, not liquidating.  The broker-dealer

9  was sold in our structured deal to Barclays, and then the SIPC

10 trustee liquidated the remainder of the estate, which was the

11 broker-dealer, but most of it had been sold to Barclays.  It

12 was really a litigation case.

13 BY MR. TAYLOR:

14 Q    But it did -- that trustee did sell off subsequent assets

15 after the initial sale, correct?

16 A    That trustee, I don't think, managed -- I don't know about

17 that.  The trustee didn't really manage any assets.  Other

18 than litigations.

19 Q    You've also testified that you didn't believe or that you

20 would not take on this role without the gatekeeper and

21 injunction -- gatekeeper role and injunction being in place;

22 is that correct?

23 A    Yes.

24 Q    And you're also familiar with the Barton Doctrine,

25 correct?

1    A    I'm not.

2    Q    Okay.  Do you believe that a Chapter 7 trustee could be

3    sued by third parties without obtaining either relief from

4    this Court -- let me just stop there.  Do you believe that a

5    Chapter 7 trustee could be sued without seeking leave of this

6    Court?

7    A    I think it would be difficult.  I know that Chapter 7

8    trustees have qualified immunity, so I think, whether it would

9    be leave of this Court or it's just that there's a very high

10   bar to suing them, I'm not exactly sure.  It's not something

11   I've spent time on.

12   Q    Okay.  So a hypothetical Chapter 7 trustee would have no

13   need of the gatekeeper role or injunction if this case were

14   converted to one under Chapter 7, correct?

15   A    That's probably true.

16   Q    Thank you.

17          MR. TAYLOR:  No further questions.

18          THE COURT:  All right.  Any other recross?

19          MR. DRAPER:  Your Honor, I have nothing --

20          THE COURT:  All right.

21          MR. DRAPER:  -- further.

22          THE COURT:  All right.  I think we're done, but

23   anyone I've missed?

24       All right.  Mr. Seery, it's been a long day.  You are

25   excused from the virtual witness stand.

Seery - Recross                                    259

1          THE WITNESS:  Thank you, Your Honor.

2          THE COURT:  All right.  Mr. Morris, let's see if

3     there's anything else we can accomplish today.  It's 4:18

4     Central time.  Who would be your next witness?

5          MR. MORRIS:  My next witness would be John Dubel,

6     Your Honor.

7          THE COURT:  All right.  Can you give us a time

8     estimate for direct?

9          MR. MORRIS:  I wouldn't expect Mr. Dubel to be more

10    than 20 minutes or so, but I would offer the Court, if you

11    think it would be helpful, counsel for the CLO Issuers is on

12    the call, and I believe that they would be prepared to just

13    confirm for Your Honor that there is an agreement in

14    principle, just as Mr. Seery has testified to, and maybe you

15    want to hear from her.  I know she's not really a witness, but

16    she might be able to make some representations to give the

17    Court some comfort that everything Mr. Seery has said is true.

18         THE COURT:  I think that would be useful.  Is it Ms.

19    Anderson or who is it?

20         MS. ANDERSON:  That is -- it is, Your Honor.  And you

21    know, I appreciate the testimony given.  I certainly do not

22    want to testify, but thought it might be useful for the Court

23    to hear from us.

24       Amy Anderson on behalf of the Issuers from Jones Walker.

25    Schulte Roth also represents the Issuers.  And I can represent

260

```
 1   to the Court that the agreement as it's represented on Docket

 2   1807, as more particularly described in Exhibit C, which Your

 3   Honor has seen, is the agreement reached between the Issuers

 4   and the Debtor.

 5       There was some testimony about fees owed, accrued fees

 6   owed to the Debtor.  I certainly cannot speak to the substance

 7   of each particular management agreement with each CLO.  They

 8   are all distinct and unique and very lengthy documents.  I

 9   will -- I can represent to the Court that any accrued fees

10   that are owed were not intended to be included in the release.

11   It is -- it is not meant to release fees owed to Highland

12   under the particular management agreements.

13       Of course, if the Court has any questions or if I can

14   provide anything further, I'm happy to.  And I will be on the

15   hearing today and tomorrow, but I thought it might be useful,

16   given the topic of the testimony this afternoon.

17           THE COURT:  All right.  That was useful.  Thank you,

18   Ms. Anderson.

19       All right.  Well, Mr. Morris, shall we go ahead and hear

20   from Mr. Dubel today, perhaps finish up a second witness?

21           MR. MORRIS:  Yeah.  I think we have the time.  I

22   think Mr. Dubel is here.  Are you here, Mr. Dubel?

23           MR. DUBEL:  I am.  Can you hear me, Your Honor?

24           THE COURT:  I can hear you, but I cannot see you.

25   Oh, now I can see you.  Please raise your right hand.
```

                              Dubel - Direct                    261

1                 JOHN S. DUBEL, DEBTOR'S WITNESS, SWORN

2              THE COURT:  All right.  Thank you.  Mr. Morris, go

3    ahead.

4              MR. MORRIS:  Thank you very much, Your Honor.

5                          DIRECT EXAMINATION

6    BY MR. MORRIS:

7    Q    Mr. Dubel, can you hear me?

8    A    I can, Mr. Morris.

9    Q    Okay.  Do you have a position today with the Debtor, sir?

10   A    I am a director of Strand Advisors, Inc., which is the

11   general partner of the Debtor.

12   Q    Okay.  And can you --

13             MR. MORRIS:  Your Honor, just as a reminder, I'm

14   going to ask Mr. Dubel to describe his professional experience

15   in some detail, to put into context his testimony, but his

16   *C.V.* can be found at Exhibit 6Y as in yellow on Docket No.

17   1822.

18             THE COURT:  All right.

19   BY MR. MORRIS:

20   Q    Mr. Dubel, can you describe your professional background?

21   A    Yes.  I have approximately, almost, and I hate to say it

22   because it's making me feel old, but I have almost 40 years of

23   experience working in the restructuring industry.

24        I have served in many roles in that, both as an advisor,

25   an investor in distressed debt, and also a member of

Dubel - Direct                                    262

1  management teams, and as a director, both an independent

2  director and a non-independent director.

3      My executive roles have included the -- both an executive

4  director, chief executive officer, president, chief

5  restructuring officer, chief financial officer.  And I have

6  been involved in some of the largest Chapter 11 cases over the

7  last several decades, including cases like *WorldCom* and

8  *SunEdison*.

9  Q   Let's focus your attention for a moment just on the

10 position of independent director.  Have you served in that

11 capacity before this case?

12 A   I have.

13 Q   Can you describe for the Court some of the cases in which

14 you've served as an independent director?

15 A   Sure.  I've served as an independent director in several

16 cases that were I'll call post-reorg cases.  *Werner Company*,

17 which was the largest climbing equipment manufacturer in the

18 world, manufacturer of ladders, Werner Ladders.  You'll see

19 them on every pickup truck running around the countryside.

20     *FXI Corporation*, which is a -- one of the largest foam

21 manufacturers.  Everybody's probably slept or sat on one of

22 their products.

23     *Barneys New York*, back in 2012, when they did an out-of-

24 court restructuring.  I had previously been involved with

25 Barneys 15 years before that, and so I was called upon because

Dubel - Direct                         263

1  of my knowledge to be an independent director in that

2  situation.  Have had no relationship with Barneys since it

3  emerged from Chapter 11 back in 1998.

4      I have been the independent director in *WMC Mortgage*,

5  which was a mortgage company owned by General Electric.

6      And I am currently serving as an independent director in a

7  company -- in two companies.  One, *Alpha Media*, which is a

8  large radio station chain that recently filed Chapter 11, I

9  believe it was late Sunday night, and I am also an independent

10  director in the *Purdue Pharma* bankruptcy, and have served

11  prior to the bankruptcy and am the chair of the special

12  independent committee of directors -- special committee of

13  independent directors in that particular situation.

14  Q   That sounds like a lot.  In terms of other fiduciary

15  capacities, I think your *C.V.* refers to Leslie Fay.  Were you

16  involved in that case, and if so, how?

17  A   I was.  That was -- for those people who may remember it,

18  that goes back into the 1993 era.  *Leslie Fay* was a large

19  apparel manufacturer, and at the time was one of the largest

20  companies that had gone through an extensive fraud.  I say at

21  the time because it was about a $180 million fraud, which

22  pales by some of the ones that have followed it.

23      I was brought in as the executive vice president in charge

24  of restructuring, chief financial officer, and was also added

25  to the board of directors.  Even though I wasn't independent,

Dubel - Direct                                            264

1  I was added to the board of directors to have the fresh face

2  on the board in that particular situation because of the fraud

3  that had taken place.

4  Q    And --

5  A    *Sun* --

6  Q    Go ahead.

7  A    *SunEdison*, I was brought in as the CEO.  Actually,

8  initially, as the chief restructuring officer, with a mandate

9  to replace the CEO, which took place shortly after I was

10 brought on board and -- because of various issues surrounding

11 investigations by the SEC, DOJ, and allegations by the

12 creditors of fraud.  And so I was brought in to run the

13 company through its Chapter 11 process.

14      As I'd mentioned earlier, *WorldCom*, I was brought in at

15 the beginning of the case as the fresh chief financial

16 officer.  And I think everybody is familiar with what happened

17 in the *WorldCom* situation.

18 Q    All right.  Based on that experience, do you have a view

19 as to whether the appointment of independent directors is

20 unusual?

21 A    It is not.  More recently, it has -- it had been in the

22 past.  Usually, you know, they would try and take the existing

23 directors and form a special committee of the existing

24 directors.  But I think the state of the art has become more

25 where independent directors are brought in, mainly because the

Dubel - Direct                    265

1  cases have become a lot more complex in nature, and larger,

2  and the transactions themselves are much more sophisticated.

3  And so having somebody independent has been important for

4  analyzing the various transactions.  And also, quite often,

5  it's just bringing a fresh, independent voice to the company

6  on the board.

7  Q    Do you have an understanding as to the purpose and the

8  role of independent directors generally in restructuring and

9  bankruptcy cases?

10 A    Sure.  As I kind of alluded to a little bit earlier, the

11 -- probably the most critical thing is for restoring

12 confidence in the company and in the management in terms of

13 corporate governance, especially when there have been troubled

14 situations, where -- whether it's been fraud or allegations

15 made against the company and its prior management or when

16 management has left under difficult situations.

17     Also, you know, independent thought process being brought

18 to the board is very important for helping guide companies.

19 It's quite often the existing management team or the existing

20 board may get stuck in a rut, as you can say, you know, in

21 terms of their thinking on how to manage it, and having

22 somebody with restructuring experience who provides that

23 independent voice is very important to the operations.

24     In addition, having someone who can look at conflicts that

25 might arise between shareholders or shareholders and the board

Dubel - Direct                                        266

1   members is important.  As I mentioned earlier, the *WMC*

2   *Mortgage* situation was one where I was brought on to -- as an

3   independent member of the board to effectively negotiate an

4   agreement or a settlement between WMC and its parent, General

5   Electric.  That entity was being -- WMC was being sued for

6   billions of dollars, and there were issues as to whether or

7   not General Electric should fund those obligations.  And so

8   that was a role that is quite often occurring in today's day

9   and age.

10      In addition, evaluating transactions for companies is

11  important, whereby either the shareholders who sit on the

12  board or board members may be involved in those transactions,

13  needing an independent voice to review it.  And, you know, I

14  have served in situations.  Again, *Barneys New York* and *Alpha*

15  *Media* is another example where, as an independent director, I

16  am one of the parties responsible for evaluating those

17  transactions and making recommendations to the entire board.

18      And then, again, you know, situations where it's just

19  highly-contentious and having, as I said, having that

20  independent view brought to the table is something that is

21  very helpful in these cases.

22  Q    I appreciate the fulsomeness of the answer.  During the

23  time that you served in these various fiduciary capacities, is

24  it fair to say you spent a lot of time considering and

25  addressing issues relating to D&O and other executive

Dubel - Direct                           267

1  liability issues?

2  A    It's usually one of the things that you get involved with

3  thinking about prior to taking on the role because you want to

4  make sure that there are the appropriate protections for the

5  director.

6  Q    Can you describe for the Court some of the protections

7  that you've sought or that you've seen employed in some of the

8  cases you've worked on, including this one, by the way?

9  A    Sure.  I mean, one of the first things you look to is does

10 the company -- will the company indemnify the director for

11 serving in that capacity?  And if the company will not

12 indemnify, then there's always a question as to why not, and

13 it's probably something you don't want to get involved with.

14     Generally, that is something that I don't think I've ever

15 seen a case where there has not been indemnification.

16 Obviously, it would, you know, cause great pause or concern if

17 they weren't willing to indemnify.  But that is important.

18     Providing D&O insurance is very important.  And in most

19 situations, you know, over the last 10-15 years, if there's

20 not adequate D&O insurance -- quite often, the D&O insurance

21 has been tapped out because of claims that will -- have been

22 brought or are anticipated to be brought -- new D&O insurance

23 is something that's front and center for the minds of

24 independent directors such as myself.

25     As you -- that gets you into the case and gets you moving.

Dubel - Direct                                    268

1   As you start to look towards the confirmation and exit from

2   the case, things that would be appropriate, that, you know,

3   would always be something you would want to look at would be

4   exculpation language, releases.  And in this particular case,

5   the injunction, or what Mr. Seery earlier referred to as the

6   gatekeeper clause, is something that is very important for

7   directors, both, you know, as they're thinking through it and

8   as they emerge.

9   Q    All right.  Let's shift now to this case, with that

10  background.  How did you learn about this case?

11  A    I had a party who was involved in the case reach out to me

12  in early part of December of 2019 to see if I would be

13  interested in getting involved.  I think that was about the

14  time -- it was after -- as I recall, it was after the case had

15  been moved to Dallas and when there was a -- consideration of

16  either a Chapter 11 or a Chapter 7 trustee.  I can't remember

17  exactly which it was.  But there was talk about a motion to

18  bring on a trustee and get rid of all the management and the

19  like and such.

20  Q    Can you describe in as much detail as you can recall the

21  facts and circumstances that led to your appointment as an

22  independent director?

23  A    Sure.  I, as I said, I had -- early December, I had an --

24  one of the parties involved -- had, probably within the next

25  week, probably two or three others -- that reached out to see

Dubel - Direct                                          269

1   if I would be interested in participating.  I met with the

2   Creditors' Committee or -- I'm not sure if it was all the

3   members, but representatives of the Creditors' Committee,

4   along with counsel, and I believe financial advisors were

5   involved.  They walked me through the issues.  They wanted to

6   hear about my *C.V.*  Quite a few of them knew me, knew me well,

7   but others wanted to hear about my background and how I would

8   look at things as an independent director.

9       That went through into the latter part of December.  I

10  knew that they were talking to other parties.  I think it was

11  probably right around the first of the year or so that I was

12  informed, maybe a little bit earlier than that, that I was

13  informed that Mr. Seery was one of the other parties that they

14  were talking to, and Mr. Seery and I were put in touch with

15  each other.  I had worked with Mr. Seery back probably nine

16  years earlier when I was the CEO of FGIC.  He was involved in

17  a matter that we were restructuring, and so knew him a little

18  bit and was comfortable working with him as a, you know,

19  another independent director.

20      Then we took the time that we had to to -- or, I took the

21  time to -- from the beginning, you know, the early part of

22  December, look at the docket, understand what was taking

23  place.  I -- in addition, I met with the company and its

24  advisors, in-house counsel, the folks at DSI who were at the

25  time the CRO and the company's counsel to better understand

Dubel - Direct                                    270

1   some of the issues.

2        Mr. Seery and I, as I said, were both selected, and we

3   went through the process of, I guess, breaking the tie, I

4   think, if I could say it that way, amongst the creditors and

5   the Debtor as to who would be the third member of the board.

6   And we were given the opportunity to go out, interview, and

7   select the third member, which resulted in Russell Nelms'

8   appointment to the board.  And also during that time, we were

9   given the opportunity to have some input -- not a hundred

10  percent input, but some input -- on the January 9th order that

11  -- the January 9, 2020 order that was put in place appointing

12  us and giving us some of the protections that we felt were

13  appropriate and necessary in this case.

14  Q    All right.  We'll get to that in a moment, but during this

15  diligence period, did you form an understanding as to why an

16  independent board was being formed, why it was being sought?

17  A    Yes.  There was, my words, there was a lot of distrust

18  between the creditors and the management -- not the CRO, but

19  the prior management of the company -- and there had been a

20  motion brought both to obviously bring the case back to Dallas

21  from I think it was originally in Delaware and then there was

22  a motion to seek, you know, to remove management and put in a

23  trustee.

24       There had been a dozen years of litigation with one party,

25  about eight or nine years with another major party, and

Dubel - Direct                                              271

1  several other of the major creditors were litigants.  The

2  other, as I understood, the other creditors, main creditors in

3  the case were all lawyers who had not yet gotten paid for the

4  litigation work that they had done.  And so it was obvious

5  that this was a very -- a highly-litigious situation.

6  Q   In addition to speaking with the various constituents, did

7  you do any diligence on your own to try to understand the case

8  before you accepted the appointment?

9  A   Yes.  I went to the docket to look at all the -- not every

10  single thing that had been filed, but to try and look at all

11  the key, relevant items that had been filed, get a better

12  understanding of what was out there.  Looked at some of the

13  initial filings of the company in terms of the, you know, the

14  creditors, to understand who the creditor base was per the

15  schedules that had been filed.  Looked at the -- some of the

16  various pleadings that had been put in place.

17  Q   Did you form a view as to the causes of the bankruptcy

18  filing?

19  A   Litigation.  That was my clear view.  This company had

20  been in litigation with multiple parties, various different

21  parties, since around 2008.  Generally, you would see

22  litigation like the types that were, you know, that were here,

23  you know, you'd litigate for a while, then you'd try and

24  settle it.

25      It did not appear to me that there was any intention on

Dubel - Direct                                  272

1  the -- the Debtor to settle these litigations, but would
2  rather just continue the process and proceed forward on the
3  litigation until the very last minute.  And so it was obvious
4  that this was going to -- that the Debtor was a, as I said, a
5  highly-litigious shop, and that was one of the causes,
6  obviously, the cause of the filing, along with the fact that
7  judgments were about to be entered against the Debtor.
8  Q    All right.  And in January 2020, do you recall that's when
9  the agreement was reached between the Debtor, the Committee,
10 and Mr. Dondero?
11 A    Yeah, it was the first week or so, which resulted in a
12 hearing on I believe it was January 9th in front of Judge
13 Jernigan.
14 Q    And as a part of that -- I think you testified at that
15 hearing.  Do I have that right?
16 A    I don't recall if I did.  I might have.  I might have
17 testified at a subsequent hearing.  But --
18 Q    But was --
19 A    -- I was in the courtroom for that hearing, yes.
20 Q    Was it part of that process by which you accepted the
21 appointment as independent director?
22 A    I accepted it based upon the order that had been
23 negotiated amongst the parties, the creditors, the Debtor, Mr.
24 Dondero, and others.  And that was the key thing that was --
25 and approved by the Court on that date.  And that was key for

Dubel - Direct                                              273

1  my acceptance of the role as an independent director.

2  Q    And did you and the other prospective independent

3  directors participate in the negotiation of the substance of

4  the agreement?

5  A    We did.  We didn't have a hundred percent say over it, but

6  we were able to get our voices heard.  As Mr. Seery testified

7  earlier, he was instrumental in coming up with an idea about

8  how to put in place the injunction, you know, the -- I think

9  he referred to it as the gatekeeper injunction, which was

10 obviously in this case very critical to all three of us:  Mr.

11 Seery, Mr. Nelms, and myself.

12 Q    Can you describe for the Court kind of the issues of

13 concern to you and the other prospective board members?  What

14 was it that you were focused on in terms of the negotiations?

15 A    Well, obviously, indemnification was important, but that

16 was something that was going to be granted.  Having the right

17 to obtain separate D&O insurance just for the three directors

18 was important.  We were concerned that Strand Advisors, Inc.

19 really had no assets, and so we wanted to make sure that the

20 Debtor was going to get -- was going to basically guarantee

21 the indemnification.

22     The -- because of the litigious nature and what we had

23 heard from all of the various parties involved, including

24 people inside the Debtor who we had talked with, that it would

25 be something that was important for us to make sure that the

Dubel - Direct                                274

1    injunction, the gatekeeper injunction was put in place.

2    Q    And can you elaborate a little bit on I think you said you

3    had done some diligence and you had formed a view as to the

4    causes of the bankruptcy filing, but did this case present any

5    specific concerns or issues that you and the board members had

6    to address perhaps above and beyond what you experienced in

7    some of the other cases you described?

8    A    Well, as I said earlier, the fact that the litigation --

9    the various litigations with the creditors have been going on

10   for what I viewed as an inordinate amount of years, and that

11   it was clear from my diligence that I had done that this had

12   been directed by Mr. Dondero, to keep this moving forward in

13   the litigation, and to, in essence, just, you know, never give

14   up on the litigation.

15        It was important that the types of protections that we

16   were afforded in the January 9th order were put in place,

17   because we -- none of us -- none of the three of us, and

18   myself in particular, did not want to be in a position where

19   we would be sued and harassed through lawsuits for the next,

20   you know, ten years or so.  That's not something anybody would

21   want to sign up for.

22   Q    All right.  Let's look at the January 9th order and the

23   specific provisions I think that you're alluding to.

24        MR. MORRIS:  Can we call up Exhibit 5Q, please?

25        THE WITNESS:  Pardon me while I put my glasses on to

Dubel - Direct                                    275

1   read this.

2           MR. MORRIS:   All right.  And if we can go to

3   Paragraph 4.

4   BY MR. MORRIS:

5   Q   Is that the paragraph, sir, that was intended to address

6   the concern that you just articulated about Strand not having

7   any assets of its own?

8   A   Yes, it is.

9   Q   And can you just describe for the Court how that

10  particular provision addressed that concern?

11  A   Sure.  Since we were directors of Strand, which is the

12  general partner of the Debtor, we felt it was important that

13  the general -- that Highland, the Debtor, would provide the

14  guaranty on indemnification, because Highland had the assets

15  to back up the indemnification.

16      It was also pretty clear, from my experience in having

17  placed D&O insurance, you know, over the last 25-30 years,

18  that if there was no, you know, opportunity for

19  indemnification, putting in place insurance would be very

20  difficult or exorbitantly expensive.  So having this

21  indemnification by Highland was a very important piece of the

22  order that we were seeking.

23  Q   And the next piece is the insurance piece in Paragraph 5.

24  Do you see that?

25  A   I do.

Dubel - Direct                                                      276

1   Q    Did you have any involvement in the Debtor's efforts to

2   obtain D&O insurance for the independent board?

3   A    I did.

4   Q    Can you just describe for the Court what role you played

5   and what issues came up as the Debtor sought to obtain that

6   insurance?

7   A    Sure.  The Debtors had been looking to get an insurance

8   policy in place.  They were not able to do that.  I happen to

9   have worked with an insurance broker on D&O situations in some

10  very difficult situations over the years and brought them into

11  the mix.  They were able to go out to the market and find a

12  policy that would cover us, the -- kind of the key components

13  of that policy, though, were, number one, the guaranty that

14  HCMLP would give -- I'm sorry, the guaranty that HCMLP would

15  give to Strand's obligations, and also the -- I'll call it the

16  gatekeeper provision was very important because these parties

17  did not want to have -- they wanted to have what was referred

18  to, commonly referred to as the Dondero Exclusion.

19       So while we were -- we purchased a policy that covered us,

20  it did have an exclusion, unless there were no assets left,

21  and then the what I'll call -- we refer to as kind of a Side A

22  policy would kick in.

23  Q    Okay.  What do you mean by the Dondero Exclusion?

24  A    The insurers did not want to cover the -- any litigation

25  that Mr. Dondero would bring against directors.  It was pretty

Dubel - Direct                    277

1   commonly known in the marketplace that Mr. Dondero was very

2   litigious, and insurers were not willing to write the

3   insurance without the protections that this order afforded

4   because they did not want to be hit with frivolous -- hit with

5   claims on the policy for frivolous litigation that might be

6   brought.

7           MR. TAYLOR:  Your Honor, this is Mr. Taylor.  I've

8   got to object to the last answer.  He testified as to what the

9   insurers' belief was and what they would or would not do based

10  upon their own knowledge.  It's not within his personal

11  knowledge.  And therefore we'd move to strike.

12          THE COURT:  I overrule that objection.

13          MR. MORRIS:  Your Honor?

14          THE COURT:  I overrule the objection.

15          MR. MORRIS:  Thank you.  Thank you, Your Honor.

16  BY MR. MORRIS:

17  Q   Mr. Dubel, can you explain to the Court, in your work in

18  trying to secure the D&O insurance, what rule the gatekeeper

19  provision played in the Debtor's ability to get that?

20  A   Based upon my discussions with the insurance broker, who I

21  have worked with for 25-plus years, had that gatekeeper

22  provision not been put in place, we would not have been able

23  to get insurance.

24  Q   All right.  Let's look at the gatekeeper provision.

25          MR. MORRIS:  Can we go down to Paragraph 10, please?

Dubel - Direct                                278

1  Perfect.  Right there.

2  BY MR. MORRIS:

3  Q   Is this gatekeeper provision, is this also the source of

4  the exculpation that you referred to?

5  A   Yes.

6  Q   And what's your understanding of how the exculpation and

7  gatekeeper functions together?

8  A   Well, my apologies, I'm not an attorney, so just from a

9  business point of view, the way I look at this is that, you

10 know, obviously, we're -- you know, the directors are not

11 protected from willful misconduct or gross negligence, but any

12 negligence -- you know, claims brought under negligence and

13 the likes of such, and things that might be considered

14 frivolous, would have to first go to Your Honor in the

15 Bankruptcy Court for a review to determine if they were claims

16 that should be entitled to be brought.

17 Q   If you take a look at the provision, right, do you

18 understand that nobody can bring a claim without -- in little

19 i, it says, first determining -- without the Court first

20 determining, after notice, that such claim or cause of action

21 represents a colorable claim of willful misconduct or gross

22 negligence against an indirect -- independent director.  Do

23 you see that?

24 A   I do.

25 Q   Is it your understanding that parties can only bring

Dubel - Direct                                                279

1  claims for gross negligence or willful misconduct if the Court

2  makes a determination that there is a colorable claim?

3  A    That's my understanding.

4  Q    And the second --

5  A    I think they have the right -- I think they have the right

6  to go to the Court to ask if they can bring the claim, but the

7  Court has to make the determination that it's a colorable

8  claim for willful misconduct or gross negligence.

9  Q    And if the Court -- is it your understanding that if the

10 Court doesn't find that there is a colorable claim of willful

11 misconduct or gross negligence, then the claim can't be

12 brought against the independent directors?

13 A    That is my understanding, yes.

14 Q    And was -- taken together, Paragraphs 4, 5, and 10, were

15 they of importance to you and the other independent directors

16 before accepting the position?

17 A    They were absolutely critical to me and definitely

18 critical to the other directors, because we all negotiated

19 that together, and it would -- I don't -- I don't think any of

20 the three of us would have taken on this role if those

21 paragraphs had not been included in the order.

22 Q    Okay.  Just speaking for yourself personally, is there any

23 chance you would have accepted the appointment without all

24 three of those provisions?

25 A    I would not have.

Dubel - Direct                                      280

1   Q    And why is that?  In this particular case, why did you

2   personally believe that you needed all three of those

3   provisions?

4   A    Well, you know, people like myself, you know, someone

5   who's coming in as an independent director, come in in a

6   fiduciary capacity.  And, you know, we take on risks.  Now,

7   granted, in a Chapter 11 case, as the saying goes, you know,

8   it's a lot safer because everything has to be approved by the

9   Court, but there are still opportunities for parties to, in

10  essence, have mischief going on and bring nuisance lawsuits

11  that would take a lot of time and effort away from either the

12  role of our job of restructuring the entity or post-

13  restructuring, would just be nuisance things that would cost

14  us money.  And we, you know, I did not want to be involved in

15  that situation, knowing the litigious nature of Mr. Dondero

16  from the research that I had done, you know, the diligence

17  that I had done.  I did not want to subject myself to that.

18  And it has proven an appropriate and very solid order because

19  of the conduct of Mr. Dondero, as Mr. Seery has testified to

20  earlier.

21  Q    Do you have a view as to what the likely effect would be

22  on future corporate restructurings if you and your fellow

23  directors weren't able to obtain the type of protection

24  afforded in the January 9th order?

25  A    I think it would be very difficult to find qualified

Dubel - Direct                    281

1   people who would be willing to serve in these types of

2   positions if they knew they had a target on their backs.  You

3   know, it was something that was clear to us, to Mr. Seery, Mr.

4   Nelms, myself at the time, that if we had a target -- we felt

5   like we would have a target on our back if we didn't have

6   these protections.

7       It just wasn't worth the risk, the stress, the

8   uncertainty, the potential cost to us.  And so I don't think

9   anybody else would be, you know, willing to take on the roles

10  as an independent director with the facts and circumstances

11  and the players involved in this particular case.

12          MR. MORRIS:  I have no further questions, Your Honor.

13          THE COURT:  All right.  Pass the witness.  Let's see.

14  You went -- I'm going to give a time.  You went 32 minutes.

15  So, for cross of this witness, I'm going to limit it to an

16  aggregate of 32 minutes.  Who wants to go first?

17          MR. DRAPER:  Your Honor, this is Douglas Draper.

18  I'll be happy to go first.

19          THE COURT:  All right.

20                      CROSS-EXAMINATION

21  BY MR. DRAPER:

22  Q   Mr. Dubel, prior to your engagement, did you happen to

23  read the case of *Pacific Lumber*?

24  A   I did not.

25  Q   And were you advised about *Pacific Lumber* by somebody

Dubel - Cross                                    282

1  other than a -- your lawyer?

2  A    I'm not familiar with the case at all, Mr. Draper.

3  Q    Are you aware, and you've been around a long time, that

4  different circuits have different rules for liabilities of

5  officers, directors, and people like that?

6  A    I am aware that there are different, I don't know what the

7  right term is, but precedents, I guess, in different circuits

8  for any number of things, whether it's a sale motion or

9  protections of officers and directors or anything.  So each

10 circuit has its own unique situations.

11 Q    And one last question.  On a go-forward, after -- if this

12 plan is confirmed and on the effective date, you will not have

13 any role whatsoever as an officer or director of the new

14 general partner, correct?

15 A    I have not been asked to.  As Mr. Seery testified, he may

16 ask for assistance or just -- in most situations that I'm

17 involved with, I may have a continuing role just as a -- I'll

18 call it an advisor or somebody to provide a history.  But at

19 this point in time, I have not been asked to have any

20 involvement.

21 Q    And based on your experience, you know that there's a

22 different liability for a director and an officer versus

23 somebody who is an advisor?

24            MR. MORRIS:  Objection to the form of the question.

25 No foundation.

1          THE COURT:  Overruled.

2          MR. DRAPER:  Mr. Dubel has shown --

3          THE COURT:  Mr. Dubel, you can answer if you know.

4          MR. DRAPER:  Mr. Dubel, you can answer.

5          THE WITNESS:  I'm sorry, Your Honor, I didn't hear

6    you say overruled.  Thank you.

7       Mr. Draper, I apologize, could you repeat the question?

8    BY MR. DRAPER:

9    Q    The question is you know from your experience that there's

10   a different liability for somebody who is an officer or

11   director versus somebody who's an advisor?

12   A    Yes, that's my experience, which is why in several

13   situations post-reorganization, while I have not been involved

14   *per se*, and I use the term involved meaning, you know, on a

15   day-to-day basis, if someone asks me to assist, I'll usually

16   ask them to bring me in as a non -- an unpaid employee or a,

17   you know, a nominally-amount-paid employee, so that I would be

18   protected by whatever protections the company might provide.

19          MR. DRAPER:  I have nothing further for this witness,

20   Your Honor.

21          THE COURT:  All right.  Other cross?

22          MR. TAYLOR:  Yes, Your Honor.

23          MR. RUKAVINA:  Yes, Your Honor.

24          MR. TAYLOR:  Oh, go ahead, Davor.

25          MR. RUKAVINA:  No, Clay, go ahead.

Dubel - Cross                                    284

1                        CROSS-EXAMINATION

2    BY MR. TAYLOR:

3    Q    Mr. Dubel, this is Clay Taylor here on behalf on Mr.

4    Dondero.  I believe you had previously testified in response

5    to questions from Mr. Morris that Mr. Dondero had engaged in a

6    pattern of litigious behavior; is that correct?

7    A    I believe that's the testimony I gave, yes.

8    Q    Okay.  And please give me the specific examples of which

9    cases you believe he has engaged in overly-litigious behavior.

10   A    Well, all of the cases that resulted in creditors, large

11   creditors in our bankruptcy.  That would be the UBS situation,

12   the Crusader situation which became the Redeemer Committee,

13   litigation with Mr. Daugherty, with Acis and Mr. Terry.  And

14   as I mentioned earlier, I'd, you know, been informed by

15   members of the management team that it was Mr. Dondero's style

16   to just litigate until the very end to try and grind people

17   down.

18   Q    Okay.  Was Mr. Dondero or a Highland entity the plaintiff

19   in the UBS case?

20   A    No, but what was referred -- what I was referring to was

21   the nature in which he defended it and went overboard and

22   refused to ever, you know, try and settle things in a manner

23   that would have gotten things done.  And just looking at,

24   having been involved in the restructuring industry for the

25   last 40 years, as I said, almost 40 years, and been involved

Dubel - Cross                          285

1  in many, many litigious situations, it's obvious when someone

2  is litigious, whether they're the plaintiff or the defendant.

3  Q   So are you personally familiar with the settlement

4  negotiations in the UBS case that happened pre-bankruptcy,

5  then?

6  A   I have been informed that there were settlement

7  negotiations, and subsequently determined, through discussions

8  with the parties, that they weren't really close to -- to a

9  settlement.

10 Q   But are you aware of --

11 A   Mr. Dondero might have thought they were, but they were

12 not.

13 Q   Okay.  Would you be surprised to learn if UBS had offered

14 to settle pre-bankruptcy for $7 million?

15 A   As I understand, settlements -- settlement offers pre-

16 bankruptcy had a tremendous number of -- I don't know what the

17 right term is -- things tied to it and that clearly were never

18 going to get done.

19 Q   Okay.  When you say things were tied to it, what things

20 were tied to it?

21 A   I don't know all of the settlement discussions that took

22 place, but what I was informed was that there were a lot of

23 conditions that were included in that.  And it's -- if it had

24 been an offer of $7 million and Mr. Dondero didn't settle for

25 that, there must have been a reason why.  So, you know, since

1  the entities -- all of the entities within the Highland

2  Capital empire, if you'd call it that, were being sued for

3  almost a billion dollars.

4  Q    Okay.  And you say there was lots of conditions that were

5  tied to that.  What were the conditions?

6  A    As I said earlier, I wasn't informed of them on all the

7  prepetition settlements.  That's just what I was told, there

8  was conditions.

9  Q    Okay.  And who were you told these things by?

10  A    Both external counsel and internal counsel.  Mr.

11  Ellington, Scott Ellington, and Isaac -- the litigation

12  counsel.

13  Q    Okay.  So --

14  A    That's -- sorry.

15  Q    Okay.  In each of these cases, you were informed by your

16  views by statements that were made to you by other people?

17  A    Yes.

18  Q    Okay.

19  A    Made -- and particularly made by members of management of

20  the Debtor, which is pretty informed.

21  Q    Okay.  Which members of management were those?

22  A    As I just testified, it was Mr. Ellington, who was the

23  general -- the Debtor's general counsel, and Mr. Leventon,

24  Isaac Leventon, who was the -- I believe his title was

25  associate general counsel in charge of litigation.

Dubel - Cross                                    287

1    Q    Okay.  Thank you.

2              MR. TAYLOR:  No further questions.

3              THE COURT:  All right.  Mr. Rukavina?

4                        CROSS-EXAMINATION

5    BY MR. RUKAVINA:

6    Q    Mr. Dubel, we've never met, although I think we were on

7    the phone once together.  I know you're a director, so you're

8    at the top, but having been in this case for more than a year,

9    you probably have some understanding of the assets that the

10   Debtor has, don't you?

11   A    I do, but I'm not as facile with it as Mr. Seery,

12   obviously.

13   Q    Sure.  Is it true, to your understanding, that the Debtor

14   owns various equity interests in third-party companies?

15   A    Either directly or indirectly.  That's my understanding,

16   yes.

17   Q    Okay.  Have you heard of an entity called Highland Select

18   Equity Fund, LP?

19   A    I have.

20   Q    And is that a publicly-traded company?

21   A    I'm not familiar with its nature there, no.

22   Q    Do you know how much of the equity of that entity the

23   Debtor owns?

24   A    I don't know off the top of my head, no.

25   Q    And again, these may be unfair questions because you're at

Dubel - Cross                                    288

1  the top, so I'm not trying to make you look foolish.  I'm just

2  trying to see.  Let me ask one more.  Have you heard of

3  Wright, W-R-I-G-H-T, Limited?

4          MR. MORRIS:  Objection, Your Honor.  Beyond the

5  scope.

6          MR. RUKAVINA:  Your Honor, I can recall him on my

7  direct, then.

8          THE COURT:  Yeah.  I'll --

9          MR. RUKAVINA:  But I'd just rather get it over with.

10         THE COURT:  I'll allow it.

11         MR. MORRIS:  All right.  If we're going to get rid of

12 --

13         THE COURT:  Overruled.

14         MR. MORRIS:  No, that's fine.

15 BY MR. RUKAVINA:

16 Q   Have you heard of Wright, W-R-I-G-H-T, Limited?

17 A   I think I have, but I just don't recall it, Mr. Rukavina.

18 I'm sorry, Rukavina.  Sorry.

19 Q   It's okay.  It's a --

20 A   I'm looking at your chart here, at your name here, and it

21 looks like Drukavina, so I really apologize.

22 Q   Believe it or not, it's actually a very famous name in

23 Croatia, although it means nothing here.

24      So, all of the entities that the Debtor owns equity in, I

25 guess you probably, just because, again, you're not in the

Dubel - Cross                                    289

1   weeds, you can't tell us how much of that equity the Debtor

2   owns, can you?

3   A   I can't individually, no.  You know, Mr. Seery is our CEO

4   and he's responsible for the day-to-day, you know, issues.  So

5   usually we look at it more on a consolidated basis and not in

6   the, you know, down in the weeds, as you refer to it, unless

7   something specific came up.

8   Q   Well, would you remember whether, when Mr. Seery or the

9   prior CRO would provide you, as the board member, financial

10  reports, whether that included P&Ls and balance sheets and

11  financial reports for the entities that the Debtor owned

12  interests in?

13  A   We might -- we would have seen certain consolidating

14  reports that might -- that would be, you know, consolidating

15  financial statements that would be P&Ls.  Where we didn't

16  consolidate them, I'm not sure we saw the actual individual-

17  entity P&Ls on a regular basis.  We might have seen them if

18  there was a transaction taking place.  But again, you know, I

19  don't have -- I don't remember every single one of them, no.

20  Q   And you would agree with me, sir, that the Pachulski law

21  firm is an excellent restructuring, reorganization, insolvency

22  law firm, wouldn't you?

23  A   Yes, I would agree with you there.

24  Q   Okay.  And you would expect them to ensure that anything

25  that has to be filed with Her Honor is timely filed, wouldn't

```
                       Dubel - Cross                     290
```

1   you?

2   A   I would expect that they would follow the rules.

3   Q   Okay.  And you have the utmost of confidence, I take it,

4   in your CRO, don't you?

5   A   I have a tremendous amount of confidence in our CEO, who

6   also happens to hold the title of CRO, yes, if that's what

7   you're referring to as, Mr. Seery.

8       (Interruption.)

9           MR. RUKAVINA:  John.

10  BY MR. RUKAVINA:

11  Q   Okay, I think -- yeah, I think I heard that you have

12  tremendous confidence in the CEO, who happens to be the CRO,

13  right?

14  A   Yes, that's the case.

15          MR. RUKAVINA:  Thank you, Your Honor.  I'll pass the

16  witness.

17          THE COURT:  All right.  Any other cross of Mr. Dubel?

18      All right.  Mr. Morris, redirect?

19          MR. MORRIS:  Yeah, just very briefly, Your Honor.

20                      REDIRECT EXAMINATION

21  BY MR. MORRIS:

22  Q   You were asked about that *Pacific Lumber* case, Mr. Dubel;

23  do you remember that?

24  A   I do remember being asked about it.

25  Q   And you weren't familiar with that case, right?

Dubel - Redirect                    291

1  A    I'm not familiar with the name of the case, no.

2  Q    But you did know that the exculpation and gatekeeping

3  provisions were going to be included in the order; is that

4  fair?

5  A    I did.

6  Q    And did you testify that you wouldn't have accepted the

7  position without it?

8  A    I did testify that way.

9  Q    And if you knew that you couldn't get those provisions in

10 the Fifth Circuit, would you ever accept a position as an

11 independent director in the Fifth Circuit on a go-forward

12 basis?

13 A    Not in a situation such as this, no.

14 Q    Okay.  Okay.

15        MR. MORRIS:  No further questions, Your Honor.

16        THE COURT:  All right.  Any recross on that narrow

17 redirect?

18     All right.  Well, Mr. Dubel, you are excused from the

19 virtual witness stand.

20        THE WITNESS:  Thank you, Your Honor.

21        THE COURT:  All right.  I want to go ahead and --

22        MR. DUBEL:  Do you mind if I turn my video off?

23        THE COURT:  I'm sorry, what?

24        MR. DUBEL:  I said, do you mind if I turn my video

25 off?

292

1           THE COURT:  No, you may.  That's fine.

2           MR. DUBEL:  Thank you, Your Honor.

3           THE COURT:  All right.  I want to break now, unless

4    there's any quick housekeeping matter.  Anything?

5            MR. MORRIS:  No, Your Honor, but I would just ask

6    all parties to let me know by email if they have any

7    objections to any of the exhibits on the witness list that was

8    filed at Docket No. 1877, because I want to begin tomorrow by

9    putting into evidence the balance of our exhibits.

10          MR. RUKAVINA:  And Your Honor, I was responsible for

11   this due to an internal mistake.  The only ones I have an

12   objection to are -- is that 7?  John, is that 7, right, 7OO --

13          MR. MORRIS:  Yes.

14          MR. RUKAVINA:  Your Honor, I only have an objection

15   to 7O and 7P, although I think -- think the Court has already

16   admitted 7P, so my objection is moot.

17          THE COURT:  I have.

18          MR. RUKAVINA:  Okay.

19          THE COURT:  So, what --

20          MR. RUKAVINA:  Then it would just be --

21          THE COURT:  Go ahead.

22          MR. RUKAVINA:  I'm sorry.  It would just be 7O.

23   Septuple O or whatever the word is.

24          THE COURT:  All right.  So I will go ahead and admit

25   7F through 7Q, with the exception of 7O.  Again, these appear

293

1  at Docket Entry 1877.  And Mr. Morris, you can try to get in

2  7O the old-fashioned way if you want to.

3         MR. MORRIS:  Yeah, I'll deal with 7O and the very

4  limited number of other objections at the beginning of

5  tomorrow's hearing.

6         THE COURT:  All right.

7     (Debtor's Exhibits 7F through 7Q, with the exception of

8  7O, are received into evidence.)

9         THE COURT:  So we will reconvene at 9:30 Central time

10 tomorrow.  I think we're going to hear from the Aon, the D&O

11 broker, Mr. Tauber; is that correct?

12        MR. MORRIS:  That's right.  And that should be

13 shorter than even Mr. Dubel.

14        THE COURT:  All right.  Well, we will see you at 9:30

15 in the morning.  We are in recess.

16        MR. MORRIS:  Thank you so much.

17        THE CLERK:  All rise.

18    (Proceedings concluded at 5:09 p.m.)

19                        --oOo--

20                      CERTIFICATE

21    I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22 above-entitled matter.

23  **/s/ Kathy Rehling**                    **02/04/2021**

24 _____    _____

   Kathy Rehling, CETD-444                      Date
25 Certified Electronic Court Transcriber

294

INDEX

PROCEEDINGS                                                    5

OPENING STATEMENTS

- By Mr. Pomerantz                                           12
- By Mr. Kathman                                             29
- By Mr. Clemente                                            33
- By Mr. Draper                                              40
- By Mr. Rukavina                                            42
- By Mr. Taylor                                              44
- By Mr. Kathman                                             49
- By Ms. Drawhorn                                            50

WITNESSES

Debtor's Witnesses

James P. Seery
- Direct Examination by Mr. Morris                           58
- Cross-Examination by Mr. Rukavina                         169
- Cross-Examination by Mr. Taylor                           212
- Cross-Examination by Mr. Draper                           233
- Redirect Examination by Mr. Morris                        236
- Recross-Examination by Mr. Rukavina                       249
- Recross-Examination by Mr. Taylor                         255

John S. Dubel
- Direct Examination by Mr. Morris                          261
- Cross-Examination by Mr. Draper                           281
- Cross-Examination by Mr. Taylor                           284
- Cross-Examination by Mr. Rukavina                         287
- Redirect Examination by Mr. Morris                        290

EXHIBITS

Debtor's Docket 1822 Exhibits                    Received  55
   (exclusive of Exhibits B, D, E, 4D, 4E, 4G,
    5T, 6R, 6S, 6T, and 6U)
Debtor's Docket 1866 Exhibits                    Received  56
Debtors' Exhibits 7F through 7Q (exclusive of    Received 293
   Exhibit 7O)
Debtor's Exhibit 7P                              Received 140
Debtor's Exhibit 7Q                              Received  75

295

1
                                    INDEX
2                                  Page 2

3    RULINGS

4    Confirmation Hearing [1808] - *Continued to 2/3/2021*        293

5    Agreed Motion to (1) Assume Non-Residential Real Property   293
     Lease with Crescent TC Investors, LP upon Confirmation of
6    Plan and (II) Extend Assumption Deadline [1624] -
     *Continued to 2/3/2021*
7
     END OF PROCEEDINGS                                          293
8
     INDEX                                                  294-295
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 207

Appx. 04478

```
                    IN THE UNITED STATES BANKRUPTCY COURT
1                     FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
2
                                     )    Case No. 19-34054-sgj-11
3   In Re:                           )    Chapter 11
                                     )
4   HIGHLAND CAPITAL                 )    Dallas, Texas
    MANAGEMENT, L.P.,                )    Wednesday, February 3, 2021
5                                    )    9:30 a.m. Docket
            Debtor.                  )
6                                    )    CONFIRMATION HEARING [1808]
                                     )    AGREED MOTION TO ASSUME [1624]
7                                    )
                                     )    Continued from 02/02/2021
8   _____)

9                        TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                   UNITED STATES BANKRUPTCY JUDGE.

11  WEBEX APPEARANCES:

12  For the Debtor:            Jeffrey Nathan Pomerantz
                               PACHULSKI STANG ZIEHL & JONES, LLP
13                             10100 Santa Monica Blvd.,
                                13th Floor
14                             Los Angeles, CA  90067-4003
                               (310) 277-6910
15
    For the Debtor:            John A. Morris
16                             PACHULSKI STANG ZIEHL & JONES, LLP
                               780 Third Avenue, 34th Floor
17                             New York, NY  10017-2024
                               (212) 561-7700
18
    For the Debtors:           Ira D. Kharasch
19                             PACHULSKI STANG ZIEHL & JONES, LLP
                               10100 Santa Monica Blvd.,
20                              13th Floor
                               Los Angeles, CA  90067-4003
21                             (310) 277-6910

22  For the Official Committee Matthew A. Clemente
    of Unsecured Creditors:    SIDLEY AUSTIN, LLP
23                             One South Dearborn Street
                               Chicago, IL  60603
24                             (312) 853-7539

25
```

```
 1   APPEARANCES, cont'd.:

 2   For James Dondero:          Clay M. Taylor
                                 BONDS ELLIS EPPICH SCHAFER
 3                                  JONES, LLP
                                 420 Throckmorton Street,
 4                                  Suite 1000
                                 Fort Worth, TX  76102
 5                               (817) 405-6900

 6   For Get Good Trust and      Douglas S. Draper
     Dugaboy Investment Trust:   HELLER, DRAPER & HORN, LLC
 7                               650 Poydras Street, Suite 2500
                                 New Orleans, LA  70130
 8                               (504) 299-3300

 9   For Certain Funds and       Davor Rukavina
     Advisors:                   Julian Vasek
10                               MUNSCH, HARDT, KOPF & HARR
                                 500 N. Akard Street, Suite 3800
11                               Dallas, TX  75201-6659
                                 (214) 855-7587
12
     For the NexPoint            Lauren K. Drawhorn
13   Parties:                    WICK PHILLIPS
                                 3131 McKinney Avenue, Suite 100
14                               Dallas, TX  75204
                                 (214) 692-6200
15
     For the U.S. Trustee:       Lisa L. Lambert
16                               OFFICE OF THE UNITED STATES
                                    TRUSTEE
17                               1100 Commerce Street, Room 976
                                 Dallas, TX  75242
18                               (214) 767-8967

19   For Scott Ellington,        Debra A. Dandeneau
     Isaac Leventon, Thomas      BAKER & MCKENZIE, LLP
20   Surgent, and Frank          452 Fifth Avenue
     Waterhouse:                 New York, NY 10018
21                               (212) 626-4875

22   For Certain Funds and       A. Lee Hogewood, III
     Advisors:                   K&L GATES, LLP
23                               4350 Lassiter at North Hills
                                    Avenue, Suite 300
24                               Raleigh, NC  27609
                                 (919) 743-7306
25
```

3

1   Recorded by:               Michael F. Edmond, Sr.
                                  UNITED STATES BANKRUPTCY COURT
2                              1100 Commerce Street, 12th Floor
                              Dallas, TX  75242
3                              (214) 753-2062

4   Transcribed by:           Kathy Rehling
                              311 Paradise Cove
5                              Shady Shores, TX  76208
                              (972) 786-3063
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24       Proceedings recorded by electronic sound recording;
         transcript produced by transcription service.
25

4

1          <u>DALLAS, TEXAS - FEBRUARY 3, 2021 - 9:38 A.M.</u>

2          THE CLERK:  All rise.  The United States Bankruptcy

3  Court for the Northern District of Texas, Dallas Division, is

4  now in session, the Honorable Stacey Jernigan presiding.

5          THE COURT:  Good morning.  Please be seated.  All

6  right.  We are ready for Day Two of the confirmation hearing

7  in Highland Capital Management, LP, Case No. 19-34054.  I'll

8  just make sure we've got the key parties at the moment.  Do we

9  have Mr. Pomerantz, Mr. Morris, for the Debtor team?

10          MR. POMERANTZ:  Yes.  Good morning, Your Honor.  Jeff

11  Pomerantz for the Debtors.

12          MR. MORRIS:  And I'm here as well, Your Honor.

13          THE COURT:  All right.  Good.

14     All right.  For our objecting parties, do we have Mr.

15  Taylor and your crew for Mr. Dondero?

16          MR. TAYLOR:  Yes, Your Honor.

17          THE COURT:  Good morning.

18     All right.  For Dugaboy Trust and Get Good Trust, do we

19  have Mr. Draper?  (No response.)  All right.  I do see Mr.

20  Draper.  I didn't hear an appearance.  You must be on mute.

21          MR. DRAPER:  I'm present, --

22          THE COURT:  Okay.

23          MR. DRAPER:  -- Your Honor.

24          THE COURT:  Okay.  Good morning.

25          MR. DRAPER:  I'm present, Your Honor.

5

1    THE COURT: Good morning. I heard you that time.

2  Thank you.

3    All right. And now for what I'll call the Funds and

4  Advisors Objectors, do we have Ms. Rukavina present?

5    MR. RUKAVINA: Yes, Your Honor. Good morning.

6    THE COURT: Good morning. All right. And I will

7  check. Do we have Mr. Clemente or your team there?

8    MR. CLEMENTE: Yes. Good morning, Your Honor. Matt

9  Clemente from Sidley Austin on behalf of the Committee.

10    THE COURT: All right. Ms. Drawhorn, do we have you

11  there for the NexPoint Real Estate Partners and related funds?

12    MS. DRAWHORN: Yes, Your Honor. Good morning.

13    THE COURT: Good morning. All right. Did I miss --

14  I think that captured all of our Objectors. Anyone who I've

15  missed?

16    All right. Well, when we recessed yesterday, Mr. Morris,

17  I think you were about to call your third witness; is that

18  correct?

19    MR. MORRIS: It is, Your Honor. But if I may, I'd

20  like to just address the objections to the remaining exhibits,

21  since I hope that won't take too long.

22    THE COURT: All right. You may.

23    MR. POMERANTZ: Actually, Your Honor, before we go

24  there, we filed the supplemental declaration of Patrick

25  Leatham, as we indicated we would do yesterday. We just

6

1  wanted to get confirmation again that nobody intends to cross-

2  examine him, so that he doesn't have to sit through the

3  festivities today.

4          THE COURT:  All right.  Well, I did see that you

5  filed that.

6      Does anyone anticipate wanting to cross-examine Mr.

7  Leatham, the balloting agent?

8          MR. RUKAVINA:  Your Honor, I take it that that

9  declaration is part of the record.  As long as the Court

10 confirms that, I do not intend to call the gentlemen.

11         THE COURT:  All right.  Well, I will take judicial

12 notice of it and make it part of the record.  It appears at

13 Docket Entry No. 1887.  Again, it was filed -- well, it was

14 actually filed early this morning, I think.  So, all right.

15 So, with --

16         MR. MORRIS:  And to avoid --

17         THE COURT:  Go ahead.

18         MR. MORRIS:  To -- I was just going to say, to avoid

19 any ambiguity, Your Honor, the Debtor respectfully moves that

20 document into the evidentiary record.

21         THE COURT:  All right.  The Court will --

22      (Interruption.)

23         THE COURT:  Someone needs to put their phone on mute,

24 perhaps.  Unless someone was intentionally speaking.

25      All right.  So, I will grant that request.  Docket Entry

7

1  No. 1887 will be part of the confirmation evidence of this

2  hearing.

3      (Debtor's Patrick Leatham Declaration at Docket 1887 is

4  received into evidence.)

5          THE COURT:  All right.  Anything else?  There were

6  other exhibits I think you were going to talk about?

7          MR. MORRIS:  Yeah.  Let me just go through them one

8  at a time, if I may, Your Honor.

9          THE COURT:  Okay.

10          MR. MORRIS:  All right.  So, I'm going to deal with

11  the transcripts that have been objected to one at a time.  And

12  I'll just take them in order.  The first one can be found at

13  Exhibit B.  It is on Docket No. 1822.

14          THE COURT:  Okay.

15          MR. MORRIS:  Exhibit B is the deposition transcript

16  from the December 16, 2020 hearing on the Advisor and the

17  Funds' motion for an order restricting the Debtor from

18  engaging in certain CLO-related transactions.

19      During that hearing, the Court heard the testimony of

20  Dustin Norris.  Mr. Norris is an executive vice president for

21  each of the Funds and each of the Advisors.

22      We would be offering the transcript for the limited

23  purposes of establishing Mr. Dondero's ownership and control

24  over the Advisors.

25      Mr. Norris also gave some pretty substantial testimony

8

1  concerning the so-called independent board of the Funds.

2      And as a general matter, Your Honor, to the extent that

3  the objection is on hearsay grounds, the transcript -- at

4  least the portions relating to Mr. Norris's testimony --

5  simply are not hearsay under Evidentiary Rule 801(d)(2).

6  These are statements of an opposing party, and I think we fall

7  well within that.

8      So, we would respectfully request that the Court admit

9  into the record the transcript from December 16th, at least

10  the portions of which are Mr. Norris's testimony.

11          THE COURT:  All right.  And, again, these appear at

12  -- I think I heard you say B and then E.  Is that correct?

13          MR. MORRIS:  Just B.  Just B at the moment.  B as in

14  boy.

15          THE COURT:  Okay.  Just B at the moment?

16      All right.  Any objections to that?

17          MR. RUKAVINA:  Your Honor, I had objected, but now

18  that it's offered for that limited purpose, I withdraw my

19  objection.

20          THE COURT:  All right.  Then B -- I'm sorry.  Was

21  there anyone else speaking?

22      B will be admitted.  And, again, it appears at Docket

23  Entry 1822.

24      (Debtor's Exhibit B, Docket Entry 1822, is received into

25  evidence.)

9

1         MR. MORRIS:  Okay.  Next, the next transcript can be

2     found at Exhibit 6R, and that's Docket 1866.  Exhibit 6R is

3     the transcript of the January 9, 2020 hearing where the Court

4     approved the corporate governance settlement.  We think that

5     that transcript is highly relevant, Your Honor, because it

6     reflects not only Mr. Dondero's notice and active

7     participation in the consummation of the corporate governance

8     agreement, but it also reflects the Court and the parties'

9     views and expectations that were established at that time,

10    such that if anybody contends that there's any ambiguity about

11    any aspect of the order, I believe that that would be the best

12    evidence to resolve any such disputes.

13        So, for the purpose of establishing Mr. Dondero's notice,

14    Mr. Dondero's participation, and the parties' discussions and

15    expectations with regard to every aspect of the corporate

16    governance settlement, including Mr. Dondero's stipulation,

17    the order that emerged from it, and the term sheet, we think

18    that that's properly into evidence.

19        THE COURT:  Any objection?

20        All right.  6R will be admitted.  Again, at Docket Entry

21    1822.

22        (Debtor's Exhibit 6R, Docket Entry 1822, is received into

23    evidence.)

24        MR. MORRIS:  Next, Your Honor, we've got Exhibits 6S

25    as in Sam and 6T as in Thomas.  They're companions.  And they

1  can be found at Docket 1866.  And those are the transcripts.

2  The first one is from the October 27th disclosure statement

3  hearing, and the second one actually is from the Patrick

4  Daugherty, I believe, lift stay motion.

5      I'll deal with the first one first, Your Honor.  We

6  believe that the transcript of the October 27th hearing goes

7  to the good faith nature of the Debtor's proposed plan.  It

8  shows that the Debtor and the Committee were not always

9  aligned on every interest.  It shows that the Committee, in

10  fact, strenuously objected to certain aspects of the then-

11  proposed plan by the Debtors.  And we just think it goes to

12  the heart of the good faith argument.

13      The transcript for the 28th, we would propose to offer for

14  the limited purpose of the commentary that you offered at the

15  end of that hearing, where Your Honor made it clear that

16  employee releases would not be -- would not likely be

17  acceptable to the Court unless there was some consideration

18  paid.

19      And it was really, frankly, Your Honor's comments that

20  helped spur the Committee and the Debtor to discuss over the

21  next few weeks the resolution of the issues concerning the

22  employee releases.

23      So we're not offering Exhibit 6T for anything having to do

24  with Mr. Daugherty or his claim, but just the latter portion

25  relating to the discussion about the employee releases.  And,

11

1    with that, we'd move those transcripts into evidence.

2          THE COURT: Any objection?

3          MR. RUKAVINA: Your Honor, yes, I do object. 6S is

4    hearsay, and under Rule 804(b)(1) it's admissible only if the

5    witnesses are unavailable to be called. There's been no

6    suggestion that they're not.

7      As far as 6T, what Your Honor says is not hearsay, so as

8    long as it's just what Your Honor was saying, I do not object

9    to 6T. I object to the balance of it.

10          THE COURT: Okay. What about that objection on 6S?

11          MR. MORRIS: Yeah. One second, Your Honor. I would

12    go to the residual exception to the hearsay rule under 807.

13    807 specifically applies if the statement being offered is

14    supported by sufficient guarantees of trustworthiness and it's

15    more probative on the point -- and the point here is simply to

16    help buttress the Debtor's good faith argument -- and it's

17    more probative on the point than any other evidence. And I'm

18    not sure what better evidence there would be than an on-the-

19    record discussion between the Debtor and the Committee as to

20    the disputes they were having on the disclosure statement.

21          THE COURT: All right. I'm going to overrule the

22    objection and accept that 807 exception as being valid here.

23    So, I am admitting both 6S and 6T. And for the record, I

24    think you said they appeared at 1866. They actually appear at

25    1822.

12

1          MR. MORRIS:  Okay, Your Honor.  I am corrected.  It

2     is 6S and 6T, and they are indeed at 1822.  Forgive me.

3          THE COURT:  Okay.

4        (Debtor's Exhibits 6S and 6T, Docket Entry 1822, is

5     received into evidence.)

6          MR. MORRIS:  The next transcript and the last one is

7     6U, which is also at 1822.  6U is the transcript from the

8     December 10th hearing on the Debtor's motion for a TRO against

9     Mr. Dondero.  We believe the entirety of that transcript is

10    highly relevant, and it relates specifically to the Debtor's

11    request for the exculpation, gatekeeper, and injunction

12    provisions of their plan.  And on that basis, we would offer

13    that into evidence.

14         THE COURT:  Any objection?

15         MR. TAYLOR:  Yes, Your Honor.  This is Clay Taylor on

16    behalf of Mr. Dondero.

17       We do object, on the same basis that it is hearsay.  There

18    has certainly been plenty of testimony before this Court and

19    on the record as to why the Debtor believes that its plan

20    provisions are appropriate and allowable, and there's no need

21    to allow hearsay in for that.  All of the witnesses were

22    available to be called by the Debtor.  The Debtor is in the

23    midst of its case and can call whoever else it needs to call

24    to get these into evidence or to get those docs into evidence.

25    And therefore, we don't believe that any residual exception

13

1  should apply.

2            THE COURT:  Mr. Morris, your response?

3            MR. MORRIS:  First, Your Honor, any statements made

4  by or on behalf of Mr. Dondero would not be hearsay under

5  801(d)(2).

6      And secondly, there is no other evidence of the Debtor's

7  motion of the -- of the argument that was had.  There is no

8  other evidence, let alone better evidence, than the transcript

9  itself.  And I believe 807 is certainly the best rule to

10 capture that.

11     It is a statement that's supported by sufficient

12 guarantees of trustworthiness.  Again, these are the litigants

13 appearing before Your Honor.  It may not be sworn testimony,

14 but I would hope that everybody is doing their best to comply

15 with the guarantee of trustworthiness in that regard, putting

16 aside advocacy.

17     And it is more probative on the point for which we're

18 offering -- and that is on the very issues of exculpation,

19 gatekeeper, and injunction -- than anything else we can offer

20 in that regard.

21            THE COURT:  All right.  I overrule the objection and

22 I will admit 6U.  Okay.

23     (Debtor's Exhibit 6U, Docket Entry 1822, is received into

24 evidence.)

25            MR. MORRIS:  All right.  Going back to the top, Your

14

1    Honor, Companions Exhibit D as in David and E as in Edward,

2    which are at Docket 1822.

3        Exhibit D is an email string that relates to the Debtor's

4    communications with the Creditors' Committee concerning a

5    transaction known as SSP, which stands for Steel Products --

6    Structural and Steel Products.  So that was an asset that the

7    Debtor was selling, trying to sell at a particular point in

8    time.  And Exhibit E is a deck that the Debtor had prepared

9    for the benefit of the UCC.

10       And if we looked that those documents, Your Honor, you'd

11   see that the Debtor was properly following the protocols that

12   were put in place in connection with the January 9th corporate

13   governance settlement.  And the Committee is being informed by

14   the Debtor of what the Debtor intends to do with that

15   particular asset.

16       And the reason that it's particularly relevant here, Your

17   Honor, is Dustin Norris had submitted a declaration in support

18   of their motion that was heard on September -- on December

19   16th.  That declaration is an exhibit to what is Exhibit A on

20   Docket 1822.  Exhibit A on the docket is the Advisor and the

21   Funds' motion.  Okay?  So, Exhibit A is the motion.  Attached

22   to that Exhibit A is an exhibit, which is Mr. Norris's

23   declaration.

24       At Paragraph 9 of Mr. Norris's declaration, he takes issue

25   with the Debtor's process for the sale of that particular

15

1   asset.

2       And so, having admitted already into the record Mr.

3   Norris's declaration, we believe that these documents rebut

4   the statements made in Mr. Norris's declaration, and indeed,

5   were part of the transcript that has now already been admitted

6   into evidence.  So we think the documents are needed because

7   they were exhibits during that hearing.

8           THE COURT:  All right.  Any objection?

9           MR. RUKAVINA:  Your Honor, yes, I object based on

10  authenticity.  This document has not been authenticated, nor

11  has the attachment.  And on hearsay.  And I don't think that

12  the Debtor can introduce one exhibit just to introduce another

13  to rebut the first.

14          THE COURT:  Your response?

15          MR. MORRIS:  You know, in all honesty, I wish that

16  the authenticity objection had been made yesterday and I might

17  have been able to deal with that.

18      These documents have already been admitted by the Court

19  against these very same parties.  I think it would be a little

20  unfair for them now to exclude the document that they had no

21  objection to the first time around.  They clearly relate to

22  Paragraph 9 of Mr. Norris's declaration, which was admitted

23  into evidence in this case without objection.

24          THE COURT:  All right.  I overrule the objection.  D

25  and E are admitted.

16

1       (Debtor's Exhibits D and E, Docket Entry 1822, is received

2   into evidence.)

3           MR. MORRIS:  Next, Your Honor, we have Exhibits 4D as

4   in David, 4E as in Edward, and 4G as in Gregory.  And those

5   can all be found on Docket 1822.  And to just cut to the

6   chase, Your Honor, these are the K&L Gates letter that were

7   sent in late December and my firm's responses to those

8   letters.

9       Those letters are being offered, again, to support --

10  well, the Debtor contends that, in the context of this case,

11  and at the time and under the circumstances, the letters

12  constituted interference and evinces a disregard for the

13  January 9th order, for Mr. Dondero's TRO, and for the Court's

14  comments at the December 16th hearing.  And they go

15  specifically to the Debtor's request for the gatekeeper,

16  exculpation, and injunction provisions.

17      To the extent that those exhibits contain the letters that

18  were sent on behalf of the Funds and on behalf of the

19  Advisors, they would simply not be hearsay under 801(d)(2).

20  And to the extent the objection goes to my firm's response, I

21  think just as a matter of completeness the Court -- I won't

22  offer them for the truth of the matter asserted.  I'll simply

23  offer the Pachulski responses at those exhibits for the

24  purpose of stating the Debtor's position, without regard to

25  the truth of the matter asserted.

17

1          THE COURT:  All right.  Any objection?

2          MR. RUKAVINA:  Your Honor, with that understanding,

3   I'll withdraw my objection to these exhibits.

4          THE COURT:  All right.  So, 4D, 4E, and 4G are

5   admitted.

6      (Debtor's Exhibits 4D, 4E, and 4G, Docket Entry 1822, are

7   received into evidence.)

8          MR. MORRIS:  Next, Your Honor, we've got Exhibit 5T

9   as in Thomas.  That document can be found at Docket No. 1822.

10  Your Honor, that document is a schedule of a long list of

11  promissory notes that are owed to the Debtor by the Advisors,

12  Dugaboy, and Mr. Dondero.  But I think that, upon reflection,

13  I'll withdraw that exhibit.

14         THE COURT:  All right.

15     (Debtor's Exhibit 5T is withdrawn.)

16         MR. MORRIS:  And then, finally, just one last one.  I

17  think Mr. Rukavina objected to Exhibit 7O as in Oscar, which

18  can be found at Docket No. 1877.  Exhibit 7O are the documents

19  that were admitted in the January 21st hearing, and I believe

20  that they all go -- they're being offered to support the

21  Debtor's application for the gatekeeper, exculpation, and

22  injunction provisions.

23         THE COURT:  All right.  7O is being offered.  Any

24  objection?

25         MR. RUKAVINA:  Yes, Your Honor.  I do object.  Those

18

1  are exhibits from a separate adversary proceeding that has not

2  been concluded.  In fact, my witness is still on the stand in

3  that.

4      And I'll note that that's another 20,000 pages that's very

5  duplicative of the current record, and we already are going to

6  have an unwieldy record.  So I question why Mr. Norris -- why

7  Mr. Morris would even need this.

8      So that's my objection, Your Honor.

9          MR. MORRIS:  You know what?  That's a fair point,

10 Your Honor.  And -- that is a fair point, and I guess what I'd

11 like to do is at some point this morning see if I can single

12 out documents that are not duplicative and come back to you

13 with very specific documents.  I think that's a very fair

14 point.

15          THE COURT:  All right.

16          MR. MORRIS:  And with that, Your Honor, I think we've

17 now addressed every single document that the Debtor has

18 offered into evidence, and I believe, other than the

19 withdrawal of --

20          THE COURT:  5T.

21          MR. MORRIS:  -- 5T --

22          THE COURT:  Uh-huh.

23          MR. MORRIS:  -- and the open question on 7O, I

24 believe every single document at Docket 1822, 1866, and 1877

25 has been admitted.  Do I have that right?

19

1          THE COURT:  All right.  Yes, because I did admit

2   yesterday 7F through 7Q, minus 7O, at 1877.  So, yes, I agree

3   with what you just said.

4          MR. RUKAVINA:  Your Honor, I apologize.  And Mr.

5   Morris.  I have that 5S -- or six -- that 5S and 6C, Legal

6   Entities List, have not been admitted.  But if I'm wrong on

7   that, then I apologize.

8          THE COURT:  Okay.  5S was part of 1866, which I

9   admitted entirely.

10      And what was the other thing?

11          MR. RUKAVINA:  I'm counting letters, Your Honor.

12   One, two, three, four.  6D, Legal Entities List, Redacted.

13          THE COURT:  Okay.  6B would have been --

14          MR. RUKAVINA:  D, Your Honor, as in dog.  I'm sorry.

15   6-dog.

16          THE COURT:  Okay.  6D, yeah, that was part of 1822

17   that I admitted *en masse* yesterday.

18          MR. MORRIS:  Yeah, I didn't hear an objection to that

19   one yesterday, and I agree, Your Honor.  My records show that

20   it was already admitted.

21          MR. RUKAVINA:  Then I apologize to the Court.

22          THE COURT:  All right.  Any --

23          MR. MORRIS:  No worries.  Let's get --

24          THE COURT:  Any other housekeeping matters before we

25   go to the next witness?

20

1          MR. MORRIS:  No, Your Honor.  Not from the Debtor.

2          THE COURT:  Anyone else?

3      All right.  Well, let's hear from the next witness.

4          MR. MORRIS:  All right, Your Honor.  The Debtor calls

5   as its next and last witness Marc Tauber.

6          THE COURT:  All right.  Mr. --

7          MR. MORRIS:  Mr. Tauber, if you're on the phone,

8   please identify yourself.

9      (No response.)

10          THE COURT:  Mr. Tauber, we're not hearing you.

11   Perhaps you are on mute.  Could you unmute your device?

12      (No response.)

13          THE COURT:  All right.  If it's a phone, you need to

14   hit *6.

15      Hmm.  Any -- do you know which caller he is?

16          THE CLERK:  I'm trying to find out.

17          THE COURT:  All right.  We've got well over a hundred

18   people, so we can't easily identify where he is at the moment.

19      All right.  Mr. Tauber, Marc Tauber?  This is Judge

20   Jernigan.  We cannot hear you, so -- all right.  Well, maybe

21   we can --

22          MR. MORRIS:  Can we just take a three-minute break

23   and let me see if I can track him down?

24          THE COURT:  Yes.  Why don't you do that?  So let's

25   take a three-minute break.

21

1          MR. MORRIS:  Thank you, Your Honor.

2          THE COURT:  Okay.

3      (A recess ensued from 10:02 a.m. until 10:04 a.m.)

4          MR. MORRIS:  Your Honor, if we may, he'll be dialing

5  in in a moment.  But I've been reminded that there is one more

6  exhibit.  It's the exhibit I used on rebuttal yesterday with

7  Mr. Seery.  There was the one document that was on the docket,

8  and that was the Debtor's omnibus reply to the plan

9  objections, where we looked at Paragraph 135, I believe.  And

10  we would offer that into evidence for the purpose of just

11  establishing that the Debtor had given notice no later than

12  January 22nd of its agreement in principle to assume the CLO

13  management contracts.

14      And then the second exhibit that we had offered that I

15  think I suggested could be marked as Exhibit 10A was the email

16  string between my firm and counsel for the CLO Issuers where

17  they agreed to the agreement in principle for the Debtor's

18  assumption of the CLO management contracts.

19      And we would offer both of those documents into evidence

20  as well.

21          THE COURT:  All right.  Any objections?

22      All right.  Well, I will admit them.

23      As far as this email string with the CLO Issuers that you

24  called 10A, does that appear on the docket?  I remember you

25  putting it on the screen, but, if not, you'll need to file a

22

1    supplement to the record, a supplemental exhibit.

2            MR. MORRIS:  We will, Your Honor.  We'll do that for

3    both of those exhibits.

4            THE COURT:  And then as -- okay, for both?  Because I

5    -- I've read that reply, and I could reference the docket

6    number if we need to.

7            MR. MORRIS:  We'll clean that up, Your Honor.

8            THE COURT:  Okay.

9        (Debtor's Exhibit 10A is received into evidence.)

10       (Clerk advises Court re new caller.)

11           THE COURT:  Oh, okay.  Just a minute.  I was looking

12   up something.

13       (Pause.)

14           THE COURT:  All right.  Well, you're going to file --

15   hmm, I really wanted to just reference where that reply brief

16   appears on the record.  There were a heck of a lot of things

17   filed on January 22nd.

18       (Interruption.)

19           THE COURT:  Okay.  We'll --

20           MR. MORRIS:  All right.  We're just going to need one

21   more minute with Mr. Tauber.  It's my fault, Your Honor.

22           THE COURT:  Okay.

23           MR. MORRIS:  I didn't send him easily-digestible

24   dial-in instructions.  He'll be just a moment.

25           THE COURT:  Okay.

23

1     (Court confers with Clerk regarding exhibit.)

2          THE COURT:  Oh, it's at 1807?  Okay.  So, the reply

3     brief that we talked about Paragraph 35, that is at Docket No.

4     1807.  Okay?  All right.

5          (Debtor's Omnibus Reply to Plan Objections, Docket 1807,

6     is received into evidence.)

7          (Pause.)

8          MR. TAUBER:  Hi.  It's Marc Tauber.

9          THE COURT:  All right.

10         MR. MORRIS:  Excellent.

11         THE COURT:  Mr. Tauber, this is Judge Jernigan.  I

12    can hear you, but I can't see you.  Do you have a video --

13         MR. TAUBER:  Yeah, I don't know why it's not working.

14         THE COURT:  Hmm.

15         MR. TAUBER:  I'm on WebEx all day.  Usually it works

16    no problem.

17         THE COURT:  Okay.  Well, do you want to give it

18    another try or two?

19         MR. TAUBER:  Yeah.  It looks like it's starting to

20    come up.  It's all -- pictures, so --

21         THE COURT:  Okay.

22         MR. TAUBER:  -- hopefully you'll be able to see me in

23    a second.

24         THE COURT:  Okay.  The first thing I'm going to need

25    to do is swear you in, so we'll see if the video comes up here

24

1 in a minute.

2         MR. TAUBER:  Okay.

3         THE COURT:  Can you see us, Mr. Tauber?

4         MR. TAUBER:  I can see four people.  The rest are

5 just names still.

6         THE COURT:  Okay.

7         MR. TAUBER:  I can go out and try to come back in, if

8 you think that's --

9         THE COURT:  I'm afraid of losing you.  So, your

10 audio, is it on your phone or is it on --

11         MR. TAUBER:  No.

12         THE COURT:  -- a computer?

13         MR. TAUBER:  On the computer.  Yeah.

14         THE COURT:  Okay.  So you're coming through loud and

15 clear on your computer.

16         MR. TAUBER:  Yeah.  Like I said, we use WebEx for

17 work, so I have them on all day long without any issues,

18 typically.

19         THE COURT:  Okay.

20      (Court confers with Clerk.)

21         THE COURT:  Okay.  Our court reporter thinks it's a

22 bandwidth issue on your end, so I don't --

23         MR. TAUBER:  There's only two of us here at home on

24 the line right now, so I don't know why.  It looks like it's

25 trying to come in, and then just keeps --

                    Tauber - Direct                 25

1        THE COURT:  I at least see your name on the screen

2  now, which I did not before.

3        MR. TAUBER:  Yeah.

4        THE COURT:  So hopefully we're going to -- ah.  We

5  got you.

6        MR. TAUBER:  There it is.

7        THE COURT:  All right.

8        MR. TAUBER:  Yeah.

9        MR. MORRIS:  There we go.

10        MR. TAUBER:  I might lose you, though.  Give me one

11  second, because I have a thing saying the WebEx meeting has

12  stopped working.  Let me close that.

13        THE COURT:  Okay.  We've still got you.  Please raise

14  your right hand.

15        MR. TAUBER:  Okay.

16          MARC TAUBER, DEBTOR'S WITNESS, SWORN

17        THE COURT:  All right.  Thank you.  Mr. Morris?

18        MR. MORRIS:  Thank you, Your Honor.

19                    DIRECT EXAMINATION

20  BY MR. MORRIS:

21  Q   Good morning, Mr. Tauber.

22  A   Good morning.

23  Q   I apologize for the delay in getting you the information.

24  Are you currently employed, sir?

25  A   Yes, sir.

Tauber - Direct                        26

1   Q    By whom?

2   A    Aon Financial Services.

3   Q    And does Aon Financial Services provide insurance

4   brokerage services among its services?

5   A    Yes.

6   Q    And what position do you currently hold?

7   A    Vice president.

8   Q    How long have you been a vice president at Aon?

9   A    Since October of 2019.

10  Q    Can you just describe for the Court generally your

11  professional background?

12  A    Sure.  I spent about 20 years on Wall Street, working in a

13  variety of jobs, in research, trading, and as the COO of a

14  hedge fund.  And then in 2010 I switched to the insurance

15  world.  I was an underwriter for ten-plus years for Zurich and

16  QBE.  And then in 2019 switched to the brokering side for Aon.

17  Q    And what are your duties and responsibilities as a vice

18  president at Aon?

19  A    Well, we're responsible or my team and I are responsible

20  for creating bespoke insurance programs, focusing on D&O and

21  E&O insurance for our insureds.

22  Q    And what is, for the benefit of the record, what do you

23  mean by bespoke insurance program?

24  A    Well, each client is different, so the programs and the

25  policies that we put in place might be off-the-shelf policies,

Tauber - Direct                    27

1   but we endorse and amend them as needed to meet the needs of

2   the individual client.

3   Q    And during your work, both as an underwriter and now as a

4   broker, have you familiarized yourself with the market for D&O

5   and E&O insurance policies?

6   A    Yes.

7   Q    All right.  Let's talk about the early part of this case.

8   Did there come a time in early 2020 when Aon was asked to

9   place insurance on behalf of the board of Strand Advisors?

10  A    Yes.

11  Q    Can you describe for the Court how that came about?

12  A    Sure.  One of our account executives, a man by the name of

13  Jim O'Neill, had a relationship with a man named John Dubel,

14  who was one of the appointees to serve on -- as a member of

15  Strand, which was being appointed, as we understood it, to be

16  the general partner of Highland Capital Management by the

17  Bankruptcy Court.  And they -- we had done -- or, Jim and John

18  had a longstanding relationship.  I had actually underwritten

19  an account for a previous appointment of John's when I was an

20  underwriter, so I had some familiarity with John as well, and

21  actually brokered a subsequent deal for John at Aon.

22      So I had, again, some familiarity with John, and we were,

23  you know, tasked with going out and finding a program for

24  Strand.

25  Q    Can you describe what happened next?  How did you go about

Tauber - Direct                                    28

1   accomplishing that task?

2   A    So, there are a number of markets or insurance companies

3   that provide management liability insurance, which this was a

4   management liability-type policy.  D&O is a synonym for

5   management liability, I guess you'd say.  And we approached

6   the, I think, 14 or 15 markets that we knew to provide

7   insurance in this space and that would be willing to buy the

8   type of policy we were seeking and have interest in a risk

9   like this, which had a little hair on it.  Obviously, there

10  was the Dondero involvement, as well as the bankruptcy.

11  Q    As part of that process, did you and your firm put

12  together a package of information for prospective interested

13  parties?

14  A    Yes.

15  Q    Can you describe for the Court what was contained in the

16  package?

17  A    Had the *C.V.s*, some relevant pleadings from the case,

18  court order.  I'd have to go back and look exactly.  But sort

19  of just general, you know, general information that was

20  available about the situation at hand and Strand's

21  appointment.

22  Q    And the court order that you just mentioned, is that the

23  one that had that gatekeeper provision in it?

24  A    Correct.

25  Q    And can you explain to the Court why you and your team

Tauber - Direct                              29

1    decided to include the order with the gatekeeper provision in
2    the package that you were delivering to prospective carriers?
3    A    Sure.  In our initial conversations to discuss our
4    engagement, the gatekeeper function was explained to us by
5    John.  And I'm not sure who else was on the initial call.
6    And, but it was explained to us that I guess Judge Jernigan
7    would sit as the gatekeeper between any potential claimant
8    against the insureds and, you know, would basically have to
9    approve any claim that would be made against (indecipherable),
10   which would thereby prevent any frivolous claims from
11   happening.
12   Q    All right.  Let's just talk for a moment.  How did you and
13   your firm decide which underwriters to present the package to?
14   A    Again, you know, I -- my background, or my Wall Street
15   background, obviously, sort of made me have a -- it was very
16   unique for the insurance world when I switched over, so I had
17   sort of risen to a certain level of expertise within the
18   space.  And, you know, our team also is very experienced, and
19   decades of experience in the insurance world.  So we're very
20   familiar with the markets that are willing to provide these
21   types of policies and the markets that would be likely to take
22   a look at a risk such as this.
23   Q    Okay.  You mentioned that there was -- I think your words
24   were a little hair on this, and one of the things you
25   mentioned was bankruptcy.  How did the fact that Strand was

Tauber - Direct                        30

1  the general partner of a debtor in bankruptcy impact your

2  ability to solicit D&O insurance?

3  A   Well, it's just not a plain vanilla situation, so people

4  are somewhat, you know, are -- I think -- so, the type of

5  insurance, D&O insurance, that we write is very different from

6  auto insurance, as an example.  Auto insurance, people expect

7  there to be a certain amount of claims, and they expect the

8  premiums to cover the claims plus the expenses and then

9  provide them a reasonable profit on top of that.

10      Our insurance is really much more by binary.  The

11  expectation for underwriters is that they will be completing

12  ignoring -- or, avoiding risk at all costs, wherever possible.

13  So anytime there is a situation that looks a little risky, so

14  the premium might be a little higher, the deductible might be

15  a little higher, but, again, the underwriters are really

16  making a bet that they will not have a claim.  Because the

17  premiums pale in comparison to the limits that are available

18  to the policyholder.

19  Q   And so --

20  A   So, -- I'm sorry.  What were you going to say?

21  Q   I didn't mean to interrupt.

22  A   Yeah.

23  Q   Have you finished your answer?

24  A   Sure.

25  Q   Okay.  So, were some of the 14 or 15 markets that you

Tauber - Direct                              31

1   contacted reluctant to underwrite because there was a

2   bankruptcy ongoing?

3   A    Well, I think that probably -- I mean, there are certain

4   markets that we didn't go to in the beginning because they

5   would be very reluctant to write a risk that had that kind of

6   hair on it, based on our experience from dealing with them.

7   And, you know, I think the bankruptcy was certainly a little

8   bit of an issue.  And then, obviously, as people did their

9   research and -- or if they weren't already familiar with

10  Highland and got to know, you know, got -- I will just say for

11  a simple Google search and learned a little bit about Mr.

12  Dondero, I think there was definitely some significant

13  reluctance to write this program.

14  Q    Was the fact that the Debtor -- was the fact that the

15  Debtor is a partnership an issue that came up, in your -- in

16  your process?

17  A    There are certainly some carriers who won't write what's

18  known as general partnership liability insurance.  So, yes,

19  that is part of that.  It was part of the limiting factor in

20  terms of who we went to.

21  Q    Okay.  And, finally, you mentioned Mr. Dondero.  What role

22  did he play in your ability to obtain insurance for the Strand

23  board?

24  A    Well, that's a very significant role.  As, you know, as

25  mentioned, the underwriters are very risk-averse, so the

Tauber - Direct                               32

1  litigiousness of Mr. Dondero is a very strong red flag

2  prohibiting a number of people from writing the insurance at

3  all.  And the ones that were writing, that were willing to

4  provide options, were looking for protections from Mr.

5  Dondero.

6  Q    And what kind of protections were they looking for?

7  A    Well, the gatekeeper function was a key factor.  That was

8  really the only way we could even start a conversation with

9  any of the people that we were able to engage.  And in

10 addition, they wanted a, you know, sort of a belts and

11 suspenders additional protection of having an exclusion

12 preventing any litigation brought by or on behalf of Mr.

13 Dondero.

14 Q    Were you able to identify any carrier who was prepared to

15 underwrite D&O insurance for Strand without the gatekeeper

16 provision or without a Dondero exclusion?

17 A    We were not.

18 Q    Okay.  Let's fast-forward now.  Has your firm been

19 requested to obtain professional management insurance for the

20 contemplated post-confirmation debtor entities and individuals

21 associated with those entities?

22 A    Yes.

23 Q    Okay.  So let's just talk about the entities first, the

24 Claimant Trust and the Litigation Trust.  In response to that

25 request, have you and your team gone out into the marketplace

Tauber - Direct                          33

1  to try to find an underwriter willing to underwrite a policy

2  for those entities?

3  A    Yes.

4  Q    And have you been able to find any carrier who's willing

5  to provide coverage for the Claimant Trust and the Litigation

6  Trust?

7  A    Yes.

8  Q    And how many -- how many have expressed a willingness to

9  do that?

10  A    Two.

11  Q    And have those two carriers indicated that there would be

12  conditions to coverage for the entities?

13  A    Both will require a -- the continuation of the gatekeeper

14  function, as well as a Dondero exclusion.

15  Q    Okay.  Have you also been tasked with the responsibility

16  of trying to find coverage for the individuals associated with

17  the Claimant Trust and the Litigation Trust, meaning the

18  Claimant Trustee, the Litigation Trustee, and the Oversight

19  Board?

20  A    Yes.  So we did it concurrently.

21  Q    Okay.  So, are the two firms that you just mentioned

22  willing to provide insurance for the individuals as well as

23  the entities?

24  A    Correct.  With the same stipulations.

25  Q    They require -- they both require the gatekeeper and the

Tauber - Direct                                34

1  Dondero exclusion?

2  A    That's correct.

3  Q    Is there any other firm who has indicated a willingness to

4  consider providing D&O insurance for the individuals?

5  A    There is one that is willing to do so, as long as the

6  gatekeeper function remains in place.  They have indicated

7  that if the gatekeeper function was to be removed, that they

8  would then add a Dondero exclusion to their coverage.

9  Q    So is there any insurance carrier that you're aware of who

10  is prepared to insure either the individuals or the entities

11  without a gatekeeper provision?

12  A    No.

13  Q    And that last company, I just want to make sure the record

14  is clear:  If the gatekeeper provision is overturned on appeal

15  or is otherwise not effective, do you have an understanding as

16  to what happens to the insurance coverage?

17  A    They will either add an exclusion for any claims brought

18  by or on behalf of Mr. Dondero or cancel the coverage

19  altogether.

20        MR. MORRIS:  I have no further questions, Your Honor.

21        THE COURT:  All right.  Cross of this witness?

22                    CROSS-EXAMINATION

23  BY MR. RUKAVINA:

24  Q    Mr. Tauber, I'm a little confused.  So, the insurance

25  that's being written now for the post-bankruptcy entities, did

Tauber - Cross                    35

1   I hear you say that there is one carrier that would give that

2   insurance subject to having a Dondero exclusion?

3   A    So, first of all, there's nothing currently being written.

4   We have solicited quotes.  So, just to make sure that that --

5   I want to make sure that's clear.

6       We have three carriers that are willing to provide varying

7   levels of coverage.  All three will only do so with the

8   existence of the gatekeeper function continuing to be in

9   place.  One of the three has -- two of those three will also

10  provide the coverage with -- even with the gatekeeper function

11  and the Dondero exclusion.  The third one was not requiring a

12  Dondero exclusion unless the gatekeeper function goes away.

13  Q    Okay.  So the third one, you believe, will, whatever the

14  term is, write the insurance or provide the coverage without a

15  gatekeeper, as long as there is a strong Dondero exclusion?

16  A    No.  Their initial requirement is that the gatekeeper

17  function remains in place.  That is their preferred option.

18  If the gatekeeper function is removed, then they will add a

19  Dondero exclusion in place of the gatekeeper exclusion.  In

20  addition, that carrier is only willing to provide coverage for

21  the individuals, not for the entities.

22  Q    Okay.  Thank you.

23           MR. RUKAVINA:  I'll pass the witness, Your Honor.

24           THE COURT:  All right.  Other cross?

25           MR. TAYLOR:  Clay Taylor on behalf of Mr. Dondero.

Tauber - Cross                                    36

1           THE COURT:  Okay.

2                            CROSS-EXAMINATION

3    BY MR. TAYLOR:

4    Q    Good morning, Mr. Tauber.

5    A    Good morning.

6    Q    Are you generally familiar with placing D&O insurance at

7    distressed debt level private equity firms?

8    A    I am familiar with it probably more from the underwriting

9    side, and I also worked at a fund that was distressed and had

10   to be liquidated, so I -- as the COO, so I have a fair amount

11   of familiarity, yes.

12   Q    Okay.  Before taking this to market for the first time for

13   the pre-confirmation policies that you have in place, did your

14   firm conduct any due diligence or analysis of comparing the

15   amount of litigation the Highland entities and Mr. Dondero

16   were involved in as compared to other comparable firms in the

17   marketplace?  Say, you know, Apollo, Fortress, Cerberus, other

18   similar market participants?

19   A    Well, it wouldn't really be our role as the broker.

20   That's the role of the underwriter.

21   Q    Are you familiar if any of the underwriters undertook any

22   such analysis?

23   A    I would assume that they did, since they all had concerns

24   about Mr. Dondero almost immediately.

25   Q    Do you have any -- you didn't conduct any personal due

1  diligence on comparing the amount of litigation that the

2  Highland entities were involved in as compared to, say,

3  Fortress, do you?

4  A    Well, again, that wouldn't really be my role as the

5  broker.  But I will say that I used to write the primary

6  insurance for Fortress Investment Group when I was at Zurich.

7  So I'm extremely familiar with Fortress, to use your example,

8  and I would say that the level of litigation at Fortress was

9  much, just out of personal knowledge, was significantly less

10 than I had encountered or than I had read about at Highland.

11 Q    That you have read about?  Is that based upon a number of

12 cases where Fortress was a plaintiff as compared to Highland

13 was a plaintiff?  Over what time period?

14 A    Again, not my role.  Not something that I've done.  I'm

15 just generally familiar with Fortress and I'm generally

16 familiar with Highland.

17 Q    All right.  So you're generally familiar and you say that

18 -- you're telling me and this Court that Fortress is involved

19 in less litigation.  Could you quantify that for me, please?

20 A    No, but it's really irrelevant to the situation at hand.

21 The issue is not my feelings whatsoever.  The issue is the

22 underwriters' feelings and their concern with Mr. Dondero, not

23 mine or anybody else's.

24 Q    So, I appreciate your answer and thank you for that, but I

25 believe the question that was before you is, have you

1  quantitatively -- do you have any quantitative analysis by

2  which you can back up the statement that Fortress is less

3  litigious than Highland?

4  A    I wouldn't even try, no.

5  Q    Okay.  Do you have any quantitative analysis for -- that

6  Cerberus is any less litigious than Highland?

7  A    I don't have any real knowledge of Cerberus's

8  litigiousness.

9  Q    Same question as to Apollo.

10 A    Again, the Fortress, you just happened to mention

11 Fortress, which was a special case because I used to be their

12 primary underwriter.  I don't have any specific -- I'm not a

13 claims attorney.  I don't have any specific knowledge of the

14 level of litigiousness.

15      And, again, it's not up to me, my decision.  It's the

16 underwriters' decision of whether or not they're willing to

17 write the coverage, not mine.

18 Q    You mentioned that the -- when you took this out to

19 market, it had a little hair on it.  Correct?

20 A    Correct.

21 Q    And you put together a package of materials that you sent

22 out to 14 or 15 market participants; is -- did I get that

23 correct?

24 A    Yes.

25 Q    And in that package, you had certain pleadings, including

1  the court order, correct?

2  A    Yes.  I believe that's correct.

3  Q    And that was after your initial conversation with John and

4  -- where he pointed out the gatekeeper role.  Correct?

5  A    Correct.

6  Q    And so when you went out to market, presumably you

7  highlighted the gatekeeper role to all the people you

8  solicited offers from because you thought it included less

9  risk, correct?

10  A    It offered a level of protection that was not -- that's

11  not common.  So it's, yes, it's a huge selling point for the

12  risk.

13  Q    Okay.  So, to be clear, you never went out to the market

14  to even see if you could get underwriting the first time

15  without the gatekeeper function; is that correct?

16  A    Well, it's my job as a broker to present the risk in the

17  best possible light.  So if we have a fact that makes the risk

18  a better write for the underwriters, we, of course, will

19  highlight it.  So, no, I did not do that.

20  Q    Okay.  So, the quick answer to the question is no, you did

21  not go out and solicit any bids without the gatekeeper

22  function?

23  A    Correct.

24  Q    When you have approached the market for the post-

25  confirmation potential coverage, did you approach the same 14

Tauber - Cross                                    40

1    or 15 parties that you did before?

2    A    I don't have the two lists in front of me.  They would

3    have been vastly similar, yes.

4    Q    Okay.  And so, again, all of the 14 or 15 parties or the

5    lists that you solicited were already familiar with the

6    gatekeeper function, correct?

7    A    Yes.

8    Q    And so therefore they already had that right; they're not

9    going to trade against themselves and therefore say that,

10   without it, we'll go ahead and write coverage.  Correct?

11   A    I -- I -- it'd be hard to answer that question.  I don't

12   know.

13   Q    Okay.  Because you didn't try that, did you?

14   A    I would have had no reason to, no.

15   Q    Okay.  So you don't know if a market exists without the

16   gatekeeper function because you haven't asked, have you?

17   A    I guess that's fair, yeah.

18            MR. TAYLOR:  I have no further questions.

19            THE COURT:  All right.  Any other Objectors with

20   cross-examination?

21            MR. DRAPER:  I have no questions for the witness,

22   Your Honor.

23            THE COURT:  All right.  Anyone else?  Mr. Morris,

24   redirect?

25            MR. MORRIS:  Just one.

Tauber - Redirect                    41

1                        REDIRECT EXAMINATION
2    BY MR. MORRIS:
3    Q    One question, Mr. Tauber.  Is there any -- do all
4    underwriters -- any underwriters for Fortress require, as a
5    condition to underwriting the D&O insurance, require a
6    gatekeeping provision?
7    A    In my, you know, 11, 12 years of experience in this
8    industry, in this space, I have never seen that gatekeeper
9    function be available, as an underwriter or as a broker.  So,
10   no.
11             MR. MORRIS:  No further questions, Your Honor.
12             THE COURT:  Any recross on that redirect?
13        All right.  Well, Mr. Tauber, you are excused.  We thank
14   you for your testimony today.  So you can log off.
15             THE WITNESS:  Thank you.
16             THE COURT:  Okay.
17        (The witness is excused.)
18             THE COURT:  Mr. Morris, does the Debtor rest?
19             MR. MORRIS:  The Debtor does rest, Your Honor.
20             THE COURT:  All right.  Well, what are we going to
21   have from the Objectors as far as evidence?
22             MR. RUKAVINA:  Your Honor, I will be very short.  I
23   will call Mr. Seery for less than ten minutes.  I will call
24   Mr. Post for less than ten minutes.  I will have one exhibit.
25   And I think that that's it for all the Objectors, unless I'm

42

 1  mistaken, gentlemen.

 2          MR. TAYLOR:  Your Honor, I had one witness, Mr.

 3  Sevilla, under subpoena to testify, and needed a brief moment

 4  to discuss with my colleagues whether we're going to call him,

 5  and if so, put him on notice that he would be coming up

 6  probably about -- I don't know your schedule, Your Honor, but

 7  probably, I'm guessing, either before lunch or after, and I

 8  need to let him know that also.

 9    So I do need a brief three to five minutes to confer with

10  my colleagues and some direction from the Court to, if we

11  decide to call him, as to when we would tell him to be

12  available.

13          THE COURT:  All right.  Well, before I get to that,

14  Mr. Draper, do you have any witnesses?

15          MR. DRAPER:  I do not.

16          THE COURT:  All right.  Well, let's see.  It's 10:34.

17  We're making good time this morning.  If Seery is truly ten

18  minutes of direct, and Post is truly ten minutes of direct,

19  and I don't know how long the documentary exhibits are going

20  to take, it sounds to me like we are very likely to get to Mr.

21  Sevilla before a lunch break.

22    So if you want to -- you know, I don't know what that

23  involves, you sending text messages or making a quick phone

24  call.  Do you need a five-minute break for that?

25          MR. TAYLOR:  Yes, Your Honor.  It involves a phone

1  call and an email.  Just a confirmatory phone call just to

2  make sure that the guy -- just so you know who he is, he is

3  actually a Highland employee, but he's represented by separate

4  counsel, and so we do need to go through him just because

5  that's the right thing to do.

6  　　　　　THE COURT:  All right.  Well, again, I mean, I never

7  know how long cross is going to take, but I'm guessing, you

8  know, we're going to get to him in an hour or so, if not

9  sooner, it sounds like.  So, all right.  So, do we need a

10  five-minute break?

11  　　　　　MR. RUKAVINA:  And Your Honor, it might make more

12  sense to make it a ten-minute break.  I suspect that Mr.

13  Taylor will be able to release his witness if he and I will

14  just be able to talk.  So I would ask the Court's indulgence

15  for a ten-minuter.

16  　　　　　THE COURT:  Okay.  We'll take a ten-minute break.

17  We'll come back at 10:46 Central time.

18  　　　　　THE CLERK:  All rise.

19  　　　(A recess ensued from 10:36 a.m. until 10:46 a.m.)

20  　　　　　THE CLERK:  All rise.

21  　　　　　THE COURT:  Please be seated.  We're going back on

22  the record in the Highland confirmation hearing.  Are the

23  Objectors ready to proceed?

24  　　　　　MR. RUKAVINA:  Your Honor, Davor Rukavina.  We are.

25  　　　　　THE COURT:  All right.  Well, Mr. Rukavina, are you

44

1   going to call your witnesses first?

2          MR. RUKAVINA:  Yes, I will.  Before that, if it might

3   help the Court and Mr. Morris:  Mr. Morris, with respect to

4   that last exhibit, I do not object to the admission of any of

5   the exhibits that were admitted at that PI hearing.

6      But I do think, Your Honor, for the record, that -- and I

7   would ask Mr. Morris that he should refile those exhibits here

8   in this case, except for those that are duplicative.  Because,

9   again, there's 10,000 pages of indentures, et cetera.

10         MR. MORRIS:  Thank you very much, sir.

11     Your Honor, if that's acceptable to you, we'll do that as

12  soon as possible.

13         THE COURT:  All right.  And let me make sure the

14  record is clear.  Are we talking about what you've described

15  as 7O?  I'm getting mixed up now.  Am I --

16         MR. MORRIS:  Yes, Your Honor.

17         THE COURT:  Okay.

18         MR. MORRIS:  It's 7O, which is the documents that

19  were introduced into evidence in the prior hearing.  And Mr.

20  Rukavina is exactly right, that there is substantial overlap

21  between that and other documents that have already been

22  admitted in the record in this case.  So we'll just file an

23  abridged version of Exhibit O that only includes non-

24  duplicative documents.

25         THE COURT:  All right.  So that will be admitted, and

Seery - Direct                                45

1    we'll look for your filed abridged version to show up on the

2    docket.  70.

3        (Debtor's Exhibit 70 is received into evidence as

4    specified.)

5            THE COURT:  All right.  What's next?

6            MR. RUKAVINA:  Your Honor, Jim Seery, please.  Mr.

7    James Seery.

8            THE COURT:  All right.  Mr. Seery, welcome back.

9    Please raise your right hand.

10            MR. SEERY:  Can you -- can you hear me, Your Honor?

11            THE COURT:  I can now.

12     JAMES P. SEERY, CERTAIN FUNDS AND ADVISORS' WITNESS, SWORN

13            THE COURT:  All right.  Thank you.

14        Mr. Rukavina, go ahead.

15                        DIRECT EXAMINATION

16    BY MR. RUKAVINA:

17    Q   Mr. Seery, --

18            MR. RUKAVINA:  Thank you.

19    BY MR. RUKAVINA:

20    Q   Mr. Seery, good morning.

21            MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

22    the schedules.

23        What we have here, Your Honor, is Docket 247, the Debtor's

24    schedules.  I'd ask the Court to take judicial notice of it.

25            THE COURT:  All right.  The Court will do so.

Seery - Direct                                46

1   BY MR. RUKAVINA:

2   Q    Mr. Seery, are you familiar with these entities listed

3   here on the Debtor's schedules?

4   A    Generally.  Each one a little bit different.

5   Q    Okay.  Do you agree that the Debtor still owns equity

6   interests in these entities?

7   A    I believe it does, yes.

8   Q    Okay.  Is it true that none of these entities are publicly

9   traded?

10  A    I don't believe any of these are publicly-traded entities,

11  no.

12  Q    Okay.  And none of these, to your knowledge, are debtors

13  in this bankruptcy case, right?

14  A    No.  We only have one debtor in the case.

15  Q    Okay.  So, Highland Select Equity Fund, LP, the Debtor

16  owns more than 20 percent of the equity in that entity, right?

17  A    I believe the Debtor owns the majority of that entity.

18  That is a fund with an on- and offshore feeder.  And I, off

19  the top of my head, don't recall exactly how the allocations

20  of equity work.  But I believe we do.

21  Q    Does 67 percent refresh your memory?  Are you prepared to

22  say that the Debtor owns 67 percent of that equity?

23  A    I'm not prepared to say that, no.

24  Q    Okay.  Wright, Ltd.  Does the Debtor own more than 20

25  percent of that equity?

Seery - Direct                              47

1   A    There's about -- I don't recall.  There's about at least

2   25 artist, designers, or designs.  Wright, AMES, Hockney,

3   Rothco, all own in different places, and they all own in turn

4   some other thing.  So I don't know what each of them, off the

5   top of my head, own.  There's -- they're part of a myriad of

6   corporate structures here.

7   Q    Strak, Ltd.  Do you know whether the Debtor owns more than

8   20 percent of the equity of that entity?

9   A    Stark?  I don't know.

10  Q    Okay.  I don't know how to pronounce the next one.  Eamis

11  (phonetic) Ltd.  Do you know whether the Debtor owns more than

12  20 percent of that equity?

13  A    Off the top of my head, I don't recall.

14  Q    What about Maple Avenue Holdings, LLC?

15  A    I believe, I don't know if it's directly or indirectly,

16  that we own a hundred percent of that entity.  But I'm not

17  sure.

18  Q    What about Highland Capital Management Korea, Ltd.?

19  A    Effectively, Highland Capital Management is owned a

20  hundred percent.

21  Q    What about Highland Capital Management Singapore Pte.

22  Ltd.?

23  A    We are in the process of shutting it down, so I don't know

24  that -- what the equity percentages are.  It's really just a

25  question -- it's -- it's dissolved save for a signature from a

                        Seery - Direct                    48

1    Singaporean.
2    Q    Okay.  But did the Debtor own more than 20 percent of that
3    entity?
4    A    I don't know the specific allocations of equity ownership.
5    Q    Okay.  What about Pennant (phonetic) Management, LP?  Do
6    you know whether the Debtor owns or owned more than 20 percent
7    of that entity?
8    A    I don't recall, no.
9          MR. RUKAVINA:  You can take that exhibit down, Mr.
10   Vasek.
11   BY MR. RUKAVINA:
12   Q    Mr. Seery, very quick, are you familiar with Bankruptcy
13   Rule 2015.3?
14   A    I am, yes.
15   Q    Okay.  Has the Debtor filed any Rule 2015.3 statements in
16   this case?
17   A    I don't believe we have.
18   Q    Okay.
19          MR. RUKAVINA:  Thank you, Your Honor.  I'll pass the
20   witness.
21          THE COURT:  All right.  Any other Objector
22   questioning?  None from Mr. Taylor, none from Mr. Draper, none
23   from Ms. Drawhorn?
24        All right.  Any cross -- any examination from you, Mr.
25   Morris?

1           MR. MORRIS:  Just one question.

2           THE COURT:  Go ahead.

3                          CROSS-EXAMINATION

4   BY MR. MORRIS:

5   Q   Mr. Seery, do you know why the Debtor has not yet filed

6   the 2015.3 statement?

7   A   I have a recollection of it, yes.

8   Q   Can you just describe that for the Court?

9   A   When we -- when we initially filed, when the Debtor filed

10  and it was transferred over, we started trying to get all the

11  various rules completed.  There are, as the Court is aware, at

12  least a thousand and maybe more, more like three thousand,

13  entities in the total corporate structure.

14      We pushed our internal counsel to try to get that done,

15  and were never able to really get it completed.  We did not

16  have -- we were told we didn't have separate consolidating

17  statements for every entity, and it would be difficult.  And

18  just in the rush of things that happened from the first

19  quarter into the COVID into the year, we just didn't complete

20  that filing.  There was no reason for it other than we didn't

21  get it done initially and I think it fell through the cracks.

22          MR. MORRIS:  Nothing further, Your Honor.

23          THE COURT:  All right.  Anything further, Mr.

24  Rukavina?

25                        REDIRECT EXAMINATION

                         Seery - Redirect                    50

1  BY MR. RUKAVINA:

2  Q    Mr. Seery, I appreciate that answer.  But you never sought

3  leave from the Bankruptcy Court to postpone the deadlines for

4  filing 2015.3, did you?

5  A    No.  If it hadn't fallen through the cracks, it would have

6  been something we recalled and we would have done something

7  with it.  But, frankly, it just fell off the -- through the

8  cracks.  We didn't deal with it.

9  Q    Okay.

10        MR. RUKAVINA:  Thank you, Your Honor.  Thank you, Mr.

11  Seery.

12        THE COURT:  All right.  Any other Objector

13  examination?

14     Mr. Morris, anything further on that point?

15        MR. MORRIS:  No, thank you, Your Honor.  No further

16  questions.

17        THE COURT:  All right.  Mr. Seery, thank you.  You're

18  excused once again from the witness stand.

19     (The witness is excused.)

20        THE COURT:  Your next witness?

21        MR. SEERY:  Thank you, Your Honor.

22        THE COURT:  Uh-huh.

23        MR. RUKAVINA:  Your Honor, I'll call Jason Post.  Mr.

24  Post, if you're listening, which I believe you are, if you'll

25  please activate your camera.

Post - Direct                              51

1          THE COURT:  Mr. Post, we do not see or hear you yet.

2          MR. RUKAVINA:  Talk, Mr. Post, and I think it'll

3    focus on you.

4          MR. POST:  Yes.  Can you hear me now?

5          THE COURT:  We can hear you.  We cannot see you yet.

6    Could you say, "Testing, one, two; testing, one, two"?

7          MR. POST:  Testing, one, two.  Testing, one, two.

8          THE COURT:  There you are.  Okay.  Please raise your

9    right hand.

10       JASON POST, CERTAIN FUNDS AND ADVISORS' WITNESS, SWORN

11         THE COURT:  All right.  Thank you.  You may proceed.

12                     DIRECT EXAMINATION

13   BY MR. RUKAVINA:

14   Q    Mr. Post, good morning.  State your name for the record,

15   please.

16   A    Robert Jason Post.

17   Q    How are you employed?

18   A    I'm employed by NexPoint Advisors, LP.

19   Q    What is your title?

20   A    Chief compliance officer.

21   Q    Were you ever employed by the Debtor here?

22   A    Yes.

23   Q    Between when and when?  Approximately?

24   A    I believe it was July of '08 through October of 2020.

25   Q    What was your last title while you were employed at the

Post - Direct                                    52

1  Debtor?

2  A    Still chief compliance officer.  For the retail funds.

3  Q    Okay.  Very, very quickly, what does a chief compliance

4  officer do?  Or what do you do?

5  A    It's multiple things.  Interaction with the regulators.

6  Adherence to prospectus and SAI limitations for the funds.

7  And then establishment of written policies and procedures to

8  prevent and detect violations of the federal securities laws

9  and then testing those on a frequent basis.

10 Q    And I believe you mentioned you're the CCO for NexPoint

11 Advisors and Highland Capital Management Fund Advisors.  Are

12 you also the CCO for any funds that they advise?

13 A    Yes.  For all the funds that they advise.

14 Q    Okay.  Does that include so-called retail funds?

15 A    Yes.  They're all retail funds.

16 Q    What is a retail fund?

17 A    It typically constitutes funds that are subject to the

18 Investment Company Act of 1940, such as open-end mutual funds,

19 closed-end funds, ETFs.

20 Q    Obviously, you know who my clients are.  Are any of my

21 clients so-called retail funds that you just described?

22 A    Yes.

23 Q    Name them, please.

24 A    You've got NexPoint Capital, Inc., Highland Income Fund,

25 and NexPoint Strategic Opportunities Fund.

Post - Direct                                53

1   Q   Do those three retails funds hold any voting preference

2   shares in the CLOs that the Debtor manages?

3   A   Yes.

4         MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

5   Exhibit 2.

6      Your Honor, I believe I have a stipulation with Mr. Morris

7   that this exhibit can be admitted, so I'll move for its

8   admission.

9         MR. MORRIS:  No objection, Your Honor.

10        THE COURT:  All right.  Exhibit 2 will be admitted.

11   And let's be clear.  That appears at -- is it Docket No. --

12   let's see.  Is it 1673 that you have your -- no, no, no, no.

13   1670?  Is that where your exhibits are?

14        MR. RUKAVINA:  No, Your Honor.  It's 1863.  I think

15   we did an amended one because we numbered our exhibits instead

16   of having seventeen Os and Ps.  So it's 1863.

17        THE COURT:  1863?  Okay.  All right.  There it is.

18   Okay.  Again, this is -- I'm sorry.  I got sidetracked.  What

19   exhibit?  It's Exhibit 2, is admitted.  Okay.

20        MR. RUKAVINA:  Thank you, Your Honor.

21     (Certain Funds and Advisors' Exhibit 2 is received into

22   evidence.)

23   BY MR. RUKAVINA:

24   Q   Real quick, Mr. Seery.  What do these HIF, NSOF, NC, what

25   do they stand for?  Do they stand for the retail funds you

Post - Direct                                54

1   just named?

2          MR. SEERY:  I don't think he meant me.

3          THE WITNESS:  Yeah.

4   BY MR. RUKAVINA:

5   Q    I'm sorry, Mr. Post.  I didn't hear you.

6   A    You addressed me as Mr. Seery.

7   Q    Oh.  I apologize.  What do those initials stand for?

8   A    The names of the funds that I mentioned.

9   Q    Okay.  And what do these percentages show?

10  A    The percentages show the amount of shares outstanding and

11  the preference shares that each of the respective funds hold

12  of the named CLOs.

13  Q    And those CLOs on the left there, those are the CLOs that

14  the Debtor manages pursuant to agreements, correct?

15  A    Yes.  Those are some of them, correct.

16  Q    Yes.  The ones that the retail funds you mentioned have

17  interests in, correct?

18  A    Correct.

19  Q    And what does the far-right column summarize or show?

20  A    That would be the aggregate across the three retail funds.

21  Q    In each of those CLOs?

22  A    Correct.

23  Q    Thank you.

24         MR. RUKAVINA:  Mr. Vasek, you may pull this down.

25  BY MR. RUKAVINA:

Post - Direct                         55

1   Q    Mr. Post, in the aggregate, how much do those three retail
2   funds have invested in those CLOs, ballpark?
3   A    I believe it's approximately $130 million, give or take.
4   Q    Is it closer to 140 or 130?
5   A    A hundred -- I think it's 140, actually.
6   Q    Okay.  Thank you.  Who controls those three retail funds?
7   A    Ultimately, the board --
8   Q    And what --
9   A    -- of the funds.
10  Q    What is -- what do you mean by the board?  Do they have
11  independent boards?
12  A    Yes.  They have a majority independent board, the funds
13  do.
14  Q    Do you report to that board?
15  A    Yes.
16  Q    Does Mr. Dondero sit on those boards?
17  A    He does not.
18  Q    Okay.
19       MR. RUKAVINA:  I'll pass the witness, Your Honor.
20  Thank you, Mr. Post.
21       THE COURT:  All right.  Any other Objector
22  examination of Mr. Post?
23     All right.  Mr. Morris, do you have cross?
24       MR. MORRIS:  Yes, Your Honor, I do.
25       THE COURT:  Okay.

Post - Cross                            56

1                          CROSS-EXAMINATION
2    BY MR. MORRIS:
3    Q    Mr. Post, can you hear me okay, sir?
4    A    Yes, I can hear you.
5    Q    Okay.  Nice to see you again.  When did you first join
6    Highland?
7    A    I believe it was July of '08.
8    Q    So you've worked with the Highland family of companies for
9    about a dozen years now; is that right?
10   A    Yes.
11   Q    And you were actually employed by the Debtor from 2008
12   until October 2020; is that right?
13   A    Correct.
14   Q    And you left at that time and went to join Mr. Dondero as
15   the chief compliance office of the Advisors; do I have that
16   right?
17   A    Yes.  I transitioned to NexPoint Advisors shortly, I
18   believe, after Mr. Dondero left, but I was already the named
19   CCO for that entity.
20   Q    Right, but your employment status changed from being an
21   employee of the Debtor to being an employee of NexPoint; is
22   that right?
23   A    Correct.
24   Q    And that happened shortly after Mr. Dondero resigned from
25   the Debtor and went to NexPoint Advisors, correct?

Post - Cross                        57

1  A    Correct.

2  Q    Okay.  You mentioned that the funds are controlled by

3  independent boards; do I have that right?

4  A    It's a majority independent board, correct.

5  Q    Okay.  There's no independent board member testifying in

6  this hearing, is there?

7  A    I --

8         MR. RUKAVINA:  Your Honor, Mr. Post wouldn't know

9  that, but I'll stipulate to that as a fact.

10        THE COURT:  All right.

11        MR. MORRIS:  Okay.

12  BY MR. MORRIS:

13  Q    Did you -- do you speak with the board members from time

14  to time?

15  A    Yes.

16  Q    Did you tell them that it might be best if they came and

17  identified themselves and helped persuade the Court that they

18  were, in fact, independent?

19  A    They have counsel to assist them with that determination.

20  I never mentioned anything along those line to them.

21  Q    Okay.  Can you tell me who the board members are?

22  A    Yes.  Ethan Powell, Bryan Ward, Dr. Bob Froehlich, John

23  Honis, and then Ed Constantino.  He is only a board member,

24  though, for NSOF.  NexPoint Strategic Opportunities Fund.

25  Q    All right.  Mr. Honis, is he -- has he been determined to

Post - Cross                                      58

1   be an interested director, for purposes of the securities

2   laws?

3   A    Yes.

4   Q    Okay.  Mr. Froeh..., do you know much about his

5   background?

6   A    I believe he worked at Deutsche Bank and a couple of the

7   other -- or maybe a couple of other investment firms in the

8   past.  And he also owns a minor league baseball team.

9   Q    Do you know how long he served as a director of the funds?

10  A    I don't know, approximately.  I think maybe seven -- six,

11  seven years.

12  Q    Okay.  How about Mr. Ward?  Did Mr. Froehlich ever work

13  for Highland?

14  A    Not that I can recall.

15  Q    Did Mr. Ward ever work for Highland?

16  A    Not that I can recall.

17  Q    Do you recall how long he's been serving as a director of

18  the funds?

19  A    Mr. Ward?

20  Q    Yes.

21  A    I believe -- I'd be -- I don't recall specifically.  I

22  think it's been, you know, 10 to 12 years, give or take.

23  Q    He was a director when you got to Highland; isn't that

24  right?

25  A    He was on the board of directors.

Post - Cross                                    59

1    Q    Yeah.  So fair to say that Mr. Ward has been a director

2    since at least the mid to late oughts?  2005 to 2008?

3    A    I'm sorry, you cut out.  Late what?

4    Q    The late oughts.  Withdrawn.  Is it fair to say that Mr.

5    Ward's been a director of the funds since somewhere between

6    2005 and 2008?

7    A    Again, I don't recall specifically.  You know, I joined

8    the complex, the retail complex as the named CCO in 2015, and

9    he had been serving in that role prior to that, and I believe

10   it was for probably a period of five to seven years, so that

11   sounds in line.

12   Q    Did you have a chance to review Dustin Norris's testimony

13   from the December 16th hearing?

14   A    I did not.

15   Q    Do you know -- are you aware that he testified at some

16   length regarding the relationship of each of these directors

17   to Mr. Dondero and Highland?

18   A    I didn't review anything, so I don't know what he said or

19   how long it took.

20   Q    Do you know if Mr. Powell's ever worked for Highland?

21   A    He has.

22   Q    Do you know in what capacity and during what time periods?

23   A    He was -- I think his last title was -- I believe was

24   chief product strategist, I believe.  And he was also the

25   named PM for one of -- or, a suite of ETF funds.  I think he

1  was last employed maybe --from my recollection, 2014,

2  possibly.  Or 2015.  Somewhere around in there.

3  Q   Okay.  And to the best of your knowledge, did Mr. Dondero

4  appoint Mr. Powell to be the chief product strategist?

5  A   I don't -- I don't know.  I wasn't involved in the

6  decision for his appointment.  I don't know how he attained

7  that role.

8  Q   To the best of your knowledge, did Mr. Dondero appoint Mr.

9  Powell as the PM of the ETF funds?

10  A   Again, I wasn't involved in that determination, but he

11  probably would have had a role in making the determination on

12  who was the PM, along with probably some other investment

13  professionals.

14  Q   Okay.  And did Mr. Powell join the board of the funds

15  before or after he left Highland around 2015?

16  A   I can't recall specifically if he was already on the board

17  or was an interested member, but I believe he, you know, I

18  believe he joined shortly after he left.

19  Q   Okay.  So he went from being an employee and being a

20  portfolio manager at Highland to being on the board of these

21  funds.  Do I have that right?

22  A   Again, I can't recall specifically.  He may have already

23  been on the board as an interested board member.  But, you

24  know, I believe, you know, if that wasn't the case, he would

25  have joined the board shortly after leaving.

Post - Cross                          61

1  Q    And Mr. Ward, I think you said, has been on the funds'
2  board since somewhere between 2005 and 2008.  Does that sound
3  right?
4  A    I think that was a time frame you referenced, and I think
5  that was kind of in line, walking it back.  But I don't recall
6  specifically when he joined.
7  Q    And to the best of your knowledge, have the Advisors for
8  which you serve as the chief compliance officer managed the
9  Funds for which Mr. Ward has served as a director since the
10 time he became a director?
11 A    I'm sorry.  Can you repeat the question?
12 Q    Yeah.  I'm just trying to understand if the advisors --
13 withdrawn.  The Advisors manage the Funds; do I have that
14 right?
15 A    They provide investment advice on behalf of the Funds.
16 Q    And they do that pursuant to written agreements; do I have
17 that right?
18 A    Correct.
19 Q    And is it your understanding that, for the entire time
20 that Mr. Ward has served as a member of the board of the
21 Funds, the Advisors have provided the investment advice to
22 each of those Funds?
23 A    Yes, in one form or fashion.  I believe at one period in
24 time, historically, the Advisor may have changed its name, but
25 it would have been, you know, at the end of the day, one or

Post - Cross                                    62

1   more -- one of either NexPoint Advisors or Highland Capital

2   Management Fund Advisors would have advised those Funds.

3   Q   Is it fair to say that each of the Advisors for which you

4   serve as the chief compliance officer has always been managed

5   by an Advisor owned and controlled by Mr. Dondero?

6   A   I believe so, yes.

7           MR. MORRIS:  I have no further questions, Your Honor.

8           THE COURT:  All right.  Any redirect?

9           MR. RUKAVINA:  Yes.

10          THE COURT:  Okay.  Mr. Rukavina?

11          MR. RUKAVINA:  Your Honor, was I on mute?  I

12  apologize.

13          THE COURT:  Yes.

14                      REDIRECT EXAMINATION

15  BY MR. RUKAVINA:

16  Q   Mr. Post, why did you leave Highland?

17  A   It -- because I was a HCMLP employee and it was --

18  basically, there was conflicts that were created by being an

19  employee of the Debtor and by also serving as the CCO to the

20  named Funds and the Advisors, and it coincided with Jim

21  toggling over from HCMLP to NexPoint.  It just made sense more

22  functionally and from a silo perspective for me to be the

23  named CCO for that entity since he was no longer an employee

24  of HCMLP.

25  Q   And by Jim, you mean Jim Dondero?

Post - Redirect/Recross                    63

1  A    Yes, sorry.  Jim Dondero.

2  Q    You're not some kind of lackey for Mr. Dondero, where you

3  go wherever he goes, are you?

4          MR. MORRIS:  Objection to the question.

5          THE WITNESS:  No.

6          THE COURT:  Overruled.  He can answer.

7          MR. RUKAVINA:  Okay.

8          THE WITNESS:  No.

9          MR. RUKAVINA:  Okay.  Thank you, Your Honor.  I'll

10  pass the witness.

11          THE COURT:  Any other Objector examination?

12      All right.  Any recross, Mr. Morris?

13                    RECROSS-EXAMINATION

14  BY MR. MORRIS:

15  Q    Just one question, sir.  The conflicts that you just

16  mentioned, they were in existence for the one-year period

17  between the petition date and the date you left; isn't that

18  right?

19  A    I think -- I believe so, and I think they became more

20  evident as, you know, time progressed.

21  Q    Okay.  But they existed on day one of the bankruptcy

22  proceeding; isn't that right?

23  A    Yes, I believe so.

24  Q    All right.

25          MR. MORRIS:  No further questions, Your Honor.

Post - Recross                          64

1          THE COURT:  All right.  Thank you, Mr. Post.  You're

2     excused from the virtual witness stand.

3          (The witness is excused.)

4          THE COURT:  All right.  Your next witness?

5          MR. RUKAVINA:  Your Honor, my exhibit has been

6     admitted, I promised I'd be short, and my evidentiary

7     presentation is done.  Thank you.

8          THE COURT:  All right.  Well, Mr. Taylor, your

9     evidence?

10          MR. TAYLOR:  First of all, given the testimony that

11     we have received just recently, we have released Mr. Sevilla

12     from his subpoena and are not going to call him.

13          With that being said, we do have some documents that we

14     would like to get into evidence.  We filed our witness and

15     exhibit list at Docket No. 1874.  I don't believe any of these

16     are controversial.  I'm trying to keep from duplicating those

17     that are already into evidence by the Debtor.  And therefore I

18     would like to offer into evidence Exhibits No. 6 through 12

19     and 17.  And that is it, Your Honor.

20          THE COURT:  Okay.  Is there any objection to Dondero

21     Exhibits 6 through 12 and 17, appearing at Docket 1874?

22          MR. MORRIS:  I just want to be clear that Exhibits 6

23     and 7, which are letters, I believe, from Mr. Lee (phonetic)

24     are not being offered for the truth of the matter asserted in

25     either letter.

65

1      MR. TAYLOR:  That is correct, Your Honor.  Just
2  merely that those requests and the words that were stated in
3  there were indeed sent on those dates.

4      MR. MORRIS:  And the same comment, Your Honor, with
5  respect to Exhibits 9 through 12, that those documents are not
6  being offered for the truth of the matter asserted.

7      MR. TAYLOR:  Again, just that those requests were
8  sent and those responses as stated were sent.

9    And I apologize.  I missed one, Your Honor.  Also No. 15.
10  6 through 12, 15, and 17.

11      MR. MORRIS:  Your Honor, the Debtor has no objection
12  to Exhibits 15, 16, and 17.

13      THE COURT:  All right.  So, so they are all admitted
14  with the representation that 6 and 9 through 12 are not being
15  offered for the truth of the matter asserted.  With that
16  representation, you have no objection, Mr. Morris?

17      MR. MORRIS:  That's right.  I do just want to get
18  confirmation that Exhibits 1 through 5 and 13 through 16 -- 13
19  and 14 are not being offered at all.

20      THE COURT:  Mr. Taylor?

21      MR. TAYLOR:  So, that -- that is correct.  1 through
22  5 would be duplicative of what has already been introduced
23  into the record by Mr. Morris, so I am not offering those.
24  And do not believe that 13 and 14 are relevant anymore, and so
25  therefore did not offer those.

66

1          THE COURT:  Okay.  So, with that, I have admitted 6

2    through 12, 15, 16, and 17 at Docket Entry 1874.

3      (Dondero Exhibits 6 through 12 and 15 through 17 are

4    received into evidence.)

5          THE COURT:  All right.  Anything else, Mr. Taylor?

6          MR. TAYLOR:  No, Your Honor.  We are not calling any

7    witnesses.

8          THE COURT:  All right.  Mr. Draper, what about you?

9    Any evidence?

10          MR. DRAPER:  No evidence or witnesses.  The evidence

11    that's been introduced by Mr. Taylor and Mr. Rukavina are

12    sufficient for me.

13          THE COURT:  All right.  Ms. Drawhorn, anything from

14    you?

15          MS. DRAWHORN:  No additional evidence, Your Honor.

16          THE COURT:  All right.  Well, then, Mr. Morris, did

17    you have anything in rebuttal?

18          MR. MORRIS:  No, Your Honor.  I think we can proceed

19    to closing statements.  I would just appreciate confirmation

20    by the Objecting Parties that they rest.

21          THE COURT:  All right.  Well, I guess we'll get that

22    clear if it is isn't clear.  All of the Objectors rest.

23    Confirm, yes, Mr. Rukavina?

24          MR. RUKAVINA:  Confirm.

25          THE COURT:  And Mr. Taylor?

67

```
 1          MR. TAYLOR:  Confirmed, Your Honor.

 2          THE COURT:  Okay.  And Draper and Drawhorn?

 3          MR. DRAPER:  Yes, Your Honor.

 4          MS. DRAWHORN:  Confirmed, Your Honor.

 5          THE COURT:  All right.  By the way, I assume Mr.

 6  Dondero has been participating this morning.  I didn't

 7  actually get that clarification before we started.  Mr.

 8  Taylor, is he there with you this morning?

 9          MR. TAYLOR:  Your Honor, he is.  He has been

10  participating.  He is sitting directly to my left about

11  slightly more than six feet apart.

12          THE COURT:  Okay.  All right.  Good.

13      All right.  Well, let's talk about our closing arguments

14  and let me figure out, do we have -- should we break a bit

15  before starting?  I have an idea in my brain about a time

16  limitation, but before I do that, let me ask.  Mr. Morris,

17  first I'll ask you.  How much time do you think you need for a

18  closing argument?

19          MR. MORRIS:  Your Honor, --

20          MR. POMERANTZ:  Your Honor?

21          MR. MORRIS:  -- I'll defer to Mr. Pomerantz, who's

22  going to deliver that portion of our presentation today.

23          THE COURT:  All right.  Mr. Pomerantz?

24          MR. POMERANTZ:  Your Honor, I will be making -- yes,

25  Your Honor.  I will be making the majority portion of the
```

68

 1 │ argument.  Mr. Kharasch will be making the portion of the

 2 │ argument dealing with the Advisor and Funds' objection.  But I

 3 │ expect my closing to be quite lengthy, given the 1129

 4 │ requirements, all the legal issues, which I plan to spend a

 5 │ fair amount of time.  So I would anticipate a range of an hour

 6 │ and 45 minutes.

 7 │        THE COURT:  An hour and 45 minutes?  All right.

 8 │ Well, --

 9 │        MR. POMERANTZ:  Correct.

10 │        THE COURT:  I'm getting an echo.

11 │        MR. CLEMENTE:  Your Honor, it's Matt Clemente on

12 │ behalf on the Committee.  I'll have 15 minutes or less, Your

13 │ Honor.  Just some things I would like to touch on.

14 │        THE COURT:  All right.  So, two hours.  If I were to

15 │ --

16 │        MR. POMERANTZ:  And then you need, Your Honor, to add

17 │ Mr. Kharasch.  I think he's on.  He can indicate how long his

18 │ part of the closing will be.

19 │        THE COURT:  Mr. Kharasch?

20 │        MR. KHARASCH:  Yes.  I would figure my argument would

21 │ probably be about 20 minutes to 30 minutes.

22 │        THE COURT:  Okay.

23 │        MR. RUKAVINA:  Your Honor, let me interject something

24 │ that I think will help everyone out.  With the CLOs having

25 │ consented through their counsel to the assumption, the bulk of

69

 1   my objection is now moot.  We no longer can and will argue

 2   that the contracts are unassignable under 365(b) or (c)

 3   because we do have now their consent.  So that will hopefully

 4   help the Debtor on that issue.

 5          MR. KHARASCH:  Your Honor, Ira Kharasch again.  I was

 6   not anticipating that.  I believe that that will take away the

 7   bulk of my argument.  I'm still going to be dealing with some

 8   of the other non-assumption-type arguments raised by the CLO

 9   Objectors, kind of dovetailing with Mr. Pomerantz's arguments

10   on the injunction.  But that will greatly reduce, Your Honor,

11   my argument.

12          THE COURT:  All right.  So if I say two hours of

13   argument for the Debtor and Creditors' Committee, Rukavina,

14   Taylor and Draper and Drawhorn, can you collectively manage to

15   share that two hours?  Have a two-hour argument in the

16   aggregate?  That seems fair to me.

17          MR. RUKAVINA:  Your Honor, I think -- I think that's

18   fine, Your Honor.

19          THE COURT:  All right.  And I guess I'll --

20          MR. TAYLOR:  This is Mr. Taylor.  And yes, I agree.

21          THE COURT:  Okay.  And Mr. Draper?

22          MR. DRAPER:  This is Douglas Draper.  I agree.  I

23   agree also, Your Honor.

24          THE COURT:  All right.  And I'm going to ask --

25          MR. POMERANTZ:  Your Honor, I --

1          THE COURT:  Go ahead.

2          MR. POMERANTZ:  Your Honor, we -- I think we may need

3   like two hours and ten minutes, because mine was 1:45, Mr.

4   Clemente was 15, and then Mr. Kharasch.  But we'll be around

5   that.  And I tend to speak fast, so I might even shorten mine.

6          THE COURT:  Okay.  You negotiated me up to two hours

7   and ten minutes, Debtors/Objectors, each.

8       I'm going to ask one more time.  The U.S. Trustee lobbed a

9   written objection, but we've not heard anything from the U.S.

10  Trustee.  Are you out there wanting to make an oral argument?

11         MS. LAMBERT:  Yes, Your Honor.  The United States

12  Trustee is on the line.  And we've been listening to the

13  hearing.  I can turn my video on.  I think you're --

14         THE COURT:  Yes.  I can hear you.  I can't see you.

15         MS. LAMBERT:  Okay.  All right.  And so the U.S.

16  Trustee feels that the issues about the releases have been

17  adequately joined and raised by the other parties and that

18  it's an issue of law.  The U.S. Trustee does not feel that we

19  can add to that dialogue by, you know, wasting more of the

20  Court's time.  I think it's been adequately briefed and it's

21  been adequately argued here today.

22         THE COURT:  Okay.

23         MS. LAMBERT:  And we do have an agreement to include

24  governmental release language in the order.  I understand that

25  agreement is still being honored.  That's a separate agreement

71

 1   than the issue of whether the releases are precluded.  But

 2   we're going to let the other people carry the water on that.

 3            THE COURT:  Okay.

 4            MR. POMERANTZ:  Yeah.  And that is correct.  That is

 5   correct, Your Honor.  They asked for some information -- a

 6   provision on government releases.  They also asked for a

 7   provision regarding joint and several liability for Trustee

 8   fees.

 9       As I mentioned previously, the IRS has asked for a

10   provision in the confirmation order, as have the Texas Taxing

11   Authorities.

12       We have not uploaded a proposed confirmation order, but I

13   will state right now on the record that, before we do so, we

14   will, of course, give Ms. Lambert, Mr. Adams, and the Texas

15   Taxing Authorities the opportunity to review.  We expect there

16   won't be any issue because the language has already been

17   agreed to.

18            THE COURT:  All right.  Well, how about this.  It's

19   11:23 Central time.  Let's break until 12:00 noon Central

20   time, okay, so that gives everyone a little over 30 minutes to

21   have a snack and get their notes together, and we'll start

22   with closing arguments at 12:00 noon.  All right?  So we're in

23   recess until then.

24            THE CLERK:  All rise.

25       (A recess ensued from 11:24 a.m. until 12:05 p.m.)

72

1          THE COURT:  All right.  Please be seated.  All right.

2     This is Judge Jernigan.  We are back on the record in

3     Highland.  Let me make sure we have the people we need.  Do we

4     have the Pachulski team there?  Mr. Pomerantz, Mr. Kharasch?

5          MR. POMERANTZ:  Yes, you do, Your Honor.

6          THE COURT:  All right.  For our Objectors, Mr.

7     Taylor, are you there?

8          MR. TAYLOR:  Yes, Your Honor, I am.

9          THE COURT:  All right.  I see Mr. Draper there on the

10    video.  You're there.

11         MR. DRAPER:  I'm here.  Can you hear me?

12         THE COURT:  I can hear you loud and clear, yes.

13         MR. DRAPER:  Great, because I didn't -- I'm not

14    hearing, something so I apologize.

15         THE COURT:  All right.  So we have Mr. Rukavina, and

16    I think I see Mr. Hogewood there as well.  Is that correct?

17    You're ready to go forward?

18         MR. RUKAVINA:  Yes, Your Honor.

19         THE COURT:  All right.

20         MR. RUKAVINA:  Yes, Your Honor.  Good afternoon.

21         THE COURT:  All right.  And Ms. Drawhorn, you're

22    there?

23         MS. DRAWHORN:  Yes, Your Honor.

24         THE COURT:  Okay.  Committee.  Mr. Clemente, are you

25    there?

73

```
 1          MR. CLEMENTE:  Yes, Your Honor.  I'm here, Your
 2   Honor.
 3          THE COURT:  Okay.  Very good.  All right.  So, let me
 4   reiterate.  We've given two-hour and 10-minute time
 5   limitations for the Debtor, and that'll be both any time you
 6   reserve for rebuttal and your closing, initial closing
 7   argument.  Mr. Clemente, you're going to be in that time frame
 8   as well.  Okay?
 9          MR. CLEMENTE:  Yes, Your Honor.
10          THE COURT:  And so, as supporters of the plan.
11      And then, of course, the Objectors, they have collectively
12   two hours and ten minutes.
13      A couple of things.  I'm going to have my law clerk, Nate,
14   who you can't see but he's to my right, he's going to keep
15   time.  I promise I won't be a jerk and cut anyone off
16   midsentence, but please don't push the limit if I say, you
17   know, "Time."
18      The other thing I will tell you is I'll probably have some
19   questions here or there.  And I've told Nate, cut off the
20   timer if we're in a question-answer session.  I won't count
21   that as part of the two hours and ten minutes.
22      All right.  So, with that, Mr. Pomerantz, you may begin.
23           CLOSING STATEMENT ON BEHALF OF THE DEBTOR
24          MR. POMERANTZ:  Thank you, Your Honor.  As Your Honor
25   is aware, the Debtor has been able to resolve all objections
```

74

1  to confirmation other than the objection by Mr. Dondero or his

2  entities and the United States Trustee.

3      Your Honor, I have a very lengthy closing argument, given

4  the number of issues that are raised in the objections, and I

5  want to make a complete record, since I understand that

6  there's a good likelihood that (garbled) appeal.

7      With that in mind, Your Honor, I'm prepared to go through

8  each and every confirmation requirement in Section 1129.

9  However, as an alternative, I might propose that I can go

10 through each of the Section 1129 requirements that are the

11 subject of pending objections or otherwise depend upon

12 evidence that Your Honor has heard.

13          THE COURT:  Okay.

14          MR. POMERANTZ:  And of course, I'll be happy to

15 answer any questions that you have in the process.

16          THE COURT:  Okay.

17          MR. POMERANTZ:  And after my closing argument, I will

18 turn it over to Mr. Kharasch to address the Advisor and Funds'

19 objections.

20          THE COURT:  Okay.

21          MR. POMERANTZ:  Before I walk the Court through the

22 confirmation requirements, I did want to note for the Court,

23 as I did previously, that we filed an updated ballot summary

24 at Docket No. 1887.  And as reflected in the summary, Classes

25 2 and 7 have voted to accept the plan with the respective

75

1  numerosity and amounts required.  In fact, the votes are a

2  hundred percent.

3      Class 8, however, has voted to reject the plan.  Seventeen

4  creditors in Class 8 voted yes and 24 objectors, which are, I

5  think, all but one the employees with one-dollar claims for

6  voting purposes, voted against.

7      In dollar amount, Class 8 has accepted the plan by 99.8

8  percent of the claims.  And I will address the issues of the

9  cram-down over that class a little bit later on.

10      Lastly, during the course of my presentation, I will

11  identify for the Court certain modifications we have made to

12  address the objections that were filed on January 22nd and

13  then also on February 1st.  And at the end of my presentation,

14  I will raise a couple of other modifications that I won't get

15  to during my presentation and will explain to the Court why

16  all the modifications do not require resolicitation and are

17  otherwise appropriate under Section 1127.

18      Your Honor, as Your Honor is aware, Section 1129 requires

19  the Debtors to demonstrate to the court that the plan

20  satisfies a number of statutory requirements.  1129(a)(1)

21  provides that the plan requires -- complies with all statutory

22  provisions of Title 11, and courts interpreted this provision

23  as requiring the debtor to demonstrate it complies with

24  Section 1122 and 1123.

25      With respect to classification, Your Honor, there has been

76

1    one objection that was raised to essentially a classification,

2    and that was raised by Mr. Dondero to Article 3C of the plan

3    on the grounds that it purports to eliminate a class that did

4    not have any claims in it as of the effective date but which

5    may later have a claim in that class.

6        I think he was primarily concerned about Class 9

7    subordinated claims.  But Mr. Dondero misunderstands the

8    provision.  It only eliminates a claim for voting purposes,

9    and if there's later a claim in that class, it will be treated

10   as the plan provides the treatment.

11       In any event, Class 9, as we know now, will be populated

12   by the HarbourVest claims, as well as the UBS claims and the

13   Patrick Daugherty claims, if the Court approves the settlement

14   approving those claims.

15       Next, Your Honor, Section 1123(a) contains seven mandatory

16   requirements that a plan must include.  Sections 1, 2, and 3

17   of 1123(a) apply to the classification of claims and where

18   they're impaired and treatment.  The plan does that.

19       There has been an objection to 1123(a)(3) raised by

20   several parties with respect to the classification and

21   treatment of subordinated claims.  The concerns stem from the

22   mistaken belief that the Debtor reserved the right to

23   subordinate claims without providing parties with notice and

24   without obtaining a court order.

25       The Debtor never intended to have unilateral ability to

77

1  subordinate claims without affording parties due process

2  rights, and we've added some clarificatory language to so

3  provide.

4      We made changes to the plan on January 22nd, and then on

5  February 1st, and the plan addresses all those issues in

6  Article 3(j) and it talks about when a claim is going to be

7  subordinated as a non-creditor.  We've also redefined the

8  definition of subordinated claims to make clear that a claim

9  is only subordinated upon entry of an order subordinating that

10 claim.

11     Mr. Dondero also objected on the grounds that the plan did

12 not contain a deadline pursuant to which the Debtor would be

13 required to seek any subordination, and we have revised

14 Article 7(b) of the plan to provide that any request to

15 subordinate a claim would have to be made on or before the

16 claim objection deadline, which is 180 days after the

17 effective date.

18     Lastly, certain former employees, Mr. Yang and Borud,

19 objection also joined by Mr. Deadman, Travers, and Kauffman,

20 objected to the inclusion of language in the definition of

21 "Subordinated Claims" that a claims arising from a Class A, B,

22 or C limited partnership is deemed automatically subordinated.

23 The concerns were that the language could broadly apply to any

24 potential claims by a former partner, and could be also read

25 to encompass claims outside the statutory scope of 510(b) or

78

1   otherwise relating to limited partnership interests.

2        While the Debtor does reserve the right to seek to

3   subordinate the claims on any basis, we have modified the plan

4   to address that concern and to address the concern that we're

5   not attempting to create any new causes of action for

6   subordination that don't otherwise exist under applicable law,

7   but it just preserves the parties' rights with respect to

8   subordination and deals with that at a later date.

9        Next, Your Honor, Section 1123(a)(5).  I skipped over

10  1123(a)(4) because there are no objections to that provision.

11            THE COURT:  Okay.

12            MR. POMERANTZ:  Section 1123(a)(5), a plan must

13  provide for adequate means of implementation.  And the plan

14  provides a detailed structure and blueprint how the Debtor's

15  operations will continue, how the assets will be monetized,

16  including the establishment of the Claimant Trust,

17  establishment of the Litigation Sub-Trust, the Reorganized

18  Debtor, the Claimant Trust Oversight Board.  And the documents

19  precisely describing how this will occur were filed as part of

20  the various plan supplements.

21       1123(a)(7), Your Honor, requires that the plan only

22  contain provisions that are consistent with the interest of

23  equity holders and creditors with respect to the manner,

24  selection, and -- of any director, officer, or trustee under

25  the plan.  And as discussed in the plan, at the disclosure

79

1   statement, and as testified to by Mr. Seery, the Committee and

2   the Debtor had arm's-length negotiations regarding the post-

3   effective date corporate governance and believe that the

4   selection of the claimant Trustee, the Litigation Sub-Trustee,

5   and the Claimant Trust Oversight Board are in the best

6   interest of stakeholders.

7      HCMFA has raised a particular objection, I think, to these

8   issues, but I will address it in the context of the

9   requirement under Section 1129(a)(5).

10      Your Honor, Section 1129(a)(2) requires that the plan

11   comply with the disclosure and solicitation requirements under

12   the plan. Section 1125 requires that the Debtor only solicit

13   with a court-approved disclosure statement. The Court

14   approved the disclosure statement on November 23rd, and

15   pursuant to the proofs of service on file, the plan and

16   disclosure statement were mailed, along with solicitation

17   materials that the court approved.

18      Now, there has been an objection raised by Dugaboy, and

19   also alluded to by Mr. Taylor in some of his comments before,

20   that the plan does violate 1129(a)(2) because the Debtor's

21   disclosure statement was deficient.

22      In support of that argument, Dugaboy points to the

23   reduction in the anticipated distribution to creditors from

24   the November plan analysis to the January plan analysis, and

25   argues that that reduction requires resolicitation. However,

80

1  those arguments are not well-taken.

2      First, none of the people making these objections were

3  solicited for their vote on the plan, or if they had been,

4  they didn't vote or decided to reject the plan.  And to the

5  extent that Class 8 creditors, the distribution has gone down

6  -- that's the class that Mr. Taylor and Mr. Draper are

7  concerned about -- you don't hear the Committee, Acis,

8  Redeemer, UBS, HarbourVest, Daugherty, or the Senior Employees

9  making their argument, this argument, and they represent over

10 99 percent of the claims in that class.  And in fact, of the

11 17 Class 8 creditors that have accepted the plan, 15 are

12 represented by the parties I just mentioned.

13     So who are the two creditors that they're so concerned

14 about?  One is Contrarian, which is a claims trader that

15 actually elected to be treated in Class 7, and one is one of

16 the employees who voted to accept the plan.

17     Second, Your Honor, the argument conflates the difference

18 between adverse change to the treatment of a claim or interest

19 that would require a resolicitation under Section 1127 and a

20 change to the distribution that would not.

21     More importantly, Your Honor, the argument is specious.

22 As Mr. Seery testified yesterday, the material differences

23 between the analysis contained on November and late January

24 and the one we filed on February 1st were based on three types

25 of changes:  an update regarding the increased value of assets

1    based upon events that had transpired during this period,

2    which included an increase in asset value, no recoveries, and

3    revenues expected to be generated by the CLO management

4    agreements; an update to the expected costs of the Reorganized

5    Debtor and the Claimant Trust as a result of the continued

6    evaluation of staffing needs, operational expenses, and

7    professional fees; and an update to reflect resolution of the

8    HarbourVest and UBS claims.

9         In the filing Monday, Your Honor, we updated the plan

10   projection, a liquidation analysis which revised the unsecured

11   claims based upon the UBS settlement that I was able to

12   disclose to Your Honor.  And in the filing, the distribution

13   now revised to Class 8 creditors is now 71 percent, compared

14   to the 87 percent that was in the disclosure statement that

15   went out for solicitation.

16        Your Honor, there can be no serious argument that the

17   creditors in this case were not fully aware of the potential

18   for the UBS and HarbourVest creditors receiving claims.  Your

19   Honor's UBS 3018 order granting its claim for voting purposes

20   was entered right around the time that the disclosure

21   statement was approved.  And, in fact, a last-minute addition

22   to the disclosure statement disclosed the 3018 amount,

23   although the amount did not make it to the attachment to the

24   disclosure statement.  And that reference, Your Honor, to the

25   UBS claim being allowed for voting purposes can be found at

82

1 Page 41 of Docket No. 1473.

2     And the HarbourVest settlement was filed on about December

3 23, two weeks before the voting deadline, sufficient time for

4 people to take that into consideration.

5     And as Your Honor surely knows, the hearings in this case

6 have been very well-attended by the major parties, and I

7 believe that if we went back and looked at the records of who

8 was on the WebEx system during the HarbourVest and UBS

9 hearings, you would find that representatives of basically

10 every creditor, every major creditor in this case in Class 8

11 participated.

12     Moreover, Your Honor, creditors were not guaranteed any

13 percentage recovery under the plan and disclosure statement,

14 which clearly identified the size of the claims pool as a

15 material risk.

16     Article 4(a)(7) of the disclosure statement, which is at

17 Docket 1473, is entitled "Claims Estimation" and warns

18 creditors that there can be no assurances that the Debtor's

19 claims estimates will prove correct, and that the actual

20 amount of the allowed claims may vary materially.

21     And if Dugaboy is arguing it was misled as the holder of a

22 disputed administrative claim and general unsecured claim,

23 that argument is simply preposterous.

24     Dugaboy cites several cases for the proposition that

25 deficient disclosure may warrant resolicitation, and the

83

1 Debtor agrees with the proposition as a general matter. But

2 if one looks at the cases that were filed -- that Dugaboy

3 cited to, it will see that they are clearly inapposite and

4 distinguishable.

5     *In re Michaelson*, the Bankruptcy Court for the Eastern

6 District of California, revoked confirmation because the

7 debtor failed to disclose in the disclosure statement a mail

8 fraud indictment of the turnaround specialist who was to lead

9 the reorganization effort and a prior Chapter 7 company he

10 drove into the ground.

11     In *In re Brotby*, the Ninth Circuit BAP affirmed a decision

12 of the Bankruptcy Court that the individual debtor's decision

13 to modify its financial projections on the eve of confirmation

14 did not require a resolicitation. And there, the financial

15 projections were off by 75 percent.

16     And in *Renegade Holdings*, the Bankruptcy Court granted a

17 motion by a group of states to revoke confirmation by the

18 debtors, who manufactured and distributed tobacco products,

19 because the debtors failed to disclose in its disclosure

20 statement that the debtor and its principals were under

21 criminal investigation for unlawful trafficking in cigarettes,

22 which was not disclosed to creditors.

23     Your Honor, none of these cases are remotely analogous to

24 this case, and they certainly do not stand for the proposition

25 that the Debtor was required to resolicit.

1    Next, Your Honor, the next requirement is 1129(a)(3),

2  which requires that any plan be proposed in good faith.  As

3  Mr. Seery testified at length, and the Court has personal

4  knowledge of, having presided over this case for a year, the

5  plan is the result of substantial arm's-length negotiations

6  with the Committee over a period of several months.

7    Mr. Seery testified yesterday that, soon after the board

8  was appointed, the Committee wanted to immediately pursue down

9  the path of an asset monetization plan.  However, as Mr. Seery

10 testified, the board decided that it was inappropriate to rush

11 to judgment and that it should consider all potential

12 restructuring alternatives for the Debtor.  And Mr. Seery

13 testified what those alternatives were:  a traditional

14 restructuring and continuation of the Debtor's business; a

15 potential sale of the Debtor's assets in one or more

16 transactions; an asset monetization plan like the one before

17 the Court today; and, last but not least, a grand bargain plan

18 that would involve Mr. Dondero sponsoring the plan with a

19 substantial equity infusion.

20    As Mr. Seery testified, by the early summer of 2020, the

21 Debtor decided that it was appropriate to start moving down

22 the path of an asset monetization plan while it continued to

23 work on the grand bargain plan.  Accordingly, Mr. Seery

24 testified that the Debtor commenced good-faith negotiations

25 with the Committee regarding the asset monetization plan, and

85

1   that those negotiations took several months, were hard-fought

2   and at arm's-length, and involved substantial analysis of the

3   appropriate post-confirmation corporate structure, governance,

4   operational, regulatory, and tax issues.  And on August 12th,

5   Your Honor, the plan was filed with the Court.

6       And although the Debtor at that time had not reached an

7   agreement with the Committee on some of the most significant

8   issues, Mr. Seery testified that the independent board

9   believed that it was important to file that plan at that time,

10   a proverbial stake in the ground to act as a catalyst for

11   reaching a consensual plan with the Committee or others, which

12   it has done.

13       As Mr. Seery testified, he continued to work with Mr.

14   Dondero to try to achieve a grand bargain plan, while at the

15   same time proceeding down the path of the filed plan.

16       He testified that the parties participated in mediation at

17   the end of August and early September to try to reach an

18   agreement on a grand bargain plan, but were unsuccessful.  And

19   the Debtor proceeded on the path of the August 12th plan and

20   sought approval of its disclosure statement on August 27th,

21   2020.

22       Mr. Seery testified that, at that time, the Debtor still

23   had not reached an agreement with the Committee on certain

24   significant issues involving post-confirmation governance and

25   the scope of releases.  And as a result, after a contested

86

1  hearing, Your Honor, Your Honor did not approve the disclosure

2  statement on October 27th, but asked us to go back again to

3  try to work out the issues, and we came back on November 23rd.

4      Mr. Seery testified that the Debtor continued to negotiate

5  with the Committee to resolve the material disputes leading --

6  which led up to the November 23rd hearing, where we came in

7  with the support of the Committee.  But as Mr. Seery has also

8  testified, he has continued to try to reach a consensus on a

9  global plan, notwithstanding the approval of the disclosure

10 statement.  And he spent personally several hundred hours

11 since his appointment trying to build consensus.

12     As part of this process, Mr. Seery testified that Mr.

13 Dondero received access to substantial information regarding

14 the Debtor's assets and liabilities, most recently in

15 connection with a series of informal document requests which

16 were made at the end of December.

17     And after the Court asked the parties to again reengage in

18 efforts to try to reach a global hearing after the Debtor's

19 preliminary injunction motion, Mr. Seery testified that he and

20 the board participated in calls with Mr. Dondero and his

21 advisors and the Committee to see if common ground could be

22 attained.

23     Unfortunately, as Mr. Seery testified, the Committee and

24 Mr. Dondero were not able to reach an agreement.

25     Accordingly, Your Honor, the testimony unequivocally and

87

1    overwhelmingly demonstrates that the plan was proposed in good

2    faith.

3        I expect the Objectors may argue in closing that they have

4    filed a plan under seal that is a better alternative than that

5    being proposed by the plan that the Debtor seeks to confirm.

6    Your Honor, as a threshold matter, yesterday I said any

7    mention of the specifics of the recent plan would be

8    inappropriate.  We are not here today to debate the merits of

9    Mr. Dondero's plan, which the Court permitted him to file

10   under seal.  He had ample opportunity to file this plan after

11   exclusivity was terminated, seek approval of a disclosure

12   statement, and, if approved, solicit votes in connection with

13   a confirmation hearing, but he failed to do so.

14       What matters today, Your Honor, is whether the Debtor's

15   plan, the plan that has been accepted by 99.8 percent of the

16   amount of creditors, and opposed only by Mr. Dondero, his

17   related entities, and certain employees, meets the

18   confirmation requirements of Section 1129, which we most

19   certainly argue it does.

20       And perhaps most importantly, Your Honor, the Court

21   remarked at the last hearing that, without the Committee's

22   support for a competing plan, Mr. Dondero's plan would be dead

23   on arrival.  And as you have heard from Mr. Clemente, Mr.

24   Dondero does not yet have the Committee's support.

25       Next, Your Honor, is Section 1129(a)(5).  That requires

88

1  that the plan disclose the identity of any director,

2  affiliate, officer, or insider of the debtor, and such

3  appointment be consistent with the best interest of creditors

4  and equity holders.  Courts have held that this section

5  requires the disclosure of the post-confirmation governance of

6  the reorganized entity.

7      HCMFA objects to the plan, arguing that it did not comply

8  with Section 1129(a)(5) because it didn't disclose the people

9  who would control and manage the Reorganized Debtor and who

10  might be a sub-servicer.  HCMFA's objection is off-base.

11  Under the plan, Mr. Seery will be the claimant Trustee and

12  Marc Kirschner will be the Litigation Trustee.  Mr. Seery

13  testified extensively about his background, and he has

14  appeared before the Court many times and the Court is familiar

15  with him.  We have also introduced his *C.V.* into evidence.

16      As he testified, he will be paid $150,000 per month,

17  subject to further negotiations with the Claimant Trust

18  Oversight Committee regarding the monthly amount and any

19  success fee and severance fee, which negotiation is expected

20  to be completed within the 45 days following the effective

21  date.

22      Mr. Seery also testified regarding the names of the

23  members of the Claimant Trust Oversight Committee, which

24  information was also contained in the plan supplement and it

25  generally includes the four members of the Committee and David

89

1   Pauker, a restructuring professional with decades of

2   restructuring experience.

3       The members of the Oversight Committee will serve without

4   compensation, except for Mr. Pauker, who Mr. Seery testified

5   will receive $250,000 in the first year and $150,000 for

6   subsequent years.

7       As set forth in the Claimant Trust agreement, if at any

8   time there is a vacant seat to be filled by another

9   independent member, their compensation will be negotiated by

10  and between the Claimant Trust Oversight Board and them.

11      Mr. Seery has also testified that he believed the Claimant

12  Trust will have sufficient personnel to manage its business.

13  Specifically, he has testified that he intends to employ

14  approximately ten of the Debtor's employees, who will be

15  sufficient to enable him to continue to operate the Debtor's

16  business, including as an advisor to the managed funds and the

17  CLOs, until the Claimant Trust is able to effectively and

18  efficiently monetize its assets for fair value, whether that

19  takes two years or whether that takes 18 months or whether

20  that takes longer.

21      Mr. Seery further testified that he believes that the

22  operations can be best conducted by the Debtor's employees.

23  And while he did consider the retention of a sub-servicer, he

24  ultimately decided, in consultation with the Committee, that

25  the monetization would be a lot more effective if done with a

90

1    subset of the Debtor's current employees.

2         The proposed corporate governance is also consistent with

3    the interests of the Debtor and its stakeholders.  The Court

4    is very familiar with Mr. Seery and the Debtor, and I believe

5    that Mr. Clemente, when he comments, will say the Committee

6    can think of no better person to continue managing the

7    Claimant Trust than Mr. Seery.

8         Mr. Kirschner is also well qualified to be the Litigation

9    Trustee.  His *C.V.* is part of the evidence that's been

10   admitted and contains additional information regarding his

11   background.  And he will receive $40,000 a month for the first

12   three months and $20,000 a month thereafter, plus a to-be-

13   negotiated success fee.

14        There just simply can be no challenge to Mr. Seery's or

15   Mr. Kirschner's qualifications or abilities to act in a manner

16   contemplated by the plan or that their involvement is not in

17   the best interest of the estate and its creditors.

18        Your Honor, the next requirement that is objected to is

19   Section 1129(a)(7).  That, of course, requires the Debtor to

20   demonstrate that creditors will receive not less under the

21   plan than they would receive if the Debtor was to be

22   liquidated in Chapter 7.  And on February 1st, Your Honor, we

23   filed our updated liquidation analysis, which contains the

24   latest-and-greatest evidence to support that.

25        These documents, the updated documents, in connection with

91

1  the prior analysis, was provided to objecting parties in

2  advance of the January 29th deposition, and Your Honor has

3  heard the differences between the January 29th and the

4  February 1st documents being very minimal.

5      The Court heard extensive evidence and testimony from Mr.

6  Seery regarding the assumptions that went into the preparation

7  of the liquidation analysis and the differences of what

8  creditors are projected to receive under the plan as compared

9  to what they are projected to receive in a Chapter 7.

10     Such testimony also included a comparison between the

11 liquidation analysis that was filed with the plan in November,

12 the updated liquidation analysis filed on the -- or, provided

13 to parties on January 28th, and the last version, filed on

14 February 1st.

15     Mr. Seery testified that, on the revenue side, the

16 liquidation analysis was updated to include the HCLOF

17 interest, which was required as part of the settlement with

18 HarbourVest; the increase in value of certain assets,

19 including Trussway; revenue expected to be generated from

20 continued management of the CLOs; and increased recovery on

21 notes as a result of the acceleration of certain related

22 notes.

23     On the expense side, Mr. Seery testified regarding his

24 best estimate of the likely expenses to be incurred by a

25 Chapter 7 trustee -- by the Claimant Trust, including

1  personnel costs; professional costs, which increase because of

2  the litigious nature this case has become; and operating

3  expenses.

4      And lastly, on the claim side, Your Honor, Mr. Seery

5  testified that the claims numbers have been updated to include

6  the settlement from HarbourVest and initially the amount

7  approved to UBS pursuant to the 3018 order and then the

8  reduction at $50 million based upon the settlement announced.

9  And like the prior liquidation analysis, the current analysis

10  demonstrates that creditors will fare substantially better

11  under in Chapter -- under the plan than in Chapter 7.  In

12  fact, the projected recovery under the plan is 85 percent for

13  Class 7 creditors and 71.32 percent for Class 8 creditors, as

14  compared to 54.96 percent for all unsecured creditors in a

15  Chapter 7.

16      Mr. Seery also testified that expenses are expected to be

17  more under Chapter 11 than under Chapter 7, but he also

18  testified that the tens of millions of dollars in greater

19  revenue and asset recoveries under the plan will more than

20  offset the additional expenses.

21      As a result, the Court has more than sufficient

22  evidentiary basis to conclude that the Debtor has carried its

23  burden to prove that it meets the best interest of creditors

24  best.

25      But Mr. Dondero's counsel spent a lot of time crossing --

93

1   cross-examining Mr. Seery, in a vain attempt to demonstrate to

2   the Court that a Chapter 7 actually would be much better for

3   creditors.  And this argument has also been made by Dugaboy

4   and the Advisors and the Funds.

5       Before I address these arguments on its merits, Your

6   Honor, I just wanted to remind the Court of the Objectors --

7   these Objectors' interest in this case.  Mr. Dondero owns no

8   equity in the Debtor.  He owns a general partner.  Strand, in

9   turn, owns a quarter-percent -- a quarter of one percent of

10  the total equity in the Debtor.  And Mr. Dondero's claim, it's

11  only a claim for indemnification.  Dugaboy asserts two claims:

12  a frivolous administrative claim relating to the postpetition

13  management of a Multi-Strat, which, as an administrative

14  claim, if it's valid, would not even be affected by the best

15  interest of creditors test, because it would have to be paid

16  in full.  And he also asserts a claim that the Debtor's

17  subsidiary -- against the Debtor's subsidiary for which it

18  tries to pierce the corporate veil.

19      Just think about it.  Dugaboy, Mr. Dondero's entity, is

20  arguing that he should be able to pierce the corporate veil to

21  get at the entity that was his before the bankruptcy.

22      Dugaboy's only other interest in this case relates to a --

23  a one -- point eighteen and several-hundredths percent of the

24  equity interest of the Debtor, and that is out of the money.

25      And as I mentioned previously, Your Honor, Mr. Rukavina's

94

1  clients either didn't file any general unsecured claims or

2  filed them and withdrew them.  Their only claim is a disputed

3  administrative claim against the Debtor that was filed a week

4  ago and which, at the appropriate time, the Debtor will

5  demonstrate is without merit.

6       And I understand that, just today, NexPoint Advisors also

7  filed administrative claim.

8       So I'm not going to argue to Your Honor that these parties

9  do not have standing, although their standing is tenuous, at

10  best, to assert this argument.  The Court should keep their

11  relative interests in mind when evaluating the merits and the

12  good faith of this objection.

13       The principal objection, as I said, is that creditors will

14  do better in a Chapter 7.  Essentially, they argue that a

15  Chapter 7 trustee can liquidate the assets just as well as Mr.

16  Seery can and not require the cost structure that is included

17  in the Debtor's plan projections.  Yes, they argue that a

18  Chapter 7 will be more efficient.

19       Mr. Seery's testimony, the only testimony on the topic,

20  however, establishes that this preposterous proposition has no

21  basis in reality.  Mr. Seery testified that a Chapter 7

22  trustee's mandate would be to reduce Debtor's assets as fast

23  as possible, while he will monetize assets as and when

24  appropriate to maximize the value.

25       But even if you can assume that the Chapter 7 trustee

95

1   could get court authority in a Chapter 7 to operate, there are

2   several reasons Mr. Seery testified why a liquidation by a

3   Chapter 7 trustee would be far worse than the plan.

4        First, Your Honor, no matter how competent the Chapter 7

5   trustee is -- and Mr. Seery did not say he is more competent

6   than anyone else out there -- the lack of a learning curve

7   that Mr. Seery established through the 13 months in this case

8   puts Mr. Seery at such a major advantage compared to a Chapter

9   7 trustee.

10       Second, Mr. Seery questioned whether the Chapter 7 trustee

11  would be able to retain the Debtor's existing professionals,

12  even assuming they were willing to be retained.  I'm not sure

13  what's the Court's practice or the practice in the Northern

14  District, but in many districts around the country debtor's

15  counsel and professionals cannot be retained by Chapter 7

16  trustee, as general counsel, at least.

17       And I could just imagine, Your Honor, Mr. Dondero's

18  position if the Chapter 7 trustee actually sought to hire

19  Pachulski Stang and DSI.

20       Third, Your Honor, regardless of whether the Chapter 7

21  trustee obtained some operating authority, the market

22  perception will be that a Chapter 7 trustee will sell assets

23  for less value than would Mr. Seery as claimant Trustee.  Mr.

24  Seery testified to that.

25       The argument that the Objectors make that a Chapter 7

96

1   process, whereby the trustee would seek court approval of

2   assets, is better for value than a process overseen by the

3   Claimant Trust Board lacks any evidentiary basis and also is

4   contradicted by Mr. Seery's testimony.

5       In fact, Mr. Seery testified that the Chapter 7 process,

6   the public process of it, would very likely result in less

7   recovery than a sale conducted in the Claimant Trust.

8       And lastly, Mr. Seery testified that it's unlikely that

9   the ten or so valuable employees who Mr. Seery is planning to

10  heavily rely on to assist him with post-confirmation would

11  agree to a work for Chapter 7 trustee.  Your Honor is all too

12  familiar with the fights in the *Acis* case and Chapter 7

13  trustee, and it's just hard to believe that any of the

14  Highland employees would go work for the Chapter 7 trustee.

15      So why is Mr. Dugaboy -- why is Dugaboy and Mr. Dondero

16  actually making this objection and advocating for a Chapter 7?

17  It's because they would expect to buy the Debtor's assets on

18  the cheap from a Chapter 7 trustee, exactly what they've been

19  trying to do in this case.

20      Your Honor, moving right now to Section 1129(a)(11), that

21  requires the debtor to demonstrate that the plan is feasible.

22  In other words, it's not likely to be followed by a further

23  liquidation or restructuring.  Under the Fifth Circuit law,

24  the debtor need only demonstrate that the plan will have a

25  reasonable probability of success to satisfy the feasibility

97

1   requirement, and the Debtor has easily met this standard.

2        As Mr. Seery testified, the Debtor's plan contemplates

3   continued operations through which time the assets will be

4   monetized for the benefit of creditors.  The plan contemplates

5   that Class 7 creditors will be paid off shortly after the

6   effective date.  Class 8 creditors are not guaranteed any

7   recovery but will receive pro rata distributions over a period

8   of time.  Class 2, Frontier secured claim, will be paid off

9   over time, and the projections demonstrate that it will -- the

10  Debtor will have money to do so.

11       Mr. Seery testified at length regarding the assumptions

12  that went into the preparation of the projections most

13  recently filed on February 1, and based on that testimony, the

14  Debtor has clearly demonstrated that the plan is feasible.

15       Your Honor, I think that brings us to Section 1129(b).  Of

16  course, again, Your Honor, if Your Honor has any other

17  questions with the sections I'm skipping over.  I believe

18  we've adequately covered them in the briefs and I don't think

19  there's any objection.

20       But as I mentioned before, we have three classes that have

21  voted to reject the plan.  Class 8 is the general unsecured

22  claims.  They voted to reject the plan.  Yes.  Even though,

23  based upon the ballot summary, 99 percent of the amount of

24  claims in that class voted to accept the plan, approximately

25  24 employees voted to reject the plan.  And accordingly, the

98

1  Debtor cannot satisfy the numerosity requirement of Section
2  1126(c).

3      I do want to briefly recount for Your Honor Mr. Seery's
4  testimony regarding the nature of the claims of the 24
5  employees who voted to reject the plan.  And I'm not doing
6  this to argue that the votes from these contingent creditors
7  are not valid or that the Debtor doesn't need to satisfy the
8  cram-down requirements.  The Debtor understands it needs to
9  demonstrate to the Court that Section 1129(b) is satisfied for
10  the Court to confirm the plan.

11      Rather, why I do this, Your Honor, is to provide the Court
12  with context about the nature and extent of the creditors in
13  this class as the Court determines whether the plan is, in
14  fact, fair and equitable and can be crammed down to a
15  dissenting vote.

16      Mr. Seery testified that these employees originally had
17  claims under the annual bonus plan and the deferred
18  compensation plan.  And as he testified, in order for claims
19  under each of those plans to vest -- I think he referred to
20  them as be-in-the-seat plans -- the employee was required to
21  remain employed as of that date.

22      Mr. Seery testified that the Debtor terminated the annual
23  bonus plan in the middle of January and replaced it with the
24  key employee retention plan that the Court previously
25  approved.

1    Accordingly, Mr. Seery testified that no employee who

2  voted to reject the plan anymore has a claim on the annual

3  bonus plan.  He also testified that, with respect to the

4  deferred compensation plan, people have contingent claims

5  under that plan and that no payments are due until May 20 --

6  2021.

7    As Mr. Seery testified, if the employees who would be

8  entitled to receive payments under the deferred compensation

9  plan do not agree to enter into a separation agreement that

10 was approved by the Court, they will be terminated before May

11 and there will no -- not longer be any deferred compensation

12 due.

13    Accordingly, while the 24 employees who voted to reject

14 the plan do technically have claims at this time they have

15 voted, Mr. Seery testified the claims will go away soon.

16    I do want to point out something that's obviously

17 painfully obvious at this point, that while Class 8 voted to

18 reject the plan, the Committee, the statutory fiduciary for

19 all unsecured creditors, supports the plan enthusiastically

20 and I believe it does so unanimously.

21    The other classes to reject the plan, Your Honor, are

22 Class 11, the A limited partnerships, and none of the holders

23 in Class B and C limited partnerships voted on the plan, so

24 cram-down is required over those classes as well.  So Your

25 Honor is able to confirm the plan pursuant to the cram-down

1  procedures under 1129(b) if the Court determines that the plan

2  is fair and equitable and does not discriminate unfairly

3  against the rejecting classes.

4  Let's first turn to the fair and equitable requirement.  A

5  plan is fair and equitable if it follows the absolute priority

6  rule, meaning that if a class does not receive payment in

7  full, no junior class will receive anything under the plan.

8  With respect to Class 8, no junior class -- junior class to

9  Class 8 will receive payment, and here is the key point,

10  unless Class 8 is paid in full, with appropriate interest.

11  NPA and Dugaboy -- Dugaboy in a brief filed on Monday -- argue

12  that the plan does not satisfy the absolute priority rule

13  because Class 10 and Class Equity Interests have a contingent

14  right to receive property under the plan.

15  Your Honor, this argument misunderstands the absolute

16  priority rule.  Class 10 and Class Creditors will only receive

17  payment after distribution to 8 and 9, the unsecured claims

18  and the subordinated claims, are all paid in full, plus

19  interest.

20  And, in fact, Dugaboy, in its brief, to its credit, admits

21  that the argument is contrary to the Bankruptcy Court's

22  decision of Judge Gargotta in the Western District case of *In*

23  *re Introgen Therapeutics*.  There, the Court was faced with a

24  similar argument by a group of unsecured creditors who argued

25  that the debtor's plan violated the absolute priority rule

101

1   because equity was retaining a contingent interest that would

2   only be payable if general unsecured claims were paid in full.

3        In rejecting the argument, the Court reasoned, and I

4   quote, "The only way Class 4 will receive anything is if Class

5   3, in fact, gets paid in full, in satisfaction of

6   1129(b)(2)(B)(i)," meaning that the absolute priority rule

7   would not be an issue.  If Class 3 is not paid in full, Class

8   4's property interest is not -- is just -- is not just

9   valueless, it just doesn't exist.

10       Your Honor, this is precisely the situation in this case.

11  Equity interests will only receive a recovery if Class 8 and 9

12  are paid in full.

13       But Dugaboy attempts to escape the logical reading of the

14  absolute priority rule by claiming that *Introgen* was wrongly

15  decided and goes against the Supreme Court's decision in

16  *Ellers* (phonetic).  Dugaboy argues that because the Supreme

17  Court decided that property given to a junior class without

18  paying a senior class in full is property, even if it's

19  worthless.

20       But Dugaboy misses the point.  Like the debtor in the

21  *Introgen*, the Debtor here is not arguing that the property  --

22  the absolute priority rule is not violated because the

23  contingent trust is worthless.  Rather, the argument is that

24  the absolute priority rule is not violated; it's, in order to

25  receive anything on account of the junior -- of the equity,

102

1  the senior creditors have to be paid a hundred percent plus

2  interest.

3      In fact, Your Honor, if the plan just didn't give any

4  recovery to the equity Class 10 and 11, I bet you Dugaboy and

5  Mr. Dondero would be arguing that it violated the absolute

6  priority rule because senior classes, unsecured creditors,

7  could potentially receive more than a hundred percent of their

8  interest.  And there's a case in the Southern District of

9  Texas, *In re MCorp*, where the Bankruptcy Court said that for a

10  plan to be confirmed, its stockholders eliminated, creditors

11  must not receive more than payment in full.

12      Excess proceeds, Your Honor, if any, have to go somewhere.

13  They can't go to creditors, so they have to go to equity.  And

14  the absolute priority rule is not violated.

15      And how is Dugaboy harmed?  They say they may want to buy

16  the contingent interests, and the lack of a marketing effort

17  violates the *LaSalle* opinion as well.  And who holds the Class

18  B and Class C partnership interests that come before Dugaboy

19  that Dugaboy is concerned may have this opportunity rather

20  than them?  Yes, it's Hunter Mountain, Your Honor, an entity,

21  like Dugaboy, that's owned and controlled by Mr. Dondero.

22      Accordingly, the argument that the plan violates the

23  absolute priority rule is actually a frivolous argument.

24      Turning now to unfair discrimination, Your Honor, Dugaboy

25  argued in its brief Monday that because the projected

1 distribution to unsecured creditors has gone down in the

2 recent plan projections, the discrepancy between Class 7 and

3 Class 8 is so large that that amounts to unfair

4 discrimination.

5     Again, the Court should first ask why is Dugaboy even the

6 right party to be making the objection.  Its claim against the

7 Debtor to pierce the corporate veil, as I mentioned, is

8 frivolous.  It's subject to objection.  It didn't even bother

9 to have the claim temporarily allowed for voting purposes, as

10 did other creditors who thought they had a valid claim.  Yet

11 this is another example of Mr. Dondero, through Dugaboy,

12 trying to throw as many roadblocks in front of confirmation as

13 he can.

14     But this argument, like the other ones, fails as well.

15 Class 8 contains the general unsecured creditor claims,

16 predominately litigation claims that have been pending against

17 the Debtor for years.  The Debtor was justified in treating

18 the other unsecured creditors differently.

19     Class 6 consists of the PTO claims in excess of the cap,

20 which are of different quality and nature than the other

21 claims.

22     Class 7 consists of the convenience class.  And it's

23 appropriate to bribe convenience class creditors with a

24 discount option for smaller claims to be cashed out for

25 administrative convenience.

1     Mr. Seery testified that when the plan was formulated, the

2    concept was to separately classify liquidated claims in small

3    amounts in Class 7 and unliquidated claims in Class 8.  Mr.

4    Seery also testified that there's a valid business

5    justification to treat the -- hold business 7 -- Class 7

6    claims differently.  These creditors had a reasonable

7    expectation of getting paid promptly, as compared to

8    litigation creditors, who would expect to be paid over time.

9     As the Court is aware, the litigation claims in Class 8

10   involve litigation that has been pending for several years in

11   the case of Acis, Daugherty, Redeemer, and more than a decade

12   in UBS.

13     And most importantly, as Mr. Seery testified, the

14   Committee and the Debtor had significant negotiation regarding

15   the classification and treatment provisions of the plan for

16   Class 7.

17     The Committee does have one constituent who is a Class 7

18   creditor.  However, the other three creditors are all in Class

19   8 and hold claims in excess of $200 million and supported the

20   separate classification and the different treatment.

21     So, Your Honor, discrimination, different treatment among

22   Class 7 and 8 is appropriate, and the different treatment is

23   not unfair.  In the February 1 projections, the Class 8

24   creditors are estimated to receive 71.32 percent of their

25   claims, but that's just an estimate.  As Mr. Seery testified,

1   the number can go up based upon the value he can generate from

2   the assets and, importantly, from litigation claims.  Class 8

3   creditors could up end up receiving a hundred percent on

4   account of their claims.  Class 7 creditors are fixed at 85

5   percent.

6        Giving Class 8 creditors the opportunity to roll the dice

7   and potentially get more or less than the 85 percent offered

8   to Class 7 is not at all unfair.

9        For these reasons, Your Honor, the Court has the ability

10  and should confirm the plan pursuant to the cram-down

11  provisions of 1129(b).

12       Your Honor, I'm now going to switch from the statutory

13  requirements to all the issues raised by the release,

14  injunction, and exculpation provisions.

15       I'd just like to take a brief sip of water.

16       Dugaboy -- I will first deal with the Debtor release

17  provided in Article 9(f) of the plan, which we claim is

18  appropriate.  Dugaboy and the U.S. Trustee have objected to

19  the release contained in Article 9(f).  Dugaboy objects

20  because it believes that the Debtor release releases claims

21  that the Claimant Trust or Litigation Trust have that have not

22  yet arisen, and the U.S. Trustee objects because it believes

23  that the release is a third-party release.

24       These objections have no merit, and they should be

25  overruled.

106

1      I would like to ask Ms. Canty to put up a demonstrative

2  which contains the provision Article 9(f) of the plan.

3      Your Honor, as set forth in this Article 9(f), only the

4  Debtor is granting any release.  While that --

5          THE COURT:  And for the record, it's 9(d)?  9(d),

6  right?

7          MR. POMERANTZ:  9(d)?  9(d), correct, Your Honor.

8          THE COURT:  Yes.  Okay.

9          MR. POMERANTZ:  Sorry about that.

10          THE COURT:  Uh-huh.

11          MR. POMERANTZ:  While the release is broad, it does

12  not purport to release the claims of any third party.  The

13  Claimant Trust and the Litigation Trust are only included in

14  the release as successors of the Debtor.  The release is

15  specifically only for claims that the Debtor or the estate

16  would have been legally entitled to assert in their own right.

17      Section 1123(b)(3)(A) of the Bankruptcy Code provides that

18  a plan may provide for the settlement or adjustment of any

19  claims or interests belonging to the debtor or the estate, and

20  that's exactly what the Debtor release provides.

21      Accordingly, Dugaboy is wrong that the release effects a

22  release of claims that the Claimant Trust or the Litigation

23  Sub-Trust have that won't arise until after the effective

24  date.  And the U.S. Trustee is simply wrong; there's no third-

25  party release aspect under the release.

1      The last point I will address on the release, Your Honor,

2  is who is being released and why and what does the evidence

3  show.  The Debtor release extends to release parties which

4  include the independent directors, Strand, for actions after

5  January 9th, Jim Seery as the CEO and CRO, the Committee,

6  members of the Committee, professionals, and employees.

7      You have heard Mr. Seery's testimony that the Debtor does

8  not believe that any claims against the parties that are

9  proposed to be released actually exist.  You have heard Mr.

10  Seery's testimony that he worked closely with the employees

11  and believes that not only have they all been instrumental in

12  getting the Debtor to the -- be on the cusp of plan

13  confirmation, but that also Mr. Seery is not aware of any

14  claims against them.

15      Moreover, as Mr. Seery testified, the release for the

16  employees is only conditional.  He testified that the

17  employees are required to assist in the monetization of assets

18  and the resolution of claims, and if they do not like -- if

19  they do not lose their release, then any Debtor claims are

20  tolled, such that could be pursued by the Litigation Trustee

21  at a future time.

22      Lastly, I'm sure that the Dondero entities will argue that

23  someone needs to investigate claims against Mr. Seery for

24  mismanagement or for, God forbid, having failed to file the

25  2015.3 statements.  Such claims are part of the continuing

108

1  harassment of Mr. Seery that the Dondero entities have

2  embarked on after it was apparent that nobody would support

3  their plan.

4      There is no evidence of any claims that exist, Your Honor.

5  In fact, the Committee and its professionals have watched the

6  Debtor through this case like a hawk.  They have not been

7  afraid to challenge the Debtor's actions in general and Mr.

8  Seery's in particular.  FTI has worked on a daily basis with

9  DSI and the company, had access to information.  When COVID

10 was happening, they were looking at trades going on on a daily

11 basis.

12     So if the Committee, whose members hold approximately $200

13 million of claims against the estate, are okay with the

14 release against the independent directors and Mr. Seery, that

15 should provide the Court with comfort to approve the releases

16 as part of the plan.

17     In summary, Your Honor, the Debtor release is entirely

18 appropriate and does not affect the release of third-party

19 claims that have not yet arisen.

20     Next, Your Honor, I want to go to the discharge.  There's

21 been objections to the discharge.  Dugaboy and NexPoint have

22 objected that the Debtor receiving a discharge under the plan

23 -- argue a debtor is liquidating.  The objection is not well

24 taken based upon Mr. Seery's testimony regarding what it is

25 the Claimant Trust and the Reorganized Debtor plan to do after

109

1   the effective date, as compared to what the limitations of a

2   discharge are under 1141(d)(3).

3      Your Honor, Article 9 of the -- 9(b) of the plan provides

4   that as -- except as otherwise expressly provided in the plan

5   or the confirmation order, upon the effective date, the Debtor

6   and its estate will be discharged or released under and to the

7   fullest extent provided under 1141(d)(A) [sic] and other

8   applicable provisions of the Bankruptcy Court.  Bankruptcy

9   Code.

10     Section 1141(d)(3) provides an exception to the discharge,

11   and I'd like to have that section put up for Your Honor at

12   this point.  Ms. Canty?

13     As this -- as the section reflects, and as the Fifth

14   Circuit has ruled in the *TH-New Orleans Limited Partnership*

15   case cited in our materials, in order to deny the debtor a

16   discharge under 1141(d)(3), three things must be true:  (1)

17   the plan provides for the liquidation of all or substantially

18   all of the property in the estate; (2) the debtor does not

19   engage in business after consummation of the plan; and (3) the

20   debtor would be denied a discharge under 727(a) of this title

21   if the case was converted to Chapter 7.  Here, only C applies.

22     With respect to A, Your Honor, while the plan does project

23   that it will take approximately two years to monetize the

24   Debtor's assets for fair value, the Debtor is just not

25   liquidating within the meaning of Section A.

1    As Mr. Seery testified, during the post-confirmation

2 period, post-effective date period, the Debtor will continue

3 to manage its funds and conduct the same type of business it

4 conducted prior to the effective date.  It'll manage the CLOs.

5 It'll manage Multi-Strat.  It'll manage Restoration Capital.

6 It'll manage the Select Fund, and it'll manage the Korea Fund.

7    The Bankruptcy Court for the Southern District of New

8 York's 2000 opinion in *Enron*, cited in our materials, is on

9 point.  There, the Court found that a debtor liquidating its

10 assets over an indefinite period of time that is likely to

11 take years is not liquidating within the meaning of Section

12 1141(b)(3)(A), justifying a denial of discharge.

13    But even if we failed A, based upon Mr. Seery's testimony,

14 we would not fail B.  The Debtor will be continuing to do what

15 it has done during the case, as it did before, as I said,

16 managing its business.  B says the debtor does not engage in

17 the business after management.  So while Mr. Seery testified

18 that it would take approximately two years, it could take

19 more, it could take less, and there is no requirement to

20 liquidate assets over a period of time.

21    Accordingly, Your Honor, the Debtor is conducting the type

22 of business contemplated by Section B so as not to just deny a

23 discharge.

24    As the Fifth Circuit said in the *TH-New Orleans* case, the

25 court granted a discharge there because it was likely that the

111

1    debtor would be liquidating its assets and conducting business

2    (indecipherable) years following a confirmation date.  And

3    this result makes sense, Your Honor, because the Debtor will

4    need the discharge and the tenant injunctions, which I'll get

5    to in a moment, in order to prevent interference with the

6    Debtor's ability to implement the terms of the plan and make

7    distributions to creditors.

8        I would now like, Your Honor, to turn to the exculpation

9    provisions, which there's been -- there's been a lot of

10   briefing on it, and I know Your Honor is very aware of the

11   exculpation provisions and the *Pacific Lumber* case.  And

12   several parties have objected to the exculpation contained in

13   the plan, based primarily on the Fifth Circuit ruling in

14   *Pacific Lumber*.

15       The exculpation provision, which is not dissimilar to what

16   is found in many plans around the country, including in plans

17   confirmed in bankruptcy courts in the Fifth Circuit, acts to

18   exculpate the exculpated parties for negligent-only acts as it

19   contains the standard carve-outs for gross negligence,

20   intentional conduct, and willful misconduct.

21       I do want to bring to the Court's attention a deletion we

22   made to the parties protected by the exculpation in the plan

23   and now -- were filed on February 1st.  The definition of

24   exculpated parties included, before February 1, not only the

25   Debtor but its direct and indirect majority-owned subsidiaries

112

1    and the managed funds.  In the plan amendment, we have deleted

2    the Debtor's direct and indirect majority-owned subsidiaries

3    and managed funds from the definition and are not seeking

4    exculpation for those entities.

5        But before, Your Honor, I address *Pacific Lumber* and why

6    the Debtor believes it does not preclude the Court from

7    approving the exculpation in this case, I do want to focus on

8    something that the Objectors conveniently ignore from their

9    argument.

10       As I mentioned in my opening argument, Your Honor, the

11   independent directors were appointed pursuant to the Court's

12   order on January 9, 2020.  They have resolved many issues

13   between the Debtor and the Committee, and avoided the

14   appointment of a Chapter 11 trustee.

15       The January 9th order was specifically approved by Mr.

16   Dondero, who was in control of the Debtor at the time, and I

17   believe the transcripts that are admitted into evidence will

18   demonstrate that he was fully behind the approval of the

19   January 9th order.

20       In addition to appointing the independent directors into

21   what was sure to be a contentiously litigious case, the

22   January 9th order set the standard of care for the independent

23   directors, and specifically exculpated them from negligence.

24       You have heard Mr. Seery and Mr. Dubel testify that they

25   had input into what the order said and would have not agreed

113

1  to be appointed as independent directors if it did not include

2  Paragraph 10, as well as the provisions regarding

3  indemnification and D&O insurance.

4      I would like to put a demonstrative on the screen, which

5  is actually Paragraph 10 of that order.  Your Honor, Paragraph

6  10, there's two concepts embedded here.  First, it requires

7  any parties wishing to sue the independent directors or their

8  agents to first seek such approval from the Bankruptcy Court.

9  Secondly, and importantly for purposes of the independent

10 directors and their agents, who would include the employees,

11 it set the standard of care for them during the Chapter 11 and

12 entitled them to exculpation for negligence.  Paragraph 10

13 says the Court will only permit a suit to go forward if such

14 claim represents a colorable claim for willful misconduct or

15 gross negligence.

16     And Your Honor, Paragraph 10 does not expire by its terms.

17     By not including negligence in the definition of what a

18 colorable claim might be, the Court has already exculpated the

19 independent directors and their agents, which include the

20 employees acting at their direction.

21     And because the independent directors and their agents are

22 exculpated under Paragraph 10, Strand needs to be exculpated

23 as well for actions occurring after January 9th.  This is

24 because a suit against Strand for conduct after the

25 independent board was appointed is effectively a suit against

114

1   the independent directors, who were the only people in control

2   of Strand at that time.

3       After the effective date, Mr. Dondero will regain control

4   of Strand, as the independent directors will be discharged.

5   And for parties able to sue Strand essentially for negligence

6   for conduct conducted by the independent directors after

7   January 9th, Strand will then be able to seek indemnification

8   from the Debtor under the Debtor's partnership agreement

9   because the partnership agreement does provide the general

10  partner is entitled to indemnification.

11      Accordingly, an exculpation for Strand is really the

12  functional equivalent of an exculpation for the independent

13  directors and the Debtor.

14      The January 9th order was not appealed, and an objection

15  to exculpation at this point as it relates to the independent

16  directors, their agents, and Strand is a collateral attack on

17  this order.  So, Your Honor, Your Honor does not even need to

18  get to the thorny issues addressed by *Pacific Lumber*.

19      However, even in the absence of the January 9th order,

20  exculpation of the independent directors and their employees,

21  as well as the other exculpated parties, is not prohibited by

22  *Pacific Lumber*.  In *Pacific Lumber*, the Fifth Circuit reversed

23  a bankruptcy court order confirming a plan because the

24  exculpation provision was too broad and included parties that

25  the Fifth Circuit thought could not be exculpated under

1   Section 524(e) of the Code.

2       A close look at the issue before the Court, Your Honor,

3   the reasoning for the Court's ruling and why certain parties

4   like Committee and its members were entitled to exculpation,

5   reflects that this case does not prevent the Court from

6   approving exculpation of this case.

7       A careful read of the underlying briefs and opinions in

8   *Pacific Lumber* reveals that the concern that the Appellants

9   had in that case was the application of exculpation to non-

10  fiduciary sponsors.  There were two competing plans in the

11  case.  The first was filed by the indenture trustee.  The

12  second was filed by the debtor's parent and lender, and was

13  deemed -- called the Marathon Plan.  The Court confirmed the

14  Marathon Plan, and the indenture trustee appealed, and the

15  indenture trustee argued that the plan sponsors could not be

16  exculpated.

17      After determining that the appeal of the exculpation

18  provisions were not equitably moot, the Fifth Circuit

19  determined that exculpation was not authorized under 524(e) of

20  the Code because that section provides a discharge of the

21  debtor does not affect the liability of any other entity on

22  such debt.

23      However, and here's the important part, Your Honor:  The

24  Fifth Circuit did not say that all exculpations are prohibited

25  under the Code and authorized the exculpation of the Committee

1  and its members.  And why did the Court do that?  Because it

2  looked at the Committee's qualified immunity under 1103 and

3  also reasoned that Committee members are essentially

4  disinterested volunteers that should be entitled to

5  exculpation on negligence.

6      The Court also cited approvingly *Colliers* for the

7  proposition that if Committee members were not exculpated for

8  negligence and subject to suit by people who are unhappy with

9  them, they just would not serve.

10     Accordingly, the Fifth Circuit based its willingness to

11 exculpate Committee members on the strong public policy that

12 supports exculpation for those parties under those

13 circumstances.  And against this backdrop, Your Honor, there

14 are several reasons why the Court should authorize exculpation

15 in this case, notwithstanding *Pacific Lumber*.

16     First, Your Honor, the independent directors in this case

17 are analogous -- much more analogous to the Committee members

18 that the Fifth Circuit ruled were entitled to than the

19 incumbent officer and directors.

20     Your Honor has the following facts before the Court, based

21 upon the testimony of Mr. Seery and Mr. Dubel and other

22 evidence in the record.  The independent board members were

23 not part of the Highland enterprise before the Court appointed

24 them on January 9th.  The Court appointed the independent

25 directors in lieu of a Chapter 11 trustee to address what the

1  Court perceived as the serious conflicts of interest and

2  fiduciary duty concerns with current management, as identified

3  by the Committee.

4      The independent directors would not have agreed to accept

5  their role without indemnification, insurance, exculpation,

6  and the gatekeeper function provided by the January 9th order.

7      And Mr. Dubel testified regarding the significant

8  experience he has as an independent director during his 30-

9  plus years in the restructuring community, including several

10  engagements as an independent director in Chapter 11 cases.

11  And he testified that independent directors have become

12  commonplace in complex restructurings over the last several

13  years and have been appointed in many cases, including high-

14  profile cases.  We've cited to just a few of those cases in

15  our brief, but we could go on and on.

16      Mr. Dubel testified that the independent directors are a

17  critical tool in proper corporate governance and restoring

18  creditor confidence in management in modern-day

19  restructurings, and he testified that, based upon his

20  experience, independent directors expect to be indemnified by

21  the company, expect to obtain directors and officers

22  insurance, and expect to be exculpated from claims of

23  negligence when they agree to be appointed.

24      He further testified that if independent directors cannot

25  be assured that they will be exculpated for simple negligence,

118

1   he believes they will be unwilling to serve in contentious

2   cases like the one we have here, which will have a material

3   adverse effect on the Chapter 11 restructuring process as we

4   know it.

5       Based upon the foregoing testimony, Your Honor, which is

6   uncontroverted, the Court should have no problem finding that

7   the independent directors are much more analogous to the

8   Committee members in *Pacific Lumber* who the Fifth Circuit said

9   could be exculpated.

10      The facts, these facts also distinguish this case from the

11  *Dropbox v. Thru* case which Your Honor decided and which was

12  reversed on this issue by the District Court.  In neither

13  *Pacific Lumber* or *Thru* was there an argument that the policy

14  reasons that supported exculpation of Committee members also

15  supported the exculpation of the parties sought to be

16  exculpated.

17      Moreover, Your Honor, the independent directors in this

18  case were pointed as essentially as substitute for a Chapter

19  11 trustee.  There was a Chapter 11 trustee motion filed a few

20  days before, I believe, and the Court, in approving this, said

21  that you -- better than a Chapter 11 trustee.  And Chapter 11

22  Trustees are entitled to qualified immunity.  So, while, yes,

23  the independent directors aren't truly Chapter 11 trustees,

24  they are analogous.

25      Second, Your Honor, while there is language in *Pacific*

Appx. 04596

119

1    *Lumber* that says that the directors and officers of the debtor

2    are not entitled to exculpation, the issue before the Court

3    really on appeal was the plan sponsors and whether they were.

4    So I would argue that any discussion of the exculpation not

5    being available for directors and officers in the Fifth

6    Circuit opinion in *Palco* is actually dicta.

7        Third, Your Honor, as I discussed before, the *Pacific*

8    *Lumber* decision was based solely on 524(e) of the Bankruptcy

9    Code, which only says that the discharge of a claim against

10   the debtor does not affect the discharge of a third party.

11   However, the Debtor is not relying on 524(e) as the basis of

12   their exculpation.  As we outline in our brief, Your Honor, we

13   believe that the exculpation is appropriate under Section 105

14   and 1123(b)(6) as a means -- part of an implementation of the

15   plan.

16       Importantly, Your Honor, as other courts hostile to third-

17   party releases have determined, exculpation only sets a

18   standard of care for parties and is not an effort to relieve

19   fiduciaries of liability.

20       Other courts that have aligned with the Fifth Circuit and

21   rejected third-party releases, like the Ninth Circuit, have

22   recently determined exculpation has nothing to do with 524(e).

23   In *In re Blixseth*, a Ninth Circuit case decided at the end of

24   2020 cited in our materials, they examined several of their

25   circuit cases that had strongly prohibited non-consensual

1  third-party releases under 524(e).  But again, the Court

2  concluded that 524(e) only prohibits third parties from being

3  released from liability of a prepetition claim for which the

4  debtor receives a discharge.  The Court reasoned that the

5  exculpation clause, however, protects parties from negligence

6  claims relating to matters that occurred during the Chapter 11

7  case and has nothing to do with 524(e).

8      The Ninth Circuit, which along with the Fifth Circuit has

9  been notorious for prohibiting third-party releases, issued

10  its ruling against this backdrop and said that exculpations

11  are appropriate.

12      Your Honor, the Objectors made a point yesterday of

13  pointing out that Strand, as the Debtor's general partner, is

14  liable for the debts under applicable law.  To the extent they

15  intend to argue that the exculpation is seeking to discharge

16  any such prepetition liability, they would be wrong.  The

17  exculpation only applies to postpetition matters.  And to the

18  extent they argue that the exculpation seeks to discharge

19  Strand's potential postpetition liability, for the reasons I

20  discussed, a claim against Strand will essentially be a claim

21  against the Debtor because the Debtor will be obligated to

22  indemnify them.

23      Accordingly, Your Honor, we submit that if this matter

24  goes up to appeal to the Fifth Circuit, which it may very well

25  do, that the Fifth Circuit may very well come out the same way

121

1  as the Ninth Circuit and start relaxing the standard or

2  otherwise provide that the independent directors are much more

3  like Committee members.

4      Lastly, Your Honor, if the Court does confirm the plan,

5  which we certainly hope it will do, it will have made a

6  finding that the plan has been proposed in good faith, and in

7  doing so, the Court essentially finds that the independent

8  directors and their agents have acted appropriately and

9  consistent with their fiduciary duties, and it makes --

10 exculpation for negligence naturally flows from that finding.

11     Your Honor, I would now like to go to the injunction

12 provisions, and my argument is that the injunction provisions

13 as amended are appropriate.

14         THE COURT:  Can I stop you?

15         MR. POMERANTZ:  We received several of -- yes.

16         THE COURT:  I want to just recap a couple of things I

17 think I heard you say.  You're not asking this Court, you say,

18 to go contrary to *Pacific Lumber* per se.  You have thrown out

19 there the possibility that *Pacific Lumber* mistakenly relied on

20 524(e) in rejecting exculpations of plan sponsors.  You're

21 saying, eh, as a technical matter, I think they were wrong in

22 focusing on that statute because that statute seems to deal

23 with prepetition liability.  Okay?  Its actual wording, 524(e)

24 states, discharge of a debt of a debtor does not affect the

25 liability of any other entity on such debts.

122

1    And reading between the lines, I think you're saying --

2  well, maybe this isn't what you're saying, but here's what I

3  inferred -- "debt" is defined in 101(12) to mean liability on

4  a claim, and then "claim" is defined in 101(5) of the

5  Bankruptcy Code as meaning right to payment.  It doesn't say

6  as of the petition date, but I think if you look at, then,

7  Section 502 of the Bankruptcy Code that addresses claims and

8  interests, clearly, it seems to be referring to the

9  prepetition time period, you know, claims and interest as of

10  the petition date.  And then -- that's 502.  And then 503

11  speaks of, for the most part, postpetition administrative

12  expenses.

13    So that was my rambling way of saying I'm understanding

14  you to say, eh, as a technical matter, we think the Fifth

15  Circuit was wrong to focus on 524(e) because when you're

16  talking about exculpation you're talking about postpetition

17  liability, not prepetition liability.  And 524(e) is talking

18  more about prepetition liability.

19    But I think what I also hear you saying is, at bottom,

20  *Pacific Lumber* was sort of a policy-driven holding where, you

21  know, we're worried about no one would ever sign up for being

22  on an unsecured creditors' committee if they could be exposed

23  to lawsuits.  They're fiduciaries, we think, for policy

24  reasons.  Exculpation is appropriate for this one group.  And

25  you're saying, well, they didn't have an independent board

123

1   that they were considering.  They were just considering non-

2   fiduciary plan sponsors.  And so the rationale presented by

3   *Pacific Lumber* applies equally here, and just they didn't make

4   a holding in this factual context.

5       Have I recapped what you're saying?

6           MR. POMERANTZ:  Your Honor, that's generally --

7   generally correct, with a couple of nuances.  So, yes, first,

8   I think, on a policy basis, Your Honor -- again, putting aside

9   the January 9th order, because we don't see --

10          THE COURT:  Right.  Right.

11          MR. POMERANTZ:  -- Your Honor even needs to get to

12  this issue.

13          THE COURT:  I understand.

14          MR. POMERANTZ:  But if Your Honor does get to this

15  issue, we think, as a first point, Your Honor could be totally

16  consistent with *Pacific Lumber* because there's policy reasons

17  and there was not a categorical rejection of exculpation.

18  Okay.  So if there was a categorical rejection, then it

19  wouldn't have been okay for committee members.  Okay.

20      Second argument, yes, we don't think -- we think it's part

21  of dicta.  It's not part of the holding.  We understand that

22  other courts may have not agreed, maybe your *Thru* case, which

23  Your Honor was appealed on.

24      But the third issue, our argument is all they looked at

25  was 524(e).  They said 523 -- 4(e) does not authorize it.

124

1   They did not say 524(e) prohibits it.

2       We think there's other provisions in the Code.  And then

3   when you basically add in the analysis that Your Honor

4   provided, which we agree with, and what 524 was -- to do,

5   524(e) just says that discharge doesn't affect.  It doesn't

6   say that under another provision of the Code or for another

7   reason you are authorized to give an exculpation.  I think

8   it's a nuance and it's a difference there.

9       And my point of bringing up the *Blixseth* case -- which, of

10  course, is Ninth Circuit and it's not binding on Your Honor,

11  it's not binding on the Fifth Circuit -- is to say, when that

12  was presented to them, they saw the distinction that 524(e)

13  has nothing to do with an exculpation.  And while, yes, the

14  Fifth Circuit hasn't ruled on that, and if the Fifth -- if

15  that argument is made to the Fifth Circuit, we don't know how

16  they would rule, I think that, based upon their analysis --

17  which, again, Your Honor, is no more than a page and a half of

18  their opinion, right, of a long, lengthy opinion on the

19  confirmation issues.  So I think, Your Honor, with the Fifth

20  Circuit, there is a good chance that based upon the developing

21  case law of exculpation, based upon the sister circuit in

22  *Blixseth* making that distinction, that there is a very good

23  chance that the Fifth Circuit would change.

24      But look, I recognize that argument requires Your Honor to

25  say, okay, this is outside and -- and what *Pacific Lumber* did

125

1    or didn't do.  But I think, Your Honor, there's several

2    potential reasons, there's several potential arguments that

3    you can get to the same place.

4              THE COURT:  Okay.  Thank you.

5              MR. POMERANTZ:  Okay.  If I may just get another

6    glass of -- sip of water before my time starts?

7              THE COURT:  Okay.

8              MR. POMERANTZ:  Okay, Your Honor.  We're now turning

9    to the injunction provision.  The Debtor received several

10   objections to the injunction provisions in -- I think I have

11   it right now -- Article 9(f) to the plan.  And we've modified

12   Article 9(f) to address certain of those concerns, and we

13   believe that, as modified, that the injunction provision

14   implements and enforces the plan's discharge, release, and

15   exculpation provisions to prevent parties from pursuing claims

16   in interest that are addressed by the plan and otherwise

17   interfering with consummation and implementation of the plan.

18       I'd like to put up the first paragraph of the injunction

19   on the screen now.

20       Okay, Your Honor.  The first paragraph, all it does is

21   prohibits the enjoined parties from taking action to interfere

22   with consummation or implementation of the plan.  I suspect a

23   sentence like that is probably in hundreds of plans in the

24   Fifth Circuit and elsewhere.

25       Initially, to address a concern that it applied to too

126

1  many parties, the Debtor added a definition in the revised

2  plan that defines "enjoined parties," which I'd like to now

3  put that definition up on the screen.

4      The changes -- it's a little hard to read there, but you

5  have it in the -- oh, there you go.  The changes made clear

6  that only parties who have a relationship to this case, either

7  holding a claim or interest, having appeared in the case, be a

8  -- or be a party in interest, Jim Dondero, or related entity,

9  or related person of the foregoing are covered.  The claim

10 objectors argue that the word "implementation and

11 consummation" is vague, or vague and unclear.  Your Honor,

12 these terms are both defined in the Bankruptcy Code and under

13 the case law, and they're, as I said, common features of many

14 plans.

15     Section 1123(a)(5) of the Code provides that a plan shall

16 provide for its implementation, and identifies a list of items

17 that the plan can include.  Article 4 of our plan is defined

18 as "Means of Implementation of This Plan," and describes the

19 various corporate steps required to implement the provisions

20 of the plan, including canceling equity interests, creation of

21 new general partners and a limited part of the Reorganized

22 Debtor, the restatement of the limited partnership agreement,

23 and the establishment of the various trusts.

24     Paragraph 1 rightly and appropriately enjoins efforts to

25 interfere with these steps.

127

1      Nor is the term "consummation of the plan" vague.

2   "Consummation" also is a commonly-used term and has been

3   defined by the Fifth Circuit and the Code.  1102 -- 1101(2)

4   defines "Substantial Consummation" to be the transfer of

5   assets to be transferred under the plan, the assumption by the

6   debtor of the management of all the property dealt with by the

7   plan, and the commencement of distributions under the plan.

8      Section 1142 gives the Court authority to direct a party

9   to perform any act necessary for consummation of a plan.  And

10   as the Fifth Circuit, in *United States Brass Corp.*, which is

11   said in our material, states, said the Bankruptcy Court had

12   post-confirmation jurisdiction to enforce the unperformed

13   terms of a plan with respect to a matter that could affect the

14   parties' post-confirmation rights because the plan had not

15   been fully consummated.

16      And Your Honor just wrote on this issue last year in the

17   *Senior* -- the *Texas* -- the *TXMS Real Estate v. Senior Care*

18   case, and you cited to *U.S. Brass* to find that, in that case,

19   post-confirmation jurisdiction existed to resolve a dispute

20   relating to an assumed contract because the matter related to

21   interpretation, implementation, and execution of the plan.

22      Accordingly, Your Honor, neither implementation or

23   consummation are vague, and the first paragraph of the

24   injunction is necessary and appropriate to enforce the

25   Debtor's discharge.

128

1     As I said before, I will leave it to Mr. Kharasch to

2   address specifically the concerns that the Advisor and the

3   Funds have with the injunction.

4     The second and third paragraphs of the injunction, Your

5   Honor, certain parties have objected to them on the ground

6   that they constitute an improper release of the independent

7   directors as well as the release of claims against the

8   Reorganized Debtor, the Claimant Trust, and the Litigation

9   Sub-Trust, entities that will not have come into existence

10  until after the effective date.

11    We believe we have addressed these concerns by

12  modifications to the second and third paragraphs of the

13  injunction, which I would now like to put the second and third

14  paragraphs on the screen.

15    (Pause.)

16      MR. POMERANTZ:  As that is happening, Your Honor, I

17  will -- there we go.

18    We believe that the changes that were made to these

19  paragraphs should address the Objectors' concerns.

20    First, as with the first paragraph, we have created a

21  defined term of "Enjoined Parties" who are subject to the

22  injunction which is narrower than all persons, I believe, or

23  all entities that was included in the prior plan.  So we've

24  narrowed that.

25    "Enjoined Parties" are generally defined, as I mentioned

129

1  before, as entities involved in this case or related to Jim

2  Dondero, or have appeared in this case.

3      Second, we have removed independent directors from these

4  paragraphs to address the concern that the injunction was a

5  disguised third-party release.

6      Third, we have removed the Reorganized Debtor and the

7  Claimant Trust from the second paragraph and moved them to the

8  third paragraph.  We did this to make clear that the

9  Reorganized Debtor and Claimant Trust were only getting the

10  benefit of the injunction as the successors to the Debtor.  As

11  the Reorganized Debtor and the Claimant Trust receives the

12  property from the Debtor free and clear of all claims and

13  interests and equity holders under 1141(c), they are entitled

14  to the benefit of the injunction.

15      Fourth, we have addressed the concern that the injunction

16  improperly affected set-off rights.  We added language to make

17  clear that the injunction would only affect the parties' set-

18  off of an obligation owed to the Debtor to the extent that

19  that was permissible under 553 and 1141 of the Bankruptcy

20  Code.

21      In other words, we are punting the issue for another day,

22  and there's nothing in the plan that gives the Debtor any more

23  set-off rights than it otherwise has under the Bankruptcy

24  Code.

25      Lastly, Your Honor, certain Objectors have argued that the

1  injunction somehow prevents them from enforcing the rights
2  they have under the plan or the confirmation order.  We don't
3  really understand this concern, as the language leading into
4  the second paragraph of the injunction says, except as
5  expressly provided in the plan, the confirmation order, or a
6  separate order of the Bankruptcy Court.

7     With these modifications, Your Honor, the provisions do
8  nothing more than implement 1123(b)(6) and 1141 by preventing
9  parties from taking actions to interfere with the Debtor's
10 plan.

11    The Court has also heard testimony from Mr. Seery
12 regarding the importance of the injunction to implementation
13 of the plan.  He testified that he intends to monetize assets
14 in a way that will maximize value.  And to effectively do
15 that, he has testified that the Claimant Trust needs to be
16 able to pursue its objectives without interference and
17 continued harassment from Mr. Dondero and his related
18 entities.

19    In fact, Mr. Seery testified that if the Claimant Trust
20 were subject to interference by Mr. Dondero, it would take him
21 more time to monetize assets, they would be monetized for less
22 money, and creditors would be harmed.

23    If Your Honor doesn't have any questions for me on the
24 injunction provisions, I'd like to turn to the last part of
25 the injunction, which is really the gatekeeper provision.

131

1          THE COURT:  All right.  You may.

2          MR. POMERANTZ:  Your Honor, the last paragraph in

3   Article 9(f) is really not an injunction but is rather a

4   gatekeeper provision.  And as originally drafted, it'd do two

5   things:  first, it'd require that before any entity, which is

6   defined very broadly, could file an action against a protected

7   party relating to certain specified matters, the entity would

8   have to seek a determination from this Court that the claim

9   represented are colorable claim of bad faith, criminal

10  conduct, willful misconduct, fraud, or gross negligence.  The

11  specified matters to which the gatekeeper provision would

12  apply included the Chapter 11 case, negotiations regarding the

13  plan, the administration of the plan, the property to be

14  distributed under the plan, the wind-down of the Debtor's

15  business, the administration of the Claimant Trust, or

16  transactions related to the foregoing.

17      Subject to certain exceptions for Dondero-related parties,

18  protected parties were defined to include the Debtor, its

19  successors and assigns, indirect and direct, majority-owned

20  subsidiaries and managed funds, employees, Strand, Reorganized

21  Debtor, the independent directors, the Committee and its

22  members, the Claimant Trust, the Claimant Trustee, the

23  Litigation Trust, the Litigation Sub-Trustee, the members of

24  the Oversight Committee, retained professionals, the CEO and

25  CRO, and persons related to the foregoing.  Essentially,

1  parties related to the pre-effective-date administration of

2  the estate or the post-confirmation implementation of the

3  plan.

4      Second, the gatekeeper provision as originally presented

5  gave the Bankruptcy Court exclusive jurisdiction to adjudicate

6  any cause of action that it determined would pass through the

7  gate.  The gatekeeper provision, Your Honor, is not a release

8  in any way.  Rather, it permits enjoined parties who believe

9  they have a claim against the protected parties to pursue such

10 a claim, provided they first make a showing that the claim is

11 colorable to the Bankruptcy Court.

12     Several parties, Your Honor, objected to the Bankruptcy

13 Court having exclusive jurisdiction to adjudicate the claims

14 that pass through the gate.  The Debtor believes that the

15 Bankruptcy Court would ultimately have jurisdiction of any of

16 those claims that pass through the gate.  However, the Debtor

17 did, upon reflection, appreciate the concern that if the Court

18 agreed to that now, it would essentially be determining its

19 jurisdiction before a claim was filed.

20     Accordingly, in the January 22nd plan, Your Honor, we

21 amended the provision to provide that the Bankruptcy Court

22 will only have jurisdiction over such claims to the extent it

23 was legally permissible to do so, essentially deferring the

24 issue to a later time.

25     And as Your Honor, I believe, in one of cases called the

133

1   *Icing on the Cake*, the retention and jurisdiction provisions

2   in the plan only are to the extent under applicable law and

3   are quite broad and include the things that we would have the

4   Court -- have jurisdiction for the Court, otherwise

5   determined.

6       The Court made some other changes to the gatekeeper

7   provision, and I would like to place the amended gatekeeper

8   provision on the screen right now.  In addition to the change

9   I mentioned, the Debtor made the following changes:  the

10  provision is limited now to apply only to enjoined parties,

11  rather than any entity.  Than any entity.  Much narrower.  The

12  provision added the administration of the Litigation Sub-Trust

13  to the matters to which the provision would apply.  The

14  provision makes clear now that any claim, including

15  negligence, is a claim that could be sought and pursued

16  through the gatekeeper function.  And the provision made some

17  other syntax changes.

18      We believe, Your Honor, with these changes, we believe

19  that the gatekeeper provision is within the Court's

20  jurisdiction and it's appropriate to include under the plan.

21      But certain parties have argued that the Court does not

22  have the authority, the jurisdictional authority to perform

23  the gatekeeper function, separate and apart from whether it

24  has jurisdiction to adjudicate the claims that pass through

25  the gate.

134

1    Your Honor, we submit that these arguments represent a

2    fundamental misunderstanding of Bankruptcy Court jurisdiction

3    and the Court's authority to make sure the Debtor is free of

4    interference in carrying out the plan which I'll get to in a

5    couple moments.

6    As a preliminary matter, Your Honor, it is important for

7    the Court to remember that Paragraph 10 of the January 9 order

8    already contains a gatekeeper provision as it relates to the

9    independent directors and their agents.  And as I mentioned on

10   a couple of occasions, that order is not going away, it

11   doesn't expire by its terms, and it cannot be collaterally

12   attacked in this forum.

13   The Debtor does acknowledge, though, that the gatekeeper

14   provision in the plan is broader in terms of the people it

15   protects and it applies to post-confirmation matters.

16   Before I address the Court's authority to approve the

17   gatekeeper provision, I want to summarize the evidence that it

18   has heard from Mr. Seery and Mr. Tauber regarding why the

19   gatekeeper is so important a provision to the success of the

20   plan.

21   Although the Court is all too familiar with the history of

22   litigation initiated by and filed against Mr. Dondero and his

23   related affiliates, Mr. Seery spent some time on the stand

24   testifying about the litigation so the Court would have a

25   complete record for this hearing.  He testified that prior to

135

the petition date, the Debtor faced years of litigation from
Mr. Terry and Acis that led to the *Acis* bankruptcy case, which
Your Honor has said many times it's still in your mind.  Years
of litigation with the Redeemer Committee which precipitated
the filing of a bankruptcy case and resulted in an award very
critical of the Debtor's conduct.  Years of litigation with
UBS.  Years of litigation with Patrick Daugherty.  And we
placed all the dockets for all these matters before the Court.

    Also, during the bankruptcy and after the Committee
essentially rejected the Debtor's pot plan proposal and
indicated -- and the Debtor indicated it would be terminating
the shared service agreements with Mr. Dondero and his related
entities, the Debtor was the subject of harassment from Mr.
Dondero and related entities which resulted in the temporary
restraining order against him, a preliminary injunction
against him, a contempt motion, which Your Honor is scheduled
to hear Friday, a motion by the Debtor's controlled -- by the
Dondero-controlled investors and funds in CLO managed --
managed by the Debtor, which the Court referred to that motion
as being frivolous and a waste of the Court's time.  Multiple
plan objections, most of which are focused on allowing the
Debtors to continue their litigation crusade against the
Debtor and its successors post-confirmation.  An objection to
the Debtor approval of the Acis order and a subsequent appeal.
An objection to the HarbourVest settlement and subsequent

136

1    appeal.  A complaint and injunction against the Advisors and

2    the Funds to prevent them from violating Paragraph 9 of the

3    January 9th order.  And a temporary restraining order against

4    those parties, which was by consent.

5        Mr. Dondero's counsel tends to argue that he is the victim

6    here and that the litigation is being commenced against him

7    and -- instead of by him.  That response does not even deserve

8    a response, Your Honor.  It is disingenuous.

9        Mr. Tauber testified that he was part of the team at Aon

10   that sourced coverage for the independent directors after

11   their appointment in January 2020 and that he has over 20

12   years of underwriting experience.  He testified that at Aon he

13   builds bespoke insurance programs which are not cookie-cutter

14   programs for his clients, with an emphasis on D&O and E&O.

15   And he was asked by the independent board to obtain D&O and

16   E&O insurance after the board's appointment on January 9th.

17       Based upon the process Aon conducted in reaching out to

18   insurance carriers, Mr. Tauber testified that Aon was only

19   able to obtain D&O insurance based upon the inclusion of

20   Paragraph 10 of the January 9 order, the gatekeeper provision.

21   I know Mr. Taylor said that that was spoon-fed to the

22   insurers, but Mr. Tauber's testimony is they knew about Mr.

23   Dondero and they knew about his litigation tactics, so it is

24   not a good inference to be made from the testimony that they

25   would not have required something.  They probably would have

137

1   just said no.

2       Aon has now been -- Mr. Tauber testified that Aon has now

3   been asked to obtain D&O coverage for the Claimant Trustee,

4   the Litigation Trustee, the Oversight Committee, the members,

5   the Claimant Trust, and the Litigation Sub-Trust.  He

6   testified that he and Aon have approached the insurance

7   carriers that they believe might be interested in underwriting

8   coverage.

9       And no, he hasn't approached every D&O and E&O carrier out

10  there, and there may be, just like an investment banker

11  doesn't have to approach everyone.  They are experts in the

12  field, and he testified they approached the people they

13  thought would likely be willing or interested and potentially

14  be willing to extend coverage.  And as a result of Aon's

15  efforts, Mr. Tauber has determined that there's a continued

16  resistance to provide any coverage that does not contain an

17  exclusion for actions relating to Mr. Dondero or his related

18  entities.  And he further believes that all carriers that will

19  -- that have discussed a willingness to provide coverage will

20  only do so if there is a gatekeeper provision, and only one

21  carrier will agree to provide coverage without a Dondero

22  exclusion.

23      Mr. Tauber testified that he believes that any ultimate

24  policy will provide that if at any time the gatekeeper

25  provision is not in place, either the carrier will not cover

138

1  any actions related to Mr. Dondero or his affiliates or that

2  the coverage will be vacated or voided.

3      Based upon the foregoing record, Your Honor, which is

4  uncontroverted, there's ample justification on a factual basis

5  for approval of the gatekeeper provision.

6      I will now turn to the Court's authority to approve the

7  gatekeeper provision.

8      There are three alternative bases upon which the Court can

9  approve the gatekeeper provision.  First, several provisions

10  of the Bankruptcy Code give broad authority to approve a

11  provision like the gatekeeper provision.

12      Second, the Court can analogize to the Barton Doctrine the

13  facts and circumstances in this case and authorize the Court

14  to act as a gatekeeper to prevent frivolous litigation from

15  being filed against court-appointed officers and directors and

16  those that will lead the post-confirmation monetization of the

17  estate's assets.

18      And third, Your Honor, the Court can find that Mr. Dondero

19  and his entities are vexatious litigants, and use the

20  gatekeeper provision as a sanction to prevent the filing of

21  baseless litigation designed merely to harass those in charge

22  of the estate post-confirmation.

23      So, Bankruptcy Court authority.  Your Honor, there are

24  several provisions in the Bankruptcy Code which we rely on to

25  support the Court's authority.  First, Section 1123(a)(5)

139

1    permits the plan to approve adequate means of implementation,

2    and contains a long, non-exclusive list.  Mr. Seery's

3    testimony is uncontroverted that a gatekeeper provision is

4    necessary for the adequate implementation of the plan.

5        Second, Your Honor, 1123(b)(6) authorizes a plan to

6    include any appropriate provision in a plan not inconsistent

7    with any other provision in this Code.  There are not any

8    provisions and none have been cited by the Objectors that

9    would prohibit a gatekeeper provision.  Section 1141

10   effectively holds that the terms of a plan bind the debtor and

11   its creditors and vest property in a reorganized debtor, free

12   and clear of the interests of third parties.

13       If nothing else, Your Honor, the spirit of 1141 allows the

14   Court to prevent, in appropriate cases, vexatious litigation

15   by unhappy creditors and parties in interest from torpedoing

16   the plan.

17       1142(b), Your Honor, provides that the confirmation --

18   that, after confirmation, the Court may direct any parties to

19   perform any act necessary for the consummation of the plan,

20   and requiring the party to seek court-approval before filing

21   an action is certainly an act.

22       And lastly, Your Honor, Section 105 allows the Court to

23   enter orders necessary to order other things, enforce orders

24   of the Court like the confirmation order, and prevent an abuse

25   of process which would certainly occur if baseless litigation

140

1  were filed against the parties in charge of the Reorganized

2  Debtor and the trust vehicles entrusted with carrying out the

3  plan.

4      Your Honor, gatekeepers are not a novel concept and have

5  been approved by courts in appropriate circumstances.  In the

6  *Madoff* cases, the Court has been the gatekeeper post-

7  confirmation to determine whether investor claims are

8  derivative or direct claims.

9      In *General Motors*, the Court has been the gatekeeper post-

10 confirmation to determine whether product liability claims are

11 proper claims against the reorganized debtor.

12     Closer to home, Judge Lynn, Mr. Dondero's counsel,

13 approved a gatekeeper provision, arguably even more far-

14 reaching than the provision here, in the *Pilgrim's Pride* case.

15 In that case, Judge Lynn held that *Pacific Lumber* prevented

16 him -- prevented the Court from approving the exculpation

17 provision in the plan.  However, he did hold that it was

18 appropriate for the Court to ensure that debtor

19 representatives are not improperly pursued for their good-

20 faith actions by requiring that any actions against the debtor

21 or its representatives, and further, on the performance of

22 their obligations as debtor-in-possession, be heard

23 exclusively before the Bankruptcy Court.

24     And *Pilgrim's Pride* is not the only case in this district

25 to include a gatekeeper provision, as Judge Houser approved

141

1   one in the *CHC Group* in 2016, which is cited in our materials.

2       The theme in all these cases, Your Honor, is that there

3   are circumstances where it is necessary and appropriate for

4   the Bankruptcy Court to act as a gatekeeper as a means of

5   reducing litigation that could interfere with a confirmed plan

6   and that a Court has the authority to approve such provisions.

7       The Objectors argue that the Bankruptcy Court does not

8   have jurisdiction to approve that provision.  The Debtor

9   understands the argument as it related to the prior provision,

10  which gave the Court exclusive jurisdiction over any claim it

11  found colorable, and we've amended the plan to address that

12  issue.  The jurisdiction to deal with those claims could be

13  left to a later day.

14      But to the extent the Objectors still pursue the

15  jurisdiction argument in light of the current provision,

16  they're really conflating two very different things:  the

17  ability to determine whether a claim is colorable and the

18  ability to adjudicate that claim if the Court determines it's

19  colorable.

20      None of the authorities cited by the Objectors hold that

21  the Court is without jurisdiction to approve a gatekeeper

22  provision like the one here.  So, rather, what they do is they

23  try to -- they argue, based upon the *Craig's Stores* case,

24  which is narrower than other circuits of post-confirmation

25  jurisdiction in the Bankruptcy Court, and argue that the

142

1  gatekeeper provision doesn't fall within that.  But that --

2  such reliance is misplaced, Your Honor.

3     *Craig* held that the Bankruptcy Court did not have

4  jurisdiction to adjudicate a post-confirmation dispute over a

5  private-label credit card agreement between the debtor and the

6  bank.  In declining to find jurisdiction, the Fifth Circuit

7  remarked that there was no antagonism or claim pending between

8  the parties as of the reorganization and no facts or law

9  deriving from the reorganization or the plan was necessary to

10  the claim asserted by the debtor.

11     However, in so ruling, Your Honor, the Fifth Circuit did

12  reason that post-confirmation jurisdiction in the Bankruptcy

13  Court continues to exist for matters pertaining to

14  implementation and execution of the plan.  Requiring parties

15  to seek Bankruptcy Court determination the claim is colorable

16  before embarking on litigation that will impact

17  indemnification rights and affect distributions to creditors

18  is not an expansion of jurisdiction and fits well within the

19  *Craig* reasoning.

20     Unlike the credit card agreement dispute in *Craig*, Mr.

21  Dondero and his entities have demonstrated tremendous

22  antagonism towards the Debtor.  And while the Debtor's plan

23  may be confirmed, further litigation has been threatened by

24  Mr. Dondero.  It's in the pleadings.  That's one of the

25  reasons Mr. Dondero says his plan is better.  It'll avoid

143

1   tremendous amount of litigation.

2       After *Craig*, the Fifth Circuit again examined the

3   bankruptcy court's post-confirmation jurisdiction in the

4   *Stoneridge* case in 2005.  In that case, the Fifth Circuit

5   ruled that a bankruptcy court has post-confirmation

6   jurisdiction to resolve a dispute between two nondebtors that

7   could trigger indemnification claims against a liquidating

8   trust formed as a result of a confirmed plan.

9       And lastly, as I mentioned Your Honor's decision before,

10  the *TXMS Real Estate* case, I think just a couple of months

11  ago, it stands for the proposition that post-confirmation

12  jurisdiction exists for matters bearing on the implementation,

13  interpretation, and execution of a plan.  In that case, Your

14  Honor ruled that Your Honor had jurisdiction to resolve a

15  post-confirmation dispute between a liquidating trust formed

16  under a plan and a landlord, the result of which could

17  significantly and adversely affect the value of the

18  liquidating trust and monies available for unsecured

19  creditors.

20      And you have heard Mr. Seery testify that litigation will

21  have an adverse effect on the ability to make distributions to

22  creditors.

23      So, Your Honor, under these authorities, the Court

24  undoubtedly would have jurisdiction to act as the gatekeeper

25  for the litigation.

1      There's also an independent basis for the gatekeeper

2  provision, Your Honor, the Barton Doctrine, which the Court is

3  very familiar from your opinion in the *In re Ondova* case in

4  2017 and which provides that before a suit may be brought

5  against a trustee, leave of Court is required.  In *Ondova*, the

6  Court reviewed the history of the doctrine in connection with

7  litigation brought by a highly-litigious debtor against a

8  trustee and his professionals.  This Court noted that there

9  are several important policies followed by the doctrine,

10  including a concern for the overall integrity of the

11  bankruptcy process and the threat of trustees being distracted

12  from or intimidated from doing their jobs.  And Your Honor's

13  language still:  For example, losers in the bankruptcy process

14  might turn to other courts to try to become winners there by

15  alleging the trustee did a negligent job.

16      Your Honor, this is precisely what the Debtor is trying to

17  prevent here, Mr. Dondero and his entities from putting the

18  bad experience before Your Honor in this case behind it and

19  going to try to find better luck in a more hospitable court.

20      Your Honor, the Barton Doctrine originally only applied to

21  receivers, and over the course of time has been extended to

22  apply to various court-appointed fiduciaries, as we have cited

23  in our materials:  trustees, debtors-in-possession, officers

24  and directors, employees, and attorneys representing the

25  debtor.

145

1      And I expect the Objectors to argue that there is a

2    statutory exception to the Barton Doctrine under 28 U.S.C. 959

3    and it does not apply to acts or transactions in carrying out

4    business conducted with a property.  The exception, Your

5    Honor, is very narrow and was meant to apply for things like

6    slip-and-fall cases.  In fact, the Eleventh Circuit in the

7    *Carter v. Rodgers* case, 220 F.3d 1249 in 2000, held that

8    Section 11 -- 28 U.S.C. 959(a) does not apply to suits against

9    trustees for administering or liquidating the bankruptcy

10   estate.

11      The Objectors also argue that the gatekeeper provision

12   violates *Stern v. Marshal*.  However, as the Court acknowledged

13   in *Ondova*, the Fifth Circuit in *Villegas v. Schmidt* has

14   recognized that the Barton Doctrine remains viable post-*Stern

15   v. Marshal*.  The Fifth Circuit reasoned that while Barton

16   Doctrine is jurisdictional in that a court does not have

17   jurisdiction of an action if preapproval has not been

18   obtained, it does not implicate the extent of a bankruptcy

19   court's jurisdiction to adjudicate the underlying claim,

20   precisely the distinction we're making here.  The bankruptcy

21   court would be the gatekeeper for deciding whether the claim

22   passes through the gate, and then after will decide if it has

23   jurisdiction to rule on the underlying claim.

24      And this is important especially in a case like this, Your

25   Honor, where Your Honor has had extensive experience with the

146

1  parties and is in the best position to determine whether the

2  claims are valid or attempted to be used as harassment.

3      The Objectors will complain about the open-ended nature of

4  the gatekeeper provision, whether it will or won't apply after

5  the case is closed or a final decree is issued, and the unfair

6  burden of their rights.

7      Your Honor has a previous reported opinion where basically

8  jurisdiction does extend after a case is closed or a final

9  decree is entered, so that issue is a red herring.

10     As Your Honor is well aware, it's a decade-long -- a

11  decade of litigation against the Dondero-controlled entities

12  that caused the Highland bankruptcy.  And the Court is very

13  well aware of the litigation that occurred in *Acis*, very well

14  aware of the litigation that's occurred here that I mentioned

15  a few minutes ago.  Your Honor, it is not over, you'll be

16  presiding over the contempt hearing.

17     And if the Court needs yet another ground to approve the

18  gatekeeper provision, the Debtor submits that the procedure is

19  an appropriate sanction for Dondero's vexatious litigation

20  activities.  We cited the *In re Carroll* case in the Fifth

21  Circuit of 2017 that held that a bankruptcy court has the

22  authority to enjoin a litigant from filing any pleading in any

23  action without the prior authority from the bankruptcy court.

24     And in affirming the decision of the bankruptcy court, the

25  Fifth Circuit commented on the reasons the bankruptcy court

1  gave for its ruling.  After recounting the bad faith of

2  appellants, the bankruptcy court determined that the Carrolls'

3  true motives were to harass the trustee and thereby delay the

4  proper administration of the estate, in the hope that they

5  would be able to retain their assets or make pursuit of the

6  assets so unappealing that the trustee would be compelled to

7  settle on terms favorable to appellants.

8      Sounds familiar, Your Honor.  The same can certainly be

9  said about what Mr. Dondero is doing in this case.

10     And to make a showing that a party is vexatious litigant,

11 the Court must find that the party has a history of vexatious

12 and harassing litigation, whether the party has a good faith

13 -- the litigation or has filed it as a means to harass, the

14 burden to the Court and other parties, and the adequacy of

15 alternative sanctions.

16     And as Your Honor is well aware from all the litigation,

17 Your Honor is well, well able to make the finding required for

18 the vexatious litigation finding.

19     But here, we don't ask for the drastic sanction of

20 enjoining from any further filings.  Rather, we just ask for a

21 less-severe sanction, requiring Mr. Dondero and his entities

22 to first make a showing that he has a colorable claim.

23     The Fifth Circuit in *Baum v. Blue Moon*, 2007, did exactly

24 that.  In *Baum*, the district court barred a vexatious litigant

25 from initiating litigation without first obtaining the

148

1   approval of the district court.  Ultimately, the matter

2   reached the Fifth Circuit after the district court had

3   modified the pre-filing injunction to limit it to a certain

4   case, and then broadened it again based upon continued bad

5   faith conduct.

6       On appeal, the Fifth Circuit, citing several prior cases,

7   noted that a district court has the authority to impose a pre-

8   filing injunction to defer vexatious, abusive, and harassing

9   litigation.

10      And for those reasons, Your Honor, the Debtor asks the

11  Court to overrule any objections to the gatekeeper provision.

12      Your Honor, I was just going to then go to the plan

13  modification provisions, but I wanted to stop and see if you

14  had any questions at this point.

15          THE COURT:  I do not.  Let's give him a time

16  estimate, Nate.  About how --

17          THE CLERK:  Twenty.

18          MR. POMERANTZ:  I have another five or six minutes, I

19  think, based upon --

20          THE COURT:  Okay.

21          MR. POMERANTZ:  And then I'll be ready to turn it

22  over to --

23          THE COURT:  Okay.

24          MR. POMERANTZ:  -- to Mr. Kharasch.

25          THE COURT:  All right.  Yes.  You've got -- you've

149

1   done an hour and 33 minutes.  So you have about, I guess, 37

2   minutes left.  Okay.  Go ahead.

3           MR. POMERANTZ:  Thank you, Your Honor.

4       I would like to address the modifications of the plan that

5   were contained in our January 22nd plan and the additional

6   changes filed on February 1, several of which I have referred.

7       As a preliminary matter, Your Honor, under 1127(b), the

8   Debtor can modify a plan at any time prior to confirmation if

9   -- and not require resolicitation if there's no adverse change

10  in the treatment of claim or interest of any equity holder.

11      With that background, I won't go through the changes we

12  made that I've already discussed, but I will point out a

13  couple, Your Honor, that I would like to point out now.  We

14  have modified the plan with respect to conditions of the

15  effective date in Article 8.  First, a condition to the

16  effective date will now be entry of a final order confirming a

17  plan, as opposed just to entry of order.  And final order is

18  defined as the exhaustion of all appeals.

19      In addition, the ability to obtain directors and officers

20  insurance coverage on terms acceptable to the Debtor, the

21  Committee, the Claimant Trustee, the Claimant Trustee

22  Oversight Board, and the Litigation Trustee is now a condition

23  to the effective date.

24      The Court heard testimony today and has experienced

25  firsthand the litigiousness of Mr. Dondero and his related

1  entities.  And the Court heard testimony from Mr. Tauber and

2  Aon that the D&O insurance will not be available post-

3  effective date without assurances that the gatekeeper

4  provision will be in effect for the duration of the policy and

5  any run-off period.

6      Mr. Tauber further testified that he expected the final

7  terms from the insurance carrier to provide that if the

8  confirmation order was reversed on appeal and the gatekeeper

9  was removed, it would void -- it would either void the

10 directors and officers coverage or it'd result in a Dondero

11 exclusion.

12     Mr. Dondero and his entities are no strangers to the

13 appellate process, as Your Honor knows.  They appealed several

14 of your orders, and continue the tack in this case, having

15 appealed the Acis and the HarbourVest orders and the

16 preliminary injunction.  It would not surprise the Debtor if

17 Mr. Dondero and his entities appealed your confirmation order,

18 if Your Honor decides to confirm the plan.

19     The Debtor is confident that it will prevail on any appeal

20 in the confirmation order, as we believe the Debtor has made a

21 compelling case for confirmation.

22     The Debtor also believes a compelling case exists that if

23 the plan went effective without a stay pending appeal, that

24 the appeal would be equitably moot, but we understand we are

25 facing headwinds from the courts, bankruptcy court have

151

1  addressed that issue before.

2      However, given the effect a reversal would have on the

3  availability of insurance coverage, the Claimant Trustee, the

4  Claimant Oversight Committee, and the Litigation Trustee are

5  just not willing to take that risk.

6      We are hopeful that Mr. Dondero and his entities will

7  recognize that any appeal is futile and step aside and let the

8  plan proceed and become effective.

9      If Mr. Dondero and his related entities do appeal the

10  confirmation order, preventing it from becoming final and

11  preventing the effective date from the occurring, the Debtor

12  intends to work closely with the Committee to ratchet down

13  costs substantially and proceed to operate and monetize assets

14  as appropriate until an order becomes final.

15      None of these modifications adversely affect the treatment

16  of claims or interests under the plan, Your Honor, and for

17  those reasons, Your Honor, we request that the Court approve

18  those modifications.

19      And with that, I would like to turn the podium over to Mr.

20  Kharasch to briefly address the remaining CLO objections.

21          THE COURT:  All right.  Mr. Kharasch?

22          CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

23          MR. KHARASCH:  Good afternoon, Your Honor.  I'll be

24  as brief as possible.  I know we're under a deadline.

25      As you've heard yesterday, you've heard before in other

152

1  proceedings, Your Honor, the CLO Objecting Parties, the so-

2  called investors, do have rights under the CLO management

3  agreements and indentures, including contractual rights to

4  terminate the management agreements under certain

5  circumstances.

6      What they complain about today, Your Honor, is that the

7  injunction language in the plan, including the language

8  preventing actions to interfere with the implementation and

9  consummation of the plan, is so broad and ambiguous that their

10  rights are or may be improperly impacted, especially any

11  rights to remove the manager for acts of malfeasance.

12      But the Debtor is primarily relying, Your Honor, not so

13  much on the plan injunctions but on the clear provisions of

14  the January 9 order, to which Mr. Dondero consented and which

15  provides that Mr. Dondero shall not cause any of his related

16  entities to terminate any agreements with the Debtor.

17      Yes, that is a broad provision, but it is very clear, and

18  it does not even allow the CLO Objecting Parties to come to

19  court under a gatekeeper-type provision.  But that is what Mr.

20  Dondero consented to on behalf of himself and his related

21  entities.

22      Important to note, Your Honor, we are not here today to

23  litigate who is and who is not a related entity.  That will be

24  left for another day.  However, Your Honor, we have considered

25  these issues, including last night and this morning, and we

1 are going to propose -- well, we will modify our plan through

2 a provision in the confirmation order to provide the

3 following:  Notwithstanding anything in the plan or the

4 January 9 order, the CLO Objecting Parties will not be

5 precluded from exercising their contractual or statutory

6 rights in the CLOs based on negligence, malfeasance, or any

7 wrongdoing, but before exercising such rights shall come to

8 this Court to determine whether those rights are colorable and

9 to also determine whether they are a related entity.  If the

10 Court has jurisdiction, the Court can determine the underlying

11 colorable rights or claims.

12     This does not impact the separate settlement we have with

13 CLO Holdco, Your Honor.

14     We think that such modification addresses some of the

15 concerns raised yesterday by the objecting parties by

16 providing more clarity as to what the plan is doing and not

17 doing with respect to the plan and the January 9 order, and we

18 think it is also a fair resolution of some legitimate

19 concerns.

20     So, with that, Your Honor, we think that, with that

21 clarification that we did not have to make but are willing to

22 make, that this should fully satisfy the CLO Objecting Parties

23 with regard to their objections to the injunction and the

24 gatekeeper.

25     Thank you, Your Honor.

154

1          THE COURT:  All right.  Mr. Clemente?

2       CLOSING ARGUMENT ON BEHALF OF THE CREDITORS' COMMITTEE

3          MR. CLEMENTE:  Yes, Your Honor.  And I actually am

4    going to be brief.  Mr. Pomerantz's discussion, obviously, was

5    very, very thorough, so I'm able to cut out a lot of stuff.

6       Thank you, Your Honor.  Matt Clemente, Sidley Austin, on

7    behalf of the Committee.

8       The plan, Your Honor, meets the confirmation standards and

9    should be confirmed.  Mr. Pomerantz covered a lot of ground,

10   and I will endeavor not to repeat that, but there are a few

11   points that I think the Committee wishes to emphasize.

12      Your Honor, since I first appeared in front of you, I have

13   maintained consistently that no plan can or should be

14   confirmed without the consent of the Committee.  Your Honor,

15   in her wisdom, understood this immediately, as it was obvious

16   -- it was the obvious conclusion, given the makeup of the

17   creditor body, the asset pool, and the impetus for the filing

18   of the case.

19      Unfortunately, not everyone came to this conclusion so

20   easily, and it took much hard-fought negotiations as well as a

21   defeated disclosure statement, among other things, and

22   tireless dedication and commitment by each individual

23   Committee member to drive for a value-maximizing plan that is

24   in the best interests of its constituencies and for us to get

25   to where we are today.

1       And where we are today, Your Honor, is at confirmation for

2   a plan that the Committee unanimously supports, which was the

3   inevitable outcome for this case from the very beginning.

4       I've also said, Your Honor, that context is critical in

5   this case.  It has been from the beginning, and it remains so

6   now.  Mr. Draper, interestingly, began his comments yesterday

7   by saying that even a serial killer is entitled to *Miranda*

8   rights.  While I will admit that at times the rhetoric in this

9   case has been heated, I have never certainly likened Mr.

10  Dondero to a serial killer.  But the record shows, and Mr.

11  Dondero's own words and actions show, that he is, in fact, a

12  serial litigator who has no hesitation at all to take any

13  position in an attempt to leverage an outcome that suits his

14  self-interest.  And he has no hesitation at all to use his

15  many tentacles in a similar fashion.

16      That is a very important context in which the Court should

17  view the remaining objections of the Dondero tentacles and

18  weigh confirmation of the Debtor's plan.

19      Against this context of a serial litigator, Your Honor, we

20  have a plan supported by each member of the Official Committee

21  of Unsecured Creditors, accepted by two classes of claims,

22  Class 2 and Class 7, and holders of almost one hundred percent

23  in amount of non-insider claims in Class 8.

24      The parties that have voted against the plan are either

25  employees who are not receiving distributions under the plan

 1  or are insiders or parties related to Mr. Dondero.

 2      The overwhelming number and amount of creditors who are

 3  receiving distributions under this plan, therefore, have

 4  accepted the plan.  The true creditors and economic parties in

 5  interest have spoken, they have spoken loudly, and they have

 6  spoken in favor of confirming the plan.

 7      Your Honor, I'm not going to address the technical

 8  requirements, as Mr. Pomerantz did that.  So I'm going to skip

 9  over my remarks in that regard, except I do want to emphasize

10  the remarks regarding the gatekeeper, exculpation, and

11  injunction provisions as they're of critical importance to the

12  plan.

13      The testimony has shown and the proceedings of this case

14  has shown, again, Mr. Dondero is a serial litigator with a

15  stated goal of causing destruction and delay through

16  litigation.

17      The testimony has further shown that none of the

18  independent board members would have signed onto the role

19  without the gatekeeper and injunction provisions and the

20  indemnity from the Debtor.

21      Therefore, it follows that such provisions are necessary

22  to entice parties to serve in the Claimant Trustee and other

23  roles under the plan, which, as I remarked in my opening

24  comments, are integral to providing the structure that the

25  creditors believe is necessary to unlocking the value and

157

1   unlocking themselves from the Dondero web.

2      Regarding the exculpation and injunction provisions

3   specifically, Your Honor, the Court will recall that the

4   Committee raised objections to them in connection with the

5   first disclosure statement hearing. In response, the Debtor

6   narrowed the provisions, and the Committee believes they

7   comply with the Fifth Circuit precedent, as Mr. Pomerantz ably

8   walked Your Honor through.

9      And to be clear, Your Honor, not only does the Committee

10   believe the exculpation and injunction provisions comply with

11   Fifth Circuit law, the Committee does not believe the estate

12   is harmed by such provisions, as the Committee does not

13   believe there are any cognizable claims that could or should

14   be raised that would otherwise be affected by the exculpation

15   or injunction, and, frankly, with respect to the release that

16   Mr. Pomerantz walked Your Honor through with respect to the

17   directors and the officers.

18      Regarding the gatekeeper, Your Honor, Your Honor

19   presciently approved it in her January 9th order, and the

20   developments since then only serve as further justification

21   for including it in the plan and confirmation order. Mr.

22   Dondero is a serial and vexatious litigator, and the

23   instruments put in place under the plan to maximize value for

24   the creditors and to oversee that value-maximizing process

25   must be protected, and the gatekeeper function serves that

158

1  protection while also, importantly, as Mr. Pomerantz pointed

2  out, providing Mr. Dondero with a forum to advance any

3  legitimate claims he and his tentacles may have.

4       In short, Your Honor, the gatekeeper provision is

5  necessary to the implementation to the plan, is fair under the

6  circumstances of the case, and is therefore within this

7  Court's authority, and it is appropriate to approve.

8       Your Honor, in sum, it has been a long road to get here

9  today, but we are finally here. And we are here, Your Honor,

10  I believe in large part as a result of the tireless efforts of

11  the individual members of my Committee, and for that I thank

12  them.

13       The Committee fully supports and unanimously supports

14  confirmation of the plan. As demonstrated by the evidence,

15  the plan meets all the requirements of the Bankruptcy Code.

16  The Committee believes the plan is in the best interests of

17  its constituencies. And therefore the Committee, along with

18  two classes of creditors and the overwhelming amount of

19  creditors in terms of dollars, urge you to confirm the plan.

20       That's all I have, Your Honor, but I'm happy to answer any

21  questions you may have for me.

22            THE COURT: Okay. Not at this time.

23       Nate, how much time --

24       (Clerk advises.)

25            THE COURT: Twenty-five minutes remaining? All

159

1    right.  Just so you know, you've got a collective Debtor's

2    counsel/Committee's counsel 25 minutes remaining for any

3    rebuttal, if you choose to make it.

4        Let's take a five-minute break, and then we'll hear the

5    Objectors' closing arguments.  Okay.

6            THE CLERK:  All rise.

7        (A recess ensued from 2:00 p.m. until 2:06 p.m.)

8            THE COURT:  All right.  Please be seated.  We're

9    going back on the record in Highland.  We're ready to hear the

10   Objectors' closing arguments.  Who wants to go first?

11           MR. DRAPER:  Your Honor, this -- this is Douglas

12   Draper.  I get the joy of going first.

13           THE COURT:  Okay.

14    CLOSING ARGUMENT ON BEHALF OF THE GET GOOD AND DUGABOY TRUSTS

15           MR. DRAPER:  We've heard a great deal of testimony

16   about the Debtor's belief that the circumstances in this case

17   warrant an exception to existing Fifth Circuit case law, the

18   Bankruptcy Code, and Court's post-confirmation jurisdiction.

19       I would not be standing here today objecting to the plan

20   if the Debtor didn't attempt to extend, move past and beyond

21   the Barton Doctrine, move beyond 1141, move beyond *Pacific*

22   *Lumber*.  In fact, I think I heard an argument that *Pacific*

23   *Lumber* is not applicable and this Court should disregard Fifth

24   Circuit case law.

25       Let's start with the exculpation provision.  And the focus

160

1   of this case has been, and what we've heard over the last few

2   days, is about the independent directors.  I understand there

3   was an order entered earlier, the order stands, and the order

4   is applicable in this case.  It cuts off, however, when we

5   have a Reorganized Debtor, because these independent directors

6   are no longer independent directors.  It cuts off when we have

7   a new general partner.

8       And so the protections that were afforded by that order do

9   not need to be afforded to the new officers and new directors

10  of the new general partner.  And in fact, the protections that

11  they're entitled to are completely different than the

12  protections that were entitled -- that are covered by the

13  order that the Court has looked at.

14      Let's first focus on, however, the exculpation provision.

15  And I wanted to ask the Court to look at the exculpated

16  parties.  Have to be very careful and very interest -- and

17  focus solely on the independent directors.  But if you look at

18  the parties covered by exculpation provision, it includes the

19  professionals retained by the Debtor.  My reading of *Pacific*

20  *Lumber* is that neither the Creditors' Committee counsel nor

21  the Debtor can be covered by an exculpation provision.  This

22  in and of itself makes the plan non-confirmable.  This

23  exculpation provision is unwarranted and unnecessary.

24      Two, --

25              THE COURT:  Well, let's drill down on that.

161

1    MR. DRAPER:  -- we have --

2    THE COURT:  Let's drill down on that.  Mr. Pomerantz

3  says that this wasn't what they considered one way or another

4  by *Pacific Lumber*.  Debtor, debtor professionals.  Okay?  Do

5  you disagree with that?

6    MR. DRAPER:  I disagree with that.  *Pacific Lumber*

7  said you could only have releases and exculpations for the

8  Creditors' Committee members.  And the rationale behind that

9  was that those people volunteered to be part and parcel of the

10  bankruptcy process, that those parties did not get paid.

11  Here, we have two professionals who both volunteered and are

12  being paid, and are not entitled to an exculpation under

13  *Pacific Lumber*.  They're not entitled to a --

14    THE COURT:  Okay.  So you say *Pacific* --

15    MR. DRAPER:  -- release.  Now, ultimately, they --

16    THE COURT:  -- *Pacific Lumber* categorically rejected

17  all exculpations except to Creditors' Committee and its

18  members.  That's your --

19    MR. DRAPER:  I agree.  That's --

20    THE COURT:  -- interpretation of *Pacific Lumber*?

21    MR. DRAPER:  Yes.

22    THE COURT:  Okay.  All right.  So you just absolutely

23  disagree, one by one, with every one of the arguments, that it

24  was really -- the only thing before the Fifth Circuit was plan

25  sponsors, okay?  A plan proponent that I think was like a

162

1   competitor previously of the debtor, and I think a large

2   creditor or secured creditor.  I think those were the two plan

3   proponents.

4        So you disagree -- I'm going to, obviously, go back and

5   line-by-line pour through *Pacific Lumber*, but you disagree

6   with Mr. Pomerantz's notion that, look, it was really a page

7   and a half or two of a multipage opinion where the Fifth

8   Circuit said, no, I don't think 524(e) is authority to give

9   exculpation from postpetition liability for negligence as to

10  these two plan sponsors.  And I guess it was also -- I don't

11  know.  They say, Pachulski's briefing says it was really only

12  looking at these two plan sponsors and the Committee and its

13  members on appeal, you know, going through the briefing, and

14  in such, you can see that these were all that was presented

15  and addressed by the Fifth Circuit.  You disagree with that?

16           MR. DRAPER:  Look, I know the facts of *Pacific Lumber*

17  and they -- I know what the posture of the case was.  However,

18  the literal language by the opinion in it, it transcends just

19  a dispute in the case.  And I think the U.S. Trustee's

20  position that this exculpation provision is correct as a

21  matter of law support -- is further evidence of the fact that

22  the U.S. Trustee, as watchdog of this process, and *Pacific*

23  *Lumber* say this cannot be done, period, end of story.

24           THE COURT:  Okay.  So you, at bottom, just totally

25  disagree with Mr. Pomerantz?  You say *Pacific Lumber* is

163

1   actually a very broad holding, and I guess, if such, there's a

2   conflict among the Circuits, right?

3           MR. DRAPER:  Well, that's okay.

4           THE COURT:  So, --

5           MR. DRAPER:  I mean, quite frankly, *Pacific Lumber* is

6   binding on you.

7           THE COURT:  Understood.

8           MR. DRAPER:  There may be a conflict in the Circuits,

9   and ultimately the Supreme Court may make a decision and

10  decide who's right and who's wrong.

11      But for purposes of today and for purposes of this

12  exculpation provision and for purposes of this confirmation,

13  *Pacific Lumber* is the applicable law.

14          THE COURT:  Okay.  Well, again, this is a hugely

15  important issue, although in many ways I don't understand why

16  it is, because we're just talking about postpetition acts and

17  negligence, okay?  You know, many might say it's much ado

18  about nothing, but it's front and center of your objection.

19  So I guess I'm just thinking through, if the Fifth Circuit was

20  presented these exact facts and was presented with the

21  argument, you know, the *Blixseth* case says 524(e) has nothing

22  to do with exculpation because exculpation is a postpetition

23  concept, and it's just talking about standard liability --

24  these people aren't going to be liable for negligence; they

25  can be liable for anything and everything else -- if presented

1  with that *Blixseth* case, you know, there are several arguments

2  that Mr. Pomerantz has made why, if you accept that 524(e)

3  might not apply here, let's look at the reasoning, the little

4  bit of reasoning we had of *Pacific Lumber*, that it was really

5  a policy rationale, right?  These independent fiduciaries,

6  strangers to the company and case, they'd never want to do

7  this if they knew they were vulnerable for getting sued for

8  negligence.  Mr. Pomerantz's argument is that these

9  independent board members are exactly analogous to a

10  Committee, more than prepetition officers and directors.  What

11  do you have to say about that policy argument?

12         MR. DRAPER:  Well, I think there's a huge distinction

13  between the members of a Creditors' Committee who are

14  volunteers and are not paid versus a paid independent

15  director.  And more importantly, I think there's a huge

16  difference between a member of a Creditors' Committee who's

17  not paid and counsel for a Debtor and counsel for a Creditors'

18  Committee.

19         THE COURT:  Okay.

20         MR. DRAPER:  Look, you have -- you've --

21         THE COURT:  So, at bottom, it was all about

22  compensation to the Fifth Circuit?

23         MR. DRAPER:  Well, no.  The Fifth Circuit policy

24  decision was we want to protect a party who wants to serve and

25  do their civic duty to serve on a Creditors' Committee for no

1   compensation.  I agree with that.  I think it's a laudable

2   policy decision.  I think it makes sense.

3      However, the Fifth Circuit in its language basically said,

4   nobody else gets it.  It didn't say, look, you know, if there

5   are circumstances that are different, we may look at it

6   differently.  The language is absolute in the opinion.  And

7   that's what I think is binding and I think that's what the

8   case stands for.

9      And look, just so the Court is very clear, when Pachulski

10  files its fee application and the Court grants the fee

11  application, any claim against them is res judicata.  So, in

12  fact, they do have -- they do have protection.  They do have

13  the ability to get out from under.  The Court -- they're just

14  not -- they just can't get out from under through an

15  exculpation provision.  And the same goes for Mr. Clemente and

16  his firm.

17          THE COURT:  Which, --

18          MR. DRAPER:  And the same goes for DSI.

19          THE COURT:  Which, by the way, that's one reason I

20  think sometimes this is much ado about nothing.  It goes both

21  ways.  The Debtor professionals, the Committee professionals,

22  estate professionals, they're going to get cleared on the day

23  any fee app is approved, right?  I mean, there's Fifth Circuit

24  law that says --

25          MR. DRAPER:  I -- I --

166

1          THE COURT:  -- says that's res judicata as to any

2    future claims.

3       But I guess I'm really trying to understand, you know, at

4    bottom, I feel like the Fifth Circuit was making a holding

5    based on policy more than any directly applicable Code

6    provision.

7       I mean, it's been said, for example, that Committee

8    members, they're entitled to exculpation because of, what,

9    1103, some people argue, 1103, which subsection, (c)?  That's

10   been quoted as giving, quote, qualified immunity to

11   Committees.  But it doesn't really say that, right?  It's just

12   something you infer.

13          MR. DRAPER:  No.  Look, what I think, if you really

14   want to put the two concepts together, I think what the Fifth

15   Circuit, when they told lawyers and professionals that you

16   can't get an exculpation, was very mindful of the fact that

17   you can get released once your fee app is approved.  So, as a

18   policy, they didn't need to do it in a exculpation provision.

19   There was another methodology in which it could be done.

20          THE COURT:  Uh-huh.

21          MR. DRAPER:  And so that's -- you have to look at it

22   as holistic and not just focus on the exculpation provision.

23   Because, in fact, they recognize and they -- I'm sure they

24   knew their existing case law on res judicata, and that's why

25   they read it out.

1      So, honestly, there's no reason for Pachulski to be in

2  here.  There's no reason for Mr. Clemente to be in here.

3  There's no reason for the professionals employed by the Debtor

4  to be in here.  They have an exit not by virtue of the plan.

5           THE COURT:  But so then it boils down to the

6  independent directors and Strand post January 9th?

7           MR. DRAPER:  It boils down somewhat to them, but

8  quite frankly, there are two parts to this.  One is you have

9  an order that's in place.  I am not asking the Court to

10  overturn the order.  And quite frankly, this provision could

11  have been written to the effect that the order that was in

12  place on -- that's been presented to the Court is applicable

13  and applied.

14      However, let's parse that down.  Let's look at Mr. Seery.

15  The order that's in place solely protects the independent

16  directors acting in their capacities as independent directors.

17  If somebody's acting as -- and if you want to liken it to a

18  trustee, their protection is afforded by the Barton Doctrine,

19  and that's how the protection arises.

20      What's going on here is they're extending the provisions,

21  first of all, of the Court's order, and number two, of the

22  Barton Doctrine, which are -- which cannot be -- which should

23  not be extended.  The law limits what protections you have and

24  what protections you don't have.  And we, as lawyers -- look,

25  I'll give you the best example.  Think of all the times you

168

1    had somebody write in the concept of superpriority in a cash
2    collateral order.  And how many times have you had a lawyer
3    rewrite the concept of the issue as to diminution in value?
4    The Code says diminution in value, and quite frankly, a cash
5    collateral order should just say if, to the extent there's
6    diminution in value, just apply the Code section.  It's
7    written there.  Smart people put it in, and Congress approved
8    it.  And once you start getting beyond that, those things
9    should be limited.
10       And what we have are lawyers trying to extend out by
11   definitions things that the Code limits by its reach.  That
12   goes for post-confirmation jurisdiction.  That goes for the
13   injunction.  That goes for the so-called gatekeeper provision.
14       And so, again, I would not be here if, in fact, they had
15   said, we have an injunction to the full extent allowed by the
16   Bankruptcy Code and *Pacific Lumber*.  We have an exculpation
17   provision that's allowed by virtue of the Court's order.  We
18   have the full extent and full reach of the Barton Doctrine.
19   Those are legitimate.  Once you start expanding upon that,
20   you're reaching into matters that are not authorized and not
21   allowed.
22       And then you get into 105 territory, which is always very
23   dangerous.  And that's really what's going on here.  And
24   that's the tenor of my argument and what I'm trying to say.
25   The Code gives protections.  It is not for us to extend the

169

1   protections. It's not for us to enlarge them, even under a,

2   gee, the other party's litigious.

3      And so that's -- let's take *Craig's Store*. Attempted to

4   limit its reach. *Craig's Store* says once you have a confirmed

5   plan, any dispute between the parties, for -- let's take an

6   executory contract. If there's a breach of the executory

7   contract, that's a matter to be handled aft... by another

8   court. It's not a matter to be handled by this Court. This

9   Court lets the parties out.

10      And in this case, it's even worse, because you basically

11   have a new general partner coming in, you have an assumption

12   of various executory contracts, and you have a -- Strand is no

13   longer present.

14      If you adopted Mr. Seery's argument, anybody who appeals a

15   decision, questions what he does or how he does it, is a

16   vexatious litigator. That's not the case. And the fact that

17   we are appealing a decision is a right that we have. It

18   shouldn't be limited, and it shouldn't be held against us.

19   Courts can rule against us. That's fine.

20      And so that's really what the focus is here and that's why

21   I gave the opening that I had. We are willing to be bound by

22   applicable law. And quite frankly, the concept that the

23   exigencies of a case allow a court to change what applicable

24   law is is problematic. I gave the criminal example as a

25   reason. And the reason was that, in certain instances, the

1   application of law may allow a criminal to go free.  It's a

2   problem with our system and how we work, but that's what the

3   law does, and it is absolute in its application.

4       Let me address the so-called gatekeeper provision.  The

5   gatekeeper provision, in a certain sense, is recognized in the

6   Barton Doctrine.  It's jurisdictional, and it says, to the

7   extent you're going to litigate with somebody who served

8   during the bankruptcy, who was a trustee, then you have to

9   come to the bankruptcy court and pass through a gate.  It

10  doesn't say you have to pass through a gate for a reorganized

11  debtor who does something after a plan is confirmed and going

12  forward.  And so that's -- there's a distinction.

13      And if you look at Judge Summerhays' decision, which I

14  will be happy to send to the Court, in *WRT* involving -- it's

15  kind of (indecipherable) and Mr. Pauker, where, in that case,

16  the trustee, the litigation trustee, spent more litigating

17  than it had in recoveries, and Baker Hughes filed suit.  Judge

18  Summerhays said, look, the Barton Doctrine only applies to a

19  certain extent.  It is limited once you get into post-

20  confirmation matters and related-to jurisdiction.

21      And so, again, the Barton Doctrine is what it stands for.

22  We agree with it, we recognize it, and it should be applied.

23  The Barton Doctrine, however, should not be extended, should

24  not go past its reach, and should not go past the grant of

25  jurisdiction for this Court.

1    And so you have in here, though they have -- they have

2  tried to hide it in a limited fashion, this gatekeeper

3  provision.  The gatekeeper provision, as currently written,

4  covers post-confirmation claims that somebody has to come

5  before this Court to the extent there's a breach of a

6  contract.  That's not proper, and it's not covered by your

7  post-confirmation jurisdiction.  To the extent there's an

8  interpretation of an existing contract and an interpretation

9  of the order, you do have authority, and I don't question

10  that.

11       THE COURT:  But address Mr. Pomerantz's statement

12  that there's a difference between saying you have to go to the

13  bankruptcy court and make an argument, we have a colorable

14  claim that we would like to pursue, and having that

15  jurisdictional step required.  There's a difference between

16  that and the bankruptcy court adjudicating the claim.

17       MR. DRAPER:  Well, there are two parts to that.

18  Number one is there's an injunction in place from an action

19  taken post-confirmation against property of the estate.  We

20  all agree at that, correct?  And we believe that the

21  injunction applies to post-confirmation action against

22  property of the pre-confirmation estate.  We all agree to

23  that.

24    However, if in fact there's a breach of a contract

25  postpetition that the parties have a dispute about, that

1   contract is now no longer under your purview once the contract

2   has been assumed.  And so they shouldn't have to make a

3   colorable claim to you that a breach of the contract has

4   occurred.  That should be the determining factor for another

5   court.

6       That's, in essence, what *Craig's Store* says.  Your

7   jurisdiction and the jurisdiction of a bankruptcy court is

8   limited.  It's limited by *Stern vs. Marshall*.  It's limited by

9   your ability to render findings of fact and conclusions of law

10  versus render a final decision.  That decision has been made

11  not by us, it's been made by Congress and it's been made by

12  the United States Constitution.

13          THE COURT:  All right.  And I think we all agree with

14  you regarding the holding of *Craig's Stores* and some of the

15  other post-confirmation bankruptcy subject matter jurisdiction

16  holdings.  But Mr. Pomerantz is arguing that this gatekeeping

17  function is warranted by, among other things, you know, there

18  was a district court holding, *Baum v. Blue Moon*, or a Fifth

19  Circuit case, that upheld a district court having the ability

20  to impose pre-filing injunctions in the context of a vexatious

21  litigator.  So, you know, that's a strong analogy he makes to

22  what's sought here.  What is your response to that?

23          MR. DRAPER:  My response to that is a district court

24  can do that.  A district court has jurisdiction to make that

25  decision.  And quite frankly, a district court can sanction a

1  vexatious litigator under Rule 11.

2      So, in fact -- again, you have to bifurcate your power

3  versus the power that a district court has.  And that

4  gatekeeper provision is allowed by a district court because

5  they had authority over the case.  You may not have authority

6  over being the gatekeeper for a post-confirmation matter that

7  you had no jurisdiction over to start with.

8          THE COURT:  Okay.

9          MR. DRAPER:  That, that's the distinction between

10  here.  That's -- what's going on here is they are -- they are

11  mashing together a whole load of concepts under the vexatious

12  litigator and the anti-Dondero function that fundamentally

13  abrogate the distinction between what your jurisdiction is

14  pre-confirmation versus your jurisdiction post-confirmation.

15  And that --

16          THE COURT:  Do you think --

17          MR. DRAPER:  -- is sacrosanct.

18          THE COURT:  Do you think Judge Lynn got it wrong in

19  *Pilgrim's Pride*?  Do you think Judge Houser got it wrong in

20  *CHC*?  Or do you think this situation is different?

21          MR. DRAPER:  There are two parts to that.  I have

22  told Judge Lynn, since I have been working with him, that I

23  think *Pilgrim's Pride* is wrongfully decided.  However, having

24  said that, *Pilgrim's Pride* and those cases dealt with claims

25  against the -- the channeling injunction affected actions

174

1  during the bankruptcy.  It did not serve as a post-

2  jurisdictional grant of jurisdiction to the bankruptcy court.

3  It did not pose as an ability -- as a limitation on a post-

4  confirmation litigator or a post-effective date litigator to

5  address a wrong done to them by an independent director of a

6  general partner.

7      In a sense, Judge Lynn's determination, and Judge Houser,

8  is consistent somewhat with the Barton Doctrine.  Now, do I

9  agree that they're right?  No.  But I understand the decision

10  and I understand the context in which it was rendered and I

11  don't have a huge problem with it.

12      So, again, let's parse what we're trying to do here.

13  Number one, we are -- we have to bifurcate post-confirmation

14  jurisdiction or post-effective date jurisdiction and what you

15  can do as a post-effective date arbiter versus what you could

16  do pre-effective date and pre-effective date claims.  And

17  again, that's the problem with what's written here.  It is

18  designed one hundred percent to expand your post-effective

19  date jurisdiction through both the gatekeeper provision and

20  the jurisdictional grant that's here from your pre-effective

21  date capability, your pre-effective date jurisdiction, and

22  your pre-effective date ability to either curb a claim or not

23  to curb a claim.  And that, that's the issue.

24      And again, let's start talking about the independent

25  directors.  I recognize, again, that there's an order there.

175

1  But if Mr. Seery -- let's take Mr. Seery -- is acting as a

2  director of Strand but is also an accountant for the Debtor

3  and makes a mistake, he would be sued in his capacity as the

4  accountant for the Debtor, not as an independent director of

5  Strand.  That distinction needs to be made.

6      What we are doing here under this plan, and what's been

7  argued by Mr. Pomerantz, is too broad a brush.  It needs to be

8  cut back.  The Court needs to take a very hard look at what's

9  being presented here.

10      And again, the Court's order is very clear.  And this is

11  binding.  I recognize that.  But the protection they got was

12  serving as an independent director.  The protection they

13  didn't get was -- let's take Mr. Seery, if Mr. Seery was

14  serving as an accountant and blew a tax return.  Those are

15  distinctions that warrant analysis and warrant looking at

16  here.  And again, it is too broad a brush that's touted here,

17  and that is why this plan on its face is not confirmable with

18  respect to both the post-confirmation jurisdiction, the

19  gatekeeper provision, the exculpation provisions.

20      And so let me address a few other things, just to address

21  them.  Number one, the argument has been made with respect to

22  the creditors and the resolicitation issue and that creditors

23  could have come in looking, seen, followed the case, and

24  basically calculated and made the same calculation that the

25  Debtor made when they filed this and put forth the new plan

176

1   analysis versus liquidation analysis.  And then they've also

2   made the argument, well, nobody came and complained.  Well,

3   two parts to that.

4        Number one, as you know, a disclosure statement needs to

5   be on its face and should not require a creditor to go back in

6   and monitor the record -- and quite frankly, in this record,

7   there are thousands of pages -- and do the calculation

8   himself.  This was incumbent upon the Debtor to possibly

9   resolicit when these material changes took place.

10       Number two, the recalculation has not been subject to the

11  entire creditor body seeing it.  And anybody who wanted to

12  call them would have had to have seen the document they filed

13  on February 1st and made a telephone call basically

14  contemporaneous with seeing it.

15       Those are two things.  The argument that they didn't call

16  me is just nonsensical.  There's nobody -- you, you are

17  sitting here -- and I've had a number of battles over the

18  years with Judge (indecipherable), who was -- who -- and her

19  view was, I'm here to protect the little guy who's not --

20  didn't hire counsel, who's not represented by Mr. Clemente and

21  his huge clients who have voted in favor of the plan.  It's

22  the little person, *i.e.*, the employees who would vote against

23  a plan that they so -- so desperately tried to get out from

24  under.

25            THE COURT:  Well, --

177

1          MR. DRAPER:  It's really a function --

2          THE COURT:  -- Mr. Pomerantz argues it's not as

3     though there was a materially adverse change in treatment; it

4     was the disbursement estimate.  And doesn't every Chapter 11

5     plan -- most Chapter 11 plans, not every -- they make an

6     estimate.  I mean, and it's, frankly, it's very often a big

7     range of recovery, right, a big range of recovery, because we

8     don't know what the allowed claims are going to compute to at

9     the end of the day.  There's obviously liquidation of assets.

10    We don't know.  Isn't this sort of like every -- not, again,

11    not every other plan, but most other plans -- where there's a

12    big range of possible estimated distributions?  I mean, this

13    wasn't a change in treatment, right?

14         MR. DRAPER:  Well, let me address that.  There are

15    two parts to that.  Most plans I see that contain some sort of

16    analysis have a range.  This one doesn't have a range.  What

17    they've done is they've buried in a footnote or assumption

18    that these numbers may change.  So had they said, look, your

19    recovery can go from 60 cents to 85 cents, God bless, they

20    probably would have been right.

21        Number two, which is more problematic to me, to be honest

22    with you, is the fact that, number one, the operating expenses

23    have increased over a hundred percent.  And number two, the

24    Debtor has made a determination post-disclosure statement and

25    pre-hearing that they're going to change their model of

178

1  business.

2      The original disclosure statement said we're not going to

3  get into the managing CLO part of the business and we're going

4  to let these contracts go.  However, at some point along the

5  way, they made a change.  I don't know to this day, because I

6  was never furnished the backup to the expense side.  I

7  understand what they said why they didn't give me the asset

8  side, but the expense side, they should have given me, and I

9  did ask for.

10     But, you know, what we have now is a more fundamental

11 problem with the execution of the plan and the expectation

12 that creditors -- what they're going to get, because, in fact,

13 the expense items have doubled.

14     I think creditors were entitled to know that, rather than

15 it having been sprung upon everybody, when I got it the day

16 before a deposition.  And so those are things that I think

17 warranted a change in solicitation.  Now, the result may have

18 been the same.  I don't know.  More people may have voted

19 against the plan.  More people may have opted in from Class 8

20 to Class 7, I mean, based upon that information.  That

21 information was not provided to them.

22     And so I look at two -- three things.  One is a range

23 could have been given, and they probably would have been a

24 whole lot better off.  Two, you have a material change in

25 expenses.  And three, you have a material change in business

179

```
 1   model.  Three things that occurred between November and this
 2   confirmation hearing.  Three things that were not known by the
 3   creditor body and not told to them.
 4               THE COURT:  Mr. Draper, I --
 5               MR. DRAPER:  Now, it may have been told --
 6               THE COURT:  I don't want to belabor this any more
 7   than I think we need to, but I've got a Creditors' Committee
 8   with very sophisticated professionals, very sophisticated
 9   members.  They're fiduciaries to this constituency.  You know,
10   you mentioned the little guy.  I'm not quite sure who is the
11   little guy in this case.  I think it's a case of all big guys.
12   But, I mean, they're fine with what's happened here.
13   Meanwhile, you -- I mean, clarify your standing here for
14   Dugaboy and Get Good.  I mean, --
15               MR. DRAPER:  I have --
16               THE COURT:  -- I know you have standing.  Mr.
17   Pomerantz did not say you don't have standing.  But in
18   pointing out the economic interests here, I think he said your
19   clients only have asserted a postpetition administrative
20   expense.  Is that correct?
21               MR. DRAPER:  No.  I have a post -- I have an -- I
22   have a claim that's been objected to.  I don't think my
23   economic --
24               THE COURT:  A claim of what amount?
25               MR. DRAPER:  I think it's $10 million.  But Mr.
```

180

1  Pomerantz is right, it requires a looking through the --

2  through the entity that I had a loan relationship with.

3      I recognize all of those things.  I don't think that's

4  relevant to whether my argument is correct or incorrect.  I

5  have standing to do it.  I don't think whether my claim is 50

6  cents or $50 million should change the Court's view of whether

7  the claim is good or bad.

8          THE COURT:  Well, I do want to understand, though.

9  Okay.  So you have not asserted an administrative expense,

10  correct?

11          MR. DRAPER:  No.  There's been an administrative

12  expense that's been asserted, --

13          THE COURT:  For what?

14          MR. DRAPER:  -- but that --

15          THE COURT:  For what?

16          MR. DRAPER:  I don't have the number in front of me,

17  Your Honor.  I don't -- I don't have those numbers --

18          THE COURT:  Okay.  Well, then, --

19          MR. DRAPER:  -- in front of me.  I have asserted --

20          THE COURT:  -- what is the concept?  What is the

21  basis for it?

22          MR. DRAPER:  It deals with -- Mr. Pomerantz is

23  absolutely right as to how he's articulated it.

24          THE COURT:  I can't remember what he said.

25          MR. DRAPER:  It deals with -- it deals with a

181

1   transaction that's unrelated to the Debtor that deals with

2   Multi-Strat.  I agree with that.

3           THE COURT:  Okay.  So I remember him saying piercing

4   the corporate veil.  Your trusts -- both of them, one of them,

5   I don't know -- engaged in a transaction with Multi-Strat that

6   you say --

7           MR. DRAPER:  No, that --

8           THE COURT:  -- gave -- okay.  Well, you say Multi-

9   Strat is liable and the Debtor is also liable?

10          MR. DRAPER:  No.  Let me make two things.  The

11  administrative claim deals with a Multi-Strat transaction that

12  took place during the bankruptcy.  My unsecured claim deals

13  with a transaction that took place prior to the bankruptcy,

14  where we lent money to another entity that then funneled money

15  out into the Debtor.  We're -- our contention is that the

16  Debtor is liable for that loan.

17          THE COURT:  All right.  So both the administrative

18  expense as well as the prepetition claim require veil-piercing

19  to establish liability of the Debtor?

20          MR. DRAPER:  Or single business enterprise.  I don't

21  necessarily have to veil-pierce.

22          THE COURT:  Okay.  I'm not even sure that single

23  business enterprise is completely available anymore in Texas,

24  by the Texas legislature doing different things, assuming

25  Texas law applies.  I don't know, maybe Delaware does.  But I

182

1  -- sorry.  Just let me let that sink in a little bit.  You're

2  -- okay.  Okay.  Let me let it --

3          MR. DRAPER:  Your Honor, I --

4          THE COURT:  -- sink in a little bit.

5          MR. DRAPER:  Okay.

6          THE COURT:  These trusts -- of which Mr. Dondero is

7  the beneficiary ultimately, right?

8          MR. DRAPER:  Yes.  Well, and to --

9          THE COURT:  So, your --

10         MR. DRAPER:  Again, I have not gone up --

11         THE COURT:  The beneficiary of your client --

12         MR. DRAPER:  Mr. Dondero is --

13         THE COURT:  The beneficiary of your client is

14 ultimately hoping to succeed on the administrative expense and

15 the claim on the basis that you should disregard the

16 separateness of Highland and these other entities?

17         MR. DRAPER:  Well, let's take the --

18         THE COURT:  When he's resisted that --

19         MR. DRAPER:  -- unsecured claim.  The --

20         THE COURT:  -- in multiple pieces of litigation?

21 Right?  I'm sorry.  I'm just trying to let this sink in.

22 Okay.  If you could elaborate.  I'm sorry.  I'm talking too

23 much.  You answer me.

24         MR. DRAPER:  Okay.  What we are saying is that, in

25 essence, the party we lent the money to was a conduit for the

183

1  Debtor.

2           THE COURT:  Okay.  And who was that entity that

3  either --

4           MR. DRAPER:  Highland Select.

5           THE COURT:  -- Dugaboy or Get Good lent money to?

6           MR. DRAPER:  The Get Good claim is completely

7  different.  The Get Good claim is written as a tax claim.

8  Honestly, I haven't taken a hard look at it.  I will, once we

9  get through this, and it may be withdrawn.  The Dugaboy claim

10 is a claim that arises through a conduit loan.

11          THE COURT:  Okay.  But to which entity?

12          MR. DRAPER:  Highland Select.

13          THE COURT:  Okay.  All right.  Well, continue with

14 your argument.  I'll get my flow chart out and --

15          MR. DRAPER:  Well, let me -- again, I think I've made

16 the points that I needed to make.  I think I've done it in a

17 sense that you -- what I think the Court needs to do is take a

18 very hard look at the jurisdictional extension that's being

19 granted here.  I think the exculpation provision, in and of

20 itself, just by the mere inclusion of Pachulski and the

21 Debtor's professionals and the Committee professionals, is

22 just unconfirmable.  It has to be stricken.

23     And I think the injunction and the juris... the gatekeeper

24 provision are not allowed by applicable law.  If this plan

25 merely said, we will enforce the Barton Doctrine, we will

184

1   abide -- and this order the Court has entered stands, the

2   injunction that's provided and the rights that we have under

3   1141 stand, nobody would be objecting.  That's why the U.S.

4   Trustee has objected, because of the expansive nature of what

5   the -- what's been done in this plan.

6       And with that, I'll turn it over to Mr. Taylor or Davor.

7           THE COURT:  All right.  Who's next?

8           MR. RUKAVINA:  Your Honor, Davor Rukavina.  Can you

9   hear me?

10          THE COURT:  I can.

11     CLOSING ARGUMENT ON BEHALF OF CERTAIN FUNDS AND ADVISORS

12          MR. RUKAVINA:  Your Honor, thank you.  I'll try not

13  to repeat the arguments from Mr. Draper, but I do want to

14  point out a couple bigger-picture issues, I think.

15      One, the issue today is not Mr. Dondero, what he has been

16  alleged to have done, what he is alleged to do in the future.

17  The Debtor has gone out of its way to create the impression

18  that we're all tentacles, we're vexatious litigants, we're

19  frivolous litigants.  The issue today is whether this plan is

20  confirmable under 1129(a) and 1129(b).  And I think that that

21  has to be the focus.

22      Nor is the issue, I think, today any motivation behind my

23  objection or Mr. Draper's or anything else.

24      And I do take issue that my motivation or my client's

25  motivation has some ulterior motive for a competing plan or

185

1    burning down the house or anything like that.  It's very, very

2    simple.  My clients do not want $140 million of their money

3    and their investors' money, to whom they owe fiduciary duties,

4    to be managed by a liquidating debtor under new management

5    without proper staffing and with an obvious conflict of

6    interest in the form of Mr. Seery wearing two hats.

7         I respect very much that Mr. Seery wants to monetize

8    estate assets for the benefit of the estate creditors.  That's

9    his job.  That's incompatible with his job under the Advisers

10   Act and, as he said, to maximize value to my clients and over

11   a billion dollars of investments in these CLOs.

12        That should not be, Your Honor, a controversial

13   proposition.  I should not be described as a tentacle or

14   vexatious because my clients don't want their money managed by

15   someone that they, in effect, did not contract with.  I may be

16   -- I may lose that argument.  The CLOs have obviously

17   consented to the assumption.  But my argument should not be

18   controversial.  It should not be painted with a broad brush of

19   somehow being done in bad faith by Mr. Dondero.

20        And in fact, Mr. Seery has admitted that the Debtor and he

21   are fiduciaries to us.  The fact that today they call us

22   things like tentacles and serial litigants and vexatious

23   litigants -- we all know what a vexatious litigant is.  We've

24   all dealt with those.  The fact that our fiduciary would call

25   us that just reconfirms that it should have no business

1   managing our or other people's money.

2       And then for what?  Mr. Seery has basically said that the

3   Debtor will make some $8.5 million in revenue from these

4   contracts, net out $4 million of expenses.  That's net profit

5   of $4.5 million.  But then they have to pay $3.5 million for

6   D&O insurance and $525,000 in cure claims.  But it's the

7   Debtor's business decision, not ours.

8       Your Honor, the second issue is the cram-down of Class 8.

9   There are two problems here:  the disparate treatment between

10  Class 7 and Class 8, which also raises classification, and

11  then the absolute priority rule.  Class 7 is a convenience

12  class claim -- is a convenience claim, Your Honor, with a $1

13  million threshold.  Objectively, that is not for

14  administrative convenience, as the Code allows.  And the only

15  evidence as to how that million dollars was arrived at was,

16  oh, it was a negotiation of the Committee.

17      There is no evidence justifying administrative

18  convenience.  Therefore, there is no evidence justifying

19  separate classification.  And on cram-down, the treatment has

20  to be fair and equitable, which *per se* it is not if there is

21  unfair discrimination.  And there is unfair discrimination,

22  because Class 8 will be paid less.

23      On the absolute priority rule, Your Honor, I think that

24  it's very simple.  I think that the Code is very clear that

25  equity cannot retain anything -- I'm sorry, equity cannot

187

1  retain any property or be given any property.  Property is the

2  key word in 1129(b), not value.  It doesn't matter that this

3  property may not have any value, although Mr. Seery said that

4  it might.  What matters is whether these unvested contingent

5  interests in the trust are property.  And Your Honor, they are

6  property.  They have to be property.  They are trust

7  interests.

8      So the absolute priority rule is violated on its face.

9  There is no evidence that unsecured creditors in Class 8 will

10 receive hundred-cent dollars.  The only evidence is that

11 they'll receive 71 cents.  Mr. Seery said there's a potential

12 upside from litigation.  He never quantified that upside.  And

13 there is zero evidence that Class 8 creditors are likely to be

14 paid hundred-cent dollars.  So, again, you have the absolute

15 priority rule issue.

16     And this construct where, okay, well, equity won't be in

17 the money unless everyone higher above is paid in full, that

18 is just a way to try to get around the dictate of the absolute

19 priority rule.  If that logic flies, then the next time I have

20 a hotel client or a Chapter 11 debtor-in-possession client

21 where my equity wants to retain ownership, I'll just create

22 something like, well, here's a trust, creditors own the trust,

23 I won't distribute any money to equity, and equity can just

24 stay in control.

25     The point again is that this is property and it's being

188

1   received on account of prepetition equity.

2       And there's also the control issue.  The absolute priority

3   rule, the Supreme Court is clear that control of the post-

4   confirmation equity is also subject to the absolute priority

5   rule.  Here you have the same prepetition management

6   postpetition controlling the Debtor and the assets.

7       Your Honor, the Rule 2015.3 issue, someone's going to say

8   that it's trivial.  Someone's going to accuse me of pulling

9   out nothing to make something.  Your Honor, it's not trivial.

10  That's part of the problem in this case, that this Debtor owns

11  other entities that own assets, and there's been precious

12  little window given into that during the case, during this

13  confirmation hearing, and in the disclosure statement.

14      Rule 2015.3 is mandatory.  It's a shall.  I respect very

15  much Mr. Seery's explanation that there was a lot going on

16  with the COVID and with everything and that it just fell

17  through the cracks.  That's an honest explanation.  But the

18  Rule has not been complied with.  And 1107(a) requires that

19  the debtor-in-possession comply with a trustee's duties under

20  704(a)(8).  Those duties include filing reports required by

21  the Rules.

22      So we have an 1129(a)(3) problem, Your Honor, because this

23  plan proponent has not complied with Chapter 11 and Title 11.

24  I'll leave it at that, because I suspect, again, someone will

25  accuse me of being trivial on that.  It is not trivial.  It is

189

1    a very important rule.

2        On the releases and exculpations, Your Honor, I'm not

3    going to try -- I'm not going to hopefully repeat Mr. Draper.

4    But there's a couple of huge things here with this exculpation

5    that takes it outside of any possible universe of *Pacific*

6    *Lumber*.

7        First, you have a nondebtor entity that is being

8    exculpated.  I understand the proposition that, during a

9    bankruptcy case, the professionals of a bankruptcy case might

10   be afforded some protection.  I understand that proposition.

11   But here you have Strand and its board that's a nondebtor.

12       The other thing you have that takes this outside of any

13   plausible case law is that the Debtor is exculpated from

14   business decisions, including post-confirmation.  I understand

15   that professionals in a case make decisions, and

16   professionals, at the end of the case, especially if the Court

17   is making findings about a plan's good faith, that

18   professionals making decisions on how to administer an estate

19   ought to have some protection.

20       That does not hold true for whether a debtor and its

21   professionals should have protection for how they manage their

22   business.  GM cannot be exculpated for having manufactured a

23   defective product and sold it during its bankruptcy case.

24       Here, I asked Mr. Seery whether this language in these

25   provisions, talking about whether the administration of the

190

1  estate and the implementation of the plan includes the

2  Debtor's management of those contracts and funds.  He said

3  yes.  He said yes.  So if you look at the exculpation

4  provision, it is not limited in time.  It affects, Your Honor,

5  I'm quoting, it affects the implementation of the plan.

6  That's going forward.

7      So you are exculpating the Debtor and its professionals

8  from business decisions, including post-confirmation, from

9  negligence.  Well, isn't negligence the number one protection

10 that people that have invested a billion dollars with the

11 Debtor have?  It's cold comfort to hear, well, you can come

12 after us for gross negligence or theft.  I get that.  What

13 about negligence?  Isn't that what professionals do?  Isn't

14 that why professionals have insurance, liability insurance?

15 It's called professional negligence for malpractice.

16     So this exculpation, let there be no mistake -- I heard

17 Your Honor's view and discussion -- this is a different

18 universe, both in space and in time.

19     And we don't have to worry about *Pacific Lumber* too much

20 because we have the *Dropbox* opinion in *Thru, Inc.*  We have

21 that opinion.  Whether it's sound law or not, I don't wear the

22 robe.  But the exculpation provision in that case was

23 virtually identical.  And Your Honor, that's a 2018 U.S. Dist.

24 LEXIS 179769.  In that opinion, Judge Fish -- I don't think

25 anyone could say that Judge Fish was not a very experienced

191

1    district court judge -- Judge Fish found that the exculpation

2    violated Fifth Circuit precedent.  That exculpation covered

3    the debtor's attorneys, the debtor, the very people that Mr.

4    Pomerantz is now saying, well, maybe the Fifth Circuit would

5    allow an exculpation for.

6           THE COURT:  Well, I think he is relying heavily on

7    the analogy of independent directors to Creditors' Committee

8    members, saying that's a different animal, if you will, than

9    prepetition officers and directors.  And he thinks, given the

10   little bit of policy analysis put out there by the Fifth

11   Circuit, they might agree that that's analogous and worthy of

12   an exculpation.

13          MR. RUKAVINA:  And they might.  And they might.  And

14   again, I usually do debtor cases.  You know that.  I'd love to

15   be exculpated.

16          THE COURT:  But --

17          MR. RUKAVINA:  And I think, again, I do -- I do --

18          THE COURT:  -- I really want people to give me their

19   best argument of why, you know, that's just flat wrong.  And

20   Mr. Draper just said it's, you know, there's a categorical --

21          MR. RUKAVINA:  Yeah.

22          THE COURT:  -- rejection of exculpations except for

23   Committee members and Committee in *Pacific Lumber*.  And I'm

24   scratching my head on that one.  And partly the reason I am,

25   while 524(e) was thrown out there, the fact is there's nothing

192

1   explicitly in the Bankruptcy Code, right, that explicitly

2   permits exculpation to a Committee or Committee members.

3   There's just sort of this notion, you know, allegedly embodied

4   in 1103(c), or maybe there are cases you want to cite to me,

5   that they're fiduciaries, they're voluntary fiduciaries, they

6   ought to have qualified immunity.

7       And again, I see it as more of a policy rationale the

8   Fifth Circuit gave than pointing to a certain statute.  So if

9   it's really a policy rationale, then I think the analogy given

10  here to a newly-appointed independent board is pretty darn

11  good.

12      So tell me why I'm all wrong, why Mr. Pomerantz is all

13  wrong.

14          MR. RUKAVINA:  I am not going to tell you that you're

15  all wrong.  I'm not going to tell Mr. Pomerantz that he's all

16  wrong.  Although I am, I guess, a Dondero tentacle, I am not a

17  Mr. Draper tentacle, and I happen to disagree with him.

18  That's my right.  I respect the man very much.  I thought he

19  did a very honorable and ethical job explaining his position

20  to Your Honor.  I believe that the Fifth Circuit would approve

21  exculpations for postpetition pre-confirmation matters taken

22  by estate fiduciaries.  I do believe that they would.  And I

23  do believe that that should be the case.

24      But again, I'm telling you that this one is different.

25  It's -- Mr. Pomerantz is misdirecting you.  The estate

193

1  professionals manage the estate.  The Debtor manages its

2  business.  It goes out into the world and it manages business.

3  And as Your Honor knows, under that 1969 Supreme Court case,

4  of course I blanked, and under 28 U.S. 959, a debtor must

5  comply, when it's out there, with all applicable law.

6       So if the Debtor -- and I'm making this up, okay?  I am

7  making this up.  I'm not alleging anything.  But if the

8  Debtor, through actionable neglect, lost $500 million of its

9  clients' or its investor clients' money, I'm telling you that

10  under no theory can that be exculpated, and I'm telling you

11  that that's what this provision does.

12       The estate and the Debtor can release their claims.  It

13  happens all the time.  Whatever -- whatever claims the estate

14  may have against professionals, those can be released.  It's a

15  9019.  I'm not complaining about that.  Although I do think

16  that it's premature in this case, because we don't know

17  whether there's any liability for the $100 million that Mr.

18  Seery told you Mr. Dondero lost.  But in no event can business

19  -- business --

20            THE COURT:  I don't understand what you just said.

21            MR. RUKAVINA:  Your Honor, I --

22            THE COURT:  Mr. Dondero is not released --

23            MR. RUKAVINA:  -- went through Mr. Seery's --

24            THE COURT:  -- by the estate.

25            MR. RUKAVINA:  I understand.  I understand.  But we

194

1   all have to also understand that a board of directors and

2   officers can be liable, breaches of fiduciary duty by not

3   properly managing an employee.  So I'm not suggesting -- I

4   mean, I know that there's been an examiner motion filed.  I'm

5   not suggesting that we have a mini-trial.  I'm not suggesting

6   there's actionable conduct.  What I'm telling you is that the

7   evidence shows that there's a large postpetition loss.  And

8   it's premature to prevent third parties that might have claims

9   from bringing those.

10      And then I think -- I'm not sure that Your Honor

11  understood my point.  Let me try to make it again.  This

12  exculpation is not limited in time.  This exculpation is

13  expressly not limited in time and applies to the

14  administration of the plan post-confirmation.  I don't think

15  under any theory would the Fifth Circuit or any court at the

16  appellate level allow an exculpation for purely post-

17  reorganization post-bankruptcy matters.  I have nothing more

18  to tell Your Honor on exculpation.

19          THE COURT:  Well, again, I -- perhaps I go down some

20  roads I really don't need to go down here, but I'm not sure I

21  read it the way you did.  I thought we were just talking about

22  pre -- postpetition, pre-confirmation.  Or pre-effective date.

23          MR. RUKAVINA:  Your Honor, Page --

24          THE COURT:  The --

25          MR. RUKAVINA:  Page 48 of the plan, Section C,

195

1    Exculpation.  Romanette (iv).  The implementation of the plan.

2    And I -- and that's -- that's part of why I asked Mr. Seery

3    that yesterday.  Does the implementation of the plan, in his

4    understanding, include the Reorganized Debtor's management and

5    wind-down of the Funds, and he said yes.

6             THE COURT:  Okay.

7             MR. RUKAVINA:  So that's right there in black and

8    white.

9        It also includes the administration of the Chapter 11

10   case.  If that is defined broadly, as Mr. Seery wants it to

11   be, to define business decisions, then that also exceeds any

12   permissible exculpation.

13       So, again, I'm telling Your Honor, with due respect to you

14   and to Mr. Pomerantz, that the focus of Your Honor's

15   questioning is wrong.  The focus of Your Honor's questioning

16   should be on exculpation from what?  From business -- *i.e.*, GM

17   manufacturing and selling the car -- or from management of the

18   bankruptcy case?  Management of the bankruptcy case?  Okay.

19   Postpetition pre-confirmation managing business, never okay.

20       Your Honor, on the channeling -- and let me add, I think

21   it's very clear, there is no Barton Doctrine here.  This is

22   not a Chapter 11 trustee.  The Barton Doctrine does not

23   extend to debtors-in-possession.  And I can cite you to a

24   recent case, *In re Zaman*, 2020 Bankr. LEXIS 2361, that

25   confirms that the Barton Doctrine does not apply to a debtor-

196

1  in-possession.

2     I want to --

3          THE COURT:  Remind me of that --

4          MR. RUKAVINA:  -- discuss, Your Honor, the --

5          THE COURT:  Remind me of the facts of that case.  I

6  feel like I read it, but -- or saw it in the advance sheets,

7  maybe.

8          MR. RUKAVINA:  I honestly do not recall.  I read it a

9  few days ago, and since then, I hope Your Honor can

10  appreciate, I've been up very late trying to negotiate

11  something good in this case.

12          THE COURT:  I'd like to know --

13          MR. RUKAVINA:  So, I mean, I have the case in front

14  of me.

15          THE COURT:  I'd like to know about a holding that

16  says Barton Doctrine can't be applied in a Chapter 11 post-

17  confirmation context, if that's --

18          MR. RUKAVINA:  Well, I have it --

19          THE COURT:  -- indeed the holding.

20          MR. RUKAVINA:  I have it right in front of me here,

21  Your Honor, and I can certainly -- all I know is that this

22  case held that -- it rejected the notion that the Barton

23  Doctrine applies to a debtor-in-possession.

24          THE COURT:  Okay.

25          MR. RUKAVINA:  And maybe --

1           THE COURT:  That --

2           MR. RUKAVINA:  There it is, right there.

3           THE COURT:  What judge?

4           MR. RUKAVINA:  Your Honor, it is the Southern

5    District of Florida, and it is the Honorable -- Your Honor, it

6    is the Honorable Mindy Mora.

7           THE COURT:  Okay.

8           MR. RUKAVINA:  M-O-R-A.

9           THE COURT:  Okay.

10          MR. RUKAVINA:  I have not had the pleasure of being

11   in front of that judge.

12       Your Honor, let me discuss the channeling injunction.

13   This is the big one for me.  This is the big one.  And I think

14   we have to begin -- and it's the big one, as I'll get to,

15   because Your Honor knows that the CLO management agreements

16   give my clients certain rights, and this injunction would

17   prevent those rights from being exercised post-confirmation.

18   It's not dissimilar from the PI hearing that we're in the

19   middle of in an adversary.

20       But I begin my analysis, again, with 28 U.S.C. 959.  Your

21   Honor, that -- the first sentence of that statute makes it

22   very clear that when it comes to carrying on a business, a

23   debtor-in-possession may be sued without leave of the court

24   appointing them.

25       So the first thing that this channel -- gatekeeper,

198

1  channeling, I don't mean to miscall it -- the first thing that

2  this gatekeeping injunction does is it stands directly

3  opposite to 28 U.S.C. 959.

4      28 U.S.C. 959 also says that jury rights must be

5  preserved.  As I'll argue in a moment, this injunction also

6  affects those rights.

7      In addition to 959, we have the fundamental issue of post-

8  confirmation jurisdiction.  As Mr. Draper said, here, this

9  channeling injunction applies to post-confirmation matters.

10  Similar to my answer to you on exculpation, I can see there

11  being a place for a channeling injunction during the pendency

12  of a case or for claims that might have arisen during the

13  pendency of a case.  I cannot see that, and I don't know of

14  any court that, at least at a circuit level, that would agree

15  that this can apply post-confirmation.

16      It is, again, the equivalent of GM manufacturing a car

17  post-confirmation and having to go to bankruptcy court because

18  someone's wanting to sue it for product negligence or

19  liability.  It's unthinkable.  The reason why a debtor exits

20  bankruptcy is to go back out into the community.  It's no

21  longer under the protection of the bankruptcy court.  That's

22  what the media calls Chapter 11, it calls it the protection of

23  the court.  There's no such protection post-reorganization.

24  So, --

25          THE COURT:  Is that really analogous, Mr. Rukavina?

199

1  Let's get real.  Is this really analogous --

2          MR. RUKAVINA:  It is.

3          THE COURT:  -- to GM --

4          MR. RUKAVINA:  It is.

5          THE COURT:  -- manufacturing thousands of cars?

6          MR. RUKAVINA:  It absolutely is analogous.  Because

7  this Debtor is going to assume these contracts and it is going

8  to go out there and it is going to make daily decisions

9  affecting a billion dollars of other people's money.  Each of

10 those decisions hopefully will be done correctly and make

11 everyone a lot of money, but each of those decisions is the

12 potential for claims and causes of action.

13     So it is analogous, Your Honor.  They want my clients and

14 others to come to you for purely post-confirmation matters.

15 The Court will not have that jurisdiction.  There will be no

16 bankruptcy estate, nor can the Court's limited jurisdiction to

17 ensure the implementation of the plan go to and affect a post-

18 confirmation business decision.

19     That's the distinction.  The Debtor's post-confirmation

20 business is not the implementation of a plan.  As Mr. Draper

21 said, there's a new entity.  There's a new general partner.

22 There's a new structure.  Go out there and do business,

23 Debtor.  That's what they're telling you.  They're telling you

24 this is not a liquidation because they're going to be in

25 business.  Okay.  Well, the consequence of that is that

200

1  there's no post-confirmation jurisdiction.

2      Now, Mr. Pomerantz says, and I think you asked Mr. Draper,

3  well, the jurisdiction to adjudicate whether something is

4  colorable is different from the jurisdiction to adjudicate the

5  underlying matter.  Your Honor, I don't understand that

6  argument, and I don't see a distinction.  If the Court has no

7  jurisdiction to decide the underlying matter, then how can the

8  Court have any jurisdiction to pass on any aspect of that

9  underlying matter?

10      And whether something is colorable is a fundamental issue

11  in every matter.  That's the thing that courts look at in a

12  12(b)(6), in a Rule 11 issue, in a 1927 issue.  So they're

13  going to come -- or someone is going to have to come to Your

14  Honor and present evidence and law that something is

15  colorable.  Let's say that we've said there's a breach of

16  contract.  Aren't we going to have to show you, here's the

17  contract, here's the language, here's the facts giving rise to

18  the breach, here's the elements?  And Your Honor is going to

19  have to pass on that.  And if Your Honor decides that

20  something is not colorable, then there ain't no step two.

21      And if Your Honor decides that something is colorable,

22  then isn't that going to be binding on the future proceeding?

23  And if it's going to be binding on the future proceeding, then

24  of course you're exercising jurisdiction to adjudicate an

25  aspect of that lawsuit.

201

1      I don't think that that -- I don't know I can be clearer

2    than that, Your Honor, unless the Debtor has some other

3    understanding of what a colorable claim or cause of action is

4    that I'm misunderstanding.

5      And Your Honor, I would ask, when Your Honor is in

6    chambers, to look at one of these CLO management agreements.

7    I'm sure Your Honor has already.  I just pulled one out of the

8    Debtor's exhibits, Exhibit J as in Jason.  And Section 14, 14

9    talks about termination for cause.  Most of these contracts

10   are for cause.  So, Your Honor, cause includes willfully

11   breaching the agreement or violating the law, cause includes

12   fraud, cause includes a criminal matter, such as indictment.

13     So let's imagine, Your Honor, that I come to you a year

14   from now and I say, I would like to terminate this agreement

15   because I don't want the Debtor managing my $140 million

16   because of one of these causes.  What am I going to argue to

17   Your Honor?  I'm going to argue to Your Honor that those

18   causes exist.  And Your Honor is going to have to pass on

19   that.

20     And if Your Honor says they don't exist, again, I'm done.

21   I just got an effective final ruling from a federal judge that

22   my claim is without merit.  I'm done.  Your Honor has decided

23   the matter effectively, legally, and finally.

24     That's why, when Mr. Pomerantz says that the jurisdiction

25   to adjudicate the colorableness of a claim is different from

202

1    adjudicating that claim, it's not correct.  They're part of

2    the same thing, Your Honor.

3        We strenuously object to that injunction, we think it's

4    unprecedented, and we strenuously object to that injunction

5    because we are not Mr. Dondero.

6        I understand the January 9th order.  I'll let Mr.

7    Dondero's counsel talk about why that was never intended to be

8    a perpetual order.  I'll let Mr. Dondero's counsel argue as to

9    why the extension of that order *ad infinitum* in the plan is

10   illegal.

11       But even if Mr. Dondero is enjoined in perpetuity from

12   causing the related parties to terminate these agreements,

13   Your Honor, the related parties themselves are not subject to

14   that injunction.  That's why you have the preliminary

15   injunction proceeding impending in front of you on ridiculous

16   allegations of tortious interference.

17       So whether the Court enjoins Mr. Dondero or not in

18   perpetuity is a separate matter.  The question is, as you've

19   heard, at least my retail clients, they have boards.  Those

20   boards are the final decision-makers.  Mr. Dondero is not on

21   those boards.

22       In other words, it is wrong to conclude *a priori* that

23   anything that my clients do has to be at the direction of Mr.

24   Dondero.  There is no evidence of that.  The evidence is to

25   the contrary.

1     Yes, a couple of my clients, the Advisors are controlled

2   by Mr. Dondero.  Mr. Norris testified to that.  You'll not

3   find Mr. Norris anywhere testifying in that transcript that

4   Your Honor allowed into evidence that the funds, my retail

5   fund clients are controlled by Mr. Dondero.  You won't find

6   that evidence.  There was no evidence yesterday or today that

7   Mr. Dondero controls those retail funds.  The only evidence is

8   that they have independent boards.

9     So I ask the Court to see that it's a little bit of a

10  sleight of hand by the Debtor.  If I am to be enjoined or if I

11  am to have to come to Your Honor in the future as a vexatious

12  litigant or a tentacle or a frivolous litigant, whatever else

13  I've been called today, then let it be because of something

14  that I've done or failed to do, something that my client has

15  done to warrant such a serious remedy, not something that Mr.

16  Dondero is alleged to have done.

17    And what have my clients done, Your Honor?  What have we

18  done to be called vexatious litigants and serial litigants?

19  We've done nothing in this case, pretty much, until December

20  16th, when we filed a motion that was a poor motion,

21  unfortunately, the Court found it to be frivolous, and the

22  Court read us the riot act.

23    We refused, on December 22nd, we, my clients' employees,

24  to execute two trades that Mr. Dondero wanted us to execute.

25  We had no obligation to execute them.  We knew nothing about

204

1  them.  And Mr. Seery -- I'm sorry.  Not Mr. Dondero, that Mr.

2  Seery wanted to execute.  And Mr. Seery closed those

3  transactions that same day.  And then a professional lawyer at

4  K&L Gates, a seasoned bankruptcy lawyer, sent three letters to

5  a seasoned professional lawyer at Pachulski, and the letters

6  were basically ignored.

7      Okay.  Those are the things that we've done.  Other than

8  that, we've defended ourselves against a TRO, we've defended

9  ourselves against a preliminary injunction, we will continue

10 to defend ourselves against a preliminary injunction, and we

11 defend ourselves against this plan because it takes away our

12 rights.  Is that vexatious litigation?  Is that, other than

13 the frivolous motion, is that frivolous litigation?

14     And we heard you loud and clear when you read us the riot

15 act on December 16th.  And I will challenge any of these

16 colleagues here today to point me to something that we have

17 filed since then that is in any way, shape, or form arguably

18 meritless.

19     So where is the evidence that my retail funds are

20 tentacles or vexatious litigants or anything else?  There is

21 no evidence, Your Honor, and the Debtor is doing its best to

22 give you smoke and mirrors to just make that mental jump from

23 Mr. Dondero to my clients, effectively an alter ego, without a

24 trial on alter ego.

25     Once these contracts are assumed, the Debtor must live

205

1   with their consequences.  It's as simple as that.  Your Honor

2   has so held.  Your Honor has so held forcefully in the *Texas*

3   *Ballpark* case.  And the Court, I submit respectfully, cannot

4   excise by an injunction a provision of a contract.

5       Also, this injunction will -- is a permanent injunction.

6   We know from *Zale* and other cases the Fifth Circuit does

7   permit certain limited plan injunctions that are temporary in

8   hundred-cent plans.  This is a permanent one.  It doesn't even

9   pretend to be a temporary one.

10      It's also a permanent one because the Debtor knows and I

11  think the Debtor is banking on me being unable to get relief

12  in the Fifth Circuit before Mr. Seery is finished liquidating

13  these CLOs.

14      So what we are talking about today is effectively excising

15  valuable and important negotiated provisions of these

16  contracts, provisions that, although my clients are not

17  counterparties to these contracts, you've heard from at least

18  three of them we do control the requisite vote, the voting

19  percentages, to cause a termination, to remove the Debtor, or

20  to seek to enforce the Debtor's obligations under those

21  contracts.

22      And again, Your Honor, it's very simple.  Where those

23  contracts require cause, there either is cause or is not

24  cause.  If there is not cause, the Debtor has its remedies.

25  If there is cause, I'll have my remedies.  But it's not for

1  this Court post-confirmation to be making that determination.

2  That's not my decision. That's Congress's decision.

3      So, Your Honor, for those reasons, we object, and we

4  continue to object, and we'd ask that the Court not confirm

5  this plan because it is patently unconfirmable. Or if the

6  Court does confirm the plan, that it excise those provisions

7  of the releases, exculpations, and injunction that I just

8  mentioned as being not in line with the Fifth Circuit or

9  Supreme Court precedent.

10      Thank you.

11          THE COURT: All right. Can I -- I meant to ask Mr.

12  Draper this. Can we all agree that we do not have third-party

13  releases *per se* in this plan? Can we all agree on that?

14          MR. DRAPER: I don't know. I have to look at that.

15  I think what you have are exculpations and channeling

16  injunctions for third parties who have not paid for those

17  channeling injunctions or those exculpations.

18          THE COURT: All right.

19          MR. RUKAVINA: Your Honor, was that question -- was

20  that question solely to Mr. Draper?

21          THE COURT: Well, no, it was to all of you. I

22  thought we could all agree that we don't have third party

23  releases *per se*. Okay. There was --

24          MR. RUKAVINA: Your Honor, we --

25          THE COURT: -- a little bit of glossing over that in

1  some of the briefing, I can't remember whose.  But we have

2  Debtor releases, we have --

3          MR. RUKAVINA:  Yes.

4          THE COURT:  -- exculpations that deal with

5  postpetition negligence only, we have injunctions, which I

6  guess the Debtor would say merely serve to implement the plan

7  provisions and are commonplace, but Mr. Draper would say maybe

8  are tantamount to third-party releases.  Is that --

9          MR. RUKAVINA:  Your Honor, I don't think --

10          THE COURT:  -- where we are?

11          MR. RUKAVINA:  -- there's any question -- I don't

12  think there's any question that the exculpation is a third-

13  party release, and that that's also what Judge Fish held in

14  the *Dropbox* case.  It says that none of the exculpated parties

15  shall have any liability on any claim.  So, --

16          THE COURT:  All right.

17          MR. RUKAVINA:  -- that necessarily --

18          THE COURT:  I get what you're saying, but I just

19  think, in common bankruptcy lingo, most people regard a third-

20  party release as when third parties are releasing -- third

21  parties meaning, for example, creditors, interest holders --

22  are releasing officers and directors and other third parties

23  for anything and everything.

24      Exculpation, I get it, it's worded in a passive voice, but

25  it is third parties releasing third parties, but for a narrow

208

1 thing, postpetition conduct that is negligent. Okay. So I

2 think -- while there's technically something like a third-

3 party release there, it's not in bankruptcy lingo what we call

4 a third-party release. It's an exculpation means no liability

5 of the exculpated parties for postpetition conduct that's

6 negligent. So I -- anyway, I think we all agree that, I mean,

7 can we all agree there aren't any *per se* third-party releases

8 as that term is typically used in bankruptcy parlance?

9          MR. RUKAVINA: I apologize, Your Honor, and I'm not

10 trying to try your patience, but I cannot agree to that.

11 Whatever claims my client, a nondebtor, has against Strand, a

12 nondebtor, are gone. Whether it's a release or exculpations,

13 they're gone. So I apologize, I cannot agree to that, Your

14 Honor.

15          MR. DRAPER: Your Honor, this is Douglas Draper. I

16 can't agree, either. I think it's definitional. And quite

17 frankly, I think I'm looking at the functional effect of

18 what's here, and they appear to be third-party releases.

19          THE COURT: Okay. All right. Who is making the

20 argument for Mr. Dondero?

21          MR. TAYLOR: Your Honor, Clay Taylor appearing on

22 behalf of Mr. Dondero.

23          THE COURT: Okay.

24          CLOSING ARGUMENT ON BEHALF OF JAMES D. DONDERO

25          MR. TAYLOR: Your Honor, first of all, as this Court

209

1 is well aware, this Court sits, as a bankruptcy court, as a

2 court of equity. It has many different tools available to it.

3 One of those, of course, is denying confirmation of this plan

4 because of the laws that we have discussed today and that we

5 believe the evidence has shown, and I won't go into those. Of

6 course, of course, Your Honor could confirm that plan. Yet

7 another tool available to this Court is it can take it under

8 advisement.

9     To the extent that this Court decides to confirm this plan

10 and decides to confirm it today, it certainly takes a lot of

11 options off the table for all parties. There are ongoing

12 discussions, I'm not going to go into any of the particulars

13 of those discussions, but a ruling on confirmation today would

14 effectively end that, because, absent, then, an order vacating

15 confirmation, there's a lot of eggs that can't become

16 unscrambled after a confirmation order is entered.

17     So we would respectfully ask that, to the extent that the

18 Court is even considering confirmation, we don't believe it to

19 be appropriate, but at least take it under advisement for 30

20 days, or at least, in the very alternative, that it announce

21 some date which it is going to give a ruling, so that we kind

22 of know when that is going to come down, to see if any

23 positive ongoing discussions can result in more of a global

24 resolution that all parties can agree upon.

25     Addressing more the merits of the case, Your Honor, Mr.

1    Dondero does indeed object to the nondebtor releases, the

2    exculpations, the injunction.  I believe those have been

3    covered rather extensively in the prior argument, so I wasn't

4    going to go into those here because they've been addressed.

5    Of course, I will endeavor to answer any questions that Your

6    Honor may have on those.

7      I will say I think Your Honor asked for everybody's best

8    shot as to why this is different for a Committee member versus

9    the independent trustees here.  I will say my best shot is,

10    first of all, *Pacific Lumber* says what it says.  I believe Mr.

11    Pomerantz has indicated their position that that language is

12    dicta and therefore not binding upon this Court.  I

13    respectfully disagree with that.  But to the extent, more

14    directly answering Your Honor's question, to me, the

15    difference is clear.  Chapter 7 trustees are a creature of

16    statute.  So are Chapter 11 trustees.  And -- as are members

17    of a Committee that are seated pursuant to the Bankruptcy

18    Code.  Those are all creatures of statute.  And the

19    independent board of trustees, while there are certainly --

20    there are some analogies that can be made, undoubtedly, but

21    they are not a creature of statute.  There is no provision for

22    them under the Bankruptcy Code.  And therefore I don't believe

23    that they should and can receive the same protections under

24    *Pacific Lumber*.

25      And so hopefully that -- that is my best shot at

1 answering, directly answering the question that Your Honor

2 posed.

3     THE COURT:  Okay.

4     MR. DRAPER:  Mr. Dondero also has issue with the

5 overbroad continuing jurisdiction of this Court.  I believe

6 Mr. Rukavina has stated that rather succinctly, too.  Merely

7 ruling upon whatever claim is colorable or not certainly has

8 definite impacts.  If this Court has jurisdiction to do that

9 when it otherwise wouldn't have jurisdiction, it enacts an

10 expansion, a potentially impermissible expansion of this

11 Court's jurisdiction.  And for that reason, the plan should --

12 confirmation should be denied.

13     Getting into the particulars of 1129, Your Honor, there is

14 problems under 1129(a)(2).  Those are the solicitation

15 problems.  Let's just kind of look at what the evidence

16 showed.  On November 28th, there was a disclosure statement,

17 it was published to all creditors, and it said, under this

18 plan, you're going to get 87 cents.  It wasn't a range.  Now,

19 there was some assumptions that went in there, but they said,

20 under a liquidation of all these assets, you're going to get

21 62 cents.

22     The Debtors came back approximately two months later, on

23 January 28th, and said, oh, wait, we missed the boat here, and

24 actually, under the plan, you're going to get 61 cents.  And

25 under a liquidation, though, you'd only get 48.

1    Well, the problem is, already, two months later, they've

2  already told you they missed the boat on what the liquidation

3  analysis was just two months ago.  And two months ago, they

4  told you under a liquidation you'd get 62 cents, and now we're

5  telling you you're going to get less.  That's at least some

6  very good evidence that the best interests of the creditors

7  isn't being met, and potentially a liquidation is much better.

8    They then came back, potentially maybe realizing that

9  problem, also because some new information came in with the

10  employees, and also with UBS, which adjusted the overall

11  general unsecured claims pool, and said, well, under the plan

12  you're going to get 71 cents, and under a liquidation you're

13  going to get 55 cents.

14    In between those iterations from November to February,

15  they found $67 million more in assets.  So Mr. Seery testified

16  he believed some of that's as to market increases in values,

17  and some (garbling) investment, market -- securities.  And

18  some were just in these private equity investments.

19    There are indeed some rollups behind all of these numbers.

20  I do understand why they wouldn't want to make some of these

21  numbers public, because they might not be able to get --

22  create the upside for any particular asset class that they're

23  seeking to monetize.

24    However, we and others, including Mr. Draper, asked for

25  those rollups to be provided, and we certainly could have

1  taken those under seal or a confidentiality agreement, could

2  have also put those before this Court under seal and the

3  Debtor could have put those rollups before this Court under

4  seal.  It elected not to do so.

5      So, rather, what you have is the naked assumptions of this

6  is what we think we can monetize the assets, or we're not

7  going to tell you what it is, but trust me, Creditors, and

8  cool, we found $67 million worth of value in the past two

9  months, so therefore we're going to beat the liquidation

10  analysis that we previously told you just two months ago.

11      They also acknowledge that, in those two months, that

12  there was going to be about $26 million in increased costs

13  from their November analysis to their February analysis.  And

14  they included that in their projections.

15      Finally, they acknowledged, in those two months, that we

16  had previously estimated -- and they even have it in their

17  assumptions in November liquidation and plan analysis -- that

18  UBS, HarbourVest, and I believe it was Acis, were all going to

19  be valued at zero dollars, and that's what the claims were

20  going to be.  Well, they kind of missed the boat on those, and

21  they missed it by a lot.  They -- it increased all the claims

22  in the pool from $195 million to $273 million, or sorry, I

23  don't -- look at that again, but it was an increase of $95

24  million.  I'm sorry, 190 -- the claims pool increased from

25  $194 million to -- I'm sorry, Your Honor, I have too many

214

1    papers in front of me -- on November, the claims pool was 176

2    and it increased by February 1st to 273.   Therefore,

3    approximately $95, almost $100 million worth of claims that

4    they weren't anticipating that actually came in.

5        That tells you about the quality of the assumptions that

6    went into the analysis to begin with.  They missed it by 50

7    percent on what the overall claims pool was going to be.

8    That's significant.  It's material.

9        There is a lot of other assumptions that could go into

10   this document, and one of those assumptions are how much are

11   we going to be able to monetize these assets for?  One other

12   assumption is, well, how much is it going to cost during the

13   two-year life of this wind-down?  Another assumption is going

14   to be, are we actually going to be able to wind down in two

15   years?  Because if we're not, well, guess what, all those

16   costs are going to go up.  Another assumption is, well, how

17   much are those fee claims going to be over the two-year

18   period?  Again, if it goes over two years, they're going to be

19   significantly higher.  Moreover, you might have just missed

20   what the burn rate is.

21       So I think it's rather telling that the assumptions made

22   of -- all the way back of over two -- of only two months ago

23   were off by $100 million, and therefore it skewed all of the

24   plan-versus-liquidation analysis all over the board.

25       That's the only evidence that the Debtor has put forth as

215

1   to why it's in the best interest of the creditors.  And quite

2   frankly, we don't believe they have met their burden.  And it

3   is their burden to prove to Your Honor that the plan is better

4   than what a Chapter 7 trustee will -- can do.

5       What the evidence does show, as far as what the plan would

6   do as compared to a hypothetical Chapter 7 trustee, is that we

7   know for sure that the Claimant Trust base fee, just over the

8   two years, is going to be $3.6 million.

9       (Interruption.)

10          MR. TAYLOR:  I'm sorry.

11          THE COURT:  Someone needs to put their device on

12  mute.  I don't know who that was.

13          MR. TAYLOR:  Oh, I'm sorry.  I thought you said

14  something, Your Honor.

15          THE COURT:  No.

16          MR. TAYLOR:  So what we do know is the Claimant

17  Trustee base fee is going to be $3.6 million.  What we don't

18  know and what was not put into evidence because they are still

19  negotiating it is there's going to be a bonus fee on top of

20  that that's going to be paid to Mr. Seery.  Is that $2

21  million?  Is that $4 million?  Is that $10 million?  Well, we

22  don't know.  We can't perform that analysis as compared to

23  what a hypothetical Chapter 7 trustee could be.  Nor can Your

24  Honor, based upon the evidence presented.

25      And quite frankly, I don't see how one could ever conclude

216

1    -- and there are some other unknowns that we're about to go

2    over, including the Litigation Trust base fee and there are

3    collection fees, contingency fees.  Those are also to be

4    negotiated.  To be negotiated and unknown.  You can't perform

5    the analysis.  The Debtor couldn't perform the analysis

6    because those are to be negotiated, so you can't tell whether

7    a Chapter -- hypothetical Chapter 7 trustee might come out

8    better because he's not going to incur all these costs.  We

9    know that they're going to incur D&O costs.

10            THE COURT:  Let me interject right now.

11            MR. TAYLOR:  Sure.

12            THE COURT:  Again, I'm going to go back to

13   understanding who your client is arguing for.  Okay?  Again,

14   as we've said before, Mr. Pomerantz did not technically say no

15   standing, but he thought it was important to point out the

16   economic interests that our Objectors either have or don't

17   have.  Okay?

18       So I'm looking through my notes to see exactly what the

19   Dondero economic interest is.  I have something written in my

20   notes, but I'm going to let you tell me.  Tell me what his

21   economic interests are with regard to this Debtor, this

22   reorganization.

23            MR. TAYLOR:  Your Honor, I believe he has been placed

24   into Class 9, Subordinated Claims.  So to the extent that

25   there is recovery available to Class 9, he can recover on

217

1   those claims.

2           THE COURT:  But what proof of claim --

3           MR. TAYLOR:  We also have --

4           THE COURT:  What proof of claim does he have pending

5   at this juncture?

6           MR. TAYLOR:  Your Honor, I would have to go back and

7   look.  I don't have the proofs of claim register in front of

8   me.  And I'm sorry, if I tried to speculate, I would be doing

9   a disservice to my client and this Court by trying to

10  speculate.  I did not prepare those proofs of claim.  People

11  in my firm did.  But I would be merely speculating if I tried

12  to give you an answer off the spot.  And I apologize.  I'm

13  happy to submit a post-confirmation hearing letter --

14          THE COURT:  No, no, no.

15          MR. TAYLOR:  -- as to that.

16          THE COURT:  I'm not going to allow one more piece of

17  paper in connection with confirmation.  I thought you would be

18  able to answer that.

19          MR. TAYLOR:  I'm sorry.  I just don't want to lie to

20  Your Honor.

21          THE COURT:  What about his -- what would be an

22  indirect equity interest?

23          MR. TAYLOR:  Well, again, there are a lot of people

24  that know this org chart a lot better than me.  This is me

25  going on hearsay myself.  But I understand he also owns a lot

218

1  of indirect interests in subsidiaries, some of which are

2  majority, some of which are minority, and some of which he

3  owns maybe directly, some of which through other entities.  So

4  the way in which these assets could be monetized at the sub-

5  debtor level could certainly impact his economic rights and

6  could impact him greatly.  For instance, if the --

7          THE COURT:  I really wanted an exact answer.

8          MR. TAYLOR:  Mr. Seery --

9          THE COURT:  I really wanted an exact answer, not just

10  he has an indirect interest in, you know, some of the 2,000 --

11  I'm not going to say tentacles, but --

12      I'm going to interrupt briefly, because I really want to

13  nail down the answer as best I can.  Mr. Pomerantz, can you

14  just remind me of what your answer was or statement was

15  regarding Mr. Dondero, individually, his economic stake in all

16  this?

17          MR. POMERANTZ:  He has an indemnification claim

18  that's been objected to, --

19          THE COURT:  That's the one and only --

20          MR. POMERANTZ:  -- although it's not before --

21          THE COURT:  That's the one and only pending proof of

22  claim, right?

23          MR. POMERANTZ:  That's my understanding.  And while

24  it's not before the Court, we could all imagine whether Mr.

25  Dondero's going to be entitled to indemnification.

219

1     He has an interest in Strand, which is the general

2  partner.

3          THE COURT:  Right.

4          MR. POMERANTZ:  And Strand owns a quarter-percent --

5  a quarter of one percent of the equity.  I believe that is all

6  of Mr. Dondero's economic interest in the Debtor.

7          THE COURT:  Okay.  So, again, I'm just trying to, you

8  know, understand who he's looking out for, for lack of a

9  better way of saying it, Mr. Taylor, in making these

10  arguments.

11          MR. TAYLOR:  So, there is also, and this is -- I'm

12  not involved in what are these going to be filed collection

13  suits, or some of which have been filed, some of which have

14  not been filed, none of which I believe the answer date has

15  been -- has passed or come to be yet.

16      But he is also a defendant in collection suits on these

17  notes, as you are undoubtedly aware.

18          THE COURT:  Okay.  He's a defendant in adversary

19  proceedings.  Okay?  That makes him a party in interest to --

20  well, I keep -- that makes him have standing to make an

21  1129(a)(7) argument?  That's why I'm going down this trail.

22  Because you've spent the last five minutes talking about, you

23  know, creditors could do better in a Chapter 7 liquidation.

24  I'm not sure he has standing to make that argument, so I'm

25  wanting you to address that squarely.

1      MR. TAYLOR:  Your Honor, I believe he has economic

2  interests up and down the capital structure.  And I cannot

3  describe to you, without wildly speculating and potentially

4  lying to this Court, which I'm not going to do, without some

5  time to have looked at that, because I was -- I was not

6  involved in the proofs of claim and I am not his accountant.

7  So I could not do that without wildly speculating, so I just

8  -- I would like to more directly answer your question, Your

9  Honor.  I am not trying to avoid the question.  But I can't

10  honestly answer your question with true facts as we sit here

11  right now.

12      THE COURT:  All right.  But do you agree or disagree

13  with me that only parties -- the only parties that really can

14  make an 1129(a)(7) argument are holders of claims or interests

15  in impaired classes?

16      MR. TAYLOR:  Your Honor, I believe that Mr. Dondero

17  has standing to do so by virtue of claims for indemnification

18  --

19      THE COURT:  Okay.

20      MR. TAYLOR:  -- if these -- if these -- if this

21  Debtor (indecipherable) able to meet its obligations to

22  indemnify him.  And some of those are significant claims that

23  are being brought against him that could total millions, if

24  not tens of millions of dollars, just in defense costs alone,

25  that I do believe give some standing.

221

1         THE COURT:  Okay.  So, assuming you're right, you

2    think the evidence does not show this is better than a Chapter

3    7 liquidation where we would have a stranger trustee come in

4    and just, yeah, I guess, cold-turkey liquidate it all.

5         MR. TAYLOR:  Your Honor, I do believe that the

6    evidence shows that the Debtor hasn't met its burden as to

7    this.  A Chapter 7 trustee doesn't necessarily have to

8    liquidate immediately.  It can run these -- these assets.  I

9    mean, Mr. Seery is going to do it with ten people.  At one

10   time, just two months ago, he said he was going to do it with

11   three people.  A Chapter 7 trustee could certainly have a

12   limited runway, or even an extended runway, if it so asked for

13   it, to liquate these Debtors.

14       Moreover, there would be at least the requirements that

15   the Chapter 7 trustee would request the sale, tell creditors

16   about it.  And, as many courts have said, the competitive

17   bidding process is the best way to make sure that you ensure

18   the highest and best offer that you can get.

19       Mr. Seery has not committed to providing notice of sales

20   to creditors and other parties in interest, potentially

21   bringing them in as bidders.  They -- he could name a stalking

22   horse, but he has not indicated any desire to do so.  A

23   Chapter 7 trustee would endeavor to do so.

24       So I do believe that there are some advantages.  And

25   you've heard no testimony that they've performed any analysis

222

1  or conducted any interviews with any Chapter 7 trustees as to

2  whether or not this was possible or not.  They just made the

3  naked assumption that they would do work based upon what they

4  said was their experience.  And Mr. Seery's deposition, when

5  it was taken and noticed as a 30(b)(6) deposition, and I

6  believe it has been entered into evidence here, he said the

7  last time he dealt with a Chapter 7 trustee was 11 or 13 years

8  ago, and it was the *Lehman* case, and that was the -- a SIPC

9  trustee.  So --

10          THE COURT:  Well, --

11          MR. TAYLOR:  -- that's the last time he had any

12  experience with it.

13          THE COURT:  -- again, I don't mean to belabor this

14  point, just like I didn't mean to belabor a few others.  But,

15  you know, there is a mechanism, yes, in Chapter 7, Section

16  704, for a trustee to seek court authority to operate a

17  business.  But it's not a statute that contemplates long-term

18  operation.  Okay?  It's just, oh, we've got a little bit of --

19  you know, we have some assets here that really require a

20  short-term operation here.

21      If it's long-term, then you convert to Chapter 11.  Okay?

22  It's just a temporary tool, Section 704.  Right?  Would you

23  agree with me?

24          MR. TAYLOR:  That's typically how it has been used.

25          THE COURT:  Okay.

1          MR. TAYLOR:  But that's not to say that it's limited

2   in time by the statute itself.  It doesn't say that it can't

3   go for one year or two years.  That can be a short wind-down

4   period.

5          THE COURT:  But hasn't your client's argument been

6   this past several weeks that Mr. Seery is moving too fast,

7   he's wanting to sell things and he needs to hold them longer?

8   I mean, these two argument seem inconsistent to me.

9          MR. TAYLOR:  So, just because a Chapter 7 trustee has

10  been appointed doesn't mean that he has to sell them any

11  faster than Mr. Seery.

12      I think what the -- the problem with the process that has

13  been going on with Mr. Seery, my client's problem with it, is

14  not necessarily the timing but the process that Mr. Seery is

15  going through with these sales.  Provide notice, allow more

16  bidders to come in, make sure that he's getting the highest

17  and best price.  And if that happens to be Mr. Dondero who

18  offers the highest and best price, great.  And if Mr. Dondero

19  gets outbid by somebody, well, that's all the more better for

20  the estate.

21         THE COURT:  Okay.  Continue your argument.

22         MR. TAYLOR:  I believe we covered a lot of it, Your

23  Honor, and the plan analysis is all based upon their

24  assumptions that there's $257 million worth of value.  Again,

25  there's no rollup provided as to how that asset allocation is

224

1    broken out, but they consist of a couple of items.

2        First, there's the notes; and second, there's the assets.

3    The notes are either long-term or demand notes.  Those long-

4    term notes, Mr. Seery will tell you some have been validly

5    accelerated and therefore are now due and payable.  I think

6    there's arguments to the contrary.  But those long-term notes

7    probably have some both time value of money and collection

8    costs.  And then, of course, you have to discount them by

9    collectability issues, too.

10       I don't believe any analysis went into it, or at least the

11   Court was not provided any data or analysis as to what

12   discounts were applied to those notes.  And, therefore, I

13   don't think that this Court can make any determination that

14   the best interests of the creditors have been met.

15       As far as the assets that are to be monetized, again,

16   there's two sub-buckets of those assets.  There's securities

17   that are to be sold.  Some of those are semi-public securities

18   that have markets.  Those are somewhat more readily

19   ascertained.  The others are holdings in private equity

20   companies, and sometimes holdings in companies that own other

21   companies.

22       There's no evidence of the value -- empirical evidence of

23   the value of those companies, nor of the assumptions that went

24   into as to when they should be sold, how much they'd be sold

25   for.

225

1      Again, I do realize the sensitive nature of such

2   information, but that could have been placed under seal.  And

3   without that information, I don't believe that the Court can

4   conduct the due diligence it's necessary to say the best

5   interest of the creditors have been met.

6      To sum up, Your Honor -- oh, I'm sorry.  One other point

7   that I did want to talk about before I summed up is, you know,

8   Mr. Pomerantz and I were listening to a different record or I

9   was totally confused as to the testimony that was put forth

10  regarding the directors and officers.  I believe the testimony

11  in the record is extremely clear that the Debtor made no

12  effort to go out and find out if it could obtain directors and

13  officers insurance without a gatekeeping injunction or a

14  channeling injunction, whatever you want to call it.  I

15  believe that his testimony was extremely clear.  He didn't

16  shop it.  He doesn't know.  And that's what the record is

17  before this Court.

18      To the extent that the Debtor wants to rely upon we can't

19  get Debtor -- or, directors and officers insurance because

20  without this gatekeeping function we just can't get it, I

21  believe the record just wholly does not support that.  The

22  testimony was at least extremely clear, as how I heard it.

23  Your Honor will have to review the record herself, but I don't

24  believe that there was much argument about it.

25      I'm sure -- as I stated in the beginning, Your Honor, this

226

1  is a court of equity. It could deny confirmation, as I

2  believe Your Honor should, based upon the flaws in the plan.

3     If Your Honor finds that the plan as written is

4  impermissible because of any of the exculpation or the

5  gatekeeping functions that they're asking, the testimony is

6  equally clear that the independent directors would not serve

7  in -- as officers of the Reorganized Debtor. Any plan that is

8  put forth by the Debtor has to tell the people who are going

9  to be officers going forward. And with that naked testimony

10  before the Court, that it's simply not feasible, and I don't

11  think it is one of the possible -- where the Court can come

12  back and say, well, I can't confirm this plan as written, but

13  if you change it and rewrite it to get rid of the certain

14  offensive parts of the exculpation or the gatekeeping

15  functions, then we can confirm this plan. And I think the

16  evidence before this Court is it's not feasible because none

17  of the directors will serve in that capacity, and therefore

18  this plan should be dead on arrival if Your Honor agrees the

19  proposed provisions do not meet *Pacific Lumber*.

20     We would ask the Court to deny confirmation, but in the

21  alternative, to at least take this under advisement. Give us

22  a time frame -- we'd ask for 30 days -- but give us a time

23  frame of when the Court is going to rule, to allow the

24  positive conversations to move forward.

25     To that end, Your Honor, there is, indeed, a hearing on

227

1  the extension of a temporary injunction and contempt that is

2  scheduled for Friday.  I understand that the parties, at least

3  the joint parties, will not -- will agree to, I'm sorry, will

4  agree to the extension of the temporary injunction until such

5  time as the Court can rule on confirmation.  I do see that

6  there could be a lot of harm done at the Friday hearing.  We

7  would ask that the Court additionally continue that hearing on

8  that motion and on the injunction, and contempt, until such

9  time as confirmation has been ruled upon.  It will be both

10  efficient and allow discussions to continue regarding

11  potential global resolution.

12      And so that is the end of my argument, Your Honor.

13          THE COURT:  All right.  Thank you.  All right.  Mr.

14  Pomerantz, do you have any rebuttal?

15      REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

16          MR. POMERANTZ:  Yes, I do, Your Honor.  I want to

17  address a couple of comments that Mr. Taylor made towards the

18  end.  First of all -- and, actually, the beginning.

19      We think Your Honor should rule on confirmation.  Ruling

20  on confirmation and having an entered confirmation order are

21  two separate things.  We understand that a new offer was made.

22  Whether that's acceptable to the Committee -- I actually think

23  it will enhance the ability of the parties to see if they

24  could reach a deal if there's (audio gap) that Your Honor is

25  going to confirm the plan.

228

1    Again, doesn't mean a confirmation order has to be

2   entered, but I think, based upon my personal experience in

3   negotiating with Mr. Dondero, that your clear communication to

4   the parties that, unless something happens, you will enter a

5   confirmation order, I think will change things.  Okay?

6   Without getting into settlement discussions, things have

7   changed over the last several days, and we wish you would have

8   -- wish things would have happened sooner.  But we totally

9   disagree that Your Honor should hold your ruling for 30 days

10   or any other period of time.

11    Part of the reason I think they are making that argument

12   is because they have an examiner motion and they recognize

13   that, upon confirmation, the examiner motion is moot.  So I

14   think there's strategic reasons as well.

15    We don't think there should be a continuance of the TRO

16   hearing and of the contempt hearing.  As Your Honor recalls,

17   the contempt motion was specifically set for this time to give

18   Mr. Dondero enough time to prepare.  Your Honor was sensitive

19   to his due process concerns.  We set the TRO, the preliminary

20   injunction hearing against the Advisors and the Funds, we set

21   that, again, knowing that it would be after confirmation.

22    So we do not agree that either should be continued.

23   Again, we think the more direct, unequivocal answers Your

24   Honor can give to the parties, the better off we'll be.

25    I guess -- Mr. Taylor and I do agree that the record was

229

1  clear.  I guess we just disagree on the clarity of it.  I

2  heard Mr. Tauber testify that when he went out to people, to

3  insurance carriers, after he and Aon were engaged, they all

4  talked about a Dondero exclusion.  Okay?  They weren't

5  convinced into a gatekeeper provision because it was provided

6  as part of the normal materials you would provide in a

7  bankruptcy court and trying to get D&O liability in the

8  context of a bankruptcy case.  Mr. Tauber's testimony was

9  pretty clear, that carriers wanted to have a Dondero

10  exclusion.  And, in fact, the only reason we were able to get

11  any coverage was because of the gatekeeper.

12      So, yes, the record was clear.  We just disagree.

13      I'd like to go back to Mr. Draper's comments going -- and

14  a couple of things, obviously, overlap.  I guess one of the

15  things here, it's great that everyone is coming in here as

16  different interests and different parties or whatnot.  But as

17  I mentioned, Your Honor, at the outset, and I've repeated a

18  few times, these are all -- the only people we have not been

19  able to resolve issues with are the Dondero parties and the

20  related parties.  And I recall the tentacles.  Mr. Davor

21  questioned that.  Mr. Clemente, his comments.  But the fact of

22  the matter is, Your Honor, Your Honor has heard testimony.

23  Your Honor has had hearings.  Mr. Rukavina represents the

24  Advisors and the Funds.  Your Honor has never seen the

25  independent board member testify in this case to demonstrate

1  how these entities are really different.  So while Mr.

2  Rukavina does -- you know, tries his best, and I think he has

3  limited stuff to work with, but I give him credit for doing

4  the best he can, these are all Dondero-related entities and

5  Your Honor has seen that.

6      So, Your Honor, going to the resolicitation argument, it

7  actually has taken up a lot more time than the argument is

8  worth, for one very simple reason.  As I said in my argument,

9  and as Mr. Taylor and Mr. Draper totally ignored, there were

10  17 creditors who voted yes, 17 creditors who were apparently

11  misled, that Mr. Draper is looking out for the little guy and

12  Mr. Taylor is fumbling over his reason for why that's

13  important to Dondero.  And of those 17 creditors that voted

14  yes, Your Honor, they were either the employees related to

15  HarbourVest, UBS, Redeemer, or Acis, except for two.  And you

16  know the other two?  One was Contrarian, a claim buyer, who,

17  yeah, elected to be in Class 7, and the other was an employee

18  with a dollar claim.

19      So the whole argument that there should be a

20  resolicitation is preposterous, Your Honor.  But to go to some

21  of the specifics in what they argued, we didn't require

22  creditors to monitor recovery.  The footnote -- as I

23  indicated, the UBS 3018 was in the disclosure statement that

24  went out.  It didn't make it to the projections.  It was

25  clearly -- and they characterize it, I think Mr. Draper

231

1  characterized it as buried in the document.  There is a

2  section that every disclosure statement is required to have

3  called Risk Factors.  This disclosure statement had that.  And

4  in the disclosure statement, it talked about the amount of

5  claims being a risk factor.

6       Mr. Draper also said that the Debtor totally changed its

7  business model from the first to the second analysis.  That is

8  incorrect.  The Debtor was always going to manage funds.  Yes,

9  did they add the CLOs?  But before, they were going to manage

10 Multi-Strat, they were going to manage Restoration Capital,

11 they were going to oversee Korea, they were going to be doing

12 the management of the funds.  So there wasn't a big change in

13 the business model, Your Honor.

14      Mr. Taylor, on the solicitation issue, says we found $67

15 million in assets.  You know, that's a disingenuous statement.

16 I think over $20 million was found because his client and

17 related entities didn't make a payment on notes and they got

18 accelerated.  So while before we would have had to wait over

19 time if they were paid, it's not surprising that Mr. Dondero

20 and his related entities just failed to basically pay the

21 notes.

22      So that was, I think, over $20 million.  And then there

23 was the HCLOF asset.  That was acquired in the HarbourVest

24 settlement.  And then there was basically an increase in some

25 value to some assets.

232

1    So there wasn't anything mysterious here.  There wasn't

2  anything that the Debtor was trying to hide.  There weren't

3  any found assets.  It was based upon different circumstances.

4    Mr. Taylor complains about the lack of rollup of assets,

5  the lack of evidence on the best interests of creditors test.

6  Your Honor, you've had extensive testimony from Mr. Seery

7  about what would happen in a Chapter 7 and what would happen

8  in a Chapter 11.  And you know why we didn't provide the

9  information to Mr. Taylor and his client on what the rollup of

10  the assets would be, and do you know why he wants them?  He

11  wants to know what the assets are so he can try to bid.

12    And there also was the allegation that the failure to

13  allow them to bid means we're going to get less in a Chapter

14  11 than a 7.  Two comments to that, Your Honor.  Number one,

15  if that was the case, a debtor would never be able to satisfy

16  the best interests of creditors test.  If the existence of a

17  public process *de facto* meant you would get more value than

18  outside, you would never be able to satisfy that.  And, quite

19  honestly, that's just not the law, Your Honor.

20    You have an Oversight Committee with over $200 million of

21  creditors who are going to watch Mr. Seery like a hawk, like

22  they have watched him during the case.  And the concern that

23  somehow, because these assets are not put into full view to

24  sell, that they will get less value, it's just not -- it's not

25  supported by the evidence at all, Your Honor.  And Mr. Seery

233

1  will make the determination.  If it makes sense to notice up

2  and provide Mr. Dondero with notice, he will.  If he doesn't,

3  he won't.

4      Your Honor, going -- oh, and then the last comment on the

5  -- that I'll make on the resolicitation and the liquidation

6  analysis is Mr. Taylor chides us and we've been criticized for

7  not disclosing more about the HarbourVest and the UBS

8  settlements and that we were off substantially.  Your Honor,

9  you've heard testimony that we were in pending litigation with

10  HarbourVest and UBS at the time.  What kind of litigant would

11  we be if we came in and said, you know, Your Honor, you know,

12  Creditors, we think the UBS claim is going to be allowed at

13  $60 million and we think the HarbourVest claim is going to be

14  allowed at $30 million?  Would that really have benefited

15  creditors and this estate, to basically, after we took the

16  position, hard negotiations and hard pleadings that we

17  prepared, and in some cases filed, that we didn't have any

18  liability?  It would have made no sense, and it would have

19  been a dereliction of our duty to actually come out and say

20  what the claims -- the claims were, or what we thought they

21  could be settled for.

22      Your Honor, going back to Mr. Draper's comments.  He

23  started with the exculpation.  First he made a comment that I

24  don't think he intended what he said, but he said that the

25  exculpation order, the January 9th order, cuts off when the

234

 1    independent directors go away.  I think what he meant to say
 2    is that since the three people are not going to be independent
 3    directors anymore, that basically any actions going forward by
 4    any of those three are not covered.  But let's be clear.  The
 5    January 9th order is in effect, and if at some point in the
 6    future somebody has a claim against those three gentleman, or
 7    their agents, for what they did as independent directors or
 8    their agents, that order will apply.
 9        Your Honor, we next had a discussion, or Mr. Draper and
10    you had a discussion on professionals.  I'm aware of the Fifth
11    Circuit law that says res judicata, fee applications.  I think
12    that only applies to claims that the Debtor and estate would
13    have.  It doesn't really apply to an exculpation.  But there's
14    Texas state law that I identified in our brief and we cited to
15    that limits third parties' ability to go after professionals.
16        But the bottom line is the Fifth Circuit, in *Pacific
17    Lumber*, didn't deal with professionals.  Your Honor was
18    correct in pushing both Mr. Taylor and Mr. Rukavina.  What
19    really that was was a policy case.  And professionals have
20    nothing to do with 524(e).  So the *Palco* and the *Pacific
21    Lumber* reference and explanation of 524(e) doesn't have
22    anything to do with professionals.  And we would submit, Your
23    Honor, that an exculpation, especially in a case like this, is
24    important for professionals.
25        I understand Your Honor's comments that maybe it's much

235

1  ado about nothing, but I'm not really sure it's much ado about

2  nothing when we have Mr. Dondero and his affiliates who,

3  notwithstanding their efforts to just claim that all they are

4  doing is trying to get a fair shake, Your Honor knows better.

5  Your Honor knows better from the years you've been litigating

6  with them, and we know better and the Debtor knows better from

7  what the independent directors have been dealing with.

8          THE COURT:  Let me ask you this, though.  I came into

9  the hearing with the impression we were just talking about

10  postpetition pre-confirmation, or pre-effective date maybe I

11  should say, was the expanse of time covered by exculpation.

12  And Mr. Rukavina said no, no, no, go back, look at, I don't

13  know, Subsection 4 of something.  It is a post-confirmation

14  concept.  What is your response to that?

15          MR. POMERANTZ:  I believe it's implementation.  And,

16  again, --

17          THE COURT:  Implementation?  Yes.

18          MR. POMERANTZ:  -- I think Mr. Rukavina -- right.  I

19  think Mr. Rukavina and Mr. Taylor and Mr. Draper have done a

20  great job trying to muddy the issues.  They talk about our

21  sleight of hand and how we're trying to do things that are way

22  beyond the bankruptcy court's jurisdiction.  We are not.  I

23  think they are trying -- what they have done throughout the

24  case is throw up enough mud.  And here's, here's the answer to

25  that question, Your Honor.  Implementation.  Okay?  We know

236

1  what implementation means.  The plan says implementation is

2  cancelation of the equity interests, creation of new general

3  partners, restatement of the limited partners, establishment

4  of the Claimant Trust and Litigation Sub-Trust.  That's the

5  implementation.

6      We are not trying to get exculpation for post-confirmation

7  activity.  Actually, my partner, Mr. Kharasch, in specifically

8  addressing Mr. Rukavina's concern, said, look, if you have a

9  problem with cause, if you have a problem, want to exercise

10 your rights, we're only asking you to come back to the Court.

11 We are not stopping you.

12     So the whole argument that the exculpation is really broad

13 and is not really -- does not really cover just the plan, the

14 approved plan, I think is a red herring.  Implementation is

15 implementation in the context of the plan.

16     And also Mr. Rukavina tries to argue that, well, it's

17 administration, it's not really you acting any operation of

18 business.  I just don't think there's any support in the case

19 law.  Your Honor has overseen this case, overseen this

20 Debtor's activities, overseen the independent directors'

21 activities, overseen Strand's activities, overseen the

22 employees' activities.  And those activities have been

23 (indecipherable) administration of the case.  And his attempt

24 to create a different category for, well, it's not

25 administration, it's operation and so it doesn't apply, I just

237

1   think is wrong.

2       Your Honor made a couple of comments about what was

3   *Pacific Lumber* doing.  It was a policy decision.  If there was

4   a bright-line rule, then nobody would be entitled to

5   exculpation.  The very fact that the Fifth Circuit said that

6   Committee members are different made -- makes it clear it was

7   -- it was policy.

8       And Mr. Taylor's comments that, well, their creation of

9   statute, Chapter 11 trustees and Committee members, that's not

10  what basically the case said.  If you look at the citation to

11  touters in the case, it was we want people to volunteer and

12  who are needed for the process.  Committee members are needed

13  for the process.  We don't want to discourage them from coming

14  in.  And the only testimony you have on the independent

15  directors is from Mr. Dubel, and he testified the importance

16  of independent directors to modern-day Chapter 11 practice,

17  the importance of exculpation, indemnification, and D&O

18  insurance.  And his testimony:  uncontroverted.  The Objectors

19  could have brought in someone to say something different, but

20  the only testimony before Your Honor is, if Your Honor does

21  not approve exculpations in cases like this, you will not get

22  independent directors and it will have an adverse effect on

23  the Chapter 11 process.

24      So, while I appreciate all the Objectors trying to say

25  bright line, trying to say *Pacific Lumber*, that is the gut

238

1  reaction, right?  That's -- it's easy to say.  But Your Honor

2  will know better, from reading the cases, that's not what

3  *Pacific Lumber* says.  And for the several reasons I gave, it's

4  the reason why *Pacific Lumber* does not govern the decision in

5  this case.

6      Your Honor, Mr. Draper then started to talk about *Craig*.

7  And everyone cites *Craig* as this, you know, limiting

8  jurisdiction.  Now, we acknowledge that *Craig* and the Fifth

9  Circuit has a more limited post-confirmation jurisdiction

10  approach than the other Circuits, but it's not nonexistent.

11  And just because the Debtor is going out post-confirmation and

12  acting does not mean that the conduct that they are engaging

13  in is not -- and disputes that arise, doesn't come within the

14  Court's jurisdiction.  If that was the case, and I think Your

15  Honor recognized this, in your case it was the *TXMS* case,

16  while it's limited, more limited after confirmation, and I

17  think you even, in the case -- or, in one case of yours, said

18  that even after the case is closed there could be

19  jurisdiction.  So their just trying to argue *Craig* is just --

20  is just too much.

21      Going out of the gatekeeper, Mr. Draper tried to say we

22  are *Barton*, and that's it, and *Barton* has its limitations, et

23  cetera.  First of all, with respect to *Barton*, it is not

24  limited and doesn't include debtors-in-possession.  We have

25  cited cases in our materials where it has been applied to

239

1 debtors-in-possession.

2     So, you know, look, maybe this is a provision -- this is a

3 proposition like many in bankruptcy, you could find a

4 bankruptcy court to agree with a proposition, but there's

5 cases all over the place on that.  There's cases applying to

6 post-confirmation.  The trend has been to expand *Barton*.  But

7 the beauty of it is, Your Honor, you don't have to rely on

8 *Barton*.  *Barton* was one of our arguments.  We gave *Barton* as,

9 you know, somewhat of an analogy but somehow applying because

10 in the -- because the independent directors were like the

11 trustees.

12     But we recognize it may be going farther than *Barton* has

13 previously gone.  But the case law is clear, it is being

14 extended.  But we -- I gave you several provisions of the

15 Bankruptcy Code that authorized you to enter a gatekeeper

16 order.  None of the Objectors objected on any of those

17 grounds.  They didn't say the statutes that I cited.  And it

18 wasn't only 105, I know bankruptcy practitioners love to cite

19 105, but there were three or four others that I mentioned, and

20 they're in our brief.  There's no case that they cited that

21 said that there is no authority on the gatekeeper.

22     But what was the argument that was raised?  And I think

23 Mr. Rukavina raised it, saying, you know, look, I don't

24 understand the argument of no jurisdiction, of jurisdiction

25 for a gatekeeper but no jurisdiction for underlying cause of

240

 1 │ action.  Well, Mr. Rukavina should read and Your Honor should

 2 │ read, when you're considering the plan, the case, the *Villegas*

 3 │ case in the Fifth Circuit as it dealt with *Stern*.  That was

 4 │ particularly a case.  Does *Barton* -- is *Barton* impacted from

 5 │ *Stern*?  By *Stern*?  And *Stern*, we know, limits the bankruptcy

 6 │ court's jurisdiction.  But, no, the Fifth Circuit said, in

 7 │ that case, no.  Even though the bankruptcy court's

 8 │ jurisdiction is limited to hear the claim, there is nothing

 9 │ inconsistent with that and allowing the bankruptcy court to

10 │ act as a gatekeeper.

11 │     So Mr. Rukavina's argument that, well, he'll present to

12 │ you that there's cause and you'll find there's no cause and

13 │ then he will be without a remedy by someone that had

14 │ jurisdiction, that really sounds good but it just doesn't

15 │ withstand analytic scrutiny.  There is a distinction.  They

16 │ are glossing over the distinction.  They don't like the

17 │ distinction.

18 │     And why is that distinction -- and why is it important in

19 │ this case?  Again, we're not talking about garden-variety

20 │ people who are just involved with a debtor and will get caught

21 │ up in a bankruptcy.  We narrowly tailored the gatekeeper to

22 │ enjoined parties.  Enjoined parties are the people before Your

23 │ Honor, some of the people that have made the Debtor's life

24 │ miserable over the last few months.

25 │     We have every interest and desire, as does the Committee,

241

1  to go out post-confirmation and monetize these assets.  But we

2  see the clouds on the horizon.  We see all the pleadings that

3  have been filed by the Objectors saying how, if there's no

4  deal, there will be an unending amount of costs and appeals.

5  It's, you know, the point, not too subtle.  It wasn't lost on

6  us.

7       Your Honor, going to Mr. Rukavina's arguments on Class 8

8  cram down, again, it's really a hard argument to understand,

9  but first I want to make a point.  He sort of mentioned -- and

10  I'm not sure if he intends to preserve this on appeal, but it

11  was not objected to and I'll ask for a ruling on it, Your

12  Honor -- he said that there was inappropriate separate

13  classification.  That was not raised in any of the objections.

14  We don't think it was properly before the Court.  We

15  understand there's a component of that in unfair

16  discrimination in connection with a cram down, but there is no

17  objection, there was no filed objection, to the separate

18  classification of the deficiency claims and the Class 8

19  unsecured claims.

20       And if you look at the voting, you realize it wasn't done

21  for gerrymandering, because if you put both claims together,

22  both classes together, you would have had one class that voted

23  yes.

24       So I don't believe the separate classification under the

25  1129 standards is appropriate for Your Honor to consider,

242

1  other than in connection with the cram down.

2      Now, Mr. Rukavina complains that the only way the

3  convenience class was decided was by way of negotiation.  Your

4  Honor, how else do provisions like that get decided?  And who

5  was the negotiation between?  It was between the Committee.

6  And one of the benefits of a Committee process, and I

7  represent a lot of Committees, you put people in a Committee

8  that have diverse interests and they can come up with an

9  appropriate result.  And here you have that.  You had one

10  creditor who was a convenience creditor.  You have three other

11  creditors who would lose liquidity if convenience payments are

12  made.

13      Do you think that UBS, Acis and Redeemer, do you think

14  they had a desire just to pay people off?  No.  It was part of

15  a collaborative process.  So to say that there was no basis

16  and no testimony on the appropriateness to have -- and how the

17  convenience class was put together just would be wrong.

18      And with respect to the absolute priority rule, Your

19  Honor, again, there's a missing link here, okay?  These are

20  contingent interests.  They are property.  No doubt they are

21  property.  But if I did not allow those creditors or those

22  equity to have a contingent interest, the argument would have

23  been made that the plan violates the absolute priority rule.

24  And I said that in my argument.  And why would it have

25  violated the absolute priority rule?  Because there's a

243

1　potential that creditors could get over a hundred cents on the

2　dollar, plus interest.  So it's a game of gotcha, right?

3　　　And why do they really care?  Mr. Dugaboy said in his --

4　Mr. Draper said in his brief that Dugaboy cares because they

5　may have wanted to buy the interest.  Well, I'm sure they can

6　go to Hunter Mountain, you know, Mr. Dondero's left hand can

7　go to his right hand, and I'm sure he'd be happy to sell the

8　contingent interests.

9　　　And with respect to the argument that Mr. Rukavina made

10　about control, equity be in control, yeah, control is a right.

11　No doubt.  You've got -- if you're giving control to the post-

12　confirmation Debtor, that could be a right and implicate the

13　absolute priority rule.  But what is the control here?  Equity

14　is not given any rights.  Your Honor heard how the post-

15　confirmation entity is structured.  It's going to be Mr.

16　Seery, overseen by an Oversight Board.  So I really don't

17　understand the concept of control.  There just is no violation

18　of the absolute priority rule.

19　　　Your Honor, Mr. Rukavina then took us to task for 2000 --

20　or, for not filing the 2015.3 statement.  And if you take his

21　argument to the logical conclusion -- well, we didn't file it,

22　we didn't comply with that Rule, so we're not in compliance

23　with the Bankruptcy Code, so we can never basically get our

24　plan confirmed, right, because it's a violation and we didn't

25　file and seek an extension.

244

1      That's just a preposterous argument, Your Honor.  Mr.

2  Seery poignantly told the Court, in the rush of things that

3  were going on, it wasn't filed.  Did Mr. Rukavina, before

4  yesterday, having Mr. Dubel on the stand, did he ever ask

5  where is our 2015.3 report?  He probably didn't ask it because

6  the answer -- when I told him the reason why it wasn't filed

7  before January 9 was because I don't think Mr. Dondero wanted

8  it filed, and I think that's why, as Mr. Seery testified, we

9  were having a challenging time getting that information from

10  the in-house -- in-house.

11      But, yes, should it have been filed?  Yes.  But if that is

12  all they could point to through the course of the case that

13  Mr. Seery or Mr. -- or the rest of the board did wrong, you

14  know, I think that just demonstrates they did a fine job.

15            THE COURT:  All right.

16            MR. POMERANTZ:  Your Honor?

17            THE COURT:  You've got four minutes left.

18            MR. POMERANTZ:  Oh.  Okay.  Your Honor, going to Mr.

19  Rukavina and the Strand argument that it's a nondebtor entity,

20  as I explained in my argument, the Strand -- Strand needs to

21  get exculpation or else that's a backdoor way to the Debtor.

22  Forget about the independent directors, it's a backdoor way to

23  the Debtor.  Because Mr. Dondero will be in control.  If

24  Strand is sued for post-January 9th activities, he will assert

25  an administrative claim.  And one thing from *Pacific Lumber* is

245

1    clear, the Debtor is entitled to an exculpation as part of the

2    injunction and the -- and the discharge.

3        Your Honor, Mr. Kharasch adequately addressed Mr.

4    Rukavina's comments with the gatekeeper and the gatekeeper

5    problem.  We are not seeking to stop his clients, however

6    related they may be, from exercising their rights.  We are

7    seeking a process that will not embroil the Debtor in

8    litigation going forward.  There is no problem with Your Honor

9    acting as the gatekeeper to do so.  And to the extent that

10   they are bound by the January 9th order is not really an issue

11   for today.  That'll be an issue at the temporary -- the

12   temporary -- at the preliminary injunction hearing.

13       I -- just one minute, Your Honor.

14       (Pause.)

15           MR. POMERANTZ:  Your Honor, I think I covered a lot.

16   If there's anything that any of the Objectors have mentioned

17   that I failed to respond to, I'd be happy to answer questions

18   Your Honor has.

19           THE COURT:  All right.  I guess there's, what, about

20   two minutes left, if Mr. Clemente had anything.

21       Mr. Clemente, have you drifted off?  I doubt it.  But

22   anything else from you, Mr. Clemente?

23           MR. TAYLOR:  Your Honor, I show him talking -- this

24   is Clay Taylor -- but no one's hearing him.

25           THE COURT:  Okay.  Mr. Clemente, we are not hearing

246

 1  you, or I'm not seeing you.  Make sure you're not on mute.

 2           THE CLERK:  He's not on mute, Judge.

 3           THE COURT:  He's not on mute?  So we must have a

 4  bandwidth issue or something else.

 5      All right.  Mr. Clemente, still not hearing or seeing you.

 6  We'll give him another 30 seconds.

 7           THE CLERK:  He's coming up.

 8           THE COURT:  He's coming up?  Ah, I see his name now.

 9           MR. CLEMENTE:  Your Honor, can you hear me?

10           THE COURT:  I can hear you now.

11           MR. CLEMENTE:  Okay, Your Honor.  I don't know what

12  happened.  I just switched another camera, so you may not be

13  able to see me, but can you hear me?  I'll be very quick.

14           THE COURT:  Okay.  I can hear you.

15           MR. CLEMENTE:  Can you hear me?

16           THE COURT:  Yes.

17           MR. CLEMENTE:  Okay.  Thank you, Your Honor.

18  CLOSING ARGUMENT ON BEHALF OF THE UNSECURED CREDITORS' COMMITTEE

19           MR. CLEMENTE:  Two things I want to say.  First, just

20  on Class 8, I think what's important, as my comments

21  emphasized earlier, the structure of Class 8.  We must

22  remember what it is.  It's really designed so that Class 8

23  holders receive their pro rata share of what's left after

24  prior claims are paid.  That's really what Class 8 creditors

25  voted on.  That's what the disclosure provided.  They did not

1  vote on receiving a specific dollar or a specific recovery

2  percentage.

3      And regarding the projections and estimates, Your Honor,

4  we're talking about large litigation claims that were asserted

5  and then settled.  And given the nature of these assets, the

6  values fluctuate.  It's perfectly expected, Your Honor, and

7  indeed disclosed, that there could be wide swings in the

8  amount of claims.  That does not lead to the conclusion that

9  the plan needs to be resolicited.

10      And then, finally, Your Honor, again, Mr. Pomerantz

11  adequately addressed all the points, as he did with his

12  earlier presentation, so I'm not going to touch on them, but I

13  did want to respond to one thing that Mr. Taylor said.  And I,

14  of course, agree with Mr. Pomerantz.  The Committee believes

15  there's no reason for you to delay a ruling and would in fact

16  urge you to rule as soon as Your Honor is ready to rule.

17  Confirmation of the plan, to the extent that there are

18  conversations occurring, is not going to prevent those

19  conversations from taking place, and they can continue after

20  the plan is confirmed.  There's simply nothing inherent in

21  Your Honor confirming the plan that would prevent those

22  conversations from occurring or would ultimately prevent

23  parties from pivoting to a deal on the off-chance that one

24  should be reached.

25      So I just wanted to emphasize, Your Honor, again, Your

1  Honor is going to rule when Your Honor rules, but the

2  Committee would urge you to rule, and certainly the idea that

3  there may or may not be discussions with Mr. Dondero should

4  not at all in any way lead you to the conclusion that you

5  shouldn't rule or that those conversations cannot continue

6  after plan confirmation.

7      Thank you, Your Honor.  Unless you have questions for me.

8  And my apologies with the technology.

9          THE COURT:  No problem.  All right.  Here's what I'm

10  going to do.  We can see you now, Mr. Clemente.

11          MR. CLEMENTE:  Oh.  I'm sorry, Your Honor.  I

12  switched to another camera again because it wasn't working.

13  So, I apologize.

14          THE COURT:  All right.  I am going to call you back

15  Monday.  What day of the week will that be?  Is that -- I

16  mean, Monday, what date, I should say.  That'll be the 8th,

17  right?  I am going to call you back Monday, this coming

18  Monday, February 8th, at 9:30 Central time, and I am going to

19  give you my ruling.  It will be a detailed oral bench ruling.

20  And I'm not going to leave you hanging on the edge of your

21  seat over the next few days.  I will tell you I'm inclined to

22  confirm this plan.  I think it meets all of the requirements

23  of 1129 and 1123 and 1122.

24      The thing that I am going to spend some time thinking

25  about between now and Monday morning is, no surprise, the

249

1   propriety of the exculpations, the propriety of the plan

2   injunctions, the propriety of the gatekeeper provisions.  I

3   certainly am duty-bound to go back and reread *Pacific Lumber*,

4   to go back and read *Thru, Inc.*, and to really think hard about

5   what is happening here.

6      So, I'm pretty much down, I think, to just those three

7   issues here.  I'll talk to my law clerk.  He may remind me of

8   something else that I'm not articulating right now.  But I

9   think I'm just down to those issues.  Okay?  So it's not going

10   to be a mystery very long.  We will come back Monday, 9:30.

11   My courtroom deputy will post on the docket the WebEx

12   connection instructions as usual, and we'll go from there.

13   Now, --

14        MR. POMERANTZ:  Your Honor?  Your Honor, this is Jeff

15   Pomerantz.  I have a question, and it's going to sound odd

16   coming from someone on the West Coast, but I was wondering if

17   you could do it earlier.  And the only reason I say that is,

18   the night before, I have to call in to see if I'm on jury duty

19   on Monday, and it would be helpful to me -- I assume your

20   reading the ruling would be within a half hour, 45 minutes.

21   That if you started at 9:00, if that was possible, I could

22   then get in a car, and if I'm actually called to jury duty, I

23   can get there.  Of course, I don't know if I will be called,

24   but I'd hate to miss it.

25        THE COURT:  Okay.  Well, I don't want to make you

250

 1  miss jury duty.  Okay.  We will do 9:00 o'clock.

 2          MR. POMERANTZ:  Thank you, Your Honor.

 3          THE COURT:  Hopefully no one will be, you know, hung

 4  over from watching the Super Bowl.  Personally, I don't like

 5  Tom Brady, so I may be boycotting the Super Bowl.  But maybe

 6  I'll watch it.  Maybe I'll -- I'll watch it.  So we'll do it

 7  9:00 o'clock.  So 9:00 o'clock next Monday.

 8      Now, let's talk about next the currently-set hearing this

 9  Friday, February 5th, on the injunction and contempt of court

10  motion as to Mr. Dondero and the other entities.  I want to

11  continue that, and here is what I am struggling with.  The

12  only day I have next week is Friday, the 12th, and I would

13  rather not use that date because I'm pretty jam-packed Monday

14  through Thursday, unless stuff has been settled that I haven't

15  become aware of.  So let me ask two things.  First, when is

16  the examiner motion set?  I'm just wondering if there's a

17  block of time we have coming up that --

18          MR. POMERANTZ:  I believe that's March 2nd, Your

19  Honor, so that's not for another month.

20          THE COURT:  Oh, that's not for another month?  All

21  right.

22      Traci, are you on the line?  I want to ask you --

23          THE CLERK:  Yes, I am.

24          THE COURT:  What about the following week?  I know

25  Monday, the 15th, is a federal holiday, but do we have

251

1  availability for -- I fear a full day is going to be needed

2  for continuing this Friday setting.

3  　　　　　THE CLERK:  Wednesday, February 17th, is available.

4  　　　　　THE COURT:  We've got all day on Wednesday, February

5  17th?

6  　　　　　THE CLERK:  Yes.

7  　　　　　THE COURT:  All right.  What about that?  I think I

8  heard Mr. Rukavina, I think he's the one who threw it out

9  there -- or maybe it was Mr. Taylor; I'm getting mixed up --

10  the possibility that they would agree to a continuation of the

11  preliminary injunction through -- well, I think you said

12  through confirmation.  Until the Court enters a confirmation

13  order.  And if I were to rule and approve confirmation Monday,

14  then we're talking about an order that might be entered sooner

15  than the 17th.  So, do you all have any --

16  　　　　　MR. RUKAVINA:  Your Honor?

17  　　　　　THE COURT:  -- mutually-agreeable suggestions?  If

18  not, I'm just going to set it the 12th and I'll, you know, I'm

19  killing myself, but I'll --

20  　　　　　MR. TAYLOR:  Your Honor?

21  　　　　　MR. RUKAVINA:  No, Your Honor.  I think Your Honor is

22  wise to do what's she's proposing.  The agreed TRO against my

23  clients expires on the 15th of February.

24  　　　　　THE COURT:  Uh-huh.

25  　　　　　MR. RUKAVINA:  We can easily move that back a week or

252

```
 1   a sufficient amount of time so that there's no prejudice by
 2   going on the 17th, if that would be acceptable to the Debtor,
 3   and then we can just pick a date that's sufficiently after the
 4   PI hearing so that there's protection for everyone.
 5              THE COURT:  All right.  Mr. Taylor, do you agree?
 6              MR. TAYLOR:  Yes, Your Honor.  That is acceptable to
 7   Mr. Dondero.
 8              THE COURT:  Okay.
 9              MR. TAYLOR:  We can also push it back.  Can you hear
10   me?
11              THE COURT:  Yes, I can.  Uh-huh.
12              MR. TAYLOR:  Okay.
13              THE COURT:  All right.
14              MR. POMERANTZ:  I just want to make -- I just want to
15   make sure Mr. Morris, John Morris, is on, since he's taking
16   the lead in those matters.  I don't see his picture.
17              MR. MORRIS:  I am, Jeff, and I appreciate that.  I'm
18   available, Your Honor.  We were supposed to take the
19   depositions of Mr. Leventon and Mr. Ellington tomorrow.  I
20   don't know if their counsel is on the phone.  But given Your
21   Honor's decision to adjourn the hearing from Friday, I would
22   respectfully request at this time that counsel for those two
23   individuals work with me to find a date next week in order to
24   take those depositions.
25              THE COURT:  All right.  That's --
```

253

1    MS. DANDENEAU:  Debra Dandeneau from --

2    THE COURT:  Go ahead.

3    MS. DANDENEAU:  This is Debra Dandeneau from Baker

4  McKenzie.  We agree, and we're happy to work with you on a

5  rescheduled time.

6    MR. MORRIS:  Thank you very much.

7    THE COURT:  All right.  All right.  So, someone had

8  filed a motion to continue Friday's hearing.  I think it was

9  your firm, Mr. Taylor.  I already had a motion pending for a

10 few days now.  So I'm going to direct you to upload an order,

11 Mr. Taylor, or someone at your firm, continuing the hearing to

12 the 17th at 9:30, with language in there that your -- the

13 injunction is continuing at least through that date.  And,

14 again, it's a continuance of the motion for contempt as well

15 as the setting on the preliminary injunction.  And, of course,

16 run that by Mr. Morris and Mr. Rukavina.

17   MR. TAYLOR:  Sure.  Your Honor, this is -- I'm not

18 handling the injunction hearing, or at least I don't think I

19 am.  But just so that I'm clear, should maybe the injunction

20 continue through the next day or something, so depending on

21 how Your Honor rules, there's not a rush to try and get an

22 order to you?

23   MR. RUKAVINA:  Your Honor, I think that Mr. Morris

24 and I can work this out.  Mr. Taylor is not involved in that

25 adversary, that's true, but Mr. Morris and I will be able to

254

1  very quickly enter a proposed agreed order that extends that

2  TRO for some period of time.

3           THE COURT:  Okay.

4           MR. RUKAVINA:  I'm not going to be difficult.

5           THE COURT:  Okay.  So we'll shift to you and Mr.

6  Morris to be the scriveners.  I just -- I suggested that

7  because I thought there was a motion to link the order to that

8  had been filed by Bonds Ellis.  I may be --

9           MR. MORRIS:  There was, Your Honor.  There was an

10  emergency motion to continue.  We filed an opposition, and

11  Your Honor has not yet ruled on that motion.  You're exactly

12  right.

13           THE COURT:  Okay.  All right.

14           MR. TAYLOR:  Your Honor, this is Clay Taylor.  I will

15  make sure the right people confer with Davor and John, and

16  we'll get -- we'll link it to that motion, because that makes

17  sense, to have something to link it to.

18           THE COURT:  Okay.  Yes.  And it can be a two-

19  paragraph order, I would think.

20     All right.  And then so I'm going to see you Monday at

21  9:00 o'clock Central time with the ruling.

22     Please, don't anyone file anymore paper.  I threw that out

23  earlier today.  I've got all the paper I need.  And I will see

24  you Monday at 9:00 o'clock.  Okay?  We're adjourned.

25           MR. POMERANTZ:  Thank you, Your Honor.

255

1          THE CLERK:  All rise.

2          MR. MORRIS:  Thank you, Your Honor.

3      (Proceedings concluded at 4:34 p.m.)

4                          --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                    **02/05/2021**

24  _____      _____
   Kathy Rehling, CETD-444                    Date
25  Certified Electronic Court Transcriber

256

                            INDEX

 1

 2   PROCEEDINGS                                                    4

 3   WITNESSES

 4   Debtor's Witnesses

 5   Marc Tauber
     - Direct Examination by Mr. Morris                           25
 6   - Cross-Examination by Mr. Rukavina                          34
     - Cross-Examination by Mr. Taylor                            36
 7   - Redirect Examination by Mr. Morris                         41

 8   Certain Funds and Advisors' Witnesses

 9   James P. Seery
     - Direct Examination by Mr. Rukavina                         45
10   - Cross-Examination by Mr. Morris                            49
     - Redirect Examination by Mr. Rukavina                       50
11
     Robert Jason Post
12   - Direct Examination by Mr. Rukavina                         51
     - Cross-Examination by Mr. Morris                            56
13   - Redirect Examination by Mr. Rukavina                       62
     - Recross-Examination by Mr. Morris                          63
14

15   EXHIBITS

16   Debtor's Docket 1887 - Leatham Declaration      Received   6
     Debtor's Exhibit B, Docket 1822                 Received   8
17   Debtor's Exhibit 6R, Docket Entry 1822          Received   9
     Debtor's Exhibits 6S and 6T, Docket Entry 1822  Received  12
18   Debtor's Exhibit 6U, Docket Entry 1822          Received  13
     Debtor's Exhibits D and E, Docket Entry 1822    Received  15
19   Debtor's Exhibits 4D, 4E, and 4G, Docket 1822   Received  17
     Debtor's Exhibit 5T, Docket 1822                Withdrawn 17
20   Debtor's Exhibit 10A                            Received  22
     Debtor's Omnibus Reply to Plan Objections,      Received  23
21      Docket 1807
     Debtor's Exhibit 7O (Abridged)                  Received  44
22

23   Certain Funds and Advisors' Exhibit 2,          Received  53
        Docket Entry 1863
24

25   Dondero's Exhibits 6 through 12 and             Received  66
        15 through 17

257

INDEX
Page 2

EXHIBITS, cont'd.

Judicial Notice to be Taken of Docket 1887,                    6
    Patrick Leatham Declaration

Judicial Notice to be Taken of Docket 247,                   45
    Schedules

CLOSING ARGUMENTS

- By Mr. Pomerantz                                           73
- By Mr. Kharasch                                           151
- By Mr. Clemente                                           154
- By Mr. Draper                                             159
- By Mr. Rukavina                                           184
- By Mr. Taylor                                             208
- By Mr. Pomerantz                                          227
- By Mr. Clemente                                           246

RULINGS

Confirmation Hearing [1808] - *Taken Under Advisement*      248

Agreed Motion to (1) Assume Non-Residential Real Property   248
Lease with Crescent TC Investors, LP upon Confirmation of
Plan and (II) Extend Assumption Deadline [1624] - *Taken
Under Advisement*

END OF PROCEEDINGS                                          255

INDEX                                                    256-257