PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
         rfeinstein@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com
-and-

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:   MHayward@HaywardFirm.com
         ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Plaintiff, | § § | Adv. Proc. No. 21-03003-sgj |
| vs. | § § | |
| JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § | Case No. 3:21-cv-01010-E |
| Defendants. | § § § | |

HIGHLAND CAPITAL MANAGEMENT, L.P.,

                              Plaintiff,

vs.

HIGHLAND CAPITAL MANAGEMENT FUND
ADVISORS, L.P.,

                              Defendant.

§
§
§
§
§
§
§
§
§
§
§
§
§
§

Adv. Proc. No. 21-3004

Case No. 3:21-cv-00881-X

---

HIGHLAND CAPITAL MANAGEMENT, L.P.,

                              Plaintiff,

vs.

NEXPOINT ADVISORS, L.P., JAMES
DONDERO, NANCY DONDERO, AND
THE DUGABOY INVESTMENT TRUST,

                              Defendants.

§
§
§
§
§
§
§
§
§
§
§
§

Adv. Proc. No. 21-3005

Case No. 3:21-cv-00880-C

---

HIGHLAND CAPITAL MANAGEMENT, L.P.,

                              Plaintiff,

vs.

HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC., JAMES DONDERO,
NANCY DONDERO, AND THE DUGABOY
INVESTMENT TRUST,

                              Defendants.

§
§
§
§
§
§
§
§
§
§
§
§
§
§

Adv. Proc. No. 21-3006

Case No. 3:21-cv-01378-N

HIGHLAND CAPITAL MANAGEMENT, L.P.,       §
      §
      §
      §   Adv. Proc. No. 21-3007

                  Plaintiff,       §

vs.       §
      §   Case No. 3:21-cv-01379-X

HCRE PARTNERS, LLC (n/k/a NexPoint       §
Real Estate Partners, LLC), JAMES       §
DONDERO, NANCY DONDERO, AND       §
THE DUGABOY INVESTMENT TRUST,       §
      §
      §
                  Defendants.       §

**TABLE OF CONTENTS**

**Page**

I. PRELIMINARY STATEMENT ...................................................................................... 1

II. STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................... 2

    A. BACKGROUND ............................................................................................. 2

        1. The Bankruptcy Case .......................................................................... 2

        2. Procedural History ............................................................................... 3

            i. Commencement of the Adversary Proceedings ...................... 3

            ii. Defendants' Motions to Withdraw the Reference ................... 4

            iii. The Adversary Proceedings are Consolidated for Pretrial Purposes ................................................................................... 4

            iv. Plaintiff Files the Amended Complaints ................................ 5

    B. HIGHLAND EXTENDS LOANS TO THE OBLIGORS IN EXCHANGE FOR THE NOTES BUT THE OBLIGORS DEFAULT ....................................... 5

        1. The Demand Notes .............................................................................. 5

            i. James Dondero ....................................................................... 6

            ii. HCMFA ................................................................................. 6

            iii. HCMS .................................................................................... 6

            iv. HCRE ..................................................................................... 7

        2. The Term Notes ................................................................................... 9

    C. THE EVIDENCE OF THE EXISTENCE, VALIDITY AND ENFORCEABILITY OF THE NOTES IS OVERWHELMING ......................... 12

        1. Highland Disclosed The Notes In its Audited Financial Statements and Carried them as Assets on its Balance Sheet ..................................... 13

        2. In October 2020, HCMFA and NexPoint Jointly Informed The Retail Board of their Obligations under Their Respective Notes ............. 17

        3. Without Exception, the Notes were Disclosed in Highland's Books and Records and Were Consistently Carried as Assets without Discount ...................................................................................... 19

        4. Recovery on the Notes Was A Significant Component of the Plan Yet the Obligors Remained Silent On the Point Despite Lodging Objections ............................................................................... 21

    D. THE OBLIGORS' AFFIRMATIVE DEFENSES ............................................... 23

|  |  | 1. | The Alleged Agreement Defense | 23 |
|  |  |  | i. The Allegations Materially Changed Over Time | 24 |
|  |  |  | ii. The Final Version of the "Alleged Agreement" Defense | 26 |
|  |  |  | iii. No Reasonable Trier of Fact Can Find that the Alleged Agreement Existed | 26 |
|  |  | 2. | HCMFA's "Mutual Mistake" Defense | 32 |
|  |  | 3. | Waiver and Estoppel [NexPoint, HCMS, HCRE] | 37 |
|  |  | 4. | Other Defenses | 38 |
| III. | ARGUMENT | | | 38 |
|  | A. | Legal Standard | | 38 |
|  |  | 1. | Summary Judgment Standard | 38 |
|  |  | 2. | Summary Judgment Standard for Promissory Notes | 40 |
|  | B. | Highland is Entitled to Summary Judgment for Defendants' Breach of the Notes | | 40 |
|  | C. | Defendants Fail to Rebut Highland's Prima Facie Case | | 43 |
|  |  | 1. | No Reasonable Jury Could Find that the "Alleged Agreement" Exists | 43 |
|  |  | 2. | No Reasonable Jury Could Find the HCMFA Note Was a "Mistake" | 46 |
|  |  | 3. | No Reasonable Jury Could Find that NexPoint's, HCRE's, and HCMS's Defaults under the Notes Were the Result of Highland's Negligence | 48 |
|  |  | 4. | No Reasonable Jury Could Find that NexPoint "Prepaid" on the NexPoint Note | 49 |
| CONCLUSION | | | | 49 |

EXHIBIT A - Parties, Witnesses, and Definitions

## TABLE OF AUTHORITIES

**CASES**

*Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.*,
   MO:19-CV-173-DC, 2021 WL 2772808 (W.D. Tex. Apr. 28, 2021) ................................ 46, 48

*Alton v. Texas A&M University*,
   168 F.3d 196 (5th Cir. 1999) ........................................................................... 39, 40

*Armstrong v. City of Dallas*,
   997 F.2d 62 (5th Cir.1993) ...................................................................................... 40

*Crisalli v. ARX Holding Corp.*,
   177 F. App'x 417 (5th Cir. 2006)............................................................................. 46

*FDIC v. Cardinal Oil Well Servicing Co.*,
   837 F.2d 1369 (5th Cir.1988) ................................................................................. 40

*Hall v. Branch Banking*,
   No. H-13-328, 2014 WL 12539728 (S.D.Tex. Apr. 30, 2014)................................... 39

*Hitachi Capital Am. Corp. v. Med. Plaza Surgical Ctr., LLP.*,
   CIV.A. 06-1959, 2007 WL 2752692 (S.D. Tex. Sept. 20, 2007)............................ 47

*In re Heritage Org., L.L.C.*,
   354 B.R. 407, 431–32 (Bankr. N.D. Tex. 2006)................................................ 45, 46

*In re Magna Cum Latte, Inc.*,
   07-31814, 2007 WL 3231633 (Bankr. S.D. Tex. Oct. 30, 2007) ................. 39, 40, 44

*Latimer v. Smithkline & French Laboratories*,
   919 F.2d 301 (5th Cir.1990) .................................................................................. 39

*Looney v. Irvine Sensors Corp.*,
   CIV.A.309-CV-0840-G, 2010 WL 532431 (N.D. Tex. Feb. 15, 2010) ........ 40, 43, 46, 48

*Melanson v. Navistar, Inc.*,
   3:13-CV-2018-D, 2014 WL 4375715 (N.D. Tex. Sept. 4, 2014)........................... 45

*Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*,
   40 F.3d 698 (5th Cir. 1994) .................................................................................. 39

*Resolution Tr. Corp. v. Starkey*,
   41 F.3d 1018 (5th Cir. 1995) ........................................................................... 40, 43

*Scott v. Wollney*,
   No. 3:20-CV-2825-M-BH, 2021 WL 4202169 (N.D. Tex Aug. 28, 2021)............... 45

*Turner v. Baylor Richardson Med. Ctr.*,
   476 F.3d 337 (5th Cir. 2007) ................................................................................ 39

*Warfield v. Byron*,
   436 F.3d 551 (5th Cir. 2006) ................................................................................ 38

*Whitney Nat. Bank v. Medical Plaza Surgical Center L.L.P.*,
No. H-06-1492, 2007 WL 3145798 (S.D.Tex. Oct. 27. 2007) ..................................... 46, 47, 48

**RULES**

FED. R. CIV. P. 56(c) ................................................................................................................... 36

DOCS_NY:44673.9 36027/003

### HIGHLAND CAPITAL MANAGEMENT, L.P.'S AMENDED MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Highland Capital Management, L.P., the reorganized debtor and the plaintiff in the above-captioned adversary proceedings ("Highland" or "Plaintiff"), hereby files this amended memorandum of law in support of its *Motion for Partial Summary Judgment* (the "Motion") on its First and Second Causes of Action.[1]  In support of its Motion, Highland states as follows:

### I.    PRELIMINARY STATEMENT[2]

1.     In accordance with its Plan and the clear and unambiguous terms of the Notes, Plaintiff seeks to collect on over $50 million of promissory notes issued by Mr. Dondero and certain entities controlled by him.  The Notes were tendered in exchange for hard dollars at a time when Mr. Dondero controlled both the borrower and the lender.  Now, Mr. Dondero refuses to make good on his promises to repay the money he borrowed.

2.     Plaintiff makes out its prima facie case for summary judgment for Defendants' breach of the Notes.  The uncontroverted documentary evidence shows that the Notes are (i) valid, (ii) executed by Defendants and in favor of Highland, and (iii) there is a balance due and owing under the Notes.  Defendants fail to rebut Plaintiff's prima facie case because Defendants fail to create a genuine issue of material fact regarding their breach.   There is a complete absence of evidence to support each of Defendants' affirmative defenses.

3.     Nevertheless, Defendants are certain to contest every single fact and erect countless strawmen regardless of the record in support of their own fabricated stories.  But in the end, there will be no evidence to corroborate the Defendants' contentions other than their own

---

[1] Concurrently herewith, Highland is filing the *Appendix of Exhibits in Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment* (the "Appendix"). Citations to the Appendix are notated as follows: Ex. #, Appx. #

[2] Capitalized terms in this Preliminary Statement shall have the meanings ascribed to them below.

self-serving, conclusory, and unsubstantiated assertions. There will be no documents or written communications that credibly support Defendants' story. By contrast, Plaintiffs claims are both simple and buttressed by a mountain of undisputed evidence including contemporaneous written communications, audited financial statements, statements to third parties, books and records, and the plain words of the Defendants and their officers.

4.　Plaintiff does not have to prove its case beyond a reasonable doubt or by clear and convincing evidence nor does Plaintiff have the burden of proving that *no* facts are in dispute. Instead, Plaintiff need only show that there is no "genuine" dispute of material fact.

5.　Viewed fairly, Plaintiff's evidence is so overwhelming, and Defendants' stories are so weak, that the Court must grant the Motion.

## II.　STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.　BACKGROUND[3]

#### 1.　The Bankruptcy Case

6.　On October 16, 2019 (the "Petition Date"), Highland filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

7.　On December 4, 2019, the Delaware Court entered an order transferring venue of Highland's bankruptcy case to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") [Bankr. Docket No. 186].[4]

---

[3] Attached hereto as **Exhibit A** is a list of *Parties, Witnesses, and Definitions*.

[4] "Bankr. Docket No. __" refers to the docket maintained by the Bankruptcy Court in case no. 19-34054.

2

8.      On January 22, 2021, Highland filed its *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Bankr. Docket No. 1808] (the "Plan").

9.      On February 22, 2021, the Bankruptcy Court entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Bankr. Docket No. 1943] (the "Confirmation Order") which confirmed Highland's Plan.[5]

10.     On August 11, 2021, the Plan became Effective (as defined in the Plan), and Highland became the Reorganized Debtor (as defined in the Plan). *See Notice of Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Bankr. Docket No. 2700].

### 2.      Procedural History

#### i.      Commencement of the Adversary Proceedings

11.     On January 22, 2021, Plaintiff commenced the Adversary Proceedings by filing a *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* (the "Original Complaints") against each of the Defendants.[6]

12.     In its Original Complaints, Plaintiff asserted claims against each Defendant for (i) breach of contract for the Defendant's breach of its respective obligations under the Notes and (ii) turnover by each Defendant for all accrued and unpaid principal and interest due under the

---

[5] The confirmed Plan included certain amendments filed on February 1, 2021. *See Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, Ex. B [Bankr. Docket No. 1875].

[6] *See* Adv. Pro. No. 21-03003 (the "Dondero Action"), Docket No. 1 (the "Dondero Original Complaint"); Adv. Proc. No. 21-03004 (the "HCFMA Action"), Docket No. 1 (the "HCMFA Original Complaint"); Adv. Pro. No. 21-03005 (the "NexPoint Action"), Docket No. 1 (the "NexPoint Original Complaint"); Adv. Proc. No. 21-03006 (the "HCMS Action"), Docket No. 1 (the "HCMS Original Complaint"); and Adv. Pro. No. 21-03007 (the "HCRE Action"), Docket No. 1 (the "HCRE Original Complaint"). The forgoing are collectively referred to as the "Original Complaints."

Notes until the date of payment, plus Plaintiff's cost of collection and reasonable attorney's fees (as expressly provided for under each of the Notes).

