

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 19, 2022**

_____
**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Reorganized Debtor. | Case No. 19-34054-sgj11<br><br>Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>     Plaintiff.<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.,<br><br>     Defendant. | Adversary No. 21-03004-sgj<br><br>Civ. Act. No. 3:21-cv-00881 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>     Plaintiff.<br><br>v.<br><br>NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND<br>THE DUGABOY INVESTMENT TRUST,<br><br>     Defendants. | Adversary No.: 21-03005-sgj<br><br>Civ. Act. No. 3:21-cv-00880<br><br>**(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>     Plaintiff. | |

| | |
|---|---|
| v. <br><br> JAMES D. DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, <br><br> Defendants. | Adversary No. 21-03003-sgj <br><br> Civ. Act. No. 3:21-cv-01010 <br><br> **(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P., <br><br> Plaintiff. <br><br> v. <br><br> HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, <br><br> Defendants. | Adversary No.: 21-03006-sgj <br><br> Civ. Act. No. 3:21-cv-01378 <br><br> **(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P., <br><br> Plaintiff. <br><br> v. <br><br> HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST, <br><br> Defendants. | Adversary No.: 21-03007-sgj <br><br> Civ. Act. No. 3:21-cv-01379 <br><br> **(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |

## <u>REPORT AND RECOMMENDATION TO DISTRICT COURT: COURT SHOULD GRANT PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST ALL FIVE NOTE MAKER DEFENDANTS[1] (WITH RESPECT TO ALL SIXTEEN PROMISSORY NOTES) IN THE ABOVE-REFERENCED CONSOLIDATED NOTE ACTIONS</u>

### I.    Introduction

The five above-referenced civil actions, emanating from the Chapter 11 bankruptcy case

of Highland Capital Management, L.P. ("Highland," "Plaintiff," or, sometimes, the "Debtor"[2])

---

[1] The "Note Maker Defendants"—sometimes collectively referred to simply as the "Defendants"—are: James D. Dondero (Civ. Action No. 3:21-cv-01010); Highland Capital Management Fund Advisors, L.P. (Civ. Action No. 3:21-cv-00881); NexPoint Advisors, L.P. (Civ. Action No. 3:21-cv-00880); Highland Capital Management Services, Inc (Civ. Action No. 3:21-cv-01378); and HCRE Partners, LLC, n/k/a NexPoint Real Estate Partners, LLC (Civ. Action No. 3:21-cv-01379).

[2] Highland is actually now a "Reorganized Debtor," having obtained confirmation of a Chapter 11 plan, which went "effective" in August 2021.

started out as what seemed like very simple lawsuits by a Chapter 11 debtor to collect on large promissory notes owed to it (collectively, the "Note Actions"). The Note Actions were initially filed in the bankruptcy court as adversary proceedings.

The Defendants soon filed motions to withdraw the reference in these Note Actions, arguing that the causes of action asserted against them are statutory non-core claims and the bankruptcy court also does not have constitutional authority to enter final judgments. The bankruptcy court agreed that the litigation presents non-core, related-to matters—since there are no proofs of claims of the Note Maker Defendants still pending, the resolution of which might be intertwined with the underlying promissory notes.[3] Additionally, the Note Maker Defendants did not consent to final judgments being issued by the bankruptcy court, and they also demanded jury trials.[4] The District Court accepted a report and recommendation of the bankruptcy court that the reference should be withdrawn when these Note Actions are trial-ready, with the bankruptcy court acting essentially as a magistrate judge for the District Court prior to trial, presiding over all pretrial matters. The Plaintiff's motion for partial summary judgment, now pending, is the type of pretrial matter contemplated to be handled by the bankruptcy court (with submission to the District Court of a Report and Recommendation required—to the extent final disposition of any claim is proposed).

By way of further background, the five Note Actions were originally brought on January 22, 2021, by Plaintiff (before confirmation of its Chapter 11 plan), again, as simple suits on promissory notes—that is, alleging breach of contract (nonpayment of notes) and seeking turnover of amounts allegedly due and owing from the various Defendants. Each of the Note Maker

---

[3] *See Stern v. Marshall*, 131 S. Ct. 2594 (2011).

[4] 28 U.S.C. § 157(c) & (e).

Defendants are closely related to Highland's founder and former president, James Dondero ("Mr. Dondero), and collectively borrowed tens of millions of dollars from Highland prepetition. The indebtedness was memorialized in a series of demand and term notes (i.e., sixteen notes altogether: thirteen demand notes and three term notes). The indebtedness represented by these notes remains unpaid.

The five Note Actions were subsequently consolidated into one action before District Judge Brantley Starr, in the interest of judicial economy, under Civ. Action No. 3:21-cv-881, since there are overlapping facts and defenses.[5] As alluded to above, the consolidated litigation involves sixteen different promissory notes on which Highland is the payee. More than $60 million of unpaid principal and interest was alleged to be due and owing on the notes as of the time that the five Note Actions were filed. The Note Maker Defendants and their notes are as follows: (i) Mr. Dondero is maker on three demand notes; (ii) Highland Capital Management Fund Advisors, L.P. ("HCMFA") is maker on two demand notes; (iii) NexPoint Advisors, L.P. ("NexPoint") is maker on one term note; (iv) Highland Capital Management Services, Inc ("HCMS") is maker on five notes (four demand notes and one term note); and (v) HCRE Partners, LLC, n/k/a NexPoint Real Estate Partners, LLC ("HCRE") is maker on five notes (four demand notes and one term note). Highland filed the five Note Actions—one against each of the Note Maker Defendants—to pursue payment on the notes to help fund distributions to creditors under its Chapter 11 plan. Mr. Dondero,

---

[5] The typical procedure in consolidation actions is to consolidate under the lowest-numbered case, which here would have been Civ. Action No. 3:21-cv-880, previously assigned to Judge Sam Cummings. However, Judge Starr determined that judicial efficiency would be best served by consolidating under Civ. Action No. 3:21-cv-881, because Civ. Action Nos. 3:21-cv-880 and 3:21-cv-881 were actually filed in district court on the same day and due to certain other factors explained in Judge Starr's Order Granting Defendant's Motion to Consolidate the Note Cases, dated January 6, 2022.

while a maker on three of the sixteen notes, was the signatory on a total of twelve of the sixteen notes.

The Note Actions morphed, so to speak, when *four* of the five Note Maker Defendants defended the Note Actions by alleging that an ***oral agreement*** existed between Highland and each of them—the substance of which was allegedly that Highland would not pursue collection on their underlying notes if certain conditions subsequent occurred.[6]

The "Oral Agreement" Defense Asserted by Four of the Five Note Defendants. To be clear, the "oral agreement" defense was asserted by each of the Note Maker Defendants *except* HCMFA. The four Defendants who assert the oral agreement defense are sometimes collectively referred to by the Plaintiff as the ***"Alleged Agreement Defendants"*** and they are: Mr. Dondero; NexPoint; HCMS; and HCRE. To be further clear, these Alleged Agreement Defendants represent that:

> Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each Note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. The purpose of this agreement was to provide compensation to Defendant James Dondero, who was otherwise underpaid compared to reasonable compensation levels in the industry, through the use of forgivable loans, a practice that was standard at [Highland] and in the industry. This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant James Dondero believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this [Action].

Paragraph 82 in Amended Answer of Mr. Dondero [DE # 83 & DE # 16 ¶ 40 in Adv. Proc. No. 21-3003]. *See also* Paragraph 42 in Amended Answer of NexPoint [DE # 50 & DE # 64 ¶ 83 in

---

[6] These Note Maker Defendants also pleaded the affirmative defenses of justification and/or repudiation; estoppel; waiver; and ambiguity.

Adv. Proc. No. 21-3005]; Paragraph 56 in Amended Answer of HCMS [DE #34 & DE # 73 ¶ 97 in Adv. Proc. No. 21-3006]; Paragraph 58 in Amended Answer of HCRE [DE # 34 & DE # 68 ¶ 99 in Adv. Proc. No. 21-3007].

Somewhat shockingly for a multi-billion-dollar enterprise with sophisticated officers and directors—which was audited by one of the largest and most iconic public accounting firms in the world (PwC)—the alleged "oral agreement" was supposedly made (unbeknownst to any of those officer, directors, and PwC) between: (a) Mr. Dondero, acting on behalf of each of the Alleged Agreement Defendants; and (b) **his sister, Nancy Dondero**, of Vero Beach, Florida ("Sister Dondero"), acting on behalf of Highland.  Notably, Sister Dondero was never an officer, manager, or held any role with Highland, but the position of the Alleged Agreement Defendants is that she nevertheless had authority to act for Highland, in connection with agreeing not to collect on the Notes, because she was/is the trustee of the Dugaboy Investment Trust ("Dugaboy"), which is a family trust of Mr. Dondero, of which Mr. Dondero is sole beneficiary during his lifetime (with his children as the future beneficiaries).[7] Here is the catch:  Dugaboy happens to own a majority of the **limited partnership interests of Highland**—which, according to the Alleged Agreement Defendants, means Dugaboy can exert control over Highland and do things like release millions of dollars' worth of debt owed to Highland.[8]

When this "oral agreement" defense was articulated, the bankruptcy court granted Highland's request for leave to amend its original complaints in each of the four applicable Note

---

[7] Mr. Dondero was himself the trustee of Dugaboy until his resignation as such on August 26, 2015. James Dondero Dec., DE # 155, ¶ 21 in Adv. Proc. No. 21-3003.

[8] *See id.* ¶ 20 (more specifically, the Defendants make a bizarre argument that a majority of equity holders in Highland could approve "compensation" set for Highland's general partner, Strand Advisors, Inc. ("Strand") and Strand's affiliates; the further argument is that Mr. Dondero is an affiliate of Strand, and, thus, Sister Dondero could release obligations on the Notes as a form of "compensation" to Mr. Dondero).

Actions to allege alternative theories of liability and add Mr. Dondero,[9] Dugaboy, and Sister Dondero as additional defendants on new counts—the theories being that, if such an "oral agreement" was made, it may have given rise to other causes of action on the part of the actors involved. Highland amended its complaints in each of the four applicable Note Actions, adding new Counts III, IV, V, VI, and VII alleging, among other things, fraudulent transfers (Counts III and IV), declaratory judgment as to certain provisions of Highland's limited partnership agreement (Count V), breach of fiduciary duty (Count VI), and aiding and abetting breach of fiduciary duty (Count VII) (the "Amended Complaints").