### ii.    Defendants' Motions to Withdraw the Reference

13.    Between April and June 2021, the Obligors each filed a similar motion to withdraw the reference (the "Motions to Withdraw") in which the Obligors sought to withdraw the Adversary Proceedings from the Bankruptcy Court to the District Court.

14.    In July 2021, the Bankruptcy Court issued Reports and Recommendations (the "R&Rs") to the District Court recommending that the Motions to Withdraw be granted, but that the Bankruptcy Court retain the cases for all pre-trial matters, including the consideration (but not determination) of any dispositive motions.

15.    The applicable District Court subsequently adopted the Bankruptcy Court's R&Rs in the NexPoint, HCMS, HCRE, and HCMFA Actions, but the decision on the R&R in the Dondero Action remains pending.

### iii.    The Adversary Proceedings are Consolidated for Pretrial Purposes

16.    The Parties subsequently agreed to, among other things, consolidate discovery for all purposes and coordinate the timing of the service of pleadings (i.e., Plaintiff's amended complaints adding the New Claims against the Duty Defendants and the Defendants' responses thereto). That agreement was memorialized in a *Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* dated August 17, 2021, approved by the Bankruptcy Court on September 6, 2021, and entered in each respective Adversary Proceeding (collectively, the "Discovery Stipulations").

17.    In furtherance of the intent reflected in the Discovery Stipulations, and consistent with the related Orders granting Plaintiff's unopposed motions for leave to amend its pleadings, Plaintiff was "deemed to have served the Amended Complaint on the [applicable]

4

[D]efendant on July 13, 2021," even though the Amended Complaints were not actually filed on the dockets until August 27, 2021.

### iv.  Plaintiff Files the Amended Complaints

18.     On August 27, 2021, Highland filed its Amended Complaints against Mr. Dondero (Ex. 32, Appx. 658-728), NexPoint (Ex. 2, Appx. 22-95), HCMS (Ex. 3, Appx. 96-179), and HCRE (Ex. 4, Appx. 180-263).[7]  In the Amended Complaints, Highland added the new claims against new defendants.  Specifically, Plaintiff (a) added as defendants (i) Ms. Dondero; (ii) Dugaboy; and (iii) Mr. Dondero, in his capacity as an "aider and abetter" to Dugaboy (collectively, the "Duty Defendants") and (b) asserted claims against the Duty Defendants for (i) declaratory relief; (ii) breach of fiduciary duty; and (iii) aiding and abetting a breach of fiduciary duty, arising from the Duty Defendants' unlawful entry into the Alleged Agreements.[8]

### B.  HIGHLAND EXTENDS LOANS TO THE OBLIGORS IN EXCHANGE FOR THE NOTES BUT THE OBLIGORS DEFAULT

19.     The Obligors are the makers under a series of promissory notes tendered to Highland in exchange for contemporaneous loans and other consideration.  These Notes were executed between 2013 and 2019 and are described below.

### 1.  The Demand Notes

20.     As the documentary evidence specifically identified below establishes, Mr. Dondero, HCMFA, HCMS, and HCRE each executed certain demand notes, as makers, in favor of Highland (collectively, the "Demand Notes") in exchange for contemporaneous loans as follows:

---

[7] All of the amendments related to the belated assertion of the Alleged Agreement defense.  Plaintiff did not amend its complaint against HCMFA because that entity did not assert the Alleged Agreement defense.

[8] Plaintiff also added claims for actual fraudulent transfer against Mr. Dondero, NexPoint, HCRE, and HCMS because their respective Notes were purportedly all subject to the Alleged Agreement.

i. **James Dondero**

- a Demand Note in the original principal amount of $3,825,000, executed on February 2, 2018, in favor of Highland (the "First Dondero Note"); (Klos Dec.[9] ¶ 18 at Ex. D); Ex. 125 at 9, Appx. 2357; Ex. 188, Appx. 3001-3002; Ex. 189, Appx. 3003-3004; Ex. 74, Appx. 1338-1340; Ex. 81 (Responses to RFAs 1-3), Appx. 1387; *see also* Ex. 32 ¶ 20, Appx. 664; Ex. 31 ¶ 20, Appx. 647)

- a Demand Note in the original principal amount of $2,500,000, executed on August 1, 2018, favor of Highland (the "Second Dondero Note"); (Klos Dec. ¶ 19 at Ex. E); Ex. 126 at 2, Appx. 2366; Ex. 190, Appx. 3005-3006; Ex. 76, Appx. 1354-1356; Ex. 81 (Responses to RFAs 5-7), Appx. 1387-1388; *see also* Ex. 32 ¶ 21, Appx. 664; Ex. 31 ¶ 21, Appx. 647); and

- a Demand Note in the original principal amount of $2,500,000, executed on August 13, 2018, in favor of Highland (the "Third Dondero Note," collectively with the First Dondero Note and the Second Dondero Note, the "Dondero Notes") (Klos Dec. ¶ 20 at Ex. F); Ex. 126 at 2, Appx. 2366; Ex. 77, Appx. 1357-1359; Ex. 81 (Responses to RFAs 9-11), Appx. 1388; *see also* Ex. 32 ¶ 22, Appx. 664; Ex. 31 ¶ 22, Appx. 647).

ii. **HCMFA**

- a Demand Note in the original principal amount of $2,400,000, executed on May 2, 2019, in favor of Highland (the "First HCMFA Note") (Klos Dec. ¶ 21 at Ex. G); Ex. 147 at 7, Appx. 2526; Ex. 54, Appx. 870-873; Ex. 55, Appx. 874-875; Ex. 1 (Exhibit 1) Appx. 9-11; Ex. 53, Appx. 866-869); and

- a Demand Note in the original principal amount of $5,000,000, executed on May 3, 2019, in favor of Highland (the "Second HCMFA Note," together with the First HCMFA Note, the "HCMFA Notes") (Klos Dec. ¶ 22 at Ex. H); Ex. 147 at 7, Appx. 2526; Ex. 56, Appx. 876-877; Ex. 1 (Exhibit 2), Appx. 12-15; Ex. 57, Appx. 878-880).

iii. **HCMS**

- a Demand Note in the original principal amount of $150,000, executed on March 28, 2018, in favor of Highland (the "First HCMS Demand Note") (Klos Dec. ¶ 23 at Ex. I); Ex. 143, Appx. 2487-2490; Ex. 3 (Exhibit 1), Appx. 117-119;

---

[9] Refers to the *Declaration of David Klos in Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment*, being filed concurrently herewith.

- a Demand Note in the original principal amount of $200,000, executed on June 25, 2018, in favor of Highland (the "Second HCMS Demand Note") (Klos Dec. ¶ 24 at Ex. J); Ex. 144, Appx. 2491-2494; Ex. 3 (Exhibit 2), Appx. 120-122);

- a Demand Note in the original principal amount of $400,000, executed on May 29, 2019, in favor of Highland (the "Third HCMS Demand Note") (Klos Dec. ¶ 25 at Ex. K); Ex. 145 at 11, Appx. 2506; Ex. 3 (Exhibit 3), Appx. 123-125); and

- a Demand Note in the original principal amount of $150,000, executed on June 26, 2019, in favor of Highland (the "Fourth HCMS Demand Note," collectively with the First HCMS Demand Note, the Second HCMS Demand Note, and the Third HCMS Demand Note, the "HCMS Demand Notes") (Klos Dec. ¶ 26 at Ex. L); Ex. 146 at 7, Appx. 2516; Ex. 3 (Exhibit 4), Appx. 126-128).

### iv.  HCRE

- a Demand Note in the original principal amount of $100,000, executed on November 27, 2013, in favor of Highland (the "First HCRE Demand Note") (Klos Dec. ¶ 27 at Ex. M); Ex. 148, Appx. 2533-2536; Ex. 4 (Exhibit 1), Appx. 201-203);

- a Demand Note in the original principal amount of $2,500,000, executed on October 12, 2017, in favor of Highland (the "Second HCRE Demand Note") (Klos Dec. ¶ 28 at Ex. N); Ex. 154 at 7, Appx. 2575; Ex. 4 (Exhibit 2), Appx. 204-206);

- a Demand Note in the original principal amount of $750,000, executed on October 15, 2018, in favor of Highland (the "Third HCRE Demand Note") (Klos Dec. ¶ 29 at Ex. O); (Ex. 155 at 5, Appx. 2585; Ex. 4 (Exhibit 3), Appx. 207-209); and

- a Demand Note in the original principal amount of $900,000, executed on September 25, 2019, in favor of Highland (the "Fourth HCRE Demand Note," collectively with the First HCRE Demand Note, the Second HCRE Demand Note, and the Third HCRE Demand Note, the "HCRE Demand Notes") (Klos Dec. ¶ 30 at Ex. P); Ex. 156 at 6, Appx. 2596; Ex. 4 (Exhibit 4), Appx. 210-212).

21.     Except for the date, the amount, the maker, and the interest rate, each of the

Demand Notes is identical and includes the following provisions, among others:

2.     Payment of Principal and Interest.  The accrued interest and principal of this Note shall be ***due and payable on demand of the Payee***.

5.     Acceleration Upon Default.  ***Failure to pay this Note or any installment hereunder as it becomes due shall***, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate notice of acceleration, or any other notice of any kind which are hereby waived, ***mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.***  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

6.     Waiver.  Maker hereby ***waives*** grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

7.     Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, ***the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection***, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

Ex. 74, Appx. 1338-1340; Ex. 76, Appx. 1354-1356; Ex. 77, Appx. 1357-1359; Ex. 1 (Exhibits 1-2), Appx. 9-15; Ex. 3 (Exhibits 1-4), Appx. 117-128; and Ex. 4 (Exhibits 1-4), Appx. 201-212 (emphases added).

22.     On December 3, 2020, Highland made separate demands on Mr. Dondero, HCMFA, HCMS, and HCRE, respectively, for payment of all accrued principal and interest due under the Demand Notes by December 11, 2020.  The Demand Letters also included a demand for all costs of collection, including attorneys' fees, as provided in the Notes.  Ex. 79, Appx. 1370-1373; Ex. 1 (Exhibit 3), Appx. 16-19; Ex. 3 (Exhibit 5), Appx. 129-132; and Ex. 4 (Exhibit 5), Appx. 213-216 (collectively, the "Demand Letters").

8

23.     Neither Mr. Dondero, nor HCMFA, nor HCMS, nor HCRE made any payments to Highland on account of Notes or otherwise responded to the Demand Letters prior to the commencement of the Adversary Proceedings.

24.     Consequently, Mr. Dondero, HCMFA, HCMS, and HCRE breached Section 2 of each Demand Note, and each such Obligor is in default.

25.     As of December 11, 2020, the unpaid principal and accrued interest due under the Dondero Notes was $9,004,013.07, and (b) as of December 17, 2021, the unpaid principal and accrued interest due under the Dondero Notes was $9,263,365.05. (Klos Dec. ¶ 37).

26.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCMFA Notes was $7,687,653.06, and (b) December 17, 2020, the unpaid principal and accrued interest due under the HCMFA Demand Notes was $7,874,436.09. (Klos Dec. ¶ 40).

27.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCMS Demand Notes was $947,519.43, and (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81. (Klos Dec. ¶ 45).

28.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,012,170.96, and (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23. (Klos Dec. ¶ 50).

## 2.     <u>The Term Notes</u>

29.     As the documentary evidence specifically identified below establishes, on May 31, 2017, Mr. Dondero executed a 30-year term note on behalf of NexPoint (the "<u>NexPoint Term Note</u>"), HCMS (the "<u>HCMS Term Note</u>"), and HCRE (the "<u>HCRE Term Note</u>"),

respectively, each as a maker, in favor of Highland (collectively, the "Term Notes"). (Klos Dec. ¶¶ 27-29).

30.     Each of the Term Notes "rolled up" the respective maker's obligations under certain then-outstanding demand notes that were identified as the "Prior Notes" in each Term Note.[10]

31.     The following Term Notes are at issue:

- a Term Note signed on NexPoint's behalf in the original principal amount of $30,746,812.23 (the "NexPoint Term Note") (Klos Dec. ¶ 31 at Ex. A); Ex. 2 (Exhibit 1), Appx. 41-44; Ex. 2 ¶ 21, Appx. 28; Ex. 15 ¶ 21, Appx. 428);

- a Term Note signed on HCMS's behalf in the original principal amount of $20,247,628.02 (the "HCMS Term Note" and together with the HCMS Demand Notes, the "HCMS Notes") (Klos Dec. ¶ 32 at Ex. R); Ex. 3 (Exhibit 6), Appx. 133-136); and

- a Term Note signed on HCRE's behalf in the original principal amount of $6,059,831.51 (the "HCRE Term Note" and together with the HCRE Demand Notes, the "HCRE Notes") (Klos Dec. ¶ 33 at Ex. S); Ex. 4 (Exhibit 6), Appx. 217-220).

32.     According to Mr. Waterhouse, Highland loaned money to NexPoint, HCMS, and HCRE to enable those entities to make investments. Ex. 105 at 126:21-129:3, Appx. 2081.[11]

---

[10] Proof of the loans underlying the Prior Notes (as defined in each Term Note) can be found at Exs. 127-141, Appx. 2368-2481 (HCMS); Exs. 149-153, Appx. 2537-2567 (HCRE); Exs. 157-161, Appx. 2599-2636 (NexPoint (the July 22, 2015 Prior Note appears to have been backdated because the underlying loans were effectuated between July 2015 and May 2017 (*see* Ex. 161))).