The "Mutual Mistake" Defense of one sole Defendant: HCMFA. Another way in which the simple Note Actions morphed was with regard to the "mutual mistake" defense that was alleged only with regard to the **two notes on which Defendant HCMFA was the maker**.

The "mutual mistake" defense was articulated as follows. First, the signature on the two notes on which HCMFA was the maker—that of Frank Waterhouse, who was the Treasurer of HCMFA and also the former Chief Financial Officer ("CFO") of Highland until February 2021 (when he went to work for entities now controlled by Mr. Dondero)—was allegedly not authorized. More pointedly, it was alleged that the creation of the notes was entirely a ***mistake*** because (a) even though funds were frequently transferred between Highland and affiliates such as HCMFA, and (b) even though the Debtor's in-house accountants usually papered these transfers as loans, and (c) even though $7.4 million was undisputedly transferred from Highland to HCMFA at the time of the preparation and execution of the HCMFA Notes, the transfers of $7.4 million of funds to HCMFA was allegedly not supposed to be treated as a loan or loans in this instance. The fund

---

[9] Mr. Dondero was, of course, already a Defendant in Adv. Proc. No. 21-3003, as he was a maker on three notes.

transfer was allegedly supposed to be treated as *compensation* to HCMFA from Highland, for certain harm Highland allegedly caused to HCMFA and its stakeholders through an error or negligence committed by Highland or its professionals. The HCMFA notes were allegedly not what *Mr. Dondero*—the person in charge of both Highland and HCMFA[10]—intended, and no one consulted with him before creating the HCMFA Notes. *See* Paragraph 29, DE # 127, in Adv. Proc. No. 21-3004.

Manufacturing Chaos. In the Plaintiff's motion for partial summary judgment now pending before the court—again, filed as to all five Note Maker Defendants and as to all sixteen notes— the Plaintiff contends that these are simple suits on promissory notes, and the Note Maker Defendants are essentially trying to manufacture chaos by attempting to create fact issues with bizarre (if not preposterous) defenses. The Plaintiff asserts that it is entitled to judgment as a matter of law on Counts I (breach of contract for nonpayment) and II (turnover of funds, pursuant to Bankruptcy Code Section 542(b)) in each of the five Note Actions.

The bankruptcy court agrees. The summary judgment evidence shows that the sixteen Notes: (i) are valid, (ii) were executed by the Note Maker Defendants and in favor of Highland; and (iii) there is a balance due and owing under each of the sixteen Notes. The Note Maker Defendants failed to rebut Plaintiff's prima facie case because the Note Maker Defendants failed to create a *genuine* issue of material fact regarding their breaches. There was an absence of evidence to support each of Note Maker Defendants' affirmative defenses. Interestingly, among other things, Mr. Dondero has referred to all of the Notes at issue here as "soft notes" that were "made between friendly affiliates," implying that this somehow makes them less collectible.[11] For

---

[10] *See* James Dondero Dec. DE # 155, ¶¶ 3-4, in Adv. Proc. No. 21-3003.

[11] *Id*. ¶¶ 5-18.

the avoidance of doubt, a "soft note" is not a thing—not under the Bankruptcy Code, not in the world of commercial finance, and not as described in any evidence submitted to the court.[12] The bankruptcy court hereby recommends that the District Court grant summary judgment in favor of the Plaintiff/Reorganized Debtor on Counts I and II in all five consolidated Note Actions, for the reasons set forth below.

## II.     Undisputed Facts Regarding Each of the Thirteen Demand Notes

Of the sixteen notes at issue in the Notes Actions (sometimes collectively referred to as the "Notes"): (a) thirteen were demand notes; and (b) three were term notes. These notes were executed between 2013 and 2019 and are described below. These are the undisputed facts pertaining to the thirteen demand notes.

### A.  *The Three Demand Notes on Which Mr. Dondero is Maker*

On February 2, 2018, Mr. Dondero executed a promissory note in favor of Highland, as payee, in the original principal amount of $3,825,000 ("Dondero's First Note"). Klos Dec. ¶ 18, Ex. D;[13] Pl. Ex. 125 at p. 9, Appx. 2357; Pl. Ex. 188, Appx. 3001-3002; Pl. Ex. 189, Appx. 3003-

---

[12] For the sake of clarity, this court can take judicial notice that there are plenty of complex chapter 11 cases where there are intercompany loans among debtor-affiliates, and the intercompany loans are cancelled as part of a plan. However, this happens in *very different circumstances from the Highland case*—i.e., when all affiliates file bankruptcy, and either a secured lender has liens on all the assets of all the affiliates and/or there is no benefit to the general creditor body of collecting on the intercompany loans.

[13] This refers to the Declaration of David Klos—the current Chief Financial Officer ("CFO") of the Reorganized Debtor—and the Exhibits attached thereto, filed concurrently with Highland's Motion for Partial Summary Judgment, found at DE # 133 in Adv. Proc No. 21-3003. For convenience, the court will occasionally refer to the "Klos Declaration" at this same DE # 133 in Adv. Proc. No. 21-3003 even when referring herein to the *other* Note Actions (i.e., the Note Actions involving the other Note Maker Defendants) since the very same Declaration was filed in each of the Note Actions.

3004; Pl. Ex. 74, Appx. 1338-1340; Pl. Ex. 81 (Responses to RFAs 1-3), Appx. 1387; *see also* Pl. Ex. 32 ¶ 20, Appx. 664; Pl. Ex. 31 ¶ 20, Appx. 647.[14]

On August 1, 2018, Mr. Dondero executed a promissory note in favor of Highland, as payee, in the original principal amount of $2,500,000 ("Dondero's Second Note"). Klos Dec. ¶ 19, Ex. E; Pl. Ex. 126 at p. 2, Appx. 2366; Pl. Ex. 190, Appx. 3005-3006; Pl. Ex. 76, Appx. 1354-1356; Pl. Ex. 81 (Responses to RFAs 5-7), Appx. 1387-1388; *see also* Pl. Ex. 32 ¶ 21, Appx. 664; Pl. Ex. 31 ¶ 21, Appx. 647.

On August 13, 2018, Mr. Dondero executed a promissory note in favor of Highland, as payee, in the original principal amount of $2,500,000 ("Dondero's Third Note" and collectively, with Dondero's First Note and Dondero's Second Note, the "Dondero Notes"). Klos Dec. ¶ 20, Ex. F; Pl. Ex. 126 at p. 2, Appx. 2366; Pl. Ex. 77, Appx. 1357-1359; Pl. Ex. 81 (Responses to RFAs 9-11), Appx. 1388; *see also* Pl. Ex. 32 ¶ 22, Appx. 664; Pl. Ex. 31 ¶ 22, Appx. 647.

B. *The Two Demand Notes on Which HCMFA is Maker*

On May 2, 2019, HCMFA executed[15] a promissory note in favor of Highland, as payee, in the original principal amount of $2,400,000 ("HCMFA's First Note"). Klos Dec. ¶ 21, Ex. G; Pl. Ex. 147 at p. 7, Appx. 2526; Pl. Ex. 54, Appx. 870-873; Pl. Ex. 55, Appx. 874-875; Pl. Ex. 1 at Ex. 1, Appx. 9-11; Pl. Ex. 53, Appx. 866-869.

---

[14] Concurrently with filing its Motions for Partial Summary Judgment, Highland filed an Appendix of Exhibits in Support (the "Appendix") at DE #135 in Adv. Proc No. 21-3003. Citations to the Appendix are notated as follows: Pl. Ex. #, Appx. # . For convenience, the court will occasionally refer to this Appendix at this same DE # 135 in Adv. Proc No. 21-3003 even when referring herein to the **other** Note Actions (i.e., the Note Actions involving the other Note Maker Defendants) since the very same Appendix was filed in each of the Note Actions.

[15] HCMFA disputes that the signature of HCMFA's Treasurer, Frank Waterhouse, on this document was genuine or authorized. This allegation will be addressed later herein.

On May 3, 2019, HCMFA executed[16] a promissory note in favor of Highland, as payee, in the original principal amount of $5,000,000 ("HCMFA's Second Note," and together with HCMFA's First Note, the "HCMFA Notes"). Klos Dec. ¶ 22, Ex. H; Pl. Ex. 147 at p. 7, Appx. 2526; Pl. Ex. 56, Appx. 876-877; Pl. Ex. 1 at Ex. 2, Appx. 12-15; Pl. Ex. 57, Appx. 878-880.

### C. Four Demand Notes on Which Highland Capital Management Services, Inc. ("HCMS") is Maker

On March 28, 2018, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $150,000 ("HCMS's First Demand Note"). Klos Dec. ¶ 23, Ex. I; Pl. Ex. 143, Appx. 2487-2490; Pl. Ex. 3 at Ex. 1, Appx. 117-119.

On June 25, 2018, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $200,000 ("HCMS's Second Demand Note"). Klos Dec. ¶ 24, Ex. J; Pl. Ex. 144, Appx. 2491-2494; Pl. Ex. 3 at Ex. 2, Appx. 120-122.

On May 29, 2019, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $400,000 ("HCMS's Third Demand Note"). Klos Dec. ¶ 25, Ex. K; Pl. Ex. 145 at p. 11, Appx. 2506; Pl. Ex. 3 at Ex. 3, Appx. 123-125.

On June 26, 2019, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $150,000 ("HCMS's Fourth Demand Note," and collectively, with HCMS's First Demand Note, HCMS's Second Demand Note, and HCMS's Third Demand Note, the "HCMS Demand Notes"). Klos Dec. ¶ 26, Ex. L; Pl. Ex. 146 at p. 7, Appx. 2516; Pl. Ex. 3 at Ex. 4, Appx. 126-128.

---

[16] HCMFA disputes that the signature of HCMFA's Treasurer on this document was genuine or authorized. This allegation will be addressed later herein.

### D. Four Demand Notes on Which HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) ("HCRE") is Maker

On November 27, 2013, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $100,000 ("HCRE's First Demand Note"). Klos Dec. ¶ 27, Ex. M; Pl. Ex. 148, Appx. 2533-2536; Pl. Ex. 4 at Ex. 1, Appx. 201-203.