[11] Highland sought to inquire as to the use of the loan proceeds by NexPoint, HCMS, and HCRE (Exs. 47-49, Appx. 842-859 (Rule 30(b)(6) Topic 3(e))), but (a) those Obligors objected on relevance grounds (Ex. 191, Appx. 3007-3012; Ex. 98 at 348:18-20, Appx. 1758), and (b) Mr. Dondero claimed to have no personal knowledge of the purpose of the loans or the borrowers' use of the loan proceeds. Ex. 98 at 420:10-18, Appx. 1776, 435:17-25, Appx. 1779, 448:4-13, Appx. 1783, and 450:3-24, Appx. 1783.

33. Except for the date, the amount, the maker, the interest rate, and the identity of the Prior Notes (as that term is defined in each Term Note), each of the Term Notes is identical and includes the following provisions, among others:

2.1 <u>Annual Payment Dates</u>. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**<u>Annual Installment</u>**") until the Note is paid in full. ***Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note***, commencing on the first such date to occur after the date of execution of this Note.

4. <u>Acceleration Upon Default</u>. *Failure to pay this Note or any installment hereunder as it becomes due shall*, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, ***mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof***. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5. <u>Waiver</u>. Maker hereby ***waives*** grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6. <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, ***the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection***, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

34. NexPoint, HCMS, and HCRE each failed to make the Annual Installment payment due on December 31, 2020.

35. As of (a) January 8, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,471,804.98, and (b) December 17, 2021, the unpaid

11

principal and accrued interest due under the NexPoint Term Note was $24,383,877.27.[12] (Klos Dec. ¶ 51).

36. As of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,758,507.81, and (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,748,456.31.[13] (Klos Dec. ¶ 52).

37. As of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $6,145,466.84, and (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $5,899,962.22.[14] (Klos Dec. ¶ 53).

## C.    THE EVIDENCE OF THE EXISTENCE, VALIDITY AND ENFORCEABILITY OF THE NOTES IS OVERWHELMING

38. As described in more detail below, the existence, validity, and enforceability of the Notes is corroborated by the following undisputed facts:

- Plaintiff's audited financial statements (prepared based on management representation letters signed by Mr. Dondero and Mr. Waterhouse) showed that each of the Notes (including the HCMFA Notes) (a) was carried as an asset on Plaintiff's balance sheet, (b) had a value equal to the unpaid principal and interest then due, and (c) was disclosed without reference to the Alleged Agreement, HCMFA's Mistake Defense, or any other defense;

- HCMFA and NexPoint jointly reported to the Retail Board in October 2020 that they were obligated to pay Highland the amounts due under the HCMFA Notes and the NexPoint Notes, respectively, each without any setoff or reservation;

---

[12] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

[13] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[14] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

- Without exception, Plaintiff's contemporaneous books and records recorded the Notes (including the HCMFA Notes) as debts due and owing by each of the Obligors to Plaintiff;

- Without exception, throughout Plaintiff's bankruptcy (including during the period from the Petition Date through January 9, 2020, when Mr. Dondero solely controlled Plaintiff), Plaintiff's bankruptcy filings (most of which were prepared or signed by Mr. Waterhouse) reported the Notes (including the HCMFA Notes) as being assets of the Debtor's estate, each without any setoff or reservation;

- The Notes (including the HCMFA Notes) were identified as substantial assets and sources of recovery under Plaintiff's proposed Plan, yet none of the Obligors informed the Court, Plaintiff, or any creditors of any of their purported defenses even though (a) each of them filed a Plan Objection, and (b) the Adversary Proceedings had already been commenced when the confirmation hearing on the Plaintiff's Plan was conducted.

1.   **Highland Disclosed The Notes In its Audited Financial Statements and Carried them as Assets on its Balance Sheet**

39.     The undisputed evidence cited below establishes, among other things, that (a) all of the Notes executed through early May 2019 were provided to PwC, Highland's long-time outside auditors, and were described in Highland's audited financial statements; (b) all of the Notes were carried as assets on Highland's balance sheet and were valued in amounts equal to the accrued and unpaid principal and interest without any offset or reservation whatsoever;[15] and (c) neither Highland nor Mr. Dondero disclosed the Alleged Agreement, HCMFA's Mistake Defense, or any other defense to PwC despite having an affirmative obligation to do so under generally accepted accounting principals ("GAAP").

---

[15] As discussed below, the HCMFA Notes were executed in May 2019, and were fully described in the "Subsequent Events" section of Highland's audited financial statements for the period ending December 31, 2018. Ex. 34 at 39, Appx. 782. Because the HCMFA Notes were executed after the end of the fiscal year, they were **not** included as "assets" for 2018, and Highland never completed its 2019 audit. Nevertheless, the undisputed evidence also shows that HCMFA (a) disclosed the existence of the HCMFA Notes in the "Subsequent Events" section of its *own* 2018 audited financial statements and (b) carried the HCMFA Notes as liabilities on its *own* balance sheet. Ex. 45 at 17; Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3, Appx. 3028, 56:20-59:3, Appx. 3028-3029.

40.     PwC's audit process was extensive and took months to complete.  Ex. 94 at
9:24-12:14, Appx. 1554-1555.

41.     As part of the process, Highland was responsible for drafting the financial
statements and accompanying notes and "management" provided the information that PwC needed
to conduct its audits.  *Id*. at 14:8-15:14, Appx. 1556; *see also id*. at 49:11-50:22, Appx. 1564-1565.
All of Highland's employees who worked on the audit reported to Mr. Waterhouse, and Mr.
Waterhouse was ultimately responsible for making sure the audit was accurate before it was
finalized.  Ex. 105 at 87:25-89:10, Appx. 2071.

42.     Before signing off on its audit, PwC required Highland to deliver
"management representation letters" that included specific representations that PwC relied upon.
Ex. 94 at 16:18-17:20, Appx. 1556, 23:4-9, Appx. 1558.  *See also* Ex. 105 at 96:24-98:6, Appx.
2073-2074 (according to Mr. Waterhouse, management representation letters are "required in an
audit to help verify completeness.").

43.     For at least the fiscal years 2017 and 2018, Mr. Dondero and Mr.
Waterhouse signed Highland's management representation letters; their representations were
applicable through the date of the audit's completion so that all "material" subsequent events could
be included and disclosed.  Ex. 33, Appx. 729-740, Ex. 86, Appx. 1420-1431, Ex. 94 at 17:21-25,
Appx. 1556, 19:2-22:6, Appx. 1557-1558; *see also* Ex. 105 at 92:4-8, Appx. 2072, 94:20-95:12,
Appx. 2073.

44.     On June 3, 2019, in connection with PwC's audit of Highland's financial
statements for the period ending December 31, 2018, Mr. Dondero and Mr. Waterhouse made the
following representations to PwC:

- The Affiliated Party Notes represented bona fide claims against the makers, and all Affiliated Party Notes were current as of June 3, 2019 (Ex. 33 ¶11, Appx. 732; Ex. 94 at 24:6-25:5, Appx. 1558);[16]

- If there were any errors in Highland's financial statements, they were not "material" (Ex. 33 ¶32, Appx. 735; Ex. 94 at 25:6-26:13, Appx. 1558-1559);

- There were no "material" transactions or agreements that were not recorded in the financial statements (Ex. 33 ¶34, Appx. 735; Ex. 94 at 26:14-27:11, Appx. 1559);

- All relationships and transactions with, and amounts receivable or payable to or from, related parties were properly reported and disclosed in the consolidated financial statements (Ex. 33 ¶35(d), Appx. 735; Ex. 94 at 27:12-28:11, Appx. 1559);

- All related party relationships and transactions known to Mr. Dondero and Mr. Waterhouse were disclosed (Ex. 33 ¶36, Appx. 736; Ex. 94 at 28:12-29:5, Appx. 1559); and

- All subsequent events were disclosed (Ex. 33 (signature page), Appx. 738; Ex. 94 at 29:6-30:2, Appx. 1559-1560).

45.     Under GAAP, Highland was required to disclose to PwC (a) all "material" related party transactions and (b) any circumstances that would call into question the collectability of any of the Notes.  Ex. 94 at 34:17-35:2, Appx. 1561, 51:17-52:5, Appx. 1565, 70:20-71:3, Appx. 1570.[17]

46.     Neither Mr. Dondero nor Highland ever disclosed to PwC (a) the existence or terms of the Alleged Agreement; (b) the existence of any oral or written amendment to any of the Affiliate Notes listed in PwC's 2018 work papers; or (c) that any of the Notes might be

---

[16] "Affiliated Party Notes" is the term used by PwC to refer to notes tendered to Highland by officers, employees, or affiliates of Highland.  *See generally* Ex. 33, Appx. 729-740; Ex. 94, Appx. 1551-1585.

[17] For purposes of the 2017 audit, the "materiality" threshold was $2 million.  Ex. 86 at 1, Appx. 1421.  For purposes of the 2018 audit, the "materiality" threshold was $1.7 million or more.  Ex. 33 at 1, Appx. 730; Ex. 94 at 22:11-23:3, Appx. 1558.  *See also* Ex. 105 at 91:14-93:6, Appx. 2072.

forgiven. Ex. 24 (Responses to RFAs 1-2), Appx. 521; Ex. 94 at 67:16-70:19, Appx. 1569-1570, 71:4-74-8, Appx. 1570-1571, 92:19-93:12, Appx. 1575; Ex. 105 at 102:2-5, Appx. 2075.

47.     If PwC had learned before June 3, 2019, that any of the Notes (a) might not be collectible, or (b) might be forgiven, or (c) was amended, or (d) would be extinguished based on the fulfillment of certain conditions subsequent, it would have required that fact to be disclosed. Ex. 94 at 74:19-76:12, Appx. 1571.

48.     For purposes of PwC's audit, "affiliate notes" were considered receivables of Highland and were carried as assets on Highland's balance sheet under "Notes and other amounts due from affiliates." Ex. 34 at 2, Appx. 745; Ex. 72 at 2, Appx. 1291; Ex. 94 at 23:10-22, Appx. 1558, 31:11-33:20, Appx. 1560; Ex. 105 at 106:20-109:12, Appx. 2076.

49.     For the 2017 fiscal year, Highland valued "Notes and other amounts due from affiliates" in the aggregate amount of approximately $163.4 million, which then constituted more than 10% of Highland's total assets; for the 2018 fiscal year, Highland valued "Notes and other amounts due from affiliates" in the aggregate amount of approximately $173.4 million, which then constituted more than 15% of Highland's total assets. Ex. 72 at 2, Appx. 1291; Ex. 34 at 2, Appx. 745; Ex. 94 at 33:21-34:2, Appx. 1560-1561, 51:2-16, Appx. 1565.

50.     The notes to the financial statements described the "Affiliate Notes" that were carried on Highland's balance sheet; management calculated the amounts due and owing to Highland from each Affiliate. Ex. 72 at 30-31; Ex. 34 at 28-29; Ex. 94 at 34:17-36:25; 51:17-53:12, Appx. 1565; Ex. 105 at 110:22-112:21, Appx. 2077.

51.     The "fair value" of the Affiliate Notes was "equal to the principal and interest due under the notes." Ex. 72 at 30-31, Appx. 1319-1320; Ex. 34 at 28-29, Appx. 771-772; Ex. 94 at 37:11-39:12, Appx. 1561-1562; 53:19-25, Appx. 1565.

52. At the time PwC completed its 2017 and 2018 audits, PwC had no reason to discount the value of any of the Affiliate Notes. Ex. 94 at 39:17-21, Appx. 1562; 54:2-8, Appx. 1566.

53. Moreover, as reflected in PwC's work papers, and based on the information provided by Highland and PwC's own independent analysis, PwC concluded that the obligors under each of the Affiliate Notes had the ability to pay all amounts outstanding. Ex. 92, Appx. 1514-1530; Ex. 93, Appx. 1531-1550; Ex. 94 at 41:2-45:6, Appx. 1562-1563, 55:17-60:22, Appx. 1566-1567, 68:20-25, Appx. 1569.

54. Note 15 to Highland's 2018 audited financial statements disclosed as a "subsequent event" (*i.e.*, an event occurring after the December 31, 2018 end of the fiscal year and on or before June 3, 2019, the date Mr. Dondero and Mr. Waterhouse signed the management representation letters and PwC completed its audit) the following:

> Over the course of 2019, through the report date, HCMFA issued promissory notes to [Highland] in the aggregate amount of $7.4 million. The notes accrue interest at a rate of 2.39%.

Ex. 34 at 39, Appx. 782. *See also* Ex. 94 at 54:9-55:7, Appx. 1566.

55. There will be no evidence that HCMFA issued any notes to Highland in 2019 other than the HCMFA Notes.

### 2. In October 2020, HCMFA and NexPoint Jointly Informed The Retail Board of their Obligations under Their Respective Notes

56. The Advisors have contracts to manage certain funds (the "Fund Agreements"). The Fund Agreements are among the most important contracts the Advisors have; HCMFA's Rule 30(b)(6) witness acknowledged that its contracts with the Funds are largely the reason for HCMFA's existence. Ex. 192 at 66:3-67:6, Appx. 3031.