On October 12, 2017, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $2,500,000 ("HCRE's Second Demand Note"). Klos Dec. ¶ 28, Ex. N; Pl. Ex. 154 at p. 7, Appx. 2575; Pl. Ex. 4 at Ex. 2, Appx. 204-206.

On October 15, 2018, 2017, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $750,000 ("HCRE's Third Demand Note"). Klos Dec. ¶ 29, Ex. O; Pl. Ex. 155 at p. 5, Appx. 2585; Pl. Ex. 4 at Ex. 3, Appx. 207-209.

On September 25, 2019, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $900,000 ("HCRE's Fourth Demand Note," and collectively, with HCRE's First Demand Note, HCRE's Second Demand Note, and HCRE's Third Demand Note, the "HCRE Demand Notes"). Klos Dec. ¶ 30, Ex. P; Pl. Ex. 156 at p. 6, Appx. 2596; Pl. Ex. 4 at Ex. 4, Appx. 210-212.

### E. The Identical Provisions in Each of the Demand Notes.

Except for the date, the amount, the maker, and the interest rate, each of the thirteen Demand Notes listed above is identical and includes the following provisions:

2. Payment of Principal and Interest. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

5. Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of

this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

6. Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

7. Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

*See* Pl. Ex. 74, Appx. 1338-1340; Pl. Ex. 76, Appx. 1354-1356; Pl. Ex. 77, Appx. 1357-1359; Pl. Ex. 1 at Exs.1-2, Appx. 9-15; Pl. Ex. 3 at Exs. 1-4, Appx. 117-128; and Pl. Ex. 4 at Exs. 1-4, Appx. 201-212.

      F. *Demands by Plaintiff and Non-Payment*.

The undisputed evidence is that on December 3, 2020, during its bankruptcy case—with its Chapter 11 plan coming up for confirmation and its need of funding to pay its millions of dollars' of debt owed to creditors—Highland made separate demands on Mr. Dondero, HCMFA, HCMS, and HCRE, respectively, for payment of all accrued principal and interest due under the Demand Notes by December 11, 2020. The demand letters also included a demand for all costs of collection, including attorneys' fees, as provided in the above-referenced Demand Notes. Pl. Ex. 79, Appx. 1370-1373; Pl. Ex. 1 at Ex. 3, Appx. 16-19; Pl. Ex. 3 at Ex. 5, Appx. 129-132; and Pl. Ex. 4 at Ex. 5, Appx. 213-216 (collectively, the "Demand Letters").

Furthermore, it is undisputed that none of these Note Maker Defendants made any payments on the Demand Notes or otherwise replied to the Demand letters before Plaintiff

commenced these Note Actions. Therefore, the Note Maker Defendants have breached Section 2 of the Demand Notes by their terms and are in default.

With regard to the three Dondero Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under their terms was $9,263,365.05. Klos Dec. ¶ 37.

With regard to the two HCMFA Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under their terms was $7,874,436.09. Klos Dec. ¶ 40.

With regard to the four HCMS Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81. Klos Dec. ¶ 45.

With regard to the four HCRE Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23. Klos Dec. ¶ 50.

### III.    Undisputed Facts Regarding Each of the Three Term Notes

Of the sixteen notes at issue in the Notes Actions, three were term notes (the "Term Notes"). These are the undisputed facts pertaining to the three Term Notes.

*A. The Three Term Notes*

The Term Notes were each executed by Mr. Dondero on May 31, 2017. They were each for 30-year terms. One was for NexPoint, one was for HCMS, and one was for HCRE. Klos Dec.

¶¶ 27-29. Each of these three Term Notes rolled up obligations of the makers under prior notes.[17] Each Term Note is more fully described as follows:

A Term Note signed on NexPoint's behalf in the original principal amount of $30,746,812.23 (the "NexPoint Term Note"). Klos Dec. ¶ 31, Ex. A; Pl. Ex. 2 at Ex. 1, Appx. 41-44; Pl. Ex. 2 ¶ 21, Appx. 28; Pl. Ex. 15 ¶ 21, Appx. 428.

A Term Note signed on HCMS's behalf in the original principal amount of $20,247,628.02 (the "HCMS Term Note" and together with the HCMS Demand Notes, the "HCMS Notes"). Klos Dec. ¶ 32, Ex. R; Pl. Ex. 3 at Ex. 6, Appx. 133-136.

A Term Note signed on HCRE's behalf in the original principal amount of $6,059,831.51 (the "HCRE Term Note" and together with the HCRE Demand Notes, the "HCRE Notes"). Klos Dec. ¶ 33, Ex. S; Pl. Ex. 4 at Ex. 6, Appx. 217-220.

According to Frank Waterhouse,[18] the former Highland CFO (who was also an officer of each of these three Note Maker Defendants), Highland loaned the money to NexPoint, HCMS, and HCRE to enable those entities to make investments. Pl. Ex. 105 at 126:21-129:3, Appx. 2081. Mr. Dondero claimed to have no personal knowledge of the purpose of the loans or the borrowers' use of the loan proceeds. Pl. Ex. 98 at 420:10-18, Appx. 1776, 435:17-25, Appx. 1779, 448:4-13, Appx. 1783, and 450:3-24, Appx. 1783.

B.      *The Identical Provisions in Each of the Term Notes.*

---

[17] Proof of the loans underlying the prior notes (as defined in each of the Term Notes) is found at Pl. Exs. 127-141, Appx. 2368-2481 (HCMS); Pl. Exs. 149-153, Appx. 2537-2567 (HCRE); Pl. Exs. 157-161, Appx. 2599-2636 (NexPoint (the July 22, 2015 prior note appears to have been backdated because the underlying loans were effectuated between July 2015 and May 2017 (see Pl. Ex. 161))).

[18] Frank Waterhouse was CFO of Highland until he left Highland in February 2021. He now works for entities controlled by Mr. Dondero.

Except for the date, the amount, the maker, the interest rate, and the identity of the Prior Notes (as that term is defined in each Term Notes), each of the Term Notes is identical and includes the following provisions:

> 2.1 **Annual Payment Dates.** During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "Annual Installment") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

> 4. **Acceleration Upon Default.** Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

> 5. **Waiver.** Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

> 6. **Attorneys' Fees.** If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

> *C. Non-Payment/Defaults Under the Term Notes.*

NexPoint, HCMS, and HCRE each failed to timely make their Annual Installment payments that were due on December 31, 2020. Belatedly, NexPoint made a payment of $1,406,111.92, on January 14, 2021, which reduced the total principal and interest then-outstanding. Also, belatedly, HCMS made a payment of $181,226.83, on January 21, 2021, which reduced the total principal and interest then-outstanding. Finally, belatedly HCRE made a payment

of $665,811.09, on January 21, 2021, which reduced the total principal and interest then-outstanding. However, as set forth in Section 4 above, the Term Notes allowed Highland to declare a default without notice when the annual installments were not timely paid on December 31, 2020.

As of December 17, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,383,877.27.12. Klos Dec. ¶ 51.

As of December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,748,456.31.13. Klos Dec. ¶ 52.

As of December 17, 2021, the unpaid principal and accrued interest due under the HCRE Term Loan was $5,899,962.22.14. Klos Dec. ¶ 53.

## IV. Undisputed Corroborating Evidence Regarding the Sixteen Notes

### A. The Notes Were All Disclosed on Highland's Financial Statements Audited by the Outside Accounting Firm PwC

The undisputed evidence establishes that (a) all of the Notes were provided to the accounting firm PwC, Highland's long-time outside auditors, and were described in Highland's audited financial statements; (b) all of the Notes were carried as assets on Highland's balance sheet and were valued in amounts equal to the accrued and unpaid principal and interest without any offset or reservation whatsoever;[19] and (c) neither Highland nor Mr. Dondero disclosed any potential defenses to PwC, despite having an affirmative obligation to do so under generally accepted accounting principles ("GAAP").

---

[19] As discussed below, the HCMFA Notes were executed in May 2019, and were fully described in the "Subsequent Events" section of Highland's audited financial statements for the period ending December 31, 2018. Pl. Ex. 34 at p. 39, Appx. 782. Because the HCMFA Notes were executed after the end of the fiscal year, they were not included as "assets" for 2018, and Highland never completed its 2019 audit. Nevertheless, the undisputed evidence also shows that HCMFA (a) disclosed the existence of the HCMFA Notes in the "Subsequent Events" section of its own 2018 audited financial statements, and (b) carried the HCMFA Notes as liabilities on its own balance sheet. Pl. Ex. 45 at p. 17; Pl. Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3, Appx. 3028, 56:20-59:3, Appx. 3028-3029.

As part of the PwC audit process[20] (as is typical), Highland was the one who actually drafted the financial statements and accompanying notes, and management provided the information that PwC needed to conduct its audits. Pl. Ex. 94 at 14:8-15:14, Appx. 1556; *see also id.* at 49:11-50:22, Appx. 1564-1565. All of Highland's employees who worked on the audit reported to Mr. Waterhouse (Highland's CFO), and Mr. Waterhouse was ultimately responsible for making sure the audit was accurate before it was finalized. Pl. Ex. 105 at 87:25-89:10, Appx. 2071. As further part of the audit, PwC required Highland to deliver "management representation letters" that included specific representations that PwC relied upon. Pl. Ex. 94 at 16:18-17:20, Appx. 1556, 23:4-9, Appx. 1558. *See also* Pl. Ex. 105 at 96:24-98:6, Appx. 2073-2074 (according to Mr. Waterhouse, management representation letters are "required in an audit to help verify completeness."). For fiscal years 2017 and 2018, Mr. Dondero and Mr. Waterhouse signed Highland's management representation letters; their representations were applicable through the date of the audit's completion so that all "material" subsequent events could be included and disclosed. Pl. Ex. 33, Appx. 729-740, Pl. Ex. 86, Appx. 1420-1431, Pl. Ex. 94 at 17:21-25, Appx. 1556, 19:2-22:6, Appx. 1557-1558; *see also* Pl. Ex. 105 at 92:4-8, Appx. 2072, 94:20-95:12, Appx. 2073.