17

57.     The Funds are purportedly managed by a board (the "Retail Board"). In the fall of each year, the Retail Board must determine whether to renew the Fund Agreements with the Advisors, a process referred to as a "15(c) Review." As part of the 15(c) Review process, the Retail Board requests information from the Advisors. Ex. 99 at 129:17-130:3, Appx. 1844-1845, Ex. 105 at 32:17-33:6, Appx. 2057, 168:9-12, Appx. 2091, 169:9-170:16, Appx. 2091-2092.

58.     Mr. Waterhouse, the Advisors' Treasurer, and Mr. Norris, HCMFA's Executive Vice President, participated in the annual 15(c) Review process with the Retail Board. Ex. 192 at 67:7-68:19, Appx. 3031; Ex. 105 at 168:13-169:8, Appx. 2091.

59.     In October 2020, as part of its 15(c) Review, the Retail Board asked the Advisors to provide certain information including the following:

> Are there any outstanding amounts currently payable or due in the future (e.g., notes) to HCMLP by HCMFA or NexPoint Advisors or any other affiliate that provides services to the Funds?

Ex. 36 at 3, Appx. 793.

60.     Ms. Thedford, the Secretary of the Advisors and an employee of Highland, followed up on this particular question, and Mr. Waterhouse directed her to "the balance sheet that was provided to the [Retail Board] as part of the" 15(c) Review. *Id.* at 2, Appx. 792.

61.     As directed by Mr. Waterhouse, Ms. Thedford (a) obtained the relevant information from the Advisors' June 30, 2020 financial statements and (b) drafted a response that she shared with, among others, Mr. Waterhouse, Mr. Norris (the Advisors' Executive Vice President), and Mr. Post (the Advisors' Chief Compliance Officer). Ex. 35, Appx. 788-789; Ex. 37, Appx. 795-796.

62.     Based on HCMFA's June 30, 2020 financial statements, Ms. Thedford sent her draft response to Mr. Waterhouse, Mr. Norris, Mr. Post, and others and reported that "$12,286,000 remains outstanding to HCMLP from HCMFA." Ex. 36 at 1, Appx. 791.

18

63. This amount necessarily included the amounts due under the HCMFA Notes because, as HCMFA has admitted, HCMFA carried the HCMFA Notes as liabilities on its balance sheet and the balance sheet was Ms. Thedford's source of information. Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3, Appx. 3028, 56:20-59:3, Appx. 3028-3029; Ex. 194 at 117:16-122:15, Appx. 3156-3157; Ex. 195 at 120:23-122:13, Appx. 3211-3212.

64. On October 23, 2020, the Advisors provided their final, formal responses to the questions posed by the Retail Board. As to the issue of outstanding amounts currently payable or due to Highland or its affiliates, the Advisors reported as follows:

> As of June 30, 2020, $23,683,000 remains outstanding to HCMLP and its affiliates from NexPoint and $12,286,000 remains outstanding to HCMLP from HCMFA. The Note between HCMLP and NexPoint comes due on December 31, 2047. The earliest the Note between HCMLP and HCMFA could come due is in May 2021. All amounts owed by each of NexPoint and HCMFA pursuant to the shared services arrangement with HCMLP have been paid as of the date of this letter. The Advisor notes that both entities have the full faith and support of James Dondero.

Ex. 59 at 2, Appx. 885.

65. Based on the foregoing, there is no dispute that the Advisors -- with the full knowledge of each of their officers and based on HCMFA's own balance sheet -- informed the Retail Board in October 2020 of their unmitigated obligations under the NexPoint Note the HCMFA Notes.

### 3. Without Exception, the Notes were Disclosed in Highland's Books and Records and Were Consistently Carried as Assets without Discount

66. In addition to its audited financial statements, and without exception, Highland's contemporaneous books and records – before the Petition Date and after -- recorded the Notes as valid debts due and owing by each of the Obligors to Plaintiff.

19

67. For example, in the Debtor's February 2018 internal monthly reporting package, under the heading "Significant Items Impacting HCMLP's Balance Sheet," the transfer to Mr. Dondero on February 2, 2018 was contemporaneously identified as "($3.8M) partner loan." Ex. 39 at 1, Appx. 801. *See also* Ex. 78 at 2, Appx. 1362 (in the Debtor's August 2018 internal monthly reporting package, under the heading "Significant Items Impacting HCMLP's Balance Sheet," the August 2018 transfers to Mr. Dondero were together contemporaneously identified as "($5.0M) partner loan.").

68. After the Petition Date, but while Mr. Dondero was still in control of Highland, the Debtor filed its *Schedules of Assets and Liabilities* [Bankr. Docket No. 247] (the "Debtor's Schedules"). The Debtor's Schedules included the Notes among the Debtor's assets. Ex. 40, Appx. 812-815 (excerpts of the Debtor's Schedules showing that Highland (i) disclosed as assets of the estate "Notes Receivable" in the approximate amount of $150 million (Item 71), and (ii) provided a description of the Notes (Exhibit D)).

69. In every one of the Debtor's *Monthly Operating Reports* (the "MORs") filed with the Court (while Mr. Dondero was in control of Highland and after), the Debtor included as assets of the estate amounts "Due from affiliates" that included the Notes. *See, e.g.,* Ex. 41, Appx. 816-825; Ex. 42, Appx. 826-835; Ex. 88, Appx. 1475-1486; Ex. 89, Appx. 1487-1496.[18]

70. Highland's "back-up" to the amounts "Due from affiliates" set forth in the MORs identified the Obligors under the Notes and included all unpaid principal and accrued

---

[18] *See also* Bankr. Docket No. 405 (October 2019); Bankr. Docket No. 289 (November 2019); Bankr. Docket No. 418 (December 2019); Bankr. Docket No. 497 (January 2020); Bankr. Docket No. 558 (February 2020); Bankr. Docket No. 634 (March 2020); Bankr. Docket No. 686 (April 2020); Bankr. Docket No. 800 (May 2020), as amended in Bankr. Docket No. 905; Bankr. Docket No. 913 (June 2020); Bankr. Docket No. 1014 (July 2020); Bankr. Docket No. 1115 (August 2020); Bankr. Docket No. 1329 (September 2020); Bankr. Docket No. 1493 (October 2020); Bankr. Docket No. 1710 (November 2020); Bankr. Docket No. 1949 (December 2020); and Bankr. Docket No. 2030 (January 2021).

interest. *See, e.g.,* Exs. 196-198, Appx. 3239-3244 (the back-up to the "Due from Affiliates" amounts set forth in the MORs for December, September 2020, and January 2021).

71. Relatedly, Highland's accounting group has a regular practice of creating, maintaining and updating on a monthly basis "loan summaries" in the ordinary course of business (the "Loan Summaries"). The Loan Summaries identify amounts owed to Highland under affiliate notes and are created by updating underlying schedules for activity and reconciling with Highland's general ledger. Ex. 199, Appx. 3245-3246 is an example of a Loan Summary. The Loan Summaries identify each Obligor by reference to the "GL" number used in the general ledger. *See* Ex. 199, Appx. 3246 (HCMS ("GL 14530"), HCMFA ("GL 14531"), NexPoint ("GL 14532"), HCRE ("GL 14533"), and Mr. Dondero ("GL 14565")).

72. The Loan Summaries were used in connection with the PwC audits and to support accounting entries and year-end balances in the ordinary course of Highland's business. For example, Ex. 199, Appx. 3246 ties exactly into Ex. 198, Appx. 3243-3244, the "back up" to the "Due from affiliates" entry in the January 2021 MOR. Bankr. Docket No. 2020. Klos Dec. ¶¶15-16.[19]

**4. Recovery on the Notes Was A Significant Component of the Plan Yet the Obligors Remained Silent On the Point Despite Lodging Objections**

73. On November 24, 2020, Highland filed its *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Bankr. Docket No. 1473]. Included therein were the Debtor's Liquidation Analysis/Financial Projections (the

---

[19] Colloquially, the Loan Summaries are the "back up" to the "back up." To illustrate, and working backwards, the January 2021 MOR reported that $152,538,000 was "Due from affiliates." Bankr. Docket No. 2030 (balance sheet). Ex. 198, Appx. 3243-3244 is the "back up" to the January 2021 MOR and it shows that $152,537,622 was the "Total Due from Affiliates" (the January 2021 MOR rounded up to the nearest thousand). Ex. 199, Appx. 3245-3246, the Loan Summary, is the "back up" to the "back up," and is reconciled with Highland's general ledger. As can be seen, the Loan Summary specifies the outstanding principal amounts due under each Note. *See* Klos Dec. ¶¶15-16.

"Projections"). Ex. 90, Appx. 1497-1505. Among the assumptions supporting the Projections was that "[a]ll demand notes are collected in the year 2021." *Id.* at 173 of 178, Appx. 1500 (Assumption C).

74.     Thus, even though Highland had not yet called the Demand Notes, the Obligors and all parties in interest were put on notice on November 24, 2020, that the Debtor's Projections assumed all Demand Notes would be collected the following year.

75.     By early February 2021, Highland had already commenced the Adversary Proceedings to collect on all of the Notes. Consequently, it amended the Projections [Bankr. Docket No. 1875-1] and modified the assumption concerning the Notes to state "[a]ll demand notes are collected in the year 2021; 3 term notes defaulted and have been demanded based on default provisions; payment estimated in 2021." Ex. 91 at 2, Appx. 1508 (Assumption C) (the "Assumption").

76.     Thus, as of February 1, 2021, on the eve of confirmation, the Obligors and all parties in interest knew the Debtor's Projections, as amended, assumed that all amounts due under the Notes would be collected as part of the Plan.

77.     At the confirmation hearing, James P. Seery, Jr., Highland's Chief Executive Officer, testified as to (a) why the Debtor believed the Assumption was reasonable, and (b) how the commencement of the Adversary Proceedings impacted the Projections. Mr. Dondero's counsel asked limited questions on cross-examination concerning the Notes. Ex. 206 at 123:23-124:23, Appx. 4305-4306, 128:23-129:21, Appx. 4310-4311, 185:8-15, Appx. 4367.

78.     In his closing argument, Mr. Dondero's counsel discussed the Notes and (a) vaguely suggested that there may be "arguments" against the Debtor's assertion that the Term

Notes are due and payable and (b) observed that the Notes were not discounted for "collectability issues," but made no mention of the Alleged Agreement, HCMFA's Mutual Mistake defense, or any other defense:

> First, there's the notes; and second, there's the assets. The notes are either long-term or demand notes. Those long-term notes, Mr. Seery will tell you some have been validly accelerated and therefore are now due and payable. I think there's arguments to the contrary. But those long-term notes probably have some both time value of money and collection costs. And then, of course, you have to discount them by collectability issues, too.
>
> I don't believe any analysis went into it, or at least the Court was not provided any data or analysis as to what discounts were applied to those notes. And, therefore, I don't think that this Court can make any determination that the best interests of the creditors have been met.

Ex. 207 at 223:22-224:14, Appx. 4701-4702.

## D.   THE OBLIGORS' AFFIRMATIVE DEFENSES

79.    The Obligors have asserted various defenses to Plaintiff's claims concerning Counts One and Two and those are addressed below.

### 1.    The Alleged Agreement Defense

80.    Over the course of several months, Mr. Dondero cobbled together an affirmative defense premised on an alleged oral agreement pursuant to which all of the Notes would be forgiven based on certain "conditions subsequent" or if certain assets were sold by a third party. After Mr. Dondero settled on that defense, all of the Obligors (except HCMFA) amended their pleadings to adopt the same affirmative defense.

### i.     The Allegations Materially Changed Over Time

81.     In due course, each of the Defendants filed its respective Original Answer.[20] In his Original Answer, Mr. Dondero asserted as his first affirmative defense that "Plaintiff's claims should be barred because it was previously agreed that Plaintiff would not collect on the Notes." Ex. 80 ¶40, Appx. 1380 (the "Alleged Agreement"). None of the Corporate Obligors asserted the Alleged Agreement or any similar defense in its respective Original Answer.

82.     In late March, Highland asked Mr. Dondero to admit, among other things, that he did not pay taxes on the amounts loaned to him but that Plaintiff allegedly agreed not to collect. Ex. 81 (Responses to RFAs 4, 8, and 12), Appx. 1387-1388. Having been alerted to a fatal flaw in his defense, Mr. Dondero modified his affirmative defense based on the Alleged Agreement to state that: "Plaintiff's claims should be barred because it was previously agreed that Plaintiff would not collect on the Notes *upon fulfillment of conditions subsequent*." Ex. 83 ("Amended Answer") ¶40, Appx. 1403.

83.     On April 15, 2021, about ten days after serving his Amended Answer, Mr. Dondero served his *Rule 26 Initial Disclosures.* Ex. 184, Appx. 2982-2990 (the "Rule 26 Disclosures"). In his Rule 26 Disclosures, Mr. Dondero specifically identified fifteen (15) "individuals likely to have discoverable information," but his sister, Ms. Dondero, was not among them. *Id.* at 2-5, Appx. 2984-2987.

84.     On April 26, 2021, Mr. Dondero served his sworn *Objections and Answers to Highland Capital Management L.P.'s First Set of Interrogatories.* Ex. 82, Appx. 1390-1396.