Mr. Dondero and Mr. Waterhouse made the following representations to PwC, on June 3, 2019, in connection with PwC's audit of Highland financial statements for the period ending December 31, 2018:

> The Affiliated Party Notes[21] represented bona fide claims against the makers, and all Affiliated Party Notes were current as of June 3, 2019. Pl. Ex. 33 ¶ 11, Appx. 732; Pl. Ex. 94 at 24:6-25:5, Appx. 1558.

---

[20] Pl. Ex. 94 at 9:24-12:14, Appx. 1554-1555.

[21]"Affiliated Party Notes" is the term used by PwC to refer to any and all notes payable to Highland and made by officers, employees, or affiliates of Highland. *See generally* Pl. Ex. 33, Appx. 729-740; Pl. Ex. 94, Appx. 1551-1585.

If there were any errors in Highland's financial statements, they were not "material." Pl. Ex. 33 ¶ 32, Appx. 735; Pl. Ex. 94 at 25:6-26:13, Appx. 1558-1559.

There were no "material" transactions or agreements that were not recorded in the financial statements. Pl. Ex. 33 ¶ 34, Appx. 735; Pl. Ex. 94 at 26:14-27:11, Appx. 1559.

All relationships and transactions with, and amounts receivable or payable to or from, related parties were properly reported and disclosed in the consolidated financial statements. Pl. Ex. 33 ¶ 35(d), Appx. 735; Pl. Ex. 94 at 27:12-28:11, Appx. 1559.

All related party relationships and transactions known to Mr. Dondero and Mr. Waterhouse were disclosed. Pl. Ex. 33 ¶ 36, Appx. 736; Pl. Ex. 94 at 28:12-29:5, Appx. 1559.

All subsequent events were disclosed. Pl. Ex. 33 (signature page), Appx. 738; Pl. Ex. 94 at 29:6-30:2, Appx. 1559-1560.

Under GAAP, Highland was required to disclose to PwC: (a) all "material" related party transactions; and (b) any circumstances that would call into question the collectability of any of the Notes. Pl. Ex. 94 at 34:17-35:2, Appx. 1561, 51:17-52:5, Appx. 1565, 70:20-71:3, Appx. 1570. For purposes of the 2017 audit, the "materiality" threshold was $2 million. Pl. Ex. 86 at p. 1, Appx. 1421. For purposes of the 2018 audit, the "materiality" threshold was $1.7 million. Pl. Ex. 33 at p. 1, Appx. 730; Pl. Ex. 94 at p. 22:11-23:3, Appx. 1558. *See also* Pl. Ex. 105 at 91:14-93:6, Appx. 2072.

There is no evidence that Mr. Dondero nor anyone at Highland disclosed to PwC the existence of any defenses to the Notes (such as an "oral agreement or "mutual mistake"). Pl. Ex. 24 (Responses to RFAs 1-2), Appx. 521; Pl. Ex. 94 at 67:16-70:19, Appx. 1569-1570, 71:4-74-8, Appx. 1570-1571, 92:19-93:12, Appx. 1575; Pl. Ex. 105 at 102:2-5, Appx. 2075.

The Notes were carried on Highland's balance sheets as "Notes and other amounts due from affiliates." Pl. Ex. 34 at p. 2, Appx. 745; Pl. Ex. 72 at p. 2, Appx. 1291; Pl. Ex. 94 at 23:10-22, Appx. 1558, 31:11-33:20, Appx. 1560; Pl. Ex. 105 at 106:20-109:12, Appx. 2076.

19

The notes to the financial statements described the "Affiliate Notes" that were carried on Highland's balance sheet; management calculated the amounts due and owing to Highland from each Affiliate. Pl. Ex. 72 at p. 30-31; Pl. Ex. 34 at p. 28-29; Pl. Ex. 94 at 34:17-36:25; 51:17-53:12, Appx. 1565; Pl. Ex. 105 at 110:22-112:21, Appx. 2077. The "fair value" of the Affiliate Notes was "equal to the principal and interest due under the notes." Pl. Ex. 72 at p. 30-31, Appx. 1319-1320; Pl. Ex. 34 at p. 28-29, Appx. 771-772; Pl. Ex. 94 at 37:11-39:12, Appx. 1561-1562; 53:19-25, Appx. 1565. No discounts were given to the Notes, and PwC concluded that the obligors under each of the Affiliate Notes had the ability to pay all amounts outstanding. Pl. Ex. 92, Appx. 1514-1530; Pl. Ex. 93, Appx. 1531-1550; Pl. Ex. 94 at 41:2-45:6, Appx. 1562-1563, 55:17-60:22, Appx. 1566-1567, 68:20-25, Appx. 1569.

Finally, with regard to the two HCMFA Notes in particular (i.e., the ones allegedly subject to a "mutual mistake" defense—as further described below), a note to Highland's audited financial statements for year 2018 disclosed, as a "subsequent event" (i.e., an event occurring after the December 31, 2018 end of the fiscal year and on or before June 3, 2019, the date Mr. Dondero and Mr. Waterhouse signed the management representation letters and PwC completed its audit), the following: "Over the course of 2019, through the report date, HCMFA issued promissory notes to [Highland] in the aggregate amount of $7.4 million. The notes accrue interest at a rate of 2.39%." Pl. Ex. 34 at p. 39, Appx. 782. *See also* Pl. Ex. 94 at 54:9-55:7, Appx. 1566.

> B. *More Corroborating Evidence: During the Highland Bankruptcy Case (In Fact, Shortly Before the Note Actions Were Filed) HCMFA and NexPoint Informed Their Retail Board of their Obligations Under their Respective Notes*

HCMFA and NexPoint are engaged in the business of managing certain funds, for the benefit of various investors in those funds. In fact, HCMFA and NexPoint have contracts to

manage those funds (the "Fund Agreements"). Pl. Ex. 192 at 66:3-67:6, Appx. 3031. The funds themselves, in turn, are overseen to an extent by a board known as the "Retail Board." The Retail Board must determine on an annual basis whether to renew the Fund Agreements with HCMFA and NexPoint, a process referred to as a "15(c) Review." As part of the 15(c) Review, the Retail Board requests information from HCMFA and NexPoint. Pl. Ex. 99 at 129:17-130:3, Appx. 1844-1845, Pl. Ex. 105 at 32:17-33:6, Appx. 2057, 168:9-12, Appx. 2091, 169:9-170:16, Appx. 2091-2092. Mr. Waterhouse, the Treasurer of HCMFA and NexPoint (along with various other officers of HCMFA and NexPoint) participated in the annual 15(c) Review process with the Retail Board. Pl. Ex. 192 at 67:7-68:19, Appx. 3031; Pl. Ex. 105 at 168:13-169:8, Appx. 2091.

The Retail Board, as part of the annual 15(c) Review, asked HCMFA and NexPoint, in October 2020, to provide information regarding any outstanding amounts currently payable or due in the future (e.g., notes) to Highland by HCMFA or NexPoint or to any other affiliate that provided services to the Funds." Pl. Ex. 36 at p. 3, Appx. 793.

On October 23, 2020, HCMFA and NexPoint provided their formal responses to the questions posed by the Retail Board. As to the issue of outstanding amounts currently payable or due to Highland or its affiliates, HCMFA and NexPoint reported as follows:

> As of June 30, 2020, $23,683,000 remains outstanding to HCMLP [Highland] and its affiliates from NexPoint and $12,286,000 remains outstanding to HCMLP [Highland] from HCMFA. The Note between HCMLP [Highland] and NexPoint comes due on December 31, 2047. The earliest the Note between HCMLP [Highland] and HCMFA could come due is in May 2021. All amounts owed by each of NexPoint and HCMFA pursuant to the shared services arrangement with HCMLP [Highland] have been paid as of the date of this letter. The Advisor notes that both entities have the full faith and support of James Dondero.

Pl. Ex. 59 at p. 2, Appx. 885.

*C. More Corroborating Evidence: Before and During the Highland Bankruptcy Case, the Notes Were Reflected on Highland's Books, Records, and Bankruptcy Paperwork as Assets Owed to Highland, without Discounts*

In addition to its PwC-audited financial statements, Highland's contemporaneous books and records—before and after the Petition Date—recorded the Notes as valid debts due and owing by each of the Note Makers Defendants to Highland.

By way of example, the three Dondero Notes, reflecting personal loans to Mr. Dondero, show they were made on February 2, 2018; August 1, 2018; and August 13, 2018, respectively. A February 2018 internal monthly operating results of Highland, underneath a heading "Significant Items Impacting HCMLP's [Highland's] Balance Sheet," reflected a transfer to Mr. Dondero on February 2, 2018, as "($3.8M) partner loan." Ex. 39 at 1, Appx. 801. And in the Debtor's August 2018 internal monthly operating results, also under a heading "Significant Items Impacting HCMLP's [Highland's] Balance Sheet," the August 2018 transfers to Mr. Dondero were together contemporaneously identified as "($5.0M) partner loan." *See also* Pl. Ex. 78 at p. 2, Appx. 1362.

Highland's accounting group had a regular practice of creating, maintaining, and updating on a monthly basis "loan summaries" in the ordinary course of business (the "Loan Summaries"). The Loan Summaries identified amounts owed to Highland under affiliate notes and were created by updating underlying schedules for activity and reconciling with Highland's general ledger. Pl. Ex. 199, Appx. 3245-3246 is an example of a Loan Summary. The Loan Summaries identified each Note Maker Defendant by reference to the "GL" number used in the general ledger. *See* Pl. Ex. 199, Appx. 3246 (HCMS ("GL 14530"), HCMFA ("GL 14531"), NexPoint ("GL 14532"), HCRE ("GL 14533"), and Mr. Dondero ("GL 14565")).

The Debtor's Schedules of Assets and Liabilities [Bankr. DE # 247] (the "Debtor's Schedules"), filed during the Highland bankruptcy case at a time when Mr. Dondero was still under

control of Highland, included all of the Notes among the Debtor's assets. Pl. Ex. 40, Appx. 812-815 (excerpts of the Debtor's Schedules showing that Highland (i) disclosed as assets of the estate "Notes Receivable" in the approximate amount of $150 million (Item 71), and (ii) provided a description of the Notes (Exhibit D)).