---

[20] Dondero Action, Docket No. 6 (the "Dondero Original Answer"); HCFMA Action, Docket No. 6 (the "HCMFA Original Answer"); NexPoint Action, Docket No. 6 (the "NexPoint Original Answer"); HCMS Action, Docket No. 6 (the "HCMS Original Answer"); and HCRE Action, Docket No. 7 (the "HCRE Original Answer").

85. In response to an interrogatory that required Mr. Dondero to identify, with respect to each Note, "the person who entered into each [Alleged] Agreement on behalf of the Debtor," Mr. Dondero answered that "[t]he [Alleged] Agreements were entered into on behalf of the Debtor *by James Dondero* subsequent to the time each note was executed." *Id*. at 4, Appx. 1394 (Answer to Interrogatory No. 1) (emphasis added).

86. In response to an interrogatory that required Mr. Dondero to identify "every person who James Dondero believes has actual knowledge of each [Alleged] Agreement," Mr. Dondero identified five (5) individuals, including himself, but – like the Rule 26 Disclosures – Mr. Dondero's sister was not among them. *Id.*, Appx. 1394 (Answer to Interrogatory No. 2).

87. It was not until later in discovery that Mr. Dondero identified his sister – someone he failed to include as a person likely to have discoverable information or someone he believed had actual knowledge of each Alleged Agreement – as the person who allegedly bound Plaintiff to the Alleged Agreement, rather than himself.[21]

88. In the weeks that followed, each of the Obligors (except for HCMFA) sought leave from the Court to amend its respective answer to adopt Mr. Dondero's Alleged Agreement defense, contending that it is not liable under any of the Notes because Plaintiff (bound by Ms. Dondero, acting as the Dugaboy Trustee) previously entered into an oral agreement pursuant to which it promised not to collect on the Notes "upon fulfillment of conditions subsequent as a form of compensation to Mr. Dondero."[22]

---

[21] Ms. Dondero was allegedly acting in her capacity as the Trustee of Dugaboy, a family trust in which Mr. Dondero is the sole beneficiary during his lifetime and that purportedly held a majority of certain of the limited partner interests in Highland. *See* Ex. 31 ¶82, Appx. 655.

[22] *See* Ex. 11, Appx. 384-393 (NexPoint's Motion for Leave to Amend); Ex. 14 (NexPoint's First Amended Answer) ¶42, Appx. 421-422; Ex. 8, Appx. 292-312 (HCMS's Motion for Leave to Amend); Ex. 12 (HCMS's First Amended Answer) ¶56, Appx. 402; Ex. 9 (HCRE's Motion for Leave to Amend), Appx. 313-333; Ex. 17 (HCRE's Amended Answer) ¶99, Appx. 468.

ii.     **The Final Version of the "Alleged Agreement" Defense**

89.     After months of maneuvering, Mr. Dondero, HCMS, HCRE, and NexPoint

finally settled on the following affirmative defense based on the Alleged Agreement:

> Plaintiff's claims are barred … because prior to the demands for
> payment Plaintiff agreed that it would not collect the Notes upon
> fulfillment of conditions subsequent.  Specifically, sometime
> between December of the year in which each note was made and
> February of the following year, [] Nancy Dondero, as representative
> for a majority of the Class A shareholders of Plaintiff agreed that
> Plaintiff would forgive the Notes if certain portfolio companies were
> sold for greater than cost or on a basis outside of James Dondero's
> control.   The purpose of this agreement was to provide
> compensation to Defendant James Dondero, who was otherwise
> underpaid compared to reasonable compensation levels in the
> industry, through the use of forgivable loans, a practice that was
> standard at HCMLP and in the industry.  This agreement setting
> forth the conditions subsequent to demands for payment on the
> Notes was an oral agreement; however, Defendant [ ] believes there
> may be testimony or email correspondence that discusses the
> existence of this agreement that may be uncovered through
> discovery in this Adversary Proceeding.

Ex. 31 ¶ 82, Appx. 655 ("Dondero's Answer").[23]

iii.     **No Reasonable Trier of Fact Can Find that the Alleged Agreement Existed**

90.     For the reasons set forth below, no reasonable trier of fact can find that the

Alleged Agreement ever existed.

91.     Mr. Dondero could not identify a material term of the Alleged Agreements.

Mr. Dondero could not describe a material terms of the Alleged Agreements without relying on a

document prepared by counsel.  Specifically, without a list prepared by counsel, Mr. Dondero

could not identify any of the Notes subject to the Alleged Agreements nor could he recall (i) the

number of Notes subject to each Alleged Agreement, (ii) the maker of each Note subject to each

---

[23] *See also* Ex. 15 ¶83, Appx. 435-436 ("NexPoint's Answer"); Ex. 16 ¶97, Appx. 451-452 ("HCMS's Answer"); and Ex. 17 ¶99, Appx. 468 ("HCRE's Answer").

Alleged Agreement, (iii) the date of each Note subject to each Alleged Agreement, or (iv) the principal amount of any Note subject to the Alleged Agreements. Ex. 99 at 13:4-28:22, Appx. 1815-1819.

92. Mr. Dondero's inability to identify the notes subject to the Alleged Agreement is significant because he and HCMFA had other notes outstanding at the same time. *See, e.g.,* Ex. 43, Appx. 836-838 (January 18, 2018 note executed by Mr. Dondero in the principal amount of $7.9 million); Adv. Pro. 21-03082, Docket No. 1 (Exhibit 1, February 26, 2014 note executed by HCMFA in the principal amount of $4 million) (Exhibit 2, a February 26, 2016 note executed by HCMFA in the principal amount of $2.3 million).

93. <u>Mr. and Ms. Dondero dispute a key aspect of the Alleged Agreements</u>. Mr. and Ms. Dondero disagree on perhaps the most important aspect of the Alleged Agreements; namely, its scope. Ms. Dondero insists that Mr. Dondero identified the notes that are the subject of each Alleged Agreement. Mr. Dondero, on the other hand, disagrees. *Compare* Ex. 100 at 180:8-183:20, Appx. 1919-1920 *with* Ex. 99 at 79:6-81:23, Appx. 1832.

94. <u>Mr. Dondero personally caused MGM stock to be sold in November 2019 and failed to declare the Notes forgiven</u>. According to Mr. and Ms. Dondero, all of the Notes would be forgiven if Mr. Dondero sold one of three portfolio companies -- Trussway, Cornerstone, or MGM -- above cost. *See* Ex. 31 ¶82, Appx. 655.

95. In November 2019, Mr. Dondero caused the sale of a substantial interest in MGM for $123.25 million, a portion of which was for the Debtor's interest in a fund, but failed to declare all of the Notes forgiven, and remained silent about the Alleged Agreement altogether. *See* Ex. 201 ¶29-30, Appx. 3270-3271; Ex. 202 ¶14, Appx. 4135; Ex. 203 ¶1, Appx. 4143; Ex. 204 at 5 n. 5, Appx. 4156.

96.    <u>Ms. Dondero was not competent to enter into the Alleged Agreements</u>.

Under the circumstances, Ms. Dondero was not competent to enter into the Alleged Agreements,

and she made no effort to educate herself before purportedly binding Highland.  Ms. Dondero:

- had no meaningful knowledge, experience, or understanding of (a) Highland or its business, (b) the financial industry, (c) executive compensation matters, or (d) Mr. Dondero's compensation or whether he was "underpaid compared to reasonable compensation levels in the industry" (Ex. 100 at 42:22-43:8, Appx. 1885, 48:7-61:9, Appx. 1886-1889; 211:8-216:21, Appx. 1927-1928);[24]

- never reviewed Highland's financial statements (including balance sheets, bank statements, profit and loss statements and statements of operations), never asked to see them, and knew nothing about Highland's financial condition prior to the Petition Date (*Id*. at 61:25-63:13, Appx. 1889-1890);

- did not know of Highland's "portfolio companies" except for those her brother identified, and as to those, Ms. Dondero did not know the nature of Highland's interests in the portfolio companies, the price Highland paid to acquire those interests, or the value of the portfolio companies (*Id*. at 63:18-80-22, Appx. 1890-1894; 208:24-210:13, Appx. 1926-1927);

- never saw a promissory note signed by James Dondero, any other officer or employee of Highland, or any "affiliate" of Highland (*Id*. at 83:14-84:8, Appx. 1895; 95:3-16, Appx. 1898; 99:20-100:10, Appx. 1899; 115:11-116:4, Appx. 1903; 127:13-128:4, Appx. 1906; 140:15-141:22, Appx. 1909, 180:18-23, Appx. 1919);

- learned (falsely, as shown below) from her brother that Highland allegedly had a "common practice" of forgiving loans, but had no actual knowledge or information concerning any loan that Highland made to an officer, employee, or affiliate that was actually forgiven and made no effort to verify her brother's statement (*Id*. 84:9-92:3, Appx. 1895-1897, 100:11-103:8, Appx. 1899-1900);

---

[24] The only information Ms. Dondero had concerning Mr. Dondero's compensation from Highland was that he "was not highly paid" and that in recent years, "his salary has been roughly less than a million, 500, 700,000 somewhere in that ballpark." Ex. 100 at 51:11-22, Appx. 1887.  This information was false.  Ex. 68, Appx. 1129-1130 (2016 base salary of $1,062,500 with total earnings and awards of $2,287,175); Ex. 50, Appx. 860-861 (2017 base salary of $2,500,024 with total earnings and awards of $4,075,324); Ex. 51, Appx. 862-863 (2018 base salary of $2,500,000 with total earnings and awards of $4,194,925); and Ex. 52, Appx. 864-865 (2019 base salary of $2,500,000 with total earnings and awards of $8,134,500).

- had no knowledge of NexPoint, HCMS, or HCRE (the Corporate Obligors whose Notes are purportedly subject to the Alleged Agreement), including (a) the nature of their businesses, (b) their relationships with Highland, including whether they provided any services to Highland, (c) their financial condition, or (d) the purpose of the loans made to them by Highland, and their use of the proceeds (*Id.* at 103:19-115:10, Appx. 1900-1903, 119:5-127:7, Appx. 1904-1906, 129:5-140:14, Appx. 1906-1909).

- had no authority under the HCMLP partnership agreement to negotiate and enter into binding agreements on behalf of HCMLP Ex. 2 (Exhibit4), Appx. 57-93.

97. Mr. Dondero retained Alan Johnson as an executive compensation expert. Mr. Johnson has experience advising boards, compensation committees, and other parties on issues concerning loan forgiveness transactions. Based on his expertise, Mr. Johnson would very likely concur that Ms. Dondero was not competent to enter into the Alleged Agreements on behalf of Highland. Ex. 101 at 12:3-73:17, Appx. 1961-1976.

98. The Alleged Agreements were kept secret and were never disclosed. The Alleged Agreements were never disclosed by Mr. Dondero or Ms. Dondero:

- Other than Mr. and Ms. Dondero, no one participated in the discussions that led to each Alleged Agreement. Ex. 100 at 190:16-191:17, Appx. 1922;

- Ms. Dondero and Dugaboy have admitted that (1) neither ever disclosed the existence or terms of the Alleged Agreements to *anyone*, including PwC, Mr. Waterhouse, or Mr. Okada, and (2) neither ever caused Highland to disclose the existence or terms of the Alleged Agreements to the Bankruptcy Court. Ex. 25 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1-2, Appx. 538-542; Ex. 26 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1-2, Appx. 554-558); and

- Mr. Dondero has admitted that he (1) never disclosed the existence or terms of the Alleged Agreements to PwC, Mr. Okada, or the Bankruptcy Court; and (2) never caused Highland to disclose the existence or terms

of the Alleged Agreement to the Bankruptcy Court. Ex. 24 (Responses to RFAs 1-2, 5-7, 11-17, Appx. 521-524).[25]

99. <u>No Document Exists that Reflects the Existence or Terms of the Alleged Agreements</u>. No document was created prior to the Petition Date that memorializes or reflects the existence or terms of the Alleged Agreement:

- Neither Dugaboy nor Ms. Dondero (a) ever made a list of the promissory notes that are the subject of the Alleged Agreement; or (b) is otherwise aware of anything in writing that identifies the promissory notes that are the subject of each Alleged Agreement. Ex. 100 at 178:25-180:7, 180:24-181:6, Appx. 1919.

- The terms of the Alleged Agreement were never reduced to writing. Ex. 25 (Responses to RFAs 7-8, Appx. 539, Responses to Interrogatories 3-4, Appx. 542); Ex. 26 (Responses to RFAs 7-8, Appx. 555, Responses to Interrogatories 3-4, Appx. 558); Ex. 100 at 217:2-17, Appx. 1928.

- Mr. Dondero has admitted that (a) he never wrote down a list of the Notes that are subject to the Alleged Agreement; (b) he is unaware of any document that was created prior to the commencement of the Adversary Proceedings that identifies the Notes subject to the Alleged Agreements; and (c) no document was created prior to the commencement of the Adversary Proceeding that reflects or memorializes the terms of the Alleged Agreements. Ex. 24, Appx. 522 (Response to RFA 7); Ex. 99 at 28:24-29:12, Appx. 1819.