Additionally, all of the Debtor's Monthly Operating Reports filed during the Highland bankruptcy case (including those filed while Mr. Dondero was still in control of the Debtor) included the Notes as assets of the Debtor. *See, e.g.*, Pl. Ex. 41, Appx. 816-825; Pl. Ex. 42, Appx. 826-835; Pl. Ex. 88, Appx. 1475-1486; Pl. Ex. 89, Appx. 1487-1496. *See also* Bankr. DE # 405 (October 2019); Bankr. DE # 289 (November 2019); Bankr. DE # 418 (December 2019); Bankr. DE # 497 (January 2020); Bankr. DE # 558 (February 2020); Bankr. DE # 634 (March 2020); Bankr. DE # 686 (April 2020); Bankr. DE # 800 (May 2020), as amended in Bankr. DE # 905; Bankr. DE # 913 (June 2020); Bankr. DE # 1014 (July 2020); Bankr. DE # 1115 (August 2020); Bankr. DE # 1329 (September 2020); Bankr. DE # 1493 (October 2020); Bankr. DE # 1710 (November 2020); Bankr. DE # 1949 (December 2020); and Bankr. DE # 2030 (January 2021).

## V.     The Note Maker Defenses

### *A. The "Oral Agreement" Defense involving Mr. Dondero's Sister*

As mentioned earlier, all Note Maker Defendants, besides HCMFA (sometimes referred to by Plaintiff as the "Alleged Agreement Defendants") have asserted as their primary defense to payment on their Notes that there was an alleged "oral agreement," pursuant to which all of the Notes would be forgiven based on certain "conditions subsequent," or if certain assets were sold by a third party. Only Mr. Dondero originally asserted that defense (somewhat obliquely, in his original answer—merely stating that "it was previously agreed that Plaintiff would not collect the

Notes")[22] and thereafter all of the Note Maker Defendants (except HCMFA) amended their pleadings to adopt the same affirmative defense. To be clear, the defense actually evolved over time. First, it was simply an alleged agreement by Highland not to collect on *Mr. Dondero's* Notes. Then, there were amended answers by each of the other Note Maker Defendants (except HCMFA) which obliquely referred to alleged agreements by Highland not to collect on the Notes upon fulfillment of undisclosed conditions subsequent. Finally, the "oral agreement" defense was set up as follows:

> Plaintiff's claims are barred . . . because prior to the demands for payment Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each note was made and February of the following year, [] Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of James Dondero's control. The purpose of this agreement was to provide compensation to James Dondero, who was otherwise underpaid compared to reasonable compensation levels in the industry, through the use of forgivable loans, a practice that was standard at HCMLP [Highland] and in the industry.[23] This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant [ ] believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

---

[22] Pl. Ex. 80, ¶ 40.

[23] This statement appears to have been false, according to Mr. Dondero's own executive compensation expert, Alan Johnson. During the deposition of Mr. Johnson, he testified that he reviewed Highland's audited financial statements for each year from 2008 through 2018 (Pl. Ex. 101 at 119:14-189:21, Appx. 1988-2005) and concluded that (a) Highland did not have a standard practice of forgiving loans and had not forgiven a loan to anyone in the world since 2009, (b) Highland had never forgiviven a loan of more than $500,000, (c) Highland had not forgiven any loan to Mr. Dondero since at least 2008, and (d) since at least 2008, Highland had never forgiven in whole or in part any loan that it extended to any affiliate. *Id.* at 189:24-192:10, Appx. 2005-2006. *See also* Pl. Ex. 98 at 422:18-428:14, Appx. 1776-1778.

Pl. Ex. 31 ¶ 82, Appx. 655 ("Dondero's Answer"). *See also* Pl. Ex. 15 ¶ 83, Appx. 435-436 ("NexPoint's Answer"); Pl. Ex. 16 ¶ 97, Appx. 451-452 ("HCMS's Answer"); and Pl. Ex. 17 ¶ 99, Appx. 468 ("HCRE's Answer").

With regard to this "oral agreement" defense, certainly any trial judge should be inclined to send a dispute to a jury when there is any genuine material fact issue raised upon which reasonable minds might disagree. Nonetheless, ***there are numerous reasons why this court believes no reasonable jury could find that there was truly an "oral agreement" to forgive these loans to the Alleged Agreement Defendants***. The "oral agreement" defense does not pass the "straight face" test for a myriad of reasons.

First, to be clear, ***no document was ever uncovered or produced in discovery to establish, memorialize, or reflect the existence or terms of the alleged "oral agreement."***

Second, Mr. Dondero could not describe any material terms of the alleged "oral agreement" without relying on a document prepared by counsel. Specifically, without a list prepared by counsel, Mr. Dondero could not identify any of the Notes subject to the alleged "oral agreement" nor could he recall (i) the number of Notes subject to each alleged "oral agreement," (ii) the maker of each Note subject to each alleged "oral agreement," (iii) the date of each Note subject to each alleged "oral agreement," or (iv) the principal amount of any Note subject to the alleged "oral agreement." Pl. Ex. 99 at 13:4-28:22, Appx. 1815-1819.

Third, according to both Mr. Dondero and Sister Dondero, all of the Notes would be forgiven if Mr. Dondero sold one of three portfolio companies—***Trussway, Cornerstone, or MGM***—above cost. *See* Pl. Ex. 31 ¶ 82, Appx. 655. Notably, in November 2019, Mr. Dondero (while still in control of Highland) caused the sale of a substantial interest in ***MGM*** for $123.25

million, a portion of which was for the Debtor's interest in a fund, but failed to declare all of the Notes forgiven, and remained silent about the alleged "oral agreement" altogether. *See* Pl. Ex. 201 ¶¶ 29-30, Appx. 3270-3271; Pl. Ex. 202 ¶ 14, Appx. 4135; Pl. Ex. 203 ¶ 1, Appx. 4143; Pl. Ex. 204 at p. 5 n.5, Appx. 4156.

Fourth, Mr. Dondero separately testified that Highland disclosed to its auditors all loans of a material amount that Highland ever forgave. Pl. Ex. 98 at 426:8-427:15, Appx. 1777. As earlier discussed, no forgiven loans are mentioned anywhere in Highland's audited financial statements.

Fifth, Sister Dondero was simply not capable of entering into any alleged "oral agreement" on behalf of Highland. For one thing, it is undisputed that Sister Dondero had no meaningful knowledge, experience, or understanding of (a) Highland or its business, (b) the financial industry, (c) executive compensation matters, or (d) Mr. Dondero's compensation or whether he was "underpaid compared to reasonable compensation levels in the industry." Pl. Ex. 100 at 42:22-43:8, Appx. 1885, 48:7-61:9, Appx. 1886-1889; 211:8-216:21, Appx. 1927-1928. Sister Dondero resides in Vero Beach, Florida and represents that she owns a private investigations business.[24] The only information Sister Dondero purported to have regarding Mr. Dondero's compensation from Highland was that he had told her he "was not highly paid" and that, in recent years, "his salary has been roughly less than a million, 500, 700,000 somewhere in that ballpark." Pl. Ex. 100 at 51:11-22, Appx. 1887.[25] But this information was simply inaccurate. Pl. Ex. 68, Appx. 1129-1130 (2016 base salary of $1,062,500 with total earnings and awards of $2,287,175); Pl. Ex. 50, Appx. 860-861 (2017 base salary of $2,500,024 with total earnings and awards of $4,075,324); Pl. Ex. 51, Appx. 862-863 (2018 base salary of $2,500,000 with total earnings and awards of

---

[24] *See* Nancy Dondero Dec. DE # 155 in Adv. Proc. No. 21-3003.

[25] *See also id.*

$4,194,925); and Pl. Ex. 52, Appx. 864-865 (2019 base salary of $2,500,000 with total earnings and awards of $8,134,500).

Additionally, Sister Dondero never reviewed Highland's financial statements (including balance sheets, bank statements, profit and loss statements, and statements of operations), never asked to see them, and knew nothing about Highland's financial condition prior to the Petition Date. *Id.* at 61:25-63:13, Appx. 1889-1890. Sister Dondero did not know of Highland's "portfolio companies" except for those her brother identified, and as to those, Sister Dondero did not know the nature of Highland's interests in the portfolio companies, the price Highland paid to acquire those interests, or the value of the portfolio companies. *Id.* at 63:18-80-22, Appx. 1890-1894; 208:24-210:13, Appx. 1926-1927.

Still further, Sister Dondero never saw a promissory note signed by Mr. Dondero, nor any other officer or employee of Highland, nor any "affiliate" of Highland. *Id.* at 83:14-84:8, Appx. 1895; 95:3-16, Appx. 1898; 99:20-100:10, Appx. 1899; 115:11-116:4, Appx. 1903; 127:13-128:4, Appx. 1906; 140:15-141:22, Appx. 1909, 180:18-23, Appx. 1919. Sister Dondero purportedly learned from her brother that Highland allegedly had a "common practice" of forgiving loans but had no actual knowledge or information concerning any loan that Highland made to an officer, employee, or affiliate that was actually forgiven and made no effort to verify her brother's statement. *Id.* 84:9-92:3, Appx. 1895-1897, 100:11-103:8, Appx. 1899-1900.

And still further, Sister Dondero had no knowledge regarding any of the Alleged Agreement Defendants (i.e., NexPoint, HCMS, or HCRE), including (a) the nature of their businesses, (b) their relationships with Highland, including whether they provided any services to Highland, (c) their financial condition, or (d) the purpose of the loans made to them by Highland,

and their use of the proceeds. *Id.* at 103:19-115:10, Appx. 1900-1903, 119:5-127:7, Appx. 1904-1906, 129:5-140:14, Appx. 1906-1909.

Finally, and perhaps most important, Sister Dondero (purportedly acting as trustee for Dugaboy—the family trust of which Mr. Dondero was beneficiary, and which was an indirect, majority *limited* partner of Highland) had no authority under the Highland partnership agreement to negotiate and enter into binding agreements on behalf of Highland. Pl. Ex. 2 at Ex. 4, Appx. 57-93.