100. <u>Even if the Alleged Agreements existed, they are unenforceable for lack of consideration</u>. Mr. Dondero is the founder of Highland and Highland was the platform he used to support his other businesses, including the Advisors, HCRE, and HCMS. No reasonable trier of fact could conclude that Highland (a) needed to enter into the Alleged Agreements to retain or motivate Mr. Dondero or (b) that Highland received anything of value in exchange for agreeing to forgive over $50 million in valid promissory notes if either (i) Mr. Dondero sold one of the three

---

[25] Mr. Dondero asserts that he informed Mr. Waterhouse about the Alleged Agreement. Ex. 24, Appx. 521 (Responses to RFAs 3 and 4). But Mr. Waterhouse testified that he did not learn of the Alleged Agreement until 2021 and even now only knows that it was subject to "milestones" that he cannot identify. Ex. 105 at 65:5-72:14, Appx. 2065-2067, 82:19-84:7, Appx. 2070.

portfolio companies at a dollar above cost or (ii) the portfolio companies were sold by a third party. Yet, according to Ms. Dondero, "motivating" Mr. Dondero is all Highland received. *See, e.g.,* Ex. 100 at 221:2-225:7, Appx. 1929-1930.

101. Indeed, Ms. Dondero admitted that she did not know, and had no reason to expect, that Highland would benefit from the sale of the portfolio companies by a third party. She also acknowledged that (a) Highland would not benefit from the Alleged Agreements if a third party sold the portfolio companies at less than cost and (b) the Notes would all be forgiven even if a third party sold the portfolio companies at a price "substantially below cost." Ex. 100 at 201:24-203:11, Appx. 1924-1925; 227:17-229:14, Appx. 1931.

102. Mr. Dondero fixed the terms of the Alleged Agreements without negotiation. No aspect of the Alleged Agreement was the subject of negotiation and Ms. Dondero made no counterproposal of any kind. Indeed, the undisputed facts show that Ms. Dondero never (i) made a counterproposal; (ii) negotiated any aspect of the Alleged Agreements; (iii) asked Mr. Dondero how he selected the portfolio companies; (iv) inquired as to whether Mr. Dondero already had a duty to maximize value; (v) rejected any aspect of Mr. Dondero's proposal; or (vi) rejected or pushed back on Mr. Dondero's proposal that all of the Notes would be forgiven if any of the portfolio companies were sold by a third party. Ex. 100 at 194:16-19, Appx. 1923, 195:14-199:15, Appx. 1923-1924.

103. There is No History of Loans Being Forgiven at Highland. Mr. Dondero, NexPoint, HCMS, and HCRE contend that the use of "forgivable loans" was a "practice that was standard at Highland." *See, e.g.,* Ex. 31 ¶82, Appx. 655. This is demonstrably false.

104. Mr. Dondero has admitted that Highland disclosed to its auditors all loans of a material amount that Highland ever forgave. Ex. 98 at 426:8-427:15, Appx. 1777. During his

31

deposition, Mr. Johnson, Mr. Dondero's executive compensation expert, reviewed Highland's audited financial statements for each year from 2008 through 2018 (Ex. 101 at 119:14-189:21, Appx. 1988-2005) and concluded that (a) Highland has not forgiven a loan to anyone in the world since 2009, (b) the largest loan Highland has forgiven since 2008 was $500,000, (c) Highland has not forgiven any loan to Mr. Dondero since at least 2008, and (d) since at least 2008, Highland has never forgiven in whole or in part any loan that it extended to any affiliate. *Id.* at 189:24-192:10, Appx. 2005-2006. *See also* Ex. 98 at 422:18-428:14, Appx. 1776-1778.

## 2.    HCMFA's "Mutual Mistake" Defense

105.    HCMFA's primary affirmative defense is that the HCMFA Notes are "void" or "unenforceable" for "lack of consideration," "mutual mistake," and for the "lack of authority from Defendant to Waterhouse to executive the same for Defendant." Ex. 13 ¶ 47, Appx. 412.

106.    In support of its defense, HCMFA asserts that Mr. Waterhouse signed the HCMFA Notes by mistake and without authority ("HCMFA's Mistake Defense"), and that Highland's transfer of $7.4 million on May 2 and May 3, 2019 should have been treated "as compensation by the Plaintiff to the Defendant." Ex. 13 ¶ 45, Appx. 412.

107.    HCMFA specifically contends that, in March 2019, Highland made a "mistake in calculating" the net asset value ("NAV") of certain securities Highland Global Allocation Fund ("HGAF") held in Terrestar (the "NAV Error"). HCMFA maintains that after the NAV Error was discovered in early 2019:

> The Securities and Exchange Commission opened an investigation, and various employees and representatives of the Plaintiff, the Defendant, and HGAF worked with the SEC to correct the error and to compensate HGAF and the various investors in HGAF harmed by the NAV Error. Ultimately, and working with the SEC, the Plaintiff determined that the losses from the NAV Error to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the NAV Error itself, as well as rebating related advisor fees and processing costs; and (ii) $1.4 million of losses to the shareholders of HGAF.

32

> The Defendant accepted responsibility for the NAV Error and paid out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019. In turn, the Plaintiff accepted responsibility to the Defendant for having caused the NAV Error, and the Plaintiff ultimately, whether through insurance or its own funds, compensated the Defendant for the above payments by paying, or causing to be paid, approximately $7.5 million to the Defendant directly or indirectly to HGAF and its investors.

Ex. 13 ¶¶ 41-42, Appx. 411.

108.    On May 28, 2019, HCMFA sent a memorandum to the Board of Trustees of HGAF to describe the "Resolution of the Fund's" NAV Error, HCMFA did not mention Highland but reported:

> The Adviser and Houlihan Lokey, an independent third party expert valuation consultant approved by the Board, initially determined that the March Transactions were "non-orderly" and should be given "zero weighting" for purposes of determining fair value.  As reflected in the consultation, the Adviser ultimately determined that both March Transactions should be classified as "orderly."  The fair valuation methodology adopted, as addressed in the consultation, weights inputs and does not reflect last sales transaction pricing exclusively in determining fair value.  The "orderly determination and adoption of the weighted fair valuation methodology resulted in NAV errors in the Fund (the "<u>NAV Error</u>").

Ex. 182, Appx. 2978-2980.

109.    HCMFA will not offer into evidence any document to establish that (a) it ever told Securities and Exchange Commission that Highland, and not HCMFA, was responsible for the NAV Error; (b) it ever told the HGAF Board that anyone other than HCMFA and Houlihan Lokey were responsible for the NAV Error; or that (c) Highland ever agreed to "compensate" HCMFA for any mistake it may have made with respect to the NAV error.  *See* Ex. 192 at 140:7-11, Appx. 3049.[26]

---

[26] While no document exists that corroborates HCMFA's contention that Highland agreed to pay HCMFA $7.4 million as compensation for the NAV Error, HCMFA has identified Mr. Dondero as the person who allegedly agreed to make that payment on behalf of Highland. *Id.* Ex. 192 at 138:15-19, Appx. 3049.

110.   <u>HCMFA Recovers Approximately $5 million Through Insurance to Compensate HGAF for the NAV Error</u>.  HCMFA reported to the HGAF Board that the "Estimated Net Loss" from the NAV Error was $7,442,123.  Ex. 182 at 2, Appx. 2980.  HCMFA admits that it received almost $5 million in the form of insurance proceeds to fund the loss and had to pay approximately $2.4 million out-of-pocket to fully cover the estimated loss.[27]   Despite having received approximately $5 million in insurance proceeds (representing more than two-third of the total loss), HCMFA insists that (a) Highland's subsequent payment of $7.4 million was "compensation" for its negligence and (b) HCMFA was entitled to receive **both** and $5 million in insurance proceeds $7.4 million in "compensation" from Highland even though the total loss was only $7.4 million.  HCMFA never told its insurance carrier that Highland was at fault or that Highland paid HCMFA $7.4 million as compensation for the same loss the carrier covered.  Ex. 192 at 133:14-150:22, Appx. 3047-3052.

111.   After HCMFA filed its claim with ICI Mutual, HCMFA received the $7.4 million from Highland in connection with the Notes. Ex. 192 at 146:20-25, Appx. 3051.

112.   Thus, according to HCMFA, "it received $7.4 million from Highland as compensation, and approximately $5 million from the insurance carrier as compensation for the total receipts of $12.4 million in connection with the [NAV Error]." Ex. 192 at 147:4-11, Appx. 3051.

113.   HCMFA is not aware of (a) anyone on behalf of HCMFA ever informing ICI mutual that it received $7.4 million from Highland on account of the NAV Error, Ex. 192 at 150:3-6, Appx. 3052, or (b) anyone on behalf of HCMFA ever informing ICI Mutual that HCMFA

---

[27] Specifically, HCMFA reported that it (a) received $4,939,520 as insurance proceeds, (b) paid a deductible of $246,976, and (c) after accounting for other sources of capital and expenses, needed an additional payment of $2,398,842 to fully fund the loss.  Ex. 182 at 2, Appx. 2980.

believed Highland was the cause of the NAV Error, Ex. 192 at 150:19-22, Appx. 3052. In other words, HCMFA admits that it never told ICI Mutual that Highland made HCMFA "whole" or otherwise compensated HCMFA approximately $5 million dollars in connection with the NAV Error—the same amount HCMFA recovered from ICI Mutual in connection with the NAV Error.

114.    <u>Mr. Waterhouse Knew the HCMFA Notes Were Treated as Intercompany Loans</u>. Highland maintained an e-mail group called "Corporate Accounting" that included Mr. Waterhouse, among others. *See, e.g.,* Ex. 194 at 111:6-112:7, Appx. 3154.

115.    On May 2, 2019, David Klos, Highland's Controller, sent an e-mail to the Corporate Accounting group entitled "HCMLP to HCMFA loan" that said:

> Blair, Please send $2,400,000 from HCMLP to HCMFA. This is a new interco loan. Kristin, can you or Hayley please prep a note for execution. I'll have further instructions later today, but please process this payment as soon as possible.

Ex. 54, Appx. 870-873.

116.    Thus, on May 2, 2019, Mr. Waterhouse was informed that (a) HCMLP was transferring $2.4 million to HCMFA, and (b) Ms. Hendrix and another HCMLP employee were asked to prepare a promissory note.

117.    The next day, on May 3, 2019, Ms. Hendrix sent an e-mail to the Corporate Accounting group that said:

> Blair, Please set up a wire from HCMLP to HCMFA for $5M as a new loan ($4.4M should be coming in from Jim soon).

> Hayley, please add this to your loan tracker. I will paper the loan.

Ex. 56, Appx. 876-877.

118.    Thus, on May 3, 2019, Mr. Waterhouse was informed that (a) HCMLP was going to make a "new loan" to HCMFA in the amount of $5 million, and (b) Ms. Hendrix was going to "paper the loan." And that's exactly what happened.

35

119.   <u>HCMFA Represented to Third Parties that the HCMFA Notes Were Liabilities</u>.  As discussed above, HCMFA represented to the Retail Board in October 2020 as part of the 15(c) Review that as of June 30, 2020, the HCMFA Notes were liabilities of HCMFA.  *See* Ex. 59 at 2, Appx. 885.  Before filing its Original Answer, HCMFA never told anyone that was there was an error in the letter to the Retail Board.  Ex. 192 at 125:18-127:2, Appx. 3045-3046.

120.   <u>The HCMFA Notes Are Carried as Liabilities on HCMFA's Balance Sheet and Included in its Audited Financial Statements</u>.  HCMFA (a) disclosed the existence of the HCMFA Notes in the "Subsequent Events" section of its 2018 audited financial statements and (b) carried the HCMFA Notes as liabilities on its balance sheet.  Ex. 45 at 17; Ex. 192 at 49:19-50:2, 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59-3, Appx. 3026-3029.

121.   <u>Nothing in HCMFA's Books and Records Corroborates HCMFA's Mistake Defense</u>.  There is nothing in HCMFA's books and records that corroborates HCMFA's contention that the payments from Highland to HCMFA in exchange for the HCMFA Notes were intended to be compensation and not a loan. Ex. 192 at 59:8-63:20, Appx. 3029-3030.

122.   <u>Highland's Bankruptcy Court Filings Contradict HCMFA's Mistake Defense</u>.  As discussed *supra*, Highland's contemporaneous books and records – before the Petition Date and after -- recorded the HCMFA Notes as valid debts due and owing by each of the Obligors to Plaintiff.  Thus, regardless of what HCMFA may think, there is no evidence that any purported mistake is "mutual."  Moreover, if Mr. Waterhouse "made a mistake" in preparing and executing the HCMFA Notes, then he compounded the mistake at least twenty (20) times when he (i) signed off on Highland's and HCMFA's audited financial statements, (ii) included the HCMFA Notes as liabilities on HCMFA's own balance sheet, and (iii) prepared each of the Debtor's MORs and other court filings.

3.    **Waiver and Estoppel [NexPoint, HCMS, HCRE]**

123.    There is no dispute that Highland was never directed or instructed to make the Annual Installment payments due on December 31, 2020. Ex. 98 at 462:16-463:9, Appx. 1786; Ex. 105 at 381:21-382:16, Appx. 2144-2145. Nevertheless, NexPoint, HCMS, and HCRE assert that any default under the Notes was the "result of Plaintiff's own negligence, misconduct, breach of contract" under the Shared Services Agreement. Ex. 15 ¶ 80, Appx. 435; Ex. 12 ¶¶ 54-55, Appx. 402; Ex. 17 ¶¶ 97-98, Appx. 467.