If this were not all enough, the alleged "oral agreement" was never disclosed to anyone by Mr. Dondero or Sister Dondero. Other than Mr. Dondero and Sister Dondero, no one participated in the discussions that led to the alleged "oral agreement." Pl. Ex. 100 at 190:16-191:17, Appx. 1922. Sister Dondero and Dugaboy have admitted that (1) neither ever disclosed the existence or terms of the alleged "oral agreement" to anyone, including PwC, Mr. Waterhouse (again, Highland's CFO), or Highland's co-founder, Mark Okada,[26] and (2) neither ever caused Highland to disclose the existence or terms of the alleged "oral agreement" to the bankruptcy court. Pl. Ex. 25 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1 & 2, Appx. 538-542); Pl. Ex. 26 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1 & 2, Appx. 554-558). Mr. Dondero has admitted that he (1) never disclosed the existence or terms of the alleged "oral agreement" to PwC, Mr. Okada, or the bankruptcy court; and (2) never caused Highland to disclose the existence or terms of the alleged "oral agreement" to the bankruptcy court. Pl. Ex. 24 (Responses to RFAs 1, 2, 5-7, 11-17, Appx. 521-524). To be clear, Mr. Dondero represented that he did, indeed, inform Mr. Waterhouse about the alleged "oral agreement." Pl. Ex. 24, Appx. 521 (Responses to RFAs

---

[26] Mark Okada was not only the co-founder of Highland, but he and his family trusts owned all the limited partnership interests of Highland, other than those interests held by Dugaboy. *See* James Dondero Dec., DE # 155, ¶ 19 in Adv. Proc. No. 21-3003.

3 & 4). However, Mr. Waterhouse—again, the CFO of Highland and an officer of each of the Alleged Agreement Defendants—testified he did not learn of the alleged "oral agreement" until recently and only believes that it was subject to "milestones" that he cannot identify. Pl. Ex. 105 at 65:5-72:14, Appx. 2065-2067, 82:19-84:7, Appx. 2070.

### B. The "Mutual Mistake" Defense of HCMFA

The "Mutual Mistake" defense—like the "oral agreement" defense asserted by the other Note Maker Defendants—is farfetched, to say the least, especially in the context of a multi-billion company with perhaps the world's most iconic and well-known public accounting firm serving as its auditors. As set forth below, this court does not believe any reasonable jury could reach a verdict in favor of HCMFA on the "Mutual Mistake" defense.

To fully understand the defense, a reminder is in order regarding the many hats that Frank Waterhouse wore. Mr. Waterhouse is a Certified Public Accountant who joined Highland in 2006 and served as Highland's CFO on a continuous basis from approximately 2011 or 2012 until early 2021. While serving as Highland's CFO, Mr. Waterhouse simultaneously served as (1) an officer of HCMFA, NexPoint, and HCMS, holding the title of Treasurer; and (2) Principal Executive Officer of certain retail funds managed by HCMFA and NexPoint. As Treasurer and Principal Executive Officer of these entities, Mr. Waterhouse was responsible for managing, among other things, HCMFA's accounting and finance functions. Pl. Ex. 35; Pl. Ex. 37; Pl. Ex. 105 at 18:6-15, 18:23-19:6, 21:15-17, 23:5-20, 25:17-26:8, 27:17-28:16, 29:2-10, 30:9-31:6, 34:12-35:19, 38:20-39:5.

With that in mind, the "Mutual Mistake" defense works as follows. HCMFA asserts that the HCMFA Notes are void or unenforceable because they were signed by mistake or without authority by Mr. Waterhouse, and Mr. Dondero (as the person in charge of both Highland and

29

HCMFA) *did not intend* for $7.4 million of funds that were transferred from the Debtor to HCMFA in May 2019 to be loans—rather the money was intended to be *compensation to HCMFA from Highland*, for a Highland error that allegedly cause HCMFA harm. Pl. Ex. 13 ¶¶ 45 & 47, Appx. 412. HCMFA specifically contends that, in March 2019, Highland made a "mistake in calculating" the net asset value ("NAV") of certain securities that Highland Global Allocation Fund ("HGAF")—a fund managed by HCMFA—held in a portfolio company called Terrestar (the "NAV Error"). HCMFA maintains that after the NAV Error was discovered in early 2019:

> The Securities and Exchange Commission opened an investigation, and various employees and representatives of the Plaintiff, the Defendant, and HGAF worked with the SEC to correct the error and to compensate HGAF and the various investors in HGAF harmed by the NAV Error. Ultimately, and working with the SEC, the Plaintiff [i.e., Highland] determined that the losses from the NAV Error to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the NAV Error itself, as well as rebating related advisor fees and processing costs; and (ii) $1.4 million of losses to the shareholders of HGAF.
>
> The Defendant [HCMFA] accepted responsibility for the NAV Error and paid out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019. In turn, the Plaintiff [Highland] accepted responsibility to the Defendant [HCMFA] for having caused the NAV Error, and the Plaintiff [Highland] ultimately, whether through insurance or its own funds, compensated the Defendant [HCMFA] for the above payments by paying, or causing to be paid, approximately $7.5 million to the Defendant [HCMFA] directly or indirectly to HGAF and its investors.

Pl. Ex. 13 ¶¶ 41-42, Appx. 411.

While this is the theory of HCMFA's "Mutual Mistake" defense, there is an absence of summary judgment evidence to support it. In fact, to the contrary, on May 28, 2019, HCMFA sent a memorandum to the Board of Trustees of HGAF to describe the "Resolution of the Fund's" NAV Error, and HCMFA *did not mention Highland*. Pl. Ex. 182, Appx. 2978-2980. In fact, no document was submitted to suggest: (a) HCMFA ever told the Securities and Exchange Commission or HGAF Board that Highland, and not HCMFA, was responsible for the NAV Error;

or that (b) Highland ever agreed to "compensate" HCMFA for any mistake it may have made with respect to the NAV Error. *See* Pl. Ex. 192 at 140:7-11, Appx. 3049. While no document exists that corroborates HCMFA's contention that Highland agreed to pay HCMFA $7.4 million as compensation for the NAV Error, HCMFA has identified Mr. Dondero as the person who allegedly agreed to make that payment on behalf of Highland. *Id.* at 138:15-19, Appx. 3049.

HCMFA reported to the HGAF Board that the "Estimated Net Loss" from the NAV Error was $7,442,123. Pl. Ex. 182 at p. 2, Appx. 2980. Notably, HCMFA admits that it filed a claim for and received almost $5 million in insurance proceeds to fund the loss and had to pay approximately $2.4 million out-of-pocket to fully cover the estimated loss. *Id.* at p. 2, Appx. 2980; Pl. Ex. 192 at 146:20-25, Appx. 3051. Yet, despite having received approximately $5 million in insurance proceeds, HCMFA now takes the position that (a) Highland's subsequent transfer of $7.4 million to HCMFA was "compensation" for Highland's negligence and (b) HCMFA was entitled to receive both and $5 million in insurance proceeds and $7.4 million in "compensation" from Highland, even though the total loss was only $7.4 million. It is undisputed that HCMFA never told its insurance carrier, ICI Mutual, that Highland was at fault or that Highland paid HCMFA $7.4 million as compensation for the same loss the carrier covered. Pl. Ex. 192 at 133:14-150:22, Appx. 3047-3052.

In summary, according to HCMFA, "it received $7.4 million from Highland as compensation, and approximately $5 million from the insurance carrier as compensation for a total receipt of $12.4 million in connection with the [NAV Error]." *Id.* at 147:4-11, Appx. 3051. There is no evidence that HCMFA ever told ICI Mutual that Highland made HCMFA "whole" or otherwise compensated HCMFA approximately $5 million dollars in connection with the NAV Error—the same amount HCMFA recovered from ICI Mutual in connection with the NAV Error.

To be clear, similar to all other Notes involved in this litigation, the HCMFA Notes were carried on its balance sheet and audited financial statements as liabilities. Pl. Ex. 45 at p. 17; Pl. Ex. 192 at 49:19-50:2, 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59-3, Appx. 3026-3029.   There is nothing in HCMFA's books and records that corroborates HCMFA's contention that the payments from Highland to HCMFA in exchange for the HCMFA Notes were intended to be compensation and not a loan. Pl. Ex. 192 at 59:8-63:20, Appx. 3029-3030. And Highland's bankruptcy filings (most or all of which were signed by Mr. Waterhouse—both the CFO of Highland and the Treasurer of HCMFA) contradict HCMFA's "Mutual Mistake" defense. As discussed earlier, Highland's contemporaneous books and records—before the Petition Date and after—recorded the HCMFA Notes as valid debts due and owing by HCMFA to Highland.

In summary, there is no evidence that creates any genuine issue of "Mutual Mistake."  If one assumes that Mr. Waterhouse might have made a mistake in authorizing the preparation and execution of the HCMFA Notes,[27] then one must likewise assume that he compounded the mistake well over a dozen times when he (i) signed off on Highland's and HCMFA's audited financial

---

[27] There can be no genuine dispute regarding Mr. Waterhouse's authority to execute the Notes on behalf of HCMFA. "The term 'actual authority' denotes that authority that a principal intentionally confers upon an agent or intentionally allows the agent to believe himself to possess." *Polland & Cook v. Lehmann*, 832 S.W.2d 729, 738 (Tex. App. 1992). Apparent authority arises when the "principal has acted in a manner that manifests the alleged agent's authority and whether the third party reasonably relied on the agent's authority." *Commercial Capital Holding Corp. v. Team Ace Joint Venture*, Civ. Action No. 99-3040, 2000 WL 726880, at *5 (E.D. La. June 2, 2000). The undisputed evidence establishes that Mr. Waterhouse had both actual and apparent authority to sign the Notes. At the time Mr. Waterhouse executed the Notes on behalf of HCMFA, Mr. Waterhouse was the Treasurer of HCMFA. See Incumbency Certificate (Pl. Ex. 35, Appx. 789). As Treasurer, he was authorized to, inter alia, "execute any and all agreements on behalf of the General Partner [of HCMFA] in its capacity as the general partner of [HCMFA]." *Id.* In this role, Mr. Waterhouse managed the accounting and finance for HCMFA. (Pl. Ex. 105 at 25:22-26:3, Appx. 2055-2056). Mr. Waterhouse testified that he "signed a lot of documents in [his] capacity" as Treasurer, and believed he was authorized to sign the HCMFA Notes. *Id.* at 143:24-25, Appx. 2085. To Mr. Waterhouse, the Notes were "just another document." *Id.* at 144:2-3, Appx. 2085. No one at HCMFA ever told Mr. Waterhouse that, as the Treasurer of HCMFA, he did not possess such authority. *Id.* at 158:2-16, Appx. 2089. At the time he signed the Notes on behalf of HCMFA, Mr. Waterhouse had no reason to believe he was not authorized to do so. *Id.* at 160:23-161:2, Appx. 2089. In fact, Mr. Waterhouse would not have signed the Notes on behalf of HCMFA if he did not believe he possessed such authority. *Id.* at 144:4-20, Appx. 2085. The Incumbency Certificate, which named Mr. Waterhouse as the Treasurer of HCMFA, gave Mr. Waterhouse "comfort" that he was authorized to sign the Notes. *Id.* at 159:13-160:4, Appx. 2089.

statements, (ii) included the HCMFA Notes as liabilities on HCMFA's own balance sheet, and (iii) prepared each of the Debtor's MORs and other court filings. No reasonable jury could go there— particularly when the defense is based on mostly self-serving conclusory statements of Mr. Dondero and not any tangible evidence.[28]

### C. Miscellaneous Defenses

Mr. Dondero also raised the affirmative defenses of waiver, estoppel, or lack of consideration. There is no summary judgment evidence in the record that supports his affirmative defenses of waiver, estoppel, or lack of consideration. Pl. Ex. 98 at 357:24-360:14, Appx. 1760-1761.