124.    NexPoint and Highland entered into that certain *Amended and Restated Shared Services Agreement* effective as of January 1, 2018 (the "SSA"). Ex. 205, Appx. 4162-4181.

125.    Article II of the SSA required Highland to provide "assistance and advice" with respect to certain specified services. None of the services authorized Highland to control NexPoint's bank accounts or required Highland to effectuate payments on behalf of NexPoint without receiving instruction or direction from an authorized representative of NexPoint. In fact, Article II of the SSA expressly provided that "for the avoidance of doubt . . . [Highland] shall ***not*** provide any advice to [NexPoint] or perform any duties on behalf of [NexPoint], other than the back- and middle office services contemplated herein, with respect to (a) the general management of [NexPoint], its business or activities . . . ." Ex. 205 at § 2.02, Appx. 4165-4167 (emphasis added).

126.    To emphasize the point further, the SSA expressly curtailed Highland's authority to act on NexPoint's behalf:

> Section 2.06 Authority. [Highland's] scope of assistance and advice hereunder is ***limited to the services specifically provided for in this Agreement. [Highland] shall not assume or be deemed to assume any rights or obligations of [NexPoint] under any other document or agreement to which NexPoint is a party***. . . . [Highland] shall not

37

> have any duties or obligations to [NexPoint] unless those duties and
> obligations are specifically provided for in this Agreement (or in any
> amendment, modification or novation hereto or hereof to which
> [NexPoint] is a party.

*Id.* § 2.06, Appx. 4170 (emphasis added).

**4.** **Other Defenses**

127.     Mr. Dondero could not identify any facts to support his affirmative defenses of waiver, estoppel, or lack of consideration. Ex. 98 at 357:24-360:14, Appx. 1760-1761.

128.     NexPoint and HCMS assert that they did not default by failing to make the December 31, 2020 Annual Installment payment because they "prepaid." Ex. 98 at 362:12-366:10, Appx. 1761-1762, 370:6-11, Appx. 1763, 389:10, Appx. 1768. The facts relevant to this defense are described above and in the Klos Declaration. (Klos Dec. ¶¶ 3-14). Further, while NexPoint and HCMS now contend that they "pre-paid," both chose to pay Highland in January 2021 after receiving notice of default (in a transparent but futile attempt to "cure," for which they had no right rather than assert the "prepayment" defense. *See* Ex. 2 (Exhibit 3), Appx. 49-56.

## III.     ARGUMENT

### A.     Legal Standard

#### 1.     Summary Judgment Standard

129.     "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006) ("[S]ummary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (quoting Fed. R. Civ. P. 56(c)). "A dispute about a material fact is 'genuine' if the

38

evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party." *Alton v. Texas A&M University*, 168 F.3d 196, 199 (5th Cir. 1999). The moving party meets its initial burden of showing there is no genuine issue for trial by "point[ing] out the absence of evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French Laboratories,* 919 F.2d 301, 303 (5th Cir.1990); *see also In re Magna Cum Latte, Inc.*, 07-31814, 2007 WL 3231633, at *3 (Bankr. S.D. Tex. Oct. 30, 2007) ("A party seeking summary judgment may demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) the absence of a genuine issue of material fact.").

130.    "If the moving party carries [their] initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of genuine issue of material fact." *Latimer*, 919 F.3d at 303; *see also Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 712 (5th Cir. 1994) ("To withstand a properly supported motion for summary judgment, the nonmoving party must come forward with evidence to support the essential elements of its claim on which it bears the burden of proof at trial."). "This showing requires more than some metaphysical doubt as to the material facts." *Latimer*, 919 F.3d at 303 (internal quotations omitted); *see also Hall v. Branch Banking*, No. H-13-328, 2014 WL 12539728, at *1 (S.D.Tex. Apr. 30, 2014) ("[T]he nonmoving party's bare allegations, standing alone, are insufficient to create a material dispute of fact and defeat a motion for summary judgment."); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) ("The nonmovant's burden cannot be satisfied by conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.") (internal quotations omitted).

131.    Thus, "[w]here critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming

39

that it mandates judgment in favor of the movant, summary judgment is appropriate." *Alton*, 168 F.3d at 199; *see also Armstrong v. City of Dallas*, 997 F.2d 62, 66 n 12 (5th Cir.1993) ("We no longer ask whether literally little evidence, *i.e.*, a scintilla or less, exists but, whether the nonmovant could, on the strength of the record evidence, carry the burden of persuasion with a reasonable jury.").

### 2.   Summary Judgment Standard for Promissory Notes

132.   "Ordinarily, suits on promissory notes provide 'fit grist for the summary judgment mill.'" *Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th Cir. 1995) (quoting *FDIC v. Cardinal Oil Well Servicing Co.*, 837 F.2d 1369, 1371 (5th Cir.1988)); *see also Looney v. Irvine Sensors Corp.*, CIV.A.309-CV-0840-G, 2010 WL 532431, at *2 (N.D. Tex. Feb. 15, 2010) ("Suits on promissory notes are typically well-suited for resolution via summary judgment."). To prevail on summary judgment for breach of a promissory note under Texas law, the movant need not prove all essential elements of a breach of contract, but only must establish (i) the note in question, (ii) that the non-movant signed the note, (iii) that the movant was the legal owner and holder thereof, and (iv) that a certain balance was due and owing on the note. *See Resolution*, 41 F.3d at 1023; *Looney*, 2010 WL 532431, at *2-3; *Magna Cum Latte*, 2007 WL 3231633, at *15.

### B.   Highland is Entitled to Summary Judgment for Defendants' Breach of the Notes

133.   Highland has made its *prima facie* case that it is entitled to summary judgment on Defendants' breach of the Notes.

134.   The Dondero Demand Notes are: (i) valid, (ii) signed by Mr. Dondero, and in Highland's favor, (Klos Dec. ¶¶ 18-20, Exs. D, E, F), and (iii) as of (a) December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes was

$9,004,013.07, and as of (b) December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes was $9,263,365.05. (Klos Dec. ¶ 37).

135.    The HCMFA Demand Notes are: (i) valid, (ii) signed by HCMFA, and in Highland's favor, (Klos Dec. ¶¶ 21-22, Exs. G, H), and (iii) as of (a) December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes was $7,687,653.06, and as of (b) December 17, 2020, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes was $7,874,436.09, (Klos Dec. ¶ 40).

136.    The HCMS Demand Notes are: (i) valid, (ii) signed by HCMFA, and in Highland's favor, (Klos Dec. ¶¶ 23-26, Exs. I, J, K, L), and (iii) as of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCMS Demand Notes was $947,519.43, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81, (Klos Dec. ¶ 45).

137.    The HCRE Demand Notes are: (i) valid, (ii) signed by HCRE, and in Highland's favor, (Klos Dec. ¶¶ 27-30, Exs. M, N, O, P), and (iii) as of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,012,170.96, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23, (Klos Dec. ¶ 50).

138.    The NexPoint Term Note is: (i) valid, (ii) signed by NexPoint, and in Highland's favor, (Klos Dec. ¶ 31, Ex. A), and (iii) as (a) January 8, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,471,804.98, and as of (b)

41

December 17, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,383,877.27,[28] (Klos Dec. ¶ 51).

139. The HCMS Term Note is: (i) valid, (ii) signed by HCMS, and in Highland's favor, (Klos Dec. ¶ 32, Ex. R), and (iii) as of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,758,507.81, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,748,456.31,[29] (Klos Dec. ¶ 52).

140. The HCRE Term Note is: (i) valid, (ii) signed by HCRE, and in Highland's favor, (Klos Dec. ¶ 33, Ex. S), and (iii) as of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $6,145,466.84, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $5,899,962.22.[30] (Klos Dec. ¶ 53).

141. Each of the Obligors under the Demand Notes breached their obligations by failing to pay Highland all amounts due and owing upon Highland's demand.

142. Each of the Obligors under the Term Notes breached their obligations by failing to make the Annual Installment payment due on December 31, 2020.

---

[28] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

[29] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[30] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

143. Highland has been damaged by the Obligors' breaches in amounts that are set forth above but which (a) continued to increase daily, and (b) which do not include a calculation of collection costs and attorneys' fees.[31]

144. Accordingly, Highland has made out its prima facie case for summary judgment that Defendants have breached the Notes. *See Resolution*, 41 F.3d at 1023 (holding that where affidavit "describes the date of execution, maker, payee, principal amount, balance due, amount of accrued interest owed, and the date of default for each of the two promissory notes," movant "presented a prima facie case of default on the notes."); *Looney*, 2010 WL 532431, at *2-3 (where movant "has attached a copy of the note … to a sworn affidavit in which he states that the photocopy is a true and correct copy of the note, that he is the owner and holder of the note, and that there is a balance due on the note … [movant] has made a prima facie case that he is entitled to summary judgment on the note.").[32]

## C.    Defendants Fail to Rebut Highland's Prima Facie Case

145. Defendants fail cannot rebut Highland's prima facie case for breach of the Notes because there is no substantive or credible evidence to support any of their affirmative defenses and there is substantial evidence to contradict them.

### 1.    No Reasonable Jury Could Find that the "Alleged Agreement" Exists

146. Mr. Dondero, NexPoint, HCRE, and HCMS fail to show there is any genuine issue of material fact to support their "Alleged Agreement" defense. There is a complete absence of evidence in support of this defense and there is substantial evidence to contradict them.

---

[31] Plaintiff seeks to add to its damages accrued and unpaid interest, and Plaintiff's costs of collection, including reasonable attorney's fees. Ex. 162-180, Appx. 2637-2945. Plaintiff respectfully requests an opportunity to conduct a final damage calculation if the Court fully grants the Motion.

[32] In the event the Motion is granted, Highland requests that the Court hold a hearing on damages, as interest under the Notes and attorney's fees continue to accrue.

147. As discussed above, (i) Mr. Dondero cannot identify materials terms of the Alleged Agreement, such as (a) which Notes are subject to the Alleged Agreement, (b) the number of Notes subject to the Alleged Agreement, (c) the maker of each Note subject to the Alleged Agreement; (d) the date of each Note subject to the Alleged Agreement, or (e) the principal amount of any Note subject to the Alleged Agreement, (*see supra* ¶¶ 91-92); (ii) Mr. and Ms. Dondero cannot even agree whether Mr. Dondero identified the Notes subject to each Alleged Agreement, (*see supra* ¶¶ 93); (iii) Mr. Dondero sold MGM stock in November 2019—an alleged "condition subsequent" under the Alleged Agreement—but failed to declare the Notes forgiven, and otherwise remained silent about the Alleged Agreement, (*see supra* ¶¶ 94-95); (iv) Ms. Dondero, the counter-party to the Alleged Agreement, never saw a Note signed by Mr. Dondero or any affiliate of Highland and was not competent to enter into the Alleged Agreements (*see supra* ¶¶ 96); (v) the existence or terms of the Alleged Agreement was never disclosed by Mr. Dondero or Ms. Dondero to anyone, including PwC, Mr. Waterhouse, Mr. Okada or the Bankruptcy Court, (*see supra* ¶¶ 98); (vi) no document exists memorializing or otherwise reflecting the existence of terms of the Alleged Agreement, (*see supra* ¶ 99); and (vii) there is no history of loans being forgiven at Highland, (*see supra* ¶¶ 103-104). Accordingly, there is an absence of evidence showing the Alleged Agreement exists. *See Magna*, 2007 WL 3231633, at *16 (granting summary judgment with respect to breach of promissory note where defendants assert that they are discharged from debt obligations after terms of lease were altered, finding "[t]here is no evidence that any agreement was altered. At best, the summary judgment evidence supports a theory that the terms of the leases were not what the [] Defendants expected them to be.")

148. The Alleged Agreement would also be unenforceable as a matter of law for lack of (a) consideration, (b) definiteness, and (c) a meeting of the minds. In order to be legally

enforceable, a contract "must address all of its essential and material terms with a reasonable degree of certainty and definiteness." *Scott v. Wollney*, No. 3:20-CV-2825-M-BH, 2021 WL 4202169, at * 7 (N.D. Tex Aug. 28, 2021); *In re Heritage Org., L.L.C.*, 354 B.R. 407, 431–32 (Bankr. N.D. Tex. 2006) (in order to prove existence of a valid and binding subsequent oral agreement binding upon parties, party must prove that there was "(1) a meeting of the minds" and "(2) consideration to support such a subsequent oral agreement.") "Whether a contract contains all of the essential terms for it to be enforceable is a question of law." *Id.* (internal quotations omitted). "A contract must also be based on valid consideration." *Id.* "In determining the existence of an oral contract, courts look at the communications between the parties and the acts and circumstances surrounding those communications." *Melanson v. Navistar, Inc.*, 3:13-CV-2018-D, 2014 WL 4375715, at *5 (N.D. Tex. Sept. 4, 2014).