With regard to the term loans of NexPoint, HCRE, and HCMS, these Note Maker Defendants each also contend that they made prepayments on their Notes, such that they cannot be deemed to have defaulted, and also assert they did not default under those loans because of Annual Installment payments that they made. First, the unrefuted summary judgment evidence of Plaintiff clearly dispels any argument that prepayments may have averted any defaults. *See* Klos Dec. pp. 3-6; Pl. Ex. 198 (Loan Summaries). Moreover, the Annual Installment payments were due on December 31, 2020, and these Note Maker Defendants did not make their Annual Installment payments to Highland until mid-January 2021, after receiving notices of default. These Note Maker Defendants had no right to cure in the loan documents. Thus, this defense fails as a matter of law. *See* Pl. Ex. 2 at Ex. 3, Appx. 49-56; Pl. Ex. 98 at 362:12-366:10, Appx. 1761-1762, 370:6-11, Appx. 1763, 389:10, Appx. 1768.

---

[28] One disturbing aspect of both the "Mutual Mistake" defense and the "oral agreement" defense is that, if they are to be believed, it means the audited financial statements of Highland and the Note Maker Defendants were materially misleading for several years. What human being(s) would be held accountable for this? Mr. Dondero himself? *See* Pl. Ex. 33.

Finally, the "Alleged Agreement Defendants" pleaded defenses of "justification and/or repudiation; estoppel; waiver; and ambiguity."[29] No summary judgement evidence supported these affirmative defenses or any other defenses that were otherwise raised.[30]

## V.     Legal Standard

It is, of course, well settled that summary judgment is appropriate if a movant shows there is no genuine dispute as to any material fact and that movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006) ("[S]ummary judgment is proper when the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'") (quoting FED. R. CIV. P. 56(c)). A movant meets its initial burden of showing there is no genuine issue for trial by "point[ing] out the absence of evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French Lab'ys*, 919 F.2d 301, 303 (5th Cir.1990); *see also In re Magna Cum Latte, Inc.,* Bankr. No. 07-31814, 2007 WL 3231633, at *3 (Bankr. S.D. Tex. Oct. 30, 2007) ("A party seeking summary judgment may demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) the absence of a genuine issue of material fact."). "If the moving party carries [its] initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of genuine issue of material fact." *Latimer*, 919 F.2d at 303; *see also Nat'l Ass'n of Gov't*

---

[29] Mr. Dondero, who signed twelve of the sixteen Notes, testified that he did not read the Notes. Thus, he cannot rely on ambiguity as a defense. *See* Pl. Ex. 96 at 111:19-21; 125:13-20; 128:23-129:7.

[30] One stray defense alleged by HCMS, HCRE, and NexPoint, with regard to each of their Term Notes, is that they had "Shared Services Agreements" with Highland and, thus, Highland "made" them default by not directing them to make their Annual Installment payments timely in December 2021. First, as a technical matter, there was no admissible evidence that HCMS and HCRE had a shared service agreement with Highland. Second, while NexPoint did have a Shared Service Agreement with Highland, no provision authorized or obligated Highland to control NexPoint's bank accounts or to effectuate payments without instruction or direction from an authorized representative. *See* Pl. Ex. 205. Section 2.02 provided that "for the avoidance of doubt . . . [Highland] shall not provide any advice to [NexPoint] to perform any duties on behalf of [NexPoint], other than back- and middle-office services contemplated herein."

*Emps v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 712 (5th Cir. 1994) ("To withstand a properly supported motion for summary judgment, the nonmoving party must come forward with evidence to support the essential elements of its claim on which it bears the burden of proof at trial.") "This showing requires more than some metaphysical doubt as to the material facts." *Latimer*, 919 F.2d at 303 (internal quotations omitted); *see also Hall v. Branch Banking*, No. H-13-328, 2014 WL 12539728, at *1 (S.D. Tex. Apr. 30, 2014) ("[T]he nonmoving party's bare allegations, standing alone, are insufficient to create a material dispute of fact and defeat a motion for summary judgment."); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) ("[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.") (internal quotations omitted). "Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant, summary judgment is appropriate." *Alton v. Tex. A&M Univ*, 168 F.3d 196, 199 (5th Cir. 1999); *see also Armstrong v. City of Dallas*, 997 F.2d 62, 66 n.12 (5th Cir.1993) ("We no longer ask whether literally little evidence, i.e., a scintilla or less, exists but, whether the nonmovant could, on the strength of the record evidence, carry the burden of persuasion with a reasonable jury.").

## VI.    Legal Analysis

### A.  The Context Here Matters:  Promissory Notes are at Issue

It has often been said that "suits on promissory notes provide 'fit grist for the summary judgment mill.'" *Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th Cir. 1995) (quoting *FDIC v. Cardinal Oil Well Servicing Co.*, 837 F.2d 1369, 1371 (5th Cir. 1988)); *see also Looney v. Irvine Sensors Corp.*, Civ. Action No. 3:09-CV-0840-G, 2010 WL 532431, at *2 (N.D. Tex. Feb. 15, 2010) ("Suits on promissory notes are typically well-suited for resolution via summary

judgment."). To prevail on summary judgment for breach of a promissory note under Texas law, the movant need not prove all essential elements of a breach of contract, but only must establish (i) the note in question, (ii) that the non-movant signed the note, (iii) that the movant was the legal owner and holder thereof, and (iv) that a certain balance was due and owing on the note. *See Resolution*, 41 F.3d at 1023; *Looney*, 2010 WL 532431, at *2-3; *Magna Cum Latte*, 2007 WL 3231633, at *15.

Highland has made its prima facie showing that it's entitled to summary judgment on each of the Note Maker Defendants' breach of their respective Notes.

With regard to the Dondero Demand Notes, the evidence was that they were valid, signed by Mr. Dondero in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes was $9,263,365.05. Klos Dec. ¶¶ 18-20, Exs. D, E, F; ¶ 37.

With regard to the HCMFA Demand Notes, the evidence was that they were valid, signed by HCMFA in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes was $7,874,436.09. Klos Dec. ¶¶ 21-22, Exs. G, H; ¶ 40.

With regard to the HCMS Demand Notes, the evidence was that they were valid, signed by HCMS in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCMS Term Notes was $972,762.81. Klos Dec. ¶¶ 23-26, Exs. I, J, K, L; ¶ 45.

With regard to the HCRE Demand Notes, the evidence was that they were valid, signed by HCRE in Highland's favor and as of December 17, 2021, the total outstanding principal and

accrued but unpaid interest due under the HCRE Demand Notes was $5,330,378.23. Klos Dec. ¶¶ 27-30, Exs. M, N, O, P; ¶ 50.

With regard to the NexPoint Term Note, the evidence was that it was valid, signed by NexPoint in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the NexPoint Term Note was $24,383,877.27.[31] Klos Dec. ¶ 31, Ex. A; ¶ 51.

With regard to the HCMS Term Note, the evidence was that it was valid, signed by HCMS in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCMS Term Note was $6,748,456.31.[32] Klos Dec. ¶ 32, Ex. R; ¶ 52.

With regard to the HCRE Term Note, the evidence was that it was valid, signed by HCRE in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCRE Term Note was $5,899,962.22.[33] Klos Dec. ¶ 33, Ex. S; ¶ 53.

Each of the Note Maker Defendants under the Demand Notes breached their obligations by failing to pay Highland all amounts due and owing upon Highland's demand. Each of the Note Maker Defendants under the Term Notes breached their obligations by failing to make the Annual Installment payment due on December 31, 2020.

---

[31] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

[32] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[33] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

The Reorganized Debtor, Highland, has been damaged by the Note Maker Defendants' breaches in the amounts set forth above, plus the interest that has accrued under the Notes since those calculations, plus collection costs and attorneys' fees—which amounts Highland should separately submit to the court.

In summary, Highland has made its prima facie case for summary judgment for the Note Makers Defendants' breach of the Notes. *See Resolution*, 41 F.3d at 1023 (holding that where affidavit "describes the date of execution, maker, payee, principal amount, balance due, amount of accrued interest owed, and the date of default for each of the two promissory notes," movant "presented a prima facie case of default on the notes."); *Looney,* 2010 WL 532431, at *2-3 (where movant "has attached a copy of the note … to a sworn affidavit in which he states that the photocopy is a true and correct copy of the note, that he is the owner and holder of the note, and that there is a balance due on the note … [movant] has made a prima facie case that he is entitled to summary judgment on the note.").

The Note Maker Defendants failed to rebut Highland's prima facie case.