149.    Based on the evidence cited above, no reasonable trier of fact could find that there was a meeting of the minds between Ms. Dondero and Mr. Dondero regarding the material terms of the oral Alleged Agreement or that such oral Agreement was exchanged for consideration. *See Melanson v. Navistar, Inc.*, 3:13-CV-2018-D, 2014 WL 4375715, at *5 (N.D. Tex. Sept. 4, 2014) (finding that a reasonable trier of fact could not find that based on the oral conversation between the plaintiff and the defendant that there was an offer, an acceptance, and a meeting of the minds because the conversation did not contain all essential terms); *Wollney*, 2021 WL 4202169, at *8 (finding that "[w]hen, as here, 'an alleged agreement is so indefinite as to make it impossible for a court to 'fix' the legal obligations and liabilities of the parties, a court will not find an enforceable contract,'" finding that party "has not identified evidence of record that would allow a reasonable trier of fact to find that there was an offer, an acceptance, and a meeting of the minds between Plaintiff and Defendant.") (quoting *Crisalli v. ARX Holding Corp.*, 177 F. App'x

45

417, 419 (5th Cir. 2006)) (citation omitted); *Heritage*, 354 B.R. at 431–32 (finding a "subsequent oral amendment" defense fails where the summary judgment record does not support the existence of a subsequent agreement").

150.     Accordingly, there is no genuine issue of material fact regarding the Alleged Agreement defense, and Highland is, therefore, entitled to summary judgment on Mr. Dondero's, NexPoint's, HCMS's, and HCRE's breach of their respective Notes.

### 2.     No Reasonable Jury Could Find the HCMFA Note Was a "Mistake"

151.     HCMFA's Mistake Defense also fails as a matter of law because there is no evidence to show that HCMFA and Highland were acting under a shared factual mistake when executing the HCMFA Notes.

152.     "For mutual mistake to nullify a promissory note, the evidence must show that both parties were acting under the same misunderstanding of the same material fact." *Looney*, 2010 WL 532431, at *5 (internal quotations omitted) (citing Texas law). "[A] party must show that there exists (1) a mistake of fact, (2) held mutually by the parties, (3) which materially affects the agreed upon exchange. *Whitney Nat. Bank v. Medical Plaza Surgical Center L.L.P.*, No. H-06-1492, 2007 WL 3145798, at *6 (S.D.Tex. Oct. 27. 2007) (citing Texas law). In other words, "[m]utual mistake of fact occurs where the parties to an agreement have a common intention, but the written instrument does not reflect the intention of the parties due to a mutual mistake." *Id.* (internal quotations omitted). "In determining the intent of the parties to a written contract, a court may consider the conduct of the parties and the information available to them at the time of signing in addition to the written agreement itself." *Id.* "When mutual mistake is alleged, the party seeking relief must show what the parties' true agreement was and that the instrument incorrectly reflects that agreement because of a mutual mistake." *Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.*, MO:19-CV-173-DC, 2021 WL 2772808, at *9 (W.D. Tex. Apr. 28, 2021) (internal quotations

46

omitted). "The question of mutual mistake is determined not by self-serving subjective statements of the parties' intent … but rather solely by objective circumstances surrounding execution of the [contract.]" *Hitachi Capital Am. Corp. v. Med. Plaza Surgical Ctr., LLP.*, CIV.A. 06-1959, 2007 WL 2752692, at *6 (S.D. Tex. Sept. 20, 2007) (internal quotations omitted). "The purpose of the mutual mistake doctrine is not to allow parties to avoid the results of an unhappy bargain." *Whitney*, 2007 WL 3145798, at *7.

153.     Here, the HCMFA Notes were apparently hiding in plain sight for almost two years. The undisputed documentary and testimonial evidence overwhelmingly establishes that both HCMFA and Highland intended the HCMFA Notes to be loans. As discussed above: (i) Mr. Waterhouse, HCMFA's treasurer, knew the money Highland transferred to HCMFA was being treated as an "intercompany loan" (*supra*, ¶¶ 114-118); (ii) the HCMFA Notes have always been recorded as liabilities in HCMFA's audited financial statements and balance sheets (*supra* ¶ 120); (iii) the HCMFA Demand Notes were reflected as assets in Highland's Bankruptcy filings, (see supra ¶ 122), and (iv) the HCMFA Demand Notes were represented as "liabilities" to third parties at all relevant times, (*supra*, ¶¶ 119).

154.     There is no evidence in support of HCMFA's contention that there existed a mistake of fact held by both Highland and HCMFA when entering into this agreement. The purported "mistake" was never disclosed to critical (or any) third parties, such as: (i) the Retail Board or (ii) ICI Mutual. (*See supra*, ¶¶ 110-115; 119). The purported "mistake" is also not reflected in HCMFA's books and records or audited financials. (*See supra*, ¶¶ 120).

155.     HCMFA's Mistake Defense, therefore, fails as a matter of law. *See Hitachi*, 2007 WL 2752692, at *6 (finding "mutual mistake" defense fails as a matter of law where "there is no evidence that a *mutual mistake* was made in the [agreement,]" and where "the fact that

47

[defendant] did not discover the 'mistake' until well after the [] agreements were signed undermines" the mutual mistake defense.) (emphasis in original); *Whitney*, 2007 WL 3145798, at *6 (finding defendants' assertion of mutual mistake "fails as a matter of law" where assertions were "insufficient to raise a fact issue as to mutual mistake of fact regarding written agreement where plaintiff "has presented competent evidence" of its own intention regarding the agreement, "there is no evidence that [plaintiff] had the intent that these defendants assert," "no document suggests any such intent," and where "the documents are clear" on their face); *Looney*, 2010 WL 532431, at *5 (granting summary judgment in favor of plaintiff for breach of note as a matter of law on "mutual mistake" defense where defendant "does not cite any record evidence in support of its claim that [parties] were operating under a shared mistake when they executed the note."); *Al Asher & Sons*, 2021 WL 2772808, at *9 (finding that defendant failed to carry its burden to establish there is a genuine issue of material fact as to mutual mistake under an agreement, noting that "mutual mistake" defense is inapplicable as a matter of law, because, even if [defendant's] assumption regarding the [] contract is a mistake of fact, there is no evidence in the record that Plaintiff and [defendant] mutually held the mistake … ").

156.    Accordingly, there is no genuine issue of material fact regarding HCMFA's Mistake Defense, and Highland is entitled to summary judgment for HCMFA's breach of the HCMFA Demand Notes.

**3.    <u>No Reasonable Jury Could Find that NexPoint's, HCRE's, and HCMS's Defaults under the Notes Were the Result of Highland's Negligence</u>**

157.    No reasonable jury could find that NexPoint's default under its Note was the result of Highland's negligence under the SSA.[33]  As discussed above, the SSA, by its clear

---

[33] Highland did not enter into shared services agreements with HCRE and HCMS so those Obligors' affirmative defenses fail as a matter of law.

terms, does not impose a duty on Highland to make payments under the Term Notes, on behalf of NexPoint, HCRE, and HCMS, without the express authorization of those entities or an agent of those entities. *See supra* ¶¶ 120-125. It is undisputed that Highland was never directed to make the payments under the Term Notes. *See supra* ¶ 123.

158. Accordingly, there is no genuine issue of material fact regarding NexPoint's, HCRE's, and HCMS's breach under the Term Notes, and Highland is entitled to summary judgment on its claims for breach of the Term Notes.

**4.    No Reasonable Jury Could Find that NexPoint "Prepaid" on the NexPoint Note**

159. NexPoint's and HCMS's assertion that they did not default by failing to make the December 31, 2020 Annual Installment payment because they "prepaid" is contradicted by undisputed documentary evidence. (*See* Klos Dec. ¶¶ 3-14).

160. Accordingly, there can be no genuine dispute of material fact regarding NexPoint's and HCMS's failure to pay amounts due and owing under the NexPoint and HCMS Term Notes.

## CONCLUSION

WHEREFORE, Highland respectfully requests that the Court (i) grant its Motion, (ii) hold Defendants liable for (a) breach of contract and (b) turnover for all amounts due under the Notes, including the costs of collection and reasonable attorneys' fees in an amount to be determined and (iii) grant such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Blank]*

Dated: December 20, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
    jmorris@pszjlaw.com
    gdemo@pszjlaw.com
    hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
    ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT A

DOCS_NY:44673.9 36027/003

## PARTIES, WITNESSES, AND DEFINITIONS

1.      "Advisors" refers to HCMFA and NexPoint, together.  The Advisors provide investment advisors services to certain retail funds and are effectively owned or controlled by Mr. Dondero. Ex. 96 at 228:11-19; Ex. 105 at 32:17-23.[34]

2.      "Corporate Obligors" refers to HCMFA, NexPoint, HCMS, and HCRE in their capacities as makers under their respective Notes.

3.      "Dugaboy" refers to The Dugaboy Investment Trust, a trust formed in 2010 to purportedly provide for the living maintenance, education, health, and lifestyle of its beneficiaries. Mr. Dondero is the sole beneficiary of Dugaboy during his lifetime; his children and subsequent generations shall become the beneficiaries following his demise.

4.      "HCMFA" refers to Highland Capital Management Advisors, L.P.  HCMFA is an entity that provides investment advisory services to certain retail funds. Ex. 105 at 32:17-23. HCMFA is directly or indirectly owned and controlled by Mr. Dondero. Ex. 96 at 228:11-15.

5.      "NexPoint" refers to NexPoint Advisors, L.P.  NexPoint is an entity that provides investment advisory services to certain retail funds. Ex. 105 at 32:17-23.  HCMFA is directly or indirectly owned and controlled by Mr. Dondero. Ex. 96 at 228:16-19.

6.      "HCRE" refers to HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC), and is an entity that is directly or indirectly owned by Mr. Dondero. Ex. 96 at 228:20-23.

7.      "HCMS" refers to Highland Capital Management Services, Inc., and is an entity that is directly or indirectly owned or controlled by Mr. Dondero. Ex. 96 at 228:24-229:4.

---

[34] All citations herein to "Appx." refer to the *Appendix of Exhibits in Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment*.

1

8.      "<u>Klos Dec.</u>" refers to the *Declaration of David Klos In Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment*, filed simultaneously with the Motion.

9.      "<u>Mr. Dondero</u>" refers to an individual named James Dondero.  Mr. Dondero is the founder and former president and Chief Executive Officer of Highland.  Ex. 96 at 248:3-6.  Mr. Dondero served as Highland's president from 1994 until January 9, 2020. Ex. 98 at 291:6-292:16. At all relevant times, Mr. Dondero also served as President of HCMFA and directly or indirectly owned or controlled each of the Corporate Obligors.  Ex. 37; Ex. 96 at 228:6-229.

10.      "<u>Ms. Dondero</u>" refers to an individual named Nancy Dondero.  Ms. Dondero is Mr. Dondero's sister.  At Mr. Dondero's request, Ms. Dondero became the sole Trustee of Dugaboy in October 2015 and has served in that capacity since that time.  Ex. 96 at 174:21-25; Ex. 100 at 166:19-169:5.

11.      "<u>Mr. Norris</u>" refers to an individual named Dustin Norris.  Mr. Norris has been an officer of HCMFA since 2012, and currently serves as the Executive Vice President of HCMFA. Ex. 35; Ex. 192 at 18:11-25.

12.      "<u>Mr. Post</u>" refers to an individual named Jason Post. Mr. Post was employed by Highland in 2018 and 2019, and then became an employee of HCMFA and served as the Chief Compliance Officer for each of the Advisors.  Ex. 105 at 184:13-185:3; Ex. 192 at 32:6-33:25.

13.      "<u>Mr. Sauter</u>" refers to an individual named Dennis C. Sauter.  Mr. Sauter served as Highland's general counsel of real estate from approximately February 2020 until April 2021, and has served as the general counsel of NexPoint from April 2021 to the present. Ex. 193 at: 7:16-9:12.

14.      "<u>Ms. Thedford</u>" refers to an individual named Lauren Thedford.  Ms. Thedford is an attorney who was previously employed by Highland while simultaneously serving as an officer

2

of HCMFA and NexPoint, holding the title of Secretary. Ms. Thedford also served as an officer of the retail funds managed by the Advisors until early 2021. Ex. 35; Ex. 37; Ex. 105 at 172:10-173:25.

15.    "<u>Mr. Waterhouse</u>" refers to an individual named Frank Waterhouse. Mr. Waterhouse is a Certified Public Accountant who joined Highland Capital Management, L.P. in 2006 and served as Highland's Chief Financial Officer ("<u>CFO</u>") on a continuous basis from approximately 2011 or 2012 until early 2021. While serving as Highland's CFO, Mr. Waterhouse simultaneously served as (1) an officer of HCMFA, NexPoint, and HCMS, holding the title of Treasurer and (2) Principal Executive Officer of certain retail funds managed by the Advisors. As Treasurer and Principal Executive Officer of these entities, Mr. Waterhouse was responsible for managing the Advisor's accounting and finance functions. Ex. 35; Ex. 37; Ex. 105 at 18:6-15, 18:23-19:6, 21:15-17, 23:5-20, 25:17-26:8, 27:17-28:16, 29:2-10, 30:9-31:6, 34:12-35:19, 38:20-39:5.

16.    "<u>Notes</u>" refers to the Demand Notes and the Term Notes, as those terms are defined below.

17.    "<u>Obligors</u>" refers to Mr. Dondero and the Corporate Obligors in their capacities as makers under the Notes.

18.    "<u>PwC</u>" refers to Pricewaterhouse Coopers, firm that served as Highland's outside auditors from 2003 through at least June 3, 2019. Ex. 34; Exs. 63-66; Exs. 69-72; Ex. 87 at 9 (Item 26b.1).

DOCS_NY:44673.9 36027/003