B.  *The Unsubstantiated "Oral Agreements"*

With regard to the alleged "oral agreement" defense, there was a complete lack of evidence for it—it was only supported by conclusory statements of Mr. Dondero and, to a lesser extent, Sister Dondero. Mr. Dondero could not identify any material terms of the alleged "oral agreement," such as (a) which Notes are subject to the alleged "oral agreement;" (b) the number of Notes subject to the alleged "oral agreement;" (c) the maker of each Note subject to the alleged "oral agreement;" (d) the date of each Note subject to the alleged "oral agreement;" or (e) the principal amount of any Note subject to the alleged "oral agreement." Mr. Dondero and Sister Dondero

cannot even agree whether Mr. Dondero identified the Notes subject to the alleged agreement. Mr. Dondero sold MGM stock in November 2019—an alleged "condition subsequent" under the alleged agreement—but failed to declare the Notes forgiven, and otherwise remained silent about the alleged agreement. Sister Dondero, the counter-party to the alleged agreement, never saw a Note signed by Mr. Dondero or any affiliate of Highland and was not qualified to enter into the alleged agreement. The existence or terms of the alleged agreement were never disclosed by Mr. Dondero or Sister Dondero to anyone, including PwC, Mr. Waterhouse, or the bankruptcy court. No document exists memorializing or otherwise reflecting the existence of terms of the alleged agreement. There is no history of loans being forgiven at Highland in the past decade.

No genuine issue of material fact has been raised here such that a reasonable jury might find an alleged "oral agreement." Moreover, any alleged agreement would be unenforceable as a matter of law for lack of: (a) consideration, (b) definiteness, and (c) a meeting of the minds. In order to be legally enforceable, a contract "must address all of its essential and material terms with a reasonable degree of certainty and definiteness." *Scott v. Wollney*, No. 3:20-CV-2825-M-BH, 2021 WL 4202169, at * 7 (N.D. Tex Aug. 28, 2021) (internal quotations omitted); *In re Heritage Org., L.L.C.*, 354 B.R. 407, 431–32 (Bankr. N.D. Tex. 2006) (In order to prove existence of a valid and binding subsequent oral agreement binding upon parties, a party must prove that there was "(1) a meeting of the minds" and "(2) consideration to support such a subsequent oral agreement.") "Whether a contract contains all of the essential terms for it to be enforceable is a question of law." *Id.* (internal quotations omitted). "A contract must also be based on valid consideration." *Id.* "In determining the existence of an oral contract, courts look at the communications between the parties and the acts and circumstances surrounding those communications." *Melanson v. Navistar, Inc.*, 3:13-CV- 2018-D, 2014 WL 4375715, at *5 (N.D. Tex. Sept. 4, 2014). *See also id.* at *6

(finding that a reasonable trier of fact could not find that based on the oral conversation between the plaintiff and the defendant that there was an offer, an acceptance, and a meeting of the minds because the conversation did not contain all essential terms); *Wollney*, 2021 WL 4202169, at *8 (finding that "[w]hen, as here, 'an alleged agreement is so indefinite as to make it impossible for a court to 'fix' the legal obligations and liabilities of the parties, a court will not find an enforceable contract,'" finding that party "has not identified evidence of record that would allow a reasonable trier of fact to find that there was an offer, an acceptance, and a meeting of the minds between Plaintiff and Defendant.") (quoting *Crisalli v. ARX Holding Corp.*, 177 F. App'x 417, 419 (5th Cir. 2006) (citation omitted)); *Heritage*, 354 B.R. at 431–32 (finding a "subsequent oral amendment" defense fails where the summary judgment record does not support the existence of a subsequent agreement).

Accordingly, there is no genuine issue of material fact regarding the alleged "oral agreement" defense, and Highland is, therefore, entitled to summary judgment on Mr. Dondero's, NexPoint's, HCMS's, and HCRE's breach of their respective Notes.

### C. The Alleged "Mutual Mistake" Asserted by HCMFA is Unsubstantiated

Finally, the "Mutual Mistake" defense also fails as a matter of law because there is no evidence to show that Highland and HCMFA were acting under some shared factual mistake when the HCMFA Notes were prepared and executed. "For mutual mistake to nullify a promissory note, the evidence must show that both parties were acting under the same misunderstanding of the same material fact." *Looney*, 2010 WL 532431, at *5 (internal quotations omitted) (citing Texas law). "[A] party must show that there exists (1) a mistake of fact, (2) held mutually by the parties, (3) which materially affects the agreed upon exchange." *Whitney Nat'l Bank v. Med. Plaza Surgical Ctr. L.L.P.*, No. H-06 1492, 2007 WL 3145798, at *6 (S.D.Tex. Oct. 27, 2007) (alteration in

original) (citing Texas law). In other words, "[m]utual mistake of fact occurs where the parties to an agreement have a common intention, but the written instrument does not reflect the intention of the parties due to a mutual mistake." *Id.* (internal quotations omitted). "In determining the intent of the parties to a written contract, a court may consider the conduct of the parties and the information available to them at the time of signing in addition to the written agreement itself." *Id.* (internal quotations omitted). "When mutual mistake is alleged, the party seeking relief must show what the parties' true agreement was and that the instrument incorrectly reflects that agreement because of a mutual mistake." *Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.,* MO:19-CV-173-DC, 2021 WL 2772808, at *9 (W.D. Tex. Apr. 28, 2021) (internal quotations omitted). "The question of mutual mistake is determined not by self-serving subjective statements of the parties' intent … but rather solely by objective circumstances surrounding execution of the [contract.]" *Hitachi Cap. Am. Corp. v. Med. Plaza Surgical Ctr., L.L.P.*, Civ. Action No. 06-1959, 2007 WL 2752692, at *6 (S.D. Tex. Sept. 20, 2007) (internal quotations omitted). "The purpose of the mutual mistake doctrine is not to allow parties to avoid the results of an unhappy bargain." *Whitney*, 2007 WL 3145798, at *7 (internal quotations omitted).

The undisputed documentary and testimonial evidence overwhelmingly establish that both HCMFA and Highland intended the HCMFA Notes to be loans. As discussed above: (i) Mr. Waterhouse, HCMFA's Treasurer, knew the money Highland transferred to HCMFA was being treated as an "intercompany loan"; (ii) the HCMFA Notes have always been recorded as liabilities in HCMFA's audited financial statements and balance sheets; (iii) the HCMFA Demand Notes were reflected as assets in Highland's Bankruptcy filings, and (iv) the HCMFA Demand Notes were represented as "liabilities" to third parties at all relevant times.

There is no evidence in support of HCMFA's contention that there existed a mistake of fact held by both Highland and HCMFA when entering into HCMFA Notes. The purported "mistake" was never disclosed to critical (or any) third parties, such as: (i) the Retail Board or (ii) the insurance company ICI Mutual. The purported "mistake" is also not reflected in HCMFA's books and records or audited financials.

In conclusion, HCMFA's "Mutual Mistake" defense fails as a matter of law. *See Hitachi*, 2007 WL 2752692, at *6 (finding "mutual mistake" defense fails as a matter of law where "there is no evidence that a mutual mistake was made in the [agreement,]" and where "the fact that [defendant] did not discover the 'mistake' until well after the [] agreements were signed undermines" the mutual mistake defense.); *Whitney*, 2007 WL 3145798, at *6-7 (finding defendants' assertion of mutual mistake "fails as a matter of law" where assertions were "insufficient to raise a fact issue as to mutual mistake of fact" regarding written agreement where plaintiff "has presented competent evidence" of its own intention regarding the agreement, "there is no evidence that [plaintiff] had the intent that these defendants assert," "no document suggests any such intent," and where "the documents are clear" on their face); *Looney*, 2010 WL 532431, at *5 (granting summary judgment in favor of plaintiff for breach of note as a matter of law on "mutual mistake" defense where defendant "does not cite any record evidence in support of its claim that [parties] were operating under a shared mistake when they executed the note."); *Al Asher & Sons*, 2021 WL 2772808, at *9 (finding that defendant failed to carry its burden to establish there is a genuine issue of material fact as to mutual mistake under an agreement, noting that "mutual mistake [defense] is inapplicable [as a matter of law], because, even if [defendant's] assumption regarding the … contract is a mistake of fact, there is no evidence in the record that Plaintiff and [defendant] mutually held the mistake …").

There is no summary judgment evidence to support any remaining defenses of the Note Makers Defendants.

**VII.    Summary Judgment**.

Accordingly, summary judgment should be entered holding the Note Maker Defendants liable for (a) breach of contract and (b) turnover for all amounts due under the Notes, pursuant to Bankruptcy Code Section 542, including the costs of collection and reasonable attorneys' fees in an amount to be determined.  Specifically:

With regard to the Dondero Demand Notes, Mr. Dondero should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$9,263,365.05**, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCMFA Demand Notes, HCMFA should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$7,874,436.09**, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCMS Demand Notes, HCMS should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$972,762.81**, the total outstanding principal and accrued but unpaid interest due under the HCMS Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCMS Term Note, HCMS should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$6,748,456.31**, the total outstanding principal and accrued but unpaid interest due under the HCMS Term Note as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCRE Demand Notes, HCRE should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$5,330,378.23**, the total outstanding principal and accrued but unpaid interest due under the HCRE Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCRE Term Note, HCRE should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$5,899,962.22**, the total outstanding principal and accrued but unpaid interest due under the HCRE Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the NexPoint Term Note, NexPoint should be liable on a Judgment for breach of contract and turnover in the amount of: (a) **$24,383,877.27**, the total outstanding principal and accrued but unpaid interest due under the NexPoint Term Note as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

**<u>Submission of Judgment</u>. The bankruptcy court directs Plaintiff to promptly submit a form of Judgment applicable to each Note Maker Defendant that calculates proper**

amounts due pursuant to this Report and Recommendation, including interest accrued to date (and continuing to accrue per diem), as well as costs and attorneys' fees incurred. The costs and attorneys' fees calculation shall be separately filed as a Notice with backup documentation attached. The Note Maker Defendants shall have 21 days after the filing of such Notice to file an objection to the reasonableness of the attorneys' fees and costs. The bankruptcy court will thereafter determine the reasonableness in Chambers (unless the bankruptcy court determines that a hearing is necessary) and will promptly submit the form Judgments, along with appropriate attorneys' fees and costs amounts inserted into the form Judgments, to the District Court, to consider along with this Report and Recommendation. This Report and Recommendation is immediately being sent to the District Court.

*### End of Report and Recommendation ###*